1  AZRA Z. MEHDI (220406)
   THE MEHDI FIRM
2  One Market
   Spear Tower, Suite 3600
3  San Francisco, CA 94105
   Telephone: 415/293-8039
4  Facsimile: 415/293-8001
   Azram@themehdifirm.com
5
   Attorney for Plaintiff and the [Proposed] Class
6

7                        E-filing

8            UNITED STATES DISTRICT COURT                    LB

9           NORTHERN DISTRICT OF CALIFORNIA

10  DJENEBA SIDIBE, Individually and on          ) Case No. 12                4854
    Behalf of All Others Similarly Situated,     )
11                                                )  CLASS ACTION
                        Plaintiff,               )
12                                                )  COMPLAINT FOR:
             vs.                                  )
13                                                )  (1) Violation of Section 1 of the Sherman
    SUTTER HEALTH, and DOES 1 through 25,         )      Act, 15 U.S.C. Section 1;
14  inclusive,                                    )
                                                  )  (2) Violation of California Business and
15                      Defendants.               )      Professions Code Section 16720, *et
                                                  )      seq.*, of the Cartwright Act;
16                                                )
                                                  )  (3) Violation of California Business &
17                                                )      Professions Code Section 17200, *et
                                                  )      seq.*; and
18                                                )
                                                  )  (4) Unjust Enrichment and Disgorgement
19                                                )      of Profits.
                                                  )
20                                                )
                                                  )
21  _____)  DEMAND FOR JURY TRIAL

22

23

24

25

26

27

28



1     Plaintiff Djeneba Sidibe, on behalf of herself and all others similarly situated, by and
2  through her undersigned counsel, brings this action against defendant Sutter Health and its
3  affiliated entities (collectively, "Sutter Health") for violations of the Sherman Act, the Cartwright
4  Act and California's Unfair Competition Law. This class action complaint ("Complaint") arises
5
6  from Sutter Health's illegal and anti-competitive conduct in connection with the market for
7  medical and ancillary healthcare-related services in Northern California. The allegations herein
8  are made on information and belief (except as to allegations specifically pertaining to plaintiff,
9  which are made on personal knowledge) based on the investigation conducted by and under the
10 supervision of plaintiff's counsel, including among others, reviewing and analyzing publicly
11 available press releases, news articles, and other media reports (whether disseminated in print or
12 by electronic media); various court filings and other scholarly articles. Plaintiff demands trial by
13
14 jury of all claims properly triable thereby, and alleges as follows:

15                                    **NATURE OF THE CLAIM**

16     1.     Plaintiff alleges that defendant Sutter Health conspired to impose supra-
17 competitive prices and coercively to maintain and enhance the monopoly power of Sutter Health
18 in the market for medical and ancillary healthcare-related services in Northern California (the
19 "Northern California Medical Services" market) (defined in greater detail below) through, *inter*
20 *alia*, the imposition of: (1) tying arrangements that require health plans to use ALL Sutter
21
22 Health providers or affiliated physician's groups (even where less expensive options are
23 available) OR suffer the devastating consequences of having contracted access to NONE of
24 them; and (2) exclusive dealing arrangements that force health plans to require plaintiff and other
25 members of the class to obtain all their medical and ancillary healthcare-related services through
26 Sutter Health providers, Sutter Health affiliated entities or Sutter Health affiliated physicians'
27 groups and to penalize members that use non-Sutter Health providers.
28

CLASS ACTION COMPLAINT

1

2. By engaging in the anti–competitive conduct as further detailed below, Sutter Health and its affiliates (other healthcare providers and physicians' groups) – collectively comprising by far the largest and most dominant hospital chain and provider of medical services in Northern California – have intentionally and systematically destroyed competition for medical services in Northern California in order to impose prices on the nearly ten million residents of Northern California that are 40% to 80% greater than they could obtain in a competitive marketplace.

3. Sutter Health's expansion strategy is designed to increase its geographic concentration, local market dominance, and functional reach through the acquisition of hospitals (Sutter Health has grown from 13 hospitals in 1994 to 33 presently) and through the aggressive acquisition of physicians' groups and providers of numerous ancillary medical services, such as laboratories, radiation services, in-home care and skilled nursing facilities. This targeted expansion strategy in conjunction with Sutter Health's grossly anti-competitive practices – including coercive market domination, tying, and unreasonable exclusionary agreements – has stifled competition for medical services in Northern California. Purchasers of medical services on behalf of consumers, *i.e.* health plans, are deliberately prevented by Sutter Health from selecting amongst providers in a given region or service based upon quality and price. If a health plan were instead to insist upon so selecting, the health plan would be denied contracted access to any part of the Sutter Health's network, which would for all practical purposes mean that the health plan could not do business in Northern California at all. This, in turn, would effectively result in some Northern California residents not having access to *any* medical or ancillary services. This is because some parts of the Sutter Health network, such as in the East Bay or counties in which Sutter owns *every* licensed hospital bed, are indispensable to health plans attempting to offer consumers a network that complies with existing California regulations.

2

CLASS ACTION COMPLAINT

4.     Whether styled as selective market domination coupled with tying and exclusivity – or more simply as a large group of "affiliates" plainly operating as a cartel under the common direction of parent Sutter Health – Sutter Health's ongoing misconduct costs every resident of Northern California thousands of dollars a year in increased medical expenses and insurance premiums.  These very significant damages have been demonstrated in multiple objective and independent analyses using multiple methodologies.  For example, Figure 1, below, is a map of Sutter Health's network – a more comprehensive copy of the map is attached hereto as Exhibit A.  Figure 2 is a "heat map" of hospital charges that conveys the degree to which various regions deviate from the state median on an index of hospital charges, which was prepared by the California Public Interest Research Group ("CALPIRG") Education Fund as part of its July 2012 report on geographic variation in hospital charges in California:

3

CLASS ACTION COMPLAINT



FIGURE 1[1]

---

[1] Source: "California Statewide Communities Development Authority Revenue Bonds (Sutter Health), Series 2011C (the 'CSCDA Bonds');" *see also* excerpts from CSCDA Bonds attached hereto as Exhibit A.

CLASS ACTION COMPLAINT

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FIGURE 2[2]

---

[2] Source: CalPIRG Education Fund Study at 2, excerpt attached hereto as Exhibit 2.

5

CLASS ACTION COMPLAINT

5.       The portions of the state exhibiting abnormally high hospital prices and the region comprising Sutter Health's territory precisely correspond. The story told by these two maps is evident.

6.       These are very real ongoing improper and even illegal transfers of billions of dollars from the pocketbooks of Northern California families to the coffers of Sutter Health – a purported "non-profit" organization. These transfers or "profits," are derived from Sutter Health prices that are demonstrably 40%-80% higher than they could be on a competitive basis. Meanwhile, Sutter Health's misconduct structurally decreases the quality of medical care in Northern California because it eliminates competition amongst providers of medical care on the basis of quality as well as price.

7.       Meanwhile, parent Sutter Health styles itself as a "nonprofit" in order to avoid income and property taxes and to obtain inexpensive tax-free financing. Beyond that, even Sutter Health's publicly disclosed operations have been so tremendously profitable that by September 30, 2011, "nonprofit" Sutter Health had accumulated $4.4 billion in cash and investments. Indeed Sutter Health's hospitals and operations are among the most profitable in the state – if not the country – and Sutter Health's managers are awarded bonuses by its Board of Directors directly based on profitability. These bonuses augment massive salary and benefit packages of $5 to $10 million per year. This tremendous level of disclosed compensation is possibly dwarfed by Sutter Health managers' and directors' profits, stock and options from Sutter's for-profit subsidiaries and various undisclosed entities to which Sutter Health transfers funds, "loans" and/or deeply discounted assets, goods or services.

8.       Sutter Health's nominal non-profit status should not create any implication that it acts with a greater degree of accountability, transparency, ethics, or effective corporate governance than a publicly traded corporation. On the contrary, the reality is that Sutter Health's

6

CLASS ACTION COMPLAINT

management and board of directors are in a very real sense accountable to no one and report to no one. There are no shareholders to whom to report. There is nothing to file with the Securities and Exchange Commission. There are no CEO and CFO certifications. There are no quarterly conference calls. No detailed operational financial data is provided on a segmented basis – or on almost any sort of basis – indeed, Sutter Health's audited financial statements are so lacking in detail as to be useless.

9.      Sutter Health's nominal nonprofit status is merely another cynical component of its scheme. Greed is the motive for Sutter Health's anti-competitive behavior as well as its nonprofit status, which provides it a tax break of several hundred million dollars per annum. Instead, Sutter Health and its web of affiliates and for-profit subsidiaries are a profit-making machine. Dr. William Kirby, Chief of Staff at Sutter Auburn Faith Hospital, noted this regarding Auburn Faith's experience following Sutter's takeover of the hospital in the early 1990s: "They take $3 million out of here a year. They're cutting our staff so badly, patient care is dropping. Nurses are dramatically overworked patients are not being bathed as often as they should be. . . ." He further stated that the board and managers of Sutter Health are "absolutely dishonest. They are driven by power, greed, profit and control. They don't really give a damn about the quality of patient care. Sutter Health is the primary contributor to the destruction of local health care in Auburn."

10.     As a direct and proximate result of the Sutter Health's anti-competitive conduct, plaintiff and other members of the Class were charged higher prices for their medical and ancillary healthcare-related services than they would have been absent Sutter Health's anti-competitive conduct. These actions violate Section 1 of the Sherman Act, 15 U.S.C. §1, Cal. Bus. & Prof. Code Section 16720 of the Cartwright Act, and Cal. Bus. & Prof. Code Section 17200, *et seq*.

CLASS ACTION COMPLAINT

7

**JURISDICTION AND VENUE**

11. This action is brought under Section 16 of the Clayton Act (15 U.S.C. §26) to secure equitable relief against Sutter Health due to its violations of Section 1 of the Sherman Act (15 U.S.C. §1), as well as under the antitrust, unfair competition and consumer laws of the State of California, to obtain restitution, recover damages, and to secure other relief against Sutter Health for violations of those laws.

12. This Court has subject matter jurisdiction of the federal antitrust claim asserted in this action under Section 16 of the Clayton Antitrust Act (15 U.S.C. §26), Section 1 of the Sherman Act (15 U.S.C. §1) and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state-law claims asserted in this action under Title 28, United States Code, Sections 1332(d) and 1367, in that the matter in controversy exceeds the sum of $5 million exclusive of interest and costs.

13. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22, and under 28 U.S.C. §1391, because a substantial part of the events giving rise to plaintiff's claims occurred in this District and defendant Sutter Health transacts business and is found within this District.

14. Sutter Health is a corporation organized and existing under the laws of the State of California, with its principal place of business located at 2200 River Plaza Drive, Sacramento, California. Sutter Health sells medical and ancillary services in Northern California and Hawaii. Sutter Health is engaged in, and its activities substantially affect, interstate and foreign commerce.

