AZRA Z. MEHDI (220406)
THE MEHDI FIRM
One Market
Spear Tower, Suite 3600
San Francisco, CA  94105
Telephone:  415/293-8039
Facsimile:  415/293-8001
Azram@themehdifirm.com

Attorney for Plaintiffs and the [Proposed] Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DJENEBA SIDIBE and DIANE DEWEY, on Behalf of Themselves and All Others Similarly Situated, | Case No.: 3:12-cv-4854-LB |
| | CLASS ACTION |
| Plaintiffs, | FIRST AMENDED COMPLAINT |
| vs. | |
| SUTTER HEALTH, and DOES 1 through 25, inclusive, | |
| Defendants. | DEMAND FOR JURY TRIAL |

Plaintiffs Djeneba Sidibe ("Sidibe") and Diane Dewey ("Dewey"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this action against defendant Sutter Health and its affiliated entities (collectively, "Sutter Health") for violations of the Sherman Act, the Cartwright Act and California's Unfair Competition Law ("UCL"). The allegations herein are made on information and belief (except as to allegations specifically pertaining to plaintiffs, which are made on personal knowledge) based on the investigation conducted by and under the supervision of plaintiffs' counsel, including among others, reviewing and analyzing publicly available press releases, news articles, and other media reports (whether disseminated in print or by electronic media); various court filings and other scholarly articles. Plaintiffs demand a trial by jury of all claims properly triable thereby, and allege as follows:

## NATURE OF THE ACTION

1. The federal antitrust laws prohibit certain business activities that reduce competition in the marketplace and have the consequence of increasing prices for consumers. Under the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. §1. California's Cartwright Act contains parallel provisions against unreasonable restraints of trade. Cal. Bus. & Prof. Code §16720, *et seq*.

2. Defendant Sutter Health is a provider of health care services to people like the plaintiffs and members of the class in various counties in Northern California through contractual agreements with health plans like Blue Cross, Blue Shield, Aetna, CIGNA, HealthNet, Interplan, United HealthCare, among others. Plaintiffs and other residents of Northern California generally gain access to health care services through health plans, including all forms of "managed care organizations" or "health insurance," including health maintenance

FIRST AMENDED COMPLAINT

organizations or "HMOs," preferred provider organizations or "PPOs," employer-sponsored health plans, government-sponsored health plans and union-sponsored health plans.

3.     Health plans, in turn, contract for services with providers of health care and related services.  The retail prices charged by providers like Sutter Health are typically three to ten times higher than their contract prices.  As a result, if a health plan does not have contracted access to a given hospital or provider, the health plan cannot afford to include the provider in the network of providers that it makes available to members.  If the health plan cannot enter into a contract with a given provider, the provider must remain "outside-of-plan."  Frequently, though, health plans have no choice but to include a provider – even where the provider's prices are exorbitant – in order to comply with the requirements of California's Knox-Keene Health Care Service Plan Act of 1975 ("Knox-Keene Act").

4.     This action challenges and seeks to remedy defendant Sutter Health's anti-competitive agreements or combinations with health plans that eliminate competition in the market for health care services.  For some time now, Sutter Health has engaged in conduct designed to severely limit competition by imposing supra-competitive prices through, *inter alia*, the imposition of:  (1) tying arrangements that require health plans to use ALL Sutter Health providers or affiliated physicians' groups (even where less expensive options are available) OR suffer the devastating consequences of having contracted access to NONE of them; and (2) exclusive dealing arrangements that have the consequence of forcing health plans to require plaintiffs and other members of the class to obtain all their health care services through Sutter Health providers, Sutter Health affiliated entities or Sutter Health affiliated physicians' groups and to penalize members that use non-Sutter Health providers.

5.     By engaging in the anti-competitive conduct as further detailed below, the Sutter Health system, collectively comprising by far the largest and most dominant hospital chain and

FIRST AMENDED COMPLAINT

provider of health care services in Northern California, has intentionally and systematically destroyed competition for health care services in Northern California in order to impose prices on the nearly ten million residents of Northern California that are **40% to 80% greater** than they could obtain in a competitive marketplace.

6.     The Sherman Act also prohibits conduct designed to monopolize any part of the trade and commerce. 15 U.S.C. §2.  Defendant Sutter Health gained market power by embarking upon an expansion strategy that is designed to increase its geographic concentration, local market dominance, and functional reach through the acquisition of hospitals (Sutter Health has grown from 13 hospitals in 1994 to 33 in 2012) and through the aggressive acquisition of physicians' groups and providers of numerous ancillary medical services, such as laboratories, radiation services, in-home care and skilled nursing facilities.

7.     By 2012, Sutter Health's publicly disclosed network – located almost exclusively in Northern California – included at least 33 hospitals and 4 skilled nursing facilities with a total of 5,484 licensed beds; 14 home healthcare locations; and contracts with medical groups operating as professional corporations that account for the services of at least **2,291** physicians and physician extenders.

8.     Indeed, Sutter Health, through its affiliate California Pacific Medical Center ("CPMC") is currently in negotiations with the City of San Francisco to convert the Cathedral Hill hotel property located at Van Ness Avenue and Geary Boulevard into a massive medical campus with 550 beds and other related medical facilities.  In addition, angling for even more control and market power, defendant Sutter Health applied for an HMO license from the California Department of Managed Health Care in August 2012 and hopes to begin selling a Sutter Health-owned health plan next fall for coverage in 2014.

FIRST AMENDED COMPLAINT

9.      This targeted expansion strategy in conjunction with Sutter Health's grossly anti-competitive practices – including, coercive market domination, tying, and unreasonable exclusionary agreements – has stifled competition for health care services in Northern California. Purchasers of health care services on behalf of consumers, *i.e.* health plans, are deliberately prevented by Sutter Health from selecting amongst providers in a given region or service based upon quality and price.  If a health plan were instead to insist upon so selecting, the health plan would be denied contracted access to any part of the Sutter Health's network, which would for all practical purposes mean that the health plan could not do business in Northern California at all.  This, in turn, would effectively result in some Northern California residents not having access to *any* health care services.  This is because some parts of the Sutter Health network, such as in the East Bay or counties in which Sutter owns *every* licensed hospital bed (not including Kaiser Permanente ("Kaiser")) are indispensable to health plans attempting to offer consumers a network that complies with existing California regulations.

10.      Defendant Sutter Health's ongoing misconduct costs every resident of Northern California thousands of dollars a year in increased medical expenses and health premiums. These very significant damages have been demonstrated in multiple objective and independent analyses using multiple methodologies.  For example, Figure 1, below, is a map of Sutter Health's network.  Figure 2 is a "heat map" of hospital charges that conveys the degree to which various regions deviate from the state median on an index of hospital charges, which was prepared by the California Public Interest Research Group ("CALPIRG") Education Fund as part of its July 2012 report on geographic variation in hospital charges in California.  The portions of the state exhibiting abnormally high hospital prices and the region comprising territory where Sutter Health has market power precisely correspond.  The story told by these two maps is evident.

FIRST AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FIGURE 1[1]

---

[1] Source:  California Statewide Communities Development Authority Revenue Bonds (Sutter Health), Series 2011C.

5



FIGURE 2[2]

---

[2] Source:  CALPIRG Education Fund Study at 2.

6

FIRST AMENDED COMPLAINT

11.     These maps represent very real ongoing improper and even illegal transfers of billions of dollars from the pocketbooks of Northern California families to the coffers of Sutter Health – a purported "non-profit" organization.  These transfers or "profits," are derived from Sutter Health prices that are unconscionably higher – 40% to 80% higher – than they could be on a competitive basis.  Meanwhile, Sutter Health's misconduct structurally decreases the quality of medical care in Northern California because it eliminates competition amongst providers of medical care on the basis of quality as well as price.

12.     As a direct and proximate result of the Sutter Health's anti-competitive conduct, plaintiffs and other members of the class were charged higher prices for their health care services than they would have been absent Sutter Health's anti-competitive conduct.  These actions violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 & 2; Cal. Bus. & Prof. Code Section 16720 of the Cartwright Act, and Cal. Bus. & Prof. Code Section 17200, *et seq*.

**JURISDICTION AND VENUE**

13.     Plaintiffs bring this action under Section 16 of the Clayton Act, 15 U.S.C. §§15, 26, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2.  This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§1331 and 1337.

14.     Plaintiffs also bring this action under the Cartwright Act, Cal. Bus. & Prof. Code §16720, *et seq*., and California's UCL, Cal. Bus. & Prof. Code §17200, *et seq*., to obtain restitution, recover statutory damages, and to secure other relief against defendant Sutter Health for violations of those laws.  This Court has subject matter jurisdiction of the pendant California state law claims under 28 U.S.C. Sections 1332(d) and 1367 because the claims arise from the same nucleus of operative facts as the remaining claims in this Complaint over which this Court has original federal question subject-matter jurisdiction.

FIRST AMENDED COMPLAINT

No. 3:12-cv-04854-LB

15.     This Court also independently has subject-matter jurisdiction over all the counts of this Complaint pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), because the amount in controversy sought exceeds $5 million, among other things.

16.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22, and under 28 U.S.C. §1391, because a substantial part of the events giving rise to plaintiffs' claims occurred in this District and defendant Sutter Health transacts business and is found within this District, and thus is subject to personal jurisdiction in this District.  Sutter Health is engaged in, and its activities substantially affect, interstate and foreign trade and commerce.

**PARTIES**

**A.     Plaintiffs**

17.     Plaintiff Djeneba Sidibe has been a resident of Marin County since January 2012. From November 2009 to January 2012, she was a resident of Alameda County and prior to November 2009, she was a resident of San Mateo County.  Beginning in or around October 2005, Sidibe is currently and has been enrolled in a licensed health care plan that has a contractual relationship with Sutter Health for health care services.  As a result of Sutter Health's anti-competitive conduct, Sidibe and other members of class have been injured in their business and property by paying more for health care services than they otherwise would have paid in the absence of defendant Sutter Health's anti-competitive conduct.

18.     Plaintiff Diane Dewey is currently and since 1994 has been a resident of San Francisco County.  At various times during the timeframe relevant herein, Dewey has been and currently continues to be enrolled in a licensed health care plan that has a contractual relationship with Sutter Health for health care services.  As a result of Sutter Health's anti-competitive conduct, Dewey and other members of the class have been injured in their business and property

FIRST AMENDED COMPLAINT

by paying more for health care services than they otherwise would have paid in the absence of defendant Sutter Health's anti-competitive conduct.

**B.     Defendant Sutter Health**

19.     Sutter Health is a non-profit corporation organized and existing under the laws of the State of California, with its principal place of business located at 2200 River Plaza Drive, Sacramento, California.  Sutter Health controls the largest and most dominant hospital chain and provider of health care services in Northern California.  Sutter Health is the "parent" of various non-profit and for-profit entities and organizations that operate primarily in Northern California and that are directly or indirectly (through one or more intermediaries) controlled by or under common control with, Sutter Health.

**Sutter Health Affiliated Entities**

20.     A Sutter Health "Affiliated Entity" is any organization that directly or indirectly, through one or more intermediaries, is controlled by, or is under common control with, Sutter Health.   Each Sutter Health Northern California region consists of at least one hospital corporation and a medical foundation corporation.

**a.  Sutter Health Hospital and Medical Foundation Corporations**

21.     The Central Valley Region (Merced, San Joaquin and Stanislaus Counties) includes a single medical foundation corporation, Sutter Gould Medical Foundation, and a single hospital corporation, Sutter Central Valley Hospitals, which does business as Memorial Medical Center, Memorial Hospital Los Banos and Sutter Tracy Community Hospital.  As of September 30, 2011, 254 physicians and physician extenders contracted with the Sutter Gould Medical Foundation.

22.     The East Bay Region (Alameda and Contra Costa Counties) includes a single medical foundation corporation, Sutter East Bay Medical Foundation, and a hospital corporation,

FIRST AMENDED COMPLAINT

Sutter East Bay Hospitals, which does business as Alta Bates Summit Medical Center (operating on three campuses with four addresses) and Sutter Delta Medical Center. As of September 30, 2011, 150 physicians and physician extenders contracted with the Sutter East Bay Medical Foundation.  Eden Medical Center (operating Eden Medical Center and San Leandro Hospital), Sutter Medical Center, Castro Valley (constructing a new acute care hospital), and East Bay Perinatal Center, a community clinic are also part of the East Bay Region.

