1

2

3

4

5

6

7

8

9            UNITED STATES  DISTRICT COURT

10              Northern District of California

11               San Francisco Division

12   DEJENEBA SIDIBE and DIANE DEWEY,          No. C 12-04854 LB
     on Behalf of Themselves and All Others
13   Similarly Situated,                       **ORDER GRANTING MOTION TO**
                                               **DISMISS**
14              Plaintiffs,
                                               [Re: ECF Nos. 15, 17]
15        v.

16   SUTTER HEALTH, and DOES 1 through 25,
     inclusive,
17
                Defendants.
18   _____/

19                  **INTRODUCTION**

20        In this putative class action, Plaintiffs Djeneba Sidibe and Diane Dewey sued Sutter Health, a

21   company that owns and operates hospitals and other health care service providers, alleging that

22   Sutter's anticompetitive conduct in the health care services industry in Northern California violates

23   federal and state antitrust laws and California's unfair competition law.  *See generally* First

24   Amended Complaint ("FAC"), ECF No. 15.[1]  The allegedly anticompetitive conduct includes

25   imposing tying arrangements that require health plans to use Sutter providers or affiliated physician

26

27   _____

28        [1]  Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
     generated page numbers at the top of the page.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   groups (even if there are lower-priced alternatives) or be denied the ability to have contracted access

2   to any of them (even in areas where Sutter has monopolies). *Id.* ¶ 143.  Plaintiffs also complain that

3   Sutter's contracts require health plans to incentivize and encourage the use of Sutter's services and

4   penalize plan members who fail to use them. *Id.* ¶ 144.   These arrangements allow Sutter to impose

5   supracompetitive pricing, meaning, pricing above what could be sustained in a competitive market,

6   and to maintain and enhance its monopoly power in Northern California. *Id.* ¶ 143.

7        Sutter moved to dismiss for lack of standing and for failure to state a claim.  *See* Motion, ECF

8   No. 15.  The court grants Sutter's motion to dismiss without prejudice and with leave to amend.

9                                   **STATEMENT**[2]

10  **I. THE PARTIES**

11    **A. Sutter Health**

12      Defendant Sutter Health is a non-profit corporation organized and existing under California laws,

13  with its principal place of business in Sacramento, California.  FAC, ECF No. 11, ¶ 19.  Sutter

14  provides health care and related services[3] in Northern California through contracts with "health

15  plans" (insurance, employer-sponsored plans, and managed care plans such as health maintenance

16  organizations and preferred provider organizations), including Blue Cross, Blue Shield, Aetna,

17  CIGNA, HealthNet, Interplan, United HealthCare, and others. FAC, ECF No. 11, ¶¶ 2, 35.  It

18  "controls the largest and most dominant hospital chain and provider of health care services in

19  Northern California." *Id.* ¶ 19.  Sutter is the parent company of various non-profit and for-profit

20  entities and organizations that operate primarily in Northern California and that are controlled

21

22

23        [2] Except for the procedural history, the statement is composed of allegations from the

24  complaint in furtherance of the analysis under Federal Rule of Civil Procedure 12(b)(6).

25        [3] "The provision of health care and related services" includes "inpatient hospital services;

26  outpatient hospital services or ambulatory care; physician services; the services of other health
    professionals such as nurses, optometrists, psychologists or nutritionists; diagnostic laboratory

27  services; home health services; rehabilitation, physical or occupational therapy; preventive health
    services; emergency services; hospice services; chemical dependency services; and psychiatric

28  services." *Id.* ¶ 36.

UNITED STATES DISTRICT COURT
For the Northern District of California

directly or indirectly through intermediaries.[4]  *Id.* ¶ 19.  "Each Sutter Health Northern California region consists of at least one hospital corporation and a medical foundation corporation."[5]  *Id.* ¶ 20.  Other Sutter entities are members of Sutter's "Obligated Group," a financial arrangement that combines the revenues, expenses, assets, and liabilities of the Obligated Group Members.  *Id.* ¶ 26.  There are other entities affiliated with Sutter, including some in Hawaii and the Cayman Islands.  *See id.* ¶¶ 27-30.  "[Sutter], its managers and/or directors currently or previously own or owned and control in-whole or in-part" more than 30 additional for-profit entities.  *See id.* ¶ 31.

The FAC makes allegations about Sutter's non-profit status, *see id.* ¶¶ 109-123, but also states that "[t]his action does not concern Sutter Health's non-profit status."  *Id.* ¶ 113.  Plaintiffs allege that Sutter "styles itself as a 'non-profit'" to avoid taxes, but it really is one of the most profitable health care operations in the country.  *Id.* ¶ 109.  Sutter generates over $9 billion in annual revenue and as of September 30, 2011, it had accumulated $4.4 billion in cash and investments.  *Id.* ¶ 109.  Sutter's true profits may be higher than this.  *Id.* ¶ 111.  Sutter also has a "*de facto* network" beyond its "publicly disclosed network" that includes numerous for-profit entities.  *Id.* ¶ 110.  Sutter provides its managers and directors with "massive salary and benefit packages."  *Id.* ¶ 109.  Many of the same individuals have occupied key positions of control at Sutter for the last two decades and that their conduct is "unaccountable and non-transparent."  *Id.* ¶¶ 119-23.

**B. Plaintiffs and the Putative Class**

Since around October 2005, Plaintiff Djeneba Sidibe is and has been enrolled in a licensed health care plan that has a contractual relationship with Sutter for health care services.  *Id.*  Sidibe lived in San Mateo County before November 2009, Alameda County from November 2009 to January 2012, and Marin County since January 2012.  *Id.*  Plaintiff Diane Dewey has lived in San Francisco

---

[4]  A Sutter Health "Affiliated Entity," as that term is defined in the FAC, is "any organization that directly or indirectly through one or more intermediaries, is controlled by, or is under common control with, Sutter Health.  *Id.* ¶ 20.  The FAC lists many of these allegedly affiliated entities.  *See id.* ¶¶ 20-31.

[5]  The FAC does not explain the corporate or legal significance of these "regions" but lists Sutter's alleged holdings in the Central Valley Region, East Bay Region, Peninsula Coastal Region, Sacramento Sierra Region, and the West Bay Region.  *Id.* ¶¶ 21-25.

UNITED STATES DISTRICT COURT
For the Northern District of California

County since 1994. *Id.* ¶ 18.  At various times during the relevant period, including the present, Dewey has been enrolled in a licensed health care plan that has a contractual relationship with Sutter for health care services. *Id.*

Sidibe and Dewey claim that they and other members of the class have been injured as a result of Sutter's allegedly anti-competitive conduct by paying more for health care services than they otherwise would have paid. *Id.* ¶¶ 17-18.  Plaintiffs allege that Sutter's conduct "deprive[s] every resident of Northern California of at least several thousand dollars per year." *Id.* ¶ 101.  These higher costs are the result of (1) Sutter's "contracts with health plans that impose tying," (2) Sutter's "contracts with health plans that force those plans to impose exclusivity on their enrollees," and (3) Sutter's "contracts with physician groups that force the doctors to refer to Sutter service providers." *Id.* ¶¶ 98-100.

