AZRA Z. MEHDI (220406)
ARCELIA HURTADO (191481)
THE MEHDI FIRM
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
(415) 293-8039
(415) 293-8001 (fax)
azram@themehdifirm.com
ahurtado@themehdifirm.com

Counsel for Plaintiffs and the [Proposed] Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DJENEBA SIDIBE and DIANE DEWEY, on Behalf of Themselves and All Others Similarly Situated, | Case No.: 3:12-cv-4854-LB |
| | CLASS ACTION |
| Plaintiffs, | SECOND AMENDED COMPLAINT |
| vs. | |
| SUTTER HEALTH, and DOES 1 through 25, inclusive, | |
| | DEMAND FOR JURY TRIAL |
| Defendants. | |

TABLE OF CONTENTS

I. NATURE OF THE ACTION .................................................................................. 1

II. JURISDICTION AND VENUE ............................................................................ 6

III. PARTIES ............................................................................................................ 7

    A. The Plaintiffs ............................................................................................ 7

    B. The Defendant ........................................................................................... 8

    C. Doe Co-Conspirators ............................................................................. 11

IV. SUBSTANTIVE ALLEGATIONS ..................................................................... 11

    A. The Purchase of Health Care Services ................................................... 11

    B. Sutter's Contracts with Commercial Health Insurers Incorporate Its All-or-Nothing and Other Anti-Competitive Provisions. ...................................................... 13

V. RELEVANT MARKETS ................................................................................... 16

    A. The Relevant Product Markets ............................................................... 16

        1. Inpatient Hospital Services ....................................................... 16

        2. Specialty Provider Services ....................................................... 18

    B. The Relevant Geographic Markets ......................................................... 20

        1. Local Geographic Markets ........................................................ 20

        2. Linked Geographic Markets ...................................................... 23

VI. MARKET POWER ............................................................................................ 24

VII. HARM TO COMPETITION DUE TO SUTTER'S CONDUCT ......................... 29

    A. Sutter's Conduct Results in Supra-Competitive Health Insurance Prices. ................... 29

    B. Sutter Forecloses Competition by Acquiring Physician Groups and Forcing Insurers Falsely to List All Sutter Doctors as "High-Performers." ............................... 32

    C. Sutter Has Deliberately Prevented the Creation of Competition by the City of San Francisco. .................................................................................. 36

    D. Hospital Acquisitions and Closures ....................................................... 37

        1. San Leandro Hospital ................................................................ 38

        2. Sutter Medical Center of Santa Rosa ........................................ 39

        3. Sutter Auburn Faith ................................................................... 40

4. Mills Peninsula Medical Center ............................................................ 42

5. Marin General Hospital ...................................................................... 43

6. Alta Bates and Summit ...................................................................... 43

7. St. Luke's and CPMC ........................................................................ 44

E. Quality of Care Suffers. ................................................................. 46

VIII. CLASS ALLEGATIONS ................................................................. 47

IX. CAUSES OF ACTION ...................................................................... 49

COUNT I: Unreasonable Restraint of Trade in Violation
of Section 1 of the Sherman Act .......................................... 49

COUNT II: Tying in Violation of Section 1 of the Sherman Act ............................ 50

COUNT III: Monopolization and Attempted Monopolization in
Violation of Section 2 of the Sherman Act ............................ 51

COUNT IV: Unreasonable Restraint of Trade in Violation of the Cartwright Act ............... 53

COUNT V: Violation of Cal. Bus. & Prof. Code Section 17200, *et seq.* ..................... 55

COUNT VI: Unjust Enrichment ................................................................. 57

X. PRAYER FOR RELIEF ...................................................................... 58

XI. DEMAND FOR JURY TRIAL ............................................................ 60

SECOND AMENDED COMPLAINT                              No. 3:12-cv-04854-LB

Plaintiffs Djeneba Sidibe and Diane Dewey on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this civil antitrust action to enjoin defendant Sutter Health and its affiliated entities (collectively, "Sutter") from entering into, maintaining, or enforcing "all-or-nothing" contracts with commercial health insurers that restrain trade and foreclose competition, in violation of the Sherman Act, the Cartwright Act and California's Unfair Competition Law ("UCL"), and to remedy the harmful effects of Sutter's unlawful and anti-competitive conduct. Plaintiffs demand a trial by jury of all claims properly triable thereby, and allege as follows:

## I.   NATURE OF THE ACTION

1.   Commercial health insurers such as Blue Cross, UnitedHealthcare, Aetna, CIGNA and others compete to offer health insurance and administrative services products that are attractive to plan sponsors for group healthcare coverage (such as employers or unions) as well as individuals purchasing health insurance. An important aspect of their competitive offering is the ability to offer a provider network that enables plan members to obtain services from facility and non-facility medical providers at negotiated rates in the areas in which plan members require such services.

2.   Many plan sponsors place a significant value on having access to a provider network that includes all local areas in a region (such as Northern California) because employers often have multiple locations across regions, as well as employees that live throughout a region. It is, therefore, important to obtain coverage across the entire area in which their employees work and live. Thus, if a commercial health insurer offers a network that has significant gaps within a region, it is at a substantial competitive disadvantage to its competitors, and it may even be precluded from competing meaningfully for the business in a region.

3.   Furthermore, commercial health insurers compete not only with respect to the make-up of their networks, but also with respect to the network rates that they are able to negotiate with providers. If a commercial health insurer pays rates to network providers that are substantially above

SECOND AMENDED COMPLAINT                                No. 3:12-cv-04854-LB

its competitors' rates, the premiums it will charge to fully insured customers will be higher than its competitors' premiums, and therefore its health insurance products and services will be less attractive. Likewise, because self-insured customers pay higher healthcare costs if their network rates are higher, a commercial health insurer with higher network rates than its competitors will be impaired in its ability to sell services to self- insured customers.

4.    Accordingly, commercial health insurers seek to contract with a network of facility and non-facility medical providers that provide both (i) access throughout the entire area in which its targeted customers live and work, and (ii) competitively attractive (*i.e.*, low) network rates.

5.    Providers of medical services such as hospitals, on the other hand, seek to increase their revenues by maximizing both the number of procedures that they sell as well as the prices at which they sell them. Because insured customers are indifferent to price when they choose between participating providers if a provider such as a hospital secures designation as a "participating provider" in a health plan's network, this virtually ensures that a percentage of the plan enrollees approximately corresponding to the hospital's local market share will use the hospital. This is tremendously valuable to the provider. Therefore the principle manner in which a provider can increase the number of procedures that it sells is by securing listings as a "participating provider" with health insurers. In return for its listing as a "participating provider," the provider agrees to reduced network rates with the health insurer.

6.    Accordingly, medical providers seek to contract with commercial health insurers in a manner that provides both (i) a large volume of demand through listings as a participating network provider, and (ii) high network rates.

7.    This case concerns a tremendously dominant medical provider, Sutter, that controls a Northern California network that includes at least 31 acute care facilities, 4 skilled nursing facilities, 2 chemical dependency recovery facilities with a total of 5,397 licensed beds; 14 home healthcare

2

locations; and contracts with medical groups operating as professional corporations that account for the services of at least 2,499 physicians and physician extenders.

8.      Sutter has acquired illegal monopolies in various product and geographic markets in Northern California, including inpatient hospital services in Alameda, San Francisco and Sacramento Counties, among others. Sutter employs various practices, tactics and policies in restraint of trade. It also uses these tactics and policies to maintain and reinforce these monopolies, as well as to expand its monopoly power into new product and geographic markets.

9.      Among these tactics is Sutter's policy of forcing commercial health insurers to list each and every hospital and provider in the Sutter network, including each and every Sutter physician, as a participating provider in their health plans. Sutter thus literally prohibits selective contracting for its various hospitals, services and physician groups. It categorically prevents the back and forth, give and take, and bargaining that normally takes place between insurers and individual hospitals, physician groups or other providers. Because negotiation provider-by-provider basis is prohibited, commercial health insurers are prevented from negotiating lower in-network prices with Sutter providers, which would otherwise dramatically lower premiums, co-payments and deductibles for enrollees. Instead, either all Sutter providers must be listed as participating providers or no Sutter providers whatsoever may be utilized in-network. One negotiation, one policy, one contract, take it or leave it, all-or-nothing.

10.      Sutter is able to impose this all-or-nothing policy on insurers because it owns a number of "must have" hospitals that commercial health insurers have no choice but to include in their networks if they want to (1) create a viable product with broad regional coverage throughout the entire area which their customers live and work, and (2) comply with California regulations governing accessibility standards for health plans. No commercial health insurer could practicably offer a licensed health plan in the Bay Area/Sacramento region without in-network access to at least some of Sutter facilities in Alameda, San Francisco and Sacramento Counties.

3

SECOND AMENDED COMPLAINT                                              No. 3:12-cv-04854-LB

11. And in return for this aggressive demand that all Sutter providers be designated participating providers in its networks Sutter does not even grant any pricing concessions to commercial health insurers. On the contrary, Sutter demands prices over 50% higher than its local competitors (where they exist). Sutter's prices are also over 50% higher than the prices for the same procedures in Southern California and over 80% higher than the statewide average.

12. In sum, even as it charges astronomically high prices, Sutter forces every commercial health insurer in Northern California to list every Sutter provider as a "participating provider" thereby automatically capturing — and foreclosing from Sutter's competitors — a percentage of the insurer's demand approximately corresponding to each provider's local market share. All of this is possible only because no commercial health insurer could practicably do business in Northern California without in-network access to certain hospitals in the Sutter network. It is as simple as that.

13. As Sean Harrigan, the President of the California Public Employees' Retirement System ("CalPERS") has stated: "Every citizen in the state of California should be outraged by Sutter," which uses its "monopoly hold on some markets" to extort high prices.

14. Among other effects, Sutter's all-or-nothing contracts insulate Sutter-controlled physician groups from competition in various specialty physician services product markets ("Specialty Provider Services," as defined below). This has prevented commercial health insurers from negotiating lower in-network prices with Sutter physician groups, which commercial insurers would have otherwise accomplished in the absence of the challenged all-or-nothing contracts. Lower in-network prices for Specialty Provider Services would benefit class members in the form of lower premiums, and less money paid directly to physicians in the form of co-payments and deductibles.

15. The all-or-nothing contracts also defeat the desire of both insurers and consumers to increase efficiency and the quality of medical services by utilizing only the best and most-efficient physicians. As demonstrated by their experiences elsewhere, if commercial insurers were free to contract in a competitive environment, they would have excluded less-efficient Sutter physicians from

4

their networks. Instead, Anthem Blue Cross, UnitedHealthcare, and Aetna have all tried to launch "high performance network" products in Northern California that include only the most-efficient physicians who meet objective quality standards for performance and price efficiency. Yet in Northern California, not one of these insurers has succeeded in offering a product that provides access to less than all Sutter physicians. Sutter's contracting practices thus shield its physicians from the forces of competition, leaving them unconstrained in their ability to prescribe inefficient care through the Sutter network. The inclusion of less-efficient physicians in commercial insurers' networks harms consumers because these physicians unnecessarily increase the total amount of money paid for physician services because less-efficient physicians, among other things, fail to diagnose medical problems properly at an early state, order unnecessary tests and procedures; order less cost-effective tests and procedures; and make mistakes that require multiple visits to correct.

16.     Sutter benefits from this inefficiency because the physicians in the groups must utilize or make referrals to Sutter and its affiliated entities, even when competing facilities would offer lower prices or higher quality. Sutter threatens financial penalties and immediate contract termination if health plan's fail to steer their members to Sutter providers. Sutter thereby transforms the inefficiency of its physicians into further increases in its revenues, market share and market power.

17.     There is no valid pro-competitive business justification for Sutter's all-or-nothing contracts.

18.     In addition, the very monopolies that are the basis for the market power that Sutter uses to force the all-or-nothing contracts on insurers, have been willfully acquired by Sutter by gaining control over financially challenged hospitals through false promises and infusions of cash to local communities who find themselves "up against a wall" as they strive to fulfill the basic human right of access to health care. The Sutter take-overs have consistently resulted in the acquisition of additional monopoly power by Sutter, after which it breaks its promises, consolidates hospital

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

services and eliminates competition in order to leverage control in price setting in the health care market.

19.     These business practices — evidenced in repeated conduct spanning 15 years and continuing to the present day — foreclose competition and create entry barriers through the direct shuttering of hospitals and providers, the prevention of the acquired hospitals from competing in price, and the preclusion of new competitors from entering the market. Examples of this misconduct discussed herein include: (1) San Leandro Hospital and Eden Medical Center, (2) Sutter Medical Center of Santa Rosa, (3) Sutter Auburn Faith, (4) Mills Peninsula Medical Center, (5) Marin General Hospital, (6) Alta Bates and Summit Medical Center ("Alta Bats/Summit"), and (7) St Luke's Hospital ("St. Luke's") and California Pacific Medical Center ("CPMC").

20.     In addition, seeking further to reinforce and expand its monopoly power, Sutter applied for an HMO license from the California Department of Managed Health Care ("DMHC") in August 2012 and intends to begin selling a Sutter-owned health plan in the Fall for coverage beginning 2014.

21.     Sutter's conduct restrains trade, forecloses competition and monopolizes, in violation of the Sherman Act, the Cartwright Act and California's UCL under Cal. Civ. Code §17200.

