Jeffrey A. LeVee (State Bar No. 125863)
jlevee@JonesDay.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA  90071
Telephone:     213.489.3939
Facsimile:      213.243.2539

David C. Kiernan (State Bar No. 215335)
dkiernan@JonesDay.com
Lin Wang Kahn (State Bar No. 261387)
linkahn@JonesDay.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     415.626.3939
Facsimile:      415.875.5700

Attorneys for Defendant
SUTTER HEALTH

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DJENEBA SIDIBE and DIANE DEWEY, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>SUTTER HEALTH, and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No. 3:12-CV-04854-LB<br><br>**DEFENDANT SUTTER HEALTH'S NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**<br><br>**Date:   October 17, 2013**<br>**Time:  9:30 a.m.**<br>**The Honorable Laurel Beeler** |

1

2

# TABLE OF CONTENTS

Page

ISSUES TO BE DECIDED ......................................................................................... 2

INTRODUCTION AND FACTUAL BACKGROUND ............................................... 2

ARGUMENT ............................................................................................................ 4

I.      PLAINTIFFS' FIRST AND SECOND CAUSES OF ACTION UNDER
        SHERMAN ACT SECTION 1 FAIL ..................................................... 5

        A.      Plaintiffs Have Not Alleged That The "Tying" Has Caused
                Anticompetitive Effects In The Tied Product Market.................... 6

        B.      The SAC Does Not Properly Define A Relevant Market
                For The Tying Product Either ...................................................... 11

        C.      These Consumer Plaintiffs Have Not Been Affected By,
                And Lack Standing To Challenge, Any Alleged Tying
                Agreement Between Sutter And Health Plans ............................. 15

II.     PLAINTIFFS' THIRD CAUSE OF ACTION UNDER SHERMAN ACT
        SECTION 2 FAILS.............................................................................. 17

        A.      Plaintiffs Have Not Alleged That Sutter Has Monopoly
                Power In The Relevant Product Market....................................... 18

        B.      Plaintiffs Have Not Alleged That Sutter Has Unlawfully
                Acquired Or Maintained Its Monopoly Power.............................. 19

        C.      Plaintiffs' Claim Of Attempted Monopolization Also Fails.................. 22

III.    PLAINTIFFS' STATE LAW CLAIMS IN THE FOURTH, FIFTH AND
        SIXTH CAUSES OF ACTION FAIL ................................................. 23

CONCLUSION ....................................................................................................... 24

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

**CASES**

4

*Abcor Corp. v. AM Int'l,*
    916 F.2d 924 (4th Cir. 1990)........................................................................ 20

5

6

*Abraham v. Intermountain,*
    461 F.3d (10th Cir. 2006)............................................................................ 16

7

*Aguilar v. Atl. Richfield Co.,*
    25 Cal. 4th 826 (2001) ................................................................................ 24

8

9

*Alaska Airlines, Inc. v. United Airlines, Inc.,*
    948 F.2d 536 (9th Cir. 1991)................................................................ 17, 18

10

*Asahi Kasei Pharma Corp. v. CoTherix, Inc.,*
    204 Cal. App. 4th 1 (2012) ......................................................................... 23

11

12

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985) .................................................................................... 19

13

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................ 5, 14

14

15

*Berkey Photo, Inc. v Eastman Kodak Co.,*
    603 F.2d 263 (2d Cir. 1979)........................................................................ 18

16

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
    182 F.3d 1096 (9th Cir. 1999)..................................................................... 14

17

18

*Blough v. Holland Realty,*
    574 F.3d ........................................................................................................ 7

19

*Brantley v. NBC Universal, Inc.,*
    675 F.3d 1192 (9th Cir. 2012)................................................................... 6, 8

20

21

*California v. Sutter Health Sys.,*
    84 F. Supp. 2d 1057 (N.D. Cal. 2001) ....................................................... 12

22

*Cascade Health Solutions v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008)................................................................... 6, 19

23

24

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
    20 Cal. 4th 163 (1999) ................................................................................ 24

25

26

*Chavez v. Whirlpool Corp.,*
    93 Cal. App. 4th 363 (2001) ....................................................................... 24

27

28

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
  236 F.3d 1148 (9th Cir. 2001)................................................................................7

*Crocs, Inc. v. Austl. Unlimited, Inc.*,
  No. 07-cv-00221-MSK-MJW, 2008 U.S. Dist. LEXIS 82942 (D. Colo. Sept. 25, 2008)...... 23

*Cyntegra, Inc. v. Idexx Labs, Inc.*,
  520 F. Supp. 2d 1199 (C.D. Cal. 2007) ................................................................ 16

*Datagate, Inc. v. Hewlett–Packard Co.*,
  60 F.3d 1421 (9th Cir. 1995)................................................................................6

*Exxon Corp. v. Berwick Bay Real Estate Partners*,
  748 F.2d 937 (5th Cir. 1984)................................................................................18

*Faulkner Adver. Ass'n, Inc. v. Nissan Motor Corp.*,
  905 F.2d 769 (4th Cir. 1990)................................................................................16

*Gordon v. Lewistown Hosp.*,
  423 F.3d 184 (3d Cir. 2005).................................................................................7

*Hishon v. King & Spalding*,
  467 U.S. 69 (1984).............................................................................................5

*Ice Cream Distribs. of Evansville, LLC v. Dryer's Grand Ice Cream, Inc.*,
  No. 09-5815 CW, 2010 WL 2198200 (N.D. Cal. May 28, 2010) ...........................7

*Ill. Tool Works v. Indep. Ink, Inc.*,
  547 U.S. 28 (2006)........................................................................................ 7, 11

*In re eBay Seller Antitrust Litig.*,
  545 F. Supp. 2d 1027 (N.D. Cal. 2008) ............................................................ 7, 10

*In re Webkinz Antitrust Litig.*,
  695 F. Supp. 2d 987 (N.D. Cal. 2010) ......................................................... 7, 10, 11

*In re Webkinz Antitrust Litig.*,
  No. C 08-1987-RS, 2010 WL 4168845 (N.D. Cal. Oct. 20, 2010)....................... 7, 11

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984)...............................................................................................6

*Kendall v. Visa U.S.A.*,
  518 F.3d 1042 (9th Cir. 2008)............................................................................. 14

*Kinderstart.com LLC v. Google, Inc.*,
  No. C 06-2057 JF (RS), 2007 WL 831806 (N.D. Cal. Mar. 16, 2007)................... 18

*LePage's Inc. v. 3M*
  324 F.3d 141 (3d Cir. 2003) (en banc)................................................................ 19

*Marin Cnty. Bd. of Realtors, Inc. v. Palsson*,
   16 Cal. 3d 920 (1976) ................................................................................. 23

*MetroNet Servs. Corp. v. US West Commc'ns*,
   329 F.3d 986 (9th Cir. 2003), *vacated on other grounds*, 540 U.S. 1147 (2004) .................. 17

*Mozart Co. v. Mercedes Benz of N. Am., Inc.*,
   833 F.2d 1342 (9th Cir. 1987) ..................................................................... 14

*Multistate Legal Studies v. Harcourt Brace Jovanovich*,
   63 F.3d 1540 (10th Cir. 1995) ..................................................................... 20

*N. Pac. Ry. Co. v. United States*,
   356 U.S. 1 (1958) ......................................................................................... 6

*Newcal Indus. Inc. v. IKON Office Solutions, Inc.*,
   513 F.3d 1038 (9th Cir. 2008) ..................................................................... 12

*Newcal Indus. Inc. v. IKON Office Solutions, Inc.*,
   513. F.3d 1038, 1045 (9th Cir. 2008) ............................................................ 9

*Pac. Bell Tel. Co., v. Linkline Commc'ns*,
   555 U.S. 438 (2009) ................................................................................... 17

*PepsiCo, Inc. v. Coco-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002) ........................................................................ 18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ........................................................................ 10

*R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*,
   199 F. Supp. 2d 362 (M.D.N.C. 2002) .................................................... 18, 19

*Realnetworks Inc. v. DVD Copy Control Ass'n*,
   No. C 08-4548 MHP, No. C 08-4719 MHP, 2010 U.S. Dist. LEXIS, at *17-19 (N.D.
   Cal. Jan, 6, 2010) ........................................................................................ 14

*Redwood Theatres, Inc. v. Festival Enters., Inc.*,
   200 Cal. App. 3d 687 (1988) ....................................................................... 23

*Rik-Mik Enters. Inc. v. Equilon Enters., LLC.*,
   532 F.3d 963 (9th Cir. 2008) .................................................................. 7, 14

*Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*,
   No. C93 20613 RMW, 1995 WL 853037 (N.D. Cal. Sept. 7, 1995) ...................... 15

