1
2
3
4
5
6
7
8
9                    UNITED STATES  DISTRICT COURT

10                     Northern District of California

11                       San Francisco Division

12   DJENEBA SIDIBE and DIANE DEWEY, on          No. C 12-04854 LB
     Behalf of Themselves and All Others
13   Similarly Situated,                         **ORDER GRANTING MOTION TO
                                                 DISMISS**
14                         Plaintiffs,
                                                 [Re: ECF Nos. 40 & 41]
15        v.

16   SUTTER HEALTH, and DOES 1 through 25,
     inclusive,
17
                           Defendants.
18   _____/

19                          **INTRODUCTION**

20        In this putative class action, Plaintiffs Djeneba Sidibe and Diane Dewey sued Sutter Health, a

21   company that owns and operates hospitals and other health care service providers, alleging that

22   Sutter's anticompetitive conduct in the health care services industry in Northern California violates

23   federal and state antitrust laws and California's unfair competition law.  *See generally* Second

24   Amended Complaint ("SAC"), ECF No. 37.[1]  The alleged anticompetitive conduct includes (1)

25   Sutter's imposing tying arrangements that require health plans to include all Sutter providers in their

26

27   _____

28        [1]  Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
     generated page numbers at the top of the page.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

networks in order to have reduced rate access at Sutter's hospitals and (2) Sutter's use of its market power to maintain and enhance its monopolies over Inpatient Hospital Services in Northern California. Sutter moved to dismiss for lack of standing and for failure to state a claim. *See* Motion, ECF No. 40. The court grants Sutter's motion to dismiss without prejudice and with leave to amend.

## STATEMENT[2]

### I. THE PARTIES

#### A. Sutter Health

Defendant Sutter Health is a California non-profit corporation that controls the largest and most dominant hospital chain and provider of health care services in Northern California. *See* SAC ¶ 28. It is the "parent" of various non-profit and for-profit entities and organizations that operate primarily in Northern California and that are controlled by Sutter directly or indirectly through intermediaries.[3] *Id.* ¶ 28. Sutter's network includes numerous hospitals and medical foundations,[4] at least 31 acute care facilities, 4 skilled nursing facilities, 2 chemical dependency recovery facilities, and 14 home healthcare locations. *Id.* ¶¶ 29, 31. By contracting with medical groups that operate as professional corporations, Sutter's network includes at least 2,499 physicians and physician extenders. *Id.* There are other entities affiliated with Sutter, including some in Hawaii and the Cayman Islands. *See id.* ¶¶ 32-34. "Sutter, its managers and/or directors currently or previously own or owned and control in-whole or in-part" more than 30 additional for-profit entities. *See id.* ¶ 35. Sutter also has a "*de facto* network" beyond its "publicly disclosed network" that includes numerous for-profit entities. *Id.* ¶ 34.

---

[2] Except for the procedural history, the statement is composed of allegations from the complaint in furtherance of the analysis under Federal Rule of Civil Procedure 12(b)(6).

[3] The SAC lists many of these allegedly affiliated entities. *See id.* ¶¶ 28-35.

[4] The SAC lists five medical foundations that operate numerous hospitals and other medical centers and contract with between 175 and 1,036 physicians and physician extenders. *Id.* ¶ 28. The medical foundations (and their afilliated medical providers) serve residents of the following Northern California counties: Alameda, Amador, Contra Costa, El Dorado, Marin, Merced, Lake, Nevada, Placer, Sacramento, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Solano, Sonoma, Stanislaus, Sutter, Yolo, and Yuba. *Id.*

**B. Plaintiffs and the Putative Class**

Plaintiff Djeneba Sidibe lives or has lived in San Mateo County (before November 2009), Alameda County (November 2009 to January 2012), and Marin County (since January 2012). *Id.* ¶ 26. She was enrolled in a health plan with Anthem Blue Cross (October 2005 to March 2012) and now is enrolled in an Aetna plan. *Id.* Plaintiff Diane Dewey has lived in San Francisco County since 1994, was enrolled in health plans with Anthem Blue Cross (2008 to 2010) and Regence Blue Cross (2010 to 2012), and now is enrolled in a Premera Blue health plan. *Id.* ¶ 27. Both plaintiffs paid premiums to their respective health plans and received health care services at Sutter facilities (Mills-Peninsula for Sidibe and California Pacific Medical Center for Dewey). *Id.* ¶¶ 26-27. Both claim that they and the putative class members were injured by Sutter's allegedly anti-competitive conduct by paying higher premiums, co-payments, deductibles, and other out-of-pocket payments not covered by their health plans. *Id.* ¶¶ 26-27.

The class is defined as follows:

> Any person in the San Francisco Bay Area Combined Statistical Area and the Sacramento-Roseville-Arden-Arcade Metropolitan Statistical Area who during all or part of the period beginning September 17, 2008, and continuing until the present (the "Class Period") was (or is): (1) enrolled in a licensed health plan offered by a commercial health insurer; and (2) the commercial health insurer had (or has) a contractual relationship with Sutter or any of its affiliated entities.

*Id.* ¶ 146.

## II. FACTUAL BACKGROUND

**A. Market Information**

In the health insurance market, commercial health insurers such as Blue Cross, UnitedHealthcare, Aetna, CIGNA and others compete to provide the most attractive plans to individuals and group plan sponsors. SAC, ECF No. 37, ¶¶ 1, 37-38. To remain competitive, the insurers have to offer a provider network that enables their plan members to obtain services from medical providers throughout the entire area in which the plan members live and work and at relatively low network rates. *Id.* ¶¶ 1-4. Accordingly, commercial health insurers seek to contract with a network of medical providers that maximizes access and minimizes cost. *Id.* ¶ 4.

Medical service providers (such as hospitals) seek to increase their revenues by maximizing the

number of procedures they sell and the prices they sell them at. *Id.* ¶ 5. The main way that a provider can maximize its revenue is by securing "participating provider" status with health insurers. *Id.* This is because if a hospital is a "participating provider" in an insured customer's health plan, the customer is indifferent to price. *Id.* Thus, "participating provider" status "virtually ensures that a percentage of the plan enrollees approximately corresponding to the hospital's local market share will use the hospital." *Id.* Accordingly, medical providers seek to contract with commercial health insurers that provide increased demand for participating providers and high network rates. *Id.* ¶ 6.

Medical providers also compete to be included in health plans' provider networks as "participating providers." *Id.* ¶¶ 5, 39. In order to obtain "participating provider" status (and the increased market share that comes with it), medical providers negotiate discounted network rates with health insurers. *Id.* ¶¶ 5, 40. The rates and contract terms in a finalized agreement between a hospital (for example) and a commercial health insurer are a function of each party's bargaining power. *Id* ¶¶ 40-42.

