**CONSTANTINE CANNON LLP**
**MATTHEW L. CANTOR (admitted** *phv)*
**AXEL BERNABE (admitted** *phv)*
**JEAN KIM (admitted** *phv)*
**335 MADISON AVENUE, 9**[TH] **FLOOR**
**NEW YORK, NY 10017**
**212.350.2700**
**212.350.2701**
**mcantor@constantinecannon.com**
**abernabe@constantinecannon.com**
**jkim@constantinecannon.com**

*Lead Counsel for Plaintiffs and the [Proposed] Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DJENEBA SIDIBE, DIANE DEWEY and JERRY JANKOWSKI on Behalf of Themselves and All Others Similarly Situated, | Case No. 3:12-cv-4854-LB |
| Plaintiffs, | CLASS ACTION |
| vs. | THIRD AMENDED COMPLAINT |
| SUTTER HEALTH, | DEMAND FOR JURY TRIAL |
| Defendant. | |

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     JURISDICTION AND VENUE ................................................................................4

III.    THE PARTIES............................................................................................................5

      A.      Plaintiffs..........................................................................................................5

      B.      Defendant .........................................................................................................6

      C.      Co-Conspirators ..............................................................................................6

IV.     FACTUAL BACKGROUND ....................................................................................6

      A.      The Purchase of Inpatient Hospital Services by Commercial Health Plans .................6

      B.      Commercial Health Plans "Must Have" Sutter's Inpatient Hospital Services. ............7

      C.      The Tying Arrangements That Sutter Has Forced Upon Commercial Health Plans.............................................................................................................8

      D.      The Anti-Steering Provisions That Sutter Has Forced Upon Commercial Health Plans. .................................................................................................10

V.      RELEVANT MARKETS .......................................................................................12

      A.      Markets for Inpatient Hospital Services in Individual HSAs. ....................12

      B.      Markets for the Sale of Commercial Health Insurance to Subscribers in Northern California Metropolitan Statistical Areas ("MSAs") ...................20

VI.     MARKET POWER..................................................................................................24

VII.    HARM TO COMPETITION ..................................................................................25

      A.      Sutter Has Foreclosed Competition in Inpatient Hospital Services..........................25

      B.      Sutter's Anti-Competitive Conduct Has Raised Prices For Medical Care. ................27

      C.      Sutter Has Harmed the Quality of Patient Care. ........................................29

      D.      Plaintiffs and Class Members Have Been Overcharged for Health Insurance Premiums and Out-of-Pocket Costs........................................29

VIII.   CLASS ALLEGATIONS ........................................................................................30

IX.     CLAIMS FOR RELIEF .........................................................................................33

      A.      First Claim – Section 1 Unlawful Tying (*Per Se* or Rule of Reason)........................33

      B.      Second Claim – Section 1 Course of Conduct............................................34

      C.      Third Claim – Violation of the Cartwright Act ..........................................35

      D.      Fourth Claim – Section 2 Monopolization..................................................36

      E.      Fifth Claim  – Section 2 Attempted Monopolization..................................37

      F.      Sixth Claim – Violation of California Unfair Competition Law Section 17200 .........37

X.      PRAYER FOR RELIEF .........................................................................................38

XI.     DEMAND FOR JURY TRIAL ..............................................................................39

Plaintiffs Djeneba Sidibe, Diane Dewey, and Jerry Jankowski, on behalf of themselves and those similarly situated bring this action against defendant Sutter Health and its affiliated entities ("Sutter") for violations of the Sherman Act, the Cartwright Act and California's Unfair Competition Law, and allege as follows:

## I.  INTRODUCTION

1.     This case concerns anticompetitive tying arrangements that Sutter has forced upon health insurance plans that must purchase Inpatient Hospital Services from Sutter in order to offer commercial insurance products in Northern California markets.  These illegal arrangements have been imposed upon commercial health plans through unabated exercises of market power by Sutter. They have also injured competition in relevant markets for Inpatient Hospital Services sold to commercial health plans by substantially foreclosing hospital competition and artificially raising the price of Inpatient Hospital Services charged to commercial health plans above competitive levels. And they have maintained Sutter's hospital monopolies in Northern California and have furthered Sutter's attempt to monopolize additional Northern California hospital markets.  As reported last week in a *New York Times* article dated December 3, 2013, a professor of health care economics at the University of Southern California, Glenn Melnick, has concluded that "Sutter is a leader – a pioneer – in figuring out how to amass market power to raise prices and decrease competition."

2.     The supra-competitive overcharges that have been foisted upon commercial health plans by virtue of Sutter's anticompetitive conduct have ultimately harmed hundreds of thousands of patient-health plan members that reside in Northern California, including plaintiffs, who have incurred these overcharges in the form of inflated insurance premiums.

3.     Sutter has accrued substantial market power in the form of Inpatient Hospital Services sold to health plans in geographic markets known as hospital service areas ("HSAs").  These HSAs have been defined by *The Dartmouth Atlas of Health Care,* a well-established industry source compiled by the Dartmouth Institute for Health Policy & Clinical Practice.  Policy makers and other legal and economic authorities have looked to Dartmouth Institute-defined HSAs in order to assess the economics of hospital markets.  Each of these HSAs constitutes an economically-coherent relevant antitrust market for the sale of Inpatient Hospital Services to health plans.

4.     In *each* of nine Northern California HSAs -- including the HSAs that have been defined for Antioch, Berkeley, Burlingame, Castro Valley, Davis, Roseville, San Leandro, Tracy and Vallejo -- Sutter possesses monopoly power.  (Each of these nine HSAs will be referred to as a "Tying Market."  Collectively, these HSAs will be referred to as the "Tying Markets.")  In each of these HSAs other than the San Leandro HSA, Sutter wields a 100% share of the relevant Inpatient Hospital Services market according to publicly-available data on discharges and hospital beds.  In the San Leandro HSA, Sutter wields a 78% share.[1]

5.     Sutter has leveraged its substantial market power in each of these nine Tying Markets via anticompetitive tying arrangements imposed upon health plans -- such as Anthem Blue Cross, Aetna, Blue Shield, Regence Blue Cross Blue Shield, and Premera Blue Cross.  These arrangements force health plans to include the Inpatient Hospital Services that Sutter supplies in five other HSAs and pay supra-competitive rates for same.  (These five "Tied Markets" are the San Francisco, Oakland, Sacramento, Modesto and Santa Rosa HSAs.)  In particular, Sutter imposes "all or nothing" terms upon health plans: if health plans do not accede to Sutter's demand that they include the Inpatient Hospital Services that it supplies in the Tied Markets in their health plan provider networks, then the health plans cannot include Sutter's "must have" Inpatient Hospital Services supplied in the Tying Markets in their provider networks.  As health plans cannot compete in Northern California without contracting for Sutter's Inpatient Hospital Services in the Tying Markets, Sutter's "all or nothing" demands offer them no choice at all.  In effect, they force health plans to include Sutter's Tied Market Inpatient Hospital Services in their provider networks at prices that Sutter dictates.

6.     Sutter has also required certain health plans to steer their members away from lower-cost, quality hospital options to higher-priced Sutter facilities for Inpatient Hospital Services in order to reinforce and exacerbate the core anticompetitive impact of its tying arrangements.  Sutter has done this by, for example, contractually requiring plans to financially penalize their members (by either direct financial penalties or by foregoing "out of pocket" incentives) if these members do not

---

[1]   Sutter wields monopoly power in these HSAs because the other large hospital system located in Northern California -- Kaiser Permanente  -- does not participate in the relevant markets, as it does not offer to contract with non-Kaiser health plans.  Rather, Kaiser only contracts with Kaiser's affiliated health insurance plans.  Kaiser thus fails to constrain Sutter Health's pricing leverage over the various health plans purchasing Inpatient Hospital Services in the referenced HSAs.

seek medical treatment at Sutter, as opposed to other, hospitals. These contractual clauses effectively fine health plans, if they fail to steer patients towards Sutter's higher-priced hospitals, by charging health plans even higher rates for Inpatient Hospital Services than the supra-competitive rates that Sutter already imposes. In a competitive market, health plans could steer some (but far from all) of their members away from high-priced Sutter hospitals to reduce their medical costs: such steering is consistent with managed care practices. In the markets relevant to this action, Sutter's anti-steering clauses preclude health plans from engaging in these established managed care practices, reinforcing the anticompetitive impact of Sutter's tying and monopolistic conduct.

7. Sutter's conduct has caused anticompetitive harm in the relevant Inpatient Hospital Services markets by causing health plans to pay higher rates for Inpatient Hospital Services than they would have paid but for this conduct. These higher rates have been passed downstream by health plans to individuals and employers that contract with health plans for commercial health insurance. In this regard, there are six geographic markets for the purchase of commercial health insurance by subscribers that are relevant to this case. Each of these commercial health insurance markets is as wide as a Metropolitan Statistical Area ("MSA"): they include the markets for the sale of commercial health insurance in the (1) Modesto MSA, (2) Sacramento-Roseville-Arden-Arcade MSA, (3) San Francisco-Oakland-Freemont MSA, (4) Santa Rosa-Petaluma MSA, (5) Stockton MSA, and (6) Vallejo-Fairfield MSA. MSAs are geographic areas defined by the Office of Management and Budget for the purpose of economic analysis.

