Jeffrey A. LeVee (State Bar No. 125863)
jlevee@JonesDay.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA  90071
Telephone:     213.489.3939
Facsimile:     213.243.2539

David C. Kiernan (State Bar No. 215335)
dkiernan@JonesDay.com
Lin W. Kahn (State Bar No. 261387)
linkahn@JonesDay.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     415.626.3939
Facsimile:     415.875.5700

Attorneys for Defendant
SUTTER HEALTH

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DJENEBA SIDIBE, DIANE DEWEY, and JERRY JANKOWSKI on Behalf of Themselves and All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>v.<br><br>SUTTER HEALTH,<br><br>                              Defendant. | Case No. 3:12-CV-04854-LB<br><br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANT SUTTER HEALTH TO DISMISS THIRD AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6); MEMORANDUM OF POINT AND AUTHORITIES**<br><br>**Date:   March 6, 2014**<br>**Time:  9:30 a.m.**<br>**The Honorable Laurel Beeler** |

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

THE THREE COMPLAINTS ......................................................................................... 2

ARGUMENT ................................................................................................................... 4

I.      THE THIRD AMENDED COMPLAINT DOES NOT ALLEGE CLAIMS
        UNDER SHERMAN ACT SECTION 1 OR THE CARTWRIGHT ACT ........... 5

        A.      The TAC Again Fails to Allege That The "Tying" Has Caused
                Anticompetitive Effects in the Tied Product Markets............................... 5

        B.      The Court Has Already Rejected Plaintiffs' Allegations Regarding
                The So-Called "Anti-Steering" Language ................................................... 8

        C.      Plaintiffs Lack Standing To Pursue Damages Claims Under
                Sherman Act Sections 1 and 2 ................................................................. 11

II.     THE THIRD AMENDED COMPLAINT DOES NOT ALLEGE
        PLAUSIBLE GEOGRAPHIC MARKETS ........................................................ 12

        A.      The Relevant Geographic Market Must Be Defined As Where
                Consumers Could Go, Not Merely Where They Do Go, To Receive
                Hospital Services...................................................................................... 13

        B.      Plaintiffs Do Not Attempt To Define The Relevant Geographic
                Market Properly, And Their Reference To Dartmouth "HSAs" Is
                Not Plausible As A Matter of Law............................................................ 16

        C.      Plaintiffs' Failure To Define A Proper Relevant Geographic Market
                Again Warrants Dismissal At The Rule 12 Stage...................................... 21

III.    THE THIRD AMENDED COMPLAINT DOES NOT ALLEGE
        PLAUSIBLE MONOPOLIZATION CLAIMS .................................................. 21

IV.     THE UCL CLAIM SHOULD BE DISMISSED.................................................. 23

CONCLUSION ............................................................................................................. 23

1

## TABLE OF AUTHORITIES

2

3                                                                             **Page**

**CASES**

4

5 *Austin v. Blue Cross & Blue Shield of Alabama*,
    903 F.2d 1385 (11th Cir. 1990) ............................................................................. 12

6 *Barry v. Blue Cross of Cal.*,
7     805 F.2d 866 (9th Cir. 1986) .................................................................................. 9

8 *Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................. 4

9 *Branch v. Tunnell*,
10     14 F.3d 449 (9th Cir. 1994) ................................................................................... 17

11 *Campos v. Ticketmaster Corp.*,
12     140 F.3d 1166 (8th Cir. 1998) ............................................................................... 12

13 *Cascade Health Solutions v. PeaceHealth*,
    502 F.3d 895 (9th Cir. 2007) ................................................................................. 14

14 *Cascade Health Solutions v. PeaceHealth*,
15     515 F. 3d 883 (9th Cir. 2008) ................................................................................ 22

16 *Conwood Co. v. U.S. Tobacco Co.*,
17     290 F.3d 768 (6th Cir. 2002) ................................................................................. 7

18 *Del. Valley Surgical Supply v. Johnson & Johnson*,
    523 F.3d 1116 (9th Cir. 2008) ........................................................................... 11, 12

19 *Forsyth v. Humana, Inc.*,
20     114 F.3d 1467 (9th Cir. 1997) ............................................................................... 14

21 *FTC v. Butterworth Health Corp.*,
22     946 F. Supp. 1285 (W.D. Mich. 1996) ................................................................... 15

23 *FTC v. Freeman Hosp.*,
    69 F.3d 260 (8th Cir. 1995) ................................................................................... 15

24 *FTC v. ProMedica Health Sys., Inc.*,
25     No. 3:11 CV 47, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ............................. 15

26 *FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ............................................................................... 15

27

28 *Griffin v. Dugger*,
    823 F.2d 1476 (11th Cir. 1987) ............................................................................. 12

*Ice Cream Distribs. of Evansville, LLC v. Dryer's Grand Ice Cream, Inc.*,
  No. 09-5815 CW, 2010 WL 2198200 (N.D. Cal. May 28, 2010) ........................................... 6

*Ill. Brick v. Illinois*,
  431 U.S. 720 (1977) ............................................................................................................... 11

*In re Ebay Seller Antitrust Litig.*,
  545 F. Supp. 2d 1027 (N.D. Cal. 2008) ................................................................................... 5

*In re Webkinz Antitrust Litig.*,
  695 F. Supp. 2d 987 (N.D. Cal. 2010) ................................................................................. 7, 8

*In re Webkinz*,
  C08-1897 RS, 2010 WL 4168845 (N.D. Cal. Oct. 20, 2010) ............................................ 5, 7, 8

*Ind. Grocery v. Super Valu Stores*,
  864 F.2d 1409 (7th Cir. 1989) ............................................................................................... 23

*Kansas v. UtiliCorp United Inc.*,
  497 U.S. 199 (1990) ............................................................................................................... 11

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) ............................................................................................... 17

*Marder v. Lopez*,
  450 F.3d 445 (9th Cir. 2006) ................................................................................................. 17

*Morganstern v. Wilson*,
  29 F.3d 1291 (8th Cir. 1994) ................................................................................................. 15

*Person v. Google, Inc.*,
  No. C 06-7297 JF (RS), 2007 WL 832941 (N.D. Cal. 2007) ................................................ 21

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
  658 F. Supp. 2d 299 (D. Mass. 2009) .................................................................................... 12

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) .................................................................................................. 13

*Rutman Wine Co. v. E. & J. Gallo Winery*,
  829 F.2d 729 (9th Cir. 1987) ................................................................................................... 1

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) ................................................................................................. 11

*Spectrum Sports v. McQuillan*,
  506 U.S. 447 (1993) ............................................................................................................... 22

*State of California v. Sutter Health*,
  130 F. Supp. 2d 1109 (N.D. Ca. 2001) ........................................................................... passim

iii

*Surgical Care Ctr. v. Hosp. Servs. Dist.*,
    309 F. 3d 836 (5th Cir. 2002) ................................................................................ 17

*U.S. Anchor Mfg. Co. v. Rule Indus.*,
    7 F.3d 986 (11 Cir. 1993) ..................................................................................... 23

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3rd Cir. 2005) .................................................................................. 7

*United States v. Mercy Health Servs.*,
    902 F. Supp. 968 (N.D. Ia., 1995) ......................................................................... 15

*Universal Grading Serv. v. eBay, Inc.*,
    No. C-09-2755 RMW, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012) ........................... 21

## STATUTES

Rule 12 ...................................................................................................... 12, 21

## OTHER AUTHORITIES

76 Fed. Reg. at 67027 .............................................................................. 10, 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

Plaintiffs initiated this litigation on September 17, 2012.  On June 3, 2013, the Court dismissed the First Amended Complaint.  On November 7, 2013, the Court dismissed the Second Amended Complaint.  Both dismissals were based on plaintiffs' failure to allege:  (i) a plausible relevant antitrust market; (ii) facts to support a claim of unlawful tying; and (iii) predicate acts to support claims for unlawful monopolization.  The Third Amended Complaint ("TAC") asserts the same claims as its predecessors based on the exact same language that plaintiffs allege to exist in Sutter's contracts with health plans.  The question is whether the TAC satisfactorily addresses the deficiencies that caused the Court to dismiss the two prior complaints.  The answer undoubtedly is "no."

