**CONSTANTINE CANNON LLP**
**MATTHEW L. CANTOR (admitted *phv*)**
**AXEL BERNABE (admitted *phv*)**
**JEAN KIM (admitted *phv*)**
**335 MADISON AVENUE, 9TH FLOOR**
**NEW YORK, NY 10017**
**212.350.2700**
**212.350.2701**
mcantor@constantinecannon.com
abernabe@constantinecannon.com
jkim@constantinecannon.com

*Lead Counsel for Plaintiffs and the [Proposed] Class*

**THE MEHDI FIRM, PC**
**AZRA Z. MEHDI (220406)**
**One Market**
**Spear Tower, Suite 3600**
**San Francisco, CA 94105**
**(415) 293-8039**
**(415) 293-8001 (fax)**
azram@themehdifirm.com

*Co-Lead Counsel for Plaintiffs and the [Proposed] Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DJENEBA SIDIBE, DIANE DEWEY and JERRY JANKOWSKI on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SUTTER HEALTH,<br><br>Defendant. | Case No. 3:12-cv-4854-LB<br><br>CLASS ACTION<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT SUTTER HEALTH'S MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT**<br><br>**DATE:   March 6, 2014**<br>**TIME:    9:30 a.m.**<br>**The Honorable Laurel Beeler** |

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................4

    A.    The Parties ....................................................................................................4

    B.    The Purchase of Inpatient Hospital Services by Commercial Health Plans .................5

    C.    The Relevant Product and Geographic Markets .........................................5

        1.    Markets for Inpatient Hospital Services in Individual HSAs .........................5

            a.    The Product Market For The Purchase of Inpatient Hospital Services by Commercial Health Plans......................................................5

            b.    The Geographic Markets For The Purchase of Inpatient Hospital Services by Commercial Health Plans......................................................6

        2.    Markets for the Sale of Commercial Health Insurance to Subscribers in Northern California Metropolitan Statistical Areas ("MSAs") ........................6

            a.    The Commercial Health Insurance Product Market ..............................6

            b.    The Geographic Markets for the Sale of Commercial Health Insurance to Subscribers ....................................................7

    D.    Sutter Possesses Substantial Market Power. ..............................................7

    E.    The Tying Arrangements Sutter Has Forced On Health Plans ....................................8

    F.    The "Anti-Steering" Provisions that Sutter Has Forced Upon Health Plans .................9

    G.    Sutter Has Caused Massive Adverse Economic Effects. ............................9

        1.    Sutter Has Caused the Price of Medical Care to Increase ................................9

        2.    Sutter Has Substantially Foreclosed Competition in Inpatient Hospital Services. ......................................................10

        3.    Sutter Has Harmed the Quality of Patient Care. .............................................12

    H.    Plaintiffs and Class Members Have Suffered Antitrust Injury. ...............................12

ARGUMENT ........................................................................................................................13

    A.    The Legal Standard .....................................................................................13

    B.    Plaintiffs Have Alleged Cognizable Tying Claims.....................................13

C.      Sutter's Steering Provisions Exacerbate and Reinforce The Anticompetitive Effects of Its Tying Arrangement. ...................................................................18

D.      Plaintiffs Have Pled Plausible Geographic Markets. ....................................20

E.      Plaintiffs Have Standing to Sue for Damages. .............................................24

F.      Plaintiffs Have Pled Plausible Monopolization and UCL Claims ...............25

CONCLUSION ..................................................................................................................25

<u>Cases</u>

*Am. Ad Mgmt. v. GTE Corp.*,
    92 F.3d 781 (9th Cir. 1996) ............................................................................. 14

*Barry v. Blue Cross of Cal.*,
    805 F.2d 866 (9th Cir. 1986) ............................................................................. 20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................... 12-13

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982) ......................................................................................... 16

*California v. Sutter Health*,
    130 F. Supp. 2d 1109 (N.D. Cal. 2001) ........................................................... 21

*Cascade Health Solutions v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008) ....................................................................... 15, 16

*Cascades Computer Innovation LLC v. RPX Corp.*,
    2013 WL 6247594 (N.D. Cal. Dec. 3, 2013) .................................................... 18

*Continental Ore v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ......................................................................................... 18

*Conwood Co. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) ....................................................................... 16, 18

*Covad Commc'ns Co. v. Pac. Bell*,
    1999 WL 33757058 (N.D. Cal. Dec. 14, 1999) ............................................... 18

*Datagate, Inc. v. Hewlett-Packard Co.*,
    941 F.2d 864 (9th Cir. 1991) ............................................................................. 16

*Datel Holdings Ltd. v. Microsoft Corp.*,
    712 F. Supp. 2d 974 (N.D. Cal. 2010) .......................................................... 13-14

*Discover Fin. Servs. v. Visa U.S.A. Inc.*,
    598 F. Supp. 2d 394 (S.D.N.Y. 2008) ............................................................... 24

*Eastman Kodak co. v. Image Technical Servs., Inc.*,
    504 U.S. 451 (1992) ......................................................................................... 14

*FTC v. St. Luke's Health Sys., Ltd.*,
    No. 1:13-cv-00116-BLW, 1:12-cv-00560-BLW (D. Idaho Jan. 24, 2014) .................... 3, 4, 21, 22

*Hospital Corp. of Am. v. FTC*,
    807 F.2d 1381(7th Cir. 1986), ..................................................................... 22-23

*Ill. Tool Works Inc. v. Independent Ink Inc.*,
    547 U.S. 28 (2006) ........................................................................................... 13

*In re Gilead Sci. Secs. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ............................................................... 13

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ............................................................... 13

*In re VisaCheck/MasterMoney Antitrust Litig.*,
    2003 Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003) ............................... 16, 26

*In re Webkinz Antitrust Litig.*,
    695 F. Supp. 2d 987 (N.D. Cal. Feb. 17, 2010) .................................... 17

*In re Webkinz Antitrust Litig.*,
    2010 U.S. Dist LEXIS 111810 (N.D. Cal. Oct. 20, 2010) ..................... 15, 17

*Jefferson Parish Hosp. Dist. No. 2 et al. v. Hyde*,
    466 U.S. 2 (1984) ....................................................................... 13, 14, 15

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ............................................................... 18

*New York Medscan, LLC v. NYU Sch. of Med.*,
    430 F. Supp. 2d 140 (S.D.N.Y. 2006) .................................................. 15

*Newcal Indus., Inc. v. IKON Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ......................................................... 13, 20

*Pecover v. Elec. Arts Inc.*,
    633 F. Supp. 2d 976 (N.D. Cal. 2009) .................................................. 21

*Pelfresne v. Vill. of Lindenhurst*,
    2004 WL 1660812  (N.D. Ill.  July 23, 2004) ...................................... 16

*Person v. Google, Inc.*,
    2007 WL 832941  (N.D. Cal. Mar. 16, 2007) ...................................... 20

*Pinnacle Sys., Inc. v. XOS Techs., Inc.*,
    2003 WL 21397845 (N.D. Cal. June 17, 2003) .................................... 20

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997) ......................................................... 20, 22

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................... 25

*Rick-Mik Enter. v. Equilon Enter.*,
    532 F.3d 963 (9th Cir. 2008) ......................................................... 14, 15

*Stapley v. Pestalozzi*,
    733 F.3d 804 (9th Cir. 2013) ............................................................... 12

*Tate v. Pac. Gas & Elec. Co.*,
    230 F. Supp. 2d 1072 (N.D. Cal. 2002) .............................................. 17

*U.S. v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ......................................................................... 16, 17

*U.S. v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ........................................................................ 16, 17

*United States Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir.1988) ............................................................................. 24

*Universal Grading Service v. eBay, Inc.*,
    2012 WL 70644  (N.D. Cal. Jan. 9, 2012) ......................................................... 20


Other Authorities

2B PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW
    (3d ed. 2007) ..................................................................................................... 22

10 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW
    (2d ed. 2004) ..................................................................................................... 15

ABA Section of Antitrust Law, *Antitrust Law Developments*,
    (7th ed. 2012) .................................................................................................... 14

Clark C. Havinghurst, & Barak D. Richman, *The Provider Monopoly Problem in Health Care*,
    89 OREGON L. REV. (2011) ............................................................................... 19

Gregory S. Vistnes & Yiania Sarafidis, *Cross-Market Hospital Mergers: A Holistic Approach*,
    79 ANTITRUST L.J., 253 (2013) ........................................................................ 21

**PRELIMINARY STATEMENT**

This case concerns illegal tying arrangements forced upon commercial health plans by defendant Sutter Health to the detriment of patients/health plan subscribers, such as plaintiffs. These arrangements have caused (1) patients/subscribers to pay massive anticompetitive overcharges (¶¶ 101-04),[1] and (2) hospital competitors to suffer substantial foreclosure in relevant markets for Inpatient Hospital Services sold to commercial health plans (¶¶ 86-91). The TAC streamlines and focuses plaintiffs' antitrust theory. It recounts that Sutter has exercised its market power over Inpatient Hospital Services in each of nine Northern California hospital service areas (HSAs)[2] to require health plans to purchase all of Sutter's Inpatient Hospital Services throughout fourteen Northern California HSAs[3] at supra-competitive prices. ¶¶ 5, 28-33, 78. The TAC also explains how Sutter has reinforced the anticompetitive effects of its tying arrangements by imposing provisions upon health plans that prevent them from steering subscribers to lower-cost medical practices, thus barring health plans from engaging in a central managed care function. ¶¶ 6, 34-38. And the TAC specifies how the higher medical costs caused by Sutter have been passed downstream to patients/subscribers, such as plaintiffs, in the form of inflated health insurance premiums and co-insurance payments. ¶¶ 7, 101-04.

Sutter's actions constitute violations of Sherman Act § 1 (illegal tying, under both *per se* and rule of reason analysis, and illegal course of conduct), Sherman Act § 2 (illegal monopoly maintenance and attempts to monopolize), the Cartwright Act and California's UCL. Consequently, plaintiffs sue, on behalf of themselves and similarly situated persons, for damages incurred as a result of Sutter's conduct and injunctive relief.

The antitrust theory specified in the TAC is more than merely plausible and easily satisfies minimal pleading standards. The TAC is rich in factual detail, relying on various public sources that

---

[1] These paragraph references are to the Third Amended Complaint, filed December 9, 2013 (referred to as the "TAC"). (Dkt. No. 69.)

[2] Antioch, Berkeley, Burlingame, Castro Valley, Davis, Roseville, San Leandro, Tracy and Vallejo.

[3] Antioch, Berkeley, Burlingame, Castro Valley, Davis, Modesto, Oakland, Roseville, Sacramento, San Francisco, San Leandro, Santa Rosa, Tracy and Vallejo.

1   substantiate plaintiffs' claims, including statements by health plans, insurance administrators,

2   antitrust enforcers, well-regarded economists, Sutter itself and public advocates.  For example, the

3   TAC references a December 3, 2013 *New York Times* feature article that confirms Sutter's exercise

4   of market power, quoting a noted economist and USC Professor of Economics as saying: "Sutter is a

5   leader – a pioneer – in figuring out how to . . . raise prices and decrease competition."  ¶ 1.

6          Nonetheless, Sutter now moves for dismissal despite not even contesting plaintiffs'

7   allegations of market power, health plan forcing, or the supracompetitive prices that Sutter's conduct

8   has caused health plan members to incur.  Sutter's motion is based on errors of law and quibbling

9   over factual issues.  It should be denied.

10          *First*, Sutter argues that plaintiffs' Section 1 claims should be dismissed because the TAC

11   "does not include ***any*** allegations of anticompetitive effects caused by the so-called tying

12   agreement."  MTD at 6 (emphasis in original).[4]  That is wrong.  Over twenty paragraphs in the TAC

13   detail the anticompetitive effects of Sutter's challenged conduct, including: 1) the substantial

14   foreclosure incurred by competitor hospitals; 2) resulting supra-competitive prices for Inpatient

15   Hospital Services paid by health plans; and 3) harm to patient care.  ¶¶ 7-9, 86-104.  Sutter argues,

16   however, that providers must be entirely barred from joining a health plan's network in order for

17   plaintiffs to prove the requisite anticompetitive impact.  MTD at 7-8.  That is not the law: absolute

18   foreclosure need not be proven to prevail on a Section 1 claim under any mode of analysis.  Indeed,

19   plaintiffs asserting *per* se tying claims – like those here – need only prove that the ties led to

20   economic distortions on some "not insubstantial amount of commerce" in the tied market, such as

21   higher prices or some losses incurred by the defendant's competitors.

22          Here, the distortions of the competitive landscape in the relevant markets alleged in the TAC

23   are readily apparent.  But for Sutter's conduct, many more patients would have visited lower-cost

24   hospitals for treatment rather than Sutter hospitals.  If not for Sutter's forcing, Sutter hospitals would

25   be "out-of-network" due to the higher prices demanded by Sutter.  In turn, patients seeking to reduce

---

[4]  References to "MTD at __." are to Defendant Sutter Health's Memorandum of Law in support of its Motion to Dismiss Third Amended Complaint Pursuant to Rule 12(b)(6), filed on August 2, 2013. (Dkt. No. 40.)

out-of-pocket costs (which are paid to visit out-of-network providers) would have chosen to visit lower-cost hospital competitors instead of Sutter.  Moreover, some of those low cost hospitals would have been included in low cost "high performance" networks which, in turn, would have increased their patient volume.  *See, e.g.*, ¶¶ 87-89.  Sutter's tying arrangements altered the patient flow that would have occurred in a competitive market, causing health plans to incur higher prices and foreclosing competitors.  This is precisely the type of harm to be expected from anticompetitive tying arrangements, such as Sutter's.

*Second*, Sutter erroneously argues that plaintiffs' tying claims fail because the TAC does not properly specify the contours of coherent tying and tied markets.  Sutter contends that HSAs, which are defined by *The Dartmouth Atlas of Health Care* – an industry authority whose analysis is used for evaluating the provision of medical services in various localities – are not plausible antitrust markets because they do not consider where patients "could go" for Inpatient Hospital Services.  MTD at 13-16.  However, the market definition analysis that Sutter urges is flawed, as it focuses on the wrong demand.  The relevant market here is the sale of Inpatient Hospital Services to *commercial health plans*.  Accordingly, one must look at the economic substitutes that health plans – not patients – have in determining the scope of the geographic market.  *See* Findings of Fact & Conclusions of Law, *FTC v. St. Luke's Health Sys., Ltd.*, No. 1:13-cv-00116 BLW, 1:12-cv-00560-BLW ¶¶ 50-73 at 12-16 (D. Idaho Jan. 24, 2014) (defining the relevant geographic market for particular medical services by looking to insurer demand for health care services) (attached hereto under Tab 1).  Those health plan substitutes are based on where most health plan members/patients actually go for Inpatient Hospital Services, not where any health plan members theoretically could go for same.  In any event, the geographic market definition inquiry is a factual one that is reserved for summary judgment and/or trial.

The test for market definition at the pleadings stage is plausibility.  Here, the proposed HSA-wide markets for the purchase of Inpatient Hospital Services by health plans are readily endorsed by experts, let alone plausible.  HSAs are widely used in the health care industry by hospital officials, economists and policy makers to assess the quality, competitiveness and utilization of hospital

services and to establish appropriate pricing mechanisms in numerous localities.  Contrary to

Sutter's incorrect recitation of the law, geographic markets for certain health care services have been

held to be very localized – often no broader than a single municipality – as recently held in *St.*

*Luke's*.  *Id.*  The referenced HSAs are plausible geographic markets.

        *Third*, Sutter again argues that plaintiffs do not have standing to claim certain damages.

Plaintiffs have standing to sue for damages as indirect purchasers under the Cartwright Act and for

an injunction under Section 16 of the Clayton Act.  They (and all Class members) can recover

damages for all monetary losses that were caused by the anticompetitive impact of Sutter's conduct.

This includes overcharge damages for inflated insurance premiums that were passed downstream

and resulted from supracompetitive prices that Sutter forced upon health plans.  It also includes out-

of-pocket expenses (*i.e.*, co-payments and deductibles) that they would not have had to pay in a

competitive market.

        *Fourth*, Sutter erroneously seeks dismissal of plaintiffs' Section 2 claims.  These claims are

supported by the TAC's contentions that Sutter wields monopoly power for Inpatient Hospital

Services in nine HSAs, and is dangerously likely to do so in five HSAs.  ¶¶ 147, 154.  Sutter's power

over price, ability to exclude, and market shares all demonstrate this, as the TAC articulates.  These

claims are also supported by the TAC's allegations of Sutter's exclusionary conduct in the form of

tying and anti-steering protocols.

        The remainder of Sutter's arguments regarding plaintiffs' UCL claim also fails as a matter of

law and should be rejected.

## STATEMENT OF FACTS

### A.  The Parties

        Plaintiffs Djeneba Sidibe ("Sidibe"), Diane Dewey ("Dewey") and Jerry Jankowski

("Jankowski") are or have been residents of Alameda, Marin, San Francisco and San Mateo counties

during the applicable damages period.  During that time, plaintiffs have paid premiums to Aetna,

Anthem Blue Cross, Regence Blue Cross, Premera Blue Cross and Blue Shield health plans, and

deductibles, co-payments and other out-of-pocket payments for their health care. ¶¶ 16-18.  Also

during that time, plaintiffs Sidibe and Dewey have received medical services at Sutter's facilities.

¶ 104 ("Plaintiffs and Class members have also paid higher deductibles and co-payments for medical care from Sutter facilities").  They seek to represent a class of persons enrolled in certain health plans that contract with Sutter or its affiliates.

Defendant Sutter controls the largest and most dominant network of hospitals and medical service providers in Northern California.  ¶ 19.

