1

2

3

4

5

6

7

8                                    UNITED STATES  DISTRICT COURT

9                                     Northern District of California

10                                      San Francisco Division

11   DJENEBA SIDIBE and DIANE DEWEY, on              No. C 12-04854 LB
     Behalf of Themselves and All Others
12   Similarly Situated,                             **ORDER GRANTING SUTTER
                                                     HEALTH'S MOTION TO DISMISS
13                          Plaintiffs,              PLAINTIFFS' THIRD AMENDED
                                                     COMPLAINT**
14          v.
                                                     [Re: ECF No. 70]
15   SUTTER HEALTH, and DOES 1 through 25,
     inclusive,
16
                           Defendants.
17   _____/

18                                         **INTRODUCTION**

19        In this putative class action, Plaintiffs Djeneba Sidibe, Diane Dewey, and Jerry Jankowski sued

20   Sutter Health, a company that owns and operates hospitals and other health care service providers,

21   alleging that Sutter's anticompetitive conduct in the health care services industry in Northern

22   California violates federal and state antitrust laws and California's unfair competition law.  *See*

23   *generally* Third Amended Complaint ("TAC"), ECF No. 69.[1]  The alleged anticompetitive conduct

24   is Sutter's imposing tying arrangements that require health plans to include in their provider

25   network, and pay supra-competitive rates for, all Inpatient Hospital Services that Sutter supplies in

26

27   _____

28        [1]  Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
     generated page numbers at the top of the page.

UNITED STATES DISTRICT COURT
For the Northern District of California

five tied hospital service area ("HSA") markets (the San Francisco, Oakland, Sacramento, Modesto, and Santa Rosa HSAs).  If the health plans do not, then they cannot have access to Sutter's "must have" Inpatient Hospital Services that Sutter supplies in the nine tying HSA markets (Antioch, Berkeley, Burlingame, Castro Valley, Davis, Roseville, San Leandro, Tracy, and Vallejo).  TAC ¶ 5.  Without access to the Inpatient Hospital Services in the tying market, health plans cannot compete.  *Id.*  The alleged result is that Sutter forces health plans to include Sutter's tied market Inpatient Hospital Services in their provider networks at prices that Sutter dictates.  *Id.*

The arrangement also requires health plans to include every Sutter hospital in the tying markets in their provider networks, and but for this tying, health plans would be able to forego including Sutter hospitals in their networks unless the hospitals offered lower, competitively-priced rates for their Inpatient Hospital Services.  *Id.* ¶ 29.  Also, in a competitive market, health plans can steer participants to lower-cost providers in their networks, but Sutter precludes such steering arrangements by requiring health plans to "actively encourage" their members to use Sutter Health Providers and by penalizing the health plans with higher rates for Inpatient Hospital Services if they do not.  *Id.* ¶¶ 34-36.

Sutter's anticompetitive conduct allegedly harmed hundreds of thousands of patient health-plan members in Northern California who suffered from these overcharges in the form of higher insurance

premiums and co-insurance payments.  *Id.* ¶¶ 2, 112.

Sutter moved to dismiss for failure to state a claim.  *See* Motion, ECF No. 70.  The court grants the motion for the reasons stated below.

STATEMENT[2]

## I. THE PARTIES

### A. Sutter Health

Defendant Sutter Health is a California corporation with its principal place of business in

---

[2] Except for the procedural history, the statement is composed of allegations from the complaint in furtherance of the analysis under Federal Rule of Civil Procedure 12(b)(6).

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Sacramento, California.  TAC ¶ 19.  Sutter controls the largest and most dominant network of

2  hospitals and medical service providers in Northern California.  *See* TAC ¶ 19.  Sutter's network

3  includes at least 31 acute care hospitals with approximately 4,500 beds.  *Id.*  Over the last 30 years,

4  sutter has acquired approximately 20 hospitals and now owns the only acute care hospitals in several

5  Northern California Health Service Areas.  *Id.* ¶ 20.  In 2012, Sutter's operating revenues were

6  approximately $9.6 billion.  *Id.* ¶ 21.  Other persons, firms, corporations, organizations, and other

7  entities have participated as co-conspirators in Sutter's antitrust violations, and Sutter has some

8  degree of ownership or control over various entities and organizations that are a party to, benefit

9  from, or are a respository for the proceeds generated by the alleged antitrust violations.  *Id.* ¶ 22.

10  **B. Plaintiffs and the Putative Class**

11  Plaintiff Djeneba Sidibe lives or has lived in San Mateo County (before November 2009),

12  Alameda County (November 2009 to January 2012), and Marin County (since January 2012).

13  *Id.* ¶ 16.  She was enrolled in a health plan with Anthem Blue Cross (October 2005 to March 2012)

14  and now is enrolled in an Aetna plan.  *Id.*  Plaintiff Diane Dewey has lived in San Francisco County

15  since 1994, was enrolled in health plans with Anthem Blue Cross (2008 to 2010) and Regence Blue

16  Cross Blue Shield (2010 to 2012), and now is enrolled in a Premera Blue Cross health plan.  *Id.* ¶ 17.

17  Plaintiff Jerry Jankowski has lived in San Francisco County since August 1992, was enrolled in the

18  Anthem Blue Cross health plan (July 2012 to June 2013), and is now enrolled the Blue Shield health

19  plan.  *Id.* ¶ 18.  All three Plaintiffs paid premiums to be to be enrolled as a plan member in a health

20  plan.  *Id.* ¶¶ 16-18.  Plaintiffs claim that they were injured by Sutter's allegedly anti-competitive

21  conduct by paying higher premiums, co-payments, deductibles, and other out-of-pocket payments

22  not covered by their health plans.  *Id.*

23  Plaintiffs seek to represent a class of persons under Federal Rule of Civil Procedure 23(b)(3),

24  defined as follows:

25  Any person in the six relevant commercial health insurance markets who during all or part of
the period beginning September 17, 2008 to the present was or is enrolled in a licensed health
26  plan offered by Anthem Blue Cross, Aetna, Blue Shield, Regence Blue Cross Blue Shield
and Premera Blue Cross.

27

28

1   *Id.* ¶ 105.[3]  Plaintiffs also seek to represent a class under Rule 23(b)(2), defined as "all members of

2   the Rule [23](b)(3) Class, and all consumers who are threatened with injury by the violations alleged

3   herein."  *Id.* ¶ 108.

