Jeffrey A. LeVee (State Bar No. 125863)
jlevee@JonesDay.com
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Telephone: 213.489.3939
Facsimile: 213.243.2539

David C. Kiernan (State Bar No. 215335)
dkiernan@jonesday.com
Brian G. Selden (State Bar No. 261828)
bgselden@jonesday.com
Matthew J. Silveira (State Bar No. 264250)
msilveira@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: 415.626.3939
Facsimile: 415.875.5700

Robert H. Bunzel (State Bar No. 99395)
rbunzel@bzbm.com
Patrick M. Ryan (State Bar No. 203215)
pryan@bzbm.com
Oliver Q. Dunlap (State Bar No. 225566)
odunlap@bzbm.com
BARTKO, ZANKEL, BUNZEL & MILLER
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Telephone:  (415) 956-1900
Facsimile:   (415) 956-1152

Attorneys for Defendant
SUTTER HEALTH

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN HANSEN, DAVID HERMAN, CAROLINE STEWART, OPTIMUM GRAPHICS, INC., and JOHNSON POOL & SPA, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>SUTTER HEALTH,<br><br>Defendants. | Case No. 3:12-CV-04854-LB<br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANT SUTTER HEALTH FOR SUMMARY JUDGMENT PURSUANT TO RULE 56; MEMORANDUM OF POINT AND AUTHORITIES**<br><br>Date:  October 11, 2018<br>Time:  9:30 a.m.<br>The Honorable Laurel Beeler |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 11, 2018 at 9:30 a.m. before the Honorable Laurel Beeler, United States District Court, San Francisco, California, Defendant Sutter Health will, and hereby does, move the Court for an Order under Rule 56 of the Federal Rules of Civil Procedure granting summary judgment in Defendant's favor on all of Plaintiffs' claims.  This motion is based on the accompanying Memorandum of Points and Authorities, Declaration of Jeffrey A. LeVee and exhibits attached thereto, Declaration of Gautam Gowrisankaran, Ph.D. and exhibits attached thereto, the complete files and records in this action, oral argument of counsel, and such other and further matters as the Court may consider.

### RELIEF REQUESTED

Plaintiff respectfully requests that the Court enter summary judgment in Defendant's favor on all of Plaintiffs' claims.

# TABLE OF CONTENTS

Page

I.    STATEMENT OF ISSUES TO BE DECIDED ................................................ 1

II.   INTRODUCTION ......................................................................................... 1

III.  BACKGROUND ............................................................................................ 3

      A.    The Health Care Marketplace .......................................................... 3

      B.    Procedural History ........................................................................... 5

IV.   LEGAL STANDARD ..................................................................................... 7

V.    ARGUMENT ................................................................................................. 7

      A.    Geographic Market Definition Requires Consideration of Where
            Consumers Could Practicably Turn for Alternatives. ....................... 8

      B.    HSAs Are Not Designed to Assess the Market Realities of Hospital
            Competition. .................................................................................. 11

            1.   By Design, HSAs Tend to Exclude Potential Market Substitutes. ................. 12

            2.   HSAs Are Based on Outdated Data for Patients Who Are Not
                 Commercially Insured. ................................................................. 13

            3.   Antitrust Enforcement Actions Reinforce That HSAs Do Not
                 Capture the Realities of Hospital Competition. ............................... 15

      C.    The Specific HSAs Alleged to Be Markets by Plaintiffs Exclude
            Competitors. .................................................................................. 17

            1.   The HSAs Exclude Nearby Hospitals. ............................................ 17

            2.   Patients View Hospitals Outside of the HSAs as Alternatives. ....................... 19

            3.   Kaiser's Network Shows That Insurers Can Market Plans Without
                 Hospitals in the HSAs. ................................................................. 21

VI.   CONCLUSION ............................................................................................ 22

1

# TABLE OF AUTHORITIES

2

Page

3

## CASES

4

*AFMS LLC v. United Parcel Serv. Co.*,
105 F. Supp. 3d 1061 (C.D. Cal. 2015), *aff'd sub nom. AFMS LLC v. United
Parcel Serv., Inc.*, No. 15-55778, 2017 WL 3588380 (9th Cir. Aug. 21, 2017) ........................8

5

6

7

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ........................8

8

9

*Brown v. Our Lady of Lourdes Med. Ctr.*,
767 F. Supp. 618 (D.N.J. 1991) ........................19

10

11

*California v. Sutter Health Sys.*,
130 F. Supp. 2d 1109 (N.D. Cal. 2001) ........................9, 17

12

13

*Cty. of Tuolumne v. Sonora Cmty. Hosp.*,
236 F.3d 1148 (9th Cir. 2001) ........................6

14

15

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
123 F.3d 301 (5th Cir. 1997) ........................9, 13, 15

16

17

*FTC v. Advocate Health Care Network*,
841 F.3d 460 (7th Cir. 2016) ........................9, 10, 11, 17

18

19

*FTC v. Butterworth*,
946 F. Supp. 1285 (W.D. Mich. 1996) ........................17

20

21

*FTC v. Freeman Hosp.*,
69 F.3d 260 (8th Cir. 1995) ........................17, 20

22

*FTC v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016) ........................ passim

23

24

*FTC v. Tenet Health Care Corp.*,
186 F.3d 1045 (8th Cir. 1999) ........................9, 17, 19, 20

25

26

*Gordon v. Lewistown Hosp.*,
423 F.3d 184 (3d Cir. 2005) ........................19

27

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
547 U.S. 28 (2006) ........................8

28

*In re Blue Cross Blue Shield Antitrust Litig.*,
   No. 2:13-CV-20000-RDP, 2017 WL 2797267 (N.D. Ala. June 28, 2017)...............................16

*It's My Party, Inc. v. Live Nation, Inc.*,
   811 F.3d 676 (4th Cir. 2016).................................................................................10, 12

*Little Rock Cardiology Clinic PA v. Baptist Health*,
   591 F.3d 591 (2009)...............................................................................................10, 21

*Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*,
   208 F.3d 655 (8th Cir. 2000)............................................................................................9

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
   924 F.2d 1484 (9th Cir. 1991).......................................................................................7, 8

*Novak v. Somerset Hosp.*,
   625 F. App'x 65 (3d Cir. 2015)................................................................................ passim

*ProMedica Health Sys., Inc. v. FTC*,
   749 F.3d 559 (6th Cir. 2014)...........................................................................................11

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995)..............................................................................................8

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
   778 F.3d 775 (9th Cir. 2015).........................................................................7, 9, 10, 11

*Sidibe v. Sutter Health*,
   667 F. App'x 641 (9th Cir. 2016) ........................................................6, 14, 16, 17

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993)............................................................................................................8

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*,
   997 F. Supp. 2d 142 (D.R.I. 2014).................................................................................16

*Steward Health Care Sys. LLC v. Southcoast Health Sys., Inc.*,
   No. CV 15-14188-MLW, 2016 WL 9022444 (D. Mass. Sept. 2, 2016)..................16

*Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*,
   309 F.3d 836 (5th Cir. 2002)...............................................................................10, 14, 22

*United States v. Mercy Health*,
   902 F. Supp. 968 ...............................................................................................................17

*Western Parcel Express v. United Parcel Serv. of Am., Inc.*,
   65 F. Supp. 2d 1052 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974 (9th Cir. 1999)...............................8

**STATUTES**

42 U.S.C. § 1395c(1) .........................................................................................................14

28 Cal. Code Regs. § 1300.51 ...........................................................................................18

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 56 ...............................................................................1, 7

1

**I.     STATEMENT OF ISSUES TO BE DECIDED**

2

        Whether Sutter is entitled to summary judgment because Plaintiffs' use of *Dartmouth*

3

*Atlas of Health Care* Health Service Areas ("HSAs") to define relevant geographic markets in

4

this case fails as a matter of law.

