1  Jeffrey A. LeVee (State Bar No. 125863)
   jlevee@JonesDay.com
2  JONES DAY
   555 South Flower Street, 50th Floor
3  Los Angeles, CA 90071
   Telephone: 213.489.3939
4  Facsimile: 213.243.2539

5  David C. Kiernan (State Bar No. 215335)
   dkiernan@jonesday.com
6  Brian G. Selden (State Bar No. 261828)
   bgselden@jonesday.com
7  Matthew J. Silveira (State Bar No. 264250)
   msilveira@jonesday.com
8  JONES DAY
   555 California Street, 26th Floor
9  San Francisco, CA 94104
   Telephone: 415.626.3939
10 Facsimile: 415.875.5700

11 Attorneys for Defendant
   SUTTER HEALTH

12

13            UNITED STATES DISTRICT COURT

14           NORTHERN DISTRICT OF CALIFORNIA

15              SAN FRANCISCO DIVISION

16

| 17 | DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN HANSEN, DAVID HERMAN, CAROLINE STEWART, OPTIMUM GRAPHICS, INC., and JOHNSON POOL & SPA, on Behalf of Themselves and All Others Similarly Situated, | Case No. 3:12-CV-04854-LB |
|---|---|---|
| | Plaintiffs, | **DECLARATION OF JEFFREY A. LEVEE IN SUPPORT OF SUTTER HEALTH'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56** |
| | v. | |
| | SUTTER HEALTH, | Date:  October 11, 2018 Time: 9:30 a.m. The Honorable Laurel Beeler |
| | Defendants. | |

28

1    I, Jeffrey A. LeVee, declare as follows:

2    1.      I am a partner with the law firm of Jones Day, counsel for Defendant Sutter Health

3    ("Sutter") in the above-captioned action.  I am admitted to practice law before this Court.  I

4    submit this declaration in support of Sutter's Motion for Summary Judgment.  I have personal

5    knowledge of the facts stated in this declaration and if called as a witness, I could and would

6    competently testify to them.

7    2.      Attached hereto as Exhibit A is a true and correct copy of the *The Dartmouth Atlas*

8    *of Health Care* web page, publicly available at http://www.dartmouthatlas.org/data/region/.  This

9    web page contains language quoted in paragraph 30 of Plaintiffs' Fourth Amended Complaint

10   ("FAC").  I obtained this document from the Dartmouth Atlas website (www.dartmouthatlas.org),

11   under the "Data by Region" link located on the home page.

12   3.      Attached hereto as Exhibit B is a true and correct copy of the Research Methods

13   web page on the Dartmouth Atlas website, publicly available at

14   http://www.dartmouthatlas.org/tools/faq/researchmethods.aspx.  This web page also contains

15   language quoted in paragraph 30 of the FAC.  I obtained this document by going to the

16   Dartmouth Atlas website (www.dartmouthatlas.org), clicking on the "FAQ" option under the

17   "Tools" drop down menu on the home page.  I then clicked on the link for "Research Methods"

18   on the right hand side of the page.

19   4.      The Research Methods page on the Dartmouth website indicates that "[m]ore

20   information on how HSAs and HRRs were defined is available on our Appendix on the

21   Geography of Health Care in the United States."  *See* Exhibit B.  A true and correct copy of this

22   Appendix, publically available at

23   http://www.dartmouthatlas.org/downloads/methods/geogappdx.pdf, is attached hereto as Exhibit

24   C.

25   5.      Attached hereto as Exhibit D is a true and correct copy of page 16 of Plaintiffs'

26   Reply Brief (Dkt. No. 40), filed April 16, 2015 in *Sidibe v. Sutter Health*, No. 14-16234 (9th

27   Cir.).

28   6.      At a meet and confer I participated in by telephone on September 29, 2016, I asked

LEVEE DECL. ISO MOT. FOR SUMM. J.
3:12-cv-04854-LB

1   Plaintiffs' counsel if they intended to amend their Third Amended Complaint ("TAC") following

2   the Ninth Circuit's remand of the case.  Plaintiffs' counsel Jean Kim stated that Plaintiffs did not

3   intend to amend their complaint.  That position was reflected in Plaintiffs' portion of the joint

4   case management conference statement filed on October 20, 2016, ECF No. 111, and in the

5   statements of Plaintiffs' counsel Matt Cantor at the Case Management Conference held on

6   October 27, 2016, wherein he stated in response to a question from the Court that Plaintiffs did

7   not intend to amend and would instead stand on their TAC.

