1   Jeffrey A. LeVee (State Bar No. 125863)
    jlevee@JonesDay.com
2   JONES DAY
    555 South Flower Street, 50th Floor
3   Los Angeles, CA 90071
    Telephone: 213.489.3939
4   Facsimile: 213.243.2539

5   David C. Kiernan (State Bar No. 215335)
    dkiernan@jonesday.com
6   Brian G. Selden (State Bar No. 261828)
    bgselden@jonesday.com
7   Matthew J. Silveira (State Bar No. 264250)
    msilveira@jonesday.com
8   JONES DAY
    555 California Street, 26th Floor
9   San Francisco, CA 94104
    Telephone: 415.626.3939
10  Facsimile: 415.875.5700

11  Attorneys for Defendant
    SUTTER HEALTH

Robert H. Bunzel (State Bar No. 99395)
rbunzel@bzbm.com
Patrick M. Ryan (State Bar No. 203215)
pryan@bzbm.com
Oliver Q. Dunlap (State Bar No. 225566)
odunlap@bzbm.com
BARTKO, ZANKEL, BUNZEL & MILLER
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Telephone:  (415) 956-1900
Facsimile:   (415) 956-1152

12

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN HANSEN, DAVID HERMAN, CAROLINE STEWART, OPTIMUM GRAPHICS, INC., and JOHNSON POOL & SPA, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> SUTTER HEALTH, <br><br> Defendants. | Case No. 3:12-CV-04854-LB <br><br> **DECLARATION OF GAUTAM GOWRISANKARAN, PH.D. IN SUPPORT OF DEFENDANT SUTTER HEALTH'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56** <br><br> Date:  October 11, 2018 <br> Time: 9:30 a.m. <br> The Honorable Laurel Beeler |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN HANSEN, DAVID HERMAN, CAROLINE STEWART, OPTIMIUM GRAPHICS, INC., and JOHNSON POOL & SPA, on Behalf of Themselves and All Others Similarly Situated, | Case No. 3:12-cv-04854-LB |
| Plaintiffs, v. | |
| SUTTER HEALTH, | |
| Defendant. | |

DECLARATION OF GAUTAM GOWRISANKARAN, PHD
April 3, 2018

# Table of Contents

I.      Introduction ................................................................................................. 1

      A.     Qualifications ................................................................................. 1

      B.     Assignment ................................................................................... 1

      C.     Summary of Opinions .................................................................... 5

II.     Hospital Market Definition for Antitrust Analysis ....................................... 8

      A.     Market Definition in Tying Cases.................................................... 8

      B.     Hospital Competition ................................................................... 11

III.    Dartmouth Atlas HSAs Were Not Constructed for the Purpose of Antitrust Analysis and, by Design, Tend to Exclude Rather Than Include Relevant Substitutes ............ 14

      A.     Dartmouth Atlas HSAs Were Not Intended to Serve as Antitrust Markets..... 15

      B.     The Dartmouth Atlas HSA Construction Methodology Is Biased Towards Creating Single-Hospital HSAs that Exclude Competitive Alternatives.................... 16

      C.     Dartmouth HSAs are Based on Outdated Data for a Different Population than That at Issue in this Matter—Medicare Patients Hospitalized in 1992 and 1993........ 24

      D.     Antitrust Markets Recently Accepted by Courts Were Neither Equivalent to, Nor Based on, Dartmouth Atlas HSAs ........................................................... 33

IV.    Dartmouth HSAs in Northern California Exclude Competitive Alternatives ............ 37

      A.     The Alleged Tying HSAs Exclude Nearby Hospitals...................................... 38

      B.     Patients' Choices Show that There Are Competitive Alternatives Outside Patients' HSA of Residence ........................................................................ 41

      C.     Plaintiffs' Decision to Combine the Berkeley and Oakland HSAs into One Market Confirms that HSAs Are Not Proper Antitrust Markets ................................ 50

      D.     Kaiser's Experience Further Shows that HSAs Are Not Proper Antitrust Markets ........................................................................................... 51

V.     Conclusion ................................................................................................ 56

## I.       Introduction

### A.       Qualifications

1.       I am the Arizona Public Service Professor of Economics at the University of Arizona. I earned my B.A. from Swarthmore College in 1991 and my Ph.D. in Economics from Yale University in 1995.  I have previously served as a visiting or regular faculty member at Harvard University, HEC Montreal, Universidad de los Andes (Chile), the University of Michigan, the University of Minnesota, Northwestern University, Washington University in St. Louis, and Yale University.  I am a Research Associate of the National Bureau of Economic Research and a recipient of a Doctorate *Honoris Causa* from the University of Oulu (Finland).

2.       I am an expert in the fields of industrial economics and health care economics.  I have taught courses on industrial organization, competitive strategy, health economics, microeconomic theory, and econometrics at the undergraduate and graduate levels.  My research has been published in leading Economics and Health Services journals, including the American Economic Review, Econometrica, Health Affairs, and the Journal of Political Economy.  I serve on the editorial boards of four economics journals, including the American Economic Review and the RAND Journal of Economics.

3.       I have received several research grants from the National Science Foundation, the Agency for Healthcare Quality and Research, and private foundations to support my research. I am frequently invited to present my work in keynote speeches, at professional conferences, and at invited seminars.  I have served as a consulting expert or expert witness on a number of antitrust cases on behalf of the Federal Trade Commission ("FTC"), state agencies, and private clients.  My curriculum vitae, including a list of my prior testimony, is attached as Appendix A.

### B.       Assignment

4.       I have been retained by Sutter Health to evaluate whether Plaintiffs' proposed markets, as set forth in the Fourth Amended Complaint filed in *Sidibe et al. v. Sutter Health,* constitute plausible relevant markets for purposes of antitrust analysis.  In particular, I assess whether geographic markets for Inpatient Hospital Services based on the geographic boundaries of Dartmouth hospital service areas ("HSAs") are appropriate to the task of

assessing Plaintiffs' claim that Sutter has engaged in anticompetitive tying of hospital services in the alleged "tying" markets to the purchase of hospital services sold in the alleged "tied" markets.  I conclude that they are not.

5.      Plaintiffs define twelve separate hospital markets that are based on Dartmouth HSAs, as defined by the Dartmouth Institute for Health Policy & Clinical Practice.[1]  Plaintiffs claim these regions "constitute economically-coherent relevant antitrust markets for the sale of Inpatient Hospital Services to health plans."[2]  In particular, Plaintiffs have identified twelve areas based on Dartmouth HSAs, eight of which they have claimed are "tying" markets in which Sutter is the only (or, in Berkeley-Oakland's case, largest) provider of Inpatient Hospital Services (Antioch, Auburn, Berkeley-Oakland (two HSAs combined), Crescent City, Davis, Jackson, Lakeport, and Tracy) and four of which they have claimed are "tied" markets (San Francisco, Sacramento, Modesto, and Santa Rosa).[3]  See *Figure 1*.

---

[1] Fourth Amended Complaint, *Sidibe et al. v. Sutter Health*, Sept. 29, 2017, ("Fourth Amended Complaint"), ¶¶ 3, 5.

[2] Fourth Amended Complaint, ¶¶ 4, 48.  Inpatient Hospital Services are defined by Plaintiffs to include "a broad group of medical and surgical diagnostic and treatment services that include an overnight stay in the hospital by the patient," but excluding:  1) services at Veterans Affairs and military hospitals; 2) services at outpatient facilities; and 3) psychiatric, substance abuse, and rehabilitation services.

[3] Fourth Amended Complaint, ¶¶ 4–5.

# Figure 1
# Plaintiff's Alleged Tied and Tying HSAs in Northern CA



Source:  California Office of Statewide Health Planning and Development Discharge and Financial Data, 2015; The
Dartmouth Atlas of Healthcare, 1996; US Department of Commerce, Census Bureau, County Boundary File; American
Hospital Association Annual Survey Data, 2015; Google Geocode API, 2017

6.      As *Figure 1* shows, these selected HSAs are not contiguous and do not capture all the HSAs with Sutter hospitals in the region, including HSAs that are adjacent to the twelve proposed tying and tied markets.  Plaintiffs do not provide any justification for the selection of these HSAs and not others containing Sutter hospitals.

7.      In the Fourth Amended Complaint, Plaintiffs appear to moderate their reliance on HSAs by stating that markets for Inpatient Hospital Services are only "roughly congruent" with HSAs.[4]  However, they do not clarify if, how, or on what basis they would modify HSAs to produce proper geographic markets.  In addition, while stating that their markets are "roughly congruent" with HSAs, Plaintiffs define their proposed markets by ZIP code, in a mapping that corresponds *exactly* to ZIP codes used by the Dartmouth Atlas to define those same HSAs.[5]  Accordingly, in evaluating the sufficiency of their proposed markets for antitrust analysis, I follow Plaintiffs' map and ZIP code definition of each "market," which correspond precisely to Dartmouth HSAs, with the exception of the proposed Berkeley-Oakland market, which is the combination of two Dartmouth HSAs.  I also confirm that slight modifications to HSAs would not change my conclusion that markets based on HSAs are insufficient for the purpose of antitrust analysis.

8.      In completing this assignment, I have reviewed materials reflecting the creation of the Dartmouth Atlas HSAs, hospital financial and discharge data from the California Office of Statewide Health Planning and Development ("OSHPD"), data on hospital characteristics from the American Hospital Association ("AHA"), recent court decisions assessing the proper geographic markets for the purpose of evaluating proposed hospital mergers, academic and legal work on tying and insurer-hospital negotiations, and other public information.  A listing of the materials I have relied upon is attached as Appendix B.

9.      I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.

10.      I am being compensated for my time on this matter at the rate of $850 per hour.  I also receive compensation from Cornerstone Research based on its collected staff billings for its

---

[4] Fourth Amended Complaint, ¶ 3.

[5] Fourth Amended Complaint, ¶¶ 55–67.  The ZIP codes listed in each of Plaintiffs' alleged markets correspond identically with the ZIP codes that the Dartmouth Atlas maps to HSAs, based on the 2015 ZIP code to HSA crosswalk.  Dartmouth Atlas of Health Care, "Zip code crosswalks," http://www.dartmouthatlas.org/tools/downloads.aspx?tab=39.

support of me in this matter.  My compensation in this matter is not in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

### C.     Summary of Opinions

11.     Based on my review of Dartmouth's methodology to construct HSAs, my understanding of hospital competition, and the analyses described below, I conclude that HSAs are not equivalent to antitrust markets and are not an appropriate basis for defining antitrust markets.  I appreciate that, because HSAs purport to define "local health care markets," the Court might view HSAs as at least potentially relevant to antitrust markets because of the use of the word "markets."[6]  However, as I discuss herein, the HSAs in question are very different from markets that are properly defined for the purpose of antitrust analysis.  Hence, they cannot be relied upon, as Plaintiffs do, to identify antitrust markets.  In sum:

- *Dartmouth Atlas HSAs were not constructed to be antitrust markets, are not equivalent to antitrust markets, and cannot be used to define antitrust markets.*
    - HSAs define stable geographic areas in which healthcare services are provided and consumed, but they were not designed for the purpose of antitrust analysis.
        - HSAs were constructed for the study of healthcare inputs and health outcomes across regions and over time.
        - The HSA methodology does not include the key element of antitrust market definition, which is identifying the set of firms that are substitutes for each other, and would provide purchasers with an alternative if one firm attempted to raise prices, lower quality, or engage in anticompetitive behavior.
    - The Dartmouth methodology is biased toward creating HSAs with one hospital and, as such, will tend to exclude rather than include potential substitutes to hospital(s) within an HSA.  The bias toward excluding potential substitutes demonstrates that HSAs are designed to meet different objectives and are not an appropriate basis for antitrust markets.
        - To construct HSAs, the Dartmouth methodology starts by placing each city or town with a hospital in a separate *candidate HSA*.  The Dartmouth methodology will only group two or more hospitals together in an HSA if: 1) there is more than one hospital in the city or town to start; 2) more of the discharges for residents of a city or town with a hospital take place in another single candidate HSA; or 3) combining candidate HSAs is needed to avoid discontinuous HSAs, or an HSA that is completely surrounded by another HSA.

---

[6] Dartmouth Atlas of Health Care, "About Our Regions," http://www.dartmouthatlas.org/data/region/.

- o Unsurprisingly, when HSAs were first constructed, eighty-two percent had only one hospital.  Currently, seventy-seven percent of California HSAs have either one or no non-Kaiser hospitals.
- o None of the conditions that would lead to more than one hospital being located in a single HSA ensures that all relevant substitutes will be included.  This means that none of these criteria ensures that an HSA will form an appropriate market for antitrust purposes.  To the contrary, HSAs tend to isolate hospitals
- o The Dartmouth methodology will separate even close competitors into different HSAs, in some cases.  Consider the example of three hospitals, located in nearby, small cities with one ZIP code each, where each hospital serves forty percent of its own city's resident discharges and thirty percent of the resident discharges from each of the other two cities.  Since each hospital serves a plurality of its own city's resident discharges, each would be in a different HSA.  Yet such hospitals would be actively competing with each other and serve as substitutes for residents and insurers for all three cities.  According to Plaintiffs' market definition, though, these hospitals would likely be in different markets.

– Dartmouth HSAs were constructed using decades-old data on discharges by Medicare enrollees.  These HSAs are not only inappropriate as the basis for antitrust analysis, but they would also not even meet the criteria of the Dartmouth methodology if it were applied to current data on commercial discharges, i.e., discharges for patients that are similar to the proposed class.

- o Dartmouth Atlas used data on hospitalizations of Medicare patients in 1992 through 1993.  Changes in medical care since the 1990s, hospital closures, and differences between Medicare patients and the population at issue in this case all contribute to differences in where patients seek care.
- o I evaluate Dartmouth HSAs using current hospital locations and current commercial discharges and find that many Dartmouth HSAs would not exist in their current form if they had been defined with the population at issue in this case.
- o Almost ten percent of HSAs no longer have a hospital within their borders.
- o For another thirty percent of HSAs, hospitals from another single HSA account for as many or more of the HSA's residents' commercial discharges than do hospitals *within* the HSA.
- o For example, more of the discharges for the residents of the Davis HSA (one of Plaintiff's alleged tying markets) take place in Sacramento hospitals (in the Sacramento HSA) than in Davis HSA hospitals.  Similarly, I calculate that an equal share of discharges (thirty percent) for residents of the Auburn HSA take place in the Auburn and the Roseville HSAs.  Since Auburn hospitals do not account for more of its residents' discharges than any other single HSA, Auburn would not meet the plurality criterion established by the Dartmouth Atlas.
- o The dissolution of HSAs that no longer meet the criteria of the Dartmouth methodology would lead to broader HSAs if the Dartmouth methodology were applied to current commercial discharges.  ZIP codes from HSAs that are no longer valid, and the hospitals they include, would be merged into other regions.

- A comparison of HSAs to geographic markets that were actually created for the purpose of antitrust analysis shows that HSAs do not constitute appropriate antitrust markets.

  - In the two most recent proposed hospital mergers that were litigated to judgment, both in 2016, the geographic markets that were accepted by the courts: 1) were not based on HSAs; and 2) included hospitals that are located in many different HSAs.
  - These decisions confirm that HSAs exclude relevant competitors for antitrust analysis, are not equivalent to antitrust markets, and do not form the basis for appropriate antitrust markets.

- *Dartmouth HSAs in California, including those identified by Plaintiffs as alleged tying and tied markets, exclude competitive alternatives and are inappropriate as antitrust markets.*

  - The HSAs that make up Plaintiffs' alleged tying markets exclude many nearby competitors.

    - Nearby hospitals outside the alleged tying HSAs are likely competitive alternatives to hospitals inside the HSA.  An HSA-based market definition would not recognize the competitive pressures that these hospitals exert and thus would be inappropriate for antitrust analyses.
    - HSAs exclude hospitals that are close to the hospitals within the HSA. Most hospitals in alleged tying HSAs have at least one non-Sutter hospital that is outside the HSA, but within a thirty minute drive of the hospital.
    - HSAs exclude hospitals that are close to residents of the HSA.  For most of the alleged tying HSAs, a significant share of discharges for HSA residents are for individuals who live within thirty minutes of a hospital outside the HSA.  Crescent City is an exception, stemming from its isolated geographic location on the coast of the Oregon-California border, but twenty-nine percent of Jackson HSA resident discharges are for individuals living within thirty minutes of a non-Sutter hospital outside the HSA, and forty-four percent or more of resident discharges for all other alleged tying discharges are for individuals living within thirty minutes of a non-Sutter hospital outside the HSA.

  - Patients frequently cross HSA borders, including the borders of the alleged tying and tied HSAs, to receive hospital care.

    - In fifty-two percent of the HSAs in California, a majority of resident discharges take place outside the HSA, despite there being a hospital within the HSA.
    - In several of the alleged tied and tying HSAs, a significant proportion of residents' discharges take place in hospitals that are outside the patient's HSA of residence.  In four alleged tying HSAs—Antioch, Auburn, Davis, and Lakeport—more than fifty percent of residents' discharges take place in hospitals outside the HSA.
    - Similarly, many of the discharges that take place at hospitals within an HSA represent care for patients coming from outside the HSA.
    - These discharge flows demonstrate significant patient substitution between hospitals across different HSAs, indicating that patients consider hospitals

in different HSAs to be attractive alternatives and that insurance plans could, in many instances, successfully leverage hospitals in different HSAs against each other in contract negotiations. The fact that HSAs would isolate these competitive alternatives instead of combining them into a single market again demonstrates that HSAs are not equivalent to antitrust markets and cannot be used as the basis for antitrust markets.

– Plaintiffs' decision to combine the Berkeley and Oakland HSAs into one alleged market underscores the insufficiency of HSAs as proper antitrust markets. By combining Berkeley and Oakland, Plaintiffs concede that HSAs do not define antitrust markets. However, they offer no criteria to determine what other HSAs do not constitute a geographic market on their own, or even whether the combined Berkeley-Oakland region forms a proper antitrust market.

– The success of the Kaiser system, including in HSAs without a Kaiser hospital, illustrates that it is possible to successfully market a health insurance plan to residents of an HSA without an in-network hospital within the HSA.

  o In Plaintiffs' proposed tying and tied HSAs without a Kaiser hospital, thirty percent of residents' discharges are still accounted for by Kaiser hospitals. This means not only that those patients left the HSA to obtain hospital services, but that they signed up for Kaiser insurance understanding that they would not have an in-network hospital within their HSA (except in the case of emergency or other special circumstances).

  o Kaiser's success shows that insurers could leverage hospitals in different HSAs against one another when negotiating with hospitals. Thus, HSAs do not, in general, include the full set of relevant competitors for evaluating market power and alleged anticompetitive actions—they are not relevant geographic markets for antitrust purposes.

## II.    Hospital Market Definition for Antitrust Analysis

### A.    Market Definition in Tying Cases

12.    Plaintiffs' theory of tying requires that there be markets in which Sutter has substantial market power (the tying markets) and markets where Sutter must compete with other providers (the tied markets).[7]  Plaintiffs claim that Sutter leverages monopoly power in the alleged tying markets to extract higher prices and more favorable terms for its hospitals in the alleged tied markets than it would otherwise be able to negotiate with insurers.[8]  In other words, Plaintiffs contend that Sutter "ties" access to its inpatient services in those markets

---

[7] Whinston, Michael D., "Tying, Foreclosure, and Exclusion," *American Economic Review* 80, no. 4, September 1990, pp. 837–859 at p. 837 ("[T]ying provides a mechanism whereby a firm with monopoly power in one market can use the leverage provided by this power to foreclose sales in, and thereby monopolize, a second market.").

[8] Fourth Amended Complaint, ¶¶ 5–7.

where it faces little or no competition to network inclusion, higher prices, and other favorable treatment for its inpatient services in markets that would otherwise be competitive.

13.     Plaintiffs' tying claims depend on the identification of distinct, economically supportable tying and tied markets.[9]  Without a separation between the alleged tying and tied markets there cannot be a claim that market power in *one market* is being used to extract supra-competitive prices in *another market*.[10]

14.     Additionally, the theory of tying requires that Sutter has substantial market power in the alleged tying markets.  Market power can be defined as the ability to raise prices above the competitive level.  It depends on a lack of alternatives.[11]  If Sutter does not have sufficient market power to elevate prices in the alleged tying markets, it cannot be expected to use its position in those markets to extract supra-competitive prices in other markets.  In the current case, the sole hospital in a city, county, or HSA might still lack market power if patients in the region are willing to seek care at outside hospitals and insurers are able to leverage the presence of those alternative hospitals to negotiate lower prices.

15.     To determine whether or not Sutter has market power, it is necessary to define a set of appropriate markets over which that power can be evaluated.  An economically-coherent market, for the purpose of antitrust analysis, should include the firms and products[12] that are close substitutes to each other, from the point of view of purchasers.[13]  Firms that are

---

[9] Plaintiffs also have monopolization claims that are based on the same proposed relevant geographic markets. Thus, my analysis throughout this report addresses both the tying and the monopolization claims. See Fourth Amended Complaint, ¶ 153.

[10] Ahlborn, Christian, David S. Evans, and A. Jorge Padilla, "The Antitrust Economics of Tying: a Farewell to Per Se Illegality," *The Antitrust Bulletin*, Spring 2004, pp. 287–341 at pp. 292–294 ("The elements of the per se approach … (b) Tying arrangements:  Firms with significant market power were prohibited from entering into tying arrangements, i.e. to force customers to purchase a tied product along with the 'separate' tying product … Establishing 'separate products' is not enough, however.  A key element of tying 'is the forced purchase of a second distinct commodity.'"); ABA Section of Antitrust Law, "Restraints of Trade" in *Antitrust Law Developments (Eighth)*, ed. Darren S. Tucker et al. (American Bar Association, 2017), p. 175 ("Two Supreme Court cases, *Eastman Kodak Co. v. Image Technical Services* and *Jefferson Parish*, provide the modern framework for antitrust analysis of tying claims.  To begin, there can be no unlawful tie-in unless the arrangement involves two separate products.").

[11] Davis, Peter and Eliana Garces, *Quantitative Techniques for Competition and Antitrust Analysis*, (Princeton, NJ:  Princeton University Press, 2010), p. 162 ("Market power is sometimes defined as the ability of a firm to raise the prices of its products above the competitive level.  If a firm faces many substitutes for its products, the market power of the firm will be limited.").

[12] "Products" also includes services throughout my report.

[13] Davis, Peter and Eliana Garces, *Quantitative Techniques for Competition and Antitrust Analysis*, (Princeton, NJ:  Princeton University Press, 2010), pp. 162–163 ("When we define the relevant competition policy market, we are attempting to define the set of products that impose constraints on each other's pricing or other dimension of competition (quality, service, innovation)… Market definition for competition policy purposes is directly related to the concept of market power… The key factors that limit market power—the ability to raise prices above the competitive level—are the extent of demand substitutability and the extent and nature of supply reaction...").  Also see United States Department of Justice and Federal Trade Commission, "The Horizontal

substitutes to each other offer purchasers potential alternatives when one firm raises its prices, reduces quality, imposes restrictive contract terms, or engages in other behavior that reduces the value that purchasers receive.  The threat of losing sales to such alternatives can limit the incentive and ability of a firm to engage in anticompetitive conduct.[14]  A firm with market power is one that does not face sufficient competitive alternatives that prevent it from increasing prices.

16.     The *Horizontal Merger Guidelines* from the U.S. Department of Justice and Federal Trade Commission, which numerous courts have adopted, offer a precise way to define a relevant antitrust market:  the hypothetical monopolist test.[15]  The test specifies how to construct a set of substitutes that would discipline a firm's attempts to raise prices.  Under the test, a market is composed of the smallest set of products such that a hypothetical monopolist that controlled all those products could profitably impose a small, but significant and non-transitory increase in price (a "SSNIP").[16]  If a hypothetical monopolist that imposed a SSNIP would lose so many purchasers to products outside the proposed market that the SSNIP would be unprofitable, then the proposed market is too small.  It should then be expanded to include those products to which individuals would have shifted in response to the hypothetical monopolist's price increase.[17]  Hence, the relevant market identified by this

---

Merger Guidelines," August 19, 2010 ("Horizontal Merger Guidelines, 2010"), p. 7, available at https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf ("Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase…").

[14] Davis, Peter and Eliana Garces, *Quantitative Techniques for Competition and Antitrust Analysis*, (Princeton, NJ:  Princeton University Press, 2010), pp. 162–163 ("If a firm faces many substitutes for its products, the market power of the firm will be limited…if consumers can relatively easily switch to alternative energy sources, perhaps gas or coal, the monopoly electricity provider's ability to raise prices profitably will be heavily constrained – it cannot raise the price beyond the point where too many consumers would switch.").

[15] Varney, Christine A., "The 2010 Horizontal Merger Guidelines:  Evolution, Not Revolution," *Antitrust Law Journal* 77, no. 2, 2011, pp. 651–660 at p. 653 ("Innovative at the time of its adoption in 1982, the test [hypothetical monopolist test] is now well-established.  The horizontal merger complaints filed by the Department since the 1982 Guidelines have defined markets under the test.  Courts have embraced the analytical rigor it gives the relatively general pronouncements of the Supreme Court.  Moreover, it has been adopted in many jurisdictions outside the United States.").

