# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN HANSEN, DAVID HERMAN, CAROLINE STEWART, OPTIMUM GRAPHICS, INC., and JOHNSON POOL & SPA, on Behalf of Themselves and All Others Similarly Situated,

*Plaintiffs*,

v.

SUTTER HEALTH,

*Defendant*.

Case No. 3: 12-cv-4854-LB

CLASS ACTION

Expert Declaration of Dr. Tasneem Chipty
in Support of Plaintiffs' Motion for Class Certification

June 21, 2018

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

## Table of Contents

I.    Introduction ................................................................................................ 1

II.   Summary of Opinions ................................................................................. 8

III.  Background ................................................................................................ 11

      A. Unique Features of Healthcare Markets ............................................. 12

      B. The Role of Kaiser Permanente .......................................................... 15

      C. Northern California Hospitals .............................................................. 16

      D. Sutter Health ........................................................................................ 19

      E. California Health Plans ........................................................................ 22

      F. Rating Areas ......................................................................................... 24

      G. Estimated Size of the Proposed Class ................................................. 27

      H. Plaintiffs' Theory of Harm .................................................................. 28

IV.   Health Plans Face Common Contractual Provisions in Systemwide Contracts with Sutter...... 29

      A. Blue Shield ........................................................................................... 30

      B. Anthem .................................................................................................. 31

      C. United .................................................................................................... 33

      D. Health Net ............................................................................................. 35

      E. Aetna ..................................................................................................... 36

V.    Economics of Tying and Anti-Steering Provisions ................................. 38

      A. Tying ..................................................................................................... 39

      B. Steering Practices ................................................................................. 39

      C. Anti-Steering Provisions ...................................................................... 41

VI.   Sutter's Prices Are Higher than Prices at Other Northern California Hospitals ...................... 43

      A. Health Plan Testimony and Documents Describe Sutter as More Expensive ................... 43

      B. Sutter's Own Documents Recognize Itself as More Expensive ........................................ 46

      C. Industry Reports and Academic Studies Describe Sutter as More Expensive................... 47

      D. OSHPD Data Show Sutter as More Expensive, Beginning in 2002.................................... 48

      E. ██████████████ Show Sutter as More Expensive, in Each Year of the Proposed Class
         Period .......................................................................................................... 51

VII.  A Common Method Exists to Calculate Sutter Hospital Overcharges for Inpatient Hospital
      Services ......................................................................................................... 53

      A. Identification Strategy .......................................................................... 53

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

B.  Analysis Dataset.................................................................................................. 55

C.  Regression Model .............................................................................................. 56

    1.  Regression Primer ........................................................................................ 56

    2.  Dependent Variable: Hospital Prices ........................................................... 60

    3.  Explanatory Variables .................................................................................. 61

    4.  Measuring Hospital-Level Overcharge, By Year .......................................... 67

D.  Regression Results ............................................................................................ 69

VIII. Health Plans Pass Through Increases in Medical Costs ........................................... 74

A.  Economics of Pass-Through ............................................................................. 74

B.  Institutional Factors that Will Drive Health Plans to Pass Through Healthcare Costs
    Increases to Purchasers of Healthcare Coverage .............................................. 74

C.  Health Plan Actuaries Testified that Health Plans Pass Through Increases in Healthcare
    Costs.................................................................................................................. 75

D.  Sutter Itself Expects Health Plans to Fully Pass Through Changes in Costs...................... 76

E.  Econometric Analysis of Health Plan Cost and Premium Data Shows Full Pass-Through  80

IX.  Common Impact..................................................................................................... 81

A.  Statistical Evidence of Common Impact............................................................ 82

B.  Sutter Has Market Power Over All Class Health Plans ...................................... 82

C.  Sutter Charged Similar Prices Across Health Plans ........................................... 84

D.  Sutter Used Similar Contract Terms Across Health Plans................................... 85

X.  Individual Damages Can Be Calculated on Formulaic Basis ...................................... 85

A.  Step One of the Individual Damage Methodology ............................................ 87

B.  Step Two of the Individual Damage Methodology............................................. 88

C.  Step Three of the Individual Damage Methodology........................................... 91

D.  Step Four of the Individual Damage Methodology ............................................ 94

XI.  Conclusions........................................................................................................... 96

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

## I.   Introduction

1.     My name is Tasneem Chipty. I declare under penalty of perjury under the laws of the United States of America as follows:

2.     I am the managing principal and founder of Matrix Economics, an economic consulting firm in the Boston area. I specialize in industrial organization – the study of how markets function, including the choices consumers make and the competitive interactions among firms. I also specialize in econometrics – the application of statistical methods, including regression models, to empirically study marketplace behaviors. I have served on the faculties of The Ohio State University, Brandeis University, and the Massachusetts Institute of Technology, where I taught courses in industrial organization, regulatory policy, and econometrics. I am the author or coauthor of several academic articles, published in peer-reviewed journals including the *American Economic Review* and the *Review of Economics and Statistics*. I am also a co-editor of the 3rd Edition of the American Bar Association's *Proving Antitrust Damages* book, which describes different empirical approaches to measuring antitrust damages.

3.     I have been a consultant to a variety of businesses and government agencies, including the Department of Justice and the Federal Communications Commission. As part of this work, I have studied market definition and competitive effects of firm behavior in a wide range of industries, for both plaintiffs and defendants involved in adversarial proceedings. A significant portion of my work has focused on the healthcare marketplace, specifically on issues involving hospital competition and hospital contracting practices. For example, I served as a consulting expert for private plaintiff Saint Alphonsus Medical Center to evaluate the competitive effects of St. Luke's Health System's acquisition of Saltzer Medical Group, in Nampa, Idaho. I serve as an antitrust advisor to the Massachusetts Health Policy Commission, and in that capacity have studied the competitive effects of hospital acquisitions by Partners HealthCare. For these and other assignments, I have analyzed patients' choice of hospitals using both state inpatient databases and health plan claims data; I have studied issues of product and geographic market definition; and I have studied the question of whether hospitals have market power over health plans in various relevant antitrust markets. I have also provided economic analyses in matters concerning class certification: in particular, I served as a testifying expert for the defense in *Comcast Corp. v. Behrend,* a case that included United States Supreme Court

proceedings. I received my Ph. D. in economics from the Massachusetts Institute of Technology in 1993 and my B. A. degree in economics and mathematics from Wellesley College in 1989. A copy of my resume is attached as Appendix A. It describes my background, including education, publications, and testimony experience.

4.      I have been retained as an independent expert by Plaintiffs' counsel to undertake economic analyses of issues pertaining to liability, damages, and class certification in *Sidibe et al. vs. Sutter*, a lawsuit challenging certain contracting practices of Sutter Health ("Sutter") with commercial health plans, such as Anthem Blue Cross of California ("Anthem") and Blue Shield of California ("Blue Shield").[1] Sutter is the second largest health system in Northern California, second only to Kaiser Permanente ("Kaiser"). Kaiser, however, is a closed health system that does not contract with non-Kaiser commercial health plans. Therefore, Sutter is the largest hospital system in Northern California with which commercial health plans contract to assemble provider networks to attract subscribers seeking access to healthcare in Northern California.

5.      Plaintiffs allege that Sutter exercises its market power over certain irreplaceable Sutter hospitals, in what Plaintiffs refer to as "Tying Markets," to force health plans into "all-or-nothing" contracting; the effect of this practice is to tie the sale of Sutter inpatient hospital services in the Tying Markets to the sale of services by other Sutter hospitals, in what Plaintiffs refer to as "Tied Markets," where health plans (and their plan members) have more hospital choices.[2,3] Plaintiffs also allege that Sutter prohibits health plans from offering narrow or tiered network products that would provide members immediate financial incentives for choosing lower-cost hospitals, instead of Sutter.[4] I refer to Sutter's imposition of these contractual terms on health plans as the "challenged conduct." According to the Complaint, the challenged conduct has: (a) interfered with competition among hospitals that offer, among other things, general acute

---

[1] "Fourth Amended Complaint," *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, filed September 29, 2017 in the United States District Court Northern District of California (hereafter "Complaint"), ¶ 1.

[2] Complaint, ¶¶ 4-6.

[3] Throughout this report, I use the terms: (a) "health plan" to mean commercial health plans or insurers that sell health insurance products; (b) "entities" to mean the purchasers of healthcare insurance products, including both group purchasers, such as employers, and individuals; (c) "plan members" to mean individuals that are covered by the health insurance policy; (d) "subscribers" to mean the primary plan members (*e.g.* the employees of a large group); and (e) "patients" to mean individuals that use healthcare services.

[4] Complaint, ¶¶ 40-45.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

care inpatient hospital services;[5] (b) caused commercial health plans to pay more for inpatient hospital services than they would have otherwise paid; and (c) caused employers and employees in several insurance markets to pay more for healthcare coverage than they would have otherwise paid.[6] The proposed Class is as follows:[7]

> "All entities in California Rating area 1, 2, 3, 4, 5, 6, 8, 9 or 10 (the "Nine RAs"[8]), and all individuals that either live or work in one of the Nine RAs, that paid premiums for a fully-insured health insurance policy from Blue Shield, Anthem Blue Cross, Aetna, Healthnet or United Healthcare. This class definition includes Class Members that paid premiums for individual health insurance policies that they purchased from these health plans and Class Members that paid premiums, in whole or in part, for health insurance policies provided to them as a benefit from an employer or other group purchaser located in one of the Nine RAs."

6. I have previously submitted a report in this matter in which I evaluate issues surrounding geographic market definition for inpatient hospital services.[9] Based on the analyses I present in that report, I have concluded that the four candidate Tied Markets that Plaintiffs describe in their Complaint, based on the geographic regions known as "health service areas" (or

---

[5] General acute care inpatient hospital services include a broad range of 24-hour inpatient care that includes but is not limited to medical, nursing, surgical, and pharmacy services. Hospitals that provide such services are typically referred to as general acute care inpatient hospitals; these hospitals exclude specialty facilities such as psychiatric hospitals, rehabilitation facilities, and long-term acute care. For ease of notation, I refer to general acute care inpatient hospitals as "hospitals" and general acute care inpatient hospital services as "inpatient hospital services." *See* "§ 70005. General Acute Care Hospital," 22 CCR § 70005, available at https://govt.westlaw.com/calregs/Document/ID7B72350D4BB11DE8879F88E8B0DAAAE?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc.Default), *site visited* May 11, 2018.

[6] Complaint, ¶¶ 94-112.

[7] "Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification," *Djeneba Sidibe et al. on Behalf of Themselves and All Others Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, filed June 22, 2018 in the United States District Court Northern District of California (hereafter "Memorandum of Points"), at p. 4.

[8] Rating area 1 includes the counties of: (a) Del Norte; (b) Siskiyou; (c) Modoc; (d) Lassen; (e) Shasta; (f) Trinity; (g) Humboldt; (h) Tehama; (i) Plumas; (j) Nevada; (k) Sierra; (l) Mendocino; (m) Lake; (n) Butte; (o) Glenn; (p) Sutter; (q) Yuba; (r) Colusa; (s) Amador; (t) Calaveras; (u) Tuolumne; and (v) Alpine. Rating area 2 includes the counties of: (a) Napa; (b) Sonoma; (c) Solano; and (d) Marin. Rating area 3 includes the counties of: (a) Sacramento; (b) Placer; (c) El Dorado; and (d) Yolo. Rating area 4 includes the county of San Francisco. Rating area 5 includes Contra Costa County. Rating area 6 includes Alameda County. Rating area 8 includes San Mateo County. Rating area 9 includes Santa Cruz County. Rating area 10 includes the counties of: (a) Merced; (b) San Joaquin; and (c) Stanislaus. *See* Complaint, ¶¶ 77-85.

[9] "Declaration of Dr. Tasneem Chipty in Opposition to Motion for Summary Judgment," *Djeneba Sidibe et al. on Behalf of Themselves and All Others Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, May 26, 2018 (hereafter "Chipty SJ Declaration").

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER                3

"HSAs"), are relevant antitrust markets.[10] These Tied Markets include: (a) the Sacramento HSA, where Sutter owns and operates Sutter Medical Center, Sacramento ("Sutter Sacramento"); (b) the San Francisco HSA, where Sutter owns and operates four campuses of California Pacific Medical Center, three of which (the Davies, Pacific, and California campuses) are described as "CPMC-Main" and one of which (the St. Luke's campus) is described as "CPMC-St. Luke's;" (c) the Modesto HSA, where Sutter owns and operates Memorial Medical Center Modesto ("Sutter Modesto"); and (d) the Santa Rosa HSA, where Sutter owns and operates Sutter Santa Rosa Regional Hospital ("Sutter Santa Rosa").[11] I have also concluded that seven of the eight candidate Tying Markets that Plaintiffs describe in their Complaint constitute relevant antitrust markets. These seven Tying Markets include: (a) the combination of the Berkeley and Oakland HSAs, where Sutter owns and operates three campuses of Alta Bates Medical Center, two of which (the main and Herrick campuses) are located in Berkeley and are described together as "Alta Bates-Main" and one of which (the Summit campus) is located in Oakland and is described as "Alta Bates-Summit;" (b) the Crescent City HSA, where Sutter owns and operates Sutter Coast Hospital ("Sutter Coast"); (c) the Lakeport HSA, where Sutter owns and operates Sutter Lakeside Hospital ("Sutter Lakeside"); (d) the Antioch HSA, where Sutter owns and operates Sutter Delta Medical Center ("Sutter Delta"); (e) the Jackson HSA, where Sutter owns and operates Sutter Amador Hospital ("Sutter Amador"); (f) the Tracy HSA, where Sutter owns and operates Sutter Tracy Community Hospital ("Sutter Tracy"); and (g) the Auburn HSA, where Sutter owns and operates Sutter Auburn Faith Hospital ("Sutter Auburn").[12] In the case of the

---

[10] Complaint, ¶ 5. The Dartmouth Institute for Health Policy & Clinical Practice, the organization that compiles the *Dartmouth Atlas of Healthcare*, describes HSAs as a "collection of ZIP codes whose residents receive most of their hospitalizations from the hospitals in that area." *See* The Dartmouth Atlas of Healthcare, "Glossary," available at http://www.dartmouthatlas.org/tools/glossary.aspx, *site visited* April 4, 2018. *See also,* The Center for the Evaluation of Clinical Services, "The Dartmouth Atlas of Health Care," available at http://www.dartmouthatlas.org/downloads/atlases/96Atlas.pdf, *site visited* April 4, 2018, at pp. 12-13.

[11] In 2014, Sutter closed Sutter Medical Center of Santa Rosa and opened a new location, Sutter Santa Rosa Regional Hospital. *See* Sutter Health, "Sutter Santa Rosa History," available at https://www.sutterhealth.org/ssrrh/about/history/history-ssrrh, *site visited* April 2, 2018.

[12] Chipty SJ Declaration, ¶ 9.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

Sutter Davis Hospital ("Sutter Davis"), the evidence suggests that the relevant antitrust market is no broader than the hospital's 90 percent primary service area ("PSA").[13],[14]

7.       In this report, I describe economic analyses that I have performed and conclusions that I have reached in connection with Plaintiffs' motion for class certification. As part of my assignment, I describe the likely economic effects of Sutter's contracting practices. I determine whether evidence exists that is common to members of the proposed Class which can be used to show that all or nearly all proposed Class Members incurred at least some common antitrust impact as a result of Sutter's conduct (in the form of an overcharge). I also estimate the aggregate overcharge incurred by the proposed Class as a result of the alleged anticompetitive conduct and determine whether a common method can be used to calculate individual damages for Class Members on a formulaic basis. For reasons I explain in the report, my analysis of common impact and damages is limited to harm resulting from overcharges at the Sutter hospitals in the four Tied Markets and the Tying Market of Berkeley-Oakland (referred to collectively as the "Sutter Damage Hospitals").

8.       In forming my opinions, I have reviewed documents prepared in the ordinary-course of business from Sutter and various California health plans, including Anthem, Blue Shield, UnitedHealthcare ("United"), Health Net, and Aetna (referred to collectively as the "Class Health Plans"). I understand that my team and I have had access to all documents, deposition testimony, and discovery responses produced by or to Plaintiffs in this matter. These documents include, but are not limited to, strategy documents, internal email exchanges, pricing analyses, and contracts. Among other things, I have analyzed: (a) data from the American Hospital Association; (b) inpatient discharge and hospital annual financial disclosure data from

---

[13] The term primary service area generally refers to the geography from which the hospital receives most of its patients. This concept is used in the ordinary-course by hospitals as well as by federal antitrust authorities tasked with oversight of hospital markets. For example, accountable care organizations track their 75 percent service area, which is defined as "the lowest number of postal zip codes from which [an accountable care organization participant] draws at least 75 percent of its [patients]." (*See* U.S. Department of Justice, "Statement of Antitrust Enforcement Policy Regarding Accountable Care Organizations Participating in the Medicare Shared Savings Program." *Federal Register*, Vol. 76, No. 209, 2011, available at https://www.gpo.gov/fdsys/pkg/FR-2011-10-28/pdf/2011-27944.pdf, *site visited* April 24, 2018, at p. 67028.) Similarly, a hospital's 90 percent primary service area is the smallest collection of zip codes which account for 90 percent of the hospital's discharges. Throughout this report, I use the term "PSA" to refer to a 90 percent primary service area defined in this way.

[14] Chipty SJ Declaration, ¶ 10.

the Office of Statewide Health Planning and Development ("OSHPD"); (c) data from the Centers for Medicare and Medicaid Services ("CMS"); ███████████████████ and (h) data from California Department of Insurance ("CDI") and California Department of Managed Health Care ("DMHC"). I have also reviewed health plan declarations filed in the UFCW & Employers Benefit Trust ("*UEBT*") matter or in this case by Sutter and former and current health plan executives,[16] including, but not limited to, those of: (a) David Joyner, Vice President of Blue Shield;[17] (b) Tracy Barnes, Director of Contracting for Northern California at Blue Shield;[18] (c) Steve Melody, who served as Director of Network Development and Management for Northern California at Anthem from 1997 to 2001 and Vice President of Anthem's Health Care Service from 2001-2009;[19] (d) Aldo De La Torre, Vice President of Anthem;[20] (e) Janet Lundbye, who served as Vice President of Network Management in California from 2009-2015 and is currently the Regional Vice President of Network Strategy for the West Region at United;[21] (f) Chandra

---

[15] Based on my staff's review of ███████████████ which were produced on April 25, 2018, I have identified several anomalies in the data. I have also determined that the data are missing information on Diagnosis Related Group codes, which are t⎯ically used in hospital price analyses to control for differences in case mix across hospitals. I understand ██████ will be re-producing this data set to address these issues but it has not done so to-date. As such, the overcharge analysis presented in this report is based upon ██████████ The basic methodology I describe, however can be adapted to claims data from other health plans, including ████████████ which I understand ██████ will ultimately produce.

[16] "Class Action Complaint," *UFCW & Employers Benefit Trust v. Sutter Health; Sutter East Bay Hospitals; Sutter West Bay Hospitals; Eden Medical Center; Sutter Central Valley Hospitals; Mills-Peninsula Health Services; Sutter Health Sacramento Sierra Regio8n; Sutter Coast Hospital; Palo Alto Medical Foundation for Healthcare, Research and Education; and Sutter Medical Foundation*, Case No. CGC-14-538451, filed April 7, 2014 in Superior Court of the State of California for the City and County of San Francisco (hereafter "UEBT Complaint").

[17] "Declaration of David Joyner in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 7, 2017 (hereafter "Joyner Declaration").

[18] "Declaration of Tracy Barnes in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 7, 2017 (hereafter "Barnes Declaration").

[19] "Declaration of Steve Melody in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 7, 2017 (hereafter "Melody Declaration").

[20] "Declaration of Aldo De La Torre in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 7, 2017 (hereafter "De La Torre Declaration").

[21] "Declaration of Janet Lundbye in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 6, 2017 (hereafter "Lundbye Declaration").

Welsh, Vice President for Network Management in Northern California at Aetna;[22] (g) Becky LaCroix-Milani, Regional Vice President for Provider Network Management at Health Net;[23] (h) Jeff Sprague, Chief Financial Officer at Sutter;[24] and (i) Michael Ramseier, President and General Manager at Anthem.[25] I have also reviewed deposition testimony collected in this matter, including, but not limited to, the testimony of: (a) Bob Reed, Sutter's Chief Financial Officer until January 2015; (b) Jeff Sprague, Sutter's current Chief Financial Officer; (c) Peter Anderson, Sutter's Chief Strategy Officer; (d) Melissa Brendt, Sutter's Chief Contracting Officer; (e) Randy Lukins, Regional Director of Contracting for Anthem; (f) David Joyner, Senior Vice President of Network Management for Blue Shield; (g) Michael Beuoy, Vice President at Blue Shield, overseeing pricing and forecasting for all of Blue Shield's lines of business; (h) Tracy Barnes, Director of Contracting for Northern California at Blue Shield; (i) and Chris Mathewson,  Actuarial Director for Anthem Blue Cross. Additionally, I have reviewed and relied upon the opinions of David Axene, actuary and founder of Axene Health Partners, who has also submitted a report in this matter.[26] These and other materials are cited throughout my report. A full list of materials that I have considered in forming my expert opinions is attached as Appendix B to this report.

9.      The work presented in this report has been conducted by me and staff working under my direction, at both Berkeley Research Group and Matrix Economics. I receive $850 per hour for my work in this matter. I also receive compensation from Berkeley Research Group based on its collected staff billings in support of this effort. My compensation is not dependent on the outcome of this matter. My work is ongoing, and I will continue to review the discovery

---

[22] "Declaration of Chandra Welsh in Connection with Plaintiff UEBT's Motion for Class Certification", *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 8, 2017 (hereafter "Welsh Declaration").

[23] "Declaration of Becky LaCroix-Milani in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 7, 2017 (hereafter "LaCroix-Milani Declaration").

[24] "Declaration of Jeff Sprague in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, April 11, 2017 (hereafter "Sprague Declaration").

[25] Declaration of Michael Ramseier in Connection with Plaintiff UEBT's Motion for Class Certification, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 6, 2016 (hereafter "Ramseier Declaration").

[26] "Declaration of David V. Axene, FSA, FCA, CERA, MAAA in Support of Plaintiffs' Motion for Class Certification," *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, June 21, 2018 (hereafter "Axene Declaration").

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**                7

record to understand the evidence in this case. I reserve the right to supplement and to amend my opinions.

## II.     Summary of Opinions

10.     Based on my training and experience in healthcare antitrust economics, my analysis of the ordinary-course evidence in this case, and statistical analyses of Northern California hospital prices from ████████████████ it is my opinion that: (a) the proposed Class includes hundreds of thousands of Class Members; (b) a common method exists to demonstrate that Sutter's contracting practices have resulted in harm to all or nearly all Class Members; (c) evidence that is common to members of the proposed Class shows that all or nearly all proposed Class Members paid higher health insurance premiums as a result of Sutter's conduct; and (d) the amount of harm to the proposed Class can be estimated on an aggregate and an individual level using a common, formulaic methodology. The key pieces of evidence relevant to the opinions that I express in this report are summarized here.

- The proposed Class consists of hundreds of thousands of entities (employers and individuals) who during the Class period paid premiums for a fully-insured health insurance product offered by the Class Health Plans.

- A growing body of economics literature indicates that contracting practices like Sutter's can interfere with the competitive process for the sale of inpatient hospital services to commercial health plans. This literature demonstrates that higher prices can result from "all-or-nothing" and anti-steering contracting practices, like the ones at issue here.

- There is ample case-specific evidence from ordinary-course documents and declarations from health plan executives that Sutter's contracting practices interfered with health plans' ability to walk away from Sutter and offer lower-cost health insurance products. There is also ample evidence from the record – including in deposition testimony of Sutter personnel and health plan executives – and from third-party reports studying hospital prices in Northern California that, over the course of many years, Sutter has charged significantly higher prices for inpatient hospital services (in addition to outpatient and professional services), as compared to other California healthcare systems. This evidence is reinforced by my own analysis of: (a) hospital prices from OSHPD data

on both inpatient and outpatient services; and (b) inpatient hospital prices from █████████
██████████

- There is common proof demonstrating antitrust impact. This proof includes, but is not limited to, testimony offered by health plan executives in declarations, that Sutter used its market power to force the "all-or-nothing" and anti-steering restrictions upon each of the health plans.[27] There are also contracts between Sutter and each of the health plans that show similarities in contract terms. Furthermore, there is testimony from Sutter that indicates Sutter's practice was to offer substantially similar prices to each of the health plans.[28] These facts indicate that the mechanism Sutter used to raise prices and the associated harm caused by the challenged conduct is common to all or nearly all Class Members.

- Econometric analysis of █████████████ covering the period 2006 to 2015, shows that Sutter's conduct had a common impact on all or nearly all Class Members that purchased a health insurance policy████████ Using███████ on all commercial claims for inpatient hospital services provided to California residents receiving care at a Northern California hospital, I compare the prices paid to the Sutter Damage Hospitals against the prices paid to a set of benchmark hospitals that did not engage in the challenged conduct.[29] This analysis provides a basis for determining the Sutter prices that would have prevailed had Sutter not engaged in the challenged conduct. My findings

---

[27] ████████████████████████████████████████

[28] Deposition of Robert Reed, Chief Financial Officer of Sutter between 1996 and 2014, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* October 17, 2017 (hereafter "Reed Deposition"), at pp. 60-61 (Sutter's former Chief Financial Officer Robert Reed testified that his recollection was of Sutter "generally wanting to have a strategy of charging like payers at similar levels.").

[29] I understand that the damages period in this case began in September 2008 – four years before the filing of the original complaint in the matter – and continues through the present. As I explain later in this report, given the premium setting process, premium levels in a given year are based on medical costs from two years prior. (*See* Axene Declaration, ¶ 27.) Thus, my analysis of hospital prices begins in 2006, two years before the start of the damages period.

show that over the years 2006 to 2015, Sutter inflated its inpatient hospital prices  by an average of: (a) about 75 percent at Sutter Sacramento; (b) about 44 percent and 38 percent at CPMC-Main and CPMC-St. Luke's, respectively; (c) about 51 percent at Sutter Modesto; (d) about 15 percent at Sutter Santa Rosa; and (e) about 79 percent and 63 percent at Alta Bates-Main and Alta Bates-Summit, respectively.[30] Analysis conducted separately for each year also shows common impact in nearly all years, for nearly all hospitals. Using this approach,

for inpatient hospital services provided to Class Health Plan members covered by individual, small group, or large group fully-insured policies purchased by Class Members.

- The evidence shows that health plans pass through all or nearly all increases in healthcare costs, in the form of higher premiums, to entities purchasing health insurance. Accordingly, I find that the overcharges that Sutter imposed on health plans for inpatient hospital services were passed on to members of the Class in the form of higher health insurance premiums.

- I find that aggregate premium overpayments in the nine rating areas can be computed in a formulaic manner, consistent with the methodology described by Plaintiffs' actuarial expert, Mr. David Axene, to trace the effect of increased medical expenditures on premiums. Specifically, my calculation uses the econometric estimates of Sutter's hospital price overcharges, my analysis of pass-through, and the actuarial relationship between health care costs and premiums to compute premium overpayments by Class Members who purchased health insurance policies                The analysis shows that from September 2008 to December 2017, these Class Members paid                        ore in health insurance premiums          than they would have but-for the challenged conduct. One can undertake a similar analysis with claims and premium data                                    to estimate premium overpayments for Class Members who purchased health insurance policies from these

---

[30] In 2014, Sutter closed Sutter Medical Center of Santa Rosa and opened a new location, Sutter Santa Rosa Regional Hospital. *See* Sutter Health, "Sutter Santa Rosa History," available at https://www.sutterhealth.org/ssrrh/about/history/history-ssrrh, *site visited* April 2, 2018.

other health plans. To get an approximate sense of total premium overpayments resulting from the challenged conduct, one can extrapolate from ████████████████ to all Class Health Plans, using information on ████████ share of all entities in the nine rating areas purchasing health insurance policies from one of the Class Health Plans. This calculation yields aggregate premium damages, or overpayments by all Class Members, to be between $723 million and $749 million.

