1  Jeffrey A. LeVee (State Bar No. 125863)
   jlevee@jonesday.com
2  JONES DAY
   555 South Flower Street
3  Fiftieth Floor
   Los Angeles, CA  90071.2300
4  Telephone:   +1.213.489.3939
   Facsimile:   +1.213.243.2539
5
   David C. Kiernan (State Bar No. 215335)
6  dkiernan@jonesday.com
   Brian G. Selden (State Bar No. 261828)
7  bgselden@jonesday.com
   Matthew J. Silveira (State Bar No. 264250)
8  msilveira@jonesday.com
   JONES DAY
9  555 California Street, 26th Floor
   San Francisco, CA  94104
10 Telephone:   415.626.3939
   Facsimile:   415.875.5700
11

   Robert H. Bunzel (State Bar No. 99395)
   rbunzel@bzbm.com
   Patrick M. Ryan (State Bar No. 203215)
   pryan@bzbm.com
   Oliver Q. Dunlap (State Bar No. 225566)
   odunlap@bzbm.com
   BARTKO, ZANKEL, BUNZEL & MILLER
   One Embarcadero Center, Suite 800
   San Francisco, CA 94111
   Telephone: (415) 956-1900
   Facsimile: (415) 956-1152

   Attorneys for Defendant
12 SUTTER HEALTH

13

14

15                     UNITED STATES DISTRICT COURT

16                    NORTHERN DISTRICT OF CALIFORNIA

17                       SAN FRANCISCO DIVISION

18

19  DJENEBA SIDIBE, et al.,                    Case No. 3:12-CV-04854-LB

20            Plaintiffs,                       **DEFENDANT SUTTER HEALTH'S**
                                                **OPPOSITION TO PLAINTIFFS'**
21       v.                                     **MOTION TO EXCLUDE EXPERT**
                                                **REPORT OF DR. GOWRISANKARAN**
22  SUTTER HEALTH,

            Defendant.                          Date: November 8, 2018
23                                              Time: 9:30 a.m.
                                                The Honorable Laurel Beeler
24

25

26

27            <u>**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**</u>

28

1

## TABLE OF CONTENTS

2

Page

3   I.      STATEMENT OF ISSUE TO BE DECIDED ................................................................ 1

4   II.     INTRODUCTION ......................................................................................................... 1

5   III.    BACKGROUND ........................................................................................................... 3

6           A.      Plaintiffs' Alleged Geographic Markets ......................................................... 3

7           B.      Dr. Gowrisankaran's Testimony .................................................................... 5

8   IV.     LEGAL STANDARD .................................................................................................... 6

9   V.      ARGUMENT ................................................................................................................. 6

10          A.      Dr. Gowrisankaran's Testimony that Dartmouth HSAs Do Not Define
                    Relevant Markets Is Highly Relevant Because the Fourth Amended
11                  Complaint Defines Relevant Markets Based on HSAs ..................................... 6

12          B.      Dr. Gowrisankaran's Failure to Address Evidence That Did Not Exist At
                    The Time He Wrote His Declaration Is Not a Legitimate Basis to Exclude
13                  His Testimony .............................................................................................. 10

14          C.      Dr. Gowrisankaran's Consideration of Where Patients Could Reasonably
                    Turn to Receive Impatient Hospital Services Was Entirely Proper ................ 10

15  VI.     CONCLUSION ........................................................................................................... 13

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

Page

3

**CASES**

4

5

*Allen v. Dairy Farmers of Am., Inc.*,
    No. 5:09-CV-230, 2014 WL 266290 (D. Vt. Jan. 23, 2014) ....................................................11

6

7

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
    135 F. Supp. 2d 1031 (N.D. Cal. 2001) ..................................................................................9

8

9

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ..................................................................................................................9

10

11

*California v. Sutter Health Sys.*,
    130 F. Supp. 2d 1109 (N.D. Cal. 2001) ................................................................................12

12

13

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) .................................................................................................6

14

*FTC v. Advocate Health Care*,
    No. 15 C 11473, 2017 WL 1022015 (N.D. Ill. Mar. 16, 2017) .............................................8

15

16

*FTC v. Advocate Health Care Network*,
    841 F.3d 460 (7th Cir. 2016) .............................................................................................8, 12

17

18

*FTC v. Penn State Hershey Med. Ctr.*,
    838 F.3d 327 (3d Cir. 2016) ...............................................................................................8, 12

19

20

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
    No. 3:11-CV-268 JD, 2016 WL 6091244 (N.D. Ind. Oct. 19, 2016) ...................................11

21

22

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    No. CV-00-20905 RMW, 2008 WL 73681 (N.D. Cal. Jan. 5, 2008) ......................................9

23

24

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ..................................................................................................................13

25

*In re Novatel Wireless Sec. Litig.*,
    830 F. Supp. 2d 996 (S.D. Cal. 2011) ...................................................................................10

26

27

*In re Se. Milk Antitrust Litig.*,
    No. 2:07-CV-188, 2010 WL 8228885 (E.D. Tenn. Dec. 8, 2010)..........................................11

