1   Jeffrey A. LeVee (State Bar No. 125863)
    jlevee@jonesday.com
2   JONES DAY
    555 South Flower Street
3   Fiftieth Floor
    Los Angeles, CA  90071.2300
4   Telephone:   +1.213.489.3939
    Facsimile:    +1.213.243.2539
5
    David C. Kiernan (State Bar No. 215335)
6   dkiernan@jonesday.com
    Brian G. Selden (State Bar No. 261828)
7   bgselden@jonesday.com
    Matthew J. Silveira (State Bar No. 264250)
8   msilveira@jonesday.com
    JONES DAY
9   555 California Street, 26th Floor
    San Francisco, CA  94104
10  Telephone:   415.626.3939
    Facsimile:    415.875.5700
11
12  Attorneys for Defendant
    SUTTER HEALTH

Robert H. Bunzel (State Bar No. 99395)
rbunzel@bzbm.com
Patrick M. Ryan (State Bar No. 203215)
pryan@bzbm.com
Oliver Q. Dunlap (State Bar No. 225566)
odunlap@bzbm.com
BARTKO, ZANKEL, BUNZEL & MILLER
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Telephone: (415) 956-1900
Facsimile: (415) 956-1152

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DJENEBA SIDIBE, et al.,<br><br>               Plaintiffs,<br><br>    v.<br><br>SUTTER HEALTH,<br><br>          Defendant. | Case No. 3:12-CV-04854-LB<br><br>**DEFENDANT SUTTER HEALTH'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. TASNEEM CHIPTY IN OPPOSITION TO SUTTER HEALTH'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: November 8, 2018<br>Time: 9:30 a.m.<br>The Honorable Laurel Beeler |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on November 8, 2018 at 9:30 a.m. Defendant Sutter Health ("Sutter") will and hereby does move to exclude the expert testimony of Dr. Tasneem Chipty submitted in opposition to Sutter's motion for summary judgment.  This motion is submitted pursuant to Federal Rules of Civil Procedure 702 and 703, and is based on the accompanying Memorandum of Points and Authorities, Declaration of Matthew J. Silveira and exhibits attached thereto, the complete files and records in this action, oral argument of counsel, and such other and further matters as the Court may consider.

## RELIEF SOUGHT

Sutter requests that the testimony of Plaintiffs' expert, Dr. Chipty, submitted in opposition to Sutter's motion for summary judgment, be excluded.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

Page

I.     STATEMENT OF ISSUE TO BE DECIDED ............................................... 1

II.    INTRODUCTION .............................................................................. 1

III.   BACKGROUND .............................................................................. 2

    A.    Plaintiffs' Alleged Geographic Markets ................................ 2

    B.    Dr. Chipty's Testimony ...................................................... 3

        1.    Dr. Chipty Admitted the Dartmouth Methodology Does Not Define Relevant Geographic Markets ............................. 3

        2.    Dr. Chipty Used a Variety of Inconsistent Approaches to Back Into the HSA-Based Markets Defined in the Complaint ................... 4

        3.    Dr. Chipty Uncritically Accepted Blue Shield's Redirection Analysis ............................................................ 5

IV.   LEGAL STANDARD ...................................................................... 10

V.    ARGUMENT ................................................................................ 11

    A.    Dr. Chipty's Inconsistent and Result-Oriented Approach to Market Definition Does Not Constitute a Reliably Applied Methodology ...................... 12

    B.    Dr. Chipty's Methodology for Defining the Eight Tying Markets Substitutes Flawed Insurer Testimony for the Requisite Expert Economic Analysis .................................................... 14

        1.    Dr. Chipty's Adoption of Blue Shield's Redirection Analysis Renders Her Opinion Unreliable ............................. 14

        2.    Dr. Chipty's Parroting of the Redirection Analysis Is Not Admissible Expert Testimony in Any Event ........................... 17

        3.    The Remaining Evidence Dr. Chipty Relies on Does Not Salvage Her Analysis of the Tying Markets ............................. 19

    C.    Dr. Chipty's Methodology for Defining the Four Tied Markets Is Untested, Manufactured for Litigation, and Contradicts the Blue Shield Redirection Analysis She Relies on to Define Tying Markets ................................. 21

    D.    Dr. Chipty Improperly Ignores Critical Evidence Regarding Excluded Competitor Hospitals, Further Establishing the Invalidity of Her Opinions ........ 23

VI.   CONCLUSION ............................................................................. 25

# <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

*AFMS LLC v. United Parcel Serv. Co.*,
No. CV105830, 2014 WL 12515335 (C.D. Cal. Feb. 5, 2014) ...............................22

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
247 F.R.D. 156 (C.D. Cal. 2007) ....................................................................15

*Bailey v. Allgas, Inc.*,
148 F. Supp. 2d 1222 (N.D. Ala. 2000) (*Bailey I*), *aff'd*, 284 F.3d 1237 (11th
Cir. 2002) (*Bailey II*)................................................................................13, 14

*Barber v. United Airlines, Inc.*,
17 F. App'x 433 (7th Cir. 2001) .....................................................................21

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
214 F. Supp. 2d 530 (D. Md. 2002) ................................................................15

*Castellow v. Chevron USA*,
97 F. Supp. 2d 780 (S.D. Tex. 2000) ...............................................................13

*Cholakyan v. Mercedes-Benz, USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012) ....................................................................17

*Clausen v. M/V NEW CARISSA*,
339 F.3d 1049 (9th Cir. 2003)........................................................................22

*Cooper v. Brown*,
510 F.3d 870 (9th Cir. 2007)..........................................................................11

*Crescenta Valley Water Dist. v. Exxon Mobile Corp.*,
No. CV 07-2630-JST, 2013 WL 12116333 (C.D. Cal. Jan. 8, 2013) ......................22

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ............................................................................... passim

*Estate of Barabin v. AstenJohnson, Inc.*,
740 F.3d 457 (9th Cir. 2014)..........................................................................10

*Feduniak v. Old Republic Nat'l Title Co.*,
No. 13–CV–02060–BLF, 2015 WL 1969369 (N.D. Cal. May 1, 2015) .................22

*FTC v. Advocate Health Care Network*,
    841 F.3d 460 (7th Cir. 2016) .................................................................................... passim

*FTC v. Advocate Health Care*,
    No. 15 C 11473, 2017 WL 1022015 (N.D. Ill. Mar. 16, 2017) ................................17

*FTC v. Penn State Hershey Med. Ctr.*,
    838 F.3d 327 (3d Cir. 2016) ......................................................................................24

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    No. CV-00-20905 RMW, 2008 WL 73689 (N.D. Cal. Jan. 5, 2008) .......................14

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ..............................................................................................11, 21

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) ....................................................................17

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008) ..............................................................................11

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................12, 14, 19, 20

*In re Mirena IUD Prods. Liab. Litig.*,
    169 F. Supp. 3d 396 (S.D.N.Y. 2016) .......................................................................13

*In re Se. Milk Antitrust Litig.*,
    No. 2:07-CV 188, 2012 WL 947106 (E.D. Tenn. Mar. 20, 2012) .....................16, 22

*It's My Party, Inc. v. Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) .....................................................................................11

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) .......................................................................................................21

*Johns v. Bayer Corp.*,
    No. 09CV1935, 2013 WL 1498965 (S.D. Cal. Apr. 10, 2013) .................................18

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
    No. CIV.A.05-138(WOB), 2008 WL 113987 (E.D. Ky. Jan. 7, 2008)
    (*Kentucky Speedway I*), aff'd, 588 F.3d 908 (6th Cir. 2009) (*Kentucky
    Speedway II*) .................................................................................12, 22, 24

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. 2005) ..................................................................19

*McLaughlin Equip. Co. v. Servaas*,
   No. 98-127-C-T/K, 2004 WL 1629603 (S.D. Ind. Feb. 18, 2004) ...........................16

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
   354 F.3d 661 (7th Cir. 2004)..................................................................................17

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
   924 F.2d 1484 (9th Cir. 1991)................................................................................14

*Mukhtar v. Cal. State Univ., Hayward*,
   299 F.3d 1053 (9th Cir. 2002) *amended*, 319 F.3d 1073 (9th Cir. 2003) ...............11

*Munoz v. Orr*,
   200 F.3d 291 (5th Cir. 2000)..................................................................................25

*Ohio v. American Express Co.*,
   138 S. Ct. 2274 (2018) ...........................................................................................11

*PODS Enters., Inc. v. U-Haul Int'l, Inc.*,
   No. 812CV01479T27MAP, 2014 WL 12628664 (M.D. Fla. June 27, 2014) ..........18

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995)..................................................................................23

*Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys., Ltd.*,
   No. 1:12-CV-00560-BLW, 2014 WL 407446 (D. Idaho Jan. 24, 2014), *aff'd*,
   778 F.3d 775 (9th Cir. 2015)..................................................................................20

