Jeffrey A. LeVee (State Bar No. 125863)
jlevee@jonesday.com
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Telephone:     +1.213.489.3939
Facsimile:     +1.213.243.2539

David C. Kiernan (State Bar No. 215335)
dkiernan@jonesday.com
Brian G. Selden (State Bar No. 261828)
bgselden@jonesday.com
Matthew J. Silveira (State Bar No. 264250)
msilveira@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:     +1.415.626.3939
Facsimile:     +1.415.875.5700

Robert H. Bunzel (State Bar No. 99395)
rbunzel@bzbm.com
Patrick M. Ryan (State Bar No. 203215)
pryan@bzbm.com
Oliver Q. Dunlap (State Bar No. 225566)
odunlap@bzbm.com
BARTKO, ZANKEL, BUNZEL & MILLER
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Telephone:  (415) 956-1900
Facsimile:  (415) 956-1152

Attorneys for Defendant
SUTTER HEALTH

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DJENEBA SIDIBE, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>SUTTER HEALTH,<br><br>                    Defendant. | Case No. 3:12-CV-04854-LB<br><br>**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION**<br><br>Date:          December 20, 2018<br>Time:          9:30 AM<br>The Honorable Laurel Beeler |

**<u>REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</u>**

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................... 1

BACKGROUND ......................................................................................................... 3

    A.    Plaintiffs' Antitrust Theory .............................................................. 3

    B.    Alleged Effect on Inpatient Hospital Prices. ................................... 4

    C.    Alleged Pass-through of Hospital Charges in Premiums .................. 5

    D.    Alleged Pass-through of Premium Increase to Employees. ............. 7

ARGUMENT ............................................................................................................... 9

I.     LEGAL STANDARD. .................................................................................... 9

II.    CERTIFICATION UNDER RULE 23(B)(3) IS IMPROPER ....................... 9

    A.    Plaintiffs Have Not Satisfied Their Burden to Show a Common Method for Proving Impact, Which Defeats Predominance. ............................................................. 9

    B.    Determining Whether Any Employer or Individual Paid an Increased Premium Due to Sutter's Alleged Conduct is a Highly Individualized Inquiry. .......... 11

          1.    Whether the insurance company's premium was inflated is an individual issue. .................................................................... 12

          2.    Whether an employer passed along any overcharge to employees is an individual issue. ............................................ 15

          3.    Determining whether a class member suffered any harm from a premium increase is an individual issue. .................... 16

          4.    Plaintiffs' experts' methodology is flawed. ........................... 18

               (a)    The existence of aggregate pass-through does not resolve the impact question. ............................................... 18

               (b)    Plaintiffs' purported proof of "common impact" also fails. ................... 19

               (c)    Plaintiffs' model is limited only to Anthem data. .................... 20

    C.    Plaintiffs Have Not Demonstrated That a Feasible, Common Method Exists for Calculating Damages. ............................................ 20

    D.    A Class Action Is Not Manageable or Superior ............................. 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

III.   PLAINTIFFS DO NOT SATISFY RULE 23(A)'s TYPICALITY AND ADEQUACY
       REQUIREMENTS................................................................................................ 23

       A.   Class Members Have Conflicting Interests. ................................................23

       B.   The Named Plaintiffs Are Not Representative. ..........................................24

IV.    CERTIFICATION IS NOT APPROPRIATE UNDER RULE 23(B)(2). ...........................24

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Allied Ortho. Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
247 F.R.D. 156 (C.D. Cal. 2007) ................................................................ 14, 17, 23, 24

*Barraza v. C.R. Bard, Inc.*,
322 F.R.D. 369 (D. Az. 2017) ................................................................................. 24

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) .................................................................................. 10

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) .................................................................................. 10

*Burkhead v. Louisville Gas & Elec. Co.*,
250 F.R.D. 287 (W.D. Ky. 2008) ............................................................................ 24

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ................................................................................................. 9

*Clayworth v. Pfizer, Inc.*,
49 Cal. 4th 758 (2010) ............................................................................................ 23

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ............................................................................................... 9, 20

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ................................................................................................ 20

*Douglas v. Talk Am. Inc.*,
2009 WL 10669481 (C.D. Cal. Mar. 10, 2009) ...................................................... 23

*Doyle v. Chrysler Grp., LLC*,
663 F..App'x. 576 (9th Cir. 2016) .......................................................................... 21

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .................................................................................... 9

*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
663 F.2d 253 (D.C. Cir. 1981) ............................................................................... 10

*Food Lion, LLC v. Dean Foods Co.*,
312 F.R.D. 472 (E.D. Tenn. 2016) .......................................................................... 14

*Gates v. Rohm & Haas Co.*,
655 F.3d 255 (3d Cir. 2011) .................................................................................... 25

Case No. 3:12-CV-04854-LB
Opp. to Mot. Class Cert.

*In re Fla. Cement & Concrete Antitrust Litig.,*
278 F.R.D. 674 (S.D. Fla. 2012) ............................................................................. 11

*In re Flash Memory Antitrust Litig.,*
2010 WL 2332081 (N.D. Cal. June 9, 2010) ........................................................... 14

*In re Flonase Antitrust Litig.,*
879 F.3d 61 (3d Cir. 2017) ...................................................................................... 25

*In re Fresh Del Monte Pineapples Antitrust Litig.,*
2008 WL 5661873 (S.D.N.Y. Feb. 20, 2008) .......................................................... 11

*In re Graphics Processing Units Antitrust Litig.,*
253 F.R.D. 478 (N.D. Cal. 2008) ....................................................................... 11, 14

*In re Korean Ramen Antitrust Litig.,*
2017 WL 235052 (N.D. Cal. Jan. 19, 2017) ........................................................... 25

*In re Lithium Ion Batteries Antitrust Litig.,*
2018 WL 1156797 (N.D. Cal. Mar. 5, 2018) ........................................................... 10

*In re Methionine Antitrust Litig.,*
204 F.R.D. 161 (N.D. Cal. 2001) ..................................................................... 10, 23

*In re Optical Disk Drive Antitrust Litig.,*
303 F.R.D. 311 (N.D. Cal. 2014) ............................................................................ 14

*In re Processed Egg Prods. Antitrust Litig.,*
312 F.R.D. 124 (E.D. Pa. 2015) .............................................................................. 11

*In re Processed Egg Prods. Antitrust Litig.,*
321 F.R.D. 555 (E.D. Pa. 2017) .............................................................................. 25

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
725 F.3d 244 (D.C. Cir. 2013) ................................................................................ 10

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
264 F.R.D. 603 (N.D. Cal. 2009) ..................................................................... 11, 25

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
267 F.R.D. 583 (N.D. Cal. 2010) ............................................................................ 25

*J.P. Morgan & Co. v. Superior Court,*
113 Cal. App. 4th 195 (2003) ................................................................................. 10

*Kline v. Coldwell, Banker & Co.,*
508 F.2d 226 (9th Cir. 1974) .................................................................................. 10

*Kottaras v. Whole Foods Mkt., Inc.,*
281 F.R.D. 16 (D.D.C. 2012) .................................................................................. 18

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013)..................................................................... 21

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
   791 F.2d 1356 (9th Cir. 1986)................................................................... 18

*Major v. Ocean Spray Cranberries, Inc.*,
   2013 WL 2558125 (N.D. Cal. June 10, 2013) .......................................... 24

*Meijer, Inc. v. 3M*,
   2006 WL 2382718 (E.D. Pa. Aug. 14, 2006)............................................ 25

*Melnick v. Microsoft Corp.*,
   2001 WL 1012261 (Me. Super. Ct. Aug. 24, 2001) ................................. 11

*Rahman v. Mott's LLP*,
   2014 WL 6815779 (N.D. Cal. 2014),
   *aff'd*, 693 F.App'x. 578 (9th Cir. 2017)................................................... 22

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995)..................................................................... 10

*Sali v. Corona Reg'l Med. Ctr.*,
   889 F.3d 623 (9th Cir. 2018)..................................................................... 20

*State of Ala. v. Blue Bird Body Co. Inc.*,
   573 F.2d 309 (5th Cir. 1978)..................................................................... 10

*W. States Wholesale, Inc. v. Synthetic Indus., Inc.*,
   206 F.R.D. 271 (C.D. Cal. 2002) .............................................................. 23

*Wal–Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011).................................................................................... 9

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001)................................................................... 22

Statutes

28 U.S.C. § 516 ................................................................................................. 25

28 U.S.C. § 519 ................................................................................................. 25

California Business & Professions Code
   Section 17204............................................................................................. 10

1

Rules

2

Federal Rules of Civil Procedure

3

Rule 23(a)................................................................................................................... 2, 23
Rule 23(b)(2)................................................................................................................ 2, 24
Rule 23(b)(3)................................................................................................... 9, 10, 20, 25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:12-CV-04854-LB
Opp. to Mot. Class Cert.

