**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DJENEBA SIDIBE, *et al*., | Case No. 3:12-CV-4854-LB |
| Plaintiffs, | <u>CLASS ACTION</u> |
| vs. | |
| SUTTER HEALTH, | |
| Defendant. | |

**EXPERT DECLARATION OF PATRICK TRAVIS IN SUPPORT OF**
**DEFENDANT'S OPPOSITION TO CLASS CERTIFICATION**

**September 21, 2018**

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS

**Page**

I.     BACKGROUND OF THE WITNESS ................................................................ 1

II.    SCOPE OF ASSIGNMENT .......................................................................... 2

III.   DOCUMENTS CONSIDERED ...................................................................... 3

IV.    CASE BACKGROUND ............................................................................... 3

V.     SUMMARY OF OPINIONS ......................................................................... 6

VI.    FUNDAMENTALS OF HEALTH INSURANCE AND PREMIUM
       RATE SETTING ...................................................................................... 10

VII.   ANALYSES SUPPORTING OPINIONS .......................................................... 17

       A.    Plaintiffs Have Not Accounted for the Varying Impacts—
             Including No Impact—that Result From Experience Rating ................. 17

       B.    Back-end Rate Adjustments Can Negate the Effect of Alleged
             Overcharges and Have Not Been Considered ................................ 27

       C.    Employers' Varying Approaches to Setting Employee
             Contributions Can Result in No Damages from Alleged Sutter
             Overcharges ......................................................................... 31

       D.    Plaintiffs' Argument of 100% Pass-through of Alleged Sutter
             Overcharges to Premium Rates Has Not Been Established ................. 36

VIII.  CONCLUSION ........................................................................................ 47

## I.     BACKGROUND OF THE WITNESS

1.      I am Patrick Travis, a Specialist Leader with Deloitte Consulting LLP ("Deloitte Consulting"), where I specialize in healthcare benefits strategy, design, pricing, cost projection and management, and participant cost sharing.  I graduated from Miami University in 1980 with a Bachelor of Science degree in Business, Finance major. I received a Master of Business Administration, concentration in Finance, from Louisiana State University in 1985.

2.      I joined Deloitte Consulting in 1999.  I consult with employer clients of various sizes, in areas such as healthcare benefit strategies and cost management; assistance with strategy development, cost projections, design underwriting, rate setting, and contribution modeling; private healthcare exchange strategies, vendor selections, and program implementations; and performance of medical benefit claim audits of third-party administrators and insurance companies.  In the scope of my consulting engagements, I regularly interact with healthcare insurance companies related to matters of rate setting, plan design, provider network management, cost control strategies, quality initiatives, and employer and member satisfaction.  I provide these consultative services to plan sponsors, principally small and large employers.

3.      Immediately prior to joining Deloitte Consulting, I served as Division President for a large Chicago-based third-party administrator specializing in medical claims administration for mid- and large-sized self-insured companies.

4.      I began my career as a group underwriter at Ohio Medical Indemnity Insurance Company (a Blue Cross Blue Shield affiliate) in Worthington, Ohio in 1981.

Accordingly, I have 37 years of total professional experience in the healthcare benefits industry.

5.      My education, training, and experience as a consultant in the healthcare benefits industry qualify me to analyze certain matters in dispute in this case.

6.      Deloitte[1] is compensated for my time on this matter at a rate of $700 per hour (and is compensated for the time of the people who have assisted me at their hourly rates).  Payment of Deloitte's fees and expenses is not contingent upon my opinions, my conclusions, the results of my testimony, or the outcome of the case.  My resume is attached as **Exhibit 1**.


II.      **SCOPE OF ASSIGNMENT**

7.      I was retained in this litigation to perform analyses and render opinions concerning plaintiffs' claims regarding Sutter's alleged overcharges and the impact on premiums paid by proposed class members.

8.      I was specifically asked to respond to opinions expressed by David Axene in his declaration dated June 21, 2018 (the "Axene Declaration") and Dr. Tasneem Chipty in her declaration dated June 21, 2018 (the "Chipty Declaration"): (1) that proposed class members are substantively equally impacted by alleged increased inpatient hospital prices imposed by Sutter; and (2) that a common methodology can be used to calculate the alleged premium overcharges.

---

[1] As used in this declaration, "Deloitte" refers to Deloitte Financial Advisory Services LLP ("Deloitte FAS") and Deloitte Consulting.  Deloitte FAS was engaged by Jones Day and Bartko Zankel Bunzel & Miller (individually and collectively "Counsel"), on behalf of Sutter Health ("Sutter"), to provide services in the referenced matter.  Deloitte Consulting is acting as a subcontractor of Deloitte FAS.

9.      During my work on this matter, I was assisted by personnel from Deloitte who worked under my direction.

## III.   DOCUMENTS CONSIDERED

10.     My opinions were reached based on my education, training, and experience as a consultant in the healthcare benefits industry, after reading and analyzing certain documents produced in this matter and performing external research.  A list of documents I considered is attached as **Exhibit 2**.

## IV.   CASE BACKGROUND

11.     The named plaintiffs, acting on behalf of a putative class (collectively the "Plaintiffs"), seek to recover damages allegedly caused by Sutter's "artificially inflated prices for Inpatient Hospital Services," which Plaintiffs allege "impacted all members of the Class in the form of higher insurance premiums."[2]

12.     Plaintiffs seek certification of a purported class defined as "All entities in California Rating Area 1, 2, 3, 4, 5, 6, 8, 9 or 10 (the "Nine RAs"), and all individuals that either live or work in one of the Nine RAs, that paid premiums for a fully-insured health insurance policy from Blue Shield, Anthem Blue Cross, Aetna, Health Net or United Healthcare from September 28, 2008 to the present.  This class definition includes persons who paid premiums for individual health insurance policies that they purchased directly from these insurance companies and persons who paid premiums, in whole or in part, for health insurance policies provided to them as a benefit from an employer or other group purchaser located in one of the Nine RAs."[3]  This case involves healthcare

---

[2] Fourth Amended Complaint, ¶ 120.
[3] Plaintiffs' Notice of Motion and Motion for Class Certification, at 4.

claims arising from "fully-insured" plans only; it does not involve claims arising from "self-insured" plans.

13.     The proposed class is a disparate group of employers and individuals comprising three lines of business, or market segments: Large Group, Small Group and Individual.[4]  Looking at the Individual market only, there is an enormous range in premiums paid, from as low as $92 per month to as high as $1,922 per month,[5] a range of nearly 2000%.  Tremendous variability also exists with the premiums paid by employers. This variability exists across the board, including in the Large Group market segment, where employers with high historical use of healthcare services pay greater premiums than employers with low historical use of such services.

14.     One contributor to this variability is the sheer number of distinct products purchased by proposed class members from the five relevant insurance companies since 2008.  For example, in 2013, Anthem Blue Cross ("Anthem") alone filed at least 51 distinct Individual and Small Group products with the California regulatory authorities.[6] Further still, for one of the Anthem PPO products offered in Rating Area 1 in 2013, Anthem offered 6 different benefit designs, each with its own premium that further varied according to the age of enrollees.  For example, the premium for a 25-year-old individual

---

[4] Plaintiffs' Notice of Motion and Motion for Class Certification, at 5, n.3 (citing to Axene Declaration).
[5] This is the range for Individual market products filed in 2015 by Anthem Blue Cross under filing #AWLP-129656693, as shown in the filing attachment "Rate Submission Template," retrieved from the California Department of Managed Health Care at
http://wpso.dmhc.ca.gov/premiumratereview/filingdetails?id=OfMHXe1R058%2.
[6] This number is calculated by counting, for each filing submitted to the Department of Insurance, the number of "Product Names" on the "Rate Review Detail" page of the filing, and also counting, for each filing submitted to the Department of Managed Health Care, the number of "Product Names" on the "California Rate Filing Spreadsheet."  One filing submitted to the DMHC (#AWLP-128965566) was a new product filing and did not include a "California Rate Filing Spreadsheet," but did include a "Rate Review Detail" page, similar to the Department of Insurance filings, so those product names were included in the count.  The 51 is a minimum number of products because for some filings, the company did not list the product names but instead made a general statement such as "Non-Grandfathered Forms."  In some cases, the same products were included in multiple filings during 2013; these products were only counted once.

purchasing a plan with a $20 co-pay was $765, while the premium for a 55-year-old

purchasing the same plan was $2,081.[7]

15.    The variability in the putative class members' premium rates goes well

beyond the vast menu of product offerings available to consumers over the past 10 years.

In the Large Group market segment, both before and after the effective date of the Patient

Protection and Affordable Care Act ("ACA"), there is relatively little regulation, and

premium rates may vary for reasons such as employee demographics, variation in product

provisions such as covered benefits and cost sharing, and underwriter discretion.  In the

Small Group and Individual market segments, there was some regulation before the

ACA, but premiums were allowed to vary based on reasons such as employee

demographics, variation in product/plan provisions, and differences in health status of

covered members.  Post-ACA, premiums in the Small Group and Individual markets

became highly regulated, though premiums still vary within a product by plan design,

Rating Area, age, and family composition.

16.    The balance of this declaration addresses some of the key factors that have

an impact on premiums on an individual basis, or show that any alleged hospital

overcharge was not passed through in the form of increased premiums.  These factors

directly refute Mr. Axene's and Dr. Chipty's opinions that putative class members were

impacted equally and that a common methodology can be used to determine the alleged

premium overcharges.

---

[7] 2013 Small Group DMHC filing, #AWP-128683754.

V.     **SUMMARY OF OPINIONS**

17.     Members of the proposed class are not uniformly impacted by alleged hospital overcharges.  In fact, the Plaintiffs' proposed class includes employers and individuals whose premiums could not have been impacted by alleged Sutter overcharges.

18.     Plaintiffs and their experts have not proposed a viable common damages methodology for the proposed class.

19.     Plaintiffs' argument that alleged Sutter overcharges are directly passed through to premium rates is fundamentally flawed because it ignores key rate-setting mechanisms and makes inappropriate assumptions arising from a lack of information on Rating Areas.

20.     **(Point A)** Plaintiffs have not accounted for the wide variation in how Sutter's costs might relate to a premium rate, including the possibility that some employers may not be harmed at all.

