CONSTANTINE CANNON LLP
MATTHEW L. CANTOR (*pro hac vice*)
ANKUR KAPOOR (*pro hac vice*)
JEAN KIM (*pro hac vice*)
J. WYATT FORE (*pro hac vice*)
ROSA M. MORALES (*pro hac vice*)
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701
mcantor@constantinecannon.com
jkim@constantinecannon.com
rmorales@constantinecannon.com

*Lead Counsel for Plaintiffs and the [Proposed] Class*

DAVID BROWNSTEIN (141929)
WILLIAM S. FARMER (46694)
DAVID GOLDSTEIN (142334)
FARMER BROWNSTEIN JAEGER LLP
235 Montgomery Street, Suite 835
San Francisco, CA 94104
(415) 795-2050
(415) 520-5678 (fax)
dbrownstein@fbj-law.com
wfarmer@fbj-law.com
dgoldstein@fbj-law.com

*Additional Co-Lead Counsel for Plaintiffs*

AZRA Z. MEHDI (220406)
One Market Street
Spear Tower, Suite 3600
San Francisco, CA 94105
(415) 293-8039
(415) 293-8001 (fax)
azram@themehdifirm.com

*Co-Lead Counsel for Plaintiffs*

ALLAN STEYER (100318)
D. SCOTT MACRAE (104663)
JILL MANNING (178849)
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
One California Street, Third Floor
San Francisco, CA 94111
(415) 421-3400
(415) 421-2234 (fax)
asteyer@steyerlaw.com
smacrae@steyerlaw.com
jmanning@steyerlaw.com

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN HANSEN, DAVID HERMAN, OPTIMUM GRAPHICS, INC., and JOHNSON POOL & SPA, on Behalf of Themselves and All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>     vs.<br><br>SUTTER HEALTH,<br><br>          Defendant. | Case No. 3:12-cv-4854-LB<br><br>**PLAINTIFFS' OPPOSITION TO SUTTER HEALTH'S MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. TASNEEM CHIPTY**<br><br>Date: November 8, 2018<br>Time: 9:30 AM<br>Judge: The Honorable Laurel Beeler |

## <u>TABLE OF CONTENTS</u>

STATEMENT OF THE ISSUE TO BE DECIDED.............................................................................1

I.     INTRODUCTION .................................................................................1

II.    STATEMENT OF FACTS .................................................................6

        **a.**    Dr. Chipty Appropriately Analyzed the FAC's Geographic Markets. .............6

        **b.**    Dr. Chipty Analyzed the FAC's Geographic Markets Through the Well-Established Lens of the HMT. ................................................................6

            **i.**    Dr. Chipty Analyzed Where In-Market Residents Went For IHS ........7

            **ii.**    Dr. Chipty Analyzed Drive Times and Distances to Potential Hospital Alternatives. ................................................................8

            **iii.**   Dr. Chipty Applied a Diversion Analysis to Evaluate Where Patients Could Reasonably Turn for Alternatives. ............................10

            **iv.**   Dr. Chipty Appropriately Considered Qualitative, Record Evidence When Analyzing Market Definition. ..................................14

            **v.**    Dr. Chipty Further Tested Whether the Alleged Tying Markets Were Relevant Markets....................................................16

        **c.**    Dr. Chipty's Analysis Is Far From Novel. ......................................................16

III.   ARGUMENT ...................................................................................17

        **a.**    Legal Standards....................................................................................17

        **b.**    Dr. Chipty Uses a Generally-Accepted Approach to Market Definition.........19

        **c.**    Blue Shield Redirection Analyses Are Precisely the Type of Evidence Relied Upon by Economic Experts.................................................................23

        **d.**    Dr. Chipty Did Not Fail to Consider Evidence Regarding Excluded Competitor Hospitals. ........................................................................24

CONCLUSION.......................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*AFMS LLC v. United Parcel Serv. Co.*,
   No. CV105830 JGB, 2014 WL 12515335 (C.D. Cal. Feb. 5, 2014) ............................................ 22

*Apple iPod iTunes Antitrust Litig.*,
   No. 05-CV-0037 YGR, 2014 WL 4809288 (N.D. Cal. Sept 26, 2014)........................................ 22

*Bailey v. Allgas, Inc.*,
   148 F. Supp. 2d 1222 (N.D. Ala. 2000) ...................................................................................... 20

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)..................................................................................................................... 17

*Castellow v. Chevron USA*,
   97 F. Supp. 2d 780 (S.D. Tex. 2000) .......................................................................................... 20

*Crescenta Valley Water Dist. v. Exxon Mobile Corp.*,
   No. CV 07-2630 JST, 2013 WL 12116333 (C.D. Cal. Jan. 8, 2013) .......................................... 22

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ..................................................................................................................... 18

*Dorn v. Burlington Northern Santa Fe R.R.*,
   397 F.3d 1183 (9th Cir. 2005) ................................................................................................. 2, 18

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ....................................................................................................... 18

*FTC v. Advocate Health Care*,
   841 F.3d 464 (7th Cir. 2016) ................................................................................................ *passim*

*FTC v. Advocate Health Care*,
   No. 15 C 11473, 207 WL 1022015 (N.D. Ill. Mar. 16, 2017) ............................................ *passim*

*FTC v. Penn. State Hershey Med. Ctr.*,
   838 F.3d 327 (3d Cir. 2016)........................................................................................... 18, 20, 21

*Giuliano v. SanDisk Corp.*,
   No. C 10-02787 SBA, 2015 WL 10890654 (N.D. Cal. May 14, 2015) .............................. 5, 18, 19

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   MDL No. 1917, 2013 WL 5428139 (N.D. Cal. June 20, 2013) .................................................. 23

*In re High-Tech Employee Antitrust Litig.*,
   No. 11-cv-02509 LHK, 2014 WL 1351040 (N.D. Cal. Apr. 4, 2014)..................................... 18, 19

*In re Korean Ramen Antitrust Litig.*,
   No. 13-cv-04115-WHO, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017)........................................ 25

*In re Lidoderm Antitrust Litig.*,
No. 14-md-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) .................................... 5, 19

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) ........................................................................................ 20

*In re Mirena IUD Prods. Liab. Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016) ........................................................................................ 20

*In re Qualcomm Antitrust Litig.*, 17-MD-02773-LHK,
2018 WL 4680214 (N.D. Cal. Sept. 27, 2018) ........................................................................... 24

*In re SE Milk Antitrust Litig.*,
No. 2:07-CV 188, 2012 WL 947106 (E.D. Tenn., Mar. 20, 2012) .............................................. 18

*In re SE M ilk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) ...................................................................................................... 19

*Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, CIV. A. No.
5-138 WOB, 2008 WL 113987 (E.D. Ky. Jan. 7, 2008) ............................................................. 22

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
387 F. Supp. 2d 794 (N.D. Ill. 2005) .......................................................................................... 24

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015) .................................................................................................... 19

*Ohio v. American Express*,
138 S. Ct. 2274 (2018) ....................................................................................................... 3, 17, 18

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ................................................................................................. 19, 25

*Samsung Elecs. Co. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014) .................................................................................................... 18

*Sidibe v. Sutter Health*,
667 Fed. App'x 641 (9th Cir. 2016) ............................................................................................. 2

*St. Alphonsus Med. Ctr. - Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir 2015) ................................................................................................. *passim*

*TK-7 Corp. v. Estate of Barbouti*,
993 F.2d 722 (10th Cir. 1993) .................................................................................................... 24

*United States v. Aetna*,
240 F.Supp.3d 1 (D.D.C. Jan. 23, 2017) .................................................................................... 23

*United States v. Conn. Nat'l Bank*,
418 U.S. 656 (1974) ............................................................................................................. 3, 17

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ...................................................................................................................... 7

*United States v. Eastman Kodak Co.*,
63 F.3d 95 (2d Cir. 1995) ............................................................................................................ 22

iii

*United States v. Fleet Mgmt. Ltd.*,
   Crim. A. No. 07-279, 2008 WL 1924250 (E.D. Pa. Apr. 29, 2008) .................................. 20

**Rules**

Fed. R. Evid. 702 .................................................................................................. 1, 18, 19

Fed. R. Evid. 703 ................................................................................................................ 24

**Other Authorities**

IIB Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2014) ...................................... 17

R. Posner, *Antitrust Law* 150 (2d ed. 2001) ............................................................................... 7

Steven Tenn, *The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction* (FTC, Working Paper No. 293, 2008) ...................................................................... 17

U.S. Dep't of Justice and Federal Trade Comm'n, *Horizontal Merger Guidelines* (2010) .......... *passim*

iv

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATEMENT OF THE ISSUE TO BE DECIDED**

Whether Sutter Health ("Sutter") has shown that the opinions of Dr. Tasneem Chipty, plaintiffs' economist expert, concerning the scope of twelve geographic markets for the sale of Inpatient Hospital Services to commercial health plans ("IHS") are "unreliable" under Fed. R. Evid. 702 where those opinions are premised on well-established economic methodologies and sufficient record evidence.

