# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, JERRY JANKOWSKI,
SUSAN HANSEN, DAVID HERMAN,
CAROLINE STEWART, OPTIMUM
GRAPHICS, INC., and JOHNSON POOL &
SPA, on Behalf of Themselves and All Others
Similarly Situated,

*Plaintiffs*,

v.

SUTTER HEALTH,

*Defendants*.

Case No. 3: 12-cv-4854-LB

CLASS ACTION

Declaration of Dr. Tasneem Chipty in Opposition to Motion for Summary Judgment

May 26, 2018

**Filed Under Seal Pursuant to Protective Order**

## Table of Contents

I.  Introduction .................................................................................................................. 1

II.  Summary of Opinions .................................................................................................. 6

III.  Background ................................................................................................................ 17

    A.  Unique Features of Healthcare Markets ............................................................ 17

    B.  The Role of Kaiser Permanente ........................................................................ 20

    C.  Northern California Hospitals ............................................................................ 21

    D.  Sutter Health ...................................................................................................... 24

    E.  California Health Plans ....................................................................................... 27

    F.  Challenged Contractual Provisions in Sutter's Systemwide Contracts with Health Plans .. 28

    G.  Plaintiffs' Theory of Harm ................................................................................ 29

IV.  Antitrust Principles of Market Definition ................................................................. 30

    A.  Basics of Market Definition ............................................................................... 30

    B.  Economic Insights on Defining Hospital Antitrust Markets from the Literature ............... 33

    C.  Approaches to Hospital Market Definition ........................................................ 35

        1.  *Diversion Analysis* .................................................................................. 35

        2.  *Hypothetical Monopolist Test* ................................................................ 39

V.  The Tied Geographic Markets .................................................................................... 44

    A.  The Relevant Geographic Market for Sutter Sacramento Is the Sacramento HSA ........... 44

    B.  The Relevant Geographic Market for CPMC Is the San Francisco HSA ........... 50

    C.  The Relevant Geographic Market for Sutter Modesto Is the Modesto HSA ...... 56

    D.  The Relevant Geographic Market for Sutter Santa Rosa Is the Santa Rosa HSA ............. 60

VI.  The Tying Geographic Markets .................................................................................. 64

    A.  The Relevant Geographic Market for Alta Bates Is the Combination of the Berkeley-Oakland HSAs ..................................................................................................... 64

    B.  The Relevant Geographic Market for Sutter Coast Is the Crescent City HSA .. 70

    C.  The Relevant Geographic Market for Sutter Lakeside Is the Lakeport HSA ..... 74

    D.  The Relevant Geographic Market for Sutter Delta Is the Antioch HSA ............ 77

    E.  The Relevant Geographic Market for Sutter Amador Is the Jackson HSA ........ 81

    F.  The Relevant Geographic Market for Sutter Tracy Is the Tracy HSA ............... 85

    G.  The Relevant Geographic Market for Sutter Auburn Is the Auburn HSA ......... 88

      H.  The Relevant Geographic Market for Sutter Davis Is the 90 Percent Primary Service Area for Sutter Davis ................................................................................................................ 91

VII.  General Acute Care Inpatient Services Are a Relevant Product Market .................................. 95

VIII. Market Power ......................................................................................................................... 96

      A.  Approaches to Assess Market Power ................................................................................. 96

      B.  There Is High Insistence for Sutter Hospitals in the Tying Markets ................................. 97

      C.  There Is Less Insistence for Sutter Hospitals in the Tied Markets ..................................... 99

      D.  Sutter Has Relatively High Share of Discharges in the Tying Markets, Compared to the Tied Markets ................................................................................................................ 100

      E.  Kaiser Competition in the Downstream Market Does Not Constrain Sutter's Market Power in the Upstream Market ................................................................................................ 101

IX.  Assessment of Professor Gowrisankaran's Analyses and Conclusions................................... 103

      A.  It is Irrelevant that HSAs Were Not Constructed to be Antitrust Markets ....................... 103

      B.  Professor Gowrisankaran Fails to Recognize the Silent Majority ..................................... 104

      C.  Professor Gowrisankaran Did Not Perform the Hypothetical Monopolist Test ............... 107

      D.  Professor Gowrisankaran Ignores His Own Evidence Showing that Some Sutter Hospitals Face Little to No Competition ................................................................................... 107

X.    Conclusions ........................................................................................................................ 108

Appendix A: CV

Appendix B: Materials Considered

Appendix C: Hospital Choice Model

Appendix D: Hypothetical Monopolist's Optimal Price Increase

## I.      Introduction

1.      My name is Tasneem Chipty. I declare the following under penalty of perjury.

2.      I am the managing principal and founder of Matrix Economics, an economic consulting firm in the Boston area. I specialize in industrial organization – the study of how markets function, including the choices consumers make and the competitive interactions among firms. I also specialize in econometrics – the application of statistical methods, including regression models, to study empirically marketplace behaviors. I have served on the faculties of The Ohio State University, Brandeis University, and the Massachusetts Institute of Technology, where I taught courses in industrial organization, regulatory policy, and econometrics. I am the author or coauthor of several academic articles, published in peer-reviewed journals including the *American Economic Review* and the *Review of Economics and Statistics*.

3.      I have been a consultant to a variety of businesses and government agencies, including the Department of Justice and the Federal Communications Commission. As part of this work, I have studied market definition and competitive effects of firm behavior in a wide range of industries, for both plaintiffs and defendants involved in adversarial proceedings. A significant portion of my work has focused on the healthcare marketplace, specifically on issues involving hospital competition and hospital contracting practices. For example, I served as a consulting expert for private plaintiff Saint Alphonsus Medical Center to evaluate the competitive effects of St. Luke's Health System's acquisition of Saltzer Medical Group, in Nampa, Idaho. I serve as an antitrust advisor to the Massachusetts Health Policy Commission, and in that capacity have studied the competitive effects of hospital acquisitions by Partners Health Care. For these and other assignments, I have analyzed patients' choice of hospitals using both state inpatient databases and health plan claims data; I have studied issues of product and geographic market definition; and I have studied the question of whether hospitals have market power over health plans in various relevant antitrust markets. I have also provided economic analyses in matters concerning class certification: in particular, I served as a testifying expert for the defense in *Comcast Corp. v. Behrend,* a case that included United States Supreme Court proceedings. I received my Ph. D. in economics from the Massachusetts Institute of Technology in 1993 and my B. A. degree in economics and mathematics from Wellesley College in 1989. A

copy of my resume is attached as Appendix A. It describes my background, including education, publications, and testimony experience.

4.      I have been retained as an independent expert by Plaintiffs' counsel to undertake economic analyses of issues pertaining to liability, damages, and class certification in *Sidibe et al. vs. Sutter*, a lawsuit challenging certain contracting practices of Sutter Health ("Sutter") with commercial health plans, such as Anthem Blue Cross of California ("Anthem") and Blue Shield of California ("Blue Shield").[1] Sutter is the second largest health system in Northern California, second only to Kaiser Permanente ("Kaiser"). Kaiser, however, is a closed health system that does not contract with non-Kaiser commercial health plans. Sutter, therefore, is the largest hospital system in Northern California with which commercial health plans can contract to assemble provider networks to attract subscribers seeking to access healthcare in Northern California. Plaintiffs allege that Sutter exercises its market power over certain irreplaceable Sutter hospitals, in what Plaintiffs refer to as "Tying Markets," to force health plans into "all-or-nothing" contracting; the effect of this practice is to tie the sale of Sutter hospitals in the Tying Markets to the sale of other Sutter hospitals, in what Plaintiffs refer to as "Tied Markets," where health plans (and their plan members) have more hospital choices.[2,3]

5.      In their Complaint, Plaintiffs describe the boundaries of the relevant geographic markets for the sale of general acute care inpatient hospital services to health plans using geographic regions known as "hospital service areas" (or "HSAs"), as defined by the *Dartmouth*

---

[1] "Fourth Amended Complaint," *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, filed September 29, 2017 in the United States District Court Northern District of California (hereafter "Complaint"), ¶ 1.

[2] Complaint, ¶ 4-6.

[3] Throughout this report, I use the terms: (a) "health plan" to mean commercial health plans or insurers that sell health insurance products; (b) "subscribers" to mean the purchasers of healthcare insurance products, including both group purchasers, such as employers, and individuals; (c) "plan member" to mean individuals that are covered by the health insurance policy; and (d) "patients" to mean individuals that use healthcare services.

*Atlas of Health Care*.[4],[5] Specifically, the Complaint describes as the tied geographic markets the four geographies of: (a) the Sacramento HSA; (b) the San Francisco HSA; (c) the Modesto HSA; and (d) the Santa Rosa HSA.[6] The Complaint also describes as the tying geographic markets the eight geographies of: (a) the combination of the Berkeley and Oakland HSAs; (b) the Crescent City HSA; (c) the Lakeport HSA; (d) the Antioch HSA; (e) the Jackson HSA; (f) the Tracy HSA; (g) the Auburn HSA; and (h) the Davis HSA.[7]

6.      My assignment for this report is to evaluate whether the Tying and Tied Markets described by Plaintiffs in their Complaint constitute relevant hospital antitrust markets for the purpose of assessing harm to competition resulting from Sutter's conduct. I have also been asked to evaluate the analyses and opinions put forward by Sutter's expert, Professor Gautam Gowrisankaran, regarding the validity of the geographic markets set forth in the Complaint.[8] Professor Gowrisankaran makes four distinct points in his report. First, he explains that Dartmouth Atlas HSAs "were not intended to serve as antitrust markets."[9] Second, he describes the distance between residents of an HSA and their nearest hospital outside of that HSA, concluding that patients have nearby alternative hospitals outside of their HSA.[10] Third, he

---

[4] Complaint, ¶ 3. The Dartmouth Institute for Health Policy & Clinical Practice, the organization that compiles the *Dartmouth Atlas of Healthcare*, describes HSAs as a "collection of ZIP codes whose residents receive most of their hospitalizations from the hospitals in that area." *See The Dartmouth Atlas of Healthcare*, "Glossary," available at http://www.dartmouthatlas.org/tools/glossary.aspx, *site visited* April 4, 2018. *See also,* The Center for the Evaluation of Clinical Services, "The Dartmouth Atlas of Health Care," available at http://www.dartmouthatlas.org/downloads/atlases/96Atlas.pdf, *site visited* April 4, 2018, pp. 12-13.

[5] General acute care inpatient hospitals provide a broad range of 24-hour inpatient care that includes but is not limited to medical, nursing, surgical, and pharmacy services. These hospitals exclude specialty facilities such as psychiatric hospitals, rehabilitation facilities, and long-term acute care. For ease of notation, I refer to general acute care inpatient hospitals as "hospitals" and general acute care inpatient hospital services as "inpatient hospital services." *See* "§ 70005. General Acute Care Hospital," 22 CCR § 70005, available at https://govt.westlaw.com/calregs/Document/ID7B72350D4BB11DE8879F88E8B0DAAAE?viewType=FullText&o riginationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc.Default), *site visited* May 11, 2018.

[6] Complaint, ¶ 5.

[7] Complaint, ¶ 4.

[8] "Declaration of Gautam Gowrisankaran, Ph. D," *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, filed October 5, 2017 (hereafter "Gowrisankaran Report"); and Deposition of Gautam Gowrisankaran, Ph. D., *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, February 6, 2018 (hereafter "Gowrisankaran Deposition").

[9] Gowrisankaran Report, pp. 14-37.

[10] Gowrisankaran Report, pp. 37-41.

describes patient flows and observes that some area-patients seek care outside of the HSA in which they live.[11] Fourth, he observes that Kaiser competes for subscribers in HSAs where it does not have a local hospital.[12] Based on these analyses, Professor Gowrisankaran concludes that the geographic markets outlined in the Complaint are not valid antitrust markets because they ignore significant competitive constraints on Sutter.[13] I evaluate the relevance of each of Professor Gowrisankaran's points in this report.

7.       In forming my opinions, I have reviewed documents prepared in the ordinary course of business from Sutter and various California health plans, including Anthem, Blue Shield, UnitedHealthcare Group Inc. ("United"), Health Net, Inc. ("Health Net"), and Aetna Inc. ("Aetna"). I understand that my team and I have had access to all documents, deposition testimony, and discovery responses produced by or to Plaintiffs in this matter. These documents include, but are not limited to, strategy documents, internal email exchanges, pricing analyses, and contracts. Among other things, I have analyzed: (a) data from the American Hospital Association; (b) inpatient discharge and hospital annual financial disclosure data from the Office of Statewide Health Planning and Development ("OSHPD"); (c) data from the Centers for Medicare and Medicaid Services; (d) claims data from Anthem; and (e) data from the California Department of Insurance ("CDI") and the California Department of Managed Health Care ("DMHC"). I have also reviewed declarations filed in the *UFCW & Employers Benefit Trust* ("*UEBT*") matter by Sutter and by former and current health plan executives,[14] including, but not limited to, those of: (a) David Joyner, who served as Vice President of Corporate Development from 1998 to 2002, Vice President of Network Management from 2002 to 2008, and Senior Vice President of Large Group and Specialty Benefits from 2009 to 2012 at Blue Shield;[15] (b) Tracy

---

[11] Gowrisankaran Report, pp. 41-51.

[12] Gowrisankaran Report, pp. 51-56.

[13] Gowrisankaran Report, p. 56.

[14] "Class Action Complaint," *UFCW & Employers Benefit Trust v. Sutter Health; Sutter East Bay Hospitals; Sutter West Bay Hospitals; Eden Medical Center; Sutter Central Valley Hospitals; Mills-Peninsula Health Services; Sutter Health Sacramento Sierra Region; Sutter Coast Hospital; Palo Alto Medical Foundation for Healthcare, Research and Education; and Sutter Medical Foundation,* Case No. CGC-14-538451, filed April 7, 2014 in Superior Court of the State of California for the City and County of San Francisco (hereafter "UEBT Complaint").

[15] "Declaration of David Joyner in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants,* Case No. CGC 14-538451, February 7, 2017 (hereafter "Joyner Declaration").

Barnes, Director of Contracting for Northern California at Blue Shield;[16] (c) Steve Melody, who served as Director of Network Development and Management for Northern California from 1997 to 2001 and Vice President of Health Care Service from 2001 to 2009 at Anthem;[17] (d) Aldo De La Torre, Vice President of Anthem;[18] (e) Janet Lundbye, who served as Vice President of Network Management in California from 2009 to 2015 and is currently the Regional Vice President of Network Strategy for the West Region at United;[19] (f) Chandra Welsh, Vice President for Network Management in Northern California at Aetna;[20] and (g) Becky LaCroix-Milani, Regional Vice President for Provider Network Management at Health Net.[21] I have also reviewed deposition testimony collected in this matter, including, but not limited to, the testimony of: (a) Robert Reed, Sutter's Former Chief Financial Officer; (b) Peter Anderson, Sutter's Chief Strategy Officer; (c) Melissa Brendt, Sutter's Chief Contracting Officer; (d) Randy Lukins, Regional Director of Contracting for Anthem; (e) Michael Beuoy, Vice President at Blue Shield, overseeing pricing and forecasting for all of Blue Shield's lines of business; (f) Tracy Barnes; and (g) David Joyner. In addition, I have reviewed both Professor Gowrisankaran's report and his deposition testimony in this matter. These and other materials are cited throughout my report. A full list of materials that I have considered in forming my expert opinions with respect to my assignment in this report is attached as Appendix B.

8.      The work presented in this report has been conducted by me and staff working under my direction, at both Berkeley Research Group and Matrix Economics. I receive $850 per

---

[16] "Declaration of Tracy Barnes in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 7, 2017 (hereafter "Barnes Declaration").

[17] "Declaration of Steve Melody in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 7, 2017 (hereafter "Melody Declaration").

[18] "Declaration of Aldo De La Torre in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 7, 2017 (hereafter "De La Torre Declaration").

[19] "Declaration of Janet Lundbye in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 6, 2017 (hereafter "Lundbye Declaration").

[20] "Declaration of Chandra Welsh in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 8, 2017 (hereafter "Welsh Declaration").

[21] "Declaration of Becky LaCroix-Milani in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 7, 2017 (hereafter "Lacroix-Milani Declaration").

hour for my work in this matter. I also receive compensation from Berkeley Research Group based on its collected staff billings in support of this effort. My compensation is not dependent on the outcome of this matter. My work in this matter is ongoing. I reserve the right to supplement and to amend my opinions.

## II.     Summary of Opinions

9.      Based on my training and experience in healthcare antitrust economics, my review of the record in this case, and the analyses described in this report, it is my opinion that eleven of the twelve candidate geographic markets described by Plaintiffs in their Complaint are relevant hospital antitrust markets. Of these eleven, four are Tied Markets and seven are Tying Markets. These eleven are as follows:

- The Sacramento HSA, where Sutter owns and operates Sutter Medical Center, Sacramento ("Sutter Sacramento");

- The San Francisco HSA, where Sutter owns and operates four campuses, including the St. Luke's campus, of California Pacific Medical Center ("CPMC");

- The Modesto HSA, where Sutter owns and operates Memorial Medical Center Modesto ("Sutter Modesto");

- The Santa Rosa HSA, where Sutter owns and operates Sutter Santa Rosa Regional Hospital ("Sutter Santa Rosa");[22]

- The combined Berkeley and Oakland HSAs, where Sutter owns and operates several campuses, including the Summit campus, of Alta Bates Medical Center ("Alta Bates");

- The Crescent City HSA, where Sutter owns and operates Sutter Coast Hospital ("Sutter Coast");

- The Lakeport HSA, where Sutter owns and operates Sutter Lakeside Hospital ("Sutter Lakeside");

---

[22] In 2014, Sutter closed Sutter Medical Center of Santa Rosa and opened a new location, Sutter Santa Rosa Regional Hospital. *See* Sutter Health, "Sutter Santa Rosa History," available at https://www.sutterhealth.org/ssrrh/about/history/history-ssrrh, *site visited* April 2, 2018.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**          6

- The Antioch HSA, where Sutter owns and operates Sutter Delta Medical Center ("Sutter Delta");

- The Jackson HSA, where Sutter owns and operates Sutter Amador Hospital ("Sutter Amador");

- The Tracy HSA, where Sutter owns and operates Sutter Tracy Community Hospital ("Sutter Tracy"); and

- The Auburn HSA, where Sutter owns and operates Sutter Auburn Faith Hospital ("Sutter Auburn").

10.     In the case of the Sutter Davis Hospital ("Sutter Davis"), the evidence suggests that the relevant antitrust market is no broader than the hospital's 90 percent primary service area ("PSA").[23] I also find that Sutter has market power in each of the Tying Markets, regardless of whether there may be support for a broader geography. My conclusions are based on a combination of economic principles, descriptive and statistical analyses of patient discharge data, ordinary-course documents from both health plans and Sutter, and testimony from health plan executives. The key pieces of evidence are summarized here:

11.     *First, the evidence shows that, in most of the candidate markets, the majority of area-patients prefer a local area-hospital for their inpatient hospital care.* For eleven of the twelve candidate geographic markets (I discuss the Davis HSA separately, below), the percent of patients in each candidate geographic market that stays in the candidate geographic market for their care is: (a) over 75 percent for Sacramento; (b) about 95 percent for San Francisco; (c) about 80 percent for Modesto; (d) about 75 percent for Santa Rosa; (e) about 80 percent for Berkeley-Oakland; (f) about 70 percent for Crescent City; (g) about 50 percent for Lakeport; and

---

[23] The term primary service area generally refers to the geography from which the hospital receives most of its patients. This concept is used in the ordinary course by hospitals as well as by federal antitrust authorities tasked with oversight of hospital markets. For example, accountable care organizations track their 75 percent service area, which is defined as "the lowest number of postal zip codes from which [an accountable care organization participant] draws at least 75 percent of its [patients]." (*See* U.S. Department of Justice, "Statement of Antitrust Enforcement Policy Regarding Accountable Care Organizations Participating in the Medicare Shared Savings Program." *Federal Register*, Vol. 76, No. 209, 2011, available at https://www.gpo.gov/fdsys/pkg/FR-2011-10-28/pdf/2011-27944.pdf, *site visited* April 24, 2018, at p. 67028.) Similarly, a hospital's 90 percent primary service area is the smallest collection of zip codes which account for 90 percent of the hospital's discharges. Throughout this report, I use the term "PSA" to refer to a 90 percent primary service area defined in this way.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

(h) about 55 percent for Tracy. For Jackson, Antioch, and Auburn, this number is about 40 percent. This evidence is consistent with nationwide findings that show that most patients seek care near where they live.[24] It is also consistent with evidence from other cases cited by Professor Gowrisankaran.[25] Professor Gowrisankaran fails to recognize this pattern, even though he computes comparable numbers.[26]

12.     *Second, the evidence shows that patients who stay in the candidate geographic market for their inpatient care spend substantially less time driving than patients who travel outside the area for their care.* The average drive times for area-patients who receive their care from a hospital in the candidate geographic market versus area-patients who receive their care from an outside hospital are as follows: (a) 17 versus 38 minutes for Sacramento; (b) 16 versus 45 minutes for San Francisco; (c) 18 versus 71 minutes for Modesto; (d) 20 versus 67 minutes for Santa Rosa; (e) 14 versus 45 minutes for Berkeley-Oakland; (f) 16 versus 107 minutes for Lakeport; (h) 17 versus 44 minutes for Antioch; (i) 21 versus 71 minutes for Jackson; (i) 9 versus 51 minutes for Tracy; and (k) 18 versus 45 minutes for Auburn.[27] If patients who choose to

---

[24] Probst, Janice, Sarah Laditka, Jong-Yi Wang, and Andrew Johnson, "Effects of Residence and Race on Burden of Travel for Care: Cross Sectional Analysis of the 2001 US National Household Travel Survey," *BMC Health Services Research,* Vol. 7, No. 40, 2007, pp. 1-13.

[25] In *FTC et al. vs. Advocate-NorthShore*, the economic evidence noted by the court was that "most patients prefer to go to nearby hospitals" and that "80 percent of patients drove to the hospital of their choice in 20 minutes or less." (*See* "Opinion," *Federal Trade Commission and State of Illinois v. Advocate Health Care Network,* Case No. 16-2492, filed October 31, 2016 (hereafter "Advocate-NorthShore Appellate Decision"), p. 14.) In *FTC et al. v. Penn State Hershey Medical Center et al.*, the court noted that "The Government presented undisputed evidence that 91% of patients who live in Harrisburg receive GAC [general acute care] services in the Harrisburg area. Such a high number of patients who do not travel long distances for healthcare supports the Government's contention that GAC services are inherently local." (*See* "Opinion," *Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center; Pinnacle Health System,* Case No. 16-2365, filed September 27, 2016 hereafter "Hershey-Pinnacle Appellate Decision"), p. 21.)

[26] Differences in my and Professor Gowrisankaran's patient flows stem from differences in our underlying data. Professor Gowrisankaran uses the 2015 release of OSHPD's Patient Origin and Market Share Data ("POMS"), a summary dataset calculated by OSHPD based on patient discharges. By contrast, I use the 2011 OSHPD Patient Discharge Data ("PDD"). A key difference between the two datasets is the rate at which zip codes are shortened from five digits to three digits, or completely redacted to preserve patient confidentiality. Roughly ten percent of zip codes in the POMS data are partially or completely masked, compared to roughly one percent of zip codes in the 2011 PDD. 2011 is the last year in which OSHPD made available the more disaggregate data. Thus, my estimates, computed from the PDD, are more accurate than Professor Gowrisankaran's estimates. *See* Gowrisankaran Report, Footnote 78.

[27] For Crescent City, the average drive time for area-patients who receive care at an area-hospital is 32 minutes. I am not able to compute average drive times for area-patients who travel outside of the area for hospital care, because the OSHPD data are missing data for area-patients that choose an Oregon hospital. The average drive time for area-patients that choose a California hospital is 275 minutes.

receive care at out-of-area hospitals do so because of the proximity to these hospitals, they should have similar average drive times as patients who receive care at in-area hospitals. These results show that, contrary to Professor Gowrisankaran's assertions, area-patients who drive outside of the candidate geographic markets are typically not going to otherwise closer hospitals just outside of the candidate geography. Further, the large difference in drive times makes it less likely that patients who receive their care at an area-hospital would be willing to switch to a hospital outside of the area. In other work, Professor Gowrisankaran himself has recognized that the large literature on hospital choice finds that patients are "very sensitive to travel time" and that "an increase in travel time of 5 minutes" can have a material impact on patient choice and consumer welfare.[28]

13.      *Third, the evidence shows that patients who choose hospitals in the candidate geographic area are insistent on hospitals in the candidate geography.* There are several pieces of evidence that show insistence for hospitals in the candidate geography. The first of these comes from an ordinary-course analysis performed by Blue Shield in 2014 (referred to as the "Blue Shield redirection analysis") that provides direct assessment of health plans' ability to substitute hospitals in the candidate geography with hospitals outside of it.[29] As part of this analysis, Mr. Tracy Barnes, Blue Shield's Director of Provider Contracting for Northern California, and his colleagues used their decades of experience designing hospital networks in California to determine whether and where patients would be redirected if Sutter were to go out-of-network and patients were to experience a significant increase in out-of-pocket costs for

---

[28] Gowrisankaran, Gautam, Aviv Nevo, and Robert Town, "Mergers When Prices are Negotiated: Evidence from the Hospital Industry," *American Economic Review*, Vol. 175, No. 1, 2015, pp. 172-203, at p. 23 ("Consistent with the large literature on hospital choice, we find that patients are very sensitive to travel times. The willingness to travel is increasing in the DRG weight and decreasing in age. An increase in travel time of 5 minutes reduces each hospital's share between 17 and 41%. The parameter estimates imply that increasing the travel time to all hospitals by one minute reduces consumer surplus by approximately $167.").

[29] For several Sutter hospitals, a Blue Shield team conducted a two-step analysis of UEBT claims to determine whether and where Sutter patients would redirect, if their chosen Sutter hospital were to go out of network. In the first step, the team determined the share of dollars that could potentially be redirectable to other hospitals. In the second step, the team determined, based on their "experience of the marketplace and understanding of which hospitals are complimentary, how far apart they are from one another, [and] preferences of members," where patients would redirect. (*See* Deposition of Tracy Barnes, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, January 30-31, 2018 and February 1, 2018 (hereafter "Barnes Deposition"), pp. 432 and 440.) For a more complete description of the Shield redirection analysis, see: (a) BSC_SutterSub00063535; (b) BSC_SutterSub00037814 – 2014-4 Analysis Redirect.xls; and (c) Barnes Deposition, pp. 423-470 and Exhibit 162.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

choosing their local Sutter hospital. Blue Shield expected that ██████████████ of patient dollars, for patients who received care at a Sutter hospital in each of the candidate geographies, would remain at a local area-hospital, even if the local Sutter hospital were to go out-of-network. The percent that would remain local, either at Sutter or at another area-hospital, is: (a) ████ percent for ██████████ (b) ████ percent for ██████████ (c) ████ percent for ██████████ (d) ████ percent for ██████████ (e) ████ percent for ██████████ (f) ████ percent for ██████████ (b) ████ percent for ██████████ (c) ████ percent for ██████████ (d) ████ percent for ██████████ (e) ████ percent for ████████ and (f) ████ percent for ████████[30] Thus, the Blue Shield redirection analysis shows that patients of these Sutter hospitals have strong preferences for hospitals in the local geography, implying that health plans have little to no ability to substitute inside hospitals for outside ones. Professor Gowrisankaran ignores this evidence. He explained in his deposition that he did not review or seek out any ordinary-course documents or health plan testimony in reaching his conclusions on market definition in this case,[31] even though health plan preferences provide direct insight into patient preferences for area hospitals.

14.    For the four candidate Tied Markets, I also conducted a diversion analysis based on an econometric model of patient choice among non-Kaiser hospitals.[32,33] This diversion analysis studies the question of where area-patients would go if they could no longer go to their first-choice hospital and were forced to go elsewhere for their inpatient care. In each instance, I find that the majority of patients who receive care inside of the candidate geographic market would stay in the candidate geographic market even if their first-choice hospital were no longer available to them. The percent that would stay in the candidate geography is: (a) 61 percent for

---

[30] Chipty Workpapers.

[31] Gowrisankaran Deposition, p. 83.

[32] This is a method commonly used in defining hospital geographic markets. *See* Farrell, Joseph, David Balan, Keith Brand, and Brett Wendling, "Economics at the FTC: Hospital Mergers, Authorized Drugs, and Consumer Credit Markets," *Review of Industrial Organization* Vol. 39, No. 4, 2011, pp. 271-296 (hereafter "Farrell *et al.*"), at p. 275 ("We typically begin our empirical analysis by estimating the diversion ratios between the merging hospitals.").

[33] Diversion analysis evaluates where patients would go if their preferred hospital was removed from their choice set. If there are no other local hospitals, then this thought experiment necessarily forces patients to choose a hospital outside of the candidate market, and it is inherently incapable of providing information on patient preference to stay local. None of the candidate Tying Markets, with the exception of Berkeley-Oakland, have another non-Kaiser local hospital. Berkeley-Oakland has a single alternative, Alameda County Medical Center, which has been out-of-network for the major health plans for many years.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER    10

Sacramento; (b) 65 percent for San Francisco; (c) 68 percent for Modesto; and (d) 73 percent for Santa Rosa.

15.      One cannot reject the notion of a candidate market as a relevant market, as Professor Gowrisankaran has, simply because some patients leave the candidate market for their hospital care.[34] To do so would be to fall into the trap of what is described by economists and recognized by courts to be the "silent majority" fallacy.[35] For example, in *Advocate-North Shore*, a case cited by Professor Gowrisankaran,[36] the appellate court concluded that the district court erred by overlooking the market power created by the remaining patients' preferences. In that case, the evidence was that 48 percent of patients would stay in the candidate market if their first-choice hospital (inside the candidate market) was not available to them.[37] Despite this fact, the FTC's economist found, and the court accepted, that the candidate market was a relevant market.[38] As explained by the court, it is a mistake to "focus on the patients who leave a proposed market instead of on hospitals' market power over the patients who remain, which means that the hospitals have market power over the insurers who need them to offer commercially viable products to customers who are reluctant to travel farther for general acute hospital care."[39] Professor Gowrisankaran did not rely upon a diversion analysis, a widely-used method in hospital market definition, in arriving at his opinions about market definition in this case.[40] Furthermore, by rejecting the candidate markets as relevant markets because of patient outflow, he has committed the error of ignoring the "silent majority."

---

[34] To do so would require a basis to conclude that the actual travel habits of some consumers would be predictive of the travel habits of others, in response to a price increase by a hypothetical monopolist. *See* Capps, Cory, David Dranove, Shane Greenstein, and Mark Satterthwaite, "The Silent Majority Fallacy of the Elzinga-Hogarty Criteria: A Critique and New Approach to Analyzing Hospital Mergers," *National Bureau of Economics Research*, Working Paper 8216, available at http://www.nber.org/papers/w8216, *site visited* April 4, 2018, pp. 1-52 (hereafter "Capps *et al.*"), at p. 1 ("[I]f travelers and non-travelers display fundamentally different demand behavior, either because they differ in their taste for travel or their need for local/non-local services, then there is no necessary relationship between the market experiences of these two groups post-merger.").

[35] Capps *et al.*, *Op. Cit.*

[36] Gowrisankaran Report, pp. 35-36 and Exhibit 6.

[37] Advocate-North Shore Appellate Decision, pp. 23-24.

[38] *Id*.

[39] Advocate-North Shore Appellate Decision, pp. 25-26.

[40] Gowrisankaran Deposition, p. 164 ("Q: Is [the diversion ratio] a tool that's used in market definition analysis when it comes to hospital services? A: Yes diversion ratios are used."), and pp. 201-202 ("Q: In your analysis, did you go through a diversion ratio exercise? A: I did not perform any diversion ratios for – for my report here, for my analysis.").

16.     *Fourth, most of the candidate markets satisfy the hypothetical monopolist test, as described by the Federal Trade Commission and Department of Justice Merger Guidelines.*[41] For the four candidate Tied Markets (the Sacramento, San Francisco, Modesto, and Santa Rosa HSAs), I am able to use the diversion ratios and data on hospital prices and margins to determine whether a profit-maximizing hypothetical monopolist over the non-Kaiser hospitals located in the candidate geographic market would raise the price of at least one area-hospital, by at least five percent above current levels. In each instance, I find that the answer is yes, meaning that the test is satisfied and the candidate market is a relevant market. While Professor Gowrisankaran describes the idea of the hypothetical monopolist test,[42] he does not actually implement or use it to interpret whether the patient flows that exist are competitively significant. Had he done so, he would have found that each of these four candidate Tied Markets is a relevant antitrust market.

17.     For the candidate Tying Markets, I am not able to implement the same numerical calculation, because there are no viable hospital alternatives in the local area. Where there are no viable hospitals, standard diversion analysis will necessarily show outflow and the current price levels will reflect monopoly pricing.[43] In these instances, I use the health plan testimony and ordinary-course documents to draw inferences about market definition.[44]

- The first piece of evidence comes from the Blue Shield redirection analysis; it provides a direct window to the hypothetical monopolist test, to the extent the preferences of the hospital's patients resemble preferences of the residents of the candidate geography. The evidence shows that most patients of these hospitals in Plaintiffs' candidate Tying

---

[41] U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," *DOJ*, August 19, 2010, available at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010, *site visited* April 7, 2018 (hereafter *Merger Guidelines*), § 4.

[42] Gowrisankaran Report, pp. 10-11.

[43] Where the hypothetical monopolist is an actual monopolist, the numerical calculation would suffer from the Cellophane fallacy and lead to a false rejection of the candidate market as the relevant antitrust market. *See* Werden, Gregory, "Market Delineation under the Merger Guidelines: Monopoly Cases and Alternative Approaches," *Review of Industrial Organization*, Vol. 16, No. 2, 2000, pp. 211-218 (explaining that there are times when it is appropriate to use the Merger Guidelines' paradigm for market delineation in non-merger cases, and there are times when it is not.).

[44] As I explain below, central to hospital market definition is the question of whether a hypothetical monopolist over hospitals in a candidate market could create a viable provider network without some set of area hospitals. If the answer to the question is no, the hypothetical monopolist would have market power over health plans, and the candidate market would be a relevant market. Testimony and document evidence can shed light on the extent to which health plans need area-hospitals, even where numerical calculations are not possible.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**          12

Markets would not switch away from their chosen Sutter hospital, even if they had to pay significantly more out-of-pocket. (*See* Exhibit 19, below.) The evidence also shows

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████[45] Thus, this evidence supports the candidate geographies of the████████████████████████████

█████████████as relevant antitrust markets. It also suggests███████████████████

████████████████████████████████████████could be relevant antitrust markets.

- For Berkeley-Oakland, there is also direct evidence that a health plan would not be able to create a commercially viable network without including the local Sutter hospitals (Alta Bates-Main and Alta Bates-Summit).████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████[46] Because of the substantial overlap between Alameda County and the Berkeley-Oakland HSAs,[47] Mr. Beuoy's statement implies that

███████████████████████████████████████████████████████████████

█████████████████████████Consistent with this view,██████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████[48,49]

---

[45] The share of PSA discharges that are in the candidate geographic market for each hospital are as follows: (a) 100 percent for Sutter Coast; (b) 82 percent for Sutter Lakeside; (c) 77 percent for Sutter Delta; (d) 66 percent for Sutter Amador; (e) 51 percent for Alta Bates-Main; (f) 45 percent for Alta Bates-Summit; (g) 43 percent for Sutter Tracy; and (h) 35 percent for Sutter Auburn. *See* Chipty Workpapers.

[46]█████████████████████████████████████████████████████████████
████████████████████████████████████

[47] Nearly 85 percent of Alta Bates patients living in Alameda County live in the two-HSA area of Berkeley and Oakland. *See* Chipty Workpapers.

[48]█████████████████████████████████████████████████████████████
███████████████████████████████

[49] Despite the fact that it was out-of-network and perceived to be lower quality, diversion analysis shows Alameda County Medical Center was among the highest recipients of patients being diverted away from both Alta Bates and Alta Bates Summit. *See* Chipty Workpapers.

- In addition, there is direct evidence from health plans and Sutter about the "must have" nature of some of the Sutter hospitals. For example, according to United, Sutter has a "geographic monopoly" in areas with Sutter Tracy, Sutter Auburn, and Sutter Amador, indicating that from the perspective of residents living near these hospitals, it would not be feasible to assemble a commercially viable health plan without the local Sutter hospital.[50] Further, network adequacy requirements also necessitate that health plans include certain Sutter hospitals in their networks in some geographies, such as in the Crescent City HSA (with Sutter Coast).[51]

Professor Gowrisankaran has ignored this documentary and testimony evidence. Yet, this evidence supports the conclusion that the candidate Tying Markets of the Berkeley-Oakland HSAs, the Crescent City HSA, the Lakeport HSA, the Antioch HSA, the Jackson HSA, the Tracy HSA, and the Auburn HSA are relevant antitrust markets.

18.     The evidence is less clear with respect to the Davis HSA, where Sutter owns and operates Sutter Davis, the only non-Kaiser hospital in the HSA. The data show that 38 percent of patients who live in the Davis HSA stay in the Davis HSA for hospital inpatient care. The average drive time of these patients that stay in the HSA is 15 minutes and the average drive time of those who go out is 39 minutes. The Blue Shield redirection analysis anticipates that ███ percent of Sutter Davis patients would continue to use Sutter Davis if the hospital were to go out-of-network. However, only eight percent of Sutter Davis patients, from the hospital's PSA, live in the Davis HSA. Thus, there is no basis to conclude that the preferences residents in the Davis HSA resemble the strong preferences of Sutter Davis patients overall. Therefore, I cannot conclude from this evidence that the Davis HSA is a relevant antitrust market. I conclude, however, that the relevant market is no broader than Sutter Davis's PSA.

---

[50] Email from Anne Harvey, United's Director of Provider Services Northern CA, to United's Marianna D'Ambrosi and Kerri Balbone, "RE: Sutter indemnified claims – transition to ACME, process improvement and risk mitigation project kick off," October 13, 2008, UHC-00134453 (hereafter "Harvey Email"), p. 1 (indicating that Sutter has "geographic monopolies for the following submarkets – Auburn, Amador, Tracy, Marin, Vallejo, Antioch, Berkeley, Oakland, San Mateo, Clearlake and Humboldt…Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them.").

[51] California's Knox Keene Health Care Service Plan Act of 1975 requires DMHC-regulated (predominantly HMO) health insurance products to adhere to network adequacy standards under which health plans must provide hospital services within 30 minutes or 15 miles of a member's residence or workplace. Analogous network adequacy requirements exist for products regulated by the California Department of Insurance; *See* 10 CCR § 2240.1(c)(2), available at http://www.insurance.ca.gov/0400-news/0100-press-releases/2016/upload/NetworkAdequacyRegulation3-8-16.pdf, *site visited* May 2, 2018.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

19.     Thus, based on consideration of the evidence within the framework of the hypothetical monopolist test, I find that eleven of the twelve candidate geographic markets described by Plaintiffs in their Complaint are economically coherent antitrust markets. I also find that the relevant antitrust market with respect to Sutter Davis is no broader than the hospital's 90 percent PSA.

