Jeffrey A. LeVee (State Bar No. 125863)
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Telephone:    +1.213.489.3939
Facsimile:    +1.213.243.2539
Email:    jlevee@jonesday.com

David C. Kiernan (State Bar No. 215335)
Brian G. Selden (State Bar No. 261828)
Matthew J. Silveira (State Bar No. 264250)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:    +1.415.626.3939
Facsimile:    +1.415.875.5700
Email:    dkiernan@jonesday.com
         bgselden@jonesday.com
         msilveira@jonesday.com

Robert H. Bunzel (State Bar No. 99395)
Patrick M. Ryan (State Bar No. 203215)
Oliver Q. Dunlap (State Bar No. 225566)
BARTKO, ZANKEL, BUNZEL & MILLER
One Embarcadero Center, Suite 800
San Francisco, CA  94111
Telephone:  (415) 956-1900
Facsimile:  (415) 956-1152
Email: rbunzel@bzbm.com
       pryan@bzbm.com
       odunlap@bzbm.com

Attorneys for Defendants
Sutter Health

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

DJENEBA SIDIBE, et al.,

Plaintiffs,

v.

SUTTER HEALTH,

Defendant.

Case No. 3:12-CV-04854-LB

**DEFENDANT'S SUR-REPLY IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

Date: January 24, 2019
Time: 9:30 AM
The Honorable Laurel Beeler

**<u>REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</u>**

# TABLE OF CONTENTS

                                                                                Page

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 1

I.    DR. CHIPTY'S NEW ARGUMENTS REGARDING THE EMPLOYER-EMPLOYEE
      CONTRIBUTION SPLIT ARE GROUNDLESS................................................. 1

II.   DR. CHIPTY'S NEW ARGUMENT THAT NO CLASS MEMBERS WOULD BE
      HARMED IN THE ALLEGED BUT-FOR WORLD IS UNFOUNDED........................... 3

      A.    Dr. Chipty Disregards the Evidence and Plaintiff's Allegations. ...................................3

      B.    Whether Class Members Suffered Net Harm is An Individual Issue. ...........................5

III.  DR. CHIPTY'S NEW PASS-THROUGH REGRESSION REMAINS FLAWED AND AT
      MOST CONFIRMS THE NEED FOR INDIVIDUAL INQUIRY. ....................................... 7

IV.   DR. CHIPTY'S NEW APPROACH FOR DETERMINING INJURY AND DAMAGES
      FOR LARGE-GROUP EMPLOYERS IS UNFOUNDED. ................................................. 9

V.    DR. CHIPTY HAS NOT OFFERED ANY METHOD FOR FINDING IMPACT OR
      COMPUTING OVERCHARGES FOR UNITED, HEALTH NET, OR AETNA................. 9

1

**INTRODUCTION**

2       Sutter's opposition to class certification showed that class certification is improper

3  because, among other reasons, individual proof is required to determine whether (1) insurers

4  passed along the alleged hospital overcharges in their premiums to employers and individuals,

5  (2) employers who may have paid higher premiums bore the entire amount themselves or passed

6  some or all of it on to their employees, and (3) individuals who may have paid the small alleged

7  increase in premiums were not harmed because they benefited from Sutter being included in their

8  network.  Plaintiffs' motion offered no common, classwide method to resolve any of these issues.

9  As to the first, plaintiffs improperly relied on average pass-through rates that ignored the variation

10  in actual pass-through that both of their experts admit exists and also ignored the presence of

11  Kaiser, which their expert admitted would impact pass-through rates.  And they offered no

12  method at all to address the second and third issues.  Plaintiffs also failed to offer any model to

13  estimate impact and damages for any class members other than those insured by Anthem.

14       Plaintiffs have now submitted a lengthy new declaration from their expert, Dr. Tasneem

15  Chipty, to try to correct these deficiencies.  But Dr. Chipty's new models and analyses are no

16  more valid than her original submission and only confirm the impropriety of class certification.

17  She continues to rely on the same invalid aggregate measures of purported harm that poisoned her

18  first report.  And, in her zeal to justify a class, she repeatedly contradicts her own sworn testi-

19  mony, the allegations of plaintiffs' complaint, and the indisputable record evidence in this case.

20       Plaintiffs' inability to offer any valid defense of their flawed motion eliminates any doubt

21  that class certification must be denied.  Plaintiffs' complex, multi-step theory of purported harm

22  to millions of widely disparate employers, employees, and individuals simply cannot be resolved

23  on a class basis, consistent with the requirements of Rule 23 and with Sutter's due process rights.

24

**ARGUMENT**

25  **I.     DR. CHIPTY'S NEW ARGUMENTS REGARDING THE EMPLOYER-**

26       **EMPLOYEE CONTRIBUTION SPLIT ARE GROUNDLESS.**

27       Dr. Chipty's original report offered no method for determining whether the impact of the

28  alleged premium overcharge fell on employers or their employees or both.  The issue arises

1  because employers set the amount their employees must pay in varying ways.  Some employers

2  fix the employees' contribution year over year, with the employer absorbing any premium

3  increase.  This was true, for example, of named plaintiff David Herman (allegedly representative

4  of the class as a whole), who paid the same contribution for two years and then a lower amount in

5  the following year, even though the total premium paid by his employer increased in each year.

6  ECF No. 414-1, at 8.  Other employers pay only the amount of a Kaiser or other non-Sutter plan,

7  with the employee paying any higher amount for a plan that includes Sutter (resulting in the

8  employee absorbing the full amount of any increase allegedly caused by Sutter).  *Id*. at 8-9;

9  Willig Reply ¶¶ 20-22.  Dr. Chipty's original report did not address any of this.  She proposed

10  only that the claims administrator could allocate damages on the assumption that the employers

11  and employees each bore any overcharge in proportion to the percentage share of their actual

12  contributions.  *See* ECF No. 414-1, at 15-16.  This would mean that, even where the employer's

13  or the employee's share was fixed and thus not impacted by any premium increase, Dr. Chipty

14  would find both of them to have been injured and would allocate damages to each.[1]  In her reply,

15  Dr. Chipty offers three items of new evidence to try to justify this result.  None suffices.

16      First, Dr. Chipty refers to survey evidence from the Kaiser Family Foundation ("KFF"),

17  which she claims shows that "relatively few employers hold fixed their employees' contribution"

18  and that "the premium split between employers and employees has remained relatively stable

19  over time."  Chipty Reply ¶¶ 53-54.  In fact, the KFF surveys do not present any data about how

20  many employers hold fixed their employees' contribution.  Nor do the KFF surveys show that the

21  split remained relatively stable.  As Dr. Chipty admitted in deposition, the KFF survey reported

22  only nationwide average data.  Ex.[2] 1, at 733:12-16, 740:2-9.  This average data does not reveal

23  how much individual variation exists even nationwide (let alone in Northern California), and it

24  does not reveal how many employee class members here pay only a fixed contribution.  *Id*. at

25  
------------------------------

26  [1]      Among other problems, by awarding damages to some class members at the expense of
other class members, this result creates a classic class conflict issue.  ECF No. 414-1, at 23.

27  [2]      Unless otherwise indicated, all "Ex." references are to the exhibits to the accompanying
28  declaration of Evan B. McGinley.

Sur-Reply in Opp. to Mot. Class Cert.
3:12-CV-04854-LB

733:12-734:9; 739:12-24; 738:25-739:11.  In fact, as the survey reports themselves repeatedly advise, "[t]here is a great deal of variation in worker contributions to premiums" and "consider-able variation in premiums for both single and family coverage."  Ex. 2, at 22, 84; Willig Reply ¶ 23.  The KFF surveys thus do nothing to show that few employers had fixed contribution plans.  And Dr. Chipty has no common method to determine whether the employer or employee was impacted.  To the contrary, she admits that she still has not attempted to determine how many employee class members paid only a flat contribution.  Ex. 1, at 726:25-727:9.

Second, Dr. Chipty offers a regression model that she claims shows that employers generally do not change the employer-employee split in response to small changes in premiums of the kind allegedly caused by Sutter here.  Chipty Reply ¶¶ 56-57.  Again, however, this only proves the point.  If an employer has decided to charge employees only a fixed amount each month, the regression indicates that the employer will not change that amount in response to a small premium increase (*e.g.*, will not respond to a 1% premium increase by raising a flat $50 employee contribution to $50.50).  And absent such a change, the employee has not been injured.[3]

Finally, Dr. Chipty points to Mr. Travis' testimony that employees share in each premium element in proportion to their share of the total premium.  Chipty Reply ¶¶ 60-61.  But the issue is how the relative shares were set in the first place and whether that changed.  If an employee paid only a flat contribution that did not change, the employee's percentage share of the total may have changed if the total premium increased (including the proportionate share of each element) but the employee still paid only the same amount and suffered no overcharge.

## II.     DR. CHIPTY'S NEW ARGUMENT THAT NO CLASS MEMBERS WOULD BE HARMED IN THE ALLEGED BUT-FOR WORLD IS UNFOUNDED.

### A.     Dr. Chipty Disregards the Evidence and Plaintiff's Allegations.

Dr. Chipty asserts that no inquiry is needed into whether individual class member patients

---

[3]     Dr. Chipty contends that, to retain their employees, employers have an incentive to not change in a radical way the amounts they charge their employees for health care.  Ex. 1, at 734:10-736:3; Chipty Reply ¶ 57.  As she admits, however, this is only further reason why an employer would keep the employee contribution at a fixed level.  Ex. 1, at 736:4-18.

1    benefited from (or were damaged by) Sutter's conduct in allegedly curtailing narrow or tiered

2    networks because "in a but-for world where health plans could steer, health plans **would not pull**

3    Sutter hospitals out of existing provider networks."  Chipty Reply ¶ 7 (emphasis added).  This

4    assertion is contrary to plaintiffs' own allegations, their substantive antitrust theory, Dr. Chipty's

5    own admissions, and the indisputable evidence.

6        Plaintiffs expressly allege that, in the but-for world, insurers "would have launched a

7    number of **_additional_** 'tiered' or 'limited' or 'narrow' networks."  ECF No. 204, ¶ 97 (emphasis

8    added).  According to plaintiffs, these networks "**_would have not included higher cost, Sutter_**

9    **_hospitals._**"  _Id._ (emphasis added); _id._ ¶ 9 (same).  The result, plaintiffs allege, would be that

10   patients wishing to use Sutter hospitals "would have had to pay substantial 'out-of-pocket' costs."

11   _Id._ ¶ 9.  These allegations are irreconcilable with Dr. Chipty's current assertion that no additional

12   narrow or tiered networks would have been created—and they describe precisely the harm that

13   would have been suffered in the alleged but-for world by class member patients who prefer Sutter

14   or are referred to Sutter hospitals by their primary care physician.

15       Dr. Chipty's contention is also irreconcilable with plaintiffs' tying theory.  A tying

16   arrangement is one in which the defendant forces customers to buy a product the customer did not

17   want or would have purchased from a different supplier.  _Jefferson Parish Hosp. Dist. No. 2 v._

18   _Hyde_, 466 U.S. 2, 12 (1984).  Thus, plaintiffs allege that Sutter forced insurers to include in their

19   networks certain Sutter hospitals (the "tied" hospitals) that the insurers did not want.  ECF

20   No. 204, ¶ 9.  If (as Dr. Chipty contends) insurers would have included all Sutter hospitals in their

21   networks even in the but-for world, this predicate for a tying claim would be absent.

22       Dr. Chipty's deposition admissions also contradict her contention.  She admitted that, in

23   the but-for world, insurers "might actually pull Sutter out of network in some instances."  Ex. 1,

24   at 640:22-24.  As one example, she said that, because CPMC is an alleged "tied" hospital (_i.e._, a

25   hospital that insurers are allegedly being forced to include in their networks), "it is possible that in

26   some product or products that a health plan offers, [an insurer] might choose to pull CPMC out"

27   of the network.  _Id._ at 641:5-24.  Alternatively, she asserted that insurers might offer both a

28   "broad network" that included CPMC and a narrow or tiered network that excluded or disfavored

1   CPMC. *Id.* at 641:24-643:24. As she put it, "in the but-for world, a variety of different things

2   might play out." *Id.* at 640:6-8. It is this variety of outcomes that gives rise to individual issues.

3   Whether a Sutter hospital would have been entirely excluded or included only on terms more

4   costly to the patient, patients who preferred that hospital would be harmed in the but-for world.

5       Dr. Chipty's own preferred example proves the point. She asserts that Sutter "eventually

6   allowed Alta Bates to ███████████████████████████████████████

7   ███████████████████████. Chipty Reply ¶ 26. However, other Sutter hospitals remained

8   excluded. ECF No. 414-4, ¶ 10; ECF No. 415-2, Ex. 7. Dr. Chipty asserts that similar narrow

9   networks "would occur more often in the but-for world than . . . in the actual world." Chipty

10  Reply ¶ 26. Accepting that as true, Dr. Chipty's but-for world is thus one in which more narrow

11  and tiered networks like the Blue & Gold product would exist—and the patients in such products

12  who preferred to use one of the excluded Sutter hospitals would be harmed.

13      Dr. Chipty's reliance on testimony from the Summit/Alta Bates litigation (Chipty Reply

14  ¶ 23) is likewise unfounded. That a threatened loss of volume before a contract is entered may

15  constrain prices does not mean that Sutter would inevitably have responded to threatened exclu-

16  sion of its hospitals by agreeing to lower prices. Depending on the price reductions demanded,

17  Sutter may have concluded it makes more economic sense to agree to a narrow network that

18  excludes some of its hospitals. Indeed, that is precisely what Sutter repeatedly did over the years

19  when it agreed to participate in numerous narrow and tiered networks. *See* ECF No. 414-1, at 4.

20      **B.    Whether Class Members Suffered Net Harm is An Individual Issue.**

21      Nor is there any merit to Dr. Chipty's argument that no class members would have been

22  harmed if Sutter hospitals were excluded from their insurance network. She asserts that Sutter

23  hospitals are "not likely to be indispensable" to patients. Chipty Reply ¶ 32. But the issue is not

24  whether a Sutter hospital is "indispensable." The question is whether a patient values the Sutter

25  hospital more than the alternatives, such that the patient's loss from losing in-network access to

26  that hospital outweighs any benefit the patient might have obtained from the slightly lower

27  premiums that Dr. Chipty calculates he or she would have paid. *See* ECF No. 446-2, ¶¶ 34-35.

28      On that issue, Dr. Chipty offers no evidence to negate the need for individual inquiry. She

Sur-Reply in Opp. to Mot. Class Cert.
3:12-CV-04854-LB

asserts that the ***average*** additional drive time to alternative hospitals is small.  Chipty Reply ¶ 32.  But even if drive time were the sole factor, individual inquiry would still be necessary because averages do not reveal the actual additional drive time for a given patient.  The fact that an alternative hospital may entail only 2 or 3 minutes additional drive time for some class members does not resolve the issue for patients for whom the additional drive time is much greater.  *See* ECF No. 311-3, ¶ 148 (approvingly quoting Professor Gowrisankaran as recognizing that "patients are 'very sensitive to travel time' and that 'an increase in travel time of 5 minutes' can have a material impact on patient choice and consumer welfare").

In addition, drive time is not the sole determinant of a hospital's value, as Dr. Chipty admitted.  Ex. 1, at 676:7-17.  The evidence shows that patients choose Sutter for a variety of reasons, including because they view Sutter as offering high-quality services, their primary care physician has admitting privileges, or they do not view the alternative as adequate.  *See* ECF No. 446-2, ¶¶ 39-45; Willig Reply ¶ 7 (discussing "willingness to pay" measure).  Dr. Chipty addresses only the first of these, asserting that "the quality of Sutter's hospitals varies" and is "not consistently better" than competitor hospitals.  Chipty Reply ¶ 35.  But that generalized assertion does not answer the question of how the specific alternative hospitals available to a given patient compare to the Sutter hospital preferred by that patient.  And if quality does in fact vary by hospital, that would only heighten the individualized nature of this inquiry.  Further, even if a third-party review found that a Sutter hospital was not markedly better than the alternatives, that would not answer the individual question whether a particular patient nonetheless preferred the Sutter hospital for his or her own reasons, based on his or her own medical needs.

Dr. Chipty's theory of lack of harm is also contrary to the very premise of plaintiffs' claim.  The whole point of steering is to penalize patients for choosing the hospital they would otherwise select by charging them more for receiving care at that hospital.  The patient must either pay that additional cost or opt to receive care at a less-preferred hospital.  Either option inflicts harm on the patient—and for many or most patients, that harm far outweighs the minimal increase in their premium that Dr. Chipty calculates.  *See* Willig Reply ¶ 6 (discussing extra costs to patient even if Sutter is not entirely excluded from all products).

Sur-Reply in Opp. to Mot. Class Cert.
3:12-CV-04854-LB

1    Dr. Chipty asserts that Sutter has not "quantified" the number of persons who benefited

2    from Sutter's alleged conduct in supposedly curtailing the number of narrow and tiered networks.

3    Chipty Reply ¶ 17.  But Sutter does not have the burden to "quantify" how many were allegedly

4    harmed and how many were not.  Rather, where (as here) the evidence shows the likely presence

5    of uninjured class members, plaintiffs have the burden, as the parties seeking class certification,

6    to show a common method for separating the injured from the uninjured.  *See* ECF No. 414-1, at

7    9-11 (citing cases).  Plaintiffs have not met that burden.  They instead attempt only to deny that

8    any class member could have benefited from being covered by broad networks that include

9    Sutter.  That contention is implausible on its face and (as shown above) is contradicted by the

10   evidence.  Plaintiffs have accordingly failed to satisfy their burden to obtain class certification.

11   **III.    DR. CHIPTY'S NEW PASS-THROUGH REGRESSION REMAINS FLAWED**

12   **AND AT MOST CONFIRMS THE NEED FOR INDIVIDUAL INQUIRY.**

13   Dr. Chipty's original declaration presented a regression model that purported to show the

14   degree to which insurers pass-through hospital costs in their premiums.  ECF No. 379-1, ¶¶ 123-

15   27.  As discussed in Sutter's opposition, that model did not support class certification because, at

16   best, it showed only that, on an aggregate basis, an insurer's total premium in a given year is

17   correlated with its total costs in that year.  See ECF No. 414-1, at 19.  The model did not answer

18   the critical question of pass-through at the individual payer level—*i.e.*, whether the pass-through

19   was uniform across payers or whether it varied by class member.  That question is critical

20   because, as both Dr. Chipty and Mr. Axene admitted, premiums are designed to recover costs in

21   the aggregate for a given business line, not necessarily for each individual payer.  *Id.* at 12-13.

22   As Mr. Axene put it, within a given business line, "pluses and minuses" may exist in the degree to

23   which costs are recovered.  ECF No. 415-1, Ex. 1 (Axene) 259:17–260:1.

24   Dr. Chipty's now offers a new regression (Chipty Reply ¶ 76) but it also does not answer

25   the critical question.  Unlike her original regression (which was limited to small groups), her new

26   regression analyzes pass-through rate across various other parameters.  But it still fails to analyze

27   pass-through at the individual payer level.  It thus continues to fail to shed any light on whether

28   some payers experienced no increased premium due to any Sutter overcharges.  Without

Sur-Reply in Opp. to Mot. Class Cert.
3:12-CV-04854-LB

1   persuasive evidence addressing that question, plaintiffs have failed to show that injury and

2   damages can be determined on a common basis.

3        Dr. Chipty previously admitted that one of the reasons costs may not be passed through to

4   a given payer is that an insurer "might decide to absorb a cost increase in order to better compete

5   with Kaiser." ECF No. 415-1, Ex. 2 (Chipty) 471:25–472:18; ECF No. 379-1, ¶ 112. This testi-

6   mony is buttressed by voluminous evidence confirming that Kaiser "absolutely" constrains price

7   and showing specific instances in which an insurer agreed to forego any premium increase

8   because of competition from Kaiser. ECF No. 414-1, at 13 & n.5. Dr. Chipty now tries to

9   backtrack by asserting that her new regression shows that pass-through rates are not affected by

10  competition from Kaiser. In fact, however, her new model contradicts that assertion. Rather than

11  show no effect, it gives different pass-through rates for areas in which Kaiser is a competitor and

12  those in which it is not. Chipty Reply ¶ 74; Ex. 1, at 746:1-747:10. Dr. Chipty makes no attempt

13  to account in her model for these differences. Instead, she applies the same 100% pass-through

14  rate to all alleged overcharges without regard to whether the employer operates in an area in

15  which Kaiser is a competitor. This is not a valid basis upon which a class may be certified. *See*

16  Willig Reply ¶¶ 11-12 (discussing consequences of Dr. Chipty's results as to Kaiser).

17       Dr. Chipty claims that she now has "additional documentary evidence" showing that

18  insurers "account for increases in healthcare expenditures in their premium modeling." Chipty

19  Reply ¶ 77. This purported new evidence is inadequate for the same reasons as the evidence on

20  which Dr. Chipty previously relied. At best, it shows only that insurers seek to recover their costs

21  in the aggregate. ████████████████████████████████

22  ██████████████████████████. *Id.* ████████████████████

23  ████████████████████████████████████████████

24  ████████████████████████████████████████████

25  ████████████████████████████████████████.

26  Ex. 3, at 195:7-25. Similarly, the Health Net witness on which Dr. Chipty relies stated ████

27  ███████████████████████████ Chipty Reply ¶ 78. ████████

28  ████████████████████████████████████████

Sur-Reply in Opp. to Mot. Class Cert.
3:12-CV-04854-LB

1

2                                                                    As Dr. Chipty admitted, insurers can reduce

3  their premiums to better compete with Kaiser not only by lowering their medical costs, but also

4  by absorbing cost increases when they occur.

5  **IV.    DR. CHIPTY'S NEW APPROACH FOR DETERMINING INJURY AND**

6  **         DAMAGES FOR LARGE-GROUP EMPLOYERS IS UNFOUNDED.**

7         Dr. Chipty previously proposed to lump together all large-group employers in a given area

8  and apply a single annual overcharge percentage to all of them.  ECF No. 348-3, ¶ 137.  Sutter's

9  opposition demonstrated that this approach improperly ignores important differences in the way

10 premiums are calculated as between manually-rated, blended-rated, and experience-rated

11 employers.  ECF No. 414-1, at 6-7.  Dr. Chipty now offers a new model, in which she proposes to

12 calculate separate overcharge amounts for each rating method.  Chipty Reply ¶¶ 89-94.  Her new

13 model reduces the damages for large-group employers by 40 percent—from $97 million to $58

14 million—which both highlights the unreliability of her average/aggregate approach to finding

15 injury and casts doubt on all of her previous overcharge calculations.  Willig Reply ¶ 13.

16        Further, her new model does not solve the problem.  First, as discussed in Sutter's

17 opposition, the differences among large-group employers are not limited to their rating method.

18 The premiums they pay also differ based on individualized negotiations between the employer (or

19 its broker) and the insurers, often resulting in "rate passes" and other discounts that eliminate or

20 reduce any pass-through of increased costs.  ECF No. 414-1, at 7, 12-14.  Dr. Chipty's new model

21 does nothing to address this issue.

22        Second, the model is flawed on its own terms.  Among other problems, it inaccurately

23 assigns employers to rating types, does not account for certain rating mechanisms that affect

24 premiums (such as high-dollar pooling), and incorrectly blends manual and experience rates for

25 most entities.  Willig Reply ¶¶ 13-17.

26 **V.    DR. CHIPTY HAS NOT OFFERED ANY METHOD FOR FINDING IMPACT OR**

27 **       COMPUTING OVERCHARGES FOR UNITED, HEALTH NET, OR AETNA.**

28        At the time of her previous declaration, Dr. Chipty had applied her impact and damages

1    model only to class members who purchased from Anthem. Dr. Chipty now claims to have also

2    applied her model to purchasers from Blue Shield. That model is seriously flawed and finds an

3    overcharge where none exists. See Willig Reply ¶¶ 24-31. But even putting that aside,

4    Dr. Chipty admits that she has still not offered an impact/damages model for class members who

5    paid premiums to United, Health Net, or Aetna. Ex. 1, at 666:25-667:11. The best she can say is

6    that she "expect[s]" that she either has or will have sufficient data from those entities to allow her

7    to apply her regression model to them. *Id*. at 668:13-671:1. Failing that, she says that she

8    expects that she can calculate an overcharge as to those entities by extrapolating from the results

9    for Anthem or Blue Shield. *Id*. at 671:20-673:10. But she has not reached an opinion on whether

10   either method will work. And she testified that it may take a "few months" or longer to offer any

11   such opinion. *Id*. at 680:22-681:13.

12          The need to have an actual, verified model for each insurer—and the reason why

13   extrapolation is unworkable—is demonstrated by the wildly varying results Dr. Chipty's models

14   have produced for Anthem and Blue Shield. Even though she claims that there was "parity"

15   among the rates Sutter negotiated with each insurer, and that the "same mechanism of harm"

16   applies to each insurer (*id*. at 720:8-14, 692:5-8), the overcharges she calculates for Blue Shield

17   dramatically differ from those she offers up for the Anthem. She finds, for example, that the

18   overcharge at Alta Bates-Main in 2006 was ███ for Anthem but 53% for Blue Shield. *Compare*

19   ECF No. 348-3, at 88 (Ex. 14A), *with* Chipty Reply, at 92 (Ex. 17). For CPMC-St. Luke's, she

20   finds a ███ overcharge in 2011 for Anthem but ███ for Blue Shield. *Id*. And, for Sutter Santa

21   Rosa, she finds a ██████████████████ for Anthem, but an

22   ██████████ for Blue Shield. *Id*. Dr. Chipty could not offer any explanation for these radically

23   different amounts, except to vaguely assert it could be due to a "variety of factors" such as

24   different "medical needs." Ex. 1, at 715:19-720:1. But even assuming the differences can be

25   explained (and that her entire approach is not rejected as patently unreliable), the presence of

26   these differences makes clear that the results for one insurer cannot simply be "extrapolated" to a

27   different insurer, as Dr. Chipty proposes if the data turn out to be unavailable. If class certifica-

28   tion is granted at all, it should therefore be limited to Anthem and Blue Shield customers.

Sur-Reply in Opp. to Mot. Class Cert.
3:12-CV-04854-LB

Dated: January 7, 2019

By: */s/ David C. Kiernan*
       David C. Kiernan

NAI-1506084103