UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

DJENEBA SIDIBE, et al.,

        Plaintiffs,

v.

SUTTER HEALTH,

        Defendant.

Case No. 12-cv-04854-LB

**(REDACTED) ORDER GRANTING MOTION TO CERTIFY CLASS UNDER RULE 23(B)(2) AND DENYING WITHOUT PREJUDICE MOTION TO CERTIFY CLASS UNDER RULE 23(B)(3)**

Re: ECF Nos. 348 (under seal) and 379 (redacted version)

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 3

STATEMENT ..................................................................................................................... 5

1. The Proposed Class ..................................................................................................... 5

2. Background ................................................................................................................... 5

3. The Plaintiffs' Antitrust Allegations Regarding Sutter's Anticompetitive Practices ................. 7

    3.1    Sutter's Systemwide Contracting and Its "All-or-Nothing," "Anti-Steering," and "Penalty Rate" Provisions ....................................................................................... 7

    3.2    The "But For" World .............................................................................................. 12

4. The Plaintiffs' Calculations of Antitrust Injury and Damages to Class Members ................. 13

    4.1    Calculating Sutter's Overcharges ........................................................................... 15

4.2　Assuming Health Plans "Pass On" 100 Percent of Any Sutter Overcharges They Have to Pay Through to the Premiums That They Charge Their Customers.................. 20

ANALYSIS ...................................................................................................................... 27

1.　Rule 23(a) Prerequisites ........................................................................................ 28

　　1.1　Numerosity — Rule 23(a)(1)........................................................................ 28

　　1.2　Commonality — Rule 23(a)(2) ..................................................................... 29

　　1.3　Typicality — Rule 23(a)(3) .......................................................................... 30

　　1.4　Adequacy — Rule 23(a)(4) .......................................................................... 32

　　　　1.4.1　Prosecuting the action vigorously on behalf of the class.................... 33

　　　　1.4.2　Conflicts of interest ......................................................................... 33

2.　Rule 23(b) Prerequisites ........................................................................................ 38

　　2.1　Predominance — Rule 23(b)(3) .................................................................. 38

　　　　2.1.1　Antitrust violations .......................................................................... 39

　　　　2.1.2　Antitrust injury and calculating damages ......................................... 39

　　　　　　2.1.2.1　Calculating Sutter's overcharges ........................................... 42

　　　　　　2.1.2.2　Assuming health plans "pass on" 100 percent of any Sutter overcharges they have to pay through to the premiums that they charge their customers ...................................................................... 44

　　2.2　Acting on Grounds That Apply Generally to the Class — Rule 23(b)(2)...................... 50

CONCLUSION ................................................................................................................ 53

**INTRODUCTION**

In this putative class action, six plaintiffs (four individuals who enrolled in health-insurance policies from the health plans Aetna, Anthem Blue Cross, and Blue Shield and two small companies that paid for health insurance for their employees) are suing Sutter Health, which owns and operates a network of hospitals and medical-service providers in Northern California, for violations of the federal Sherman Antitrust Act, the California Cartwright Act, and the California Unfair Competition Law.

The plaintiffs allege that Sutter has "market power" in seven specific "geographic markets" (the "Tying Markets") in Northern California, where Sutter's hospitals are either the only hospital (i.e., a monopoly) or the dominant hospital in the market.[1] Health plans like Anthem and Blue Shield must include those Sutter hospitals in their provider networks to be able to assemble health-insurance products that are commercially marketable.[2] Sutter allegedly uses that leverage to require that health plans enter into "systemwide contracts" that include "all-or-nothing" and "anti-steering" provisions. Those provisions (1) require health plans to accept as in-network providers all of Sutter's hospitals, at the prices Sutter dictates, and (2) prevent health plans from incentivizing their enrollees to go to lower-cost hospitals instead of Sutter's higher-cost hospitals.[3]

In particular, the plaintiffs allege that Sutter (1) requires health plans to include its hospitals in four other geographic markets (the "Tied Markets"), at the prices Sutter dictates, and (2) prevents health plans from incentivizing their enrollees to go to non-Sutter hospitals in the Tied Markets.[4] Unlike in the Tying Markets, where Sutter has market power, in the Tied Markets, there are more hospitals and more hospital competition. This competition normally would drive Sutter's prices

---

[1] Fourth Amend. Compl. ("4AC") – ECF No. 204 at 4 (¶ 4), 10 (¶¶ 30–31), 29 (¶¶ 86–87). The plaintiffs originally alleged eight Tying Markets but stipulated that summary judgment should be granted with respect to one of them. Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 4 (¶ 6), 11–12 (¶ 35).

[3] *Id.* at 4–5 (¶¶ 5–7), 11–12 (¶¶ 33–36), 13–15 (¶¶ 40–45).

[4] *Id.*

down.[5] But by tying its hospitals in the Tied Markets to its "must have" hospitals in the Tying Markets, Sutter forecloses competition by other hospitals in the Tied Markets and thus is able to charge and maintain supra-competitive prices at its hospitals.[6] The plaintiffs allege that the health plans have to pay Sutter supra-competitive prices and then, in turn, pass on those costs through to their customers in the form of higher premiums.[7] Consequently, it is the health plans' customers — individuals and employers that buy health insurance — that ultimately bear the burden of paying Sutter's supra-competitive prices.[8]

The plaintiffs seek (1) treble damages and restitution from Sutter to compensate them for the overcharges they incurred from Sutter's alleged anticompetitive behavior and (2) a declaration that Sutter's practices are anticompetitive and an injunction barring Sutter from continuing to engage in anticompetitive behavior, including its "tying," "all-or-nothing," and "anti-steering" arrangements.[9] They move to certify a class under Federal Rule of Civil Procedure 23(b)(2) and (b)(3) of all individuals and entities located in nine specific California Rating Areas ("RAs")[10] that paid premiums for fully insured health-insurance policies from the health plans Blue Shield, Anthem, Aetna, Health Net, or UnitedHealthcare from September 28, 2008 to the present.[11]

Sutter opposes the plaintiffs' motion. Sutter's main arguments are that (1) there are intraclass differences and conflicts that render the plaintiffs atypical and inadequate to represent the class and (2) individual issues about whether class members suffered antitrust injury, and how class members' damages would be calculated, predominate over common issues.

---

[5] *See id.* at 6 (¶ 9), 30 (¶ 94).

[6] *Id.* at 4–5 (¶¶ 5–8), 11–12 (¶¶ 35–36), 30 (¶ 94), 33 (¶¶ 103–05).

[7] *Id.* at 3 (¶ 2), 5 (¶ 8), 10 (¶ 28), 34–35 (¶¶ 109–12).

[8] *Id.*

[9] *Id.* at 43.

[10] Under the Affordable Care Act, states are required to define geographic "rating areas" to be used by health plans in setting premium prices for individual and small-group health-insurance policies. 42 U.S.C. § 300gg(a)(2).

[11] Pls. Mot. for Class Certification ("MCC") – ECF No. 379 at 3.

The court held a hearing and now rules as follows. The court finds that the plaintiffs have not made a showing that issues of antitrust injury and damages are subject to common proof such that certification of a damages class under Rule 23(b)(3) is appropriate. But the court also finds that the plaintiffs have met the requirements for certification of an injunctive- and declaratory-relief class under Rule 23(b)(2). The court thus grants the plaintiffs' motion to certify their proposed class under Rule 23(b)(2) and denies without prejudice their motion to certify their proposed class under Rule 23(b)(3).

## STATEMENT

### 1. The Proposed Class

The plaintiffs seek to certify a proposed class of:

> All entities in California Rating area 1, 2, 3, 4, 5, 6, 8, 9 or 10 (the "Nine RAs"), and all individuals that either live or work in one of the Nine RAs, that paid premiums for a fully-insured health insurance policy from Blue Shield, Anthem Blue Cross, Aetna, Health Net or United Healthcare from September 28, 2008 to the present. This class definition includes Class Members that paid premiums for individual health insurance policies that they purchased from these health plans and Class Members that paid premiums, in whole or in part, for health insurance policies provided to them as a benefit from an employer or other group purchaser located in one of the Nine RAs.[12]

### 2. Background

"'The market for hospital services and medical care is complex.'" *Sidibe v. Sutter Health*, No. 12-cv-04854-LB, 2019 WL 2078788, at *4 (N.D. Cal. Apr. 12, 2019) (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 891 (9th Cir. 2008)). "There are at least three transactions involved in providing hospital services and health care in connection with health insurance." *Id.*

"First, hospitals [such as Sutter] sell hospital services to health-insurance plans [such as Blue Shield, Anthem, Aetna, Health Net, or UnitedHealthcare]. Hospitals and health plans negotiate whether a given hospital will be included in the health plan's network and negotiate the rates that

---

[12] Pls. MCC – ECF No. 379 at 13.

the health plan will pay the hospital for its hospital services." *Id.* (citing *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 & n.10 (9th Cir. 2015) (citing Gregory Vistnes, *Hospitals, Mergers, and Two-Stage Competition*, 67 Antitrust L.J. 671, 672, 674 (2000))). "These negotiations are highly price-sensitive." *Id.* (citing *FTC v. Advocate Health Care Network*, 841 F.3d 460, 465 (7th Cir. 2016) (citing Vistnes, 67 Antitrust L.J. at 674–75)). "All else being equal, hospitals prefer higher rates and health plans prefer lower rates." *Id.* (citing *Cascade Health*, 515 F.3d at 892).[13]

"Second, health plans sell health insurance to consumers. The consumers are individuals (who directly purchase health insurance for themselves or their families) and employers (which purchase health insurance for their employees)." *Id.* at *5 (citing *Cascade Health*, 515 F.3d at 892; *St. Luke's*, 778 F.3d at 784). "An important way that health plans compete for consumers is their provider networks: the hospitals, physicians, and ancillary providers that the health plan offers 'in network' and that enrollees are encouraged to use." *Id.* (citing Gregory S. Vistnes & Yianis Sarafidis, *Cross-Market Hospital Mergers: A Holistic Approach*, 79 Antitrust L.J. 253, 267 (2013)). "All else being equal, a health plan with a more comprehensive provider network will be more attractive to consumers." *Id.* (citing Vistnes & Sarafidis, 79 Antitrust L.J. at 267). "At the same time, health plans that have high-priced providers in their networks have higher costs." *Id.* (citing Vistnes & Sarafidis, 79 Antitrust L.J. at 267). "Thus, in choosing how inclusive their provider network is, health plans balance the benefit of more comprehensive networks with the costs of paying more to providers in their networks." *Id.* (citing Vistnes & Sarafidis, 79 Antitrust L.J. at 267).[14]

"Third, hospitals seek to attract health-plan enrollees who need hospital services to come to them (as opposed to other hospitals)." *Id.* (citing *St. Luke's*, 778 F.3d at 784 n.10 (citing Vistnes, 67 Antitrust L.J. at 681–82); *Advocate Health*, 841 F.3d at 471 (citing Vistnes, 67 Antitrust L.J. at 672); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 342 (3d Cir. 2016) (citing Vistnes,

---

[13] *Accord* Chipty Decl. – ECF No. 379-1 at 17 (¶ 14); Chipty Dep. – ECF No. 415-1 (under seal) at 122 (p. 425).

[14] *Accord* Chipty Dep. – ECF No. 415-1 (under seal) at 123–24 (pp. 426–31).

Antitrust L.J. at 672)). "Unlike health plans, which are sensitive to the prices that hospitals charge for their services, enrollees are 'largely insensitive' to price because the prices that hospitals charge are largely borne by the enrollees' health plans, not by the enrollees." *Id.* (some internal quotation marks omitted) (quoting *St. Luke's*, 778 F.3d at 784 n.10 (citing Vistnes, 67 Antitrust L.J. at 682) and citing *Advocate Health*, 841 F.3d at 471 (citing Vistnes, 67 Antitrust L.J. at 677, 680); *Penn State Hershey*, 838 F.3d at 342). "Instead of taking price into account, enrollees choose hospitals based mostly on non-price factors, such as location or quality of services." *Id.* (internal quotation marks omitted) (quoting *Penn State Hershey*, 838 F.3d at 341 and citing *St. Luke's*, 778 F.3d at 784 n.10 (citing Vistnes, 67 Antitrust L.J. at 682); *Advocate Health*, 841 F.3d at 465 (citing Vistnes, 67 Antitrust L.J. at 677, 682)).[15]

### 3. The Plaintiffs' Antitrust Allegations Regarding Sutter's Anticompetitive Practices

#### 3.1 Sutter's Systemwide Contracting and Its "All-or-Nothing," "Anti-Steering," and "Penalty Rate" Provisions

As of 2015, Sutter was the largest health system (other than Kaiser Permanente) in Northern California, with 22 hospitals and approximately 4,000 patient beds.[16] Currently, Sutter has 24 hospitals and approximately 5,200 patient beds.[17]

Before the early 2000s, health plans were able to negotiate with Sutter's various hospitals individually. Health plans could include some Sutter hospitals in their provider network while excluding (or threatening to exclude) others. Under that structure, if a health plan determined that a particular Sutter hospital was too expensive, it had the option to exclude that hospital from its provider networks. Consequently, each Sutter hospital had an incentive to offer competitive prices

---

[15] *Accord* Chipty Decl. – ECF No. 379-1 at 17 (¶ 14); Chipty Dep. – ECF No. 415-1 (under seal) at 122 (p. 425). Some enrollees may be more directly sensitive to price, e.g., enrollees in high-deductible plans. *Sidibe*, 2019 WL 2078788, at *5 n.13 (citing *Penn State Hershey*, 838 F.3d at 342 n.6).

[16] Chipty Decl. – ECF No. 379-1 at 20–22 (¶ 20).

[17] *Id.* at 22–23 (¶¶ 21–22).

1   to incentivize health plans to include the hospital in their provider networks (which in turn would

2   result in the hospital getting more patient volume).[18]

3        The plaintiffs maintain that beginning in the early 2000s, Sutter began requiring health plans to

4   enter into "systemwide" contracts that included "all-or-nothing" requirements. Sutter's

5   systemwide contracts require, or effectively require, a health plan that wants to include one Sutter

6   hospital in its provider network to include all Sutter hospitals. Additionally, Sutter's systemwide

7   contracts contain "anti-steering" provisions that effectively bar health plans from creating "tiered"

8   insurance products to incentivize their enrollees to use lower-cost non-Sutter hospitals rather than

9   more expensive Sutter hospitals (i.e., products where enrollees pay lower co-pays to use providers

10   in higher tiers and higher co-pays to use providers in lower tiers where Sutter hospitals are in a

11   lower tier).[19]

12        More specifically, Sutter's systemwide contracts include provisions under which health plans

13   must pay Sutter what they have characterized as "penalty rates"[20] for any Sutter hospital that they

---

[18] Joyner Decl. – ECF No. 497 at 4–5 (¶ 7) ("Prior to 2002, Blue Shield negotiated with Sutter's various hospitals, physician groups, and other providers individually to assemble provider networks. Blue Shield had the ability to decide whether and under what conditions each Sutter provider could participate in Blue Shield's provider networks. During that time, if Blue Shield found that a particular Sutter provider was too expensive, it had the option to exclude that provider from its networks. Therefore, each Sutter provider had an incentive to offer competitive prices if it wanted to be included in Blue Shield's networks."); Melody Decl. – ECF No. 313-1 (under seal) at 5 (¶ 9); Lacroix-Milani Decl. – ECF No. 314 (under seal) at 6 (¶ 12); Welsh Decl. – ECF No. 335 (under seal) at 5 (¶ 11).

[19] Joyner Decl. – ECF No. 497 at 5 (¶ 8) ("This dynamic changed dramatically when Sutter announced that all of its providers would be negotiating as a bloc on a 'systemwide' basis. Beginning with the negotiations leading to the 2002 Systemwide Amendment between Sutter and Blue Shield, it became clear that selecting anything less than all Sutter hospitals and physician groups would have resulted in a requirement that Blue Shield and its self-funded health plan customers pay unsustainably high prices for the healthcare services of Sutter's providers. Thus, as a practical matter, inclusion of one Sutter hospital suddenly required inclusion of all Sutter hospitals and physician groups, and one systemwide agreement would govern all of the relationships between Blue Shield and each Sutter provider. This was Sutter's 'systemwide' negotiation strategy. It required Blue Shield to include 'all' of Sutter's hospitals and physician groups in any new networks for the health plans to be competitive."), 6 (¶¶ 15–16), 10 (¶ 30); Melody Decl. – ECF No. 313-1 (under seal) at 5–6 (¶¶ 9–13), 7 (¶ 18), 9 (¶ 26); de la Torre Decl. – ECF No. 312-4 (under seal) at 5 (¶ 12); Lacroix-Milani Decl. – ECF No. 314 (under seal) at 5–6 (¶¶ 9, 12–14); Lundbye Decl. – ECF No. 321 (under seal) at 4 (¶ 8), 8 (¶ 16); Welsh Decl. – ECF No. 335 (under seal) at 4 (¶¶ 9–10), 5 (¶¶ 12–14).

[20] Joyner Decl. – ECF No. 497 at 11–12 (¶¶ 34–35); Melody Decl. – ECF No. 313-1 (under seal) at 8 (¶ 23); de la Torre Decl. – ECF No. 312-4 (under seal) at 6 (¶ 14), 7 (¶¶ 17–18).

place out-of-network or in a lower tier. Typically, when health-plan enrollees use a hospital that is not in-network, the hospital can charge the health plan only the "reasonable and customary value" of the hospital services provided, as mandated by state law. Sutter, however, requires health plans to sign contracts that supersede the "reasonable and customary value" limit on charges and instead require health plans to pay 95 percent of Sutter's "full billed charges" — a substantially higher amount — if their enrollees use Sutter hospitals that they have placed out-of-network or in a lower tier. No matter how a health plan might structure its health-insurance products, it is inevitable that some enrollees will have to use Sutter hospitals (e.g., if they need emergency care and a Sutter hospital is the nearest hospital), in which case Sutter's "penalty rates" would apply. These higher "penalty rates" reduce or eliminate any savings the health plans could achieve by excluding or tiering Sutter hospitals in the first place. Consequently, even where health plans technically are permitted under their contracts to exclude or tier Sutter hospitals, they are effectively prevented from doing so in a way that would give Sutter any incentive to lower its prices.[21]

---

[21] As a former Senior Vice President from Blue Shield explained:

Sutter's unique out-of-network pricing terms worked as follows: In California, health plans must pay the appropriate charges for emergency room services even when their members seek emergency room treatment at out-of-network hospitals. Typically, when a Blue Shield member uses a hospital outside of Blue Shield's provider network (e.g., in an emergency situation), the amount that Blue Shield (or its self-funded customers) must pay may be limited to the "reasonable and customary value for the health care services rendered," as mandated by state law for out-of-network providers. (Cal. Code Regs., title 28 §1300.71(a)(3)(B).) The "reasonable and customary" rates that Blue Shield pays for services at an out-of-network hospital are often somewhat higher than the rates it would pay to an in-network hospital but they typically are substantially less than the "full billed charges" that hospitals often list on their hospital "chargemasters" for their services.

A substantial percentage of hospital healthcare is provided through hospital emergency rooms and large numbers of CalPERS [California Public Employees' Retirement System] health plan enrollees inevitably would end up in the emergency rooms of Sutter's 26 acute care hospitals in Northern California. Accordingly, Sutter demanded that CalPERS agree in advance to pay 95% of full billed charges for any services provided at an out-of-network ("non-participating") Sutter hospital. As a result, CalPERS had to agree in advance to pay "non-par" rates that substantially exceeded the "reasonable and customary" out-of-network rates otherwise mandated by state law.

. . . .

In 2005, Sutter introduced the concept of the Non-Par rate, or 95% of billed charges, into its Systemwide Amendment with Blue Shield. . . .

. . . .

The plaintiffs maintain that Sutter can impose these systemwide contracts on health plans because it has "market power" in seven specific geographic markets — the Tying Markets — in Northern California. Sutter hospitals are either the only hospital or the predominant hospital in

---

The power of the Non-Par (95% of billed charges) rate cannot be overstated. Blue Shield has performed financial analyses that have concluded that payment of 95% of Sutter's full billed charges erases any possible benefit of excluding some higher-priced Sutter providers from a network. This is because it is impossible to prevent health plan enrollees from using Sutter hospitals in all instances. If a member needs emergency care and uses a Sutter hospital outside of his plan (a common scenario we refer to as "leakage"), then Blue Shield (and its self-funded payor customers) would have to pay 95% of billed charges to Sutter. These prices are so high that having to pay them would defeat any significant benefit of a narrow network.

. . . .

For many years Blue Shield has attempted to create tiered networks to foster price and quality competition among the health care providers in its networks. In 2001, for example, Blue Shield created a tiered network called Network Choice that included Sutter hospitals, but Sutter required that all of its facilities be included as "Tier 1 (Choice) providers." Sutter threatened that Blue Shield and its self-funded health plan customers would have to pay Non-Par rates equal to 95% of full-billed charges if all its facilities were not placed in the preferred tier. By requiring that all of its facilities be included in the first tier, Sutter prevented Blue Shield from offering customers financial incentives to utilize more cost-effective hospitals. Thus, although Sutter technically was participating in a tiered product, its hospitals were not placed in the lower tier that actually corresponded with its significantly higher prices.

. . . .

Sutter's threat to charge Non-Par rates in response to Blue Shield's proposals for tiered products was typically the death knell for these products. If Blue Shield and its self-funded health plan customers had to pay this exorbitant 95% of billed charges rate, an amount much higher than Blue Shield had to pay any other out-of-network provider, these products would be economically unfeasible. Any benefit to be gained by excluding high-priced Sutter hospitals from Tier 1 would be erased once the inevitable emergency room "leakage" to Non-Par Sutter hospitals occurred.

. . . .

Sutter's anti-tiering contractual restraints affected Blue Shield and each of Blue Shield's self-funded health plan customers in precisely the same manner. Because Sutter contractually prohibited health plans from giving their members financial incentives to select lower-priced alternatives, insisted upon 1st Tier status for Sutter providers that did not qualify and imposed charges for non-participating Sutter providers at non-par rates of 95% of full billed charges, Sutter was able to destroy the ability of any "tiered" health plan to moderate Sutter's above-market pricing.

Joyner Decl. – ECF No. 497 at 10–18 (¶¶ 31–55); *accord* Melody Decl. – ECF No. 313-1 (under seal) at 6–10 (¶¶ 14–31); de la Torre Decl. – ECF No. 312-4 (under seal) at 6–9 (¶¶ 13–28); Lacroix-Milani Decl. – ECF No. 314 (under seal) at 6–15 (¶¶ 12–36); Lundbye Decl. – ECF No. 321 (under seal) at 4–7 (¶¶ 9–13), 8–10 (¶¶ 18–21); Welsh Decl. – ECF No. 335 (under seal) at 5–11 (¶¶ 11–36), 12–13 (¶¶ 45–46).

those markets. Because health plans are required to offer their enrollees at least one nearby in-network hospital, they have no choice but to contract with Sutter so that they can include those Tying Market hospitals in their provider networks. Sutter then uses the fact that health plans have no choice but to contract with it to force health plans to accept its systemwide-contract terms, including its all-or-nothing, anti-steering, and penalty-rate provisions.[22]

The plaintiffs maintain that Sutter's systemwide contracts allow it to charge higher prices at its hospitals in certain other geographic markets — the Tied Markets. Unlike in the Tying Markets, in the Tied Markets, there are more hospitals and more competition among hospitals. Those other hospitals normally would act as price constraints on Sutter hospitals. Health plans could threaten to exclude Sutter hospitals in favor of those other hospitals or place Sutter hospitals in lower tiers — thereby reducing Sutter hospitals' patient volume (and, thus, their revenues) — to negotiate with Sutter to get it to lower its prices. But the systemwide contracts that Sutter imposes on health plans effectively bar health plans from using these negotiating tactics. Health plans thus are prevented from exposing Sutter to price competition. As a result, Sutter is free to charge supra-competitive prices at its hospitals in the Tied Markets.[23]

---

[22] Joyner Decl. – ECF No. 497 at 7 (¶ 20) ("Sutter's new 'systemwide' approach was very effective in promoting all-or-nothing contracting in the context of California's healthcare laws regulating the assembly of provider networks. For example, in assembling a provider network to be marketed to self-funded payors and insured clients, California law requires Blue Shield to create a network with access to health care providers such that 'all enrollees have a residence or workplace within 30 minutes or 15 miles of a contracting or plan-operated hospital . . . .' (Cal. Code Regs. title 28, § 1300.51(d)(H)(ii)). For example, if one of Blue Shield's self-funded customers has an employee living in a rural area of Northern California, and the only hospital within 30 minutes or 15 miles of his residence or workplace was a Sutter Hospital, the law mandates that Sutter's hospital be included in the network. Beginning with Sutter's 2002 Systemwide Amendment, Blue Shield could not feasibly contract with that one Sutter hospital alone. It had to include all Sutter providers on a 'systemwide' basis.") (ellipsis in original), 9 (¶ 27); Melody Decl. – ECF No. 313-1 (under seal) at 5 (¶¶ 7–8), 6 (¶ 11); de la Torre Decl. – ECF No. 312-4 (under seal) at 4 (¶¶ 8–9); Lacroix-Milani Decl. – ECF No. 314 (under seal) at 5–6 (¶ 9), 11 (¶ 28); Lundbye Decl. – ECF No. 321 (under seal) at 3–4 (¶¶ 5–6); Welsh Decl. – ECF No. 335 (under seal) at 4 (¶ 8).

[23] Joyner Decl. – ECF No. 497 at 8–9 (¶¶ 23–25) ("It would have been desirable for Blue Shield to foster price competition by excluding selected Sutter hospitals in locations where there were competing hospitals that had higher or comparable quality but charged significantly lower prices. However, for all of the reasons described above, it was not economically feasible to assemble a provider network in Northern California that excluded all of Sutter's hospitals and medical practices from Blue Shield's provider networks. Therefore, Sutter's 'all or none' contracting policy substantially impaired Blue Shield's ability to foster price competition. As a result, Sutter was able to quickly raise

The plaintiffs maintain that Sutter engages in systemwide contracting with its all-or-nothing, anti-steering, and penalty-rate provisions with each of the health plans Blue Shield, Anthem, Aetna, Health Net, or UnitedHealthcare in the same general way. Sutter also charges these health plans the same allegedly supra-competitive prices, across different insurance products offered by any one health plan, and across different health plans.[24]

### 3.2    The "But For" World

The plaintiffs maintain that in the "but for" world — the counterfactual world where Sutter did not tie its hospitals or engage in anticompetitive practices[25] — health plans would be able to negotiate lower rates from Sutter. While health plans might still have no choice but to contract with Sutter hospitals in the Tying Markets, in the but-for world, health plans could threaten to exclude Sutter hospitals in the Tied Markets from their provider networks or place those Sutter hospitals in a lower tier in lieu of other competitor hospitals. In the face of this competition, Sutter would no longer be able to charge supra-competitive prices at its Tied Market hospitals and instead would have to lower its prices to stay competitive. The plaintiffs maintain that this would benefit all healthcare consumers and class members.[26]

For example, suppose a health plan currently offers a health-insurance policy that costs $100 a month and includes Tied Market Sutter hospitals in the top tier of its in-network providers. Under

---

its reimbursement rates significantly above the rates that competing providers charged. . . . At or around the time that Blue Shield entered into its 'systemwide' agreement with Sutter in 2002, Blue Shield determined that Sutter's pricing for acute care hospital services began increasing at a dramatically faster pace than the prices of all or nearly all of its competitors.") (emphasis in original), 9 (¶ 27), 12 (¶ 36), 18–20 (¶¶ 54–61); Melody Decl. – ECF No. 313-1 (under seal) at 8–9 (¶ 24), 10 (¶ 30); de la Torre Decl. – ECF No. 312-4 (under seal) at 3–4 (¶¶ 4–7); de la Torre Decl. – ECF No. 312-4 (under seal) at 5 (¶ 10), 7 (¶ 16); Lacroix-Milani Decl. – ECF No. 314 (under seal) at 4–5 (¶¶ 5–7), 6 (¶ 10); Lundbye Decl. – ECF No. 321 (under seal) at 9–10 (¶ 20).

[24] Joyner Decl. – ECF No. 497 at 5–6 (¶ 13), 20 (¶ 61); Melody Decl. – ECF No. 313-1 (under seal) at 4 (¶¶ 4, 6); de la Torre Decl. – ECF No. 312-4 (under seal) at 5 (¶ 11); Lacroix-Milani Decl. – ECF No. 314 (under seal) at 15 (¶¶ 37–39); Welsh Decl. – ECF No. 335 (under seal) at 5 (¶ 12), 13 (¶¶ 47–48).

[25] *See* Chipty Dep. – ECF No. 415-1 (under seal) at 125 (p. 436) ("Q. And in this case — taking the general to the specific, in this case, the but-for world would be Sutter negotiating contracts that did not have the challenge[d] contract terms? A. That's correct.").

[26] Pls. MCC Reply – ECF No. 559 at 14.

Sutter's systemwide contracts, the health plan effectively is barred from offering an alternative health-insurance policy for, say, $80 a month,[27] that excludes those Sutter hospitals or places them in a lower tier.[28] In the but-for world, however, the health plan could offer such a policy. Some health-insurance buyers who prioritize having in-network access to Sutter hospitals might continue to enroll in the first policy. But others who place less importance on access to Sutter hospitals or more importance on lowering their insurance premiums might enroll in the new second policy instead. Under the second policy, those latter buyers would use Sutter hospitals less often to avoid the higher co-pays associated with using out-of-network or lower-tiered providers. This would reduce Sutter's patient volume and, consequently, its revenues. In response, the plaintiffs argue, Sutter would reduce the prices it charges the health plan, so that, in turn, the health plan could reduce the premiums it has to charge for the first policy (perhaps down to, say, $90 a month instead of $100), which in turn would entice more customers to sign up for the first policy again instead of the second and use more Sutter hospitals, which in turn would restore some of Sutter's lost patient volume. As a result, even Sutter loyalists who would not enroll in a tiered health-insurance policy (even if one were offered) nonetheless would be better off in the but-for world because they would be able to enroll in the first non-tiered policy at a cheaper rate.[29]

### 4. The Plaintiffs' Calculations of Antitrust Injury and Damages to Class Members

One of the central issues in the litigation and in the plaintiffs' motion for class certification (and Sutter's opposition thereto) is how to assess the antitrust injury that class members allegedly have sustained and how to calculate class members' purported damages.

---

[27] These numbers are arbitrary and are used solely for illustrative purposes.

[28] According to the plaintiffs, under Sutter's systemwide contracts, the health plan either is actually barred from offering such a policy or is effectively barred from doing so because Sutter would then charge the health plan a "penalty rate" if any enrollee who held that policy used a Sutter hospital (e.g., in an emergency situation), a rate so onerous as to make the policy unsustainable. *See supra* notes 19, 21.

[29] *See* Chipty Decl. – ECF No. 379-1 at 44–45 (¶¶ 61–62); Chipty Reply Decl. – ECF No. 559-1 at 20–22 (¶¶ 19, 22).

The plaintiffs offer the following formula, developed by their expert Dr. Tasneem Chipty, to assess the purported antitrust injury and calculate damages for each class member. Broadly speaking, the plaintiffs' formula is as follows:

1. For each year between 2006 and 2015, calculate as a percentage how much of the amount that each relevant Sutter hospital charged each health plan and its patients was an overcharge (i.e., was beyond what the Sutter hospital would have charged in the but-for world).[30]

2. Disaggregate the total amount each health plan paid to each Sutter hospital into "cohorts" based on (1) the geographic Rating Area where health-plan enrollees live or work, (2) the "group type" of the insurance buyer (individual buyers versus "small-group"[31] employer buyers versus "large-group"[32] employer buyers) and (3) year, and, using the overcharge percentage from step one, calculate as a dollar figure each cohort's per-member-per-month ("PMPM") share of the overcharge.[33]

3. Assume that (1) health plans pass on 100 percent of any Sutter overcharge they have to pay through to the premiums they charge their customers and (2) there is a lag between when a health plan is overcharged and when it passes that overcharge on to its customers in the form of higher premiums, and, based on those assumptions, divide each cohort's PMPM overcharge for each year between 2006 and 2015 from step two

---

[30] Chipty Decl. – ECF Nos. 379-1 at 89 (¶ 137); Chipty Decl. – ECF Nos. 348-3 (under seal), 379-1 (redacted version) at 90–91 (¶ 138).

[31] Until 2016, small-group employers were employers with 50 or fewer employees. From 2016 onward, small-group employers are employers with 100 or fewer employees. Chipty Decl. – ECF No. 348-3 at 25 n.53 (¶ 23 n.53); Axene Decl. – ECF No. 379-2 at 5 n.3 (¶ 5 n.3).

[32] Until 2016, large-group employers were employers with over 50 employees. From 2016 onward, large-group employers are employers over 100 employees. Axene Decl. – ECF No. 379-2 at 5 n.3 (¶ 5 n.3).

[33] Chipty Decl. – ECF Nos. 379-1 at 89 (¶ 137); Chipty Decl. – ECF Nos. 348-3 (under seal), 379-1 (redacted version) at 91–94 (¶¶ 139–41). "Member-months" are a measure of how many people were enrolled in the health-insurance product and for how long. For example, if one enrollee was enrolled in a health-insurance product from January 1 to June 30 of a given year and another was enrolled from January 1 to December 31 of the same year, the two of them together would represent 18 member-months. Chipty Decl. – ECF No. 379-1 at 93 n.276 (¶ 141 n.276).

by the cohort's total PMPM premium for each year between 2008 and 2017, respectively (i.e., the PMPM premium two years later), to calculate as a percentage how much of the premium was part of the Sutter overcharge.[34]

4. Multiply the individual premiums each class member paid by the premium-overcharge percentage from step three to calculate that class member's share of damages.[35] Where an employer and an employee both paid a portion of the employee's health-insurance premium, split the damages proportionately based on the amount that the employer and employee respectively contributed toward the total premium.[36]

For the purposes of this order, the court focuses on two aspects of the plaintiffs' formula: (1) calculating Sutter's overcharges and (2) the assumption that health plans pass on 100 percent of any Sutter overcharges through to the premiums they charge their customers.[37]

## 4.1 Calculating Sutter's Overcharges

To calculate the amount that Sutter allegedly has overcharged health plans, Dr. Chipty developed a regression-analysis model.[38]

Regression analysis is a statistical methodology for determining the relationship between a dependent variable and a set of explanatory variables that can influence or drive the dependent variable.[39] In Dr. Chipty's model, the dependent variable is hospital prices, or, more specifically, "case-mixed adjusted hospital prices."[40] The explanatory variables are factors that Dr. Chipty

---

[34] *Id.* at 89 (¶ 137); Chipty Decl. – ECF Nos. 348-3 (under seal), 379-1 (redacted version) at 94–96 (¶¶ 142–44).

[35] Chipty Decl. – ECF Nos. 379-1 at 89 (¶ 137); Chipty Decl. – ECF Nos. 348-3 (under seal), 379-1 (redacted version) at 97–98 (¶ 146).

[36] Chipty Reply Decl. – ECF No. 559-1 at 44 (¶ 60).

[37] The parties additionally raise disputes about other aspects of the plaintiffs' formula, including how health plans distribute higher premiums caused by alleged Sutter overcharges across their customer base and how higher premiums are apportioned between employers and employees when both pay a portion of the premium for an employee's health insurance. The court focuses in this order on the two aspects of the plaintiffs' formula listed above.

[38] Chipty Decl. – ECF No. 379-1 at 56–76 (¶¶ 80–111).

[39] *Id.* at 59–60 (¶ 88).

[40] *Id.* at 59 (¶ 88). The "case-mixed adjusted hospital price" for a given hospital for a given year is the total amount of money paid to the hospital (by either the health plan or the end patient) for all

identified as being likely to drive hospital prices, such as the hospital's operating costs, its perceived quality, the size of its system, and how many competitors it has (or variables that are measures or proxies of those factors).[41] Dr. Chipty states that her regression model measures how much Sutter hospital prices are driven by her explanatory variables (costs, perceived quality, size, or number of competitors) versus how much they are driven by the hospital's being in the Sutter system — with the latter being a measure of how much the hospital is overcharging health plans by virtue of being Sutter and benefiting from Sutter's anticompetitive practices.[42]

Dr. Chipty examined Sutter hospitals in the Tied Markets and in one Tying Market (Berkeley-Oakland) and group of "benchmark" hospitals that purportedly resemble Sutter hospitals except that (unlike Sutter) they do not impose tying or other similar anticompetitive restrictions on health plans.[43] Dr. Chipty initially used claims data from the health plan Anthem to calculate the case-mix adjusted hospital prices charged to Anthem enrollees for each of these hospitals from 2006 to

_____

individual claims divided by the "diagnosis related group" weights associated with those claims. *Id.* at 63–64 (¶ 97). Dr. Chipty explains that "[d]iagnosis-related groups ('DRGs') categorize inpatient stays into groups based on the diagnosis and resources necessary to treat the condition. Each DRG is assigned a weight based on the average resources used to treat the patient. Therefore, dividing the allowed amount, or total eligible expenses including insurance payment and patient liability, by the DRG weight is a method of adjusting for the acuity/complexity of the inpatient stay." *Id.* at 54 n.161 (¶ 77 n.161).

[41] *Id.* at 64 (¶¶ 98–99). Specifically, Dr. Chipty selected as explanatory variables (1) the hospital's wage index, as a measure of the cost of paying salary to its employees, (2) whether the hospital is a major teaching hospital, (3) whether the hospital has trauma facilities, (4) how many competitors the hospital has, (5) the hospital's patient ratings, as a proxy for aspects of its quality, (6) the number of inpatient beds the hospital has, as a measure of the size of its system, and (7) the year, to reflect the general inflation in hospital prices over time. *Id.* at 64–67 (¶ 99).

[42] *Id.* at 70–71 & n.215 (¶ 104 & n.215) ("The estimated coefficients on these indicator variables capture the differences between the actual price at each Sutter Damage Hospital in each year and the predicted but-for price that the Sutter Damage Hospital would have negotiated for that year had it not been in the Sutter system, but otherwise maintained all of its other attributes (e.g. wage index, teaching status, trauma status, system size, and competitive landscape). Thus, under the model assumptions, the estimated coefficients on the *Sutter Damage Hospital x Year* indicators capture the overcharges resulting from Sutter's challenged conduct. If, for example, the coefficient on a *Sutter Damage Hospital x Year* indicator takes the value of 0.35, one would say that the Sutter hospital price in that year is 42 percent higher as a result of the challenged conduct, accounting for the log transformation $[100 \times (e^{0.35} - 1)$, where $e$ is the base of the natural logarithm, or approximately 2.71828]."), 72 (¶ 107) (same).

[43] *Id.* at 56 (¶ 80).

2015.[44] Dr. Chipty ran her regression model twice on the Anthem-based case-mixed adjusted hospital prices, (1) once on only the benchmark hospitals to calculate an "out-of-sample prediction" and (2) once on a sample of both Sutter and benchmark hospitals to calculate an "in-sample prediction."[45] (Dr. Chipty explained that, among other things, the out-of-sample regression generates year-by-year estimates of Sutter hospital overcharges, whereas the in-sample regression generates only a single average estimate of Sutter hospital overcharges.[46]) Based on her regression model, Dr. Chipty estimated Sutter's overcharges of Anthem by year and hospital as set forth in the chart below.

**[Opening Declaration] Exhibit 14A[47]**
**Hospital Case-Mix Adjusted Price Overcharge Percentages, Anthem**
**Baseline Regression 2006-2015**

| Hospital | Out-of-Sample | | | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2006-2015 |
| Alta Bates-Main | | | | | | | | | | | |
| Alta Bates-Summit | | | | | | | | | | | |
| Sutter Sacramento | | | | | | | | | | | |
| CPMC-Main | | | | | | | | | | | |
| CPMC-St. Luke's | | | | | | | | | | | |
| Sutter Santa Rosa | | | | | | | | | | | |
| Sutter Modesto | | | | | | | | | | | |

In response to criticisms by Sutter's expert Dr. Robert Willig that Dr. Chipty's overcharge estimates were based on data only from Anthem,[48] Dr. Chipty applied her regression model to claims data from the health plan Blue Shield.[49] After processing the data, Dr. Chipty ran her

---

[44] The claims data contained information, at the claim level, on the inpatient hospital services received by each of Anthem's health-plan enrollees, including the allowed amount (the amount paid to the hospital) for that claim. Chipty Decl. – ECF Nos. 348-3 (under seal), 379-1 (redacted version) at 11–14 (¶ 10), 58 (¶¶ 84–85); Chipty Decl. App'x C – ECF No. 348-3 (under seal), 379-1 (redacted version) at 129–37.

[45] Chipty Decl. – ECF No. 379-1 at 70–72 (¶¶ 102–07).

[46] *Id.* at 70 (¶ 103), 71–72 (¶ 106).

[47] Chipty Decl. – ECF Nos. 348-3 (under seal), 379-1 (redacted version) at 75 (¶ 110).

[48] Willig Decl. – ECF Nos. 446-2 (under seal), 557 (redacted version) at 124–25 (¶¶ 216–17).

[49] Chipty Reply Decl. – ECF No. 559-1 at 94 (¶ 148). Because the Blue Shield claims data did not report the total amount of money paid to hospitals in the same way as the Anthem data did and did not contain DRG codes at all — the two components that go into Dr. Chipty's calculation of case-mix

regression model twice on the Blue Shield-based case-mixed adjusted hospital prices to calculate an "out-of-sample" and an "in-sample" prediction.[50] Based on the Blue Shield claims data and her regression model, Dr. Chipty estimated Sutter's overcharges at its hospitals by year and hospital, as set forth in the chart below.

**[Reply Declaration] Exhibit 17[51]**
**Hospital Case-Mix Adjusted Price Overcharge Percentages, Blue Shield**
**Baseline Regression 2006-2015**

| Hospital | Out-of-Sample | | | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2006-2015 |
| Alta Bates-Main | 53% ** | 44% * | 58% ** | 42% * | 40% * | 21% | 42% * | 17% | 144% *** | 88% * | 50% ** |
| Alta Bates-Summit | 135% *** | 127% *** | 158% *** | 165% *** | 172% *** | 142% *** | 140% *** | 126% ** | 22% ** | 3% | 96% *** |
| Sutter Sacramento | 95% *** | 37% | 95% *** | 114% *** | 83% *** | 99% *** | 84% *** | 65% ** | 39% * | 50% ** | 75% *** |
| CPMC-Main | 25% ** | 11% | 60% *** | 44% *** | 76% *** | 78% *** | 69% *** | 57% *** | 53% ** | 40% *** | 50% *** |
| CPMC-St. Luke's | 33% | 16% | 70% *** | 40% ** | 45% ** | 109% *** | 31% | 30% | 44% ** | 39% * | 41% ** |
| Sutter Santa Rosa | 1% | -22% ** | 21% * | 7% | -6% | -15% | -8% | 6% | -4% ** | -6% | -3% |
| Sutter Modesto | 38% *** | 57% *** | 50% *** | 29% ** | 24% * | 26% ** | 28% ** | 31% ** | 19% ** | 34% ** | 33% *** |

Dr. Chipty has not conducted similar regression analyses on claims data from the health plans Aetna, Health Net, or UnitedHealthcare. She testified at her deposition that she has not offered an overcharge model for class members who bought insurance through those health plans.[52] She stated that she had two approaches for addressing those three health plans: (1) if she had access to the same types of data for each health plan, she could run her regression models on each health plan separately, or (2) she could try to extrapolate her findings from some health plans to other health plans.[53] She testified, "I have not reached an opinion as to whether I have a preferred

---

adjusted hospital prices — Dr. Chipty had to process the Blue Shield data somewhat differently than she processed the Anthem data. Chipty Reply Decl. – ECF Nos. 462-3 (under seal), 559-1 (redacted version) at 94 (¶ 149).

[50] Chipty Reply Decl. – ECF No. 559-1 at 95 (¶ 150).

[51] Chipty Reply Decl. – ECF Nos. 462-3 (under seal), 559-1 (redacted version) at 96 (¶ 151).

[52] Chipty Dep. – ECF No. 531-4 (under seal) at 64–65 (pp. 666–67) ("Q. Have you offered an overcharge model for class members who access through Aetna? A. No, I have not. Q. Have you offered an overcharge model for class members who access through United? A. No, I have not. Q. Have you offered an overcharge model for class members who accessed through Health Net? A. No, I have not.").

[53] Id. at 70–71 (pp. 672–73).

method between those two as yet."[54] With respect to the first approach, she stated that she did not fully know whether she had sufficient data from Aetna, Health Net, or UnitedHealthcare to run her regression analyses and would not know until she tried to run the analyses.[55] With respect to the second approach, she stated that she has not reached an opinion as to whether it would be reasonable to use extrapolation as an overcharge-damages model.[56]

Sutter noted that Dr. Chipty's regression model, when applied to Blue Shield claims data, shows an undercharge (as opposed to an overcharge) at one of Sutter's hospitals in a Tied Market, Sutter Santa Rosa. When asked about it during her deposition, Dr. Chipty stated that this reflects that her regression model has "an inability to measure the overcharge for Sutter-Santa Rosa."[57] Dr.

---

[54] *Id.* at 71 (p. 673). She began by saying that she would apply her regression-analysis model to Aetna, Health Net, and UnitedHealthcare but then shifted to saying that she might use extrapolation instead. *Id.* at 69 (p. 671) ("Q. So is it your opinion, Dr. Chipty, that the methodology for estimating aggregate overcharge amounts that you use for Anthem and Blue Shield, that's the methodology that you're proposing to estimate aggregate damages amounts for Aetna, United and Health Net? A. I would — I would imagine using the same model to estimate those damages. Except to the point if I were to do — do my continued work on their claims data and their specific circumstances, it's possible that I reached the conclusion that it's reasonable to extrapolate from the experiences of Anthem and Blue Shield, but I haven't completed my work on that front yet.").

[55] *Id.* at 71–74 (pp. 673–76) ("Q. And have you reached an opinion on whether you have sufficient data from Aetna, United and Health Net to apply the overcharge methodology that you use for Anthem and Blue Shield for those health plans? A. Okay. So I may mess this up, in which case I'll come back and tell you. But I believe for United, we have the data that we need to move forward. By that I mean we have adequate claims data and adequate premium data. I believe that's true, but I would have to talk to the team to make sure I've got that right. And for Aetna, I believe we're still waiting on some of the data. I believe we're waiting on their premium data. On Health Net, there's been a large production of data from Health Net. It takes a different form, and I don't think my team has completed its assessment of the adequacy as yet of the Health Net data, but we're working on that. . . . Q. . . . . Your understanding, subject to verification from your staff, is that you and your staff have sufficient data from United to apply the same overcharge methodology that you used for Anthem and Blue Shield; is that correct? A. That's correct. That's my understanding. But I should also add that until we undertake the exercise, we won't know fully whether we do or we don't. We actually — one never knows until one gets deep into a problem. But, yes, my expectation is that we do and that we will look at that. Q. And then subject to verification with respect to Aetna and Health Net, you and your staff are still examining the data that has been received to determine whether there is sufficient data to use the same methodology, and you noted that Aetna may not have the premium data to date? A. That's correct. I think that's correct.").

[56] *Id.* at 71 (p. 673).

[57] *Id.* at 111 (p. 713).

Chipty did not propose an alternative model for estimating the overcharge percentage for Sutter Santa Rosa for Blue Shield class members.[58]

### 4.2 Assuming Health Plans "Pass On" 100 Percent of Any Sutter Overcharges They Have to Pay Through to the Premiums That They Charge Their Customers

Dr. Chipty's formula for converting the amount that Sutter allegedly overcharged health plans to the amount that class members were overcharged for their insurance premiums relies on an assumption that health plans "pass on" 100 percent of any Sutter overcharges they have to pay through to the premiums that they charge their customers.[59] In other words, her formula assumes that if Sutter charged, say, Anthem $100,000 more than it would have been able to charge in the but-for world, Anthem charged its customers (i.e., class members) $100,000 more in premiums than it would have charged in the but-for world as well.

Dr. Chipty stated in her report that health plans may actually pass on less than 100 percent of hospital overcharges through to increased premiums to their customers. She explained in her report:

> Basic economic principles indicate that health plans will pass through at least some portion of medical cost increases on to their consumers in the form of higher premiums. How much is passed through depends on market conditions. Given competitive conditions, a health plan may decide to absorb some portion of a medical cost increase, by cutting into [its] margins, to remain price competitive with other health plans who do not experience similar cost increases.[60]

As she testified in her deposition, "the different health plans may have different administrative costs, the different health plans may have different medical loss ratios or profit margins that they're targeting."[61]

Among other things, Dr. Chipty acknowledges that health plans like Anthem and Blue Shield might decide not to pass on 100 percent of hospital overcharges because of the competitive

---

[58] *Id.*

[59] *See* Chipty Decl. – ECF No. 379-1 at 96 (¶ 144) (assuming for the purposes of her formula that the pass-through ratio is equal to one, i.e., 100 percent).

[60] *Id.* at 77 (¶ 112).

[61] Chipty Dep. – ECF No. 415-1 (under seal) at 113 (p. 386).

pressures they face from Kaiser Permanente.[62] Kaiser is the largest health system in Northern California (and California generally).[63] Kaiser is a "closed" health system consisting of a Kaiser health plan and Kaiser hospitals and other medical providers, where Kaiser health-plan enrollees can receive healthcare only from Kaiser hospitals and medical providers (other than in emergencies).[64] Because Kaiser is a closed system that maintains its own network of hospitals, Kaiser's health plan does not contract with Sutter to include Sutter hospitals within its network and thus is not subject to Sutter's alleged systemwide contracting with its all-or-nothing, anti-steering, and penalty-rate provisions.[65] Kaiser's health plan competes with health plans like Anthem and Blue Shield in the sale of commercial health insurance to individuals and employers.[66] Dr. Chipty stated in her report that "[t]o the extent health plans like Anthem and Blue Shield would absorb cost increases to compete with Kaiser, pass-through may be less than 100 percent."[67] She explained in her deposition:

> A. . . . . So the way I understand the premiums work is, at least actuarially, they're built to cover health care expenses. And actuarially, if health care expenses go u[p], premiums will go up, but there's also some room to adjust profit margin. So [my report] is recognizing that a health plan might decide to absorb a cost increase to better compete with Kaiser. . . .
>
> Q. Okay. And one way that you've described is to — rather than passing through 100 percent, is pass through a portion of it and then either lower the profit margin or perhaps cut expenses and maintain their profit margin?
>
> A. Perhaps.[68]

---

[62] Chipty Decl. – ECF No. 379-1 at 77 (¶ 112).

[63] *Id.* at 5 (¶ 4), 18 (¶ 16).

[64] *Id.* at 18 (¶ 16).

[65] *See id.* (¶ 17) ("[N]o patient would have both Kaiser and Sutter hospitals in his or her provider network.").

[66] *Id.* at 19 (¶ 17); Chipty Dep. – ECF No. 415-1 (under seal) at 129 (p. 450).

[67] Chipty Decl. – ECF No. 379-1 at 77 (¶ 112).

[68] Chipty Dep. – ECF No. 415-1 (under seal) at 134 (pp. 472–73).

Sutter agrees and submits evidence (unrebutted by the plaintiffs) that supports Dr. Chipty's assessment that health plans might decide to not pass on their costs (including hospital costs) through to the premiums they charge their customers, in order to remain competitive vis-à-vis rival health plans. To take one example, in 2011, ███████ was discussing insurance rates for 2012 for one of its customers, Woodruff Sayer, and originally proposed ████████████████████ ███████.[69] Woodruff Sayer responded that █████████████████████████████████ █████████████████████████████████████████.[70] In response, ████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████.[71] To take another example, in 2014, Blue Shield was discussing insurance rates for 2015 for one of its customers, the City and County of San Francisco.[72] Blue Shield acknowledged that it was in a "difficult position" given that competitor health plans Kaiser and UnitedHealthcare had both proposed rate decreases.[73] In response, Blue Shield offered the City a "rate pass" (a 0 percent increase in premium rates) for 2015.[74]

Dr. Chipty's damages-calculation formula nonetheless assumes that the rate at which health plans pass on Sutter's alleged overcharges through to their customers' premiums will be 100 percent.[75] Dr. Chipty stated that one of the things she relies on to assume that (1) health plans pass on 100 percent of any Sutter overcharges and (2) the passthrough rate is the same across all health plans and class members, is a slide from a PowerPoint presentation drafted by Sutter's former

---

[69] ████████ email chain – ECF Nos. 415-3 (under seal), 445-6 (redacted version) at 10 (WSAW003956).

[70] *Id.* at 6 (WSAW003952).

[71] *Id.* at 5 (WSAW003951).

[72] Blue Shield email chain – ECF No. 445-10 at 274–75 (AON0009800–01).

[73] *Id.* at 274 (AON0009800).

[74] *Id.*

[75] Chipty Decl. – ECF No. 379-1 at 96 (¶ 144).

CFO Bob Reed.[76] ████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████[77] The

presentation discussed a hypothetical scenario where Sutter reduced its prices by ██████ and

then examined how that might cause health plans to reduce their premiums ████████████████

███████, assuming the health plans passed on 100 percent of Sutter's price reductions to their

customers.[78] ███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████[79] Dr. Chipty also cited other documents and analyses that she

said indicates that health plans try to set premiums at a level that covers all their expenses and that

when their costs increase, their premiums do as well.[80]

Dr. Chipty also conducted a regression analysis that she claims supports her formula's

assumption that health plans pass on 100 percent of alleged overcharges through to their

customers. For her regression, Dr. Chipty used health plans' PMPM health-care costs and

premiums between 2012 and 2015 for small-group-employer insurance buyers, as disclosed by the

plans in their annual Uniform Rate Review Template filings.[81] (She did not include data from

_____

[76] Chipty Decl. – ECF Nos. 348-3 (under seal), 379-1 (redacted) at 79–81 (¶¶ 118–19); Chipty Reply Decl. – ECF No. 559-1 at 55 (¶ 80); Chipty Dep. – ECF No. 415-1 (under seal) at 115 (pp. 395–97), 131 (p. 459).

[77] Sutter Strategy Session PowerPoint Presentation – ECF Nos. 349 at 130 (under seal), 379-4 at 131 (redacted version) (DEF001993774).

[78] *Id.*

[79] *Id.* ██████████████████████████████████████████

██████████████████████████████████████████████

[80] Chipty Decl. – ECF Nos. 348-3 (under seal), 379-1 (redacted version) at 77–82 (¶¶ 114–22).

[81] Chipty Decl. – ECF No. 379-1 at 83 (¶ 123).

individual or large-group-employer buyers.[82]) In her analysis, her dependent variable was the natural logarithm of PMPM premium in a given year, and her sole explanatory variable was the natural logarithm of PMPM cost in that year.[83] She acknowledged that this was "a very simple regression model."[84] Her regression analysis calculated an estimated passthrough coefficient for small-group-employer insurance of approximately 0.9 (where a coefficient of 1 indicates 100-percent passthrough[85]), as set forth in the chart below.

**[Opening Declaration] Exhibit 17[86]**
**Pass-Through Analysis for Small Groups**
**Dependent Variable = Log ($ Premium)**

| Explanatory Variable | Estimates |
| --- | --- |
| Log(Cost) | 0.914*** |
| | (0.0874) |
| Includes Health Plan Fixed Effects | Yes |
| Observations | 41 |
| R-squared | 0.965 |

*Notes:*
1. Standard errors shown in parentheses below coefficient estimate. The estimate is statistically significant at 1 percent significance level.
2. Coefficient estimated using ordinary least squares.

In response to criticisms by Sutter's expert Dr. Willig that Dr. Chipty's analysis did not examine whether passthrough rates vary across different health plans, across health-plan business lines (individual buyers versus small-group employer buyers versus large-group employer buyers), or across different health-insurance products, or whether passthrough rates vary based on how much competition a health plan faces (including competition from Kaiser),[87] Dr. Chipty ran additional regression analyses, as set forth in the charts below.

---

[82] *Id.*; Chipty Dep. – ECF No. 415-1 at 116 (p. 399) ("[R]emember this is just for small group. It's exactly how Exhibit 17 is laid out.").

[83] Chipty Decl. – ECF No. 379-1 at 83 (¶ 125).

[84] Chipty Dep. – ECF No. 415-1 at 114 (p. 391).

[85] Chipty Decl. – ECF No. 379-1 at 83 (¶ 125).

[86] *Id.* at 84 (¶ 125).

[87] Willig Decl. – ECF No. 557 at 46 (¶ 67), 59–60 (¶ 98).

### [Reply Declaration] Exhibit 7[88]
### Dr. Willig's Table 1, Showing More Information

| Descriptions | Aetna | Blue Cross | Blue Shield | Health Net | UHC |
|---|---|---|---|---|---|
| Coefficient | 0.302 | ███*** | 1.042*** | 1.054*** | ███*** |
| Standard Error | (0.228) | (0.233) | (0.091) | (0.164) | (0.216) |
| 95% CI | -0.164, 0.768 | ███ | 0.857, 1.227 | 0.719, 1.389 | ███ |
| R-squared | | | 0.976 | | |
| Plan/Year Observation | 9 | 8 | 7 | 8 | 9 |

*Notes:*
1. Asterisks *** indicates statistical significance at the one percent level.
2. The data upon which the model relies are aggregated at the year-level for each health plan.

### [Reply Declaration] Exhibit 8[89]
### Summary of Evidence Indicating Pass-Through Is at or Near 100 Percent

| Health Plan [1] | Source [2] | Costs Included [3] | Product Included [4] | Line-of-Business Included [5] | Kaiser Non-Kaiser [6] | Coefficient [7] | 95 Percent Confidence Interval [8] | Observations [9] |
|---|---|---|---|---|---|---|---|---|
| Aetna Blue Cross Blue Shield Health Net UHC | [1] | All Medical Costs | All | Small Group | Combined | 0.914*** | 0.748, 1.079 | 41 |
| Aetna Blue Cross Blue Shield Health Net UHC | [1] | All Medical Costs | All | Small Group | Combined | 0.302 ███*** 1.042*** 1.054*** ███*** | -0.164, 0.768 ███ 0.857, 1.227 0.719, 1.389 ███ | 9 8 7 8 9 |
| Blue Shield | [2] | All Medical Costs | All | Large Group | Combined | 0.954*** | 0.800, 1.109 | 9 |
| Blue Shield | [2] | All Medical Costs | All | Large Group: 101 ≤ Insured Employees | Combined | 0.993*** | 0.816, 1.171 | 9 |
| Blue Shield | [2] | All Medical Costs | All | Large Group: 100 - 500 Insured Employees | Combined | 0.898*** | 0.723, 1.073 | 9 |
| Blue Shield | [2] | All Medical Costs | All | Large Group: 501 ≤ Insured Employees | Combined | 0.988*** | 0.810, 1.165 | 9 |
| Blue Shield | [2] | All Medical Costs | All | Large Group: 2,000+ Insured Employees | Combined | 1.002*** | 0.771, 1.233 | 9 |
| Anthem | [3] | Inpatient Spend | All | Individual | Combined | ███*** | ███ | 10 |
| Anthem | [3] | Inpatient Spend | All | Large Group | Combined | ███*** | ███ | 10 |
| Anthem | [3] | Inpatient Spend | All | Large Group | Non-Kaiser | ███*** | ███ | 10 |
| Anthem | [3] | Inpatient Spend | All | Large Group | Kaiser | ███*** | ███ | 10 |
| Anthem | [3] | Inpatient Spend | All | Large Group | Non-Kaiser Kaiser | ███*** ███*** | ███ ███ | 20 |
| Anthem | [3] | Inpatient Spend | All | Individual | Non-Kaiser | ███*** | ███ | 10 |
| Anthem | [3] | Inpatient Spend | All | Individual | Kaiser | ███*** | ███ | 10 |
| Anthem | [3] | Inpatient Spend | All | Individual | Non-Kaiser Kaiser | ███*** ███*** | ███ ███ | 20 |
| Anthem | [3] | Inpatient Spend | PPO | Large Group | Combined | ███*** | ███ | 10 |
| Anthem | [3] | Inpatient Spend | HMO | Large Group | Combined | ███*** | ███ | 10 |

*Note:* Asterisks *** indicates statistical significance at the one percent level.

---

[88] Chipty Reply Decl. – ECF Nos. 462-3 (under seal), 559-1 (redacted version) at 49 (¶ 69).

[89] *Id.* at 51–52 (¶ 76) ("Exhibit 8 summarizes pass-through analyses separately for Anthem and Blue Shield data, by health plan, by line-of-business, by Kaiser's presence, and by product. Column [1] identifies the health plan whose data was analyzed. Column [4] identifies the product (e.g., all, HMO,

Dr. Chipty maintains that these analyses support her decision to assume a uniform 100-percent-passthrough rate across all health plans, health products, and class members in her damages calculations. She stated that the health-plan-by-health-plan analysis (Exhibit 7, above), which calculated passthrough coefficients of 0.32, ███, 1.042, 1.054, and ███ for the five health plans at issue in this case, "supports the view, using Dr. Willig's own results, that pass-through rates for four of the five health plans are similar to each other and equal to 100 percent"[90] and that the fifth health plan's coefficient rate — "0.3 (or a 30 percent pass-through rate)" — is "not statistically different from a pass-through rate as high as 77 percent."[91] She similarly said that her analyses disaggregating health plans, business lines, and products (Exhibit 8, above), which generated coefficients ranging from 0.302 to ███, support her using a uniform 100-percent-passthrough rate in her damages calculations.[92] She acknowledged that for many of her analyses, the upper bound of the 95-percent confidence interval around the passthrough-rate estimate[93] fell below 1 (i.e., below a 100-percent-passthrough rate) interval.[94] She nonetheless maintains that

---

PPO) considered. Column [5] identifies the line-of-business (e.g., individual, small group, and large group). Column [6] identifies whether pass-through rates in Kaiser and non-Kaiser areas were estimated separately or jointly. Column [7] shows the estimated pass-through coefficient. Column [8] describes the 95 percent confidence interval of the estimated passthrough rates, and Column [9] shows the regression observations, where each observation reflects the premium and claims experience of many. The first row shows results of the model presented in my Class Declaration. The second row shows the results of Dr. Willig's model. Statistically, the estimated pass-through rates are at or near 100 percent, for virtually all models. The lowest estimated pass-through rate comes from Dr. Willig's small group analysis, for Aetna.").

[90] Chipty Reply Decl. – ECF No. 559-1 at 48 (¶ 69).

[91] Id. at 46 (¶ 66).

[92] Chipty Reply Decl. – ECF Nos. 462-3 (under seal), 559-1 (redacted) at 50–54 (¶¶ 72–78).

[93] Dr. Chipty explains that "a 'confidence interval' provides a range of values within which the true population value is likely to lie." Chipty Decl. – ECF No. 379-1 at 62 (¶ 94). "A 95 percent two-sided confidence interval is an interval around the sample estimate, constructed based on the standard error, that would contain the true population value 95 percent of the time if the sampling procedure were to be repeated infinitely." Id. at 62 n.191 (¶ 94 n.191).

[94] Chipty Reply Decl. – ECF Nos. 462-3 (under seal), 559-1 (redacted version) at 50–51 nn.167–69 (¶¶ 72 n.167, 74 n.168–69) (noting that in row 8 of Exhibit 8, the upper bound of the 95-percent confidence interval around the passthrough estimate is 0.9; in row 10, the upper bound of the 95-percent confidence interval around the passthrough estimate is 0.87; in row 13, the upper bound of the 95-percent confidence interval around the passthrough estimate is 0.95; and in row 14, the upper bound of the 95-percent confidence interval around the passthrough estimate is 0.92).

these results are "near one [100 percent]" or "close to one [100 percent]."[95] She does not cite any sources to explain what being "near" or "close to" 1 means or how that supports her decision to assume a passthrough rate of 100 percent.[96]

Dr. Chipty acknowledged in her deposition that she has never conducted in any other contexts the passthrough regression analyses she is running here.[97] She has not studied passthrough rates in the context of medical premiums and has never offered an expert opinion on passthrough rates outside of the context of this case.[98]

## ANALYSIS

Class actions are governed by Federal Rule of Civil Procedure 23. A party seeking to certify a class must prove that all the prerequisites of Rule 23(a) are met, as well as those of at least one subsection of Rule 23(b) (the relevant subsections here are (b)(2) and (b)(3)).

The following are the prerequisites of Rule 23(a):

1. the class is so numerous that joinder of all members is impracticable;

2. there are questions of law or fact common to the class;

3. the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4. the representative parties will fairly and adequately protect the interests of the class.

A court may certify a class under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual

---

[95] *Id.* at 50–51 (¶¶ 72, 74).

[96] Dr. Chipty describes some of her results as being "not statistically different from one." Chipty Reply Decl. – ECF No. 559-1 at 50 (¶¶ 72, 74). She explains what she means when she says results are "not statistically different from one": that a value of 1 (a 100-percent-passthrough rate) is within the 95-percent confidence interval. *See* Chipty Decl. – ECF No. 379-1 at 62 (¶ 94). She does not explain what a result's being "near one" or "close to one" means. It necessarily must mean that it is "statistically different" from 1 (a 100-percent-passthrough rate), given that 1 falls above the 95-percent confidence interval.

[97] Chipty Dep. – ECF No. 415-1 (under seal) at 110 (pp. 376–77).

[98] *Id.* at 110–11 (pp. 377–80). In addition to Dr. Chipty, the plaintiffs proffered another expert, David Axene, but Mr. Axene did not conduct any analysis to calculate passthrough rates of hospital charges to health-plan premiums. Axene Dep. – ECF No. 415-1 (under seal) at 20 (pp. 68–69), 29 (p. 105).

members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A court may certify a class under Rule 23(b)(2) for injunctive or declaratory relief (i.e., not for money damages) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2).

"[P]laintiffs wishing to proceed through a class action must actually *prove* — not simply plead — that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (emphasis in original) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011); *Comcast Corp. v. Behrend*, 569 U.S. 27, 32–33 (2013)). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23[] have been satisfied.'" *Comcast*, 569 U.S. at 33 (quoting *Wal-Mart*, 564 U.S. at 350–51). "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'" *Id.* at 33–34 (quoting *Wal-Mart*, 564 U.S. at 351). "That is so because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.* at 34 (quoting *Wal-Mart*, 564 U.S. at 351). Still, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citing *Wal-Mart*, 564 U.S. at 351 n.6).

## 1. Rule 23(a) Prerequisites

### 1.1 Numerosity — Rule 23(a)(1)

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable." There is no absolute minimum class size for establishing numerosity, but courts have held that classes as small as 40 satisfy the numerosity requirement. *See, e.g.*, *In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 294 (N.D. Cal. 2018) (citing *Twegbe v. Pharmaca Integrative*

*Pharmacy, Inc.*, No. CV 12-5080 CRB, 2013 WL 3802807, at *3 (N.D. Cal. July 17, 2013)), *appeal docketed sub nom. Stromberg v. Qualcomm Inc.*, No. 18-80135 (9th Cir. filed Oct. 11, 2018); *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *13 (N.D. Cal. Feb. 21, 2017) (citing Daniel R. Coquillette et al., 5 Moore's Federal Practice – Civil § 23.22 (2016)). The plaintiffs reasonably estimate that the proposed class contains at least hundreds of thousands of members.[99] Sutter does not dispute numerosity.[100] The court finds that the plaintiffs have satisfied Rule 23(a)(1)'s numerosity requirement.

### 1.2    Commonality — Rule 23(a)(2)

Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class." "What matters to class certification is not the raising of common 'questions' — even in droves — but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (internal ellipsis and some internal quotation marks omitted) (quoting *Wal-Mart*, 564 U.S. at 350). "To satisfy Rule 23(a)(2) commonality, 'even a single common question will do.'" *Id.* (some internal quotation marks omitted) (quoting *Wal-Mart*, 564 U.S. at 359). Courts have held that "'antitrust liability alone constitutes a common question.'" *In re Qualcomm*, 328 F.R.D. at 294 (internal brackets omitted) (quoting *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013)); *accord, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 WL 1391491, at *3 (N.D. Cal. Apr. 12, 2017) (*In re Lithium Ion Batteries I*) ("'[T]he very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist.'") (quoting *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *3 (N.D. Cal. June 5, 2006)). The plaintiffs have raised common questions about whether Sutter's systemwide contracting with its all-or-nothing, anti-steering, and penalty-rate provisions is anticompetitive that would generate common answers apt to drive

---

[99] Chipty Decl. – ECF No. 379-1 at 31 (¶ 30) ("[T]here could be between 430,000 and 680,000 Class Members in any given year.").

[100] *See* Def. MCC Opp'n – ECF No. 445 at 9, 30–31 (disputing whether the plaintiffs have satisfied Rule 23(a)'s typicality and adequacy requirements but not numerosity or commonality).

resolution of the litigation. Sutter does not dispute commonality.[101] The court finds that the plaintiffs have satisfied Rule 23(a)(2)'s commonality requirement.

### 1.3 Typicality — Rule 23(a)(3)

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." "The test of typicality serves to ensure that 'the interest of the named representative aligns with the interests of the class.'" *Torres*, 835 F.3d at 1141 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "'Under the Rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical.'" *Id.* (quoting *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014)). "In this context, 'typicality refers to the nature of the claim or defense and not to the specific facts from which it arose or the relief sought.'" *Id.* (internal ellipsis omitted) (quoting *Parsons*, 754 F.3d at 685). "Measures of typicality include 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (quoting *Hanon*, 976 F.2d at 508). Put another way, "[t]ypicality is present 'when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability.'" *In re Qualcomm*, 328 F.R.D. at 295 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010)). "Thus, 'in antitrust cases, typicality usually will be established by plaintiffs and all class members alleging the same antitrust violations by defendants.'" *Id.* (internal brackets and some internal quotation marks omitted) (quoting *In re High-Tech Emp.*, 985 F. Supp. 2d at 1181).

The named plaintiffs' claims are typical of the class's claims. The conduct they challenge — Sutter's systemwide contracting with its all-or-nothing, anti-steering, and penalty-rate provisions — is not unique to any plaintiff. Rather, Sutter engaged in this same conduct with the five health plans at issue and allegedly charged all five health plans supra-competitive rates as a result, which

---

[101] *See* Def. MCC Opp'n – ECF No. 445 at 9, 30–31 (disputing whether the plaintiffs have satisfied Rule 23(a)'s typicality and adequacy requirements but not numerosity or commonality).

the health plans then allegedly passed on to their customers (the class members). The alleged injuries to the named plaintiffs and to the class arise from the same course of conduct.

Sutter argues that the named plaintiffs' claims are not typical because the named plaintiffs are two small employers and four individuals (two of whom worked for the same employer) and do not include any large-group employers or any persons who bought an individual health-insurance policy.[102] Sutter argues that the plaintiffs do not have any personal stake or interest in establishing that health plans passed on supra-competitive hospital costs through to large-group employers despite the presence of individually negotiated premiums.[103] But under Rule 23's permissive standards, the plaintiffs' claims need only be "reasonably coextensive" with absent class members' claims; they need not be substantively identical. *Torres*, 835 F.3d at 1141. The overarching gravamen of the plaintiffs' claims is Sutter's alleged anticompetitive tying activity. While differences in how health plans may have passed on Sutter's alleged overcharges through to their customers may go to Rule 23(b)(3)'s predominance requirement, it is not sufficient to defeat typicality. *Cf. In re Lithium Ion Batteries I*, 2017 WL 1391491, at *7–8 (rejecting argument that claims of individuals who bought battery products at non-negotiable prices were atypical of claims of large institutional buyers who bought products in bulk and could negotiate prices because "the overarching [antitrust] price-fixing scheme is the gravamen of the claim, regardless of the type of product purchased, the quantity, the purchasing procedures, or the price paid") (citing *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 609 (N.D. Cal. 2009)); *In re Online DVD Antitrust Litig.*, No. M 09-2029 PJH, 2010 WL 5396064, at *4 (N.D. Cal. Dec. 23, 2010) (*In re Online DVD I*) ("The named plaintiffs' claims are typical of the class because for all claims, proof of the alleged violations in question will depend on proof of violation *by defendants*, and not on the individual positioning of each plaintiff.") (emphasis in original).[104]

---

[102] Def. MCC Opp'n – ECF No. 445 at 31. Sutter also argues that the plaintiffs and class members have conflicts of interest, *id.* at 30–31, which the court will address in the next section in connection with Rule 23's adequacy requirement.

[103] *Id.* at 31.

[104] It is worth noting that the "individually negotiated premiums" that Sutter discusses in its opposition refers to large-group employers' negotiations with *health plans*, not with Sutter. Sutter does not

The court finds that the plaintiffs have satisfied Rule 23(a)(3)'s typicality requirement.[105]

### 1.4    Adequacy — Rule 23(a)(4)

Rule 23(a)(4) requires that "the representative parties [] fairly and adequately protect the interests of the class." "This adequacy requirement . . . 'serves to uncover conflicts of interest between named parties and the class they seek to represent' as well as the 'competency and conflicts of class counsel.'" *Espinosa v. Ahearn (In re Hyundai and Kia Fuel Econ. Litig.)*, 926 F.3d 539, 566 (9th Cir. 2019) (en banc) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 626 n.20 (1997)). "To determine legal adequacy, [courts] resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and

---

contend that large-group employers had any more ability to negotiate with *Sutter* over prices or premiums than individuals or small-group employers did. The fact that large-group employers might have engaged in negotiations with health plans does not render plaintiffs' claims — which are against Sutter, not the health plans — atypical of the claims of the class as a whole. *Cf. In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 317–18 (N.D. Cal. 2014) (in price-fixing antitrust case, finding that typicality was not satisfied based on differences between large institutional class members and small class members where the large institutional class members engaged in direct price negotiations with the defendants — i.e., the parties that were actually doing the price-fixing — and small class members did not) (citing *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 489–90 (N.D. Cal. 2008)).

[105] Sutter cites *Burkhead v. Louisville Gas & Electric Co.*, 250 F.R.D. 287 (W.D. Ky. 2008), and *Major v. Ocean Spray Cranberries, Inc.*, No. 5:12-CV-03067 EJD, 2013 WL 2558125 (N.D. Cal. June 10, 2013), to argue that the named plaintiffs' claims are not typical of the class's. Def. MCC Opp'n – ECF No. 445 at 31. Neither case is apposite here. *Burkhead* was a class action brought against an allegedly polluting power plant where the named plaintiffs were a "geographically concentrated group living relatively close to Defendant's plant." *Burkhead*, 250 F.R.D. at 300. The plaintiffs sought to represent a class of residents in a two-mile radius of the plant but offered no evidence that the plant spread any pollution elsewhere within that radius. *Id.* at 292–93 & n.3. In light of the plaintiffs' geographic concentration and their lack of evidence that other areas were affected, the court held that their claims were not typical. *Id.* at 295–96. The court contrasted that situation from a situation where "the harm suffered by the named plaintiffs may differ in *degree* from that suffered by other members of the class so long as the harm suffered is of the same *type*," which would support a finding of typicality. *Id.* at 295 (emphasis in original, citation omitted). *Major* was a class action brought against a food manufacturer where the named plaintiff alleged misleading product labeling. *Major*, 2013 WL 2558125, at *1. The plaintiff bought allegedly mislabeled fruit drinks but sought to represent classes of persons who bought the defendant's products more broadly. *Id.* at *2. The court held that the plaintiff "fail[ed] to link any of those products to any alleged misbranding issue[.]" *Id.* at *4. For example, the plaintiff alleged that a blueberry drink she purchased made misleading claims specifically about blueberries, which the court held was not typical of claims related to other products that did not contain blueberries. *Id.* ("[T]he content that purportedly gives rise to Plaintiffs claims is unique to the specific and particular product she purchased and has no applicability to other products within the same line."). Neither of those cases is analogous to the case here.

(2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

### 1.4.1    Prosecuting the action vigorously on behalf of the class

Taking the second issue first, the plaintiffs and their counsel maintain that they will prosecute this case vigorously on behalf of the class. The named plaintiffs have actively participated in this case, cooperated in discovery, made themselves available for and sat for depositions, and followed case developments.[106] All are willing to prosecute the action vigorously and to sit for trial.[107] They have retained class counsel with experience in litigating antitrust class actions.[108] Sutter does not dispute that the named plaintiffs and their counsel will prosecute this case vigorously on behalf of the class.[109]

The court finds that the plaintiffs have satisfied this component of Rule 23(a)(4)'s adequacy requirement.

### 1.4.2    Conflicts of interest

The Ninth Circuit has cautioned that "we do not 'favor denial of class certification on the basis of speculative conflicts.'" *Resnick v. Frank (In re Online DVD-Rental Antitrust Litig.)*, 779 F.3d 934, 942 (9th Cir. 2015) (*In re Online DVD II*) (quoting *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003)). "Nor does a district court abuse its discretion [in certifying a class] when conflicts are trivial." *Id.* (citing *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 813 (7th Cir. 2013)). "'Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.'" *Id.* (quoting William

---

[106] MacAusland Decl. – ECF No. 356-16; Feeney Decl. – ECF No. 356-17; Hansen Decl. – ECF No. 356-18; Herman Decl. – ECF No. 356-19; Stewart Decl. – ECF No. 356-20; Jankowski Decl. – ECF No. 356-21; Sidibe Decl. – ECF No. 356-22; *see, e.g.*, Feeney Dep. – ECF No. 558 at 3–33 (co-owner of named employer plaintiff sitting for deposition); Herman Dep. – ECF No. 445-6 at 195–221 (named individual plaintiff sitting for deposition).

[107] MacAusland Decl. – ECF No. 356-16; Feeney Decl. – ECF No. 356-17; Hansen Decl. – ECF No. 356-18; Herman Decl. – ECF No. 356-19; Stewart Decl. – ECF No. 356-20; Jankowski Decl. – ECF No. 356-21; Sidibe Decl. – ECF No. 356-22.

[108] *See* Counsel Biographies – ECF No. 362-3.

[109] *See* Def. MCC Opp'n – ECF No. 445 at 9, 30–31 (disputing whether the plaintiffs have satisfied Rule 23(a)(4)'s adequacy requirements in light of purported conflicts but not disputing the plaintiffs' or counsel's prosecution of this case).

B. Rubenstein et al., 1 Newberg on Class Actions § 3.58 (5th ed. 2011)). "A conflict is fundamental when it goes to the specific issues in controversy." *Id.* (quoting Newberg on Class Actions § 3.58).

Sutter argues that there are two conflicts of interest that prevent class certification. Neither purported conflict goes to the heart of the litigation so as to render the plaintiffs inadequate to pursue their class claims.

First, Sutter argues that employers and employees have conflicts, because employers have an incentive to argue that they bore the entire brunt of any premium increase and did not pass any of it along to their employees, while employees have an incentive to argue that the entire alleged increase was passed on to them.[110] This is not a conflict that goes to the heart of the litigation. Employers and employees do not have a conflict regarding the central issues at controversy in this case, namely, whether Sutter overcharged health plans for its hospital services, whether health plans passed on those overcharges through to the premiums that they charged their customers, whether they as the health plans' customers paid more in premiums than they otherwise would have but for Sutter's anticompetitive conduct, and whether Sutter should pay damages to make them whole. Only if the class collectively were to establish that Sutter is liable and should pay damages would any purported conflicts arise between employers and employees regarding how those damages should be allocated. This is not a conflict that is so fundamental to the suit or goes so much to the heart of the litigation as to render the plaintiffs inadequate to pursue their class claims. *Cf. In re Lidoderm*, 2017 WL 679367, at *26 (finding plaintiffs adequate in antitrust class action alleging that defendants had inflated the price of lidocaine patches, rejecting arguments that end purchasers had insuperable conflicts with employers or insurers that bore some of the costs, and finding that "any theoretical disputes between, for example, an end payor consumer and her health insurance plan over how their overcharge damages should be split. . . . does not create a type of conflict that precludes certification").

---

[110] Def. MCC Opp'n – ECF No. 445 at 30.

Second, Sutter argues that class members have conflicts because some class members received a net benefit from its allegedly anticompetitive practices "and would have been harmed in the world plaintiffs[] hypothesize absent Sutter's challenged conduct."[111] Sutter and its expert Dr. Willig maintain that some class members derive more benefit from having Sutter hospitals in their health-insurance provider networks than any harm they suffer in increased health-insurance premiums attributable to Sutter's alleged overcharges.[112] Sutter argues that these class members thus have a conflict with other class members who do not derive such benefit and want to challenge Sutter's practices.

Sutter's argument necessarily relies on an assumption that, in the but-for world where Sutter is barred from engaging in allegedly anticompetitive practices, health plans would no longer offer health-insurance policies that have Sutter hospitals in-network. In other words, Sutter's argument assumes that in the but-for world, health plans would offer only narrow health-insurance policies that exclude Sutter hospitals (or that place Sutter hospitals in a lower tier and increase the amount enrollees had to pay to use those hospitals[113]), thereby harming class members who currently benefit from having access to Sutter hospitals.

But that is not the plaintiffs' case theory. The plaintiffs' theory is that in the but-for world, health plans would offer narrow policies that exclude some Sutter hospitals (e.g., the Sutter hospital in the Tying Markets) in addition to — not to the exclusion of — the broader policies they currently offer that include Sutter hospitals in-network.[114] Class members who derive benefit from

---

[111] Def. MCC Opp'n – ECF No. 445 at 30.

[112] Def. MCC Sur-Reply – ECF No. 535 at 7–9; Willig Decl. – ECF Nos. 446-2 (under seal), 557 (redacted) at 27–35 (¶¶ 34–45).

[113] The fact that health plans might place Sutter hospitals in a lower tier does not, on its own, necessarily harm any class member. For example, if a health plan currently requires enrollees to make a co-payment of, say, $40 for hospital services, and then were to create a new health-insurance policy that placed Sutter hospitals in a lower tier and required enrollees to make a co-payment of $20 for services from hospitals in the highest tier and $40 for services from hospitals in the lowest tier (with all else being equal), no enrollee would be worse off.

[114] As the plaintiffs explain, "Sutter's 'net harm' argument distorts plaintiffs' antitrust theory. Dr. Chipty posited that, in the but for world: (a) Sutter would have faced price competition due to the threat of exclusion, the launching of additional narrow networks and/or steering; (b) Sutter would have dropped its rates in order to retain critical patient volume; and (c) consumers would thus have

1    having Sutter hospitals in-network could remain in the original broader policies. Consequently,

2    class members would not be worse off. Class members would also have the additional option of

3    signing up for cheaper narrower policies that excluded Sutter hospitals (or placed them in a lower

4    tier). Not all class members would sign up for those cheaper narrower policies, but some would.

5    This would cause Sutter to lose patient volume. This loss in patient volume (and, thus, revenues)

6    would pressure Sutter to lower its supra-competitive prices, so that health plans could in turn

7    lower the premiums of the original Sutter-including broader policies to make them more appealing

8    to customers and more competitive vis-à-vis the narrower policies.[115] Those lower prices and

9    premiums would benefit all class members. To take the example discussed above, no matter how

10   much a class member might benefit from having a health-insurance policy that includes Sutter

11   hospitals in-network, that class member would benefit more (and not be harmed) if she were able

12   to enroll in that policy for, say, $90 a month instead of $100. That some class members benefit

13   from the inclusion of Sutter hospitals in-network does not mean that they benefit from Sutter's

14   alleged overcharges and, consequently, does not present a conflict that is so fundamental to the

15   suit or goes so much to the heart of the litigation as to render the plaintiffs inadequate to pursue

16   their class claims.

17        Sutter's expert Dr. Willig challenges the plaintiffs' view and argues that in the but-for world

18   — where Sutter faces the prospect of losing patient volume due to increased competition from

19   cheaper narrower health-insurance policies that do not include Sutter hospitals in-network —

20   Sutter might respond by increasing its prices instead of reducing them.[116] Sutter argues that if

21

22   continued access to the hospitals of their choice (including any in-demand Sutter hospitals) but at
     lower prices. Consequently, in Dr. Chipty's 'but for' world, all existing insurance products that include
23   Sutter hospitals in-network *would continue to exist*, but at substantially lower prices, making all Class
     Members better off." Pls. MCC Reply – ECF No. 559 at 14 (emphasis in original) (citing Chipty Reply
24   Decl. – ECF Nos. 462-3 (under seal), 559-1 (redacted) at 20–24 (¶¶ 19–27)); *accord* Def. MCC Sur-
     Reply – ECF No. 535 at 6 ("Plaintiffs expressly allege that, in the but-for world, insurers 'would have
25   launched a number of **additional** "tiered" or "limited" or "narrow" networks.'") (emphasis in original)
     (quoting 4AC – ECF No. 204 at 31 (¶ 97)).

26   [115] Alternatively, health plans might be able simply to threaten to create new cheaper narrower policies
27   that excluded Sutter hospitals (without actually going through with it) because even the threat of
     competing cheaper policies could exert pressure on Sutter to lower its prices. *See infra* note 117.

28   [116] *See, e.g.,* Willig Decl. – ECF No. 557 at 22 (¶ 22).

health plans then passed those increased prices through to the premiums the health plans charged their customers (i.e., class members), those class members who wanted to keep Sutter hospitals in-network would be worse off. But whether, in the but-for world, Sutter would respond to increased competition and the threatened loss of patient volume by reducing its prices or increasing them is not for the court to resolve on this class-certification motion. *Cf. In re Lidoderm*, 2017 WL 679367, at *18 ("[W]hat the but-for price should have been is not appropriately resolved on this [class-certification] motion."); *see also In re Aftermarket Automotive Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 373–74 (C.D. Cal. 2011) ("[I]n situations where a court is faced with two opposing expert analyses or econometric models of what the 'but for' world would look like, the Court is not supposed to decide at the certification stage which expert analysis or model is better.") (citing *In re TFT-LCD Antitrust Litig.*, 267 F.R.D. 291, 313 (N.D. Cal. 2010)). The plaintiffs and Dr. Chipty sufficiently support their position that Sutter would respond to a threatened loss of patient volume by lowering, not raising, its prices (and thus leaving no intraclass conflict that goes to the heart of the litigation) to establish adequacy at this juncture.[117]

---

[117] Among other things, the plaintiffs and Dr. Chipty point to Sutter's own assertions before the court in *California v. Sutter Health*, No. 3:99-cv-03803-MMC (N.D. Cal. filed Aug. 10, 1999), that health plans' ability to steer patients away from Sutter — and thereby threaten Sutter with a loss of patient volume — would serve to "discipline" Sutter's pricing.

The California Attorney General brought the *California v. Sutter* case in 1999, challenging as anticompetitive a proposed merger between Sutter's Alta Bates Medical Center in Berkeley, Alameda County, and the then independently owned Summit Medical Center in Oakland, Alameda County. *See California v. Sutter Health Sys.*, 84 F. Supp. 2d 1057, 1059–60 (N.D. Cal. 2001). In defending why the proposed merger would not be anticompetitive and would not result in higher prices for patients, Sutter argued to the court that "hospitals are very sensitive to even small declines in [patient] volume" and that "the loss of even a modest number of patients would be sufficient to discipline Alta Bates' and Summit's prices. Defendants' economist estimates that a shift of less than 8% (equal to about an additional 1 patient per day in various competing East Bay hospitals) would be sufficient to prevent a 5% increase at Summit or Alta Bates." *California v. Sutter* Defs. Proposed Findings of Fact and Conclusions of Law – ECF No. 462-5 (under seal) at 15–17 (¶¶ 27, 30). Sutter argued that its hospitals' "viability depends on volume, and only a modest loss of patients would be sufficient to discipline their pricing activity," *id.* at 29 (¶ 55), that "the evidence establishes that relatively modest redirection of patients would impose a critical loss sufficient to defeat a price increase" by Sutter, *id.* at 37 (¶ 70), that "[t]here are numerous mechanisms by which health plans can discipline the hospitals in the event of an attempted price increase. The simplest, but rarely used, is to exclude hospitals from the plans' provider networks," *id.* at 31 (¶¶ 58–59) (citations omitted), and thus that "if the combined Alta Bates/Summit acted in an anticompetitive manner, the physician groups could, either on their own or at the impetus of health plans, discipline the merged entity by admitting patients to other hospitals, by threatening to do so, or by shifting referrals (particularly for high value specialty services) to physician

The court finds that the plaintiffs have satisfied this component of Rule 23(a)(4)'s adequacy requirement.

## 2. Rule 23(b) Prerequisites

### 2.1 Predominance — Rule 23(b)(3)

Among other things, Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." "Considering whether 'questions of law or fact common to class members predominate' begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The plaintiffs here bring claims under Sections 1 and 2 of the federal Sherman Antitrust Act, the California Cartwright Act, and the California Unfair Competition Law

---

specialists at other hospitals," *id.* at 36 (¶ 68). In 2001, the court denied the California Attorney General's request for an injunction blocking the merger and allowed the merger to go forward, adopting Sutter's arguments that "[w]hen faced with price increases, there are numerous mechanisms through which health plans can discipline hospitals. The simplest, but rarely used, is to exclude hospitals from the plans' provider networks." *California v. Sutter*, 84 F. Supp. 2d at 1078.

Sutter's own assertions in the *California v. Sutter* case, together with the other analyses Dr. Chipty discusses, Chipty Decl. – ECF No. 379-1 at 42–46 (¶¶ 57–63); Chipty Reply. Decl. – ECF Nos. 462-3 (under seal), 559-1 (redacted version) at 21–24 (¶¶ 22–27), provide support for the plaintiffs' position that in the but-for world, Sutter would lower its prices, not raise them, thereby benefiting all class members and leaving no fundamental intraclass conflicts. *Cf. In re Online DVD II*, 779 F.3d at 942 (courts "do not 'favor denial of class certification on the basis of speculative conflicts'") (quoting *Cummings*, 316 F.3d at 896). Sutter's disagreement with the plaintiffs' but-for world may be a merits issue, but it does not defeat class certification in the first instance.

It is worth noting that around the time that the merger was allowed or shortly thereafter, Sutter (according to the plaintiffs) began engaging in its systemwide-contracting practices, thereby allegedly preventing health plans from using the patient-steering mechanisms that Sutter argued in *California v. Sutter* would discipline it from imposing price increases. Following the merger, Sutter (according to the plaintiffs) increased its prices at Summit by 29.0 to 72.0 percent, significantly more than other hospitals. Chipty Reply Decl. – ECF No. 559-1 at 102–03 (¶ 164); *see also Advocate Health*, 841 F.3d at 472 ("For example, in 2001 the Northern District of California refused to enjoin a hospital merger, relying in part on patient movement data. In 2011, a follow-up study found that the cheaper of the two hospitals raised its prices by 29 to 72 percent, much more than a control group had.") (citing *California v. Sutter*, 130 F. Supp. 2d at 1131–32, 1137; Steven Tenn, *The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction*, 18 Int'l J. of the Econ. of Bus. 65, 75–76 (2011)). Whether Sutter in fact increased its prices to supra-competitive levels, and whether it was because of its systemwide-contracting practices that it was able to do so, are issues that can be addressed at the merits phase of the litigation.

("UCL").[118] "To establish a federal antitrust claim, 'plaintiffs typically must prove (1) a violation of antitrust laws, (2) an injury they suffered as a result of that violation, and (3) an estimated measure of damages.'" *In re Qualcomm*, 328 F.R.D. at 296 (quoting *In re High-Tech Emp.*, 985 F. Supp. 2d at 1183). "With regard to Plaintiffs' Cartwright Act claim, 'the analysis mirrors the analysis under federal law because the Cartwright Act was modeled after the Sherman Act.'" *Cf. id.* (quoting *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001)). "Also, Plaintiffs' UCL claim is premised at least in part upon the Sherman and Cartwright Act violations." *Cf. id.* (citing *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)). "Neither party identifies any material difference between the federal and state claims warranting separate treatment." *Cf. id.* "Thus, the Court may treat the state law claims together with the federal claims in this case." *Cf. id.*

### 2.1.1 Antitrust violations

As discussed above, the plaintiffs have introduced evidence that Sutter engaged in common anticompetitive systemwide-contracting practices with respect to all five health plans at issue in this case and that its practices allow it to charge all five health plans supra-competitive rates in the same way.[119] Sutter does not meaningfully dispute that the plaintiffs' claims — that it violated the antitrust laws — are subject to common proof.[120] The court finds that common questions will predominate with respect to the alleged antitrust violations.

### 2.1.2 Antitrust injury and calculating damages

"Antitrust 'impact' — also referred to as antitrust injury — is the 'fact of damage' that results from a violation of the antitrust laws." *In re Qualcomm*, 328 F.R.D. at 299 (some internal quotation marks omitted) (quoting *In re DRAM*, 2006 WL 1530166, at *7). "'It is the causal link between the antitrust violation and the damages sought by plaintiffs.'" *Id.* (quoting *Brown v. Am.*

---

[118] 4AC – ECF No. 204 at 38–43 (¶¶ 124–70).

[119] *See supra* notes 18–24 and accompanying text.

[120] *See* Def. MCC Opp'n – ECF No. 445 at 16–29 (disputing whether antitrust injury or damages calculations are subject to common proof but not disputing whether antitrust violations are subject to common proof).

*Honda (In re New Motor Vehicles Canadian Antitrust Litig.)*, 522 F.3d 6, 19 n.18 (1st Cir. 2008)). "Thus, Plaintiffs here 'must be able to establish, predominantly with generalized evidence, that all (or nearly all) members of the class suffered damage as a result of [defendant's] alleged anti-competitive conduct.'" *Id.* (quoting *In re High-Tech Emp.*, 289 F.R.D. at 567).

On a motion for class certification, "plaintiffs [must] be able to show that their damages stemmed from the defendant's actions that created the legal liability" and "must show that 'damages are capable of measurement on a classwide basis,' in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiffs' legal theory." *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817 (9th Cir. 2019) (some internal quotation marks omitted) (quoting *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120 (9th Cir. 2017)). "'[U]ncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages.'" *Id.* (quoting *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd on other grounds*, 139 S. Ct. 710 (2019)). "Although uncertain damages calculations do not alone defeat certification, the Supreme Court has emphasized that 'at the class-certification stage (as at trial), any model supporting a plaintiff's damages case *must be consistent* with its liability case.'" *Id.* (emphasis in original, some internal quotation marks omitted) (quoting *Comcast*, 569 U.S. at 35).

The plaintiffs' liability theory is that Sutter charged the five health plans at issue in this case — Blue Shield, Anthem, Aetna, Health Net, and UnitedHealthcare — supra-competitive rates. The plaintiffs do not allege that Sutter directly charged class members supra-competitive rates. Instead, the alleged antitrust injury is indirect: the class members' harm comes only to the extent the health plans passed on Sutter's alleged overcharges through to class members in the form of higher premiums than the health plans would have charged in the but-for world. As a result, the plaintiffs have a two-fold burden: they must demonstrate that (1) the five health plans paid Sutter inflated

prices for inpatient hospital services, and then (2) those overcharges were passed on to class members in the form of inflated premiums. *Cf., e.g.*, *In re Qualcomm*, 328 F.R.D. at 299.[121]

Courts have recognized that "'antitrust plaintiffs have in recent years trended toward presenting an econometric formula or other statistical analysis to show class-wide impact' and that such analysis has often been accepted at the certification stage." *In re Optical Disk Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 WL 467444, at *7 (N.D. Cal. Feb. 8, 2016) (*In re Optical Disk Drive II*) (quoting *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 491 (N.D. Cal. 2008)). "'[S]uch methods, where plausibly reliable, should be allowed as a means of common proof. To rule otherwise would allow antitrust violators a free pass in many industries.'" *Id.* (quoting *In re Graphics Processing Units*, 253 F.R.D. at 491). "Accordingly, it is clear that statistical and economic methodologies . . . *may* be employed to establish class-wide impact." *Id.* (emphasis in original). Courts are cautious about "engaging in a battle of expert testimony" at the certification stage. *Id.* at *6 (citing *In re DRAM*, 2006 WL 1530166, at *9); *accord, e.g.*, *In re Lidoderm*, 2017 WL 679367, at *18. At the same time, "'[c]ertification should not be automatic every time counsel dazzle the courtroom with graphs and tables.'" *In re Optical Disk Drive II*, 2016 WL 467444, at *6 (internal brackets omitted) (quoting *In re Graphics Processing Units*, 253 F.R.D. at 491). "If the presumption were otherwise, 'nearly all antitrust plaintiffs could survive certification without fully complying with Rule 23.'" *Id.* (quoting *In re Graphics Processing Units*, 253 F.R.D. at 492). "'It is now clear that Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance — the rule commands it.'" *Id.* (internal ellipsis omitted) (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.* 725 F.3d 244, 255 (D.C. Cir. 2013)). "Put another way, the inquiry must be to determine if the proffered expert testimony has the requisite integrity to demonstrate class-wide impact." *Id.*; *accord Nguyen*, 932 F.3d at 817 (plaintiff's method for calculating damages must be "valid").

---

[121] This distinguishes this case from the *UFCW & Employers Benefit Trust v. Sutter Health* class action pending against Sutter in state court. In contrast to the putative class here, the class in that case consists of self-funded payors that paid Sutter directly for healthcare charges incurred by their employee-members instead of buying health insurance. *UFCW & Emps. Benefit Tr. v. Sutter Health*, No. CGC - 14-538451, 2017 WL 11405066, at *5 (Cal. Super. Ct. S.F. Cty. Aug. 14, 2017).

The court has taken a "hard look" at the plaintiffs' proposed methodology for assessing antitrust injury and calculating antitrust damages. The court finds the plaintiffs' proposed methodology has at least two significant deficiencies that prevent the plaintiffs from relying on it to demonstrate that they can prove antitrust injury or calculate antitrust damages on a class-wide basis: (1) it does not include a reliable method for proving or calculating Sutter's overcharges to the five health plans, and (2) it does not include a reliable method for proving or calculating how the overcharges were passed through to health-insurance premiums paid by class members.[122]

### 2.1.2.1    Calculating Sutter's overcharges

As discussed above, the plaintiffs and Dr. Chipty used a regression-analysis model that purports to calculate what portion of Sutter's charges to the health plans Anthem and Blue Shield are attributable to Sutter's alleged anticompetitive practices. Dr. Chipty has not offered an overcharge model with respect to Aetna, Health Net, or UnitedHealthcare.[123] She stated that she had two approaches for addressing those three health plans — (1) trying to run her regression-analysis model on them or (2) extrapolating her findings from some health plans to other health plans — but she had not reached an opinion as to which approach she preferred, did not know if she could run regression analyses on those three health plans, and did not have an opinion about whether extrapolation would be reasonable.[124] She does not explain how one of her two alternatives — extrapolation — would actually work: despite the fact that her regression-analysis model returned significantly different overcharge rates as between Anthem and Blue Shield,[125] she does not explain how she would reconcile those differences to use them to extrapolate rates for Aetna, Health Net, or UnitedHealthcare. Assuming without deciding that Dr. Chipty's regression-

---

[122] The court is not engaging in a "battle of the experts" here. The court does not find that the plaintiffs' methodology is unreliable because Sutter's experts or methodologies are more persuasive. Rather, it finds that the plaintiffs' methodology is unreliable due to deficiencies within the methodology.

[123] *See supra* note 52.

[124] *See supra* notes 53–56.

[125] For example, her model calculated the overcharge rate by Sutter's Alta Bates Main hospital in 2006 as ▮▮▮▮▮ for Anthem and 53 percent for Blue Shield, ▮▮▮▮▮▮▮▮. *See supra* notes 47, 51.

analysis model for Anthem and Blue Shield is sound, the plaintiffs nonetheless have not

demonstrated that they can prove or calculate Sutter's overcharges on a class-wide basis given that

they have not offered a method (or hedged between various methods) for calculating overcharges

for the remaining three health plans, customers of which Dr. Chipty estimates comprise 30 percent

of the class.[126]

The court in *In re Lithium Ion Batteries* was confronted with a similar situation. The plaintiffs

there alleged that battery manufacturers engaged in a price-fixing conspiracy to inflate the price of

batteries used in portable consumer electronics (e.g., laptops, smartphones, etc.). *In re Lithium Ion

Batteries I*, 2017 WL 1391491, at *1–2. The plaintiffs relied on an expert report and model to

prove and calculate damages on a class-wide basis. *Id.* at *16. The court found, however, that:

> [The expert]'s analysis fails to provide a firm foundation for class certification
> because he was unable to complete an analysis based on the actual cost data for any
> products other than Toshiba laptops. Further, even in his analysis of the Toshiba
> products, the data was limited and required some extrapolation. The data for all
> other products was, by [the expert]'s own admission, insufficient to run an analysis
> as to any of the other products types covered by the class definition. While it is
> unclear where to lay the blame, the Court nevertheless cannot ignore the large gaps
> in the evidence supporting the ability to demonstrate impact and damages on a
> class-wide basis. . . . As it stands, the analysis of the Toshiba laptops alone does not
> satisfy the Court that a showing of antitrust impact for that product can be
> extrapolated as a measure of impact for the rest of the Cells, Batteries and Finished
> Products in the class definition.

*Id.* at *17–18. The court reaches a similar conclusion here. Dr. Chipty offers an overcharge model

only for Anthem and Blue Shield, which is insufficient to demonstrate a method for proving

antitrust impact or calculating damages on a class-wide basis across the entire class.[127]

---

[126] Chipty Reply Decl. – ECF No. 559-1 at 16–17 (¶ 13).

[127] The plaintiffs argue that "[c]lasses have . . . been certified where experts have proposed a damages model, *but have not yet actually calculated any damages* for any class members." Pls. Sur-Sur-Reply – ECF No. 569 at 4 (emphasis in original). But it is not simply that the plaintiffs have not calculated damages for Aetna, Health Net, or UnitedHealthcare. They have not proposed a damages model (or try to hedge between two different models, in order to have it both ways). *See supra* notes 52, 54.

The court also has some questions about other aspects of Dr. Chipty's overcharge model with respect to Anthem and Blue Shield. For example, her model shows an undercharge — rather than an overcharge — for Blue Shield by one of Sutter's hospitals in a Tied Market, Sutter Santa Rosa. *See supra* note 51. Dr. Chipty testified that this reflects that her model has "an inability to measure the

#### 2.1.2.2 Assuming health plans "pass on" 100 percent of any Sutter overcharges they have to pay through to the premiums that they charge their customers

"Where, as here, the class is composed of indirect purchasers, 'proof of class-wide antitrust impact is made more complex because plaintiffs must offer a model of impact and damages that demonstrates the alleged overcharge was passed through to each successive link in the distribution chain, and ultimately to the plaintiffs.'" *In re Qualcomm*, 328 F.R.D. at 301 (quoting *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2018 WL 1156797, at *3 (N.D. Cal. Mar. 5, 2018) (*In re Lithium Ion Batteries II*)).

Courts in indirect-purchaser antitrust cases have recognized the use of averaging in calculating passthrough rates where experts have shown the sound methodological steps through which they calculated their averages. *See, e.g.*, *id.* at 315 (collecting cases). For example, *In re Qualcomm* — an antitrust case against a manufacturer of "modem chips" used in cellphones brought by a class of indirect purchasers who bought phones containing the chips — the plaintiffs' expert calculated an average passthrough rate from the chip manufacturer through cellphone manufacturers and retailers to cellphone buyers through regression analyses based on sales data from (1) six major cellphone manufacturers, including the five largest manufacturers in the U.S. market (Apple, Samsung, Motorola, LG, and HTC), representing approximately 90 percent of total cellphone sales, (2) six of the largest U.S. retailers (including Best Buy, Amazon, Wal-Mart, and Target), representing approximately 84 percent of the retailer market, and (3) five wireless carriers, including the four major U.S. carriers (AT&T, Sprint, T-Mobile, and Verizon) and one regional carrier, representing approximately 97 percent of the wireless-carrier market. *Id.* at 302–03. The expert used ten control variables in his regressions (the same ten control variables that the

---

overcharge for Sutter-Santa Rosa." *See supra* note 57. It is unclear if the plaintiffs are taking the position that Sutter did not overcharge Blue Shield at its Sutter Santa Rosa hospital or if they are taking the position that it did overcharge and that they need a new model to determine how much it overcharged (because their current model cannot measure that overcharge). The latter raises the prospect of the plaintiffs proposing additional individualized overcharge models for specific hospitals or health plans. In light of the court's decision on other grounds that the plaintiffs have not provided a sufficient model, it need not fully resolve these questions now, but it raises them as issues that may need to be addressed on any further class-certification motion.

1  defendant used in a submission to the FTC) and calculated separate passthrough rates for each of

2  18 sales channels, which he then weighted to calculate an overall sales-channel-weighted average

3  passthrough rate of 87.4 percent. *Id.* at 303–04. In finding that the expert's average weighted

4  passthrough rate was sufficient to support class certification, the court found that:

5      [The plaintiffs' expert] does not simply assume a uniform pass-through rate for
       OEMs. Instead, he examines transactional data for six different OEMs — including
6      the five largest OEMs in the U.S. market (Apple, Samsung, Motorola, LG, and
       HTC) — who "accounted for approximately 90% of total cell phone sales" during
7      the relevant period. [He] calculates individual pass-through rates for these six
       OEMs in order to model a composite pass-through rate.
8

9  *Id.* at 308. By contrast, courts have rejected the use of averaging in calculating passthrough rates

10 where experts have not shown the sound methodological steps through which they calculated their

11 averages. For example, in *In re Lithium Ion Batteries* — an antitrust case against manufacturers of

12 batteries used in consumer electronics — the plaintiffs' expert assumed that the passthrough rate at

13 each level in the distribution chain from the battery manufacturers to device manufacturers to

14 retailers to the end consumers approached 100 percent without sufficiently supporting his analysis.

15 *In re Lithium Ion Batteries I*, 2017 WL 1391491, at *12. Among other things, "[the expert]

16 acknowledged that bundling, rebates, and discounts would affect the accuracy of cost data, but

17 apparently has offered no methodology to account for it in his analysis." *Id.*[128] The court there

18 "f[ound] the [expert's] declarations insufficient to show that pass-through and damages can be

19 established by expert analysis on a class-wide basis" and denied certification. *Id.* On a renewed

20 motion a year later, the court found that the expert's supplemental analysis still failed to account

21 for a central issue affecting passthrough rates (focal-point pricing; meaning, the practice of

22 retailers setting prices at certain "focal points," such as prices ending with 9, and not adjusting

23 such prices based on small differences in costs) and thus "left too much uncertainty as to whether

24 pass-through can be estimated reliably at 100% as to retailers or distributors farther down the

25

26 ─────────────────────

27 [128] By way of contrast, the expert in *In re Qualcomm* "perform[ed] separate pass-through rate
   calculations for subsidized and unsubsidized phones and f[ound] statistically significant pass-through
   rates for each wireless carrier for subsidized and unsubsidized phones." *In re Qualcomm*, 328 F.R.D.
28 at 310.

supply chain, and ultimately to the consumers who make up the proposed class," and once again denied certification. *In re Lithium Ion Batteries II*, 2018 WL 1156797, at *4.

The *In re Optical Disk Drive* antitrust litigation is instructive because the court there first denied class certification due in part to deficiencies in the plaintiffs' passthrough assumptions and then, two years later, granted a renewed motion for class certification. The plaintiffs there alleged that optical-disc-drive ("ODD") manufacturers engaged in bid-rigging to prop up the price of ODDs. *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 314 (N.D. Cal. 2014) (*In re Optical Disk Drive I*).[129] The plaintiffs sought to certify a class of direct-purchaser plaintiffs ("DPPs") that bought ODDs directly from the defendants, *id.* at 316, and a class of indirect-purchaser plaintiffs ("IPPs") that bought products that contained ODDs manufactured by the defendants (but which the IPPs did not buy directly from the defendants), *id.* at 323. On the plaintiffs' initial class-certification motion, the plaintiffs' expert aggregated prices for all purchasers who bought ODDs of particular types in given years before running a regression analysis to calculate a passthrough rate. *Id.* at 324. The court found that this resulted in "class-wide impact . . . being *assumed* by the models, rather than demonstrated by the results." *Id.* (emphasis in original). The expert "purport[ed] to test the validity of his models by looking to specific examples in the data," but the court rejected this approach, holding that "[i]dentifying some instances where the empirical data appears to match the model does not transform the analysis from one that assumes class-wide impact into one that proves it." *Id.* The court ultimately concluded that "the IPPs have not presented a persuasive explanation as to why it would be reasonable to assume a uniform pass through rate" and denied certification. *Id.*

Two years later, the plaintiffs moved for certification again, this time for a narrower IPP class. *In re Optical Disk Drive II*, 2016 WL 467444, at *3. The plaintiffs' expert offered a modified overcharge model that, among other things, "integrate[d] all 'useable' sales and costs data produced — from 86 percent of the market" and "provide[d] further detail on the multivariable

---

[129] "Optical discs" include CDs and DVDs. *In re Optical Disk Drive I*, 303 F.R.D. at 314. While the action was captioned "Optical Disk Drive Antitrust Litigation," apparently "disc" (not "disk") is the preferred spelling for optical media. *Id.* at 314 n.1.

regression analysis, which [the plaintiffs] contend shows that all factors other than [the antitrust] conspiracy are being adequately controlled for in the overcharge model." *Id.* at *6. The court found that this new analysis, which measured passthrough rates for over 273 million ODD products, *id.* at *9, was sufficient to support certification.

Dr. Chipty's passthrough analyses here have more in common with the deficient models in *In re Lithium Ion Batteries* and the first *In re Optical Disk Drive* decision than the models in *In re Qualcomm*, the second *In re Optical Disk Drive* decision, or other decisions where courts have accepted passthrough models. Dr. Chipty began by assuming what she needs to prove, namely, that each of the five health plans pass on 100 percent of any Sutter overcharges through to the premiums they charge their customers. Dr. Chipty based her 100-percent-passthrough assumption in large part on the Bob Reed PowerPoint presentation where Sutter supposedly assumed a 100-percent-passthrough rate for the purpose of running hypotheticals ███████████████

████████████████████████████████████████████

███████.[130] Contrary to Dr. Chipty's inference, the hypothetical in that presentation does not establish that Sutter actually concluded that health plans pass on 100 percent of Sutter's price reductions (or increases) through to their customers' premiums. Even if it did, the fact that Sutter (which is not a health plan) might have drawn this conclusion does not establish that health plans actually pass on 100 percent of price reductions (or increases) through to their customers' premiums. Dr. Chipty further based her 100-percent-passthrough assumption on documents and analyses that she said indicates that health plans try to set premiums at a level that covers all their expenses and that when their costs increase, their premiums do as well.[131] The fact that health plans try to set premiums at a level that covers all their expenses as a whole, or that their premiums generally increase when their costs increase, does not establish that health plans pass on 100 percent of any given cost increase or overcharge through to their customers. To the contrary, Dr. Chipty herself acknowledged that "a health plan may decide to absorb some portion of a

---

[130] *See supra* notes 77–79.

[131] *See supra* note 80.

1    medical cost increase, by cutting into [its] margins," rather than passing on 100 percent of those

2    increases to its customers.[132]

3      Dr. Chipty tries to bolster her 100-percent-passthrough-rate assumption with a regression

4    analysis. Her original regression analysis is overly simplistic, using data only from small-group

5    employers (not individuals or large-group employers) and measuring the relationship between

6    PMPM premiums and only a single explanatory variable, PMPM costs. Dr. Chipty herself

7    acknowledged that this was "a very simple regression model" and that this model might not be

8    appropriate if the relationship between a health plan's costs (including costs in paying hospitals

9    like Sutter) and the health plan's premiums were complex.[133] She said that she nonetheless elected

10    to use this simple model because she assumed that the relationship between costs and premiums

11    was "formulaic."[134] In other words, Dr. Chipty assumed what she set out to prove — that the

12    method by which health plans pass on their costs through to their customers' premiums is in fact

13    "formulaic" — and then developed a "simple" regression-analysis model to try to support that

14    assumption. *Cf. In re Optical Disk Drive I*, 303 F.R.D. at 324 (finding unreliable models that

15    assumed class-wide impact, rather than demonstrating class-wide impact).

16      Among the model's other flaws is its failure to take into account how competition from rival

17    health plans (including Kaiser Permanente) affects a health plan's decision to pass its costs

18

19

20

---

[132] *See supra* note 60.

[133] *See* Chipty Dep. – ECF No. 415-1 (under seal) at 114 (pp. 391–92) ("Q. Are you aware of any generally accepted method of determining the pass-through rates? A. Oh, I believe this is a generally accepted method. There are a range of methods ranging from simple to highly complicated that people use and can use. And it just depends, I think, on the context and the available evidence to study as well as the other corroborating evidence you have. So I view this as a component of the larger evidence that I use to reach my conclusion. Now, would I do exactly the same thing in a different setting? Probably not. I would have to adapt to the — to the circumstances and the facts of the case. Q. What would it depend on? A. It would depend in part on the complexity of the relationship between the price and the cost. Here are the reasons — clear reasons to believe, given the rate setting process, that there is a, if you will, formulaic relationship between costs and premiums. So that's part of the underpinning that led me to believe that there would surely be a relationship, and the question was to what extent are those movements correlated.").

[134] *See id.*

through to its premiums.[135] Dr. Chipty stated in her report that "[t]o the extent health plans like Anthem and Blue Shield would absorb cost increases to compete with Kaiser, pass-through may be less than 100 percent."[136] But she offers no methodology for taking health-plan competition into account in her original regression-analysis model, undermining her model's reliability. *Cf. Lithium Ion Batteries I*, 2017 WL 1391491, at *12 (finding unreliable models where expert acknowledged that certain factors would affect the accuracy of cost data but had no methodology to account for those factors in his analysis).

Dr. Chipty's additional analyses in her reply declaration fare no better. For one health plan, Aetna, Dr. Chipty does not dispute Dr. Willig's analysis estimating a passthrough rate of 30 percent, with a 95-percent confidence interval ranging from negative 16.4 percent and 76.8 percent.[137] Dr. Chipty describes this 30-percent-passthrough rate as being "not statistically different from a pass-through rate as high as 77 percent"[138] — ignoring that, by that same logic, it also is not statistically different from a passthrough rate as low as negative 16.4 percent — and then offers no analysis for how she went from a passthrough rate "as high as 77 percent" to assuming a significantly higher 100-percent-passthrough rate for Aetna in her damages model. Similarly, of the 23 passthrough calculations that she listed in Exhibit 8 of her reply declaration,[139] ▮ of them (i.e., more than ▮ of her results) had 95-percent-confidence intervals whose upper bound fell below 1 — meaning that for those regressions, there was less than a five-percent chance that the actual passthrough rate was as high as 100 percent. Other than saying that these results nevertheless were "near" or "close to" 100 percent[140] — terms she does not define with any precision[141] — she does not explain how these results or her analyses support her decision to

---

[135] *Cf. supra* notes 69–74 and accompanying text (discussing examples where health plans did not pass on costs through to their customers' premiums due to competition from rival health plans).

[136] *See supra* note 67; *see also supra* notes 62, 68.

[137] *See supra* note 88.

[138] *See supra* note 91.

[139] *See supra* note 89.

[140] *See supra* note 95.

[141] *See supra* note 96.

United States District Court
Northern District of California

assume a uniform 100-percent-passthrough rate across all health plans, all business lines, all health-insurance products, in all competitive situations.

The court finds that Dr. Chipty's analyses are insufficient to show that antitrust injury and damages can be established on a class-wide basis. And absent a sound methodology for proving on a class-wide basis what Sutter's overcharges were and how those overcharges were passed through to the class, the plaintiffs have not met their burden of showing that common issues predominate. *Cf. In re Optical Disk Drive I*, 303 F.R.D. at 324 (absent a class-wide methodology for calculating overcharges and passthroughs, the case would result in "'thousands of mini-trials, rendering this case unmanageable and unsuitable for class action treatment'"). The court therefore denies the plaintiffs' motion to certify their proposed class under Rule 23(b)(3). *Cf. In re Lithium Ion Batteries II*, 2018 WL 1156797, at *5 (denying certification due to lack of valid class-wide passthrough model); *In re Lithium Ion Batteries I*, 2017 WL 1391491, at *19 (same); *In re Optical Disk Drive I*, 303 F.R.D. at 324–25 (same).

This denial is without prejudice to the plaintiffs moving to certify a Rule 23(b)(3) class if they are able to make a fuller showing that they can prove antitrust injury and calculate damages on a class-wide basis with a model that addresses the deficiencies the court identified here (and any other deficiencies that may be present elsewhere in their models). *Cf. In re Lithium Ion Batteries I*, 2017 WL 1391491, at *12. This denial also is without prejudice to the plaintiffs moving to certify a Rule 23(b)(3) class for settlement purposes, which does not raise the same manageability issues that certifying a litigation class does. *In re Hyundai and Kia*, 926 F.3d at 556–57 ("The criteria for class certification are applied differently in litigation classes and settlement classes. In deciding whether to certify a litigation class, a district court must be concerned with manageability at trial. However, such manageability is not a concern in certifying a settlement class where, by definition, there will be no trial.").

### 2.2   Acting on Grounds That Apply Generally to the Class — Rule 23(b)(2)

A court may certify a class under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"

"'The key to the (b)(2) class is the 'indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 971 (9th Cir. 2019) (quoting *Wal-Mart*, 564 U.S. at 360). "'In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 360).

Rule 23(b)(2) "does not require [courts] to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010). "'[I]t is sufficient' to meet the requirements of Rule 23(b)(2) that 'class members complain of a pattern or practice that is generally applicable to the class as a whole.'" *Id.* (quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)). "The fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)." *Id.* (citing *Walters*, 145 F.3d at 1047). "Furthermore, unlike actions brought under one of the other 23(b) prongs, 'questions of manageability and judicial economy are irrelevant to 23(b)(2) class actions.'" *Id.* (internal ellipsis omitted) (quoting *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1105 (5th Cir. 1993)).

The Ninth Circuit has recently instructed that courts should not impose a "cohesiveness" requirement in assessing whether certification under Rule 23(b)(2) is appropriate. *Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d 918, 937–38 (9th Cir. 2019) (internal brackets omitted) (quoting Fed. R. Civ. P. 23(b)(2)). "Although common issues must predominate for class certification under Rule 23(b)(3), no such requirement exists under 23(b)(2)." *Id.* at 938 (quoting *Walters*, 145 F.3d at 1047). Instead, "Rule 23(b)(2) . . . requires only that 'the party opposing the class have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Id.* at 928 (internal brackets omitted) (quoting Fed. R. Civ. P. 23(b)(2)). Due to Rule 23(b)(2)'s and Rule 23(b)(3)'s differing requirements, courts have granted motions to certify

putative classes under Rule 23(b)(2) while denying motions to certify the classes under Rule 23(b)(3). *See, e.g.*, *Ang v. Bimbo Bakeries USA, Inc.*, No. 13-cv-01196-HSG, 2018 WL 4181896, at *12, *17 (N.D. Cal. Aug. 31, 2018) (denying certification under Rule 23(b)(3) "[b]ecause Plaintiffs have not shown that the economic harm they allegedly sustained . . . is capable of measurement on a classwide basis" but granting certification under Rule 23(b)(2) because "a single injunction would provide relief to each member of the class") (internal ellipsis omitted); *Campbell v. Facebook Inc.*, 315 F.R.D. 250, 269–70 (N.D. Cal. 2016) (same).

The plaintiffs here seek a single injunction or declaratory judgment — namely, an injunction barring Sutter from engaging in anticompetitive behavior, including its systemwide-contracting practices with their "all-or-nothing," "anti-steering," and "penalty rate" provisions or a declaration that Sutter's practices are anticompetitive and violate the antitrust laws — that would provide relief to each member of the class.[142] They therefore have satisfied the requirement for certifying a class under Rule 23(b)(2). *Cf. In re Qualcomm*, 328 F.R.D. at 318–19 (certifying Rule 23(b)(2) class in antitrust case); *In re TFT-LCD*, 267 F.R.D. at 595–97 (same).[143]

---

[142] The plaintiffs do not need to specify at the class-certification stage the precise injunction they will ultimately seek on the merits. *B.K.*, 922 F.3d at 972.

[143] Sutter argues that the putative class is not sufficiently "cohesive" to be certified under Rule 23(b)(2) and argues that "[t]he need for cohesiveness under (b)(2) is similar to the requirements of 'predominance' and 'superiority' under Rule 23(b)(3)," citing cases from the Third Circuit. Def. MCC Opp'n – ECF No. 445 at 31–32. This argument fails in light of the Ninth Circuit's decision in *Senne*, 934 F.3d at 937–38. Sutter also argues that certification under Rule 23(b)(2) is improper because (so it claims) many class members benefited from its practices. Def. MCC Opp'n – ECF No. 445 at 32. As the court discussed above in the context of Rule 23(a)(4)'s adequacy requirement, Sutter's argument about ostensible "benefit" to some class members from its practices is misplaced. Additionally, arguments that some hypothetical members of the class allegedly benefit from the practices that the class seeks to enjoin and do not want those practices to end do not provide a basis for denying certification under Rule 23(b)(2). *Campbell*, 315 F.R.D. at 269–70 (citing *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 601 (N.D. Cal. 2015)). "[C]lass certification is not a decision on the merits, and the plaintiffs will only be entitled to injunctive relief if such relief is necessary to redress the . . . violations they actually prove at trial." *B.K.*, 922 F.3d at 971.

United States District Court
Northern District of California

## CONCLUSION

The court grants the plaintiffs' motion to certify their proposed class under Rule 23(b)(2) and denies without prejudice their motion to certify their proposed class under Rule 23(b)(3).

**IT IS SO ORDERED.**

Dated: August 30, 2019

_____
LAUREL BEELER
United States Magistrate Judge