CONSTANTINE CANNON LLP
MATTHEW L. CANTOR (*pro hac vice*)
JEAN KIM (*pro hac vice*)
ROSA M. MORALES (*pro hac vice*)
335 Madison Avenue, 9th Floor
New York, NY 10017
(212) 350-2700
(212) 350-2701 (fax)
mcantor@constantinecannon.com
jkim@constantinecannon.com
rmorales@constantinecannon.com

*Lead Counsel for Plaintiffs and the Class*

THE MEHDI FIRM, PC
AZRA Z. MEHDI (220406)
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
(415) 293-8039
(415) 293-8001 fax
azram@themehdifirm.com

*Co-Lead Counsel for Plaintiffs and the Class*

FARMER BROWNSTEIN JAEGER &
GOLDSTEIN LLP
DAVID C. BROWNSTEIN (141929)
WILLIAM S. FARMER (46694)
DAVID M. GOLDSTEIN (142334)
235 Montgomery Street, Suite 835
San Francisco, CA 94104
(415) 795-2050
(415) 520-5678 (fax)
dbrownstein@fbj-law.com
wfarmer@fbj-law.com
dgoldstein@fbj-law.com

*Additional Co-Lead Counsel for Plaintiffs and the Class*

STEYER LOWENTHAL BOODRAKAS
ALVAREZ & SMITH LLP
ALLAN STEYER (100318)
D. SCOTT MACRAE (104663)
JILL MANNING (178849)
SUNEEL JAIN (314558)
235 Pine Street, 15th Floor
San Francisco, CA 94104
(415) 421-3400
(415) 421-2234 (fax)
asteyer@steyerlaw.com
smacrae@steyerlaw.com
jmanning@steyerlaw.com
sjain@steyerlaw.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN HANSEN, DAVID HERMAN, OPTIMUM GRAPHICS, INC., and JOHNSON POOL & SPA, on Behalf of Themselves and All Others Similarly Situated,<br><br>           Plaintiffs,<br><br>   vs.<br><br>SUTTER HEALTH,<br><br>           Defendant. | Case No. 3:12-cv-4854-LB<br><br>**PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION PURSUANT TO FED. R. CIV. P. 23(b)(3)**<br><br>Date: March 26, 2020<br>Time: 9:30 A.M.<br>Judge: The Honorable Laurel Beeler |

1   **NOTICE OF MOTION AND RENEWED MOTION FOR CLASS CERTIFICATION**

2   **PURSUANT TO FED. R. CIV. P. 23(b)(3) TO ALL PARTIES AND THEIR**

3   **COUNSEL OF RECORD:**

4   PLEASE TAKE NOTICE that on March 26, 2020 at 9:30 a.m., or on such other date and

5   time as may be specified by the Court, in the Courtroom of the Honorable Laurel Beeler, United

6   States District Court for the Northern District of California, First Street Courthouse, Courtroom C-

7   15th Floor, 450 Golden Gate Avenue, San Francisco, CA 90102, the certified Rule 23(b)(2) Class

8   and Plaintiffs Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Johnson Pool & Spa

9   and Optimum Graphics, on behalf of themselves and all others similarly situated, will and hereby

10   do move for certification of a class pursuant to Fed. R. Civ. P. 23(b)(3).

11   Plaintiffs' Motion is based upon this Notice of Motion and the following concurrently filed

12   documents, as well as all of the papers and pleadings on file in this action, including those that are

13   cross-referenced in these papers and pleadings and upon such other and further evidence as the

14   Court may be presented at the time of the hearing:

15   1)   Memorandum of Points and Authorities in Support of Plaintiffs' Renewed Motion To

16       Certify a Rule 23(b)(3) Class;

17   2)   Declaration of Matthew L. Cantor in Support of Plaintiffs' Renewed Motion To Certify a

18       Rule 23(b)(3) Class and the exhibits thereto;

19   3)   Supplemental Declaration of Tasneem Chipty, Ph.D. in Support of Plaintiffs' Renewed

20       Motion to Certify a Rule 23(b)(3) Class; and

21   4)   [Proposed] Order Granting Plaintiffs' Renewed Motion To Certify a Rule 23(b)(3) Class.

22   Plaintiffs respectfully request that this Court enter an Order (1) granting certification of a

23   class pursuant to Federal Rule of Civil Procedure 23(b)(3), and (2) appointing Constantine Cannon

24   LLP as Lead Counsel and The Mehdi Firm as Co-Lead Counsel for the Rule 23(b)(3) Class.

25

26

27

28

1

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................................1

STATEMENT OF FACTS .....................................................................................................4

    I.    The Order .............................................................................................................4

        A.    The Court Held That Plaintiffs' Theory of Class-Wide Injury Is Supported. ............................................................................................4

        B.    The Court's Holdings Concerning Dr. Chipty's Econometric Models ..............5

    II.    Common Evidence Can Be Used To Show That All Class Health Plans Have Incurred Sutter IHS Overcharges ........................................................................6

        A.    Dr. Chipty Estimated Sutter IHS Overcharges Incurred by Each Class Health Plan. ...............................................................................6

        B.    Common Evidence Supports Dr. Chipty's Estimates of Sutter IHS Overcharges. ......................................................................................8

        C.    Plaintiffs Do Not and Need Not Propose Additional Models to Account for Regression Estimates Related to Sutter Santa Rosa Pricing. ......................9

    III.    Dr. Chipty's Supplemental Econometric Analyses Further Evidence That Uniformly High and Significant Overcharges Are Passed Through to Class Members .......................................................................................................9

    IV.    Common Evidence Shows That Sutter Overcharges Were Passed Through To Class Members In a Uniformly High and Significant Manner. ...................................12

        A.    Dr. Chipty's Prior Regressions Provide Common Evidence of Uniformly High and Significant Pass-Through. ...............................................12

        B.    This Case Concerns A Simple Distribution Model........................................13

        C.    Actuarial Testimony and Expert Opinions Are Common Evidence of Uniformly High and Significant Pass-through. ..........................................13

        D.    Health Plan Testimony and Documents Are Common Evidence of Uniformly High and Significant Pass-Through. ..........................................15

        E.    Sutter Admissions Are Common Evidence of Uniformly High and Significant Pass-Through. ...........................................................................16

    V.    Dr. Chipty's Calculation of Damages .................................................................17

ARGUMENT ......................................................................................................................17

    I.    LEGAL STANDARDS .......................................................................................17

    II.    PLAINTIFFS HAVE PROVIDED COMMON EVIDENCE THAT CLASS MEMBERS HAVE SUFFERED A COMMON IMPACT. ......................................18

|   |   |   |
|---|---|---|
| A. | Plaintiffs Have Put Forth Common Evidence That All Class Health Plans Have Been Overcharged by Sutter As A Result of Its Conduct. | 19 |
| 1. | Plaintiffs' Theory of Sutter Overcharges to Health Plans Is Supported by Evidence | 19 |
| 2. | Dr. Chipty's Regressions Are Common Evidence That Sutter Has Overcharged All Class Health Plans | 20 |
| 3. | Common Record Evidence Demonstrates That the Class Health Plans Have Been Overcharged by Sutter. | 20 |
| B. | Common Evidence Shows That Sutter Overcharges to Class Health Plans Were Passed Through to Class Members. | 21 |
| 1. | Dr. Chipty's Economic Work Demonstrates Uniformly High and Positive Rates of Pass-Through. | 21 |
| 2. | Sutter Admissions and Other Class Health Plan Evidence Demonstrates Substantial Pass-Through. | 25 |
| III. | PLAINTIFFS HAVE A COMMON METHOD FOR REASONABLY ESTIMATING DAMAGES. | 26 |
| IV. | A CLASS ACTION PROVIDES A SUPERIOR MECHANISM TO LITIGATE CLASS MEMBER CLAIMS. | 27 |
| CONCLUSION | | 28 |

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Amgen Inc. v. Conn. Re. Plans and Tr. Funds,*
    568 U.S. 455 .................................................................................................... 18

4

5

*Apple iPod iTunes Antitrust Litig.,*
    No. 05-00037-JW, 2011 WL 5864036 (N.D. Cal. Nov. 22, 2011).......................... 27

6

*Bigelow v. RKO Radio Pictures,*
    327 U.S. 251 (1946).............................................................................................. 26

7

8

*Briseno v. ConAgra Foods, Inc.,*
    844 F.3d 1121 (9th Cir. 2017) .............................................................................. 28

9

*Comcast v. Behrend,*
    569 U.S. 27 (2013)................................................................................................ 26

10

11

*In re Capacitors Antitrust Litig.,*
    Case No. 17-md-02801-JD, 2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) .......... 17, 23

12

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
    No. MDL 1917, 2013 WL 5429718 (N.D. Cal. June 20, 2013) .............. 20, 22, 23, 24

13

14

*In re Cathode Ray Tube Antitrust Litig.,*
    308 F.R.D. 606 (N.D. Cal. 2013)................................................... 17, 18, 19, 28

15

*In re Cipro Cases I & II,*
    121 Cal. App. 4th 402 (2004) .............................................................................. 19

16

17

*In re Graphics Processing Units Antitrust Litig.,*
    253 F.R.D. 478 (N.D. Cal. 2008).......................................................................... 26

18

*In re High-Tech Emp. Antitrust Litig.,*
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) ......................................................... 21, 28

19

20

*In re Korean Ramen Antitrust Litig.,*
    No. 13-CV-04115-WHO, 2017 WL 235052 (N.D. Cal. Jan. 19, 2017) .................... 22

21

*In re Lidoderm Antitrust Litig.,*
    No. 14-MD-02521-WHO, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ............. 23, 28

22

23

*In re Lithium Ion Batteries,*
    No. 13-MD-2420 YGR, 2018 WL 1156797 (N.D. Cal. Mar. 5, 2018) ..................... 26

24

*In re Online DVD Rental Antitrust Litig.,*
    No. M 09-2029 PJH, 2010 WL 5396064 (N.D. Cal. Dec. 23, 2010) ....................... 18

25

*In re Optical Disk Drive Antitrust Litig.,*
    303 F.R.D. 311 (N.D. Cal. 2014)........................................................................... 26

26

27

*In re Optical Disk Drive Antitrust Litig.,*
    Case No. 3:10-md-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016)................ *passim*

28

*In re Packaged Seafood Prods. Antitrust Litig.*,
  No. 15-MD-2670 JLS (MDD), 2019 WL 3429174 (S.D. Cal. July 30, 2019) .................. 22, 23, 25

*In re Qualcomm Antitrust Litig.*,
  328 F.R.D. 294 (N.D. Cal. 2018) ................................................................................. *passim*

*In re Reformulated Gasoline (RFG) Antitrust & Patent Litig.*,
  No. CV-05-01671 CAS (VBKX), 2007 WL 8056980 (C.D. Cal. Mar. 27, 2007) ...................... 22

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) .................................................................. 18, 20, 23, 27

*In re Static Random Access Memory Antitrust Litig.*,
  No. C07-01819 CW, 2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) ............................................ 27

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) ................................................................................. *passim*

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) ........................................................................................... 28

*J. Truett Payne Co. Inc. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) ......................................................................................................... 26

*Kleen Prod. LLC v. Int'l Paper*,
  306 F.R.D. 585 (N.D. Ill. 2015) ...................................................................................... 21

*Lambert v. Nutraceutical Corp.*,
  870 F.3d 1170 (9th Cir. 2017) .................................................................................... 3, 26

*Leyva v. Medline Indus., Inc.*,
  716 F.3d 510 (9th Cir. 2013) ........................................................................................... 27

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ........................................................................................... 20

*Nitsch v. Dreamworks Animation SKG Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016) ..................................................................................... 27

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
  282 U.S. 555 (1931) ................................................................................................. 18, 26

*Tyson Foods, Inc. v. Bouapheakeo*,
  136 S.Ct. 1036 (2016) ..................................................................................................... 17

*Wortman v. Air New Zealand*,
  326 F.R.D. 549 (N.D. Cal. 2018) ........................................................................ 23, 24, 28

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) ........................................................................................................ 26

**Rules**

Fed. R. Civ. P. 23 ..................................................................................................................... 1

Fed. R. Civ. P. 23(a) ................................................................................................................ 4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Fed. R. Civ. P. 23(b)(2)................................................................................................................. 1, 4

Fed. R. Civ. P. 23(b)(3)................................................................................................................. *passim*

**PRELIMINARY STATEMENT**

In its August 30, 2019 Class Order (the "Order"), the Court certified an injunction class under Fed R. Civ. P. 23(b)(2), and denied, without prejudice, Plaintiffs' motion to certify a damages class under Fed. R. Civ. P. 23.  ECF No. 698.  The Court invited Plaintiffs to renew their motion for Rule 23(b)(3) certification by submitting additional evidence showing that Sutter's anticompetitive conduct commonly impacted Class Members and that Plaintiffs' common economic model can reasonably estimate damages for Class Members that paid premiums to all five Class Health Plans.[1] Plaintiffs respond to this invitation by submitting substantial, supplemental econometric analyses from their expert, Dr. Tasneem Chipty, that easily satisfy Rule 23(b)(3) standards.

Dr. Chipty's supplemental econometric analyses address issues previously raised by the Court relevant to Plaintiffs' econometric evidence.  ***They apply her common overcharge regression model to one hundred percent of relevant paid claims data, produced by all five relevant Class Health Plans***, and demonstrate that Sutter imposed supra-competitive Inpatient Hospital Services ("IHS") prices on each of the Class Health Plans.  They also econometrically estimate the amount of Sutter IHS overcharges that were passed through to Class Members in the form of higher premiums. They do this by applying a ***pass-through regression model to comprehensive data on premium revenues accrued and total medical costs incurred by the Class Health Plans for all of their business lines*** that Class Health Plans submitted to the federal government to ensure compliance with the Affordable Care Act ("ACA").  ***Dr. Chipty's supplemental analyses calculate specific pass-through rates (1) for each Class Health Plan, and (2) for each of their lines of business (i.e., Individual, Small and Large Group), while controlling for various product, competition-related and temporal characteristics***.  Importantly, Dr. Chipty's analyses of these data and her corroborating analyses of transaction data produced by Class Health Plans illustrate that Sutter overcharges are significantly passed through to all Class Members, irrespective of the degree of competition from (a) the Kaiser Permanente health plan or (b) non-Kaiser health plans.  Dr. Chipty's supplemental econometric analyses demonstrate that pass-through is uniformly high and significant for each Class Health Plan and each of their lines of business, and she conservatively estimates that,

---

[1]  The "Class Health Plans" are Anthem Blue Cross, Blue Shield of California, Health Net, United HealthCare, and Aetna.

1   on a weighted average basis, 97.16% of Sutter IHS overcharges are passed through to all Class

2   Members.  Consequently, these supplemental analyses confirm that Class Members have been

3   commonly impacted by Sutter's conduct and that Plaintiffs have a substantial model by which they

4   can plausibly estimate Class Member damages.

5          Specifically, the Court stated that, for Plaintiffs to prevail on their Rule 23(b)(3) bid, Dr.

6   Chipty should show that her overcharge regression model could be applied to data for the entire

7   Class.  Order at 50.  Dr. Chipty had, on Plaintiffs' prior Class Motion, estimated overcharges

8   relevant to 70% of Class Members, utilizing Anthem and Blue Shield (but not Aetna, HealthNet, and

9   United Healthcare ("UHC")) paid claims data.  Order at 42-43.  However, following the submission

10  of that Motion, in her April 22, 2019 Merits Report, Dr. Chipty applied her common overcharge

11  model to *all* of the Class Health Plans using data produced by each plan that collectively amount to

12  tens of millions of lines of paid claims.  Accordingly, Dr. Chipty's regression methodology, which

13  identifies and quantifies Sutter overcharges incurred by all Class Health Plans, fully addresses the

14  Court's prior concern regarding the applicability of Dr. Chipty's overcharge model to data from all

15  Class Health Plans. Order at 50.

16         The Court also suggested that Plaintiffs should provide additional mathematics "proving or

17  calculating how the overcharges were passed through" on average.  Order at 42.  Plaintiffs need not

18  provide additional evidence of pass-through in order to prove whether Class Members ultimately

19  paid *some* Sutter IHS overcharges, *i.e.*, whether they incurred common injury.  There is no serious

20  dispute over whether premiums generally increase when health plan medical costs do.  *See* Order at

21  47.  Sutter's expert, Dr. Robert Willig, admitted that "███████████████████████████████

22  ████████████████████████████████████████████████████████" (Ex. P5 ("Willig Decl.") ¶ 65),[2]

23  and other common evidence from Health Plans and Sutter supports this as well.  The primary issue

24  to which Dr. Chipty's analysis of the ***average level*** of pass-through applies concerns ***the estimated***

25  ***amount of damages*** that Class Members sustained.

26

27  [2]  References to "Ex." or "Exs." are to the Declaration of Matthew L. Cantor in Support of Renewed
    Motion To Certify A Rule 23(b)(3) Class, dated November 18, 2019 ("Cantor Decl.").  References
    to "Willig Decl." are to the Declaration of Sutter's expert, Robert Willig, Ph.D., dated November 8,
28  2018, submitted in support of Sutter's Opposition to Plaintiffs' Motion for Class Certification, ECF
    No. 446.

1    Consequently, Plaintiffs' model for estimating the average pass-through rate must be

2    adjudged under standards that govern antitrust damage claims – standards that are much more lenient

3    than those that govern whether plaintiffs have suffered antitrust impact *at all*.   Under longstanding

4    Supreme Court precedent, Plaintiffs must merely set forth a reasonable way to estimate monetary

5    losses; they need not calculate them with scientific precision.   As this Court held, "uncertainty

6    regarding class members' damages does not prevent certification . . . as long as a valid method has

7    been proposed for calculating those damages."  Order at 40 (quoting *Lambert v. Nutraceutical Corp.*

8    870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd on other grounds,* 139 S. Ct. 710 (2019)).

9    The econometric evidence presented here far exceeds that which is required to prove

10   damages on a class basis.   The pass-through analyses set forth in the Supplemental Declaration of

11   Dr. Chipty filed in support of this motion ("Chipty Supp.")[3] are far more rigorous and exacting than

12   the methods used for estimating pass-through rates in *In re Qualcomm Antitrust Litig.*, 328 F.R.D.

13   80, 301-04 (N.D. Cal. 2018) and *In re Optical Disk Drive Antitrust Litig.*, Case No. 3:10-md-2143

14   RS, 2016 WL 467444, *11 (N.D. Cal. Feb. 8, 2016) (*"ODD II"*), decisions granting Rule 23(b)(3)

15   certification to which the Court pointed.   The data that the plaintiffs' expert used, for example, in

16   *Qualcomm* only related to a small fraction of relevant product sales, and that expert did not account

17   for how competition at the retail level affected prices, let alone pass-through rates.   Dr. Chipty's

18   regression analysis, by contrast, relies on data pertaining to over 99.9% percent of Class Health Plan

19   sales from 2011 to 2018.   Her pass-through analysis accounts for competition and tests whether

20   competition significantly impacts pass-through.   It shows significant rates of pass-through of Sutter

21   overcharges, regardless of the Health Plan at issue, the type of group to which the Class Member

22   belonged, or the effect of competition.   And it confirms what numerous market actors concluded as a

23   foundation for their strategic business decisions – that Sutter's supracompetitive prices were passed

24   through to, and ultimately borne by, Class Members.

25   Moreover, Dr. Chipty's econometric analyses are consistent with Court statements

26   recognizing that Plaintiffs and Dr. Chipty previously presented common proof that Sutter's conduct

27   had resulted in overcharges to all Class Members.   The Court noted the common evidence that

28

---

[3] References to the "Chipty Supp." are to the Supplemental Declaration of Dr. Tasneem Chipty in
Support of Plaintiffs' Renewed Motion for Class Certification, dated November 18, 2019.

1    showed that, in a world absent Sutter's tying arrangements and anti-steering restrictions, Class

2    Health Plans would have paid less for Sutter IHS.  It found that "[t]he plaintiffs and Dr. Chipty

3    sufficiently support their position that Sutter would [have] respond[ed] to a threatened loss of patient

4    volume" from actual or potential steering or network exclusion prevented by Sutter's conduct ". . .

5    by lowering, not raising, its prices" to Class Health Plans.  Order at 37.  The Court also

6    acknowledged the common evidence showing that Class Health Plans, passed through on average, at

7    least some amount of Sutter's overcharges to Class Members: it pointed to evidence that "[Health

8    Plan] premiums generally increase when their costs increase." Order at 47.  Dr. Chipty's

9    supplemental analyses provide further evidence that the Class suffered common impact from Sutter's

10    anticompetitive conduct.

11          Without class certification, hundreds of thousands of employers and individuals will have no

12    recourse to remedy the harm that Sutter caused them.  Given the governing law, the substantial

13    economic and record evidence supporting certification, and the fact that a class proceeding here

14    provides a far more efficient mechanism than individual litigation for adjudicating the proposed

15    Class' well-supported claims, the Rule 23(b)(3) Class should be certified.[4]

16                              **STATEMENT OF FACTS**

17    **I.    The Order**

18          **A.  The Court Held That Plaintiffs' Theory of Class-Wide Injury Is Supported.**

19          In the Order, the Court found that Plaintiffs had satisfied Rule 23(a) and (b)(2) and thus

20    certified a Class.  The Court denied Rule 23(b)(3) certification, but invited Plaintiffs to "make a

21    fuller showing that they can prove antitrust injury and calculate damages on a class-wide basis."

22    Order at 50.

23          The Court recognized the validity of Plaintiffs' theory of injury:

24                . . . in the but-for world, health plans would offer narrow policies that exclude some
                  Sutter hospitals . . . in addition to . . . broader policies they currently offer that include
25                Sutter hospitals in-network. . . .  [Sutter's] loss in patient volume . . . would [then]
                  pressure Sutter to lower its supra-competitive prices, so that health plans could in turn
26

27    ───────────────────
      [4]  Sutter recently settled, in state court, claims brought by the California Attorney General and a
28    certified class of self-insured entities that concern the same Sutter conduct challenged by Plaintiffs
      here.  We understand that the terms of the proposed settlement will be filed publicly in December
      2019 as part of a motion for preliminary settlement approval.

1  lower the premiums. . . .   Those lower prices and premiums would benefit *all* class
   members.

2  *Id.* at 35-36 (emphasis added).  In so doing, it rejected arguments posed by Sutter and Dr. Willig

3  that (1) Sutter's conduct benefits certain class members that desire to visit Sutter's hospitals more

4  than it harms them, and (2) Sutter might have increased, rather than reduced, its prices in a world

5  absent the challenged conduct.  The Court found that, for class purposes, "plaintiffs and Dr. Chipty

6  sufficiently support their position that Sutter would respond to a threatened loss of patient volume

7  by lowering, not raising, its prices."  *Id.* at 37.  The Court also rejected Sutter's arguments that there

8  are class conflicts between employers and employees that "split" premiums.  *Id.* at 34.

9      **B.  The Court's Holdings Concerning Dr. Chipty's Econometric Models.**

10     The Order focused on two aspects of Plaintiffs' proposed methodology for assessing

11 antitrust injury and calculating damages.  First, while the Court acknowledged that Dr. Chipty had

12 calculated Sutter IHS overcharges to Anthem and Blue Shield, it held that Dr. Chipty had not

13 shown that her overcharge model could be applied to Aetna, Health Net or UHC.  *Id.* at 42-43.[5]

14 The Court stated that, to certify a Rule 23(b)(3) class, Plaintiffs should demonstrate that their

15 damages model could be applied to these Class Health Plans.

16     Second, the Court stated that Dr. Chipty had "assumed" a uniform 100 percent pass-through

17 of overcharges and a formulaic relationship between Sutter's overcharges and premiums.  Dr.

18 Chipty's estimate that approximately 100 percent of Sutter IHS overcharges had been passed

19 through to Class Members was, however, based upon substantial economic and record evidence: it

20 was not a bare assumption.  This evidence included: (i) 23 pass-through regressions that she had

21 completed consistent with a finding of 100 percent pass-through; (ii) facts regarding the relatively

22 simple distribution scheme at issue; (iii) the testimony of Class Health Plan actuaries and Plaintiffs'

23 actuarial expert, David Axene, that confirmed the *formulaic manner* in which premiums are set and,

24 in particular, that IHS costs are a direct input into the premium equation; (iv) the regulations that

25 require that medical expenses incurred by Health Plans account for the vast majority of premiums;

26 and (v) admissions from Sutter executives, other Class Health Plan testimony, and ordinary course

27 documents that established substantial pass-through.

28

---

[5] Dr. Chipty had, in deposition testimony, affirmed that she expected that her model could be used to calculate overcharges relevant to all Class Health Plans.  Ex. P6 (12/20/2018 Chipty Dep.) at 678.

There is no dispute that, at least, some pass-through of medical expenses, including IHS expenses, to premium payors occurs.  Dr. Willig admitted that ███████████████ ██████████████████████████████████████████  Ex. P5 (Willig Decl.) ¶ 65.  *See also* Ex. P7 (*amici curiae* brief filed by Sutter's economist expert, Dr. Gautam Gowrisankaran, and others in *St. Luke's* case) at 3 ("Higher [provider] reimbursements lead to higher [health plan] costs [and] higher premiums . . . all else being equal.").  And the Court acknowledged common evidence demonstrating that "premiums generally increase when their costs increase" and, as a result, that some degree of pass-through to premium payors occurs when Health Plan costs are increased.  Order at 47.  To certify a Rule 23(b)(3) class, the Court, nonetheless, sought additional evidence showing that Dr. Chipty had a plausible method to estimate the *degree* (or percentage) of Sutter IHS overcharges that were passed through to Class Members.  *See* Order at 42, 47.

## II.   Common Evidence Can Be Used To Show That All Class Health Plans Have Incurred Sutter IHS Overcharges

### A.   Dr. Chipty Estimated Sutter IHS Overcharges Incurred by Each Class Health Plan.

In her prior Class Declarations, Dr. Chipty described her regression methodology for calculating Sutter IHS overcharges incurred by each Class Health Plan.  This regression model calculates the IHS prices that would have prevailed at Sutter Damages Hospitals in a world absent Sutter's anticompetitive conduct and compares them to actual Damages Hospital IHS prices.  To apply that model, Dr. Chipty studied price differences between each of the Sutter Damages Hospitals (Alta Bates-Main, Alta Bates-Summit, CPMC–Main, CPMC-St. Luke's, Sutter Modesto, Sutter Sacramento and Sutter Santa Rosa) and a group of approximately ninety (90) Northern California "benchmark" hospitals that resemble Sutter hospitals, but have not imposed the panoply of systemwide, contractual restrictions that Sutter has imposed upon Class Health Plans.  *See* Exs. P1 (Chipty Class) at pp. 51-73; P2 (Chipty Reply)[6] at pp. 90-94 & Ex. E3.  To isolate Sutter IHS overcharges, Dr. Chipty applied ten (10) commonly-used explanatory variables to control for factors that might affect hospital prices, but are unrelated to the challenged conduct.  Ex. P1 (Chipty

---

[6]  References to "Chipty Class" are to the Declaration of Tasneem Chipty, Ph.D., in support of Plaintiffs' Motion for Class Certification, dated June 21, 2018, ECF No. 348-3.  References to "Chipty Reply" are to the Reply Declaration of Tasneem Chipty, Ph.D., in further support of Plaintiffs' Motion for Class Certification, dated November 26, 2018, ECF No. 462-3.

1   Class) ¶¶ 98-99; Order at 16 n.41.

2          For Plaintiffs' original class motion, Dr. Chipty applied her regression model and calculated

3   Sutter overcharges to Blue Shield and Anthem.  The other three Class Health Plans had not

4   produced all relevant data by that time, and Anthem and Blue Shield members represented

5   approximately 70% of the Class.  Ex. P2 (Chipty Reply) ¶ 13.  However, after all claims data were

6   produced, in her April 22, 2019 Merits Report, Dr. Chipty applied her regression model to claims

7   data from *all Class Health Plans*.  Ex. P3 (Chipty Merits)[7] ¶¶ 210-223 & Ex. 25 at p. 210.[8]  *See also*

8   Chipty Supp. ¶¶ 4, 6 & Ex. 1 at p. 5.

9           In conducting her overcharge regressions, Dr. Chipty processed data containing over **120**

10  **million claims** across all Class Health Plans, and analyzed 100 percent of the useable claims data

11  relevant to Class Members.  Ex. P3 (Chipty Merits) ¶ 7.  She estimated Sutter overcharges for each

12  Class Health Plan for each year of the relevant damages period.  *See id.* at p. 210 (Ex. 25 – showing

13  overcharges for each Class Health Plan at each of the Sutter Damages Hospitals) & Appendix J

14  (showing overcharge percentages calculated for each Class Health Plan).[9]  The following shows the

15  average overcharge percentages that Class Health Plans incurred for services rendered to their

16  members at each of the Sutter Damages Hospitals during the damages period:

17

18

19

20

21

22  [7]  References to the "Chipty Merits" are to the Merits Report of Tasneem Chipty, Ph.D., dated April
23  22, 2019.

24  [8]  In response to Dr. Willig's comments about her overcharge regression model, Dr. Chipty made
    some minor modifications.  For example, she calculated overcharges in her Merits Report by pooling
25  data among the Class Health Plans in order to calculate case-mix index for various hospitals.  Dr.
    Willig used this pooling technique in his Sur-Reply Report.  Ex. P3 (Chipty Merits) ¶¶ 219-220.

26  [9] Dr. Chipty uses aggregated case-mix adjusted hospital prices for her overcharge regression.  The
    use of such data is supported by industry literature and evidence, including the fact that "[h]ospitals,
27  including Sutter, negotiate price increases at the hospital system level."  *See* Ex. P2 (Chipty Reply)
    ¶¶ 115-130.  Dr. Chipty has also demonstrated that the "claim level regressions" that Dr. Willig
28  favors for determining whether overcharges exist "fail to detect overcharges even when they exist"
    and have been criticized by econometricians.  *Id.* ¶¶ 125 & ¶¶ 124-132, pp. 77-83.



**Exhibit 25**
**Overcharge Estimates by Health Plan**
**Based on Combined (In Sample) Model**

Ex. P3 (Chipty Merits) at p. 210.

**B.  Common Evidence Supports Dr. Chipty's Estimates of Sutter IHS Overcharges.**

Dr. Chipty's estimates of Sutter overcharges to Class Health Plans are consistent with substantial record evidence.  This evidence from both the Class Health Plans and Sutter demonstrates that Sutter's prices were higher when compared to other Northern California hospitals.  *See* Exs. P1 (Chipty Class) ¶¶ 64-73; P2 (Chipty Reply) ¶¶ 108-113 & Appendix D; P3 (Chipty Merits) ¶¶ 199-205 & Appendix F; P9 - P31 (Class Health Plan and Sutter evidence).[10]  Dr. Chipty analyzed this evidence and observed that her overcharge estimates were "in line with [] substantial qualitative . . . evidence."  She concluded that "[t]he fact that both the quantitative and qualitative evidence align provides additional support for the regression model."  Ex. P3 (Chipty Merits) ¶ 223.

---

[10]  *See* Cantor Decl. for pin-cites to these and other exhibits.  Pin-cites in the Cantor Decl. are also "bookmarked" per the Court's November 10, 2019 Order, ECF No. 716.

### C.  Plaintiffs Do Not and Need Not Propose Additional Models to Account for Regression Estimates Related to Sutter Santa Rosa Pricing.

The Court's Order asked whether Plaintiffs intended to propose additional overcharge models for specific hospitals or Health Plans because Dr. Chipty's regression did not detect statistically significant overcharges for Sutter Santa Rosa for certain plans.  Order at 43 n.127.  The answer is no.  Plaintiffs do not intend to propose such additional models and need not do so.

Dr. Chipty recognizes that her regression was unable to reliably measure statistically significant overcharges for Sutter Santa Rosa for any plan other than Anthem.  Exs. P3 (Chipty Merits) ¶ 211; P2 (Chipty Reply) ¶ 151 n.321.  Accordingly, to be conservative and because Sutter Santa Rosa accounted for a very small portion (approximately 4%) of relevant IHS spend by the Class Health Plans, Plaintiffs do not seek to recover overcharges caused by Santa Rosa (even though Anthem members were harmed by these overcharges).  Dr. Chipty has explained that the inability to calculate an overcharge for Sutter Santa Rosa does <u>not</u> indicate a lack of impact for any particular group of Class Members. Ex. P3 (Chipty Merits) ¶ 212.[11]

### III.   Dr. Chipty's Supplemental Econometric Analyses Further Evidence That Uniformly High and Significant Overcharges Are Passed Through to Class Members.

Dr. Chipty performed supplemental pass-through analyses using comprehensive data reflecting underlying transactions from each Class Health Plan.  These analyses resemble, but are more rigorous than, the pass-through analyses courts have relied upon to certify classes, such as the classes in *Qualcomm* and *ODD II*.

To estimate, as precisely as possible, the percentage of IHS overcharges that were passed through to premiums, Dr. Chipty sought a complete and credible data set that was common to all Class Health Plans.  She specifically sought a data set that identified both the total medical costs that

---

[11]  Plaintiffs' damages model mimics how premiums are calculated.  Premiums take into account ***the total amount of medical expenses*** incurred by Class Health Plans for their particular groups.  Accordingly, it is *the total amount of Sutter Damages Hospitals overcharges* incurred by Class Health Plans for its particular groups -- not the amount of overcharges incurred by the Class Health Plans for any particular Sutter Hospital (such as Santa Rosa) -- that impact premiums paid by Class Members.  *See also* Chipty Supp. n.12 at p. 12 & ¶¶ 8, 20.  *See, e.g.,* Ex. P1 (Chipty Class) Ex. 20 at p. 90 (showing how Anthem Small Group members attached to RA 2 in 2012 incurred anticompetitive impact and damages: overcharge calculations for IHS services rendered to these members from Sutter Damages Hospitals sum up to ▓▓▓▓▓ even though they did not incur overcharges from Sutter Santa Rosa).

1   Class Health Plans paid and all premiums that they charged for each of their business lines and

2   products.[12]  Chipty Supp. ¶ 13.  Dr. Chipty, moreover, sought a data set that would enable her to

3   estimate the degree of medical cost pass-through via an econometric method that controlled for

4   various characteristics relevant to insurance products sold by all Class Health Plans and account for

5   the effect Kaiser and non-Kaiser plan competition may have had on pass-through rates.  Chipty

6   Supp. ¶¶ 13, 14.

7   　　　To that end, Dr. Chipty chose, for her supplemental econometric analyses of pass-through, to

8   analyze the comprehensive transaction data that health plans file each year with the Centers of

9   Medicare and Medicaid Studies ("CMS") to ensure compliance with the ACA's so-called Medical

10   Loss Ratio ("MLR") provisions (the "MLR Data").  The ACA's MLR provisions require that 80% of

11   a premium charged by health plans for Individual or Small Group products be made up of medical

12   costs and 85% of premiums charged for Large Group products be made up of medical costs.  *See*

13   CMS "Medical Loss Ratio," *available at* https://www.cms.gov/CCIIO/Programs-and-

14   Initiatives/Health-Insurance-Market-Reforms/Medical-Loss-Ratio.html (last visited Nov. 18, 2019).

15   The MLR Data has substantial credibility, as such data is filed by the Class Health Plans with CMS.

16   It sets forth the total medical costs that a Class Health Plan paid for a particular line of business and

17   the corresponding total premiums that it received for it.  Moreover, the MLR Data allow for

18   disaggregation by Class Health Plan, line of business, and California regulator responsible for the

19   product offering.

20   　　　Dr. Chipty then constructed a multi-variable regression model that includes controls for costs

21   along with multiple other explanatory variables, including (1) a control for the Class Health Plan, (2)

22   a set of controls for the line-of-business (*i.e.*, Individual, Small, and Large Group), (3) a proxy for

23   product type (*i.e.*, HMO or PPO); and a (4) a time trend to control for temporal changes over the

24   examined period.  Chipty Supp. ¶ 66.  Further, as Dr. Chipty explains, the cost variable in the

───────────────────────────────

25   [12]  The best way to estimate the pass-through rate of Sutter IHS overcharges to Class Members is to

26   assess the rate at which total medical costs are passed through to premiums.  *See* Chipty Supp. ¶¶ 40-
    42, 58.  Dr. Chipty's prior analyses, including her analyses of (1) Uniform Rate Review Templates

27   (URRTs) filed with California (Exs. P2; P1 (Chipty Class) Ex. 17 at p. 81), (2) Blue Shield Large
    Group Data (Ex. P2 (Chipty Reply) Ex. 8 at p. 48,); and ███████████████

28   ██████████████████████████ (Exs. P57; P1 (Chipty Class) Ex. 16 at p. 78) all look
    at the rate at which total medical costs was passed through.  *See* Order at 22-25.

regression model controls for one aspect of benefit design.  Moreover, she controls for competition

from Kaiser in three ways: (1) in her baseline specification, she controls for it through the

explanatory variables for line-of-business and product type, because Kaiser has a greater competitive

presence in the Large Group line (than in other lines of business) and Kaiser insurance products are

predominantly HMO; (2) in an alternative specification, she controls for an HHI measure for

concentration (which controls for competition from non-Kaiser Plans as well); and (3) in another

alternative specification, she controls directly for Kaiser share.  Chipty Supp. ¶¶ 66-69, 73 &

Appendix D.  All three of her regression models, when applying the MLR Data, empirically

illustrate that pass-through to all Class Members was uniformly high and positive, notwithstanding

any impact on pass-through from competition from the Kaiser health plan and non-Kaiser health

plans, including at levels of market shares observed in Class Members' Rating Areas ("RAs").

Chipty Supp. ¶¶ 67-70 & Exs. 4 & 5 at pp. 43-44.[13]  Her baseline model yields the following Class

Health Plan specific pass-through rates of 102.31% for Anthem; 97.89% for Blue Shield; 83.11% for

Health Net; 106.97% for Aetna; and 102.10% for UHC.  It also yields a weighted average pass-

through rate of 97.16% for all Class Members.  Chipty Supp. ¶ 70 & Ex. 6.[14]

Dr. Chipty did not stop with her MLR Data regressions in assessing pass-through.  She also

analyzed hospital paid claims and production data produced from various Class Health Plan

segments (as the data relevant to those segments was useable for pass-through analysis) to estimate

pass-through using a series of regressions of tailored subsamples that implicitly control for multiple

explanatory variables.  Chipty Supp. ¶¶ 76-81.  The results of that analysis, in addition to other

regression analyses that she completed of this data, further confirm that pass-through is uniformly

positive and significant in the Class RAs, regardless of competition from Kaiser and non-Kaiser

---

[13]  Like the URRT data and Blue Shield Large Group data that Dr. Chipty previously analyzed for estimating pass-through, the MLR Data provides state-wide information on total cost and premiums. Chipty Supp. ¶ 13.  The MLR Data, however, contains information that allows her to account the degree of competition from Kaiser and non-Kaiser health plans.  Accordingly, Dr. Chipty was able, using the MLR Data, to assess whether Kaiser share or market concentration of non-Kaiser plans at levels observed in the Class RAs substantially impacted pass-through rates. Chipty Supp. ¶¶ 66, 73 & Appendix D.

[14]  When calculating the weighted average pass-through rate, Dr. Chipty conservatively capped individual Class Health Plan pass-through rates at 100%.  Chipty Supp. ¶¶ 11, 70. Dr. Flamm did not do this in *Qualcomm*.

Plans.  Chipty Supp. ¶¶ 79-81, Exs. 8-10 at pp. 52-54.

Notably, Dr. Chipty's econometric studies are far more rigorous than those used by Dr. Flamm in *Qualcomm*.  First, Dr. Chipty uses a much more comprehensive data set to calculate pass-through rates than did Dr. Flamm.  Dr. Flamm relied on a "miniscule" sampling of data representing "as little as 0.1% of Relevant Cellular Phone sales for some distribution channels" and while he "claim[ed] to have data representing 'approximately 90% of total cell phone sales' in the United States . . . he drop[ped] the vast majority of these data, ultimately using only data representing 7.3% of all Relevant Cellular Devices sales by OEMs."  Ex. P8 (Flamm *Daubert* Mot.) at 2, 4-5.  By contrast, Dr. Chipty utilized over 99.9% of the MLR Data over the period 2011 to 2018 from all five relevant distributors (*i.e.,* the Class Health Plans) in estimating pass-through rates.  Chipty Supp. ¶ 57.  *See also ODD II*, 2016 WL 476444 at *6 (data used by Dr. Flamm for pass-through did not include data from two defendants and related to only six products from only one OEM).  Second, Dr. Flamm did not account for competition in his econometric analyses, which Dr. Chipty did, in multiple ways.  Chipty Supp. ¶¶ 19, 66, 71-73 & Appendix D.

## IV.   Common Evidence Shows That Sutter Overcharges Were Passed Through To Class Members In a Uniformly High and Significant Manner.

### A.   Dr. Chipty's Prior Regressions Provide Common Evidence of Uniformly High and Significant Pass-Through.

Dr. Chipty's prior regression analyses support her finding that pass-through of Sutter overcharges is uniformly high and significant.  For Plaintiffs' original motion, Dr. Chipty completed 23 regressions on the issue of pass-through (on both a total medical cost and IHS cost only basis).  Ex. P2 (Chipty Reply) ¶ 76; Order at 49.  These regressions used Blue Shield or Anthem transactional data.  They, along with a regression that Dr. Chipty completed in her original Class Declaration that used URRT Small Group filings made by the Class Health Plans, concerned each of the three lines of business, accounted for product type, and analyzed to what extent, if any, the presence or absence of Kaiser affected pass-through rates. Ex. P2 (Chipty Reply) ¶ 76.  These regressions show that pass-through of Sutter overcharges to Class Members has been positive and significant, notwithstanding Health Plan, line of business, product type or Kaiser presence, and

support the findings made by Dr. Chipty in her Supplemental Class Declaration. *Id.* ¶ 66.[15]

In the Class Order, the Court also concluded that "Dr. Chipty does not dispute Dr. Willig's analysis estimating a pass through rate of 30 percent, with a 95-percent confidence interval ranging from negative 16.4 percent and 76.8 percent." Order at 49. But Dr. Chipty noted that this result was "imprecisely estimated," meaning that it had no *statistical significance*.[16] Ex. P2 (Chipty Reply) ¶ 66. In any event, the MLR Data regression run by Dr. Chipty for Aetna demonstrates that the pass-through rate for Aetna premium payors is 106.97% -- far higher than 30%. Chipty Supp. ¶ 70, Ex. 6.[17]

### B. This Case Concerns A Simple Distribution Model.

The very simple industry structure at issue supports the finding that pass-through of Sutter IHS overcharges to Class Members is uniformly high and significant. Only one intermediary level separates the sole defendant – Sutter – from the premium paying Class Members. Consequently, the pass-through analysis relevant to Plaintiffs' claims here is not nearly as complicated as the analyses that resulted in certification of other indirect purchaser classes -- analyses that had to track pass-through rates through several distribution tiers (*see infra* n.26). Chipty Supp. ¶¶ 35-36. *See* Ex. P32 (demonstrative used at first Class oral argument).

### C. Actuarial Testimony and Expert Opinions Are Common Evidence Of Uniformly High and Significant Pass-through.

Plaintiffs have submitted the expert Declaration of David Axene, an actuary with over 40 years of experience constructing premiums and reviewing premium rates filings for the Department of Managed Health Care ("DMHC") in California. *See* Ex. P34 (Axene Decl.).[18] That Declaration

---

[15] These regressions use a log rather than a levels approach, as Dr. Chipty did not intend to apply them to her damages model (based on her opinion that an estimate of 100% aggregate pass-through was supported by evidence). Dr. Chipty now calculates pass-through rates on a levels basis so that she can specifically apply her pass-through rate calculations to her damages model. *See* Chipty Supp. ¶¶ 50-53.

[16] The second row of Exhibit 8 of the Chipty Reply (p. 48) reflects the results of Dr. Chipty running Sutter's expert, Dr. Willig's, pass-through model. Ex. P2 (Chipty Reply). Different from every other figure identified in the "Coefficient [7]" column, Dr. Willig's 0.302 pass-through rate for Aetna (the 30% cited in the Order) lacks the asterisks (***) that indicate statistical significance. *Id*.

[17] Dr. Willig's prior pass-through exercises also show uniformly high and significant rates of pass-through in all Class RAs. Chipty Supp. ¶ 93.

[18] References to "Axene Decl." are to the Declaration of David Axene, FSA, FCA, CERA, MAAA, dated June 21, 2018, in support of Plaintiffs' Motion for Class Certification, ECF No. 348-4.

1    also supports the findings of uniformly high and significant pass-through rates.

2            Mr. Axene's Declaration explains the formulaic manner by which health plans develop

3    premiums.  As he explains, the "starting point for the actuary to develop and recommend premium

4    rates is historical claims data that is used to make estimates of projected claims." *Id.* ¶ 40.[19]  He

5    further stated, *"*[s]ince historical health care costs are used to develop future premium rates, any

6    change in health care costs will have a direct impact on those premium rates. . . .  A change that

7    increases IHS costs would increase the premium rate, and in the aggregate 100% of that increase

8    would be reflected in the increase in the premium rates." *Id.* ¶ 56.  In this way, "[i]f historical IHS

9    costs were elevated as a result of Sutter's conduct, future IHS costs projected by health plans . . .

10   will as a consequence be higher than they would have been absent Sutter's conduct." *Id.* ¶ 36.

11   Evidence from the actuaries that construct premiums from each Class Health Plan and URRT

12   filings that illustrate how premiums are constructed (Exs. P33, P36 - P40) verifies that pass-through

13   occurs at substantially high levels for all Class Members.[20]

14           It is critical to note that, Mr. Axene explains, actuaries *are required to certify* that they have

15   included 100% of projected medical costs, including the costs of IHS, in the premiums that they

16   have constructed, also supporting a finding of full pass-through of Sutter overcharges in the

17   aggregate.  Ex. P34 (Axene Decl.) ¶ 23.  Class Health Plan actuaries agreed that pricing regulation -

18   - regulation not at issue in other indirect purchaser antitrust cases -- requires them to certify that

19   premiums include all expected medical costs, including IHS.  In particular, they explained that they

20   are required to construct premiums in compliance with the ACA's MLR provisions, under which

21   _____

22   [19]  Actuaries take *actual* historical cost data from an experience period approximately two years
     prior and apply "trend factors" to it in order to assure that premiums will cover projected health care
23   costs for their member in the coming year.  Ex. P34 (Axene Decl.) ¶ 36; Order at 14-15.

     [20]  *See* Exs. P36 at 23-24 (*UHC* actuary: ███████████████████████████
24   ████████); *id.* at 70 ("You want to make certain that a carrier is in a position where their rates will
     cover the expected claims and their expenses . . . ."); P37 at 217 (*Aetna* actuary: agrees "in
25   calculating premiums . . . it [is] always the case that [] all healthcare – expected healthcare expenses
     are include in the premium calculation"); P38 at 69-70 (*Blue Shield* actuary: agrees██████████
26   ███████████████████████████████████████████; P39 at 38-40
     (*Anthem* actuary: "███████████████████████████████████
27   ████████ P40 at 131-32 (*Heath Net* actuary: "we take historical costs.  We project them into the
     future and then we add administrative costs and expected profit loads to come up with a
28   premium.").

total medical, including IHS, costs must account for the overwhelming portion of the premium. Exs. P36-P39 (Class Health Plan testimony regarding ACA's MLR premium requirements).

### D. Health Plan Testimony and Documents Are Common Evidence of Uniformly High and Significant Pass-Through.

Ordinary course documents from Class Health Plans modeling the impact of Sutter's prices upon premiums also support uniformly high and significant -- indeed, full -- pass-through of Sutter overcharges to premiums in the aggregate. For example, in 2010, when Blue Shield was modeling the potential savings that could be realized from steering away from Sutter in connection with a narrow network product, it ███████████

████████████████████████████████████████████████████████

███████████████████████████████████ Ex. P41 (Wells Dep. & Ex. 570) at 583-84. Similarly, in 2012, when Health Net was modeling hypothetical Sutter rate increases and the impact to premiums for its PremierCare narrow network product, Health Net assumed a ***100% pass-through*** of total medical costs, including Sutter hospital costs, for each scenario for each of the years projected. Ex. P55 (Chason Dep. & Ex. 268, "Sutter/HealthNet Narrow Network Premium Model Summary") at 605, 629-30. In 2015, Health Net, as part of its Sutter contract renewal strategy, modeled the impact of terminating Sutter from its networks. Ex. P42 (Hamilton Ex. 5653). When calculating the impact to premiums, Health Net assumed full pass-through of Sutter out-of-network prices. *Id.* at *6043 & *6056.

Additional evidence demonstrates that Class Health Plans passed through Sutter's high prices to the premiums that they charged their plan members.

- ***Aetna***: ██████████████████████████████████████ ███████████ Ex. P43 (Terry Dep.) at 111-12. ██████ ██████████ Ex. P44 (Robinson Ex. 490) at *703.

- ***Health Net***: "Sutter Health is consistently a cost outlier and has a significant impact on overall health care costs and premiums in Northern California. . . . [Sutter's] cost trajectory result[s] in premiums that do not allow us to compete." Ex. P45 (Chason Ex. 265) at *937.

- ***Anthem***: ████████████████████████████████ ██████████████████████████ Ex. P12 (De La Torre Ex. 1662) at *1588. █████████████████████████████████ ████████████████████████████████████████████

███████████ Ex. P46 (Schwefler Dep.) at 147-48.

- **Blue Shield**: Hospital costs "are the real cost drivers now.  They drive the premiums."  Ex. P47 (Markovich Ex. 489) at p. 14.

*See also* Exs. P48 – P54 (attaching additional health plan evidence).

### E.  Sutter Admissions Are Common Evidence of Uniformly High and Significant Pass-Through.

Sutter admissions support uniformly high and significant -- indeed, full -- pass-through of overcharges in the aggregate.  In a 2010 internal assessment ████████████████ ████████████████████████████████████████████ Ex. P56 (Chason Ex. 60) at 10.  In ████████ ████████████████████████████████████████████ ████████████ *Id.*

Sutter's ████████████████████ ████████████████████████████████████ Ex. P57 (Reed Ex. 95) at *774; Order at 47.  This analysis, which was conducted by Sutter's then-CFO, Robert Reed, was presented to Sutter's entire executive leadership during a "Pricing Strategy" meeting.  Significantly, ████████████████████████ Exs. P57 (Reed Ex. 95); P1 (Chipty Class) at p. 78, Ex. 16 (showing that ████████████████████ ████████████████████████████.  Indeed, other evidence from Mr. Reed shows that ████████████████████████████████████ ████████████████  In an email to Sutter's then-CEO Patrick Fry, Mr. Reed admitted that ████████████████████████████ and verified that ████████████ ████████████████████████████████████ Ex. P28 (Reed Ex. 2780) at *4377 (emphasis supplied). This confirms that Sutter knew that its prices were substantially passed on to premium payors.  *See also* Exs. P58 (Sprague Ex. 346) at *865 & *892 (2014 analysis Boston Consulting Group analysis recommending that ████████████████████ ████████████████████████████████

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.     Dr. Chipty's Calculation of Damages

Dr. Chipty applied the Sutter IHS overcharge rates and the weighted average pass-through rate to her damages methodology, which mimics the process by which premiums are set.  Order at 13-15; Exs. P2 (Chipty Reply) ¶¶ 136-147; P3 (Chipty Merits) ¶¶ 266-273; Chipty Supp. ¶ 8.[21]  Dr. Chipty's calculations estimate that aggregate damages sustained by the Class as a result of Sutter's conduct, through 2017, are between $465.00 million to $489.04 million.  Chipty Supp. ¶ 20 at p. 13.

ARGUMENT

## I.     LEGAL STANDARDS

"A court may certify a class under Rule 23(b)(3) if 'the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Order at 27-28 (quoting Rule).  Predominance is satisfied when "common questions present a significant aspect of the case" and a common nucleus of operative facts and issues underlies the claims of the proposed class.  *In re Cathode Ray Tube Antitrust Litig.,* 308 F.R.D. 606, 620 (N.D. Cal. 2013) ("*CRT II*") (quotation omitted).  "The ultimate predominance question is 'whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating individual issues.'" *Qualcomm*, 328 F.R.D. at 296 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016)).

To determine whether common issues predominate, a court is "guided by the elements of the underlying cause of action."  *In re Capacitors Antitrust Litig.,* Case No. 17-md-02801-JD, 2018 WL 5980139, *4 (N.D. Cal. Nov. 14, 2018).  Consequently, to determine predominance in antitrust cases, courts examine whether common proof exists of "(1) a violation of antitrust law[], (2) an injury suffered as a result of that violation, and (3) an estimated measure of damages."  Order at 39.[22]  In determining whether to certify a Rule 23(b)(3) class, a court is <u>not</u> "grant[ed] . . . [a] license

---

[21] Dr. Chipty's common method for calculating damages is conservative in several respects.  For example, Dr. Chipty did not apply a "trend factor" that actuaries use in premium construction to account for impacts to historical medical expenditure, such as inflation, when projecting IHS.  Ex. P3 (Chipty Merits) ¶ 57.  Had she applied a trend factor, damages would have increased by approximately $75 million in the example she provided.  Ex. P2 (Chipty Reply) Appendix E; Chipty Supp. ¶ 20.  *See also* Ex. P3 (Chipty Merits) ¶ 274 (identifying other "Conservative Aspects" of the damages methodology).

[22] The Court has already held that "common questions will predominate with respect to the alleged

1    to engage in free-ranging merits inquiries," as part of any rigorous analysis of the proof proffered.

2    *Id.* at 28 (quoting *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds,* 568 U.S. 455, 466 (2013).

3          It has "long been recognized that class actions play an important role in the private

4    enforcement of antitrust laws." *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010

5    WL 5396064, at *3 (N.D. Cal. Dec. 23, 2010) (certifying (b)(3) class), *aff'd* 779 F.3d 934 (9th Cir.

6    2015).  Thus, in antitrust cases, courts "resolve doubts in these actions in favor of certifying the

7    class." *CRT II*, 308 F.R.D. at 612 (quotation omitted) (certifying (b)(3) class); *In re Static Random*

8    *Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 612 (N.D. Cal. 2009) (certifying (b)(3)

9    indirect purchaser classes).

10         *ODD II* demonstrates the type of predominance analysis that a court should employ.  2016

11   WL 467444, at *11.  There, Judge Seeborg certified an indirect purchaser class despite that

12   "defendants [] offered some compelling evidence apparently contradicting the IPP's contention that

13   cost savings are virtually always passed through" and the defendants "attack[ed] [] the completeness

14   and accuracy of [the] pass-through studies" of plaintiffs' experts.  Specifically, he held that "***whether***

15   ***the IPPs theory is right or wrong***" was irrelevant to the class certification query.  Rather, what was

16   pertinent to Judge Seeborg was whether the indirect purchasers' theory of injury was "***something***

17   ***that can be decided on a class-wide basis.***" *Id.* (emphasis supplied).

18         In considering whether to grant Rule 23(b)(3) certification in an antitrust case, the Court

19   must analyze the issues of fact-of-injury (*i.e.,* whether Class Members were injured at all) and

20   damages (*i.e.* the *amount* of monetary losses that Class Members incurred) under the different

21   standards that govern them.  It is axiomatic that once any antitrust injury is proven, more liberal

22   standards apply to estimating the *amount* of damages.  *Story Parchment Co. v. Paterson Parchment*

23   *Paper Co.,* 282 U.S. 555, 562 (1931) ("[T]here is a clear distinction between the measure of proof

24   necessary to establish the fact that petitioner had sustained some damage and the measure of proof

25   necessary to enable the jury to fix the amount.").

26   **II.     PLAINTIFFS HAVE PROVIDED COMMON EVIDENCE THAT CLASS**
           **MEMBERS HAVE SUFFERED A COMMON IMPACT.**

27         To certify a Rule 23(b)(3) class, the court must determine whether Plaintiffs "have made a

28

---

antitrust violations."  Order at 39.

1   sufficient showing that the evidence they intend to present concerning antitrust impact will be made

2   using generalized proof common to the class, and that these common issues will predominate." *CRT*

3   *II*, 308 F.R.D. at 629. "'Plaintiffs need only advance a plausible methodology to demonstrate that

4   antitrust injury can be proven on a class-wide basis.'" *In re TFT-LCD (Flat Panel) Antitrust Litig.,*

5   267 F.R.D. 583, 600 (N.D. Cal. 2010) (quotation omitted).  Accordingly, courts must be "cautious

6   about 'engaging in a battle of expert testimony' at the certification stage," including when assessing

7   the issue of common impact.  Order at 41 (quoting *ODD II*) & 37 ("[I]n situations where a court is

8   faced with two opposing expert analyses or econometric models of what the 'but for' world would

9   look like, the Court is not supposed to decide at the certification stage which expert analysis or

10  model is better") (quotation omitted).  *See also ODD II*, 2016 WL 467444, at *10 ("While it may be

11  that Dr. Flamm and the IPPs have not 'studied' pass through in all of the various marketing chains

12  and manners through which ODDs are sold, this too falls into the category of arguments defendants

13  may present to a fact finder . . . rather than a basis for denying certification.").

14         Where, as here, a class of consumers indirectly purchased goods or services in an

15  anticompetitive market and seeks overcharge damages under the Cartwright Act, there is a

16  presumption of class-wide impact.  *In re Cipro Cases I & II*, 121 Cal. App. 4th 402, 413 (2004).

17  This presumption of class-wide injury applies in federal courts because it is substantive and not

18  procedural.  *LCD*, 267 F.R.D. at 600.  Nonetheless, Plaintiffs do not merely rely on this presumption.

19  Instead, they have put forth a wealth of economic and record evidence demonstrating common

20  impact.  This evidence demonstrates that *all* Class Health Plans incurred anticompetitive

21  overcharges as a result of Sutter's conduct.  It also shows that these Sutter overcharges were passed

22  through by *all* Class Health Plans to *all* Class Members in the form of higher premiums.

23      **A.  Plaintiffs Have Put Forth Common Evidence That All Class Health Plans Have
            Been Overcharged by Sutter As A Result of Its Conduct.**

24          *1.  Plaintiffs' Theory of Sutter Overcharges to Health Plans Is Supported by Evidence.*

25         The Court has already held that Dr. Chipty has set forth a plausible and evidentiary-

26  supported theory of how Sutter's conduct resulted in Class Health Plans paying supra-competitive

27  rates for Sutter Damages Hospital IHS.  *See supra* Sect. I.A, pp. 4-5; Order at 35-38 ("plaintiffs and

28  Dr. Chipty sufficiently support their position that Sutter would respond to a threatened loss of patient

1    volume by lowering, not raising, its prices.").

2              *2.   Dr. Chipty's Regressions Are Common Evidence That Sutter Has Overcharged All*
                    *Class Health Plans.*

3

4         Dr. Chipty has further demonstrated that all or nearly all Class Members were impacted by

5    Sutter's conduct.  Dr. Chipty has applied her price regression to claims data from *each* of the Class

6    Health Plans, regressing over tens of millions of claims, and calculated upstream overcharges

7    imposed by the Sutter Damages Hospitals upon *all* the Class Health Plans.  *See supra* Sect. II.A, pp.

8    6-8; Ex. P3 (Chipty Merits) ¶ 7; Chipty Supp. ¶ 6 & Ex. 1 at p. 5.  Through that regression

9    methodology, Dr. Chipty identified overcharges incurred by *each* Class Health Plan, including

10   Aetna, UHC, and Health Net, for services rendered by each Sutter Damages Hospital in each year

11   during the damages period.  She also averaged these results over the damage period.  Ex. P3 (Chipty

12   Merits) at p. 210, Ex. 25 & Appendix J.  Dr. Chipty's more recent application of her regression

13   methodology to *all* relevant claims data produced resolves any question that Plaintiffs have a reliable

     method to calculate Sutter overcharges relevant to all Class Members.  Order at 42-43.

14
          Courts in this Circuit have certified indirect purchaser damages classes based upon far less
15
     rigorous expert analyses of direct purchaser overcharges.  *See e.g.*, *ODD II*, 2016 WL 467444, at *6
16
     (plaintiffs' economist did not measure overcharges by two of the defendants whose products
17
     comprised 14% of the market).  Moreover, classes have been certified where experts have proposed
18
     a damages model, but have not yet actually calculated any class damages.[23]
19

20             *3.   Common Record Evidence Demonstrates That the Class Health Plans Have Been*
                    *Overcharged by Sutter.*

21        Plaintiffs have proffered ample common evidence demonstrating that Sutter imposed IHS

22   overcharges upon Class Health Plans.  *See supra* Sect. II.B, p. 8; Exs. P9 – P31; P3 (Chipty Merits)

23

24   _____

     [23]  *See LCD*, 267 F.R.D. at 314; *SRAM*, 264 F.R.D. at 615 (indirect purchaser class certified even
25   though expert did not run any damages regression); *Messner v. Northshore Univ. HealthSystem,* 669
     F.3d 802, 818 (7th Cir. 2012) (vacating district court's denial of  class certification where expert
26   stated that his econometric analysis could "show that all or most [class members] suffered some
     antitrust injury").  *See also In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL
27   5429718, at *18 (N.D. Cal. June 20, 2013) ("*CRT*"), *report and recommendation adopted*, No. C-07-
     5944-SC, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) (certifying indirect purchaser class despite
28   defendants' claim that expert used only a "tiny" sample of data to demonstrate how regression
     formula would work).

1   at 186-97.  This contemporaneous evidence cannot be ignored.  As Judge Koh explained, "the

2   importance of [] statistical models [to demonstrate antitrust impact] is diminished. . . [when there is]

3   extensive documentary evidence that supports Plaintiffs' theory of impact. . . . courts have long

4   noted that statistical and anecdotal evidence must be considered in tandem."  *In re High-Tech Emp.*

5   *Antitrust Litig.*, 985 F. Supp. 2d 1167, 1217 (N.D. Cal. 2013); *see also Kleen Prod. LLC v. Int'l*

6   *Paper*, 306 F.R.D. 585, 595 (N.D. Ill. 2015), *aff'd* 831 F.3d 919 (7th Cir. 2015) (common impact

7   established "where Plaintiffs have presented [] record and expert evidence *independently* showing

8   impact") (emphasis added).

9   **B.  Common Evidence Shows That Sutter Overcharges to Class Health Plans Were Passed Through to Class Members.**

10          There is *no* serious dispute that at least *some* amount of Sutter's overcharges has been passed

11   through to premiums charged by each Class Health Plan.  The Court acknowledged, in fact, the

12   common evidence that shows "premiums generally increase when their costs increase."  Order at 47.

13   This establishes, given the overcharges that Sutter imposed on Class Health Plans, that Class

14   Members suffered a common impact.

15          *1.  Dr. Chipty's Economic Work Demonstrates Uniformly High and Positive Rates of*
16          *Pass-Through.*

17          Plaintiffs' common impact showing is supported by Dr. Chipty's supplemental, econometric

18   analyses of pass-through, which show uniformly high and positive pass-through rates of Sutter

19   overcharges, notwithstanding the Class Health Plan at issue, the line of business relevant to the Class

20   Member, the attributes of the product purchased, or competition from Kaiser and non-Kaiser plans.

21   *See Qualcomm*, 328 F.R.D. at 308 (court finds predominance where pass-through regression "show

22   the pass-through rates [while] not identical, . . . are uniformly high and positive."); *ODD II*, 2016

23   WL 467444, at *9 ("While results show the pass-through rates are not uniform, they are uniformly

24   high and positive").  These analyses not only substantiate the *fact of pass-through* (demonstrating

25   that Class Members have been commonly impacted), but the *level of pass-through* (demonstrating

26   how much Class Members have been damaged).  *See supra* Sect. III, pp. 9-12, & V, p. 17.

27          Dr. Chipty's pass-through regression model and results are consistent with and more robust

28   than the pass-through analyses that have satisfied certification standards in other indirect purchaser

1   class actions.  Her results are predicated on the comprehensive and highly credible MLR Data set

2   that provides information on total medical expenses paid and premiums for *each* Class Health Plan

3   (and are consistent with regressions of paid claims and premium data produced by the Class Health

4   Plans).  The MLR Data set concerns 100% of the products and lines of business sold by Class Health

5   Plans from 2011 to 2018: it does not only include a subset of the sales data relevant to entities that

6   sold the overpriced product downstream, as did the data utilized by plaintiff experts in other indirect

7   purchaser cases that resulted in certification.  *See supra* p. 10.[24]  Dr. Chipty's results are

8   corroborated through econometric examination of paid claims and premium data produced by the

9   Class Health Plans.  And, unlike other econometric analyses that have passed certification muster,

10   Dr. Chipty's analyses control for various health insurance product dimensions and account for

11   competition from Kaiser and non-Kaiser plans.  *See supra* Sect. III, pp. 9-12.[25]

12          Dr. Chipty's findings of uniformly high and significant rates of pass-through of Sutter

13   overcharges to Class Members are also supported by economic theory and actuarial science.  As

14   mentioned, the real world distribution model here is much simpler than the distribution models in

15   other indirect purchaser cases, including those that resulted in certification.[26]  Moreover, Dr.

---

16

17   [24]  Other indirect purchaser classes have been certified upon regression analysis of only partial or a
    sampling of data.  *CRT*, 2013 WL 5429718, at **15, 17 (certifying indirect purchaser class although
18   pass-through analyses "were not based on data from each individual firm in the distribution channel"
    but instead based on a "representative sample" that defendants claimed was "too small and
19   unrepresentative");  *LCD*, 267 F.R.D. at  602, 605 (certifying where expert did not use transactional
    data from all defendants and instead used certain pricing "data from a market research company.")
20   In *In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2017 WL 235052, at *19 (N.D.
    Cal. Jan. 19, 2017), the court certified an indirect purchaser class based on a pass-through analysis of
21   only a "small sampling of resellers."

22   [25] Indirect purchaser classes have been certified even where experts have been criticized for ignoring
    "geographic location and product variation." *In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-
23   MD-2670 JLS (MDD), 2019 WL 3429174, at *30 (S.D. Cal. July 30, 2019); *In re Reformulated
    Gasoline (RFG) Antitrust & Patent Litig.*, No. CV-05-01671 CAS (VBKx), 2007 WL 8056980, at
24   *6 (C.D. Cal. Mar. 27, 2007) (indirect purchaser class certified despite defendants argument that
    pass-through created individual issues because "prices vary by geographic location, as well as within
25   the same geographic area in response to local competition").

26   [26]  *See Qualcomm*, 328 F.R.D. at 308 (multiple pass-through levels involving eighteen distribution
    channels including OEMs, contract manufacturers, wireless carriers, distributors, and retailers);
27   *CRT*, 2013 WL 5429718, at *6, ("tube manufacturers first sold CRTs to either a manufacturer of a
    finished CRT product or to a distributor, who would then resell the finished CRT product to the
28   manufacturer…. the finished product manufacturers sometimes sold the product directly to
    consumers or to another layer of distributors or to retailers."); *LCD*, 267 F.R.D. at 587-88, 603

1    Chipty's conclusions on pass-through in this matter are supported by the formulaic manner in which

2    premiums are set.  Unlike pricing for electronic goods, premium rate-setting is formulaic, due to

3    actuarial science and regulation.  *See supra* Sect. IV.C, pp. 13-15.  Medical costs, including Sutter

4    IHS costs, are undisputedly and directly included in the calculation of the premium.  *Id.*  This is

5    highly relevant to the issue of pass-through.  *See Qualcomm,* 328 F.R.D. at 302 ("Dr. Flamm relies

6    on . . . evidence evincing that Qualcomm, OEMs, and wireless carriers treated Qualcomm's royalty

7    as a known component cost . . ."); *Packaged Seafood*, 2019 WL 3429174, at * 28 (certifying indirect

8    purchaser class where "Defendants' documents and internal communications . . . show that they

9    were aware any price increases would be passed through to consumers."); *In re Capacitors*, 2018

10   WL 5980139, at *8 ("The Court [ ] noted the. . . documents produced by defendants showing that the

11   defendants themselves acknowledged that 'their collusion had a wide impact on prices for

12   capacitors.'").

13          Sutter previously criticized Dr. Chipty for utilizing averaging in her pass-through

14   calculations, stating that there is variance among pass-through rates to individual Class Members.

15   That argument is irrelevant under well-established law. Averaging is appropriate, and often

16   necessary, to demonstrate common impact class-wide damages.  Order at 44 ("Courts in indirect-

17   purchaser antitrust cases have recognized the use of averaging in calculating passthrough rates . . .

18   .").[27]  The use of averaging is particularly appropriate here, because the premium construction

19   process *relies on averaging medical costs* across a pool of insureds to spread risk of loss.  *See* Exs.

20   35 (Axene Dep.) at 43-44 ("[H]ealth plans tend to do a lot of averaging when they make their rates.

---

21   (indirect purchasers of "many different types and sizes" of TFT-LCD panels purchased "through
22   different manufacturing and distribution channels" along a complex, multi-layered supply chain
     with up to six levels of intermediaries); *see also SRAM*, 264 F.R.D. at 606  (multiple types of SRAM
23   used in different products and sold to large and small customers through a wide variety of
     distribution paths, including original equipment manufacturers, resellers, distributors and retailers.);
24   *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367, at *16 (N.D. Cal. Feb.
     21, 2017) (certifying end payor class despite "a number of differences in chain of distribution . . .").
25   [27] *Packaged Seafood*, 2019 WL 3429174, at *29; *Qualcomm*, 328 F.R.D. at 315; *Wortman v. Air
     New Zealand*, 326 F.R.D. 549, 558 (N.D. Cal. 2018); *In re Capacitors*, 2018 WL 5980139, at **6-7;
26   *ODD II*, 2016 WL 467444, at *7; *LCD*, 267 F.R.D. at 605; *SRAM*, 264 F.R.D. at 614 ("average pass-
     through rates appear reasonable and even necessary to prove damages here") (quotation omitted).  In
27   *CRT*, the court rejected Dr. Willig's criticisms of averaging to demonstrate common impact, and
     explained, "courts have held that averaged and aggregated data may be used to demonstrate pass-
28   through." 2013 WL 5429718, at **16-17.

1   They average across all kinds of populations. . . . the averaging [] done here [by Dr. Chipty] is very

2   consistent with how premium rates are . . . developed."); P34 (Axene Decl.) ¶¶ 32-46 (to craft

3   premiums, actuaries look at averaged per member, per month health care costs).  Sutter's purported

4   expert on premium construction agreed that premium construction process relies on averaging.  Ex.

5   P63 (Travis Dep.) at 18-21.  Any claim of significant variation in pass-through rates is thus legally

6   irrelevant, particularly when one considers that Sutter's rates have been passed through to all or

7   nearly all Class Members in a uniformly high and significant fashion.

8        Sutter also previously argued that pass-through cannot be uniform because in some

9   unquantified number of instances Class Health Plans agreed to a "rate pass": they declined to raise

10  premiums in a given year in the face of competing bids by other health plans.  Order at 21-22 (noting

11  two instances of same).  But any supposed "rate passes," which effectively amount to a discount, at

12  most, go to the *degree* of pass-through (in one given year to only some Class Members) and not to

13  *whether Class Members were injured at all*.  Moreover, a handful of isolated instances (Sutter points

14  to a total of four) do not defeat Dr. Chipty's empirical analysis based on actual claims and premium

15  data from all five Class Health Plans.  Courts consistently hold that discounts in the actual world do

16  not negate common impact, as actual discounts would have likewise been received in the but for

17  world: class members receiving those actual world discounts would thus have paid even lower prices

18  absent the subject anticompetitive conduct.  *See e.g.*, *Wortman*, 326 F.R.D. at 560 (including class

19  members who "received discounted fares [] is not an obstacle to class certification"); *ODD II*, 2016

20  WL 467444, at *10 (certifying class despite argument that plaintiffs "ha[d] not accounted for, and

21  will never be able to account for, instances in which retailers sold computer systems below cost,

22  provided discounts or rebates. . ."); *CRT*, 2013 WL 5429718, at *20 ("CRT manufacturers would

23  have offered special price concessions to [] buyers in the but-for as well as the actual world.");

24  Chipty Supp. ¶ 106.

25        Where common impact is evidenced by substantial econometric analyses, such as those

26  completed by Dr. Chipty, anecdotal evidence that overcharges may not have been passed on to

27  certain class members does not bar certification.  As the *ODD II* court ruled:

28        To the extent defendants rely on testimony from industry participants denying that
         cost-savings are always passed through, they have, in the language of summary

judgment motion practice, merely created a triable issue of fact.  In the context of
class certification, they have not shown the existence of such testimony compels a
conclusion that the IPP's based economic theory is so lacking in possible validity that
it can be legally foreclosed at this juncture.

2016 WL 467444, at *10.  *See Qualcomm*, 328 F.R.D. at 308 ("[t]o the extent that Qualcomm has

identified some examples where market participants have not always passed through cost-savings, []

Qualcomm raises a merits question, not a basis to deny class certification.").

> 2.  *Sutter Admissions and Other Class Health Plan Evidence Demonstrates Substantial Pass-Through.*

Dr. Willig conceded that some portion of medical costs are passed through to Class

Members.  Ex. P5 (Willig Opp.) ¶ 65.  Other Sutter admissions confirm the substantial pass-through

of Sutter pricing to premium payors occurs.  Exs. P55 - P62.

This includes Mr. Reed's Pricing Strategy document, ███████████████████████

████████████████████  *See, e.g., Packaged Seafood*, 2019 WL 3429174, at *28 (pass-through

evidence included "Defendants' documents and internal communications, which show that they were

aware any price increases would be passed through to consumers.").  Respectfully, on that

document, the Court erred by drawing a merits conclusion that "the hypothetical in that presentation

does not establish that Sutter actually concluded that health plans pass on 100 percent of Sutter's

price reductions (or increases) through to their customers premiums."  Order at 47.  *See* Ex. P57

(Reed Ex. 95) at *774.  Mr. Reed's testimony confirmed that ██████████████████

██████████  Ex. P57.  Other Reed statements in ordinary course documents demonstrate that

████████████████████████████████████████████████████

██████████████████  Ex. P28.

Class Health Plan personnel (both actuaries and non-actuaries) completed analyses that

likewise corroborate Dr. Chipty's empirical analyses and together support substantial pass-through

of Sutter's overcharges to premium-paying Class Members.  *See supra* Sects. IV.C-D, pp. 13-16.

Dr. Chipty's economic analysis and the record evidence show that Sutter has overcharged

Health Plans, and there is no dispute that at least some of these overcharges were passed on to all

Class Members in the form of higher premiums.  Plaintiffs have shown that they have generalized

1   proof that can establish common impact.[28]

2   **III.     PLAINTIFFS HAVE A COMMON METHOD FOR REASONABLY ESTIMATING
           DAMAGES.**

3           Class action plaintiffs in antitrust cases are given wide latitude to prove the amount of

4   damages.  Under the lenient standards that apply, Plaintiffs are merely required to develop a

5   mechanism that can be used to *reasonably estimate* the amount of Class Member damages.

6   Plaintiffs' damages estimates "need not be exact."  *Comcast v. Behrend*, 569 U.S. 27, 35 (2013);

7   *ODD II*, 2016 WL 467444, at *4.  That is because the precise economics of a world absent the

8   alleged anticompetitive conduct can, by definition, never be known, and it would be impossible for

9   antitrust plaintiffs to pinpoint losses with mathematical precision.  *See J. Truett Payne Co. Inc. v.*

10  *Chrysler Motors Corp.,* 451 U.S. 557, 566-67 (1981) ("[I]t does not 'come with very good grace' for

11  the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.");

12  *Story Parchment.,* 282 U.S. at 562; *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946);

13  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124 (1969).

14          Accordingly, it is well-established that "uncertainty regarding class members' damages does

15  not prevent certification . . . as long as a valid method has been proposed for calculating those

16  damages."  Order at 40 (quoting *Lambert*, 870 F.3d at 1182), *rev'd on other grounds,* 139 S. Ct. 710

17  (2019)).  "[P]laintiffs . . . must simply offer a proposed method for determining damages that is not

18

---

19  [28]  Plaintiffs' evidence of common impact does not suffer from the deficiencies that prevented
    certification in cases cited in the Order.  *In re Lithium Ion Batteries,* No. 13-MD-2420 YGR, 2018
20  WL 1156797 **3-4 (N.D. Cal. Mar. 5, 2018) concerned denial of class certification where plaintiffs
    failed to "adequately account for the effects of focal point pricing" whereby retailers had a pervasive
21  practice of "assign[ing] products with small to moderate differences in costs to the same price point
    despite cost differences."   Here, insurance premiums are not subject to focal point pricing.  *In re*
22  *Graphics Processing Units Antitrust Litig.,* 253 F.R.D. 478 (N.D. Cal. 2008), involved "potentially
    thousands" of direct purchasers (as contrasted with the five Class Health Plans here), and *nineteen*
23  proposed subclasses for which the plaintiffs proffered only "promises" of demonstrating pass-on and
    impact. 253 F.R.D. at 502.   Here, Dr. Chipty did not merely promise to show common impact;
24  instead, she conducted econometric analyses that demonstrates it.  Moreover, Dr. Chipty used MLR
    data from all Class Health Plans, further distinguishing this case from the data deficiencies in *GPU*.
25  In *In re Optical Disk Drive Antitrust Litig*., 303 F.R.D. 311, 321 (N.D. Cal. 2014) ("*ODD I*"),  class
    certification was originally denied where the plaintiffs challenged bid-rigging conduct that was
26  specific to only a subset of purchasers, and the "overcharge [was] assumed to be the same for all
    purchasers across all models."  Later, the court granted a renewed class motion even though the
27  expert's data was aggregated, and the expert presented single overcharge numbers by type of drive.
    *ODD II*, 2016 WL 467444, at *6-7.
28

1   'so insubstantial as to amount to no method at all.'" *Apple iPod iTunes Antitrust Litig.,* No. 05-

2   00037-JW, 2011 WL 5864036, at *3 (N.D. Cal. Nov. 22, 2011) (quotation omitted).  *See also LCD*,

3   267 F.R.D. at 314; *In re Static Random Access Memory Antitrust Litig.*, No. C 07-01819 CW, 2008

4   WL 4447592, at *6 (N.D. Cal. Sept. 29, 2008) (quotation omitted).  Furthermore, "[a]ntitrust

5   plaintiffs have a limited burden with respect to showing that individual damages issues do not

6   predominate." *SRAM*, 264 F.R.D. at 615 (quotation omitted).  *See also Qualcomm*, 328 F.R.D. at

7   315 ("[T]he amount of damages is invariably an individual question and does not defeat class action

8   treatment.") (quoting *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)); *ODD II*,

9   2016 WL 467444, at *11 n.10 ("'In this circuit . . . damage calculations alone cannot defeat class

10  certification.").

11          Plaintiffs and Dr. Chipty do much more than merely satisfy this test.  They provide a measure

12  of aggregate damages and a method to calculate individual damages based on a reliable model that

13  uses common pricing data; well-established scientific techniques, substantial econometric analyses

14  that calculate specific pass-through rates and a composite weighted average pass-through rate

15  relevant to all Class Members, and tracks "how premiums are actually developed for all lines of

16  business." Ex. P34 (Axene Decl.) ¶ 66.  Dr. Chipty's proposed damages method permits individual

17  damages to be calculated, notwithstanding: (a) the Class Health Plan; (b) the insurance product at

18  issue; (c) the line of business relevant to the Class Member; or (d) the RA in which the Class

19  Member was located.  Exs. P1 (Chipty Class) ¶¶ 136-148; P2 (Chipty Reply) ¶¶ 89-94.

20          Sutter's disagreement with Plaintiffs' estimates of the *amount* that Sutter has overcharged

21  Class Health Plans or the *amount* of the weighted average overcharge that was passed on to Class

22  Members should be disregarded.  That disagreement does not preclude class certification.

23  **IV.    A CLASS ACTION PROVIDES A SUPERIOR MECHANISM TO LITIGATE**

24  **        CLASS MEMBER CLAIMS.**

25          Rule 23(b)(3) requires that a class action be "superior to other available methods for fairly

26  and efficiently adjudicating the controversy." *Nitsch v. Dreamworks Animation SKG Inc*., 315

27  F.R.D. 270, 315-316 (N.D. Cal. 2016).  "[I]f common questions are found to predominate in an

28  antitrust action, . . . courts generally have ruled that the superiority prerequisite of Rule 23(b)(3) is

    satisfied." *LCD*, 267 F.R.D. at 314.  In light of the substantial common proof at issue, requiring

1   Class Members to proceed individually "would merely multiply the number of trials with the same

2   issues and evidence," leading to massive inefficiencies and benefitting only those that could afford

3   to litigate. *High-Tech*, 985 F. Supp. 2d at 1228; *Nitsch*, 315 F.R.D. at 316.

4          Moreover, if certification is denied, the overwhelming amount of potential Class Members

5   would be unable to challenge Sutter's conduct, because "a class action . . . is likely the only means

6   of recovery for many plaintiffs whose recovery would [ ] be too low to justify the cost of individual

7   litigation . . . ." *CRT II*, 308 F.R.D. at 630.  This is particularly true here as the California Attorney

8   General did not seek damages redress for the fully-insured Class Members at issue here.  The

9   prosecution of separate actions would also create the risk of inconsistent rulings and could result in

10  prejudice to Class Members.  *Wortman*, 326 F.R.D. at 561.

11         The Ninth Circuit has held that manageability challenges do not bar certification.  *See*

12  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 (9th Cir. 2017) (affirming certification despite

13  that class members lacked "receipts" to validate claims and rejecting assessment of "administrative

14  feasibility" of damages distribution).  This is particularly true where, as here, Plaintiffs propose a

15  sound damages methodology.  *See Lidoderm*, 2017 WL 679367, at *26 (where "aggregate damages"

16  are calculated at trial, "claims mechanisms . . . may be employed to resolve [] theoretical disputes

17  [about how] . . . damages should be split").  Arguments regarding how employer and employee Class

18  Member damages will be allocated do not defeat Rule 23(b)(3) certification.[29]

19         Accordingly, the superiority requirement is also satisfied and certification under Rule

20  23(b)(3) is appropriate.

21                                   **CONCLUSION**

22         For the foregoing reasons, Plaintiffs respectfully request that the Court grant their renewed

23  motion to certify a Rule 23(b)(3) damages class.

24  _____

25  [29]  Allocation can be done through a claims process where employers and/or employees provide
    information to validate their claims.  Here, employer and employee records show premium

26  contributions, contrary to Sutter's suggestion otherwise, and can be used to allocate damages for
    each year in the Class Period. *See, e.g.*, Ex. P64.  *See, e.g., In re Visa Check/MasterMoney Antitrust*

27  *Litig.,* 280 F.3d 124, 140 (2d Cir. 2001) (Sotomayor, J.) (affirming class of millions, holding
    refusing to certify class "on the sole ground that it would be unmanageable is disfavored and 'should

28  be the exception'") (quotation omitted); *LCD*, 267 F.R.D. 583, 592 (requiring "some information" to
    validate claims does not bar certification).

1

DATED: November 18, 2019

2

Respectfully submitted,

3

/s/ Matthew L. Cantor

4

MATTHEW L. CANTOR (admitted *phv*)
JEAN KIM (admitted *phv*)

5

ROSA M. MORALES (admitted *phv*)
CONSTANTINE CANNON LLP

6

335 Madison Avenue
New York, NY 10017

7

(212) 350-2738
(212) 350-2701 (fax)

8

mcantor@constantinecannon.com
jkim@constantinecannon.com

9

rmorales@constantinecannon.com

10

AZRA Z. MEHDI (220406)
One Market

11

Spear Tower, Suite 3600
San Francisco, CA 94105

12

(415) 293-8039
(415) 293-8001 (fax)

13

azram@themehdifirm.com

14

DAVID C. BROWNSTEIN (141929)
WILLIAM S. FARMER (46694)

15

DAVID M GOLDSTEIN (142334)
FARMER BROWNSTEIN JAEGER &

16

GOLDSTEIN LLP
235 Montgomery Street, Suite 835

17

San Francisco, CA 94104
(415) 795-2050

18

(415) 520-5678 (fax)
dbrownstein@fbj-law.com

19

wfarmer@fbj-law.com
dgoldstein@fbj-law.com

20

21

ALLAN STEYER (100318)
D. SCOTT MACRAE (104663)

22

JILL MANNING (178849)
SUNEEL JAIN (314558)
STEYER LOWENTHAL BOODROOKAS

23

ALVAREZ & SMITH LLP
235 Pine Street, 15th Floor

24

San Francisco, CA 94104
(415) 421-3400

25

(415) 421-2234 (fax)
asteyer@steyerlaw.com

26

smacrae@steyerlaw.com
jmanning@steyerlaw.com

27

sjain@steyerlaw.com

28

*Counsel for Plaintiffs and the Class*

PLAINTIFFS' RENEWED MOTION TO CERTIFY A RULE 23(B)(3) CLASS, CASE NO. 3:12-CV-04854-LB

29