UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, JERRY JANKOWSKI,
SUSAN HANSEN, DAVID HERMAN,
OPTIMUM GRAPHICS, INC., and JOHNSON
POOL & SPA, on Behalf of Themselves and All
Others Similarly Situated,

              Plaintiffs,

    v.

SUTTER HEALTH,

              Defendant.

Case No. 3:12-cv-4854-LB

CLASS ACTION

Supplemental Declaration of Dr. Tasneem Chipty

In Support of Class Certification

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

# Table of Contents

I.      Introduction ................................................................................................................. 1

II.     Summary of Opinions ................................................................................................. 6

III.    Framework for Estimating Pass-Through for Damages ........................................... 15

        A.  Economics of Pass-Through ........................................................................... 15

        B.  Regression Approaches to Estimating Pass-Through ..................................... 17

        C.  Considerations that Guide Pass-Through Analysis in This Case ................... 20

            1.  Only One Link in the Supply Chain ................................................... 20

            2.  Risk Pooling ...................................................................................... 22

            3.  Costs the Premiums Are Designed to Cover ...................................... 23

            4.  Product Attributes .............................................................................. 26

            5.  Regulatory Environment .................................................................... 27

            6.  Competitive Conditions ..................................................................... 29

        D.  Using the Econometric Pass-Through Estimates to Estimate Premium Damages ............. 31

IV.     Evidence Shows Uniformly High and Significant Pass-Through Rates Based on
        Econometric Analysis of the MLR Data .................................................................. 33

        A.  MLR Data ...................................................................................................... 33

        B.  Baseline Model Results Show Uniformly High and Significant Pass-Through ................. 37

        C.  Sensitivity Analyses Reinforce the Baseline Results .................................... 45

V.      Corroborating Quantitative Evidence ...................................................................... 49

        A.  New Analysis of Production Data .................................................................. 49

        B.  My Original Econometric Pass-Through Analysis ........................................ 54

            1.  My Previous Models Implicitly Controlled for Other Explanatory Variables ............. 57

            2.  My Prior Works Supports Pass-Through of 100 Percent ................... 58

        C.  Dr. Willig's Analysis of Pass-Through ......................................................... 62

VI.     Econometric Estimates of Pass-Through Are Consistent with Qualitative Evidence ............. 66

        A.  Evidence from Health Plans .......................................................................... 67

        B.  Evidence from Sutter ..................................................................................... 71

        C.  Actuarial Testimony ...................................................................................... 73

        D.  Sutter's Examples of Health Plan "Rate Passes" Do Not Contradict My Opinion on
            Pass-Through ................................................................................................. 74

VII.    Updated Damages Estimates ................................................................................... 77

VIII.   Conclusion ............................................................................................................... 80

## I.      Introduction

1.      My name is Tasneem Chipty. I declare under penalty of perjury under the laws of the United States of America as follows:

2.      At the request of counsel for the Class Plaintiffs, I previously submitted six reports/declarations in *Sidibe et al. vs. Sutter*.[1] I am an expert in the areas of industrial organization and econometrics, the application of statistical methods to economics problems. I regularly study competitive interactions among firms and the factors that determine their prices. I am the editor of the current edition of the *Proving Antitrust Damages*, a book published by the American Bar Association that discusses the use of regression methods to estimate overcharges and pass-through in the context of proving antitrust damages. My prior reports contain a more complete description of my qualifications.

3.      Based on the body of work I have conducted in this case, I concluded that Sutter's systemwide contracts, with provisions requiring "all-or-nothing" contracting, onerous non-participating provider rates, and equal treatment and anti-tiering clauses, constitute an anticompetitive arrangement whereby Sutter ties the purchase of GAC inpatient services in four Tied Markets to the purchase of GAC inpatient services in seven Tying Markets and prevents health plans from engaging in pro-competitive steering. I concluded that: (a) there is common proof demonstrating that all Class Health Plans have paid supracompetitive rates for Sutter inpatient services as a result of the challenged conduct; (b) the overpayments by Class Health Plans to the Sutter Damage Hospitals were passed through in a uniformly high and significant manner, in the form of higher premiums, to all or nearly all Class Members; and (c) all or nearly all Class Members were harmed as a result of the higher premiums. I also provided a formulaic method that is common to all Class Members and consistent with economic principles for calculating aggregate and individual premium damages.

---

[1] The opinions expressed in my previous reports/declarations in this matter are incorporated by reference herein: I understand that Plaintiffs will be submitting my two prior Declarations filed on the prior motion for Class Certification as well as my Merits Reports as Exhibits on their renewed motion for class certification. My qualifications are set forth in those reports. I adopt in this report the citation shorthand and the use of terms as defined in my previous reports, and my updated CV is included here as Appendix A.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

4.      In my Class Declarations, I studied claims data relevant to approximately 70 percent of Class Member damages—from two of the five Class Health Plans (Anthem and Blue Shield), and I studied the extent to which Class Health Plans would pass through cost increases to Class Members. In my subsequent merits reports in this matter, I studied claims data from all five Class Health Plans (Anthem, Blue Shield, Health Net, Aetna, and United), and I estimated Sutter inpatient hospital overcharges for each one of them. Using my damages methodology and the comprehensive set of inpatient hospital claims and premium data from all five Class Health Plans, I estimated aggregate premium damages to be between $478.6 million to $503.3 million, from September 2008 to December 2017.[2] I explained these estimates are conservative for several reasons, including (but not limited to) the fact that they do not account for: (a) the onerous non-participating rates the Class Health Plans were required to pay when they attempted to exclude any of the Tied Hospitals; and (b) trend factors which actuaries would have applied during premium construction. I demonstrated that accounting for trend factors alone would increase damages, through 2017, by around an additional $75 million.[3]

5.      On August 30, 2019, the Court granted in part and denied in part Plaintiffs' class certification motion.[4] In so doing, the Court focused primarily on two components of my damages analysis: (a) the calculation of Sutter overcharges; and (b) the rates at which the Class Health Plans pass through Sutter overcharges by raising premiums to Class Members.[5] The issues raised by the Court are as follows:

- With respect to the Sutter overcharges—in my Class Declarations, I estimated Sutter overcharges using data from Anthem and Blue Shield, Class Health Plans whose

---

[2] This estimate was presented in my merits report, that was dated April 22, 2019. My merits rebuttal report, dated August 1, 2019, addressed critiques raised by Sutter's experts about my analyses.

[3] Chipty Merits Rebuttal Report, Exhibit 11.

[4] "Order Granting Motion to Certify Class Under Rule 23(b)(2) and Denying Without Prejudice Motion to Certify Class Under Rule 23(b)(3)," *Djeneba Sidibe, et al. v. Sutter Health*, Case No. 3:12-cv-04854-LB, August 30, 2019 (hereafter "Class Order"), p. 5.

[5] Class Order, p. 15.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

customers comprise approximately 70 percent of the Class.[6] The Court recognized this work, but said that it was "insufficient to demonstrate a method for proving antitrust impact or calculating damages" for the customers of the three remaining Class Health Plans, Health Net, Aetna, and United.[7]

- With respect to pass-through rates—I evaluated a combination of institutional facts, deposition testimony, and ordinary-course documents; I also developed econometric evidence using data from the Anthem individual, all Class Health Plan small group, and Anthem and Blue Shield large group lines of business, reflecting the premiums and medical cost experience of approximately 50 percent of the Class member months. The Court described my pass-through analysis as amounting to "assuming" that Class Health Plans pass through 100 percent of any Sutter overcharges.[8] The Court found that the pass-through regression analysis in my Class Declaration was "overly simplistic" and used data "only from small-group employers."[9,10] And the Court observed that, in a

---

[6] Class Order, pp. 42-43.

[7] Class Order, p. 43.

[8] Class Order, pp. 44 and 47.

[9] Class Order, p. 48.

[10] In this context, the Court described analyses from two prior indirect purchaser antitrust cases in which courts certified a damages class, as support for her view on what a more rigorous pass-through analysis would entail (*see* Class Order, pp. 43-47):

- *In re Qualcomm*: The Court described the plaintiffs' pass-through analysis. She explains that there, the expert calculated average pass-through across a multi-step supply chain, using sales data from: (a) "six major cellphone manufacturers . . . representing approximately 90 percent of total cellphone sales;" (b) "six of the largest U.S. retailers . . . representing approximately 84 percent of the retailer market;" and (c) "five wireless carriers . . . representing approximately 97 percent of the wireless-carrier market."[10] The Court explained that the plaintiffs' expert "used ten control variables in his [pass-through] regressions" and "calculated separate passthrough rates for each of 18 sales channels, which he then weighted to calculate an overall sales-channel-weighted average passthrough rate of 87.4 percent." (Class Order, pp. 43-44.) As I explain below, the pass-through analysis in *Qualcomm* actually relied on only a small subset of data described in the passage here. (*See* footnote 23.) By contrast, my new pass-through analysis uses information on premiums and medical costs reflecting the experience of about 85 percent of Class member months.

- *In re Optical Disk Drive II*: The Court described the plaintiffs' overcharge model. She explains that there, the expert used a model that, "among other things, 'integrate[d] all 'useable' sales and costs data produced — from 86 percent of the market' and 'provide[d] further detail on the multivariable regression analysis,

---

minority of instances, the range of regression-based pass-through estimates presented in my Class Reply Declaration were below 100 percent.[11]

6.    With respect to the first issue of proving antitrust impact or calculating overcharges for three remaining Class Health Plans, I refer the Court to my April 22, 2019 merits report submitted in this matter, which I understand will be submitted with Plaintiffs' renewed motion for class certification.[12] There, I applied my common overcharge methodology to calculate overcharges to *all five Class Health Plans*, including Aetna, Health Net, and United.[13] *The Class Health Plans produced data that contain over 120 million claims,[14] and my overcharge analysis studied all usable inpatient claims data relevant to estimating overcharges for Class Members.* Applying my econometric estimates of overcharges, by Class Health Plan, by year, I computed the cost increases borne by Class Health Plans and the subsequent premium damages borne by Class Members over the period September 2008 to December 2017. Exhibit 1 below reproduces Exhibit 25 from my merits report: it displays my in-sample overcharge estimates for each of the five Class Health Plans, by Sutter Damage Hospital. Appendix B of this

---

which [the plaintiffs] contend shows that all factors other than [the antitrust] conspiracy are being adequately controlled for in the overcharge model.'" *See* Class Order, pp. 46-47 (quoting *In re Optical Disk Drive II*, 2016 WL 467444, at *6).

These cases are different from the Sutter case. For example, *Qualcomm* involved estimating pass-through across multiple chains of distribution, absent a regulatory framework that constrains the firm's pricing behavior. In many ways, pass-through of Sutter overcharges to health insurance premiums is more straightforward: (a) it involves only one level of pass-through; (b) health plans adhere to well-documented actuarial principles that build premiums from historical cost experience; and (c) health plan pricing behavior is constrained by regulations that both limit profit margins and require solvency. Economic analyses must reflect the specific realities of the markets studied; given the differences between healthcare, modem chips, and optical disc drives, it is likely that the approaches to both pass-through and overcharges may be different. Nonetheless, where appropriate, I will explain how my analyses relate to each of these cases.

[11] Class Order, pp. 49-50.

[12] Chipty Merits Report, ¶¶ 210-223.

[13] In my Class Declaration, I presented statistically significant overcharge estimates for Sutter Santa Rosa, using Anthem data. However, I was not able to reliably estimate a significant overcharge for Sutter Santa Rosa, for any of the other Class Health Plans, using the same regression model. Accordingly, to be conservative, I did not estimate overcharges on or calculate damages for claims paid to Sutter Santa Rosa by any Class Health Plan. Sutter Santa Rosa represents a relatively small share (3.9 percent) of Class Health Plan inpatient spend at the Sutter Damage Hospitals. My not estimating overcharges at Sutter Santa Rosa does not affect my opinion that all or nearly all Class Members were impacted by Sutter overcharges. (*See* Chipty Merits Report, ¶¶ 211-212 and footnotes 653-654.)

[14] Chipty Merits Report, ¶ 7.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

report reproduces Appendix J of my merits report that displayed the full set of overcharge estimates.



**Exhibit 1**
**Overcharge Estimates by Health Plan, Based on Combined (In Sample) Model**
**Reproduction of Chipty Merits Report, Exhibit 25**

*Note*: Overcharge estimates which are not significant at the 5 percent level are displayed with transparency. This affects Anthem, Health Net, and United estimates at CPMC-St. Luke's, and the Health Net estimate at Sutter Modesto.
*Source*: Chipty Merits Report, Exhibit 25.

7.      In this report, I address the issues raised by the Court with respect to the applicable level of pass-through, by providing supplemental econometric analyses that study the rate at which Class Health Plans pass through cost increases to premium-paying Class Members and applying the more precise estimates from this new analysis to compute premium damages. I begin with a more fundamental discussion of pass-through: (a) I describe the economics of pass-through; (b) I explain the use of regression models to estimate pass-through rates; (c) I discuss the considerations in this case that guide the design and interpretation of the pass-through analysis; and (d) I describe how to use the estimated pass-through rates to estimate premium damages. I then develop new econometric models to estimate pass-through for each Class Health

Plan, using data that span all Class Health Plans, all lines of business, and all Class Members from 2011 to 2018; these models control for several explanatory variables, including ones that control for the effects of the differing levels of competition among Kaiser and non-Kaiser health plans. I close the discussion of pass-through by presenting numerous other pieces of corroborating evidence, including both quantitative and qualitative evidence.

8.      I then revisit my damages methodology that mimics the process by which health plans set premiums, by updating my damages estimates to reflect the more mathematically precise pass-through estimates, based on my new econometric pass-through analysis. Along the way, I respond to various criticisms made by Sutter's expert, Dr. Willig, regarding my prior pass-through analysis.

9.      As part of my new work, I have relied upon: (a) statewide data from the Centers for Medicare and Medicaid Services ("CMS") on premiums and medical costs for health plans in California; (b) production data, *i.e.*, the paid claims and premium data produced by Class Health Plans in these proceedings; (c) prior econometric analyses of pass-through, including analyses presented by Sutter's expert, Dr. Robert Willig; and (d) ordinary-course evidence and record testimony that relates to the issue of pass-through. These and other materials upon which I rely are cited throughout this report. A full list of incremental materials considered is included in Appendix C.

10.     The work presented in this report has been conducted by me and staff working under my direction, at both Berkeley Research Group and Matrix Economics. I receive $850 per hour for my work in this matter. Matrix Economics also receives compensation from Berkeley Research Group based on its collected staff billings in support of this effort. My compensation is not dependent on the outcome of this matter. My work is ongoing, and I will continue to review the discovery record to understand the evidence in this case. I reserve the right to supplement and to amend my opinions.

## II.      Summary of Opinions

11.     Based on the evidence described in this report, it is my opinion that Class Health Plans have passed through to premiums all or nearly all of the overcharges incurred as a result of Sutter's challenged contracting practices. My new pass-through econometric analyses study all

five Class Health Plans using regression models that control for multiple explanatory variables, including measures of competition from Kaiser and non-Kaiser health plans. These analyses show that pass-through rates are uniformly high and significant, across all business lines. The specific pass-through estimates that form the basis of my damages calculation are as follows: (a) 102.31 percent for Anthem; (b) 97.89 percent for Blue Shield; (c) 83.11 percent for Health Net; (d) 106.97 percent for Aetna; and (e) 102.10 percent for United. All five of these estimates are statistically different from zero, but they are not statistically different from 100 percent— meaning that they support the use of a pass-through rate of 100 percent. The overall weighted average pass-through across the five Class Health Plans is 98.86 percent. Capping pass-through rates at 100 percent for each Class Health Plan to be conservative, but otherwise applying the more mathematically precise pass-through estimates yields: (a) an overall weighted average pass-through of 97.16 percent; and (b) damages estimates between $465.00 million and $489.04 million over the period September 2008 to December 2017. For reasons I explain, these estimates understate the true amount of damages flowing from Sutter's challenged contracting practices. I provide here an overview of my new pass-through analyses and my updated estimates of premium damages.

### *Pass-Through*

12.    In economics, the term "pass-through" refers to the extent to which a firm increases its price in response to an increase in its cost. Pass-through analysis begins with an understanding of a firm's pricing behavior and the competitive conditions it faces. In this case, the Class Health Plans build premiums to cover expected medical and administrative costs; when premiums exceed these costs, a health plan earns a positive margin. Given the nature of competition in California health insurance markets, Class Health Plans faced with a cost increase must decide whether to: (a) pass through all or nearly all of the cost; (b) absorb some of the cost increase (and cut into margins); or (c) forgo sales to price sensitive customers and possibly raise price by more than the cost increase.[15] As I explain in this report, the state and federal

---

[15] I recognized some of these theoretical possibilities in a prior deposition. (*See* Chipty Deposition, August 16, 2018, pp. 470-473.)

regulations governing all health plans in California, including the Class Health Plans, suggest that the first of these responses may be the most likely.

13.     To determine the precise levels of pass-through, I conduct a series of new econometric analyses that empirically study, for each of the Class Health Plans, the relationship between premiums and costs. My primary analysis uses comprehensive, statewide data that Class Health Plans file with CMS annually to ensure compliance with the Medical Loss Ratio ("MLR") provisions of the Affordable Care Act ("ACA").[16] These data, to which I refer as the "MLR Data," are uniquely suited to study pass-through in this case:

- The data are of high quality and credible: (a) they reflect actual premium and claims experience for all Class Health Plans and Class Members, across all business lines in California, from 2011 to 2018; (b) they are constructed from transaction-level data by the health plans themselves, to comply with federal regulations; (c) they are filed with the federal government as a requirement under the ACA; and (d) they are used in the ordinary-course by CMS, as an input into its assessment of whether health plan premiums meet the MLR requirements.

- The data contain the information necessary to study pass-through: premiums and all medical costs. This information is available annually, by health plan, line of business, and regulator—the California Department of Insurance ("CDI") or the Department of Managed Health Care ("DMHC").

---

[16] The MLR provisions of the ACA require that medical costs account for at least 80 percent of premiums charged to Individual and Small Group subscribers and at least 85 percent of premiums charged for Large Group subscribers. (*See* CMS, "Medical Loss Ratio Data and System Resources," available at https://www.cms.gov/CCIIO/Resources/Data-Resources/mlr.html, *site visited* November 5, 2019; and CMS, "Medical Loss Ratio: Getting Your Money's Worth on Health Insurance," November 22, 2010, available at https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/medical-loss-ratio html, *site visited* November 5, 2019.) If these provisions constrain health plans from raising premiums, health plans will be more inclined to pass through all increases in cost.

- The data contain sufficient information to study the importance of competition from Kaiser and non-Kaiser health plans on pass-through.

As I explain, the pass-through estimates based on the MLR Data are reliable for the purposes of estimating damages to Class Members in this case.

14.     My MLR Data pass-through analyses study the relationship between Class Health Plan premiums and their medical costs. My baseline regression model controls for 14 explanatory variables, including: (a) medical costs, which reflect benefit design;[17] (b) measures of competition from Kaiser and non-Kaiser health plans; (c) a regulator indicator for whether the premium was determined under DMHC oversight, which serves as a proxy for HMO products; (d) health plan-specific effects that control for time-invariant differences across health plans; and (e) a time trend, to allow for general changes in market conditions over time. My model also includes interaction terms that enable me to estimate pass-through separately by Class Health Plan. Using this model, I estimate the weighted average pass-through across all Class Health Plans to be 97.16 percent. For reasons I explain, this estimate is conservative, meaning that actual pass-though is likely higher.

15.     In addition, I estimate a series of alternative regression models using the MLR Data, as robustness-checks; these models allow for a more flexible relationship between premiums and certain explanatory variables. Across the board, I find that the Class Health Plans' pass-through rates are uniformly high and significant. I also find that the Class Health Plans are likely to pass through cost increases at a *greater* rate when they face more competition from Kaiser. As I explain below, this result is consistent with both economic theory and qualitative evidence.

16.     In addition, I develop corroborating evidence studying pass-through using the available production data. These data, to which I refer as the "Production Data," represent the premiums and inpatient and outpatient claims experience for the Class Health Plans. These data are not as complete as the MLR Data and as such do not form the basis for my primary pass-through estimates. For example:

---

[17] For example, when patients bear greater out-of-pocket costs, health plans incur lower medical costs.

- The Production Data include information on only facilities costs, not all medical costs. Facilities costs include inpatient costs and outpatient costs at hospitals, clinics, and ambulatory surgical centers; they do not include any physician and pharmacy costs. Yet, studying the relationship between premiums and costs is best understood with all medical costs: as I explain in this report, using only a component of costs can have the effect of understating pass-through.[18] For this reason, where possible, I previously analyzed the relationship between premiums and all medical costs;[19] consistent with this fact, pass-through estimates that I had previously estimated using the relationship between premium and only a component of costs were generally lower than those estimated with all medical costs.[20]

- Some of the available Production Data are not usable to study pass-through because they lack certain information necessary to build a pass-through analysis dataset.[21]

---

[18] Plaintiffs' expert Dr. Flamm, in *Qualcomm*, also studied the relationship between handset prices and the total variable cost of making the handset (measured by cost of goods sold), not a component of cost. Public Redacted Version of Declaration of Dr. Kenneth Flamm, *In Re: Qualcomm Antitrust Litigation*, Case No. 17-md-2773-LHK, July 5, 2018 (hereafter "Flamm Qualcomm Report"), ¶ 255 ("Economic theory holds that it is the incremental cost of the product that is a determinant of product price. The cost variable I use is the best available measure of total variable cost. For Apple, this measure is total material costs. For other [original equipment manufacturers], the cost variable is typically based on cost of goods sold.").

[19] My prior analyses that studied all medical costs included: (a) regression analysis of the statewide data provided by the Class Health Plans on the Uniform Rate Review Templates ("URRTs") filed with the California's Department of Managed Health Care for small groups; (b) regression analysis of Blue Shield data in a Blue Shield document summarizing its premiums and medical costs for large groups in the state; (c) testimony from Class Health Plan actuaries explaining that premiums need to cover total costs across a business line in order for the business line to be viable; and (d) ██████████████████████████████████████████████ *See* Chipty Class Declaration, ¶¶ 116-125 and Exhibits 15-17; and Chipty Reply Declaration, ¶¶ 70-71 and Exhibit 8.

[20] Exhibit 8 in the Chipty Reply Declaration explicitly describes which analyses relied on all medical costs and which ones relied on only inpatient costs.

[21] For example, studying pass-through requires linking a health plan's premium data to its claims data, but it is not possible to link these data for the vast majority of Aetna claims. Though I cannot use Aetna's production data to estimate pass-through, I can use it to calculate damages for a given pass-through rate, because the damage calculation requires linking premium data to inpatient claims at only the Sutter Damage Hospitals, which is possible with the Aetna production data.

- The Production Data do not contain member and cost information for non-Class health plans; as such, there are fewer ways in which one can use them to study the effects of competition on pass-through.

Nonetheless, I study pass-through using the Production Data for: (a) Anthem Individual; (b) Anthem Small Group; (c) Anthem Large Group; and (d) Blue Shield Small Group. The Production Data provide some insights, including the extent to which pass-through varies by geographies across Class / non-Class areas and Kaiser / non-Kaiser areas. My analyses based on the Production Data show that pass-through rates are positive and significant for the Class Health Plan-business lines that I study, regardless of Kaiser's competitive significance.

17.       In prior reports in this case, Dr. Willig and I estimated pass-through using a combination of Production Data and other data sources. For instance, in his merits report, Dr. Willig analyzed Anthem individual and Blue Shield small group Production Data.[22] As I describe below, his own work establishes that pass-through rates are uniformly high and significant in each of the Class RAs, notwithstanding the degree of competition from Kaiser and non-Kaiser health plans.

18.       Collectively, these Production Data analyses corroborate the results of my MLR Data analyses, and they demonstrate that Class Members suffered common antitrust impact as a result of Sutter's conduct.

19.       Finally, I note that my econometric approach to estimating pass-through is more rigorous than that of Dr. Flamm, Plaintiffs' expert in *Qualcomm*, in at least two important dimensions. First, my regressions are estimated using data that are substantially more comprehensive than the data Dr. Flamm used in his pass-through regressions in *Qualcomm*. Notably, my MLR Data analysis reflects over 99 percent Class Member months over the period 2011 to 2018, whereas Dr. Flamm discarded the vast majority of available sales data at different

---

[22] Willig Merits Report, Table 8.

levels of the supply chains he analyzed in *Qualcomm* (a decision described by the Court).[23] Second, my analysis controls for the effect of competition on prices and on pass-through; by contrast, Dr. Flamm's analysis in *Qualcomm* did not.[24] One similarity in the two cases appears to be that the ordinary-course documents from market participants (*i.e.*, Class Health Plans and Sutter itself) support the view that average pass-through is likely to be high, something which the Court in *Qualcomm* found persuasive.[25]

### Premium Damages

20.      My premium damages model is built upon standard principles from competition economics, and it reflects the actuarial principles to which health plans adhere in setting premiums. Health plans set premiums to cover their costs and earn a profit margin, within the bounds of regulations and subject to the competitive conditions of the marketplace. The pass-through rates I use to calculate damages reflects these competitive conditions. Premium damages

---

[23] "Dr. Flamm claims to have data representing 'approximately 90% of total cell phone sales' in the United States during the class period . . . [but] he drops the vast majority of these data, ultimately using only data representing 7.3% of all Relevant Cellular Device sales by OEMs. . . . Additionally, Dr. Flamm eliminated available data from all but one of the [mobile phone] contract manufacturers . . . [such that] his [contract manufacturer] pass-through regression represents only 0.3% of the 421 million phones manufactured by [contract manufacturers]… Dr. Flamm uses data from just a single distributor—Brightstar—and thus performs no modeling whatsoever of 99.1% of phones sold by distributors." *See* Public Redacted Version of "Defendant Qualcomm Incorporated's Motion to Strike the Declaration of Kenneth Flamm," *In Re: Qualcomm Antitrust Litigation*, Case No. 17-MD-02773-LHK, August 9, 2018 (hereafter "Qualcomm's Motion to Strike Flamm"), pp. 4-8.

[24] Dr. Flamm explains that his "analysis uses a hedonic price function, which is a reduced form equation determining average equilibrium market price *conditional on product characteristics*" (emphasis added). In addition to cost, Dr. Flamm controls for the following ten product characteristics: operating system; OEM; data speed; battery storage capacity; storage; design weight; screen size; camera megapixels; MHz speed; and download speed. There are no explicit controls in his regression model for competition. Flamm Qualcomm Report, ¶¶ 253 and 256.

[25] Public Version of "Order Granting Plaintiffs' Motion for Class Certification; Denying Qualcomm's Motion to Strike the Declaration of Kenneth Flamm," *In Re: Qualcomm Antitrust Litigation*, Case No. 17-MD-02773-LHK, September 27, 2018 (hereafter "Koh Qualcomm Class Decision"), pp. 33-34, 36 ("Dr. Flamm relies on documentary and testimonial evidence evincing that Qualcomm, OEMs, and wireless carriers treated Qualcomm's royalty as a known component cost and 'included the Qualcomm royalty in their calculations of the total costs of cellular phones.' . . . For example, Qualcomm's own internal analysis of the average sales price of phones in 2011 and 2013 showed that Qualcomm considered royalties as one component of the cost to OEMs that would be incorporated in the price to retailers and then incorporated into the price to consumers. . . . Moreover, Dr. Flamm identifies multiple pieces of testimony in which Qualcomm and other participants in the cellular industry (including OEMs and wireless carriers) stated that Qualcomm's royalty would be an added component to the price of the phone. . . . The Court finds that Plaintiffs' documentary evidence and expert reports . . . suggest[] that common proof could be used to demonstrate that Qualcomm's above-FRAND royalty charges are passed through every level of the distribution chain to consumers.").

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

are computed as the difference between: (a) the premiums that Class Members paid in the actual world where Sutter overcharged the Class Health Plans; and (b) the premiums that Class Members would have paid in the but-for world where Sutter did not engage in the challenged conduct. My damages analysis is conducted in four steps.

- *Step 1*: Using a near-complete set of inpatient claims data from each of the five Class Health Plans, I estimate a set of multivariable regression models to determine the percentage by which each Class Health Plan was overcharged on Sutter inpatient hospital claims, by year, by Sutter Damage Hospital. Where the available data do not permit overcharge estimation, I do not calculate premium damages.

- *Step 2*: Applying the overcharge percentages estimated in Step 1, I compute the amount by which each of the Class Health Plans overpaid Sutter, across the Sutter Damage Hospitals, by line of business, RA, and year. These overpayment dollars represent an increase in Class Health Plan costs.

- *Step 3*: I then calculate the dollar increase in premiums paid by Class Members, to each Class Health Plan, using a weighted average pass-through rate based on my econometric analyses of MLR Data: *Overpayment by each Class Health Plan to the Sutter Damage Hospitals x Pass-Through Rate*.

- *Step 4*: I compute aggregate premium damages as the sum of premium damages across all Class Members.

Based on this analysis, I estimate total premium damages through 2017 to be between $465.00 million and $489.04 million.[26] For reasons I explain, these estimates understate damages. I demonstrate, for example, that addressing one of the important ways in which my analysis is conservative, *i.e.*, applying a trend factor, could increase damages by about $73.39 million to $76.41 million.[27]

---

[26] As Sutter's conduct continued to harm the Class through 2018 and 2019, I may calculate damages incurred by Class Health Plans for 2018 and 2019, should information from the Class Health Plans become available that would allow me to do so.

[27] *See* Chipty Workpapers.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

***

21.     In summary, it is my opinion that Sutter's conduct has resulted in harm to all or nearly all Class Members and that premium damages can be estimated using the common formulaic method that I described in my Class Declarations. My opinion is grounded in economic principles, documentary evidence, testimony, and substantial econometric work studying the medical costs incurred by each of the five Class Health Plans and the premiums paid by all or nearly all Class Members. My analyses of pass-through and premium damages rely upon data covering all five Class Health Plans; they are not restricted to just Anthem and Blue Shield. The data that inform my pass-through analyses reflect the experience of about 99 percent of Class Members after 2011 and about 50 percent of Class Members before 2011.[28]

22.     My analysis shows that Sutter elevated hospital prices at the Sutter Damage Hospitals, and in so doing, overcharged the Class Health Plans. Class Health Plans passed on these elevated costs to Class Members: a large body of econometric analyses show that pass-through rates are uniformly high and significant. As a result, Class Members suffered common impact due to Sutter's conduct.

23.     The remainder of this report explains my analyses and results in greater detail. Section III describes the framework for estimating pass-through. Section IV presents a series of new econometric pass-through models, using the MLR Data. Section V describes a host of corroborating econometric evidence, including new evidence based on the Production Data, my prior econometric evidence, and evidence and opinions put forth by Dr. Willig in his prior reports in this case. Section VI shows that the econometric estimates are consistent with qualitative evidence in this case. Section VII presents updated damage estimates, using the pass-through rates from my preferred econometric model. Section VIII concludes.

---

[28] Chipty Workpapers.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

### III. Framework for Estimating Pass-Through for Damages

24.     Class Members sustain injury when the premiums they pay are increased by the Class Health Plans to cover the additional costs they bear because of Sutter's elevated hospital prices. Economic theory tells us that, depending on competitive conditions, firms may pass through some, all, or more than all of their cost increases.[29] The extent to which a firm passes through cost increases (*i.e.*, the pass-through rate) can be estimated by using, among other things, regression analysis. In this section, I provide a framework for estimating pass-through: (a) I begin with a general discussion of the economics of pass-through; (b) I describe a general regression analysis approach to estimating the pass-through rate; (c) I describe economic considerations that guide my design of pass-through regression models in this case; and (d) I demonstrate how the pass-through estimates from the regression model can be used to calculate premium damages to Class Members.

#### A. Economics of Pass-Through

25.     Pass-through refers to the extent to which a firm changes the price it charges its customers in response to a change in its cost. Pass-through is often reported as a percent (*e.g.*, 90 percent) or rate (*e.g.*, 0.9), where the percent or rate reflects the proportion of a cost increase that the firm "passes through" to its customers in the form of a higher price.

26.     There is a long theoretical literature in economics that studies the determinants of pass-through.[30] Pass-through depends on the shape of a firm's demand curve (which embodies

---

[29] For example, the pass-through rate is: (a) exactly 50 percent in the case of a monopolist facing linear demand and constant marginal cost; (b) 100 percent in a perfectly competitive market with constant marginal cost; and (c) greater than 100 percent in other situations. Moreover, a firm with market power will pass on more of its cost increase the less price sensitive are its consumers. *See* Kosicki, George and Miles Cahill, "Economics of Pass Through and Damages in Indirect Purchaser Cases," *The Antitrust Bulletin*, Vol. 51, No. 3, Fall 2006, pp. 599-630 (hereafter "Kosicki and Cahill (2006)"), at pp. 611-613.

[30] *See* RBB Economics, "Cost pass-through: theory, measurement, and potential policy implications," A report prepared for the United Kingdom's Office of Fair Trading, February 2014 (hereafter "RBB Report"), available at https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/320912/Cost_Pass-Through_Report.pdf, site visited November 5, 2019. *See also*, Bishop, Robert, "The Effects of Specific and Ad Valorem Taxes," *The Quarterly Journal of Economics*, Vol. 82, No. 2, 1968, pp. 198-218; Bulow, Jeremy, and Paul

---

consumers' willingness to pay) and the competitive conditions it faces.[31] For example, a firm that is pricing above cost may choose not to pass through all of its cost increase if its consumers have limited tolerance for higher prices or if the firm faces a lower-cost competitor; in either case, the firm may choose to earn lower margins in order to keep its business.[32] If all firms in a relevant market experience the same cost increase, they may be more inclined to pass through the entire cost increase, because no firm has a cost advantage.[33] If a firm is already pricing at the competitive level, there will be no room to absorb cost increases; in this case, one would expect the firm to pass through all of its cost increase, even if that decision results in a loss of business to a lower-cost competitor.[34] Further, a cost increase may have the effect of forcing the firm to forego sales to its more price sensitive consumers, and sell instead only to its less price sensitive consumers; in this case, the firm may respond to a cost increase by raising price by more than the increase in cost.[35]

27.     There is widespread consensus among economists that the determination of a specific pass-through rate, in a specific situation, needs to be informed by actual marketplace

---

Pfleiderer, "A Note on the Effect of Cost Changes on Prices," *Journal of Political Economy*, Vol. 91, No. 1, 1983, pp. 182-185 at p. 183; Cotterill, Ronald, Leonard Egan, and William Buckhold, "Beyond Illinois Brick: The Law and Economics of Cost Pass-Through in the ADM Price Fixing Case," *Review of Industrial Organization*, Vol. 18, No. 1, 2001, pp. 45-52; and Deng, Fei, John H. Johnson, and Gregory K. Lenoard, "Economic Analysis in Indirect Purchaser Class Actions," *Antitrust*, Vol. 26, No. 1, Fall 2011 pp. 51-57 (hereafter "Deng *et al.* (2011)").

[31] Deng *et al*. (2011), p. 52.

[32] Kosicki and Cahill (2006), pp. 613, 617-18.

[33] RBB Report, p. 5 ("The extent of firm-specific cost pass-through is typically less than industry-wide cost passthrough.")

[34] Dr. Willig has suggested that my econometric models that show greater pass-through rates in areas where Class Health Plans face more competition from Kaiser are counterintuitive. (Willig Merits Report, ¶ 238.) However, as explained Kosicki and Cahill, citing to Professor Varian, "[t]he notion that a monopolist may pass through less of a cost increase than a company in a competitive industry is sometimes considered to be counterintuitive, but the result is consistent with the fact that each firm in a perfectly competitive market must at least break even in the long-run. In contrast, a monopolist can still survive if it does not completely pass through cost changes, provided it is earning positive economic profits prior to the cost change." *See* Kosicki and Cahill (2006), footnote 34 (citing Hal Varian, *Intermediate Microeconomics: A Modern Approach*, 6th Edition, 2002, pp. 423-25.).

[35] *See* footnote 79 below, for a discussion of examples of firms adapting their pricing strategies to focus on selling to less price sensitive consumers.

realities. For this reason, economists typically rely on a range of qualitative and quantitative evidence, to develop a reliable estimate of pass-through.[36]

### B.      Regression Approaches to Estimating Pass-Through

28.      A standard approach to estimating pass-through in the academic literature involves regression analysis of the relationship between prices and costs.[37] In this case, the relevant prices are health insurance premiums, and the relevant costs are all medical costs.[38] As with all regression analyses, there are several design decisions that must be made. These involve: (a) whether to estimate the regression model in logs, as opposed to levels; (b) what is the appropriate level of data aggregation at which to conduct the analysis; (c) how to measure costs; and (d) whether and how to control for other explanatory variables, in addition to cost.

29.      *Regression Model in Logs*: In many economic applications, economists estimate the relationship between two variables in logs, not levels. For example, a pass-through regression model in logs estimates the relationship between the logarithm of premiums and the logarithm of costs, while the regression model in levels estimates the relationship between premiums and costs. An important reason for estimating a regression in logs is a view that the relationship

---

[36] For example, Dr. Flamm in *Qualcomm* attempted to use three types of evidence to study pass-through: (a) economic literature; (b) documentary and testimonial evidence; and (c) regression analysis of sales data. *See* Koh Qualcomm Class Decision, pp. 33-35.

[37] There are many articles in the competition economics literature that empirically study the question of pass-through. For example, Gron and Swenson (2000) study pass-through of cost increases for the U.S. automobile industry. (*See* Gron, Anne and Deborah Swenson, "Cost pass-through in the U.S. automobile market," *Review of Economics and Statistics*, Vol. 82, No. 2, 2000, pp. 316-324 (hereafter "Gron and Swenson (2000)").) Sullivan and Dutkowsky (2012) study pass-through of tax increases on cigarette prices. (*See* Sullivan, Ryan W. and Donald H. Dutkowsky, "The Effect of Cigarette Taxation on Prices: An Empirical Analysis Using Local-Level Data," *Public Finance Review*, Vol. 40(6), 2012, pp. 687-711.) Besley and Rosen (1999) study pass-through of tax increases for a variety of commodities. (*See* Besley, Timothy J. and Harvey S. Rosen, "Sales Taxes and Prices: An Empirical Analysis," *National Tax Journal*, Vol. 52(2), 1999, pp. 157-178.)

[38] In my Class Declaration, I explained that regression analysis is a statistical methodology for determining the relationship between a *dependent variable* and a set of *explanatory variables*. *See* Chipty Class Declaration, ¶¶ 87-96. *See also*, Rubinfield, Daniel L., "Reference Guide on Multiple Regressions," in *Reference Manual on Scientific Evidence*, 2011, 3rd Edition (hereafter "Reference Guide on Multiple Regression"), pp. 303-357, available at https://www.fjc.gov/sites/default/files/2015/SciMan3D08.pdf, *site visited* June 4, 2018.

between two economic variables may be distorted by looking at the levels.[39] There are also other practical benefits of estimating a regression model in logs.[40] Both Dr. Willig and I have estimated our pass-through regression models in logs.[41]

30.     The pass-through regression model in logs can be expressed as follows: $\ln(Premium) = \beta_0 + \beta_1 \ln(Cost) + \epsilon$. The $\epsilon$ term is the *error term*.[42] The parameter $\beta_1$ represents the *pass-through rate on a percentage-basis*: it measures the percentage change in premiums that results from a percentage change in cost. Suppose, for example, that cost is $100, price is $120, and the pass-through rate is estimated to be 0.9 or 90 percent on a percentage-basis. In this case, the pass-through rate means that:

- A ten percent increase in costs would be expected to result in a nine percent increase in premium.

- A 10 percent or $10 dollar increase in cost increase is associated with a $10.80 increase in premium: $10.80 = $120 x 9 percent.

---

[39] As Dr. Wooldridge explains in his introductory econometrics textbook, "linear relationships are not nearly general enough for all economic applications," and for this reason, one "will often encounter regression equations where the dependent appears in logarithmic form" in "applied work in the social sciences." Dr. Wooldridge explains the importance of log regressions using an example involving a study of the effect of one additional year of education on hourly wages. In his example, he runs a regression in levels (regressing hourly wages on years of education) and finds that each additional year of education is predicted to increase hourly wage by 54 cents. Because of the linear relationship imposed by the levels-regression, the model predicts that 54 cents is the increase for either the first year of education or the twentieth year. In this context, it becomes clear that the relationship between education and hourly wages may be distorted by the regression in levels. Dr. Wooldridge goes on to explain, "Probably a better characterization of how wage changes with education is [with a regression in logs in which] each year of education increases wage by a constant *percentage*. Such a model might yield a result that "an increase in education from 5 years to 6 years increases wage by, say, 8% (ceteris paribus), and an increase in education from 11 to 12 years also increases wage by 8%." Thus, while the percentage increase may be the same, the increase in dollars will be different, depending on the initial level of education. *See* Wooldridge, Jeffrey M., *Introductory Econometrics, A Modern Approach*, 5th Edition (Mason Ohio: Southwestern-Cengage Learning, 2013), p. 41-43 (emphasis added).

[40] The log transformation makes the model less sensitive to outliers, and it can improve the fit of the regression model. As Kosicki and Cahill explain, economists sometimes prefer the log model in estimating pass-through for practical reasons. (*See* Kosicki and Cahill (2006), p. 609.)

[41] *See* Chipty Class Declaration, ¶ 125; Willig Class Declaration, Table 1; Chipty Reply Declaration, ¶ 65; Willig Sur-Rebuttal Report, Exhibit 5; and Willig Merits Report, Table 8 and backup production. Others studying pass-through have also estimated their pass-through regression models in logs. *See*, *e.g.*, Gron and Swenson (2000).

[42] The error term captures the summary effects of random influences, excluded variables, and measurement errors; it also reflects the fact that the results will be a function of any particular sample of data. The *standard error* of the parameter estimates measures the variability of the estimated parameters around their true values. *See* Reference Guide on Multiple Regression, pp. 340-344, 352; Kennedy, Peter, *A Guide to Econometrics*, Malden, MA: Blackwell Publishing, 6th edition, 2008, pp. 3-4.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

Noticeably, premium went up by *more than* the increase in cost, but the pass-through rate on a percentage-basis was less than one. This simple example demonstrates *the need to transform the pass-through rate on a percentage-basis to a pass-through rate on a dollars-basis*, in order to calculate the dollar amount of damages. I discuss this mathematics of this transformation and how to use estimates of pass-through to calculate damages in Section III.D.

31.     *Level of data aggregation*: One needs to decide the appropriate level of data aggregation at which to estimate the model parameters. For example, data permitting and assuming it makes sense, one could use highly disaggregated data, at the purchaser transaction-year level. Or one could aggregate the data across the purchaser transactions to study to the health plan-business line-year level. For the later, one could study the relationship between average premium per member, per month and average medical cost per member per month, by year, within the business line. In my previous pass-through analyses, I estimated regression models at the health plan-business line-year level, health plan-business line-product type-year level, and health plan-business line-Kaiser/non-Kaiser-year level. Dr. Willig estimated his models at the health plan-business line-year level and the health plan-business line-rating area ("RA") level. I discuss the choice of aggregation in the next section.

32.     *Choice of appropriate cost measure*: One needs to decide which cost measure to use as an explanatory variable in the regression model. Should one use variable costs or total costs (including some portion of fixed costs)? In studying marginal incentives over the short and medium term, as in this case, one typically studies variable costs. Should one use all medical costs or a component of medical costs, like inpatient costs or facilities costs? All three are variable costs, in that they vary with the number of members a health plan attracts. In our previous work, both Dr. Willig and I used all medical costs where it was possible to study medical costs. For reasons I explain in the next section, it is better to control for all medical costs in a regression model estimating pass-through in this case.

33.     *Choice of other explanatory variables*: One also has to choose whether and how to control for other explanatory variables. In my prior work on this case, I controlled for benefit design (including product type), competition from Kaiser, factors that differ systematically across lines of business, and factors that differ systematically across health plans. I controlled for these factors, not by including additional explanatory variables in a pooled regression model, but

by estimating the model parameters on separate subsamples of data; the latter is an analytical approach that controls for each of these dimensions. In this way, my previous regression models implicitly controlled for several explanatory variables. I discuss the choice of other explanatory variables in the description of my new econometric work, and I now explicitly control for the explanatory variables using a pooled regression model.

### C.    Considerations that Guide Pass-Through Analysis in This Case

34.    There are several relevant features that guide the econometric analysis of the pass-through rate in this case. I highlight six of them here: (1) the links in the distribution chain; (2) risk pooling; (3) differences in all medical and facilities costs; (4) product attributes; (5) the regulatory environment in which Class Health Plans operate; and (6) the competitive conditions facing the Class Health Plans. The first of these allows me to simplify the design of the pass-through analysis. The second provides insight into the level of data aggregation. The third and fourth guide the choice of explanatory variables to be included in a pass-through regression model in this case. The fifth and sixth can provide context within which to assess the reasonableness of specific pass-through estimates. I discuss each of these features here.

### 1.    Only One Link in the Supply Chain

35.    In many indirect purchaser cases, such as the *Qualcomm* and *ODD II* cases referenced by the Court in its Class Order, there are multiple links in the supply chain, which complicate the pass-through analysis. For example, Kosicki and Cahill describe a case in which an input supplier overcharges an upstream supplier. In their example, the upstream firm sells to an indirect intermediary purchaser who, in turn, sells to end purchasers. There are *two* links in this distribution chain and *two* pass-through rates. The authors explain that, in such cases, assessing harm to the indirect purchaser involves an analysis of:[43] (a) "how much of the overcharge was passed on to the indirect purchaser by the upstream supplier;" and (b) "how

---

[43] Kosicki and Cahill (2006), Figure 1.

much of the cost change was passed on [by the indirect purchaser] downstream [to end consumers]." As explained by Deng *et al.*, where there are multiple levels of the supply chain, one has to allow pass-through rates to differ across different levels of the supply chain. As they explain, "In the typical indirect purchaser action, this could represent a large number of econometric analyses [and] feasibility may become an issue."[44] By contrast, in the *Sidibe* case, there is only *one* link in the distribution chain. Under the Plaintiffs' theory of harm, Class Health Plans passed on the Sutter overcharge in the form of higher premiums to Class Members. Because Class Members are the end purchasers, there is no further pass-through to estimate.[45]

36.     The exemplar cases referenced by the Court are even more complex than even the supply chain described by Kosicki and Cahill.[46] For example, in *Qualcomm*, the pass-through analysis had to trace the effects of the alleged overcharge across multiple segments of the mobile phone distribution chain, including original equipment manufacturers ("OEMs"), contract manufacturers, wireless carriers, distributors, and retailers.[47] For this reason, the Plaintiffs' expert calculated pass-through for 18 different channels of distribution, where each channel of distribution represented a different path by which mobile phones that integrate Qualcomm technology were manufactured, distributed, and ultimately purchased by the end purchaser.[48] For example, one of the 18 channels of distribution involved Qualcomm licensing a contract

---

[44] Deng *et al.* (2011), p. 54.

[45] Dr. Willig describes this case as having a second level of pass-through, from employers to their employees. (*See* Willig Class Declaration, Figure 1.) In my Class Reply Declaration, I explained that Dr. Willig's characterization of a second level of pass-through is inappropriate and misleading because employers do not sell health insurance; instead they consume it along with their employees. (*See* Chipty Reply Declaration, ¶¶ 45-46.) Further, I presented evidence that the "split" of premiums that employers and employees pay has been stable from year-to-year and explained that a "proportional split of damages (proportional to the amount each party contributed towards the premium) is both a reasonable and feasible method for allocating damages between an employer and its employees." (Chipty Reply Declaration, ¶¶ 47-61.)

[46] In *ODD*, Plaintiffs' expert studied pass-through at three levels of the supply chain: (a) manufacturers; (b) distributors; and (c) retailers. "[Corrected] Declaration of Dr. Kenneth Flamm in Support of Plaintiffs' Motion for Class Certification," *In re Optical Disk Drive Antitrust Litigation*, Case No. 3:10-md-2143 RS, filed May 28, 2015, Table 5, p. 100.

[47] Koh Qualcomm Class Decision, p. 35.

[48] Koh Qualcomm Class Decision, pp. 35-36.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

manufacturer, who sold a mobile phone to an OEM, who sold the mobile phone to a wireless carrier, who sold the mobile phone to the end purchaser.[49] In this one channel of distribution, there are three pass-through rates: (a) contract manufacturer *to* OEM; (b) OEM *to* wireless carrier; and (c) wireless carrier *to* end purchaser. As explained by Judge Koh in *Qualcomm*, "Dr. Flamm uses the pass-through rates for each segment of the distribution chain to calculate cumulative pass-through rates for each of the 18 sales channels. At the final step of his analysis, Dr. Flamm weights the pass-through rate for each of the 18 sales channels by [the] percentage of total sales to yield a final overall pass-through rate that 'estimate[s] damages to end purchasers due to Qualcomm's overcharge.'"[50] By contrast, in the *Sidibe* case, there is *one* channel of distribution and *one* level of pass-through. Dr. Flamm needed a more complicated framework and many more assumptions to capture the very different circumstances of his case.

### 2.  *Risk Pooling*

37.    Individuals and businesses purchase health insurance to pool the risk of needing expensive medical care across many people. As such, the premium a purchaser pays does not reflect the actual cost of his or her own medical care; rather*, it reflects the average expected cost of caring for the purchasers with whom the medical risk has been pooled.*[51] This fact, by itself, has important implications for pricing and, as such, the design of a pass-through analysis for health insurance products: one should not study the relationship between premiums paid and the medical costs actually incurred by individual purchasers, disaggregated to the purchaser transaction-level. Instead, one should study the relationship between average premiums and costs over a collection of purchasers.

---

[49] Flamm Qualcomm Report (Public Redacted Version), Table 23 and ¶ 283.

[50] Koh Qualcomm Class Decision, p. 36 (internal references omitted).

[51] Sutter's expert, Patrick Travis, recognizes that plans pool risk as I describe. *See* Travis Declaration, ¶ 25 ("The function of any insurance, including health insurance, is to spread risk over a large pool of participants, where the law of large numbers provides a greater statistical level of confidence that the aggregate expected claims, administrative expenses, and profit margin will be covered by aggregate premiums, even though any one policyholder may experience more or fewer claims than expected.").

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

38.     Assuming the data permit, one could reasonably study the relationship between premium and medical costs at the health plan-business line level. This design is supported by Michael Beuoy, actuary and Vice President at Blue Shield, who testified that ███████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████[52] It is also supported by that fact that, in required filings made to the federal government and California regulators that I describe below, Class Health Plans identify the relationship between premiums and medical costs by business line, across the State of California.

39.     For these reasons, I estimate my regression pass-through models at the health plan-business line-year level. As I show later in this report, in nearly all instances, I find pass-through rates to be uniformly high and significant, which supports my conclusion of common antitrust impact to Class Members.

    3.     *Costs the Premiums Are Designed to Cover*

40.     Ideally, an econometric analysis of pass-through should relate premiums to all medical costs borne by health plans.[53,54] These costs include facilities costs, other medical costs (such as physician and pharmacy costs), and capitation payments. Facilities costs are the payments made by health plans to hospitals for inpatient care and to hospitals, clinics, and ambulatory surgical centers for outpatient care. Capitation payments are payments made by health plans to risk bearing organization on behalf of health plan members, regardless of the amount of medical services the members actually use. In these cases, the risk bearing

---

[52] Beuoy Deposition, p. 69. *See also*, Axene Declaration, ¶¶ 5, 40-41.

[53] Collectively, all medical costs account for about 88 percent of health plan's total costs incurred. Chipty Workpapers, based on data from America's Health Insurance Plans, "Where Does Your Health Care Dollar Go?" 2018, available at https://www.ahip.org/wp-content/uploads/2017/03/HealthCareDollar_FINAL.pdf, *site visited* November 13, 2019.

[54] In Section VI.C below, I describe testimony from actuaries in this case explaining that premiums are designed to ensure that, in the aggregate, each health plan business line covers all medical costs that it incurs.

organization (*e.g.*, a provider) bears the risk that members will need medical care, and the cost of care does not appear in the health plan's claims data.[55]

41.     As Deng *et al.* explain, pass-through analyses that study all relevant costs are generally preferred to ones that study only a component cost.[56] They go on to explain that attempting to measure pass-through using only a component of cost (even if it is the cost of the allegedly overharged input) can lead to biased results due to the omitted variables problem.[57] To understand the potential omitted variable problem, suppose that—on a per member, per month basis—premiums increase in a given period by $10, going from $120 to $130 (*i.e.*, an 8.3 percent increase). In the same period, suppose that: (a) all medical costs increase by $10, going from $100 to $110 (*i.e.*, a 10 percent increase); and (b) facilities costs increase by $5, going from $20 to $25 (*i.e.*, a 25 percent increase). In this case:

- A regression of log(premium) on log(*all medical costs*) would find a pass-through rate on a percentage-basis of 83 percent: a 10 percent increase in total cost is associated with an 8.3 percent increase in premium (83% = 8.3% ÷ 10%).

- By contrast, a simplistic regression model of log(premium) on log(*facilities cost*) would find a *lower* pass-through rate on a percentage-basis of 33 percent: a 25 percent increase inpatient costs is associated with an 8.3 percent increase in premiums (33% = 8.3% ÷ 25%).

Further, if all medical costs (and premiums) increase, but the component of medical costs does not increase by as much, the simplistic regression model may overstate pass-through. If the component cost decreases, the simplistic regression model may yield the incorrect (and

---

[55] Overall, capitated payments account for around 16 percent of Class Health Plans' medical costs for their small group line of business. (*See* Chipty Workpapers.) My damages model conservatively does not estimate damages to Class Members from inflated capitated payments, even though they are inflated because of the inflated Sutter hospital prices.

[56] Deng *et al.* (2011), pp. 54-55.

[57] Deng *et al.* (2011), pp. 54-55.

nonsensical) result that pass-through is *negative* (*i.e.*, a lower component cost corresponds to a higher premium). On the other hand, if the percentage change in all medical costs resembles the percentage change in the component cost, then one could study pass-through with the component cost, although using all medical costs would still provide more precise pass-through estimates.[58]

42.     The evidence suggests that studying the relationship between premiums and only facilities costs may be problematic for some Class Health Plans, because of their significant and growing reliance on capitation. For example, capitation payments account for a significant percent of all medical costs for the small group line of business for United, Aetna, and Health Net; from 2012 to 2016: (a) about 59 percent for United; (b) about 50 percent for Aetna; and (c) about 45 percent for Health Net.[59] ███████ capitation payments account for a ███████ portion of Blue Shield's and Anthem's small group all medical costs: (a) abou ███████ percent of Blue Shield; and (b) about seven percent for Anthem.[60] Evidence also shows that Health Net and United have shifted a significant portion of their medical costs, including their facilities costs, to risk bearing organizations over the Class Period.[61] Thus, facilities costs significantly understate all medical costs, particularly for United, Aetna, and Health Net.

43.     For this reason, my previous pass-through analyses prioritized the URRT data for small groups and the Blue Shield Profit Data for large groups—because both contained information on all medical costs.[62] My new analyses study pass-through using the MLR Data, for all Class Health Plans, across all of their business lines, because they also contain information on all medical costs. By contrast, the Production Data do not contain information on all medical

---

[58] Chipty Workpapers.

[59] Chipty Workpapers.

[60] Chipty Workpapers.

[61] Health Net and United each experienced an increase in their share of medical costs that are capitated and a decrease in their share of medical costs associated with facilities costs, for their small group lines of business from 2012 to 2016. *See* Chipty Workpapers.

[62] Chipty Class Declaration, ¶¶ 123-125 and Exhibit 17; and Chipty Reply Declaration, ¶¶ 70-71 and Exhibit 8. In my Class Declaration, I also studied pass-through using figures provided by Mr. Robert Reed, former CFO of Sutter, regarding ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████n doing this calculation, I considered the relationship between *all medical costs* incurred by a health plan and premium, not only the level of facilities costs that ███████████████████████████████████Chipty Class Declaration, ¶¶ 118-119 and Exhibits 15-16.

cost; nor do they contain information on capitation payments by Class Health Plans to risk bearing organizations: they only contain information on facilities costs. Thus, one cannot use these data to study the relationship between premiums and all medical costs. For reasons I have explained, one must be careful in studying pass-through using only a component of all medical costs borne by the Class Health Plans, especially if those component costs are trending differently than total costs. I had previously studied the Production Data from Anthem, for individual and large groups, to corroborate my opinion that Class Members incurred common antitrust impact.

44.    To calculate damages using mathematically precise, econometrically estimated pass-through rates, I prefer my estimated pass-through rates based on the MLR Data, because they allow me to study the relationship between premiums and all medical costs. I continue to use certain Production Data, where possible, to test whether pass-through rates are positive and significant and, in turn, to test whether Class Members incurred common antitrust impact.

### 4.    Product Attributes

45.    In principle, prices can be a function of both costs and product attributes. For example, in *Qualcomm*, Plaintiffs' expert controlled for cost of goods sold and ten different phone attributes.[63] Product attributes of health insurance products include: (a) the extent to which patients and their health plan share the cost of medical care (*e.g.*, as implemented through the use of coinsurance, copayments, and deductibles); and (b) the extent to which patients need to go through a medical "gatekeeper" before accessing healthcare (*e.g.*, the HMO model). My pass-through regression analysis controls for product attributes in different ways:

- *Cost variable*: A health plan that bears a higher share of the cost of care, relative to its patients, will have higher incurred medical costs. Thus, the cost variable reflects the extent to which the health plan bears a higher share of the cost of care.

---

[63] Koh Qualcomm Class Decision, pp. 34-35.

- *Indicator variable for the regulator*: HMO products generally require pre-approval from a primary care physician before a member can visit a specialist or receive some other form of medical care. By contrast, PPO products do not require pre-approval from a "gatekeeper." In California, all HMO products are overseen by DMHC, whereas PPO products are overseen by both CDI and DMHC.[64] Thus, my new regression models based on the MLR Data include as an additional explanatory variable an indicator for the regulator.

- *Health plan fixed effects*: My regression models also allow for the possibility that health plans may systematically differ in their benefit design, by controlling for health plan-specific effects. This approach is commonly used in regression analyses to control for time-invariant effects that may differ systematically across firms but are not captured by other explanatory variables.

- *Time effects*: Further, my regression models based on the MLR Data allow for the possibility that benefit design has changed systematically over the Class Period, by controlling for time effects. Under certain circumstances, this approach can be used in regression analyses to control for time-varying effects that are not captured by other explanatory variables.

5.    *Regulatory Environment*

46.    The Class Health Plans are subject to regulatory oversight that has implications for pass-through, including: (a) solvency requirements; and (b) MLR requirements. The first requirement attempts to ensure that health plans have enough money to cover medical costs. For this reason, both the CDI and DMHC monitor health plans' finances and proposed rates,[65] and

---

[64] DMHC, "Types of Plans," available at https://www.dmhc.ca.gov/HealthCareinCalifornia/TypesofPlans.aspx, *site visited* November 17, 2019.

[65] Axene Declaration, ¶ 23 ("Actuaries at DOI and DMHC . . . review [health plans' individual and Small Group] filings. . . . One of the major objectives of the regulators is to assure the general public that rates have been set at an appropriate level and provide confidence to insureds that the carriers will remain in business. Regulators have

they require health plans to maintain financial reserves.[66] The second requirement attempts to ensure that health insurance is affordable. To this end, the federal government (as part of the ACA) requires health plans to ensure that the percentage of premium revenue spent on medical care and healthcare quality improvement does not fall below: (a) 80 percent, for individual and small group lines of business; and (b) 85 percent, for large group lines of business.[67] (Under the ACA, if a health plan falls under these so-called MLR thresholds, they will have to provide premium payers with rebates.) Prior to the ACA MLR requirement going into effect in 2011,[68] California had its own regulation that required health plans to maintain a 70 percent MLR over the life a product, for individual and group mass-marketed products.[69]

47.    These regulatory requirements limit health plans' flexibility in setting premiums: (a) the solvency requirements ensure that premiums are not too low relative to medical costs; and (b) the MLR requirements ensure that premiums are not too high relative to medical costs. These requirements will tend to make health plans adjust their premiums in the face of rising or declining healthcare costs. By contrast, my understanding is that industries involved in the cases cited by the Court in the Class Order (*e.g.*, mobile phone industry, consumer electronics products

---

specific requirements for solvency monitoring in the case that a health plan struggles financially.") and footnote 20 ("The California DOI sets financial surveillance criteria based upon carrier surplus and capital falling below specific percentages of Risk Based Capital (e.g., 200% of RBC). California DMHC has similar requirements. . . .").

[66] California Health Care Foundation, "Insurance Markets: Regulatory Oversight of Health Insurance in California," June 2003, available at https://www.chcf.org/wp-content/uploads/2017/12/PDF-HIMURegulatoryOversight.pdf, *site visited* November 8, 2019 ("Both of California's regulatory agencies are responsible for monitoring and enforcing solvency. . . . DMHC enforces minimum financial reserve standards through what are known as 'tangible net equity' requirements. . . . CDI applies nationally developed 'risk-based capital' standards to ensure that insurers have adequate financial reserves to cover claims liabilities.").

[67] CMS, "Medical Loss Ratio: Getting Your Money's Worth on Health Insurance," November 22, 2010, available at https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/medical-loss-ratio html, *site visited* November 5, 2019.

[68] *Id*.

[69] Mathewson Deposition (Anthem, May 18, 2018), pp. 220-221; and America's Health Insurance Plans, "State Mandatory Medical Loss Ratio (MLR) Requirements for Comprehensive, Major Medical Coverage: Summary of State Laws and Regulations," April 15, 2010, available at https://www.naic.org/documents/committees_e_hrsi_comdoc_ahip_chart_mlr.pdf, *site visited* November 9, 2019, p. 7.

containing optical disc drives) are not subject to the same types of regulatory oversight and regulations.

### 6.    Competitive Conditions

48.    As I explained earlier, if all firms in a relevant market experience the same cost increase, they may be more inclined to pass through the entire cost increase, because no firm has a cost advantage.[70] In 2016, the five Class Health Plans accounted for about 90 percent of commercially-insured non-Kaiser health plan members in California,[71] and they compete with each other in multiple geographies throughout the state. Throughout California, the Class Health Plans: (a) operate under the same regulatory framework; (b) follow the same actuarial principles in setting premium rates;[72] and (c) have attempted to launch steered products.[73] In Northern California, the Class Health Plans are all affected by Sutter's conduct. They are forced to pay elevated hospital prices to Sutter, and as explained in my merits report, many of the steered products that the Class Health Plans have attempted to launch in Northern California have failed because of Sutter's restrictive contracting practices.[74]

49.    The Class Health Plans also compete against the Kaiser health plan, that covers around 45 percent of commercially-insured health plan members in California.[75] Because Kaiser is a "closed" healthcare system that does not contract with non-Kaiser providers,[76] Kaiser does not pay Sutter overcharges, nor is it hampered by Sutter in competing for commercially-insured

---

[70] RBB Report, p. 5 ("The extent of firm-specific cost pass-through is typically less than industry-wide cost passthrough.")

[71] Chipty Class Declaration, ¶ 24 and Exhibit 6.

[72] Axene Declaration, ¶¶ 25-26 ("Premium rates are calculated using nearly identical approaches regardless of the product (i.e., HMO vs. PPO) or the line of business the product is developed for (i.e., Individual, Small Group, or Large Group).") and ¶ 29 ("Premium rates for health plans are developed by qualified actuaries; in my experience, that is the role of actuaries at all the major health plans operating in California.").

[73] Chipty Merits Report, ¶¶ 188-190.

[74] Chipty Merits Report, ¶¶ 181-190.

[75] Chipty Class Declaration, ¶¶ 16-17.

[76] Id.

lives in Northern California. The question for pass-through is: Are Class Health Plans less likely to pass through cost increases (from the Sutter overcharges) when they face strong competition, particularly from Kaiser? Economic theory gives no clear prediction about how Class Health Plans' pass-through rates will respond to the intensity of competition from Kaiser. For instance, a Class Health Plan may:

- Pass through *less than all* of its cost increase and forego some margin, in an attempt to retain business in the face of competition with Kaiser; Dr. Willig has emphasized this theoretical possibility.[77]

- Pass through *the entire* cost increase because it faces a high degree of competition throughout California, especially in areas with a strong Kaiser presence.[78]

- Pass through *more than all* of its cost increase, because it now finds it more profitable to forego sales to more price-sensitive customers that prefer Kaiser.[79]

---

[77] *See*, *e.g.*, Willig Class Declaration, ¶ 90.

[78] Peter Anderson, Sutter's former Senior Vice President of Strategy and Business Development, described the Northern California health insurance marketplace as "one of the most competitive (and un-concentrated) insurance delivery systems in the nation." (Anderson Deposition (Sutter, August 31, 2017), pp. 129-130.) Dr. Willig has also opined that "the [health] insurance market is highly competitive." (Willig Merits Report, ¶ 64.)

[79] Economists have documented this type of market segmentation (and accompanying pricing behavior) in other industries. *See*, *e.g.*, Grabowski, Henry and John Vernon, "Brand loyalty, entry, and price competition in pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics*, Vol. 35, No. 2, 1992, pp. 331-350, at pp. 334-335; Grabowski, Henry and John Vernon, "Longer patents for increased generic competition in the U.S.—the Waxman–Hatch Act after one decade," *PharmacoEconomics*, Vol. 10, No. 2, 1996, pp. 110-123, at p. 112; and Regan, Tracy L., "Generic entry, price competition, and market segmentation in the prescription drug market," *International Journal of Industrial Organization*, Vol. 26, No. 4, 2008, pp. 930-948, at pp. 946-947. *See also*, World Trade Organization, "Australia – Certain Measures Concerning Trademarks, Geographical Indications and Other Plain Packaging Requirements Applicable to Tobacco Products and Packaging: Reports of the Panels," June 28, 2018, ¶ 7.1222 (explaining that "actual market experience—including experience with Australian cigarettes—demonstrates that downward shifts in demand can lead to higher prices." (quoting Dr. Michael Katz) and ¶ 7.1224. Consistent with this idea, insurance broker testimony in this case indicates that health plans sometimes opt to not engage in a price war; instead, they maintain a relatively high premiums in circumstances where a rival health plan offers a substantially lower premium. *See* Deposition of Daniel Hodges, Senior Vice President and Partner at Woodruff Sawyer, November 2, 2018 (hereafter "Hodges Deposition (Woodruff Sawyer, November 2, 2018)"), pp. 92-95.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

Thus, it is an empirical question as to whether Class Health Plans pass through costs at a higher, lower, or the same rate in response to stronger competition from Kaiser. My prior work in this case indicates that the Class Health Plans are likely to pass through costs at a higher rate in areas where they compete with Kaiser.[80] My new econometric work explores this issue further.

### D.    Using the Econometric Pass-Through Estimates to Estimate Premium Damages

50.    I now turn to a discussion of how to use the pass-through estimates from the log-log regression models to calculate premium damages. I did not provide this explanation in my prior report because I did not directly use the pass-through estimates from the regression work to estimate damages. Given the focus of this report, this explanation is now necessary.

51.    The aggregate amount of premium damages equals the difference between actual and but-for premiums paid by Class Members. This amount is calculated as the dollar amount of the overpayments made by the Class Health Plans to the Sutter Damage Hospitals that are passed through to Class Members in the form of higher premiums. For example, if the overpayments made by the Class Health Plans (to the Sutter Damage Hospitals) is $100 and pass-through on a dollars-basis is 90 percent,[81] then aggregate premium damages would be $90 = $100 x 90 percent. In this case, Class Members would have collectively paid $90 more than they would have, absent Sutter's conduct. (This amount could also be expressed on a per member, per month basis.)

52.    Thus, *to calculate premium damages using the pass-through rates estimated from the log-log regression model, one needs to convert the estimated pass-through on a percentage-basis to pass-through on a dollars-basis.* As I explained above, the coefficient on cost—in a model that studies the relationship between log(premium) and log(all medical cost)—represents the *pass-through rate on a percentage-basis*: it measures the percentage change (not the dollar

---

[80] Chipty Reply Declaration, ¶¶ 73-74 and Exhibit 8.

[81] Some economists use the term "levels-basis" to mean "dollars-basis." Substantively, both terms describe the same thing: the absolute portion of the cost increase that was passed through to consumers. That portion, when applied to the dollar cost increase is the increase in premium dollars. For consistency, I use the term "dollars-basis" everywhere.

change) in premiums that results from a percentage change in cost. This is not the same as pass-through rate on a dollars-basis; the pass-through rate on a dollars-basis is the portion of the cost increase that is passed through to consumers. To see the difference between the two measures of pass-through, suppose that cost is $100, price is $120, and the pass-through rate is 0.9 on a percentage-basis. In this case:

- A ten percent or $10 increase in costs would result in a nine percent increase in premium.

- A nine percent increase in premium is equivalent to a $10.80 increase: $10.80 = $120 x 9 percent.

In this example, the pass-through rate on a percentage-basis is 0.9 (or 90 percent) and the pass-through rate on a dollars-basis is 1.08 (or 108 percent). In words, a $10 dollar increase in costs resulted in a *more than* $10 increase in price, and we would say that the firm passed through 108 percent of its $10 cost increase.

53.     The relationship between the pass-through rate on a percentage-basis and pass-through rate on a dollars-basis can be expressed as: $\frac{\Delta Premium}{\Delta Cost} = \beta_1\ x\ \frac{Premium}{Cost}$.[82] In words, the pass-through rate on a dollars-basis is equal to the pass-through rate on a percentage-basis, scaled by the ratio of premiums to cost. Notably, because premiums are greater than cost, the pass-through rate on a dollars-basis is greater than the pass-through rate on a percentage-basis.[83] In my example above, the pass-through rate on a percentage-basis is 0.9 (or 90 percent) and the ratio of premiums to costs is 1.2 (= $120 ÷ $100); thus, the pass-through rate on a dollars-basis is: 1.08 (or 108 percent) = 0.9 x 1.2. This is the same transformation that Dr. Willig appears to have made in converting estimates by Ho and Lee (2019) to calculate the pass-through rate on a dollars-basis of 75 percent.[84]

---

[82] Kosicki and Cahill (2006), p. 610.

[83] More formally, denote α as the pass-through rate on a dollars-basis and β as the pass-through rate on a percentage-basis. Because $\alpha = \beta \times (price/cost)$, $\alpha > \beta$. so if price is larger than cost.

[84] Ho and Lee (2019) studied the relationship between health insurance premiums and changes in health plan payments to hospitals in California. Unlike the regression studies described here, they built a simulation model that

## IV.   Evidence Shows Uniformly High and Significant Pass-Through Rates Based on Econometric Analysis of the MLR Data

54.     In this section, I present my regression model and new estimates of pass-through, using the MLR Data. First, I describe the MLR Data and the construction of my analysis dataset. Second, I describe my new regression model and results, including the resulting pass-through estimates on a dollars-basis by: (a) health plan; and (b) health plan-line of business. Third, I present a series of sensitivity analyses, which, among other things, respond to and refute some of Dr. Willig's criticisms of my pass-through analysis. As explained above, the MLR Data are uniquely suited to study pass-through in this case. The estimated pass-through rates are uniformly high and significant, irrespective of the different ways to calculate them; these sensitivity results reinforce my baseline results, and they demonstrate that Dr. Willig's criticism are without merit.

### A.     MLR Data

55.     The MLR Data contain statewide information on premium revenues collected and all incurred medical costs, for each of the California health plans, separately by line of business (individual, small group, and large group), annually from 2011 to 2018.[85] These data are

---

holds constant, by assumption, other costs (like physician and drug costs). Dr. Willig says the pass-through implied by Ho and Lee is about 75 percent. (Willig Class Declaration, ¶ 70.) Ho and Lee do not report pass-through in their paper, but they report inputs which could be used to construct pass-through. Specifically, in their Table 1, Ho and Lee report: (a) the percentage change in premium (0.6%, shown in row 5); (b) the percentage change in health plan payments to hospitals (5.6%, shown in row 6); and (c) the average premium ($2,460) and health plan payments to hospitals ($369) (in the last column for rows 5 and 6). Using these inputs, it appears that Dr. Willig calculated pass-through on a percentage-basis, (% change in premium ÷ % change in health plan payments to hospitals), then multiplied by (premium ÷ health plan payments to hospitals), to calculate pass-through on a dollars-basis: 77% = (0.6% ÷ 5.6%) x ($2,640 ÷ $369). Ho, Kate and Robin Lee, "Equilibrium Provider Networks: Bargaining and Exclusion in Health Care Markets," *American Economic Review*, Vol. 109, No. 2, 2019, pp. 473-522 (hereafter "Ho and Lee (2019)"), Table 1. Notably, the pass-through rate that Dr. Willig calculated based on Ho and Lee (2019) is positive and economically significant.

[85] Dr. Willig, Mr. Travis, and Ms. Keller have all relied upon analyses that use statewide or nationwide information. *See, e.g.,* Willig Class Declaration, ¶¶ 51 and 56 (citing analyses from the Kaiser Family Foundation's nationwide employer survey) and Table 1 (using statewide URRT data to estimate pass-through rates); Willig Merits Report, ¶ 224 (identifying examples of hospitals that closed, many of which were in Southern California, to argue that Sutter hospitals remained viable in part because they were part of a system); Travis Merits Report, ¶ 41 and footnote 45

compiled by the health plans from transaction-level data, like the transaction-level premium and
claims databases produced in this case—except that the MLR Data report all medical costs, not
just facilities costs. As explained in Sections II and III.C.5 above, CMS collects these to
implement the MLR provision of the ACA that requires health plans to ensure that the
percentage of premium revenues allocated to medical costs does not fall below 80 percent or 85
percent, depending on group type.[86] To determine compliance with this provision, health plans
are required to report their data to CMS each year. In California, health plans submit separate
MLR reports for each of their subsidiaries that are regulated by either DMHC or CDI,[87] and
CMS posts the MLR Data on their website for public use.[88]

56.     I collected the MLR Data associated with the State of California for all available
years, 2011 to 2018.[89] Each unit of observation in the dataset is a Class Health Plan-line of
business-regulator-year; and the key data fields are: (a) total premiums;[90] (b) total incurred

---

(using statewide DMHC rate filings to infer a "$100,000 pooling threshold"); and Keller Merits Report, ¶¶ 56-57
and Table 5 (using the same statewide MLR Data to propose adjustments to my damages calculations).

[86] CMS, "Medical Loss Ratio," available at https://www.cms.gov/apps/mlr/, *site visited* November 5, 2019; and
CMS, "Announcement of Medical Loss Ratio Annual Reporting Procedures for the 2018 MLR Reporting Year,"
*available at* https://www.cms.gov/CCIIO/Resources/Training-Resources/Downloads/Issuer-2018-MLR-Memo.pdf,
*site visited* November 5, 2019, pp. 1 and 4.

[87] For example, the Anthem subsidiary Blue Cross of California is regulated by DMHC, whereas the Anthem
subsidiary Anthem Blue Cross Life and Health Insurance Company is regulated by CDI. (*See* DMHC, "View All
Health Plans," available at https://wpso.dmhc.ca.gov/hpsearch/viewall.aspx, *site visited* November 5, 2019; and
CDI, "Health Insurance and ASO Health Covered Lives Report: Individual Health Plan Data Sorted by Company (as
of December 31, 2018)," available at http://www.insurance.ca.gov/01-consumers/110-
health/upload/AB1083_REPORT_2019_Individual_v1-2.pdf, *site visited* November 5, 2019.) The California Health
Care Foundation identifies the regulator overseeing each health plan subsidiary in their compiled MLR database. *See*
Chipty Workpapers.

[88] CMS, "Medical Loss Ratio Data and System Resources," available at
https://www.cms.gov/CCIIO/Resources/Data-Resources/mlr.html, *site visited* November 5, 2019.

[89] The California Health Care Foundation has consolidated into one database all MLR Data files associated with the
State of California for years 2012 to 2017. (California Health Care Foundation, "Medical Loss Ratio Resources,"
August 23, 2019, available at https://www.chcf.org/publication/medical-loss-ratio-resources/, *site visited* November
5, 2019.) I extended the California Health Care Foundation's database by appending on MLR Data for the State of
California from 2011 and 2018, as downloaded from the CMS website.

[90] The MLR Data report information on: (a) direct premium written; and (b) direct premium earned. Direct premium
written represents "premium collected from [January] of the MLR reporting year through [March] of the year
following the MLR reporting year *for coverage in the MLR reporting year only*, plus uncollected (due and unpaid)

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

medical claims;[91] and (c) member-months. In some limited instances, Class Health Plans reported very few member-months for certain line of business-regulator-year combinations. For example, Aetna reported less than 7,500 member-months (*i.e.*, less than *625 members*) for its entire California individual line of business for each year from 2016 to 2018,[92] reflecting the fact that Aetna began to exit the California individual line of business a few years earlier.[93] The CMS describes plans "with fewer than 1,000 life years [(*i.e.*, fewer than 12,000 member-months) in line of a business] as being "non-credible," and has determined that these plans lack sufficient experience to calculate a meaningful or reliable MLR.[94] Accordingly, I drop from my analysis observations associated with fewer than 12,000 members months; this data screen drops less than 0.02 percent of Class Health Plan member-months reported in the MLR Data.[95]

57.     Thus, my pass-through analysis of MLR Data reflects the premium experience for: (a) over 99.9 percent of Class member months, for all years from 2011 to 2018; and (b)

---

premium *for coverage in the MLR reporting year only*" (emphasis added). (*See*, *e.g.*, CMS, "Medical Loss Ratio (MLR) Annual Reporting Form Filing Instructions for the 2017 MLR Reporting Year," available at https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/2017-MLR-Form-Instructions.pdf, *site visited* November 5, 2019 (hereafter "2017 MLR Form Instructions"), p. 25.) By contrast, direct premium earned is calculated by applying various adjustments to direct premium written, such as payments that the plan receives from or makes to the federal government for ACA "premium stabilization programs" that are intended to "reduce incentives for health insurance issuers to avoid enrolling sicker people, and to stabilize premiums in the individual and small group health insurance markets." (*See*, *e.g.*, 2017 MLR Form Instructions, pp. 12 and 27-28; and CMS, "Premium Stabilization Programs," available at https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/, *site visited* November 9, 2019.) For my primary pass-through analysis, I use direct premium written, because that premium reflects the premiums collected by the plan from enrollees. As a sensitivity, I use direct premium earned instead, and the qualitative results are similar. *See* Chipty Workpapers.

[91] Incurred claims "include direct claims paid to or received by physicians and other non-physician clinical providers, including under capitation contracts with those providers, whose services are covered by the policy for clinical services or supplies covered by the policy." (*See*, *e.g.*, 2017 MLR Form Instructions, p. 29.)

[92] Chipty Workpapers.

[93] Schneider Deposition (Aetna, July 25, 2018), pp. 39 and 162. Similarly, United participated on California's individual exchange in only 2016 and thus reported very few individual line of business member-months in the MLR Data. (*See*, Lundbye Deposition (United, May 15-16, 2018), pp. 188-189.)

[94] California Health Care Foundation, "What Is the Medical Loss Ratio?" August 2019, available at https://www.chcf.org/wp-content/uploads/2019/08/WhatIsMLR.pdf, *site visited* October 31, 2019, p. 2.

[95] Chipty Workpapers. "Non-credible" observations tend to be outliers. *See* Chipty Workpapers.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

about 70 percent of Class member-months, for the entire period over which I have estimated damages (September 2008 to December 2017).[96] To put these sample sizes into perspective, I observe that Dr. Flamm in *Qualcomm* applied data screens such that he "ultimately [used] only data representing 7.3% of all Relevant Cellular Device sales by OEMs . . . [and] only 0.3% of the 421 million phones manufactured by [contract manufacturers];" he also performed "no modeling whatsoever of 99.1% of phones sold by distributors."[97] In other words, for certain links in the distribution chain of his pass-through analysis, Dr. Flamm has relied upon a negligible fraction of the relevant data. By contrast, I estimate pass-through for the one link in the distribution chain, between the Class Health Plans and the Class Members, using data that is substantially more comprehensive.

58.     There are several advantages to estimating pass-through rates using the MLR Data, relative to the Production Data. First, the MLR Data cover all Class Members, across all Class Health Plans, in all lines of business, over an eight-year period; for reasons I explain below, not all of the Production Data are useable for all Class Health Plans. Second, the MLR Data report all medical costs, while the Production Data report facilities costs that appear to represent about half or less of all medical costs.[98] As explained earlier, all medical costs are the better cost measure for estimating pass-through rates. Third, the MLR Data report information on Kaiser's medical costs, which allows me to address one of Dr. Willig's criticisms of my analysis—that I should include an explanatory variable for Kaiser's cost in my pass-through regressions.[99]

59.     In Section V below, I probe the geographic variation in pass-through rates using the Production Data. The results of these sensitivity analyses show there is no systematic bias from using the statewide MLR Data. As such, these results demonstrate that there was antitrust

---

[96] Chipty Workpapers.

[97] Qualcomm's Motion to Strike Flamm, pp. 4-8.

[98] Chipty Workpapers.

[99] Willig Merits Report, footnote 488 ("[T]he pass-through rate estimated by Dr. Chipty's regression is inflated relative to the one that is pertinent for the purpose of assessing damages, to an extent that is more important the stronger the competition from Kaiser to the unintegrated carriers. One way to mitigate this [omitted variable] bias would be to include in the regression a separate variable that controls for the level of Kaiser's costs, perhaps also interacted with a measure of the competitive significance of Kaiser.").

impact on all or nearly all Class Members as a result of Sutter's anticompetitive conduct, and that the precise pass-through estimates from the regression analysis using the MLR data provide a reasonable basis to compute premium damages for Class Members.

## B. Baseline Model Results Show Uniformly High and Significant Pass-Through

60.     In this section, I describe my baseline pass-through regression model and results. I begin by describing two key considerations: (a) how to model the effect of product attributes on prices; and (b) how to control for competition from Kaiser and non-Kaiser health plans.

### Modelling the Effect of Product Attributes

61.     As I explained above in Section III.C.4, I model the benefit design associated with health insurance products in several different ways. One aspect of benefit design is the cost split between the health plan and the member, as implemented through the structure of coinsurance, deductibles, and copayments; I measure this feature directly through the cost measure included in the regression model. For example, the more a health plan pays towards the costs of medical services rendered and the less the member pays "out of pocket," the greater will be all medical cost incurred by the health plan. Another aspect of benefit design governs the rules patients follow to access their provider networks. In comparison to HMO products, PPO products have fewer restrictions on how patients can access their provider network.[100] As I explained above, in California, health plans submit separate MLR reports for each of their subsidiaries that are regulated by either DMHC or CDI. Because only the DMHC regulates HMO products, controlling for the regulator will control for product attributes that vary by HMO / PPO.

### Modelling Competition from Kaiser and Non-Kaiser Health Plans

62.     I control for competition from Kaiser and non-Kaiser health plans using several different approaches. To understand these approaches, consider the following diagnostic, showing Kaiser's share of commercial member-months, shown in Exhibit 2, by business line

---

[100] Medical Mutual, "HMO vs. PPO: What's The Difference Between Them," available at https://www.medmutual.com/For-Individuals-and-Families/Health-Insurance-Education/Compare-Health-Insurance-Plans/HMO-vs-PPO-Insurance.aspx, *site visited* November 16, 2019.

(aggregated across regulators). As seen here, Kaiser's share is consistently: (a) lowest in the individual business line; (b) next-highest in the small group business line; and (c) highest in the large group business line. Exhibit 3 displays Kaiser's annual share of commercial member-months, by regulator (aggregating across lines of business). Nearly all of Kaiser health plan members are on products that are regulated by the DMHC.[101]

**Exhibit 2**
**Kaiser's Share of Commercial Health Plan Member-Months, by Line of Business**



*Source*: MLR Data, 2011-2018.

---

[101] The difference in the trend of the lines displayed in Exhibit 2 (upward trend) and Exhibit 3 (flat trend) is explained in part by a shift over time towards a higher proportion of commercial members being on individual business line products, where Kaiser has a lower share relative to the other business lines.

**Exhibit 3**
**Kaiser's Share of Commercial Health Plan Member-Months, by Regulator**



*Source*: MLR Data, 2011-2018.

63.     Given these patterns, there are multiple ways that one could control for Kaiser's competitive presence in a pass-through regression. In my baseline regression analysis, I exploit the cross-business line and cross-regulator variation in Kaiser's share to control for its competitive presence. I do so by including business line fixed effects and a DMHC fixed effect in my regression. The line of business fixed effects account for the differential level of Kaiser's presence in each business line, as well as any other systematic differences across business lines that influence premiums. The DMHC fixed effect accounts for Kaiser's stronger presence in HMO products, which are regulated by DMHC. To the extent that Class Health Plans' DMHC-regulated products face more competitive pressure from Kaiser relative to their CDI-regulated products, the DMHC fixed effect will account for it.[102]

---

[102] I note that Dr. Flamm did not explicitly control for competition in his pass-through regression analysis in *Qualcomm*. *See* Footnote 24 above.

64.     Another way to control for Kaiser's competitive presence would be to include Kaiser's share as an explanatory variable. There are, however, at least two drawbacks of doing so. First, Kaiser's share could be "endogenous" with the premiums set by Class Health Plans, in that Kaiser's share may influence Class Health Plan premiums, while, at the same time, Class Health Plans premiums may influence Kaiser's share. Second, Kaiser's share is highly correlated with line of business (as shown in Exhibit 2).[103] Thus, including controls for both Kaiser share and line of business could lead to problems with multicollinearity, such that the regression model could be unable to reliably estimate the effect of both Kaiser share and line of business.[104] Nonetheless, in the next subsection, I describe the results of a sensitivity where I include Kaiser's share directly as an explanatory variable, and my qualitative findings on pass-through are unchanged.

65.     Yet another way to control for competition from Kaiser and non-Kaiser health plans would be to include an HHI variable that reflects the relative importance of different health plans. Like the share variable, the HHI variable could also be "endogenous." Nonetheless, in the next subsection, I describe the results of a sensitivity where I include HHI as an explanatory variable, and my qualitative findings on pass-through are unchanged.

Baseline Model Specification

66.     The dependent variable in my pass-through regression model is the logarithm of per member, per month premium. I calculate this variable using MLR Data by dividing total premium revenue by total member-months and taking the logarithm. Given my review of the available data and my understanding of the drivers of premium rates, the explanatory variables in my baseline specification are:

---

[103] Regressing the Kaiser shares reported in Exhibit 2 on line of business indicator variables yields an adjusted R-squared of 0.86. *See* Chipty Workpapers.

[104] Greene, William, *Econometric Analysis*, Second Edition, New York, NY: Macmillan, 1993, pp.266-267 (explaining that under multicollinearity, "[t]he measured variables are too highly intercorrelated to allow precise analysis of their individual effects." In particular, "we often observe the following problems: 1. Small changes in the data can produce wide swings in the parameter estimates. 2. Coefficients may have very high standard errors and low significance levels in spite of the fact that they are jointly highly significant. . . . 3. Coefficients will have the wrong sign or an implausible magnitude.")

- *Logarithm of Per Member, Per Month Cost*: This variable is constructed by dividing total incurred medical costs by total member-months and taking the logarithm. The coefficient estimates associated with this variable reflect the pass-through rate on a percentage-basis. In my analysis, I allow the pass-through rate to vary by Class Health Plan and, in some versions, to vary by line of business.

- *Five Class Health Plan Fixed Effects*: These five variables take the value one for observations associated with that Class Health Plan, and zero otherwise. These variables are flexible controls that account for systematic, time-invariant differences in premiums across the five Class Health Plans.

- *Two Line of Business Fixed Effects*: These two variables—one for the individual line of business and one for the small group line of business—take the value of one for observations associated with that business line, and zero otherwise. The coefficient estimates associated with the individual and small group fixed effects reflect the incremental effect, on the log of per member, per month premium, of each of those two business lines *relative* to the large group business line. Thus, the model implicitly accounts for the large group line of business by virtue of including fixed effects for the other two business lines. The business line fixed effects control for systematic, time-invariant differences across the products types that are sold across business lines. Moreover, as I explained above, these variables also control for differential effects of Kaiser's presence across business line, because Kaiser's share is highly correlated with business line.

- A Fixed Effect for DMHC-Regulated Subsidiaries: This variable that takes the value one for observations associated with products that are regulated by DMHC, and zero otherwise. As I explained above, DMHC regulates all HMO products. As such, the DMHC fixed effect is a proxy for an HMO product type. In addition, Exhibit 3 shows that DMHC regulates nearly all of Kaiser's products. To the extent that Kaiser products are closer substitutes to non-Kaiser products regulated by the DMHC, this variable will also control for the differential effect of competition from Kaiser.

- *Linear time trend*: This variable takes the value one in 2011, two in 2012, and so on, up to eight in 2018. The linear time trend accounts for systematic trends in the log of per member, per month premium not reflected in the other variables in the model.

Results of the Baseline Model

67.     I estimate three versions of my baseline regression model, where the estimated pass-through rates are allowed to vary by: (a) Class Health Plan; (b) line of business; and (c) Class Health Plan and line of business.[105] Exhibit 4 displays the pass-through estimates on a dollars-basis, by Class Health Plan. The height of each bar reflects pass-through on dollars-basis for each health plan, across all lines of business.[106] The thin gray line associated with each bar displays the 95 percent confidence interval around the pass-through estimate. The pass-through estimates are uniformly high and statistically significant, at the one percent significance level. The estimated pass-through rate varies from 106.97 percent for Aetna to 83.11 percent Health Net. The confidence intervals around each of the five pass-through estimates includes 100 percent, indicating that the estimate is not statistically significantly different from 100 percent pass-through.

---

[105] I report here the results of the first and third versions of my baseline model. The results of the second version are presented in the Chipty Workpapers. All three versions show uniformly high and significant pass-through rates on a dollars-basis. I use a weighted average pass-through rate from the first version of my baseline model to estimate premium damages.

[106] Appendix D displays the full results of this regression.



**Exhibit 4**
**Dollars-Basis Pass-Through Estimates, by Class Health Plan**

*Note*: The gray line associated with each bar reflects the 95 percent confidence interval.
*Source*: MLR Data, 2011-2018.

68.    Exhibit 5 displays pass-through estimates on a dollars-basis, by health plan and line of business.[107] The pass-through estimates are all positive and statistically significant, ranging from 138.30 percent for Anthem's large group business line to 55.98 percent for Health Net's individual business line. Nine of the fifteen pass-through estimates are above 100 percent, and twelve of the fifteen estimates have confidence intervals that either include or exceed 100 percent. These figures also show uniformly high and significant pass-through for all Class Members, across all Class Health Plan and line-of-business.

---

[107] Appendix D displays the full results of this regression.



**Exhibit 5**
**Dollars-Basis Pass-Through Estimates, by Class Health Plan and Line of Business**

*Note*: The gray line associated with each bar reflects the 95 percent confidence interval.
*Source*: MLR Data, 2011-2018.

69.     Exhibit 5 also shows that, for each Class Health Plan, pass-through rates are: (a) lowest for the individual business line; (b) next-highest for the small group business line; and (c) highest for the large group business line. Notably, Kaiser's share is also lowest in the individual business line and highest in the large group business lines (*see* Exhibit 2). These patterns are consistent with the interpretation that Class Health Plans pass through a higher share of their cost increases when they face stronger competitive pressure from Kaiser.

70.     Exhibit 6 calculates the overall weighted average pass-through rates across all five Class Health Plans, using two different sets of weights. Column [A] displays each of the health plan-specific pass-through rates reported in Exhibit 4. Columns [B] and [C] display total member-months and total premium dollars, by health plan, as reported in the MLR Data. The bottom row displays the weighted average pass-through rate, weighting by the member-months and premiums reported in Columns [B] and [C]. In calculating the weighted average, I conservatively "cap" each plan-specific pass-through estimate at 100 percent. To be

conservative, I use the premium dollars weighted average pass-through of 97.16 percent to compute premium damages.[108]

**Exhibit 6**
**Weighted Average Dollars-Basis Pass-Through Rate**

| Plan | Pass-Through Rate [A] | Weighted by: | |
| | | MLR Member Months (in 000s) [B] | MLR Premium Dollars ($M) [C] |
|---|---|---|---|
| Anthem | 102.31% | 264,824 | 102,108 |
| Blue Shield | 97.89% | 225,865 | 82,254 |
| Health Net | 83.11% | 90,441 | 35,622 |
| Aetna | 106.97% | 58,816 | 24,021 |
| United | 102.10% | 75,978 | 29,061 |
| **Class Health Plans** | | **97.20%** | **97.16%** |

*Note*: The weighted average pass-through rate caps each plan-specific pass-through rate at 100 percent prior to averaging.
*Source*: MLR Data, 2011-2018.

### C.  Sensitivity Analyses Reinforce the Baseline Results

71.      I now investigate a series of sensitivity analyses of my MLR Data pass-through regression model. The first of these is designed to examine an argument asserted by Dr. Willig to suggest that my pass-through estimates are inflated because of the Kaiser health plan.[109] Dr. Willig's argument begins with his observation that Kaiser and non-Kaiser health plans share some common cost shocks (from factors such as wage and general medical cost inflation), but that the Kaiser health plan is unaffected by Sutter's conduct. He goes on to argue that the Class Health Plans would be more likely to pass through common cost shocks, and less likely to pass

---

[108] In *Qualcomm,* Dr. Flamm also put forth one composite weighted average pass-through rate, but he did ***not*** cap his pass-through rates by distributor when calculating a weighted average pass-through rate. (Flamm Qualcomm Report, Table 23.) Thus, my weighted average pass-through rate is more conservative, in addition to being more robust, than his.

[109] Willig Merits Report, footnote 488.

through the Sutter overcharge, because such pass-through would disadvantage non-Kaiser health plans when competing against Kaiser. As such, he speculates that my pass-through estimates likely reflect the pass-through of common cost shocks, and thus overstate the pass-through of Sutter overcharges.[110] Dr. Willig describes a way to address the potential bias that concerns him: "include in the regression a separate variable that controls for the level of Kaiser's costs, perhaps also interacted with a measure of the competitive significance of Kaiser."[111] I run two different regression models that implement Dr. Willig's suggestions, using the MLR Data:

- *Add Kaiser Costs*: I add to my baseline specification the logarithm of per member, per month all medical costs for Kaiser, for a given line of business and year, as an additional explanatory variable; and

- *Add Kaiser Costs and Kaiser Cost Interactions*: I also add to my baseline specification a set of interaction terms that allows the effect of the logarithm of per member, per month all medical costs for Kaiser to vary by line of business and regulator, because Kaiser's competitive significance varies in these dimensions.

To the extent that Dr. Willig's theory is correct, one would expect the estimated pass-through rates to be lower accounting for Kaiser costs. They are not.

72.     Exhibit 7 compares the pass-through estimates from with and without controls for Kaiser costs (and Kaiser cost interactions): (a) the solid bars report the health plan-specific pass-through estimates reported above in Exhibit 4, without controlling for Kaiser costs; (b) the bars with the diagonal-lined pattern report pass-through estimates controlling for Kaiser costs; and (c) the bars with the horizontal-lined pattern report pass-through estimates controlling for Kaiser costs and Kaiser cost interaction terms. *A comparison of the three sets of bars, shows there is virtually no effect of Kaiser costs on the pass-through estimates.* Further, the updated estimates are well within the confidence intervals associated with my baseline estimates. A similar

---

[110] Willig Merits Report, footnote 488.

[111] *Id.*

qualitative pattern emerges when Kaiser's costs are integrated into the version of my baseline model that allows the pass-through rate to vary by plan and by business line.[112] These analyses demonstrate that Dr. Willig's theoretical concern about competition from Kaiser is entirely unsupported by the data.



**Exhibit 7**
**Overall Dollars-Basis Pass-Through Rates by Plan,**
**Accounting for Kaiser's Cost as Advocated by Dr. Willig**

■ Baseline
▨ Baseline, Adding Kaiser Cost
▤ Baseline, Adding Kaiser Cost and Kaiser Cost Interactions

*Note*: The gray line associated with each bar reflects the 95 percent confidence interval.
*Source*: MLR Data, 2011-2018.

73.    In Appendix D, I show pass-through estimates for a variety of additional sensitivity analyses, separately for the versions of my baseline model that allow pass-through to vary by health plan (Exhibit D1) and vary by health plan and by business line (Exhibit D2). In every instance, the estimated pass-through rates are positive and significantly different from zero. An overview of the results is as follows:

---

[112] Chipty Workpapers.

- Adding as an explanatory variable Kaiser's share of member-months, for the associated business line and year. I find that Class Health Plans' premiums tend to be higher when Kaiser's share increases, which is consistent with Class Health Plans focusing more on selling to members or groups that are less price sensitive when they face stronger competition from Kaiser.

- Adding as explanatory variables a measure of health plan HHI,[113] and the interaction of that HHI variable with log of medical costs for the Class Health Plans. In prior reports, Dr. Willig has advocated using HHI as a control for competition.[114] The estimates indicate that pass-through by Class Health Plans is higher in areas with higher plan concentration.

- Adding a complete set of fixed effects for each Class Health Plan-business line-regulator combination. This specification explicitly controls for all time-invariant differences specific to each plan-business line-regulator combination.

- Using an alternative measure of premium that health plans report in the MLR Data.

- Adjusting the premium measure to deduct MLR rebates paid by health plans to their customers.

- Removing the time trend from the model.

* * * * *

74.    In summary, my MLR regression analyses provide strong evidence of uniformly high and significant pass-through rates for all Class Health Plans. Collectively, the results from these analyses support the view that there was antitrust impact on all or nearly all Class Members as a result of Sutter's anticompetitive conduct. Furthermore, premium damages estimated using pass-through rate this MLR analysis is conservative for at least three reasons:

---

[113] My HHI measure uses data for all health plans that operate in California, including Kaiser. I calculate HHI separately for each line of business and year, using plan-level shares of commercial member-months.
[114] *See*, *e.g.*, Willig Merits Report, ¶ 203.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- The MLR Data analysis shows that pass-through rates are higher in the lines of business where Kaiser has a greater competitive presence. To the extent these higher pass-through rates are attributable to Kaiser's stronger presence there, then it would follow that pass-through estimates using statewide data would understate the degree of pass-through in the Class RAs, because as Dr. Willig has shown, Kaiser has a greater presence in Northern California.[115]

- When calculating weighted average pass-through rate, I cap pass-through by each of the plans at 100 percent, even though my point estimates suggest that several plans have pass-through in excess of 100 percent.

- To estimate pass-through, I use the weighted average pass-through rate using premium dollar weights, not member-month weights, because the former yields a lower pass-through rate.

## V.   Corroborating Quantitative Evidence

75.    There is substantial other quantitative evidence that corroborates my MLR Data analysis. This evidence comes from: (a) my new analyses of the Production Data; (b) my original econometric analyses; and (c) Dr. Willig's analyses of pass-through. This evidence, which I describe in this section, consistently shows that pass-through rates are positive and significant, including specifically in the Class RAs and Northern California more generally. These results corroborate my opinion that Class Members suffered common antitrust impact as a result of Sutter's conduct.

### A.   New Analysis of Production Data

76.    The Production Data enable me to exploit geographic variation to study pass-through rates in: (a) the Class RAs (vs. the non-Class RAs); and (b) geographies where Kaiser

---

[115] Willig Merits Report, Figure 1.

has a greater competitive presence.[116] In each instance, I find that pass-through rates are positive and significant, and there is generally no statistical difference in average pass-through rates across Class and non-Class areas,[117] or across Kaiser and non-Kaiser areas.

77.     As a reminder, there are two challenges in using the Production Data. First, some of the Production Data are unsuitable to study pass-through.[118] Second, the Production Data contain information on only a portion of medical costs incurred by the Class Health Plans (*i.e.,* facilities costs), not all medical cost.[119] Notwithstanding this later issue, I have used the Production Data where possible to study the importance of geographic variation on pass-through, for four Class Health Plan-line of business combinations: (a) Anthem individual; (b) Anthem small group; (c) Anthem large group; and (d) Blue Shield small group.

---

[116] Following the approach I described in my Class Reply Declaration, I identify: (a) large groups as operating in a "Non-Kaiser Area" if at least 70 percent of the large group's insured employees reside in a zip code where Kaiser cannot write health insurance policies; (b) small groups as operating in a "Non-Kaiser Area" if the small group is located in an RA where Kaiser cannot write health insurance policies for at least 70 percent of the population in the RA; and (c) individuals as residing in a "Non-Kaiser Area" if the individual resides in an RA where Kaiser cannot write health insurance policies for at least 70 percent of the population in the RA. *See* Chipty Reply Declaration, ¶ 73.

[117] I identify large groups operating in a non-Class RA if at least 70 percent of the large group's insured employees reside in a non-Class RA. I identify small groups as located in a non-Class RA if the small group is located or is residing in RA 7 or RA 11 to 19; I use an analogous approach for individuals.

[118] The Blue Shield Individual and Large Group, Aetna, and United Production Data are unsuitable for assessing whether pass-through varies geographically, depending on the level of Kaiser's competitive presence:

- Blue Shield Individual and Large Group: Blue Shield premium data are insufficient to perform a pass-through analysis for the Individual and Large Group lines of business as information related to the geographic location of members is limited. Blue Shield premium data do report the geographic location of the group, which is necessary for conducting a pass-through analysis for small groups because health plans set premiums for small groups by RA in which the small group is located.

- Aetna: I am not able to use Aetna's production data to estimate pass-through because the Aetna premium data cannot be linked to the vast majority of Aetna inpatient claims.

- United: United's premium data are insufficient to perform pass-through analysis as information related to the geographic location of the individual or group is limited.

My assessment of the Health Net Production Data is still on-going, but my current assessment suggests the data may be unusable. Dr. Willig also recognizes that only some of the Production Data are amenable to estimating pass-through. *See* Willig Merits Report, footnote 492.

[119] *See* the discussion in Section III.C.3.

78.     For Anthem individual and Blue Shield small group, I adopt Dr. Willig's data
processing that underpinned his RA-by-RA pass-through analysis.[120] For the remaining two
health plan-line of business combinations, I follow Dr. Willig's approach of calculating per
member, per month cost using the complete set of facilities costs (both inpatient and outpatient)
produced by Anthem. I then analyze the data by estimating the relationship between log
premiums and log facilities cost for subsamples, each of which controls for health plan, line of
business, and Class area (or Kaiser area). As I explain below, estimating pass-through using a
series of regressions in tailored subsamples implicitly controls for multiple explanatory variables,
in this case: (a) facilities cost; (b) factors that are specific to health plans; (c) factors that are
specific to lines of business; (d) an indicator for whether the premiums and costs are generated in
the Class areas (for the Class / non-Class analysis); and (e) an indicator for whether the
premiums and costs are generated in the Kaiser areas (for the Kaiser / non-Kaiser analysis).[121] If
anything, the subsample approach is more flexible, and potentially more appropriate for the
study of the Production Data, given the inability to measure all medical costs.

79.     Exhibit 8 displays pass-through estimates for Class and non-Class RAs, on a
*dollars-basis*, separately for each of the four health plan-line of business combinations, using
statewide Production Data. Solid-shaded bars correspond to pass-through estimates for Class
RAs, and diagonal-shaded bars correspond to pass-through estimates for non-Class RAs. The
pass-through estimates range about 80 percent to about 125 percent. All of the estimates are
positive and statistically different from zero, and there are generally no systematic differences in
the pass-through rates across the Class and non-Class areas (as seen by the overlapping
confidence intervals, for each pair of results). These findings support a conclusion of Class-wide
impact.

---

[120] Willig Merits Report, Table 8.
[121] *See* Section V.B.1.



**Exhibit 8**
**Pass-Through on a *Dollars-Basis*: Class RAs vs. Non-Class RAs,**
**Using Statewide Production Data**

*Notes*:

1. The gray line associated with each bar reflects the 95 percent confidence interval.
2. For each plan, pass-through estimates are converted to a dollars-basis by multiplying the percentage-basis pass-through regression estimates by the average ratio of premium dollars to all medical costs reported in the MLR Data, for the plan's lines of business included in the regression and for the overlapping years in the Production Data and MLR Data.

*Sources*:

1. Anthem premium and claims data.
2. Willig Merits Report backup production.
3. MLR Data, 2011-2016.

80.     Exhibit 9 displays pass-through estimates for Kaiser and non-Kaiser areas, on a *dollars-basis*, separately for each of the four health plan-line of business combinations, using statewide Production Data. Solid-shaded bars correspond to pass-through estimates for Kaiser areas, and diagonal-shaded bars correspond to pass-through estimates for non-Kaiser areas. The pass-through estimates range about 80 percent to about 120 percent. All of the estimates are positive and statistically different from zero. There are generally no systematic differences in the

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

pass-through rates across the Kaiser and non-Kaiser areas (as seen by the overlapping confidence intervals, for each pair of results).[122] These findings support a conclusion of Class-wide impact.

**Exhibit 9**
**Pass-Through on a *Dollars-Basis*: Kaiser vs. Non-Kaiser**
**Using Statewide Production Data**



Notes: See notes for Exhibit 8.
Sources: See sources for Exhibit 8.

81.    Like Exhibit 9, Exhibit 10 displays pass-through estimates for Kaiser and non-Kaiser areas, on a *dollars-basis*, estimated separately for three of the four health plan-line of business combinations, using Production Data from Northern California. (As in my Class Report Exhibit 8, I did and do not split large groups into Northern and Southern California.) The pass-through estimates range about 90 percent to about 120 percent. All of the estimates are positive

---

[122] For Anthem large group, the pass-through in Kaiser areas is statistically higher than the pass-through in non-Kaiser areas; and for Anthem individual, the opposite is true. Taken together, these results suggest no systematic difference across Kaiser and non-Kaiser areas.

and statistically different from zero, and there are no systematic differences between the Kaiser and non-Kaiser areas (as seen by the overlapping confidence intervals).

**Exhibit 10**
**Pass-Through on a *Dollars-Basis*: Kaiser vs. Non-Kaiser**
**Using Northern California Production Data**



*Notes*: See notes for Exhibit 8.
*Sources*: See sources for Exhibit 8.

## B.    My Original Econometric Pass-Through Analysis

82.    In my Class Reply Declaration, I provided econometric estimates of pass-through rates on a percentage-basis (not a dollars-basis) using: (a) statewide URRT data on each of the Class Health Plans' small group line of business, reflecting all medical costs incurred by health plans; (b) statewide Blue Shield data for its large group line of business reflecting all medical costs incurred by Blue Shield; and (c) Anthem Production Data for its individual and large group

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

lines of business reflecting *inpatient* costs incurred by Anthem.[123] For my Blue Shield large group analysis, I estimated pass-through separately for different subsets of large groups, depending on the number of insured employees.[124] For each of my Anthem individual and large group analyses, I estimated pass-through separately for "Kaiser Areas" or "Non-Kaiser Areas," to distinguish between geographic areas and groups where Kaiser health plans have a stronger competitive presence.[125] For my Anthem large group analyses, I also estimated pass-through for PPO products and HMO products.[126] Exhibit 11 graphically shows my prior estimates of pass-through on a *percentage-basis*, where the height of the bar denotes the pass-through estimate, the lighter color denotes lack of statistical significance, and the gray lines denote the range of the 95 percent confidence interval around that estimate.

---

[123] Chipty Reply Declaration, Exhibit 8.

[124] Chipty Reply Declaration, ¶ 70.

[125] Footnote 116 above describes the methodology I developed in the Chipty Reply Declaration to classify Anthem individual line of business members and large groups as being located in Non-Kaiser Areas. In preparing Exhibit 11, I identified a coding error for the Anthem individual line of business: in Chipty Reply Declaration, Exhibit 8, I classified members as residing in a "Non-Kaiser Area" if the individual lived in a Northern California RA where Kaiser cannot write health insurance policies for at least 30 percent (instead of 70 percent, as intended) of the population in the RA. By so doing, I inadvertently classified one RA as a "Kaiser Area" when in fact it should have been a "Non-Kaiser Area." The correction resulted in a slight decrease in the estimated pass-through rates on a percentage-basis of about one percent on average for the Anthem individual line of business analysis. I have corrected that error in the numbers shown in Exhibit 11, in the "Anthem Individual Inpatient Incurred Costs" panel.

[126] Chipty Reply Declaration, ¶ 75.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit 11**
**Pass-Through Estimates and 95 Percent Confidence Intervals**
**Reporting Corrected Estimates on a *Percentage-Basis***
**from Chipty Reply Declaration, Exhibit 8**



*Note*: The pass-through estimates shown in the "Anthem Individual Incurred Costs" panel reflect the correction described in footnote 130.

*Source*: Chipty Reply Declaration, Exhibit 8.

83.    The Court commented on two aspects of this analysis. First, the Court viewed my URRT regression analysis as "simplistic," suggesting that it did not control for anything but costs.[127] Second, the Court did not see how the pattern of results in Exhibit 8 of my Class Reply Declaration supported the use of a pass-through rate of 100 percent for the purpose of computing damages.[128] I respond to both concerns raised by the Court here.

---

[127] Class Order, pp. 48-49.
[128] Class Order, pp. 49-50.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

### 1.    *My Previous Models Implicitly Controlled for Other Explanatory Variables*

84.    A regression analysis can control for factors that influence the dependent variable in different ways. Suppose for example, one wishes to study whether the returns to education are the same for men and women. To do so, one could estimate a regression model that regresses wage on education, a gender indicator, and an interaction term between education and the gender indicator. This regression appears to have three explanatory variables. Alternatively, one study the relationship between earnings and gender using two subsamples: (a) a subsample of women, regressing wage on education; and (b) a subsample of men, regressing wage on education; and then one could compare the two returns on education parameters to see if they are the same. The second approach may appear more simplistic because it only has one explanatory variable, in each regression. However, this second approach implicitly controls for the same explanatory variables by estimating the relationship between earnings and education specific to each gender; that is, it actually controls for three, not one explanatory variable.

85.    To see how this modelling choice relates to the models I presented in Exhibit 8 of my Class Reply Declaration, recall the pass-through analyses for the four subsamples: (a) Anthem individual in Kaiser areas; (b) Anthem individual in non-Kaiser areas; (c) Anthem large group in Kaiser areas; and (d) Anthem large group in non-Kaiser areas.[129] For each subsample, I regressed log premiums on a measure of log costs, and it appeared that each regression only included one explanatory variable. However, given that the regressions were run on subsamples controlling for health plan, line of business, and Kaiser presence, the regressions implicitly controlled for several variables, and they allowed pass-through rates to vary with differing levels of competition from Kaiser. Both approaches to estimating pass-through can be useful when appropriately implemented.

---

[129] *See* Chipty Reply Declaration, Exhibit 8.

86.     Taken to an extreme, estimating regressions on too narrow of a subsample can create instability and lack of precision in estimation results. In practice, slicing data samples to create narrow subsamples can be irresponsible. For example, in one of his merits report pass-through analyses, Dr. Willig did exactly this: he sliced the data into subsamples as small as three or four observations, and then attempted to estimate pass-through using these negligible samples.[130] Not surprisingly, Dr. Willig's estimates were unstable, but this instability was a symptom of the problem he created by slicing the data too finely.

87.     In practice, one must exercise judgement in the design of a regression model: (a) on the one hand, one might run a regression on a series of subsamples; and (b) on the other hand, one might run a pooled regression where some of the explanatory variables are allowed to have the same effects across different subsamples. In principle, there can be reasons to prefer either approach, but in practice one approach may be better than the other.

2.      *My Prior Works Supports Pass-Through of 100 Percent*

88.     The pass-through estimates displayed above in Exhibit 11—and all of the pass-through estimates in my Class Declarations—reported pass-through rates on a *percentage-basis*. *To use these pass-through rates for computing damages, one has to convert them to pass-through on a dollars-basis, as described above*. This conversion involves: multiplying the pass-through rates on a percentage-basis *by* the ratio of premiums to costs. Exhibit 12 displays the pass-through estimates depicted in Exhibit 11, but rescaled such that the estimates reflect pass-through on a dollars-basis. For example, the pass-through for Blue Shield's entire large group business line is ██ percent on a *percentage-basis*, and it is ██ percent on a *dollars-basis*. For 20 of the 23 estimates of pass-through on a dollars-basis displayed in Exhibit 12, the pass-through is approximately 100 percent or more. For the remaining three, a pass-through of 100 percent is in the confidence interval surrounding the estimate. For this reason, my prior econometric work supported pass-through of 100 percent; however, because I did not use a mathematically precise estimate of pass-through from these regressions, I did not make the necessary transformation or spend time explaining the details of how that would be done.

---

[130] Willig Merits Report, Table 7.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA



**Exhibit 12**
**Pass-Through Estimates and 95 Percent Confidence Intervals**
**Reporting Estimates on a *Dollars*-Basis**
**Converting Corrected Estimates from Chipty Reply Declaration, Exhibit 8**

*Notes*:

1. The pass-through estimates shown in the "Anthem Individual Incurred Costs" panel reflect the correction described in footnote 130.

2. The dollars-basis pass-through estimates reported in this exhibit are calculated by multiplying the percentage-basis pass-through estimates reported in Chipty Reply Declaration, Exhibit 8 by the average ratio of premium to total incurred medical cost, calculated as follows: (a) for URRT Small Group, the ratio is calculated separately for each pass-through estimate using the corresponding premiums and incurred costs associated with the observations underlying the estimate in the URRT data; (b) for Blue Shield Large Group, the ratio is calculated separately for each pass-through estimate using the corresponding premiums and incurred costs associated with the observations underlying the estimate; and (c) for Anthem Individual and Large Group, the ratio is calculated using the MLR Data corresponding to that line of business, for the years where the MLR Data overlap with the years of data underlying the Anthem pass-through estimates (2011 to 2015).

*Sources*:

1. Chipty Reply Declaration backup production.

2. URRT Data, 2012-2016.

3. MLR Data, 2011-2015.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

89.     I provide a brief summary of my prior econometric estimates, by data source:

- *URRT data*: In my Class Declaration, I estimated pass-through using statewide data from the five Class Health Plans' URRT small group rate filings.[131] Plans report their total incurred medical costs on these filings, which are submitted to the DMHC. Using these data, I estimated pass-through on a *percentage-basis* of 91 percent across the five Class Health Plans, which on a *dollars-basis* is 119 percent. Neither of these two estimates are statistically significantly different from 100 percent. Dr. Willig used these same data to estimate pass-through rates for each of the five Class Health Plans. He also reported his estimates on a *percentage-basis*, and his estimates ranged from 30 percent (for Aetna) to 127 percent (for United).[132] On a *dollars-basis*, Dr. Willig's estimates ranged from 40 percent to 163 percent, and all of his estimates—including the Aetna estimate—are either not statistically significantly different from 100 percent, or have a confidence interval that completely exceeds 100 percent.[133]

In the Class Order, the Court focused part of its analysis on the Aetna URRT pass-through estimate of 30 percent that was not statistically significantly different from zero.[134] That pass-through estimate, which was expressed on a percentage-basis, was advanced by Dr. Willig, for the Aetna small group line of business. In my Class Reply Declaration, I explained that Dr. Willig's pass-through estimate for Aetna's small group line of business was imprecisely estimated,[135] meaning that the associated 95 percent confidence interval includes a *45 percentage points* swing (plus and minus) on either side of the estimate. His estimate is not significantly different from a pass-through rate anywhere between -16 percent and +77 percent. Dr. Willig's finding does *not* tell us that

---

[131] Chipty Class Declaration, ¶¶ 123-125 and Exhibit 17.

[132] Willig Class Declaration, Table 1.

[133] The second row of Exhibit 8 in my Class Reply Declaration (displayed on a dollars-basis in Exhibit 12) are Dr. Willig's results. Chipty Reply Declaration, ¶ 76.

[134] Class Order, p. 49.

[135] Class Reply Declaration, ¶ 66.

Aetna has a 30 percent pass-through rate; rather, it tells us that one cannot reliably estimate pass-through using his approach. Further, a 30 percent pass-through rate (using an all medical cost measure) is implausibly low given the regulations governing health plans, and other estimates for Aetna (based on my new MLR Data work) show Aetna small group pass through rates to be positive and significant; *see* Exhibit 5.

- *Blue Shield Cost Report Data*: In my Class Reply Declaration, I estimated pass-through using statewide Blue Shield data for its large group line of business, reflecting all medical costs incurred.[136] I estimated pass-through for Blue Shield's entire large group business line and for different subsets of large groups that varied by the number of insured employees in the group. On a *percentage-basis*, the pass-through estimates ranged from ███ percent to ███ percent. On a *dollars-basis*, these pass-through estimates range from ███ percent to ███ percent. On both a percentage- and dollars-basis, all of the estimates are not significantly different from 100 percent.

- *Anthem Production Data*: In my Class Reply Declaration, I estimated pass-through for Anthem's individual and large group lines using Anthem claims and premium data.[137] My Anthem analysis used inpatient cost because the Anthem claims data do not contain sufficient information to calculate all medical cost. For each of Anthem's individual and large group lines of business, I estimated pass-through for the entire line of business and separately for "Kaiser Areas" and "Non-Kaiser Areas."[138] For Anthem's large group business line, I also estimated pass-through separately for HMO and PPO products. My Anthem individual business line pass-through estimates ranged from 81 percent to 84 percent on a *percentage-basis*, and all estimates had confidence intervals that were below 100 percent. On a *dollars-basis*, these individual business line pass-through estimates range from 99 percent to 103 percent and are not significantly different from 100 percent.

---

[136] Chipty Reply Declaration, ¶¶ 70-71 and Exhibit 8.

[137] Chipty Reply Declaration, ¶¶ 72-75 and Exhibit 8.

[138] *See* footnote 125 above for a description of how I defined "Kaiser Areas" and "Non-Kaiser Areas," and the correction I made in this report.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

My Anthem large group business line pass-through estimates ranged from 71 percent to 128 percent on a *percentage-basis* and 84 percent to 152 percent on a *dollars-basis*.

90.     These previous econometric analyses corroborate the MLR Data pass-through analyses that I summarized in Section IV. *First*, 22 of the 23 estimates are uniformly high and significantly different from zero, including four of the five estimates advanced by Dr. Willig. *Second*, the confidence intervals associated with all estimates either contain or completely exceed 100 percent when reported on a *dollars-basis*. *And third*, I find that pass-through tends to be about the same across Kaiser and non-Kaiser areas.

### C.     Dr. Willig's Analysis of Pass-Through

91.     The finding that Class Health Plans pass through a substantial portion of increases in all medical costs is not a point of dispute. Dr. Willig himself acknowledges "it is not controversial" that health plans pass through increases in medical expenses in the form of higher premiums.[139] Moreover, in characterizing pass-through in Northern California, Dr. Willig references an academic article, Ho and Lee (2018), which studies the effect of the introduction of a narrow network product in Northern California.[140] Dr. Willig describes the article as "show[ing] that on average across markets the prices and premiums associated with various narrow network constructions are consistent with pass-through rates of *approximately 75 percent*."[141]

92.     In his merits report, Dr. Willig presented analyses where he estimated pass-through rates separately for each RA in Northern California, using production data on Anthem's

---

[139] Willig Class Declaration, ¶ 65 ("As a matter of economics, it is not controversial that there will be some amount of medical cost pass-through to premiums in the aggregate."). In his merits report, Dr. Willig also presented pass-through estimates for Anthem and Blue Shield small group and large group lines of business, ranging from *negative* 95 percent to 149 percent. (Willig Merits Report, Table 7.) In my merits reply report, I explained that Dr. Willig sliced the data so finely that his regressions each relied on as few as three or four observations; as such, it's not surprising that his estimates vary so widely. (Chipty Merits Rebuttal Report, footnote 153.)

[140] Willig Class Declaration, ¶¶ 69-70.

[141] Willig Class Declaration, ¶ 70 (emphasis added).

individual business line and Blue Shield's small group business line.[142] Dr. Willig claims that these analyses demonstrate that "there is in fact substantial variation of pass-through rates across RAs for individuals and small groups."[143] In reality, however, Dr. Willig's analyses demonstrate that: (a) pass-through is uniformly high and significant across the Class RAs; (b) pass-through is *not* systematically lower in RAs with higher Kaiser presence, as Dr. Willig has speculated;[144] and (c) pass-through rates *do not* vary substantially across Class RAs.

93.      Exhibit 13 and Exhibit 14 display Dr. Willig's analyses in graphical form, for Anthem individual and Blue Shield small group, respectively. There are 12 bars in each chart, corresponding to the 12 Northern California RAs (RAs 1 through 11 and 13). The height of each bar corresponds to Dr. Willig's pass-through estimate for that RA, after I have transformed the estimate to be on a dollars-basis as opposed to a percentage-basis, and the dark gray lines report the 95 percent confidence intervals. The green line reports Kaiser's share of commercial discharges in each RA, as calculated by Dr. Willig;[145] the RAs are sorted in ascending order based on Kaiser share. Across both charts, Dr. Willig's estimates show that pass-through is uniformly high and significant in the Class RAs: (a) for Anthem's individual line of business, the estimates range from 81 percent to 97 percent; and (b) for Blue Shield's small group line of business, the estimates range from ██ percent to ██ percent. All of the pass-through estimates in Exhibit 13 and Exhibit 14 are significantly greater than zero, and 14 of the 18 estimates associated with the Class RAs are not significantly different from 100 percent pass-through on a *dollars-basis*.

---

[142] Willig Merits Report, Table 8.

[143] Willig Merits Report, ¶ 243.

[144] Willig Class Declaration, ¶ 99 ("The more intense the competition between unintegrated insurance carriers and Kaiser for sales to a particular cohort, the smaller the likely effect of any overcharge on premiums paid by members of the cohort."); and Willig Merits Report, ¶ 238 ("[O]ne would expect that the pass-through rate would be *lower* (and thus premiums would be lower) where Kaiser is a more significant competitor" (emphasis in original)).

[145] Willig Class Declaration, Table 3.



**Exhibit 13**
**Dr. Willig's RA-Level Pass-Through Estimates, Transformed to a _Dollars-Basis_**
**Anthem Individual Line of Business**



*Notes*:

1. When rerunning Dr. Willig's backup production, the coefficient estimates for RAs 1, 8, 9, and 13 differ at the thousandths decimal place relative to what Dr. Willig reported in his Table 8.

2. Pass-through on a dollars-basis is calculated by multiplying Dr. Willig's percentage-basis pass-through estimates by the average ratio of premium dollars to all medical costs reported in the MLR Data for Anthem's individual line of business, for the overlap years between Dr. Willig's analysis and the MLR Data (2011 to 2015).

*Sources*:

1. Willig Merits Report backup production.
2. Willig Class Declaration, Table 3.
3. MLR Data, 2011-2015.

**Exhibit 14**
**Dr. Willig's RA-Level Pass-Through Estimates, Transformed to a *Dollars-Basis***
**Blue Shield Small Group Line of Business**



*Note*: Pass-through on a dollars-basis is calculated by multiplying Dr. Willig's percentage-basis pass-through estimates by the average ratio of premium dollars to all medical costs reported in the MLR Data for Blue Shield's small group line of business, for the overlap years between Dr. Willig's analysis and the MLR Data (2011 to 2015).

*Sources*: *See* sources for Exhibit 13.

94.     Contrary to Dr. Willig's characterization, there is <u>*not*</u> "substantial variation of pass-through rates across Rating Areas:" a statistical test cannot reject the hypothesis that Dr. Willig's pass-through estimates in the Class RAs are equal when applied to both sets of estimates.[146] Finally, I note that Dr. Willig's own analysis flatly contradicts his assertion that Class Health Plans' pass-through rates are lower when Kaiser has a stronger competitive

---

[146] Chipty Workpapers. Dr. Willig implemented the same statistical test in his Class Declaration, when he tested whether his pass-through estimates were the same across all five health in his URRT regression. (Willig Class Declaration, ¶ 68.)

presence; there is no systematic relationship between Dr. Willig's pass-through estimates and of Kaiser's share.

* * * * *

95.     My new pass-through analysis of the Production Data, my original pass-through analyses, and Dr. Willig's pass-through analyses, in particular his Anthem individual and Blue Shield small group RA-by-RA analyses, all strongly corroborate my preferred pass-through estimates that use the comprehensive MLR Data. This body of evidence shows that: (a) pass-through is uniformly positive and significantly different than zero; and (b) Dr. Willig's concern that Class Health Plans pass-through a smaller portion of cost increases when they compete with Kaiser is unfounded.

## VI.     Econometric Estimates of Pass-Through Are Consistent with Qualitative Evidence

96.     In my Class Declarations,[147] I explained that institutional features of the health insurance marketplace and the premium rate setting process make it likely that health plans will pass through a significant portion of hospital price overcharges to entities that purchase healthcare coverage. In setting premiums, health plan actuaries analyze both historical and projected healthcare costs.[148] I understand that the actuarial process begins with historical costs approximately two years in advance of the year for which premiums are being determined ("target year").[149] These historical costs are then adjusted to reflect anticipated inflation and changes in utilization patterns, to predict actual costs in the target year and construct an actuarially sound premium for the target year.[150] As such, increases in healthcare expenses are necessarily factored, dollar-for-dollar, into the actuarial analysis of premiums. Hospital expenses represent the single-largest component of healthcare costs.[151] Given the relative importance (and burden)

---

[147] Chipty Class Declaration, ¶¶ 114-122, and 124; and Chipty Reply Declaration, ¶¶ 77-80.

[148] Chipty Class Declaration, ¶¶ 114-117.

[149] Axene Declaration, ¶¶ 27-28.

[150] Aetna, "1495757742035.xls," April 1, 2014; and Axene Declaration, ¶ 36.

[151] For example, a 2010 Blue Shield analysis indicates that hospital expenses accounted for ████████ of Blue Shield's premium. (*See* "Narrow Network Scenarios & Impact," DEF00661911-918 at 913.)

of facilities costs, inflated hospital prices will likely force health plans to consider raising premiums.

97.     In this section, I describe qualitative evidence consistent with the econometric estimates that I presented above—namely, that Class Health Plans pass through a substantial portion of increases in medical expenses in the form of higher premiums.

## A.     Evidence from Health Plans

98.     I previously described evidence from health plans that indicates they pass through changes in incurred medical costs through changes in premiums.[152] For instance:

- [153]

- Health Net's Regional Vice President and lead negotiator on Health Net's contract with Sutter starting in 2010, Becky Lacroix-Milani, confirmed that "[i]n calculating premiums, Health Net includes all projected medical costs inclusive of inpatient hospital costs that Health Net anticipates it will incur. . . . The annual projected amount of medical costs is a component of the premium."[154]

- Anthem's former Regional Vice President of Provider Engagement and Contracting, Aldo De La Torre, indicated that ███████████████████████████████████,"[155]

---

[152] *See*, *e.g.*, Chipty Reply Declaration, ¶¶ 77-78.

[153] Email from Jon Chason, Director, Managed Care Analysis at Sutter Health, to Joseph Masley, "Health Net File," September 28, 2012, DEF003741120, and attachment, "Sutter/ HealthNet Narrow Network Premium Model Summary," DEF003741121; Deposition of John Chason, Director, Managed Care Analysis at Sutter Health, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health*, May 25, 2018, at pp. 604-606, 629-630, and 635-37.

[154] LaCroix-Milani Declaration, ¶¶ 41-42.

[155] Email from Aldo De La Torre of Anthem to Pam Kehaly President of Anthem, "Subject: Follow-Up to Friday Conversation," June 20, 2011, ABCLH127629-630, p. 630; and Deposition of Aldo De La Torre, Director of

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

in explaining that 

████████ ,[156] Mr. De La Torre also testified that ███████████████████

████████████████████████████████ .[157]

99.     Other evidence from Class Health Plans shows the central role of medical costs in determining premiums. Consider a 2015 URRT, small group rate filing for Blue Shield. This analysis shows that the premium is built to cover costs; for example, the document shows: (a) PMPM medical costs in the experience period was $385.25 (shown in the left-most red box); (b) expected PMPM total cost for the coverage period was $445.56 (shown in the middle red box); and (c) given administration costs, profits, and taxes, total PMPM premium implied by the actuarial analysis was $462.38 (shown in the right-most red box). This analysis can be used to deduce what would happen if inpatient costs in the experience period were to increase 9.5 percent or $10 on a PMPM basis: (a) expected PMPM total cost for the coverage period would increase by about $11;[158] (b) were Blue Shield to hold constant *the dollar amount* of administrative expenses, taxes, and profit, the average premium would increase by the $11—the exact amount of the expected cost increase; and (c) if instead, the plan were to hold constant *the percentage of overall premium* associated with administrative expenses, taxes, and profit, then premium would increase by about $12 (*i.e.*, more than the increase in expected PMPM medical cost).

---

Provider Engagement & Contracting at Anthem, July 18, 2018 (hereafter "De La Torre Deposition (Anthem, July 17-18, 2018)"), p. 411.

[156] Email from Aldo De La Torre, of Anthem to Pam Kehaly President of Anthem, "Subject: Follow-Up to Friday Conversation," June 20, 2011, ABCLH127629-630, p. 630; De La Torre Deposition (Anthem, July 17-18, 2018), pp. 409-410.

[157] De La Torre Deposition (Anthem, July 17-18, 2018), p. 363.

[158] The $11 is the trend factor-adjusted increase of the original $10 increase.

## Exhibit 15
## Screenshot of Blue Shield URRT Filing:
## Small Group Line of Business, Projection Period of January–December 2015]

**Section I: Experience period data**

Experience Period: 1/1/2013 to 12/31/2013

| | Aggregate Amount | PMPM | % of Prem |
|---|---|---|---|
| Premiums (net of MLR Rebate) in Experience Period | $2,140,759,121 | $391.71 | 100.00% |
| Incurred Claims in Experience Period | $1,653,233,883 | 302.51 | 77.23% |
| Allowed Claims | $2,105,424,764 | 385.25 | 98.35% |
| Index Rate of Experience Period | | $385.25 | |
| Experience Period Member Months | 5,465,099 | | |

**Section II: Allowed Claims, PMPM basis**

| Benefit Category | Utilization Description | Experience Period on Actual Experience Allowed Utilization per 1,000 | Average Cost/Service | PMPM | Adj't. from Experience to Projection Period Pop/risk Morbidity | Other | Annualized Trend Factors Cost | Util | Projections, before credibility Adjustment Utilization per 1,000 | Average Cost/Service | PMPM | Credibility Manual Utilization per 1,000 | Average Cost/Service | PMPM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Inpatient Hospital | Days | 167.77 | $7,508.48 | $104.98 | 0.978 | 1.009 | 1.053 | 1.005 | 165.75 | $8,398.80 | $116.01 | 0.00 | 0.00 | $0.00 |
| Outpatient Hospital | Services | 3,131.60 | 369.04 | 96.31 | 0.978 | 1.009 | 1.057 | 1.030 | 3,252.57 | 415.79 | 112.70 | 0.00 | 0.00 | 0.00 |
| Professional | Services | 7,996.43 | 112.33 | 74.85 | 0.978 | 1.009 | 1.022 | 1.048 | 8,595.50 | 118.43 | 84.83 | 0.00 | 0.00 | 0.00 |
| Other Medical | Services | 4,976.30 | 62.76 | 26.03 | 0.978 | 1.009 | 1.011 | 1.048 | 5,347.25 | 64.71 | 28.84 | 0.00 | 0.00 | 0.00 |
| Capitation | Benefit Period | 12,000.00 | 30.85 | 30.85 | 0.978 | 1.009 | 1.038 | 1.014 | 12,074.56 | 33.55 | 33.76 | 0.00 | 0.00 | 0.00 |
| Prescription Drug | Prescriptions | 8,929.02 | 70.20 | 52.23 | 0.978 | 1.009 | 1.135 | 1.023 | 9,134.09 | 91.21 | 69.43 | 0.00 | 0.00 | 0.00 |
| Total | | | | $385.25 | | | | | | | $445.56 | | | $0.00 |

Projection Period: 1/1/2015 to

Mid-point to Mid-point, Experience to Projection: 24 months

**Section III: Projected Experience:**

| | | After Credibility | Projected Period Totals |
|---|---|---|---|
| Projected Allowed Experience Claims PMPM (w/applied credibility if applicable) | 100.00% | $445.56 | $882,656,336 |
| Paid to Allowed Average Factor in Projection Period | | 0.832 | |
| Projected Incurred Claims, before ACA rein & Risk Adj't, PMPM | | $370.68 | $734,323,163 |
| Projected Risk Adjustments PMPM | | 16.67 | 33,031,674 |
| Projected Incurred Claims, before reinsurance recoveries, net of rein prem, PMPM | | $354.00 | $701,291,489 |
| Projected ACA reinsurance recoveries, net of rein prem, PMPM | | 0.00 | 0 |
| Projected Incurred Claims | | $354.00 | $701,291,489 |
| Administrative Expense Load | 14.92% | 68.98 | 136,644,530 |
| Profit & Risk Load | 2.84% | 13.13 | 26,014,191 |
| Taxes & Fees | 5.68% | 26.27 | 52,042,441 |
| Single Risk Pool Gross Premium Avg. Rate, PMPM | | $462.38 | $915,992,651 |
| Index Rate for Projection Period | | $445.56 | |
| % increase over Experience Period | 18.04% | | |
| % increase, annualized | 8.65% | | |
| Projected Member Months | | | 1,981,026 |

*Source:* California Department of Managed Health Care, "Unified Rate Review Template filings," available at http://wpso.dmhc.ca.gov/premiumratereview/searchratefilings, "149575467784413.xls," *site visited June 16, 2017.*

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA 69

100.    Other evidence also indicates that Class Health Plans pass through changes in medical costs through changes in premiums, with some evidence explicitly indicating that pass-through is 100 percent. For example:

- Ernest Schwefler, Regional Vice President at Anthem until 2015, testified that " [59]

- In 2010, Blue Shield performed a financial analysis to assess the premium savings of a product where "Sutter wouldn't be given preferential treatment;" in performing their analysis, Blue Shield [160]

- Thomas Hamilton, Vice President, Provider Network Management at Health Net, testified that had Sutter's Alta Bates hospitals been included in Health Net's Blue & Gold narrow network product at the higher rates Sutter initially proposed, then "by definition" Health Net's premium rates would have been higher. [161]

- Brendhan Green, former Vice President, Network Management at Aetna, wrote [62]

---

[159] Schwefler Deposition (Anthem, July 23, 2018), pp. 147-148.

[160] Wells Deposition (Blue Shield, August 29-30, 2018), pp. 581-584; and Wells Deposition Exhibit 570, email from Darrin Wells, Director of Actuarial & Analytics at Blue Shield, to Kristen Miranda, former Senior Vice President of Strategic Partnerships and Innovation at Blue Shield, "Subject: CCSF / Hill/UCSF/CHW," September 22, 2010, BSC_UFCW -00117079-080, at 079.

[161] Hamilton Deposition (Health Net, September 11, 2018), pp. 83-84.

[162] Robinson Deposition Exhibit 490, email from Brendhan Green, former Vice President for Network Management at Aetna, to Aetna colleagues, "Subject: Sutter Strategic Meeting-Action Items," May 18, 2006, AET-ESI0022703-704, at 703.

### B.      Evidence from Sutter

101.     In my Class Declarations, I described ordinary-course Sutter documents that are consistent with health plans passing through a substantial portion of changes in medical costs.[163] For instance, I described an analysis that Sutter's Chief Financial Officer, Bob Reed, summarized in a Sutter strategy presentation from January 2011. Mr. Reed's slides explained █████████ ███████████████████████████████████████████████████████████████████████████ ██████████████████████████[164] In my Class Declaration, I explained that ██████████ ███████████████████████████████████████████████████████ ███████[165] Mr. Reed's slide summarizes the business implications of his analysis as: █████ ██████████████████████████████████████████████████████████████████████████ ███████████████████████████████████[1]66 As an economist, I view Mr. Reed's analysis as significant because█ ████████████████████████████████████████████████████████████████████████ ███████████████ Nevertheless, for the purposes of my opinion in this report, I do not rely on Mr. Reed's January 2011 strategy session analysis.

102.     Numerous other Sutter documents are also consistent with health plans passing through changes in medical costs through changes in premiums. For instance:

- In an internal 2009 email, Bob Reed explained ████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[163] Chipty Class Declaration, ¶¶ 118-122; and Chipty Reply Declaration, ¶ 79.

[164] Sutter Health, "Strategy Session," January 18, 2011, DEF001993646-928 (hereafter "Sutter Strategy Session"), at 774.

[165] Chipty Class Declaration, ¶¶ 118-119.

[166] Sutter Strategy Session, at 774.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      71



███████ [167] In his deposition, Mr. Reed clarified that "███████████
█████████████████████████████████████████████████████████
████████ [168] Mr. Reed also clarified that ████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████ 69 ████████████████
███████████████████████████

- A Sutter document from 2005 stated that ████████████████████
  ████████████████████████████████████," [170]

- In a 2012 email, Peter Anderson, Sutter's Senior Vice President of Strategy and Business
  Development, wrote, ████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████ 71

- In a research report from January 2015, Sutter's consultant, Boston Consulting Group
  stated that █████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████," [172]

---

[167] Robert Reed Deposition Exhibit 2780, Email from Robert Reed, former Chief Financial Officer at Sutter, to Bill Gleeson, Vice President of Communications at Sutter, "Subject: RE: Self Funded Product, Holding Statement," August 25, 2009, DEF001454377-379, at 377.

[168] Deposition of Robert Reed, Chief Financial Officer at Sutter, June 12-13, 2018 (hereafter "Reed Deposition (Sutter, June 12-13, 2018)"), p. 211.

[169] Reed Deposition (Sutter, June 12-13, 2018), p. 210.

[170] Email from Darlyn Jones of Sutter to Patrick Fry, President and CEO of Sutter, "Subject: Symposium Summary for review," November 14, 2005, DEF007471585-591, p. 587.

[171] Email from Peter Anderson, Chief Strategy Officer at Sutter Health, to Pat Fry, Sarah Krevans, and Robert Reed, Chief Financial Officer at Sutter Health, "Price Elasticity," June 1, 2012, DEF001361203-04, at 03.

[172] Sutter Health, "Consumer and Employer Research: Key Imperatives and Strategic Implications as Identified by Boston Consulting Group," January 2015, DEF000877864-907, at 892.

### C.    Actuarial Testimony

103.    Acturarial testimony indicates that each of the Class Health Plans sets premiums to cover all expected medical costs:

- Blue Shield's actuary Michael Beuoy explained that as a general matter, Blue Shield designs its premiums to cover healthcare expenses, administrative costs, and margins. He explained that while some purchasers may pay more or less, as a whole across each of the three lines of business—individual, small group, and large group—Blue Shield's premiums cover healthcare expenses, administrative costs, and margins.[173] Furthermore, Mr. Beuoy explained that Blue Shield charges higher premiums in areas where it faces higher hospital prices.[174]

- Anthem's actuary Chris Mathewson testified not recalling an instance where he "was involved with a rate development that was intended to be or expected to be deficient."[175]

- Health Net's actuary Robert Kueks testified that Health Net sets premiums by "tak[ing] historical costs . . . [and] project[ing] them into the future and then we add in administrative costs and expected profit loads to come up with a premium."[176]

- Aetna's actuary Steve Schneider confirmed at deposition that "in calculating premiums . . . it [is] always the case that . . . [all] expected healthcare expenses are included in the premium calculation."[177]

- United actuary Gerald Lalande testified that "[i]npatient costs would be implicitly reflected in [United's] rates, absolutely,"[178] and that a plan will "want to make certain

---

[173] Beuoy Deposition (Blue Shield, May 2, 2018), pp. 68-70.
[174] Beuoy Deposition (Blue Shield, May 2, 2018), pp. 86-87.
[175] Mathewson Deposition (Anthem, May 18, 2018), p. 75.
[176] Kueks Deposition (Health Net, July 31, 2018), pp. 131-132.
[177] Schneider Deposition (Aetna, July 25, 2018), pp. 216-217.
[178] Lalande Deposition (United, September 29, 2017), pp. 23-24.

that [they are] in a position where their rates will cover the expected claims and their expenses so that they're viable long-term."[179]

104.    Mr. Axene confirmed that hospital costs incurred by health plans are incorporated into the construction of premium rates such that any increase in those costs—including an overcharge by Sutter—would in the aggregate be fully passed through by health plans.[180] In particular, Mr. Axene explained that "[i]f historical [inpatient hospital service] costs were inflated as a result of Sutter's conduct, future [inpatient hospital service] costs projected by health plans . . . will as a consequence be higher than they would have been absent Sutter's conduct."[181] Further, *"[s]ince historical health care costs are used to develop future premium rates, any change in health care costs will have a direct impact on those premium rates. . . . A change that increases [inpatient hospital service] costs would increase the premium rate, and in the aggregate 100% of that increase would be reflected in the increase in the premium rates."*[182]

### D.    Sutter's Examples of Health Plan "Rate Passes" Do Not Contradict My Opinion on Pass-Through

105.    In its Class Order, the Court described two examples of a health plan agreeing to a "rate pass" (*i.e.*, not increasing premium rates for a year) for a customer:[183] (a)

[184] and (b) in 2014 in response to competitive pressure from Kaiser and United, Blue

---

[179] Lalande Deposition (United, September 29, 2017), p. 70.

[180] This is also shown by the state-mandated rate filings made by health plans. *See* Axene Declaration, ¶¶ 23-24.

[181] Axene Declaration, ¶ 36.

[182] Axene Declaration, ¶ 56.

[183] Class Order, p. 22.

[184] Deposition of Daniel Hodges, Senior Vice President and Partner at Woodruff Sawyer, November 2, 2018 (hereafter "Hodges Deposition (Woodruff Sawyer, November 2, 2018)"), pp. 83-97; Hodges Deposition Exhibit 6008, WSAW003950-967, at 956; and Hodges Deposition Exhibit 6008.

Shield agreed to a rate pass for the San Francisco Health Service System,[185] which coordinates medical benefits for active and retired municipal employees in San Francisco.[186] I understand that Sutter has identified other examples of rate passes: (a) ███████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████[87] and (b) █████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████[188]

106.    A "rate pass" is a discount. It means the health plan was going to raise its premium, but instead decided not to do so; in this case, the amount of the planned increase that the health plan decided not to implement is the amount of the discount. Examples of four rate passes do not negate the either the principle of pass-through or the findings of substantial pass-through:

- All else equal, one would expect that a health plan that decided to discount (i.e. give a rate pass) in the actual world, would also do so in the but-for world absent Sutter's conduct. It is likely that with lower costs (in a world without Sutter's excessive pricing),

---

WSAW003950-967, at 951.

[185] Email from Kris Perreras, Major Account Manager, Premier Accounts at Blue Shield, to Anil P. Kochhar of Aon Hewitt, "Subject: HSS GMAPD/GPDP Renewal Update," April 30, 2014, AON0009800-801, at 800.

[186] San Francisco Health Service System, "About Us," available at https://sfhss.org/about-us, *site visited* November 3, 2019.

[187] Hodges Deposition (Woodruff Sawyer, November 2, 2018), pp. 66-69; and Hodges Deposition Exhibit 6007, ██████████████████████████████████████████████████████WSAW011513-514.

[188] ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████WSAW052889-894, at 890; and ██████████████████████████████████████████████████ ███████████████████████████████████████████████████WSAW052889-894, at 889.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

the health plan could have provided even greater discounts. To suggest that discounting in the actual world means no harm from the challenged conduct is to ignore the central concept of a but-for analysis in proving antitrust damages.

- Furthermore, deposition testimony suggests that rate passes are uncommon. For example, Jeffrey Hermosillo, former Senior Vice President of the Markets Division at Blue Shield, testified that Blue Shield offered a rate pass for a "[v]ery small percentage [of contract renewals]. Less than 2 percent, 1 percent. I mean, very small."[189] Mr. Hermosillo also testified that a rate pass could occur because of a reduction in the expected cost of medical care for a particular employer,[190] not necessarily because of competition from rival plans. Where a rate pass is motivated by a reduction in cost, it is direct evidence of pass-through.

****

107.    The qualitative evidence, including ordinary-course documents and testimony from industry participants, recognizes that health plans set premiums to cover medical costs. *In Qualcomm*, the Court credited Dr. Flamm for relying "on documentary and testimonial evidence evincing that Qualcomm, OEMs, and wireless carriers treated Qualcomm's royalty as a known component cost and 'included the Qualcomm royalty in their calculations of the total costs of cellular phones.'"[191] In many ways, the evidence in the *Sidibe* case is stronger because of the

---

[189] Deposition of Jeffrey Hermosillo, Former Senior Vice President, Markets Division, at Blue Shield, October 11, 2018 (hereafter "Hermosillo Deposition (Blue Shield, October 11, 2018)"), p. 47 ("Q: How often would Blue Shield give a client a rate pass? . . . A: Wasn't common. It was not a common occurrence. Q: Could you give an approximate percentage, out of the total number of renewals that you were involved with, how many Blue Shield gave the client a rate pass? . . . A: Very small percentage. Less than 2 percent, 1 percent. I mean, very small.").

[190] Hermosillo Deposition (Blue Shield, October 11, 2018), pp. 47-48 ("Q: What are some of the reasons that you would offer a rate pass for a client? . . . A: Rate pass could be an underlying change in the cost of health care assumptions, the future period is assumed in some way to be better, less care being consumed.").

[191] Koh Qualcomm Class Decision, pp. 33-34 (explaining that "Qualcomm's own internal analysis of the average sales price of phones in 2011 and 2013 showed that Qualcomm considered royalties as one component of the cost to OEMs that would be incorporated in the price to retailers and then incorporated into the price to consumers" and that there were "multiple pieces of testimony in which Qualcomm and other participants in the cellular industry

nature of insurance products and the regulatory oversight that closely monitors the relationship between premiums and costs.

## VII.   Updated Damages Estimates

108.    I now use my econometric pass-through estimates to compute updated premium damages, using data from each of the five Class Health Plans. I previously computed the amount by which each Class Health Plan overpaid Sutter, across the Sutter Damage Hospitals, using my econometric estimates of hospital price overcharges.[192] This overpayment amount represents an increase in each Class Health Plan's costs. Aggregate premium damages are equal to the amount of this overpayment that is passed through to Class Members in the form of higher premiums. Thus, to compute aggregate premium damages, I multiply a Class Health Plan's overpayment to Sutter by my MLR Data econometric pass-through estimate.

109.    My damages methodology can accommodate any pass-through estimate. For example, I can compute damages using: (a) a single weighted average pass-through rate, across all Class Health Plans; (b) pass-through estimates that vary by Class Health Plan; (c) pass-through estimates that vary by line of business; or (d) pass-through estimates that vary by Class Health Plan-line of business. Here, I calculate damages using a single weighted average pass-through rate. In Section IV.B above, I explained that I calculated the single weighted average pass-through rate by conservatively capping each of the Class Health Plan pass-through rates at 100 percent. These pass-through estimates, from my MLR Data analysis, were presented in Exhibit 6, above. I repeat that exhibit here for convenience. In the damages calculations that follow, I apply the pass-through rate that is weighted by premium dollars (97.16 percent).

---

(including OEMs and wireless carriers) stated that Qualcomm's royalty would be an added component to the price of the phone.").

[192] Chipty Merits Report, Section XI.

**Exhibit 6**
**Weighted Average Dollars-Basis Pass-Through Rate**

| | Pass-Through Rate | Weighted by: | |
| | | MLR Member Months (in 000s) | MLR Premium Dollars ($M) |
| Plan | [A] | [B] | [C] |
|---|---|---|---|
| Anthem | 102.31% | 264,824 | 102,108 |
| Blue Shield | 97.89% | 225,865 | 82,254 |
| Health Net | 83.11% | 90,441 | 35,622 |
| Aetna | 106.97% | 58,816 | 24,021 |
| United | 102.10% | 75,978 | 29,061 |
| **Class Health Plans** | | **97.20%** | **97.16%** |

*Source*: MLR Data, 2011-2018.

110.   Following the work presented in my merits report, I compute aggregate premium damages from September 2008 to September 2017. Exhibit 16 shows the updated premium damages based on the application of the 97.16 percent weighted average pass-through rate. Exhibit 17 presents updated extrapolated premium damages based on the application of the 97.16 percent weighted average pass-through rate, where I made limited extrapolations for Health Net and Aetna in 2008 and 2009 and for United in 2008, based upon my overcharge analysis for each of these health plans and consistent with the extrapolations that I made for these years and these health plans in my merits report.[193]

---

[193] Chipty Merits Report, ¶ 272 and Exhibit 35.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit 16**
**Updated Aggregate Premium Damages, with No Extrapolation**
**September 2008 to December 2017**

| Health Plan | Years | Using Out-of-Sample Overcharge Estimates | Using In-Sample Overcharge Estimates |
|---|---|---|---|
| Anthem | 2008 - 2017 | | |
| Blue Shield | 2008 - 2017 | $205,921,311 | $221,934,381 |
| Health Net | 2010 - 2017 | $41,714,273 | $43,149,943 |
| Aetna | 2010 - 2017 | | |
| United | 2009 - 2016 | | |
| **Total** | | $451,693,758 | $476,238,198 |

*Note*: Damages estimates have been updated to reflect a pass-through rate of 97.16 percent.

*Sources*:

1. Anthem, Blue Shield, Health Net, Aetna, and United Claims and Premium Data.
2. U.S. Census Bureau Zip Code and County Data.
3. The Center for Consumer Information & Insurance Oversight: California Geographic RAs.
4. MLR Data, 2011-2018.

**Exhibit 17**
**Updated Aggregate Premium Damages, with Some Extrapolation**
**September 2008 to December 2017**

| Health Plan | Years | Using Out-of-Sample Overcharge Estimates | Using In-Sample Overcharge Estimates |
|---|---|---|---|
| Anthem | 2008 - 2017 | | |
| Blue Shield | 2008 - 2017 | $205,921,311 | $221,934,381 |
| Health Net | 2008 - 2017 | $52,700,364 | $52,963,812 |
| Aetna | 2008 - 2017 | | |
| United | 2008 - 2016 | | |
| **Total** | | $464,997,155 | $489,040,300 |

*Notes*:

1. *See* note for Exhibit 16.
2. The premium damages reported in this table extrapolate damages for: (a) Health Net and Aetna in 2008 and 2009; and (b) United in 2008. (*See* Chipty Merits Report, ¶ 272 and Exhibit 35).

*Source*: *See* sources for Exhibit 16.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

111.     As I have mentioned before, the methodology I use to estimate premium damages is conservative for many reasons.[194] For example, as I explained in my Class Declaration, my damage calculation does not account for "trend factors" actuaries use to inflate the historical medical expenditure to construct healthcare premiums. Incorporating this feature alone would increase damages by around $75 million. In addition to the features I have previously described, I highlight the fact that my damage calculation also excludes the effect of inflated capitation payments on the overpayments made by Class Health Plans to risk bearing organizations (who have to pay the Sutter Damage Hospitals); because capitation payments can be sizeable, the effect of inflated capitation payments on premiums would also be sizeable. And, as I explained above, I cap the Class Health Plan pass-through rates at 100 percent to calculate a weighted average pass-through rate across all health plans: this has the effect of lowering the total weighted average pass-through rate. Collectively, these facts suggest that actual premium damages to Class Members exceed the amounts I have calculated.

112.     Finally, I have not yet been provided with all of the premium and claims data necessary to complete a 2018 or 2019 premium damage calculation. If I am provided the relevant data and if Plaintiffs' counsel requests that I do so, I will use those data to update my calculations to include premium damages for 2018 and 2019.

## VIII.   Conclusion

113.     Based on my review and analysis of a substantial volume of data, documents, and testimony in this case, it is my opinion that: (a) there is common proof demonstrating that all Class Health Plans have paid supracompetitive rates for Sutter inpatient services as a result of the challenged conduct; (b) pass-through rates are uniformly high and significant—meaning that the Class Health Plans have passed through, in the form of higher premiums, all or nearly all of the additional inpatient costs they incurred because of Sutter; and (c) all or nearly all Class Members were harmed as a result of the higher premiums. I also provided a formulaic method that is

---

[194] *See*, *e.g.*, Chipty Class Declaration, ¶ 148; Chipty Merits Report, ¶ 274; and Chipty Merits Rebuttal Report, ¶ 57.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

common to all Class Members and consistent with economic principles for calculating aggregate and individual premium damages.

114.     My damage analysis begins by estimating econometric overcharges reflecting the amount by which Sutter elevated its prices due to the challenged conduct, for each Class Health Plan, using each of their inpatient claims data. I then calculate the amount by which each Class Health Plan overpaid Sutter, based on what each of the Class Health Plans paid to the Sutter Damage Hospitals over the Class Period. I then apply my new econometric estimates of pass-through rates to compute aggregate premium damages to be between $465.00 million and $489.04 million over the period September 2008 to December 2017. For reasons I have explained, these estimates understate the true amount of damages flowing from Sutter's challenged contracting practices.

Tasneem Chipty, Ph.D.
November 18, 2019



**TASNEEM CHIPTY**
**Managing Principal**

**Appendix A: CV**

Office: (617) 315-0355
Cell: (617) 697-6826
tchipty@matrixeconomics.com

125 High Street
Suite 1801
Boston, MA 02110

Dr. Chipty is an expert in industrial organization, antitrust economics, and econometrics. Her practice spans both the areas of antitrust litigation and mergers and acquisitions, in a broad array of sectors including: agricultural equipment; airlines; broadcast and satellite radio; cable and satellite television; containerized shipping; healthcare; newspapers; pharmaceuticals; pulp and paper; and tobacco. Her work has been influential both internationally and domestically. She has assisted the U.S. Department of Justice on several investigations and merger reviews. She has assisted the Government of Australia at the World Trade Organization in a dispute surrounding Australia's national tobacco control policy. She was Comcast's antitrust damages expert in *Behrend et al. vs. Comcast* – a U.S. Supreme Court case in which the Court dismissed the case against Comcast because of deficiencies in the plaintiffs' damages model. On behalf of the parties, she studied the competitive effects of the CenturyLink-Level 3 merger and the Charter-Time Warner Cable merger, both of which received approvals from the U.S. Department of Justice and the Federal Communications Commission. She served as an antitrust advisor to the Massachusetts Health Policy Commission, for whom she has evaluated the competitive effects of healthcare transactions in the Commonwealth, including Partners Healthcare's attempted acquisition of South Shore Hospital and Hallmark Health. Dr. Chipty has submitted testimony, been deposed, and testified at trial in several litigation matters. She has appeared before the Federal Trade Commission, the Department of Justice, the World Trade Organization, the Canadian Mergers Bureau, the U.S. Copyright Board, and the Canadian Copyright Board. She is co-editor of the current edition of the American Bar Association's book *Proving Antitrust Damages*. She has published research on the strategic use of vertical integration, the role of firm size and network effects on bilateral business negotiations, and the effects of regulations on firm behavior.

Prior to founding Matrix Economics, Dr. Chipty was a Managing Principal at Analysis Group, and before that a Vice President at Charles River Associates. She has served on the faculties of the Ohio State University, Brandeis University, and MIT, where she taught courses in antitrust and regulation, industrial organization, and econometrics. Dr. Chipty received her Ph.D. in economics from the Massachusetts Institute of Technology and her undergraduate degree in economics and mathematics from Wellesley College.

**EDUCATION**

Ph.D.          Economics, Massachusetts Institute of Technology

B.A.           Mathematics and Economics, with honors, Wellesley College

## PROFESSIONAL EXPERIENCE

2016 –          Matrix Economics, LLC
                *Founder and Managing Principal*

2010 – 2016     Analysis Group, Inc.
                *Managing Principal* (2010-2016)

1999 – 2010     Charles River Associates, Inc.
                *Vice President* (2005-2010)

2005            Massachusetts Institute of Technology
                *Visiting Associate Professor of Economics*

1997 – 1999     Brandeis University, Graduate School of International Economics and Finance
                *Visiting Assistant Professor of Economics*

1995            Osaka University
                *Visiting Foreign Scholar*

1993 – 1999     Ohio State University
                *Assistant Professor of Economics*


## TESTIMONY EXPERIENCE

- *Djeneba Sidibe et al. v. Sutter Health*, Case No. 3: 12-cv-4854-LB, in United States District Court for the Northern District of California. On behalf of the Djeneba Sidibe *et al.*, submitted testimony on May 26, 2018, June 22, 2018, November 26, 2018, April 22, 2019, April 30, 2019, and August 1, 2019; and testified at deposition on August 15, 2018, August 16, 2018, December 20, 2018, and June 11, 2019. Constantine Cannon (Matthew Cantor).

- *Federal Trade Commission vs. Qualcomm Incorporated*, Case No. 17-CV-00220-LHK, in United States District Court for the Northern District of California. On behalf of Qualcomm, submitted testimony on June 28, 2018; testified at deposition on August 10, 2018; and testified at trial on January 22, 2019. Cravath Swaine and Moore (Gary Bornstein and Yonatan Even).

- *In Re: Qualcomm Litigation*, Case No. 17-cv-00108-GPC-MDD, in United States District Court for the Southern District of California. On behalf of Qualcomm, submitted testimony on June 29, 2018 and October 2, 2018; and testified at deposition on October 10, 2018. Cravath Swaine and Moore (Gary Bornstein and Yonatan Even).

- *In Re: Qualcomm Antitrust Litigation*, Case No. 17-MD-02773-LHK, in United States District Court for the Northern District of California. On behalf of Qualcomm, submitted testimony on November 16, 2018; and testified at deposition on December 14, 2018. Keker, Van Nest & Peters LLP (Eugene Paige and Justina Sessions).

- *United States of America and the State of North Carolina vs. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System*, in the Western District of North Carolina, Charlotte Division, Case No. 3:16-cv-00311-RJC-DCK. On behalf of the United States of America, submitted testimony on August 10, 2018. U.S. Department of Justice (Andy Ewalt and Beth Armington).

- *United States of America v. Deere & Company, Precision Planting LLC, and Monsanto Company,* Civil Action No. 1:16-cv-08515, in the United States District Court for the Northern District of Illinois Eastern Division. On behalf of the United States, submitted testimony on December 23, 2016 and January 10, 2017; and testified at deposition on March 2, 2017. U.S. Department of Justice (Norm Familant and Bill Jones).

- *United States of America, et al. v. Hillsdale Community Health Center, et. al.,* Case No. 5:15-cv-12311-JEL-DRG in the United States District Court for the Eastern District of Michigan. On behalf of the United States, submitted testimony on October 27, 2016 and December 5, 2016; and testified at deposition on December 12, 2016. U.S. Department of Justice (Beth Armington and Katrina Rouse).

- *In the Matter of: Statement of Proposed Royalties to be Collected for the Retransmission of Distant Television Signals, In Canada, for the Years 2014 to 2018*, before the Canadian Copyright Board. On behalf of Bell Canada, Cogeco Cable Inc., Rogers Communications Inc, Shaw Communications Inc., Videotron G.P., and Telus Communications Company, submitted testimony on October 2, 2015 and testified at trial on January 25-26, 2016. Fasken Martineau DuMoulin, LLP (Jay Kerr-Wilson).

- Challenges to Australia's Tobacco Plain Packaging Act, on behalf of Australia, in the World Trade Organization. Submitted testimony on March 9, 2015, May 31, 2015, September 14, 2015, October 26, 2015, December 8, 2015, and February 1, 2016. Australian Government Solicitor (Simon Sherwood and Damien O'Donovan).

- *Caroline Behrend et al. v. Comcast Corporation et al.*, Civil Action No. 03-6604 in the United States District Court for the Eastern District of Pennsylvania. On behalf of Comcast Corporation, submitted testimony on April 10, 2009, on May 6, 2009, on May 11, 2009, on August 21, 2009, September 18, 2009, May 22, 2012, and January 15, 2014; testified at deposition on May 22, 2009; and testified at a class recertification hearing on October 26, 2009. Kasowitz Benson Torres & Freidman (Michael Shuster and Sheron Korpus) and Davis Polk (David Toscano and Arthur Burke).

- *American Broadcasting Company Inc., et. al. v. Aereo*, 12 Civ. 1543, in United States District Court in the Southern District of New York. On behalf of Aereo, submitted testimony on December 20, 2013. Fish and Richardson (David Hosp).

- *DISH Network LLC. f/k/a Echostar Satellite LLC v. ESPN, Inc., and ESPN Classic, Inc.*, No. 09 CIV 6875 (JGK) (FM), in United States District Court in the Southern District of New York. On behalf of DISH Network, submitted testimony on July 29, 2011; testified at deposition on November 22, 2011; testified at deposition in January 2013; testified at trial February 2013. Flemming Zulack Williamson Zauderer LLP (Dean Nyciper) and Simpson Thatcher (Barry Ostrager and Mary Kay Vyskocil).

- *Echostar Satellite LLC v. ESPN, Inc., ESPN Classic, Inc., ABC Cable Networks Group, Inc., Soapnet L.L.C., and International Family Entertainment Inc.*, Index 08-600282 in the Supreme Court of the State of New York County of New York. On behalf of Echostar Satellite LLC, testified at deposition on June 23, 2011. Flemming Zulack Williamson Zauderer LLP (Dean Nyciper).

- *Casitas Municipal Water District v. United States*, Case No. 05-168L in the United States Court of Federal Claims. On behalf of the United States, submitted testimony on February

25, 2010 and February 8, 2007, testified at deposition on March 10, 2010, testified at trial on October 28, 2010. U.S. Justice Department (James Gette and Barrett Atwood).

- *Royalties To Be Collected By CSI and SOCAN For the Reproduction and the Communication to the Public by Online Music Services, In Canada, of Musical or Dramaticaomusical Works, for the years 2007 to 2010*, before the Canadian Copyright Board. On behalf of Apple Inc., Bell Canada Enterprises Inc., Rogers Communications Inc., Telus Communications Company, and Videotron Ltd., submitted testimony on April 29, 2010 and on June 9, 2010, and testified at trial on June 28-9, 2010. Goodmans LLP for Apple Inc. (Michael Koch); and Fasken Martineau DuMoulin, LLP for the rest (Jay Kerr-Wilson).

- *United States of America v. Daily Gazette Company and MediaNews Group, Inc.*, Civil Action No. 2:07-0329 in the United States District Court Southern District of West Virginia. On behalf of the United States of America, submitted testimony on September 1, 2009. U.S. Justice Department (John Reed, Mark Merva and Norm Familant).

- *In re. ASARCO LLC, et al.*, Case No. 05-21207 in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division. On behalf of Ready Mix USA, LLC., submitted testimony on August 1, 2008 and testified at deposition on August 7, 2008. Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. (Gary Shockley).

- *SOCAN Tariff No. 16 – Royalties To Be Collected By SOCAN For the Public Performance or the Communication to the Public by Telecommunication, In Canada, of Musical or Dramaticaomusical Works, for the years 2007 to 2009*, before the Canadian Copyright Board. On behalf of a consortium of Canadian background music users, including Bell ExpressVu, Chum Satellite Services, and DMX Canada, submitted testimony on November 30, 2007 and testified at trial in January 2008. Fasken Martineau DuMoulin, LLP (Jay Kerr-Wilson and Aidan O'Neill).

- *In the Matter of Digital Performance Right in Sound Recordings and Ephemeral Recordings for a New Subscription Service*, CRB Proceeding 2005-5, before the U.S. Copyright Board. On behalf of Sirius Satellite Radio and XM Satellite Radio, submitted testimony on October 30, 2006 and July 24, 2007; testified at deposition on May 8, 2007; and testified at trial in June 2007. Wiley Rein, LLP for Sirius (Bruce Joseph) and Weil, Gotshal & Manges for XM (Ralph Miller).

## MERGERS AND ACQUISITIONS AND OTHER GOVERNMENT INVESTIGATIONS

Dr. Chipty has extensive experience evaluating the competitive effects of proposed transactions and has advised clients at various stages of their deals, including strategic advice in identifying targets, assistance with agency review, and analyses for post-merger contestations. She has employed economic and econometric tools to evaluate issues of market definition, critical loss analysis, direct evidence of unilateral effects, and efficiencies. She has studied the likelihood of temporary or permanent foreclosure, as part of a raising rivals cost strategy. In addition, she has assessed regulatory structures and their associated effect on competition. Examples of Dr. Chipty's work in this area include:

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     A-4

- Assisted parties in the formation of a joint venture between Nippon Yusen Kabushiki Kaisha Ltd., Mitsui O.S.K. Lines, Ltd., Kawasaki Kisen Kaisha Ltd, before the Department of Justice, 2017. WilmerHale (Hartmut Schneider).

- Assisted parties in the CenturyLink-Level 3 merger, before the Department of Justice and the Federal Communications Commission, 2017. Wachtell, Lipton, Rosen & Katz and Jones Day (Ilene Gotts and Bruce McDonald) and Covington & Burling (Yaron Dori).

- Assisted parties in the Charter-Time Warner Cable merger, before the Department of Justice and the Federal Communications Commission, 2015-2016. Wachtell, Lipton, Rosen & Katz and Jenner Block (Ilene Gotts and John Flynn).

- Submitted white paper evaluating the impact of tobacco plain packaging on smoking prevalence in Australia, to the Australian Parliament on behalf of the Government of Australia, in Australia's post implementation review of tobacco plain packaging legislation, 2016. Australian Government Solicitor (Simon Sherwood and Simon Daley).

- Expert for the U.S. Department of Justice in its review of the One Main-Spring Leaf merger, 2015. U.S. Department of Justice (Stephanie Fleming and Nicholas Hill).

- Coauthored a white paper, on behalf of Aeromexico, evaluating the competitive effects of airport slot allocation governing air traffic to and from Mexico City Airport, submitted to Mexico's competition authority, 2015, (joint with Professor Robert Pindyck).

- Expert for Olin Corporation in its acquisition of Dow Chemical's cholor-alkali business unit, before the Federal Trade Commission, 2014-2015. Baker Botts (William Henry and Thomas Dillickrath).

- Expert for the Mergers Bureau of Canada in its review of Post Media's acquisition of Sun Media. Canadian Mergers Bureau (Steve Sansom and Nicholas Janota).

- Assisted the U.S. Department of Justice in its challenge of American Express's use of merchant restraints, 2014-2015. U.S. Department of Justice (Craig Conrath and John Read).

- Advised the Massachusetts Health Policy Commission on the likely competitive impact of Partners HealthCare System's proposed acquisition of Hallmark Health System, including submitting a written statement in the HPC's Cost and Market Impact Review of the transaction, 2014. Health Policy Commission (Karen Tseng and Kate Scarborough).

- Advised the Massachusetts Health Policy Commission on the likely competitive impact of Partners HealthCare System's proposed acquisition of South Shore Hospital, including submitting a written statement in the HPC's Cost and Market Impact Review of the transaction, 2013-2014. Health Policy Commission (Karen Tseng and Kate Scarborough).

- Assisted Saint Alphonsus Medical Center to evaluate the competitive effects of St. Luke's Health System's acquisition of Saltzer Medical Group, in Nampa, Idaho, 2012-2013. Honigman, Miller, Schwartz and Cohn (David Ettinger).

- Assisted Arris Group in its acquisition of Motorola Home business unit from Google, before the Department of Justice, 2013. Hogan Lovells (Logan Breed) and Troutman Sanders (Daniel Anziska).

- Coauthored a white paper, on behalf of Televisa, evaluating the competitive impact in the mobile telephone marketplace of Televisa's proposed acquisition of 50% of GSF Telecom

Holdings, S.A.P.I. de C.V., which owns 100% of Grupo Iusacell, S.A. de C.V. (joint with Almudena Arcelus and David Sosa). Submitted to Mexico's competition authority, Federal Commission of Economic Competition, 2012.

- Conducted analyses and presented before staff of the FTC, in an investigation of two joint venture partners involving allegations of potentially anticompetitive conduct, 2011-2012. Baker Botts (Thomas Dillickrath and William Henry).

- Authored a white paper analyzing the likely effects of Steward Healthcare's acquisition of Morton Hospital, in the greater Boston area, submitted to the State Attorney General's office, June 14, 2011. Edwards Angell Palmer & Dodge (Patricia Sullivan).

- Evaluated the likely effects of the Southwest Airlines-Airtran merger, on behalf of the United States, Winter 2011. U.S. Justice Department (Michael Billiel and Oliver Richard).

- Coauthored a white paper, on behalf of Time Warner Cable, analyzing brinkmanship tactics and broadcast retransmission consent rules established by the 1992 Cable Act, submitted to the Federal Communications Commission (joint with Prof. Steven Salop, Dr. Martino DeStefano, Dr. Serge Moresi, and Dr. John Woodbury), June 3, 2010.

- Authored Federal Communication Commission Media Study #5, on behalf of the Commission, as part of it periodic review of the media ownership rules, analyzing the effects of ownership structure in broadcast radio, on program variety and advertiser and listener welfare, released June 2007.

- Coauthored a white paper analyzing bidding behavior and the potential competitive effects of the merger of Alcatel and Lucent, submitted to the Department of Justice (joint with Drs. Andrew Dick and Stanley Besen), April 28, 2006. Skadden, Arps, Slate Meagher & Flom LLP (James Keyte and Neal Stoll).

- Conducted and presented analysis before the Federal Trade Commission on behalf of Barr Pharmaceuticals regarding its acquisition of a hormone contraceptive product (joint with Prof. Steven Salop), Fall 2005. Kirkland & Ellis LLP (Mark Kovner).

- Conducted an analysis of efficiencies on behalf of Time Warner and Comcast, in their joint bid for Adelphia Communications (joint with Dr. Stanley Besen). Paul Weiss Rifkind Wharton & Garrison, LLP (Joseph Simons).

- Assisted NorthShore University HealthSystem (formerly Evanston Northwestern Health Corporation) with the Federal Trade Commission's post-merger investigation of the 2000 merger of Evanston Hospital and Highland Park Hospital. Winston & Strawn LLP (Michael Sibarium).

## OTHER CONSULTING EXPERIENCE, BY TOPICAL AREA

Dr. Chipty has also provided consultation to litigation clients on matters some of which eventually settled, and she has provided business guidance to clients for strategic planning. Examples of Dr. Chipty's work in this area include:

## Tobacco

- Assisted the Department of Justice, in *United States v. Philip Morris et al.*, Civil Action No. 99- 2486, a RICO case against the major tobacco manufacturers and associations involving allegations of conspiracy to suppress information and to suppress innovation. U.S. Department of Justice (Steve Brody, Renee Brooker, and James Gette).

- Assisted Appalachian Oil Company, in *R.J. Reynolds Tobacco Company v. Market Basket Food Stores, Inc., et al.*, Civil Action No. 5:05-CV-253. Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. (Gary Shockley).

- Assisted Star Scientific, in *Star Scientific, Inc. v. R.J. Reynolds Tobacco Company*, Case No. AW 01-CV-1504 and AW 02-CV-2504. Crowell and Moring (Richard MacMillan and Kathryn Kirmayer).

## Pharmaceutical and Health Care

- Advised the working groups of the Advanced Market Commitment ("AMC"), an initiative of the Gates Foundation to pilot the first AMC for the pneumococcus vaccine. The goal of this AMC is to provide appropriate market-based incentives to induce capacity investments by the major pharmaceutical companies for manufacturing sufficient vaccines for low-income countries.

- Assisted a pharmaceutical manufacturer against Medicaid reimbursement, fraud, and unfair trade practices claims brought by numerous State Attorneys General. O'Melveny & Meyers LLP (Steve Brody and Brian Anderson) and Baker Botts LLP (Richard Josephson).

- Advised Regional Urology, in *Willis-Knighton Health System and Health Plus of Louisiana, Inc. v. Regional Urology LLC, et al.*, Civil No. CV02-1094-S. Breazeale Sachse & Wilson, LLP (Claude Reynaud).

## Media and Sports

- Assisted the YES Television Network in evaluating the value to the network of carriage rights for certain New Jersey Nets games, for contract renegotiation and possible arbitration. Boies Schiller & Flexner, LLP (Robert Dwyer).

- Assisted the Monte Carlo Tennis Tournament, in a dispute with the ATP Tour, alleging abuse of market power. Sidley Austin LLP (Alan Unger).

- Assisted a team of the National Football League, in a dispute with a cable operator, alleging vertical foreclosure. Boies Schiller & Flexner, LLP (Robert Dwyer).

- Assisted Major League Baseball in *Major League Baseball Properties, Inc. v. Salvino,* involving a challenge to the league's use of centralized trademark licensing. Foley & Lardner LLP (Jim Mckeown).

- Advised HBO on reasonable fees for music performance rights in their negotiation with BMI. Cravath, Swaine & Moore LLP (Kenneth Lee).

- Advised XM Satellite Radio on reasonable fees for music performance rights for business negotiations. Shaw Pittman LLP (Cynthia Greer).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      A-7

## ECONOMETRICS AND STATISTICS

Dr. Chipty is an expert in the area of statistics and econometrics and has been successful at using econometric arguments both to construct affirmative arguments in litigation as well as to evaluate the use of econometrics by opposing experts. Many of the projects described above used econometric analysis. Other examples of Dr. Chipty's work in this area are described below:

- Submitted a white paper to the European Commission, DG Competition Bureau, on behalf of the European Liner Affairs Association, analyzing the impact of shipping conferences on carriers' ability to collude on prices (joint with Professor Fiona Scott Morton and Mr. Nils Von Hinten-Reed).

- Developed analyses and drafted a report on behalf of defendants in the *In Re: Monosodium Glutamate Litigation* in support of a defendants' motion to dismiss plaintiff's expert testimony based upon improper use of econometrics. Dorsey & Whitney LLP (Michael Lindsay) and Haynes & Boone LLP (Ronald Breaux).

- Used advanced statistical techniques along with a large volume of administrative data, on behalf of United Parcel Service, to evaluate the Postal Service's expert testimony on variable costs. Piper & Marbury LLP (John McKeever).

- Evaluated and criticized the econometric testimony of a defendants' expert, on behalf of a generic pharmaceuticals firm alleging vertical foreclosure and unlawful delay of entry. Solomon Zauderer (Colin Underwood).

## TRISTATE RESEARCH PARTNERSHIP

Dr. Chipty was a member of the research team from 1997-1999 in this Department of Health and Human Resources funded collaboration that included the states of Massachusetts, Alabama, and Florida. Dr. Chipty worked with state governments to design research experiments, develop econometric models, and process large administrative databases, in an effort to understand the structure, administration, and impact of minimum standards regulations.

- "The Black-White Wage Gap in the Deep South: Location, Location, Location?" (with Ann Dryden Witte), Working Paper 98-03, Tri-State Child Care Research Partnership, Miami, FL.

- "Employment Patterns of Workers Receiving Subsidized Child Care: A Study of Eight Counties in Alabama," (with Ann Dryden Witte), Available from Margie Curry, Executive Director, Childcare Resources, 1904 First Ave. North, Birmingham, AL 35203-4006.

- "Parents Receiving Subsidized Child Care: A Study of Alabama's Labor Force," (with Ann Dryden Witte), Working Paper 98-01, Tri-State Child Care Research Partnership, Miami, FL.

- "Employment of Parents Receiving Subsidized Child Care in Dade County, Florida," (with Harriet Griesinger and Ann Dryden Witte), Working Paper 98-03, Department of Economics, Wellesley College, Wellesley MA 02481.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     A-8

## PAPERS AND PRESENTATIONS

### Published Articles

"US: Economics" (with Michael Chapman), *Global Competition Review*, *The Antitrust Review of the Americas 2016*, available at: http://globalcompetitionreview.com/reviews/74/sections/275/chapters/2983/us-economics/.

"Economists' Perspective on the Efficiency Defense in Provider Consolidations: What Works, What Doesn't Work, and What We Still Don't Know" (with Asta Sendonaris), American Health Lawyer's Association *Connections Magazine*, September 2015.

"Competitor Collaborations in Health Care: Understanding the Proposed ACO Antitrust Review Process," *CPI Antitrust Chronicle*, May 2011 (1).

"Vertical Integration, Market Foreclosure, and Consumer Welfare in the Cable Television Industry," *American Economic Review*, Vol. 91, No. 3, June 2001, pp. 428-453.

"The Role of Buyer Size in Bilateral Bargaining: A Study of the Cable Television Industry" (with Christopher Snyder), *Review of Economics and Statistics*, May 1999, 81(2): 326-340.

"Economic Effects of Quality Regulations in the Daycare Industry," *American Economic Review*, Vol. 85, No. 2, May 1995, pp. 419-424.

"Horizontal Integration for Bargaining Power: Evidence from the Cable Television Industry," *Journal of Economics and Management Strategy*, Vol. 4, No. 2, Summer 1995, pp. 375-397.

"A Marginal Cost Transfer Pricing Methodology," *Tax Notes*, Nov. 26, 1990 (with Ann Dryden Witte, Wellesley College and NBER).

### Chapters in Books

"Hospital-Physician Integration: The St. Luke's Case" (with Deborah Haas-Wilson), in *The Antitrust Revolution, 7th Edition* (Oxford University Press), edited by John Kwoka and Lawrence White.

### Books Edited

*Proving Antitrust Damages*, 3rd Edition, (American Bar Association, 2017).

### Book Reviews

*The Antitrust Source*, October 2007, Book Review of Michael D. Whinston, *Lectures on Antitrust Economics* (Cambridge, MIT Press, 2006).

*The Journal of Economic Literature*, June 1992, Vol. XXX, No. 2, Book Review of Frank Cowell, *Cheating the Government* (with Ann Dryden Witte, Wellesley College and NBER) (Cambridge, MIT Press, 1990).

**Working Papers**

"In a Race Against the Clock:  Auctioneer Strategies and Selling Mechanisms in Live Outcry Auctions," 2014 (with Lucia Dunn and Stephen Cosslett, the Ohio State University).

 "Efficient Estimation Via Moment Restrictions," (with Whitney K. Newey).

"Antidumping and Countervailing Orders: A Study of the Market for Corrosion-Resistant Steel," (with Brian L. Palmer).

"Firms' Responses to Minimum Standards Regulations: An Empirical Investigation" (with Ann Dryden Witte), NBER Working Paper # 6104.

"Effects of Information Provision in a Vertically Differentiated Market" (with Ann Dryden Witte), NBER Working Paper # 6493.

"Unintended Consequences? Welfare Reform and the Working Poor" (with Ann Dryden Witte, Magaly Queralt, and Harriet Griesinger), NBER Working Paper # 6798.

**Select Invited Presentations and Interviews**

FTC Hearings #3: Competition and Consumer Protection in the 21st Century, October 2018.

Interview with the Antitrust Practice Group, *AHLA Antitrust Spotlight Series*, March 2018.

ABA Webinar: "Market Definition in section 2 and section 7: The same but not the same? Questions of fact or law?" November 2017.

International Congress of Addictology Albatros, "Economics of Tobacco Plain Packaging: Australian Legislation," May 2017.

Federal Communication Commission's Event on Challenges Facing Independent Programmers, April 2016, available at: https://www.youtube.com/watch?v=8yxC_3M4IWA.

Federal Communication's Panel on Challenges Facing Multichannel Video Programming Distributors, March 2016, available at: https://www.youtube.com/watch?v=03CMDtdpRDQ.

ABA Webinar: "Sports Leagues Claims After 5 Years After American Needle," 2015.

NYSBA Antitrust Class Action Program: "Comcast v. Behrend:  Interpretation and Application of *Comcast* to Damages Issues in Class Certification," 2015.

AHLA Annual Meetings: "Antitrust and Provider Mergers and Affiliations: Competition vs. More Affordable Care?" 2015.

AHLA Webinar: "Antitrust Implications and Lessons Learned from the Ninth Circuit Decision in *St. Luke's*," 2015.

ABA Webinar: "St. Lukes: State and Federal Enforcement in Non-Reportable Program," 2015.

NYC Bar Antitrust and Healthcare Program, 2015.

NYSBA Antitrust Law Section Annual Meetings: "Efficiencies:  The Cheshire Cat of Merger Analysis," 2014.

NYC Bar Antitrust & Trade Regulation Committee: "Approaches to Antitrust Damages," 2014.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    A-10

**PROFESSIONAL SERVICE**

Defendant's expert at the ABA Mock Trial involving the issue exclusivity, in the form of theaters' use of clearances, 2017.

Vice Chair of the Antitrust Practice Group of the American Health Lawyers Association, 2014-2016.

Advisory board of the Pricing Conduct Committee, 2011-2012.

Editorial comments on a chapter of the ABA's *Price Discrimination Handbook*, 2011.

Plaintiffs' expert at the ABA Mock Trial involving the issue of resale price maintenance, 2008.

Editorial comments on a chapter of the ABA's book on *Market Definition*, 2008.

Contribution to the ABA's *Econometrics Legal, Practical, and Technical Issues*, 2005.

**MEMBERSHIPS**

American Health Lawyers Association
American Bar Association
American Economic Association

**HONORS**

National Science Foundation Fellowship, 1989-1992
Phi Beta Kappa, 1988

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    A-11

**Appendix B: Full Set of Overcharge Estimates for Regression Model
Reproduction of Chipty Merits Report, Appendix J**

**Exhibit J1
Overcharge Estimates by Health Plan
Based on Pooled In-Sample Model**

| Hospital | Anthem | Blue Shield | Aetna | United | Health Net |
|---|---|---|---|---|---|
| Alta Bates-Main | | 57% *** | | | 30% *** |
| Alta Bates-Summit | | 81% *** | | | 45% *** |
| Sutter Sacramento | | 76% *** | | | 81% *** |
| CPMC-Main | | 36% *** | | | 28% *** |
| CPMC-St. Luke's | | 21% ** | | | 3% |
| Sutter Modesto | | 28% *** | | | 10% |

*Notes*:

1. These estimates are based on in-network, fully-insured, commercial claims for each Health Plan occurring at general acute care hospitals in Northern California. *See* Chipty Merits Report, Appendices H and I for more detail on data processing.

2. Asterisks *, **, *** represent statistical significance at ten percent, five percent, and one percent levels.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data, 2006-2015.

2. Centers for Medicare & Medicaid Services (CMS) Impact Files and Hospital Compare Data, 2006-2015.

3. Anthem, Blue Shield, and United Claims Data, 2006-2015. Aetna and Health Net Claims Data, 2008-2015.

4. Google Maps Distance Matrix API.

5. National Bureau of Economic Research (NBER) NPI to Medicare CCN Crosswalk.

**Exhibit J2**
**Overcharge Estimates for Anthem**
**Pooled Model**

| Hospital | Out of Sample | | | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2006-2015 |
| Alta Bates-Main | | | | | | | | | | | |
| Alta Bates-Summit | | | | | | | | | | | |
| Sutter Sacramento | | | | | | | | | | | |
| CPMC-Main | | | | | | | | | | | |
| CPMC-St. Luke's | | | | | | | | | | | |
| Sutter Modesto | | | | | | | | | | | |

*Note*: *See* notes for Exhibit J1.

*Source*: *See* sources for Exhibit J1.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     B-2

**Exhibit J3**
**Overcharge Estimates for Blue Shield**
**Pooled Model**

| Hospital | Out of Sample | | | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2006-2015 |
| Alta Bates-Main | 68% *** | 59% *** | 70% *** | 53% *** | 53% *** | 32% *** | 54% *** | 27% *** | 117% *** | | 57% *** |
| Alta Bates-Summit | 116% *** | 109% *** | 133% *** | 140% *** | 147% *** | 120% *** | 117% *** | 103% *** | 19% ** | | 81% *** |
| Sutter Sacramento | 95% *** | 40% *** | 94% *** | 110% *** | 81% *** | 96% *** | 82% *** | 67% *** | 43% *** | | 76% *** |
| CPMC-Main | 25% *** | 12% | 56% *** | 39% *** | 50% *** | 50% *** | 43% *** | 32% ** | 29% ** | | 36% *** |
| CPMC-St. Luke's | 14% | 0% | 42% *** | 18% | 22% * | 74% *** | 9% | 8% | 20% | | 21% ** |
| Sutter Modesto | 35% *** | 52% *** | 46% *** | 25% *** | 21% *** | 21% *** | 25% *** | 26% *** | 16% *** | | 28% *** |

*Note*: *See* notes for Exhibit J1.

*Source*: *See* sources for Exhibit J1.

**Exhibit J4**
**Overcharge Estimates for Health Net**
**Pooled Model**

| Hospital | Out of Sample | | | | | | | | In-Sample |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2008-2015 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Alta Bates-Main | 20% * | 21% ** | 25% *** | 9% | 31% *** | 21% ** | 90% *** | 56% *** | 30% *** |
| Alta Bates-Summit | 44% *** | 64% *** | 83% *** | 90% *** | 107% *** | 52% *** | 19% ** | -1% | 45% *** |
| Sutter Sacramento | 106% *** | 129% *** | 89% *** | 97% *** | 68% *** | 51% *** | 36% *** | 82% *** | 81% *** |
| CPMC-Main | 11% | 29% *** | 12% | 21% * | 34% ** | 31% ** | 45% *** | 39% *** | 28% *** |
| CPMC-St. Luke's | -1% | -12% | 14% | -6% | 21% | -10% | 17% | 2% | 3% |
| Sutter Modesto | 19% ** | 43% *** | 13% | 15% * | 10% | -8% | 16% ** | -15% ** | 10% |

*Note*: *See* notes for Exhibit J1.

*Source*: *See* sources for Exhibit J1.

**Exhibit J5**
**Overcharge Estimates for Aetna**
**Pooled Model**

| Hospital | Out of Sample | | | | | | | | In-Sample |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2008–2015 |
|---|---|---|---|---|---|---|---|---|---|
| Alta Bates-Main | | | | | | | | | |
| Alta Bates-Summit | | | | | | | | | |
| Sutter Sacramento | | | | | | | | | |
| CPMC-Main | | | | | | | | | |
| CPMC-St. Luke's | | | | | | | | | |
| Sutter Modesto | | | | | | | | | |

*Note*: *See* notes for Exhibit J1.

*Source*: *See* sources for Exhibit J1.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit J6**
**Overcharge Estimates for United**
**Pooled Model**

| Hospital | Out of Sample | | | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2006-2015 |
| Alta Bates-Main | | | | | | | | | | | |
| Alta Bates-Summit | | | | | | | | | | | |
| Sutter Sacramento | | | | | | | | | | | |
| CPMC-Main | | | | | | | | | | | |
| CPMC-St. Luke's | | | | | | | | | | | |
| Sutter Modesto | | | | | | | | | | | |

*Note*: *See* notes for Exhibit J1.

*Source*: *See* sources for Exhibit J1.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

## Appendix C: Materials Considered

All materials cited in this report, all materials listed in Appendix B of Chipty SJ Declaration, Chipty Class Declaration, Chipty Reply Declaration, Chipty Merits Report, Chipty Merits Rebuttal Report and Appendix A of Chipty Supplemental Report, and the following:

### I.   Depositions and Associated Exhibits

- Deposition of Tasneem Chipty, *Djeneba Sidibe, et al., v. Sutter Health*, Case No. 3:12-CV-4854-LB, August 16, 2018.
- Deposition of Brent Hitchings, *Djeneba Sidibe, et al., v. Sutter Health*, Case No. 3:12-CV-4854-LB, August 28, 2018.
- Deposition of Jeff Smith, *Djeneba Sidibe, et al., v. Sutter Health*, Case No. 3:12-CV-4854-LB, October 10, 2018.

### II.   Legal Documents

- "[Corrected] Declaration of Dr. Kenneth Flamm in Support of Plaintiffs' Motion for Class Certification," *In re Optical Disk Drive Antitrust Litigation*, Case No. 3:10-md-2143 RS, filed May 28, 2015.
- "Defendant's Opposition to Motion for Class Action," *Djeneba Sidibe, et al. v. Sutter Health*, Case No. 3:12-CV-04854-LB, December 20, 2018.
- "Order Adopting Special Master's Reports and Recommendations on Defendants' Motion to Exclude Expert Testimony and Indirect-Purchaser Plaintiffs' Motion for Class Certification," *In Re Cathode Ray Tube (CRT) Antitrust Litigation*, Case No. C-07-5944-SC, September 24, 2013.
- "Order Granting Indirect Purchaser Plaintiffs' Motion for Class Certification; Denying Defendants' Motion to Strike Modified Class Definitions; Granting Motions to Strike Untimely Declarations," *In Re TFT-LCD (Flat Panel) Antitrust Litigation, Case No. M-07-1827-SI*, March 28, 2010.
- "Order Granting IP Plaintiffs' Motion for Class Certification and Denying Motions to Exclude Expert Opinions," *In Re Static Random Access Memory (SRAM) Antitrust Litigation*, Case No. C-07-01819-CW, November 25, 2009.

- "Order Granting Motion to Certify Class Under Rule 23(b)(2) and Denying Without Prejudice Motion to Certify Class Under Rule 23(b)(3)," *Djeneba Sidibe, et al. v. Sutter Health*, Case No. 3:12-CV-04854-LB, August 30, 2019.

- "Order Granting Motions for Class Certification," *In Re Packaged Seafood Products Antitrust Litigation*, Case No. 15-MD-2670-JLS, July 30, 2019.

- "Report and Recommendation Regarding Indirect Purchaser Plaintiffs' Motion for Class Certification," *In Re Cathode Ray Tube (CRT) Antitrust Litigation*, Case No. C-07-5944-SC, June 20, 2013.

- "Reports of the Panels: Australia – Certain Measures Concerning Trademarks, Geographical Indications And Other Plain Packaging Requirements Applicable To Tobacco Products And Packaging," Docket Nos. WT/DS435/R, WT/DS441/R, WT/DS458/R, WT/DS467/R, World Trade Organization, June 28, 2018.

- Public Redacted Version of "Defendant Qualcomm Incorporated's Motion to Strike the Declaration of Kenneth Flamm," *In Re: Qualcomm Antitrust Litigation*, Case No. 17-MD-02773-LHK, August 9, 2018.

- Public Redacted Version of Declaration of Dr. Kenneth Flamm, *In Re: Qualcomm Antitrust Litigation*, Case No. 17-MD-2773-LHK, July 5, 2018.

- Public Version of "Order Granting Plaintiffs' Motion for Class Certification; Denying Qualcomm's Motion to Strike the Declaration of Kenneth Flamm," *In Re: Qualcomm Antitrust Litigation*, Case No. 17-MD-2773-LHK, September 27, 2018.

## III. Produced Documents

- AON0009800
- WSAW003950
- WSAW004022
- WSAW004024
- WSAW011527
- WSAW011545
- WSAW052889
- WSAW052897

## IV. Data Sources and Documentation

- "2016 Service Area County + ZIP Codes for Metal Plans," Kaiser Permanente, available at http://www.247delivers.com/docs/KP_CA_SB_ZIP_Code_Guide_2016.pdf.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- "HUD USPS Zip Code Crosswalk Files," Department of Housing and Urban Development, Office of Policy Development and Research, available at https://www.huduser.gov/portal/datasets/usps_crosswalk.html.
- Aetna, "1495757742035.xls," April 1, 2014.
- American Medical Association, "Competition in Health Insurance: A Comprehensive Study of U.S. Markets 2018 Update," 2018.
- California Department of Managed Health Care, "Unified Rate Review Template filings," available at http://wpso.dmhc.ca.gov/premiumratereview/searchratefilings, *site visited* October 7, 2019.
- California Health Care Foundation, "California's Medical Loss Database, 2017 (ZIP)," available at https://www.chcf.org/wp-content/uploads/2016/07/MedicalLossRatio2017Data.zip.
- Centers for Medicare & Medicaid Services, "Medical Loss Ratio (MLR) Annual Reporting Form Filing Instructions for the 2017 MLR Reporting Year," available at https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/2017-MLR-Form-Instructions.pdf, *site visited* November 5, 2019.
- Centers for Medicare & Medicaid Services, "Medical Loss Ratio Data and System Resources," available at https://www.cms.gov/CCIIO/Resources/Data-Resources/mlr, *site visited* November 4, 2019.

## V.   Articles and Books

- Ashenfelter, Orley, David Ashmore, Jonathan B. Baker and Signe-Mary McKernan, "Identifying the Firm-Specific Cost Pass-Through Rate," Working Paper, January 1998.
- Besley, Timothy J. and Harvey S. Rosen, "Sales Taxes and Prices: An Empirical Analysis," *National Tax Journal*, Vol. 52(2), 1999, pp. 157-178.
- Bishop, Robert, "The Effects of Specific and Ad Valorem Taxes," *The Quarterly Journal of Economics*, Vol. 82, No. 2, 1968, pp. 198-218.
- Cotterill, Ronald, Leonard Egan, and William Buckhold, "Beyond Illinois Brick: The Law and Economics of Cost Pass-Through in the ADM Price Fixing Case," *Review of Industrial Organization*, Vol. 18, No. 1, 2001, pp. 45-52.

- Deng, Fei, John H. Johnson and Gregory K. Leonard, "Economic Analysis in Indirect Purchaser Class Actions," *Antitrust*, Vol. 26, No. 1, Fall 2011: pp. 51-57.

- Doyle Jr., Joseph J. and Krislert Samphantharak, "$2.00 Gas! Studying the effects of a gas taxation moratorium," *Journal of Public Economics*, Vol 92, pp. 869-884, 2008.

- Dutz, Mark, Ioannis Kessides, Stephen O'Connell and Robert D. Willig, "Competition and Innovation-Driven Inclusive Growth," Working Paper, The World Bank, Poverty Reduction and Economic Management Network, Economic Policy and Debt Department, October 2011.

- Dutz, Mark, Jonathan Orzag, and Robert Willig, "The Substantial Consumer Benefits of Broadband Connectivity for U.S. Households," Compass Lexecon, July 2009.

- Dutz, Mark, Lucas Ferreira Mation, Stephen O'Connell and Robert D. Willig, "Economywide and Sectoral Impacts on Workers of Brazil's Internet Rollout," Working Paper, World Bank Group, Trade and Competitiveness Global Practice Group, April 2017.

- Grabowski, Henry and John Vernon, "Brand loyalty, entry, and price competition in pharmaceuticals after the 1984 Drug Act," *Journal of Law and Economics*, Vol. 35, No. 2, 1992.

- Grabowski, Henry G. and John M. Vernon, "Longer patents for increased generic competition in the U.S.—the Waxman–Hatch Act after one decade," *PharmacoEconomics*, Vol. 10, No. 2, 1996.

- Greene, William, *Econometric Analysis*, Second Edition, New York, NY: Macmillan, 1993.

- Gron, Anne and Deborah Swenson, "Cost pass-through in the U.S. automobile market," *Review of Economics and Statistics*, Vol. 82, No. 2, 2000.

- Hellerstein, Rebecca, and Sofia B. Villas-Boas, "Outsourcing and Pass-Through," Working Paper, University of California, Berkeley, Department of Agriculture and Resource Economics, Paper 1016R3, 2010.

- Israel, Mark, Bryan Keating, Daniel L. Rubinfeld and Bobby Willig, "Airline Network Effects and Consumer Welfare," *Review of Network Economics*, 2013.

- Kennedy, Peter, *A Guide to Econometrics*, Malden, MA: Blackwell Publishing, 6th edition, 2008.

- Kim, Donghun and Ronald W. Cotterill, "Cost Pass-Through in Differentiated Product Markets: The Case of U.S. Processed Cheese," *The Journal of Industrial Economics*, Vol. 56, No. 1, pp. 32-48, 2008.

- Kosicki, George and Miles Cahill, "Economics of Pass Through and Damages in Indirect Purchaser Cases," *The Antitrust Bulletin*, Vol. 51, No. 3, Fall 2006: pp. 599-630.

- Ormiston, Michael B., *Intermediate Microeconomics*, The Dryden Press, 1992.

- Peltzman, Sam, "Prices Rise Faster than They Fall," *The Journal of Political Economy*, Vol. 108, No. 3, pp. 466-502, 2000.

- Pindyck, Robert S. and Daniel L. Rubinfeld, *Microeconomics*, 2nd Edition, Macmillan Publishing Company,1992.

- RBB Economics, "Cost pass-through: theory, measurement, and potential policy implications," A report prepared for the United Kingdom's Office of Fair Trading, February 2014, available at https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/320912/Cost_Pass-Through_Report.pdf, site visited November 5, 2019.

- Regan, Tracy L., "Generic entry, price competition, and market segmentation in the prescription drug market," *International Journal of Industrial Organization*, Vol. 26, No. 4, 2008.

- Stern Nicholas, "The Effects of Taxation, Price Control and Government Contracts in Oligopoly and Monopolistic Competition," *Journal of Public Economics*, Vol. 32, pp. 133-158, 1987.

- Sullivan, Ryan W. and Donald H. Dutkowsky, "The Effect of Cigarette Taxation on Prices: An Empirical Analysis Using Local-Level Data," *Public Finance Review*, Vol. 40(6), 2012.

- Varian, Hal R., *Microeconomic Analysis*, 3rd Edition, W.W. Norton & Company, 1992.

- Varian, Hal, *Intermediate Microeconomics: A Modern Approach*, 6th Edition, 2002.

- Weyl, Glen E. and Michal Fabinger, "Pass-Through as an Economic Tool: Principles of Incidence under Imperfect Competition," *Journal of Political Economy*, Vol. 121, No. 3, pp. 528-583, 2013.

- Wooldridge, Jeffrey M., *Introductory Econometrics, A Modern Approach*, 5th Edition (Mason Ohio: Southwestern-Cengage Learning, 2013).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

## VI.  Other Materials Considered

- http://www.insurance.ca.gov/01-consumers/110-health/10-basics/types.cfm#targetText=In%20some%20cases%2C%20Department%20of,Care%20(DMHC)%20regulates%20PPOs.&targetText=If%20you%20are%20not%20sure,get%20to%20the%20right%20place

- http://www.insurance.ca.gov/01-consumers/110-health/upload/AB1083_REPORT_2019_Individual_v1-2.pdf

- https://newsroom.healthnet.com/press-release/health-net-selected-participate-covered-california-health-insurance-exchange

- https://sfhss.org/about-us

- https://wpso.dmhc.ca.gov/hpsearch/viewall.aspx

- https://www.ahip.org/wp-content/uploads/2017/03/HealthCareDollar_FINAL.pdf

- https://www.baltimoresun.com/health/bs-hs-aetna-maryland-exchange-20130802-story.html

- https://www.blueshieldca.com/bsca/documents/about-blue-shield/health-reform/02%206%20-%202016%20Medical%20Loss%20Ratio%20(MLR)%20broker-employer%20talking%20points_092016.pdf

- https://www.chcf.org/publication/medical-loss-ratio-resources/

- https://www.chcf.org/wp-content/uploads/2017/12/PDF-CaliforniaHealthInsurers2017.pdf

- https://www.chcf.org/wp-content/uploads/2017/12/PDF-HIMURegulatoryOversight.pdf

- https://www.chcf.org/wp-content/uploads/2017/12/PDF-MakingSenseManagedCareRegulation.pdf

- https://www.chcf.org/wp-content/uploads/2019/08/HowtoUseMLRdatabase.pdf

- https://www.chcf.org/wp-content/uploads/2019/08/WhatIsMLR.pdf

- https://www.cms.gov/apps/mlr/

- https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Market-Reforms/Medical-Loss-Ratio.html

- https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/

- https://www.cms.gov/CCIIO/Resources/Data-Resources/mlr.html

- https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/medical-loss-ratio.html
- https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/2017-MLR-Form-Instructions.pdf
- https://www.cms.gov/CCIIO/Resources/Training-Resources/Downloads/Issuer-2018-MLR-Memo.pdf
- https://www.dmhc.ca.gov/HealthCareinCalifornia/TypesofPlans.aspx
- https://www.ebri.org/docs/default-source/fast-facts/ff-335-selfinsur-8aug19.pdf?sfvrsn=69773c2f_4
- https://www.fjc.gov/sites/default/files/2015/SciMan3D08.pdf
- https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-10-plan-funding
- https://www.medmutual.com/For-Individuals-and-Families/Health-Insurance-Education/Compare-Health-Insurance-Plans/HMO-vs-PPO-Insurance.aspx
- https://www.naic.org/documents/committees_e_hrsi_comdoc_ahip_chart_mlr.pdf
- https://www.pbs.org/newshour/health/unitedhealthcare-to-pull-out-of-obamacare-markets-in-california

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

## Appendix D: MLR Regression Estimates

### Exhibit D1
### MLR Regression Results and Sensitivities: Plan-Level

| | (1) Baseline | (2) Add Kaiser Cost | (3) Add Kaiser Cost with Interactions | (4) Add Kaiser Share | (5) Add HHI with Interactions | (6) Plan - LOB - DMHC FEs | (7) Use Ln Prem Earned as Dep Var | (8) Remove MLR Rebates from Prem | (9) Drop Linear Time Trend |
|---|---|---|---|---|---|---|---|---|---|
| **Log PMPM Cost X Plan** | | | | | | | | | |
| Log PMPM Cost X Anthem | 0.823*** | 0.820*** | 0.808*** | 0.819*** | -0.342 | 0.904*** | 0.894*** | 0.819*** | 0.859*** |
| Log PMPM Cost X Blue Shield | 0.794*** | 0.790*** | 0.774*** | 0.787*** | -0.377 | 0.879*** | 0.919*** | 0.800*** | 0.834*** |
| Log PMPM Cost X Health Net | 0.723*** | 0.723*** | 0.723*** | 0.720*** | -0.424 | 0.709*** | 0.852*** | 0.724*** | 0.736*** |
| Log PMPM Cost X Aetna | 0.844*** | 0.847*** | 0.837*** | 0.840*** | -0.317 | 0.894*** | 0.953*** | 0.828*** | 0.890*** |
| Log PMPM Cost X United | 0.833*** | 0.830*** | 0.828*** | 0.849*** | -0.298 | 0.874*** | 0.875*** | 0.837*** | 0.862*** |
| **Line of Business Fixed Effects** | | | | | | | | | |
| Individual | -0.036 | -0.008 | 0.316 | 0.320* | -0.011 | | -0.003 | -0.038* | -0.038* |
| Small Group | 0.080*** | 0.150*** | -0.663 | 0.288*** | 0.112*** | | 0.085*** | 0.075*** | 0.079*** |
| DMHC Fixed Effect | 0.032* | 0.033** | 1.535** | 0.032** | 0.021 | | 0.003 | 0.030* | 0.030* |
| **Kaiser Costs** | | | | | | | | | |
| Ln Kaiser Costs PMPM | | 0.453 | 0.637 | | | | | | |
| Ln Kaiser Costs PMPM X Individual | | | -0.055 | | | | | | |
| Ln Kaiser Costs PMPM X Small Group | | | 0.143 | | | | | | |
| Ln Kaiser Costs PMPM X DMHC | | | -0.257* | | | | | | |
| **Additional Controls** | | | | | | | | | |
| Kaiser Share | | | | 0.015*** | | | | | |
| HHI Incl. Kaiser | | | | | -2.404*** | | | | |
| Log PMPM Cost X HHI Incl. Kaiser | | | | | 0.424*** | | | | |
| **Plan Fixed Effects?** | Yes | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes |
| **Plan X LOB X Regulator Fixed Effects?** | No | No | No | No | No | Yes | No | No | No |
| **Linear Time Trend?** | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No |
| Observations | 216 | 216 | 216 | 216 | 216 | 216 | 216 | 216 | 216 |
| Adj. R-squared | 0.864 | 0.865 | 0.865 | 0.867 | 0.883 | 0.908 | 0.943 | 0.863 | 0.859 |
| ***Pass-Through on a Dollars-Basis*** | | | | | | | | | |
| Anthem | 1.023*** | 1.019*** | 1.005*** | 1.019*** | 0.940*** | 1.124*** | 1.130*** | 1.017*** | 1.068*** |
| Blue Shield | 0.979*** | 0.974*** | 0.955*** | 0.970*** | 0.894*** | 1.084*** | 1.150*** | 0.982*** | 1.029*** |
| Health Net | 0.831*** | 0.830*** | 0.831*** | 0.827*** | 0.771*** | 0.815*** | 0.995*** | 0.832*** | 0.845*** |
| Aetna | 1.070*** | 1.073*** | 1.061*** | 1.064*** | 0.979*** | 1.133*** | 1.204*** | 1.046*** | 1.127*** |
| United | 1.021*** | 1.018*** | 1.015*** | 1.040*** | 0.989*** | 1.071*** | 1.069*** | 1.024*** | 1.057*** |

*Note:* Asterisks *, **, *** represent statistical significance at ten percent, five percent, and one percent levels.

*Source:* MLR Data, 2011 to 2018.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

D-1

Exhibit D2
MLR Regression Results and Sensitivities: Plan-Line of Business-Level

| | (1) Baseline | (2) Add Kaiser Cost | (3) Add Kaiser Cost with Interactions | (4) Add Kaiser Share | (5) Add HHI with Interactions | (6) Plan - LOB - DMHC FEs | (7) Use Ln Prem Earned as Dep Var | (8) Remove MLR Rebates from Prem | (9) Drop Linear Time Trend |
|---|---|---|---|---|---|---|---|---|---|
| **Log PMPM Cost X Plan** | | | | | | | | | |
| Log PMPM Cost X Anthem | 1.137*** | 1.128*** | 1.133*** | 1.124*** | -0.509 | 1.188*** | 1.022*** | 1.135*** | 1.163*** |
| Log PMPM Cost X Blue Shield | 1.059*** | 1.051*** | 1.035*** | 1.045*** | -0.591* | 1.084*** | 1.030*** | 1.065*** | 1.089*** |
| Log PMPM Cost X Health Net | 0.899*** | 0.895*** | 0.913*** | 0.891*** | -0.677** | 0.906*** | 0.926*** | 0.900*** | 0.909*** |
| Log PMPM Cost X Aetna | 1.037*** | 1.033*** | 1.032*** | 1.025*** | -0.607* | 1.142*** | 1.020*** | 1.022*** | 1.066*** |
| Log PMPM Cost X United | 0.985*** | 0.980*** | 1.003*** | 0.994*** | -0.543* | 0.964*** | 0.942*** | 0.988*** | 1.006*** |
| **Line of Business Fixed Effects** | | | | | | | | | |
| Individual | 2.050*** | 2.041*** | -0.837 | 2.298*** | 1.800*** | | 0.961*** | 2.037*** | 2.091*** |
| Small Group | 0.820*** | 0.751*** | -0.622 | 0.854*** | -1.047** | | -0.249 | 0.895*** | 0.653** |
| **Log PMPM Cost X Line of Business Fixed Effects** | | | | | | | | | |
| Log PMPM Cost X Individual | -0.361*** | -0.356*** | -0.388*** | -0.352*** | -0.314*** | -0.34*** | -0.167*** | -0.359*** | -0.368*** |
| Log PMPM Cost X Small Group | -0.129** | -0.108** | -0.117* | -0.105** | 0.192** | -0.211*** | 0.057 | -0.143*** | -0.100** |
| **DMHC Fixed Effect** | 0.033** | 0.035** | 1.722** | 0.034** | 0.029** | | 0.008 | 0.031** | 0.033*** |
| **Kaiser Costs** | | | | | | | | | |
| Ln Kaiser Costs PMPM | | 0.337 | 0.228 | | | | | | |
| Ln Kaiser Costs PMPM X Individual | | | 0.522 | | | | | | |
| Ln Kaiser Costs PMPM X Small Group | | | 0.241 | | | | | | |
| Ln Kaiser Costs PMPM X DMHC | | | -0.289** | | | | | | |
| **Additional Controls** | | | | | | | | | |
| Kaiser Share | | | | 0.013* | | | | | |
| HHI Incl. Kaiser | | | | | -3.311*** | | | | |
| Log PMPM Cost X HHI Incl. Kaiser | | | | | 0.567*** | | | | |
| Plan Fixed Effects? | Yes | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes |
| Plan X LOB X Regulator Fixed Effects? | No | No | No | No | No | Yes | No | No | No |
| Linear Time Trend? | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No |
| Observations | 216 | 216 | 216 | 216 | 216 | 216 | 216 | 216 | 216 |
| Adj. R-squared | 0.897 | 0.897 | 0.901 | 0.899 | 0.920 | 0.930 | 0.951 | 0.896 | 0.895 |
| **Pass-Through on a Dollars-Basis** | | | | | | | | | |
| Anthem - Individual | 0.972*** | 0.967*** | 0.933*** | 0.966*** | 0.863*** | 1.061*** | 1.087*** | 0.971*** | 0.995*** |
| Anthem - Small Group | 1.277*** | 1.291*** | 1.286*** | 1.291*** | 1.191*** | 1.238*** | 1.412*** | 1.248*** | 1.346*** |
| Anthem - Large Group | 1.383*** | 1.371*** | 1.378*** | 1.367*** | 1.338*** | 1.445*** | 1.243*** | 1.379*** | 1.415*** |
| Blue Shield - Individual | 0.841*** | 0.837*** | 0.779*** | 0.834*** | 0.732*** | 0.895*** | 1.077*** | 0.847*** | 0.868*** |
| Blue Shield - Small Group | 1.208*** | 1.224*** | 1.191*** | 1.221*** | 1.115*** | 1.134*** | 1.426*** | 1.188*** | 1.283*** |
| Blue Shield - Large Group | 1.281*** | 1.271*** | 1.251*** | 1.264*** | 1.232*** | 1.310*** | 1.244*** | 1.286*** | 1.317*** |

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

D-2

## Exhibit D2 (Cont.)

| | (1)<br>Baseline | (2)<br>Add Kaiser Cost | (3)<br>Add Kaiser Cost with Interactions | (4)<br>Add Kaiser Share | (5)<br>Add HHI with Interactions | (6)<br>Plan - LOB - DMHC FEs | (7)<br>Use Ln Prem Earned as Dep Var | (8)<br>Remove MLR Rebates from Prem | (9)<br>Drop Linear Time Trend |
|---|---|---|---|---|---|---|---|---|---|
| *Pass-Through on a Dollars-Basis* | | | | | | | | | |
| **Health Net - Individual** | 0.560*** | 0.561*** | 0.546*** | 0.560*** | 0.543*** | 0.588*** | 0.826*** | 0.563*** | 0.562*** |
| **Health Net - Small Group** | 0.960*** | 0.981*** | 0.991*** | 0.980*** | 0.979*** | 0.867*** | 1.234*** | 0.943*** | 1.008*** |
| **Health Net - Large Group** | 1.043*** | 1.038*** | 1.059*** | 1.034*** | 1.083*** | 1.052*** | 1.075*** | 1.044*** | 1.055*** |
| **Aetna - Individual** | 0.889*** | 0.890*** | 0.847*** | 0.884*** | 0.857*** | 1.053*** | 1.119*** | 0.872*** | 0.916*** |
| **Aetna - Small Group** | 1.181*** | 1.202*** | 1.190*** | 1.197*** | 1.112*** | 1.211*** | 1.399*** | 1.137*** | 1.255*** |
| **Aetna - Large Group** | 1.264*** | 1.258*** | 1.258*** | 1.250*** | 1.222*** | 1.391*** | 1.238*** | 1.245*** | 1.299*** |
| **United - Individual** | 0.637*** | 0.637*** | 0.628*** | 0.655*** | 0.787*** | 0.637*** | 0.803*** | 0.642*** | 0.652*** |
| **United - Small Group** | 1.144*** | 1.166*** | 1.184*** | 1.188*** | 1.228*** | 1.008*** | 1.318*** | 1.126*** | 1.211*** |
| **United - Large Group** | 1.198*** | 1.193*** | 1.221*** | 1.209*** | 1.298*** | 1.174*** | 1.146*** | 1.203*** | 1.225*** |

*Note:* Asterisks *, **, *** represent statistical significance at ten percent, five percent, and one percent levels.

*Source:* MLR Data, 2011 to 2018.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA