UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, JERRY JANKOWSKI,
SUSAN HANSEN, DAVID HERMAN,
OPTIMUM GRAPHICS, INC., and JOHNSON
POOL & SPA, on Behalf of Themselves and All
Others Similarly Situated,

               Plaintiffs,

    v.

SUTTER HEALTH,

               Defendant.

Case No. 3:12-cv-4854-LB

CLASS ACTION

Supplemental Reply Declaration of Dr. Tasneem Chipty
In Support of Class Certification
March 12, 2020

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Table of Contents**

I.    Introduction .............................................................................................................. 1

II.   Summary of Opinions ............................................................................................ 4

III.  Dr. Willig's Arguments About Pass-Through Variability Are Misleading and False ............. 10

    A.  Dr. Willig Misunderstands the Use and Purpose of Averaging ........................................ 11

    B.  Dr. Willig Overstates Variability Across Geographies .................................................... 13

    C.  Dr. Willig Overstates Variability Across Time .............................................................. 18

IV.  Dr. Willig's Arguments Regarding Kaiser Are Misleading and Misrepresent My Pass-Through Analyses .......................................................... 22

    A.  My Analyses Account for Competition from Kaiser ........................................................ 22

    B.  Dr. Willig's Analyses Show Pass-Through Rates Do Not Vary Substantially Across Kaiser-Heavy and Kaiser-Light Areas ........................ 26

    C.  Documents Show Class Health Plans Have Abandoned Products that Were Intended to Compete Against Kaiser ............................... 29

V.   MLR Data Provide a Reliable Basis for Estimating Pass-Through Rates .............................. 31

    A.  Reasons for Preferring MLR Data over Production Data ................................................. 32

    B.  The MLR Data Are Representative of Class Members ..................................................... 34

    C.  Dr. Willig's Claim that the "MLR Data Do Not Allow for Proper Analysis of Large Claims" Is Incorrect .......................................... 37

    D.  My MLR Analyses Are Corroborated by My Production Data Analyses and Qualitative Evidence ............................................. 38

    E.  Dr. Willig's Other Criticisms of the MLR Analysis are Distractions ................................ 39

VI.  Dr. Willig's Employer-Employee Split Arguments Are Incorrect and Misleading ................ 40

    A.  Dr. Willig's Rejection of the Proportional Split in Certain Scenarios Is Flawed ................ 43

    B.  Dr. Willig's Arguments about Cross-Sectional Variation in the Employer-Employee Split Are Completely Irrelevant ........................... 47

    C.  Dr. Willig's Arguments about Temporal Variation in the Employer-Employee Split Are Exaggerated ...................................... 47

    D.  Dr. Willig's View that Determining the Employer-Employee Split for the Named Plaintiffs Is "Likely Impossible" Is Untrue ........................ 49

VII.  Conclusions ....................................................................................................... 50

## I.      Introduction

1.      My name is Tasneem Chipty. I declare under penalty of perjury under the laws of the United States of America as follows:

2.      At the request of counsel for the Class Plaintiffs, I previously submitted seven reports/declarations in *Sidibe et al. vs. Sutter*.[1] Most recently, I submitted a report that provided new econometric analyses calculating the substantial rates at which Class Health Plans pass through Sutter hospital overcharges to employers, employees, and individual consumers, in the form of higher health insurance premiums.[2] In that report and among other things, I estimated pass-through rates: (a) by Class Health Plan; (b) by Class Health Plan and line of business; and (c) on a class-wide weighted average basis (which I estimate to be 97.16 percent). In that report, I also described prior econometric analyses of pass-through conducted by me and Sutter's expert, Dr. Willig, that also showed substantial pass-through rates of Sutter hospital overcharges to consumers. In this report, I describe and respond to the new arguments made by Dr. Willig and Mr. Travis in response to my latest report.[3]

3.      I am an expert in the areas of industrial organization and econometrics, which is the application of statistical methods to economics problems. I have taught graduate econometrics while I was on faculty at the Ohio State University and Brandeis University. I have also taught graduate and undergraduate microeconomics, including competition economics, at Ohio State, Brandeis, and the Massachusetts Institute of Technology. For the past 25 years, I have studied the competitive interactions among firms and the factors that determine their prices, in a wide range of applications. My work has been published in leading academic journals, and it has been influential in real-world settings, including both merger and non-merger cases. I am the

---

[1] The opinions expressed in my previous reports/declarations in this matter are incorporated by reference herein. I adopt in this report the citation shorthand and the use of terms as defined in my previous reports, and my updated CV is included here as Appendix A.

[2] Supplemental Declaration of Dr. Tasneem Chipty, November 18, 2019 ("Chipty Supplemental Declaration").

[3] Supplemental Declaration of Dr. Robert D. Willig, January 31, 2020 ("Willig Supplemental Declaration"); and Rebuttal Declaration of Patrick Travis, January 31, 2020 ("Travis Rebuttal Declaration").

co-editor of the current edition of *Proving Antitrust Damages*, a book published by the American Bar Association that describes the use of regression methods to estimate overcharges and pass-through in the context of proving antitrust damages.

4.        I have substantial expertise in the econometric methods that are required to estimate the factors that affect health insurance premiums in this case. I have provided econometric analyses in expert reports and testimony to federal courts, government agencies in the U.S. and abroad, and the World Trade Organization. I also have substantial experience and expertise studying different aspects of healthcare systems, often using econometric methods. For example:

- As an expert for Steward Healthcare, I studied the effects of Steward's acquisition of Morton Hospital, in the greater Boston area. Consistent with my analysis showing potential cost savings that would flow to consumers, the Massachusetts Attorney General's Office approved the transaction.

- As an antitrust advisor to the Massachusetts Health Policy Commission, I studied, among other things, the competitive effects of two proposed hospital acquisitions of Partners Healthcare System, in Massachusetts, the *same* two transactions on which Dr. Willig provided expert testimony for Partners supporting the acquisitions. Consistent with my work, the Suffolk Superior Court in Massachusetts, relying heavily on the submission by the Health Policy Commission, found the transaction would likely be anticompetitive. The Court explained that the cost increases that were likely to result from the transactions would "ultimately be borne by consumers and employers in the form of higher insurance premiums and higher deductibles on their insurance plans,"[4] thus recognizing the inevitable pass-through of healthcare costs to premiums.

- As an expert for the Antitrust Division of the Department of Justice, I submitted an expert report in an antitrust lawsuit challenging the anti-steering restrictions imposed by

---

[4] Memorandum of Decision and Order on Joint Motion for Entry of Amended Final Judgement by Consent, Commonwealth of Massachusetts Suffolk, ss. Superior Court, SUCV2014-02033-BLS2, *Commonwealth vs. Partners Healthcare System, Inc. & Others*, January 29, 2015, available at https://www.mass.gov/doc/partners-memo-of-decision-and-order/download, *site visited* March 8, 2020, p. 2.

Carolinas Healthcare System (now Atrium) in contracts with health plans in North Carolina. Dr. Willig describes working for Atrium on a sister case, involving the same conduct in North Carolina. Based on my opinion in that case, the government explained that "Atrium's steering restrictions interfered with the competitive process, resulting in fewer choices and higher costs for consumers," and Atrium settled that case, agreeing to strike its anti-steering restrictions from its contracts.[5]

My work on these and other healthcare matters, some of which are described in my CV, shows that I have substantial experience and expertise in assessing the competitive effects of hospital system conduct, including issues related to hospital overcharges and the relationship between hospital prices, healthcare spending generally, and premiums for health insurance.

5.       As part of my work assessing Dr. Willig's and Mr. Travis' new reports, I have reviewed Dr. Willig's February 25, 2020 deposition transcript,[6] Mr. Travis' February 27, 2020 deposition transcript,[7] and additional URRT filing data. These and other materials upon which I rely are cited throughout this report. A full list of the incremental materials that I considered is included in Appendix B.

6.       The work presented in this report has been conducted by me and staff working under my direction, at both Berkeley Research Group and Matrix Economics. Matrix Economics receives $850 per hour for my work in this matter. Matrix Economics also receives compensation from Berkeley Research Group based on its collected staff billings in support of this effort. My compensation is not dependent on the outcome of this matter. My work is ongoing, and I will continue to review the discovery record to understand the evidence in this case. I reserve the right to supplement and to amend my opinions.

---

[5] Department of Justice, "Atrium Health Agrees to Settle Antitrust Lawsuit and Eliminate Anticompetitive Steering Restrictions," November 15, 2018, available at https://www.justice.gov/opa/pr/atrium-health-agrees-settle-antitrust-lawsuit-and-eliminate-anticompetitive-steering, *site visited* March 8, 2020.
[6] Deposition of Robert D. Willig, Ph.D., February 25, 2020 (hereafter "Willig Deposition (February 25, 2020)").
[7] Deposition of Patrick Travis, February 27, 2020 (hereafter "Travis Deposition (February 27, 2020)").

II.     **Summary of Opinions**

7.      The bulk of the new reports submitted by Dr. Willig and Mr. Travis challenge my opinion that pass-through rates are uniformly high and significant. As I explain, there is a substantial volume of quantitative and qualitative evidence in this case that shows that pass-through rates are uniformly high and significant, and most of Dr. Willig's and Mr. Travis' claims to the contrary stem from misleading and exaggerated arguments. Dr. Willig also revisits whether a proportional split of damages between employers and employees reasonably estimates individual Class Member damages. As I discuss more fully below and have previously shown, quantitative and qualitative evidence, including Mr. Travis' own testimony, shows that a proportional split is reasonable.

8.      Before discussing where Dr. Willig's arguments fail, I highlight three important assessments that Dr. Willig does *not* challenge:

- *First*, *Dr. Willig does not challenge that Class Health Plans pass-through Sutter prices to consumers of health insurance.* To be sure, his own analyses demonstrate that Class Health Plans' pass-through rates of these prices are positive, substantial, and statistically significant.

- *Second*, *Dr. Willig does not challenge that data produced by Health Net, Aetna, and United are either not useable or otherwise are not reliable for the purpose of estimating pass-through.* As I have explained, it was not possible to use Production Data from these three Class Health Plans to reliably estimate pass-through for their individual, small, or large group lines of business (or estimate a weighted average pass-through rate for the Class as a whole). However, while I provided pass-through estimates for each of the Class Health Plans (including Health Net, Aetna, and United) using the MLR Data, Dr. Willig has not.

- *Third, Dr. Willig does not challenge that: (a) pass-through is positive, substantial, and statistically significant regardless of the competitive presence of Kaiser Health Plan; (b) both of our pass-through estimates show that Class Health Plans' pass-through rates tend to be higher, if not about the same, when Kaiser Health Plan has a stronger competitive presence; and (c) Kaiser has a stronger competitive presence in Northern California.* Taken together, these facts imply that, if anything, my pass-

through estimates using state-wide MLR Data are conservative. In other words, it is likely that the weighted average pass-through by Class Health Plans is even higher than 97.16 percent in the nine Class RAs.

9.        Despite these agreements, Dr. Willig makes new arguments criticizing my pass-through rate estimates. These arguments are misleading and often incorrect. I note at the outset that Dr. Willig accuses me of "assuming" a "uniform" pass-through rate for all Class Members.[8] I have not done so. What I have done is estimated pass-through rates in various different dimensions using data that is appropriately aggregated. Moreover, I have calculated an overall weighted average pass-through rate for the Class. Dr. Willig knows that taking an average do not suggest that the various inputs that went into the calculation of that average are "uniform."[9]

10.        Dr. Willig also criticizes my average pass-through rate estimates saying they "mask[] variation" among Class Members. Dr. Willig argues that, in light of this "variation," the damages Class should not be certified. This criticism rings hollow. This is seen most starkly by the fact that Dr. Willig,  himself, relies upon averaging throughout his opposition report.[10] This criticism is also undone by Dr. Willig's admission that there is no standard in economics of which he is aware that quantifies when variation is too great amongst Class Members to analyze claims and evidence on a class basis.[11] It is in fact a judgment call as to whether variation is so great as to be of concern.[12] In my judgment, based on the evidence and the analyses that I have completed, the variation in pass-through rates in this case is not significant enough to undermine

---

[8] *See*, *e.g.*, Willig  Supplemental Declaration, ¶¶ 31 and 38.

[9] Willig  Deposition (February 25, 2020), p. 34 ("Q: So my question is the numbers that go into the average calculation, when you have calculated averages, have all of the numbers that have gone into that calculation been the exact same number? A: Why no.")

[10] Willig  Deposition (February 25, 2020), pp. 118 (noting that his Table 1 figures that present RA-by-RA pass-through rate estimates "average over the nine or ten" years relevant to the calculations), 136, and 145 (noting that point estimates were based on statewide data).

[11] Willig  Deposition (February 25, 2020), p. 194.

[12] Willig  Deposition (February 25, 2020), pp. 194-196.

a class analysis. My opinion continues to be that the Class suffered a common impact as a result of Sutter's conduct.

11.      Analyzed correctly, Dr. Willig's own analyses support my conclusion that: (a) pass-through rates are uniformly high and significant; and (b) it is reasonable to average pass-through rates, over time, across lines of business, and across Class Health Plans. Highlights of some of the issues with Dr. Willig's arguments are as follows:

a.  First, a closer look reveals that Dr. Willig has reported pass-through rates on a percentage-basis, *not* a dollars-basis.[13] The effect of this decision falsely gives the appearance of lower pass-through rates. Expressed on a dollars-basis, as is *required* to apply specific econometric pass-through rate estimates to calculate damages, it becomes apparent that Dr. Willig's estimates are substantially higher than they appear. For example:

- In Table 1 of his report, Dr. Willig reports pass-through rates by RA. For RA 1, he reports pass-through rates to be: (a)██████for Anthem individual; (b)██████for Anthem small group; and (c)██████for Blue Shield small group. On a dollars-basis, these pass-through rates are actually: (a)███████████████for Anthem individual; (b)███████████████ for Anthem small group; and (c)██████(not██████for Blue Shield small group. *See* Exhibit 1 below.

- In Figure 2 of his report, Dr. Willig reports pass-through rates for different time periods. He reports that all pass-through rates are below 100 percent. Had he reported pass-

---

[13] Willig Supplemental Declaration, Footnote 56. In my Class Reply Declaration, I also reported pass-through rates on a percentage basis. However, in that report, I was not directly using the econometric pass-through estimate to calculate class-wide damages; instead, I used the econometric pass-through estimates to corroborate the substantial qualitative evidence in this case that showed that the Class Health Plans passed through approximately all overcharges to Class Members in the form of higher premiums. However, in light of the Court's Class Order, I now use the econometric pass-through estimates to calculate damages. To do so requires multiplying the dollars of overpayment by the Class Health Plans to Sutter *by* pass-through on a dollars-basis. Thus, it is now necessary to transform pass-through on a percentage-basis *to* pass-through on a dollars-basis. Yet, Dr. Willig refuses to do that. Accordingly, as I explained in my Supplemental Declaration (and Dr. Willig does not dispute the need to do so), I calculated pass-through rates on a dollars-basis. *See* Chipty Supplemental Declaration, ¶ 88.

through rates on a dollars-basis, one would have seen that four of the five pass-through estimates for the 2011 to 2014 period are *over* 100 percent. *See* Exhibit 3 below.

- In Table 6 of his report (repeating Table 1 of his Class Declaration), Dr. Willig reports pass-through rates ranging from ▉▉▉▉▉ (for Aetna) to ▉▉▉▉▉▉ (for United). On a dollars-basis, Dr. Willig's estimates range from 40 percent to 163 percent, and all of his estimates—including the Aetna estimate—have confidence intervals that include or exceed 100 percent.[14]

b.  Second, the analyses where Dr. Willig finds substantially lower pass-through rates are based on questionable design decisions. For example:

- In Table 1 of his report, Dr. Willig describes all RAs, not the Class RAs. Had Dr. Willig studied the pattern, he would have found generally higher pass-through rates in the Class RAs, and he would have found it would be conservative to average across Class and Non-Class RAs. *See* Exhibit 1 and Exhibit 2 below. (This too supports my conclusion that the statewide MLR Data pass-through rates that I have estimated are conservative.)

- In Table 2 of his report, he "slices and dices" the data into very small samples. In a few cases, he gets negative or close to zero pass-through rates. When asked in his deposition whether he believed his anomalous results, Dr. Willig answered, "In reality, no."[15]

c.  Third, in many places, Dr. Willig grossly mischaracterizes my work and opinions. For example:

- Dr. Willig states that I "justif[y] estimating the pass-through rates at the health plan/line of business level across the entire state by suggesting that carriers pool their risk at the state level."[16] That is simply not true. I have explained that health

---

[14] Chipty Supplemental Declaration, ¶ 89,
[15] Willig Deposition (February 25, 2020), p. 144:21-24.
[16] Willig Supplemental Declaration, ¶ 32.

plans pool risk for individuals and small groups at the RA-level and for large groups at the state-level.[17] My analysis shows that: (a) one could study individual and small group pass-through at the RA-level, but analysis supports averaging at the state-level;[18] and (b) one should not study large groups at the RA-level because attempting to split a large group across RAs creates a mismatch of costs and premiums.

- Dr. Willig says, "Dr. Chipty does not present any analysis of whether the significant disparity in Kaiser presence across geographic RAs impacts cost pass-through, and she cannot do so using her favored MLR data."[19] Dr. Willig's statement is misleading. As I have explained, my MLR Data analysis accounts for variation in Kaiser presence, over time, across lines-of-business, and by regulator.[20] Further, my Production Data analysis (stemming from Dr. Willig's own analysis) shows that pass-through does not vary systematically with differing levels of Kaiser presence across geographies.[21]

12.     Dr. Willig and Mr. Travis also challenge whether the California MLR Data reflect the experience of all Class Members because of CMS's reporting requirement with respect to multi-state insurance products.[22] Neither Dr. Willig nor Mr. Travis offers any evidence, either quantitative or qualitative, with respect to the magnitude of the so-called problem on which they focus. Mr. Travis clarified in his deposition that the MLR Data are not "inaccurate" and that what he was trying to say is that "the MLR data are *perhaps* inappropriate for" studying pass-through, but that he has not done any analysis as to whether in fact they are actually

---

[17] Chipty Merits Report, ¶ 36.
[18] Chipty Supplemental Declaration, ¶¶ 93-95; and Deposition of Tasneem Chipty, January 15, 2020 (hereafter "Chipty Deposition (January 15, 2020)"), pp. 237-238.
[19] Willig Supplemental Declaration, ¶ 66.
[20] Chipty Supplemental Declaration, ¶¶ 62-65.
[21] Chipty Supplemental Declaration, Exhibits 13 and 14.
[22] Willig Supplemental Declaration, ¶ 113; and Travis Rebuttal Declaration, ¶¶ 10-11.

inappropriate.[23] Dr. Willig testified at his deposition that he does not dispute that health plans' MLR filings provide true and correct data.[24] In this report, I describe both quantitative and qualitative evidence that demonstrates that Dr. Willig's and Mr. Travis' concerns with respect to this issue are exaggerated and misleading.

13.     Finally, Dr. Willig continues to challenge whether a proportional split of the damage award between employers and employees is reasonable.[25] Although, he now concedes the employer-employee relationship is not a pass-through relationship, [26] and that a proportional split is reasonable where employers and employees split the premium bill proportionally.[27] As I have explained, accounting for the different premium-sharing arrangements is straightforward. Dr. Willig appears to suggest that in some situations (involving a fixed employee contribution or an employer pegging its contribution to a product that does not include Sutter), there would be no harm to either the employee or the employer, when comparing the actual and the but-for world without Sutter's conduct.[28] His logic is faulty: (a) he has no support for his conjecture that the employee's (or employer's) contribution would have stayed the same in the but-for-world; and (b) even if the contribution would have stayed the same, there could still be harm to both employer and employee. Both quantitative and qualitative evidence shows that a proportional split of the damage award between an employer and its employees, based on the actual cost-sharing arrangement, will either exactly or reasonably compensate each Class Members for the damage they incurred from the challenged conduct. Based on his deposition testimony, it appears that Mr. Travis agrees with me.[29] Further, I show that Dr. Willig's arguments about the lack of adequate premium payment records for the named Plaintiffs are false.[30]

---

[23] Travis Deposition (February 27, 2020), p. 30 (emphasis added).

[24] Willig Deposition (February 25, 2020), p. 77.

[25] Willig Supplemental Declaration, ¶¶ 98-103.

[26] Willig Supplemental Declaration, ¶ 97.

[27] Willig Supplemental Declaration, ¶ 103 ("Dr. Chipty's suggested approach fails to account for those situations in which the contribution split was not done on a percentage basis but in which the contribution of one side or the other was fixed.")

[28] Willig Supplemental Declaration, ¶ 103.

[29] Travis Deposition (February 27, 2020), pp. 171-173.

[30] See Appendix D for exemplar premium payment records for each of the named Plaintiffs.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

14.     After having considered the arguments offered by Sutter's experts, my overarching opinions on the issue of class certification remain as follows: (a) a common method exists to demonstrate that Sutter's contracting practices have resulted in harm to all or nearly all Class Members; (b) evidence that is common to members of the proposed Class shows that all or nearly all proposed Class Members paid higher health insurance premiums as a result of Sutter's conduct; and (c) the amount of harm to the proposed Class can be estimated on an aggregate and an individual level using a common, formulaic methodology.

## III.     Dr. Willig's Arguments About Pass-Through Variability Are Misleading and False

15.     Dr. Willig says that "cost pass-through varies significantly across geographies, including the geographic RAs"[31] and that pass-through rates estimated using data from 2011 to 2018 do not reflect pass-through rates for 2008 to 2010.[32] A closer look at Dr. Willig's arguments shows that he mischaracterizes much of my analysis and takes statements out of context. To be clear, my MLR analysis provides estimates of average pass-through across RAs, over products sold through a given California regulator (separately for DHMC and CDI), and over the years 2011 to 2018; these estimates vary by line of business, and by Class Health Plan. A series of corroborating analyses, including some of Dr. Willig's own analysis, shows that averaging: (a) across the Class RAs is reasonable; and (b) across the state is also reasonable, and if anything, conservative for the purpose of computing damages. Analysis also shows that pass-through rates from 2011 to 2018 are a reasonable proxy for pass-through rates in the earlier years.

16.     As I explain here, most of Dr. Willig's arguments stem from an exaggerated aversion to averaging. However, economists (including Dr. Willig) often find averaging to be reasonable. Further, Dr. Willig overstates the variability in pass-through rates across geography

---

[31] Willig Supplemental Declaration, ¶ 29.
[32] Willig Supplemental Declaration, ¶ 38.

and time, and his argument that I have "ignored" variability across lines of business and health plans is simply false.

### A.   Dr. Willig Misunderstands the Use and Purpose of Averaging

17.   Many economists (including Dr. Willig) find it appropriate to use averages in some situations. There would be no point to averaging if there were no variability. Economists prefer averaging when it simplifies unnecessary complexity.[33] Averaging in situations where there is relative stability in more disaggregate estimates is especially preferred. As I have explained, Dr. Willig overstates the variability in pass-through rates, by geography, over time, and by line of business. Dr. Willig is also inconsistent: while he criticizes my use of averaging, *he himself averages* in his analyses in this case, and he uses the results of those analyses without questioning the validity of his averaging.[34] Elsewhere, Dr. Willig admitted that he was not aware of "an economic standard that identifies, with respect to pass-through rates and the issue of class certification, how much variation is too much."[35]

18.   Further, Dr. Willig has not provided any quantification of how the variability in pass-through estimates in my analysis compare to those of other experts who have also used averaging to arrive at an opinion in class certification cases. For example, Dr. Flamm in *Qualcomm* presented pass-through estimates that ranged from: (a) 89.6 percent to 174.6 percent for original equipment manufacturers;[36] (b) 43.0 percent to 95.3 percent for wireless carriers;[37]

---

[33] Regression estimates themselves are averages. When asked at his deposition, "[d]o averages ever summarize or represent the general significance of a set of unequal values in your estimation," Dr. Willig answered, "I think it could, depending upon the context and the use of that summary." Willig Deposition (February 25, 2020), pp. 38-39.
[34] For example, Dr. Willig admitted he averages in Willig Supplemental Declaration, Table 1. He explained in his deposition that the estimates presented in his Table 1 "reflect average pass-through rates for th[e] multiyear time period that [he] referenced." He also explained that the estimates presented in his Table 1 include "the average calculations for all four of the lines studied in Table 1, Anthem individual, Anthem small group, Anthem large group, and Blue Shield small group." Willig Deposition (February 25, 2020), pp. 117 and 136.
[35] Willig Deposition (February 25, 2020), p. 194.
[36] Flamm Qualcomm Report, Table 17.
[37] Flamm Qualcomm Report, Table 18.

(c) 89.1 percent for a single distributor (assumed to be the same for all distributors);[38] and (d) 94.1 percent to 126.7 percent for retailers.[39, 40] By comparison, my pass-through rates by line-of-business, by Class Health Plan range from 56 percent to 138 percent,[41] and my pass-through rates by Class Health Plan range from 83 percent to 107 percent.[42] Dr. Flamm first averages his pass-through estimates by channel, then he multiplies the different averages to account for the different combinations of channels (*e.g.*, from OEM, to carrier, to end purchaser) to construct a weighted average pass-through rate.[43] Thus, the order in which Dr. Flamm implements his calculations masks the significantly more variation that exists in his application, than is apparent from his presentation. Finally, I observe that: (a) my pass-through estimates are based on an analysis of significantly more relevant data than Dr. Flamm's;[44] and (b) my damage calculation relies on a weighted average pass-through estimate that caps pass-through at 100 percent. For these reasons, my analysis is both more reliable and more conservative than Dr. Flamm's.

19.     Dr. Willig argues that it is inappropriate to compare my analysis to Dr. Flamm's because of differences between cell phones and healthcare.[45] No one is arguing that the two are the same. If anything, I have explained that the empirical challenges in this case are simpler in some respects, and there is a much stronger connection between costs and premiums in this case, given the nature of premium construction and regulatory oversight. The point is that the

---

[38] Flamm Qualcomm Report, Table 19 and Footnote 259.

[39] Flamm Qualcomm Report, Table 20.

[40] In *ODD II*, Plaintiffs' expert's pass-through estimates also exhibited variability. For example, pass-through estimates for: (a) different Dell computer brands ranged from 40 percent to 130 percent; and (b) different retailers ranged from 64 percent to 141 percent. *See*, "[Corrected] Declaration of Dr. Kenneth Flamm in Support of Plaintiffs' Motion for Class Certification," *In re Optical Disk Drive Antitrust Litigation*, Case No. 3:10-md-2143 RS, filed May 28, 2015, Pass-Through Exhibits 1 and 7.

[41] Chipty Supplemental Declaration, Exhibit D2.

[42] Chipty Supplemental Declaration, Exhibit 6.

[43] Flamm Qualcomm Report, Table 23.

[44] As explained in my prior report, Dr. Flamm claims to have data representing about 90 percent of all cell phone sales, but he uses in his analysis data representing only 7.3 percent of cell phone sales. *See* Chipty Supplemental Declaration, Footnote 23.

[45] Willig Supplemental Declaration, ¶ 120.

methodology and the pattern of variability that the Court in *Qualcomm* found to be acceptable can shed light on the validity of some of Dr. Willig's arguments.

20.     Finally, Dr. Willig claims that I "ignore variation across health plans and lines of business."[46] This is untrue. I present three different sets of pass-through estimates using MLR Data that were calculated: (a) first, by Class Health Plan; (b) second, by Class Health Plan, by line of business; and (c) third, by line of business. Upon consideration of the pattern of variability and the reasonableness of averaging, I concluded that constructing a weighted average pass-through rate based on the first set of estimates was reasonable.

### B.     Dr. Willig Overstates Variability Across Geographies

21.     Dr. Willig says that my "insistence on aggregating data to the highest possible level of geographic aggregation when estimating cost pass-through causes" problems.[47] As I have explained, health plans pool costs within RAs for their individual and small group lines of business. Thus, an RA-level analysis is the lowest level of disaggregation for these lines of business. Further, the data show that the variability across RAs is relatively low and that it is reasonable to average across the RAs for these lines of business.[48] Moreover, health plans pool costs statewide for their large group line of business. For this line of business, it is entirely inappropriate to estimate RA-level pass-through rates.

22.     Dr. Willig presents a series of pass-through estimates, disaggregated by RA, for each of the following health plan-line of business combinations: (a) Anthem individual; (b) Anthem small group; (c) Anthem large group; and (d) Blue Shield small group.[49] I observe at the outset that Dr Willig's large group, RA-level analysis is nonsensical. Dr. Willig himself previously admitted that "for Anthem and Blue shield data on large groups, it is not possible to

---

[46] Willig Supplemental Declaration, § V.

[47] Willig Supplemental Declaration, ¶ 29.

[48] Chipty Supplemental Declaration, ¶¶ 92-94.

[49] Willig Supplemental Declaration, Table 1 and Figure 1.

split the group-level premiums to individual Rating areas."[50] Yet, he now claims to use one of my algorithms that was designed to show the distribution damages, by RA.[51] Dr. Willig's off-the-shelf use of one of my algorithms was entirely inappropriate: it was *not* designed to study pass-through. As I have explained, one cannot study large group pass-through at the RA-level, because large group premiums are set statewide and attempting to split a large group across RAs creates a mismatch of costs and premiums. Thus, I ignore Dr. Willig's large group RA-level analysis.

23.     Dr. Willig concludes based on his Table 1 analysis that "[t]he differences in cost pass-through across RAs are economically significant, and in many cases the differences are also statistically significant."[52] Remarkably, Dr. Willig's Table 1 shows pass-through estimates on a *percentage-basis*, and he pools Class and non-Class RAs in his statistical testing.[53] Exhibit 1 re-presents Dr. Willig's Table 1 by converting the estimates to a *dollars-basis*, separately for the Class and non-Class RAs.[54] In his deposition, Dr. Willig did not dispute the need to convert from a percentage- to a dollars-basis,[55] nor did he dispute my arithmetic in so doing.[56] Instead, he quibbled with the conversion factor I used to translate pass-through on a percentage-basis to pass-through on a dollars-basis.[57] To the extent Dr. Willig is arguing that the conversion factor should vary by RA, he has provided no evidence to suggest the ratio of premiums to costs varies

---

[50] Willig Merits Report, Footnote 492.

[51] Willig Deposition (February 25, 2020), pp. 123-124 and 183.

[52] Willig Supplemental Declaration, ¶ 35.

[53] Willig Deposition (February 25, 2020), p. 120 and Willig Supplemental Declaration, ¶ 36 and Footnote 56.

[54] Dr. Willig says in his Supplemental Declaration that "it is unclear [to him] why [I] made this change" to a dollars-basis, though he does not actually dispute its legitimacy. (Willig Supplemental Declaration, Footnote 186.) Dr. Willig's statement is particularly surprising because it is well-known that pass-through has to be stated on a dollars-basis for calculating dollar damages, and Dr. Willig himself made that conversion in calculating an implied pass-through rate using estimates in the Ho and Lee paper. *See* Chipty Supplemental Declaration, § III.D.

[55] Willig Deposition (February 25, 2020), pp. 120-121.

[56] Willig Deposition (February 25, 2020), pp. 162-163.

[57] Willig Deposition (February 25, 2020), pp. 164-166.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

systematically by RA. Furthermore, had I used a conversion factor based on the Production Data, I would have computed *higher* pass-through rates.[58]

24.    Exhibit 1 shows Dr. Willig's estimated pass-through rates on a *dollar-basis*, by RA, separately for the Class and non-Class RAs.

### Exhibit 1: Dr. Willig's Table 1 RA-Level Passthrough Estimates, Calculated on a Dollar-Basis

| Rating Area | Anthem Individual Pass-Through Rate | Anthem Small Group Pass-Through Rate | Blue Shield Small Group Pass-Through Rate |
|---|---|---|---|
| *Class Rating Areas* | | | |
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| **Simple Average Pass-Through Rate** | | | |
| **Weighted Average Pass-Through Rate** | | | |
| *Non-Class Rating Areas* | | | |
| 7 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| **Simple Average Pass-Through Rate** | | | |
| **Weighted Average Pass-Through Rate** | | | |

*Notes*:
1. Weighted averages are weighted by premium dollars.
2. Asterisks ** and *** represent statistical significance at five percent and one percent levels, respectively.
*Sources*: Willig Supplemental Declaration, Table 1 and backup production; and MLR Data.

---

[58] The conversion factor is: premium ÷ cost, and pass-through on a dollars-basis = pass-through on a percentage-basis $x$ the conversion factor. Because the cost in the MLR Data > the cost in the Production Data, it necessarily follows that a conversion factor based on the Production Data is smaller than the conversion factor based on the MLR Data and my method is conservative.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

Remarkably, Dr. Willig's own analysis shows that pass-through rates in each of the Class RAs are high and statistically significant. Moreover, a comparison of the pass-through rates across the Class (top panel) and non-Class (bottom panel) RAs shows that pass-through rates are higher in the Class RAs. This fact shows that averaging across all RAs is conservative for the purpose of calculating pass-through for Class RAs. Furthermore, running Dr. Willig's statistical test for "equality" across just the Class RAs shows that one cannot reject equality in two of the three cases; thus, his own test supports averaging.[59]

25.     For Anthem small group, where the statistical test rejects equality, it is instructive to look at the actual pass-through estimates. Exhibit 2 replicates Dr. Willig's Figure A2, for Anthem small group, only it shows pass-through on a dollars-basis and it depicts the confidence intervals around each pass-through estimate.[60] As seen here, each of the pass-through rates is significantly different from zero and with one exception not significantly different from pass-throughs ███████████████. Thus, beyond the statistical testing, the variability in the pass-through estimates has little economic significance, particularly since I cap my pass-through rates at 100 percent, in computing an overall weighted average pass-through rate. Further, the pattern of results suggests that equality may be satisfied using a different statistical test.

---

[59] *See* Chipty Workpapers.
[60] Appendix E presents exhibits for Anthem individual and Blue Shield small group.

**Exhibit 2: Dr. Willig's Figure A2 Showing RA-Level Pass-Through Estimates,
Calculated on a Dollar-Basis, with Confidence Intervals,
for Anthem Small Group**



*Sources*: Willig Supplemental Declaration, Figure A2 and backup production; and MLR Data.

26.    In sum, Dr. Willig's table and figures give the false impression of lower pass-through rates, because he insists on presenting pass-through on a percentage-basis. Moreover, he overstates the geographic variability in the pass-through rates by conflating the Class and non-Class RAs. And, he ignores the lack of economic significance in the variance of the estimated pass-through rates. Exhibit 1 and Exhibit 2 show that, in this case, geographically aggregated pass-through models provide reasonable estimates and do not "mask" impact or non-impact for any Class Members.[61] As Dr. Willig himself concedes, he estimated positive and significant

---

[61] The results are similar for other health plans and lines of business. *See* Appendix E.

Case 3:12-cv-04854-LB   Document 842   Filed 08/21/20   Page 20 of 83


pass-through rates in each Class RA.[62] These analyses strongly support a conclusion of class-wide impact.

### C.    Dr. Willig Overstates Variability Across Time

27.    In my prior report, I estimated pass-through rates using both the MLR Data from 2011 to 2018 and Production Data from 2006 to 2015/2016.[63] Of the eleven years from 2008 to 2018, for which the Class seeks damages: (a) the MLR Data span eight or 73 percent of the years; and (b) the Production Data span nine or 82 percent of the years. Moreover, the MLR Data are weighted towards second half of the damage period, and the Production Data are weighted towards the first half of the damage period. The estimates from both sets of analyses showed uniformly high and significant pass-through rates and were highly corroborative of each other. Taken together, these facts (coupled with the qualitative evidence) gave me sufficient information to conclude that using the pass-through rate estimated using the MLR Data is reliable for the entire damage period.

28.    Dr. Willig argues that my pass-through estimates are "unreliable" because my analysis "assumes uniform pass-through across time periods."[64] He suggests the passage of the ACA invalidates the use of the MLR Data for 2008-2010.[65] Dr. Willig claims that pass-through estimates using the Production Data "show that there is significant variation across time periods in cost pass-through rates."[66] He also suggests "there is substantial variation in pass-through estimates between… two sub-periods for some carriers" using the MLR Data.[67] I respond to these three arguments here.

---

[62] Deposition of Robert Willig (February 25, 2020), pp. 124-129.
[63] Specifically, the Anthem individual and Blue Shield small group analyses used data from 2006 to 2015, and the Anthem small group and large group analyses used data from 2006 to 2016.
[64] Willig Supplemental Declaration, ¶¶ 38-39.
[65] Willig Supplemental Declaration, ¶ 44.
[66] Willig Supplemental Declaration, ¶ 38.
[67] Willig Supplemental Declaration, ¶ 55.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     18

29.     As I explained in my deposition, the passage of the ACA was an important milestone, and it provides a unique opportunity to study how the Class Health Plans change their premiums when faced with higher costs. In the academic literature, such an event is described as a "natural experiment," responses to which can be very informative.[68] Dr. Willig twists the facts to suggest that data post-ACA cannot be used to learn about behavior pre-ACA. Dr. Willig's argument ignores the fact that pre- *and* post-ACA, the Class Health Plans: (a) faced similar competitive conditions; (b) faced an MLR requirement, with California regulations governing pre-ACA and federal regulations governing post-ACA; and (c) set premiums in accordance with well-established actuarial principles. These commonalities pre- and post-ACA imply that the post-ACA data can be used to learn about the pre-ACA pass-through rates.

30.     Dr. Willig attempts to argue temporal variability by reviving his prior analysis in which he sliced and diced the Production and URRT Data into small subsamples.[69] For example, Dr. Willig presents the results of a regression analysis for Anthem small group for two different time periods: (a) 2012 to 2014; and (b) 2014 to 2016. For each subsample, Dr. Willig only has three or five data points; not surprisingly, there is more variability in the estimated pass-through rates as a result of his specious sample construction.[70] In the case of Anthem small group, Dr. Willig finds a pass-through rate from 2012 to 2014 of ███. When asked whether he believed these anomalous results in his deposition, Dr. Willig answered, "In reality, no."[71] Three of the four rows in his table show visibly anomalous results ████████████████. Given that Dr.

---

[68] *See, e.g.,* Stock, James and Mark Watson, *Introduction to Econometrics,* 2nd Edition, New York, NY: Pearson, 2007, pp. 87-88.

[69] Willig Supplemental Declaration, Table 2.

[70] About his small samples, Dr. Willig claims that because some of his estimated coefficients are statistically significant, there should be no small samples concerns. That is not the case. As explained by researchers, "[in] noisy small samples settings, statistically significant results can often be misleading." *See* Gelman, Andrew and John Carlin, "Beyond Power Calculations: Assessing Type S (Sign) and Type M (Magnitude) Errors," *Perspectives on Psychological Science,* 2014, Vol. 9(6), pp. 641-651, p. 641.

[71] Willig Deposition (February 25, 2020), p. 144:21-24.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

Willig does not believe his own results, he should not use them to conclude anything about temporal variability in pass-through rates.[72]

31.     Dr. Willig also attempts to argue temporal variability modifying my MLR Data pass-through analysis.[73] Dr. Willig re-estimates my pass-through regression model by splitting the MLR dataset into two subsamples: (a) 2011 to 2014; and (b) 2015 to 2018. This analysis is somewhat more robust than his attempt with the Production and URRT Data (described above) because there are multiple observations per year. Exhibit 3 re-creates Dr. Willig's results presented in his Figure 2 with the following four changes: (a) I convert the estimates from a percentage-basis to a dollars-basis; (b) I include for comparison an estimate of pass-through for the full time period for each health plan; (c) I include a horizontal line indicating 100 percent pass-through; and (d) I show the 95 percent confidence interval associated with each pass-through estimate. The results of Dr. Willig's analysis simply do not support his view that there are significant temporal differences; as seen here:

- The confidence intervals for all but one bar include or exceed the pass-through rate of 100 percent, and the confidence intervals generally overlap, suggesting a lack of significant differences.

- Statistical tests show that for all health plans, except for ▮▮▮▮ one cannot reject the hypothesis that the differences in the pass-through estimates based on the 2011-2014 and the 2015-2018 time periods are same. In other words, the results show no difference in pass-through between the two time periods in four of the five cases.[74]

---

[72] Willig Deposition (February 25, 2020), p. 144 ("Q: Is it your opinion that there was a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ for the 2012 to 2015 period with respect to the Anthem large group offering? A: You mean in reality? Q: Yes. A: It does seem implausible to me. Of course, what this suggests is that this kind of analysis has its foibles that one has to be guarded against.").

[73] Willig Supplemental Declaration, Table 3 and Figure 2.

[74] Statistical testing was performed at the five percent significance level. *See* Chipty Workpapers.

- If anything, there appears to be a downward trend, meaning that the pass-through estimates from the later period (2015-2018) appear to be lower than the pass-through estimates from the earlier period (2011-2013): (a) the average pass-through rate for the earlier period is ▮▮▮ percent; and (b) the average pass-through rate for the later period is ▮▮▮ percent.[75] This trend suggests that if anything, the average pass-through estimate based on the 2011 to 2018 will understate the pass-through for the earlier years 2008-2010.



**Exhibit 3: Dr. Willig's Figure 2 Pass-Through Estimates, Calculated on a Dollar-Basis**

*Sources*: Willig Supplemental Declaration, Figure 2 and backup production; and MLR Data, 2011-2018.

[75] *See* Chipty Workpapers.

32.     These results do not support Dr. Willig's arguments. To the contrary, they show that in nearly all cases, there is no systematic difference in the estimates of pass-through rates over time and, if anything, averaging over the years is conservative. Further, all of the results show that pass-through is uniformly high and significant. Even Dr. Willig admits that these pass-through estimates are all positive and significant.[76]

## IV.     Dr. Willig's Arguments Regarding Kaiser Are Misleading and Misrepresent My Pass-Through Analyses

33.     In my prior reports, I presented a series of econometric models that account for competition from Kaiser. In each model, I found that pass-through rates were uniformly and significant even after accounting for Kaiser. Dr. Willig challenges my analyses as "unreliable" because, according to him, they "fail[] to account for substantial variation across geographies and time periods in competition, including from Kaiser."[77] In this section, I explain that: (a) Dr. Willig misrepresents my pass-through analyses with respect to Kaiser; (b) his own analyses contradict his claim that Class Health Plans' pass-through rates vary substantially by Kaiser share; and (c) evidence contradicts Dr. Willig's theory that stronger competition from Kaiser should cause Class Health Plans to pass through less of a Sutter overcharge.

### A.     My Analyses Account for Competition from Kaiser

34.     Dr. Willig's fundamental arguments regarding Kaiser boil down to assertions that: (a) I "[did] not incorporate the substantial variation in Kaiser share across geographies and time periods" in my pass-through regressions;[78] and (b) I "[did] not present any analysis of whether the significant disparity in Kaiser presence across geographic RAs impacts cost pass-through."[79] Dr. Willig motivates his assertions by presenting figures that he claims show "significant[]"

--------

[76] Willig Deposition (February 25, 2020), p. 152.
[77] Willig Supplemental Declaration, § IV.
[78] Willig Supplemental Declaration, ¶ 57.
[79] Willig Supplemental Declaration, ¶ 66.

variability in the extent to which Kaiser's RA-level discharge share changed from 2008 to 2016, which he claims vary from 148 percent (for RA 10) to negative 14 percent (for RA 19).[80] In this section, I explain that Dr. Willig's figures are misleading and his assertions misrepresent my work.[81]

35.       As I explained in my Supplemental Declaration, there are, at least, four sources of variation in Kaiser's competitive presence: (a) by regulator (*i.e.*, Kaiser products are predominantly HMO and regulated by DMHC); (b) by line of business (*i.e.*, Kaiser has a higher share in some lines of business); (c) over time; and (d) by geography.[82] To account for Kaiser's competitive presence, a pass-through regression model has to exploit at least one of these sources of variation. My MLR Data analyses account for the first three sources of variation and my Production Data analyses account for the fourth source of variation.

36.       Specifically, all of my MLR Data regressions control for regulator and line of business.[83] As sensitivities, I also estimated regressions that directly controlled for different measures of competitive significance that vary by year and line of business: (a) Kaiser's share of commercial health plan member-months; and (b) HHI across all health plans, including Kaiser.[84] Thus, my MLR Data analyses *do* account for the variation over time in Kaiser's competitive presence (along with other sources of variation). Further, I find that pass-through rates are

---

[80] Willig Supplemental Declaration, ¶¶ 62-63, Footnote 85, and Figures 4 and A4.

[81] I also note that Dr. Willig repeatedly quotes certain portions of a nearly-page-long answer I gave at deposition as support for his argument that pass-through must be estimated using RA-level data. A closer look shows that Dr. Willig has cherry-picked my words out of context. (Willig Supplemental Declaration, ¶¶ 65 and 70 (quoting Chipty Deposition (January 15, 2020), p. 121).) Had he quoted my entire answer, he would have shown I explained that: (a) "to the extent that competition from Kaiser has an influence on a health plan's ability to pass through, we should see that in differences across the lines of business;" and (b) "I have found is that *cost is the single biggest driver [of premiums], which is very consistent with the other evidence in the case and that differences in Kaiser's competitive presence [are] not nearly as important.*" (Chipty Deposition (January 15, 2020), pp. 121-122 (emphasis added).)

[82] Chipty Supplemental Declaration, ¶¶ 62-65 and 76-77.

[83] Chipty Supplemental Declaration, Appendix D.

[84] Chipty Supplemental Declaration, ¶¶ 64-65, 73, and Appendix D.

positive, highly statistically significant, and qualitatively similar, irrespective of how I account for Kaiser's competitive presence.[85]

37.     My Production Data analyses also study the importance of geographic variability in Kaiser's competitive presence on pass-through:

- Exhibits 9 and 10 of my Supplemental Declaration compared pass-through rates in geographic areas with strong and weaker Kaiser presence,[86] both statewide (Exhibit 9) and for Northern California RAs only (Exhibit 10). These analyses studied each of Anthem individual, Anthem small group, Anthem large group, and Blue Shield small group lines of business.[87] My estimates showed that there are generally no systematic differences in the pass-through rates in Kaiser-heavy and Kaiser-light areas.[88]

- Exhibits 13 and 14 of my Supplemental Declaration presented *Dr. Willig's own RA-level pass-through estimates*, for Anthem individual and Blue Shield small group lines of business. Visually, those exhibits showed that there is no systematic pattern between Kaiser's RA-level discharge share and Dr. Willig's pass-through estimates.[89] Further, I explained that a statistical test cannot reject the hypothesis that Dr. Willig's own pass-through estimates for the Class RAs *are equal* when applied to his Anthem individual and Blue Shield small group pass-through estimates.[90]

---

[85] Chipty Supplemental Declaration, ¶ 73 and Appendix D.

[86] *See* Chipty Supplemental Declaration, Footnote 116 for a description of how I identified "Kaiser Areas" and "Non-Kaiser Areas."

[87] Chipty Supplemental Declaration, ¶¶ 80-81 and Exhibits 9-10. I did not present estimates for the Anthem large group line of business in Exhibit 10—which limits the analysis to Northern California RAs—because such an analysis would entail splitting large groups into Northern and Southern California. (Chipty Supplemental Declaration, ¶ 81.) As I have explained, because premiums for large groups are set statewide, attempting to split premiums (either by RA or into Northern and Southern California) will create a mismatch of costs and premiums.

[88] Chipty Supplemental Declaration, ¶¶ 80-81.

[89] Chipty Supplemental Declaration, ¶¶ 92-94 and Exhibits 13-14.

[90] Chipty Supplemental Declaration, ¶ 94.

Thus, contrary to Dr. Willig's assertion, I *presented multiple analyses* "of whether the significant disparity in Kaiser presence across geographic RAs impacts cost pass-through." Dr. Willig's assertion is especially puzzling because elsewhere in his report, he acknowledges Exhibits 9 and 10 in my Supplemental Declaration.[91] In this context, Dr. Willig's claims that my analyses do not "account[] for Kaiser's competitive significance" mischaracterize my testimony and are at best confused.[92]

38.    Dr. Willig presents new figures that display changes over time, between 2008 and 2017, in Kaiser's RA-level discharge share. At first glance, it appears these changes are quite significant. However, a closer look reveals they are highly misleading: Dr. Willig reports those changes as *percentage changes*, but because Kaiser's discharge share was relatively low in some RAs in 2008, the percentage changes look large even though they are not economically large. For example, Dr. Willig's Figure 4 shows that Kaiser's discharge share increased by around 30 percent for RA 9 from 2008 to 2016,[93] but his figure masks that Kaiser's discharge share increased by about *one percentage point* in RA 9, from about three percent of discharges in 2008 to about four percent of discharges in 2016.[94] Exhibit 4 shows Kaiser's discharge share by RA, for 2008 and 2016: the light blue bars show Kaiser's discharge share in 2008, and dark blue bars show Kaiser's discharge share in 2016. For nearly all RAs, the change in Kaiser's discharge share from 2008 to 2016 was less than five percentage points—substantially less than suggested by Dr. Willig's figures.[95] These comparisons expose the false impression created by Dr. Willig's use of statistics: the facts show that they exaggerate the changes in RA-level Kaiser discharge shares.[96]

---

[91] Willig Supplemental Declaration, ¶ 70.

[92] Willig Supplemental Declaration, ¶ 70.

[93] Willig Supplemental Declaration, Figure 4.

[94] *See* Chipty Workpapers.

[95] *See* Chipty Workpapers.

[96] Dr. Willig fails to recognize that my MLR analysis controls for changes in Kaiser's share of commercial health plan members over time—which is more appropriate than controlling for changes in Kaiser discharge share over time. In his deposition, Dr. Willig expressed regret for having studied Kaiser's discharge share and not its commercial health plan member share, as I did. *See* Willig Deposition (February 25, 2020), p. 161:17-21 ("Q. By the way, why did you use discharge information and not enrollee information? A. I have second thoughts about that from time to time, frankly.").



**Exhibit 4: Deconstructing Dr. Willig's Figure 4,
Kaiser Discharge Share by RA, for 2008 and 2016**

*Sources*: Willig Supplemental Declaration, Figure 4 and backup production.

**B.      Dr. Willig's Analyses Show Pass-Through Rates Do Not Vary
         Substantially Across Kaiser-Heavy and Kaiser-Light Areas**

39.      Dr. Willig presents four new regression analyses where he allows pass-through to
vary by Kaiser's RA-level discharge share, using Production Data for Anthem individual,
Anthem small group, Anthem large group, and Blue Shield small group lines of business.[97] Dr.
Willig claims these analyses show that "pass-through rates vary significantly across RAs with
Kaiser's competitive presence."[98] Contrary to Dr. Willig's claim, his analyses actually show that

---

[97] Willig Supplemental Declaration, ¶¶ 71-72, Table 5, and Figures 5 and A5-A7.
[98] Willig Supplemental Declaration, ¶ 71.

pass-through rates *do not* vary much, if at all, across geographies with differing degrees of Kaiser's competitive presence.

40.    A closer look at his Table 5 shows that Dr. Willig found *no statistically significant effect* of Kaiser share on pass-through for two of the four plan-business lines he studied (Anthem large group and Blue Shield small group).[99] Dr. Willig conceded his lack of statistically significant findings at his deposition.[100] Further, the magnitude of Dr. Willig's estimated effect of Kaiser discharge share on pass-through is relatively small for the two plan-business lines (Anthem individual and small group) where he found a statistically significant effect. For example, Dr. Willig's estimates indicate that a five percentage point increase in Kaiser's share is associated with a change in pass-through of about: (a) ███████████ ████████████████████████████████ [101] Such differences are quite small both economically and statistically, in the sense that they are within the confidence intervals both Dr. Willig and I estimate in our pass-through regressions.

41.    Exhibit 5 displays Dr. Willig's pass-through estimates for the Anthem small group line of business.[102] The light blue bars and dark blue bars display Dr. Willig's estimated pass-through rates using Kaiser's RA-level discharge shares as of 2008 and 2016, respectively. The light orange and dark orange lines display Kaiser's share of discharges in that RA as of 2008 and 2016, respectively. The vertical gray lines display in the 95-percent confidence intervals. Exhibit 5 shows that Dr. Willig's pass-through estimates for all RAs and years shown are either: (a) above ███ percent; or (b) have confidence intervals that contain ███ percent. That is,

_____

[99] Willig Supplemental Declaration, Table 5.
[100] Willig Deposition (February 25, 2020), pp. 188-191.
[101] *See* Chipty Workpapers. I use a five-percentage point change for this calculation because, for nearly all RAs, Dr. Willig found that the change in Kaiser's discharge share from 2008 to 2016 was less than five percentage points. *See* Exhibit 4, above.
[102] Appendix F presents the same analysis for Anthem individual line of business. That analysis shows Dr. Willig's pass-through estimates range from ███████████ or all RAs in 2008 and 2016, and the confidence interval for each estimate overlaps with the confidence intervals of all other pass-through estimates.

regardless of Kaiser's share, Anthem's pass-through rate for its small group line of business is


42.    Finally, I observe that Dr. Willig's analysis does not control for Kaiser's
enrollment (or commercial member) share or Kaiser costs. In his deposition, he admitted regret
for studying discharge share, not enrollment share.[103] Moreover, he previously said it was
necessary to control for Kaiser cost to ensure no "omitted variable bias."[104] By contrast, my
MLR analysis controls for Kaiser cost and Kaiser's enrollment share.

**Exhibit 5: Dr. Willig's Table 5 RA-Level Pass-Through Estimates,
Calculated on a Dollar-Basis, for Anthem Small Group, 2008 and 2016**



*Note*: Pass-through on a dollars-basis is calculated by multiplying Dr. Willig's percentage-basis pass-through estimates by the average ratio of premium dollars to all medical costs reported in the MLR Data for Anthem's individual line of business.

*Sources*: Willig Supplemental Declaration, Table 5 and backup production; and MLR Data.

---

[103] *See* Footnote 96.
[104] Willig Merits Report, Footnote 488.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

43.     Despite these shortcomings, Dr. Willig's Table 5 results, even on their face, support my opinion that: (a) there are generally no systematic, significant differences in pass-through rates across geographic areas where Class Health Plans face differing levels of competition from Kaiser; and (b) where such differences do exist, they tend to be small and support the notion that pass-through is higher when Kaiser's share is higher. Finally, I note that Dr. Willig finds that pass-through is, if anything, ████████ in Class RAs relative to non-Class RAs, which supports the notion that my MLR Data pass-through analyses are conservative for the purposes of calculating damages for the Class, because those analyses rely on data for the entire state.

### C.     Documents Show Class Health Plans Have Abandoned Products that Were Intended to Compete Against Kaiser

44.     In my Supplemental Declaration, I explained that "[e]conomic theory gives no clear prediction about how Class Health Plans' pass-through rates will respond to the intensity of competition from Kaiser."[105] In particular, I explained that Class Health Plans may pass through *more* of a cost increase when they face more-intense competition from Kaiser, if Class Health Plans forgo attempting to sell to more price-sensitive customers when Kaiser has a stronger presence.[106] I explained that this phenomenon is sometimes referred to as "market segmentation."[107] At my January 2020 deposition, I explained there is qualitative evidence from this case, described in my Merits Report, that is consistent with this theory:[108]

> "[H]ealth plans that had created certain products to really compete with Kaiser, and, in fact, require these products in order to compete with Kaiser, needed to contain costs . . . because Kaiser is generally lower priced. . . . I've seen examples of health plans abandon products, these products that were initially designed to compete with certain Kaiser

---

[105] Chipty Supplemental Declaration, ¶ 49 and Footnotes 78-79.
[106] *Id.*
[107] Chipty Supplemental Declaration, ¶ 49.
[108] Chipty Deposition (January 15, 2020), pp. 177-178; and Chipty Merits Report, ¶¶ 182-187.

products, because they couldn't make money given the restrictions and the cost burden that they had to bear in order to -- to price the product."

Further, I explained that the pattern of Class Health Plans dropping low-cost products in response to competition from Kaiser would translate into higher pass-through.[109]

45.    Despite my explanation at deposition, Dr. Willig asserts in his report that "Dr. Chipty does not cite to *any qualitative evidence* supporting this theory. In fact, her theory is completely contradicted by facts."[110] Dr. Willig then attempts to provide examples showing that Class Health Plans cut prices to compete with Kaiser:[111] remarkably, he relies upon ██████████ ████████████████████████████████████████ As I explained in my Merits Report:

- ██████████████████████ ⟨⟩ ████████████████
  ████████████████████████████████████████
  ██████████████████████████████████████████
  ████████████████████████████████████████
  ██████████████████████████████████████
  ██████████████████████████████████████
  ████████████████████████████████████ ██████
  ████████████"[112]

- *United's Signature Value Alliance*: "United has also attempted to market a Sutter-focused narrow network product called 'SignatureValue' in Northern California. Although the product is still available,███████████████████████████████
  ████████████████████████████████████████

---

[109] Chipty Deposition (January 15, 2020), pp. 181-182.
[110] Willig Supplemental Declaration, ¶ 69 (emphasis added).
[111] Willig Supplemental Declaration, ¶ 69 and Footnotes 98-100.
[112] Chipty Merits Report, ¶ 185 (footnotes omitted).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA        30



"113

As these examples demonstrate, ███████ and ████ focused their efforts on their higher-priced products that were not designed to compete with Kaiser. These examples provide evidence that Class Health Plans struggle to compete with Kaiser in the Class RAs, and they are consistent with the market segmentation theory.

46.     Finally, Dr. Willig testified that he could not rule out the possibility that the market segmentation theory is correct.[114] Further, both Dr. Willig and I estimate pass-through rates that are either not statistically significantly related to Kaiser's competitive strength or, to a limited extent, increase where Kaiser has a greater presence. This latter result is also consistent with the market segmentation theory.

## V.     MLR Data Provide a Reliable Basis for Estimating Pass-Through Rates

47.     Dr. Willig makes a combination of incorrect, exaggerated, and unsupported arguments in an attempt to discredit the use of the MLR Data for estimating pass-through. Specifically, he argues that my reasons for preferring the MLR Data are not based on quantitative evidence.[115] He argues that the MLR Data cannot be restricted to Class Members.[116]

---

[113] Chipty Merits Report, ¶ 187 (footnotes omitted).

[114] Willig Deposition (February 25, 2020), pp. 177-179 ("Q: You previously opined, sir, that you believed that where Kaiser had a greater presence, the class health plans would have had a lower pass-through rate; isn't that right? A: . . . [W]hat theory I found interesting or plausible . . . was the idea that if Kaiser has a bigger share . . . [Class Health Plans] would have to be more delicate in passing [costs] through. . . . There is another version of that [theory] which says that, yeah, for a certain level of Kaiser's competitiveness . . . if [Class Health Plans'] cost rise, they are very tight and they can't really forego the pass-through because otherwise their costs are going to outrun their revenues. . . . So between those two theories, I don't know which would prevail at what levels of Kaiser's competitiveness. . . . And then there is the question of misspecification, maybe coming in with that sign due to misspecification for a variety of reasons. So at this point I can't say why it's coming in that way.")

[115] Willig Supplemental Declaration, ¶¶ 110-112.

[116] Willig Supplemental Declaration, ¶¶ 113-114.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

He also argues that the MLR Data do not allow for proper analysis of large claims.[117] As I explain here, there are problems with each of Dr. Willig's argument.

### A.   Reasons for Preferring MLR Data over Production Data

48.   As I explained in my Supplemental Declaration, there are several advantages to estimating pass-through rates using the MLR Data, relative to the Production Data.[118] The MLR Data are constructed by the Class Health Plans in their ordinary course of business, from transaction-level data like the transaction-level premium and claims databases produced in this case. The data contain information on premiums paid and the total medical costs incurred for members generating those premiums. These data cover substantially all Class Members, across all Class Health Plans, in all lines of business, over an eight-year period, accounting for approximately 70 percent of the damages period. In addition, the MLR Data report information on Kaiser's medical costs and health plan commercial enrollments (including Kaiser enrollments) which allows me to test one of Dr. Willig's theories regarding the impact of Kaiser on the extent to which Class Health Plans pass through Sutter overcharges.[119]

49.   By contrast, there are important limitations in using the Production Data:

- The Production Data are not usable for the purpose of reliably estimating pass-through for Aetna, United, and ▇▇▇▇▇▇▇ individual and large group. For Aetna across all lines of business, it was not possible to join cost and premium data.[120] For

---

[117] Willig Supplemental Declaration, ¶¶ 115-117.

[118] Chipty Supplemental Declaration, ¶¶ 57-58.

[119] Willig Merits Report, Footnote 488 ("[T]he pass-through rate estimated by Dr. Chipty's regression is inflated relative to the one that is pertinent for the purpose of assessing damages, to an extent that is more important the stronger the competition from Kaiser to the unintegrated carriers. One way to mitigate this [omitted variable] bias would be to include in the regression a separate variable that controls for the level of Kaiser's costs, perhaps also interacted with a measure of the competitive significance of Kaiser."). It is noteworthy that Dr. Willig did not know that the MLR data contained information on Kaiser costs. See Willig Deposition (February 25, 2020), p. 80 ("Q: And does the MLR data provide information on Kaiser? A: I don't know if Kaiser reports or not. Frankly. I don't know that. It's certainly not in the data presented to CMS by a particular non-Kaiser carrier."). Though, he seemed to recall after his lunch break. Willig Deposition (February 25, 2020), pp. 130-1.

[120] Chipty Supplemental Declaration, Footnote 118.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

United and ████████ it was not possible to assign premiums and costs to specific geographies. [121] Dr. Willig does not dispute these limitations with the Production Data. [122]

- The Production Data report facilities costs that generally represent about half or less of all medical costs. [123] Dr. Willig does not dispute that the Production Data, in virtually all instances, does not provide information on total medical costs. [124] This information problem is even more severe for ████████ ████████ and ████████ because of their heavy reliance on capitation. [125] Dr. Willig acknowledges that the Production Data do not include capitation payments. [126] Dr. Willig does not refute the proposition that if the Production Data are missing a substantial portion of medical

---

[121] Chipty Supplemental Declaration, Footnote 118. For Blue Shield large group, it is possible to estimate pass-through using ████████ produced by Blue Shield, as I did in my Class Reply Report, Exhibit 8.

[122] Willig Deposition (February 25, 2020), pp. 84-88; and Willig Merits Report, Footnote 492 ("Although data are available on . . . ████████ individuals, and ████████ large groups, these data lack ████████ ████████ ████████").

[123] *See, e.g.,* Appendix C (showing an analysis of URRT data). The Health Care Cost Institute reports that for individuals under 65 insured through their employer, facilities costs represent half or less of all medical costs. *See* Health Care Cost Institute, "2017 Health Care Cost and Utilization Report," available at https://www.healthcostinstitute.org/images/easyblog_articles/276/HCCI-2017-Health-Care-Cost-and-Utilization-Report-02.12.19.pdf, *site visited* March 10, 2020.

[124] Willig Deposition (February 25, 2020), pp. 88-97. In this context, it is noteworthy that Sutter's expert Mr. Travis challenges my MLR analysis because it does not control for the ACA "insurance provider fee," which is about two to three percent of premiums. *See* Travis Rebuttal Declaration, ¶ 6 and Cigna, "Health Insurance Industry Fee Fact Sheet," 2018, *available at* https://www.cigna.com/assets/docs/about-cigna/informed-on-reform/health-insurance-industry-fact-sheet.pdf, site visited February 27, 2020.

[125] Capitation refers to the practice by which a health plan sells the risk for its members' cost of care to a risk bearing organization. If a health plan sells its inpatient hospital risk for some members, the facilities costs paid on behalf of those members for inpatient care would not be included in the Production Data. Dr. Willig claims wrongly that I did not quantify the extent of capitation used by each of the Class Health Plans. (*See* Willig Supplemental Declaration, ¶ 111.) This is simply not true: in my Supplemental Declaration, I quantified the degree to which Class Health Plans used capitation for small groups. (*See* Chipty Supplemental Declaration, ¶ 42.) Appendix C shows: (a) this information, which I previously presented, in a graphical form; (b) the degree to which Class Health Plans used capitation for their individual lines of business; and (c) an analysis for small groups which shows that when capitation increases, the facilities costs incurred by the health plans decreases.

[126] Willig Supplemental Declaration, ¶ 111 (explaining that "Dr. Chipty did not have any data on capitated products in the production data").

costs (because of capitation or any other reason), it would be problematic to use them to study pass-through.

50.     For these reasons, I prefer the MLR Data to the Production Data for the quantification of pass-through, and for computing damages. I could not have calculated pass-through for each of the Class Health Plans, given the data limitations, using the Production Data. I do, however, use the Production Data to "sanity check" my MLR Data analysis: the exercises I conducted with the Production Data corroborate my findings based on the MLR Data. For the reasons I explain next, Dr. Willig's criticisms of the MLR Data are false and misleading.

## B.     The MLR Data Are Representative of Class Members

51.     Dr. Willig and Mr. Travis challenge whether the California MLR data reflect the experience of all Class Members because of CMS's reporting requirement, requiring health plans to file data in the state where a contract is "sitused."[127] Specifically, Dr. Willig and Mr. Travis claim that the MLR data *may*: (a) exclude some Californians that pay premiums on a plan that is reported to CMS in a different state; and (b) include some non-Californians who pay premiums on a plan that is reported to CMS in California. I note at the outset that neither Dr. Willig nor Mr. Travis offers qualitative or quantitative evidence on the magnitude of the so-called problem on which they focus.[128] I provide here both qualitative and quantitative evidence which demonstrates that Dr. Willig's and Mr. Travis' concerns are exaggerated and misleading.

---

[127] CMS requires an insurance company that has issued a group health insurance plan to a single employer that has employees in multiple states to report that plan's MLR Data in the state where the contract is sitused. *See* 45 C.F.R § 158.120(b); and CMS, Medical Loss Ratio Annual Reporting Form Filing Instructions for the 2016 MLR Reporting Year, p. 6, available at https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/2016-MLRForm-Instructions.pdf, *site visited* March 9, 2020.

[128] Willig Supplemental Declaration, ¶ 113; Travis Rebuttal Declaration, ¶¶ 10-11; and Travis Deposition (February 27 2020), p. 30 ("Q: Now, I take it your opinion here, if I can summarize it, is that the data used by Dr. Chipty may not be completely accurate with respect to the MLR data she relies on for her pass-through analysis? A: Well, I wouldn't use the term 'accurate.' That makes it sound like the MLR data are erroneous or inaccurate. I believe my opinion is stating that MLR data are perhaps inappropriate for this purpose….") In fact, Mr. Travis conceded that the alleged problem may be immaterial or nonexistent; *see* Travis Deposition (February 27 2020), p. 35 ("Q: Did you or your team make any investigation to determine whether, in fact, the data includes data from people who live out of state and excludes data from people who live out of state and excludes the data from some people who live in the

52.     First, data from the DMHC and DOI enrollment files, maintained by the California Health Care Foundation ("CHCF"), provide a direct quantification of the significance of the situs issue. As explained by the CHCF, "A comparison of the MLR database and the California Health Insurance Enrollment Database found that commercial market enrollment totals from these two sources were within 5% of each other. Small differences in reporting practices, including the MLR requirement to report enrollment based on where the contract is based ('sitused') may account for some of these differences."[129] This statement makes clear that the CHCF enrollment data are *not* based on where the contract is sitused. Further, by CHCF's own description, *the situs concern raised by Dr. Willig (and Mr. Travis) is "small."* This fact by itself indicates that Dr. Willig's and Mr. Travis's challenge is insignificant.

53.     Second, it is my understanding that Section 1333 of the ACA legalized the interstate sale of individual and small group health insurance, yet "[n]o state has yet taken advantage of the option."[130] As a consequence, there are unlikely to be sales of individual line-of-business health insurance products sitused outside of California to residents of California. Similarly, there are unlikely to be sales of small group health products sitused outside of California to employees who reside in California and whose employers are also located in California, *i.e.* the population for which I calculate small group damages. In this context, it is noteworthy that while it is theoretically possible for there to be multi-state small groups, the fact

---

state? A: Yeah, that's the rub.......it does not allow you to do any analysis to determine if it's material or immaterial to nonexistent.) and p. 39 ("Q: The analysis of whether the data set is overinclusive, for the purpose that Dr. Chipty is using it, because it includes data from out-of-state people and underinclusive because it excludes some people from in state? … A: I have not done that analysis.…").

[129] California Health Care Foundation, "California Health Insurers Enrollment Database, Reporting by DMHC & CDI, 2012-2016," available at
https://www.chcf.org/wpcontent/uploads/2018/01/CaliforniaHealthInsurersEnrollmentDataPublished2018.zip, *site visited* March 17, 2018 (produced as backup to the Chipty SJ Declaration), "Overview" tab.

[130] Blumberg, Linda, "Sales of Insurance across State Lines: ACA Protections and the Substantial Risks of Eliminating Them," Urban Institute, June 2016, available at
https://www.urban.org/sites/default/files/publication/81866/2000840-sales-of-insurance-across-state-lines.pdf, *site visited* March 8, 2020. *See also* Marchica, John, "Interstate Insurance Sales: Wishful thinking, or A Viable Policy Option?" Health Affairs Blog, January 18, 2017, available at
https://www.healthaffairs.org/do/10.1377/hblog20170118.058360/full/, *site visited* March 9, 2020.

---

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

that the average small group employs approximately eight individuals suggests it is unlikely.[131] Finally, for the large group line of business, largest employers tend to self-insure, and therefore would be excluded from *both* the MLR data and the putative class.[132]

54.     Finally, I quantify the extent of cross-state enrollment using Production Data from Health Net, which contain information on subscriber and (where appropriate) employer location for each line of business:



[134]

55.     Although the Production Data indicate the presence of a small fraction non-Californian membership, the level of out-of-state membership, to which Dr. Willig and Mr. Travis dedicate entire sections of their reports without any evidence or analysis, is quite small. Consistent with this fact, there are several published studies where healthcare researchers use the California MLR data to study the California health insurance market.[135] Collectively, these facts

---

[131] Axene Declaration, ¶ 85.

[132] Kaiser Family Foundation, "2019 Employer Health Benefits Survey – Section 10 - Plan Funding", available at https://www.kff.org/report-section/ehbs-2019-section-10-plan-funding/, *site visited* March 9, 2020.

[133] *See* Chipty Workpapers.

[134] *See* Chipty Workpapers.

[135] *See, e.g.*, Callaghan, Sandra Renfro, Elizabeth Plummer, and William F. Wempe, "Health Insurer's Claims and Premiums Under the Affordable Care Act: Evidence on the Effects of Bright Line Regulations," *Journal of Risk and Insurance*, Vol. 87, No. 1, 2019, pp. 67-93; Abraham, Jean Marie, Drake Coleman, Jeffrey S. McCullough, and Kosali Simon, "What drives insurer participation and premiums in the Federally-Facilitated Marketplace?" *International Journal of Health Economics and Management*, Vol. 17, 2017, pp. 395-412; and Finocchio, Len and Katrina Connolly, "Medical Loss Ratios for California's Dental Insurance Plans: Assessing Consumer Value and Policy Solutions," *Health Affairs*, Vol. 37, No. 9, 2018, pp. 1517-1523. The fact that these studies draw conclusions

demonstrate that Dr. Willig's (and Mr. Travis') concern that the MLR Data cannot be used reliably to study pass-through of Californians is simply incorrect.

### C.   Dr. Willig's Claim that the "MLR Data Do Not Allow for Proper Analysis of Large Claims" Is Incorrect

56.     Dr. Willig, relying on Mr. Travis' analysis, claims that my pass-through analysis using the MLR data is "likely overstated" because of how health plans pool large (or catastrophic) claims statewide.[136] There are several problems with Dr. Willig's arguments:

- First, Dr. Willig appears to misunderstand how health plans pool large claims. He states that "large claim pooling is a process that spreads portions of high-cost claims across the entire state for Small Group and Individual, and across all Large Group entities in the Large Group market."[137] That is wrong. Dr. Willig fails to understand that the large claim pooling process does not eliminate or spread medical costs; it is an analytical tool used by actuaries in assigning an appropriate expected cost of very large claims to premiums.[138] Thus, the large claim process may make an upward or downward adjustment to the per-member, per-month medical cost for a specific group, but it does not change the statewide total medical cost and, thus, does not impact the reliability of the MLR Data.

- Dr. Willig claims, without support, that failing to adjust for how health plans treat large claims will tend to overstate pass-through. In theory, the bias could go in either direction. For example, if premiums are based on expected costs that are lower than

---

about California using the California MLR Data is consistent with my finding that the impact of the CMS reporting requirements is insignificant.

[136] Willig Supplemental Declaration, ¶¶ 115-117. Remarkably, Dr. Willig's RA-level analysis of pass-through ignores the issue of large (or catastrophic) claims. According to him, he would have had to adjust his analysis to account for how he thinks health plans smooth large claims; yet, he did not.

[137] Willig Supplemental Declaration, ¶ 115.

[138] Axene Merits Rebuttal Declaration, ¶ 15 ("As described, Catastrophic Claims Pooling helps the actuary develop premiums that reflect the true expected cost of insuring a group. It does not, as suggested by Mr. Travis and Ms. Keller, transfer claims from one region to another. At deposition, Ms. Keller agreed that Catastrophic Claims Pooling does not involve subsidization from high-cost regions to low-cost regions.").

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

actual costs, a model that relates premiums to actual costs will tend to understate pass-through.

- Further, because my MLR analysis studies the relationship between *statewide* per-member, per-month medical costs and premiums, it properly accounts for large (or catastrophic) claims, even if it works as Dr. Willig describes.

57. Finally, Dr. Willig tries to turn a vice into a virtue by admitting that "Large claim pooling is of particular importance to the analysis of pass-through because when large claims are pooled state-wide, some of the effect of large claims at Sutter hospitals will be spread outside the proposed class."[139] In other words, Dr. Willig confirms that Sutter's anticompetitive conduct has harmed millions of premium payers in Californian in addition to the members of the Class.[140]

**D.    My MLR Analyses Are Corroborated by My Production Data Analyses and Qualitative Evidence**

58. My MLR analyses are corroborated with substantial other evidence, including both quantitative and qualitative evidence. The quantitative evidence includes: (a) the analyses of the Production Data set forth in my November 18, 2019 Supplemental Declaration on Class Certification; (b) my original econometric analyses set forth in my June 21, 2018 and November 26, 2018 Declarations submitted in connection with Plaintiffs' original class motion; (c) Dr. Willig's analyses of pass-through; and (d) the pass-through estimates derived from the previously-referenced Ho and Lee study, examining relationship between hospital costs and insurance premiums in Northern California. The qualitative evidence spans ordinary-course documents and testimony from: (a) each of the Class Health Plans; (b) Sutter; and (c) actuaries. All of these industry participants recognize that health plans set premiums to cover medical costs, a basic fact which directly links premiums to costs.

---

[139] Willig Supplemental Declaration, ¶ 117.
[140] Travis Deposition (February 27, 2020), pp. 97–98 ("Q: Well, you've testified that these Sutter overcharges have been spread across the state and are being absorbed by millions of other Californians; correct? … A: Yeah, the charges are spread across the state. That's what our model is assuming. Q: And by that it means that millions of people across the state are paying those overcharges through premiums; correct? … A: I would suggest that that could be the case.").

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

59.     Each of these different approaches leads to the same conclusion: pass-through rates in California (and in Northern California) are uniformly high and significant. The ability to replicate the results using this rich variety of methods raises confidence in each method.

### E.     Dr. Willig's Other Criticisms of the MLR Analysis are Distractions

60.     Dr. Willig makes a handful of other arguments about my MLR analyses, none of which are credible. For example, Dr. Willig criticizes my use of indicators identifying whether a set of insurance products was regulated by the DMHC or the DOI as a proxy for HMO and PPO product types. His criticism stems from his limited understanding about certain PPO plans that were "grandfathered" into reporting "much of their insured PPO business to the DMHC, not the DOI."[141] The evidence contradicts Dr. Willig's limited understanding:

- A systematic review of CHCF enrollment data from 2012 to 2016 indicates that the DOI does not regulate enrollment for *any* HMO products and that 80 percent of the enrollment regulated by the DMHC relates to HMO products.[142] The comparatively high proportion of HMO enrollment in DMHC versus DOI data is sufficient for the indicator variable to capture variation across these product types.

- Published literature on California health insurance markets confirms that other researchers frequently regard the DMHC as a regulator of HMO products, and the DOI as a regulator of traditional health insurance products, including PPOs. For example, the first paragraph of a CHCF publication entitled "Making Sense of Managed Care Regulation in California" states the following: "In California, regulation and oversight of health insurance is split between two state departments. The new Department of Managed Health Care (DMHC) primarily regulates health maintenance organizations (HMOs), while the California Department of Insurance (CDI) has jurisdiction over traditional

---

[141] Willig Supplemental Declaration, ¶ 94.
[142] *See* Chipty Workpapers. The CHCF enrollment data were previously relied upon for my May 26, 2018 Declaration in Opposition to Motion for Summary Judgment.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

health insurance."[143] In a paper published in the *American Economic Review*, authors Kate Ho and Ariel Pakes describe the DMHC as a regulator of "all Knox Keene plans (essentially the same as HMOs) in California."[144]

Had Dr. Willig reviewed the available enrollment data or the literature regarding regulation of health insurance products in California, he might have realized that it is commonly known in California that each regulator specializes in the regulation of different products and that the usage of the plan indicator variable is a reasonable proxy for determining product type.

## VI.    Dr. Willig's Employer-Employee Split Arguments Are Incorrect and Misleading

61.     In my Class Reply Declaration, I explained that it would be reasonable to allocate damages proportionately between employers and employees, based on their respective share of the premium burden. Initially, Dr. Willig described the employer-employee split as a "pass-through" relationship.[145] I explained that employers do not resell insurance to their employees, and therefore do not "pass through" Sutter overcharges to employees.[146] Rather, employers and employees jointly pay for and consume health insurance. Under these circumstances, the employer and employee are both end-payors that each pay a share of the premium. As a result, each pays for a share of the Sutter overcharge that was passed through by the Class Health Plans to that premium. It appears Dr. Willig has retracted his description of the employ-employee relationship being a "pass-through" relationship, saying that "employee-employer split does not depend on whether one labels the determination of the split 'pass-through'."[147]

---

[143] Roth, Debra L., and Deborah Reidy Kelch, "Making Sense of Managed Care Regulation in California," California HealthCare Foundation Report, November 2001, available at https://www.chcf.org/wp-content/uploads/2017/12/PDF-MakingSenseManagedCareRegulation.pdf, *site visited* March 9, 2020, p. 5.

[144] Ho, Kate and Ariel Pakes, "Hospital Choices, Hospital Prices, and Financial Incentives to Physicians," *American Economic Review*, Vol. 104, No. 12, 2014, pp. 3841-884, at 3849.

[145] Willig Declaration, ¶ 29.

[146] Chipty Reply Declaration, ¶¶ 45-46.

[147] Willig Supplemental Declaration, ¶ 97.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

62.    Dr. Willig falls back to insist that, while employers and employees split the premium, there is no guarantee that they would split the change in premiums caused by the challenged conduct in the same way.[148] Dr. Willig continues to miss the point. Consider an insurance premium of $600, $500 of which goes to medical expenses and $100 of which goes to administration. The employer pays a fixed contribution of $500 and the employee pays the balance of $100. In this case, the employer-employee split is 83.3 percent-16.7 percent. If it was determined that $10 of the $600 premium was an overcharge due to Sutter's conduct, the $10 could be split 83.3 percent-16.7 percent, between the employer and the employee, respectively. Dr. Willig seems to suggest that the $10 would be split different from the $590, because the $10 represents a different element of the cost. *When asked about exactly this hypothetical scenario at deposition, Mr. Travis said that "every element of cost" would be split the same way.*[149] He went on to say "I do not know of a single employer that would look at their premium in that manner. I think that's a somewhat arbitrary situation. I mean, employers are looking at total cost of the plan. And they're not looking at what the individual components are and establishing their subsidy or establishing the employee's contribution based upon some split within the total cost of the plan."[150]

63.    As I explained in my Class reply declaration, a proportional split of the damages provides reasonable estimate of damages for each of the payors that jointly pay a premium. In my previous report, I presented:

- Mathematical derivations that demonstrated that under a wide variety of scenarios, a proportional split correctly allocates damages between employers and employees that jointly pay a premium.[151]

---

[148] Willig Supplemental Declaration, ¶ 98.
[149] Travis Deposition (October 23, 2018), pp. 169-170.
[150] *Id*.
[151] Chipty Reply Declaration, ¶¶ 47-50.

- Descriptive analyses of Kaiser Family Foundation ("KFF") data, upon which Sutter's experts in this proceeding initially relied, demonstrating that the average premium split between employers and employees has remained relatively stable over time,[152] despite the fact that average monthly premiums have increased substantially.[153] This analysis suggests that employers tend *not* to hold their employees' dollar contribution fixed.

- Regression analysis of KFF data that showed the average share of the premium bill paid by the employee remains unchanged for changes in premium below five percent.[154] Given the magnitude of the estimated premium overcharges, I explained that the regression results suggest that the employee *share* of the total premium bill is unlikely to change in response to premium increases caused by the Sutter overcharges.[155] This analysis demonstrates that, in the but-for world absent a Sutter overcharge, both the employer and employee would have paid lesser amounts, regardless of how their premiums were split in the actual world or whether those amounts were tied to a non-Sutter plan.

- Qualitative evidence, including survey evidence, suggesting that employers are unlikely to require employees to pay all premium increases.[156]

64.    To defend his position, Dr. Willig has revived some of his old arguments. He has also presented new arguments about cross-sectional variation and temporal variation in the employer-employee split.[157] Further, he claims that it is likely impossible to determine the level

---

[152] Chipty Reply Declaration, Exhibit 3.

[153] Chipty Reply Declaration, Exhibit 4.

[154] Chipty Reply Declaration, Exhibit 5.

[155] Chipty Reply Declaration, ¶ 57. About this inference, Dr. Willig says, "Dr. Chipty's conclusory statement that it is unlikely that employers would change their benefit design because the premium impact of any Sutter overcharge likely would be small is unsupported." (Willig Supplemental Declaration, ¶ 98.) It appears Dr. Willig did not notice my regression model and associated results, which support my conclusion.

[156] Chipty Reply Declaration, ¶¶ 58-59.

[157] Willig Supplemental Declaration, ¶¶ 104-109.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA        42

of employer/employee split for several of the named plaintiffs.[158] I respond to all of Dr. Willig's arguments here.

### A.    Dr. Willig's Rejection of the Proportional Split in Certain Scenarios Is Flawed

65.    Dr. Willig appears to concede that a proportional split (or what he calls the contribution split) of damages would be reasonable if the employer-employee sharing of the premium were done on a percentage basis: *e.g.*, the employer pays a certain percentage of the premium and the employee pays the balance.[159] His remaining disagreement appears to be in situations where the employer contribution was fixed to some amount, either an absolute amount or an amount pegged to another plan (like Kaiser) that excludes Sutter. Specifically, Dr. Willig describes four scenarios:[160]

- *Scenario 1*: "Employers whose benefit design keeps an employee's contribution fixed would effectively cause the employee to pay no amount of any cost change."

- *Scenario 2*: "Employers whose benefit design keeps their own contribution fixed would effectively cause the employer to pay no amount of any cost change."

- *Scenario 3*: "Employers who set employee contributions to be the same whether or not the plan includes Sutter may cause the employee to pay no amount of any cost change."

- *Scenario 4*: "Employers who use the premiums of Kaiser or another plan that excludes Sutter to set the relative contribution amount may cause either the employer or the employee to pay any cost difference for plans that include Sutter."

66.    Dr. Willig places an inappropriate emphasis on the structure of the employer's subsidy of employee health insurance. He ignores the fact that employers set the subsidy

---

[158] Willig Supplemental Declaration, ¶¶ 101-103.

[159] Willig Supplemental Declaration, ¶ 103 ("Dr. Chipty's suggested approach fails to account for those situations in which the contribution split was not done on a percentage basis but in which the contribution of one side or the other was fixed.")

[160] Willig Supplemental Declaration, ¶ 98.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

knowing the cost consequences, for themselves and their employees. For example, a fixed contribution of $500 may make sense when premiums are $600, but the same "fixed" contribution may not make sense if premiums are $590. An employer that does not change its "fixed" contribution when costs decline has made a decision to offer greater benefits; similarly, an employer that does not change its "fixed" contribution when costs increase has also made a decision to offer less generous benefits. In either case (*i.e.* whether there is *or* is not a change in contribution), the employer subsidy could appear to the outsider to be "fixed," when in fact it is not. Further, the employer's decision is not disconnected from business needs of simultaneously managing costs, competing for employees, and ensuring a productive workforce.[161] I discussed some of these considerations in my Class Reply Report.[162]

67.     In this context, I observe that Mr. Travis endorsed a proportional split of damages based on the employer-employee split in each of these scenarios, irrespective of the structure of the subsidy.[163] In situations where the employee contribution is held constant, from one-year to the next in the face of rising premiums, the employee would receive a smaller share of the damage amount, because the employer pays a higher share of the premium. In situations where the employer contribution is held constant, from one-year to the next in the face of rising premiums, the employer would receive a smaller share of the damage amount, because the employee pays a higher share of the premium. This dynamic is illustrated in Exhibit 6, which considers a situation in which premiums increase from $600 to $700 from one-year to the next. The left panel describes a situation where the employee contribution is fixed at $100: (a) in year one, the employer would receive 83 percent of the damage amount; and (b) in year two, the employer would receive 86 percent of the damage amount. The right panel describes a situation

_____

[161] The empirical evidence shows that Dr. Willig's "fixed" contribution scenario is unlikely. However, even assuming it were true, it still does not prove that there is no harm to either the employer or employee. Consider for example Dr. Willig's example in which: (a) the employee pays $20 towards health insurance in the actual and but-for worlds; and (b) the employer pays $80 towards health insurance in the actual world, and it would have paid $70 in the but-for world. (*See* Willig Supplemental Declaration, ¶ 103.) According to Dr. Willig, the employee could not be harmed because she pays $20 either way. Dr. Willig forgets that the employer decided to pay $80 towards an employee benefit in the actual world, suggesting that the employer might enhance some other employee benefit (or salary) with the $10 savings per employee on health insurance that it would have enjoyed in the but-for world. Thus, even in Dr. Willig's hypothetical scenario, the employee is harmed.

[162] Chipty Class Reply Report, ¶¶ 58-59.

[163] Travis Deposition (October 23, 2018), pp. 169-170.

where the employer contribution is fixed at $500: (a) in year one, the employer would receive 83 percent of the damage amount; and (b) in year two, the employer would receive 71 percent of the damage amount. As seen here, the proportional split would increase and decrease the damage award based on the relative burden of the premium, and thus premium overcharge.

### Exhibit 6: Illustrative Examples of Premium-Sharing Arrangements in the Face of Rising Premiums



68.     There are additional problems with Dr. Willig's analysis of his Scenarios 2 and 4, which involve fixing contributions or pegging the subsidy to a Kaiser plan or a plan that does not include Sutter. For example, Dr. Willig assumes that employers that "peg" their subsidy of a non-Kaiser plan to a Kaiser plan would have kept the same percent "peg" unchanged absent Sutter's overcharge.[164] The evidence indicates that is unlikely, given my empirical work showing that on average the employer-employee share of the premium bill has remained stable over the years. Employers can choose to peg their subsidy for non-Kaiser plans to be anywhere between 50 percent and 100 percent of the Kaiser plan premium.[165] Thus, contrary to Dr. Willig, pegging to Kaiser is not a binary decision: it is entirely plausible that an employer that chose to peg non-

---

[164] Willig Supplemental Declaration, ¶ 98.
[165] Declaration of Steven Nyugh, Senior Vice President of Operations at Choice Administrators Insurance Services, *Djeneba Sidibe, et al., v. Sutter Health*, 3:12-CV-4854-LB, October 15, 2018, p. 2.

Kaiser subsidies to Kaiser would have chosen a smaller subsidy (expressed as a lesser percent of Kaiser plan premium) in the but-for world.

69.    Furthermore, implicit in Dr. Willig's argument is the presumption that those premiums (associated with plans that do not include Sutter) would be unaffected by Sutter's conduct and thus, employers paying those premiums could not have been harmed by Sutter's conduct. However, as I have explained, there is evidence of an "umbrella effect" through which Sutter's high prices have allowed other providers to raise their prices.[166] There is also evidence that Sutter's conduct impeded the competition between Kaiser and the Class Health Plans, that would have otherwise taken place.[167]

70.    Even under Dr. Willig's unsupported theory, Class Members would be harmed if at any point in the damages period, their (dollar) contribution increased in the face of Sutter overcharges: thus, only Class Members that never experienced a change in their contribution toward premiums over the eleven-year (to date) damages period would arguably not be harmed. To my knowledge, Dr. Willig has not identified *any* employer or employee Class Member that, throughout the damages period, experienced no change in their contribution, let alone quantified how many of them there might be. Accordingly, at most Dr. Willig must be arguing that there *may be* some Class Members who *may* not have been injured *in certain years* for *some subset* of the eleven-year (to date) damages period. My KFF descriptive analysis shows that the average share of the premium bill paid by employees has been relatively stable for long periods of time (*see* Exhibit 3 of my Class Reply Report, reproduced below as Exhibit 7); and my KFF regression analysis shows that the average share of the premium bill paid by the employee is not likely to change—or in other words, there will likely be an increase in contribution—in response to Sutter's overcharges (*see* Exhibit 5 of my Class Reply Report).

---

[166] Chipty Class Reply Report, ¶ 111.
[167] Chipty Merits Report, ¶¶ 52, 131.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

71.     Finally, setting aside all of the problems with his unsupported theory, Dr. Willig's suggestion that there are "likely thousands of potential class member-employers who shift any Sutter overcharge that exists onto their employees" is exaggerated.[168] By my calculation, employers account for less than four percent of the all Class Members; and employers that adopt subsidy structures like those described in Dr. Willig's Scenarios 2 and 4 would account for a substantially smaller subset of the four percent.[169] Accordingly, even under Dr. Willig's theory, there could be at most a *de minimis* number of Class Members (employers) that would have shifted their burden of the overcharge to employees. Either way, the proportional split would compensate the employees of those employers.

### B.     Dr. Willig's Arguments about Cross-Sectional Variation in the Employer-Employee Split Are Completely Irrelevant

72.     Dr. Willig goes on for many paragraphs explaining the different ways in which employees' share of premium costs can vary. For example, he describes differences based on firm size, type of coverage (*e.g.*, individual or family), average worker salary, and employee demographics.[170] To be clear, I have never argued that there are no differences across employees; for example, Exhibit 3 of my Class Reply Declaration shows a difference in the average employee share of premium costs for single versus family coverage. The presence of these differences is irrelevant from the perspective of whether Class Members incurred any harm and the aggregate amount of damage caused by Sutter's conduct.

### C.     Dr. Willig's Arguments about Temporal Variation in the Employer-Employee Split Are Exaggerated

73.     In my Class Reply Report, I explained that the employer-employee split has been stable over time, based on an analysis of the average percent of premiums paid by covered workers for single and family coverage over a 19-year period, from 1999 to 2017. For convenience, Exhibit 3 of my Class Reply Report is repeated here as Exhibit 7. As seen here,

---

[168] Willig Supplemental Declaration, ¶ 99.
[169] *See* Chipty Workpapers.
[170] Willig Supplemental Declaration, ¶ 106.

from 2008 to 2017, the employee share ranged from 27 percent to 31 percent for family coverage and it ranged from 16 percent to 19 percent for single coverage.

**Exhibit 7: Reproduction of Chipty Reply Declaration Exhibit 3**
**Average Percentage of Premium Paid by Covered Workers for Single and Family Coverage, 1999-2017**



*Note*: Average percentage premium paid reported by employers weighted by employer's number of covered workers.
*Source*: Kaiser Family Foundation Employer Health Benefits Annual Survey data, 1999-2017.

74.    By contrast, Dr. Willig says that the average percentage of the employer-employee split has changed over the class period. He explains that "[a]lthough premiums for family coverage have increased by an average of *61 percent* from 2005 to 2015, employee contributions for family coverage have increased on average *by 83 percent*."[171] Dr. Willig's reported percentage changes are misleading. The actual changes are not nearly as large has he suggests: the changes in employee share are much smaller (3.5 percentage points or 14 percent), as shown in Exhibit 7 above.

---

[171] Willig Supplemental Declaration, ¶ 106 (emphasis added).

**D.**   **Dr. Willig's View that Determining the Employer-Employee Split for the Named Plaintiffs Is "Likely Impossible" Is Untrue**

75.     Dr. Willig argues that "determining the level of employer/employee split is likely impossible for three of the named plaintiffs."[172] I note at the outset that neither I nor Dr. Willig are class administrators. Nonetheless, I respond to Dr. Willig's contentions regarding administration because he relies on facts that are incorrect. A closer look at the evidence he cites shows that he has cherry-picked portions of the named Plaintiffs' deposition testimony:

- Dr. Willig says that Ms. Feeney of Johnson Pool and Spa testified that "Johnson Pools and Spa's records have gaps and that she can't tell from insurer invoices how much the employer paid."[173] *However*, later in the same deposition, Ms. Feeney testified that her company has "everything [they've] ever done around health insurance…from 1994 to current."[174] Johnson Pool & Spa provided records on this motion identifying the premiums that they paid.

- Dr. Willig says that Susan MacAusland of Optimum Graphics "testified that she does not issue paystubs every month and there is no document that reflects the amount withheld from her employees and could not explain why there were gaps in the records and she admitted that the records may not be accurate."[175] *However*, elsewhere in her deposition, Ms. MacAusland said that payroll is maintained on Quickbooks and that she produced "everything that I had" from 2008 to 2017.[176] Optimum Graphics provided records on this motion concerning the premiums that they paid.

--------

[172] Willig Supplemental Report, ¶ 101 and Footnote 161.

[173] Willig Supplemental Declaration, Footnote 161.

[174] Deposition of Tina Feeney, Co-Owner of Johnson Pool & Spa, August 24, 2018, p. 48.

[175] Willig Supplemental Declaration, Footnote 161.

[176] Deposition of Susan MacAusland, Co-Owner of Optimum Graphics, Inc., August 22, 2018, pp. 38-39.

- Dr. Willig says Jerry Jankowski testified that "for many years he cannot tell from the documents produced what was related to medical premiums, versus what was deducted for visual and dental coverage."[177] However, later in the same deposition, Mr. Jankowski goes on to say that it could be cross-checked from the record.[178] Mr. Jankowski provided records on this motion identifying the premiums that he paid.

76.     Appendix D shows exemplar records for each of the named Plaintiffs. For example, plaintiff Djeneba Sidibe produced earning statements showing that she paid $25.38 from January 9, 2013 to January 23, 2013 towards health insurance. A companion document describes Ms. Sidibe's benefit package and shows that her employer-employee split during this period was 90 percent and 10 percent, respectively.

## VII.    Conclusions

77.     Based on the analyses presented in this report, it remains my opinion that: (a) Class Members have suffered common impact due to Sutter's elevated prices at the Sutter Damage Hospitals; and (b) a common method exists to reasonably approximate aggregate and individual Class Member damages. To calculate aggregate damages using my baseline methodology, I first identified payments (and payments per member per month) made by all five Class Health Plans to the Sutter Damage Hospitals. I then applied my econometric estimates of overcharge, that vary by Class Health Plan, to compute overpayments made by the Class Health Plans to Sutter. Finally, I applied my weighed average pass-through estimate of 97.16 percent to calculate the portion of those overpayments that were passed through to Class Members in the form of higher premiums. My baseline calculation yields aggregate damages of $489 million. As an alternative, I have also calculated aggregate damages by applying a weighted average pass-through rate, by weighting a pass-through rate by line-of-business, by Class Health Plan, as preferred by Dr. Willig. Exhibit 8 shows these different estimates graphically: the blue bar shows my baseline damage estimate, and the green and orange bars show the alternative damage estimate with and without capping pass-through at 100 percent, respectively. As seen here, my

-----

[177] Willig Supplemental Declaration, Footnote 161.
[178] Deposition of Jerry Jankowski, March 9, 2018, pp. 182-184, 204-205, and 207-209. *See also*, Appendix D.

baseline estimate (blue bar) is within 0.1 percent of the green bar, and it is substantially below the orange bar.



**Exhibit 8: Damage Estimates: Based on In-Sample Overcharges Estimates**

*Sources*: Anthem, Blue Shield, Health Net, Aetna, and United Claims and Premium Data; U.S. Census Bureau Zip Code and County Data; The Center for Consumer Information & Insurance Oversight: California Geographic RAs; and MLR Data, 2011-2018.

Moreover, my damage methodology is conservative for many other reasons. For example: (a) benchmark prices would have been lower in the but-for world; (b) my analysis did not consider Sutter's elevated out-of-network charges; (c) my analysis did not apply a trend factor; and (d) my analysis did not consider claims for mental health and substance abuse. In a prior report, I demonstrated that incorporating trend factors alone would have increased my damage estimates by about $75 million.

Tasneem Chipty, Ph.D.
March 12, 2020



**TASNEEM CHIPTY**
**Managing Principal**

**Appendix A: CV**

Office: (617) 315-0355
Cell: (617) 697-6826
tchipty@matrixeconomics.com

125 High Street
Suite 1801
Boston, MA 02110

Dr. Chipty is an expert in industrial organization, antitrust economics, and econometrics. She works with both private parties and government agencies in antitrust litigation and merger review. Her work spans a broad array of sectors, including: agricultural equipment; airlines; broadcast and satellite radio; cable and satellite television; credit cards; containerized shipping; healthcare; modem chips; newspapers; pharmaceuticals; telecommunications; and tobacco. Her work has been influential both internationally and domestically. For example, she was the Department of Justice's antitrust expert in the federal lawsuit challenging Atrium Health's use of anti-steering restrictions in contracts with health plans. She was an expert for the Government of Australia, at the World Trade Organization, in a series of disputes surrounding Australia's national tobacco control policy. She was Comcast's antitrust damages expert in *Behrend et al. vs. Comcast*—a U.S. Supreme Court case in which the Court decertified the class because of deficiencies in the plaintiffs' damages model. She was one of Qualcomm's antitrust experts in a series of lawsuits challenging Qualcomm's licensing practices. Currently, she is an antitrust expert in one of several lawsuits against Sutter Healthcare, challenging Sutter's use of anti-steering provisions in contracts with health plans. Dr. Chipty has submitted testimony, been deposed, and testified at trial in several litigation matters. She has appeared before the Federal Trade Commission, the Department of Justice, the World Trade Organization, the Canadian Mergers Bureau, the Canadian Radio-television and Telecommunications Commission, the U.S. Copyright Board, and the Canadian Copyright Board. She is the co-editor of the current edition of the American Bar Association's book *Proving Antitrust Damages*. She has published research on the strategic use of vertical integration, the role of firm size and network effects on bilateral business negotiations, and the effects of regulations on firm behavior.

Prior to founding Matrix Economics, Dr. Chipty was a Managing Principal at Analysis Group, and before that a Vice President at Charles River Associates. She has served on the faculties of the Ohio State University, Brandeis University, and MIT, where she taught courses in antitrust and regulation, industrial organization, and econometrics. Dr. Chipty received her Ph.D. in economics from the Massachusetts Institute of Technology and her undergraduate degree in economics and mathematics from Wellesley College.

## EDUCATION

Ph.D.        Economics, Massachusetts Institute of Technology

B.A.         Mathematics and Economics, with honors, Wellesley College

**PROFESSIONAL EXPERIENCE**

2016 –          Matrix Economics, LLC
                *Founder and Managing Principal*

2010 – 2016  Analysis Group, Inc.
                *Managing Principal* (2010-2016)

1999 – 2010  Charles River Associates, Inc.
                *Vice President* (2005-2010)

2005          Massachusetts Institute of Technology
                *Visiting Associate Professor of Economics*

1997 – 1999  Brandeis University, Graduate School of International Economics and Finance
                *Visiting Assistant Professor of Economics*

1995          Osaka University
                *Visiting Foreign Scholar*

1993 – 1999  Ohio State University
                *Assistant Professor of Economics*

**TESTIMONY EXPERIENCE**

▪ *Djeneba Sidibe et al. v. Sutter Health*, Case No. 3: 12-cv-4854-LB, in United States District Court for the Northern District of California. On behalf of the Djeneba Sidibe *et al.*, submitted testimony on May 26, 2018, June 22, 2018, November 26, 2018, April 22, 2019, April 30, 2019, August 1, 2019, November 18, 2019; and testified at deposition on August 15, 2018, August 16, 2018, December 20, 2018, June 11, 2019, and January 15, 2020. Constantine Cannon (Matthew Cantor and Jean Kim).

▪ *Federal Trade Commission vs. Qualcomm Incorporated*, Case No. 17-CV-00220-LHK, in United States District Court for the Northern District of California. On behalf of Qualcomm, submitted testimony on June 28, 2018; testified at deposition on August 10, 2018; and testified at trial on January 22, 2019. Cravath Swaine and Moore (Gary Bornstein and Yonatan Even).

▪ *In Re: Qualcomm Litigation*, Case No. 17-cv-00108-GPC-MDD, in United States District Court for the Southern District of California. On behalf of Qualcomm, submitted testimony on June 29, 2018 and October 2, 2018; and testified at deposition on October 10, 2018. Cravath Swaine and Moore (Gary Bornstein and Yonatan Even).

▪ *In Re: Qualcomm Antitrust Litigation*, Case No. 17-MD-02773-LHK, in United States District Court for the Northern District of California. On behalf of Qualcomm, submitted testimony on November 16, 2018; and testified at deposition on December 14, 2018. Keker, Van Nest & Peters LLP (Eugene Paige and Justina Sessions).

▪ *United States of America and the State of North Carolina vs. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System*, in the Western District of North Carolina, Charlotte Division, Case No. 3:16-cv-00311-RJC-DCK. On behalf of the United States of America, submitted testimony on August 10, 2018. U.S. Department of Justice (Andy Ewalt and Beth Armington).

- *United States of America v. Deere & Company, Precision Planting LLC, and Monsanto Company,* Civil Action No. 1:16-cv-08515, in the United States District Court for the Northern District of Illinois Eastern Division. On behalf of the United States, submitted testimony on December 23, 2016 and January 10, 2017; and testified at deposition on March 2, 2017. U.S. Department of Justice (Norm Familant and Bill Jones).

- *United States of America, et al. v. Hillsdale Community Health Center, et. al.,* Case No. 5:15-cv-12311-JEL-DRG in the United States District Court for the Eastern District of Michigan. On behalf of the United States, submitted testimony on October 27, 2016 and December 5, 2016; and testified at deposition on December 12, 2016. U.S. Department of Justice (Beth Armington and Katrina Rouse).

- *In the Matter of: Statement of Proposed Royalties to be Collected for the Retransmission of Distant Television Signals, In Canada, for the Years 2014 to 2018*, before the Canadian Copyright Board. On behalf of Bell Canada, Cogeco Cable Inc., Rogers Communications Inc, Shaw Communications Inc., Videotron G.P., and Telus Communications Company, submitted testimony on October 2, 2015 and testified at trial on January 25-26, 2016. Fasken Martineau DuMoulin, LLP (Jay Kerr-Wilson).

- Challenges to Australia's Tobacco Plain Packaging Act, on behalf of Australia, in the World Trade Organization. Submitted testimony on March 9, 2015, May 31, 2015, September 14, 2015, October 26, 2015, December 8, 2015, and February 1, 2016. Australian Government Solicitor (Simon Sherwood and Damien O'Donovan).

- *Caroline Behrend et al. v. Comcast Corporation et al.*, Civil Action No. 03-6604 in the United States District Court for the Eastern District of Pennsylvania. On behalf of Comcast Corporation, submitted testimony on April 10, 2009, on May 6, 2009, on May 11, 2009, on August 21, 2009, September 18, 2009, May 22, 2012, and January 15, 2014; testified at deposition on May 22, 2009; and testified at a class recertification hearing on October 26, 2009. Kasowitz Benson Torres & Freidman (Michael Shuster and Sheron Korpus) and Davis Polk (David Toscano and Arthur Burke).

- *American Broadcasting Company Inc., et. al. v. Aereo*, 12 Civ. 1543, in United States District Court in the Southern District of New York. On behalf of Aereo, submitted testimony on December 20, 2013. Fish and Richardson (David Hosp).

- *DISH Network LLC. f/k/a Echostar Satellite LLC v. ESPN, Inc., and ESPN Classic, Inc.*, No. 09 CIV 6875 (JGK) (FM), in United States District Court in the Southern District of New York. On behalf of DISH Network, submitted testimony on July 29, 2011; testified at deposition on November 22, 2011; testified at deposition in January 2013; testified at trial February 2013. Flemming Zulack Williamson Zauderer LLP (Dean Nyciper) and Simpson Thatcher (Barry Ostrager and Mary Kay Vyskocil).

- *Echostar Satellite LLC v. ESPN, Inc., ESPN Classic, Inc., ABC Cable Networks Group, Inc., Soapnet L.L.C., and International Family Entertainment Inc.*, Index 08-600282 in the Supreme Court of the State of New York County of New York. On behalf of Echostar Satellite LLC, testified at deposition on June 23, 2011. Flemming Zulack Williamson Zauderer LLP (Dean Nyciper).

- *Casitas Municipal Water District v. United States*, Case No. 05-168L in the United States Court of Federal Claims. On behalf of the United States, submitted testimony on February

25, 2010 and February 8, 2007, testified at deposition on March 10, 2010, testified at trial on October 28, 2010. U.S. Justice Department (James Gette and Barrett Atwood).

- *Royalties To Be Collected By CSI and SOCAN For the Reproduction and the Communication to the Public by Online Music Services, In Canada, of Musical or Dramaticaomusical Works, for the years 2007 to 2010*, before the Canadian Copyright Board. On behalf of Apple Inc., Bell Canada Enterprises Inc., Rogers Communications Inc., Telus Communications Company, and Videotron Ltd., submitted testimony on April 29, 2010 and on June 9, 2010, and testified at trial on June 28-9, 2010. Goodmans LLP for Apple Inc. (Michael Koch); and Fasken Martineau DuMoulin, LLP for the rest (Jay Kerr-Wilson).

- *United States of America v. Daily Gazette Company and MediaNews Group, Inc.*, Civil Action No. 2:07-0329 in the United States District Court Southern District of West Virginia. On behalf of the United States of America, submitted testimony on September 1, 2009. U.S. Justice Department (John Reed, Mark Merva and Norm Familant).

- *In re. ASARCO LLC, et al.*, Case No. 05-21207 in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division. On behalf of Ready Mix USA, LLC., submitted testimony on August 1, 2008 and testified at deposition on August 7, 2008. Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. (Gary Shockley).

- *SOCAN Tariff No. 16 – Royalties To Be Collected By SOCAN For the Public Performance or the Communication to the Public by Telecommunication, In Canada, of Musical or Dramaticaomusical Works, for the years 2007 to 2009*, before the Canadian Copyright Board. On behalf of a consortium of Canadian background music users, including Bell ExpressVu, Chum Satellite Services, and DMX Canada, submitted testimony on November 30, 2007 and testified at trial in January 2008. Fasken Martineau DuMoulin, LLP (Jay Kerr-Wilson and Aidan O'Neill).

- *In the Matter of Digital Performance Right in Sound Recordings and Ephemeral Recordings for a New Subscription Service*, CRB Proceeding 2005-5, before the U.S. Copyright Board. On behalf of Sirius Satellite Radio and XM Satellite Radio, submitted testimony on October 30, 2006 and July 24, 2007; testified at deposition on May 8, 2007; and testified at trial in June 2007. Wiley Rein, LLP for Sirius (Bruce Joseph) and Weil, Gotshal & Manges for XM (Ralph Miller).

**MERGERS AND ACQUISITIONS AND OTHER GOVERNMENT INVESTIGATIONS**

Dr. Chipty has extensive experience evaluating the competitive effects of proposed transactions and has advised clients at various stages of their deals, including strategic advice in identifying targets, assistance with agency review, and analyses for post-merger contestations. She has employed economic and econometric tools to evaluate issues of market definition, critical loss analysis, direct evidence of unilateral effects, and efficiencies. She has studied the likelihood of temporary or permanent foreclosure, as part of a raising rivals cost strategy. In addition, she has assessed regulatory structures and their associated effect on competition. Examples of Dr. Chipty's work in this area include:

- Submitted Report Studying the State of Competition in the Retail Wireless Marketplace and the Benefits of Additional Competition Among Wireless Service Providers, on behalf of the

Competition Bureau of Canada, to the Canadian Radio-Television and Telecommunications Commission, and testified before the CRTC on February 18, 2020, in CRTC 2019-57: Review of Mobile Wireless Services, November 22, 2019. Competition Bureau of Canada (Laura Sonley and Matthew Boswell).

- Assisted the Government of Australia, before the World Trade Organization Appellate Body, in "Certain Measures Concerning Trademarks, Geographical Indications and other Plain Packaging Requirements Applicable to Tobacco Products and Packaging," WT/ DS441/ DS435, November 18-22, 2019. Steptoe & Johnson (Matthew Yeo).

- Assisted parties in the formation of a joint venture between Nippon Yusen Kabushiki Kaisha Ltd., Mitsui O.S.K. Lines, Ltd., Kawasaki Kisen Kaisha Ltd, before the Department of Justice, 2017. WilmerHale (Hartmut Schneider).

- Assisted parties in the CenturyLink-Level 3 merger, before the Department of Justice and the Federal Communications Commission, 2017. Wachtell, Lipton, Rosen & Katz (Ilene Gotts), Jones Day (Bruce McDonald), and Covington & Burling (Yaron Dori).

- Assisted parties in the Charter-Time Warner Cable merger, before the Department of Justice and the Federal Communications Commission, 2015-2016. Wachtell, Lipton, Rosen & Katz (Ilene Gotts) and Jenner Block (John Flynn).

- Submitted white paper evaluating the impact of tobacco plain packaging on smoking prevalence in Australia, to the Australian Parliament on behalf of the Government of Australia, in Australia's post implementation review of tobacco plain packaging legislation, 2016. Australian Government Solicitor (Simon Sherwood and Simon Daley).

- Expert for the U.S. Department of Justice in its review of the One Main-Spring Leaf merger, 2015. U.S. Department of Justice (Stephanie Fleming and Nicholas Hill).

- Coauthored a white paper, on behalf of Aeromexico, evaluating the competitive effects of airport slot allocation governing air traffic to and from Mexico City Airport, submitted to Mexico's competition authority, 2015, (joint with Professor Robert Pindyck).

- Expert for Olin Corporation in its acquisition of Dow Chemical's cholor-alkali business unit, before the Federal Trade Commission, 2014-2015. Baker Botts (William Henry and Thomas Dillickrath).

- Expert for the Mergers Bureau of Canada in its review of Post Media's acquisition of Sun Media. Canadian Mergers Bureau (Steve Sansom and Nicholas Janota).

- Assisted the U.S. Department of Justice in its challenge of American Express's use of merchant restraints, 2014-2015. U.S. Department of Justice (Craig Conrath and John Read).

- Advised the Massachusetts Health Policy Commission on the likely competitive impact of Partners HealthCare System's proposed acquisition of Hallmark Health System, including submitting a written statement in the HPC's Cost and Market Impact Review of the transaction, 2014. Health Policy Commission (Karen Tseng and Kate Scarborough).

- Advised the Massachusetts Health Policy Commission on the likely competitive impact of Partners HealthCare System's proposed acquisition of South Shore Hospital, including submitting a written statement in the HPC's Cost and Market Impact Review of the transaction, 2013-2014. Health Policy Commission (Karen Tseng and Kate Scarborough).

- Assisted Saint Alphonsus Medical Center to evaluate the competitive effects of St. Luke's Health System's acquisition of Saltzer Medical Group, in Nampa, Idaho, 2012-2013. Honigman, Miller, Schwartz and Cohn (David Ettinger).

- Assisted Arris Group in its acquisition of Motorola Home business unit from Google, before the Department of Justice, 2013. Hogan Lovells (Logan Breed) and Troutman Sanders (Daniel Anziska).

- Coauthored a white paper, on behalf of Televisa, evaluating the competitive impact in the mobile telephone marketplace of Televisa's proposed acquisition of 50% of GSF Telecom Holdings, S.A.P.I. de C.V., which owns 100% of Grupo Iusacell, S.A. de C.V. (joint with Almudena Arcelus and David Sosa). Submitted to Mexico's competition authority, Federal Commission of Economic Competition, 2012.

- Conducted analyses and presented before staff of the FTC, in an investigation of two joint venture partners involving allegations of potentially anticompetitive conduct, 2011-2012. Baker Botts (Thomas Dillickrath and William Henry).

- Authored a white paper analyzing the likely effects of Steward Healthcare's acquisition of Morton Hospital, in the greater Boston area, submitted to the State Attorney General's office, June 14, 2011. Edwards Angell Palmer & Dodge (Patricia Sullivan).

- Evaluated the likely effects of the Southwest Airlines-Airtran merger, on behalf of the United States, Winter 2011. U.S. Justice Department (Michael Billiel and Oliver Richard).

- Coauthored a white paper, on behalf of Time Warner Cable, analyzing brinkmanship tactics and broadcast retransmission consent rules established by the 1992 Cable Act, submitted to the Federal Communications Commission (joint with Prof. Steven Salop, Dr. Martino DeStefano, Dr. Serge Moresi, and Dr. John Woodbury), June 3, 2010.

- Authored Federal Communication Commission Media Study #5, on behalf of the Commission, as part of it periodic review of the media ownership rules, analyzing the effects of ownership structure in broadcast radio, on program variety and advertiser and listener welfare, released June 2007.

- Coauthored a white paper analyzing bidding behavior and the potential competitive effects of the merger of Alcatel and Lucent, submitted to the Department of Justice (joint with Drs. Andrew Dick and Stanley Besen), April 28, 2006. Skadden, Arps, Slate Meagher & Flom LLP (James Keyte and Neal Stoll).

- Conducted and presented analysis before the Federal Trade Commission on behalf of Barr Pharmaceuticals regarding its acquisition of a hormone contraceptive product (joint with Prof. Steven Salop), Fall 2005. Kirkland & Ellis LLP (Mark Kovner).

- Conducted an analysis of efficiencies on behalf of Time Warner and Comcast, in their joint bid for Adelphia Communications (joint with Dr. Stanley Besen). Paul Weiss Rifkind Wharton & Garrison, LLP (Joseph Simons).

- Assisted NorthShore University HealthSystem (formerly Evanston Northwestern Health Corporation) with the Federal Trade Commission's post-merger investigation of the 2000 merger of Evanston Hospital and Highland Park Hospital. Winston & Strawn LLP (Michael Sibarium).

## OTHER CONSULTING EXPERIENCE, BY TOPICAL AREA

Dr. Chipty has also provided consultation to litigation clients on matters some of which eventually settled, and she has provided business guidance to clients for strategic planning. Examples of Dr. Chipty's work in this area include:

### Tobacco

- Assisted the Department of Justice, in *United States v. Philip Morris et al.*, Civil Action No. 99- 2486, a RICO case against the major tobacco manufacturers and associations involving allegations of conspiracy to suppress information and to suppress innovation. U.S. Department of Justice (Steve Brody, Renee Brooker, and James Gette).

- Assisted Appalachian Oil Company, in *R.J. Reynolds Tobacco Company v. Market Basket Food Stores, Inc., et al.*, Civil Action No. 5:05-CV-253. Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. (Gary Shockley).

- Assisted Star Scientific, in *Star Scientific, Inc. v. R.J. Reynolds Tobacco Company*, Case No. AW 01-CV-1504 and AW 02-CV-2504. Crowell and Moring (Richard MacMillan and Kathryn Kirmayer).

### Pharmaceutical and Health Care

- Advised the working groups of the Advanced Market Commitment ("AMC"), an initiative of the Gates Foundation to pilot the first AMC for the pneumococcus vaccine. The goal of this AMC is to provide appropriate market-based incentives to induce capacity investments by the major pharmaceutical companies for manufacturing sufficient vaccines for low-income countries.

- Assisted a pharmaceutical manufacturer against Medicaid reimbursement, fraud, and unfair trade practices claims brought by numerous State Attorneys General. O'Melveny & Meyers LLP (Steve Brody and Brian Anderson) and Baker Botts LLP (Richard Josephson).

- Advised Regional Urology, in *Willis-Knighton Health System and Health Plus of Louisiana, Inc. v. Regional Urology LLC, et al.*, Civil No. CV02-1094-S. Breazeale Sachse & Wilson, LLP (Claude Reynaud).

### Media and Sports

- Assisted the YES Television Network in evaluating the value to the network of carriage rights for certain New Jersey Nets games, for contract renegotiation and possible arbitration. Boies Schiller & Flexner, LLP (Robert Dwyer).

- Assisted the Monte Carlo Tennis Tournament, in a dispute with the ATP Tour, alleging abuse of market power. Sidley Austin LLP (Alan Unger).

- Assisted a team of the National Football League, in a dispute with a cable operator, alleging vertical foreclosure. Boies Schiller & Flexner, LLP (Robert Dwyer).

- Assisted Major League Baseball in *Major League Baseball Properties, Inc. v. Salvino*, involving a challenge to the league's use of centralized trademark licensing. Foley & Lardner LLP (Jim Mckeown).

- Advised HBO on reasonable fees for music performance rights in their negotiation with BMI. Cravath, Swaine & Moore LLP (Kenneth Lee).
- Advised XM Satellite Radio on reasonable fees for music performance rights for business negotiations. Shaw Pittman LLP (Cynthia Greer).

## ECONOMETRICS AND STATISTICS

Dr. Chipty is an expert in the area of statistics and econometrics and has been successful at using econometric arguments both to construct affirmative arguments in litigation as well as to evaluate the use of econometrics by opposing experts. Many of the projects described above used econometric analysis. Other examples of Dr. Chipty's work in this area are described below:

- Submitted a white paper to the European Commission, DG Competition Bureau, on behalf of the European Liner Affairs Association, analyzing the impact of shipping conferences on carriers' ability to collude on prices (joint with Professor Fiona Scott Morton and Mr. Nils Von Hinten-Reed).
- Developed analyses and drafted a report on behalf of defendants in the *In Re: Monosodium Glutamate Litigation* in support of a defendants' motion to dismiss plaintiff's expert testimony based upon improper use of econometrics. Dorsey & Whitney LLP (Michael Lindsay) and Haynes & Boone LLP (Ronald Breaux).
- Used advanced statistical techniques along with a large volume of administrative data, on behalf of United Parcel Service, to evaluate the Postal Service's expert testimony on variable costs. Piper & Marbury LLP (John McKeever).
- Evaluated and criticized the econometric testimony of a defendants' expert, on behalf of a generic pharmaceuticals firm alleging vertical foreclosure and unlawful delay of entry. Solomon Zauderer (Colin Underwood).

## TRISTATE RESEARCH PARTNERSHIP

Dr. Chipty was a member of the research team from 1997-1999 in this Department of Health and Human Resources funded collaboration that included the states of Massachusetts, Alabama, and Florida. Dr. Chipty worked with state governments to design research experiments, develop econometric models, and process large administrative databases, in an effort to understand the structure, administration, and impact of minimum standards regulations.

- "The Black-White Wage Gap in the Deep South: Location, Location, Location?" (with Ann Dryden Witte), Working Paper 98-03, Tri-State Child Care Research Partnership, Miami, FL.
- "Employment Patterns of Workers Receiving Subsidized Child Care: A Study of Eight Counties in Alabama," (with Ann Dryden Witte), Available from Margie Curry, Executive Director, Childcare Resources, 1904 First Ave. North, Birmingham, AL 35203-4006.
- "Parents Receiving Subsidized Child Care: A Study of Alabama's Labor Force," (with Ann Dryden Witte), Working Paper 98-01, Tri-State Child Care Research Partnership, Miami, FL.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     A-8

- "Employment of Parents Receiving Subsidized Child Care in Dade County, Florida," (with Harriet Griesinger and Ann Dryden Witte), Working Paper 98-03, Department of Economics, Wellesley College, Wellesley MA 02481.

## PAPERS AND PRESENTATIONS

### Published Articles

"US: Economics" (with Michael Chapman), *Global Competition Review*, *The Antitrust Review of the Americas 2016*, available at: http://globalcompetitionreview.com/reviews/74/sections/275/chapters/2983/us-economics/.

"Economists' Perspective on the Efficiency Defense in Provider Consolidations:  What Works, What Doesn't Work, and What We Still Don't Know" (with Asta Sendonaris), American Health Lawyer's Association *Connections Magazine*, September 2015.

"Competitor Collaborations in Health Care: Understanding the Proposed ACO Antitrust Review Process," *CPI Antitrust Chronicle*, May 2011 (1).

"Vertical Integration, Market Foreclosure, and Consumer Welfare in the Cable Television Industry," *American Economic Review*, Vol. 91, No. 3, June 2001, pp. 428-453.

"The Role of Buyer Size in Bilateral Bargaining: A Study of the Cable Television Industry" (with Christopher Snyder), *Review of Economics and Statistics*, May 1999, 81(2): 326-340.

"Economic Effects of Quality Regulations in the Daycare Industry," *American Economic Review*, Vol. 85, No. 2, May 1995, pp. 419-424.

"Horizontal Integration for Bargaining Power: Evidence from the Cable Television Industry," *Journal of Economics and Management Strategy*, Vol. 4, No. 2, Summer 1995, pp. 375-397.

"A Marginal Cost Transfer Pricing Methodology," *Tax Notes*, Nov. 26, 1990 (with Ann Dryden Witte, Wellesley College and NBER).

### Chapters in Books

"Hospital-Physician Integration: The St. Luke's Case" (with Deborah Haas-Wilson), in *The Antitrust Revolution, 7th Edition* (Oxford University Press), edited by John Kwoka and Lawrence White.

### Books Edited

*Proving Antitrust Damages*, 3rd Edition, (American Bar Association, 2017).

### Book Reviews

*The Antitrust Source*, October 2007, Book Review of Michael D. Whinston, *Lectures on Antitrust Economics* (Cambridge, MIT Press, 2006).

*The Journal of Economic Literature*, June 1992, Vol. XXX, No. 2, Book Review of Frank Cowell, *Cheating the Government* (with Ann Dryden Witte, Wellesley College and NBER) (Cambridge, MIT Press, 1990).

## Working Papers

"In a Race Against the Clock:  Auctioneer Strategies and Selling Mechanisms in Live Outcry Auctions," 2014 (with Lucia Dunn and Stephen Cosslett, the Ohio State University).

 "Efficient Estimation Via Moment Restrictions," (with Whitney K. Newey).

"Antidumping and Countervailing Orders: A Study of the Market for Corrosion-Resistant Steel," (with Brian L. Palmer).

"Firms' Responses to Minimum Standards Regulations: An Empirical Investigation" (with Ann Dryden Witte), NBER Working Paper # 6104.

"Effects of Information Provision in a Vertically Differentiated Market" (with Ann Dryden Witte), NBER Working Paper # 6493.

"Unintended Consequences? Welfare Reform and the Working Poor" (with Ann Dryden Witte, Magaly Queralt, and Harriet Griesinger), NBER Working Paper # 6798.

## Select Invited Presentations and Interviews

Georgetown on the Hill, "New Debates and New Tensions in Antitrust: What's Different About Platforms?" March 2, 2020.

ABA Teleseminar: "The Role of Intent in Monopolization, Merger and Other Civil Cases," February 28, 2020.

ABA Teleseminar: "Are You Ready for Some Football (and Antitrust)?! What Does the NFL Sunday Ticket Litigation Bode for Sports Collaborations?" December 9, 2019.

ABA Teleseminar: "Nuts & Bolts Program: Market Definition," June 27, 2019.

FTC Hearings #3: Competition and Consumer Protection in the 21st Century, October 2018.

Interview with the Antitrust Practice Group, *AHLA Antitrust Spotlight Series*, March 2018.

ABA Webinar: "Market Definition in section 2 and section 7: The same but not the same? Questions of fact or law?" November 2017.

International Congress of Addictology Albatros, "Economics of Tobacco Plain Packaging: Australian Legislation," May 2017.

Federal Communication Commission's Event on Challenges Facing Independent Programmers, April 2016, available at: https://www.youtube.com/watch?v=8yxC_3M4IWA.

Federal Communication's Panel on Challenges Facing Multichannel Video Programming Distributors, March 2016, available at: https://www.youtube.com/watch?v=03CMDtdpRDQ.

ABA Webinar: "Sports Leagues Claims After 5 Years After American Needle," 2015.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA   A-10

NYSBA Antitrust Class Action Program: "Comcast v. Behrend:  Interpretation and Application of *Comcast* to Damages Issues in Class Certification," 2015.

AHLA Annual Meetings: "Antitrust and Provider Mergers and Affiliations: Competition vs. More Affordable Care?" 2015.

AHLA Webinar: "Antitrust Implications and Lessons Learned from the Ninth Circuit Decision in *St. Luke's*," 2015.

ABA Webinar: "St. Lukes: State and Federal Enforcement in Non-Reportable Program," 2015.

NYC Bar Antitrust and Healthcare Program, 2015.

NYSBA Antitrust Law Section Annual Meetings: "Efficiencies:  The Cheshire Cat of Merger Analysis," 2014.

NYC Bar Antitrust & Trade Regulation Committee: "Approaches to Antitrust Damages," 2014.

**PROFESSIONAL SERVICE**

Defendant's expert at the ABA Mock Trial involving the issue exclusivity, in the form of theaters' use of clearances, 2017.
Vice Chair of the Antitrust Practice Group of the American Health Lawyers Association, 2014-
2016.
Advisory board of the Pricing Conduct Committee, 2011-2012.
Editorial comments on a chapter of the ABA's *Price Discrimination Handbook*, 2011.
Plaintiffs' expert at the ABA Mock Trial involving the issue of resale price maintenance, 2008.
Editorial comments on a chapter of the ABA's book on *Market Definition*, 2008.
Contribution to the ABA's *Econometrics Legal, Practical, and Technical Issues*, 2005.

**MEMBERSHIPS**

American Health Lawyers Association
American Bar Association
American Economic Association

**HONORS**

National Science Foundation Fellowship, 1989-1992
Phi Beta Kappa, 1988

## Appendix B: Materials Considered

All materials cited in this report, all materials listed in Appendix B of Chipty SJ Declaration, Chipty Class Declaration, Chipty Reply Declaration, Chipty Merits Report, Chipty Merits Rebuttal Report, Appendix A of Chipty Supplemental Report, Appendix C of Chipty Supplemental Declaration, and the following:

### I.   Expert Reports and Declarations

- Rebuttal Declaration of Patrick Travis and Backup Production, January 31, 2020.

- Supplemental Declaration of Dr. Robert D. Willig and Backup Production, January 31, 2020.

### II.   Depositions and Associated Exhibits

- Deposition of Patrick Travis, *Djeneba Sidibe, et al. v. Sutter Health,* Case No. 3:12-cv-4854-LB, February 27, 2020.

- Deposition of Robert D. Willig, Ph.D., *Djeneba Sidibe, et al. v. Sutter Health,* Case No. 3:12-cv-4854-LB, February 25, 2020.

- Deposition of Tasneem Chipty, Ph.D., *Djeneba Sidibe, et al. v. Sutter Health,* Case No. 3:12-cv-4854-LB, January 15, 2020.

- Deposition of Tina Feeney, *Djeneba Sidibe, et al. v. Sutter Health,* Case No. 3:12-cv-4854-LB, August 24, 2018.

- Deposition of Susan MacAusland, *Djeneba Sidibe, et al. v. Sutter Health,* Case No. 3:12-cv-4854-LB, August 22, 2018.

- Deposition of Susan Hansen, *Djeneba Sidibe, et al. v. Sutter Health,* Case No. 3:12-cv-4854-LB, August 21, 2018.

- Deposition of David Herman, *Djeneba Sidibe, et al. v. Sutter Health,* Case No. 3:12-cv-4854-LB, August 17, 2018.

- Deposition of Jerry Louis Jankowski, *Djeneba Sidibe, et al. v. Sutter Health,* Case No. 3:12-cv-4854-LB, March 9, 2018.

- Deposition of Djeneba Sidibe, *Djeneba Sidibe, et al. v. Sutter Health,* Case No. 3:12-cv-4854-LB, December 7, 2017.

### III.    Produced Documents

- SIDIBE00000087

### IV.    Data Sources and Documentation

- California Department of Managed Health Care, "Health Plan Financial Summary Report," available at https://www.dmhc.ca.gov/DataResearch/FinancialSummaryData.aspx.

- California Department of Managed Health Care, "Unified Rate Review Template filings," available at http://wpso.dmhc.ca.gov/premiumratereview/searchratefilings.

### V.    Articles and Books

- Abraham, Jean Marie, Drake Coleman, Jeffrey McCullough, and Kosali Simon, "What drives insurer participation and premiums in the Federally-Facilitated Marketplace?" *International Journal of Health Economics and Management*, Vol. 17, 2017.

- Callaghan, Sandra Renfro, Elizabeth Plummer, and William F. Wempe, "Health Insurer's Claims and Premiums Under the Affordable Care Act: Evidence on the Effects of Bright Line Regulations," *Journal of Risk and Insurance*, Vol, 87, No. 1, 2019.

- Cooper, Zack, Stuart V. Craig, Martin Gaynor, and John Van Reenen, "The Price Ain't Right? Hospital Prices and Health Spending on the Privately Insured," *The Quarterly Journal of Economics*, Vol. 134, No. 1, 2019.

- Finocchio, Len and Katrina Connolly, "Medical Loss Ratios for California's Dental Insurance Plans: Assessing Consumer Value and Policy Solutions," *Health Affairs*, Vol. 37, No. 9, 2018.

- Gelman, Andrew and John Carlin, "Beyond Power Calculations: Assessing Type S (Sign) and Type M (Magnitude) Errors," *Perspectives on Psychological Science*, Vol. 9, No. 6, 2014.

- Ho, Kate and Ariel Pakes, "Hospital Choices, Hospital Prices, and Financial Incentives to Physicians," *American Economic Review*, Vol. 104, No. 12, 2014.

- Stock, James and Mark Watson, *Introduction to Econometrics*, 2nd Edition, New York, NY: Pearson, 2007.

**VI.    Other Materials Considered**

- 45 Code of Federal Regulations, § 158.120(b).

- Declaration of Steven Nyugh, Senior Vice President of Operations at Choice Administrators Insurance Services, *Djeneba Sidibe, et al., v. Sutter Health*, 3:12-CV-4854-LB, October 15, 2018.

- https://www.chcf.org/wp-content/uploads/2017/12/PDF-MakingSenseManagedCareRegulation.pdf

- https://www.cigna.com/assets/docs/about-cigna/informed-on-reform/health-insurance-industry-fact-sheet.pdf

- https://www.claconnect.com/-/media/files/white-papers/whitepapermedicallossratiorebates.pdf

- https://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/2016-MLRForm-Instructions.pdf

- https://www.cms.gov/files/document/highlights.pdf

- https://www.healthaffairs.org/do/10.1377/hblog20170118.058360/full/

- https://www.healthcostinstitute.org/images/easyblog_articles/276/HCCI-2017-Health-Care-Cost-and-Utilization-Report-02.12.19.pdf

- https://www.justice.gov/opa/pr/atrium-health-agrees-settle-antitrust-lawsuit-and-eliminate-anticompetitive-steering

- https://www.kff.org/report-section/ehbs-2019-section-10-plan-funding/

- https://www.mass.gov/doc/partners-memo-of-decision-and-order/download

- https://www.urban.org/sites/default/files/publication/81866/2000840-sales-of-insurance-across-state-lines.pdf

**Appendix C: Quantitative Analysis of Levels of Capitation**

**Exhibit C1: Differing Levels of Capitation, by Health Plan
Small Group Line of Business, 2012-2016**



*Note*: "Facilities Costs" includes medical costs incurred by health plans for patient care at hospitals for inpatient and outpatient services.

*Source*: DMHC Unified Rate Review Template small group line of business filings, 2012-2016.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA



**Exhibit C2: Differing Levels of Capitation, by Health Plan Individual Line of Business, 2017**

*Notes*:

1. Aetna and United did not report URRT filings to the DMHC for the individual line of business.

2. "Facilities Costs" includes medical costs incurred by health plans for patient care at hospitals for inpatient and outpatient services.

*Source*: DMHC Unified Rate Review Template individual line of business filings, 2017.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit C3: Capitation in the Small Group Line of Business, 2012-2016
Health Net, Aetna, and United Relative to Anthem and Blue Shield**



*Notes*:

1. "Facilities Costs" includes medical costs incurred by health plans for patient care at hospitals for inpatient and outpatient services.

2. The "Facilities Costs" bars equal one minus the ratio of: (a) the Health Net, Aetna, and United facilities cost percent reported in Exhibit C1; to (b) the average of the Anthem and Blue Shield facilities cost percent reported in Exhibit C1 (48 percent).

3. The "Capitation" line equals the ratio of: (a) the Health Net, Aetna, and United capitation percent reported in Exhibit C1; to (b) the average of Anthem's and Blue Shield's capitation percent reported in Exhibit C1 (eight percent).

*Source*: DMHC Unified Rate Review Template small group line of business filings, 2012-2016.

**Appendix D: Examples of Documents that**
**Show Premiums Payments Made by Named Plaintiffs**

1.   **Djeneba Sidibe:** Ms. Sidibe produced earning statements like the one shown in Exhibit D1. As seen here, the earning statement shows that she paid $25.38 from January 9, 2013 to January 23, 2013 towards health insurance ("Medical"). Exhibit D2 shows a companion document from Ms. Sidibe's employer, which describes her benefit package. This document shows her employer-employee split during this period to be 90 percent and 10 percent, respectively.

### Exhibit D1: Earnings Statement for Djeneba Sidibe



*Source*: SIDIBE00000087.

**Exhibit D2: Benefit Packet for Djeneba Sidibe,**
**Explaining the Employer-Employee Split**

## Your Benefits

BENEFIT PLAN HIGHLIGHTS 3/1/12 – 2/28/13

### Contributions

TechSoup Global pays the full cost of your life, AD&D, and LTD coverage. You share in the cost of your health care coverages. You pay for health coverage on a pretax basis. Since your health care contributions are subtracted from your gross pay before federal, state, and Social Security taxes are withheld, you pay less in taxes. Because this tax advantage reduces your reported taxable wages, your Social Security benefits could be slightly reduced when you become eligible to receive them. Should you wish not to have your contributions deducted pre-tax, please contact the Payroll Department for further information.

Domestic partner contributions are regulated by the IRS. Contributions you make for domestic partner coverage must be made on a post-tax basis. Similarly, TechSoup Global's contribution towards the cost of benefits for your domestic partner and his or her dependents is taxable income to you. If your domestic partnership is registered with the Secretary of the State of California, your imputed income will be exempt from California state tax. Contact your tax advisor for more detailed information on how the tax treatment may affect you.

| Coverage Level | Employee Monthly Contribution | Employee Per Paycheck Contribution | TechSoup Global Monthly Contribution | Total Monthly Cost |
|---|---|---|---|---|
| **Kaiser HMO** | | | | |
| Employee Only | $53.34 | $26.67 | $480.08 | $533.42 |
| Employee + Spouse | $277.38 | $138.69 | $896.14 | $1173.52 |
| Employee + Child(ren) | $202.70 | $101.35 | $757.46 | $960.16 |
| Employee + Family | $445.41 | $222.71 | $1208.19 | $1653.6 |
| **Aetna HMO** | | | | |
| Employee Only | $50.75 | $25.38 | $456.74 | $507.49 |
| Employee + Spouse | $263.92 | $131.96 | $852.62 | $1116.54 |
| Employee + Child(ren) | $192.85 | $96.43 | $720.64 | $913.49 |
| Employee + Family | $423.78 | $211.89 | $1149.51 | $1573.29 |
| **Aetna PPO (CA & Non-CA)** | | | | |
| Employee Only | $74.00 | $37.00 | $665.96 | $739.96 |
| Employee + Spouse | $384.81 | $192.41 | $1243.19 | $1628.00 |
| Employee + Child(ren) | $281.19 | $140.60 | $1050.75 | $1331.94 |
| Employee + Family | $617.90 | $308.95 | $1676.07 | $2293.97 |
| **MetLife Dental** | | | | |
| Employee Only | $4.59 | $2.30 | $41.33 | $45.92 |
| Employee + Spouse | $19.02 | $9.51 | $68.11 | $87.13 |
| Employee + Child(ren) | $20.02 | $10.01 | $69.97 | $89.99 |
| Employee + Family | $38.48 | $19.24 | $104.26 | $142.74 |
| **Blue Shield Vision** | | | | |
| Employee Only | $0.81 | $0.41 | $7.29 | $8.10 |
| Employee + 1 | $3.61 | $1.81 | $12.49 | $16.10 |
| Employee + Family | $5.26 | $2.63 | $15.54 | $20.80 |

*Source*: TechSoup_00081.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

2.    <u>Jerry Jankowski:</u> Mr. Jankowski produced earning statements like the one shown in Exhibit D3. As seen here, the earning statement shows that he paid $22.15 for his pay period ending August 10, 2014 towards medical, dental, and vision insurance ("M - MEDICAL"). Consistent with what Mr. Jankowski said at his deposition (that he would have to go back and do the "math" to figure out what was medical and what was dental/vision), it is possible to use this information to figure out the necessary details.[1] Exhibit D4 shows a companion document, which describes Mr. Jankowski's benefit package. This document shows his employer-employee split for medical insurance during this period was 97 percent and three percent, respectively.

### Exhibit D3: Earnings Statement for Jerry Jankowski



*Source*: JANKOW00000707.

---

[1] Deposition of Jerry Jankowski, March 9, 2018, pp. 207-209 (explaining that he: (a) was paid every *two weeks*; (b) paid $20 *per month* for his medical plan, Blue Shield Medical HMO; and (c) the $22.15 deduction on his earning statement covered his medical plan and his "vision or dental or combination"). Mr. Jankowski's benefit packet lists a *monthly* employee contribution of: (a) $20 for his medical plan; (b) $24.30 for the "Principal Dental High Plan A;" and (c) $0 for the "EyeMed Vision" plan. (*See* Exhibit D4.) The $22.15 deduction from Mr. Jankowski's earning statement equals ($20 + $24.30 + $0) / 2.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    D-3

**Exhibit D4: Benefit Packet for Jerry Jankowski,
Explaining the Employer-Employee Split**

| OVER $75K | CONTRIBUTIONS FOR BENEFIT PERIOD JULY 1, 2014 - JUNE 30, 2015 | | |
| --- | --- | --- | --- |
| | SFHP Contribution | Employee Monthly Contribution >=$75k | Total Premium Cost |
| **Blue Shield Medical PPO** | | | |
| Employee | $740.74 | $82.30 | $823.04 |
| Employee + Spouse | $1,530.85 | $279.83 | $1,810.68 |
| Employee + Child(ren) | $1,267.47 | $213.99 | $1,481.46 |
| Family | $2,123.44 | $427.98 | $2,551.42 |
| **Blue Shield Medical HMO** | | | |
| Employee | $706.66 | $20.00 | $726.66 |
| Employee + Spouse | $1,404.26 | $194.40 | $1,598.66 |
| Employee + Child(ren) | $1,171.76 | $136.27 | $1,308.03 |
| Family | $1,927.49 | $325.21 | $2,252.70 |
| **Kaiser Medical HMO** | | | |
| Employee | $562.45 | $0.00 | $562.45 |
| Employee + Spouse | $1,102.39 | $134.99 | $1,237.38 |
| Employee + Child(ren) | $1,012.41 | $112.49 | $1,124.90 |
| Family | $1,430.00 | $257.34 | $1,687.34 |
| **Principal Dental Low Plan B** | | | |
| Employee | $48.66 | $12.17 | $60.83 |
| Employee + Spouse | $97.25 | $24.32 | $121.57 |
| Employee + Child(ren) | $99.82 | $24.96 | $124.78 |
| Family | $153.52 | $38.38 | $191.90 |
| **Principal Dental High Plan A** | | | |
| Employee | $48.65 | $24.30 | $72.95 |
| Employee + Spouse | $97.25 | $48.30 | $145.55 |
| Employee + Child(ren) | $99.78 | $63.66 | $163.44 |
| Family | $153.52 | $91.59 | $245.11 |
| **EyeMed Vision** | | | |
| Employee | $6.57 | $0.00 | $6.57 |
| Employee + Spouse | $9.98 | $2.50 | $12.48 |
| Employee + Child(ren) | $10.51 | $2.63 | $13.14 |
| Family | $15.45 | $3.86 | $19.31 |

*Source*:LCKPS_0001308.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     D-4

3.   **Susan Hansen:** Ms. Hansen produced statements of earnings and deductions like the one shown in Exhibit D5. As seen here, the earnings and deductions statement shows that during the period April 12, 2014 through April 25, 2014, Ms. Hansen paid $1.83 for health insurance from Blue Shield ("BLUESHIELD") and her employer paid $268.91. Thus, Ms. Hansen's employer-employee split during this period was 99 percent and one percent, respectively.

**Exhibit D5: Statement of Earnings and Deductions, for Susan Hansen**



Source: HANSEN00000124.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     D-5

4.    **David Herman:** Mr. Herman produced statements of earnings and deductions like the one shown in Exhibit D6. As seen here, the earnings and deductions statement shows that he paid $42.73 for medical insurance ("HEALTH PLAN") during the period with payment date August 31, 2011.[2] Exhibit D7 shows a companion document from Mr. Herman's former employer, which describes his retirement benefit package.[3] This document shows his employer-employee split during this period to be about 97 percent and 3 percent, respectively.

**Exhibit D6: Statement of Earnings and Deductions, for David Herman**



*Source*: HERMAN00000105.

---

[2] Deposition of David Herman, August 17, 2018, pp. 81-84 (explaining that he was paid monthly and the $42.73 covered his share of the medical premium and would not have included medical or dental coverage).
[3] Deposition of David Herman, August 17, 2018, pp. 162-165.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit D7: Benefit Packet for David Herman,**
**Explaining the Employer-Employee Split**

Retired Employees Plan Year 2011–2012

# Rates: Retiree Not Eligible for Medicare

**MONTHLY CONTRIBUTIONS EFFECTIVE JULY 1, 2011 - JUNE 30, 2012**

| MEDICAL | BLUE SHIELD HMO | | KAISER HMO | | CITY HEALTH PLAN PPO | |
|---|---|---|---|---|---|---|
| | City Pays | Retiree Pays | City Pays | Retiree Pays | City Pays | Retiree Pays |
| Retiree Only | 1,265.71 | 42.73 | 1,014.23 | 0.64 | 984.26 | 303.46 |
| Retiree + 1 Dependent with no Medicare | 1,559.92 | 336.93 | 1,266.33 | 252.74 | 1,606.56 | 925.75 |
| Retiree + 2 or More Dependents with no Medicare | 1,559.92 | 825.29 | 1,266.33 | 671.23 | 1,606.56 | 1,802.84 |
| Retiree + 1 Dependent with Medicare Part A Only | 1,559.92 | 336.93 | 1,266.33 | 252.74 | 1,525.54 | 844.73 |
| Retiree + 1 Dependent with Medicare Part B Only | 1,559.92 | 336.93 | 1,266.33 | 252.74 | 1,240.99 | 560.18 |
| Retiree + 1 Dependent with Medicare Part A and Part B | 1,454.61 | 231.62 | 1,191.29 | 177.69 | 1,158.15 | 477.34 |
| Retiree + 1 Dependent with Medicare Part A Only + 1 or more Dependents | 1,559.92 | 825.29 | 1,266.33 | 671.23 | 1,525.54 | 1,721.82 |
| Retiree + 1 Dependent with Medicare Part B Only + 1 or more Dependents | 1,559.92 | 825.29 | 1,266.33 | 671.23 | 1,240.99 | 1,437.27 |
| Retiree + 1 Dependent with Medicare Part A and B + 1 or more Dependents | 1,454.61 | 719.98 | 1,191.29 | 596.18 | 1,158.15 | 1,354.43 |

| DENTAL | DELTA DENTAL | | PACIFIC UNION DENTAL | | DELTACARE USA | |
|---|---|---|---|---|---|---|
| | City Pays | Retiree Pays | City Pays | Retiree Pays | City Pays | Retiree Pays |
| Retiree Only | 0 | 39.87 | 0 | 16.47 | 0 | 31.70 |
| Retiree + 1 Dependent | 0 | 79.80 | 0 | 27.20 | 0 | 52.31 |
| Retiree + 2 or More Dependents | 0 | 120.54 | 0 | 40.22 | 0 | 77.37 |

*Source*: Sidibe_CCSF 0003974.

5.    **Optimum Graphics, Inc.:** Optimum Graphics produced records of premium payments like the one shown in Exhibit D8. Susan MacAusland, co-owner of Optimum Graphics, testified that her company paid its employees' premiums in their entirety, so the employer-employee split for Optimum Graphics was 100 percent and 0 percent, respectively.[4]

**Exhibit D8: Premium Payments by Optimum Graphics, Inc.**

| | | | | | |
|---|---|---|---|---|---|
| 2016-07-02 | Check | 15665 | ANTHEM BLUE CROSS - DARIN | Health Insurance | 467.00 |
| 2016-08-02 | Check | 15668 | ANTHEM BLUE CROSS - DARIN | Health Insurance | 467.00 |
| 2016-09-02 | Check | 015921 | ANTHEM BLUE CROSS - DARIN | Health Insurance | 467.00 |
| 2016-10-02 | Check | 015941 | ANTHEM BLUE CROSS - DARIN | Health Insurance | 467.00 |
| 2016-11-02 | Check | 015943 | ANTHEM BLUE CROSS - DARIN | Health Insurance | 467.00 |
| 2016-12-02 | Check | 015945 | ANTHEM BLUE CROSS - DARIN | Health Insurance | 467.00 |
| 2017-01-02 | Check | 015948 | ANTHEM BLUE CROSS - DARIN | Health Insurance | 467.00 |
| 2017-02-02 | Check | auto debit | ANTHEM BLUE CROSS - DARIN | Health Insurance | 467.00 |
| 2017-03-02 | Check | auto debit | ANTHEM BLUE CROSS - DARIN | Health Insurance | 467.00 |
| 2017-04-02 | Check | 161128 | ANTHEM BLUE CROSS - DARIN | Health Insurance | 467.00 |
| 2017-04-05 | Check | 161138 | ANTHEM BLUE CROSS - DARIN | Health Insurance | 467.00 |

*Source*: OPTIMUM00000010.

---

[4] Deposition of Susan MacAusland, Co-Owner of Optimum Graphics, Inc., August 22, 2018, pp. 75-76.

6.      **Johnson Pool & Spa:** Johnson Pool & Spa produced the document shown in Exhibit D9. As seen here, the statement shows the amount paid by the employer and employee for medical insurance, separately for each employee, effective as of December 2015. For example, the third row in the table shows that the employer-employee split for that employee was 78 percent and 22 percent, respectively.

**Exhibit D9: Deposit & Employee Contribution Statement for Johnson Pool & Spa.**



*Source:* JOHNSON00000362.

**Appendix E: Additional Exhibits Showing Dr. Willig's RA-by-RA Pass-Through Esitmates**

**Exhibit E1: Dr. Willig's Figure A1, Showing RA-Level Pass-Through Estimates, Calculated on a Dollars-Basis, with Confidence Intervals, Anthem Individual**



*Note*: Pass-through on a dollars-basis is calculated by multiplying Dr. Willig's percentage-basis pass-through estimates by the average ratio of premium dollars to all medical costs reported in the MLR Data for Anthem's individual line of business for the overlapping years in the Production Data and MLR Data.

*Sources*: Willig Supplemental Declaration, Figure A1 and backup production; and MLR Data.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      E-1



**Exhibit E2: Dr. Willig's Figure A3, Showing RA-Level Pass-Through Estimates,
Calculated on a Dollars-Basis, with Confidence Intervals, Blue Shield Small Group**



*Note*: Pass-through on a dollars-basis is calculated by multiplying Dr. Willig's percentage-basis pass-through estimates by the average ratio of premium dollars to all medical costs reported in the MLR Data for Blue Shield's small group line of business for the overlapping years in the Production Data and MLR Data.

*Sources*: Willig Supplemental Declaration, Figure A3 and backup production; and MLR Data.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Appendix F: Dr. Willig's Table 5 RA-Level Pass-Through Estimates, Calculated on a Dollar-Basis, for Anthem Individual, 2008 and 2016**



*Note*: Pass-through on a dollars-basis is calculated by multiplying Dr. Willig's percentage-basis pass-through estimates by the average ratio of premium dollars to all medical costs reported in the MLR Data for Anthem's individual line of business for the overlapping years in the Production Data and MLR Data.

*Sources*: Willig Supplemental Declaration, Table 5 and backup production; and MLR Data.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      F-1