1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

San Francisco Division

11

DJENEBA SIDIBE, et al.,

12

Plaintiffs,

13

v.

14

SUTTER HEALTH,

15

Defendant.

16

Case No. 12-cv-04854-LB

**ORDER GRANTING SUTTER'S MOTION FOR SUMMARY JUDGMENT FOR 2008 TO 2010 AND FOR THE § 2 CLAIMS AND OTHERWISE DENYING THE MOTION**

Re: ECF Nos. 838 and 838-1

17

## INTRODUCTION

18        In this certified class action, the named plaintiffs — four persons who paid for health insurance

19  and two companies who paid for health insurance for their employees — challenge Sutter Health's

20  allegedly anticompetitive practices as (1) unlawful tying and an unlawful course of conduct in

21  violation of the Sherman Antitrust Act § 1 and California's Cartwright Act, (2) monopolization and

22  attempted monopolization in violation of the Sherman Act § 2, and (3) a violation of California's

23  Unfair Competition Law (UCL). The plaintiffs allege that through its contracts with health plans,

24  Sutter uses its market power for inpatient services in seven Northern California markets (the Tying

25  Markets, where it is the only or dominant hospital) to force health plans in four other geographic

26  markets (the Tied Markets, where it faces competition from other providers) to include (in their

27  networks) Sutter's inpatient services at hospitals in the Tied Markets, resulting in higher prices. The

28  plaintiffs challenge contract terms — such as high rates for out-of-network Sutter services in the Tied

United States District Court
Northern District of California

Markets and the inability to change Sutter's status as a preferred provider without Sutter's permission — as anticompetitive because the terms allegedly prevented health plans from steering their enrollees away from high-cost Sutter hospitals to lower-priced providers. As a result, the plaintiffs allege, health-plan enrollees (including the plaintiffs) pay higher premiums.[1]

Sutter moved for summary judgment. It contends that its contracts with the health plans did not condition the purchase of any service on the purchase of any other service and instead gave discounted rates to the plans for including Sutter's tied hospitals in the plans' networks. That in-network status, it contends, justifies the lower rates because health plans incentivize members to choose in-network hospitals by paying most or all in-network expenses (and few or no out-of-network expenses). Volume discounting, Sutter asserts, is not anticompetitive conduct, and the contract terms protected the benefit of the bargain. Sutter also contends that there is no evidence that it willfully maintained monopoly power in the Tying Markets or that there is a dangerous probability of monopolization in the Tied Markets. Finally, it contends that it is entitled to summary judgment on claims for 2008 to 2010 because the plaintiffs did not show class-wide damages.[2]

Triable issues of material fact preclude summary judgment on the Sherman Act § 1 and the Cartwright Act claims. For one, there are fact disputes about whether Sutter's power in the Tying Market allowed it to force insurers to accept Sutter's higher prices in the Tied Markets. The court grants summary judgment on the Sherman Act § 2 claims because the plaintiffs did not produce evidence showing disputed issues of material fact and on the 2008–2010 claims because the plaintiffs did not show damages.

## STATEMENT

The main issue is whether Sutter forces insurers — through its systemwide contracts with them — to include (in their networks) inpatient services at Sutter hospitals in the Tied Markets as a condition to access to inpatient services at Sutter hospitals in the Tying Markets (where Sutter is the

---

[1] Fourth Am. Compl. (4AC) – ECF No. 204; Orders – ECF Nos. 714, 823 (certifying classes). Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Mot. – ECF No. 838-1 at 10–11.

United States District Court
Northern District of California

only or dominant hospital), resulting in higher prices. (In this motion, Sutter does not dispute that it has power in the Tying Markets for the time periods relevant to the lawsuit.[3])

Before 2002, insurers negotiated with Sutter hospitals individually when they assembled their provider networks.[4] Then, Sutter moved to systemwide contracts, forcing insurers to participate.[5] For example, when one insurer (Anthem) pushed back, Sutter terminated its individual hospital contracts with Anthem. Anthem then folded and entered into a systemwide contract.[6]

The systemwide contracts had allegedly anticompetitive provisions: (1) penalty non-par rates; (2) anti-steering and anti-tiering terms; and (3) secrecy provisions about price and quality.

First, for Sutter hospitals that were out of network, the contracts imposed a rate (called a non-participating provider rate or "non-par rate") that generally was 95% of billed charges.[7] The health plans/insurers in this case objected to the provisions but ultimately acceded to them.[8] The non-par rates were higher than the insurers' customary out-of-network rates.[9] As a result, the health plans could not build narrow networks that excluded Sutter because there were no costs saved in the narrow network (compared to a network that included Sutter hospitals).[10]

---

[3] Opp'n – ECF No. 861-1 at 12–13 (evidence regarding Sutter's market power in the Tying Markets); Reply – ECF No. 877-1 at 7 (challenging only whether there is a tie, not whether there is market power).

[4] Joyner Decl., Ex. P75 to Cantor Decl. – ECF No. 862-3 at 4–5 (¶ 7).

[5] *Id*. at 5 (¶ 8).

[6] Sutter Health Mem. P27 to Cantor Decl. – ECF No. 791-4 at 153; Sutter 1/12/1998 Letter, P25 to *id*. – ECF No. 791-4 at 116–18; Johnson Dep., P35 to *id*. – ECF No. 791-4 at 221–22.

[7] *See, e.g.*, 2015 Blue Shield Systemwide Agreement – ECF No. 887-2 at 13 (§ 2.01.2); Aetna 2016 Systemwide Agreement – ECF No. 887-3 at 12 (§ 2.01.2).

[8] *See, e.g.*, Brendt Dep., P138 to Cantor Decl. – ECF No. 863-6 at 25; Welsh Dep., P120 to *id*. – ECF No. 863-1 at 305.

[9] *See, e.g.*, Barnes Decl., Ex. P74 to Cantor Decl. – ECF No. 862-2 at 6 (¶ 16) (Sutter's rates "are much higher than the 'reasonable and customary' rates or its contracted rates"); Melody Decl., Ex. P71 to *id.* – ECF No. 862-1 at 7 (¶ 18).

[10] *See, e.g.*, Miranda Dep., P141 to *id.* – ECF No. 863-6 at 66–67 ("the practical implication of [the non-par rate] was for Blue Shield is that there were effectively two choices: You either included Sutter in a product, which typically drove the cost of that product up, or you excluded Sutter from that product, which, because of that 95 percent penalty, also drove the cost of that product up"); Joyner Decl., Ex. P75 to *id.* – ECF No. 862-3 at 14 (¶ 40) ("payment of 95% of Sutter's full billed charges erases any possible benefit of excluding some higher-priced Sutter providers from a network"); De La Torre Email, Ex. P148 to *id.* – ECF No. 863-7 at 68–69 ("When members land in the [non-participating] Sutter ER we are exposed to 100% of billed charges . . . the result is that the savings [between narrow and full network] begin to evaporate").

United States District Court
Northern District of California

Second, the plaintiffs challenge contract terms that prevented the insurers from changing Sutter's status in the networks (by, for example, putting Sutter providers into less preferred tiers) without Sutter's consent:

Provider Participation in Company Benefit Programs/Networks. Sutter has negotiated this Agreement, including the rates and terms applicable to Payers, on behalf of an integrated network of Providers and based on the assumption that Payers will treat Providers, individually and collectively, in the same manner that it treats all of their participating providers. In order to assure that Sutter and the Providers continue to obtain the benefit of the agreement that the Parties have negotiated and that the assumptions made by both Parties continue to apply, the Parties agree that Providers shall participate in Payer's programs, Benefit Programs and participating provider networks . . . in accordance with the following provisions:

2.06.1 No Change to Provider Status. During the term of this Agreement, Payer shall not make any changes to any Provider's participating status in Payer's Benefit Programs and Networks without Sutter's prior written consent.

. . .

2.06.3 Equal Treatment. Payer shall treat Provider as an equal member of all of the provider panels for all Benefit Programs and Networks in which that Provider participates and shall make the services of each Provider equally available within the Benefit Programs and Networks covered by this Agreement. In no event shall the Member be financially penalized for accessing any Provider that participates in the Member's Benefit Program and Network.

2.06.4 Tiered Products, Restricted or Limited Networks. Providers have not agreed to participate in any tiered products, plans, benefit designs, Benefit Programs or Networks offered by a Payer that ranks participating Providers, and the rank directly affects the Member's cost share(s), the employer's premium or both or restricts or limits network access . . . . Further, Providers have not agreed to participate in any restricted or limited network or products that would require Members (or those who pay for their coverage) to pay more for the same (or substantially similar) product or benefit design to access all Sutter Providers compared to a network that did not include all Providers. If a Payer wants some or all Sutter Providers to participate in such New Plans, Company will provide prior written notice to Sutter that explains in detail how the New Plan or new Network and benefit design will work, including specifically the basis for determining the tiers or establishing the Provider's rank or inclusion in the restricted network. Company and Sutter shall then meet and confer to determine which, if any, Providers will participate in such New Plan or new Network, and the terms and conditions that will apply to their participation. Notwithstanding the foregoing, nothing in this Agreement shall limit a BlueCard Plan from being able to develop and/or market; Tiered Restricted or Limited Networks or products within its own home service area, outside of California.[11]

---

[11] 2015 Blue Shield Systemwide Agreement – ECF No. 887-2 at 22 (§§ 2.06, 2.06.1, 2.06.3–2.06.4); Aetna 2016 Systemwide Agreement – ECF No. 887-3 at 22–23 (§§ 2.06, 2.06.1, 2.06.3–2.06.4).

United States District Court
Northern District of California

1       The health plans/insurers in this case objected to the provisions but ultimately acceded to

2   them.[12] The provisions allegedly prevented the health plans from steering their enrollees away

3   from high-cost Sutter plans to lower-priced providers (called tiering) — through means such as

4   higher co-pays or deductibles — without Sutter's permission.[13] Sutter's expert confirmed that

5   tiered networks (with lower-cost providers) can lower hospital prices.[14] Sutter denied the health

6   plans' requests to put Sutter hospitals in non-preferred tiers.[15] When the health plans tried to

7   market tiered networks that did not include Sutter in the most-favored tier, Sutter threatened to

8   terminate the contracts and to initiate litigation.[16]

9       Third, the contracts blocked the health plans from disclosing Sutter's prices to plan members

10   to inform their choice of provider.[17] Blue Shield stated that "Sutter was restricting our ability to be

11   transparent with our customers regarding their relevant cost, quality, or clinical data."[18]

12       The complaint has six counts: (1) unlawful tying in violation of Sherman Act § 1 and the

13   Cartwright Act (counts I and III); (2) an unlawful course of conduct in violation of Sherman Act §

14   1 and Cartwright Act (counts II and III); (3) monopolization and attempted monopolization in

15   violation of Sherman Act § 2 (counts IV and V); and (4) a violation of the UCL (count VI).[19]

16

17

18   ---

    [12] *See, e.g.*, Joyner Decl., Ex. P75 to Cantor Decl. – ECF No. 862-3 at 15–18 (¶¶ 45–55); Lundbye

19   Decl., Ex. P78 to *Id*. – ECF No. 862-6 at 6 (¶ 12), 8–9 (¶¶ 17–19).

    [13] Chipty Report, Ex. P2 to *id*. – ECF No. 791-3 at 313 (¶ 160), 317 (¶ 164).

20
    [14] Willig Dep., Ex. P154 to *id.* – ECF No. 863-7 at 334.

21       [15] *E.g.* Brendt 10/22/2008 Email, Ex. P162 to *id.* – ECF No. 863-7 at 426; Vine 12/6/2001 Letter, Ex.
P167 to *id*. – ECF No. 863-7 at 466.

22
    [16] *See, e.g.*, Joyner Decl., Ex. P75 to *id.* – ECF No. 862-3 at 15–18 (¶¶ 45–55) (describing Blue

23   Shield's inability to put Sutter hospitals into lower tiers despite Sutter's higher prices); Lundbye Decl.,
Ex. P78 to *id.* – ECF No. 862-6 at 8–9 (¶¶ 17–19) (UnitedHealthcare objected to Sutter's anti-tiering

24   and equal treatment provisions because the provisions "prevented United from launching products it
otherwise would have launched"); Brendt 12/5/2003 Letter, P174 to *id.* – ECF No. 863-7 at 522–23

25   (excluding Sutter from a network without Sutter's written consent could be "an anticipatory breach of
the Systemwide Amendment" and noting that "Sutter is hopeful that the parties can resolve this issue

26   without having to resort to the dispute resolution procedures").

    [17] 2015 Blue Shield Systemwide Agreement – ECF No. 887-2 at 38–40 (§ 6.06), 41–43 (§ 6.08).

27       [18]Joyner Decl., Ex. P75 to Cantor Decl. – ECF No. 862-3 at 21 (¶ 64).

28       [19] 4AC – ECF No. 204 at 38–43 (¶¶ 124–170).

After the court certified Rule 23(b)(2) and Rule 23(b)(3) classes, the plaintiffs moved for partial summary judgment on the "distinct products" element of their tying claims under the Sherman Act and Cartwright Act, and Sutter moved for summary judgment on the ground that its contracts were not unlawful.[20] The court held a hearing on October 22, 2020.[21] The court granted the plaintiffs' unopposed partial summary-judgment motion and held that inpatient hospital services at Sutter's tying hospitals, on the one hand, and inpatient hospital services offered at Sutter's tied hospitals, on the other, are distinct or separate products under the Cartwright and Sherman Acts.[22] The court deferred issuing its ruling on Sutter's summary-judgment motion until the opt-out period ended to prevent one-way intervention and held — for the reasons stated on the record — that Sutter had not waived the issue.[23] The opt-out period ended March 8, 2021.[24]

## SUMMARY-JUDGMENT STANDARD

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is enough evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

The party moving for summary judgment has the initial burden of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material

---

[20] Mots. – ECF Nos. 791-1, 838-1.

[21] Minute Entry – ECF No. 882.

[22] Order – ECF No. 886.

[23] Mot. – ECF No. 838-1 at 2 (raising the one-way intervention issue); *Scharzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995) (unless a defendant waives the issue by obtaining summary judgment before class notice is sent, district courts should "not grant summary judgment on the merits of a class action until the class has been properly certified and notified").

[24] Order – ECF No. 955 at 3.

United States District Court
Northern District of California

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

In ruling on a summary-judgment motion, inferences drawn from underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

The court grants summary judgment to Sutter for 2008 to 2010 because the plaintiffs' failure to prove damages means that they failed to establish injury. *Weinberg v. Whatcom Cty.*, 241 F.3d 746, 751 (9th Cir. 2001) ("summary judgment is appropriate where appellants have no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages") (cleaned up). The court denies summary judgment for the Sherman Act § 1 and Cartwright Act claims because disputes of material fact preclude summary judgment. The court grants summary judgment on the Sherman Act § 2 claims because the plaintiffs did not produce evidence showing disputes of material fact.

The next sections address (1) the Sherman Act § 1 and Cartwright Act tying claims (counts I and III), (2) the Sherman Act § 1 and Cartwright Act course-of-conduct claims (counts II and III),

1    (3) the Sherman Act § 2 claims for monopolization and attempted monopolization (counts IV and

2    V), and (4) the UCL claim (count VI).

3

4    **1.  Tying Claims — Sherman Act § 1 and Cartwright Act (Counts I and III)**

5        Sutter contends that it never conditioned access to inpatient services in the Tying Markets to the

6    health plans' including inpatient services in the Tied Markets in their networks, and it never required

7    health plans to pay for one service as a condition for accessing another service. Instead, it gave

8    discounted rates to the health plans for including Sutter's hospitals in their networks. A systemwide

9    contract is not necessarily unlawful. But the theory of liability is that Sutter used its market power for

10    inpatient services in the Tying Market to force the health plans to include (in their networks) Sutter

11    inpatient services in the Tied Markets and then had terms that prevented the health plans from

12    excluding Sutter tied hospitals from the networks or establishing lower-cost networks.[25] Fact disputes

13    about how Sutter exercised its market power preclude summary judgment on the tying claims.

14        A tying arrangement occurs where "a seller with market power in one product market []

15    extend[s] its market power to a distinct product market." *Cascade Health Sols. v. PeaceHealth*,

16    515 F.3d 883, 912 (9th Cir. 2008). "To accomplish this objective, the seller conditions the sale of

17    one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Id*.

18    "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its

19    control over the tying product to force the buyer into the purchase of a tied product that the buyer

20    either did not want at all, or might have preferred to purchase elsewhere on different terms." *Id.* at

21    913–14 (cleaned up) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)).

22        The elements of a tying claim are as follows: "(1) [] the defendant tied together the sale of two

23    distinct products or services; (2) [] the defendant possesses enough economic power in the tying

24    product market to coerce its customers into purchasing the tied product; and (3) [] the tying

25    arrangement affects a not insubstantial volume of commerce in the tied product market." *Id*. at 913

26

27

28    ———————————————
[25] 4AC – ECF No. 204 at 4 (¶ 6), 38 (¶ 126).

United States District Court
Northern District of California

(cleaned up); *Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.*, 101 Cal. App. 3d 532, 542 (1980) (similar elements for a tying claim under California's Cartwright Act).[26]

Sutter contends that its systemwide contracts do not impose a tie because it does not condition the sale of one product to a health plan's purchase of another product. Instead, its contracts are its mechanism for setting prices, giving discounted rates to a plan if it is in a network and non-discounted non-par rates if it is not in a network.[27] But the facts are disputed. First, the contracts were systemwide and required health plans to include Sutter inpatient services in the Tied Markets. There are fact disputes about whether this was merely Sutter's setting its prices, or rather, whether Sutter forced higher prices in the Tied Markets that were passed through to consumers through insurance premiums. For example, the 95-percent non-par rates were higher than the insurers' customary out-of-network rates. As a result, the health plans allegedly could not build narrow networks (at a lower cost) that excluded Sutter because there was no cost advantage (compared to a network that included Sutter hospitals). Second, the contracts prevented insurers from changing Sutter's status in the health plans' networks (by, for example, putting Sutter providers into less preferred tiers resulting in lower costs) without Sutter's consent. There is evidence that Sutter permitted health plans to exclude or tier Sutter hospitals.[28] But there is evidence that it was occasional, that Sutter denied requests to put Sutter hospitals in non-preferred tiers, and that when health plans tried to market lower-cost tiered networks that did not include Sutter in the favored tier, Sutter threatened to terminate the contracts and sue the plans. There is evidence too that the plans objected to the provisions and ultimately acceded to them because they had no choice.

In sum, disputed facts about the combined effect of the contract provisions precludes summary judgment. On similar facts, another court reached the same conclusion. *UFCW & Emp. Benefit Tr. v. Sutter Health*, No. CGC-14-538451, 2019 WL 3856011, at *8–9 (Super. Ct. Cal. June 13, 2019).

---

[26] The analysis applies under the Sherman Act and the Cartwright Act. *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) ("The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act . . . was modeled after the Sherman Act.").

[27] Mot. – ECF No. 838-1 at 12–23; Reply – ECF No. 877-1 at 7–14.

[28] Burnside Decl. – ECF No. 838-3 at 11–17 (¶¶ 83–88).

United States District Court
Northern District of California

**2.   Course-of-Conduct Claims — Sherman Act § 1 and Cartwright Act (Counts II–III)**

The plaintiffs predicate the course-of-conduct claims on (1) the same systemwide contracts that allegedly condition the insurers' access to inpatient services in the Tying Markets to their including inpatient services in the Tied Markets in their network and (2) the same contract terms that allegedly result in higher prices: the 95-percent sub-par rate, the contractual impediments to tiering, and the confidentiality provisions. Sutter contends that these are the same claims, "in slightly different garb," as the tying claims and challenges them on the grounds addressed in the last section.[29] For the reasons in the last section, disputes of fact preclude summary judgment on these claims too. *See id.* (reaching the same conclusion).

**3.   Monopolization and Attempted Monopolization Claims — Sherman Act § 2 (Counts IV–V)**

Sutter moved for summary judgment on the Sherman Act § 2 monopolization and attempted monopolization on the ground that the plaintiffs alleged only conduct that does not raise a triable issue on the Sherman Act § 1 claim. If a § 2 claim is predicated only on facts "insufficient to withstand summary judgment" on a § 1 claim, then the § 2 claim does not survive a summary-judgment motion either. *Thomsen v. W. Elec. Co.*, 680 F.2d 1263, 1267 (9th Cir. 1982); *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 856 (9th Cir. 1995). Because disputed issues of fact preclude summary judgment on the § 1 claims, the court denies summary judgment on this ground.

Sutter also moved for summary judgment on the monopolization claim (primarily because there is no evidence of its willful maintenance of market power in the Tying Markets) and on the attempted monopolization claim (primarily because there is no dangerous probability of monopolization in the Tied Markets).[30] The court grants summary judgment on both claims.

---

[29] Mot. – ECF No. 838-1 at 23–30. The plaintiffs advance the same arguments to support liability for all Sherman Act § 1 and Cartwright Act claims. Opp'n – ECF No. 861-1 at 24–34 (addressing claims in one section). Sutter splits the analysis, at least in part, addressing tying claims (I and III) and course-of-conduct claims (II and III) separately. Mot. – ECF No. 838-1 at 15–30.

[30] Mot. – ECF No. 831-1 at 31–37; Reply – ECF No. 877-1 at 16–20.

### 3.1 Monopolization in Tying Markets

Sutter contends there is no evidence that it willfully acquired or maintained monopoly power in the Tying Markets or that it had market power in four Tying Markets (the Antioch, Auburn, Jackson, and Lakeport HSAs).[31] Because the plaintiffs did not produce evidence showing disputed issues of material fact that Sutter willfully acquired or maintained monopoly power, the court grants summary judgment on the § 2 monopolization claim.

A § 2 monopolization claim has the following elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.* 504 U.S. 451, 480 (1992).

Market power can be established through direct evidence, such as "evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with a market power may inflict, and thus, of the actual exercise of market power." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (cleaned up). Market power also can be can be shown circumstantially: the plaintiff must (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run. *Id*. (citations omitted).

### 3.1.1   Willful Acquisition or Maintenance of Market Power

Sutter contends that there is no evidence that its contracting practices led to its acquiring or maintaining market power in the Tying Markets. Instead, as the plaintiffs' expert opines, the undisputed facts establish that Sutter's market power exists because nearly all hospitals are in rural areas, and the operator of those hospitals automatically has some degree of market power.[32]

The plaintiffs respond (in a single paragraph) that "by forcing the [health plans] to accept its anticompetitive contract provisions, Sutter has maintained its monopoly power over [inpatient

---

[31] Mot. – ECF No. 831-1 at 31–34.

[32] *Id.* at 31–32 (citing Chipty Report, Exs. D17 to Burnside Decl., ECF No. 838-4 at 97 (pt. VI), D18 at 388 (pt. IV); Chipty Dep, Ex. D101 to *id.* – ECF No. 838-12 at 46–47.

hospital services] in its Tying Markets, particularly at Alta Bates in the Berkeley-Oakland market."[33] The plaintiffs cite Sutter's contention during the Alta Bates/Summit merger — that health plans could steer away from Alta Bates to constrain prices — and contrast it with Sutter's subsequent imposition of the anti-steering/anti-tiering terms in its contracts that prevented health plans from steering members away from the more expensive tied hospitals and Alta Bates (a tying hospital) and launching more inexpensive, tiered networks that put Sutter in a less-preferred tier.[34]

The plaintiffs have the burden of proof at trial, and Sutter points to the absence of evidence to support their case. *Celotex*, 477 U.S. at 325; *Devereaux*, 263 F.3d at 1076. The plaintiffs offer no evidence for six of the seven Tying Markets (and the corresponding hospitals). For those markets and hospitals, the evidence is undisputed that Sutter's power exists because the markets are rural. As to Alta Bates, the plaintiffs identify evidence — through their expert — that more steering would have resulted in lower prices there.[35] But that is not the equivalent of preventing other hospitals from entering or expanding in the Berkeley-Oakland HSA (meaning, hospital-service area) Tying Market. Instead, the theory of liability in the complaint is that Sutter used its market power in the Tying Markets (where it faced no competition) to force health plans to include Sutter hospitals in the Tied Markets (where it faced competition).

In sum, the plaintiffs have not produced evidence that shows disputed material facts about Sutter's willful maintenance of monopoly power. *Devereaux*, 263 F.3d at 1076. The court grants summary judgment on the § 2 claims. *Celotex*, 477 U.S. at 323.

### 3.1.2 Monopoly Power in Four HSAs

Sutter contends that there is no evidence that Sutter has monopoly power in four Tying Markets — the Antioch, Auburn, Jackson, and Lakeport HSAs — because its market shares are below the 65% threshold.[36] "Courts generally require a 65% market share to establish prima facie case of

---

[33] Opp'n – ECF No. 861-1 at 35.

[34] *Id.* at 18 (citing Sutter and Alta Bates Am. Proposed Findings of Fact, Ex. P130 to Cantor Decl., – ECF No. 863-3 at 395–96 (¶ 30), 409–10 (¶ 56), 411–12 (¶ 62)), 36.

[35] Chipty Report, Ex. P2 to Cantor Decl. – ECF No. 791-3 at 358–60 (¶¶ –196–98).

[36] Mot. – ECF No. 838-1 at 32.

market power."[37] *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997); *see Rebel Oil*, 51 F.3d at 1438 ("numerous cases hold that a market share of less than 50 percent is presumptively insufficient to establish market power"). Sutter relies on the plaintiffs' expert. The plaintiffs define the relevant markets in terms of HSAs, and the plaintiffs' expert uses primary service areas, or PSAs, as a cross-check. The plaintiffs' expert calculated the local Sutter hospital's discharges for all patients who live in the market as less than 50% for the four Tying Markets: Antioch HSA (40%), Auburn HSA (37%), Jackson HSA (43%), and Lakeport HSA (50%). She generally calculated even lower shares of the PSAs for the same hospitals.[38]

The plaintiffs respond that (1) Sutter's monopoly power is shown by its high prices, (2) their expert's alternative calculations exceed the 65% threshold and show that Sutter has the dominant share in each of the Tying Markets, and (3) the relevant markets are characterized by high barriers to entry and expansion.[39]

First, the higher prices alone do not establish monopoly power. "[W]hen dealing with a heterogeneous product or service, such as the full range of medical care, a reasonable finder of fact cannot infer monopoly power just from higher prices." *Blue Cross & Blue Shield United v. Marshfield Clinic.*, 65 F.3d 1406, 1411–12 (7th Cir. 1995). "To prove monopoly power directly, supracompetitive pricing must be accompanied by restricted output." *Safeway, Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 887 (N.D. Cal. 2011). The plaintiffs did not produce evidence of restricted output.

Second, the plaintiffs' expert calculated market shares in the four Tying Markets that exceed 65%. Sutter contends that the calculations are incorrect because they are based on discharges for patients "who live and stay to receive care in the HSA," not the plaintiffs' defined antitrust product market of all inpatient health services "offered in the HSA."[40] But the definition of the relevant

---

[37] *Id.*; Opp'n – ECF No. 861-1 at 36.

[38] Mot. – ECF No. 838-1 at 32–33; Chipty Report, D17 to Burnside Decl. – ECF No. 838-4 at 95 (¶ 100); Chipty Decl., D19 to Burnside Decl. – ECF No. 838-4 at 469 (Ex. 21).

[39] Opp'n – ECF No. 861-1 at 36 (citing Chipty Report, P2 to Cantor Decl. – ECF No. 791-3 at 264–265).

[40] Mot. – ECF No, 838-1 at 33–34; Reply – ECF No. 877-1 at 17; Chipty Report, D17 to Burnside Decl. – ECF No. 838-4 at 95 (¶ 100).

United States District Court
Northern District of California

market generally is a question for the jury. *Rebel Oil Co.*, 51 F.3d at 1435. The parties did not address this point explicitly. Moreover, at the hearing, Sutter argued only that there was no evidence that it willfully maintained monopoly power in the Tying Market and did not address its alleged lack of monopoly power in the four HSAs.[41] There is not an absence of evidence that allows summary judgment. *Id.* The court denies the motion on this ground.

In sum, although there are material disputes about whether Sutter had monopoly power, the court grants summary judgment on the § 2 monopolization claim because the plaintiffs have not shown that disputed material facts exist about Sutter's willful maintenance of the alleged monopoly power.

### 3.2   Attempted Monopolization in Tied Markets

Sutter contends that there is no evidence that there is a dangerous probability of its achieving monopoly power in the Tied Markets, and thus there is no attempted monopolization, and its market shares in two Tied Markets (Sacramento and Santa Rosa) in any event are too low.[42] The plaintiffs counter that Sutter's intent to monopolize the Tied Markets can be inferred from its systemwide contracts, the dangerous probability is shown by the higher prices that the health plans pay for services in the Tied Markets, and Sutter's market shares in Sacramento and Santa Rosa are close to monopoly power.[43]

"To demonstrate attempted monopolization, a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Cascade Health*, 515 F.3d at 893.

First, Sutter contends that its market share has not increased, despite conduct spanning 18 years.[44] It cites authority for the proposition that there must be conduct that propels it from a non-monopolistic share to a monopolistic share. *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.* 885 F.2d 683, 693–94 (10th Cir. 1989); *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No.

---

[41] 10/20/2020 Hr'g Tr. – ECF No. 899 at 47:2–5 ("[Sutter] dispute[s] that there is monopoly power in all the hospitals. But [the court] do[esn't] have to resolve that. The only question is: Did Sutter do something to maintain the monopoly power?").

[42] Mot. – ECF No. 838-1 at 34–36.

[43] Opp'n – ECF No. 861-1 at 37–38.

[44] Mot. – ECF No. 838-1 at 34–35.

United States District Court
Northern District of California

12-cv-05847-JST, 2013 WL 3242245, at *14 (N.D. Cal. June 25, 2013) (in dismissing a case under Rule 12(b)(6), held that "Plaintiffs fail to allege that [the defendant] willfully acquired or maintained its monopoly power, because there are no allegations regarding [its] position in the relevant markets over time. For similar reasons, Plaintiffs have failed to allege that [the defendant's] allegedly anticompetitive conduct presents a 'dangerous probability of success' in monopolizing the relevant markets").

The court grants summary judgment. The plaintiffs do not cite any evidence — except for higher prices in the Tied Markets — to support their contention of a dangerous probability of monopolization. The higher prices may be, as the plaintiffs contend, "direct evidence of the injurious exercise of market power." *Rebel Oil*, 51 F.3d at 1434. But they say nothing about Sutter's position in the Tied Markets. The plaintiffs' expert did not assess Sutter's market share at all and instead analyzed its share of patient discharges only in 2011.[45] Inpatient discharges in San Francisco and Modesto have decreased since 2002.[46] The plaintiffs produce no evidence to counter the undisputed evidence of either no increase in market share or falling market share. *Horst v. Laidlaw Waste Sys., Inc.*, 917 F. Supp. 739, 744–45 (D. Colo. 1996) ("there is no probability of success in monopolizing the relevant market since [the defendant's] market share actually decreased during the relevant time period"); *Advanced Health-Care Sys. v. Giles Mem'l Hosp.*, 846 F. Supp. 488, 497 n.17 (W.D. Va. 1994) (falling market share is "further evidence that there was no dangerous probability of monopolization"). Thus, there are no disputed facts showing a dangerous probability of Sutter's achieving monopoly power in the Tied Markets. *Rebel Oil*, 51 F.3d at 1441.

Second, Sutter contends that — as the plaintiffs' expert's calculations show — its market shares in Sacramento (29%) and Santa Rosa (26%) are presumptively insufficient because they are below 30%.[47] "When the claim involves attempted monopolization, most cases hold that a market share of

---

[45] Chipty Report, P2 to Cantor Decl. – ECF No. 791-3 at 357–58 (¶ 194) (calculating 64% share in the San Francisco market and 51% in the Modesto market).

[46] Gowrisankaran Report, Ex. D21 to Burnside Decl. – ECF No. 838-4 at 517 (¶ 212), 519–20 (¶ 214), 521 (¶ 221).

[47] Mot. – ECF No. 28-1 at 35–36.

1   30 percent is presumptively insufficient to establish the power to control price." *Rebel Oil*, 51 F.3d

2   at 1438. But the plaintiffs' expert also calculated market shares in the two Tied Markets that exceed

3   30%.[48] Sutter again contends that the calculations are incorrect because they are not based on the

4   plaintiffs' defined antitrust product market of all inpatient health services "offered in the HSA."[49]

5   Again, the definition of the relevant market generally is a question for the jury. *Rebel Oil Co.*, 51

6   F.3d at 1435. The parties did not address this point explicitly. There is not an absence of evidence

7   that allows summary judgment. *Id.* The court denies the motion on this ground.

8                                    *        *        *

9       In sum, the court grants summary judgment to Sutter on the § 2 claims (counts IV and V).

10

11  **4. Unfair Competition Law (Count VI)**

12      The UCL claim survives to the extent that the underlying claims survive.

13

14                              **CONCLUSION**

15      The court denies summary judgment on the § 1 and Cartwright Act claims and grants summary

16  judgment on the § 2 claims and the 2008–2010 claims.

17      This disposes of ECF Nos. 838 and 838-1.

18      **IT IS SO ORDERED.**

19      Dated: March 9, 2021

20                                                LAUREL BEELER
                                                  United States Magistrate Judge

21

22

23

24

---

25  [48] Chipty Report, P2 to Cantor Decl. – ECF No. 791-3 at 357 (¶ 194) (2019 report calculating Sutter's
26  share of inpatient health services for plaintiffs who live and stay to receive care in an HSA as 37% for
    Sacramento and 35% for Santa Rosa); Chipty Decl., D19 to Burnside Decl. – ECF No. 838-4 at 469 (2018
27  declaration calculating Sutter's system-discharge share as 35% for Sacramento and 31% for Santa Rosa).

    [49] Mot. – ECF No, 838-1 at 35–36; Reply – ECF No. 877-1 at 17; Chipty Report, D17 to Burnside
28  Decl. – ECF No. 838-4 at 95 (¶ 100); Chipty Decl., D19 to *id.* – ECF No. 838-4 at 469.