**PARTIES**

**A.   Plaintiff**

15. Plaintiff Djeneba Sidibe is currently a resident of Marin County since January 2012. From November 2009 to January 2012, she was a resident of Alameda County and prior to

8

CLASS ACTION COMPLAINT

November 2009 she was a resident of San Mateo County. During the timeframe relevant herein, plaintiff is and has indirectly been a purchaser of Sutter Health's medical and ancillary healthcare-related services beginning in or around October 2005. As a result of Sutter Health's anti-competitive conduct, plaintiff and other members of class have been injured in their business and property by paying more for medical and ancillary healthcare-related services than they otherwise would have paid in the absence of defendant Sutter Health's anti-competitive conduct.

**B.   Defendant Sutter Health**

16.     Sutter Health is a non-profit corporation based in Sacramento, California, that controls the largest and most dominant hospital chain and provider of medical services in Northern California. Sutter Health is the "parent" of various non-profit and for-profit entities and organizations that operate primarily in Northern California and that are directly or indirectly (through one or more intermediaries) controlled by or under common control with, Sutter Health.

17.     Sutter Health is the "parent" of various affiliated entities (defined below) that operate primarily in Northern California. The affiliated entities, together with Sutter Health, comprise Sutter Health system and provide a full range of healthcare and related services through an integrated healthcare delivery model. Sutter Health also provides certain centralized support functions to Sutter Health, which include the operation of a system-wide laboratory, administrative services and system initiatives throughout Northern California.

18.     By 2012, Sutter Health's publicly disclosed network – located almost exclusively in Northern California – included at least 33 hospitals and 4 skilled nursing facilities with a total of 5,484 licensed beds; 14 home healthcare locations; and contracts with medical groups operating as professional corporations that account for the services of at least *2,291* physicians and physician extenders. *See* map of Sutter Health's network attached hereto as Exhibit A.

CLASS ACTION COMPLAINT

9

**C.    Sutter Health Affiliated Entities**

19.    A Sutter Health "Affiliated Entity" is any organization that directly or indirectly, through one or more intermediaries, is controlled by, or is under common control with, Sutter Health.    Each Sutter Health Northern California region consists of at least one hospital corporation and a medical foundation corporation.

**1.    Sutter Health Hospital and Medical Foundation Corporations**

20.    The Central Valley Region (Merced, San Joaquin and Stanislaus Counties) includes a single medical foundation corporation, Sutter Gould Medical Foundation, and a single hospital corporation, Sutter Central Valley Hospitals, which does business as Memorial Medical Center, Memorial Hospital Los Banos and Sutter Tracy Community Hospital.  As of September 30, 2011, 254 physicians and physician extenders contracted with the Sutter Gould Medical Foundation.

21.    The East Bay Region (Alameda and Contra Costa Counties) includes a single medical foundation corporation, Sutter East Bay Medical Foundation, and a hospital corporation, Sutter East Bay Hospitals, which does business as Alta Bates Summit Medical Center (operating on three campuses with four addresses) and Sutter Delta Medical Center. As of September 30, 2011, 150 physicians and physician extenders contracted with the Sutter East Bay Medical Foundation. The following Operating Corporations are also part of the East Bay Region: Eden Medical Center (operating Eden Medical Center and San Leandro Hospital), Sutter Medical Center, Castro Valley (constructing a new acute care hospital), and East Bay Perinatal Center, a community clinic.

22.    The Peninsula Coastal Region (San Mateo, Santa Clara and Santa Cruz Counties) includes a single medical foundation corporation, Palo Alto Medical Foundation for Health Care, Research and Education ("PAMF"), and a single hospital corporation, Mills-Peninsula Health

10

CLASS ACTION COMPLAINT

Services ("MPHS"), which does business as Mills-Peninsula Medical Center, Mills Health Center, Sutter Maternity and Surgery Center of Santa Cruz and Menlo Park Surgical Hospital. As of September 30, 2011, 994 physicians and physician extenders contracted with PAMF.

23.     The Sacramento Sierra Region (Amador, El Dorado, Nevada, Placer, Sacramento, Solano, Sutter, Yolo and Yuba Counties) includes a single medical foundation corporation, Sutter Medical Foundation, and a single hospital corporation, Sutter Health Sacramento Sierra Region, which does business as Sutter Medical Center Sacramento (which includes Sutter General Hospital and Sutter Memorial Hospital), Sutter Center for Psychiatry, Sutter Davis Hospital, Sutter Auburn Faith Hospital, Sutter Roseville Medical Center, Sutter Solano Medical Center and Sutter Amador Hospital. As of September 30, 2011, 659 physicians and physician extenders contracted with Sutter Medical Foundation.

24.     The West Bay Region (City and County of San Francisco, and Marin, Lake and Sonoma Counties) includes a single medical foundation corporation, Sutter West Bay Medical Foundation doing business as Sutter Pacific Medical Foundation ("SPMF"), and a single hospital corporation, Sutter West Bay Hospitals, which does business as California Pacific Medical Center (operating on five campuses in San Francisco), Novato Community Hospital, Sutter Lakeside Hospital, Sutter Medical Center of Santa Rosa and St. Luke's Health Care Center, a primary care community clinic. As of September 30, 2011, 234 physicians and physician extenders contracted with SPMF.

**2.     Sutter Health Obligated Group Members**

25.     The financial structure of Sutter Health system is designed around the concept of an Obligated Group that combines the revenues, expenses, assets and liabilities of all Obligated Group Members. *See* attached Exhibit A at A-49 to A-50 for a List of Obligated Group Members. The following entities are among the Sutter Health Obligated Group Members:

- East Bay Perinatal Center

- Eden Medical Center

- Marin Community Health

- Mills-Peninsula Health Services

- Palo Alto Medical Foundation for Health Care (Research and Education)

- Sutter Coast Hospital

- Sutter Central Valley Hospitals

- Sutter East Bay Hospitals

- Sutter Gould Medical Foundation

- Sutter Health Sacramento Sierra Region

- Sutter Medical Foundation

- Sutter Medical Center, Castro Valley

- Sutter Visiting Nurse Association and Hospice

- Sutter West Bay Hospitals

- Sutter Coast Hospital, an acute care hospital located in Del Norte County, California

- Sutter Visiting Nurse Association and Hospice doing business as Sutter Care at Home, a home health and hospice organization with locations throughout Northern California.

### 3.    Other Sutter Health Affiliated Entities

26.    Sutter Health Pacific owns and operates a psychiatric hospital, located in Oahu, Hawaii doing business as Kahi Mohala Behavioral Health.

27.    Sutter Insurance Services Corporation ("SISCO") is a Hawaii domiciled, nonprofit, captive insurance company, of which Sutter Health is the sole member. SISCO was

12

—

1 established in 1991 to provide a comprehensive program of hospital professional and general

2 liability insurance for the benefit of Sutter Health.

3 28. Sutter Connect, LLC doing business as Sutter Physician Services ("SPS"), is a
4
5 single member limited liability company, of which Sutter Health is the sole member. SPS
6 supports certain Aligned Physician Independent Practice Associations ("Aligned IPAs") or
7 medical foundations, hospitals and ancillary providers that provide healthcare services
8 throughout Sutter Health. SPS services include third party administration, physician billing and
9 managed care management, financial management reporting and provider relations.

10 29. Beyond its publicly disclosed network, Sutter Health's *de facto* and undisclosed
11 network includes numerous additional entities – highly-profitable laboratories, Cayman Islands
12 insurance companies, medical device suppliers and the like – that are in some cases: (1) owned
13
14 in whole or in part by officers, directors and board members of Sutter Health; (2) share board
15 members or officers with Sutter Health or its various affiliate entities; and/or (3) pay
16 compensation, benefits, shares or stock options to such officers, directors or board members. On
17 information and belief, Sutter Health routinely transfers funds – both directly and through
18 transfer pricing and other techniques – between many of the publicly disclosed and non-
19 disclosed for-profit and non-profit entities. Sutter Health provides minimal disclosure regarding
20 these transfers or the entities that make or receive such transfers.
21
22 30. A sample list of *for-profit* entities that Sutter Health, its managers and/or directors
23 currently or previously own/control in-whole or in-part includes:

24 • Abbey Medical

25 • P.I.T.

26 • Bay Mesh

27
28 • Advanced Respiratory Care Partnership

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- Alta Imaging Association

- North Bay MRI

- Alta CT Services

- East Medical Network, Inc.

- Guardian Care, Inc.

- East Bay Health Services, Inc.

- Alta Bates Medical Resources

- East Bay Health Funding

- Valley Surgical Partners

- Unified Management Services Organization

- Sun Medical Technologies, Inc.

- Timberlake Corporation

- Synvasive Technology, Inc.

- Sutter Ventures, Ltd.

- Sutter Preferred Health Plan Services, Inc.

- Omni Healthcare, Inc.

- Sutter Preferred Health & Life Insurance Company

- Memorial Partners In Care, Inc.

- Integrated Surgical Systems, Inc.

- Derijan Associates, Inc.

- Managed Care Systems, Inc.

- Marin Outpatient Imaging Center

- Marin CT Scanning

14

CLASS ACTION COMPLAINT

1       •  Marin Magnetic Imaging

2       •  North Bay Nursing Services

3       •  Roseville Health Enterprises.

4

5    **D.**    **Does 1 through 25**

6       31.    Plaintiff is currently unaware of the true names, capacities, or basis for liability of

7 defendants Does 1 through 25, inclusive, and therefore sues said defendants by their fictitious

8 names. On information and belief, defendant Sutter Health has established and/or exercises

9 some degree of ownership or control over various entities and organizations that are a party to,

10 benefit from, or are a repository for illegal proceeds created by the misconduct described herein.

11 Plaintiff will amend her Complaint (if necessary) to allege their true names, capacities or basis

12 for liability when the same have been ascertained. Plaintiff is informed and believes, and on that

13 basis alleges, that defendants Does 1 through 25, inclusive, and each of them, are in some

14 manner liable to plaintiff, and/or are proper and necessary parties to this action in light of the

15 relief requested.

16

17                           **RELEVANT MARKETS**

18    **A.**    **Geography**

19       32.    Sutter Health's territory in Northern California includes the following counties:

20 Alameda, Contra Costa, San Francisco, Marin, Sonoma, Napa, San Mateo, Santa Clara, Santa

21 Cruz, Solano, Yolo, Sutter, Yuba, Nevada, Sacramento, Amador, Placer, El Dorado, San

22 Joaquin, Stanislaus, Merced and Lake.

23

24    **B.**    **Services**

25       33.    Sutter Health describes itself as providing "a full range of health care and related

26 services through an integrated health care delivery model." The relevant services include

27 essentially all medical services (except drugs and pharmacies) including, but not limited to, all

28

15

forms of acute care, emergency care, outpatient care, primary care, medical care in every specialty, home care, care in a skilled nursing facility, hospice care, doctors' groups, laboratory and other ancillary services, chemical dependency care and psychiatric care.

### C.     Health Plans

34.     Except for the uninsured, plaintiff, as well as all other residents of Northern California, generally gain access to medical and ancillary healthcare-related services through health plans, including all forms of "managed care organizations" or "health insurance," including health maintenance organizations or "HMOs," preferred provider organizations or "PPOs," employer-sponsored health plans, government–sponsored health plans and union-sponsored health plans.

35.     Health plans in turn contract for services with providers of medical services and other healthcare-related services.  Providers include hospitals, skilled nursing facilities, medical groups (also referred to herein as "doctor groups" or "physician groups"), home healthcare providers, and providers of ancillary services.  The retail prices charged by providers like Sutter Health are typically three to ten times their contract prices.  As a result, if a health plan does not have contracted access to a given hospital or provider, the health plan cannot afford to include the provider in the network of providers that it makes available to members.  If the health plan cannot enter into a contract with a given provider, the provider must remain "outside-of-plan." Alternatively, if use of the provider is necessitated by emergency and must be paid for by the health plan, the health plan suffers a financial loss.

36.     The primary relevant market in this action is health plans' purchase of contracted access to a network of medical services and facilities in Northern California sufficient to provide a credible and marketable network to its members. In order to illustrate some of the most basic and outside limits of the parameters of a "credible and marketable network," the requirements of

16

1 California's Knox-Keene Health Care Service Plan Act of 1975 includes standards for
2 accessibility. *Available at*: http://wpso.dmhc.ca.gov/regulations/12CCRP/2012CCRP.pdf.

3      1.      Primary Care Providers. All enrollees have a residence or workplace
4 within 30 minutes or 15 miles of a contracting or plan-operated primary care provider in such
5
6 numbers and distribution as to accord to all enrollees a ratio of at least one primary care provider
7 (on a full-time equivalent basis) to each 2,000 enrollees.

8      2.      Hospitals. In the case of a full-service plan, all enrollees have a
9 residence or workplace within 30 minutes or 15 miles of a contracting or plan-operated hospital
10 which has a capacity to serve the entire dependent enrollee population based on normal
11 utilization, and, if separate from such hospital, a contracting or plan-operated provider of all
12 emergency healthcare services.
13

14      3.      Hospital Staff Privileges. In the case of a full-service plan, there is a
15 complete network of contracting or plan-employed primary care physicians and specialists each
16 of whom has admitting staff privileges with at least one contracting or plan-operated hospital
17 equipped to provide the range of basic healthcare services the plan has contracted to provide.

18      4.      Ancillary Services. Ancillary laboratory, pharmacy and similar services
19 and goods dispensed by order or prescription of the primary care provider are available from
20
21 contracting or plan-operated providers at locations (where enrollees are personally served) within
22 a reasonable distance from the primary care provider.

23      37.      In order to comply with relevant California laws and regulations – and again
24 simply to illustrate the outside limits of what could constitute a "credible and marketable
25 network" – the health plan must also provide:

26      • a ratio of at least one primary care provider (on a full-time equivalent basis) to
27        each 2,000 enrollees;

28

17
CLASS ACTION COMPLAINT

- a contracting or plan-operated hospital which has a capacity to serve the entire dependent enrollee population based on normal utilization within 30 minutes or 15 miles of all enrollees;

- a complete network of contracting or plan-employed primary care physicians and specialists each of whom has admitting staff privileges with at least one contracting or plan-operated hospital; and

- laboratory, pharmacy and similar services and goods available from contracting or plan-operated providers at locations within a reasonable distance from the primary care provider.

38. The market for a network of medical and ancillary healthcare-related services as purchased by a health plan is distinct from the market for medical services in general. If the market for medical services were organized in the traditional manner – like the market for televisions or automobiles, for example – there would be a huge number of buyers and a huge number of sellers. The buyers would each try to maximize their utility by buying the best medical care at the cheapest price. High-cost/low-quality providers of medical services would be forced by competition either to lower their prices, to raise their quality, or be driven out of business.

39. Furthermore, even if consumers wanted to comparison shop, they would find it difficult to do so. Sutter Health's contracts specifically prohibit health plans from disclosing Sutter Health's prices. Since 2007, Sutter Health has repeatedly fought – with the extraordinary lobbying apparatus that it has assembled in Sacramento – to defeat bills introduced in the California legislature that sought to outlaw such "gag clauses" or to mandate that health plans disclose their prices. Similarly, the structure of Sutter Health's exclusivity and tying arrangements between doctors' groups, hospitals and ancillary services such as labs, is designed to hijack the trust of patients in their doctors for Sutter Health's economic gain: when Sutter Health doctors make a referral, they are doing so because they must do so pursuant to their

CLASS ACTION COMPLAINT

1 contract with Sutter Health, whereas their patients are led to believe that their trusted doctors are
2 making the referral for quality reasons.

3
## SUTTER HEALTH'S ANTI-COMPETITIVE CONDUCT

4     40.    In 1999, the Office of the California Attorney General sought to enjoin Sutter
5
6 Health's purchase of Summit Medical Center in Oakland based largely on competitive concerns
7 similar to those expressed herein. The Attorney General's 1999 efforts were rebuffed and Sutter
8 Health was permitted to acquire Summit. According to a 2008 Federal Trade Commission study,
9 in the two years following the acquisition, Summit's prices rose 29% to 72% more than its peers,
10 surpassing even the most pessimistic scenarios feared by the Attorney General. Indeed following
11 the merger, Summit's revenues increased five times more than even Sutter Health CEO Patrick
12 Fry assured the court (under oath on the witness stand) that they would rise.

13
14     41.    By 2004, in the wake of Sutter Health's continuing anti-competitive conduct,
15 Sean Harrigan, the President of the California Public Employees' Retirement System
16 ("CalPERS"), the largest pension fund in the United States, was driven to state: "Every citizen
17 in the state of California should be outraged by Sutter Health," which uses its "monopoly hold on
18 some markets" to extort high prices. CalPERS separately noted in its Operations Summary for
19 the year ended June 30, 2004, that Sutter Health demanded 2005 rates at least *50% higher* than
20 other hospitals in its Northern California markets. CalPERS' analysis was corroborated by
21
22 another analysis performed by Blue Cross of California on behalf of CalPERS in 2004. The
23 analysis asks the question: How did the actual costs of claims of the many CalPERS plan
24 participants differ at Sutter Health hospitals versus non-Sutter Health hospitals? The answer was
25 nothing short of astonishing:

26     The average cost of claims paid for CalPERS PPO Basic plan participants at
27     Sutter Health hospitals is *73% greater* than the average cost of all other hospital
       claims paid on behalf of CalPERS PPO Basic plan participants in the State of
28     California.

19
CLASS ACTION COMPLAINT

42.     Echoing the 2004 comments of CalPERS President Harrigan regarding Sutter

Health's pricing, market power and anti-competitive misconduct, an August 2010 analysis by

*Bloomberg* concluded that Sutter Health

has market power that commands prices *40 to 70 percent higher* than its rivals
per typical procedure – and pacts with insurers that keep those prices secret.
Sutter Health can charge these prices because it has acquired more than a third of
the market in the San Francisco-to-Sacramento region through more than 20
hospital takeovers in the last 30 years, according to executives of Aetna Inc.,
Health Net Inc. and Blue Shield of California, who asked not to be named because
their agreements with Sutter Health ban disclosure of prices.

43.     In March 2011, *The Los Angeles Times* conducted an analysis of state records and

similarly concluded that "on average, hospitals in Northern California's six most populous

counties collect *56% more revenue* per patient per day from insurance companies and patients

than hospitals in Southern California's six largest counties." The report continues:

The driving force in the north is Sutter Health, a not-for-profit system of 24
hospitals and roughly *5,000* doctors that reaches into more than 100 cities and
towns across 20 counties.

Insurance companies say that Sutter Health's size and dominant position in many
local markets give it the upper hand in contract negotiations over prices and
which of its hospitals are included in the insurers' networks.

Insurers also say they must include Sutter Health hospitals – which account for 1
in 5 such facilities in the region – because they are in such high demand by
patients. . . .

Aetna Inc... charges customers in Northern California about *30% more in
premiums* than those in Southern California as a result of higher hospital
reimbursements in the north that average $5,169 for each patient per day,
compared with $3,578 in the south.

Blue Shield of California, a not-for-profit insurer, reports a similar trend. It says it
charges up to *40% more for insurance* in the north, where it spends an average of
$6,570 per patient each day compared with $4,646 in the south.

"Where the cost of care is more expensive, the cost of premiums is more
expensive," said Juan Davila, Blue Shield's top executive who oversees provider
contracting.

44.     Even more recently, in July 2012, the CALPIRG Education Fund prepared a detailed report on geographic variation in hospital charges in California. On page 2 of the report, the authors provide a "heat map" of hospital charges that conveys the degree to which various regions deviate from the state median on an index of hospital charges. This heat map and a map of Sutter Health's network are reproduced above as Figures 2 and 1, respectively. The portions of the state exhibiting abnormally high hospital prices and the region comprising Sutter Health's territory precisely correspond.

45.     This overlap was not lost on the CALPIRG researchers, who note in the body of the report that the regional variations conveyed in their map cannot be explained by cost-of-living differences but instead:

[H]ospital charges may be influenced by how much market power the hospital has – the ability to ask for and receive a higher price. Hospitals can acquire market power by merging with other hospitals and acquiring networks of facilities, by building their reputation to gain "must-have" status in the eyes of patients and thus insurers or by providing a large volume of care. . . . In California, for example, Sutter Health has two dozen facilities in northern California, and it negotiates prices with insurers on an "*all or none*" basis. *In a city where Sutter Health represents a large share of the market it can command a higher price from insurers, and then by negotiating a systemwide contract it can impose higher rates at all its hospitals.*

46.     However, the "systemwide contracts" negotiated by Sutter Health on an "all or none" basis are relevant to much more than hospital pricing. They are relevant to *all* of Sutter Health's pricing and *artificially inflate every dollar of revenue that Sutter Health collects.* Sutter Health's strategy is, first, to establish monopolistic market power in certain regions and services that are indispensable to insurers seeking to market a credible network to their customers. Second, Sutter Health ties other regions and services to the indispensable ones. Insurers must purchase a laundry list of geographies and services that they do not want in order to purchase the geographies and services that they need. Third, Sutter Health creates a self-reinforcing dynamic by forcing the various services to make cross-referrals.

21

CLASS ACTION COMPLAINT

47. For example, if an insurer needs to have access to Sutter Health's hospitals in Alameda County, where Sutter Health owns every major hospital, the insurer must contract not only with all of Sutter Health's hospitals across Northern California, but also with all of Sutter Health's affiliated physician groups, laboratories, skilled nursing facilities, home care facilities, device suppliers, and so on. And all of these physician groups, nursing facilities, and home care services must in turn refer any patient who needs acute care to Sutter Health hospitals, any patient who needs blood work to Sutter Health labs, any patient who needs a medical device to Sutter Health device suppliers, and so on.

48. As a result, competing hospitals – even in counties where a contract with Sutter Health is not indispensable – are deprived of customers. Less-expensive or higher-quality physician groups, labs, skilled nursing facilities, home care providers and device suppliers – both in counties where a contract with Sutter Health is indispensable and in counties where a contract with Sutter Health is not indispensable – are likewise deprived of customers.

49. Another effect of these anti-competitive practices has been to release pressure on all parts of Sutter Health's network from maintaining standards of high quality and safety. After all, Sutter Health's network does not compete on quality any more than it competes on price. Sutter Health does not compete at all. As noted in a California Health Care Coalition report:

> The quality of care is highly inconsistent within and across Sutter Health facilities. Three of Sutter Health's nine Bay Area hospitals have so seriously violated national standards as to jeopardize either their participation in the Medicare or Medicaid programs or their accreditation as a health care organization. Other data also show serious quality deficiencies: Sutter Health Sacramento's General campus ranked in the bottom half of reporting hospitals nationally on eight of ten hospital performance indicators developed by the Centers for Medicare and Medicaid services while Sutter Health's Memorial Hospital in Modesto has higher than expected mortality rates in 6 of 16 procedures analyzed.

> Looking again at the key set of DRGs [Diagnosis Related Groups], quality performance at Sutter Health's Summit Medical Center in Oakland was not nearly as favorable, with 53 percent of the key procedures having higher complications

22

CLASS ACTION COMPLAINT

then the national peer group. Sutter Health Medical Center, Sacramento, Memorial campus had higher complications than the national peer group in 50 percent of the key procedures. Finally, at Memorial Modesto, while it generally has similar complication rates compared to the national peer group, two exceptions stand out: Memorial's complication rate is 93 percent higher than the peer group for Heart Failure and Shock (DRG 127), and hundreds of times higher for Psychoses (DRG 430).

Mortality rates for 20 key procedures in the same three facilities also vary. Summit generally performs on par with or better than the peer group, with two exceptions: its mortality rate for Psychoses (DRG 430) is double the expected rate, and for Cardiac Valve and other Major Cardiothoracic Procedures (DRG 104), its mortality rate is 72 percent higher than expected. Sutter Health Medical Center Sacramento's Memorial campus also generally performs on par with its peers, with one notable exception: the mortality rate is 81 percent higher than expected for Coronary Bypass with Cardiac Catheterization (DRG 107). Memorial Modesto has the most disturbing mortality trends. Of the 16 key procedures analyzed, 6 had higher than expected mortality rates. California Health Care Coalition, "High Prices, Questionable Quality: A Program to Put Patients First in California Hospitals," April 2005.

50.     The anti-competitive tactics employed by Sutter Health have been successful only because of:

1.     the structure of the relevant market, specifically the fact that the market for Sutter Health's medical and ancillary services is organized on the basis of the purchase of entire networks of geographic and service coverage by insurers and employers, as opposed to purchases by the patients themselves;

2.     the lack of price transparency that characterizes the relevant market, a lack of transparency that is fostered and enforced by Sutter Health itself in various ways including contractual prohibitions against health plans publishing Sutter Health's prices; and

3.     the trust that patients traditionally place in their doctors, trust that Sutter Health hijacks and subverts for economic gain by forcing health plans and providers to refer and recommend Sutter Health providers, regardless of the quality of care or prices that they offer.

23

CLASS ACTION COMPLAINT

51.     Sutter Health is thus able to create and sustain market distortions that would simply not exist in a competitive, transparent and efficient market such as televisions or automobiles.

52.     Unlike plaintiff and members of the Class, the large buyers of medical services from Sutter Health, i.e., health plans, are well-aware of Sutter Health's high prices and questionable quality but are *prevented* by Sutter Health from choosing a $15,000 high-quality provider over a $50,000 low-quality Sutter Health provider. This is possible because health plans must secure a *network* of seamless geographic access and service coverage for their members, and a health plan cannot secure such a network in Northern California without having contracted access to some of Sutter Health's providers. Sutter Health has 100% of beds in Placer and Amador counties, over 80% in Alameda, over 50% in San Francisco, and over 50% in Sacramento. But Sutter Health refuses to deal with any health plan on anything except an "all or none" basis, so Sutter Health's monopolies in a few places are transformed into a monopoly in Northern California as a whole. Hence, the health plans' absolute need to access some parts of Sutter Health's network is transformed by Sutter Health's anti-competitive tying and exclusivity into a requirement to contract with Sutter Health as a whole on a virtually exclusive basis.

53.     Health plans that have attempted to choose "none" instead of "all" have found themselves faced with protests by their members, as evidenced by this example reported by *Bloomberg*:

> Last November, Claire Zvanski, a San Francisco parking administrator and commissioner of the city-employees' health insurance fund, proposed dropping Sutter Health hospitals from the plan offered to the city's 110,000 workers. Zvanski said she hoped dumping Sutter Health would cut costs and curb an expected rate increase from Blue Shield. Her proposal stirred heated protest from plan members at commission meetings, who said they would have to drive 30 miles to find a non-Sutter Health hospital. Under pressure, Zvanski tabled the idea.

24

CLASS ACTION COMPLAINT

> On July 1, the city, to cover rising costs, raised health-care contributions from employees by 13 percent – to $6,552 a year for a firefighter with two or more dependents. It doubled co-payments to $100 for emergency-room and outpatient services and $200 for hospital stays.

> "Sutter Health really has us over a barrel, I hate to admit it," said Larry Barsetti, a retired police lieutenant who supported Zvanski's proposal. His premiums went up $100 on July 1, to $10,188 a year – more than double what he paid upon retiring in 2003. "We're getting gouged," Barsetti said.

54. And for its part, Blue Shield could not conceivably propose that a large Bay Area employer such as Wells Fargo or Levi's use Blue Shield as its employee health plan while suggesting that their Alameda County employees would be required to travel to San Francisco, Fremont or Concord to visit a hospital. Employers such as Wells Fargo or Levi's could never accept such an arrangement. Moreover, under the Knox-Keene Act, and the rules promulgated thereunder by the California Department of Managed Health Care, Blue Shield would most likely be precluded from even offering such a plan, as it would likely violate 15-mile/30-minute accessibility standards.

55. Instead, just as the San Francisco city-employee insurance fund was forced to accept "all" instead of "nothing" with Sutter Health, Blue Shield would similarly be forced to accept "all" as opposed to "nothing" with Sutter Health, because – as discussed in further detail below in the sections, "Sutter Health's Monopolies and "Sutter Health's Improper Tying Arrangements" – having access to none of Sutter Health's network would make it impossible for Blue Shield to offer a credible and marketable health plan in Northern California.[3]

---

[3] In May 1998. Sutter Health threatened to cancel its contracts for Blue Cross' Prudent Buyer and California Care insurance plans because the reimbursements offered by Blue Cross were lower than Sutter Health desired. Blue Cross was left with the untenable prospect that only UC Davis Medical Center would accept Blue Cross patients in the Sacramento area. Miraculously, Blue Cross and Sutter Health reached a three-year agreement for Sutter Health's acute care hospitals. The most likely scenario here was that Blue Cross capitulated and agreed to pay higher rates.

CLASS ACTION COMPLAINT

56.     And what "all" means with Sutter Health – to quote directly from one of Sutter Health's agreements – is as follows:

> Each payer accessing Sutter Health providers shall designate ALL Sutter Health providers (*see* Sutter Health provider listing) as participating providers unless a Payer excludes the entire Sutter Health provider network.
>
> Sutter Health shall require each group health payer accessing Sutter Health providers through the [health plan] network to actively encourage members obtaining medical care to use Sutter Health providers. . . ."  Actively encourage" or "active encouragement" means incentivizing members to use participating providers through the use of one or more of the following:  reduced co-payments, reduced deductibles, premium discounts directly attributable to the use of a participating provider, financial penalties, or requiring such members to pay additional sums directly attributable to the non-use of a participating provider.
>
> If Sutter Health or any provider learns that a payer either does not actively encourage its members to use network participating providers. . . .  Sutter Health shall have the right upon not less than thirty (30) days' written notice to terminate that payer's right to the negotiated rates. In the event of such termination, the terminated payer shall pay for covered services rendered by providers at 100% of billed charges until such time as Sutter Health reasonably believes and notices that the payer does in fact actively encourage its members to use network participating providers. . . .

57.     So in the regions and services where Sutter Health has a sheer monopoly, it shields its $50,000 low-quality providers from competition from $15,000 high-quality providers through sheer monopoly power.  In the remaining regions and services where Sutter Health does not have a sheer monopoly, Sutter Health shields its $50,000 providers from competition from the $15,000 providers through tying and exclusionary agreements linked to the regions/services where Sutter Health does have a sheer monopoly.  The buyers that purchase services on behalf of the residents of Northern California are literally prevented by Sutter Health – through various pockets of sheer monopoly power combined with coercion, tying and exclusionary agreements – from choosing the $15,000 high-quality provider over the Sutter Health's $50,000 low-quality provider anywhere in Sutter Health's growing territory.

CLASS ACTION COMPLAINT

58. In an internal Sutter Health memo produced in the aforementioned 1999 trial in which the California Attorney general sought to enjoin Sutter Health's purchase of Summit Medical Center, Robert Montgomery, the then Head of Sutter Health's Bay Area operations, suggested Sutter Health should "hire a very aggressive negotiator and take no prisoners" on pricing if it obtained enough market share.

59. Sutter Health's strategic planning documents that also became public during the suit define how much market share Sutter Health believed would be "enough." Specifically, the documents express Sutter Health's goals for "market share growth" that include obtaining a "critical presence" in each of four geographic markets in Sutter Health's "Western Division" and note:

> This "critical presence" amounts to a 25 to 30 percent share of the physician-hospital lines of business. . . . Securing the 25 to 30 percent share of the market is vital if we are to be indispensable for the major health plans.

60. The documents also discuss how market consolidation and the removal of excess capacity assist hospitals in their pricing strategies by "*eliminating the health plans' option to buy services at the margin*." The documents also describe additional elements of Sutter Health's East Bay market strategy, including Sutter Health's pursuit of East Bay hospital acquisitions in order to prevent competitors such as HCA and Catholic Healthcare West from "enter[ing] the East Bay market and develop[ing] a competing network." The documents note that Sutter Health's acquisition of Eden Medical Center "would protect our market from a takeover by competitors that could develop competing physician networks."

**A. Sutter Health's Monopolies**

61. Sutter Health has 100% of hospital beds in Place and Amador Counties, 60% in the East Bay, over 50% in San Francisco, and over 50% in Sacramento. Overall, Sutter Health has 35% of the revenue and 36% of beds that compete for patients in Northern California.

27

(These percentages exclude insurer/provider Kaiser Permanente whose hospitals are only available to plan members.) *See* Figures 1 and 2 above.

62.     In 1994, Sutter Health had 14 hospitals.  In 2012, it has 33 hospitals.  Sutter Health's hospital acquisitions resulted in substantial price increases at the hospitals that were acquired, reflecting *per se* Sutter Health's ability to engage in supra-competitive pricing in its network.  For example, the average charge per discharge (acuity and inflation adjusted) at Eden Medical Center immediately prior to Sutter Health's acquisition of Eden in 1998 was $13,428, below the Northern California average of $15,471.  By 2002, Eden's average charge per discharge had grown to $27,367, by then far *above* the northern California average of $22,645.  Regarding the Eden acquisition, an internal planning document that took the form of a presentation to the Sutter Health Finance and Planning Committee on September 30, 1996, included a full-page reproduction of a "Monopoly" game board with the words, "The East Bay Monopoly Game" in the center of the board:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21      63.     Similarly, with respect to Sutter Health's subsequent acquisition of Summit in

22  2000, the average charge per discharge (acuity and inflation adjusted) at Summit Medical Center

23  immediately prior to Sutter Health's acquisition of Summit was $15,721, below the Northern

24  California average of $18,901. By 2002, Summit's average charge per discharge had grown to

25
26  $26,148, by then far *above* the northern California average of $22,645.

27
28

CLASS ACTION COMPLAINT

**B.     Sutter Health's Improper Tying Arrangements**

64.     Tying is requiring a customer to buy something they do not want as a condition of buying something they do want. Sutter Health includes the following tying language in its agreements with health plans:

> Each payer accessing Sutter Health providers shall designate ALL Sutter Health providers (see Sutter Health provider listing) as participating providers unless a Payer excludes the entire Sutter Health provider network.

65.     This is an example of the "all or none" language that Sutter Health uses to tie the regions/services in which it has a monopoly to its remaining regions/services.

66.     The intended objective of such language is to prevent health plans from using Sutter Health facilities only in regions or only for services in which Sutter Health has monopoly power.     Instead the health plans must also use Sutter Health in competitive markets where higher-quality/lower-prices are available. Or to put it from Sutter Health's perspective, the effect of such language is to enable Sutter Health to "shadow" its monopoly prices in markets where it does not have monopoly power.

67.     For example, Sutter Health owns every non-Kaiser hospital in Alameda with the exception of St. Rose, a small hospital in Hayward that lacks the medical equipment and facilities to provide many advanced medical procedures. Moreover, St. Rose is located 17 miles from the center of Oakland, which could violate the 15-mile/30-minute accessibility regulation promulgated by the Department of Managed Health Services pursuant to the Knox-Keene Act. Thus, if a health plan has no access to Sutter Health hospitals, the health plan's Oakland members would need to travel south 17 miles to St. Rose, even further south to Fremont (Washington Hospital, 28 miles), across the Bay Bridge to San Francisco (San Francisco General Hospital, 13 miles), east from Oakland to Concord (John Muir Medical Center, 22 miles) or north from Oakland to San Pablo (Doctors Medical Center, 13 miles).     Only two of these

30

CLASS ACTION COMPLAINT

hospitals, San Francisco General and Doctors Medical Center, are under the 15-mile accessibility limit, and neither is reliably under the 30-minute limit for travel time since they both involve travel on routes that are often congested (the Bay Bridge and San Francisco city streets to travel to San Francisco General; and Highway 80 between Emeryville and San Pablo Dam Road to travel to Doctors Medical Center).

68.     In other words, in order to have members that reside or work in Alameda County, a health plan such as Blue Shield, Aetna or Blue Cross would arguably have a legal obligation under California laws and regulations to gain contracted access to Sutter Health hospitals in Alameda County such as Alta Bates, Summit, Eden and San Leandro. Beyond the issue of regulatory compliance, it is difficult to imagine consumers living in Oakland – or any business located in Oakland or with a number of employees who are residents of Oakland – choosing a health plan that lacked access to any Oakland hospitals and instead provided access only to hospitals at least a half-hour drive away.

69.     So, to put it succinctly, Sutter Health forces health plans to choose between "all" and "none," and "none" would be a disaster. Or as expressed in more polite terms by academics Glenn Melnick (University of Southern California) and Emmett Keeler (RAND) in "The effects of multi-hospital systems on hospital prices":

> Several bargaining strategies that appear to have become common among both local and non-local multi-hospital systems in recent years.     One involves threatening the plan with disruption caused by multi-hospital systems pulling all of their member hospitals out of a health plan's provider network simultaneously to foster an image of instability related to the health plan's products and possibly lowering health plan brand value (Strunk et al., 2001). Perceptions of health plan instability may lead to reduced demand for the health plan, not just in the affected areas but more broadly, thus potentially imposing a substantial cost on the plan for not agreeing to higher price terms with multi-hospital systems.

> Another reported strategy was for hospitals to form a multi-hospital system that included one or more hospitals that had market power and then to use this power to extract higher prices from health plans for other hospitals in the system including those located in more competitive markets.

31

CLASS ACTION COMPLAINT

*See* Glenn Melnick and Emmett Keeler, "The effects of multi-hospital systems on hospital prices," *Journal of Health Economics* 26 (2007) 400-413.

70.    Melnick and Keeler conclude their paper with recommendations regarding potential responses by health plans to extortive tactics such as those described in the preceding paragraph. Notably, at the top of Melnick and Keeler's recommendations is antitrust legal action. They write:

> How can health plans respond if bargaining leverage has shifted to multi–hospitals systems? To the extent that the increased leverage comes from systems using the monopoly power of member hospitals to raise prices in other hospitals, legal action under antitrust laws may be an option. From an antitrust perspective, it is interesting to note that the estimated price increase to hospitals from joining a non–local system outweighs the price advantage from a merger with a direct (non–system) competitor in same market.

## C.    Sutter Health Imposes a Mandate of Exclusive Dealing

71.    Sutter Health also typically includes language such as the following in its agreements with health plans:

> Sutter Health shall require each group health payer accessing Sutter Health providers through the [health plan] network to actively encourage members obtaining medical care to use Sutter Health providers... "Actively encourage" or "active encouragement" means incentivizing members to use participating providers through the use of one or more of the following: reduced co-payments, reduced deductibles, premium discounts directly attributable to the use of a participating provider, financial penalties, or requiring such members to pay additional sums directly attributable to the non–use of a participating provider.

> If Sutter Health or any provider learns that a payer either does not actively encourage its members to use network participating providers... Sutter Health shall have the right upon not less than thirty (30) days' written notice to terminate that payer's right to the negotiated rates. In the event of such termination, the terminated payer shall pay for covered services rendered by providers at 100% of billed charges until such time as Sutter Health reasonably believes and notices that the payer does in fact actively encourage its members to use network participating providers. . . .

72.    This exclusivity or mandatory referral language in Sutter Health's agreements goes hand-in-hand with its illegal tying. The health plans must not only *include* in their plans

32

CLASS ACTION COMPLAINT

the parts of Sutter Health's network engaging in "shadow" monopoly pricing, they must also *promote* them by incentivizing their member to use those monopoly–priced providers, and *penalize* them if they fail to do so.

73.     To illustrate, suppose that a health plan such as Aetna or Blue Shield identifies a new medical group comprised of a highly credentialed and talented group of primary care physicians with which it wishes to contract. Suppose further – and as is generally the case – that this new medical group would, offers its service to members of the health plan at prices 50% below those of Sutter Health's doctor groups. Regardless, while Sutter Health does not prevent Aetna or Blue Shield from contracting with the new medical group, exclusivity language such as the portion of a Sutter Health agreement quoted above literally requires health plans to "actively encourage" their member to enroll with Sutter Health medical groups – and to penalize them if they fail to do so – even though they provide inferior services and cost 50% more.

74.     These unreasonable and anti-competitive exclusivity provisions therefore reinforce and spread the anti-competitive effects of Sutter Health's hospital monopolies and tying to other regions and services, such as doctor groups and lab services. The exclusivity provisions further spread the reach of Sutter Health's monopolistic umbrella.

### D.     Anti-Competitive Effects of Sutter Health's Misconduct

75.     The effects of Sutter Health's anti-competitive practices include both tremendously inflated prices for medical services in Northern California as well as lower quality medical services in Northern California. Sutter Health does not compete on quality any more than it competes on price. Sutter Health does not compete at all.

76.     Several objective analyses or reports concerning or relating to Sutter Health's pricing and quality standards, all of which have been quoted herein, include:

33

CLASS ACTION COMPLAINT

(i)     Elizabeth Ridlington, Travis Madsen, Mike Russo and Emily Rusch, "Your Price May Vary: Geographic Variation in Hospital Charges in California," CALPIRG       Education       Fund,       Summer       2012,       *available*       *at*: http://www.calpirg.org/sites/pirg/files/reports/Your%20Price%20May%20Vary%20web.pdf (last retrieved: July 31, 2012).

(ii)    Duke Helfand, "Hospital stays cost more in Northern California than Southern California," *The Los Angeles Times*, March 6, 2011, *available at*: http://articles.latimes.com/2011/mar/06/business/la–fi–hospital–cost–20110306 (last retrieved: July 31, 2012).

(iii)   Peter Waldman, "Why Baby Costs Less Down the Road in Silicon Valley," *Bloomberg*, August 20, 2010, *available at*: http://www.bloomberg.com/news/2010–08– 20/hospital–monopolies–ruin–mri–bill–as–Sutter       Health–gets–price–it–wants.html       (last retrieved: July 31, 2012).

(iv)    Steven Tenn, "The Price Effects of Hospital Mergers: A Case Study of the Sutter Health-Summit Transaction," Federal Trade Commission, Bureau of Economics,       Working       Paper       No.       293,       November       2008,       *available*       *at*: http://www.ftc.gov/be/workpapers/wp293.pdf (last retrieved: July 31, 2012).

(v)     Glenn Melnick and Emmett Keeler, "The effects of multi-hospital systems on hospital prices," *Journal of Health Economics* 26 (2007) 400-413.

(vi)    California Health Care Coalition, "High Prices, Questionable Quality: A Program to Put Patients First in California Hospitals," April 2005.

(vii)   California State Auditor, "California Department of Corrections: More Expensive Hospital Services and Greater Use of Hospital Facilities Have Driven the Rapid

34

Rise in Contract Payments for Inpatient and Outpatient Care, Bureau of Audits," July 2004,

*available at*: http://www.bsa.ca.gov/pdfs/reports/2003-125.pdf (last retrieved: July 31, 2012).

          (viii)     Lisa Rapaport, "CalPERS could drop 15 Sutter Health hospitals,"

*The Sacramento Bee*, February 19, 2004.

## CLASS ACTION ALLEGATIONS

77.    Plaintiff brings this action pursuant to Rule 23(a) and (b)(3) of the Federal Rules

of Civil Procedure on behalf of plaintiff and the following Class:

> All natural persons and entities in the following Northern California counties: Alameda, Contra Costa, San Francisco, Marin, Sonoma, Napa, San Mateo, Santa Clara, Santa Cruz, Solano, Yolo, Sutter, Yuba, Nevada, Sacramento, Amador, Placer, El Dorado, San Joaquin, Stanislaus, Merced and Lake, who paid directly or indirectly for medical services or ancillary healthcare-related services from Sutter Health or any of its Affiliated Entities (the "Class") beginning four years from the filing of this complaint and continuing until the present (the "Relevant Period"). Specifically excluded from this Class are defendants and their parent companies, subsidiaries, affiliates, officers, directors, employees, legal representatives, heirs or assigns, and co-conspirators. Also excluded are any federal governmental entities, any judicial officers presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

78.    Subject to additional information obtained through further investigation and discovery, the foregoing definition may be expanded or narrowed by amendment or amended complaint.

79.    Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of Class members is unknown to plaintiff, it is believed to be in the thousands. Furthermore, the Class is readily identifiable from information and records in Sutter Health's possession.

80.    Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members because Sutter Health has acted

35

CLASS ACTION COMPLAINT

on grounds generally applicable to the Class. Such generally applicable conduct is inherent in defendant Sutter Health's wrongful conduct. Among those common questions of law or fact are:

(a) whether defendant restrained trade in, or excluded competition in, and/or monopolized the markets for medical services;

(b) whether defendant conspired to unreasonably restrain trade and maintain prices for medical and ancillary healthcare-related services at supra-competitive levels by imposing tying or exclusive dealing arrangements thus restricting or foreclosing a free and competitive market for such services;

(c) whether defendant conspired to maintain and extend an unlawful monopoly for medical and ancillary healthcare-related services in Northern California;

(d) the existence and duration of the illegal conduct alleged herein;

(e) whether defendant's anti-competitive conduct resulted in diminished competition for medical services in Northern California;

(f) whether defendant's anti-competitive conduct caused prices for medical and ancillary healthcare-related services to be higher than they would have been in the absence of defendant's conduct;

(g) whether defendant's conduct violates the Sherman Act;

(h) whether defendant's conduct violates the Cartwright Act;

(i) whether defendant Sutter Health California's Unfair Trade Practices Act, Cal. Bus. & Prof. Code §17200, *et seq.* (the "UCL");

(j) whether defendant Sutter Health unjustly enriched itself as a result of its inequitable conduct at the expense of the members of the Class; and

36

CLASS ACTION COMPLAINT

(k)     whether plaintiff and other Class members have sustained, or continue to sustain, damages in the nature of overcharges as a result of defendant's wrongful conduct, and, if so, the quantum of such damages.

81.     Plaintiff is a member of the Class, and plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct by Sutter Health; *i.e.*, they paid increased prices for medical and health-related services as a result of defendant's wrongful conduct.

82.     Plaintiff will fairly and adequately protect the interests of other Class members because she has no interests that are antagonistic to, or that conflict with, those of any other Class member. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in litigation of this nature to represent plaintiff and other members of the Class.

83.     The prosecution of separate actions by individuals would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendant.

84.     This class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly situated persons or entities to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. The damages sustained by individual Class members, although meaningful, does not rise to the level where it is economically rational to prosecute separate complex actions against these well-financed corporate defendant. The instant case will be eminently manageable as a class action. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

37

CLASS ACTION COMPLAINT

## COUNT I
### (Violation of Section 1 of the Sherman Act)

85.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

86.    Defendant Sutter Health and its Affiliated Entities entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

87.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among defendant Sutter Health and its Affiliated Entities in furtherance of which Sutter Health engaged in tying and exclusive dealing agreements. Sutter Health possesses monopoly power in the Northern California Medical Services market.    Through the anti-competitive conduct described herein, Sutter Health has willfully maintained, and unless restrained by the Court will continue to willfully maintain, that power by anti-competitive and unreasonably exclusionary conduct.

88.    Sutter Health's agreements with health plans require the health plans actively to incentivize and "encourage" the use of Sutter Health's services, and to penalize health plan members that fail to do so. These agreements unreasonably restrain trade and restrict the access of Sutter Health's competitors to compete – on the basis of price and/or quality – for the business of members of health plans that use the Sutter Health network, thereby restraining competition in the Northern California Medical Services market.

89.    The purpose and effect of these agreements are to restrain trade and competition in the Northern California Medical Services market. These agreements violate Section 1 of the Sherman Act, 15 U.S.C. §1.

90.    Defendant Sutter Health's conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

38

1    91.    Defendant Sutter Health's conduct had the resulting impact of increasing prices
2 for medical and ancillary healthcare-related services in Northern California.

3    92.    The various counties and regions in which Sutter Health provides medical
4 services are separate markets. In addition, there are separate markets for each of the medical and
5
6 ancillary services that Sutter Health provides in each of these markets. That is, there are separate
7 degrees of supply and separate demand for each of many medical and ancillary services in each
8 of these regions and counties. The essence of free competition is the freedom for each of these
9 markets to set prices for the medical or ancillary service in question in the region in question
10 based on the supply/demand dynamic of that particular medical or ancillary service in that
11 particular region.
12
      93.    Sutter Health has tied together regions and services in which Sutter Health has
13
14 monopoly power with regions and services in which it does not have monopoly power, in
15 violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

16    94.    The purpose and the effect of this tying are to prevent customers from choosing
17 among medical service providers on their merits and pricing and to foreclose competing
18 Northern California medical service providers from customers and channels of distribution (e.g.
19
   health plans), thereby restraining competition in the Northern California Medical Services
20
   market.
21
22    95.    As a proximate result of defendant Sutter Health's unlawful conduct, plaintiff and
23 the Class have suffered injury to their business or property.

24    96.    Plaintiff and the Class are entitled to an injunction against defendant Sutter
25 Health, preventing and restraining the violations alleged herein.
26
27
28
                                                    39
CLASS ACTION COMPLAINT

## COUNT II
### (Unreasonable Restraint of Trade in Violation of the Cartwright Act, Cal. Bus. & Prof. Code Section 16720, *et seq.*)

97.     Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

98.     Defendants entered into and engaged in an unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code section 16720.

99.     The anti-competitive conduct consisted of a continuing agreement, understanding or concerted action between and among defendant Sutter Health and its Affiliated Entities in furtherance of which Sutter Health engaged in tying and exclusive dealing agreements.

100.    Specifically, Sutter Health has conspired to impose supra-competitive prices and coercively to maintain and enhance its monopoly power in the market for medical and ancillary services in Northern California the imposition of tying arrangements that require health plans to use all Sutter Health providers or affiliated physician's groups (even where less expensive options are available) or suffer the devastating consequences of having contracted access to none of them – including areas where Sutter Health has local monopolies.

101.    Sutter Health's agreements with health plans also require the health plans actively to incentivize and "encourage" the use of Sutter Health's services, and to penalize health plan members that fail to do so. These agreements unreasonably restrain trade and restrict the access of Sutter Health's competitors to compete – on the basis of price and/or quality – for the business of members of health plans that use the Sutter Health network, thereby restraining competition in the Northern California Medical Services market.

102.    The purpose and effect of these agreements are to restrain trade and competition in the Northern California Medical Services market.

40

CLASS ACTION COMPLAINT

103.    Defendant's anti-competitive conduct constitutes *a per se* violation of California's antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

104.    As a proximate result of defendant Sutter Health's unlawful conduct, Plaintiff and the Class have suffered injury to their business or property.

105.    Accordingly, plaintiff seeks three times her damages caused by defendant's violations of the Cartwright Act, the costs of of bringing suit, and reasonable attorneys' fees.

## COUNT III
**For Violation of California Business & Professions Code Section 17200, *et seq.***

106.    Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

107.    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendant Sutter Health for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

108.    Plaintiff has standing to bring this action under the UCL because she has suffered injury in fact as a result of defendant Sutter Health's anti-competitive conduct.  Plaintiff and other members of the Class have been overcharged and paid inflated prices for medical and other ancillary services in the form on higher health insurance premiums.

109.    Defendant Sutter Health's anti-competitive conduct through the use of exclusionary contracts and tying constitutes unfair competition in violation of the UCL. Defendant Sutter Health's business acts and practices were centered in, carried out, effectuated, and perfected mainly within the State of California, and defendant's conduct injured at least all members of the Class defined herein.

110.    Beginning on a date unknown and continuing thereafter, defendant Sutter Health has committed and continues to commit acts of unfair competition, as defined by Sections 17200,

41

CLASS ACTION COMPLAINT

*et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

111. Defendant Sutter Health's conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of defendant Sutter Health, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; and (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above.

112. Defendant Sutter Health's acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.,* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

113. Defendant Sutter Health's acts or practices are unfair to all consumers of medical and other ancillary health-related services in the State of California within the meaning of Section 17200, California Business and Professions Code.

114. Defendant Sutter Health has also committed "unfair" business acts or practices by, among other things, engaging in conduct:

- where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiff and the Class members;

- that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and Class members; and

42

CLASS ACTION COMPLAINT

- that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint.

115. Defendant Sutter Health's acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and professions Code.

116. Plaintiff and each of the member of the Class is entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendant Sutter Health as a result of such business acts or practices.

117. The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

118. The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause plaintiff and the members of the Class to pay supra-competitive and artificially-inflated prices for medical and ancillary healthcare-related services.

119. As alleged in this Complaint, defendant has been unjustly enriched as a result of its wrongful conduct and by defendant's unfair competition. Plaintiff and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendant as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

120. As a proximate result of defendant Sutter Health's unlawful and anti-competitive conduct, Plaintiff and the members of the Class have suffered injury to their business and property.

121. Plaintiff and members of the Class seek restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, and injunctive relief, and other

43

CLASS ACTION COMPLAINT

1  relief allowable under California Business & Professions Code §17203, including, but not
2  limited to, enjoining defendant Sutter Health from continuing to engage in its unfair, unlawful
3  and/or fraudulent conduct as alleged.

4

5
## COUNT IV
### For Unjust Enrichment/Quasi-Contract Against Defendant

6      122.    Plaintiff incorporates by reference and realleges the preceding allegations, as
7  though fully set forth herein.

8      123.    This Count is brought in the alternative. *See* Fed. R. Civ. P. 8(d)(2).

9
10     124.    Defendant Sutter Health has been unjustly enriched through overpayments by
11  plaintiff and members of the Class and maintenance of the resulting profits.

12     125.    Under common law principles of unjust enrichment, defendant Sutter Health
13  should not be permitted to retain the benefits conferred on them by overpayments by plaintiff
14  and Class members.

15     126.    Plaintiff and members of the Class seek disgorgement of all profits resulting from
16  such overpayments and establishment of a constructive trust from which plaintiff and members
17  of the Class may seek restitution.
18
19     127.    Plaintiff and the Class have no adequate remedy at law.  It would be inequitable
20  for defendant Sutter Health to retain the profits, benefits, and other compensation obtained from
21  its wrongful conduct as alleged herein.

22
## PRAYER FOR RELIEF

23     128.    WHEREFORE, plaintiff prays that:

24          A.    The Court determines that the Sherman Act, Cartwright Act and the UCL
25  claims in this action may be maintained as a class action under Rule 23(a) and (b)(2)-(3) of the
26  Federal Rules of Civil Procedure;
27

28

44

CLASS ACTION COMPLAINT

1    B.    Plaintiff be appointed as Class representative, and plaintiff's counsel as

2  lead Class counsel;

3        C.    The unlawful conduct alleged herein be adjudged and decreed to be:

4            (1)    A restraint of trade or commerce in violation of Section 1 of the

5
6  Sherman Act;

7            (2)    Acts of unjust enrichment;

8            (3)    An unlawful combination, trust, agreement, understanding, and/or

9  concert of action in violation of the Cartwright Act; and

10           (4)    Violations of the Cal. Bus. & Prof. Code Section 17200.

11       D.    Plaintiff and the Class alleged herein recover damages, to the maximum

12
13  extent allowed under the laws identified herein, and that judgment in favor of plaintiff and the

14  Class be entered against the defendant Sutter Health in an amount to be trebled to the extent

15  permitted by such laws;

16       E.    Defendant Sutter Health, their affiliates, successors, transferees, assignees,

17  and the officers, directors, partners, agents, and employees thereof, and all other persons acting

18  or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained

19  from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or

20  combination alleged herein, or from entering into any other conspiracy alleged herein, or from

21
22  entering into any other contract, conspiracy or combination having a similar purpose or effect,

23  and from adopting or following any practice, plan, program, or device having a similar purpose

24  or effect;

25       F.    The Court enter an order providing injunctive relief and precluding

26  defendant Sutter Health from continuing to implement the exclusionary contracts and tying

27  agreements alleged herein that are used to facilitate the anti-competitive conduct alleged herein;

28

45

CLASS ACTION COMPLAINT

1    G.    Plaintiff and members of the Class be awarded restitution, including

2 disgorgement of profits obtained by defendant as a result of their acts of unfair competition and

3 acts of unjust enrichment;

4    H.    Plaintiff and members of the Class be awarded pre- and post-judgment

5

6 interest as provided by law, and that such interest be awarded at the highest legal rate from and

7 after the date of service of the initial complaint in this action;

8    I.    Plaintiff and members of the Class recover their costs of suit, including a

9 reasonable attorney's fee, as provided by law; and

10    J.    Plaintiff and members of the Class have such other, further, and different

11 relief as the case may require and the Court may deem just and proper under the circumstances.

12

13    **DEMAND FOR JURY TRIAL**

14    129.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff, on her

15 own behalf and on behalf of the Class, demands a trial by jury of all claims asserted in this

16 Complaint so triable.

17

18 DATED: September 17, 2012          THE MEHDI FIRM

19

20                                   AZRA Z. MEHDI

21                                   One Market
                                     Spear Tower, Suite 3600
22                                   San Francisco, CA 94105
                                     Telephone: 415/293-8039
23                                   Facsimile: 415/293-8001
                                     Azram@themehdifirm.com

24                                   Counsel for Plaintiff and the [Proposed] Class

25

26

27

28
                                                    46
   CLASS ACTION COMPLAINT

# EXHIBIT A

**NEW ISSUE—BOOK-ENTRY ONLY**                                                                                                                   *Ratings†*

In the opinion of Orrick, Herrington & Sutcliffe LLP, Bond Counsel to the Issuers, based upon an analysis of existing laws, regulations, rulings and court decisions, and assuming, among other matters, the accuracy of certain representations and compliance with certain covenants, interest on the Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986 and is exempt from State of California personal income taxes. In the further opinion of Bond Counsel, interest on the Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although Bond Counsel observes that such interest is included in adjusted current earnings when calculating corporate alternative minimum taxable income. Bond Counsel expresses no opinion regarding any other tax consequences related to the ownership or disposition of, or the accrual or receipt of interest on, the Bonds. See "TAX MATTERS" herein.

<table>
<tr><td align="center"><strong>$36,535,000</strong><br><strong>CALIFORNIA STATEWIDE COMMUNITIES</strong><br><strong>DEVELOPMENT AUTHORITY</strong><br><em>Revenue Bonds</em><br><em>(SUTTER HEALTH)</em><br><strong>Series 2011C</strong></td><td align="center"><strong>$310,300,000</strong><br><strong>CALIFORNIA HEALTH FACILITIES</strong><br><strong>FINANCING AUTHORITY</strong><br><em>Revenue Bonds</em><br><em>(SUTTER HEALTH)</em><br><strong>Series 2011D</strong></td></tr>
</table>

Sutter Health

**Dated:** *Date of Issuance*                                                                                           **Due:** *August 15, on the inside cover*

The California Statewide Communities Development Authority Revenue Bonds (Sutter Health), Series 2011C (the "CSCDA Bonds") are limited obligations of the California Statewide Communities Development Authority ("CSCDA"), payable from Loan Repayments to be made by Sutter Health under the CSCDA Loan Agreement and from certain funds held under the CSCDA Indenture, as described herein.

The California Health Facilities Financing Authority Revenue Bonds (Sutter Health), Series 2011D (the "CHFFA Bonds" and, together with the CSCDA Bonds, the "Bonds") are limited obligations of the California Health Facilities Financing Authority ("CHFFA"; CSCDA and CHFFA are collectively referred to herein as the "Issuers" and, individually, as an "Issuer"), payable from Loan Repayments to be made by Sutter Health under the CHFFA Loan Agreement and from certain funds held under the CHFFA Indenture, as described herein. The CSCDA Bonds and the CHFFA Bonds are each referred to us an "Issue" of Bonds.

The obligation of Sutter Health to make Loan Repayments is evidenced and secured by Obligation No. 97, in the case of the CSCDA Bonds, and Obligation No. 98, in the case of the CHFFA Bonds, each issued under the Master Indenture described herein (jointly, the "Bond Obligations"). Under the Master Indenture, Sutter Health and certain of its affiliates (collectively, the "Obligated Group") jointly and severally are obligated to make payments on the Bond Obligations in amounts sufficient to pay when due the principal of and premium, if any, and interest on the Issue of the Bonds secured by the respective Bond Obligation. The CSCDA Bonds and the CHFFA Bonds are each secured solely by the separate Indenture pursuant to which they are issued and are payable solely from payments under the Loan Agreement and the Bond Obligation relating to the particular Issue of Bonds.

The Bonds are subject to optional, mandatory and extraordinary redemption prior to their respective maturities, as described herein.

The Bonds are issuable in fully registered form only in denominations of $5,000 or any integral multiple thereof and, when delivered, will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"). Beneficial owners of Bonds will not receive physical certificates representing the Bonds purchased but will receive a credit balance on the books of the nominees of such purchasers. So long as Cede & Co. is the registered owner of any of the Bonds of a particular Issue, principal of and premium, if any, and interest on the Bonds of that Issue will be paid by Wells Fargo Bank, National Association, as Trustee, to DTC, which, in turn, will remit such principal, premium, if any, and interest to its participants for subsequent disbursement to the beneficial owners of the Bonds, as described herein. Interest on the Bonds will be payable on February 15 and August 15 of each year, commencing August 15, 2012.

THE BONDS ARE NOT A DEBT OR LIABILITY OF THE ISSUERS, THE STATE OF CALIFORNIA OR OF ANY POLITICAL SUBDIVISION THEREOF OR A PLEDGE OF THE FAITH AND CREDIT OF THE STATE OF CALIFORNIA OR ANY SUCH POLITICAL SUBDIVISION, BUT SHALL BE PAYABLE SOLELY FROM THE FUNDS PROVIDED THEREFOR. THE ISSUERS SHALL NOT BE OBLIGATED TO PAY THE PRINCIPAL OF THE BONDS OR THE PREMIUM, IF ANY, OR INTEREST THEREON, EXCEPT FROM THE FUNDS PROVIDED UNDER THE RELATED LOAN AGREEMENT, THE RELATED BOND OBLIGATION AND THE RELATED INDENTURE, AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE STATE OF CALIFORNIA OR OF ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF OR THE PREMIUM, IF ANY, OR INTEREST ON THE BONDS. THE ISSUANCE OF THE BONDS SHALL NOT DIRECTLY OR INDIRECTLY OR CONTINGENTLY OBLIGATE THE STATE OF CALIFORNIA OR ANY POLITICAL SUBDIVISION THEREOF TO LEVY OR TO PLEDGE ANY FORM OF TAXATION OR TO MAKE ANY APPROPRIATION FOR THEIR PAYMENT. NEITHER OF THE ISSUERS HAS TAXING POWER.

This cover page contains certain information for quick reference only. It is not intended to be a summary of this transaction. Investors are instructed to read the entire Official Statement to obtain information essential to the making of an informed investment decision.

The Bonds are offered when, as and if received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of the validity of the Bonds and certain other legal matters by Orrick, Herrington & Sutcliffe LLP, Bond Counsel to the Issuers, the approval of certain matters for CSCDA by its special counsel, Orrick, Herrington & Sutcliffe LLP, and for CHFFA by its special counsel, Hawkins Delafield & Wood LLP, and the approval of certain matters for the Obligated Group Members by their counsel, Monali, Phelps & Phillips, LLP, San Francisco, California. Certain legal matters will be passed upon for the Underwriters by Sidley Austin LLP, San Francisco, California. It is expected that the Bonds in book-entry form will be available for delivery through the facilities of DTC on or about December 22, 2011.

**HONORABLE BILL LOCKYER**
*Treasurer of the State of California*
*As Agent for Sale for CHFFA*

**MORGAN STANLEY**          **BofA MERRILL LYNCH**

**SUTTER SECURITIES INCORPORATED**

*Date: December 8, 2011*

† *See "RATINGS" herein.*

## MATURITY SCHEDULE

### $36,535,000
### CALIFORNIA STATEWIDE COMMUNITIES DEVELOPMENT AUTHORITY
#### Revenue Bonds
#### (SUTTER HEALTH)
#### Series 2011C

#### $19,825,000 Serial Bonds

| Maturity (August 15) | Principal Amount | Interest Rate | Price or Yield | CUSIP[†] |
|---|---|---|---|---|
| 2018 | $2,155,000 | 3.00% | 2.25% | 1307954L8 |
| 2019 | 2,220,000 | 4.00 | 2.59 | 1307954M6 |
| 2020 | 2,310,000 | 4.00 | 2.85 | 1307954N4 |
| 2022 | 900,000 | 3.25 | 3.29 | 1307954P9 |
| 2022 | 1,500,000 | 5.00 | 3.29[c] | 1307954V6 |
| 2023 | 1,350,000 | 4.00 | 3.52[c] | 1307954Q7 |
| 2023 | 1,160,000 | 5.00 | 3.52[c] | 1307954W4 |
| 2024 | 1,000,000 | 4.00 | 3.74[c] | 1307954R5 |
| 2024 | 1,615,000 | 5.00 | 3.74[c] | 1307954X2 |
| 2025 | 2,740,000 | 5.00 | 3.89[c] | 1307954S3 |
| 2026 | 2,875,000 | 5.00 | 4.02[c] | 1307954T1 |

$13,445,000 5.25% Series 2011C Term Bonds due August 15, 2031; Priced to Yield 4.57%[c]; CUSIP[†] 1307954Y0
$3,265,000 4.50% Series 2011C Term Bonds due August 15, 2031; Priced to Yield 4.57%; CUSIP[†] 1307954U8

### $310,300,000
### CALIFORNIA HEALTH FACILITIES FINANCING AUTHORITY
#### Revenue Bonds
#### (SUTTER HEALTH)
#### Series 2011D

#### $105,910,000 Serial Bonds

| Maturity (August 15) | Principal Amount | Interest Rate | Price or Yield | CUSIP[†] |
|---|---|---|---|---|
| 2018 | $10,665,000 | 5.00% | 2.25% | 13033LVL8 |
| 2019 | 11,205,000 | 5.00 | 2.59 | 13033LVM6 |
| 2020 | 11,760,000 | 5.00 | 2.85 | 13033LVN4 |
| 2021 | 5,715,000 | 5.00 | 3.05 | 13033LVP9 |
| 2022 | 12,640,000 | 5.00 | 3.29[c] | 13033LVQ7 |
| 2023 | 9,720,000 | 5.00 | 3.52[c] | 13033LVR5 |
| 2024 | 10,215,000 | 5.00 | 3.74[c] | 13033LVS3 |
| 2025 | 10,725,000 | 5.00 | 3.89[c] | 13033LVT1 |
| 2026 | 11,265,000 | 5.00 | 4.02[c] | 13033LVU8 |
| 2027 | 12,000,000 | 5.00 | 4.14[c] | 13033LVX2 |

$155,210,000 5.25% Series 2011D Term Bonds due August 15, 2031; Priced to Yield 4.57%[c]; CUSIP[†] 13033LVV6
$49,180,000 5.00% Series 2011D Term Bonds due August 15, 2035; Priced to Yield 4.95%[c]; CUSIP[†] 13033LVW4

[†] A registered trademark of The American Bankers Association. CUSIP is provided by Standard & Poor's CUSIP Service Bureau, a division of The McGraw-Hill Companies, Inc. CUSIP numbers are provided for convenience of reference only. Neither the Issuers, the Obligated Group Members nor the Underwriters assume any responsibility for the accuracy of such numbers.

[c] Priced to call at par on the optional redemption date of August 15, 2021.



## LIST OF OBLIGATED GROUP MEMBERS
### and Health Care Facilities as of <u>September 30, 2011</u>
(Obligated Group Members in Bold)

| Affiliated Entity | Type | Location | Region | Licensed Beds [1] |
|---|---|---|---|---|
| **East Bay Perinatal Center** | Non-Acute | Oakland, CA | East Bay | N/A |
| **Eden Medical Center** | | | | |
| Eden Hospital | Acute | Castro Valley, CA | East Bay | 178 |
| San Leandro Hospital | Acute | San Leandro, CA | East Bay | 93 |
| **Marin Community Health Services** | Support | Greenbrae, CA | West Bay | N/A |
| **Mills-Peninsula Health Services** | | | | |
| Mills-Peninsula Medical Center | Acute | Burlingame, CA | Peninsula Coastal | 257 |
| Mills Health Center | Acute | San Mateo, CA | Peninsula Coastal | 8 |
| Mills-Peninsula Extended Care | SNF | San Mateo, CA | Peninsula Coastal | 75 |
| Menlo Park Surgical Hospital | Acute | Menlo Park, CA | Peninsula Coastal | 16 |
| Sutter Maternity and Surgery Center of Santa Cruz | Acute | Santa Cruz, CA | Peninsula Coastal | 30 |
| **Palo Alto Medical Foundation for Health Care, Research and Education** | Medical Foundation | Palo Alto, CA | Peninsula Coastal | N/A |
| **Sutter Central Valley Hospitals** | | | | |
| Memorial Medical Center | Acute | Modesto, CA | Central Valley | 423 |
| Memorial Hospital Los Banos | Acute | Los Banos, CA | Central Valley | 46 |
| Sutter Tracy Community Hospital | Acute | Tracy, CA | Central Valley | 82 |
| **Sutter Coast Hospital** | Acute | Crescent City, CA | Freestanding | 49 |
| **Sutter East Bay Hospitals** | | | | |
| Alta Bates Summit Medical Center – Alta Bates Campus | Acute | Berkeley, CA | East Bay | 347 |
| Alta Bates Summit Medical Center – Herrick Campus | Acute | Berkeley, CA | East Bay | 180 |
| Alta Bates Summit Medical Center – Summit Campus | Acute | Oakland, CA | East Bay | 509 |
| Sutter Delta Medical Center | Acute | Antioch, CA | East Bay | 145 |
| **Sutter Gould Medical Foundation** | Medical Foundation | Modesto, CA | Central Valley | N/A |
| **Sutter Health** | Support | Sacramento, CA | Freestanding | N/A |
| **Sutter Health Sacramento Sierra Region** | | | | |
| Sutter Amador Hospital | Acute | Jackson, CA | Sacramento Sierra | 52 |
| Sutter Auburn Faith Hospital | Acute | Auburn, CA | Sacramento Sierra | 80 |
| Sutter Center for Psychiatry | Acute | Sacramento, CA | Sacramento Sierra | 69 |
| Sutter Davis Hospital | Acute | Davis, CA | Sacramento Sierra | 48 |
| Sutter General Hospital | Acute | Sacramento, CA | Sacramento Sierra | 406 |
| Sutter Memorial Hospital | Acute | Sacramento, CA | Sacramento Sierra | 348 |
| Sutter Roseville Medical Center | Acute | Roseville, CA | Sacramento Sierra | 313 |
| Sutter Solano Medical Center | Acute | Vallejo, CA | Sacramento Sierra | 102 |

## LIST OF OBLIGATED GROUP MEMBERS
### and Health Care Facilities as of <u>September 30, 2011</u>
#### (Obligated Group Members in Bold)

| Affiliated Entity | Type | Location | Region | Licensed Beds [1] |
|---|---|---|---|---|
| **Sutter Medical Center, Castro Valley** [2] | Acute (Under Construction) | Castro Valley, CA | East Bay | N/A |
| **Sutter Medical Foundation** | | | | |
|   Sutter Medical Foundation | Medical Foundation | Sacramento, CA | Sacramento Sierra | N/A |
|   Sutter North Medical Foundation | Medical Foundation | Yuba City, CA | Sacramento Sierra | N/A |
|   Sutter Regional Medical Foundation | Medical Foundation | Fairfield, CA | Sacramento Sierra | N/A |
| **Sutter Visiting Nurse Association & Hospice** | Non-Acute | Emeryville, CA | Freestanding | N/A |
| **Sutter West Bay Hospitals** | | | | |
|   California Pacific Medical Center – Pacific Campus | Acute | San Francisco, CA | West Bay | 313 |
|   California Pacific Medical Center – California West Campus | Acute | San Francisco, CA | West Bay | 299 |
|   California Pacific Medical Center – California East Campus | Acute | San Francisco, CA | West Bay | 101 |
|   California Pacific Medical Center – Davies Campus | Acute | San Francisco, CA | West Bay | 232 |
|   California Pacific Medical Center – St. Luke's Campus | Acute | San Francisco, CA | West Bay | 228 |
|   Novato Community Hospital | Acute | Novato, CA | West Bay | 47 |
|   Sutter Lakeside Hospital | Acute | Lakeport, CA | West Bay | 49 |
|   Sutter Medical Center of Santa Rosa | Acute | Santa Rosa, CA | West Bay | 135 |

[1] A portion of the beds listed for certain acute care facilities consists of skilled nursing or psychiatric beds. The numbers above reflect the total number of beds that the health care facilities are permitted to operate under state law, but may not reflect the number of beds actually operated by each health care facility at the present time.

[2] This health care facility remains under construction with an expected completion date of November 2012.

# EXHIBIT B





# YOUR PRICE MAY VARY

## Geographic Variation in Hospital Charges in California



# Your Price May Vary
## Geographic Variation
## in Hospital Charges
## in California

## CALPIRG Education Fund

Elizabeth Ridlington and Travis Madsen,
Frontier Group

Mike Russo and Emily Rusch,
CALPIRG Education Fund

Summer 2012

# Acknowledgments

CALPIRG Education Fund thanks Micah Weinberg of the Bay Area Council and Jennifer Eames Huff of the Pacific Business Group on Health for their insightful review of this document. Thanks also to Tony Dutzik of Frontier Group for editorial assistance.

CALPIRG Education Fund thanks the California Wellness Foundation for making this report possible.

The authors bear responsibility for any factual errors. The views expressed in this report are those of the authors and do not necessarily reflect the views of our funders or those who provided review.

© 2012 CALPIRG Education Fund. Some rights reserved. This work is licensed under a Creative Commons Attribution Non-Commercial No Derivatives 3.0 US License. To view the terms of this license, visit http://creativecommons.org/licenses/by-nc-nd/3.0/us.

You are free to display, reproduce and distribute this work in its entirety for noncommercial purposes, with proper attribution. To attribute this work, please credit the CALPIRG Education Fund and provide a link to www.calpirgedfund.org.

With public debate around important issues often dominated by special interests pursuing their own narrow agendas, CALPIRG Education Fund offers an independent voice that works on behalf of the public interest. CALPIRG Education Fund, a 501(c)(3) organization, works to protect consumers and promote good government. We investigate problems, craft solutions, educate the public and offer meaningful opportunities for civic participation. For more information, please visit www.calpirgedfund.org.

Frontier Group conducts independent research and policy analysis to support a cleaner, healthier and more democratic society. Our mission is to inject accurate information and compelling ideas into public policy debates at the local, state and federal levels. For more information about Frontier Group, please visit www.frontiergroup.org.

Cover photo credit: Sean O'Riordan/istockphoto.com
Design and layout: Harriet Eckstein Graphic Design

# Table of Contents

| | |
|---|---|
| Executive Summary | 1 |
| Introduction | 7 |
| The High Cost of Health Care Imposes a Heavy Burden on California | 8 |
| Health Care Charge Variation in California | 10 |
| Understanding Variations in the Charge for Common Surgeries in California | 10 |
| Large Variations in the Price Charged for Common Surgeries | 12 |
| Large Variations between Regions in the Price Charged for Specific Surgeries | 14 |
| Large Variations within Regions in the Price Charged for Specific Surgeries | 16 |
| Exploring Possible Causes of Charge Variation | 18 |
| Higher Prices Do Not Necessarily Indicate Higher Quality of Care | 18 |
| Patient Income and Health Status Do Not Explain Price | 19 |
| Within a Hospital Region, Higher Costs Do Not Explain Higher Prices | 19 |
| Factors Correlated with Higher Charges | 19 |
| Conclusion | 22 |
| Methodology | 24 |
| Appendix A. Charge Index for Common Surgeries, by Region | 28 |
| Appendix B. Median Charge for Surgery, by Region | 29 |
| Appendix C. Median Charge for Selected Surgeries at Specific Hospitals, within Regions | 33 |
| Notes | 42 |

# Executive Summary

The cost of health care has increased faster than inflation for years, consuming a growing share of household, business and government spending. Research shows that not all increases in health care costs translate into better outcomes for patients. The price charged for common surgeries varies dramatically from one region to another within California. By examining why charges for surgeries vary from place to place, state officials, health insurers and advocates may be able to identify opportunities for cost savings that can benefit Californians statewide.

Since 2009, hospitals in California have provided information on how much they charge for common, elective, inpatient surgeries, revealing immense variation between different facilities. Hospitals in California's highest-priced hospital region charge 2.7 times as much for surgery as do hospitals in the lowest-priced region. These high hospital charges add to the financial burden of health care.

Health care costs are taking up an ever-growing percentage of California families' budgets.

- In 2009, health care spending per Californian was $6,238, 79 percent more than just 10 years earlier. Family insurance premiums rose by 113 percent from 2001 to 2009.

- Employers who provide insurance to their employees now spend 12 percent of employee compensation costs providing health insurance. Growing health care costs have added to the financial troubles of government: California spent 19 percent of its general fund monies on health care in 2009.

The prices charged for surgery in California vary from one geographic region to another. We analyzed hospital charge information provided in the California Common Surgeries and Charges Comparison database—a record of the prices charged for common, elective, inpatient surgeries performed at hospitals across the state—and created a charge index that can be used to compare charges for the 12 most common surgeries, such as Cesarean

births, knee replacements and angioplasty. Though the database includes information on how much hospitals *charged*, not on how much they were ultimately *paid*, the observed variation in prices suggests important differences in surgery pricing.

**Figure ES-1. Charge Index for Common Surgeries in California Hospital Regions**



Areas of California colored beige are uninhabited or are part of hospital referral regions centered in other states and without sufficient information for regional analysis.