23.     The Peninsula Coastal Region (San Mateo, Santa Clara and Santa Cruz Counties) includes a single medical foundation corporation, Palo Alto Medical Foundation for Health Care, Research and Education ("PAMF"), and a single hospital corporation, Mills-Peninsula Health Services, which does business as Mills-Peninsula Medical Center, Mills Health Center, Sutter Maternity and Surgery Center of Santa Cruz and Menlo Park Surgical Hospital. As of September 30, 2011, 994 physicians and physician extenders contracted with PAMF.

24.     The Sacramento Sierra Region (Amador, El Dorado, Nevada, Placer, Sacramento, Solano, Sutter, Yolo and Yuba Counties) includes a single medical foundation corporation, Sutter Medical Foundation, and a single hospital corporation, Sutter Health Sacramento Sierra Region, which does business as Sutter Medical Center Sacramento (which includes Sutter General Hospital and Sutter Memorial Hospital), Sutter Center for Psychiatry, Sutter Davis Hospital, Sutter Auburn Faith Hospital, Sutter Roseville Medical Center, Sutter Solano Medical Center and Sutter Amador Hospital. As of September 30, 2011, 659 physicians and physician extenders contracted with Sutter Medical Foundation.

25.     The West Bay Region (City and County of San Francisco, and Marin, Lake and Sonoma Counties) includes a single medical foundation corporation, Sutter West Bay Medical Foundation doing business as Sutter Pacific Medical Foundation ("SPMF"), and a single hospital corporation, Sutter West Bay Hospitals, which does business as CPMC (operating on five

FIRST AMENDED COMPLAINT

campuses in San Francisco), Novato Community Hospital, Sutter Lakeside Hospital, Sutter Medical Center of Santa Rosa and St. Luke's Health Care Center, a primary care community clinic. As of September 30, 2011, 234 physicians and physician extenders contracted with SPMF.

### b.  Sutter Health Obligated Group Members

26.    The financial structure of Sutter Health system is designed around the concept of an Obligated Group that combines the revenues, expenses, assets and liabilities of all Obligated Group Members.  The following entities are among some of the Sutter Health Obligated Group Members:  East Bay Perinatal Center, Eden Medical Center, Marin Community Health, Mills-Peninsula Health Services, Palo Alto Medical Foundation for Health Care (Research and Education), Sutter Coast Hospital, Sutter Central Valley Hospitals, Sutter East Bay Hospitals, Sutter Gould Medical Foundation, Sutter Health Sacramento Sierra Region, Sutter Medical Foundation, Sutter Medical Center, Castro Valley, Sutter Visiting Nurse Association and Hospice, Sutter West Bay Hospitals, Sutter Coast Hospital, an acute care hospital located in Del Norte County, California; and Sutter Visiting Nurse Association and Hospice doing business as Sutter Care at Home, a home health and hospice organization with locations throughout Northern California.

### c.  Other Sutter Health Affiliated Entities

27.    Sutter Connect, LLC doing business as Sutter Physician Services ("SPS"), is a single member limited liability company, of which Sutter Health is the sole member.  SPS supports certain Aligned Physician Independent Practice Associations ("Aligned IPAs") or medical foundations, hospitals and ancillary providers that provide healthcare services throughout Sutter Health.  SPS services include third party administration, physician billing and managed care management, financial management reporting and provider relations.

FIRST AMENDED COMPLAINT

28.     Sutter Health Pacific owns and operates a psychiatric hospital, located in Oahu, Hawaii doing business as Kahi Mohala Behavioral Health.

29.     Sutter Insurance Services Corporation ("SISCO") is a Hawaii-domiciled, non-profit, captive insurance company, of which Sutter Health is the sole member. SISCO was established in 1991 to provide a comprehensive program of hospital professional and general liability insurance for the benefit of Sutter Health.

30.     Beyond its publicly disclosed network, Sutter Health's *de facto* and undisclosed network includes numerous additional entities – highly-profitable laboratories, Cayman Islands insurance companies, medical device suppliers and the like – that are in some cases:  (1) owned in whole or in part by officers, directors and board members of Sutter Health; (2) share board members or officers with Sutter Health or its various affiliate entities; and/or (3) pay compensation, benefits, shares or stock options to such officers, directors or board members.  On information and belief, Sutter Health routinely transfers funds – both directly and through transfer pricing and other techniques – between many of the publicly disclosed and non-disclosed for-profit and non-profit entities.  Sutter Health provides minimal disclosure regarding these transfers or the entities that make or receive such transfers.

31.     A sample of the ***for-profit*** entities that Sutter Health, its managers and/or directors currently or previously own or owned and control in-whole or in-part include, among others: Abbey Medical, P.I.T., Bay Mesh, Advanced Respiratory Care Partnership, Alta Imaging Association, North Bay MRI, Alta CT Services, East Medical Network, Inc., Guardian Care, Inc., East Bay Health Services, Inc., Alta Bates Medical Resources, East Bay Health Funding, Valley Surgical Partners, Unified Management Services Organization, Sun Medical Technologies, Inc., Timberlake Corporation, Synvasive Technology, Inc., Sutter Ventures, Ltd., Sutter Preferred Health Plan Services, Inc., Omni Healthcare, Inc., Sutter Preferred Health &

FIRST AMENDED COMPLAINT

Life Insurance Company, Memorial Partners In Care, Inc., Integrated Surgical Systems, Inc., Derijan Associates, Inc., Managed Care Systems, Inc., Marin Outpatient Imaging Center, Marin CT Scanning, Marin Magnetic Imaging, North Bay Nursing Services, and Roseville Health Enterprises.

32.     As referred to herein, defendant Sutter Health includes all Sutter Health Affiliated Entities.

**C.  Does 1 through 25**

33.     Plaintiffs are currently unaware of the true names, capacities, or basis for liability of defendants Does 1 through 25, inclusive, and therefore sue said defendants by their fictitious names.   On information and belief, defendant Sutter Health has established and/or exercises some degree of ownership or control over various entities and organizations that are a party to, benefit from, or are a repository for illegal proceeds created by the misconduct described herein. Plaintiffs will amend this Complaint (if necessary) to allege their true names, capacities or basis for liability when the same have been ascertained.   Plaintiffs are informed and believe, and on that basis allege, that defendants Does 1 through 25, inclusive, and each of them, are in some manner liable to plaintiffs and the members of the class, and/or are proper and necessary parties to this action in light of the relief requested.

**THE RELEVANT MARKET**

34.     The health care market is unlike any other market because the purchases – particularly hospital services – often can literally be a matter of life or death.  Close substitutes do not exist.  The barriers to entry are high requiring any applicant to overcome significant licensing and other regulatory hurdles.

35.     There is a relevant product or service market defined as the provision of health care and related services in the following counties:  Alameda, Contra Costa, San Francisco,

13

Marin, Sonoma, Napa, San Mateo, Santa Clara, Santa Cruz, Solano, Yolo, Sutter, Yuba, Nevada, Sacramento, Amador, Placer, El Dorado, San Joaquin, Stanislaus, Merced and Lake.  This is the relevant geographic market in which Sutter Health primarily operates.

36.    The provision of health care and related services includes, but is not limited to: inpatient hospital services; outpatient hospital services or ambulatory care; physician services; the services of other health professionals such as nurses, optometrists, psychologists or nutritionists; diagnostic laboratory services; home health services; rehabilitation, physical or occupational therapy; preventive health services; emergency services; hospice services; chemical dependency services; and psychiatric services.

37.    Most importantly for this action, there is a relevant market for the ***provision of contracted access to health care services in Northern California through health plans.***[3]  Such health plans must comply with relevant laws and regulations, including California's Knox-Keene Act and the regulations promulgated thereunder.  *See*: http://wpso.dmhc.ca.gov/regulations/12CCRP/2012CCRP.pdf.

38.    These laws and regulations define the minimum scope of services and accessibility standards for health plans to operate in California.  For example, the Plan License Application under the Knox-Keene Act states as follows:

> The applicant is required to demonstrate that, throughout the geographic regions designated as the plan's Service Area, a comprehensive range of primary, specialty, institutional and ancillary services are readily available at reasonable times to all enrollees and, to the extent feasible, that all services are readily accessible to all enrollees.

---

[3] Note that the relevant market – ***provision of contracted access to health care services in Northern California to health plans*** – by definition excludes all parts of the Kaiser network. Kaiser is a closed system.  None of its services is available on a contracted basis to health plans.

FIRST AMENDED COMPLAINT

\*   \*   \*

An applicant for plan license must demonstrate compliance with the accessibility requirement in each of the areas specified in paragraphs (i) through (iv) below, either by demonstrating compliance with the guideline specified in such paragraphs or, in the alternative, by presenting other information demonstrating compliance with reasonable accessibility. . . .

    i.   <u>Primary Care Providers</u>.   All enrollees have a residence or workplace within 30 minutes or 15 miles of a contracting or plan-operated primary care provider in such numbers and distribution as to accord to all enrollees a ratio of at least one primary care provider (on a full-time equivalent basis) to each 2,000 enrollees.

    ii.   <u>Hospitals</u>. In the case of a full-service plan, all enrollees have a residence or workplace within 30 minutes or 15 miles of a contracting or plan-operated hospital which has a capacity to serve the entire dependent enrollee population based on normal utilization, and, if separate from such hospital, a contracting or plan-operated provider of all emergency healthcare services.

    iii.   <u>Hospital Staff Privileges</u>. In the case of a full-service plan, there is a complete network of contracting or plan-employed primary care physicians and specialists each of whom has admitting staff privileges with at least one contracting or plan-operated hospital equipped to provide the range of basic health care services the plan has contracted to provide.

    iv.   <u>Ancillary Services</u>. Ancillary laboratory, pharmacy and similar services and goods dispensed by order or prescription on the primary care provider are available from contracting or plan-operated providers at locations (where enrollees are personally served) within a reasonable distance from the primary care provider.

39.   As detailed below, Sutter Health's conduct has directly affected and foreseeably restrained the interstate trade and commerce of the United States, by *inter alia*, imposing tying arrangements that require health plans to use ALL Sutter Health providers or affiliated physician's groups in all geographic markets (even where less expensive options are available) OR suffer the devastating consequences of having contracted access to NONE of them; and exclusive dealing arrangements that have the consequence of forcing health plans to require its members to obtain all their health care and related services through Sutter Health providers,

Sutter Health affiliated entities or Sutter Health affiliated physicians' groups and penalizes members that use non-Sutter Health providers.

**SUTTER HEALTH'S MARKET POWER AND ANTI-COMPETITIVE CONDUCT**

40.    Sutter Health's size and dominant position in the health care market in Northern California gives it the ability to exercise market power through its contracts and combinations with health plans in the market for contracted access to health care services in Northern California.

41.    Currently, Sutter Health has 100% of the non-Kaiser hospital beds in Placer and Amador Counties, over 60% in the Alameda and Contra Costa counties, over 50% of the beds in San Francisco, and over 50% in Sacramento.  Overall, Sutter Health has 35% of the revenue and 36% of beds that compete for patients in Northern California.[4]  Thus, defendant Sutter Health clearly has monopoly power in the market for hospital services in Alameda, Contra Costa, San Francisco, Sacramento, Amador and Placer Counties.

42.    In 1994, Sutter Health had 13 hospitals and in 2012, it has 33 hospitals – not that protests have not been made along the way.  For example, in 1999, the Office of the California Attorney General ("AG") sought unsuccessfully to enjoin Sutter Health's purchase of Summit Medical Center ("Summit") in Oakland.  Sutter Health CEO Patrick Fry assured the court under oath on the witness stand that he projected that Summit's revenue would rise only 3% annually post-merger.  The AG's 1999 efforts were rebuffed and Sutter Health was permitted to acquire Summit.  According to a 2008 Federal Trade Commission ("FTC") study, in the two years

---

[4] These percentages exclude insurer/provider Kaiser since Kaiser is a closed system, it does not contract with health plans and thus non-Kaiser hospitals are the only hospitals available to plaintiffs and other class members through health plans.

16

FIRST AMENDED COMPLAINT

following the acquisition, Summit's prices rose 29% to 72% more than its peers, surpassing even the most pessimistic scenarios feared by the AG.  Meanwhile, Summit's revenue rose 15%, according to the state database, or five times CEO Fry's forecast at trial.

43.    By 2004, in the wake of Sutter Health's continuing anti-competitive conduct, Sean Harrigan, the President of the California Public Employees' Retirement System ("CalPERS"), the largest pension fund in the United States, was driven to state:  ***"Every citizen in the state of California should be outraged by Sutter Health," which uses its "monopoly hold on some markets" to extort high prices***.

44.    CalPERS separately noted in its Operations Summary for the year ended June 30, 2004, that Sutter Health demanded 2005 rates at least ***50% higher*** than other hospitals in its Northern California markets.   CalPERS' analysis was corroborated by another analysis performed by Blue Cross of California on behalf of CalPERS in 2004.   The analysis asks the question:  How did the actual costs of claims of the many CalPERS plan participants differ at Sutter Health hospitals versus non-Sutter Health hospitals?   The answer was nothing short of astonishing:

> The average cost of claims paid for CalPERS PPO Basic plan participants at Sutter Health hospitals is ***73% greater*** than the average cost of all other hospital claims paid on behalf of CalPERS PPO Basic plan participants in the State of California

45.    Echoing the 2004 comments of CalPERS President Harrigan regarding Sutter Health's pricing, market power and anti-competitive misconduct, CALPERS' conclusions *Bloomberg*'s August 2010 analysis concluded that Sutter Health

> has market power that commands prices ***40 to 70 percent higher*** than its rivals per typical procedure – and pacts with insurers that keep those prices secret. ***Sutter Health can charge these prices because it has acquired more than a third of the market in the San Francisco-to-Sacramento region through more than 20 hospital takeovers in the last 30 years***, according to executives of Aetna Inc.,

FIRST AMENDED COMPLAINT

17

No. 3:12-cv-04854-LB

Health Net Inc. and Blue Shield of California, who asked not to be named because their agreements with Sutter Health ban disclosure of prices.[5]

46.　　In March 2011, *The Los Angeles Times* conducted an analysis of state records and similarly concluded that "on average, hospitals in Northern California's six most populous counties collect **56% more revenue** per patient per day from insurance companies and patients than hospitals in Southern California's six largest counties." The report continues:

> The driving force in the north is Sutter Health, a not-for-profit system of 24 hospitals and roughly **5,000** doctors that reaches into more than 100 cities and towns across 20 counties.
>
> Insurance companies say that Sutter Health's size and dominant position in many local markets give it the upper hand in contract negotiations over prices and which of its hospitals are included in the insurers' networks.
>
> Insurers also say they must include Sutter Health hospitals – which account for 1 in 5 such facilities in the region – because they are in such high demand by patients. . . .
>
> Aetna Inc. . . . charges customers in Northern California about **30% more in premiums** than those in Southern California as a result of higher hospital reimbursements in the north that average $5,169 for each patient per day, compared with $3,578 in the south.
>
> Blue Shield of California, a not-for-profit insurer, reports a similar trend. It says it charges up to **40% more for insurance** in the north, where it spends an average of $6,570 per patient each day compared with $4,646 in the south.
>
> "Where the cost of care is more expensive, the cost of premiums is more expensive," said Juan Davila, Blue Shield's top executive who oversees provider contracting.

47.　　Even more recently, in July 2012, the CALPIRG Education Fund prepared a detailed report on geographic variation in hospital charges in California. The report analyzed

---

[5] Peter Waldman, "Why Baby Costs Less Down the Road in Silicon Valley," *Bloomberg*, August 20, 2010, *available at*: http://www.bloomberg.com/news/2010–08–20/hospital–monopolies–ruin–mri–bill–as–Sutter Health–gets–price–it–wants.html (last retrieved: July 31, 2012).

FIRST AMENDED COMPLAINT

hospital charge information provided in the California Common Surgeries and Charges Comparison database – a record of the prices charged for common, elective, inpatient surgeries performed at hospitals across the state – and created a charge index that can be used to compare charges for the 12 most common surgeries.  As demonstrated below, Sutter Health has market power in the six top charging geographic areas:



48.	On page 2 of the report, the authors provide a "heat map" of hospital charges that conveys the degree to which various regions deviate from the state median on an index of hospital charges.  This heat map and a map of Sutter Health's network are reproduced above as Figures 2 and 1, respectively.  The portions of the state exhibiting abnormally high hospital prices and the region comprising Sutter Health's territory precisely correspond.

49.	This overlap was not lost on the CALPIRG researchers, who note in the body of the report that the regional variations conveyed in their map cannot be explained by cost-of-living differences but instead:

[H]ospital charges may be influenced by how much market power the hospital has – the ability to ask for and receive a higher price. Hospitals can acquire market

19

power by merging with other hospitals and acquiring networks of facilities, by building their reputation to gain "must-have" status in the eyes of patients and thus insurers or by providing a large volume of care. . . . In California, for example, Sutter Health has two dozen facilities in northern California, and it negotiates prices with insurers on an "*all or none*" basis. ***In a city where Sutter Health represents a large share of the market it can command a higher price from insurers, and then by negotiating a systemwide contract it can impose higher rates at all its hospitals***.

50. However, the "systemwide contracts" negotiated by Sutter Health on an "all or none" basis are relevant to much more than hospital pricing.  They are relevant to all of Sutter Health's pricing and artificially inflate every dollar of revenue that Sutter Health collects.  Sutter Health's strategy is first, to establish monopolistic market power in certain regions (for example, Alameda, Contra Costa, San Francisco, Sacramento, Amador and Placer Counties) and particular services (for example, hospital services) that are indispensable to health plans seeking to assemble a network that complies with California law and is a credible network to their customers.  Second, Sutter Health ties other regions and services to the indispensable ones.  Health plans must purchase a laundry list of geographies and services that they do not want in order to purchase the geographies and services that they need.  Third, Sutter Health creates a self-reinforcing dynamic by imposing (1) contracts on health plans that force the health plans to penalize the enrollees that use non-Sutter Health services; and (2) contracts on medical groups that include mandatory-referral provisions that force the physicians to refer to Sutter Health even if better or less expensive services are readily available.

51. According to a report on market power by the non-profit group Catalyst for Payment Reform ("CPR") entitled, "Provider Market Power in the U.S. Health Care Industry: Accessing its Impact and Looking Ahead" (hereinafter, the "Market Power Report"), hospital consolidation concentrates providers in markets where few purchasers or payers have significant negotiating power, leading to higher prices with either a neutral or negative effect on quality.

FIRST AMENDED COMPLAINT

The Market Power Report also notes that increased size grants hospitals and health systems increased market and political power that they can use to protect and increase their negotiating leverage.  "In the Bay Area, the [health plans] have less and less power at this point because there are dominant medical systems in play and that can say, 'This is how much it costs,' said Catherine Dodd, director of the San Francisco Health Service System, which negotiates benefits for city and county employees, retirees and their dependents."  Victoria Colliver, "Hospital mergers are driving up the cost in Bay Area, employer's group reports," *San Francisco Chronicle*, Dec. 7, 2012.

52.   The Market Power Report further observes that:

> [H]ealth systems increasingly are merging with hospitals over a larger region and then are able to extract higher prices for all facilities in their chain and not just those in smaller markets where they are the dominant providers.  Multi-hospital systems benefit by negotiating a single contract for all ("all or none" provisions) and obtaining higher prices across the board for every facility . . . .

Market Power Report at 21.

53.   A second prong of Sutter Health's strategy is to acquire physician groups through Sutter Health's five medical foundation corporations, namely, the Sutter Gould Medical Foundation in the central valley region, the Sutter East Bay Medical Foundation, the Palo Alto Medical Foundation, the Sutter Medical Foundation in the Sacramento/Sierra region, and the Sutter Pacific Medical Foundation for the West Bay region.  Sutter Health is the sole member of each of these corporations which contract with multi-specialty medical groups on an exclusive basis to provide physician services to the Sutter Health system's medical foundation patients.

54.   The foundations' contracts with the medical groups require the physicians in the groups to make referrals to Sutter Health hospitals and its Affiliated Entities.  This restraint of

FIRST AMENDED COMPLAINT

trade prevents the doctors from referring their patients to non-Sutter Health facilities or services even when those competing facilities would offer lower prices or higher quality.

55.     For example, the Palo Alto Medical Foundation has contracts with medical groups that include about 1,098 physicians. Those doctors directed the following business to Sutter Health in 2011:

> Patient Visits: 2,345,573
> Urgent Care Visits: 209, 902
> Diagnostic X-Ray Procedures: 477,794
> Clinical Laboratory Tests: 1,535,325
> Pathology Tests: 99,965
> Surgeries: 154,117

56.     All of the foregoing visits, procedures, tests and surgeries were directed ***away*** from non-Sutter hospitals, physicians and labs, even if those competitors plainly offered lower prices or superior quality. As a result, throughout Northern California one observes an odd combination of events: some hospitals are charging the highest prices in the state for medical procedures while other hospitals in the same cities – for example, many of the few remaining non-Sutter hospitals in the East Bay and San Francisco – including Saint Rose, Washington, San Francisco General and San Pablo – are in financial difficulty or going out of business for lack of patients.

57.     Sutter Health's contracts with medical groups, coupled with its aggressive acquisitions of hospitals and other medical facilities, have created a self-reinforcing vicious circle of ever-increasing levels of market power for Sutter Health.

58.     A third prong of Sutter Health's market power is the commercial reality that more potentially formidable competitors to Sutter Health, such as Kaiser Permanente, simply shadow price Sutter health. HSS, the largest employer in San Francisco, notes that "***Sutter charges the highest fees***. Many providers in Bay area market (including Kaiser), shadow Sutter's prices,

FIRST AMENDED COMPLAINT

1   regardless of the true cost of providing care."  *See* excerpt HSS presentation, "Healthcare Trends

2   and Challenges" (Dec. 2012):

12   59.   Kaiser's shadow-pricing behavior – a commercial reality as demonstrated by

13   information from the HSS – eliminates a competitive safety-valve that Kaiser would otherwise

14   represent as a means of undermining or limiting Sutter Health's anti-competitive behavior.

15   The historical evidence from 20-plus years of provider consolidation in the U.S. is that

16   consolidation has not benefited consumers, particularly as it relates to hospital care.  HSS, the

17   largest employer in San Francisco, identifies hospital consolidations as one of the primary health

18   care cost drivers of health care premiums, specifically noting that:  "lack of competition

19   (prevents value-based contracting) SUTTER expanding market share – and Sutter prevents

20   offering differential premiums between Medical Groups (Hill Physicians and Brown and

21   Toland), which prevents competition."  *See* excerpt HSS presentation, "Overview of Retiree

22   Health Cost," Oct. 23, 2012 (emphasis in original).  Meanwhile HSS noted that premiums for the

23   City's Sutter Health plan keep rising every year, resulting in unsustainable employee and retiree

24   health benefits.

FIRST AMENDED COMPLAINT

October 23, 2012

## 2014 Short-Term Cost Drivers

**Provider Market:** Even if we achieve perfectly balanced risk pools, the market still drives prices. Many "non-profit" providers do seek profit, to build reserves, fund expansion and other initiatives.
- Bay area healthcare costs are among the highest in the nation
- Non-staff model HMO inefficiencies in care delivery (improved with ACOs)
- Fee-for-Service payments incentivize more (not necessarily better) care
- Sutter hospital consolidation – need reciprocity rate setting in Land Use agreement
- Kaiser shadow pricing

**Employer/Employee Contribution Incentives:**
Higher employer contribution for Kaiser at all levels: E only, E+1, and E+2 increases migration of healthy individuals and families out of Blue Shield into Kaiser leaving Blue Shield with older (riskier-more chronic illness) members and fewer children thus increasing Blue Shield's risk pool. Increasing E only contribution for City Plan will move the older riskier City Plan members to Blue Shield.

**Health Service System**
CITY & COUNTY OF SAN FRANCISCO

81

MYHSS.ORG

October 23, 2012

## Long Term Cost Drivers (3-5 Years)

- Hospital Consolidation - a lack of competition (prevents value-based contracting)
  SUTTER expanding market share – and Sutter prevents offering differential premiums between Medical Groups (Hill Physicians and Brown and Toland), which prevents competition
- Continued employer financial incentive for families to select Kaiser
- Employee chronic illness
- Employee age
- Uncertainty in the market relative to election outcome, implementation of CA Health Insurance Exchange

**Health Service System**
CITY & COUNTY OF SAN FRANCISCO

82

MYHSS.ORG

60.     Tying – illegal under both federal and California antitrust laws – is requiring another party to buy something they do not want as a condition of buying something they need. Sutter Health includes the following tying language in its agreements with health plans (emphasis in original):

> Each payer accessing Sutter Health providers shall designate ALL Sutter Health providers (see Sutter Health provider listing) as participating providers unless a Payer excludes the entire Sutter Health provider network.

61.     This is an example of the "all or none" language that Sutter Health uses to tie the regions/services in which it has a monopoly or significant market power to its remaining

24

FIRST AMENDED COMPLAINT

regions/services.   Such language in its contracts with health plans is the mechanism through which Sutter Health effectuates its anti-competitive tying conduct.

62.   The intended objective of such language is to prevent health plans from using Sutter Health facilities only in regions or only for services that the health plan needs, i.e. in which Sutter Health has significant market power.   Instead the health plans must also use Sutter Health in competitive markets where the health plan could secure lower-priced and higher quality services.   Or to put it from Sutter Health's perspective, the effect of such language is to enable Sutter Health to charge the same monopolistic prices even in markets where it does not have market power, while getting away with providing low quality healthcare.   The effect of such tying is to impose supra-competitive prices and lower quality on the plaintiffs and members of the class.

63.   Understanding *why* the health plans do not have any bargaining power and must agree to these tying contracts requires considering the intersection of the accessibility standards and scope of services required of any California health plan.   The accessibility standards for health plans are reproduced in the above section entitled, "The Relevant Market."   *See supra*, ¶38.   Meanwhile the Scope of Services required of California health plans is available at page 88 here:   http://wpso.dmhc.ca.gov/regulations/12CCRP/2012CCRP.pdf.   Article   7   Standards §1300.67. Scope of Basic Health Care Services, states:

> The basic health care services required to be provided by a health care service plan to its enrollees shall include, where medically necessary, subject to any co-payment, deductible, or limitation of which the Director may approve:
>
> (a) Physician services, which shall be provided by physicians licensed to practice medicine or osteopathy in accordance with applicable California law. There shall also be provided consultation with and referral by physicians to other physicians.
>
> (1) The plan may also include, when provided by the plan, consultation and referral (physician or, if permitted by law, patient initiated) to other health professionals who are defined as dentists, nurses, podiatrists, optometrists,

25

FIRST AMENDED COMPLAINT

physician's assistants, clinical psychologists, social workers, pharmacists, nutritionists, occupational therapists, physical therapists and other professionals engaged in the delivery of health services who are licensed to practice, are certified, or practice under authority of the plan, a medical group, or individual practice association or other authority authorized by applicable California law.

(b) Inpatient hospital services, which shall mean short-term general hospital services, including room with customary furnishings and equipment, meals (including special diets as medically necessary), general nursing care, use of operating room and related facilities, intensive care unit and services, drugs, medications, biologicals, anesthesia and oxygen services, diagnostic laboratory and x-ray services, special duty nursing as medically necessary, physical therapy, respiratory therapy, administration of blood and blood products, and other diagnostic, therapeutic and rehabilitative services as appropriate, and coordinated discharge planning including the planning of such continuing care as may be necessary, both medically and as a means of preventing possible early re-hospitalization.

(c) Ambulatory care services, (outpatient hospital services) which shall include diagnostic and treatment services, physical therapy, speech therapy, occupational therapy services as appropriate, and those hospital services, which can reasonably be provided on an ambulatory basis. Such services may be provided at a hospital, any other appropriate licensed facility, or any appropriate facility which is not required by law to be licensed, if the professionals delivering such services are licensed to practice, are certified, or practice under the authority of the plan, a medical group, or individual practice association or other authority authorized by applicable California law.

(d) Diagnostic laboratory services, diagnostic and therapeutic radiological services, and other diagnostic services, which shall include, but not be limited to, electrocardiography and electroencephalography.

(e) Home health services, which shall include, where medically appropriate, health services provided at the home of an enrollee as prescribed or directed by a physician or osteopath licensed to practice in California. Such home health services shall include diagnostic and treatment services which can reasonably be provided in the home, including nursing care, performed by a registered nurse, public health nurse, licensed vocational nurse or licensed home health aide.

(1) Home health services may also include such rehabilitation, physical, occupational or other therapy, as the physician shall determine to be medically appropriate.

(f) Preventive health services (including services for the detection of asymptomatic diseases), which shall include, under a physician's supervision,

(1) reasonable health appraisal examinations on a periodic basis;

26

(2) a variety of voluntary family planning services;

(3) prenatal care;

(4) vision and hearing testing for persons through age 16;

(5) immunizations for children in accordance with the recommendations of the American Academy of Pediatrics and immunizations for adults as recommended by the U.S. Public Health Service;

(6) venereal disease tests;

(7) cytology examinations on a reasonable periodic basis;

(8) effective health education services, including information regarding personal health behavior and health care, and recommendations regarding the optimal use of health care services provided by the plan or health care organizations affiliated with the plan.

(g)(1) Emergency health care services which shall be available and accessible to enrollees on a twenty-four hour a day, seven days a week, basis within the health care service plan area. Emergency health care services shall include ambulance services for the area served by the plan to transport the enrollee to the nearest twenty-four hour emergency facility with physician coverage, designated by the Health Care Service Plan.

(2) Coverage and payment for out-of-area emergencies or urgently needed services involving enrollees shall be provided on a reimbursement or fee-for-service basis and instructions to enrollees must be clear regarding procedures to be followed in securing such services or benefits. Emergency services defined in section 1317.1 include active labor. "Urgently needed services" are those services necessary to prevent serious deterioration of the health of an enrollee, resulting from an unforeseen illness, injury, or complication of an existing condition, including pregnancy, for which treatment cannot be delayed until the enrollee returns to the plan's service area. "Urgently needed services" includes maternity services necessary to prevent serious deterioration of the health of the enrollee or the enrollee's fetus, based on the enrollee's reasonable belief that she has a pregnancy-related condition for which treatment cannot be delayed until the enrollee returns to the plan's service area.

(h) Hospice services as set forth in Section 1300.68.2.

Cal. Code Regs. Tit. 28, §1300.67 (2012).

64.     The purpose of reproducing these detailed excerpts from California's regulations for health plans is to illustrate that health plans are *obligated* to assemble a comprehensive network of a broad spectrum of medical services providers that must be available within a 15-

FIRST AMENDED COMPLAINT

No. 3:12-cv-04854-LB

mile radius of every enrollee.  At the same time, health plans are under pressure from enrollees and prospective enrollees to have as large a coverage area as possible.  Employers often have employees that live and work all over Northern California, for example.  Health plans also need to attain a minimum coverage areas and enrollment sufficient to allow them to meet their expenses and justify the creation of the health plan in the first place.

65.     The need to put together as large a coverage area as possible, coupled with the above accessibility and scope of service requirements, together mean – from the perspective of market power – that anyone who is the only provider in a 15-mile radius of one of the required services has a pure monopoly. Sutter Health possesses many hundreds of such monopolies. This creates market power that goes well beyond simply owning a large percentage of hospital beds. These pockets of monopoly comprise Sutter Health's true market power, a market power that they possess and exercise "under the radar," as explained by Clark C. Havighurst & Barak D. Richman, "The Provider Monopoly Problem in Health Care," 89 Or. L. Rev. 847, 869 (2011):

> [A]ntitrust enforcers and courts have been drawn to viewing the relevant "product market" not service-by-service but as a so-called "cluster market" for inpatient acute-care services. Although precedent and some logic support this approach, its averaging of concentration levels in many markets necessarily obscures high levels of concentration in some of them, thus allowing some mergers of doubtful legality to go unchallenged. Hospitals' market power in such submarkets is also obscured by hospitals' practice of negotiating a single formula for pricing all services together instead of separate prices for each service. By not pricing their monopolized services individually, hospitals can exercise their market power under the radar, charging high prices for everything rather than astronomical prices for those services for which there is no close (or perfect) substitute.

66.     For example, Sutter Health owns every non-Kaiser hospital in Alameda with the exception of St. Rose, a small hospital in Hayward that lacks the medical equipment and facilities to provide many advanced medical procedures.  Moreover, St. Rose is located 17 miles from the center of Oakland, which could violate the 15-mile/30-minute accessibility regulation promulgated by the Department of Managed Health Services pursuant to the Knox-Keene Act.

FIRST AMENDED COMPLAINT

Thus, if a health plan has no access to Sutter Health hospitals (and making the generous assumption that they had been able to contract with every non-Sutter Health hospital in the area), the health plan's Oakland members would need to travel south 17 miles to St. Rose, even further south to Fremont (Washington Hospital, 28 miles), across the Bay Bridge to San Francisco (San Francisco General Hospital, 13 miles), east from Oakland to Concord (John Muir Medical Center, 22 miles) or north from Oakland to San Pablo (Doctors Medical Center, 13 miles).  Only two of these hospitals, San Francisco General and Doctors Medical Center, are under the 15-mile accessibility limit, and neither is reliably under the 30-minute limit for travel time since they both involve travel on routes that are often congested (the Bay Bridge and San Francisco city streets to travel to San Francisco General; and Highway 80 between Emeryville and San Pablo Dam Road to travel to Doctors Medical Center).  Moreover, most of these hospitals are considered small and lacking in advanced capabilities.  More importantly, many are in financial difficulty or being driven out of business by Sutter Health's tactics described herein.

67.    In other words, in order to have members who reside or work in Alameda County, a health plan such as Blue Shield, Aetna or Blue Cross would arguably have a legal obligation under California laws and regulations to gain contracted access to Sutter Health hospitals in Alameda County such as Alta Bates, Summit, Eden and San Leandro.  Beyond the issue of regulatory compliance, it is difficult to imagine consumers living in Oakland – or any business located in Oakland or with a number of employees who are residents of Oakland – choosing a health plan that lacked access to any Oakland hospitals and instead provided access only to hospitals at least a half-hour drive away.

68.    Sutter Health forces health plans to choose between "all" and "none," and "none" would be a disaster.  A real-world example was the City of San Francisco's experiment beginning July 2011 to create two competing Accountable Care Organizations ("ACO") for city

FIRST AMENDED COMPLAINT

employees.   *See* HSS presentation, "San Francisco Board of Supervisors Land Use and Economic Development Committee," July 9, 2012, attached hereto as Exhibit A.  The noble idea was that the employees could choose between the two ACOs and they would compete for the enrollment of the employees based on price and quality.  One ACO was to be comprised of a Sutter Health physician group (Brown and Toland) and Sutter Health San Francisco hospitals (CPMC's various campuses, St. Luke's, Davies and Children's).  The other ACO was to be comprised of a non-Sutter Health physician group (Hill) and the non-Sutter Health San Francisco hospitals (UCSF, St. Mary's and St. Francis).  *Id.* at 4.

69.    After 12 months, the non-Sutter Health ACO had been "very successful" at reducing costs, whereas the Sutter Health ACO had achieved no cost improvements whatsoever.  *Id.*

70.    Around the same time, Sutter Health limited the availability of contracted rates for emergency room services at Sutter Health hospitals to Sutter Health members.  The members of the non-Sutter Health ACO were not Sutter Health members, which was the entire point of San Francisco's experiment.  Now, the non-Sutter Health ACO would have to pay the astronomical full charge every time one of its members had to go to one of Sutter Health's many San Francisco hospitals on an emergency basis.  This created such risk for Hill physicians and the non-Sutter Health ACO that it had to pull out of the San Francisco experiment and return to having a contractual agreement with Sutter Health.  Ex. A at 5-7.

71.    Put simply, Sutter Health used its market power to scuttle the City of San Francisco's attempt to create real competition.  Or, as expressed in more polite terms by academics Glenn Melnick (University of Southern California) and Emmett Keeler (RAND) in "The effects of multi-hospital systems on hospital prices":

FIRST AMENDED COMPLAINT

Several bargaining strategies that appear to have become common among both local and non-local multi-hospital systems in recent years.   One involves threatening the plan with disruption caused by multi-hospital systems pulling all of their member hospitals out of a health plan's provider network simultaneously to foster an image of instability related to the health plan's products and possibly lowering health plan brand value (Strunk et al., 2001).  Perceptions of health plan instability may lead to reduced demand for the health plan, not just in the affected areas but more broadly, thus potentially imposing a substantial cost on the plan for not agreeing to higher price terms with multi-hospital systems.

Another reported strategy was for hospitals to form a multi-hospital system that included one or more hospitals that had market power and then to use this power to extract higher prices from health plans for other hospitals in the system including those located in more competitive markets.

*See* Glenn Melnick and Emmett Keeler, "The effects of multi-hospital systems on hospital prices," *Journal of Health Economics* 26 (2007) 400-13.

72.     Melnick and Keeler conclude their paper with recommendations regarding potential responses by health plans to extortive tactics such as those described in the preceding paragraph. Notably, at the top of Melnick and Keeler's recommendations is antitrust legal action. They write:

How can health plans respond if bargaining leverage has shifted to multi-hospitals systems?  To the extent that the increased leverage comes from systems using the monopoly power of member hospitals to raise prices in other hospitals, legal action under antitrust laws may be an option.  From an antitrust perspective, it is interesting to note that the estimated price increase to hospitals from joining a non-local system outweighs the price advantage from a merger with a direct (non-system) competitor in same market.

73.     Other examples of tying services include acute inpatient services throughout Amador and Placer Counties, where Sutter Health enjoys a 100% monopoly.  It likewise enjoys tremendous market power across a number of types of services, including acute inpatient services and physician groups, throughout large swathes of the East Bay, which has been repeatedly cited by plans such as CalPERS as Sutter Health's most important tying region.  It also has substantial market power in various types of services in Tracy, San Francisco County and Solano County.

31

74.     For example, if a health plan needs to have access to Sutter Health's hospitals in Alameda or Contra Costa County, where Sutter Health owns every "must-have" hospital, the plan must contract not only with all of Sutter Health's hospitals across Northern California, but also with all of Sutter Health's affiliated physician groups, laboratories, skilled nursing facilities, home care facilities, device suppliers, and so on.   All of these physician groups, nursing facilities, and home care services must in turn refer any patient who needs acute care to Sutter Health hospitals, any patient who needs blood work to Sutter Health labs, any patient who needs a medical device to Sutter Health device suppliers, and so on.

75.     As a result, competing hospitals – even in counties where a contract with Sutter Health is not indispensable – are deprived of customers.   Less-expensive or higher-quality physician groups, labs, skilled nursing facilities, home care providers and device suppliers – both in counties where a contract with Sutter Health is indispensable and in counties where a contract with Sutter Health is not indispensable – are likewise deprived of customers.

76.     To quote its own strategic planning document, Sutter Health's tying services and regions are "indispensable" to health plans attempting to comply with the minimum scope of services and accessibility standards for California health plans.   Sutter Health leverages this indispensability into "all-or-none" contracts with health plans that impose supra-competitive prices and lower quality in the tied services and regions.

77.     Another effect of these anti-competitive practices has been to release pressure on all parts of Sutter Health's network from maintaining standards of high quality and safety.   As a result, Sutter Health's network does not compete on quality any more than it competes on price. Indeed, Sutter Health does not compete at all.   As noted in a California Health Care Coalition report:

FIRST AMENDED COMPLAINT

The quality of care is highly inconsistent within and across Sutter Health facilities. Three of Sutter Health's nine Bay Area hospitals have so seriously violated national standards as to jeopardize either their participation in the Medicare or Medicaid programs or their accreditation as a health care organization. Other data also show serious quality deficiencies: Sutter Health Sacramento's General campus ranked in the bottom half of reporting hospitals nationally on eight of ten hospital performance indicators developed by the Centers for Medicare and Medicaid services while Sutter Health's Memorial Hospital in Modesto has higher than expected mortality rates in 6 of 16 procedures analyzed.

*     *     *

Looking again at the key set of DRGs [Diagnosis Related Groups], quality performance at Sutter Health's Summit Medical Center in Oakland was not nearly as favorable, with 53 percent of the key procedures having higher complications then the national peer group.

Sutter Health Medical Center, Sacramento, Memorial campus had higher complications than the national peer group in 50 percent of the key procedures. Finally, at Memorial Modesto, while it generally has similar complication rates compared to the national peer group, two exceptions stand out: Memorial's complication rate is 93 percent higher than the peer group for Heart Failure and Shock (DRG 127), and hundreds of times higher for Psychoses (DRG 430).

Mortality rates for 20 key procedures in the same three facilities also vary. Summit generally performs on par with or better than the peer group, with two exceptions: its mortality rate for Psychoses (DRG 430) is double the expected rate, and for Cardiac Valve and other Major Cardiothoracic Procedures (DRG 104), its mortality rate is 72 percent higher than expected. Sutter Health Medical Center Sacramento's Memorial campus also generally performs on par with its peers, with one notable exception: the mortality rate is 81 percent higher than expected for Coronary Bypass with Cardiac Catheterization (DRG 107).

Memorial Modesto has the most disturbing mortality trends. Of the 16 key procedures analyzed, 6 had higher than expected mortality rates.

78.     The anti-competitive tactics employed by Sutter Health have been successful only because of:

    a.  the structure of the relevant market, specifically the fact that the market for contracted access to Sutter Health's health care services in Northern California is organized on the basis of the purchase of entire networks of geographic and service coverage by health plans or employers, as opposed to purchases by the patients themselves;

33

FIRST AMENDED COMPLAINT

No. 3:12-cv-04854-LB

  b. the lack of price transparency that characterizes the relevant market, a lack of transparency that is fostered and enforced by Sutter Health itself in various ways including contractual prohibitions against health plans publishing Sutter Health's prices; and

  c. the trust that patients traditionally place in their doctors, trust that Sutter Health hijacks and subverts for economic gain by forcing health plans and providers to refer and recommend Sutter Health providers, regardless of the quality of care or prices that they offer.

  79. Sutter Health is thus able to create and sustain market distortions that would simply not exist in a competitive, transparent and efficient market.  The HSS noted in its Health Benefit Pillars presentation:  "Plans should compete fairly, based on transparent and accurate price and quality data. Currently, lack of data transparency prohibits employees from being able to compare hospital and provider quality and cost."

  80. Unlike plaintiffs and members of the class, health plans, are well-aware of Sutter Health's high prices and questionable quality, but are *prevented* by Sutter Health from choosing a $15,000 high-quality provider over a $50,000 low-quality Sutter Health provider.  This is possible because pursuant to the Knox-Keene Act, health plans must secure a *network* of seamless geographic access and service coverage for their members, and a health plan cannot secure such a network in Northern California without having contracted access to some of Sutter Health's providers.

  81. Employers that have attempted to choose "none" instead of "all" have found themselves faced with protests by their members, as evidenced by this example reported by *Bloomberg*:

  Last November, Claire Zvanski, a San Francisco parking administrator and commissioner of the city-employees' health insurance fund, proposed dropping Sutter Health hospitals from the plan offered to the city's 110,000 workers. Zvanski said she hoped dumping Sutter Health would cut costs and curb an expected rate increase from Blue Shield. Her proposal stirred heated protest from plan members at commission meetings, who said they would have to drive 30

FIRST AMENDED COMPLAINT

miles to find a non-Sutter Health hospital. Under pressure, Zvanski tabled the idea.

On July 1, the city, to cover rising costs, raised health-care contributions from employees by 13 percent – to $6,552 a year for a firefighter with two or more dependents. It doubled co-payments to $100 for emergency-room and outpatient services and $200 for hospital stays.

"Sutter Health really has us over a barrel, I hate to admit it," said Larry Barsetti, a retired police lieutenant who supported Zvanski's proposal. His premiums went up $100 on July 1, to $10,188 a year – more than double what he paid upon retiring in 2003. "We're getting gouged," Barsetti said.

82.    As a further example, Sutter Health, in May 1998, threatened to cancel its contracts for Blue Cross' Prudent Buyer and California Care insurance plans because the reimbursements offered by Blue Cross were lower than Sutter Health desired.  Blue Cross was left with the untenable prospect that only UC Davis Medical Center would accept Blue Cross patients in the Sacramento area.   Blue Cross and Sutter Health then reached a three-year agreement for Sutter Health's acute care hospitals.  The most likely scenario here was that Blue Cross capitulated and agreed to pay higher rates.

83.    And for its part, Blue Shield could not conceivably propose that a large Bay Area employer such as Wells Fargo or Levi's use Blue Shield as its employee health plan while suggesting that their Alameda County employees would be required to travel to San Francisco, Fremont or Concord to visit a hospital.  Employers such as Wells Fargo or Levi's could never accept such an arrangement.  Moreover, under the Knox-Keene Act, and the rules promulgated thereunder by the California Department of Managed Health Care, Blue Shield would most likely be precluded from even offering such a plan, as it would likely violate 15-mile/30-minute accessibility standards.

84.    Instead, just as the San Francisco city-employee insurance fund was forced to accept "all" instead of "nothing" with Sutter Health, Blue Shield would similarly be forced to accept "all" as opposed to "nothing" with Sutter Health, because having access to none of Sutter

FIRST AMENDED COMPLAINT

Health's network would make it impossible for Blue Shield to comply with the Knox-Keene Act's mandate to offer a credible and marketable health plan in Northern California.

85.     So in the geographic regions and service areas where Sutter Health has a sheer monopoly, it shields its $50,000 low-quality providers from competition from $15,000 high-quality providers.  In the remaining regions and services where Sutter Health does not have a sheer monopoly, Sutter Health shields its $50,000 providers from competition from the $15,000 providers through tying and exclusionary agreements linked to the regions/services where Sutter Health does have a sheer monopoly. Residents of Northern California are literally prevented by Sutter Health – through various pockets of sheer monopoly power combined with coercion, tying and exclusionary agreements – from choosing the $15,000 high-quality provider over the Sutter Health's $50,000 low-quality provider anywhere in Sutter Health's growing territory.

86.     In an internal Sutter Health memo produced in the 1999 trial in which the California AG sought to enjoin Sutter Health's purchase of Summit, Robert Montgomery, the then Head of Sutter Health's Bay Area operations, suggested Sutter Health should "hire a very aggressive negotiator and take no prisoners" on pricing if it obtained enough market share.

87.     Sutter Health's strategic planning documents that also became public during the suit define how much market share Sutter Health believed would be "enough."  Specifically, the documents express Sutter Health's goals for "market share growth" that include obtaining a "critical presence" in each of four geographic markets in Sutter Health's "Western Division" and note:

> This "critical presence" amounts to a 25 to 30 percent share of the physician-hospital lines of business . . . .
>
> Securing the 25 to 30 percent share of the market is vital if we are to be indispensable for the major health plans. . . .

FIRST AMENDED COMPLAINT

No. 3:12-cv-04854-LB

88.     The documents also discuss how market consolidation and the removal of excess capacity assist hospitals in their pricing strategies by "***eliminating the health plans' option to buy services at the margin***."   "Eliminating the health plans' option to buy services at the margin" is merely another expression for Sutter Health's anti-competitive tying.   The documents also describe additional elements of Sutter Health's East Bay market strategy, including Sutter Health's pursuit of East Bay hospital acquisitions in order to prevent competitors such as HCA and Catholic Healthcare West from "enter[ing] the East Bay market and develop[ing] a competing network."   The documents note that Sutter Health's acquisition of Eden Medical Center "would protect our market from a takeover by competitors that could develop competing physician networks."

89.     Yet more facial evidence of the anti-competitive conduct described herein is available in the form of substantial price increases at the hospitals that were acquired, reflecting *per se* Sutter Health's ability to engage in supra-competitive pricing in its network.  For example, the average charge per discharge (acuity and inflation adjusted) at Eden Medical Center ("Eden") immediately ***before*** Sutter Health's acquisition of Eden in 1998 was $13,428, ***below*** the Northern California average of $15,471.   ***After*** Sutter health's acquisition Eden's average charge per discharge had grown by 2002 to $27,367, by then far ***above*** the Northern California average of $22,645.

90.     Indeed, regarding the Eden acquisition, an internal planning document that took the form of a presentation to the Sutter Health Finance and Planning Committee on September 30, 1996, included a full-page reproduction of a "Monopoly" game board with the words, "The East Bay Monopoly Game" in the center of the board:

FIRST AMENDED COMPLAINT

37

No. 3:12-cv-04854-LB



91.     Similarly, with respect to Sutter Health's subsequent acquisition of Summit in 2000, the average charge per discharge (acuity and inflation adjusted) at Summit Medical Center immediately before Sutter Health's acquisition of Summit was $15,721, below the Northern California average of $18,901.   After the acquisition, Summit's average 2002 charge per discharge had grown to $26,148, by then far above the Northern California average of $22,645.

38

FIRST AMENDED COMPLAINT

92.     Sutter Health also typically includes language such as the following in its agreements with health plans:

> ***Sutter Health shall require each group health payer accessing Sutter Health providers through the [health plan] network to actively encourage members obtaining medical care to use Sutter Health providers. . . . "[A]ctively encourage" or "active encouragement"*** means incentivizing members to use participating providers through the use of one or more of the following: reduced co-payments, reduced deductibles, premium discounts directly attributable to the use of a participating provider, ***financial penalties***, or requiring such members ***to pay additional sums*** directly attributable to the non-use of a participating provider.

> ***If Sutter Health or any provider learns that a payer either does not actively encourage its members to use network participating providers***, . . . Sutter shall have the right upon not less than thirty (30) days' written notice ***to terminate that payer's right to the negotiated rates***. In the event of such termination, the terminated payer shall pay for covered services rendered by providers ***at 100% of billed charges*** until such time as Sutter reasonably believes and notices that the payer does in fact actively encourage its members to use network participating providers . . . .

93.     This exclusivity language in Sutter Health's agreements goes hand-in-hand with its illegal tying.  The health plans must not only include in their plans the parts of Sutter Health's network engaging in "shadow" monopoly pricing, they must also promote them by incentivizing their plan members, i.e., plaintiffs and the class to use those monopoly–priced providers, and penalize them if they fail to do so.

94.     To illustrate, suppose that a health plan such as Aetna or Blue Shield identifies a new medical group comprised of a highly credentialed and talented group of primary care physicians with which it wishes to contract.  Suppose further – and as is generally the case – that this new medical group would, offers its service to members of the health plan at prices 50% below those of Sutter Health's doctor groups.  Regardless, while Sutter Health does not prevent Aetna or Blue Shield from contracting with the new medical group, exclusivity language such as the portion of a Sutter Health agreement quoted above literally requires health plans to "actively

FIRST AMENDED COMPLAINT

encourage" their member to enroll with Sutter Health medical groups – and to penalize them if they fail to do so – even though they provide inferior services and cost 50% more.

95.     As discussed above, Sutter Health also enters into exclusive contracts with physician groups through its wholly owned medical foundations corporations.  These contracts require, among other things, that the physicians in the groups to make referrals to Sutter Health hospitals and its Affiliated Entities. This restraint of trade prevents the doctors from referring their patients to non-Sutter Health facilities or services even when those competing facilities would offer lower prices or higher quality.

96.     Sutter Health's exclusivity and mandatory referral provisions reinforce and spread the anti-competitive effects of Sutter Health's hospital monopolies and tying to other regions and services, such as doctor groups and lab services.  They further spread the reach of Sutter Health's monopolistic umbrella.

97.     In addition, the exclusivity and mandatory referral provisions have a tremendously negative effect on competing hospitals and other services that are thereby deprived of patients because the patients will be penalized if they use them and Sutter doctors may not refer to them. For example, many of the few remaining non-Sutter hospitals in the East Bay and San Francisco – including Saint Rose, Washington, San Francisco General and San Pablo – are in financial difficulty. Ironically these hospitals being deliberately driven out of business by Sutter Health are also often the hospitals that generally serve the poor in their communities. Thus Sutter not only fails to fulfill its ostensible nonprofit mission by failing to serve the poor itself, it moreover engages in a strategy of driving out of business any hospitals that do serve the poor.

FIRST AMENDED COMPLAINT

**PLAINTIFFS AND THE CLASS ARE DIRECTLY IMPACTED BY THE ANTI-COMPETITIVE EFFECTS OF SUTTER HEALTH'S MISCONDUCT**

98.     When Sutter Health enters into contracts with health plans that impose tying, it is preventing competition.  It is preventing health plans from assembling networks based upon negotiating the best possible deals from the best possible individual hospitals and service providers on a region-by-region and service-by-service basis.

99.     When Sutter Health enters into contracts with health plans that force those plans to impose exclusivity on their enrollees, it is preventing competition.  It is preventing the enrollees from choosing the best possible service providers in their health plan network, because choosing those service providers instead of Sutter Health will result in a penalty.

100.     When Sutter Health enters into contracts with physician groups that force the doctors to refer to Sutter Health service providers, it is preventing competition.  It is literally preventing the doctors and their patients from choosing the service provider with best services and lowest prices.

101.     Through such conduct, Sutter Health increases health care costs and erodes the quality of health care in Northern California.  However, this simple statement fails to express the scale of these effects.  The higher costs directly deprive every resident of Northern California of at least several thousand dollars per year.  In fact, Sutter health is easily one of the most egregious monopolists in American history.

102.     The primary reason that Sutter Health has been able to engage in such egregious conduct without attracting more attention is because it effectuates its monopoly through intermediaries, the health plans, that spread the costs of Sutter Health's monopoly pricing (that it achieves through the mechanisms described herein) amongst all of the enrollees in a health plan. Because of this, the normal limits that would naturally apply to a normal monopolist do not

apply to Sutter Health.  As a matter of basic economic theory, even a pure monopolist cannot raise prices above the purchaser's utility, but here the monopoly prices are spread across the entire population of enrollees.  As a result, Sutter Health's capacity to raise prices is almost unlimited.

103.    A second reason that Sutter Health's capacity to raise prices is unlimited is because of its industry:   health care.  On a case-by-case basis, no one would object to the imposition of a high price, no matter how astronomical, for a service that is the difference between life and death.

104.    Havighurst and Richman express these ideas in a slightly different manner in their paper, The Provider Monopoly Problem in Health Care:

> In the textbook model, the monopolist's higher price enables it to capture for itself much of the welfare gain, or "surplus," that consumers would have enjoyed if they had been able to purchase the valued good or service at a low, competitive price. In health care, insurance puts the monopolist in an even stronger position by greatly weakening the constraint on its pricing freedom ordinarily imposed by the limits of consumers' willingness or ability to pay. This effect appears in theory as a steepening of the demand curve for the monopolized good or service. The extraordinary profits that health insurance makes available to powerful sellers are earned mostly at the expense not of direct purchasers – insurers or patients – but of consumers bearing the cost of insurance.

> Even under orthodox theory, therefore, health insurance enables a monopolist of a covered service to charge substantially more than the textbook "monopoly price," thus earning even more than the usual "monopoly profit." As serious as this added redistributive effect may be in theory, however, it is rendered even more serious in practice by certain deficiencies in the design and administration of real-world health insurance. For legal, regulatory, and other reasons, health insurers in the United States are in no position (as consumers themselves would be) to refuse to pay a provider's high price whenever it appears to exceed the service's likely value to the patient. Instead, insurers are bound by both deep-rooted convention and their contracts with subscribers to pay for any service that is deemed advantageous (and termed "medically necessary") for the patient's health, whatever that service may cost.

Havighurst & Richman, *supra*, at 854.

105.    Havighurst and Richman also note that

42

economists generally agree . . . that employees themselves, not employers, ultimately bear the cost of their own health coverage in reduced wages or other fringe benefits.  To be sure, employers are never happy to pay higher insurance premiums and would prefer to increase their employees' compensation in more visible ways. But they are ultimately committing their workers' money, not their own (or their shareholders'), in hospital boardrooms.

*Id*. at 856.

106.    Havighurst and Richman further noted that

financing hospital activities and projects of any kind from hospitals' monopoly profits causes their costs to fall ultimately and more or less equally on individuals bearing the cost of health insurance premiums. The incidence of this financial burden thus closely resembles that of a "head tax" – that is, a tax levied equally on individuals regardless of their income or ability to pay. Few methods of public finance are more unfair (regressive) than this. Those who take a benign view of the seemingly good works of health care providers should focus more attention on who (ultimately) pays for and who benefits from those nominally charitable activities.

*Id*. at 860.

107.    Further, as demonstrated by the chart below, consumers in the cities and counties where Sutter Health operates end up paying the highest health care rates in the country:



FIRST AMENDED COMPLAINT

108.    These astronomical levels of health plan premiums and health care costs in Northern California have been noted time and again.  Sutter Health's tremendous market power, anti-competitive conduct and the high prices that it causes have not only been repeatedly noted by journalists and academics, they are a subject that is bemoaned and discussed at dinner tables, conferences rooms, street corners and barbershops across Northern California every day.

### SUTTER HEALTH ABUSES ITS "NON-PROFIT" STATUS TO ENGAGE IN ANTI-COMPETITIVE CONDUCT

109.    Sutter Health styles itself as a "non-profit" in order to avoid income and property taxes and issue tax-exempt bonds.  In reality, Sutter Health is one the most profitable health care operations in the country, generating over $9 billion in revenue annually and accumulating $4.4 billion in cash and investments as of September 30, 2011.  Sutter Health's managers are awarded bonuses by the board of directors based on profitability, bonuses that augment massive salary and benefit packages of $5 to $10 million per year and perquisites such as first-class travel.

110.    Beyond its publicly disclosed network, Sutter Health's *de facto* network includes numerous additional for-profit entities – highly profitable laboratories, Cayman Islands insurance companies, medical device suppliers and the like – that are in some cases:  (1) owned in whole or in part by officers, directors and board members of Sutter Health; (2) share board members or officers with Sutter Health or its various affiliate entities; and/or (3) pay compensation, benefits, shares or stock options to such officers, directors or board members.  On information and belief, Sutter Health routinely transfers funds – both directly and through transfer pricing and other techniques – between many of the publicly disclosed and non-disclosed for-profit and non-profit entities.  Sutter Health provides minimal disclosure regarding these transfers or the entities that make or receive such transfers.

FIRST AMENDED COMPLAINT

111.     As a result, the aforementioned management compensation is possibly dwarfed by Sutter Health managers' and directors' ownership stakes and distributions from Sutter Health's for-profit subsidiaries and various undisclosed entities to which Sutter Health transfers discounted assets, goods or services, or perhaps even transfers funds or "loans."  It may well be the case that the $4.4 billion is only the profit that Sutter Health recognized after it transferred as many profits off of its books as possible using a variety of transfer schemes.  There is no way definitively to determine if this is taking place because Sutter Health provides no detailed operational financial data on a segmented basis – or on almost any sort of basis. Indeed Sutter Health's audited financial statements are so lacking in detail as to be useless.

112.     Sutter Health's nominal non-profit status should not create any implication that it acts with a greater degree of accountability, transparency, ethics, or effective corporate governance than a publicly traded corporation.  On the contrary, the reality is that Sutter Health's management and board of directors are in a very real sense accountable to no one and report to no one.  Sutter Health maintains its non-profit status by filing tax returns that the Franchise Tax Board ("FTB"), Board of Equalization and the IRS apparently deem to be consistent with the requirements that Sutter Health is:  (1) organized and operated for non-profit purposes; (2) that none of its net earnings benefit any individual or private shareholder; and (3) that Sutter Health makes no attempt to influence legislation.  Any close examination reveals that Sutter Health in fact fulfills none of these requirements, considering the massive profits generated by Sutter Health and the massive financial enrichment that it provides to private individuals.

113.     This action does not concern Sutter Health's non-profit status.  However, the outcomes of previous antitrust cases involving nonprofit hospital chains have been improperly influenced "because too many judges and commentators have chosen to deem competition as inappropriate in health care or to view nonprofit hospitals as benign servers of the public interest

FIRST AMENDED COMPLAINT

rather than as potential monopolists against whom consumers need antitrust protection." Havighurst & Richman, *supra*, at 854.

114.    The foregoing article points out at page 856 that the judge in *FTC v. Butterworth Health Corp.*, 946 F. Supp. 1285, 1303 (W.D. Mich. 1996), permitted the merger in part because the chairmen of the two hospitals' boards each represented a large local employer and "testified convincingly that the proposed merger [was] motivated by a common desire to lower health care costs."  In this same vein, a proponent of another hospital merger in 2007 gave assurance that allowing the merger would not cause health insurance premiums to increase because several hospital "board members . . . are employers who worry about the cost of health-care."

115.    Here, Sutter Health CEO Patrick Fry similarly assured the court under oath on the witness stand – in the 1999 case brought by the California AG attempting to block  Health's acquisition of Summit – that he projected that Summit's revenue would rise only 3% annually post-merger.

116.    In fact, Summit's revenue rose 15%, according to the state database, or five times CEO Fry's forecast at trial.  Summit's health care prices rose 29% to 72% in the two years after the merger, according to a 2008 FTC staff study of the takeover.

117.    Similarly, in the Market Power Report, CPR authors note that in the context of many antitrust cases, a number of judges are under the misconception that non-profit hospitals would refrain from exercising their market power or that if they did raise prices they would use the extra revenue for more mission-oriented activities.

118.    Havighurst and Richman suggest instead that,

Managers of nonprofit firms . . . have incentives to build larger empires to enhance their self-esteem and status in the community and to justify increased perquisites for themselves and their physicians.  Such empire building is most easily accomplished by obtaining market power and using it to generate surpluses with which to further entrench and extend the firm's dominance.

FIRST AMENDED COMPLAINT

Havighurst & Richman, *supra*, at 867-67.

119.    Sutter Health's non-profit status highlights the fact that very little accountability, disclosure or transparency is ever required of Sutter Health now that it has been blessed by the FTC, Board of Equalization and the IRS as being a non-profit.  There are no shareholders to whom to report with the Securities and Exchange Commission.  There are no CEO and CFO certifications.  There are no quarterly conference calls.  Sutter Health's financial statements are so lacking in detail as to be useless.  There is simply no transparency or accountability.

120.    Moreover, when one tracks the careers of the various directors and senior managers of Sutter Health, what emerges is a rotating cast of characters who trade regions, positions and directorships while always collectively maintaining – for the last two decades – largely the same core group of about a dozen individuals in control of the key positions of control at Sutter Health.  For example, Sutter Health's CEO, Patrick Fry, has served not only as President of Sutter Health's Eastern Division, but also as the Vice President of Sutter Health's Western Division and as Sutter Health's Chief Operating Officer.  Sutter Health's CFO, Robert D. Reed, has held that position since 1997.  Martin Brotman has been Senior Vice President for Education, Research and Philanthropy for Sutter Health since January 2012; from 2009 to January 2012 he was Regional President, West Bay Region; and from 1996 to 2009, he was President of CPMC for Sutter Health.  Sutter Health's board of directors also includes the same core group of people who have overseen various acquisitions over the past several decades further extending Sutter Health's market dominance in health care provision.

121.    The gap between the conduct of Sutter Health's inner circle and its stated mission recently surfaced in a dispute between the people of Marin County and Sutter Health in which Marin was forced to go to extraordinary lengths to pry Marin General Hospital out of Sutter Health's control.  In the period between the parties' agreement that Sutter Health would give up

FIRST AMENDED COMPLAINT

control and Sutter Health's actual ceding of control in 2010, Sutter Health transferred approximately $120 million in profits from Marin General Hospital to itself.  While an arbitrator eventually ruled that these transfers were technically legal, it is evident that Marin General would never have agreed to accede to being a part of Sutter Health's "Obligated Group" had Marin had a fuller understanding sham-like nature of Sutter Health's non-profit status and mission.

122.    Dr. William Kirby, Chief of Staff at Sutter Auburn Faith Hospital, noted this regarding Auburn Faith's experience following Sutter's takeover of the hospital in the early 1990s:  "They take $3 million out of here a year. They're cutting our staff so badly, patient care is dropping. Nurses are dramatically overworked patients are not being bathed as often as they should be. . . ."  He further stated that the board and managers of Sutter Health are "absolutely dishonest.  They are driven by power, greed, profit and control.  They don't really give a damn about the quality of patient care. Sutter Health is the primary contributor to the destruction of local health care in Auburn."

123.    Finally, as a concluding illustration of the unaccountable and non-transparent conduct of the foregoing managers and directors – and an illustration that the minimal procedural requirements for a tax exemption provide no assurance that the extraordinary surpluses gained by non-profit hospital monopolists are spent to address social needs – a source of recent controversy has been Sutter Health's aggressive and cynical effort to shut down its money-losing 229-bed St. Luke's hospital that serves San Francisco's poorest residents in the Mission District, even as Sutter Health simultaneously seeks approval for a $2 billion Cathedral Hill campus project in San Francisco that includes a 555-bed hospital that would further entrench its already dominant position providing services to San Francisco's more profitable demographics.

48

**HARM TO COMPETITION AND CONSUMERS OUTWEIGHS ANY PRO-COMPETITIVE JUSTIFICATIONS SUTTER HEALTH MIGHT HAVE FOR ITS ANTI-COMPETITIVE CONDUCT**

124.    As detailed above, Sutter Health's improper and illegal anti-competitive conduct of tying and exclusive dealing has resulted in illegal restraints on trade and dramatically increased priced paid by consumers for contracted access to health care in Northern California.

125.    Multiple different sources corroborate the higher prices commanded by Sutter Health.  Sutter Health's own documents demonstrate that it simply has no justification for its misconduct and there are no pro-competitive effects to balance the harm caused by its illegal restraints of trade.  Indeed, the contrary is true – even Sutter Health competitors "shadow price," worsening the overall impact of Sutter Health's anti-competitive conduct.

126.    Sutter Health's contracts in restraint of trade and their mandate of tying and exclusive dealing do not achieve any pro-competitive or legitimate objectives – they do not result either in lower prices for consumers or better quality health care.  Indeed, Sutter Health has failed so miserably in its mission of charity care that its conduct could be described as the opposite of charity.  It is systematically forcing hospitals that provide services to the poor out of business and wants to shut down the "unprofitable" St. Luke's hospital in the Mission District.

127.    Indeed, as noted by Havighurst and Richman, even if Sutter Health's tying might make for efficient negotiating,

> [t]he general antitrust rule on tying is that a firm with market power may not use it to force customers to purchase possibly unwanted goods or services.  If this principle could be invoked to frustrate hospitals' practice of negotiating a comprehensive pricing formula for large bundles of their services, purchasers could then bargain down the prices of those services having good substitutes.  If a hospital still wished to fully exploit its various monopolies, it would have to do so in discrete negotiations, making its highest prices visible. Health plans could then hope to realize significant savings by challenging such monopolies, which they could do by adopting purchasing policies and enrollee incentives designed to expand the geographic market or encourage new entry.

49

Havighurst & Richman, *supra*, at 876-77.

128.    Sutter Health has no business justifications upon which its monopolistic conduct is predicated.   Efficient negotiating is no justification, as just discussed.   The generation of profits – which Sutter Health does in spades – is certainly not a justification for a "non-profit." Then there is Sutter Health's rhetoric about creating an "integrated" health care system, but there is not an appreciable difference, for example, between the manners in which two Sutter Health affiliates share the medical records of a given patient, and the way that two comparable service providers would share those records.   Assuming even *arguendo* that there are some efficiency gains from Sutter Health's "integrated" system, should not those efficiency gains result in lower prices from Sutter Health network instead of prices that are 40%-70% higher than higher-quality competitors?   In truth, the only thing that is "integrated" is Sutter Health's system of contracts and arrangements that insure Sutter Health's exclusivity as the provider for a given patient or doctor.

129.    Clearly there are alternative methods – less restrictive alternatives – of achieving real efficiencies that do not restrain trade and result in better prices for consumers.   The clearest of these alternative routes is for Sutter Health simply to cease and desist from entering into contracts that include tying and exclusivity provisions.   As Havighurst and Richman put it,

> An antitrust or regulatory initiative to curb hospitals' tying practices and to prohibit anticompetitive contracts between payers and providers – perhaps as remedies for earlier mergers found unlawful after the fact – might also significantly reduce the extraordinary pricing freedom that hospital and other monopolists enjoy by virtue of U.S.-style health insurance.   By enabling competing health plans to bypass, or foster new competitors for, local monopolists, such antitrust or regulatory actions could promote price competition where it is currently lacking.

Havighurst & Richman, *supra*, at 882.   In plain English, if Sutter Health were simply to eliminate all tying and exclusivity provisions from its contracts with health plans and physician

FIRST AMENDED COMPLAINT

groups, the price of health care in Northern would decrease by approximately 50% and the quality of health care in Northern California would increase dramatically.

## CLASS ACTION ALLEGATIONS

130.    Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2)-(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class:

> Any person in the Northern California counties of Alameda, Contra Costa, San Francisco, Marin, Sonoma, Napa, San Mateo, Santa Clara, Santa Cruz, Solano, Yolo, Sutter, Yuba, Nevada, Sacramento, Amador, Placer, El Dorado, San Joaquin, Stanislaus, Merced and Lake, who during all or part of the period beginning September 17, 2008, and continuing until the present (the "Class Period") was (or is): (1) enrolled in a licensed health care service plan; and  (2) the licensed health care service plan simultaneously had (or has) a contractual relationship with Sutter Health or any of its Affiliated Entities for access to health care services.

131.    Specifically excluded from this Class are defendant, the parent, defendant's subsidiaries, affiliates, officers, directors, employees, legal representatives, heirs or assigns, and co-conspirators.   Also excluded are any federal governmental entities, any judicial officers presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

132.    Subject to additional information obtained through further investigation and discovery, the foregoing definition may be expanded or narrowed by amendment or amended complaint.

133.    Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable.   While the exact number of Class members is unknown to plaintiffs, it is believed to be in the thousands.   Furthermore, the Class is readily identifiable from information and records in Sutter Health's possession.

134.    Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members because Sutter Health has acted

FIRST AMENDED COMPLAINT

on grounds generally applicable to the Class.  Such generally applicable conduct is inherent in defendant Sutter Health's wrongful and anti-competitive conduct.  Among those common questions of law or fact are:

(a)     whether Sutter Health restrained trade in, or excluded competition in, and/or monopolized the markets for health care services;

(b)     whether Sutter Health entered into a contract or combination to unreasonably restrain trade and maintain prices for health care and related services at supra-competitive levels by imposing illegal tying or exclusive dealing arrangements thus restricting or foreclosing a free and competitive market for such services;

(c)     whether Sutter Health's conduct resulted in it maintaining and extending an unlawful monopoly for health care and related services in certain geographic regions in Northern California;

(d)     the existence and duration of the illegal conduct alleged herein;

(e)     whether Sutter Health's anti-competitive conduct resulted in diminished competition for health care and related services in Northern California;

(f)     whether defendant's anti-competitive conduct caused prices for health care and related services to be higher than they would have been in the absence of defendant's conduct;

(g)     whether Sutter Health's conduct violates the Sherman Act;

(h)     whether Sutter Health's conduct violates the Cartwright Act;

(i)     whether Sutter Health's conduct violates California's Unfair Trade Practices Act, Cal. Bus. & Prof. Code §17200, *et seq.*;

(j)     whether Sutter Health unjustly enriched itself as a result of its anti-competitive and inequitable conduct at the expense of plaintiffs and members of the Class; and

FIRST AMENDED COMPLAINT

(k)      whether plaintiffs and other Class members have sustained, or continue to sustain, damages in the nature of higher premiums and other health care costs as a result of Sutter Health's wrongful conduct, and, if so, the quantum of such damages.

135.    Plaintiffs are members of the Class, and plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct by Sutter Health; *i.e.*, they paid increased prices for health care and related services as a result of defendant's wrongful conduct.

136.    Plaintiffs will fairly and adequately protect the interests of other Class members because they have no interests that are antagonistic to, or that conflict with, those of any other Class member.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent plaintiffs and other members of the Class.

137.    The prosecution of separate actions by individuals would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendant.

138.    A class action is the superior method for the fair and efficient adjudication of this controversy.  Class treatment will permit a large number of similarly situated persons or entities to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.  The damages sustained by individual Class members, although meaningful, does not rise to the level where it is economically rational to prosecute separate complex actions against this well-financed corporate defendant.  The instant case will be eminently manageable as a class action.  Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

53

**COUNT I**
**(Unreasonable Restraint of Trade in Violation of Section 1 of the Sherman Act)**

139.    Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

140.    Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. §1.

141.    Defendant Sutter Health entered into contracts, agreements, and/or combinations with health plans and engaged in anti-competitive conduct that was and continues to be unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

142.    Sutter Health entered into contracts, agreements or other combinations with health plans and engaged in anti-competitive conduct that was and continues to be an unreasonable restraint of trade and commerce in violation of the Sherman Act.

143.    The anti-competitive conduct included among other things in Sutter Health imposing illegal and improper tying and exclusive dealing agreements to impose supra-competitive prices on Plaintiffs and members of the Class and coercively to maintain and enhance its monopoly power in the market for health care in Northern California.   The imposition of tying arrangements required health plans to use all Sutter Health providers or affiliated physician's groups (even where less expensive options are available) or suffer the devastating consequences of having contracted access to none of them – including areas where Sutter Health has local monopolies.

144.    Sutter Health's agreements with health plans also required the health plans to actively to incentivize and "encourage" the use exclusively of Sutter Health's services, and to penalize health plan members that fail to do so.

54

145.     These agreements and combinations unreasonably restrain trade and restrict the access of Sutter Health's competitors to compete – on the basis of price and/or quality – for the business of members of health plans that use the Sutter Health network, thereby restraining competition in the Northern California health care services market.

146.     The purpose and effect of these agreements and combinations was and continues to restrain trade and competition in the Northern California health care services market.

147.     Sutter Health's anti-competitive conduct constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.  The anticompetitive effects of Sutter Health's conduct far outweigh any purported non-pretextual, procompetitive justifications, and, in any event, Sutter Health's conduct was not reasonably necessary to achieve the same.

148.     As a proximate result of defendant Sutter Health's unlawful conduct, plaintiffs and members of the Class they seek to represent have been injured in their business or property by Sutter Health's anti-competitive conduct in violation of the Sherman Act, 15 U.S.C. §1, by, *inter alia*, being subjected to and paying supra-competitive pricing for their health care services during the Class Period.  Such injury, called "overcharges" or "improper charges" is of the type antitrust laws were designed to prevent, flows from that which makes Sutter Health's conduct unlawful, and Plaintiffs and the Class are proper persons to bring a case concerning this conduct.

149.     Plaintiffs and members of the Class they seek to represent, have standing to and do hereby seek injunctive relief to prevent Sutter Health from continuing to engage in the conduct described above as redress for Sutter Health's violations of the Sherman Act, 15 U.S.C. §1.

FIRST AMENDED COMPLAINT

No. 3:12-cv-04854-LB

**COUNT II**
**(Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. Section 2)**

150.    Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

151.    Section 2 of the Sherman Act provides that

[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. §2.

152.    Defendant Sutter Health engaged in conduct designed to monopolize and to maintain and enhance Sutter Health's monopoly power in the relevant market for health care and relevant submarkets.

153.    Defendant Sutter Health specifically intended that its agreements and combinations with health plans would maintain and enhance its monopoly in the relevant market for health care services, and injure Plaintiffs and the Class.

154.    As detailed throughout this Complaint, Sutter Health benefitted substantially from its continued and enhanced monopoly power in certain markets for health care services because of, *inter alia*, imposing illegal and improper tying and exclusive dealing agreements on health plans to impose supra-competitive prices on Plaintiffs and members of the Class.  The imposition of tying arrangements required health plans to use all Sutter Health providers or affiliated physician's groups (even where less expensive options are available) or suffer the devastating consequences of having contracted access to none of them – including areas where Sutter Health has local monopolies.

FIRST AMENDED COMPLAINT

155.    Sutter Health's agreements and combinations with health plans also required the health plans to actively to incentivize and "encourage" the use exclusively of Sutter Health's services, and to penalize health plan members that fail to do so.  This anti-competitive conduct excluded other competitors and protected Sutter Health's monopoly power.  As a result, Sutter Health was able to demand drastically high amounts for the price of health care services that they would have been able to obtain absent the anti-competitive conduct.

156.    The anticompetitive effects of Sutter Health's conduct far outweigh any purported non-pretextual, procompetitive justifications, and, in any event, Sutter Health's conduct was not reasonably necessary to achieve the same.

157.    As a result of these unlawful contracts, agreements or combinations to monopolize, Plaintiffs and members of the Class paid artificially inflated prices for enrolling in health plans in order to obtain vitally necessary health insurance coverage.

158.    Plaintiffs and members of the Class have been injured in their business or property by Sutter Health's antitrust violations.  Their injury consists of having paid higher prices for health care services than they would have paid in the absence of the violations.  Such injury, called "overcharges" or "improper charges" is of the type antitrust laws were designed to prevent, flows from that which makes Defendants' conduct unlawful, and Plaintiffs and the Class are proper entities to bring a case concerning this conduct.

159.    Plaintiffs and members of the Class they seek to represent, have standing to and do hereby seek injunctive relief to prevent Sutter Health from continuing to engage in the conduct described above as redress for Sutter Health's violations of the Sherman Act ,15 U.S.C. §2.

FIRST AMENDED COMPLAINT

**COUNT III**
**(Unreasonable Restraint of Trade in Violation of the Cartwright Act, Cal. Bus. & Prof. Code Section 16720, *et seq.*)**

160.    Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

161.    Sutter Health entered into contracts, agreements or other combinations with health plans and engaged in anti-competitive conduct that was and continues to be an unreasonable restraint of the and commerce described above in violation of California Business & Professions Code Section 16720.

162.    The anti-competitive conduct included among other things in Sutter Health imposing illegal and improper tying and exclusive dealing agreements to impose supra-competitive prices on plaintiffs and members of the Class and coercively to maintain and enhance its monopoly power in the market for health care and related services in Northern California.  The imposition of tying arrangements required health plans to use all Sutter Health providers or affiliated physician's groups (even where less expensive options are available) or suffer the devastating consequences of having contracted access to none of them – including areas where Sutter Health has local monopolies.

163.    Sutter Health's agreements with health plans also required the health plans to actively to incentivize and "encourage" the use exclusively of Sutter Health's services, and to penalize health plan members that fail to do so.

164.    These agreements and combinations unreasonably restrain trade and restrict the access of Sutter Health's competitors to compete – on the basis of price and/or quality – for the business of members of health plans that use the Sutter Health network, thereby restraining competition in the Northern California health care services market.

FIRST AMENDED COMPLAINT

165.   The purpose and effect of these agreements and combinations was and continues to restrain trade and competition in the Northern California health care services market.

166.   Sutter Health's anti-competitive conduct constitutes a *per se* violation of California's antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade. The anticompetitive effects of Sutter Health's conduct far outweigh any purported non-pretextual, procompetitive justifications, and, in any event, Sutter Health's conduct was not reasonably necessary to achieve the same.

167.   As a proximate result of defendant Sutter Health's unlawful conduct, plaintiffs and members of the Class they seek to represent have been injured in their business or property by Sutter Health's anti-competitive conduct in violation of the California Cartwright Act by, *inter alia*, being subjected to and paying supra-competitive pricing for their health care services during the Class Period.  Such injury, called "overcharges" and "improper charges" is of the type antitrust laws were designed to prevent, flows from that which makes Sutter Health's conduct unlawful, and Plaintiffs and the Class are proper persons to bring a case concerning this conduct.

168.   Under California Business and Professions Code Section 16750, plaintiffs and members of the Class they seek to represent, have standing to and do hereby seek monetary (including treble damages), injunctive and declaratory relief, as well as attorneys' fees and costs, as redress for Sutter Health's violation of the Cartwright Act.

## COUNT IV
### (For Violation of California Business & Professions Code Section 17200, *et seq.*)

169.   Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

170.   This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from defendant Sutter Health for acts, as

59

FIRST AMENDED COMPLAINT

alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the UCL.

171.    Plaintiffs have standing to bring this action under the UCL because they have suffered injury in fact as a result of defendant Sutter Health's anti-competitive conduct. Plaintiffs and other members of the Class they seek to represent have been overcharged and paid inflated prices for health care and related services in the form on higher health insurance premiums, co-pays, out-of-pocket expenses for treatments, lab work, etc.

172.    Defendant Sutter Health's anti-competitive conduct through the use of exclusionary contracts and tying constitutes unfair competition in violation of the UCL. Defendant Sutter Health's business acts and practices were centered in, carried out, effectuated, and perfected mainly within the State of California, and defendant's conduct injured at least all members of the Class defined herein.

173.    Beginning on a date unknown and continuing thereafter, defendant Sutter Health has committed and continues to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

174.    Defendant Sutter Health's conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of defendant Sutter Health, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; and (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above.

FIRST AMENDED COMPLAINT

175.     Defendant Sutter Health's acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.,* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

176.     Defendant Sutter Health's acts or practices are unfair to all consumers of medical and other ancillary health-related services in the State of California within the meaning of Section 17200, California Business and Professions Code.

177.     Defendant Sutter Health has also committed "unfair" business acts or practices by, among other things, engaging in conduct that:

a)      as part of a business practice is still ongoing;

b)      where the utility of such conduct, if any, is outweighed by the gravity of the consequences to plaintiffs and Class members;

c)      is immoral, unethical, oppressive, unscrupulous, or substantially injurious to plaintiffs and Class members; and

d)      undermines or violates the spirit or intent of the antitrust consumer protection laws alleged in this Complaint; and

e)      threatens competition at its incipiency by thwarting competition among rival and/or would-be competing providers within various counties in Northern California because it forbids health plans subject to Sutter Health's agreements from contracting with these actual or would-be competitors of Sutter Health.

178.     Sutter Health's conduct described herein was undertaken as part of a business practice, and is still ongoing.

179.     The illegal conduct alleged herein is continuing and there is no indication that Sutter Health will not continue such activity into the future.

61

180.     As a proximate result of Sutter Health's unlawful and unfair business practices and anti-competitive conduct, plaintiffs and the members of the Class have suffered injury in fact, by having to pay supra-competitive and artificially inflated prices for health care and related services.

181.     As alleged in this Complaint, Sutter Health has been unjustly enriched as a result of its wrongful conduct and unfair competition.   Plaintiffs and members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Sutter Health as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

182.     Plaintiffs and the Class members have standing to and do seek equitable relief against Sutter Health, including an order of equitable restitution that would restore to plaintiffs and the Class members the interest or moneys conveyed to Sutter Health during its unlawful and/or unfair business practices within the Class Period.

## COUNT V
### (For Unjust Enrichment)

183.     Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

184.     This Count is brought in the alternative.  *See* Fed. R. Civ. P. 8(d)(2).

185.     Defendant Sutter Health has been unjustly enriched through overpayments by plaintiffs and members of the Class and maintenance of the resulting profits.

186.     Under common law principles of unjust enrichment, defendant Sutter Health should not be permitted to retain the benefits conferred on them by overpayments by plaintiffs and Class members.

FIRST AMENDED COMPLAINT

No. 3:12-cv-04854-LB

187.    Plaintiffs and members of the Class seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which plaintiffs and members of the Class may seek restitution.

188.    Plaintiffs and the Class have no adequate remedy at law.  It would be inequitable for defendant Sutter Health to retain the profits, benefits, and other compensation obtained from its wrongful conduct as alleged herein.

### PRAYER FOR RELIEF

189.    WHEREFORE, plaintiffs pray that:

A.    The Court determines that the Sherman Act, Cartwright Act and the UCL claims in this action may be maintained as a class action under Rule 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure;

B.    Plaintiffs be appointed as Class representatives, and plaintiffs' counsel as lead Class counsel;

C.    The unlawful conduct, contract or combination alleged herein be adjudged and decreed to be:

(1)    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2)    Acts of unjust enrichment;

(3)    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the Cartwright Act; and

(4)    Violations of the Cal. Bus. & Prof. Code Section 17200.

D.    Plaintiffs and the Class alleged herein recover damages, to the maximum extent allowed under the laws identified herein, and that judgment in favor of plaintiffs and the

63

Class be entered against the defendant Sutter Health in an amount to be trebled to the extent permitted by such laws;

E.      Defendant Sutter Health, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      The Court enter an order providing injunctive relief and precluding defendant Sutter Health from continuing to implement the exclusionary contracts and tying agreements alleged herein that are used to facilitate the anti-competitive conduct alleged herein;

G.      Plaintiffs and members of the Class be awarded restitution, including disgorgement of profits obtained by defendant Sutter Health as a result of their acts of unfair competition and acts of unjust enrichment;

H.      Plaintiffs and members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

I.      Plaintiffs and members of the Class recover their costs of suit, including a reasonable attorney's fee, as provided by law; and

J.      Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

FIRST AMENDED COMPLAINT

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs, on behalf of themselves and on behalf of the Class, demand a trial by jury of all claims asserted in this Complaint so triable.

DATED:  December 10, 2012                    THE MEHDI FIRM

                                             _____
                                                        /s/
                                             AZRA Z. MEHDI

                                             One Market
                                             Spear Tower, Suite 3600
                                             San Francisco, CA  94105
                                             Telephone:  415/293-8039
                                             Facsimile:  415/293-8001
                                             Azram@themehdifirm.com

                                             Counsel for Plaintiffs and the [Proposed] Class

FIRST AMENDED COMPLAINT

                                                      No. 3:12-cv-04854-LB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on, I authorized the electronic filing of the First Amended Complaint, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 10, 2012.

_____/s/_____

AZRA Z. MEHDI

# Mailing Information for a Case 3:12-cv-04854-LB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Azra Z. Mehdi**
  azram@themehdifirm.com,ghamilton@themehdifirm.com

- **Lin Wang**
  linwang@jonesday.com,adefilippo@jonesday.com,mdavis@jonesday.com,jlevee@jonesday.com,tgsinger@jonesday.com,dkiernan@jonesday.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)