Plaintiffs seek to represent a class, defined as:

> Any person in the Northern California counties of Alameda, Contra Costa, San Francisco, Marin, Sonoma, Napa, San Mateo, Santa Clara, Santa Cruz, Solano, Yolo, Sutter, Yuba, Nevada, Sacramento, Amador, Placer, El Dorado, San Joaquin, Stanislaus, Merced and Lake, who during all or part of the period beginning September 17, 2008, and continuing until the present (the "Class Period") was (or is): (1) enrolled in a licensed health care service plan; and (2) the licensed health care service plan simultaneously had (or has) a contractual relationship with Sutter Health or any of its Affiliated Entities for access to health care services.

*Id.* ¶ 130.[6]

## II. PRICING AND PROVISION OF HEALTH SERVICES

Health care providers such as Sutter typically charge retail prices that are three to ten times higher than their contract prices. *Id.* ¶ 3.  As a result, if a health plan does not have contracted access to a hospital or provider, the health plan cannot afford to include the provider in the provider network it makes available to members. *Id.*  If the health plan cannot contract with a provider, the provider must remain "outside-of-plan." *Id.*  In order to comply with the requirements of

---

[6] Excluded from the Class are defendant, the parent, defendant's subsidiaries, affiliates, officers, directors, employees, legal representatives, heirs or assigns, and co-conspirators, and any federal governmental entities, any judicial officers presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action. *Id.* ¶ 131.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    California's Knox-Keene Health Care Service Plan Act of 1975 (the "Knox-Keene Act"),[7] health

2    plans frequently must include a provider even where the provider's prices are exorbitant.  *Id.*

3        Sutter engages in anti-competitive agreements or combinations with health plans that eliminate

4    competition in the market for health care services.  *Id.* ¶ 4.  Specifically, Sutter

5        engage[s] in conduct designed to severely limit competition by imposing supra-competitive
     prices through, *inter alia*, the imposition of:  (1) tying arrangements that require health plans

6    to use ALL Sutter Health providers or affiliated physicians' groups (even where less
     expensive options are available) OR suffer the devastating consequences of having

7    contracted access to NONE of them; and (2) exclusive dealing arrangements that have the
     consequence of forcing health plans to require plaintiffs and other members of the class to

8    obtain all their health care services through Sutter Health providers, Sutter Health affiliated
     entities or Sutter Health affiliated physicians' groups and to penalize members that use non-

9    Sutter Health providers.

10   *Id.* ¶ 4.  By engaging in this conduct, Sutter has intentionally destroyed competition for health care

11   services in Northern California in order to impose prices on the ten million Northern California

12   residents that are 40% to 80% greater than they could obtain in a competitive market.  *Id.* ¶ 5.  Sutter

13   executed an expansion strategy designed to increase its geographic concentration, local market

14   dominance, and functional reach by acquiring hospitals, physicians' groups, and providers of

15   ancillary medical services, such as laboratories, radiation services, in-home care, and skilled nursing

16   facilities.  *Id.* ¶ 6.

17       Sutter's expansion strategy and its other anti-competitive practices – including coercive market

18   domination, tying, and unreasonable exclusionary agreements – have stifled competition for health

19   care services in Northern California.  *Id.* ¶ 9.  For example, purchasers of health care services on

20   behalf of consumers cannot select among the providers in a given region based on quality and price.

21   *Id.* ¶ 9.  If a health plan were to insist on selecting providers based on quality and price, they would

22   be denied contracted access to any part of Sutter's network, which would effectively mean that the

23   health plan could not do business in Northern California at all.  *Id.* ¶ 9.[8]  This would have the effect

24

25       [7]  As described later in the complaint and below on page 6, the Act and its regulations define
     standards such as time-and-distance accessibility for plan enrollees to access health care providers.

26   *See* FAC ¶ 38.

27

28       [8]  As described later in the complaint and below on pages 8 and 9, this results from the tying
     and accessibility provisions in Sutter's contracts with health plans.  *See, e.g.*, FAC ¶ 60.

C 12-04854 LB
ORDER                                              5

UNITED STATES DISTRICT COURT
For the Northern District of California

of denying some Northern California residents access to any health care services because some parts of the Sutter network are indispensable to heath plans attempting to offer a network that complies with California regulations. *Id.* ¶ 9. As a result of Sutter's alleged conduct, every resident of Northern California, including Plaintiffs and the putative class, have been charged higher prices for health care services than they would have been absent Sutter's conduct. *Id.* ¶¶ 10-12.

## III. THE RELEVANT MARKET

The health care market is unique because purchases can be a matter of life or death. *Id.* ¶ 34. Close substitutes do not exist and the barriers to entry are high. *Id.* Sutter primarily operates in a relevant geographic market defined as "the provision of health care and related services in the following counties: Alameda, Contra Costa, San Francisco, Marin, Sonoma, Napa, San Mateo, Santa Clara, Santa Cruz, Solano, Yolo, Sutter, Yuba, Nevada, Sacramento, Amador, Placer, El Dorado, San Joaquin, Stanislaus, Merced and Lake." *Id.* ¶ 35.

There also is "a relevant market for the provision of contracted access to health care services in Northern California through health plans. *Id.* ¶ 37 (emphasis omitted). This market excludes all parts of the Kaiser network because Kaiser Permanente is a closed system and its services are not available on a contracted basis to health plans. *Id.* ¶ 37 n.3. Health plans in the relevant market "must comply with relevant laws and regulations, including the Knox-Keene Act and the regulations promulgated thereunder." *Id.* ¶ 37.

The Knox-Keene Act and its regulations define the minimum scope of services and accessibility standards for health plans to operate in California. The Plan License Application under the Knox-Keene Act states:

> The applicant is required to demonstrate that, throughout the geographic regions designated as the plan's Service Area, a comprehensive range of primary, specialty, institutional and ancillary services are readily available at reasonable times to all enrollees and, to the extent feasible, that all services are readily accessible to all enrollees.
>
> . . .
>
> An applicant for plan license must demonstrate compliance with the accessibility requirement in each of the areas specified in paragraphs (i) through (iv) below, either by demonstrating compliance with the guideline specified in such paragraphs or, in the alternative, by presenting other information demonstrating compliance with reasonable accessibility. . . .

i. <u>Primary Care Providers</u>. All enrollees have a residence or workplace within 30 minutes or 15 miles of a contracting or plan operated primary care provider in such numbers and distribution as to accord to all enrollees a ratio of at least one primary care provider (on a full-time equivalent basis) to each 2,000 enrollees.

ii. <u>Hospitals</u>. In the case of a full-service plan, all enrollees have a residence or workplace within 30 minutes or 15 miles of a contracting or plan-operated hospital which has a capacity to serve the entire dependent enrollee population based on normal utilization, and, if separate from such hospital, a contracting or plan-operated provider of all emergency healthcare services.

iii. <u>Hospital Staff Privileges</u>. In the case of a full-service plan, there is a complete network of contracting or plan-employed primary care physicians and specialists each of whom has admitting staff privileges with at least one contracting or plan-operated hospital equipped to provide the range of basic health care services the plan has contracted to provide.

iv. <u>Ancillary Services</u>. Ancillary laboratory, pharmacy and similar services and goods dispensed by order or prescription on the primary care provider are available from contracting or plan-operated providers at locations (where enrollees are personally served) within a reasonable distance from the primary care provider.

*Id.* ¶ 38.

## IV. SUTTER'S ALLEGED MARKET POWER AND ANTI-COMPETITIVE CONDUCT

Sutter's size and dominant position in the Northern California health care market allow it to exercise market power through its contracts and combinations with health plans in the relevant market. *Id.* ¶ 40. Sutter does this

by imposing tying arrangements that require health plans to use ALL Sutter Health providers or affiliated physician's groups in all geographic markets (even where less expensive options are available) OR suffer the devastating consequences of having contracted access to NONE of them; and exclusive dealing arrangements that have the consequence of forcing health plans to require its members to obtain all their health care and related services through Sutter Health providers, Sutter Health affiliated entities or Sutter Health affiliated physicians' groups and penalizes members that use non-Sutter Health providers.

*Id.* ¶ 39.

### A. Sutter's Alleged Market Power

Sutter is dominant in the Northern California health care market. *Id.* ¶ 40. Excluding closed systems such as Kaiser Permanente, Sutter has amassed the following: 100% of the hospital beds in Placer and Amador counties; 60% of the beds in Alameda and Contra Costa counties; and over 50% of the beds in San Francisco and Sacramento. *Id.* ¶ 41. Sutter has 35% of the revenue and 36% of the hospital beds that compete for patients in Northern California. *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

Different sources corroborate that Sutter charges more than other hospitals and that this has increased health care costs throughout Northern California. *See generally id.* ¶¶ 42-49. These sources include the Federal Trade Commission, ¶ 42, the California Public Employees' Retirement System ("CalPERS") and its officers, ¶¶ 43-44, Blue Cross of California, ¶ 44, Bloomberg, ¶ 45, the Los Angeles Times, ¶ 46, the California Public Interest Research Group ("CALPIRG"), ¶¶ 47-49 & figs. 1-2. The portions of California "exhibiting abnormally high hospital prices and the region comprising Sutter Health's territory precisely correspond." *Id.* ¶ 48.

### B. The Anti-Competitive Conduct

The "'systemwide contracts' negotiated by Sutter Health on an 'all or none' basis . . . artificially inflate every dollar of revenue that Sutter Health collects." *Id.* ¶ 50. Sutter's strategy is as follows:

> first, to establish monopolistic market power in certain regions . . . and particular services . . . that are indispensable to health plans seeking to assemble a network that complies with California law and is a credible network to their customers. Second, Sutter Health ties other regions and services to the indispensable ones. Health plans must purchase a laundry list of geographies and services that they do not want in order to purchase the geographies and services that they need. Third, Sutter Health creates a self-reinforcing dynamic by imposing (1) contracts on health plans that force the health plans to penalize the enrollees that use non-Sutter Health services; and (2) contracts on medical groups that include mandatory-referral provisions that force the physicians to refer to Sutter Health even if better or less expensive services are readily available.

*Id.* ¶ 50.

A "second prong" of Sutter Health's strategy is to

> acquire physician groups through Sutter Health's five medical foundation corporations . . . . Sutter Health is the sole member of each of these corporations which contract with multi-specialty medical groups on an exclusive basis to provide physician services to the Sutter Health system's medical foundation patients. . . . The foundations' contracts with the medical groups require the physicians in the groups to make referrals to Sutter Health hospitals and its Affiliated Entities. This restraint of trade prevents the doctors from referring their patients to non-Sutter Health facilities or services even when those competing facilities would offer lower prices or higher quality.

*Id.* ¶¶ 53-54. For example, the Palo Alto Medical Foundation has contracts with medical groups that include approximately 1,098 physicians. *Id.* ¶ 55. They directed visits, procedures, tests, and surgeries away from non-Sutter hospitals, physicians, and laboratories, even when those competitors offered lower prices or superior quality. *Id.* ¶ 56.

In addition, "a commercial reality" related to Sutter's market power is that its "more potentially

1   formidable competitors, such as Kaiser Permanente, simply shadow price Sutter Health." *Id.* ¶ 58.

2   According to excerpts from a December 2012 presentation by "HSS, the largest employer in San

3   Francisco," "Sutter charges the highest fees," other providers in the "Bay area market . . . shadow

4   Sutter's prices," and the lack of competition causes increased premiums. *Id.* ¶¶ 58-59.

5   ### 1. Tying Allegations

6   Sutter includes the following tying language in its agreements with health plans:

7   Each payer accessing Sutter Health providers shall designate ALL Sutter Health providers
    (see Sutter Health provider listing) as participating providers unless a Payer excludes the
8   entire Sutter Health provider network.

9   *Id.* ¶ 60. This "all or none language . . . in its contracts with health plans is the mechanism through

10  which Sutter Health effectuates its anti-competitive tying conduct." *Id.* ¶ 61. The intended

11  objective of such language is to prevent health plans from using Sutter facilities only in regions or

12  for services the health plan needs. *Id.* ¶ 62. Absent such language, where Sutter has less market

13  power, the health plans could use non-Sutter facilities. *Id.* Thus, "[t]he effect of such tying is to

14  impose supra-competitive prices and lower quality on the plaintiffs and members of the class." *Id.*

15  The accessibility standards discussed previously effectively force the health plans to agree to

16  these tying contracts. *Id.* ¶ 63. Under California regulations governing the scope of services that a

17  California health plan must provide, "health plans are obligated to assemble a comprehensive

18  network of a broad spectrum of medical services providers that must be available within a 15-minute

19  radius of every enrollee." *Id.* ¶¶ 63-64 (quoting Cal. Code Regs. tit. 28, § 1300.67 (2012)). Market

20  pressures also encourage health plans to have as large a coverage area as possible. *Id.* ¶ 64.

21  The health plans' need to provide as large a coverage area as possible and the accessibility

22  regulations mean that "anyone who is the only provider in a 15-mile radius of one of the required

23  services has a pure monopoly." *Id.* ¶ 65. Sutter "possesses many hundreds of such monopolies" that

24  allow it to exercise an "under the radar" market power. *Id.* ¶ 65.

25  For example, Sutter owns all but one non-Kaiser hospital in Alameda, and the non-Sutter

26  hospital is 17 miles from the center of Oakland. *Id.* ¶ 66. The result is that any health plan without

27  access to Sutter's hospitals must require its members to travel to a hospital outside the 15-mile / 30-

28  minute regulatory limit. *Id.* ¶ 66. Thus, the health plans "arguably have a legal obligation under

1    California laws and regulations to gain contracted access to Sutter Health hospitals in Alameda

2    County." *Id.* ¶ 67.

3        The FAC provides additional examples to show that Sutter "forces health plans to choose

4    between 'all' and 'none,' and 'none' would be a disaster." *Id.* ¶ 68.  These include the failure of "the

5    City of San Francisco's experiment beginning July 2011 to create to competing Accountable Care

6    Organizations ("ACO") for city employees." *Id.* ¶ 68.  Plaintiffs assert that this experiment at

7    increasing competition failed because Sutter "limited the availability of contracted rates for

8    emergency room services at Sutter Health hospitals to Sutter Health members," which forced the

9    non-Sutter ACO to pull out of the experiment and sign a contract with Sutter.  *Id.* ¶¶ 68-70.  Thus,

10   Sutter "used its market power to scuttle the City of San Francisco's attempt to create real

11   competition." *Id.* ¶ 71.  Sutter's tying agreements also affect the market for acute inpatient services

12   in Amador and Placer Counties, and Sutter has substantial market power for various services in

13   "large swatches of the East Bay, . . . Tracy, San Francisco County, and Solano County." *Id.* ¶ 73.

14       Sutter also engages in tying across regions.  *Id.* ¶¶ 74-75.  Thus, a health plan that needs access

15   to, for example, Sutter's Alameda County hospitals, must contract with all of Sutter's hospitals

16   across Northern California, and all of Sutter's "affiliated physician groups, laboratories, skilled

17   nursing facilities, home care facilities, device suppliers, and so on." *Id.* ¶ 74.  Furthermore, all of

18   these entities "must in turn refer any patient who needs acute care to Sutter Health hospitals, any

19   patient who needs blood work to Sutter Health labs . . . and so on." *Id.* ¶ 74.  The effect of this is to

20   deprive competing hospitals of customers (even in otherwise competitive areas). *Id.* ¶ 75.

21       Sutter's own strategic planning document states that its "tying services and regions are

22   'indispensable' to health plans attempting to comply with the minimum scope of services and

23   accessibility standards for California health plans." *Id.* ¶ 76.  Another effect of these practices is that

24   Sutter's network "does not compete on quality any more than it competes on price." *Id.* ¶ 77

25   (quoting a California Health Care Coalition report about Sutter).

26       Sutter's anti-competitive tactics have been successful only because of:

27       a.  the structure of the relevant market, specifically the fact that the market for contracted
            access to Sutter Health's health care services in Northern California is organized on the basis

28          of the purchase of entire networks of geographic and service coverage by health plans or

1    employers, as opposed to purchases by the patients themselves;

2    b.  the lack of price transparency that characterizes the relevant market, a lack of
     transparency that is fostered and enforced by Sutter Health itself in various ways including
3    contractual prohibitions against health plans publishing Sutter Health's prices; and

4    c.  the trust that patients traditionally place in their doctors, trust that Sutter Health hijacks
     and subverts for economic gain by forcing health plans and providers to refer and
5    recommend Sutter Health providers, regardless of the quality of care or prices that they offer.

6    *Id.* ¶ 78.

7        Several Sutter strategic planning documents became public during a 1999 trial in which the

8    California Attorney General sought to enjoin Sutter's purchase of Summit hospital.  *See id.* ¶¶ 86-88.

9    Plaintiffs assert that these documents show Sutter's plan for "market share growth" to obtain a

10   "critical presence" in certain geographic markets and how it uses its market share to stifle

11   competition, increase prices, and "eliminate the health plans' option to buy services at the margin."

12   *Id.* ¶¶ 86-88.  Hospitals (including Eden Medical Center and Summit Medical Center) that were

13   subsequently acquired by Sutter substantially increased their prices.  *Id.* ¶¶ 89-91.

14       ***2.  Exclusivity Language***

15       Sutter "also typically includes language such as the following" in its agreements with health

16   plans:

17       ***Sutter Health shall require each group health payer accessing Sutter Health providers***
         ***through the [health plan] network to actively encourage members obtaining medical care***
18       ***to use Sutter Health providers. . . . "[A]ctively encourage" or "active encouragement"***
         means incentivizing members to use participating providers through the use of one or more
19       of the following: reduced co-payments, reduced deductibles, premium discounts directly
         attributable to the use of a participating provider, ***financial penalties***, or requiring such
20       members ***to pay additional sums*** directly attributable to the non-use of a participating
         provider.

21
         ***If Sutter Health or any provider learns that a payer either does not actively encourage its***
22       ***members to use network participating providers***, . . . Sutter shall have the right upon not less
         than thirty (30) days' written notice ***to terminate that payer's right to the negotiated rates***.
23       In the event of such termination, the terminated payer shall pay for covered services rendered
         by providers ***at 100% of billed charges*** until such time as Sutter reasonably believes and
24       notices that the payer does in fact actively encourage its members to use network
         participating providers . . . .
25

26   *Id.* ¶ 92 (emphasis in original).  This "exclusivity language" and the "mandatory referral provisions

27   reinforce and spread the anti-competitive effects" of Sutter's monopolies and tying.  *Id.* ¶¶ 93-97.

28       **C.  Harm to Competition and Consumers Outweighs Pro-Competitive Justifications**

UNITED STATES DISTRICT COURT
For the Northern District of California

Sutter's conduct of "tying and exclusive dealing has resulted in illegal restraints on trade and dramatically increased price[s] paid by consumers for contracted access to health care in Northern California." *Id.* ¶ 124. Multiple sources corroborate that Sutter's prices are higher, and its own documents demonstrate the lack of justification or pro-competitive effects of its conduct. *Id.* ¶¶ 124-29.

## V. PROCEDURAL HISTORY

Plaintiffs filed an original complaint and then the FAC, which Sutter moved to dismiss. *See* ECF Nos. 1, 11, 15. The FAC alleges the following claims: (1) unreasonable restraint of trade in violation of the Sherman Act Section 1, 15 U.S.C. § 1; (2) monopolization in violation of Sherman Act Section 2, 15 U.S.C. § 2; (3) unreasonable restraint of trade in violation of the Cartwright Act, Cal. Bus. & Prof. Code Section 16720, *et. seq.*; (4) unfair competition, in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code Section 17200, *et. seq.*; and (5) unjust enrichment. FAC, ECF No. 11 at ¶¶ 139-188. Plaintiffs seek the following relief: (1) injunctive relief under the Sherman Act; (2) treble monetary damages, injunctive and declaratory relief, and attorney's fees and costs under the Cartwright Act; (3) "equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Sutter Health as a result of" the UCL violation; and (4) "disgorgement of all profits resulting from [the alleged] overpayments and establishment of a constructive trust from which plaintiffs and members of the Class may seek restitution." *Id.* ¶¶ 149, 159, 168, 181, 187.

## VI. JURISDICTION

This court has subject matter jurisdiction over the Sherman Act claims under 28 U.S.C. §§ 1331 and 1337 and supplementary jurisdiction over the state law claims under 28 U.S.C. § 1367. *See id.* ¶¶ 13-14. The court has subject matter jurisdiction over the claims under the Class Action Fairness Act, ("CAFA"), 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5 million. *Id.* ¶ 15.

## ANALYSIS

## I. PLEADING STANDARD

Rule 8(a) requires that a complaint contain a "short and plain statement of the claim showing that

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint therefore must provide a

2    defendant with "fair notice" of the claims against it and the grounds for relief. *See Bell Atlantic*

3    *Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

4         A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does

5    not contain enough facts to state a claim to relief that is plausible on its face. *See id.* at 570. "A

6    claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

7    the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

8    129 S.Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,'

9    but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting

10   *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does

11   not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

12   'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the

13   elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief

14   above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals

15   omitted). As to Sherman Act claims, "proceeding to antitrust discovery can be expensive." *Id.* at

16   558 (addressing pleading standard in Sherman Act Section 1 claims). Thus, the court must "insist

17   upon some specificity in pleading before allowing a potentially massive factual controversy to

18   proceed." *Id.* The decision explained,

19         stating such a claim requires a complaint with enough factual matter (taken as true) to suggest an
           agreement was made. Asking for plausible grounds to infer an agreement does not impose a
20         probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable
           expectation that discovery will reveal evidence of illegal agreement.
21

22   *Id.*

23         In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true

24   and construe them in the light most favorable to the plaintiff. *See id.* at 550; *Erickson v. Pardus*, 551

25   U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007). In

26   addition, courts may consider documents attached to the complaint. *Parks School of Business, Inc.*

27   *v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). If the court dismisses the complaint, it should

28   grant leave to amend even if no request to amend is made "unless it determines that the pleading

1    could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127

2    (9th Cir. 2000) (quotation omitted).

3    **II. SHERMAN ACT CLAIMS**

4         Plaintiffs allege violations of sections 1 and 2 of the Sherman Act.

5         Section 1 prohibits (1) a contract between two or more unrelated persons or distinct businesses

6    entities (2) that the persons or entities intend to harm or unreasonably restrain competition and (3)

7    that actually injures competition. *See Twombly*, 550 U.S. at 548; *Kendell v. Visa U.S.A., Inc.*, 518

8    F.3d 1042, 1047 (9th Cir. 2008). Second 2 prohibits monopolies. A section 2 claim has two

9    elements: "(1) the possession of monopoly power in the relevant market; and (2) the willful

10   acquisition or maintenance of that power as distinguished from growth or development as a

11   consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell*

12   *Corp.,* 384 U.S. 563, 570-571 (1966).

13        Plaintiffs charge that Sutter's contracts with health plans are unlawful tying or exclusive dealing

14   arrangements that violate section 1 by injuring competition and section 2 by enabling Sutter to

15   maintain and enhance its monopoly power for health-care services. *See FAC ¶¶ 143, 152-55.*

16        An exclusive dealing arrangement is when a seller agrees with a buyer to sell its products or

17   services only to that buyer, or the buyer agrees to buy only from the seller. *See Allied Orthopedic*

18   *Appliances v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). To violate section 1 as

19   an unlawful exclusive-dealing arrangement, a threshold requirement is that the contract foreclose a

20   substantial percentage of the market as a whole from competition. *See id.*

21        Tying involves an agreement by the seller to sell a product (the "tying" product) only if the buyer

22   also will buy a different product (the "tied" product) (or at least agree not to buy it from anyone

23   other than the seller). *See Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958). An

24   unlawful tying arrangement requires an anticompetitive effect. *See Cascade Health Solutions v.*

25   *PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008) (seller must possess appreciable economic power in

26   the tying product market to coerce purchase of the tied product, and the tying arrangement must

27   affect more than an insubstantial volume of commerce in the tied product market).

28        In addition to establishing the elements of the Sherman Act claims, plaintiffs must plead "that

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

C 12-04854 LB
ORDER                                            14

1  they were harmed by the defendant's anticompetitive contract . . . and that this harm 'flowed from an

2  anti-competitive aspect of the practices under scrutiny.'" *Brantley v. NBC Universal, Inc.*, 675 F.3d

3  1192, 1197 (9th Cir. 2012) (quoting *Atlantic Ritchfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344

4  (1990)); *accord Allied Orthopedic*, 592 F.3d at 998. "This fourth element is generally referred to as

5  'antitrust injury' or 'antitrust standing'" (as is explained in more detail in the next section). *See*

6  *Brantley*, 675 F.3d at 1197 (citing as an example *Atlantic Ritchfield Co.,* 495 U.S. at 344).

7      Sutter challenges Plaintiffs' antitrust standing[9] and also argues that they fail to state a claim.

8  **A. Standing**

9      Sutter argues that Plaintiffs do not have antitrust standing under the Sherman Act because (a)

10  they did not allege sufficiently that they were customers of Sutter, and (b) they are not parties to the

11  contracts and instead are only indirect purchasers of Sutter's services. *See* Motion, ECF No. 15 at

12  13-18.

13  *Associated General Contractors* set forth factors that a court should consider when evaluating

14  antitrust standing:

15      (1) the closeness or the causal connection between the violation and the harm to the plaintiff;

16      (2) whether the defendant intended to cause the harm to the plaintiff that it caused;

17      (3) the nature of the plaintiff's alleged injury, including whether the plaintiff was a customer or
       competitor in the relevant market affected by the violation;

18      (4) the directness or indirectness of the injury, including whether there are other victims whose

19

20

---

21      [9] Sutter does not challenge Plaintiffs' constitutional or prudential standing. Article III's
    constitutional requirements are as follows: (1) the party invoking federal jurisdiction must have

22  suffered some actual or threatened injury; (2) the injury must be fairly traceable to the challenged
    conduct; and (3) a favorable decision would likely redress or prevent the injury. *See Friends of the*

23  *Earth, Inc. v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 180-81, 185 (2000). The prudential
    limitations on federal court jurisdiction require the following: (1) a party must assert his own legal

24  rights and interests, not those of others; (2) courts will not adjudicate "generalized grievances;" and
    (3) a party's claims must fall within the zone of interests that is protected or regulated by the statute

25  or constitutional guarantee in question. *See Valley Forge Christ. College,* 454 U.S. at 474-75;
    *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009). The court finds that Plaintiffs

26  sufficiently pleaded Article III standing based on their allegations about paying more for services.
    *See* FAC ¶¶ 17, 18, 171. Also, as discussed below, in any amended complaint, they can add

27  allegations about the out-of-pocket expenses that they incurred. *See* Opposition, ECF No. 20 at 11

28  & n.3 (additional allegations).

C 12-04854 LB
ORDER

1    injury was more direct and who are likely to sue;

2    (5) whether Plaintiff's damages are highly speculative;

3    (6) the risk of duplicative recovery; and

4    (7) the complexity in apportioning damages.

5    *See Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535-

6    46 (1983); *American Ad Mgmt., Inc. v. General Telephone Co. of Cal.*, 190 F.3d 1051, 1054-55 (9th

7    Cir. 1999) (listing the factors somewhat differently by joining closeness and causal connection with

8    directness and characterizing the nature of the alleged injury as whether it was the type of injury

9    antitrust laws were designed to forestall).  The only factor that a plaintiff must show is antitrust

10   injury.  *See Associated Gen. Contractors*, 459 U.S. at 535.  Otherwise, the other factors are not

11   absolute requirements and instead are balanced by the court to determine antitrust standing.  *Id.; see*

12   *Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1997).  "No single factor is decisive."  *R.C. Dick*

13   *Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 146 (9th Cir. 1989) (en banc).

14        In a case – such as this one – that involves only a claim for injunctive relief under the Sherman

15   Act, the factors regarding complex issues of damages or speculative or duplicative recoveries do not

16   apply.  *See Bhan v. NME Hospitals, Inc.,* 772. F.2d 1467 (9th Cir. 1995); *Bubar v. Ampco Foods,*

17   *Inc.*, 752 F.2d 445, 449 n.2 (9th Cir. 1985); Reply, ECF No. 24 at 8 (acknowledging the point); FAC

18   ¶¶ 139-159 (injunctive relief only).

19        Plaintiffs allege that they have been enrolled in a licensed health care plan that has a contractual

20   relationship with Sutter for health care services."  FAC ¶¶ 17-18.  Sutter argues that they should

21   plead more facts to establish their connection with Sutter and points to their failure to allege the

22   following:

23   •    Where plaintiffs purchased their health plans or what health plans they had;

24   •    Any details as to the nature of the specific health plans and whether those health plans
         contain the "tying" or "exclusive dealing" language that plaintiffs allege to violate the
25       Sherman Act;

26   •    Whether Plaintiffs ever received medical care from a Sutter provider (or, for that matter, any
         other provider);

27   •    Whether Plaintiffs ever paid Sutter directly for any medical care;

28   •    Any details that would demonstrate that the price that plaintiffs paid to any healthcare

UNITED STATES DISTRICT COURT
For the Northern District of California

provider other than a Sutter provider might somehow have been affected by Sutter's so-called antitrust violations.

Motion at 15-16.  Sutter's larger argument is that Plaintiffs are not parties to the contracts between Sutter and their health plans.  They did not pay money to Sutter; their health plans did.  Thus, any injury to them is indirect, and as "indirect purchasers," they lack standing under *Illinois Brick co. v. Illinois*, 431 U.S. 720 (1977)).  *Id.* at 16-17.

The Ninth Circuit has parsed "antitrust injury" into four requirements: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *American Ad Mgmt., Inc.* 190 F.3d 1051, 1055 (9th Cir. 1999).  Sutter's preliminary argument is really about requirements 2 through 4, and this section addresses only those requirements and discusses in the next section whether Plaintiffs sufficiently pleaded unlawful conduct (and concludes that they did not).

Assuming unlawful conduct in the form of tying and exclusive dealing that reduced competition from independent medical service providers and other medical provider networks, *see* FAC, ECF No. 11 at ¶¶ 54-56, 60, 80, 98-100, Plaintiffs allege that they were harmed because they are "enrolled in a licensed health care plan that has a contractual relationship with Sutter Health for health care services" and – as a result of the unlawful conduct – incurred inflated health care expenses in the form of higher premiums, co-payments, and out-of-pocket costs for other services. *See id.* ¶¶ 17, 18, 171.  At the pleadings stage, the allegations are sufficient.

First, the court observes that Plaintiffs had more robust allegations in their opposition brief about their deductibles, co-pays, out-of-pocket expenses as direct purchasers of services that are consistent generally with their allegations already in the complaint.  *See* Opposition, ECF No. 20 at 11 & n.3. In response to this proffer and the clarification that Plaintiffs seek only injunctive relief on the Sherman Act claims, Sutter points out that the allegations are not in the complaint,[10] Plaintiffs never alleged that they visited a Sutter facility, and plaintiffs do not allege an injury (such as increased co-payments) that plausibly is antitrust injury.  *See* ECF No. 24 at 7-11.

---

[10]  The court considers the allegations in the opposition only to illuminate what the complaint's allegations mean, not to supplement the complaint.

In *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997) (*overruled on other grounds by Lacey v. Maricopa Co.*, 693 F.3d 896, 925 (9th Cir. 2012)), the Ninth Circuit found standing on summary judgment when the plaintiffs established that the practice of diverting indigent patients to other hospitals and threatening physicians who did not support its monopoly resulted in higher prices for hospital services that "translated into higher copayments and premium payments." *Id.* "Such an increase in consumer prices caused by the asserted conduct would constitute antitrust injury of the type the antitrust laws were designed to prevent." *Id.*

Sutter points out that the *Forsyth* plaintiffs received care from the defendant hospital and paid co-payments for those services. Reply, ECF No. 24 at 10. The court appreciates that receipt of services presents a different antitrust injury. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 468 (1982) (plaintiff was denied reimbursement for costs of psychotherapy services that she received). But the *Forsyth* court found antitrust injury based not only on increased copayments but also on increases in premium payments, *see* 14 F.3d at 925, and Plaintiffs here alleged that higher premiums (and increased costs) resulted from Sutter's allegedly anti-competitive conduct. *See* FAC ¶¶ 17 (refers to paying more for health care services), 18, 171.

Second, as to Sutter's argument that Plaintiffs are not parties to the contract and do not participate in the relevant market because they are not health plans or medical providers, certainly "the injured party [must] be a participant in the same market as the alleged malefactors." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.* ("*DRAM II*"), 536 F. Supp. 2d 1129, 1137-38 (N.D. Cal. 2008) (collecting cases). But foreclosed physicians, patients, and health plans have challenged exclusive arrangements between hospitals and hospital-based physicians as unlawful tying arrangements or unlawful exclusive-dealing arrangements, and the standing analysis is not different merely because the challenged conduct is about exclusive arrangements with health plans and health-care service providers. Courts "routinely recognize the antitrust claims of market participants other than consumers or competitors." *American Ad. Mgt.*, 190 F.3d at 1057; *see also DRAM II*, 536 F. Supp. 2d at 1140. Here, Plaintiffs allege that Sutter, through its allegedly anticompetitive conduct in the market for the health care services that they received through their

health plans, caused them to pay higher prices for health care services,[11] premiums, and co-pays. *See, e.g.,* FAC ¶¶ 148-58.  These allegations of injury are sufficient at this stage of the case to show injury that is directly related to Sutter's actions for purposes of Plaintiffs' Sherman Act claims for injunctive relief only.  *Cf. Illinois Brick v. Illinois*, 431 U.S. 720 (1977) (indirect purchasers lack standing to seek damages against a manufacturer for alleged violations of federal antitrust laws); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145 (9th Cir. 2003) ("*Illinois Brick* doesn't apply to equitable relief").

**B.  Failure to State a Claim**

    *1.  Unlawful Tying or Exclusive Dealing Arrangements*

    Both Sherman Act claims are about unlawful tying or exclusive dealing arrangements. *See* FAC ¶¶ 143, 152-55.  Sutter argues that Plaintiffs did not identify either.  Motion, ECF No. 1 at 18-19.

    Plaintiffs allege Sutter's "strategy" to establish monopoly power and acquire physician groups. FAC ¶¶ 50-59 (summarized on page 8).  Plaintiffs's introduction refers to Sutter's (1) imposition of all-or-nothing "tying arrangements" that require health plans to use Sutter health providers or affiliated physicians or lose contracted access to any of them and (2) exclusive dealing arrangements between plans and Sutter providers or affiliated entities.  FAC ¶ 4.  They also point to the following "tying" language that Sutter includes in its agreements with health plans: "Each payer accessing Sutter Health Providers shall designate ALL Sutter Health Providers . . . as participating providers unless a Payer excludes the entire Sutter Health provider network."  *Id.* ¶ 60.  They explain that the exclusive dealing arrangements require health plans to "actively encourage" patients who use a Sutter provider to use other Sutter providers.  *Id.* ¶ 92; *see supra* pages 9-11 (excerpting allegations).

    As Sutter points out, this is managed care.[12]  Opposition, ECF No. 15 at 20.  The "exclusive

---

    [11]  As discussed above, the FAC defines "the provision of health care and related services" as including a wide range of medical services including inpatient and outpatient hospital services and physician services.  FAC ¶ 36.

    [12]  Sutter submitted a Request for Judicial Notice with reports by "five of California's largest health plans – Aetna, Blue Cross, Blue Shield, Cigna, and Heath Net – that [Sutter asserts] demonstrate that" "all major health plans have contracts with many of Sutter's competitors." Motion, ECF No. 15 at 20-21 & n.2; Request for Judicial Notice, ECF No. 17 at 3-5 (asking for

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   dealing" allegations do not show substantial foreclosure or a requirement to purchase services only

2   from service providers with an exclusive contract.  *See Allied Orthopedic Appliances*, 592 F.3d at

3   996.  The tying allegations – contracting with one Sutter provider requires contracting with the other

4   Sutter providers – do not allege a requirement that patients can choose only Sutter providers, and the

5   complaint alleges no facts about anticompetitive effect in the form of, for example, an effect on more

6   than an insubstantial volume of commerce.  *See Cascade Health Solutions*, 515 F.3d at 913.

7   Plaintiffs allege that Sutter's conduct "destroys" and "stifles" competition, *see* FAC ¶¶ 3-12

8   (summarized *supra* on page 5) and "dramatically increased price[s]," *id.* ¶ 124, but these allegations

9   are conclusory.  Also, as Sutter points out, high prices alone are not necessarily anticompetitive.

10  Opposition, ECF No. 15 at 27-28; *see Grinnell Corp.*, 384 U.S. at 570-71.  The allegations do not

11  show predatory conduct resulting in or enhancing monopolization.

12      Plaintiffs must provide some factual support for each essential element of the violations they

13  allege.  They did not do so.

14          ***2. The Relevant Market***

15      Plaintiffs' Sherman Act claims require Plaintiffs to establish market power in a "relevant

16  market," meaning a relevant product market and a relevant geographic market.  *See Omega*

17  *Environmental, Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1169 (9th Cir. 1997) (exclusive dealing);

18  *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 42-43 (2006) (tying); *Spectrum*

19  *Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (monopolization); *Newcal Industries, Inc. v.*

20  *Ikon Office Solutions*, 513 F.3d 1038, 1044-45 & n.3 & n.4 (9th Cir. 2008) (standards the same

21  under Sections 1 and 2).  The relevant product market identifies the products or services that

22

23  judicial notice because the reports were filed with the California Department of Managed Health

24  Care ("DMHC") pursuant to the plans' statutory obligations under the Knox-Keene and DMHC
    regulations; analogizing to cases taking judicial notice of public disclosure documents required to be

25  filed with the U.S. Securities and Exchange Commission and cases involving recording of real-estate
    public records); *see supra* pages 6-7 (describing Knox-Keene Act's 15-minute/30-mile scope of

26  service and accessibility requirements for California health plans).  Plaintiffs oppose the motion as
    an impermissible attempt to determine factual issues on a motion to dismiss.  Opposition to Request

27  for Judicial Notice, ECF No. 22 at 4-11.  The court does not need to take judicial notice to grant the

28  motion to dismiss and thus denies as moot the request for judicial notice.

1   compete with each other, and the relevant geographic market identifies the area where the

2   competition in the relevant product market takes place.  *See Los Angeles Mem'l Coliseum Comm'n*

3   *v. NFL*, 726 F.2d 1381, 1392 (9th Cir. 1974).  A complaint may be dismissed under Rule 12(b)(6) if

4   its "relevant market definition is facially unsustainable."  *Newcal Indus.*, 513 F.3d at 1044-45 & n.3.

5       Plaintiffs allege that the relevant market is "the provision of health care and related services" in

6   22 counties in Northern California.  FAC ¶ 35.  They define "health care and related services" as

7   including but not limited to the following:  inpatient hospital services; outpatient hospital services;

8   physician services; services of other providers such as nurses, optometrists, psychologists, or

9   nutritionists; diagnostic laboratory services; home health services; rehabilitation; physical or

10  occupational therapy; preventive health services; emergency services; hospice services; chemical

11  dependency services; and psychiatric services.  *Id.* ¶ 36.  Plaintiffs also allege, "[m]ost importantly

12  for this action, there is a relevant market for the provision of contracted access to health care

13  services through health care plans" (except for the closed-system Kaiser network) that must comply

14  with the Knox-Keene Act.  *Id.* ¶ 37.

15      As to the definition of the "product market," it is broad, and it is not apparent on the face of the

16  complaint why it is a plausible market.  This is not a case where all the services may be combined

17  into a single relevant market.  *See Morgan, Strand, Wheeler & Biggs v. Radiology*, 924 F.2d 1484,

18  1489-90 (9th Cir. 1991) (in determining relevant product market for, and who competed with,

19  private radiologists, the court included office interpretations of radiology tests by nonradiologists

20  and services provided by osteopathic radiologists and radiologists working at university hospitals);

21  *Weiss v. York Hosp.*, 745 F.2d 786, 826 (3d Cir. 1984) ("inpatient health care services" are a

22  legitimate cluster market because a consumer of hospital services makes one purchase decision

23  where to be hospitalized and subsequent treatment decisions are insulated from competitive effect).

24  By contrast, the services here are not substitutes or related services "that enjoy reasonable

25  interchangeability of use and cross-elasticity of demand."  *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d

26  1440, 1446 (9th Cir. 1988); *see also Tanaka v. Univ. of S. California*, 252 F.3d 1059, 1063 (9th Cir.

27  2001).  The only broad thing that Plaintiffs allege – without any factual support – is that it is one

28  product market because it is all about contracted access to all health care services through health

UNITED STATES DISTRICT COURT
For the Northern District of California

1   plans.

2       The geographic market similarly is defined broadly: 22 counties where Sutter provides services.

3   The only support for that definition is the same argument that it is one market because it is about

4   contracted access to services through health plans.  If patients and their health plans are the

5   purchasers, the relevant geographic market should be local, particularly given the interplay with the

6   Knox-Keene Act's 15-minute/30-mile scope of service and accessibility requirements.  Patients (or

7   their physicians or health plans involved in the choice of where the medical services are provided)

8   do not travel over large geographic areas for services.  This suggests that the providers located

9   outside the relatively small geographic area cannot foreclose a substantial percentage of the market

10  from competition, *see Allied Orthopedic Appliances*, 592 F.2d at 996, or affect more than an

11  insubstantial volume of commerce in the tied product market, *see Cascade Health Solutions*, 515

12  F.3d at 913.

13      Even assuming that some kind of 22-county regional geographic market could be established for

14  managed care through health plans (which is all that Plaintiffs have alleged), Plaintiffs do not allege

15  facts showing Sutter's market power either in the entire region or in particular counties.

16      In sum, Plaintiffs do not allege specific products (and instead allege products in the form of

17  contracted access to health care services through health plans), and they do not allege any specific

18  geographic areas (and instead allege an amorphous region of 22 counties that is not tethered to any

19  factual allegations about Sutter's market power).  The allegations about the relevant market do not

20  identify the services that compete with each other or the geographic area where competition takes

21  place.  *See Los Angeles Mem'l Coliseum Comm'n*, 726 F.2d at 1392.  The allegations thus are

22  facially unsustainable.  *See Newcal Industries, Inc.*, 513 F.3d at 1044-45 & n.3.

23  **III.  CARTWRIGHT ACT CLAIM**

24      Plaintiffs allege that Sutter violated California's Cartwright Act, which prohibits any

25  combination "[t]o prevent competition in . . . the sale or purchase of merchandise . . . or any

26  commodity.  FAC, ¶¶ 160-168; Cal. Bus. & Prof. Code § 16720(c); *Knevelbaard Dairies v. Kraft*

27  *Foods*, 232 F.3d 979, 986 (9th Cir. 2000).  Plaintiffs' claim rests on the same allegations of tying

28  and exclusive dealing arrangements.  *See, e.g.,* FAC ¶ 162.  Sutter challenges Plaintiffs' antitrust

1  standing and also argues that they fail to state a claim.  Opposition, ECF No. 15 at 21-22.  The court

2  holds that Plaintiffs fail to state a claim.

3  **A. Standing**

4      Antitrust standing under the California Cartwright Act is broader than under the federal Sherman

5  Act.  *See Knevelbaard Dairies*, 232 F.3d at 987, 991. The parties disagree about whether the

6  *Associated General Contractors* factors apply and – if they do – whether Plaintiffs have standing.

7  Motion, ECF No. 15 at 29; Reply, ECF No. 24 at 8-12; Opposition, ECF No. 20 at 12-13.  The

8  California courts have not decided the issue (although intermediate appellate courts have applied the

9  factors).  *See In Re Flash Memory Antitrust Litig.*, 643 F.Supp. 1133, 1151-52 (N.D. Cal. 2009); *In*

10  *re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1097 (N.D. Cal. 2007) .  The

11  Ninth Circuit has not addressed the issue.  Courts in this district have reached different conclusions.

12  The court's view is that the cases that do not require the factors are persuasive.  *See In re Graphics*

13  *Processing Units Antitrust Litig.*, 540 F. Supp. 2d at 1097 (N.D. Cal. 2007) ("some California

14  appellate courts have used the *AGC* test . . . . [but t]his is not the same as showing that *AGC* has been

15  adopted"; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1120-24 (N.D. Cal.

16  2008) (need clear directive from state legislature or high court; plaintiffs had standing under factors

17  anyway*; In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2011 WL 3894376, at *11-

18  12 (N.D. Cal. Aug. 3, 2011) (finding plaintiff had standing based on reasoning in *In re TFT-LCD*).

19      Because Plaintiffs fail to state a claim, the court does not decide the standing issue but likely

20  would find standing.  The analysis under the Sherman Act about nature of the injury is the same.

21  The issue about Plaintiffs' status as indirect purchasers might be relevant to a Sherman Act damages

22  claim under *Illinois Brick*, but they are not dispositive under the Cartwright Act because California

23  courts have allowed indirect purchasers to pursue Cartwright Act claims that arise from agreements

24  to restrain trade.  *See In Re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp.

25  2d 1072, 1087 (N.D. Cal. 2007); Opposition, ECF No. 15 at 29 n.7.  The allegations about damages

26  appear sufficient at the pleadings stage.  The risk of duplicative recovery does not appear to be an

27  issue in this kind of case where no direct purchasers are bringing claims, and it seems unlikely that

28  they will.

*UNITED STATES DISTRICT COURT*
*For the Northern District of California*

C 12-04854 LB
ORDER

UNITED STATES DISTRICT COURT
For the Northern District of California

**B.  Failure to State a Claim**

Plaintiffs' claim rests on the same allegations about tying and exclusive dealing.  Thus, Plaintiffs fail to state a Cartwright Act claim for the same reasons that they failed to state a section 1 Sherman Act claim.

**IV.  THE UNFAIR COMPETITION LAW CLAIM**

Plaintiffs also charge that the tying and exclusive dealing is unfair competition in violation of California's Unfair Competition Law ("UCL"), which prohibits unlawful or unfair business practices.  *See* FAC ¶ 172; Cal. Bus. & Prof. Code § 17200.[13]  As to the "unlawful" prong, the claim fails for the same reasons as the antitrust claims fail.  As to the unfairness prong, as discussed above, Plaintiffs' allegations about tying and exclusive dealing challenge managed care and do not allege facts that enable the court to conclude that the complaint plausibly states an unfairness claim.  In any event, the court would decline to exercise supplemental jurisdiction over the claim.  *See* 28 U.S.C. § 1367.

**V.  UNJUST ENRICHMENT**

Plaintiffs claim for unjust enrichment is based on Sutter's retention of their overpayments and it is predicated on the same allegations about tying and exclusive dealing.  *See* FAC ¶¶ 183-88.  Sutter argues that unjust enrichment is not an independent cause of action under California law.  Motion, ECF No. 15 at 30.

If a plaintiff invokes a valid theory of recovery, California courts allow claims for "unjust enrichment" to proceed, regardless of the label attached to the cause of action.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 10-5616 SI, MDL No. 1827, 2012 WL 506327, at *4 (N.D. Cal. Feb. 15, 2012).  "To state a claim for restitution, a plaintiff 'must plead receipt of a benefit and the unjust retention of the benefit at the expense of another.'"  *Walters v. Fid. Mortg. of Cal.*, No. 2:09-cv-3317 FCD/KJM, 2010 WL 1493131, at *12 (E.D. Cal. Apr. 14, 2010) (quoting *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000)).  Courts in this district hold that California law permits restitution to be awarded for unjust enrichment "either (1) in lieu of breach of contract

---

[13]  The "fraudulent" prong of the UCL is not implicated by the lawsuit.

damages, where an asserted contract is found to be unenforceable or ineffective, or (2) where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct, but the plaintiff has chosen not to sue in tort." *Oracle Corp. v. SAP AG,* No. C 07-1658 PJH, 2008 WL 5234260, at *8 (N.D. Cal. Dec. 15, 2008)).

For the same reasons that Plaintiffs fail to state antitrust or UCL claims, they fail to state a claim for unjust enrichment. The court also would decline supplementary jurisdiction.

## CONCLUSION

The court grants Sutter's motion to dismiss and denies as moot its request for judicial notice. Plaintiffs have 28 days from the date of this order to file a second amended complaint.

This disposes of ECF Nos. 15 & 17.

**IT IS SO ORDERED.**

Dated: June 3, 2013

_____
LAUREL BEELER
United States Magistrate Judge

UNITED STATES DISTRICT COURT
For the Northern District of California