## II.   JURISDICTION AND VENUE

22.     Plaintiffs bring this action under §16 of the Clayton Act, 15 U.S.C. §§15, 26, for violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2. This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§1331 and 1337.

23.     Plaintiffs also bring this action under the Cartwright Act, Cal. Bus. & Prof. Code §16720, *et seq.*, and California's UCL, Cal. Bus. & Prof. Code §17200, *et seq.*, to obtain restitution, recover statutory damages, and to secure other relief against Sutter for violations of those laws. This Court has subject matter jurisdiction of the pendant California state law claims under 28 U.S.C. §§1332(d) and 1367 because the claims arise from the same nucleus of operative facts as the

SECOND AMENDED COMPLAINT                                              No. 3:12-cv-04854-LB

1  remaining claims in this Complaint over which this Court has original federal question subject-matter

2  jurisdiction.

3      24.     This Court also independently has subject-matter jurisdiction over all the Counts of

4  this Complaint pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), because the amount in

5  controversy sought exceeds $5 million, among other things.

6      25.     Venue is proper in this District under §12 of the Clayton Act, 15 U.S.C. §22, and

7

8  under 28 U.S.C. §1391, because a substantial part of the events giving rise to plaintiffs' claims

9  occurred in this District and Sutter transacts business and is found within this District, and thus is

10 subject to personal jurisdiction in this District. Sutter is engaged in, and its activities substantially

11 affect, interstate and foreign trade and commerce.

12 **III.  PARTIES**

13     **A.     The Plaintiffs**

14     26.     Plaintiff Djeneba Sidibe ("Sidibe") is currently a resident of Marin County and has

15 been since January 2012. From November 2009 until January 2012, she was a resident of Alameda

16 County and prior to November 2009, she was a resident of San Mateo County. Since March 2012,

17 Sidibe has been enrolled in a health plan with commercial health insurer, Aetna. Beginning in or

18 around October 2005 until March 2012, Sidibe was enrolled in a health plan with Anthem Blue

19

20 Cross. During the period relevant herein, Sidibe paid premiums in order to be enrolled as a plan

21 member in the respective health plans. During the period relevant herein, Sidibe received a variety of

22 health care services at various Sutter facilities, including the Mills-Peninsula Health Services facility.

23 As a result of Sutter's anti-competitive conduct, Sidibe and other members of the class have been

24 injured in their business and property by being forced to pay higher premiums, co-payments,

25

26 deductibles and other out-of-pocket payments not covered by the health plan, than they otherwise

27 would have paid in the absence of Sutter's anti-competitive conduct.

28

SECOND AMENDED COMPLAINT                              No. 3:12-cv-04854-LB

27.     Plaintiff Diane Dewey ("Dewey") is currently and since 1994 has been a resident of San Francisco County. Dewey was enrolled in a health plan with commercial health insurer, Anthem Blue Cross from 2008 until 2010. Beginning in or around 2010 until 2012, Dewey was enrolled in a health plan with the Regence Blue Cross Blue Shield. Dewey is currently enrolled in a health plan with Premera Blue Cross. During the period relevant herein, Dewey paid premiums in order to be enrolled as a plan member in the respective health plans. During the period relevant herein, Dewey received a variety of health care services at various Sutter facilities, including the CPMC facility. As a result of Sutter's anti-competitive conduct, Dewey and other members of the class have been injured in their business and property by being forced to pay higher premiums, co-payments, deductibles and other out-of-pocket payments not covered by the health plan, than they otherwise would have paid in the absence of Sutter's anti-competitive conduct.

**B.     The Defendant**

28.     Sutter is a non-profit corporation organized and existing under the laws of the State of California, with its principal place of business located at 2200 River Plaza Drive, Sacramento, California. Sutter controls the largest and most dominant hospital chain and provider of health care services in Northern California. Sutter is the "parent" of various non-profit and for-profit entities and organizations that operate primarily in Northern California and that are directly or indirectly (through one or more intermediaries) controlled by or under common control with, Sutter.

29.     Sutter's network — located almost exclusively in Northern California — includes at least 31 acute care facilities, 4 skilled nursing facilities, 2 chemical dependency recovery facilities with a total of 5,397 licensed beds; 14 home healthcare locations; and contracts with medical groups operating as professional corporations that account for the services of at least 2,499 physicians and physician extenders.

30.     Sutter operates its provider network through medical foundation corporations and hospital corporations in the relevant markets. Sutter is the sole member of its medical foundations

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

that contract with multi-specialty medical groups on an exclusive basis to provide various physician services to the Sutter's consumers.

31. Sutter's network consists of a number of "must-have" hospitals that contract with commercial health insurers. Sutter's network is comprised of the following medical foundations and hospitals corresponding to the counties Sutter serves:

(1) The Sutter Pacific Medical Foundation and Sutter West Bay Hospitals, which do business as CPMC (operating on five campuses in San Francisco), Novato Community Hospital, Sutter Lakeside Hospital, Sutter Medical Center of Santa Rosa and St. Luke's collectively serve residents of the City and County of San Francisco, Marin, Lake and Sonoma Counties through 285 physicians and physician extenders.

(2) The Sutter East Bay Medical Foundation and the Sutter East Bay Hospitals, which include Alta Bates/Summit (operating on three campuses with four addresses), Sutter Delta Medical Center, Eden Medical Center (operating Eden Medical Center and San Leandro Hospital), Sutter Medical Center, Castro Valley, and East Bay Perinatal Center serve the residents of Alameda and Contra Costa Counties through 175 physicians and physician extenders.

(3) The Palo Alto Medical Foundation and Mills-Peninsula Health Services ("MPHS") that includes Mills-Peninsula Medical Center, Mills Health Center, Sutter Maternity and Surgery Center of Santa Cruz and Menlo Park Surgical Hospital serve the residents of San Mateo, Santa Clara and Santa Cruz Counties through 1,036 physicians and physician extenders.

(4) The Sutter Medical Foundation, and Sutter Medical Center Sacramento (which includes Sutter General Hospital and Sutter Memorial

9

Hospital), Sutter Center for Psychiatry, Sutter Davis Hospital, Sutter Auburn Faith Hospital, Sutter Roseville Medical Center, Sutter Solano Medical Center and Sutter Amador Hospital serve the residents of Amador, El Dorado, Nevada, Placer, Sacramento, Solano, Sutter, Yolo and Yuba Counties through 737 physicians and physician extenders.

(5)     The Sutter Gould Medical Foundation and Sutter Central Valley Hospitals (which include Memorial Medical Center, Memorial Hospital Los Banos and Sutter Tracy Community Hospital) serve the residents of Merced, San Joaquin and Stanislaus Counties through 266 physicians and physician extenders.

32.     Sutter also controls Sutter Coast Hospital, an acute care hospital located in Del Norte County, California and owns and operates Kahi Mohala Behavioral Health, a psychiatric hospital, located in Oahu, Hawaii.

33.     Sutter Visiting Nurse Association and Hospice does business as Sutter Care at Home, a home health and hospice organization with locations throughout Northern California.

34.     Beyond its publicly disclosed network, Sutter's *de facto* and undisclosed network includes numerous additional entities — highly profitable laboratories, Cayman Islands insurance companies, medical device suppliers and the like — that are in some cases: (1) owned in whole or in part by officers, directors and board members of Sutter; (2) share board members or officers with Sutter or its various affiliated entities; and/or (3) pay compensation, benefits, shares or stock options to such officers, directors or board members. On information and belief, Sutter routinely transfers funds — both directly and through transfer pricing and other techniques — between many of the publicly disclosed and non-disclosed for-profit and non-profit entities. Sutter provides minimal disclosure regarding these transfers or the entities that make or receive such transfers.

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

35.     A sample of the for-profit entities that Sutter, its managers and/or directors currently or previously own or owned and control in-whole or in-part include, among others: Abbey Medical, P.I.T., Bay Mesh, Advanced Respiratory Care Partnership, Alta Imaging Association, North Bay MRI, Alta CT Services, East Medical Network, Inc., Guardian Care, Inc., East Bay Health Services, Inc., Alta Bates Medical Resources, East Bay Health Funding, Valley Surgical Partners, Unified Management Services Organization, Sun Medical Technologies, Inc., Timberlake Corporation, Synvasive Technology, Inc., Sutter Ventures, Ltd., Sutter Preferred Health Plan Services, Inc., Omni Healthcare, Inc., Sutter Preferred Health & Life Insurance Company, Memorial Partners In Care, Inc., Integrated Surgical Systems, Inc., Derijan Associates, Inc., Managed Care Systems, Inc., Marin Outpatient Imaging Center, Marin CT Scanning, Marin Magnetic Imaging, North Bay Nursing Services, and Roseville Health Enterprises.

### C.     Doe Co-Conspirators

36.     Plaintiffs are currently unaware of the true names, capacities, or basis for liability of defendants Does 1 through 25, inclusive, and therefore sue said defendants by their fictitious names. On information and belief, Sutter has established and/or exercises some degree of ownership or control over various entities and organizations that are a party to, benefit from, or are a repository for illegal proceeds created by the misconduct described herein. Plaintiffs will amend this Complaint (if necessary) to allege their true names, capacities or basis for liability when the same have been ascertained. Plaintiffs are informed and believe, and on that basis allege, that defendants Does 1 through 25, inclusive, and each of them, are in some manner liable to plaintiffs and the members of the class, and/or are proper and necessary parties to this action in light of the relief requested.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     The Purchase of Health Care Services

37.     Privately insured patients obtain health insurance coverage primarily through health plans offered by commercial health insurers. Employers that offer health insurance negotiate with

SECOND AMENDED COMPLAINT                                         No. 3:12-cv-04854-LB

health plans and select the combination of rates, benefit structures, and healthcare provider networks that best meets the needs of the employer and its employees. Employers generally do not negotiate directly with hospitals, instead relying on commercial health insurers to do so.

38.     Commercial health insurers compete with one another to be selected by employers to be included in the menu of plans made available to employees. Once on the employer's menu, health plans compete with one another to attract enrollees. Commercial health insurers regularly survey members and review consumer preferences in order to maintain marketable and attractive provider networks that appeal to employers, employees and the self-insureds.

39.     Similarly, medical providers such as hospitals compete with each other for inclusion in health plans' provider networks.

40.     Rates for medical services are determined in contract negotiations between providers (like Sutter) and commercial health insurers that negotiate rates for services on behalf of their customers. For example, rates for inpatient hospital services are determined through contract negotiations between hospitals and commercial health insurers. These negotiations typically involve a series of offers and counteroffers, and result in either the inclusion of a hospital in a health insurer's network, or not.

41.     The rates and terms of the contracts that are negotiated by a hospital and a commercial health insurer are a function of each party's bargaining power in the negotiations. The respective degrees of bargaining power are determined by how each party would fare if no agreement were reached.

42.     The bargaining power of a provider is tied to the value that the commercial health insurer's current and potential customers place on having in-network access to that hospital. This is reflected in the number of plan enrollees that use or would use the particular hospital provider. The more a plan's enrollees value a hospital, the more bargaining leverage the hospital possesses in its negotiations with the commercial health insurers. If failing to reach an agreement with a particular

SECOND AMENDED COMPLAINT                                              No. 3:12-cv-04854-LB

hospital provider would make a health insurer's network substantially less attractive to its enrollees, then that hospital would have substantial bargaining leverage vis-à-vis the commercial health insurer.

**B.    Sutter's Contracts with Commercial Health Insurers Incorporate Its All-or-Nothing and Other Anti-Competitive Provisions.**

43.    As a policy, Sutter includes the following language in all its contracts with commercial health insurers:

> Each payer accessing Sutter Health providers shall designate ALL Sutter Health providers (*see* Sutter Health provider listing) as participating providers unless a Payer excludes the entire Sutter Health provider network.

44.    As a result of this policy, the bargaining power — or indispensability — of every hospital and service in Sutter's network is elevated to the level of Sutter's most valuable hospital or service. One demonstrable effect of this — as evidenced in detail below — is supra-competitive pricing imposed on the commercial health insurers and passed on to enrollees including plaintiffs and members of the class.

45.    A second effect of the all-or-nothing policy is the mandatory inclusion of all Sutter providers in insurers' provider networks. As Sutter's policy requires, this means that the health insurer "shall designate ALL Sutter Health providers … as participating providers." Sutter's designation as a participating provider means that enrollees of the health plan will use the Sutter provider in a percentage approximately corresponding to Sutter's local market share. It also prevents the health insurer from channeling enrollees to more efficient providers or achieving volume discounts.

46.    Sutter's mandatory inclusion of all Sutter providers thus defeats the very purpose of managed care, which is based on the idea that some providers will be excluded from health care networks and/or reimbursed at different rates. "Selective contracting intensifies price competition and allows payors to negotiate volume discounts and choose providers based on a range of criteria…. When insurers have a credible threat to exclude providers from their networks and channel patients

SECOND AMENDED COMPLAINT                                          No. 3:12-cv-04854-LB

elsewhere, providers have a powerful incentive to bid aggressively." Federal Trade Commission

("FTC") and the Department of Justice ("DOJ") Report, "Improving Health Care: A Dose of

Competition," at Ch. 1 at 4 (July 2004),

http://www.ftc.gov/reports/healthcare/040723healthcarerpt.pdf.

47.     Similarly, according to a 2011 FTC and DOJ report, conduct that may "prevent

private payers from obtaining lower prices and better quality service for their enrollees" includes:

> Tying sales (either explicitly or implicitly through pricing policies) of the
> ACO's [accountable care organization] services to the private payer's purchase
> of other services from providers outside the ACO (and vice versa), including
> providers affiliated with an ACO participant (*e.g.*, an ACO should not require
> a purchaser to contract with **all** of the hospitals under common ownership
> with a hospital that participates in the ACO).

FTC/DOJ, "Statement of Antitrust Enforcement Policy Regarding Accountable Care Organizations

Participating in the Medicare Shared Savings Program" ("DOJ/FTC Antitrust Policy Statement"), at

10–11 (2011) (emphasis in original), http://www.justice.gov/atr/public/health_care/276458.pdf.

This is precisely the kind of all-or-nothing provision that Sutter imposes on health insurers.

48.     The DOJ/FTC Antitrust Policy Statement also proscribes:

> Preventing or discouraging private payers from directing or incentivizing
> patients to choose certain providers, including providers that do not
> participate in the ACO, through "anti-steering," "anti-tiering," "guaranteed
> inclusion," "most-favored-nation," or similar contractual clauses or
> provisions.

*Id*.

49.     Sutter engages in the anti-tiering conduct proscribed by the DOJ and FTC. Sutter's

all-or-nothing policy forces commercial health insurers to include as participating providers every

Sutter physician group and every Sutter physician in those groups. Many health insurers, including

Blue Cross, UnitedHealthcare, and Aetna have tried to launch "high performance network" ("HPN")

products that highlight the most-efficient physicians that meet objective quality standards for

performance and efficiency. Yet in Northern California, not one of these insurers has succeeded in offering a product that provides access to less than **all** Sutter physicians.

50.     This harms the patients who patronize a physician who is — for example — inappropriately classified as an "Aexcel designated" physician in Aetna's high-performance network or a "SignatureValue Alliance designated" physician in UnitedHealthcare's high-performance network **solely because the physician is a member of a Sutter-owned physician group** and solely because Sutter has leveraged its market power to require that all Sutter physicians be designated as being "high-performance" regardless of their actual track record.

51.     Sutter's policies harm all Northern California patients because Sutter has distorted the incentives faced by physicians. In the absence of Sutter's all-or-nothing requirement, physicians would have an incentive to compete with other physicians on quality and cost, in order to obtain the certification as particularly high-quality providers offered by commercial health insurers such as Aetna, UnitedHealthcare and others. This would incentivize physicians not only to improve their own performance, by eliminating unnecessary testing and procedures, it would also to cease the practice of referring patients to overly expensive hospitals and specialists.

52.     As a policy, Sutter also includes language in all its contracts with commercial health insurers:

> Sutter Health shall require each group health payer accessing Sutter Health providers through the [health plan] network to actively encourage members obtaining medical care to use Sutter Health providers. . . . "[A]ctively encourage" or "active encouragement" means incentivizing members to use participating providers through the use of one or more of the following: reduced co-payments, reduced deductibles, premium discounts directly attributable to the use of a participating provider, financial penalties, or requiring such members to pay additional sums directly attributable to the non-use of a participating provider.
>
> If Sutter Health or any provider learns that a payer … does not actively encourage its members to use network participating providers . . . Sutter shall have the right upon not less than thirty (30) days' written notice to terminate that payer's right to the negotiated rates. In the event of such termination, the terminated payer shall pay for covered services rendered by providers at 100%

SECOND AMENDED COMPLAINT                                             No. 3:12-cv-04854-LB

of billed charges until such time as Sutter reasonably believes and notices that the payer does in fact actively encourage its members to use network participating providers . . . .

53.     The foregoing provisions force commercial health insurers to steer patients to Sutter facilities regardless of whether other providers or facilities offer superior medical services by extracting financial penalties for non-compliance. This policy, in conjunction with the all-or-nothing policy has allowed Sutter to leverage a few local monopolies into spiraling prices and ever-increasing market power for Sutter.

## V.     RELEVANT MARKETS

### A.     The Relevant Product Markets

#### 1.     Inpatient Hospital Services

54.     The sale of general acute-care inpatient hospital services ("Inpatient Hospital Services") is a relevant product market in this case. Inpatient Hospital Services consist of the cluster of services consumed by patients who spend one or more nights in the hospital. The cluster of services includes physician services, radiology services, and the services of other medical professionals such as nurses and technicians. Although individual inpatient hospital services are not substitutes for each other (*e.g.*, obstetrics and cardiac services are not substitutes for each other), the various individual Inpatient Hospital Services can be aggregated for analytic convenience.

55.     A patient's choice to consume Inpatient Hospital Services is almost exclusively the product of medical judgment rather than a decision made based on cost. Thus, patients are unlikely to substitute non-medical services or other types of medical services (*e.g.*, outpatient hospital services) for Inpatient Hospital Services in response to an increase in the price of Inpatient Hospital Services.

56.     The principal direct purchasers in the market for contracted access to Inpatient Hospital Services are commercial health insurers (which does not include Medicare, Medicaid, or other government payors). Enrollees (consumers/plan members/insureds/patients such as the plaintiffs and class members) directly receive a benefit when commercial health insurers pay less for

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

Inpatient Hospital Services, and are directly harmed when commercial health insurers pay more for Inpatient Hospital Services. Enrollees are harmed because higher prices for Inpatient Hospital Services translate into higher premiums and less generous plan benefits, including in Specialty Provider Services. In addition, higher prices for Inpatient Hospital Services result in enrollees directly paying higher premiums, co-payments, and other increased direct payments in the form of higher deductible payments.

57.    Medicare, Medicaid, and other government programs do not compete for members with commercial health insurers. Because Medicare, Medicaid, and other government programs do not face competition for members, they do not negotiate with providers for "in-network" prices, as do commercial insurers or access to Inpatient Hospital Services (or any other type of healthcare services), instead they present a take-it-or-leave it offer to reimburse healthcare providers for services rendered to eligible, patients, based on a fixed schedule of payments. Because Medicare, Medicaid, and other government programs neither compete for membership nor negotiate in competition with commercial insurers, these government programs are not competitors which purchase in the relevant product market for contracted access to Inpatient Hospital Services (or any other type of healthcare services).

58.    Moreover, because commercial health insurers require access to Inpatient Hospital Services at favorable in-network rates, hospitals that do not provide network services to commercial health insurers are not a reasonable substitute that do so. Thus, for example, for a commercial health insurer seeking network access at inpatient hospitals, hospitals that do not offer in-network access to

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

commercial health insurers (such as Kaiser Permanente or VA hospitals) are not a reasonable substitute for hospitals that do offer such access.[1]

### 2.   Specialty Provider Services

59.   There exist relevant product markets for non-facility specialty medical provider services in a number of specialties, including among others:

- Allergy and immunology
- Cardiology
- Dermatology
- Endocrinology
- Gastroenterology
- General surgery
- Geriatrics
- Gynecology
- Hepatology
- Infectious disease
- Nephrology
- Neurology
- Neurosurgery
- Obstetrics and gynecology
- Oncology
- Ophthalmology
- Oral and maxillofacial surgery
- Orthopedic surgery
- Otorhinolaryngology
- Palliative care
- Pathology
- Pediatrics
- Pediatric surgery
- Physiatry
- Plastic surgery
- Podiatry
- Proctology
- Psychiatry
- Pulmonology

---

[1] The Kaiser Permanente health system is a closed member or captive system. In other words, it only contracts with Kaiser's affiliated health insurance plan and does not make its services available to non-Kaiser health plans. Kaiser thus fails to constrain Sutter's leverage over the various commercial health insurance plans doing business with patient-consumers in the relevant markets described *infra*.

SECOND AMENDED COMPLAINT                              No. 3:12-cv-04854-LB

- Radiology
- Rheumatology
- Stomatology
- Surgical oncology
- Thoracic surgery
- Transplant surgery
- Urgent care medicine
- Urology
- Vascular surgery

60.     Each specialty constitutes a separate relevant product market, because for a significant proportion of patients a specialist in one area is not a reasonable substitute for a specialist in another area. From the perspective of the vast majority of consumers, when medical care in a particular specialty is required, there is no reasonable alternative to obtaining medical care from a provider who is licensed and qualified to provide those services. For example, a patient with a heart condition typically needs to see a cardiologist; a patient with a torn knee ligament typically needs to see an orthopedist; a patient delivering a baby typically needs to see an obstetrician; and so forth.

61.     Because patients' demand for services in each specialty is based on medical need, a small but significant non-transitory increase in price imposed by a hypothetical monopolist in one specialty would not be checked by consumer defection to other specialties (or to non-medical care). Collectively, these markets for various specialties are referred to herein as "Specialty Provider Services." These Specialty Provider Services include medical services provided by physicians and, in some cases, other providers (such as nurse practitioners or other non-physician providers that may be qualified to perform certain services). These services may be rendered in a variety of settings, including hospital facilities on an outpatient basis, in ambulatory surgery centers, or in physicians' offices. Specialty Provider Services do not include services provided to patients who spend one or more nights in the hospital.

62.     The cost of Specialty Provider Services is typically a substantial component of the overall medical costs borne by a health plan. Thus, enrollees would not find a health plan attractive if the plan was unable to offer in-network rates for Specialty Provider Services that are substantially

19

SECOND AMENDED COMPLAINT                                                          No. 3:12-cv-04854-LB

lower than physicians' list prices for such services. Thus, a relevant product market exists for contracted access to Specialty Provider Services in this case.

**B.      The Relevant Geographic Markets**

**1.      Local Geographic Markets**

63.      Individuals have a strong preference for consuming healthcare services, including but not limited, to Inpatient Hospital Services, in close proximity to where they live and/or work. Travel can be particularly inconvenient for those in need of such healthcare services, and the need to provide transportation to patients can place severe burdens on patients' families and loved ones.

64.      Individuals purchasing individual insurance and employers offering group health insurance to their employees therefore demand insurance products that provide access to health care services, including but not limited, to Inpatient Hospital Services, in the areas in which a substantial number of their employees live and work. Thus, the relevant geographic market in this case is local in nature.

65.      Moreover, the State of California has regulations that require health insurers to meet accessibility standards. These accessibility standards dictate that a "comprehensive range" of healthcare services must be available in reasonable proximity to customers' homes and workplaces. For example, these regulations (the Knox-Keene Act and the regulations promulgated thereunder) require that "all enrollees have a residence or workplace within 30 minutes or 15 miles of a contracting or plan-operated hospital which has a capacity to serve the entire dependent enrollee population based on normal utilization." DMHC, "Regulations Applicable to California Licensed HealthCare Service Plans," at 39 (2012),

http://wpso.dmhc.ca.gov/regulations/12CCRP/2012CCRP.pdf.

66.      In addition, as discussed, competitive forces among commercial health insurers dictate that insurers must have network access in the areas in which their customers (and prospective customers) live and work. Accordingly, a healthcare network that lacks meaningful and affordable

SECOND AMENDED COMPLAINT                                No. 3:12-cv-04854-LB

access to providers in a local geographic area is unable to serve patients in that area. And, likewise, network access to providers in another geographic area is not a reasonable substitute for network access in the area in which the insureds live and work. To illustrate this point, a health insurer could not successfully sell managed care services in Alameda County via a network of providers in San Francisco County. The San Francisco network is not a reasonable substitute for a network in Oakland for purposes of serving plan members in Alameda County.

67.    Accordingly, the markets for the sale of (a) Inpatient Hospital Services, and (b) Specialty Provider Services are local in nature, consisting of the area in which the seller operates and in which the purchaser can practicably turn for supplies or services. For purposes of analyzing the competitive effects of Sutter's conduct, the local relevant geographic markets include all of the local geographic markets in which Sutter-controlled hospitals and physicians provide services. In particular, due to the patients' demand for access to a network of healthcare providers close to where they live and work, the relevant geographic market for analyzing the effect of a contract governing relations between a commercial health insurer and a Sutter-controlled hospital consists of the area in which the relevant hospital operates and in which patients covered by the insurance company might practicably turn to seeks substitutes for the Sutter-controlled hospital. Similarly, the relevant geographic market for analyzing the effect of a contract governing relations between an insurer and a Sutter-controlled physician group consists of the area in which the relevant physician group operates and in which patients covered by the insurance company might practicably turn to seek substitutes for the Sutter-controlled physician group.

68.    For example, San Francisco County is a relevant local geographic market in this case. San Francisco employers and insureds cannot practicably turn to commercial health insurers that do not offer in-network access to Inpatient Hospital Services in San Francisco where doing so would require enrollees to travel long distances. Moreover, that would violate the Knox-Keene Act. Sutter controls over 240 physicians in San Francisco and surrounding counties (Marin, Sonoma, and Lake

SECOND AMENDED COMPLAINT                                No. 3:12-cv-04854-LB

Counties) through the Sutter Pacific Medical Foundation. San Francisco employers and insureds cannot practicably turn to commercial health insurers that do not offer in-network access to Specialty Provider Services in San Francisco.

69.     Another local geographic market implicated by Sutter's conduct is Alameda County (which contains Oakland, the eighth-largest city in California, with more than 400,000 residents). Alameda employers and insureds cannot practicably turn to commercial health insurers that do not offer in-network access to Inpatient Hospital Services in Alameda. In addition, Alameda employers and insureds cannot practicably turn to commercial health insurers that do not offer in-network access to Specialty Provider Services in Alameda. Sutter controls at least 200 physicians in Alameda and the surrounding East Bay region through the Sutter East Bay Medical Foundation.

70.     Sacramento County is another local geographic market implicated by Sutter's conduct. Sacramento employers and insureds cannot practicably turn to commercial health insurers that do not offer in-network access to Inpatient Hospital Services in Sacramento. In addition, Sacramento employers and insureds cannot practicably turn to commercial health insurers that do not offer in-network access to Specialty Provider Services in Sacramento. Sutter controls more than 1,300 physicians in Sacramento and nearby counties (Amador, El Dorado, Placer, Nevada, Solano, Yuba and Yolo Counties) through the Sutter Medical Group.

71.     In addition, Contra Costa County, which neighbors Alameda County, is also a local market in this case. Placer and Amador Counties, which neighbor Sacramento County, are also local markets. Thus, the six local geographic markets implicated by Sutter's conduct include the following counties:

- San Francisco
- Alameda
- Contra Costa
- Sacramento
- Placer
- Amador

SECOND AMENDED COMPLAINT                                  No. 3:12-cv-04854-LB

## 2. Linked Geographic Markets

72. A linked geographic market exists for the sale of commercial health insurance products and services ("Linked Geographic Market"). The geographic markets for the sale of commercial health insurance products and services are often broader than local geographic areas, because it is often economically infeasible for insurers to offer a commercial insurance product that is attractive only to those individuals that happen to live, for instance, within a short distance of a particular hospital. A commercial insurance company able to offer a broader provider network will be able to appeal to a broader population of customers, and thus spread fixed administrative costs, advertising costs, and other costs, over a larger number of potential patients, and thus offer each patient a more attractive price.

73. Thus, the geographic markets for the sale of commercial health insurance products and services are regional, such as a market spanning Northern California. Geographic "gaps" in network coverage can render products unattractive to consumers because individuals travel, and because many employers have multiple locations throughout Northern California. It is essential for commercial health insurers seeking to sell products and services across these regions to have network contracts spanning all of the local provider markets in those regions.

74. In addition, the Linked Geographic Market is particularly relevant to the Specialty Provider Services product markets because enrollees are willing to travel more than 30 minutes for specialty medical services, such as transplant, oncology, or elective surgery. Indeed, Knox-Keene Act's 15-mile/30-minute accessibility standards apply to Inpatient Hospital Services and not to the specialty medical services that comprise the Specialty Provider Services product markets.

75. By virtue of this regional effect via the Linked Geographic Market and the need for insurers to have network access in all local areas within the region, as well as the broader geographic reach of the Specialty Provider Services product markets, Sutter is able to exploit its market power in a local geographic market (or markets) to distort competition throughout the larger region.

SECOND AMENDED COMPLAINT                                          No. 3:12-cv-04854-LB

76.     The relevant Linked Geographic Market includes an area at least as large as the San Francisco Bay Area Combined Statistical Area and the Sacramento-Roseville-Arden-Arcade Metropolitan Statistical Area, as well as all local markets within that region.

## VI.     MARKET POWER

77.     Inpatient Hospital Services are the tying product in this action. Sutter controls an overwhelming share of Inpatient Hospital Services available to commercial health insurers in Alameda County, Contra Costa County, San Francisco County, Sacramento County, Amador County, and Placer County. Currently, Sutter has 100% of the non-Kaiser hospital beds in Placer and Amador Counties, over 60% in the Alameda and Contra Costa Counties, over 50% in San Francisco County, and over 50% in Sacramento County. Overall, Sutter has 35% of the revenue and 36% of beds that compete for patients in Northern California. Sutter thus has market power in these six counties for Inpatient Hospital Services and thus the power to dictate prices (*see infra* ¶¶84–95) and the power to foreclose competition (*see infra* ¶¶113–141).

78.     For example, Sutter owns every non-Kaiser hospital in the tying market of Alameda County with the exception of St. Rose, a small hospital in Hayward that lacks the medical equipment and facilities to provide many advanced medical procedures. Moreover, St. Rose is located 17 miles from the center of Oakland, which could violate the 15-mile/30-minute accessibility regulation promulgated by the DMHC pursuant to the Knox-Keene Act. Thus, if a health plan has no access to Sutter hospitals (and making the generous assumption that they had been able to contract with every non-Sutter hospital in the area), the health plan's Oakland members would need to travel south 17 miles to St. Rose, even further south to Fremont (Washington Hospital, 28 miles), across the Bay Bridge to San Francisco (San Francisco General Hospital, 13 miles), east from Oakland to Concord (John Muir Medical Center, 22 miles) or north from Oakland to San Pablo (Doctors Medical Center, 13 miles). Only two of these hospitals, San Francisco General and Doctors Medical Center, are under the 15-mile accessibility limit, and neither is reliably under the 30-minute limit for travel time since

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

they both involve travel on routes that are often congested (the Bay Bridge and San Francisco city streets to travel to San Francisco General; and Highway 80 between Emeryville and San Pablo Dam Road to travel to Doctors Medical Center). Moreover, most of these hospitals are considered small and lacking in advanced capabilities.

79.     In order to have enrollees who reside or work in Alameda County, a commercial health insurer such as Blue Cross, Aetna or UnitedHealthcare would arguably have a legal obligation under California laws and regulations to gain contracted access to Sutter facilities in Alameda County such as Alta Bates/Summit, Eden and San Leandro. Beyond the issue of regulatory compliance, it is difficult to imagine consumers living in Oakland — or any business located in Oakland or with a number of employees who are residents of Oakland — choosing a health plan that lacked access to any Oakland hospitals and instead provided access only to hospitals at least a half-hour drive away.

80.     Sutter's control of Inpatient Hospital Services affords it market power in relevant antitrust markets, including:

        a.     A relevant antitrust market consisting of contracted access to Inpatient Hospital Services accessible to residents of Alameda and Contra Costa Counties, California. Commercial Health insurers wishing to market a product attractive to the residents of demand access to inpatient hospital facilities in Alameda and Contra Costa Counties because, as described above, residents of Oakland, California would not find a health plan attractive that failed to offer robust in-network access to hospitals in Alameda and Contra Costa Counties. Sutter is able to exert market power over insurers who desire to market health plans to the residents of Oakland, because Sutter controls access to over 60% of the non-Kaiser hospital beds in the Alameda and Contra Costa Counties, as well as over 50% of the hospital beds in the neighboring counties of San Francisco and Sacramento.

        b.     A relevant antitrust market consisting of contracted access to Inpatient Hospital Services accessible to residents of Sacramento County, California. Sutter controls more than

25

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

50% of the hospital beds in Sacramento County, as well as 100% of the non-Kaiser beds in neighboring Placer and Amador Counties. Commercial health insurers wishing to market a product attractive to the residents of Sacramento County, California demand access to inpatient hospital facilities in Sacramento County, because individuals prefer to consume Inpatient Hospital Services close to where they live and work. Sutter is thus able to exert market power over insurers who desire to market health plans to the residents of Sacramento, California, because Sutter controls access to over 60% of the non-Kaiser hospital beds in Alameda and Contra Costa Counties, over 50% of the hospital beds in the neighboring counties of San Francisco and Sacramento, and 100% in Placer and Amador Counties.

        c.      A relevant antitrust market consisting of contracted access to Inpatient Hospital Services accessible to residents of San Francisco, California. Health insurers wishing to market a product attractive to the residents of San Francisco demand access to inpatient hospital facilities and as described above, Sutter controls over 50% of the hospital beds in San Francisco County and has a dominant position in neighboring Alameda and Contra Costa Counties. Because San Francisco is bordered on three sides by water, residents of the city face extended travel times if they seek Inpatient Hospital Services in other California counties, and thus do not view as attractive health plans unable to offer in-network access to hospitals within San Francisco.

        81.      Sutter's market power in the relevant antitrust markets described above is sufficient to allow Sutter to dictate contract terms to purchasers of services in the relevant markets in which it does business, and thereby restrain trade in relevant markets set forth above.

        82.      Specialty Provider Services are the tied products in this action. In the tied markets, Sutter has aggressively acquired physician groups including about 2,500 physicians in the various specialties listed above. Sutter also wields significant market power in the Specialty Provider Services product markets as it has power over price (*see infra* ¶¶84–95) and the power to foreclose competition (*see infra* ¶¶98–109).

SECOND AMENDED COMPLAINT                      No. 3:12-cv-04854-LB

83.     As described below, Sutter is now leveraging its market power in the tying market further to insulate these tied markets from competition. This has prevented commercial health insurers from negotiating lower in-network prices with Sutter-owned physician groups, which commercial insurers would have accomplished in the absence of the challenged contracts. Sutter also uses its market power to prevent the insurers even from differentiating between Sutter physicians in their presentation to enrollees in order to encourage the use of more efficient and higher-quality physicians who do not, for example, make it a practice to prescribe unnecessary tests and procedures. This conduct — especially when combined with Sutter's cross-referral and steering requirements as discussed herein — has in turn further reinforced Sutter's market power in both the tying and tied markets by, for example, forcing hospitals and physician groups into financial straits so that they can be taken over and, in some cases, shuttered by Sutter, as discussed below.

84.     An August 2010 *Bloomberg* article described a real-world illustration of Sutter's market power as follows:

> Last November, Claire Zvanski, a San Francisco parking administrator and commissioner of the city-employees' health insurance fund, proposed dropping Sutter hospitals from the plan offered to the city's 110,000 workers. Zvanski said she hoped dumping Sutter would cut costs and curb an expected rate increase from Blue Shield. Her proposal stirred heated protest from plan members at commission meetings, who said they would have to drive 30 miles to find a non-Sutter Health hospital. Under pressure, Zvanski tabled the idea.

> On July 1, the city, to cover rising costs, raised health-care contributions from employees by 13 percent - to $6,552 a year for a firefighter with two or more dependents. It doubled co-payments to $100 for emergency-room and outpatient services and $200 for hospital stays.

> "Sutter Health really has us over a barrel, I hate to admit it," said Larry Barsetti, a retired police lieutenant who supported Zvanski's proposal. His premiums went up $100 on July 1, to $10,188 a year — more than double what he paid upon retiring in 2003. "We're getting gouged," Barsetti said.

85.     An article published in the *Los Angeles Times* in March 2011 compared hospital stay costs between Northern and Southern California and attributed the considerably higher prices in Northern California to the market dominance of Sutter. According to the article:

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

In Northern California, analysts say, **much of the reason for higher costs lies with Sutter, which has medical groups throughout the region. The operation collects higher daily revenues from privately insured patients than any of the state's 16 other hospital chains** — $6,942 on average for each patient, state records show. The state average is $5,042.

"They are a very powerful hospital system that has proved very successful," said Dr. Robert Berenson, a fellow at the Urban Institute in Washington who has studied California's healthcare markets. "They are in a position to drive hard bargains. **I don't think there are many hospitals systems in the country that have that kind of market power**."

Another expert quoted in the article, health economist Glenn Melnick of the University of Southern California, described Sutter's consolidation as "a really serious problem."

86.     In an earlier article published in the *Journal of Health Economics* coauthored with RAND Corporation economist Emmett Keeler, Professor Glenn Melnick described results of a study funded in part by the California Health Care Foundation, explaining the strategies by which hospital consolidation drives up prices. Among those strategies is formation of a multi-hospital system that includes one or more hospitals with significant market power, then using this power to extract higher prices from health plans for other hospitals in the system, including those located in more competitive markets. "Under this approach, multi-hospital systems who have hospitals with market power may feel that there are social constraints on the prices they can charge at monopoly facilities but use that power to minimize discounts elsewhere in the system. Removing key hospitals from a plans' network can substantially raise the operating cost of the health plan if the plan is forced to pay higher prices to an out of network provider." Glenn Melnick & Emmett B. Keeler, "The Effects of Multi-Hospital Systems on Hospital Prices," *Journal of Health Economics*, Vol. 26, No. 2 (Mar. 2007).

87.     Experts at CALPIRG similarly noted in a July 2012 report:

**[H]ospital charges may be influenced by how much market power the hospital has** — the ability to ask for and receive a higher price. Hospitals can acquire market power by merging with other hospitals and acquiring networks of facilities, by building their reputation to gain "must-have" status in the eyes of patients and thus insurers or by providing a large volume of care. . . . **In California, for example, Sutter Health has two dozen facilities in northern California, and it negotiates prices with insurers on an "all or**

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

> *none" basis. In a city where Sutter Health represents a large share of the market it can command a higher price from insurers, and then by negotiating a systemwide contract it can impose higher rates at all its hospitals.*

## VII.   HARM TO COMPETITION DUE TO SUTTER'S CONDUCT

### A.   Sutter's Conduct Results in Supra-Competitive Health Insurance Prices.

88.   Sutter forces commercial health insurers to pay supra-competitive rates, thereby forcing patient-consumers to pay higher prices. These high prices result in direct injury to plaintiffs and the class. They are also circumstantial evidence of: (1) Sutter's tremendous market power, and (2) the anti-competitive effects of Sutter's conduct.

89.   In 2004, CalPERS, the largest pension fund in the United States, noted in its Operations Summary (for the year ended June 30, 2004) that Sutter demanded 2005 *rates at least 50% higher* than other hospitals in its Northern California markets. CalPERS' analysis was corroborated by another analysis performed by Blue Cross of California on behalf of CalPERS in 2004. The analysis asks the question: How did the actual costs of claims of the many CalPERS plan participants differ at Sutter hospitals versus non-Sutter hospitals? The answer was astonishing:

> The average cost of claims paid for CalPERS PPO Basic plan participants at Sutter hospitals is *73% greater* than the average cost of all other hospital claims paid on behalf of CalPERS PPO Basic plan participants in the State of California.

90.   CalPERS Health Benefits Committee observed the following regarding Sutter's prices: "Sutter Health is a huge outlier. Its costs are 60% higher than its Northern California peers and 80% higher than the statewide average." Sean Harrigan, the President of CalPERS, stated: "Every citizen in the state of California should be outraged by Sutter," which uses its "monopoly hold on some markets" to extort high prices.

91.   Internal documents regarding Sutter's purchase of Summit Medical Center in Oakland discuss how market consolidation and the removal of excess capacity enable hospitals in their pricing strategies by "*eliminating the health plans' option to buy services at the margin*." The

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

documents also describe additional elements of Sutter's East Bay market strategy, including Sutter's pursuit of East Bay hospital acquisitions in order to **prevent competitors** from "enter[ing] the East Bay market and develop[ing] a competing network." Sutter's corporate acquisition strategy for Eden Medical Center was to "protect our market from a takeover by competitors that could develop competing physician networks," an explicit expression of Sutter's willful foreclosure of competition.

92.    Just one year after Sutter's acquisition of Summit Medical Center in Oakland, mammograms went from $60.00 to $226.00, an increase of almost 40% because when Summit merged with Alta Bates Medical Center, the higher charges at Alta Bates were adopted for the merged hospitals. According to a 2008 FTC study, in the two years following the acquisition, Summit's prices rose 29% to 72% more than its peers.

93.    An August 2010 analysis by *Bloomberg* also concluded that Sutter

> **has market power that commands prices 40 to 70 percent higher than its rivals per typical procedure** — and pacts with insurers that keep those prices secret. Sutter Health can charge these prices because it has **acquired more than a third of the market in the San Francisco-to-Sacramento region** through more than 20 hospital takeovers in the last 30 years, according to executives of Aetna Inc., Health Net Inc. and Blue Shield of California, who asked not to be named because their agreements with Sutter Health ban disclosure of prices.

94.    Eugene Suksi, former CEO of Sutter Coast Hospital in Crescent City, California, corroborates this, noting that Sutter affiliated hospitals are able to charge 30%-40% more than competing hospitals, solely due to being part of the Sutter system. That is, a Sutter hospital can price at a 30% to 40% premium to an identical non-Sutter hospital in the same location due to the challenged contracts and other anti-competitive conduct described herein. For example, a knee MRI costs $3,383 at Sutter Coast Hospital compared to $495, $1,129 or $1,657 at the closest non-Sutter facilities.

95.    In March 2011, *The Los Angeles Times* conducted an analysis of state records and similarly concluded that "on average, hospitals in Northern California's six most populous counties

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

collect 56% more revenue per patient per day from insurance companies and patients than hospitals

in Southern California's six largest counties." The report continues:

> **The driving force in the north is Sutter Health**, a not-for-profit system of 24 hospitals and roughly 5,000 doctors that reaches into more than 100 cities and towns across 20 counties.
>
> **Insurance companies say that Sutter Health's size and dominant position in many local markets give it the upper hand in contract negotiations over prices and which of its hospitals are included in the insurers' networks.**
>
> Insurers also say they must include Sutter Health hospitals — which account for 1 in 5 such facilities in the region — because they are in such high demand by patients.
>
> *          *          *
>
> Aetna Inc. . . . charges customers in Northern California about 30% more in premiums than those in Southern California as a result of higher hospital reimbursements in the north that average $5,169 for each patient per day, compared with $3,578 in the south.
>
> Blue Shield of California, a not-for-profit insurer, reports a similar trend. It says it charges up to 40% more for insurance in the north, where it spends an average of $6,570 per patient each day compared with $4,646 in the south.
>
> "Where the cost of care is more expensive, the cost of premiums is more expensive," said Juan Davila, Blue Shield's top executive who oversees provider contracting.

Duke Helfand, "Hospital stays cost more in Northern California than in Southern California," *Los Angeles Times* (Mar. 6, 2011), *available at* http://articles.latimes.com/2011/mar/06/business/la-fi-hospital-cost-20110306.

96.     Sutter effectuates its anti-competitive conduct via intermediaries — commercial health insurers — that spread the costs of Sutter's supra-competitive pricing amongst all of the enrollees in a health plan. As a matter of basic economic theory, even a pure monopolist cannot raise prices above the purchaser's utility, but here the monopoly prices are spread across the entire population of enrollees. Because of this, the normal limits that would naturally apply to a monopolist do not apply to Sutter. As a result, Sutter's capacity to raise prices is almost unlimited. A second reason that Sutter's capacity to raise prices is unlimited is because of its industry: health care. On a

SECOND AMENDED COMPLAINT                                      No. 3:12-cv-04854-LB

case-by-case basis, no one would object to the imposition of a high price, no matter how astronomical, for a service that is the difference between life and death.

97.     As noted by Clark Havighurst and Barak Richman in their paper, "The Provider Monopoly Problem in Health Care":

> In health care, insurance puts the monopolist in an even stronger position by greatly weakening the constraint on its pricing freedom ordinarily imposed by the limits of consumers' willingness or ability to pay. . . . The extraordinary profits that health insurance makes available to powerful sellers are earned mostly at the expense not of direct purchasers — insurers or patients — but of consumers bearing the cost of insurance.

> [H]ealth insurance enables a monopolist of a covered service to charge substantially more than the textbook "monopoly price," thus earning even more than the usual "monopoly profit." … [Moreover] health insurers in the United States are in no position (as consumers themselves would be) to refuse to pay a provider's high price whenever it appears to exceed the service's likely value to the patient. Instead, insurers are bound by both deep-rooted convention and their contracts with subscribers to pay for any service that is deemed advantageous (and termed "medically necessary") for the patient's health, whatever that service may cost. . . .

Clark C. Havighurst & Barak D. Richman, "The Provider Monopoly Problem in Health Care," 89 Or. L. Rev. 847, 862–63 (2011), *available at* http://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=2905&context=faculty_scholarship.

**B.     Sutter Forecloses Competition by Acquiring Physician Groups and Forcing Insurers Falsely to List All Sutter Doctors as "High-Performers."**

98.     In recent years Sutter has been aggressively acquiring (or exclusively contracting with) physician groups in order to prevent them from competing in price and precluding new competitors from entering the market. These actions have also prevented the introduction of high quality, low cost competitive networks by commercial health insurers, as described in this section.

99.     The acquisitions have been carried out through Sutter's five medical foundation corporations, namely, the Sutter Gould Medical Foundation, the Sutter East Bay Medical Foundation, the Palo Alto Medical Foundation, the Sutter Medical Foundation, and the Sutter Pacific Medical Foundation. Sutter is the sole member of each of these corporations which acquire multi-specialty

SECOND AMENDED COMPLAINT                                            No. 3:12-cv-04854-LB

physician groups or contract with them on an exclusive basis (collectively, "Sutter Physician Groups"). All Sutter physicians refer Sutter patients back to the Sutter network for any facility or non-facility provider services, including Inpatient Hospital Services and Specialty Provider Services.

100.    Sutter uses its power over Inpatient Hospital Services to impose all-or-nothing provisions that insulate Sutter Physician Groups and Sutter physicians from competition in the Specialty Provider Services market. This has prevented commercial health insurers from negotiating lower in-network prices with Sutter-owned physician groups, which commercial insurers would have been able to do in the absence of the all-or-nothing contracts. Lower in-network prices would benefit class members in the form of lower premiums, and less money paid directly to providers in the form of co-payments and deductibles.

101.    In addition, Sutter has caused harm by defeating the desire of both insurers and consumers to increase the efficiency and quality of medical services by utilizing only the best and most-efficient physicians. Sutter's policies have caused antitrust injury to plaintiffs and members of the class because if insurers were free to contract in a competitive environment, commercial health insurers would have excluded less-efficient physicians from their networks. The inclusion of less-efficient physicians in commercial insurers' networks harms consumers because these physicians unnecessarily increase the total amount of money paid for physician services. Less-efficient physicians, among other things: fail to diagnose medical problems properly at an early stage, order unnecessary tests and procedures; order less cost-effective tests and procedures; and make mistakes that require multiple visits to correct. These increased costs harm enrollees of health plans, and defeat the very foundation upon which managed care is based. And this further harms patients who patronize a physician whom Sutter has demanded be listed a "high-performance" physician despite their actual track record.

102.    Furthermore, the prospect of exclusion from insurers' networks for inefficient behavior (including patterns of prescribing inefficient care, such as unnecessary inpatient stays at

33

SECOND AMENDED COMPLAINT                                         No. 3:12-cv-04854-LB

Sutter-controlled hospitals) would create incentives for physicians — including Sutter-controlled physicians — to engage in more effective and more efficient care, which would benefit all members of the class. In other words, competition would yield more efficient physician behavior. But Sutter's contracting practices shielded its physicians from the forces of competition, leaving them unconstrained in their ability to prescribe inefficient care through the Sutter network.

103.    Moreover, the inclusion of less-efficient physicians harms patients even more than it harms the commercial health insurers, because the patients are the ones who are unnecessarily poked, prodded, and punctured during unnecessary tests and procedures, the patients are the ones who have to take time off of work to attend (or drive their loved ones to) multiple appointments that could have been avoided with more competent medical care, and the patients are the ones who have to suffer through the anxiety and indignities that attend medical uncertainty and incompetence.

104.    Sutter's anti-competitive contracting practices have resulted in physicians being included in commercial insurers' networks from which they would otherwise be excluded based on the publicly available information regarding the "high performance network" products that multiple insurers have tried to launch within the relevant geographic markets and throughout Northern California. These products are designed to control the rising cost of medical care, create incentives for providers to provide care efficiently and effectively, and ensure that patients are informed of the providers that can offer both top-notch quality and efficient care per dollar, measured by objective criteria. These networks not only benefit current patients, they lead to increased efficiency in the marketplace as a whole by creating incentives for inefficient and/or ineffective providers to become more efficient and effective.

105.    As the independent non-profit California Healthcare Foundation has explained:

> Responding to the backlash by consumers against managed care in the mid-1990s, health plans broadened hospital and physician networks. Recently, however, plans have developed narrower networks — often called "high-performance" networks — that encourage enrollees to choose physicians who score well on efficiency and quality measures.

SECOND AMENDED COMPLAINT                                           No. 3:12-cv-04854-LB

California Healthcare Foundation, "High-Performance Health Plan Networks: Early Experiences" (April 2007), *available at* http://www.chcf.org/publications/2007/04/highperformance-health-plan-networks-early-experiences.

106.    The method used to profile physicians for inclusion in these networks usually involves some combination of costs and quality. *See id.* And as independent experts have explained:

> [H]ealth plans have developed high-performance networks that encourage enrollees to choose network physicians who score well on measures of efficiency and quality. Health plans analyze claims data to assess network physicians on the basis of efficiency using costs per episode of care, such as treatment of low back pain, and on measures of quality that can be assessed with claims data, such as hemoglobin A1c blood testing for a diabetic. At the market level, if these networks influence enough enrollees to shift to high-performing providers, physicians losing market share might be motivated to improve efficiency and quality to better compete. . . .

Debra A. Draper, et al., "High-Performance Health Plan Networks: Early Experiences," Center for Studying Health System Change, *available at* http://www.hschange.com/CONTENT/929/.

107.    Many insurers, including Anthem Blue Cross, UnitedHealthcare, Aetna and others have all tried to launch "high performance network" or HPN products that include only the most-efficient physicians that meet objective quality standards for performance and price efficiency. Yet in Northern California, not one of these insurers has succeeded in offering a product that provides access to less than all Sutter physicians.

108.    Sutter's all-or-nothing provision has hampered these commercial insurers' efforts to launch products that promise to bring efficiency and cost reduction to Northern California consumers. This harms the patients who patronize a physician that is — for example — inappropriately classified as an "Aexcel designated" physician solely because the physician is a member of a Sutter-owned physician group. But more broadly, Sutter's policies have harmed all Northern California patients because Sutter has distorted the incentives faced by physicians. In the absence of Sutter's all-or-nothing requirement, physicians would have an incentive to compete with other physicians on quality and cost, in order to obtain the certification as particularly high-quality

SECOND AMENDED COMPLAINT                                          No. 3:12-cv-04854-LB

providers offered by commercial health insurers such as UnitedHealthcare, Aetna, Blue Cross and others. This would incentivize physicians not only to improve their own performance, by eliminating unnecessary testing and procedures, it would also to cease referring patients to overly-expensive hospitals and specialists. Thus, one consequence of true competition among providers would be to encourage physicians to refer patients to only the most cost-effective providers. This is how competition is supposed to work.

109.   Sutter's all-or-nothing requirement, however, has defeated the competitive process. Insurers have been unable to trigger any cycle of efficiency-enhancing competition in Northern California, because Sutter's restraints insulate Sutter physicians from competition. The thousands of Sutter-controlled physicians have no incentive to increase their efficiency and quality, which operates to the detriment of the class members. Moreover, the fact that Sutter-controlled physicians are guaranteed a place in networks by virtue of Sutter's anti-competitive contracts reduces the incentive of non-Sutter physicians to engage in more efficient behavior, because the incentives associated with placement in a high-performance network have been diluted by Sutter's anti-competitive conduct. In short, if all are guaranteed to be in the network, none has an incentive to strive harder to gain a place in the network.

**C.   Sutter Has Deliberately Prevented the Creation of Competition by the City of San Francisco.**

110.   In July 2011, the City of San Francisco created two competing ACOs for city employees. The noble idea was that the enrollees could choose between the two ACOs and they would compete for the enrollment of the employees based on price and quality. One ACO was to be comprised of a Sutter physician group (Brown and Toland) and Sutter San Francisco hospitals (CPMC's various campuses, St. Luke's, Davies and Children's). The other ACO was to be comprised of a non-Sutter Hill Physician Group and the non-Sutter San Francisco hospitals (UCSF, St. Mary's and St. Francis).

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

111.    After 12 months, the non-Sutter ACO had been "very successful" at reducing costs, whereas the Sutter ACO had achieved no cost improvements whatsoever.

112.    Around the same time, Sutter limited the availability of contracted rates for emergency room services at Sutter hospitals to Sutter members. The members of the non-Sutter ACO were not Sutter members, which was the entire point of San Francisco's experiment. Now, the non-Sutter ACO would have to pay the astronomical full charge every time one of its members had to go to one of Sutter's many San Francisco hospitals on an emergency basis. This created such risk for Hill Physicians and the non-Sutter ACO that it had to pull out of the San Francisco experiment and return to having a contractual agreement with Sutter. Put simply, Sutter used its market power to scuttle the City of San Francisco's attempt to create real competition. It is difficult to imagine a more literal demonstration of "harm to competition."

**D.    Hospital Acquisitions and Closures**

113.    Sutter has willfully acquired monopoly power by gaining control over financially challenged hospitals through false promises and infusions of cash to local communities who find themselves "up against a wall" as they strive to fulfill a basic a basic human right of access to health care. The Sutter take-overs have consistently resulted in the acquisition of additional monopoly power by Sutter, after which it breaks its promises, consolidates hospital services and eliminates competition in order to leverage control in price setting in the health care market.[2]

---

[2] HSS, the largest employer in San Francisco, identifies hospital consolidations generally, and Sutter's acquisitions specifically, as one of the primary health care cost drivers of health care premiums, specifically noting that: "lack of competition (prevents value-based contracting) SUTTER expanding market share — and Sutter prevents offering differential premiums between Medical Groups (Hill Physicians and Brown and Toland), which prevents competition." *See* HSS presentation, "Overview of Retiree Health Cost," Oct. 23, 2012 (emphasis in original), http://www.myhss.org/downloads/board/regular_meetings/2012/RM_110812_RetireeHealthTrust Presentation.pdf.

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

114.     Sutter's practices — evidenced in repeated conduct spanning 15 years and continuing to the present day — foreclose competition and create entry barriers through the direct shuttering of hospitals and providers, the prevention of the acquired hospitals from competing on price, and the preclusion of new competitors from entering the market.

### 1.     San Leandro Hospital

115.     As part of its effort to expand market share in well-to-do suburban communities in Alameda County, Sutter proposed a transaction with the Eden Township Healthcare District ("ETHD") a public entity created in 1948 to build and operate a hospital for the benefit of citizens leaving in and around Castro Valley, a bedroom community located near Dublin, Pleasanton and San Ramon. When ETHD was forced to confront the hospital's seismic vulnerability, Sutter proposed the formation of a joint public/private corporation to rebuild the hospital. A ballot measure was put to the voters in 1997, describing a new 11-member hospital board that would include the 5 elected District Board members and the then CEO of Eden Hospital — a majority — plus District approval of the remaining five members so as to assure continuing public control. The measure passed, creating Eden Medical Center, a joint public/private corporation.

116.     In 2004, the ETHD purchased San Leandro Hospital using public funds owned by the District. The District then signed a lease agreement with Sutter, pursuant to which Sutter agreed to operate San Leandro Hospital for 20 years for the benefit of the residents in the community surrounding that facility. The lease required Sutter to provide funding for certain physical plant and equipment upgrades, in exchange for which Sutter received an option to purchase the facility. Those who questioned this lease arrangement were assured that it was negotiated for the express purpose of ensuring funding from Sutter for the continued operation of the hospital as an acute care facility. Sutter, however, negotiated a provision in the lease by which it had the option to cease its operating commitment if net revenues fell below a certain level which was to be determined after accounting by Sutter itself.

SECOND AMENDED COMPLAINT                                              No. 3:12-cv-04854-LB

117.    San Leandro Hospital serves a less affluent population than the related hospital in Castro Valley. Rather than stand by its assurances that it would operate San Leandro Hospital until at least 2024, Sutter intends to close San Leandro Hospital leaving San Leandro and its residents scrambling to find alternative options for keeping the facility open and operating as an acute-care hospital.

118.    In the years since the 1997 ballot measure passed, Sutter has solidified control of the ETHD Board and it now can move forward with plans to rebuild an expanded state-of-the-art facility in Castro Valley without the burden of operating a less profitable hospital in the already underserved community of San Leandro.

## 2.    Sutter Medical Center of Santa Rosa

119.    In November 1995, the Board of Supervisors of Sonoma County voted to lease the county-owned hospital then known as Community Hospital to Sutter for 20 years. Four months later, in March 1996, Sutter negotiated a "Health Care Access Agreement," pursuant to which it guaranteed a certain level of access to healthcare for the community and the indigent in exchange for Sonoma County relinquishing direct control of the hospital.

120.    Several cuts in patient services followed. In 1998, Sutter was cited by regulators for insufficient registered nurse staffing and for flawed record keeping. During 2002 and 2003, Sutter closed the Senior Health Center and the pediatric intensive care units at the former Community Hospital, claiming that financial difficulty forced the closures.

121.    The citizens of Sonoma County protested the cuts as inconsistent with the negotiated agreement and Sutter responded by announcing plans in 2007 to close the hospital altogether and to transfer its obligations under the 1996 Health Care Access Agreement to another facility. Sutter was criticized by patients and residents for secretly negotiating the transfer and in 2008, Sutter announced that it would remain in Santa Rosa, close the county-owned facility and build a new hospital, which it would own outright.

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

122.    The new hospital, which is currently under construction, is now the subject of litigation initiated by the North Sonoma County Healthcare District, the Palm Drive Health Care District and the Sierra Club. Opponents of the new Sutter-owned facility contend, among other things, that the new hospital with its expanded size and increased number of beds will negatively impact the delivery of healthcare throughout Sonoma County, possibly resulting in the closure of district hospitals to the detriment of local residents and in violation of the 1996 County Health Care Access Agreement.

### 3.    Sutter Auburn Faith

123.    In March 2008, the Chief Administrative Officer (CAO) of Sutter Auburn Faith, Mitch Hanna, publically proclaimed to the Auburn community that Sutter had a long-term commitment to providing health care services locally:

> "Sutter Health's renovation approval is a reflection of the long-term commitment that Sutter has to ensuring that excellent health care provided in an environment conducive to healing is available locally," said Mitch Hanna, Sutter Auburn's Chief Administrative Officer.

124.    Less than six months later, Sutter shuttered the Acute Rehabilitation Unit at that facility, forcing local patients to transfer to Sutter's larger and more profitable facility in Roseville, creating expense and inconvenience for the families of patients who now have to travel a considerable distance to visit and assist with the care of their loved ones.

125.    The Birthing Center at Sutter Auburn Faith suffered a similar fate. CAO Hanna repeatedly announced to the Auburn community that Sutter was committed to keeping the Auburn Faith Birth Center open. In April 2008 he said:

> "We want to continue providing Auburn area residents with access to outstanding women's health services close to home. . . . We are committed to doing everything possible in order to maintain an inpatient Family Birth Center at Sutter Auburn Faith Hospital."

126.    In July of that same year, Hanna released another statement, this one titled "Sutter Auburn Confirms Commitment to Local Women's and Children's Services." The release heralded the

SECOND AMENDED COMPLAINT                                        No. 3:12-cv-04854-LB

arrival of a new obstetrician and gynecologist and sought to reassure the community that Hanna and

Sutter were working to ensure that the birthing center "continues to be strong and thrive[s]." Sutter

Auburn Faith Press Release, "New Auburn OB/GYN Plans to Stay Put," July 1, 2008. The July press

release emphasized Sutter's commitment to keeping its promise to the Auburn community:

> "[Earlier this year] CAO Mitch Hanna told the community that Sutter Health
> was committed to keeping the hospital's well-regarded Family Birth Center
> open by recruiting at least two new OB/GYNs to the area, with one arriving
> in July. So far, he has kept that promise."

127.    Despite these repeated promises, Sutter ultimately reneged on its commitments to the

Auburn community, announcing in May 2011, the decision to **close** the Sutter Auburn Faith Birthing

Center and provide all inpatient labor and delivery services at Sutter Roseville Medical Center.

128.    Even the considerable spin on these events provided by Sutter's public relations

specialists cannot hide a corporate agenda for achieving ever higher profits at the expense of essential

patient care.

129.    Yet another example of Sutter eliminating services in the Auburn area involved

critical mental health services for underserved residents of Sacramento County. In October 2010,

Sutter Auburn Faith's CEO told *Inside HealthCare* magazine that

> "there is a strong need for the mental health program because Sacramento
> County recently closed many of its psychiatric facilities, leading to an increase
> in psychiatric patients in area Emergency Departments." ("Changing with the
> times: this California hospital is updating its buildings to keep up with the
> changing face of healthcare.")

*Inside HealthCare*, Vol. 6 No. 6, at 144(4) (Oct. 1, 2010).

130.    Just 3 months later, Sutter announced the termination of a program in operation for

40 years that, at that time, served 299 low-income and special needs youth under contract with

Sacramento County. Rather than offer a genuine explanation for why it was abandoning this high

need and underserved community, Sutter offered only empty and meaningless rhetoric: "Sutter's

commitment to providing health care to the whole person will remain unchanged," John Boyd, CAO

at Sutter Center for Psychiatry told the *Sacramento Business Journal. See* Kathy Robertson, "Sutter Ends

SECOND AMENDED COMPLAINT                                                    No. 3:12-cv-04854-LB

Longtime County Mental Health Contract; Parents Question Why," *Sacramento Business Journal* (Dec. 3, 2010).

### 4.    Mills Peninsula Medical Center

131.    In 1985, the Peninsula Healthcare District, a publically owned hospital entity serving residents from South San Francisco to San Mateo, leased Peninsula Hospital and the land upon which it stands to private non-profit Mills-Peninsula Health Services for a 30-year term expiring in 2015. In 1995, Mills-Peninsula Health Services found itself in financial trouble and affiliated with Sutter. Thus, Sutter became the beneficiary of that lease, which, according to a 2009 article in the *Examiner*,

> included some peculiar items such as the a large cash payment from the district to the private entity, the transfer of several ancillary properties at the end of the lease to the private lessee around the hospital worth millions of dollars and a no-cash rent deal for the hospital itself, substituting instead improvements and investments made by Sutter in lieu of rent.
>
> It was this deal that later became the basis for a lengthy and difficult lawsuit brought forth by newly elected activist board majority against Sutter to stop the transfer of public assets to the corporate entity that now operated the hospital.

*See* Bruce Balshone, "Shakeup with the Peninsula Health Care District Board," *Examiner* (Apr. 15, 2009).

132.    According to a news article in the *San Mateo County Times*, Mills-Peninsula (by then, Sutter) had told the district in 1998 that it was using $4.5 million of district funds to move inpatient rehabilitation from Mills Hospital to Peninsula Hospital but this never happened and patients continued to be transferred to Mills Hospital for in-patient rehabilitation. In 2010, Sutter announced a plan to sell off several units at Mills-Peninsula, including the skilled nursing (long-term care) and dialysis units because they were not profitable. Those units employed 219 people. After the sale and resulting patient service and job losses, Sutter's profits at Mill-Peninsula soared nearly 30%, from $677 million in 2009, to $878 million in 2010.

SECOND AMENDED COMPLAINT                                            No. 3:12-cv-04854-LB

### 5.   Marin General Hospital

133.    Sutter signed a 30-year lease to operate Marin General Hospital (MGH), heavily infiltrated the Marin Healthcare District Board and depleted the assets. When the North Bay community affected by Sutter's moves filed a lawsuit to regain control of the hospital, it is alleged that Sutter deliberately protracted the litigation, so as to remain in control of the hospital as long as possible in order to slowly choke MGH of its reserves. As Sutter was well aware, MGH did not have sufficient "days of cash on hand" to allow for operation as a free standing community-owned hospital. After the litigation was filed, Sutter purchased property near the facility to position itself to compete with MGH after ownership was returned to the public hospital district, an effort to establish market dominance in the North Bay region and deliver a final blow to the community hospital.

134.    A recent arbitration between MGH and Sutter resulted in an interim award dated June 19, 2012, requiring Sutter to turnover certain files and to pay MGH Corporation $21,593,459 for improper charges for cost of capital, breach of agreements relating to physician recruitment, restoration of excess contributions MGH made to the Sutter Retirement Plan and to reimburse charges MGH incurred due to Sutter's failure to cooperate with providing data for operation of information systems. Sutter has touted the outcome of the arbitration as a victory because the award was far smaller than the hospital district sought, but it is undeniable evidence of business practices this so called "charitable nonprofit" corporation will resort to in its quest to shape the healthcare industry in Northern California to serve its strategy of market dominance, selective patient care delivery and pricing control.

### 6.   Alta Bates and Summit

135.    In 1999, Sutter fought to purchase and merge Summit Hospital ("Summit") in Oakland with Alta Bates Medical Center in Berkeley in order to create a "must-have" hospital in Oakland and gain control of 80% of the non-Kaiser hospital beds in Alameda County. In an effort by the California Attorney General to block the merger, Sutter CEO Patrick Fry assured the court under

SECOND AMENDED COMPLAINT                                         No. 3:12-cv-04854-LB

oath on the witness stand that he projected that Summit's revenue would rise only 3% annually post-merger, and Sutter was permitted to acquire Summit. According to a subsequent FTC study, in the two years following the acquisition, Summit's prices rose 29% to 72% more than its peers, surpassing even the most pessimistic scenarios feared by the attorney general. Steven Tenn, FTC Working Paper No. 293, "The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction" (Nov. 2008), http://www.ftc.gov/be/workpapers/wp293.pdf. Sutter now holds an 80% market share of Inpatient Hospital Services in Alameda County.

136.    Meanwhile, Summit's revenue rose 15%, according to the state database, or five times CEO Fry's forecast at trial. Fry's false assurance is consistent with Sutter's conduct in the other communities discussed in this section.

### 7.    St. Luke's and CPMC

137.    Sutter just completed negotiations with the City of San Francisco to convert a Cathedral Hill Hotel property located at Van Ness Avenue and Geary Boulevard into a massive medical campus with 274 beds and other related medical facilities. Meanwhile Sutter will reduce St. Luke's in the Mission from 228 to only 120 beds — half of its current size.[3]

138.    Sutter's new Cathedral Hill mega-hospital is designed to create a "must-have" Sutter hospital in San Francisco similar to Alta Bates/Summit in Oakland, such that commercial health insurers that do not include the hospital in their provider networks will be disfavored, with the effect of forcing plans to submit to the higher prices demanded by Sutter.

139.    A second purpose of Sutter's CPMC/St. Luke's plan — consistent with its practices as described in several examples above — is permanently to eliminate St. Luke's as a future potential

---

[3] Sutter originally sought a 555-bed facility at the Cathedral Hill Hotel site and a reduction to 80 beds at St. Luke's.

SECOND AMENDED COMPLAINT                                        No. 3:12-cv-04854-LB

full-service hospital, thereby permanently eliminating part of CPMC's competition and indeed

transforming the same into a referral source as a feeder hospital. CPMC's insistence on radically

reducing the size of St. Luke's is deliberately designed to eliminate future competition, and the design

of the new St. Luke's as a small "feeder" hospital to the specialized care units planned for the

Cathedral Hill campus virtually ensures that the future owner of that facility will be not be able to

operate a competitive, full-service facility. Not only is the "guarantee" that Sutter will operate St.

Luke's for the benefit of the underinsured citizens residing South of Market for 20 years a paltry

timeline in the life of a hospital, it provides another example of the calculating approach Sutter

exhibits time and again under the guise of "investing in the community."

140.    Sutter attempted to justify the downsizing of St. Luke's by pointing to its currently

low average daily patient census, which, according to the comments of Dr. Edward Kersh, Chief of

Staff of St. Luke's, at the Planning Commission hearing on April 26, 2012 was an average of only 59

patients per day over the past 15 years. That low average census, however, was expressly **created** by

Sutter as part of its deliberate scheme to gain market share for insured health care services in San

Francisco. Prior to Sutter's acquisition in 2001, St. Luke's was run as a charitable Episcopalian

hospital. In a study commissioned by the California Attorney General immediately prior to Sutter's

acquisition, data filed with the Office of Statewide Health Planning and Development (OSHPD)

showed that over the seven-year period from 1994 to 2000, the lowest average daily patient census

was 131 (in 1996) and the highest was 151 (in 2000), for a seven-year average daily inpatient census of

142. The Lewin Group, Inc., "Effect of Affiliation of St. Luke's Hospital with Sutter Health on the

Availability and Accessibility of Health Care Services," *ConsumersUnion*, at 13 (May 29, 2001),

http://consumersunion.org/wp-content/uploads/2013/04/yourhealthdollar.org_st-lukes-impact-

statement.pdf (prepared at the request of the California Attorney General's Office). Subsequent

OSHPD data shows a sharp drop in census at St. Luke's beginning in 2002, **the year after Sutter**

**assumed control.**

SECOND AMENDED COMPLAINT                                        No. 3:12-cv-04854-LB

141.    St. Luke's has historically served a poorer and often uninsured population comprising primarily racial minorities as compared to CPMC. Many of the public concerns relate to a distrust of Sutter's intentions and a fear of loss of charity care for less advantaged San Franciscans living South of Market. Those fears are not without basis, especially if Sutter succeeds in securing approval of a project that will allow Sutter to completely abandon St. Luke's in 20 years and (if its business practices remains consistent) much sooner than that, leaving a decimated feeder hospital in its place.

**E.    Quality of Care Suffers**

142.    Yet another effect of Sutter's anti-competitive practices has been to release pressure on all parts of Sutter's network from maintaining standards of high quality and safety. As a result, Sutter's network does not compete on quality any more than it competes on price. Indeed, Sutter does not compete at all. As noted in a California Health Care Coalition report:

> The quality of care is highly inconsistent within and across Sutter Health facilities. Three of Sutter Health's nine Bay Area hospitals have so seriously violated national standards as to jeopardize either their participation in the Medicare or Medicaid programs or their accreditation as a health care organization. Other data also show serious quality deficiencies: Sutter Health Sacramento's General campus ranked in the bottom half of reporting hospitals nationally on eight of ten hospital performance indicators developed by the Centers for Medicare and Medicaid services while Sutter Health's Memorial Hospital in Modesto has higher than expected mortality rates in 6 of 16 procedures analyzed.

143.    A 2006 analysis done by the California Health Care Coalition based on publicly available information showed that Sutter's consistently higher costs were not connected in any manner to consistently higher quality care, but rather were driven by the prices set by the hospitals themselves. Where a hospital system had a major share of the market, prices were higher.

144.    A 2005 Blue Cross analysis concluded that Sutter facilities charged two or even three times more than the comparison hospital for comparable admissions. For example, the acuity-adjusted cost of Alta Bates Medical Center was nearly 200% higher than the comparison facility.

SECOND AMENDED COMPLAINT                                              No. 3:12-cv-04854-LB

145.    Other studies demonstrate that patients at Sutter suffer from 87% more complications; complication and death rates are higher for major diagnosis at Sutter facilities and nurse and caregiver staffing levels are inadequate at Sutter facilities.

## VIII.   CLASS ALLEGATIONS

146.    Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2)–(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following class:

> Any person in the San Francisco Bay Area Combined Statistical Area and the Sacramento-Roseville-Arden-Arcade Metropolitan Statistical Area who during all or part of the period beginning September 17, 2008, and continuing until the present (the "Class Period") was (or is): (1) enrolled in a licensed health plan offered by a commercial health insurer; and (2) the commercial health insurer had (or has) a contractual relationship with Sutter or any of its affiliated entities.

147.    Specifically excluded from this Class are Sutter, the parent, Sutter's subsidiaries, affiliates, officers, directors, employees, legal representatives, heirs or assigns, and co-conspirators. Also excluded are any federal governmental entities, any judicial officers presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

148.    Subject to additional information obtained through further investigation and discovery, the foregoing definition may be expanded or narrowed by amendment at class certification or amended complaint.

149.    Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable. While the exact number of Class members is unknown to plaintiffs, it is believed to be in the thousands. Furthermore, the Class is readily identifiable from information and records in Sutter's possession.

150.    Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members because Sutter has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Sutter's wrongful and anti-competitive conduct. Among those common questions of law or fact are:

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

a.     whether Sutter as a policy entered into contracts that unreasonably restrain trade in the relevant geographic and product markets by imposing tying, steering and other provisions restricting or foreclosing competition in the relevant geographic and product markets;

b.     whether Sutter willfully established, maintained and extended one or more unlawful monopolies in the relevant geographic and product markets;

c.     whether Sutter's ongoing conduct continues to restrain trade and reinforce its monopolies in the relevant geographic and product markets;

d.     the existence and duration of the anti-competitive conduct alleged herein;

e.     whether Sutter's anti-competitive conduct results in diminished competition in the relevant geographic and product markets;

f.     whether Sutter's anti-competitive conduct causes prices for health insurance to be higher than they would have been in the absence of such conduct;

g.     whether Sutter's conduct violates the Sherman Act;

h.     whether Sutter's conduct violates the Cartwright Act;

i.     whether Sutter's conduct violates California's Unfair Trade Practices Act, Cal. Bus. & Prof. Code §17200, *et seq.*;

j.     whether Sutter unjustly enriched itself as a result of its anti-competitive and inequitable conduct at the expense of plaintiffs and members of the Class; and

k.     whether plaintiffs and other Class members have sustained, or continue to sustain, damages in the nature of higher premiums and other health care costs as a result of Sutter's wrongful conduct, and, if so, the quantum of such damages.

151.    Plaintiffs are members of the Class, and plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same

wrongful conduct by Sutter; *i.e.*, they paid increased premiums, co-payments, deductibles and out-of-pocket expenses as a result of Sutter's wrongful conduct.

152.    Plaintiffs will fairly and adequately protect the interests of other Class members because they have no interests that are antagonistic to, or that conflict with, those of any other Class member. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent plaintiffs and other members of the Class.

153.    The prosecution of separate actions by individuals would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendant.

154.    A class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit a large number of similarly situated persons or entities to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. The damages sustained by individual Class members, although meaningful, do not rise to the level where it is economically rational to prosecute separate complex actions against this well-financed corporate defendant. The instant case will be eminently manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## IX.    CAUSES OF ACTION

### COUNT I
### Unreasonable Restraint of Trade in Violation of Section 1 of the Sherman Act

155.    Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

49

SECOND AMENDED COMPLAINT                                           No. 3:12-cv-04854-LB

156.     Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. §1.

157.     The preceding paragraphs set forth all elements of a claim under Section 1 of the Sherman Act for an unreasonable restraint of trade. By definition, Sutter's written contracts with commercial health insurers satisfy the requirement for a "contract, combination, or conspiracy."

158.     Sutter's anti-competitive contracts unreasonably restrain trade. As set forth above, in ¶¶88–145, Sutter's contracts have clear anti-competitive effects. On the other hand, Sutter's "all or nothing" clause serves no pro-competitive purpose, but rather serves only to restrain trade. Thus this contractual provision violates the rule of reason because its anti-competitive effects outweigh any conceivable pro-competitive benefits.

159.     And finally, as set forth above in ¶¶88–97, Sutter's anti-competitive contracts have caused injury to plaintiffs and all members of the Class.

160.     Plaintiffs and members of the Class they seek to represent, have standing to and do hereby seek injunctive relief to prevent Sutter from continuing to engage in the conduct described above as redress for Sutter's violations of the Sherman Act ,15 U.S.C. §1.

## COUNT II
### Tying in Violation of Section 1 of the Sherman Act

161.     Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

162.     Sutter's contracts with commercial health insurers constitute an unlawful tying arrangement, which is *per se* unlawful under Section 1 of the Sherman Act, as well as a violation under the rule of reason. As described above (*see* ¶¶43–87, 98–109), Sutter has imposed a "tying" arrangement by refusing to allow commercial health insurers to contract for access to any Sutter hospitals unless the insurer agrees to contract with all Sutter providers, including unwanted providers.

Sutter thus conditions commercial health insurers' access to Inpatient Hospital Services on commercial health insurers' agreement to purchase Specialty Provider Services from **all** of Sutter Physician Groups. Commercial health insurers do not have the option to purchase Inpatient Hospital Services on a contracted basis from Sutter, but not to purchase Specialty Provider Services.

163.     As described above, Sutter has market power within relevant antitrust markets for contracted access to Inpatient Hospital Services sufficient to restrain trade within the relevant Specialty Provider Services markets described above. The restraint impacts a substantial amount of interstate commerce in the market for Specialty Provider Services, and thus this tying arrangement represents a "per se" violation of Section 1 of the Sherman Act.

164.     Moreover, Sutter's tying arrangements violate the rule of reason because Sutter has conditioned access to one product (contracted access to Inpatient Hospital Services) on the commercial health insurer's agreement to buy a separate product (contracted access to Specialty Provider Services), which has created the effect of restraining trade within relevant antitrust markets for Specialty Provider Services.

165.     Sutter's tying contracts have caused injury to plaintiffs and all members of the Class as detailed in ¶¶88–97.

166.     Plaintiffs and members of the Class they seek to represent have standing to, and do, hereby seek injunctive relief to prevent Sutter from continuing to engage in the conduct described above as redress for Sutter's violations of the Sherman Act ,15 U.S.C. §1.

## COUNT III
### Monopolization and Attempted Monopolization in Violation of
### Section 2 of the Sherman Act (**15 U.S.C. Section 2**)

167.     Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

SECOND AMENDED COMPLAINT                                      No. 3:12-cv-04854-LB

168.    Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize." 15 U.S.C. §2.

169.    Sutter has engaged in anti-competitive conduct designed to monopolize, maintain and enhance Sutter's monopoly power in the relevant geographic and product markets.

170.    As outlined in ¶¶77–81, Sutter possesses monopoly power in Inpatient Hospital Services in the local geographic markets. As outlined in ¶¶113–141 Sutter has acquired monopoly power through a pattern of false promises and cash infusions to local communities and community hospitals, after which Sutter breaks its promises, consolidates and eliminates hospital services, enhances its monopolies, reduces competition, leverages further control in price setting in the health care market, and reinforces its ability to force contract provisions such as those challenged herein.

171.    Sutter specifically intended that its contracts with health insurers would maintain and enhance its monopoly in the relevant product and geographic markets, and injure plaintiffs and the Class. Moreover, Sutter continues its expansion and consolidation in order to maintain that monopoly power. Sutter's growth and development is not a consequence of a superior product, business acumen or historic accident.

172.    Furthermore, Sutter's continued expansion as well as intent to become licensed HMO evidence a dangerous probability of achieving monopoly power in the markets where it does not already have such market power.

173.    As detailed throughout this Complaint, Sutter has benefitted substantially from its continued and enhanced monopoly power in the local geographic markets for Inpatient Hospital Services by, *inter alia*, imposing illegal and improper tying contracts as well as other steering provisions on commercial health insurers to impose supra-competitive prices on plaintiffs and members of the Class.

SECOND AMENDED COMPLAINT                                        No. 3:12-cv-04854-LB

174.    Sutter's contracts with health plans also require them to actively incentivize and "encourage" plan members to exclusive use of Sutter's services and physicians, and to penalize health plans that fail to do so. This anti-competitive conduct excluded other competitors and protected Sutter's monopoly power. As a result, Sutter was able to demand drastically high amounts for the price of Inpatient Hospital Services as well as Specialty Provider Services that they would not have been able to obtain absent the anti-competitive conduct.

175.    The anti-competitive effects of Sutter's conduct far outweigh any purported non-pretextual, procompetitive justifications, and, in any event, Sutter's conduct was not reasonably necessary to achieve the same.

176.    Plaintiffs and members of the Class have been injured in their business or property by Sutter's antitrust violations. Their injury consists of having paid higher prices for health insurance premiums, co-payments, deductibles and other out-of-pocket expenses than they would have paid in the absence of the violations. Such injury, called "overcharges" or "improper charges" is of the type antitrust laws were designed to prevent, flows from that which makes Sutter's conduct unlawful, and plaintiffs and members of the Class are proper persons to bring a case concerning this conduct.

177.    Plaintiffs and members of the Class they seek to represent, have standing to and do hereby seek injunctive relief to prevent Sutter from continuing to engage in the conduct described above as redress for Sutter's violations of the Sherman Act, 15 U.S.C. §2.

**COUNT IV**
**Unreasonable Restraint of Trade in Violation of the Cartwright Act**
**(Cal. Bus. & Prof. Code Section 16720, *et seq.*)**

178.    Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

179.    Sutter entered into contracts with commercial health insurers and engaged in anti-competitive conduct that was and continues to be an unreasonable restraint of trade and commerce detailed above in violation of California Bus. & Prof. Code §16720.

SECOND AMENDED COMPLAINT                                        No. 3:12-cv-04854-LB

180.    The anti-competitive conduct included, among other things, in Sutter imposing tying and other steering provisions to impose supra-competitive prices on plaintiffs and members of the Class and coercively to maintain and enhance its monopoly power in the market for Inpatient Hospital Services in Northern California. The imposition of tying and steering arrangements required health plans to use all Sutter providers or affiliated physician's groups (even where less expensive options are available) or suffer the devastating consequences of having contracted access to none of them — including areas where Sutter has local monopolies.

181.    These agreements and combinations unreasonably restrain trade and restrict the access of Sutter's competitors to compete — on the basis of price and/or quality — for the business of enrollees that use the Sutter network, thereby restraining competition in the Inpatient Hospital Services and Specialty Provider Services markets.

182.    The purpose and effect of these contracts was and continues to restrain trade and competition in the relevant geographic markets described above.

183.    Sutter's anti-competitive conduct constitutes a *per se* violation of California's antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade. The anti-competitive effects of Sutter's conduct far outweigh any purported non-pretextual, pro-competitive justifications, and, in any event, Sutter's conduct was not reasonably necessary to achieve the same.

184.    As a proximate result of Sutter's unlawful conduct, plaintiffs and members of the Class they seek to represent have been injured in their business or property by Sutter's anti-competitive conduct in violation of the California Cartwright Act, Cal. Bus.& Prof. Code §16750, by, *inter alia*, being subjected to and paying supra-competitive pricing for their health care services during the Class Period. Such injury, called "overcharges" and "improper charges" is of the type antitrust laws were designed to prevent, flows from that which makes Sutter's conduct unlawful, and plaintiffs and the Class are proper persons to bring a case concerning this conduct.

SECOND AMENDED COMPLAINT                                    No. 3:12-cv-04854-LB

185.    Under Cal. Bus. & Prof. Code §16750, plaintiffs and members of the Class they seek to represent, have standing to and do hereby seek monetary (including treble damages), injunctive and declaratory relief, as well as attorneys' fees and costs, as redress for Sutter's violations of the Cartwright Act.

## COUNT V
### Violation of Cal. Bus. & Prof. Code Section 17200, *et seq.*

186.    Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

187.    This claim is instituted pursuant to §§17203 and 17204 of the Cal. Bus. & Prof. Code, to obtain restitution from Sutter for acts, as alleged herein, that violated §17200 of the Cal. Bus. & Prof. Code, commonly known as the UCL.

188.    Plaintiffs have standing to bring this action under the UCL because they have suffered injury in fact as a result of Sutter's anti-competitive conduct. Plaintiffs and other members of the Class they seek to represent have been overcharged and paid inflated prices for health care and related services in the form of higher health insurance premiums, co-payments, deductibles and other out-of-pocket expenses for treatments.

189.    Sutter's anti-competitive conduct through the use of exclusionary contracts and tying constitutes unfair competition in violation of the UCL. Sutter's business acts and practices were centered in, carried out, effectuated, and perfected mainly within the State of California, and Sutter's conduct injured at least all members of the Class defined herein.

190.    Beginning on a date unknown and continuing thereafter, Sutter has committed and continues to commit acts of unfair competition, as defined by §17200, *et seq.* of the Cal. Bus. & Prof. Code, by engaging in the acts and practices specified above.

191.    Sutter's conduct as alleged herein violated §17200. Sutter's contracts and other anti-competitive conduct, as alleged herein, constituted a common, continuous, and continuing course of

SECOND AMENDED COMPLAINT                                      No. 3:12-cv-04854-LB

conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of Cal. Bus. & Prof. Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of §1 of the Sherman Act, as set forth above; (2) the violations of §2 of the Sherman Act as set forth above; and (3) the violations of §16720, *et seq.*, of the Cal. Bus. & Prof. Code as set forth above.

192.    Sutter's contracts and other anti-competitive conduct, as described above, whether or not in violation of §16720, *et seq.*, of the Cal. Bus. & Prof. Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

193.    Sutter's contracts and other anti-competitive conduct is unfair to all consumers of Inpatient Hospital Services and Specialty Provider Services in the relevant Local and Linked Geographic Markets (as defined above) within the meaning of §17200 of the Cal. Bus. & Prof. Code.

194.    Sutter has also committed "unfair" business acts or practices by, among other things, engaging in anti-competitive conduct that:

a)    was undertaken as part of a business practice is still ongoing;

b)    where the utility of such conduct, if any, is outweighed by the gravity of the consequences to plaintiffs and Class members;

c)    is immoral, unethical, oppressive, unscrupulous, or substantially injurious to plaintiffs and Class members;

d)    undermines or violates the spirit or intent of the antitrust consumer protection laws alleged in this Complaint; and

e)    threatens competition at its incipiency by thwarting competition in the relevant Local and Linked Geographic markets in Northern California.

195.    The anti-competitive conduct alleged herein is continuing and there is no indication that Sutter will not continue such activity into the future.

196.     As a proximate result of Sutter's unlawful and unfair business practices and anti-competitive conduct, plaintiffs and the members of the Class have suffered injury in fact, by having to pay supra-competitive and artificially inflated prices for health insurance premiums, co-payments, deductibles and other out-of-pocket expenses, as outlined in ¶¶88–97 above.

197.     As alleged herein, Sutter has been unjustly enriched as a result of its wrongful conduct and unfair competition. Plaintiffs and members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Sutter as a result of such business practices, pursuant to Cal. Bus. & Prof. Code §§17203 and 17204.

198.     Plaintiffs and the Class members have standing to and do seek equitable relief against Sutter, including an order of equitable restitution that would restore to plaintiffs and the Class members the interest or moneys conveyed to Sutter during its unlawful and/or unfair business practices within the Class Period.

**COUNT VI**
**Unjust Enrichment**

199.     Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

200.     This Count is brought in the alternative. *See* Fed. R. Civ. P. 8(d)(2).

201.     Sutter has been unjustly enriched through payment of inflated premiums, co-payments, deductibles and other out-of-pocket expenses by plaintiffs and members of the Class and maintenance of the resulting profits.

202.     Under common law principles of unjust enrichment, Sutter should not be permitted to retain the benefits conferred on it by overcharges by plaintiffs and Class members.

SECOND AMENDED COMPLAINT                                          No. 3:12-cv-04854-LB

Not applicable

203.    Plaintiffs and members of the Class seek disgorgement of all profits resulting from such overcharges and establishment of a constructive trust from which plaintiffs and members of the Class may seek restitution.

204.    Plaintiffs and the Class have no adequate remedy at law. It would be inequitable for defendant Sutter to retain the profits, benefits, and other compensation obtained from its wrongful conduct as alleged herein.

## X.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that:

A.    The Court determines that the Sherman Act, Cartwright Act and the UCL claims in this action may be maintained as a class action under Rule 23(a) and (b)(2)–(3) of the Federal Rules of Civil Procedure;

B.    Plaintiffs be appointed as Class representatives, and plaintiffs' counsel as lead Class counsel;

C.    The unlawful conduct, contract or combination alleged herein be adjudged and decreed to be;

(1)    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2)    An unlawful monopoly or attempted monopoly in violation of §2 of the Sherman Act;

(3)    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the Cartwright Act;

(4)    Violations of Cal. Bus. & Prof. Code §17200; and

(5)    Acts of unjust enrichment.

D.      Plaintiffs and the Class alleged herein recover damages, to the maximum extent allowed under the laws identified herein, and that judgment in favor of plaintiffs and the Class be entered against Sutter in an amount to be trebled to the extent permitted by such laws;

E.      Sutter, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      The Court enter an order providing injunctive relief and precluding Sutter from continuing to implement the all-or-nothing contracts, tying and steering agreements alleged herein that are used to facilitate the anti-competitive conduct alleged herein;

G.      Plaintiffs and members of the Class be awarded monetary damages (trebled as appropriate), restitution, including disgorgement of profits obtained by Sutter as a result of its acts of unfair competition and acts of unjust enrichment;

H.      Plaintiffs and members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

I.      Plaintiffs and members of the Class recover their costs of suit, including a reasonable attorney's fee, as provided by law; and

J.      Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

SECOND AMENDED COMPLAINT                                      No. 3:12-cv-04854-LB

## XI.      DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs, on behalf of themselves and on behalf of the Class, demand a trial by jury of all claims asserted in this Complaint so triable.

DATED: July 1, 2013                                THE MEHDI FIRM

                                                   _____
                                                            /s/
                                                   AZRA Z. MEHDI

                                                   AZRA Z.MEHDI
                                                   ARCELIA HURTADO
                                                   One Market
                                                   Spear Tower, Suite 3600
                                                   San Francisco, CA 4105
                                                   (415) 293-8039
                                                   (415) 293-8001 (fax)
                                                   azram@themehdifirm.com
                                                   arceliah@themehdifirm.com

                                                   Counsel for Plaintiffs and the [Proposed] Class

SECOND AMENDED COMPLAINT                                      No. 3:12-cv-04854-LB

CERTIFICATE OF SERVICE

I hereby certify that on, I authorized the electronic filing of the Second Amended Complaint, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 1, 2013.



/s/

AZRA Z. MEHDI

## Mailing Information for a Case 3:12-cv-04854-LB

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lin W. Kahn**
  linkahn@jonesday.com,adefilippo@jonesday.com,mdavis@jonesday.com,jlevee@jonesday.com,tgsinger@jonesday.com,dkiernan@jonesday.com

- **Azra Z. Mehdi**
  azram@themehdifirm.com,ghamilton@themehdifirm.com

- **Toby G Singer**
  tgsinger@jonesday.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)