*Smith v. eBay Corp.*,
   No. C 10-03825 JSW, 2012 WL 27718 (N.D. Cal. Jan. 5, 2012) .......................... 7

*Spectrum Sports v. McQuillan*,
    506 U.S. 447 (1993) ................................................................................................ 22

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ................................................................................ 14

*Ticketmaster LLC v. RMG Techs., Inc.*,
    536 F. Supp. 2d 1191 (C.D. Cal. 2008) ................................................................. 22

*Total Renal Care v. W. Nephrology & Metabolic Bone Disease, P.C.*,
    No. 08-cv-00513-CMA-KMT, 2009 U.S. Dist LEXIS 80821 (D. Colo. Aug. 21, 2009) ...... 22

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992) (en banc) .................................................................... 7

*Transamerica Computer Co. v. IBM*,
    698 F.2d 1377 (9th Cir. 1983) ................................................................................ 22

*U.S. v. Grinnell Corp.*,
    384 U.S. 563 (1966) ................................................................................................ 17

*United States v. Dentsply Int'l*,
    399 F.3d 181 (3d Cir. 2005) .................................................................................... 19

*United States v. Lowe's*,
    371 U.S. 38 (1962) .................................................................................................... 6

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. 2001 (en banc) (per curiam)) ................................................... 20

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) .................................................................................. 20

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) .......................................................................................... 18, 19

**STATUTES**

Cal. Bus. & Prof. Code § 17200 ...................................................................... 23, 24

California Cartwright Act, Cal. Bus. & Prof. Code § 16720 ................................. 23

California Insurance Code § 10178.3 .................................................................... 16

Sherman Act § 1 ............................................................................................. passim

Sherman Act § 2 ............................................................................................. passim

Federal Rule of Civil Procedure 12(b)(6) ..................................................... 1, 3, 14

1

**NOTICE OF MOTION AND MOTION**

2      PLEASE TAKE NOTICE THAT, pursuant to Federal Rule of Civil Procedure 12(b)(6),

3  Defendant Sutter Health ("Sutter") will and hereby does move the Court to dismiss plaintiffs'

4  Second Amended Complaint.  Pursuant to the parties' stipulation as approved by the Court, this

5  motion shall be heard on October 1, 2013, at 9:30 a.m., or as soon thereafter as it may be heard, in

6  the courtroom of the Honorable Laurel Beeler, United States Magistrate Judge, at United States

7  District Court, 450 Golden Gate Avenue, 15th Floor, Courtroom C, San Francisco, California

8  94102.

9

**RELIEF SOUGHT**

10      Pursuant to Federal Rule of Civil Procedure 12(b)(6), Sutter requests that the Court

11  dismiss plaintiffs' Second Amended Complaint with prejudice for failure to state a claim upon

12  which relief can be granted.

13      Plaintiffs' first and second causes of action under Section 1 of the Sherman Act fail

14  because plaintiffs have not sufficiently alleged the elements of an unlawful tying agreement.

15      Plaintiffs' third cause of action under Section 2 of the Sherman Act fails because plaintiffs

16  have not alleged that Sutter unlawfully acquired or maintained a monopoly in a properly defined

17  relevant market.

18      Plaintiffs' fourth, fifth and sixth causes of action fail for the same reasons that the first

19  three causes of action fail.

20      Sutter's motion is based on this Notice of Motion and Motion, the accompanying

21  Memorandum of Points and Authorities, the complete files and records in this action, oral

22  argument of counsel, and such other and further matters as this Court may consider.

23  Dated:      August 2, 2013              JONES DAY

24

25                                     By:    /s/ Jeffrey A. LeVee

26                                         Jeffrey A. LeVee
                                      Attorneys for Defendant SUTTER HEALTH

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**ISSUES TO BE DECIDED**

1.     Have plaintiffs stated a valid Section 1 Sherman Act claim?

2.     Have plaintiffs stated a valid Section 2 Sherman Act claim?

3.     Have plaintiffs stated a valid Cartwright Act claim?

4.     Have plaintiffs stated a valid claim under California's unfair competition statute?

5.     Have plaintiffs stated a valid unjust enrichment claim?

**INTRODUCTION AND FACTUAL BACKGROUND**

Plaintiffs' Second Amended Complaint (ECF No. 37, hereinafter "Complaint" or "SAC") corrects a few of the deficiencies that caused this Court to dismiss the First Amended Complaint (June 3, 2013 Order, ECF No. 34) but does not address the most glaring deficiencies that should, again, result in dismissal of this lawsuit, this time with prejudice.  In particular, while plaintiffs have abandoned their "exclusive dealing" theory of antitrust liability, plaintiffs continue to pursue a "tying" theory that is flawed both legally and factually, and plaintiffs still have not defined a proper antitrust relevant market that would support their Sherman Act or Cartwright Act claims. By this motion, defendant Sutter Health ("Sutter") seeks to have the entire Complaint dismissed with prejudice.

The named plaintiffs continue to be Djeneba Sidibe and Diane Dewey, and they continue to propose to represent an enormous putative class, this time consisting of all persons in the "San Francisco Bay Area Combined Statistical Area and the Sacramento-Roseville-Arden-Arcade Metropolitan Statistical Area" who, dating back to September 2008, were "enrolled in a licensed health plan offered by a commercial health insurer [that] . . . had (or has) a contractual relationship with Sutter or any of its affiliated entities."  The putative class potentially consists of millions of persons in 16 Northern California counties (down from 22 counties in the First Amended Complaint).  (SAC, ¶ 146.)

In contrast to the First Amended Complaint, which alleged no direct connection between the named plaintiffs and Sutter, the Second Amended Complaint alleges that both Ms. Sidibe and Ms. Dewey, while enrolled in various health plans over the past several years, "received a variety

DEFENDANT'S MOTION TO DISMISS SAC
Case No. 3:12-CV-04854-LB

1    of health care services at various Sutter facilities." (SAC, ¶¶ 26-27.) The SAC further alleges

2    that Ms. Sidibe and Ms. Dewey were "forced to pay higher premiums, co-payments, deductibles

3    and other out-of-pocket payments not covered by the health plan . . . ." (*Id*.) In view of these

4    new allegations, and the Court's previous ruling with respect to standing (June 3 Order at 15-19,

5    23), Sutter will not in this motion address the generic issue of standing (except with respect to

6    unique standing issues that arise in the context of tying claims).[1]

7         The focal point of the Complaint continues to be the contracts between Sutter and the

8    health plans that contract with Sutter, which enable the health plans' members to visit Sutter

9    providers at reduced prices. Plaintiffs allege that Sutter has an "all-or-nothing" provision in its

10   contracts with health plans (SAC, ¶ 43) pursuant to which health plans are forced to contract with

11   the entire Sutter network. According to plaintiffs, health plans are not given the option of

12   contracting with Sutter for only a portion of the Sutter network, and this "prevents the health

13   insurer from channeling enrollees to more efficient providers or achieving volume discounts."

14   (SAC, ¶ 45.)

15        The biggest problem with plaintiffs' allegations in this respect is they are <u>absolutely false</u>:

16   Sutter does <u>not</u> require health plans to contract with the entirety of Sutter's network, and several

17   major health plans (including Blue Cross, Blue Shield and HealthNet) have been offering, for the

18   past several years, products that include some but not all Sutter providers. Indeed, to give just

19   two examples, health plan products that are offered to CalPERS beneficiaries and to employees of

20   the University of California include some but not all Sutter providers, directly refuting the very

21   premise of this litigation. However, addressing this at the Rule 12 stage would be complicated

22   and is unnecessary, because the Complaint is defective in so many other respects.

23        Plaintiffs' lead claim consists of an allegation of unlawful "tying." Based on the faulty

24   premise that Sutter requires health plans to include all Sutter providers in their networks,

25   plaintiffs allege that Sutter "ties" the availability of its hospitals to a requirement that health plans

26   also contract with Sutter's physician specialists. Specifically, plaintiffs allege that there is a

27        [1] Sutter continues to contend that plaintiffs do not have standing under the antitrust laws to pursue their Sherman Act and Cartwright Act claims, and Sutter reserves the right to raise the standing issues later in the litigation in the event any portion of the antitrust claims survive.

28

1 relevant product market that consists of "Inpatient Hospital Services," and separate relevant

2 markets that consist of 38 separate physician specialties that plaintiffs lump together in all of their

3 allegations, using the term "Specialty Provider Services." (SAC, ¶¶ 59-61.) Plaintiffs then allege

4 that Sutter has market power in the market for "Inpatient Hospital Services," and that Sutter ties

5 the sale of its hospital services to the sale of Sutter's "Specialty Provider Services." (SAC, ¶¶ 80-

6 83.) According to the Complaint, Sutter leverages its market power in the hospital market to

7 prevent health plans from negotiating lower in-network prices with Sutter-owned physician

8 groups. (SAC, ¶ 83.) As discussed below, the Complaint alleges that Sutter has market power in

9 only six of the sixteen California counties that are within the proposed geographic market; the

10 Complaint does not contain <u>any</u> allegations of Sutter's market position with respect to physicians

11 or other providers (specialty or otherwise).[2]

12      In addition to the tying claim, the SAC includes a monopolization claim under Sherman

13 Act Section 2. Plaintiffs allege that Sutter has monopoly power in the market for Inpatient

14 Hospital Services in six of the sixteen California counties identified in the Complaint. Plaintiffs

15 then allege various acts that allegedly support their claim – including that Sutter has purchased,

16 re-built, closed or sold various hospitals, and that Sutter intends to operate a new health plan – but

17 none of these acts could possibly support a Section 2 claim as a matter of law. Indeed, it cannot

18 possibly be true that opening <u>and</u> closing hospitals are both anticompetitive acts, and the

19 Complaint does not address the alleged anticompetitive impact of any of these acts.

20      The remaining causes of action assert claims under the Cartwright Act, the Unfair

21 Competition Law, and for unjust enrichment. As with the First Amended Complaint, these claims

22 will rise or fall with the claims under the Sherman Act. As explained below, none of plaintiffs'

23 claims should survive.

24 **<u>ARGUMENT</u>**

25      On a motion to dismiss, the Court should accept well-pleaded factual allegations as

26 correct, but a complaint should be dismissed when its allegations fail to state a cognizable claim.

27 _____

28 [2] The Complaint uses the term "specialty medical providers" (SAC, ¶ 59). Sutter presumes this refers to physicians.

1   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (courts shall not accept legal conclusions as true,

2   and complaints must state a plausible claim for relief in order to survive a motion to dismiss);

3   *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  The Court in *Twombly* noted that the costs

4   of modern federal antitrust litigation, in particular, should counsel against sending the parties into

5   discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the

6   events set forth in the complaint.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. at 558 ("Thus, it is

7   one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but

8   quite another to forget that proceeding to antitrust discovery can be expensive.  As we indicated

9   over 20 years ago in *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 'a district court

10  must retain the power to insist upon some specificity in pleading before allowing a potentially

11  massive factual controversy to proceed.'" (internal citations omitted)).

12  **I.      PLAINTIFFS' FIRST AND SECOND CAUSES OF ACTION UNDER**

13  **          SHERMAN ACT SECTION 1 FAIL.**

14          Plaintiffs' first cause of action (SAC, ¶¶ 155-160) purports to allege a violation of

15  Section 1 of the Sherman Act.  However, in this cause of action, plaintiffs do not identify any

16  antitrust theory that forms the basis for the alleged violation.  Instead, plaintiffs simply allege that

17  the contracts between Sutter and the health plans are the "contract, combination, or conspiracy,"

18  and that "Sutter's anti-competitive contracts unreasonably restrain trade."  (SAC, ¶¶ 157-158.)

19  Plaintiffs refer to the so-called "all-or-nothing" clause in Sutter's contracts with health plans but

20  do not provide any legal theory in Count I as to how that clause violates the Sherman Act.  The

21  cause of action also references SAC paragraphs 88-97, which contain allegations that Sutter's

22  prices are higher than its competitors' prices, but these paragraphs do not link Sutter's prices to

23  any specific anticompetitive conduct (such as price fixing).

24          The second cause of action also purports to allege a violation of Section 1 of the Sherman

25  Act, but unlike Count I, plaintiffs specifically articulate a legal theory to support this claim, and

26  Sutter will assume that this legal theory forms the basis for the first cause of action as well.  In the

27  second cause of action, plaintiffs allege that Sutter's contracts with health plans constitute

28  unlawful tying agreements because Sutter refuses to allow health plans "to contract for access to

1   any Sutter hospitals unless the insurer agrees to contract with all Sutter providers, including

2   unwanted providers," and Sutter "conditions commercial health insurers' access to Inpatient

3   Hospital Services on commercial health insurers' agreement to purchase Specialty Provider

4   Services from all of Sutter Physician Groups." (SAC, ¶ 162 (emphasis in original).) Plaintiffs

5   allege that this "tying" is both unlawful *per se* and unlawful under the rule of reason. (*Id.*)

6       Tying is defined as "an agreement by a party to sell [the tying product] but only on the

7   condition that the buyer also purchases a different (or tied) product, or at least agrees he will not

8   purchase that product from any other supplier." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6

9   (1958). *See also Datagate, Inc. v. Hewlett–Packard Co.*, 60 F.3d 1421, 1423 (9th Cir. 1995)

10  (describing a tying arrangement as a "device used by a competitor with market power in one

11  market . . . to extend its market power into an entirely distinct market."). In order to prevail on a

12  *per se* tying claim, a plaintiff must generally allege and prove three elements: (1) that there exists

13  two distinct products or services in different markets whose sales are tied together; (2) that the

14  seller possesses appreciable economic power in the tying product market sufficient to coerce

15  acceptance of the tied product; and (3) that the tying arrangement affects more than an

16  insubstantial volume of commerce in the tied product market. *See Brantley v. NBC Universal,*

17  *Inc.*, 675 F.3d 1192, 1197 n.7 (9th Cir. 2012); *Cascade Health Solutions v. PeaceHealth,* 515

18  F.3d 883, 913 (9th Cir. 2008).

19      **A.**   **Plaintiffs Have Not Alleged That The "Tying" Has Caused**

20          **Anticompetitive Effects In The Tied Product Market.**

21      The Ninth Circuit recently explained that "[t]he potential injury to competition threatened

22  by [tying] is that the tying arrangement will either 'harm existing competitors or create barriers to

23  entry of new competitors in the market for the tied product' . . . or will 'force buyers into giving

24  up the purchase of substitutes for the tied product.'" *Brantley*, 675 F.3d at 1199 (citing *Jefferson*

25  *Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984)[3]; *United States v. Loew's*, 371 U.S. 38,

26      [3] *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 34, 35 (1984) (J. Conner,

27  concurring) ("The 'per se' doctrine in tying cases has thus always required an elaborate inquiry
    into the economic effects of the tying arrangement." "Our prior opinions indicate that the purpose
    of tying law has been to identify and control those tie-ins that have a demonstrable exclusionary

28  impact in the tied product market").

1    45 (1962)).[4]

2         Thus, courts in *per se* tying cases typically require plaintiffs to allege that the tying

3    arrangement has a "pernicious effect on competition and lack . . . of any redeeming virtue."

4    *Smith v. eBay Corp.*, No. C 10-03825 JSW, 2012 WL 27718, at *6 (N.D. Cal. Jan. 5, 2012); *In re*

5    *eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1034 (N.D. Cal. 2008) ("The Ninth Circuit has

6    adopted the pernicious effect requirement, explaining that 'the hallmark of a tie-in is that it denies

7    competitors free access to the tied product market.'"); *In re Webkinz Antitrust Litig.*, 695 F. Supp.

8    2d 987, 995 (N.D. Cal. 2010) ("Plaintiffs must plead a 'pernicious effect on competition and lack

9    of…any redeeming value.'"); *In re Webkinz Antitrust Litig.*, No. C 08-1987-RS, 2010 WL

10   4168845, at *2 (N.D. Cal. Oct. 20, 2010) ("a plaintiff must allege and ultimately prove facts

11   showing a significant negative impact on competition in the tied product market").  Indeed, Ninth

12   Circuit *per se* tying cases have consistently recognized that the potential harm threatened by tying

13   arrangements is reduced competition in the tied product market or the ability to exclude other

14   sellers from the tied product market.  *Rik-Mik Enters. Inc. v. Equilon Enters., LLC.*, 532 F.3d 963,

15   971 (9th Cir. 2008) ("Tying arrangements are forbidden on the theory that, if the seller has market

16   power over the tying product, the seller can leverage this market power through tying

17   arrangements to exclude other sellers of the tied product."); *Blough v. Hollard Realty, Inc.,* 574

18   F.3d at 1088.[5]

19        Thus, in order for a tying claim to proceed, plaintiffs must allege reduced competition in

20   ───────────────────

        [4] Where there is no foreclosure in the tied product market, "there is no unlawful tying

21   arrangement because there is no adverse effect on competition in the tied product market."
     *Blough v. Holland Realty*, 574 F.3d at 1089; *Ice Cream Distribs. of Evansville, LLC v. Dryer's*

22   *Grand Ice Cream, Inc.,* No. 09-5815 CW, 2010 WL 2198200, at *8 (N.D. Cal. May 28, 2010)
     (plaintiffs must allege that the "tying arrangement affected a 'not insubstantial amount of
     commerce,' through a reduction in competition" in the tied product market).

23        [5] A rule of reason inquiry requires an even more detailed analysis of the competitive

24   effects of the alleged tie, but the essential elements of the claim are otherwise the same as a *per se*
     claim.  *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1158-60 (9th Cir. 2001);

25   *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 214 (3d Cir. 2005).  As a result, to sustain a rule of
     reason claim, plaintiffs still must identify a relevant market and allege that defendant has market

26   power in the tying product.  *Ill. Tool Works v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (in all tying
     cases, "the plaintiff must prove that the defendant has market power in the tying product.").  And

27   the plaintiff must allege and prove a competitive injury in the tied product market.  *Town Sound*
     *& Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 486-87 (3d Cir. 1992) (en banc).

28   As explained in this section, for the same reasons that the per se claim fails, plaintiffs' rule of
     reason claim fails as well.

1   the market for the tied product, here the market for "Specialty Provider Services."  But the SAC's

2   allegations do not indicate that <u>any</u> foreclosure has occurred in this market or even that the

3   alleged tying has affected more than an insubstantial amount of commerce.  Indeed, the SAC is

4   entirely devoid of allegations regarding competition in any specialty physician market.  Thus, for

5   example, the SAC does not allege that Sutter's competitors have been injured by the alleged tie,

6   that the tie has prevented non-Sutter physicians from entering or competing in the relevant

7   market, or that consumers have been forced to use Sutter's physicians in lieu of other physicians.

8   *Brantley*, 675 F.3d at 1199.

9       Beyond alleging that Sutter has "2,500 physicians in the various specialties listed above"

10  (SAC, ¶ 82), the SAC does not contain allegations of Sutter's alleged market presence in any

11  physician market (either as individual specialties or collectively), or the number of specialty

12  physician competitors that exist in the six counties where Sutter is alleged to have market power

13  in the market for inpatient hospital services or in the sixteen counties that make up the proposed

14  geographic market.  Indeed, there are no allegations whatsoever about these 38 medical

15  specialties, either as 38 separate markets or in a theoretical cluster of the 38 individual markets.

16      The SAC alleges that Sutter has 240 physicians in "San Francisco and the surrounding

17  counties (Marin, Sonoma, and Lake Counties)" (SAC, ¶ 68), 200 physicians in "Alameda and the

18  surrounding East Bay region" (SAC, ¶ 69), and 1,300 physicians in "Sacramento and nearby

19  counties (Amador, El Dorado, Placer, Nevada, Solano, Yuba and Yolo Counties)" (SAC, ¶ 70).

20  But plaintiffs do not allege how many of these physicians are "Specialty Providers" in the

21  specialties listed in the SAC, much less what percentage of the market these specialists control.

22  As a result, the Complaint does not allege, for example, whether the 240 physicians that Sutter

23  allegedly controls in San Francisco and the three "surrounding counties" even includes one or

24  more physicians from each of the 38 different types of specialties that the Complaint identifies,

25  much less whether Sutter has any appreciable percentage of the specialists in these four counties.

26  Nor does the Complaint offer any basis to know whether 240 physicians in four heavily populated

27  counties constitutes a "significant" number, much less a percentage that could be useful in

28  determining whether any anticompetitive effects might have occurred in the tied market.

DEFENDANT'S MOTION TO DISMISS SAC
Case No. 3:12-CV-04854-LB

1    In short, the Complaint does not allege that consumers lack access to non-Sutter

2    physicians or that consumers have been forced to use Sutter physicians and have, thus, suffered

3    anticompetitive effects.  As a result, the Court's ruling on page 20 of its June 3 Order remains

4    applicable here:  "The tying allegations – contracting with one Sutter provider requires

5    contracting with the other Sutter providers – do not allege a requirement that patients can choose

6    only Sutter providers, and the complaint alleges no facts about anticompetitive effect in the form

7    of, for example, an effect on more than an insubstantial volume of commerce."  Although the

8    SAC attempts to clarify the nature of the alleged "tie," it offers no more allegations of

9    anticompetitive effect than did the First Amended Complaint.

10    Further, while plaintiffs allege that the "relevant geographic market in this case is local in

11    nature" (SAC, ¶ 64), the Complaint also acknowledges that consumers are willing to travel farther

12    for specialty medical services (SAC, ¶ 74).  Yet, the Complaint makes no effort to define any

13    relevant geographic markets for any of the physician specialties, much less whether any "tying"

14    has caused anticompetitive effects in any properly defined geographic market.  And, of course,

15    the relevant geographic market for certain types of specialists – transplant and oncology, for

16    example – might be much broader than the relevant geographic market for pediatrics or

17    gynecology, but the Complaint inappropriately lumps all 38 different specialties together in a

18    single proposed product market and simply assumes that the geographic market for each of these

19    specialties is the same (albeit undefined) geographic region.  Even assuming that 38 different

20    types of physician specialists could be lumped into a single relevant antitrust market – an

21    assumption that the Complaint makes no attempt to justify[6] – plaintiffs do not allege that

22    ─────────────────────
       [6] Plaintiffs' failure to allege how dermatologists, gynecologists, oral surgeons, podiatrists,
23    and psychiatrists (among many others) possibly co-exist in the same relevant product market
       constitutes yet another basis to dismiss the tying claim.  Plaintiffs initially allege that each of the
24    38 types of physician specialists constitutes its own separate relevant market (SAC, ¶ 60), but
       plaintiffs then lump the 38 specialties together without any explanation to form a much larger
       proposed market (SAC, ¶ 61).  A properly defined product market includes the pool of goods or
25    services that enjoy reasonable interchangeability of use and cross-elasticity of demand.  If
       plaintiffs want to lump 38 different types of physician specialties together in a single relevant
26    market, plaintiffs have an obligation to allege how these various physician specialties interact
       with one another.  *See Newcal Indus. Inc. v. IKON Office Solutions, Inc.*, 513. F.3d 1038, 1045
27    (9th Cir. 2008) ("[T]he market must encompass the product at issue as well as all economic
       substitutes for the product. . . .  [T]he relevant market must include 'the group or groups of sellers
28    or producers who have actual or potential ability to deprive each other of significant levels of
       business.'") (citing *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th

consumers lack ample alternatives for these physician specialists.

In short, the Complaint does not provide any allegations that the alleged "tie" of the sale of hospital services to the sale of physician services has had any impact whatsoever in any purported "market" for specialty provider services.  Absent facts to support such an allegation, the tying claim should be dismissed.[7]

The law in the Northern District makes this point abundantly clear as several Northern District decisions have granted motions to dismiss tying claims for failure to allege harm to competition in the tied product market.  For example, in *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027 (N.D. Cal. 2008), plaintiffs, individuals who sell products on eBay, brought a *per se* unreasonable tying claim alleging that eBay required all sellers to use PayPal to the exclusion of other person-to-person online payment systems.  *Id.* at 1030.  The tying market was the market for online auctions; the tied market was the market for person-to-person payments such as PayPal. Defendants moved to dismiss.  The court agreed with defendants that plaintiffs must plead a "pernicious effect on competition and lack . . . of any redeeming value." *Id.* at 1034.  The complaint alleged nothing more than that competition in the tied market had been injured, reduced, restrained, suppressed, and foreclosed, and that eBay sellers that accept PayPal have or will pay artificially inflated prices caused by reduction in competition.  The court found this was insufficient to survive the motion to dismiss.  *Id.*

In *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987 (N.D. Cal. 2010), plaintiff retailers

---

(continued…)

Cir. 1989)); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436-37 (3d Cir. 1997)("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.").

[7] The Complaint contains allegations that Sutter has "aggressively acquired" physician groups (SAC, ¶ 98) and has "defeat[ed] the desire of both insurers and consumers to increase the efficiency and quality of medical services by utilizing only the best and most-efficient physicians" (SAC, ¶ 101), but the Complaint again makes no effort to quantify these effects so as to demonstrate the possibility of a legitimate anticompetitive effect in the relevant market. Indeed, the Complaint does not identify a single specific physician acquisition during the relevant time period (or at any other time).

1    alleged that defendant, a developer/distributor of toys and other products, conditioned the sale of

2    a popular toy (the tying product) on the purchase of unrelated products (the tied products).  *Id.* at

3    992.  As a result of the tie, plaintiffs alleged that they were unable to purchase those same

4    products from other producers (defendants' competitors) due to limited shelf space.  *Id.* at 996.

5    Thus, the complaint alleged, plaintiffs were unable to provide those competitor choices to

6    consumers.  *Id.*  The court granted defendants' motion to dismiss, finding that plaintiffs did not

7    allege an anticompetitive effect in the tied market.  *Id.* at 995-96.  The court reasoned that the

8    complaint did not allege that consumers were unable to purchase the competing manufacturer's

9    products from other retailers; nor did the complaint allege that competing sellers were foreclosed

10   from carrying competitive products, or that consumers were unable to access the tied product

11   market.[8]

12        **B.      The SAC Does Not Properly Define A Relevant Market For The**

13                **Tying Product Either.**

14        Not only must plaintiffs allege an anticompetitive effect in a properly defined market for

15   the tied product, but plaintiffs also must allege that Sutter possesses market power in the "tying

16   product," the so-called market for inpatient hospital services.  *Ill. Tool Works v. Indep. Ink, Inc.*,

17   547 U.S. 28, 46 (2006) (plaintiff must prove that defendant has market power in the tying

18   product).  Although the Second Amended Complaint is somewhat more specific than the First

19   Amended Complaint on the issue of the relevant market, the complaint still falls well short of

20   alleging that Sutter has market power in <u>any</u> market, in part because plaintiffs dramatically

21   overreach in attempting to define the relevant geographic market.

22        Plaintiffs allege that the "sale of general acute-care inpatient hospital services" is the

23   primary relevant product market in this case, and that these services consist of a "cluster of

24   services consumed by patients who spend one or more nights in the hospital [and] physician

25   services, radiology services, and the services of other medical professionals such as nurses and

26   ────────────────
     [8] Subsequent to this decision, plaintiff filed a second amended complaint, which added
27   significant factual allegations showing negative impact on competition in the tied market, such as
     the identity of various competitors that had been foreclosed as a direct result of the tying policies.
28   *In re Webkinz Antitrust Litig.*, No. C 08-1987 RS, 2010 WL 4168845, * 4 (N.D. Cal. Oct. 20,
     2010).

1    technicians." (SAC, 54.)  For purposes of this motion only, Sutter does not challenge the notion

2    that "inpatient hospital services" as defined in the Complaint could be a plausible antitrust

3    product market.  However, an antitrust market requires both a product and a geographic

4    component, *Newcal Indus. Inc. v. IKON Office Solutions, Inc.,* 513 F.3d 1038, 1045 (9th Cir.

5    2008), and plaintiffs clearly fail with respect to the geographic portion of the market.

6          The Complaint initially alleges that "the relevant geographic market in this case is local in

7    nature" (SAC ¶ 64), and that "the local relevant geographic markets include all of the local

8    geographic markets in which Sutter-controlled hospitals and physicians provide services." (SAC,

9    ¶ 67.)  Plaintiffs do not define those various "local" markets, however, beyond alleging

10   conclusorily that "the relevant geographic market for analyzing the effect of a contract governing

11   relations between a commercial health insurer and a Sutter-controlled hospital consists of the area

12   in which the relevant hospital operates and in which patients covered by the insurance company

13   might practicably turn to seeks [sic] substitutes for the Sutter-controlled hospital." (*Id.*)

14         The Complaint then contains specific allegations regarding six Northern California

15   counties.  Although plaintiffs suggest that each of these six counties constitutes a separate

16   relevant market, they confuse the market definition by alleging that residents of these counties

17   cannot turn to other <u>health plans</u> if they are dissatisfied with Sutter's hospitals in those counties

18   (as opposed to alleging that the residents could not find alternative hospitals in those counties).

19   (SAC, ¶¶ 80a – 80c.)  Plaintiffs allege that Sutter has over 50% of the "non-Kaiser" hospital beds

20   in San Francisco and Sacramento Counties, over 60% in Alameda and Contra Costa Counties,

21   and 100% in Placer and Amador Counties.[9]  Plaintiffs then allege (without any citation or other

22   reference) that Sutter has "35% of the revenue and 36% of the beds that compete for patients in

23   Northern California," although plaintiffs do not define what they mean by "Northern California."

24   (SAC, ¶ 77.)

25   _____

26        [9] These allegations are not accurate, as a glance at any map would show.  Nor is it
     accurate to say that each of these six counties constitutes a separate relevant market.  For
     example, Judge Chesney held in *California v. Sutter Health Sys.*, 84 F. Supp. 2d 1057, 1060,
27   1068-81 (N.D. Cal. 2001), that there were at least 20 hospitals located in the East Bay, that
     Alameda, San Francisco, and Contra Costa Counties were in the same relevant market for
28   hospital services, and that Kaiser hospitals were part of the relevant market for hospital services.

1    The Complaint does not, however, limit the proposed relevant geographic market to a

2    region that is limited to these six counties.  Instead, plaintiffs introduce the concept of a "Linked

3    Geographic Market," which is based on the notion that health plans offer services on a regional

4    basis "to appeal to a broader population of consumers."  (SAC, ¶ 72.)  Without any explanation of

5    how all these various geographic regions are connected – much less any discussion of how far or

6    where consumers are willing to travel for inpatient hospital services – plaintiffs define the

7    "Linked Geographic Market" in this case to be "an area at least as large as the San Francisco Bay

8    Area Combined Statistical Area and the Sacramento-Roseville-Arden-Arcade Metropolitan

9    Statistical Area, as well as all local markets within that region."  (SAC, ¶ 76.)  In other words,

10   based on Sutter's alleged "hospital" market power in six counties, plaintiffs propose a relevant

11   geographic market that is much larger than these six counties.  But plaintiffs cannot have it both

12   ways:  if patients cannot practicably turn to hospitals outside each of the six counties, the market

13   cannot be larger than those six counties.  If the market is larger, that means patients have a choice

14   of hospitals throughout the regions that plaintiffs define.

15   Although the Complaint does not identify which counties are in these two "Statistical

16   Areas," official census data does.  *See* Sutter's Request for Judicial Notice ("RJN") and

17   Declaration of Lin W. Kahn ("Kahn Decl.), filed concurrently.  The "San Francisco Bay Area

18   Combined Statistical Area" comprises seven Metropolitan Statistical Areas and includes the

19   following twelve counties:  Alameda, Contra Costa, San Francisco, San Mateo, Marin, Santa

20   Clara, San Benito, San Joaquin, Sonoma, Solano, Santa Cruz County, and Napa.  *See* RJN at 2-3;

21   Kahn Decl. ¶ 6, Ex. A.  The "Sacramento-Roseville-Arden-Arcade Metropolitan Area" comprises

22   Sacramento, Yolo, El Dorado, and Placer counties.  *See* RJN at 2-3; Kahn Decl. ¶ 7, Ex. A.

23   Accordingly, the Complaint proposes to define a relevant geographic market that consists

24   of sixteen California counties.  Sutter does not even own a hospital in several of these counties,

25   meaning that plaintiffs obviously are ignoring important non-Sutter alternatives in defining the

26   relevant geographic market.  In any event, even assuming the allegations regarding Sutter's

27   market power in the six identified counties are accurate, these allegations fall well short of

28   demonstrating that Sutter has sufficient economic power in the market for "Inpatient Hospital

Services" in 16 counties to permit Sutter to be found liable for unlawful tying in the proposed relevant market.[10]

In order to state a claim for unlawful tying, Plaintiffs have an obligation to allege a viable relevant geographic market as well as the defendants' alleged power in that market. When a plaintiff fails in this respect, the complaint can and should be dismissed at the Rule 12 stage. *Rick-Mik Enters., Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 972 (9th Cir. 2008) ("A failure to allege power in the relevant market is sufficient to dismiss an antitrust complaint."); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (plaintiffs must allege that the market as defined is an "area of effective competition"); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104-05 (9th Cir. 1999) (plaintiffs must allege both a "relevant geographic and product market[] . . . and allege facts demonstrating that Defendants' conduct has an anticompetitive effect on those market."); *Mozart Co. v. Mercedes Benz of N. Am., Inc.,* 833 F.2d 1342 (9th Cir. 1987); *Realnetworks Inc. v. DVD Copy Control Ass'n*, No. C 08-4548 MHP, No. C 08-4719 MHP, 2010 U.S. Dist. LEXIS, 1433, at *17-19 (N.D. Cal. Jan, 6, 2010) (plaintiff must allege a relevant market that makes sense with regard to its complaint).[11]

It is not enough for plaintiffs to allege that Sutter has market power in only six of sixteen counties that make up the proposed relevant geographic market. Nor is it sufficient to allege that Sutter has "35% of the revenue and 36% of the beds that compete for patients in Northern

---

[10] The SAC again refers to the Knox-Keene Act's requirements that health plan enrollees have a residence or workplace within 30 minutes or 15 miles of a hospital that has a contract with the health plan, but plaintiffs again make no effort to connect these requirements to their proposed geographic market. The Knox-Keene regulations, if relevant here, would argue for smaller geographic markets, whereas plaintiffs now define a relevant geographic market that consists of a huge area that includes sixteen California counties. Further, as discussed below, plaintiffs do not explain the relevance of the Knox-Keene Act to a market of specialty physicians, which is the "tied" product market.

[11] The definition of the relevant market in this case is particularly critical because of how that definition would affect the scope of discovery in the event the litigation proceeds. "[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Associated Gen. Contractors*, 459 U.S. at 528 n.17; *see also Twombly*, 550 U.S. at 558 ("[I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery . . . , but quite another to forget that proceeding to antitrust discovery can be expensive."); *Kendall v. Visa U.S.A.*, 518 F.3d 1042, 1046-47 (9th Cir. 2008) (concluding that the Supreme Court clarified the Sherman Act pleading requirements in Twombly "because discovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case") (citing *Twombly*, 550 U.S. at 558-59).

California" (SAC, ¶ 77), because plaintiffs do not connect these numbers to the specific relevant geographic market that they propose.  A tying claim can only proceed if the complaint specifically alleges that the defendant has market power in the specific geographic markets that the complaint defines, and this Complaint fails in this respect.

> **C.**     **These Consumer Plaintiffs Have Not Been Affected By, And Lack Standing To Challenge, Any Alleged Tying Agreement Between Sutter And Health Plans.**

As with the original complaint, plaintiffs' tying claim fails because plaintiffs have not alleged that consumers are directly affected by any purported tying agreements.  Plaintiffs allege that Sutter has unlawful tying agreements with health plans pursuant to which the health plans are required to contract with Sutter's specialty physicians in order to contract with Sutter's hospitals, but the plaintiffs in this case are not health plans.  Instead, the plaintiffs are two consumers who purport to represent a class of consumers, and there is not a single allegation in the complaint that they or any other consumers have been forced to use either Sutter hospitals or Sutter doctors.  It would be a different story if the health plans were challenging the alleged tie, but these plaintiffs are consumers who are not "tied" to purchasing any service that Sutter provides.

The absence of any effect of a "tying arrangement" on consumers is highlighted by the fact that the economic theory of the first two causes of action – that health plans want Sutter hospitals and are then obligated to contract with Sutter doctors – has no logic as applied to consumers.  Consumers almost always choose a doctor before they choose a hospital (with the exception of emergencies).  The doctor then typically recommends a hospital for the consumer, presumably a hospital where the doctor has admitting privileges.  But plaintiffs do not allege that consumers lack choices when it comes to physicians (either primary care or specialty physicians) such that consumers are "forced" to use Sutter doctors.  In any event, the "tying" notion simply is not viable with respect to consumer plaintiffs because there are no allegations that consumers have needed to purchase services from Sutter hospitals, and are then forced against their will to purchase services from Sutter's doctors; this is simply contrary to how consumers purchase medical services.  *See Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, No. C93 20613

1   RMW, 1995 WL 853037, at *13 (N.D. Cal. Sept. 7, 1995) (finding no tying of inpatient hospital

2   services to the purchase of physician services because payors were not required to purchase one

3   service in order to purchase the other and because plaintiffs' physician practice was a viable

4   option that was considered and chosen by several health plans and thus was not foreclosed by any

5   contract entered into between defendant and a payor).

6        As a result, these plaintiffs have not been injured by any alleged tying agreement, and they

7   do not have standing to challenge any such agreements.  *See Cyntegra, Inc. v. Idexx Labs, Inc.*,

8   520 F. Supp. 2d 1199, 1210 (C.D. Cal. 2007) ("Two types of plaintiffs have standing to challenge

9   illegal tying arrangements – purchasers who are forced to buy the tied product to obtain the tying

10  product, and competitors who are restrained from entering the market for the tied product.");

11  *Abraham v. Intermountain*, 461 F.3d at 1266 n.10 (10th Cir. 2006) (denying standing to assert

12  tying claim where "[p]laintiffs neither purchase[d] nor provide[d]" the tied product; *Faulkner*

13  *Adver. Ass'n, Inc. v. Nissan Motor Corp.*, 905 F.2d 769, 772 n.5 (4th Cir. 1990) (only "coerced

14  buyers and the other sellers of a tied product have standing to challenge a tying arrangement.").

15  This defect was central to the problems with the First Amended Complaint, and the Second

16  Amended Complaint does not address, much less cure, the problem.

17                                        * * * * *

18       In sum, there are three independent reasons why plaintiffs' Section 1 claims should be

19  dismissed:  (i) plaintiffs have failed to allege that the "tie" has caused any anticompetitive effects

20  in the "tied" (specialty physician) market; (ii) plaintiffs have failed to allege that Sutter has

21  market power in the "tying" (hospital) market in the proposed geographic market; and

22  (iii) plaintiffs lack standing to challenge any alleged "tying" agreements between Sutter and

23  health plans.[12]  Plaintiffs have had two opportunities to try to state a "tying" claim; Sutter urges

24  _____

   [12] Sutter notes that the SAC, like the First Amended Complaint, quotes from an alleged
25  contract that Sutter has with a health plan to the effect that health plans are supposed to "actively
    encourage members obtaining medical care to use Sutter providers."  (SAC, ¶ 52.)  The First
26  Amended Complaint alleged that this language constituted unlawful exclusive dealing, but the
    Court's June 3 Order held that these allegations were entirely consistent with managed care and
    "do not show substantial foreclosure or a requirement to purchase only from service providers
27  with an exclusive contract."  (Order at 19-20.)  Because plaintiffs have abandoned their
    "exclusive dealing" claim, Sutter does not address this contractual language in any further detail
28  except to note that this language is entirely consistent with California Insurance Code Section
    10178.3, which provides that when a health care provider gives a discount, the provider can

DEFENDANT'S MOTION TO DISMISS SAC
Case No. 3:12-CV-04854-LB

1    that the SAC be their last opportunity.

2    **II.     PLAINTIFFS' THIRD CAUSE OF ACTION UNDER SHERMAN ACT**

3    **SECTION 2 FAILS.**

4         In their third cause of action, plaintiffs allege a violation of Section 2 of the Sherman Act,

5    which prohibits unlawful monopolization. A claim for monopolization has two elements:

6    "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or

7    maintenance of that power as distinguished from growth or development as a consequence of a

8    superior product, business acumen, or historic accident.'" *Alaska Airlines, Inc. v. United Airlines,*

9    *Inc.,* 948 F.2d 536, 541 (9th Cir. 1991), *quoting United States v. Grinnell Corp.*, 384 U.S. 563,

10   570-71 (1966).

11        As to the first element, a Section 2 plaintiff must allege that a defendant has an extremely

12   high share of the relevant market – usually, at least 65 percent (*MetroNet Servs. Corp. v. US West*

13   *Commc'ns*, 329 F.3d 986, 1003 (9th Cir. 2003), *vacated on other grounds*, 540 U.S. 1147 (2004))

14   – and must also allege that the defendant willfully and unlawfully acquired or maintained that

15   power. As the U.S. Supreme Court noted recently: "Simply possessing monopoly power and

16   charging monopoly prices does not violate § 2; rather, the statute targets 'the willful acquisition

17   or maintenance of that power as distinguished from growth or development as a consequence of a

18   superior product, business acumen, or historic accident.'" *Pac. Bell Tel. Co., v. Linkline*

19   *Commc'ns*, 555 U.S. 438, 447-48 (2009) (*quoting United States v. Grinnell Corp.*, 384 U.S. 563,

20   570-71 (1966)).

21        In order to demonstrate that Sutter has engaged in unlawful monopolization, plaintiffs

22   must allege not just that Sutter has monopoly power, but also that Sutter willfully acquired or

23   unlawfully maintained its monopoly power. High prices, in and of themselves, do not constitute a

24   Section 2 violation, and the Complaint's continued focus on Sutter's prices (SAC ¶¶ 84-97)

25   ignores the Court's acknowledgement that "high prices alone are not necessarily anticompetitive"

26

27   _____

     (continued…)

28   require that the payer receiving the discount actively encourage (via direct financial incentives
     such as lower co-pays) its members to obtain services from other contracted providers.

1    (June 3, 2013 Order, ECF No. 34).  As the U.S. Supreme Court has stated:  "The opportunity to

2    charge monopoly prices-at least for a short period-is what attracts 'business acumen' in the first

3    place; it induces risk taking that produces innovation and economic growth.  To safeguard the

4    incentive to innovate, the possession of monopoly power will not be found unlawful unless it is

5    accompanied by an element of anticompetitive *conduct*."  *Verizon Commc'ns Inc. v. Law Offices*

6    *of Curtis V. Trinko, LLP,* 540 U.S. 398, 407 (2004) (emphasis in original); *Alaska Airlines, Inc. v.*

7    *United Airlines, Inc.,* 948 F.2d 536, 549 (9th Cir. 1991) ("setting a high price . . . is not in itself

8    anti-competitive") (*quoting Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 294 (2d Cir.

9    1979)).

10        **A.        Plaintiffs Have Not Alleged That Sutter Has Monopoly Power In The**

11                    **Relevant Product Market.**

12            A plaintiff claiming monopolization must first define the relevant market.  *See*

13    *Kinderstart.com LLC v. Google, Inc.,* No. C 06-2057 JF (RS), 2007 WL 831806, at *11 (N.D.

14    Cal. Mar. 16, 2007).  Plaintiffs allege in a conclusory fashion that "Sutter possesses monopoly

15    power in Inpatient Hospital Services in the local geographic markets."  (SAC, ¶ 170.)  Plaintiffs

16    appear to be referring to the six California Counties where the Complaint provides specific

17    market share information, but (as explained above) the SAC proposes to define a relevant

18    geographic market that includes at least sixteen California counties.  As to this proposed relevant

19    market, the Complaint actually demonstrates that Sutter does <u>not</u> have monopoly power.

20            As noted above, courts normally require that a complaint alleges that the defendant has at

21    least a 65% share of the market before allowing a Section 2 claim to proceed.  *Exxon Corp. v.*

22    *Berwick Bay Real Estate Partners*, 748 F.2d 937, 940 (5th Cir. 1984) (requiring share of 70%);

23    *PepsiCo, Inc. v. Coco-Cola Co*., 315 F.3d 101, 109 (2d Cir. 2002) (64% share insufficient to

24    demonstrate monopoly power); *R.J. Reynolds Tobacco Co. v. Philip Morris Inc*., 199 F. Supp. 2d

25    362, 394 (M.D.N.C. 2002) ("51.3% market share falls far below the generally accepted 70% to

26    75% minimum share necessary to support a finding of monopoly power.").

27            The SAC, however, identifies only two California counties – Placer and Amador – in

28    which Sutter has an alleged share of the market for Inpatient Hospital Services that is greater than

1   65%.  (SAC, ¶ 77.)  (And plaintiffs do not allege any anticompetitive conduct by Sutter with

2   respect to those two counties.)  As to the broader geographic region, the SAC actually

3   acknowledges that Sutter has only "35% of the revenue and 36% of beds that compete for patients

4   in Northern California."  (*Id.*)  Although plaintiffs do not clarify whether these percentages "for

5   Northern California" are consistent with the percentages for the sixteen counties identified in the

6   Complaint, the point is that these allegations actually prove that Sutter does <u>not</u> have monopoly

7   power in the relevant geographic market.[13]

8          **B.**      **Plaintiffs Have Not Alleged That Sutter Has Unlawfully Acquired Or**

9                    **Maintained Its Monopoly Power.**

10          Even if the Complaint contained sufficient allegations of Sutter's market power in the

11   relevant market to support a Section 2 claim, the Complaint fails to allege that Sutter also

12   engaged in unlawful acts that permitted Sutter to acquire or maintain its monopoly power.  *See*

13   *Cascade Health Solutions*, 515 F.3d at 894 ("Anticompetitive conduct is behavior that tends to

14   impair the opportunities of rivals and either does not further competition on the merits or does so

15   in an unnecessarily restrictive way.").  Examples of the types of acts that have supported Section

16   2 claims are predatory (below cost) pricing, refusals to deal, and exclusive dealing.[14]

17          While the nature of the acts that can support a Section 2 claim is difficult to characterize,[15]

18   the courts have agreed that only actual "anticompetitive" behavior can satisfy this element of a

19   _____

20          [13] The Complaint does not propose that the Section 2 claim be limited only to Placer and
     Amador Counties, or even to the six counties referenced in paragraph 77 of the Complaint, which
21   alleges that Sutter has a "hospital market" share of 60% in Alameda and Contra Costa counties,
     and 50% in San Francisco and Sacramento counties.  Shares of 50% or even 60% are insufficient
22   as a matter of law to support Section 2 claims, as set forth above.

          [14] *See, e.g., United States v. Dentsply Int'l*, 399 F.3d 181 (3d Cir. 2005) (dominant
23   manufacturer of artificial teeth violated Section 2 by prohibiting its distributors from carrying
     competing brands of teeth); *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc)
24   (exclusive dealing); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)
     (refusal to deal).

25          [15] *See, e.g., Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 414
     (2004) ("Under the best of circumstances, applying the requirements of § 2 'can be difficult'
26   because 'the means of illicit exclusion, like the means of legitimate competition, are myriad.'. . .
     Mistaken inferences and the resulting false condemnation 'are especially costly, because they
27   chill the very conduct the antitrust laws are designed to protect.' . . . The cost of false positives
     counsels against an undue expansion of § 2 liability.") (*quoting United States v. Microsoft Corp.*,
28   253 F.3d 34, 58 (D.C. 2001) (en banc) (per curiam)).

1   Section 2 claim.  *United States v. Microsoft*, 253 F.3d 34, 44-45 (D.C. Cir. 2001).  *See also Abcor*

2   *Corp. v. AM Int'l*, 916 F.2d 924, 927 (4th Cir. 1990) ("A desire to increase market share or even

3   drive a competitor out of business through vigorous competition on the merits is not sufficient.");

4   *United States v. Syufy Enters.*, 903 F.2d 659, 669 (9th Cir. 1990) ("an efficient, vigorous,

5   aggressive competitor is not the villain antitrust laws are aimed at eliminating").  Thus, for

6   example, a defendant can avoid Section 2 liability by demonstrating that it had a legitimate

7   business justification for its conduct.  *Multistate Legal Studies v. Harcourt Brace Jovanovich*, 63

8   F.3d 1540, 1550 (10th Cir. 1995).

9       The SAC does not allege that Sutter has committed any of the types of "traditional"

10  predicate acts that have resulted in liability under Section 2, nor does the Complaint allege that

11  Sutter lacked a legitimate business justification for any of these acts.  Instead, the SAC focuses

12  primarily on Sutter's decisions to construct or close hospitals over the past 15 years, and most of

13  the alleged conduct occurred well outside the four-year limitations period.[16]  In any event, none of

14  the alleged acts is indicative of conduct that could support a Section 2 claim, and the Complaint

15  does not even allege that Sutter undertook any of the conduct for the purpose or with the effect of

16  injuring competitors or competition.

17      Specifically, plaintiffs allege that Sutter has engaged in a "pattern of false promises and

18  cash infusions to local communities and community hospitals, after which Sutter breaks its

19  promises, consolidates and eliminates hospital services, [and] enhances its monopolies[.]"  (SAC,

20  ¶ 170.)  These acts, which the Complaint outlines in paragraphs 113 through 141, relate to

21  Sutter's acquisitions or dispositions of various hospitals.  As noted above, most of this conduct

22  pre-dates the beginning of the four-year statute of limitations period (September 2008 – four

23  years before the September 2012 filing of plaintiffs' original complaint).

24      For example, the Complaint references Sutter's relationship with San Leandro Hospital in

25  2004, Sutter's decision to close its medical center in Santa Rosa in 2007 and to build a new

26  ───────────────
    [16] The Complaint also alleges that Sutter "used its market power to scuttle the City of San
27  Francisco's attempt to create real competition" (SAC, ¶ 112), but other than referencing that
    Sutter declined to participate in an ACO (Accountable Care Organization), the Complaint does
28  not explain why Sutter was obligated to participate or why Sutter's decision not to participate was
    the type of conduct that enhances or maintains a monopoly.

1    hospital in that community, Sutter's affiliation with Mills Peninsula Medical Center in 1985 and

2    Sutter's decision in 2010 to sell parts of that hospital, Sutter's purchase of Summit Hospital in

3    1999, Sutter's acquisition of St. Luke's Hospital in 2001, and Sutter recent decision to build a

4    new hospital in San Francisco.  Even if these were not time-barred (and most are), Sutter's

5    decision to construct new hospitals or to close portions of hospitals could not possibly be

6    anticompetitive acts that could form the basis for Section 2 liability.[17]

7        Most importantly, paragraphs 113-141 of the SAC do not allege that Sutter undertook the

8    conduct with the purpose or effect of eliminating or suppressing competition.  Instead, in several

9    instances, Plaintiffs' complaint is that Sutter elected to close or reduce the capacity of facilities,

10   which presumably would <u>enhance</u> the ability of Sutter's competitors to compete.  *See, e.g.,* SAC

11   ¶ 117 (referring to closing San Leandro Hospital); ¶ 120 (reducing services at Sutter Medical

12   Center of Santa Rosa); ¶¶ 124-126 (closing a unit at Sutter Auburn Faith Hospital); ¶ 132 (selling

13   portions of Mills Peninsula Medical Center); ¶ 137 (reducing the capacity of St. Luke's Hospital).

14   Likewise, Sutter's decision to construct new hospitals cannot possibly be viewed as

15   <u>anti</u>competitive, yet the Complaint is quite critical of Sutter's alleged plans in this respect as well.

16   *See, e.g.,* SAC ¶ 122 (referring to construction of a new hospital in Sonoma County); ¶ 133

17   (referring to Sutter purchasing property in Marin County for a possible new hospital); ¶ 138

18   (referring to new hospital in San Francisco).

19       In any event, the Complaint makes no effort to link Sutter's "bad acts" to actual

20   anticompetitive effects.  The Complaint alleges that some in the various communities were upset

21   with Sutter or believed that Sutter had "reneged" on promises, but being "disappointed" or even

22   outraged at a defendant's conduct does not mean that the defendant violated Section 2 of the

23   Sherman Act.  Indeed, the plaintiffs allege both that building new hospitals and shutting down

24   existing hospitals constitute anticompetitive conduct, and that cannot be correct.  At a minimum,

25   _____

[17] The Complaint also references an arbitration that Sutter recently completed regarding
26   Marin General Hospital, which used to be (but is no longer) a Sutter affiliate, and Sutter's interest
in constructing a new hospital in Marin County.  (SAC, ¶ 133.)  But the Complaint does not
27   explain how the result of an arbitrated dispute, combined with Sutter's purchase of property in
Marin County, could be viewed as predicate acts to support a violation of Section 2 of the
28   Sherman Act.  If anything, these allegations indicate that Marin County will wind up with two
hospitals instead of one, hardly an anticompetitive result.

DEFENDANT'S MOTION TO DISMISS SAC
Case No. 3:12-CV-04854-LB

1    plaintiffs would have to allege (and then prove) that Sutter's decisions to open or close hospitals

2    resulted in higher prices or poorer quality in the defined relevant market, but the Complaint is

3    completely silent in this respect.

4         In sum, the only way that plaintiffs possibly could state a Section 2 claim would be to

5    define a relevant geographic market as to which Sutter has at least a 65% share, and then to

6    articulate predicate acts that Sutter committed during the relevant statute of limitations period that

7    had anticompetitive effects in that specific market.  Allegations of buying, selling or closing all

8    (or portions of) hospitals in various geographic areas does not suffice, and certainly not where

9    plaintiffs do not allege that those acts were intended to and caused specific anticompetitive

10   effects.

11        **C.**    **Plaintiffs' Claim Of Attempted Monopolization Also Fails.**

12        A claim of attempted monopolization requires "(1) that the defendant has engaged in

13   predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous

14   probability of achieving monopoly power." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456

15   (1993).  A claim for attempted monopolization also requires that the complaint adequately plead a

16   relevant market.  *Ticketmaster LLC v. RMG Techs., Inc.,* 536 F. Supp. 2d 1191, 1196-97 (C.D.

17   Cal. 2008); *Total Renal Care v. W. Nephrology & Metabolic Bone Disease, P.C.*, No. 08-cv-

18   00513-CMA-KMT, 2009 U.S. Dist LEXIS 80821, at *22-26 (D. Colo. Aug. 21, 2009)

19   (dismissing attempted monopolization claim for failure properly to allege relevant market).

20        Plaintiffs' claim for attempted monopolization fails for three reasons.  First, plaintiffs do

21   not adequately plead a relevant market, as explained above.  Second, plaintiffs do not allege that

22   Sutter has engaged in predatory or anticompetitive conduct in any market, much less conduct with

23   a specific intent to monopolize.  *Transamerica Computer Co. v. IBM*, 698 F.2d 1377, 1382 (9th

24   Cir. 1983) (conduct that is not sufficient to establish willful acquisition or maintenance of

25   monopoly power is likewise insufficient to establish "predatory or anticompetitive" conduct

26   required to establish a claim of attempt to monopolize).  Third, plaintiffs do not allege that Sutter

27   has a dangerous probability of achieving monopoly power in the hospital market, for example, by

28   acquiring new hospitals from Sutter's competitors that would eliminate competition in the

1  relevant market.  *Crocs, Inc. v. Austl. Unlimited, Inc.,* No. 07-cv-00221-MSK-MJW, 2008 U.S.

2  Dist. LEXIS 82942, at *11-12 (D. Colo. Sept. 25, 2008) (dismissing attempted monopolization

3  claim because plaintiff made only conclusory allegations of defendant's specific intent to

4  monopolize).

5       Apparently in support of the attempted monopolization claim, plaintiffs allege in

6  paragraph 172 of the SAC that "Sutter's continued expansion as well as intent to become a

7  licensed HMO evidence a dangerous probability of achieving monopoly power in the markets

8  where it does not already have such market power."  The notion that Sutter could violate the

9  antitrust laws by expanding into a market in which it does not presently participate – licensed

10  HMOs – is ludicrous, because new entry is procompetitive not anticompetitive.  Further, Sutter's

11  current share of the HMO market is zero, and the Complaint does not and could not credibly

12  allege that, by entering into this market, Sutter would immediately have monopoly power or a

13  dangerous probability of achieving monopoly power.

14  **III.    PLAINTIFFS' STATE LAW CLAIMS IN THE FOURTH, FIFTH AND**

15  **SIXTH CAUSES OF ACTION FAIL.**

16       Plaintiffs' fourth cause of action alleges a violation of the California Cartwright Act, Cal.

17  Bus. & Prof. Code Section 16720, the California version of Section 1 of the Sherman Act.  The

18  allegations of the complaint are identical to those set forth in the earlier causes of action, and the

19  Court's June 3, 2013 Order recognized that plaintiffs' failure to adequately allege claims under

20  the Sherman Act should result in dismissal of plaintiffs' Cartwright Act claim.[18]

21       Plaintiffs' fifth cause of action alleges a violation of California's unfair competition

22  statute, Cal. Bus. & Prof. Code Section 17200.  Again, the allegations that support this claim are

23  identical to those that plaintiffs allege with respect to their Sherman Act claims, and the Court's

24  _____
[18] California courts interpreting the Cartwright Act rely on federal authority interpreting

25  Section 1 of the Sherman Act because the prohibitions found in the Cartwright Act are nearly identical to those found in the Sherman Act.  *Marin Cnty. Bd. of Realtors, Inc. v. Palsson*, 16 Cal.

26  3d 920, 925 (1976); *Redwood Theatres, Inc. v. Festival Enters., Inc.*, 200 Cal. App. 3d 687, 694 (1988).  Thus, for the very same and numerous reasons that plaintiffs' Sherman Act Section 1

27  claim fails, their Cartwright Act claim fails as well.  The Cartwright Act does not prohibit unlawful monopolization analogous to a Sherman Act Section 2 claim.  *Asahi Kasei Pharma*

28  *Corp. v. CoTherix, Inc.*, 204 Cal. App. 4th 1, 8 (2012) ("The Cartwright Act bans combinations, but single firm monopolization is not cognizable under the Cartwright Act.").

1   dismissal of this claim warrants dismissal of the claim in the SAC as well.[19]

2       As to Plaintiffs' fifth claim for unjust enrichment, the Court previously ruled that

3   California courts allow claims for unjust enrichment but only if a plaintiff invokes an independent

4   and valid theory of recovery.  (June 3, 2013 order at 24.)  In the June 3 order, the Court dismissed

5   the unjust enrichment claim because plaintiffs had failed to state antitrust or UCL claims; the

6   same result is warranted here.

                                   **CONCLUSION**

8       Sutter urges the Court to dismiss the Second Amended Complaint with prejudice.

9

10  Dated: August 2, 2013                       JONES DAY

11

12                                  By:   /s/ *Jeffrey A. LeVee*
                                              Jeffrey A. LeVee, Esq.
13
                                    Attorneys for Defendant SUTTER HEALTH
14

15

16

17

18

19

20

21

22

23

24

25  LAI-3196688

26  ————————————————
        [19] Section 17200 "borrows violations of other laws and treats them as unlawful practices
27  that the unfair competition law makes independently actionable."  *Cel-Tech Commc'ns, Inc. v.
    Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).  Thus, where the borrowed
28  allegations fail, the Section 17200 claims based on them fail as well.  *Chavez v. Whirlpool Corp.*,
    93 Cal. App. 4th 363, 374 (2001); *Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 866-67 (2001).

DEFENDANT'S MOTION TO DISMISS SAC
Case No. 3:12-CV-04854-LB