### B. Sutter's "All-or-Nothing" Contract Provisions

As a matter of policy, Sutter includes the following language in all of its agreements with commercial health insurers:

> Each payer accessing Sutter Health providers shall designate ALL Sutter Health providers (see Sutter Health provider listing) as participating providers unless a Payer excludes the entire Sutter Health provider network.

*Id.* ¶ 43. The effect of this policy is that "the bargaining power – or indispensability – of every hospital and service in Sutter's network is elevated to the level of Sutter's most valuable hospital or service." *Id.* ¶ 44. For Sutter, this means that "enrollees of the health plan will use the Sutter provider in a percentage approximately corresponding to Sutter's local market share." *Id.* ¶ 45. But the policy "prevents the health insurer from channeling enrollees to more efficient providers or achieving volume discounts." *Id.* It also results in "supra-competitive pricing [being] imposed on the commercial health insurers and passed on to enrollees," including Plaintiffs and the putative class members. *Id.* ¶ 44.

A number of authorities support Plaintiffs' assertion that Sutter's "all-or-nothing policy" results in supra-competitive prices. For example, a 2011 FTC and DOJ antitrust policy statement listing

conduct that may "prevent private payers from obtaining lower prices and better quality service for their enrollees" includes:

> Tying sales (either explicitly or implicitly through pricing policies) of the ACO's [accountable care organization] services to the private payer's purchase of other services from providers outside the ACO (and vice versa), including providers affiliated with an ACO participant (*e.g.*, an ACO should not require a purchaser to contract with *all* of the hospitals under common ownership with a hospital that participates in the ACO).

*Id.* ¶ 47 (citation omitted).  The same policy statement proscribes:

> Preventing or discouraging private payers from directing or incentivizing patients to choose certain providers, including providers that do not participate in the ACO, through "anti-steering," "anti-tiering," "guaranteed inclusion," "most-favored-nation," or similar contractual clauses or provisions.

*Id.* ¶ 48.  Sutter's contracting policy constitutes "anti-tiering" conduct because it forces health insurers to include every Sutter physician and physician group as a participating provider.  *Id.* ¶ 49.

For example, health insurers including Blue Cross, UnitedHealthcare, and Aetna have attempted to create "high performance network" plans that highlight the most effective physicians.  *Id.* ¶¶ 49, 105-07.  In Northern California, however, these insurers have not been able to offer high performance networks that include fewer than all Sutter physicians.  *Id.* ¶¶ 49, 107.  Some of the Sutter physicians are included in the high-performance networks solely because they are members of a Sutter physician group.  *Id.* ¶ 50.  These physicians no longer have an incentive to compete on quality and cost in order to become designated high-performance physicians.  *Id.* ¶¶ 51, 108.

## C. Sutter's "Steering" Contract Provisions

Plaintiffs also challenge Sutter's alleged policy of requiring its contracts with commercial health insurers to include the following language:

> Sutter Health shall require each group health payer accessing Sutter Health providers through the [health plan] network to actively encourage members obtaining medical care to use Sutter Health providers. . . . "[A]ctively encourage" or "active encouragement" means incentivizing members to use participating providers through the use of one or more of the following: reduced co-payments, reduced deductibles, premium discounts directly attributable to the use of a participating provider, financial penalties, or requiring such members to pay additional sums directly attributable to the non-use of a participating provider.

> If Sutter Health or any provider learns that a payer . . . does not actively encourage its members to use network participating providers, . . . Sutter shall have the right upon not less than thirty (30) days' written notice to terminate that payer's right to the negotiated rates. In the event of such termination, the terminated payer shall pay for covered services rendered by providers at 100% of billed charges until such time as Sutter reasonably believes and

UNITED STATES DISTRICT COURT
For the Northern District of California

notices that the payer does in fact actively encourage its members to use network participating providers . . . .

*Id.* ¶ 52.  These contract provisions force health insurers to steer patients to Sutter facilities regardless of whether other providers or facilities offer superior medical services.  *Id.* ¶ 53.

## III.  THE RELEVANT MARKETS

Plaintiffs allege the existence of several product and geographic markets.  *See id.* ¶¶ 54-76.

### A.  The Product Market for Inpatient Hospital Services

The first product market is "[t]he sale of general acute-care inpatient hospital services ("Inpatient Hospital Services")."  *Id.* ¶ 54.  This consists of the "cluster of services consumed by patients who spend one or more nights in the hospital" and includes "physician services, radiology services, and the services of other medical professionals such as nurses and technicians."[5]  *Id.*

Plaintiffs allege that the Inpatient Hospital Services market has several relevant characteristics. First, because the decision to consume Inpatient Hospital Services is almost exclusively based on medical judgment, rather than cost, patients are unlikely to respond to an increase in the price of Inpatient Hospital Services by choosing a substitute product (like non-medical or outpatient services).  *Id.* ¶ 55.  Second, "[t]he principal direct purchasers in the market for contracted access to Inpatient Hospital Services are commercial health insurers."  *Id.* ¶ 56.  When commercial health insurers pay less for Inpatient Hospital Services, enrollees "directly receive a benefit."  *Id.*  When commercial health insurers pay more, enrollees are "directly harmed" in the form of "higher premiums, co-payments, and . . . deductible payments."  *Id.* ¶ 56.  Enrollees are also harmed because higher prices for Inpatient Hospital Services "translate into higher premiums and less generous plan benefits, including in Specialty Provider Services."  *Id.*

Plaintiffs' definition of the Inpatient Hospital Services market excludes government programs, including Medicare and Medicaid.  *Id.* ¶ 56.  Plaintiffs allege that these programs "are not competitors which purchase in the relevant product market for contracted access to Inpatient

---

[5]  Plaintiffs state that while different Inpatient Hospital Services (e.g., obstetrics and cardiac services) are not substitutes for each other, they "can be aggregated for analytic convenience."  *Id.* ¶ 54.

1   Hospital Services (or any other type of healthcare services)."  *Id.* ¶ 57.  This is because they do not

2   negotiate with providers but "present a take-it-or-leave it offer" to the providers.  *Id.*

3       The Inpatient Hospital Services market also excludes those hospitals that do not provide network

4   services to commercial health insurers.  *Id.* ¶ 58.  This includes VA and Kaiser Permanente

5   hospitals.  *Id.*  Plaintiffs allege that these are not reasonable substitutes for hospitals that provide

6   network services to commercial health insurers at favorable in-network rates.  *Id.*

7   **B.   The Product Markets for Specialty Provider Services**

8       There are relevant product markets for "non-facility specialty medical provider services,

9   including among others" the following specialties:  allergy and immunology, cardiology,

10  dermatology, endocrinology, gastroenterology, general surgery, geriatrics, gynecology, hepatology,

11  infectious disease, nephrology, neurology, neurosurgery, obstetrics and gynecology, oncology,

12  ophthalmology, oral and maxillofacial surgery, orthopedic surgery, otorhinolaryngology, palliative

13  care, pathology, pediatrics, pediatric surgery, physiatry, plastic surgery, podiatry, proctology,

14  psychiatry, pulmonology, radiology, rheumatology, stomatology, surgical oncology, thoracic

15  surgery, transplant surgery, urgent care medicine, urology, and vascular surgery.  *Id.* ¶ 59.  Plaintiffs

16  refer to these collectively as "Specialty Provider Services."  *Id.* ¶ 61.

17      Each specialty is a separate product market because, for a significant proportion of patients,

18  specialists in different areas are not substitutes for one another.  *Id.* ¶ 60.  In other words, "a small

19  but significant non-transitory increase in price imposed by a hypothetical monopolist in one

20  specialty would not be checked by consumer defection to other specialties (or to non-medical care)."

21  *Id.* ¶ 61.

22      There also is "a relevant product market . . . for contracted access to Specialty Provider Services

23  in this case."  *Id.* ¶ 62.  This is because Specialty Provider Services typically make up a component

24  of the medical costs borne by a health plan.  *Id.*  Thus, enrollees would not find attractive a health

25  plan that could not offer Specialty Provider Services at in-network rates that are substantially lower

26  than list prices.  *Id.*

27  **C.   The Local Geographic Markets**

28      Plaintiffs assert generally that "the markets for Inpatient Hospital Services and Specialty

C 12-04854 LB
ORDER

7

UNITED STATES DISTRICT COURT
For the Northern District of California

Provider Services are local in nature, consisting of the area in which the seller operates and in which the purchaser can practicably turn for supplies or services." *Id.* ¶ 67. This is because individuals prefer to consume healthcare services near to where they live and work. *Id.* ¶ 63. Individual and employer purchasers thus demand insurance products that provide access to health care services, including Inpatient Hospital services, near where employees live and work *Id.* ¶¶ 64, 66.

In addition, the State of California has regulations requiring health insurers to meet accessibility standards. *Id.* ¶ 65. These accessibility standards dictate that a "comprehensive range" of healthcare services must be available in reasonable proximity to customers' homes and workplaces. For example, the Knox-Keene Act (and the regulations promulgated thereunder) require that "all enrollees have a residence or workplace within 30 minutes or 15 miles of a contracting or plan-operated hospital which has a capacity to serve the entire dependent enrollee population based on normal utilization." *Id.* ¶ 65.

Competitive forces among commercial health insurers thus dictate that insurers have network access in areas where their customers and prospective customers live and work. *Id.* ¶ 66. A healthcare network without "meaningful and affordable access to providers in a local geographic area is unable to serve patients in that area." *Id.* "[L]ikewise, network access to providers in another geographic area is not a reasonable substitute for network access in the area in which the insureds live and work." *Id.*

Plaintiffs define three local geographic markets. First, "[f]or analyzing the competitive effects of Sutter's conduct, the local relevant geographic markets include all of the local geographic markets in which Sutter-controlled hospitals and physicians provide services." *Id.* ¶ 67. Second, "the relevant geographic market for analyzing the effect of a contract governing relations between a commercial health insurer and a Sutter-controlled hospital consists of the area in which the relevant hospital operates and in which patients covered by the insurance company might practicably turn to seek substitutes for the Sutter-controlled hospital." *Id.* Finally, "the relevant geographic market for analyzing the effect of a contract governing relations between an insurer and a Sutter-controlled physician group consists of the area in which the relevant physician group operates and in which patients covered by the insurance company might practicably turn to seek substitutes for the

UNITED STATES DISTRICT COURT
For the Northern District of California

Sutter-controlled physician group." *Id.*

For example, San Francisco County is a relevant geographic market because San Francisco employers and insureds cannot practicably turn to commercial health insurers that do not offer in-network access to Inpatient Hospital Services and Specialty Provider Services in San Francisco. *Id.* ¶ 68. The same is true for Alameda and Sacramento Counties. Sutter controls 240 physicians in San Francisco and surrounding counties, 200 physicians in Alameda County and the surrounding East Bay Region, and more than 1,300 physicians in Sacramento and seven nearby counties. *Id.* ¶¶ 68-70. The six local geographic markets implicated by Sutter's conduct include the following counties: San Francisco, Alameda, Contra Costa, Sacramento, Placer, and Amador. *Id.* ¶ 71.

**D. The Linked Geographic Markets**

There is also a linked geographic market for the sale of commercial health insurance products and services ("Linked Geographic Market"). *Id.* ¶ 72. The geographic markets for the sale of commercial health insurance products and services are often broader than local geographic areas. *Id.* This is because commercial health insurers offer insurance products that appeal to more than just those people who live, for example, a short distance from a particular hospital. *Id.* In addition, insurance plans with geographic "gaps" in network coverage may be unattractive to consumers because individuals travel and employers have multiple locations. *Id.* ¶ 73. Thus, a commercial insurance company able to offer a broader provider network will be able to appeal to a broader population of customers, spread costs over a larger number of potential patients, and offer more attractive prices. *Id.* ¶ 72. As a result, "the geographic markets for the sale of commercial health insurance products and services are regional, such as a market spanning Northern California." *Id.* ¶ 73. It is also essential for commercial health insurers that want to sell products and services across a region to have network contracts that span all of the local provider markets in that region. *Id.*

The Linked Geographic Market is particularly relevant with regard to Specialty Providers Services because enrollees are willing to travel farther for specialized services, and the Knox-Keene Act's accessibility standards do not apply to the Specialty Provider Services markets. *Id.* ¶ 74.

The "regional effect" of the Linked Geographic Market and the market pressures described

UNITED STATES DISTRICT COURT
For the Northern District of California

1    above mean that Sutter can "exploit its market power in a local geographic market (or markets) to

2    distort competition throughout the larger region." *Id.* ¶ 75.  The relevant Linked Geographic Market

3    includes an area at least as large as the San Francisco Bay Area Combined Statistical Area and the

4    Sacramento-Roseville-Arden-Arcade Metropolitan Statistical Area, and it includes all local markets

5    within that region.[6]  *Id.* ¶ 76.

6    **IV.  SUTTER'S ALLEGED MARKET POWER**

7        **A.  Inpatient Hospital Services**

8        The tying product in this action is Inpatient Hospital Services.  *Id.* ¶ 77.  Sutter controls an

9    "overwhelming" share of the Inpatient Hospital Services available to commercial health insurers in

10   Northern California.  Excluding closed systems such as Kaiser Permanente, Sutter has amassed the

11   following: 100% of the hospital beds in Placer and Amador counties; 60% of the beds in Alameda

12   and Contra Costa counties; and over 50% of the beds in San Francisco and Sacramento.  *Id.* ¶ 77.

13   Sutter has 35% of the revenue and 36% of the hospital beds that compete for patients in Northern

14   California.  *Id.*  Plaintiffs allege that Sutter, therefore, "has market power in these six counties for

15   Inpatient Hospital Services and thus the power to dictate prices and . . . foreclose competition."  *Id.*

16   (internal citation omitted).

17       For example, Sutter owns all but one non-Kaiser hospital in Alameda, and the non-Sutter

18   hospital is 17 miles from the center of Oakland.  *Id.* ¶ 78.  The result is that any health plan without

19   access to Sutter's hospitals must require its members to travel to a hospital outside the 15-mile/30-

20

---

21         [6] Sutter requests the court take judicial notice of excerpts of a federal Office of Management

22   and Budget bulletin and excerpts from its appendices in order show what areas are included in the
     Combined Statistical Areas plaintiffs cite.  *See* Request for Judicial Notice ("RJN"), ECF No. 41.

23   Plaintiffs oppose Sutter's request as improper for the court to consider on a 12(b)(6) motion and
     because "[t]he existence or non-existence of certain counties alone within a given statistical area

24   does not establish facts underlying the coherence of alleged geographic markets."  Opp'n to RJN,

25   ECF No. 60 at 3; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

26         The court likely could take judicial notice of these documents under the "incorporation by

27   reference" doctrine.  On this record, though, the court denies as moot Sutter's request.  The court
     does not need to take judicial notice of these documents to find that Plaintiffs fail to establish the

28   coherence of their alleged geographic markets.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  minute regulatory limit.  *Id.*  Thus, the health plans "arguably have a legal obligation under

2  California laws and regulations to gain contracted access to Sutter Health hospitals in Alameda

3  County."  *Id.* ¶ 79.

4      Sutter's "control of Inpatient Hospital Services" means that it has market power in relevant

5  antitrust markets.  *Id.* ¶ 80.  Three of the relevant antitrust markets are defined as contracted access

6  to Inpatient Hospital Services accessible to residents of:  (1) Alameda and Contra Costa Counties;

7  (2) Sacramento County; and (3) San Francisco County.  *Id.*

8      **B.  Specialty Provider Services**

9      The tied products in this action are the 38 Specialty Provider Services.  *Id.* ¶ 82.  In the tied

10  markets, Sutter has acquired physician groups, including approximately 2,500 specialist physicians.

11  *Id.*  Sutter wields market power because it can control price and foreclose competition.  *Id.*

12      Different sources corroborate that Sutter has relied on its market power to raise prices, including

13  Bloomberg, *id.* ¶¶ 84 & 93, the Los Angeles Times, *id.* ¶ 85, the Journal of Health Economics, *id.*

14  ¶ 86, and the California Public Interest Research Group ("CALPIRG"), *id.* ¶ 87.

15  **V.  Harms Caused By Sutter's Alleged Practices**

16      **A.  Increased Health Insurance Prices**

17      Sutter's action force health insurers to pay supra-competive prices that are passed on to

18  consumers.  *Id.* ¶ 88.  These injure Plaintiffs directly and are evidence of Sutter's market power and

19  the anti-competitive effects of its conduct.  *Id.*  Additional sources confirm that Sutter charges

20  relatively higher prices, including the California Public Employees' Retirement System

21  ("CalPERS") and its officers, *id.* ¶¶ 89-90; the Federal Trade Commission, *id.* ¶ 92, Bloomberg, *id.*

22  ¶ 93, the former CEO of Sutter Coast Hospital, *id.* ¶ 94, the Los Angeles Times, *id.* ¶ 95, and

23  Sutter's own internal documents regarding its purchase of Summit Medical Center in Oakland, *id.*

24  ¶ 91.

25      Sutter has been able to carry out its anti-competitive conduct because its supra-competitive

26  prices are spread through commercial health insurers and distributed among all of a health plans

27  enrollees.  *Id.* ¶ 96.  This allows Sutter to increase prices above the amount that any individual

28  purchaser would pay.  In addition, because the product at issue is health care, "no one would object

the imposition of a high price . . . for a service that is the difference between life and death." *Id.*; *see also id.* ¶ 97 (quotation from a journal article titled "The Provider Monopoly Problem in Health Care").

## B. Foreclosed Competition

Sutter also engages in conduct designed to foreclose competition. *See id.* ¶¶ 98-109. For example, Sutter (through its five medical foundation corporations) has acquired or signed exclusive contracts with physician groups that prevent them from competing on price and that keep out Sutter's competition. *Id.* ¶¶ 98-99. In addition, Sutter physicians refer Sutter patients back to providers in the Sutter network. *Id.* ¶ 99.

With regard to Inpatient Hospital Services, Sutter uses its market power to impose the all-or-nothing contract provisions discussed above. *Id.* ¶ 100. As discussed, these provisions (1) prevent health insurers from competitively negotiating for lower prices with Sutter-owned physician groups, (2) water down the quality of insurers' high-performance provider networks, and (3) take away the prospect of being excluded from an insurer's network as an incentive for physicians to provide effective and efficient care. *Id.* ¶¶ 100-04, 108-09.

### 1. San Francisco's Accountable Care Organizations

The SAC provides an example of how Sutter allegedly forced competition out of the market. *See generally id.* ¶¶ 110-112. In July 2011, the City of San Francisco created two competing Accountable Care Organizations ("ACOs") for city employees." *Id.* ¶ 110. One ACO was made of Sutter providers and the other had non-Sutter providers. *Id.* After 12 months, the non-Sutter ACO had been "very successful" at reducing costs, while the Sutter ACO was not. *Id.* ¶ 111. Then Sutter "limited the availability of contracted rates for emergency room services at Sutter Health hospitals to Sutter Health members" (meaning that the non-Sutter ACO would have to pay full charges), which forced the non-Sutter ACO to pull out of the experiment and sign a contract with Sutter. *Id.* ¶ 112. Thus, Sutter "used its market power to scuttle the City of San Francisco's attempt to create real competition." *Id.*

1

### 2. *Sutter's Hospital Acquisitions and Closures*

2  Plaintiffs allege that Sutter has acquired monopoly power by gaining control over financially-

3 challenged hospitals, consolidating services, and eliminating competition. *Id.* ¶ 113. Plaintiffs cite

4 several examples in which Sutter allegedly acquired an interest in a particular hospital based on

5 assurances that it would operate the hospital or ensure a certain level of access to the local

6 community. After acquiring control of these hospitals, Sutter engaged in allegedly anti-competitive

7 conduct including the following: closing the hospitals, consolidating hospitals, transferring services

8 to a more profitable facility, cutting patient services, drastically raising prices, and engaging in other

9 allegedly underhanded tactics to keep out competition. *See id.* ¶¶ 113-41 (allegations concerning

10 San Leandro Hospital, Sutter Medical Center of Santa Rosa, Sutter Auburn Faith, Mills Peninsula

11 Medical Center, Marin General Hospital, Alta Bates Medical Center, Summit Hospital, St. Lukes

12 Hospital, and CPMC).

13 ### C. Decreasing Quality of Care

14  Sutter's practices also have reduced the quality of health care available because "Sutter's

15 network does not compete on quality any more than it competes on price." *See id.* ¶¶ 142-45 (citing

16 studies documenting higher costs at Sutter facilities without correspondingly higher quality of care).

17 ## VI. PROCEDURAL HISTORY

18  Plaintiffs filed an original complaint and then an amended complaint, which the court dismissed

19 after a hearing and without prejudice following Sutter's motion to dismiss. *See* ECF Nos. 1, 11, 15,

20 35. Sutter filed a second amended complaint with the following claims: (1) unreasonable restraint of

21 trade in violation of section 1 of the Sherman Act, 15 U.S.C. § 1; (2) tying in violation of section 1

22 of the Sherman Act, (3) monopolization and attempted monopolization in violation of section 2 of

23 the Sherman Act, 15 U.S.C. § 2; (4) unreasonable restraint of trade in violation of the Cartwright

24 Act, Cal. Bus. & Prof. Code Section 16720, *et. seq.*; (5) unfair competition in violation of

25 California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code Section 17200, *et. seq.*; and

26 (6) unjust enrichment. SAC, ECF No. 37 at ¶¶ 155-204. Plaintiffs seek monetary damages

27 (including treble damages as appropriate), restitution, disgorgement, injunctive and declaratory

28 relief, and fees, costs, and interest. *Id.* at 61-63.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

**VII.  JURISDICTION**

This court has subject matter jurisdiction over the Sherman Act claims under 28 U.S.C. §§ 1331 and 1337 and supplementary jurisdiction over the state law claims under 28 U.S.C. § 1367.  *See id.* ¶¶ 22-23.  The court also has subject matter jurisdiction over the claims under the Class Action Fairness Act, ("CAFA"), 28 U.S.C. § 1332(d).  *Id.* ¶ 24.

## ANALYSIS

Sutter moves to dismiss the claims on four bases.  *See* Motion to Dismiss, ECF No. 40.  First, Sutter challenges the sufficiency of the relevant market definitions for claims one through three, the Sherman Act claims.  Second, Sutter argues that Plaintiffs' tying claims fail because they fail to allege market power in the tying market or an anti-competitive effect in the tied market.[7]  Third, Sutter argues that the monopolization and attempted monopolization claims fail because Plaintiffs have not alleged that Sutter either (1) has market power in the relevant product market, (2) has unlawfully acquired or maintained its monopoly power, or (3) engaged in conduct with a specific intent to monopolize.  Finally, Sutter contends that Plaintiffs' remaining claims must be dismissed because they stand or fall with the Sherman Act claims.  For all of these reasons, the court grants Sutter's motion to dismiss.

## I.  PLEADING STANDARD

Rule 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint therefore must provide a defendant with "fair notice" of the claims against it and the grounds for relief.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face.  *See id.* at 570.  "A

---

[7]  Sutter initially argued that Plaintiffs lack standing to challenge the alleged tying agreement.  *See* Motion at 21-22.  Plaintiffs contradict Sutter's arguments in their opposition.  *See* ECF No. 59 at 22-23 ("Courts in this Circuit have consistently found that indirect purchasers have standing to maintain antitrust claims where anti-competitive conduct in an upstream market resulted in higher prices for indirect purchasers in an 'inextricably linked' downstream market.") (collecting cases).  Sutter does not address the argument in its reply, and the court does not address it here.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

129 S.Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,'

but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting

*Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does

not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief

above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals

omitted). As to Sherman Act claims, "proceeding to antitrust discovery can be expensive." *Id.* at

558 (addressing pleading standard in Sherman Act Section 1 claims). Thus, the court must "insist

upon some specificity in pleading before allowing a potentially massive factual controversy to

proceed." *Id.* The decision explained,

> stating such a claim requires a complaint with enough factual matter (taken as true) to suggest an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

*Id.*

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true

and construe them in the light most favorable to the plaintiff. *See id.* at 550; *Erickson v. Pardus*, 551

U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007). In

addition, courts may consider documents attached to the complaint. *Parks School of Business, Inc.*

*v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). If the court dismisses the complaint, it should

grant leave to amend even if no request to amend is made "unless it determines that the pleading

could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127

(9th Cir. 2000) (quotation omitted).

## II. THE SAC FAILS TO ALLEGE PLAUSIBLE RELEVANT MARKETS

Sutter moves to dismiss claims one through three, the Sherman Act claims, for failure to

plausibly define the relevant markets.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

Plaintiffs must establish that Sutter has market power in a "relevant market," meaning a relevant product market and a relevant geographic market. *See Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 42-43 (2006) (tying); *Forsyth v. Humana*, 114 F.3d 1467, 1476-77 (9th Cir. 1997) (monopolization and attempted monopolization); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (monopolization); *Newcal Industries, Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1044-45 & n.3 & n.4 (9th Cir. 2008) (standards the same under Sections 1 and 2). The relevant product market identifies the products or services that compete with each other, and the relevant geographic market identifies the area where the competition in the relevant product market takes place. *See Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1392 (9th Cir. 1974). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962). A complaint may be dismissed under Rule 12(b)(6) if its "relevant market definition is facially unsustainable." *Newcal*, 513 F.3d at 1044-45 & n.3.

### A. The Inpatient Hospital Services Markets

The tying and monopolization claims are based on the existence of a relevant market for "Inpatient Hospital Services." The term "Inpatient Hospital Services" is defined as the "sale of general acute-care inpatient hospital services" and it "consist[s] of the cluster of services consumed by patients who spend one or more nights in the hospital." *Id.* ¶ 54. Sutter does not dispute (for purposes of this motion) that this is a plausible antitrust product market. Motion at 18.

Instead, Sutter challenges the plausibility of the corresponding geographic markets. *Id.* at 18. According to the SAC, "the relevant geographic market in this case is local in nature."[8] *Id.* ¶¶ 64-66. Then the SAC refers to multiple "local relevant geographic markets" that "include all of the local geographic markets in which Sutter-controlled hospitals and physicians provide services." *Id.* ¶ 67.

---

[8] The SAC alleges that this is because consumer preferences and California regulations force health insurers to provide network access in the areas their enrollees live and work. For example, there are separate markets for contracted access to Inpatient Hospital Services in San Francisco and Alameda Counties because a health insurer could not substitute network access to a hospital in Alameda County with network access to a hospital in San Francisco and still hope to attract enrollees from Alameda County. *Id.* ¶ 66.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    These "local markets" are described as "the area in which the relevant hospital operates and in which

2    patients covered by the insurance company might practicably turn to seek[] substitutes for the Sutter-

3    controlled hospital." *Id.* Later, the SAC states that "the six local geographic markets implicated by

4    Sutter's conduct include" San Francisco, Alameda, Contra Costa, Sacramento, Placer, and Amador

5    counties. SAC ¶ 71. Not only does the word "include" indicate that this list is non-exclusive, but

6    the SAC later combines the Alameda and Contra Costa county markets in order to allege Sutter's

7    market power there. *Id.* ¶ 80.

8        These allegations fail to plausibly define the relevant Inpatient Hospital Services geographic

9    markets. First, it is unclear whether Plaintiffs' claims are based on a single local market (¶ 64), the

10   six county-wide markets (¶ 71), or an indeterminate number of markets bounded by the areas in

11   which Sutter hospitals operate (¶ 67). Second, with regard to the six county-wide markets, except

12   for Alameda County (¶¶ 78-79), Plaintiffs provide no factual allegations to support drawing lines at

13   these county borders. Finally, if Plaintiffs' claims are based on tying in all of the local markets in

14   which Sutter hospitals operate, they need to identify those markets (in reasonably concrete

15   geographic terms), rather than just describing methodologies for drawing market boundaries.

16   Plaintiffs bear the burden of identifying those markets, and they have not done so here.

17       Plaintiffs respond that other courts have accepted similar "county-wide medical services

18   markets." Opp'n at 23 (collecting cases). They also contend that they need not plead the relevant

19   markets with specificity and "'the validity of the 'relevant market' is typically a factual element

20   rather than a legal element' and in the vast majority of cases is a question reserved for summary

21   judgment or trial." Opp'n at 23-24 (quoting *Newcal*, 513 F.3d at 1045). Plaintiffs are correct about

22   all of this, but it does not change the outcome here. The problem is not that the geographical

23   markets for Inpatient Hospital Services are necessarily invalid or pleaded too generally. The

24   problem is that Plaintiffs fail to identify many of the local markets at all. They identify six county-

25   wide markets, but that is insufficient because their claims are not limited to those markets. *See* SAC

26   ¶ 71. Even if they were, except for Alameda county, Plaintiffs provide no factual support for

27   drawing boundaries at the county lines

28       Plaintiffs also argue that their proposed market definitions comport with DOJ and FTC

1    *Horizontal Merger Guidelines*.  Opp'n at 24-25.  The court disagrees.  Plaintiffs refer to these

2    theories and methodologies without actually defining their proposed markets.

3        In sum, Plaintiffs' three Sherman Act claims are based on the Inpatient Hospital Services

4    markets.  Because Plaintiffs have not plausibly alleged those markets, the court grants Sutter's

5    motion to dismiss claims one through three.

6    **B. The Specialty Provider Services Markets**

7        Sutter also moves to dismiss on the basis that the SAC fails to plausibly allege the "Specialty

8    Provider Services" product and geographic markets.  Motion at 14-15; Reply at 10.  This is the "tied

9    market" in Plaintiffs' tying claims.

10       Plaintiffs' tied product market allegations are implausible.  The SAC names 38 medical

11   specialties in the Specialty Provider Services category and alleges that each of these "constitutes a

12   separate relevant product market."  *Id.* ¶ 60.  Plaintiffs' claims also are based on additional,

13   unidentified Specialty Provider Services markets.  *See id.* ¶ 59 (Specialty Provider Services includes

14   the named specialties "among others").  In addition, the named specialities are not clearly defined.

15   For example, the SAC alleges that each specialty market includes services performed by doctors,

16   nurse practitioners, or other non-physician providers, *id.* ¶ 61, and may be rendered in hospitals (on

17   an outpatient basis), in ambulatory surgery centers, or in physicians' offices.  *Id.*

18       The SAC also fails to allege geographic markets that correspond to the product markets.

19   According to the SAC, the geographic markets for the various Specialty Provider Services are "local

20   in nature, consisting of the area in which the seller operates and in which the purchaser can

21   practicably turn for supplies or services."  *Id.* ¶ 64.  The relevant geographic market for analyzing

22   the effect of a contract governing relations between an insurer and a Sutter-controlled physician

23   group[9] consists of the area in which the relevant physician group operates and in which patients

24   covered by the insurance company might practicably turn to seek substitutes for the Sutter-

25   controlled physician group."  *Id.* ¶ 67.  The SAC also states that the geographic markets for

26   Specialty Provider Services may be larger than the markets for Inpatient Hospital Services because

27   _____

28        [9]  The SAC does not explain the relationship between Sutter-controlled physician groups and
     any markets for Specialty Provider Services.

C 12-04854 LB
ORDER                                   18

1   enrollees are willing to travel farther to see specialists and California accessibility standards do not

2   apply. *Id.* ¶ 67. But nowhere do Plaintiffs actually identify the geographic markets that correspond

3   to the Specialty Provider Services markets.

4       Plaintiffs' opposition to Sutter's motion does not alter the outcome or clarify the market

5   allegations.[10] *See* Opp'n, ECF No. 59. The opposition suggests that Plaintiffs intend to limit the

6   Specialty Provider Services product markets: "[w]hile the SAC identifies a number of Outpatient

7   Specialty Provider Services markets, this case will focus on the anticompetitive impact that Sutter

8   has caused in Outpatient Surgical markets." *Id.* at 13 n.8. That is not a clear election, and even if it

9   were, the complaint's allegations do not identify the markets. With regard to the geographic

10  markets, Plaintiffs' opposition brief claims that "[t]he geographic scope of the relevant Outpatient

11  Services market, including the relevant Outpatient Surgical Services market, is local and, for

12  purposes of analysis, is roughly congruent with county borders." *Id.* at 14 (citing SAC ¶¶ 67-70).

13  But the cited paragraphs do not align the Specialty Provider Services markets (however renamed)

14  with county borders. And even if they did, there are no factual allegations to support bounding

15  markets at the county line.

16      The court is not requiring heightened pleading. But if Plaintiffs want to assert tying and

17  monopolization claims, they must identify the relevant markets and support their allegations with

18  some facts to show that they are plausible.

19  **III.  PLAINTIFFS FAIL TO STATE A TYING CLAIM**

20      In their first two claims,[11] Plaintiffs allege that Sutter's contracts with commercial health insurers

21

22      [10]  In the opposition brief, Plaintiffs refer to the Specialty Provider Services markets as
    "Outpatient Specialty Provider Services" or "Outpatient Services." *See* Opp'n at 9. Because this is
23  a motion to dismiss the existing complaint, the court retains the Specialty Provider Services
    nomenclature from complaint wherever possible. The court appreciates that the opposition tries to
24  preview what a complaint might look like in the next round.

25

26      [11]  Plaintiffs' first claim is for unreasonable restraint of trade, and the second claim is for
    tying. *See* SAC ¶¶ 155-66. In its motion to dismiss, Sutter observes that the first claim does not
27  identify a particular antitrust theory and the second claim rests on tying allegations, and it thus
    assumes that the tying allegations are the basis for the first claim too. Mot., ECF No. 40 at 11.
28  Sutter also points out in the reply that Plaintiffs' opposition does not distinguish between the first
    and second claims. *See* Opp'n, ECF No. 59; Reply, ECF No. 61 at 8 n.8. The court thus assumes

UNITED STATES DISTRICT COURT
For the Northern District of California

1  constitute unlawful tying arrangements because Sutter "conditions commercial health insurers'

2  access to Inpatient Hospital Services on [their] agreement to purchase Specialty Provider Services

3  from *all* of Sutter Physician Groups." SAC ¶ 162.  Plaintiffs allege that the contracts are *per*

4  *se* tying and also violate the rule of reason.  *Id.* ¶¶ 163-64.  Sutter moves to dismiss on the additional

5  ground that Plaintiffs do not allege that the tying caused an anticompetitive effect in the tied market.

6  Reply, ECF No. 61.

7      **A. Tying Claims Under the *Per Se* Rule and the Rule of Reason**

8      Tying involves an agreement by the seller to sell a product (the "tying" product) only if the buyer

9  also will buy a different product (the "tied" product) (or at least agree not to buy it from anyone

10  other than the seller).  *See Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 995 (N.D.

11  Cal. 2010); *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958).  "Tying arrangements are

12  forbidden on the theory that, if the seller has market power over the tying product, the seller can

13  leverage this market power through tying arrangements to exclude other sellers of the tied product."

14  *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008).

15     The presumptive mode of analysis in Section 1 cases (including tying claims) is the rule of

16  reason.  *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).  To state a "rule of reason" tying claim, a

17  plaintiff must allege that the defendant (1) entered into a tying arrangement (2) that adversely

18  affected competition.  *See Jefferson Parish Hosp. Dist. v. Hyde*, 466 U.S. 2, 31 (1984) (plurality

19  opinion); *Tele Atlas N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184, 1191 (N.D. Cal. 2005); *see also*

20  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (quoting *Kendall v. Visa*

21  *U.S.A., Inc.*, 518 F.3d 1042, 1046 (9th Cir. 2008) and *Atl. Richfield Co. v. USA Petroleum Co.*, 495

22  U.S. 328, 334 (1990) (internal quotation marks omitted)) *cert. denied*, 133 S. Ct. 573 (2012).  To

23  plead injury to competition, "a claimant must, at a minimum sketch the outline of the injury to

24  competition with allegations of supporting factual detail."  *Brantley*, 675 F.3d at 1198.  To allege the

25  injury to competition, the claimant must define the relevant market.  *See Jefferson Parish*, 466 U.S.

26  at 29 (noting that respondent could not show unreasonable restraint on competition in rule of reason

27

28

that the tying allegations are the basis for both claims too.

tying claim because the relevant market was not defined).

A *per se* rule applies to some tying claims, however:

> A tying arrangement will constitute a per se violation of the Sherman Act if the plaintiff proves '(1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market.

*Brantley*, 675 F.3d at 1197 n.7 (quoting *Cascade Health Solutions*, 515 F.3d at 913) (internal

quotation marks omitted).

### B. Anticompetitive Effects in the Tied Product Market

Sutter claims that the SAC fails to plead an additional element of a *per se* tying claim – that the

tying arrangement has a "pernicious effect on competition." Motion at 12-14. Sutter cites several

recent cases from this district requiring plaintiffs bringing *per se* tying claims to allege harm to

competition in the tied product market. *See* Motion at 13 (citing *Smith v. eBay Corp.*, No. C 10-

03825 JSW, 2012 WL 27718, at *6 (N.D. Cal. Jan. 5, 2012); *In re eBay Seller Antitrust Litigation*,

545 F. Supp. 2d 1027, 1034 (N.D. Cal. 2008) ("The Ninth Circuit has adopted the pernicious effect

requirement, explaining that 'the hallmark of a tie-in is that it denies competitors free access to the

tied market.'"); *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 995 (N.D. Cal. 2010) ("Plaintiffs

must plead a 'pernicious effect on competition and lack of . . . any redeeming value.'"); *In re*

*Webkinz Antitrust Litig.*, No. C 08-1987 RS, 2010 WL 4168845, at *2 (N.D. Cal. Oct. 20, 2010)).

Applying this "pernicious effect" standard, Sutter argues that the SAC lacks "allegations of

Sutter's alleged market presence in any physician market . . . or the number of specialty physician

competitors" in the alleged product and geographic markets. Motion at 14.

Plaintiffs counter that Sutter is trying to "blur the line between a *per se* and rule of reason

analysis," Opp'n at 20 n.16, and that the "pernicious effect" requirement is a minority requirement

inapplicable in the Ninth Circuit. They rely on *Digidyne Corporation v. Data General Corporation*,

in which the Ninth Circuit held that once the prerequisites of a *per se* tying claim are met, the court

does "not consider whether competition was in fact unreasonably restrained." 734 F.2d 1336, 1338

(9th Cir. 1984); *see also Hirsh v. Martindale-Hubbell, Inc.*, 674 F.2d 1343, 1347 & n.16 (9th Cir.

1982) (noting that "[a] minority of courts . . . require a showing of some sort of anticompetitive

UNITED STATES DISTRICT COURT
For the Northern District of California

1  effect in the market for the tie product").  Plaintiffs argue that the *In re eBay* court erred in relying

2  on earlier Ninth Circuit authority and that "[n]o showing of anti-competitive effects is necessary

3  when the elements of a *per se* violation are met."  Opp'n at 20.

4      The court finds persuasive the analysis in the later *In re Webkinz* opinion.  2010 WL 4168845, at

5  *2.  There, the court noted the apparent conflict regarding whether a pernicious effect on

6  competition requirement "may exist independently of a plaintiff's obligation to show that a 'not

7  insubstantial volume' of commerce in the tied product market has been affected."  *Id.* (contrasting

8  the holdings in *In re eBay Seller Antitrust Litigation* and *Hirsh v. Martindale-Hubbell, Inc*).

9  Ultimately, however it was:

10      of little consequence whether a 'pernicious effect' is characterized as a separate element to be
        pleaded and proved, or whether the use of that term in some of the precedents merely makes
11      explicit that the requisite effect on a 'not insubstantial volume of commerce' cannot be a
        benign one.  In either event, a plaintiff must allege and ultimately prove facts showing a
12      significant negative impact on competition in the tied product market.

13  *Id.*

14      Here, the tying claims fail because the SAC does not plead facts showing any negative impact on

15  competition in the tied markets.  Part of the problem is that Plaintiffs have not defined the relevant

16  markets sufficiently to make such a showing.  Even if they had, the SAC's allegations as to harm to

17  competition in the tied markets are (with one exception) inapposite or entirely conclusory.  For

18  example, the section of the SAC titled "Harm to Competition Due to Sutter's Conduct" cites a

19  variety of sources to show the following:  (1) prices at Sutter hospitals are higher than non-Sutter

20  hospitals, SAC ¶¶ 88-90, 92-95; (2) internal Sutter documents show that Sutter intended to prevent

21  competition from entering the East Bay market by purchasing hospitals, ¶ 91; (3) health insurers

22  have not established "high performance networks" that include fewer than all Sutter providers,

23  ¶¶ 101-09; (4) Sutter's hospital operations have resulted in consolidation of its control over that

24  market, ¶¶ 113-41; and (5) quality of care is relatively lower at Sutter hospitals, ¶¶ 142-42.  None of

25  these shows an injury to competition in the Specialty Provider Services markets.  The only non-

26  conclusory allegation is that Sutter refused to permit a San Francisco Accountable Care

27  Organization that used only non-Sutter providers to contract for access to lower rates at Sutter

28  hospitals.  *Id.* ¶¶ 110-12.  But this allegation cannot support a claim because Plaintiffs do not explain

UNITED STATES DISTRICT COURT
For the Northern District of California

1   what Specialty Provider Services markets this may have harmed.

2       Finally, Plaintiffs point to their allegations that Sutter's contacts also include so-called "steering"

3   provisions by which Sutter "force[s] commercial health insurers to steer patients to Sutter facilities

4   regardless of whether other providers or facilities offer superior medical services by extracting

5   financial penalties for non-compliance."  SAC ¶ 53.  But the contractual provisions that Plaintiffs

6   quote simply require the health insurer to charge patients lower rates for using "network

7   participating providers," which does not appear to be limited to Sutter providers.  *Id.* ¶ 52.  Even if it

8   were, the allegations are consistent with managed care.

9       In sum, because the SAC fails to plead any factual allegations showing an effect on a "not

10  insubstantial volume of commerce" in a defined market, Plaintiffs fail to state claims for unlawful

11  tying under either the *per se* or rule of reason tests.

12  **IV.  MONOPOLIZATION AND ATTEMPTED MONOPOLIZATION CLAIMS**

13      Sutter also moves to dismiss Plaintiffs' second claim for monopolization and attempted

14  monopolization in violation of section 2 of the Sherman Act.  *See* Motion at 23; SAC ¶¶ 167-77.

15      The monopolization and attempted monopolization claim is based on the theory that "Sutter

16  possesses monopoly power in Inpatient Hospital Services in the local geographic markets."  SAC

17  ¶ 170.  Sutter allegedly acquired monopoly power "through a pattern of false promises and cash

18  infusions to local communities and community hospitals, after which Sutter breaks its promises,

19  consolidates and eliminates hospital services, reduces competition, leverages further control in price

20  setting in the health care market, and reinforces its ability to force contract provisions such as those

21  challenged herein."  *Id.*  The SAC alleges (without factual support) that Sutter's contracts with

22  health plans "require them to actively incentivize and 'encourage' plan members to exclusive use of

23  Sutter's services and physicians, and to penalize health plans that fail to do so."[12]  *Id.* ¶ 174.  The

24  allegedly anti-competitive effects of Sutter's conduct outweigh any procompetitive justifications and

25  have injured Plaintiffs by forcing them to pay more for health care.  *See id.* ¶¶ 145-76.

26

27  _____

28      [12]  To the extent this statement refers to the contract language quoted at paragraph 52 of the
    SAC, the plain language of the contract (at least as quoted) contradicts Plaintiffs' allegation.

UNITED STATES DISTRICT COURT
For the Northern District of California

**A. Monopolization**

A section 2 monopolization claim requires a plaintiff to demonstrate the following:  (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury.  *See Forsyth*, 114 F.3d at 1475 (quoting *Pacific Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 817 (9th Cir. 1992)) (internal quotation marks and alterations omitted).  Monopoly power is defined as "the power to control prices or exclude competition." *Forsyth*, 114 F.3d at 1475. (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)).

A plaintiff may demonstrate market power either by direct evidence (for example, evidence of restricted output and supracompetitive prices) or by circumstantial evidence.  *Id.*  To demonstrate market power by circumstantial evidence, the plaintiff must:  "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run."  *Id.*

Plaintiffs' conclusory allegations do not establish direct evidence of market power.  Thus, they needed to define the relevant market.  *See id; see also Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) ("Without a definition of the relevant market, it is impossible to determine market share.").  As discussed above, they did not define the relevant geographic markets for Inpatient Hospital Services.  The court dismisses the claim on this ground.

Sutter has other arguments about monopoly power, but Plaintiffs do not really respond to Sutter's monopolization arguments.  *See, e.g.,* Opposition, ECF No. 59 at 30 (arguing only that the hospital services market is already characterized by high fixed costs and low margins and that Sutter's "construction of additional barriers to entry and expansion prevent, or significantly deter, new hospitals from entering the market and existing hospitals from expanding their services, facilities, or both.") A possible explanation is that the opposition contemplates a different complaint. As Sutter points out in its reply, Plaintiffs have abandoned many allegations in the SAC and essentially posit a hypothetical third amended complaint in the opposition.  While Sutter advances arguments about why the hypothetical complaint does not state claims either, the court declines to address them or how Sutter's other arguments about monopoly power might apply to the

UNITED STATES DISTRICT COURT
For the Northern District of California

1   hypothetical complaint.  In any event, the tying allegations are not sufficient to establish monopoly

2   power, Plaintiffs' arguments in the opposition brief do not change this outcome, and the claim fails

3   on this ground too.

4   **B.  Attempted Monopolization**

5   "[T]o demonstrate attempted monopolization a plaintiff must prove that the defendant (1) has

6   engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a

7   dangerous probability of achieving monopoly power."  *Cascade Health Solutions*, 502 F.3d at 904

8   (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).  The plaintiff also must

9   plead causal antitrust injury.  *See Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202

10  (9th Cir. 1997).  An attempted monopolization claim also is dependent upon a definition of the

11  relevant market.  *Forsyth*, 114 F.3d at 1477.  "Without such a determination, we cannot assess

12  whether challenged activity was anticompetitive."  *Id.*

13  Because Plaintiffs did not plausibly define the geographic market for Inpatient Hospital Services,

14  the court dismisses the attempted monopolization claim too.

15  **V.  THE STATE LAW CLAIMS**

16  First, Plaintiffs allege that Sutter violated California's Cartwright Act.  SAC, ¶¶ 178-85; Cal.

17  Bus. & Prof. Code § 16720(c).  Plaintiffs fail to state a Cartwright Act claim for the same reasons

18  they failed to state claims under section 1 of the Sherman Act.  *See Knevelbaard Dairies v. Kraft*

19  *Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000).

20  Second, the UCL and unjust enrichment claims are predicated on the antitrust claims, and the

21  court dismisses them for the same reasons.

22  **VI.  LEAVE TO AMEND**

23  The dismissal is with leave to amend.

24  **CONCLUSION**

25  The court grants Sutter's motion to dismiss and denies as moot its request for judicial notice.

26  Plaintiffs have 30 days from the date of this order to file a third amended complaint.

27  This disposes of ECF Nos. 40 & 41.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IT IS SO ORDERED.**

Dated: November 7, 2013



_____
LAUREL BEELER
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
For the Northern District of California

C 12-04854 LB
ORDER