8. Sutter's conduct has also harmed competition by substantially foreclosing hospital competition. Sutter's conduct has forced commercial health plans to include higher-priced Sutter hospital facilities in their networks. But for this conduct, these higher-priced Sutter hospitals would not have been included in these health plan networks. Had these higher-priced hospitals not been included in these networks, patients-health plan members would have had financial incentives to visit lower-cost facilities in the Tied Markets for Inpatient Hospital Services. (Specifically, in a world absent Sutter's tying arrangements, patients-health plan members would have had to pay substantial "out of pocket" costs to visit Sutter hospitals on an out-of-network basis.) Consequently, the conduct at issue has resulted in lower-cost, non-Sutter hospitals in the Tied Markets serving far

fewer patients than they otherwise would have had competition prevailed.  This is quintessential foreclosure.

9.     Sutter's conduct has also substantially raised barriers to entry in each of the Tying Markets.  It has made it much less likely that any hospital competitor will be able to grow in Northern California and challenge the hospital monopolies that Sutter has created in each of the Tying Markets.  This has allowed Sutter to maintain its monopolies and force health plans to pay supra-competitive rates in the Tying Markets that would not have been charged in the absence of the conduct at issue.

10.     There is no legitimate justification or offsetting procompetitive benefit for Sutter's conduct.

11.     Sutter's conduct violates Sections 1 and 2 of the Sherman Act and California's Cartwright Act.  It also constitutes unlawful and unfair business acts or practices under California Civil Code Section 17200.

12.     Plaintiffs seek to represent a Class of Anthem Blue Cross, Aetna, Blue Shield, Regence Blue Cross Blue Shield, and Premera Blue Cross members that have paid anticompetitive overcharges as a result of Sutter's monopolistic scheme during the relevant damages period.  In particular, they seek to recover treble damages on behalf of the Class, under Fed. R. Civ. P. 23(b)(3), as Sutter's conduct commonly impacts Class members.  And they seek permanent injunctive relief on behalf of the Class, under Fed. R. Civ. P. 23(b)(2), that requires Sutter to terminate its tying arrangements and anti-steering practices.

## II.     JURISDICTION AND VENUE

13.     Plaintiffs bring this action under Section 16 of the Clayton Act, 15 U.S.C. §§ 15 and 16, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.  This Court has subject matter jurisdiction over this claim pursuant to 28 U.S.C. §§ 1331 and 1337.

14.     Plaintiffs also bring this action under the Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*, to obtain restitution, statutory damages, and injunctive relief.  This Court has supplemental

jurisdiction over these pendant California state law claims under 28 U.S.C. §§ 1332(d) and 1367 because the claims arise from the same nucleus of operative facts as the federal antitrust law claims.

15.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because a substantial part of the events giving rise to plaintiffs' claims occurred in this District, Sutter transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here.  Sutter is engaged in, and its activities substantially impact, interstate commerce.

## III.    THE PARTIES

### A.    Plaintiffs

16.     Plaintiff Djeneba Sidibe ("Sidibe") is a resident of Marin County and has been since January 2012.  From November 2009 until January 2012, she was a resident of Alameda County and, prior to November 2009, she was a resident of San Mateo County.  Since March 2012, Sidibe has been a member of the Aetna health plan.  Beginning in or around October 2005 until March 2012, Sidibe was a member of the Anthem Blue Cross health plan.  During the relevant period, Sidibe paid premiums in order to be enrolled as a plan member in the respective health plans.  As a result of Sutter's anticompetitive conduct, Sidibe paid artificially high premiums, co-payments, deductibles and other out-of-pocket payments not covered by the health plan.

17.     Plaintiff Diane Dewey ("Dewey") is and has been a resident of San Francisco County since 1994.  Dewey was enrolled in the Anthem Blue Cross health plan from 2008 until 2010. Beginning in or around 2010 until 2012, Dewey was enrolled in the Regence Blue Cross Blue Shield plan.  Dewey is currently enrolled in the Premera Blue Cross health plan.  Dewey paid premiums in order to be enrolled as a plan member in the respective health plans.  As a result of Sutter's anti-competitive conduct, Dewey paid artificially high premiums, co-payments, deductibles and other out-of-pocket payments not covered by the health plan.

18.     Plaintiff Jerry Jankowski ("Jankowski") is a resident of San Francisco County and has been since August 1992.  Since July 1, 2013, Jankowski has been enrolled as a member in the Blue Shield health plan.  Beginning in or around July 1, 2012 until June 30, 2013, Jankowski was enrolled in the Anthem Blue Cross health plan.   Jankowski paid premiums in order to be enrolled as a plan

member in the respective health plans.  As a result of Sutter's anticompetitive conduct, Jankowski paid artificially high premiums, co-payments, deductibles and other out-of-pocket payments not covered by the health plan.

     **B.**     **Defendant**

     19.     Sutter is a corporation organized and existing under the laws of the State of California, with its principal place of business located at 2200 River Plaza Drive, Sacramento, California.  Sutter controls the largest and most dominant network of hospitals and medical service providers in Northern California.  Sutter's network includes at least 31 acute care hospitals with approximately 4,500 beds.

     20.     Over the last 30 years, Sutter has engaged in an acquisition campaign in order to expand its market power.  During that time, it has acquired approximately 20 hospitals.  As a result of this campaign, Sutter now owns the only acute care hospitals in several Northern California HSAs.

     21.     In 2012, Sutter's operating revenues were approximately $9.6 billion.

     **C.**     **Co-Conspirators**

     22.     Various persons, firms, corporations, organizations and other entities have participated as co-conspirators in the violations alleged herein.  On information and belief, Sutter has some degree of ownership or control over various entities and organizations that are a party to, benefit from, or are a repository for illegal proceeds generated by the violations alleged herein. Plaintiffs are currently unaware of the identities of and degree of involvement by the co-conspirators in the challenged conduct.

**IV.**     **FACTUAL BACKGROUND**

     **A.**     **The Purchase of Inpatient Hospital Services by Commercial Health Plans**

     23.     Commercial health plans -- such as Anthem Blue Cross, Aetna, Blue Shield, Regence Blue Cross Blue Shield, and Premera Blue Cross -- purchase medical services, including Inpatient Hospital Services, for the benefit of their insured members, who are consumers that purchase commercial health insurance from these commercial health plans.  In a competitive market, commercial health plans will enter into a contract with a hospital for Inpatient Hospital Services to

be provided to the health plan's members when the hospital offers competitively-priced and quality services.  The costs associated with the Inpatient Hospital Services provided to members of a commercial health plan by hospitals are ultimately passed onto health plan members, such as plaintiffs, in the form of commercial health insurance premiums.  Accordingly, the insurance premiums paid by health plan members, such as plaintiffs, increase when their health plans are forced to purchase Inpatient Hospital Services at supra-competitive rates.  Health plan members also directly pay for the costs of medical services provided by hospitals in the form of co-insurance payments.

**B.      Commercial Health Plans "Must Have" Sutter's Inpatient Hospital Services.**

24.      Commercial health plans offering insurance products in Northern California must include Sutter Inpatient Hospital Services in their participating provider networks.

25.      Sutter dominates numerous hospital service areas (HSAs) in Northern California, often offering the only available hospital facility to health plan members in a given HSA.  HSAs are areas defined by the *Dartmouth Atlas of Health Care* -- a well-established industry authority -- as "local health care markets for hospital care."  According to the Dartmouth Atlas website (www.dartmouthatlas.org), "[a]n HSA is a collection of ZIP codes whose residents receive most of their hospitalizations from the hospitals in that area."   As set forth in Paragraphs 45 -77 below, there are fourteen Northern California HSAs that constitute geographic markets for Inpatient Hospital Services relevant to this action.  These include: Antioch, Berkeley, Burlingame, Castro Valley, Davis, Modesto, Oakland, Roseville, Sacramento, San Francisco, San Leandro, Santa Rosa, Tracy, and Vallejo.

26.      Specifically, as referenced in Paragraphs 78-85, Sutter wields and exercises market power in the form of Inpatient Hospital Services sold to health plans in *each* of the following nine HSAs: Antioch, Berkeley, Burlingame, Castro Valley, Davis, Roseville, San Leandro, Tracy, and Vallejo.  (As stated above, these HSAs are collectively referred to as the "Tying Markets").

27.      Sutter's market power over health plans in the Tying Markets is enhanced by the fact that Kaiser Permanente -- the other large hospital system in Northern California -- does not offer to supply Inpatient Hospital Services to health plans that are unaffiliated with Kaiser Permanente health

plans.  The Kaiser Permanente health system is a closed member system.  In other words, as Kaiser only offers Inpatient Hospital Services to Kaiser's affiliated (and vertically-integrated) insurance plans, Kaiser is not a competitor in the relevant markets.

**C.     The Tying Arrangements That Sutter Has Forced Upon Commercial Health Plans.**

28.     Sutter has forced health plans -- including Anthem Blue Cross, Aetna, Blue Shield, Regence Blue Cross Blue Shield, and Premera Blue Cross -- to include Sutter's higher-priced Inpatient Hospital Services in the Tied Markets in their health plan networks.  For example, Sutter has forced certain health plans to include language in their contracts with Sutter that is either identical or similar to the following:

> Each payer [i.e., commercial health plan] accessing Sutter Health providers shall designate ALL Sutter Health providers . . . as participating providers unless a Payer excludes the entire Sutter Health provider network.

Sutter has also forced health plans to include its higher-priced Tied Market Inpatient Hospital Services  in their networks by orally threatening that failure to do so would mean that health plans could not include Sutter's Tying Market Inpatient Hospital Services in their networks.

29.     As a result of these "all or nothing" arrangements and the "must have" power that Sutter wields over health plans in the Tying Markets, health plans are forced to include Sutter Inpatient Hospital Services in their provider networks in *each* of the following five Tied Markets: the HSAs of San Francisco, Oakland, Sacramento, Modesto and Santa Rosa.  These arrangements also require health plans to include every Sutter hospital in each of the Tying Markets in their provider networks.  If not for these tying arrangements, health plans would have the ability to forego including Sutter hospitals in their provider networks unless and until those hospitals offered health plans lower, competitively-priced rates for their Inpatient Hospital Services.

30.     Sutter's tying arrangements utilize Sutter's market power in the Tying Markets to force health plans to include supra-competitively priced Sutter hospitals in the Tied Markets in their networks.  If not for these contractual tying arrangements, health plans would have purchased Inpatient Hospital Services on other terms.

31.     The following map indentifies the geographic layout of the Tying Markets and Tied Markets:



HSA
1  Antioch
2  Berkeley
3  Burlingame
4  Castro Valley
5  Davis
6  Modesto
7  Oakland
8  Roseville
9  Sacramento
10 San Francisco
11 San Leandro
12 Santa Rosa
13 Tracy
14 Vallejo

32.     Sutter's tying arrangements constitute anticompetitive conduct, particularly when considering Sutter's power to force health plans to accept these tying arrangements.  Such tying of health care services by providers with market power has been particularly and recently identified as "conduct to avoid" by the Federal Trade Commission and Department of Justice, Antitrust Division in their Statement of Antitrust Enforcement Policy Regarding Accountable Care Organizations ("ACOs") Participating in the Medicare Shared Savings Program (the "DOJ/FTC Policy Statement").  There, these enforcement agencies noted that a group of providers (e.g., an ACO) "should not require a purchaser to contract with all of the hospitals under common ownership with a hospital that participates in the ACO."  This prohibition applies to Sutter's tying arrangement because Sutter's dominant market shares in the Tying Markets far exceed the 30% provider market share threshold that the FTC and DOJ identify as causing a need for heightened antitrust scrutiny of providers.

33.     In a February 2013 advisory opinion, the FTC again noted the anticompetitive nature of "all or nothing" tying arrangements that are thrust upon health plans by hospitals with market power, such as the ones at issue in this case.  There, the FTC stated that a proposed physician-hospital organization did not violate antitrust law because:

> the proposal does not appear to include 'vertical' arrangements that would enable [the organization] to use any market power that [it] might possess in selling certain services to limit competition in the sale of any other services. For example, [it] **does not propose to use any contracting requirements that would require payers to do business with all of [the organization's] participating hospitals . . .**

Norman PHO Advisory Opinion, Op. FTC 19 (Feb. 13, 2013) (emphasis supplied).

**D.     The Anti-Steering Provisions That Sutter Has Forced Upon Commercial Health Plans.**

34.     In a competitive environment, commercial health plans have the ability to steer some (but far from all) of their members to lower-cost, quality providers that participate in their provider networks.  Health plans do this to reduce the cost of the medical expenses that they pay.  Such steering to low-cost providers over higher-cost providers is consistent with the practice of managed care.

35.     Sutter, however, precludes such steering to lower-cost facilities.  For example, Sutter has included provisions in a number of its agreements that force health plans to route members away from lower-cost hospitals and to higher-cost Sutter hospitals.  These anti-steering clauses reinforce and exacerbate the core anticompetitive impact of Sutter's tying arrangements.  For example, one Sutter contract has required the health plan:

> . . . to actively encourage members obtaining medical care to use Sutter Health Providers.  "Actively encourage" or "active encouragement" means incentivizing members to use participating providers [i.e., defined elsewhere as only Sutter providers] through the use of one or more of the following: reduced co-payments, reduced deductibles, premium discounts directly attributable to the participating provider, financial penalties, or requiring such members to pay additional sums directly attributable to the non-use of a participating provider.
>
> If Sutter Health or any provider learns that a payer . . . .does not actively encourage its members to use network participating providers [i.e., Sutter only providers] . . . **Sutter shall have the right upon not less than thirty (30) days' written notice to terminate that payer's right to negotiated rates.  In the event of such termination, the terminated payer shall pay for covered services rendered by providers at 100% of billed charges**

until such time as Sutter reasonable believes and notices that the payer does
in fact actively encourage its members to use network participating providers
. . .

(Emphasis supplied).

36.     These clauses preclude health plans from steering certain members away from Sutter, as one would expect would occur in a competitive market.  These clauses do this by giving Sutter the ability to extract substantial financial penalties from health plans for non-compliance: Sutter is provided with the right to charge the commercial health plan even higher billed charge rates for Inpatient Hospital Services if the health plan does not steer members away from lower-cost providers and to Sutter hospitals.  (According to a professor of health management and policy at the University of Michigan, Simone Singh, hospital billed charges are generally twice as much as what insurers typically pay for hospital procedures.)

37.     For example, these clauses specify that commercial health plans should charge <u>higher</u> "out of pocket" costs to members that would choose to use competing facilities that charge <u>lower</u> rates for overall reimbursement (which includes payment from the patient and health plan).  These clauses therefore specify that health plans engage in economically counter-intuitive behavior: they force health plans to incentivize members to frequent higher-cost Sutter facilities (particularly as the member generally has no knowledge of the overall costs that are paid for these procedures.)  This is the antithesis of managed care.

38.     The DOJ/FTC Policy Statement evidences that Sutter's anti-steering policy is anticompetitive.  That Policy Statement proscribes a provider group, like Sutter, from "preventing or discouraging private payers from directing or incentivizing patients to choose certain providers . . . through 'anti-steering' clauses."  Moreover, economic literature has identified that anti-steering provisions such as those that Sutter forces upon commercial health plans, compromise price competition.  *See* Havighurst, Clark C. & Richman, Barak D., *The Provider Monopoly Problem in Health Care*,  89 OREGON L. REV. 847-883 (2011).  The referenced February 2013 FTC advisory opinion also identifies the anticompetitive nature of anti-steering provisions forced upon health plans by entities with market power.  It states that the proposed physician-hospital organization at issue there did not appear to be "limit[ing] competition" because, among other things, it did not "prevent papers from directing or incentivizing patients to choose certain providers . . . through 'anti-steering'

. . . contractual clauses or provisions."  Norman PHO Advisory Opinion, Op. FTC 19 (Feb. 13, 2013).

## V.      RELEVANT MARKETS

### A.      Markets for Inpatient Hospital Services in Individual HSAs.

#### i.      The Inpatient Hospital Service Product Market

39.      The sale of Inpatient Hospital Services to commercial health plans is a relevant product market.

40.      Inpatient Hospital Services are a broad group of medical and surgical diagnostic and treatment services that include an overnight stay in the hospital by the patient.  Although individual Inpatient Hospital Services are not substitutes for each other (e.g., obstetrics and cardiac services are not substitutes for each other), the various individual Inpatient Hospital Services can be aggregated for analytic convenience and has been so aggregated by courts, antitrust enforcers, and industry sources such as the Institute of Medicine and the California HealthCare Foundation.   Inpatient Hospital Services *exclude*: (1) services at hospitals that serve solely military personnel or veterans; (2) services at outpatient facilities that provide same-day service only; and (3) psychiatric, substance abuse, and rehabilitation services.

41.      The market for the sale of Inpatient Hospital Services to health plans excludes outpatient services because health plans and patients would not substitute outpatient services for inpatient services in response to a sustained price increase.  There are no other reasonably interchangeable services for Inpatient Hospital Services.

42.      The market for the sale of Inpatient Hospital Services to commercial health plans *excludes* sales of such services to government payers.  The primary government payers are the federal government's Medicare program (coverage for the elderly and disabled), the joint federal and state Medicaid programs (coverage for low-income persons), and the federal government's TRICARE program (coverage for military personnel and families).  The federal government sets the rates and schedules at which the government pays healthcare providers for services provided to individuals covered by Medicare, Medicaid, and TRICARE.  These rates are not subject to negotiation.

43.     In contrast, commercial health plans negotiate rates with healthcare providers and sell health insurance policies to organizations and individuals, who pay premiums for the policies. Generally, the rates that commercial health plans pay hospitals for Inpatient Hospital Services are substantially higher than those paid by government payers (Medicare, Medicaid, and TRICARE).

44.     There are no reasonable substitutes or alternatives to Inpatient Hospital Services sold to commercial health plans.  A hospital's negotiations with commercial health plans are separate from the process used to determine the rates paid by government payers, and hospitals could, therefore, target a price increase just to commercial health plans.  Commercial health plans cannot shift to government rates in response to an increase in rates for Inpatient Hospital Services sold to commercial health plans, and patients who are ineligible for Medicare, Medicaid, or TRICARE cannot substitute those programs for commercial health insurance in response to a price increase for commercial health insurance.  Consequently, a hypothetical monopolist provider of Inpatient Hospital Services sold to commercial health plans could profitably maintain supra-competitive prices for those services over a sustained period of time.

ii.     *The Relevant Geographic Markets for Inpatient Hospital Services.*

45.     *The Dartmouth Atlas of Health Care*, a well-established industry authority, has been defining hospital service areas, or HSAs, for the purpose of economic analysis for over twenty years. In that regard, *The Dartmouth Atlas* has recognized that there are "local health care market[s] for hospital care" and has defined HSAs as such.  In particular, *The Dartmouth Atlas* has defined local HSAs as "a collection of ZIP codes whose residents receive most of their hospitalizations from the hospitals in that area."

46.     The fact that the geographic scope of markets for Inpatient Hospital Services are roughly congruent with Dartmouth Institute-defined HSAs is evidenced by the requirements of California's Knox-Keene Act (and the regulations promulgated thereunder).  To ensure that health plan members can access local hospitals for Inpatient Hospital Services (among other things), the Knox-Keene Act requires that all health plans contract with a "hospital that has the capacity to serve the entire dependent enrollee population based on normal utilization" that is located within 30 minutes or 15 miles of member residences or workplaces.  Department of Managed Health Care,

"Regulations Applicable to California Licensed HealthCare Service Plans," at 39 (2012), http://wpso.dmhc.ca.gov/regulations/12CCRP/2012CCRP.pdf.

47.     There are fourteen HSAs that are relevant markets for Inpatient Hospital Services in this manner.  Nine of them are the Tying Markets.  Five of them are the Tied Markets.

48.     **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the Antioch HSA**, as defined by *The Dartmouth Atlas of Health Care.* The Antioch HSA is a Tying Market.  The following zip codes are, according to the *Dartmouth Atlas,* included in the Antioch HSA: 94505, 94509, 94511, 94514, 94531, 94548, and 94561.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the Antioch HSA.  In other words and in order to compete for members that reside in the Antioch HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for Inpatient Hospital Services to a hypothetical (or actual) monopolist of Inpatient Hospital Services located in the Antioch HSA.  Sutter provides Inpatient Hospital Services in the Antioch HSA via the Sutter Delta Medical Center.

49.     **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the Berkeley HSA**, as defined by *The Dartmouth Atlas of Health Care.* The Berkeley HSA is a Tying Market.  The following zip codes are, according to the *Dartmouth Atlas,* included in the Berkeley HSA: 94530, 94702, 94704, 94706, 94708, 94710, 94720, 94701, 94703, 94705, 94707, 94709, and 94712.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the Berkeley HSA.  In other words and in order to compete for members that reside in the Berkeley HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for Inpatient Hospital Services to a hypothetical (or actual) monopolist of such services located in the Berkeley HSA.  Sutter provides Inpatient Hospital Services in the Berkeley HSA via the Alta-Bates Summit Medical Center - Alta-Bates and Herrick campuses.

50.     **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the Burlingame HSA**, as defined by *The Dartmouth Atlas of Health Care.*  The Burlingame HSA is a Tying Market.  The following zip codes are, according to the

*Dartmouth Atlas,* included in the Burlingame HSA: 94010, 94011, 94012, 94030, 94031, 94066, 94067, 94096, 94098, and 94099.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the Burlingame HSA.  In other words and in order to compete for members that reside in the Burlingame HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for Inpatient Hospital Services to a hypothetical (or actual) monopolist of such services located in the Burlingame HSA.  Sutter provides Inpatient Hospital Services in the Burlingame HSA via the Mills-Peninsula Medical Center.

51.     **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the Castro Valley HSA**, as defined by *The Dartmouth Atlas of Health Care.*  The Castro Valley HSA is a Tying Market.  The following zip codes are, according to the *Dartmouth Atlas,* included in the Castro Valley HSA: 94541, 94543, 94546, and 94552.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the Castro Valley HSA.  In other words and in order to compete for members that reside in the Castro Valley HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for Inpatient Hospital Services to a hypothetical (or actual) monopolist of such services located in the Castro Valley HSA.  Sutter provides Inpatient Hospital Services in the Castro Valley HSA via the Eden Medical Center.

52.     **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the Davis HSA**, as defined by *The Dartmouth Atlas of Health Care.*  The Davis HSA is a Tying Market.  The following zip codes are, according to the *Dartmouth Atlas,* included in the Davis HSA: 95616, 95617, 95618, 95620, 95678, and 95694.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the Davis HSA.  In other words and in order to compete for members that reside in the Davis HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for Inpatient Hospital Services to a hypothetical (or actual) monopolist of such services located in the Antioch HSA.  Sutter provides Inpatient Hospital Services in the Davis HSA via the Sutter Davis Hospital.

53.     **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the Roseville HSA**, as defined by *The Dartmouth Atlas of Health Care.*

The Roseville HSA is a Tying Market.  The following zip codes are, according to the *Dartmouth Atlas,* included in the Roseville HSA: 95648, 95650, 95661, 95663, 95677, 95678, 95681, 95747, and 95765.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the Roseville HSA.  In other words and in order to compete for members that reside in the Roseville HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for Inpatient Hospital Services to a hypothetical (or actual) monopolist of such services located in the Roseville HSA.  Sutter provides Inpatient Hospital Services in the Roseville HSA via the Sutter Roseville Medical Center.

54.    **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the San Leandro HSA**, as defined by *The Dartmouth Atlas of Health Care.*  The San Leandro HSA is a Tying Market.  The following zip codes are, according to the *Dartmouth Atlas,* included in the San Leandro HSA: 94577, 94578, 94579, and 94622.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the San Leandro HSA.  In other words and in order to compete for members that reside in the San Leandro HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for Inpatient Hospital Services a hypothetical (or actual) monopolist of such services located in the San Leandro HSA.  Sutter provides Inpatient Hospital Services in the San Leandro HSA via the San Leandro hospital.

55.    **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the Tracy HSA**, as defined by *The Dartmouth Atlas of Health Care.* The Tracy HSA is a Tying Market.  The following zip codes are, according to the *Dartmouth Atlas,* included in the Tracy HSA: 95304, 95376, 95377, 95378, and 95391.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the Tracy HSA.  In other words and in order to compete for members that reside in the Tracy HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for Inpatient Hospital Services to a hypothetical (or actual) monopolist of such services located in the Tracy HSA. Sutter provides Inpatient Hospital Services in the Tracy HSA via the Sutter Tracy Community Hospital.

56.     **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the Vallejo HSA**, as defined by *The Dartmouth Atlas of Health Care.* The Vallejo HSA is a Tying Market.  The following zip codes are, according to the *Dartmouth Atlas,* included in the Vallejo HSA: 94503, 94510, 94589, 94590, 94591, and 94592.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the Vallejo HSA.  In other words and in order to compete for members that reside in the Vallejo HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for Inpatient Hospital Services to a hypothetical (or actual) monopolist of such services located in the Vallejo HSA.  Sutter provides Inpatient Hospital Services in the Vallejo HSA via the Sutter Solano Medical Center.

57.     **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the Modesto HSA**, as defined by *The Dartmouth Atlas of Health Care.* The Modesto HSA is a Tied Market.  The following zip codes are, according to the *Dartmouth Atlas,* included in the Modesto HSA: 95307, 95320, 95326, 95350, 95353, 95356, 95360, 95367, 95386, 95397, 95313, 95322, 95328, 95351, 95354, 95357, 95363, 95368, 95387, 95319, 95323, 95329, 95352, 95355, 95358, 95366, 95385, and 95390.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the Modesto HSA.  In other words and in order to compete for members that reside in the Modesto HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for Inpatient Hospital Services to a hypothetical monopolist of such services located in the Modesto HSA.  Sutter provides Inpatient Hospital Services in the Modesto HSA via the Memorial Hospital Medical Center Modesto.

58.     **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the Oakland HSA**, as defined by *The Dartmouth Atlas of Health Care.* The Oakland HSA is a Tied Market.  The following zip codes are, according to the *Dartmouth Atlas,* included in the Oakland HSA: 94502, 94604, 94608, 94612, 94616, 94620, 94625, 94649, 94661, 94601, 94605, 94609, 94613, 94617, 94621, 94626, 94650, 94662, 94602, 94606, 94610, 94614, 94618, 94623, 94627, 94659, 94666, 94603, 94607, 94611, 94615, 94619, 94624, 94643, and 94660.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services

provided in the Oakland HSA.  In other words and in order to compete for members that reside in the Oakland HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for Inpatient Hospital Services to a hypothetical monopolist of Inpatient Hospital Services located in the Oakland HSA.  Sutter provides Inpatient Hospital Services in the Oakland HSA via the Alta-Bates Medical Center – Summit Campus.

59.    **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the Sacramento HSA**, as defined by *The Dartmouth Atlas of Health Care.*  The Sacramento HSA is a Tied Market.  The following zip codes are, according to the *Dartmouth Atlas,* included in the Sacramento HSA: 94203, 94204, 94205, 94206, 94207, 94208, 94209, 94211, 94229, 94230, 94232, 94234, 94235, 94236, 94237, 94239, 94240, 94243, 94244, 94245, 94246, 94247, 94248, 94249, 94250, 94252, 94253, 94254, 94256, 94257, 94258,  94259, 94261, 94262, 94263, 94267, 94268, 94269, 94271, 94273, 94274, 94277, 94278, 94279, 94280, 94282, 94283, 94284, 94285, 94286, 94287, 94288, 94289, 94290, 94291, 94293, 94294, 94295, 94296, 94297, 94298, 94299, 95605, 95612, 95615, 95624, 95626, 95639, 95651, 95652, 95655, 95659, 95662, 95668, 95670, 95671, 95672, 95673, 95680, 95683,  95690, 95691, 95693, 95741, 95743, 95757, 95758, 95759, 95762, 95798, 95799, 95811, 95812, 95813, 95814, 95815, 95816, 95817, 95818, 95819, 95820, 95821, 95822, 95823, 95824, 95825, 95826, 95827, 95828, 95829, 95830, 95831, 95832, 95833, 95834, 95835, 95836, 95837, 95838, 95840, 95851, 95852, 95853, 95857, 95860, 95864, 95865, 95866, 95867, 95873, 95887, 95894, and 95899.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the Sacramento HSA.  In other words and in order to compete for members that reside in the Sacramento HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for those Inpatient Hospital Services to a hypothetical monopolist of such services located in the Sacramento HSA.  Sutter provides Inpatient Hospital Services in the Sacramento HSA via the Sutter General Hospital and Sutter Memorial Hospital.

60.    **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the San Francisco HSA**, as defined by *The Dartmouth Atlas of Health Care.*  The San Francisco HSA is a Tied Market.  The following zip codes are, according to the

*Dartmouth Atlas,* included in the San Francisco HSA: 94101, 94102, 94103, 94104, 94105, 94106, 94107, 94108, 94109, 94110, 94111, 94112, 94114, 94115, 94116, 94117, 94118, 94119, 94120, 94121, 94122, 4123, 94124, 94125, 94126, 94127, 94129, 94130, 94131, 94132, 94133, 94134, 94135, 94136, 94137, 94138, 94139, 94140, 94141, 94142, 94143, 94144, 94145, 94146, 94147, 94150, 94151, 94152, 94153, 94154, 94155, 94156, 94157, 94158, 94159, 94160, 94161, 94162, 94163, 94164, 94165, 94166, 94167, 94168, 94169, 94170, 94171, 94172, 94175, 94177, 94188, and 94199.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the San Francisco HSA.  In other words and in order to compete for members that reside in the San Francisco HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for Inpatient Hospital Services to a hypothetical monopolist of such services located  in the San Francisco HSA.  Sutter provides Inpatient Hospital Services in the San Francisco HSA via five California Pacific Medical Center campuses, including, the California East, California West, Davies, Pacific, and St. Luke's campuses.

61.    **A relevant geographic market for the sale of Inpatient Hospital Services to commercial health plans is the Santa Rosa HSA**, as defined by *The Dartmouth Atlas of Health Care.*  The Santa Rosa HSA is a Tied Market.  The following zip codes are, according to the *Dartmouth Atlas,* included in the Santa Rosa HSA: 94926, 94927, 94928, 94931, 95401, 95402, 95403, 95404, 95405, 95406, 95407, 95408, 95409, 95412, 95421, 95436, 95439, 95445, 95446, 95452, 95459, 95462, 95468, 95471, 95480, 95486, 95492, 95494, and 95497.  There are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in the Santa Rosa HSA.  In other words and in order to compete for members that reside in the Santa Rosa HSA, commercial health plans would pay a small, but significant, non-transitory increase in price for those Inpatient Hospital Services for a hypothetical monopolist of such services located in the Santa Rosa HSA.  Sutter provides Inpatient Hospital Services in the Santa Rosa HSA via the Summit Medical Center of Santa Rosa.

B.     **Markets for the Sale of Commercial Health Insurance to Subscribers In Northern California Metropolitan Statistical Areas ("MSAs")**

i.     *The Commercial Health Insurance Product Market*

62.     The sale of commercial health insurance is a relevant product market.  Individuals, who are not disabled, elderly, or indigent, and therefore eligible for Medicare or Medicaid programs, typically obtain health insurance from commercial health plans.  Such health insurance is generally used to pay for medical expenses incurred by health plan members.

63.     Commercial health insurance is purchased by individuals from commercial health plans.  It also is obtained by employers from commercial health plans who, as a benefit, will sometimes pay for a share of the premiums incurred by the employee-member.

64.     Health plans compete to be chosen by individuals and employers based on the provider configuration of their provider networks, on the amounts of their premiums, and on the customer's cost of using providers, among other factors.  Health plans in California compete by offering their actual and potential members access to a provider network that includes hospitals providing Inpatient Hospital Services close to their homes or place of work.

65.     There are no reasonable economic substitutes for the purchase of commercial health insurance by individuals or employees.  Purchasers of commercial health insurance would pay a small, but significant, non-transitory increase in price for such insurance from a hypothetical (or actual) monopolist of such insurance.

66.     Purchasing hospital services without commercial health insurance, rather than through a commercial health plan, is typically prohibitively expensive and is not a viable substitute for group or individual commercial health insurance.

67.     Health plans purchase Inpatient Hospital Services for the benefit of their members and include contracted access to such services as part of the commercial health insurance that they sell.  Accordingly, the downstream market for the sale of commercial health insurance is inextricably linked with the upstream market for the sale of Inpatient Hospital Services to health plans.  The following demonstrative shows the linked nature of the upstream market for the sale of Inpatient Hospital Services to commercial health plans and the downstream market for the sale of commercial health insurance.



ii.     *MSAs Are Relevant Geographic Markets for the Sale of Commercial Health
Insurance to Subscribers.*

68.     The markets for the sale of commercial health insurance to subscribers are roughly
congruent with the boundaries of Metropolitan Statistical Areas ("MSAs").  MSAs are areas defined
by the Office of Management and Budget (based on U.S. census data) for the purpose of economic
analysis.  Moreover, antitrust enforcers have asserted that markets for the sale of commercial
insurance to subscribers are MSA-wide.  In this case, there are six independent relevant geographic
markets for the sale of commercial health insurance to subscribers that are MSA-wide.  They are the
(1) Modesto MSA, (2) Sacramento-Roseville-Arden-Arcade MSA, (3) San Francisco-Oakland-
Fremont MSA, (4) Santa Rosa-Petaluma MSA, (5) Stockton MSA, and (6) Vallejo-Fairfield MSA.
(Each of these MSAs will be referred to as a "Health Plan MSA."  Collectively, they will be referred
to as the "Health Plan MSAs").

69.     Patients typically seek medical care close to their homes or workplaces.  Health plan members therefore strongly prefer health plans with networks of hospitals and physicians that are within the MSA where they work or live.

70.     Antitrust enforcers have previously recognized that the geographic scope of various commercial health insurance markets is MSA-wide.  *See, e.g.,* Competitive Impact Statement, *U.S. v. Blue Cross and Blue Shield of Montana*, No. 1:11-cv-00123-RFC, Dkt. No. 4 (D. Mont. Nov. 8, 2011).

71.     All of the Inpatient Hospital Services markets relevant to this case fall within the Health Plan MSAs.  The geographic boundaries of the downstream markets for the sale of commercial insurance are broader than the geographic scope of upstream markets for the sale of Inpatient Hospital Services to health plans.  This is because (i) health plans must supply their products to a broader array of consumers than those that live in a particular HSA in order to make their product offerings viable, and (ii) employers that obtain insurance for their employees must often obtain insurance that will cover individuals in an area broader than an HSA because of where their employees reside.

72.     **A relevant geographic market for the sale of commercial health insurance to subscribers is the Modesto MSA.**  The Modesto MSA includes Stanislaus County.  Consumers that reside in the Modesto MSA cannot practicably turn to commercial health plans that do not have a network of hospitals in the Modesto MSA.  Consequently, a small but significant increase in the price of commercial health insurance by a hypothetical (or actual) monopolist of same located in the Modesto MSA would not cause a sufficient number of consumers to switch to insurers located outside of the Modesto MSA to render such a price increase unprofitable.

73.     **A relevant geographic market for the sale of commercial health insurance to subscribers is the Sacramento-Roseville-Arden-Arcade MSA.**   The Sacramento-Roseville-Arden-Arcade MSA includes El Dorado, Sacramento, Yolo and Placer counties.  Consumers that reside in the Sacramento-Roseville-Arden-Arcade MSA cannot practicably turn to commercial health plans that do not have a network of hospitals in the Sacramento-Roseville-Arden-Arcade MSA.  Consequently, a small but significant increase in the price of commercial health insurance by

a hypothetical (or actual) monopolist of same located in the Sacramento-Roseville-Arden-Arcade MSA would not cause a sufficient number of consumers to switch to insurers located outside of the Sacramento-Roseville-Arden-Arcade MSA to render such a price increase unprofitable.

74.     **A relevant geographic market for the sale of commercial health insurance to subscribers is the San Francisco-Oakland-Fremont MSA.**   The San Francisco-Oakland-Fremont MSA includes the Alameda, Contra Costa, Marin, San Francisco, and San Mateo counties. Consumers that reside in the San Francisco-Oakland-Fremont MSA cannot practicably turn to commercial health plans that do not have a network of hospitals in the San Francisco-Oakland-Fremont MSA.  Consequently, a small but significant increase in the price of commercial health insurance by a hypothetical (or actual) monopolist of same located in the San Francisco-Oakland-Fremont MSA would not cause a sufficient number of consumers to switch to insurers located outside of the San Francisco-Oakland-Fremont MSA to render such a price increase unprofitable.

75.     **A relevant geographic market for the sale of commercial health insurance to subscribers is the Santa Rosa-Petaluma MSA.**   The Santa Rosa-Petaluma MSA includes Sonoma County.  Consumers that reside in Santa Rosa-Petaluma MSA cannot practicably turn to commercial health plans that do not have a network of hospitals in the Santa Rosa-Petaluma MSA. Consequently, a small but significant increase in the price of commercial health insurance by a hypothetical (or actual) monopolist of same located in the Santa Rosa-Petaluma MSA would not cause a sufficient number of consumers to switch to insurers located outside of the Santa Rosa-Petaluma MSA to render such a price increase unprofitable.

76.     **A relevant geographic market for the sale of commercial health insurance to subscribers is the Stockton MSA.**   The Stockton MSA includes San Joaquin County.  Consumers that reside in the Stockton MSA cannot practicably turn to commercial health plans that do not have a network of hospitals in the Stockton MSA.  Consequently, a small but significant increase in the price of commercial health insurance by a hypothetical (or actual) monopolist of same located in the Stockton MSA would not cause a sufficient number of consumers to switch to insurers located outside of the Stockton MSA to render such a price increase unprofitable.

77.     **A relevant geographic market for the sale of commercial health insurance to subscribers is the Vallejo-Fairfield MSA.**     The Vallejo-Fairfield MSA includes Solano County. Consumers that reside in the Vallejo-Fairfield MSA cannot practicably turn to commercial health plans that do not have a network of hospitals in the Vallejo-Fairfield MSA.  Consequently, a small but significant increase in the price of commercial health insurance by a hypothetical (or actual) monopolist of same located in the Vallejo-Fairfield MSA would not cause a sufficient number of consumers to switch to insurers located outside of the Vallejo-Fairfield MSA to render such a price increase unprofitable.

## VI.   MARKET POWER

78.     Sutter possesses and exercises market power in *each* of the Tying Markets for Inpatient Hospital Services.  This is demonstrated by the fact that Sutter wields a 100% share in each of the Tying Markets, other than San Leandro, based on publicly-available information on patient discharges and hospital beds from the Office of Statewide Health Planning and Development (OSHPD) (http://www.oshpd.ca.gov/).  With respect to the San Leandro Tying Market, Sutter wields an approximate 78% market share in terms of patient discharges or hospital beds.  These shares and the costs of entry in these relevant markets -- costs that are substantially heightened by Sutter's anticompetitive conduct -- demonstrate that Sutter has market power in the Tying Markets.

79.     There is also direct evidence of Sutter's market power in the Tying Markets.  For example, the prices that Sutter charges for hospital services in each of these markets is substantially higher than the prices charged by hospital competitors in Northern California.

80.     In 2004, CalPERS, the largest pension fund in the United States, noted in its Operations Summary (for the year ended June 30, 2004) that Sutter demanded 2005 **rates at least 50% higher** than other hospitals in its Northern California markets.  CalPERS' analysis was corroborated by another analysis performed by Blue Cross of California on behalf of CalPERS in 2004.  The analysis asks the question: How did the actual costs of claims of the many CalPERS plan participants differ at Sutter hospitals versus non-Sutter hospitals?  The answer stated that:

> The average cost of claims paid for CalPERS PPO Basic plan participants at Sutter hospitals is **73% greater** than the average cost of all other hospital claims paid on behalf of CalPERS PPO Basic plan participants in the State of California.

81.     Moreover, CalPERS' Health Benefits Committee observed the following regarding Sutter's prices: "Sutter Health is a huge outlier.  Its costs are 60% higher than its Northern California peers and 80% higher than the statewide average."  And an August 2010 analysis by *Bloomberg* also concluded that Sutter "***has market power that commands prices 40 to 70 percent higher than its rivals per typical procedure*** — and pacts with insurers that keep those prices secret."

82.     In March 2011, *The Los Angeles Times* conducted an analysis of state records and similarly concluded that "on average, hospitals in Northern California's six most populous counties collect 56% more revenue per patient per day from insurance companies and patients than hospitals in Southern California's six largest counties." Duke Helfand, *Hospital Stays Cost More in Northern California than in Southern California*, L.A. Times, Mar. 6, 2011, *available at* http://articles.latimes.com/2011/mar/06/business/la-fi-hospital-cost-20110306.

83.     Sutter executives have acknowledged the huge pricing power that it has attained over health plans.  In particular, Eugene Suksi, former CEO of Sutter Coast Hospital in Crescent City, California, noted that Sutter affiliated hospitals are able to charge 30% to 40% more than competing hospitals, solely due to being part of the Sutter system. That is, a Sutter hospital can price at a 30% to 40% premium as compared to an identical non-Sutter hospital in the same location due to the challenged contracts and other anticompetitive conduct described herein.

84.     A 2008 study from the FTC also verifies Sutter's pricing power in the relevant Inpatient Hospital Services Markets.  It considered that, within two years after Sutter merged Summit Hospital with its Alta-Bates hospital, Summit's charges rose between 29% and 72% more per hospital procedure than its hospital peers.

85.     Finally, Sutter's ability to impose the subject tying arrangements, anti-steering clauses, or supra-competitive rates upon health plans seeking to minimize medical costs, directly evidences Sutter's massive market power.

## VII.   HARM TO COMPETITION

### A.     Sutter Has Foreclosed Competition in Inpatient Hospital Services.

86.     Sutter's conduct has harmed competition.  In *each* of the Tied Markets, as a result of Sutter's conduct, Sutter hospitals offering Inpatient Hospital Services do not have to compete with

other hospitals for inclusion in commercial health plan networks.  This has distorted the normal competitive process -- a process that would have resulted in vastly different competitive outcomes absent Sutter's tying arrangements.

87.     In each of the Tied Markets, Sutter's conduct has caused hospitals that compete with Sutter to suffer substantial foreclosure, particularly by losing a substantial amount of patient-customers that they otherwise would have treated.  In a world where Sutter's tie would not force health plans to include Sutter facilities located in the Tied Markets in their networks, health plan members would have enjoyed greater financial incentives to visit non-Sutter hospitals.  In that world, health plan members would incur substantial "out of pocket" costs if they chose to be treated at a Sutter facility that was out of network.  Many of these members would have chosen to seek medical treatment at competitive non-Sutter facilities in the Tied Markets rather than pay these "out of pocket" costs in a world absent Sutter's anticompetitive conduct.

88.     Sutter's anti-steering provisions, in addition to the foreclosing impact of the Sutter ties, have caused competitive hospitals in the Tied Markets to lose patient volume.  As stated above, in a competitive market, health plans would not have been precluded from channeling, at least some (but far from all) of their patients, to lower-cost, quality network providers over Sutter.  In this regard, Sutter's forcing of these provisions upon health plans have harmed hospital competitors in the Tied Markets by causing quality non-Sutter providers to lose patient volume that they would have treated in a competitive market, notwithstanding that they charge much lower costs for Inpatient Hospital Services.

89.     Indeed, if not for Sutter's anticompetitive tying arrangements which force health plans to include higher-cost Sutter hospitals in their networks, health plans would have launched lower-cost "high performance" networks in the Tied Markets as they have elsewhere in the country.  These high performance networks -- which would have not included higher cost, Sutter hospitals -- would have been used as the networks for members that purchased lower-priced insurance products.  Accordingly, but for Sutter's anticompetitive conduct, a substantial amount of health plan members would have frequented the lower-cost hospitals in high performance networks, as opposed to Sutter

hospitals, and these lower-cost hospitals would have treated substantially more patients than they otherwise did.  All of this foreclosure was caused by Sutter's tying arrangements.

90.     Sutter's foreclosure of competition in each of the Tied Markets is likely to lead to Sutter's accrual of market power in these markets, particularly when one considers the market shares of Inpatient Hospital Services that Sutter has already acquired.  According to patient discharge data, Sutter currently accounts for an approximate 50% share in the Modesta HSA and about 35% share in each of the Oakland, San Francisco, Sacramento and Santa Rosa HSAs.

91.     Sutter's tying arrangement and anti-steering provisions have also foreclosed substantial commerce in each of the Tying Markets for Inpatient Hospital Services.  But for these provisions, hospitals would have much greater ability and incentive to open competitive facilities in the Tying Market.  With these provisions in force -- provisions that ensure that patients are directed towards Sutter hospitals rather than any potential competitors -- the proposition for opening a competing hospital in these markets loses its viability.  But for these provisions, it is likely that other hospital systems would have opened facilities in the Tying Markets.

**B.     Sutter's Anti-Competitive Conduct Has Raised Prices For Medical Care.**

92.     Sutter's anticompetitive practices have also permitted Sutter to reap supra-competitive charges in both the Tying and Tied Markets.

93.     The fact that the entire cost of medical procedures are opaque to patient-health plan members and that these costs are spread throughout a health plan's member base exacerbates the anticompetitive impact of Sutter's tying arrangement.  Because consumers may choose any "in network" provider in a health plan for treatment (without paying any "out of pocket" costs other than co-insurance payments), some irreducible number of health plan members will choose a particular network provider for treatment even if that provider is higher-priced.  (This will occur, regardless of whether anti-steering provisions, such as Sutter's, are included in certain health plan contracts.) Accordingly, a tying arrangement, such as those employed by Sutter, in and of itself causes higher prices for medical services to be incurred by health plans.

94.     In each of the Tying Markets, these practices have facilitated supra-competitive prices by ensuring that Sutter's hospital monopolies are not challenged.  Moreover, the "all or nothing"

provisions in the Sutter/health plan contracts ensure that all of the hospitals in the various Tying

Markets are included in health plan networks even if those health plans would have otherwise

chosen to not include them.

95.     In each of the Tied Markets, Sutter's anticompetitive practices have allowed Sutter to

charge supra-competitive rates for Inpatient Hospital Services through Sutter's forcing power.

Sutter would not have been able to charge these rates in these markets without the tying

arrangements in question.  The aforementioned July 2012 report by CALPIRG evidences how

Sutter's forcing has caused higher prices for Inpatient Hospital Services.  It states that:

> In California, for example, Sutter Health has two dozen facilities in northern
> California, and ***it negotiates prices with insurers on an "all or none" basis***.
> In a city where Sutter Health represents a large share of the market it can
> command a higher price from insurers, and ***then by negotiating a
> systemwide contract it can impose higher rates at all its hospitals***.

(Emphasis supplied).

96.     The fact that Sutter's economic forcing has caused higher Inpatient Hospital Services

rates is also confirmed by the March 2011 article from the *L.A. Times* referenced above.  It details

statements by health plan executives that reference the byproduct of Sutter's forcing:  *"Insurance*

companies say that Sutter Health's size and **dominant position in many local markets give it the**

**upper hand in contract negotiations over prices and which of its hospitals are included in the**

**insurers' networks**."  (Emphasis supplied).

97.     The December 3, 2013 *New York Times* article referenced herein also confirmed that

Sutter's anticompetitive tactics has resulted in artificially high prices in the Tied Markets.  It notes

that, for example, prices "for many procedures" at Sutter's California Pacific Medical Center in San

Francisco "are among the top 20 percent in the country."   That article also notes that a substantial

hospital competitor of Sutter in San Francisco -- the University of California San Francisco --

"charges far less per day" for hospital services than Sutter does in San Francisco, particularly when

the greater severity of illnesses of patients is factored in.

98.     The referenced *New York Times* article also notes – by referring to comments by

Professor Glenn Melnick of USC -- how Sutter's higher prices have caused other hospitals in the

relevant markets to increase prices for Inpatient Hospital Services.  It states that the "high prices"

that Sutter has charged "have had a ripple effect across Northern California, allowing smaller hospitals to charge more as well."  These higher prices -- permitted by virtue of the Sutter pricing umbrella -- have increased the prices for Inpatient Hospital Services purchased by commercial health plans.

### C.    Sutter Has Harmed the Quality of Patient Care.

99.    Sutter's  anticompetitive practices have also caused the quality of patient care to suffer in the relevant market for Inpatient Hospital Services.  As a result of these anticompetitive practices which force Sutter hospitals upon health plans, Sutter's network does not compete on quality any more than it competes on price.  Consequently, the quality of patient care that Sutter offers is not as high as it would have been in a market where Sutter had to compete for entry into health plan provider networks.  This lack of a competitive impetus has led to, as stated by the California Health Care Coalition in an April 2005 report, a "quality of care [which] is a highly inconsistent within and across Sutter facilities."

100.    The California Health Care Coalition, indeed, went on to document the poor state of patient care at various Sutter hospitals in that report.  It stated that:

> Three of Sutter Health's nine Bay Area hospitals have so seriously violated national standards as to jeopardize either their participation in the Medicare or Medicaid programs or their accreditation as a health care organization. Other data also show serious quality deficiencies: Sutter Health Sacramento's General campus ranked in the bottom half of reporting hospitals nationally on eight of ten hospital performance indicators developed by the Centers for Medicare and Medicaid services while Sutter Health's Memorial Hospital in Modesto has higher than expected mortality rates in 6 of 16 procedures analyzed.

### D.    Plaintiffs and Class Members Have Been Overcharged for Health Insurance Premiums and Out-of-Pocket Costs.

101.    The higher costs for Inpatient Hospital Services that have been foisted upon health plans -- including Anthem Blue Cross, Aetna, Blue Shield, Regence Blue Cross Blue Shield, and Premera Blue Cross -- via Sutter's distortions of competition have been passed downstream to the health plan members residing in the relevant downstream markets for commercial health insurance as part of the premiums that they pay for their health insurance products.  Plaintiffs, in particular, have paid overcharges for the premiums that they paid for health insurance as a result of Sutter's

anticompetitive actions.  Accordingly, plaintiffs and the Class members that they seek to represent have incurred antitrust injury.

102.    In this regard, *The L.A. Times* identified in March 2011 that Aetna "charges customers in Northern California about 30% more in premiums than those in Southern California as a result of higher hospital reimbursements in the north."  It also identified that Blue Shield "says it charges up to 40% more for insurance in" Northern, as opposed to Southern California, due to the higher medical costs that it pays for services in Northern California.  As stated above, these health and other plans have paid more for medical costs in Northern California than they do in Southern California because of Sutter's anticompetitive conduct.

103.    Indeed, Sutter's monopolistic conduct has been successful, in part, due to the passing on of higher medical costs to health plan members and the spreading of such higher costs to the entire health plan member base.  As noted by Clark Havighurst and Barak Richman in their paper, "The Provider Monopoly Problem in Health Care":

> In health care, insurance puts the monopolist in an even stronger position by greatly weakening the constraint on its pricing freedom ordinarily imposed by the limits of consumers' willingness or ability to pay. . . . The extraordinary profits that health insurance makes available to powerful sellers are earned mostly at the expense not of direct purchasers — insurers or patients — but of consumers bearing the cost of insurance.

> [H]ealth insurance enables a monopolist of a covered service to charge substantially more than the textbook "monopoly price," thus earning even more than the usual "monopoly profit."

Clark C. Havighurst & Barak D. Richman, "The Provider Monopoly Problem in Health Care," 89 OR. L. REV. 847, 862–63 (2011), *available at*

http://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=2905&context=faculty_scholarship.

104.    Plaintiffs and Class members have also paid higher deductibles and co-payments for medical care from Sutter facilities as a result of Sutter's anticompetitive conduct, causing additional antitrust injury.

## VIII.   CLASS ALLEGATIONS

105.    Plaintiffs bring this action as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure for violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, the

Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*  The Rule(b)(3) Class is comprised of the following:

> Any person in the six relevant commercial health insurance markets who during all or part of the period beginning September 17, 2008 to the present was or is enrolled in a licensed health plan offered by Anthem Blue Cross, Aetna, Blue Shield, Regence Blue Cross Blue Shield and Premera Blue Cross.

106.    Excluded from this Class, are Sutter, its subsidiaries, affiliates, officers, directors, employees, legal representatives, heirs or assigns, and co-conspirators.  Also excluded are any federal governmental entities, any judicial officers presiding over this action and the members of his or her immediate family and judicial staff, and any juror assigned to this action.

107.    Subject to additional information obtained through further investigation, this class definition may be expanded or narrowed by amendment.

108.    Plaintiffs also bring this action under Rule 23(b)(2) for the same violations of federal and state law alleged for the (b)(3) Class.  The Rule 23(b)(2) Class includes all members of the Rule (b)(3) Class, and all consumers who are threatened with injury by the violations alleged herein.

109.    Sutter has acted, continues to act, refuses to act and continues to refuse to act on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.  The Rule (b)(2) Class does not include defendants or their co-conspirators.

110.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable.  While the exact number of Class members is unknown to plaintiffs, it is believed to be in the hundreds of thousands.  Furthermore, the Class is readily identifiable from information and records in Sutter's and commercial health insurers' possession.

111.    Questions of law and fact common to members of the Class predominate over questions that may affect only individual Class members because Sutter has acted on grounds generally applicable to the Class.  Among the common questions of fact are:

> *i.*    whether Sutter entered into tying arrangements that unreasonably restrain trade in the relevant markets for the sale of Inpatient Hospital Services to commercial health plans;
>
> *ii.*    whether Sutter tied the purchase by health plans of Inpatient Hospital Services

supplied by Sutter in the Tying Markets to the purchase of Inpatient Hospital Services supplied by Sutter in the Tied Markets;

*iii.*    whether Sutter willfully established, maintained and extended unlawful monopolies in the relevant markets;

*iv.*    the existence and duration of Sutter's anticompetitive conduct;

*v.*    whether Sutter's anticompetitive conduct foreclosed competition in the relevant markets;

*vi.*    whether Sutter's anticompetitive conduct caused insurance premiums and/or co-insurance payment to be higher than they would have been but for its conduct; and

*vii.*    whether plaintiffs and other Class members have been harmed by higher insurance premiums and/or co-insurance payments as a result of Sutter's conduct, and, if so, the quantum of such damages.

112.    Sutter's anticompetitive conduct resulted in artificially inflated prices for Inpatient Hospital Services, which impacted all members of the Class in the form of higher premiums and co-insurance payments.

113.    Plaintiffs are members of the Class and plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all Class members were damaged by the same conduct, i.e., they all paid artificially inflated insurance premiums and co-insurance payments.

114.    Plaintiffs have no conflict of interest with Class members.  Counsel competent and experienced in federal class action and antitrust litigation has been retained to represent the Class.

115.    A class action is superior to any other method for the fair and efficient adjudication of this matter.  Joinder of all members is not practicable.  The damages suffered by individual members are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for Class members to seek redress on an individual basis for Sutter's wrongful conduct. Class treatment will permit a large number of similarly situated persons or entities to prosecute their claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

## IX.    CLAIMS FOR RELIEF

### A.    First Claim – Section 1 Unlawful Tying (*Per Se* or Rule of Reason)

116.    Plaintiffs repeat and reallege each and every allegation of this complaint as if fully set forth herein.

117.    Sutter has continually engaged in unlawful contracts and agreements in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, including forced and coerced contracts and agreements with commercial health plans forcing them to include all, or no, Sutter hospitals in their networks.

118.    These contracts and agreements have consisted of forced arrangements with health plans, the substantial terms of which have been to condition the inclusion of any Inpatient Hospital Services that Sutter has supplied in the Tying Markets, on the inclusion of the separate, distinct and higher-priced Inpatient Hospital Services that Sutter has supplied in the Tied Markets.

119.    At all times Sutter has had market power to force insurers to include Sutter hospitals in the Tying Markets and Tied Markets in their networks.

120.    The continued use of Sutter's tying arrangements achieves no legitimate efficiency benefits to counterbalance their demonstrated anticompetitive effects, including the foreclosure of competition from non-Sutter hospitals.

121.    Commercial health plans were forced to purchase and include in their networks Sutter Inpatient Hospital Services at supra-competitive prices.

122.    The ability of health plans to have their members utilize lower-cost non-Sutter Inpatient Hospital Services has been foreclosed by the subject tying arrangements.

123.    The ability of non-Sutter hospitals to compete effectively with Sutter, on the merits, has been substantially reduced, limited and foreclosed by the subject tying arrangements.

124.    As a result of Sutter's violation of Section 1, plaintiffs and Class members have been injured in their business and property in an amount not presently known with precision but which is, at minimum, hundreds of millions of dollars prior to trebling.

**B.    Second Claim – Section 1 Course of Conduct**

125.    Plaintiffs repeat and reallege each and every allegation of this complaint as if fully set forth herein.

126.    Sutter has continually engaged in unlawful contracts and agreements in unreasonable restraint of interstate trade and commerce, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, including forced and coerced contracts and agreements with commercial health plans (i) tying the purchase of Inpatient Hospital Services supplied by Sutter in the Tying Markets to Inpatient Hospital Services supplied by Sutter in the Tied Markets, and (ii) requiring health plans to steer their members away from lower-priced hospitals and to higher-priced Sutter hospitals, and imposing financial penalties for failing to do same.  The referenced anti-steering provisions reinforce and exacerbate the effects of Sutter's tying arrangements.

127.    At all times Sutter has had market power to force health plans to (i) forego steering patients away from lower-priced hospitals, and steer to higher-priced Sutter hospitals and (ii) succumb to its tying arrangements.

128.    The continued use of the anti-steering provisions, in addition to Sutter's tying arrangements, achieves no legitimate efficiency benefits to counterbalance their demonstrated anticompetitive effects, including the foreclosure of competition from non-Sutter hospitals.

129.    The commercial insurers were forced to steer their members away from low-priced hospitals and to higher-priced Sutter hospitals, which, in conjunction with Sutter's tying arrangement, raised the prices of Sutter Inpatient Hospital Services to supra-competitive levels.  The ability of health plans to have their members utilize lower-cost, non-Sutter Inpatient Hospital Services has been foreclosed.

130.    The ability of non-Sutter hospitals to compete effectively with Sutter, on the merits, has been substantially reduced, limited and foreclosed.

131.    As a result of Sutter's violation of Section 1, plaintiffs and Class members have been injured in their business and property in an amount not presently known with precision but which is, at minimum, hundreds of millions of dollars prior to trebling.

C.    **Third Claim – Violation of the Cartwright Act**

132.    Plaintiffs repeat and reallege each and every allegation of this complaint as if fully set forth herein.

133.    Sutter has continually engaged in an unlawful contracts and agreements in unreasonable restraint of interstate trade and commerce, in violation of the Cartwright Act, including forced and coerced contracts and agreements with commercial health plans requiring them to include all, or no, Sutter hospitals in their networks.

134.    The contracts have consisted of forced agreements with commercial health plans, the substantial terms of which have been to condition the inclusion of any Inpatient Hospital Services supplied by Sutter in the Tying Markets, on the inclusion of separate and distinct Inpatient Hospital Services supplied by Sutter in the Tied Markets.

135.    At all times Sutter has had substantial market power to force health plans to include in their networks Sutter's Inpatient Hospital Services in the Tying Markets and Tied Markets.

136.    Sutter's conduct has also consisted of the imposition, in addition to the tying arrangement, of anti-steering provisions in certain health plan contracts that preclude health plans from steering patients to lower-cost hospital options.

137.    The tying arrangements imposed by Sutter have caused substantial anticompetitive impact.  The anticompetitive impacts of Sutter's tying arrangements have been reinforced and exacerbated by the anti-steering provisions that Sutter has imposed upon commercial health insurers.

138.    Commercial health plans, by virtue of Sutter's conduct, have been forced to include in their networks Sutter Inpatient Hospital Services at supra-competitive prices and to pay higher prices for Sutter's Inpatient Hospital Services.  Those higher prices were then passed on to plaintiffs and Class members.

139.    Sutter has also, as described below, maintained its monopolies in the relevant Tying Markets and attempted to monopolize the relevant Tied Markets by virtue of its exclusionary conduct in violation of the Cartwright Act.

140.    The ability of health plans to have their members utilize lower-cost non-Sutter Inpatient Hospital Services has been foreclosed.

141.    The ability of non-Sutter hospitals to compete effectively with Sutter on the merits has been substantially reduced, limited and foreclosed by Sutter's tying arrangements.

142.    Sutter's actions achieve no legitimate efficiency benefits to counterbalance their demonstrated anticompetitive effects, including the foreclosure of competition from non-Sutter hospitals.

143.    As a result of Sutter's violation of the Cartwright Act, plaintiffs and Class members have been injured in their business and property in an amount not presently known with precision but which is, at minimum, hundreds of millions of dollars prior to trebling.

**D.    Fourth Claim – Section 2 Monopolization**

144.    Plaintiffs repeat and reallege each and every allegation of this complaint as if fully set forth herein.

145.    In violation of Section 2 of the Sherman Act, 15, U.S.C. § 2, Sutter has acquired, enhanced and maintained its monopoly power over Inpatient Hospital Services in the Tying Markets.

146.    Sutter's monopolization of the Tying Markets has been effectuated by overt exclusionary acts, including forcing acceptance of its "all or nothing" terms upon health plans and forcing health plans to steer patients away from lower-priced hospitals to higher-priced Sutter hospitals upon threat of financial penalties.

147.    Sutter has had monopoly power in the Tying Markets.  Sutter has power over the price of Inpatient Hospital Services and the ability to foreclose hospital competition substantially in these markets.  At all times relevant to this action, Sutter has had monopoly power to force insurers to include in their networks all Sutter hospitals and steer patients to them.  Sutter also has dominant market shares in the relevant markets.

148.    Sutter's exclusionary practices achieve no legitimate efficiency benefits to counterbalance their demonstrated anticompetitive effects, including the foreclosure of competition from non-Sutter hospitals.

149.    Health plans were forced to purchase and include in their networks Sutter Inpatient Hospital Services at supra-competitive prices.  Sutter's exclusionary conduct has foreclosed hospital competition in the Tying Markets.

150.    As a result of Sutter's violation of Section 2, plaintiffs and Class members have been injured in their business and property in an amount not presently known with precision but which is, at minimum, hundreds of millions of dollars prior to trebling.

### E.    Fifth Claim  – Section 2 Attempted Monopolization

151.    Plaintiffs repeat and reallege each and every allegation of this complaint as if fully set forth herein.

152.    In violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Sutter has willfully, knowingly and with specific intent to do so, attempted to monopolize the Tied Markets.

153.    This attempt to monopolize the Tied Markets has been effectuated by overt exclusionary acts, including forcing acceptance of its "all or nothing" terms upon health plans and forcing health plans to steer patients away from  lower-priced hospitals to higher-priced Sutter hospitals upon threat of financial penalties.

154.    There exists a dangerous probability that Sutter will monopolize the Tied Markets as a result of these overt acts.

155.    Sutter's exclusionary practices achieve no legitimate efficiency benefits to counterbalance their demonstrated anticompetitive effects, including the foreclosure of competition from non-Sutter hospitals.

156.    Health plans were forced to purchase and include in their networks Sutter Inpatient Hospital Services at supra-competitive prices.

157.    Sutter's exclusionary conduct has foreclosed hospital competition in the Tied Markets.

158.    As a result of Sutter's violation of Section 2, plaintiffs and Class members have been injured in their business and property in an amount not presently known with precision but which is, at minimum, hundreds of millions of dollars prior to trebling.

### F.    Sixth Claim -- Violation of California Unfair Competition Law ("UCL") Section 17200

159.    Plaintiffs repeat and reallege each and every allegation of this complaint as if fully set forth herein.

160.    Sutter has engaged in unlawful business acts or practices within the meaning of Section 17200 of the UCL, including forcing upon commercial insurers contract provisions that require them to include all, or no, Sutter hospitals in their networks, and steer patients to Sutter hospitals upon threat of financial penalties.  Such conduct is ongoing and continues to date.

161.    Sutter's unfair business practices cause substantial economic injury to plaintiffs and Class members in an amount not presently known with precision but which is, at minimum, hundreds of millions of dollars.

162.    Such unlawful or unfair business practices are continuing and will continue unless relief enjoining these practices is granted under Section 17204 of the UCL.  Plaintiffs and Class members have no adequate remedy at law.

## X.    PRAYER FOR RELIEF

WHEREFORE, the Class requests the following relief:

    *i.*    That the Court declare, adjudge and decree that defendants have committed the violations of the Sherman Act, Cartwright Act and the UCL alleged herein;

    *ii.*    That the Court determine that plaintiffs' Sherman Act, Cartwright Act and the UCL claims may be maintained as a class action under Rule 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure;

    *iii.*    That Sutter, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein, or conduct having a similar purpose or effect;

    *iv.*    That the Court enter an order enjoining Sutter from continuing to implement its "all or nothing" terms, and tying and anti-steering arrangements, or contracts or agreements having a similar purpose or effect alleged herein;

    *ii.*    That Sutter provide Class members, in an amount to be proven at trial, to be trebled according to law, plus interest -- including prejudgment interest -- to compensate them for the overcharges they incurred from Sutter's violations of the federal and state antitrust laws;

    *i.*    That Sutter provide Class members with restitution for the overcharges that were extracted by violating the California Unfair Competition Law;

    *ii.*    That plaintiffs and Class members recover their cost of suit, and such other

and further relief as this Court may deem just and proper.

## XI.    DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

DATED:  December 9, 2013

/s/ MATTHEW L. CANTOR
MATTHEW L. CANTOR (admitted *phv*)
AXEL BERNABE (admitted *phv*)
JEAN KIM (admitted *phv*)
CONSTANTINE CANNON LLP
335 Madison Avenue
New York, NY 10017
(212) 350-2738
(212) 350-2701 (fax)
mcantor@constantinecanon.com
abernabe@constantinecannon.com
jkim@constantinecannon.com

*Lead Counsel for Plaintiffs*

AZRA Z. MEHDI (220406)
ARCELIA L. HURTADO (191481)
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
(415) 293-8039
(415) 293-8001 (fax)
azram@themehdifirm.com
ahurtado@themehdifirm.com

*Co-Lead Counsel for Plaintiffs*

DAVID C. BROWNSTEIN (141929)
FARMER BROWNSTEIN JAEGER LLP
235 Pine Street, Suite 1300
San Francisco, CA 94104
(415) 795-2050
(415) 520-5678 (fax)
dbrownstein@fbj-law.com

ALLAN STEYER (100318)
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111
(415) 421-3400
(415) 421-2234 (fax)
asteyer@steyerlaw.com

*Additional Co-Lead Counsel for Plaintiffs*