The TAC actually contains *fewer* allegations on the key issues that caused the Court to dismiss the previous complaints.  In particular:  (i) plaintiffs still have not attempted to allege anticompetitive effects in the "tied" product markets; (ii) plaintiffs do not attempt to allege a relevant geographic market that is consistent with the numerous antitrust cases in the healthcare industry, instead proposing to define the geographic market based on a "Dartmouth" methodology that has never been cited by any court for any purpose, much less for defining a relevant geographic market in an antitrust case; and (iii) plaintiffs do not allege any facts in support of their monopolization and attempted monopolization claims.

At the November 7, 2013 hearing on the motion to dismiss the Second Amended Complaint, the Court made it clear that plaintiffs would have one last chance to attempt to state a claim.  When the Court dismisses the TAC, as Sutter urges via this motion, the dismissal should be with prejudice.[1]

---

[1] *See Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) (affirming denial of leave to amend where "[t]he district court's written order identified the defects in the First Amended Complaint and then permitted [plaintiffs] to amend its complaint" but the "Second Amended Complaint did not cure the deficiencies").

1

**THE THREE COMPLAINTS**

A. <u>The First Amended Complaint</u>

The First Amended Complaint (ECF 11) was 68 pages long and alleged that Sutter had entered into unlawful tying agreements with health plans that required the health plans to include all Sutter hospitals and physicians in the health plans' networks via so-called "all-or-nothing" language.  (FAC ¶¶ 60-61.)  The FAC also alleged that Sutter requires health plans to "actively encourage" the health plan members to use Sutter providers.  (FAC ¶ 92.)  The FAC asserted claims for unlawful tying, exclusive dealing, monopolization, and state law claims.

In its order dismissing the FAC (ECF 34), the Court determined that plaintiffs had standing to assert claims for injunctive relief under the Sherman Act (June 3 Order at 19) and "likely" would have standing to assert Cartwright Act claims.  (*Id*. at 23.)  However, the Court dismissed the exclusive dealing allegations, finding that the "actively encourage" language was consistent with managed care (*id*.), and that the allegations "do not show substantial foreclosure or a requirement to purchase services only from service providers with an exclusive contract." (*Id*. at 20.)  The Court likewise dismissed the tying allegations, finding that the "tying allegations – contracting with one Sutter provider requires contracting with other Sutter providers – do not allege a requirement that patients can only choose Sutter providers, and the complaint alleges no facts about anticompetitive effect in the form of, for example, an effect on more than an insubstantial volume of commerce. . . .  Plaintiffs allege that Sutter's conduct 'destroys' and 'stifles' competition, and 'dramatically increased price[s]', but these allegations are conclusory." (*Id*. at 20.)  As to plaintiffs' proposed geographic market – consisting of 22 counties where Sutter provides services – the Court found that, "[e]ven assuming that some kind of 22-county regional geographic market could be established for managed care through health plans (which is all that Plaintiffs have alleged), Plaintiffs do not allege facts showing Sutter's market power either in the entire region or in particular counties."  (*Id*. at 22.)

B. <u>The Second Amended Complaint</u>

The thrust of the 65-page Second Amended Complaint (ECF 37) was that Sutter had unlawfully "tied" the sale of inpatient hospital services to the sale of both other inpatient hospital

services and the sale of physician services.  The SAC quoted the same alleged "all-or-nothing" language and the same "actively encourage" language as quoted in the FAC.  (SAC ¶¶ 9, 43, 52.) In addition to tying the sale of "inpatient hospital services" at certain Sutter hospitals to the sale of "inpatient hospital services" at other Sutter hospitals, the SAC alleged that Sutter had tied the sale of "inpatient hospital services" to the sale of "Specialty Provider Services," primarily physicians.  (SAC ¶¶ 59-61.)  The SAC alleged multiple geographic markets, including "local" markets (SAC ¶ 67), markets based on several counties (SAC ¶¶ 68-71), "Linked Geographic Markets" (SAC ¶ 74), and two large Metropolitan Statistical Areas covering 16 California counties (SAC ¶ 76).

In its November 7 Order dismissing the SAC (ECF 64), the Court again quoted the "all-or-nothing" language and the "actively encourage" language (*id*. at 4-5), again explaining that the language is insufficient to support a tying claim (*id*. at 23), and then proceeded to dismiss all of plaintiffs' claims.  The Court held that plaintiffs had not plausibly defined the relevant geographic market, that the tied product market allegations were implausible, that plaintiffs had failed to allege anticompetitive effects in the tied product market, and that plaintiffs had not adequately alleged monopolization claims.  The Court noted that "Plaintiffs have abandoned many allegations in the SAC and essentially posit a third amended complaint in the opposition." (*Id*. at 24.)  Over Sutter's objections, the Court's dismissal was with leave to amend.

C.  The Third Amended Complaint

Rather than pursuing the "theoretical third amended complaint" that formed the basis for plaintiffs' opposition to Sutter's motion to dismiss the SAC, the TAC does not contain any allegations regarding Sutter's physicians or any "outpatient surgical markets."  The TAC likewise abandons the various theories of the relevant geographic market that were included in the SAC and in the opposition to Sutter's motion to dismiss.  Instead, the 41-page TAC retreats to asserting claims that are extremely similar to the FAC and are based entirely on the "all-or-nothing" and "actively encourage" language (the latter of which plaintiffs now refer to as "anti-steering"[2]

---

[2] To be clear, the so-called "anti-steering" language is actually just "steering," not "anti" steering.  As discussed herein, the language requires health plans to urge patients to stay "in network" either at Sutter providers or at other providers.

language).  Plaintiffs allege (as they did in the FAC and SAC) that Sutter has tied the sale of inpatient hospital services at certain Sutter hospitals to the sale of inpatient hospital services at other Sutter hospitals.  The new wrinkle in the TAC is the use of *The Dartmouth Atlas of Health Care* to attempt to define the relevant geographic markets, using "hospital services areas" or "HSA's" that are alleged to be "a collection of ZIP codes whose residents receive most of their hospitalizations from the hospitals in that area." (TAC ¶ 45.)  According to the TAC, Sutter has a 100% share of the Inpatient Hospital Services market in eight HSAs, and a 78% share in a ninth HSA.  (TAC ¶ 78.)  The TAC also proposes to define separate geographic markets for the sale of commercial health insurance based on six separate Metropolitan Statistical Areas ("MSAs") that comprise 13 different California counties.  (TAC ¶¶ 68-77.)  Based on these allegations, plaintiffs again assert tying and monopolization claims.  Plaintiffs also assert a claim for "Section 1 Course of Conduct."

As set forth herein, the Court should dismiss the Third Amended Complaint, this time with prejudice.  There are no new allegations in the TAC relating to Sutter's conduct; plaintiffs did not even attempt to amend their complaint to address the bases on which the Court dismissed the earlier complaints.  And even if plaintiffs had added facts to support their tying and monopolization claims, plaintiffs' proposed use of Dartmouth "HSAs" as relevant geographic markets finds utterly no basis in fact or law.

**ARGUMENT**

On a motion to dismiss, the Court should accept well-pleaded factual allegations as correct, but a complaint should be dismissed when its allegations fail to state a cognizable claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (courts shall not accept legal conclusions as true, and complaints must state a ***plausible*** claim for relief in order to survive a motion to dismiss) (emphasis added).  The Court in *Twombly* noted that the costs of modern federal antitrust litigation, in particular, should counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events set forth in the complaint.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. at 558.

I. **THE THIRD AMENDED COMPLAINT DOES NOT ALLEGE CLAIMS UNDER SHERMAN ACT SECTION 1 OR THE CARTWRIGHT ACT.**

Plaintiffs' first cause of action alleges that Sutter unlawfully ties the sale of Inpatient Hospital Services at nine Sutter hospitals identified in paragraphs 48-56 (in the "Tying Markets") to the sale of those same services at five other Sutter hospitals identified in paragraphs 57-61 (in the "Tied Markets").  According to plaintiffs, health plans need to contract with the nine Sutter hospitals because those hospitals are "must have" hospitals for the health plan networks, and Sutter's "all or nothing" policy results in the health plans also having to contract with the other five Sutter hospitals (implying the health plans would prefer not to contract with these hospitals, although the TAC never actually alleges this).  (TAC ¶¶ 28-29, 118-122.)

Plaintiffs' second cause of action, which is pled as "Section 1 course of conduct,"[3] likewise is based on the alleged tying (TAC ¶ 126), although this cause of action also is based on the alleged "steering" provisions in Sutter's health plan contracts.  Plaintiffs' third cause of action pleads a state-law Cartwright Act violation that is based primarily on the elements of the first two causes of action.

Even if plaintiffs had adequately defined a relevant geographic market (which they have not as explained below in Part II), neither of these causes of action states a claim.

A.    <u>The TAC Again Fails to Allege That The "Tying" Has Caused Anticompetitive Effects in the Tied Product Markets.</u>

In its November 7 Order dismissing the SAC, the Court held that a plaintiff alleging a tying claim "must allege and ultimately prove facts showing a significant negative impact on competition in the tied product market."  (Order at 22 (*citing In re Webkinz*, C08-1897 RS, 2010 WL 4168845, at *2 (N.D. Cal. Oct. 20, 2010).)  *Webkinz* is one of a series of cases in this judicial district confirming that allegations of harm to competition in the tied product market are required to state a *per se* or a rule of reason tying claim.  *See also In re Ebay Seller Antitrust Litig.*, 545 F.

_____

[3] Sutter is not aware of a Sherman Act claim that is based on (or known as) "course of conduct."  While a course of conduct might support a "tying" or "exclusive dealing" claim, there is no independent violation for a "course of conduct."  In any event, the second claim for relief relies solely on the "tying" and "steering" allegations that are addressed in Parts I and II of this motion and, thus, should be dismissed for the very same reasons.

1   Supp. 2d 1027, 1034 (N.D. Cal. 2008); *Ice Cream Distribs. of Evansville, LLC v. Dryer's Grand*

2   *Ice Cream, Inc.*, No. 09-5815 CW, 2010 WL 2198200, at *8 (N.D. Cal. May 28, 2010) (plaintiffs

3   must plead the tying arrangement "affected a 'not insubstantial amount of commerce,' through a

4   reduction in competition, in the [tied product] market").

5            Despite the Court's unambiguous ruling on this issue, the TAC does not include ***any***

6   allegations of anticompetitive effects caused by the so-called tying agreement.  In order to state a

7   claim for unlawful tying, plaintiffs must allege harm to competition in the tied product market,

8   which plaintiffs have now defined to be Inpatient Hospital Services in the five "HSAs" of San

9   Francisco, Oakland, Sacramento, Modesto and Santa Rosa."  (TAC ¶ 29.)  But the TAC does not

10  include a single factual allegation of competitive harm in those regions.  Instead, the "harm to

11  competition" allegations are contained almost entirely in two conclusory paragraphs.  In

12  paragraph 86, plaintiffs allege that "Sutter's conduct has harmed competition" because Sutter's

13  hospitals "do not have to compete with other hospitals for inclusion in commercial health plan

14  networks.  This has distorted the normal competitive process – a process that would have resulted

15  in vastly different competitive outcomes."  And in paragraph 87, plaintiffs allege that "Sutter's

16  conduct has caused hospitals that compete with Sutter to suffer substantial foreclosure,

17  particularly by losing a substantial amount of patient-customers that they otherwise would have

18  treated. . . . [and] health plan members would have enjoyed greater financial incentives  to visit

19  non-Sutter hospitals."[4]

20           These vague allegations are not anywhere close to sufficient to state a claim.  When the

21  Court dismissed the SAC, it ruled that "the SAC's allegations as to harm to competition in the

22  tied markets are (with one exception) inapposite or entire conclusory."  (November 7 Order at

23  22.)  The TAC literally adds nothing in this respect; indeed, the TAC does not contain allegations

24  regarding – or even the identity of – the other hospitals in the tied product market, much less any

25  anticompetitive effects that the "tying" has caused to these hospitals or to their ability to compete.

26  _____

27  [4]  The TAC, like its predecessors, contains numerous allegations of Sutter's allegedly "high
    prices," but the TAC makes no effort to tie the "high prices" to the particular geographic markets
    referenced in the complaint or to the claimed antitrust violations.  As the Court has already ruled,

28  "high prices alone are not necessarily anticompetitive."  (June 3 Order at 20.)

MOTION TO DISMISS TAC
CASE NO. 3:12-CV-04854-LB

Instead, all plaintiffs allege is that Sutter's hospitals "don't have to compete to be included in networks" while other (unnamed) hospitals (in unnamed locations) have "lost patients."  These unspecific allegations are obviously insufficient,[5] as are the allegations in paragraphs 90 and 91 of the TAC that the tying "is likely to lead to Sutter's accrual of market power in these markets" or that but for the tying provisions, "it is likely that other hospital systems would have opened facilities in the Tying Markets."

Part of the reason that plaintiffs cannot allege injury to any of Sutter hospital's competitors is that, as the TAC implicitly acknowledges, those competitors have contracts with the very same health plans.  Thus, there truly is no foreclosure here.  Plaintiffs do not allege – nor could they – that Sutter restricts the ability of health plans to contract with Sutter's competitors.  As a result, as the TAC concedes, consumers are able to obtain access to Sutter's hospital competitors, giving those competitors a 65% market share in the Oakland, San Francisco, Sacramento and Santa Rosa HSAs, and a 50% market share in the Modesto HSA.  (TAC ¶ 90.)  In short, the TAC confirms that there is considerable competition in the "Tied Hospital Markets" and offers no indication that the "tying" has resulted in anticompetitive effects in the those markets.

Judge White's decision in *Webkinz*, is (again) exactly on point.  Plaintiffs in *Webkinz* were retailers that purchased Webkinz toys.  *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 995 (N.D. Cal. 2010).  In order to purchase those toys, the defendant required the plaintiff retailers to purchase other Ganz products as well.  *Id.* at 992.  The plaintiffs argued that this "tying" limited the number of products that they could purchase from competing manufacturers, making the "tie" unlawful.  *Id.*  Judge White disagreed, using language that is particularly apt here:

---

[5] By contrast, the cases that plaintiffs previously have cited on this issue contain detailed allegations or proof that rivals were significantly limited in their ability to compete due to the alleged unlawful conduct.  *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783-86 (6th Cir. 2002) (evidence that manufacturer defendant excluded rival manufacturers from competing by entering into exclusive agreements with retailers, removing and discarding retailer racks with competitors' products, and other similar conduct); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3rd Cir. 2005) (abundant evidence that the main channel of distribution was eliminated to competitors due to defendant's conduct).

the allegation is that there is a restriction on retailers or dealers, not on end users or consumers.  There is no inference that competing manufacturers of the core product lines are excluded or injured by consumers being unable to purchase their products. There is no allegation or necessary inference that competing sellers have been foreclosed from carrying competing products or that consumers are not able to have access to the tied product markets.  There is no allegation that Ganz dominates the tied product submarkets and no inference or allegation that prices, output or general market competition has been affected by Ganz's alleged exclusionary practices.  The only allegation of injury is that Plaintiffs, particular retailers with limited shelf space, are unable to stock competing products.

*Id*. at 996.

While plaintiffs in *Webkinz* could not purchase certain competing toys from defendant's competitors, consumers were able to purchase those toys from competing retailers.  Here, there is even less "foreclosure" because there is unlimited "shelf space" in health care networks and no restrictions on the ability of health plans and their members to "purchase" services from Sutter's competitors.  Thus, as with the first two complaints, the extent of the foreclosure alleged in the TAC is *zero*.  The first cause of action fails to state a claim.

### B.   The Court Has Already Rejected Plaintiffs' Allegations Regarding The So-Called "Anti-Steering" Language.

Paragraphs 34-38 of the TAC contain allegations regarding the so-called "anti-steering" language.  As alleged in paragraph 35, Sutter's contracts with health plans require those plans to "actively encourage members obtaining medical care to use Sutter Health Providers," with "actively encourage" defined to mean the creation of financial incentives for health plan members to use Sutter providers.  The quotation in paragraph 35 omitted the introductory clause of the language that plaintiffs had quoted in their previous complaints.  (*See* FAC ¶ 92; SAC ¶ 52.)  The omitted words state:  "Sutter Health shall require each group health payer accessing Sutter Health providers through the 'health plan' network to actively encourage members obtaining medical care to use Sutter providers."

As Sutter has previously explained, the effect of this language is that, when Sutter providers are included in a health plan's network, the health plan is supposed to encourage members to stay "in network" and use other Sutter providers.  The language does not prevent Sutter's competitors from having the very same contract language with health plans, and the language is the essence of managed care, as this Court already has ruled.  *See* June 3 Order at 19; *Barry v. Blue Cross of Cal.*, 805 F.2d 866, 872 (9th Cir. 1986) ("We agree that paying lower benefits for treatment by nonparticipating physicians greatly discourages patients from using such physicians. This, however, is simply the ordinary consequence of every commercial contract[.]").  Plaintiffs do not – and could not – allege that this language has prevented consumers from choosing non-Sutter providers, and thus there is nothing anticompetitive about the language.

In the FAC, this language was the basis of plaintiffs' "exclusive dealing" claim.  The Court quoted the language on page 11 of its June 3 Order and then proceeded to dismiss the claim.  On pages 19-20 of the June 3 Order, the Court ruled that this language "is managed care" and that the allegations "do not show substantial foreclosure or a requirement to purchase services only from service providers with an exclusive contract." (*Id*, citing *Allied Orthopedic Appliances v. Tyco Health Care Grp.*, 592 F.3d 991, 996 (9th Cir. 2010).  The Court further ruled that "Plaintiffs must provide some factual support for each essential element of the violations they allege.  They did not do so." (Order at 20.)[6]

Plaintiffs quoted this same language in paragraph 52 of the SAC, but plaintiffs dropped their claim for exclusive dealing and did not appear to rely on the language to support their tying or other claims.  Even so, the Court quoted the language on page 5 of its November 7 Order dismissing the SAC, and again ruled that the language did not violate the antitrust laws:

---

[6] Sutter argued on page 11 of its reply memorandum in support of its motion to dismiss the FAC (ECF 24):  "Thus, plaintiffs do not deny that consumers have a choice in the first instance whether to select a Sutter doctor or hospital, and the complaint does not allege that Sutter requires health plans to refuse to contract with Sutter's competitors.  To the contrary, plaintiffs concede on page 3 of their opposition to Sutter's Request for Judicial Notice that the 'FAC does not allege that the health plans' contracts at issue in this litigation required the health plans only to deal with Sutter.'"  Like the FAC, the TAC does not allege that health plans are restricted from contracting with Sutter's competitors.

> Finally, plaintiffs point to their allegations that Sutter's contracts also include so-called "steering" provisions by which Sutter "force[s] commercial health insurers to steer patients to Sutter facilities regardless of whether other providers or facilities offer superior medical services by extracting financial penalties for non-compliance. SAC ¶ 53. But the contractual provisions that Plaintiffs quote simply require the health insurer to charge patients lower rates for using "network participating providers," which does not appear to be limited to Sutter providers. Id. ¶ 52. Even if it were, the allegations are consistent with managed care. (Nov. 7 Order at 23.)

The allegations of the TAC are no different in this respect than the allegations of the FAC and SAC; relabeling them as "anti-steering" provisions does not change that fact. As a result, there is no basis for the Court to reconsider its previous rulings that the language does not violate the antitrust laws. Although plaintiffs reference the steering provisions in their tying, "course of conduct" and "monopolization" claims, the TAC does not include any allegations explaining how the language relates to the inpatient hospital markets that plaintiffs have alleged in support of their claims. Nor does the TAC attempt to allege specific anticompetitive effects allegedly caused by the language.

Finally, paragraph 38 of the TAC alleges that the anti-steering" language is anticompetitive under a "DOJ/FTC Policy Statement" involving Accountable Care Organizations, and that a law review article has stated that "anti-steering provisions such as those that Sutter forces upon commercial health plans [] compromise price competition." As Sutter has previously explained, the "DOJ/FTC Policy Statement" has no application here because the provisions described by the Policy Statement are those that *prevent* steering, which this language does not do. Indeed, plaintiffs' claims have nothing to do with Accountable Care Organizations, which is what the Policy Statement is addressing.[7] As to the law review article, it does not even refer to Sutter and obviously is not "evidence" of any antitrust violation by Sutter.

---

[7] The policy statement applies to "collaborations among otherwise independent providers and provider groups" participating in the Medicare Shared Savings Program, not to contracting by a single integrated health system such as Sutter Health. 76 Fed. Reg. at 67027. Moreover, the language plaintiffs quote demonstrates that the alleged conduct is not in fact anticompetitive. The

C.      **Plabelsiffs Lack Standing To Pursue Damages Claims Under Sherman**

**Act Sections 1 and 2.**

Plaintiffs previously acknowledged that they were seeking injunctive relief but not

damages under the Sherman Act.  (Compl. ¶ 96; FAC ¶¶ 149, 159; SAC ¶¶ 160, 166, 177; Doc.

20 Pls.' Opp. to Sutter's Mot. to Dismiss FAC at 4 ("Plaintiffs are not bringing claims for

damages under the Sherman Act, but solely for injunctive relief.").)  Plaintiffs now attempt to

broaden the scope of the complaint by seeking damages under the Sherman Act.  (TAC Prayer for

Relief, ¶ ii.)  This runs afoul of well established Supreme Court precedent that bars indirect

purchaser damages claims under federal antitrust laws.

In *Illinois Brick v. Illinois*, 431 U.S. 720, 746 (1977), the U.S. Supreme Court held that

only a direct purchaser is deemed "injured" under Section 4 of the Clayton Act with standing to

sue for damages, even when the direct purchaser passes on the overcharge to its customers.

Accordingly, the Court ruled that indirect purchasers cannot recover damages for violations of the

federal antitrust laws.  Subsequent cases have reaffirmed this rule.[8]

Plaintiffs allege that this case is an indirect purchaser case.  (*See* TAC Diagram at 21.)

The TAC alleges that Sutter engaged in anticompetitive conduct in the "upstream" market for the

sale of Inpatient Hospital Services, resulting in higher costs for health plans, which is then passed

to plan members in the form of higher premiums in the "downstream" market for the sale of

commercial health insurance.  (TAC ¶¶ 7, 23, 39-67, 101.)  Plaintiffs do not allege that any of the

three named plaintiffs ever received medical care from a Sutter provider or ever paid Sutter

---

(continued…)

policy statement warns against conduct that *prevents* payers from incentivizing patients to choose
certain providers (*id.* at 67030), while the TAC alleges that Sutter has required payers to include
such incentives – conduct that is part and parcel of every managed care contract and that is
procompetitive.

[8] *See, e.g., Kansas v. UtiliCorp United Inc.*, 497 U.S. 199, 207 (1990) (applying *Illinois Brick*
to bar indirect purchaser suit even though 100% of the overcharge was passed to indirect
purchasers); *Del. Valley Surgical Supply v. Johnson & Johnson*, 523 F.3d 1116, 1122, 1124 (9th
Cir. 2008) (*Illinois Brick* "intended to make a bright line rule for identifying the proper plaintiff"
and the "firm rule does not provide [] leeway to make a policy determination on a case-by-case
basis as to whether standing should be recognized"); *Somers v. Apple, Inc.*, 729 F.3d 953, 961-62
(9th Cir. 2013) (affirming dismissal of indirect purchaser suit because claim for damages was
barred by *Illinois Brick*).

MOTION TO DISMISS TAC
CASE NO. 3:12-CV-04854-LB

directly for medical care.  In fact, plaintiffs have now **deleted** prior allegations that two of the named plaintiffs (Ms. Sidibe and Ms. Dewey) received health care services from Sutter facilities. (*Compare* SAC ¶¶ 26-27, TAC ¶¶ 16-18.)  Instead, the crux of the damages alleged in the TAC is "overcharges in the form of inflated insurance premiums."  (TAC at ¶¶ 2, 7, 23, 39-67, 101.[9])  While plaintiffs allege they also paid "artificially high" "co-payments, deductibles and other out-of-pocket payments," the TAC does not allege that these payments were made to Sutter or as a result of a visit to a Sutter hospital.  (*See* TAC ¶¶ 16-18.)  Thus, plaintiffs are not the "immediate buyer[s] from the alleged antitrust violator," but are alleged to have suffered an overcharge "only by virtue of an antecedent transaction" between the alleged wrongdoer and another party.[10] *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169-70 (8th Cir. 1998); *Del. Valley Surgical Supply*, 523 F.3d at 1122 (hospital was indirect purchaser because it purchased products from a distributor and never paid defendant directly"); *Austin v. Blue Cross & Blue Shield of Alabama*, 903 F.2d 1385, 1392 (11th Cir. 1990) (patients' claims were barred because they were not in privity with defendant and were "at least one step removed from the antitrust violation.").

In the unlikely event that any portion of plaintiffs' Section 1 or Section 2 claims survive, the Court should dismiss plaintiffs' claims for damages under the Sherman Act.

## II.   THE THIRD AMENDED COMPLAINT DOES NOT ALLEGE PLAUSIBLE GEOGRAPHIC MARKETS.

This Court already has ruled – twice – that plaintiffs' antitrust claims "require Plaintiffs to establish market power in a 'relevant market,' meaning a relevant product market and a relevant

---

[9] Plaintiffs bring this action on behalf of a putative class consisting of any person enrolled in a health plan offered by five health insurers (limited by geography and time), without regard to whether these individuals ever received services from, or made any payments to, Sutter.  (TAC ¶ 105.)

[10] The TAC contains one statement that "[p]laintiffs and Class members have also paid higher deductibles and co-payments for medical care from Sutter facilities as a result of Sutter's anticompetitive conduct."  TAC ¶ 104.  This is vague, ambiguous, and conclusory.  Given the deletion of allegations that the named plaintiffs received services from Sutter, this statement appears to refer to putative class members, not the named plaintiffs.  The question of antitrust standing, however, relates initially to the named plaintiffs, not to all the members of the putative class.  *See Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987) (courts must address the standing of the named plaintiffs before considering whether they can represent the putative class); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 658 F. Supp. 2d 299, 303 (D. Mass. 2009) *vacated on other grounds*.

geographic market. . . .  A complaint may be dismissed under Rule 12(b)(6) if its 'relevant market definition is facially unsustainable.'"  (June 3 Order at 20-21; *see also* November 7 Order at 16.) In dismissing the SAC, the Court ruled that plaintiffs had failed to provide any "factual allegations to support drawing lines at these county borders" and that the geographic markets proposed in the SAC were "necessarily invalid or pleaded too generally."  (Nov. 7 Order at 17.)

The TAC is slightly more specific with respect to the proposed geographic market for the Sherman Act and Cartwright Act claims, but the methodology that plaintiffs have proposed is "facially unsustainable" (in the Court's words from its June 3 Order) as a matter of law.  Further, plaintiffs fail even to attempt to allege, as they must, that hospitals outside of these proposed geographic markets are not alternatives for patients treated at Sutter hospitals inside the proposed markets.  For this reason, all of plaintiffs' claims must be dismissed.  *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436-37 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiffs' favor, the relevant market is legally insufficient and a motion to dismiss may be granted.").

A.       **The Relevant Geographic Market Must Be Defined As Where Consumers Could Go, Not Merely Where They Do Go, To Receive Hospital Services.**

Plaintiffs have proposed to define a relevant product market that consists of Inpatient Hospital Services in nine Northern California communities.  (FAC ¶¶ 49-50.)  Sutter does not oppose this definition of the relevant product market for purposes of this motion to dismiss.  As to the geographic market, there are numerous antitrust decisions that address how a relevant geographic market is supposed to be defined in the context of such a product market:  plaintiffs are not writing on a blank slate here despite the failure of the TAC to include allegations necessary to define a geographic market.

"The proper geographic market is 'that geographic area 'to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition.'"  . . .  A determination of the proper geographic market . . . must involve a dynamic

MOTION TO DISMISS TAC
CASE NO. 3:12-CV-04854-LB

1   as opposed to static analysis of 'where consumers could practicably go, not on where they

2   actually go.'"  *State of California v. Sutter Health*, 130 F. Supp. 2d 1109, 1120 (N.D. Ca. 2001)

3   (internal citations omitted).  As a result, in cases involving acute care hospital services, the "basic

4   question to be asked in determining the relevant geographic market is where can patients

5   practicably go for acute inpatients services." *Id*. (citing *FTC v. Freeman Hosp*., 69 F.3d 260, 268

6   (8th Cir. 1995)).

7        Cases involving inpatient hospital services product markets have analyzed a wide variety

8   of factors in assessing the proposed geographic market.  *Sutter Health*, for example, involved the

9   proposed merger of Alta Bates Hospital in Berkeley and Summit Hospital in Oakland.  *Sutter*

10  *Health*, 130 F. Supp. 2d  at 1111.  Judge Chesney held that the relevant geographic market

11  included the region where the hospitals attract 90% of their patients (rejecting the 85% threshold

12  proposed by plaintiff).  *Id*. at 1122.   She also analyzed the "other hospitals to which patients

13  residing in the service areas could turn if they were dissatisfied with the prices or services of the

14  merging hospitals" (*id*. at 1124), looking at geography, travel times and the perception of market

15  participants:  "Where a hospital outside of the proposed geographic market draws patients from

16  the same region from which the merging hospitals draw their patients, the hospital located outside

17  of the test market is considered a practical alternative to which patients residing in the area of

18  overlap can turn for acute inpatient services." (*Id*. at 1125).  Ultimately, Judge Chesney rejected

19  the geographic market proposed by plaintiff – "the area between the San Francisco Bay on the

20  west and the Caldecott Tunnel on the east, and running from the Carquinez Strait in the north to

21  Union City in the south" (*id*. at 1121) – and ruled that the geographic market also included Contra

22  Costa and San Francisco Counties.  (*Id*. at 1127-28.)

23        Earlier in this litigation, plaintiffs alleged that the relevant geographic market could be as

24  small as county borders, and plaintiffs proposed to define relevant markets such as Alameda

25  County and San Francisco County, among others.  (SAC ¶¶ 67-71.)  Some courts have in fact

26  accepted county borders to be a relevant geographic market, but others have found the market to

27  be much broader than an individual county.  Courts that have found single counties to be relevant

28  geographic markets include:  *Cascade Health Solutions v. PeaceHealth*, 502 F.3d 895, 901-02

14

(9th Cir. 2007) (relevant market defined as the market for primary and secondary acute care hospital services in one county, with two competitor hospitals in the market); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) (relevant market defined as general acute care hospital market in one county, with eight competitors); *FTC v. ProMedica Health Sys., Inc.*, No. 3:11 CV 47, 2011 WL 1219281, at * 9-11, 55 (N.D. Ohio Mar. 29, 2011) (relevant market defined as general acute care inpatient hospital services in one county with four competitors).

There is, however, no "one-size-fits-all" type of geographic market, which is one reason that plaintiffs' new approach, their attempt to use HSAs, must fail. As Sutter pointed out in the motion to dismiss the SAC, many courts have found the relevant geographic market to be broader than a single county (and, thus, substantially broader than HSAs). In addition to *Sutter Health*, those decisions include: *FTC v. Freeman Hosp*., 69 F.3d 260, 265 (8th Cir. 1995) (defining the relevant geographic market to include a 13-county area including hospitals within 54 miles from Joplin, Missouri); *FTC v. Tenet Health Care Corp*., 186 F.3d 1045 (8th Cir. 1999) (rejecting the FTC's proposed geographic market of a 50 mile radius from downtown Poplar Bluff in favor of defendant's proposed 65 mile radius); *United States v. Mercy Health Servs.*, 902 F. Supp. 968 (N.D. Ia., 1995) (rejecting plaintiff's proposed geographic market of Dubuque County, Iowa and 15 miles further east in favor of a larger market including Cedar Rapids, Waterloo, Iowa City, Davenport, and Madison); *FTC v. Butterworth Health Corp*., 946 F. Supp. 1285 (W.D. Mich. 1996) (relevant market defined as "Greater Kent County" including Grand Rapids and a 30-mile radius around Grand Rapids consisting of portions of 7 counties and 9 hospitals); *Morganstern v. Wilson*, 29 F.3d 1291 (8th Cir. 1994) (rejecting as too narrow plaintiffs' proposed market of 27 counties in Nebraska for adult cardiac surgery market).

Sutter provides this discussion of the case law because, as discussed below, plaintiffs now propose to define relevant geographic markets that are ***substantially smaller*** than county borders. In so doing, plaintiffs make no effort to allege facts that would permit the Court to find that these narrow regions, some of which include only a handful of zip codes, are relevant geographic markets for inpatient hospital services under the antitrust laws. Indeed, the TAC does not include ***any*** allegations that consumers do not – and could not – view hospitals outside these narrowly-

15

drawn HSAs to be alternatives for their care.  And the markets that plaintiffs have proposed yield some truly absurd results that confirms definitively that these markets could not plausibly be the bases for antitrust claims.

**B.      Plaintiffs Do Not Attempt To Define The Relevant Geographic Market Properly, And Their Reference To Dartmouth "HSAs" Is Not Plausible As A Matter of Law.**

As explained above, in order to allege legitimate relevant geographic markets, a plaintiff must attempt to define an area to which consumers can practically turn for alternative sources of the product and in which the defendant faces competition.  The cases cited above have employed a variety of means to test the proposed geographic market as a factual matter; as a legal matter, a plaintiff must at least allege that consumers who seek care from hospitals in the alleged geographic market defined by the complaint cannot practically turn to competitors outside of this market (and, similarly, that consumers who seek care outside of this alleged market cannot practically turn to the hospitals inside of the market).  *See, e.g.*, *Sutter Health*, 130 F. Supp. 2d at 1125-1133.  These points are critical in determining what competitors the hospitals inside the alleged market must compete with for patients, and therefore their market share.  Instead, the TAC is ***completely silent*** on where the consumers treated at hospitals in the proposed relevant markets come from:  plaintiffs do not attempt to explain how they define the relevant geographic markets, nor do they allege (even superficially) that consumers inside and outside of those geographic markets cannot practically turn to competitors inside and outside of these markets.

Instead, plaintiffs simply propose to define the geographic markets based on "hospital service areas" that have been adopted by *The Dartmouth Atlas of Health Care*, which plaintiffs allege to be "a well-established industry authority."  (TAC ¶ 45.)  As a matter of law, the Dartmouth HSAs are not plausible "antitrust geographic markets," confirmed by the absence of any court decision even mentioning the *Dartmouth Atlas* in conjunction with any antitrust issue. Indeed, the contents of the Dartmouth Atlas website, which should be deemed incorporated by reference into the TAC and can properly be considered on a motion to dismiss, absolutely confirm that the Dartmouth HSAs have no bearing whatsoever in defining a relevant geographic

market for antitrust purposes.  (*See* Declaration of Jeffrey A. LeVee ("LeVee Decl.") ¶¶ 2-4, Exs. A-C.)[11]

First, the Dartmouth HSAs are, by design, defined to be very narrow regions that do not address competitive conditions in the marketplace.  According to the Dartmouth website:

> Hospital service areas (HSAs) are local health care markets for hospital care.  An HSA is a collection of ZIP codes whose residents receive most of their hospitalizations from the hospitals in that area.  HSAs were defined by assigning ZIP codes to the hospital area where the greatest proportion of their Medicare residents were hospitalized.  Minor adjustments were made to ensure geographic contiguity.  This process resulted in 3,436 HSAs.  When these regions were created in the early 1990s, most hospital service areas contained only one hospital.  In the intervening years, hospital closures have left some HSAs with no hospital; these HSAs have been maintained as distinct areas in order to preserve the continuity of the database.

(LeVee Decl. ¶ 2, Ex. A.)  By defining an HSA as a "collection of ZIP codes whose residents receive most of their hospitalizations from the hospitals in that area," Dartmouth does not purport to address competitive conditions in the marketplace or where consumers could practicably turn for inpatient hospital services.  Instead, these HSAs simply provide a static description of where a plurality of consumers in particular zip codes are presently receiving their hospital services.  This is grossly insufficient for antitrust purposes.  *See Sutter Health*, 130 F.Supp.2d at 1120-1132;

---

[11] Under the "incorporation by reference" doctrine, a court may take into account documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading."  *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), overruled on other grounds.  The Ninth Circuit has extended the doctrine to apply to documents crucial to plaintiffs' claims, even when plaintiffs do not explicitly refer to or allege the contents of the documents in the complaint.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  The "'incorporation by reference' doctrine applies with equal force to internet pages as it does to printed materials."  *Knievel*, 393 F.3d at 1076.  The TAC explicitly references and directly quotes from the Dartmouth Atlas website.  TAC ¶ 25.  Moreover, the contents of the website that explain the methodology in constructing HSAs are essential (and indeed necessary) to determining whether plaintiffs have alleged plausible antitrust markets.  Accordingly, the contents of the website which are referenced by the TAC, and attached as Exhibits A, B, and C to the concurrently filed LeVee Declaration, should be deemed incorporated by reference and considered by the Court in ruling on this Motion.

*Surgical Care Ctr. v. Hosp. Servs. Dist.*, 309 F. 3d 836, 840 (5th Cir. 2002) (rejecting the geographic market definition proffered by plaintiff's expert because he relied solely on defendant's service area (where its current patients reside) as opposed to "where people could practicably go for inpatient services . . . .").

Second, the Dartmouth HSAs frequently include zip codes where substantially less than 90%, *even less than 40%,* of the residents of that zip code select the hospital(s) in that HSA.[12] This means that a substantial number of people living in these zip codes use hospitals outside of the HSA, meaning that patients obviously have alternatives, and the HSA cannot be a relevant geographic market.[13]  Indeed, Dartmouth makes no effort to determine where the hospitals located within a particular HSA obtain their patients; as discussed above, Judge Chesney held that a properly defined relevant geographic market includes the region where the hospitals attract 90% of their patients (rejecting the 85% threshold proposed by plaintiff).  This is important to know because if a hospital gets a significant portion of its patients from areas near where other hospitals are located, those other hospitals are likely to be important competitors.  Not only does Dartmouth make no effort to analyze this information, but most of Dartmouth's HSAs contain only one hospital, indicating that Dartmouth had no interest in assessing competitive conditions within or between HSAs.  (LeVee Decl. ¶ 2, Ex. A.)

Third, plaintiffs' use of the Dartmouth HSAs is at odds with plaintiffs' proposed product market.  Dartmouth's HSAs are based entirely on Medicare discharges.  (LeVee Decl. ¶ 2, Ex. A ("Data for all Dartmouth Atlas regional data reflect the experience of Medicare patients living in the region. . . .").)  But plaintiffs' proposed relevant product market specifically excludes Medicare patients.  (TAC ¶¶ 42, 105.)  Thus, by definition, plaintiffs' product and geographic markets are in conflict because the alleged geographic markets do not account for the members of

---

[12] The Dartmouth website states that a zip code was placed into an HSA even if as few as 36% of the residents of that zip code were receiving hospital services in a particular HSA.  This means that a majority of the residents of many of the zip codes in a particular HSA actually are going to hospitals outside of the HSA, demonstrating that the HSA is not a relevant antitrust market. (LeVee Decl. ¶ 4, Ex. C at 2.)

[13] Indeed, according to the Dartmouth website, some HSAs, no longer even address that question; in those HSAs where hospitals have closed, consumers must by definition use hospitals outside of the HSA.  (LeVee Decl. ¶ 2, Ex. A.)

MOTION TO DISMISS TAC
CASE NO. 3:12-CV-04854-LB

the putative class (commercial health plan subscribers).  The Dartmouth HSAs are thus inapplicable here even if they were otherwise relevant in defining an antitrust market.  And the Dartmouth data is 20 years old, a further flaw.

Fourth, the geographic market definitions that plaintiffs have proposed based on the Dartmouth's HSAs yield absurd results that demonstrate that they could not possibly be used as antitrust markets.  Four examples suffice:

1.     Contradicting the allegations of the Second Amended Complaint that proposed to define Alameda County as a relevant geographic market (SAC ¶ 69), plaintiffs now propose to place Berkeley and Oakland in separate HSAs, even though both are in Alameda County.  (TAC ¶¶ 49, 58.)  If hospitals in Berkeley did not compete against hospitals in Oakland, the State of California never would have challenged the merger of Alta Bates and Summit hospitals in 2001 because they would not have been viewed as competitors!  As discussed above, the State's proposed geographic market in that case included a significant portion of the East Bay, and Judge Chesney ruled that the geographic market was actually even larger, including San Francisco and Contra Costa counties.  In any event, the notion that these two particular hospitals, which are approximately 4 miles apart, are in separate markets is absurd.  (Request for Judicial Notice; LeVee Decl. ¶ 5, 6, 7.a., Exs. D, E.)

2.     Plaintiffs propose to define an HSA for Burlingame in San Mateo County that includes Sutter's hospital Mills-Peninsula Medical Center.  (TAC ¶ 50.)  But two non-Sutter hospitals are located a short distance from Mills-Peninsula:  Seton-Medical Center in Daly City (less than 11 miles away, also in San Mateo County), and Sequoia Hospital in Redwood City (15 miles away, also in San Mateo County).  (Request for Judicial Notice; LeVee Decl. ¶ 7.b., 7.c., Exs. D, F, G.)  The Court can easily determine as a matter of law that a geographic market limited to the region immediately surrounding Mills-Peninsula Medical Center is not a plausible antitrust market.[14]

---

[14] The TAC again refers to the Knox-Keene Act that allegedly "requires that all health plans contract with a 'hospital that has the capacity to serve the entire dependent enrollee population based on normal utilization' that is located within 30 minutes or 15 miles of member residences or workplaces.  (TAC ¶ 46.)  Yet, the Burlingame HSA excludes two competitor hospitals that are within 15 miles of Mills-Peninsula Medical Center.

3.     Plaintiffs propose to define an HSA for Castro Valley where Sutter operates Eden Medical Center.  But this HSA would exclude St. Rose Hospital in Hayward, which is only 8.2 miles away.  Both of these hospitals are in Alameda County.  (Request for Judicial Notice; LeVee Decl, ¶ 7.d., Exs. D, H.)

4.     Plaintiffs propose to define an HSA for Davis where Sutter operates Sutter Davis Hospital, but that HSA does not include Woodland Healthcare, a hospital operated by Dignity Health in Woodland, CA, which is only ten miles away.  Both of these hospitals are in Yolo County.  (Request for Judicial Notice; LeVee Decl. ¶ 7.e., Exs. D, I.)

Fifth, and for all of the reasons set forth in the previous paragraphs, no court has ever cited the Dartmouth HSAs in conjunction with defining a relevant antitrust market.  Indeed, a Lexis and Westlaw search indicated that the Dartmouth Atlas has never been cited by any state or federal court for any reason.  (LeVee Decl. ¶ 8.)  There are a multitude of antitrust cases defining relevant markets in the health care arena, several of which are cited in this motion, but not one that uses the Dartmouth Atlas in conjunction with market definition.  This simply reconfirms that the Dartmouth Atlas is irrelevant in this context.

In sum, attempting to define antitrust markets using Dartmouth's HSAs is not plausible and can be rejected as a matter of law.  Further, plaintiffs do not even attempt to allege that hospitals outside of the nine HSAs in the "Tying Markets" do not compete for consumers who live within those nine HSAs and are not practical alternatives for those consumers.  Nor do Plaintiffs allege any other basis for the Court to define the relevant geographic markets.

Sutter notes that the TAC also includes separate allegations for six larger geographic markets – which plaintiffs define based on Metropolitan Statistical Areas ("MSAs") – that plaintiffs allege to relate to the sale of commercial health insurance.  (TAC ¶¶ 68-77.)  These MSAs include 13 California counties and appear designed to increase the size of the putative plaintiff class.  Although plaintiffs propose to define a class based on the sale of commercial insurance in these six markets (TAC ¶¶ 105), plaintiffs do not connect these geographic regions to the allegations that support the five causes of action.  To the contrary, plaintiffs allege in paragraph 69 of the TAC that: "Health plan members therefore strongly prefer health plans with

20

1   networks of hospitals and physicians that are within the MSA where they work or live," an

2   allegation that totally contradicts the notion that the much smaller HSAs might be relevant

3   geographic markets.  In any event, these allegations likewise are insufficient to support a relevant

4   geographic market, but Sutter does not address them in greater detail in this motion.

5           **C.      Plaintiffs' Failure To Define A Proper Relevant Geographic Market**

6                   **Again Warrants Dismissal At The Rule 12 Stage.**

7           This Court has twice dismissed plaintiff's claims for failure adequately to allege a

8   geographic market.  Even so, Sutter anticipates that plaintiffs will argue that the question of

9   whether the Dartmouth HSAs could constitute plausible geographic markets is one that should be

10  addressed at the summary judgment, not the motion to dismiss, stage.  As demonstrated via this

11  motion, however, the Dartmouth HSAs were not intended to be used as antitrust markets, they do

12  not attempt to address options that are available to consumers, they frequently result in HSAs that

13  include only one hospitals even though competing hospitals are nearby, they are based on old

14  Medicare data, and they yield absurd results as applied to the Northern California marketplace.

15  Inasmuch as plaintiffs do not propose any alternative other than the Dartmouth HSAs, the Court

16  can and should rule at the Rule 12 stage that these HSAs cannot plausibly support a claim under

17  the antitrust laws.  *See, e.g., Universal Grading Serv. v. eBay, Inc*., No. C-09-2755 RMW, 2012

18  WL 70644, at *7 (N.D. Cal. Jan. 9, 2012) (granting motion to dismiss because plaintiffs "provide

19  no authority supporting [their] overbroad and amorphous market definition . . . ."); *Person v.*

20  *Google, Inc.,* No. C 06-7297 JF (RS), 2007 WL 832941, at *4 (N.D. Cal. 2007) (granting motion

21  to dismiss based on "vague and overbroad" relevant market definition).

22  **III.    THE THIRD AMENDED COMPLAINT DOES NOT ALLEGE PLAUSIBLE**

23          **MONOPOLIZATION CLAIMS.**

24          Plaintiffs' Fourth Claim for Relief attempts to assert a monopolization claim under

25  Section 2 of the Sherman Act.  This claim fails for two reasons.  First, as discussed above,

26  plaintiffs have failed to define a relevant geographic market in which Sutter allegedly has

27  monopoly power.  Second, beyond the insufficient allegations of "tying" addressed above, the

28

1   SAC does not contain any allegations that Sutter unlawfully acquired or maintained its
2   "monopoly power."

3        Plaintiffs allege that Sutter has monopolies in the Inpatient Services Market in nine
4   "HSAs."  As discussed above, Dartmouth's HSAs make no effort to approximate relevant
5   antitrust markets and should be disregarded.  Indeed, the Court can take judicial notice that other
6   hospitals exist within just a few miles of most of the hospitals located in these nine HSAs.

7        Even if plaintiffs had properly identified relevant markets as to which Sutter plausibly had
8   monopoly power, plaintiffs still would have to allege facts demonstrating that Sutter had engaged
9   in unlawful acts that permitted Sutter to acquire or maintain its monopoly power.  *See Cascade*
10  *Health Solutions v. PeaceHealth*, 515 F. 3d 883, 894 (9th Cir. 2008) ("Anticompetitive conduct is
11  behavior that tends to impair the opportunity of rivals and either does not further competition on
12  the merits or does so in an unnecessarily restrictive way.")  But other than referencing the
13  insufficient "tying" and "steering" provisions discussed above, the Fourth Claim for Relief (like
14  the Section 2 claims in the previous complaints) does not contain *any* allegations regarding
15  Sutter's "improper acts."[15]  Accordingly, the Section 2 claim should be dismissed.

16       The Fifth Claim for Relief attempts to state a claim for "attempted monopolization" and
17  alleges that the "tying" and "steering" has caused a "dangerous probability that Sutter will
18  monopolize the five Tied Markets as a result of these overt acts."  (TAC ¶ 154.)  Again, these
19  allegations are woefully inadequate.

20       A claim of attempted monopolization requires "(1) that the defendant has engaged in
21  predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous
22  probability of achieving monopoly power."  *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456
23  (1993).  Even assuming that the "tying" and "steering" allegations constituted predatory or
24  anticompetitive conduct – which they do not – the complaint does not allege a "specific intent" to

25  _____
26  [15] Plaintiffs allege in paragraph 146 of the TAC that Sutter's monopolization of the Tying
    Markets "has been effectuated by overt exclusionary acts," including "forcing health plans to
27  steer patients away from lower-priced hospitals to higher-priced hospitals upon threat of financial
    penalties."  Of course, if a health plan can steer a patient from one hospital to another, those two
    hospitals are almost certainly in the same relevant geographic market, thereby contradicting the
28  notion that Sutter has monopolies in any of the Tying Markets.

1    monopolize or a dangerous probability of achieving monopoly power in any of the "Tying"

2    markets (such as increasing shares in these markets over time).[16]

3    **IV.     THE UCL CLAIM SHOULD BE DISMISSED.**

4         The TAC, like its predecessor complaints, alleges a violation of California's unfair

5    competition law.  The allegations of the UCL claim are based entirely on the allegations

6    associated with the earlier claims for relief.  As the Court ruled in conjunction with the SAC:

7    "the UCL and unjust enrichment claims are predicated on the antitrust claims, and the court

8    dismisses them for the same reasons."  (November 7 Order at 25.)  *See also* June 3 Order at 24

9    (dismissing UCL claim and stating that the court would decline to exercise supplemental

10   jurisdiction over the claim).

11                                  **CONCLUSION**

12        Including plaintiffs' original complaint, which plaintiffs amended before Sutter filed its

13   first motion to dismiss, plaintiffs have now had four opportunities to define plausible antitrust

14   markets and to allege viable antitrust claims.  Sutter requests that the Court dismiss the Third

15   Amended Complaint and strongly urges that this dismissal be with prejudice.

16

17   Dated:  January 8, 2014                              JONES DAY

18                                                        By:   /s/ *Jeffrey A. LeVee*
                                                              Jeffrey A. LeVee
19

20                                                        Attorneys for Defendant Sutter Health

21   LAI-3205211

22

23

24

25

─────────────────────

26      [16] The TAC alleges that Sutter has a 35% share in 4 of the 5 "Tied Markets" and a 50% share
     in the fifth.  (TAC ¶ 90.)  These shares generally are insufficient to support the "dangerous
27   probability of success" factor of an attempted monopolization claim.  *See, e.g., U.S. Anchor Mfg.
     Co. v. Rule Indus.,* 7 F.3d 986, 1001 (11 Cir. 1993); *Ind. Grocery v. Super Valu Stores*, 864 F.2d
28   1409, 1414 (7th Cir. 1989).

                                        23
                                                             CASE NO. 3:12-CV-04854-LB