**B.      The Purchase of Inpatient Hospital Services by Commercial Health Plans**

Commercial health plans purchase Inpatient Hospital Services for the benefit of their insured members.  In a competitive market, a commercial health plan contracts for Inpatient Hospital Services based upon hospitals offering competitive pricing and quality services.  The associated costs to commercial health plans for their purchase of Inpatient Hospital Services are ultimately passed on to their members in the form of insurance premiums.  Therefore, insurance premiums paid by health plan members, such as plaintiffs, increase when their health plans are forced to purchase Inpatient Hospital Services at supra-competitive rates.  These members also pay for the costs of medical services provided by hospitals in the form of out-of-pocket expenses.  ¶ 23.

**C.      The Relevant Product and Geographic Markets**

*1.      Markets for Inpatient Hospital Services in Individual HSAs*

a.      <u>The Product Market For The Purchase of Inpatient Hospital Services by Commercial Health Plans</u>

The sale of Inpatient Hospital Services to commercial health plans is a relevant product market.  ¶ 39.  Inpatient Hospital Services are a group of medical services that include a hospital stay.  ¶ 40.

There are no reasonable economic substitutes for Inpatient Hospital Services sold to commercial health plans.  Health plans cannot switch to another set of services in response to a price increase for Inpatient Hospital Services.  ¶ 44.

b.    The Geographic Markets For The Purchase of Inpatient Hospital Services by Commercial Health Plans

The following fourteen Northern California HSAs are relevant geographic markets for Inpatient Hospital Services: Antioch, Berkeley, Burlingame, Castro Valley, Davis, Modesto, Oakland, Roseville, Sacramento, San Francisco, San Leandro, Santa Rosa, Tracy and Vallejo. ¶¶ 45-61.  Of these fourteen HSAs, nine are "Tying Markets" (*i.e.,* Antioch, Berkeley, Burlingame, Castro Valley, Davis, Roseville, San Leandro, Tracy and Vallejo) and five are "Tied Markets" (*i.e.,* San Francisco, Oakland, Sacramento, Modesto and Santa Rosa).  ¶ 47.  Sutter provides Inpatient Hospital Services in all fourteen HSAs.  ¶¶ 48-61.

HSAs are hospital service areas that have been defined by *The Dartmouth Atlas of Health Care*, a well-established authority.  HSAs are widely utilized in the healthcare industry to analyze the provision of hospital services.  ¶¶ 3, 25, 45.  *The Dartmouth Atlas* has found HSAs to be "local health care market[s] for hospital care" and has defined them as "a collection of ZIP codes whose residents receive most of their hospitalizations for the hospitals in that area."  ¶ 45.[5]

Health plans would pay a small, but significant, non-transitory increase in price to a hypothetical (or actual) monopolist of Inpatient Hospital Services located in each of these HSAs. ¶¶ 48-61.  Accordingly, HSAs are coherent relevant markets for antitrust purposes.

2.    *Markets for the Sale of Commercial Health Insurance to Subscribers in Northern California Metropolitan Statistical Areas ("MSAs")*

a.    The Commercial Health Insurance Product Market

The sale of commercial health insurance to subscribers is a relevant product market. Individuals and employers typically obtain health insurance from health plans to pay for medical expenses.  ¶ 62.   Health plans compete to be chosen by individuals and employers based upon, *inter*

---

[5]  The requirements of California's Knox-Keene Act further suggest that HSA borders are roughly congruent with relevant geographic markets for Inpatient Hospital Services sold to commercial health plans.  ¶ 46.  That Act ensures access for health plan members to local hospitals for Inpatient Hospital Services by requiring all health plans to contract with a hospital located within 30 minutes or 15 miles of member residences or workplaces.  *Id.*

*alia*, their provider networks, rates for premiums and the cost to the customer of using providers.  ¶ 64.

There are no reasonable substitutes for the purchase of commercial health insurance by individuals or employees.  Purchasers of health insurance would pay a small, but not insignificant, non-transitory increase in price from a hypothetical (or actual) monopolist of such insurance.  ¶¶ 64-65.

Health plans purchase Inpatient Hospital Services for use by their members and include contracted access to such services as part of the commercial health insurance they sell.  Therefore, the downstream market for the sale of commercial health insurance is inextricably linked with the upstream market for the sale of Inpatient Hospital Services to health plans.  ¶ 67 (*See* Chart identifying the link between the two relevant product markets).

> b.   The Geographic Markets for the Sale of Commercial Health Insurance to Subscribers

The relevant geographic markets for commercial health insurance are the following six Northern California Metropolitan Statistical Areas ("MSAs"):  (1) Modesto MSA, (2) Sacramento-Roseville-Arden-Arcade MSA, (3) San Francisco-Oakland-Fremont MSA, (4) Santa Rosa-Petaluma MSA, (5) Stockton MSA, and (6) Vallejo-Fairfield MSA.  ¶ 68.

Health plan members strongly prefer health plans with networks of hospitals and physicians that are within the MSA where they work or live.  Antitrust enforcers have previously recognized that the geographic scope of various commercial health insurance markets is MSA-wide.  ¶ 69.  *See, e.g.,* Competitive Impact Statement, *U.S. v. Blue Cross and Blue Shield of Mont.*, No. 1:11-cv-00123-RFC at 10-11 (D. Mont. Nov. 8, 2011).

**D.   Sutter Possesses Substantial Market Power.**

Sutter possesses substantial market power in *each* of the Tying Markets for Inpatient Hospital Services.  Sutter has a 100% share in each Tying Market, other than San Leandro.  ¶¶ 48-

53, 55-56 and an approximate 78% share in the San Leandro HSA.  ¶ 54.  These shares and the high costs of entry demonstrate that Sutter has market power in the Tying Markets.  ¶ 78.[6]

There is also direct evidence of Sutter's market power in the Tying Markets.  Sutter's prices for hospital services in each of these markets are substantially higher than the prices of competitors.  ¶ 79.  In 2004, CalPERS, the largest pension fund in the United States, found that Sutter demanded 2005 ***rates at least 50% higher*** than other hospitals in its Northern California markets.  ¶ 80.  Similarly, an analysis performed by Blue Cross of California in 2004 found:

> The average cost of claims paid for CalPERS PPO Basic plan participants at Sutter hospitals is ***73% greater*** than the average cost of all other hospital claims paid on behalf of CalPERS PPO Basic plan participants in California.

¶ 80.  Moreover, CalPERS' Health Benefits Committee observed the following regarding Sutter's prices: "Sutter Health is a huge outlier.  Its costs are 60% higher than its Northern California peers and 80% higher than the statewide average."  ¶ 82.  News sources, including *Bloomberg* and the *L.A. Times* have also reported that Sutter charges 40% to 70% more than its competitors.  ¶¶ 81-82.  Even Sutter executives have touted Sutter's pricing power over health plans by noting that Sutter affiliated hospitals can charge 30% to 40% more than competing hospitals.  ¶ 83.

Finally, Sutter's ability to force the subject tying arrangements, anti-steering clauses, and/or supracompetitive rates upon health plans is evidence of Sutter's massive market power.  ¶ 85.

**E.     The Tying Arrangements Sutter Has Forced On Health Plans**

Through the exercise of its market power, Sutter has forced health plans to include in their networks Sutter's higher-priced Inpatient Hospital Services in the five Tied Markets.  ¶ 28.  For example, Sutter has forced health plans to include in their contracts with Sutter an "all or nothing" provision with language identical or similar to the following:

> Each payer [*i.e.*, commercial health plan] accessing Sutter health providers shall designate ALL Sutter Health providers . . . as participating providers unless a Payer excludes the entire Sutter health provider network.

---

[6]  Sutter wields market power in these HSAs over health plans because the other large hospital system in Northern California – Kaiser Permanente – does not offer to contract with non-Kaiser health plans.  It is therefore not a competitor in the relevant market for Inpatient Hospital Services sold to health plans.  ¶ 4 n.1.

¶ 28.  Sutter has also orally conditioned the inclusion in provider networks of its "must have" services in the Tying Markets on the inclusion of its services in the Tied Markets.  *Id.*

**F.    The "Anti-Steering" Provisions that Sutter Has Forced Upon Health Plans**

In a competitive managed care regime, health plans have the ability to steer some of their members to lower-cost, quality healthcare providers in their provider networks.  Health plans do this to reduce the cost of the medical expenses that they pay.  ¶ 34.  Sutter, however, has included provisions in a number of its agreements with health plans to force them to divert members from lower-cost hospitals to higher-cost Sutter hospitals.  These "anti-steering" clauses reinforce and exacerbate the anticompetitive effects of Sutter's tying arrangements.

For example, one Sutter contract includes a provision that requires the health plan to "[a]ctively encourage members obtaining medical care to use Sutter Health Providers" and to punish members who use non-Sutter providers through the use of, *inter alia*, "financial penalties."  ¶ 35. The penalties to health plans for failing to steer members to Sutter facilities are severe:

> If Sutter Health or any provider learns that a payer . . . does not actively encourage members to use network participating providers [i.e., Sutter-only providers] . . . **Sutter shall have the right . . . to terminate the payer's right to negotiated rates.  In the event of such termination, the terminated payer shall pay for covered services rendered by providers at 100% of billed charges** . . .

¶ 35 (emphasis added).  In other words, health plans that fail to steer to Sutter are threatened with having to pay Sutter double what insurers typically pay for hospital procedures.  ¶ 36.  Health plans are thus forced to incentivize members to utilize *higher-cost* Sutter facilities and steer them away from *lower-cost* providers.  ¶ 37.  This is contrary to the core function of managed care, pursuant to which health plans control costs by steering members to lower-cost providers.  *Id.*

**G.    Sutter Has Caused Massive Adverse Economic Effects.**

*1.    Sutter Has Caused the Price of Medical Care to Increase*

Sutter's anticompetitive practices have permitted Sutter to extract supra-competitive prices in both the Tying and Tied Markets.  ¶ 92.  Some irreducible number of health plan members will visit a particular hospital for treatment even if that hospital is higher-priced, particularly because the rates that health plans pay for Inpatient Hospital Services are not transparent to health plan members.

¶ 93.  Accordingly, Sutter's tie, which forces health plans to include higher priced hospitals in their networks, drives up prices for medical services.  *Id.*

Industry authorities and news sources confirm the high prices resulting from Sutter's anticompetitive conduct.  A July 2012 report by CALPIRG found that:

> In California, for example, Sutter Health has two dozen facilities in northern California, and ***it negotiates prices with insurers on an "all or none" basis***. In a city where Sutter Health represents a large share of the market it can command a higher price from insurers, and ***then by negotiating a systemwide contract it can impose higher rates at all its hospitals***.

(emphasis added).  ¶ 95.  A March 2011 *L.A. Times* article details statements by health plan executives regarding how Sutter leverages its market power to control prices: "Insurance companies say that Sutter Health's size and **dominant position in many local markets give it the upper hand in contract negotiations over prices and which of its hospitals are included in the insurers' networks.**"  ¶ 96 (emphasis added).

For example, a recent *New York Times* exposé, dated December 3, 2013, notes that prices "for many procedures" at Sutter's California Pacific Medical Center in the San Francisco HAS "are among the top 20 percent in the country."  ¶ 97.  The UCSF Medical Center, a world renowned teaching hospital, "charges far less per day" for hospital services than Sutter does in San Francisco, particularly when the greater severity of illnesses of patients is factored in.  *Id.*[7]

### 2. *Sutter Has Substantially Foreclosed Competition in Inpatient Hospital Services*

Sutter has substantially foreclosed competition in the relevant markets.  As a result of Sutter's tie, Sutter hospitals offering Inpatient Hospital Services do not have to compete with other hospitals for inclusion in commercial health plan networks.  ¶ 86.  In each of the Tied Markets, Sutter's conduct has foreclosed non-Sutter hospitals by causing them to lose a substantial number of patients that they otherwise would have treated. ¶ 87.   This has resulted from Sutter's forcing health

---

[7]  The *Times* also notes – by reference to comments by Professor Glenn Melnick of USC, an economist that specializes in health care matters – how Sutter's higher prices have caused other hospitals in the relevant markets to increase prices for Inpatient Hospital Services.  ¶ 98.  It states that the "high prices" that Sutter has charged "have had a ripple effect across Northern California, allowing smaller hospitals to charge more as well."  *Id.*

plans to include Sutter facilities located in the Tied Markets in their networks.  But for this forced network inclusion, health plan members would have had greater financial incentives (*i.e.*, avoiding "out-of-pocket" costs associated with going "out of network") to visit non-Sutter hospitals.  *Id.* Accordingly, in the absence of Sutter's tie, many health plan members would have chosen to seek medical treatment at competitive, non-Sutter facilities in the Tied Markets rather than pay these "out-of-pocket" costs.  *Id.*

Sutter's anti-steering provisions, which preclude plans from steering patients away from Sutter facilities, have also caused competing hospitals in the Tied Markets to lose substantial patient volume.  ¶ 88.   In a competitive market, health plans would not have been precluded from channeling, at least some members, to lower-cost, quality providers and away from Sutter.  *Id.*  To the contrary, in a market not distorted by these anti-steering provisions, health plans would have had an economic incentive to engage in steering patients to lower-cost facilities.  Accordingly, Sutter's forcing of these anti-steering provisions upon health plans have harmed lower-cost competitors in the Tied Markets by causing them to lose patient volume.  *Id.*

Specifically, Sutter's tying and anti-steering arrangements have thwarted health plans from launching lower-cost limited "high performance" networks in the Tied Markets as they have elsewhere in the country.  ¶ 89.  These high performance networks – which would have not included higher cost, Sutter hospitals – would have been used by members who are looking to purchase lower-priced insurance products.  *Id.*  But for Sutter's anticompetitive conduct, a substantial number of health plan members would have frequented the lower-cost hospitals in high performance networks.  *Id.*[8]

---

[8]   The Office of the Attorney General of Massachusetts (AGO) has condemned precisely such arrangements for causing the foreclosure of limited high-performance networks.  It has found, "[t]he commercial health care marketplace has been distorted by contracting practices that reinforce and perpetuate disparities in pricing," and that, as with Sutter, "providers with market leverage are able to obtain contractual provision that prohibit or inhibit insurers from creating limited network products and/or tiered products that might steer patients away from them."  *Available at* http://www.mass.gov/ago/docs/healthcare/2010-hcctd-full.pdf.  In effect, the AGO recognized that providers such as Sutter are able to use their market power to force anti-steering provision that foreclose competitor hospitals from launching limited high-performance networks.

1    Sutter's tying arrangements and anti-steering provisions have also foreclosed substantial

2    commerce in each of the Tying Markets for Inpatient Hospital Services.  But for these provisions,

3    hospitals would have had much greater ability and incentive to open competitive facilities in the

4    Tying Market.  ¶ 91.  With Sutter's anti-steering provisions in force, opening competing hospitals in

5    these markets has not been viable.  *Id.*  But for these provisions, it is likely that new facilities would

6    have opened in the Tying Markets.  *Id.*

7        3.      *Sutter Has Harmed the Quality of Patient Care*

8    Sutter's anticompetitive practices have also caused the quality of patient care to suffer in the

9    relevant markets.  ¶ 99.  As a result of these anticompetitive practices, Sutter's network does not

10   compete on quality any more than it competes on price.  *Id.*  Consequently, the quality of patient

11   care that Sutter offers is not as high as it would have been in a market where Sutter had to compete

12   for entry into health plan provider networks.  *Id.*  This lack of competition has led to a quality of care

13   that it has violated national medical standards and "jeopardize[d] . . . [Sutter's] participation in the

14   Medicare or Medicaid programs or their accreditation as a health care organization."  ¶ 100

15   (California Health Care Coalition's April 2005 Report).

16   **H.    Plaintiffs and Class Members Have Suffered Antitrust Injury.**

17       The higher costs for Inpatient Hospital Services that have been forced upon health plans due

18   to Sutter's anticompetitive conduct have been passed downstream, in the form of insurance

19   premiums, to plaintiffs and other health plan members in the relevant markets for commercial health

20   insurance.  ¶ 101.  Accordingly, plaintiffs and Class members have incurred antitrust injury.

21       News sources and industry experts confirm the overcharges plaintiffs have been forced to

22   pay.  *L.A. Times* article notes that Aetna "charges customers in Northern California about 30% more

23   in premiums than those in Southern California as a result of higher hospital reimbursements in the

24   north."  ¶ 102.   It also identified that Blue Shield "says it charges up to 40% more for insurance in"

25   Northern, as opposed to Southern, California due to the higher medical costs that it pays there.  *Id.*

26       Plaintiffs and Class members have also incurred additional antitrust injury by paying higher

27   deductibles and co-payments as a result of Sutter's anticompetitive conduct.  ¶ 104.

28

**ARGUMENT**

**A.     The Legal Standard**

A motion to dismiss should not be granted unless the well-stated allegations of the complaint, which are to be taken as true and construed in the light most favorable to plaintiffs, fail to state a claim.  *See Stapley v. Pestalozzi*, 733 F.3d 804, 809 (9th Cir. 2013).  Under *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007), antitrust complaints must merely state sufficient factual matter to state a plausible claim for relief: they are not held to any heightened pleading standard.

Accordingly, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely."  *In re Gilead Sci. Secs. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556); *Newcal Indus., Inc. v. IKON Office Solution,* 513 F.3d 1038, 1044 (9th Cir. 2008) (reversing district court that held that complaint "failed to allege a legally cognizable 'relevant market'"); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 624 (7th Cir. 2010) (Posner, J.).

Here, the TAC far surpasses minimal pleadings standards, particularly by referencing factual contentions made by well-regarded sources that concern Sutter's market power, anticompetitive conduct and the adverse economic consequences that it has caused.

**B.     Plaintiffs Have Alleged Cognizable Tying Claims.**

Tying claims focus on arrangements that force purchasers to buy products or services, such as the Inpatient Hospital Services at issue here, from a seller that exercises market power rather than from elsewhere or on different terms.  As explained in the seminal *per se* tying case:

> the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product *to force the buyer into the purchase of a tied product* that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.  *When such 'forcing' is present, competition on the merits for the tied item is restrained and the Sherman Act is violated.*

*Jefferson Parish Hosp. Dist. No. 2 et al. v. Hyde*, 466 U.S. 2, 12 (1984) (emphasis added).  *Accord, Ill. Tool Works Inc. v. Independent Inck Inc.*, 547 U.S. 28, 34-35 (2006).  When a plaintiff establishes that the defendant-seller possesses market power, it is presumed that the tying arrangement was forced upon the purchaser and anticompetitive impacts have been caused.  *See Ill. Tool Works*, at 547 U.S. at 42-43.   Thus, the Ninth Circuit has held that a plaintiff need only prove

three elements in order to prove a *per se* tying claim: 1) a tie between two separate products or services sold in separate markets; 2) sufficient economic power in the tying product market to affect the tied market; and (3) an effect on a not insubstantial volume of commerce in the tied market. *See Datel Holdings Ltd. v. Microsoft Corp*., 712 F. Supp. 2d 974, 995 (N.D. Cal. 2010) (citing *Eastman Kodak co. v. Image Technical. Servs., Inc.*, 504 U.S. 451, 502 (1992)).  Plaintiffs have pled all three elements.[9]

The Supreme Court has never required proof of anticompetitive impact on a *per se* tying claim.  *See* ABA Section of Antitrust Law, Antitrust Law Developments, 200 (7th ed. 2012) (noting, for example, that the Court in *Eastman Kodak v. Image Technical Servs.,*504 U.S. 451 (1992) does not "refer[] to any requirement of anticompetitive effect in the tied product market.").  Some lower courts have held, however, that some minimal adverse effects from the ties must be shown to cause *per se* condemnation.  They have said, for example, that the *per se* tying rules are offended when the ties cause "reduced competition" on merely a "not insubstantial amount of commerce in the tied market)."  *Rick-Mik Enter. v. Equilon Enter.,* 532 F.3d 963, 971 (9th Cir. 2008).  *See Jefferson Parish*, 466 U.S. at 14 (holding that tie is illegal when it "is used to impair competition on the merits" in the tied market).

Sutter argues that the TAC's *per se* tying claim should be dismissed because it fails to allege that Sutter's tying arrangements have caused anticompetitive effects, which it equates only with substantial foreclosure.  This is wrong on the law, as stated above.  This is also belied by a cursory review of the TAC's many allegations of anticompetitive effects, including substantial foreclosure.  Sutter's ties created precisely the reduced competition that is illegal under tying doctrine – under any mode of analysis.

---

[9]  Plaintiffs have also pled a Rule of Reason tying claim.  That claim is plausible particularly as plaintiffs have pled that Sutter's tying arrangements have caused substantial foreclosure in the relevant markets and that there is "no legitimate or offsetting procompetitive benefit for Sutter's conduct."  ¶ 10.  *See Am. Ad Mgmt. v. GTE Corp.*, 92 F.3d 781, 789 (9th Cir. 1996); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 41-42 (1984) (weighing the "economic benefits as well as economic harms" to determine whether the "anticompetitive impact [of the ties] outweighs its contribution to efficiency").

Specifically, Sutter argues that plaintiffs' claims of anticompetitive effects are "contained almost entirely in two conclusory paragraphs" that fail to identify that these alleged effects occurred in the relevant markets alleged.  MTD at 6-11 (citing ¶¶ 86 and 87).  These contentions are easily refuted by the TAC.  Specifically, the TAC alleges that:

1. **Sutter's Tying Arrangements Caused Substantial Foreclosure In The Relevant Markets.**  The TAC alleges that the ties resulted in anticompetitive effects by causing substantial foreclosure in *each* of the Tied Markets by identifying that (a) competing hospitals in Tied Markets have lost substantial patient volume by virtue of the ties and (b) "high performance" networks, which would not have included Sutter Hospitals, would have been launched in the Tied Markets absent the tying arrangements.  *See supra* at 10-11; ¶¶ 8, 87-91.

2. **Sutter's Tying Arrangements Caused Health Plans To Pay Higher Prices for Inpatient Hospital Services In The Relevant Markets.**  The TAC alleges Sutter's forcing its Inpatient Hospital Services in Tied Markets upon health plans resulted in it being able to charge supracompetitive prices for these services.  ¶¶ 7, 30, 95-97.  This is the essence of an illegal tying claim.  *Jefferson Parish* 466 U.S. at 13.  For example, in *Cascade Health Solutions v. PeaceHealth,* 515 F.3d 883, 915 (9th Cir. 2008), a summary judgment for the defendant on a *per se* tying claim was reversed.  There, the Ninth Circuit held that, where the plaintiff hospital "provided some evidence that its prices . . . . were lower than [the defendant's] prices on those services . . . it is a permissible inference that a rational customer would not purchase [the defendant's] allegedly overpriced product in the absence of a tie."  *Id.* at 915; 10 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW, ¶1756b3 at 301 (2d ed. 2004)."[10]  *Cascade Health* demonstrates that higher prices caused by a tie, is a cognizable anticompetitive effect.

3. **Sutter's Tying Arrangements Harmed Quality Of Patient Care In The Relevant Markets.**  The TAC alleges that Sutter's anticompetitive practices have also caused the quality of patient care to suffer in the each of the relevant markets – a particular anticompetitive harm in a health care antitrust case.  *See, e.g., New York Medscan, LLC v. NYU Sch. of Med.*, 430 F. Supp. 2d 140, 148 (S.D.N.Y. 2006) (denying motion to dismiss in antitrust case when "the quality of diagnostic imaging services purportedly has decreased" due to the alleged restraints).

---

[10]  Sutter argues that high prices alone do not demonstrate anticompetitive impact, citing the Court's prior orders.  MTD at 6 n.4.  Of course, this principle is not controversial.  The fact, for example, that a BMW sedan is priced higher than a Chevrolet sedan, does not demonstrate that BMW engaged in anticompetitive behavior.  However, when prices are *caused* to be higher, not due to differential consumer demand, but because a seller forces purchases of a product through exercises of market power, quintessential anticompetitive impact has occurred.  *See In re Webkinz Antitrust Litig.,* 2010 U.S. Dist LEXIS 111810, at *18 (N.D. Cal. Oct. 20, 2010) (*Webkinz II*) (denying motion to dismiss).  Here, consistent with tying law, the TAC alleges that higher prices were *caused* by Sutter's tying arrangements – not merely that high prices exist.

4. **Sutter's Tying Arrangements Caused Competitive Distortions In The Relevant Markets.**  The TAC also alleges that the competitive process was distorted in *each* of the Tied Markets by the fact that Sutter hospitals do not have to compete to be included in health plan networks.  ¶ 86.  *See Rick-Mik,* 532 F.3d at 971 (The injury created by a tying arrangement "is reduced competition in the market for the tied product.")

Notwithstanding the above, Sutter argues its arrangements are not anticompetitive because its hospital "competitors have contracts with the very same health plans" as Sutter.  MTD at 7.  In other words, Sutter contends that, if Sutter's tying arrangement does not totally foreclose competitors from dealing with health plans with which Sutter contracts, they cannot be anticompetitive.  This is meritless for two reasons.

*First,* anticompetitive effects in a *per se* tying case need not be proven via foreclosure, let alone total foreclosure, but can instead be proven through a showing of different types of anticompetitive effects, including higher prices caused by the tie.  See *supra* at 15.

*Second,* neither a *per se* nor a Rule of Reason tying claim requires a plaintiff to show that the tying arrangement wholly precludes competitors from contracting with health plans. [11]  Two prominent tying cases illustrate this point.  In *Cascade Health*, the Ninth Circuit, in reversing a summary judgment, rejected the defendant hospital's argument that the alleged tie could not be illegal because the plaintiff (and other) hospitals could still contract with health plans.  515 F.3d at 914-15.[12]  In *In re: VisaCheck/MasterMoney Antitrust Litig,* 2003 Dist. LEXIS 4965, at *14

---

[11]  Complete foreclosure or exit of a competitor from a market is not required to demonstrate anticompetitive effects in any type of antitrust case.  *See Blue Shield of Va. v. McCready,* 457 U.S. 465 at 482 (1982) ("[C]ompetitors may be able to prove antitrust injury before they actually are driven from the market") (internal quotes omitted); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 789-90 (6th Cir. 2002) (finding anticompetitive harm despite increase in plaintiff's market share during damages period); *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) ("[t]he test is not total foreclosure. . ."); *U.S. v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001); *Tate v. Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1082 (N.D. Cal. 2002) ("elimination of competition does not require total elimination").

[12]  Contrary to Sutter's contention, the law does not require plaintiffs to specifically identify foreclosed competitors to demonstrate anticompetitive effects.  *See Pelfresne v. Vill. of Lindenhurst*, 2004 WL 1660812, at *14 (N.D. Ill.  July 23, 2004) (holding that at the pleading stage, a plaintiff need only define the relevant market as that to which access had been sought and foreclosed by anticompetitive conduct and need not identify defendant's foreclosed competitors);  *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 870 (9th Cir. 1991) (reversing dismissal of tying claim and finding that allegations of forcing alone were sufficient to show significant impact on competition).  Here, plaintiffs have alleged that *all* competing hospitals in the relevant markets were foreclosed

1    (E.D.N.Y.  Apr. 1, 2003), the court held that the plaintiff need not show that the ties caused absolute

2    foreclosure in order to satisfy any anticompetitive impact requirement on a *per se* tying claim.  That

3    case concerned a class-action brought on behalf of merchants who accepted Visa and MasterCard-

4    branded credit cards.  Under Visa and MasterCard's rules, all merchants who accepted credit cards

5    with the Visa or MasterCard brand also had to accept Visa and MasterCard (signature-based) debit

6    cards, a rule which was challenged as an allegedly illegal tying arrangement.  *Id.* at *1.  There, the

7    district court denied defendants' motion for summary judgment, rejecting defendants' contention

8    that "since the merchants are not precluded from accepting" online (PIN-based) debit cards that

9    competed with those bearing the Visa and MasterCard brands, "the merchants have failed to show

10   that the arrangement poses any threat to competition in the tied market."

11          Sutter wrongly relies on *In re Webkinz Antitrust Litig.,* 695 F. Supp. 2d 987 (N.D. Cal.

12   February 17, 2010) ("*Webkinz I")* to support their argument that *per se* tying claims should be

13   dismissed when the arrangement at issue does not cause complete foreclosure.  Even the language

14   quoted by Sutter in its brief from *Webkinz I* does not support that proposition.  *See* MTD at 7-8.  The

15   *Webkinz I* court lays out several ways in which plaintiffs can allege anticompetitive effects.  It

16   specifically identifies that the *Webkinz* complaint would not have been dismissed if it contained an

17   "allegation that *prices*, output or general market competition has been affected by [defendant's]

18   alleged exclusionary practices."  *Webkinz I,* 695 F. Supp. 2d at 996 (emphasis added).  Here,

19   plaintiffs *have* alleged that prices and general competition have been adversely affected by Sutter's

20   tying arrangements.  *See also Webkinz II,* 2010 U.S. Dist. LEXIS 111810, at *15  (denying motion to

21   dismiss and explaining that plaintiffs' alleged anticompetitive effects in several ways, including that

22   "consumers paid higher prices for tied products" and " plaintiffs' purchases from [defendant's]

23   competitors have substantially decreased as a direct result of the requirement that they buy tied

24   products from" defendant)

25

26   _____

27   due to Sutter's diverting patients who, but for the ties, would have gone to them.  ¶¶ 8, 86-91.  Sutter
     is well aware of these competitors, as is clear from its Motion for Judicial Notice filed in connection
     with its dismissal motion.

28

**C.      Sutter's Steering Provisions Exacerbate and Reinforce The Anticompetitive Effects of Its Tying Arrangements.**

Sutter's anti-steering clauses have exacerbated and reinforced the anticompetitive effects of Sutter's tying arrangements.  ¶¶ 91, 93.  To support its motion, Sutter obfuscates the meaning of these clauses and mischaracterizes the legal principles concerning their propriety.[13]

*First*, Sutter attempts to confuse the meaning of these anti-steering provisions.  On the one hand, Sutter notes that the Court previously stated – in analyzing a different Complaint – that the provisions in question "appear" to benefit all "network providers."  MTD at 10.  On the other hand, Sutter acknowledges that these anti-steering provisions "encourage [health plan] members to stay 'in network' *and use other Sutter providers*."  MTD at 9 (emphasis added).  This latter interpretation of the anti-steering provisions at issue, per the TAC's allegations, is the correct one.  Sutter's provisions are designed to force health plans to "route members away from lower-cost hospitals to higher-cost Sutter hospitals."  ¶ 35.  Sutter's conflicting statements about the meaning of these provisions alone demonstrate that summary adjudication of them is inappropriate.[14]

---

[13]   In a footnote, Sutter acknowledges that plaintiffs' allegations concerning Sutter's anti-steering clause are relevant to Count II, claiming a course of conduct that causes an unreasonable restraint of trade under Section 1.  MTD at 5 n.3.  (These allegations are also relevant to plaintiffs' Section 2 causes of action).  However, Sutter argues that is "not aware" of any Sherman Act claim that is based on a "course of conduct."  *Id.*  The Court should be aware that Supreme Court precedent establishes that claims based on an entire course of conduct, rather than only isolated actions, can be brought under Sections 1 and 2.  *See Continental Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (" [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole").  *Accord LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (stating that allegations of various "exclusionary practices [are to be] considered together"); *Conwood*, 290 F.3d at 783; *Cascades Computer Innovation LLC v. RPX Corp.*, 2013 WL 6247594, at *6 (N.D. Cal. Dec. 3, 2013) (denying motion to dismiss); *Covad Commc'ns Co. v. Pac. Bell*, No. C 98-1887, 1999 WL 33757058, at *11 (N.D. Cal. Dec. 14, 1999) (refusing to dismiss complaint based on "various forms of anti-competitive conduct" despite fact that allegations for "price squeez[ing] standing alone . . . would not equal exclusionary practices").

[14]   Moreover, Sutter's unsupported contention that its competitors can "hav[e] the very same contract language with health plans" (MTD at 9) makes no sense.  As alleged in the TAC, Sutter *requires* health plans to "actively encourage" patients to use Sutter-only providers; if health plans fail to do so, Sutter will have the right to "terminate" the rates negotiated between the health plan and Sutter.  ¶ 35.  By its very terms, health plans cannot be obligated to both encourage members to use Sutter facilities and also be obligated to encourage its members to use non-Sutter providers.  And, in any event, relevant competitors of Sutter cannot force anti-steering language upon health plans, as Sutter has done, because they do not wield substantial market power.

1       *Second,* Sutter argues that these anti-steering provisions are merely unremarkable aspects of

2 managed care.   As the Court stated in its November 7, 2013 Order, some patient steering can be a

3 pro-competitive, managed care functions, particularly when the purpose of the steering is to reduce

4 overall medical expenditures for the health plan.   But, as the TAC explains, the anti-steering

5 provisions at issue here are *not* those used by managed care organizations/health plans to hold down

6 costs.   ¶¶ 34-38.   Rather, they are provisions that are forced upon health plans by Sutter which

7 preclude health plans from managing costs by steering to the most efficient providers.   Anti-steering

8 provisions like Sutter's have been held anti-competitive by courts, competition agencies, and

9 academics.   *See* U.S. Dep't of Justice & Fed. Trade Comm'n, "Statement of Antitrust Enforcement

10 Policy Regarding Accountable Care Organizations Participating in the Medicare Shared Savings

11 Program," 76 Fed. Reg. 67,026, 67030 (Oct. 28, 2011), *available at*

12 http://www.gpo.gov/fdsys/pkg/FR-2011-10-28/pdf/2011-27944.pdf (referenced in ¶ 38 and

13 proscribing that a provider group, like Sutter, should not "prevent[] or discourage[e] private payers

14 from directing or incentivizing patients to choose certain providers . . . through 'anti-steering'

15 clauses."); Fed. Trade Comm'n, Staff Letter regarding Norman PHO Advisory Opinion, at 19 (Feb.

16 13, 2013), *available at* http://www.ftc.gov/sites/default/files/documents/advisory-opinions/norman-

17 physician-hospital-organization/130213normanphoadvltr_0.pdf (referenced in ¶ 38 and noting that

18 PHO at issue did not appear to be "limiting competition," as it did not "prevent" health plans from

19 "directing or incentivizing patients to choose certain providers through 'anti-steering' . . . contractual

20 clauses or provisions"); Final Judgment, *U.S. and State of Texas v. United Reg'l Health Care Sys.,*

21 No. 7: 11-cv 00030 at 6 (N.D. Tex. Sept. 29, 2011) ("Defendant shall not offer or agree to any term

22 in an agreement with a Commercial Health Insurer that prohibits the Insurer from offering products

23 that encourage members to use other in-network Hospital Services Providers").   *See also* Clark C.

24 Havinghurst & Barak D. Richman, *The Provider Monopoly Problem in Health Care*, 89 OREGON L.

25 REV. 847-83 (2011).

26

27

28

1    In light of the TAC's specific allegations, and the substantial legal and expert authority

2    stating that anti-steering provisions, such as Sutter's, are anticompetitive, Sutter's motion to dismiss

3    the TAC's allegations relevant to these anti-steering provisions should be rejected.[15]

4    **D.    Plaintiffs Have Pled Plausible Geographic Markets.**

5    Sutter contends that plaintiffs have not pled plausible markets.  This is incorrect.  It is well-

6    established that neither the product nor the geographic contours of a relevant market need be pled

7    with specificity.  *Newcal*, 513 F.3d at 1045.  As with all other elements of an antitrust claim, the

8    relevant market allegations need only be "plausible," not probable, to defeat Rule 12(b)(6) dismissal.

9    *Pinnacle Sys., Inc. v. XOS Techs., Inc.*, 2003 WL 21397845, at *7 (N.D. Cal. June 17, 2003)

10   (denying motion to dismiss).  This is so because market definition is a fact-intensive enterprise.

11   *Newcal*, 515 F.3d at 1045.[16]

12   *First,* Sutter argues that the relevant geographic markets at issue "must" be based on

13   geographic areas in which seemingly any patient in a geographic area can go for Inpatient Hospital

14   Services.  MTD at 13-14.  This is wrong.  The relevant Inpatient Hospital Services market alleged in

15   this case concerns the "sale of Inpatient Hospital Services to commercial health plans." ¶¶ 39-44.  It

16   is in this market (and over health plans ) that Sutter is leveraging its market power.  A very recent

17   decision from a court in this Circuit confirms that, where commercial health plans are the purchasers

18

19   [15] Sutter's "anti-steering" clauses, which require health plans to steer exclusively to one provider
     (*i.e.*, Sutter), are very different from the anti-steering provisions at issue in *Barry v. Blue Cross of*
20   *Cal.*, 805 F.2d 866, 872 (9th Cir. 1986), a case Sutter cites for support.  MTD at 9.  The provisions
     at issue in *Barry* merely provided that health plans could steer patients to in-network (versus out-of-
21   network) providers.  Far from supporting Sutter, *Barry* underscores that health plans' ability to make
     decisions about inclusion/exclusion in their networks and steer patients to those that are in-network
22   is critical to a competitive managed care system.  Sutter's ties and anti-steering provisions bar health
     plans from performing this essential function.
23
     [16] The vast majority of the case law Sutter relies upon in challenging plaintiffs' geographic market
24   definition concerned a ruling on the factual merits.  Sutter fails to cite a single case where a court
     dismissed a complaint based upon a finding of an inadequately pled geographic market.  *See*
25   *generally* cases cited in MTD at 14-21. The only pleadings stage opinions Sutter cites concerned
     inadequately pled *product* markets, the contours of which Sutter does not challenge in the instant
26   motion. *See* MTD at 13, 21 (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438
     (3d Cir. 1997) (dismissal for a failure to sufficiently allege a product market); *Universal Grading*
27   *Service v. eBay, Inc.*, 2012 WL 70644, at * 7 (N.D. Cal. Jan. 9, 2012) (same); *Person v. Google,*
     *Inc.*, 2007 WL 832941, at *4 (N.D. Cal. Mar. 16, 2007) (same)).
28

of medical services, the market definition exercise must look to how these health plans, not patients, would respond to a price hike.  *See St. Luke's*, No. 1:13-cv-00116, ¶ at 13.  Sutter's claim that the market definition exercise should be solely based on where *any* patient can theoretically turn to an alternative hospital, as opposed to where *health plans* can turn to alternative hospitals, is out of touch with recent antitrust analysis concerning how to define the geographic contours of hospital markets. *See e.g.,* Gregory S. Vistnes & Yianis Sarafidis, *Cross-Market Hospital Mergers: A Holistic Approach*, 79 ANTITRUST L.J., 253, 291 (2013) ("In recent years, the federal antitrust agencies have increasingly adopted the perspective of health plans as the relevant customers when analyzing hospital mergers.  This focus on the substitution options facing health plans, rather than individual patients, has similarly meant that relevant antitrust markets have been defined from the perspective of health plans").[17]

The TAC alleges that "there are no economic substitutes to commercial health plans for Inpatient Hospital Services provided in" *each* of the various markets alleged.  ¶¶ 41-61.  In other words, the TAC confirms that health plans cannot purchase Inpatient Hospital services outside any of the relevant HSA markets to substitute for Inpatient Hospital services that are provided within those HSA markets.  To further detail this, the TAC also makes allegations that are wholly consistent with the well-established test for defining markets, which is set forth in the DOJ/FTC *Horizontal Merger Guidelines*.  *See Pecover v. Elec. Arts Inc.*, 633 F. Supp. 2d 976, 981 (N.D. Cal. 2009) (denying motion to dismiss where plaintiffs defined a product market in accordance with the *Horizontal Merger Guidelines*).  Those Guidelines look to how direct purchasers – *e.g.*, commercial health plans – would react to a price increase by the supplier – *e.g.*, Sutter.  *See St. Luke's*, No. 13-

---

[17]  Sutter relies on a twelve year old preliminary injunction case, *California v. Sutter Health*, 130 F. Supp. 2d 1109 (N.D. Cal. 2001), arguing that the geographic hospital markets that plaintiffs allege are not plausible.  That Section 7 case, which concerned an attempt by California to block the acquisition of Summit Hospital by Sutter's Alta Bates Medical Center, is inapposite.  The market definition analysis in that case was based on a patient substitution test not applicable in this case concerning market power exercised over health plans.  Moreover, the outcome of that case, which did not stop that transaction, has been heavily criticized as erroneous.   TAC paragraph 84 details, for example, how the FTC concluded that, as a result of that transaction, massive anticompetitive impact was incurred.  According to the FTC, Summit Hospital increased prices 29% to 72 % per procedure following the closing of that deal.  ¶ 84.

cv-000116,  ¶¶ 52-56 at 13, 52-56 (looking to *Merger Guidelines* test in determining geographic scope of market for the purchase of primary care services by health plans).

Specifically, the relevant inquiry seeks to assess whether the products in the alleged geographic market would be substituted for in response to a small, but significant, non-transitory increase in price ("SSNIP") by a hypothetical monopolist.  If that inquiry shows that a sufficient number of purchasers would substitute for products supplied in a different region following a price increase, the proposed market is deemed to not be economically coherent.  Here, the TAC alleges that health plans would *not* substitute for Inpatient Hospital Services provided in any of the 14 relevant HSAs, even following a SSNIP of these services, with Inpatient Hospital services provided outside any of these HSAs.  ¶¶ 48-61.  This shows that each of these HSAs is a relevant geographic market.[18]

*Second,* contrary to Sutter's claim otherwise, plaintiffs' geographic market allegations are supported by law and economic authority.  Sutter argues that this case is deficient as a matter of law because the TAC alleges *some* geographic markets smaller than county borders.  MTD 15:23-27.[19] That is just plain wrong.  Courts have found geographic markets for hospital services exist in all shapes and sizes – some far smaller than counties.  Indeed, antitrust scholars have found that "tribunals have **often** found that a single municipality is a relevant geographic market for hospital services."  2B PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 553e, at 346 (3d ed. 2007) (emphasis added).  *See  St. Luke's*, No. 1:13-cv-00116, ¶ 65 at 15 (accepting city of Nampa – single city in Canyon County, Idaho – as a geographic market for primary care services); *Hospital*

---

[18]  Health plan decisions on their economic alternatives will be based on where most of their members actually consume their health care services, not where any potential consumer can theoretically turn to an alternative hospital for such services.  *St. Luke's*, No. 1:13-cv-00116, ¶¶ 64-69 at 15.  In order to stay competitive in the commercial insurance market, health plans need to include hospitals in their networks that substantial amounts of their members actually visit for treatment.  As HSAs are "a collection of ZIP codes whose residents *receive most of their hospitalizations* for the hospitals in that area" (¶ 25), the TAC provides a rational market definition from the perspective of health plans.  (Emphasis added).

[19]  Some of the HSAs alleged are as large as counties, including the Sacramento HSA, which is over five times the size of San Francisco County.  All of them are larger than a single municipality.  *See* TAC at 9 (identifying map of relevant HSAs).

1    *Corp. of Am. v. FTC,* 807 F.2d 1381, 1387-88 (7th Cir. 1986), *cert. denied,* 481 U.S. 1038 (1987)

2    (accepting geographic market in hospital merger case of Tennessee municipality, Chattanooga).

3        *Third,* Sutter's brief makes factual attacks on the use of *Dartmouth Atlas* HSAs as market

4    areas for which competitive consequences can be ascertained.  These attacks are not relevant to a

5    12(b)(6) motion.  For example, Sutter argues that *Dartmouth Atlas*-HSAs cannot be deemed

6    plausible geographic markets for this case because they rely on data concerning where patients

7    covered by Medicare are discharged from hospitals and the markets alleged in this case concern

8    commercially-insured patients.  MTD at 18-19.  In other words, Sutter argues that the Medicare data

9    used by *The Dartmouth Atlas* cannot be used as a proxy for hospitalization patterns of other patient

10   populations.  Putting aside the fact that this is an evidentiary question for economist experts,[20] it

11   should be noted that other economic sources and policy makers wholly disagree with Sutter.  *See*

12   American Hospital Association, "Geographic Variation in Health Care Spending: A Closer Look,"

13   TrendWatch (Nov. 2009) (using HSA data as a valid data set upon which to make conclusions about

14   health-care spending for the population as a whole rather than only for Medicare patients);[21] N.J.

15   Comm'n on Rationalizing Health Care Resources, "Final Report: Supply and Utilization of New

16   Jersey Acute Care Hospitals," at 44 (Jan. 24, 2008) (relying on Dartmouth HSAs because they

17   "reflect how and where people utilize health care services").[22]

---

[20]  Sutter's contention that Dartmouth HSAs cannot be used to determine market boundaries because
they "frequently include zip codes where . . . less than 40% . . . of the residents of that zip code
select the hospitals in that HSA" is the type of economic question that cannot be decided on this
motion.  MTD at 18.  It is also a red herring: Sutter does not contend that zip codes in any of the 14
HSAs that *are relevant to this case* include zip codes where less than 40% of the residents therein
selected hospitals within the HSA.

[21]  *Available at* www.aha.org/research/reports/tw/twnov09geovariation.pdf.

[22]  *Available at* http://www.state.nj.us/health/rhc/finalreport/documents/entire_finalreport.pdf.  In
any event, the court cannot decide these factual issues relating to geographic market on a motion to
dismiss.  Plaintiffs will, at the appropriate time, present evidence that HSAs are used to understand
the economics of hospital services by numerous industry participants, including Sutter's own CEO
of its Santa Cruz Area Health Care Services, who has endorsed the use of HSAs in evaluating
hospital performance in presentations to federally-commissioned industry experts."  Testimony of
Dr. Larry DeGhetaldi before the Institute of Medicine Committee on "Geographic Variation in
Health Care Spending and Promotion of High-Value Care" held on January 17-18, 2011 in
Washington, D.C.  *Available at*

1    Sutter also erroneously suggests that HSAs cannot be used to define all 14 geographic

2  markets, arguing that using HSAs to so define markets is a "one size fits all" approach.  MTD at 15.

3  That is completely wrong.  HSAs do not provide a "one size fits all" approach: in fact, each of the

4  relevant HSAs vary in size and number of zip codes.  ¶¶ 48-61 at 9 (map identifying the geographic

5  scope of the relevant HSAs).

6    The TAC correctly alleges that *The Dartmouth Atlas of Health Care* is a trusted, authoritative

7  source used by government officials and economists for the purpose of defining "local health care

8  markets for hospital care" for economic analysis.  ¶ 3.  This fact alone shows that defendants' market

9  definition contentions are without merit.

10 **E.    Plaintiffs Have Standing to Sue for Damages.**

11   Sutter argues that plaintiffs lack standing to seek damages under Sections 1 and 2 of the

12 Sherman Act.  MTD at 11.  Plaintiffs are not seeking same.  Rather, plaintiffs are seeking damages

13 under the Cartwright Act as indirect purchasers for a variety of damages, and Sutter does not

14 challenge plaintiffs' standing under the Cartwright Act on this motion.  Plaintiffs' damages includes

15 "overcharges" that they paid "in the form of inflated insurance premiums" that materially were

16 caused by Sutter's conduct.  ¶¶ 2, 101.  It also includes damages that they incurred for paying higher

17 co-insurance payments when they went for services at competitors – higher co-pays that were

18 imposed as a result of Sutter's anti-steering clause.  And it includes higher deductibles than would

19 have otherwise existed in a world where Sutter was not imposing higher prices upon health plans due

20 to anticompetitive conduct.  ¶¶ 16-18.  Insurers would have offered more coverage benefits but for

21 Sutter's anticompetitive conduct.  Plaintiffs have standing to pursue all damages that they had

22 incurred as the result of Sutter's conduct.  *See Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp.

23 2d 394, 407 (S.D.N.Y. 2008) (quoting *United States Football League v. Nat'l Football League*, 842

24 F.2d 1335, 1378 (2d Cir.1988)) (denying motion for summary judgment on issue of damages and

25 holding "once proof of injury causation has been established, courts have allowed antitrust plaintiffs

26

27 http://www.iom.edu/~/media/Files/Activity%20Files/HealthServices/GeographicVariation/Larry%2
   0deGhetaldi_.ppt.

28

considerable latitude in proving the amount of damages.  Proof of amount of damages need not conform to a particular theory or model").

**F.      Plaintiffs Have Pled Plausible Monopolization and UCL Claims.**

Finally, the Court need not be detained long with Sutter's arguments regarding plaintiffs' monopolization, attempted monopolization, and UCL claims.  Sutter's arguments are entirely derivative of its attack on the tying claims, and should be rejected for the same reason.[23]  The one additional argument that Sutter makes – that plaintiffs have failed to allege a specific intent to monopolize – is incorrect.  Paragraphs 152 and 153 of the TAC specifically make such allegations.

### CONCLUSION

For all the foregoing, Sutter's motion to dismiss should be denied.


DATED:  February 5, 2014                    */s/ MATTHEW L. CANTOR*
                                             MATTHEW L. CANTOR (admitted *phv*)
                                             AXEL BERNABE (admitted *phv*)
                                             JEAN KIM (admitted *phv*)
                                             CONSTANTINE CANNON LLP
                                             335 Madison Avenue
                                             New York, NY 10017
                                             (212) 350-2738
                                             (212) 350-2701 (fax)
                                             mcantor@constantinecannon.com
                                             abernabe@constantinecannon.com
                                             jkim@constantinecannon.com

                                             *Lead Counsel for Plaintiffs*

---

[23]  Sutter's contention that 35% and 50% market shares are insufficient to support the "dangerous probability of success" factor of an attempted monopolization claim conflicts with controlling authority.  MTD at 23 n.16.  The Ninth Circuit has provided that any market share above 30% may suffice to allege a Section 2 attempt claim.  *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (finding that while most courts hold that a 30% market share is presumptively insufficient, 44% is sufficient as a matter of law).

AZRA Z. MEHDI (220406)
THE MEHDI FIRM, PC
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
(415) 293-8039
(415) 293-8001 (fax)
azram@themehdifirm.com

*Co-Lead Counsel for Plaintiffs*

DAVID C. BROWNSTEIN (141929)
FARMER BROWNSTEIN JAEGER LLP
235 Pine Street, Suite 1300
San Francisco, CA 94104
(415) 795-2050
(415) 520-5678 (fax)
dbrownstein@fbj-law.com

ALLAN STEYER (100318)
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111
(415) 421-3400
(415) 421-2234 (fax)
asteyer@steyerlaw.com

*Additional Co-Lead Counsel for Plaintiffs*

1

2

**CERTIFICATE OF SERVICE**

3

       I hereby certify that on February 5, 2014, I authorized the electronic filing of Plaintiffs'

4

Opposition to Defendant Sutter Health's Motion to Dismiss Third Amended Complaint Pursuant to

5

Rule 12(b)(6), with the Clerk of the Court using the CM/ECF system which will send notification of

6

such filing to the e-mail addresses denoted on the attached Electronic Mail Notice.

7

       I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on February 5, 2014.

9

10

                                                            _____
                                                                        /s/

11

                                                            MATTHEW L. CANTOR

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 3:12-cv-04854-LB

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Axel Bernabe**
  abernabe@constantinecannon.com

- **David C. Brownstein**
  dbrownstein@fbj-law.com

- **Matthew L Cantor**
  mcantor@constantinecannon.com

- **William S Farmer**
  wfarmer@fbj-law.com,jalpren@fbj-law.com,dbrownstein@fbjlaw.com,jsmith@fbj-law.com

- **Arcelia Leticia Hurtado**
  ahurtado@themehdifirm.com

- **Charles Ralph Jaeger**
  cjaeger@fbj-law.com

- **Lin W. Kahn**
  linkahn@jonesday.com,adefilippo@jonesday.com,mdavis@jonesday.com,jlevee@jonesday.com,tgsinger@jonesday.com,dkiernan@jonesday

- **Jean Kim**
  jkim@constantinecannon.com,jmurphy@constantinecannon.com

- **Donald Scott Macrae**
  smacrae@bamlawlj.com

- **Azra Z. Mehdi**
  azram@themehdifirm.com,ghamilton@themehdifirm.com

- **Toby G Singer**
  tgsinger@jonesday.com

- **Allan Steyer**
  asteyer@steyerlaw.com,lrorem@steyerlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

TAB 1

UNITED STATES DISTRICT COURT

IN THE DISTRICT OF IDAHO

| | |
|---|---|
| SAINT ALPHONSUS MEDICAL CENTER - NAMPA, INC., TREASURE VALLEY HOSPITAL LIMITED PARTNERSHIP, SAINT ALPHONSUS HEALTH SYSTEM, INC., AND SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC.<br><br>       Plaintiffs,<br>v.<br><br>ST. LUKE'S HEALTH SYSTEM, LTD.<br><br>       Defendant. | Case No. 1:12-CV-00560-BLW (Lead Case)<br><br>**FINDINGS OF FACT<br>AND<br>CONCLUSIONS OF LAW** |
| FEDERAL TRADE COMMISSION; STATE OF IDAHO<br><br>       Plaintiffs,<br>v.<br><br>ST. LUKE'S HEALTH SYSTEM, LTD.; SALTZER MEDICAL GROUP, P.A.<br><br>       Defendants. | Case No. 1:13-CV-00116-BLW |

## INTRODUCTION

The Court completed a bench trial in this case in October of 2013, and directed counsel to file proposed Findings of Fact and Conclusions of Law. Those have been filed and the case is at issue. For the reasons explained below, the Court finds for the plaintiffs and will order divestiture of the affiliation between St. Luke's and the Saltzer Medical Group.

**Findings of Fact & Conclusions of Law – page 1**

# SUMMARY

For years, health care costs have exceeded the inflation rate. Americans spend more on health care than the next 10 biggest spenders combined – a list that includes Japan, Germany, France and the U.K. – yet we lag behind many of them on quality and patient outcomes. In Idaho, the quality of our health care is outstanding, but we pay substantially more than the national average for that quality.

Among the experts, there is a rough consensus on a solution to the cost and quality concerns nationwide. They advocate moving away from our present fee-for-service health insurance reimbursement system that rewards providers, not for keeping their patients healthy, but for billing high volumes of expensive medical procedures. A far better system would focus on maintaining a patient's health and quality of life, rewarding successful patient outcomes and innovation, and encouraging less expensive means of providing critical medical care. Such a system would move the focus of health care back to the patient, where it belongs.

In fact, there is a broad if slow movement to such a system. It will require a major shift away from our fragmented delivery system and toward a more integrated system where primary care physicians supervise the work of a team of specialists, all committed to a common goal of improving a patient's health.

St. Luke's saw this major shift coming some time ago. And they are to be complimented on their foresight and vision. They started purchasing independent physician groups to assemble a team committed to practicing integrated medicine in a system where compensation depended on patient outcomes.

**Findings of Fact & Conclusions of Law – page** 2

In Nampa, they acquired the Saltzer Medical Group ("the Acquisition"). The combined entity now includes 80% of the primary care physicians in Nampa. Its size, and the sterling reputations of Saltzer and St. Luke's, make it the dominant provider in the Nampa area for primary care, and give it significant bargaining leverage over health insurance plans.

These circumstances prompted the Federal Trade Commission (FTC), and a group of other health care providers including St. Alphonsus and Treasure Valley Hospital, to file this lawsuit claiming that the Acquisition violated the antitrust laws. They ask the Court to unwind the deal.

The antitrust laws essentially require the Court to predict whether the deal under scrutiny will have anticompetitive effects. The Court predicts that it will. Although possibly not the intended goal of the Acquisition, it appears highly likely that health care costs will rise as the combined entity obtains a dominant market position which will enable it to (1) negotiate higher reimbursement rates from health insurance plans that will be passed on to the consumer, and (2) raise rates for ancillary services (like x-rays) to the higher hospital-billing rates.

The Acquisition was intended by St. Luke's and Saltzer primarily to improve patient outcomes. The Court believes that it would have that effect if left intact, and St. Luke's is to be applauded for its efforts to improve the delivery of health care in the Treasure Valley. But there are other ways to achieve the same effect that do not run afoul of the antitrust laws and do not run such a risk of increased costs. For all of these

reasons, the Acquisition must be unwound. The Court will set forth its detailed Findings of Fact and Conclusions of Law below.

## FINDINGS OF FACT

### Plaintiff Saint Alphonsus

1. Saint Alphonsus Health System, Inc. ("St. Alphonsus") operates hospitals, outpatient clinics, and other health care facilities in the Treasure Valley of Idaho and eastern Oregon.

2. In Idaho, St. Alphonsus owns and operates plaintiff Saint Alphonsus Regional Medical Center, Inc., a 381-bed hospital located in Boise, and Saint Alphonsus Medical Center, Nampa, Inc. ("St. Alphonsus Nampa"), a 152-bed acute care hospital located in Nampa.

3. Saint Alphonsus Nampa is the only hospital in the City of Nampa. *Trial Tr.* at 324 (J. Crouch).

4. Saint Alphonsus employs over 200 physicians, who practice in what Saint Alphonsus calls the Saint Alphonsus Medical Group ("SAMG").

5. Over 60 of the SAMG physicians provide primary care services.

6. SAMG currently employs 20 primary care physicians in Canyon County, at least nine of whom practice in Nampa. *Trial Tr.* at 791 (N. Powell).

7. Saint Alphonsus is owned by Michigan-based Trinity Health, one of the largest Catholic health care systems in the United States. Trinity operates approximately 50 hospitals across the country. *Trial Tr.* at 855 (K. Keeler); *Trial Tr.* at 979-81 (B.Checketts); *Trial Tr.* at 650 (D. Pate)

**Findings of Fact & Conclusions of Law – page** 4

**Plaintiff Treasure Valley Hospital**

8. Plaintiff Treasure Valley Hospital Limited Partnership, doing business as Treasure
Valley Hospital ("TVH"), is a nine-bed, physician-owned, for-profit hospital in Boise,
largely used for outpatient surgeries.

**Partnership Between TVH and Saint Alphonsus**

9. In the fall of 2012, Saint Alphonsus and TVH jointly opened a new outpatient surgery
center in Nampa called the Treasure Valley Surgery Center ("TVSC").

**St. Luke's**

10. St. Luke's operates the following hospitals in Idaho: (1) St. Luke's Boise Medical
Center, a 400-plus bed medical center in Boise; (2) St. Luke's Meridian Medical
Center, a 165-plus bed hospital in Meridian; (3) St. Luke's Magic Valley Regional
Medical Center, a 228-bed hospital in Twin Falls; (4) St. Luke's Wood River, a 25-
bed critical-access hospital in Ketchum; (5) St. Luke's Jerome, a 25-bed critical-
access hospital in Jerome; (6) St. Luke's McCall, a 15-bed critical access hospital in
McCall; and (7) North Canyon Medical Center, a 15-bed critical access hospital in
Gooding.

11. St. Luke's also operates an emergency clinic with outpatient services in Nampa.

12. St. Luke's employs or has entered into a professional services agreement ("PSA") with each of its 500 physicians in numerous medical specialties who are geographically dispersed across southern Idaho and eastern Oregon.[1]

13. Each of the physicians employed by or under a PSA with St. Luke's is part of the St. Luke's Clinic. *Trial Tr.* at 1863-64 (M. Johnson); *Trial Tr.* at 1879 (J. Kee).

14. Prior to the Saltzer transaction, no more than eight of the St.Luke's Clinic physicians who practiced adult primary care services did so in Canyon County. *Trial Tr.* at 2658 (A. Enthoven).

15. Prior to the fall of 2011, St. Luke's did not employ any primary care physicians in Nampa.

16. In the fall of 2011, seven physicians affiliated with the Mercy Physicians Group, who were employed by Saint Alphonsus in Nampa, decided to leave Saint Alphonsus and join St. Luke's. *See Jeffcoat Deposition (Dkt. No. 397)* at 66, 68; *Trial Tr.* at 871-72 (N.Powell).

---

[1] Under a professional services agreement ("PSA"), a physician practice group agrees to provide health care services exclusively on behalf of St. Luke's, and St. Luke's is reimbursed for the practice's services under contracts that St. Luke's enters into with payors. Although physicians practicing under a PSA do not have a direct employment relationship with St. Luke's, the PSA sets forth the compensation that St. Luke's pays the physician practice for services provided by the physicians on its behalf. For purposes of this case, a PSA arrangement creates a relationship functionally equivalent to employment to the extent that it provides, at the group level, the same clinical and financial alignment that employment provides at the individual level. Therefore, St. Luke's PSA-based relationships with physicians will be described and regarded as the same as "employment" by St. Luke's.

17. Prior to the closing of the Saltzer transaction, St. Luke's had recruited another primary care physician to join the seven who departed from Saint Alphonsus, for a total of eight St. Luke's primary care physicians practicing in Nampa. *Id.*

## Saltzer Medical Group

18. Saltzer Medical Group consisted of 41 physicians, nearly three-quarters of whom provide adult or pediatric primary care services.

19. Specifically, 19 Saltzer physicians practice in the specialties of family medicine and internal medicine, while 10 Saltzer physicians are general pediatricians. Thirty-four of the Saltzer physicians, including 16 of the adult primary care physicians and 8 of the pediatricians, practice in Nampa.

20. Saltzer was the largest, independent, multispecialty physician group in Idaho. *Trial Tr.* at 465 (L. Duer).

21. Saltzer is a very prestigious group with a long history. *Trial Tr.* at 465 (L. Duer). Saltzer is "a reputable and long-standing significant player" in the Treasure Valley healthcare community. *See Castledine Deposition (Dkt. No. 262) at* 122; *see also Trial Tr.* 2001-02 (John Kee).

## The Acquisition

22. For years before the transaction with St. Luke's, physician leadership at Saltzer saw that health care was demanding integrated services and high quality at reduced costs. *Trial Tr.* at 2371-72 (J. Kaiser); *see also Trial Tr.* at 808 (N. Powell).

23. Saltzer physicians were concerned that the traditional fee-for-service reimbursement model was no longer sustainable and that they needed to explore transitioning to a

value-based compensation model. *Trial Tr.* at 3344 (H. Kunz); *see also Savage Deposition (Dkt. No. 253)* at 65-66.

24. Saltzer believed that it needed to upgrade its medical record system and health information technology to keep pace with the industry, but could not afford to do so without partnering with a larger system. *Trial Tr.* at 3344 (H. Kunz).

25. Prior to making the decision to join St. Luke's, Saltzer made attempts to coordinate care with other health systems under less-formal affiliations. For example, Saltzer worked with the Mercy Medical Center (the former name of what is now Saint Alphonsus-Nampa) in an attempt to coordinate limited services. None of those projects came to fruition because Mercy's out-of-state parent, Catholic Health Initiatives ("CHI"), was unwilling to participate. *Trial Tr.* at 2372-74 (J. Kaiser).

26. After Saltzer's negative experience with Mercy and CHI, Saltzer determined that in order to work effectively towards a solution it would need a local partner in the Idaho community. *Trial Tr.* at 2374 (J.Kaiser).

27. In December of 2008, Saltzer and St. Luke's executed a memorandum of understanding ("MOU") establishing an informal partnership to begin more deliberate and focused efforts around a series of joint initiatives aimed at improving access to high quality medical care, enhancing coordination of medical services, and streamlining the health care delivery model in Ada and Canyon Counties. *Trial Tr.* at 2225-27 (C. Roth); Exhibit 2196.

28. The MOU also outlined five core areas of improvement sought to be achieved by the informal alignment. *Trial Tr.* at 2227 (C. Roth).

**Findings of Fact & Conclusions of Law – page 8**

29. Although the parties made some progress in the five areas (*Trial Tr.* at 2228 (C. Roth)), and Saltzer physicians such as Dr. Kaiser testified that the relationship succeeded in getting the parties "finally talking about" integration, the parties did not get "a whole lot of things accomplished" (*Trial Tr.* at 2373 (J. Kaiser)), and what limited success was achieved often took years to develop. *Trial Tr.* at 2227-28 (C. Roth).

30. In 2009, Saltzer initiated discussions with St. Luke's regarding a closer affiliation. *Trial Tr.* at 2228-29 (C. Roth); *Trial Tr.* at 3345 (H. Kunz); *Trial Tr.* at 3081 (W. Savage). Negotiations between Saltzer and St. Luke's progressed over approximately three years (*Trial Tr.* at 2237 (C. Roth)) and "evolved significantly" during that time. *Trial Tr.* at 1712 (D. Pate).

31. Effective December 31, 2012, St. Luke's acquired the assets of Saltzer for an amount not to exceed $16,000,000. *See St. Luke's Answer (Dkt No. 100)* at ¶18. Pursuant to this transaction (the "Acquisition"), St. Luke's received Saltzer's intangible assets, personal property, and equipment.

32. In addition, Saltzer, on behalf of its physicians, entered into a five-year professional services agreement ("PSA") with St. Luke's. *See* Exhibit 24.

33. The PSA guarantees Saltzer physicians' annual compensation for the first two years after the agreement will be no less than the average for three years ending September 30, 2011. The PSA also specifies that Saltzer physicians will be compensated on the basis of work Relative Value Units ("wRVUs") for the procedures and services performed by the physicians. *See* Exhibit 24 at SLHS000787894.

**Findings of Fact & Conclusions of Law – page** 9

34. The PSA contains an "exclusivity" provision that prohibits the Saltzer physicians from becoming employed by or financially affiliated with other health systems or hospitals during the term of the PSA.  *Id.* at §§ 3.2, 3.3, 4.1.

35. The PSA also provides that "all Saltzer physicians may have privileges at any hospital and may refer patients to any practitioner or facility regardless of its affiliation with St. Luke's."  *Id.* at § 2.2(a).

The parties to the PSA uniformly interpret that provision to mean that Saltzer physicians have complete freedom to refer patients wherever they choose.  *Trial Tr.* at 773 (N. Powell); *Trial Tr.* at 1958-60 (J. Kee); *Trial Tr.* at 2241-42 (C. Roth); *Trial Tr.* at 2387 (J. Kaiser).

36. Saltzer physicians currently have a guaranteed salary with additional compensation based on RVUs.  *Trial Tr.* at 3321 (T. Patterson).

37. A plan to implement quality-based incentives was referenced in the PSA, but specific quality incentives were not built into the contract at the outset because, according to Dr. Patterson, "it takes time to develop what the outcome measures would be, and so it wasn't something that could be established at the time."  *Trial Tr.* at 1337.(T. Patterson).

38. However, it was expected that compensation for the Saltzer physicians would include quality-based incentives in the future.  *Trial Tr.* at 3326-27 (T. Patterson).

39. Saltzer and St. Luke's have amended their initial PSA to include an addendum that provides for up to 20 percent of Saltzer's compensation being put at risk or otherwise tied to quality-based incentives.  *See* Exhibit 2624; *Trial Tr.* at 3327 (T. Patterson).

**Findings of Fact & Conclusions of Law – page** 10

40. There is nothing in the PSA that expressly ties compensation for the Saltzer physicians to where they make referrals or to the volume or revenue generated by Saltzer physicians for ancillary services, such as laboratory or imaging services.

41. Saltzer's primary motivation for affiliating with St. Luke's was to provide the best possible health care to the community. *Trial Tr.* at 3313 (T. Patterson); *Trial Tr.* at 3346 (H. Kunz).

42. Saltzer believed that becoming "tightly aligned" with St. Luke's increased the likelihood that St. Luke's would invest the time, resources, and risk to bring much-needed additional services and facilities to Canyon County. *See Page Deposition (Dkt. No. 270)* at 130-31.

43. Saltzer physicians also considered it important that an affiliation with St. Luke's would give them the ability to be "involved in all aspects of care rather than being fragmented as part of an outside system that works in concert with the health system but not integrated with the health system." *Trial Tr.* at 3315 (T. Patterson).

44. Additionally, Saltzer did not believe that by itself, it was big enough, or had sufficient financial reserves, to engage in capitation (or value-based billing) that will be discussed in more detail below. *Trial Tr.* at 2374-75 (J. Kaiser).

45. Saltzer leadership believed that a closer affiliation was necessary to permit Saltzer to transition to value-based compensation, and did not view a joint venture or looser affiliation with St. Luke's as sufficient. *Trial Tr.* at 3318, 3345-46 (T. Patterson).

46. It was also important to Saltzer that an affiliation with St. Luke's would increase access to medical care for the significant population of Medicaid and Medicare

**Findings of Fact & Conclusions of Law – page** 11

patients in Canyon County by enabling Saltzer to move away from providing fee-for-service care as an independent group, which required many Saltzer physicians to manage their patient populations to limit the number of Medicaid or uninsured patients they could accept. *Trial Tr.* at 787 (N. Powell); *Trial Tr.* at 3323 (T. Patterson).

47. Saltzer received almost $9 million in payment for goodwill and intangibles as part of the Acquisition—which does not have to be paid back if the Acquisition is undone. *Trial Tr.* at 244:5-11 (John Kaiser).

## Product Market

48. With regard to the FTC action, there is no dispute that the relevant product market is Adult Primary Care Services sold to commercially insured patients ("Adult PCP services"). *See Proposed Findings of Defendants (Dkt. No. 404)* at ¶ 598; *Proposed Findings of Plaintiffs (Dkt. No. 430)* at ¶ 47

49. Adult PCP services include physician services provided to commercially insured patients aged 18 and over by physicians practicing internal medicine, family practice, and general practice. *See Reinhardt Deposition (Dkt. No. 363)* at 134-35; *see generally Trial Tr.* at 1313 (Dr. Dranove).

## Geographic Market

50. A proper geographic market is "an area of effective competition . . . where buyers can turn for alternate sources of supply." *Morgan, Strand v. Radiology Ltd.* 924 F.2d 1484, 1490 (9th Cir. 1991) (quotations omitted).

51. Plaintiffs bear the burden of proving that their definition of the relevant geographic market is correct. *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974).

52. Economists define a market by using the "hypothetical monopolist" or "SSNIP" test.

53. The SSNIP test evaluates whether all the sellers in the proposed candidate market would be able to impose a small but significant, non-transitory increase in price (SSNIP), which is generally 5 to 10 percent, and still make a profit. *Trial Tr.* at 1311-14 (Dr. Dranove).

54. When consumers are the direct purchasers of the product at issue, the SSNIP test evaluates whether the market sellers' price hike would cause consumers to travel to adjacent areas where sellers offer lower prices, thereby making the price hike unprofitable. If that is likely, the market definition would need to be broadened to include those adjacent areas. *Id.*

55. In this case, however, the vast majority of health care consumers are not direct purchasers of health care – the consumers purchase health insurance and the insurance companies negotiate directly with the providers. The consumers pay indirectly through their insurance premiums and more directly through co-pays and deductibles. *Id.*

56. Under these circumstances, the SSNIP test examines the likely response of insurers to a hypothetical demand by all the PCPs in a particular market for a significant non-transitory reimbursement rate hike. *Id.*

57. If it is likely that the insurers would reject the demand, drop those PCPs from their network, and depend on PCPs in adjacent regions to provide care for their insureds,

the definition of the relevant market would need to be broadened to include those

adjacent regions. *Id.*

58. If, however, it is likely that the insurers would agree to the demand – that is, it is

likely that the PCPs in that particular market could successfully demand a SSNIP –

then the relevant market is the area where those PCPs practice. *Id.*

59. The largest insurer in Idaho is Blue Cross of Idaho (BCI). *Trial Tr.* at 305 (J.

Crouch).

60. BCI has PCPs in-network in every zip code where they have enrollees. BCI does not

require a single enrollee to travel outside of their zip code for primary care. *Trial Tr.*

at 1329 (Dr. Dranove).

61. BCI considers "primary care services in the direct community that the member

resides" to be a "threshold" consideration for an employer evaluating a potential

health plan. *Trial Tr.* at 230 (J. Crouch).

62. In many instances, if a health plan does not have primary care physicians close to a

potential client's employees, the health plan will not even be considered an eligible

vendor for the employer. *Trial Tr.* at 235 (J.Crouch).

63. This applies to health plans offered to Nampa employers. St. Luke's System Director

of Payer Contracting, Steve Drake, testified that the Board for St. Luke's Select

Medical Network decided it should include Saltzer in the network because it needed

providers in Nampa in order to market itself to employers. *See Drake Deposition*

*(Dkt. No. 322)* at 181:19-183:3; Exhibit 1196

64. This is confirmed by the statistics showing where Nampa residents want to obtain their primary care.

65. 68% of Nampa residents get their primary care from providers who are located in Nampa. *Trial Tr.* at 1320 (Dr. Dranove).

66. Only 15% of Nampa residents obtain their primary care in Boise. *Trial Tr.* at 1320-21 (Dr. Dranove).

67. Those Nampa residents getting their primary care outside of Nampa "are getting their physician services near where they work. And this is basically confirming that patients like to get their medical care close to home." *Trial Tr.* at 1320 (Dr. Dranove).

68. St. Luke's Dr. Mark Johnson, a family practice physician with Mountain View Medical, a St. Luke's Clinic located in West Boise, does not consider Saltzer to be a competitor because of its "geographic separation." *See Johnson Deposition (Dkt. No. 249)* at 124:14-18; *Trial Tr.* at 1873:6-22 (Mark Johnson).

69. Because Nampa patients strongly prefer access to local PCPs, commercial health plans need to include Nampa PCPs in their networks to offer a competitive product. Health plans in the Treasure Valley consistently include Nampa-based PCPs in their provider networks. *See* Exhibit 1782 at Fig. 11; *Trial Tr.* at 1329-30 (Dr. Dranove).

70. A health plan could not successfully offer a network of PCP services to Nampa residents that only included Boise PCPs. As Dr. Dranove testified, that would be akin to the health plan saying to Nampa residents "I'm not going to have any doctors in Nampa, but don't worry, if you want to have a convenient PCP, just get a job in

Boise, like the other folks who are seeing doctors in Boise." *Trial Tr*. at 1324 (Dr. Dranove).

71. Given this dynamic – that health plans must offer Nampa Adult PCP services to Nampa residents to effectively compete – Nampa PCPs could band together and successfully demand a 5 to 10% price increase (or reimbursement increase) from health plans. *Trial Tr*. at 3434 (Dr. Dranove).

72. Thus, Nampa PCPs have the leverage with health plan networks to profitably impose a SSNIP in Nampa.

73. Nampa is therefore the relevant geographic market.

## **Anticompetitive Effects – Market Share**

74. With the Acquisition, there is no dispute that St. Luke's became the largest provider of adult primary care services in Nampa. *See St. Luke's Answer (Dkt. No. 100)* at ¶3; *see also Saltzer's Answer (Dkt. No. 105)* at ¶3.

75. Under the FTC's *Merger Guidelines*, market concentration is "often one usual indicator of the likely competitive effects of a merger." *See Merger Guidelines § 5.3 (Appendix B1)*.

76. In evaluating market concentration, the FTC looks at both the pre- and post-merger market concentration.

77. The preeminent measure of market concentration is the Herfindahl–Hirschman Index ("HHI"). It is calculated by squaring the market share of each firm competing in a market and then summing the resulting numbers. The FTC uses HHI numbers to determine thresholds for when an industry is considered highly concentrated or when

potential mergers require investigation. *Malaney v. UAL Corp.,* 2010 WL 3790296 (Sept. 27, 2010).

78. A particular HHI will range anywhere from zero (representing an infinite number of very small providers) to 10,000 (representing one pure monopolist). *Trial Tr.* at 1336 (Dr. Dranove).

79. A market is considered highly concentrated if the HHI is above 2500, and a merger that increases the HHI by more than 200 points will be presumed to be likely to enhance market power. *See Merger Guidelines § 5.3.*

80. Combined, St. Luke's and Saltzer account for nearly 80 percent of PCP services in Nampa. *Trial Tr.* at 1340 (Dr. Dranove); Exhibit 1789.

81. As a result of the merger between St. Luke's and Saltzer, the Nampa market has a post-merger HHI of 6,219 and an increase in HHI of 1,607, both of which are well above the thresholds for a presumptively anticompetitive merger (more than double and seven times their respective thresholds, respectively). *Trial Tr.* at 1340-41 (Dr. Dranove).

82. The Acquisition is therefore presumptively anticompetitive under § 7 of the Clayton Act.

**Anticompetitive Effects – Saltzer Leverage pre-Acquisition**

85. There is evidence in addition to the HHI numbers that the Acquisition will have anticompetitive effects.

83. Saltzer is the preeminent group of primary care physicians in Canyon County. *Trial Tr.* at 2230 (testimony of St Luke's CEO Christopher Roth that "Saltzer was and is an

incredibly well-respected group. They are the preeminent group, if you will, in the state of Idaho relative to multispecialty group practice. They know Nampa. They know Canyon County. They have the relationships. They have the trust of the community").

84. The largest health plan in Idaho – Blue Cross of Idaho – considers Saltzer "to be a must have provider for Blue Cross in Nampa." *Trial Tr.* at 331 (J. Crouch).

85. Ed Castledine (St. Luke's Director of Business Development) sent a list of names of Nampa physicians in an e-mail to Chris Roth (St. Luke's Regional Medical Center CEO) and remarked that "[t]his begins to show the dominance of Saltzer in the Nampa market . . . .  Out of roughly 80 physicians in Nampa, Saltzer represents 47.  If you add the [7 physicians St. Luke's hired from Nampa's] Mercy Group, we have the opportunity to work exclusively with 54 of the 80." *See* Exhibit 1281 at CON0007045; Castledine *Deposition (Dkt. No. 262)* at 120.

## Anticompetitive Effects – St. Luke's Leverage pre-Acquisition

86. Between January 2007 and January 2012, St. Luke's acquired 49 physician clinics in the Treasure Valley and at least 28 physician practices in the Magic Valley.  *See* Exhibit 2148 (identified at *Trial Tr.* 412-413 (J. Crouch)).

87. In 2007, according to BCI's statistics, St. Luke's Boise facility was receiving an average amount of reimbursement from BCI as compared to other facilities in Idaho, and St. Luke's had just one hospital in the top five highest paid in Idaho.

88. By 2012, St. Luke's had three of the top five highest paid hospitals, and its top hospital was receiving reimbursements 21% higher than the average Idaho hospital. *Trial Tr.* at 292 (J. Crouch); Exhibit 1300 at BCI368370.

89. If St. Luke's chose not to contract with BCI, then BCI would have an "immediately unsustainable product" in the markets where St. Luke's is a provider. *Trial Tr.* at 299 (J. Crouch).

**Anticompetitive Effects – St. Luke's/Saltzer Leverage post-Acquisition**

97. A prominent report from the School of Public Health at U.C. Berkeley concluded that the recent trend of physician employment by hospitals increases costs because "larger physician groups with added bargaining power can negotiate for higher [reimbursement] rates." *See Berkeley Forum, A New Vision* at p. 38 (Feb. 2013).

98. The Acquisition will increase substantially St. Luke's bargaining leverage with health plans.

99. The Acquisition is not only a merger of the first and second largest providers for primary care services but is also a merger of each of those providers' closest substitutes. *Trial Tr.* at 1437 (Dr. Dranove).

100. If St. Luke's Nampa patients could not see St.Luke's physicians, 50 percent of them would choose to go to Saltzer. *Trial Tr.* at 1351-52 (Dr. Dranove).

101. If Saltzer's Nampa location were unavailable, one-third of its patients would switch to St. Luke's – more than any other provider. *Trial Tr.* at 1352-53 (Dr. Dranove).

102.    Thus, the Acquisition merges the closest substitutes for the two largest providers in Nampa. *Trial Tr.* at 1437(Dr.Dranove).

103.    Moreover, as discussed, consumers of health care are typically not direct purchasers of health care, and it is health insurers that are negotiating with providers.

104.    And so bargaining leverage is a function of the relative strength of the insurer and the provider.

105.    Bargaining leverage consists largely of the ability to walk away.

106.    A buyer has leverage if he has acceptable alternatives to a seller driving a hard bargain.

107.    Stripped of acceptable alternatives, the buyer's leverage disappears.

108.    Economists have an acronym for this process called BATNA – the best alternative to a negotiated agreement.

109.    If a health plan were negotiating with Saltzer before the Acquisition, its best outside option for PCP services in Nampa was St. Luke's. The best outside option for a health plan negotiating with St. Luke's was Saltzer. For both examples, the merger takes away the health plan's best outside option and makes less desirable the health plan's BATNA. *Trial Tr.* at 1354 (Dr. Dranove); *Trial Tr.* 239 (J. Crouch).

110.    After the Acquisition, if a health plan removed St. Luke's/ Saltzer from its network in Nampa, patients would be forced to choose their third best option. That is not an attractive option for a health plan trying to market that network to patients who live in Nampa. *Trial Tr.* at 1305-06 (Dr. Dranove).

111.   The Acquisition adds to St. Luke's market power and weakens BCI's ability to negotiate with St. Luke's. As BCI's Jeff Crouch explained, St. Luke's is already the dominant provider in a number of markets, and the transaction extends their reach to the Nampa market. *Trial Tr.* at 311, 433 (J. Crouch).

112.   BCI's concerns are supported by an e-mail written by Christopher Roth (St. Luke's Regional Medical Center CEO) to St. Luke's CFO and COO. *See* Exhibit 1093 at SLHS0000006605. The purpose of the e-mail, written in December of 2011, was to identify ways to improve St. Luke's financial performance in 2012. *Id.* The e-mail discussed revenue and volume shortfalls in 2011 and contained a plan for improvement. The e-mailed plan called for (1) reducing expenses, (2) increasing volume, and (3) a "Price Increase ($ Unknown)." *Id.* Under that heading of "Price Increase" was a bullet point stating: "Pressure Payors for new/directed agreements." *Id.* In explaining this e-mail, Roth claimed that he did not mean that St. Luke's could pressure payors for more reimbursement but rather could pressure them to direct more patients to St. Luke's high quality and low cost clinics. *Trial Tr.* at 2339 (Roth). That explanation is not credible, however, given that the "pressure" language quoted above was contained under a heading entitled "Price Increase" and was part of a discussion of how to increase income. The point being made in the e-mail was that St. Luke's should use its bargaining leverage to increase reimbursements from health plans.

113.   Saltzer's documents likewise confirm that the Acquisition will enhance its negotiating leverage. In an internal exchange, Nancy Powell (who at the time was Saltzer's Chief Financial Officer) informed Dr. Page (Saltzer's Chairman of the

Contracting Committee) that BCI's changed policy on reimbursements for consults would cost Saltzer $22,000.  *See* Exhibit 1361.  Dr. Page responded that "this is a pretty big blow," and he speculated that "[i]f our negotiations w/luke's go to fruition, this will be something we could try to get back, i.e. consult codes, as there would be *the clout of the entire network*."  *Id.* (emphasis added).

114.   Dr. Dranove testified that Dr. Page's response in this e-mail informed his opinion that the Acquisition would enhance St. Luke's/Saltzer's bargaining leverage to the point where they could re-open past negotiations and take back past bargaining losses.  *Trial Tr.* 1344-45 (Dr. Dranove).

115.   St. Luke's bargaining tactic is common.  In a study by Casalino et. al. entitled "*Benefits of and Barriers to Large Medical Group Practice in the United States,*" the authors interviewed 195 leaders of physician groups, hospitals and health insurance plans, and obtained further information from 6,000 physicians.  The authors sought to cull from these surveys the main benefits and barriers to large group practices as cited by these medical provider participants.  What they found was this:  "Gaining negotiating leverage with health insurance plans was the most frequently cited benefit; it was cited 8 times more often than improving quality."  *Trial Tr.* at 2671 (Dr. Enthoven)

116.   St. Luke's itself confirmed the importance of gaining negotiating leverage with health insurance plans.  In a 2009 presentation to the Board of Directors discussing a plan to integrate physician practices with the hospital, St. Luke's officials wrote that "St. Luke's Treasure Valley recognizes that market share in primary care is a key

success factor, critical to sustaining a strong position relative to payer contracting . . . .” *See* Exhibit 1461 at SLHS000039821.

**<u>Anticompetitive Effects – Twin Falls Example</u>**

117.  In the Twin Falls Idaho market, the dominant provider of primary care services was the Physician Center, managed by St. Luke's. *Trial Tr.* at 241 (J. Crouch).

118.  Between 2002 and 2009, BCI did not contract with this St Luke's group, believing that there remained sufficient coverage with about 20 primary care providers within 15 miles and almost 50 primary care providers within 30 miles, including the Burley area. *Trial Tr.* at 244-45 (J. Crouch).

119.  But patients did not want to drive that distance for primary care, and thus employers were purchasing "very little" insurance from BCI in this market during this six year period. *Trial Tr.* at 241, 245 (J. Crouch).

120.  Eventually, the St. Luke's negotiators had such leverage that BCI had no choice but to concede to their pricing proposal. *Trial Tr.* at 247 (J. Crouch).

**<u>Anticompetitive Effects – Hospital-Based Billing</u>**

121.  It is likely that St Luke's will exercise its enhanced bargaining leverage from the Acquisition to charge more services at the higher hospital-based billing rates. *Trial Tr.* at 1347 (Dr. Dranove).

122.  The Berkeley Forum Study concluded that the recent trend of physician employment by hospitals increases costs because "physician reimbursement may be higher for services rendered at hospitals than in physicians' offices . . . ." *See Berkeley Forum, supra* at p. 38.

**Findings of Fact & Conclusions of Law – page** 23

123. St. Luke's own analysis of the Acquisition considered the possibility that it could increase commercial reimbursements by insisting that health plans pay higher "hospital-based" rates for routine ancillary services, such as X-rays and laboratory tests, even when those services are performed in the same physical location as before the Acquisition. *See* Exhibit 1277, SLHS000820291 at SLHS000820297; *Trial Tr*. at 252-53 (J. Crouch).

124. Prior to the Acquisition, Saltzer performed many routine ancillary services at its own facilities. Such services included laboratory and diagnostic imaging, as well as therapy services and specialized facility services for colonoscopies and minor outpatient surgeries. *Trial Tr*. 252-53 (J. Crouch).

125. After the Acquisition, if St. Luke's were to bill for these ancillary services at the higher "hospital-based" rates, BCI estimates that costs under its commercial contracts would increase by 30 to 35 percent. *Trial Tr*. 253-54 (J. Crouch).

126. St. Luke's own analysis projected that it could gain an extra $750,000 through hospital-based billing from Saltzer from commercial payers for lab work and $900,000 extra for diagnostic imaging. *See* Exhibit 1277 at SLHS000820291, SLHS000820297; see *also Trial Tr*. at 1347 (Dr. Dranove) (testifying that St. Luke's "thought that hospital-based billing alone could generate an extra $750,000 . . . .").

127. St. Luke's planned to fund a 30% pay raise for its physicians in connection with the Acquisition by obtaining "higher hospital reimbursement" from the health plans. *See* Exhibit 1262 at 7.

128. Consultant Peter LaFluer prepared an analysis at the direction of St. Luke's showing how office/outpatient visits could be billed for higher amounts if the visit was hospital-based rather than Saltzer-based. The hospital-based billings were more than 60% higher. *See LaFluer Deposition (Exhibit 54)* at 74; *Trial Tr.* at 735-36 (N. Powell); Exhibit 1480 at CON0000984-026, -027.

129. The leverage gained by the Acquisition would give St. Luke's the ability to make these higher rates "stick" in future contract negotiations. *Trial Tr.* at 1347-49 (Dr. Dranove).

130. By increasing St. Luke's relative leverage, the Acquisition will likely lead to higher reimbursements from health plans. *Trial Tr.* at 3425-26 (Dr. Dranove).

131. When health plans pay more, they pass that increase along to their customers in the form of higher premiums and higher out-of-pocket costs. *Trial Tr.* at 1309-10 (Dr. Dranove).

## **Anti-competitive Effects – Referrals**

132. Patients largely accept the recommendations of their primary care physician as to what hospital, specialist, and ancillary services they should use. *Trial Tr.* at 1478-49 (D. Haas-Wilson) ("[T]he primary care providers are key to determining where patients receive their outpatient services, their ancillaries, and how they decide which hospital to use for their inpatient or outpatient services"); *Trial Tr.* at 3058 (D. Argue) ("[M]any patients do not have a preference about where they are hospitalized and will just follow their physicians' recommendations").

133.   The Berkeley Forum Study concluded that the recent trend of physician

employment by hospitals increases costs because "physicians may be influenced by

hospitals to . . . increase referrals and admissions." *See Berkeley Forum, supra* at

p.38.

134.   It is true that Saltzer physicians have complete discretion under the terms of the

PSA in referring patients. *See* Exhibit 24 (PSA) at Section 2.2(a) (stating that Saltzer

physicians "may refer patients to any practitioner or facility regardless of its

affiliation with St. Luke's"); *Trial Tr.* at 1649 (testimony of Dr. Pate, St. Luke's CEO,

that "as a physician, I would find it completely objectionable for us to direct where

our physicians are supposed to refer business").

135.   While this complete discretion has been the rule for years, in practice that

discretion  has been exercised to favor the hospital where the physician was

employed.

136.   After St. Luke's purchased five specialty practices[2], "their business at Saint

Alphonsus Boise dropped dramatically [and] the amount of business that they did at

St. Luke's facilities increased dramatically." *Trial Tr.* at 1501 (D. Haas-Wilson).

137.   For example, before Idaho Cardiothoracic and Vascular Associates was purchased

by St. Luke's, 34% of their inpatient referrals were to St. Alphonsus in Boise.  After

---

[2] The five specialty care clinics were (1) Boise Orthopedic Clinic, (2) Idaho Cardiothoracic and
Vascular Associates, (3) Idaho Pulmonary Associates, (4) Intermountain Orthopedics, and (5) Idaho
Cardiology Associates.

the purchase, none were referred there, and all their referrals were to St. Luke's. *See* Exhibit 1705.

138. Similarly, inpatient referrals from Boise Orthopedic Clinic to St. Alphonsus dropped from 57% to 6% after the purchase by St. Luke's. *Id.*

139. This pattern carries over to the use of imaging services. After the group of seven primary care physicians previously with the Mercy Medical Group went to work for St. Luke's, the percentage of imaging services they performed at St. Alphonsus fell from 81% to 19%. *Trial Tr.* at 1505 (D. Haas-Wilson).

140. After the Acquisition, it is virtually certain that this trend will continue and Saltzer referrals to St. Luke's will increase.

## Anticompetitive Effects -- Conclusion

141. The Acquisition results in a substantial market share for St. Luke's in the Nampa market for primary care services.

142. After the Acquisition, St. Luke's will have 80 percent of PCP services in Nampa, and the HHI in the Nampa market will be 6,219.

143. This substantial market share will give St. Luke's a dominant bargaining position over health plans in the Nampa market.

144. It is highly likely that St. Luke's will use its bargaining leverage over health plan payers to receive increased reimbursements that the plans will pass on to consumers in the form of higher health care premiums and higher deductibles.

145.    Services that used to be performed outside the hospital setting will increasingly be referred to St Luke's and billed out with the higher hospital-based billing rates, increasing the cost to the patient.

146.    While the St. Luke's/Saltzer entity will continue its outstanding quality of care, the cost of that care will rise as a result of the Acquisition.

**Efficiency Defense**

147.    St Luke's argues that the merger will create efficiencies that will far outweigh any anticompetitive effects.

148.    As discussed further below in the Conclusions of Law section, the efficiencies must be merger-specific – that is, "they must be efficiencies that cannot be achieved by either company alone because, if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor." *F.T.C. v. H.J. Heinz Co*, 246 F.3d 708, 722 (C.A.D.C. 2001).

149.    St. Luke's recognizes this requirement that the efficiencies be merger-specific, and argues that "[t]he transaction's benefits are merger-specific because the transaction will enhance the ability of the combined St. Luke's/Saltzer to offer coordinated, patient-centered care; to support physicians in the practice of evidence-based medicine in an environment that rewards teamwork and value of care rather than volume of care; to accept risk and accountability for patients' outcomes; and to manage population health. Saltzer and St. Luke's could not achieve these benefits as effectively or as quickly by any looser affiliation or other means." *See Proposed Findings and Conclusions (Dkt. No.404)* at ¶ 646.

**Findings of Fact & Conclusions of Law – page** 28

150.    One of the driving forces behind the Acquisition is St. Luke's desire to improve quality and reduce costs by moving toward value-based or risk-based care and away from fee-for-service ("FFS") care.

151.    The present system of fee-for-service reimbursement is a leading factor in rising health care costs.

152.    Health care costs in the United States are at least twice that of other developed countries.  *See Trial Tr.* at 191 (J. Crouch).

153.    For example, in 2012, the per capita health expense in the United States was $8,233, more than twice the expense in France ($3974) or the United Kingdom ($3433), and nearly twice that of Germany ($4338) or Canada ($4445).  *See OECD Health Data 2012 (June 28, 2012).*[3]

154.    Despite, such extraordinary expense, the health care delivered in the United States is decidedly ordinary.  In virtually every study comparing the quality of health care delivered to consumers, the United States is consistently in the middle of the pack among developed nations.   *See Why Not the Best? Results from the National Scorecard on U.S. Health System Performance (Oct. 2011).*[4]

155.    For example, the United States ranks last out of 16 industrialized countries on a measure of mortality amenable to medical care (deaths that might have been

---

[3]   Found at http://www.oecd.org/health/healthataglance.

[4]   Found at http://www.commonwealthfund.org/Publications/Fund-Reports/2011/Oct/Why-Not-the-Best-2011.aspx.

prevented with timely and effective care), with premature death rates that are 68% higher than in the best-performing countries. *Id.*

156. In Idaho, health care costs are above even the already-high national average.

157. Idaho's largest insurer, Blue Cross of Idaho (BCI), pays considerably more than what the average commercial insurance plans pays in the United States. *Trial Tr.* at 204 (J. Crouch).

158. Across the United States, the average commercial insurance plan pays about 120% of what Medicare pays. *Id.* For overnight hospital stays in Idaho, BCI pays between 150% to 200% more than Medicare pays. *Id.* at 211. For outpatient hospital services, BCI pays 300% more than Medicare. *Id.* For routine office visits, BCI pays 140% more than other commercial plans. *Id.* at 206.

159. Idaho's reimbursement rate for routine office visits is higher than 95% of the rates paid by other insurance plans across the country. *Id.* at 224-225; *see also* Baker, Bundorf & Royalty, *Private Insurers' Payments For Routine Physician Office Visits Vary Substantially Across The United States, in Health Affairs* (Sept. 2013) at 1583.

160. For other medical services, BCI pays between 175% and 200% more than Medicare. *Id.* at 204.

**Efficiency Defense – Elimination of Fee-For-Service Reimbursement System**

161. One reason – perhaps the principal reason – for the extraordinary cost of the U.S. health care system is our fee-for-service (FFS) reimbursement system. *Trial Tr.* at 191-92 (J. Crouch).

162.   It is the primary way that health care providers are compensated under the current system in the U.S. and in Idaho.  *Id.*

163.   In the FFS system, providers are rewarded for doing more, whether or not more leads to better health outcomes.  *See Trial Tr.* at 1608 (D. Pate).

164.   The FFS system "incentivizes volume" because "the more services [physicians] perform, the more they can bill and the more they're compensated."  *Trial Tr.* at 191-92 (J. Crouch).

165.   For providers compensated on a FFS basis, there is no reward for teamwork or enhancing the value of care for patients.  If a botched hip replacement must be redone, both surgeries will be paid for under the FFS system, providing no incentive to get it right the first time.  *Trial Tr.* at 2578 (Dr. Enthoven).

166.   Because of the focus on volume rather than value, the National Academy of Sciences estimates that 30% to 40% of health care spending is waste.  *Id.* at 2573-74 (Dr. Enthoven).

167.   The Berkeley Forum Report, endorsed by Dr. Enthoven at trial, concluded that "[o]ur predominately fee-for-service payment system often results in incentives that lead to uncoordinated care, fragmented care delivery, low-value services and sub-optimal population health."  *See Berkeley Forum, supra,* at p. 40; *Trial Tr.* at 2606-10 (Dr. Enthoven).

168.   To remedy this problem, the Berkeley Report recommended a movement toward integrated care and risk-based reimbursement.  *Trial Tr.* at 2606-2610 (A. Enthoven).

169.    The Berkeley Report concluded that "the few examples of fully-integrated delivery systems that exist today demonstrate that financial accountability for a population's health is a very effective motivator of innovative practices in prevention, chronic disease management and care for seriously ill patients." *Berkeley* at p. 13.

170.    In an integrated delivery system, primary care physicians ("PCPs") and specialty physicians work as a team, with PCPs managing patient care and specialty physicians consulting and providing care as needed. *Trial Tr.* at 2585-2586 (Dr. Enthoven).

171.    In this integrated system, the primary care physician acts "as the coordinator and team leader" to "review the whole thing, make sure what's needed is done and nothing falls between the cracks." *Id.*

**Efficiency Defense – Move to Risk-Based Reimbursement System**

172.    In this integrated system, providers receive reimbursement from insurers in the form of a set amount for each patient rather than a payment for each service rendered. The set amount is based on the average expected health care utilization for the patients given such factors as their age and medical history. This set amount is often referred to as "capitation."

173.    Capitation motivates providers to consider the costs of treatment as they will share in the savings if they can keep actual costs below the set amount they receive. *Trial Tr.* at 2576 (Dr. Enthoven)

174.    For the same reason, providers have an incentive to practice preventative care and keep their patients healthy. *Id.* at 2572, 2574-2575 (Dr. Enthoven).

175.    In the botched hip replacement example discussed above, capitation provides an incentive to get the operation done right the first time, and would financially punish providers whose shoddy work required a second surgery.

176.    In addition to punishing errors, capitation promotes innovation.  For example, when the Duke Medical School identified an improved procedure for treating coronary bypass patients that resulted in lower cost and better results for patients, reimbursement based on a capitation system would ensure that the innovation increased the School's revenue while reimbursement based on an FFS system would have the opposite effect (because the volume of services declined).  *Trial Tr.* at 2574 (Dr. Enthoven).

177.    In this way, incentives are properly aligned between providers and patients, so that providers have incentives to provide higher-value care at lower cost—not to provide higher volume of care without regard to value.  *Id.* at 2586-2587 (Dr. Enthoven).

**Efficiency Defense – Employed Physicians**

178.    Integrated medicine is "team-based medicine," and one way to create a committed and unified team of physicians is to employ them.  *Trial Tr.* at 2611, 2616 (Dr. Enthoven).

179.    Successful groups like Kaiser Permanente and the Cleveland Clinic have mostly employed physicians.

180.    But physicians are committed to improving the quality of health care, and lowering its cost, whether they are employed or independent.  *Trial Tr.* at 3524 (testimony of Dr. Kizer – board certified in six specialties and a professor at the

University of California at Davis – that physicians are committed to improving

quality, and citing a study finding 95% of physicians "recognize they have a

responsibility for lowering the cost of healthcare").

181.    There is no empirical evidence to support the theory that St Luke's needs a core

group of employed primary care physicians beyond the number it had before the

Acquisition to successfully make the transition to integrated care. *Trial Tr.* at 3538-

39 (Dr. Kizer).

182.    Integrated care – and risk-based contracting – do not require a large number of

physicians because the health plans "manage the level of risk proportionate to the

level of the provider organization." *Trial Tr.* at 195 (J. Crouch).

183.    In Idaho, independent physician groups are using risk-based contracting

successfully. *Trial Tr.* at 195-96 (J. Crouch).

184.    It is the committed team – and not any one specific organization structure – that is

the key to integrated medicine. *Trial Tr.* at 3525 (Dr. Kizer).

185.    Because a committed team can be assembled without employing physicians, a

committed team is not a merger-specific efficiency of the Acquisition. *Trial Tr.* at

3558 (there are "alternative models [to employing physicians] . . . that are being

widely utilized and can be utilized to achieve those same purposes") (Dr. Kizer).

**Efficiency Defense – Shared Electronic Record**

186.    An important component of integrated care delivery is a shared electronic record.

*Trial Tr.* at 3540 (Dr. Kizer).

**Findings of Fact & Conclusions of Law – page** 34

187.   When a patient sees multiple providers for treatment, the electronic health record enables those providers not only to communicate with one another in real time, but also to have a complete picture of the medical progress of that patient as they consider their own treatment approach.  *See Trial Tr.* at 1920 (J. Kee).

188.   When, for example, a patient suffers from multiple conditions like diabetes, coronary artery disease, and depression, which require him to see a primary care physician, endocrinologist, cardiologist, and psychiatrist, the physicians can ensure, via the electronic health record, that none of their prescribed medications conflict, and that all services that need to be provided are made available.  *See Trial Tr.* at 2586 (Dr. Enthoven).

189.   The electronic health record improves preventative care.  Physicians can categorize and track who, for example, is due for a mammogram or suffers from diabetes and does not have their blood sugar under control.  *See Trial Tr.* at 2590 (Dr. Enthoven).  This monitoring seeks to avoid preventable, serious episodes that would otherwise require costly treatment.

190.   An electronic health record "can make health care delivery more efficient, cost-effective, and safe because it makes practice guidelines and evidence databases available to health care providers and improves computerized patient record accessibility."  *See Big Data, 99 Iowa L. Rev. 225 (Nov. 2013)* at 247-48.

191.   Nevertheless, providers have generally "been slow to adopt [electronic health records] for financial reasons, since transitioning to electronic systems often entails high up-front costs for training and new infrastructure."  *Id*. at 248.

**Findings of Fact & Conclusions of Law – page** 35

192.   St. Luke's is in the process of implementing Epic, an electronic health record that
tracks, centralizes, and updates a patient's family and medical history and, in turn,
improves the continuity and coordination of care the patient receives across multiple
providers. Transcript at 2796:13-2797:23 (M. Chasin).

193.   The Epic system is "generally recognized at or near the top of . . . enterprise-wide
patient health records systems." *Trial Tr.* 1918-19 (J. Kee).

194.   St. Luke's presently has 500 providers on the system and has spent $40 million
installing the system. *Trial Tr.* at 1919-20 (J. Kee).

195.   Epic allows patients to get more involved in their own health care. *Trial Tr.* at
2798-99 (M. Chasin). Through its patient portal, MyChart, patients have secure email
access to their physicians, as well as the ability to track and manage their
appointments, view their lab results, and refill their prescriptions. *Id.* Patients can
increase their participation in their own care without increasing the amount of time
they need to spend in a physician's office – or incur the costs of an office visit – to do
so. *Trial Tr.* 2627-28 (Dr. Enthoven).

196.   Furthermore, Epic allows physicians to share information across specialties,
creating a complete picture of the patients' treatment experiences. *Trial Tr.* at 1920-
22 (J. Kee). Physicians can view the entire health history of a patient, including all of
his or her lab work and radiological images, all of the contemporaneous notes
physicians have made on the patient, all of the tests pending, and all of the
preventative care measures outstanding. *Trial Tr.* at 2807 (M. Chasin).

197. Epic reduces errors resulting from incomplete information, as well as duplicative testing. *Trial Tr.* 1621-22 (D. Pate); Trial *Tr.* 1922 (J. Kee).

198. Epic also improves communication between providers and enhanced coordination of care. *Trial Tr.* 2047-48; 2097 (J. Souza).

199. To achieve all of these benefits, it is crucial that all physicians – whether employed by St. Luke's or practicing independently – have access to Epic. *Trial Tr.* at 3549 (testimony by Dr. Kizer that "interoperability is both a business imperative as well as national policy"); *Trial Tr.* at 1658 (testimony by Dr. Pate, St. Luke's CEO, that "[t]he delivery system necessary to provide this population health management will include St. Luke's, but includes many independent physicians and facilities all working together around the state").

200. The numerous benefits of Epic listed above would be severely reduced if that system was off limits to independent doctors. *Trial Tr.* at 3546 (testimony by Dr. Kizer that "if one's intent is to optimize quality and lower costs, you want maximum ability of information, which means that you would want to be able to connect with as many other providers as possible and share information").

201. To ensure that Epic is accessible, St Luke's is developing the Affiliate Electronic Medical Records program that would allow independent physicians access to Epic. *Trial Tr.* at 3545 (Dr. Kizer).

202. The Affiliate program would allow independent physicians to share in Epic's health records so long as those physicians were willing "to adhere to very significantly rigid standards." *Trial Tr.* at 1961 (J. Kee).

203. St. Luke's plans to roll out the Affiliate program in April of 2014, and already has about 15 groups showing interest. *Trial Tr.* at 1964, 2006 (J. Kee).

204. These circumstances demonstrate that the efficiencies resulting from the use of Epic do not require the employment of physicians and hence are not merger-specific.

205. The same analysis applies to the White Cloud data analytics tool. *Trial Tr.* at 3562 (testimony from Dr. Kizer that "independent physicians currently use and have available to them a wide array of . . . data analytics tools . . . .").

206. For all of these reasons, the efficiencies resulting from Epic and White Cloud are not merger-specific.

**Entry Defense**

207. St. Luke's raises the defense that other providers will enter the Nampa market and compete, thereby mitigating any anticompetitive effects of the Acquisition.

208. As will be discussed further in the Conclusions of Law section below, St. Luke's must show that entry by competitors will be "timely, likely, and sufficient in its magnitude, character and scope to deter or counteract the competitive effects" of a proposed transaction. *See* Merger Guidelines § 9; *FTC v. Procter & Gamble, Co.*, 386 U.S. 568, 579 (1967).

209. It is difficult to recruit family doctors to Canyon County. *Trial Tr.* at 1179 (David Peterman).

210. Younger doctors prefer to live and practice in Ada County. *Trial Tr.* at 1181 (David Peterman).

211.   Recruiting general internists has been difficult because there is a tendency among internal medicine physicians who finish their residencies either to go into a hospitalist program, which is just inpatient medicine, or to go on to various subspecialties like cardiology or pulmonology. *Trial Tr.* at 714 (Nancy Powell).

212.   In 2013, SAMG was not able to recruit any family practice doctors to Nampa. *Trial Tr.* at 715:5-7 (Nancy Powell).

213.   SAMG has also been unable to recruit any pediatricians or general internists to Nampa in the last two years. *Trial Tr.* at 713-14 (Nancy Powell).

214.   Given these circumstances, the Court cannot find that entry of competitors is likely to mitigate the anticompetitive effects of the Acquisition.

## Conclusions of Law

### Jurisdiction

1.   This is a civil action arising under Section 7 of the Clayton Act, 15 U.S.C. § 18, and the Idaho Competition Act, Idaho Code § 48-106.[5]

2.   This Court has subject matter jurisdiction over this action pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, and based upon 28 U.S.C. §§ 1331, 1337, and 1345.

---

[5] All plaintiffs challenge the Saltzer transaction under § 7 of the Clayton Act, 15 U.S.C. § 18, and the analogous Idaho state law, Idaho Code Ann. § 48-106. The private plaintiffs also challenge the transaction under § 1 of the Sherman Act, 15 U.S.C. § 1, and the corresponding Idaho state law, Idaho Code Ann. § 48-104. Claims under both Clayton Act § 7 and Sherman Act § 1 are generally adjudicated according to the same standards. *See, e.g.*, *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1283 (7th Cir. 1990).

3. The FTC is vested with authority and responsibility for enforcing Section 7 of the Clayton Act, 15 U.S.C. § 18.

4. The Idaho Attorney General, Lawrence G. Wasden, is the chief law enforcement officer of the State of Idaho, see Idaho Code §§ 67-1401 et seq., with the authority to bring this action on behalf of the State of Idaho pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Idaho Code § 48-108 of the Idaho Competition Act.

5. Defendant St. Luke's Health System, Ltd. is, and at all relevant times has been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12 (2006). It has also engaged in "Idaho Commerce" as defined in Idaho Code Section 48-103(1) of the Idaho Competition Act.

6. Defendant Saltzer Medical Group, P.A. is, and at all relevant times has been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act,15 U.S.C. § 44 (2006), and Section 1 of the Clayton Act, 15 U.S.C. § 12 (2006). It has also engaged in "Idaho Commerce" as defined in Idaho Code Section 48-103(1) of the Idaho Competition Act.

7. St. Luke's and Saltzer, by virtue of their engagement in activities in or affecting "commerce" as defined in Section 1 of the Clayton Act, are subject to the FTC's jurisdiction to enforce Section 7 of the Clayton Act. 15 U.S.C. § 21 (2006) (vesting authority to enforce compliance with 15 U.S.C. § 18 in the FTC "where applicable to all other character of commerce"); *FTC v. Univ. Health, Inc.,* 938

F.2d 1206, 1214–15 (11th Cir. 1991) (holding that 15 U.S.C. § 21 makes clear that the FTC's enforcement of Section 7 applies to asset acquisitions by nonprofit hospitals).

8. Because the FTC has jurisdiction to enforce Section 7 against St. Luke's and Saltzer, it has the authority under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to bring this civil action asking this Court, "after proper proof," to issue a permanent injunction and grant other equitable relief. 15 U.S.C. § 53(b); *Univ. Health,* 938 F.2d at 1217 n.23 (holding that "Section 13(b) authorizes the FTC to seek injunctive relief against violations of 'any provision of law enforced by [it]'"); *see also FTC v. H.N. Singer, Inc*., 668 F.2d 1107, 1111 (9th Cir. 1982) (holding that "[Section] 13(b) gives the Commission the authority to seek, and gives the district court the authority to grant, permanent injunctions in proper cases even though the Commission does not contemplate any administrative proceedings").

9. St. Luke's and Saltzer transact business in the District of Idaho and are subject to personal jurisdiction here. *See St. Luke's Answer (Dkt. No. 100)* at ¶12; Saltzer's *Answer (Dkt. No. 105)* at ¶12. Venue is therefore proper in this district under 28 U.S.C. § 1391(b) and (c) and under 15 U.S.C. § 53(b).

## **Clayton Act**

10. The Acquisition is illegal under Section 7 of the Clayton Act if "the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18.

11. Congress used the words "may be" "to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 323 (1962).

12. A fundamental purpose of § 7 is "to arrest the trend toward concentration, the tendency to monopoly, before the consumer's alternatives disappeared through merger . . . ." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 367 (1963).

13. At the same time, § 7 deals with "probabilities" and not "ephemeral possibilities" of anticompetitive effects. *Brown Shoe,* 370 U.S. at 323; *United States v. Marine Bancorporation, Inc*., 418 U.S. 602, 622–23 (1974) (rejecting claim that was "considerably closer to 'ephemeral possibilities' than to 'probabilities'").

14. Section 7 necessarily "requires a prediction" of a transaction's likely competitive effect, and "doubts are to be resolved against the transaction." *FTC v. Elders Grain, Inc*., 868 F.2d 901, 906 (7th Cir. 1989).

15. Although the burden of persuasion always remains firmly on the plaintiffs in a § 7 case, the burden of production shifts based on the plaintiffs' and defendants' showings. *See, e.g., United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975).

16. First the plaintiffs must show that the Acquisition would produce "a firm controlling an undue percentage share of the relevant market, and [would] result[ ] in a significant increase in the concentration of firms in that market." *Philadelphia Nat'l Bank*, 374 U.S. at 363.

17. Such a showing establishes a "presumption" that the merger will substantially lessen competition. *Heinz,* 246 F.3d at 715.

18. To rebut the presumption, the defendants must produce evidence clearly showing that the market's concentration inaccurately predicts the likely competitive effects of the transaction. *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 631 (1974).

19. This rebuttal evidence could take the form of a showing that "the anticompetitive effects of the merger will be offset by efficiencies resulting from the union of the two companies." *Heinz,* 246 F.3d at 715

20. Other forms of rebuttal evidence may include a showing of "ease of entry into the market, the trend of the market either toward or away from concentration, and the continuation of active price competition." *Heinz,* 246 F.3d at 715 n. 7.

21. If the defendant successfully rebuts the presumption of illegality, the burden of producing additional evidence of anticompetitive effect shifts to the plaintiffs, and merges with the ultimate burden of persuasion, which remains with the plaintiffs at all times. *Id.* at 715.

## Idaho Competition Act

22. Like Section 7 of the Clayton Act, the Idaho Competition Act prohibits acquisitions that may substantially lessen competition. Idaho Code § 48-106. Because the provisions of the Idaho Competition Act "shall be construed in harmony with federal judicial interpretation of comparable federal antitrust

statutes," the antitrust analysis under the Clayton Act applies equally to the Idaho

Competition Act. Idaho Code §§ 48-102(3), 48-106.

## FTC's Prima Facie Case

23. Adult PCP services sold to commercially insured patients in Nampa constitutes the relevant product and geographic markets for purposes of analysis under § 7 of the Clayton Act.

24. The Acquisition will result in a post-merger HHI of 6,219 and an increase in HHI of 1,607, far above the levels necessary to trigger the presumption that the combined entity will lessen competition. *See Merger Guidelines § 5.3.*

25. Moreover, it is highly likely that the combined entity will use its substantial market share (1) to negotiate higher reimbursements with health plans, and (2) charge more services at the higher hospital billing rates. This will raise costs to consumers.

26. For all these reasons, the plaintiffs have established a prima facie case that the Acquisition is anti-competitive. *Heinz*, 246 F.3d at 716.

## Defense – Ease of Entry

27. St. Luke's raises the defense that other providers will enter the Nampa market and compete, thereby mitigating any anticompetitive effects of the Acquisition.

28. To constitute a defense, St. Luke's must show that entry by competitors will be "timely, likely, and sufficient in its magnitude, character and scope to deter or counteract the competitive effects" of a proposed transaction. *See* Merger Guidelines § 9; *FTC v. Procter & Gamble, Co*., 386 U.S. 568, 579 (1967).

29. The higher the barriers to entry, as in this case, the less likely it is that the "timely, likely, and sufficient" test can be met. *United States v. Visa U.S.A., Inc*., 163 F.Supp.2d 322, 342 (S.D.N.Y.2001), *aff'd*, 344 F.3d 229, 240 (2d Cir.2003).

30. In assessing the evidence, the "history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future." *F.T.C. v Cardinal Health*, 12 F.Supp.2d 34, 56 (D.C.D.Ct. 1998); *see also* Horizontal Merger Guidelines § 9 ("Recent examples of entry, whether successful or unsuccessful, generally provide the starting point for identifying the elements of practical entry efforts.").

31. That history, discussed in the Findings of Fact section above, demonstrates that entry into the market has been very difficult and would not be timely to counteract the anticompetitive effects of the Acquisition.

32. Those Findings demonstrated how difficult it is to recruit primary care physicians into Canyon County, and how difficult it is for new primary care physicians to open an office, hire staff, earn a reputation, and develop a practice with the quality to compete with St. Luke's/Saltzer.

33. St. Luke's has not carried its burden of proving that entry is likely and will be timely.

**Defense – Efficiencies Defense**

36. St. Luke's argues that the merger will create efficiencies that will far outweigh any anticompetitive effects.

37. This defense requires "convincing proof" of "significant" and "merger-specific" efficiencies arising as a result of the merger. *Areeda* at ¶ 971, p. 48.

38. Although the Supreme Court has not sanctioned the use of the efficiencies defense in a section 7 case, *see  Procter & Gamble Co*., 386 U.S. at 580, the trend among lower courts is to recognize the defense.  *See, e.g., F.T.C. v. H.J. Heinz Co*, 246 F.3d 708, 720 (C.A.D.C. 2001).

39. When high market concentrations will result from the merger, the defense requires "proof of extraordinary efficiencies."  *Id*.

40.  Professor Areeda explains that an "extraordinary" showing is necessary when the "post merger market's HHI is well above 1800 and the HHI increase is well above 100 . . . [because] the likelihood of a significant price increase is particularly large . . . ."  4A *Areeda, et al., Antitrust Law*  ¶ 971f, at 48.

41. Moreover, given high concentration levels, "courts must undertake a rigorous analysis of the kinds of efficiencies being urged by the parties in order to ensure that those 'efficiencies' represent more than mere speculation and promises about post-merger behavior."  *Heinz*, 246 F.3d at 721.

42. The efficiencies must be merger-specific – that is, "they must be efficiencies that cannot be achieved by either company alone because, if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor."  *Heinz*, 246 F.3d at 722.

43. The Merger Guidelines "credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects."  *See Merger Guidelines* at § 10.

44. St. Luke's believed that the best way to create the unified and committed team of physicians required to practice integrated medicine was to employ them.

45. St. Luke's followed this strategy to improve the quality of medical care.

46. However, the Findings of Fact demonstrate that while employing physicians is one way to put together a unified and committed team of physicians, it is not the only way. The same efficiencies have been demonstrated with groups of independent physicians.

47. There are a number of organizational structures that will create a team of unified and committed physicians other than that selected by the Acquisition, a structure that employs physicians and creates a substantial concentration of market power.

48. Moreover, the efficiencies of a shared electronic record can be similarly achieved even without the Acquisition, and thus these efficiencies are also not merger-specific.

49. The Court finds that St. Luke's has not carried its burden of showing convincing proof of significant and merger-specific efficiencies arising as a result of the Acquisition.

## **Remedy**

50. Divestiture is "the remedy best suited to redress the ills of an anticompetitive merger." *California v. Am. Stores Co.,* 495 U.S. 271, 285 (1990).

51. Divestiture "should always be in the forefront of a court's mind when a violation of Section 7 has been found." *Ash Grove Cement Co. v. FTC*, 577 F.2d 1368, 1380 (9th Cir. 1978).

52. In *Garabet,* the Circuit stated that "the costs and complexities of unwinding a merger may be considered in evaluating prejudice to the affected parties." *Garabet*, 116 F. Supp. 2d at 1173.

53. However, in this case, St. Luke's represented to the Court that "we will not oppose divestiture on grounds that divestiture cannot be accomplished." *Transcript of Preliminary Injunction Hearing (Dkt. No. 49)* at 87–88; *see also* TX 2625 (letter by St Luke's to St. Al's stating that St. Luke's "would not argue that "the transaction should not be unwound because doing so would be costly or burdensome").

54. Thus, the cost and complexity of unwinding the transaction is no defense to divestiture.

55. St. Luke's argues, however, that an unwound Saltzer will be significantly and negatively affected due to the departure of seven surgeons from Saltzer to St. Al's.

56. While it is true that the loss of the seven surgeons was a financial hardship to Saltzer, *see Trial Tr.* at 3235 (L. Ahern), they left in large part because of the Acquisition. *See Trial Tr.* at 2486-97 (Dr. Williams).

57. If Saltzer's weakness (the loss of seven surgeons) was caused by the Acquisition, St. Luke's cannot raise that weakness as a reason to hold together the Acquisition.

58. Moreover, any financial hardship to Saltzer will be mitigated by St. Luke's payment of $9 million for goodwill and intangibles as part of the Acquisition, a payment that does not have to be paid back if the Acquisition was undone. *Trial Tr.* at 244 (J. Kaiser).

59. The Court also rejects St. Luke's proposal that divestiture be dropped as a remedy in favor of ordering that St. Luke's and Saltzer negotiate separately with health plans, *Trial Tr.* at 167-68 (Jack Bierig).

60. A similar proposal was rejected in *In re ProMedica Health Sys., Inc.,* No. 9346, 2012 WL 1155392, at *48 (FTC June 25, 2012).

61. In that case, two merging hospitals proposed maintaining two separate negotiating teams that would prevent anticompetitive effects while addressing concerns about the financial viability of one of the hospitals. The F.T.C. rejected the argument, citing case law favoring divestiture. Responding to an argument that the separate negotiating team remedy had been approved in a past case, the F.T.C. noted that the remedy had only been approved because the entities had fully integrated seven years earlier, making divestiture unworkable. The F.T.C. distinguished that past case on the ground that the parties in the case now before it – just like the parties here – had not fully integrated.

62. The Court finds *ProMedica* persuasive and will likewise reject the separate negotiating teams remedy.

## **Private Plaintiffs' Claims**

63. The Private Plaintiffs (but not the Government Plaintiffs) allege anticompetitive effects in four additional markets: (1) general pediatric physician services sold to commercial payors in Nampa; (2) general acute care inpatient hospital services in Ada and Canyon Counties, (3) neurosurgery and orthopedic ("neuro+ortho")

outpatient surgical facility services in Ada and Canyon Counties, and (4) general surgery outpatient surgical facility services in Ada and Canyon Counties.

64. The Court need not resolve the issues raised by the private plaintiffs because the Acquisition is being unwound due to its effects in the Nampa market for primary physician services.

65. Thus, the Court need not address whether the Acquisition would have violated § 7 in other markets.

## Conclusion

66. Health care is at a crisis point. Nationally, quality lags far behind the inexorable rise in prices. This has created a groundswell of demand for change.

67. One change universally recommended is to move away from fee-for-service reimbursement and toward integrated care and risk-based reimbursement, where payment is made on the basis of patient outcomes, not the volume of services.

68. This is a major change and is slowly being implemented.

69. This period of change might be best described as being in an experimental stage, where hospitals and other providers are examining different organizational models, trying to find the best fit.

70. To be part of this experimental wave moving toward integrated care, St. Luke's and Saltzer agreed on the Acquisition.

71. The Acquisition is an attempt by St. Luke's and Saltzer to improve the quality of medical care.

72. But the particular structure of the Acquisition – creating such a huge market share for the combined entity – creates a substantial risk of anticompetitive price increases.

74. More specifically, there is a substantial risk that the combined entity will use its dominant market share (1) to negotiate higher reimbursements with health plans, and (2) charge more services at the higher hospital billing rates. This will raise costs to consumers.

75. As discussed above, this has been the result in the past when St. Luke's has achieved bargaining leverage over health insurers.

76. In a world that was not governed by the Clayton Act, the best result might be to approve the Acquisition and monitor its outcome to see if the predicted price increases actually occurred. In other words, the Acquisition could serve as a controlled experiment.

77. But the Clayton Act is in full force, and it must be enforced. The Act does not give the Court discretion to set it aside to conduct a health care experiment.

78. For all of the reasons set forth above, the Court finds that the Acquisition violates § 7 of the Clayton Act and the Idaho Competition Act.

79. The Court will permanently enjoin the Acquisition under § 7 of the Clayton Act and the Idaho Competition Act.

80. The Court will order St. Luke's to fully divest itself of Saltzer's physicians and assets and take any further action needed to unwind the Acquisition.

81. While the plaintiffs ask the Court to order St. Luke's to notify the Government plaintiffs in advance of any future acquisitions of physician groups, the Court does not find such a remedy appropriate.

82. The Court will file a separate Judgment as required by Rule 58(a).

DATED: January 24, 2014

_____

B. Lynn Winmill
Chief Judge
United States District Court