## II.  THE ALLEGED ANTI-COMPETITIVE CONDUCT

5       In the health insurance market, commercial health plans such as Anthem Blue Cross, Aetna, Blue

6   Shield, Regence Blue Cross Blue Shield, and Premera Blue Cross purchase medical services,

7   including Inpatient Hospital Services, for the benefit of their insured members: consumers who

8   purchase commercial health insurance from these health plans.  *Id.* ¶ 23.  Commercial health plans

9   contract with hospitals for Inpatient Hospital Services and pass those costs on to health plan

10   members, such as Plaintiffs, in the form of commercial health insurance premiums.  *Id.*

11   Accordingly, the insurance premiums paid by health plan members increase when their health plans

12   are forced to purchase Inpatient Hospital Services at supra-competitive rates.  Health plan members

13   also directly pay for the costs of medical services provided by hospitals in the form of co-insurance

14   payments.  *Id.*

### A.  The Tying Arrangements

16       Sutter has forced health plans – including Anthem Blue Cross, Aetna, Blue Shield, Regence Blue

17   Cross Blue Shield, and Premera Blue Cross – to include Sutter's higher-priced Inpatient Hospital

18   Services in the Tied Markets in their health plan networks.  *Id.* ¶ 28.  For example, Sutter has forced

19   health plans to include language in their contracts with Sutter that is identical or similar to the

20   following:

21       Each payer [i.e., commercial health plan] accessing Sutter Health providers shall designate
         ALL Sutter Health providers . . . as participating providers unless a Payer excludes the entire
22       Sutter Health provider network.

23   *Id.* ¶ 28 (alterations in TAC).  Sutter has also forced health plans to include its higher-priced Tied

24   Market Inpatient Hospital Services in their networks by orally threatening that failure to do so would

25

26       [3]  Excluded from this Class are Sutter, its subsidiaries, affiliates, officers, directors,
27   employees, legal representatives, heirs or assigns, and co-conspirators.  Also excluded are any
     federal governmental entities, any judicial officers presiding over this action and the members of his
28   or her immediate family and judicial staff, and any juror assigned to this action.  *Id.* ¶ 106.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    mean that health plans could not include Sutter's Tying Market Inpatient Hospital Services in their

2    networks.  *Id.*  As a result of these "all or nothing" contracts and Sutter's market power in the Tying

3    Markets, health plans are forced to include in their provider networks the Sutter Inpatient Hospital

4    Services in both the Tied Markets and the Tying Markets.  *Id.* ¶ 29.  But for these tying

5    arrangements, health plans would have the ability to forego including Sutter hospitals in their

6    provider networks unless those hospitals offered the health plans lower, competitively-priced rates

7    for Inpatient Hospital Services.  *Id.*

8         A number of authorities support Plaintiffs' assertion that Sutter's "all-or-nothing policy" results

9    in anticompetitive conduct.  For example, the Federal Trade Commission and Department of Justice,

10   Antitrust Division, recently identified tying of health care services by providers with market power

11   as "conduct to avoid."  *Id.* ¶ 32 (citing Statement of Antitrust Enforcement Policy Regarding

12   Accountable Care Organizations ("ACOs") Participating in the Medicare Shared Savings Program)

13   (the "DOJ/FTC Policy Statement").  *Id.*  There, these enforcement agencies noted that a group of

14   providers (e.g., an ACO) "should not require a purchaser to contract with all of the hospitals under

15   common ownership with a hospital that participates in the ACO."  According to Plaintiffs, this

16   statement applies to Sutter's tying arrangement because "Sutter's dominant market shares in the

17   Tying Markets far exceed the 30% provider market share threshold that the FTC and DOJ identify as

18   causing a need for heightened antitrust scrutiny of providers."  *Id.* ¶ 32.

19        Plaintiffs also point to a February 2013 FTC advisory opinion to show the anticompetitive nature

20   of "all or nothing" tying arrangements required by hospitals with market power such as Sutter's.  *Id.*

21   ¶ 33.  There, the FTC stated that a proposed physician-hospital organization did not violate antitrust

22   law because

> the proposal does not appear to include 'vertical' arrangements that would enable [the
> organization] to use any market power that [it] might possess in selling certain services to
> limit competition in the sale of any other services.  For example, [it] does not propose to use
> any contracting requirements that would require payers to do business with all of [the
> organization's] participating hospitals . . .

26   *Id.* ¶ 33 (citing Norman PHO Advisory Opinion, Op. FTC 19 (Feb. 13, 2013)) (emphasis omitted).

27   **B. Sutter's "Anti-Steering" Contract Provisions**

28        Plaintiffs also challenge Sutter's alleged policy of including "anti-steering" clauses in a number

of its agreements with health plans. *See id.* ¶¶ 34-38.  In a competitive market, commercial health plans have the ability to steer some of their members to lower-cost, quality providers that participate in their provider networks, thus reducing the costs of medical expenses. *Id.* ¶ 34.  Sutter, however, precludes such "steering" by including contract provisions in a number of its agreements that Plaintiffs allege force health insurers to steer patients away from lower-cost hospitals and to higher-cost Sutter hospitals. *Id.* ¶¶ 35-37.  For example, one Sutter contract requires the health plan:

> . . . to actively encourage members obtaining medical care to use Sutter Health providers. "Actively encourage" or "active encouragement" means incentivizing members to use participating providers [i.e., defined elsewhere as only Sutter providers] through the use of one of more of the following: reduced co-payments, reduced deductibles, premium discounts directly attributable to the use of the participating provider, financial penalties, or requiring such members to pay additional sums directly attributable to the non-use of a participating provider.

> If Sutter Health or any provider learns that a payer . . . does not actively encourage its members to use network participating providers [i.e., Sutter only providers] . . . **Sutter shall have the right upon not less than thirty (30) days' written notice to terminate that payer's right to negotiated rates.  In the event of such termination, the terminated payer shall pay for covered services rendered by providers at 100% of billed charges** until such time as Sutter reasonably believes and notices that the payer does in fact actively encourage its members to use network participating providers . . .

*Id.* ¶ 35 (emphasis and alterations in TAC).

Plaintiffs cite the DOJ/FTC Policy Statement as showing Sutter's anti-steering policy to be anticompetitive in that it proscribes a provider group (such as Sutter) from "preventing or discouraging private payers from directing or incentivizing patients to choose certain providers . . . through 'anti-steering' clauses." *Id.* ¶ 38.  Other economic literature identifies anti-steering provisions such as Sutter's as compromising price competition. *Id.* (citing Havighurst, Clark C. & Richman, Barak D., *The Provider Monopoly Problem in Health Care*, 89 Oregon L. Rev. 847-83 (2011)).  The February 2013 FTC advisory opinion discussed above also identifies anti-steering provisions forced upon health plans by entities with market power as anticompetitive. *Id.* ¶ 38.  In the FTC advisory opinion, "that proposed physician-hospital organization at issue . . . did not appear to be 'limit[ing] competition' because, among other things, it did not 'prevent payers from directing or incentivizing patients to choose certain providers . . . through 'anti-steering' . . . contractual clauses or provisions." *Id.* (quoting Norman PHO Advisory Opinion, Op. FTC 19 (Feb. 13, 2013)).

UNITED STATES DISTRICT COURT
For the Northern District of California

### III. THE RELEVANT MARKETS

A.  Inpatient Hospital Services Sold to Commercial Health Plans

#### 1. The Inpatient Hospital Services Product Market

The first relevant product market is the market for the sale of Inpatient Hospital Services to commercial health plans.  *Id.* ¶ 39.  Plaintiffs define Inpatient Hospital Services as follows:

> Inpatient Hospital Services are a broad group of medical and surgical diagnostic and treatment services that include an overnight stay in the hospital by the patient.  Although individual Inpatient Hospital Services are not substitutes for each other (e.g., obstetrics and cardiac services are not substitutes for each other), the various individual Inpatient Hospital Services can be aggregated for analytic convenience and has been so aggregated by courts, antitrust enforcers, and industry sources such as the Institute of Medicine and the California HealthCare Foundation.  Inpatient Hospital Services exclude: (1) services at hospitals that serve solely military personnel or veterans; (2) services at outpatient facilities that provide same-day service only; and (3) psychiatric, substance abuse, and rehabilitation services.

*Id.* ¶ 40.

The market for the sale of Inpatient Hospital Services to health plans excludes outpatient services and services to government payers.  *Id.* ¶¶ 41-44.  It excludes outpatient services because health plans and patients would not substitute outpatient services for inpatient services in response to a sustained price increase.  *Id.* ¶ 41.  The market for the sale of Inpatient Hospital Services to health plans excludes sales to government payers, including Medicare, Medicaid, and TRICARE, because the process used to determine the rates paid by government payers is separate from a hospital's negotiations with commercial health plans, and a hospital could target a price increase just to commercial health plans.  *Id.* ¶¶ 42, 44.  There are no reasonable substitutes or alternatives to Inpatient Hospital Services sold to commercial health plans.  *Id.* ¶ 44.

#### 2. The Inpatient Hospital Services Geographic Market

Sutter dominates numerous hospital service areas ("HSAs") in Northern California and often offers the only available hospital facility to health plan members in a given HSA.  *Id.* ¶ 25.  HSAs are areas defined in the *Dartmouth Atlas of Health Care*, which is compiled by the Dartmouth Institute for Health Policy & Clinical Practice.  *Id.* ¶¶ 3, 25.  Policy makers and other legal and economic authorities have looked to Dartmouth Institute-defined HSAs in order to assess the economics of hospital markets.  *Id.* ¶¶ 3, 45.

The *Dartmouth Atlas of Health Care* defines HSAs as "local health care markets for hospital

care." *Id.* ¶ 25.  According to the Dartmouth Atlas website (www.dartmouthatlas.org), "[a]n HSA is a collection of ZIP codes whose residents receive most of their hospitalizations from the hospitals in that area." *Id.* ¶¶ 25, 45.

There are 14 Northern California HSAs that constitute geographic markets for Inpatient Hospital Services including the following: Antioch, Berkeley, Burlingame, Castro Valley, Davis, Modesto, Oakland, Roseville, Sacramento, San Francisco, San Leandro, Santa Rosa, Tracy, and Vallejo.  *Id.* ¶ 25.  The TAC identifies the zip codes in each of these HSAs, the Sutter Inpatient Hospital Services facilities located there, and whether the HSA is a "Tying" or "Tied" market, as defined below. *See id.* ¶¶ 47-61.  These allegations are summarized in the following chart:

| Hospital Service Area | Sutter Presence | Type of Market Alleged |
| --- | --- | --- |
| Antioch | Sutter Delta Medical Center | Tying |
| Berkeley | Alta-Bates Summit Medical Center | Tying |
| Burlingame | Mills-Peninsula Medical Center | Tying |
| Castro Valley | Eden Medical Center | Tying |
| Davis | Sutter Davis Hospital | Tying |
| Roseville | Sutter Roseville Medical Center | Tying |
| San Leandro | San Leandro Hospital | Tying |
| Tracy | Sutter Tracy Community Hospital | Tying |
| Vallejo | Sutter Solano Medical Center | Tying |
| Modesto | Memorial Hospital Center Modesto | Tied |
| Oakland | Alta-Bates Medical Center – Summit Campus | Tied |
| Sacramento | Sutter General Hospital Sutter Memorial Hospital | Tied |
| San Francisco | The five California Pacific Medical Center campuses, including the California East, California West, Davies, Pacific, and St. Luke's campuses | Tied |
| Santa Rosa | Summit Medical Center of Santa Rosa | Tied |

*Id.* ¶¶ 47-61.  According to Plaintiffs "[e]ach of these HSAs constitutes an economically-coherent relevant antitrust market for the sale of Inpatient Hospital Services to health plans." *Id.* ¶ 3.

UNITED STATES DISTRICT COURT
For the Northern District of California

In addition, the geographic markets for Inpatient Hospital Services are roughly congruent with Dartmouth Institute-defined HSAs because of California's Knox-Keene Act (and the regulations promulgated thereunder). *Id.* ¶ 46. To ensure that health plan members can access local hospitals for Inpatient Hospital Services (among other things), the Knox-Keene Act requires that all health plans contract with a "hospital that has the capacity to serve the entire dependent enrollee population based on normal utilization" and that is located within 30 minutes or 15 miles of member residences or workplaces. *Id.* ¶ 46.

### 3. The Tying Markets

Sutter has market power in the form of Inpatient Hospital Services sold to health plans in the following nine HSAs: Antioch, Berkeley, Burlingame, Castro Valley, Davis, Roseville, San Leandro, Tracy, and Vallejo. *Id.* ¶ 26. Each of these HSAs is a separate "Tying Market," and Plaintiffs refer to them collectively as the "Tying Markets." *Id.* ¶ 4. Except for the San Leandro HSA, Sutter has a 100% share of the relevant Inpatient Hospital Services market according to publicly-available data on discharges and hospitals. *Id.* ¶ 4. In the San Leandro HSA, Sutter has a 78% share. *Id.* Sutter's market power over health plans in the Tying Markets is enhanced by the fact that Kaiser Permanente, the other large hospital system in Northern California, is a closed member system that offers Inpatient Hospital Services only to Kaiser-affiliated health plans. *Id.* ¶ 27. Kaiser, therefore, is not a competitor in the relevant markets. *Id.*

### 4. The Tied Markets

The Tied Markets are the HSAs for San Francisco, Oakland, Sacramento, Modestro, and Santa Rosa. *Id.* ¶¶ 5, 57-61.

## B. The Sale of Commercial Health Insurance to Subscribers

The second relevant market is for the sale of commercial health insurance to subscribers. *Id.* ¶ 62. Individuals typically purchase health insurance from commercial health plans and use the insurance to pay for their medical expenses.[4] *Id.* ¶¶ 62-63. Commercial health insurance also is

---

[4] There is an exception for those who are disabled, elderly or indigent, and therefore eligible for Medicare or Medicaid programs. *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

1  obtained from commercial health plans by employers who, as a benefit, will sometimes pay for a

2  share of the premiums incurred by the employee-member.  *Id.* ¶ 63.  Health plans compete to be

3  chosen by individuals and employers based on the provider configuration of their provider networks,

4  on the amounts of their premiums, and on the customer's cost of using providers, among other

5  factors.  *Id.* ¶ 64.  In California, health plans compete by offering their actual and potential members

6  access to a provider network that includes hospitals providing Inpatient Hospital Services close to

7  their home or place of work.  *Id.* ¶ 64.

8      There are no reasonable economic substitutes for the purchase of commercial health insurance by

9  individuals or employees, and purchasers of commercial health insurance would pay a small, but

10 significant, non-transitory increase in price for such insurance from a hypothetical (or actual)

11 monopolist.  *Id.* ¶ 65.  Purchasing hospital services without commercial health insurance, rather than

12 through a commercial health plan, is typically prohibitively expensive and is not a viable substitute

13 for group or individual commercial health insurance.  *Id.* ¶ 66.

14     The "downstream market for the sale of commercial health insurance is inextricably linked with

15 the upstream market for the sale of Inpatient Hospital Services to health plans."  *Id.* ¶ 67.  This is

16 because health plans purchase Inpatient Hospital Services for the benefit of their members and

17 include contracted access to the services as part of the health insurance that they sell.  *Id.*

18     **1.  The Geographic Markets for the Sale of Commercial Health Insurance to**

19        **Subscribers**

20     Plaintiffs define the markets for the sale of commercial health insurance to subscribers as being

21 "roughly congruent with the boundaries of Metropolitan Statistical Areas ("MSAs")."  *Id.* ¶ 68.

22 MSAs are areas defined by the Office of Management and Budget based on census data for the

23 purpose of economic analysis.  *Id.*  "Antitrust enforcers" also have asserted that markets for the sale

24 of commercial insurance to subscribers are MSA-wide.  *Id.*  The relevant geographic markets for the

25 sale of commercial health insurance to subscribers are the following six independent, MSA-wide

26 markets:  (1) Modesto MSA, (2) Sacramento-Roseville-Arden-Arcade MSA, (3) San

27 Francisco-Oakland-Fremont MSA, (4) Santa Rosa-Petaluma MSA, (5) Stockton MSA, and (6)

28 Vallejo-Fairfield MSA.  *Id.* ¶ 68.  Plaintiffs refer to these markets as "Health Plan MSAs."  *Id.*

These MSAs include one or more counties, as summarized in the following table:

| MSA | Included Counties |
|---|---|
| Modesto | Stanislaus |
| Sacramento-Roseville-Arden-Arcade | El Dorado, Placer, Sacramento, Yolo |
| San Francisco-Oakland-Fremont | Alameda, Contra Costa, Marin, San Francisco, San Mateo |
| Santa Rosa-Petaluma | Sonoma |
| Stockton | San Joaquin |
| Vallejo-Fairfield | Solano |

*Id.* ¶ 72-77.  Plaintiffs allege that consumers in each MSA cannot practicably turn to commercial health plans that do not have a network of hospitals in that MSA.  *See id.*  Therefore, "a small but significant increase in the price of commercial health insurance by a hypothetical (or actual) monopolist of same located in [each MSA identified] would not cause a sufficient number of consumers to switch to insurers located outside of [that MSA] to render such a price increase unprofitable.  *Id.*

Because patients typically seek medical care close to their homes or workplaces, health plan members prefer health plans with networks of hospitals and physicians that are within the MSA where they work or live.  *Id.* ¶ 69.  Antitrust enforcers have previously recognized that the geographic scope of various commercial health insurance markets is MSA-wide.  *Id.* ¶ 70 (citing Competitive Impact Statement, *U.S. v. Blue Cross and Blue Shield of Montana*, No. 1:11-cv-00123-RFC, ECF No. 4 (D. Mont. Nov. 8, 2011)).

The Inpatient Hospital Services markets relevant to this case all fall within the Health Plan MSAs.  *Id.* ¶ 71.  Plaintiffs allege that the geographic boundaries of the downstream markets for the sale of commercial insurance are broader than the geographic scope of upstream markets for the sale of Inpatient Hospital Services to health plans because "(i) health plans must supply their products to a broader array of consumers than those that live in a particular HSA in order to make their product offerings viable, and (ii) employers that obtain insurance for their employees must often obtain insurance that will cover individuals in an area broader than an HSA because of where their employees reside."  *Id.*

**IV.  SUTTER'S ALLEGED MARKET POWER**

Sutter has market power in each of the Tying Markets for Inpatient Hospital Services because it has a 100% share in each of the Tying Markets other than San Leandro. *Id.* ¶ 78.  This is based on publicly-available information on patient discharges and hospital beds from the Office of Statewide Health Planning and Development. *Id.*  By the same measure, Sutter has approximately a 78% market share in the San Leandro Tying Market. *Id.*  Sutter also charges substantially higher prices for Inpatient Hospital Services than the prices charged by their Northern California hospital competitors. *Id.* ¶ 79.  Plaintiffs allege that this is direct evidence of Sutter's market power in the Tying Markets. *Id.*

Plaintiffs cite additional sources to show that Sutter has market power including CalPERS, ¶¶ 80-81, Blue Cross of California, ¶ 80, Bloomberg, ¶ 81, the Los Angeles Times, ¶ 82, and statements by the former CEO of Sutter Coast Hospital, ¶ 83, and the FTC, ¶ 84.

**V.  HARMS CAUSED BY SUTTER'S ALLEGED PRACTICES**

**A.  Harms to Competition**

As a result of Sutter's conduct, Sutter hospitals in each of the Tied Markets do not have to compete with other hospitals to be included in commercial health plan networks. *Id.* ¶ 87.  This has distorted the normal competitive process. *Id.*

In each of the Tied Markets, Sutter's conduct has caused its hospital competitors to suffer substantial foreclosures by losing a substantial number of patient-customers. *Id.* ¶ 87.  Had Sutter's ties not forced health plans to include Sutter facilities in the Tied Markets in their networks, then health plan members would have enjoyed greater financial incentives to visit non-Sutter hospitals. *Id.*  This is because the health plan members would have had to incur substantial "out of pocket" costs to visit a Sutter facility that was out of network. *Id.*

Sutter's anti-steering provisions also have caused competitive hospitals in the Tied Markets to lose patient volume. *Id.* ¶ 88.  This is because without the anti-steering provisions, health plans could channel some of their patients to lower-cost non-Sutter providers. *Id.* ¶ 88.

But for Sutter's anticompetitive tying arrangements, health plans would have launched lower-cost, "high performance" networks in the Tied Markets, as they have done elsewhere. *Id.* ¶ 89.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   These networks would not have included Sutter hospitals and would have been used as networks for

2   members who purchased lower-priced insurance products.  *Id.* ¶ 89.

3       Sutter's foreclosure of competition is likely to lead to Sutter's accruing market power in the Tied

4   Markets.  *Id.* ¶ 90.  Sutter already has approximately 50% of the market in the Modesto HSA and

5   about 35% share in each of the Oakland, San Francisco, Sacramento, and Santa Rosa HSAs.

6   *Id.* ¶ 90.  Sutter's tying and anti-steering provisions also have foreclosed substantial commerce in the

7   Tying Markets.  *Id.* ¶ 91.  But for these provisions, hospitals would have greater ability and

8   incentives to open competitive facilities in each of the Tying Markets.  *Id.* ¶ 91.

9       **B.  Increased Prices for Medical Care**

10      Sutter's practices also have enabled Sutter to charge supra-competitive prices in the Tying and

11  Tied Markets.  *Id.* ¶ 92.  This is because the entire cost of medical procedures is opaque to patients,

12  and the costs are spread throughout a health plan's member base.  *Id.* ¶ 93.  Because consumers can

13  choose any "in network" provider without paying "out of pocket" costs other than co-insurance

14  payments, some number of health plan members will choose a network provider for treatment even

15  if that provider is higher-priced.  *Id.*  These practices also have led to supra-competitive pricing

16  because Sutter's hospital monopolies are unchallenged.  *Id.*  ¶ 94.

17      In support of their argument that Sutter's anticompetitive practices have allowed it to charge

18  supra-competitive prices in each of the Tied Markets, Plaintiffs cite a number of sources, including a

19  July 2012 report by CALPIRG, a March 2011 L.A. Times article, and a December 3, 3013, New

20  York Times article.  *Id.* ¶¶ 95-98.

21      **C.  Lower Quality of Patient Care**

22      Sutter's practices also have reduced the quality of health care available because "Sutter's

23  network does not compete on quality any more than it competes on price."  *See id.* ¶ 99 (citing

24  studies documenting higher costs at Sutter facilities without correspondingly higher quality of care).

25      **D.  Plaintiffs and Class Members Have Been Overcharged**

26      The increased costs for Inpatient Hospital Services sold to health plans (including Anthem Blue

27  Cross, Aetna, Blue Shield, Regence Blue Cross Blue Shield, and Premera Blue Cross) have been

28  passed downstream to health plan members.  *Id.* ¶ 101.  Plaintiffs have paid higher health insurance

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  premiums, deductibles, and co-payments as a result of Sutter's actions.  *Id.* ¶¶ 101-04 (citing the

2  March 2011 L.A. Times article discussed above and Clark C. Havighurst & Barak D. Richman, "The

3  Provider Monopoly Problem in Health Care," 89 Or. L. Rev. 847, 862-63 (2011)).

4  **VI.  PROCEDURAL HISTORY**

5      Plaintiffs filed an original complaint and then an amended complaint, which the court dismissed

6  after a hearing and without prejudice following Sutter's motion to dismiss.  *See* ECF Nos. 1, 11, 15,

7  35.  Sutter filed a second amended complaint, which the court also dismissed after a hearing and

8  without prejudice.  *See* ECF Nos. 40, 63-64.  On December 9, 2013, Plaintiffs filed the operative

9  TAC, which states the following claims:  (1) unlawful tying (*per se* or rule of reason) in violation of

10  section 1 of the Sherman Act, 15 U.S.C. § 1; (2) "Section 1 Course of Conduct" that causes an

11  unreasonable restraint of trade; (3) unreasonable restraint of trade in violation of the Cartwright Act,

12  Cal. Bus. & Prof. Code Section 16720, *et. seq.*; (4)-(5) monopolization and attempted

13  monopolization in violation of section 2 of the Sherman Act, 15 U.S.C. § 2; and (6) unfair

14  competition in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code

15  Section 17200, *et. seq.*  TAC ¶¶ 116-62.  Plaintiffs seek monetary damages (including treble

16  damages as appropriate), restitution, disgorgement, injunctive and declaratory relief, and fees, costs,

17  and interest.  *Id.* at 40.

18  **VII.  JURISDICTION**

19      This court has subject matter jurisdiction over the Sherman Act claims under 28 U.S.C. §§ 1331

20  and 1337 and supplementary jurisdiction over the state law claims under 28 U.S.C. § 1367.  *Id.*

21  ¶¶ 13-14.

22                                    **ANALYSIS**

23      Sutter moves to dismiss the claims on several bases.  *See* Motion to Dismiss ("Motion"), ECF

24  No. 70.  First, Sutter challenges the sufficiency of the relevant market definitions and that this

25  dooms all of the claims.  Second, Sutter argues that the TAC fails to allege that the tying caused

26  anticompetitive effects in the tied products market.  Third, to the extent Plaintiffs' claims are based

27  on the "anti-steering" allegations, Sutter argues they fail because the referenced language does not

28  support Plaintiffs' position.  Fourth, Sutter argues that the monopolization claim also fails for the

1   reasons described above and because Plaintiffs have not alleged facts demonstrating that Sutter

2   unlawfully acquired or maintained its monopoly power.  Fifth, the attempted monopolization claim

3   fails because Sutter does not allege a "specific intent" to monopolize or a dangerous probability of

4   achieving monopoly power in the Tying Markets.  Finally, Sutter argues that Plaintiffs UCL claims

5   should be dismissed because it is predicated on the other claims, which all fail.[5]

6   **I.  PLEADING STANDARD**

7       Rule 8(a) requires that a complaint contain a "short and plain statement of the claim showing that

8   the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint therefore must provide a

9   defendant with "fair notice" of the claims against it and the grounds for relief.  *See Bell Atlantic*

10  *Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

11      A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does

12  not contain enough facts to state a claim to relief that is plausible on its face.  *See id.* at 570.  "A

13  claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

14  the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*,

15  129 S. Ct. 1937, 1949 (2009).  "The plausibility standard is not akin to a 'probability requirement,'

16  but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting

17  *Twombly*, 550 U.S. at 557).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does

18  not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

19  'entitle[ment]' to relief' requires more than labels and conclusions, and a formulaic recitation of the

20  elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief

21  above the speculative level."  *Twombly*, 550 U.S. at 555 (internal citations and parentheticals

22  omitted).  As to Sherman Act claims, "proceeding to antitrust discovery can be expensive."  *Id.* at

23  558 (addressing pleading standard in Sherman Act Section 1 claims).  Thus, the court must "insist

24  upon some specificity in pleading before allowing a potentially massive factual controversy to

25  proceed."  *Id.*  The decision explained,

26  _____

27      [5] Sutter initially argued that Plaintiffs lack standing to sue for damages under the Sherman
    Act.  Motion at 16.  Sutter does not pursue this argument in its reply brief, however, and states its
28  intent to "defer for now its challenge to [P]laintiffs' standing."  Reply at 5 n.1.  The order thus does
    not address the standing argument.

UNITED STATES DISTRICT COURT
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> stating such a claim requires a complaint with enough factual matter (taken as true) to suggest an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

*Id.*

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *See id.* at 550; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007). In addition, courts may consider documents attached to the complaint. *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). If the court dismisses the complaint, it should grant leave to amend even if no request to amend is made "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quotation omitted).

## II. THE TAC FAILS TO ALLEGE PLAUSIBLE RELEVANT MARKETS

The first issue is whether the TAC plausibly alleges relevant antitrust markets. This issue was one reason for dismissing Plaintiffs' first and second amended complaints. *See* 6/3/2013 Order, ECF No. 35; 11/7/2013 Order, ECF No. 64. Plaintiffs' TAC alleges a new theory of liability but fails for the same reasons as the earlier complaints.

In order to state claims for tying, unreasonable restraint of trade, monopolization, or attempted monopolization, Plaintiffs must establish that Sutter has market power in a "relevant market," meaning a relevant product market and a relevant geographic market. *See Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 42-43 (2006) (tying); *Forsyth v. Humana*, 114 F.3d 1467, 1476-77 (9th Cir. 1997) (monopolization and attempted monopolization); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (monopolization); *Newcal Industries, Inc. v. Ikon Office Solutions*, 513 F.3d 1038, 1044-45, n.3, n.4 (9th Cir. 2008) (standards the same under Sections 1 and 2). The relevant product market identifies the products or services that compete with each other, and the relevant geographic market identifies the area where the competition in the relevant product market takes place. *See Los Angeles Mem'l Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1392 (9th Cir. 1974).

16

UNITED STATES DISTRICT COURT
For the Northern District of California

1     "The outer boundaries of a product market are determined by the reasonable interchangeability

2     of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown*

3     *Shoe v. United States*, 370 U.S. 294, 325 (1962).  Thus, the geographic market "extends to the area

4     of effective competition where buyers can turn for alternative sources of supply." *Tanaka v. Univ. of*

5     *S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (quotations and alterations omitted); *Double D Spotting*

6     *Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (same); *Michigan Div.-Monument*

7     *Builders of N. Am. v. Michigan Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008) (same).  A

8     complaint may be dismissed under Rule 12(b)(6) if its "relevant market definition is facially

9     unsustainable." *Newcal*, 513 F.3d at 1044-45 & n.3; *see also Big Bear Lodging Ass'n v. Snow*

10    *Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999) (affirming dismissal for failure to allege plausible

11    geographic market); *Apani Southwest, Inc. v. Coca-Cola Enterps., Inc.*, 300 F.3d 620, 633 (5th Cir.

12    2002) (affirming Rule 12(b)(6) dismissal of antitrust complaint for failure to allege geographic

13    market that corresponded to the commercial realities of the industry); *Double D*, 136 F.3d at 560

14    (same).

15    **A.  The Geographic Markets**

16         Sutter does not dispute (for purposes of this motion) that the market for the sale of Inpatient

17    Hospital Services to commercial health plans is a plausible antitrust product market.  Motion at 18.

18    Instead, Sutter challenges the plausibility of the corresponding geographic markets.  *Id.*  Because

19    Plaintiffs' geographic market definition is unsupported by factual allegations, the court grants

20    Sutter's motion to dismiss.[6]

21    _____

22         [6]  Sutter argues that the court should consider the contents of the Dartmouth Atlas website
      (attached as LeVee Decl. Exs. A-C, ECF No. 71) as incorporated by reference to the complaint
23    because it provides an additional basis for concluding that the HSA boundaries are not plausible.
      *See* Motion at 22, n.11.  The website defines HSAs as local health care markets for hospital care in
24    the form of a collection of zip codes for residents who receive most of their hospitalizations from
      hospitals in that area, a static description of where customers receive hospitalizations in that area.
25    *Id.* at 22.  The Dartmouth HSAs also include zip codes where substantial numbers of people use
      hospitals outside the HSA, which means that the HSA boundaries do not establish plausible markets.
26    *Id.* at 23.  The HSAs also are based on Medicare discharges, a population excluded by Plaintiffs'
      proposed relevant product market, which puts the product and geographic markets in conflict
27    because the geographic markets do not account for the class here of commercial health plan
      subscribers.  *Id.* at 23-24.  In addition, Sutter contends – and asks for judicial notice of facts that
28

UNITED STATES DISTRICT COURT
For the Northern District of California

1   According to the TAC, the geographic markets for the sale of Inpatient Hospital Services to

2   health plans are roughly congruent with "hospital service areas," as defined by the Dartmouth Atlas

3   of Health Care.  TAC ¶¶ 45-46.  As described in the TAC, the Dartmouth Atlas as "a well-

4   established industry source compiled by the Dartmouth Institute for Health Policy & Clinical

5   Practice.  Policy makers and other legal and economic authorities have looked to Dartmouth

6   Institute-defined HSAs in order to assess the economics of hospital markets."  *Id.* ¶ 3.

7      The Dartmouth Atlas defines HSAs as "'a collection of ZIP codes whose residents receive most

8   of their hospitalizations from the hospitals in that area'" and "'local health care market[s] for

9   hospital care.'"  *Id.* ¶ 45.  The 14 alleged geographic markets include as few as 4 zip codes (the

10  Castro Valley and San Leandro HSAs) and as many as 160 zip codes (the Sacramento HSA).  *See*

11  *id.* ¶¶ 48-61.  With regard to each HSA, Plaintiffs allege (without factual support) that "[t]here are

12  no economic substitutes to commercial health plans for Inpatient Hospital Services provided in" that

13

_____

14  support its contentions – that using the HSAs yields demonstrably absurd results, including (1)
15  putting Berkeley and Oakland in different HSAs (even though both are in Alameda County), (2)
    limiting a geographic market to an area immediately surrounding Mills-Peninsula Medical Center in
16  San Mateo County (even though two non-Sutter hospitals are located a short distance away in Daly
    City and Redwood City, both in San Mateo County), (3) defining an HSA for Castro Valley, where
17  Sutter operates Eden Medical Center (even though that excludes a non-Sutter hospital 8.2 miles
18  away that also is in Alameda County), and (4) defining an HSA for Davis, where Sutter operates
    Sutter Davis Hospital (even though that excludes a Dignity Health hospital 10 miles away that also
19  is in Yolo County).  *Id.* at 24-25; Request for Judicial Notice ("RJN"), ECF No. 71; Reply Supp.
20  RJN, ECF No. 75.  This shows that there are reasonable substitutes for Sutter's Inpatient Hospital
    Services that are not included in the proposed geographic markets and that the markets thus are not
21  plausible.  Motion at 22-25.

22
    Plaintiffs oppose Sutter's request as an attempt to rely upon "contentions of purported 'facts'
23  well beyond the four corners of the TAC" and contend that relying on those documents would
    require the court to convert the motion to dismiss into a motion for summary judgment.  *See* RJN
24  Opp'n, ECF No. 73 at 3-4.

25
    While the court likely could rely on contents of the Dartmouth Atlas website under the
26  incorporation by reference doctrine, and take judicial notice of the geographic facts that support
    Sutter's arguments that Plaintiffs do not allege a plausible market, it does not need to do so to reach
27  the conclusion that Plaintiffs do not allege a plausible geographic market.  Accordingly, the court
28  denies as moot Sutter's requests for judicial notice.

particular HSA. *Id.*

These allegations fail to plausibly define the geographic markets for the sale of Inpatient Hospital Services to commercial health plans because they do not define the geographic markets in terms of the areas where a health plan (or its members) could seek substitutes for Sutter's Inpatient Hospital Services. Instead, the TAC cites the Dartmouth Atlas, alleges that it is an authority used to "assess the economics of hospital markets," and concludes that HSAs constitute plausible geographic markets. *See* TAC ¶ 3. But just because HSAs are useful tools for "assessing the economics of hospital markets" in some capacity does not mean that they define relevant markets for antitrust purposes. Nor is it apparent why the fact that most of the people in the HSAs seek treatment within those boundaries means that they could not seek substitutes elsewhere or that a health plan could not contract with a substitute hospital from outside the HSA. Plaintiffs do not explain why or how HSAs are roughly congruent to the boundaries of the geographic markets. Nor do they cite a single instance in which the Dartmouth HSAs have been accepted in an antitrust case. Plaintiffs must identify the relevant markets and support their allegations with some factual allegations to render them plausible. They have not done so.

Plaintiffs make several arguments in that do not alter this conclusion.

First, Plaintiffs criticize Sutter's argument that the relevant geographic market should be defined in terms of where patients, rather than health plans, can go for substitute Inpatient Hospital Services. *See* Opp'n at 26-27. Plaintiffs argue the following:

> [T]he relevant inquiry seeks to assess whether the products in the alleged geographic market would be substituted for in response to a small, but significant, non-transitory increase in price ("SSNIP") by a hypothetical monopolist. If that inquiry shows that a sufficient number of purchasers would substitute for products supplied in a different region following a price increase, the proposed market is deemed to not be economically coherent.

Opp'n at 28. Plaintiffs' proposed analysis can be a reasonable way to assess the sufficiency of the relevant geographic market allegations. The problem is that Plaintiffs do not plead facts that allow the court to conduct that inquiry. Instead, the TAC alleges that "in order to compete for members that reside in [each HSA], commercial health plans would pay a [SSNIP] for Inpatient Hospital Services to a hypothetical (or actual) monopolist of such services located" in that HSA. *See* TAC ¶¶ 48-61. That allegation, unmoored from any factual support, fails to establish that Plaintiffs'

1    claims are plausible.

2         Second, Plaintiffs posit an economic theory they contend supports defining the geographic

3    markets as coextensive with the HSAs.  *See* Opp'n at 28, n.18.  Plaintiffs state that health plans

4    would not seek substitute products outside the HSAs because competition forces the health plan to

5    provide access to the hospitals that their members currently visit (as opposed to those the members

6    could visit).  Plaintiffs argue the following:

7         Health plan decisions on their economic alternatives will be based on where most of their
          members actually consume their health care services, not where any potential consumer can
8         theoretically turn to an alternative hospital for such services.  [Findings of Fact and
          Conclusions of Law, ¶¶ 64-69 at 15, *St. Alphonsus Medical Center - Nampa, Inc. v. St.*
9         *Luke's Health Sys., Ltd.*, No. 1:12-CV-00560-BLW (D. Id. Jan. 24, 2014)].  In order to stay
          competitive in the commercial insurance market, health plans need to include hospitals in
10        their networks that substantial amounts of their members actually visit for treatment.  As
          HSAs are "a collection of ZIP codes whose residents *receive most of their hospitalizations*
11        for the hospitals in that area" (¶ 25), the TAC provides a rational market definition from the
          perspective of health plans.
12

13   Opp'n at 28 (attaching cited authority at ECF No. 72 at 35).  In other words, Plaintiffs argue that the

14   geographic markets here should be defined by where health plan members actually go for Inpatient

15   Hospital Services and not where they could go in response to an SSNIP.  Plaintiffs rely on the

16   Finding of Fact and Conclusions of Law in *St. Luke's*, but those findings do not support Plaintiffs'

17   position.

18        In *St. Luke's*, the district of Idaho found that a hospital system's acquisition of the largest

19   primary care physician group in Nampa, Idaho, violated the Clayton Act and the Idaho Competition

20   Act.  *See St. Lukes*, ¶ 78.  It permanently enjoined the acquisition and ordered the hospital group to

21   divest itself of the primary physician group.  *Id.* ¶¶ 79-80.  The relevant product market was "Adult

22   Primary Care Services sold to commercially insured patients."  *Id.* ¶ 48.  In relevant part, the court

23   addressed how to define the geographic market when health plans, rather than consumers, were the

24   direct purchasers, as follows:

25        Under these circumstances, the SSNIP test examines the likely response of insurers to a
          hypothetical demand by all the PCPs in a particular market for a significant non-transitory
26        reimbursement rate hike.

27        If it is likely that the insurers would reject the demand, drop those PCPs from their network,
          and depend on PCPs in adjacent regions to provide care for their insureds, the definition of
28        the relevant market would need to be broadened to include those adjacent regions.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    If, however, it is likely that the insurers would agree to the demand – that is, it is likely that
2    the PCPs in that particular market could successfully demand a SSNIP – then the relevant
     market is the area where those PCPs practice.

3    *Id.* ¶¶ 56-58.  The *St. Luke's* court relied on testimony from health plan representatives that in order

4    to compete in the Nampa, Idaho, market they needed to include Nampa physicians in their network,

5    and could not substitute providers in West Boise, Idaho.  *Id.* ¶¶ 59-63.  The court then cited statistics

6    and testimony that showed most consumers preferred to obtain primary care in Nampa, rather than in

7    Boise, and that a clinic in West Boise did not consider Nampa physicians as competitors because of

8    "geographic separation."  *Id.* ¶¶ 64-69.

9         The court in *St. Luke's* did not (as Plaintiffs claim) base its geographic market determination

10   solely on where health plan members actually went.  Instead, the evidence of where consumers

11   sought treatment merely "confirmed" direct testimony that there were no available substitutes.

12   *See id.* ¶ 64.  Regardless, Plaintiffs provide no evidence that findings regarding the Nampa, Idaho,

13   market for Adult Primary Care Services apply to the Northern California Inpatient Hospital Services

14   markets.  Also, Ninth Circuit authority mandates analyzing geographic markets by examining the

15   availability of substitute products.[7]

16        In the end, however, the problem is not that Plaintiffs' geographic market definition is based on

17   faulty logic.  The problem is that it is unsupported by non-conclusory factual allegations.

18   Accordingly, the court grants Sutter's motion to dismiss.  As the court previously explained, it is not

19   requiring heightened pleading.  But if Plaintiffs want to assert these claims, they must identify the

20   relevant markets and support their allegations with some facts to show that they are plausible.  *See*

21   11/7/2013 Order, ECF No. 64 at 19.

22        The parties do not dispute that all of the antitrust claims in the TAC are predicated on Plaintiffs'

23

24        [7]  In their opposition, Plaintiffs make other arguments in support of their geographic market

25   definition, but these merely respond to Sutter's subsidiary arguments.  *See, e.g.,* Opp'n at 28
     (addressing Sutter's criticism that Plaintiffs define the geographic market too narrowly), 29

26   (addressing Sutter's factual attack that HSAs are based on Medicare discharges while the relevant
     product market excludes Medicare patients), 30 (addressing Sutter's criticism that the HSAs are

27   "one-size-fits-all" geographic market definitions).  The court finds Sutter's arguments either

28   unpersuasive at the 12(b)(6) stage or (with regard to arguments based on Sutter's requests for
     judicial notice) the court does not reach them.

1   unsupported relevant market definitions.  Plaintiffs' UCL claim also is predicated on the antitrust

2   claims.  Because Plaintiffs again fail to allege plausible geographic markets, the court grants Sutter's

3   motion to dismiss the Third Amended Complaint in its entirety.[8]

4   **III.  THE COURT GRANTS THE MOTION TO DISMISS WITH PREJUDICE**

5       The final question is whether to grant Plaintiffs leave to file a Fourth Amended Complaint.  A

6   district court may deny leave to amend "for repeated failure to cure deficiencies by previous

7   amendment."  *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008).  Plaintiffs

8   have had four opportunities to state a plausible claim for relief and to plausibly allege relevant

9   antitrust markets.  *See* 6/4/2013 Order at 22; 11/7/2013 Order at 19.  With each iteration, Plaintiffs

10  have recast their allegations, but in the end, did not allege facts to plausibly support their proposed

11  market definitions.  Also, at the hearing on the motion to dismiss the Second Amended Complaint,

12  the court said it would give Plaintiffs one more chance to plead viable claims.  The court dismisses

13  Plaintiffs' Third Amended Complaint with prejudice.

14                                            **CONCLUSION**

15      The court grants Sutter's motion to dismiss with prejudice and denies as moot its request for

16  judicial notice.  The clerk shall close the file.

17      This disposes of ECF Nos. 70 and 71.

18      **IT IS SO ORDERED.**

19  Dated: June 20, 2014                    _____

20                                          LAUREL BEELER
                                            United States Magistrate Judge
21

22

23

24

25

26

27      [8]  Because Plaintiffs' failure to define the relevant markets disposes of the entire case, and
    because the court addressed nearly identical arguments in its previous orders, the court does not
28  reach the arguments regarding Plaintiffs' failure to allege anticompetitive effects in the tied product
    market and the alleged anti-steering clauses.

UNITED STATES DISTRICT COURT
For the Northern District of California