5

**II.    INTRODUCTION**

6

        This Court granted Sutter's motions to dismiss Plaintiffs' First, Second and Third

7

Amended Complaints based on Plaintiffs' failure to define relevant geographic markets to support

8

their claims.  The Ninth Circuit reversed the dismissal of the Third Amended Complaint,

9

concluding that, for purposes of a motion to dismiss, Plaintiffs' allegations supported an inference

10

that HSAs might theoretically constitute antitrust markets.  But the Ninth Circuit did not analyze

11

the suitability of using HSAs to define antitrust markets as a factual matter and in fact noted that

12

geographic market definition is more appropriately addressed via summary judgment.

13

        At the initial Case Management Conference following the Ninth Circuit's reversal, Sutter

14

promised to bring a motion for summary judgment on the ground that HSAs, as a matter of fact

15

and law, could not support Plaintiffs' claims.  This is that motion.

16

        The Fourth Amended Complaint alleges that Sutter tied the sale of its inpatient hospital

17

services in eight Northern California "markets" to the sale of those services in four other Northern

18

California "markets," allowing it to charge supracompetitive prices for its services in both the

19

allegedly tying and tied "markets."  Plaintiffs also claim that Sutter has monopolized several

20

Northern California "markets" for inpatient hospital services and is attempting to monopolize

21

others.

22

        The fundamental problem with all of Plaintiffs' claims is that they rely on HSAs to define

23

their geographic markets, which is improper for antitrust purposes.  HSAs do not rest on an

24

analysis of where purchasers currently obtain the services at issue and where they could

25

potentially turn to avoid paying supracompetitive prices.  In fact, an analysis of (1) how HSAs

26

were created, and (2) the competitive conditions in the particular HSAs pled in the complaint,

27

demonstrates that Plaintiffs' market definitions are improper for antitrust purposes.

28

        *First*, HSAs were not constructed for antitrust purposes or with hospital competition in

SUTTER'S MOT. FOR SUMM. J.
CASE NO. 3:12-cv-04854-LB

mind.  To the contrary, HSAs were constructed without regard to whether substitutable hospitals were in the same HSA.  The creators of HSAs defined candidate HSAs so that each city with a hospital would be in a separate HSA, which does not account for substitutability of reasonably available hospitals in nearby cities.  The HSAs that resulted from these candidate HSAs were hence biased toward including only the hospitals within one city.  Moreover, HSAs were defined based on where Medicare patients obtained services using data from more than twenty years ago.  They do not reflect today's competitive conditions for sale of inpatient hospital services used by commercially insured patients.  Recent antitrust enforcement actions demonstrate that the FTC does not use HSAs to define antitrust markets but uses geographic markets that span *multiple* HSAs based on realities of where consumers currently obtain health care services or could turn in the event of a price increase.

*Second*, in many cases, an HSA's definition excludes hospitals that are closer to the HSA's residents than the hospitals within the HSA.  Given the importance of proximity in evaluating competition among hospitals, there is no reason to assume that all the hospitals within an HSA are substitutes for each other, but that nearby hospitals are not simply because they are in a different HSA.  Recognizing this, Plaintiffs have now merged two HSAs (Berkley and Oakland) into a single "market" to avoid the absurdity of claiming that hospitals just four miles apart—but in different HSAs—would not compete.

But that does not solve Plaintiffs' problems.  Contrary to Plaintiffs' allegations, in many cases HSAs are *not* the areas in which residents obtain most of their services, including in the particular HSAs Plaintiffs picked for their Fourth Amended Complaint ("FAC").  For example, in four of the eight alleged tying "markets," more than half of discharges for the HSA's residents take place in hospitals outside the HSA.  And in more than half of all HSAs at issue, more than a quarter of discharges from the HSAs' hospitals are for patients from outside the HSA.  Unsurprisingly, Kaiser, which is a strong competitive force in Northern California, markets an insurance product that does not include hospitals within the alleged tying HSAs, yet successfully draws insureds to its hospitals even though the hospitals in the tying HSAs are closer to the insureds.  This reality demonstrates the fallacy of Plaintiffs' argument that insurers require

1    hospitals in every HSA identified in the FAC.

2         In short, HSAs do not—and cannot—define the various areas of hospital competition in

3    Northern California.  There is no genuine issue as to any material fact regarding the unsuitability

4    of HSAs to define antitrust markets.  Because Plaintiffs have the burden of establishing the

5    relevant geographic market, and Plaintiffs' geographic markets are entirely dependent on HSAs,

6    which cannot support their antitrust claims, Sutter is entitled to summary judgment.

7    **III.    BACKGROUND**

8         **A.    The Health Care Marketplace**

9         Hospitals typically compete for consumers in two related stages of competition:  first, they

10   negotiate with commercial insurers over reimbursement terms and inclusion in insurers'

11   networks; and second, they compete to attract patients.  Gowrisankaran Decl. ¶¶ 19-20.  Inclusion

12   in an insurer's network increases the likelihood that a hospital will attract more enrollees because

13   they will pay lower copays or coinsurance when using an in-network hospital.  *Id.* ¶ 20.  During

14   the negotiation process, if there are nearby hospitals to which patients would be willing to turn for

15   care, insurers can use the availability of those alternatives as leverage in negotiating more

16   favorable reimbursement rates.  *Id.*  If a hospital lacks close competitors, insurers will have less

17   leverage when negotiating terms.  *Id.* ¶ 22.  In either case, patients' views regarding hospital

18   substitutability influence insurers' decisions in building acceptable provider networks.  *Id.*

19        When competing for patients in the second stage, hospitals generally compete on the basis

20   of cost, travel time, and quality or reputation.  *Id.* ¶ 21.  Investing in good physicians, new

21   facilities and treatments, and amenities can help hospitals attract patients.  *Id.* ¶ 21.  But if

22   patients view two hospitals as relatively close in price, convenience, and quality of care, they may

23   view the two hospitals as substitutes.  *Id.*  When patients are willing to seek care at either hospital,

24   the hospitals' leverage with insurers in the first stage of competition is reduced.  *Id.* ¶ 22.

25        Focusing specifically on Northern California, there are scores of hospitals across the

26   region that provide inpatient services:

27

28

SUTTER'S MOT. FOR SUMM. J.
CASE NO. 3:12-cv-04854-LB





*Id.* Ex. 1A.[1]  Many of these hospitals are within close proximity of each other.  For example, after

excluding Sutter hospitals, Kaiser hospitals, and hospitals within the Berkeley-Oakland combined

HSA, there are still *seven* hospitals located within a 30-minute drive of the Highland Hospital,

and *six* hospitals located within a 30-minute drive of the Alta Bates Summit Medical Center.  *Id.*

Ex. 7.  Further, residents of Northern California are frequently close to hospitals in multiple

HSAs.  For example, 100% of discharges that are for residents of the Tracy HSA are for patients

that live within a 30-minute drive of a non-Sutter, non-Kaiser hospital in another HSA, as are 100%

of the discharges for patients living in the combined Berkeley-Oakland HSAs, and 51% of the

discharges for patients living in the Antioch HSA.  *Id.* Ex. 8.

      The availability of nearby competitor hospitals in Northern California is also reflected in

patient flow data, which shows substantial patient movement across HSA boundaries.  Looking

first at outflow, over half of the discharges for residents of the Auburn, Davis, Lakeport, and

---

[1] Exhibit 1B of the Gowrisankaran Declaration identifies the hospitals in the region
containing the final Sutter hospital at issue in this complaint, which is in the isolated Crescent
City HSA spanning the California-Oregon border.

1   Antioch HSAs were from hospitals outside those HSAs.  *Id.* ¶¶ 69-71 & Fig. 5.  Patient inflow is

2   also substantial:  more than half of the discharges at hospitals within the Davis HSA and

3   combined Berkeley-Oakland HSAs were for residents of other HSAs.  *Id.* ¶ 74 & Fig. 8.

4       **B.     Procedural History**

5           The proper definition of relevant geographic markets is essential to Plaintiffs' claims.

6   Plaintiffs allege that Sutter tied the sale of inpatient hospital services in eight tying "markets" to

7   the sale of its services in four tied "markets" in Northern California.  FAC ¶¶ 4-5, 125, 134, ECF

8   No. 204.  Specifically, Plaintiffs claim that Sutter has used substantial market power in the eight

9   tying "markets" to:  (1) extract "all or nothing" contract terms that force commercial insurers to

10  include all Sutter hospitals in their health plans, thereby tying unwanted hospitals to necessary

11  hospitals; and (2) force insurers to accept contract provisions that, among other things, require

12  "active encouragement" of plan members to use Sutter providers, and preclude insurers from

13  penalizing access to in-network Sutter providers all in alleged violation of Section 1 of the

14  Sherman Act.  *Id.* ¶¶ 4-6, 41-43.  Plaintiffs also assert monopolization and attempted

15  monopolization claims under Section 2 of the Sherman Act based on the same "markets" and

16  conduct, *id.* ¶¶ 153, 160, and derivative state law claims under California's Cartwright Act and

17  Unfair Competition Law, *id.* ¶¶ 141, 168.[2]

18          Plaintiffs' claims all center on their tying allegations and are premised on Plaintiffs'

19  ability to identify distinct relevant geographic markets—tying markets—in which Sutter has

20  substantial market power, and tied markets in which Sutter extracts supra-competitive prices by

21  virtue of its power in the tying markets.  *See, e.g., id.* ¶¶ 53-67, 86-93, 127, 135, 143, 155, 162,

22  168.  In fact, Plaintiffs allege that Sutter has "reap[ed] supra-competitive [prices] in both the tying

23  and tied markets."  *Id.* ¶ 100.  Further, to allege market power, Plaintiffs rely on data from the

24  Office of Statewide Health Planning and Development ("OSHPD").  *Id.* ¶ 86.

25          In the five years since they initiated this litigation, Plaintiffs have repeatedly struggled to

26  ────────────────
        [2] Plaintiffs have never disputed that their state law claims are predicated on the same
27  allegations as their federal claims, governed by the same standards, and that they rise or fall
    together with their federal claims.  *See Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148,
28  1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under
    federal law . . . .").

SUTTER'S MOT. FOR SUMM. J.
CASE NO. 3:12-cv-04854-LB

define the relevant geographic markets necessary to support their claims.  This Court granted

three separate motions to dismiss for failure to allege plausible relevant geographic markets in

successive complaints.  ECF Nos. 34, 64, 83.  By the time Plaintiffs' Third Amended Complaint

("TAC") was dismissed in June 2014, they had long since abandoned their allegation that the

relevant geographic market was comprised of 22 counties in favor of allegations that there were

14 relevant markets defined not by county borders, but by much smaller HSAs.  *Compare* First

Am. Compl. ¶ 35 *with* TAC ¶¶ 45-61.  Because this Court found that Plaintiffs failed to support

their geographic market assertions with non-conclusory, factual allegations, it denied as moot

Sutter's request for judicial notice of factual materials that Sutter argued conclusively

demonstrated the insufficiencies of HSAs to define relevant markets.  ECF No. 83 at 17-18 n.6.

On appeal, the Ninth Circuit reversed, holding that Plaintiffs' pleadings, accepted as true,

were sufficient to allege plausible geographic markets, and that market definition is "more

appropriately addressed at summary judgment or trial."  *Sidibe v. Sutter Health*, 667 F. App'x 641,

643 (9th Cir. 2016).  The lynchpin of the Court's analysis was its acceptance of Plaintiffs'

allegation that HSAs are "areas within which the residents obtain most of their inpatient hospital

services" such that they could be unwilling to seek treatment elsewhere.  *Id.* at 642–43.  The court

declined to take judicial notice of the publicly available materials Sutter provided to establish that

HSAs do not define relevant geographic markets and remanded the case to this Court.  *Id.* at 643

n.1.

On remand, Plaintiffs stood on their TAC, including its reliance on HSAs to define

relevant geographic markets.  LeVee Decl. ¶ 6.  Thus, in the October 20, 2016 Joint Case

Management Statement, Sutter stated that it intended to file an early summary judgment motion

on the ground that "HSAs cannot constitute relevant geographic markets as a factual matter" and

that it "wishe[d] to avoid a Rule 56(d) response . . . that further discovery is necessary or that

plaintiffs' experts need more time to address the geographic market issues."  ECF 111 at 6.

Discovery opened on October 27, 2016, but on July 26, 2017, Plaintiffs moved for leave to file a

Fourth Amended Complaint ("FAC"), ECF. No. 154, which this Court granted, ECF No. 202.  In

the FAC, Plaintiffs changed course regarding which HSAs allegedly comprise tying markets and

1  merged the Oakland and Berkeley HSAs into a single tying market.  Other than these arbitrary

2  changes, they continue to define geographic markets based exclusively on separate HSAs.  FAC

3  ¶¶ 3, 56-67.

4      Because HSAs do not define areas of hospital competition and cannot define a relevant

5  geographic market, and because market definition is an essential element Plaintiffs' claims, Sutter

6  is entitled to summary judgment.

7  **IV.   LEGAL STANDARD**

8      "Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

9  where there is no genuine issue as to any material fact and the moving party is entitled to

10  judgment as a matter of law."  *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d

11  1484, 1487–88 (9th Cir. 1991).  "[P]laintiff has the burden of establishing the relevant geographic

12  market," *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd. (St. Luke's)*, 778

13  F.3d 775, 784 (9th Cir. 2015), and summary judgment for the defendant is proper where there is

14  no evidence in the record to support the plaintiff's geographic market definition, *see Morgan*, 924

15  F.2d at 1490.  Indeed, many courts have granted summary judgment to antitrust defendants when

16  plaintiffs fail to properly define the geographic market.  *See, e.g.*, *Morgan*, 924 F.2d at 1490

17  (affirming summary judgment on geographic market grounds); *AFMS LLC v. United Parcel Serv.*

18  *Co.*, 105 F. Supp. 3d 1061, 1080 (C.D. Cal. 2015), *aff'd sub nom. AFMS LLC v. United Parcel*

19  *Serv., Inc.*, No. 15-55778, 2017 WL 3588380 (9th Cir. Aug. 21, 2017) (granting summary

20  judgment for failure to present factual question as to relevant market); *Western Parcel Express v.*

21  *United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1064 (N.D. Cal. 1998), *aff'd*, 190 F.3d 974

22  (9th Cir. 1999) (granting summary judgment on grounds including market definition).

23  **V.   ARGUMENT**

24      To prevail on their tying and monopolization claims, Plaintiffs must establish the market

25  in which Sutter is alleged to have acted anticompetitively.  That requires them to prove both the

26  product market at issue and the geographic area in which the product or alternative sources of

27  supply can be found.  *See Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006) (holding

28  that, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has

1   market power in the tying product," and remanding so plaintiff could attempt to define a market);

2   *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) (in an attempted monopolization

3   case, just as in a monopolization case, adjudicating the claim "requires inquiry into the relevant

4   product and geographic market and the defendant's economic power in that market").  For

5   purposes of this motion, Sutter does not contest the alleged product market.  HSAs, however, do

6   not properly define the geographic areas in which consumers currently purchase inpatient hospital

7   services, let alone where they could turn in the event of a price increase.  For that reason alone,

8   Sutter is entitled to summary judgment on all of Plaintiffs' claims.

9        **A.      Geographic Market Definition Requires Consideration of Where Consumers**

10               **Could Practicably Turn for Alternatives.**

11        A relevant geographic market is "an area of effective competition . . . where buyers can

12   turn for alternate sources of supply." *Morgan*, 924 F.2d at 1490  (internal quotation marks and

13   citations omitted).  The market must "correspond to the commercial realities of the industry" and

14   be "economically significant," *Brown Shoe Co. v. United States*, 370 U.S. 294, 336–37 (1962)

15   (internal quotation marks and citations omitted), and it must include those competitors "who have

16   the actual or potential ability to deprive each other of significant levels of business," *Rebel Oil Co.*

17   *v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (internal quotation marks omitted).

18        A proper geographic market is forward-looking and requires more than evidence of

19   current consumer behavior; it requires "prospective analysis" of what consumers could do in

20   response to a hypothetical price increase.  *St. Luke's*, 778 F.3d at 785; *California v. Sutter Health*

21   *Sys.*, 130 F. Supp. 2d 1109, 1120 (N.D. Cal. 2001) ("A determination of the proper geographic

22   market must be based on the 'commercial realities of the industry,' and therefore, must involve a

23   dynamic as opposed to static analysis of 'where consumers could practicably go, not on where

24   they actually go.'" (citations omitted)).  Accordingly, courts and economists routinely utilize the

25   "hypothetical monopolist test" to define the boundaries of an economically coherent relevant

26   geographic market.  *See, e.g.*, *FTC v. Advocate Health Care Network (Advocate Health)*, 841

27   F.3d 460, 468 (7th Cir. 2016); *St. Luke's*, 778 F.3d at 784.  The test asks whether it would be

28   profitable for a hypothetical monopolist that was the only seller of a product in a proposed

geographic market to increase prices by a small but significant amount for a meaningful period of time. *St. Luke's*, 778 F.3d at 784; *see also* Gowrisankaran Decl. ¶ 16. "If enough consumers would respond to [the price increase] by purchasing the product from outside the proposed geographic market, making the [price increase] unprofitable, the proposed market definition is too narrow." *St. Luke's*, 778 F.3d at 784.

This analysis applies in the health care industry. A relevant geographic market for health care services must be supported by evidence of "'where consumers could practicably go, not on where they actually go.'" *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 662 (8th Cir. 2000) (quoting *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 (8th Cir. 1999)); *see also Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 311 (5th Cir. 1997) ("Critically, evidence must be offered demonstrating not just where consumers currently purchase the product, but where consumers could turn for alternative products or sources of the product if a competitor raises prices."). Applied to the market for inpatient hospital services, the core question is thus defining a geographic region that includes the hospitals to which patients can practicably go in the event of an anticompetitive price increase. *See Novak v. Somerset Hosp.*, 625 F. App'x 65, 68 (3d Cir. 2015) (holding that when "potential patients . . . would rationally look to [other hospitals]," a geographic market that excludes those other hospitals "is legally insufficient"); *see also Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598–601 (2009). "Absent a showing of where people could practicably go for inpatient services," a plaintiff cannot "meet its burden of presenting sufficient evidence to define the relevant geographic market," and summary judgment is appropriate. *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 840 (5th Cir. 2002).

Because health care providers compete both to be included in insurance networks and to attract patients in need of care, Gowrisankaran Decl. ¶¶ 19-22, some recent cases have framed the geographic market inquiry by focusing on where insurers could practicably turn for health care providers in the event of a price increase. *See Advocate Health*, 841 F.3d at 475–76; *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 342-43 (3d Cir. 2016); *St. Luke's*, 778 F.3d at 784–85; *but see Little Rock Cardiology*, 591 F.3d at 598–600 (analyzing geographic market based on

SUTTER'S MOT. FOR SUMM. J.
CASE NO. 3:12-cv-04854-LB

where patients could turn).  But these decisions recognize that insurers' views of acceptable

substitutes for inpatient care are ultimately derivative of patients' views, which cannot be

ignored.[3]  *See Penn State Hershey*, 838 F.3d at 342 ("Patients are relevant to the analysis,

especially to the extent that their behavior affects the relative bargaining positions of insurers and

hospitals as they negotiate rates."); *Advocate Health*, 841 F.3d at 474–75 (addressing patient

preference for "local" hospitals and noting that 95% of patients in the FTC's proposed market

"drive 30 miles or less" to reach a hospital); *cf. St. Luke's*, 778 F.3d at 784–85 ("Citing testimony

that Nampa residents 'strongly prefer access to local PCPs,' the court found that 'commercial

health plans need to include Nampa PCPs in their networks to offer a competitive product.'"); *see*

*also* Gowrisankaran Decl. ¶ 22 (explaining that patient preferences inform insurer preferences).[4]

Insurers "assemble networks based primarily upon patients' preferences, not their own[,]" which

means that "the extent to which an [insurer] regards [hospitals] as close substitutes depends upon

the extent to which the [insurer's] members do."  *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d

559, 572 (6th Cir. 2014) (rejecting as "an argument about semantics" the claim that insurers

rather than patients are the relevant consumers for assessing hospital competition).

   Even those cases that frame the market inquiry around insurers' alternatives agree that a

relevant geographic market definition must account for commercial realities in the first instance,

and they ground their analysis of the parties' evidence in consideration of those realities.  *See*

*Advocate Health*, 841 F.3d at 464 (holding that evidence of "commercial reality" was clear that

patients in Chicago area market preferred to receive care within a defined region and insurers

---

[3] Indeed, Plaintiffs concede that "health plan demand is derived from patient demand," LeVee Decl. ¶ 5, Ex. D at n.11, and they have attempted to define relevant geographic markets based on areas where patients allegedly receive most of their hospital services and where insurers seek to construct networks reflecting those patients' preferences, *see, e.g.*, FAC ¶¶ 53-56.

[4] The failure to recognize the relationship between consumer demand in linked markets has proven fatal in other industries, as well.  For example, in *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016), the Fourth Circuit rejected a plaintiff's market definition on summary judgment as blind to basic market realities where the plaintiff failed to recognize that artists' demand for concert promotion services is derivative of the public's demand for concerts. *Id.* at 681–82 ("In its market definition analysis, [plaintiff] characterized the promotion market as national rather than local and restricted the venue market to major amphitheaters . . . .  As the district court recognized, these definitions were plainly designed to bolster [plaintiff's] monopolization and tying claims by artificially exaggerating [defendant's] market power and shrinking the scope of artists' choices.").

could not market plans there without including the merging hospitals); *Penn State Hershey*, 838 F.3d at 342–43 (crediting evidence that showed insurers in Harrisburg area market could not sell a plan to patients without the in-market hospitals); *St. Luke's*, 778 F.3d at 784–85 (summarizing evidence showing that in Nampa market, local primary care physicians were needed to market a health plan, and noting that defendants did not show that a significant number of residents would travel outside Nampa in response to a price increase).

In this case, however, Plaintiffs' proposed markets are entirely divorced from such considerations.  The creators of the HSAs completely ignored the hospital options available to consumers (or insurers), using discharge data from Medicare patients in the early 1990's. *See* Part V.A.1.2, *infra*.  As such, they fail to account for the present commercial realities of hospital competition from the perspective of either patients ***or*** insurers.  From the perspective of either insurers or patients, the result is the same:  HSAs do not—and cannot—define relevant geographic markets.

**B.      HSAs Are Not Designed to Assess the Market Realities of Hospital Competition.**

Plaintiffs rely on HSAs—which represent neither the area to which consumers can practically turn for alternative sources of inpatient services nor the area in which Sutter faces competition—to define the boundaries of their proposed geographic markets.[5]  Because Sutter has the only non-Kaiser hospital in seven HSAs, Plaintiffs allege that those HSAs constitute relevant geographic markets in which Sutter has monopoly power.  But the Court is not required to accept Plaintiffs' allegations on a motion for summary judgment; instead, it is required to consider the evidence.  Nor is the Court "required to accept uncritically . . . market definitions . . . that coincidentally fit plaintiff's precise circumstances.  No party can expect to gerrymander its way to an antitrust victory without due regard for market realities." *It's My Party*, 811 F.3d at 683.

---

[5] Although Plaintiffs' FAC for the first time characterizes its proposed geographic markets as "roughly congruent" with HSAs (¶ 3), it did not propose any boundaries other than the ZIP codes used by the *Dartmouth Atlas* to define HSAs (¶¶ 56-67).  In any event, slight modifications to HSAs would not make them any more sufficient for antitrust purposes. *See* Gowrisankaran Decl. ¶ 7.

SUTTER'S MOT. FOR SUMM. J.
CASE NO. 3:12-cv-04854-LB

1. **By Design, HSAs Tend to Exclude Potential Market Substitutes.**

An HSA is defined as a "collection of ZIP codes whose [Medicare] residents receive most of their hospitalizations from the hospitals in that area." LeVee Decl. ¶¶ 2-3, Exs. A, B.  Created in the early 1990's to help study "variations in the use of medical care among communities and regions," HSAs were not designed to—and do not—measure current competitive conditions in relevant antitrust markets.  Gowrisankaran Decl. ¶¶ 25-28.

When HSAs were first defined based on data from 1992 and 1993, "over 82 percent contained only a single acute care hospital."  Gowrisankaran Decl. ¶ 36.  This was by design. The methodology used to create HSAs starts "with the assumption that every city which contains a hospital constitutes a separate 'candidate HSA,'" reassigning them only if a plurality of Medicare patients sought care in another city, or to "ensure[] geographic contiguity."  *Id.* ¶¶ 31-35.  As a consequence of their bias towards single-hospital "markets," HSAs exclude potential substitute providers of inpatient hospital services in nearby cities.  *Id.* ¶¶ 29-31, 38-40.  In fact, HSAs have included zip codes where as few as 37% of residents received hospital services inside the HSA, and the remaining 63% received care outside of the HSA.  LeVee Decl. ¶ 4, Ex. C at 2. This is clearly inadequate.  *Cf. Novak*, 625 F. App'x at 68 (rejecting proposed market as "illogical and inconsistent with the record" where just over 32% of patients from the proposed single hospital market were admitted to excluded hospitals); *Doctor's Hosp. of Jefferson*, 123 F.3d  at 311–12 (5th Cir. 1997) (rejecting proposed geographic market where a "substantial percentage" of residents left the area for hospital services).

Dartmouth's approach to assigning HSAs has not evolved over time.[6]  In 2015, excluding Kaiser hospitals,

- 10% of HSAs in California contained no acute care hospital;

---

[6] Although its methodology remains unchanged, Dartmouth has reassigned ZIP codes among HSAs when a ZIP code spans two HSAs and (1) the U.S. Post Office determines that the population centroid of the ZIP code is now in a different HSA or (2) the U.S. Post Office splits the area into two separate ZIP codes and causes the population centroid of either or both ZIP codes to fall in another HSA.  Gowrisankaran Decl. ¶ 25 n.31.  Dartmouth has not, however, updated the boundaries of its HSAs based on hospital closures or changes in discharge data, choosing instead to maintain the HSAs it created in the early 1990's "in order to preserve the continuity of the database."  LeVee Decl. ¶ 2, Ex. A; Gowrisankaran Decl. ¶ 25 n.31.

SUTTER'S MOT. FOR SUMM. J.
CASE NO. 3:12-cv-04854-LB

1          •     68% contained a single acute care hospital; and

2          •     only 23% percent contained more than one hospital.

3     Gowrisankaran Decl. ¶ 37.[7]  The fact that more than three-quarters of California HSAs contain no

4     hospital or a single hospital is unsurprising given their purpose and design, which does not

5     include assessing current competitive conditions for hospitals.

6              **2.     HSAs Are Based on Outdated Data for Patients Who Are Not**

7                      **Commercially Insured.**

8              Plaintiffs purport to represent a class of ***commercially*** insured consumers from September

9     17, 2008 to the present.  FAC ¶ 113.  In contrast, *Dartmouth Atlas* HSAs were constructed by

10    analyzing where pluralities of ***Medicare*** patients were discharged between 1992 and 1993.

11    Gowrisankaran Decl. ¶¶ 34, 43; LeVee Decl. ¶ 4, Ex. C at 2.  Even if HSAs constituted relevant

12    geographic markets for Medicare consumers of inpatient hospital services at that time (and there

13    is no evidence or reason to believe that they did), they would still not satisfy Plaintiffs' burden of

14    proving a commercially relevant geographic market in this case today.

15             *First*, data about hospitalizations that are more than twenty years old shed no light on

16    where consumers go for inpatient hospital services today, let alone where they would go in the

17    event of a price increase.  The delivery of health care has changed substantially over the last

18    quarter-century, with the adoption of technological advances, development of new treatments and

19    procedures, and hospital closures all impacting the set of hospitals that consumers utilize and

20    view as substitutable.  Gowrisankaran Decl. ¶ 44.  The static, outdated data on which HSAs

21    depend are therefore not capable of identifying markets that accurately reflect today's commercial

22    realities, let alone where consumers would plausibly turn in the event of a price increase.  *Cf.*

23    *Sutter Health*, 130 F. Supp. 2d at 1120–1132 (analyzing "where patients currently go for acute

24    inpatient services" and "the suppliers to whom consumers could practically turn if faced with

25    _____

26          [7] Including Kaiser hospitals, 8% of California HSAs fail to include a single hospital; 64%
      contain a single hospital; and 28% contain more than one hospital.  Gowrisankaran Decl. ¶ 37
27    nn.58-60.  Dr. Gowrisankaran analyzed the data in this case including and, consistent with
      Plaintiffs' allegations, excluding Kaiser hospitals.  *Id.* ¶ 46; *see also* FAC ¶ 32.  Although both
28    analyses are contained in Dr. Gowrisankaran's declaration, this Motion generally focuses on data
      that exclude Kaiser in keeping with Plaintiffs' approach to market definition in this case.

anticompetitive pricing"); *Surgical Care Ctr. of Hammond*, 309 F.3d at 840 (rejecting geographic market definition based on defendant's current service area as opposed to "where people could practicably go for inpatient services").

*Second*, old data about Medicare patients' hospitalization histories are no substitute for data about hospital choices by the commercially insured.  Medicare patients are generally at least 65 years old and usually retirees, *see* 42 U.S.C. § 1395c(1), who have different needs than the commercially insured, Gowrisankaran Decl. ¶ 47.  Additionally, although Kaiser hospitals account for a significant share of discharges for commercially insured patients, most traditional Medicare enrollees in 1992 and 1993 did not use Kaiser hospitals, which only treat Medicare patients for emergency conditions. *Id.* ¶ 45.  This differentiates Medicare enrollees from commercially insured patients, who have the ability to enroll in Kaiser plans or other commercial health plans.  *Id.*  These significant distinctions between the Medicare population and commercially insured patients further undermine the ability of HSAs to predict where commercially insured consumers could practicably turn in response to an anticompetitive price increase.

Using the *Dartmouth Atlas*' own market-creation methodology and applying it to 2015 discharge information from commercially insured patients reveals the gravity of these flaws.  The alleged Davis and Auburn HSA tying markets, for example, would not even qualify as HSAs (let alone relevant antitrust markets) today because a plurality of their residents' discharges occurred in other HSAs. *Id.* ¶ 51.  Additionally, the Sacramento, Modesto, San Francisco, Santa Rosa, and Berkley-Oakland HSAs each fails to capture nearby zip codes where a plurality, or in some cases a majority, of residents' discharges took place within those HSAs. *Id.* ¶¶ 51-54.  Once updated, those five HSAs would expand to include zip codes from the Davis, Carmichael, Oakdale, Daly City, Healdsburg, Sebastopol, Pinole, Alameda, and San Pablo HSAs. *Id.*  These changes, which Plaintiffs' proposed markets fail to incorporate, are significant and do not yield markets that are "roughly congruent" with HSAs. *Id.* ¶ 55.  For example, they would move the Sutter Davis Hospital and the Mercy San Juan Hospital into the Sacramento HSA, and add *six* other hospitals to the Modesto, San Francisco, Santa Rosa, and Berkley HSAs. *Id.*

SUTTER'S MOT. FOR SUMM. J.
CASE NO. 3:12-cv-04854-LB

These are not isolated examples of *Dartmouth Atlas* HSAs failing to reflect current discharge patterns among the commercially insured population.  In 87 of the 222 California HSAs—including the Davis and Auburn HSAs that Plaintiffs identify as relevant markets, FAC ¶¶ 57, 59—there were more discharges of HSA residents from hospitals ***outside*** the HSA than from inside the HSA in 2015.  Gowrisankaran Decl. ¶¶ 50-51.[8]  This is definitive evidence that these HSAs cannot function as relevant geographic markets for antitrust purposes.  More than 40% of California HSAs fail to capture where a majority or even a plurality of consumers currently receive inpatient hospital care, which precludes them from qualifying not only as relevant geographic markets for antitrust purposes but also as HSAs under the *Dartmouth Atlas'* methodology.  These facts are fatal to Plaintiffs' claims that HSAs reflect areas where residents "receive most of their hospitalizations" and constitute relevant geographic markets.  *See Novak*, 625 F. App'x at 68; *Doctor's Hosp. of Jefferson*, 123 F.3d at 311–12.

### 3.    Antitrust Enforcement Actions Reinforce That HSAs Do Not Capture the Realities of Hospital Competition.

The absence of HSAs from the relevant case law shows that HSAs do not define relevant geographic markets.[9]  ***No*** court has found that HSAs constitute relevant geographic markets as a factual matter.  Even here, the Ninth Circuit held only that ***if*** HSAs, as Plaintiffs claimed, captured areas "within which the residents obtain most of their inpatient hospital services," and ***if*** residents "would be unwilling to seek treatment elsewhere" such that insurers could not turn to hospitals outside the HSAs, then HSAs would not constitute "inherently implausible" markets.

---

[8] In fact, in those 87 HSAs, hospitals within another particular HSA accounted for more discharges of HSA residents than hospitals inside the HSA of residence.  Gowrisankaran Decl. ¶¶ 50-51.

[9] Private plaintiffs in three other cases have referenced the *Dartmouth Atlas* in their complaints, but tellingly, ***none*** of the courts relied upon those allegations when analyzing the relevant market.  *See In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2017 WL 2797267, at *5-6, 11-12 & n.7 (N.D. Ala. June 28, 2017) (holding that plaintiffs plausibly alleged that the state of Alabama and Alabama Core-Based Statistical Areas, encompassing Metropolitan and Micropolitan Statistical Areas, were relevant geographic markets without analyzing the plausibility of HSA-based alternative market allegations); *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 997 F. Supp. 2d 142, 162 (D.R.I. 2014) (holding that the state of Rhode Island was a plausible relevant geographic market without mentioning HSAs); *see also Steward Health Care Sys. LLC v. Southcoast Health Sys., Inc.*, No. CV 15-14188-MLW, 2016 WL 9022444, at *5 (D. Mass. Sept. 2, 2016) (dismissing antitrust claims on *Noerr-Pennington* grounds without analyzing relevant market).

*Sidibe*, 667 F. App'x at 643.  "[A]t the pleading stage, plaintiffs were not required to allege evidentiary facts such as what percentages of patients from inside and outside a particular HSA use the hospitals in that HSA, or to otherwise rebut every purported flaw in the *Dartmouth Atlas of Healthcare's* methodology."  *Id.*  But the pleading stage has passed, and after nearly a year of discovery, Plaintiffs can no longer rely on demonstrably false allegations to define relevant geographic markets in order meet their burden of proof.

Indeed, in all of the cases where the government has successfully litigated and blocked hospital mergers in 2016, the government has not defined the relevant geographic market using HSAs.  The government's asserted geographic market in *Penn State Hershey*, for example, consisted of a four-county area that included portions of eleven different HSAs.  838 F.3d at 346; Gowrisankaran Decl. ¶ 59.  Had the government attempted to use HSAs to define the relevant market, it would have found that the parties to the enjoined merger were in separate HSAs (and thus there would have been no basis to challenge the merger because they would not be considered competitors by reason of being in different relevant geographic markets).

Similarly, in *Advocate Health*, the government's geographic market included six of the merging companies' hospitals and five competitor hospitals.  841 F.3d at 466.  Had the government used HSAs to define the boundaries of the relevant geographic market, it would have found that the merging parties' six hospitals were in five separate geographic markets, and that the five competitor hospitals in the government's analysis were located in four additional HSAs. Gowrisankaran Decl. ¶ 60.  Put another way, where the government saw a single market with close competition among eleven hospitals, HSAs would reveal nine separate markets excluding local competitors and thus indicating that the merger likely posed no antitrust concerns.  *Id.*[10]

---

[10] Earlier antitrust enforcement actions also defined broader geographic markets without relying on—or even mentioning—HSAs.  *See Sutter Health*, 130 F. Supp. 2d at 1127–28 (holding that relevant geographic market for inpatient hospital services must include Alameda, Contra Costa, and San Francisco counties); *FTC v. Freeman Hosp.*, 69 F.3d 260, 268–69 (8th Cir. 1995) (defining relevant geographic market to include 13-county area covering hospitals within 54 miles of Joplin, Missouri); *Tenet*, 186 F.3d at 1052–55 (rejecting FTC's proposed market with a 50-mile radius from downtown Poplar Bluff, which covered eight counties, in favor of a 65-mile radius); *United States v. Mercy Health*, 902 F. Supp. 968, 976–86 (rejecting proposed geographic market of Dubuque County, Iowa and 15 miles east in favor of larger market including five additional cities); *FTC v. Butterworth*, 946 F. Supp. 1285, 1291–93 (W.D. Mich. 1996) (defining relevant market to include 30-mile radius around Grand Rapids, covering portions of seven counties and nine hospitals).

In both of these cases, the government relied not on HSAs or arbitrary geographic areas, but on statistical analyses to define relevant geographic markets that wound up being substantially larger than HSAs.  *See, e.g.*, *Advocate Health*, 841 F.3d at 465 (FTC expert used hypothetical monopolist test to identify relevant geographic market); *Penn State Hershey*, 838 F.3d at 336 ("[T]he Government and the Hospitals agree that the hypothetical monopolist test is the correct standard to apply."); *see also Sutter Health*, 130 F. Supp. 2d at 1120–28 (state attempted to prove relevant geographic market using hospital service areas, patient flow data, and hypothetical monopolist test).  After nearly a year of discovery, however, Plaintiffs still have not abandoned their reliance on HSAs to define the relevant markets.  Their Fourth Amended Complaint demonstrates Plaintiffs are clearly wedded exclusively to HSAs in a faulty attempt to define geographic markets.

**C.     The Specific HSAs Alleged to Be Markets by Plaintiffs Exclude Competitors.**

That HSAs were designed without any consideration of antitrust concerns is reflected in the specific HSAs Plaintiffs allege are relevant geographic markets.  In many instances, those HSAs exclude nearby hospital competitors, as reflected in an analysis of drive times, and publicly available data showing where an HSA's residents travel for services and where an HSA's hospitals obtain their patients.  Moreover, Kaiser's success in marketing a hospital network that lacks hospitals in many of the HSAs identified by Plaintiffs as relevant markets contradicts Plaintiffs' allegation that insurers require hospitals in every HSA alleged.

**1.     The HSAs Exclude Nearby Hospitals.**

Drive times between hospitals within HSAs and nearby hospitals confirm that HSAs were not designed to identify potential substitute hospitals, and in fact exclude close competitors.[11]  In fact, in six of the eight alleged tying HSAs, there is at least one non-Sutter hospital outside the HSA that is within a 30-minute drive of a hospital within the HSA, which Plaintiffs contend is the relevant distance for insurers forming provider networks under the Knox-Keene Act.  Gowrisankaran Decl. ¶¶ 65-66; FAC ¶ 54; 28 Cal. Code Regs. § 1300.51.

---

[11] Sutter asked the Court to take judicial notice of similar evidence in the context of its motion to dismiss, but the Court declined because it concluded that these materials were not necessary to dismiss.  The Ninth Circuit also declined to consider these materials.  Thus, this is the first time any of this evidence is being considered.

Given the importance of proximity in determining competition between and substitution among hospitals, there is no reason to believe that hospitals operating within an HSA are necessarily competitive, and that nearby hospitals are not substitutes simply because they are located in different HSAs.  Gowrisankaran Decl. ¶¶ 64, 68.  For example, Plaintiffs do not and cannot justify treating CPMC - St. Luke's Campus and the Chinese Hospital, which are a twenty-nine minute drive apart, as competitors simply because they are located in the same HSA, while excluding seven non-Sutter hospitals located within a thirty minute drive of Highland Hospital simply because they do not fall within the combined Berkeley-Oakland HSAs.  *Id.* ¶¶ 65-68 & Ex. 7.  Indeed, the very fact that Plaintiffs propose to combine the Berkeley and Oakland HSAs into a single "market"—which still fails to constitute a relevant market for antitrust purposes— implicitly acknowledges HSAs' endemic failure to define the relevant and coherent antitrust markets that capture the competitive alternatives reasonably available to their residents.  *Id.* ¶¶ 77-78.

Moreover, in three of Plaintiffs' alleged tying HSAs, a majority of discharges are for patients who reside within a 30-minute drive of hospitals outside the HSA.  *Id.* Ex. 8.  In the combined Berkley-Oakland "market," for example, 100% of discharges are for patients who live within a 25-minute drive of a hospital outside the combined HSA, 90% of discharges are for patients who live within twenty minutes of a hospital outside the combined HSA, and "[o]ver fifty percent of the discharges . . . are for patients who live closer to a hospital *outside* the combined HSAs than at least one hospital within either the Berkley or Oakland HSAs, and nearly twenty percent live closer to a hospital outside the combined HSAs than *any* hospital within them."  *Id.* ¶ 67 & Ex. 8; *cf. Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005) (holding that rejection of proposed two-county market was appropriate where, among other things, "21% of the Hospital's patients for outpatient cataract surgery live closer to other facilities" that were excluded).  With the exceptions of the Crescent City and Jackson HSAs, "each of the alleged tying HSAs has over forty percent of its resident discharges accounted for by individuals living within thirty minutes of a hospital in a different HSA."  Gowrisankaran Decl. ¶ 67.

By ignoring these realities and relying on HSAs, Plaintiffs improperly exclude nearby

SUTTER'S MOT. FOR SUMM. J.
CASE NO. 3:12-cv-04854-LB

1   competitors and fail to define acceptable relevant antitrust markets.  *Id.* ¶ 68.  As the Eighth

2   Circuit has explained, it would be "absurd" to define a "market area that stops just short of

3   including a regional hospital . . . that is closer to many patients" than the hospitals within the

4   proposed market.  *Tenet*, 186 F.3d at 1053–54; *see also Brown v. Our Lady of Lourdes Med. Ctr.*,

5   767 F. Supp. 618, 631 (D.N.J. 1991) ("The court takes judicial notice that Our Lady of Lourdes is

6   only a few minutes' drive from Philadelphia, seriously calling into question plaintiff's contention

7   that the relevant geographic market is 'South Jersey' to the exclusion of Philadelphia.").  That is

8   precisely what HSAs do here.

9               **2.     Patients View Hospitals Outside of the HSAs as Alternatives.**

10          Data on residents' hospital choices also confirm that Plaintiffs' HSA-based markets fail to

11   account for viable economic substitutes across HSAs.  A review of publicly available OSHPD

12   data on patient discharges—the same data on which Plaintiffs rely, FAC ¶ 86—shows that

13   patients already view hospitals outside of their HSAs as alternatives and thus are highly likely to

14   turn to hospitals outside of their HSAs in the event of a SSNIP.  *See* Gowrisankaran Decl. ¶¶ 69-

15   76 & Ex. 9.  Indeed, Sutter is not aware of any evidence that consumers are even cognizant of the

16   boundaries of HSAs, much less that consumers consider those boundaries when selecting a

17   hospital.

18          "If patients use hospitals outside the service area, those hospitals can act as a check on the

19   exercise of market power by the hospitals within the service area."  *Tenet*, 186 F.3d at 1053.  In

20   this case, the number of patients who have already shown a willingness to use hospitals outside

21   their HSAs for care is substantial.  Statewide, in 52% of the California HSAs that contain at least

22   one hospital, more than half of each HSA's residents' discharges occur outside the HSA.

23   Gowrisankaran Decl. ¶ 70.  OSHPD discharge data reveal that the same holds true in Plaintiffs'

24   alleged tying HSAs.  Discharges for residents in four of the eight alleged markets are more likely

25   to be from hospitals outside of the resident's HSA of residence than from within it.  *Id.*

26   Specifically, 70% of discharges for residents of the Auburn HSA took place in another HSA, as

27   did 64% of discharges for Davis residents, 58% of discharges for Lakeport residents, 56% of

28   discharges for Antioch residents, 43% of discharges for Tracy residents, and 36% of discharges

1   for Jackson residents.  *Id.* Fig. 5.

2          This substantial patient outflow confirms that HSAs do not reflect areas in which a large

3   percentage of residents currently receive inpatient hospital services, let alone define the

4   boundaries of where they could turn in the event of a price increase.  Plaintiffs' proposed HSAs

5   are thus far too narrow to constitute relevant geographic markets.  *Cf. Novak*, 625 F. App'x at 68

6   (rejecting geographic market defined to include only defendant's hospital as too narrow and

7   inconsistent with the record where, among other things, more than 32% of patients from that

8   hospital's primary service area were admitted to other hospitals); *Freeman Hosp.*, 69 F.3d at 264

9   n.9 (noting that "[i]f patients utilize hospitals from outside the area, those hospitals can act as a

10  check on the exercise of market power by hospitals within the service area").  Here, the

11  percentages of patients traveling out of the proposed markets to obtain hospital services are

12  substantial, such that resident discharges from other HSAs exceed 40% in the majority of the

13  alleged tying HSAs.  *See* Gowrisankaran Decl. Fig. 5.

14         Plaintiffs' proposed markets include not only HSAs where a majority of resident

15  discharges are from outside the HSA, but also HSAs that draw large percentages of patients from

16  beyond their borders.  A majority of discharges for hospitals in the alleged tying Davis HSA are

17  for patients from outside of the HSAs, while 40% and 37% of discharges in the alleged tied San

18  Francisco and Sacramento HSAs are for patients from other HSAs.  Gowrisankaran Decl. ¶ 74 &

19  Fig. 8.  In other words, Plaintiffs' HSA-based markets fail to reflect the areas in which hospitals

20  compete for and attract a substantial percentage of their patients.  This further reinforces that the

21  proffered HSAs are too narrow to constitute relevant geographic markets.  *Id.* ¶ 76; *cf. Little*

22  *Rock*, 591 F.3d at 599 ("An antitrust plaintiff must allege a geographic market in which the

23  defendant supplier draws a sufficiently large percentage of its business.  This crucial first step

24  serves as a limitation, preventing antitrust plaintiffs from delineating arbitrarily narrow

25  geographic markets.").  And while the *Penn State Hershey* court criticized economic analysis that

26  focused exclusively on patient inflow data while ignoring outflow data, 838 F.3d at 341, in this

27  case, inflow and outflow data together confirm the inadequacy of the proposed geographic

28  markets, which fail to reflect either the commercial realities of the inpatient hospital services

1   market today or the alternatives to which commercially insured plaintiffs can and would turn in

2   the event of an anticompetitive price increase.

3               **3.      Kaiser's Network Shows That Insurers Can Market Plans Without**

4               **Hospitals in the HSAs.**

5               Plaintiffs artificially structured their allegations to exclude Kaiser, which is one of Sutter's

6   main competitors, despite the fact Kaiser claims a 38% share of discharges in the twelve HSAs at

7   issue, including a 51% share in the alleged tied Santa Rosa HSA, a 50% share in the alleged tying

8   Antioch HSA, and a 42% share in the alleged tied Sacramento HSA.  Gowrisankaran Decl.

9   Fig. 10.  Kaiser's experience in successfully marketing plans across Northern California—

10  including in HSAs where it does not even have a hospital—further demonstrates that HSAs

11  cannot define relevant geographic markets and that having a hospital in every HSA is not

12  necessary.  Although Kaiser offers general acute care hospitals in only 12% of HSAs in

13  California, it enrolls 44% of the state's large-group insurance enrollees and accounts for 24% of

14  commercial discharges.  Gowrisankaran Decl. ¶ 81.  And 62% of the discharges from Kaiser

15  hospitals occur *outside* the patient's HSA of residence, further reinforcing the willingness of

16  California patients to travel outside their HSA for inpatient care.  *Id.* ¶ 81–83.  Further, Kaiser

17  successfully serves enrollees in ten of the twelve HSAs at issue even though it does not offer an

18  in-network hospital in five of those HSAs.  *Id.* Fig. 10.  And in those five HSAs where Kaiser

19  does not have a hospital, it still accounts for 30% of the HSA's residents' discharges.  *Id.* ¶ 83.

20  As the Kaiser data confirms, insurers can and do market plans without in-HSA hospitals because

21  HSA boundaries do not reflect barriers to effective competition or the availability of substitutable

22  hospitals.

23              Plaintiffs' continuing reliance on HSAs to define relevant markets is fatal to their claims.

24  They have failed to meet their burden of defining a relevant market that captures "where people

25  could practicably go for inpatient services," and their claims cannot succeed.  *Surgical Care Ctr.*

26  *of Hammond*, 309 F.3d at 840; *see also Nova*k, 625 F. App'x at 68 (holding that where "potential

27  patients . . . would rationally look to [other hospitals]," a geographic market that excludes them

28  "is legally insufficient").

## VI.    CONCLUSION

Plaintiffs' Fourth Amended Complaint relies on geographic markets that cannot, as a matter of law, support Plaintiffs' claims for relief.  Therefore, Sutter asks the Court to enter summary judgment for Sutter and dismiss this litigation.

Dated: April 4, 2018                                Respectfully submitted,

                                                    JONES DAY

                                                    By: */s/ Jeffrey A. LeVee*
                                                    Jeffrey A. LeVee

                                                    BARTKO, ZANKEL, BUNZEL & MILLER
                                                    A Professional Corporation

                                                    By: */s/ Patrick M. Ryan*
                                                    Patrick M. Ryan

                                                    Attorneys for Defendant Sutter Health

### FILER'S ATTESTATION

I attest under penalty of perjury that concurrence in the filing of this document has been obtained from all signatories.

Dated: April 4, 2018                                JONES DAY

                                                    By: */s/ Jeffrey A. LeVee*
                                                    Jeffrey A. LeVee

                                                    Attorneys for Defendant Sutter Health

NAI-1503577177v1