8        I declare under penalty of perjury under the laws of the United States that the foregoing is

9   true and correct.  Executed this 4th day of April 2018 in Los Angeles, California.

10

11                    */s/ Jeffrey A. LeVee*
                     Jeffrey A. LeVee

12

13   NAI-1503577326v1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEVEE DECL. ISO MOT. FOR SUMM. J.
3:12-cv-04854-LB

EXHIBIT A

Case 3:12-cv-04854-LB    Document 272-2    Filed 04/04/18    Page 5 of 32



DOWNLOADS | FAQ | ABOUT US

# THE DARTMOUTH ATLAS OF HEALTH CARE

Custom Search 🔍

| 🏠 | DATA BY REGION | DATA BY HOSPITAL | DATA BY TOPIC | TOOLS ▼ | KEY ISSUES ▼ | PUBLICATIONS ▼ | PRESS ROOM ▼ |

[ Home Page > Data By Region ]

## DATA BY REGION

The use of health care resources in the United States is highly localized. Most Americans use the services of physicians whose practices are nearby. Physicians, in turn, are usually affiliated with hospitals that are near their practices. As a result, when patients are admitted to hospitals, the admission generally takes place within a relatively short distance of where the patient lives. This is true across the United States. Although the distances from homes to hospitals vary with geography – people who live in rural areas travel farther than those who live in cities – in general most patients are admitted to a hospital close to where they live that provides an appropriate level of care. Data for all Dartmouth Atlas regional data reflect the experience of Medicare patients living in the region, regardless of where the care was actually delivered.



### CHOOSE REGION LEVEL

Hospital Referral Region ▼

Select a region from the map on the left and click "View Profile" to view data for that region.

### SEARCH REGIONS

Enter a zip code, city, or town name.

🔍 Zip code, city, or town name

Refresh

### STAY INFORMED

Enter email address to learn about site updates and news.

Your Email Address

Join Notification List

 Print    PDF    Download to PowerPoint

### About Our Regions

**Hospital referral regions** (HRRs) represent regional health care markets for tertiary medical care that generally requires the services of a major referral center. The regions were defined by determining where patients were referred for major cardiovascular surgical procedures and for neurosurgery. Each hospital service area (HSA) was examined to determine where most of its residents went for these services. The result was the aggregation of the 3,436 hospital service areas into 306 HRRs. Each HRR has at least one city where both major cardiovascular surgical procedures and neurosurgery are performed.

**Hospital service areas** (HSAs) are local health care markets for hospital care. An HSA is a collection of ZIP codes whose residents receive most of their hospitalizations from the hospitals in that area. HSAs were defined by assigning ZIP codes to the hospital area where the greatest proportion of their Medicare residents were hospitalized. Minor adjustments were made to ensure geographic contiguity. This process resulted in 3,436 HSAs. When these regions were created in the early 1990s, most hospital service areas contained only one hospital. In the intervening years, hospital closures have left some HSAs with no hospital; these HSAs have been maintained as distinct areas in order to preserve the continuity of the database.

**Pediatric surgical areas** (PSAs) are regional markets for pediatric surgery. In order to define geographic markets for pediatric surgery in Northern New England, we aggregated hospital service areas based on children's travel for common ENT procedures and appendectomies. This resulted in 30 pediatric surgical areas in Northern New England.

**Primary care service areas** (PCSAs) reflect Medicare patient travel to primary care providers. Version 3.1 (based on 2010 Census tracts) will be available soon from the Health Resources & Services Administration (HRSA).

Terms and Conditions of Data Use: please read before downloading data.

© 2017 The Trustees of Dartmouth College | 35 Centerra Parkway, Lebanon, NH 03766 | (603) 653-0800

*The Dartmouth Atlas of Health Care is based at The Dartmouth Institute for Health Policy and Clinical Practice and is supported by a coalition of funders led by the Robert Wood Johnson Foundation, including the WellPoint Foundation, the United Health Foundation, the California HealthCare Foundation, and the Charles H. Hood Foundation.*





DATA BY REGION
DATA BY HOSPITAL
DATA BY TOPIC

**Tools**
Downloads
Hospital Care Intensity
Benchmarking
Case Studies
Glossary
FAQ

**Key Issues**
Medicare Spending
Supply-Sensitive Care
Preference-Sensitive Care
Effective Care
The Physician Workforce
End-of-Life Care
Racial Disparities
Accountable Care
Reflections on Variations
International
Primary Care Service Areas

**Publications**
Atlases & Reports
Research Articles

**Press Room**
Recent News & Press Releases
Press Contact Information
In The Media

EXHIBIT B

Research Methods - Dartmouth Atlas of Health Care



# THE DARTMOUTH ATLAS OF HEALTH CARE

DOWNLOADS | FAQ | ABOUT US

Custom Search

**DATA BY REGION** | **DATA BY HOSPITAL** | **DATA BY TOPIC** | **TOOLS ▼** | **KEY ISSUES ▼** | **PUBLICATIONS ▼** | **PRESS ROOM ▼**

[ Home Page > Tools > FAQ > Research Methods ]

## RESEARCH METHODS

**STAY INFORMED**

Enter email address to learn about site updates and news.

Your Email Address

Join Notification List

**How does the Dartmouth Atlas Project get access to its data? Where does the data come from?**

The very large claims databases come from the Centers for Medicare and Medicaid Services (CMS), the federal agency that collects data for every person and provider using Medicare health insurance. Access to this data is provided for research purposes. Other data sources include the U.S. Census, the American Hospital Association, the American Medical Association, and the National Center for Health Statistics.

**What is an HSA/HRR? How are the populations determined?**

Hospital service areas (HSAs) are local health care markets for hospital care. An HSA is a collection of ZIP codes whose residents receive most of their hospitalizations from the hospitals in that area. HSAs were defined by assigning ZIP codes to the hospital area where the greatest proportion of their Medicare residents were hospitalized. Minor adjustments were made to ensure geographic contiguity. Most hospital service areas contain only one hospital. The process resulted in 3,436 HSAs.

Hospital referral regions (HRRs) represent regional health care markets for tertiary medical care. Each HRR contains at least one hospital that performs major cardiovascular procedures and neurosurgery. HRRs were defined by assigning HSAs to the region where the greatest proportion of major cardiovascular procedures were performed, with minor modifications to achieve geographic contiguity, a minimum population size of 120,000, and a high localization index. The process resulted in 306 hospital referral regions. More information on how HSAs and HRRs were defined is available in our Appendix on the Geography of Health Care in the United States.

**What population does the Dartmouth Atlas Project study?**

The Medicare population in an area includes those alive, age 65 to 99, and not enrolled in a risk-bearing health maintenance organization (HMO). For physician services, the population is restricted to a random sample of Medicare enrollees having Medicare Part B physician claims. For Medicare reimbursement rates, the population was restricted to a random sample belonging to both the Medicare A (inpatient) and B (physician services) programs.

**How are an area's health care resources measured and allocated?**

An area's health care resources consist of acute care hospital beds and medical personnel. As some patients seek care outside their area, these resources (beds, physicians, other hospital personnel, etc.) were allocated to HSAs in proportion to the area residents' use of hospital services. This allocation procedure "transfers" resources from one area to another in proportion to how they are used. Areas with high migration will be allocated more resources but the allocated amount will reflect what is actually used in that area. For health policy purposes, it is necessary to be aware of this distinction since reduction in utilization in one area may require reduction in capacity of resources in an adjacent area.

*Hospital beds and personnel.* All short term medical and surgical hospitals, specialty and children's hospitals are included with a few exceptions. Hospital beds included cribs, pediatric and neonatal bassinets, medical/surgical intensive care, and cardiac intensive care beds. Full-time equivalent hospital personnel are defined as the sum of full-time employees and half of the part time employees, not including medical or dental interns, residents and trainees.

To account for patients who live in one HSA but obtain medical care in another, hospital resources are allocated to HSAs in proportion to the Medicare hospital days provided by hospitals to that HSA. For example, if 60% of total Medicare inpatient days at a hospital were used by residents of the HSA where the hospital was located, then 60% of that hospital's resources would be assigned to its HSA. If 20% of the Medicare patient days provided by that hospital were used by a neighboring HSA, 20% of the hospital's resources would be assigned to that neighboring HSA.

*Physician workforce.* All physicians working at least 20 hours a week in clinical practice are included and classified according to their primary self-designated specialty.

Physicians provide services to patients residing both in and outside the HSA where their practices are located, so the physician workforce is adjusted for patient migration. Since information on the travel patterns of patients is not available, physicians are allocated in proportion to inpatient days in hospitals located in their HSAs. For example, if an HSA had four primary care physicians and if 25% of the patient days at the local hospital(s) were to residents of a neighboring HSA, then these physicians contributed one full-time equivalent primary care physician to the neighboring HSA.

**What is a rate?**

A rate is the number of events or amount of resources divided by the number in the population. For example, if an area with 100,000 Medicare enrollees has 810 hip fracture repairs, then the rate of hip fracture repair is 8.1 per 1,000 Medicare enrollees. For rare events, the rate is often re-scaled to reflect events per 100,000 persons.

Why are some rates suppressed?

Rates based on a count of fewer than 11 patients are not displayed for reasons of patient confidentiality. Rates with fewer than 26 expected events are reported in parentheses to indicate lack of statistical precision; for these rates, the margin of error is greater than 20%, so the estimate is considered statistically unreliable.

How are rates adjusted?

Most rates of utilization and spending are adjusted to the age, sex and race distribution of the national Medicare population using the indirect method. First, the national event rate for each age–sex–race category was computed. These rates were then applied to the HSA population to produce the expected number of events in the HSA, that is, the number of events that would have occurred in the HSA if its rate was the same as the national event rate. It is one way to standardize for different distributions of risk factors across areas. Click here for more information about indirect adjustment.

Measures of the care of the chronically ill population are adjusted for differences in age, sex, race, primary chronic illness, and the presence of more than one chronic conditions using ordinary least squares regression.

Where can I find more information?

Comprehensive information on such topics as files used, rate definitions, code specifications, physician classifications, allocation and adjustment methods, and so on is available in our Research Methods compendium. Information about our data and methods related to the care of chronic illness is available in the Appendix on Methods of our most recent report on the care of chronically ill patients during the last two years of life.

[ CONTACT US ]   [ SITE MAP ]

© 2017 The Trustees of Dartmouth College | 35 Centerra Parkway, Lebanon, NH 03766 | (603) 653–0800

*The Dartmouth Atlas of Health Care is based at The Dartmouth Institute for Health Policy and Clinical Practice and is supported by a coalition of funders led by the Robert Wood Johnson Foundation, including the WellPoint Foundation, the United Health Foundation, the California HealthCare Foundation, and the Charles H. Hood Foundation.*



THE DARTMOUTH INSTITUTE
FOR HEALTH POLICY & CLINICAL PRACTICE



DATA BY REGION
DATA BY HOSPITAL
DATA BY TOPIC

**Tools**
Downloads
Hospital Care Intensity
Benchmarking
Case Studies
Glossary
FAQ

**Key Issues**
Medicare Spending
Supply-Sensitive Care
Preference-Sensitive Care
Effective Care
The Physician Workforce
End–of–Life Care
Racial Disparities
Accountable Care
Reflections on Variations
International
Primary Care Service Areas

**Publications**
Atlases & Reports
Research Articles

**Press Room**
Recent News & Press Releases
Press Contact Information
In The Media

EXHIBIT C

# Appendix on the Geography of Health Care in the United States*

The use of health care resources in the United States is highly localized. Most Americans use the services of physicians whose practices are nearby. Physicians, in turn, are usually affiliated with hospitals that are near their practices. As a result, when patients are admitted to hospitals, the admission generally takes place within a relatively short distance of where the patient lives. This is true across the United States. Although the distances from homes to hospitals vary with geography – people who live in rural areas travel farther than those who live in cities – in general most patients are admitted to a hospital close to where they live which provides an appropriate level of care.

The Medicare program maintains exhaustive records of hospitalizations, which makes it possible to define the patterns of use of hospital care. When Medicare enrollees are admitted to hospitals, the program's records identify both the patients' places of residence (by ZIP Code) and the hospitals where the admissions took place (by unique numerical identifiers). These files provide a reliable basis for determining the geographic pattern of health care use, because research shows that the migration patterns of patients in the Medicare program are similar to those for younger patients.

Medicare records of hospitalizations were used to define 3,436 geographically distinct hospital service areas in the United States. In each hospital service area, most of the care received by Medicare patients is provided in hospitals within the area. Based on the patterns of care for major cardiovascular surgery and neurosurgery, hospital service areas were aggregated into 306 hospital referral regions; this Atlas reports on patterns of care in these hospital referral regions.

## How Hospital Service Areas Were Defined

Hospital service areas were defined through a three-step process. First, all acute care hospitals in the 50 states and the District of Columbia were identified from the American Hospital Association and Medicare provider files and assigned to the town or city in which they were located. The name of the town or city was used

*Abstracted from the 1996 edition of the Dartmouth Atlas of Health Care

as the name of the hospital service area, even though the area might have extended well beyond the political boundary of the town. For example, the Mt. Ascutney Hospital is in Windsor, Vermont. The area is called the Windsor hospital service area, even though the area serves several other communities.

In the second step, all 1992 and 1993 Medicare hospitalization records for each hospital were analyzed to ascertain the ZIP Code of each of its patients. When a town or city had more than one hospital, the counts were added together. Using a plurality rule, each ZIP Code was assigned on a provisional basis to the town containing the hospitals most often used by local residents.

The analysis of the patterns of use of care by Medicare patients led to the provisional assignment of five post office ZIP Codes to the Windsor hospital service area.

| ZIP Code | Community Name | 1990 Population | % of Medicare Discharges to Mt. Ascutney Hospital |
|---|---|---|---|
| 05037 | Brownsville | 415 | 52.8 |
| 05048 | Hartland | 1,730 | 46.8 |
| 05053 | Pomfret | 245 | 52.6 |
| 05062 | Reading | 614 | 36.8 |
| 05089 | Windsor | 5,406 | 63.2 |

The third step involved the visual examination of the ZIP Codes using a computer-generated map to make sure that the ZIP Codes included in the hospital service areas were contiguous. In the case of the Windsor area, inspection of the map led to the reassignment of Pomfret to the Lebanon hospital service area. In the final determination, the Windsor hospital service area contained four communities and a total population of 8,165. (See Map A)

Details about the method of constructing hospital service areas are given in The Appendix on Methods.



**Map A. ZIP Codes Assigned to the Windsor, Vermont, Hospital Service Area**

The analysis of the pattern of use of hospitals revealed that Medicare enrollees living in the five ZIP Code areas in light blue most often used the Mt. Ascutney Hospital in Windsor, Vermont. To maintain geographic continuity of hospital service areas, the Pomfret ZIP Code 05053 was reassigned to the Lebanon hospital service area. The Windsor hospital service area contained four communities, with a 1990 census of 8,165. During 1992-93, there were 679 hospitalizations among the Medicare population; 394 (58%) were to Mt. Ascutney Hospital, 131 to the Mary Hitchcock Memorial Hospital, and 154 to other hospitals.

## Hospital Service Areas in the United States

The documentation of the patterns of use of hospitals according to Medicare enrollee ZIP Codes during 1992-93 led to the aggregation of approximately 42,000 ZIP Codes into 3,436 hospital service areas. In each area, more Medicare patients were hospitalized locally than in any other single hospital service area. The propensity of patients to use local hospitals is measured by the localization index, which is the percentage of all residents' hospitalizations that occur in local hospitals (the number of local hospitalizations of residents divided by all hospitalizations of residents). This index varied from a low of 17.9% to over 94%. More than 85% of Americans lived in hospital service areas where the majority of Medicare hospitalizations occurred locally. More than 51% lived in areas where the localization index exceeded 70%.

In 1993, most Americans lived in hospital service areas with three or fewer local hospitals. Eighty-two percent, or 2,830, of all hospital service areas, which comprised 39% of the population in 1990, had only one hospital. Four hundred twenty-eight hospital service areas, which comprised 23% of the United States population, had either two or three hospitals. One hundred seventy-eight, or less than 6% of hospital service areas, had four or more local hospitals and comprised about 37% of the population of the United States.



**Figure A. Cumulative Percentage of Population of the United States According to the Hospital Service Area Localization Index (1992-93)**

*The localization index is the proportion of all hospitalizations for area residents that occur in a hospital or hospitals within the area. The figure shows the localization index for Medicare patients in 3,436 hospital service areas, according to the cumulative proportion of the population living in the region. Most of the population lived in regions where more than 50% of hospitalizations occurred locally.*



**Map B. Hospital Service Areas According to the Number of
Acute Care Hospitals**

Thirty-nine percent of the population of the United States lived in areas with
one hospital (buff); 15% lived in areas with two hospitals (light orange); 8.4%
lived in areas with three hospitals ( bright orange); and 37% of the population
lived in areas with four or more hospitals within the hospital service area (red).



**Count of Acute Care Hospitals**
by Hospital Service Area (1993)



| | | |
|---|---|---|
| ⬛ | 4 or more | (178 HSAs) |
| 🟧 | 3 | (106) |
| 🟧 | 2 | (322) |
| 🟨 | 1 | (2,830) |
| ⬜ | Not Populated | |

### How Hospital Referral Regions Were Defined

Hospital service areas make clear the patterns of use of local hospitals. A significant proportion of care, however, is provided by referral hospitals that serve a larger region. Hospital referral regions were defined in this Atlas by documenting where patients were referred for major cardiovascular surgical procedures and for neurosurgery. Each hospital service area was examined to determine where most of its residents went for these services. The result was the aggregation of the 3,436 hospital service areas into 306 hospital referral regions. Each hospital referral region had at least one city where both major cardiovascular surgical procedures and neurosurgery were performed. Maps were used to make sure that the small number of "orphan" hospital service areas – those surrounded by hospital service areas allocated to a different hospital referral region – were reassigned, in almost all cases, to ensure geographic contiguity. Hospital referral regions were pooled with neighbors if their populations were less than 120,000 or if less than 65% of their residents' hospitalizations occurred within the region.

Hospital referral regions were named for the hospital service area containing the referral hospital or hospitals most often used by residents of the region. The regions sometimes cross state boundaries. The Evansville, Indiana, hospital referral region (Map C) provides an example of a region that is located in three states: Illinois, Indiana, and Kentucky. In this region, three hospitals provided cardiovascular surgery services. Two were in Evansville; a third hospital, in Vincennes, Indiana, also provided cardiovascular surgery, but in the years of this study residents of the Vincennes area used cardiovascular and neurosurgery procedures provided in Evansville more frequently than those in Vincennes, resulting in the assignment of the Vincennes hospital service area to the Evansville hospital referral region.

Map C also provides an example of a region with a population too small to meet the minimum criterion for designation as a hospital referral region. The Madisonville, Kentucky, hospital service area met the criterion as a hospital referral region on the basis of the plurality rule, but its population was less than 57,000. The area was assigned to the Paducah, Kentucky, hospital referral region because hospitals in Paducah were the second most commonly used place of care for cardiovascular and neurosurgical procedures.



**Map C. Hospital Service Areas Assigned to the Evansville, Indiana, Hospital Referral Region**

Hospital referral regions are named for the hospital service area containing the referral hospital or hospitals most often used by residents of the region. Hospital referral regions overlap state boundaries in every state except Alaska and Hawaii. The Evansville, Indiana, hospital referral region is in parts of three states: Illinois, Indiana, and Kentucky.

# Maps of Hospital Referral Regions in the United States

The maps on the following pages outline the boundaries of the hospital referral regions. Although in some regions more than one city provided referral care, each hospital referral region was named for the city where most patients receiving major cardiovascular surgical procedures and neurosurgery were referred for care.



**Map D. New England Hospital Referral Regions**



**Map E. Northeast Hospital Referral Regions**



**Map F. South Atlantic Hospital Referral Regions**

300   THE DARTMOUTH ATLAS OF HEALTH CARE 1999



**Map G. Southeast Hospital Referral Regions**



**Map H. South Central Hospital Referral Regions**



**Map I. Southwest Hospital Referral Regions**



**Map J. Great Lakes Hospital Referral Regions**



**Map K. Upper Midwest Hospital Referral Regions**



**Map L. Rocky Mountains Hospital Referral Regions**



**Map M. Pacific Northwest Hospital Referral Regions**



**Map N. Pacific Coast Hospital Referral Regions**

EXHIBIT D

No. 14-16234

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

DJENEBA SIDIBE, DIANE DEWEY, AND JERRY JANKOWSKI, ON
BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellants,*

v.

SUTTER HEALTH,

*Defendant-Appellee.*

---

### REPLY BRIEF OF PLAINTIFFS-APPELLANTS

---

Appeal from the United States District Court for the Northern District of
California, Case No. 3:12-cv-04854-LB,
Honorable Laurel D. Beeler, Magistrate Judge

---

Matthew L. Cantor
Axel Bernabe
CONSTANTINE CANNON LLP
335 Madison Avenue, 9th Floor
New York, New York 10017
(212) 350-2700
mcantor@constantinecannon.com
abernabe@constantinecannon.com

*Lead Counsel for Plaintiffs-*
*Appellants and the [Proposed] Class*

Azra Mehdi
THE MEHDI FIRM, P.C.
One Market
Spear Tower, Suite 3600
San Francisco, California 94105
(415) 293-8039
azram@themehdifirm.com

*Co-Lead Counsel for Plaintiffs-*
*Appellants and the [Proposed] Class*

The E-H test is now disfavored for defining hospital markets, as it focuses on patient, not health plan, responses to a SSNIP. The Ninth Circuit did not rely upon it in *St. Luke's* and should not do so now. *See* Gregory S. Vistnes and Yianis Sarafidis, *Cross-Market Hospital Mergers: A Holistic Approach*, 79 ANTITRUST L.J. 253, 291 (2013) ("In recent years, the federal antitrust agencies have increasingly adopted the perspective of health plans as the relevant customers when analyzing hospital mergers. This focus on the substitution options facing health plans, rather than individual patients, has similarly meant that relevant antitrust markets have been defined from the perspective of health plans").[11]

---

have been defined by a third-party source used throughout the healthcare industry, not by the *ipse dixit* of a party expert. *See, e.g., Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 840 (5th Cir. 2002) (at merits trial, plaintiff expert "relied solely on what he defined" as defendant's "service area*"*). Finally, Sutter merely argues that a "[t]rade area is not *necessarily* the relevant geographic market" in a hospital market power case. AB at 25 (emphasis added). It therefore admits that hospital "service areas" can be co-extensive with defined relevant markets.

[11] Sutter points out that "health plan demand is fundamentally derived from patient demand." AB at 30. This is, indeed, why, as the TAC alleges, health plans cannot substitute with out-of-HSA hospitals that do not provide substantial Inpatient Hospital Services to residents within HSAs. But just because health plan demand is derived from patient demand does not mean that geographic markets should be defined from a patient perspective, as opposed to the health-plan perspective. *See supra* Part II.A. Sutter fails to address this issue.

16