[16] Horizontal Merger Guidelines, 2010, pp. 9–10 ("The test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypothetical monopolist") likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market, including at least one product sold by one of the merging firms.").

[17] Davis, Peter and Eliana Garces, *Quantitative Techniques for Competition and Antitrust Analysis*, (Princeton, NJ:  Princeton University Press, 2010), pp. 163–164 ("If, when a firm attempts to increase its price, "enough" of her customers switch to substitute goods, then clearly her ability to raise prices is severely constrained.  We want to include substitute products in our competition policy market whenever "enough" buyers, in a sense that will be made more precise below, would switch in response to a price increase.  Of course, goods to which consumers do not switch in response to a price increase should be excluded from the market.").

test will include close substitutes to the products in question (if they exist); these are the products that are capable of exerting pressure on the prices of other products in the market.

17.    At the same time, an antitrust market defined under the hypothetical monopolist test will exclude distant substitutes that would not constrain prices as needed to prevent a SSNIP.[18]  If the hypothetical monopolist imposed a SSNIP and only a small fraction of individuals switched to products outside the market, the SSNIP may still be profitable.  The higher price charged to purchasers that continued to buy from the hypothetical monopolist would outweigh the profits lost from purchasers that switched to other suppliers.  The SSNIP test would conclude that these products are too distant to constrain prices and should not be included in the antitrust market.

18.    To assess whether HSAs, or roughly congruent areas, constitute an economically-coherent market for the purpose of antitrust analysis, I consider whether the methodology that creates HSAs groups sets of hospitals that are economic substitutes for each other, or if, in contrast, the methodology tends to divide hospitals that compete with each other into different HSAs.  In particular, I consider whether the specific HSAs that constitute Plaintiffs' alleged tying and tied markets will tend to isolate hospitals within these HSAs from potential substitutes that should be part of an analysis of Sutter's alleged ability to impose anticompetitive contract terms.

### B.    Hospital Competition

19.    To evaluate whether a proposed market for Inpatient Hospital Services includes the set of hospitals that are sufficiently close substitutes to act as competitive constraints, it is necessary to consider how hospitals compete with one another.  Hospital competition occurs in two stages:  negotiation with insurers and competition for patients.[19]

20.    In the first stage, hospitals negotiate with insurers for reimbursement and contract terms upon inclusion in the insurers' networks.[20]  Insurers generally offer lower copays and coinsurance to their enrollees who seek care at in-network hospitals, making in-network

---

[18] Horizontal Merger Guidelines, 2010, pp. 9–10.

[19] Academic research has often modeled hospital competition in these two stages.  See Vistnes, Gregory, "Hospitals, Mergers, and Two-Stage Competition," *Antitrust Law Journal* 67, 1999–2000, pp. 671–692 at p. 672 ("Hospital competition is modeled as a two-stage game.  In the first stage, hospitals compete to be included in a plan's hospital network.  In the second stage, hospitals compete for a plan's individual enrollees, with that competition affected by whether a hospital is in the plan's network.").

[20] See footnote 19.

hospitals less expensive and more attractive to patients than out-of-network hospitals.[21]  In contrast, insurers generally impose higher copays and coinsurance if patients seek care at hospitals that are out of the insurer's network.[22]  Hence, if a hospital is in an insurer's network, it is likely to attract more patients from that insurer.  The insurer will use the availability of other nearby attractive hospitals as bargaining leverage in negotiations with in-network hospitals.  In particular, insurers can leverage the presence of multiple hospitals that offer similar services to negotiate favorable rates from hospitals.[23]

21.    In the second stage of hospital competition, hospitals compete for patients.[24]  When individuals require hospital care, they generally evaluate hospitals based on cost, on the time it takes to travel to the hospitals, on where their physicians refer them, and on the hospitals' quality or reputation.[25]  Hospitals may compete by attracting good physicians, investing in

---

[21] See, for example, Cigna, "In-Network vs. Out-of-Network," https://www.cigna.com/healthwellness/know-your-benefits/health-care-cheat-sheet/network; Blue Cross Blue Shield, "What's the Difference between In-Network and Out-of-Network Benefits?" http://www.bcbsm.com/index/health-insurance-help/faqs/topics/how-health-insurance-works/difference-between-in-network-out-of-network-benefits.html; Aetna, "Save Money by Staying in Network," https://www.aetna.com/individuals-families/using-your-aetna-benefits/network-out-of-network-care.html.

[22] For some managed care products, insurers may not pay for any non-emergent claim from out-of-network providers.  See, for example, FAIR Health, "In-Network vs. Out-of-Network Care," 2013, https://www.feeestimator.org/uploads/patient_material/14/In_Network_Vs_Out_of_Network_Care.pdf.

[23] Argue, David A. and Richard T. Shin, "An Innovative Approach to an Old Problem:  Hospital Merger Simulation," Antitrust 24, no. 1 , 2009, pp. 49–54 at p. 51 ("Imagine a scenario in which merging community hospitals are similar to each other and are similar to community hospitals that already are included in the network.  The incremental value to enrollees of adding either of the merging hospitals to a network that already includes close substitutes will be low.  The low incremental value to enrollees means that the merged hospital has little bargaining power to get a price from the health plan that is greater than the hospital's economic costs."); Town, Robert and Gregory Vistnes, "Hospital Competition in HMO Networks," *Journal of Health Economics* 20, 2001, pp. 733–753 at p. 734 ("Hospital's bargaining position with a plan, and hence its price, depend on the incremental value that hospital brings to the plan's network.  A hospital's incremental value, in turn, is a function of the plan's opportunity cost of turning to its next-best alternative network that excludes the hospital.  That opportunity cost depends importantly on how well the alternative network provides the scope of coverage the plan's enrollees want (in terms of both perceived quality and access).").

[24] See footnote 19.

[25] Gowrisankaran, Gautam, Aviv Nevo, and Robert Town, "Mergers When Prices Are Negotiated:  Evidence from the Hospital Industry," *American Economic Review* 105, no. 1, 2015, pp. 172–203 at p. 178 ("For each realized illness...the patient seeks hospital care at the hospital which gives her the highest utility, including an outside option.  The utility that patient $i$ receives from care at hospital $j$ ... is given by [equation (1)]. In equation (1), $x_{ijd}$ is a vector of hospital and patient characteristics including travel time, hospital indicators, and interactions between hospital and patient characteristics… The out-of-pocket expense to the patient is $c_{id}w_{d}p_{m(i)j}$… hence we treat out-of-pocket expense as observable [in equation (1)]"); Gaynor, Martin, and Robert J. Town, "Competition in Health Care Markets," *Handbook of Health Economics* 2, ed. Mark V. Pauly, Thomas G. Mcguire and Pedro P. Barros (Massachusetts:  North Holland, 2012), pp. 499–637 at p. 526 ("The utility that patients receive depends on the characteristics of the hospital (e.g., the services offered and the perceived quality of care."); Ho, Kate and Ariel Pakes, "Hospital Choices, Hospital Prices, and Financial Incentives to Physicians," *American Economic Review* 104, no. 12, 2014, pp. 3841–3884 at p. 3842 ("The process by which a patient chooses a hospital involves multiple players.  Decisions are made by referring physicians in consultation with their patients.").

facilities and treatments, and offering better patient amenities.[26]  Patients may view hospitals as substitutes if they are relatively close in terms of price, convenience, and quality for the type of care needed.

22.     These two stages of competition are related, with the set of hospitals that patients view as substitutes influencing the set of hospitals that will be substitutes to insurers constructing a provider network.[27]  If patients strongly prefer to receive care at a particular hospital—say, for instance, the only highly reputed academic medical center within an hour's drive—then individual enrollees or plan sponsors (e.g., employers) will favor insurance plans that include these hospitals in-network.  In such a case, the hospital that is strongly preferred by patients lacks close competitors in the first stage of competition, when reimbursement and contract terms are negotiated with insurers.[28]  Alternatively, if patients in almost all circumstances would be willing to seek care at other hospitals if a particular hospital were out of network, then they will care less about the inclusion of that hospital in an insurer's network.  Enrollees will be more willing to accept an insurer's plan without that hospital included in-network, which means in turn that the hospital will add less value to the insurer.  The hospital will thus not have much leverage when negotiating prices with insurers in the first stage of competition.

---

[26] Vistnes, Gregory, "Hospitals, Mergers, and Two-Stage Competition," *Antitrust Law Journal* 67, no. 3, 2000, pp. 671–692 at p. 682 ("… second-stage competition takes place primarily over non-price dimensions.  For example, hospitals may compete for individual patients by providing private rooms, offering labor-delivery-recovery rooms for maternity care, advertising the friendliness of their nursing staff, or improving the physical appearance of the hospital.").

[27] Vistnes, Gregory, "Hospitals, Mergers, and Two-Stage Competition," *Antitrust Law Journal* 67, no. 3, 2000, pp. 671–692 at pp. 673–674 ("With respect to managed care, hospitals compete at two different, and sequential, stages. In the first stage, hospitals compete to be included in a plan's hospital network.  In the second stage, hospitals compete to attract individual enrollees of a plan… First-stage competition represents competition for preferential access to a health plan's enrollees.  Hospitals seek preferential access because it increases the number of patients they will capture in the ensuing second stage of competition.  A critical means of gaining access to a plan's enrollees is to join the plan's hospital network.  First-stage competition requires hospitals to make themselves attractive to plans.  One way hospitals might attract plans is to increase their attractiveness to plan enrollees; for example, a hospital might expand or modernize its cardiac wing. In this way, the two stages of competition are interrelated.")

While the set of hospitals that are substitutes from the point of view of patients will be related to the set of hospitals that are substitutes from the point of view of insurers, they are not identical.  Patients select hospitals for specific purposes and may substitute between two hospitals that they would not consider substitutes when selecting an insurance plan.  For example, an enrollee in her thirties may consider two hospitals to be substitutes when selecting routine care for herself, but only one may have the pediatric care necessary if her child were to fall ill, while the other may have a superior ER in the case of an emergency.  An insurer offering plans would not be able to replace one hospital with the other when constructing a provider network.

[28] Ho, Katherine, "Insurer-Provider Networks in the Medical Care Market," *American Economic Review* 99, no. 1, March 2009, p. 408 ("The hospital may be sufficiently differentiated from its competitors that all or most consumers are willing to pay more for its services than for other hospital in the market and are willing to switch plans to access it.  This is most likely for hospitals that offer very high-tech services, teaching hospitals, and hospitals with a high reputation for quality.").

23.     It is critical in this case to understand whether HSAs—Plaintiffs' proposed markets—include a hospital's competitors at the first stage of competition where reimbursement and contract terms are negotiated between hospitals and insurers.  The allegations of tying imply that an insurer must negotiate in-network status with at least one hospital in each HSA.[29] Because Sutter is the lone hospital in some HSAs (many of the alleged tying markets), Plaintiffs allege that Sutter is able to leverage that position when negotiating with insurers in the HSAs that do include alternative hospitals (the alleged tied markets).  My analysis in the following sections will address whether HSAs include the relevant set of competitors both at the stage of competition when network terms are negotiated and at the stage when patients choose between hospitals.  I find that HSAs were not designed for this purpose, and that they do not in fact include the full set of substitutes that insurers can use to construct marketable healthcare plans.  Hence, HSAs, or areas roughly congruent with them, are not appropriate antitrust markets.

### III.     Dartmouth Atlas HSAs Were Not Constructed for the Purpose of Antitrust Analysis and, by Design, Tend to Exclude Rather Than Include Relevant Substitutes

24.     Plaintiffs have proposed twelve geographic markets for Inpatient Hospital Services, each of which is based on Dartmouth Atlas HSAs.  Eleven of their twelve proposed markets are defined by existing HSAs, and the twelfth proposed market is the combination of two HSAs, Berkeley and Oakland.[30]  Plaintiffs do not explain why they have combined the last two HSAs to define a single market, nor do they offer any criteria that they have used to determine when pre-defined HSAs form appropriate antitrust markets and when they must be altered.  As a result, much of my analysis in this section focuses on whether HSAs are themselves appropriate antitrust markets.  I discuss Plaintiffs' decision to combine the Berkeley and Oakland HSAs in Section IV.C.

25.     In this section, I explain how HSAs were constructed, that they were not defined with the purpose of identifying markets for antitrust analysis, and that they tend to exclude hospitals' economic substitutes.  Instead of being designed to uncover a set of relevant substitute hospitals, HSAs were constructed to separate hospitals into distinct regions.  This methodology tends to exclude rather than include competitive alternatives.  The use of

---

[29] Fourth Amended Complaint ¶¶ 5–6.

[30] Fourth Amended Complaint ¶¶ 4–5, 55–67.

*Medicare* discharge data from *1992 and 1993* to create Dartmouth HSAs exacerbates the error in using HSAs as the basis for antitrust markets for Inpatient Hospital Services delivered to *commercial patients*, *decades later*.[31]  A comparison of Dartmouth HSAs to antitrust markets as defined by enforcement agencies in recent proposed hospital merger evaluations confirms that HSAs can exclude relevant substitutes that should be part of appropriate antitrust markets.  Since HSAs are not constructed to include all competitively relevant substitutes, which is foundational to identifying an appropriate antitrust market, it is entirely inappropriate to use HSAs as the basis for market definition in antitrust analysis.

### A.     Dartmouth Atlas HSAs Were Not Intended to Serve as Antitrust Markets

26.     In 1996, the Center for the Evaluative Clinical Sciences at Dartmouth Medical School published the first edition of the Dartmouth Atlas of Health Care.[32]  The Dartmouth Atlas defined 3,436 hospital service areas ("HSAs") which, according to the Dartmouth Atlas group, represent "the geographic boundaries of naturally occurring health care markets in the United States."[33]  Plaintiffs, not Dartmouth, put forth these HSAs as "economically-coherent relevant antitrust market[s] for the sale of Inpatient Hospital Services to health plans."[34]  In fact, despite Dartmouth describing these regions as "naturally occurring healthcare markets," HSAs were not designed to be used for antitrust purposes and unsurprisingly typically are not an appropriate basis for defining *antitrust markets*.

27.     The introduction to the 1996 Dartmouth Atlas describes the motivation for the construction of the HSAs.  As the first sentence of the introduction notes, "[h]ealth services researchers have long been aware of large variations in the use of medical care among

---

[31] The Center for the Evaluative Clinical Sciences, "The Dartmouth Atlas of Health Care in the United States," Dartmouth Atlas of Health Care, 1996 ("Dartmouth Atlas 1996"), p. 13, http://www.dartmouthatlas.org/downloads/atlases/96Atlas.pdf.

Dartmouth has not updated HSAs with more recent discharge data to facilitate comparisons over time. However, because ZIP codes change from year to year, the mapping of ZIP codes to individual HSAs occasionally changes.  Dartmouth will reassign a ZIP code from one HSA to another if the ZIP code:  1) expands in such a way that it spans two HSAs and the population centroid of the ZIP code, as determined by the US Post Office, shifts from one HSA to the other; or 2) spans two HSAs and is split into separate ZIP codes in such a way that the population centroid of a redefined ZIP code is now in another HSA.  Dartmouth Atlas Interview with Kristy Bronner and Ali Sharp, September 20, 2017.  These reassignments are based on population data and do not take into account contemporaneous discharge data.

Between 2011 and 2015, fifteen ZIP codes were added to or dropped from the alleged tying and tied HSAs, which represents four percent of ZIP codes in these HSAs.  See workpaper 1.

[32] Dartmouth Atlas 1996.

[33] Dartmouth Atlas 1996, p. 5.

[34] Fourth Amended Complaint, ¶ 4.

communities and regions."[35]  According to the Dartmouth Atlas, this variation leads to a number of questions, including:  how should health resources be allocated and utilized; how do variations in resource allocation impact population health; and is the current geographic variation in medical care fair?[36]  The Dartmouth Atlas focused on providing information needed to answer these questions, including information on the variation in hospital resources and expenditures, hospital utilization and capacity, Medicare reimbursements, the physician workforce, the use of diagnostic and surgical procedures, and benchmarks on utilization of medical resources across regions.[37]  To facilitate comparisons over time, the Dartmouth Atlas has not redefined HSAs since they were first constructed, meaning that HSAs continue to be defined based on discharge data from 1992–1993.[38]

28.     The methodology used to construct the HSAs was suited to meeting these aims—i.e., the creation of a stable set of non-overlapping regions, or marketplaces in which healthcare services are provided, and across which variation in health care inputs and outcomes could be measured and tracked over time.  However, this methodology was not suited to the creation of *antitrust markets* because it does not make any attempt to evaluate whether neighboring hospitals compete with each other or whether patients or insurers view these hospitals as substitutes.  As such, HSAs, or regions roughly congruent with HSAs, are not equivalent to antitrust markets and are not an appropriate basis for antitrust analyses.

### B.     The Dartmouth Atlas HSA Construction Methodology Is Biased Towards Creating Single-Hospital HSAs that Exclude Competitive Alternatives

29.     Dartmouth Atlas HSAs were not defined by identifying the set of competing firms that could serve as substitutes for patients and commercial health insurers.  Instead, Dartmouth Atlas HSAs were created in a way that tended to isolate hospitals in separate regions, often with the effect of creating HSAs that included only a single hospital without

---

[35] Dartmouth Atlas 1996, p. 2.

[36] Dartmouth Atlas 1996, pp. 2, 4.

[37] Dartmouth Atlas 1996, pp. 5–7.

[38] Dartmouth Atlas of Health Care, "About Our Regions," http://www.dartmouthatlas.org/data/region/ ("When these regions were created in the early 1990s, most hospital service areas contained only one hospital.  In the intervening years, hospital closures have left some HSAs with no hospital; these HSAs have been maintained as distinct areas in order to preserve the continuity of the database.").  Also see footnote 31 for how Dartmouth updates ZIP code to HSA mapping.  Updates are not based on updated discharge data.

regard to competitive alternatives to the hospital within the HSA.  I demonstrate this below by reviewing the three-step process used by the Dartmouth Atlas group for HSA definition.[39]

30.     Dartmouth Atlas's three-step process is as follows:

- First, each acute care hospital in the United States in 1992 was assigned to the town or city where it was located.  The 3,953 towns or cities that contained at least one acute care hospital were then defined as "candidate HSAs."[40]  If a town contained only one hospital, the candidate HSA would only have one hospital.[41]

- Second, using Medicare discharge data for 1992 and 1993, each ZIP code was then assigned to one of the 3,953 candidate HSAs.[42]  All ZIP codes were assigned to the candidate HSA where the plurality (i.e., the single largest share, even when not a majority) of Medicare discharges for residents from that ZIP code had been hospitalized.[43]

  Any candidate HSA for which a plurality of its residents' Medicare hospitalizations took place in another candidate HSA was eliminated as a candidate HSA.  In other words, if more of the Medicare discharges for residents of a city took place in another specific city, despite the fact that both have local hospitals, then the first city would be eliminated as a candidate HSA.[44]  Roughly 500 of the candidate HSAs were eliminated in this manner and their ZIP codes assigned to other candidate HSAs.[45]

  Together, steps one and two define a set of candidate HSAs and a set of hospitalizations for each candidate HSA.

---

[39] Dartmouth Atlas 1996, p. 12.

[40] Dartmouth Atlas 1996, pp. 12–13, 200.  Dartmouth Atlas's list of acute care hospitals was generated from 1993 provider files from Medicare and the American Hospital Association.  See The Center for the Evaluative Clinical Sciences, Dartmouth Medical School, Dartmouth Atlas of Health Care, "Research Methods," p. 2, http://www.dartmouthatlas.org/downloads/methods/research_methods.pdf.

[41] Many candidate HSAs would have had only one hospital.  2,830 of the 3,436 HSAs (eighty-two percent) contained only one hospital.  See Dartmouth Atlas 1996, p. 16.  Since the following steps combine hospitals from different candidate HSAs into the same HSA, I can conclude that many candidate HSAs only had one hospital.

[42] Dartmouth Atlas 1996, pp. 13, 200.  These Medicare records contained both the hospital location of each individual hospitalization and the patient's home ZIP code.  See Dartmouth Atlas 1996, p. 12.

[43] Dartmouth Atlas 1996, pp. 13, 200.  A plurality may also be a majority, but does not need to be.  If forty percent of an HSA's residents' discharges took place in HSA A, thirty percent took place in HSA B, and thirty percent took place in HSA C, the plurality took place in HSA A, but no single HSA accounted for a majority of discharges.  If sixty percent of discharges took place in HSA A and forty percent took place in HSA B, then a plurality and a majority took place in HSA A.

[44] The exact criterion in the Dartmouth Atlas is a "town or city" but, for brevity, I sometimes refer to such entities as a "city" in this declaration.  See Dartmouth Atlas 1996, p. 200.

[45] Dartmouth Atlas 1996, p. 200.

- Third, the Dartmouth Atlas group visually examined the boundaries of each HSA and performed manual adjustments to achieve contiguous HSAs. These manual adjustments included the reassignment of "island" ZIP codes, which had been assigned to a non-contiguous HSA, to the HSA that surrounded them.[46]

### 1. The Dartmouth Atlas Methodology Tends to Separate Hospitals into Different HSAs

31. This methodology, while useful for comparing healthcare utilization resources and other trends across a set of geographically distinct regions, is biased towards producing "markets" that contain a single hospital, as opposed to markets that include the sets of hospitals that consumers may view as competitors. The methodology begins with the assumption that every city which contains a hospital constitutes a separate "candidate HSA."[47] This assumption is made for cities that are geographically isolated from other population centers, as well as for cities that are adjacent to other cities with competing hospitals. It is made for large sprawling cities, as well as for smaller cities. And it is made regardless of whether the hospital included is a community hospital with a local patient base or an academic medical center that attracts patients from across the nation. In fact, there are only three ways in which a Dartmouth Atlas HSA would ever contain more than one hospital, none of which occur frequently, and none of which would assure that competitive substitutes are included in a single HSA.

32. First, a given town or city could contain multiple hospitals within its geographic borders. While this is a common way that an HSA could include more than one hospital, it occurs relatively infrequently. For example, in 2015, only eighteen percent of California cities that contained at least one acute care hospital (excluding Kaiser hospitals) contained more than one such hospital.[48] Even in these cases, there is no assurance that hospitals in neighboring cities do not also serve as attractive alternatives for patients and insurers. See *Figure 2.*

---

[46] Dartmouth Atlas 1996, p. 200. In some unspecified situations, candidate HSAs were grouped into larger HSAs, possibly to prevent the formation of an HSA enclave within a larger HSA. "Point ZIPs," which did not correspond to a geographic area (such as nursing homes or post offices), were assigned to their enclosing geographic ZIP code.

[47] Dartmouth Atlas 1996, p. 200.

[48] Based on numbers in *Figure 2,* I calculate $0.18 = (0.031 + 0.052) \div (0.031 + 0.052 + 0.384)$.

California Code does not distinguish between cities and towns. See California Code, Government Code – GOV §34502,
https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=GOV&division=2.&title=4.&part=1.&chapter=3.&article=.

# Figure 2
# Most California Cities and HSAs Have Either One Hospital, or None[1]

|  |  | No Hospital | One Hospital | Two Hospitals | More than Two Hospitals |
|---|---|---|---|---|---|
|  | **Excluding Kaiser Hospitals** |  |  |  |  |
| 1. | Cities[2] | 53.3% | 38.4% | 5.2% | 3.1% |
| 2. | HSAs[3] | 9.5% | 68.0% | 12.2% | 10.4% |
|  | **Including Kaiser Hospitals** |  |  |  |  |
| 3. | Cities[2] | 51.5% | 38.2% | 6.9% | 3.5% |
| 4. | HSAs[3] | 7.7% | 64.4% | 16.7% | 11.3% |

Source:  California Office of Statewide Health Planning and Development Discharge and Financial Data, 2015; American Hospital Association Annual Survey Data, 2015; United States Census Bureau, 2016 FIPS Codes; The Dartmouth Atlas of Healthcare, 1996

Note:
[1] Hospitals counted are hospitals that exist in the OSHPD Discharge Data and are classified by the AHA as being non-federal and with a primary service of: "General medical and surgical," "Children's general", "Surgical," "Heart," "Cancer," "Obstetrics and gynecology," or "Children's Orthopedic."
[2] There are 482 cities in California.
[3] There are 222 HSAs in California.

33.     Second, a plurality of Medicare discharges for residents in a given city containing an acute care hospital could take place in another city (i.e., more resident discharges take place in one other specific city than in the city of their residence).  While patients often travel for care, it is relatively uncommon that a plurality of the discharges for residents in a city with its own hospital would be accounted for by hospitals in a single, different city.  This could be the case where the hospital in a city was small relative to the population's needs, offered limited services, or was of lower perceived quality, *and* a single nearby city had a hospital(s) that better met the needs of the first city.  In fact, only about thirteen percent of candidate HSAs were incorporated into other HSAs based on this criterion.[49]

34.     This "plurality criterion" does result in Dartmouth combining certain competitive alternatives into a single HSA.  However, it does not ensure that each HSA will contain the set of substitute hospitals that are relevant for antitrust analysis.  Applying the plurality criterion is not equivalent to evaluating the potential competitors to a hospital(s) in a city.  A nearby city need not serve a plurality of discharges from another city in order for its hospitals to be strong enough competitors to be included in an antitrust market.  Hospitals that compete could remain in separate candidate HSAs even in instances where:  one hospital outside an HSA accounts for as many or more hospitalizations than individual hospitals within the HSA;[50] hospitals outside the HSA are closer to some residents than hospitals within the HSA;[51] or the majority of patients leave the HSA for hospital care.[52]  Even in those instances in which two candidate HSAs are combined, hospitals outside the new combined region may serve as close substitutes for hospitals in the first candidate HSA, the second candidate HSA, or both.

35.     Third, the Dartmouth Atlas group could have incorporated one HSA into another during a process of visual examination.[53]  Visual examination ensured geographic contiguity, including by incorporating isolated "island" ZIP codes into bordering HSAs.  In most cases, this process likely occurred with single ZIP codes that did not contain hospitals.  In some

---

[49] Dartmouth Atlas 1996, p. 200.

[50] See workpaper 2.  There are fifty-three HSAs where the hospital with the most discharges for residents of that HSA accounts for fewer discharges than a hospital outside the HSA.  For instance, Alameda Hospital in the Alameda HSA accounts for fewer discharges of Alameda residents than Alta Bates Hospital in the Berkeley HSA.

[51] See Section IV.A and *Exhibit 8*.

[52] See Section IV.A and *Figure 5*.

[53] Dartmouth Atlas 1996, p. 200.

cases, however, the group may have incorporated one HSA into another in order, for example, to prevent an HSA from being an enclave surrounded by a larger HSA.[54]  The Dartmouth Atlas group did not document which HSAs or exactly how many it combined in this way, but the number appears to be extremely low.[55]

36.     Consistent with the fact that the Dartmouth Atlas methodology would be expected to produce single-hospital HSAs in most circumstances, the vast majority of HSAs contain only one acute care hospital.  When HSAs were first defined, eighty-two percent contained only a single acute care hospital.[56]

37.     *Exhibits 1A* and *1B* show the HSAs identified by Plaintiffs in their complaint, the surrounding HSAs, and the acute care hospitals located in this region.  Since California, including sections of Northern California, is more densely populated than the U.S. as a whole, a higher proportion of its cities contain multiple hospitals (leading to a lower proportion of single-hospital HSAs).[57]  Still, as of 2015, only twenty-three percent of California HSAs contained more than one hospital, excluding Kaiser hospitals.[58]  Well over half (sixty-eight percent) of California HSAs contained a single acute care hospital, again excluding Kaiser hospitals.[59]  An additional twenty-two HSAs in California—ten percent of the total—have no acute care hospital operating within their borders, meaning that all of the patients living in that HSA leave the HSA to obtain inpatient hospital care.[60]  HSAs without a single hospital can be explained by hospital consolidations and closures since 1992–1993, together with the fact that the Dartmouth Atlas HSAs have not been updated with more recent discharge data since their definition in that period.[61]

---

[54] Dartmouth Atlas 1996, p. 200.

[55] The Dartmouth Atlas group identified 3,953 candidate HSAs and 3,436 final HSAs.  Since roughly 500 candidate HSAs were determined not to qualify as an HSA because a plurality of discharges took place at hospitals outside the candidate HSA (Dartmouth Atlas 1996, p. 200), this means only a small number of candidate HSAs, and possibly none, are remaining as candidates that would have been incorporated into other HSAs based solely on visual examination.

[56] Dartmouth Atlas 1996, p. 16.

[57] United States Census Bureau, "Resident Population Data," 2010, https://www.census.gov/2010census/data/apportionment-dens-text.php.

[58] See *Figure 2*.  If Kaiser hospitals are included, only twenty-eight percent of HSAs contained more than one hospital.

[59] See *Figure 2*.  If Kaiser hospitals are included, sixty-four percent of HSAs contained only a single hospital.

[60] See *Exhibit 3*.  If Kaiser hospitals are included, seventeen HSAs, eight percent of the total, contained no hospitals.

[61] Dartmouth Atlas of Health Care, "About Our Regions," http://www.dartmouthatlas.org/data/region/ ("When these regions were created in the early 1990s, most hospital service areas contained only one hospital.  In the

## 2. The Dartmouth Methodology Is Not Designed to Identify Competitive Alternatives:  An Illustration

38.     By separating hospitals into their own HSAs, HSAs will tend to exclude competing hospitals that could constrain a hospital's ability to increase prices or reduce quality.  An example below illustrates how competitors can be separated into different HSAs.  An HSA that excludes close competitors will not pass the hypothetical monopolist test—nothing in the Dartmouth methodology, including the criterion that a plurality of resident discharges take place within the HSA, will ensure that HSAs will serve as appropriate antitrust markets.

39.     To illustrate how competing hospitals can often be assigned to different HSAs, consider a hypothetical county with three small cities.  Each of these three adjacent cities, City 1, City 2, and City 3, contains one hospital and one ZIP code.  Suppose that residents in each city find hospitals in the other two cities almost as attractive as the hospital within their own city.  For this reason, the data show that forty percent of the discharges for residents in each city are accounted for by local hospitals, while thirty percent are accounted for by hospitals in each of the other two cities.  Based on Dartmouth's methodology, each city would be its own candidate HSA and become its own HSA because a plurality of discharges for residents of each city are from that city's hospital.  See *Figure 3.*

---

intervening years, hospital closures have left some HSAs with no hospital; these HSAs have been maintained as distinct areas in order to preserve the continuity of the database.").  Also see footnote 31 for how Dartmouth updates ZIP code to HSA mapping.  Updates are not based on updated discharge data.

# Figure 3
# HSAs Are Not Constructed to Include All Relevant Competitors



Note: The green boundary indicates the HSA boundary.

40.     This is despite the fact that, in this case, a majority of discharges for residents of each HSA take place outside the HSA and patient flows indicate that residents of each HSA find hospitals in the other two cities attractive alternatives—i.e., each hospital appears to be in vigorous competition with the other two.  By itself, each city would not constitute an antitrust market at the stage at which reimbursement and contracting terms are negotiated because the other two hospitals could be used as leverage in these negotiations.  Yet, these hospitals are in separate HSAs because Dartmouth's methodology does not account for whether the hospitals in adjacent cities are good or poor substitutes for hospitals in a given city.

41.     While hypothetical, this example reflects patterns observed in actual HSAs, including ones identified by Plaintiffs as alleged tying and tied markets.  Like these hypothetical HSAs, five of the HSAs at issue in this case—Auburn, Davis, Lakeport, Antioch, and Oakland—have a majority of their residents' discharges take place in another HSA, and for two of them—Davis and Oakland—the majority of discharges from hospitals within their borders are for residents of other HSAs.[62]  In fact, the significant shares of discharges that cross between the Oakland and Berkeley HSAs may have led Plaintiffs to combine the two HSAs into a single market.[63]

42.     HSAs were simply not designed to be antitrust markets, and hence cannot be used as the basis for antitrust markets and analysis.

### C.     Dartmouth HSAs are Based on Outdated Data for a Different Population than That at Issue in this Matter—Medicare Patients Hospitalized in 1992 and 1993

43.     As discussed above, the Dartmouth Atlas HSAs were constructed based on the choices of Medicare patients hospitalized during 1992 and 1993.[64]  This patient population is substantially different from the proposed class in this case, which is comprised of individuals who paid for health insurance from one or more commercial health insurers during the period between September 17, 2008 and the present.[65]  Differences between the set of discharges

---

[62] See Sections IV.A and IV.B.

[63] See Section IV.B.

[64] Dartmouth Atlas 1996, pp. 15, 200.

[65] Fourth Amended Complaint, ¶ 113 ("Any individual or entity in the nine relevant commercial health insurance markets who, during all or part of the period beginning September 17, 2008 to the present, paid some portion of premiums for a fully-insured product offered by Anthem, Blue Cross, Aetna, Blue Shield, UnitedHealthcare, or Health Net.").

used (Medicare versus commercial enrollees) and the period in which their hospitalizations took place could lead to the construction of relatively narrow HSAs that do not include all the substitutes relevant for the commercial health insurers at issue in this case.  Indeed, I examine contemporary data of commercially-insured discharges and find that many California HSAs would be combined with other HSAs had the Dartmouth Atlas constructed HSAs using this data.

### 1. Medicare Hospitalizations between 1992 and 1993 Are Likely to Display Different Patterns from Current Commercial Hospitalizations

44.     There have been many changes to the delivery of medical care since the early 1990s that could affect where patients seek inpatient hospital care and hence, what HSAs would result if Dartmouth reconstructed HSAs with more current data.  Technological advances have shifted much of the care that used to be delivered on an inpatient basis to an outpatient setting.[66]  This has increased the acuity level of care that remains delivered on an inpatient basis. [67]  In addition, new treatments and procedures have been developed that were not available two decades ago.[68]  Depending on which hospitals adopted new technologies and treatments, and which hospitals have shifted more toward outpatient care, patients may select different hospitals for inpatient care than they did in 1992 or 1993.  Even absent technological changes, hospital closures would change hospitalization patterns, with populations that had relied primarily on now-closed hospitals necessarily seeking care

---

[66] American Hospital Association, "Trendwatch Chartbook 2016," Chart 3.10, 3.11, and Chart 4.3, http://www.aha.org/research/reports/tw/chartbook/2016/2016chartbook.pdf, which shows the number of outpatient visits and the percentage of revenue from outpatient visits have increased from 1994 to 2014; Goldsmith, Jeff, "Technology and the Boundaries of the Hospital:  Three Emerging Technologies," *Health Affairs* 23, no. 6, 2004, pp. 149–150 ("During the 1980s a wave of new technologies posed a major threat to hospitals….  Combined with important payment changes such as diagnostic-related groups (DRGs), these technologies helped reduce hospitals' length-of-stay and, less expectedly, hospital admissions…The three technologies discussed in this paper were chosen either because they contain the most important potential for reducing hospitalization or because they create new service opportunities….  Ambulatory services, which accounted for 13 percent of hospital spending in 1980, represented more than 37 percent in 2002.  Inpatient census fell more than 20 percent….").

[67] Kutscher, Beth, "Outpatient Care Takes the Inside Track," *Modern Healthcare,* August 4, 2012, http://www.modernhealthcare.com/article/20120804/MAGAZINE/308049929 ("At the same time, those patients who are admitted are almost uniformly sicker and require more complex care than in the past.").

[68] Cox, Lauren, "The Top 10 Medical Advances of the Decade," *Medpage Today*, December 17, 2009, https://www.medpagetoday.com/infectiousdisease/publichealth/17594.  The article lists innovations in healthcare that specialists consider the greatest developments from 2000–2009.  These include stents, more surgical options, and pharmaceuticals for heart attack patients, robotic surgery, and better pharmaceutical treatments for cancer and HIV.

elsewhere.[69]  The set of hospitals that serve as viable substitutes are likely to be different than they were in 1992–1993.

45.      The Dartmouth Atlas is also based on Medicare discharge data, which has the effect of almost entirely excluding Kaiser hospitals, which in most cases would not have been visited by patients with Traditional Medicare coverage.[70]  Kaiser health insurance is, however, an important option for purchasers of commercial health insurance, such as the putative class members defined in the *Sidibe* complaint.[71]  While *patients* with commercial insurance are prevented, except in emergency situations, from using Kaiser hospitals, *potential enrollees* can compare Kaiser networks to the networks offered by commercial plans when deciding which health insurance to purchase.  Kaiser hospitals account for a significant share of commercial discharges but would have accounted for almost no discharges for Traditional Medicare beneficiaries, reflecting another difference in the hospital choices of commercially insured and Traditional Medicare beneficiaries.[72]

46.      For most of this report, I exclude Kaiser hospitals and discharges at Kaiser hospitals from the analysis, following Plaintiffs' approach. That said, I also run these analyses with Kaiser discharges included and report those results, primarily in footnotes to the main analysis.  Statistics on patient discharges, such as whether or not a plurality of the discharges for residents of an HSA take place in that HSA (as required by the methodology which

---

[69] Office of Inspector General, "Trends in Rural Hospital Closure, 1990–2000," Department of Health and Human Services, May 2003, OEI 04-02-00610, at p. i ("Our review of rural hospitals that close from 1990 through 2000 revealed the following:  208 rural hospitals closed – 7.8 percent of all rural hospitals nationally at the beginning of the trend period."); Office of Inspector General, "Trends in Urban Hospital Closure, 1990–2000," Department of Health and Human Services, May 2003, OEI 04-02-00611, p. ii ("Our review of urban hospitals that closed from 1990 through 2000 revealed the following:  296 urban hospitals closed – 10.6 percent of all urban hospitals nationally at the beginning of the trend period.").

[70] The Center for the Evaluative Clinical Sciences, Dartmouth Medical School, Dartmouth Atlas of Health Care, "Research Methods," p. 2, http://www.dartmouthatlas.org/downloads/methods/research_methods.pdf; Stiefel, Matt, Paul Feigenbaum, and Elliott S Fisher, "The Dartmouth Atlas Applied to Kaiser Permanente: Analysis of Variation in Care at the End of Life," *The Permanente Journal*, 12, no. 1, Winter 2008, pp. 5–6, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3042338/pdf/i1552-5775-12-1-4.pdf  ("The [KP] study population consisted of Medicare members age 65.5 years and older, continuously enrolled for the six months prior to death, and who died during calendar year 2005… there were some differences from the Dartmouth Atlas in the population identification and measurement specifications. The Dartmouth Atlas includes traditional Medicare fee-for-service patients only, whereas KP members primarily participate in capitated Medicare Advantage.").

[71] Fourth Amended Complaint, ¶ 113.

[72] Large-group insurance is employer-sponsored insurance for employers with over a hundred employees. Kaiser Family Foundation, "Market Share and Enrollment of Largest Three Insurers- Large Group Market, 2014," http://www.kff.org/other/state-indicator/market-share-and-enrollment-of-largest-three-insurers-large-group-market/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.  Also see workpaper 3.

creates HSAs), change when discharges from Kaiser hospitals are included, though my basic conclusion that HSAs do not provide an appropriate basis for defining antitrust markets remains unchanged.[73]

47.     Finally, the Medicare population differs from commercial health plan enrollees in several ways that could affect where they seek hospital services.  Medicare provides coverage primarily to US residents over the age of sixty-five, and the Dartmouth Atlas only relied on discharge data for Medicare beneficiaries who were at least sixty-five years old.[74]  These Medicare beneficiaries will have different medical needs than a younger population that is commercially insured.[75]  For instance, Medicare beneficiaries do not typically need pediatric care or obstetrics care.[76]  To the extent that different hospitals offer different services, these beneficiaries will seek care at different hospitals than the commercially insured population.  Differences in where individuals receive care could affect whether HSAs would meet the Dartmouth Atlas group's own criteria for the commercially insured population.

---

[73] See Section III.C.2.

[74] Dartmouth Atlas Interview with Kristy Bronner and Ali Sharp, September 20, 2017.

[75] In the United States, Medicare covers the majority of elderly beneficiaries, and commercial plans cover relatively few beneficiaries over the age of 65.  From Centers for Medicare & Medicaid Services, 48.25 million people aged 65 and above were enrolled in Medicare in 2016.  The U.S. population was 323.13 million and the population aged 65 and above accounted for fifteen percent of the total population in 2016 according to the World Bank.  Therefore, approximately 98.5 percent of the U.S. residents over the age of 65 were enrolled in Medicare in 2016.  See Centers for Medicare & Medicaid Services, "Medicare Enrollment Dashboard," https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMSProgramStatistics/Dashboard.html; World Bank, "Population ages 65 and above (% of total)," https://data.worldbank.org/indicator/SP.POP.65UP.TO.ZS?locations=US; World Bank, "Population, total," https://data.worldbank.org/indicator/SP.POP.TOTL?locations=US.

Medicare also provides coverage to some beneficiaries with long-term disabilities or kidney failure.  However, the vast majority of Medicare beneficiaries—eighty-four percent as of 2013—are elderly.  See United States Department of Health & Human Services, "Who is eligible for Medicare?," https://www.hhs.gov/answers/medicare-and-medicaid/who-is-elibible-for-medicare/index.html; Medicare.gov, "What's Medicare?," https://www.medicare.gov/sign-up-change-plans/decide-how-to-get-medicare/whats-medicare/what-is-medicare.html; Kaiser Family Foundation, "Distribution of Medicare Beneficiaries by Eligibility Category," 2013, http://www.kff.org/medicare/state-indicator/distribution-of-medicare-beneficiaries-by-eligibility-category-2/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

Weiss, Audrey J. and Anne Elixhauser, "Overview of Hospital Stays in the United States, 2012," Healthcare Cost and Utilization Project, Statistical Brief 180, October 2014, https://www.hcup-us.ahrq.gov/reports/statbriefs/sb180-Hospitalizations-United-States-2012.pdf.  See Table 1, which shows that per 1000 population, individuals 65 and older are more likely to be hospitalized, and that Medicare pays for a plurality of hospital stays (39.1 percent).

[76] Pfunter, Anne, Laurent M. Wier, and Carol Stocks, "Most Frequent Conditions in U.S. Hospitals, 2011," Healthcare Cost and Utilization Project:  Statistical Brief #162, September 2013, pp. 1–12, https://www.ncbi.nlm.nih.gov/pubmed/24228292 ("The most common reason for hospitalization was liveborn (newborn infant), which accounted for 3.8 million stays in 2011 (10 percent of all stays).").

## 2. Several of the Plaintiffs' Proposed Markets Would Not Meet the Dartmouth Atlas Methodology If Applied to Current Discharge Data for Commercial Enrollees

48.     I examine whether the differences described above, in medical technology, insurer practices, and the population at issue, would affect the set of HSAs in California if HSAs had been constructed using the population at issue in this case.  To make this assessment, I evaluate whether California HSAs meet the Dartmouth Atlas's criteria that a plurality of each HSA's resident discharges take place at hospitals within the HSA if this test is run using 2015 discharge data for commercially insured patients.[77]  (That is, I use current commercial discharges and evaluate whether more resident discharges took place at hospitals *within* the HSA than at hospitals in *any single other* HSA.)  Under the Dartmouth Atlas methodology, if a plurality of discharges for patients residing within a particular "candidate HSA" did not take place at hospitals within that HSA, that "candidate HSA" was dissolved and its ZIP codes (and discharges) allocated to other HSAs.  My analysis shows that many of the Dartmouth Atlas HSAs no longer meet this criterion and would not qualify as HSAs based on this very recent patient population.

49.     As I have discussed above, the plurality criterion does not ensure that an HSA includes close substitutes, or would pass the hypothetical monopolist test for an antitrust market.  However, it at least ensures that no other HSA has hospitals that account for more of an HSA's resident discharges than the hospitals in the first HSA does.  In many cases, Dartmouth HSAs do not even pass this extremely weak criterion when applied to a patient population similar to that in the proposed class.

50.     Specifically, using current commercial patient discharges from 2015, eighty-seven out of California's 222 HSAs would not qualify as an HSA because a plurality of the discharges for residents that live in those HSAs took place at hospitals in another HSA.[78]  *Figure 4*

---

[77] See Section III.B.

[78] See *Figure 4*.  Discharges from Kaiser hospitals are excluded in this analysis.  If Kaiser discharges and hospitals are included in the analysis, there are ninety-one HSAs with a plurality of discharges accounted for by hospitals in another HSA.  Eighteen of these HSAs do not contain a hospital.  See *Exhibits 2* and *3*.

My analyses include inpatient discharges and inpatient discharges that resulted from emergency department visits.  The analysis excludes psychiatry, chemical dependence, and rehabilitation since they are not part of Plaintiffs' proposed product market.  Following Plaintiffs, I also exclude Kaiser hospitals (although I view Kaiser to be extremely relevant to the question of market definition, as I discuss elsewhere).  Additionally, I exclude newborn discharges since including them would tend to double-count the choice of hospital for deliveries (i.e., the OSHPD data will record a mother's discharge and her newborn's discharge as two separate discharges, but both are driven by the single choice of a hospital for the delivery).

The ZIP code of residence can be partially or fully masked by OSHPD.  ZIP codes that are partially masked contain only the first three-digits of the ZIP code.  ZIP codes that are fully masked are blank.  ZIP codes are

shows this set of HSAs on a map of California.  Of these eighty-seven HSAs, twenty-one had no hospital (or no hospital that was not a Kaiser facility), and the remaining sixty-six had a plurality of their residents' discharges take place in another HSA despite having a non-Kaiser hospital within their borders.  See *Figure 4* and *Exhibit 3*.[79]  Stated differently, in eighty-seven of 222 California HSAs, more of the 2015 commercial discharges for residents of the HSA took place in a specific HSA that was <u>not</u> their own HSA of residence.  In these HSAs, outside hospitals are an important alternative to the hospitals within the HSA.

---

partially masked if the discharge is for a resident of a county with fewer than 30,000 residents, or if there are six or fewer discharges with a unique combination of discharge year, type of care (inpatient, ambulatory surgery, etc.), OSHPD facility, age group, and patient ZIP code.  ZIP codes are fully masked if there is one discharge with a unique combination of discharge year, type of care (inpatient, ambulatory surgery, etc.), OSHPD facility, age group, and patient ZIP code.  ZIP codes are also masked for residents of other states.

For discharges with partially masked ZIP codes, I assume that the discharge is a resident of the same HSA as the discharging hospital if the three-digit ZIP code and patient county overlap with the HSA of the hospital, such that the discharge could be for a resident of the hospital's HSA.  Otherwise, the discharge is excluded.  This will tend to increase the proportion of discharges that are estimated to take place in patients' HSAs of residence.

For discharges with fully masked ZIP codes, I assume that the discharge is a resident of the same HSA as the discharging hospital if the patient county overlaps with the HSA of the hospital, such that the discharge could be for a resident of the hospital's HSA.  I also include discharges for patients who live in Oregon and receive care in the Crescent City HSA, which is located partially in Oregon.  I assume these discharges are for patients who live in the Crescent City HSA. I exclude all other discharges with fully masked ZIP codes.

[79] See *Exhibit 2* for the HSAs where a plurality of discharges take place outside the HSA when Kaiser hospitals and discharges from Kaiser hospitals are included in the analysis.

## Figure 4
## Nearly 40% of HSAs Would Not Meet Dartmouth's "Plurality Criteria" Using 2015 Commercially Insured Discharges
(Excluding Kaiser)



Source:  California Office of Statewide Health Planning and Development Discharge and Financial Data, 2015; The Dartmouth Atlas of Healthcare, 1996; US Department of Commerce, Census Bureau, County Boundary File; American Hospital Association Annual Survey Data, 2015

Note:
[1]  The analysis excludes discharges in the following OSHPD service lines:  psychiatry, chemical dependence, rehabilitation, and newborn discharges.  The analysis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits.  Discharges from Kaiser hospitals are also excluded.
[2]  For patient privacy, OSHPD masks the ZIP code of residence for some discharges.  See footnote 78.
[3]  The white space includes regions with no HSA and several HSAs that cross the California state border but are not assigned to California by Dartmouth.

51.     Focusing now on the alleged tying and tied markets, two HSAs identified by Plaintiffs in their tying claims as valid markets—Davis and Auburn—would not qualify as HSAs if they were evaluated using current commercial discharge data.[80]  A plurality of discharges for Davis residents took place in the Sacramento HSA.  Roughly equal shares of discharges for Auburn residents took place in the Roseville and Auburn HSAs, such that neither has a plurality of the discharges.[81]  Under the original methodology applied to 2015 commercial discharge data, the current Davis HSA would not have been constructed as a standalone HSA. At least some of the current Davis HSA's ZIP codes would have been allocated to the Sacramento HSA.[82]  See *Exhibit 4*.  Similarly, the current Auburn HSA would not have been constructed as a standalone HSA using 2015 commercial discharge data, and at least some of its ZIP codes would have been allocated to the Roseville HSA.[83]

52.     Other HSAs identified as markets by Plaintiffs would be significantly altered if the Dartmouth methodology were applied to current commercial discharges, even if they meet the plurality criteria.  In particular, many HSAs that are adjacent to an alleged tying or tied

---

[80] See *Exhibit 4*.  Discharges from Kaiser hospitals are excluded.  If Kaiser discharges and hospitals are included, a plurality of discharges for residents in Auburn, Davis, and Berkeley are accounted for by hospitals in another HSA.

[81] See workpaper 4.

In the OSHPD discharge data, the patient ZIP code of residence is either fully or partially masked in instances in which it would compromise individual patient privacy.  In my calculations, I assume that discharges with a masked ZIP code are for residents of the same HSA where the discharge took place (i.e., where the hospital was located), *unless* there is information on the county of residence or partial information on the ZIP code of residence that would rule this possibility out.  This assumption is conservative in that, if anything, it overstates the share of a hospital's discharges that come from within its HSA.

Under this conservative assumption, I estimate that Auburn hospitals and Roseville hospitals each accounted for the exact same number of Auburn HSA's residents' discharges.  If one of the discharges that I assumed reflected care for an Auburn resident was actually for someone who lives outside the Auburn HSA, Roseville would account for a plurality of Auburn HSA discharges.  Regardless, hospitals in the two HSAs account for very similar shares of the discharges for Auburn residents, which indicates that many residents of the Auburn HSA have chosen hospitals outside the HSA for their care and that Auburn hospitals are in competition with hospitals outside the HSA.  By excluding these competitors, the Auburn HSA does not include appropriate substitutes as an appropriate antitrust market must.

[82] This assumes that in applying the Dartmouth methodology to current commercial discharges, there remains a Sacramento HSA with all of its current hospitals.

Sutter Memorial Hospital in the Sacramento HSA closed in 2016.  It transferred its inpatient facilities to Sutter Medical Center, Sacramento in the Sacramento HSA.  This analysis was conducted with 2015 data, and includes discharges from Sutter Memorial Hospital.  Patients from the Davis HSA that were discharged from the Sutter Memorial Hospital in 2015 might seek care at other hospitals in the Davis HSA in its absence.  However, even if all Davis resident discharges from Sutter Memorial Hospital were for patients that had sought care in the Davis HSA, a plurality of discharges for Davis HSA residents would still take place in the Sacramento HSA.  See workpaper 5.

[83] This assumes that in applying the Dartmouth methodology to current commercial discharges, there remains a Roseville HSA with all of its current hospitals.

HSA do not meet the plurality criteria using current commercial discharges.  This would lead to the addition of new ZIP codes and hospitals to several HSAs identified by Plaintiffs as markets.

53.     First, as described above, a plurality of discharges from residents of the Davis HSA take place at hospitals in the current Sacramento HSA, as do a plurality of discharges for residents of the Carmichael HSA.[84]  If HSAs were reconstructed with 2015 commercial discharge data, this then implies that at least some of the ZIP codes in the Davis and Carmichael HSAs would be added to the Sacramento HSA.[85]

54.     In addition, seven other HSAs that are adjacent to Plaintiffs' alleged markets have a plurality of their 2015 commercial discharges take place at hospitals in one of Plaintiffs' alleged markets. Specifically, a plurality of discharges for Oakdale HSA residents take place at hospitals in the Modesto HSA, which Plaintiffs claim is a tied HSA.[86]  A plurality of discharges from the Daly City HSA take place at hospitals in the San Francisco HSA, which Plaintiffs also claim is a tied HSA.[87]  A majority—over sixty percent in both cases—of discharges for residents of the Healdsburg and Sebastopol HSAs are from hospitals in the Santa Rosa HSA, which Plaintiffs claim is a tied HSA.[88]  Finally, a plurality of discharges for residents of the Pinole, Alameda, and San Pablo HSAs take place at hospitals in the Berkeley HSA, which is part of the alleged tying market consisting of the Berkeley and Oakland HSAs.[89]  This analysis indicates that some HSAs identified by Plaintiffs as markets would expand with the addition of ZIP codes and hospitals if the Dartmouth methodology were applied to 2015 commercial discharges.[90]

55.     The additions of these ZIP codes are not small adjustments and do not result in areas that are "roughly congruent" with HSAs.  Several hospitals are located in the HSAs noted above that would not meet the plurality criteria and would be assigned to other HSAs if the Dartmouth Atlas's criteria were applied to current commercial discharges.  The Sutter Davis

---

[84] See *Exhibit 4*.

[85] See *Exhibit 4*. This assumes that the current Sacramento HSA would remain an HSA with all of its current hospitals if the Dartmouth methodology were reapplied with 2015 commercial discharge data.

[86] See *Exhibit 4*.

[87] See *Exhibit 4*.

[88] See *Exhibit 4* and workpaper 6.

[89] See *Exhibit 4*.

[90] This assumes that the HSAs identified by Plaintiffs as markets would remain HSAs with all of their current hospitals if the Dartmouth methodology were reapplied with 2015 commercial discharge data.

Hospital, for example, is located in a ZIP code in which a plurality of resident discharges take place in the Sacramento HSA.[91]  Similarly, the Mercy San Juan Hospital in the Carmichael HSA is located in a ZIP code in which a plurality of resident discharges take place in the Sacramento HSA.[92]  If HSAs were reconstructed using 2015 commercial discharge data and the Sacramento HSA retained its current ZIP codes, these ZIP codes and hospitals would become part of the Sacramento HSA.  Under Plaintiffs' proposed market definition, these hospitals would then be considered competitors to Sacramento HSA hospitals and vice versa. Similarly, six other hospitals would likely become part of the current Modesto, San Francisco, Berkeley, and Santa Rosa HSAs, assuming those HSAs remained intact.[93] According to Plaintiffs' market definition, this would cause the set of competitors in each "market" to change.  Such reassignments are not trivial changes and hence would not result in areas "roughly congruent" to HSAs.

56.     Setting aside the question of whether or not HSAs (and the combined Berkeley-Oakland HSA) would have been considered valid antitrust markets for Medicare beneficiaries in 1992, the Dartmouth HSAs' reliance on twenty-five-year-old data on Medicare discharges invalidates them for the purpose of analyzing the economic substitutes that commercial health insurers could have used to assemble a provider network over the class period.

## D.     Antitrust Markets Recently Accepted by Courts Were Neither Equivalent to, Nor Based on, Dartmouth Atlas HSAs

57.     As I explain in Section II, the key economic question in antitrust market definition is whether there are competing hospitals outside a particular proposed geographic market that would constrain a hypothetical monopolist within that market from either raising prices or decreasing the quality of services provided to its patients.  Courts have recently had to evaluate proposed antitrust markets in two proposed hospital mergers.  I compare publicly available information on the geographic markets proposed in these recent hospital merger investigations with the HSAs in which these hospitals are located.  As I detail below, in both cases, neither the FTC nor the merging parties used HSAs to define markets for Inpatient Hospital Services, and the geographic markets the courts ultimately adopted included several

---

[91] See *Exhibit 4* and workpaper 7.  Sutter Memorial Hospital in Sacramento HSA closed in 2016 and transferred its patients to Sutter Medical Center, Sacramento in the Sacramento HSA.  See footnote 82.

[92] See workpaper 7.

[93] See workpaper 8.

HSAs, not merely one.  In these cases, HSAs (1) were not used as antitrust markets, (2) were smaller than the accepted antitrust markets, and (3) generally had no bearing in assessing the potential competitive effect of challenged conduct.

58.     When two hospitals propose to merge, government regulators will typically define the market for Inpatient Hospital Services as an initial step toward analyzing the effect of the proposed merger on prices and other outcomes.[94]  The FTC challenged two proposed hospital mergers that were litigated to judgment in 2016.[95]  In those two challenges, both the district court and the circuit court judges examined the market definitions.[96]  While I do not, in this report, evaluate whether the FTC correctly defined markets in these two cases,[97] I note that in both cases the merging parties proposed even larger geographic markets and the ruling courts accepted markets at least as large as those proposed by the FTC.[98]

59.     The first of these two cases was the proposed merger between two Pennsylvania hospitals systems:  Pinnacle Health System, with hospitals in the Harrisburg and Camp Hill HSAs; and Penn State Hershey Medical Center in the Hershey HSA.  In this proposed merger, the Government argued that the appropriate geographic market included four entire counties in the Harrisburg area:  Dauphin, Cumberland, Lebanon, and Perry.[99]  These four counties encompass the Hershey and Harrisburg HSAs, include most of the Carlisle,

---

[94] Department of Justice, "Chapter 4:  Competition Law:  Hospitals," https://www.justice.gov/atr/chapter-4-competition-law-hospitals#3 ("The product market has typically been defined as a broad group of medical and surgical diagnostic and treatment services for acute medical conditions where the patient must remain in a health care facility for at least 24 hours for recovery or observation.").

[95] Kully, David and Christopher Carmichael, "Two Decisions Strengthen FTC's Hand In Hospital Merger Cases," *Law360*, November 22, 2016, https://www.law360.com/articles/865022/2-decisions-strengthen-ftc-s-hand-in-hospital-merger-cases.

[96] Federal Trade Commission, "Health Care Competition, The FTC's Health Care Work," https://www.ftc.gov/news-events/media-resources/mergers-competition/health-care-competition.  Also see Kully, David and Christopher Carmichael, "Two Decisions Strengthen FTC's Hand In Hospital Merger Cases," *Law360*, November 22, 2016, https://www.law360.com/articles/865022/2-decisions-strengthen-ftc-s-hand-in-hospital-merger-cases.

[97] I do not opine on whether the FTC defined an appropriate market in the Northshore-Advocate merger or the Hershey-Pinnacle merger.  As an expert on the case, I have previously opined on market definition for the Cabell Huntington-St. Mary's merger.  I do not address those arguments here, nor do my arguments here rely on my prior opinions on market definition.

[98] Maas, David and Douglas Ross, "FTC v. Penn State Hershey Medical Center:  How a Hospital Merger in the Sweetest Place on Earth Soured the FTC's 15-year Perfect Scorecard," *American Bar Association Health Law* Section 12, no. 3, 2016, https://www.americanbar.org/publications/aba_health_esource/2015-2016/july/pennstate.html; Brennan, Jeffrey W., "Evolution of FTC Geographic Market Definition in Healthcare Mergers," *American Bar Association*, May 2016, p. 5, https://www.americanbar.org/content/dam/aba/administrative/healthlaw/06_evolution_of_market_definition_in_healthcare_provider_transactions.authcheckdam.pdf.

[99] Opinion of the Court, United States Court of Appeals for the Third Circuit, *Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center and Pinnacle Health System,* no. 16-2365, September 27, 2016, p. 15.

Lebanon, and Camp Hill HSAs, and include parts of six other HSAs, meaning that they include all or a portion of *eleven* different HSAs.[100] See *Exhibit 5*. *Exhibit 5* also shows that the merging parties were in separate HSAs. If HSAs constituted relevant geographic markets, the merging parties would not be considered as competitors, but the FTC *did* consider these two hospitals to be competitors and challenged their proposed merger despite their location in two separate HSAs. In addition, the FTC included as competitors hospitals from additional, completely separate HSAs from those containing the merging parties.[101] These hospitals are shown in *Exhibit 5*. Though the District Court accepted a broader geographic market than that advocated by the FTC, the Third Circuit agreed with the Government's market definition.[102] Neither court, however, found the market was appropriately defined by HSAs, and neither court's order even discussed HSAs in conjunction with the discussion of antitrust markets.[103]

60.    The second proposed merger successfully challenged by the FTC last year was the proposed merger between Advocate Health Care Network and NorthShore University HealthSystem near Chicago, Illinois. In this proposed merger, the Government's expert proposed a market that included six of the merging parties' hospitals and five competing hospitals. He also proposed a market that included fifteen hospitals.[104] As *Exhibit 6*

---

[100] All of the ZIP codes in the Harrisburg and Hershey HSAs are included in the four county region. The four counties also include over eighty percent of ZIP codes in the Carlisle, Lebanon, and Camp Hill HSAs, and at least one ZIP code from the Gettysburg, Sunbury, Chambersville, Pottsville, Reading, and Lancaster HSAs. See workpaper 9.

[101] The two merging hospitals were located in the Harrisburg and Hershey HSAs, while the FTC's proposed market included competing hospitals in the Carlisle, Camp Hill, and Lebanon HSAs. See *Exhibit 5*.

[102] Opinion of the Court, United States Court of Appeals for the Third Circuit, *Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center and Pinnacle Health System,* no. 16-2365, September 27, 2016, pp. 15, 28.

The merging parties also advocated for a larger market, arguing, "that patients and payors consider a much larger set of options for GAC services including hospitals outside the four-county area." See Ross, Douglas and David Maas, "FTC v. Penn State Hershey Medical Center: How a Hospital Merger in the Sweetest Place on Earth Soured the FTC's 15-year Perfect Scorecard," *American Bar Association Health Law* Section 12, no. 3, 2016, https://www.americanbar.org/publications/aba_health_esource/2015-2016/july/pennstate.html.

[103] Opinion of the Court, United States Court of Appeals for the Third Circuit, *Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center and Pinnacle Health System,* no. 16-2365, September 27, 2016; Memorandum Opinion and Order, United States District Court for the Middle District of Pennsylvania, *Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center and PinnacleHealth System,* no. 1:15-cv-2362, May 9, 2016.

[104] Amended Memorandum Opinion and Order, United States District Court for the Northern District of Illinois Eastern Division, *Federal Trade Commission and State of Illinois v. Advocate Health Care, Advocate Health and Hospitals Corporation, and NorthShore University HealthSystem*, no. 15 C 11473, June 20, 2016, pp. 6–7; Opinion of the United States Court of Appeals for the Seventh Circuit, , *Federal Trade Commission and State of Illinois v. Advocate Health Care, Advocate Health and Hospitals Corporation, and NorthShore University HealthSystem* no. 15 C 11473, October 31, 2016, p. 6.

demonstrates, the merging parties' six hospitals are located in five separate HSAs. [105]  If the *Sidibe* Plaintiffs' approach to geographic market definition were applied to the proposed merger in Illinois, the hospitals in Illinois would be in separate markets because they are located in separate HSAs, and the proposed merger presumably would have had a limited effect on competition.  However, not only did the FTC challenge this proposed merger, the FTC's expert included five additional hospitals, located in an additional four HSAs, in the relevant geographic market. [106]  These hospitals are shown in *Exhibit 6*.  In other words, the Government's expert opined that hospitals in ***nine*** separate HSAs were close competitors to each other. [107]  The Northern District Court of Illinois found this market definition too narrow, but the Seventh Circuit overturned the decision. [108]  Importantly for this case, in neither decision was it suggested that a hospital market be defined as an HSA, and both decisions supported the definition of markets that contained hospitals from many HSAs, including HSAs in which neither of the merging hospitals were located.

61.     In both cases, the proposed geographic markets encompassed multiple HSAs and considered hospitals across HSA borders to be economic substitutes for each other.  Hence, these proposed antitrust markets were not even close to being roughly equivalent to an HSA.  This confirms that single, isolated HSAs (or areas that are "roughly congruent") are not a proper basis for antitrust markets.  They can exclude the full set of economic substitutes that constrain hospitals' prices and that should be included in a properly defined market for the purpose of antitrust analysis.  The Dartmouth methodology has no provision to make sure or

---

[105] Glenbrook Hospital and NorthShore Evanston Hospital are in the Evanston HSA, Highland Park Hospital is in the Highland Park HSA, Advocate Condell Medical Center is in the Libertyville HSA, Advocate Lutheran General Hospital is in the Park Ridge HSA, and NorthShore Skokie Hospital is in the Skokie HSA.  See workpaper 10.

[106] This is based on the FTC's market with eleven hospitals.  Swedish Covenant Hospital and Presence Resurrection Hospital are in the Chicago HSA, Northwest Community Hospital is in the Arlington Heights HSA, Northwestern Lake Forest Hospital is in the Lake Forest HSA, and Vista East Hospital is in the Waukegan HSA.  See workpaper 10.

[107] See workpaper 10.  The merging parties' hospitals are in Park Ridge, Libertyville, Evanston, Skokie, and Highland Park HSAs.  The list of five competitors includes hospitals in Arlington Heights, Chicago, Lake Forest, and Waukegan HSAs.

[108] Amended Memorandum Opinion and Order, United States District Court for the Northern District of Illinois Eastern Division, *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, Advocate Health and Hospitals Corporation, and NorthShore University HealthSystem*, no. 15 C 11473, June 20, 2016, p. 9; Opinion of the United States Court of Appeals for the Seventh Circuit, *Federal Trade Commission and State of Illinois v. Advocate Health Care, et al.*, no. 15 C 11473, October 31, 2016, p. 26.

The merging parties also argued for a larger geographic market, claiming that the market should include "at least nine other hospitals (in addition to the eleven identified by the FTC)."  See Defendants' Opposition To Plaintiffs' Motion for a Preliminary Injunction, *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, Advocate Health and Hospitals Corporation, and NorthShore University HealthSystem*, no. 15-cv-11473, March 23, 2016, p. 14.

even consider whether competitive alternatives are included in an HSA.  The Dartmouth methodology is thus completely inadequate to the task of defining markets for the analysis of alleged anticompetitive behavior.  Moreover, as I show in Section IV, this mismatch between HSAs and the requirements for an appropriate antitrust market is not limited to these two proposed mergers, but is also apparent with respect to HSAs in California, including those Plaintiffs claim are tying and tied markets.

## IV.    Dartmouth HSAs in Northern California Exclude Competitive Alternatives

62.    As I discuss above, the methodology used to produce the Dartmouth Atlas HSAs was not designed to identify which hospitals serve as potential substitutes to insurers negotiating provider networks and payments.  As expected, the regions that result from a process that was *not intended to encompass* competitive alternatives *do not* in fact encompass the competitive alternatives that insurers (or patients) may consider within the regions in Northern California. When a proposed antitrust market excludes hospitals that are close substitutes to hospitals within the market, a hypothetical monopolist cannot profitably impose a SSNIP.  The competing hospitals provide insurers with competitive alternatives to the hospitals owned by the hypothetical monopolist.[109]  Since HSAs tend to exclude competitive alternatives, HSAs would not pass the hypothetical monopolist test and hence are inappropriate for the task of analyzing antitrust markets.

63.    In this section, I show that many of the Dartmouth HSAs that Plaintiffs propose as antitrust "markets" exclude hospitals that are likely to compete with the hospitals within those HSAs, preventing HSAs from passing the hypothetical monopolist test.  First, many hospitals in *different* HSAs are no farther apart than at least some hospitals within *the same* HSA.  An HSA-based market definition would conclude that the hospitals in different HSAs do not compete, but that hospitals that are *farther apart* do compete, so long as they are in the same HSA.  Additionally, many of the discharges for residents of the alleged tying HSAs are for patients who live relatively close to at least one hospital outside their HSAs of residence. Relatedly, many discharges for residents of the alleged tying and tied HSAs take place in hospitals outside their HSA of residence.  Plaintiffs implicitly acknowledge the insufficiency of HSAs as a method for determining geographic markets through their decision to combine the Berkeley and Oakland HSAs into one proposed tying "market."  This decision reveals

---

[109] See Section II.A.

that Plaintiffs have no well-defined methodology for identifying appropriate antitrust markets.  Finally, the Kaiser Foundation successfully markets commercial health plans to residents of HSAs without offering in-network hospitals in each HSA covered, confirming that hospitals in different HSAs can and do serve as economic substitutes.  Because hospitals outside the alleged tying and tied HSAs are competitive alternatives to hospitals within the relevant HSAs, these HSAs cannot be antitrust markets.

### A.    The Alleged Tying HSAs Exclude Nearby Hospitals

64.    While determining the set of hospitals that constrain each other's prices requires an analysis of patient substitution and insurer-hospital bargaining, proximity is an important factor in evaluating which hospitals compete with each other and which hospitals are acceptable to consumers selecting a health plan.  I examine whether the alleged tying HSAs include all hospitals in close proximity and find that they often do not include such "nearby" hospitals, which can offer insurers competitive alternatives to the hospitals within the HSA.

65.    I use thirty minutes of drive time as a benchmark for determining which hospitals are close enough to be considered likely competitors.  Under Plaintiffs' proposed market definition, hospitals that are up to *twenty-nine minutes apart* can be competitors, as in the case of the CPMC – St. Luke's Campus and the Chinese Hospital,[110] which are a twenty-nine minute drive apart, and considered to be competitors because they are both in the San Francisco HSA.  Hospitals within a thirty minute drive of patients' residence also meet an important criteria for insurers forming a provider network.  Specifically, Plaintiffs have alleged that the Knox-Keene Act advises insurers to include hospitals "'to serve the entire dependent enrollee population based on normal utilization' that [are] located within thirty minutes or fifteen miles of member residences or workplaces."[111]  Furthermore, in surveys of

---

[110] See workpaper 11.

[111] Fourth Amended Complaint, ¶ 54. Also see California Knox-Keene Health Care Service Plan Act and Regulations, 2017 edition, Department of Managed Health Care, §1300.51.H(ii), p. 536, http://wpso.dmhc.ca.gov/regulations/docs/2017kkaregs.pdf ("(ii) Hospitals.  In the case of a full-service plan, all enrollees have a residence or workplace within thirty minutes or fifteen miles of a contracting or plan-operated hospital which has a capacity to serve the entire dependent enrollee population based on normal utilization, and, if separate from such hospital, a contracting or plan-operated provider of all emergency health care services."). The Knox-Keene regulation does not specify how thirty minutes is computed, but implies that when a plan proposes alternative standards, driving times are an important factor for establishing standards of accessibility. See California Knox-Keene Health Care Service Plan Act and Regulations, 2017 edition, Department of Managed Health Care, §1300.67.1, p. 625, http://wpso.dmhc.ca.gov/regulations/docs/2017kkaregs.pdf ("The facts and circumstances to be included in a discussion of the reasons justifying the standards of accessibility proposed by the plan pursuant to subsection (a) or (b) of this section shall include…(12) driving times.").

travel times, individuals in urban areas report traveling an average of nearly twenty-three minutes for medical and dental services, while individuals in rural areas (such as portions of Auburn, Crescent City, Jackson, and Lakeport HSAs) report traveling nearly twenty-nine minutes for medical and dental services.[112]  It is thus reasonable to consider at least those hospitals that are within thirty minutes of a hospital and the population it serves as potential competitors and leverage for insurers negotiating with hospitals (though hospitals that are farther apart can also be potential competitors).[113]

66.    Applying this benchmark of thirty minutes, I calculate expected drive times between hospitals using Google Maps projections[114] and find that in most of the alleged tying HSAs— where Plaintiffs claim Sutter holds a monopoly or has "substantial market power"[115]—there are multiple hospitals *outside* the HSA that are located within a thirty minute drive of a hospital *within* the HSA.  In five of the eight alleged tying HSAs, every single hospital within the HSA is within a twenty-five minute drive of at least one non-Sutter hospital outside the HSA.  See *Exhibit 7*, which shows the number of hospitals that are within specific drive times of each hospital in an alleged tying HSA, but located outside the alleged tying HSA.  For a sixth HSA, Auburn, there is an outside hospital that is within a thirty minute drive of the Auburn's sole hospital, Sutter Auburn Faith.[116]  The exclusion of nearby competitors is a particularly acute issue for the Plaintiffs' combined Berkeley and Oakland HSAs.  Three of the five hospitals in this "market" are within a twenty minute drive of at least one non-Sutter

---

[112] National Household Travel Survey, 2009, Department of Transportation, http://nhts.ornl.gov/tables09/ae/TableDesigner.aspx.  Those figures imply that it is highly likely that many individuals travel more than thirty minutes to obtain services.

Roughly thirty percent or more of the population in the alleged tying HSAs (Auburn, Crescent City, Jackson, and Lakeport) reside in rural areas.  See workpaper 12.  Approximately thirty percent of residents live in rural areas in the Crescent City HSA, roughly forty percent of residents live in rural areas in the Lakeport and Auburn HSAs, and roughly sixty percent of residents live in rural areas in the Jackson HSA.

[113] For example, in the proposed Hershey-Pinnacle Health merger, WellSpan Good Samaritan Hospital is over thirty minutes from the closest of hospital among the Hershey and Pinnacle Health Hospitals (PinnacleHealth Westshore Hospital), yet, it is included in the FTC's market.  See workpaper 13.

[114] Drive time is calculated using Google Maps' projections with traffic for 10:00 AM PST on Tuesday, February 6, 2018.

[115] Fourth Amended Complaint, ¶ 4.

[116] See *Exhibit 7*.

hospital that is outside the combined HSA "market" proposed by Plaintiffs, and all five are within a twenty-five minute drive of such a hospital.[117]

67.     I also examine the availability of nearby hospitals based on the distance between the residents of an HSA and their nearest hospitals outside their HSA;[118] I find that many discharges in Plaintiffs' proposed markets are for patients who live close to hospitals in a different HSA, sometimes even closer than to hospitals within their HSA of residence.[119] Ninety percent of discharges for residents of the combined Berkeley-Oakland "market" are for patients who live within twenty minutes of a hospital outside of either the Berkeley or Oakland HSAs.  Over fifty percent of the discharges for residents of the combined Berkeley-Oakland HSA are for patients who live closer to a hospital *outside* the combined HSAs than at least one hospital within either the Berkeley or Oakland HSAs, and nearly twenty percent live closer to a hospital outside the combined HSAs than *any* hospital within them.[120]  See *Exhibit 8.*  Forty-seven percent of Davis HSA resident discharges and thirty-nine percent of Lakeport HSA resident discharges were for patients who live within twenty-five minutes of a hospital outside their HSAs of residence.[121]  Except for Crescent City and Jackson, each of the alleged tying HSAs has over forty percent of its resident discharges accounted for by individuals living within thirty minutes of a hospital in a different HSA.[122]

68.     Plaintiffs' market definition would exclude as competitors many hospitals that are close to the hospitals and residents of the alleged tying HSAs simply because they are located

---

[117] I exclude Sutter hospitals in order to identify substitutes that are independent of the Sutter system.  See *Exhibit 7.*

[118] I calculate the drive time from the geographic center of the discharges' ZIP codes of residence to non-Sutter hospitals based on Google Maps' prediction with traffic for 10:00 AM PST on Tuesday, February 6, 2018.

[119] My analyses include inpatient discharges and inpatient discharges that resulted from emergency department visits.  The analysis excludes psychiatry, chemical dependence, and rehabilitation since they are not part of Plaintiffs' proposed product market.  Following Plaintiffs, I also exclude Kaiser hospitals (although I view Kaiser to be extremely relevant to the question of market definition, as I discuss elsewhere).  Additionally, I exclude newborn discharges since including them would tend to double-count the choice of hospital for deliveries (i.e., the OSHPD data will record a mother's discharge and her newborn's discharge as two separate discharges, but both are driven by the single choice of a hospital for the delivery).  In this analysis, I also exclude Sutter hospitals in other HSAs.

In this analysis, all discharges with partially or fully masked ZIP codes are excluded since I need to know ZIP codes of residence to calculate drive times.  See footnote 78 for a description of why the ZIP codes of the discharges' residences may be masked.

[120] See workpaper 14.  Fifty-one percent of discharges for residents of the Berkeley or Oakland HSAs are for individuals who live closer to hospitals outside the Berkeley or Oakland HSA than at least one hospital within the HSA and eighteen percent of discharges for residents of the Berkeley or Oakland HSAs are for individuals who live closer to hospitals outside the Berkeley or Oakland HSA than any hospital within the HSA.

[121] See *Exhibit 8.*

[122] See *Exhibit 8.*

in different HSAs.  This is despite the evidence on typical travel times, the Knox Keane regulations that Plaintiffs reference, and Plaintiffs' assumption that CPMC – St. Luke's Campus and the Chinese Hospital—which are a twenty-nine minute drive apart—are competitors.  This inconsistency can persist because HSAs are not based on an evaluation of economic substitution, and are therefore insufficient to form the basis for appropriate antitrust markets.

###    B.    Patients' Choices Show that There Are Competitive Alternatives Outside Patients' HSA of Residence

69.    In addition to travel times, another way to determine which hospitals insurers and patients may view as economic substitutes is to examine information on the hospitals actually chosen by residents of different HSAs.  These choices indicate patients' willingness to substitute between hospitals across HSAs.  For this analysis, I examined the OSHPD discharge data again.[123]  I found that in many California HSAs, including the alleged tying and tied HSAs, a significant share of the discharges for an HSA's residents take place at hospitals located outside the HSA.  Additionally, in some of these putative "markets," individuals residing outside the HSA accounted for a significant share of the discharges that took place within the HSA.

70.    Across the state, patients frequently seek inpatient care outside the HSA in which they reside, even if they have access to hospitals in their HSAs of residence.  Fifty-two percent of HSAs in California have at least one hospital within their border, but have less than half of their residents' discharges take place at hospitals within the HSA—i.e., more than half of residents' discharges take place outside the HSA.[124]  This group includes several of the alleged tying and tied HSAs.  *Figure 5* shows that out of the twelve "markets" identified by Plaintiffs, discharges for residents of four of these HSAs—Auburn, Davis, Lakeport, and Antioch—are actually more likely to take place in hospitals *outside* of the HSA of residence than inside it.[125]  These four HSAs account for half of the alleged tying markets.  Plaintiffs

---

[123] See footnote 78.

[124] See workpaper 15.  Another nine percent of California HSAs do not have a general acute care hospital, and therefore, a hundred percent of discharges for residents of the HSA take place in hospitals outside the HSA.

[125] Plaintiffs have chosen to combine the Berkeley and Oakland HSAs.  When considered separately, discharges for residents of the Oakland HSA are more likely to come from hospitals outside of the Oakland HSA than from hospitals inside the Oakland HSA.  Kaiser hospitals are excluded from this analysis.  However, if Kaiser hospitals are included, discharges for residents of the Auburn, Davis, Tracy, Lakeport, and Berkeley HSAs are more likely to take place at hospitals outside of the those HSAs, respectively, than inside the HSAs.  See *Exhibit 9*.

claim that Sutter is the only option for insurance plans forming a provider network in these four "markets," but over half of resident discharges took place in hospitals outside the HSA. Outside hospitals clearly provide an attractive alternative for patients from the HSA and could therefore offer an alternative to insurers forming a provider network.

# Figure 5
# Patients Frequently Cross HSA Borders
# for Hospital Care[1][2]
## (Excluding Kaiser)

| | HSA of Residence | Alleged Tied or Tying HSA | Percent Residents' Discharges | |
|---|---|---|---|---|
| | | | Inside HSA | Outside HSA |
| 1. | Auburn | Alleged Tying | 30.3% | 69.7% |
| 2. | Davis | Alleged Tying | 36.2% | 63.8% |
| 3. | Lakeport | Alleged Tying | 41.8% | 58.2% |
| 4. | Antioch | Alleged Tying | 44.2% | 55.8% |
| 5. | Tracy | Alleged Tying | 57.1% | 42.9% |
| 6. | Jackson | Alleged Tying | 64.2% | 35.8% |
| 7. | Crescent City[3] | Alleged Tying | 77.0% | 23.0% |
| 8. | Berkeley-Oakland[4] | Alleged Tying | 80.2% | 19.8% |
| | Oakland | | 42.6% | 57.4% |
| | Berkeley | | 65.6% | 34.4% |
| 9. | Sacramento | Alleged Tied | 81.6% | 18.4% |
| 10. | Santa Rosa | Alleged Tied | 82.7% | 17.3% |
| 11. | Modesto | Alleged Tied | 83.9% | 16.1% |
| 12. | San Francisco | Alleged Tied | 97.5% | 2.5% |

Source:  California Office of Statewide Health Planning Discharge and Financial Data, 2015; American Hospital Association Annual Survey Data, 2015; The Dartmouth Atlas of Healthcare, 1996

Note:
[1]  The analysis excludes discharges in the following OSHPD service lines:  psychiatry, chemical dependence, rehabilitation, and newborn discharges.  The analysis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits. Discharges from Kaiser hospitals are also excluded.
[2]  For patient privacy, OSHPD masks the ZIP code of residence for some discharges.  See footnote 78.
[3]  Since the Crescent City HSA spans the California/Oregon border, discharges from patients that are from Oregon and visited a hospital within the Crescent City HSA are considered to have come from within the Crescent City HSA.
[4]  Results are presented for the combined Berkeley-Oakland region and for the Berkeley HSA and Oakland HSA considered independently.

71.     The Auburn HSA, an alleged tying market, excludes the hospitals that account for the vast majority of resident discharges.  Nearly *seventy percent* of discharges for Auburn HSA residents took place *outside* the Auburn HSA.  In other words, seven out of ten hospitalizations for individuals who live in the Auburn HSA take place at hospitals outside of the HSA, demonstrating that the Auburn HSA is not a relevant geographic market for Inpatient Hospital Services.[126]  See *Figure 6.*  Sutter Roseville Medical Center, a hospital in the Roseville HSA, and Sutter Auburn, the only hospital in the Sutter Auburn HSA, accounted for equal shares (thirty percent) of discharges for patients living in the Auburn HSA.[127]  An additional seventeen percent of discharges for Auburn HSA residents took place at the University of California, Davis Medical Center.[128]  Based on these patterns of patient hospital choice, hospitals in Roseville and Sacramento provide patients and insurers with attractive alternatives that could be leveraged against Sutter Auburn Faith Hospital (in the Auburn HSA) if it attempted to implement a SSNIP.  In other words, the Auburn HSA is extremely unlikely to pass the hypothetical monopolist test.

---

[126] See *Figure 5.*

[127] See workpaper 4.  Because a plurality of Auburn HSA resident discharges did not take place in the Auburn HSA, Auburn would not qualify as an HSA.  See *Exhibit 4.*

[128] See workpaper 4.

# Figure 6
# An Equal Number of Discharges for Auburn HSA Residents Take Place in Roseville and Auburn HSAs
### (Excluding Kaiser)



Source: California Office of Statewide Health Planning and Development Discharge and Financial Data, 2015; The Dartmouth Atlas of Healthcare, 1996; American Hospital Association Annual Survey Data, 2015

Note:

[1]  The analysis excludes discharges in the following OSHPD service lines:  psychiatry, chemical dependence, rehabilitation, and newborn discharges.  The analyis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits. Discharges from Kaiser hospitals are also excluded.

[2]  For patient privacy, OSHPD masks the ZIP code of residence for some discharges.  See footnote 78.

72.     Even for HSAs in which a plurality of resident discharges takes place within the HSA, hospitals outside the HSA can still provide a significant portion of care for residents of the HSA.  For example, forty-two percent of Lakeport's resident discharges took place within the HSA at its only hospital, Sutter Lakeside Hospital.[129]  While the Lakeport HSA accounted for a larger share of discharges than any other single HSA, outside hospitals were still a frequent choice for Lakeport residents.  About eighteen percent of resident discharges took place in the Santa Rosa HSA, mostly at the Santa Rosa Memorial Hospital – Montgomery (nine percent) and the Sutter Santa Rosa Regional Hospital (nine percent).[130]  An additional thirteen percent of Lakeport resident discharges took place at the St. Helena Hospital in the Deer Park HSA, ten percent were from three hospitals in the San Francisco HSA combined, and eight percent were from the Ukiah Valley Medical Center in the Ukiah HSA.[131]  See *Figure 7.*

---

[129] See *Figure 7.*

[130] See workpaper 16.

[131] See workpaper 16 for the percentage of Lakeport HSA resident discharges that took place in San Francisco. Hospitals in the Healdsburg HSA do not account for many Lakeport HSA resident discharges because the only hospital is Healdsburg District Hospital, which had just thirty-eight beds, total, in 2015.  See American Hospital Association Annual Survey, 2015.

# Figure 7
# More than Half of the Discharges for Lakeport HSA Residents
# Take Place Outside of Lakeport HSA

(Excluding Kaiser)



Source:  California Office of Statewide Health Planning and Development Discharge and Financial Data, 2015; The Dartmouth Atlas of Healthcare, 1996; American Hospital Association Annual Survey Data, 2015

Note:

[1]  9.6% of discharges take place in the San Francisco HSA.

[2]  The analysis excludes discharges in the following OSHPD service lines:  psychiatry, chemical dependence, rehabilitation, and newborn discharges.  The analyis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits.  Discharges from Kaiser hospitals are also excluded.

[3]  For patient privacy, OSHPD masks the ZIP code of residence for some discharges.  See footnote 78.

73.     Small adjustments to HSA boundaries do not change this result—that a majority of resident discharges take place outside the patients' HSAs of residence.  For instance, for each of the four HSAs in which a majority of residents' discharges take place in other HSAs— Auburn, Davis, Lakeport, and Antioch—there is no single ZIP code that can be dropped from the HSA such that the majority of residents' discharges from the remaining ZIP codes now remain within the newly defined area.[132]  Similarly, there is no ZIP code from a neighboring HSA that could be added, without adding another hospital, such that the majority of residents' discharges from the new set of ZIP codes would remain within the newly defined area.[133]  In other words, areas that are "roughly congruent" to these HSAs would still witness a majority of their residents' discharges taking place outside the HSA.  These small changes do not change the fact that many patients in these HSAs, or roughly congruent areas, consider hospitals outside their HSA to be attractive alternatives.

74.     Just as there are HSAs for which a majority of their residents' discharges are from hospitals outside the HSA, there are also HSAs for which a majority of the discharges at hospitals inside the HSA are for non-residents.  Sometimes an HSA meets both criteria.  For example, in 2015, only thirty-six percent of the discharges of Davis HSA residents took place in the one Davis HSA hospital.[134]  At the same time, less than half—only forty-four percent—of the discharges from the Davis HSA hospital were accounted for by residents of the HSA.[135]  See *Figure 8*, which shows the percentage of discharges that come from outside hospitals' HSAs.  The remaining fifty-six percent of discharges for Davis HSA hospitals came from residents of at least ten different HSAs.[136]  The fact that both 1) a majority of an HSA's residents' discharges occur at hospitals outside the HSA, and 2) non-residents account for a majority of discharges that take place at hospitals within the HSA, demonstrates that many individuals in Northern California cross HSA borders for care.

---

[132] See workpaper 17.

[133] See workpaper 18.

[134] See *Figure 5*.  Davis has only one hospital, the Sutter Davis Hospital.

[135] See *Figure 8*.  Davis has only one hospital, the Sutter Davis Hospital.

[136] See workpaper 19.  Due to ZIP code masking it is possible that residents of additional unidentified HSAs were discharged from Davis hospitals.

# Figure 8
# Hospitals in Plaintiffs' Alleged Tied and Tying HSAs
# Frequently Care for Residents of Other HSAs[1][2]
## (Excluding Kaiser)

| | Hospital HSA | Alleged Tied or Tying HSA | Discharges of Patients from Outside HSA |
|---|---|---|---|
| 1. | Davis | Alleged Tying | 55.6% |
| 2. | Berkeley-Oakland[3] | Alleged Tying | 43.1% |
| | Berkeley | Alleged Tying | 71.1% |
| | Oakland | Alleged Tied | 58.2% |
| 3. | San Francisco | Alleged Tied | 41.6% |
| 4. | Sacramento | Alleged Tied | 37.9% |
| 5. | Santa Rosa | Alleged Tied | 28.8% |
| 6. | Modesto | Alleged Tied | 28.4% |
| 7. | Auburn | Alleged Tying | 18.6% |
| 8. | Tracy | Alleged Tying | 18.1% |
| 9. | Jackson | Alleged Tying | 15.6% |
| 10. | Antioch | Alleged Tying | 12.0% |
| 11. | Lakeport | Alleged Tying | 11.4% |
| 12. | Crescent City[4] | Alleged Tying | 0.0% |

Source: California Office of Statewide Health Planning Discharge and Financial Data, 2015; American Hospital Association Annual Survey Data, 2015; The Dartmouth Atlas of Healthcare, 1996

Note:
[1] The analysis excludes discharges in the following OSHPD service lines: psychiatry, chemical dependence, rehabilitation, and newborn discharges. The analysis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits. Discharges from Kaiser hospitals are also excluded.
[2] For patient privacy, OSHPD masks the ZIP code of residence for some discharges. See footnote 78.
[3] Results are presented for the combined Berkeley-Oakland region and for the Berkeley HSA and Oakland HSA considered independently.
[4] Since the Crescent City HSA spans the California/Oregon border, discharges from patients that are from Oregon and visited a hospital within the Crescent City HSA are considered to have come from within the Crescent City HSA.

75.     There are many reasons why patients may cross HSAs to receive inpatient care.  A patient may choose a hospital outside of her HSA because the selected facilities are highly reputed or because her physicians referred her to that facility.[137]  A patient may also select a hospital outside her HSA of residence because the facility is near extended family who can provide her with support during treatment.  She may select a facility near her workplace if she anticipates that she will need outpatient care following her inpatient stay.  For some residents of an HSA, hospitals outside the HSA may be closer than hospitals inside the HSA.  And, as a practical matter, I am not aware of any evidence that patients take the boundaries of an HSA into account when deciding where to seek care or are even aware of their HSA of residence or the HSA in which their hospital is located.

76.     Regardless of the reason, the significant share of discharges that cross HSA borders for care strongly suggests that HSAs do not include all relevant competitors.  Small adjustments to produce areas "roughly congruent" to HSAs would not be sufficient to correct this problem.  As a result, HSAs, and areas "roughly congruent" with HSAs, are not suitable antitrust markets.

### C.     Plaintiffs' Decision to Combine the Berkeley and Oakland HSAs into One Market Confirms that HSAs Are Not Proper Antitrust Markets

77.     By defining a combined Berkeley-Oakland market, Plaintiffs implicitly acknowledge that HSAs, even those with acute care hospitals, do not define proper antitrust markets.  In the Fourth Amended Complaint, they propose that the Berkeley HSA and Oakland HSA should be combined in order to define a market for Inpatient Hospital Services.[138]  But they provide no principled way of testing whether other HSAs should also be combined to form a market for antitrust purposes, or even if the combination of Berkeley and Oakland now defines a proper antitrust market.  Their decision to combine the two HSAs into one market contradicts their decision to consider other HSAs as independent markets.

78.     *Exhibit 10* shows that residents of the Berkeley and Oakland HSAs frequently cross HSA boundaries to receive care.  While forty-three percent of discharges for residents of the Oakland HSA take place in Oakland, thirty-four percent take place in the Berkeley HSA.

---

[137] NRC Health, "Getting it right:  the link between the patient experience and the hospital reputation," February 21, 2014, https://nrchealth.com/positive-patient-experience-and-hospital-reputation/; Jauhar, Sandeep and M.D., "Referral System Turns Patients Into Commodities," *The New York Times*, May 25, 2009, http://www.nytimes.com/2009/05/26/health/26essa.html.

[138] Fourth Amended Complaint, ¶ 4.

Further, among Berkeley hospital discharges, thirty-four percent are for Oakland residents while only twenty-nine percent are for residents of Berkeley.  This extent of overlap may have motivated Plaintiffs to combine the Berkeley and Oakland HSAs into one market, but this combination serves to illustrate that:  1) HSAs are not independent markets; 2) Plaintiffs agree that some of the HSAs in question do not define proper antitrust markets; and 3) small adjustments to these HSAs that maintain areas "roughly congruent" to HSAs will not be sufficient to yield properly defined markets for the purpose of antitrust analysis.

### D.    Kaiser's Experience Further Shows that HSAs Are Not Proper Antitrust Markets

79.    Plaintiffs' claim that HSAs can be used to define antitrust markets implies that insurers must offer in-network hospitals in each of the alleged tying and tied HSAs to successfully market insurance plans to that HSA.  Kaiser's experience in Northern California directly contradicts this notion.  Kaiser is able to sell insurance to residents of many HSAs without hospitals in those HSAs.  In particular, as I discuss below, Kaiser has successfully served enrollees in ten of the twelve alleged tying and tied markets, even though it does not have hospitals in five of these "markets."[139]  Kaiser's success establishes that hospitals in different HSAs can be relevant substitutes and should be included in the same market for antitrust purposes.  By excluding these options, HSAs are simply invalid as a basis for defining antitrust markets.

80.    My analysis in this report has (mostly) excluded Kaiser hospitals, following Plaintiffs' decision to exclude Kaiser from their "markets."[140]  However, Kaiser's experience as an integrated health plan and healthcare provider is a useful illustration of the unsuitability of HSAs as antitrust markets.

81.    As an integrated provider, Kaiser provides both health insurance and health care for its enrollees.[141]  Kaiser will cover treatments that its enrollees receive from Kaiser healthcare

---

[139] See *Figure 10*.  Kaiser does not offer individual insurance plans for residents of the Crescent City and Lakeport HSAs.  Only two ZIP codes from Jackson are eligible.  Searches of Kaiser's website show that individuals living in ZIP codes in these HSAs cannot purchase Kaiser plans.  See Kaiser Permanente, "Kaiser Permanente | Individual & family plans," https://individual-family.kaiserpermanente.org/healthinsurance/.

[140] Fourth Amended Complaint, ¶ 32.

[141] Fourth Amended Complaint, ¶ 32.  Also see Ho, Kate and Robin S. Lee, "Insurer Competition in Health Care Markets," *Econometrica* 85, no. 2, 2017, pp. 379–417 at p. 391 ("…Kaiser Permanente, a vertically integrated insurer with its own set of physicians and hospitals.").

providers, but does not cover non-emergency care at non-Kaiser hospitals.[142] Kaiser's general acute hospitals are located in twenty-seven, or only twelve percent, of the HSAs in California.[143] Yet, Kaiser attracts a significant proportion of discharges from many HSAs in Northern California. See *Figure 9*. Across California, Kaiser is a highly competitive health plan with approximately forty-four percent of the state's enrollees in large-group insurance[144] and twenty-four percent of commercial discharges.[145]

---

[142] Sutter and other acute care hospitals do face competition from Kaiser hospitals. If Sutter were to increase its price to insurers, and insurers increased their premiums to enrollees, individuals and self-insured employers would have an increased incentive to switch to Kaiser plans. This could reduce demand for non-Kaiser health plans and for Sutter Inpatient Hospital Services.

Over forty percent of discharges from hospitals in three of Sutter's alleged tying markets—Antioch, Berkeley-Oakland, and Tracy—take place in Kaiser hospitals. See *Figure 10*. By ignoring Kaiser hospitals, Plaintiffs ignore an important potential source of market discipline on the Sutter hospitals in those HSAs—*in addition to* nearby hospitals in other HSAs.

Additionally, Kaiser and Sutter directly compete at the stage at which employers and individuals choose insurance plans. As an integrated system, Kaiser offers commercial health insurance plans.

[143] See workpaper 20.

[144] Large-group insurance is employer-sponsored insurance for employers with over one hundred employees. See Kaiser Family Foundation, "Market Share and Enrollment of Largest Three Insurers- Large Group Market," http://www.kff.org/other/state-indicator/market-share-and-enrollment-of-largest-three-insurers-large-group-market/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[145] See workpaper 3.

# Figure 9
# Kaiser Accounts for a Significant Proportion of Resident Discharges from Many HSAs, Including Where It Has No Hospital



Source:  California Office of Statewide Health Planning Discharge and Financial Data, 2015; The Dartmouth Atlas of Healthcare, 1996; American Hospital Association Annual Survey Data, 2015

Note:
[1] The analysis excludes discharges in the following OSHPD service lines:  psychiatry, chemical dependence, rehabilitation, and newborn discharges.  The analysis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits.
[2] For patient privacy, OSHPD masks the ZIP code of residence for some discharges.  See footnote 78.

82.     As *Figure 9* suggests, enrollees in Kaiser's health plan frequently travel outside their HSAs of residence for in-network inpatient care.  Across California, sixty-two percent of discharges from Kaiser hospitals take place in a different HSA than the one in which the patient lives.[146]  For several HSAs with a high share of patient discharges at Kaiser hospitals, not only is there no Kaiser hospital within the HSA, there is not a Kaiser hospital right across the border either.  As *Figure 9* illustrates, patients in several HSAs must be traveling well across the borders of their HSAs of residence to receive care at a Kaiser hospital.  This indicates that Kaiser hospitals are not only an attractive alternative to people who have a Kaiser hospital in their HSA of residence, or just across the border, but also to individuals who must travel well outside an area that is "roughly congruent" with their HSAs of residence.

83.     Residents in many of the HSAs at issue travel across HSAs to receive care at Kaiser hospitals.  Five of the alleged tying and tied HSAs in the greater San Francisco Bay Area do not have Kaiser hospitals, yet ***thirty percent*** of discharges for residents of these HSAs take place in a Kaiser hospital.  See *Figure 10*.  As both *Figure 9* and *Figure 10* show, HSAs with a Kaiser hospital typically have a high share of their residents' discharges taking place at a Kaiser hospital, but surrounding HSAs without a Kaiser hospital often do as well.[147]

---

[146] See workpaper 21.

[147] I exclude the Crescent City and Lakeport HSAs from this analysis because Kaiser does not market plans on the California Health Insurance Exchange in any ZIP code in these HSAs.  See Kaiser Permanente, "Individual & family plans," https://individual-family.kaiserpermanente.org/healthinsurance/.

# Figure 10
# Kaiser Accounts for a Significant Proportion of Resident Discharges in Alleged Tied and Tying HSAs, Including Where it Has No Hospitals[1][2]

|  | Share of Discharges |
|---|---|
| **Alleged Tied/Tying HSAs with Kaiser Hospital** | **39%** |
| Antioch | 50% |
| Berkeley-Oakland[3] | 42% |
|    Oakland | 46% |
|    Berkeley | 32% |
| Sacramento | 42% |
| San Francisco | 25% |
| Santa Rosa | 51% |
|  |  |
| **Alleged Tied/Tying HSAs without Kaiser Hospital** | **30%** |
| Auburn | 26% |
| Davis | 29% |
| Jackson | 15% |
| Modesto | 28% |
| Tracy | 41% |
| **All Alleged Tied/Tying HSAs** | **38%** |

Source: California Office of Statewide Health Planning Discharge and Financial Data, 2015; American Hospital Association Annual Survey Data, 2015

Note:
[1] The analysis excludes discharges in the following OSHPD service lines: psychiatry, chemical dependence, rehabilitation, and newborn discharges. The analysis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits.
[2] For patient privacy, OSHPD masks the ZIP code of residence for some discharges. See footnote 78.
[3] There is a Kaiser Hospital located in Oakland, but not in Berkeley.
[4] Individual commercial health insurance plans are not offered by Kaiser in the Crescent City and Lakeport HSAs. These HSAs are excluded from the table.

84.     Kaiser markets its plan to potential enrollees based on its network of Kaiser hospitals, with care at non-Kaiser hospitals covered only under rare circumstances such as emergencies or when specialized care is needed and unavailable at Kaiser facilities.[148]  Individuals enroll in Kaiser with the understanding that they may have to travel for inpatient care.  Kaiser's success in HSAs without a Kaiser facility shows that individuals are willing to enroll in insurance plans without in-network hospitals within their HSAs of residence.  Even if Kaiser enrollees are, on average, willing to travel farther for inpatient care than average individuals, Kaiser's large share indicates that enrollees with these preferences are not unusual, and other insurers could expect to offer marketable plans without hospitals in every HSA.  Hence, other insurers could leverage hospitals in different HSAs against each other when negotiating network reimbursement and contract terms.  Because HSAs exclude relevant competitive alternatives that insurers could use in negotiations, Plaintiffs' alleged markets are too narrow and inappropriate for the analysis of antitrust issues.

## V.     Conclusion

85.     For the aforementioned reasons, I conclude that the alleged tying and tied HSAs were not designed to be antitrust markets, exclude competitive alternatives to hospitals within HSAs, and hence, do not and cannot constitute appropriate antitrust markets.

86.     This declaration was executed under penalty of perjury under the laws of the United States.  I executed this declaration on April 3, 2018 in Champaign, IL.

_____
Gautam Gowrisankaran

---

[148] Kaiser directs its members to search its online provider list, which only includes Kaiser-affiliated providers, in order to find in-network providers.  See Kaiser Permanente, "Basic Plan Evidence of Coverage," pp. 1–179 at p. 6, https://www.calpers.ca.gov/docs/2017-kaiser-basic-evidence-coverage.pdf; Kaiser Permanente, "Find doctors and locations," https://healthy.kaiserpermanente.org/northern-california/doctors-locations#/search-form. However, Kaiser does cover emergency care from "non-Plan" hospitals.  See Kaiser Permanente, "Your Guidebook to Kaiser Permanente Services:  San Francisco, Marin, and Sonoma | 2016-2017," pp. 1–88 at p. 57, https://healthy.kaiserpermanente.org/static/health/en-us/pdfs/cal/guidebook_SanFran_Marin_Sonoma.pdf.

# Exhibit 1A
# Location of Hospitals in San Francisco Bay Area



Source:  California Office of Statewide Health Planning and Development Discharge and Financial Data, 2015; The Dartmouth Atlas of Healthcare, 1996; American Hospital Association Annual Survey Data, 2015; Google Geocode API, 2017

# Exhibit 1B
# Location of Hospitals in Upper Northern CA



Source:  California Office of Statewide Health Planning and Development Discharge and Financial Data, 2015; The Dartmouth Atlas of Healthcare, 1996; US Department of Commerce, Census Bureau, County Boundary File; American Hospital Association Annual Survey Data, 2015; Google Geocode API, 2017

# Exhibit 2
# Over 40% of HSAs Would Not Meet Dartmouth's "Plurality Criteria" Using 2015 Commercially Insured Discharges
## (Including Kaiser)



Source:  California Office of Statewide Health Planning and Development Discharge and Financial Data, 2015; The Dartmouth Atlas of Healthcare, 1996; US Department of Commerce, Census Bureau, County Boundary File; American Hospital Association Annual Survey Data, 2015

Note:

[1]  The analysis excludes discharges in the following OSHPD service lines:  psychiatry, chemical dependence, rehabilitation, and newborn discharges.  The analysis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits.

[2]   For patient privacy, OSHPD masks the ZIP code of residence for some discharges.  See footnote 78.

[3]   The white space includes regions with no HSA and several HSAs that cross the California state border but are not assigned to California by Dartmouth.

# Exhibit 3
# California HSAs that Would Not Meet Dartmouth's "Plurality Criteria" Using 2015 Commercially Insured Discharges[1][2][3]

|    |                        | Excluding Kaiser | Including Kaiser |
|----|------------------------|------------------|------------------|
| 1. | HSAs without Hospitals | 21 [9.5%]        | 17 [7.7%]        |
| 2. | HSAs with Hospitals    | 66 [29.7%]       | 74 [33.3%]       |
|    | **Total**              | 87 [39.2%]       | 91 [41%]         |

Source:  California Office of Statewide Health Planning Discharge and Financial Data, 2015; American Hospital Association Annual Survey Data, 2015; The Dartmouth Atlas of Healthcare, 1996

Note:
[1]  HSAs for which a plurality of residents' discharges were from hospitals in a different HSA are identified as not meeting Dartmouth's "plurality criteria."
[2]  The analysis excludes discharges in the following OSHPD service lines:  psychiatry, chemical dependence, rehabilitation, and newborn discharges.  The analysis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits.
[3]  For patient privacy, OSHPD masks the ZIP code of residence for some discharges. See footnote 78.

# Exhibit 4
# Alleged Tied and Tying HSAs that Would Be Affected by Dartmouth's "Plurality Criteria" if Applied to Commercially Insured Discharges[1][2]
## (Excluding Kaiser)

| Alleged Tied/Tying HSA[3] | HSAs that Account for as Many or More of Alleged Tied/Tying HSA's Residents' Discharges |
|---|---|
| 1.  Auburn | Roseville accounts for as many Auburn HSA resident discharges as Auburn. |
| 2.  Davis | Sacramento accounts for a plurality of Davis HSA resident discharges. |

| Alleged Tied/Tying HSA[4] | HSAs with a Plurality of Residents' Discharges Taking Place in Alleged Tied/Tying HSA |
|---|---|
| 1.  Berkeley[5] | Alameda, Pinole, San Pablo |
| 2.  Modesto | Oakdale |
| 3.  Sacramento | Carmichael, Davis |
| 4.  San Francisco | Daly City |
| 5.  Santa Rosa | Healdsburg, Sebastopol |

Source:  California Office of Statewide Health Planning Discharge and Financial Data, 2015; American Hospital Association Annual Survey Data, 2015; The Dartmouth Atlas of Healthcare, 1996

Note:
[1]  The analysis excludes discharges in the following OSHPD service lines:  psychiatry, chemical dependence, rehabilitation, and newborn discharges.  The analysis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits.  Discharges from Kaiser hospitals are also excluded.
[2]  For patient privacy, OSHPD masks the ZIP code of residence for some discharges. See footnote 78.
[3]  All tying and tied HSAs listed have hospitals, but a plurality of residents' discharges take place in a different HSA.
[4]  All tying and tied HSAs listed meet the plurality criteria, but they also serve a plurality of discharges of residents living in other HSAs.
[5]  The Berkeley HSA is part of the combined Oakland-Berkeley HSA that Plaintiffs allege is a tying market.

## Exhibit 5
## FTC's Proposed Market for the Hershey-Pinnacle Merger Case Includes Multiple HSAs
## Harrisburg Area, PA



Source:  The Dartmouth Atlas of Healthcare, 1996; American Hospital Association Annual Survey Data, 2015; Google Geocode API, 2017; United States Census Bureau, 2010 FIPS Codes for Counties and County Equivalent Entities; United States Department of Housing and Urban Development, HUD-USPS ZIP Crosswalk Files; www.pinnaclehealth.org; Opinion of the Court, US Court of Appeals for the Third Circuit, Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center and Pinnacle Health System, No. 16-2365

Note:

[1]  FTC's proposed market is enclosed by the blue line.  It is defined by four counties in the Harrisburg area:  Dauphin, Cumberland, Lebanon, and Perry.

[2]  PinnacleHealth West Shore Hospital does not appear in the AHA Data, but is located inside the proposed market. Therefore, it is included.

# Exhibit 6
# FTC's Proposed Market for the Advocate-NorthShore Merger Case Includes Hospitals in Multiple HSAs
## Chicago Area, IL



Source:  The Dartmouth Atlas of Healthcare, 1996; Google Geocode API, 2017; Amended Memorandum Opinion and Order, US District Court for the Northern District of Illinois Eastern Division, Federal Trade Commission and State of Illinois v. Advocate Health Care, Advocate Health and Hospitals Corporation, and NorthShore University HealthSystem, No. 15 C 11473; https://www.advocatehealth.com/locations/hospital-locations; https://www.northshore.org/locations/our-hospital; https://www.nch.org/location-contact-info/nch-hospital; http://www.presencehealth.com/presence-resurrection-medical-center-chicago-maps-directions; https://www.nm.org/locations/lake-forest-hospital; https://swedishcovenant.org/patients-visitors/maps-directions

Note:
[1]  FTC's proposed market is defined by six of the merging parties' hospitals and five competing hospitals.  The hospitals are located in nine HSAs.

# Exhibit 7
## Most Hospitals in Alleged Tying HSAs Have a non-Sutter Hospital in a Different HSA Within 30 Minutes
### (Excluding Kaiser)

| | Hospital | Alleged Tying HSA[1] | Number of Hospitals in Different HSAs Within Estimated Drive (Minutes)[2] | | | Total[3] |
|---|---|---|---|---|---|---|
| | | | 16 - 20 | 21 - 25 | 26 - 30 | |
| 1. | Children's Hospital and Research Center at Oakland | Berkeley-Oakland | 2 | 3 | 2 | 7 |
| 2. | Highland Hospital | Berkeley-Oakland | 2 | 2 | 3 | 7 |
| 3. | Alta Bates Summit Medical Center | Berkeley-Oakland | 2 | 1 | 3 | 6 |
| 4. | Alta Bates Summit Medical Center - Alta Bates Campus | Berkeley-Oakland | 0 | 4 | 2 | 6 |
| 5. | Alta Bates Summit Medical Center - Herrick Campus | Berkeley-Oakland | 0 | 2 | 3 | 5 |
| 6. | Sutter Davis Hospital | Davis | 1 | 0 | 3 | 4 |
| 7. | Sutter Tracy Community Hospital | Tracy | 0 | 2 | 1 | 3 |
| 8. | Sutter Delta Medical Center | Antioch | 0 | 1 | 1 | 2 |
| 9. | Sutter Amador Hospital | Jackson | 0 | 1 | 0 | 1 |
| 10. | Sutter Auburn Faith Hospital | Auburn | 0 | 0 | 1 | 1 |
| 11. | Sutter Coast Hospital | Crescent City | 0 | 0 | 0 | 0 |
| 12. | Sutter Lakeside Hospital | Lakeport | 0 | 0 | 0 | 0 |

Source:  California Office of Statewide Health Planning Discharge and Financial Data, 2015; Google Maps Distance Matrix and Geocoding API, 2017; American Hospital Association Annual Survey Data, 2015; The Dartmouth Atlas of Healthcare, 1996

Note:
[1]  Results are presented for the combined Berkeley-Oakland region.
[2]  Drive time is calculated using Google Maps projections, including traffic, at 10:00 AM PST on Tuesday, February 6, 2018.
[3]  Nearby hospitals are those within a 30 minute drive of each hospital.  Kaiser hospitals are excluded from this analysis.  Sutter hospitals are also excluded from the set of potential "nearby" hospitals in a different HSA.

# Exhibit 8

# A Significant Share of Discharges from Alleged Tying HSAs are for Patients Living Within 30 Minutes of non-Sutter Hospitals in Other HSAs[1]
## (Excluding Kaiser)

| | Alleged Tying HSAs | Share of Discharges within a Certain Estimated Drive Time of a Hospital Outside their HSA of Residence (Minutes) | | | | |
|---|---|---|---|---|---|---|
| | | 1 - 15 | 16 - 20 | 21 - 25 | 26 - 30 | Total |
| 1. | Berkeley-Oakland[2] | 34% | 56% | 9% | 0% | 100% |
| 2. | Tracy | 0% | 0% | 61% | 39% | 100% |
| 3. | Antioch | 0% | 0% | 26% | 25% | 51% |
| 4. | Davis | 0% | 47% | 0% | 0% | 47% |
| 5. | Lakeport | 0% | 0% | 39% | 6% | 45% |
| 6. | Auburn | 0% | 0% | 13% | 32% | 44% |
| 7. | Jackson | 0% | 0% | 0% | 29% | 29% |
| 8. | Crescent City[3] | 0% | 0% | 0% | 0% | 0% |

Source:  California Office of Statewide Health Planning Discharge and Financial Data, 2015; Google Maps Distance Matrix and Geocode API, 2017; American Hospital Association Annual Survey Data, 2015; The Dartmouth Atlas of Healthcare, 1996

Note:
 [1]  The analysis excludes discharges in the following OSHPD service lines:  psychiatry, chemical dependence, rehabilitation, and newborn discharges.  The analysis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits.  Drive time is calculated from the centroid of the discharges' ZIP codes of residence in alleged tying HSAs to non-Sutter hospitals in the surrounding HSAs using Google Map's projections, including traffic, at 10:00 AM PST on Tuesday, February 6, 2018.  Kaiser hospitals are excluded from this analysis.  Sutter hospitals are excluded from the set of potential "nearby" hospitals.  Patient discharges with masked ZIP codes or identified as homeless residents are excluded from this analysis.
[2]  Results are presented for the combined Berkeley-Oakland region.
[3]  For the Crescent City HSA, Oregon discharges from Sutter Coast Hospital were included in the analysis and assumed to live at least more than 30 minutes away from any hospital.

# Exhibit 9
# Patients Frequently Cross HSA Borders
# for Hospital Care[1][2]
## (Including Kaiser)

| | Discharges HSA of Residence | Alleged Tied or Tying HSA | Percent Residents' Discharges | |
|---|---|---|---|---|
| | | | Inside HSA | Outside HSA |
| 1. | Auburn | Alleged Tying | 22.4% | 77.6% |
| 2. | Davis | Alleged Tying | 25.8% | 74.2% |
| 3. | Tracy | Alleged Tying | 33.8% | 66.2% |
| 4. | Lakeport | Alleged Tying | 41.8% | 58.2% |
| 5. | Jackson | Alleged Tying | 54.5% | 45.5% |
| 6. | Antioch | Alleged Tying | 59.2% | 40.8% |
| 7. | Modesto | Alleged Tied | 60.1% | 39.9% |
| 8. | Sacramento | Alleged Tied | 74.0% | 26.0% |
| 9. | Crescent City[3] | Alleged Tying | 77.0% | 23.0% |
| 10. | Berkeley-Oakland[4] | Alleged Tying | 81.7% | 18.3% |
| | Berkeley | | 44.4% | 55.6% |
| | Oakland | | 60.5% | 39.5% |
| 11. | Santa Rosa | Alleged Tied | 85.6% | 14.4% |
| 12. | San Francisco | Alleged Tied | 94.9% | 5.1% |

Source:  California Office of Statewide Health Planning Discharge and Financial Data, 2015; American Hospital Association Annual Survey Data, 2015; The Dartmouth Atlas of Healthcare, 1996

Note:
[1]  The analysis excludes discharges in the following OSHPD service lines:  psychiatry, chemical dependence, rehabilitation, and newborn discharges.  The analysis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits.
[2]  For patient privacy, OSHPD masks the ZIP code of residence for some discharges.  See footnote 78.
[3]  Since the Crescent City HSA spans the California/Oregon border, discharges from patients that are from Oregon and visited a hospital within the Crescent City HSA are considered to have come from within the Crescent City HSA.
[4]  Results are presented for the combined Berkeley-Oakland region and for the Berkeley HSA and Oakland HSA considered independently.

# Exhibit 10
# There Are Significant Discharge Flows between
# Berkeley and Oakland[1][2]
## (Excluding Kaiser)

|  |  | Berkeley HSA | Oakland HSA |
|---|---|---|---|
| 1. | Discharges of Berkeley HSA Residents | 65.6% | 21.6% |
| 2. | Discharges of Oakland HSA Residents | 34.4% | 42.6% |

|  |  | HSAs where Patients Live | |
|---|---|---|---|
|  |  | Berkeley HSA | Oakland HSA |
| 3. | Berkeley HSA Hospital Discharges | 28.9% | 33.5% |
| 4. | Oakland HSA Hospital Discharges | 9.6% | 41.8% |

Source:  California Office of Statewide Health Planning Discharge and Financial Data, 2015; American Hospital Association Annual Survey Data, 2015; The Dartmouth Atlas of Healthcare, 1996

Note:
[1]  The analysis excludes discharges in the following OSHPD service lines:  psychiatry, chemical dependence, rehabilitation, and newborn discharges.  The analysis includes all other inpatient discharges and inpatient discharges that resulted from emergency department visits.  Discharges from Kaiser hospitals are also excluded.
[2]  For patient privacy, OSHPD masks the ZIP code of residence for some discharges. See footnote 78.

# Appendix A

April 2018

# Gautam Gowrisankaran

**PERSONAL:**

Department of Economics      Phone: (520) 621-2529, Fax: (520) 621-8450
Eller College of Management  E-mail: gowrisankaran@eller.arizona.edu
University of Arizona         Citizenship: USA and Canada
P.O. Box 210108              Languages: English, French, fluent, Spanish, moderate
Tucson, AZ 85721             Date of Birth: March 18, 1971

**RESEARCH INTERESTS:**

Industrial Organization, Health Economics, Environmental Economics, Applied
    Econometrics

**EDUCATION:**

Honorary Doctorate (expected), University of Oulu, 2017
Ph.D., Economics, Yale University, 1995
M.Phil., Economics, Yale University, 1993
M.A., Economics, Yale University, 1992
B.A., Economics, Swarthmore College, 1991

**PROFESSIONAL EXPERIENCE:**

**Current position:**

Arizona Public Service Professor of Economics (with tenure), Department of Economics,
    Eller College of Management, University of Arizona, 2011 –

**Other current affiliations:**

Research Associate, National Bureau of Economic Research, 2012 – present
Professor (by courtesy), Department of Marketing, Eller College of Management,
    University of Arizona, Aug. 2011 –
Professeur afilié, Institut d'économie appliquée, HEC Montréal, 2007 – present

**Past positions:**

Visiting Scholar, Becker-Friedman Institute, Department of Economics, University of
    Chicago, Spring 2016
Visiting Professor, Department of Economics, Northwestern University, Winter, Spring
    2014
Visiting Professor, Universidad de los Andes, Santiago, Chile, Fall 2013
Director of Graduate Studies, Department of Economics, University of Arizona, 2009–13
Faculty Research Fellow, National Bureau of Economic Research, 2001 – 12
Associate Professor of Economics (with tenure), Department of Economics, Eller College
    of Management, University of Arizona, 2007 – 2011
Visiting Scholar, Center for the Study of Industrial Organization, Department of
    Economics, Northwestern University, 2009, 2010

Research Associate Professor, Department of Ophthalmology and Vision Sciences, Washington University in St. Louis School of Medicine, 2007 – 2009

Visiting Associate Professor, Department of Economics, Eller College of Management, University of Arizona, Spring 2007

Assistant Professor of Economics, John M. Olin School of Business, Washington University in St. Louis, 2003 – 2007

Visiting Scholar, Federal Reserve Bank of San Francisco, 2001 – 02, 2005

Consultant, Federal Reserve Bank of New York, 2002 – 04

Visiting Assistant Professor, Department of Economics, Yale University, Spring 2003

Visiting Assistant Professor, Department of Economics, Harvard University, Fall 2002

Assistant Professor, Department of Economics, University of Minnesota, 1995 – 2002

Visiting Assistant Professor, Department of Economics, University of Michigan, 1997 – 98

## REFEREED PUBLICATIONS:
### Published and forthcoming:

Collard-Wexler, Allan, Gautam Gowrisankaran and Robin Lee (2018). "'Nash-in-Nash' Bargaining: A Microfoundation for Empirical Work.'" (Also NBER Working Paper 20,640.) Forthcoming, *Journal of Political Economy*.

Gowrisankaran, Gautam, Claudio Lucarelli, Philipp Schmidt-Dengler and Robert J. Town (2018). "Can Amputation Save the Hospital? The Impact of the Medicare Rural Flexibility Program on Demand and Welfare." *Journal of Health Economics* 58: 110-122. (Also NBER Working Paper 18.894.)

Griffin, Stephanie, David Bui, Gautam Gowrisankaran, Eric A. Lutz, Charles He, Chengcheng Hu and Jefferey L. Burgess (2018). "Risk Management Interventions to Reduce Injuries and Maximize Economic Benefits in U.S. Mining." *Journal of Occupational and Environmental Medicine* 60(3): 226-233.

Gowrisankaran, Gautam, Stanley Reynolds and Mario Samano (2016). "Intermittency and the Value of Renewable Energy." (Also NBER Working Paper 17,086.) *Journal of Political Economy* 124(4): 1187-1234.

Gautam Gowrisankaran, Aviv Nevo and Robert Town (2015). "Mergers When Prices Are Negotiated: Evidence from the Hospital Industry." (Also NBER Working Paper 18,875.) *American Economic Review* 175(1): 172-203.

Gowrisankaran, Gautam, Karen Norberg, Steven Kymes, Michael Chernew, Dustin Stwalley, Leah Kemper and William Peck (2013). "A Hospital System's Wellness Program Linked To Health Plan Enrollment Cut Hospitalizations But Not Overall Costs." *Health Affairs* 32(3): 477–85.

Gowrisankaran, Gautam and Marc Rysman (2012). "Dynamics of Consumer Demand for New Durable Goods." *Journal of Political Economy* 120(6): 1173-1219.

Gowrisankaran, Gautam and John Krainer (2011). "Entry and Pricing in a Differentiated Products Industry: Evidence from the ATM Market." *RAND Journal of Economics* 42: 1-22.

Gowrisankaran, Gautam, Claudio Lucarelli, Philipp Schmidt-Dengler and Robert Town (2011). "The Impact of the Medicare Rural Hospital Flexibility Program on Patient Choice." *International Journal of Industrial Economics* 29: 342-344.

Gowrisankaran, Gautam, Robert J. Town and Eric Barrette (2011). "Managed Care, Drug

Benefits, and Mortality: An Analysis of the Elderly." *The B.E. Journal of Economic Analysis and Policy* 11: Issue 2 *(Advances)* Article 3.

Chernew, Michael, Gautam Gowrisankaran and Dennis Scanlon (2008). "Learning and the Value of Information: Evidence from Health Plan Report Cards." (Also NBER Working Paper 8589.) *Journal of Econometrics* 144: 156-74.

Gowrisankaran, Gautam, Matthew F. Mitchell and Andrea Moro (2008). "Electoral Design and Voter Welfare from the U.S. Senate: Evidence from a Dynamic Selection Model." (Also NBER Working Paper 10748.) *Review of Economic Dynamics* 11: 1–17.

Ackerberg, Daniel A. and Gautam Gowrisankaran (2006). "Quantifying Equilibrium Network Externalities in the ACH Banking Industry." *RAND Journal of Economics* 37: 738-61.

Gowrisankaran, Gautam and Thomas J. Holmes (2004). "Mergers and the Evolution of Industry Concentration: Results from the Dominant Firm Model." *RAND Journal of Economics* 35: 561–82. (Also NBER Working Paper 9151.)

Gowrisankaran, Gautam and Joanna Stavins (2004). "Network Externalities and Technology Adoption: Lessons from Electronic Payments." *RAND Journal of Economics* 35: 260–276. (Also NBER Working Paper 8943.)

Chernew, Michael, Gautam Gowrisankaran, Catherine McLaughlin and Teresa Gibson (2004). "Quality and Employers' Choice of Health Plan." *Journal of Health Economics* 23: 471–92. (Also NBER Working Paper 9847.)

Gowrisankaran, Gautam and Robert J. Town (2003). "Competition, Payers and Hospital Quality." *Health Services Research* 38: 1403 – 22. (Also NBER Working Paper 9206.)

Geweke, John, Gautam Gowrisankaran and Robert J. Town (2003). "Bayesian Inference For Hospital Quality in a Selection Model." *Econometrica* 71: 1215 – 1238. (Also NBER Working Paper 8497.)

Chernew, Michael, Gautam Gowrisankaran and A. Mark Fendrick (2002). "Payer Type and the Returns to Bypass Surgery: Evidence from Hospital Entry Behavior," *Journal of Health Economics* 21: 451 – 474. (Also NBER Working Paper 8632.)

Gowrisankaran, Gautam (1999). "A Dynamic Model of Endogenous Horizontal Mergers," *RAND Journal of Economics* 30: 56 – 83.

Gowrisankaran, Gautam (1999). "Efficient Representation of State Spaces for Some Dynamic Models." *Journal of Economic Dynamics and Control* 23: 1077 – 98.

Gowrisankaran, Gautam and Robert J. Town (1999). "Estimating the Quality of Care in Hospitals Using Instrumental Variables," *Journal of Health Economics* 18: 747 – 67.

Gowrisankaran, Gautam and Robert J. Town (1997). "Dynamic Equilibrium in the Hospital Industry." *Journal of Economics and Management Strategy* 6: 45 – 74.

## Submitted papers:

Easterbrook, Kathleen, Gautam Gowrisankaran, Dina Older Aguilar and Yufei Wu (2017). "Accounting for Complementarities in Hospital Mergers: Is a Substitute Needed for Current Approaches?" (Solicited by *Antitrust Law Journal*.)

Gowrisankaran, Gautam, Charles He, Eric Lutz and Charles Burgess (2017). "Productivity, Safety, and Regulation in Underground Coal Mining: Evidence from Disasters and Fatalities." (Also NBER Working Paper 21,129.)

Gowrisankaran, Gautam, Keith Joiner, and Pierre-Thomas Léger (2017). "Physician Quality and Healthcare Costs: Evidence from Emergency Departments."

Gowrisankaran, Gautam, Keith Joiner, and Jianjing Lin (2017). "Does Health IT Lead to

Better Information or Worse Incentives?"

Gowrisankaran, Gautam, Christina Marsh and Robert Town (2017). "Myopia and Complex Dynamic Incentives: Evidence from Medicare Part D." (Also NBER Working Paper 21,104.) Second revise and resubmit at *The Review of Economic Studies.*

**<u>Working papers:</u>**

Fleitas, Sebastian, Gautam Gowrisankaran, and Anthony Lo Sasso (2017). "Reclassification Risk in the Small Group Health Insurance Market."

Gowrisankaran, Gautam, Marc Rysman and Minsoo Park (2012). "Measuring Network Effects in a Dynamic Environment."

Gowrisankaran, Gautam, and Marc Rysman (2015). "A Framework for Empirical Models of Dynamic Demand."

Gowrisankaran, Gautam, Marc Rysman and Grace Yu (2016). "Computing Price-Cost Margins in a Durable Goods Environment."

**<u>OTHER PUBLICATIONS:</u>**

Gowrisankaran, Gautam (2011). "Evaluating the Impact of a Hospital Merger Using the Difference-in-Difference of Prices." (Comment on article by Steven Tenn.) *International Journal of the Economics of Business* 18: 83 – 89.

Gowrisankaran, Gautam (2008). "Competition Among Hospitals and Hospital Quality" (2008), Ch. 12 of *Incentives and Choice in Health and Health Care*, F. Sloan and H. Kasper, eds. Cambridge: MIT Press.

Gowrisankaran, Gautam and John Krainer (2005). "Bank ATMs and ATM Surcharges," Federal Reserve Bank of San Francisco Economic Letter 2005-36.

Gowrisankaran, Gautam (2002). "Why Do Americans Still Write Checks?" Federal Reserve Bank of San Francisco Economic Letter 2002-27.

Gowrisankaran, Gautam (2002). "Productivity in Heart Attack Treatments," Federal Reserve Bank of San Francisco Economic Letter 2002-20.

Gowrisankaran, Gautam (2002). "Competition and Regulation in the Airline Industry," Federal Reserve Bank of San Francisco Economic Letter 2002-01.

**<u>EDITORIAL POSITIONS:</u>**

Associate editor, *RAND Journal of Economics,* 2015–

Associate editor, *International Economic Review,* 2014–

Associate editor, *Journal of Business and Economic Statistics,* 2009–

Member of board of editors, *American Economic Review*, 2011–2016

Associate editor, *Economic Inquiry,* 2008–13

**<u>AWARDS AND HONORS:</u>**

Doctorate *Honoris Causa*, University of Oulu, May, 2017

Grossman Lecture, Colby College, March, 2017

Winner, 2016 Best Paper Award from the Workshop in Health IT and Economics (WHITE), for "Does Health IT Lead to Better Information or Worse Incentives?" (under former title), joint with Keith Joiner and Jianjing Lin

Invited lecture, Shanghai University of Finance and Economics Industrial Organization Summer School, Shanghai, China, June, 2016

Keynote speech, International Conference on Innovation and Industrial Economics, Nanjing

University, Nanjing, China, June, 2016

Winner, 2016 Antitrust Writing Award (http://awards.concurrences.com) for best academic paper on mergers, for "Mergers When Prices Are Negotiated: Evidence from the Hospital Industry," joint with Aviv Nevo and Robert Town

Invited lecture, Martti Ahtisaari Institute, Oulu Finland, August, 2015

Invited speaker, Colombian Health Economics Association, Cali, Colombia, 2015

Invited speaker, Latin American Meetings of the Econometric Society, Sao Paulo, Brazil, 2014

Invited speaker, European Association for Research in Industrial Economics, Evora, Portugal, 2013

Keynote speech, Zhejiang University Conference on Industrial Economics, Hangzhou, China, 2013

Canadian Economic Association State of the Art Lecture, Montreal, Canada, 2013

Keynote speech, Network of Industrial Economists Conference, London, United Kingdom, 2012

Keynote speech, Copenhagen Business School Conference, *Common Ground: Recent Work in Empirical Labour and Industrial Organization*, Copenhagen, Denmark, 2012

Keynote speech, Center for European Economic Research (ZEW) Symposium, *A Framework for Estimating Demand in Consumer Durable Goods Markets*, Mannheim, Germany, 2011

Participant in Federal Reserve Board of Governors Academic Consultant Meeting, 2011

Delivered lecture series on *Estimation of Durable Goods Models for Differentiated Products* to the Bureau of Economic Analysis, 2010

Faculty Advisor for Graduate Student Dissertation Workshop, Western Economic Association International, Portland, OR, 2010

Grande conférence (keynote speech), Les Journées de CIRPÉE 2009 (Annual Meetings), Québec, Canada

2009 Kalt Prize Recipient, for Best Doctoral Student Mentorship at the Eller College of Management

Eller College Fellow, University of Arizona, 2007–11

Distinguished Visitor, Boston University Department of Economics, June 2008

American Economic Association, Excellence in refereeing award, 2007–08

## GRANTS:

Eller College Small Research Grant and Center for Management Innovations in Healthcare Grant, "Preferred Pharmacy Networks," 2017, $12,000 (Role: PI).

Agency for Healthcare Quality and Research 1R01HS024850-01, "Narrow Network Health Plans: Effects on Access, Cost, Quality, and Selection," 2016-19, $383,180 for University of Arizona subcontract only (Role: co-PI; PI of University of Arizona subcontract).

National Science Foundation Grant SES-1425063, "Bargaining in Bilateral Oligopolies with Application to the Health Sector," 2014-17, $256,999 (Role: PI).

Alpha Foundation for the Improvement of Mine Safety and Health Grant, "Implementation of Risk Management Programs: Identification of Best Practices to Reduce Injuries and Maximize Economic Benefits," 2013-15, $668,518 (Role: co-PI).

University of Arizona Renewable Energy Network Policy Research Initiative Grant,

"Intermittency and Multiple Sources in Renewable Energy," 2012-13, $11,998 (Role: PI)

University of Arizona, Center for Management Innovations in Health Care Summer Grants, 2011, 2012, 2013, 2015 (Role: PI)

Agency for Healthcare Research and Quality Grant R01-HS018424-01A1, "Hospital Choice, Hospital Quality and Patient Welfare for Rural Residents," 2010–13, $577,514 (Role: PI)

National Science Foundation Grant SES-0922540, "Collaborative Research: Estimation and Computation of Dynamic Oligopoly and Network Effects Model," 2009–13, $207,164 (Role: PI)

NET Institute Fellowship, 2009, 2004, 2003

Missouri Foundation for Health contract. "Healthy Outcomes: The Impact of Employee Cost-Sharing on Healthcare Costs and Outcomes," 2007–08, $416,714 (Role: PI)

Commonwealth Foundation Grant 20070068. "Healthy Outcomes: The Impact of Employee Cost-Sharing on Healthcare Costs and Outcomes," 2007, $121,320 (Role: PI)

National Science Foundation Grant SES-0551360, "Collaborative Research: Dynamic Demand for New Durable Goods: An Empirical Model and Applications to Pricing and Welfare," 2006 – 09, $104,897 (Role: PI)

National Science Foundation Grant SES-0318170, "Estimating Models of Firm Entry," 2003 – 06, $207,645 (Role: PI)

University of Minnesota, Faculty Summer Research Fellowship, 1999, 1996

University of Minnesota, Single Quarter Leave, Winter 1998

Alfred P. Sloan Foundation Doctoral Dissertation Fellowship, 1994 – 95

Social Sciences and Humanities Research Council of Canada Doctoral Fellowship, 1993 – 95

Master's and Doctoral Fellowship (latter declined) from the Government of Quebec, Fonds pour la formation des chercheurs et l'aide à la recherché (FCAR), 1991 – 95

Yale University Fellowship, 1991 – 95

## PROFESSIONAL ACTIVITIES:

### Ph.D. student advising:

Advisor for Sebastian Fleitas, Ph.D., University of Arizona, 2017, first position, University of Leuven

Advisor for Anatolii Kokoza, Ph.D., University of Arizona, 2017, first position, USAA.

Co-advisor for Nedko Yordanov, Ph.D., University of Arizona, 2016, first position, EconOne Consulting.

Advisor for Jianjing Lin, Ph.D., University of Arizona, 2015, first position, Postdoctoral Fellow, Tulane University

Advisor for Chuan (Charles) He, Ph.D., University of Arizona, 2015, first position, Senior Economist, Amazon.com

Advisor for Leila Asgari, Ph.D., University of Arizona, 2014, first position, Associate Vice President, J.P. Morgan Chase

Advisor for T.N. (Subra) Subramaniam, Ph.D., University of Arizona, 2014, first position, Senior Associate in Modeling, Discover Card

Advisor for Chrystie Burr, Ph.D., University of Arizona 2013, first position, Assistant Professor, Department of Economics, University of Colorado – Boulder

Advisor for Kathleen Nosal, Ph.D., University of Arizona 2012, first position: Assistant Professor, Department of Economics, University of Mannheim

Advisor for Mario Samano, Ph.D., University of Arizona 2012, first position: Assistant Professor, Institute of Applied Economics, HEC Montreal Business School

Advisor for Joseph Cullen, Ph.D. University of Arizona 2009, first position: Harvard University Center for the Environment Postdoctoral Fellowship, Assistant Professor, Olin Business School, Washington University in St. Louis

Advisor for Ivan Maryanchyk, Ph.D. University of Arizona 2009, first position: Senior analyst, Bates White Economic Consulting

Advisor for Oleksandr Shcherbakov, Ph.D. University of Arizona 2008, first position: Cowles Postdoctoral Fellowship, Yale University

Co-advisor for Fumiko Hayashi, Ph.D. University of Minnesota 2001, first position: Federal Reserve Bank of Kansas City

**Testimony and reports submitted as an expert witness:**

Djeneba Sidibe et al. v. Sutter Health, United States District Court for the Northern District of California, Declaration (October 5, 2017) and Deposition (February 6, 2018)

In the Matter of Tribune Media Company and Sinclair Broadcast Group, Inc. Consolidated Applications for Consent to Transfer Control, FCC MB Docket No. 17-179, Applicants' Consolidated Opposition to Petitions to Deny, Declaration (August 22, 2017) in support of Sinclair Broadcast Group, Inc.

Grasso v. Electrolux Home Products, Inc., United States District Court for the Middle District of Florida, Initial Expert Report (October 3, 2016), Supplemental Export Report (November 4, 2016), and Deposition (December 9, 2016)

USA v. Cabell Huntington Hospital Inc. and St. Mary's Medical Center Inc., Expert Report (March 2, 2016) in support of defense

Efficient Pricing of ADSL Wholesale Services, joint with Jeffrey MacKie Mason, Australian Competition and Consumer Commission, Export Report (August 23, 2012) in support of Telstra Corporation Limited

In Re: TFT-LCD (Flat Panel) MDL1827 (State of Missouri et al. v. AU Optronics et al. and State of Florida et al. v. AU Optronics et al.), United States District Court for the Northern District of California, Expert Report (January 17, 2012) and Deposition (March 7, 2012), in support of plaintiffs

Comes v. Microsoft CL82311, Iowa District Court, Export Report (June 2, 2006), Supplemental Expert Report (June 19, 2006), and Deposition (July 26, 2006), in support of plaintiffs

**Selected other consulting experience:**

U.S. Department of Justice, Antitrust Division, 2008, 2010, 2013, consultant on cases involving airline and hospital mergers

Federal Trade Commission, 2007–08, consultant on hospital merger case

State of Minnesota, Office of the Attorney General, St. Paul, MN, 2001, consultant on airline merger case

Competition Economics, Inc., Washington, DC, 1998, consultant on airline competition issue

Microeconomic Consulting & Research Associates (MiCRA), Inc., Washington, DC, 1995–97, consultant on a number of merger cases

**Ad-hoc referee for:**

*American Economic Review*
*American Journal of Preventive Medicine*
*B.E. Journals in Economic Analysis & Policy*
*Canadian Journal of Economics*
*Energy Journal*
*Econometrica*
*Economic Journal*
*Economic Inquiry*
*Economica*
*European Economic Review/Journal of the European Economic Association*
*Health Affairs*
*Health Economics*
*Health Economics, Policy and Law*
*Health Services Research*
*International Economic Review*
*International Journal of Disaster Risk Reduction*
*International Journal of Industrial Organization*
*Journal of Applied Econometrics*
*Journal of Banking and Finance*
*Journal of Business and Economics Statistics*
*Journal of Comparative Economics*
*Journal of Econometrics*
*Journal of Economic Theory*
*Journal of Economics and Business*
*Journal of Economics and Management Strategy*
*Journal of Health Economics*
*Journal of Human Resources*
*Journal of Industrial Economics*
*Journal of Law and Economics*
*Journal of Law, Economics and Organization*
*Journal of Political Economy*
*Management Science*
*Marketing Science*
*Quarterly Journal of Economics*
*RAND Journal of Economics*
*Review of Economic Dynamics*
*Review of Economic Studies*
*Review of Economics and Statistics*
*Review of Network Economics*
*Southern Economic Journal*

**Ad-hoc reviewer for:**

*Chilean National Science Foundation*
*Hong Kong Research Grants Council*
*National Science Foundation*
*W.W. Norton & Company*

*Trinity College Dublin, Institute for International Integration Studies*
*University of Venice Doctoral Committee*
*John Wiley & Sons*

**Invited seminar presentations since October, 2001 (with most recent paper title):**

*A Computable Dynamic Oligopoly Model of Capacity Investment*
    University of Chile, September, 2013
    Bank of Canada, July, 2013

*A Hospital System's Wellness Program Linked To Health Plan Enrollment Cut Hospitalizations But Not Overall Costs*
    University of California, Riverside, February, 2012
    Duke University, October, 2010
    Northwestern University, May, 2009

*Bayesian Inference For Hospital Quality in a Selection Model*
    Agency for Healthcare Quality and Research, October, 2003
    University of Montreal, November, 2002
    Queen's University, October, 2002
    UC Davis, May, 2002
    Duke University, January, 2002
    Yale University, December, 2001
    Federal Reserve Bank of Chicago, November, 2001

*Causality and the Volume-Outcome Relationship in Surgery*
    University of Chicago, Health Economics Seminar, April, 2005
    Syracuse University, April, 2005

*Computing Price-Cost Margins in a Durable Goods Environment*
    Cornell University, November, 2015

*Does Health IT Adoption to Better Information or Worse Incentives?*
    UCLA Anderson School, May 2017
    University of Chicago, May, 2016
    Emory University, March, 2016

*Dynamics of Consumer Demand for New Durable Goods*
    École Polytechnique/CREST (Paris), October, 2011
    INSEAD Business School, April, 2011
    Katholieke Universiteit Leuven, April, 2011
    University of Texas, September, 2010
    U.S. Bureau of Labor Statistics, December, 2009
    U.S. Bureau of Economic Analysis, September, 2009
    University of Helsinki, August, 2009
    Harvard University, December, 2008
    University of Southern California, October, 2008
    Bristol University, May, 2008

University of Toronto Rotman School, March, 2008
Federal Trade Commission, December, 2007
University College London, May, 2007
London School of Economics, April, 2007
University of Minnesota Marketing Department, February, 2007
Drexel University, December, 2006
Arizona State University, November, 2006
University of California Los Angeles, May, 2006
Stanford University, May, 2006
Johns Hopkins University, May, 2006
Purdue University, March, 2006
University of Arizona, February, 2006
Duke University, September, 2005
Federal Reserve Bank of San Francisco, June, 2005
University of Missouri, April, 2005
Northwestern University Kellogg School of Management, April, 2005

*Escalation of Scrutiny: The Gains from Dynamic Enforcement of Environmental Regulations*
Universidad Carlos III de Madrid, April, 2018
École Polytechnique/CREST (Paris), April, 2018

*Information Feedback and Long-Term Electricity Conservation: Evidence from the Tapestry Building*
HEC Montreal, July, 2013

*Intermittency and the Value of Renewable Energy:*
Imperial College, London, June, 2015
Universidad de los Andes, Santiago, Chile, May, 2015
University of Michigan, October, 2014
Texas A&M University, April, 2012
University of Texas at Austin, February, 2012
Carnegie Mellon University, November, 2011
Harvard University, September, 2011
University of Gothenburg, May, 2011
University of Mannheim, April, 2011
New York University, March, 2011
Yale University, March, 2011
University of Arizona, March 2011
UC Berkeley, November, 2010

*Learning and the Value of Information: The Case of Health Plan Report Cards*
Washington State University, April, 2007
University of Toronto, October, 2002
UC San Diego, April, 2002
UC Berkeley, April, 2002

Brown University, April, 2002
Dartmouth College, April, 2002
Stanford University GSB, March, 2002
Columbia University, December, 2001
UC Davis, Agricultural and Resource Economics, November, 2001
UC Berkeley, Agricultural and Resource Economics, October, 2001

*Managed Care, Drug Benefits, and Mortality: An Analysis of the Elderly*
Medical University of South Carolina, March, 2007
University of Pennsylvania Health Care Management, December, 2006
HEC – Montréal (University of Montreal Business School), March, 2005
University of North Carolina, Department of Health Policy and Administration,
Triangle Health Economics Workshop (long-distance format), September, 2004
Washington University in St. Louis, Work, Family and Public Policy Seminar, April,
2004
Yale University, June, 2003
Boston University (joint with Harvard and MIT), April, 2003

*Mergers When Prices Are Negotiated: Evidence from the Hospital Industry*
University of Alabama – Birmingham, April, 2014
University of Colorado, Boulder, February, 2014
Vanderbilt University, February, 2014
U.S. Department of Justice, November, 2013
Charles River Associates, June, 2013
Stanford University GSB Marketing, May, 2013
University of Tilburg, May, 2013
Toulouse School of Economics, May, 2013
Universidad de los Andes, Santiago, Chile, April, 2013
University of East Anglia, December, 2012
Vanderbilt University, December, 2012
Indiana University, September, 2012
Clemson University, April, 2012
Ohio State University, April, 2012
Columbia University, December, 2011
Johns Hopkins University, October, 2011

*"Nash-in-Nash" Bargaining: A Microfoundation for Empirical Work*
Nanjing University, May, 2015

*Network Externalities and Technology Adoption: Lessons from Electronic Payments*
Federal Reserve Bank of New York, December, 2001
NYU Stern School of Business, October, 2001

*Policy and the Dynamics of Market Structure: The Critical Access Hospital Program*
University of Minnesota, May, 2010
University of Wisconsin, March, 2010

Bates White Economic Consulting, December, 2009
Princeton University, November, 2009
Boston College, November, 2009
Bank of Canada, June, 2009
University of California, Davis, April, 2009
University of California, Irvine, April, 2009
University of California Los Angeles, October, 2008
Federal Reserve Bank of Kansas City, October, 2008
Boston University, June, 2008
University of Cyprus, May, 2008

*Productivity, Safety, and Regulation in Coal Mining: Evidence from Disasters and Fatalities*
Hong Kong University, March, 2017

*Quantifying Equilibrium Network Externalities in the ACH Banking Industry*
Yale University, March, 2003
University of Montreal, January, 2003
Washington University in St. Louis, December, 2002
Harvard University, September, 2002

*Reclassification Risk in the Small Group Health Insurance Market*
University of Illinois Gies School of Business, April, 2018
Toulouse School of Economics, March, 2018
University at Albany, October, 2017
University of British Columbia, Sauder School of Business, October, 2016
Princeton University, September, 2016
Ohio State University, September, 2016
Singapore Management University, August, 2016

*Salience, Myopia and Complex Dynamic Incentives: Evidence from Medicare Part D*
Boston University, November, 2017
UC Irvine, May, 2017
Chinese University of Hong Kong, March, 2017
Universitat Autonoma de Barcelona, November, 2016
National University of Singapore, August, 2016
Peking University, National School of Development, June, 2016
Federal Trade Commission, December, 2015
Miami University of Ohio, September, 2015
University of Helsinki, August, 2015
Shanghai University of Finance and Economics, May, 2015
University of Chile, May, 2015
University of Southern California, May, 2015
University of California, Los Angeles, April, 2015
University of Toronto, December, 2014
University of North Carolina at Chapel Hill, November, 2014

Johns Hopkins University, April, 2014
Northwestern University, April, 2014
University of Iowa, April, 2014

*The Welfare Consequences of ATM Surcharges: Evidence From a Structural Entry Model*
Federal Reserve Bank of New York, June, 2004
University of Minnesota, May, 2004
Competition Bureau of Canada, May, 2004
University of Pennsylvania, March, 2004
University of Chicago Graduate School of Business, Marketing Seminar, April, 2004
Trinity College Dublin, Dublin (Ireland) Economics Workshop, March, 2004
Board of Governors of the Federal Reserve, November, 2003
University of Maryland, October, 2003
Pennsylvania State University, September, 2003
Columbia University, September, 2003
University of Wisconsin, September, 2003

*Why Do Incumbent Senators Win? Evidence from a Dynamic Selection Model*
American Enterprise Institute, November, 2005
Washington University in St. Louis, Political Economy Seminar, May, 2004

**Invited or refereed conference presentations of paper since October, 2001 (listed under most recent title):**

*Countervailing Market Power and Hospital Competition*
Allied Social Sciences Association Winter Meetings, Chicago, IL, January, 2017

*Bayesian Inference For Hospital Quality in a Selection Model*
Indiana University Conference on Simulation-Based Econometric Methods, February, 2003

*Causality and the Volume-Outcome Relationship in Surgery*
Conference on Evaluating Health Policy, Imperial College, UK, May, 2008
International Health Economics Association Meetings, Barcelona, Spain, July, 2005
Consumers, Information and the Evolving Healthcare Marketplace Conference, Cornell University, April, 2005

*Computing Price-Cost Margins in a Durable Goods Environment*
Empirical Models of Differentiated Products Conference, University College London, June, 2015
Ninth Annual Cowles Conference on Theory-Based Econometric Modeling, Yale University, June, 2015

*Dynamics of Consumer Demand for New Durable Goods*
Allied Social Sciences Association Winter Meetings, San Francisco, CA, January, 2009
Fifth Annual Bates White Antitrust Conference, Washington, DC, June, 2008

Ninth CEPR Conference on Applied Industrial Organization, Paris, France, May, 2008

Federal Reserve Bank of Minneapolis Applied Microeconomics Conference, October, 2007

Economics of ICT Conference, Paris, France, June, 2007

Econometric Society Summer Meetings, Minneapolis, MN, June, 2006

*Intermittency and the Value of Renewable Energy*

Marti Ahtisaari Institute Lecture, Oulu, Finland, August, 2015

Center for European Economic Research (ZEW) Energy Conference, Mannheim, Germany, June, 2012

Pressing Issues in World Energy Policy Conference, University of Florida, March, 2012

POWER Conference, University of California, Berkeley, April, 2012

Fifth Annual Cowles Conference on Theory-Based Econometric Modeling, Yale University, June, 2011

Eighth Annual Bates White Antitrust Conference, Washington, DC, June, 2011

Twelfth CEPR Conference on Applied Industrial Organization, Tel Aviv University, May, 2011

*Learning and the Value of Information: The Case of Health Plan Report Cards*

Econometric Society Winter Meetings, Chicago, IL, January, 2007

Quantitative Marketing and Economics Conference, Chicago, IL, October, 2003

Society for Economic Dynamics Annual Meetings, New York, NY, July 2002

National Bureau of Economic Research (NBER) Summer Institute, Cambridge, MA, July, 2002

Allied Social Sciences Association Winter Meetings, Atlanta, GA, January, 2002

*Managed Care, Drug Benefits, and Mortality: An Analysis of the Elderly*

National Bureau of Economic Research (NBER) Summer Institute, Cambridge, MA, August, 2004

Annual Health Economics Conference, Birmingham, AL, April, 2004

*Measuring Network Effects in a Dynamic Environment*

4th Annual Penn State University Conference on Auctions and Procurement, April, 2011

*Mergers When Prices Are Negotiated: Evidence from the Hospital Industry*

First CREST Conference on Advances in the Economics of Antitrust and Consumer Protection, Paris, France, September, 2014

Penn State/Cornell Conference on Econometrics and Industrial Organization, State College, PA, September, 2014

European Association for Research in Industrial Economics Conference, Evora, Portugal, August, 2013

Zhejiang University Conference on Industrial Economics, Hangzhou, China, June, 2013

Canadian Economic Association, Montreal, Canada, May, 2013
Quantitative Marketing and Economics Conference, Durham, NC, October, 2012
National Bureau of Economic Research (NBER) Summer Institute, Cambridge, MA,
    July, 2012
Common Ground Conference, Copenhagen Business School, May, 2012
Annual Health Economics Conference, Northwestern University, October, 2011
Allied Social Sciences Association Winter Meetings, Denver, CO, January, 2011

*Network Externalities and Technology Adoption: Lessons from Electronic Payments*
Federal Reserve Bank of Philadelphia, Conference on Payment Systems,
    Philadelphia, PA, May, 2002
Center for Economic Policy and Research Conference on Productivity and
    Technology, Alghero, Italy, March, 2002

*Policy and the Dynamics of Market Structure: The Critical Access Hospital Program*
Third Annual Cowles Conference on Theory-Based Econometric Modeling, Yale
    University, June, 2009
Penn State University Conference on Procurement and Regulated Markets, April,
    2008
HEC Montréal Conference on the I.O. of Health, November, 2007

*Pollution Mitigation and Productivity: Evidence from Chinese Manufacturing Firms*
Javeriana University Structural I.O. Conference, Bogotá, Colombia, October, 2017

*Productivity, Safety, and Regulation in Underground Coal Mining: Evidence from
Disasters and Fatalities*
New Directions in Commodities Research Conference, University of Colorado,
    Denver, August, 2017
Third Annual IZA Conference on Labor Market Effects of Environmental Policies,
    Berlin, Germany, August, 2015

*Quality and Employers' Choice of Health Plan*
Allied Social Sciences Association Winter Meetings, Washington, DC, January, 2003

*Quantifying Equilibrium Network Externalities in the ACH Banking Industry*
NET Institute 2005 Conference, New York, NY, April, 2005
Kiel – Munich Workshop on the Economics of Information and Network Industries,
    Munich, Germany, August, 2004
CEPR Conference on Two-Sided Markets, Toulouse, France, January, 2004
Society for Economic Dynamics Annual Meetings, Paris, France, June, 2003
University of Iowa Clarence Tow Conference on Industrial Organization, May, 2003
International Industrial Organization Society Conference, Boston, MA, April, 2003
Stanford Institute for Theoretical Economics (SITE), July, 2002

*Reclassification Risk in the Small Group Health Insurance Market*

Eleventh Annual Cowles Conference on Theory-Based Econometric Modeling, Yale
University, June, 2017
*Marketing Science* Conference on Marketing and Health, St. Louis, MO, November,
2016
Lancaster University Management School Conference on Auctions, Competition,
Regulation, and Public Policy, May, 2016

*Salience, Myopia and Complex Dynamic Incentives: Evidence from Medicare Part D*
Tel Aviv University / IDC Summer Conference, Herzliya, Israel, July, 2017
Colombian Association of Health Economics, Cali, Colombia, February, 2015
National Bureau of Economic Research (NBER) Winter Industrial Organization
Meetings, Stanford, CA, February, 2015
Latin American Meetings of the Econometric Society, Sao Paulo, Brazil, November,
2014
Penn State/Cornell Economics on Economics and Industrial Organization, University
Park, PA, September, 2014
Eleventh Annual Bates White Antitrust Conference, Washington, DC, June, 2014
Northwestern/Toulouse Industrial Organization Conference, Evanston, IL, May, 2014

*The Welfare Consequences of ATM Surcharges: Evidence From a Structural Entry
Model*
Recent Developments in Consumer Credit and Payments, Federal Reserve Bank of
Philadelphia, Philadelphia, PA, September, 2005
National Bureau of Economic Research (NBER) Winter Industrial Organization
Meetings, Menlo Park, CA, February, 2005
Allied Social Sciences Association Winter Meetings, Philadelphia, PA, January, 2005
University of British Columbia Summer Industrial Organization Conference, July,
2003

**Invited panel presentations at conferences:**
*New Models of Healthcare Delivery*, How Is Healthcare Changing? How is the
Government Responding? Cornerstone Research and Stanford Institute for Economic
and Policy Research, January, 2017
*The Ghosts of Small Group Health Insurance: Past, Present, and Future*, Caribbean
Health Economics Symposium, Tortola, BVI, December, 2016
*The Economics of Accountable Care Organizations,* Accountable Care Organizations and
Antitrust Conference, University of California, Berkeley, November, 2011

**Conference organization:**
Co-organizer, Workshop on Healthcare and Industrial Organization in Chile, 2017
Co-organizer, HEC Montreal/CIRPÉE Conference on Industrial Organization, 2012–17
Co-organizer, Center for European Economic Research (ZEW) Energy Conference,
Mannheim, Germany, 2012–17
Co-organizer, 2012 Econometric Society Summer Meetings
Co-organizer, 2005, 2006 and 2007 International Industrial Organization Conference
Co-organizer, 2004 and 2005 Washington University CRES Industrial Organization
Conference

# Appendix B
## Documents Considered by Gautam Gowrisankaran, Ph.D.

| Document Title | Document Date |
|---|---|
| **Case Pleadings** | |
| Fourth Amended Complaint, *Sidibe et al. v. Sutter Health* | July 14, 2017 |
| | |
| **Other Pleadings** | |
| Amended Memorandum Opinion and Order, United States District Court for the Northern District of Illinois Eastern Division, *Federal Trade Commission and State of Illinois v. Advocate Health Care, Advocate Health and Hospitals Corporation, and NorthShore University HealthSystem,* No. 15-cv-11473 | June 20, 2016 |
| Defendants' Opposition To Plaintiffs' Motion for a Preliminary Injunction, United States District Court for the Northern District of Illinois Eastern Division *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, Advocate Health and Hospitals Corporation, and NorthShore University HealthSystem*, No. 15-cv-11473 | March 23, 2016 |
| Memorandum Opinion and Order, United States District Court for the Middle District of Pennsylvania, *Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center and PinnacleHealth System,* No. 15-cv-2362 | May 9, 2016 |
| Opinion of the Court, United States Court of Appeals for the Seventh Circuit, *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, Advocate Health and Hospitals Corporation, and NorthShore University HealthSystem,* No. 16-2492 | October 31, 2016 |
| Opinion of the Court, United States Court of Appeals for the Third Circuit, *Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center and Pinnacle Health System,* No. 16-2365 | September 27, 2016 |
| | |
| **Academic Papers** | |
| Ahlborn, Christian, David S. Evans, and A. Jorge Padilla, "The Antitrust Economics of Tying:  A Farewell to Per Se Illegality," *The Antitrust Bulletin* 49, no. 1-2 | Spring 2004 |
| Argue, David A. and Richard T. Shin, "An Innovative Approach to an Old Problem:  Hospital Merger Simulation," *Antitrust* 24, no. 1 | Fall 2009 |
| Goldsmith, Jeff, "Technology and the Boundaries of the Hospital:  Three Emerging Technologies," *Health Affairs* 23, no. 6 | 2004 |
| Gowrisankaran, Gautam, Aviv Nevo, and Robert Town, "Mergers When Prices Are Negotiated:  Evidence from the Hospital Industry," *American Economic Review* 105, no.1 | 2015 |
| Ho, Kate and Ariel Pakes, "Hospital Choices, Hospital Prices, and Financial Incentives to Physicians," *American Economic Review* 104, no. 12 | 2014 |
| Ho, Kate and Robin S. Lee, "Insurer Competition in Health Care Markets," *Econometrica* 85, no. 2 | March 2017 |

| Document Title | Document Date |
|---|---|
| Ho, Katherine, "Insurer-Provider Networks in the Medical Care Market," *American Economic Review* 99, no. 1 | March 2009 |
| Town, Robert and Gregory Vistnes, "Hospital Competition in HMO Networks," *Journal of Health Economics* 20, no. 5 | 2001 |
| Varney, Christine A., "The 2010 Horizontal Merger Guidelines:  Evolution, Not Revolution," *Antitrust Law Journal 77*, no. 2 | 2011 |
| Vistnes, Gregory, "Hospitals, Mergers, and Two-Stage Competition," *Antitrust Law Journal* 67, no. 3 | 2000 |
| Whinston, Michael D., "Tying, Foreclosure, and Exclusion," *American Economic Review* 80, no. 4 | September 1990 |

**Books**

| | |
|---|---|
| ABA Section of Antitrust Law, "Restraints of Trade" in *Antitrust Law Developments (Eighth)*, ed. Darren S. Tucker et al. (American Bar Association, 2017) | 2017 |
| Davis, Peter and Eliana Garces, *Quantitative Techniques for Competition and Antitrust Analysis*, (Princeton:  Princeton University Press, 2010) | 2010 |
| Gaynor, Martin and Robert Town, "Competition in Health Care Markets" in *Handbook of Health Economics* 2, ed. Mark V. Pauly, Thomas G. Mcguire, and Pedro P. Barros (Massachusetts:  North Holland, 2012) | 2012 |
| Varian, Hal R., *Intermediate Microeconomics (6th edition)*, (New York:  W. W. Norton & Company, 2003) | 2003 |

**Interviews**

| | |
|---|---|
| Dartmouth Atlas Interview with Kristy Bronner and Ali Sharp | September 20, 2017 |

**Data**

American Hospital Association Annual Survey Data, 2015

California Office of Statewide Health Planning and Development Discharge Data, POMS_PrivateCoverage.csv, Tab "POMS_PrivateCoverage," 2015

California Office of Statewide Health Planning and Development Discharge and Financial Data, 40HospitalData.xlsx, Tab "Financial and Utilization Data," 2015, https://www.oshpd.ca.gov/HID/Hospital-Financial.asp

Center for Medicare & Medicaid Services, "California Geographic Rating Areas: Including State Specific Geographic Divisions," https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Market-Reforms/ca-gra.html

Centers for Medicare & Medicaid Services, "Medicare Enrollment Dashboard," https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMSProgramStatistics/Dashboard.html

Dartmouth Atlas of Health Care, "About Our Regions," http://www.dartmouthatlas.org/data/region

Dartmouth Atlas of Health Care, "ZIP code crosswalks," 2015, http://www.dartmouthatlas.org/tools/downloads.aspx?tab=39

Department of Transportation, National Household Travel Survey, 2009, http://nhts.ornl.gov/tables09/ae/TableDesigner.aspx

Google Geocode API, 2017, https://developers.google.com/maps/documentation/geocoding/start

Google Maps Distance Matrix API, 2017, https://developers.google.com/maps/documentation/distance-matrix/

United States Census Bureau, "Resident Population Data," 2010, https://www.census.gov/2010census/data/apportionment-dens-text.php

United States Census Bureau, 2010 FIPS Codes for Counties and County Equivalent Entities, https://www.census.gov/geographies/reference-files/2016/demo/popest/2016-fips.html

United States Census Bureau, 2010 Urban Area to ZIP Code Tabulation Area (ZCTA) Relationship File, 2010, https://www.census.gov/geo/maps-data/data/ua_rel_download.html

United States Department of Commerce, Census Bureau, County Boundary File

United States Department of Housing and Urban Development, https://www.huduser.gov/portal/datasets/usps_crosswalk.html

World Bank, "Population ages 65 and above (% of total)," https://data.worldbank.org/indicator/SP.POP.65UP.TO.ZS?locations=US

World Bank, "Population, total," https://data.worldbank.org/indicator/SP.POP.TOTL?locations=US

**Public Press and Online Content**

Aetna, "Save Money by Staying in Network," https://www.aetna.com/individuals-families/using-your-aetna-benefits/network-out-of-network-care.html

American Hospital Association, "Trendwatch Chartbook 2016," Chart 3.10, 3.11, and Chart 4.3, http://www.aha.org/research/reports/tw/chartbook/2016/2016chartbook.pdf

American Hospital Directory, "Adventist Health Glendale," https://www.ahd.com/free_profile/050239/Adventist_Health_Glendale/Glendale/California/

American Hospital Directory, "Alta Bates Summit Medical Center – Herrick Campus," https://www.ahd.com/free_profile/I41155/Alta_Bates_Summit_Medical_Center_-_Herrick_Campus/Berkeley/California/

American Hospital Directory, "Children's Recovery Center of Northern California," https://www.ahd.com/free_profile/053307/Children%27s_Recovery__Center_of__Northern_California/Campbell/California/

**Document Title** _____                                        **Document Date**

American Hospital Directory, "Citrus Valley Medical Center – Queen of the Valley Campus,"
https://www.ahd.com/free_profile/050369/Citrus_Valley_Medical_Center_-_Queen_of_the_Valley_Campus/West_Covina/California/

American Hospital Directory, "Fallbrook Hospital,"
https://www.ahd.com/free_profile/050435/Fallbrook_Hospital/Fallbrook/California/

American Hospital Directory, "Hi-Desert Medical Center,"
https://www.ahd.com/free_profile/050279/Hi-Desert_Medical_Center/Joshua_Tree/California/

American Hospital Directory, "Hoag Orthopedic Institute,"
https://www.ahd.com/free_profile/050769/Hoag_Orthopedic_Institute/Irvine/California/

American Hospital Directory, "Kaiser Permanente Antioch Medical Center,"
https://www.ahd.com/free_profile/050760/Kaiser_Permanente_Antioch_Medical_Center/Antioch/California/

American Hospital Directory, "Kaiser Permanente San Leandro Medical Center,"
https://www.ahd.com/free_profile/050777/Kaiser_Permanente_San_Leandro_Medical_Center/San_Leandro/California/

American Hospital Directory, "Kaiser Permanente Vallejo Medical Center,"
https://www.ahd.com/free_profile/050073/Kaiser_Permanente_Vallejo_Medical_Center_/Vallejo/California/

American Hospital Directory, "Los Angeles Community Hospital at Norwalk,"
https://www.ahd.com/free_profile/I41902/Los_Angeles_Community_Hospital_at_Norwalk/Norwalk/California/

American Hospital Directory, "Martin Luther King, Jr. Community Hospital,"
https://www.ahd.com/free_profile/050779/Martin_Luther_King%2C_Jr_Community_Hospital_/Los_Angeles/California/

American Hospital Directory, "Mayers Memorial Hospital,"
https://www.ahd.com/free_profile/051305/Mayers_Memorial_Hospital/Fall_River_Mills/California/

American Hospital Directory, "Mission Hospital Laguna Beach,"
https://www.ahd.com/free_profile/050193/Mission_Hospital_Laguna_Beach/Laguna_Beach/California/

American Hospital Directory, "Palomar Health Downtown Campus,"
https://www.ahd.com/free_profile/I42071/Palomar_Health_Downtown_Campus/Escondido/California/

American Hospital Directory, "San Gabriel Valley Medical Center,"
https://www.ahd.com/free_profile/050132/San_Gabriel_Valley_Medical_Center/San_Gabriel/California/

American Hospital Directory, "Seton Medical Center Coastside,"
https://www.ahd.com/free_profile/I41392/Seton_Medical_Center_Coastside/Moss_Beach/California/

| Document Title | Document Date |
| --- | --- |

American Hospital Directory, "Sharp Mary Birch Hospital for Women and Newborns," https://www.ahd.com/free_profile/050722/Sharp_Mary_Birch_Hospital_for_Women_and_Newborns/San_Diego/California/

American Hospital Directory, "Sonoma West Medical Center," https://www.ahd.com/free_profile/050385/Sonoma_West_Medical_Center/Sebastopol/California/

American Hospital Directory, "Southern California Hospital at Culver City," https://www.ahd.com/free_profile/050752/Southern_California_Hospital_at_Culver_City/Culver_City/California/

American Hospital Directory, "Tahoe Forest Hospital," https://www.ahd.com/free_profile/051328/Tahoe_Forest_Hospital/Truckee/California/

American Hospital Directory, "Temecula Valley Hospital," https://www.ahd.com/free_profile/050775/Temecula_Valley_Hospital/Temecula/California/

American Hospital Directory, "Totally Kids Rehabilitation Hospital," https://www.ahd.com/free_profile/053038/Totally_Kids_Rehabilitation_Hospital_/Loma_Linda/California/

American Hospital Directory, "University of Southern California/Norris Comprehensive Cancer Center," https://www.ahd.com/free_profile.php?hcfa_id=c40ebcdb62b1c3f5096d2f05524daf27&ek=a203a23fa91b7f910c1696f43167ce2e

Blue Cross Blue Shield, "What's the Difference between In-Network and Out-of-Network Benefits?," http://www.bcbsm.com/index/health-insurance-help/faqs/topics/how-health-insurance-works/difference-between-in-network-out-of-network-benefits.html

Brennan, Jeffrey W., "Evolution of FTC Geographic Market Definition in Healthcare Mergers," *American Bar Association*, https://www.americanbar.org/content/dam/aba/administrative/healthlaw/06_evolution_of_market_definition_in_healthcare_provider_transactions.authcheckdam.pdf                    May 2016

CA.GOV Health Facilities Consumer Information System, "Doctors Medical Center – San Pablo," http://hfcis.cdph.ca.gov/longtermcare/Facility.aspx?fac=110001204

California Code, Government Code – GOV §34502, https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=GOV&division=2.&title=4.&part=1.&chapter=3.&article=

California Knox-Keene Health Care Service Plan Act and Regulations, 2017 edition, Department of Managed Health Care, §1300.67.1.H(ii), http://wpso.dmhc.ca.gov/regulations/docs/2017kkaregs.pdf

Centers for Medicare & Medicaid Services, "Details for title: Sutter Memorial Hospital," https://www.cms.gov/Medicare/Medicare-General-Information/MedicareApprovedFacilitie/VAD-Destination-Therapy-Facilities-Aug2007-Items/Sutter-Memorial-Hospital.html

| Document Title | Document Date |
|---|---|
| Central Valley Specialty Hospital, "Mission Statement," http://centralvalleyspecialty.org/CVSH/ | |
| Cigna, "In-Network vs. Out-of-Network," https://www.cigna.com/healthwellness/know-your-benefits/health-care-cheat-sheet/network | |
| Community Memorial Health System, "Ojai Valley Community Hospital," http://www.cmhshealth.org/ovch/ | |
| Cox, Lauren, "The Top 10 Medical Advances of the Decade," *Medpage Today*, https://www.medpagetoday.com/infectiousdisease/publichealth/17594 | December 17, 2009 |
| Dartmouth Atlas of Health Care, "Research Methods," http://www.dartmouthatlas.org/downloads/methods/research_methods.pdf | 1996 |
| Department of Justice, "Chapter 4:  Competition Law:  Hospitals," https://www.justice.gov/atr/chapter-4-competition-law-hospitals#3 | |
| Eisenhower Medical Center, "On Campus Partners," https://www.emc.org/about-us/on-campus-partners/ | |
| FAIR Health, "In-Network vs. Out-of-Network Care," https://www.feeestimator.org/uploads/patient_material/14/In_Network_Vs_Out_of_Network_Care.pdf | 2013 |
| Federal Trade Commission, "Health Care Competition, The FTC's Health Care Work," https://www.ftc.gov/news-events/media-resources/mergers-competition/health-care-competition | |
| Good Samaritan Hospital, "Home," http://www.goodsamhospital.com/ | |
| Health Care 6, "Marian Regional Medical Center Arroyo Grande," https://www.healthcare6.com/hospital/arroyo-grande-ca/marian-regional-medical-center-arroyo-grande-280.html | |
| Jauhar, Sandeep and M.D., "Referral System Turns Patients Into Commodities," *New York Times*, http://www.nytimes.com/2009/05/26/health/26essa.html | May 25, 2009 |
| Kaiser Family Foundation, "Distribution of Medicare Beneficiaries by Eligibility Category," http://www.kff.org/medicare/state-indicator/distribution-of-medicare-beneficiaries-by-eligibility-category-2/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D | 2013 |
| Kaiser Family Foundation, "Market Share and Enrollment of Largest Three Insurers- Large Group Market," http://www.kff.org/other/state-indicator/market-share-and-enrollment-of-largest-three-insurers-large-group-market/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D | |
| Kaiser Permanente, "About this facility," https://healthy.kaiserpermanente.org/health/poc?uri=facility:dynamic&id=100049 | |
| Kaiser Permanente, "Basic Plan Evidence of Coverage," https://www.calpers.ca.gov/docs/2017-kaiser-basic-evidence-coverage.pdf | |

| Document Title | Document Date |
| --- | --- |
| Kaiser Permanente, "Find doctors and locations," https://healthy.kaiserpermanente.org/northern-california/doctors-locations#/search-form | |
| Kaiser Permanente, "Individual & family plans," https://individual-family.kaiserpermanente.org/healthinsurance/ | |
| Kaiser Permanente, "Locations & directions," http://kpbhc.kaisersantaclara.org/locations.php | |
| Kaiser Permanente, "Welcome to the Kaiser Permanente Behavioral Health Center in Santa Clara," http://kpbhc.kaisersantaclara.org/ | |
| Kaiser Permanente, "Your Guidebook to Kaiser Permanente Services:  San Francisco, Marin, and Sonoma \| 2016–2017," https://healthy.kaiserpermanente.org/static/health/en-us/pdfs/cal/guidebook_SanFran_Marin_Sonoma.pdf | |
| Kully, David and Christopher Carmichael, "Two Decisions Strengthen FTC's Hand In Hospital Merger Cases," *Law360*, https://www.law360.com/articles/865022/2-decisions-strengthen-ftc-s-hand-in-hospital-merger-cases | November 22, 2016 |
| Kutscher, Beth, "Outpatient Care Takes the Inside Track," *Modern Healthcare*, http://www.modernhealthcare.com/article/20120804/MAGAZINE/308049929 | August 4, 2012 |
| Maas, David and Douglas Ross, "FTC v. Penn State Hershey Medical Center: How a Hospital Merger in the Sweetest Place on Earth Soured the FTC's 15-year Perfect Scorecard," *American Bar Association Health Law Section* 12, no. 3, 2016, https://www.americanbar.org/publications/aba_health_esource/2015-2016/july/pennstate.html | |
| Medical Construction & Design, "New Frank R. Howard Memorial Hospital Opens," https://mcdmag.com/2015/11/new-frank-r-howard-memorial-hospital-opens/#.Wc1rn1tSxhE | |
| Medicare.gov, "What's Medicare?" https://www.medicare.gov/sign-up-change-plans/decide-how-to-get-medicare/whats-medicare/what-is-medicare.html | |
| Menifee Valley Medical Center, "Home," http://www.menifeevalleymedicalcenter.com/getpage.php?name=index | |
| NRC Health, "Getting it right:  the link between the patient experience and the hospital reputation," https://nrchealth.com/positive-patient-experience-and-hospital-reputation/ | February 21, 2014 |
| Office of Inspector General, "Trends in Rural Hospital Closure, 1990–2000," Department of Health and Human Services, OEI 04-02-00610 | May 2003 |
| OSHPD Healthcare Atlas, "Colusa Regional Medical Center," http://gis.oshpd.ca.gov/atlas/places/facility/106060870 | |
| Pfunter, Anne, Laurent M. Wier, and Carol Stocks, "Most Frequent Conditions in U.S. Hospitals, 2011," Healthcare Cost and Utilization Project:  Statistical Brief #162, https://www.ncbi.nlm.nih.gov/pubmed/24228292 | September 2013 |
| SLO County Mental Health Services, "Mental Health Services," http://www.slocounty.ca.gov/health/mentalhealthservices.htm | |

| Document Title | Document Date |
|---|---|
| St. Joseph Health Mission Hospital, "About Us," https://www.mission4health.com/about-us/ | |
| Sutter Health Alta Bates Summit Medical Center, "MPI Chemical Dependency Treatment Services," http://www.altabatessummit.org/mpi/ | |
| The Center for the Evaluative Clinical Sciences, "The Dartmouth Atlas of Health Care in the United States," Dartmouth Atlas of Health Care, http://www.dartmouthatlas.org/downloads/atlases/96Atlas.pdf. | 1996 |
| U.S. News and World Report, "Tahoe Forest Hospital District," https://health.usnews.com/best-hospitals/area/ca/tahoe-forest-hospital-district-6933700 | |
| UCSF Department of Psychiatry, "Langley Porter Psychiatric Hospital and Clinics," http://psych.ucsf.edu/lpphc | |
| UCSF Medical Center, "Parnassus," https://www.ucsfhealth.org/maps_and_directions/parnassus/ | |
| United States Department of Health & Human Services, "Who is eligible for Medicare?" https://www.hhs.gov/answers/medicare-and-medicaid/who-is-elibible-for-medicare/index.html | |
| United States Department of Justice and Federal Trade Commission, "The Horizontal Merger Guidelines," https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf | August 19, 2010 |
| Vallejo Kaiser Foundation Rehabilitation Center, "About our history," http://info.kaiserpermanente.org/facilities/Vallejo/center_history.html | |
| Weiss, Audrey J. and Anne Elixhauser, "Overview of Hospital Stays in the United States, 2012," Healthcare Cost and Utilization Project, Statistical Brief 180, October 2014, https://www.hcup-us.ahrq.gov/reports/statbriefs/sb180-Hospitalizations-United-States-2012.pdf | October 2014 |

*\* And any additional documents cited in report or schedules.*