- Furthermore, a common method for calculating individual damages exists for all Class Members. This method can be applied regardless of the health plan from which the Class Member purchased coverage, whether the Class Member is an individual, small group, or large group purchaser, the level of benefits purchased, the health plan product that is purchased, or the geography in which the health plan member resided or worked.

The remainder of this report describes the support for each of these opinions.

## III.  Background

11.    This section provides relevant background to help guide the discussion and assessment of class issues and damages. It provides an overview of some of the unique features of healthcare markets, the Northern California healthcare landscape where Sutter is located, and the contractual restrictions in Sutter's contracts with health plans, that are at the heart of this case. Throughout this report, I refer to "Northern California" as the 48 counties north of San Luis Obispo, Kern, and San Bernardino counties, as shown in Exhibit 1.

**Exhibit 1**
**Map of California**



*Source*: US Census Bureau; and Tenn, Steven, "The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction," *International Journal of the Economics of Business*, Vol. 18, No.1, 2011, pp. 65-82, at p.74.

### A.    *Unique Features of Healthcare Markets*

12.    As recognized by antitrust scholars in healthcare, analysis of the competitive effects of hospital conduct must account for the unique features of healthcare markets that

distinguish healthcare from "standard" goods and services.[31] Unlike with standard goods and services, consumers seek access to healthcare services even before they know what their medical needs are. In addition, consumers do not negotiate directly with healthcare providers; instead, they purchase access to provider networks assembled by health plans. Healthcare providers include: (a) hospitals that provide general or specialized care to treat diseases or trauma on a short-term, inpatient basis; (b) specialty hospitals that include psychiatric and rehabilitation facilities; (c) long-term care facilities; (d) outpatient facilities; and (e) physicians. Provider networks include a selection of each of these types of healthcare providers. The allegations in this case and, thus, the analyses in this report focus on competition among hospitals that provide acute care on a short-term, inpatient basis.

13.     Health plans negotiate agreements with hospital systems, like Sutter, over the terms of their inclusion in provider networks.[32] Such agreements specify the prices (sometimes referred to as "allowed amounts") that a hospital will receive for inpatient hospital services health plan members may receive at the hospital.[33] Agreements between health plans and hospital systems can also specify other terms. There may be terms, for example, that govern where the hospital system is placed in the health plan's provider network (*e.g.* equal placement in a broad network product or preferred placement in a tiered or narrow network product). There may be terms, as in the case of Sutter's contracts with health plans, that govern whether and how health plans can incent patients to choose among the different providers in the network.

---

[31] Vistnes, Gregory, "Hospitals, Mergers, and Two-Stage Competition," *Antitrust Law Journal*, Vol. 67, No. 3, 2000, pp. 671-692 (hereafter "Vistnes (2000)"); Ho, Kate and Robin Lee, "Equilibrium Provider Networks: Bargaining and Exclusion in Health Care Markets," NBER Working Paper 23742, Issued August 2017, Revised May 2018, available at http://www.nber.org/papers/w23742.pdf, *site visited* May 23, 2018, (hereafter "Ho and Lee (2018)"); and Kessler, Daniel and Mark McLellan, "Is Hospital Competition Socially Wasteful?" *Quarterly Journal of Economics*, Vol. 115, No. 2, 2000, pp. 577-615 (hereafter "Kessler and McLellan (2000)").

[32] Health plans sell access to provider networks to both self-insured and fully-insured covered lives. Health plans also sell administrative services such as claims processing, to self-insured employers, and risk-bearing services. *See*, for example, Austin, D. Andrew and Thomas Hungerford, "The Market Structure of the Health Insurance Industry," *Congressional Research Service*, CRS Report R40834, May 25, 2010, available at https://fas.org/sgp/crs/misc/R40834.pdf, *site visited* October 24, 2017, at pp. 21-22.

[33] Allowed amounts are borne by individuals and group purchasers through premiums. They can also be borne by plan members through deductibles, copayments, or coinsurance, depending on the terms of the agreement between the plan member and the health plan.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

14.     Hospital markets have been characterized by two stages of competition.[34] In the first stage, hospitals compete with each other to be included in provider networks. In the second stage, patients choose a hospital from their provider network. Patients that have equal access to all hospitals in their provider network typically choose a hospital based on non-price factors such as convenience and whether the hospital has the expertise to address their medical need. Health plans, however, increasingly use benefit design to cause patients to internalize hospital prices in making their hospital choice; the effect of such benefit design is to steer patients to choose hospitals that cost less.[35] For example, some health plans may give plan members a discount for agreeing to use a narrower provider network consisting of less expensive hospitals. Some health plans may give patients a discount for choosing a lower-priced hospital within a provider network. In such cases, patients are more likely to consider price as a factor in their hospital choice. Health plans have more leverage in their negotiation with hospitals when there are more competing hospitals capable of serving the needs of area-patients and when patients can be steered to use lower-priced hospitals.[36] By contrast, where there are fewer competing hospitals or where plan members have strong preferences for a hospital, that hospital has more leverage in its negotiations with health plans.

15.     According to the Complaint, there are some hospital markets in Northern California where health plans could use benefit design to steer patients away from higher-priced Sutter hospitals.[37] There are also some hospital markets in Northern California where some plan members cannot be steered because they have strong preferences for Sutter hospitals.[38]

---

[34] Vistnes (2000), at p. 672 ("Hospital competition is modeled as a two-stage game. In the first stage, hospitals compete to be included in a plan's hospital network. In the second stage, hospitals compete for a plan's individual enrollees…."); and Farrell, Joseph, David Balan, Keith Brand, and Brett Wendling, "Economics at the FTC: Hospital Mergers, Authorized Generic Drugs, and Consumer Credit Markets" *Review of Industrial Organization* Vol. 39, No. 4, 2011, pp. 271-296, at p. 4.

[35] Delbanco, Suzanne, Roslyn Murray, Robert A. Berenson, and Divvy K. Upadhyay, "A Typology of Benefit Designs," *Urban Institute*, April 2016, available at https://www.urban.org/sites/default/files/publication/80321/2000780-A-Typology-of-Benefit-Designs.pdf, *site visited* April 18, 2018, at p. 1.

[36] Vistnes (2000), at p. 677 ("The strength of a plan's threat [in negotiations with a hospital] also depends on the extent to which other hospitals are good substitutes from the patient's perspective."); and Ho and Lee (2018), at p. 48 ("[W]e find that selective contracting and informed network design can have substantial effects on overall health care spending. Narrow hospital networks are preferred by a profit-maximizing insurer primarily due to their ability to substantially reduce negotiated rates.").

[37] Complaint, ¶ 6.

[38] Complaint, ¶ 4.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

According to the Complaint, Sutter forces health plans to include all Sutter hospitals in their provider networks, and Sutter prohibits health plans from giving patients financial incentives to go to lower-priced hospitals.[39] Given the nature of hospital markets, one would expect the effect of Sutter's conduct, under certain circumstances, to raise Sutter hospital prices.

### B.    The Role of Kaiser Permanente

16.    Kaiser Permanente ("Kaiser") is the largest healthcare system in California. Kaiser consists of a network of owned and operated hospitals, outpatient facilities, and physicians.[40] Kaiser is also a health plan covering about 45 percent of commercial plan members in the state of California.[41] The Kaiser health plan is widely described as a "health maintenance organization,"[42] which means that Kaiser plan members must stay within the Kaiser network and their care is closely managed to contain costs. Kaiser is a "closed" healthcare system because non-Kaiser health plans, like Anthem and Blue Shield, cannot include Kaiser hospitals in their provider networks. With the exception of emergencies, only Kaiser plan members can access healthcare in the Kaiser system.

17.    Because Kaiser is a closed system, commercial health plans cannot turn to Kaiser hospitals as substitutes for non-Kaiser hospitals, like the Sutter hospitals, when assembling their provider networks. Thus, Kaiser does not compete with Sutter in the first stage of hospital competition, for inclusion in provider networks. Kaiser also does not compete with Sutter in the second stage of hospital competition to attract patients because no patient would have both Kaiser and Sutter hospitals in his or her provider network. Thus, Kaiser hospitals are not in the relevant antitrust markets for the purpose of evaluating Sutter's market power over health plans like Anthem and Blue Shield, which are the "upstream" markets for the sale of inpatient hospital

---

[39] Complaint, ¶¶ 33-46.

[40] Kaiser Permanente, "Fast Facts About Kaiser Permanente," available at https://share kaiserpermanente. org/article/fast-facts-about-kaiser-permanente/, *site visited* March 17, 2018.

[41] California Health Care Foundation, "California Health Insurers, Enrollment," available at https://www.chcf.org/wp-content/uploads/2018/02/QRGHealthInsurersEnrollment2018.pdf, *site visited* April 30, 2018, p. 2.

[42] CalHealth.Net, "Anthem Blue Cross Versus Kaiser – The Heavyweights of California," available at https://www.calhealth net/Kaiser-versus-Anthem-California.htm, *site visited* April 8, 2018.

services to commercial health plans.[43] By contrast, Kaiser competes with health plans like Anthem and Blue Shield for plan members in the "downstream" markets for the sale of commercial insurance.[44] When health plans lose plan members to Kaiser, Sutter also loses the ability to attract those plan members to a Sutter hospital when they need inpatient medical care. Thus, there are separate issues of whether and the extent to which Kaiser disciplines health plan premiums.

18.     Ordinary-course evidence shows that Kaiser premiums are typically lower cost than non-Kaiser premiums.[45] Ordinary-course evidence also shows that at least some non-Kaiser health plans would like to offer lower-cost, narrow network products to attract subscribers that would otherwise go to Kaiser.[46] However, the alleged conduct restricts non-Kaiser health plans' ability to offer narrow network products and, by so doing, interferes with competition between Kaiser and non-Kaiser health plans in the downstream markets.

### C.     Northern California Hospitals

19.     I turn now to a description of the non-Kaiser, Northern California hospitals with which non-Kaiser health plans can seek to assemble provider networks. For convenience, I refer to these hospitals simply as Northern California hospitals. According to OSHPD data, there were approximately 118 hospitals in Northern California, over the period 2008 to 2015.[47] Exhibit 2

---

[43] The Plaintiffs have alleged the existence of two different types of relevant markets: (a) a set of upstream markets for the sale of inpatient hospital services to commercial health plans; and (b) a set of downstream markets for the sale of commercial insurance to subscribers in different rating areas. (See Complaint, ¶ 73.)



[44] ⬛⬛⬛ DEF00877866-907, at 886 ⬛⬛⬛ Em hasis in original]).⬛⬛⬛ See Deposition of Jeff Sprague, Chief Financial Officer of Sutter, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health,* May 17, 2018 (hereafter "Sprague Deposition"), pp. 147-151.

[45] ⬛⬛⬛ DEF001993646-928  hereafter ⬛⬛⬛), at 736⬛⬛⬛

[47] I study hospitals where: (a) the hospital describes itself as either "General" or "General Acute" in its annual financial disclosure to OSHPD; and (b) the last four digits of the hospital's Medicare Provider Number (MPN) falls within the range 0001 – 0879, the range specified by the Centers for Medicare and Medicaid Services (CMS) for "Short-term (General and Specialty) Hospitals." See CMS, "Center for Clinical Standards and Quality/Survey & Certification Group Memorandum," March 11, 2016, available at https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Survey-and-Cert-Letter-16-09.pdf, *site visited* March 26, 2018.

shows a breakdown, by year, along with the split between inpatient and outpatient charges. As seen here, there has been a decrease in the number of hospitals. Throughout the period, charges for inpatient services account for the majority of hospital charges, though there has been a shift in the composition towards outpatient care.

**Exhibit 2**
**Northern California Hospitals,**
**Inpatient and Outpatient Charges**

| Year | Number of Hospitals | % of Charges Inpatient | % of Charges Outpatient |
|------|---------------------|------------------------|-------------------------|
| 2008 | 125 | 67% | 33% |
| 2009 | 124 | 66% | 34% |
| 2010 | 120 | 65% | 35% |
| 2011 | 117 | 65% | 35% |
| 2012 | 115 | 64% | 36% |
| 2013 | 114 | 63% | 37% |
| 2014 | 114 | 61% | 39% |
| 2015 | 113 | 59% | 41% |

*Notes*:

1. Hospitals are defined as hospitals with "General" or "General Acute" as a type of care in the OSHPD Patient Discharge Pivot Profiles and with a CMS ID in the range 050001 - 050879.

2. This summary excludes all Kaiser facilities.

*Sources:*

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2015.

2. OSHPD Hospital Annual Financial Disclosure Data Complete Data Set, 2008-2015.

3. Centers for Medicare and Medicaid Services (CMS) Historical Impact Files, 2008-2015.

20.    As of 2015, the top-five hospital systems, in order of number of hospitals in Northern California are: (a) Sutter, with 22 hospitals; (b) Dignity Health, with 14 hospitals; (c) Adventist, with seven hospitals; (d) St. Joseph Health System, with five hospitals; and (e) Tenet Healthcare, with three hospitals. Exhibit 3A shows the distribution of all Northern California systems, based on their number of hospitals in Northern California, and Exhibit 3B shows the distribution of all Northern California systems, based on their number of hospital beds in Northern California.[48] By both metrics, Sutter is the largest health system in Northern California

---

[48] Systems were defined based on each hospital's system name from the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, which is populated for all systems with at least three hospitals. *See* Appendix C; and Chipty Workpapers.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

with which health plans like Anthem and Blue Shield can contract. Both exhibits also show that Dignity Health is the second largest health system in Northern California. █████████████ ████████████████████████████████████████████████████████████████████ 49



**Exhibit 3A**
**Northern California Hospital Systems in 2015,**
**Based on Number of Hospital**

*Note*: *See* notes for Exhibit 2.
*Source*: *See* sources for Exhibit 2.

---

49 ████████████████████████████████████████████████████████████
████████████████████████████████████



**Exhibit 3B**
**Northern California Hospital Systems in 2015,**
**Based on Hospital Beds**

*Note*: *See* notes for Exhibit 2.
*Source*: *See* sources for Exhibit 2.

### D.    *Sutter Health*

21.    Sutter is a health system headquartered in Sacramento. Sutter consists of a network of hospitals, physician organizations, surgery centers, home health and hospice programs, medical research facilities, training programs, and specialty services, serving communities in Northern California cities and towns. Sutter currently reports that it owns and operates: (a) 24 hospitals;[50] (b) a network of about 5,500 physicians; (c) about 35 outpatient surgery centers; (d) about five acute rehabilitation centers; (e) seven behavioral health centers; (f) about 30 urgent care centers; and (g) about ten walk-in-clinics.[51]

22.    Exhibit 4 shows a list of all Sutter hospitals, along with each hospital's: (a) location; (b) bed count; and (c) description in the Complaint as a "Tying," "Tied," or "Other"

---

[50] As described in ¶ 20, OSHPD reports there were 22 Sutter hospitals in 2015. Today, Sutter reports having 24 hospitals on its website. *See* Sutter Health, "What is Sutter Health," available at https://www.sutterhealth.org/about/what-is-sutter-health, *site visited* May 17, 2018.

[51] Sutter Health, "What is Sutter Health," available at https://www.sutterhealth.org/about/what-is-sutter-health, *site visited* May 17, 2018.

hospital. As seen here, the largest Sutter hospital is CPMC-Main, located in San Francisco; it has three campuses – Davies, Pacific, and California – which report jointly to OSHPD, as well as the CPMC-St. Luke's campus, which reports separately. The next largest Sutter hospital is Sutter Sacramento, in Sacramento, which was previously composed of two campuses: Sutter Memorial and Sutter General. The third largest Sutter hospital is the combination of Alta Bates-Main and Alta Bates-Summit, located in Alameda County. Exhibit 5 shows a map of the Sutter hospitals.

**Exhibit 4**
**Sutter Hospitals**

| Hospital | HSA(s) | County | Beds | Complaint |
|---|---|---|---|---|
| CPMC-Main | San Francisco | San Francisco | 970 | Tied |
| Sutter Sacramento | Sacramento | Sacramento | 754 | Tied |
| Sutter Modesto | Modesto | Stanislaus | 423 | Tied |
| CPMC-St Luke's | San Francisco | San Francisco | 229 | Tied |
| Sutter Santa Rosa | Santa Rosa | Sonoma | 135 | Tied |
| Alta Bates-Main | Berkeley - Oakland | Alameda | 527 | Tying |
| Alta Bates-Summit | Berkeley - Oakland | Alameda | 399 | Tying |
| Sutter Delta | Antioch | Contra Costa | 145 | Tying |
| Sutter Tracy | Tracy | San Joaquin | 82 | Tying |
| Sutter Auburn | Auburn | Placer | 78 | Tying |
| Sutter Coast | Crescent City | Del Norte | 59 | Tying |
| Sutter Amador | Jackson | Amador | 52 | Tying |
| Sutter Davis | Davis | Yolo | 48 | Tying |
| Sutter Lakeside | Lakeport | Lake | 37 | Tying |
| Peninsula Medical Center | Burlingame | San Mateo | 376 | Other |
| Sutter Roseville Medical Center | Roseville | Placer | 328 | Other |
| Eden Medical Center | Castro Valley | Alameda | 271 | Other |
| Sutter Solano Medical Center | Vallejo | Solano | 102 | Other |
| San Leandro Hospital | San Leandro | Alameda | 93 | Other |
| Novato Community Hospital | Novato | Marin | 47 | Other |
| Memorial Hospital Los Banos | Los Banos | Merced | 46 | Other |
| Sutter Maternity & Surgery Center | Santa Cruz | Santa Cruz | 30 | Other |
| Menlo Park Surgical Hospital | Stanford | San Mateo | 16 | Other |

*Note*:
1. San Leandro Hospital was sold by Sutter Health in 2013.
2. Beds shown are licensed beds as reported in the OSHPD Pivot Profiles.
*Sources*:
1. California Office of Statewide Health Planning and Development (OSHPD), 2011 Pivot Profiles.
2. Dartmouth Atlas of Healthcare Hospital Service Area (HSA) Listings.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

**Exhibit 5**
**Map of the Sutter Hospitals**



*Sources*:
  1. Shapefile Sources: US Census Bureau, Google Maps.
  2. Hospital Locations: OSHPD Hospital Annual Financial Disclosure Pivot Profile Data, 2011.

### E.   California Health Plans

23.     Most California residents who have health insurance through a commercial health plan are covered under either an employer's self-funded or fully-insured product.[52] With a fully-insured product, individuals or employers, who sometimes by splitting the premium with their employees, pay a premium to a commercial health plan that underwrites the risk and assumes full financial responsibility should health plan members or their families need medical services. There are dozens of commercial health plans in the state of California selling fully-insured products to purchasing entities, who may be individuals, small group employers,[53] or large group employers.[54] Throughout the Class period, health plans have offered a menu of plan options that range from high-premium plans with low out-of-pocket expenses to low-premium plans with high out-of-pocket expenses.[55]

24.     In 2016, for example, California health plans covered 32.6 million plan members, of which between six and seven million were covered under a fully-insured health insurance product sold by one of the Class Health Plans.[56] Exhibit 6 shows the top-ten non-Kaiser health plans in California in terms of plan members as of December 2016. Of these, Blue Shield and Anthem are the largest, collectively serving about 60 percent of statewide, non-Kaiser plan members. Blue Shield, Anthem, United, Health Net, and Aetna – the health plans whose

---

[52] Self-insured employers assume the financial responsibility for paying claims and contract with a health plan for administrative services only ("ASO"). *See* Cothran, Josh, "The Private Insurance Market in California, 2015," California Healthcare Foundation, available at https://www.chcf.org/publication/the-private-insurance-market-in-california-2015/, *site visited* March 17, 2018.

[53] Until 2016, small group employers were employers with 50 or fewer workers. (*See* American Academy of Actuaries, "Potential Implications of the Small Group Definition Expanding to Employers with 51-100 Employees." available at https://www.actuary.org/files/Small_group_def_ib_030215.pdf, *site visited* June 12, 2018.)  Today, small group employers are employers with 100 or fewer workers. *See* California, the Department of Managed Health Care, "Key Terms," available at

http://www.dmhc.ca.gov/HealthCareinCalifornia/PremiumRateReview/KeyTerms.aspx, *site visited* March 17, 2018.

[54] *Id.*

[55] ██████████████████████████████████████████████████████████████████ ██████████████ *See also*, Axene Declaration, ¶ 57.

[56] Of these 32.6 million members: (a) 5.7 million were covered under administrative services only ("ASO") arrangements for self-insured employers; (b) 12.8 million were covered under a public managed care plan; (c) 6.3 million were covered through a Kaiser, commercial health insurance product; and (d) 7.8 million were covered under a non-Kaiser commercial health insurance product. Of the 7.8 million members, 6.1 million were insured by one of Class Health Plans. *See* California Health Care Foundation, "CaliforniaHealthInsurersEnrollmentDataPublished2018.xlsx," 2018, Sheet = "Pivot-1-By Market Sector."

executives' testimony upon which I have relied – account for nearly 90 percent of all non-Kaiser plan members in California.

**Exhibit 6**
**Top-Ten Commercial Health Plans in California**
**December 2016**

| Health Plan | Plan Members | % |
|---|---|---|
| Blue Shield | 2,410,961 | 31% |
| Anthem | 2,376,980 | 30% |
| UnitedHealth | 758,917 | 10% |
| Centene (Health Net) | 731,530 | 9% |
| Aetna | 568,025 | 7% |
| CIGNA | 310,883 | 4% |
| Sharp | 130,457 | 2% |
| Western Health Advantage | 128,401 | 2% |
| Western Growers | 65,105 | 1% |
| Molina | 62,735 | 1% |
| Other (N = 100) | 267,504 | 3% |

*Notes*:

1. These data reflect enrollments from both DHMC's Enrollment Summary reports and CDI's Covered Lives Reports.

2. Enrollment figures for Centene and Health Net are combined, because Centene acquired Health Net in March 2016.

*Source*: California Health Insurers Enrollment Database, Reporting by DMHC & CDI, 2012-2016.

25.     In California, regulatory oversight of health plans is handled by two separate entities: (a) the DMHC that oversees health maintenance organizations ("HMOs"); and (b) the CDI that oversees traditional health insurance products, including preferred provider organization ("PPO") products.[57] Both agencies focus on consumer rights and the stability of the healthcare delivery system in California.[58] As part of this mission, both agencies oversee the financial ability of health plans to pay claims, and both require health plans to adhere to network

---

[57] California Health Care Foundation, "Insurance Markets," June 2003, available at https://www.chcf.org/wp-content/uploads/2017/12/PDF-HIMURegulatoryOversight.pdf, *site visited* March 18, 2018 (hereafter "CHCF Insurance Markets"), p. 3.

[58] Hansen, John, "The Department of Managed Health Care Regulates California Health Plans and Protects Consumers," Health for California Insurance Center, available at https://www.healthforcalifornia.com/the-department-of-managed-health-care-regulates-california-health-plans-protects-consumers, *site visited* April 12, 2018 (hereafter "DMHC Regulates California Health Plans"); and CHCF Insurance Markets, p. 3.

adequacy standards under which health plans must provide hospital services within 30 minutes or 15 miles of a member's residence or workplace.[59]

### F.    Rating Areas

26.     My understanding is that throughout the Class period, the major health plans in California analyzed costs and premium increases based on geographic regions that are called "ratings areas."[60]



[62] Consistent with this explanation, researchers from the University of Iowa explain: "[r]ating areas are the most relevant geographic unit in the operation of [health insurance marketplaces] because [qualified health plans] must charge uniform premiums within a rating area, but may charge different premiums across rating areas in the same state and across states."[63] As of 2014, there are 19 geographic rating areas in California that have been identified by law under the Affordable Care Act. (*See* Exhibit 7.)

---

[59] DMHC Regulates California Health Plans, p. 1 ("The department gets its authority from the Knox Keene Health Care Service Plan Act of 1975;" 28 CCR § 1300.51 (H); and California Department of Insurance, "Provider Network Adequacy", available at http://www.insurance.ca.gov/01-consumers/110-health/10-basics/pna.cfm, *site visited* April 12, 2018.

[60] Axene Declaration, ¶ 49.

[61] Beuoy Deposition, p. 25.

[62] Deposition of Chris Mathewson, Actuarial Director for Anthem, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.*, May 15, 2018 (hereafter "Mathewson Deposition"), pp. 49-50.

[63] Barker, Abigail, Timothy McBride, Leah Kemper, and Keith Mueller, "Geographic Variation in Premiums in Health Insurance Marketplaces," RUPRI Center for Rural Health Policy Analysis, available at https://www.public-health.uiowa.edu/rupri/publications/policybriefs/2014/Geographic%20Variation%20in%20Premiums%20in%20Health%20Insurance%20Marketplaces.pdf, *site visited* March 26, 2018, p. 1; and Axene Declaration, ¶ 49. (explaining that health plans developed premiums through applying rating area factors prior to the Affordable Care Act).

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Exhibit 7**
**California Rating Areas, Post-Affordable Care Act**



*Source*: Shorr, Steve. 2018. "Rating region standardization." Accessed March 19, 2018 at
https://steveshorr.com/steveshorr/individual_and_family/Covered.CA/legislation/standard rating.regions.pdf.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

27.   Mr. Axene's opinions are consistent

28.      Furthermore, entities are eligible to purchase certain health plans, priced in certain ways, depending on where they or their employees live or work:

- *Individuals*:

- *Small Group*:

---

[64] Beuoy Deposition, p. 39

[65] Beuoy Deposition, p. 40. *See also*, Axene Declaration, ¶¶ 29, 50.

[66] Beuoy Deposition, pp. 85-86.

[67] Beuoy Deposition, p. 56. *See also*, Axene Declaration ¶ 51.

[68] Beuoy Deposition, p. 69. *See also*, Axene Declaration, ¶¶ 5, 40-41.

[69] Beuoy Deposition, p. 87.

[70] Axene Declaration, ¶ 8.2 ("As the full cost of health services is built into health plan premium rates, premium rates will be higher if underlying actual and, in turn, projected [inpatient hospital services] costs are higher.").

[71] Beuoy Deposition, p. 33. *See also*, Axene Declaration ¶¶ 48-50.

[72] Beuoy Deposition, p. 34

*See also*, Axene Declaration ¶¶ 48-50.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER                    26

- *Large Group*: 

[73] (b)

[74]

[75] For example, if a large employer had 100 employees residing in Los Angeles and 200 residing in San Francisco, the employer's manual rating would be based on the weighted average (one-third, two-thirds) of the Los Angeles' rating factor and the San Francisco's rating factor.[76]

### G.   Estimated Size of the Proposed Class

29.    The proposed Class in this matter is composed of hundreds of thousands of Class Members, across the nine rating areas, who during the Class period paid premiums for a fully-insured health insurance product offered by one of the Class Health Plans. Using ▇ ▇ obtained through discovery, I estimate that ▇ ▇ from 2008 to 2017. Over this period, there were ▇ ▇ *See* Exhibit 8.

---

[73] ▇ *See also*, Axene Declaration, ¶¶ 50-51.
[74] ▇ *See also*, Axene Declaration, Footnote 43.
[75] Beuoy Deposition, p. 183. *See also*, Axene Declaration ¶ 51.
[76] Axene Declaration, ¶ 51.

**Exhibit 8**



| Year | Individual | Small Group | Large Group | All Entities |
|---|---|---|---|---|
| 2008 | | | | |
| 2009 | | | | |
| 2010 | | | | |
| 2011 | | | | |
| 2012 | | | | |
| 2013 | | | | |
| 2014 | | | | |
| 2015 | | | | |
| 2016 | | | | |
| 2017 | | | | |
| Unique Entities Over the Years | | | | |

*Sources:*

1. █████████████

2. US Census Bureau Zip Code and County Data.

3. The Center for Consumer Information & Insurance Oversight: California Geographic Rating Areas.

30.     Thus, even if the proposed Class were to be comprised only of █████████ which it is not, one would conclude that the proposed Class is numerous. To get a sense of total Class size, one can extrapolate the number ████████████ in the proposed Class, using information on █████████████████████ ealth insurance coverage from one of the Class Health Plans in 2016, shown in Exhibit 6. As seen there, about 87 percent of all California health plan members were enrolled in one of the Class Health Plans in 2016 ██████

██████████████████████████████████████

█████████████████████████████████████

████████ here could be between 430,000 and 680,000 Class Members in any given year.

## H.     Plaintiffs' Theory of Harm

31.     According to Plaintiffs, Sutter has two types of hospitals. The first are hospitals that health plans could exclude from their provider networks, at least for some insurance products. These hospitals are the "Tied" hospitals of: (a) Sutter Sacramento; (b) CPMC-Main; (c) CPMC-St. Luke's; (d) Sutter Modesto; and (e) Sutter Santa Rosa.[77] The second are hospitals that health plans need to include in provider networks, because there are no or few workarounds to

---

[77] Complaint, ¶ 5.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

those hospitals from the perspective of a significant number of plan members. These hospitals are the "Tying" hospitals of: (a) Alta Bates-Main; (b) Alta Bates-Summit; (c-) Sutter Lakeside; (d) Sutter Amador; (e) Sutter Coast; (f) Sutter Delta; (g) Sutter Auburn; (h) Sutter Tracy; and (i) Sutter Davis.[78]

32.　　　According to Plaintiffs, Sutter forces health plans to take all Sutter hospitals in network, either by imposing explicit "all-or-nothing" requirements or by imposing punitive out-of-network rates (referred to as "non-par rates") for non-participating hospitals.[79] Sutter also prohibits health plans from engaging in benefit design that has the effect of steering some of their members to lower-cost, quality providers that participate in their provider networks.[80] Sutter's ability to force health plans into onerous contracts stems from health plan demand for Sutter's Tying hospitals, located in various Tying Markets.

33.　　　Thus, Sutter allegedly abuses its market power in the Tying Markets to extract higher prices from health plans in the Tied Markets, where Sutter does not have the same market power. Sutter also allegedly interferes with competition in both the Tying and the Tied markets, where health plans might use benefit design to steer patients to lower cost hospitals. The result of this conduct has been to raise inpatient hospital services prices charged to health plans, and thus, premiums charged to entities purchasing health insurance policies.

## IV.　Health Plans Face Common Contractual Provisions in Systemwide Contracts with Sutter

34.　　　The evidence shows that Sutter has imposed the same or nearly the same contractual terms with respect to "all-or-nothing" requirements, excessive non-par rates, anti-steering, and anti-tiering provisions in their contracts with each of the Class Health Plans from which Class Members purchased health insurance policies over the Class period.[81] The parity

---

[78] Complaint, ¶ 6.

[79] Complaint, ¶¶ 1, 13, and 33-34 (Beginning around 2004, Sutter required health plans to pay between 95 percent and 100 percent of billed charges, referred to as "non-par" rates, for out-of-network care). I often use the term "all-or-nothing" to describe the "non-par" provisions.

[80] Complaint, ¶¶ 40-43.

[81] Complaint, ¶¶ 1 and 13.

across health plan contracts is evident from the declarations of each of the health plan executives and the underlying contracts themselves.

### A.   Blue Shield

35.



---

[82] Joyner Declaration, ¶ 15 (emphasis in original), referencing Joyner Exhibit 1, Blue Shield's systemwide agreement with Sutter from 2002.

[83] Joyner Declaration, ¶ 7.

[84] Joyner Declaration, ¶¶ 18-19.

[85] Jo ner Declaration   45

[86] Joyner Declaration, ¶ 19.

[87] Joyner Declaration, ¶ 37.

36. ██████████████████████████████████
███████████████████████████████████████████████
██████████ ██████████████

██████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████

**B.      *Anthem***

37.   Similar terms are found in the Sutter's contracts with Anthem.██████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

████████████████████████████████████████
████████████████████████

████████████████████████████████████████

████████████████████████████████████████
████████████████

████████████████████████████████████████
████████████████████████████[92] Not only did the

health plans understand their agreements with Sutter prohibited benefit designs that would steer

---

[88] Joyner Declaration, ¶¶ 48-49.

[89] Joyner Declaration, ¶ 48 (emphasis in original).

[90] Melody Declaration, ¶ 12 (emphasis in original), ████████████████████████████
██████

[91]████████████████████████████████████████DEF000097795-900, at
805.

[92] Welsh Declaration, ¶ 14.

patients away from Sutter, but Sutter also indicated that their agreements prohibited health plans from steering patients away from Sutter.[93]

38. 

[94] The specific language of Anthem's contract is as follows:[95]

---

[93] Email from Melissa Brendt, Vice President, Managed Care at Sutter Health, to Rand  Lukins  Senior Contract Mana er at Blue Cross of California  A  ril 19, 2005  DEF004260229-230, at 230

[94] De La Torre Declaration, ¶ 12.

[95] DEF000097580-667, at 584.

[96] De La Torre Declaration, ¶ 19.

[97] STCA0125576-926, at 598.

## C.   United

39.   Similar terms are found in Sutter's contracts with United. 

<hr />

[98] Lundbye Declaration, ¶ 2.

[99] Lundbye Declaration, ¶ 8. As explained by Ms. Lundbye, ████████████ *See* Lundbye Declaration, ¶ 4.

[100] ████████████████████████████████ UHC-00073965-4075, at 3976-3977.

[101] ████ STCA0006807-7039 ██████████████████ at 6813.





---

[102] Lundbye Declaration, ¶ 17.

[103]

DEF000102373-463  at 387

*See also,*
STCA0006807-7039, at 6818

### D.     Health Net

43.     Similar terms are found in Sutter's contracts with Health Net. 

44.

45.

---

[104] LaCroix-Milani Declaration, ¶ 1.

[105] LaCroix-Milani Declaration, ¶ 12.

[106] STCA0004697-831, at 707.

[107] STCA0060998-1236, at 0999.



46.

47.

**E.     Aetna**

48.

---

108 LaCroix-Milani Declaration, ¶ 14.

109

DEF000096188-383, at 199.

110

DEF002040107-142, at 116.



49.

50.

51.

---

[111] Welsh Declaration, ¶ 13.
[112] ████████████████████████████████████████████ DEF000096837-923
████████████████████████████ t 840.
[113] Welsh Declaration, ¶ 14.



52.

53.     Thus, the evidence shows that beginning at least in 2006 (the start of the analysis period in the overcharge model I present below), Sutter has imposed the same or nearly the same contractual terms with respect to "all-or-nothing" requirements, either directly or through the imposition of the excessive non-par rates. Sutter has also imposed the same or nearly the same contractual terms with respect to "anti-steering" requirements, including either a general prohibition on steering or specific prohibitions on narrow or tiered network products. The parity across health plan contracts is evident from the declarations of each of the health plan executives and the underlying contracts themselves.

## V.     Economics of Tying and Anti-Steering Provisions

54.     Economic principles and a growing body of empirical research show that under certain circumstances tying and anti-steering provisions, especially practiced together, can interfere with the competitive process and result in consumer harm in healthcare markets.

---

[114] Seventh Amendment to the Aetna and Sutter Systemwide Amendment, at 846.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

#### A.    Tying

55.    Sutter's practice of forcing health plans to include in their provider networks all Sutter hospitals can be described by various terms, including "all-or-nothing" contracting, "bundling," or "tying." Regardless of the label or the precise mechanism through which it is achieved, the effect of the practice is that health plans need to include all Sutter hospitals in their provider network. As explained by the Federal Trade Commission ("FTC"):[115]

> "A monopolist may use forced buying, or 'tie-in' sales, to gain sales in other markets where it is not dominant and to make it more difficult for rivals in those markets to obtain sales. This may limit consumer choice for buyers wanting to purchase one ('tying') product by forcing them to also buy a second ('tied') product as well. Typically, the 'tied' product may be a less desirable one that the buyer might not purchase unless required to do so, or may prefer to get from a different seller. If the seller offering the tied products has sufficient market power in the 'tying' product, these arrangements can violate the antitrust laws."

56.    Of course, offering products together can benefit consumers who like the convenience of buying several products together at the same time. As explained by the FTC, "[o]ffering products together can also reduce the manufacturer's costs for packaging, shipping, and promoting the products."[116] However, the fact that Sutter also imposes anti-steering restrictions indicates that a non-negligible share of patients would be willing to forego use of some of the Sutter hospitals, at least at some price level. At least these patients and their health plans may prefer not to have to contract with all Sutter hospitals.

#### B.    Steering Practices

57.    In a traditional broad network insurance product, patients can choose any provider in the network without an immediate cost consequence. That is, the out-of-pocket costs to the patient are largely the same, no matter which hospital from the provider network is selected, despite the fact that some hospitals may be significantly more expensive than others for the

---

[115] Federal Trade Commission, "Tying the Sale of Two Products," available at https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/single-firm-conduct/tying-sale-two-products, *site visited* March 19, 2018.

[116] Federal Trade Commission, "Tying the Sale of Two Products," available at https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/single-firm-conduct/tying-sale-two-products, *site visited* March 19, 2018.

health plan. Thus, in a broad network insurance product, a higher-priced hospital can attract as much patient volume as a lower-priced hospital. To temper this problem, health plans and employers increasingly use plan design to provide patients incentives to use lower-priced hospitals. As explained by *Health Affairs*, health plans and employers are turning to a variety of methods to influence consumer choice.[117] These methods include the use of "narrow networks; tiered networks; reference pricing; high deductible health plans; centers of excellence; value-based insurance design; and, incentives to use alternative sites of care."[118] By giving consumers financial incentives, like lower copays for choosing lower cost providers in a tiered network or lower premiums for choosing narrow network products, several of these methods attempt to restore the price-choice connection for consumers.

58.     As explained in academic research on this topic, health plans can use steering strategies to obtain more favorable prices in their negotiations with hospitals.[119] Where they can do so, providers compete for being the preferred provider in a narrow or tiered network product, by giving discounts in exchange for volume. Health plans can use simply the threat of creating narrow and tiered network products to place competitive pressure on hospitals.

59.     The research also shows that steering (or simply the threat of steering) can result in lower premiums for consumers. For example, Professors Ho and Lee explain that because steering lowers health plans' costs and because they compete with one another for subscribers, health plans would be expected to offer lower premiums for narrow or tiered network products than they would for a broad network product.[120] To be competitive, tiered and narrow network products must be priced lower than broad network products, all else equal. If they were not, no one would buy them. Furthermore, they explain that tiered and narrow network products not only are priced lower than broad network products, they can also exert downward pressure on the prices of broad network products. In the presence of competition from popular narrow and tiered

---

[117] Delbanco, Suzanne, Robert Berenson, Divvy Upadhyay, and Roslyn Murray, "Understanding How Payment and Benefit Designs Work Together In Health Care," *Health Affairs* Blog, May 25, 2016 (hereafter "Delbanco *et al.*"), available at http://www healthaffairs.org/do/10.1377/hblog20160525.055020/full/, *site visited* November 13, 2017, p. 3.

[118] Delbanco *et al.*, pp. 4-5.

[119] Ho and Lee (2018), pp. 11-12.

[120] Ho and Lee (2018), p. 4.

network products, insurers would be expected to lower the premiums of broad network products in order to compete for the marginal consumer.[121]

### C.   *Anti-Steering Provisions*

60.   The term "anti-steering provisions" refers generally to provisions that prohibit practices that health plans use to steer patient volume. Economic principles and a growing body of empirical research show that under certain circumstances the use of anti-steering provisions can interfere with the competitive process and result in consumer harm in healthcare markets. In markets where consumers respond to prices, a firm's ability to raise price is tempered by its consumers' ability and incentive to switch to lower-priced competitors. ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████[122] When plan members become patients, they choose a hospital for their inpatient care largely on non-price factors, and their health plan pays the hospital for the care provided. The disconnect between price and choice stems in part from the incentives created by plan design. In circumstances where consumers do not respond to price differences, firms will find it profitable to charge higher prices.

61.   Thus, anti-steering provisions can interfere with the competitive process that would have otherwise led to lower inpatient prices for Sutter hospitals, lower costs for health plans, and lower premiums for purchasers of health insurance. There are several mechanisms through which steering can help contain healthcare costs:[123]

- Holding prices fixed, health plans may be able to incent patients to choose lower-priced hospitals, and thereby lower their total medical expenditures. Anti-steering provisions would interfere with health plans' attempts to get consumers to account for prices in their hospital choice and could result in higher total medical expenditures and, as such, higher insurance premiums.

---

[121] Ho and Lee (2018), pp. 8-12.

[122] ████████████████████████████████████████████████████ DEF002065731-823, at 734 ████

[123] Dafny, Leemore S., Hendel, Igal, Marone, Victoria, and Christopher Ody, "Narrow Networks on the Health Insurance Marketplaces: Prevalence, Pricing, and the Cost of Network Breadth," *Health Affairs*, Vol. 36, No. 9, 2017, pp. 1606-1614 (hereafter "Dafny *et al.*").

- By steering (or threatening to steer) patient volume to lower-priced hospitals, health plans may gain bargaining leverage over hospitals and may be able to create competitive rivalry among hospitals to lower price in exchange for volume. The inability to steer patients away from higher priced hospitals would reduce health plans' bargaining leverage in negotiations with hospitals and dampen competitive rivalry among hospitals.

- The ability to offer new and innovative health insurance products, like narrow and tiered network products, can foster competition among health plans. This competition would, in turn, place downward pressure on premiums, including for broad network products. Anti-steering provisions would interfere with this competition.

Thus, anti-steering provisions could also result in higher prices, less choice for consumers, and ultimately less innovation by health plans.

62.    These economic principles are supported by empirical evidence. For example, Professors Ho and Lee apply their bargaining framework to simulate optimal network structure and negotiated reimbursement rates in a counterfactual world where Blue Shield could create narrow network products and threaten to exclude hospitals in order to negotiate lower prices. With respect to Blue Shield's contractual incentives, Professors Ho and Lee simulate that by adopting this strategy, Blue Shield would negotiate hospital prices that are 12 percent lower than they would have been otherwise.[124] Professors Ho and Lee go on to explain that some of these price reductions would be passed along to consumers in the form of lower premiums.

63.    Empirical evidence, based on data from healthcare exchanges from multiple states, also indicates that plans with narrow hospital networks tend to be less expensive for consumers. Examination of data from eight states (California, Colorado, Florida, Michigan, New Jersey, New York, Texas, and Washington), for example, shows that network breadth is negatively correlated with insurance premiums; increasing the breadth of the network from narrow to broad is associated with an increase in premiums by about sixteen percent.[125] This result is also confirmed by an analysis based on data from all fifty states (plus the District of Columbia): after controlling for characteristics that may influence premium variations between

---

[124] Ho and Lee (2018), p. 4.
[125] Dafny *et al.*, pp. 1606-1607.

different plans, narrow networks are found to be associated with premiums about seven percent lower than the premiums paid for broad networks.[126] In addition, the increased popularity of narrow networks may have important spillover effects since it places pressure on providers within *all* networks, including broad networks, to offer greater value (e.g., lower reimbursement rates) if they want to stay competitive in the marketplace.[127]

## VI.   Sutter's Prices Are Higher than Prices at Other Northern California Hospitals

64.    The evidence shows that Sutter has been able to charge health plans substantially higher prices relative to other comparable hospitals in California and Northern California.

### A.    *Health Plan Testimony and Documents Describe Sutter as More Expensive*

65.    There is ample evidence from health plan testimony and documents that Sutter is more expensive than other California hospitals. For example,

---

[126] Polsky, Daniel, Zuleyha Cidav, and Ashley Swanson, "Marketplace Plans with Narrow Physician Networks Feature Lower Monthly Premiums than Plans with Larger Networks," *Health Affairs*, Vol. 35, No. 10, 2016, pp. 1842-1848.

[127] Dafny *et al.*, p. 1612.

[128]

[129]

[130]



[31] A

[33] (*See* Exhibit 9.)

[34]





**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

45

67. 

## B.    *Sutter's Own Documents Recognize Itself as More Expensive*

68.    Sutter is aware that it has the most expensive hospitals in Northern California, in comparison to other area hospitals. For example,







69.     Consistent with this evidence, Robert Reed – who was Chief Financial Officer of Sutter between 1996 and 2014 – testified that Sutter aimed to centralize contracting through its managed care department with the goal of achieving "better pricing."[145] In addition, Mr. Reed stated that the success of Sutter's contracting strategy can be measured in "[m]ore money."[146] In a written communication, Mr. Reed states:[147]



70.     Similarly, Peter Anderson, Sutter's Senior Vice President of Strategy and Business Development, testified that it's                              [48]

### C.     *Industry Reports and Academic Studies Describe Sutter as More Expensive*

71.     That Sutter is more expensive than other California hospitals is also seen through industry reports and academic studies. For example, in an October 2007 cost efficiency report, Milliman examines the ratio of hospital reimbursement rates to hospital costs ("Buyer Cost Index to Hospital Cost Index"). Milliman finds that Sutter hospitals consistently rank among the most expensive hospitals in California based on this measure.[149]



DEF002583666-674, at 670.

[149] Fox, Will and John Pickering, "Cost Efficiency at Hospitals Facilities in California: A Report Based on Publicly Available Data," Milliman, October 17, 2007, available at

72.     

51

73.     A 2016 academic article studying hospital prices in California, over the period 2004-2013, finds Sutter to be among the highest priced hospital systems in California, after controlling for observable cost factors and hospital characteristics such as case mix, payor mix, changes in concentration and local wage costs.[152] The authors of this study argue that the higher prices observed at large-system hospitals are a direct result of large systems' ability to increase market power through the use of "all-or-nothing" contracting, anti-tiering provisions and price secrecy clauses.[153]

54

### D.     OSHPD Data Show Sutter as More Expensive, Beginning in 2002

74.     Data on hospital net patient revenue, contained in the hospital annual financial disclosures from OSHPD, allow me to study Sutter's prices relative to prices of other hospitals in Northern California, over a longer time horizon. Net patient revenue includes all inpatient and

---

http://www.pbgh.org/storage/documents/reports/Milliman_OSHPD_Report_FINAL_20071017.pdf, *site visited* June 18, 2018.

[150] ................................ DEF000877866-907, at 892.

[151] *Id.*

[152] This study does not distinguish between Sutter and Dignity Health, although as explained below, the authors argue the higher prices are a result of contracting practices in which only Sutter engages. *See* Melnick, Glenn A. and Katya Fonkych, "Hospital Price Increase in California, Especially Among Hospitals in the Largest Multi-hospital Systems," *Inquiry: The Journal of Health Care Organization, Provision, and Financing*, 2016, Vol. 53, pp. 1-7, (hereafter "Melnick and Fonkych (2016)").

[153] Melnick and Fonkych (2016).

[154]

outpatient services revenue collected by hospitals,[155] from all commercial health plans.[156] For each hospital in Northern California, for each year from 1995 to 2016, I calculate and compare net patient revenue as a multiple of Medicare, across Sutter and non-Sutter hospitals in Northern California.[157,158] Comparisons based on this price measure implicitly adjust for differences in complexity of care provided at the different hospitals.

75.     Exhibit 10 shows this price measure for the set of the Sutter Damage Hospitals (the red line) for which I assess damages later in this report; these hospitals include: (a) Sutter Sacramento; (b) CPMC-Main; (c) CPMC-St. Luke's; (d) Sutter Modesto; (e) Sutter Santa Rosa; (f) Alta Bates-Main; and (g) Alta Bates-Summit. Exhibit 10 also shows the same measure of price for three reference groups: (a) the Dignity Health hospitals in Northern California (the orange line); (b) all non-Sutter, non-Kaiser, Northern California hospitals (the black line); and (c) all non-Sutter, non-Kaiser, Northern California hospitals that belong to a hospital system (the blue line) – for which there are data over the time period.

76.     As seen here, from 1995 to about 2002, Sutter's prices were comparable to those of other area hospitals. Beginning about 2002, at about the time when Sutter implemented its "all-or-nothing" contracting strategy, Sutter's prices have exceeded prices at the comparison hospitals; and Sutter's prices have risen at a faster rate.

---

[155] Net patient revenue is defined as gross patient revenue and capitation premium revenue less deductions from revenue. *See* OSHPD, "Hospital Annual Financial Data," June 30, 2004, available at https://www.oshpd.ca.gov/documents/HID/HospitalFinancial/Pivot/HAFDDoc2013.pdf, *site visited* April 13, 2018.

[156] These revenues include revenues for all patients covered by health plans other than those funded by Medicare, Medi-Cal, or a county, including Managed Care, Short-Doyle, CHAMPUS, IRCA/SLIAG, California Children's Services, Healthy Families, indemnity plans, fee-for-service plans, and Workers' Compensation. *See* OSHPD, "Hospital Annual Financial Data," June 30, 2004, available at https://www.oshpd.ca.gov/documents/HID/HospitalFinancial/Pivot/HAFDDoc2013.pdf, *site visited* April 13, 2018.

[157] Medicare is the single largest payor in the United States healthcare industry. This fact makes the Medicare allowed amount a commonly used and widely understood baseline for comparing provider reimbursement. The Medicare allowed amount is adjusted by provider, geography, and service type. Therefore, the Medicare allowed amount can normalize prices for relevant differences in provider, geography, and service.

[158] This price measure is calculated as net patient revenues divided by estimated Medicare allowable revenues. For example, the 1995 price measure is calculated as the sum of net patient revenue from 1995, divided by the estimated Medicare allowable 1995.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**                    49

**Exhibit 10**
**Hospital Net Patient Revenue from Commercial Health Plans as a Multiple of Medicare**



*Source*: OSHPD Annual Financial Disclosures Reports, 1995-2016.

The possible exception to this trend is in 2015 and 2016, with respect to Dignity Health, the second largest non-Kaiser health system in Northern California. To the extent competition from Sutter would have constrained prices charged by other hospital systems, like Dignity Health, the alleged conduct could also have umbrella effects that raise the price of other hospitals.[159] In such cases, evidence of overcharge based on cross-hospital price comparisons, which I present below, will understate the effect of the challenged conduct.

---

[159] American Bar Association, *Proving Antitrust Damages: Legal and Economic Issues*, 3rd Edition, Chicago, Illinois: ABA Publishing, 2017 (hereafter "*Proving Antitrust Damages*"), pp. 246-250 (explaining that the "umbrella effect" describes a situation in which the "competitive firm raises its prices under the protection of the price umbrella unfurled by the cartel.").

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

*E.* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Show Sutter as More Expensive, in Each Year of the Proposed Class Period*

77.   I also compare Sutter's inpatient hospital prices to other hospitals in Northern California, ▓▓▓▓▓▓▓▓▓▓▓▓▓ [60] Because the complexity of hospital services varies both across hospitals and over time, I calculate an average case-mix adjusted allowed amount or hospital price, for each hospital and year, by: (a) calculating the sum of allowed amount paid ▓▓▓ ▓▓▓▓ to each hospital, for inpatient claims occurring at the hospital; and (b) dividing that by the sum of the Diagnosis Related Group ("DRG") weights associated with the hospital's claims. [161] The DRG adjustment is a widely-used adjustment that standardizes prices for resource intensity, as a result of which one can compare prices across hospitals and over time. [162] The resulting price measure is referred to as a "case-mix adjusted" price. [163] Exhibit 11 presents the percentage difference in case-mix adjusted price, between each Sutter Damage Hospital and the average of all non-Sutter, Northern California hospitals ("Benchmark Hospitals"), in each year from 2006 to 2015. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓ [164]



---

[160] Appendix C provides a brief description of the claims data and the data processing steps undertake ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓

[161] Diagnosis-related groups ("DRGs") categorize inpatient stays into groups based on the diagnosis and resources necessary to treat the condition. Each DRG is assigned a weight based on the average resources used to treat the patient. Therefore, dividing the allowed amount, or total eligible expenses including insurance payment and patient liability, by the DRG weight is a method of adjusting for the acuity/complexity of the inpatient stay.

[162] Huron Healthcare, "Case Mix Index: Analyzing Case Mix Index and the Impact on CDI Programs," 2016, available at https://www.huronconsultinggroup.com/resources/healthcare/case-mix-index-analyzing-cmi, *site visited* June 12, 2018, at p. 2. *See also,* Guerin-Calvert, Margaret and Guillermo Israilevich, "Assessment of Cost Trends and Price Differences for U.S. Hospitals," *American Hospital Association,* March 2011, available at https://www.aha.org/system/files/content/11/11costtrendspricediffreport.pdf, *site visited* June 12, 2018, at p. 15.

[163] London, Katherine, Thomas Friedman, Michael Grenier, and Paul Swoboda, "Analysis of Price Variations in New Hampshire Hospitals," University of Massachusetts Medical School, April 2012, available at https://www.nh.gov/insurance/reports/documents/umms_summary.pdf, *site visited* June 14, 2018; Gapenski, Louis C., and Kristin L. Reiter, "Online Appendix B: Operating Indicator Ratios," *Healthcare Finance: An Introduction to Accounting and Financial Management*, 2016, available at https://www.ache.org/pubs/hap_companion/gapenski_finance/online%20appendix%20b.pdf, *site visited* June 14, 2018; Feng, Zhanlian, David C. Grabowski, Orna Intrator, and Vincent Mor, "The Effect of State Medicaid Case-Mix Payment on Nursing Home Resident Acuity," *Health Services Research,*Vol. 41, No. 4, 2006, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1797088/#, *site visited* June 14, 2018, pp. 1317-1336, at p. 1318.

[164] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓ *See* Sprague Declaration, ¶ 6; and Sprague Deposition, pp. 136-141.

78.     The results are that, in 65 out of 70 Sutter hospital-year combinations, each Sutter hospital in each year is significantly more expensive, in both a statistical and economic sense, than the group of Benchmark Hospitals. In these cases, I find that Sutter is between 11 percent and 57 percent more expensive than the group of comparison hospitals, where these differences are statistically significant at the 95 percent or higher confidence level. In two instances (Sutter Santa Rosa in 2014 and 2015), I find that Sutter is more expensive, but the differences are statistically significant at the 90 percent level. In two instances (CPMC-St. Luke's in 2006 and 2011), I am not able to measure a statistically significant price difference. For CPMC-St. Luke's in 2008, I find Sutter 30 percent less expensive than the group of comparison hospitals.[165]



79.     Some of these price differences are explained by observable differences in hospital characteristics and local market conditions. However, much of the Sutter price effect persists even after adjusting for these differences. These adjustments and the price effects that persist are described in the next section.

---

[165] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* Appendix C.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

## VII.   A Common Method Exists to Calculate Sutter Hospital Overcharges for Inpatient Hospital Services

80.      I now turn to a regression analysis of hospital price overcharges flowing from the challenged conduct. Anti-steering restriction can, in principle, interfere with the competitive process in both the Tied and the Tying markets.[166] In a Tied Market, a health plan that is forced to carry a hospital in-network could have discouraged use of that hospital by placing it in a less accessible tier, associated with higher patient responsibility. In a Tying Market, a health plan could have used benefit design (or even the threat of it) to steer volume away from the local Sutter hospital, towards a lower-priced hospital. Such a strategy could have placed downward pressure on Sutter's prices, despite the fact that the local Sutter hospital has market power over health plans in the Tying Market.[167] Thus, I use a regression model to study price differences between certain Sutter hospitals and a group of benchmark hospitals that in many ways resemble Sutter, except they have not imposed similar restrictions on health plans. For this purpose, my analysis focuses on the Sutter hospitals in the four Tied Markets and the Berkeley-Oakland Tying Market, which is about three times as large, in terms of population, as the next largest Tying Market. To the extent the challenged conduct caused overcharges in the other Tying Markets, the damages estimates I present below will be conservative.

### A.      Identification Strategy

81.      There are several textbook approaches to determining whether and the extent to which prices have been inflated as a result of the challenged anticompetitive conduct.[168] In all of these approaches, one attempts to model what prices would have been in a counterfactual world in which the challenged conduct never took place; then, by comparing prices that prevailed in the

---

[166] One should not conclude that there is no room for competitive harm in the Tying Markets, under the single monopoly profit theory, simply because Sutter has market power there. *See* Baker, Jonathan, "Note on "Single Monopoly Profit" Theory," September 18, 2014, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2496932, *site visited* June 4, 2018 (Explaining that some antitrust commentators argued that firms that "already have the incentive and ability to charge a monopoly price, and that it cannot profitably expand or extend its monopoly power, as by charging even higher prices, through practices that restrict …competition," and "The single monopoly profit theory is logically valid as a matter of economic theory only in one extreme case: when buyers have literally no alternatives to the monopolist's product and prohibitively high entry barriers prevent any future competition.").

[167] A regression model is able to controls for local competitive conditions and, as such, measures overcharge as prices *in excess of* prices that reflect market power exercised in the absence of the challenged conduct.

[168] *Proving Antitrust Damages*, pp. 179-187.

actual world to the prices in this counterfactual world, one can determine the extent to which actual prices were higher because of the challenged conduct. This counterfactual world is often referred to as the "but-for" world, *i.e.*, the world that would have existed "but-for" the conduct.

82.     Depending on the specifics of a given antitrust case, one might study and model the process that generated prices in: (a) the same market, but in a time period before the challenged conduct took place; (b) the same market, but in a time period after the conduct ended; or (c) in other markets that resemble the market of interest, but where the conduct did not occur. One would then use this model to predict what prices would have been in the time period or in markets affected by the conduct, had these prices been determined by the data generating process in the but-for world. The difference between actual and predicted but-for prices in the affected time period or market is the price overcharge associated with the challenged conduct. Where one studies a time period before the conduct took place or after the conduct ended, the "benchmark" against which the target prices in the alleged conduct period is studied is the same market but at a different point in time, and the price overcharge is identified based on differences between the two time periods. Where one studies other markets that resemble the market of interest, the "benchmark" against which the target prices in the market affected by the alleged conduct is studied is a different geographic area or market, possibly at the same point in time, and the price overcharge is identified based on the difference between the two areas. In both cases, the overcharge analysis must adjust for other differences between the benchmark and the target time period or market, to account for the possibility that there may be inherent price differences between the benchmark and the target, for other reasons, even absent the challenged conduct.[169]

83.     Given that Sutter has engaged in the challenged conduct since the early 2000s, it is not possible to study inpatient hospital prices during a time period before the conduct took place, because ▮▮▮▮▮▮▮▮▮ data are only available beginning in 2006. Given that Sutter continues to engage in the challenged conduct to-date, it is not possible to study a time period after the conduct ended. It is, however, possible to study prices of other hospitals, including in other hospital markets, that have not engaged in the challenged conduct to develop a benchmark of what Sutter's prices would have been had Sutter not engaged in the challenged conduct.

---

[169] Rubinfeld, Daniel L., and Justin McCrary, "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, Vol. 3, No. 1, 2014, 63-74; and *Proving Antitrust Damages*, pp. 179-187.

Sutter, in its ordinary-course of business, regularly performs this type of cross-hospital comparison.[170] ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████)[71] The prices charged by this group of Benchmark Hospitals provide a basis to determine the counterfactual hospital prices Sutter would have charged but-for the challenged conduct.

### B. *Analysis Dataset*

84.     To examine the effect of the alleged conduct on Sutter hospital prices in each of the Tied and the Berkeley-Oakland Tying Markets, I use████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████ As such, these data provide a sound basis for studying the issue of whether there exists a common method to calculate overcharges.

85.     The ████████████████ contain information, ████████████ on the inpatient hospital services received ████████████████████████████████████████

████████████████████████████████████████ Using these data, I identified 91 contracted benchmark hospitals in Northern California that provide a broad range of hospital services on an inpatient basis like the target Sutter hospitals. To these data, I matched information on: (a) DRG weights, a widely-used measure of the resource intensity associated with the inpatient care received, constructed by CMS;[172] (b) hospital characteristics from OSHPD; and (c) information on patient demographics from the IRS and U.S. Census, based on the population of the county in which the hospital is located. The final analysis dataset consists of 723 benchmark hospital-year observations, spanning the years 2006 to 2015. *See* Appendix C for a list of the benchmark hospitals.

---

[170] Sprague Declaration, ¶ 6; and Sprague Deposition. pp. 136-141.

[171] ████████████████████████████████████████████████

████████████████████████████████████

[172] Each DRG is associated with a numeric weight that reflects the national "average hospital resource consumption" by patients for that DRG, relative to the national "average hospital resource consumption" of all patients. The most commonly used DRG classification system is provided by CMS. One would expect prices of services that are more resource intensive to be higher than prices of services that are less resource intensive.

### C.   *Regression Model*

86.     Because price differences between the Sutter and the Benchmark Hospitals may be driven by differences in factors other than the challenged conduct, I use what is widely-known in the literature as a "reduced form regression model" to adjust for observable differences that may potentially explain some portion of the price differences. In this section, I provide a brief primer to guide the discussion, as well as a more detailed description of the regression model.

1.     Regression Primer

87.     For the Court's convenience, I begin with a brief primer on the statistical methods and terminology that I will use in describing my analyses and opinions. A more comprehensive discussion of regression analysis can be found in Professor Daniel Rubinfeld's "Reference Guide on Multiple Regression" in the *Reference Manual on Scientific Evidence* published by the Federal Judicial Center.[173] In particular, the glossary of terms in the Reference Guide defines all of the statistical terms that I use in this report.[174]

88.     Regression analysis is a statistical methodology for determining the relationship between a *dependent variable* and a set of *explanatory variables*.[175] The dependent variable, here the case-mix adjusted hospital prices, is what the statistical model is designed to predict. The explanatory variables, which include local cost and demand factors, are hypothesized to determine the dependent variable. Variables are numeric representations of characteristics (*e.g.*, a local "wage index" that measures how expensive an area is relative to the national average) or outcomes (*e.g.*, "hospital prices" that measure case-mix adjusted dollars). Regression analysis in which there is more than one explanatory variable is referred to as *multiple regression analysis*.[176] This analysis is distinguished from single regression analysis, in which there is one explanatory variable. Where the explanatory variables are not a function of the dependent variable, the regression analysis is called a "reduced form" regression analysis. Such models are

---

[173] Rubinfield, Daniel L., "Reference Guide on Multiple Regressions," in *Reference Manual on Scientific Evidence*, 2011, 3rd Edition (hereafter "Reference Guide on Multiple Regression"), pp. 303-357, available at https://www.fjc.gov/sites/default/files/2015/SciMan3D08.pdf, *site visited* June 4, 2018. *See also*, *Proving Antitrust Damages*, pp. 135-137.

[174] Reference Guide on Multiple Regression, pp. 352-356.

[175] Reference Guide on Multiple Regression, pp. 305 and 312-314.

[176] Reference Guide on Multiple Regression, p. 305.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER                56

widely used in antitrust litigation because they are manageable in terms of modeling and data requirements.[177]

89.    Statisticians typically use the notation $y$ to represent the dependent variable and the notation $x$ to represent the explanatory variables. In the case of multiple regression, the explanatory variables are distinguished from each other using subscripts (for example, $x_1$ and $x_2$). The dependent variable is expressed as a linear combination of the explanatory variables plus a disturbance or error term: $y = \beta_o + \beta_1 x_1 + \cdots + \beta_k x_k + \varepsilon$. In this equation, the $\beta_k$ are referred to as *parameters*; they quantify the effects that changes in the associated explanatory variables have on the dependent variable, holding all other variables constant.[178] In many economic applications, where one wishes to study the percentage change in $y$ that results from a percentage change in $x_1$ (as opposed to an absolute change in $y$ from a small change in $x_1$), it is appropriate to transform the continuous variables into logarithms.[179] In this case, a value of 0.5 for $\beta_1$ (the coefficient on the logarithmic transformation of $x_1$) means that a ten percent increase in $x_1$ is associated with a five percent increase in $y$. The *disturbance or error term*, $\varepsilon$, is intended to reflect the fact that no model can perfectly predict a dependent variable.[180] The disturbance term captures the summary effects of random influences, excluded variables, and measurement errors.[181]

90.    In practice, there is a balance of considerations in selecting the explanatory variables, which is driven largely by the economic issues. First, one should include key factors that are anticipated to affect the dependent variable. Second, one should avoid including redundant information, as such inclusion will create a multi-collinearity problem that may make it difficult to estimate and interpret the parameters of interest.[182] Third, the number of variables

---

[177] Rubinfeld, Daniel L., "Quantitative Methods in Antitrust," Issues in Competition Law and Policy, *ABA Antitrust Law*, American Bar Association, 2008 (hereafter "Rubinfeld (2008)"), Chapter 30.

[178] Reference Guide on Multiple Regression, p. 336.

[179] Proving Antitrust Damages, p. 189.

[180] Reference Guide on Multiple Regression, p. 352.

[181] Kennedy, Peter, *A Guide to Econometrics*, Malden, MA: Blackwell Publishing, 6th edition, 2008, (hereafter, "Kennedy"), pp. 3-4.

[182] Reference Guide on Multiple Regression, p. 324.

one can include is naturally limited by sample size; in the extreme, the number of explanatory variable is capped at the sample size.[183] As a general rule, one is likely to gain precision in the estimated parameters as the sample size increases.[184]

91.     A frequently used method of regression analysis estimates the parameter values, $\hat{\beta}_k$, that best "fit" the observed data.[185] It does this by choosing the parameter values that minimize the sum of squared differences between the observed values of the dependent variable, $y$, and the predicted values of the dependent variable for that set of parameter values, $\hat{y} = \hat{\beta}_o + \hat{\beta}_1 x_1 + \cdots + \hat{\beta}_k x_k$.[186] (For this reason, regression analysis is sometimes referred to as "*least squares*" or "*ordinary least squares*.") As is typical in statistics, I distinguish here between the true parameter values, $\beta_k$, which are not known to the statistician, and their estimated counterparts, $\hat{\beta}_k$, by denoting the latter with a "hat." Estimated parameters that are, on average, equal to the true parameter values are referred to as *unbiased* parameter estimates.[187] A textbook result is that when the disturbance term is independent of the explanatory variables, the estimated parameters will be unbiased.

92.     The presence of the disturbance or error term means that any particular sample of data for the dependent and explanatory variables will lead to different parameter estimates, and the *standard error* of the parameter estimates measures the variability of the estimated parameters, $\hat{\beta}_k$, around their true values, $\beta_k$.[188] A smaller standard error indicates more

---

[183] Wooldridge, Jeffrey, *Introductory Econometrics: A Modern Approach*, 5th Edition, 2012, (hereafter, "Wooldridge (2012)" at p. 86.

[184] Vice versa, a smaller sample size means a larger variance and a larger confidence interval for the estimator. *See* Wooldridge (2012), p. 761 (explaining that the variance of the sample average for estimating the mean "can be made very close to zero by increasing the sample size n. This is a key feature of a reasonable estimator…[A]mong unbiased estimators, we prefer the estimator with the smallest variance."); and p. 777 ("Because this standard error [for the sample average estimator] shrinks to zero as the sample size grows, a larger sample size generally means a smaller confidence interval.").

[185] Rubinfeld (2008), p. 723.

[186]  Reference Guide on Multiple Regression, p. 354.

[187] It is unlikely that using regression analysis on any particular sample would produce estimated parameters that were precisely equal to the true parameter values. Unbiasedness refers to the property that if the estimates were calculated on a large number of different samples, *on average* the values of the estimated parameters across those samples would be equal to the true parameter values. Unbiasedness is generally a desirable statistical property.

[188] Reference Guide on Multiple Regression, pp. 340-344.

precisely estimated parameters (that is, the parameter values vary to a less extent from sample to sample), and, all else equal, standard errors decrease as the sample size increases.

93.     Estimating reliable standard errors requires making assumptions about the properties of the error term. The basic ordinary least squares regression model assumes, among other things, that the error term exhibits *homoskedasticity*, or in other words exhibits the same variance across all hospitals. Sometimes, as may be the case here, the variance in the errors may vary from hospital to hospital; in such cases, the error term is said to exhibit *heteroskedasticity*. Furthermore, one might expect the errors across hospital-years to be correlated with each other. There are well-established methods for estimating standard errors to account for such error structures.[189]

94.     One can use reliable estimates for the parameters and their associated standard errors to test various hypotheses of interest. A hypothesis that statisticians commonly test is: a given explanatory variable has no effect on the dependent variable, or equivalently the parameter associated with that explanatory variable is zero. To test this hypothesis, one looks at whether zero is within the confidence interval of the estimated coefficient. Confidence intervals (and the standard errors used to construct them) are the statistical tools used to reflect the uncertainty that arises from the sampling error.[190] Standard error captures the variability of the sample estimate if one were to hypothetically repeat the sampling procedure many times. Given the variability of the sample estimate and the associated standard error, a "confidence interval" provides a range of values within which the true population value is likely to lie.[191] It is common practice to look at 95 percent confidence intervals, which would include the true population value 95 percent of the time. In statistical terminology, the sample estimate is not "statistically different" from each value within the confidence interval at the 5 percent (=100 – 95 percent) significance level. Thus, if zero lies inside the confidence interval of an estimated coefficient, one would not be able to reject the hypothesis that underlying parameter is zero.

---

[189] Greene, William H., *Econometric Analysis*, 5th Edition, Upper Saddle River, New Jersey: Prentice Hall, 2003, pp. 158-164.

[190] Wooldridge (2012), pp. 770-772. *See also, Proving Antitrust Damages*, pp. 159-163.

[191] A 95 percent two-sided confidence interval is an interval around the sample estimate, constructed based on the standard error, that would contain the true population value 95 percent of the time if the sampling procedure were to be repeated infinitely. The larger is the standard error, the wider the confidence interval. *See* Wooldridge (2012), pp. 770-772. *See also*, Reference Guide on Multiple Regression, p. 343.

95.     There are two reasons why the hypothesis that a parameter is zero is not rejected: (a) it may be the case that the parameter is really zero (*i.e.* the explanatory variable really has no effect on the dependent variable); or (b) it may be the case that the parameter is imprecisely estimated (*i.e.* the confidence interval includes zero, but it also includes a wide range of other non-zero values). Thus, one must be especially cautious in concluding a parameter is zero in circumstances where the parameter estimate is economically significant, but the standard error is large. As a general rule, the smaller the standard error relative to the estimated parameter, the more precise is the estimate of the parameter. Economists typically denote statistical significance using a "star" or "asterisk" convention, where one star denotes statistical significance between five and ten percent, two stars denote statistical significance between one and five percent, and three stars denotes statistical significance at one percent or less. The more stars there are, the more precisely estimated is the effect and the more confidence one has in rejecting the hypothesis that the parameter is zero or, in other words, concluding that the estimated effect is different from zero.

96.     The *adjusted $R^2$* is a measure of goodness-of-fit of the regression model that measures the fraction of the variation in the dependent variable that is explained by the explanatory variables.[192] In the standard model, the values of the adjusted $R^2$ range between zero and one: a value of zero means that the explanatory variables explain none of the variation in the dependent variable (*i.e.*, they are of no predictive value), while a value of one means that they explain all of the variation in the dependent variable (*i.e.*, they exactly predict the dependent variable).

2.     Dependent Variable: Hospital Prices

97.     For each hospital-year, over the years 2006 to 2015, I calculate a case-mix adjusted hospital price as the sum of allowed amounts from the individual claims for each hospital-year combination, divided by the sum of the DRG weights associated with the individual claims.[193] The advantage to this measure of hospital price is that it is based on claim-

---

[192] Reference Guide on Multiple Regression, p. 345.  *See also*, Kennedy, pp. 90-92 and 102-103 for a more technical discussion of the adjusted $R^2$.

[193] The analysis includes in-network, fully-insured claims. It excludes claims associated with MDC codes 0 (unknown), 19 (alcohol/drug use), or 20 (psychiatric) and DRG codes "UNK", "000", "795" (normal newborn),

level data and represents the *actual price* received by the hospital for hospital services rendered to Class Members. This includes patient out-of-pocket expenses, not just health plan payments.

### 3. Explanatory Variables

98.     To be useful for the purpose at hand, the regression model must include the key explanatory variables that are likely to predict hospital prices, especially Sutter hospital prices. For this purpose, I have surveyed the literature to identify control variables that are commonly used by researchers to predict hospital prices, including California hospital prices.[194] While individual researchers make different selections, the common themes are that they control for factors that are likely to affect hospital costs, hospital quality, and the hospital's ability to exercise market power over health plans. As a general matter, hospitals have higher prices when: (a) they have higher costs; (b) they have more desirable characteristics, like being a teaching hospital; (c) they face less competition; and (d) they belong to bigger systems.

99.     Given my review of the available data and my understanding of the drivers of hospital prices, the baseline model I use to predict Sutter prices includes the following explanatory variables:

---

"998" (ungroupable), "999" (unknown), "D30", "D31", "D37", "D45", "D54", "D56", "D62", "D63", "D64", "D75", "D86", "DR>", "DRG", "KEY", "MED", "065", "V10", or "V45". It excludes claims with missing allowed amounts, missing DRG weights, and/or non-positive allowed amounts. It excludes the bill types: "0110," "011," "0115," "115," "0118," "0119," "011A," "011C," "011G," "011H," "011I," "011K," "011M," "011N," "011P," "011Q," "011Y," "011Z," "0120," or "0129." The analysis also excludes claims associated with non-California residents, by retaining claims associated with patient zip code digits between 90000 and 96162. *See* Appendix C.

[194] *See* discussion in Guerin-Calvert, Margaret and Guillermo Israilevich, "Assessment of Cost Trends and Price Differences for U.S. Hospitals," *American Health Association*, March 2011; Capps, Cory and David Dranove, "Hospital Consolidation and Negotiated PPO Prices," *Health Affairs*, Vol. 23, No. 2, 2004, pp. 175–176; Ciliberto, Frederico and David Dranove, "The Effect of Physician-Hospital Affiliation on Hospital Prices in California," *Journal of Health Economics*, Vol. 25, 2006, pp. 29-38; Dranove, David, Richard Lindrooth, William White, and Jack Zwanziger, "Is the Impact of Managed Care on Hospital Prices Decreasing?," *Journal of Health Economics*, Vol. 27, 2008, pp. 362-376; Dranove, David and Richard Ludwick, "Competition and Pricing by Non-Profit Hospitals: A Reassessment of Lynk's Analysis," *Journal of Health Economics*, Vol. 18, 1999, pp. 87-98; Dranove, David, "Pricing by Non-Profit Institutions: the Case of Hospital Cost Shifting," *Journal of Health Economics*, Vol. 7, 1988, pp. 47-57; Keeler, Emmett, Glenn Melnick, and Jack Zwanziger, "The Changing Effect of Competition on Non-Profit and For-Profit Hospital Pricing Behavior," *Journal of Health Economics*, Vol. 18, 1999, pp. 69-86; Melnick, Glenn and Katya Fonkych, "Hospital Price Increases in California, Especially Among Hospitals in the Largest Multi-Hospital Systems," *The Journal of Health Care Organization, Provision, and Financing*, Vol. 53, 2016, pp. 1-7; Dranove, David, Mark Shanley, and William White, "Price and Concentration in Hospital Markets: The Switch from Patient-Driven to Payer-Driven Competition," *Journal of Law and Economics*, Vol. 36, No. 1, 1993, pp. 179-204; Sanchez, Jeffrey and James Welch, "Special Commission on Provider Price Variation Report," March 15, 2017, pp. 1-5.

- *Wage Index*: This is a variable constructed by CMS to measure differences in hospital wages relative to the national average. Hospitals in areas with higher hospital wages are expected to charge higher prices to cover costs; thus, ███████████████████ ████████████████████████[195]

- *Teaching*: This is an indicator variable equal to one if the hospital is a major teaching hospital and zero otherwise. A hospital is considered a major teaching hospital if its resident-to-bed ratio is greater than or equal to 0.25.[196] Teaching facilities tend to be more expensive on average; thus, I expect the estimated coefficient associated with *Teaching* to be positive.[197]

- *Trauma Level 1 or 2*: This is an indicator variable, obtained from OSHPD, that is equal to one for hospitals with trauma levels one or two, and zero otherwise.[198] Trauma facilities tend to be more expensive on average; thus, I expect the estimated coefficient associated with *Trauma* to be positive.[199]

- *Number of Competitors*: To control for differences in the competitive landscape in which each hospital operates, I control for the number of non-Kaiser hospitals from a different system within a 30-minute drive time from the hospital of interest. Drive times to nearby hospitals are calculated using the Google Distance Matrix API. The maximum number of competitors present using this measure, for any hospital in the sample, is ten. Thus, I

---

[195] ████████████████████████████████████████████████

[196] Cromwell, Jerry, Walter Adamache and Edward Drozd, "BBA Impacts on Hospital Residents, Finances, and Medicare Subsidies," *Health Care Financing Review*. Vol. 28, No. 1, 2006, p. 121. *See also*, NIS Description of Data Elements, "HOSP_TEACH – Teaching status of hospital," available at https://www hcup-us.ahrq.gov/db/vars/hosp_teach/nisnote.jsp, *site visited* June 12, 2018.

[197] Frakt, Austin, "Teaching Hospitals Cost More, but Could Save Your Life," *The New York Times*, June 5, 2017, available at https://www nytimes.com/2017/06/05/upshot/teaching-hospitals-cost-more-but-could-save-your-life.html.

[198] Sutter Health, "What is a Trauma Center?" available at https://www.sutterhealth.org/services/emergency/traumacenters, *site visited* March 17, 2018; and American College of Surgeons, "Searching for Verified Trauma Centers," available at https://www.facs.org/search/trauma-centers, *site visited* March 17, 2018. (Note that the ACS specifically disclaims, "The designation of trauma facilities is a geopolitical process by which empowered entities, government or otherwise, are authorized to designate. The ACS does not designate trauma centers; instead, it verifies the presence of the resources listed in *The Resources for Optimal Care for the Injured Patient*. This is a voluntary process and only those trauma centers that have successfully completed a verification visit are listed.").

[199] Newgard, Craig D. and Robert A. Lowe, "Cost Savings in Trauma Systems: The Devil's in the Details," Annals of Emergency Medicine, Vol. 67, No. 1, 2016, pp. 68-70.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER                    62

create a set of ten indicator variables, one for each configuration.[200] The results of a series of specification tests allow me to collapse the ten indicator variables to seven indicator variables:[201] (a) one is a composite called "One to Four Competitors" which equals one if the hospital has one to four competitors within 30 minutes; (b) the rest are the individual indicator variables for hospitals with five, six, seven, eight, nine, and ten competitors within 30 minutes. Because hospitals that face less competition tend to be more expensive on average, I expect the estimated coefficients associated with the number of competitors in the model to be negative.[202]

- *Patient Rating*: This variable, constructed by CMS, records the percent of patients saying they would rate the hospital nine or ten on a scale from zero to ten, where ten is the most favorable patient rating. Because CMS started reporting this information in 2008, I use the hospital's 2008 value for years 2006 and 2007. This variable is intended to be a proxy for some aspects of hospital quality; as such, I expect the estimated coefficient associated with Patient Rating to be positive. I recognize, however, that there is little agreement among healthcare researchers and practitioners as to the right way to measure hospital

---

[200] These indicator variables are: (a) "One Competitor" equals one if there is one hospital within 30 minutes of the hospital; (b) "Two Competitors" equals one if there are two hospitals within 30 minutes of the hospital; (c) "Three Competitors" equals one if there are three hospitals within 30 minutes of the hospital; (b) "Four Competitors" equals one if there are four hospitals within 30 minutes of the hospital; (c) "Five Competitors" equals one if there are five hospitals within 30 minutes of the hospital; (d) "Six Competitors" equals one if there are six hospitals within 30 minutes of the hospital; (e) "Seven Competitors" equals one if there are seven hospitals within 30 minutes of the hospital; (f) "Eight Competitors" equals one if there are eight hospitals within 30 minutes of the hospital; (g) "Nine Competitors" equals one if there are nine hospitals within 30 minutes of the hospital; (g) "Ten Competitors" equals one if there are ten hospitals within 30 minutes of the hospital.

[201] Specification testing cannot reject the null hypothesis that the marginal effects of "One Competitor," "Two Competitors," "Three Competitors," and "Four Competitors" are equivalent. Accordingly, I group these for convenience into a single category and estimate a common effect across the four variables. The parameter estimates from the regression model with the ungrouped competition variables are similar to the parameter estimates from the regression model with the grouped competition variables. *See* Chipty Workpapers.

[202] The sign of the parameter associated with a set of indicator variables is with reference to the omitted category, which in this case is "No Competitors" which equals one if there are no other hospitals within 30 minutes of the hospital.

quality.[203] Sutter's Chief Medical Officer has also recognized this point, testifying that, "there's not this one universally agreed-upon quality metric."[204,205]

- *System Beds*: This variable measures the total number of inpatient beds in each hospital's system, as reported to OSHPD. It is calculated by summing the total number of acute hospital beds across all hospitals within a hospital system; for other hospitals, system beds are equal to hospital beds. As described in the literature, prices are expected to be higher at hospitals belonging to larger systems, though benefits of belonging to bigger systems may diminish for sufficiently large systems.[206] To account for the potential that the effect of system size tapers off, the model allows for a non-linear effect of *System Beds*.[207]

- *Year:* These are a series of indicator variables that capture changes in average prices over time. In keeping with general inflation of healthcare costs, I expect to find an increase in average hospital prices over time.

---

[203] Bilimoria, Karl Y. and Cynthia Barnard, "The New CMS Hospital Quality Star Ratings. The Stars Are Not Aligned." *JAMA*, Vol. 316, No. 17, 2006, pp. 1761-1762 at 1761: "Many hospital quality rating systems are now available, but there is virtually no agreement among the rating systems in identifying 'better' or 'worse' hospitals".

[204] Deposition of Dr. Stephen Lockhart, Chief Medical Officer for Sutter, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health,* November 8, 2016 (hereafter "Lockhart Deposition"), at p. 124. *See also,* Lockhart Deposition, at p. 121 ("Q: Fair to say there's no one metric for quality? A: It is probably… no one universally agreed-upon metric.").

[205]


[206] Melnick, Glenn A. and Katya Fonkych, "Hospital Price Increase in California, Especially Among Hospitals in the Largest Multi-hospital Systems," INQUIRY: *The Journal of Health Care Organization, Provision, and Financing*, Vol. 53, 2016, pp. 1-7. *See also,* Sanchez, Jeffrey and James Welch, "Special Commission on Provider Price Variation Report," March 15, 2017 (hereafter "Sanchez and Welch"), pp. 19-22.

[207] The model controls for both *System Beds* and *System Beds Squared*. This functional form allows for the possibility that larger hospital systems negotiate higher prices, but the returns to system size (in terms of price effects) may diminish beyond a certain level. Consistent with this effect, one would expect the estimated coefficient associated with *System Beds* to be positive and the estimated coefficient associated with *System Beds Squared* to be negative. *See* Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach*, 5th Edition, Mason, Ohio: Thomson South-Western, 2012, pp. 710-712.

100.    I estimate the relationship between hospital prices and these explanatory variables using a logarithmic functional form, often referred to as a log-log model. As robustness checks, I have also examined: (a) the inclusion of additional and/or alternative explanatory variables;[208] (b) alternative error structures;[209] (c) alternative groups of benchmark hospitals;[210] and (d) an alternative functional form.[211] While the exact numbers vary from model to model, I find that the results are generally stable and none of these alternative specifications alters my opinion about the common impact of Sutter's conduct on hospital prices.

101.    Exhibit 12 presents descriptive statistics for the regression sample, across all years 2006 to 2015. As seen here, the average case-mix adjusted hospital price at the group of Benchmark Hospitals is $16,166; by comparison, the average case-mix adjusted hospital price at the Sutter Damage Hospitals ranges from $18,676 to $25,824. Compared to the Benchmark Hospitals, the Sutter Damage Hospitals tend to be located in more expensive counties. None of the Sutter Damage Hospitals are major teaching hospitals and only one of them is a designated trauma level 1 or 2 facility for all years 2006 to 2015.  In addition, another Sutter Damage Hospital was a designated trauma level 1 or 2 facility for only one year between 2006 and 2015. Sutter also has more beds than the average system beds of the Benchmark Hospitals; however, it is noteworthy that the Benchmark Hospitals include 16 hospitals that belong (or at some point belonged) to Dignity Health, the second largest, non-Kaiser hospital system in Northern California. ███████████████████████████████████████████

███████████████████████████████████████████████████████

---

[208] These other control variables include: (a) area income and an indicator for rural areas, instead of *Wage Index*; (b) a micro-market measure of concentration based on predicted patient flows following the method of Kessler and McClellan (2000), instead of the *Number of Competitors* indicators; and (c) the *Number of Competitors* and the *Number of Competitors Squared*, instead of the *Number of Competitors* indicators.

[209] Given the nature of the data generating process, I compute robust standard errors clustered by hospital. As an alternative, I have examined robust standard errors clustered by county.

[210] These alternatives include (a) the set of hospitals that belong to a system in Northern California; and (b) the set of all non-Sutter and non-Dignity hospitals in Northern California. To be conservative, I did not include Southern California hospitals in the benchmark set. ██████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████

[211] As an alternative, I model price levels instead of the logarithm of prices.

 [212] This concept of Sutter's conduct increasing prices at other hospitals is known as the umbrella effect. To the extent Dignity Health and other hospitals in the benchmark sample are under an umbrella effect, my overcharge estimates will be conservative.

2. OSHPD Hospital Annual Financial Disclosure Data, 2006-2015.
3. Centers for Medicare & Medicaid Services (CMS) Impact Files, 2006-2015.
4. Centers for Medicare & Medicaid Services (CMS) Hospital Compare Data, 2006-2015.
5. National Bureau of Economic Research (NBER) DRG Weights, 2006-2015.
6. Google Maps Distance Matrix API.

4.      Measuring Hospital-Level Overcharge, By Year

102.      Using a regression model, I estimate Sutter's overcharges in two different ways: (a) out-of-sample prediction; and (b) in-sample prediction. I describe each approach and its relative advantages here.

a)      Out-of-Sample Prediction

103.      With out-of-sample prediction, the coefficients of the prediction model are estimated only with the Benchmark Hospitals. The advantages of this approach are that the seven Sutter Damage Hospitals do not influence the estimation of the coefficients of the regression model, and it is possible to obtain hospital-year specific estimates of overcharges.  A disadvantage is that each overcharge estimate is based on a smaller sample (as compared to a model that does not allow the overcharge to vary across the years), leading to noisier overcharge estimates for some hospitals, in some years. Another disadvantage of out-of-sample prediction is that standard estimation techniques assume homoskedasticity of the Sutter hospital prices, though they accommodate heteroskedasticity in the estimation sample.

104.      To implement out-of-sample prediction, I add to the explanatory variables described above a set of *Sutter Damage Hospital* x *Year* indicator variables that are equal to one for the individual Sutter Damage Hospital-year combination and zero otherwise.[213] The full regression model is written as follows:

(1)      $Log\ Hospital\ Price_{i,y} = \alpha + \sum_{y=2006}^{2015}\sum_{n=1}^{7}\gamma_{n,y}Sutter\ Damage\ Hospital_n \times Year_y + \beta_2 Wage\ Index_{i,y} + \beta_3 Major\ Teaching_{i,y} + \beta_4 Trauma\ Level\ 1\ or\ 2_{i,y} + \beta_5\ One\ to\ Four\ Competitors_{i,y} + \beta_6 Five\ Competitors_{i,y} + \beta_7 Six\ Competitors_{i,y} + \beta_8 Seven\ Competitors_{i,y} + + \beta_9 Eight\ Competitors_{i,y} + \beta_{10} Nine\ Competitors_{i,y} + \beta_{11} Ten\ Competitors_{i,y} + \beta_{12} Patient\ Rating_{i,y} + \beta_{13} logSystem\ Beds_{i,y} + \beta_{14} logSystem\ Beds\ Squared_{i,y} + \sum_{y=2006}^{2015}\beta_{15,y} Year_y + \epsilon_{i,y}$

Because the model includes a separate *Sutter Damage Hospital x Year* indicator variable for each Sutter Damage Hospital and each year, the model becomes a prediction model.[214] The estimated

[213] Because a *Sutter Damage Hospital* x *Year* indicator variable is only "turned on" for a single data point, the regression model uses the parameter on the indicator variable to perfectly fit the data point. The remaining coefficients are estimated based on other data points, and the coefficient on the indicator variable captures the difference between the data point and the prediction from the remaining data points.

[214] *Proving Antitrust Damages*, p. 180; and Salkever, David S., "The Use of Dummy Variables To Compute Predictions, Prediction Errors, And Confidence Intervals," *Journal of Econometrics*, Vol. 4, 1976, pp. 393-397.

coefficients on these indicator variables capture the differences between the actual price at each Sutter Damage Hospital in each year and the predicted but-for price that the Sutter Damage Hospital would have negotiated for that year had it not been in the Sutter system, but otherwise maintained all of its other attributes (*e.g.* wage index, teaching status, trauma status, system size, and competitive landscape). Thus, under the model assumptions, the estimated coefficients on the *Sutter Damage Hospital x Year* indicators capture the overcharges resulting from Sutter's challenged conduct. If, for example, the coefficient on a *Sutter Damage Hospital x Year* indicator takes the value of 0.35, one would say that the Sutter hospital price in that year is 42 percent higher as a result of the challenged conduct, accounting for the log transformation.[215]

105.    I estimate the parameters of equation (1) using the method of ordinary least squares, with heteroskedasticity-robust standard errors, clustered by hospital.[216,217] As explained above, the method of ordinary least squares models is the most commonly used econometric method in practice.[218] Furthermore, this type of model is widely used to measure benchmark damages in antitrust litigation.[219]

b)    In-Sample Prediction

106.    With in-sample prediction, the coefficients associated with the predictor variables are estimated with a sample that includes both the Sutter Damage Hospitals and the Benchmark Hospitals. A disadvantage of in-sample prediction is that the seven Sutter Damage Hospitals influence the estimation of the coefficients of the prediction coefficients. Another disadvantage is that it is not possible to obtain hospital-year specific estimates of overcharges; rather, the model yields an average overcharge for each Sutter Damage Hospital over the relevant time

---

[215] Because the model uses the natural log of allowed amounts, the percent overcharge is approximated as $100 * (e^{\beta_1} - 1)$. *See* Halvorsen, Robert, and Raymond Palmquist, "The Interpretation of Dummy Variables in Semilogarithmic Equations," *The American Economic Review*, Vol. 70, No. 3, 1980, pp. 474 - 475, at 474.

[216] In these models, "the coefficients of the [independent] variables are estimated to minimize the amount of variation in the dependent variable that is not explained by the [independent] variables in the model or equivalently." *See* American Bar Association, *Econometrics: Legal, Practical, and Technical Issues*, 2nd Edition, Chicago, Illinois: ABA Publishing, 2014, pp. 65-66.

[217] Clustered standard errors allow for consistently estimating the standard errors of the estimated model coefficients when the model errors have non-constant variances or are correlated across observations. *See Proving Antitrust Damages*, pp. 159-163.

[218] Rubinfeld (2008), Chapter 30.

[219] Rubinfeld, Daniel L., and Justin McCrary, "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, Vol. 3, No. 1, 2014, pp. 63-74.

period. An advantage of this approach is that, because there are fewer coefficients to estimate with a larger analysis sample (in comparison to the prediction described above), the design is likely to yield more precise estimates of overcharges, particularly for certain smaller hospitals in some years. Another advantage of this approach is that standard estimation techniques accommodate heteroskedasticity in the standard errors for both Sutter Damage Hospitals and the Benchmark Hospitals.

107.    To implement the in-sample prediction model, I add to the explanatory variables described above a set of *Sutter Damage Hospital* indicator variables that are equal to one for the individual Sutter Damage Hospital and zero otherwise. The full regression model is written as follows:

(2)     $Log\ Hospital\ Price_{i,y} = \alpha + \sum_{n=1}^{7} \gamma_n Sutter\ Damage\ Hospital_n + \beta_2 Wage\ Index_{i,y} + \beta_3 Major\ Teaching_{i,y} + \beta_4 Trauma\ Level\ 1\ or\ 2_{i,y} + \beta_5\ One\ to\ Four\ Competitors_{i,y} + \beta_6 Five\ Competitors_{i,y} + \beta_7 Six\ Competitors_{i,y} + \beta_8 Seven\ Competitors_{i,y} + \beta_9 Eight\ Competitors_{i,y} + \beta_{10} Nine\ Competitors_{i,y} + \beta_{11} Ten\ Competitors_{i,y} + \beta_{12} Patient\ Rating_{i,y} + \beta_{13} logSystem\ Beds_{i,y} + \beta_{14} logSystem\ Beds\ Squared_{i,y} + \sum_{y=2006}^{2015} \beta_{15,y} Year_y + \epsilon_{i,y}$

The estimated coefficient on a *Sutter Damage Hospital* indicator variable captures the overall average difference across the years between the actual price at the Sutter Damage Hospital and the predicted but-for price that the Sutter Damage Hospital would have charged had it not been in the Sutter system, but otherwise maintained all of its other attributes (*e.g.* wage Index, teaching status and trauma level, system size, and competitive landscape). As before, under the model assumptions, the estimated coefficients on the *Sutter Damage Hospital* indicators capture the overcharges resulting from Sutter's challenged conduct. Also as before, I estimate the parameters of equation (2) using the method of ordinary least squares, with heteroskedasticity-robust standard errors, clustered by hospital.

### D.    Regression Results

108.    The baseline regression results for the predictor variables are shown in Exhibit 13, for both the out-of-sample and in-sample prediction models. As seen here, most of the explanatory variables are individually statistically significant and have the expected sign. Hospitals located in areas with a higher wage index are more expensive. Hospitals that are major

teaching hospitals and hospitals designated trauma levels 1 and 2 are more expensive, relative to non-teaching hospitals and non-trauma level 1 and 2 hospitals, respectively. Hospitals with no nearby competitors are more expensive than hospitals with some or many nearby competitor hospitals. Hospitals with higher patient ratings are more expensive. Based on the coefficients on the year indicator variables, which should be interpreted relative to 2006, case-mix adjusted hospital prices are generally increasing over time. Large systems command higher prices, and the system bed variables are jointly significant.[220] Overall, the variation in the explanatory variables is able to explain about 50 percent of the variation in the dependent variable.

109.     Thus, these regression results pass the basic sanity checks one typically performs with regression output. The baseline regression models and the robustness checks, described earlier, produce results that comport with economic principles. Furthermore, the robustness checks also indicate that the general pattern of results with respect to common impact is stable under reasonable alternative specifications and alternative groups of benchmark hospitals. For these reasons, I use the results of the baseline model to calculate predicted prices for each of the Sutter Damage Hospitals. I interpret the difference between the actual and predicted prices as an estimate of the common impact resulting from the challenged conduct. To the extent Sutter's conduct has had umbrella effects, enabling other hospitals to also raise their prices, overcharge estimates constructed in this way will understate the full effect of the challenged conduct.

---

[220] Their associated coefficient estimates indicate that a hospital system with more beds receives higher prices (as seen by the positive coefficient on *System Beds*), but the price effect is diminishing (as seen by the negative coefficient on *System Beds Squared*). *See* Chipty Workpapers.



*Notes*:

1. The analysis is based on  *See* Appendix C for the data processing steps.
2. Missing *Wage Index* values for a given hospital-year are replaced with the non-missing values for the same hospital from the following year. Missing *Patient Rating* values for 2006 and 2007 are replaced with the non-missing values for the same hospital from 2008.
3. Standard errors are clustered by hospital.
4. Asterisks *, **, *** represent statistical significance at the ten percent, five percent, and one percent levels, respectively.

*Sources*: *See* sources in Exhibit 12.

110.    Exhibit 14A presents the estimated overcharge percentages, for both the out-of-sample and the in-sample models, along with an indication of whether the estimated overcharge is statistically different from zero. The out-of-sample predictions find statistically significant overcharges in nearly all years, for nearly all hospitals. The in-sample predictions find statistically significant overcharges for all hospitals.

**Exhibit 14A**



*Sources*: *See* sources for Exhibit 12.

111.    Exhibit 14B displays the estimated overcharges using what is described by statisticians as a "Box and Whiskers" plot, which provides a sense of the distribution of the out-of-sample overcharge estimates.[221] The top and bottom borders on the blue boxes enclose the second and third quartiles of the distribution. If there are no outliers, the whiskers extend to the minimum and maximum values in the distribution. If there are outliers, the whiskers extend to minimum and maximum values, excluding the outliers, and the outliers are depicted with the dots. A coefficient estimate is considered an "outlier" if it is sufficiently above or below the

---

[221] Moore, David S., George P. McCabe, and Bruce A. Craig, *Introduction to the Practice of Statistics*, 6th Edition, New York, NY: W.H. Freeman and Company, 2009 (hereafter "Moore *et al.*"), p. 38.

interquartile range, which demarks the first and the third quartiles.[222] The number in the middle of the blue box displays average overcharge, as estimated by the in-sample prediction model. As seen here: (a) with four exceptions, all estimated overcharges are positive; (b) there are only a handful of outliers (five out of 70 or about seven percent of the estimates); and (c) the average overcharge from the in-sample prediction model is consistently within the first and third quartile of the annual overcharge estimates. Based on these results, it is my opinion that one can use either the out-of-sample prediction model or the in-sample prediction model to derive reasonable estimates of the aggregate overpayment ▇▇▇▇▇ to Sutter over the relevant time period.



---

[222] A data point is considered an outlier if it is below (1st quartile − 1.5*IQR) or above (3rd quartile + 1.5*IQR), where the IQR is the interquartile range, defined as the difference between the third and the first quartiles. *See* Moore *et al.*, pp. 38-40.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

## VIII.   Health Plans Pass Through Increases in Medical Costs

112.    Basic economic principles indicate that health plans will pass through at least some portion of medical cost increases on to their consumers in the form of higher premiums. How much is passed through depends on market conditions.[223] Given competitive conditions, a health plan may decide to absorb some portion of a medical cost increase, by cutting into their margins, to remain price competitive with other health plans who do not experience similar cost increases. In this case, given the nature of the conduct, all non-Kaiser health plans will experience the increase in Sutter's hospital prices, and in that sense, they are all on a level-playing field. To the extent health plans like Anthem and Blue Shield would absorb cost increases to compete with Kaiser, pass-through may be less than 100 percent. However, the evidence in this case indicates that Kaiser does not constrain the pricing of non-Kaiser health plans, and all or nearly all increases in hospital prices are likely to be passed directly through to premiums. I describe this evidence here.

### A.    Economics of Pass-Through

113.    To the extent that any profit-maximizing firm experiences an increase in its marginal cost of production, the firm will re-optimize and increase its price, which then induces other firms in the market to re-optimize and increase their prices. A new market equilibrium is reached when the profit-maximizing conditions for all firms are satisfied under the new costs and prices. The pass-through rate is the ratio of the change in price to the change in the cost that triggered the price change.[224]

### B.    Institutional Factors that Will Drive Health Plans to Pass Through Healthcare Costs Increases to Purchasers of Healthcare Coverage

114.    Institutional features of the health insurance marketplace make it more likely that health plans will pass through a significant portion of hospital price overcharges to entities purchasing healthcare coverage. The first has to do with the premium rate setting process itself.

---

[223] Pindyck, Robert S. and Daniel L. Rubinfeld, *Microeconomics*, 8th Edition, Boston, Massachusetts: Prentice Hall, 2013, pp. 284-287 and 358-360.  *See also*, Bulow, Jeremy I. and Paul Pfleiderer, "A Note on the Effect of Cost Changes on Prices," *Journal of Political Economy*, Vol. 6, No. 1, 1983, pp. 182-185.

[224] A firm's own pass-through rate is the change in a firm's price in response to the change in the firm's cost, and a cross-firm pass-through is the change in the firm's price in response to the change in another firm's cost.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

As explained by Mr. Axene, health plans use premiums to: (a) cover medical expenses incurred as a result of paying claims to healthcare providers for medical services provided to plan members; (b) cover administrative costs; and (c) earn margins.[225] In setting premiums, health plan actuaries analyze both historical and projected healthcare costs, reflecting healthcare inflation and anticipated changes in utilization.[226] Thus, increases in health care expenses, for whatever reason, will necessarily be factored, dollar-for-dollar, into the actuarial analysis of premiums.

115.   Second, hospital expenses are the single largest component of healthcare costs.



[227] Assuming a medical loss ratio ("MLR") of 80 percent,[228]

[229] Given the relative importance (and burden) of hospital costs, inflated hospital prices will likely force health plans to consider raising premiums.

### C.   Health Plan Actuaries Testified that Health Plans Pass Through Increases in Healthcare Costs

116.

---

[225] Axene Declaration, ¶¶ 5 and 40-41.

[226] Axene Declaration, ¶ 36.

[227] _____ DEF00661911-918 at 913.

[228] An MLR is a financial measurement that encourages health plans to provide value to enrollees. An 85 percent MLR requires a health plan to use at least 85 cents out of every premium dollar to cover medical claims and activities that improve quality of care. The remaining 15 percent is the most that a health plan can earn toward administrative costs and profits. Kaiser Family Foundation, "Explaining Health Care Reform: Medical Loss Ratio (MLR)," February 29, 2012, available at https://www.kff.org/health-reform/fact-sheet/explaining-health-care-reform-medical-loss-ratio-mlr/, *site visited* June 5, 2018. *See also*, Axene Declaration, Attachment C Glossary.

[229] _____ DEF001993762-782, at 774.

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Taken together,

this testimony indicates 100 percent pass-through to each of the business lines.

117.    Mr. Axene confirmed that inpatient hospital costs incurred by health plans are incorporated into the construction of premium rates.[232] ████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████[233]

### D.    Sutter Itself Expects Health Plans to Fully Pass Through Changes in Costs

118.    The evidence also indicates that in Sutter's view, cost savings to a health plan would be fully passed through, in the form of lower premiums, to entities purchasing healthcare coverage. ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████ These assumptions are summarized in Column (1) of Exhibit 16 below.

---

[230] ████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

[231] █████████████████████████████████████████████████████

[232] This is also shown by the state-mandated rate filings made by health plans. *See* Axene Declaration, ¶¶ 23-24.

[233] ████████████████████████████



**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

77

██████████████████████████████████████████████████████

████████████████████████████████████████████ ²³⁴

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ ████████████████

██████████████████████████████████████████████

████████████

<strong>Exhibit 16</strong>



120.    Other documentary evidence also supports the conclusion of pass through of Sutter price increases to premium increases. ██████████████████████████████

████████████████████████████████████████████████████████

---

²³⁴ Exhibit 15. *See also*, Reed Deposition ██. 115-116 ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER                78



Deposition of Gautam Gowrisankaran, Economist expert for Sutter, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* February 6, 2018, p. 139.

### E.     Econometric Analysis of Health Plan Cost and Premium Data Shows Full Pass-Through

123.    Finally, I study pass-through using a regression analysis of the relationship between health care costs and premiums, using data filed by health plans in their annual Uniform Rate Review Template ("URRT") filings.[242] As part of this filing, health plans disclose actual health care costs and actual premiums, on a per-member per-month ("PMPM") basis. Using the data from small group filings, by health plan, over the years 2012 to 2015, I study the relationship between changes in prices and changes in cost.[243]

124.    Recall that the pass-through rate is the ratio of the change in price to the change in the cost that triggered the price change. I understand that the actuarial process begins with historical costs approximately two years in advance of year for which premiums are being determined ("target year").[244] These historical costs are then adjusted to reflect anticipated inflation and changes in utilization patterns, to predict actual costs in the target year and construct an actuarially sound premium for the target year.[245] Assuming actual costs in the target year are a good approximation of expected costs in the target year, I study the relationship between contemporaneous prices and costs, using a standard regression model.

125.    In this model, the dependent variable is the natural log of PMPM premium in year *T* and the explanatory variable is the natural log of PMPM cost in year *T*, along with other controls. In this framework, the pass-through ratio is obtained directly from the coefficient on the cost variable: it is interpreted as the percentage change in the PMPM premium that is associated with a percentage change in the PMPM cost. A coefficient of one indicates 100 percent pass-through. The estimated coefficient, shown in Exhibit 17, is 0.9 indicating a near one-for-one change in prices for a given change in cost. Furthermore, I cannot reject the null hypothesis that the value of one is in the 95 percent confidence interval. A value of one (which represents 100 percent) means that if costs go down by some amount, *all* of the cost reductions will be passed



[242] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See also*, Axene Declaration, ¶¶ 42-44.
[243] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮nd DMHC, "Search Rate Review Filings," available at http://wpso.dmhc.ca.gov/premiumratereview/searchratefilings, *site visited* June 18, 2018.
[244] Axene Declaration, ¶¶ 27-28.
[245] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮nd Axene Declaration, ¶ 36.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

through, in the form of premium reductions, to entities purchasing healthcare coverage. Thus, these results support the conclusion of full pass-through.

**Exhibit 17**
**Pass-Through Analysis for Small Groups**
**Dependent Variable = Log ($ Premium)**

| Explanatory Variable | Estimates |
|---|---|
| Log(Cost) | 0.914*** |
| | (0.0874) |
| | |
| Includes Health Plan Fixed Effects | Yes |
| Observations | 41 |
| R-squared | 0.965 |

*Note*s:
1. Standard errors shown in parentheses below coefficient estimate. The estimate is statistically significant at 1 percent significance level.
2. Coefficient estimated using ordinary least squares.

*Source*: DMHC Unified Rate Review Template filings, 2012-2016.

## IX.    Common Impact

126.    I turn now to a description of the evidence that Sutter's conduct has harmed all or nearly all proposed Class Members. First, the results of my regression overcharge model show that Sutter's inpatient hospital prices were higher relative to Benchmark Hospitals, for all Sutter hospitals in the Tied and the Berkeley-Oakland Tying Markets, in nearly all years of the Class period. Second, documents, testimony, and my regression analysis support the notion that higher inpatient medical hospital costs directly translated to higher premium payments for all or nearly all Class Members. Third, documentary evidence and testimony show that Sutter forced all Class Health Plans to include all Sutter hospitals in the health plan provider networks, and Sutter prohibited the use of benefit design that would have the effect of steering volume to lower-priced hospitals. Fourth, documentary evidence and testimony show that Sutter's practice was to offer substantially similar prices to each of the health plans. These facts indicate that the mechanism that Sutter used to raise prices and the associated harm caused by the challenged conduct is common to all or nearly all Class Members. I describe each of these in turn.

### A.      Statistical Evidence of Common Impact

127.      In Section VII, I presented a regression overcharge model at the hospital and year level. For each Sutter hospital in the Tied and Berkeley-Oakland Tying Markets, for each year in the period 2006-2015, I estimated an overcharge by comparing Sutter's prices to prices at a group of Benchmark Hospitals that included 91 contracted, non-Kaiser, Northern California hospitals. The regression results show positive overcharges for all Sutter Damage Hospitals, for nearly all years.

128.      In Section VIII, I provided documentary evidence and conducted my own analysis which supported the proposition that higher inpatient hospital prices translate directly to higher premiums. Because of pass-through, Sutter's higher inpatient hospital prices in the Tied and Berkeley-Oakland Tying Markets impacted all or nearly all Class members.

### B.      Sutter Has Market Power Over All Class Health Plans

129.      Testimony by health plan representatives shows that it was important for health plans to have Sutter in their networks.





250

130.    Sutter itself recognizes how important it is for health plans to include Sutter

hospitals in their networks

53 In virtually every

instance,

### C.   *Sutter Charged Similar Prices Across Health Plans*

131.   In addition to forcing all Class Health Plans to include all Sutter hospitals in health plan provider networks, documentary evidence and testimony show that Sutter also charged each of them similar prices. For example, Sutter's Robert Reed testified that his recollection was of Sutter "generally wanting to have a strategy of charging like payers at similar levels."[254] ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████[255]

132.   Sutter's insistence on using the same or similar hospital prices across health plans is discussed in ███████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████   █████████████████

████████████████████████████████████████████████

█████████████[257]

133.   In her May 2018 deposition, Melissa Brendt ████████████████████

█████████████████████████████████████████

████████████████████████████   ████████████████████

██████████████████████████████████████████████████████

---

[254] Reed Deposition, pp. 60-61.

[255] ██████████████████████████████ July 12, 2004, STCA0285864-885, at 868 and 885.

[256] ████████████████████████████ DEF002017968.

[257] *Id.*

[258] Deposition of Melissa Brendt, Chief Contracting Officer at Sutter Health, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health,* May 15, 2018, (hereafter "Brendt Deposition (2018)"), p. 162.



[59]

### D.    *Sutter Used Similar Contract Terms Across Health Plans*

134.    In Section IV, I presented synopses of the key contract terms for each of the Class Health Plans. As seen there, Sutter forced similar contract terms on all Class Health Plans. Documentary evidence and testimony of Sutter representatives confirms this fact.[260] Sutter representatives themselves testified to the fact that

135.    Sutter's uniform use of "all-or-nothing" and anti-steering provisions in contracting with health plans resulted in common harm to entities that purchased health insurance coverage from Class Health Plans and serves as common evidence in support of class certification.

### X.    **Individual Damages Can Be Calculated on Formulaic Basis**

136.    I now turn to a discussion of estimating individual damages flowing from the challenged conduct, for which I set forth a formulaic approach based in part on the opinions rendered by Mr. Axene, the Plaintiffs' actuarial expert.[264] In his declaration, Mr. Axene

---

[259] Brendt Deposition (2018), pp. 167-168.

[260] *See* Section IV.

[261] Deposition of Melissa Brendt, Chief Contracting Officer at Sutter Health, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health,* June 13, 2016, p. 287.

[262] Sprague Deposition, p. 85.

[263] Deposition of Kris Vine, *In the Matter of Sutter/Summit,* Case No. 0210138, July 31, 2003, DEF003891466 - DEF003891723, at 491.

[264] Axene Declaration, ¶¶ 63-65.

describes the process by which actuaries in their ordinary-course of business construct "manual rated" premiums.[265] Applying the same logic, he then traces the effect of increased medical expenditures on premiums.[266] My analysis of individual damages is consistent with the opinions offered by Mr. David Axene; it is also consistent with my general understanding of how Anthem, Blue Shield, and other health plans set manual rated premiums ███████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ ██████████████████████████████████████████ ██████████[268] Thus, my approach to damages is based upon my econometric estimates of Sutter's hospital price overcharges, my analysis of pass-through, and my understanding of the actuarial relationship between health care costs and premiums. Using this approach, I am able to compute premium overpayments by (or damages to) Class Members in the nine rating areas who purchased ██████████████████████████ Given comparable claims and premium data, a similar method could be applied to each of the health plans.

137.    This damages methodology can be described in four steps, as shown in Exhibit 18 below. The first step is to calculate the percentage overcharge in hospital prices, at each Sutter Damage Hospital, for each year. The second step is to calculate the aggregate and the PMPM amount ████████████ overpaid Sutter for inpatient hospital services provided at one of the Sutter Damage Hospitals, to members attached to one of the nine rating areas, for each year. The third step is to calculate the percentage overcharge in premiums, by rating area, by year, and group type. The last step is to calculate aggregate and premium damages for each individual Class Member. I demonstrate the feasibility of implementing this method to estimate individual Class Member damages usin ████████████████████████████████

---

[265] According to Mr. Axene, the manual rating process is a process that is used to construct healthcare premiums based on statewide average claims experience, including for those groups that are evaluated on the basis of their own group's experience. (Axene Declaration, ¶ 51.) Manual ratings are used to determine premiums for individual, small group, and the majority of large group health plan products. For certain very large group employers, premiums are based on the employer's actual claims experience (called "experience rating"). (Axene Declaration, Footnote 44.) Additionally, I understand that certain mid-tier large groups rates were constructed based on a blend of the manual and experience rating. (Axene Declaration, Footnote 44.) If the Court determines that large groups whose premiums reflect experience or blended ratings should be treated differently, the approach which I describe in this section could be modified to do so.

[266] Axene Declaration, ¶ 62.

[267] ████████████████████████

[268] ████████████████████████████

**Exhibit 18**
**Overview of the Individual Damage Methodology**



| Step 1: | Calculate the percentage overcharge in hospital prices, at each Sutter Damage Hospital, for each year. |
| Step 2: | Calculate the aggregate and the per-member, per-month amoun▉▉▉▉▉▉ overpaid Sutter, for members attached to the nine rating areas, by group type, for each year. |
| Step 3: | Calculate the percentage overcharge in premiums, by rating area, by group type, and by year. |
| Step 4: | Calculate the aggregate premium damages and premium damages by Class member. |

## A.    Step One of the Individual Damage Methodology

138.    In the first step, I estimate the percentage overcharge in hospital prices at each Sutter Damage Hospital, for each year, using a benchmark analysis that compares prices charged at Sutter hospitals to prices charged by a set of Northern California hospitals. I implemented this analysis with a baseline regression model whose parameter estimates enable me to make the out-of-sample predictions, described in Section VII.[269] For convenience, I repeat Exhibit 14A, which is also presented above. The panel labeled "Out-of-Sample" shows the estimated percentage overcharges, by Sutter Damage Hospital, by year.[270]

---

[269] There, to ensure that the results of that model are sufficiently robust, I also estimated alternative regression models with additional explanatory variables and with alternative groups of benchmark hospitals. The results of these robustness checks were generally compatible with the results of the baseline model. *See* Chipty Workpapers.

[270] The overcharge percentages are calculated across all product types (*i.e.* HMO, PPO, etc.) because the premium rate setting process is methodologically the same for HMO and PPO plans▉▉▉▉▉▉▉▉▉▉▉▉ and Axene Declaration, ¶ 26.



### B.    Step Two of the Individual Damage Methodology

139.    Second, I calculate the aggregate and the PMPM amount██████████████ overpaid the Sutter Damage Hospitals for inpatient hospital services provided to Class Members attached to each of the nine rating areas,[271] by group type, and for each year. For ease of notation, I refer to the combination of a rating area, group type, and year as a "cohort." To implement this calculation, I first determine the total amount paid to each Sutter Damage Hospital directly█████████ exclusive of any patient responsibility in the form of copayments, deductibles, and coinsurance, as reflected in████████paid claims data ("incurred costs") for inpatient hospital services[272] provided to Anthem plan members attached to each of the nine rating areas.[273] These inpatient incurred costs are disaggregated by rating area, group type, and year. For illustration, Exhibit 19 presents████████incurred costs for inpatient hospital services provided by each of the Sutter Damage Hospitals to█████small group plan members attached to one of the nine rating areas, for the year 2012.

---

[271] For purposes of the damages model, the rating area for individual and small group subscribers is based on the geographic areas identified by law since 2014 under the Affordable Care Act. The rating area for large group subscribers is based on the first three digits of the five-digit zip code. The use of the rating areas established under the Affordable Care Act is appropriate because "the rating factors used today for particular areas in California are quite similar to those used prior to the implementation of the ACA." *See* Axene Declaration, ¶ 49.

[272] Incurred costs reflect inpatient claims paid by█████at the Sutter Damage Hospitals on which████████ provided primary insurance coverage to the plan member. Claims with substance abuse or behavioral health DRGs where excluded from this calculation. *See* Appendix C.

[273] My analysis identifies: (a) individual plan members attached to a rating area based on where the subscriber resides; (b) small group plan members attached to a rating area based on where the employer is located; and (c) large group plan members attached to a three-digit zip code area based on where the plan member resides (a large group plan member is only included in the calculation if the employer is also located in one of the nine rating areas . This method of attachin    lan members to a ratin   area or three-di  it zi  code reflects the methodolo    used b ████
█████████████████████████████████████████████████████████████



140.    To estimate the amount by which ▮▮▮▮ overpaid Sutter, I apply the overcharge percentages (shown in Exhibit 14A) to the ▮▮▮▮ incurred costs (shown in Exhibit 19). To understand the calculation, suppose ▮▮▮▮ incurred costs of $550 at Sutter Sacramento in 2012 and the econometric model found that Sutter Sacramento's prices were inflated by 30 percent. In this example, the amount by which ▮▮▮▮ overpaid is $126.50 (= $550 x 23 percent, where 23 percent = 30 percent ÷ (1+ 30 percent)). Here, the 30 percent overcharge is the amount of overcharge as a percentage of the *observed* hospital price, while the 23 percent is the amount of overcharge as a percentage of the *but-for* hospital price. Thus, I calculate ▮▮▮▮ aggregate overpayment to the Sutter Damage Hospitals using this approach, by cohort. For illustration, Exhibit 20 shows the aggregate hospital overpayment made by ▮▮▮▮ for 2012 to each Sutter Damage Hospital, for small group plan members attached to one of the nine rating areas.



141.    Finally, I restate ███████ aggregate overpayment to Sutter as ███████ PMPM overpayment to Sutter, for each year from 2006 to 2015, by dividing by member months in each year.[274] The PMPM conversion mimics the actuarial process, described by Mr. Axene, by which health plan actuaries study historical health care PMPM healthcare costs to determine projected PMPM healthcare costs for a premium period. As explained by Mr. Axene, given the forward-looking nature of the premium setting process, there is typically a two-year gap between the historic period and the premium period.[275] The PMPM overpayment amount is calculated by dividing aggregate ███████ overpayments by "member months," separately for each cohort.[276] Member months are the sum of total months by cohort, as described in ███████ premium data, over which ███████ plan members attached to the nine rating areas were enrolled in a fully-insured health insurance product.[277,278] For illustration, Exhibit 21 describes the aggregate and

---

[274] This PMPM conversion normalizes changes in volume across time periods.

[275] Axene Declaration, ¶ 27.

[276] Member months are the total months health plan members are enrolled in a fully-insured health insurance product. For example, a health plan member enrolled from January 1 of a year to June 30 of the same year would represent six-member months while a health plan member enrolled from January 1 of a year to December 31 of the same year would represent twelve-member months.

[277] Plan members area attached to a rating area as described in Footnote 274, above.

[278] The ███████ provide information on the number of individual contracts, the number of small group contracts, and the number of large group subscribers. To estimate member months, I need information on the average number of members per subscriber and the average number of subscribers per small group contract. According to Mr. Axene, the average number of members per individual contract is two. (*See* Axene Declaration, ¶

the PMPM overpayment of incurred costs paid by ███████ to Sutter Damage Hospitals, by rating area, for small group plan members attached to one of the nine rating areas, in 2012.

**Exhibit 21**



### C.     Step Three of the Individual Damage Methodology

142.     In the third step of the damage calculation, I determine how increased medical expenditures in a given year affected healthcare premiums paid two years later and calculate the percentage overcharge in premiums, by cohort. ████████████████████████████

████████████████████) and the Declaration of Mr. Axene, it is my understanding that healthcare premiums at a given point in time are based on historical medical expenditures.[279]



---

84.) Also according to Mr. Axene, the average number of subscribers per small group contract is approximately ei  ht.  *See* Axene Declaration    84.)  Mr. Axene's descri  tion is consistent with m   own analysis of ████████████████████████████████████████████using those data, I find the average number of subscribers in a year varies between 6.7 and 8.5. (*See* Chipty Workpapers.) Thus, I estimate member months for each group type as follows: (a) individual member months = 2 x the number of individual contract months. (b) small group member months = 2 x the average number of subscribers per small group in the relevant year x the number of contract months. (c) large group member months = 2 x large group subscriber months.

[279] Based on a review of deposition testimony, rate filings, and the Expert Report of David Axene  it a   ears that healthcare   remiums are based on claims experience that is between 15 and 24 months old. ████████████████ ████████Axene Declaration, ¶ 28.

[280] ████████████████████████

 [81] Thus, following this deposition testimony, the opinions of Mr. Axene, and URRT filings actually made by health plans, I determine the effect of overpayments in year *T-2* (two years prior to when the premium was paid) on premiums in year *T* to estimate individual damages, for *T* spanning the years 2008 to 2017.[282] For example, I determine how ▮▮▮ overpayments to Sutter in 2010 affected Anthem premiums paid by Class Members in 2012.

143.    For this purpose, I first calculate the PMPM premium paid to ▮▮▮ for each cohort, in each year from 2008 to 2017. This PMPM premium is calculated by dividing the total premiums paid to ▮▮▮ by total member months, for each cohort, using information contained in the ▮▮▮.[283,284] For illustration, Exhibit 22 presents 2014 PMPM ▮▮▮ by Class Members.

**Exhibit 22**



---

[281] ▮▮▮

[282] Axene Declaration, ¶ 27; and DMHC, "Search Rate Review Filings," available at http://wpso.dmhc.ca.gov/premiumratereview/searchratefilings, *site visited* June 18, 2018.

[283] Plan members area attached to a rating area as described in Footnote 274, above.

[284] For large groups, premiums are only available in aggregate by group. The premiums attached to each three- digit zip code were estimated by allocating the total premium in proportion to the member months attached to each three digit zip code. This is consistent with the methodology of allocating large group premiums identified by Mr. Axene. *See* Axene Declaration, ¶ 88.

144.    The percentage overcharge in premiums is then calculated, by cohort as:

$$\frac{\textbf{\textit{Pass-Through}} \times \textbf{\textit{Trend Factor}} \times PMPM\ Hospital\ Overpayment_{T-2}}{PMPM\ Premium_T}$$

where: (a) pass-through is the pass-through ratio, which I have determined is equal to one; (b) trend factor is the adjustment applied to grow costs from the historical period to the premium period, to reflect inflation and utilization trends; (c) the PMPM hospital overpayment amounts are as illustrated in Exhibit 21; and (d) the PMPM premium amounts are as illustrated in Exhibit 22. For the purpose of the illustration, I do not apply any trend factors, which I understand form Mr. Axene are substantially greater than one.[285] The effect this omission is to significantly *understate* the percentage overcharge in premiums and hence, aggregate premium damages. Exhibit 23 shows the percentage impact of 2012 overpayments on 2014 premiums for small group subscribers attached to one of the nine rating areas by rating area. These premium percentage overpayment values represent the percentage by which Class Member premium payments were inflated due to Sutter's anticompetitive conduct.

**Exhibit 23**



---

[285] It is well documented that hospital   rices in California generally increased over the years. *See* Axene Declaration, ¶ 36; ( ) and Melnick and Fonkych (2016), at p. 1 (explaining that over the period 2004-2013, hospital prices in California grew by 76 percent.).

### D.    Step Four of the Individual Damage Methodology

145.    After calculating the premium percentage overpayment by cohort, the final step of the damage calculation is to determine aggregate premium damages and premium damages by Class Member. To calculate aggregate premium damages between 2008 and 2017, I multiply together: (a) the premium percentage overpayment; and (b) the ███████████████ by cohort.[286] The aggregate premium damages for each group type in each year is computed by summing premium damages by group type, across the rating areas. Exhibit 24 presents aggregate premium damages for all years, by group type. The boxed number, in Exhibit 24, completes the exemplar calculation focusing on ████████████ entities that are located in one of the nine rating areas and that purchased a ██████████████████ As seen here, the damages due to these Class Members are $13,377,219.

### Exhibit 24



146.    To calculate premium damages for an individual Class Member, I multiply (a) the premium percentage overpayment, based on the Class Member's cohort, and (b) the Class Member's ████████████████ For illustration, Exhibit 25 presents the calculation of premium damage for one small group subscriber.[287]

---

[286] Premiums paid by year, rating area, and group type were previously calculated in determining the PMPM premium paid.

[287] Employers often subsidize only part of the premium paid as an employee benefit.  In this instance, the employee pays for the remainder of the premium to obtain health insurance coverage. Accordingly, in instances where the premium is split, both employers and employees have suffered injury.  I understand from a conference with the class

**Exhibit 25**



\*\*\*

147.    For the purpose of illustration, I can approximate the size of total damages by extrapolating my findings related to ▇▇▇▇▇▇ health plans. Based on the data provided in Exhibit 6, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ of the Class Health Plans. Assuming ▇▇▇▇▇ share of plan members across the Class Health Plans reflects ▇▇▇▇▇ share of damages across the Class Health Plans, I can extrapolate damages by dividing ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Thus, I approximate total damages to be $723 million ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Calculating overcharge percentages, in Step One above, as an average across the years for a Sutter Damage Hospital, I approximate total damages to be $749 million ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

148.    Finally, there are several reasons why the four-step methodology for calculating damages I have described is conservative, for at least four reasons. First, the methodology ignores the impact of overcharges on the patient responsibility, in the form of copayments, deductibles, and coinsurance. Second, although there is documentary evidence that the

---

administrator Jennifer Keough, President of JND Legal Administration, that information regarding the employer/employee split of premiums can be elicited as part of a claims administration process, particularly as employers generally keep such information as part of their payroll records. This information can be used to apportion premium overcharge damages to both the employer and the employee.

challenged conduct has likely affected other medical services,[288] the methodology ignores the impact of overcharges on these services (*i.e.* outpatient services, physician services, etc.) provided by Sutter to ▮▮▮▮▮▮▮▮▮▮▮▮ [289] Third, the methodology ignores trend factors, by holding medical expenditures constant in computing the premium overcharge percentage. Fourth, the out-of-sample prediction methodology does not calculate hospital overpayment for Sutter Damage Hospital-years for which the regression model produces statistically insignificant overcharge estimates. This treatment is likely conservative, as shown in the alternative, in-sample prediction model I presented, which shows positive and significant overcharge for all hospitals over the period.

## XI.    Conclusions

149.    For the reasons I have explained in this report, it is my opinion that: (a) the proposed Class includes hundreds of thousands of Class Members; (b) a common method exists to demonstrate that Sutter's contracting practices have resulted in harm to all or nearly all Class Members; (c) evidence that is common to members of the proposed Class shows that all or nearly all proposed Class Members likely incurred at least some overcharge as a result of Sutter's conduct; and (d) the amount of harm to the proposed Class can be estimated on an aggregate level and can be calculated at the individual Class Member level based on a common, formulaic methodology.

*Tasneem Chipty*

Tasneem Chipty, Ph. D.
June 21, 2018



Appendix A: CV



**TASNEEM CHIPTY**
**Managing Principal**

Office: (617) 315-0355

Cell: (617) 697-6826

tchipty@matrixeconomics.com

125 High Street

Suite 1632

Boston, MA 02110

Dr. Chipty is an expert in industrial organization, antitrust economics, and econometrics. Her practice spans both the areas of antitrust litigation and mergers and acquisitions, in a broad array of sectors including: agricultural equipment; airlines; broadcast and satellite radio; cable and satellite television; containerized shipping; healthcare; newspapers; pharmaceuticals; pulp and paper; and tobacco. Her work has been influential both internationally and domestically. She has assisted the U.S. Department of Justice on several investigations and merger reviews. She has assisted the Government of Australia at the World Trade Organization in a dispute surrounding Australia's national tobacco control policy. She was Comcast's antitrust damages expert in *Behrend et al. vs. Comcast* – a U.S. Supreme Court case in which the Court dismissed the case against Comcast because of deficiencies in the plaintiffs' damages model. On behalf of the parties, she studied the competitive effects of the CenturyLink-Level 3 merger and the Charter-Time Warner Cable merger, both of which received approvals from the U.S. Department of Justice and the Federal Communications Commission. She serves as an antitrust advisor to the Massachusetts Health Policy Commission, for whom she has evaluated the competitive effects of healthcare transaction in the Commonwealth, including Partners Healthcare's attempted acquisition of South Shore Hospital and Hallmark Health. Dr. Chipty has submitted testimony, been deposed, and testified at trial in several litigation matters. She has appeared before the Federal Trade Commission, the Department of Justice, the World Trade Organization, the Canadian Mergers Bureau, the U.S. Copyright Board, and the Canadian Copyright Board. She is co-editor of the current edition of the American Bar Association's book *Proving Antitrust Damages*. She has published research on the strategic use of vertical integration, the role of firm size and network effects on bilateral business negotiations, and the effects of regulations on firm behavior.

Prior to founding Matrix Economics, Dr. Chipty was a Managing Principal at Analysis Group, and before that a Vice President at Charles River Associates. She has served on the faculties of the Ohio State University, Brandeis University, and MIT, where she taught courses in antitrust and regulation, industrial organization, and econometrics. Dr. Chipty received her Ph.D. in economics from the Massachusetts Institute of Technology and her undergraduate degree in economics and mathematics from Wellesley College.

## EDUCATION

Ph.D.          Economics, Massachusetts Institute of Technology

B.A.          Mathematics and Economics, with honors, Wellesley College

**PROFESSIONAL EXPERIENCE**

2016 –          Matrix Economics, LLC
                *Founder and Managing Principal*

2010 – 2016     Analysis Group, Inc.
                *Managing Principal* (2010-2016)

1999 – 2010     Charles River Associates, Inc.
                *Vice President* (2005-2010)

2005            Massachusetts Institute of Technology
                *Visiting Associate Professor of Economics*

1997 – 1999     Brandeis University, Graduate School of International Economics and Finance
                *Visiting Assistant Professor of Economics*

1995            Osaka University
                *Visiting Foreign Scholar*

1993 – 1999     Ohio State University
                *Assistant Professor of Economics*

**TESTIMONY EXPERIENCE**

- *United States of America v. Deere & Company, Precision Planting LLC, and Monsanto Company,* Civil Action No. 1:16-cv-08515 in the United States District Court for the Northern District of Illinois Eastern Division. On behalf of the United States, submitted testimony on December 23, 2016 and January 10, 2017; and testified at deposition on March 2, 2017. (Norm Familant and Bill Jones).

- *United States of America, et al. v. Hillsdale Community Health Center, et. al.,* Case No. 5:15-cv-12311-JEL-DRG in the United States District Court for the Eastern District of Michigan. On behalf of the United States, submitted testimony on October 27, 2016 and December 5, 2016; and testified at deposition on December 12, 2016. U.S. Department of Justice, 2017 (Beth Armington and Katrina Rouse).

- *In the Matter of: Statement of Proposed Royalties to be Collected for the Retransmission of Distant Television Signals, In Canada, for the Years 2014 to 2018*, before the Canadian Copyright Board. Submitted testimony on October 2, 2015 and testified at trial on January 25-26, 2016, on behalf of Bell Canada, Cogeco Cable Inc., Rogers Communications Inc, Shaw Communications Inc., Videotron G.P., and Telus Communications Company. Fasken Martineau DuMoulin, LLP (Jay Kerr-Wilson).

- Challenges to Australia's Tobacco Plain Packaging Act, on behalf of Australia, in the World Trade Organization. Submitted testimony on March 9, 2015, May 31, 2015, September 14, 2015, October 26, 2015, December 8, 2015, and February 1, 2016. Australian Government Solicitor (Simon Sherwood and Damien O'Donovan)

- *Caroline Behrend et al. v. Comcast Corporation et al.*, Civil Action No. 03-6604 in the United

States District Court for the Eastern District of Pennsylvania. On behalf of Comcast Corporation, submitted testimony on April 10, 2009, on May 6, 2009, on May 11, 2009, on August 21, 2009, September 18, 2009, May 22, 2012, and January 15, 2014; testified at deposition on May 22, 2009; and testified at a class recertification hearing on October 26, 2009. Kasowitz Benson Torres & Freidman (Michael Shuster and Sheron Korpus) and Davis Polk (David Toscano and Arthur Burke).

- *American Broadcasting Company Inc., et. al. v. Aereo*, 12 Civ. 1543, in United States District Court in the Southern District of New York. Submitted testimony on December 20, 2013 on behalf of Aereo. Fish and Richardson (David Hosp).

- *DISH Network LLC. f/k/a Echostar Satellite LLC v. ESPN, Inc., and ESPN Classic, Inc.*, No. 09 CIV 6875 (JGK) (FM), in United States District Court in the Southern District of New York. Submitted testimony on July 29, 2011; testified at deposition on November 22, 2011; testified at deposition in January 2013; testified at trial February 2013 on behalf of DISH Network. Flemming Zulack Williamson Zauderer LLP (Dean Nyciper) and Simpson Thatcher (Barry Ostrager and Mary Kay Vyskocil).

- *Echostar Satellite LLC v. ESPN, Inc., ESPN Classic, Inc., ABC Cable Networks Group, Inc., Soapnet L.L.C., and International Family Entertainment Inc.*, Index 08-600282 in the Supreme Court of the State of New York County of New York. Testified at deposition on June 23, 2011, on behalf of Echostar Satellite LLC. Flemming Zulack Williamson Zauderer LLP (Dean Nyciper).

- *Casitas Municipal Water District v. United States*, Case No. 05-168L in the United States Court of Federal Claims. Submitted testimony on February 25, 2010 and February 8, 2007, testified at deposition on March 10, 2010, testified at trial on October 28, 2010 on behalf of the United States. U.S. Justice Department (James Gette and Barrett Atwood).

- *Royalties To Be Collected By CSI and SOCAN For the Reproduction and the Communication to the Public by Online Music Services, In Canada, of Musical or Dramaticaomusical Works, for the years 2007 to 2010*, before the Canadian Copyright Board. Submitted testimony on April 29, 2010 and on June 9, 2010, and testified at trial on June 28-9, 2010, on behalf of Apple Inc., Bell Canada Enterprises Inc., Rogers Communications Inc., Telus Communications Company, and Videotron Ltd. Goodmans LLP for Apple Inc. (Michael Koch); and Fasken Martineau DuMoulin, LLP for the rest (Jay Kerr-Wilson).

- *United States of America v. Daily Gazette Company and MediaNews Group, Inc.*, Civil Action No. 2:07-0329 in the United States District Court Southern District of West Virginia. Submitted testimony on September 1, 2009, on behalf of the United States. U.S. Justice Department (John Reed, Mark Merva and Norm Familant).

- *In re. ASARCO LLC, et al.*, Case No. 05-21207 in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division. Submitted testimony on August 1, 2008 and testified at deposition on August 7, 2008, on behalf of Ready Mix USA, LLC. Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. (Gary Shockley).

- *SOCAN Tariff No. 16 – Royalties To Be Collected By SOCAN For the Public Performance or the Communication to the Public by Telecommunication, In Canada, of Musical or Dramaticaomusical Works, for the years 2007 to 2009*, before the Canadian Copyright Board. Submitted testimony on November 30, 2007 and testified at trial in January 2008, on behalf of a

consortium of Canadian background music users, including Bell ExpressVu, Chum Satellite Services, and DMX Canada. Fasken Martineau DuMoulin, LLP (Jay Kerr-Wilson and Aidan O'Neill).

- *In the Matter of Digital Performance Right in Sound Recordings and Ephemeral Recordings for a New Subscription Service*, CRB Proceeding 2005-5, before the U.S. Copyright Board. Submitted testimony on October 30, 2006 and July 24, 2007; testified at deposition on May 8, 2007; and testified at trial in June 2007, on behalf of Sirius Satellite Radio and XM Satellite Radio. Wiley Rein, LLP for Sirius (Bruce Joseph) and Weil, Gotshal & Manges for XM (Ralph Miller).

## MERGERS AND ACQUISITIONS AND OTHER GOVERNMENT INVESTIGATIONS

Dr. Chipty has extensive experience evaluating the competitive effects of proposed transactions and has advised clients at various stages of their deals, including strategic advice in identifying targets, assistance with agency review, and analyses for post-merger contestations. She has employed economic and econometric tools to evaluate issues of market definition, critical loss analysis, direct evidence of unilateral effects, and efficiencies. She has studied the likelihood of temporary or permanent foreclosure, as part of a raising rivals cost strategy. In addition, she has assessed regulatory structures and their associated effect on competition. Examples of Dr. Chipty's work in this area include:

- Assisting Nippon Yusen Kabushiki Kaisha Ltd., Mitsui O.S.K. Lines, Ltd., Kawasaki Kisen Kaisha Ltd. evaluate the competitive effects of a container shipping joint venture, before the Department of Justice, 2017. Wilmer Cutler Pickering Hale and Dorr (Hartmut Schneider).

- Assisting parties in the CenturyLink-Level 3 merger, before the Department of Justice and the Federal Communications Commission, 2017. Wachtell, Lipton, Rosen & Katz and Jones Day (Ilene Gotts and Bruce McDonald) and Covington & Burling (Yaron Dori)

- Assisted parties in the Charter-Time Warner Cable merger, before the Department of Justice and the Federal Communications Commission, 2015-2016. Wachtell, Lipton, Rosen & Katz and Jenner Block (Ilene Gotts and John Flynn).

- Submitted white paper evaluating the impact of tobacco plain packaging on smoking prevalence in Australia, to the Australian Parliament on behalf of the Government of Australia, in Australia's post implementation review of tobacco plain packaging legislation, 2016. Australian Government Solicitor (Simon Sherwood and Simon Daley).

- Expert for the U.S. Department of Justice in its review of the One Main-Spring Leaf merger, 2015. U.S. Department of Justice (Stephanie Fleming and Nicholas Hill).

- Coauthored a white paper, on behalf of Aeromexico, evaluating the competitive effects of airport slot allocation governing air traffic to and from Mexico City Airport, submitted to Mexico's competition authority, 2015, (joint with Professor Robert Pindyck).

- Expert for Olin Corporation in its acquisition of Dow Chemical's cholor-alkali business unit, before the Federal Trade Commission, 2014-2015. Baker Botts (William Henry and Thomas Dillickrath).

- Expert for the Mergers Bureau of Canada in its review of Post Media's acquisition of Sun Media. Canadian Mergers Bureau (Steve Sansom and Nicholas Janota).

- Assisted the U.S. Department of Justice in its challenge of American Express's use of merchant restraints, 2014-2015. U.S. Department of Justice (Craig Conrath and John Read).

- Advised the Massachusetts Health Policy Commission on the likely competitive impact of Partners HealthCare System's proposed acquisition of Hallmark Health System, including submitting a written statement in the HPC's Cost and Market Impact Review of the transaction, 2014. Health Policy Commission (Karen Tseng and Kate Scarborough).

- Advised the Massachusetts Health Policy Commission on the likely competitive impact of Partners HealthCare System's proposed acquisition of South Shore Hospital, including submitting a written statement in the HPC's Cost and Market Impact Review of the transaction, 2013-2014. Health Policy Commission (Karen Tseng and Kate Scarborough).

- Assisted Saint Alphonsus Medical Center to evaluate the competitive effects of St. Luke's Health System's acquisition of Saltzer Medical Group, in Nampa, Idaho, 2012-2013. Honigman, Miller, Schwartz and Cohn (David Ettinger).

- Assisted Arris Group in its acquisition of Motorola Home business unit from Google, before the Department of Justice, 2013. Hogan Lovells (Logan Breed) and Troutman Sanders (Daniel Anziska).

- Coauthored a white paper, on behalf of Televisa, evaluating the competitive impact in the mobile telephone marketplace of Televisa's proposed acquisition of 50% of GSF Telecom Holdings, S.A.P.I. de C.V., which owns 100% of Grupo Iusacell, S.A. de C.V. (joint with Almudena Arcelus and David Sosa). Submitted to Mexico's competition authority, Federal Commission of Economic Competition, 2012.

- Conducted analyses and presented before staff of the FTC, in an investigation of two joint venture partners involving allegations of potentially anticompetitive conduct, 2011-2012. Baker Botts (Thomas Dillickrath and William Henry).

- Authored a white paper analyzing the likely effects of Steward Healthcare's acquisition of Morton Hospital, in the greater Boston area, submitted to the State Attorney General's office, June 14, 2011. Edwards Angell Palmer & Dodge (Patricia Sullivan).

- Evaluated the likely effects of the Southwest Airlines-Airtran merger, on behalf of the United States, Winter 2011. U.S. Justice Department (Michael Billiel and Oliver Richard).

- Coauthored a white paper, on behalf of Time Warner Cable, analyzing brinkmanship tactics and broadcast retransmission consent rules established by the 1992 Cable Act, submitted to the Federal Communications Commission (joint with Prof. Steven Salop, Dr. Martino DeStefano, Dr. Serge Moresi, and Dr. John Woodbury), June 3, 2010.

- Authored Federal Communication Commission Media Study #5, on behalf of the Commission, as part of it periodic review of the media ownership rules, analyzing the effects of ownership structure in broadcast radio, on program variety and advertiser and listener welfare, released June 2007.

- Coauthored a white paper analyzing bidding behavior and the potential competitive effects of the merger of Alcatel and Lucent, submitted to the Department of Justice (joint with Drs. Andrew

Dick and Stanley Besen), April 28, 2006. Skadden, Arps, Slate Meagher & Flom LLP (James Keyte and Neal Stoll).

- Conducted and presented analysis before the Federal Trade Commission on behalf of Barr Pharmaceuticals regarding its acquisition of a hormone contraceptive product (joint with Prof. Steven Salop), Fall 2005. Kirkland & Ellis LLP (Mark Kovner).

- Conducted an analysis of efficiencies on behalf of Time Warner and Comcast, in their joint bid for Adelphia Communications (joint with Dr. Stanley Besen). Paul Weiss Rifkind Wharton & Garrison, LLP (Joseph Simons).

- Assisted NorthShore University HealthSystem (formerly Evanston Northwestern Health Corporation) with the Federal Trade Commission's post-merger investigation of the 2000 merger of Evanston Hospital and Highland Park Hospital. Winston & Strawn LLP (Michael Sibarium).

## OTHER CONSULTING EXPERIENCE, BY TOPICAL AREA

Dr. Chipty has also provided consultation to litigation clients on matters some of which eventually settled, and she has provided business guidance to clients for strategic planning. Examples of Dr. Chipty's work in this area include:

### Tobacco

- Assisted the Department of Justice, in *United States v. Philip Morris et al.*, Civil Action No. 99-2486, a RICO case against the major tobacco manufacturers and associations involving allegations of conspiracy to suppress information and to suppress innovation. U.S. Department of Justice (Steve Brody, Renee Brooker, and James Gette).

- Assisted Appalachian Oil Company, in *R.J. Reynolds Tobacco Company v. Market Basket Food Stores, Inc., et al.*, Civil Action No. 5:05-CV-253. Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. (Gary Shockley).

- Assisted Star Scientific, in *Star Scientific, Inc. v. R.J. Reynolds Tobacco Company*, Case No. AW 01-CV-1504 and AW 02-CV-2504. Crowell and Moring (Richard MacMillan and Kathryn Kirmayer).

### Pharmaceutical and Health Care

- Advised the working groups of the Advanced Market Commitment ("AMC"), an initiative of the Gates Foundation to pilot the first AMC for the pneumococcus vaccine. The goal of this AMC is to provide appropriate market-based incentives to induce capacity investments by the major pharmaceutical companies for manufacturing sufficient vaccines for low-income countries.

- Assisted a pharmaceutical manufacturer against Medicaid reimbursement, fraud, and unfair trade practices claims brought by numerous State Attorneys General. O'Melveny & Meyers LLP (Steve Brody and Brian Anderson) and Baker Botts LLP (Richard Josephson).

- Advised Regional Urology, in *Willis-Knighton Health System and Health Plus of Louisiana, Inc. v. Regional Urology LLC, et al.*, Civil No. CV02-1094-S. Breazeale Sachse & Wilson, LLP (Claude Reynaud).

**Media and Sports**

- Assisted the YES Television Network in evaluating the value to the network of carriage rights for certain New Jersey Nets games, for contract renegotiation and possible arbitration. Boies Schiller & Flexner, LLP (Robert Dwyer).

- Assisted the Monte Carlo Tennis Tournament, in a dispute with the ATP Tour, alleging abuse of market power. Sidley Austin LLP (Alan Unger).

- Assisted a team of the National Football League, in a dispute with a cable operator, alleging vertical foreclosure. Boies Schiller & Flexner, LLP (Robert Dwyer).

- Assisted Major League Baseball in *Major League Baseball Properties, Inc. v. Salvino,* involving a challenge to the league's use of centralized trademark licensing. Foley & Lardner LLP (Jim Mckeown).

- Advised HBO on reasonable fees for music performance rights in their negotiation with BMI. Cravath, Swaine & Moore LLP (Kenneth Lee).

- Advised XM Satellite Radio on reasonable fees for music performance rights for business negotiations. Shaw Pittman LLP (Cynthia Greer).

## ECONOMETRICS AND STATISTICS

Dr. Chipty is an expert in the area of statistics and econometrics and has been successful at using econometric arguments both to construct affirmative arguments in litigation as well as to evaluate the use of econometrics by opposing experts. Many of the projects described above used econometric analysis. Other examples of Dr. Chipty's work in this area are described below:

- Submitted a white paper to the European Commission, DG Competition Bureau, on behalf of the European Liner Affairs Association, analyzing the impact of shipping conferences on carriers' ability to collude on prices (joint with Professor Fiona Scott Morton and Mr. Nils Von Hinten-Reed).

- Developed analyses and drafted a report on behalf of defendants in the *In Re: Monosodium Glutamate Litigation* in support of a defendants' motion to dismiss plaintiff's expert testimony based upon improper use of econometrics. Dorsey & Whitney LLP (Michael Lindsay) and Haynes & Boone LLP (Ronald Breaux).

- Used advanced statistical techniques along with a large volume of administrative data, on behalf of United Parcel Service, to evaluate the Postal Service's expert testimony on variable costs. Piper & Marbury LLP (John McKeever).

- Evaluated and criticized the econometric testimony of a defendants' expert, on behalf of a generic pharmaceuticals firm alleging vertical foreclosure and unlawful delay of entry. Solomon Zauderer (Colin Underwood).

## TRISTATE RESEARCH PARTNERSHIP

Dr. Chipty was a member of the research team from 1997-1999 in this Department of Health and Human Resources funded collaboration that included the states of Massachusetts, Alabama, and Florida. Dr. Chipty worked with state governments to design research experiments, develop

econometric models, and process large administrative databases, in an effort to understand the structure, administration, and impact of minimum standards regulations.

- "The Black-White Wage Gap in the Deep South: Location, Location, Location?" (with Ann Dryden Witte), Working Paper 98-03, Tri-State Child Care Research Partnership, Miami, FL.

- "Employment Patterns of Workers Receiving Subsidized Child Care: A Study of Eight Counties in Alabama," (with Ann Dryden Witte), Available from Margie Curry, Executive Director, Childcare Resources, 1904 First Ave. North, Birmingham, AL 35203-4006.

- "Parents Receiving Subsidized Child Care: A Study of Alabama's Labor Force," (with Ann Dryden Witte), Working Paper 98-01, Tri-State Child Care Research Partnership, Miami, FL.

- "Employment of Parents Receiving Subsidized Child Care in Dade County, Florida," (with Harriet Griesinger and Ann Dryden Witte), Working Paper 98-03, Department of Economics, Wellesley College, Wellesley MA 02481.

## SELECTED PAPERS AND PRESENTATIONS

### Published Articles

"US: Economics" (with Michael Chapman), *Global Competition Review*, *The Antitrust Review of the Americas 2016*, available at: http://globalcompetitionreview.com/reviews/74/sections/275/chapters/2983/us-economics/.

"Economists' Perspective on the Efficiency Defense in Provider Consolidations:  What Works, What Doesn't Work, and What We Still Don't Know," American Health Lawyer's Association *Connections Magazine*, September 2015.

"Competitor Collaborations in Health Care: Understanding the Proposed ACO Antitrust Review Process," *CPI Antitrust Chronicle*, May 2011 (1).

"Vertical Integration, Market Foreclosure, and Consumer Welfare in the Cable Television Industry," *American Economic Review*, Vol. 91, No. 3, June 2001, pp. 428-453.

"The Role of Buyer Size in Bilateral Bargaining: A Study of the Cable Television Industry" (with Christopher Snyder), *Review of Economics and Statistics*, May 1999, 81(2): 326-340.

"Economic Effects of Quality Regulations in the Daycare Industry," *American Economic Review*, Vol. 85, No. 2, May 1995, pp. 419-424.

"Horizontal Integration for Bargaining Power: Evidence from the Cable Television Industry," *Journal of Economics and Management Strategy*, Vol. 4, No. 2, Summer 1995, pp. 375-397.

"A Marginal Cost Transfer Pricing Methodology," *Tax Notes*, Nov. 26, 1990 (with Ann Dryden Witte, Wellesley College and NBER).

### Chapters in Books

"Hospital-Physician Integration: The St. Luke's Case" (with Deborah Haas-Wilson), in *The Antitrust Revolution, 7th Edition* (Oxford University Press), edited by John Kwoka and Lawrence White, forthcoming.

**Books Edited**

*Proving Antitrust Damages*, 3rd Edition (ed., with Cathy Beagan Flood), (American Bar Association, 2017).

**Book Reviews**

*The Antitrust Source*, October 2007, Book Review of Michael D. Whinston, *Lectures on Antitrust Economics* (Cambridge, MIT Press, 2006).

*The Journal of Economic Literature*, June 1992, Vol. XXX, No. 2, Book Review of Frank Cowell, *Cheating the Government* (with Ann Dryden Witte, Wellesley College and NBER) (Cambridge, MIT Press, 1990).

**Working Papers**

"In a Race Against the Clock:  Auctioneer Strategies and Selling Mechanisms in Live Outcry Auctions," 2014 (with Lucia Dunn and Stephen Cosslett, the Ohio State University).

"Efficient Estimation Via Moment Restrictions," (with Whitney K. Newey).

"Antidumping and Countervailing Orders: A Study of the Market for Corrosion-Resistant Steel," (with Brian L. Palmer).

"Firms' Responses to Minimum Standards Regulations: An Empirical Investigation" (with Ann Dryden Witte), NBER Working Paper # 6104.

"Effects of Information Provision in a Vertically Differentiated Market" (with Ann Dryden Witte), NBER Working Paper # 6493.

"Unintended Consequences? Welfare Reform and the Working Poor" (with Ann Dryden Witte, Magaly Queralt, and Harriet Griesinger), NBER Working Paper # 6798.

**Invited Presentations**

AHLA Antitrust Practice Group, "Interview with Tasneem Chipty, Founder and Managing Principal of Matrix," Member Briefing, March 2018, available at https://www.healthlawyers.org/Members/PracticeGroups/Antitrust/Pages/Default.aspx.

ABA Webinar: "Market Definition in section 2 and section 7: The same but not the same? Questions of fact or law?" November 2017.

International Congress of Addictology Albatros, "Economics of Tobacco Plain Packaging: Australian Legislation," May 2017.

Federal Communication Commission's Event on Challenges Facing Independent Programmers, April 2016, available at: https://www.youtube.com/watch?v=8yxC_3M4IWA.

Federal Communication's Panel on Challenges Facing Multichannel Video Programming Distributors, March 2016, available at: https://www.youtube.com/watch?v=03CMDtdpRDQ.

ABA Webinar: "Sports Leagues Claims After 5 Years After American Needle," 2015.

NYSBA Antitrust Class Action Program: "Comcast v. Behrend:  Interpretation and Application of *Comcast* to Damages Issues in Class Certification," 2015.

AHLA Annual Meetings: "Antitrust and Provider Mergers and Affiliations: Competition vs. More Affordable Care?" 2015.

AHLA Webinar: "Antitrust Implications and Lessons Learned from the Ninth Circuit Decision in *St. Luke's*," 2015.

ABA Webinar: "St. Lukes: State and Federal Enforcement in Non-Reportable Program," 2015.

NYC Bar Antitrust and Healthcare Program, 2015.

NYSBA Antitrust Law Section Annual Meetings: "Efficiencies:  The Cheshire Cat of Merger Analysis," 2014.

NYC Bar Antitrust & Trade Regulation Committee: "Approaches to Antitrust Damages," 2014.

## PROFESSIONAL SERVICE

Defendant's expert at the ABA Mock Trial involving the issue exclusivity, in the form of theaters' use of clearances, 2017.
Vice Chair of the Antitrust Practice Group of the American Health Lawyers Association, 2014-2016.
Advisory board of the Pricing Conduct Committee, 2011-2012.
Editorial comments on a chapter of the ABA's *Price Discrimination Handbook*, 2011.
Plaintiffs' expert at the ABA Mock Trial involving the issue of resale price maintenance, 2008.
Editorial comments on a chapter of the ABA's book on *Market Definition*, 2008.
Contribution to the ABA's *Econometrics Legal, Practical, and Technical Issues*, 2005.

## MEMBERSHIPS

American Health Lawyers Association (AHLA)
American Bar Association (ABA)
American Economic Association

## HONORS

National Science Foundation Fellowship, 1989-1992
Phi Beta Kappa, 1988

## Appendix B: Materials Considered

### I.    Expert Reports and Declarations

- Declaration of Dr. Gautam Gowrisankaran in Support of Defendant's Motion for Summary Judgment, October 5, 2017.

- Declaration of David V. Axene in Support of Plaintiffs' Motion for Class Certification, June 21, 2018.

- Declaration of Dr. Tasneem Chipty in Opposition to Motion for Summary Judgement, May 26, 2018.

### II.   Expert Reports and Declarations in the UFCW & Employers Benefit Trust v. Sutter Health Matter

- Declaration of Aldo De La Torre in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017.

- Declaration of Becky LaCroix-Milani in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017.

- Declaration of Chandra Welsh in Connection with Plaintiff UEBT's Motion for Class Certification, February 8, 2017.

- Declaration of David Joyner in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017.

- Declaration of Janet Lundbye in Connection with Plaintiff UEBT's Memorandum in Support of its Motion for Class Certification, February 6, 2017.

- Declaration of Jeff Sprague in Support of Defendants' Opposition to UEBT's Motion for Class Certification, April 11, 2017.

- Declaration of Michael Ramseier in Connection with Plaintiff UEBT's Motion for Class Certification, February 6, 2016.

- Declaration of Steve Melody in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017.

- Declaration of Tracy Barnes in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017.

**III.   All Depositions and Associated Exhibits**

- Deposition of Chris Mathewson, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* May 15, 2018.

- Deposition of Jeff Sprague, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health,* May 17, 2018.

- Deposition of Peter Anderson, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* August 31, 2017.

- Deposition of Tracy Barnes, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* January 1, 2018.

- Deposition of Michael Beuoy, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* May 2, 2018.

- Deposition of Melissa Brendt, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, May 15, 2018.

- Deposition of Melissa Brendt, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, June 13, 2016.

- Deposition of John Chason, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, May 25, 2018.

- Deposition of Gautam Gowrisankaran, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* February 6, 2018.

- Deposition of Stephen Lockhart, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health,* November 8, 2016.

- Deposition of Robert Reed, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* October 17, 2017.

- Deposition of Tammy Tomcyzk, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* April 30, 2018.

- Deposition of Aldo de la Torre, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, March 13, 2017.

- Deposition of Kris Vine, *In the Matter of Sutter/Summit,* July 31, 2003.

- Deposition of Chandra Welsh, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, April 12, 2017.

## IV.   Legal Documents

- Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification, *Djeneba Sidibe et al. on Behalf of Themselves and All Others Similarly Situated, v. Sutter Health*, June 22, 2018.

- Fourth Amended Complaint, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health*, September 29, 2017.

- Class Action Complaint, *UFCW & Employers Benefit Trust v. Sutter Health; Sutter East Bay Hospitals; Sutter West Bay Hospitals; Eden Medical Center; Sutter Central Valley Hospitals; Mills-Peninsula Health Services; Sutter Health Sacramento Sierra Region; Sutter Coast Hospital; Palo Alto Medical Foundation for Healthcare, Research and Education; and Sutter Medical Foundation*, April 7, 2014.

## V.   Produced Documents

- ABCLH008005

- ABCLH054780
- ABCLH108094
- ABCLH115049
- ABCLH117043
- ABCLH120166
- ABCLH123497
- ABCLH162555
- ABCLH172907
- ABCLH379969
- ABCLH382035
- ABCLH388256
- ABCLH396261
- ABCLH408171
- AET-ESI0001511
- AET-ESI0022876
- BSC_SutterSub00037814
- BSC_UFCW-00002428
- BSC_UFCW-00002953
- BSC_UFCW-00007608
- BSC_UFCW-00003134
- BSC_UFCW-00003325
- BSC_UFCW-00008342
- BSC_UFCW-00011799

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**          B - 4

- BSC_UFCW-00045000

- BSC_UFCW-00045202

- BSC_UFCW-00099460

- BSC_UFCW-00121265

- BSC_UFCW-00174271

- BSC_UFCW-00200169

- BSC-UEBT-0000001

- BSC-UEBT-0005326

- BSC-UEBT-0005339

- BSC-UEBT-0009556

- BSC-UEBT-0031648

- BSC-UEBT-0037886

- Cigna_6-16-00013085

- DEF000049921

- DEF000094390

- DEF000094517

- DEF000095680

- DEF000096188

- DEF000096837

- DEF000097580

- DEF000097795

- DEF000102373

- DEF000122903

- DEF000148126

- DEF000151711

- DEF000176667

- DEF000186441

- DEF000206743

- DEF000208068

- DEF000227544

- DEF000228654

- DEF000234584

- DEF000251505

- DEF000325395

- DEF000423609

- DEF000895660

- DEF001361203

- DEF001458429

- DEF001786799

- DEF001993646

- DEF001993700

- DEF001993762

- DEF001993774

- DEF002008388

- DEF002017968

- DEF002040107

- DEF002065731

- DEF002198178

- DEF002278956

- DEF002583666

- DEF002646081

- DEF002647676

- DEF002660141

- DEF002662374

- DEF002763553

- DEF003691525

- DEF003728623

- DEF003741120

- DEF003741121

- DEF004260229

- DEF004447422

- DEF004687098

- DEF004963326

- DEF004963336

- DEF004963337

- DEF004963344

- DEF00661911

- DEF00877866

- PROD00287444

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**          B - 7

- STCA0004697

- STCA0006807

- STCA0060998

- STCA0117621

- STCA0125576

- STCA0234063

- STCA0274993

- STCA0281559

- STCA0285864

- STCA0433707

- STCA0461852

- STCA0588271

- STCA0602090

- STCA0626073

- STCA0630549

- UHC-00000005

- UHC-00035140

- UHC-00073965

- UHC-00134453

- UHC-00148539

- UHC-00149371

- UHC-00171576

- UHC-00184183

- UHC-00207585

- UHC-00210338

- UHC-005058737

- UHC-005085987

## VI. Data Sources

- American Hospital Directory, "Free Hospital Profiles," available at https://www.ahd.com/search.php, *site visited* May 23, 2018.

- Aetna, "1495757742035.xls," April 1, 2014.

- Blue Shield Premiums Data

- Anthem Claims Data, SIDIBE_ABC_0139333 through SIDIBE_ABC_0139352.

- Anthem Premiums Data, SIDIBE_ABC_0139353 through SIDIBE_ABC_0139360.

- California Department of Finance, "Consumer Price Index," available at http://www.dof.ca.gov/Forecasting/Economics/Indicators/Inflation/, *site visited* June 10, 2018.

- California Department of Managed Health Care, "Unified Rate Review Template filings," available at http://wpso.dmhc.ca.gov/premiumratereview/searchratefilings, site visited June 16, 2017.

- California Health Care Foundation, "California Health Insurers Enrollment Database," available at https://www.chcf.org/wp-content/uploads/2018/01/CaliforniaHealthInsurersEnrollmentDataPublished2018.zip, *site visited* March 17, 2018.

- California Office of Statewide Health Planning and Development, "Hospital Annual Financial Data," available at https://www.oshpd.ca.gov/documents/HID/HospitalFinancial/Pivot/HAFDDoc2013.pdf, *site visited* April 13, 2018.

- California Office of Statewide Health Planning and Development, "Hospital Annual Financial Data: Complete Data Set," available at https://www.oshpd.ca.gov/HID/Hospital-Financial.html, *site visited* May 23, 2018.

- California Office of Statewide Health Planning and Development, "Hospital Annual Financial Data: Pivot Profiles," available at https://www.oshpd.ca.gov/HID/Hospital-Financial.html, *site visited* May 23, 2018.

- California Office of Statewide Health Planning and Development, "Patient Discharge Data," available by request at https://www.oshpd.ca.gov/HID/Patient-Discharge-Data.html, *site visited* May 23, 2018.

- California Office of Statewide Health Planning and Development, "Patient Discharge Data (PDD) Data Dictionary Public Use File," available at https://www.oshpd.ca.gov/documents/HID/Data_Request_Center/puf/DataDictionary_Public_PDD.pdf, *site visited* March 1, 2017.

- Centers for Medicare & Medicaid Services, "Historical Impact Files," available at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/Historical-Impact-Files-for-FY-1994-through-Present.html, *site visited* May 23, 2018.

- Google, "Distance Matrix API," available at https://developers.google.com/maps/documentation/distance-matrix/intro, *site visited* May 23, 2018.

- Internal Revenue Service, "Individual Income Tax ZIP Code Data," available at https://www.irs.gov/statistics/soi-tax-stats-individual-income-tax-statistics-zip-code-data-soi, *site visited* May 23, 2018.

- Internal Revenue Service, "SOI Tax Stats - County Data," available at https://www.irs.gov/statistics/soi-tax-stats-county-data, *site visited* June 7, 2018.

- Kennedy, Peter, "Estimation with Correctly Interpreted Dummy Variables in Semilogarithmic Equations," American Economic Review, Vol. 71, No. 4, 1981, pp. 801-802.

- The Dartmouth Atlas of Health Care, "Geographic Crosswalks and Research Files - HSA Boundaries - Geographic Boundary Files," available at http://www.dartmouthatlas.org/downloads/geography, *site visited* July 31, 2017.

- United States Census, "Cartographic Boundary Shapefiles," available at https://www.census.gov/geo/maps-data/data/tiger-cart-boundary.html, *site visited* June 14, 2018.

- National Bureau of Economic Research, "CMS's SSA to FIPS CBSA and MSA County Crosswalk," available at http://www.nber.org/data/cbsa-msa-fips-ssa-county-crosswalk.html, *site visited* June 14, 2018.

- National Bureau of Economic Research, "CBSA to FIPS County Crosswalk," available at http://www.nber.org/data/cbsa-fips-county-crosswalk.html, *site visited* June 14, 2018.

- United States Census Bureau, "Download 2010 ZIP Code Tabulation Area (ZCTA) Relationship Files," available at https://www.census.gov/geo/maps-data/data/zcta_rel_download.html, *site visited* June 14, 2018.

- Centers for Medicare and Medicaid Services, "California Geographic Rating Areas: Including State Specific Geographic Divisions," available at https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Market-Reforms/ca-gra.html, *site visited* June 14, 2018.

- Centers for Medicare and Medicaid Services, "Hospital Compare data," available at https://data.medicare.gov/data/archives/hospital-compare, *site visited* June 9, 2018.

- National Bureau of Economic Research, "Diagnosis-Related Group (DRG) Weight Data - - DRG MDC Crosswalk - Major Diagnostic Category," available at http://www.nber.org/data/drg.html, *site visited* April 5, 2018.

- United States Census Bureau, "Employment Status: 2011-2015 American Community Survey 5-Year Estimates," available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_5YR_S2301, *site visited* April 10, 2018.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

- United States Census Bureau, "FIPS Codes for Counties and County Equivalent Entities," available at https://www2.census.gov/geo/docs/reference/codes/files/national_county.txt, *site visited* June 20, 2018.

## VII.   Other Materials Considered

- "§ 70005. General Acute Care Hospital," available at https://govt.westlaw.com/calregs/Document/ID7B72350D4BB11DE8879F88E8B0DAA AE?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPa geItem&contextData=(sc.Default), *site visited* May 11, 2018.

- American Academy of Actuaries, "Potential Implications of the Small Group Definition Expanding to Employers with 51-100 Employees," available at https://www.actuary.org/files/Small_group_def_ib_030215.pdf, *site visited* June 12, 2018.

- American Bar Association, Econometrics: Legal, Practical, and Technical Issues, 2nd Edition, Chicago, Illinois: ABA Publishing, 2014.

- American Bar Association, Proving Antitrust Damages: Legal and Economic Issues, 3rd Edition, Chicago, Illinois: ABA Publishing, 2017.

- American College of Surgeons, "Searching for Verified Trauma Centers," available at https://www.facs.org/search/trauma-centers, *site visited* March 17, 2018.

- Austin, D. Andrew and Thomas Hungerford, "The Market Structure of the Health Insurance Industry," Congressional Research Service Report for Congress, May 25, 2010, available at https://fas.org/sgp/crs/misc/R40834.pdf, *site visited* October 24, 2017.

- Baker, Jonathan, "Note on 'Single Monopoly Profit' Theory," available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2496932, *site visited* June 4, 2018

- Barker, Abigail, Timothy McBride, Leah Kemper, Keith Mueller, "Geographic Variation in Premiums in Health Insurance Marketplaces," RUPRI Center for Rural Health Policy Analysis, available at https://www.public-health.uiowa.edu/rupri/publications/policybriefs/2014/Geographic%20Variation%20in%

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

20Premiums%20in%20Health%20Insurance%20Marketplaces.pdf, *site visited* March 26, 2018.

- Bilimoria, Karl Y. and Cynthia Barnard. "The New CMS Hospital Quality Star Ratings. The Stars Are Not Aligned." JAMA, Vol. 316, No. 17, 2006.

- Bulow, Jeremy I. and Paul Pfleiderer, "A Note on the Effect of Cost Changes on Prices," Journal of Political Economy, Vol. 6, No. 1, 1983.

- CalHealth.Net, "Anthem Blue Cross Over Versus Kaiser-The Heavyweights of California", available at  https://www.calhealth.net/Kaiser-versus-Anthem-California.htm, *site visited* April 8, 2018

- California Department of Insurance, "Provider Network Adequacy", available at http://www.insurance.ca.gov/01-consumers/110-health/10-basics/pna.cfm, *site visited* April 12, 2018.

- California Health Care Foundation, "Insurance Markets," June 2003, available at https://www.chcf.org/wp-content/uploads/2017/12/PDF-HIMURegulatoryOversight.pdf, *site visited* March 18, 2018

- California Office of Statewide Health Planning and Development, "Hospital Annual Financial Data," June 30,2004, available at https://www.oshpd.ca.gov/documents/HID/HospitalFinancial/Pivot/HAFDDoc2013.pdf, *site visited* April 13, 2018.

- California Department of Managed Health Care, "Key Terms," available at http://www.dmhc.ca.gov/HealthCareinCalifornia/PremiumRateReview/KeyTerms.aspx, *site visited* March 17, 2018

- Capps, Cory and David Dranove, "Hospital Consolidation and Negotiated PPO Prices," *Health Affairs*, Vol. 23, No. 2, 2004.

- Centers for Medicare & Medicaid Services, "Center for Clinical Standards and Quality/Survey & Certification Group Memorandum," March 11, 2016, available at https://www.cms.gov/Medicare/Provider-Enrollment-and-

Certification/SurveyCertificationGenInfo/Downloads/Survey-and-Cert-Letter-16-09.pdf, *site visited* March 26, 2018.

- Ciliberto, Frederico and David Dranove, "The Effect of Physician-Hospital Affiliation on Hospital Prices in California," *Journal of Health Economics*, Vol. 25, 2006.

- Cothran, Josh, "The Private Insurance Market in California, 2015," California Healthcare Foundation, available at https://www.chcf.org/publication/the-private-insurance-market-in-california-2015/, *site visited* March 17, 2018

- Cromwell, Jerry, Walter Adamache and Edward Drozd, "BBA Impacts on Hospital Residents, Finances, and Medicare Subsidies," Health Care Financing Review, Vol. 28, No. 1, 2006.

- Dafny, Leemore S., Hendel, Igal, Marone, Victoria, and Christopher Ody, "Narrow Networks on the Health Insurance Marketplaces: Prevalence, Pricing, and the Cost of Network Breadth," *Health Affairs*, Vol. 36, No. 9, 2017.

- Dafny, Leemore, Kate Ho, and Robin S. Lee, "The Price Effects of Cross-Market Hospital Mergers," Working Paper, issued March 2016, revised June 2018, available at http://www.nber.org/papers/w22106.pdf, *site visited* June 15, 2018.

- Delbanco, Suzanne, Robert Berenson, Divvy Upadhyay, and Roslyn Murray, "Understanding How Payment and Benefit Designs Work Together In Health Care," available at http://www.healthaffairs.org/do/10.1377/hblog20160525.055020/full/, *site visited* November 13, 2017.

- Delbanco, Suzanne, Roslyn Murray, Robert A. Berenson, and Divvy K. Upadhyay, "A Typology of Benefit Designs," *Urban Institute*, April 2016, available at https://www.urban.org/sites/default/files/publication/80321/2000780-A-Typology-of-Benefit-Designs.pdf, *site visited* April 18, 2018.

- Dranove, David and Richard Ludwick, "Competition and Pricing by Non-Profit Hospitals: A Reassessment of Lynk's Analysis," *Journal of Health Economics*, Vol. 18, 1999.

- Dranove, David, "Pricing by Non-Profit Institutions: the Case of Hospital Cost Shifting," *Journal of Health Economics*, Vol. 7, 1988.

- Dranove, David, Richard Lindrooth, William White, and Jack Zwanziger, "Is the Impact of Managed Care on Hospital Prices Decreasing?," *Journal of Health Economics*, Vol. 27, 2008.

- Dranove, David, Mark Shanley, and William White, "Price and Concentration in Hospital Markets: The Switch from Patient-Driven to Payer-Driven Competition," *Journal of Law and Economics*, Vol. 36, No. 1, 1993.

- Farrell, Joseph, David Balan, Keith Brand, and Brett Wendling, "Economics at the FTC: Hospital Mergers, Authorized Drugs, and Consumer Credit Markets," *Review of Industrial Organization*, Vol. 39, No. 4, 2011.

- Federal Trade Commission, "Tying the Sale of Two Products," available at https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/single-firm-conduct/tying-sale-two-products, *site visited* March 19, 2018.

- Feng, Zhanlian, David C. Grabowski, Orna Intrator, and Vincent Mor, "The Effect of State Medicaid Case-Mix Payment on Nursing Home Resident Acuity," *Health Services Research*, Vol. 41, No. 4, 2006, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1797088/#, *site visited* June 14, 2018

- Fox, Will and John Pickering, "Cost Efficiency at Hospitals Facilities in California: A Report Based on Publicly Available Data," Milliman, available at http://www.pbgh.org/storage/documents/reports/Milliman_OSHPD_Report_FINAL_200 71017.pdf, *site visited* June 18, 2018.

- Frakt, Austin, "Teaching Hospitals Cost More, but Could Save Your Life," *The New York Times*, June 5, 2017, available at https://www.nytimes.com/2017/06/05/upshot/teaching-hospitals-cost-more-but-could-save-your-life.html.

- Gapenski, Louis C., and Kristin L. Reiter, "Online Appendix B: Operating Indicator Ratios," *Healthcare Finance: An Introduction to Accounting and Financial Management*, available at

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

https://www.ache.org/pubs/hap_companion/gapenski_finance/online%20appendix%20b.pdf, *site visited* June 14, 2018

- Greene, William H., *Econometric Analysis*, 5th edition, Upper Saddle River, New Jersey: Prentice Hall, 2003.

- Guerin-Calvert, Margaret and Guillermo Israilevich, "Assessment of Cost Trends and Price Differences for U.S. Hospitals," available at https://www.aha.org/system/files/content/11/11costtrendspricediffreport.pdf, *site visited* June 12, 2018

- Halvorsen, Robert, and Raymond Palmquist, "The Interpretation of Dummy Variables in Semilogarithmic Equations," *The American Economic Review*, Vol. 70, No. 3, 1980, pp. 474 – 475.

- Hansen, John, "The Department of Managed Health Care Regulates California Health Plans and Protects Consumers," Health for California Insurance Center, available at https://www.healthforcalifornia.com/the-department-of-managed-health-care-regulates-california-health-plans-protects-consumers, *site visited* April 12, 2018.

- Ho, Kate and Robin Lee, "Equilibrium Provider Networks: Bargaining and Exclusion in Health Care Markets," Working Paper, issued August 2017, revised May 2018, available at http://www.nber.org/papers/w23742.pdf, *site visited* May 23, 2018.

- Huron Healthcare, "Case Mix Index: Analyzing Case Mix Index and the Impact on CDI Programs," 2016, available at https://www.huronconsultinggroup.com/resources/healthcare/case-mix-index-analyzing-cmi, *site visited* June 12, 2018.

- Kaiser Family Foundation, "Explaining Health Care Reform: Medical Loss Ratio (MLR)," February 29, 2012, available at https://www.kff.org/health-reform/fact-sheet/explaining-health-care-reform-medical-loss-ratio-mlr/, *site visited* June 5, 2018.

- Kaiser Permanente, "Fast Facts About Kaiser Permanente," available at https://share.kaiserpermanente. org/article/fast-facts-about-kaiser-permanente/, *site visited* March 17, 2018.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

- Keeler, Emmett, Glenn Melnick and Jack Zwanziger, "The Changing Effect of Competition on Non-Profit and For-Profit Hospital Pricing Behavior," *Journal of Health Economics*, Vol. 18, 1999.

- Kennedy, Peter *A Guide to Econometrics*, Cambridge, MA: The MIT Press, 5th edition, 2003.

- Kessler, Daniel and Mark McLellan, "Is Hospital Competition Socially Wasteful?" *Quarterly Journal of Economics*, Vol. 115, No. 2, 2000.

- London, Katherine, Thomas Friedman, Michael Grenier, and Paul Swoboda, "Analysis of Price Variations in New Hampshire Hospitals," University of Massachusetts Medical School, available at https://www.nh.gov/insurance/reports/documents/umms_summary.pdf, *site visited* June 14, 2018

- Melnick, Glenn and Katya Fonkych, "Hospital Price Increases in California, Especially Among Hospitals in the Largest Multi-Hospital Systems," *The Journal of Health Care Organization, Provision, and Financing*, Vol. 53, 2016.

- Moore, David S., George P. McCabe, and Bruce A. Craig, *Introduction to the Practice of Statistics*, 6th Edition, New York, NY: W.H. Freeman and Company, 2009.

- Newgard, Craig D. and Robert A. Lowe, "Cost Savings in Trauma Systems: The Devil's in the Details," *Annals of Emergency Medicine*, Vol. 67, No. 1, 2016.

- NIS Description of Data Elements, "HOSP_TEACH – Teaching status of hospital," available at https://www.hcup-us.ahrq.gov/db/vars/hosp_teach/nisnote.jsp, *site visited* June 12, 2018.

- Pindyck, Robert S. and Daniel L. Rubinfeld, *Microeconomics*, 8th edition, Boston, Massachusetts: Prentice Hall, 2013.

- Polsky, Daniel, Zuleyha Cidav, and Ashley Swanson, "Marketplace Plans with Narrow Physician Networks Feature Lower Monthly Premiums than Plans with Larger Networks," *Health Affairs*, Vol. 35, No. 10, 2016.

- Rubinfeld, Daniel L. "Quantitative Methods in Antitrust," Issues in Competition Law and Policy, *ABA Antitrust Law*, American Bar Association, 2008.

- Rubinfeld, Daniel L., and Justin McCrary, "Measuring Benchmark Damages in Antitrust Litigation," *Journal of Econometric Methods*, Vol. 3, No. 1, 2014.

- Rubinfield, Daniel L.  "Reference Guide on Multiple Regressions," in *Reference Manual on Scientific Evidence*, 2011, 3rd Edition, available at https://www.fjc.gov/sites/default/files/2015/SciMan3D08.pdf, *site visited* June 4, 2018.

- Salkever, David S., "The Use of Dummy Variables to Compute Predictions, Prediction Errors, And Confidence Intervals," *Journal of Econometrics*, Vol. 4, 1976.

- Sanchez, Jeffrey and James Welch, "Special Commission on Provider Price Variation Report," March 15, 2017.

- Sanger-Katz, Margot and Kevin Quealy, "Where Health Care Is Better and Cheaper: Answers to 10 Questions," *The New York Times*, December 18, 2015, available at https://www.nytimes.com/interactive/2015/12/18/upshot/19up-healthcosts.html.

- Shorr, Steve, "Rating region standardization," 2018, available at https://steveshorr.com/steveshorr/individual_and_family/Covered.CA/legislation/standard.rating.regions.pdf, *site visited* March 19, 2018.

- Sutter Health, "Sutter Santa Rosa History," available at https://www.sutterhealth.org/ssrrh/about/history/history-ssrrh, *site visited* April 2, 2018.

- Sutter Health, "What is a Trauma Center?" available at https://www.sutterhealth.org/services/emergency/trauma-centers, *site visited* March 17, 2018.

- Sutter Health, "What is Sutter Health," available at https://www.sutterhealth.org/about/what-is-sutter-health, *site visited* May 17, 2018.

- Tenn, Steven, "The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction," *International Journal of the Economics of Business*, Vol. 18, No. 1, 2011.

- The Center for the Evaluation of Clinical Services, "The Dartmouth Atlas of Health Care," available at http://www.dartmouthatlas.org/downloads/atlases/96Atlas.pdf, *site visited* April 4, 2018.

- The Dartmouth Atlas of Health Care, "Glossary," available at http://www.dartmouthatlas.org/tools/glossary.aspx, *site visited* April 4, 2018.

- U.S. Department of Justice, "Statement of Antitrust Enforcement Policy Regarding Accountable Care Organizations Participating in the Medicare Shared Savings Program." *Federal Register*, Vol. 76, No. 209, 2011, available at https://www.gpo.gov/fdsys/pkg/FR-2011-10-28/pdf/2011-27944.pdf, *site visited* April 24, 2018.

- Vistnes, Gregory, "Hospitals, Mergers, and Two-Stage Competition," *Antitrust Law Journal*, Vol. 67, No. 3, 2000.

- Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach*, 5th Edition, Mason, Ohio: Thomson South-Western, 2012.

**Appendix C: Description of Anthem Overcharge Regression Dataset**

1.      This Appendix describes the dataset used in the ████ overcharge regression analysis as well as in the estimation of damages. It discusses the different data sources used to create the overcharge regression dataset and the various filters applied to the data. In addition, the appendix provides a summary of the Sutter Damage Hospitals and the benchmark hospitals used in the overcharge regression analysis.

*A.*      ████ *Overcharge Regression Dataset*

2.      The overcharge regression analysis is based on ████████████ covering the period between January 2006 and December 2015. These data contain information, ████████ on the inpatient hospital services received ████████████ including information on the diagnosis associated with care received, the location of the service, and the allowed amount on the claim. In addition, for each year in the period 2006-2015 I obtain data on hospital level characteristics from the OSHPD Patient Discharge Data ("PDD"), the OSHPD Hospital Annual Financial Disclosure Data Complete Data Set and the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles Tables, the Center for Medicare & Medicaid Services (CMS), and the Google Maps Distance Matrix API.

- Hospital-level information, including hospital beds, system affiliation,[1] teaching status and trauma level, is obtained from the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles and from the OSHPD Hospital Annual Financial Disclosure Data Complete Data Set;

- Hospital quality information is obtained from the CMS;

- DRG weights are from the CMS;

- The number of competitors within a 30-minute drive from each hospital is determined using the Google Maps Distance Matrix API;

---

[1] Systems were defined based on each hospital's system name from the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, which is populated for all systems with at least three hospitals. In addition to the system field, I use the owner field to assign hospitals to systems. *See* Chipty Workpapers.

3.       Observations ██████████████ are identified by a CMS ID and observations in the OSHPD datasets are identified by an OSHPD ID. The two datasets are merged together using a linking ("crosswalk") table which provides a mapping between ████████ CMS IDs and the corresponding OSHPD IDs by year. When a certain CMS ID – year combination does not have a corresponding OSHPD ID, the OSHPD ID from the closest available year is assigned. If a CMS ID is not found in any year, the claims data is dropped for a lack of information. Where multiple OSHPD IDs map to the same CMS ID, the parent hospital is identified, and the smaller hospitals are dropped.

4.       In order to link model variables ████████████████ it is necessary to identify a common data field across the datasets. In order to augment ██████████ ████ with additional variables, the following methodology was used:

- OSHPD variables were merged based on the crosswalk between CMS IDs and OSHPD IDs and year.

- CMS variables are merged ██████████████ based on CMS ID and year

- IRS variables are merged to the dataset based on hospital county and year.

### B.       Data Filters and Dataset Creation

5.       The overcharge regression sample relies on claims related to the proposed Class Members. For that reason, a number of filters are applied ████████████ More specifically,

- Exclude complete duplicate records and duplicate records resulting from inconsistent provider name and address or member zip code were removed.[2]

- Limit to inpatient claims only.[3]

---

[2] Duplicate records ████████████████ esulting from inconsistent provider/patient information were determined based on all data fields excluding fields SERVICE_PROV_NM, PROV_ADRS_LINE_1_TXT, PROV_ADRS_LINE_2_TXT, PROV_CITY_NM, PROV_ST_NM, PROV_ZIP_CD, and MEMBER_ZIP.
[3] Inpatient claims were identified as records where INPAT_CD equals "Y" or TYPE_OF_BILL_CD equals "011" or "012" or the claim detail contained an accommodation revenue code (i.e., a value between 100 and 219).

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**                  C – 2

- Exclude bill types "0110", "011", "0115", "115", "0118", "0119", "011A", "011C", "011G", "011H", "011I", "011K", "011M", "011N", "011P", "011Q", "011Y", "011Z", "0120", "0129".

- Limit to ████████████████████ primary payer by requiring the PRMRY_CARR_RSPNSBLY_CD ████████████████ to equal "WLP".

- Limit to fully insured claims only by requiring field FUNDING ███████████ ██████ to equal "FI".

- Limit to in-network claims only by requiring the INN_CD ████████████████ to equal "IN".

- Limit to claims associated with members who are residents of California.

- Exclude DRG codes "UNK", "000", "795", "998", "999", "D30", "D31", "D37", "D45", "D54", "D56", "D62", "D63",  "D64", "D75", "D86", "DR>", "DRG", "KEY", "MED", "065", "V10", "V45".

- Exclude missing MDCs and MDCs "0", "19", "20".

- Limit to observations that merge by OSHPD ID and year to the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles Tables.

- Exclude claims with missing allowed amounts or DRG weights and/or non-positive allowed amounts.

- Limit to General Acute Care ("GAC") hospitals only. A GAC hospital is defined as a hospital that: (a) reports itself as "General" or "General Acute" in its annual financial disclosure to OSHPD; and (b) has a CCN whose last four digits fall within the range 0001-0879, the range specified by CMS for "Short-term (General and Specialty) Hospitals."[4]

- Remove duplicate Hospital – Year (Providence St. John's Health Center – 2014, CMS ID 50290).

- Limit to service dates in the period January 2006-December 2015.

---

[4] The first two digits of the six-digit CCN identify the state in which the hospital is located.

- Limit to hospitals in Northern California only, defined as the 48 counties north of San Luis Obispo, Kern, and San Bernardino.[5]

- Limit to claims at the Sutter Damage Hospitals and the Benchmark Hospitals.

- Limit 2006 and 2007 observations to those that merge by CMS ID to the CMI factors from the OSHPD Patient Discharge Data.

- Exclude observations for which *Patient Rating* or *Wage Index* are missing for all years in the period 2006-2015.

6.      In calculating damages, that data sample is limited to claims at the Sutter Damage Hospitals and the following observations are added back to the data sample:

- Add DRG codes "UNK", "000", "795", "998", "999", "D30", "D31", "D37", "D45", "D54", "D56", "D62", "D63", "D64", "D75", "D86", "DR>", "DRG", "KEY", "MED", "065", "V10", "V45".

- Add MDCs equal to "0".

- Add observations with missing DRG weights.

7.      Exhibit C1 summarizes the filters applied to ▮▮▮▮▮ regression dataset and the number of observations remaining in the dataset upon applying each filter along with the observations added back to the sample used for calculating damages.

---

[5] US Census Bureau; and Tenn, Steven, "The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction," *International Journal of the Economics of Business*, Vol. 18, No.1, 2011, pp. 65-82, at p.74.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**



**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**      C – 5

8.      In order to establish a case mix adjusted allowed amount for each year and each hospital, the ▮▮▮▮▮▮▮▮ ecords are rolled up to the hospital-year level by calculating hospital-year prices as the ratio of the sum of allowed dollars to the sum of the DRG weights for each hospital-year.

### C.    *Regression Sample*

9.      The final regression dataset comprises 793 hospital-year observations, 70 of which are associated with the Sutter Damage Hospitals and 723 are associated with the Benchmark Hospitals. The 793 hospital observations account for 183,049 claims, of which 25,911 (or 14.16 percent) are associated with the Sutter Damage Hospitals and the other 157,138 (85.84 percent) are associated with the Benchmark Hospitals. Exhibit 4 provides a description of the Sutter Damage Hospitals including each hospital's location and bed count.[6] Similarly, Exhibit C2 contained in this appendix describes the Benchmark Hospitals used in the regression sample.

**Exhibit C2**



---

[6] Exhibit 4 shows each hospital's licensed beds. Exhibit C2 shows the hospital's acute care beds. Acute care beds are used to calculate the system beds variable used in the regression model.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

### Exhibit C3
### Benchmark Hospitals

| Hospital | HSA | County | Beds |
|---|---|---|---|
| UCSF Medical Center | San Francisco | San Francisco | 660 |
| University Of California Davis Medical Center | Sacramento | Sacramento | 626 |
| Community Regional Medical Center | Fresno | Fresno | 594 |
| Stanford University Hospital | Stanford | Santa Clara | 566 |
| John Muir Medical Center-Walnut Creek Campus | Walnut Creek | Contra Costa | 524 |
| El Camino Hospital | Mountain View | Santa Clara | 487 |
| Santa Clara Valley Medical Center | San Jose | Santa Clara | 464 |
| St. Agnes Medical Center | Fresno | Fresno | 436 |
| Kaweah Delta Medical Center | Visalia | Tulare | 403 |
| Doctors Medical Center | Modesto | Stanislaus | 392 |
| Mercy San Juan Hospital | Carmichael | Sacramento | 370 |
| Good Samaritan Hospital- San Jose | San Jose | Santa Clara | 366 |
| Washington Hospital - Fremont | Fremont | Alameda | 359 |
| St. Joseph's Medical Center Of Stockton | Stockton | San Joaquin | 338 |
| O'Connor Hospital | San Jose | Santa Clara | 334 |
| John Muir Medical Center-Concord Campus | Concord | Contra Costa | 313 |
| St. Mary's Medical Center-San Francisco | San Francisco | San Francisco | 300 |
| Dominican Santa Cruz Hospital - Soquel | Santa Cruz | Santa Cruz | 294 |
| Santa Rosa Memorial Hospital | Santa Rosa | Sonoma | 291 |
| Rideout Memorial Hospital | Marysville | Yuba | 291 |
| Sequoia Hospital | Redwood City | San Mateo | 279 |
| Mercy General Hospital | Sacramento | Sacramento | 274 |
| Salinas Valley Memorial Hospital | Salinas | Monterey | 269 |
| St. Francis Memorial Hospital | San Francisco | San Francisco | 267 |
| Mercy Medical Center | Redding | Shasta | 266 |
| Seton Medical Center | Daly City | San Mateo | 255 |
| Regional Medical Center Of San Jose | San Jose | Santa Clara | 247 |
| Shasta Regional Medical Center | Redding | Shasta | 246 |
| Community Hospital Of The Monterey Peninsula | Monterey | Monterey | 242 |
| Marin General Hospital | Greenbrae | Marin | 218 |
| Emanuel Medical Center | Turlock | Stanislaus | 209 |
| Enloe Medical Center - Esplanade Campus | Chico | Butte | 208 |
| Valleycare Medical Center | Pleasanton | Alameda | 202 |
| Dameron Hospital | Stockton | San Joaquin | 202 |
| Adventist Medical Center - Hanford | Hanford | Kings | 199 |
| Hanford Community Hospital | Hanford | Kings | 199 |
| San Joaquin General Hospital | Stockton | San Joaquin | 196 |
| St. Rose Hospital | Hayward | Alameda | 195 |
| Lodi Memorial Hospital | Lodi | San Joaquin | 190 |
| Doctors Medical Center - San Pablo | San Pablo | Contra Costa | 189 |
| Mercy Medical Center Merced - Community Campus | Merced | Merced | 186 |
| North Bay Medical Center | Fairfield | Solano | 180 |

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Exhibit C3 (continued)**
**Benchmark Hospitals**

| Hospital | HSA | County | Beds |
|---|---|---|---|
| Queen Of The Valley Hospital | Napa | Napa | 177 |
| St. Joseph Hospital - Eureka | Eureka | Humboldt | 174 |
| Methodist Hospital Of Sacramento | Sacramento | Sacramento | 162 |
| Oroville Hospital | Oroville | Butte | 133 |
| Natividad Medical Center | Salinas | Monterey | 130 |
| Sierra View District Hospital | Porterville | Tulare | 128 |
| San Ramon Regional Medical Center | San Ramon | Contra Costa | 123 |
| Community Hospital Of Los Gatos | San Jose | Santa Clara | 113 |
| Clovis Community Medical Center | Fresno | Fresno | 109 |
| Tulare District Hospital | Fresno | Tulare | 108 |
| Madera Community Hospital | Madera | Madera | 106 |
| Watsonville Community Hospital | Watsonville | Santa Cruz | 106 |
| Mercy Hospital - Folsom | Folsom | Sacramento | 106 |
| Sierra Nevada Memorial Hospital | Grass Valley | Nevada | 104 |
| George L. Mee Memorial Hospital | King City | Monterey | 100 |
| Alameda Hospital | Alameda | Alameda | 100 |
| Feather River Hospital | Paradise | Butte | 100 |
| San Mateo Medical Center | San Mateo | San Mateo | 100 |
| San Leandro Hospital | San Leandro | Alameda | 93 |
| Marshall Medical Center | Placerville | El Dorado | 91 |
| St. Helena Hospital | Deer Park | Napa | 91 |
| Woodland Memorial Hospital | Vacaville | Yolo | 88 |
| Sonora Regional Medical Center-Greenley | Sonora | Tuolumne | 84 |
| Mad River Community Hospital | Arcata | Humboldt | 80 |
| Petaluma Valley Hospital | Petaluma | Sonoma | 80 |
| Ukiah Valley Medical Center - Hospital Drive | Ukiah | Mendocino | 78 |
| Doctors Hospital Of Manteca | Manteca | San Joaquin | 73 |
| St. Louise Regional Hospital | Gilroy | Santa Clara | 72 |
| Barton Memorial Hospital | South Lake Tahoe | El Dorado | 69 |
| St. Elizabeth Community Hospital | Red Bluff | Tehama | 66 |
| Fresno Heart & Surgical Hospital | Fresno | Fresno | 57 |
| Sonoma Valley Hospital | Sonoma | Sonoma | 56 |
| Chinese Hospital | San Francisco | San Francisco | 54 |
| Vaca Valley Hospital | Vacaville | Solano | 50 |
| Hazel Hawkins Memorial Hospital | Hollister | San Benito | 49 |
| Sierra Kings District Hospital | Fresno | Fresno | 44 |
| Colusa Regional Medical Center | Colusa | Colusa | 42 |
| Palm Drive Hospital | Sebastopol | Sonoma | 37 |
| Mark Twain St. Joseph's Hospital | San Andreas | Calaveras | 36 |
| Central Valley General Hospital | Hanford | Kings | 36 |
| Oak Valley District Hospital | Oakdale | Stanislaus | 35 |
| Mendocino Coast District Hospital | Fort Bragg | Mendocino | 34 |
| Fresno Surgical Hospital | Fresno | Fresno | 27 |
| Northern Inyo Hospital | Bishop | Inyo | 25 |
| Tahoe Forest Hospital | Truckee | Nevada | 25 |
| Corcoran District Hospital | Corcoran | Kings | 24 |
| Coalinga Regional Medical Center | Coalinga | Fresno | 24 |
| Stanislaus Surgical Hospital | Modesto | Stanislaus | 23 |
| Modoc Medical Center | Alturas | Modoc | 16 |

*Notes*:

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2015.

2. Beds shown are the count of acute beds for each benchmark hospital in 2011. 12 benchmark hospitals did not have a pivot profile in 2011. For these 12 hospitals, the count of beds from the most recent pivot profile is shown. There are 91 benchmarks hospitals across 2006 – 2015, though not all appear in a single year.

*Sources:*

1. ██████████████████████

2. OSHPD Hospital Annual Financial Disclosure Data, 2006-2015.

3. Centers for Medicare & Medicaid Services (CMS) Impact Files, 2006-2015.

4. Centers for Medicare & Medicaid Services (CMS) Hospital Compare Data, 2006-2015.

5. Google Maps Distance Matrix API

6. National Bureau of Economic Research (NBER) DRG Weights, 2006-2015.

7. American Hospital Directory "Free Hospital Profiles."

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**        C – 9