28

*Murray v. S. Route Mar. SA*,
    870 F.3d 915 (9th Cir. 2017)...................................................................................11

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018) .......................................................................................13

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995)...........................................................................9, 13

*Robinson v. G.D. Searle & Co.*,
    286 F. Supp. 2d 1216 (N.D. Cal. 2003) ................................................................9

*Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys., Ltd.*,
    778 F.3d 775 (9th Cir. 2015)..............................................................................12

*Sidibe v. Sutter Health*,
    667 F. App'x 641 (9th Cir. 2016) .....................................................................4, 5

*Stedeford v. Wal-mart Stores, Inc.*,
    No. 214CV01429JADPAL, 2016 WL 3844211 (D. Nev. July 15, 2016) ...............11

*United States v. Alatorre*,
    222 F.3d 1098 (9th Cir. 2000)..............................................................................6

*United States v. Hankey*,
    203 F.3d 1160 (9th Cir. 2000)..............................................................................6

**OTHER AUTHORITIES**

Fed. R. Evid. 702 ....................................................................................................1, 6

1    I.    STATEMENT OF ISSUE TO BE DECIDED

2          Whether Dr. Gautam Gowrisankaran's expert opinions that hospital service areas

3    ("HSAs") defined by *The Dartmouth Atlas of Healthcare* "are not equivalent to antitrust markets

4    and are not an appropriate basis for defining markets," ECF No. 272-3 at 5, may be excluded as

5    irrelevant or unreliable under Federal Rule of Evidence 702 based on Plaintiffs'

6    (1) mischaracterization of his opinions, (2) later production of a competing expert opinion, and

7    (3) misstatement of the law governing geographic market definition.

8    II.   INTRODUCTION

9          A year into the discovery period and nearly six months after retaining an expert

10   economist, Plaintiffs moved to amend their complaint for the fourth time.  Rather than attempt to

11   define the relevant geographic markets using boundaries tailored to the allegations of the

12   complaint after consulting with their expert, Plaintiffs chose to stand on their allegations that the

13   exact boundaries of *Dartmouth* HSAs or, in one instance, two *Dartmouth* HSAs merged together,

14   define the relevant geographic markets in this case.  Plaintiffs now face the unenviable task of

15   defending the HSA-based markets they have pled against clear and unrebutted evidence that

16   *Dartmouth* HSAs were never intended to comprise antitrust markets.  As Dr. Gowrisankaran

17   testified, the *Dartmouth* methodology is not up to the task of defining relevant geographic

18   markets for antirust purposes, and Sutter has moved for summary judgment on that basis.

19         In their opposition, Plaintiffs, in a stark turnabout from the allegations in the complaint,

20   seek to stave off summary judgment by distancing themselves from the *Dartmouth* methodology

21   and from their allegations that *Dartmouth* HSAs define relevant geographic markets for antitrust

22   purposes.  Adding insult to injury, Plaintiffs also seek to exclude Dr. Gowrisankaran's testimony

23   that HSAs cannot define relevant geographic markets as irrelevant because Dr. Gowrinsankaran

24   focused on the allegations of the complaint rather than on the testimony of Plaintiffs' expert,

25   testimony that was ***not even available*** until after Dr. Gowrisankaran prepared his opinion.

26         Plaintiffs cannot so easily avoid scrutiny of the *Dartmouth* HSA-based geographic

27   markets that they alleged and that a Ninth Circuit panel relied on in allowing this suit to move

28   forward after this Court had dismissed it.  Their motion to exclude Dr. Gowrisankaran's

Case No. 3:12-CV-04854-LB
Opposition to Motion to Exclude
Gowrisankaran Report

1 | testimony is meritless and should be denied.

2 |      *First*, Dr. Gowrisankaran's opinions that the *Dartmouth* HSAs on which Plaintiffs rely

3 | were not designed to and do not define relevant geographic markets for antitrust purposes are

4 | both relevant and reliable.  Indeed, Plaintiffs basically concede that Dr. Gowrinsankaran's

5 | opinions are accurate, and Dr. Chipty conceded in deposition that she does not dispute that

6 | *Dartmouth* HSAs were never intended to define relevant geographic markets for antitrust

7 | purposes.  It now turns out that, although the Third and Fourth Amended Complaints rely on

8 | *Dartmouth* HSAs, Plaintiffs' expert did not, and instead she concludes that some (but not all) of

9 | the HSAs in which Sutter has hospitals just happen to coincide with the boundaries of

10 | economically coherent geographic markets.  But the operative complaint continues to rely on

11 | HSA allegations, even after Plaintiffs amended their complaint a fourth time.  Once Dr. Chipty's

12 | report is excluded for failure to apply a reliable methodology—relief Sutter seeks by separate

13 | motion—Plaintiffs will be left with no support for their asserted market definitions apart from the

14 | *Dartmouth Atlas*.

15 |      *Second*, Plaintiffs make the facially absurd claim that Dr. Gowrisankaran's failure to

16 | address Dr. Chipty's analysis renders Dr. Gowrisankaran's opinions irrelevant.  When Plaintiffs

17 | amended their complaint in September 2017, they continued to base their geographic market

18 | definition on *Dartmouth* HSAs, not Dr. Chipty's new analysis, even though Plaintiffs had

19 | retained (but not disclosed) Dr. Chipty months earlier.  And, of course, the analysis of Dr. Chipty

20 | that they point to post-dated Dr. Gowrisankaran's declaration by more than seven months.  Dr.

21 | Gowrisankaran cannot be faulted for failing to address an analysis that did not exist at the time of

22 | his declaration, and Plaintiffs have provided no authority to support their argument that exclusion

23 | is warranted in such circumstances.

24 |      *Third*, Plaintiffs argue that Dr. Gowrisankaran's use of patient flow data to define relevant

25 | geographic markets renders his opinion unreliable.  But Plaintiffs' argument is premised on a

26 | falsehood:  Dr. Gowrisankaran did not attempt to define geographic markets.  His narrow critique

27 | of *Dartmouth* HSAs as inadequate to define relevant geographic markets cannot be excluded on

28 | the ground that he failed to analyze all facts that bear on market definition for the simple reason

1    that he did not purport to define relevant markets.  Instead, his opinions explain that *Dartmouth*

2    HSAs do not define relevant geographic markets, opinions with which Dr. Chipty basically

3    agrees, at least so far as the *Dartmouth* methodology is concerned.  Further, while Plaintiffs fail to

4    identify a single case holding that patient flow data is irrelevant to geographic market analysis,

5    recent decisions and Plaintiffs' own expert continue to rely on that data.  Dr. Gowrisankaran

6    properly considered patient flow data—along with evidence of insurers successfully marketing

7    health plans without hospitals in the very HSAs that Plaintiffs contend are relevant markets—to

8    challenge the propriety of using *Dartmouth* HSAs to define relevant markets in this case.

9    **III.    BACKGROUND**

10        **A.    Plaintiffs' Alleged Geographic Markets**

11        Plaintiffs claim that Sutter has market power in HSAs defined by the *Dartmouth Atlas of*

12   *Healthcare*.  Fourth Am. Compl. ¶ 30, ECF No. 204.  Plaintiffs specifically included and

13   excluded zip codes from their alleged markets "according to the *Dartmouth Atlas*," which they

14   claim is a "well-established industry authority" that has defined "local health care market[s] for

15   hospital care" for "the purpose of economic analysis."  *See, e.g.*, *id.* ¶¶ 3, 30, 53.  Despite alleging

16   in their Fourth Amended Complaint that the geographic markets in this case are "roughly

17   congruent" with HSAs, they use the precise boundaries of HSAs—down to the zip code—to

18   define the relevant geographic markets in this case.[1]  *Id.* ¶¶ 3, 54, 56-67.

19        When Sutter challenged the adequacy of HSAs to define relevant geographic markets at

20   the motion to dismiss stage, this Court agreed and dismissed the Third Amended Complaint.  But

21   a Ninth Circuit panel held that Plaintiffs were not yet "required to allege evidentiary facts such as

22   what percentages of patients from inside and outside a particular HSA use the hospitals in that

23   _____

24       [1] Notably, although Sutter has 23 hospitals, Plaintiffs only address 14 of them in their
     complaint and Dr. Chipty's declaration, describing 9 of the hospitals as being in 8 "tying"
25   markets and 5 of the hospitals as being in 4 "tied" markets.  *See* Fourth Am. Compl. ¶¶ 55-67;
     Chipty Decl. p. 25, Ex. 4.  At deposition, Dr. Chipty conceded that she did not evaluate whether
26   the HSAs in which the remaining 9 hospitals are located constitute relevant geographic markets.
     Chipty 56:22-57:3.

27       The deposition testimony cited in this memorandum is attached in alphabetical order by
     last name of the deponent as Exhibit 1 to the concurrently-filed Declaration of Matthew J.
28   Silveira in Support of Sutter Health's Motion to Exclude Expert Testimony of Dr. Tasneem
     Chipty in Opposition to Sutter Health's Motion for Summary Judgment.

1    HSA, or to otherwise rebut every purported flaw in the *Dartmouth Atlas of Healthcare*'s

2    methodology." *Sidibe v. Sutter Health*, 667 F. App'x 641, 643 (9th Cir. 2016).  It was enough for

3    the panel that the "complaint explains that HSAs are areas within which the residents obtain most

4    of their inpatient hospital services; it is not inherently implausible that these residents also would

5    be unwilling to seek treatment elsewhere, and that health plans therefore could not purchase

6    hospital services outside of the alleged HSAs." *Id.*  In the panel's view, the validity of the alleged

7    relevant market was better addressed on summary judgment. *Id.* (citing *Newcal Indus., Inc. v.*

8    *Ikon Office Sol.*, 513 F.3d 1038, 1044-45 (9th Cir. 2008).)

9         After the Ninth Circuit remanded the case, Plaintiffs represented to Sutter and the Court

10   that they did not intend to further amend their Third Amended Complaint, despite the fact that

11   Sutter had immediately announced to the Court that it intended to focus on the geographic market

12   issue early in discovery in order to file an early motion for summary judgment.  J. LeVee Decl.

13   ISO Sutter's Opp. to Pls.' Mot. for Leave to File Fourth Am. Compl. ¶¶ 3-5 & Ex. 1, ECF No.

14   170-1; Joint CMC Statement at 7:7-9, ECF No. 111.  Despite those representations, Plaintiffs did

15   move to amend their Complaint a fourth time on July 26, 2017.  *See* ECF No. 154.  At that point,

16   Plaintiffs had the benefit of consulting with their expert economist, who had been retained nearly

17   six months before that date.  Chipty Dep. 21:25-23:4.  But Plaintiffs nevertheless chose to

18   continue relying on *Dartmouth* HSAs to define the relevant geographic markets in their Fourth

19   Amended Complaint.  *See, e.g.*, Compl. ¶¶ 3, 30, 53, 56-67.

20        Following the Ninth Circuit's guidance, Sutter moved for summary judgment on the basis

21   that Plaintiffs have failed to define relevant geographic markets, offering its expert Dr.

22   Gowrisankaran's declaration in support of that motion.  *See* ECF Nos. 272, 272-3.  Plaintiffs'

23   opposition relies almost entirely on the declaration of their own expert, Dr. Chipty, and if that

24   report is stricken pursuant to Sutter's motion, Plaintiffs will literally have no support for their

25   proffered markets other than the clearly deficient *Dartmouth Atlas* methodology.  While Plaintiffs

26   point to a handful of documents and deposition excerpts in their summary judgment opposition,

27   none refers to or addresses HSAs or geographic areas sharing HSA boundaries.  Dr. Chipty's

28   expert testimony is essential to Plaintiffs' ability to establish the adequacy of HSA boundaries to

1   define the relevant geographic markets in this case.  That is why Dr. Gowrisankaran's testimony

2   regarding the failure of *Dartmouth* HSAs to define relevant markets matters notwithstanding its

3   narrow scope:  if the Court rejects Dr. Chipty's report, Plaintiffs literally will have no other

4   basis—after two years of active discovery—to oppose summary judgment on the basis that

5   *Dartmouth* HSAs constitute relevant geographic markets.

6           **B.      Dr. Gowrisankaran's Testimony**

7           Dr. Gowrisankaran is an established expert in the fields of industrial economics and health

8   care economics.  He received his Ph.D. in Economics from Yale, has taught relevant courses at

9   the undergraduate and graduate levels, and has published his research in leading economics and

10  health services journals.  He is a tenured professor at the University of Arizona, teaching antitrust,

11  among other subjects.  Gowrisankaran Decl. ¶¶ 1-3, ECF No. 272-3.  His qualifications as an

12  expert in his fields are not in dispute.

13          Dr. Gowrisankaran's assignment in this case was deliberately narrow and a direct

14  response to the allegations of the Fourth Amended Complaint:  he was tasked with determining

15  whether the geographic markets alleged by Plaintiffs based on the boundaries of *Dartmouth*

16  HSAs are appropriate to the task of assessing Plaintiffs' antitrust claims.  *Id.* ¶ 4.[2]  To conduct

17  this analysis, Dr. Gowrisankaran reviewed, among other things:

18                  [M]aterials reflecting the creation of Dartmouth Atlas HSAs, hospital
                    financial and discharge data from the creation of the Dartmouth Atlas
19                  HSAs, hospital financial and discharge data from the California Office
                    of Statewide Health Planning and Development ("OSHPD"), data on
20                  hospital characteristics from the American Hospital Association
                    ("AHA"), recent court decisions assessing the proper geographic
21                  markets for the purpose of evaluating proposed hospital mergers,
                    academic and legal work on tying and insurer-hospital negotiations,
22                  and other public information.

23  _____

24      [2] The narrowness of Dr. Gowrisankaran's assignment stems from the history of this
    litigation.  This Court previously rejected Plaintiffs' allegations that *Dartmouth* HSAs define
25  relevant geographic markets, but the Court at that time did not take judicial notice of the facts that
    Sutter had provided to the Court, ruling instead that judicial notice was not necessary.  The Ninth
26  Circuit panel also declined to take judicial notice of matters of public record that proved the
    inadequacy of Plaintiffs' allegations, and it found that at the motion to dismiss stage, Plaintiffs'
    geographic market assertions were "not inherently implausible."  *Sidibe*, 667 F. App'x at 643.
27  Sutter thus moved promptly for summary judgment on Plaintiffs' inadequately-defined
    geographic markets in October 2017.  ECF No. 207.  Plaintiffs asked for additional time and
28  ultimately received over seven months to oppose Sutter's motion.

1   *Id.* ¶ 8.

2          After examining the methodology and data used by the *Dartmouth Atlas* researchers to

3   construct HSAs, Dr. Gowrisankaran first determined that HSAs were not intended to define a

4   relevant market for antitrust purposes, *id.* ¶¶ 24-42, and were defined based on outdated (1992-

5   1993) discharge data from a distinct patient population (Medicare beneficiaries), *id.* ¶¶ 43-56.  Dr.

6   Gowrisankaran further determined that Dartmouth HSAs had not been used to define—and were

7   not equivalent to—recently accepted geographic markets in hospital merger cases; rather, the

8   federal government has focused on markets that include multiple HSAs.  *Id.* ¶¶ 57-61.  Next, Dr.

9   Gowrisankaran analyzed discharge data, travel times, hospital distances, and patient hospital

10  choices, and he concluded that the *Dartmouth* HSAs alleged in this case improperly exclude

11  competitive alternatives and contradict real-world evidence of consumer choices.  *Id.* ¶¶ 62-76.

12  Finally, Dr. Gowrisankaran analyzed Kaiser's ability to successfully market health plans to

13  enrollees in ten of the twelve alleged markets despite not having a hospital in five of those

14  markets, which he found further reinforced the failure of HSAs to define relevant antitrust

15  markets.  *Id.* ¶¶ 79-84.

16  **IV.    LEGAL STANDARD**

17         Federal Rule of Evidence 702 permits opinion testimony from an expert so long as the

18  expert's knowledge will help the trier of fact and "the testimony is based on sufficient facts or

19  data, … [and] is the product of reliable principles and methods" that were "reliably applied … to

20  the facts of the case."  Fed. R. Evid. 702.  "[J]udges are entitled to broad discretion when

21  discharging their gatekeeping function," *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir.

22  2000), and "assessing the relevance and reliability of expert testimony," *United States v. Alatorre*,

23  222 F.3d 1098, 1100 (9th Cir. 2000).

24  **V.     ARGUMENT**

25         **A.     Dr. Gowrisankaran's Testimony that *Dartmouth* HSAs Do Not Define**

26                 **Relevant Markets Is Highly Relevant Because the Fourth Amended**
                 **Complaint Defines Relevant Markets Based on HSAs.**

27         "Expert opinion testimony is relevant if the knowledge underlying it has a valid

28  connection to the pertinent inquiry."  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044

1   (9th Cir. 2014) (internal quotation omitted).  The relevance of Dr. Gowrisankaran's opinion is

2   immediately apparent from the language of the Fourth Amended Complaint.  He analyzed the

3   propriety of the geographic markets that Plaintiffs alleged by reference to *Dartmouth* HSAs, and

4   he explained why, contrary to Plaintiffs' claims, *Dartmouth* HSAs do not constitute authoritative

5   boundaries of relevant antitrust markets, including markets alleged in this case.  *Compare, e.g.*,

6   Compl. ¶¶ 30, 53, 57 *with* Gowrisankaran Decl. ¶¶ 11, 66, 70-71.

7          Plaintiffs attempt to minimize the impact of this testimony first by downplaying their

8   reliance on *Dartmouth* HSAs, arguing that the *Dartmouth Atlas* methodology is not "the ***primary***

9   basis" for their expert's opinions and "is not ***principally*** relied upon by Plaintiffs."  Pls.' Mot. to

10  Exclude at 1-2 ("Mot.") (emphasis added).  But Plaintiffs' belated attempt to distance themselves

11  from the *Dartmouth Atlas* merely lends further support to Dr. Gowrisankaran's testimony—while

12  Plaintiffs would prefer that HSAs recede into the background, Dr. Gowrisankaran brings their

13  fundamental insufficiency to define markets into sharp relief.

14         Importantly, while Plaintiffs' own expert concedes that "HSAs were Not Constructed to

15  be Antitrust Markets" and "not all HSAs are necessarily antitrust markets," Chipty Decl. ¶ 144,

16  Plaintiffs still have not disclaimed all reliance on the *Dartmouth Atlas* methodology, *see* Mot. at

17  10 (arguing that *Dartmouth* HSAs define relevant markets "not merely because of the

18  methodology that the *Dartmouth Atlas* used to construct them").  Plaintiffs' reluctance to

19  completely abandon their reliance on the *Dartmouth Atlas* is unsurprising because Plaintiffs are

20  obligated to have ***some*** allegations of the relevant geographic market.  But if Dr. Chipty's opinion

21  is excluded for its failure to reliably apply a reliable methodology and being based on insufficient

22  facts or data, Plaintiffs will be left with no support for their asserted HSA-based market

23  definitions apart from the *Dartmouth Atlas* itself, and Dr. Gowrisakaran's declaration will be a

24  legally sufficient basis on which to enter summary judgment.  Given Plaintiffs' continued reliance

25  on *Dartmouth* HSAs to define relevant antitrust markets—a reliance they reconfirmed in their

26  operative, post-remand Fourth Amended Complaint—their claim that Dr. Gowrisankaran's

27  critique of the *Dartmouth* methodology is "irrelevant" is truly absurd.

28         Plaintiffs next argue that Dr. Gowrisankaran's testimony "is irrelevant because it

1  disregards the actual view of health plans," i.e., insurers.  Mot. at 7.  But Plaintiffs' assertion is

2  premised on a mischaracterization both of Dr. Gowrisankaran's testimony and the actual evidence

3  of insurers' views on which Plaintiffs seek to rely.  Dr. Gowrisankaran did not, in fact, disregard

4  the views of insurers.  He testified at length regarding how patients' views inform insurers' views

5  of hospital substitutes.  Gowrisankaran 199:2-201:5.  And he further explained that, in addition to

6  reviewing hospital financial and discharge data from the California Office of Statewide Health

7  Planning and Development ("OSHPD") and data on hospital characteristics, he reviewed multiple

8  sources of insurer data.  Gowrisankaran Decl. ¶ 8; Gowrisankaran 95:3-96:20.  For example, Dr.

9  Gowrisankaran analyzed Kaiser's success in selling health plans to residents in *Dartmouth* HSAs

10 without Kaiser hospitals, which further evidenced that the proffered *Dartmouth* HSAs do not

11 constitute relevant antitrust markets.  Gowrisankaran Decl. ¶¶ 79-84.  And while Plaintiffs' expert

12 largely chose to ignore that evidence, recent case law makes clear that it is highly relevant to the

13 geographic market analysis.  *See FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 343 (3d

14 Cir. 2016) (recognizing that "an antitrust defendant may be able to demonstrate that enough

15 patients would buy a health plan marketed to them with no in-network hospital in the proposed

16 geographic market"); *cf. FTC v. Advocate Health Care Network*, 841 F.3d 460, 474 (7th Cir.

17 2016) (emphasizing that there was "no evidence that a network has succeeded" without one of the

18 relevant hospitals in-network).

19        Dr. Gowrisankaran also testified that soliciting an insurer's view to confirm his analysis

20 was "not necessary to make the determination that that the hospitals outside the [Antioch] HSA

21 are serving as a constraint on the hospitals inside the HSA," given that 55.8% of Antioch HSA

22 residents already sought care outside that HSA.  Gowrisankaran 151:6-154:21.  That is perfectly

23 consistent with case law recognizing that insurer testimony is helpful only insofar as it is

24 consistent with the record as a whole.  *See, e.g.*, *FTC v. Advocate Health Care*, No. 15 C 11473,

25 2017 WL 1022015, at *5 (N.D. Ill. Mar. 16, 2017) (crediting insurer testimony because the

26 "record as a whole support[ed] th[e insurers'] view" and there was "no inconsistency in [the

27 insurers'] testimony.").  In fact, Plaintiffs' own expert holds the view that economists need not

28 credit insurer testimony that is inconsistent with clear discharge data analysis.  *See* Chipty Decl.

¶ 126 (disregarding ███████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████).³  Unsurprisingly, Plaintiffs have provided no authority to support their view that

discharge data analysis is not relevant to assessing competitive constraints absent corroborating

testimony from an insurer.

Moreover, Plaintiffs fail to explain how the insurer evidence they accuse Dr.

Gowrisankaran of ignoring—nearly all of which discusses "markets" comprised of counties, and

***none of which refers to HSAs, let alone identifies HSAs as relevant markets***, *see* Mot. at 8-9—

could render his critique of HSA-based markets irrelevant.  Insurer consideration of other market

boundaries does not speak to the adequacy of HSA boundaries to define relevant antitrust

markets, and Plaintiffs' allegations are based on HSA boundaries.  If anything, this evidence that

insurers consistently use different market boundaries than Plaintiffs confirms that Dr. Chipty's

opinion is contradicted by record facts that render it unreasonable.  *See Brown Shoe Co. v. United

States*, 370 U.S. 294, 336 (1962) ("The geographic market selected must … 'correspond to the

commercial realities of the industry.'").

Finally, Plaintiffs cite a series of cases to support their assertion that an expert opinion

devoid of support or contradicted by "indisputable record facts" may be excluded.  Mot. at 9-10.

While Sutter does not quibble with that general proposition, Plaintiffs have pointed to no such

facts in this case, and the cases on which Plaintiffs rely are readily distinguishable.⁴

---

³ As discussed in the concurrently-filed motion to exclude the testimony of plaintiff's expert Dr. Chipty, Blue Shield's "redirection analysis" is unreliable and not a valid basis for expert testimony.  But that does not take away from the fact that Dr. Chipty recognized that insurer testimony regarding patient insistence must cede to clear evidence of patient movement reflected in discharge data that is contrary to the insurer testimony.

⁴ *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435-37 (9th Cir. 1995) (holding that plaintiff's expert's opinion could not defeat summary judgment where expert unreasonably excluded potential competitors from relevant market); *Robinson v. G.D. Searle & Co.*, 286 F. Supp. 2d 1216, 1221 (N.D. Cal. 2003) (excluding plaintiff's expert testimony that was based on false premise that plaintiff did not have prior sleep problems); *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1040-41 (N.D. Cal. 2001) (excluding plaintiff's expert's testimony that relied on assumptions rather than analysis and artificially limited the relevant market); *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 RMW, 2008 WL 73681, at *5 (N.D. Cal. Jan. 5, 2008) (excluding plaintiffs' expert's testimony where he did no economic analysis of the industry and admitted his testimony was inconsistent with reality

B.   **Dr. Gowrisankaran's Failure to Address Evidence That Did Not Exist At The Time He Wrote His Declaration Is Not a Legitimate Basis to Exclude His Testimony.**

Plaintiffs argue that Dr. Gowrisankaran's testimony is irrelevant because it critiques the *Dartmouth Atlas* methodology for defining HSAs that Plaintiffs rely on in their Complaint, rather than the result-driven methodology employed by Dr. Chipty more than seven months after Dr. Gowrisankaran filed his declaration. *See* Mot. at 10-11. The argument is nonsensical, and Plaintiffs have cited no authority supporting exclusion in circumstances where the moving party's expert was unable to rebut an expert report that did not exist at the time the moving party's expert submitted his report.

Sutter moved for summary judgment based on the deficient market allegations contained in the Fourth Amended Complaint, which relies on *Dartmouth* HSAs to define the boundaries of the relevant geographic markets. That complaint does not rely on or refer to expert analysis despite the fact that Plaintiffs amended their complaint nearly six months after retaining Dr. Chipty, who testified that she was consulted regarding the amendments to Plaintiffs' geographic market allegations. Chipty 21:25-23:4. Dr. Gowrisankaran's failure to respond to an expert who had not been disclosed and an opinion that had not been furnished at the time of his analysis has no bearing on the relevance of his critique of *Dartmouth* HSAs.

C.   **Dr. Gowrisankaran's Consideration of Where Patients Could Reasonably Turn to Receive Impatient Hospital Services Was Entirely Proper.**

Plaintiffs next argue that Dr. Gowrisankaran's analysis focused on patient outflow and inflow data and travel times, and that this renders his opinion unreliable because "relying on patient-flow data and travel time analysis alone to define hospital markets results in errors in market definition and has recently been criticized by several courts." Mot. at 12. Plaintiffs' reliability objection is baseless, in large part because it misrepresents both the nature of Dr. Gowrisankaran's testimony and the import of the cases on which Plaintiffs rely.

*First*, Plaintiffs' argument is premised on a falsehood—that Dr. Gowrisankaran opined as

---

because he failed to account for issued licenses); *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1014 (S.D. Cal. 2011) (excluding plaintiffs' expert's testimony where opinion was based entirely on the expert's mistaken belief regarding when shipments were authorized and was "not supported by any evidence").

to the definition of proper geographic markets in this case.  He did not.  Dr. Gowrisankaran

offered a narrow opinion—that the *Dartmouth* HSAs that Plaintiffs rely upon in their Fourth

Amended Complaint are not appropriate to define relevant markets in the antitrust context

generally and are not plausible relevant markets in this case.  Gowrisankaran 63:2-9, 104:10-16,

125:10-16, 127:23-128:4, 213:14-214:6; Gowrisankaran Decl. ¶¶ 4-8, 85.  Given that Plaintiffs

bear the burden of proving that Sutter has market power in relevant geographic markets, the

narrow scope of Dr. Gowrisankaran's opinion was entirely appropriate and certainly not a basis

for exclusion.

The case law is clear that a defendant's expert who "criticize[s] as too narrow Plaintiffs'

proposed geographic market" does "not need to propose his own relevant geographic market in

order to do so." *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-CV-230, 2014 WL 266290, at *3

(D. Vt. Jan. 23, 2014); *see also In re Se. Milk Antitrust Litig.*, No. 2:07-CV-188, 2010 WL

8228885, at *3 (E.D. Tenn. Dec. 8, 2010) (rejecting Plaintiffs' argument that defense expert

criticized their asserted market boundaries without offering his own view of the correct

boundaries, holding that "[i]t is not necessary for … any … expert for the defendants, to establish

the boundaries of a relevant geographic market").  Accordingly, it is "perfectly appropriate" for a

defense expert like Dr. Gowrisankaran to limit his testimony to explaining why he believes

Plaintiffs' proposed relevant geographic markets are factually and legally insufficient "even if he

did not undertake to determine the outer boundaries of the relevant market himself." *Gumwood*

*HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*, No. 3:11-CV-268, 2016 WL 6091244, at

*12 (N.D. Ind. Oct. 19, 2016).[5]

*Second*, Dr. Gowrisankaran's consideration of patient discharge data, hospital distances,

and patient travel times in forming his opinions was entirely proper.  Plaintiffs' own expert

confirmed that she also analyzed patient flow data and travel times in this case, describing such

---

[5] *See also Murray v. S. Route Mar. SA*, 870 F.3d 915, 924–25 (9th Cir. 2017) (holding that where the subject of expert's "testimony was narrow," many of opposing party's critiques were misplaced); *Stedeford v. Wal-mart Stores, Inc.*, No. 2:14-cv-01429-JAD-PAL, 2016 WL 3844211, at *2–3 (D. Nev. July 15, 2016) (denying motion to exclude "very narrow opinion" and holding that expert's failure to consider other medical records "goes to weight, not admissibility").

1   information as "an important building block of understanding geographic market."  Chipty 70:7-

2   71:15; *id.* 143:4-144:22.  And none of the authorities on which Plaintiffs rely holds that such data

3   is irrelevant to analyzing an asserted geographic market.  In fact, each recognizes that insurers'

4   views of acceptable substitutes for inpatient care are ultimately derivative of patients' views,

5   which cannot be ignored.  *See Penn State Hershey*, 838 F.3d at 342 ("Patients are relevant to the

6   analysis, especially to the extent that their behavior affects the relative bargaining positions of

7   insurers and hospitals as they negotiate rates."); *Advocate Health*, 841 F.3d at 474-75 (addressing

8   patient preference for "local" hospitals and noting that 95% of patients in proposed market "drive

9   30 miles or less" to reach a hospital); *cf. Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's*

10  *Health Sys., Ltd.*, 778 F.3d 775, 784–85 (9th Cir. 2015) ("Citing testimony that Nampa residents

11  'strongly prefer access to local PCPs,' the court found that 'commercial health plans need to

12  include Nampa PCPs in their networks to offer a competitive product.'"); *see also* Gowrisankaran

13  Decl. ¶ 22 (explaining that patient preferences inform insurer preferences).  Indeed, Plaintiffs'

14  expert testified that the purpose of her econometric analysis in this case was "to trace out patient

15  preferences," reiterating that "it's about patient preferences."  Chipty 151:21-152:7.

16          In a final effort to exclude Dr. Gowrisankaran's testimony, Plaintiffs argue that his patient

17  travel analysis is "inapposite" because patients' proximity to other hospitals can be ignored if the

18  majority of patients currently receive care within their resident HSAs.  Mot. at 12-14.  Plaintiffs'

19  argument fails as a matter of law.  A relevant geographic market is forward-looking and requires

20  more than evidence of current consumer behavior; it requires "prospective analysis" of what

21  consumers could do in response to a hypothetical price increase.  *St. Luke's*, 778 F.3d at 785;

22  *California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1120 (N.D. Cal. 2001) ("A determination

23  of the proper geographic market must be based on the 'commercial realities of the industry,' and

24  therefore, must involve a dynamic as opposed to static analysis of 'where consumers could

25  practicably go, not on where they actually go.'" (citations omitted)).[6]

26  ─────────────────────

            [6] Plaintiffs assert that Dr. Gowrisankaran's outflow analysis actually supports their
27  allegations regarding the four tied markets and the Berkley-Oakland tying market because fewer
    people traveled outside those markets than was the case for the relevant markets in *St. Luke's* and
28  *Advocate*.  Mot. at 12.  This argument does Plaintiffs no favors.  Even assuming *arguendo* that
    outflow percentages alone could define a relevant market—they cannot—Plaintiffs still would fail
    to carry their burden with respect to the remaining markets, and antitrust plaintiffs must define

1    Further, the Supreme Court's most recent antitrust decision forecloses Plaintiffs' assertion

2    that Dr. Gowrisankaran's analysis of "patient proximity to hospitals outside of their resident HSA

3    is inapposite" because "precision" is not required and "fuzziness" is inherent in market definition.

4    Mot. at 13-14.  In *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), the Supreme Court

5    explained that, while courts need not "precisely define" a relevant market to conclude that

6    horizontal agreements between competitors are anticompetitive, an "accurate" definition of the

7    relevant market is required in vertical restraint cases where the risk to competition depends on the

8    market power of the entity imposing the restraint.  *Id.* at 2285 & n.7.  A relevant geographic

9    market must include those competitors "who have the actual or potential ability to deprive each

10   other of significant levels of business."  *Rebel Oil*, 51 F.3d at 1434 (internal quotation omitted).

11   Accordingly, as Dr. Gowrisankaran explained, Plaintiffs' failure to define relevant geographic

12   markets that include those hospitals to which patients—and, by extension, insurers—could turn in

13   the event of a price increase means that their alleged *Dartmouth* HSA-based markets are not

14   coherent antitrust markets.

15   **VI.    CONCLUSION**

16       For the foregoing reasons, Sutter respectfully requests that the Court deny Plaintiffs'

17   motion to exclude the testimony of Dr. Gowrisankaran.

18   Dated: September 10, 2018                        Respectfully submitted,

19                                            Jones Day

20

21                                    By: */s/ Jeffrey A. LeVee*

22                                      Jeffrey A. LeVee

23                                    Counsel for Defendant
                                      SUTTER HEALTH

24

25   NAI-1504341236

26   _____

27   both the tying and tied markets to prevail on their claims.  If Plaintiffs cannot "prove that [Sutter]
     has market power in the tying product[s]" because they cannot define the tying markets, their
     claims still fail.  *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006).  Plaintiffs' claims

28   are based on many tying markets, not a single such market.