*Sidibe v. Sutter Health*,
   667 F. App'x 641 (9th Cir. 2016) .............................................................................3

*TK-7 Corp. v. Estate of Barbouti*,
   993 F.2d 722 (10th Cir. 1993)................................................................................19

*United States v. Fleet Mgmt. Ltd.*,
   Crim. No. 07-279, 2008 WL 1924250 (E.D. Pa. Apr. 29, 2008)............................14

*Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
   98 F. Supp. 2d 729 (W.D. Va. 2000) ......................................................................24

*Vernon Walden, Inc. v. LIPOID GmbH*,
   No. CIV. 01-4826DRD, 2005 WL 3088333 (D.N.J. Nov. 17, 2005).................15, 18

*ZF Meritor, LLC v. Eaton Corp.,*
    696 F.3d 254 (3rd Cir. 2012) ...........................................................................................18

**OTHER AUTHORITIES**

D.O.J. and F.T.C., Horizontal Merger Guidelines § 4.1.2 (2010) ....................................................5

Fed. R. Evid. 702 .........................................................................................................2, 10, 12

Fed. R. Evid. 703 .........................................................................................................11, 19

1  **I.    STATEMENT OF ISSUE TO BE DECIDED**

2    Whether to exclude Dr. Chipty's opinions that the "markets" Plaintiffs alleged based on

3  *Dartmouth Atlas of Healthcare* hospital service areas ("HSAs") constitute relevant geographic

4  markets for antitrust purposes where Dr. Chipty, in violation of the requirements for expert

5  testimony:  (1) used distinct, totally inconsistent approaches when defining tying and tied markets

6  to "back into" the markets Plaintiffs alleged; (2) substituted an unreliable document prepared by

7  an insurer in place of the economic analysis required to define tying markets; (3) used a novel and

8  untested formula manufactured for this litigation to define tied markets; and (4) disregarded

9  overwhelming evidence that the alleged geographic markets exclude relevant competitors.

10  **II.    INTRODUCTION**

11    Geographic market definition has been at the center of this case from the outset.  In their

12  first three complaints, Plaintiffs proposed conflicting approaches for defining markets before

13  settling on *Dartmouth* HSAs for the Third Amended Complaint.  This Court found *Dartmouth*

14  HSAs to be legally insufficient to state a claim, but a Ninth Circuit panel found HSAs sufficient

15  to survive the pleading stage, and Plaintiffs then recommitted to HSAs when they amended their

16  complaint for a fourth time following remand.

17    As promised when this case returned from the Ninth Circuit, Sutter has moved for

18  summary judgment on the basis that *Dartmouth* HSAs do not constitute relevant geographic

19  markets for antitrust purposes.  In response, Plaintiffs largely abandon the *Dartmouth*

20  methodology and rely instead on Dr. Chipty to provide expert testimony in support of their

21  allegations that the relevant geographic markets in this case serendipitously align with some (but

22  by no means all) of the *Dartmouth* HSAs where Sutter has hospitals.  But Dr. Chipty did not try

23  to define markets using a reliable methodology.  Instead, she sought to back into the "markets"

24  provided to her by relying on a hodgepodge of novel methods developed for this litigation and by

25  heavily relying on a completely unreliable analysis prepared by one insurer.

26    Dr. Chipty conceded that the *Dartmouth* methodology was not intended to define antitrust

27  markets, but she nevertheless sought to establish that the HSA-based markets Plaintiffs alleged

28  coincidentally shared the boundaries of relevant geographic markets.  To do so, she adjusted her

1  methodology market by market until she identified a methodology that the market could survive.

2  In short, Dr. Chipty impermissibly attempted to reverse engineer markets rather than defining

3  them by reliably applying a replicable and generally accepted methodology.

4     Dr. Chipty's approach to defining the tying markets lacked any scientific basis at all.

5  Most prominently, Dr. Chipty adopted a "redirection analysis" that Blue Shield prepared in 2014-

6  2015, which crudely—and unscientifically—estimated the percentage of Blue Shield network

7  patients that would insist on visiting Sutter hospitals versus those that could be "redirected" to

8  other hospitals if the Sutter hospitals were put out of network.  But the Blue Shield client

9  requesting the analysis (UEBT) admitted that it did not use the analysis to make any business

10  decisions, and Blue Shield has admitted that the redirection analysis was mostly a back-of-the-

11  envelope product, not the result of the sort of economic rigor that a court would expect to see if

12  an expert witness had relied almost entirely on the document to form opinions about all eight of

13  the alleged tying markets in this litigation.  Incredibly, Dr. Chipty was unaware of the fact that the

14  analysis conflicts with Blue Shield's real-world experience and representations to California

15  regulators as to what hospitals actually are available in the event Sutter's hospitals are not.

16     Economists develop calculations to model behavior.  Recognizing this, Dr. Chipty

17  developed a formula (albeit a novel and untested one) to define the tied markets.  But lacking an

18  econometric approach to substantiate the tying markets, Dr. Chipty tried to pass off Blue Shield's

19  speculation as her own expert analysis.  That flies in the face of *Daubert* and Rule 702.  Dr.

20  Chipty's opinions are not based on sufficient facts or data and are not the product of a reliable

21  methodology reliably applied.  The Court should exclude her testimony.

22  **III.  BACKGROUND**

23     **A.  Plaintiffs' Alleged Geographic Markets**

24     Plaintiffs allege that Sutter has market power in HSAs defined by the *Dartmouth Atlas.*

25  Fourth Am. Compl. ¶ 30.  Plaintiffs specifically included and excluded zip codes from their

26  alleged markets "according to the *Dartmouth Atlas,*" which they claim is a "well-established

27  industry authority" that has defined "local health care market[s] for hospital care" for "the

28  purpose of economic analysis."  *See, e.g.*, *id.* ¶¶ 3, 30, 53.

After this Court found these allegations inadequate at the pleading stage, a Ninth Circuit panel concluded Plaintiffs were not "required to allege evidentiary facts such as what percentages of patients from inside and outside a particular HSA use the hospitals in that HSA, or to otherwise rebut every purported flaw in the *Dartmouth Atlas of Healthcare*'s methodology." *Sidibe v. Sutter Health*, 667 F. App'x 641, 643 (9th Cir. 2016). In the panel's view, the validity of the alleged relevant market would be better addressed on summary judgment. *Id.*

Sutter has now moved for summary judgment on the ground that Plaintiffs have failed to define relevant geographic markets, and Plaintiffs offer the testimony of Dr. Chipty in an effort to defend their alleged geographic markets. Absent Dr. Chipty's testimony, Plaintiffs do not have a legal basis to proceed because they (and Dr. Chipty) have now conceded HSAs were not designed to be—and in many cases are not—relevant geographic markets that can be used in an antitrust case. In other words, if Dr. Chipty's testimony is excluded, summary judgment is warranted.

## B.   Dr. Chipty's Testimony

Plaintiffs directed Dr. Chipty to evaluate whether the particular "candidate markets [alleged by Plaintiffs] were reasonable antitrust markets." Chipty 133:6-22; *id.* 134:8-15.[1] She started with each of the HSA-based markets "posited in the complaint and … ask[ed] whether that candidate market survives the analysis" that she conducted to test Plaintiffs' allegations. *Id.* 135:9-25. But this resulted in an attempt to justify markets, not to define them.

### 1.   Dr. Chipty Admitted the *Dartmouth* Methodology Does Not Define Relevant Geographic Markets.

Dr. Chipty does not defend the use of *Dartmouth* HSAs as a method for determining geographic markets, and she admits HSAs were not designed to define antitrust markets. Chipty Decl. ¶ 144; Chipty 49:15-51:17, 52:23-53:19. She does not dispute that decades-old Medicare data was used to define *Dartmouth* HSAs. Chipty 56:1-7. She agrees that the Berkeley and Oakland HSAs do not form valid markets on their own, and she concludes (contrary to Plaintiffs' allegations) that the Davis HSA is not a valid geographic market given that the overwhelming majority of patient discharges from Sutter Davis Hospital do not even live in the HSA. Chipty

---

[1] The deposition testimony cited in this memorandum is attached in alphabetical order by last name of the deponent as Exhibit 1 to the concurrently-filed Silveira Declaration.

Decl. ¶¶ 95, 126.[2]  Notably, Dr. Chipty did not even bother to opine on markets for nine other Sutter hospitals absent from the complaint, almost certainly because the HSAs for those hospitals do not constitute geographic markets for antitrust purposes.  Chipty 56:22-57:3.

Dr. Chipty further admitted she was not aware of any other lawsuits in which *Dartmouth* HSAs were used to define geographic markets or any academic studies using HSAs for antitrust purposes.  Chipty 58:3-59:4.  But Dr. Chipty still claims that, while *Dartmouth* HSAs were not constructed to define antitrust markets, and she could not point to any instances where they were used to define relevant markets, some HSAs may—as a matter of coincidence—be relevant antitrust markets based on other evaluations that she performed.  *Id.* 52:16-22.

## 2. Dr. Chipty Used a Variety of Inconsistent Approaches to Back Into the HSA-Based Markets Defined in the Complaint.

Dr. Chipty asserts that the other evaluations she performed to corroborate Plaintiffs' geographic market allegations consisted of using the "overarching framework of the hypothetical monopolist test," Chipty 63:12-64:1, which asks whether "a profit-maximizing hypothetical monopolist over the set of hospitals in the candidate geography would engage in at least a small but significant, non-transitory increase in price ('SSNIP')," Chipty Decl. ¶ 57.  But, as her declaration and deposition testimony make clear, Dr. Chipty "use[d] different approaches" to assess the alleged tied and tying markets.  Chipty 63:12-64:1; *see also* Chipty Decl. ¶¶ 48-63.

Dr. Chipty examined the alleged tied markets using a novel econometric "diversion analysis," but she found that analysis was "challenging" to apply "numerically" in single-hospital HSAs without defining a broader geographic market.  Chipty 60:17-61:17 ("I don't want to say one couldn't apply a numerical calculation of the hypothetical monopolist test, but it becomes more challenging"); *accord* Chipty Decl. ¶ 62.  In other words, the nature of Plaintiffs' candidate tying markets—all but one of which has only a single non-Kaiser hospital—made it hard to use

---

[2] Plaintiffs allege that the Davis HSA is a relevant geographic market, but Dr. Chipty found that 92% of the patient discharges from Sutter Davis Hospital's primary service area ("PSA") do not even live in the HSA.  Chipty Decl. ¶ 126.  Despite rejecting the Davis HSA on this basis, Dr. Chipty finds that the Auburn and Tracy HSAs constitute relevant antitrust markets despite 65% and 57% of the PSA discharges from the Sutter hospitals in those HSAs not living in the HSA.  *See id.* ¶¶ 122 n.246 & 117 n.236.  Dr. Chipty justifies this absurdity only by saying that ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.  *Id.* (emphasis added).

Case No. 3:12-CV-04854-LB
Def.'s Motion to Exclude Chipty Testimony

1   her preferred econometric methodology to test their economic coherence.[3]  So she "did not do a

2   similar calculation with regards to the econometrics with the tying markets."  Chipty 75:3-5.

3        Instead, Dr. Chipty claimed to have resorted to "ordinary course" documents to determine

4   "what the health plans … think and thought … about the choices that were available to them" in

5   the alleged tying markets.  Chipty 64:2-13; *id.* 65:4-10.  But despite purporting to gather and

6   analyze an array of qualitative evidence because evidence to perform a quantitative analysis for

7   the tying markets was lacking, Dr. Chipty relied almost exclusively on a "redirection analysis"

8   prepared by Blue Shield for its self-funded client UEBT, Chipty Decl. ¶ 54, in lieu of the requisite

9   economic analysis necessary to support Plaintiffs' alleged geographic markets.[4]

10        **3.   Dr. Chipty Uncritically Accepted Blue Shield's Redirection Analysis.**

11        A redirection analysis assesses "alternative hospitals" to which an insurer could direct a

12   customer if a given hospital were out of network for that customer and estimates the savings that

13   the customer would realize if the hospital were removed from the network.  Baker 42:9-18, 77:7-

14   16; *see also* Barnes 436:23-437:3.  In Dr. Chipty's view, the Blue Shield redirection analysis

15   "determined the share of claim expenditures that could be diverted to alternative hospitals if

16   Sutter were to go out of-network."  Chipty Decl. ¶ 55.

17        Dr. Chipty recognized Blue Shield's numeric redirection analysis as "unique" because "it

18   gives the appearance of being more precise" than other insurer documents.  Chipty 69:17-20; *id.*

19   70:3-6 ("I can't recall … another sort of numerical calculation as detailed as Shield").  Seeking to

20   exploit that appearance of numerical precision, Dr. Chipty relied heavily on Blue Shield's

21   analysis for her opinion that an ███████████████████████████████████

22   ████████████████████████████████████████████████████████████

---

23        [3] Moreover, when she "implemented the numerical calculation" for the Berkeley-Oakland
    HSA—the only alleged tying market with more than one hospital—Dr. Chipty found that Sutter's
24   hospitals could not raise prices by 5%, which is the standard metric used under the hypothetical
    monopolist test.  Chipty Decl. ¶ 93 n.179; *see also id.* ¶¶ 16, 60, 63 n.119; Merger Guidelines
25   § 4.1.2.  In short, the Berkeley-Oakland market did not pass her econometric test.

        [4] Self-funded means that UEBT is paying Blue Shield to access its network of hospitals
26   and physicians, and UEBT is bearing the risk associated with the health care of its beneficiaries.
    UEBT is not purchasing an "insurance" product from Blue Shield.  For this reason, UEBT is not a
27   member of the putative class in this case.  Nor is UEBT similarly situated to class members, as its
    ability to manage its own risk profile and benefit design would affect its ability to redirect
28   patients to other hospital providers and the volume of that redirection.

1   ███████████████████████████████████████████, and she drew conclusions regarding the

2   contours of the tying markets on this basis.  *See* Chipty Decl. ¶ 20 ("███████████████

3   ███████████████████████████████████████████████████████████████████████████████████

4   ███████████████████████████████████").  In fact, Dr. Chipty went so far as to reproduce

5   Blue Shield's estimates in a table, a bald attempt to present a numerical analysis that she herself

6   failed to conduct using reliable principles.  *Id.* p. 98, Ex. 19 ("Blue Shield Estimate of Patient's

7   Insistence for Sutter Hospitals in the Tying Markets").[5]

8         Not only did Dr. Chipty rely on the Blue Shield redirection analysis without modification,

9   she used it as critical quantitative data to show patient insistence on Sutter hospitals, which would

10  in turn suggest that patients would not leave the HSA where the hospital was located.  Chipty

11  68:20-70:6, 125:7-12.  In other words, she constructed an *ad hoc* approach for defining the

12  relevant "tying" markets, and the most important piece of data on which she based her analysis is

13  not "data" at all, but instead is a back-of-the-envelope "thought experiment" (*id.* 106:20-107:3)

14  that Blue Shield prepared for UEBT and which Blue Shield has acknowledged was not based on

15  ***any*** science.  To the contrary, Blue Shield's Tracy Barnes, who oversaw the redirection analysis,

16  testified that "[t]here is no, you know, set criteria [for identifying alternative hospitals].…  You

17  know, so you just take your market knowledge and create these assumptions."  Barnes 440:5-19.

18        Dr. Chipty's reliance on the redirection analysis was completely untethered to any

19  economic formula.  She did not attempt to construct her own redirection analysis for the tying

20  markets.  Chipty 103:12-15.  And she did not determine whether Sutter's hospitals in the alleged

21  tying markets could increase their prices above current levels in any particular year.  *Id.* 270:2-9.

22  Nor did she use the Blue Shield redirection analysis to identify whether a hospital with a certain

23  insistence level could impose a SSNIP, and in fact "caution[ed against] overusing these numbers

24  that were created in the ordinary course," noting that additional evidence would be needed to

25  reach the conclusion that a hospital could impose a SSNIP.  *Id.* 266:25-267:15.

26        [5] *See also* Chipty Decl. ¶¶ 94 (███████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████████████████

To be clear, Dr. Chipty relies on the Blue Shield redirection analysis more than any other single piece of evidence in order to evaluate the geographic markets for the eight "tying" markets alleged in the complaint, referring to it ***23 times*** in her declaration.  But Dr. Chipty failed to account for the fact that the redirection analysis was manipulated by Blue Shield based on the subjective views of its sales personnel, and thus could not possibly be viewed as a reliable piece of scientific data.  Indeed, she did not even know how much time Blue Shield spent doing the redirection analysis or what data Blue Shield considered (if any).  Chipty 114:18-117:4.

Blue Shield testimony confirms that no economic expert could be comfortable relying on the redirection analysis.  While Blue Shield's actuarial team performed the underlying analysis, Barnes 428:18-430:14, Mr. Barnes admitted he and his network management team provided the hospital redirection numbers, adjusting them if the team thought they were "too much" or "not enough," *id.* 439:21-440:4; *see also* Wells 490:2-492:5.  When determining how many patients would move from one hospital to another, Blue Shield was "just looking at assumptions," not "any numbers," admission patterns, or data, and there "was no testing" of the assumptions on which it relied.  Barnes 730:21-731:20.  Mr. Barnes even admitted that, far from being an unbiased, scientific exercise, the redirection analysis was "one of the levers" Blue Shield used to determine the plan designs it wanted to sell.  Barnes 556:24-557:5.

Dr. Chipty tried to allay these concerns by testifying that she was "comfortable relying on ordinary course calculations on which companies make real world decisions that matter to them financially."  Chipty 113:5-8.  But while she assumed that Blue Shield had prepared the redirection analysis for what "seemed like a negotiation they were going into for UEBT," *id.* 104:15-21; *see also id.* 205:23-207:1, Dr. Chipty did not know if the redirection analysis was ever presented to UEBT or if Blue Shield had a product to offer UEBT that excluded Sutter hospitals.  *Id.* 109:13-110:6.  Nor did she know whether anyone actually used the UEBT redirection analysis to make a business decision as she "wasn't looking to see if this was a reasonable analysis for UEBT."  *Id.* 121:10-122:8; *see also id.* 207:19-24.

Dr. Chipty was unaware of testimony that UEBT did ***not*** in fact rely on the redirection analysis to make a business decision.  Chipty 117:10-20.  The redirection analysis never

1    "advance[d] to the point that [UEBT and its consultants] were comfortable relying on it."

2    Sweeney 191:22-25.[6]  She was similarly unaware of ██████████████████████████

3    ████████████████████████████████████████████████████████████████████████████████

4    ██████████████████████████████████████████████████████.  Chipty 120:6-

5    126:22; *accord* Silveira Decl. Ex. 4 (Crews email).  Even Blue Shield personnel involved in the

6    redirection analysis viewed it as nothing more than a "way to lay a foundation in terms of where

7    UEBT should look to decide their next steps."  Doolabh 284:2-285:10.

8        Moreover, Dr. Chipty was unfamiliar with actual "ordinary course calculations" Blue

9    Shield prepared when anticipating redirection related to a narrow network it assembled in 2004

10   for CALPERS and that ████████████████████████████████████████████████

11   ███████████████.  Blue Shield CEO Paul Markovich, who oversaw Blue Shield's narrow network

12   analysis for CalPERS—a fully-insured narrow network that excluded Sutter hospitals in the

13   Davis, Antioch, Tracy, Jackson, and Crescent City HSAs (and all of the tied HSAs)—testified

14   that it was "fair to say it was ██████████████████" of emergency room patients who would

15   remain at Sutter hospitals excluded from the network.  Markovich 211:6-15.  Mr. Markovich

16   stressed that assuming such ████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████████████████

18   ██████████████████████████████████████████████████████████  Silveira Decl.

19   Ex. 5 at DEF001907894; Markovich 217:1-218:22.[7]  Mr. Markovich defended Blue Shield's

20   assumption of forecasted savings to the California state auditor, Markovich 314:1-315:15, and

21   Blue Shield's own analysis confirmed that the CalPERS narrow network met or exceeded the

[6] *See also* Sweeney 169:5-25 ("I don't believe we made a recommendation to the Board of Trustees based on this preliminary analysis."); *id.* 170:2-4 ("My recollection is we never asked the Board to take formal action on the adoption of a narrow network or tiered network."); *id.* 336:17-25 ("As I mentioned earlier, the analysis we viewed as preliminary.  Therefore, the trustees did not take normal action on that analysis.").

[7] As noted above, in the redirection analysis for UEBT, Blue Shield ████████████████████████.  *See* Chipty Decl. p. 98, Ex. 19.  Blue Shield's Molly Zhou explained why a redirection analysis would differ from real-world experience: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Zhou 248:11-22 (emphasis added).

projected savings, *id.* 229:18-230:14.  Yet, even though Dr. Chipty was trying to evaluate what would happen if certain Sutter hospitals were removed from an insurer's network, Dr. Chipty had no knowledge of this real-world experience when Blue Shield removed several Sutter hospitals from its network for CalPERS, and she could not speak to how consistent or inconsistent that experience was with the redirection analysis on which she relied.  Chipty 102:1-15.  Nor did she know whether Blue Shield had taken that experience into account when it prepared the redirection analysis for UEBT.  *Id.* 102:16-22.

Perhaps most critically, Dr. Chipty could not account for the fact that, in 2014, when Blue Shield had to prepare for the State of California what amounted to a redirection analysis to advise the State what hospitals its members would use if Sutter's hospitals were no longer in its HMO network, ███████████████████████████████████████████████████████████████████████, confirming that no "empirical" or reliable work could be based on the redirection analysis.  Dr. Chipty ***had never seen*** Blue Shield's 2014 Department of Managed Health Care ("DMHC") filings that outlined Blue Shield's transition plan for Sutter hospitals in the event they went out of network.  *See, e.g.*, Chipty 157:20-159:11; *see also* Silveira Decl. Exs. 6-17.[8]  Thus, Dr. Chipty did not know that Blue Shield's representations to the DMHC—prepared at the same time as the redirection analysis—██████████████████████████████████████ ██████████████████████████, as shown in the following table:

| Sutter Hospital | HSA | Hospitals Identified to DMHC | Citation |
|---|---|---|---|
| ████████ | ████ | ████████████████ | Chipty 162:11-24 |
| ██████ | ███ | ██████████████████████ | *Id.* 165:6-166:5 |
| ███████ | ████ | █████████████████ | *Id.* 167:17-170:17 |
| ██████ | ███ | ██████████████████ | *Id.* 179:17-181:16 |

---

[8] While aware of the DMHC reporting requirement itself, Chipty 154:18-155:2, Dr. Chipty simply did not consider the ordinary course evidence resulting from Blue Shield's compliance with that requirement as part of her analysis, *id.* 155:19-156:1, 159:9-11, 173:6-13.

| | | | *Id.* 181:21-183:22 |
|---|---|---|---|
| | | | *Id.* 185:9-186:24[9] |

As discussed below, the notion that Dr. Chipty would rely on Blue Shield's redirection analysis—much less make it the centerpiece of her methodology for all eight tying markets—is astounding and a singular basis to throw out all of her opinions.  There simply is no defending an expert witness's decision to rely so heavily on a document that has no science behind it, that was never used to make a business decision, that was severely criticized by others who saw it, and that contradicted evidence that Blue Shield prepared for the State of California at the very same time (and that would have prevented Dr. Chipty from opining that most of the "tying markets" are in fact relevant geographic markets).

## IV.    LEGAL STANDARD

Federal Rule of Evidence 702 permits opinion testimony from an expert that "will help the trier of fact to understand the evidence or to determine a fact in issue," but only if the testimony is "based on sufficient facts or data," "is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702. As "gatekeeper," the Court must ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand," *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

Reliable expert testimony is grounded "in the methods and procedures of science," not "subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  Factors that may be used to determine reliability of an expert's methodology include:  "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community."  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (internal quotation omitted).

"Maintaining *Daubert's* standards is particularly important considering the aura of

---

[9] While the DMHC placed restrictions on the termination plans for some hospitals,

*See* Cantor Decl. Exs. 13-15.

1    authority experts often exude, which can lead juries to give more weight to their testimony."

2    *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063-64 (9th Cir. 2002) *amended*, 319

3    F.3d 1073 (9th Cir. 2003).  Litigants are not permitted to simply try to "dazzle the courtroom with

4    graphs and tables."  *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 491-92

5    (N.D. Cal. 2008).  Nor can a purported expert support her opinions with otherwise inadmissible

6    "facts or data" unless "their probative value in helping the jury evaluate the opinion substantially

7    outweighs their prejudicial effect."  Fed. R. Evid. 703.  "If evidence lacks either reliability or

8    relevance, it must be excluded."  *Cooper v. Brown*, 510 F.3d 870, 943 (9th Cir. 2007).

9    **V.     ARGUMENT**

10         In *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), the Supreme Court explained

11   that, while courts need not "precisely define" a relevant market to conclude that horizontal

12   agreements between competitors are anticompetitive, an "accurate" definition of the relevant

13   market is required in vertical restraint cases where the risk to competition depends on the market

14   power of the entity imposing the restraint.  *Id.* at 2285 & n.7.  This is such a case.  *See Ill. Tool*

15   *Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006) ("[I]n all cases involving a tying

16   arrangement, the plaintiff must prove that the defendant has market power in the tying product.").

17         To establish the market power necessary to prove their claims, Plaintiffs must accurately

18   define relevant markets.  Narrowly defining the market in which the allegedly tying product is

19   sold is improper because it would "artificially exaggerat[e the defendant]'s market power and

20   shrink[] the scope of [the buyer's] choices."  *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d

21   676, 681 (4th Cir. 2016).  Plaintiffs have repeatedly re-defined their markets—most recently in

22   the Fourth Amended Complaint—in search of a theory consistent with their claims.  But as Dr.

23   Chipty's testimony makes clear, Chipty Decl. ¶ 144; Chipty 51:4-17, an off-the-shelf market

24   definition from the *Dartmouth Atlas* is insufficient.

25         In trying to back her way into HSA-based geographic markets, Dr. Chipty used methods

26   that rely heavily on unreliable and contradictory documents.  Dr. Chipty claims to have used the

27   "overarching framework of the hypothetical monopolist test" to define the relevant tied and tying

28   markets in this case.  Chipty 63:12-22.  But in reality, she has cobbled together different (and

untested) methodologies to define tying and tied markets in an effort to reach her desired conclusions, resulting in an unreliable hybrid methodology created solely for purposes of this litigation.  "Where, as here, an expert offers an opinion that is based on a combination of two methodologies, each methodology must meet the *Daubert* criteria, and the combined methodology must meet those criteria also."  *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, No. CIV.A.05-138(WOB), 2008 WL 113987, at *4 (E.D. Ky. Jan. 7, 2008) (*Kentucky Speedway I*), *aff'd*, 588 F.3d 908 (6th Cir. 2009) (*Kentucky Speedway II*) (excluding expert's unreliable "hybrid" product market test created solely for litigation).

### A.    Dr. Chipty's Inconsistent and Result-Oriented Approach to Market Definition Does Not Constitute a Reliably Applied Methodology.

"[T]he hypothetical monopolist test is an iterative analysis.  The analyst proposes a candidate market, simulates a monopolization of that market, then adjusts the candidate market and reruns the simulation as necessary."  *FTC v. Advocate Health Care Network*, 841 F.3d 460, 473 (7th Cir. 2016).  Dr. Chipty did ***not*** propose candidate areas containing Sutter hospitals and apply a simulation to determine whether those areas constituted antitrust markets, rerunning the same simulation as necessary to refine the market.  Instead, she started with the HSA-based areas Plaintiffs alleged and sought to determine whether they could "survive" analysis based on any available evidence or approach.  Chipty 135:9-25.  Dr. Chipty's search "for corroborating evidence without meaningfully testing [Plaintiffs'] assumption" regarding geographic markets and her "failure to analyze, in a meaningful way, the possibility of a narrower or broader … market renders [her] purported application of the SSNIP methodology unreliable under Rule 702(d)."  *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 988-89 (C.D. Cal. 2012).

To ensure that as many alleged markets as possible "survived," Dr. Chipty continuously modified her approach to market definition.  She started by using a novel "diversion analysis" formula to support the HSA-based markets alleged in the complaint via econometrics.  Chipty Decl. ¶¶ 48-53, 65-87.  But that only worked for the four "tied markets," forcing her to use a different method for the eight "tying markets."  Specifically, when her "implement[ation] of the numerical calculation" pointed to a broader market than the tying Berkeley-Oakland HSA alleged

1     in the complaint, she chose not to expand that market until it passed her econometric test. *Id.* ¶ 93

2     n.179. Instead, she abandoned econometrics to define the tying markets in favor of a small

3     sampling of insurer testimony and documents, most prominently the Blue Shield redirection

4     analysis. *Id.* ¶¶ 54-56, 89-126; *see also* Chipty 266:25-267:10, 268:23-270:9. And when that

5     failed for the Davis HSA, she simply disregarded the insurer evidence and opined that Sutter

6     Davis Hospital's 90% primary service area ("PSA") was the relevant market for that hospital,

7     while declining to use PSAs to assist in defining other markets. Chipty Decl. ¶ 126. While Dr.

8     Chipty acknowledged that PSAs, not HSAs, "tend[] to be … the focal point of how hospitals

9     think about their service areas," Chipty 270:20-23, she believed she "had enough information to

10    make a more precise" definition for the rest of the tying markets, *id.* 271:21-272:11, namely, the

11    redirection analysis that gave "the appearance of being more precise," *id.* 69:7-20.

12         As discussed in further detail below, each of Dr. Chipty's methodologies is flawed in its

13    own right. But Dr. Chipty's grab-bag approach to market definition betrays a more fundamental

14    problem: Dr. Chipty's *ad hoc* selection of different approaches to market analysis lacks the

15    necessary indicia of reliability. These types of "result-driven procedures are anathema to both

16    science and law and are properly excluded because they are too speculative to assist the triers of

17    fact." *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 797 (S.D. Tex. 2000) (granting motion to

18    exclude expert testimony where expert repeatedly modified his opinion to reach the result posited

19    by plaintiffs and agreeing that "Plaintiffs' experts have worked backwards from the exposure

20    conclusion they needed"). In fact, courts routinely exclude testimony where an expert "was given

21    a conclusion by lawyers and worked backwards to hypothesize a mechanism by which it might

22    occur" for the simple reason that "reverse-engineering a theory to fit the desired outcome … does

23    not rise to the level of intellectual rigor" required by the Supreme Court. *In re Mirena IUD*

24    *Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 430–31 (S.D.N.Y. 2016).[10] "Reverse engineering" is

25

---

26         [10] Backward reasoning is no better suited to market definition than to any other subject of expert testimony. For example, in *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1240 (N.D. Ala.

27    2000) (*Bailey I*), *aff'd*, 284 F.3d 1237 (11th Cir. 2002) (*Bailey II*), the court excluded an expert's geographic market opinions where he did not independently analyze potential substitutes "but

28    instead relied on the representations of plaintiffs' counsel." Similarly, in *Live Concert Antitrust Litigation*, the court stressed that basing a determination of whether potential substitutes are in or out of the market solely on the expert's initial framing of the market "impermissibly

1   literally what Dr. Chipty did, and her opinions should be excluded.

2       Dr. Chipty chose to change her test to fit the markets alleged in the Fourth Amended

3   Complaint, rather than adjusting the markets until they passed her test.  She "approached [her]

4   investigation with a particular conclusion in mind … and, without using any clearly-defined

5   methodology, much less any intellectually rigorous analysis, [she] concluded that select facts and

6   data could be interpreted to support that conclusion."  *United States v. Fleet Mgmt. Ltd.*, Crim.

7   No. 07-279, 2008 WL 1924250, at *6 (E.D. Pa. Apr. 29, 2008).  "Such an approach is simply not

8   reliable and does not provide 'good grounds' for an expert opinion."  *Id.*

9   10
        **B.      Dr. Chipty's Methodology for Defining the Eight Tying Markets Substitutes
                Flawed Insurer Testimony for the Requisite Expert Economic Analysis.**

11       Perhaps the most egregious example of Dr. Chipty's unreliable methodology is her

12  decision to abandon scientific reasoning entirely and define the eight tying markets based on one

13  insurer's unscientific impressions of the market for a single customer.  Chipty 74:1-75:16

14  (explaining that the redirection analysis was "not econometric" and she "did not do a similar

15  calculation with regards to the econometrics with the tying markets").  But as the Ninth Circuit

16  has recognized, geographic market definition is "a highly technical economic question."  *Morgan,*

17  *Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991).  Thus, courts

18  routinely conclude that "[c]onstruction of the relevant market and a showing of monopoly power

19  must be based on expert testimony," *Bailey II*, 284 F.3d at 1246, not lay testimony disguised as

20  expert analysis.  *See also Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 RMW,

21  2008 WL 73689, at *10 n.13 (N.D. Cal. Jan. 5, 2008) (holding that jury would likely require

22  expert testimony to determine which products comprise a relevant market).  That is particularly

23  important where, as here, Plaintiffs' tying market analysis relies almost entirely on a single,

24  unreliable insurer document supplemented by bits of other insurer testimony and documents.

25          **1.      Dr. Chipty's Adoption of Blue Shield's Redirection Analysis Renders
                  Her Opinion Unreliable.**

26       The Blue Shield redirection analysis is not an independent assessment of which hospitals

27

28  predetermine[s] the results" of the analysis.  863 F. Supp. 2d at 988.

1    are substitutes for Sutter hospitals offered in Blue Shield's fully-insured products; rather, Blue

2    Shield was planning to use the analysis to sell UEBT, a self-funded payer that had recently sued

3    Sutter, on a particular network design.  It does not provide Blue Shield's impartial assessment of

4    substitutability across hospitals.  In fact, Blue Shield documents that Dr. Chipty ignored show

5    that even Blue Shield recognizes that the Sutter hospitals in the tied markets are substitutable.

6    "Because the foundation of [Dr. Chipty's] opinion is unreliable, the opinion itself is unreliable."

7    *Vernon Walden, Inc. v. LIPOID GmbH*, No. CIV. 01-4826DRD, 2005 WL 3088333, at *12

8    (D.N.J. Nov. 17, 2005); *see also Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,

9    247 F.R.D. 156, 172-73 (C.D. Cal. 2007) (expert's reliance on "cherry-pick[ed]" internal

10   documents was "heavier and broader than either their relevance or reliability can support").

11          Dr. Chipty admitted Blue Shield's redirection analysis was not based on any empirical

12   evidence, is not substantiated, and is not capable of being replicated.  Chipty 75:6-76:13.  For its

13   part, Blue Shield conceded that the "analysis" was not really an analysis at all, but was instead

14   largely a back-of-the-envelope estimate of what would happen if Blue Shield put Sutter's

15   hospitals out of network, prepared for UEBT after UEBT sued Sutter.  *See supra* Part II.B.3.

16          Dr. Chipty simply assumed, but did not verify, that Blue Shield tested geographic areas

17   that encompassed all of the Sutter hospitals' relevant competitors.  Chipty 107:12-108:17 ("the

18   landscape was what the landscape was…. I don't recall doing a full reconciliation of every

19   hospital in California versus the list that was considered in the Blue Shield analysis"); *see also id.*

20   114:21-116:2.  As it happens, Blue Shield did not prepare any "full reconciliation"—or even a

21   partial reconciliation.  Blue Shield chose to omit various hospital competitors for a variety of

22   reasons, including cost.  *See* Baker 258:7-260:22.  The redirection analysis itself discloses that

23   Blue Shield was only offering "reasonable assumptions" regarding alternative hospitals and the

24   anticipated volume of redirection, stressing that its results were not "exhaustive."  Silveira Decl.

25   Ex. 18 at BSC_SutterSub00063513, note [1]; *see also* Chipty 148:20-149:2.  And, as even

26   Dr. Chipty recognized, those assumptions often proved unreasonable, ██████████████████

27   █████████████████████████████████████     Blue Shield's purportedly "reasonable

28   assumptions" are not a reliable basis for "expert" market definition.  *See Berlyn, Inc. v. Gazette*

1   *Newspapers, Inc.*, 214 F. Supp. 2d 530, 539-40 (D. Md. 2002) (excluding market definition

2   opinion where expert "relied on market research done by defendants or statements by the

3   defendants regarding their perceptions of competition, market, and the like" but "there [was] no

4   indication that the assessments were based on proper research methods").

5          Dr. Chipty was similarly uninterested in the fact that the Blue Shield redirection analysis

6   was based solely on the patient population of an employer that is not even a class member.  As

7   Mr. Barnes testified, Blue Shield's redirection analysis was modified to fit UEBT based upon the

8   location of UEBT members and details about that population.  Barnes 426:22-427:2.  Dr. Chipty

9   was unaware of that fact, and she did not know anything about how the UEBT patient population

10  compared to the population of the putative class in this case.  Chipty 114:1-17.  The class here

11  consists of purchasers of fully-insured products, not self-funded payors like UEBT.  And Blue

12  Shield personnel have testified the redirection analysis would be different for an HMO and that

13  benefit design would impact redirection.  *See* Doolabh 134:24-136:9; *see also* Zhou 108:24-

14  109:19 (explaining that it is "harder to redirect PPO members in terms of which hospitals to go

15  for services").  Moreover, UEBT is an outlier even among self-funded payors, as it had already

16  sued Sutter based on allegations similar to those here when Blue Shield prepared its redirection

17  analysis, contradicting Dr. Chipty's assertion that this is an "ordinary course" document.  Chipty

18  65:22-66:7; *see also* Wells 622:6-625:20 (acknowledging outside litigation counsel's inclusion on

19  emails regarding the redirection analysis).  This too renders the redirection analysis an unreliable

20  basis for Dr. Chipty's opinions.  *See In re Se. Milk Antitrust Litig.*, No. 2:07-CV 188, 2012 WL

21  947106, at *12-13 (E.D. Tenn. Mar. 20, 2012) (finding expert "had constructed his model with

22  reference to a single customer … in violation of applicable legal requirements" for geographic

23  market definition); *McLaughlin Equip. Co. v. Servaas*, No. 98-127-C-T/K, 2004 WL 1629603, at

24  *6 (S.D. Ind. Feb. 18, 2004) (excluding relevant market opinion "based on insufficient data").

25         Moreover, as shown above (*supra* Part III.B.3), Blue Shield's experience in designing

26  narrow networks for the type of fully-insured products at issue in this litigation and its own

27  representations to California regulators about substitutes for Sutter hospitals removes any doubt

28  about the unreliability of the redirection analysis.  Blue Shield knew that the levels of patient

1    insistence for particular hospitals that it tried to pass off to UEBT were ████████

2    ████████████████████████████████████████████████████.

3    And it was well aware that it had ██████████████████████████

4    ████████████████████████████████████████████████

5    ████.  In short, Dr. Chipty did not investigate the reliability of this critical document before

6    deciding to base her opinions on it, and the facts confirm that the document is utterly unreliable.

7         In *Advocate*, the district court shared "share[d] some of defendants' concerns about the

8    credibility of the insurers' testimony, which may indeed be self-serving," but set those concerns

9    aside where the "record as a whole support[ed] th[eir] view" and there was "no inconsistency in

10   [the insurers'] testimony."  *FTC v. Advocate Health Care*, No. 15 C 11473, 2017 WL 1022015, at

11   *5 (N.D. Ill. Mar. 16, 2017).  Here, on the other hand, the inconsistency of Blue Shield's own

12   positions regarding substitutable hospitals is overwhelming, and the record as a whole contradicts

13   the redirection analysis.  Dr. Chipty's opinion is unreliable because it was reached "by first

14   identifying [her] conclusion … and then cherry-picking observational studies [like the Blue

15   Shield redirection analysis] that support [her] conclusion and rejecting or ignoring the great

16   weight of the evidence that contradicts [her] conclusion."  *In re Bextra & Celebrex Mktg. Sales*

17   *Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007).

18             **2.      Dr. Chipty's Parroting of the Redirection Analysis Is Not Admissible**
19                       **Expert Testimony in Any Event.**

20        Dr. Chipty "introduced no econometric analysis of any kind" related to market definition

21   of the tying markets.  *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 664 (7th

22   Cir. 2004) (affirming summary judgment where plaintiff's economic expert merely "offered a

23   potpourri of survey research and armchair economics").  Instead, as shown above, she relies

24   uncritically and almost exclusively on the Blue Shield redirection analysis, which she admits "is

25   not econometric."  Chipty 75:14-15 ("There's no way to use it econometrically.").  Putting aside

26   the unreliability of that analysis, it is not a proper basis for expert testimony.  *Cholakyan v.*

27   *Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 544 (C.D. Cal. 2012) (excluding expert for

28   "parroting" another expert whose results were incorporated "wholesale" with no independent

1  evaluation of the report containing the results or its validity).  An expert's "lack of familiarity

2  with the methods and the reasons underlying [someone else's] projections virtually preclude[s]

3  any assessment of the validity of the projections through cross-examination."  *ZF Meritor, LLC v.*

4  *Eaton Corp.*, 696 F.3d 254, 293-294 (3rd Cir. 2012) (internal quotation omitted).  Dr. Chipty's

5  deposition confirmed just that.

6        As shown above (*supra* Parts III.B.3 & V.B.1), while Dr. Chipty discusses the findings of

7  the Blue Shield redirection analysis at length, she did no independent examination of that analysis

8  to justify her great reliance on it as an expert, and ultimately, she (and Blue Shield) admitted that

9  the redirection analysis had no scientific basis.  As a result, her work is no different than a jury

10  interpreting evidence because there was no "expertise" involved.  "None of this evidence or

11  testimony requires the providence of an expert."  *Johns v. Bayer Corp.*, No. 09CV1935, 2013 WL

12  1498965, at *28 (S.D. Cal. Apr. 10, 2013) (excluding expert who restated "the results and

13  conclusions reached by the third-party market research firms"); *see also PODS Enters., Inc. v. U-*

14  *Haul Int'l, Inc.*, No. 812CV01479T27MAP, 2014 WL 12628664, at *4 (M.D. Fla. June 27, 2014)

15  (expert's "reliance on one-sided data" and "parroting of the … definition urged by [defendant]

16  render his … opinions unreliable and therefore inadmissible").

17        But the fundamental inadequacy of the Blue Shield redirection analysis as a basis for

18  expert opinion goes deeper than that.  Dr. Chipty testified that while she "think[s] there was a

19  formula involved" in Blue Shield's redirection analysis, it was not available to her and therefore

20  she personally lacked "enough information to independently replicate those numbers."  Chipty

21  76:2-11.  In fact, contrary to Dr. Chipty's belief, Blue Shield's Mr. Barnes testified that there was

22  no "list of criteria or assumptions … that one could use to try to replicate the analysis."  Barnes

23  732:23-733:4 ("There is no replication.  It's just the numbers listed here.").  Thus, the problem is

24  not simply that Dr. Chipty is unable to replicate Blue Shield's analysis—***not even Blue Shield***

25  ***can replicate that analysis***.  And while Dr. Chipty put stock in Mr. Barnes's title and work

26  experience creating provider networks, Chipty Decl. ¶ 55, her *ipse dixit* is not sufficient to render

27  the redirection analysis reliable without any verification or scrutiny.  *Vernon Walden*, 2005 WL

28  3088333, at *11–12 (rejecting argument that expert could rely upon information and opinions

provided to him by CFO with knowledge of the market, finding that while CFO could have provided lay testimony, he could not provide expert testimony through the expert witness).

Dr. Chipty's reliance on the redirection analysis also violates Rule 703, which "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005). That is precisely what Dr. Chipty seeks to accomplish with the redirection analysis—"[b]y assuming the [insistence] projections made by [Blue Shield], [Dr. Chipty] in essence assumed the very matter at issue on which [she] was called to express [her] opinion." *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) (excluding expert's opinion where "there is no indication in the record that [the expert] had any familiarity with the methods or reasoning used … in arriving at his projections").

### 3. The Remaining Evidence Dr. Chipty Relies on Does Not Salvage Her Analysis of the Tying Markets.

During her deposition, Dr. Chipty tried to identify a handful of additional insurer documents on which she relied, but the documents Dr. Chipty identifies—mainly correspondence mentioning the words "monopoly" or "must have" hospitals, *see e.g.*, Chipty Decl. ¶ 20 n.53—do not bring her any closer to defining a relevant market. Dr. Chipty again uncritically accepts lay testimony. Moreover, the evidence she identifies does ***not*** discuss monopoly or market power ***within HSAs***; in fact, Dr. Chipty does not point to a ***single*** piece of evidence in which any market participants (*e.g.*, insurance companies) consider HSAs. And "[e]ven assuming that … the 'collective perceptions of buyers and sellers and other persons close to the industry' support Dr. [Chipty's] proposed definition of the relevant [tying] market[s], the fundamental flaw in Dr. [Chipty's] analysis is that [s]he goes no further," that is, by performing a proper econometric analysis. *Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 989–90.

The unreliability of Dr. Chipty's methodology in interpreting the evidence is plain from the fact that the documents are internally inconsistent both with one another and the Blue Shield redirection analysis. For example, a 2008 United Healthcare email states that, among other

1   "submarkets" (not HSAs), Sutter has "geographic monopolies" in Antioch and Tracy.  Cantor

2   Decl. Ex. 17 at UHC-00134453. ██████████████████████████████████████████

3   ███████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████  Silveira Decl. Ex. 19 at 5-6.  A presentation Blue Shield

5   prepared for UEBT in 2011 also ███████████████████████████████████████████

6   ██████████████████████████████████.  *Id.* Ex. 20 at BSC_SutterSub00013043. ██████████

7   ████████████████████████████████████████████████████████.  *Id.* Ex. 21 at

8   BSC_SutterSub00037622–23.[11]  In short, while Dr. Chipty "purport[s] to rely on 'industry

9   information' … [she] did not utilize a reliable methodology for interpreting and applying this

10  information."  *Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 994.

11         Dr. Chipty's patient flow analysis also demonstrates the unreliability of Blue Shield's

12  redirection analysis and Dr. Chipty's tying market opinion more generally.  The percentage of

13  HSA residents that she calculates as leaving the alleged tying HSAs for hospital care far exceed

14  the levels in *Advocate* and *St. Luke's*.[12]  While Dr. Chipty emphasizes "a strong preference of a

15  majority of area-patients to receive their care locally" in the tied markets (Chipty Decl. ¶¶ 71, 77,

16  82, 87), she throws similar statistics out the window when analyzing tying markets, presumably

17  because she calculates that in five of her eight candidate markets, 50% or more of residents

18         [11] Similarly, the 2008 United Healthcare email claims Sutter has "geographic monopolies"
    in the Berkeley and Oakland "submarkets."  Cantor Decl. Ex. 17 at UHC-00134454. ████████

19  ██████████████████████████████████████████████████████████████████████████████

20  █████████ Silveira Decl. Ex. 19 at 5-6. ██████████████████████████████████████
    ████████████████████████████████████.  *Id.* Ex. 21 at BSC_SutterSub00037618–

21  19.  Notably, Blue Shield had the drive time analysis when it prepared the redirection analysis,
    █████████████████████████.  Wells 448:8-449:18, 452:15-455:10.

22         [12] In *Advocate*, "73 percent of patients living in plaintiffs' proposed market receive
    hospital care there.  Eighty percent of those patients drive less than 20 minutes or 15 miles to their

23  chosen hospital.  Ninety-five percent of those patients drive 30 miles or less."  841 F.3d at 474.
    And in *St. Luke's*, "68% of Nampa residents get their primary care from providers who are

24  located in Nampa." *Saint Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, No.
    1:12-CV-00560-BLW, 2014 WL 407446, at *7 (D. Idaho Jan. 24, 2014), *aff'd,* 778 F.3d 775 (9th

25  Cir. 2015).  Compare that to Dr. Chipty's own statistics for the percentage of tied HSA residents
    receiving care in the Davis (38%), Auburn (37%), Tracy (57%), Jackson (43%), Antioch (40%),

26  and Lakeport (50%) HSAs.  Chipty Decl. ¶¶ 102, 107, 111, 116, 120, 125.  Crescent City (72%)
    and Berkeley-Oakland (79%) are the only ones with outflow statistics close to those of the

27  geographic areas analyzed in *Advocate* and *St. Luke's*, Chipty Decl. ¶¶ 92, 97, but Plaintiffs do
    not and cannot claim that Sutter is able to enforce a tie based on these two hospitals alone, and

28  outflow statistics are insufficient on their own to define markets in any event.

1    *already* receive their care outside of the HSA (*id.* ¶¶ 102, 107, 111, 120, 125).

2    The inflow proxy Dr. Chipty uses—the percentage of Sutter hospital primary service area

3    ("PSA") discharges living in the HSA—also suggests substantial movement for most HSAs.  She

4    found this in-migration critical in the case of Davis and rejected the HSA in favor of the 90%

5    PSA on that basis, but she inexplicably ignored it for others, including Auburn and Tracy, where

6    she recognized that a majority of the Sutter hospitals' PSA discharges live outside the HSA—

7    65% in Auburn and 57% in Tracy.  *See* Chipty ¶ 117 n.236 (Tracy), ¶ 122 n.246 (Auburn) &

8    ¶ 126 (Davis); *see also id.* ¶ 94 nn.180-82 (Berkeley-Oakland), ¶ 99 n.199 (Crescent City), ¶ 104

9    n.210 (Lakeport), ¶ 108 n.219 (Antioch), ¶ 113 n.228 (Jackson).

10    Ultimately, Dr. Chipty and Dr. Gowrisankaran agree that there is substantial patient

11    movement even within the tied markets.  Yet, Dr. Chipty tries to mask the fact that patient flow

12    data shows that HSAs do not constitute relevant geographic markets by pairing the unhelpful flow

13    data with unreliable insistence statistics from the redirection analysis and a handful of other

14    insurer documents that say nothing of HSAs.  Put another way, Dr. Chipty "merely accepted

15    some of the testimony and … data that suited [her] theory and ignored other portions of it that did

16    not." *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001).  Her opinion based

17    on "cherry-picked" data and the "selective use of facts fails to satisfy the scientific method and

18    *Daubert*, and it thus fails to 'assist the trier of fact.'"  *Id.*

19    Dr. Chipty's failure to define relevant tying markets is, standing alone, a proper basis for

20    excluding the entirety of her testimony.  Because "a tying arrangement cannot exist unless two

21    separate … markets have been linked," her failure to define relevant tying markets renders the

22    remainder of her analysis irrelevant.  *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21

23    (1984); *see also Ill. Tool Works*, 547 U.S. at 46.

24    **C.    Dr. Chipty's Methodology for Defining the Four Tied Markets Is Untested,**
25    **Manufactured for Litigation, and Contradicts the Blue Shield Redirection**
      **Analysis She Relies on to Define Tying Markets.**

26    Dr. Chipty defined the four alleged tied markets, unlike the tying markets, through

27    econometric analysis—what she calls "the formulaic numerical implementation of the

28    hypothetical monopolist test."  Chipty 80:13-25.  But the methodology she created for this

1    litigation to define the tied markets, which has never been used in any other antitrust case, is also

2    unreliable.  *See Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1056 (9th Cir. 2003) (exposure

3    "to normal scientific scrutiny through peer review and publication" is required to render opinion

4    prepared for litigation sufficiently reliable) (internal quotation omitted); *Feduniak v. Old Republic*

5    *Nat'l Title Co.*, No. 13–CV–02060–BLF, 2015 WL 1969369, at *4 (N.D. Cal. May 1, 2015)

6    (creation of new valuation method for purposes of litigation undermined court's confidence in its

7    reliability).

8         Dr. Chipty used her own personal "judgment" to determine the appropriate margin to use

9    in her formula.  Chipty 82:18-25.  She had not previously used her formula to define geographic

10   markets, and she could not recall it being used in any academic articles.  *Id.* 81:1-83:19.[13]  And

11   while Dr. Chipty claimed she used "the same type of analysis that has been done in other hospital

12   cases," when pressed to identify a hospital case that used the same formula, she backtracked,

13   noting that she could not answer precisely because she was not involved in several recent cases,

14   although she had the "sense" that the expert in *Advocate* used the same "type of approach."  *Id.*

15        Dr. Chipty's "sense" is not enough.  While Sutter does not dispute the utility of the

16   hypothetical monopolist test for market definition, Dr. Chipty "did not apply this test, but rather

17   used [her] own version of it for this litigation."  *Kentucky Speedway I*, 2008 WL 113987, at *4.

18   Dr. Chipty's "approach, however, does not meet the *Daubert* criteria.  It has not been tested; has

19   not been subjected to peer review and publication; there are no standards controlling it; and there

20   is no showing that it enjoys general acceptance within the scientific community."  *Id.*[14]

21        [13] In fact, the articles on which Dr. Chipty relied proposed markets that are much broader
     than HSAs.  *See, e.g.*, Chipty 83:25-86:24 (acknowledging that the Ho & Lee article describes

22   markets encompassing parts of both the Davis and Sacramento HSAs, and includes additional
     hospitals in the Modesto and Tracy HSAs).  Dr. Chipty was simply uninterested in assessing

23   whether the markets described by other economists were justifiable in a way that HSAs were not.

24        [14] *See also AFMS LLC v. United Parcel Serv. Co.*, No. CV105830, 2014 WL 12515335, at
     *7 (C.D. Cal. Feb. 5, 2014) (excluding relevant market opinions where expert "does not know if

25   anyone else has employed his methodology"); *Crescenta Valley Water Dist. v. Exxon Mobile*
     *Corp.*, No. CV 07-2630-JST, 2013 WL 12116333, at *8–9 (C.D. Cal. Jan. 8, 2013) (excluding

26   expert testimony where plaintiff's expert testified that his model was accurate but expert's
     "modified model and his Report were created solely for litigation purposes" and "for the purpose

27   of ensuring that necessary" results were reflected); *In re Se. Milk Antitrust Litig.*, 2012 WL
     947106, at *10 (excluding testimony where expert gave "lip service to the Merger Guidelines …

28   but in reality us[ed] a theoretical model (*i.e.* his own version of the SSNIP test) constructed solely
     for the purpose of this litigation").

1    Perhaps most incredible is the fact that Dr. Chipty's diversion analysis conflicts with Blue

2    Shield's redirection analysis for the tied markets in identifying different hospitals as likely

3    substitutes.  Although the Blue Shield analysis is demonstrably unreliable as explained above,

4    Dr. Chipty gives it great weight when defining the tying markets, and thus her decision to ignore

5    the same analysis for the tied markets is inexcusable.  For example.

6

7

8

9

10   .  *Compare* Silveira Decl. Ex. 19 at 6, *with* Chipty Decl. p. 55, Ex. 8E.  Similarly,

11

12

13   *Compare*

14   Silveira Decl. Ex. 19 at 5, *with* Chipty Decl. p. 49, Ex. 7D.  Dr. Chipty cannot rely on her

15   diversion analysis for some markets and Blue Shield's redirection analysis for others without

16   assessing why they reach different results and attempting to reconcile the differences.

17   **D.    Dr. Chipty Improperly Ignores Critical Evidence Regarding Excluded**
18   **Competitor Hospitals, Further Establishing the Invalidity of Her Opinions.**

19       A relevant geographic market must include those competitors "who have the actual or

20   potential ability to deprive each other of significant levels of business."  *Rebel Oil Co. v. Atl.*

21   *Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (internal quotation omitted).  Whether excluded

22   entities "are potential competitors [that] should be included in the relevant market" is a "threshold

23   question."  *Id.* at 1436.  Although Dr. Chipty relies on ordinary course documents to support her

24   opinions, she ignores documents and facts that disprove her opinion—not only the evidence

25   discussed above establishing the unreliability of the Blue Shield redirection analysis and the

26   presence of substitutable non-Kaiser hospitals, but also evidence of Kaiser's competitive

27   significance.  Nor did she speak to anyone employed by the insurers in defining relevant markets.

28   Chipty 48:4-8, 110:24-111:2.  As a consequence, Dr. Chipty's market opinions are unreliable and

1   inadmissible.  *See Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 98 F. Supp. 2d 729, 737

2   (W.D. Va. 2000) (excluding testimony for failure to "thoroughly examine substitutes when

3   defining the market"); *Kentucky Speedway II*, 588 F.3d at 916-17 (same).

4          *First*, Dr. Chipty concedes that, at the stage of competition where employees select health

5   plans, Kaiser offers plans that most employees can select during the annual open enrollment

6   period.  Chipty 211:17-212:22.  She further admits that the same choice is available to employees

7   every year.  *Id.* 213:9-12.  But she nevertheless rejects the possibility that the existence of Kaiser

8   and its *45%* share of the commercial health insurance market constrains Sutter's prices based on a

9   ███████████████████████████████████████████████████████████

10  ██████████████████████████████████████.  Chipty 215:11-216:22.  And she

11  ignored significant contrary evidence.  *See id.* 229:17-232:7 (████████████████████

12  ██████████████████████████████████████████████████

13  █████████); *id.* 221:12-225:24 (██████████████████████████████

14  ██████████████████████████████).

15         Additionally, Dr. Chipty did not know that Kaiser accounted for 40% or more of the

16  discharges for residents of the Tracy HSA even though Kaiser does not even have a hospital

17  within that HSA, Chipty 220:5-19, which further evidences that an insurer need not have a

18  hospital in all alleged tying markets to compete.  In fact, Dr. Chipty disregarded evidence that

19  Kaiser successfully markets its health plan in many of the tying HSAs despite lacking hospitals

20  there.  *See* Gowrisankaran Decl. ¶¶ 79-84.  Whether a health insurance product had been

21  successfully marketed within a proposed geographic area absent the hospital or hospitals under

22  investigation was critical to the cases on which Plaintiffs relies.  *See Advocate*, 841 F.3d at 476

23  (focusing on whether insurers needed hospitals in an area "to offer commercially viable

24  products"); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 343 (3d Cir. 2016) ("an antitrust

25  defendant may be able to demonstrate that enough patients would buy a health plan marketed to

26  them with no in-network hospital in the proposed geographic market").  If Kaiser can successfully

27  market a health plan in an HSA without having a hospital there, there is no reason Blue Shield,

28  Anthem Blue Cross, or any other insurer cannot.  *See* Chipty 226:4-13 ("Kaiser competes with the

1   health plans, the Anthems and the Blue Crosses"). Dr. Chipty's failure even to consider Kaiser's

2   marketing of health plans renders her opinion unreliable.

3   *Second*, as to non-Kaiser hospitals, Dr. Chipty ignored many nearby hospitals whose

4   proximity to patients suggests they may serve as substitutes for Sutter patients and thus as

5   competitive constraints. As discussed above, the DMHC filings Blue Shield submitted shortly

6   before preparing the redirection analysis identified alternatives for nearly every Sutter hospital in

7   an HSA. And the CalPERS narrow network offered by Blue Shield excluded all Sutter hospitals

8   except Alta Bates, Marin General (a former Sutter hospital), Sutter Auburn Faith, Mills Peninsula,

9   Sutter Lakeside, Sutter Solano, and Sutter Maternity and Surgery of Santa Cruz. Silveira Decl.

10  Ex. 22 at DEF001888403–04. That means Sutter Davis, Antioch, Tracy, Jackson, and Coast were

11  out of network (as were all Sutter hospitals in the alleged tied markets), which would not be

12  possible if those hospitals had no substitutes as Dr. Chipty opines.

13  Dr. Chipty has admitted to failing to consider highly relevant insurer evidence that points

14  to glaring discrepancies in the evidence she did consider. As explained at the outset of this

15  motion, Dr. Chipty "began [her] analysis with the assumption" Plaintiffs sought to prove, which

16  is "an indicator that [she] lacked the necessary objectivity to make [her] analyses credible."

17  *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000). A thorough analysis of her opinions bears that

18  out. Dr. Chipty's opinions should be excluded as unreliable.

19  **VI.   CONCLUSION**

20  For these reasons, the Court should exclude Dr. Chipty's testimony.

21  Dated: September 10, 2018                     Respectfully submitted,

22                                               Jones Day

23

24                                               By: */s/ Jeffrey A. LeVee*
                                                    Jeffrey A. LeVee
25

26                                               Counsel for Defendant
                                                 SUTTER HEALTH
27

28  NAI-1504410947