1

**INTRODUCTION**

2          Plaintiffs' motion to certify a class of millions of disparate employers and individuals rests

3   on a demonstrably false premise.  Plaintiffs assert that whenever Sutter increases its prices for

4   inpatient hospital services, insurance companies that pay for those services pass through all of the

5   higher prices by increasing the premiums they charge to every purchaser of healthcare insurance

6   (individuals, employers, and employees alike), regardless of the type of insurance product, the

7   purchaser's claims experience, the individual negotiations that occurred over the premium, or the

8   individual decisions of hundreds of thousands of separate employers as to how much of the

9   premium their employees will pay.

10         But plaintiffs' own experts have admitted that this alleged pass-though, if it occurs, is not

11  in fact uniform or across-the-board.  First, to the extent insurers recover their increased costs by

12  passing them on, they do so only in the aggregate.  As plaintiffs' actuarial expert, Mr. David

13  Axene, acknowledged, there will be "some pluses and minuses across the entire portfolio"—*i.e.*,

14  the premiums charged to some purchasers will not cover the insurer's costs and the insurer will

15  instead seek to recover those costs in the premiums charged to other purchasers.  Ex. 1 (Axene)

16  259:17–260:1.[1]  These "pluses and minuses" may exist for myriad reasons, including

17  individualized negotiations over the premiums and competitive pressures from Kaiser and other

18  insurers.  For that reason, plaintiffs' economist expert, Dr. Tasneem Chipty, specifically

19  disclaimed that she was assessing harm as to specific individual large employers:  "I don't want

20  to mix the word 'individual' in there."  Ex. 2 (Chipty) 554:17-18.  And neither expert proposes

21  any common method for separating out the "pluses and minuses" to determine which class

22  members actually paid higher premiums and which did not.

23         Second, even if the ***employer's*** premium was affected, that does not mean the premiums

24  paid by the ***employees*** were affected—and individual employees make up the bulk of the alleged

25  class.  Instead, a separate, additional individual inquiry is needed to determine whether the

26

27  ─────────────────────

    [1] Unless otherwise indicated, all references to "Ex." are to the exhibits attached to the
28  accompanying declaration of Evan B. McGinley.

Case No. 3:12-CV-04854-LB
Opp. to Mot. Class Cert.

employer absorbed the entire premium increase by keeping the employee's insurance contribution constant (*e.g.*, $100 per month regardless of fluctuations in insurer charges).  Or, conversely, the employer may have fixed its own contribution and passed on to the employee the entire amount of any increase.  In the former case, the employee suffered no overcharge, even under plaintiffs' theory.  And in the latter case, the employer suffered no overcharge.  Each of these questions requires individual proof and cannot be resolved on any common basis.  Again, plaintiffs offer no valid method to address them.

Third, proof that an individual paid an increased premium would not be enough. Individual proof would still be needed to determine which of these individuals were harmed.  For many individuals, the inclusion of Sutter hospitals in their insurance network is a significant benefit—it provides access to their preferred hospital covered by their insurance.  However, in the but-for world plaintiffs posit, Sutter hospitals would be more frequently excluded from (or disfavored in) these networks, with the result that the individuals would lose the benefit of having in-network access to their preferred Sutter hospital.  For many of these individuals, that loss would far outweigh the relatively minor increase in their premiums that plaintiffs assert occurred. The individual circumstances of each employee must therefore be evaluated to determine which employees were harmed and which were not.  Plaintiffs do not address this point.

The need for individual proof on each of these points (and others discussed below) defeats the required predominance of common issues.  As numerous courts have held, predominance does not exist where, as here, the existence of antitrust impact depends on individual proof.

The differing circumstances of the putative class members also means that Rule 23(a)'s superiority, typicality, and adequacy requirements and Rule 23(b)(2)'s cohesiveness requirement are not met.  Indeed, the class members' interests affirmatively conflict.  Employers and their employees conflict on which of them bore the brunt of any premium increase.  And the interest of class members who benefited from the challenged conduct conflicts with class members who obtained no benefit.

In these critical respects, this case differs from the class certified in *UFCW & Employers Benefit Trust v. Sutter Health*.  Unlike here, the plaintiffs there were direct purchasers suing for

the alleged hospital overcharges, not for alleged indirect effects multiple steps removed from Sutter's alleged conduct.  Their claim did not require examining the independent premium-setting decisions and individual negotiations between insurers and employers in which Sutter had no part.  It therefore did not raise the same kind of individual issues present here.  Even if class certification were proper in *UFCW*, which Sutter disputes, it is not proper in the decidedly different circumstances here.  Class certification should be denied.

## BACKGROUND

### A.    Plaintiffs' Antitrust Theory.

Plaintiffs are indirect, remote purchasers who rely on a complex, multi-step, and implausible theory of purported class-wide harm.  They first assert that contracts Sutter negotiated with insurance companies to grant **discounted** hospital rates actually had the effect of **increasing** Sutter's rates.  According to plaintiffs, the increased rates resulted from the very provisions in the contracts that are integral to Sutter's ability to offer the discounted rates in the first place.

To gain access to the large number of insured patients, Sutter contracts with insurers, which assemble provider networks into HMO, PPO, and other products.  Sutter agrees to significant price discounts in exchange for being included in the insurers' networks, which increases the volume of patients to Sutter.  Willig Decl. ¶¶ 17-19.  As plaintiffs' expert admitted, "[t]he expectation of volume" from being included in the insurer's networks "influences the prices that are negotiated between the provider and the health plan."  Ex. 2 (Chipty) 497:1–498:3.

The contract is thus a negotiated quid-pro-quo:  discounted rates in exchange for (among other things) predictable, increased volume.  Reflecting this quid-pro-quo, the contracts provide that the insurer may not unilaterally remove a Sutter hospital from the network (or otherwise change the hospital's network status) after the contract has been negotiated.  The insurer agrees that,

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████   Cantor Decl. Ex. 68 §§ 2.06, 2.06.1.  Similarly, the insurers agree that, absent Sutter's consent, they will not treat Sutter unequally with other in-network providers by making patients pay more in the form of such things as higher co-pays, co-insurance, or

1    deductibles for using a Sutter hospital. *Id.* §§ 2.06.3, 2.06.4.

2         Plaintiffs claim that these provisions are unlawful because they prevent the insurance

3    companies from creating "narrow" networks (*i.e.*, networks that include some but not all Sutter

4    hospitals) or "tiered" networks (*i.e.*, networks that place some or all Sutter hospitals in a

5    disfavored "tier" for which patients must pay more).  As just shown, however, the contracts in

6    fact prevent insurers only from ***unilaterally*** creating such networks after Sutter has agreed to

7    discounted rates based on Sutter ***not*** being excluded or placed in a disfavored tier.  By protecting

8    the agreed-upon quid-pro-quo, the contracts facilitate the discounted rates.  Without such

9    protection, the negotiated rates would likely be higher, because Sutter would expect to receive

10   less volume and would need higher rates to generate revenue to cover its fixed expenses and for

11   innovation and needed investments.  Willig Decl. ¶¶ 22, 26.

12        Plaintiffs have also contended that, apart from any contractual provisions, Sutter had a

13   practice of not agreeing to narrow or tiered networks.  In fact, when asked, Sutter frequently has

14   agreed to such networks.  Willig Decl. ¶ 21; *see also* McGinley Decl. ¶¶ 4-10 & Exs. 3-7

15   (collecting product grids from Sutter contracts with carriers reflecting Sutter's participation in

16   narrow and tiered networks); Ex. 8 (Barnes) 277:8-13 (confirming that Sutter agreed to tiering

17   requests more often than not).  Often, however, insurers have not asked.  *See* McGinley Decl.

18   ¶ 13 & Ex. 10 (collecting insurance company witness testimony on this issue).

19        **B.    Alleged Effect on Inpatient Hospital Prices.**

20        Even if plaintiffs could prove that Sutter unlawfully prevented the formation of narrow or

21   tiered networks, however, that would only be the first step of their claim.  Relying on Dr. Chipty,

22   they next assert that, had the insurers created more narrow or tiered networks, Sutter would have

23   been forced to lower its prices.  Dr. Chipty has not previously worked on any direct and indirect

24   purchaser class actions, attempted to calculate pass-through rates for medical premiums, or

25   offered any opinion or submitted any reports, declarations or papers regarding pass-through rates.

26   Ex. 2 (Chipty) 321:23-25, 377:8-14, 380:9-18.  She does not claim to have done any factual

27   investigation into whether Sutter actually prevented any narrow or tiered networks from being

28   formed.  *Id.* 437:9–438:5.  Nor did she determine how many more such networks would have

1   existed absent Sutter's alleged conduct, or which Sutter hospitals would have been excluded by

2   which insurers from which insurance products.  *Id.* 481:16–482:24, 483:24–484:15, 441:11-23.

3          Instead, her sole basis for saying that Sutter prices would be lower but for Sutter's

4   contracting practices is a regression model she constructed using only Anthem data.  She asserts

5   that this model controls for all of the other factors that could affect Sutter's prices and finds that

6   Sutter's purported refusal to agree to more narrow or tiered networks caused prices to go up at

7   seven of Sutter's 23 hospitals.  Chipty Decl. ¶ 110.  As discussed below (at 11), Dr. Chipty's

8   analysis is fatally flawed in numerous respects.

9          **C.     Alleged Pass-through of Hospital Charges in Premiums.**

10          Even if plaintiffs could show an impact on Sutter's hospital prices, that would not prove

11   their claim because they are suing to recover alleged premium overcharges, not hospital

12   overcharges.  For this part of their claim, plaintiffs again rely on Dr. Chipty, who in turn relies

13   primarily on Mr. Axene.  The centerpiece of their opinions—and the linchpin of plaintiffs'

14   motion—is the implausible assertion that all insurers always recover through their premiums

15   whatever increased costs they incur in paying for insured hospital services, *i.e.*, that, if those costs

16   increase by $100 overall, the insurer's total premium will increase by exactly $100.  Critically,

17   they assert that this increased premium would be uniformly spread across every premium payer,

18   regardless of which of five different insurers they were insured by, which of the dozens of types

19   of insurance policies they purchased, or what network they were enrolled in.  As Dr. Chipty put it,

20   her model postulates that "the pass-through is the same across all class members," with the exact

21   same annual percentage increase in premiums for each group type for every single payer in a

22   given rating area.  Ex. 2 (Chipty) 394:24–395:1.

23          These assertions lump together a broad and diverse array of insurers, insurance products,

24   geographic areas, and group and individual premium payers.  Each of the five insurers at issue

25   sells insurance plans for individuals, small-group employers (up to 50-100 subscribers) and large-

26   group employers (above 50-100 subscribers).  Travis Decl. ¶¶ 13, 35.  Dr. Chipty estimates that

27   ████████████████████████████████████████████████████████████████

28   ████████████████████████████████████████     Chipty Decl. ¶¶ 29-30.  This

1   translates to nearly two million individual and employer purchasers in the alleged class, not

2   counting the employee class members who paid a portion of the premium for their health benefit.

3   Dr. Chipty provides no information about the employees.  But they likely number in the millions

4   as well, ███████████████████████████████████████████.  *Id.*

5         These millions of putative class members paid for a wide variety of insurance products.

6   In any given year, an insurer may offer a dozen or more products, each with its own separately

7   calculated premium.  For individuals and small groups, the premiums vary by rating area (and

8   even within rating areas, albeit to a lesser degree after the Affordable Care Act ("ACA") took

9   effect in 2014).  Travis Decl. ¶¶ 15, 29-34.  For each product and rating area, the premiums

10  further vary based on the benefit design (*i.e.*, the amount of the co-pay, co-insurance, and deduct-

11  ibles the enrollees must pay) and age of the enrollees (with further variation before the ACA

12  based on factors such as gender and health history).  *Id.*  For example, in 2013 Anthem offered a

13  Premier PPO product with six benefit designs, each with its own premium that further varied

14  according to the age of enrollees.  Travis Decl. ¶ 14.  In Anthem's Rating Area 1, the premium

15  for a 25-year-old individual with a $20 co-pay was $765, while the premium for a 55-year-old

16  purchasing the same benefit design was $2,081.  *Id.*  And that range of varying premiums existed

17  for each product for each rating area for each insurer—and was subject to change every year.

18        Even more variety exists among the products for large-group employers.  The premium

19  for each product is individually determined for each employer, using methods that vary by

20  employer.  For relatively smaller large-group employers (*e.g.*, 100-245 subscribers) plans are

21  typically "manually rated," meaning that premiums are determined based on a statewide average

22  base rate that is then adjusted for the demographics of that employer's workforce (*e.g.*, age,

23  gender, dependents, etc.), location of the employees (many of whom may be located outside of

24  Northern California), the type of industry, how the benefits are designed, and what competing

25  health plans are offered alongside the product being rated.  Travis Decl. ¶¶ 37-39.  For larger

26  large-group employers (*e.g.*, more than 500 subscribers), plans are generally "experienced rated,"

27  meaning that premiums are based almost entirely on the claims experience of that employer's

28  workforce, without the same kind of detailed examination of the particular demographics of the

workforce.  *Id.* ¶ 40.  For employers in between these two categories (*e.g.*, 250-499 subscribers), the plans are typically rated on a blended basis, meaning that claims experience is given significant weight but the workforce demographics are also significantly evaluated.  *Id.* ¶ 41.

For the large employer groups (and for some small-group employers before the ACA became effective), the rating process is usually just the first step.  The insurer's proposed premium is then subject to individual negotiation between the employer (or its broker) and the insurer.  Ex. 1 (Axene) 250:10-23; Travis Decl. ¶¶ 64-67.  The employers often solicit bids from multiple insurers and negotiate over the premium before contracting with the selected insurer.  While it is not feasible for Sutter to conduct discovery into all of the individual negotiations in which class members have engaged, even limited discovery has revealed numerous instances of employers negotiating to reduce or eliminate proposed premium increases.  For example, in 2012, Anthem proposed a 12.5% premium increase to one large-group employer, but then ultimately agreed to not increase the premiums at all (and even to contribute $20,000 to the employer's wellness fund) when the employer got rate proposals from competing insurers that would have lowered the employer's rates by as much as 4.85%.  Ex. 11 (Anthem agreed to a "rate pass," freezing a self-funded client's rates for a year); Ex. 12 (Aetna agreeing to a rate pass after initially proposing a 3.8% increase); Ex. 13 (employer switched from Blue Shield, which quoted an 11% rate increase above current, to Cigna, which quoted a rate 15.5% below current).

**D.    Alleged Pass-through of Premium Increase to Employees.**

The next step in plaintiffs' claim is to determine how much the employee class members paid for their health coverage, because plaintiffs allege that the alleged hospital overcharge was passed through to them as well.  No formula exists to determine this pass-through amount, if any, on a class-wide basis.  Each employer determines for itself how much its employees will contribute, and that amount can change from year to year based on a wide variety of factors extending far beyond any changes in the total premium charged by the insurer.  Travis Decl. ¶ 70; Willig Decl. ¶ 56.  An employer may change the employee contribution based on the employer's perception of the employee's willingness to pay, the employer's overall profitability, general business conditions, competition for labor, and other factors.  *Id.*  And employers often set

1  different contribution levels for different categories of employees. *Id.* ¶¶ 83-85.

2      Some employers set a fixed employee contribution (*e.g.*, $100 per month) that they hold

3  constant over time. Travis Decl. ¶ 75; Willig ¶ 53. For example, named plaintiff David Herman

4  paid the same amount under a Blue Shield plan each year in 2011 and 2012, and a lower amount

5  in 2013. Ex. 14 at CCSF 0003974; Ex. 15 at CCSF 0004178; Ex. 16 at HERMAN00000045

6  (setting retiree premium at $42.73 in 2011 and 2012 and $26.24 in 2013); Ex. 17 (Herman) 137:8-

7  22, 146:10-148:6, 163:1-165:8, 168:1-172:14. In those same years, however, his employer's

8  share of the cost for his premium increased each year. *See id.* (setting employer share at

9  $1,265.71 in 2011, $1,308.14 in 2012, and $1,409.74 in 2013). Other employers take the

10  opposite approach and set a maximum amount that the ***employer*** will pay each month, with the

11  employees being required to pay the remainder. Travis Decl. ¶ 80; Ex. 18 (employer contribution

12  capped at uniform rate for all health plans offered). In the former case, the employer bears the

13  expense of any increase in premiums, and in the latter case the employee bears the expense.

14      Some employers vary the amount of the employee contribution according to the health

15  plan the employee chooses. Travis Decl. ¶¶ 78-79; Willig Decl. ¶ 55. For example, in 2017

16  named plaintiff Johnson Pool & Spa offered several plans (including an Anthem plan) and told its

17  employees that it would cover the entire premium up to the cost of the Western Health Advantage

18  plan. Ex. 19 at JOHNSON00003024-32; Ex. 20 (Feeney) 220:14-22. If an employee chose a

19  plan with a higher premium, the employee had to pay for the additional cost. Ex. 20 (Feeney)

20  173:21-176:6. Western Health Advantage is a joint venture between Dignity and others,

21  excluding Sutter. *See* Ex. 21 at JOHNSON00005798. Thus, to the extent the Anthem plan cost

22  more than Western Health Advantage because of Sutter, the employer passed those higher costs

23  on entirely to the employee. Numerous other employers have similar plans.[2] ████████████

24  _____

25  [2] *See. e.g.,* Ex. 22 at 12, 14 & Ex. 48 at 29-30 (San Ramon pays up to the dollar amount of Kaiser plan; if employee chooses a more expensive plan, employee pays the excess amount); Ex. 23 at 1

26  (school district plan benefits capped at "an annually determined Kaiser composite rate to calculate [employer's] share toward an employee's monthly premium"). In other circumstances,

27  employees may not be required to make any contribution at all. *See e.g.*, Ex. 24 at 1 (employee

28  contribution for plans offered by Sacramento City Unified School District set at $0); *see also*

(continued)

1  ███████████████████████████████████████████████████

2  ██████████████████████████████████████.  Ex. 26; Ex. 27

3  (Markovich) 158:21-162:13.  This employee contribution would be unaffected by any increase in

4  Sutter costs.

5        Importantly, employers do not always hold the employee contribution amount static, and

6  may change it in response to premium increases of the kind plaintiffs allege.  For example, after

7  negotiating down a proposed Aetna premium increase from 14% to 7% (plus a $40,000 wellness

8  fund allowance), one large-group employer decided to not pass along any of the increase to its

9  employees and froze the employee's contribution at the previous year's level.  Ex. 28; *see also*

10  Ex. 29 (employer kept employee contribution the same even though premium increased;

11  employer told employees it "is taking on the entire increase"); Travis Decl. ¶ 82.

12  **ARGUMENT**

13  **I.**    **LEGAL STANDARD.**

14        "The class action is 'an exception to the usual rule that litigation is conducted by and on

15  behalf of the individual named parties only.'"  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)

16  (quoting *Califano v. Yamasaki,* 442 U.S. 682, 700–01 (1979)).  "To come within the exception, a

17  party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with

18  Rule 23."  *Id. (*quoting *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011)).  The Court

19  must conduct a "rigorous analysis" to determine whether plaintiffs have satisfied each of Rule

20  23's prerequisites.  *Comcast*, 569 U.S. at 35.  The Court must resolve "any factual disputes

21  necessary to determine whether" Rule 23's requirements are satisfied.  *Ellis v. Costco Wholesale*

22  *Corp.*, 657 F.3d 970, 983 (9th Cir. 2011).

23  **II.**    **CERTIFICATION UNDER RULE 23(B)(3) IS IMPROPER.**

24      **A.**    **Plaintiffs Have Not Satisfied Their Burden to Show a Common Method for**

25               **Proving Impact, Which Defeats Predominance.**

26        "Proof of injury is an essential substantive element" of an antitrust claim.  *Kline v.*

27  Ex. 25 (Jankowski) 195:18–196:23 (one of named plaintiffs testifying that his monthly

28  contribution was "zero" for his Aetna HMO plan for 2015 through 2016).

*Coldwell, Banker & Co.*, 508 F.2d 226, 233 (9th Cir. 1974); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) (same); *J.P. Morgan & Co. v. Superior Court*, 113 Cal. App. 4th 195 (2003) (injury is required in action under Cartwright Act).[3]  This is not simply a damages issue.  The issue is whether consumers were injured at all—an essential element of liability.

This injury requirement is not diminished in a class action.  "[T]he fact that a case is proceeding as a class action does not in any way alter the substantive proof required to prove up a claim for relief . . . .  [E]ach plaintiff must still prove [that the antitrust violation] did in fact cause him injury."  *State of Ala. v. Blue Bird Body Co. Inc.*, 573 F.2d 309, 327 (5th Cir. 1978). "Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury in fact."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252–53 (D.C. Cir. 2013); *Blades v. Monsanto Co.*, 400 F.3d 562, 574 (8th Cir. 2005) (affirming denial of class certification where plaintiffs' expert "did not show that injury could be proven on a class-wide basis with common proof"); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("[W]here fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance.").

Proof of injury is especially problematic in indirect purchaser cases like this one—and this case is even more problematic because it involves multiple levels of alleged pass-through.  In addition to establishing the antitrust violation and that the defendant charged the direct purchasers a higher price, "plaintiff must prove that the 'overcharge' was passed on to each member and that the member absorbed the overcharge or was otherwise harmed by having to pay a higher price." *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164 (N.D. Cal. 2001); *In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797, at *3 (N.D. Cal. Mar. 5, 2018) ("proof of class-wide antitrust impact is made more complex because plaintiffs must offer a model of impact and damages that demonstrates the alleged overcharge was passed through to each successive link in

---

[3]  Proof of injury is likewise an essential element of plaintiffs' other state law claims.  Cal. Bus. & Prof. Code § 17204 (UCL requires that plaintiff has suffered "injury in fact" and "has lost money or property as a result of such unfair competition").

1    the distribution chain, and ultimately to the plaintiffs") (citing *In re Static Random Access*

2    *Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 613 (N.D. Cal. 2009); *In re Graphics*

3    *Processing Units Antitrust Litig.*, 253 F.R.D. 478, 499 (N.D. Cal. 2008).

4         Numerous cases have rejected class certification because the individual issues inherent in

5    making such a showing preclude a finding that common issues predominate.  *In re Processed Egg*

6    *Prods. Antitrust Litig.*, 312 F.R.D. 124, 160-61 (E.D. Pa. 2015) (denying class certification in part

7    because "pricing at the retail level is far more individualized and complex than [plaintiffs'

8    expert's] single-pass-through model acknowledges and can accommodate."); *In re Fla. Cement &*

9    *Concrete Antitrust Litig.*, 278 F.R.D. 674, 684-86 (S.D. Fla. 2012) (denying class certification in

10   part because the indirect purchaser plaintiffs' pass-through analysis did not account for variation

11   in factual record); *In re Graphics Processing Units*, 253 F.R.D. at 505-07 (denying class

12   certification due to a lack of predominance in part because the indirect-purchaser plaintiffs' pass-

13   through analysis was flawed and prevented them proving antitrust impact on a classwide basis);

14   *In re Fresh Del Monte Pineapples Antitrust Litig.*, 2008 WL 5661873, at *6 (S.D.N.Y. Feb. 20,

15   2008) (denying class certification when plaintiffs' expert improperly assumed, rather than

16   calculated from evidence, the pass-through rate); *Melnick v. Microsoft Corp.*, 2001 WL 1012261

17   (Me. Super. Ct. Aug. 24, 2001) (denying indirect purchaser class, and cataloguing similar cases).

18        **B.**    **Determining Whether Any Employer or Individual Paid an Increased**

19                **Premium Due to Sutter's Alleged Conduct is a Highly Individualized Inquiry.**

20        Plaintiffs have not shown that they have a valid method for proving the first step of their

21   claim—*i.e.*, an overcharge on Sutter's hospital charges.  As noted, they rely for this point on

22   Dr. Chipty.  But, as shown in the declaration of Dr. Robert Willig, Dr. Chipty has not determined

23   whether her model will work for insurers other than Anthem, disregards critical data, improperly

24   compares Sutter to dissimilar providers with vastly different cost structures and offerings, and

25   relies on unsupported and improper market definitions.  *See* Willig Decl. ¶¶ 128-225.

26        Even if plaintiffs could show an overcharge on **hospital** services*,* however, that would not

27   show a common impact on **premiums***.*  Any premium impact depends on a series of highly

28   individualized factors, at two different levels:  (1) the insurance company's setting of the

premium it will charge, and (2) the employer's decision as to how much, if any, of the premium increase it will pass on to its employees.  The individual proof required to resolve these issues precludes class certification.

### 1.    Whether the insurance company's premium was inflated is an individual issue.

At the first level, impact depends on whether the premium charged by the insurance company was affected at all for a particular payer.  Plaintiffs assert this question is resolved by their experts' opinion that insurers seek to recover all of their hospital costs in the premiums they set.  But even accepting that the insurers actually succeed in their desire to recover all of their costs (which plaintiffs have not shown), Dr. Chipty admitted that "premiums are designed to cover expected medical costs *for the entire business line*," not necessarily for each individual payer.  Ex. 2 (Chipty) 554:3-5 (emphasis added); *see also id.* 354:16-19 ("the business line *as a whole* has to have a design for which the health plan recovers expected medical costs") (emphasis added).  Mr. Axene likewise admitted that the recovery of costs (to the extent it occurs) is "clearly in the aggregate."  Ex. 1 (Axene) 60:20–61:1.  As he admitted, an insurer can elect to decrease its profit margin and reduce its own administrative costs rather than increase its premium to cover any increased hospital costs.  *Id.* 264:12–265:11.[4]

As discussed above (at 7), one of the reasons an insurer may not pass through increased hospital costs is that it may agree in individual negotiations to a reduced premium that eliminates any increase.  As Mr. Axene acknowledged, a "negotiation process" over the premium occurs with respect to most large-group employers.  Ex. 1 (Axene) 250:10–251:2; *see also* Ex. 2 (Chipty) 35325–354:3.  And such individual negotiations also occurred for small-group employers before the ACA became effective in 2014.  Travis Decl. ¶¶ 65-67.

---

[4]  The testimony of the insurance company actuaries was in accord.  "So if there are certain segments that are underperforming in margin, in general, the intent is to try to recoup that by other means.  So, in general, once the targets are set, the goal is to achieve those in aggregate."  Ex. 30 (Beuoy) 103:15-20; *id.* 286:9-14; *see also id.* 68:2–69:15 ("just to clarify, the answer was with respect to ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ .

Competition from Kaiser and other insurers factors heavily into these individual

negotiations.  As Dr. Chipty admitted, an insurer "might decide to absorb a cost increase in order

to better compete with Kaiser."  Ex. 2 (Chipty) 471:25–472:18; Chipty Decl. ¶ 112.  Mr. Axene

agreed that insurers sometimes "take a loss on a particular product in order to be competitive."

Ex. 1 (Axene) 228:16-19; *see also id*. 298:15-24 (insurers "are limited by competition from other

insurers" in setting premium levels).  And the evidence supports these admissions.  For 2015, for

example, Blue Shield agreed to a "rate pass" (no premium increase from the prior year) for the

San Francisco retiree plan because of the "difficult position" Blue Shield was in "with both

Kaiser and [United] proposing rate decreases."  *See* Ex. 31.[5]

As Mr. Axene admitted, when an insurer agrees not to increase the premium for a given

employer, "there would have to be some pluses and minuses across the entire portfolio to be sure

that [the insurer is] still making money."  Ex. 1 (Axene) 259:17–260:1.  But neither Mr. Axene

nor Dr. Chipty proposes any method to account for these "pluses and minuses" arising from

individual negotiations.  To the contrary, Dr. Chipty admitted that "I have not studied that

specifically" and "I have not factored that into my calculation."  Ex. 2 (Chipty) 353:21–354:3,

---

[5]  *See also, e.g.,* Willig Decl. ¶¶ 99-101, 156-58; Ex. 32 (Davila) 138:12–139:11 (Blue Shield
witness agreeing that "absolutely" Kaiser "constrain[s] the prices you can charge for your HMO
network" because ███████████████████████████████████████████████████████████████
███████████████; Ex. 27 (Markovich) 153:9-19
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████  Ex. 33
(Anthem agreeing to a rate pass after Kaiser offered a rate pass); Ex. 34 (Widmann) 224:4-16
(describing ██████████████████████████; Ex. 35 (Lundbye) 105:4-106:7 (United
tries to "keep its HMO rates low so as to compete with Kaiser"); Ex. 36 at BSC_UFCW
00007217 (Blue Shield document emphasizing ████████████████████████████████████
███████████").

Although acknowledging that Kaiser may constrain premium increases, Dr. Chipty asserted that
the "evidence" indicates that it does not in fact do so or that insurers tried to compete with Kaiser
only by seeking to create narrow or tiered networks.  Chipty Decl. ¶ 112; Ex. 2 (Chipty) 451:10-
453:23.  This assertion is unfounded.  The only evidence she cites is that insurers generally pass
through their costs in the aggregate.  *Id.* ¶¶ 113-25.  This does nothing to show that Kaiser does
not constrain premiums either generally or as to individual payers.  *See infra*, p. 19; Willig Decl.
¶ 66.  The evidence overwhelmingly shows that Kaiser imposes just such a constraint.

554:10-13.  She thus offers no vehicle—let alone a common one that could support class

certification—for determining whether an employer in fact paid a higher premium or instead

avoided a proposed premium increase by persuading the insurance company to freeze its rates.

Instead, all Dr. Chipty offers is an "approximation of the average harm to a large group

employer" with a damages award that would "compensate on the average." *Id.* 558:20-22,

559:15-16, 554:14-17.  She disclaimed making any assessment of individual harm.  "I don't want

to mix the word 'individual' in there." *Id.* 554:17-18.  Thus, she admitted that her approach could

"mask variation across large group class members." *Id.* 559:9-12.

Dr. Chipty tried to justify her "average harm" approach by asserting that all of the large-

group employers would have been harmed, with only the amount of harm varying. *Id.* 559:12-15.

But as just shown, that is not true—employers who avoided a premium increase attributable to

increased hospital cost suffered no harm at all.  Numerous courts have rejected using purported

average harm to award damages to persons who in fact suffered no harm.  *See, e.g., In re Optical

Disk Drive Antitrust Litig.,* 303 F.R.D. 311, 321 (N.D. Cal. 2014) (use of an average overcharge

"ma[de] no attempt to establish, but instead simply assumes, class-wide impact" and therefore did

not carry the putative class's burden on predominance); *In re Flash Memory Antitrust Litig.*, 2010

WL 2332081, at *10 (N.D. Cal. June 9, 2010) ("looking only at an *average price trend . . .*

obscures individual variations over time among the prices that different customers pay for the

same or different products") (emphasis in original).[6]

There are other reasons why an insurance company's premiums charged to a particular

employer or individual may not pass through any alleged hospital overcharge.  For example, Dr.

---

[6] *In re Graphics Processing*, 253 F.R.D. at 494 (rejecting an average impact analysis and
denying certification because "[a]veraging masks the differences and by definition glides over
what may be important differences"); *Allied Ortho. Appliances, Inc. v. Tyco Healthcare Grp.
L.P.*, 247 F.R.D. 156, 176 n.30 (C.D. Cal. 2007) (certification improper where plaintiff offers "no
method for determining each plaintiffs' particular piece of the damages pie" and plaintiff cannot
"averag[e] damages to sweep individual issues under the judicial rug"); *Food Lion, LLC v. Dean
Foods Co*., 312 F.R.D. 472, 488-89 (E.D. Tenn. 2016) (denying class certification because the
plaintiffs' expert "employ[ed] averaging" to "find impact [in specific areas] where data is
otherwise insufficient to draw the conclusion of impact").

1  Chipty finds a single percentage hospital price overcharge in each of her "cohorts" (rating area,

2  group type and year), without differentiating impact based on plan type (*e.g.*, HMO, PPO, etc.),

3  insurer, or other factors such as age or type of procedure.  When her model is adjusted to account

4  for these factors, it shows widely varying overcharge amounts, including no hospital overcharge

5  for certain insurer's plan types.  Willig Decl. ¶¶ 224-25.  Experience-rated employers subscribing

6  to those plan types could not have been impacted.  Similarly, some insurance products excluded

7  Sutter hospitals—and yet Dr. Chipty's model includes premiums paid for all of those products as

8  well.  *See* Travis Decl. ¶¶ 54-58.  And her model does not account for experience-rated employers

9  that had no Sutter charges.  *Id.* ¶ 49.

10         **2.      Whether an employer passed along any overcharge to employees is an**

11              **individual issue.**

12         The individual issues are further compounded by the proof needed at the second pass-

13  through level—*i.e.*, the split between the employer and the employee.  As discussed above

14  (at 7-9), this is a highly individualized issue, because (1) some employers fix the employee

15  contribution at a flat amount that does not vary with the premium charged by the insurance

16  company, (2) some employers fix their own contribution and pass along any premium increases to

17  the employees, and (3) some employers pass along only a portion of any increase, which may

18  vary from employer to employer and from year to year.  Each of these permutations would have

19  to be examined for each of the more than one hundred thousand employers in the proposed

20  class—and their over one million employees—to determine whether the purported overcharge

21  was paid by the employer, the employee, or both.  And, because contributions are subject to

22  change annually, the inquiry would have to be repeated for every year of the ten-year damage

23  period.

24         Plaintiffs propose no valid common method for resolving this issue.  Dr. Chipty admits

25  that her model produces only a single premium overcharge amount and that she has not analyzed

26  how the alleged increase was split between employer and employee.  Ex. 2 (Chipty) 316:5-10.

27  Nor has Mr. Axene analyzed it.  Ex. 1 (Axene) 282:15–283:3.  Dr. Chipty suggested that

28  "whether the [employee] paid the premium or whether the employer paid the premium or how

that was divided" could be resolved "as part of a claims administration process." Ex. 2 (Chipty) 296:16–297:5; *id*. at 319:20-23; Chipty Decl., p. 95 n.287. But she offers no explanation as to how that would be done, let alone that it could be done on a common basis. She asserts that she was told by a "class administrator" that "generally" the employer/employee split can be deter-mined from "payroll records." Chipty Decl., p. 95 n.287. But even if that were true, it would require a highly individualized process of examining the records of over one hundred thousand employers and likely more than a million employees separately for each year of the lengthy class period. And she has not demonstrated that it is in fact true that the records needed to conduct this evaluation exist. She offers no facts to support what the class administrator purportedly told her and no basis for concluding that the administrator had the requisite knowledge regarding what kind of records employers keep, let alone that they currently have and are willing and able to produce adequate records covering the alleged ten-year damages period. The available evidence indicates that such records do not exist for many employees.[7]

Plaintiffs apparently believe this is only a damages allocation issue. Even if that were true, it would not help plaintiffs, as they have not shown that damages can properly be allocated in a feasible or efficient manner. *See infra*, pp. 20-22. In fact, however, this is not simply a damages issue. Resolving whether the employer or employee bore the overcharge goes to antitrust impact, not damages. If, for example, an employer kept the employee contribution at a flat amount, the employees suffered no harm and have no valid antitrust claim. And plaintiffs offer no common method for identifying those who were injured and those who were not.

### 3.   Determining whether a class member suffered any harm from a premium increase is an individual issue.

Even if plaintiffs had demonstrated that they could show on a common basis that all or

---

[7] *See, e.g.*, Ex. 20 (Feeney) 94:23-95:24 (named plaintiff Johnson Pool's payroll records state only one withholding amount for medical, vision, and dental); Ex. 25 (Jankowski) 204:14–205:22 (named plaintiff Jankowski testified that he did not know what portion of his payroll deductions were for premiums related to medical insurance); McGinley Decl. ¶ 71 & Exs. 25 (53:12-15), 69 (Jankowski and the successor to his (now bankrupt) former employer lack records showing his actual payments from 2005-09); Ex. 37 (MacAusland) 250:7-9 (named plaintiff Optimum Graphic's payroll records do not reflect amounts paid for insurance).

1  nearly all class members incurred a premium overcharge, that would still not resolve whether

2  those class members were injured.  Answering that question requires evaluating the value that

3  accrues to a given class member from the challenged conduct—*i.e.*, the value of a desired Sutter

4  hospital being included as an in-network provider.  Plaintiffs assert that Sutter's contracting

5  practices prevented networks that either exclude or disfavor certain Sutter hospitals.  In their but-

6  for world, therefore, more such narrow or tiered networks would have existed, which they assert

7  would have resulted in lower hospital charges and therefore lower premiums.  According to

8  Dr. Chipty, the premiums would have been lower in one rating area by a range of between █████

9  ████████████  Chipty Decl. ¶ 143.  For an employee paying $5,000 per year for insurance (and

10 many paid far less), the annual savings would thus range from about ████████████████

11        However, for many class members this asserted premium reduction would be far out-

12 weighed by the harm they would suffer from being forced to pay more for out-of-network care or

13 to seek in-network care from less-preferred hospitals.  Willig Decl. ¶¶ 34-45.  For example, a

14 person who lives close to a Sutter hospital or who otherwise places particular value on a Sutter

15 hospital obtains a tangible, measurable benefit from that hospital being included in his or her

16 healthcare coverage.  One empirical study (on which Dr. Chipty herself relies) calculated that the

17 welfare reduction that results when the patient loses this benefit can be as high as $109 per year—

18 far exceeding any alleged savings in any reduced premiums.  *Id.* ¶ 37.  By contrast, patients who

19 live far away from a Sutter hospital or who for other reasons would not choose a Sutter hospital

20 even if in-network may suffer little or no loss from the Sutter hospital being excluded.

21 *Id.* ¶¶ 39-41.  These patients may thus benefit overall if premiums were reduced.

22        This issue cannot be resolved on a common basis.  Identifying which patients benefited

23 from not being forced into narrow or tiered networks and which were harmed by the alleged

24 higher premiums would require individual-by-individual proof as to the value a particular patient

25 placed on in-network access to a Sutter hospital, based on that patient's proximity to the hospital,

26 past and expected utilization of the hospital, and personal preference.  Willig Decl. ¶ 45.  Plain-

27 tiffs do not address this issue, let alone show that it can be addressed on a common basis.  *See*

28 *Allied Orthopedic,* 247 F.R.D. at 177–78 (named plaintiffs were not adequate when some class

members appeared to "benefit from the same acts alleged to be harmful to other members of the class," noting that "to this Court's knowledge, no circuit approves of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful"); *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16 (D.D.C. 2012) (refusing to certify class challenge to merger where prices for some items went up but many went down, and individual analysis was necessary to determine net economic injury or benefit to class members).[8]

**4.     Plaintiffs' experts' methodology is flawed.**

**(a)     The existence of aggregate pass-through does not resolve the impact question.**

To support their assertion that increased hospital costs will be passed along as higher premiums, plaintiffs rely on Mr. Axene.  He opines that insurance company actuaries must certify that the company's proposed premiums will cover the company's projected costs for healthcare claims, and that the actuary's calculation of those costs is primarily driven by what the company paid in previous years.  Axene Decl. ¶ 29.  Hence, he asserts, any increase in hospital prices in a given year will result in the actuary projecting higher costs in the following years, and those higher projected costs will be recovered in future premiums.  *Id.* ¶¶ 40-41.

This theory is unfounded.  First, Mr. Axene admits that, while actuaries seek to include all costs in their premium calculation and companies seek to recover those costs, he has done no empirical analysis to determine the degree to which the companies actually succeed in doing so.  Ex. 1 (Axene) 68:16–69:13.  He admitted he has no opinion on whether the pass-through would always be 100%.  *Id.* 281:9-19.

Second, as discussed above (at 12-13), Mr. Axene and Dr. Chipty admitted that whatever pass-through occurs, it is done in the aggregate and that they have not analyzed the degree to

---

[8]  *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986) ("[T]he ultimate relief awarded must take into account any benefits which would not have been received by plaintiff 'but for' the defendant's anticompetitive conduct, or amounts a plaintiff would have expended in the absence of the violation.  An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct.").

1   which costs are passed through at the individual premium-payer level.  They thus admit that they

2   have failed to conduct the critical analysis necessary to support class certification.

3       The Sutter "Pricing Strategies" document (Cantor Decl. Ex. 1) on which plaintiffs so

4   heavily rely is irrelevant for the same reason.  That document did not purport to analyze any

5   actual premiums even for specific lines of business, let alone for any individual payer.  ███████

6   ████████████████████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████████████████████

8   ████████████████████████████.  Similarly, as Dr. Chipty admitted, it did not address

9   whether an employer passed along premium changes to its employees.  Ex. 2 (Chipty) 398:1-15.[9]

10      Nor is Dr. Chipty's purported "pass-through regression" (Chipty Decl. ¶¶ 123-27) entitled

11  to any weight.  Again, at best, it shows only that an insurer's total premiums in a given year are

12  correlated with its overall total costs in that year.  That calculation does not answer the question

13  whether and to what extent premiums were affected at the individual-payer level.  *See* Ex. 2

14  (Chipty) 400:17–401:20; Willig Decl. ¶¶ 67-68.

15                  **(b)      Plaintiffs' purported proof of "common impact" also fails.**

16      Dr. Chipty attempts to bolster her opinion by relying on four purported proofs of supposed

17  "common impact."  Chipty Decl. ¶¶ 126-35.  But these end up being nothing more than a repeat

18  of her arguments that Sutter raised prices for ***hospital*** services—*i.e.*, (1) her hospital price

19  regression, (2) Sutter's alleged market power arising from its geographic footprint, (3) Sutter's

20  alleged similar prices for hospital services, and (4) Sutter's alleged similar contract terms.  Even

21  accepting as true all of these arguments about hospital pricing, they do nothing to establish any

22  common impact on ***premiums***.  As shown above, even for insurers facing similar increases in

23  hospital prices, whether and to what extent the insurers passed those increases along to particular

24  payers is a separate question that cannot be resolved without individualized proof.

25  _____

26  [9]  The other documents Dr. Chipty cites are to the same effect.  At best, they show that health
    costs can affect premiums in the aggregate—*i.e.*, that "some pass through" may exist.  Chipty
27  Decl. ¶¶ 120-21.  They do not attempt to measure the actual degree of any pass-through, to
    identify impact on any particular product or payer, or to show that all payers are impacted.
28

(c)      **Plaintiffs' model is limited only to Anthem data.**

████████████████████████████████████████████████ Chipty Decl. ¶ 84.

She admitted at her deposition that she has not yet determined whether sufficient data exists to

use that model to calculate impact and damages with respect to the other insurers.  Ex. 2 (Chipty)

414:1–423:5.  ████████████████████████████████████████████████████████

████████████████████████████████ *Id.*  And the evidence indicates that any such

extrapolation would mask important differences.  Willig Decl. ¶¶ 224-25.  She has thus failed

entirely to support a Rule 23(b)(3) class as to the other insurers.  To the extent any class is

certified (and none is proper), it must be limited to persons who ██████████████ [10]

C.      **Plaintiffs Have Not Demonstrated That a Feasible, Common Method Exists**
        **for Calculating Damages.**

The foregoing precludes any finding of predominance and by itself defeats class

certification.  But class certification is also improper because plaintiffs have not shown a valid

method for determining damages.  In *Comcast*, the Supreme Court reiterated that Rule 23(b)(3)

requires that damages be capable of measurement on a classwide basis.  569 U.S. at 34.  Plaintiffs

must "show that their damages stemmed from the defendant's actions that created the legal

liability" and can "feasibly and efficiently be calculated once the common liability questions are

---

[10]  Although admissibility is not dispositive at the class certification stage, "in evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*."  *Sali v. Corona Reg'l Med. Ctr.*, 889 F.3d 623, 634 (9th Cir. 2018).  For all the reasons discussed above, Dr. Chipty's declaration is so narrow and incomplete that it does not support class certification, even if it were admissible.  But it is also not admissible.  To be admissible, expert testimony must "rest[] on a reliable foundation and [be] relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  Dr. Chipty's opinions do not meet this standard because, among other things, as discussed above, ██████████████████████████████████████ she examines pass-through only in the aggregate, she has not evaluated the significance of individual negotiations over premiums, she has not examined how premiums are split between employers and employees, she has not sufficiently investigated whether adequate records exist to determine that split, she has not taken into account the benefits to class members from the challenged conduct, and her hospital overcharge model is unreliable.

adjudicated." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013).[11]

Plaintiffs have not met this standard.  Based on their assumption of a uniform 100% pass-through, they simply convert the alleged dollar amount of hospital overcharge into a single alleged annual percentage premium increase for each group type and rating area and apply that percentage to the premiums paid by every single payer in that group type and rating area.  Chipty Decl. ¶¶ 139-46.  The result is that class members in these broad cohorts are awarded the same percentage damages regardless of individual circumstances.  Thus, an employee who paid no premium increase because he or she paid only a fixed contribution is awarded the same percentage damages as an employee who bore the entire brunt of the alleged premium increase because his or her employer fixed its own contribution as a static amount.  Similarly, a large-group employer that avoided any premium increase by negotiating a premium reduction is awarded the same percentage amount as an employer that obtained no such freeze and paid the entire alleged increase.

Dr. Chipty's approach ignores other issues as well.  See Willig Decl. ¶¶ 71-127.  For example, the impact of any hospital overcharge will vary depending on the degree to which an employer's particular workforce obtains inpatient services from Sutter as a percentage of that employer's total claim experience.  Travis Decl. ¶¶ 43-53, 87-111.  For example, the premium impact will generally be greater for an employer with a higher percentage of its workers in Northern California than for an employer with most of its employees located elsewhere.  Willig Decl. ¶¶ 122-24.  Likewise, an employer with many workers in age and gender categories with higher usage rates of inpatient services (*e.g.*, men over age 50 or women in their early 30's) will

---

[11]  As the Ninth Circuit recently explained, "[a]lthough [plaintiff] is correct that our court has emphasized the need for individualized findings as to the amount of damages does not defeat class certification, it has applied this understanding in cases where there existed a common methodology for calculating damages."  *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016) (internal quotation marks and citations omitted).  Thus, the Ninth Circuit observed in *Leyva* that the defendant had computerized payroll and time-keeping records that "would enable the court to accurately calculate damages and related penalties for each claim."  *Leyva*, 716 F.3d at 514.  In other words, damages could be calculated on an objective basis using the defendant's own data.  Plaintiffs have not shown that that is true here.

suffer a proportionally greater impact on its premiums than an employer with relatively fewer

employees in those categories.  *Id.* ¶ 102-12.  Dr. Chipty must also determine the total number of

employees paying a given premium, which of them paid how much of the overcharge and, if

some of them are not in the class, deduct out that portion of the alleged overcharge from the

damages.  Dr. Chipty's approach ignores all of these issues.

Indeed, because (as discussed above (at 16)) plaintiffs have not shown that sufficient

records exist to determine the premium split between an employer and its employees, they have

no way of even awarding every premium payer the same percentage overcharge amount.  For any

employer identified in the insurers' data, plaintiffs do not know whether the employees paid any

premium at all and thus whether they are entitled to recovery—or, if the employees did pay a

portion of the premium, how much they paid.  Nor can the employees be counted on to provide

that information.  Discovery of the named plaintiffs has shown that they lack adequate records to

show the premiums they paid during the class period.  *See supra*, p. 16.  Class certification is

improper in these circumstances.  *See, e.g., Rahman v. Mott's LLP*, 2014 WL 6815779, at *7-8

(N.D. Cal. 2014) (denying class certification where plaintiff "introduced no evidence showing

that restitution 'damages can feasibly and efficiently be calculated once the common liability

questions are adjudicated'") (citation omitted), *aff'd*, 693 F. App'x 578 (9th Cir. 2017).

### D.     A Class Action Is Not Manageable or Superior.

Plaintiffs' failure to show a common method for proving impact on all or substantially all

class members, together with their failure to show any means for calculating individual damages,

means this case would be unmanageable as a class action.  "If each class member has to litigate

numerous and substantial separate issues to establish his or her right to recover individually, a

class action is not 'superior.'"  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th

Cir. 2001).  This case falls squarely within that description.[12]

---

[12]  None of the cases on which plaintiffs rely as having denied class certification (Mot. 20-21) involved the circumstances here.  The issue here is not simply that premium-setting is complex and multi-layered but that the evidence demonstrates that many class members simply were not harmed—and plaintiffs' expert proposes no method at all (let alone a common method that could support class certification) for separating those who were harmed from those who were not.

III.   **PLAINTIFFS DO NOT SATISFY RULE 23(A)'s TYPICALITY AND ADEQUACY REQUIREMENTS.**

A.   **Class Members Have Conflicting Interests.**

"Class certification will be inappropriate if fundamental conflicts of interest are determined to exist among the proposed class members." *Allied Orthopedic*, 247 F.R.D. at 177. That is the situation here.

First, a conflict exists between employers and their employees (and for class counsel seeking to represent both). Employers have an incentive to assert that they bore the entire brunt of any premium increase and did not pass any of it along to their employees. Employees, by contrast, have an incentive to argue that the entire alleged increase was passed on to them. These interests are in direct conflict because, if double recovery is to be avoided, amounts awarded to one will reduce the amounts awarded to the other. *See In re Methionine*, 204 F.R.D. at 167 ("Plaintiff does appear to have a conflict with the class members to whom it resold methionine. Plaintiff, as an intermediary, has an interest in proving that it absorbed the costs of the increased price in methionine that it purchased from its suppliers, while those who purchased from plaintiff, or other similarly situated distributors, have an interest in proving that all of the costs were passed on."); *W. States Wholesale, Inc. v. Synthetic Indus., Inc.*, 206 F.R.D. 271, 277 (C.D. Cal. 2002) (plaintiff must "put forth a method for apportioning [defendant's] profits" and show how "conflict among class members can be avoided").[13]

Second, a conflict of interest exists because, as discussed above (at 16-18), some class members benefited from broad inclusion of Sutter hospitals in their insurance network and would have been harmed in the world plaintiffs' hypothesize absent Sutter's challenged conduct. *See Douglas v. Talk Am. Inc.*, 2009 WL 10669481, at *7 (C.D. Cal. Mar. 10, 2009) (finding a "serious potential conflict of interest" where the challenged conduct "appears to have been beneficial to

---

[13] Plaintiffs cannot sidestep this issue by arguing that no pass-on defense exists. "[I]f damages must be allocated among the various levels of injured purchasers, the bar on consideration of pass-on evidence must necessarily be lifted; defendants may assert a pass-on defense as needed to avoid duplication in the recovery of damages." *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 787 (2010).

1   many class members"); *Allied Orthopedic*, 247 F.R.D. at 177 ("[T]o [the court's] knowledge, no

2   circuit approves of class certification where some class members derive a net economic benefit

3   from the very same conduct alleged to be wrongful by the named representatives of the class.").

4               **B.       The Named Plaintiffs Are Not Representative.**

5           The class consists of a wide variety of differently situated premium payers, including

6   large employers, small employers, employers with many employees in Northern California,

7   employers with only a few employees here, employers with relatively higher rates of inpatient

8   hospital service usage, employers with lower rates of usage, individuals who purchased on an

9   exchange, individuals covered by employer plans, and so forth.  The named plaintiffs, however,

10  are limited to two small employers and four individuals (two of whom worked for the same

11  employer) who paid premiums for plans provided by their employer.  None of the named

12  plaintiffs is a large-group employer, and none of the consumer plaintiffs purchased an individual

13  plan.  For reasons discussed above, the absence of such plaintiffs is important because their

14  circumstances differ.  For example, none of the named plaintiffs has any personal knowledge of,

15  or any personal stake in adducing evidence of, how premiums are established for large-group

16  employers.  Thus, none of them has any interest in establishing that a pass-through occurred

17  despite the presence of individually negotiated premiums.

18          In these circumstances, the named plaintiffs are not sufficiently representative of the class

19  as a whole to be adequate representatives.  *Burkhead v. Louisville Gas & Elec. Co.*, 250 F.R.D.

20  287, 295 (W.D. Ky. 2008) (finding named plaintiffs atypical because they did not "represent 'an

21  adequate cross-section' of the proposed class"); *Major v. Ocean Spray Cranberries, Inc.*, 2013

22  WL 2558125, at *3 (N.D. Cal. June 10, 2013) ("The typicality requirement has been found to not

23  be satisfied where the evidence needed to prove at least one of the named plaintiff's claims is not

24  probative of the other class members' claims.").

25  **IV.     CERTIFICATION IS NOT APPROPRIATE UNDER RULE 23(B)(2).**

26          Class certification under Rule 23(b)(2) is improper where the alleged class is not cohesive.

27  *See Barraza v. C.R. Bard, Inc.*, 322 F.R.D. 369, 387-88 (D. Az.2017) (collecting cases).  The

28  need for cohesiveness under (b)(2) is similar to the requirements of "predominance" and

1   "superiority" under Rule 23(b)(3), but the interests of absent class members, who have no notice

2   or opportunity to opt out, make the cohesiveness inquiry particularly stringent.  *See, e.g.*, *Gates v.*

3   *Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011).  In the antitrust context, a proposed (b)(2)

4   class of indirect purchasers lacks the necessary cohesiveness when the plaintiffs' economic

5   models fail to provide "common proof of antitrust impact or injury."  *In re Processed Egg Prods.*

6   *Antitrust Litig.*, 321 F.R.D. 555, 559 (E.D. Pa. 2017) (indirect purchasers of processed eggs

7   lacked sufficient cohesiveness when the plaintiffs' economic models "failed to isolate the effect

8   of [d]efendants' conduct on the total egg supply," "failed to account for the effect of cost-plus

9   contracts on egg prices[,]" and failed to "present a reliable pass-through model").

10          That is the situation here.  The need to inquire into individual circumstances precludes

11  finding cohesiveness.  Plaintiffs' cases do not hold otherwise.  None of them involved the need

12  for individualized proof of harm that is required in this case.  Instead, they principally involved

13  price-fixing conspiracies that the court found had affected the market as a whole and caused

14  class-wide harm.  *In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *23 (N.D. Cal. Jan.

15  19, 2017); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 596-97 (N.D. Cal. 2010);

16  *In Re Static Random Access Memory*, 264 F.R.D. at 610-11.  That is not the case here, particu-

17  larly given that many class members benefited from the conduct at issue.  *Supra*, pp. 16-18.[14]

18                                      **CONCLUSION**

19          Class certification should be denied.

20  Dated: September 21, 2018

                                      By:  */s/ David C. Kiernan*
21                                          David C. Kiernan

22  NAI-1504713556v3

23

24  _____

25  [14]     Sutter reserves its challenges to particular class members.  For example, because the
    outcome cannot bind state entities, they should  be excluded unless they waive Eleventh
26  Amendment immunity.  *See In re Flonase Antitrust Litig.*, 879 F.3d 61 (3d Cir. 2017) (class
    settlement not enforceable against state absent explicit waiver).  Nor can federal entities be
27  included.  *See Meijer, Inc. v. 3M,* 2006 WL 2382718, at *31 n.15 (E.D. Pa. Aug. 14, 2006); 28
    U.S.C. §§ 516, 519.
28