- Premium rates for experience-rated Large Group employers that purchase fully-insured coverage are established by the insurance company based on each employer's unique claims utilization history.[8]  Excessive prices charged by Sutter, if proven, would have a greater impact on premiums charged to *certain* Large Group employers with high numbers of inpatient stays at Sutter, and would have limited to no impact on other Large Group employers with few or no recent admissions at Sutter hospitals.  Plaintiffs have not proposed a model that can quantify, or even roughly

---

[8] An employer's claims utilization experience is the aggregation of medical claims incurred by its employees and their covered dependents.

approximate, the impact of alleged Sutter overcharges on Large Group employers whose rates are uniquely tied to their specific claims experience.

- Insurance companies have offered numerous narrow or tiered networks where Sutter was either excluded or in a disfavored tier throughout the class period. ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████ Anthem's documents suggest this narrow HMO network, known as "Select HMO," represents more than 20%[10] of Anthem's HMO membership that had a premium differential compared to the "full" HMO network.[11] The deposition of Mr. Axene[12] confirmed that Plaintiffs' proposed damages calculation includes premiums for the Select HMO product. Including such premium dollars in the damages calculation is inappropriate. These members would have experienced little or no damage from Sutter's alleged excessive prices since most Sutter facilities were excluded from the network, and under an HMO there is no coverage for out-of-network non-emergency charges, such that usage of Sutter would be limited or non-existent.

---

[9] *See* ABC083490 at -3571. ███████████████████████████████████ ██████████████████████████████████████ █████████████████████ *see also* De La Torre Dep. 17:17-18:4.
[10] Schwefler Dep. 267:11-268:3 & Dep. Ex. 1731 (ABCLH456415).
[11] Davis Dep. 21:15-23 ████████████████████████████████████ ; Schwefler Dep. 77:12-79:10 & Dep. Ex. 1711 (ABCLH441649) ████████████████████████████ ; *see also* Schwefler Dep. 82:4-14, 121:8-17 & Dep. Ex. 1715 (ABCLH137254).
[12] Axene Dep. 208:10-212:9.

21.    **(Point B)** Premium rate setting by insurance companies involves not only actuarial work, but also significant non-actuarial adjustments in response to factors such as insurance company competition, sales and marketing initiatives, broker involvement, and underwriter discretion.  These adjustments are made to decrease premiums and can occur or be agreed to after targeted or desired premium rates have been established by the insurance company's actuaries.  I refer to these factors collectively as "back-end rate adjustments,"[13] as these adjustments are similarly made at the end of the rating process.  Back-end rate adjustments can temper or fully negate the effect of any alleged hospital overcharges and can create an environment where certain members of the proposed class may have paid lower premiums than otherwise identical class members who could not avail themselves of those adjustments.  This is evidence that not all members in the proposed class would be damaged (and certainly not equally damaged) by any hospital overcharges.  In his declaration, Mr. Axene ignores these back-end rate adjustments.[14]

22.    **(Point C)** Most Small Group and Large Group employers[15] that purchase fully-insured medical coverage require their employees to share the cost of coverage through payroll contributions.[16]  The contributions employees pay are established by each employer and may vary at their discretion from one year to the next.  There is no uniform approach or "normal" methodology that employers use to establish employee contributions; each employer makes this determination based on influences or factors

---

[13] ███████████████████████████  *See* Beuoy Dep. Ex. 1250 (BSC_SutterSidibe0126491) at -6501, -6508, -6519.

[14] Axene Dep. 204:12-206:2, 230:19-231:18.

[15] PwC Health & Well-being Touchstone Survey, June 2017, p. 51.

[16] My declaration refers to the employee's share of the total employer premium rate as the employee's "contribution" to differentiate these payments from Individual coverage purchasers who pay the full premium rate charged by the insurance company.  Employee contributions are typically deducted from the employee's paycheck by the employer on a pre-tax basis.

such as general business conditions, profitability, affordability, collective bargaining requirements (or threats thereof), competition for labor, employee turnover, employer compensation and rewards philosophy, etc.  Some employers charge employees a flat, fixed-dollar amount regardless of premium increases, meaning those employees would be unaffected by alleged overcharges included in such increases.  Other employers fix their share of premiums by, for example, tying it to an insurer such as Kaiser, with employees paying the balance, meaning the employer would be unaffected by alleged overcharges.  Even employees *within the same company* would not be similarly affected by alleged hospital overcharges, as employers are not required to charge their employees uniformly and often offer variable premiums.  Importantly, insurance companies typically have no involvement in how employers set employee contribution levels, and the insurance companies usually do not even know how employers set contributions or what employees are charged.  It is illogical to consider all employees in the proposed class as being equally damaged by alleged hospital overcharges, when the actual costs incurred by these employees vary so significantly.

23.     **(Point D)** A central tenet of Plaintiffs' argument—and that of Dr. Chipty's declaration[17]—is that there is a 100% pass-through of alleged Sutter overcharges to premium rates.  Under Plaintiffs' theory, if alleged overcharges are 20% and Sutter inpatient services are 10% of total claims, then premium rates are overstated by exactly 2%,[18] no more, no less.  But there are several distinct rate-setting mechanisms used by insurance companies, any one of which compromises the 100% pass-through assumption.  Mr. Axene acknowledged in his deposition that he has not analyzed *any* of these

---

[17] Chipty Decl., at 10.
[18] 20% x 10% = 2%, or (0.20 x 0.10 = 0.02).

mechanisms—and that Dr. Chipty's model does not address them.[19]  In addition, because Plaintiffs fail to even determine what Rating Areas applied pre-ACA for Small Group and Individual markets, their conclusions as to those time periods are not only flawed but unsupportable.

24.     I explain and more fully support these points below.

## VI.    FUNDAMENTALS OF HEALTH INSURANCE AND PREMIUM RATE SETTING

25.     The function of any insurance, including health insurance, is to spread risk over a large pool of participants, where the law of large numbers provides a greater statistical level of confidence that the aggregate expected claims, administrative expenses, and profit margin will be covered by aggregate premiums, even though any one policyholder may experience more or fewer claims than expected.  There are many factors that insurance companies consider in setting premium rates, including the demographics and health status of the members to be covered, past costs, forecasts of future costs, desired profit margins, geographic factors and market conditions.

26.     Insurance companies use different approaches to set premium rates for each of the three market segments, known as Large Group, Small Group, and Individual. Part of this variation arises from regulatory and filing requirements of the California Department of Insurance ("DOI") and the California Department of Managed Health Care ("DMHC") that differ across these market segments.  Another factor driving differences in premium rate-setting approaches is attributable to fundamentals of insurance and the law of large numbers, namely that claims for large risk pools (those of

---

[19] Axene Dep. 177:15-181:25.

employers in the Large Group market segment) are more predictable than claims for small risk pools (those of employers in the Small Group market segment).

27.     Additionally, even within a specific market segment—Individual, Small Group or Large Group—there is no standard approach for premium rate setting. Actuarial Standards of Practice ("ASOPs") created by the Actuarial Standards Board do not prescribe a specific approach or formula for developing premium rates.[20]  Indeed, an actuary's judgment is necessary to setting the premiums, and application of that judgment could lead two different actuaries to reach different results.[21]

28.     As such, the broad "actuarial soundness" standard required by the California regulatory agencies does not translate to all insurance companies using the same premium rate-setting approaches.  In fact, it allows for variations in premium rate-setting by a single insurance company for different employers, for different insurance products, and for different time periods.[22]

29.     _Individual Market Segment:_  An individual obtaining coverage through the Individual market pays premiums directly to his or her insurance company.

30.     Prior to the effective date of the ACA in 2014, the amounts included in premium rates for administrative expenses and profits were not regulated on a national basis, but solely at the state level.  Thus, insurers had the ability to charge a greater portion of the premium for administrative expenses and profit.  With the implementation

---

[20] Axene Dep. 169:21-170:10.
[21] _Id._
[22] Axene Dep. 263:3-264:11 (actuarial standards do not prevent an insurance company from taking a loss on a product); 265:7-11 (actuarial standards do not prevent an insurance company from reducing its profit margin to reduce or eliminate a premium increase); 264:12-24 (actuarial standards do not prevent an insurance company from decreasing its allowed administrative costs to maintain a lower premium); 276:6-10 (actuarial standards do not affect how employers divide contributions between employer and employee for the premiums).

of the ACA, specific regulations were added defining the maximum amounts (on a percentage basis) that insurers could charge for administrative expenses and profit. These regulations did not replace those in place at the state level; rather, these ACA regulations were in addition to any state regulations in place.[23]

31.     With respect to the levels of administrative expenses and profit margins allowed under the ACA, the ACA defines the minimum loss ratios ("MLRs") that are applicable for insurance policies in the Individual market segment.  MLRs establish the minimum portion of premium dollars received by an insurance company that must be paid out in claims to members.  For example, an MLR of 80% means at least 80 cents of every premium dollar must be used for medical claims, with no more than 20 cents of every dollar used for all non-claims costs, including administration, profit, commissions, overhead, etc.  MLRs are defined on a prospective basis (that is, the expected MLRs that would be realized under the insured premiums).  In addition, under the ACA, actual experience that results in realized MLRs under the ACA-specified levels would trigger refunds payable to policyholders.  Such refund mechanisms were not in place prior to the ACA.[24]

32.     The approach to developing Individual market premiums changed with the 2014 implementation of certain provisions of the ACA.  Prior to the ACA, California did not place specific restrictions on how much insurance companies could vary premiums in the Individual market, and premium rates could vary based on the policyholder's characteristics, such as age, geographic location, or health status, as well as depending on

---

[23] Kaiser Family Foundation, "Health Insurance Market Reforms: Rate Restrictions," June 2012.
[24] https://www.healthcare.gov/glossary/medical-loss-ratio-mlr/.

the product purchased.[25]  Post-ACA, certain rating considerations are prohibited by federal law, and the premium rate variation allowed for a given product can be based only on family composition, age, geographic location, and smoker status.[26]

33.     *Small Group and Large Group Segments:*  Employers providing fully-insured healthcare coverage pay premiums to an insurance company.  Some employers, in turn, share a portion of their premium cost with their employees in the form of required payroll deductions commonly referred to as "employee contributions" or simply "contributions."  The level of employee contributions required by an employer varies at the employer's discretion, and may differ by coverage tier (e.g., employee only coverage, employee & spouse coverage, or family coverage).

34.     For all employers, the premium rate-setting mechanism will depend on the number of employees enrolled in a specific plan.

- Small Group employers' premium rates are established based on geographic location (*see* description of Rating Areas in paragraphs 89-106), demographics of the group, industry and other factors.

- Large Group employers' premiums are established using one of three approaches:

    o  Manual rating (*see* paragraphs 37-39);

    o  Experience rating (*see* paragraph 40); or

    o  Blended rating (*see* paragraph 41).

---

[25] https://www.kff.org/other/state-indicator/individual-market-rate-restrictions-not-applicable-to-hipaa-eligible-individuals/.  As shown in the second and third columns of the table, California did not place restrictions on rating variation, such as rate bands or adjusted community rating.  As shown in the fourth and fifth columns of the table, California allowed rating by age and health status.
[26] Kaiser Family Foundation, "Health Insurance Market Reforms: Rate Restrictions," June 2012, p. 3.

35.     The segmentation between Small Group and Large Group has not been static throughout the class period.  Prior to the effective date of the ACA in 2014, employers with fewer than 50 employees were considered Small Group.  Post-ACA, employers with fewer than 100 employees are considered Small Group.[27]

36.     To understand why Plaintiffs have not demonstrated a viable method of calculating harm or damages to class members, it is necessary to provide some basic background on the different means for setting premiums.

37.     **Manual Rating:**  One way in which Large Group premiums are set is based on what is called a "manual rating" or "community rating."  The manual rate generally takes a statewide average per-member-per-month ("PMPM") amount known as a base rate, and then modifies the rate based on specific characteristics of the client, such as demographics of its members, location of its members, the client's industry, the extent to which employees also have spouses or dependents on a plan, broker commissions, benefit design, and underwriter adjustments.  The rates are done in this manner because there are too few subscribers enrolled in the plan to use their claims experience to create the premium (i.e., there is an insufficient risk pool).  ███████████████████

████████████████████████████████████████████

███████████████████████████████.[28]

38.     For Large Group "manual rating," the insurance companies generally use one of two methods to account for the variable costs of care depending on location of

---

[27] Beuoy Dep. 33:18-34:8.

[28] Mathewson Dep. Ex. 184 (SIDIBE_ABC_0139404) at -9407; Tsui Dep. 25:4-26:12 ███████████ 20:10-16 ████████████████████████████████████ ; *see also* Beuoy Dep. Ex. 1250 (BSC_SutterSidibe0126491) at -6495-502.

14

subscribers.



39.     The other approach for Large Group manual rating applies to PPO plans and new HMO plans where there are typically not assigned PMGs.  There, the insurance company generally uses a 3-digit zip code to account for the different costs in a given area.  Similar to the approach above, a specific cost factor—an Area Factor[30]—is assigned to each 3-digit zip code, and the number of subscribers in a given zip code is multiplied by the cost factor assigned to the 3-digit zip code.[31]

---

[29] Kuecks Dep. 29:11-32:5 & Dep. Ex. 1766 (HN0019446) at -9456; Beuoy Dep. 179:19-181:15 & Dep. Ex. 1250 (BSC_SutterSidibe0126491) at -6497 & Dep. Ex. 1254 (BSC_SutterSidibe0126555) at -6635.
[30] Area Factors are used to modify base rates or manual rates to account for different costs in different geographic areas.
[31] Beuoy Dep. 182:19-183:3 & Dep. Ex. 1250 (BSC_SutterSidibe0126491) at -6497 & Dep. Ex. 1254 (BSC_SutterSidibe0126555) at -6580; Mathewson Dep. 96:5-21; Tsui Dep. 32:17-33:9.



40.     **Experience Rating:**  The second method for setting premiums for Large Group employers is called "experience rating."[33]  The experience rating approach relies on historical costs for existing subscribers.  Because the employer has a significant volume of members, the previous claims experience of the group is considered a reliable or "credible" predictor of future costs. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████[34]

Premium rates for experience-rated Large Group employers are therefore unique to each employer.  Area Factors (both pre-ACA and post-ACA) are not relevant for experience-rated Large Groups and are not used in premium rate setting.

41.     **Blended Rating:**  The third method for setting premiums for Large Group employers is called "blended rating." [35]  This is for employers who are in the middle; they have an insufficient number of subscribers to be fully "experience rated," but have enough subscribers to be rated *in part* based on the specific claims experience of that

---

[32] Beuoy Dep. Ex. 1254 (BSC_SutterSidibe0126555) at -6580-581.
[33] Beuoy Dep. 124:14-125:10.
[34] Mathewson Dep. Ex. 184 (SIDIBE_ABC_0139404) at -9406.
[35] Beuoy Dep. 124:14-125:10.

particular employer.  Hence, the rate is based on a "blend" of the insurance company's manual rate and the group's specific claims experience.  ██████████████████

████████████████████████████████████████████████

██ .[36] ████████████████████████████████████████

████████████████████████████████[37]  The more subscribers enrolled in a plan, the more weight, or credibility, is given to that employer's unique claims experience.

42.     Premium rates for policies within the Small Group and Large Group market segments are also subject to MLR requirements as established by the ACA and discussed in paragraph 31.

## VII.     ANALYSES SUPPORTING OPINIONS

### A.     Plaintiffs Have Not Accounted for the Varying Impacts—Including No Impact—that Result From Experience Rating.

43.     Each Large Group employer whose premiums are based on claims experience will be uniquely impacted if Plaintiffs can prove an antitrust injury—and therefore alleged damages cannot be determined by a common model.  In particular, insurance companies set premium rates for Large Group experience-rated and blended-rated employers based, at least in part, on each employer's specific and unique historical claims experience.

44.     Consider Illustration A, below, of two experience-rated Large Group employers.  Employer #1 and Employer #2 have each incurred $200,000 in claims over

---

[36] Mathewson Dep. Ex. 184 (SIDIBE_ABC_0139404) at -9406; Tsui Dep. 25:4-26:12 ████████
██████████████████████████████████████████
[37] Tsui Dep. Ex. 5190 (Sidibe_ABC_0140063).

12 months; however, all Employer #1 inpatient hospital claims are at Sutter facilities, while all Employer #2 inpatient hospital claims are at facilities other than Sutter.  For purposes of this illustration, the two employers each have 250 enrolled members and therefore have identical PMPM costs of $66.67, as shown in the "Cost PMPM, Actual" columns.  Every other factor being equal (e.g., broker commissions, insurance company desired profit margin, negotiated discounts, etc.), an insurance company may establish identical premiums for these two employers.

| | Illustration A - Large Group Experience-Rated Underwriting | | | |
|---|---|---|---|---|
| | **Cost PMPM, Actual** | | **Cost PMPM, Hypothetical** | |
| | **Employer #1** | **Employer #2** | **Employer #1** | **Employer #2** |
| | (A) | (B) | (C) | (D) |
| Incurred Claims | | | | |
| 1  Sutter, Inpatient Hospital Services | $200,000 | $0 | $160,000  * | $0 |
| 2  Other Facilities, Inpatient Hospital Services | $0 | $200,000 | $0 | $200,000 |
| 3  Total Inpatient Hospital Claims | $200,000 | $200,000 | $160,000 | $200,000 |
| 4  Enrolled Members | 250 | 250 | 250 | 250 |
| 5  # of months | 12 | 12 | 12 | 12 |
| 6  Member-months | 3,000 | 3,000 | 3,000 | 3,000 |
| 7  Cost PMPM | $66.67 | $66.67 | $53.33 | $66.67 |
| 8  Hypothetical Overcharges, Per Member Per Month (PMPM) | | | $13.33 | $0.00 |
| | | | (A) - (C) | (B) - (D) |
| 9  Total Hypothetical Overcharges, Employer #1 + Employer #2 | | | $40,000 | |
| 10  Total Member-months, Employer #1 + Employer #2 | | | 6,000 | |
| 11  Total Hypothetical Overcharges, PMPM | | | $6.67 | |
| *Hypothetical figures assume Sutter has overcharged by 25%* | | | | |

45.     The two columns on the right side of Illustration A assume Sutter has illegally overcharged by 25%, and thus these columns assume the decreased cost absent the alleged Sutter overcharge.  In this "hypothetical" view, Sutter inpatient hospital charges incurred by Employer #1 would have been $160,000 in lieu of $200,000 (line 1), which (assuming for purposes of this illustration that 100% of the overcharges are passed through in insurance premiums) translates to a PMPM overcharge of $13.33 due to the overcharge (line 8).  In this same hypothetical world, Employer #2, who had no employees using Sutter, has experienced no harm whatsoever, and its PMPM cost remains $66.67 (line 7).

46.     This illustration demonstrates that experience-rated and blended-rated Large Group employers with utilization of Sutter inpatient hospital services in their claims history would each be *uniquely* impacted by alleged Sutter overcharges. Employers *without* historical use of Sutter inpatient services would have no impact, as illustrated above (*see* column D, line 8).

47.



48.     A similar analysis of 2012 data for Large Group, blended-rated employers in one of the Nine RAs a range of Sutter usage fomr 0% to 70% of the total inpatient care. Dr. Chipty's proposed model would similarly calculate equal damages on a PMPM basis for all Large Group blended-rated[39] employers, notwithstanding the wide range of actual damage from alleged overcharges.

49.     The damages model proposed by Dr. Chipty would also call for payment of damages to experience-rated employers that were not impacted at all by alleged Sutter

---

[38]  ████████████████████████████████████████████████
████████████████████ We are using Anthem-provided counts of members with claims, coupled with an assumption that 80% of members in a year will have at least one claim, and Mr. Axene's assumption of 2.0 members per subscriber from his Declaration (page 40) to arrive at each employer's subscriber count, which in turn determines the experience-, blended-, or manual-rated categorization.
[39] *See* Footnote 38.

overcharges. 

.[42]

50.    An examination of two experience-rated Large Group employers further demonstrates the material variation in claims experience between employers. Illustration B below reflects the Sutter inpatient hospital services paid by Anthem during 2012 on behalf of two Large Group employers located in ACA Rating Area 3, one of the Nine RAs alleged by Dr. Chipty to have encountered hospital overcharges.  Total inpatient hospital services paid by Anthem for Sacramento Municipal Utility District ("SMUD") totaled $262 PMPM, while those at Cache Creek Casino Resort ("CCCR") totaled $247 PMPM for the same period.  But CCCR had nearly twice the total inpateint Sutter costs as compared to SMUD with a similar number of subscribers such that CCCR's PMPM relative to Sutter costs would be almost twice as much as SMUD.  Even assuming Dr. Chipty's theory of pass-through were correct, these two employers would not be equally impacted by any alleged Sutter overcharges.  Nonetheless, under Dr. Chipty's methodology, their *calculated* damages would be the same.[43]

---

[40] Marin members did incur inpatient services at non-Sutter facilities.

[41] Chipty Decl. ¶ 144, Ex. 23.  Calculation:

[42] In Dr. Chipty's declaration, she indicates that her model calculates alleged damages for only those employees who reside in one of the Nine RAs.  Per the data produced by Anthem, approximately 60% of Marin employees reside in the same Rating Area 2 where Marin is located.

[43] Dr. Chipty's model expresses alleged overcharges as both PMPM amounts (Decl. Ex. 21) and as percentages, which are derived from the PMPM amounts (Decl. Ex. 21).  I use PMPM amounts here to simplify the analysis.



51.     Based on the false assumption that each employer had the same amount of Sutter charges, Dr. Chipty's methodology applies the same percentage premium overcharge to each employer.  But neither Large Group employers nor their employees would be equally impacted by the alleged Sutter overcharges, and no common model can be created to estimate the impact, as Dr. Chipty suggests.[45]

52.     The only methodology to appropriately ascertain impact and damages is to evaluate each insurance company's Large Group claims experience on an employer-by-employer basis—and to evaluate how the insurance company's underwriters evaluated

---

[44] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[45] Chipty Decl. ¶¶ 136-137 and n.265.

that claims experience. This would need to be conducted for those employers whose premium rates were either based entirely on their own experience (experience-rated) or based in part on their own experience (blended-rated).

53. This required inquiry would be further complicated by the fact that insurance companies use differing claims experience periods. Mr. Axene and Dr. Chipty rely on the simplifying assumption in their declarations that premium rates for Year T are derived from claims experience in Year $T_{-2}$ (e.g., 2014 rates are derived from 2012 claims experience).[46] In practice, underwriters may look at 12 months' experience, at 24 months' experience, or any duration in between. And if the employer or its producer (agent/broker) required January 1st renewal rates in November, a different claims experience period would be used versus January 1st renewal rates that were needed in August.

54. Not only do Plaintiffs' experts fail to account for Large Groups whose premium rates are based on experience that may or may not contain alleged Sutter overcharges, Plaintiffs' experts also fail to account for benefit designs that exclude some or all Sutter hospitals. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

55. ███████████████████████████████████████

███████████████████████████████████████.[47] █████████████

---

[46] Axene Decl. ¶¶ 27-28; Chipty Decl. ¶ 142.
[47] ABC083490, at -3571 ████████████████████████████████████████

██████████████████████████████████████████████████



██████████ Other design features such as higher or lower member copayments are available, creating a buffet-style purchasing opportunity for the employer.

56.     The Anthem HMO product offering as described—with the "Select" network option excluding Sutter hospitals—has been available in the marketplace in this general configuration since approximately 2005 and is still offered today. ███████

████████████████████████████████

████████████████████████████.[49] ███████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

██████████████

57.     ████████████████████████

████████████████████████████

██████████████████████████ Doing so will overstate the calculated damage because members enrolled in the Select network would have few claims at Sutter hospitals, as non-emergency out-of-network charges are generally not covered by HMO plan designs. ███████████████

---

[48] Martin Lutzeier Dep. 216:21-217:4 & Dep. Ex. 1479 (Sidibe_ABC_0139612) at -9621 ████
████████████████████████████████ 2011
Anthem DMHC Filing #AWLP-127314641 (Reflecting Select HMO used for Small Group); SIDIBE_ABC_0139767 (same).
[49] Schwefler Dep. 267:11-268:3 & Dep. Ex. 1731(ABCLH456290) at -6415.
[50] Chipty Decl., Exs. 22-24.

████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████.[51]  Employers purchasing the Select network with Sutter

designated as out-of-network would therefore experience very little, if any, damages from

alleged Sutter overcharges.  But if Plaintiffs are correct that insurance companies can

save money by using narrow networks, then there must have been some savings

associated with these narrow networks, and Dr. Chipty and Mr. Axene have not studied

what that amount might be or how to account for it in this litigation.

58.     In addition to Anthem's Select HMO, the insurance companies created a

number of additional narrow network products that excluded Sutter hospitals.  For

instance, Aetna had the Concentric HMO network in which only Mills Peninsula Hospital

System, California Pacific Medical Center, St. Luke's Hospital, and Sutter Medical

Center of Santa Rosa participated.[52]  Anthem had a narrow PPO network (available to

fully-insured customers) called the Select PPO, which also excluded Sutter other than

Sutter Lakeside Hospital, Sutter Coast Hospital, California Pacific Medical Center, St.

Luke's Hospital, and Sutter Amador Hospital.[53]  Anthem also excluded most Sutter

facilities from the Small Group and Individual products offered through the California

Exchange.[54]  Similarly, since 2011, Blue Shield has offered the Local Access+ HMO, in

---

[51] Axene Dep. 207:4-212:9.
[52] DEF000013014 at -3041-42, -3091-92.  The Concentric product was replaced by the Aetna Value Network in 2010, which added to the participation Alta Bates Sutter Medical Center, Eden Medical Center, and Sutter Delta Medical Center.  DEF002015404 at -5441-43, -5578-80.
[53] ABC083490 at -3571.
[54] DEF002100127 at -0135█████████████████████████████████████
████████████████████████████████████████████████████████
████████; *see also* De La Torre Dep. 92:8-18 ████████████████████████████r
████████████████████████████████

which only Sutter Lakeside Hospital, Sutter Amador Hospital, and Sutter Coast Hospital participate.[55]  I understand that this is not an exhaustive list of narrow networks that excluded some Sutter facilities.  Neither Dr. Chipty nor Mr. Axene have examined whether or how these narrow networks would impact how any alleged overcharge would affect the premiums for these products, especially where some or all of the alleged "Damage Hospitals"[56] are not included in the network.

59.    Another Large Group rate-setting variable is the insurance company's handling of catastrophic claims.  ████████████████████████████

████████████████████████████████████████████████████

████[57]  This is done so the group's future premium rates are not adversely affected by the large-dollar claim.  Pooling of catastrophic Sutter claims would partially or fully mitigate the purported effect of alleged overcharges.

60.    For example, if an employer has a $50,000 pooling point, claim dollars over this point are not charged to the group's claims experience and are not used in premium rate setting.  Consider a $250,000 Sutter claim, where Dr. Chipty claims an overcharge of 10% such that the charge in a hypothetical world would have been $225,000.  Regardless of whether the group's experience includes the $250,000 claim or the hypothetical claim of $225,000, only $50,000 is considered for purposes of future premium rate setting, and thus the portion of the experience used in setting the group's premium rate—and the ultimate premium rate itself—is not affected by any overcharge.

---

[55] SH000620 at -0713.
[56] Chipty Decl., Ex. 19 ████████████████████
[57] Mathewson Dep. 105:7-106:5.

61.     I am aware of no shortcut or simplifying assumption to address the impact
of pooling. ███████████████████████████████████████████████████
████████████████████████████████████████[58] As such, I do not believe a
common model can be created, as Dr. Chipty suggests, that would appropriately and
accurately estimate how pooling would affect the claims experience used in premium
rate-setting for every Large Group employer, every year.

62.     Yet another Large Group premium rate-setting variable is the use of
credibility weights or factors used by insurance company underwriters.  These factors
provide relative weighting to the employer's claims experience when the group is
blended rated, i.e., their premium rates are a blend of the insurance company's manual
rate and the employer's unique claim experience.  For example, a 75% credibility factor
means the group's premium rate is based 75% on its own claims experience, and 25% on
the insurance company's average or manual Large Group rate.  Because underwriters can
have authority to make discretionary adjustments to credibility factors,[59] no model can be
created to accurately quantify the impact of alleged Sutter overcharges on premium rates
paid by Large Group employers.

63.     The only viable approach for determining the impact of alleged Sutter
overcharges on experience-rated and blended-rated Large Group premiums is to evaluate
every employer one-by-one to determine exactly what claims experience was used in the
rating process (not simply looking at claims from two calendar years prior) and conduct a
comprehensive review of each employer's underwriting file.  This individualized
process—which would need to be replicated on a year-to-year-basis for each employer—

---

[58] Mathewson Dep. 105:7-107:4.
[59] Couser Dep. 172:25-173:21.

is the only way to determine what employer-specific claims experience was used, how that experience was used by the insurance company's underwriters, how pooling was determined, what credibility was assigned, etc.

**B.      Back-end Rate Adjustments Can Negate the Effect of Alleged Overcharges and Have Not Been Considered.**

64.      Insurance companies commonly make "back-end rate adjustments" to decrease premium rates below standard rates established by the insurance company actuaries.  These adjustments are generally made to increase sales, retain policies at risk of lapsing, increase market share, or reward certain producers (brokers and agents) for recurring placement of policies.

65.      Examples of back-end rate adjustments include, but are not limited to the following:

- Multi-product discounts – ███████████████████████
  ███████████████████████████████████████
  ██████████████████████████████████████
  █████████.[60]

- Preferred producer discounts – ██████████████████
  █████,[61] ██████████████████████████████
  ████████████████████████████████████
  ████████████████.

---

[60] Tsui Dep. 41:17-42:2 ██████████████████████████████████
████████████████████████████████████████████
████████████████████████ Couser Dep. 99:23-100:25; 105:22-106:14.
[61] UHC-005094904 at 4916-26; *see also* Couser Dep. 101:8-105:20.

- Small Group rate adjustment discretion – Pre-ACA, insurance company underwriters could modify a Small Group employer's filed premium rates by a factor of 0.90 to 1.10—in essence, plus or minus 10%.[62]

- Underwriter discretion – ███████████████████████████
  ██████████████████████████████████████████████████████
  ████████[63] The term generally describes the "art" associated with the process of premium rate setting. Typically, an experienced senior underwriter has the ability and authority to adjust rates up or down in response to, for example, an agent or broker that threatens to terminate coverage. Underwriter discretion is typically associated with Small Group policies (pre-ACA) and Large Group policies. ██████████████
  ██████████████████████████████████████████████████████
  ████████████████████████████████████████████
  ██████

66.     One effect of back-end rate adjustments is that the insurance companies charge two otherwise similar individuals or groups different premium rates—in other words, the difference in premium rates would not necessarily reflect the difference in underwriting risk.

67.     These back-end rate adjustments can affect the ultimate premiums paid by policyholders in all segments of the market.

---

[62] Axene Dep. 204:12-206:8; Hitchings Dep. 89:22-90:25 & Dep. Ex. 1258, at p. 6 of the "Independent Actuarial Certification" section.
[63] Beuoy Dep. 210:12-211:5; Tsui Dep. 47:24-48-2, 49:25-50:18; Couser Dep. 229:12-22.
[64] Beuoy Dep. 207:2-209:10.

68.     Importantly, the back-end rate adjustments can reduce the premium *below the premium adjusted for the alleged Sutter overcharge.*  Consider the scenario in Illustration C.  Member A is paying a premium rate of $700,[65] and in the "Hypothetical World" without Sutter's alleged overcharging, the premium would be $3.08[66] less, resulting in the premium shown of $696.92.  Member B has received the benefit of a discretionary premium rate reduction provided by the underwriter, and her premium rate is $679, lower than that of Member A's hypothetical premium rate absent the alleged Sutter overcharge.

| Illustration C - Back-end Rate Adjustments | |
|---|---|
| | **Member-A** |
| Actual Premium | $700.00 |
| Calculated Overpayment | $3.08 |
| But-For Premium | $696.92 |
| | |
| | **Member-B** |
| Target Premium | $700.00 |
| Underwriter's Discretionary Adjustment (3% reduction) | x .97 |
| Actual Premium | $679.00 |

69.     Illustration C demonstrates that the back-end rate adjustment could exceed the alleged overcharge.  The net effect in this illustration is that the alleged overcharge only affects the insurance company's profit margin and does not affect the premium paid by the member.

70.     There are many scenarios where the lower premium absent the alleged Sutter overcharge would not have influenced the underwriter's discretionary judgment.

---

[65] This is the illustrative premium from Mr. Axene's declaration, page 35, line 9.
[66] This is the illustrative premium from Mr. Axene's declaration, page 35, line 6.

For example, if the customer threatened to terminate the policy unless the rate was below $680, there would be no impact from alleged Sutter overcharges.  In this circumstance, Dr. Chipty's methodology is not valid, as the actual premium would have been $679 with or without the alleged Sutter overcharge.  In my experience working with employer clients and negotiating on their behalf with insurance companies, this is a routine occurrence.  Insurance companies place a high degree of importance on retaining existing customers and routinely lower renewal premium rates to at or near specified client-provided price points to retain the client.

71.    An individualized review of every new business and renewal sale for the presence and nature of a discretionary rate adjustment, the existence of a broker/agent preferred producer premium rate reduction, the presence or absence of a multi-product discount, and other possible back-end rate adjustments is necessary to determine the extent, if any, the alleged Sutter overcharge may have had on premiums paid by individuals and employers.

72.    Another type of a back-end rate adjustment occurs when an insurance company establishes premium rates based on an outside benchmark, typically the premium level of another insurance company.  In doing so, insurance companies are setting premium rates for a product that are not based on the underlying expected claims for that product.

[67]

[68]

---

[67] Axene Dep. Ex. 5213 (BSC_SutterSidibe0113119).
[68] BSC_SutterSidibe0109345, at p. 12.

████████████████  ████████████████████████████████████████

████████████████████████████████████████████████████████[69]  ████████

████████████████████████████████████████████████████

████████████████████.[70]  Mr. Axene acknowledged that he has not done an analysis of

how such an investment would affect the assumed 100% pass-through of alleged Sutter

overcharges to the ultimate premiums paid for the product.[71]   In this situation, the

presence or absence of alleged Sutter overcharges is irrelevant to determining Blue

Shield's Trio premium rates, and thus members of the proposed class would not be

impacted by the alleged overcharges.

### C.    Employers' Varying Approaches to Setting Employee Contributions Can Result in No Damages from Alleged Sutter Overcharges.

73.    Employers have substantial latitude in establishing contributions that their

employees pay for healthcare benefits.  Employers determine employees' contributions

on their own, without instruction from the insurance companies, and are free to vary the

methodology from one year to the next.  There is no uniform, typical, or even average

approach used by employers—each employer makes its own individualized

determination based on influences or factors such as general business conditions,

profitability, affordability to employees, collective bargaining requirements (or threats

thereof), competition for labor, employee turnover, organizational compensation, rewards

philosophy, etc.

---

[69] BSC_SutterSidibe0109345; *see also* Axene Dep. 226:14-228:15 ████████████████████
████████████████████████████████████ & Dep. Ex. 5213
(BSC_SutterSidibe0113119).
[70] Beuoy Dep. 278:24-279:8.
[71] Axene Dep. 225:13-231:18.

74.     Depending on the manner in which employers determine the employees' contributions, any alleged overcharge may be borne solely by the employer or solely by the employee.  For instance, if an employee's contribution is a fixed amount regardless of the overall cost, then any alleged increase in the premium as a result of a purported overcharge would be borne by the employer.  On the other hand, if an employer sets its own contribution on a fixed amount, then any alleged increase in the premium would be passed solely to the employee.

75.     In my experience consulting to employers, employee contributions toward the cost of medical insurance are often established on a fixed-dollar basis based on perceived "affordability" (through the lens of the employee), or based on management's evaluation of its unique labor market.  As an example, Employer A might determine that based on its unique workforce requirements, employee turnover, pay scales, and competition for talent, appropriate employee contributions will be $10 per week for single coverage and $40 per week for family coverage.[72]  Even assuming Mr. Axene's estimate of a ▮▮▮ increase in *employer* premium arising from alleged Sutter overcharges,[73] this would have no influence on the factors driving the contribution-setting process by Employer A and would not affect the employee's share of the premium.  And assuming Dr. Chipty's analysis of the pass through was correct—which it is not—the alleged inpatient hospital overcharge would cause Employer A's premium rates to increase slightly (by ▮▮▮), but Employer A's employees would pay *the exact same amount for their medical benefits*.

---

[72] *See, e.g.*, Jankowski Dep. Ex. 1111 (JANKOW00000284) at -0295-96 (showing that Jankowski's employer required different employee premium contributions for employees with spouses and children based on whether an employee made more than or less than $75,000); Jankowski Dep. 177:23-179:2.
[73] Axene Decl. ¶ 35, line 10.

76.     In this example, because the employee is contributing to the premium through weekly payroll contributions, the employee is a member of the proposed class. But as demonstrated in the preceding paragraph, the employee has not suffered any damage relating to premiums because the employee's contribution is fixed, and thus unaffected by any increase in the premium charged by the insurance company.

77.     Putative class member ████████████ is an example of the aforementioned situation where an employer's contribution methodology would shield employees from alleged damages of hospital overcharges. ████████████

████████████████████████████████████████

████████████████████[74]

78.     At the opposite end of the spectrum, some employers establish a fixed-dollar subsidy of the total premium rate, requiring employees to pay the balance.  In this case, the entire amount of the alleged overcharge is borne by the employees, and the employer is unharmed.[75]  For example, from 2016 through 2018, named Plaintiff Johnson Pool & Spa established its portion of health insurance as a fixed-dollar amount equal to the cost of the lowest-priced plan available, which, starting in 2017, was a plan that did not include Sutter facilities among its in-network providers.[76]  Johnson Pool & Spa employees choosing a plan that included Sutter would be damaged by the full amount of

---

[74] *See* WSAW005523.

[75] City of San Ramon 2018 Benefits Guide, pp. 13 & 15 (providing that the City "aligns its contribution rates with the CalPERS Kaiser Bay Area premium," which is $779.86, and then showing that employee contributions are the difference between the cost of the plan and $779.86).

[76] Feeney Dep. 151:4-152:12 (Johnson Pool and Spa switched to California Choice for 2016, under which the company would pay 100% for a base plan, and employees had the option of buying up to a richer plan at their own expense); 173:21-176:7 (with Western Health Advantage as the base plan, the additional expense of accessing Sutter was paid for by the employee).

the alleged overcharges if proven, while the premium for Johnson Pool & Spa, the employer, would be unaffected by virtue of its fixed-dollar subsidy methodology.

79.     Looking at these two contribution-setting approaches side by side, an employer's contribution-setting approach has dramatically disparate effects on how an alleged Sutter overcharge impacts its employees:

- ███████████ employees' contributions *are unaffected by* the alleged overcharges; and

- Johnson Pool & Spa employees' contributions *include the full impact of* the alleged overcharges.

80.     An employer does not have to offer multiple insurance companies' plans to adopt a fixed-dollar subsidy contribution-setting approach and insulate itself from alleged overcharges.  An increasingly popular approach, referred to as "defined contribution," entails an employer contributing a fixed monthly amount (e.g., $500 for single, $1,000 for family) and employees paying the incremental amount between the employer's defined contribution and the total premium.  According to a 2017 PwC survey, 29% of employers either use a fixed-dollar subsidy approach or determine a monthly contribution amount. [77]  This means that 29% of employers fix their contribution amount and require employees to pay the difference between what the employer has committed to pay and the total premium.  In this circumstance, the premium paid by the employer is unaffected by any alleged overcharge because the employer determined the total amount it was willing to subsidize, and it required the employee to make up the difference.

---

[77] PwC *Health and Well-being Touchstone Survey Results*, June 2017, at p. 51.

81.     A further real-world complication overlooked by Dr. Chipty and Mr. Axene in their theoretical model is the situation where contributions charged by the employer to its employees represent a share of the cost of both medical and non-medical coverages, such as dental and vision.  This is a common practice, particularly among Small Group employers, and is sometimes required by insurance companies to ensure a sufficient level of participation in the non-medical coverages.  In these situations, it would be difficult if not impossible to ascertain the damage of alleged Sutter overcharges to employees since their contribution is not directly linked to the medical plan premium.

82.     In addition, employers frequently respond to proposed premium increases by opting for a less expensive product with a leaner benefit design that incorporates greater cost sharing for members in the form of higher deductibles, co-pays, and co-insurance.  These employers often concurrently reduce the required premium contributions from the employees, linking the two changes.  Individual inquiries would be necessary to determine whether the resulting lower employee contribution was increased in any way by the alleged hospital overcharges.

83.     Even employees *within the same company* would not necessarily be similarly affected by alleged Sutter overcharges.  In the Small Group market segment, nearly half of firms with fewer than 20 employees contribute different dollar amounts toward premiums for different employees.[78]

84.     Throughout both the Large Group and Small Group market segments, employers can differentiate contributions (subject to certain nondiscrimination regulations) among segments or classes of employees.  Common methods include

---

[78] Kaiser Family Foundation and Health Research & Educational Trust, Employer Health Benefits 2012 Annual Survey, Exhibit 6.25.

requiring different contributions based on the following considerations: ████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████.[79]

85.      Some employers adopt the approach of fully subsidizing coverage for employee-only coverage, but requiring contributions from employees that cover dependents.  Fourteen percent of employees are under these arrangements according to a recent survey.[80]  In these situations, assuming the employer passed along the higher premium (and assuming Dr. Chipty is correct regarding the pass-through of Sutter's costs to premiums) employees covering dependents would be harmed while employees with self-only coverage would be unharmed.

86.      It is my opinion that it is illogical and inaccurate to consider all employees in the proposed class as being equally impacted by alleged Sutter overcharges, when the actual costs incurred by these employees vary so significantly, not only from employer to employer, but also from employee to employee in the same place of employment.

**D.      Plaintiffs' Argument of 100% Pass-through of Alleged Sutter Overcharges to Premium Rates Has Not Been Established.**

87.      Dr. Chipty's methodology assumes that 100% of any alleged overcharge by Sutter will be included in the premiums paid by class members.  She further assumes that the overcharge percentage of any premium will be the same for all groups within a Rating Area and product line (i.e., Large Group, Small Group, and Individual).  While an

---

[79] *See* Couser Dep. 135:4-138:19 & Dep. Ex. 1915 (UHC_Sidibe-0008481) at -8490.
[80] Kaiser Family Foundation and Health Research & Educational Trust, Employer Health Benefits 2017 Annual Survey, p. 85.

insurance company will indeed consider past costs in setting premiums, Dr. Chipty's

model ignores the multitude of other factors that are involved in the rate-setting process.

There are several distinct rate-setting mechanisms used by insurance companies

described below.  Each of these factors has the potential to create individualized premium

impacts, thereby compromising the 100% pass-through assumption that is fundamental to

Dr. Chipty's damage determination model.

88.     Notably, Mr. Axene testified at deposition that he does not have an

opinion as to whether or not there is a 100% pass-through of alleged Sutter overcharges

to premium rates, and that he has not completed any analysis to support Dr. Chipty's

assertion.[81]

89.     _Use of Area Factors._  Dr. Chipty's methodology is further flawed by her

failure to consider how cost in a given area relates to the premiums charged, including

her improper consideration of post-ACA Rating Areas on pre-ACA time periods.

Although Dr. Chipty assumes that the overcharge as a percentage of premiums would be

the same for all groups within a Rating Area, the use of Area Factors for Large Group

renders Dr. Chipty's assumption unsupportable.

90.



.[82]

For Large Group employers, Dr. Chipty attributes

the incurred costs for a given Rating Area based upon the inpatient costs incurred by the

---

[81] Axene Dep. 280:2-281:19.
[82] Chipty Decl. ¶ 139.  While Mr. Axene's report suggested the same methodology, during his deposition he could not recall if separate calculations would be done for each group type.  Axene Dep. 29:7-32:23.

employer's members who live in the 3-digit zip code in which the employer is located. For Small Group employers, Dr. Chipty attributes the incurred costs for a particular Rating Area based upon the costs incurred by employees of all Small Group employers that are located in that Rating Area.  For Individual policies, Dr. Chipty attributes the incurred costs for a particular Rating Area based upon the costs incurred by individuals residing in that Rating Area.[83]  Dr. Chipty's assumption is that the costs in a particular Rating Area are passed through 100% to the members who she attributes to the particular Rating Area based on the above methodology.  But contrary to Dr. Chipty's assertion, none of the insurance companies sets premiums using her methodology, and there is no basis to assume that Sutter's costs in a given Rating Area would be passed on 100% to the members attributed to that Rating Area.

91.     In particular, Dr. Chipty has chosen to use the post-ACA Rating Areas that were effective in 2014 and solely applied to Small Group and Individual market segments.  There are numerous problems with Dr. Chipty's proposed methodology as it relates to handling of Area Factors and the use of Rating Areas.

92.     First, no insurance company sets premiums for Large Group clients in a manner similar to Dr. Chipty's methodology, as ACA Rating Areas are irrelevant to Large Group employers.  As described previously in paragraphs 43-53, Large Group employers that are experience-rated would have a premium based on their particular experience.  In other words, regardless of which Sutter inpatient claims were incurred in a given Rating Area, the only Sutter claims that would even be considered for an experience-rated client would be the claims incurred by its own members.  Further, the

---

[83] Chipty Decl. ¶ 139 & n.273.

premium set for a Large Group experience-rated client is generally applied to all members.[84]  So even if there were members that had Sutter claims that were allegedly passed through to the premium, that would be spread among all employees, not just those employees in a given Rating Area.  As an example, CalPERS sets premiums for the employees of the state of California that apply to all employees regardless of where they live in the state.[85]

93.      Manually-rated employers have premiums set based on the weighted average costs of the areas where their employees reside (*see* paragraphs 37-38).



94.      As noted in paragraph 38, some insurance companies with renewing HMO groups use a factor tied to the PMG.  This only compounds the difficulty of assessing a particular group's premium.  Rather than the location of subscribers determining the Area

[84] Axene Dep. 150:4-19.
[85] *See* CalPERS06348, CALPERS06327, CALPERS06331, CALPERS06325, CALPERS06329.  CalPERS separately sets regional rates for the contracting municipalities and other local government agencies that may choose to obtain insurance through CalPERS.  Honaker Dep. 114:16-115:8.

Factor, it is which PMGs the subscribers are enrolled with that decides the weighted

average for the factor related to geographic costs.

95.     For all these reasons, the weighted average of Area Factors would lead to

materially different premiums for employers.  Mr. Axene acknowledged that under the

Area Factor weighting methodology outlined in the previous paragraph, any alleged

overcharge would be spread to all employees (in both Northern and Southern California),

and assuming higher costs in Northern California, the Northern California employees

would be subsidized by the Southern California employees.[86]  Further, the weighted

average does not relate in any way to the ACA Rating Areas.  So even if Dr. Chipty could

calculate an alleged overcharge in an ACA Rating Area, that would bear no relation to

how Large Group employers' premiums are set, which are unique to each individual

employer.

96.     Because of the weighted average used for manually-rated Large Group

employers, one cannot assume that 100% of costs in any given area would be reflected in

the premium.  For instance, an employer's address in the insurance company's data could

be in one of the Nine RAs, but the employees who subscribe to a given product could be

predominantly in Southern California as shown in the above hypothetical (paragraph 93).

Because the rate charged the employer is a single rate for all employees based on the

weighted average, in the above instance the entity's premium rates would not

predominantly reflect costs of care in Northern California.[87]  But Dr. Chipty's method

---

[86] Axene Dep. 130:7-135:18.
[87] Employers with employees throughout the United States generally use a single premium for all employees regardless of location.  *See, e.g.,* 2018 Benefit Guide for Zendesk, p. 14 (reflecting a single premium for all employees).

40

completely ignores this reality of the premium-setting process and does not even attempt to address the issue.

97.    The same situation arises for some pre-ACA Small Group policies, where employers may have received a weighted average premium and paid the same premium for all employees.

98.    I am not aware of a way in which this flaw can be addressed with a modification to the proposed model.  For every Small Group, Large Group manually-rated, and Large Group blended-rated employer[88] whose premiums were established based on its distribution of subscribers, one would need to conduct an individualized review of the employer's census—and the associated insurance company's underwriting and rating file documentation—one year at a time, for every year in the class period. This would need to be conducted on an employer-by-employer basis to accurately determine the number of subscribers in and outside of each of the relevant geographic areas used in the premium rate-setting process, and the related alleged damages.

99.    The deficiency of Dr. Chipty's proposed model described in the preceding paragraph also extends to Small Group, Large Group manually-rated, and Large Group blended-rated employers with employees exclusively in northern California, *but spread across two or more* of the Nine RAs impacted by alleged overcharges.  As the PMPM overpayments identified by Dr. Chipty's model range by a factor of more than 5-to-1,[89] the mix of employees by Area Factor and the insurance companies' associated underwriting and rating file documentation would again need to be reviewed on an

---

[88] Manually-rated and blended-rated premiums are more fully described in paragraphs 37-41.
[89] Chipty Decl. 91, Ex. 21 ▮▮▮▮▮▮▮▮▮

employer-by-employer basis to accurately determine the alleged damages, even if all employees were in Northern California.

100.    Furthermore, prior to adoption of the ACA, insurance companies established their own customized Rating Areas. ███████████████████████████

███████████████████████████████████████████████████

██████ ,[90] ████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

██████

101.    Dr. Chipty's damages model uses post-ACA Rating Areas for the entire class period, even though these Rating Areas did not exist prior to 2014.  Mr. Axene explained, based on his discussion with Dr. Chipty, that she chose to use the Nine RAs across both pre- and post-ACA periods—that is, for every year in the class period—to standardize her analysis and because she lacked information about each of the insurance companies' Area Factors in each year.[91]  This becomes relevant to the issue of whether alleged overcharges are passed through at 100% to premiums when alleged overcharges from a larger pool of members (based on the larger pre-ACA Rating Areas) are applied to a smaller headcount of members (based on the smaller post-ACA Rating Areas) (*see*

---

[90] Mathewson Dep. Ex. 1278 (SIDIBE ABC 0139551) at -9565.
[91] Axene Dep. 175:3-181:25.

**Exhibit 4**).  In other words, under the pre-ACA Rating Areas, Sutter's costs, even if passed through to a premium, would be distributed amongst many more members because the pre-ACA Rating Areas were larger and included a different membership. Importantly, the differences in premiums as a result of changing Rating Areas can be substantial. ██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████.[92]

    102.    Further complicating the situation is how insurance companies use Area Factors in setting premium rates. ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████.[93]  In other words, contrary to Dr. Chipty's methodology which attributes inpatient costs to a Rating Area based on the location of the Small Group employer, █████████████████████████████████████

████████████████████████████████

    103.    Dr. Chipty's principal assumption is that insurance companies allocate 100% of region-specific costs back to a particular region.  In other words, she assumes that 100% of the costs incurred in Rating Area 1 will be reflected in the premiums for any subscriber in Rating Area 1.  As described above, this is highly improbable for Large Group manually-rated and blended-rated employers because of the weighted average based on location of the employees.  Moreover, there is no basis for this assumption pre-

---

[92] Mathewson Dep. Ex. 1278 (SIDIBE ABC 0139551), at -9568; Axene Dep. 170:12-172:14.
[93] Mathewson Dep. 77:3-78:4.

ACA for Small Group and Individual product lines because of the insurance companies' ability to each choose their own Rating Areas.

104.    But even for Small Group and Individual plans post-ACA, the Area Factors used are not intended to allocate 100% of the costs in a specific Rating Area to the subscribers in that Rating Area.  Post-ACA, insurance companies treat Small Group and Individual each as a single risk pool, combining the different plans available to Small Group and Individual, respectively, and creating a statewide base rate.[94]  Insurance companies then use Area Factors to modify the base rate to account for different costs in different areas.  But the Area Factors are not intended to allocate 100% of the past costs to a Rating Area, and insurance companies often take into consideration other things such as competition in a given Rating Area, anticipated changes in the membership in that area, or anticipated changes in contract rates.[95]  In addition, insurance companies may decide to spread anticipated increases in healthcare costs in different ways across regions.

105.    

[96]

---

[94] Prior to the ACA, insurance companies had varying approaches.  Some developed a separate rate for each benefit plan and created a statewide base rate, and then applied Area Factors to each base rate.  Axene Dep. Ex. 5203 (BSC_SutterSidibe0000085) at 0100-01 & Axene Dep. 48:7-14.  Some insurance companies created a separate rate for each benefit plan offered and for each rating area used by the insurance company.  Kuecks Dep. 122:2-4; Axene Dep. 57:7-58:15.

[95] Axene Dep. 169:2-7 ("Q. And so that's – conforms to your experience that the Area Factors could be modified by an actuary based on considerations other than past cost? A. There's a variety of things that could come – come into it beyond past costs, yes.");  at 169:8-14 (competition is a consideration); Mathewson Dep. 211:12-212:23 (actuaries made manual adjustment to Area Factors due to anticipated changes in membership).

[96] Beuoy Dep. 271:15-273:4 & Dep. Ex. 1263 (BSC_SutterSubSidibe0188709).

some of Sutter's costs were spread to regions where Sutter does not operate, these costs would not be passed through 100% to the particular Rating Area where they were incurred.[97]  Mr. Axene further acknowledged that he has not analyzed this issue, and that nothing prevented the insurance companies from choosing any one of these methods to design premiums.[98]  This is of course contrary to Dr. Chipty's assumption that costs in a given Rating Area are passed through 100% to the premiums in that area.

106.    In summary, the methodology proposed by Dr. Chipty will not appropriately address all the intricacies of how premiums relate to medical costs incurred in a given geography, and therefore cannot be relied upon to accurately provide determination of damages from alleged Sutter overcharges.

107.    _Pooling of High-dollar Claims._   As discussed above, "pooling" is a sharing of costs or risks above a certain dollar threshold.[99] ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████[100]

108.    For example, claim amounts above $150,000 might be pooled across all products or all regions or across the state, meaning that those high-dollar claims incurred in Northern California would be passed through to premium rates in all regions in the

---

[97] Axene Dep. 88:18-89:7.
[98] Axene Dep. 86:2-89:7.
[99] The pooling concept described here differs from pooling of a single employer's high-dollar claims as described in my discussion of Large Group experience-rated employers (paragraphs 59-61).  When used in rate setting for an experience-rated group, pooling impacts the premium rates for that one specific employer.  As described here, the pooling methodology used by the insurance carrier may influence premium rates for all products or regions across the state.
[100] Axene Dep. Ex. 5205 (HN0015248) at Ex. 2B.

state, not just to members in Northern California.  In other words, claims at Sutter above a pooling threshold would not be allocated to a particular Rating Area and instead would be spread throughout the state pursuant to the pooling methodology that each insurance company individually devises.  Mr. Axene acknowledged that he has not specifically analyzed anything related to how pooling would affect the pass-through of Sutter's claims experience to particular premiums in particular Rating Areas.[101]

109.    _Handling of Premium Rebates._  From time to time, an insurance company may return or "rebate" a portion of premium rates paid due to a statutory or regulatory loss ratio or profit margin requirements.  For example, Mr. Axene noted that Blue Shield agreed to cap their profit margin at two percent, and ultimately gave money back to its policyholders because it earned more than two percent.[102]  Mr. Axene acknowledged that this would impact Dr. Chipty's damages calculation, but he has not thought through the issue.[103]  Dr. Chipty ignored such rebates in her damages analysis.

110.    _Mix of Products._  Dr. Chipty's model aggregates different insurance products—PPO, Point of Service, HMO, High Deductible—based on the assumption that within a particular region members tend to use Sutter facilities at a consistent rate across the different products.  But use of Sutter facilities could be impacted significantly by the different products.  For instance, High Deductible plans could discourage use of inpatient services because of their higher cost sharing.  Similarly, HMOs use a primary care physician to control costs, which may lead to less utilization of inpatient services.  Precisely because of these different claims experience for different products, the

---

[101] Axene Dep. 70:13-18.
[102] Axene Dep. 265:12-25.
[103] Axene Dep. 266:3-15.

insurance companies separately rate different products.[104]  Even with Dr. Chipty's

assumed pass-through of costs, the actual costs would vary between each of these

products such that the assumed harm would vary between purchasers of the different

products.  Dr. Chipty completely ignores these variations and how the different use

would affect the premiums.  Mr. Axene acknowledged that he did not recall doing any

specific analysis to determine whether this assumption was appropriate and

supportable.[105]

111.    _Changes in Age/Sex Factors for Individual Coverage Purchasers._  Pre-

ACA, insurance companies could invoke changes in age/sex factors used in setting rates

for policies purchased in the Individual market.  Mr. Axene agreed that changing the age

and/or sex factors as done by Anthem in 2009[106] could have a significant impact on the

premium rates paid by purchasers of coverage in the Individual market segment.

Mr. Axene further acknowledged that he did not recall having any discussions with

Dr. Chipty about how these age or gender factors might affect the 100% pass-through of

costs for Individual policy subscribers.[107]


## VIII.   CONCLUSION

112.    My analysis set forth in this declaration shows that the Plaintiffs' putative

class is a disparate group of individuals and employers that are not uniformly impacted

---

[104] Beuoy Dep. 173:20-174:9 & Dep. Ex. 1254 (BSC_SutterSidibe0126555) (reflecting the different base rates for PPO plans filed with the Department of Insurance, PPO plans filed with the Department of Managed Health Care, HMO plans, and Point of Service Plans).  Notably, the base rate for PPO plans is more than twice the base rate for HMO plans, reflecting the expected differences for the two plans.  _See also_ Kueks Dep. Ex. 1766 (HN0019446) ( █████████████████████████████████████████████ ).
[105] Axene Dep. 112:2-114:9.
[106] _See_ Mathewson Dep. Ex. 1278 (SIDIBE ABC 0139551).
[107] Axene Dep. 201:9-204:2.

by the alleged Sutter overcharges for inpatient hospital services—and in fact, the proposed class includes many employers and many employees who have not been damaged at all.

113.    My analysis also demonstrates that Plaintiffs' argument that alleged Sutter overcharges are directly passed through to premium rates is fundamentally flawed, principally due to inappropriate handling of Rating Areas.

114.    My analysis further demonstrates that the Plaintiffs and their experts have failed to propose a viable common methodology for accurately determining monetary damages for the members of the proposed class.

115.    My opinions, based on my education, training and experience are as follows:

A. Plaintiffs have not accounted for significant variation in premiums and the extent to which Sutter's alleged overcharge might relate to a premium for a given group:

i. In the Large Group market segment, insurance companies establish premium rates for each experience-rated and blended-rated group based upon an employer's specific and unique claims experience. Accordingly, the determination of damages from alleged Sutter overcharges would require an individualized analysis, including a detailed manual inspection of every employer's underwriting files, from every year in question.

ii. It is error to include premium dollars from narrow networks that exclude most Sutter hospitals in the damages calculation.  This is

because members would have experienced little damage, or no
damage at all, from alleged Sutter overcharges, especially where
all of the alleged "Damage Hospitals" are excluded from the
network.

B. The existence of "back-end rate adjustments" made by insurance
companies and their underwriters is likely to impact the effect of any
alleged Sutter overcharges, creating a circumstance where certain
members of the putative class would have lower premiums than otherwise
identical class members who could not obtain these adjustments.  This is
further evidence that not all members in the proposed class would be
uniformly damaged by the alleged overcharges.

C. Employers who purchase medical coverage usually require their
employees to share the cost of the coverage through payroll contributions.
Some employers charge employees a flat, fixed-dollar amount regardless
of premium increases, meaning *employees would be unaffected* by alleged
overcharges.  Other employers fix their share of premiums (through
various mechanisms) with employees paying the balance, meaning *the
employer would be unaffected* by alleged overcharges.  Employers do not
rely on a uniform approach or "normal" methodology in establishing
employee contributions.  Even employees *within the same company* would
not all be similarly affected by alleged Sutter overcharges, as an employer
is not required to charge its employees uniformly.  It is therefore faulty
logic to consider all employees in the proposed class as equally damaged

by alleged hospital overcharging, when the actual costs incurred by these employees vary significantly.  As such, employers—and their employees—would not be uniformly impacted by alleged Sutter overcharges, and no common model can be created to accurately measure damages.

D.  Plaintiffs argue that there is a 100% pass-through of alleged Sutter overcharges to premium rates paid by proposed class members.  There are several rate-setting mechanisms used by insurance companies, all of which compromise the 100% pass-through assumption.

116.    The opinions expressed in this declaration are based on my work to date.  I understand that discovery is ongoing and additional information may be provided.  As my analysis continues, I may update this declaration as appropriate.  Should counsel request, I may create demonstrative illustrations from documents, data and sources referred to in this declaration to aid my testimony.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  This declaration was executed on September 21, 2018, in Indianapolis, Indiana.

Executed on **September 21, 2018**

_____

Patrick Travis

50

EXHIBIT 1

# Deloitte.



**Patrick Travis**
**Specialist Leader**
**Deloitte Consulting LLP**
111 Monument Circle, Suite 4200
Indianapolis IN, 46204
ptravis@deloitte.com
630 779 0739

## Profile

Mr. Travis has 37 years of healthcare benefits plan design, administration, and consulting experience and specializes in healthcare benefits strategy, cost management, vendor selection and management, benefits administration, regulatory compliance, workplace communications, and work-site health and well-being solutions.

Prior to joining Deloitte in 1999, he served as Division President for a large Chicago-based third-party claims administrator (TPA) specializing in medical claims administration for mid- and large-sized self-insured companies. In his role as Division President, Mr. Travis directly or indirectly managed between 150 and 200 full-time employees.

Previous to his five years leading the TPA, Mr. Travis was a consultant at Aon Consulting at its predecessor organizations in Chicago, serving fully-insured and self-insured employers in the Midwest.

Mr. Travis began his career in the health insurance and employee benefits industry in 1981 in an underwriting position at Ohio Medical Indemnity Insurance Company, a Blue Cross Blue Shield-affiliated organization in Columbus Ohio.

## Experience

Mr. Travis assists small and large employers, under both self-insured and fully insured funding arrangement. His clients are sponsors of healthcare benefit designs of types including PPO, HMO, POS, ACO, indemnity, group Medicare Advantage, and account-based plans (HRA and HSA).

Examples of Mr. Travis's previous engagements include:

- Leading a team of health actuaries, benefit design consultants and underwriters in creation and implementation of a 5-year cost reduction roadmap for one of the country's largest private sector employers. Overseeing generation of monthly liability reserve estimates and creation of a bespoke model for evaluation of seasonality of paid and incurred medical trends. Conducting annual establishment, testing and validation of employee contributions.

- Conducting annual rate setting for fully insured plans, premium-equivalent rate setting for self-insured plans, and contribution setting for a large financial services organization. Performing biannual risk-adjustment rating for fully insured HMO/ACO plans and associated risk-based employee contributions. Risk-based rating and modification of Plan Sponsor specific rating area factors reduce the organization's net cost by $200 million over five years.

- Performing testing of carrier claims administration financial and procedural accuracy utilizing statistically valid random sample methodologies, stratified sampling, smart edits, and targeted reviews. Conducting accuracy audits of carrier-provider reimbursement contracts.

- Performing carrier discount analyses for incumbent and prospective managed care arrangements through a structured procurement process, inclusive of hospital inpatient, hospital outpatient, professional services, and pharmacy cost components.

- Creating a comprehensive workplace well-being program inclusive of work site and at-home communication. This engagement included establishment of a bespoke return-on-investment model to measure claims cost reduction and indirect cost avoidance impacts.

- Conducting a prescription drug contract request for proposal on behalf of a small privately held telecommunication company. The project involved evaluating competing pharmacy benefit manager vendor proposals, creating a custom cost projection model and assisting with negotiations of final pricing terms between the plan sponsor and the selected vendor.

- Introducing an account-based plan for a private university based in Tennessee. The engagement included creation of a custom cost projection model which incorporated carrier contract pricing analysis, plan design changes, alternative contribution methodologies, and impacts of adverse selection associated with introduction of the high-deductible plan option

- Performing prescription drug rebate contract adherence audits on behalf of a large private sector employer. This involved a manual review of selected paper rebate contracts between pharmaceutical manufacturers and the prescription benefit manager retained by the Plan Sponsor.

- Supporting collective bargaining negotiations for a Midwest-based manufacturing company. The engagement included pricing of proposed plan design changes, alternative contribution configurations, and fully insured vs. self-insured funding arrangements.

- Evaluating financial implications of an on-site primary care healthcare facility on behalf of a Southeast-based public transportation agency. The project included evaluation of current and proposed provider pricing contracts.

- Creating a comprehensive business case for adoption of a multi-carrier Private Exchange solution for a mid-size retailer. The engagement included building a custom cost-evaluation tool evaluate alternative future state costs associated with variable member enrollment by carrier plan offering.

- Evaluating a prospective Accountable Care Organization (ACO) initiative for a mid-size University. The engagement included supporting the plan sponsor in negotiation of a gainsharing agreement and collaborating with ACO leadership on suitability of clinical and financial performance metrics.

## Education

B.S. Business Finance, Miami University, Oxford OH

M.B.A., Concentration in Finance, Louisiana State University

## Recent Presentations and Publications

- Deloitte webinar, *Employer Healthcare Fundamentals* (December 2017)
- Wisconsin Health News, *Do Workplace Wellness Programs Work?* (April 2016)
- ADP Meeting of the Minds Symposium, *Transformation of the Healthcare Market* (March 2016)
- Pittsburgh Business Group on Health, *Employer Sponsored Plans and Private Exchanges* (January 2016)
- CVS Caremark Client Advisory Council, *Re-evaluating Benefit Design to Help Mitigate Costs and Exposure to Impending Excise Tax* (April 2015)
- Deloitte webinar, *ACA Training and Compliance* (January 2015)
- Chicago Private Company CFO Forum, *Healthcare Reform & Related Issues* (October 2014)
- Group Insurance Presidents Forum, *The Private Exchange Evolution: Discussion on Current Landscape and Delivery on the Promise of Cost Effectiveness for Employers* (October 2014)
- International Society of Certified Employee Benefit Specialists Educational Session, *Private Healthcare Exchanges… A Better Mousetrap or Smoke & Mirrors?* (February 2014)
- Deloitte CFO Forum, *Healthcare Reform, Private Exchanges & Cost Reduction Opportunities*
  - Memphis (Dec 2013)
  - Louisville (April 2013)
  - Cincinnati (March 2013)
  - Columbus (March 2013)
- Cleveland Tax Executive Seminar, *Rethinking Employer Health Strategy* (September 2013)
- World Congress Health Executive Forum, *3rd Annual Creating a Culture of Health,* (October 2012)
- Deloitte Center for Health Solutions, *Executive Briefing—Health Reform: Where Are We? What's Next* (September 2012)

Copyright © 2018 Deloitte Development LLC. All rights reserved.

EXHIBIT 2

**Exhibit 2**

*Documents and Information Considered*

In addition to those documents cited in this declaration, I also reviewed and considered the following documents and information.

**Court Filings**

- Fourth Amended Complain
- Plaintiffs' Notice of Motion and Motion for Class Certification, dated June 21, 2018, including exhibits and pleadings submitted in support of the motion.

**Expert Reports and Declarations**

- David Axene Declaration, dated June 21, 2018
- Tasneem Chipty Declaration, dated June 21, 2018

**Deposition Transcripts**

- Deposition of David Axene, dated September 4, 2018, and exhibits admitted during the deposition
- Deposition of Tasneem Chipty, dated August 16, 2018, and exhibits admitted during the deposition
- Deposition of Maurice Couser, dated August 15, 2018, and exhibits admitted during the deposition
- Deposition of Michael Beuoy, dated May 2, 2018, and exhibits admitted during the deposition
- Deposition of Mathewson, dated May 18, 2018, and exhibits admitted during the deposition
- Deposition of Gerald Lalande, dated September 29, 2017, and exhibits admitted during the deposition
- Deposition of Steven Scott, dated June 13, 2018, and exhibits admitted during the deposition
- Deposition of Lei Tsui, dated August 31, 2018, and exhibits admitted during the deposition
- Deposition of Robert Kueks, dated July 31, 2018, and exhibits admitted during the deposition
- Deposition of Steven Schnedier, dated July 25, 2018, and exhibits admitted during the deposition
- Deposition of Brent Hitchings, dated August 28, 2018, and exhibits admitted during the deposition

**Exhibit 2**

*Documents and Information Considered*

**Documents Produced in this Matter**

- PwC Health & Well-being Touchstone Survey dated June 2017
- California HealthCare Foundation Issue Brief, *Insurance Markets*, dated June 2003
- AHIP 2016 Survey of Health Savings Account – High Deductible Health Plans, dated February 2017
- Kaiser Family Foundation and Health Research and Educational Trust. 2009 Kaiser Employer Health Benefits Survey Report.
- Kaiser Family Foundation and Health Research and Educational Trust. 2010 Kaiser Employer Health Benefits Survey Report.
- Kaiser Family Foundation and Health Research and Educational Trust. 2011 Kaiser Employer Health Benefits Survey Report.
- Kaiser Family Foundation and Health Research and Educational Trust. 2012 Kaiser Employer Health Benefits Survey Report.
- Kaiser Family Foundation and Health Research and Educational Trust. 2013 Kaiser Employer Health Benefits Survey Report.
- Kaiser Family Foundation and Health Research and Educational Trust. 2014 Kaiser Employer Health Benefits Survey Report.
- Kaiser Family Foundation and Health Research and Educational Trust. 2015 Kaiser Employer Health Benefits Survey Report.
- Kaiser Family Foundation and Health Research and Educational Trust. 2016 Kaiser Employer Health Benefits Survey Report.
- Kaiser Family Foundation and Health Research and Educational Trust. 2017 Kaiser Employer Health Benefits Survey Report.
- Kaiser Family Foundation and Health Research and Educational Trust. 2018 Kaiser Employer Health Benefits Survey Report.
- *Health Affairs*, "High-Deductible Health Plan Enrollment Increased From 2006 To 2016, Employer-Funded Accounts Grew In Largest Firms", dated August 2018
- "A Practical Approach to Assigning Credibility for Group Medical Insurance Pricing"; Society of Actuaries, dated December 2015
- "Timing's Everything: The Impact of Benefit Rush", Health Watch, May 2018
- *Health Affairs*, "Americans Support Price Shopping for Health Care, But Few Actually Seek Out Price Information; dated August 2017
- *Health Affairs,* "Offering A Price Transparency Tool Does Not Reduce Overall Spending Among California Public Employees and Retirees; dated August 2017
- Anthem Blue Cross filing # AWLP-129656693
- Anthem Blue Cross filing # AWP-128683754
- Anthem Blue Cross filing #AWLP-127314641
- Blue Shield of California filing #BCCA-128095833
- California Department of Managed Care, Rating Filings Search Site: http://wpso.dmhc.ca.gov/premiumratereview/FilingList.aspx

**Exhibit 2**

*Documents and Information Considered*

- Kaiser Family Foundation, Health Insurance Market Reforms: Rate Restrictions; dated June 2, 2012
- City of San Ramon 2018 Benefits Guide
- Zendesk 2018 Benefit Guide
- Anthem 2012, 2014 Compare.xlsx
- ABC083490
- ABCLH456415
- ABCLH4441649
- ABLCH456290
- SIDIBE_ABC_0139551
- SIDIBE_ABC_0139767
- SIDIBE_ABC_0136912
- SIDIBE_ABC_0139404
- SIDIBE_ABC_0139551
- SIDIBE_ABC_0140063
- HN0019446
- HN0015248
- BSC_SutterSidibe0000037
- BSC_SutterSidibe0000085
- BSC_SutterSidibe0094563
- BSC_SutterSidibe0096626_
- BSC_SutterSidibe0109345
- BSC_SutterSidibe0113119
- BSC_SutterSidibe0126491
- BSC_SutterSidibe0126555
- BSC_SutterSidibe0188709
- UHC_Sidibe-0008481
- UHC_Sidibe0003024
- UHC-005094904
- DEF002100127
- DEF002015138
- DEF002015404
- DEF002015578
- DEF000013014
- DEF000013091
- SH000620
- SH001058
- JANKOW00000284
- WSAW005523

**Exhibit 2**

***Documents and Information Considered***

- CALPERS06348
- CALPERS06327
- CALPERS06331
- CALPERS06325
- CALPERS06329

EXHIBIT 3



EXHIBIT 4