**I.   INTRODUCTION**

Dr. Chipty has opined that eleven of the twelve candidate geographic markets asserted in the Fourth Amended Complaint ("FAC") for IHS are coherent.[1]  Sutter attacks these opinions as "unreliable," but fails to offer **any** testimony from **any** economist to support its motion.[2]  For that reason alone, Sutter's motion should be denied.  Sutter's motion should also be denied because it is riddled with legal error and ignores the totality of Dr. Chipty's analysis, including all the economic theory, mathematical computations, and record evidence on which it is based.

Not surprisingly, Sutter does not take issue with Dr. Chipty's stellar credentials.  Dr. Chipty has served as a testifying economist expert in numerous antitrust matters, including currently for the U.S. Dep't of Justice, Antitrust Division in *U.S. v. Carolina Health System,* a case concerning hospital market power.[3]  She has, on many occasions, defined antitrust markets in both healthcare and non-healthcare matters, including as a consulting economist for the private plaintiff in *St. Alphonsus Med. Ctr-Nampa, Inc. v. St. Luke's Health Sys., Ltd.,* 778 F.3d 775, 784 (9th Cir 2015) ("*St. Luke's*") – precedent specifically relied upon by the Ninth Circuit here.[4]  No court has stricken

---

[1]    Dr. Chipty opined that all four Tied Markets for IHS asserted in the FAC were valid antitrust markets, including those that are roughly congruent with the San Francisco, Santa Rosa, Modesto, and Sacramento Hospital Service Areas defined by the *Dartmouth Atlas of Healthcare* ("HSAs"). Dr. Chipty also opined that seven of the eight Tying Markets asserted in the FAC were valid antitrust markets, including those that are roughly congruent with the HSAs for Crescent City, Lakeport, Antioch, Jackson, Tracy, and Auburn and the combined HSAs for Berkeley and Oakland.  She also found that the "market for the Sutter Davis Hospital . . . is no broader than the hospital's 90 percent primary service area ['PSA']."  *See* Declaration of Dr. Tasneem Chipty in Opposition to Sutter's Summary Judgment Motion dated May 26, 2018 ("Chipty Decl.") ¶¶ 9-10.

[2]    Dr. Gautam Gowrisankaran, the economist that submitted a Declaration in support of Sutter's summary judgment motion, has not responded to any of Dr. Chipty's opinions.

[3]    Chipty Decl. App'x A.

[4]    *See* Declaration of Matthew L. Cantor dated October 8, 2018, Ex. 1 (Chipty) at Tr. 77:20-

1    her opinions.

2          Sutter, nonetheless, argues that Dr. Chipty "attempted to reverse engineer markets" with a

3    "results-oriented" and "untested" approach that "lacked any scientific basis."  Def. Mot. Excl. Dr.

4    Chipty 2 (Sept. 10, 2018) ("Mot.").  These incendiary labels are refuted by even a cursory review of

5    Dr. Chipty's testimony.  In truth, Dr. Chipty utilized textbook scientific methods to test whether the

6    plausible candidate markets delineated by the *Dartmouth Atlas* and asserted by the FAC were

7    coherent under the well-established hypothetical monopolist test ("HMT") set forth in the U.S. Dep't

8    of Justice and Federal Trade Comm'n, *Horizontal Merger Guidelines* (2010) ("*Merger*

9    *Guidelines*").[5]

10         Through the lens of the HMT, Dr. Chipty evaluated a substantial amount of qualitative and

11   quantitative evidence.  She did so to determine whether a hypothetical (or actual) monopolist of IHS

12   in the FAC's alleged markets could impose a small, but significant, non-transitory increase in price

13   (a "SSNIP") over commercial health plans seeking to sell in those areas.  Her analysis easily meets

14   the liberal standard for admissibility afforded to expert opinions.[6]

15         Specifically, Dr. Chipty determined that eleven of the candidate markets are relevant antitrust

16   markets by, among other things, evaluating whether the evidence showed substantial patient

17   insistence for IHS in the asserted relevant markets.  To understand the extent of such patient

18   insistence for IHS in the candidate markets, Dr. Chipty reviewed a substantial amount of economic

19   literature and ordinary course documents and testimony from Sutter and health plans.  This evidence

20   contained numerical and qualitative evaluations, ***including Sutter admissions***, regarding the extent

21   that patients prefer to stay local for their IHS.  Dr. Chipty also conducted significant mathematical

22   exercises and statistical analyses that relied on a vast amount of data (*i.e.*, hospital discharge data

---

24   79:20; *Sidibe v. Sutter Health*, 667 Fed. App'x 641, 642 (9th Cir. 2016) ("Ninth Circuit Order").
25   Unless otherwise indicated, all further references to "Ex." are to the exhibits attached to the
     accompanying declaration of Matthew L. Cantor.
26   [5]    *See* Ninth Circuit Order, 667 Fed. App'x at 642 ("a common method for determining the
     relevant geographic market" is to utilize the HMT test); Chipty Decl. ¶¶ 16-19 (noting that market
27   definition opinions were "based on consideration of the evidence within the framework of the
     [HMT]"); Ex. 1 (Chipty) at Tr. 63:12-64:1.
28   [6]    *See Dorn v. Burlington Northern Santa Fe R.R.*, 397 F.3d 1183, 1196 (9th Cir. 2005) (noting
     and applying the "liberal standard of admissibility" set forth in *Daubert*).

1   filed with the State of California and █████████████, to understand this patient insistence

2   for local Sutter hospitals, including estimated patient diversion ratios that considered where patients

3   would seek services if local Sutter hospitals were moved out of network.  Finally, where the data

4   permitted, Dr. Chipty conducted mathematical simulation exercises to quantify the likely increase in

5   price that a hypothetical monopolist could impose, given patient preferences for area hospitals.[7]

6   Based on these analyses, she was able to conclude that a hypothetical hospital monopolist of IHS

7   could profitably impose a SSNIP over commercial health plans doing business in almost all of the

8   candidate markets, as it was unlikely that a health plan could create a profitable hospital network in

9   these areas without any in-market hospitals due to patient insistence for them.  *See* Chipty Decl.

10   ¶¶ 11-17.

11        Despite this substantial work product, Sutter seeks to strike based on several flawed

12   arguments.  *First,* Sutter suggests that Dr. Chipty's testimony should identify the boundaries of

13   geographic markets with absolute precision, misusing a statement in *Ohio v. American Express,* 138

14   S. Ct. 2274 (2018), indicating that defined markets should be "accurate."  Mot. 11.  *American*

15   *Express*, however, concerned the evaluation of specific *product markets*, known as two-sided

16   transaction markets, not at issue here.  *American Express* does not come close to overruling decades

17   of jurisprudence holding that *geographic markets* need not be defined with precise metes and

18   bounds.  *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974).  And *American Express* does

19   not govern plaintiffs' Cartwright Act claims.

20        *Second*, Sutter argues that Dr. Chipty used a "variety of inconsistent approaches to back into

21   the HSA-based markets defined in the Complaint."  Mot. 4.  This too is false.  Dr. Chipty evaluated

22   twelve different candidate markets.  In each case, she considered the best available evidence and

23   consistently evaluated it within the framework of the HMT.  Sutter takes issue with the fact that, in

24   attempting to understand patient insistence for IHS in the candidate Tied Markets, Dr. Chipty

---

25

26      [7]     Because the evidence showed that prices already were elevated in many candidate markets, likely due to Sutter's conduct, Dr. Chipty reported the results of the simulation with caution.  Chipty

27   Declaration in Support of Class Certification ("Chipty Class Decl.") Ex. 14A (showing elevated prices at Sutter hospitals).  By doing so, she accounted for the *Cellophane* Fallacy (*infra* p.7), which,

28   in light of these already elevated prices, could give the impression of a broader relevant market than is actually indicated by patient preferences.

calculated diversion ratios – a method used by the government's expert in *FTC v. Advocate Health Care*, No. 15 C 11473, 2017 WL 1022015 (N.D. Ill. Mar. 16, 2017) ("*Advocate II*"),[8] but that, to understand patient insistence for IHS in the single-hospital candidate Tying Markets, she relied upon ordinary course of business evidence from Sutter itself and the health plans.  Here, Sutter incorrectly intimates that Dr. Chipty's reliance on this qualitative evidence, instead of only mathematical calculations, was error.  Mot. 17.  To the contrary, qualitative, rather than quantitative, evidence is routinely relied upon by economists in defining markets.[9]

    *Third,* Sutter challenges Dr. Chipty's reliance on significant "redirection analyses" that Blue Shield "experts on the local market around the providers" with thirty years of network contracting experience completed in 2011, 2014, and 2015.  Ex. 3 (Wells) at Tr. 502:10-20.  The redirection conclusions in these analyses are devastating to Sutter's summary judgment motion, as they quantify the percentage of patients (sometimes all of them) that Blue Shield estimated would continue to seek treatment at Sutter facilities in the Tying Markets, even if they were to pay higher prices for them. Per Sutter, these estimates are "unsubstantiated," "back-of-the-envelope," effectively irrelevant (as some were created for a self-funded PPO payor and not a fully-insured plan) and were even warped for litigation purposes.  Mot. 15.  But Sutter's criticisms of these analyses ring hollow.  These analyses were prepared in the ordinary course of business by market "experts;" are a "standard" form of analysis done by Blue Shield; relied on Blue Shield data that was "true and accurate;" and considered ████████████████████████████████████████████████████████████
████████████████████████████████████████[10]

    Dr. Chipty properly considered the patient insistence estimates made by these Blue Shield

---

[8]    Even Dr. Gowrisankaran stated that diversion calculations were "used" in "market definition analysis." Ex. 2 (Gowrisankaran) at Tr. 164:1-16.

[9]    *See, e.g., St Luke's*, 778 F.3d at 785 (holding that market definition was supported by qualitative evidence of insurers' "need" for "local" providers to "market a health care plan . . . in the Nampa market"); Ex. 1 (Chipty) at Tr. 77:15-79:20 (describing how she and plaintiff expert team in *St. Luke's* relied on qualitative evidence as the "principal method" to define markets).

[10]    Ex. 3 (Wells) at Tr. 529:20-532:13, 552:3-553:24:, 598:3-600:23; Ex. 4 (Barnes) at Tr. 435:9-23, 440:9-15, 443:5-22 ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████.

4

1    experts in the redirection analyses because they were entirely relevant to her market definition

2    assignment.  She relied on them as an input, in addition to significant other quantitative and

3    qualitative evidence, in determining whether SSNIPs could be imposed by a monopolist in the

4    candidate Tying Markets.  Ex. 1 (Chipty) at Tr. 153:16-21 (noting that the "wealth of evidence

5    suggests that" Sutter hospitals in tying markets "are local monopolies."); Chipty Decl. ¶ 17.  She did

6    not, as Sutter claims, merely "parrot" the redirection estimates made by Blue Shield; instead, she

7    explained how those estimates impacted her market definition inquiry.

8         In any event, Sutter's attempt to exclude Dr. Chipty's testimony based on her reliance on

9    these Blue Shield analyses is deficient.  It would be error to exclude Dr. Chipty's opinions based on

10   the materials that she relied upon, as these arguments merely go to the weight to be afforded to them.

11   *See Giuliano v. SanDisk Corp.*, No. C 10-02787 SBA, 2015 WL 10890654, at *4 (N.D. Cal. May 14,

12   2015); *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *28 (N.D. Cal.

13   Feb. 21, 2017).

14         *Fourth,* Sutter argues that Dr. Chipty ignored substantial evidence, including evidence on

15   drive times and distances of "alternative hospitals" that Blue Shield supplied to the Department of

16   Managed Health Care ("DMHC") in 2014.  But that evidence merely identifies hospitals that are

17   within 15 miles and 30 minutes of Sutter hospitals; it does not even purport to identify patient

18   insistence for particular hospitals or identify where patients would actually seek hospital services if

19   the Sutter hospitals were moved out-of-network, as the Blue Shield redirection analyses do.

20   Regardless, substantial drive time/mileage information *was* considered by Dr. Chipty and was

21   notably considered by the Blue Shield team that prepared the redirection analyses as well.[11]  Indeed,

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ███████████████████████  Sutter also erroneously argues that Dr. Chipty failed to adequately

25   consider Kaiser's role in her opinions, despite that Sutter purportedly assumed the product market

26

27   _____

     [11]    Silveira Decl. Ex. 21 (document summarizing drive time/distance information from Sutter
     hospitals to other hospitals considered by Dr. Chipty); Ex. 1 (Chipty) at Tr. 256:14-257:11
28   (demonstrating Dr. Chipty considered summary document); *id.* at 191:1-196:23 (noting that DMHC
     filings are not a "replacement for redirection analysis").

1    alleged in the FAC, which excluded Kaiser, on its summary judgment motion.  But Dr. Chipty's

2    testimony shows that she did consider Kaiser's role and concluded that health plans cannot turn to

3    Kaiser as substitutes for non-Kaiser hospitals.

4          Dr. Chipty's analysis was comprehensive, relied on substantial evidence, and conformed to

5    well-established economic guidelines for defining markets.  Her opinions are also supported by

6    additional evidence that has been elicited since her Declaration was served.  That Sutter disagrees

7    with her opinions does not make them "junk science."  This motion should be denied.

8    **II.     STATEMENT OF FACTS**

9          **a.     Dr. Chipty Appropriately Analyzed the FAC's Geographic Markets.**

10         Like any well-trained scientist, Dr. Chipty proposed a hypothesis: that the FAC's twelve

11   candidate markets asserted were relevant antitrust markets for the present matter.  Chipty Decl. ¶ 5.

12   And like any well-trained scientist, Dr. Chipty tested that hypothesis:  She "look[ed] at the data," to

13   determine whether "some HSAs might, in fact, be relevant antitrust markets." Ex. 1 (Chipty) at Tr.

14   52:16-22.  Contrary to what Sutter states, whether the *Dartmouth Atlas* intentionally constructed

15   those HSAs to be antitrust markets is the wrong question to ask—the right question to consider is

16   whether the candidate markets satisfy scrutiny under established market definition guidelines.  That

17   is the analysis that Dr. Chipty performed.

18         Accordingly, it is irrelevant whether HSAs "were [] designed to define antitrust markets."

19   Mot. 3.  As Dr. Chipty testified, *no* potentially plausible building block, "be they ZIP codes, be they

20   counties, be they MSAs, CSAs, none of these things are designed . . . to be antitrust markets."  Ex. 1

21   (Chipty) at Tr. 51:4-12.  The relevant question, according to Dr. Chipty, is whether they can be

22   considered antitrust markets *after* antitrust analysis is applied to them.

23         **b.     Dr. Chipty Analyzed the FAC's Geographic Markets Through the Well-**
24         **Established Lens of the HMT.**

25         Dr. Chipty applied "the same overarching framework of the [HMT]" in analyzing each of the

26   Tied and Tying Markets.  *Id.* at Tr. 63:18-22.  The HMT asks whether a hypothetical monopolist can

27   profitably impose a SSNIP.  Chipty Decl. ¶ 57.  If the answer to that question posed is yes, then the

28   market is correctly defined.  *See Merger Guidelines* § 4.1.1.  If it is no, then the relevant market is

6

defined too narrowly because alternative suppliers outside the candidate market can discipline the hypothetical monopolist's conduct.  *Id.*

The HMT, however, is primarily constructed for merger analysis, where the actual world absent the merger is usually compared to a *prospective* world after the merger has been completed. In non-merger cases concerning anticompetitive conduct—as here—the HMT must account for the *Cellophane* Fallacy: that is, it must account for the fact that an actual, real-world monopolist (or entity with substantial market power) in the candidate market could have *already* imposed supracompetitive pricing, *prior to* the HMT's application. In the presence of such supracompetitive pricing, the application of an HMT would find that pricing would not be raised significantly further, *i.e.*, in the absence of the required SSNIP.  Accordingly, employing an HMT where supracompetitive pricing already exists could lead to an improper rejection of the candidate market and wrongly suggest that a broader market is the market of relevance.  *See* R. Posner, *Antitrust Law* 150 (2d ed. 2001) ("the existence of a broad market, whether determined by price correlations or other data, can be an artifact of cartel or monopoly pricing" which has "repeatedly tripped up the courts") (criticizing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) (*Cellophane* Case)).  Therefore, contrary to Sutter's criticism that Dr. Chipty has inappropriately "used different approaches to assess the alleged tied and tying markets," Mot. 4, Dr. Chipty actually correctly applied a HMT analysis for each of the candidate markets.

Dr. Chipty applied the HMT using several analytical steps, as discussed below.

### i.   Dr. Chipty Analyzed Where In-Market Residents Went For IHS.

As a first step in her analysis, Dr. Chipty found strong patient insistence for hospitals located within the candidate markets by studying where commercially-insured residents actually sought IHS. Based on these calculations, she found that "evidence shows that, in most of the candidate markets, the majority of area-patients prefer a local area-hospital for their inpatient hospital care."  Chipty Decl. ¶ 11.[12]  Dr. Gowrisankaran also analyzed patient insistence to stay in-market—indeed, his

---

[12]   *Id.* (percent of residents who stay within candidate geographic market for services is: (a) over 75 percent for Sacramento; (b) about 95 percent for San Francisco; (c) about 80 percent for Modesto; (d) about 75 percent for Santa Rosa; (e) about 80 percent for Berkeley-Oakland; (f) about 70 percent for Crescent City; (g) about 50 percent for Lakeport; and (h) about 55 percent for Tracy.  For

outflow calculations suggest that *six of the markets alleged*, *including all of those that contain Sutter Damages Hospitals,* are economically coherent, as they had less outflow than markets found to be valid in *St. Luke's* and *Advocate I* and *II.  See* Pls. Opp. Mot. Summ. J. 25.[13]

### ii.   Dr. Chipty Analyzed Drive Times and Distances to Potential Hospital Alternatives.

Next, Dr. Chipty calculated average drive times and distances for patients who received IHS in the candidate markets, and for those who received such care outside the candidate markets.  This analysis is relevant, because, if out-of-area hospitals are as convenient for area patients as in-area hospitals, then the average drive times of patients who chose to receive care at in-area hospitals should be the same as the average drive times of patients who chose to receive care at out-of-area hospitals.  *See* Chipty Decl. ¶ 12.

The results of these calculations show that the average drive times for patients who receive their care from hospitals in the candidate geographic markets were *significantly lower* than those for patients who receive their care from outside hospitals.[14]  Based on this, Dr. Chipty concluded that patients who drive outside the candidate markets for IHS are typically not going to those hospitals due to their proximity.  In this context, Dr. Chipty recognizes the "silent majority" fallacy that Dr. Gowrisankaran failed to consider: that, even though some patients will and do travel outside the market for IHS, this does not reflect the preferences of substantial numbers of patients who would not.  *See* Chipty Decl. ¶¶ 15, 64, 146-50.  These drive time calculations show that substantial numbers of area patients would be less likely to switch to out-of-area hospitals, which, in turn, makes it more likely that an in-area hypothetical (or actual) hospital monopolist could likely impose

---

Jackson, Antioch, and Auburn, this number is about 40 percent.).

[13]     Dr. Gowrisankaran's analysis, however, is deficient, as he, unlike Dr. Chipty, only considered flow, travel time, and distance information.  *See* Plaintiffs' Motion to Strike Declaration of Dr. Gowrisankaran.

[14]     *Id.* ((a) 17 versus 38 minutes for Sacramento; (b) 16 versus 45 minutes for San Francisco; (c) 18 versus 71 minutes for Modesto; (d) 20 versus 67 minutes for Santa Rosa; (e) 14 versus 45 minutes for Berkeley-Oakland; (f) 16 versus 107 minutes for Lakeport; (h) 17 versus 44 minutes for Antioch; (i) 21 versus 71 minutes for Jackson; (i) 9 versus 51 minutes for Tracy; and (k) 18 versus 45 minutes for Auburn).  Dr. Chipty was unable to compute average drive times for patients who travel outside the Crescent City candidate market because OSHPD lacked data for California patients who choose an Oregon hospital.  *Id.* ¶ 12 n.27.

1    a SSNIP.  *Id.*; Ex. 1 (Chipty) at Tr. 70:21-71:15;[15] *FTC v. Advocate Health Care*, 841 F.3d 464, 469

2    (7th Cir. 2016) ("*Advocate I*").

3           With respect to hospital distances and drive times to hospitals, Sutter criticizes Dr. Chipty for

4    "ha[ving] never seen Blue Shield's 2014 [DMHC] filings," Mot. 9 (citing Chipty Dep. 157:20-

5    159:11) that merely identify distances and drive times between Sutter and non-Sutter hospitals when

6    she analyzed Sutter alternatives.  These analyses purport to identify "alternative" non-Sutter

7    hospitals that are within 15 miles and 30-minute drive times of Sutter facilities.  They were filed by

8    Blue Shield with the DMHC shortly before Blue Shield, ██████████████████████████████

9    ████████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████████████

11   ████████████████████████████████

12          But Dr. Chipty did consider the drive time/distance information that Sutter points to in her

13   analysis of market alternatives.  In fact, *Sutter concedes that she relied on a document that generally*

14   *summarized the drive times and distances information that appears on the relevant DMHC filings.*

15   *See* Silveira Decl. Ex. 21 (summary document); Ex. 1 (Chipty) at Tr. 256:14-257-10 (LeVee to Dr.

16   Chipty regarding summary document: "I'll represent to you that you do cite this document in your

17   report"); *see also* Ex. 3 (Wells) at Tr. 448:3-450:25 (summary drive time/distance document

18   prepared by Blue Shield employees that made DMHC filings).

19          Regardless, the time-and-distance calculations referenced in these DMHC filings do not

20   answer the core question at issue: whether patients would insist on staying at facilities in the

21   candidate markets if Sutter were moved out-of-network – a question that the redirection analysis not

22   only answers, but quantifies.  Ex. 1 (Chipty) at Tr. 191:19-192:5 ("[A]n important distinction . . . *is*

23   *that the redirection analysis has a large percentage of patients staying* . . . at the same hospital.

24   This *alternate hospital listing does not seem to do that*.") (emphasis added).

25          Moreover, Blue Shield's behavior proves that these DMHC filings did *not* identify

26   commercially viable "alternatives" to Sutter in various areas for it or its members.  Shortly after

27   these filings were made and Blue Shield ████████████████████████████████████████

28

---

[15]      *See* Gowrisankaran Decl. ¶¶ 64-65 (analyzing impact of drive-times on price).

1    ████████████████ Blue Shield signed another agreement with Sutter██████████████████

2    ████████████████████████████████████████ and it did so only 29 days after

3    it███████████████████████ Ex. 26 (relevant portion of 2015 Sutter/Blue Shield

4    contract).  The "alternative" hospitals listed in these DMHC filings were not alternatives at all for

5    health plans seeking to offer a viable network of IHS providers to consumers.

<blockquote>iii.    Dr. Chipty Applied a Diversion Analysis to Evaluate Where Patients Could Reasonably Turn for Alternatives.</blockquote>

Hospital market definition often includes a "diversion ratio" analysis which describes where patients would go for care if their first-choice hospital were no longer available as a choice.  Chipty Decl. ¶ 48; Ex. 2 (Gowrisankaran) at Tr.164:12-15 ("diversion ratios are used in market definition").  These "next best substitutes" are highly relevant to geographic market definition, which essentially lists "the competitors that would substantially constrain the firm's price-increasing ability."  *Advocate I*, 841 F.3d at 469 (citation, internal quotation marks, and internal alteration omitted).  In a bargaining framework, the availability of the next-best substitutes in a geographic market would give a health plan more leverage in negotiations with the first-choice hospital.  Chipty Decl. ¶ 48.

To test potential diversion where the FAC-asserted candidate market contained more than one non-Kaiser hospital, Dr. Chipty employed a widely-used, patient-level, hospital choice, statistical model.  *Id.* ¶ 50.  This model accounts for "a broad set of" factors, including "(a) patient characteristics . . . ; (b) patient's medical need; [and] (c) hospital characteristics, including whether the hospital is a teaching hospital, whether it is a designated trauma facility, and whether it offers the medical services the patient needs."  *Id.* & at App'x C.  For each of the Tied Markets, Dr. Chipty's choice model showed a high aggregate diversion to hospitals *within* the candidate markets, supporting that they are relevant antitrust markets.  *Id.* ¶ 52.  Dr. Chipty then utilized the diversion ratio results to conduct quantitative HMT exercises in each of the Tied Markets; that also supported the validity of the Tied Markets.  Chipty Decl. ¶¶ 57-61; Ex. 1 (Chipty) at Tr. 72:5-25.

In candidate markets where Sutter was alleged to have a monopoly, *i.e.*, where there is only one hospital, patients can only divert to putatively out-of-market hospitals.  Chipty Decl. ¶ 54.  Accordingly, Dr. Chipty could not apply the same statistical model to test whether candidate Tying

1    Markets were coherent.  Consequently, Dr. Chipty relied on estimates of diversion constructed in the

2    ordinary course of business by Blue Shield, which contemplated whether and where patients would

3    likely redirect to receive IHS if their chosen Sutter hospital were no longer in network.  *Id.*  These

4    Blue Shield "redirection number[s] mimic the same kind of information" that Dr. Chipty's statistical

5    diversion analyses provide.  Ex. 1 (Chipty) at Tr. 72:18-19; *see also* Chipty Decl. ¶ 56.  They

6    demonstrate that, in Blue Shield's experienced business judgment, ████████████████████████

7    ████████████████████████████████████████  The percent that would

8    remain in the Tying Markets based on these analyses is (a) ███% for ████████████████ (b) ███% for

9    ████████████ (c) ███% for ████████ (d) ███% for ████████ (e) ███% for ████████ (f) ███% for ████████

10   and (g) ███% for ████████  Chipty Decl. ¶ 13; Silveira Decl. Exs. 2-3, 19.

11   Importantly and contrary to Sutter's mischaracterizations, the Blue Shield redirection analyses

12   were not "back of the envelope" exercises.  Mot. 2.  Rather, they were substantial pieces of work

13   into which Blue Shield put a substantial amount of human resources.  They were completed on

14   multiple occasions, beginning in 2011, and then again "in 2014 . . . as part of [Blue Shield's] ████████

15   ████████"  Ex. 4 (Barnes) at Tr. 426:3-6, and then again in 2015.  In 2015, they were modified, in

16   response to a request by consultants for UEBT, to determine whether a narrow network that

17   excluded some Sutter hospitals would lead to lower costs, given the Sutter clause that forced payors

18   to pay ████ of billed charges for Sutter out-of-network services.  *Id.* 426:7-11.

19   The Blue Shield executives who developed the redirection estimates in these analyses had vast

20   expertise in contracting with Northern California hospitals.[16]  For example, Mr. Barnes had nearly

21   30 years of such experience (Ex. 4 (Barnes) at Tr. 324:13-15), which is why other authors of the

22   redirection analyses (*i.e.,* Blue Shield analytics personnel) relied on Barnes and his network

23   ────────────────────────────────────────────────────────────

[16] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  Ex. 4

(Barnes) at Tr. 388:19-20.  Because of the ████████████████████ estimates were that Blue Shield

could not redirect more than ████% of patients.  *See* Ex. 3 (Wells) at Tr. 534:25-536:4 (noting that

assumption that Blue Shield could not redirect more than ██% of emergency patients was

reasonable); *see also* Ex. 9 (email from Sutter's former Chief Contracting Officer, Kris Vine, to Blue

Shield noting "the inability to redirect [emergent] and other services due to access and capacity

constraints").

1   management team as "subject matter *expert[s]*" for their knowledge of the "local market around

2   providers," Ex. 3 (Wells) at Tr. 502:13-503:7; 532:6-13 (emphasis supplied).  *See also* Ex. 7 (Zhou)

3   at Tr. 101:2:22 ("We rely on the expertise from network management" including Tracy Barnes for

4   "identifying the alternative hospitals" for the redirection analysis); Ex. 8 (Doolabh) at Tr. 82:25-

5   83:18.  And, in preparing these analyses, Blue Shield drew on reliable "data and information that

6   Blue Shield itself uses to make business decisions."  Ex. 3 (Wells) at Tr. 600:16-22; *see also* Silveira

7   Exs. 2-3, 19.  Blue Shield executives considered the redirection analysis reliable.  Ex. 8 (Doolabh) at

8   Tr. 284:8-14 ("I do believe that [the redirection analysis] was . . . a good way to lay a foundation

9   [for] where UEBT should look to decide [] next steps").

10       The redirection estimates that Barnes' network management team identified for the analyses

11   were predicated on numerous market factors, including ███████████████████ Ex.

12   4 (Barnes) at Tr. 435:9-23; 440:9-15, ████████████*id.*, and ████████████" Ex. 3

13   (Wells) at Tr. 529:1-9 ███████████████████████████████

14   ████.[17]  Importantly, these estimates also considered whether the relevant geography included a

15   ███████████████ where ████████████████████████████

16   ████████████████████████████ Ex. 4 (Barnes) at Tr.

17   443:5-22; *id.* 446██████████████████████████████

18   ███████████████████████████  In contrast, none of the

19   DMHC filings made by Blue Shield considered all these factors.

20       Also, contrary to Sutter's suggestion, Blue Shield did consider time/distance information███

21   ███████████████████████████████████████████

22   On June 23, 2015, Darrin Wells of Blue Shield sent the summary document on drive time and

23   distance that Dr. Chipty considered to Tami Lucas of the network management team. ███████

24   ███████████████████████████████████████ *See*

25   *supra* at 9; Ex. 10.  Following receipt of that document by Tami Lucas – receipt of which she

26   acknowledged, Blue Shield prepared another version of the redirection analysis.  In that version,

---

[17]      Ex. 4 (Barnes) at Tr. 452:8-15 (discussing how ██████████████████████████

████████████████████████; *id.* at Tr. 459:13-19 ("There is no easy way"

to get to ██████ in ██████████ from ████████.

1   after consideration of the summary drive time/mileage document, ███████████████████

2   ████████████████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████   This eviscerates Sutter's claim that out-of-

6   area hospitals are sufficient alternatives for in-area hospitals merely because they are located within

7   15 miles/30 minutes of one another. ███████████████████████████████████

8   ████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████████

10  ██████████████████████   Ex. 3 (Wells) at Tr. 518:21-519:7 ("I don't think you could tell

11  by this [summary drive time/travel document]," e.g., Ex. 10, "the percentage of patients . . . that

12  would stay at ████████████████ if Sutter was put out of network").  These time-and-

13  distance analyses just do not speak to patient insistence for IHS at particular hospitals (unless they

14  show that there are *no* alternative hospitals close by for area residents).  *See* Chipty Decl. ¶¶ 11-12;

15  Ex. 1 (Chipty) at Tr. 191:16-192:5.[18]

16      Dr. Chipty observed that Blue Shield prepared redirection analyses for UEBT, a self-payor

17  client.  But that fact was irrelevant to her, as Blue Shield testimony demonstrated that ████████

18  ████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████

21  ██████   Ex. 1 (Chipty) at Tr. 106:2-107:3.  Moreover, Dr. Chipty also considered that the analyses

22  were prepared for a PPO client; however, that too was irrelevant, as the importance of the analysis

23  was that it identified patient insistence for hospitals in the candidate markets.  In any event, there are

24  many fully-insured PPO products.  Ex. 27 (Exhibit 23 to 2007 Systemwide agreement between Blue

25  Shield and Sutter listing fully-insured PPO products).  And these patient insistence figures would be

26  _____

27  [18]     Dr. Chipty did rely, in part, on a list of drive times and distances in concluding that the
    Auburn, Crescent City and Lakeport HSAs were antitrust markets, as there are no non-Kaiser

28  hospitals within 15 miles or 30 minutes of the sole hospital in these areas, all of which are owned by
    Sutter.  *See* Ex. 1(Chipty) at Tr. 260:16-20.

13

critical to an analysis by health plans of the viability of offering HMO products in particular areas with or without specific hospital participation.  Blue Shield ███████████████████████ ████████████████████████████████████████████ further confirming that the redirection estimates were valid for both HMO and PPO fully-insured populations.  Ex. 4 (Barnes) at Tr. 426:1-20.

Dr. Chipty fully considered how the redirection analyses were constructed and why they were prepared, and, after doing so, found them to be "highly probative."  Chipty Decl. ¶ 54.  She found these analyses salient, because they revealed Blue Shield's views regarding patient preferences for candidate market hospitals – preferences that would be central to negotiations between a health plan and a hypothetical hospital monopolist seeking to impose a SSNIP.

### iv.    Dr. Chipty Appropriately Considered Qualitative, Record Evidence When Analyzing Market Definition.

Unlike Dr. Gowrisankaran, Dr. Chipty reviewed ordinary course documents created by Sutter and health plans that analyzed whether a health plan could create a viable provider network for sale to area-residents without local hospitals in each candidate market.  Ex. 1 (Chipty) at Tr. 77:23-79:20.  She viewed this qualitative evidence through the lens of the HMT because it identified health plans understanding of actual market conditions and their ability to avoid a SSNIP for IHS.  *Id.*  She used this approach—successfully—in her economic consulting for the private plaintiff in *St. Luke*'s.  *Id.*

For example, Dr. Chipty analyzed Sutter's own ordinary course documents because "they perceive competition and . . . the availability of viable alternatives."  *Id.* at Tr. 62:18-21.  She also relied on the testimony of Sutter employees, such as Robert Reed (Sutter's former Chief Financial Officer), Peter Anderson (Sutter's former Chief Strategy Officer), and Melissa Brendt (Sutter's Chief Contracting Officer).  Chipty Decl. ¶ 7.  The testimony of Ms. Brendt affirmed that certain Sutter hospitals were the only practical alternative for IHS in their communities.  Chipty Decl. ¶ 98; *see also* Ex. 13 (Brendt) at Tr. 200:13-202:19 ("Q: So . . . you're saying that … Sutter Coast Hospital acts as a sole practical resource for acute care and emergency care within the community that it serves; correct? A: Yes.") (same for Sutter Lakeside and Sutter Amador).

14

1        Dr. Chipty also considered qualitative evidence from health plans—the purchasers of IHS.

2  Chipty Decl. ¶ 7.  She considered, in particular, qualitative evidence indicating that Sutter has

3  market power over health plans in relevant markets that contain Sutter hospitals.  *Id.* ¶ 20; *see also*

4  Silveira Ex. 20 (Bates ending 043 - 2011 Blue Shield analysis: ████████████████████████

5  ████████████████████████████████████████████████████ Silveira Ex. 21

6  (Bates ending 621-623 ████████████████████████████████████████████████

7  ███████████████████████████████████████████████ Ex. 15 (indicating that

8  Sutter has "geographic monopolies for the following submarkets – Auburn, Amador, Tracy . . .

9  Antioch, Berkeley, Oakland, . . . Clearlake . . . Despite widespread Broker acknowledgement of the

10  high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does

11  not include them.").  Dr. Chipty relied on this evidence in concluding that a health plan could not

12  create a viable provider network in the candidate markets without a hospital in those markets.

13  Chipty Decl. ¶ 62.

14        Evidence obtained since the submission of Dr. Chipty's report further buttresses her

15  conclusions that the candidate markets are valid antitrust markets.  *See* Ex. 16 (Alta Bates included

16  in CalPERS network as a result of California patient access requirements); Ex. 17 (Orchison) at Tr.

17  316:13-318:20 ("without Alta Bates Summit Medical Center [Blue Shield] would not have been able

18  to offer a network in Alameda County to CalPERS on the limited network… that met regulatory

19  approval," and, therefore, Alta Bates was a "must have" hospital); ████████████████████

20  ████████████████████████████████████████████████████████████████

21  ████████████████████████████████ Ex. 19 (Lundbye) at Tr. 379:6-380:1

22  ("there are certain geographies – for example, the Berkeley area, where there's only one hospital, it's

23  Sutter Alta Bates, we're acutely aware that in some of these markets, there's a geographic monopoly

24  such that not having them would keep us void in terms of hospital location."); Ex. 20 (Markovich) at

25  Tr. 120:5-17 (Blue Shield CEO: "there's really no other major hospital in the Oakland/Berkeley area

26  other than Alta Bates Summit").[19]

27

28  [19]   *See also* ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

v.       **Dr. Chipty Further Tested Whether the Alleged Tying Markets Were Relevant Markets.**

Finally, after reviewing whether patients could be diverted away from the candidate markets, to further estimate the scope of the single-hospital Tying Markets, Dr. Chipty also analyzed the overlap between hospital discharges in the HSAs and the relevant Sutter hospital's 90% Primary Service Areas ("PSAs"), which refers to the smallest collection of ZIP codes from which the hospital receives 90% of its patients.  That analysis showed a substantial overlap between the two, except with respect to the Davis HSA and 90% PSA for Sutter Davis Hospital.  In light of this, for the Davis area, Dr. Chipty found that the 90% PSA for the Sutter Davis Hospital identified the scope of the appropriate geographic market.  *Id.* ¶¶ 10 n.23, 17.

c.       **Dr. Chipty's Analysis Is Far From Novel.**

Dr. Chipty's application of the HMT is hardly novel, as Sutter contends (without economist support).  The diversion calculation that she used is similar to that which the FTC's expert successfully used in *Advocate I* and *II*.  Ex. 1 (Chipty) at Tr. 81:10-19.  It draws on peer-reviewed publications from well-respected economists, like Farrell and Shapiro.  Chipty Decl. D-1 (citing Farrell, Joseph and Carl Shapiro, "Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition," The B.E. Journal of Theoretical Economics, Vol. 10, No. 1, 2010).  It is also described generally in Section 6.1 of the *Merger Guidelines*: "In some cases, where sufficient information is available, the Agencies assess the value of diverted sales…".  This is precisely the exercise that Dr. Chipty undertook in her simulation analysis.

Throughout her analysis, Dr. Chipty did not rely on a wooden model, but rather applied a broad range of tools, including diversion analyses with caution to avoid the *Cellophane* Fallacy.  *See* Chipty Decl. ¶ 17 & n.43.  She also relied upon substantial record evidence, including health plan testimony and documents in applying the HMT to evaluate the candidate markets.  *Id.* ¶ 17.  *See*

Ex. 22

Ex. 14 (Davis) at Tr. 80:5-6 (Sutter Coast was kept in-network because "there are no alternatives to Sutter Coast").

16

*Merger Guidelines* § 2.2.1 (ordinary course evidence that describes competitive conditions, such as this, can be probative of the market definition question).

Thus, for example, Sutter's implication that Berkeley-Oakland is not a relevant market because it "did not pass [Dr. Chipty's] econometric test," is wrong, Mot. 5 n.3, particularly when one considers that Dr. Chipty has found that ███████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████ )  *See* Chipty Class Decl. Ex. 14A.

*See also* Steven Tenn, *The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction*, at 26 (FTC, Working Paper No. 293, 2008) (showing that, following that merger, Sutter was able to increase prices at Alta Bates-Summit campus to health plans *by up to 72 percent per procedure*).  Reliance on a quantitative HMT test alone, considering that substantial supra-competitive pricing for Alta Bates has persisted during the damages period, would lead to the erroneous conclusion that the relevant antitrust market is larger than it actually is.  Chipty Decl. ¶ 41 (citing *Merger Guidelines* § 4.1.2, n.5 ("Market definition for the evaluation of non-merger antitrust concerns such as monopolization or facilitating practices will differ in this respect if the effects resulting from the conduct of concern are already occurring at the time of evaluation.")).  It was proper for Dr. Chipty to consider this qualitative evidence along with her numerical analysis.

### III.   ARGUMENT

#### a.   Legal Standards

The relevant geographic market is the "area of effective competition where buyers can turn for alternative sources of supply." *St. Luke's*, 778 F.3d at 784 (quotation omitted).  Proposed geographic markets do not need to be defined with "scientific precision," *Conn. Nat'l Bank*, 418 U.S. at 669, but should "correspond to the commercial realities of the industry." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962).  *See* IIB Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 530(d) (4th ed. 2014) ("fuzziness is inherent in bounding any market") (quotation omitted).  While in *American Express*, 138 S. Ct. at 2285, it was held that an "accurate" product market must be defined in Sherman Act cases concerning specific two-sided transaction markets, it is well established that "market analysis" of the candidate geographic market "does not always ***yield only***

17

*one market definition that is accurate*."  Ex. 2 (Gowrisankaran) at Tr. 109:25-110:23 (emphasis added).  Instead, the contours of a candidate geographic market are considered valid so long as the expert's methodology, based on sufficient evidence and reliable economics, supports the geographic boundaries.  *See St. Luke's*, 778 F.3d at 784-85 (agreeing with expert's analysis of record evidence and concluding that the geographic market was as small as a single city – Nampa, Idaho); *see also FTC v. Penn. State Hershey Med. Ctr.*, 838 F.3d 327, 339-40 (3rd Cir. 2016) ("*Hershey*") (agreeing there was sufficient economic and evidentiary support for plaintiff's geographic market).  *American Express,* in any event, does not govern market definition analysis of the Cartwright Act claims asserted here.  *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014) (it is "no longer the law in California" that "the interpretation of California's antitrust statute [is] coextensive with the Sherman Act").

An expert defining relevant geographic markets must offer testimony that "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  The inquiry concerning the admissibility of the expert's analysis is "flexible" with an emphasis on "evidentiary relevance and reliability" and a "focus … solely on principles and methodology, not on the conclusions . . . ."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993).

The Ninth Circuit applies a "liberal" standard for the admissibility of expert testimony.  *Dorn*, 397 F.3d at 1196; *see also In re High-Tech Employee Antitrust Litig.*, No. 11-cv-02509 LHK, 2014 WL 1351040, at *2 (N.D. Cal. Apr. 4, 2014) ("Rule 702 'mandates a liberal standard for the admissibility of expert testimony'") (citations omitted); Fed. R. Evid. 702, Advisory Committee Notes (2000) ("ejection of expert testimony is the exception rather than the rule").  Courts seek to exclude "junk science."  *Giuliano*, 2015 WL 10890654, at *4 (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)).  Demonstrating the liberal standards to be applied to *Daubert* motions is the fact that *an authority upon which Sutter relies* where a market definition expert was initially excluded *was reversed*.  *See* Mot. 16, 22 n.14, citing *In re SE Milk Antitrust Litig.,* No. 2:07-CV 188, 2012 WL 947106 (E.D. Tenn., Mar. 20, 2012).  On appeal, the Sixth Circuit found that the District Court improperly excluded the testimony of plaintiffs' expert, who

18

1    had properly applied the HMT test in a Section 2 case.  739 F.3d 262, 282 (6th Cir. 2014).[20]

2          In a motion to exclude expert testimony, arguments concerning the "evidence relied upon" go

3    to the "weight, not the admissibility" of the opinion.  *Giuliano*, 2015 WL 10890654, at *8.  Even

4    expert testimony that relies upon "[s]haky but admissible evidence is to be attacked by cross

5    examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Primiano v.*

6    *Cook*, 598 F.3d 558, 564 (9th Cir. 2010); *see also Lidoderm*, 2017 WL 679367, at *28 (same).

7          **b.     Dr. Chipty Uses a Generally-Accepted Approach to Market Definition.**

8          Dr. Chipty applied a reliable and fundamentally sound economic approach to market

9    definition.  She evaluated the geographic boundaries of the twelve candidate markets through an

10   application of the HMT.  To form her opinions, Dr. Chipty relied on this widely-accepted economic

11   test, considered documentary evidence and testimony and conducted testable quantitative analyses.

12   *See supra* part II(b); *High-Tech Employee*, 2014 WL 1351040, at *5 (denying *Daubert* motion where

13   relevant market analysis relied on "economic theory, documentary evidence and multiple regression

14   analyses.").[21]

15         Sutter baselessly claims that Dr. Chipty was merely "reverse engineering" the plaintiffs'

16   market definition allegations.  Dr. Chipty's textbook application of the HMT to the facts and

17   economic evidence belies this and demonstrates that her analysis is not only reliable, but conclusive.

18   The HMT is commonly used by experts to define relevant product and geographic markets,

19   including healthcare markets.  *See St. Luke's*, 778 F.3d at 784 (apply the "common method" of the

20   HMT to define a relevant geographic market).  While the HMT is typically applied in the context of

21   analyzing a merger, the HMT is broadly accepted to define antitrust markets in business conduct

22   cases as well.  *See In re SE Milk Antitrust Litig.*, 739 F.3d at 282; *McWane, Inc. v. FTC*, 783 F.3d

23

24   [20]    As Dr. Gowrisankaran failed to look at *any* record evidence and as insurers' perspectives are
25   the most important evidence relevant to the issue of geographic markets for hospital services, his
     Declaration fails to live up to even the minimal thresholds provided by Rule 702.
26   [21]    Sutter's claim that Dr. Chipty's report is unreliable because she "did not propose candidate
     areas" is fundamentally wrong and not supported by any case.  Experts, including antitrust
27   economists, are utilized by parties to apply scientific analysis to determine if a party's theory of a
     case is accurate.  *See Advocate I*, 841 F.3d at 473 ("the candidate [geographic] market offers a
28   hypothetical answer to that question; the hypothetical monopolist analysis then ***tests the hypothesis
     and adjusts the market definition if the results require it***.") (emphasis added).

814, 829 (11th Cir. 2015) (expert could rely on an HMT in a monopolization case).

Sutter "does not dispute the utility of the HMT for market definition" in this case, but instead, erroneously seeks to undercut Dr. Chipty's report through a misleading recitation of her application of the methodology.[22]  Mot. 22.  Dr. Chipty's analysis considered whether "health plans could credibly switch away to hospitals outside of the candidate [geographic] market, in response to a price increase at hospitals inside the candidate market."  Chipty Decl. ¶ 40.[23]  This approach to defining hospital markets through the lens of health plans is widely accepted by the courts, including the Ninth Circuit.  Ninth Circuit Order, 667 Fed. App'x at 643 (geographic market boundaries determined by a health plan's ability to "purchase hospital services outside" the proposed market); *St. Luke's*, 778 F.3d at 784 ("insurance companies effectively act both as buyers and sellers," and therefore an HMT must focus on the "likely response of insurers.") (citations omitted); *Advocate I*, 841 F.3d at 471 ("The geographic market question is therefore most directly about the likely response of insurers, not patients, to a price increase.") (quotations and citations omitted); *Hershey*, 838 F.3d at 342 ("when we apply the hypothetical monopolist test, we must also do so through the lens of the insurers.").  The fact that HSAs have been proposed as candidate markets is not the issue. Nor is whether they have been proposed or accepted as markets elsewhere, particularly as the Ninth Circuit's Order in this case demonstrates that they meet the plausibility threshold as a matter of law. Rather, the issue is whether proper application of the HMT to the asserted HSA-wide markets (and

---

[22]      The cases cited by Sutter concerning "results-oriented" expert reports are all factually different from Dr. Chipty's detailed, independent analysis.  *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 797-98 (S.D. Tex. 2000) (expert report excluded because it was not "based on adequate data" and "not supported by the relevant scientific or medical literature."); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 430 (S.D.N.Y. 2016) (exclusion due to "[n]o testing of the hypothesis" and the report did "not seem to have involved any scientific methodology."); *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1240 (N.D. Ala. 2000) (expert contradicted himself on the geographic market and did not perform any "independent analyses."); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 987-88 (C.D. Cal. 2012) (expert only "looked for corroborating evidence without meaningfully testing" his assumptions); *United States v. Fleet Mgmt. Ltd.*, Crim. A. No. 07-279, 2008 WL 1924250, at *5 (E.D. Pa. Apr. 29, 2008) (no peer-review support for his opinion and the expert "did not employ any definable methodology in formulating" his opinion).

[23]      Dr. Chipty notes that the health plan's "ability to switch" its members away from certain hospitals is dependent on the plan member preferences.  Chipty Decl. ¶ 40. However, while patient preference is relevant to geographic market analysis, it is the health plan "who negotiates directly with the hospitals to determine both reimbursement rates and the hospitals that will be included in their networks."  *Id.* (quoting *Hershey*, 838 F.3d at 342).

the Berkeley/Oakland market, which constitutes two HSAs) demonstrates that they are relevant

markets.  Dr. Chipty's role was to test the viability of these proposed markets.

In applying the HMT to all of the candidate Tying and Tied Markets, Dr. Chipty considered a

wealth of evidence, including (1) her calculations regarding area resident patient flow, (2) her

calculations on patient drive time/distance to hospitals in candidate markets and outside the

candidate markets; and (3) diversion analyses.  *See supra* part II(b).  These types of evidence are

widely accepted by courts confronting the issue of market definition.  *Advocate I*, 841 F.3d at 466,

474 (applying diversion analyses and reviewing patient drive times); *St. Luke's*, 778 F.3d at 785

(analyzing patient outflows, among other things).  In addition, Dr. Chipty also considered qualitative

information, "including health plan ordinary-course documents and testimony."  Chipty Decl. ¶ 47;

*Merger Guidelines* § 4.1.3 (In implementing a HMT, "reasonably available and reliable evidence"

includes "information from buyers … concerning how they would respond to price changes" and

"evidence from other industry participants."); § 2.2.1 (ordinary course business documents probative

of market definition issue).  Documentary evidence and testimony, including information from third-

parties, are an essential piece of the HMT analysis of geographic markets. *St. Luke's*, 778 F.3d at

784-85 (citing testimony concerning insurer preference for local physicians in Nampa); *Hershey*,

838 F.3d at 345-46 (finding persuasive insurer testimony and documents concerning exclusion of

defendants from the relevant geographic market).

Sutter argues that the methodology employed by Dr. Chipty to determine whether a SSNIP

could be imposed by a hypothetical hospital monopolist in the Tied Markets "has never been used in

any other antitrust case."  That argument is without merit.  Mot. 22.  Dr. Chipty's analysis is a "well-

accepted framework" and comes directly from the economic analysis relied on in *Advocate I*.  Chipty

Decl. ¶ 58 n.115.  Sutter also contends that it was wrong for Dr. Chipty to independently determine

the appropriate type of margin to be used in her application of the HMT.  That too is wrong.

Economists studying market definition routinely rely on data for variable contribution margins,

which are sometimes referred to as "variable cost margins," *see Advocate II*, 2017 WL 1022015, at

1   *8, or simply "margins," defined as the "difference between price and incremental cost."[24]   *Merger*

2   *Guidelines* § 4.1.3.  Her independent decision to use "variable contribution margin" does not

3   undermine the reliability of her analysis.  Ex. 1 (Chipty) at Tr. 82:18-25; *Apple iPod iTunes Antitrust*

4   *Litig.*, No. 05-CV-0037 YGR, 2014 WL 4809288, at *6 (N.D. Cal. Sept 26, 2014) (denying motion

5   to exclude because econometrics contains "certain value judgments and hypotheses that are tested

6   and used in conjunction with statistics.").[25]   To the contrary, such analysis is part of the routine work

7   as an antitrust expert opining on issues of market definition and market power.

8          Dr. Chipty applied the same HMT methodology to evaluate potential diversion from Sutter

9   hospitals in the single hospital Tying Markets, relying on the Blue Shield redirection analyses and

10  other qualitative evidence to do so.  *See supra* part II(b).  She did this because the numerical

11  calculation could not be used "to determine the boundaries of a relevant market where there are no

12  other hospitals in a candidate geography."  Chipty Decl. ¶ 62.  Dr. Chipty further stated that applying

13  the numerical calculation can lead to rejection of the candidate market due to the *Cellophane*

14  Fallacy.  *Id.* ¶¶ 17 n.43, 62 (citation omitted)); *see also United States v. Eastman Kodak Co.*, 63 F.3d

15  95, 103 (2d Cir. 1995) (defining the *Cellophane* Fallacy as the failure to recognize that a monopolist

16  "seller that has reduced output and raised prices—always faces a highly elastic demand; its products

17  are so overpriced that even inferior substitutes begin to look good to consumers").  In this

18  circumstance, where a quantitative HMT would have not reported valid results, it was entirely

19  appropriate for Dr. Chipty to rely on qualitative, record evidence to determine market definition.  *See*

20

21  [24]      The calculation in the *Advocate I* decision closely resembles Dr. Chipty's calculation.  The

22  court there explained:  "Based on the diversion ratios and pricing data from the relevant hospitals,
    and assuming that the range of variable cost margins for commercial admissions (*i.e.*, the difference
    between revenue and variable costs) at NorthShore hospitals was comparable to the range at

23  Advocate hospitals, [the FTC's economist expert] calculated that the merger would cause a price

24  increase of 8% across the six party hospitals."  *Advocate II*, 2017 WL 1022015, at *8.

    [25]      None of the cases cited by Sutter are apt here.  *See Kentucky Speedway, LLC v. Nat'l Ass'n of*

25  *Stock Car Auto Racing, Inc.*, No. CIV. A. No. 05-138 WOB, 2008 WL 113987 (E.D. Ky. Jan. 7,
    2008) (failed to apply the HMT because the expert assumed a single "race stands alone as a form of

26  entertainment"); *AFMS LLC v. United Parcel Serv. Co.*, No. CV105830 JGB, 2014 WL 12515335,
    at *7 (C.D. Cal. Feb. 5, 2014) (not an economist and admitted his opinions were "not based on

27  economic theories or principles"); *Crescenta Valley Water Dist. v. Exxon Mobile Corp.*, No. CV 07-
    2630 JST, 2013 WL 12116333, at *2 (C.D. Cal. Jan. 8, 2013) (improperly modifying an accepted

28  model in addition to having "errors in input data").

22

*Merger Guidelines* § 4.1.3 ("when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition.").[26]  Within the framework of the HMT, Dr. Chipty's reliance on the available quantitative and qualitative evidence renders her opinions on the validity of the Tying Markets reliable.

Sutter erroneously argues that Dr. Chipty's expert opinion is unreliable because it does not solely rely on mathematical analysis that utilizes econometric parameters.  Mot. 14 (claiming Dr. Chipty "abandon[ed] scientific reasoning").  Sutter fails to cite a single case for this proposition, and ignores the wealth of case law, discussed above, indicating that antitrust economists may consider both quantitative and qualitative evidence in defining geographic markets.  *See United States v. Aetna*, 240 F. Supp.3d 1, 39 (D.D.C. Jan. 23, 2017) ("ordinary course of business documents" are probative in defining the relevant market).

### c.     Blue Shield Redirection Analyses Are Precisely the Type of Evidence Relied Upon by Economic Experts.

Dr. Chipty properly relied upon Blue Shield redirection analyses as substantial evidence to test the validity of the plaintiffs' candidate markets.  *See supra* part II(b)(iii) (discussing rigor that went into preparation of these analyses, experts that crafted them, and the factors that were considered in redirection estimates).  As a result, any concerns on the usage of the redirection analysis go to the weight of the opinion, not its admissibility.  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5428139, at *7 (N.D. Cal. June 20, 2013) (noting that expert's testimony was "tethered to documents and testimony" and that evidence to rebut that analysis "will bear on the weight not the methodological validity").

Contrary to Sutter's assertion, Dr. Chipty has not merely "parrot[ed]" Blue Shield's redirection estimates without "independent evaluation" of them.  Mot. 17 (citation omitted).  Instead, she "drew inferences" from these substantial Blue Shield analyses and observed (and explained) how

---

[26]     "[F]or the sake of completeness," Dr. Chipty applied her numerical analysis to Berkeley-Oakland market indicating that such calculations had "limitations" and suffered from a potential *Cellophane* Fallacy.  Chipty Decl. ¶ 93 n.173.

23

they impacted her HMT analysis for the Tying Markets.  Chipty Decl. ¶ 63.[27]  Moreover, Dr. Chipty,

in determining whether to rely on these analyses, considered how the redirection analyses were

constructed and why they were prepared.  Chipty Decl. ¶¶ 109-10.  And, she did not rest her expert

market definition opinions solely on these; a review of her report shows that she also considered a

wealth of other evidence in coming to her opinions, including calculations of patient flow, drive

times, testimony and other ordinary-course documents from health plans and Sutter.

Lastly, Sutter's claim that Dr. Chipty's reliance on the Blue Shield's redirection analyses

violates Fed. R. Evid. 703 is unfounded.  Sutter argues that the probative value of these analyses is

outweighed by their "prejudicial effect."  Mot. 11, 19.  Dr. Chipty reviewed and considered the

redirection analysis in applying her widely-accepted methodology and found them to be "highly

probative" of patient insistence for local hospitals.  Merely because these analyses cripple Sutter's

market definition case does not mean they are "prejudicial."  There is no basis under Fed. R. Evid.

703 to exclude Dr. Chipty's testimony or her reliance on the redirection analyses.

### d.   Dr. Chipty Did Not Fail to Consider Evidence Regarding Excluded Competitor Hospitals.

In forming her expert opinion concerning the viability of the candidate geographic markets,

Dr. Chipty considered significant reliable and relevant evidence.  Sutter's claim that Dr. Chipty

improperly ignored evidence concerning potential competitors – including (in Sutter's view) Kaiser

– lacks merit and is not a basis for exclusion.  *In re Qualcomm Antitrust Litig.*, 17-MD-02773-LHK,

2018 WL 4680214, at *20 (N.D. Cal. Sept. 27, 2018) ("experts' decisions about what data to use in

their analysis bear on the weight, not the admissibility, of expert testimony") (quotation and citations

omitted).  Sutter ostensibly does not contest the alleged product market in its summary judgment

motion – a product market that excludes Kaiser.  Sutter Mot. Summ. J. 8; Chipty Decl. ¶ 5.  For that

reason alone, Kaiser is of no moment here.  In any event, Dr. Chipty did consider Kaiser's impact on

the candidate markets.  She determined that Kaiser should not be part of the relevant IHS market

---

[27]   In contrast, Sutter relies on cases where the expert was acting as a "mouthpiece" for another individual.  *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005) (exclusion acceptable when expert is merely "vouching for the truth of what another expert told him.");  *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993) ("clearly adopt[ing] the projections" from another individual to form the basis of the opinion).

1  because it is "a closed system, and commercial health plans cannot turn to Kaiser as substitutes for

2  non-Kaiser hospitals."  Chipty Decl. ¶ 29; Ex. 1 (Chipty) at Tr. 216:2-22.  The fact that Kaiser may

3  compete downstream with health plans *for insureds* does not bear on an analysis of the relevant IHS

4  market.  Chipty Decl. ¶ 29.

5       Sutter also erroneously claims that Dr. Chipty failed to account for information on time and

6  distances between Sutter hospitals and non-Sutter hospitals as part of her analysis.  Mot. 25.  This is

7  wrong.  *See supra* part II(b)(ii).

8       Finally, Sutter claims that the fact that CalPERS was able to market a narrow network

9  product that excluded a limited number of Sutter hospitals in five regions from a single insurance

10 product undermines the reliability of Dr. Chipty's testimony.  Mot. 25.  That too is wrong.  Further

11 evidence indicates CalPERS members residing in these regions still had access to the Sutter

12 facilities.  *See* Ex. 23 (indicating that CalPERS members had access to both a broad hospital

13 network, in addition narrow Blue Shield network).  Regardless, this evidence – even if it were

14 contrary to Dr. Chipty's opinions, which it is not – goes to the weight of an expert's report, not its

15 admissibility.  *See In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115-WHO, 2017 WL 235052,

16 at *9 (N.D. Cal. Jan. 19, 2017) (quoting *Primiano*, 598 F.3d at 564).[28]

17                                        <u>CONCLUSION</u>

18       For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant Sutter

19 Health's motion to exclude the testimony of Dr. Chipty.

20

21

22

23

24

25

---

26 [28]     Substantial evidence also undercuts Sutter's contention that there are viable hospital
   substitutes to Sutter Davis, Antioch, Tracy, Jackson, and Coast.  *See* ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

27 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Ex. 24 ("Sutter Tracy Community

28 Hospital (STCA) … is [] a sole community hospital provider serving the southwest portion of San
   Joaquin County.").

1  Dated: October 8, 2018

2  */s/ Matthew L. Cantor*

3  CONSTANTINE CANNON LLP                          AZRA Z. MEHDI (220406)
   MATTHEW L. CANTOR (*pro hac vice*)              One Market Street
4  ANKUR KAPOOR (*pro hac vice*)                   Spear Tower, Suite 3600
   JEAN KIM (*pro hac vice*)                       San Francisco, CA 94105
5  J. WYATT FORE (*pro hac vice*)                  (415) 293-8039
   ROSA M. MORALES (*pro hac vice*)                (415) 293-8001 (fax)
6  335 Madison Avenue, 9th Floor                   azram@themehdifirm.com
   New York, NY 10017
7  Telephone: (212) 350-2700                       *Co-Lead Counsel for Plaintiffs*
   Facsimile: (212) 350-2701
8  mcantor@constantinecannon.com
   jkim@constantinecannon.com
9  rmorales@constantinecannon.com
   wfore@constantinecannon.com
10
   *Lead Counsel for Plaintiffs and the [Proposed]*
11 *Class*

12 DAVID BROWNSTEIN (141929)                       ALLAN STEYER (100318)
   WILLIAM S. FARMER (46694)                       D. SCOTT MACRAE (104663)
13 DAVID GOLDSTEIN (142334)                        JILL MANNING (178849)
   FARMER BROWNSTEIN JAEGER LLP                    STEYER LOWENTHAL BOODROOKAS
14 235 Montgomery Street, Suite 835                ALVAREZ & SMITH LLP
   San Francisco, CA 94104                         One California Street, Third Floor
15 (415) 795-2050                                  San Francisco, CA 94111
   (415) 520-5678 (fax)                            (415) 421-3400
16 dbrownstein@fbj-law.com                         (415) 421-2234 (fax)
   wfarmer@fbj-law.com                             asteyer@steyerlaw.com
17 dgoldstein@fbj-law.com                          smacrae@steyerlaw.com
                                                   jmanning@steyerlaw.com
18
19 *Additional Co-Lead Counsel for Plaintiffs*

26