20.     *Furthermore, the evidence shows that Sutter has market power over health plans in the Tying Markets, even where the Tying Markets may be broader than the candidate markets.* There is direct evidence that patients that use the Sutter hospitals in the Tying Markets are insistent on using the local Sutter hospital. The Blue Shield redirection analysis shows that the ██████████ of patients would continue to use their local Sutter hospital, even if that hospital were to go out of network: (a) ███ percent of ██████████ patients would continue to use Alta Bates; (b) ███ percent of ██████████ patients would continue to use ██████████ (c) ███ percent of ██████████ patients would continue to use ██████████ (d) ███ percent of patients would continue to use ██████████ (e) ███ percent of ██████████ patients would continue to use ██████████ (f) ███ percent of ██████████ patients would continue to use ██████████ (g) ███ percent of ██████████ patients would continue to use ██████████ and (h) ███ percent of ██████████ patients would continue to use ██████████[52] Consistent with this evidence, there is ample health plan testimony and other documentary evidence that Sutter has market power over health plans in relevant markets that contain these Sutter hospitals.[53] By contrast, the evidence shows that health plans (and plan members) have more hospital choices in the Tied Markets.

---

[52] By contrast, patient insistence on using the local Sutter hospital is substantially lower in the Tied Markets. *See* Exhibit 20, below.

[53] ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See also* Harvey Email, p. 1 (indicating that Sutter has "geographic monopolies for the following submarkets – Auburn, Amador, Tracy. Marin, Vallejo, Antioch, Berkeley, Oakland, San Mateo, Clearlake and Humboldt…Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them."). *See also* Deposition of Chandra Welsh, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health et al.*, Case No. CGC 14-538451, April 12, 2017 (hereafter "Welsh Deposition"), pp. 196-198 (describing Sutter Coast, Sutter Lakeside, and Sutter Auburn as "must-have from a marketability standpoint," and explaining that these rural hospitals are "really it for a given area.").

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**          15

***

21.     For the reasons I have already mentioned, I find Professor Gowrisankaran's arguments against the Plaintiffs Tied and Tying Markets to be unconvincing. Professor Gowrisankaran is distracted by Plaintiffs' use of HSAs to build candidate geographic markets. He spends more than half of his report explaining that HSAs as a general matter were not constructed as antitrust markets. He forgets, however, that no off-the-shelf geographic boundaries, be they ZIP codes, counties, metropolitan statistical areas, or states, are built for specific antitrust purposes. Yet, antitrust economists and practitioners use such off-the-shelf boundaries for convenience in building candidate geographic markets. Plaintiffs do not assert that all HSAs are (or need to be) relevant antitrust markets, as evidenced by the fact that one of their asserted relevant markets is the combination of two HSAs. To determine whether a candidate market is a relevant antitrust market, one must study consumer demand within the framework of the hypothetical monopolist test, as I have done in this report. One cannot merely rely, as Professor Gowrisankaran has done, on patient inflows and outflows and distances between hospitals to suggest that hospitals outside of the candidate market are substitutes for patients who live inside the candidate geographies. While patient flows may require one to broaden the boundaries of a candidate market, one cannot know that without consideration of the evidence within the framework of the hypothetical monopolist test. The evidence in this case shows that patient outflows do not defeat Sutter's market power over health plans. Had Professor Gowrisankaran performed a hypothetical monopolist test or considered the significant ordinary-course document and testimony evidence from health plans, within the framework of the hypothetical monopolist test, he would have found strong support for most of the candidate markets as relevant antitrust markets.[54] Furthermore, Professor Gowrisankaran's view that the Plaintiffs' candidate markets ignore important competitive constraints on the local Sutter hospitals in the Tying Markets ignores the significant documentary evidence to the contrary.

22.     The remainder of this report describes the support for each of these opinions.

---

[54] De La Torre Declaration, ¶ 8 ("As a result, it is not possible to develop, and successfully market a commercially viable insurance product and/or benefit plan in Northern California without any Sutter providers."); and "Declaration of David Katz in Connection with Plaintiff UEBT's Motion for Class Certification," *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, Plaintiffs, vs. Sutter Health, et al., Defendants*, Case No. CGC 14-538451, February 6, 2017 (hereafter "Katz Declaration"), ¶ 4 ██████████████████████

## III.    Background

23.    This section provides relevant background to help guide the discussion of hospital market definition in this case. It sheds light on some of the unique features of healthcare markets. It also provides an overview of the Northern California healthcare landscape, where Sutter is located. Throughout this report, I refer to "Northern California" as the 48 counties north of San Luis Obispo, Kern, and San Bernardino, as shown in Exhibit 1.

**Exhibit 1**
**Map of California**



*Source*: US Census Bureau; and Tenn, Steven, "The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction," *International Journal of the Economics of Business*, Vol. 18, No.1, 2011, pp. 65-82, at p.74.

### A.    *Unique Features of Healthcare Markets*

24.    As recognized by antitrust scholars in healthcare, analysis of the competitive effects of hospital conduct must account for the unique features of healthcare markets that

distinguish healthcare from "standard" goods and services.[55] Unlike with standard goods and services, consumers seek access to healthcare services even before they know what their medical needs are. In addition, consumers do not negotiate directly with healthcare providers, instead they purchase access to provider networks assembled by health plans. Healthcare providers include: (a) hospitals that provide general or specialized care to treat diseases or trauma on a short-term, inpatient basis;[56] (b) specialty hospitals that include psychiatric and rehabilitation facilities; (c) long-term care facilities; (d) outpatient facilities; and (e) physician services. Provider networks include a selection of each of these types of healthcare providers. The allegations in this case and, thus, the analyses in this report focus on competition among hospitals that provide care on a short-term, inpatient basis.

25.      Health plans negotiate with hospital systems, like Sutter, over the terms of their inclusion in provider networks.[57] Agreements between health plans and hospital systems specify the prices (the "reimbursement rates" or "allowed amounts") that health plans pay hospital systems for specific healthcare services, like hip replacement or normal newborn deliveries, on behalf of health plan members that receive care for both their fully-insured and self-insured products.[58] Agreements between health plans and hospital systems can also specify other terms. There may be terms, for example, that govern where the hospital system is placed in the health plan's provider network (*e.g.* equal placement in a broad network product or preferred placement in a tiered or narrow network product). There may be terms, as in the case of Sutter's contracts

---

[55] Vistnes, Gregory, "Hospitals, Mergers, and Two-Stage Competition," *Antitrust Law Journal*, Vol. 67, No. 3, 2000, pp. 671-692 (hereafter "Vistnes (2000)"); and Ho, Kate and Robin Lee, "Equilibrium Provider Networks: Bargaining and Exclusion in Health Care Markets," NBER Working Paper 23742, Issued August 2017, Revised May 2018 (hereafter "Ho and Lee (2017)"), available at http://www.nber.org/papers/w23742.pdf, *site visited* May 23, 2018; and Kessler, Daniel and Mark McLellan, "Is Hospital Competition Socially Wasteful?" *Quarterly Journal of Economics*, Vol. 115, No. 2, 2000, pp. 577-615.

[56] These hospitals typically provide a full range of round-the-clock inpatient care including medical, nursing, surgical, anesthesia, laboratory, and radiology services, among others.

[57] Health plans sell access to provider networks to both self-insured and fully-insured covered lives. Health plans also sell administrative services such as claims processing, to self-insured employers, and risk-bearing services. *See*, for example, Austin, D. Andrew and Thomas Hungerford, "The Market Structure of the Health Insurance Industry," *Congressional Research Service*, CRS Report R40834, available at https://fas.org/sgp/crs/misc/R40834.pdf, *site visited* October 24, 2017, pp. 21-22.

[58] Allowed amounts can be borne in part by plan members, in the form of deductible, copayment, or coinsurance, depending on the terms of the agreement between plan member and the health plan.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

with health plans, that govern whether and how health plans can incent patients to choose among the different providers in the network.

26.     Hospital markets have been characterized by two stages of competition.[59] In the first stage, hospitals compete with each other to be included in provider networks. In the second stage, patients choose a hospital from their provider network. Patients that have equal access to all hospitals in their provider network typically choose a hospital based on non-price factors such as convenience and whether the hospital has the expertise to address their medical need. Health plans are increasingly using benefit design to steer patients to choose hospitals that cost less.[60] For example, some health plans may give plan members a discount for agreeing to use a narrower provider network consisting of less expensive hospitals. Some health plans may give patients a discount for choosing a lower-priced hospital within a provider network. In such cases, patients are more likely to consider price as a factor in their hospital choice. Health plans have more leverage in their negotiation with hospitals when there are more hospitals capable of serving the needs of area-patients and when patients can be steered to use lower-priced hospitals.[61] By contrast, where there are fewer competing hospitals or where plan members have strong preferences for a hospital, that hospital has more leverage in its negotiations with health plans.

27.     According to the Complaint, there are some hospital markets in Northern California where health plans could use benefit design to steer patients away from higher-priced Sutter hospitals.[62] There are also some hospital markets in Northern California where some plan

---

[59] Vistnes (2000), p. 672 ("Hospital competition is modeled as a two-stage game. In the first stage, hospitals compete to be included in a plan's hospital network. In the second stage, hospitals compete for a plan's individual enrollees…."); and Farrell *et al.*, p. 4.

[60] Delbanco, Suzanne, Roslyn Murray, Robert A. Berenson, and Divvy K. Upadhyay, "A Typology of Benefit Designs," *Urban Institute*, April 2016, available at https://www.urban.org/sites/default/files/publication/80321/2000780-A-Typology-of-Benefit-Designs.pdf, *site visited* April 18, 2018.

[61] Vistnes (2000), p. 677 ("The strength of a plan's threat [in negotiations with a hospital] also depends on the extent to which other hospitals are good substitutes from the patient's perspective."); and Ho and Lee (2017), p. 48 ("[W]e find that selective contracting and informed network design can have substantial effects on overall health care spending. Narrow hospital networks are preferred by a profit-maximizing insurer primarily due to their ability to substantially reduce negotiated rates.").

[62] Complaint, ¶ 6.

members cannot be steered because they have strong preferences for Sutter hospitals.[63] According to the Complaint, Sutter requires health plans to include all Sutter hospitals in their provider networks, and Sutter prohibits health plans from giving patients financial incentives to go to lower-priced hospitals.[64] Given the nature of hospital markets, one would expect the effect of the Sutter's conduct, under certain circumstances, to raise Sutter hospital prices that are negotiated between health plans and Sutter in the first stage of competition.

### B. The Role of Kaiser Permanente

28. Kaiser Permanente ("Kaiser") is the largest healthcare system in California. Kaiser consists of a network of owned and operated hospitals, outpatient facilities, and physicians.[65] Kaiser is also a health plan covering about 45 percent of commercial plan members in the state of California.[66] The Kaiser health plan is widely described as a "health maintenance organization,"[67] which means that Kaiser plan members must stay within the Kaiser network and their care is closely managed to contain costs. Kaiser is a "closed" healthcare system because non-Kaiser health plans, like Anthem and Blue Shield, cannot include Kaiser hospitals in their provider networks. With the exception of emergencies, only Kaiser plan members can access healthcare in the Kaiser system.

29. Because Kaiser is a closed system, commercial health plans cannot turn to Kaiser as substitutes for non-Kaiser hospitals, like the Sutter hospitals, when assembling their provider networks. Thus, Kaiser does not compete with Sutter in the first stage of hospital competition, for inclusion in provider networks. Kaiser also does not compete with Sutter in the second stage of hospital competition to attract patients because no patient would have both Kaiser and Sutter hospitals in the provider network. Thus, Kaiser hospitals are not in the relevant antitrust markets for the purpose of evaluating Sutter's market power over health plans like Anthem and Blue

---

[63] Complaint, ¶ 4.

[64] Complaint, ¶¶ 33-46.

[65] Kaiser Permanente, "Fast Facts About Kaiser Permanente," available at https://share kaiserpermanente. org/article/fast-facts-about-kaiser-permanente/, *site visited* March 17, 2018.

[66] California Health Care Foundation, "California Health Insurers, Enrollment," available at https://www.chcf.org/wp-content/uploads/2018/02/QRGHealthInsurersEnrollment2018.pdf, *site visited* April 30, 2018, p. 2.

[67] *See*, for example, CalHealth.Net, "Anthem Blue Cross Versus Kaiser – The Heavyweights of California," available at https://www.calhealth.net/Kaiser-versus-Anthem-California.htm, *site visited* April 8, 2018.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

Shield, which are the "upstream" markets for the sale of inpatient hospital services to commercial health plans.[68,69] By contrast, Kaiser competes with health plans like Anthem and Blue Shield for plan members in the "downstream" markets for the sale of commercial insurance to subscribers.[70] When health plans lose plan members to Kaiser, Sutter also loses the ability to attract those plan members to a Sutter hospital when they need inpatient medical care. Thus, there are the separate issues of whether and the extent to which Kaiser disciplines health plan premiums, but these issues are not the focus of this report. For the remainder of this report assessing the boundaries of the relevant antitrust markets, I focus the discussion on non-Kaiser, Northern California hospitals. For convenience, I refer to these hospitals simply as Northern California hospitals.

### C.    Northern California Hospitals

30.    According to OSHPD data, there were approximately 118 hospitals in Northern California, over the period 2008 to 2015.[71] Exhibit 2 shows a breakdown, by year, along with the split between inpatient and outpatient charges. As seen here, there has been a decrease in the number of hospitals. Throughout the period, charges for inpatient services account for the majority of hospital charges, though there has been a shift in the composition towards outpatient care.

---

[68] The Plaintiffs have alleged the existence of two different types of relevant markets: (a) a set of upstream markets for the sale of inpatient hospital services to commercial health plans; and (b) a set of downstream markets for the sale of commercial insurance to subscribers in different rating areas. (*See* Complaint, ¶ 73.) My opinions in this report relate to the upstream markets for the sale of inpatient hospital services to commercial health plans.

[69] While Kaiser is irrelevant to the market definition analysis for the upstream market, it can potentially constrain Sutter's ability to exercise market power in this upstream market through competition with Sutter in the downstream market. However, as discussed below in the market power section, the downstream competition from Kaiser is insufficient to discipline Sutter in the upstream market.

[70] Boston Consulting Group, "Consumer and Employer Research: Key Imperatives and Strategic Implications," December 4, 2014, DEF00877866-907, at 886 ("once consumers chose [Kaiser], they no longer have the option of selecting Sutter. *[Kaiser] is the enemy and that battle must be fought at the insurance level.*" [Emphasis in original]).

[71] I study hospitals where: (a) the hospital describes itself as either "General" or "General Acute" in its annual financial disclosure to OSHPD; and (b) the last four digits of the hospital's Medicare Provider Number (MPN) falls within the range 0001 – 0879, the range specified by the Centers for Medicare and Medicaid Services (CMS) for "Short-term (General and Specialty) Hospitals." *See* CMS, "Center for Clinical Standards and Quality/Survey & Certification Group Memorandum," March 11, 2016, available at https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Survey-and-Cert-Letter-16-09.pdf, *site visited* March 26, 2018.

**Exhibit 2**
**Northern California Hospitals,**
**Inpatient and Outpatient Charges**

| Year | Number of Hospitals | % of Charges Inpatient | % of Charges Outpatient |
|------|---------------------|------------------------|-------------------------|
| 2008 | 125 | 67% | 33% |
| 2009 | 124 | 66% | 34% |
| 2010 | 120 | 65% | 35% |
| 2011 | 117 | 65% | 35% |
| 2012 | 115 | 64% | 36% |
| 2013 | 114 | 63% | 37% |
| 2014 | 114 | 61% | 39% |
| 2015 | 113 | 59% | 41% |

*Notes*:

1. Hospitals are defined as hospitals with "General" or "General Acute" as a type of care in the OSHPD Patient Discharge Pivot Profiles and with a CMS ID in the range 050001 - 050879.

2. This summary excludes all Kaiser facilities.

*Sources:*

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2015.

2. OSHPD Hospital Annual Financial Disclosure Data Complete Data Set, 2008-2015.

3. Centers for Medicare and Medicaid Services (CMS) Historical Impact Files, 2008-2015.

31.     As of 2015, the top five hospitals systems, in order of number of hospitals in Northern California are: (a) Sutter, with 22 hospitals; (b) Dignity Health, with 14 hospitals; (c) Adventist, with seven hospitals; (d) St. Joseph Health System, with five hospitals; and (e) Tenet Healthcare, with three hospitals.[72] Exhibit 3A shows the distribution of all Northern California systems, based on their number of hospitals in Northern California, and Exhibit 3B shows the distribution of all Northern California systems, based on their number of hospital beds in Northern California.[73] By both metrics, Sutter is the largest health system in Northern California with which health plans like Anthem and Blue Shield can contract.

---

[72] Chipty Workpapers.

[73] Systems were defined based on each hospital's system name from the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, which is populated for all systems with at least three hospitals. *See* Appendix C and Chipty Workpapers.

**Exhibit 3A**
**Northern California Hospital Systems in 2015,**
**Based on Number of Hospital**



*Note*: *See* notes for Exhibit 2.

*Source*: *See* sources for Exhibit 2.

**Exhibit 3B**
**Northern California Hospital Systems in 2015,**
**Based on Hospital Beds**



*Note*: *See* notes for Exhibit 2.

*Source*: *See* sources for Exhibit 2.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

### D.    Sutter Health

32.    Sutter is a health system headquartered in Sacramento. Sutter consists of a network of hospitals, physician organizations, surgery centers, home health and hospice programs, medical research facilities, training programs, and specialty services, serving communities in Northern California cities and towns. Sutter reports that it owns and operates: (a) 24 hospitals; (b) a network of about 5,500 physicians; (c) about 35 outpatient surgery centers; (d) about five acute rehabilitation centers; (e) seven behavioral health centers; (f) about 30 urgent care centers; and (g) about ten walk-in-clinics.[74]

33.    Exhibit 4 shows a list of all Sutter hospitals, along with each hospital's: (a) location; (b) bed count; and (c) description in the Complaint as a "Tying," "Tied," or "Other" hospital. As seen here, the largest Sutter hospital is CPMC, located in San Francisco; it has three campuses – Davies, Pacific, and California (referred to collectively as "CPMC") – which report jointly to OSHPD, as well as the St. Luke's campus, which reports separately. The next largest Sutter hospital is Sutter Sacramento, in Sacramento, which was previously composed of two campuses: Sutter Memorial and Sutter General. The third largest Sutter hospital is Alta Bates Medical Center ("Alta Bates"), located in Alameda County. Alta Bates has three campuses – the Alta Bates main campus located in Berkeley, the Herrick campus in Berkeley, and the Summit campus located in Oakland. (I refer collectively to the first two as "Alta Bates-Main" and to the third as "Alta Bates-Summit.") Exhibit 5 shows a map of the Sutter hospitals.

---

[74] Sutter Health, "What is Sutter Health" available at https://www.sutterhealth.org/about/what-is-sutter-health, *site visited* May 17, 2018.

**Exhibit 4**
**Sutter Hospitals**

| Hospital | HSA(s) | County | Beds | Complaint |
|----------|--------|--------|------|-----------|
| CPMC | San Francisco | San Francisco | 970 | Tied |
| Sutter Sacramento | Sacramento | Sacramento | 754 | Tied |
| Sutter Modesto | Modesto | Stanislaus | 423 | Tied |
| CPMC-St. Luke's | San Francisco | San Francisco | 229 | Tied |
| Sutter Santa Rosa | Santa Rosa | Sonoma | 135 | Tied |
| Alta Bates-Main | Berkeley - Oakland | Alameda | 527 | Tying |
| Alta Bates-Summit | Berkeley - Oakland | Alameda | 399 | Tying |
| Sutter Delta | Antioch | Contra Costa | 145 | Tying |
| Sutter Tracy | Tracy | San Joaquin | 82 | Tying |
| Sutter Auburn | Auburn | Placer | 78 | Tying |
| Sutter Coast | Crescent City | Del Norte | 59 | Tying |
| Sutter Amador | Jackson | Amador | 52 | Tying |
| Sutter Davis | Davis | Yolo | 48 | Tying |
| Sutter Lakeside | Lakeport | Lake | 37 | Tying |
| Peninsula Medical Center | Burlingame | San Mateo | 376 | Other |
| Sutter Roseville Medical Center | Roseville | Placer | 328 | Other |
| Eden Medical Center | Castro Valley | Alameda | 271 | Other |
| Sutter Solano Medical Center | Vallejo | Solano | 102 | Other |
| San Leandro Hospital | San Leandro | Alameda | 93 | Other |
| Novato Community Hospital | Novato | Marin | 47 | Other |
| Memorial Hospital Los Banos | Los Banos | Merced | 46 | Other |
| Sutter Maternity & Surgery Center | Santa Cruz | Santa Cruz | 30 | Other |
| Menlo Park Surgical Hospital | Stanford | San Mateo | 16 | Other |

*Note*: San Leandro Hospital was sold by Sutter Health in 2013.

*Sources*:
1. California Office of Statewide Health Planning and Development (OSHPD), 2011 Pivot Profiles.
2. Dartmouth Atlas of Healthcare Hospital Service Area (HSA) Listings.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

**Exhibit 5**
**Map of the Sutter Hospitals**



*Sources*:

1. Shapefile Sources: US Census Bureau, Google Maps.

2. Hospital Locations: OSHPD Hospital Annual Financial Disclosure Pivot Profile Data, 2011.

### E.    California Health Plans

34.    Most California residents who have health insurance through a commercial health plan are covered under an employer's self-insured or fully-insured product.[75] With a fully-insured product, employers pay a premium to a health plan that underwrites the risk and assumes full financial responsibility should employees need medical services. There are dozens of commercial health plans in the state of California selling fully-insured products to subscribers. Exhibit 6 shows the top-ten, non-Kaiser health plans in California in terms of fully-insured plan members as of December 2016. Of these, Blue Shield and Anthem are the largest, collectively serving about 60 percent of non-Kaiser plan members. Blue Shield, Anthem, United, Health Net, and Aetna – the health plans whose executives' testimony I have reviewed regarding the importance of Sutter to the success of their provider networks – account for nearly 90 percent of all non-Kaiser plan members in California.

**Exhibit 6**
**Top-Ten Commercial Health Plans in California**
**December 2016**

| Health Plan | Fully-Insured Members | % | Fully-Insured + ASO Members | % |
|---|---|---|---|---|
| Blue Shield | 2,410,961 | 31% | 3,173,814 | 24% |
| Anthem | 2,376,980 | 30% | 5,033,142 | 38% |
| UnitedHealth | 758,917 | 10% | 1,571,485 | 12% |
| Centene (Health Net) | 731,530 | 9% | 731,530 | 5% |
| Aetna | 568,025 | 7% | 1,247,330 | 9% |
| CIGNA | 310,883 | 4% | 900,057 | 7% |
| Sharp | 130,457 | 2% | 130,457 | 1% |
| Western Health Advantage | 128,401 | 2% | 128,401 | 1% |
| Western Growers | 65,105 | 1% | 65,105 | 0% |
| Molina | 62,735 | 1% | 62,735 | 0% |
| Other (N = 100) | 267,504 | 3% | 282,078 | 2% |

*Notes*:

1. These data reflect non-Kaiser commercial enrollments from both DHMC's Enrollment Summary reports and CDI's Covered Lives Reports.

---

[75] Self-insured employers assume the financial responsibility for paying claims and contract with health plans for access to the health plans' provider networks and administrative services; these plans are referred to as "administrative services only" ("ASO"). Although self-insured plan members are not Class members, as defined in the Complaint, they are part of the market definition because health plans negotiate with hospitals simultaneously for both fully-insured and self-insured members. *See* Cothran, Josh, "The Private Insurance Market in California, 2015," *California Healthcare Foundation*, available at https://www. chcf. org/publication/the-private-insurance-market-in-california-2015/, *site visited* March 17, 2018 (hereafter "Cothran").

2. Enrollment figures for Centene and Health Net are combined, because Centene acquired Health Net in March 2016.

*Source*: California Health Insurers Enrollment Database, Reporting by DMHC & CDI, 2012-2016.

35.     In California, regulatory oversight of health plans is handled by two separate entities: (a) the DMHC that oversees HMOs; and (b) the CDI that oversees traditional health insurance products.[76] Both agencies focus on consumer rights and the stability of the healthcare delivery system in California.[77] As part of this mission, both agencies oversee the financial ability of health plans to pay claims, and both require health plans to adhere to network adequacy standards under which health plans must provide hospital services within 30 minutes or 15 miles of a member's residence or workplace.[78]

### F.     Challenged Contractual Provisions in Sutter's Systemwide Contracts with Health Plans

36.     Plaintiffs in this case challenge Sutter's contracting practices with Blue Shield, Anthem, United, Health Net and Aetna.[79] The existence of these contracting practices was

---

[76] California Health Care Foundation, "Insurance Markets," June 2003, available at https://www.chcf.org/wp-content/uploads/2017/12/PDF-HIMURegulatoryOversight.pdf, *site visited* March 18, 2018 (hereafter "CHCF Insurance Markets").

[77] Hansen, John, "The Department of Managed Health Care Regulates California Health Plans and Protects Consumers," *Health for California Insurance Center* (hereafter "DMHC Regulates"), July 21, 2016, available at https://www.healthforcalifornia.com/the-department-of-managed-health-care-regulates-california-health-plans-protects-consumers, *site visited* April 12, 2018; and CHCF Insurance Markets, p. 3.

[78] DMHC Regulates ("The department gets its authority from the Knox Keene Health Care Service Plan Act of 1975"); "§ 1300.51. Application for License as a Health Care Service Plan or Specialized Health Care Service Plan," 28 CCR § 1300.51, available at https://govt.westlaw.com/calregs/Document/IBCF3D0D0D44911DEB97 CF67CD0B99467?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPageItem&con textData=(sc.Default), *site visited* May 23, 2018; and California Department of Insurance, "Provider Network Adequacy," available at http://www.insurance.ca.gov/01-consumers/110-health/10-basics/pna.cfm, *site visited* April 12, 2018.

[79] Complaint ¶¶ 1,13.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

confirmed by representatives of each of the health plans.[80],[81] There are two main provisions that are central to Plaintiffs' theory of harm:

- First, Sutter forces health plans to take all Sutter hospitals in network, either by imposing explicit "all-or-nothing" requirements or by imposing exorbitant out-of-network rates for non-participating hospitals.[82]

- Second, Sutter deters health plans from engaging in benefit design that has the effect of steering some of their members to lower-cost providers that participate in their provider networks.[83]

### G.    Plaintiffs' Theory of Harm

37.    According to Plaintiffs, Sutter has two types of hospitals. The first are hospitals that health plans could exclude from their provider networks, at least for some insurance products. These are the "Tied" hospitals of: (a) Sutter Sacramento; (b) CPMC; (c) Sutter Modesto; and (d) Sutter Santa Rosa.[84] The second are hospitals that health plans need to include in provider networks, because there are no or few workarounds to those hospitals from the perspective of a significant number of plan members. These are the "Tying" hospitals of: (a) Alta Bates; (b) Sutter Lakeside; (c) Sutter Amador; (d) Sutter Coast; (e) Sutter Delta; (f) Sutter Auburn; (g) Sutter Tracy; and (h) Sutter Davis.[85]

38.    According to Plaintiffs, Sutter's ability to force health plans into onerous contracts stems from health plan demand for its Tying hospitals, located in various Tying

---

[80] For Blue Shield, *see* Joyner Declaration, ¶ 15, referencing Joyner Exhibit 1, "Blue Shield's systemwide agreement with Sutter from 2002," ("With respect to Existing Plans and New Plans in which [Sutter] Providers participate, [Blue Shield] or Other Payor, whichever is applicable, shall include all [Sutter] Providers in the Plan, unless the Parties mutually agree otherwise…."); Joyner Declaration, ¶ 18 (explaining that Sutter imposed requirements prohibiting benefit design that would steer volume away from Sutter beginning in 2004); Joyner Declaration, ¶ 37 ("Effective January 1, 2005, Hospital Providers shall be paid ninety-five percent (95%) of Billed Charges, less a Member's applicable co-payment or cost-share, for services rendered to Members enrolled in any Benefit Program (excluding Medicare + Choice Members) in which a Hospital Provider does not participate.").

[81] For Anthem, *see* Melody Declaration, ¶ 12 (referencing Anthem's systemwide agreement with Sutter from 2001); *see also* De La Torre Declaration, ¶¶ 12-13, 20 (referencing De La Torre Exhibit 7, Anthem's systemwide agreement with Sutter from 2012.).

[82] Complaint ¶¶ 33-34. Sutter required health plans to pay between 95 percent and 100 percent of billed charges (referred to as "non-par" rates) for out-of-network care.

[83] Complaint ¶¶ 40-43.

[84] Complaint ¶¶ 64-67.

[85] Complaint ¶¶ 56-63.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**          29

Markets. Thus, Sutter is alleged to have abused its market power in the Tying Markets to extract higher prices from health plans in the Tied Markets, where Sutter does not have the same market power. In the remainder of this report, I assess whether Plaintiffs' proposed Tied and Tying Markets constitute economically coherent antitrust markets. I also assess whether Sutter has market power in the Tying Markets, relative to the Tied Markets, and whether these conclusions are sensitive to the exact boundaries of the relevant geographic markets.

## IV.   Antitrust Principles of Market Definition

39.     As matter of economics, market definition in antitrust analysis is intrinsically related to the alleged conduct and the theory of harm. Market definition done well can: (a) inform on the issue of whether the firm alleged to have engaged in the misconduct, Sutter in this case, has market power over some relevant antitrust markets; and (b) delineate the boundaries of the relevant antitrust markets where the defendant's conduct has interfered with the competitive process, resulting in higher prices or some other form of consumer harm. For these reasons and in response to the assertions made by Sutter and their expert Professor Gowrisankaran, I study whether the Tied and the Tying Markets described in the Complaint constitute economically coherent antitrust markets for the sale of inpatient hospital services purchased by commercial health plans.

### A.     *Basics of Market Definition*

40.     At the center of market definition is the study of the choices that are available to consumers.[86] Here, the immediate consumers of inpatient hospital services, like those offered by Sutter, are the non-Kaiser health plans selling fully-insured and self-insured products to subscribers living in various areas of Northern California.[87] A relevant antitrust market for evaluating competitive effects is found by considering where health plans might reasonably turn to defeat an attempted price increase by a hypothetical monopolist over hospitals in a candidate geographic market. If health plans could credibly switch away to hospitals outside of the candidate market, in response to a price increase at hospitals inside the candidate market, the

---

[86] *Merger Guidelines* §4 ("Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service.").

[87] Vistnes (2000), p. 672 ("In this two-stage model, the customer in the first stage is the health plan.").

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

relevant antitrust market would likely be broader than the candidate market. A health plan's ability to switch away from area-hospitals depends on the preferences of its plan members. The more insistent are plan members to area-hospitals, the less likely it would be that a provider could credibly exclude area-hospitals from its provider network.[88] Furthermore, a health plan's ability to exclude a hospital from its provider network may also be affected by network adequacy regulations. Where a hospital is the only hospital (*e.g.* Sutter Coast) within 30 minutes of a plan member's residence, health plans wishing to market a provider network to those residents will not be able to exclude the hospital from its provider network.[89] Thus, at the center of hospital market definition is evidence about health plans' ability to contract around individual hospitals or hospital systems.

41.     There are two dimensions of a relevant market: product market and geographic market. The market definition test of the *Merger Guidelines* is whether a profit-maximizing hypothetical monopolist over the set of products or geographies in the candidate market would impose at least a small but significant, non-transitory increase in price ("SSNIP") on at least one product in the market.[90] In conduct cases, like this one, one must be cautious in implementing the formal test in situations where a firm has already behaved like a monopolist. Where the market is already at the monopoly price, one would necessarily find no room to raise price; ignoring this feature of the market would lead to what is known as the Cellophane fallacy, which would result in an overly broad market.[91]

---

[88] As explained by the Third Circuit in *Hershey-Pinnacle*, "Patients are relevant to the analysis, especially to the extent that their behavior affects the relative bargaining positions of insurers and hospitals as they negotiate rates. But patients, in large part, do not feel the impact of price increases. Insurers do. And they are the ones who negotiate directly with the hospitals to determine both reimbursement rates and the hospitals that will be included in their networks." *See* Hershey-Pinnacle Appellate Decision, pp. 22-23.

[89] As described above, both DMHC and CDI require health plans to adhere to network adequacy standards under which health plans must provide hospital services within 30 minutes or 15 miles of a member's residence or workplace. Accordingly, in areas where Sutter is the only hospital within a 30-minute radius of a member's residence, health plans will need to contract with the local Sutter hospital in order to have a provider network to sell to residents in those areas.

[90] *Merger Guidelines*, §4.1.1 ("Specifically, the [hypothetical monopolist] test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ('hypothetical monopolist') likely would impose at least a small but significant and non-transitory increase in price ('SSNIP') on at least one product in the market, including at least one product sold by one of the merging firms.").

[91] *Merger Guidelines*, Footnote 5 ("Market definition for the evaluation of non-merger antitrust concerns such as monopolization or facilitating practices will differ in this respect if the effects resulting from the conduct of concern are already occurring at the time of evaluation."). *See also*, Froeb, Luke and Gregory Werden, "The Reverse Cellophane Fallacy in Market Delineation," *Review of Industrial Organization*, Vol. 7, No.2, 1992, pp. 241-247, at

42.     Where possible, the market definition test is implemented in an iterative fashion. One begins with a candidate market and evaluates whether a hypothetical monopolist would impose at least a SSNIP. The price increase would be unprofitable if it drives too many sales out of the candidate market. In this case, one expands the candidate market to include additional products or geographies. A finding that a profit-maximizing hypothetical monopolist could impose at least a SSNIP would be evidence that the candidate market is a relevant market. Notably, a well-defined antitrust market can have inflows and outflows; the market definition test provides a framework to assess whether those flows are sufficient to defeat a hypothetical monopolist's imposition of a SSNIP. Attempts to interpret patient flows outside of the framework of the hypothetical monopolist, as Professor Gowrisankaran has done, can lead to misleading interpretation.

43.     Market definition is not a precise exercise. Such analyses inherently involve some degree of uncertainty. For this reason, antitrust economists recognize that relevant markets "need not have precise metes and bounds," particularly when the economic conclusions are robust to alternative definitions.[92] Consistent with this view, Professor Gowrisankaran himself explained that a "market analysis does not always yield only one market definition that is accurate. It might yield a couple of different market definitions that could each be plausible. …[W]hat's important here is not saying well, we want to have an airtight definition of a market, but rather that [one] identifies likely potential competitors … [that are] important in assessing whether the potential act or – or acts do, in fact, violate the antitrust laws."[93] In other words, what is important is that one's conclusions about competitive effects and harm to competition are robust to reasonable alternatives to the precise boundaries of the relevant market. Furthermore,

---

241 ("In the landmark Cellophane case, the Supreme Court erroneously concluded that du Pont did not have significant market power because the Court evaluated the elasticity of demand for Cellophane at the monopoly equilibrium, at which the elasticity was far higher than at the competitive equilibrium. The Court's error is commonly referred to as the Cellophane fallacy.").

92 *Merger Guidelines*, §4 ("Customers often confront a range of possible substitutes for the products of the merging firms. Some substitutes may be closer, and others more distant, either geographically or in terms of product attributes and perceptions. Additionally, customers may assess the proximity of different products differently. When products or suppliers in different geographic areas are substitutes for one another to varying degrees, defining a market to include some substitutes and exclude others is inevitably a simplification that cannot capture the full variation in the extent to which different products compete against each other. The principles of market definition outlined below seek to make this inevitable simplification as useful and informative as is practically possible. Relevant markets need not have precise metes and bounds.").

93 Gowrisankaran Deposition, p. 110.

as a matter of economics, where there is direct evidence of market power, one may not need to rely on market definition to assess market power.[94]

### B.   *Economic Insights on Defining Hospital Antitrust Markets from the Literature*

44.     The evidence shows that most patients seek care near where they live. Nationwide, people generally travel about 20 minutes to see a doctor.[95] On average, people commute farther to work than they do to receive medical care.[96] Academic literature on hospital choice indicates that a small increase in travel time is typically associated with a large decrease in the probability that a patient will visit a hospital. For example, Professor Gowrisankaran himself explains in his academic work that: "Consistent with the large literature on hospital choice, we find that patients are very sensitive to travel times. The willingness to travel is increasing in the DRG weight and decreasing in age. An increase in travel time of 5 minutes reduces each hospital's share between 17 percent and 41 percent. The parameter estimates imply that increasing the travel time to all hospitals by one minute reduces consumer surplus by approximately $167."[97] Furthermore, some state health departments, including California's

---

[94] *Merger Guidelines* § 4 (explaining that "[s]ome of the analytical tools used by the Agencies to assess competitive effects do not rely on market definition," and "[e]vidence of competitive effects can inform market definition, just as market definition can be informative regarding competitive effects."). *See also*, Rosch, J. Thomas, "The Past and Future of Direct Effects Evidence," Remarks at ABA Section of Antitrust Law's 59th Spring Meeting Washington, DC, March 30, 2011 available at https://www.ftc.gov/sites/default/files/documents/public_statements/past-and-future-direct-effects-evidence/110330aba-directeffects.pdf, *site visited* May 17, 2018 ("Reliance on direct effects evidence offers a number of advantages over inferences drawn from market definition and concentration. Market definition, of course, is not an end in itself but rather an indirect means of determining the presence of market power or the likelihood that it will be exercised. Focusing on market definition risks obscuring the ultimate question… whether the transaction [or the practice] is likely to substantially lessen competition. The answer to that question may turn on market definition, but it doesn't have to…. Another benefit of direct effects evidence is its potential to help define the relevant market. I have described this as "backing into" the market definition.").

[95] Probst, Janice C., Sarah B. Laditka, Jong-Yi Wang, and Andrew O. Johnson, "Effects of Residence and Race on Burden of Travel for Care: Cross Sectional Analysis of the 2001 US National Household Travel Survey," *BMC Health Services Research*, Vol. 7, No. 40, 2007, pp. 1-13.

[96] Probst, Janice C., Sarah B. Laditka, Jong-Yi Wang, and Andrew O. Johnson, "Mode of Travel and Actual Distance Traveled for Medical or Dental Care by Rural and Urban Residents," *South Carolina Rural Health Research Center*, May 2006, pp. 1-61, available at http://www.sc.edu/study/colleges_schools/public_health/research/research_centers/sc_rural_health_research_center/documents/61modeoftravelandactualdistancetraveled2006.pdf, *site visited* October 17, 2017, at pp. 44-45.

[97] Gowrisankaran, Nevo, and Town (2015), at p. 191.

DMHC, as well as federal agencies, require or advocate network adequacy standards under which residents can obtain hospital care within a 30-minute drive of their residence.[98]

45.   Economists studying hospital competition in previous antitrust cases have typically defined the hospital geographic market to be no broader than a city or a metropolitan area.[99] For example, during the FTC's challenge to the proposed merger between the Advocate and NorthShore hospital systems, the FTC's economist observed that "most patients prefer to go to nearby hospitals" and that "80 percent of patients in NorthShore's service area drive 20 minutes or less (and 15 miles or less) to reach their hospital of choice."[100]

46.   While each case involves consideration of the unique circumstances of local competitive conditions, recent cases provide guidance on the methodology used to define relevant hospital markets. *See*, for example, the appellate decisions in *Advocate-NorthShore*,[101] *Hershey-Pinnacle*,[102] and *St. Luke's-Saltzer*.[103] The economic analyses described in these

---

[98] Chan, Leighton, L. Gary Hart, and David C. Goodman, "Geographic Access to Health Care for Rural Medicare Beneficiaries," *Journal of Rural Health*, Vol. 22, No. 2, Spring 2006, pp. 140-146; Bosonac, Edward M., Roslind C. Parkinson, and David S. Hall, "Geographic Access to Hospital Care: A 30-Minute Travel Time Standard," *Medical Care*, Vol. 14, No.7, July, 1976, pp. 616-624; and Department of Health and Human Services, Office of Inspector General, "State Standards for Access to Care in Medicaid Managed Care," OEI-02-11-00320, September, 2014.

[99] "Order Amending Opinion and Amended Opinion," *Cascade Health Solutions fka McKenzie-Willamette Hospital, an Oregon nonprofit corporation, Plaintiff-Appellant, v. PeaceHealth, a Washington State nonprofit corporation, Defendant-Appellee, and PacificSource Health Plans, Defendant, Regence BlueCross BlueShield of Oregon; Providence Health Plan, McKenzie-Willamette Regional Medical Center Associates, LLC, Defendant-Intervenors; McKenzie-Willamette Hospital, Plaintiff-Appellee, v. PeaceHealth, a Washington State nonprofit corporation, Defendant-Appellant, and PacificSource Health Plans, Defendant, Regence BlueCross BlueShield of Oregon, Providence Health Plan, McKenzie-Willamette Regional Medical Center Associates, LLC, Defendant-Intervenors; McKenzie-Willamette Hospital, Plaintiff-Appellee, v. PeaceHealth, a Washington State nonprofit corporation, Defendant-Appellant; McKenzie-Willamette Hospital, an Oregon nonprofit corporation, Plaintiff-Appellant, v. PeaceHealth, Defendant-Appellee*, Case Nos. 05-35627, 05-35640, 05-36153, and 05-36202, filed September 4, 2007, amended February 1, 2008, Section I.A (the relevant geographic market was "primary and secondary acute care hospital services in Lane County [Oregon]"); Hershey-Pinnacle Appellate Decision, p. 15 (the relevant geographic market was "the four counties encompassing and immediately surrounding Harrisburg, Pennsylvania: Dauphin, Cumberland, Lebanon, and Perry counties;"); Advocate-NorthShore Appellate Decision, p. 6 (the relevant geographic market was the "North Shore Area," an area encompassing eleven hospitals in and around Chicago's north shore).

[100] Advocate-NorthShore Appellate Decision, pp. 14, 17.

[101] Advocate-NorthShore Appellate Decision, pp. 14, 20-26.

[102] Hershey-Pinnacle Appellate Decision, pp. 11, 14-15, 21-23.

[103] "Opinion," *Saint Alphonsus Medical Center-Nampa Inc.; Saint Alphonsus Health System Inc.; Saint Alphonsus Regional Medical Center, Inc.; Treasure Valley Hospital Limited Partnership; Federal Trade Commission; State of Idaho; v. St. Luke's Health System Ltd.; St. Luke's Regional Medical Center, Ltd.; Saltzer Medical Group*, Case Nos. 1:12-cv-00560-BLW and 1:13-cv-00116-BLW, February 9, 2015 (hereafter "St. Luke's-Saltzer Appellate Decision"), pp. 22-23. ("The district court found that a hypothetical Nampa PCP monopolist could profitably impose a SSNIP on insurers. Citing testimony that Nampa residents 'strongly prefer access to local PCPs,' the court found

decisions highlight: (a) the importance of understanding health plans' need for area-hospitals (in *Advocate-NorthShore* and *Hershey-Pinnacle*) and area-physicians (in *St. Luke's-Saltzer*); (b) the insights that can and cannot be drawn from patient flows; and (c) the appropriate use of the hypothetical monopolist test to define geographic markets.

### C.    Approaches to Hospital Market Definition

47.    Following this literature, I evaluate the boundaries of the relevant geographic hospital market, for each of the Sutter hospitals, by studying: (a) qualitative information from health plans, including health plan ordinary-course documents and testimony, about the importance of certain hospitals to their members and, as such, to their provider networks; (b) data on how far patients drive and what share of area-patients leave the area for inpatient care; (c) data and ordinary-course analysis of diversion and aggregate diversion outside of the candidate market; and (d) assessment of patient flows and other evidence within the framework of the hypothetical monopolist test. Before turning to this evidence, I provide an overview of diversion analysis and the implementation of the hypothetical monopolist test.

### 1.    Diversion Analysis

48.    Hospital market definition typically begins with the analysis of what is widely described as "diversion."[104] Diversion describes where patients would go for care if their first-choice hospital were no longer available as a choice. The hospital that would capture the highest diversion is sometimes referred to as the "next-best substitute" for the first-choice hospital. The hospital that would capture the second-highest diversion is the next "next-best substitute" for the first-choice hospital, and so on. In a bargaining framework, the presence of a strong next-best substitute would give a health plan more leverage in negotiations with the first-choice hospital. If an area-hospital's next-best substitute is inside the candidate geographic market, then the more likely it is that the candidate geographic market is a relevant antitrust market. Conversely, if an

---

that "commercial health plans need to include Nampa PCPs in their networks to offer a competitive product.' 'Given this dynamic—that health plans must offer Nampa Adult PCP services to Nampa residents to effectively compete—Nampa PCPs could band together and successfully demand a [SSNIP] (or reimbursement increase) from health plans.'), pp. 13-15.

[104] Farrell *et al*., p. 275.

area-hospital's next-best substitute is outside the candidate geographic market, then the less likely it is that the candidate geographic market is a relevant antitrust market.

49.     Diversion analysis requires information on patient preferences for hospitals. Where there are multiple hospitals in a candidate geographic market, one can build a statistical model of patient choice and use the parameters of that model to compute diversion. Where there is only one hospital in the candidate geographic market, one needs additional insights into patient preferences to determine whether patients would remain at the area-hospital even if the area-hospital were to go out-of-network. I describe both approaches here.

### a)      Statistical Diversion Analysis

50.     Where there is more than one hospital in the candidate market, I estimate a widely-used, patient-level model of hospital choice among non-Kaiser hospitals that accounts for a broad set of observable factors, including: (a) patient characteristics, such as age, gender, income, and distance (in minutes) from different hospital choices; (b) patient's medical need; (c) hospital characteristics, including whether the hospital is a teaching hospital, whether it is a designated trauma facility, and whether it offers the medical services the patient needs. The model results are economically meaningful and consistent with prior literature.[105] For example, I find that patients dislike travelling longer distances and that patients are more willing to travel longer distances when they have a strong reason to travel (*e.g.* to access medical services that are not available locally or that better match their medical need).[106] The model results are also robust to a range of alternative modelling decisions. A detailed description of the analysis dataset, the hospital choice model, and the results of the econometric estimation are presented in Appendix C.

51.     Using these results, I estimate the utility that each patient would obtain from each hospital and predict patient choice for any set of hospitals. I then conduct a diversion analysis,

---

[105] Ho, Kate and Robin Lee, "Supplement to 'Insurer Competition in Health Care Markets,'" *Econometrica*, Vol. 85, No. 2, 2017, pp. 1-10, at pp. 1, 3 (finding that patients dislike more distant hospitals and prefer hospitals with matching clinical characteristics); and Lewis, Matthew and Kevin Pflum, "Diagnosing Hospital System Bargaining Power in Managed Care Networks," *American Economic Journal: Economic Policy*, Vol. 7, No. 1, 2015, pp. 243-274, at p. 261 (with similar qualitative results).

[106] Farrell *et al.*, p. 277.

which is a counterfactual experiment in which I remove the predicted first-choice hospital from each patient's choice set and ask: where would that patient go instead?[107] For each candidate Tied or Tying Market, where there is more than one non-Kaiser hospital in the candidate market, I compute for each area-resident the probability of choosing each alternative hospital. I also compute "aggregate diversion inside:" the share of area-residents predicted to go to one of the area-hospitals who would substitute to one of the other area-hospitals if their first-choice hospital were no longer available. As an illustration, suppose that there were: (a) two area-hospitals; (b) 60 area-patients predicted to receive care at the first area-hospital; and (c) 40 area-patients predicted to receive care at the second area-hospital. Further suppose that the model predicts that of the 60 area-patients for whom the first area-hospital was the best hospital choice, 50 would go to the second area-hospital if the first one were no longer available to them and 10 would go to an out-of-area hospital. Also suppose that the model predicts that of the 40 area-patients for whom the second area-hospital was the best hospital choice, 20 would go to the first area-hospital if the second one were no longer available to them and 20 would go to an out-of-area hospital. In this example, the "aggregate diversion inside" would be 70 percent, calculated as (50 + 20) ÷ 100.

52.     As a matter of economics, a relatively high aggregate diversion inside indicates that the area-hospitals' strongest substitutes are located inside the area, making it more likely that the candidate geographic market is a relevant antitrust market. For example, in *Advocate-NorthShore*, a recent hospital matter to which Professor Gowrisankaran cites, the FTC's expert found (and the court accepted) that aggregate diversion inside was 48 percent and that this number, coupled with other evidence, supported the FTC's geographic market definition in that case.[108]

---

[107] Farrell *et al.*, pp. 275-277 (explaining that the use of individual patient-level characteristics as control variables in the choice model enables identification of the variation in valuation of product characteristics across patients: "Hence, the model generates reasonable substitution patterns in that hospitals that are closer in product characteristics space to the hypothetically excluded hospital are predicted to capture a disproportionate (relative to observed shares) share of the diverted patients.").

[108] "Redacted Memorandum Opinion and Order," *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, et al.,* Case No. 15 C 11473, March 16, 2017, p. 9 ("48% of the patients admitted to one of the [hospitals in the candidate geographic market] would substitute to one of the other hospitals in the [candidate geographic market] if their chosen hospital were no longer available."), and p. 14 ("Dr. Tenn has appropriately delineated the relevant geographic market.").

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

53.     In addition to aggregate diversion inside that captures the diversion from all hospitals in a candidate geography, the statistical model can also be used to calculate the full set of diversion ratios that describe diversion from each Sutter hospital to all other hospitals, including ones outside of the candidate market. The diversion ratio from one hospital to another hospital is defined as the share of the first hospital's patients who would substitute to the second hospital if the first hospital were not available. These diversion ratios are used in the hypothetical monopolist test described below.

<em>b)     Blue Shield Redirection Analysis</em>

54.     Where there is only one hospital in the candidate market, patients predicted to receive care from the single area-hospital can only divert to out-of-area hospitals, and the statistical model would necessarily find that none of these patients would substitute to another area-hospital if their first-choice hospital were no longer available. This result, however, would be an artifact of there being no other hospitals in the candidate market and, by construction, the aggregate diversion inside would necessarily be zero. In this case, the approach described above cannot provide insight into patient preferences for staying local. In this case, I rely upon estimates of diversion constructed in the ordinary-course by personnel at Blue Shield, who studied where patients would likely redirect to receive inpatient care if their chosen Sutter hospital were no longer in network.[109] This type of information, upon which market participants make real-world decisions that affect their business, can be highly probative and is often used by antitrust economists to understand competitive dynamics.[110]

55.     I understand that the Blue Shield redirection analyses were created under the supervision of Blue Shield's Tracy Barnes, for the purpose of ████████████████████ ████████████████████████████████████████████████████████████████████[111]

---

[109] BSC_SutterSub00037814; and Barnes Deposition, pp. 423-468.

[110] *Merger Guidelines*, § 2.2.1 ("Documents created in the normal course are … probative…. Documents describing industry conditions can be informative regarding the operation of the market and how a firm identifies and assesses its rivals, particularly when business decisions are made in reliance on the accuracy of those descriptions.").

[111] Barnes Deposition, p. 426 ("This [referring to the redirection analysis] was done in 2014 based on some other work we were doing as part of our Sutter renewal. Whenever we have a Sutter renewal, we have to, as I discussed yesterday, filed transition and ████████████████████████████████████████████████████ ████████████████████████████████████████")

<strong>FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER</strong>          38



Using their experience in building provider networks and their knowledge of the Northern California marketplace, including information about hospital quality, member preferences, distance to other hospitals, and California's regulatory access standards,[112] Mr. Barnes and his team determined the share of claim expenditures that could be diverted to alternative hospitals if Sutter were to go out-of-network.[113] For example, the Blue Shield team determined that, if ███ ████ were to go out-of-network with Blue Shield, ██ percent of claims could be moved to ████████████████████████████ but the remaining ██ percent would stay at ████████████ in spite of any efforts Blue Shield might make to incent patients to switch away.

56.     A key difference between the statistical model and Blue Shield's redirection analysis is the treatment of the first-choice hospital in the counterfactual analysis. The statistical model removes the chosen hospital from the patient's choice set; this removal is akin to shutting the hospital down, or equivalently raising its price by a very large amount. The Blue Shield redirection analysis moves the hospital to an out-of-network status, but it keeps the hospital open and available to patients, though at a higher price; this move raises the price of the preferred hospital, but by less than it would take to shut the hospital down. Both counterfactuals are informative in their own way.

### 2.     Hypothetical Monopolist Test

57.     Where possible, one can use the framework of the hypothetical monopolist test to evaluate if the diversion, redirection patterns, or other evidence support a relevant antitrust market. Recall that the hypothetical monopolist test asks whether a profit-maximizing hypothetical monopolist over the set of hospitals in the candidate geography would engage in at least a small but significant, non-transitory increase in price ("SSNIP"). If the answer is yes, that means health plans cannot work around the area-hospitals and that hospitals outside of the

---

[112] Barnes Deposition, p. 440: 5-16 ("Q: And could you describe for us, please, the criteria that you used in coming up with these percentages? A: There is no, you know, set criteria. This is nothing out there that there is any sources. At the end of the day you have got to use your experience of the marketplace and understanding of which hospitals are complimentary, how far apart they are from one another, preferences of members. I could have hospitals right next door to each other, but if one had a very bad reputation you are not going to be able to channel there.").

[113] This analysis was done in two steps. First, Mr. Barnes and his team determined the set of claims that could be redirectable, and of those, how many would likely be redirected. ████████████████████████████████████ *See* Barnes Deposition, p. 388.

candidate market cannot discipline the hypothetical monopolist. In such cases, the candidate market is an economically coherent relevant antitrust market. If the answer is no, then one must go broader and re-assess.[114]

### a)    Inferences Using the Diversion Analysis

58.    Where there is more than one hospital in a candidate market, I can draw inferences about market definition by computing the optimal price increase, above current levels, that the hypothetical monopolist would impose over its hospitals in the candidate geography. Following the FTC's economic analysis in Advocate Northshore, I consider the outcome of negotiation between health plans and hospitals in a simplified bargaining framework. In Appendix D, I show that in such a simplified bargaining model, a hypothetical monopolist would find it profit-maximizing to impose the following price increase on each of its hospitals in the candidate market: [115],[116] This optimal price is found by comparing the current price level ($p^0$) to the hypothetical monopolist's optimal price level ($p^*$) and solving for the percentage change in price:

$$\%\Delta p_1 = \frac{(p_1^* - p_1^o)}{p_1^o} = \frac{1}{2}\sum_{i=2}^{n} M_i D_{1i} \frac{p_i}{p_1^o}$$

The expression $\frac{(p_1^* - p_1^o)}{p_1^o}$ represents the profit-maximizing price increase (or SSNIP) imposed by the hypothetical monopolist on hospital 1, where hospital $i$ is one of the other in-area hospitals,

---

[114] Katz, Michael L., and Carl Shapiro, "Critical Loss: Let's Tell the Whole Story," *Antitrust Magazine*, Spring 2003, pp. 49-56, available at https://faculty.haas.berkeley.edu/shapiro/critical.pdf, *site visited* May 22, 2018, at 49 ("In performing successive iterations of the price increase test, the hypothetical monopolist will be assumed to pursue maximum profits in deciding whether to raise the prices of any or all of the additional products under its control. This process will continue until a group of products is identified such that a hypothetical monopolist over that group of products would profitably impose at least a 'small but significant and nontransitory' increase, including the price of a product of one of the merging firms.").

[115] This is a well-accepted framework, which has been used to study competitive effects in a broad range of applications, including recently by the FTC's expert in the *Advocate-NorthShore* hospital merger matter. *See* "Brief and Required Short Appendix of Appellants Federal Trade Commission and State of Illinois (Public Version)," *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, et al.,* Case No. 16-2492, filed July 15, 2016, pp. 16-17. *See also*, Tenn, Steven, "Key Takeaways from the Advocate-Northshore Merger Litigation," *CPI Antitrust Chronicle*, July 2017, pp. 1-6 (hereafter "Tenn (2017)"), at p. 4 ("Plaintiffs relied on an economic model which takes as inputs the key factors that the Merger Guidelines identify as those which determine the incentive to raise price post-merger: the degree of substitution between the parties and variable cost margins.").

[116] Without loss of generality, the formula expresses the price increase that would be profitable for hospital 1. *See* Appendix D.

$M_i$ is the variable contribution margin (i.e., the difference between revenue and variable costs for inpatient services provided to commercial patients) of hospital $i$, $\frac{p_i}{p_1^o}$ represents the price of hospital $i$ relative to hospital 1, and $D_{1i}$ is the diversion ratio from hospital 1 to hospital $i$.

59.    As seen through the terms of the equation above, the optimal price increase is determined by a combination of: (a) the diversion from hospital 1 to each area-hospital $i$; (b) the price of each area-hospital $i$, relative to the price of hospital 1; and (c) the variable contribution margin of each area hospital $i$. The hypothetical monopolist finds it profitable to impose a larger price increase on the price of hospital 1:

- The larger is diversion ratio to in-area hospital $i$. A larger diversion between hospital 1 and hospital $i$ indicates that more of the lost patient volume from hospital 1 is captured by hospital $i$, meaning that more of the price-induced substitution effect will be internalized by the hypothetical monopolist.

- The larger is the contribution margin of hospital $i$. If the hospital capturing the patient volume were more profitable, the hypothetical monopolist would profit more from the price increase at hospital 1 for the patients it loses to hospital $i$.

- The more expensive is hospital $i$ (i.e., the higher is hospital $i$'s price, relative to hospital 1). If the in-area hospital capturing the patient volume were more expensive, relative to hospital 1, the hypothetical monopolist would be better off than it was before, for the patients it loses to hospital $i$.

60.    The hospitals in the candidate geography would constitute a relevant market if:

$$\%\Delta p_1 \geq s$$

where $s$ is the "small but significant, non-transitory increase in price" threshold used for market definition.[117] By traditional metrics, a value of $\%\Delta p_1$ greater than five percent would lead to the conclusion that the candidate market is a relevant market.

---

[117] Moresi, Serge, "The Use of Upward Price Pressure Indices in Merger Analysis," *The Antitrust Source*, February 2010, pp. 1-12, available at https://www.americanbar.org/content/dam/aba/publishing/antitrust_source/ Feb10_Moresi2_25f.authcheckdam.pdf, *site visited* November 27, 2017, at p.7.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

61.     I can obtain the inputs sufficient to implement the calculation for each of the candidate markets with more than one non-Kaiser hospital. Diversion ratios are calculated using the estimation results of the patients' choice model described above. Relative prices are obtained from Anthem claims data. Hospital-specific contribution margins for commercial patients are available only for Sutter hospitals, through Sutter documents. Thus, I use the local Sutter hospital contribution margin as a proxy for the local non-Sutter hospital contribution margin, though my conclusions are robust to contribution margins substantially lower than Sutter's margins.

<em>b)     Inference Using Testimony and Ordinary-Course Evidence</em>

62.     The standard diversion analysis and the numerical calculation described above cannot be used to determine the boundaries of a relevant market when there are no other hospitals in a candidate geography. In such cases, diversion to hospitals outside of the candidate geography is necessarily higher because patients have no other in-area alternatives; for this reason, the analysis could lead to the conclusion of a broader geographic market. Furthermore, where the hypothetical monopolist is an actual monopolist, the numerical calculation would suffer from the Cellophane fallacy and lead to a false rejection of the candidate market as the relevant antitrust market. In such instances, one can still rely on other evidence, including testimony and document evidence, to determine whether a hypothetical monopolist over hospitals in a candidate market could create a viable provider network without some set of area hospitals. If the answer to this question is no, one can conclude that the hypothetical monopolist would have market power over health plans and that the candidate market would be a relevant market.

63.     For example, one can draw inferences about the hypothetical monopolist test from the Blue Shield redirection analysis, described above. This analysis provides information on diversion patterns in response to moving individual Sutter hospitals out of network.[118] In this case, the hypothetical monopolist's price increase is replaced by the increase in out-of-pocket expenses associated with movement of a previously in-network hospital to out-of-network status,

---

[118] Barnes Deposition, pp. 423-468.

which I understand can be substantially larger than five-percent.[119,120] Nonetheless, the Blue Shield redirection analysis shows that patients are highly unlikely to move away from their local Sutter hospital in response to price increases well in excess of a SSNIP. The later sections of this report use this information, along with other testimony and documentary evidence, to draw inferences about the boundaries of the geographic market.

*** 

64.     The methods upon which I rely – ordinary-course documents, health plan testimony, patient flows, diversion analysis, and the framework of the hypothetical monopolist test – stand in contrast to Professor Gowrisankaran's approach. Professor Gowrisankaran has ignored ordinary-course documents and health plan testimony about the importance of Sutter to their provider networks.[121] He has not undertaken diversion analysis, based on patient-level hospital choice modelling, that has become standard in hospital market definition. Instead, he has interpreted patient flows without the framework of the hypothetical monopolist test. One cannot reject a candidate market as a relevant market, as Professor Gowrisankaran has done, simply because some patients leave the candidate market for their hospital care.[122] To do so would be to fall into the trap of the "silent majority" fallacy. As explained above, this term refers to the error a researcher might commit by concluding that the presence of travelers disciplines a local hospital's market power over the non-travelers.[123] As explained by the court in *Advocate-NorthShore*, it is a mistake to "focus on the patients who leave a proposed market instead of on hospitals' market power over the patients who remain."[124] Professor Gowrisankaran has studied

---

[119] *Merger Guidelines*, §4.1.2 ("The Agencies most often use a SSNIP of five percent of the price paid by customers for the products or services to which the merging firms contribute value.").

[120] *See*, for example, Aetna Inc., "Save money with Aetna's provider network," available at http://www.aetna.com/individuals-families-health-insurance/document-library/2012-aetna-provider-network.pdf, *site visited* April 6, 2018 (describing that the costs to the patient for receiving out-of-network care are more than eleven times the cost for receiving care from an in-network alternative.).

[121] Gowrisankaran Deposition, p. 83.

[122] To do so would require a basis to conclude that the actual travel habits of some consumers would be predictive of the travel habits of others, in response to a price increase by a hypothetical monopolist. *See* Capps *et al.* p. 1 ("[I]f travelers and non-travelers display fundamentally different demand behavior, either because they differ in their taste for travel or their need for local/non-local services, then there is no necessary relationship between the market experiences of these two groups post-merger.").

[123] Capps *et al*., p.1 ("If travelers differ significantly from non-travelers, then the presence of a minority of travelers does not imply that local firms lack market power *vis-à-vis* the majority of consumers who are non-travelers.").

[124] Advocate-NorthShore Opinion, pp. 25-26.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**          43

patient flows without the framework of the hypothetical monopolist test, which has led him to commit the error of ignoring the "silent majority."

## V.  The Tied Geographic Markets

65.     In this section, I evaluate the geographic boundaries of the four candidate Tied Markets to determine whether they are relevant antitrust markets: (a) the Sacramento HSA, with Sutter Sacramento; (b) the San Francisco HSA, with CPMC-Main and CPMC-St. Luke's; (b) the Modesto HSA, with Sutter Modesto; and (d) the Santa Rosa HSA, with Sutter Santa Rosa. Specifically, for each Sutter hospitals in each of the candidate markets, I present: (a) a description of the hospital and the local area in which the hospital is located, including information on how far patients drive, what share of area-patients leave the area for inpatient care, and whether there are any other non-Kaiser hospitals in the area; (b) an analysis of data and ordinary-course documents that shed light on diversion and aggregate diversion inside / outside of the candidate market; and (c) the results of a hypothetical monopolist test.

### A.  The Relevant Geographic Market for Sutter Sacramento Is the Sacramento HSA

66.     The candidate geographic market for Sutter Sacramento is the Sacramento HSA.[125] Sutter Sacramento is a general acute care hospital with over 700 licensed beds and 7,000 annual discharges; the hospital was originally composed of two separate hospitals, Sutter Memorial and Sutter General. Sutter Sacramento is located in the Sacramento HSA, in Sacramento County. As seen in Exhibit 7A, Sutter Sacramento has a case mix index of 1.43,[126]

---

[125] The Sacramento HSA includes the following zip codes as of 2015: 94203, 94204, 94205, 94206, 94207, 94208, 94209, 94211, 94229, 94230, 94232, 94234, 94235, 94236, 94237, 94239, 94240, 94244, 94245, 94247, 94248, 94249, 94250, 94252, 94254, 94256, 94257, 94258, 94259, 94261, 94262, 94263, 94267, 94268, 94269, 94271, 94273, 94274, 94277, 94278, 94279, 94280, 94282, 94283, 94284, 94285, 94286, 94287, 94288, 94289, 94290, 94291, 94293, 94294, 94295, 94296, 94297, 94298, 94299, 95605, 95612, 95615, 95624, 95626, 95639, 95651, 95652, 95655, 95659, 95662, 95668, 95670, 95672, 95673, 95680, 95683, 95690, 95691, 95693, 95741, 95757, 95758, 95759, 95762, 95798, 95799, 95811, 95812, 95813, 95814, 95815, 95816, 95817, 95818, 95819, 95820, 95821, 95822, 95823, 95824, 95825, 95826, 95827, 95828, 95829, 95830, 95831, 95832, 95833, 95834, 95835, 95836, 95837, 95838, 95840, 95851, 95852, 95853, 95860, 95864, 95865, 95866, 95867, 95894, 95899. The following zip codes were removed from Sacramento HSA between 2011 and 2015: 94246 and 95887. The following zip codes were added to Sacramento HSA between 2011 and 2015: 94245 and 94299.

[126] A hospital's case mix index ("CMI") is a measure originally constructed by the Centers for Medicare and Medicaid to reflect the diversity, clinical complexity, and the resource needs of the hospital's patients. CMIs representing sicker and more costly diagnoses relative to the national average receive an index above 1.0, while

and it is not listed among Sutter Health's designated trauma centers.[127] There are three other non-Kaiser hospitals in the candidate geography:[128] (a) University of California Davis Medical Center; (b) Methodist Hospital of Sacramento; and (c) Mercy General Hospital. Exhibit 7B shows a map depicting Sutter Sacramento and the Sacramento HSA.

**Exhibit 7A**
**Sutter Sacramento Hospital Profile, OSHPD 2011**

| | |
|---|---|
| **HSA** | Sacramento |
| **County** | Sacramento |
| **Annual Number of Discharges** | 7,015 |
| **Case Mix Index** | 1.43 |
| **Number of Beds** | 754 |
| **Trauma Center** | No |
| **Non-Kaiser, Non-Sutter Hospital(s) in HSA** | 3: Mercy General Hospital; Methodist Hospital of Sacramento; University of California Davis Medical Center |

*Note: See* Appendix C for a description of the OSHPD data analysis sample.

*Sources*:

1. OSHPD Patient Discharge Data, 2011.
2. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.
3. OSHPD Hospital Annual Financial Disclosure Data Complete Data Set, 2011.
4. National Bureau of Economic Research Diagnosis-Related Group (DRG) Weight Data, 2010-2011.
5. Centers for Medicare and Medicaid Services (CMS) Historical Impact Files, 2010-2012.
6. Dartmouth Atlas of Healthcare HSA Listings, 2015.

---

lower-intensity case mixes are rated below 1.0. *See* California HealthCare Foundation, "The Financial Health of California Hospitals," 2007, available at https://www.chcf.org/wp-content/uploads/2017/12/PDF-HospitalFinancialHealthFullReport.pdf, *site visited* March 26, 2018, p. 4–14.

[127] Sutter Health, "What is a Trauma Center?" available at https://www.sutterhealth.org/services/emergency/trauma-centers, *site visited* March 17, 2018 ("Designated trauma centers meet state and local requirements for treating life-threatening injuries from gunshot wounds, car accidents, falls and other serious harm to the head, spine and vital organs. Trauma centers are categorized into different levels based on their specific capabilities, equipment and community programs. Sutter's trauma centers in Roseville, Modesto and Castro Valley are designated Level II sites, providing care considerably above and beyond the ability of typical emergency departments…. In Northern California's rural North Coast communities, Sutter Coast Hospital and Sutter Lakeside Hospital serve as Level IV trauma centers, able to provide advanced trauma life support before transferring patients to a higher level trauma center.").

[128] There are also two Kaiser hospitals in the Sacramento HSA: (a) Kaiser Foundation Hospital-Sacramento/Roseville; and (b) Kaiser Foundation Hospital-South Sacramento.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Exhibit 7B**
**Map of Sacramento HSA and Sutter Sacramento**



*Sources*: OSHPD Patient Discharge Data, 2011; and US Census Bureau 2016 Shapefiles.

67.     Exhibit 7C provides some basic facts about local residents. There are approximately 879,000 residents of the candidate geography, about 56 percent of whom are employed. About 78 percent of non-Kaiser, commercially-insured area-patients stay in the area for inpatient hospital services, and they drive an average of 17 minutes for their care. (Instead of 78 percent, Professor Gowrisankaran calculates that 82 percent of the area-patients stay in the area for inpatient hospital services.[129]) The approximately 22 percent of area-patients who go outside of the area for their inpatient hospital services drive significantly longer – about 38 minutes – for their care. These statistics suggest that a large majority of area-patients prefer to

---

[129] Gowrisankaran Report, Figure 5.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

receive their care locally and that the preferences of those who receive their care in the area may be different from those who travel outside for their care.[130]

**Exhibit 7C**
**Sacramento HSA Profile, OSHPD 2011**

| Description | Sacramento HSA |
| --- | --- |
| Population | 878,913 |
| Employed | 56% |
| Average Adjusted Gross Income | $54,848 |
| Area Hospital Discharges | 14,199 |
| Percent that Stay in Area for Hospital Services | 78% |
| Average Drive Time for Patients that Stayed in Area (Minutes) | 16.5 |
| Average Drive Time for Patients that Left the Area (Minutes) | 38.1 |

*Notes*:

1. *See* Appendix C for a description of the OSHPD data analysis sample.

2. Population and employment rates based on population aged 16 years and over.

*Sources*:

1. OSHPD Patient Discharge Data, 2011.

2. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

3. OSHPD Hospital Annual Financial Disclosure Data Complete Data Set, 2011.

4. Centers for Medicare and Medicaid Services (CMS) Historical Impact Files, 2010-2012

5. Dartmouth Atlas of Healthcare HSA Listings, 2015.

6. American Community Survey Five Year Estimates Employment Status Data, 2011-2015.

7. Internal Revenue Service Individual Income Tax Data.

8. Google Maps Distance Matrix API.

To put this evidence into context, the economic evidence from *Advocate-NorthShore* was that 73 percent of area-patients stayed in the FTC's candidate geographic market, which was accepted by the court as a relevant antitrust market.[131] The evidence from *St. Luke's-Saltzer* was that about 67 percent of area-patients stayed in the FTC's candidate geographic market, which was also accepted by the court as a relevant antitrust market.[132]

---

[130] In such circumstances, one risks the silent majority fallacy by concluding that the existence of residents who are willing to travel for their care limits hospital market power with respect to residents who are not willing to travel.

[131] Advocate-NorthShore Appellate Decision, pp. 22 ("As one insurance executive put it: 'Typically [patients] seek [hospital] care in their own communities.' The evidence on that point is strong, not equivocal. For example, 73 percent of patients living in plaintiffs' proposed market receive hospital care there.").

[132] St. Luke's-Saltzer Appellate Decision, p.16 ("evidence that one-third of Nampa residents travel to Boise for PCPs did not prove that a significant number of other residents would so travel in the event of a SSNIP.").

68.     Exhibit 7D presents the results of the diversion analysis. The top panel of this exhibit presents the next-best substitutes to Sutter Sacramento, in order of the diversion from Sutter Sacramento to each of the next-best substitutes. I find that the next-best substitute for Sutter Sacramento is University of California Davis Medical Center, also in the Sacramento HSA. The second next-best substitute is Mercy San Juan, outside of the Sacramento HSA, and the third next-best substitute is Mercy General Hospital, inside the Sacramento HSA.

69.     The bottom panel describes the aggregate diversion inside and outside of the candidate market, computed based on the diversion from all hospitals in the candidate geography. The aggregate diversion to hospitals inside of the candidate market is 61 percent, which is higher than the 48 percent aggregate diversion inside calculated by the FTC's economist in connection with the accepted geographic market in *Advocate-NorthShore*.[133] The aggregate diversion outside is 39 percent. Professor Gowrisankaran does not study diversion.

---

[133] "Redacted Memorandum Opinion and Order," *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, et al.,* Case No. 15 C 11473, March 16, 2017, p. 9 ("48% of the patients admitted to one of the [hospitals in the candidate geographic market] would substitute to one of the other hospitals in the [candidate geographic market] if their chosen hospital were no longer available.").

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Exhibit 7D**
**Diversion Analysis: Sutter Sacramento and the Sacramento HSA**

| Name of Hospital | In HSA? | Diversion Ratio |
|---|---|---|
| University Of California Davis Medical Center | Yes | 41% |
| Mercy San Juan Hospital | No | 12% |
| Mercy General Hospital | Yes | 11% |
| Sutter Roseville Medical Center | No | 11% |
| Methodist Hospital Of Sacramento | Yes | 8% |
| Mercy Hospital - Folsom | No | 4% |
| Rideout Memorial Hospital | No | 2% |
| Sutter Davis | No | 2% |
| Woodland Memorial Hospital | No | 1% |
| Sutter Auburn | No | 1% |
| Lodi Memorial Hospital | No | 1% |
| St. Joseph's Medical Center Of Stockton | No | 1% |
| Marshall Medical Center | No | 1% |
| North Bay Medical Center | No | 1% |
| Outside Option | n/a | 1% |
| Dameron Hospital | No | 1% |
| Other (N = 68) | n/a | 3% |
| Aggregate Diversion Inside | Yes | 61% |
| Aggregate Diversion Outside | No | 39% |

*Notes*:

1. *See* Appendix C for a description of the OSHPD data analysis sample.

2. Diversion ratios based on conditional logit patient choice model. *See* Appendix C for a description of the model and underlying estimation results. Totals may not add to 100 percent due to rounding.

*Sources: See* Appendix C.

70.     The calculation of the hypothetical monopolist's optimal price requires information on diversion, relative prices, and commercial inpatient margins. I use the diversion estimates presented above. I construct relative prices using Anthem claims data. I do not have data on variable contribution margins for the local non-Sutter hospital, but I do have what appears to be variable contribution margin data from Sutter.[134] Thus, I use the local Sutter

---

[134] A hospital's variable contribution margin is the difference between the revenue and the variable cost associated with treating one more commercial patient. To the extent the margins data from Sutter are net of certain fixed costs, they may be too low for the purposes of this calculation. In this case, the calculation would understate the optimal price increase, which would, in turn, tend to reject the candidate market as the relevant market.

hospital's contribution margin as a proxy for the variable contribution margin for the local non-Sutter hospital. Sutter has provided information on margins for Sutter Sacramento for all years from 2009 to 2015. Because the hypothetical monopolist is less likely to raise prices when the margin at the hospital receiving the diverted patients is lower, my calculation conservatively uses the lowest local Sutter hospital commercial contribution margin, which in the case of Sutter Sacramento is 36.4 percent, based on 2015 data. Thus, I calculate that a hypothetical monopolist over the non-Kaiser hospitals in the candidate geography would find it profitable to raise Sutter Sacramento's price between 11 percent and 12 percent above the actual level in each year from 2010 to 2012.[135] To the extent Sutter has already elevated the price of Sutter Sacramento, beyond competitive levels as a result of the alleged conduct, this price increase understates the true hypothetical price increase.

71.     The combination of these results indicates that the candidate geography of Sacramento HSA is a relevant market. Basic descriptive statistics show a strong preference of a majority of area-patients to receive their care locally. Diversion analysis shows a relatively large aggregate diversion inside the area. Furthermore, the results of the hypothetical monopolist test more than meets the five percent threshold of the *Merger Guidelines*.[136]

### B.     The Relevant Geographic Market for CPMC Is the San Francisco HSA

72.     The candidate geographic market for California Pacific Medical Center ("CPMC") is the San Francisco HSA.[137] CPMC is a general acute care hospital with four campuses (Davies, Pacific, California, and St. Luke's),[138] but CPMC reports data for its St. Luke's campus separately to OSHPD. CPMC's three campuses (referred to collectively as

---

[135] I find that the hypothetical monopolist over the hospitals in Sacramento HSA would find it profitable to raise Sutter Sacramento's price by at least five percent even if the local non-Sutter hospital margin were as low as 17.3 percent, instead of the assumed 36.4 percent margin. *See* Chipty Workpapers.

[136] *Merger Guidelines*, §4.1.2 ("The Agencies most often use a SSNIP of five percent of the price paid by customers for the products or services to which the merging firms contribute value.").

[137] The San Francisco HSA includes the following zip codes as of 2015: 94102, 94103, 94104, 94105, 94107, 94108, 94109, 94110, 94111, 94112, 94114, 94115, 94116, 94117, 94118, 94119, 94120, 94121, 94122, 94123, 94124, 94126, 94127, 94129, 94130, 94131, 94132, 94133, 94134, 94137, 94139, 94140, 94141, 94142, 94143, 94144, 94145, 94146, 94147, 94151, 94158, 94159, 94160, 94161, 94163, 94164, 94172, 94177, 94188. The following zip codes were removed from San Francisco HSA between 2011 and 2015: 94016, 94125, 94156, and 94162.

[138] Sutter Health, "Our Campuses History," available at http://www.cpmc.org/about/history/campus html, *site visited* March 17, 2018.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

"CPMC-Main") have over 900 licensed beds, and its St. Luke's campus has more than 200 licensed beds.[139] This combination makes CPMC one of the largest hospitals in Northern California; it is also a tertiary referral center and academic medical center. CPMC is located in the San Francisco HSA, in the City and County of San Francisco.

73.     As seen in Exhibit 8A, CPMC-Main has a case mix index of 1.31; CPMC-St. Luke's has a case mix index of 1.05; and neither is listed among Sutter Health's designated trauma centers.[140] There are six other non-Kaiser hospitals in the candidate geography:[141] (a) Chinese Hospital; (b) Laguna Honda Hosp & Rehab Center; (c) San Francisco General Hospital Medical Center; (d) St. Francis Memorial Hospital; (e) St. Mary's Medical Center-San Francisco; and (f) UCSF Medical Center. Exhibit 8B shows a map depicting CPMC-Main, CPMC-St. Luke's and the San Francisco HSA.

**Exhibit 8A**
**CPMC Hospital Profile, OSHPD 2011**

| Description | CPMC-Main | CPMC-St. Luke's |
|---|---|---|
| HSA | San Francisco | San Francisco |
| County | San Francisco | San Francisco |
| Annual Number of Discharges | 12,584 | 721 |
| Case Mix Index | 1.31 | 1.05 |
| Number of Beds | 970 | 229 |
| Trauma Center | No | No |
| Non-Kaiser, Non-Sutter Hospital(s) in HSA | 6: Chinese Hospital;<br>Laguna Honda Hosp & Rehab Center;<br>San Francisco General Hospital Medical Center;<br>St. Francis Memorial Hospital;<br>St. Mary's Medical Center-San Francisco;<br>UCSF Medical Center | |

*Note: See* notes for Exhibit 7A.
*Sources: See* sources for Exhibit 7A.

---

[139] OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

[140] Sutter Health, "What is a Trauma Center?" available at https://www.sutterhealth.org/services/emergency/trauma-centers, *site visited* March 17, 2018. CPMC is also not recognized as a trauma center by the American College of Surgeons ("ACS"). American College of Surgeons, "Searching for Verified Trauma Centers," available at https://www.facs.org/search/trauma-centers, *site visited* March 17, 2018. (Note that the ACS specifically disclaims, "The designation of trauma facilities is a geopolitical process by which empowered entities, government or otherwise, are authorized to designate. The ACS does not designate trauma centers; instead, it verifies the presence of the resources listed in *The Resources for Optimal Care for the Injured Patient*. This is a voluntary process and only those trauma centers that have successfully completed a verification visit are listed.").

[141] There is also one Kaiser hospital in the Sacramento HSA: Kaiser Foundation Hospital - Geary (S.F.).

**Exhibit 8B**
**Map of San Francisco HSA and CPMC and CPMC-St. Luke's**



Sources: *See* sources for Exhibit 7B.

74.     Exhibit 8C provides some basic facts about local residents. There are approximately 740,000 residents of the candidate geography, of whom about 65 percent are employed. About 95 percent of non-Kaiser, commercially-insured area-patients stay in the area for inpatient hospital services, and they drive an average of 16 minutes for their care. (Instead of 95 percent, Professor Gowrisankaran calculates that 98 percent of the area-patients stay in the area for inpatient hospital services.[142]) The approximately five percent of area-patients who go outside of the area for their inpatient hospital services drive significantly longer – about 45 minutes – for their care. These statistics suggest that a large majority of area-patients prefer to

---

[142] Gowrisankaran Report, Figure 5.

receive their care locally and that the preferences of those who receive their care in the area may be different from those who travel for their care.[143]

**Exhibit 8C**
**San Francisco HSA Profile, OSHPD 2011**

| Description | San Francisco HSA |
|---|---|
| Population | 739,362 |
| Employed | 65% |
| Average Adjusted Gross Income | $101,805 |
| Area Hospital Discharges | 14,151 |
| Percent that Stay in Area for Hospital Services | 94% |
| Average Drive Time for Patients that Stayed in Area (Minutes) | 16 |
| Average Drive Time for Patients that Left the Area (Minutes) | 45 |

*Notes*: *See* notes for Exhibit 7C.
*Sources*: *See* sources for Exhibit 7C.

75.     Exhibits 8D and 8E present the results of the diversion analysis, for CPMC-Main and CPMC-St. Luke's, respectively. In each exhibit, the top panel presents the next-best substitutes to the Sutter hospital, in order of diversion from the Sutter hospital to the next-best substitutes. The bottom panel, which is identical across the two exhibits, describes the aggregate diversion inside and outside of the candidate market, computed based on the diversion from all hospitals in the candidate geography. I find that:

- The next-best substitute for CPMC-Main is UCSF Medical Center in the San Francisco HSA. The second next-best substitute for CPMC-Main is Marin General Hospital, outside of the San Francisco HSA, and the third best substitute for CPMC-Main is CPMC-St. Luke's.

- The next-best substitute for CPMC-St. Luke's is Seton Medical Center, not in the San Francisco HSA. The second and third best substitute are UCSF Medical Center and CPMC-Main, both of which are located in the San Francisco HSA.

- The aggregate diversion to hospitals inside of the candidate market is 65 percent and aggregate diversion outside is 35 percent.

---

[143] In such circumstances, one risks the silent majority fallacy by concluding that the existence of residents who are willing to travel for their care limits hospital market power with respect to residents who are not willing to travel.

**Exhibit 8D**
**Diversion Analysis: CPMC-Main and San Francisco HSA**

| Name of Hospital | In HSA? | Diversion Ratio |
|---|---|---|
| UCSF Medical Center | Yes | 57% |
| Marin General Hospital | No | 11% |
| CPMC-St. Luke's | Yes | 7% |
| St. Mary's Medical Center-San Francisco | Yes | 5% |
| Seton Medical Center | No | 3% |
| Alta Bates-Main | No | 3% |
| Alta Bates-Summit | No | 3% |
| Peninsula Medical Center | No | 2% |
| San Francisco General Hospital Medical Center | Yes | 1% |
| Outside Option | n/a | 1% |
| John Muir Medical Center-Walnut Creek Campus | No | 1% |
| Petaluma Valley Hospital | No | 1% |
| Stanford University Hospital | No | 1% |
| Eden Medical Center | No | 1% |
| Alameda County Medical Center | No | 1% |
| Other (N = 69) | n/a | 3% |
| Aggregate Diversion Inside | Yes | 65% |
| Aggregate Diversion Outside | No | 35% |

*Notes*: *See* notes for Exhibit 7D.
*Sources*: *See* sources for Exhibit 7D.

**Exhibit 8E**
**CPMC-St. Luke's Diversion Analysis, OSHPD 2011**

| Name of Hospital | In HSA? | Diversion Ratio |
|---|---|---|
| Seton Medical Center | No | 23% |
| UCSF Medical Center | Yes | 20% |
| CPMC-Main | Yes | 12% |
| Peninsula Medical Center | No | 11% |
| Alta Bates-Summit | No | 7% |
| San Francisco General Hospital Medical Center | Yes | 7% |
| Alta Bates-Main | No | 5% |
| St. Mary's Medical Center-San Francisco | Yes | 3% |
| Stanford University Hospital | No | 2% |
| Sequoia Hospital | No | 2% |
| John Muir Medical Center-Walnut Creek Campus | No | 1% |
| Alameda County Medical Center | No | 1% |
| El Camino Hospital | No | 1% |
| Eden Medical Center | No | 1% |
| St. Rose Hospital | No | 1% |
| Other (N = 69) | n/a | 4% |
| Aggregate Diversion Inside | Yes | 65% |
| Aggregate Diversion Outside | No | 35% |

*Notes*: *See* notes for Exhibit 7D.
*Sources*: *See* sources for Exhibit 7D.

76.     The calculation of the hypothetical monopolist's optimal price requires information on diversion, relative prices, and commercial inpatient margins. I use the diversion estimates presented above. I construct relative prices using Anthem claims data. I do not have data on contribution margins for the local non-Sutter hospital. Thus, I use as the local Sutter hospital's contribution margin as a proxy for the contribution margin for the local non-Sutter hospital. Sutter has provided information on margins for CPMC for the years 2009 and 2010. CPMC's commercial fee-for-service margin in 2009 was 45.7 percent, and its commercial margin in 2010 was 47.2 percent. Assuming the other hospitals to which CPMC-Main patients would divert have the lower Sutter margin of 45.7 percent, I calculate that a hypothetical monopolist over the non-Kaiser hospitals in the candidate geography would find it profitable to raise CPMC-Main's price 13 percent above the actual level in each year from 2010 to

2012.[144,145] To the extent Sutter has already elevated the price of CPMC-Main, beyond competitive levels as a result of the alleged conduct, this price increase understates the true hypothetical price increase.

77.     The combination of these results indicates that the boundaries of the San Francisco HSA constitute a relevant geographic market. Basic descriptive statistics show a strong preference of a majority of area-patients to receive their care locally. Diversion analysis shows a relatively large aggregate diversion within the area. Furthermore, the results of the hypothetical monopolist test more than meet the five percent threshold of the Merger Guidelines.[146]

### C.     The Relevant Geographic Market for Sutter Modesto Is the Modesto HSA

78.     The candidate geographic market for Sutter Modesto is the Modesto HSA.[147] Sutter Modesto is a general acute care inpatient hospital, with more than 400 licensed beds and a designation as a Level II Trauma Center.[148] The hospital is located in the Modesto HSA, in Stanislaus County, and became affiliated with Sutter in 1996.[149] As seen in Exhibit 9A, Sutter Modesto has a case mix index of 1.24. There is one other non-Kaiser hospital, Doctors Medical

---

[144] I find that the hypothetical monopolist over the hospitals in the San Francisco HSA would find it profitable to raise CPMC-Main's price by at least five percent even if the local non-Sutter hospital margin were 18.0 percent, instead of the assumed 45.7 percent margin. *See* Chipty Workpapers.

[145] A similar calculation for CPMC-St. Luke's shows a price increase of two to three percent above the actual level in each year from 2010 to 2012. *See* Chipty Workpapers. This result, however, does not alter the conclusion that the San Francisco HSA is a relevant antitrust market, because the price increase at CPMC-Main is found to be 13 percent and there only needs to be a SSNIP at one of the hospitals in the candidate market, in order for the candidate market to be a relevant market. *See Merger Guidelines* §4.1.1 ("Specifically, the test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypothetical monopolist") likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on <u>at least one product</u> in the market, including at least one product sold by one of the merging firms." [Emphasis added]).

[146] *Merger Guidelines*, §4.1.2 (The Agencies most often use a SSNIP of five percent of the price paid by customers for the products or services to which the merging firms contribute value.").

[147] The Modesto HSA includes the following zip codes as of 2015: 95230, 95307, 95313, 95319, 95320, 95322, 95323, 95326, 95328, 95329, 95350, 95351, 95352, 95353, 95354, 95355, 95356, 95357, 95358, 95360, 95363, 95366, 95367, 95368, 95385, 95386, 95387, 95397. The following zip codes were added to Modesto HSA between 2011 and 2015: 95230 and 95397.

[148] Sutter Health, "What is a Trauma Center?" available at https://www.sutterhealth.org/services/emergency/trauma-centers, *site visited* March 17, 2018; and OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

[149] Sutter Health, "History of Memorial Medical Center," available at http://www.memorialmedicalcenter.org/about/about_hist html, *site visited* March 14, 2018.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

Center, in the candidate geography.[150] Exhibit 9B shows a map depicting the Sutter Modesto and the Modesto HSA.

**Exhibit 9A**
**Sutter Modesto Hospital Profile, OSHPD 2011**

| HSA | Modesto |
|---|---|
| County | Stanislaus |
| Annual Number of Discharges | 4,308 |
| Case Mix Index | 1.24 |
| Number of Beds | 423 |
| Trauma Center | Yes |
| Non-Sutter, Non-Kaiser Hospital(s) in HSA | 1: Doctors Medical Center |

*Note: See* notes for Exhibit 7A.
*Sources*: *See* sources for Exhibit 7A.

**Exhibit 9B**
**Map of Modesto HSA and Sutter Modesto**



*Sources*: *See* sources for Exhibit 7B.

---

[150] There is no Kaiser hospital there. *See* OSHPD Patient Discharge Data, 2011.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**          57

79.     Exhibit 9C provides some basic facts about local residents. There are approximately 342,000 residents of the candidate geography, 52 percent of whom are employed. About 81 percent of non-Kaiser, commercially-insured area-patients stay in the area for inpatient hospital services, and they drive an average of 18 minutes for their care. (Instead of 81 percent, Professor Gowrisankaran calculates that 84 percent of the area-patients stay in the area for inpatient hospital services.[151]) The approximately 19 percent of area-patients who go outside of the area for their inpatient hospital services drive significantly longer – about 71 minutes – for their care. These statistics suggest that a large majority of area-patients prefer to receive their care locally and that the preferences of those who receive their care in the area may be different from those travel outside of the area for their care.[152]

**Exhibit 9C**
**Modesto HSA Profile, OSHPD 2011**

| Description | Modesto HSA |
|---|---|
| Population | 342,130 |
| Employed | 52% |
| Average Adjusted Gross Income | $46,472 |
| Area Hospital Discharges | 7,670 |
| Percent that Stay in Area for Hospital Services | 81% |
| Average Drive Time for Patients that Stayed in Area (Minutes) | 18 |
| Average Drive Time for Patients that Left the Area (Minutes) | 71 |

*Notes*: *See* notes for Exhibit 7C.
*Sources*: *See* sources for Exhibit 7C.

80.     Exhibit 9D presents the results of the diversion analysis. The top panel of this exhibit presents the next-best substitutes, in order of diversion, and the bottom panel describes the aggregate diversion inside and outside of the candidate market. I find that the next-best substitute for Sutter Modesto is Doctors Medical Center, also in the Modesto HSA. The aggregate diversion to hospitals inside of the candidate market is 68 percent and aggregate diversion outside is 32 percent.

---

[151] Gowrisankaran Report, Figure 5.

[152] In such circumstances, one risks the silent majority fallacy by concluding that the existence of residents who are willing to travel for their care limits hospital market power with respect to residents who are not willing to travel.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

**Exhibit 9D**
**Diversion Analysis: Sutter Modesto and Modesto HSA**

| Name of Hospital | In HSA? | Diversion Ratio |
|---|---|---|
| Doctors Medical Center | Yes | 69% |
| Emanuel Medical Center | No | 10% |
| Doctors Hospital Of Manteca | No | 5% |
| St. Joseph's Medical Center Of Stockton | No | 4% |
| Outside Option | n/a | 3% |
| Dameron Hospital | No | 3% |
| Sutter Tracy | No | 2% |
| Lodi Memorial Hospital | No | 1% |
| Mercy Medical Center Merced - Community Campus | No | 1% |
| Sutter Sacramento | No | 1% |
| Other (N = 74) | n/a | 3% |
| Aggregate Diversion Inside | Yes | 68% |
| Aggregate Diversion Outside | No | 32% |

*Notes*: *See* notes for Exhibit 7D.
*Sources*: *See* sources for Exhibit 7D.

81.     The calculation of the hypothetical monopolist's optimal price requires information on diversion, relative prices, and commercial inpatient margins. I use the diversion estimates presented above. I construct relative prices using Anthem claims data. I do not have data on contribution margins for the local non-Sutter hospital. Thus, I use as the local Sutter hospital's contribution margin as a proxy for the contribution margin for the local non-Sutter hospital. Sutter has provided information on margins for Sutter Modesto for the years 2009, 2010, and 2015. Sutter Modesto's commercial fee-for-service margin in 2009 was 62.8 percent, its commercial margin in 2010 was 66.2 percent, and its commercial margin in 2015 was 47.7 percent. Assuming the other hospitals to whom Sutter Modesto patients would divert have the lowest Sutter Modesto margin, which in this case is 47.7 percent, I calculate that a hypothetical monopolist over the non-Kaiser hospitals in the candidate geography would find it profitable to raise Memorial's price between 12 percent and 20 percent above the actual level in each year from 2010 to 2012.[153] To the extent Sutter has already elevated the price of Sutter Modesto,

---

[153] I find that the hypothetical monopolist over the hospitals in Modesto HSA would find it profitable to raise at Sutter Modesto's price by at least five percent even if the local non-Sutter hospital margin were 19.5 percent, instead of the assumed 47.7 percent margin. *See* Chipty Workpapers.

beyond competitive levels as a result of the alleged conduct, this price increase understates the true hypothetical price increase.

82.     The combination of these results indicates that the candidate geography of Modesto HSA is a relevant market. Basic descriptive statistics show a strong preference of a majority of area-patients to receive their care locally. Diversion analysis shows a relatively large aggregate diversion within the area. Furthermore, the results of the hypothetical monopolist test more than meet the threshold five percent of the *Merger Guidelines*.[154]

### D.     The Relevant Geographic Market for Sutter Santa Rosa Is the Santa Rosa HSA

83.     The candidate geographic market for Sutter Santa Rosa hospital is the Santa Rosa HSA.[155] Sutter Santa Rosa is a general acute care hospital with 135 licensed beds. It is located in Santa Rosa HSA, in Sonoma County. The hospital joined the Sutter system in 1996.[156] As seen in Exhibit 10A, Sutter Santa Rosa has a case mix index of 1.20, and it is not designated by Sutter as a trauma center.[157] There is one other non-Kaiser hospital, Santa Rosa Memorial Hospital, in the candidate geography.[158] Exhibit 10B shows a map depicting the Sutter Santa Rosa and the Santa Rosa HSA.

---

[154] *Merger Guidelines*, §4.1.2 ("The Agencies most often use a SSNIP of five percent of the price paid by customers for the products or services to which the merging firms contribute value.").

[155] The Santa Rosa HSAs includes the zip codes: 94926, 94927, 94928, 94931, 95401, 95402, 95403, 95404, 95405, 95406, 95407, 95409, 95412, 95421, 95436, 95439, 95445, 95446, 95452, 95459, 95462, 95468, 95471, 95480, 95486, 95492, 95494, 95497.

[156] Sutter Health, "Sutter Santa Rosa Regional Hospital – About Us," available at http://www.suttersantarosa. org/about/index. html, *site visited* March 16, 2018.

[157] Sutter Health, "What is a Trauma Center?" available at https://www.sutterhealth.org/services/emergency/trauma-centers, *site visited* March 17, 2018.

[158] There is one Kaiser hospital, Kaiser Foundation Hospital-Santa Rosa. *See* OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

**Exhibit 10A**
**Sutter Santa Rosa Hospital Profile, OSHPD 2011**

| HSA | Santa Rosa |
|---|---|
| County | Sonoma |
| Annual Number of Discharges | 1,132 |
| Case Mix Index | 1.20 |
| Number of Beds | 135 |
| Trauma Center | No |
| Non-Sutter, Non-Kaiser Hospital(s) in HSA | 1: Santa Rosa Memorial Hospital |

*Note: See* notes for Exhibit 7A.

*Sources*: *See* sources for Exhibit 7A.

**Exhibit 10B**
**Map of Santa Rosa HSA and Sutter Santa Rosa**



*Sources*: *See* sources for Exhibit 7B.

84.     Exhibit 10C provides some basic facts about local residents. There are approximately 256,000 residents of the candidate geography, about 59 percent of whom are employed. About 75 percent of non-Kaiser, commercially-insured area-patients stay in the area for inpatient hospital services, and they drive an average of 20 minutes for their care. (By comparison, Professor Gowrisankaran calculates that 83 percent of area-patients stay in the area for their inpatient care.[159]) The approximately 25 percent of area-patients who go outside of the area for their inpatient hospital services drive significantly longer – about 67 minutes – for their care. These statistics suggest that a large majority of area-patients prefer to receive their care locally and that the preferences of those who receive their care in the area may be different from those who travel outside of the area for their care.[160]

**Exhibit 10C**
**Santa Rosa HSA Profile, OSHPD 2011**

| Description | Santa Rosa HSA |
| --- | --- |
| Population | 255,830 |
| Employed | 59% |
| Average Adjusted Gross Income | $58,333 |
| Area Hospital Discharges | 3,110 |
| Percent that Stay in Area for Hospital Services | 75% |
| Average Drive Time for Patients that Stayed in Area (Minutes) | 20.4557 |
| Average Drive Time for Patients that Left the Area (Minutes) | 67.3287 |

*Notes*: *See* notes for Exhibit 7C.
*Sources*: *See* sources for Exhibit 7C.

85.     Exhibit 10D presents the results of the diversion analysis. The top panel of this exhibit presents the next-best substitutes, in order of diversion, and the bottom panel describes the aggregate diversion inside and outside of the candidate market. I find that the next-best substitute for Sutter Santa Rosa is Santa Rosa Memorial, also in the Santa Rosa HSA. The aggregate diversion to hospitals inside of the candidate market is 73 percent and aggregate diversion outside is 27 percent.

---

[159] Gowrisankaran Report, Figure 5.

[160] In such circumstances, one risks the silent majority fallacy by concluding that the existence of residents who are willing to travel for their care limits hospital market power with respect to residents who are not willing to travel.

**Exhibit 10D**
**Diversion Analysis: Sutter Santa Rosa and Santa Rosa HSA**

| Name of Hospital | In HSA? | Diversion Ratio |
|---|---|---|
| Santa Rosa Memorial Hospital | Yes | 81% |
| Petaluma Valley Hospital | No | 6% |
| St. Helena Hospital | No | 4% |
| CPMC-Main | No | 2% |
| Queen Of The Valley Hospital | No | 1% |
| Outside Option | n/a | 1% |
| Marin General Hospital | No | 1% |
| UCSF Medical Center | No | 1% |
| Other (N = 76) | n/a | 3% |
| Aggregate Diversion Inside | Yes | 73% |
| Aggregate Diversion Outside | No | 27% |

*Notes*: *See* notes for Exhibit 7D.
*Sources*: *See* sources for Exhibit 7D.

86.     The calculation of the hypothetical monopolist's optimal price requires information on diversion, relative prices, and commercial inpatient margins. I use the diversion estimates presented above. I construct relative prices using Anthem claims data. I do not have data on contribution margins for the local non-Sutter hospital. Thus, I use as the local Sutter hospital's contribution margin as a proxy for the contribution margin for the local non-Sutter hospital. Sutter has provided information on margins for Sutter Santa Rosa for the years 2009 and 2010. Sutter Santa Rosa's commercial fee-for-service margin in 2009 was 26.0 percent and its commercial margin in 2010 was 43.8 percent. Assuming Santa Rosa Memorial, the area hospital that would capture Sutter Santa Rosa patients, had the lower fee-for-service margin of 26.0 percent, I calculate that a hypothetical monopolist over the non-Kaiser hospitals in the candidate geography would find it profitable to raise Sutter Santa Rosa's price between seven percent and ten percent above the actual level in each year from 2010 to 2012.[161] To the extent Sutter has already elevated the price of Sutter Santa Rosa, beyond competitive levels as a result of the alleged conduct, this price increase understates the true hypothetical price increase.

---

[161] I find that the hypothetical monopolist over the hospitals in the Santa Rosa HSA would find it profitable to raise Sutter Santa Rosa's price by at least five percent even if the local non-Sutter hospital margin were 19.0 percent, instead of the assumed 26.0 percent margin. *See* Chipty Workpapers.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

87.     The combination of these results indicates that the candidate geography of Santa Rosa HSA is a relevant market. Basic descriptive statistics show a strong preference of a majority of area-patients to receive their care locally. Diversion analysis shows a relatively large aggregate diversion within the area. Furthermore, the results of the hypothetical monopolist test more than meet the five percent threshold of the *Merger Guidelines*.[162]

***

88.     Thus, I find that all four of the candidate Tied Markets are economically coherent antitrust markets.

## VI.     The Tying Geographic Markets

89.     In this section, I evaluate the geographic boundaries of the candidate Tying Markets to determine whether they are relevant antitrust markets: (a) the combined areas of the Berkeley-Oakland HSAs; (b) the Crescent City HSA; (c) the Lakeport HSA; (d) the Antioch HSA; (e) the Jackson HSA; (f) the Tracy HSA; (g) the Auburn HSA; and (h) the Davis HSA. Specifically, for each of the Sutter hospitals in each of the candidate markets, I present: (a) a description of the hospital and the local area in which the hospital is located, including information about how far patients drive, what share of area-patients leave the area for inpatient care, and whether there are any other non-Kaiser hospitals in the area; (b) an analysis of data and ordinary-course documents that shed light on diversion and aggregate diversion outside of the candidate market; and (c) analysis of evidence within the framework of the hypothetical monopolist test.

### A.     The Relevant Geographic Market for Alta Bates Is the Combination of the Berkeley-Oakland HSAs

90.     The candidate geographic market for Sutter Alta Bates is the combined area of the Berkeley-Oakland HSAs.[163] Alta Bates is a general acute care hospital with three campuses –

---

[162] *Merger Guidelines*, §4.1.2 ("The Agencies most often use a SSNIP of five percent of the price paid by customers for the products or services to which the merging firms contribute value.").

[163] The Berkeley HSA includes the following zip codes as of 2015: 94530, 94701, 94702, 94703, 94704, 94705, 94706, 94707, 94708, 94709, 94710, 94712, 94720. The Oakland HSAs includes the following zip codes as of 2015: 94502, 94601, 94602, 94603, 94604, 94605, 94606, 94607, 94608, 94609, 94610, 94611, 94612, 94613, 94614, 94615, 94617, 94618, 94619, 94620, 94621, 94623, 94624, 94649, 94659, 94660, 94661, 94662, 94666.

Alta Bates in Berkeley, Herrick in Berkeley, Summit in Oakland[164] – but Alta Bates reports only data for its Summit campus separately to OSHPD.[165] The hospital was formed from the 1999 merger of Sutter's Alta Bates Medical Center and Summit Medical Center.[166] Alta Bates in Berkeley has over 500 licensed beds, and its Summit campus has nearly 400 licensed beds.[167]

91.     As seen in Exhibit 11A, Alta Bates' two Berkeley campuses combined (referred to collectively as "Alta Bates-Main") has a case mix index of 1.05; Alta Bates-Summit has a case mix index of 1.55; and neither is listed among Sutter Health's designated trauma centers.[168] There is one other, non-Sutter, non-Kaiser hospital in the candidate geography: Alameda County Medical Center, located within ten minutes of Alta Bates-Main. Alameda County Medical Center, which is part of Alameda Health System, is a safety net hospital in Oakland, California with a poor reputation among area residents.[169] As explained by a 2015 research study on the hospital, "the biggest challenge for AHS is becoming attractive to the 'Regular Joe' who views AHS as a 'Knife and Gun Club.' People are reluctant to come here because of the challenging neighborhood and poor access."[170,171] Consistent with this, the hospital has not historically had

---

[164] Sutter Health, "Facts at a Glance," available at http://www.altabatessummit.org/about/profile.html , *site visited* May 23, 2018.

[165] OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

[166] Sutter Health, "Our History and Our Work," available at http://www.altabatessummit.org/about/history.html, *site visited* April 19, 2018.

[167] OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

[168] Sutter Health, "What is a Trauma Center?" available at https://www.sutterhealth.org/services/emergency/trauma-centers, *site visited* March 17, 2018. CPMC is also not recognized as a trauma center by the American College of Surgeons ("ACS"). American College of Surgeons, "Searching for Verified Trauma Centers," available at https://www. facs.org/search/trauma-centers, *site visited* March 17, 2018. (Note that the ACS specifically disclaims, "The designation of trauma facilities is a geopolitical process by which empowered entities, government or otherwise, are authorized to designate. The ACS does not designate trauma centers; instead, it verifies the presence of the resources listed in *The Resources for Optimal Care for the Injured Patient*. This is a voluntary process and only those trauma centers that have successfully completed a verification visit are listed…").

[169] Marianne Aiello, "Why and How Safety Net Hospitals are Marketing Themselves," *HealthLeaders Media*, March 16, 2016, available at http://www.healthleadersmedia.com/marketing/why-and-how-safety-net-hospitals-are-marketing-themselves, *site visited* May 12, 2018 ("Because of their history as a safety net provider, they [Alameda Health System] were never associated with quality of care.").

[170] Kane, Nancy M, "Alameda Health System 'Helping an institution survive that used to serve people with no choices.'," Harvard T.H. Chan School of Public Health, 2015, pp. 1-23 (hereafter "Kane (2015)"), available at http://caseresources hsph.harvard.edu/files/case/files/alameda.pdf, *site visited* May 12, 2018, at p. 6.

[171] ████████████████████████████████

contracts with many commercial health plans.[172] A closer look shows that Alameda County Medical Center is described as an out-of-network provider in both the Anthem Claims Data[173] and the Blue Shield Claims Data.[174] Furthermore, commercial discharges at Alameda County Medical Center accounted for only about 3.5 percent of the hospital's total discharges over the years 2010 to 2014.[175] Exhibit 11B shows a map depicting the Alta Bates campuses and the boundaries of the candidate geography.

**Exhibit 11A**
**Alta Bates Hospital Profile, OSHPD 2011**

|  | Alta Bates-Main | Alta Bates-Summit |
|---|---|---|
| **HSA** | Berkeley | Oakland |
| **County** | Alameda | Alameda |
| **Annual Number of Discharges** | 6,161 | 3,046 |
| **Case Mix Index** | 1.05 | 1.55 |
| **Number of Beds** | 527 | 399 |
| **Trauma Center** | No | No |
| **Non-Kaiser, Non-Sutter Hospital(s) in Berkeley-Oakland HSAs** | 1: Alameda County Medical Center | |

*Notes*: *See* notes for Exhibit 7A.
*Sources:* *See* sources for Exhibit 7A.

---

[172] Kane (2015), p. 6 (describing operational challenges for Alameda Health System "Lack of contracts with many commercial insurers, or contracts that did not reflect the best interest of AHS.") and p. 7 (explaining that Alameda Health System "had MediCal managed care contracts with two insurers, Alameda Alliance for Health (AAHP), the largest source of MediCal revenue for AHS, and Anthem Blue Cross of California. Both of them were prepared to offer private commercial insurance for the low-income "subsidized" population created by the Affordable Care Act of 2010 (ACA). The population most likely to be eligible for subsidized coverage was in the "uninsured" as well as the MediCal and County Indigent populations traditionally served by [Alameda Health System]. However, in November 2013, during the first open enrollment period under the ACA, AAHP was removed from the list of eligible insurers offering health plans through Covered California, the state insurance exchange established under the ACA[, because] AAHP failed to meet a minimum financial solvency requirement to sell commercial insurance coverage.").

[173] Chipty Workpapers.

[174] Chipty Workpapers.

[175] Kane (2015), Exhibit 6.

**Exhibit 11B**
**Map of Berkeley-Oakland HSAs, Alta Bates-Main, and Alta Bates-Summit**



*Sources*: *See* sources for Exhibit 7B.

92.     Exhibit 11C provides some basic facts about local residents. There are approximately 506,000 residents of the candidate geography, about 60 percent of whom are employed. About 79 percent of non-Kaiser, commercially-insured area-patients stay in the area for inpatient hospital services, and they drive an average of 14 minutes for their care. (Professor Gowrisankaran's analysis confirms that a similar percent – 80 percent – of these patients stay in the candidate market for inpatient care.[176]) The approximately 21 percent of area-patients who go outside of the area for their inpatient hospital services drive significantly longer – about 45 minutes – for their care. These statistics suggest that a large majority of area-patients prefer to

[176] Gowrisankaran Report, Figure 5.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER          67

receive their care locally and that the preferences of those who prefer to receive their care in the area may be different from those who do not.[177]

**Exhibit 11C**
**Berkeley-Oakland HSA Profile, OSHPD 2011**

| Description | Berkeley - Oakland HSA |
| --- | --- |
| Population | 506,138 |
| Employed | 60% |
| Average Adjusted Gross Income | $71,919 |
| Area Hospital Discharges | 8,049 |
| Percent that Stay in Area for GAC Inpatient Services | 79% |
| Average Drive Time for Patients that Stayed in Area (Minutes) | 14 |
| Average Drive Time for Patients that Left the Area (Minutes) | 45 |

*Notes*: *See* notes for Exhibit 7C.
*Sources*: *See* sources for Exhibit 7C.

93.     Because there are effectively no other hospitals in the candidate geography, competing against Alta Bates in the upstream market for inclusion in commercial health plans' provider networks, I cannot use the choice model to study diversion patterns or conduct a traditional hypothetical monopolist test. Even if in-network alternatives were present, a hypothetical monopolist test conducted in this geography may define an erroneously broad market if prevailing prices are already supra-competitive due to pre-existing market power.[178,179]

---

[177] In such circumstances, one risks the silent majority fallacy by concluding that the existence of residents who are willing to travel for their care limits hospital market power with respect to residents who are not willing to travel.

[178] A retrospective analysis of the merger between Sutter's Alta Bates and Summit, which created the current Alta Bates Medical Center, found that post-merger prices "increased at both hospitals for every insurer." The authors found that "The price increase for Alta Bates ranges from 10.2% to 20.7%, depending on the insurer, compared to 29.0% to 72.0% at Summit." *See* Tenn, Steven, "The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction," *International Journal of the Economics of Business*, Vol. 18, No.1, 2011, pp. 65-82, at p.75. The hypothetical monopolist over the Alta Bates, Alta Bates-Summit, and Alameda County Medical Center may not be able to elevate prices beyond their already elevated level. Such a finding, however, should not lead to a rejection of the candidate market as a relevant market; to do so, would risk the Cellophane fallacy.

[179] The numerical calculation of the hypothetical monopolist test for the candidate market of Berkeley-Oakland requires information on diversion from Alta Bates to Alameda County Medical Center and Alameda County Medical Center's prices and margins. There are limitations on all three inputs: (a) the diversion between the in-area hospitals will be lower than it may be otherwise, because Alameda County Medical Center was out of network for two of the big non-Kaiser health plans for much of the analysis period; (b) there are no prices for Alameda County Medical Center because it was out of network for both Anthem and Blue Shield; and (c) there are no margins for Alameda County Medical Center. For the sake of completeness, I implemented the numerical calculation using: (a) the econometric diversion; (b) Sutter's Alta Bates prices as a proxy for Alameda County Medical Center's prices; and (c) Sutter's 2009 margin as a proxy for Alameda County Medical Center's variable contribution margin. I find

94.     Instead I look to ordinary-course information that sheds light on patient preferences, including Blue Shield's redirection analysis. ███████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████[180]██████████████ █████████████████████████████████████████████████████ [81] Because of the substantial overlap between Alameda County and the Berkeley-Oakland HSAs,[182]███████████████ ███████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████[83,184]█████████ ███████████████████████████████████████████████ █████████████████████████████████████ [85] Furthermore, a 2011 Blue Shield analysis found that ███████████████████████████████████ [186] This perspective was not limited to Blue

---

that it would be profitable to raise the price at Alta Bates-Main by at most 2.2 percent, and it would be profitable to raise the price at Alta Bates–Summit by at most 2.8 percent. (*See* Chipty Workpapers.) However, for the reasons I describe in the text, one should be careful not to reject the candidate market as the relevant market, despite the numerical result, because of the Cellophane fallacy.

[180] *See* Exhibit 19. Further, 51 percent of Alta Bates-Main PSA discharges and 45 percent of Alta Bates-Summit PSA discharges are in the San Francisco HSA;███████████████████████████████ *See* Chipty Workpapers.

[181]███████████████████████████████████████████████████████████ ██████████████████████████████████

[182] Nearly 85 percent of Alta Bates PSA discharges living in Alameda County are in the two-HSA area of Berkeley and Oakland. *See* Chipty Workpapers.

[183]██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████

[184] Despite these facts, diversion analysis shows John Muir and Alameda County Medical Center were among the highest recipients of patients being diverted away from both Alta Bates and Alta Bates Summit, due to their proximity. These results highlight the importance to patients of staying local. *See* Chipty Workpapers.

[185]████████████████████████████████████████████████████████ █████████████████████████████████

[186] Blue Shield, "Blue Shield of California presented to UFCW & Employers Benefit Trust," December 8, 2011, BSC_SutterSub00013018 at p. 26██████████████████████████████████████.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER          69

Shield. For example, Aetna's Chandra Welsh expressed a similar sentiment: "using my definition of monopoly meaning a must-have from a marketability standpoint, one would be Alta Bates Summit Medical Center, which [is] the only hospital really for Oakland and Berkeley for commercial business."[187] Staff at United also described the Berkeley and Oakland area among those where Sutter has a "geographic monopoly."[188]

95.     Collectively, this evidence indicates that hospitals outside of the candidate market are not good substitutes for hospitals inside of the candidate market, from the perspective of commercial health plans seeking to assemble a commercial viable provider network.[189] As such, I conclude that the candidate geography of combined Berkeley and Oakland HSAs is a relevant market.

### B.     The Relevant Geographic Market for Sutter Coast Is the Crescent City HSA

96.     The candidate relevant geographic market for Sutter Coast is the Crescent City HSA.[190] Sutter Coast is a general acute care hospital, with 59 licensed beds and a designation of Trauma Level 4.[191] It is located in the Crescent City HSA and in Del Norte County. Originally leased to Sutter as Seaside Hospital in 1986, Sutter Coast was rebuilt as a new hospital and began operating in its current location in 1992.[192] As seen in Exhibit 12A, the hospital has a case mix index of 1.01. There are no other hospitals (Kaiser or non-Kaiser) in the candidate geography. Exhibit 12B shows a map depicting Sutter Coast and the boundaries of the candidate geography, which extends into the state of Oregon.

---

[187] Welsh Deposition, p. 196.

[188] Harvey Email, p. 1 (indicating that Sutter has "geographic monopolies for the following submarkets – Auburn, Amador, Tracy. Marin, Vallejo, Antioch, Berkeley, Oakland, San Mateo, Clearlake and Humboldt…Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them.").

[189] *Merger Guidelines* § 4.1.3 ("Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition.").

[190] The Crescent City HSA includes the following zip codes as of 2015: 95531, 95532, 95538, 95543, 95548, 95567, 97415.

[191] OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011; and Sutter Health, "What is a Trauma Center?" available at https://www.sutterhealth.org/services/emergency/trauma-centers, *site visited* March 17, 2018.

[192] Sutter Health, "Sutter Coast History," available at https://www.sutterhealth.org/coast/about/history/history-coast, *site visited* March 17, 2018.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Exhibit 12A**
**Sutter Coast Hospital Profile, OSHPD 2011**

| HSA | Crescent City |
|---|---|
| County | Del Norte |
| **Annual Number of Discharges** | 294 |
| **Case Mix Index** | 1.01 |
| **Number of Beds** | 59 |
| **Trauma Center** | Yes |
| **Non-Sutter, Non-Kaiser Hospital(s) in HSA** | None |

*Notes*: *See* notes for Exhibit 7A
*Sources*: *See* sources for Exhibit 7A.

**Exhibit 12B**
**Map of Crescent City HSA and Sutter Coast**



*Sources*: *See* sources for Exhibit 7B.

97.     Exhibit 12C provides some basic facts about local residents. There are
approximately 35,000 residents of the candidate geography, about 39 percent of whom are

employed. About 72 percent of non-Kaiser, commercially-insured area-patients stay in the area for inpatient hospital services, and they drive an average of 32 minutes for their care. About 28 percent of area-patients travel outside of the area for their inpatient hospital services.[193] These statistics show that a significant share of area-patients prefers to receive their care locally.

**Exhibit 12C**
**Crescent City HSA Profile, OSHPD 2011**

| Description | Crescent City HSA |
|---|---|
| Population | 34,476 |
| Employed | 39% |
| Average Adjusted Gross Income | $42,769 |
| Area Hospital Discharges | 404 |
| Percent that Stay in Area for GAC Inpatient Services | 72% |
| Average Drive Time for Patients that Stayed in Area (Minutes) | 32 |
| Average Drive Time for Patients that Left the Area (Minutes) | 275 |

*Notes*:
1. The OSHPD data are missing data for area-patients that choose an Oregon hospital; as such, the 275 minutes of average drive time shown in the table is for area-patients that choose a California hospital outside of the area.
2. *See* notes for Exhibit 7C.

*Sources*: *See* sources for Exhibit 7C.

98.     Ordinary-course documents indicate that health plans do not have substitute for Sutter Coast.[194] Blue Shield ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████ [195] Sutter itself explains that for hospitals whose next closest facility is at least 30 miles away, the local hospital "acts as a sole practical resource for acute care and emergency care"

---

[193] Because the OSHPD discharge data do not contain Oregon hospitals, I can only compute average drive times for area-residents patients who choose out-of-area hospitals in California: this average drive time in this case is 275 minutes.

[194] ████████████████████████████████████████████████████████████████████████
████████████

[195] ████████████████████████████████████████████████████████████████████ *See also*, Welsh Deposition, pp. 196-198 (describing Sutter Coast, Sutter Lakeside, and Sutter Auburn as "must-have from a marketability standpoint," and explaining that these rural hospitals are "really it for a given area.").

within the community it serves.[196] Consistent with this evidence, Professor Gowrisankaran finds no hospitals within a 30-minute drive of Sutter Coast[197] and describes Crescent City HSA an "isolated geographic location on the coast of the Oregon-California border."[198]

99.     Because there are no other hospitals in the candidate geography, I cannot use the choice model to study diversion patterns. Instead I look to the Blue Shield redirection analysis that provides ordinary-course information on where Blue Shield expected people to go if Sutter Coast were to be taken out of network. In this case, patients would experience a significant increase in out-of-pocket expenses, and Blue Shield would experience a significant increase in hospital reimbursement rates, because of Sutter's non-par provisions requiring payment at 95 to 100 percent of billed charges for out-of-network usage. Despite the price increase, Blue Shield anticipated that



100.     Collectively, this evidence indicates that hospitals outside of the candidate market are not good substitutes for hospitals inside of the candidate market, from the perspective of commercial health plans seeking to assemble a commercial viable provider network.[200] As such, I conclude that the candidate geography of the Crescent City HSA is a relevant antitrust market in this matter.

---

[196] Blue Cross of California and Sutter Health Systemwide Amendment, February 18, 2001, DEF000097795-900, at 801 ("1.20 Rural Hospital. A Rural Hospital is a designation given by Sutter Health to any facility which acts as a sole practical resource for acute care and emergency care within the rural community it serves, and the next closest facility is at least 30 miles away from the Rural Hospital."). *See also*, Deposition of Melissa Brendt, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, May 15, 2018 (hereafter "Brendt Deposition"), p. 202 ("Q: So this document, you're saying that … Sutter Coast Hospital acts as a sole practical resource for acute care and emergency care within the community that it serves; correct? A: Yes.").

[197] Gowrisankaran Report, Exhibit 7.

[198] Gowrisankaran Report, p. 7.

[199] I find that 100 percent of Sutter Coast PSA discharges are in the Crescent City HSA; ████████████████████████████████ *See* Exhibit 19 and Chipty Workpapers.

[200] *Merger Guidelines* § 4.1.3 ("Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition.").

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER            73

### C.      The Relevant Geographic Market for Sutter Lakeside Is the Lakeport HSA

101.    The candidate relevant geographic market for Sutter Lakeside is the Lakeport HSA.[201] Sutter Lakeside is a critical access,[202] general acute care hospital with only 37 beds and a Trauma Level IV designation. It is located in the Lakeport HSA, in Lake County. The hospital was founded in 1945 and became affiliated with Sutter Health in 1992.[203] As seen in Exhibit 13A, the hospital has a case mix index of 1.23. There are no other hospitals (Kaiser or non-Kaiser) in the candidate geography. Exhibit 13B shows a map depicting Sutter Lakeside and the boundaries of the candidate geography.

**Exhibit 13A**
**Sutter Lakeside Hospital Profile, OSHPD 2011**

| HSA | Lakeport |
|---|---|
| County | Lake |
| Annual Number of Discharges | 302 |
| Case Mix Index | 1.23 |
| Number of Beds | 37 |
| Trauma Center | Yes |
| Non-Sutter, Non-Kaiser Hospital(s) in HSA | None |

*Notes: See* notes for Exhibit 7A.
*Sources*: *See* sources for Exhibit 7A.

---

[201] The Lakeport HSA includes the following zip codes as of 2015: 95426, 95435, 95451, 95453, 95458, 95464, 95485, 95493. The following zip code was removed from Lakeport HSA between 2011 and 2015: 95715.

[202] California Critical Access Hospital Network, "Critical Access Hospital Profiles," available at https://www.ccahn.org/about-network/critical-access-hospital-profiles, *site visited* March 17, 2018.

[203] California Critical Access Hospital Network, "Sutter Lakeside Hospital," available at https://www.ccahn.org/hospital-profile/sutter-lakeside-hospital, *site visited* March 17, 2018.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**                        74

**Exhibit 13B**
**Map of Lakeport HSA and Sutter Lakeside**



*Sources*: *See* sources for Exhibit 7B.

102.    Exhibit 13C provides some basic facts about local residents. There are approximately 27,000 residents of the candidate geography, 45 percent of whom are employed. About 50 percent of area's non-Kaiser, commercially-insured area-patients stay in the area for inpatient hospital services, and they drive an average of 16 minutes for their care. The approximately 50 percent of area-patients who go outside of the area for their inpatient hospital services drive significantly longer – an average of 107 minutes – for their care. These statistics suggest that a significant share of area-patients prefer to receive their care locally and that the

preferences of those who receive their care in the area may be different from those who do not.[204]

**Exhibit 13C**
**Lakeport HSA Profile, OSHPD 2011**

| Description | Lakeport HSA |
|---|---|
| Population | 26,686 |
| Employed | 45% |
| Average Adjusted Gross Income | $43,816 |
| Area Hospital Discharges | 505 |
| Percent that Stay in Area for Hospital Services | 50% |
| Average Drive Time for Patients that Stayed in Area (Minutes) | 16 |
| Average Drive Time for Patients that Left the Area (Minutes) | 107 |

*Notes*: *See* notes for Exhibit 7C.
*Sources*: *See* sources for Exhibit 7C.

103.     Ordinary-course documents indicate that health plans ████████████
████████████[205] Blue Shield also recognizes that ████████████████
████████████████████████████████████████████████████████████
████████████[206] Sutter itself explains that for hospitals whose next closest facility is at least 30 miles away, the local hospital "acts as a sole practical resource for acute care and emergency care" within the community it serves.[207] Consistent with this evidence, Professor Gowrisankaran finds that there is no other hospital within a 30-minute drive of Sutter Lakeside[208] and that the

---

[204] In such circumstances, one risks the silent majority fallacy by concluding that the existence of residents who are willing to travel for their care limits hospital market power with respect to residents who are not willing to travel.

[205] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

[206] ████████████████████████████████████████████████████████ *See also*, Welsh Deposition, pp. 196-198 (describing Sutter Coast, Sutter Lakeside, and Sutter Auburn as "must-have from a marketability standpoint," and explaining that these rural hospitals are "really it for a given area.").

[207] Blue Cross of California and Sutter Health Systemwide Amendment, February 18, 2001, DEF000097795-900, at 801 ("1.20 Rural Hospital. A Rural Hospital is a designation given by Sutter Health to any facility which acts as a sole practical resource for acute care and emergency care within the rural community it serves, and the next closest facility is at least 30 miles away from the Rural Hospital."). *See also* Brendt Deposition, p. 202 ("Q: So this document, you're saying that Sutter Lakeside Hospital acts as a sole practical resource for acute care and emergency care within the community that it serves; correct? A: That is how we identified it, yes.").

[208] Gowrisankaran Report, Exhibit 7.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

majority of Lakeport HSA discharges live more than 30 minutes from a non-Sutter hospital in another HSA.[209]

104.     Because there are no other hospitals in the candidate geography, I cannot use the choice model to study diversion patterns. Instead I look to the Blue Shield redirection analysis that provides ordinary-course information on where Blue Shield expected people to go if Sutter Lakeside were to be taken out of network. In this case, patients would experience a significant increase in out-of-pocket expenses, and Blue Shield would experience a significant increase in hospital reimbursement rates, because of Sutter's non-par provisions requiring payment at 95 to 100 percent of billed charges for out-of-network usage. Despite the price increase, Blue Shield anticipated that ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████

105.     Collectively, this evidence indicates that hospitals outside of the candidate market are not good substitutes for hospitals inside of the candidate market, from the perspective of commercial health plans seeking to assemble a commercial viable provider network.[211] As such, I conclude that the candidate geography of the Lakeport HSA is a relevant antitrust market in this matter.

### D.     The Relevant Geographic Market for Sutter Delta Is the Antioch HSA

106.     The candidate relevant geographic market for Sutter Delta is the Antioch HSA.[212] Sutter Delta is a general acute care hospital with 145 beds. It is located in the Antioch HSA, in Contra Costa County.[213] The hospital is known for its Women's Health Center and Level II

---

[209] Gowrisankaran Report, Exhibit 8.

[210] I find that 82 percent of Sutter Lakeside PSA discharges are in the Lakeport HSA; ██████████████ ██████████████████████████████████████████████████████████████████ *See* Exhibit 19 and Chipty Workpapers.

[211] *Merger Guidelines* § 4.1.3 ("Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition.").

[212] The Antioch HSA includes the following zip codes as of 2015: 94505, 94509, 94511, 94513, 94514, 94531, 94548, 94561.

[213] OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

neonatal intensive care unit.[214] The hospital was known as Delta Memorial Hospital before joining the Sutter system in the 1990s.[215] As seen in Exhibit 14A, the hospital has a case mix index of 1.08. There are no other non-Kaiser hospitals in the candidate geography.[216] Exhibit 14B shows a map depicting Sutter Delta and the boundaries of the candidate geography.

**Exhibit 14A**
**Sutter Delta Hospital Profile, OSHPD 2011**

| HSA | Antioch |
|---|---|
| County | Contra Costa |
| Annual Number of Discharges | 1,350 |
| Case Mix Index | 1.08 |
| Number of Beds | 145 |
| Trauma Center | No |
| Non-Sutter, Non-Kaiser Hospital(s) in HSA | None |

*Notes: See* notes for Exhibit 7A.
*Sources: See* sources for Exhibit 7A.

---

[214] Sutter Health, "Sutter Delta Medical Center," available at
http://www.babies.sutterhealth.org/delivering/delivery_delta html, *site visited* May 23, 2018.

[215] Sutter Health, "Sutter Delta Medical Center – History Timeline by Decade," available at
https://www.sutterhealth.org/delta/about/history/history-delta, *site visited* May 23, 2018.

[216] There is one Kaiser hospital, Kaiser Foundation Hospital – Antioch, in the Antioch HSA.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Exhibit 14B**
**Map of Antioch HSA and Sutter Delta**



*Sources*: *See* sources for Exhibit 7B.

107.    Exhibit 14C provides basic facts about local residents. There are approximately 172,000 residents of the candidate geography, about 58 percent of whom are employed. About 40 percent of the non-Kaiser, commercially-insured area-patients stay in the area for inpatient hospital services, and they drive an average of 17 minutes for their care. The approximately 60 percent of area-patients who go outside of the area for their inpatient hospital services drive significantly longer – an average of 44 minutes – for their care. These statistics suggest that a significant share of area-patients prefer to receive their care locally and that the preferences of

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

those who receive their care in the area may be different from those who travel outside of the area for their care.[217]

**Exhibit 14C**
**Antioch HSA Profile, OSHPD 2011**

| Description | Antioch HSA |
|---|---|
| Population | 171,575 |
| Employed | 58% |
| Average Adjusted Gross Income | $60,631 |
| Area Hospital Discharges | 2,865 |
| Percent that Stay in Area for Hospital Services | 40% |
| Average Drive Time for Patients that Stayed in Area (Minutes) | 17 |
| Average Drive Time for Patients that Left the Area (Minutes) | 44 |

*Notes*: *See* notes for Exhibit 7C.
*Sources*: *See* sources for Exhibit 7C.

108.    Ordinary-course documents indicate that health plans do have a substitute for Sutter Delta. For example, according to United, Sutter has a "geographic monopoly" in Antioch and it is not feasible to present a commercially viable health plan without the hospital.[218] Because there are no other non-Kaiser hospital in the candidate geography, I cannot use the choice model to study diversion patterns. Instead I look to the Blue Shield redirection analysis that provides ordinary-course information on where Blue Shield expected people to go if Sutter Delta were to be taken out of network. In this case, patients would experience a significant increase in out-of-pocket expenses, and Blue Shield would experience a significant increase in hospital reimbursement rates, because of Sutter's non-par provisions requiring payment at 95 to 100 percent of billed charges for out-of-network usage. Despite the price increase, Blue Shield anticipated that ███████████████████████████████████████████████████

---

[217] In such circumstances, one risks the silent majority fallacy by concluding that the existence of residents who are willing to travel for their care limits hospital market power with respect to residents who are not willing to travel.

[218] Harvey Email, p. 1 (indicating that Sutter has "geographic monopolies for the following submarkets – Auburn, Amador, Tracy. Marin, Vallejo, Antioch, Berkeley, Oakland, San Mateo, Clearlake and Humboldt…Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them.").



[219]

109.   Collectively, this evidence indicates that hospitals outside of the candidate market are not good substitutes for hospitals inside of the candidate market, from the perspective of commercial health plans seeking to assemble a commercial viable provider network.[220] As such, I conclude that the candidate geography of the Antioch HSA is a relevant antitrust market in this matter.

### E.   The Relevant Geographic Market for Sutter Amador Is the Jackson HSA

110.   The candidate relevant geographic market for Sutter Amador is the Jackson HSA.[221] Sutter Amador is a general acute care hospital, with 52 licensed beds. It is located in the Jackson HSA, in Amador County. Originally called Amador County Hospital, the facility was built in 1876, rebuilt in 1952, and heavily expanded in both 1972 and 1990 before affiliating with Sutter Health in 1993, after which it was rebuilt again before opening in its current state on April 10, 2000.[222] As seen in Exhibit 15A, Sutter Amador has a case mix index of 1.01. There are no other hospitals (Kaiser or non-Kaiser) in the candidate geography. Exhibit 15B shows a map depicting Sutter Amador and the boundaries of the candidate geography.

---

[219] I find that 77 percent of Sutter Delta PSA discharges are in the Antioch HSA; ▮▮▮▮▮▮▮▮▮▮▮ *See* Exhibit 19 and Chipty Workpapers.

[220] *Merger Guidelines* § 4.1.3 ("Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition.").

[221] The Jackson HSA includes the following zip codes as of 2015: 95232, 95255, 95601, 95629, 95640, 95642, 95644, 95646, 95654, 95665, 95666, 95669, 95675, 95685, 95689, 95699. The following zip codes were removed from Jackson HSA between 2011 and 2015: 95257 and 95656.

[222] Sutter Health, "Sutter Amador History," available at https://www.sutterhealth.org/amador/about/history/history-amador, *site visited* March 17, 2018.

**Exhibit 15A**
**Sutter Amador Hospital Profile, OSHPD 2011**

| HSA | Jackson |
|---|---|
| County | Amador |
| Annual Number of Discharges | 357 |
| Case Mix Index | 1.01 |
| Number of Beds | 52 |
| Trauma Center | No |
| Non-Sutter, Non-Kaiser Hospital(s) in HSA | None |

*Notes*: *See* notes for Exhibit 7A.
*Sources*: *See* sources for Exhibit 7A.

**Exhibit 15B**
**Map of Jackson HSAs and Sutter Amador**



*Sources*: *See* sources for Exhibit 7B.

111.    Exhibit 15C provides some basic facts about local residents. There are approximately 34,000 residents of the candidate geography, about 39 percent of whom are

employed. About 43 percent of non-Kaiser, commercially-insured area-patients stay in the area for inpatient hospital services, and they drive an average of 21 minutes for their care. The approximately 57 percent of area-patients who go outside of the area for their inpatient hospital services drive significantly longer – an average of 71 minutes – for their care. These statistics suggest that a significant share of area-patients prefer to receive their care locally and that the preferences of those who receive their care in the area may be different from those who travel outside of the area for their care.[223]

**Exhibit 15C**
**Jackson HSA Profile, OSHPD 2011**

| Description | Jackson HSA |
|---|---|
| Population | 34,000 |
| Employed | 39% |
| Average Adjusted Gross Income | $54,935 |
| Area Hospital Discharges | 619 |
| Percent that Stay in Area for Hospital Services | 43% |
| Average Drive Time for Patients that Stayed in Area (Minutes) | 20.6 |
| Average Drive Time for Patients that Left the Area (Minutes) | 71.3 |

*Notes*: *See* notes for Exhibit 7C.
*Sources*: *See* sources for Exhibit 7C.

112.    Ordinary-course documents indicate that health plans do not see an alternative to contracting with Sutter Amador.[224] According to United, Sutter has a "geographic monopoly" in Amador, and it is not feasible to present a commercially viable health plan without the hospital.[225] ███████████████████████████████████████████████████████████
███████████████████████████[226] Sutter itself explains that for hospitals whose next closest

---

[223] In such circumstances, one risks the silent majority fallacy by concluding that the existence of residents who are willing to travel for their care limits hospital market power with respect to residents who are not willing to travel.

[224] ████████████████████████████████████████████████████████████
██████████████████

[225] Harvey Email, p. 1 (indicating that Sutter has "geographic monopolies for the following submarkets – Auburn, Amador, Tracy. Marin, Vallejo, Antioch, Berkeley, Oakland, San Mateo, Clearlake and Humboldt…Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them.").

[226] ████████████████████████████████████████████████████████████

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER          83

facility is at least 30 miles away, the local hospital "acts as a sole practical resource for acute care and emergency care" within the community it serves.[227]

113.    Because there is no other hospital in the candidate geography, I cannot use the choice model to study diversion patterns. Instead, I look to the Blue Shield redirection analysis that provides ordinary-course information on where Blue Shield expected people to go if Sutter Amador were to be taken out of network. In this case, patients would experience a significant increase in out-of-pocket expenses, and Blue Shield would experience a significant increase in hospital reimbursement rates, because of Sutter's non-par provisions requiring payment at 95 to 100 percent of billed charges for out-of-network usage. Despite the price increase, Blue Shield anticipated that ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████

114.    Collectively, this evidence indicates that hospitals outside of the candidate market are not good substitutes for hospitals inside of the candidate market, from the perspective of commercial health plans seeking to assemble a commercial viable provider network.[229] As such,



[227] Blue Cross of California and Sutter Health Systemwide Amendment, February 18, 2001, DEF000097795-900, at 801 ("1.20 Rural Hospital. A Rural Hospital is a designation given by Sutter Health to any facility which acts as a sole practical resource for acute care and emergency care within the rural community it serves, and the next closest facility is at least 30 miles away from the Rural Hospital."). *See also*, Brendt Deposition, p. 200 ("Q: So here Sutter was saying that Sutter Amador Hospital acts as a sole practical resource for acute care and emergency care within the community that it serves, isn't that right? A: Yes.").

[228] I find that 66 percent of Sutter Amador PSA discharges are in the Jackson HSA; ██████████████████████████ *See* Exhibit 19 and Chipty Workpapers.

[229] *Merger Guidelines* § 4.1.3 ("Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition.").

I conclude that the candidate geography of the Jackson HSA is a relevant antitrust market in this matter.

### F.     The Relevant Geographic Market for Sutter Tracy Is the Tracy HSA

115.     The candidate relevant geographic market for Sutter Tracy is the Tracy HSA.[230] Sutter Tracy is a general acute care hospital with 82 beds.[231] It is located in the Tracy HSA, in San Joaquin County. Sutter Tracy was established as Tracy Community Memorial Hospital in 1948 and affiliated with Sutter Health in 1993.[232] As seen in Exhibit 16A the hospital has a case mix index of 1.01. There are no other hospitals (Kaiser or non-Kaiser) in the candidate geography. Exhibit 16B shows a map depicting Sutter Tracy and the boundaries of the candidate geography.

**Exhibit 16A**
**Sutter Tracy Hospital Profile, OSHPD 2011**

| HSA | Tracy |
|---|---|
| County | San Joaquin |
| Annual Number of Discharges | 1,095 |
| Case Mix Index | 1.01 |
| Number of Beds | 82 |
| Trauma Center | No |
| Non-Sutter, Non-Kaiser Hospital(s) in HSA | None |

*Notes: See* notes for Exhibit 7A.
*Sources*: *See* sources for Exhibit 7A.

---

[230] The Tracy HSA includes the following zip codes as of 2015: 95304, 95376, 95377, 95378, 95391. The following zip code was removed from Tracy HSA between 2011 and 2015: 95296.

[231] OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

[232] Sutter Health, "Sutter Tracy History," available at https://www.sutterhealth.org/stch/about/history/history-stch, *site visited*, March 17, 2018.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**          85

**Exhibit 16B**
**Map of Tracy HSA and Sutter Tracy**



*Sources*: *See* sources for Exhibit 7B.

116.    Exhibit 16C provides some basic facts about local residents. There are approximately 84,000 residents of the candidate geography, about 58 percent of whom are employed. About 57 percent of the non-Kaiser, commercially-insured area-patients stay in the area for inpatient hospital services, and they drive an average of nine minutes for their care. The approximately 43 percent of area-patients who go outside of the area for their inpatient hospital services drive significantly longer – an average of 51 minutes – for their care. These statistics suggest that a significant share of area-patients prefer to receive their care locally and that the preferences of those who receive their care in the area may be different from those who travel outside of the area for their care.[233]

---

[233] In such circumstances, one risks the silent majority fallacy by concluding that the existence of residents who are willing to travel for their care limits hospital market power with respect to residents who are not willing to travel.

**Exhibit 16C**
**Tracy HSA Profile, OSHPD 2011**

| Description | Tracy HSA |
|---|---|
| Population | 83,842 |
| Employed | 58% |
| Average Adjusted Gross Income | $60,861 |
| Area Hospital Discharges | 1,494 |
| Percent that Stay in Area for Hospital Services | 57% |
| Average Drive Time for Patients that Stayed in Area (Minutes) | 9 |
| Average Drive Time for Patients that Left the Area (Minutes) | 51 |

*Notes*: *See* notes for Exhibit 7C.
*Sources*: *See* sources for Exhibit 7C.

117.     Ordinary-course documents indicate that health plans do not have a substitute for Sutter Tracy. For example, according to United, Sutter has a "geographic monopoly" in Tracy, and it is not feasible to present a commercially viable health plan without the hospital.[234] Sutter's own planning document describes Sutter Tracy as the "only hospital in the area."[235] Because there are no other hospitals in the candidate geography, I cannot use the choice model to study diversion patterns. Instead I look to the Blue Shield redirection analysis that provides ordinary-course information on where Blue Shield expected people to go if Sutter Tracy were to be taken out of network. In this case, patients would experience a significant increase in out-of-pocket expenses, and Blue Shield would experience a significant increase in hospital reimbursement rates, because of Sutter's non-par provisions requiring payment at 95 to 100 percent of billed charges for out-of-network usage. Despite the price increase, Blue Shield anticipated that it

██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████

---

[234] Harvey Email, p. 1 (indicating that Sutter has "geographic monopolies for the following submarkets – Auburn, Amador, Tracy. Marin, Vallejo, Antioch, Berkeley, Oakland, San Mateo, Clearlake and Humboldt…Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them.").

[235] Matson, Ted, "STCH AG Retreat, CVR Strategy and Business Development" January 26, 2010, STCA0510319, p. 8.

[236] I find that 43 percent of Sutter Tracy discharges are in the Tracy HSA; ██████████████████████ *See* Exhibit 19 and Chipty Workpapers.

118.    Collectively, this evidence suggests that hospitals outside of the candidate market are not good substitutes for hospitals inside of the candidate market, from the perspective of commercial health plans seeking to assemble a commercial viable provider network.[237] If they were, the area around Sutter Tracy would not be described as a "geographic monopoly."

### G.    The Relevant Geographic Market for Sutter Auburn Is the Auburn HSA

119.    The candidate relevant geographic market for Sutter Auburn is the Auburn HSA.[238] Sutter Auburn is a general acute care hospital, with 78 licensed beds. It is located in the Auburn HSA, in Placer County. The hospital was founded in 1966 and became affiliated with Sutter Health in 1989.[239] As seen in Exhibit 17A, the hospital has a case mix index of 1.29. There are no other hospitals (Kaiser or non-Kaiser) in the candidate geography. Exhibit 17B shows a map depicting Sutter Auburn and the boundaries of the candidate geography for the relevant market.

**Exhibit 17A**
**Sutter Auburn Hospital Profile, OSHPD 2011**

| HSA | Auburn |
|---|---|
| County | Placer |
| Annual Number of Discharges | 737 |
| Case Mix Index | 1.29 |
| Number of Beds | 78 |
| Trauma Center | No |
| Non-Sutter, Non-Kaiser Hospital(s) in HSA | None |

*Notes: See* notes for Exhibit 7A.
*Sources: See* sources for Exhibit 7A.

---

[237] *Merger Guidelines* § 4.1.3 ("Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition.").

[238] The Auburn HSA includes the following zip codes as of 2015: 95602, 95603, 95604, 95614, 95631, 95658, 95664, 95701, 95703, 95713, 95714, 95717, 95722, 95736. The following zip code was removed from Auburn HSA between 2011 and 2015: 95715.

[239] Caspers, Tricia, "Sutter Auburn Faith Hospital Celebrates 50 Years," *Auburn Journal*, July 14, 2016, available at http://www. auburnjournal.com/article/7/14/16/sutter-auburn-faith-hospital-celebrates-50-years, *site visited* March 17, 2018.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

**Exhibit 17B**
**Map of Auburn HSA and Sutter Auburn**



*Sources*: *See* sources for Exhibit 7B.

120.    Exhibit 17C provides some basic facts about local residents. There are approximately 69,000 residents of the candidate geography, about 50 percent of whom are employed. About 37 percent of non-Kaiser, commercially-insured area-patients stay in the area for inpatient hospital services, and they drive an average of 18 minutes for their care. The approximately 63 percent of area-patients who go outside of the area for their inpatient hospital services drive significantly longer – an average of 45 minutes – for their care. These statistics suggest that a significant share of area-patients prefer to receive their care locally and that the preferences of those who receive their care in the area may be different from those who travel outside of the area for their care.[240]

---

[240] In such circumstances, one risks the silent majority fallacy by concluding that the existence of residents who are willing to travel for their care limits hospital market power with respect to residents who are not willing to travel.

**Exhibit 17C**
**Auburn HSA Profile, OSHPD 2011**

| Description | Auburn HSA |
|---|---|
| Population | 68,647 |
| Employed | 50% |
| Average Adjusted Gross Income | $65,737 |
| Area Hospital Discharges | 1,439 |
| Percent that Stay in Area for Hospital Services | 37% |
| Average Drive Time for Patients that Stayed in Area (Minutes) | 18 |
| Average Drive Time for Patients that Left the Area (Minutes) | 45 |

*Notes*: *See* notes for Exhibit 7C.
*Sources*: *See* sources for Exhibit 7C.

121.    Ordinary-course documents indicate that health plans do not see an alternative to contracting with Sutter Auburn.[241] According to United, Sutter has a "geographic monopoly" in Auburn, and it is not feasible to present a commercially viable health plan without the hospital.[242] Blue Shield also recognizes that 

[243] [244] Consistent with this evidence, Professor Gowrisankaran found 56 percent of Auburn HSA discharges live more than 30 minutes away from a non-Sutter hospital in another HSA.[245]

---

[241] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[242] Harvey Email, p. 1 (indicating that Sutter has "geographic monopolies for the following submarkets – Auburn, Amador, Tracy. Marin, Vallejo, Antioch, Berkeley, Oakland, San Mateo, Clearlake and Humboldt…Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them.").

[243] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See also*, Welsh Deposition, pp. 196-198 (describing Sutter Coast, Sutter Lakeside, and Sutter Auburn as "must-have from a marketability standpoint," and explaining that these rural hospitals are "really it for a given area.").

[244] ▮▮▮▮▮▮▮

[245] Gowrisankaran Report, Exhibit 8.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

122.    Because there are no other hospitals in the candidate geography, I cannot use the choice model to study diversion patterns. Instead I look to the Blue Shield redirection analysis that provides ordinary-course information on where Blue Shield expected people to go if Sutter Auburn were to be taken out of network. In this case, patients would experience a significant increase in out-of-pocket expenses, and Blue Shield would experience a significant increase in hospital reimbursement rates, because of Sutter's non-par provisions requiring payment at 95 to 100 percent of billed charges for out-of-network usage. Despite the price increase, Blue Shield anticipated that ███████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████

123.    Collectively, this evidence suggests that hospitals outside of the candidate market are not good substitutes for hospitals inside of the candidate market, from the perspective of commercial health plans seeking to assemble a commercial viable provider network.[247] If they were, the area around Sutter Tracy would not be described as a "geographic monopoly."

### H.    The Relevant Geographic Market for Sutter Davis Is the 90 Percent Primary Service Area for Sutter Davis

124.    The candidate relevant geographic market for Sutter Davis is the Davis HSA.[248] Sutter Davis is a general acute care hospital with 48 beds. It is located in the Davis HSA, in Yolo County.[249] Originally opened in 1968, the hospital was purchased by Sutter Health in 1981, making it one of the system's longest-tenured hospitals.[250] As seen in Exhibit 18A the hospital has a case mix index of 0.98. There are no other hospitals (Kaiser or non-Kaiser) in the candidate geography. Exhibit 18B shows a map depicting Sutter Davis and the boundaries of the candidate geography.

---

[246] I find that 35 percent of Sutter Auburn PSA discharges are in the Auburn HSA; ███████████████ ████████████████████████████████████████████ *See* Exhibit 19 and Chipty Workpapers.

[247] *Merger Guidelines* § 4.1.3 ("Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition.").

[248] The Davis HSA includes the following zip codes as of 2015: 95616, 95617, 95618, 95620, 95694.

[249] OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

[250] Sutter Health, 2018, "Our History – Sutter Davis Hospital," available at http://www.sutterdavis.org/about/history.html, *site visited* March 17, 2018.

**Exhibit 18A**
**Sutter Davis Hospital Profile, OSHPD 2011**

| HSA | Davis |
|---|---|
| County | Yolo |
| Annual Number of Discharges | 1,152 |
| Case Mix Index | 0.98 |
| Number of Beds | 48 |
| Trauma Center | No |
| Non-Sutter, Non-Kaiser Hospital(s) in HSA | None |

*Notes: See* notes for Exhibit 7A.
*Sources*: *See* sources for Exhibit 7A.

**Exhibit 18B**
**Map of Davis HSA and Sutter Davis**



*Sources*: *See* sources for Exhibit 7B.

125.     Exhibit 18C provides some basic facts about local residents. There are approximately 90,000 residents of the candidate geography, about 55 percent of whom are employed. About 38 percent of the non-Kaiser, commercially-insured, area-patients stay in the area for inpatient hospital services, and they drive an average of 15 minutes for their care. The approximately 62 percent of area-patients who go outside of the area for their inpatient hospital services drive significantly longer – an average of 39 minutes – for their care. These statistics suggest that a significant share of area-patients prefer to receive their care locally and that the preferences of those who receive their care in the area may be different from those who travel outside of the area for their care.[251]

**Exhibit 18C**
**Davis HSA Profile, OSHPD 2011**

| Description | Davis HSA |
|---|---|
| Population | 89,861 |
| Employed | 55% |
| Average Adjusted Gross Income | $72,634 |
| Area Hospital Discharges | 1,327 |
| Percent that Stay in Area for Hospital Services | 38% |
| Average Drive Time for Patients that Stayed in Area (Minutes) | 15 |
| Average Drive Time for Patients that Left the Area (Minutes) | 39 |

*Notes: See* notes for Exhibit 7C.
*Sources*: *See* sources for Exhibit 7C.

126.     Because there are no other hospitals in the candidate geography, I cannot use the choice model to study diversion patterns. Instead I look to the Blue Shield redirection analysis that provides ordinary-course information on where Blue Shield expected people to go if Sutter Davis were to be taken out of network. In this case, patients would experience a significant increase in out-of-pocket expenses, and Blue Shield would experience a significant increase in hospital reimbursement rates, because of Sutter's non-par provisions requiring payment at 95 to 100 percent of billed charges for out-of-network usage. Despite the price increase, Blue Shield anticipated that ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████

---

[251] In such circumstances, one risks the silent majority fallacy by concluding that the existence of residents who are willing to travel for their care limits hospital market power with respect to residents who are not willing to travel.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

█████ However, only eight percent of Sutter Davis' PSA discharges live in the Davis HSA; accordingly, one cannot conclude, on the basis of this evidence, that the preferences of the residents of the candidate geography resemble █████████████████████ Instead, my analysis shows that the relevant antitrust market for Sutter Davis is no broader than the PSA, shown in Exhibit 18B.[252]

*\*\**

127.     My analysis for each candidate market involves an analysis of data, documents, and deposition testimony within the framework of the hypothetical monopolist test. In each instance, my analysis begins with a description of the share of area-patients that preferred to stay local for their care and the difference in drive times between area-patients that stayed inside the candidate market and those that went outside for their hospital care. For seven of the eight candidate markets, excluding the Davis HSA, I also relied on ordinary-course documents and deposition testimony, including the Blue Shield redirection analysis and health plan and Sutter's own descriptions of the area around the Tying hospital as a "monopoly." Based on this analysis, I conclude that the Berkeley-Oakland, Crescent City, Antioch, Lakeport, Jackson, Tracy, and Auburn HSAs are economically coherent relevant antitrust markets. I also conclude that Davis is not a relevant antitrust market; instead, the evidence suggests that the relevant antitrust market containing Sutter Davis is no bigger than Sutter Davis' 90 percent primary service area.

128.     As I explain below, in the discussion of market power, the conclusions with respect to market power are not sensitive to the precise boundaries of these relevant markets.

---

[252] The calculation of the hypothetical monopolist's optimal price requires information on diversion, relative prices, and commercial contribution margins. I use the diversion estimates from the choice model described in Appendix C. I use relative prices constructed from Anthem claims data. I use the local Sutter hospital's contribution margin as a proxy for the contribution margin for the local non-Sutter hospital. Sutter has provided information on commercial and commercial fee-for-service margins reported for Sutter Davis that exceed 20 percent in every year from 2009 to 2015, except in 2013, where the commercial margin is reported to be 4.4 percent. Using a contribution margin of 20 percent, I find that the hypothetical monopolist over the broader candidate market of the hospital's PSA could profitably raise price by at least 6.5 percent. I find that the hypothetical monopolist over the hospitals in Davis PSA would find it profitable to raise Sutter Davis' price by at least five percent even if the local non-Sutter hospital margin were as low as 15.5 percent, instead of the assumed 20 percent margin. *See* Chipty Workpapers.

## VII.   General Acute Care Inpatient Services Are a Relevant Product Market

129.    Professor Gowrisankaran does not dispute Plaintiffs' candidate product market of general acute care inpatient services.[253] General acute care hospitals provide a wide variety of acute care inpatient services that are not substitutes for one another. For example, a hip replacement is not a substitute for a normal delivery. However, for practical reasons largely out of convenience, antitrust analysts have aggregated inpatient services together for the purpose of analyzing competitive effects when the behavior at issue is likely to affect the cluster of services in the same way.[254] This condition will tend to be satisfied in circumstances where the cluster of services faces similar competitive conditions.

130.    Outpatient services are not a substitute for inpatient services.[255] Some services, like a surgery to deliver a baby (known as a cesarean section), are only performed on an inpatient basis. Other services can be performed either on an inpatient or outpatient basis. But even in these circumstances, there are differences in medical need. Outpatient services tend to be less complicated, or rather performed on patients with fewer medical complications, and as such outpatient services tend to be less expensive. Thus, because health insurance coverage is typically purchased before medical needs arise, consumers demand access to inpatient services even though outpatient services might be possible for some conditions, under some circumstances. I understand that, for purposes of the motion for summary judgment that Sutter made, it has assumed the existence of the product market alleged in the Fourth Amended Complaint – the market for inpatient hospital services sold to commercial health plans.

131.    For these reasons, a hypothetical monopolist over all inpatient services in a relevant geographic market would be able to raise prices for those services, despite the fact that

---

[253] Gowrisankaran Deposition, p. 116 ("I have not contested that definition in any way, and so I've accepted the plaintiffs' statement that that is the product market.").

[254] Tenn (2017), p. 3 ("Individual inpatient [hospital] services generally are not substitutes for each other. For example, a cardiac procedure is not a substitute for an orthopedic procedure. Because of this lack of interchangeability, in principle one might separately delineate each individual inpatient [hospital] service as a distinct product market. Instead, solely for analytical convenience, a 'cluster market' of inpatient [hospital] services is typically employed in hospital mergers.").

[255] *See* for example, "Brief and Required Short Appendix of Appellants Federal Trade Commission and State of Illinois (Public Version)," *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, et al.*, Case No. 16-2492, filed July 15, 2016, pp. 38-39; "Opinion," *ProMedica Health System, Inc. v. Federal Trade Commission*, Case No. 12-3583, filed April 22, 2014, § II.A; and "Opinion," *United States v. Rockford Memorial Corp.*, Case No. 89-1900, filed April 3, 1990, ¶ 16.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**                95

some inpatient services could be provided on an outpatient basis. Furthermore, a provider network without inpatient hospital services would not be commercially viable because patients would not be willing to replace all inpatient care with outpatient care due to a small but significant and non-transitory increase in the price of inpatient services. Consistent with this fact, I am not aware of any health insurance products in California – whether commercial or government sponsored, whether fully-insured or self-insured – that do not offer inpatient coverage.

## VIII.  Market Power

132.    Market power refers to the ability of a firm or group of firms to raise prices above competitive levels. Only firms with market power can engage in unilateral anticompetitive conduct; absent market power, the conduct would be undone by competitive forces and as such could not have an anticompetitive effect. Thus, market power is a necessary condition to concluding anticompetitive effects. In this case, the question is whether Sutter has market power in one or more of the Tying Markets, relative to one or more of the Tied Markets.

### A.    *Approaches to Assess Market Power*

133.    There can be many different types of indicia of market power. In many instances, high market shares can be indicative of market power. It may be the case that a hospital (or a hospital system) with high market shares is viewed by health plans as a "must-have" provider, meaning that health plans need to include the provider in their network to attract employers and consumers. Such a "must-have" status increases the provider's bargaining leverage in negotiations with health plans which would ultimately lead to increased negotiated reimbursement rates. It is not always clear, however, how high a market share needs to be to conclude market power. Thus, when possible, one should also look for direct evidence of market power, from documents and payer testimony. Evidence that would indicate a hospital has market power includes evidence that: (a) area-residents are insistent on the hospital; and (b) a health plan could not sell an insurance product to area-residents without the hospital being in the provider network.

134.    In its broadest sense, market power is the ability to extract surplus from consumers, either by raising price or reducing quality or choice. In competitive markets, attempts

by firms endeavoring to engage in such behavior would be undone by competitive pressure from rival firms or potential entrants. Thus, as a predicate matter, it is useful to assess whether Sutter in this case has the market power that would be necessary to engage in anticompetitive conduct.

### B.    There Is High Insistence for Sutter Hospitals in the Tying Markets

135.    The ordinary-course documents show that Sutter has bargaining leverage in negotiations with health plans and that this leverage stems from Sutter's market power in specific geographic markets, where health plans need the local Sutter hospital in their provider networks to compete in the downstream market. For example, according to Blue Shield, "Sutter Health has become the largest healthcare system in Northern California with 27 hospitals serving 100 communities. Sutter uses an aggressive bargaining strategy that leverages its overwhelming market power <u>in particular geographic regions</u> to win high-pricing contracts for all its medical groups and facilities."[256] According to United, Sutter has "<u>geographic monopolies</u> for services in the following submarkets - Auburn, Amador, Tracy, Marin, Vallejo, Antioch, Berkeley, Oakland, San Mateo, Clearlake and Humboldt. …Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them. In addition, many of our national accounts require Sutter network participation to retain and grow business."[257]

136.    Consistent with this evidence, Blue Shield's redirection analysis shows that patients who rely on the Sutter hospitals in the Tying Markets are insistent on the hospital being in their provider network.[258] According to Blue Shield, the percent of patients who would likely stay at their chosen Sutter hospital even if that hospital were to go out of network ranges from ██ ████████████████ Blue Shield's redirection analysis shows that the combination of patient preferences and Sutter's 95 percent of billed charges non-participating rate render it ████████ ████████ for Blue Shield to drop any of the hospitals in the Tying Markets.[259] Exhibit 19 shows Blue Shield's hospital insistence parameter for each of the Sutter hospitals in the Tying Markets.

---

[256] Blue Shield of California, "Communications Plan: Sutter Health Contract Negotiations November 28, 2005," Email attachment, November 30, 2005, BSC UFCW 00007608-611, p.9 [Emphasis added].

[257] Harvey Email, p.1 [Emphasis added].

[258] BSC_SutterSub00037814 - 2014-4 Analysis IP Redirect.xls; Barnes Deposition pp. 423-462.

[259] BSC_SutterSub00037814 – 2014-4 Analysis Redirect.xls; and Chipty Workpapers.

**Exhibit 19**
**Blue Shield Estimate of Patient's Insistence**
**for Sutter Hospitals in the Tying Markets**

| Hospital | Hospital Insistence |
|---|---|
| Alta Bates (Combined) | ███ |
| Sutter Coast | ███ |
| Sutter Lakeside | ███ |
| Sutter Delta | ███ |
| Sutter Amador | ███ |
| Sutter Tracy | ███ |
| Sutter Auburn | ███ |
| Sutter Davis | ███ |

*Source*: BSC_SutterSub00037814 – 2014-4 Analysis Redirect.xls.

137.    Consistent with this evidence, Sutter's own documents show a recognition that Sutter faces little to no competition in some regions. For example, a 2010 McKinsey & Company analysis prepared for Sutter describes:[260]

- Sutter Amador, Sutter Lakeside, and Sutter Auburn as the "only" facilities in each hospital's "broader service area;"

- Sutter Delta and Sutter Davis as facing one large competing hospital with more than 100 beds in "immediate service area" and "service area," respectively;

- Sutter Tracy as facing no other competition "in immediate service area."

The same presentation also recognizes that Alta Bates faces "several midsize-to-large competing hospitals in [the] immediate service area," but that Sutter is a "[m]ajor tertiary referral center [there] with a full range of tertiary care."[261] In each instance, even if one accepts McKinsey's description of the competitive landscape, the individual Sutter hospital can be expected to have market power over health plans, irrespective of the boundaries of the geographic market, because it is either the only or one of a handful of area-hospitals.

---

[260] McKinsey & Company, "Building an integrated strategy for excellence in a post-reform environment," Prepared for Sutter Health, December 2, 2010, STCA0602090-142 at 138-142.

[261] McKinsey & Company, "Building an integrated strategy for excellence in a post-reform environment," Prepared for Sutter Health, December 2, 2010, STCA0602090-142 at 139.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**                    98

### C.    There Is Less Insistence for Sutter Hospitals in the Tied Markets

138.    The ordinary-course documents show that Sutter faces more competition in other geographic markets in Northern California. ██████████████████████████████ ████████████████████████████████████████[262] A████████████████████████ ██████████████████████████████████████████████████



Source: ████████████████████████████████████

Consistent with this evidence, Sutter's own documents show a recognition that Sutter faces more local competition against its hospitals in the Tied Markets. The same McKinsey & Company analysis describes Sutter Sacramento and Sutter Modesto as facing competition from "six large" hospitals in the local service areas.[263]

139.    Further, the evidence shows that health plans would be willing to exclude Sutter hospitals in the Tied Markets, at least for some of its insurance products. For example, Chandra Welsh, Aetna's Vice President of Network Management in Northern California, explained that in 2005, Aetna began to exclude Sutter Sacramento from its Aexcel Network, where Sutter Sacramento was an out-of-network provider, and Aetna agreed to pay 95 percent of billed charges to patients who went there.[264]

---

[262] ██████████████████████████████████████████

[263] McKinsey & Company, "Building an integrated strategy for excellence in a post-reform environment," Prepared for Sutter Health, December 2, 2010, STCA0602090-142 at 138 and 140.

[264] Welsh Declaration, ¶ 46; and Welsh Declaration, Exhibit 10 (Email from Chandra Welsh to Brendhan Green, "Subject: Sutter-status," September 2, 2011, AET-ES10025032-033.).

#### D.     *Sutter Has Relatively High Share of Discharges in the Tying Markets, Compared to the Tied Markets*

140.     The evidence shows that Sutter has a relatively high share of discharges in the Tying Markets. These shares are on average higher than the shares in the Tied Markets, where health plans have more options to steer patients to other hospitals. Further, Sutter's share in each of the Tied Markets is likely inflated by Sutter's conduct. Exhibit 21 shows Sutter hospital and system shares. As seen there:

- The Sutter system has a relatively high share of discharges in each of the Tying markets. These range from 45 percent to 84 percent, with an average of 67 percent.[265] By comparison, Sutter's system share in the Tied Markets ranges from 31 percent to 62 percent, with an average of 43 percent.

- With the exception of the Davis HSA, the Sutter hospital in each of the Tying Markets has a relatively high share of the discharges from its respective candidate market. This share ranges from 37 percent to 76 percent, with an average of 53 percent. By comparison, Sutter's hospital share in the Tied Markets ranges from 26 percent to 61 percent, with an average of 39 percent. Sutter's hospital share in Sutter Davis' PSA is only six percent.

Like the other testimony and documentary evidence, these results provide support for the conclusion that Sutter has market power in the Tying Markets, and that it has relatively less market power in the Tied Markets.

---

[265] The two CPMPC facilities and the two Alta Bates facilities are reported on a combined basis. *See* Exhibit 21.

**Exhibit 21**
**Sutter Share of Discharges by HSA, OSHPD 2011**

| Hospital | Market | Market Type | Hospital Share of Discharges | Sutter System Share of Discharges |
|---|---|---|---|---|
| Sutter Sacramento | Sacramento HSA | Tied | 29% | 35% |
| CPMC (Combined) | San Francisco HSA | Tied | 61% | 62% |
| Sutter Modesto | Modesto HSA | Tied | 41% | 45% |
| Sutter Santa Rosa | Santa Rosa HSA | Tied | 26% | 31% |
| Alta Bates (Combined) | Berkeley - Oakland HSAs | Tying | 76% | 84% |
| Sutter Coast | Crescent City HSA | Tying | 72% | 77% |
| Sutter Lakeside | Lakeport HSA | Tying | 50% | 60% |
| Sutter Delta | Antioch HSA | Tying | 40% | 45% |
| Sutter Amador | Jackson HSA | Tying | 43% | 62% |
| Sutter Tracy | Tracy HSA | Tying | 57% | 64% |
| Sutter Auburn | Auburn HSA | Tying | 37% | 73% |
| Sutter Davis | Davis' 90% Service Area | Tying | 6% | 39% |

*Notes: See* notes for Exhibit 7A.
*Sources*:

1. OSHPD Patient Discharge Data, 2011.
2. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.
3. OSHPD Hospital Annual Financial Disclosure Data Complete Data Set, 2011.
4. Centers for Medicare and Medicaid Services (CMS) Historical Impact Files, 2010-2012.
5. Dartmouth Atlas of Healthcare HSA Listings, 2015.

### E. *Kaiser Competition in the Downstream Market Does Not Constrain Sutter's Market Power in the Upstream Market*

141. Evidence from Sutter itself shows that Kaiser does not constrain Sutter's ability to raise prices to non-Kaiser health plans. This fact is seen clearly in an ordinary-course document prepared by Sutter's Chief Financial Officer, Mr. Reed, shown in Exhibit 22. In this document, Mr. Reed explores the possibility of lowering Sutter's prices to health plans, in order to compete more effectively against Kaiser. However, Mr. Reed concludes that it does not make financial sense to do so. Specifically, Mr. Reed testifies that "if Sutter reduced its prices by 20 percent, it would only have a 4 or 5 percent impact on the total premium."[266] Yet, Kaiser's premiums are 15 to 20 percent lower than premiums of broad network insurance products that include Sutter and

---

[266] Deposition of Robert Reed, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, October 17,2017, pp. 115-116.

non-Sutter hospitals. Thus, Mr. Reed concludes that lowering Sutter's price would not bridge the gap between Kaiser and non-Kaiser health plans. A larger body of evidence shows that Sutter is substantially more expensive than most Northern California health systems, including Kaiser.[267]

**Exhibit 22**
**Example of Pass Through of Medical Costs to Premiums**
**Based on Sutter Health Pricing and Contracting Strategy Analysis**



Source: Bob Reed, "Pricing Strategy," DEF001993774, January 18, 2011, pp. 117 - 137.

\*\*\*

142.     Collectively, this evidence indicates that Sutter has a dominant position in the each of the Tying Markets. And this is different from its position in the Tied Markets. These

---

[267] *See*, for example, Sutter Health, "Sutter Governance Forum Strategic Plan for 2008-2018," August 29, 2007, DEF004447422 – 459, at 452 (where Sutter describes itself as having prices 35 percent higher than non-Sutter hospitals using data from 2004.); Sutter Health, "Competitor Response Analysis," January 18, 2011, STCA0234063, at slide 10 (Using Blue Shield data from 2007 in a 2011 analysis, Sutter finds that most Sutter hospitals imposed over 25% higher relative costs, noting also that "Blue Shield of Northern California communicated that Sutter's facility costs were on average 30% higher than other Northern California hospitals."); and "Email from Blue Shield's Lisa Farnan to Blue Shield's Kris Vine," February 11, 2004, BSC_UFCW 00002428 ("Sutter's costs [referring to prices paid by Blue Shield to Sutter] are dramatically higher as compared to other hospitals in the same geographic areas. Even adjusting for case mix and the complexity/severity of those cases, several Sutter hospitals are more than twice the cost of hospitals in the same area. Sutter's entire system of hospitals is more than 60% above the Northern California average and 80% above the statewide average. This tells us that there are many other hospitals are delivering similar levels of quality as we find at Sutter facilities at a far lower cost.").

conclusions are not sensitive to reasonable changes in the boundaries of the relevant geographic market.

## IX.    Assessment of Professor Gowrisankaran's Analyses and Conclusions

143.    Professor Gowrisankaran uses analyses of patient flows and distances to dismiss the Plaintiffs' candidate geographic markets for the sale of inpatient hospital services to commercial health plans. For the reasons I have already mentioned, his analyses fail to satisfy the criteria for market definition. His calculations of patient flows are consistent with my own, but his interpretation of them are flawed. By focusing on patient inflows and outflows in a vacuum, he falls into the trap of the fallacy of the silent majority. His analysis of drive times and the proximity of out-of-area hospitals supports, not contradicts, Plaintiffs' candidate markets. Furthermore, his conclusion that Sutter faces substantially more competition for certain hospitals is inconsistent with many ordinary-course documents that show that Sutter has the ability to force onerous contracting provisions, including higher prices, on health plans in those geographies.

### A.    It is Irrelevant that HSAs Were Not Constructed to be Antitrust Markets

144.    Professor Gowrisankaran is distracted by Plaintiffs' use of HSAs to build candidate geographic markets. He spends more than half of his report explaining that HSAs as a general matter were not constructed as antitrust markets.[268] While Professor Gowrisankaran is correct in stating that not all HSAs are necessarily antitrust markets, that does not negate reliance on them in specific instances. Professor Gowrisankaran also criticizes HSAs for being constructed based on older data on hospital use patterns of the Medicare population.[269] He claims that the Auburn and Davis HSAs would not satisfy the Dartmouth Atlas's own definition of HSAs if constructed with current commercial discharge data.[270] These facts, even if true, fail to speak to the question of whether in these specific instances, the HSAs put forth by Plaintiffs as relevant antitrust markets satisfy the hypothetical monopolist test. Professor Gowrisankaran

---

[268] Gowrisankaran Report, pp. 14-37.

[269] Gowrisankaran Report, pp. 24-33.

[270] Gowrisankaran Report, p. 31.

appears to concede that it is possible that HSAs could be relevant antitrust markets in some applications, but one would need to assess the reasonableness of such use on a case-by-case basis.[271] Yet, Professor Gowrisankaran has not done that work.

145.    Professor Gowrisankaran also forgets that no off-the-shelf geographic boundaries, be they ZIP codes, counties, metropolitan statistical areas, or states, are built for specific antitrust purposes. Yet, antitrust economists and practitioners use such off-the-shelf boundaries for convenience in building candidate geographic markets. Plaintiffs do not assert that all HSAs are (or need to be) relevant antitrust markets, as evidenced by the fact that one of their asserted relevant markets is the combination of two HSAs.

### B.    Professor Gowrisankaran Fails to Recognize the Silent Majority

146.    Professor Gowrisankaran argues that many discharges for residents of the alleged Tying and Tied HSAs take place in hospitals outside their HSA of residence.[272] Professor Gowrisankaran, however, has offered no basis to conclude that the actual travel habits of some consumers would be predictive of the travel habits of others, in response to a price increase by a hypothetical monopolist.[273] To do so would be to fall into the trap of what is described by economists and recognized by courts to be the "silent majority" fallacy. For example, in the *Advocate-NorthShore*, a case cited by Professor Gowrisankaran,[274] the appellate court concluded that the district court erred by overlooking the market power created by the remaining patients' preferences. In that case, the evidence was that only 48 percent of patients would stay in the candidate market if their first-choice hospital (inside the candidate market) was not available to them.[275] Thus, even in that case – where a bigger share of patients would have left the candidate geographic market than stayed in it for hospital services – the FTC's expert and the court found

---

[271] Professor Gowrisankaran admits in his deposition that it is possible that HSAs can be relevant antitrust markets. Gowrisankaran Deposition, p. 90-91 (Q: Is it your opinion that there's no HSA in the United States that constitutes the boundaries of a relevant antitrust market? A: That is not an opinion that I offered in this -- in this report.").

[272] Gowrisankaran Report, pp. 37-38 and Figure 5.

[273] Capps *et al.*, p. 1 ("[I]f travelers and non-travelers display fundamentally different demand behavior, either because they differ in their taste for travel or their need for local/non-local services, then there is no necessary relationship between the market experiences of these two groups post-merger.").

[274] Gowrisankaran Report, pp. 35-36 and Exhibit 6.

[275] Advocate-NorthShore Appellate Decision, pp. 6-7.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

that the candidate market was a relevant market.[276] As explained by the court, it is a mistake to "focus on the patients who leave a proposed market instead of on hospitals' market power over the patients who remain, which means that the hospitals have market power over the insurers who need them to offer commercially viable products to customers who are reluctant to travel farther for general acute hospital care."[277]

147.     Professor Gowrisankaran also argues that many of the patients who chose hospitals in the candidate Tying Markets live relatively close to at least one hospital outside their HSA of residence. For example, he explains that there is a hospital outside of the Auburn HSA that is within 30 minutes of Sutter Auburn, and that focusing on the Auburn HSA would miss the competitive significance of this outside hospital.[278] If patients receiving care from out-of-area hospitals do so because of the proximity to these hospitals, they should have similar average drive time as patients who receive care from in-area hospitals. However, the evidence shows that the average drive times for area-patients who receive their care from Sutter Auburn is 18 minutes and the average drive time for area-patients who receive their care outside of the Auburn HSA is 43 minutes. These results show that, contrary to Professor Gowrisankaran's assertions, area-patients who drive outside of the candidate geographic markets are typically not going to otherwise close or closer hospitals just outside of the candidate geography. Furthermore, Professor Gowrisankaran's assertion that there is a hospital outside of the Auburn HSA that places competitive pressure on Sutter Auburn is contrary to substantial documentary evidence to the contrary.[279]

148.     Systematically, the evidence shows that patients who stay in the candidate geographic market for their inpatient care spend substantially less time driving than patients who travel outside the area for their care. The large difference in drive times makes it less likely that

---

[276] *Id.*

[277] Advocate-NorthShore Appellate Decision, pp. 25-26.

[278] Gowrisankaran Report, p. 39.

[279] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮and Harvey Email, p.1 (explaining that "Sutter has "geographic monopolies for services in the following submarkets - Auburn, Amador, Tracy, Marin, Vallejo, Antioch, Berkeley, Oakland, San Mateo, Clearlake and Humboldt..... Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them. In addition, many of our national accounts require Sutter network participation to retain and grow business.").

patients who receive their care from an area-hospital would be willing to switch to a hospital outside of the area. In other work, Professor Gowrisankaran himself has recognized that the large literature on hospital choice finds that patients are "very sensitive to travel time" and that "an increase in travel time of 5 minutes" can have a material impact on patient choice and consumer welfare.[280]

149.    Based on the patient flows, Professor Gowrisankaran concludes that health plans have "attractive" options in forming provider networks, particularly for the four HSAs of Auburn, Davis, Lakeport, and Antioch.[281] This conclusion is at odds with substantial ordinary-course evidence to the contrary. As I have explained, United describes Sutter as having a "geographic monopoly" in Auburn and Antioch, among other areas, explaining that "it is not feasible to present an HMO or FFS network in Northern CA that does not include them. In addition, many of our national accounts require Sutter network participation to retain and grow business."[282] Blue Shield describes patient insistence for Sutter Auburn as 95 percent, for Sutter Lakeside as 86 percent, and for Sutter Delta as 91 percent.[283] Furthermore, Sutter's own documents show a recognition that Sutter faces little to no competition in some regions, including regions with Sutter Auburn, Sutter Lakeside, Sutter Davis, and Sutter Delta.[284]

150.    Thus, one cannot merely rely, as Professor Gowrisankaran has, on patient inflows and outflows and distances between hospitals to suggest that hospitals outside of the candidate market are substitutes for patients who live inside the candidate geographies. While patient flows may require one to broaden the boundaries of a candidate market, one cannot know that without insights from diversion analysis and the framework of the hypothetical monopolist test.

---

[280] Gowrisankaran, Nevo, and Town (2015), p. 191 ("Consistent with the large literature on hospital choice, we find that patients are very sensitive to travel times. The willingness to travel is increasing in the DRG weight and decreasing in age. An increase in travel time of 5 minutes reduces each hospital's share between 17 and 41%. The parameter estimates imply that increasing the travel time to all hospitals by one minute reduces consumer surplus by approximately $167.").

[281] Gowrisankaran Report, pp. 41-42.

[282] Harvey Email, p. 53 [Emphasis added].

[283] *See* Exhibit 19.

[284] McKinsey & Company, "Building an integrated strategy for excellence in a post-reform environment," Prepared for Sutter Health, December 2, 2010, STCA0602090-142 at 138-142.

## C.    Professor Gowrisankaran Did Not Perform the Hypothetical Monopolist Test

151.    Professor Gowrisankaran admits that the hypothetical monopolist test described by the *Merger Guidelines* is an appropriate tool that has been accepted by various courts, to determine whether a candidate market is a relevant antitrust market.[285] However, Professor Gowrisankaran does not actually apply the method of the *Merger Guidelines*, nor does he follow the guidance of the courts. He gets distracted by outflows and falls into the fallacy of the silent majority. He does not apply a framework, like the hypothetical monopolist test, to determine whether the patient flows are competitively significant. He ignores the document and deposition testimony from health plans.[286]

152.    To the contrary, the evidence in this case shows that patient outflows do not defeat Sutter's market power over health plans. Had Professor Gowrisankaran conducted a hypothetical monopolist test or considered the significant ordinary-course document and testimony evidence from health plans, he would have found strong support for most of the candidate markets as relevant antitrust markets.[287]

## D.    Professor Gowrisankaran Ignores His Own Evidence Showing that Some Sutter Hospitals Face Little to No Competition

153.    Professor Gowrisankaran's own evidence shows that Sutter is likely to command market power over health plans in several of the Tying Markets. Specifically, Professor Gowrisankaran describes in his Exhibit 8 the share of discharges from the Tying Markets that are for patients living within 30 minutes of non-Sutter hospitals in other HSAs. For reference, his Exhibit 8 is shown below, as Exhibit 23.

---

[285] Gowrisankaran Deposition, pp. 106-107.

[286] Gowrisankaran Deposition, pp. 82-83 (admitting that the only document he reviewed for this case was the Complaint).

[287] De La Torre Declaration, ¶ 8 ("As a result, it is not possible to develop, and successfully market a commercially viable insurance product and/or benefit plan in Northern California without any Sutter providers."); and Katz Declaration, ¶ 4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Exhibit 23**
**Professor Gowrisankaran's Analysis of Patient Choice**

**Exhibit 8**

**A Significant Share of Discharges from Alleged Tying HSAs are for Patients Living Within 30 Minutes of non-Sutter Hospitals in Other HSAs[1]**

(Excluding Kaiser)

| | Alleged Tying HSAs | Share of Discharges within a Certain Estimated Drive Time of a Hospital Outside their HSA of Residence (Minutes) | | | | |
|---|---|---|---|---|---|---|
| | | 1 - 15 | 16 - 20 | 21 - 25 | 26 - 30 | Total |
| 1. | Berkeley-Oakland[2] | 34% | 56% | 9% | 0% | 100% |
| 2. | Tracy | 0% | 0% | 61% | 39% | 100% |
| 3. | Antioch | 0% | 0% | 26% | 25% | 51% |
| 4. | Davis | 0% | 47% | 0% | 0% | 47% |
| 5. | Lakeport | 0% | 0% | 39% | 6% | 45% |
| 6. | Auburn | 0% | 0% | 13% | 32% | 44% |
| 7. | Jackson | 0% | 0% | 0% | 29% | 29% |
| 8. | Crescent City[3] | 0% | 0% | 0% | 0% | 0% |

*Source*: Gowrisankaran Report, Exhibit 8.

Notably, for Crescent City (with Sutter Coast), Professor Gowrisankaran's own analysis shows that there are no other choices for area-discharges within 30 minutes. For Jackson (with Sutter Amador) there are no other choices for area-discharges within 25 minutes, and no other choices within 30 minutes for 70 percent of area-discharges. For Antioch (Sutter Delta), Lakeport (Sutter Lakeside), and Auburn (Sutter Auburn), there are no other choices for area-discharges within 20 minutes, and no other choices within 30 minutes for the majority or near-majority of area-discharges. Professor Gowrisankaran ignores these facts found in his own report. Professor Gowrisankaran ignores these facts found in his own report.

## X.    Conclusions

154.    For the reasons I have explained in this report, it is my opinion that candidate markets of the Sacramento HSA, the San Francisco HSA, the Modesto HSA, the Santa Rosa HSA, the Berkeley-Oakland HSAs, the Crescent City HSA, the Lakeport HSA, the Antioch HSA, the Jackson HSA, the Tracy HSA, and the Auburn HSA are relevant antitrust markets. For Sutter Davis, I find that the relevant antitrust market could be no broader than the hospital's 90 percent PSA. Furthermore, I find that Sutter has market power in each of the Tying Markets, even where there the relevant market could be broader, as Professor Gowrisankaran might claim. My conclusions are based on a combination of economic principles, descriptive and statistical

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER                      108

analyses of patient discharge data, ordinary-course documents from both health plans and Sutter, and testimony from health plan executives.

155.   I find Professor Gowrisankaran's arguments against the Plaintiffs Tied and Tying Markets to be unconvincing. He rejects the candidate geographic markets as valid antitrust markets largely because of patient flow; by so doing, he inappropriately ignores the preferences of the majority of residents who are insistent on their local Sutter hospital. Professor Gowrisankaran has ignored health plan testimony and evidence from the ordinary course, and he has failed to apply the framework of the hypothetical monopolist test.

156.   The evidence in this case shows that patient outflows do not defeat Sutter's market power over health plans. Had Professor Gowrisankaran conducted a hypothetical monopolist test or considered the significant ordinary-course document and testimony evidence from health plans, he would have found strong support for most of the candidate markets as relevant antitrust markets. Furthermore, Professor Gowrisankaran's view that the Plaintiffs candidate markets ignore important competitive constraints on the local Sutter hospitals in the Tying Markets ignores the significant documentary evidence to the contrary.

Tasneem Chipty, Ph.D.
Dated:  May 26, 2018
Boston, Massachusetts

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**                    109

Appendix A: CV



**TASNEEM CHIPTY**
**Managing Principal**

Office: (617) 315-0355

Cell: (617) 697-6826

tchipty@matrixeconomics.com

125 High Street

Suite 1632

Boston, MA 02110

Dr. Chipty is an expert in industrial organization, antitrust economics, and econometrics. Her practice spans both the areas of antitrust litigation and mergers and acquisitions, in a broad array of sectors including: agricultural equipment; airlines; broadcast and satellite radio; cable and satellite television; containerized shipping; healthcare; newspapers; pharmaceuticals; pulp and paper; and tobacco. Her work has been influential both internationally and domestically. She has assisted the U.S. Department of Justice on several investigations and merger reviews. She has assisted the Government of Australia at the World Trade Organization in a dispute surrounding Australia's national tobacco control policy. She was Comcast's antitrust damages expert in *Behrend et al. vs. Comcast* – a U.S. Supreme Court case in which the Court dismissed the case against Comcast because of deficiencies in the plaintiffs' damages model. On behalf of the parties, she studied the competitive effects of the CenturyLink-Level 3 merger and the Charter-Time Warner Cable merger, both of which received approvals from the U.S. Department of Justice and the Federal Communications Commission. She serves as an antitrust advisor to the Massachusetts Health Policy Commission, for whom she has evaluated the competitive effects of healthcare transaction in the Commonwealth, including Partners Healthcare's attempted acquisition of South Shore Hospital and Hallmark Health. Dr. Chipty has submitted testimony, been deposed, and testified at trial in several litigation matters. She has appeared before the Federal Trade Commission, the Department of Justice, the World Trade Organization, the Canadian Mergers Bureau, the U.S. Copyright Board, and the Canadian Copyright Board. She is co-editor of the current edition of the American Bar Association's book *Proving Antitrust Damages*. She has published research on the strategic use of vertical integration, the role of firm size and network effects on bilateral business negotiations, and the effects of regulations on firm behavior.

Prior to founding Matrix Economics, Dr. Chipty was a Managing Principal at Analysis Group, and before that a Vice President at Charles River Associates. She has served on the faculties of the Ohio State University, Brandeis University, and MIT, where she taught courses in antitrust and regulation, industrial organization, and econometrics. Dr. Chipty received her Ph.D. in economics from the Massachusetts Institute of Technology and her undergraduate degree in economics and mathematics from Wellesley College.

## EDUCATION

Ph.D.          Economics, Massachusetts Institute of Technology

B.A.          Mathematics and Economics, with honors, Wellesley College

**PROFESSIONAL EXPERIENCE**

2016 –        Matrix Economics, LLC
              *Founder and Managing Principal*

2010 – 2016   Analysis Group, Inc.
              *Managing Principal* (2010-2016)

1999 – 2010   Charles River Associates, Inc.
              *Vice President* (2005-2010)

2005          Massachusetts Institute of Technology
              *Visiting Associate Professor of Economics*

1997 – 1999   Brandeis University, Graduate School of International Economics and Finance
              *Visiting Assistant Professor of Economics*

1995          Osaka University
              *Visiting Foreign Scholar*

1993 – 1999   Ohio State University
              *Assistant Professor of Economics*

**TESTIMONY EXPERIENCE**

- *United States of America v. Deere & Company, Precision Planting LLC, and Monsanto Company,* Civil Action No. 1:16-cv-08515 in the United States District Court for the Northern District of Illinois Eastern Division. On behalf of the United States, submitted testimony on December 23, 2016 and January 10, 2017; and testified at deposition on March 2, 2017. (Norm Familant and Bill Jones).

- *United States of America, et al. v. Hillsdale Community Health Center, et. al.,* Case No. 5:15-cv-12311-JEL-DRG in the United States District Court for the Eastern District of Michigan. On behalf of the United States, submitted testimony on October 27, 2016 and December 5, 2016; and testified at deposition on December 12, 2016. U.S. Department of Justice, 2017 (Beth Armington and Katrina Rouse).

- *In the Matter of: Statement of Proposed Royalties to be Collected for the Retransmission of Distant Television Signals, In Canada, for the Years 2014 to 2018*, before the Canadian Copyright Board. Submitted testimony on October 2, 2015 and testified at trial on January 25-26, 2016, on behalf of Bell Canada, Cogeco Cable Inc., Rogers Communications Inc, Shaw Communications Inc., Videotron G.P., and Telus Communications Company. Fasken Martineau DuMoulin, LLP (Jay Kerr-Wilson).

- Challenges to Australia's Tobacco Plain Packaging Act, on behalf of Australia, in the World Trade Organization. Submitted testimony on March 9, 2015, May 31, 2015, September 14, 2015, October 26, 2015, December 8, 2015, and February 1, 2016. Australian Government Solicitor (Simon Sherwood and Damien O'Donovan)

- *Caroline Behrend et al. v. Comcast Corporation et al.*, Civil Action No. 03-6604 in the United

States District Court for the Eastern District of Pennsylvania. On behalf of Comcast Corporation, submitted testimony on April 10, 2009, on May 6, 2009, on May 11, 2009, on August 21, 2009, September 18, 2009, May 22, 2012, and January 15, 2014; testified at deposition on May 22, 2009; and testified at a class recertification hearing on October 26, 2009. Kasowitz Benson Torres & Freidman (Michael Shuster and Sheron Korpus) and Davis Polk (David Toscano and Arthur Burke).

- *American Broadcasting Company Inc., et. al. v. Aereo*, 12 Civ. 1543, in United States District Court in the Southern District of New York. Submitted testimony on December 20, 2013 on behalf of Aereo. Fish and Richardson (David Hosp).

- *DISH Network LLC. f/k/a Echostar Satellite LLC v. ESPN, Inc., and ESPN Classic, Inc.*, No. 09 CIV 6875 (JGK) (FM), in United States District Court in the Southern District of New York. Submitted testimony on July 29, 2011; testified at deposition on November 22, 2011; testified at deposition in January 2013; testified at trial February 2013 on behalf of DISH Network. Flemming Zulack Williamson Zauderer LLP (Dean Nyciper) and Simpson Thatcher (Barry Ostrager and Mary Kay Vyskocil).

- *Echostar Satellite LLC v. ESPN, Inc., ESPN Classic, Inc., ABC Cable Networks Group, Inc., Soapnet L.L.C., and International Family Entertainment Inc.*, Index 08-600282 in the Supreme Court of the State of New York County of New York. Testified at deposition on June 23, 2011, on behalf of Echostar Satellite LLC. Flemming Zulack Williamson Zauderer LLP (Dean Nyciper).

- *Casitas Municipal Water District v. United States*, Case No. 05-168L in the United States Court of Federal Claims. Submitted testimony on February 25, 2010 and February 8, 2007, testified at deposition on March 10, 2010, testified at trial on October 28, 2010 on behalf of the United States. U.S. Justice Department (James Gette and Barrett Atwood).

- *Royalties To Be Collected By CSI and SOCAN For the Reproduction and the Communication to the Public by Online Music Services, In Canada, of Musical or Dramaticaomusical Works, for the years 2007 to 2010*, before the Canadian Copyright Board. Submitted testimony on April 29, 2010 and on June 9, 2010, and testified at trial on June 28-9, 2010, on behalf of Apple Inc., Bell Canada Enterprises Inc., Rogers Communications Inc., Telus Communications Company, and Videotron Ltd. Goodmans LLP for Apple Inc. (Michael Koch); and Fasken Martineau DuMoulin, LLP for the rest (Jay Kerr-Wilson).

- *United States of America v. Daily Gazette Company and MediaNews Group, Inc.*, Civil Action No. 2:07-0329 in the United States District Court Southern District of West Virginia. Submitted testimony on September 1, 2009, on behalf of the United States. U.S. Justice Department (John Reed, Mark Merva and Norm Familant).

- *In re. ASARCO LLC, et al.*, Case No. 05-21207 in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division. Submitted testimony on August 1, 2008 and testified at deposition on August 7, 2008, on behalf of Ready Mix USA, LLC. Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. (Gary Shockley).

- *SOCAN Tariff No. 16 – Royalties To Be Collected By SOCAN For the Public Performance or the Communication to the Public by Telecommunication, In Canada, of Musical or Dramaticaomusical Works, for the years 2007 to 2009*, before the Canadian Copyright Board. Submitted testimony on November 30, 2007 and testified at trial in January 2008, on behalf of a

consortium of Canadian background music users, including Bell ExpressVu, Chum Satellite Services, and DMX Canada. Fasken Martineau DuMoulin, LLP (Jay Kerr-Wilson and Aidan O'Neill).

- *In the Matter of Digital Performance Right in Sound Recordings and Ephemeral Recordings for a New Subscription Service*, CRB Proceeding 2005-5, before the U.S. Copyright Board. Submitted testimony on October 30, 2006 and July 24, 2007; testified at deposition on May 8, 2007; and testified at trial in June 2007, on behalf of Sirius Satellite Radio and XM Satellite Radio. Wiley Rein, LLP for Sirius (Bruce Joseph) and Weil, Gotshal & Manges for XM (Ralph Miller).

## MERGERS AND ACQUISITIONS AND OTHER GOVERNMENT INVESTIGATIONS

Dr. Chipty has extensive experience evaluating the competitive effects of proposed transactions and has advised clients at various stages of their deals, including strategic advice in identifying targets, assistance with agency review, and analyses for post-merger contestations. She has employed economic and econometric tools to evaluate issues of market definition, critical loss analysis, direct evidence of unilateral effects, and efficiencies. She has studied the likelihood of temporary or permanent foreclosure, as part of a raising rivals cost strategy. In addition, she has assessed regulatory structures and their associated effect on competition. Examples of Dr. Chipty's work in this area include:

- Assisting Nippon Yusen Kabushiki Kaisha Ltd., Mitsui O.S.K. Lines, Ltd., Kawasaki Kisen Kaisha Ltd. evaluate the competitive effects of a container shipping joint venture, before the Department of Justice, 2017. Wilmer Cutler Pickering Hale and Dorr (Hartmut Schneider).

- Assisting parties in the CenturyLink-Level 3 merger, before the Department of Justice and the Federal Communications Commission, 2017. Wachtell, Lipton, Rosen & Katz and Jones Day (Ilene Gotts and Bruce McDonald) and Covington & Burling (Yaron Dori)

- Assisted parties in the Charter-Time Warner Cable merger, before the Department of Justice and the Federal Communications Commission, 2015-2016. Wachtell, Lipton, Rosen & Katz and Jenner Block (Ilene Gotts and John Flynn).

- Submitted white paper evaluating the impact of tobacco plain packaging on smoking prevalence in Australia, to the Australian Parliament on behalf of the Government of Australia, in Australia's post implementation review of tobacco plain packaging legislation, 2016. Australian Government Solicitor (Simon Sherwood and Simon Daley).

- Expert for the U.S. Department of Justice in its review of the One Main-Spring Leaf merger, 2015. U.S. Department of Justice (Stephanie Fleming and Nicholas Hill).

- Coauthored a white paper, on behalf of Aeromexico, evaluating the competitive effects of airport slot allocation governing air traffic to and from Mexico City Airport, submitted to Mexico's competition authority, 2015, (joint with Professor Robert Pindyck).

- Expert for Olin Corporation in its acquisition of Dow Chemical's cholor-alkali business unit, before the Federal Trade Commission, 2014-2015. Baker Botts (William Henry and Thomas Dillickrath).

- Expert for the Mergers Bureau of Canada in its review of Post Media's acquisition of Sun Media. Canadian Mergers Bureau (Steve Sansom and Nicholas Janota).

- Assisted the U.S. Department of Justice in its challenge of American Express's use of merchant restraints, 2014-2015. U.S. Department of Justice (Craig Conrath and John Read).

- Advised the Massachusetts Health Policy Commission on the likely competitive impact of Partners HealthCare System's proposed acquisition of Hallmark Health System, including submitting a written statement in the HPC's Cost and Market Impact Review of the transaction, 2014. Health Policy Commission (Karen Tseng and Kate Scarborough).

- Advised the Massachusetts Health Policy Commission on the likely competitive impact of Partners HealthCare System's proposed acquisition of South Shore Hospital, including submitting a written statement in the HPC's Cost and Market Impact Review of the transaction, 2013-2014. Health Policy Commission (Karen Tseng and Kate Scarborough).

- Assisted Saint Alphonsus Medical Center to evaluate the competitive effects of St. Luke's Health System's acquisition of Saltzer Medical Group, in Nampa, Idaho, 2012-2013. Honigman, Miller, Schwartz and Cohn (David Ettinger).

- Assisted Arris Group in its acquisition of Motorola Home business unit from Google, before the Department of Justice, 2013. Hogan Lovells (Logan Breed) and Troutman Sanders (Daniel Anziska).

- Coauthored a white paper, on behalf of Televisa, evaluating the competitive impact in the mobile telephone marketplace of Televisa's proposed acquisition of 50% of GSF Telecom Holdings, S.A.P.I. de C.V., which owns 100% of Grupo Iusacell, S.A. de C.V. (joint with Almudena Arcelus and David Sosa). Submitted to Mexico's competition authority, Federal Commission of Economic Competition, 2012.

- Conducted analyses and presented before staff of the FTC, in an investigation of two joint venture partners involving allegations of potentially anticompetitive conduct, 2011-2012. Baker Botts (Thomas Dillickrath and William Henry).

- Authored a white paper analyzing the likely effects of Steward Healthcare's acquisition of Morton Hospital, in the greater Boston area, submitted to the State Attorney General's office, June 14, 2011. Edwards Angell Palmer & Dodge (Patricia Sullivan).

- Evaluated the likely effects of the Southwest Airlines-Airtran merger, on behalf of the United States, Winter 2011. U.S. Justice Department (Michael Billiel and Oliver Richard).

- Coauthored a white paper, on behalf of Time Warner Cable, analyzing brinkmanship tactics and broadcast retransmission consent rules established by the 1992 Cable Act, submitted to the Federal Communications Commission (joint with Prof. Steven Salop, Dr. Martino DeStefano, Dr. Serge Moresi, and Dr. John Woodbury), June 3, 2010.

- Authored Federal Communication Commission Media Study #5, on behalf of the Commission, as part of it periodic review of the media ownership rules, analyzing the effects of ownership structure in broadcast radio, on program variety and advertiser and listener welfare, released June 2007.

- Coauthored a white paper analyzing bidding behavior and the potential competitive effects of the merger of Alcatel and Lucent, submitted to the Department of Justice (joint with Drs. Andrew

Dick and Stanley Besen), April 28, 2006. Skadden, Arps, Slate Meagher & Flom LLP (James Keyte and Neal Stoll).

- Conducted and presented analysis before the Federal Trade Commission on behalf of Barr Pharmaceuticals regarding its acquisition of a hormone contraceptive product (joint with Prof. Steven Salop), Fall 2005. Kirkland & Ellis LLP (Mark Kovner).

- Conducted an analysis of efficiencies on behalf of Time Warner and Comcast, in their joint bid for Adelphia Communications (joint with Dr. Stanley Besen). Paul Weiss Rifkind Wharton & Garrison, LLP (Joseph Simons).

- Assisted NorthShore University HealthSystem (formerly Evanston Northwestern Health Corporation) with the Federal Trade Commission's post-merger investigation of the 2000 merger of Evanston Hospital and Highland Park Hospital. Winston & Strawn LLP (Michael Sibarium).

## OTHER CONSULTING EXPERIENCE, BY TOPICAL AREA

Dr. Chipty has also provided consultation to litigation clients on matters some of which eventually settled, and she has provided business guidance to clients for strategic planning. Examples of Dr. Chipty's work in this area include:

### Tobacco

- Assisted the Department of Justice, in *United States v. Philip Morris et al.*, Civil Action No. 99-2486, a RICO case against the major tobacco manufacturers and associations involving allegations of conspiracy to suppress information and to suppress innovation. U.S. Department of Justice (Steve Brody, Renee Brooker, and James Gette).

- Assisted Appalachian Oil Company, in *R.J. Reynolds Tobacco Company v. Market Basket Food Stores, Inc., et al.*, Civil Action No. 5:05-CV-253. Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. (Gary Shockley).

- Assisted Star Scientific, in *Star Scientific, Inc. v. R.J. Reynolds Tobacco Company*, Case No. AW 01-CV-1504 and AW 02-CV-2504. Crowell and Moring (Richard MacMillan and Kathryn Kirmayer).

### Pharmaceutical and Health Care

- Advised the working groups of the Advanced Market Commitment ("AMC"), an initiative of the Gates Foundation to pilot the first AMC for the pneumococcus vaccine. The goal of this AMC is to provide appropriate market-based incentives to induce capacity investments by the major pharmaceutical companies for manufacturing sufficient vaccines for low-income countries.

- Assisted a pharmaceutical manufacturer against Medicaid reimbursement, fraud, and unfair trade practices claims brought by numerous State Attorneys General. O'Melveny & Meyers LLP (Steve Brody and Brian Anderson) and Baker Botts LLP (Richard Josephson).

- Advised Regional Urology, in *Willis-Knighton Health System and Health Plus of Louisiana, Inc. v. Regional Urology LLC, et al.*, Civil No. CV02-1094-S. Breazeale Sachse & Wilson, LLP (Claude Reynaud).

**Media and Sports**

- Assisted the YES Television Network in evaluating the value to the network of carriage rights for certain New Jersey Nets games, for contract renegotiation and possible arbitration. Boies Schiller & Flexner, LLP (Robert Dwyer).

- Assisted the Monte Carlo Tennis Tournament, in a dispute with the ATP Tour, alleging abuse of market power. Sidley Austin LLP (Alan Unger).

- Assisted a team of the National Football League, in a dispute with a cable operator, alleging vertical foreclosure. Boies Schiller & Flexner, LLP (Robert Dwyer).

- Assisted Major League Baseball in *Major League Baseball Properties, Inc. v. Salvino,* involving a challenge to the league's use of centralized trademark licensing. Foley & Lardner LLP (Jim Mckeown).

- Advised HBO on reasonable fees for music performance rights in their negotiation with BMI. Cravath, Swaine & Moore LLP (Kenneth Lee).

- Advised XM Satellite Radio on reasonable fees for music performance rights for business negotiations. Shaw Pittman LLP (Cynthia Greer).

## ECONOMETRICS AND STATISTICS

Dr. Chipty is an expert in the area of statistics and econometrics and has been successful at using econometric arguments both to construct affirmative arguments in litigation as well as to evaluate the use of econometrics by opposing experts. Many of the projects described above used econometric analysis. Other examples of Dr. Chipty's work in this area are described below:

- Submitted a white paper to the European Commission, DG Competition Bureau, on behalf of the European Liner Affairs Association, analyzing the impact of shipping conferences on carriers' ability to collude on prices (joint with Professor Fiona Scott Morton and Mr. Nils Von Hinten-Reed).

- Developed analyses and drafted a report on behalf of defendants in the *In Re: Monosodium Glutamate Litigation* in support of a defendants' motion to dismiss plaintiff's expert testimony based upon improper use of econometrics. Dorsey & Whitney LLP (Michael Lindsay) and Haynes & Boone LLP (Ronald Breaux).

- Used advanced statistical techniques along with a large volume of administrative data, on behalf of United Parcel Service, to evaluate the Postal Service's expert testimony on variable costs. Piper & Marbury LLP (John McKeever).

- Evaluated and criticized the econometric testimony of a defendants' expert, on behalf of a generic pharmaceuticals firm alleging vertical foreclosure and unlawful delay of entry. Solomon Zauderer (Colin Underwood).

## TRISTATE RESEARCH PARTNERSHIP

Dr. Chipty was a member of the research team from 1997-1999 in this Department of Health and Human Resources funded collaboration that included the states of Massachusetts, Alabama, and Florida. Dr. Chipty worked with state governments to design research experiments, develop

econometric models, and process large administrative databases, in an effort to understand the structure, administration, and impact of minimum standards regulations.

- "The Black-White Wage Gap in the Deep South: Location, Location, Location?" (with Ann Dryden Witte), Working Paper 98-03, Tri-State Child Care Research Partnership, Miami, FL.

- "Employment Patterns of Workers Receiving Subsidized Child Care: A Study of Eight Counties in Alabama," (with Ann Dryden Witte), Available from Margie Curry, Executive Director, Childcare Resources, 1904 First Ave. North, Birmingham, AL 35203-4006.

- "Parents Receiving Subsidized Child Care: A Study of Alabama's Labor Force," (with Ann Dryden Witte), Working Paper 98-01, Tri-State Child Care Research Partnership, Miami, FL.

- "Employment of Parents Receiving Subsidized Child Care in Dade County, Florida," (with Harriet Griesinger and Ann Dryden Witte), Working Paper 98-03, Department of Economics, Wellesley College, Wellesley MA 02481.

## SELECTED PAPERS AND PRESENTATIONS

### Published Articles

"US: Economics" (with Michael Chapman), *Global Competition Review*, *The Antitrust Review of the Americas 2016*, available at: http://globalcompetitionreview.com/reviews/74/sections/275/chapters/2983/us-economics/.

"Economists' Perspective on the Efficiency Defense in Provider Consolidations:  What Works, What Doesn't Work, and What We Still Don't Know," American Health Lawyer's Association *Connections Magazine*, September 2015.

"Competitor Collaborations in Health Care: Understanding the Proposed ACO Antitrust Review Process," *CPI Antitrust Chronicle*, May 2011 (1).

"Vertical Integration, Market Foreclosure, and Consumer Welfare in the Cable Television Industry," *American Economic Review*, Vol. 91, No. 3, June 2001, pp. 428-453.

"The Role of Buyer Size in Bilateral Bargaining: A Study of the Cable Television Industry" (with Christopher Snyder), *Review of Economics and Statistics*, May 1999, 81(2): 326-340.

"Economic Effects of Quality Regulations in the Daycare Industry," *American Economic Review*, Vol. 85, No. 2, May 1995, pp. 419-424.

"Horizontal Integration for Bargaining Power: Evidence from the Cable Television Industry," *Journal of Economics and Management Strategy*, Vol. 4, No. 2, Summer 1995, pp. 375-397.

"A Marginal Cost Transfer Pricing Methodology," *Tax Notes*, Nov. 26, 1990 (with Ann Dryden Witte, Wellesley College and NBER).

### Chapters in Books

"Hospital-Physician Integration: The St. Luke's Case" (with Deborah Haas-Wilson), in *The Antitrust Revolution, 7th Edition* (Oxford University Press), edited by John Kwoka and Lawrence White, forthcoming.

**Books Edited**

*Proving Antitrust Damages*, 3rd Edition (ed., with Cathy Beagan Flood), (American Bar Association, 2017).

**Book Reviews**

*The Antitrust Source*, October 2007, Book Review of Michael D. Whinston, *Lectures on Antitrust Economics* (Cambridge, MIT Press, 2006).

*The Journal of Economic Literature*, June 1992, Vol. XXX, No. 2, Book Review of Frank Cowell, *Cheating the Government* (with Ann Dryden Witte, Wellesley College and NBER) (Cambridge, MIT Press, 1990).

**Working Papers**

"In a Race Against the Clock:  Auctioneer Strategies and Selling Mechanisms in Live Outcry Auctions," 2014 (with Lucia Dunn and Stephen Cosslett, the Ohio State University).

"Efficient Estimation Via Moment Restrictions," (with Whitney K. Newey).

"Antidumping and Countervailing Orders: A Study of the Market for Corrosion-Resistant Steel," (with Brian L. Palmer).

"Firms' Responses to Minimum Standards Regulations: An Empirical Investigation" (with Ann Dryden Witte), NBER Working Paper # 6104.

"Effects of Information Provision in a Vertically Differentiated Market" (with Ann Dryden Witte), NBER Working Paper # 6493.

"Unintended Consequences? Welfare Reform and the Working Poor" (with Ann Dryden Witte, Magaly Queralt, and Harriet Griesinger), NBER Working Paper # 6798.

**Invited Presentations**

AHLA Antitrust Practice Group, "Interview with Tasneem Chipty, Founder and Managing Principal of Matrix," Member Briefing, March 2018, available at https://www.healthlawyers.org/Members/PracticeGroups/Antitrust/Pages/Default.aspx.

ABA Webinar: "Market Definition in section 2 and section 7: The same but not the same? Questions of fact or law?" November 2017.

International Congress of Addictology Albatros, "Economics of Tobacco Plain Packaging: Australian Legislation," May 2017.

Federal Communication Commission's Event on Challenges Facing Independent Programmers, April 2016, available at: https://www.youtube.com/watch?v=8yxC_3M4IWA.

Federal Communication's Panel on Challenges Facing Multichannel Video Programming Distributors, March 2016, available at: https://www.youtube.com/watch?v=03CMDtdpRDQ.

ABA Webinar: "Sports Leagues Claims After 5 Years After American Needle," 2015.

NYSBA Antitrust Class Action Program: "Comcast v. Behrend:  Interpretation and Application of *Comcast* to Damages Issues in Class Certification," 2015.

AHLA Annual Meetings: "Antitrust and Provider Mergers and Affiliations: Competition vs. More Affordable Care?" 2015.

AHLA Webinar: "Antitrust Implications and Lessons Learned from the Ninth Circuit Decision in *St. Luke's*," 2015.

ABA Webinar: "St. Lukes: State and Federal Enforcement in Non-Reportable Program," 2015.

NYC Bar Antitrust and Healthcare Program, 2015.

NYSBA Antitrust Law Section Annual Meetings: "Efficiencies:  The Cheshire Cat of Merger Analysis," 2014.

NYC Bar Antitrust & Trade Regulation Committee: "Approaches to Antitrust Damages," 2014.

**PROFESSIONAL SERVICE**

Defendant's expert at the ABA Mock Trial involving the issue exclusivity, in the form of theaters' use of clearances, 2017.
Vice Chair of the Antitrust Practice Group of the American Health Lawyers Association, 2014-2016.
Advisory board of the Pricing Conduct Committee, 2011-2012.
Editorial comments on a chapter of the ABA's *Price Discrimination Handbook*, 2011.
Plaintiffs' expert at the ABA Mock Trial involving the issue of resale price maintenance, 2008.
Editorial comments on a chapter of the ABA's book on *Market Definition*, 2008.
Contribution to the ABA's *Econometrics Legal, Practical, and Technical Issues*, 2005.

**MEMBERSHIPS**

American Health Lawyers Association (AHLA)
American Bar Association (ABA)
American Economic Association

**HONORS**

National Science Foundation Fellowship, 1989-1992
Phi Beta Kappa, 1988

## Appendix B: Materials Considered

### I.   Expert Reports and Declarations

- Declaration of Dr. Gautam Gowrisankaran, October 5, 2017.

### II.   Expert Reports and Declarations in the UFCW & Employers Benefit Trust v. Sutter Health Matter

- Declaration of Aldo De La Torre in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017.

- Declaration of Becky LaCroix-Milani in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017.

- Declaration of Benjamin Katz in Connection with Plaintiff UEBT's Motion for Class Certification, February 6, 2017.

- Declaration of Chandra Welsh in Connection with Plaintiff UEBT's Motion for Class Certification, February 8, 2017.

- Declaration of David Joyner in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017.

- Declaration of Janet Lundbye in Connection with Plaintiff UEBT's Memorandum in Support of its Motion for Class Certification, February 6, 2017.

- Declaration of Jeff Sprague in Support of Defendants' Opposition to UEBT's Motion for Class Certification, April 11, 2017.

- Declaration of Michael Ramseier in Connection with Plaintiff UEBT's Motion for Class Certification, February 6, 2016.

- Declaration of Paige Rothermel in Connection with Plaintiff UEBT's Motion for Class Certification, February 6, 2017.

- Declaration of Randy Lukins in Connection with Plaintiff UEBT's Motion for Class Certification, February 6, 2016.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**          B - 1

- Declaration of Scott Hamilton in Connection with Plaintiff UEBT's Motion for Class Certification, February 6, 2017.

- Declaration of Steve Melody in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017.

- Declaration of Tracy Barnes in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017.

- Redacted Declaration of Ben C. Lee in Support of Defendants' Opposition to Motion for Class Certification, April 14, 2017.

- Redacted Declaration of Dr. Jeffrey J. Leitzinger, February 10, 2017.

- Redacted Declaration of Jon Chason in Support of Defendants' Opposition to UEBT's Motion for Class Certification, April 13, 2017.

- Redacted Declaration of Margaret E. Guerin-Calvert in Support of Defendants' Opposition to Class Certification, April 14, 2017.

- Redacted Declaration of Melissa Brendt in Support of Defendants' Opposition to UEBT's Motion for Class Certification, April 13, 2017.

- Reply Declaration of Dr. Jeffrey J. Leitzinger in Support of UEBT's Motion for Class Certification, May 25, 2017.

## III.   All Depositions and Associated Exhibits

- Deposition of Aldo de la Torre, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, March 13, 2017.

- Deposition of Chandra Welsh, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, April 12, 2017.

- Deposition of David Joyner, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health,* March 20, 2017.

- Deposition of Gautam Gowrisankaran, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* February 6, 2018.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**          B - 2

- Deposition of Gerald David Crews, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health,* March 15-16, 2018.

- Deposition of Gerald Lalande, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* September 29, 2017.

- Deposition of Jan Voge, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* August 11, 2017.

- Deposition of Janet Lundbye, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health,* March 30, 2018.

- Deposition of Jeffrey Leitzinger, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, March 15, 2017.

- Deposition of Jonathan Chason, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* September 6, 2017.

- Deposition of Margaret E. Guerin-Calvert, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, May 11, 2017.

- Deposition of Melissa Lynn Brendt, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, July 13, 2016.

- Deposition of Michael Beuoy, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* May 2, 2018.

- Deposition of Michael Ramseier, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, March 30, 2017.

- Deposition of Paige Rothermel, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, March 23, 2017.

- Deposition of Peter Anderson, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, October 14, 2016.

- Deposition of Phil Jackson, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* December 21, 2017.

- Deposition of Randy Lukins, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, July 19, 2016.

- Deposition of Randy Lukins, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, March 30, 2017.

- Deposition of Robert Reed, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* October 17, 2017.

- Deposition of Steve Melody, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, March 21, 2017.

- Deposition of Todd Smith, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* August 17, 2017.

- Deposition of Tracey Barnes, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health et al.,* January 30-February 1, 2018.

## IV.  Legal Documents

- Brief and Required Short Appendix of Appellants Federal Trade Commission and State of Illinois (Public Version), *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, et al.*, July 15, 2016.

- Class Action Complaint, *UFCW & Employers Benefit Trust v. Sutter Health; Sutter East Bay Hospitals; Sutter West Bay Hospitals; Eden Medical Center; Sutter Central Valley Hospitals; Mills-Peninsula Health Services; Sutter Health Sacramento Sierra Region; Sutter Coast Hospital; Palo Alto Medical Foundation for Healthcare, Research and Education; and Sutter Medical Foundation*, April 7, 2014.

- Fourth Amended Complaint, *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health*, September 29, 2017.

- Opinion, *Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center; Pinnacle Health System*, September 27, 2016.

- Opinion, *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, et al.*, October 31, 2016.

- Opinion, *ProMedica Health System, Inc. v. Federal Trade Commission*, April 22, 2014.

- Opinion, *Saint Alphonsus Medical Center-Nampa Inc.; Saint Alphonsus Health System Inc.; Saint Alphonsus Regional Medical Center, Inc.; Treasure Valley Hospital Limited Partnership; Federal Trade Commission; State of Idaho; v. St. Luke's Health System Ltd.; St. Luke's Regional Medical Center, Ltd.; Saltzer Medical Group*, February 9, 2015.

- Opinion, *United States v. Rockford Memorial Corp.*, April 3, 1990.

- Order Amending Opinion and Amended Opinion, *Cascade Health Solutions fka McKenzie-Willamette Hospital, an Oregon nonprofit corporation, Plaintiff-Appellant, v. PeaceHealth, a Washington State nonprofit corporation, Defendant-Appellee, and PacificSource Health Plans, Defendant, Regence BlueCross BlueShield of Oregon; Providence Health Plan; McKenzie-Willamette Regional Medical Center Associates, LLC, Defendant-Intervenors. McKenzie-Willamette Hospital, Plaintiff-Appellee, v. PeaceHealth, a Washington State nonprofit corporation, Defendant-Appellant. and PacificSource Health Plans, Defendant, Regence BlueCross BlueShield of Oregon; Providence Health Plan; McKenzie-Willamette Regional Medical Center Associates, LLC, Defendant-Intervenors. McKenzie-Willamette Hospital, Plaintiff-Appellee, v. PeaceHealth, a Washington State nonprofit corporation, Defendant-Appellant, McKenzie-Willamette Hospital, an Oregon nonprofit corporation, Plaintiff-Appellant, v. PeaceHealth, Defendant-Appellee*, September 4, 2007, amended February 1, 2008.

- Order Granting Class Certification, *UFCW & Employers Benefit Trust v. Sutter Health; Sutter East Bay Hospitals; Sutter West Bay Hospitals; Eden Medical Center; Sutter Central Valley Hospitals; Mills-Peninsula Health Services; Sutter Health Sacramento*

*Sierra Region; Sutter Coast Hospital; Palo Alto Medical Foundation for Healthcare, Research and Education; and Sutter Medical Foundation*, August 14, 2018.

- Redacted Memorandum Opinion and Order, *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, et al.*, March 16, 2017.

## V.   Produced Documents

- ABCLH002694

- ABCLH008005

- ABCLH054780

- ABCLH106417

- ABCLH108094

- ABCLH108096

- ABCLH111410

- ABCLH111808

- ABCLH115049

- ABCLH115096

- ABCLH117043

- ABCLH119031

- ABCLH119922

- ABCLH120166

- ABCLH123497

- ABCLH127629

- ABCLH135963

- ABCLH142249

- ABCLH149828

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

- ABCLH161586

- ABCLH162555

- ABCLH166755

- ABCLH172907

- ABCLH223862

- ABCLH365510

- ABCLH379968

- ABCLH379969

- ABCLH382035

- ABCLH388256

- ABCLH394926

- ABCLH396261

- ABCLH402856

- ABCLH408171

- ABCLH465813

- AET-ES10025032

- AET-ESI0001511

- AET-ESI0003351

- AET-ESI0008321

- AET-ESI0022418

- AET-ESI0022876

- AET-ESI0022876.

- AET-ESI0023568

- AET-ESI0023574

- AET-ESI0026354

- AET-ESI0034157

- BSC_SutterSidibe0267438

- BSC_SutterSub00013018

- BSC_SutterSub00030379

- BSC_SutterSub00037618

- BSC_SutterSub00037814

- BSC_SutterSub00062387

- BSC_SutterSub00062476

- BSC_SutterSub00062559

- BSC_SutterSub00063535

- BSC_UFCW-00002428

- BSC_UFCW-00002953

- BSC_UFCW-00003134

- BSC_UFCW-00003249

- BSC_UFCW-00003325

- BSC_UFCW-00007608

- BSC_UFCW-00008342

- BSC_UFCW-00010568

- BSC_UFCW-00011799

- BSC_UFCW-00044752

- BSC_UFCW-00045000

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

- BSC_UFCW-00045202

- BSC_UFCW-00045213

- BSC_UFCW-00060354

- BSC_UFCW-00099460

- BSC_UFCW-00115484

- BSC_UFCW-00121265

- BSC_UFCW-00174271

- BSC_UFCW-00200169

- BSC-UEBT-0000001

- BSC-UEBT-0005326

- BSC-UEBT-0005337

- BSC-UEBT-0005339

- BSC-UEBT-0009556

- BSC-UEBT-0009704

- BSC-UEBT-0031648

- BSC-UEBT-0037886

- BSC-UEBT-0037887

- BSC-UFCW00010568

- BSC-UFCW00045202

- BSC-UFCW00060354

- Cigna_6-16-00013085

- DEF000002613

- DEF000020880

- DEF000049921
- DEF000094071
- DEF000094390
- DEF000094517
- DEF000094759
- DEF000095680
- DEF000097795
- DEF000122903
- DEF000147336
- DEF000148126
- DEF000151711
- DEF000152820
- DEF000154044
- DEF000154045
- DEF000154047
- DEF000176667
- DEF000186441
- DEF000186566
- DEF000206743
- DEF000208068
- DEF000218792
- DEF000227544
- DEF000227548

- DEF000228654

- DEF000234584

- DEF000251505

- DEF000325395

- DEF000403701

- DEF000405001

- DEF000411493

- DEF000423609

- DEF000474192

- DEF000728516

- DEF000751719

- DEF000756198

- DEF000761111

- DEF000807441

- DEF000891947

- DEF000895660

- DEF001170498

- DEF001258766

- DEF001361203

- DEF001454452

- DEF001458429

- DEF001472015

- DEF001567261

- DEF001771416

- DEF001786550

- DEF001786799

- DEF001806980

- DEF001826709

- DEF001927710

- DEF001993646

- DEF001993700

- DEF001993762

- DEF001993774

- DEF002008388

- DEF002065731

- DEF002190232

- DEF002198177

- DEF002198178

- DEF002216931

- DEF002278956

- DEF002345130

- DEF002583665

- DEF002641158

- DEF002646081

- DEF002647676

- DEF002660141

- DEF002763553

- DEF003231202

- DEF003691525

- DEF003728623

- DEF004150400

- DEF004388157

- DEF004447422

- DEF004687098

- DEF004933316

- DEF004963326

- DEF004963336

- DEF004963338

- DEF004963344

- HN-0003199

- HN-0003254

- HN-0003274

- HN-0003276

- STCA0006169

- STCA0098363

- STCA0113844

- STCA0117621

- STCA0119334

- STCA0132775

- STCA0136693
- STCA0145931
- STCA0234063
- STCA0234221
- STCA0274993
- STCA0281559
- STCA0282420
- STCA0285864
- STCA0321358
- STCA0367598
- STCA0391747
- STCA0433707
- STCA0449970
- STCA0461852
- STCA0483629
- STCA0483630
- STCA0509709
- STCA0588271
- STCA0589151
- STCA0596286
- STCA0602090
- STCA0608569
- STCA0625045

- STCA0626073

- STCA0630549

- STCA0692962

- STCA0719211

- STCA0719241

- STCA0719416

- UHC-00000005

- UHC-00000009

- UHC-00003579

- UHC-00011192

- UHC-00035140

- UHC-00073965

- UHC-00101128

- UHC-00134453

- UHC-00148539

- UHC-00149274

- UHC-00149371

- UHC-00149552

- UHC-00171442

- UHC-00171572

- UHC-00171576

- UHC-00180454

- UHC-00184183

- UHC-00204851

- UHC-00207585

- UHC-00210338

- UHC-00291232

- UHC-00298908

- UHC-00330451

- UHC-00347957

- UHC-00499801

- UHC-005058737

- UHC-005085987

## VI. Data Sources

- American Hospital Directory, "Free Hospital Profiles," available at https://www.ahd.com/search.php, *site visited* May 23, 2018.

- Anthem Claims Data, SIDIBE_ABC_0139333 through SIDIBE_ABC_0139352.

- Blue Shield Claims Data, "sidibe_facets_extract.txt" and "sidibe_tpsu_extract.txt".

- California Health Care Foundation, "California Health Insurers Enrollment Database," available at https://www.chcf.org/wp-content/uploads/2018/01/CaliforniaHealthInsurersEnrollmentDataPublished2018.zip, *site visited* March 17, 2018.

- California Office of Statewide Health Planning and Development, "Hospital Annual Financial Data: Pivot Profiles," available at https://www.oshpd.ca.gov/HID/Hospital-Financial.html, *site visited* May 23, 2018.

- California Office of Statewide Health Planning and Development, "Hospital Annual Financial Data: Complete Data Set," available at https://www.oshpd.ca.gov/HID/Hospital-Financial.html, *site visited* May 23, 2018.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

- California Office of Statewide Health Planning and Development, "Patient Origin & Market Share Reports," available at https://www.oshpd.ca.gov/HID/POMS-Report.html, *site visited* May 23, 2018.

- California Office of Statewide Health Planning and Development, "Patient Discharge Data," available by request at https://www.oshpd.ca.gov/HID/Patient-Discharge-Data.html, *site visited* May 23, 2018.

- California Office of Statewide Health Planning and Development, "Appendix D – Patient Discharge Data, Emergency Department, Ambulatory Surgery, 2010-2014 Facility Consolidations," available at http://oshpd.ca.gov/HID/Data_Request_Center/documents/App_D_Facility-Status.xlsx, *site visited* March 10, 2017.

- California Office of Statewide Health Planning and Development, "Appendix J Medicare Severity-Diagnosis Related Groups (MS-DRGs)," available at http://oshpd.ca.gov/HID/Data_Request_Center/documents/App_J_MS-DRG_PDD.xlsx, *site visited* July 5, 2017.

- Centers for Medicare & Medicaid Services, "Historical Impact Files," available at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/Historical-Impact-Files-for-FY-1994-through-Present.html, *site visited* May 23, 2018.

- Google, "Distance Matrix API," available at https://developers.google.com/maps/documentation/distance-matrix/intro, *site visited* May 23, 2018.

- Internal Revenue Service, "Individual Income Tax ZIP Code Data," available at https://www.irs.gov/statistics/soi-tax-stats-individual-income-tax-statistics-zip-code-data-soi, *site visited* May 23, 2018.

- National Bureau of Economic Research, "Diagnosis-Related Group (DRG) Weight Data and DRG MDC Crosswalk," available at http://www.nber.org/data/drg.html, *site visited* May 23, 2018.

- The Dartmouth Atlas of Health Care, "Geographic Crosswalks and Research Files - ZIP Code Crosswalks," available at http://www.dartmouthatlas.org/downloads/geography/hsa_bdry.zip, *site visited* June 6, 2017.

- The Dartmouth Atlas of Health Care, "Geographic Crosswalks and Research Files - HSA Boundaries - Geographic Boundary Files," available at http://www.dartmouthatlas.org/downloads/geography, *site visited* July 31, 2017.

- United States Census Bureau, "Cartographic Boundary Shapefiles – ZIP Code Tabulation Areas (ZCTAs)," available at https://www2.census.gov/geo/tiger, *site visited* May 22, 2018.

- United States Census Bureau, "Employment Status: 2011-2015 American Community Survey 5-Year Estimates," available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_5YR_S2301, *site visited* April 10, 2018.

## VII.  Other Materials Considered

- "§ 1300.51. Application for License as a Health Care Service Plan or Specialized Health Care Service Plan.," available at https://govt.westlaw.com/calregs/Document/IBCF3D0D0D44911DEB97CF67CD0B994 67?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPag eItem&contextData=(sc.Default), *site visited* May 11, 2018.

- "§ 70005. General Acute Care Hospital," available at https://govt.westlaw.com/calregs/Document/ID7B72350D4BB11DE8879F88E8B0DAA AE?viewType=FullText&originationContext=documenttoc&transitionType=CategoryPa geItem&contextData=(sc.Default), *site visited* May 11, 2018.

- "10 CCR § 2240.1," available at http://www.insurance.ca.gov/0400-news/0100-press-releases/2016/upload/NetworkAdequacyRegulation3-8-16.pdf, *site visited* May 2, 2018.

- Aetna, "Save Money with Aetna's Provider Network," available at http://www.aetna.com/individuals-families-health-insurance/document-library/2012-aetna-provider-network.pdf, *site visited* April 6, 2018.

- Aiello, Marianne, "Why and How Safety Net Hospitals are Marketing Themselves," *HealthLeaders Media*, March 16, 2016, available at http://www.healthleadersmedia.com/marketing/why-and-how-safety-net-hospitals-are-marketing-themselves, *site visited* May 12, 2018.

- American College of Surgeons, "Searching for Verified Trauma Centers," available at https://www.facs.org/search/trauma-centers, *site visited* March 17, 2018.

- Austin, D. Andrew and Thomas Hungerford, "The Market Structure of the Health Insurance Industry," *Congressional Research Service Report for Congress*, May 25, 2010, available at https://fas.org/sgp/crs/misc/R40834.pdf, *site visited* October 24, 2017.

- Beck, Melinda, "How to Bring the Price of Health Care Into the Open," *The Wall Street Journal*, February 23, 2014, available at https://www.wsj.com/articles/what-does-health-care-really-cost-1393020966, *site visited* April 18, 2018.

- Bosonac, Edward M., Roslind C. Parkinson, and David S. Hall, "Geographic Access to Hospital Care: A 30-Minute Travel Time Standard," *Medical Care*, Vol. 14, No. 7, 1976.

- California Critical Access Hospital Network, "Critical Access Hospital Profiles," available at https://www.ccahn.org/about-network/critical-access-hospital-profiles, *site visited* March 17, 2018.

- California Critical Access Hospital Network, "Sutter Lakeside Hospital," available at https://www.ccahn.org/hospital-profile/sutter-lakeside-hospital, *site visited* March 17, 2018.

- California Department of Insurance, "Provider Network Adequacy," available at http://www.insurance.ca.gov/01-consumers/110-health/10-basics/pna.cfm, *site visited* April 12, 2018.

- California Health Care Foundation, "California Health Insurers, Enrollment," February 2018, available at https://www.chcf.org/wp-

content/uploads/2018/02/QRGHealthInsurersEnrollment2018.pdf, *site visited* April 30, 2018.

- California Health Care Foundation, "Insurance Markets," June 2003, available at https://www.chcf.org/wp-content/uploads/2017/12/PDF-HIMURegulatoryOversight.pdf, *site visited* March 18, 2018.

- California Health Care Foundation, "The Financial Health of California Hospitals," 2007, available at https://www.chcf.org/wp-content/uploads/2017/12/PDF-HospitalFinancialHealthFullReport.pdf, *site visited* March 26, 2018.

- California Office of Statewide Health Planning and Development, "Patient Discharge Data (PDD) Data Dictionary Public Use File," available at https://www.oshpd.ca.gov/documents/HID/Data_Request_Center/puf/DataDictionary_Public_PDD.pdf, *site visited* March 1, 2017.

- California Office of Statewide Health Planning and Development, "Hospital Annual Financial Data Selected Data File Documentation for Report Periods Ended On and After June 30, 2004", available at https://www.oshpd.ca.gov/documents/HID/HospitalFinancial/Pivot/HAFDDoc2013.pdf, *site visited* April 27, 2018.

- Capps, Cory, David Dranove, Shane Greenstein, and Mark Satterthwaite, "The Silent Majority Fallacy of the Elzinga-Hogarty Criteria: A Critique and New Approach to Analyzing Hospital Mergers," Working Paper, April 2001, available at http://www.nber.org/papers/w8216, *site visited* April 4, 2018.

- Caspers, Tricia, "Sutter Auburn Faith Hospital Celebrates 50 Years," *Auburn Journal*, July 14, 2016, available at http://www.auburnjournal.com/article/7/14/16/sutter-auburn-faith-hospital-celebrates-50-years, *site visited* March 17, 2018.

- Centers for Medicare & Medicaid Services, "Center for Clinical Standards and Quality/Survey & Certification Group Memorandum," March 11, 2016, available at https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/SurveyCertificationGenInfo/Downloads/Survey-and-Cert-Letter-16-09.pdf, *site visited* March 26, 2018.

- Chan, Leighton, L. Gary Hart, and David C. Goodman, "Geographic Access to Health Care for Rural Medicare Beneficiaries," Working Paper, April 2005, available at http://depts.washington.edu/uwrhrc/uploads/RHRC_WP97_Dec-27-10.pdf, *site visited* May 23, 2018.

- Chipty, Tasneem and Christopher Snyder, "The Role of Firm Size in Bilateral Bargaining: A Study of the Cable Television Industry," *Review of Economics and Statistics*, Vol. 81, No. 2, May 1999.

- Delbanco, Suzanne, Roslyn Murray, Robert A. Berenson, and Divvy K. Upadhyay, "A Typology of Benefit Designs," *Urban Institute*, April 2016, available at https://www.urban.org/sites/default/files/publication/80321/2000780-A-Typology-of-Benefit-Designs.pdf, *site visited* April 18, 2018.

- Department of Health and Human Services, Office of the Inspector General, "State Standards for Access to Care in Medicaid Managed Care," OEI-02-11-000320, September 2014.

- Farrell, Joseph, David Balan, Keith Brand, and Brett Wendling, "Economics at the FTC: Hospital Mergers, Authorized Drugs, and Consumer Credit Markets," *Review of Industrial Organization*, Vol. 39, No. 4, 2011.

- Farrell, Joseph and Carl Shapiro, "Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition," *The B.E. Journal of Theoretical Economics*, Vol. 10, No. 1, 2010.

- Froeb, Luke and Gregory Werden, "The Reverse Cellophane Fallacy in Market Delineation," *Review of Industrial Organization*, Vol. 7, No. 2, 1992.

- Gowrisankaran, Gautam, Aviv Nevo, and Robert Town, "Mergers When Prices are Negotiated: Evidence from the Hospital Industry," *American Economic Review*, Vol. 175, No. 1, 2015.

- Greene, William, *Econometric Analysis*, 6th Edition, 2008.

- Hansen, John, "The Department of Managed Health Care Regulates California Health Plans and Protects Consumers," *Health for California Insurance Center*, available at

https://www.healthforcalifornia.com/the-department-of-managed-health-care-regulates-california-health-plans-protects-consumers, *site visited* April 12, 2018.

- Ho, Kate and Robin Lee, "Equilibrium Provider Networks: Bargaining and Exclusion in Health Care Markets," Working Paper, Issued August 2017, Revised May 2018, available at http://www.nber.org/papers/w23742.pdf, *site visited* May 23, 2018.

- Ho, Robin and Kate Lee, "Insurer Competition in Health Care Markets," *Econometrica*, Vol. 85, No. 2, 2017.

- Kaiser Permanente, "Fast Facts About Kaiser Permanente," available at https://share.kaiserpermanente. org/article/fast-facts-about-kaiser-permanente/, *site visited* March 17, 2018.

- Kane, Nancy M. "Alameda Health System: 'Helping an institution survive that used to serve people with no choices.'," *Harvard T.H. Chan School of Public Health*, 2015, available at http://caseresources.hsph.harvard.edu/files/case/files/alameda.pdf, *site visited* May 12, 2018.

- Katz, Michael L. and Carl Shapiro, "Critical Loss: Let's Tell the Whole Story," *Antitrust Magazine*, Spring 2003, available at https://faculty.haas.berkeley.edu/shapiro/critical.pdf, *site visited* May 22, 2018.

- Kessler, Daniel and Mark McLellan, "Is Hospital Competition Socially Wasteful?" *Quarterly Journal of Economics*, Vol. 115, No. 2, 2000.

- Lewis, Matthew and Kevin Pflum, "Diagnosing Hospital System Bargaining Power in Managed Care Networks," *American Economic Journal: Economic Policy*, Vol. 7, No. 1, 2015.

- McFadden, Daniel, "Conditional Logit Analysis of Qualitative Choice Behavior," *Frontiers in Econometrics*, 1973.

- Moresi, Serge, "The Use of Upward Price Pressure Indices in Merger Analysis," *The Antitrust Source*, February 2010, available at https://www.americanbar.org/content/dam/aba/publishing/antitrust_source/Feb10_Moresi 2_25f.authcheckdam.pdf, *site visited* November 27, 2017.

- Nash, John F., "The Bargaining Problem*," Econometrica*, Vol. 18, No. 2, April 1950.

- Probst, Janice C., Sarah B. Laditka, Jong-Yi Wang, and Andrew O. Johnson, "Mode of Travel and Actual Distance Traveled for Medical or Dental Care by Rural and Urban Residents," *South Carolina Rural Health Research Center*, May 2006, available at http://www.sc.edu/study/colleges_schools/public_health/research/research_centers/sc_rural_health_research_center/documents/61modeoftravelandactualdistancetraveled2006.pdf, *site visited* May 23, 2017

- Probst, Janice, Sarah Laditka, Jong-Yi Wang, and Andrew Johnson, "Effects of Residence and Race on Burden of Travel for Care: Cross Sectional Analysis of the 2001 US National Household Travel Survey," *BMC Health Services Research*, Vol. 7, No. 40, 2007.

- Rosch, J. Thomas, "The Past and Future of Direct Effects Evidence," Remarks at ABA Section of Antitrust Law's 59th Spring Meeting Washington, DC, March 30, 2011, available at http://www.sc.edu/study/colleges_schools/public_health/research/research_centers/sc_rural_health_research_center/documents/61modeoftravelandactualdistancetraveled2006.pdf, *site visited* May 17, 2018.

- Sutter Health, "About California Pacific Medical Center," available at http://www.cpmc.org/about/, *site visited* March 17, 2018.

- Sutter Health, "Alta Bates Summit Medical Center," available at http://www.altabatessummit.org, *site visited* April 14, 2018.

- Sutter Health, "History of Memorial Medical Center," available at http://www.memorialmedicalcenter.org/about/about_hist.html, *site visited* March 14, 2018.

- Sutter Health, "Our History – Sutter Davis Hospital," available at http://www.sutterdavis.org/about/history.html, *site visited* March 17, 2018.

- Sutter Health, "Sutter Amador History," available at https://www.sutterhealth.org/amador/about/history/history-amador, *site visited* March 17, 2018.

- Sutter Health, "Sutter Coast History," available at https://www.sutterhealth.org/coast/about/history/history-coast, *site visited* March 17, 2018.

- Sutter Health, "Sutter Delta Medical Center – About Us," available at http://www.sutterdelta.org/about/, *site visited* March 17, 2018.

- Sutter Health, "Sutter Delta Medical Center – History Timeline by Decade," available at http://www.sutterdelta.org/about/history.html, *site visited* March 17, 2018.

- Sutter Health, "Sutter Santa Rosa History," available at https://www.sutterhealth.org/ssrrh/about/history/history-ssrrh, *site visited* April 2, 2018.

- Sutter Health, "Sutter Santa Rosa Regional Hospital – About Us," available at http://www.suttersantarosa.org/about/index.html, *site visited* March 16, 2018.

- Sutter Health, "Sutter Tracy History," available at https://www.sutterhealth.org/stch/about/history/history-stch, *site visited* March 17, 2018.

- Sutter Health, "What is a Trauma Center?" available at https://www.sutterhealth.org/services/emergency/trauma-centers, *site visited* March 17, 2018.

- Sutter Health, "What is Sutter Health," available at https://www.sutterhealth.org/about/what-is-sutter-health, *site visited* April 16, 2018.

- Tenn, Steven, "The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction," *International Journal of the Economics of Business*, Vol. 18, No. 1, 2011.

- Tenn, Steven, "Key Takeaways from the Advocate-Northshore Merger Litigation," *CPI Antitrust Chronicle*, July 2017.

- The Dartmouth Atlas of Healthcare, "Glossary," available at http://www.dartmouthatlas.org/tools/glossary.aspx, *site visited* April 4, 2018.

- U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010, available at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010, *site visited* April 7, 2018.

- U.S. Department of Justice, "Statement of Antitrust Enforcement Policy Regarding Accountable Care Organizations Participating in the Medicare Shared Savings Program." *Federal Register*, Vol. 76, No. 209, 2011, available at https://www.gpo.gov/fdsys/pkg/FR-2011-10-28/pdf/2011-27944.pdf, *site visited* April 24, 2018.

- Vistnes, Gregory, "Hospitals, Mergers, and Two-Stage Competition," *Antitrust Law Journal*, Vol. 67, No. 3, 2000.

- Werden, Gregory, "Market Delineation under the Merger Guidelines: Monopoly Cases and Alternative Approaches," *Review of Industrial Organization*, Vol. 16, No. 2, 2000.

- Wooldridge, Jeffrey, *Econometric Analysis of Cross Section and Panel Data*, 2002.

## Appendix C: Hospital Choice Model and Data Processing

1.       This Appendix describes the hospital discrete choice model used as a basis for the diversion ratio analyses.[1] It provides a description of the data, the data processing steps used to create the choice model analysis dataset, and the econometric framework, including the variables used in the estimation. Attachments 1 and 2 provide an overview of the analysis sample and the estimation results.

### A.      Dataset

2.       The analysis relies upon the 2011 OSHPD Patient Discharge Data ("PDD"). For each inpatient discharge at a California hospital, these data provide information on patient medical need, hospital chosen, demographics, and five-digit zip code of residence. I used the 2011 PDD because they are the most recent PDD with sufficiently detailed patient demographic information – specifically, 2011 is the last year to include five-digit zip codes for patient residence.

### B.      Creation of the Data Set for Estimation

3.       The choice model analysis dataset is created by applying standard sample restrictions to arrive at a set of discharges for Northern California residents with sufficient information to study non-Kaiser hospital choice, conditional on having a medical need. For this purpose, the sample is restricted to patients identified as having access to a broad provider network for whom key pieces of information are available. The sample excludes discharges with the following characteristics:

- Health plan was missing, unknown, or non-commercial;

- Health plan was a Knox-Keene/Medi-Cal County Organized Health System ("MCOHS") plan, marked as invalid, or is marked as another HMO;[2]

---

[1] Chipty Workpapers provide the computer programs.

[2] For the purposes of Exhibits 7A to 18A, Exhibits 7C to 18C, and Exhibit 21, I only drop observations for which the patient's health plan is Kaiser.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

- Discharge was associated with DRG codes 795 ("Normal Newborn"), 998 ("Principal Diagnosis invalid as Discharge Diagnosis"), or 999 ("Ungroupable");

- Discharge was associated with Major Diagnostic Category ("MDC") codes 19 ("Mental Diseases and Disorders"), 20 ("Alcohol/Drug Use or Induced Mental Disorders"), or 00 ("Ungroupable");[3]

- Discharge had a length of stay that is missing, unknown, or greater than 180 days; or

- Discharge was: (a) a transfer from another hospital, a skilled nursing facility or intermediate care facility, another health care facility, an ambulatory surgery center, or a hospice; (b) associated with a patient admitted to the hospital due to court or law enforcement; or (c) a newborn.

4.     The sample also applies additional filters based on demographic characteristics.[4] Specifically, the estimation sample excludes observations for which the patient's:

- Sex was unknown, other, or marked as invalid;

- Race was missing or unknown;

- Ethnicity was unknown or marked as invalid; or

- Age range (measured in twenty categories) was missing or unknown.

Attachment 1 describes the impact of this first set of data steps on sample size. After applying these filters, 244,758 discharges remain in the analysis dataset.

5.     Additional information on hospital characteristics and patient demographics is then merged onto the analysis dataset. This information is obtained from various sources. Specifically:

---

[3] Ungroupable MDCs are coded as "00" in OSHPD's patient discharge data. *See* OSHPD, "Patient Discharge Data (PDD) Data Dictionary Public Use File," available at https://www.oshpd.ca.gov/documents/HID/Data_Request_Center/puf/DataDictionary_Public_PDD.pdf, *site visited* March 1, 2017.

[4] I do not apply these demographic filters to Exhibits 7A to 18A, Exhibits 7C to 18C, or Exhibit 21, as they are not relevant to those exhibits.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**             C – 2

- Hospital-level information, including hospital beds, system affiliation,[5] and medical services provided, is obtained from the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles and from the OSHPD Hospital Annual Financial Disclosure Data Complete Data Set;

- Zip code-level information is obtained from the IRS Statistics of Income (SOI) Tax Stats for California;[6]

- DRG weight information is obtained from the National Bureau of Economic Research;

- Hospital service area ("HSA") information is obtained from Dartmouth Atlas;

- Hospital latitude and longitude information is obtained via Google Maps API;

- Zip code latitude and longitude information is obtained via Google Maps API;

- Calculated drive times from zip codes to hospitals are obtained via Google Maps API; and

- Centers for Medicare and Medicaid Services ("CMS") Certification Numbers ("CCNs," sometimes referred to as Medicare Provider Numbers or "MPNs") are obtained from the CMS Historical Impact Files and the American Hospital Directory ("AHD").

6.      After merging in information from the above sources, discharges were then excluded if:

- The chosen hospital did not have a valid CCN;

- The patient's zip code was not in the IRS's SOI Tax Stats for California;[7,8,9]

- The discharge did not occur at a general acute care hospital, defined as a hospital that: (a) reports itself as "General" or "General Acute" in its annual financial disclosure to

---

[5] Systems were defined based on each hospital's system name from the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, which is populated for all systems with at least three hospitals. In addition to the system field, I use the owner field to assign hospitals to systems. My staff manually reviewed system ownership for all remaining unassigned hospitals. *See* Chipty Workpapers.

[6] I also obtain tax information on zip code 97415, which is in Oregon but belongs to the Crescent City HSA.

[7] The exception to this filter is zip code 97415.

[8] This filter eliminates discharges where the patient's full five-digit zip code is not available due to masking as well as patients whose zip code is a P.O. box.

[9] These filters are not used in reporting data for Exhibits 7A to 18A, Exhibits 7C to 18C, or Exhibit 21.

OSHPD; and (b) has a CCN whose last four digits fall within the range 0001-0879, the range specified by CMS for "Short-term (General and Specialty) Hospitals;"[10] or

- The discharge occurred at a Kaiser hospital.

Applying these additional filters results in an analysis sample of 223,272 discharges.

7.     Next, to determine the set of relevant zip codes whose residents' hospital choices might shed light on preferences for Sutter hospitals, I first identify all hospitals that are located within 100 miles of any of the 23 hospitals owned by Sutter in 2011 and that receive at least one discharge from the set of 223,272 discharges. This calculation results in 107 hospitals. I then identify the set of relevant zip codes as those zip codes that are within 100 miles of any of the 107 hospitals defined above. This calculation results in 767 relevant zip codes.

8.     The estimation sample then consists of the 102,589 discharges from the set of relevant zip codes defined above. To identify the set of inside hospitals, I calculate each hospital's volume of discharges. The hospitals within 100 miles of a Sutter hospital with at least 150 discharges from this sample are considered part of the "inside" choice set. Hospitals with fewer than 150 discharges or farther than 100 miles from the nearest Sutter hospital are instead considered part of the "outside" choice set and are treated as a single composite choice in the estimation.[11]

9.     I then expand the set of discharges so that each has 85 observations, one for each of the 84 hospitals in the inside set and one for the composite outside choice. This results in a final analysis dataset of 8,720,065 observations.

### C.     Economic Framework for Hospital Patient Choice

10.     I study patients' hospital choices given their medical need using a conditional logit model, a standard approach in the literature.[12] In this economic framework, individuals are assumed to make decisions that maximize their expected utility. A patient $p$'s utility from

---

[10] The first two digits of the six-digit CCN identify the state in which the hospital is located.

[11] See below for a discussion of the hospital characteristics assigned to the outside option.

[12] *See* Farrell *et. al.,* pp. 275-276. *See also*, Daniel McFadden, "Conditional Logit Analysis of Qualitative Choice Behavior," *Frontiers in Econometrics*, 1973, pp. 105 – 142.

choosing hospital $h$ is separated into two components, a deterministic component and a stochastic component:

$$U_{p,h} = V_{p,h} + \varepsilon_{p,h}$$

where $V_{p,h}$ is the deterministic component of utility and $\varepsilon_{p,h}$ is the idiosyncratic, unobservable component of utility. I model the deterministic component of utility from choosing hospital $h$ as a function of hospital-specific characteristics, patient-specific characteristics, and characteristics of a hospital that vary between patients using a conditional logit model:

$$V_{p,h} = \alpha_s + \beta X_{p,h,z} + \gamma_p$$

where: (a) $\alpha_s$ are system "fixed" effects which are used to take into account all system-specific characteristics (*e.g.* system reputation) not directly captured by the hospital characteristics included in the model; (b) $X_{p,h,z}$ is the set of patient and hospital-specific characteristics; and (c) $\gamma_p$ is a patient-specific fixed effect. Patient-specific characteristics are as follows:

- An indicator for emergency and urgent admissions;

- An indicator for female patients;

- An indicator for patients older than 64;

- An indicator for patients younger than 20;

- An indicator for African-American patients;

- An indicator for non-white patients (including African-Americans);

- An indicator for Hispanic patients;

- The number of diagnoses associated with each discharge;[13]

- The number of procedures associated with each discharge;[14]

---

[13] The OSHPD 2011 PDD only contains a maximum of 24 diagnosis codes for each discharge and uses a value of 799.9 to denote missing or invalid diagnosis codes. *See* OSHPD, "Patient Discharge Data (PDD) Data Dictionary Public Use File," available at https://www.oshpd.ca.gov/documents/HID/Data_Request_Center/puf/DataDictionary_Public_PDD.pdf, *site visited* March 1, 2017. I exclude the 799.9 codes when determining the number of diagnoses for each discharge.

[14] The OSHPD 2011 PDD only contains a maximum of 21 procedure codes for each discharge. *See* OSHPD, "Patient Discharge Data (PDD) Data Dictionary Public Use File," available at

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

- DRG weight;

- The patient's length of stay; and

- The mean adjusted gross income for the patient's zip code.

Hospital characteristics are as follows:

- An indicator for whether the hospital is a teaching hospital;

- Number of hospital beds;

- Number of hospital beds squared;

- Total number of beds across all hospitals for the system to which the hospital belongs ("system beds");[15] and

- System beds squared.

Hospital characteristics that vary over different patients are as follows:

- Drive time between a patient's zip code and hospital $h$;[16]

- Drive time squared;

- A set of "match" variables for six disease categories: cardiology, delivery, oncology, pediatric, organ transplant, and trauma.

11.      The match variables are defined in two steps. The first step is to consider the set of DRGs that define a particular patient-need. Table C.1 lists the DRG and MDC codes used to define patient needs. A patient was determined to have a pediatric need if they are younger than 20 years of age.

---

https://www.oshpd.ca.gov/documents/HID/Data_Request_Center/puf/DataDictionary_Public_PDD.pdf, *site visited* March 1, 2017.

[15] For hospitals not belonging to the system, this characteristic is equal to the hospital beds.

[16] Since the outside choice is a composite set of different hospitals, the drive time between zip code $z$ and the outside choice has been set to the simple average of the drive time between zip code $z$ and all hospitals in the outside set.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Table C.1**
**List of DRG Codes and MDCs Used to Define Patient Needs**

| Match Category | MDC/DRG Codes |
|---|---|
| Cardiology | MDC 05 (includes DRGs 215-316) |
| Delivery | DRGs: 765-769; 774-777; 780-782 |
| Oncology | DRGs: 54-55; 146-148; 180-182; 374-376; 420-422; 435-437; 456-458; 542-544; 582-585; 597-599; 656-658; 686-688; 711-712; 715-716; 722-724; 736-741; 744-745; 754-756; MDC 17 (includes DRGs 820-849) |
| Organ Transplant | DRGs: 1-2; 5-8; 10; 14-17; 652 |
| Trauma | MDC 24 (includes DRGs 955-965) |

12.     The second step is to identify the hospitals' ability to treat the patient needs described above for which I use the hospital service line indicators present in the OSHPD "Complete Data Set." For each of the patient needs described above, I define the hospital as able to meet the patient need if the hospital reported a "1" in the OSHPD Complete Data Set for the service offerings listed in Table C.2 below.[17] I determine that a hospital was able to provide trauma care if it reported being either a level 1, 2, 3, or 4 trauma center to OSHPD.[18]

**Table C.2**
**List of Service Line Offerings Used to Define Hospitals' Service Offerings**

| Match Category | Hospital Service Offering |
|---|---|
| Cardiology | Intensive Care Services Coronary |
| Delivery | Obstetric Services Delivery Room Services OR Obstetric Services Combined Labor/Delivery Birthing Room |
| Oncology | Acute Care Services Oncology |
| Organ Transplant | Surgery Services Organ Transplant |
| Pediatric | Acute Care Services Pediatric AND Surgery Services Pediatric |
| Trauma | Trauma Center (levels 1-4) |

---

[17] For each service offering, hospitals report either a "1," "2," or "3" to OSHPD indicating whether the service is "available at the hospital," "available through arrangement at another health care entity," or is "not available," respectively. *See* OSHPD, "Hospital Annual Disclosure Report for Report Periods Ended June 30, 2004 through June 29, 2012" available at https://www.oshpd.ca.gov/documents/HID/HospitalFinancial/HADR_Excel-Full-DB-Documentation-2004-12_HIRC_V6-8-29-12.pdf, *site visited* October 16, 2017.

[18] OSHPD, "Hospital Annual Financial Data Selected Data File Documentation for Report Periods Ended On and After June 30, 2004", available at https://www.oshpd.ca.gov/documents/HID/HospitalFinancial/Pivot/HAFDDoc2013.pdf, *site visited* April 27, 2018. Though the OSHPD documentation indicates there are only three levels of a trauma center, the trauma designation field take on values 1 – 4. The OSHPD Atlas website notes that some hospitals are "Level IV Trauma" centers. *See, for example*, Sutter Lakeside, available at http://gis.oshpd.ca.gov/atlas/places/facility/106171395, *site visited* April 27, 2018.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

An observation is considered to have a "match" if the patient is a pediatric patient or has a specific need (Table C.1) and the hospital has the service offerings that meet that specific need (Table C.2).

13.     Finally, the following hospital-specific characteristics are assigned to the composite outside option: (a) the drive time, hospital beds, and system beds are set to the simple average of each field over the outside hospitals; (b) the teaching indicator is set to be non-teaching; and (c) the service indicators are set to the mode of the joint distribution of the outside hospitals' services (with the match variable computed as described above).[19]

14.     In the conditional logit framework, patient-specific characteristics enter the model via interaction terms with the hospital-specific characteristics. Each of the patient-specific characteristics is interacted with each hospital-specific and patient/hospital-specific characteristic except for the system fixed effects. This allows, for example, for the effect of drive time on utility to vary between males and females.

15.     Within this framework, it can be shown that the predicted probability that patient $p$ chooses hospital $h$ over all hospitals $j \in J$ is:[20]

$$\frac{e^{V_{p,h}}}{\sum_j^J e^{(V_{p,j})}}$$

I estimate this probability for each of the 8,720,065 observations defined above and use it to calculate diversion ratios.[21] The full set of parameter estimates appears as Attachment 2 to this Appendix. I estimate this model via maximum likelihood using Stata, a common statistical software package.

---

[19] This results in the outside option having cardiology, delivery, pediatric, and oncology services, but not trauma or transplant services.

[20] Jeffrey Wooldridge, *Econometric Analysis of Cross Section and Panel Data*, 2002, p. 500.

[21] Farrell *et. al.,* pp. 275-277.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**              C – 8

**Appendix C: Attachment 1**
**Summary of the First Set of Choice Model Filters**

| Filter | Discharges Removed | Percentage Removed | Discharges Remaining |
|---|---|---|---|
| Health plan was non-commercial, missing, or unknown. | 2,675,883 | 68.0% | 1,257,356 |
| Health plan was a Knox-Keene/MCOHS plan or other HMO. | 702,701 | 17.9% | 554,655 |
| Source of admission indicated a transfer, newborn, court, or law enforcement. | 131,828 | 3.4% | 422,827 |
| MDC code was for mental disorders, alcohol or drug use, or ungroupable. | 28,955 | 0.7% | 393,872 |
| DRG code was for normal newborn or is invalid, unknown, or ungroupable. | 834 | 0.0% | 393,038 |
| Length of stay was greater than 180 days, missing, or unknown. | 18 | 0.0% | 393,020 |
| Age range was missing or unknown. | 73,694 | 1.9% | 319,326 |
| Sex was unknown or invalid. | 22,739 | 0.6% | 296,587 |
| Race was unknown or invalid. | 35,216 | 0.9% | 261,371 |
| Ethnicity was unknown or invalid. | 16,613 | 0.4% | 244,758 |
| **Total** | **3,688,481** | | **244,758** |

*Notes*:

1.  Invalid and ungroupable DRGs are coded as 998 and 999, respectively; ungroupable MDCs are coded as "00" in OSHPD's patient discharge data. *See* OSHPD, "Patient Discharge Data (PDD) Data Dictionary Public Use File," available at https://www.oshpd.ca.gov/documents/HID/Data_Request_Center/puf/DataDictionary_Public_PDD.pdf, *site visited* March 1, 2017; and OSHPD, "Appendix J Medicare Severity-Diagnosis Related Groups (MS-DRGs)," available at http://oshpd.ca.gov/HID/Data_Request_Center/documents/App_J_MS-DRG_PDD.xlsx, *site visited* July 5, 2017.

2.  Knox-Keene/MCOHS plans are managed care plans which are licensed under the Knox-Keene Healthcare Service Plan Act of 1975 or are designated as a Medi-Cal County Organized Health System. *See* OSHPD, "Patient Discharge Data (PDD) Data Dictionary Public Use File," available at https://www.oshpd.ca.gov/documents/HID/Data_Request_Center/puf/DataDictionary_Public_PDD.pdf, *site visited* March 1, 2017.

*Source*: 2011 OSHPD patient discharge data.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Appendix C: Attachment 2**
**Parameter Estimates for Patient Hospital Choice Model**

| Interaction Category | Variable | Parameter Estimate | $z$-Statistic |
|---|---|---|---|
| Main Effect (Uninteracted) | Drive Time | -0.081*** | (-52.630) |
| | Drive Time Squared | 0.000*** | (19.894) |
| | Teaching Hospital | -0.413*** | (-7.824) |
| | Hospital Beds | 0.012*** | (27.531) |
| | Hospital Beds Squared | -0.000*** | (-21.107) |
| | System Beds | -0.002*** | (-7.061) |
| | System Beds Squared | 0.000*** | (16.283) |
| | Cardiology Match | 1.362*** | (5.174) |
| | Delivery Match | 1.302*** | (4.746) |
| | Oncology Match | 2.887*** | (4.423) |
| | Pediatric Match | 1.190*** | (4.500) |
| | Transplant Match | 15.028*** | (6.376) |
| | Trauma Match | 5.564*** | (4.098) |
| Drive Time | Emergency Room | -0.009*** | (-12.454) |
| | Female | -0.009*** | (-11.801) |
| | Under 20 | 0.011*** | (10.105) |
| | Over 64 | -0.012*** | (-10.095) |
| | African American | -0.003 | (-1.734) |
| | Non-White | 0.001 | (0.579) |
| | Hispanic | -0.017*** | (-26.705) |
| | Number of Diagnoses | 0.000*** | (4.093) |
| | Number of Procedures | -0.000 | (-1.689) |
| | Length of Stay | 0.000*** | (3.302) |
| | Average Adjusted Gross Income | -0.000*** | (-29.659) |
| | Acuity (DRG Weight) | 0.003*** | (7.689) |
| Drive Time Squared | Emergency Room | 0.000*** | (8.933) |
| | Female | 0.000*** | (7.678) |
| | Under 20 | -0.000*** | (-7.796) |

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Appendix C: Attachment 2**
**Parameter Estimates for Patient Hospital Choice Model**

| Interaction Category | Variable | Parameter Estimate | z-Statistic |
|---|---|---|---|
| | Over 64 | 0.000*** | (6.593) |
| | African American | 0.000** | (3.131) |
| | Non-White | 0.000 | (0.125) |
| | Hispanic | 0.000*** | (17.031) |
| | Number of Diagnoses | -0.000*** | (-3.742) |
| | Number of Procedures | 0.000 | (1.849) |
| | Length of Stay | -0.000*** | (-3.617) |
| | Average Adjusted Gross Income | 0.000*** | (32.254) |
| | Acuity (DRG Weight) | -0.000*** | (-4.121) |
| Teaching Flag | Emergency Room | 0.107*** | (3.295) |
| | Female | -0.752*** | (-23.658) |
| | Under 20 | 0.058 | (1.022) |
| | Over 64 | -0.545*** | (-9.238) |
| | African American | 0.982*** | (13.061) |
| | Non-White | -0.102** | (-3.084) |
| | Hispanic | 0.266*** | (5.728) |
| | Number of Diagnoses | 0.008* | (2.327) |
| | Number of Procedures | -0.010 | (-1.337) |
| | Length of Stay | 0.010** | (2.764) |
| | Average Adjusted Gross Income | -0.000*** | (-4.063) |
| | Acuity (DRG Weight) | 0.127*** | (9.018) |
| Hospital Beds | Emergency Room | 0.005*** | (20.278) |
| | Female | -0.001** | (-3.146) |
| | Under 20 | -0.002*** | (-3.580) |
| | Over 64 | 0.006*** | (12.618) |
| | African American | 0.002* | (2.403) |
| | Non-White | -0.000 | (-0.783) |
| | Hispanic | 0.000 | (0.531) |

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Appendix C: Attachment 2**
**Parameter Estimates for Patient Hospital Choice Model**

| Interaction Category | Variable | Parameter Estimate | z-Statistic |
|---|---|---|---|
| | Number of Diagnoses | -0.000*** | (-12.511) |
| | Number of Procedures | 0.000*** | (6.859) |
| | Length of Stay | 0.000** | (3.140) |
| | Average Adjusted Gross Income | -0.000*** | (-37.678) |
| | Acuity (DRG Weight) | 0.001*** | (7.949) |
| Hospital Beds Squared | Emergency Room | -0.000*** | (-26.985) |
| | Female | 0.000 | (0.770) |
| | Under 20 | 0.000*** | (9.131) |
| | Over 64 | -0.000*** | (-11.910) |
| | African American | -0.000*** | (-3.416) |
| | Non-White | 0.000*** | (5.634) |
| | Hispanic | -0.000*** | (-4.098) |
| | Number of Diagnoses | 0.000*** | (12.930) |
| | Number of Procedures | -0.000*** | (-6.011) |
| | Length of Stay | -0.000 | (-0.613) |
| | Average Adjusted Gross Income | 0.000*** | (39.363) |
| | Acuity (DRG Weight) | -0.000*** | (-6.085) |
| System Beds | Emergency Room | -0.000 | (-0.411) |
| | Female | 0.000*** | (10.477) |
| | Under 20 | 0.000*** | (9.923) |
| | Over 64 | 0.000*** | (5.751) |
| | African American | 0.000 | (1.841) |
| | Non-White | -0.000*** | (-3.510) |
| | Hispanic | -0.000*** | (-5.540) |
| | Number of Diagnoses | -0.000 | (-0.071) |
| | Number of Procedures | 0.000*** | (6.544) |
| | Length of Stay | 0.000 | (0.995) |
| | Average Adjusted Gross Income | -0.000*** | (-9.848) |

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Appendix C: Attachment 2**
**Parameter Estimates for Patient Hospital Choice Model**

| Interaction Category | Variable | Parameter Estimate | z -Statistic |
|---|---|---|---|
| | Acuity (DRG Weight) | -0.000*** | (-6.978) |
| System Beds Squared | Emergency Room | -0.000*** | (-4.769) |
| | Female | -0.000*** | (-9.992) |
| | Under 20 | -0.000*** | (-10.314) |
| | Over 64 | -0.000*** | (-7.506) |
| | African American | 0.000 | (0.809) |
| | Non-White | 0.000*** | (4.709) |
| | Hispanic | 0.000*** | (8.114) |
| | Number of Diagnoses | 0.000** | (2.923) |
| | Number of Procedures | -0.000*** | (-5.329) |
| | Length of Stay | -0.000 | (-1.170) |
| | Average Adjusted Gross Income | 0.000*** | (14.905) |
| | Acuity (DRG Weight) | 0.000*** | (6.156) |
| Cardiology Match | Emergency Room | -0.887*** | (-4.114) |
| | Female | 0.129 | (0.982) |
| | Under 20 | 0.360 | (0.314) |
| | Over 64 | -1.267*** | (-8.127) |
| | African American | -0.688 | (-1.632) |
| | Non-White | 0.422 | (1.635) |
| | Hispanic | -0.414* | (-2.079) |
| | Number of Diagnoses | 0.002 | (0.139) |
| | Number of Procedures | 0.100** | (3.193) |
| | Length of Stay | -0.058** | (-2.627) |
| | Average Adjusted Gross Income | -0.000 | (-1.778) |
| | Acuity (DRG Weight) | 0.021 | (0.272) |
| Delivery Match | Emergency Room | -0.880*** | (-3.547) |
| | Female | 0.000 | (.) |
| | Under 20 | -0.180 | (-0.350) |

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Appendix C: Attachment 2**
**Parameter Estimates for Patient Hospital Choice Model**

| Interaction Category | Variable | Parameter Estimate | z-Statistic |
|---|---|---|---|
| | Over 64 | 0.000 | (.) |
| | African American | 1.646 | (1.599) |
| | Non-White | 1.100*** | (6.491) |
| | Hispanic | 0.030 | (0.211) |
| | Number of Diagnoses | -0.166*** | (-7.463) |
| | Number of Procedures | -0.322*** | (-8.067) |
| | Length of Stay | 0.481*** | (5.768) |
| | Average Adjusted Gross Income | 0.000*** | (9.577) |
| | Acuity (DRG Weight) | 0.036 | (0.096) |
| Oncology Match | Emergency Room | -2.783*** | (-4.866) |
| | Female | 0.152 | (0.337) |
| | Under 20 | 0.500 | (0.439) |
| | Over 64 | -1.524** | (-2.665) |
| | African American | 13.369*** | (12.454) |
| | Non-White | 1.078 | (1.202) |
| | Hispanic | -0.762 | (-1.077) |
| | Number of Diagnoses | 0.042 | (0.641) |
| | Number of Procedures | -0.140 | (-0.979) |
| | Length of Stay | 0.086 | (1.358) |
| | Average Adjusted Gross Income | 0.000 | (1.612) |
| | Acuity (DRG Weight) | -0.254 | (-0.906) |
| Pediatric Match | Emergency Room | -0.077 | (-0.500) |
| | Female | -0.393* | (-2.446) |
| | Under 20 | 0.000 | (.) |
| | Over 64 | 0.000 | (.) |
| | African American | -0.630 | (-1.794) |
| | Non-White | -0.531*** | (-3.356) |
| | Hispanic | -0.506** | (-2.989) |

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Appendix C: Attachment 2**
**Parameter Estimates for Patient Hospital Choice Model**

| Interaction Category | Variable | Parameter Estimate | z-Statistic |
|---|---|---|---|
| | Number of Diagnoses | -0.095** | (-3.207) |
| | Number of Procedures | -0.097* | (-1.977) |
| | Length of Stay | 0.012 | (0.545) |
| | Average Adjusted Gross Income | 0.000** | (2.793) |
| | Acuity (DRG Weight) | 0.204* | (2.001) |
| Transplant Match | Emergency Room | -3.653** | (-2.624) |
| | Female | -1.735 | (-1.384) |
| | Under 20 | -7.325*** | (-4.004) |
| | Over 64 | -4.105** | (-2.739) |
| | African American | -6.136 | (-1.478) |
| | Non-White | 12.606*** | (4.804) |
| | Hispanic | 7.767*** | (3.380) |
| | Number of Diagnoses | 0.007 | (0.038) |
| | Number of Procedures | 0.155 | (0.736) |
| | Length of Stay | -0.072 | (-1.405) |
| | Average Adjusted Gross Income | -0.000 | (-0.564) |
| | Acuity (DRG Weight) | -0.246 | (-1.760) |
| Trauma Match | Emergency Room | -1.105 | (-1.168) |
| | Female | 0.515 | (0.507) |
| | Under 20 | -0.589 | (-0.625) |
| | Over 64 | 0.997 | (0.469) |
| | African American | 16.520*** | (15.447) |
| | Non-White | -1.505* | (-2.216) |
| | Hispanic | 0.736 | (1.009) |
| | Number of Diagnoses | -0.130 | (-1.804) |
| | Number of Procedures | 0.143 | (1.531) |
| | Length of Stay | 0.032 | (0.890) |
| | Average Adjusted Gross Income | 0.000 | (1.034) |

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Appendix C: Attachment 2**
**Parameter Estimates for Patient Hospital Choice Model**

| Interaction Category | Variable | Parameter Estimate | $z$-Statistic |
|---|---|---|---|
| | Acuity (DRG Weight) | -0.383 | (-1.662) |
| | Number of Discharges | 102,589 | |
| | Choice Set Size (Including Outside Option) | 85 | |
| | Total Observations | 8,720,065 | |
| | System Fixed Effects | Yes | |
| | Pseudo-$R^2$ | 69.17% | |

*Notes*:

1.  Asterisks ***, **, and * indicate statistical significance at the one, five, and ten percent level, respectively.

2.  Some interaction terms dropped out of the model due to collinearity.

*Source: See* Appendix C.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

## Appendix D: Hypothetical Monopolist's Optimal Price Increase

1.      As described by the *Merger Guidelines*, the formal test for market definition evaluates whether there would be a SSNIP over current levels, for at least one product in the candidate market, if all products (here, hospitals) in the candidate market were controlled by a hypothetical monopolist ("HM"). Accordingly, this Appendix describes the profit-maximizing price increase for a single hospital (denoted $H_1$) when it is owned by a HM of all hospitals in a candidate market. For simplicity, the derivations assume that the prices of all other hospitals (those owned by the HM in the candidate market and those not owned by the HM outside of the candidate market) are held fixed at their original levels. As a result, the profit-maximizing price is a measure of "upward pricing pressure" in the spirit of Farrell and Shapiro (2010).[1] In other words, if owners of hospitals outside of the candidate market would find it optimal to change their prices due to the hypothetical change in industry ownership structure inside the candidate market, the prices derived below would not be equilibrium prices.

2.      Here, I describe a simple Nash bargaining model in which a single health plan bargains with each hospital system over the reimbursement rate (the price) that the health plan will pay to the hospital system when one of its plan members visits a specific hospital within that system.[2,3] Following Nash, I assume that the health plan enters into simultaneous negotiations with each hospital system separately and all parties believe that efficient trade will occur, and this belief is justified in equilibrium, where the parties equally divide the surplus generated from trade.[4] For convenience, I also assume the health plan and each hospital system engage in separate bargaining for each individual hospital within that system.

---

[1] Farrell, Joseph and Carl Shapiro, "Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition," *The B.E. Journal of Theoretical Economics*, Vol. 10, No. 1, 2010.

[2] The same profit-maximizing price increase can be derived from an alternative model that assumes linear demand and Bertrand price competition, as long as the health plan reaches an agreement in the equilibrium with the other hospitals in the candidate market. In this alternative approach, the only decision the health plan makes is whether or not to purchase at the price posted by the hospital system.

[3] Following Nash, I use the term "bargaining" to refer to a situation where: (a) the parties can conclude a mutually beneficial agreement; (b) there is a conflict of interests about which agreement to conclude; and (c) no agreement can be reached without the approval of all the parties. *See* Nash, John F., "The Bargaining Problem," *Econometrica*, Vol. 18, No. 2, April 1950, pp. 155-62.

[4] As explained by Chipty and Snyder, the Nash assumption is that the outcome from negotiations between the health plan (buyer) and each hospital (seller) maximizes joint surplus and therefore involves an efficient amount of trade. The health plan and hospital $i$ split evenly the incremental surplus generated by their trade under the belief that the health plan buys the efficient amount in each of its negotiations with hospitals $k \neq i$. It can be shown that this

### A.    Basic Setup

3.     To begin, consider a single health plan $I$ that seeks to assemble a provider network in a candidate market with $m$ competing hospital systems, $S_1, S_2, \ldots, S_m$ that own $n \geq m$ different hospitals, $H_1, H_2, \ldots H_n$.  It is useful to denote the set of hospitals owned by $S_j$ as $J_j$. For example, if $S_1$ owns $H_1$ and $H_2$, then $J_1 = [H_1, H_2]$, and the set of all hospitals is $J = [J_1, J_2, \ldots, J_m] = [H_1, H_2, \ldots, H_n]$. Within this framework:

- Let $Q_i$ denote the number of health plan $I$'s members that visit $H_i$.

- Assume that each hospital $i$ receives a price $p_i$ for each unit of service that it provides at cost $c_i$ to health plan $I$'s members.

- Let $\Delta_i$ denote the gain in health plan $I$'s membership when $H_i$ is included in the network.

- Assume that the health plan receives a fixed net premium $\phi$ (premium paid net of costs other than hospital reimbursements) for each member.

4.     Denote the set of hospitals in $J_j$ for which an agreement is successfully negotiated as $\bar{J}_j$. If the health plan and hospital system do not come to an agreement over any individual hospital, that hospital is out-of-network for the health plan. The set of all hospitals in the health plan's network is $\bar{J} = [\bar{J}_1, \bar{J}_2, \ldots, \bar{J}_m]$. In the two-hospital problem, this notation can be simplified. If $J_1 = [H_1, H_2]$, then $I$ must bargain with $S_1$ separately for hospitals $H_1$ and $H_2$. If the health plan and hospital system come to an agreement over the price at which the health plan will reimburse $H_2$, but not $H_1$, then $H_2$ will be in-network for $I$'s plan members, but $H_1$ will be out-of-network. In this instance, $\bar{J}_1 = [H_2]$.

5.     I assume that health plan members only go to in-network hospitals, and the out-of-network hospitals do not recapture any of the lost patients through other channels. However, the hospital system can recapture these lost patients through other in-network hospitals in the hospital system, and the health plan can recapture the patients that continue to subscribe to the health plan and visit other hospitals in the health plan's network. Let $D_{ki}$ be the diversion ratio from $H_k$ to $H_i$, or the percentage of patients that would have visited $H_k$ if it were in-network, but

---

outcome emerges as a limiting perfect Bayesian equilibrium of an extensive-form game. *See* Chipty, Tasneem and Christopher Snyder, "The Role of Firm Size in Bilateral Bargaining: A Study of the Cable Television Industry," *Review of Economics and Statistics*, May 1999, Vol. 81, No. 2, pp. 326–340, at p. 329.

instead visit $H_i$ when $H_k$ is out-of-network. In the two-hospital example above, the percentage of $I$'s plan members that would have visited $H_1$ if it were in-network, but instead visit $H_2$ when $H_1$ is out of network is denoted $D_{12}$.

### B.    Equilibrium with Independent Ownership

6.    Consider first the equilibrium in the actual world with independent hospital systems negotiating with a health plan. Hospital system $S_1$'s "surplus" from an agreement with health plan $I$ over the price to be paid for hospital $H_1$ is the variable profit from treating insured patients at $H_1$ (if an agreement is reached) minus the variable profit that would be recaptured at other hospitals within the hospital system $S_1$ (if an agreement is not reached):

(1)    $\sum_{i \in \bar{J}_1}(p_i - c_i)Q_i - \sum_{i \in \bar{J}_1; i \neq 1}(p_i - c_i)(Q_i + Q_1 D_{1i})$,

which, after rearranging and collecting terms, is equal to $(p_1 - c_1)Q_1 - \sum_{i \in \bar{J}_1; i \neq 1}(p_i - c_i)\,Q_1 D_{1i}$.

7.    Health plan $I$'s surplus from an agreement with $S_1$ over $H_1$ is the additional revenue gained from having $H_1$ in the network minus the additional costs to the health plan of paying for patients treated at $H_1$:

(2)    $\phi \Delta_1 - \left[\sum_{i \in \bar{J}} p_i Q_i - \sum_{i \in \bar{J}; i \neq 1} p_i(Q_i + Q_1 D_{1i})\right]$,

which, after rearranging and collecting terms, equals $\phi \Delta_1 - p_1 Q_1 + \sum_{i \in \bar{J}; i \neq 1} p_i Q_1 D_{1i}$.

8.    Because of the assumption of an equal split of the surplus created by the agreement, the equilibrium negotiated price $p_1^0$ will be the one that makes the hospital system's surplus from the agreement equal to the seller's surplus from the agreement.  In other words, setting (1) equal to (2):

(3)    $(p_1^0 - c_1)Q_1 - \sum_{i \in \bar{J}_1; i \neq 1}(p_i - c_i)\,Q_1 D_{1i} = \phi \Delta_1 - p_1^0 Q_1 + \sum_{i \in \bar{J}; i \neq 1} p_i Q_1 D_{1i}$

Solving (3) for $p_1^0$ would yield the equilibrium negotiated price, as a function of other hospital prices and other model parameters.

### C.    Equilibrium with the Hypothetical Monopolist

9.    Now consider an alternative scenario in which a HM owns $S_1$ as well as other hospital systems in the candidate market. Denote the set of other hospitals in the candidate

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

market as $J_A$, and the set of other hospitals in the candidate market that are in the health plan's network as $\bar{J}_A$. For example, if $S_1$ were to acquire $S_2$ and $S_3$ (because of the hypothetical monopolist thought experiment), then $J_A = [J_2, J_3]$ and $\bar{J}_A = [\bar{J}_2, \bar{J}_3]$.

10.     The HM's surplus from an agreement with $I$ is:

(4)     $(p_1^* - c_1)Q_1 - \sum_{i \in \bar{J}_1; i \neq 1}(p_i - c_i)\,Q_1 D_{1i} - \sum_{i \in \bar{J}_A}(p_i - c_i)\,Q_1 D_{1i}$

where the third term in equation (4) represents the profit that would be earned by the HM when patients that would have visited $H_1$ if it were in-network are diverted to acquired hospitals. The presence of the third term indicates that the benefit to an agreement for the HM, shown in (4), is lower than the benefit to $S_1$ in the independent negotiation scenario, shown above in (1).

11.     Because the health plan and hospital system bargain over hospitals individually, the health plan $I$'s surplus from an agreement over $H_1$ is the same in the independent and HM scenarios, and is given by (2). Once again, the equilibrium negotiated price $p_1^*$ will be the one that makes the hospital system's surplus from the agreement equal to the seller's surplus from the agreement. In other words, setting (4) equal to (2):

(5)     $(p_1^* - c_1)Q_1 - \sum_{i \in \bar{J}_1; i \neq 1, \bar{J}_A}(p_i - c_i)\,Q_1 D_{1i} = \phi \Delta_1 - p_1^* Q_1 + \sum_{i \in \bar{J}; i \neq 1} p_i Q_1 D_{1i}$

Solving (5) for $p_1^*$ would yield the equilibrium negotiated price, as a function of other hospital prices and other model parameters.

### D.     *Optimal Price Increase for the HM*

12.     To calculate the optimal price increase for the hypothetical monopolist, I calculate the difference between the equilibrium price with a hypothetical monopolist and the equilibrium price with independent ownership. Substituting (3) into (5), solving for the difference in price $p_1^* - p_1^o$, and dividing by $p_1^o$, gives the predicted percentage price increase:

(6)     $\%\Delta p_1 = \frac{1}{2}\sum_{i \in \bar{J}_A} M_i\, D_{1i}\frac{p_i}{p_1^o}$

where $M_i = \frac{(p_i - c_i)}{p_i}$ is the margin for hospital $H_i$.

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER