CONSTANTINE CANNON LLP
MATTHEW L. CANTOR (*pro hac vice*)
JEAN KIM (*pro hac vice*)
335 Madison Avenue, FL 9
New York, NY  10017
(212) 350-2700
(212) 350-2701 (fax)
mcantor@constantinecannon.com
jkim@constantinecannon.com

*Lead Counsel for Plaintiffs and the Class*

FARMER BROWNSTEIN JAEGER &
GOLDSTEIN LLP
DAVID C. BROWNSTEIN (141929)
WILLIAM S. FARMER (46694)
DAVID M. GOLDSTEIN (142334)
235 Montgomery Street, Suite 835
San Francisco, CA 94104
(415) 795-2050
(415) 520-5678 (fax)
dbrownstein@fbj-law.com
wfarmer@fbj-law.com
dgoldstein@fbj-law.com

*Lead Counsel for Plaintiffs and the Class*

THE MEHDI FIRM, PC
AZRA Z. MEHDI (220406)
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
(415) 293-8039
(415) 293-8001 (fax)
azram@themehdifirm.com

*Co-Lead Counsel for Plaintiffs and the Class*

STEYER LOWENTHAL BOODRAKAS
ALVAREZ & SMITH LLP
ALLAN STEYER (100318)
D. SCOTT MACRAE (104663)
JILL M. MANNING (178849)
SUNEEL JAIN (314558)
235 Pine Street, 15th Floor
San Francisco, CA 94104
(415) 421-3400
(415) 421-2234 (fax)
asteyer@steyerlaw.com
smacrae@steyerlaw.com
jmanning@steyerlaw.com
sjain@steyerlaw.com

*Additional Co-Lead Counsel for Plaintiffs
and the Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN HANSEN, DAVID HERMAN, OPTIMUM GRAPHICS, INC., and JOHNSON POOL & SPA, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SUTTER HEALTH,<br><br>Defendant. | Case No. 3:12-cv-4854-LB<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SANCTIONS BASED ON SUTTER'S SPOLIATION OF EVIDENCE**<br><br>Date: August 5, 2021<br>Time: 9:30 AM<br>Judge: The Honorable Laurel Beeler |

## <u>TABLE OF CONTENTS</u>

I.     NOTICE OF MOTION AND MOTION ................................................................1

II.    ISSUE TO BE DECIDED ...............................................................................2

III.   INTRODUCTION ............................................................................................2

IV.   BACKGROUND ..............................................................................................4

     A.     Plaintiffs' Claims and Case Background ..................................................4

     B.     Sutter's Destruction of Evidence from the 1995-2005 Time Period ...........................6

     C.     Judge Karnow's Order Finding Intentional Document Destruction and Resulting Prejudice ..................................................................................................9

V.    ARGUMENT ..................................................................................................12

     A.     Sutter Had an Obligation to Preserve its Contracting Department Documents at the Time They Were Destroyed ................................................................13

     B.     Sutter Had a Culpable State of Mind ......................................................14

     C.     The Evidence Sutter Destroyed Was Relevant to the Parties' Claims and Defenses 17

VI.   CONCLUSION ................................................................................................20

# TABLE OF AUTHORITIES

Cases:

*Akiona v. United States*, 938 F.2d 158 (9th Cir.1991) ....................................................................12

*Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132 (N.D. Cal. 2012) ...........................12, 17

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, No. EDCV141926JAKSPX, 2016 WL 6609208, (C.D. Cal. July 12, 2016) ................................................................................................... *passim*

*Bordegaray v. Cty. of Santa Barbara*, No. 214CV8610CASJPRX, 2016 WL 7260920 (C.D. Cal. Dec. 13, 2016).........................................................................................................................12

*Colonies Partners, L.P. v. Cty. of San Bernardino*, No. 518CV00420JGBSHK, 2020 WL 1496444 (C.D. Cal. Feb. 27, 2020).............................................................................................14, 16

*Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040 (S.D. Cal. 2015) .....13, 16, 17

*Dong Ah Tire & Rubber Co., Ltd. v. Glasforms, Inc.*, No. C 06–3359 JF, 2009 WL 1949124 (N.D. Cal. July 2, 2009).....................................................................................................................17

*First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*, No. 15-CV-1893-HRL, 2016 WL 5870218 (N.D. Cal. Oct. 7, 2016)..................................................................................................................14

*Glover v. BIC Corp.*, 6 F.3d 1318 (9th Cir. 1993) ..................................................................12, 14

*In re Cipro Cases I & II*, 61 Cal. 4th 116 (2015)..............................................................................18

*In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060 (N.D. Cal. 2006) ..............13, 14, 16, 20

*Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006)................................................................14, 17

*Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971 (9th Cir. 2009) .........................................12

*Oppenheimer v. City of La Habra*, No. SACV1600018JVSDFMX, 2017 WL 1807596 (C.D. Cal. Feb. 17, 2017) ................................................................................................................................16

*Phoceene Sous–Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802 (9th Cir.1982) ...................17

*Ramos v. Swatzell*, No. EDCV121089BROSPX, 2017 WL 2857523 (C.D. Cal. June 5, 2017).....20

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99 (2d Cir. 2002)....................17, 18

*S.E.C. v. Mercury Interactive LLC*, No. 07-2822-WHA (JSC), 2012 WL 3277165 (N.D. Cal. Aug. 9, 2012)...........................................................................................................................................17

*Sidibe et al. v. Sutter Health*, 333, F.R.D. 463 (N.D. Cal. 2019)...........................................4, 5, 14

*Stanley Black & Decker, Inc. v. D&L Elite Investments*, LLC, No. C 12-04516 SC (LB), 2014 WL 3738327 (N.D. Cal. June 20, 2014) .................................................................................................12

*UFCW v. Emp'rs Benefit Tr. et al. v. Sutter Health*, 2019 WL 3866011 (Cal. Sup. Ct. June 13, 2019) ................................................................................................................................. *passim*

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363 (9th Cir.1992)..................14

*United States v. Kitsap Physicians Svs.*, 314 F.3d 995 (9th Cir. 2002) ...........................16

*Waters v. Kohl's Dep't Stores, Inc.*, No. 14-CV-00043-KAW, 2015 WL 1519657 (N.D. Cal. Apr. 2, 2015) ..................................................................................................................13, 14, 20

## I.      NOTICE OF MOTION AND MOTION

### <u>TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:</u>

PLEASE TAKE NOTICE that on August 5, 2021, or as soon thereafter as the matter may be heard, in Courtroom C – 15th Floor, 450 Golden Gate Ave., San Francisco, California, before the Honorable Laurel Beeler, the undersigned Plaintiffs will move the Court for an adverse inference jury instruction based on Sutter's intentional destruction of 192 boxes of highly relevant documents from its Managed Care Department.

This motion is based upon this Notice of Motion and the accompanying Memorandum of Points and Authorities; the Declaration of Suneel Jain dated March 19, 2021 and the exhibits thereto; the complete files and records in this action; oral argument of counsel; authorities that may be presented at or before the hearing on this motion; and such other and further matters as this Court may consider.

## II.     ISSUE TO BE DECIDED

Whether the Court should order an adverse inference jury instruction as a sanction for Sutter's intentional destruction of 192 boxes of Managed Care Department documents highly relevant to the issues of this case that were subject to a litigation hold?

## III.     INTRODUCTION

In 2015, more than two years after Plaintiffs filed this lawsuit, Sutter's Vice President and Chief Contracting Officer, Melissa Brendt – Sutter's central witness in this case – directed her executive assistant, Sina Santagata, to destroy **192 boxes** of Sutter Managed Care Department documents covering the 1995-2005 time period.  It was during those ten years that Sutter implemented the anticompetitive restraints at the heart of Plaintiffs' claims and forced them upon the Class Health Plans.  These boxes contained unique, archived documentary evidence from that critical period – documentary evidence that was subject to a litigation hold.

Ms. Santagata testified that, before destroying this evidence, Ms. Brendt repeatedly confirmed that Daniela Almeida – an experienced Sutter in-house lawyer in charge of overseeing this litigation – acquiesced in Ms. Brendt's decision to have these documents destroyed.  Declaration of Suneel Jain in Support of Plaintiffs' Motion for Spoliation Sanctions ("Jain Decl."), Ex. 1 at 96:18-97:15; 171:15-18.[1]  Moreover, immediately after relaying the destruction authorization to warehouse personnel, Ms. Santagata acknowledged guilt over doing so by sending an email stating that she was "running and hiding" and had her "[f]ingers crossed that I haven't authorized something that the FTC will hunt me down for." Ex. 2 at DEF000108219.

Upon learning of Sutter's intentional destruction of these 192 boxes, Plaintiff in *UFCW & Employers Benefit Trust v. Sutter Health, et al.* ("*UEBT*"), the California state court case which concerned the very same anticompetitive conduct at issue here, moved for sanctions. Judge Curtis Karnow granted that motion, holding that:

---

[1] Exhibits cited in this brief are attached to the concurrently filed Jain Decl. unless otherwise specified.

(1) "Sutter's conduct was more than just an inadvertent error" (Ex. 3 ("Order") at 2:20);

(2) "this was not a routine destruction authorization: [Ms. Santagata] testified that in her 17 years at Sutter, she was not aware of any other time when the Managed Care department authorized destruction of records in storage" (Order at 3:4-6);

(3) the people who authorized the destruction "knew of this litigation, and knew of [a] litigation hold [issued by Sutter] which covered documents back to 2002" (Order at 3:14-15);

(4) the documents at issue were relevant and material (Order at 5:20-6:3); and

(5) Sutter could not show that plaintiff was not prejudiced by the destruction (Order at 6:25).

Judge Karnow concluded that "**the destruction was intentional … [and] the destruction was done knowing that the evidence was relevant to antitrust issues**." Order at 7:22-25 (emphasis added).

Judge Karnow ordered Sutter to restore certain backup tapes for the relevant time period. Judge Karnow recognized, however, that this would be insufficient to remedy the harm Sutter caused and indicated that he would adopt a jury instruction regarding the intentional spoliation after the close of discovery.  Order at 10:18-22.  After Judge Massullo succeeded Judge Karnow in presiding over that case, she issued a spoliation sanctions order, adopting Judge Karnow's findings, that again suggested that an adverse evidentiary inference jury instruction would be appropriate after evidence of Sutter's spoliation was presented to the jury.  Ex. 4 at 6-7.

As Judge Karnow concluded, Sutter's document destruction was intentional and has resulted in grave prejudice to Plaintiffs.  It has left large gaps in the factual record and has allowed Sutter witnesses to evade having their credibility impeached or their recollections refreshed by materials that memorialized their contemporaneous thoughts and actions.  This has allowed Sutter witnesses to claim to remember nothing about certain subjects, and enabled Sutter and its experts to advance theories (including theories of Sutter's rationale for

1    adopting the major contract provisions at issue in this case) constructed out of thin air.

2        Shortly after Judge Karnow issued his November 2017 sanctions order, Plaintiffs in

3    this case raised the issue of Sutter's spoliation in a Joint Case Management Statement, asking

4    the Court whether Plaintiffs should immediately file their motion for sanctions. *See* Dkt. No.

5    214, filed November 12, 2017.  This Court instructed Plaintiffs to defer bringing a sanctions

6    motion until sometime closer to trial.

7        Sutter's destruction of evidence flouts the processes which are central to the fair and

8    orderly workings of our judicial system.  It is emphatically the role of the Court to defend and

9    protect those processes.  Plaintiffs therefore request that this Court find, as the California court

10   did, that Sutter intentionally destroyed relevant evidence and, on that basis, issue an adverse

11   inference jury instruction.

12   **IV.   BACKGROUND**

13       **A.   Plaintiffs' Claims and Case Background**

14       Sutter dramatically changed its approach to contracting with health plans in the late

15   1990s/early 2000s time period.  Up until the late 1990s, Sutter hospitals separately contracted with

16   health plans on an individual basis – that is, each Sutter hospital or provider negotiated its own

17   contract with health plans. Ex. 5 ("Brendt Declaration") at ¶¶8-10; *Sidibe et al. v. Sutter Health*,

18   333, F.R.D. 463, 472 (N.D. Cal. 2019) ("*Sidibe* Class Order") ("Before the early 2000s, health

19   plans were able to negotiate with Sutter's various hospitals individually. Health plans could

20   include some Sutter hospitals in their provider network while excluding (or threatening to

21   exclude) others. Under that structure, if a health plan determined that a particular Sutter hospital

22   was too expensive, it had the option to exclude that hospital from its provider networks.").  Sutter

23   eliminated this practice, and by 2002 forced all major health plans to contract with Sutter on a

24   "systemwide" basis under a single contract covering all Sutter providers.  During this time, Sutter

25   also imposed explicit All-or-None and Price Secrecy clauses in all its contracts with the health

26   plans.  As the Court stated in its most recent order:

27       Before 2002, insurers negotiated with Sutter hospitals individually when they
         assembled their provider networks.  Then, Sutter moved to systemwide contracts,
28       forcing insurers to participate. For example, when one insurer (Anthem) pushed back,

4

> Sutter terminated its individual hospital contracts with Anthem. Anthem then folded and entered into a systemwide contract.

Dkt. No. 962 ("Summary Judgment Order") at 3:3-6; *see also Sidibe* Class Order, 333, F.R.D. at 472 ("The plaintiffs maintain that beginning in the early 2000s, Sutter began requiring health plans to enter into "systemwide" contracts that included "all-or-nothing" requirements. Sutter's systemwide contracts require, or effectively require, a health plan that wants to include one Sutter hospital in its provider network to include all Sutter hospitals.").  Sutter later adopted the anti-steering, anti-tiering, and 95% non-par pricing provisions at issue in this case as well.  "The systemwide contracts had allegedly anticompetitive provisions: (1) penalty non-par rates; (2) anti-steering and anti-tiering terms; and (3) secrecy provisions about price and quality."  "Summary Judgment Order" at 3:7-8.

Sutter's Managed Care Department was then, and still is, responsible for these activities.  Ex. 5 at ¶1.  It negotiated the health care contracts at issue, and managed Sutter's relationships with the major health plans in Northern California.  Melissa Brendt began working in the Managed Care Department twenty-three years ago, in 1997. Ex. 5 at ¶1; Ex. 8 at 12:19-13:6.  She became a "Vice President of Managed Care Contracting" in 2001 and currently serves as Sutter's "Vice President and Chief Contracting Officer - Sutter Health Managed Care Department," the head of the Managed Care Department.  Ex. 5 at ¶1.  Thus, Ms. Brendt's conduct, and the conduct of her direct reports in the Department, are the central issue in the case.

Plaintiffs' Third Amended Complaint filed December 9, 2013, nineteen months before Sutter's wholesale destruction of its Managed Care Department documents, put Sutter on notice of Plaintiffs' claims based on Sutter's anti-competitive "all or nothing" and anti-steering contracting practices.  *See* Dkt. No. 69 at ¶¶ 5, 6, 12, 29, 33-38, 85, 88, 91, 94, 126, 128, 136, 137 146, 153.

Plaintiffs' first set of Requests for Production of Documents included a request for all documents produced in the *UFCW & Employers Benefit Trust, et al. v. Sutter Health, et al.* state court case, which included many requests targeting the contracting practices that Sutter initiated in the early 2000s.  Ex. 6.[2]  For example, the *UFCW* Plaintiffs requested "[a]ll documents relating to

---

[2] These requests sought documents dating from January 1, 2000.  Sutter also agreed to provide Plaintiffs with all documents it produced in the *UEBT* litigation.

any "All-or-Nothing Terms" and documents relating to any "strategy regarding [] Sutter's pricing" for hospital services; whether Sutter allows "any [health plan] to offer access to some – but not all – Sutter hospitals"; and documents regarding Sutter's market share. Ex. 7, Definition 12 and Requests 3, 6, 8, 12.  Notwithstanding the inclusion of the documents produced in the *UFCW* matter, Plaintiffs' first set of Requests for Production of Documents independently sought documents, dating back to January 1, 2000, concerning Sutter's contract practices and pricing. Ex. 6, Requests 2, 4, 5, 7, 25.  For example, Request No. 4 required production of all documents regarding Sutter's systemwide contracting policy.

**B.**     **Sutter's Destruction of Evidence from the 1995-2005 Time Period**

It is beyond dispute that Sutter intentionally destroyed 192 boxes of documents – the entirety of Sutter's Managed Care Department files archived from 1995-2005.  Melissa Brendt, Chief Contracting Officer, in consultation with Sutter's in-house counsel managing this litigation, Daniela Almeida, ordered that the 192 boxes be destroyed twenty years before the documents were scheduled for destruction in 2035.

Since 1997, Ms. Brendt has "negotiated contracts, managed Sutter-health plan relationships, and managed dispute resolution processes with health plans."  Ex. 8 at 9:11-13, 13:11-20. Ms. Brendt has been personally involved in this lawsuit almost since its filing and was designated as Sutter's Rule 30(b)(6) corporate representative on most of the subjects in Plaintiffs' Rule 30(b)(6) deposition notice.  Jain Decl. at ¶25.

Since 2001, Ms. Santagata has been Ms. Brendt's executive assistant. Ex. 1 at 18:12-15, 19:6-11.  Ms. Brendt and the Managed Care Department rely on Sutter's in-house counsel to play a "support role" in contract negotiations with all of the health plans. Ex. 8 at 73:8-11.  For the past five years, Ms. Almeida has been responsible for managing this lawsuit and the "point person" in Sutter's in-house counsel department dedicated to supporting the Managed Care Department. *Id*. at 71:22-72:1 & 73:12.

Ms. Brendt confirmed that, sometime in 2014, two years after this lawsuit was filed, she received a litigation hold notice instructing her not to destroy documents that could be relevant to

the *UEBT* lawsuit and thus, by definition, this lawsuit.  Ex. 8 at 198:6-200:12.  In March 2015, nearly three years after Plaintiffs filed this lawsuit and a litigation hold was in place for this case, Ms. Santagata received a packet from the Sutter Health Records Management department listing boxes of documents that the Managed Care Department had placed in storage. Ex. 1 at 78:19-79:9.

After receiving this packet, Ms. Santagata met with Ms. Brendt to discuss the Managed Care Department documents that Ms. Brendt wished to destroy. Ex. 1 at 48:18-49:20, 83:9-16.  At this meeting, Ms. Brendt instructed Ms. Santagata to have all boxes of Managed Care Department documents dated between 1995 and 2005 destroyed:

"Q. And who gave you the instruction about the time frame for documents to be destroyed?

A. Melissa Brendt."

Ex. 1 at 50:1-15

On March 24, 2015, Ms. Santagata confirmed, by email, Ms. Brendt's order to destroy the documents.  Ex. 9.  The boxes Ms. Brendt ordered to be destroyed included files, documents, and binders for completed projects – many of which contained handwritten notes – that had been sent by the Managed Care Department to storage. Ex. 1 at 40:17-41:1, 44:1-25; Ex. 8 at 214:22-216:25. For example, "Records of Deposit" for certain of the destroyed boxes include files named: "Melissa handwritten notes [regarding Cigna]" (DEF000107760); "M. Brendt's files SH/Blue Cross 2001 negotiations" (DEF000107785); "Negotiation Notes" (DEF000107986).  Exs. 10-12.

Later emails show that Ms. Santagata discussed the document destruction with Ms. Brendt several times in the following months. Ex. 9 (March 24: Ms. Brendt affirms to Ms. Santagata that Ms. Santagata "can work with the Warehouse to destroy boxes dated 3.15.95 through November 2005"); Ex.13 (April 28: "[O]ur intent is to authorize the destruction of the below records in the immediate future. Again, I will verify."); Ex. 2 at DEF000108234 (July 13: "please forward the formal email with signature lines. I will share that with our VP/Chief Contracting Officer for her review/signature.").

On July 28, 2015, Ms. Santagata instructed the Records Management Department to destroy the documents that Ms. Brendt had selected. Ex. 1 at 118:13-119:12. The Records Management would not destroy the documents unless Ms. Santagata signed a form stating that:

7

"THERE ARE NO DOCUMENT PRESERVATION HOLDS ON THE RECORDS TO BE

DESTROYED."

Ex. 14 at DEF000093620. Ms. Santagata testified that Ms. Brendt and Ms. Almeida authorized her

to sign that portion of the document destruction form. Ex. 1 at 171:15-18; *see also id*. at 52:1-11,

56:2-15, 70:1-5 ("I would never approve destruction without checking with my supervisor.").

Ms. Santagata knew what a litigation hold was, *id.* at 64:25-65:11, and was familiar with

document preservation notices and had received such notices before. *Id*. at 28:1-29:19. After

checking with Ms. Brendt and that "we have the ok from legal to destroy some of our records,"

Ex. 15 at DEF000108588, Ms. Santagata erroneously verified to the Records department that there

were no document preservation holds on the 192 boxes of Managed Care documents to be

destroyed. Ex. 14 at DEF000093620.

In total, Ms. Brendt instructed Ms. Santagata to destroy 192 boxes of critical Managed

Care documents. Ex.14 at DEF000093590. Ms. Santagata testified that, to her knowledge, this was

the ***only*** time the Managed Care Department had ever approved the destruction of any boxes of

documents kept in the Records department since she started at Sutter in 2001. Ex. 1 at 70:1-71:13,

76:10-20, 76:25-77:8, 84:3-9.  Assuming these were standard boxes that hold about 2500 pages,

Sutter destroyed nearly 500,000 pages of documents.  Of course, these boxes probably contained

digital storage media (floppy discs, CDs, DVDs, tapes, etc.) so the destruction likely was in the

millions of pages of documents.

It is undisputed that the documents were subject to a litigation hold. Ex. 3 at 2:22-24; Ex. 1

at 82:1-5; Ex. 16 at 52:18-22 (Q: Okay. All Right. But it is correct that the litigation hold for the

Sidibe case was in place when you joined Sutter in approximately February 2014. A: That's

correct.").  The day Ms. Santagata sent her signed authorization to the Records department for the

boxes of documents to be destroyed, she wrote an email to Ms. Brendt (Jain Decl. Ex. 2)

demonstrating she recognized the peril of destroying these irreplaceable documents.

| From: | Santagata, Sina H. |
|---|---|
| Sent: | Thursday, July 30, 2015 1:49 PM |
| To: | Brendt, Melissa |
| Subject: | FW: Managed Care - Customer #396 |
| Attachments: | Man CareCust 396Auth 7.30.15.pdf |
| Sensitivity: | Confidential |

I've pushed the button...if someone is in need of a box between 3/15/95 & 11/23/05...I'm running and hiding. I did give Jan an 'fyi' as if anyone needed a box...it would be Ms. Voge. "Fingers crossed" that I haven't authorized something the FTC will hunt me down for. Sina

Sina Santagata | Administrative Assistant | Managed Care Department
2200 River Plaza Drive | Sacramento, CA 95833 | santags@sutterhealth.org | 916-286-6818

Sutter Health

### C.     Judge Karnow's Order Finding Intentional Document Destruction and Resulting Prejudice

UEBT filed a motion for sanctions in the state court case.  After extensive briefing and a hearing, Judge Karnow issued an 11-page order that included detailed findings of fact.

Judge Karnow concluded that the document destruction was "intentional," Ex. 3 at 2-3 and 7-8, and noted that "[t]he circumstances of the document destruction were, to put it as mildly as I can, decidedly odd, and Sutter has not explained them except to argue it was all a mistake." *Id.* at 2:13-15. Judge Karnow found that explanation not credible, concluding that "the record shows that Sutter's conduct was more than just an inadvertent error." *Id.* at 2:19.

Judge Karnow further found that Ms. Brendt and Ms. Almeida authorized the destruction in "more than one discussion" with Ms. Santagata, and that "[t]hese are the people who knew of this litigation and knew of the litigation hold which covered documents back to 2002." *Id.* at 3:12-15. Judge Karnow also found Ms. Santagata's "running and hiding" email to be "particularly noteworthy," noting that this email is "strong evidence in UEBT's favor." *Id.* at 3:16-4:10. Judge Karnow noted that "UEBT had already served its first set of document requests [prior to the destruction], and Sutter was then under a duty to preserve evidence." *Id.* at 3 n. 4.

Judge Karnow then considered whether the destroyed evidence was material, *i.e.,* that it "had a substantial probability of damaging the moving party's ability to establish an essential element of his claim or defense." *Id.* at 5:5-6:16.  Judge Karnow concluded that the evidence favored UEBT because the documents cover "a relevant time period when Sutter was assertedly

1   implementing its alleged anticompetitive policies and the missing papers … probably reflected

2   Sutter's then current approaches to that implementation as well as its purposes and intent." *Id.* at

3   5:24-6:2.  Similarly, Judge Karnow found that Sutter had failed to meet its burden of

4   demonstrating that there was no prejudice to UEBT from the document destruction, noting that

5   Sutter "cannot credibly make" the assertion that "the documents are not important or [are] fully

6   captured and preserved elsewhere." *Id.* at 6:22-25.

7        Finally, Judge Karnow determined that Sutter's conduct was sufficiently egregious to

8   justify the imposition of sanctions, in that Sutter "positively ordered the destruction … knowing

9   that the evidence was relevant to antitrust issues." *Id.* at 7:22-24.

10       Judge Karnow first ordered Sutter to make efforts to restore backup tapes believed to

11  contain Managed Care Department emails (but not other documents) from the 2002 to 2005

12  period. *Id.* at 9:10-12. This was an attempt to partially address the loss of any emails that might

13  have been contained in the archived Managed Care Department files.  (Because Sutter had

14  transitioned email systems in 2005/2006, backup tapes were the only source of emails predating

15  2006, unless individuals happened to have retained emails in their inbox at the time of the

16  transition.)

17       Judge Karnow then considered UEBT's request for a jury instruction.  While rejecting the

18  language of UEBT's proposed request, he noted that a jury instruction of some sort would be

19  appropriate as one of the remedies for Sutter's misconduct, and noted:  "We will discuss this

20  further after – as the parties have suggested – discovery is closed. *Id.* at 10:6-22.

21       Following Judge Karnow's Order, the parties submitted further briefing regarding Sutter's

22  restoration of backup tapes.  Sutter ended up identifying several tapes that it believed contained

23  emails from the Managed Care Department, some of which it was unable to restore. Ultimately,

24  Sutter produced just 5,683 emails (not counting attachments) from the back up tapes, the vast

25  majority of which were from 2004 and 2005.  Jain Decl. at ¶24.  Only 458 emails were produced

26  from the tapes for the years prior to 2004 – *i.e.*, when Sutter was implementing systemwide

27  contracting and was first considering and commencing the contracting practices at issue in this

28

litigation. *Id*.[3] Thus, Sutter was unable to produce anything close to all the relevant emails for Managed Care Department custodians for the 1995-2005 time period, despite the restoration of backup tapes.

More fundamentally, however, even if Sutter had been able to identify, restore and produce every single email for that time period, that still would not eliminate the prejudice to Plaintiffs from Sutter's spoliation.  Indeed, it is likely that most of the destroyed documents were not emails, but were instead hard copy documents, such as drafts of health plan contracts, internal explanations for the adoption of anti-competitive provisions, meeting packages, agendas, pricing analyses, business strategies and goals, spreadsheets, presentations, and irreplaceable handwritten notes and communications.  Ms. Brendt testified that she sent notes taken during negotiations to off-site storage in the boxes that she later ordered destroyed:

> Q. Do the negotiators ever take hard-copy notes regarding the negotiations?
>
> A. They may, yes…. I may have put notes in a box after a negotiation.
>
> Q. And sent it off-site.
>
> A. Yeah…

Ex. 8 at 214:22-216:25.

Storage practices and technical limitations in the 1995-2005 timeframe mean that these hardcopy documents were not preserved in emails. *See* Ex. 17 at 450:14-451:15 ("financial modeling documents… were too big to actually be emailed;" "Managed Care Department meeting agendas… the most complete form is the handout that's actually provided at the meeting"). Thus, the restoration of backup tapes had only a minor utility and did not address the full scope of harm that Sutter's document destruction caused.

Accordingly, Judge Massullo issued a spoliation sanctions order that again suggested that an adverse evidentiary inference jury instruction would be appropriate after evidence of Sutter's spoliation was presented to the jury.  Ex. 4 at 6-7.

---

[3] In stark contrast, Sutter produced approximately 337,000 emails in the *UEBT* case for the four-year period from 2006 through 2010, an average of approximately 67,000 emails per year that far exceeds the 5,683 emails that Sutter produced for the entire period prior to 2006. Jain Decl., ¶ 24.

11

## V.   ARGUMENT

"Courts may sanction parties responsible for spoliation of evidence in a few ways. First, a court may instruct the jury that it may draw an adverse inference against the party or witness responsible for destroying the evidence." *Stanley Black & Decker, Inc. v. D&L Elite Investments*, LLC, No. C 12-04516 SC (LB), 2014 WL 3738327, at \*9 (N.D. Cal. June 20, 2014), report and recommendation adopted in part, No. 12-CV-04516-SC, 2014 WL 3728517 (N.D. Cal. July 28, 2014) (citing *Glover v. BIC Corp.*, 6 F.3d 1318 (9th Cir. 1993)).

As the Ninth Circuit explained in *Glover*:

> A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence. Such power includes the power where appropriate to order the exclusion of certain evidence…. Short of excluding the disputed evidence, a trial court also has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior.

6 F.3d at 1329 (citing *Akiona v. United States*, 938 F.2d 158 (9th Cir.1991)).

The imposition of an adverse inference instruction is based on two rationales: (1) "the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy it[;]" and (2)"[a]llowing the trier of fact to draw an adverse inference presumably deters parties from destroying relevant evidence before it can be introduced at trial." *Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 981 (9th Cir. 2009) (citation and quotation marks omitted).

Although Sutter's destruction of the 192 boxes was intentional and therefore in bad faith, a finding of "bad faith" is not a prerequisite for an adverse inference jury instruction. *Glover*, 6 F.3d at 1329. "Surely a finding of bad faith will suffice, but so will simple notice of 'potential relevance to the litigation.'" *Id.* (quoting *Akiona*, 938 F.2d at 161)). "In the Ninth Circuit, spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it." *Bordegaray v. Cty. of Santa Barbara*, No. 214CV8610CASJPRX, 2016 WL 7260920, at \*6 (C.D. Cal. Dec. 13, 2016) (quoting *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 976, 993 (N.D. Cal. 2012)).

An adverse inference instruction is appropriate if:

(1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."

*Waters v. Kohl's Dep't Stores, Inc.*, No. 14-CV-00043-KAW, 2015 WL 1519657, at *2 (N.D. Cal. Apr. 2, 2015); *see also In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006); *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, No. EDCV141926JAKSPX, 2016 WL 6609208, at *25 (C.D. Cal. July 12, 2016), report and recommendation adopted, No. EDCV1401926JAKSPX, 2016 WL 6901696 (C.D. Cal. Sept. 2, 2016); *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1053 (S.D. Cal. 2015).

Judge Karnow has already found that: 1) the evidence showed that Sutter had an obligation to preserve the documents it destroyed; 2) Sutter's destruction of documents was intentional; 3) the documents were relevant to the parties' claims and defenses; and 4) that some type of jury instruction would be appropriate in the *UEBT* case.  Ex. 3 at 5-10.  This Court should make the same findings and order an adverse inference jury instruction as a sanction for Sutter's wholesale, intentional and prejudicial destruction of highly relevant documents.

A.   **Sutter Had an Obligation to Preserve its Contracting Department Documents at the Time They Were Destroyed**

Sutter had an obligation to preserve evidence relevant to this lawsuit as soon as the Complaint was served, on September 17, 2012.  As discussed above, Sutter violated this obligation by destroying evidence that was both core to this case and that was specifically called for by UEBT's then-pending discovery requests.

"Although the Ninth Circuit has not precisely defined when the duty to preserve is triggered, courts in this district generally agree that, '[a]s soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action.'" *Waters*, 2015 WL 1519657, at *2–6 (quoting *Napster*, 462 F.Supp.2d at 1067).  Since the obligation to preserve relevant documents arises as soon as a party becomes aware of a potential claim, there can be no dispute that Sutter had that obligation in 2015, nearly three years

13

after this case had been filed and a litigation hold was in place.  Sutter was put on notice that Plaintiffs claimed that its "all or nothing" contracts and anti-steering clauses violated California and federal antitrust law, whether afforded *per se* or Rule of Reason treatment.  Accordingly, Sutter knew that it had an obligation to preserve documents that were prepared during the very period that it began to deploy such contracts and force health plans to accept them.  Indeed, this Court has previously noted that Sutter began to engage in the alleged anticompetitive conduct in the late '90s/early 2000s. *See* Summary Judgment Order at 3:3-6; *Sidibe* Class Order, 333, F.R.D. at 472.

### B.   <u>Sutter Had a Culpable State of Mind</u>

An adverse inference jury instruction is appropriate when documents are destroyed with a culpable state of mind, which Judge Karnow has already found to be the case here.

Culpable intent may be inferred if a party is on notice that documents were potentially relevant and fails to take measures to preserve relevant evidence. *Leon v. IDX Sys. Corp*., 464 F.3d 951, 959 (9th Cir. 2006) ("A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'"); *Colonies Partners, L.P. v. Cty. of San Bernardino*, No. 518CV00420JGBSHK, 2020 WL 1496444, at *6–9 (C.D. Cal. Feb. 27, 2020), report and recommendation adopted, No. 518CV00420JGBSHK, 2020 WL 1491339 (C.D. Cal. Mar. 27, 2020); *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*, No. 15-CV-1893-HRL, 2016 WL 5870218, at *3 (N.D. Cal. Oct. 7, 2016); *Blumenthal Distrib.*, 2016 WL 6609208, at *17-19.

Accordingly, "gross negligence" by the party destroying evidence is sufficient to establish a culpable state of mind for an adverse inference jury instruction.  *Napster*, 462 F. Supp. 2d at 1078; see also *Waters*, 2015 WL 1519657, at *3 ("Whether Kohl's employees destroyed the potentially relevant evidence unintentionally or intentionally is of no consequence, because Plaintiff may obtain an adverse inference instruction even in the absence of a finding of bad faith.") (citing *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp*., 982 F.2d 363, 368 n. 2 (9th Cir.1992) and *Glover v. BIC Corp*., 6 F.3d 1318, 1329 (9th Cir.1993)).

The evidence regarding Sutter's decision to destroy 192 boxes of Managed Care documents from a crucial time period conclusively establishes Sutter's culpable state of mind.  Sutter acted with deliberate intent.  Ms. Santagata confirmed that her boss, Ms. Brendt – a Sutter Vice President and the head of the Managed Care Department – personally selected the ten-year time frame for boxes to be destroyed.  Ex. 1 at 50:9-24 ("Q. And who gave you the instruction about the time frame for documents to be destroyed? A. Melissa Brendt.").  *See also id.* at 66:6-15 ("Q. And that instruction would have come from Melissa Brendt? A. In this case that you're speaking of on those documents, yes. I wouldn't just do it.").

Before Ms. Brendt and Ms. Almeida accelerated the "destruction date" for the 192 boxes, the "packet" cataloguing all Managed Care Department boxes that Ms. Santagata received in March 2015 listed a destruction date 20 years later (in 2035) for every single box. Ex. 13; *see also* Ex. 1 at 82:17-83:7. The evidence shows that Ms. Santagata had multiple discussions with Ms. Brendt to decide which boxes of Managed Care Department files she wished to destroy. Ex. 3 at 3:9-20.

At Ms. Brendt's direction, on July 28, 2015, Ms. Santagata instructed the Sutter Records department to destroy all 192 boxes of Managed Care Department filed in Sutter's archives between 1995 and 2005. Ms. Santagata testified that she issued this instruction at the "direction from Melissa Brendt and Daniela Almeida."  Ex. 1 at 171:15-18.

The day Ms. Santagata sent her signed authorization to the Records department for the boxes of documents to be destroyed, she acknowledged guilt in an email to Ms. Brendt (Jain Decl. Ex. 2) that read:

> I've pushed the button ...if someone is in need of a box between 3/15/95 & 11/23/05 ...I'm running and hiding. I did give Jan an 'fyi' as if anyone needed a box ...it would be Ms. Voge. **"Fingers crossed" that I haven't authorized something the FTC will hunt me down for.**

(emphasis added).  Ms. Santagata further testified that, to her knowledge, ***this was the only time the Managed Care Department had ever approved the destruction of any boxes of documents*** since she started at Sutter in 2001. Ex. 1 at 70:1-71:13 (emphasis added). The documents were not scheduled to be destroyed until 2035. Ex. 3 at 2:22-24; Ex. 1 at 82:1-5.  Thus, during a pending

lawsuit, Ms. Brendt decided to destroy 192 boxes of documents subject to a litigation hold, containing information directly relevant to this lawsuit twenty years earlier than scheduled.

Even routine destruction constitutes spoliation where a party "had 'some notice that the documents were potentially relevant' to the litigation before they were destroyed[.]" *Colonies Partners*, 2020 WL 1496444, at *7 (quoting *United States v. Kitsap Physicians Svs*., 314 F.3d 995, 1001 (9th Cir. 2002)).  Accordingly, courts in the Ninth Circuit consistently find culpable intent if parties fail to preserve documents that were routinely scheduled for destruction under corporate document retention policies.  *See e.g.*, *Napster, Inc*., 462 F. Supp. 2d at 1070 (A party must "suspend any existing policies related to deleting or destroying files and preserve all relevant documents related to the litigation."); *Compass Bank*, 104 F. Supp. 3d at 1052; *Oppenheimer v. City of La Habra*, No. SACV1600018JVSDFMX, 2017 WL 1807596, at *11 (C.D. Cal. Feb. 17, 2017).

Destruction of all of Sutter's Managed Care department files from the critical years when Sutter formulated and implemented the anticompetitive restraints at issue in this case – ***which were subject to a litigation hold*** – more than satisfies the culpable intent requirement.  The fact that these crucial documents were subject to a litigation hold, and Ms. Santagata had to falsely attest that they were not, in order to carry out Ms. Brendt's instruction to destroy them further demonstrates the willful and egregious nature of Sutter's spoliation.

Because Sutter acted willfully and in bad faith, a strong remedial jury instruction is necessary, appropriate, and justified.  "[A]n adverse inference instruction can take many forms, again ranging in degrees of harshness. The level of harshness should be commensurate with the egregiousness of the conduct." *Blumenthal Distrib*., 2016 WL 6609208, at *10 (citation and internal quotations omitted).

> There are three levels of instructions generally considered: (1) "when a spoliating party has acted willfully or in bad faith, the jury can be instructed that certain facts are deemed admitted and must be accepted as true"; (2) "when a spoliating party has acted willfully or recklessly, a court may impose a mandatory presumption"; and (3) the least harsh instruction "permits (but does not require) a jury to presume that the lost evidence is both relevant and favorable to the innocent party." Id. (citation omitted).

*Id.* (quoting *Apple Inc. v. Samsung Elecs. Co*., 881 F. Supp. 2d 1132, 1150 (N.D. Cal. 2012)).

Plaintiffs are seeking the mid-level sanction of a mandatory presumption instruction, even though the harshest level of instruction would also be appropriate and commensurate with the egregiousness of Sutter's bad faith and willful spoliation of 192 boxes of important evidence. Sutter's conscious destruction of these critical documents – after extensive internal deliberation – specifically authorized by Sutter's key witness (Ms. Brendt) and Sutter's in-house counsel responsible for this litigation (Ms. Almeida) conclusively demonstrates that Sutter's conduct far exceeds the "willfully or recklessly" threshold for a mandatory presumption instruction. *See Blumenthal Distrib*., 2016 WL 6609208, at *25 (ordering mandatory presumption instruction although evidence did not show deliberate intent); *Compass Bank*, 104 F. Supp. 3d at 1060.

### C.   The Evidence Sutter Destroyed Was Relevant to the Parties' Claims and Defenses

"In the Ninth Circuit, spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it." *Dong Ah Tire & Rubber Co., Ltd. v. Glasforms, Inc*., No. C 06–3359 JF, 2009 WL 1949124, at *10 (N.D .Cal. July 2, 2009) (citing *Phoceene Sous–Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir.1982)); "[T]he presence of bad faith automatically establishes relevance." *S.E.C. v. Mercury Interactive LLC*, No. 07-2822-WHA (JSC), 2012 WL 3277165, at *10 (N.D. Cal. Aug. 9, 2012). The party seeking sanctions must show relevance only if the destruction of evidence was negligent rather than intentional. *Id.*

Even in cases of negligent spoliation where relevance must be shown, courts require only a showing of potential or likely relevance, since the spoliating party's wrongful destruction of evidence hampers proof or relevance. *See Leon v. IDX Sys. Corp*., 464 F.3d at 960 ("any number of the 2,200 files could have been relevant to IDX's claims or defenses, although it is impossible to identify which files and how they might have been used,"); *Residential Funding Corp. v. DeGeorge Fin. Corp*., 306 F.3d 99, 109 (2d Cir. 2002) (noting that holding victims of spoliation " 'to too strict a standard of proof regarding the likely contents of the destroyed evidence ... would

1    ... allow parties who have ... destroyed evidence to profit from that destruction'").

2          It cannot be disputed that the destroyed files – consisting of the entirety of the archived

3    hard copy files from the relevant department for the time period when Sutter implemented the

4    anti-competitive contract provisions and strategies that underlie this lawsuit – were relevant to the

5    claims in this case.  The destroyed files contained, among other things, handwritten notes and

6    other non-electronic documents that, by their nature, would not exist anywhere except in the

7    destroyed boxes.[4]

8          In this case, Sutter asserts there are procompetitive justifications for the challenged

9    conduct, including its decision to go from individual hospital to systemwide contracting. *See* Ex. 5

10   at ¶8 (individual contracts between Sutter hospitals and providers with health plans were

11   "inefficient" and "time-consuming"). These purported justifications are irrelevant to Plaintiffs'

12   Cartwright and Sherman Act *per se* tying clams, as business justifications are not a defense to *per*

13   *se* tying.  The history of Sutter's contractual restraints and its reasons for adopting them are,

14   however, potentially relevant to their Cartwright and Sherman Act unreasonable restraint claims.

15   *See In re Cipro Cases I & II*, 61 Cal. 4th 116, 146 (2015) (to determine whether an agreement

16   harms competition under the rule of reason a court may consider factors including "the history of

17   the restraint and the reasons for its adoption.").  Thus, documents from the very period when

18   Sutter was planning and implementing the all-or-none, anti-tiering, non-par, and price secrecy

19   contract provisions are highly relevant.

20          As a result of the destruction, however, Plaintiffs have been denied substantial evidence

21

22   ───────────────
     [4] Sutter's massive destruction of these unique records was so extensive that, after Judge Karnow
23   ruled that Sutter was guilty of intentional spoliation, Sutter spent 7000 hours trying to reconstruct
     them.  Sutter, however, only attempted to reconstruct the 55 boxes that it asserted were relevant.
24   Of those 55 boxes, Sutter could not reconstruct a full box's worth of documents for 17 of them.
     *See* Jain Decl. at ¶24.  Furthermore, Sutter's partial reconstruction of just 29% of the 192
25   destroyed boxes did not reproduce all the additional pages of documents on CDs, DVDs, tapes and
     other electronic media in the destroyed boxes nor did it reproduce all the handwritten notes on the
26   hard copy documents.  Moreover, even as to the boxes Sutter recreated, the Sutter employee in
     charge of the effort admitted that their reconstruction was, at best, "guesswork."  Ex. 16 at 104:20-
27   24.  The fact that Sutter did not recreate at least 154 boxes of documents, and none of the boxes
     could be completely recreated, underscores the permanent damage resulting from its intentional
28   destruction of these documents.

1  concerning these crucial issues. Only a few documents concerning Sutter's intent have been

2  produced and they show that Sutter's intent, in fact, was anticompetitive.  For example, in a

3  surviving document from 1997 Ed Berger, of Sutter's Managed Care Division explained that the

4  purpose of systemwide contracting was "the increased leverage that twenty-one hospitals can

5  achieve by working together."  Ex. 18 at DEF001924640.  A memorandum written by Sutter's

6  CFO Robert Reed in 1998, which he referred to as "a 'start' on the Pricing Policy", discusses how

7  Sutter could increase the prices it charged health plans. Ex. 19.[5] It is extremely likely that the

8  destroyed documents contained additional internal analyses regarding the reasons why Sutter

9  made the dramatic shift to systemwide contracting, adopted an express all-or-nothing clause,

10  replaced the express all-or-nothing clause with a non-par provision, and added anti-tiering and

11  anti-steering provisions.  Plaintiffs could have and would have relied on these materials to prove

12  their case.

13  Many Sutter witnesses who were central to Sutter's operations from 1995-2005 claimed a

14  lack of memory concerning why Sutter chose to implement the key contract provisions challenged

15  in this case. The witnesses included, among others: Sarah Krevans, the Senior Vice President of

16  Managed Care until 2000 and CEO since 2016;[6] Van Johnson, Sutter's CEO from 1995-2005; Pat

17  Fry, Sutter's COO from 2000-2006 and CEO from 2005 -2016; and Todd Smith, Sutter's PMQ for

18  contracting relationships. Exs. 20-23.[7]  Had Sutter not intentionally destroyed these documents,

19  Plaintiffs would have had the opportunity to refresh the recollection of those witnesses and/or

20  impeach their testimony with those destroyed documents.

21  The lack of impeaching evidence also left other witnesses, notably Ms. Brendt, free to

22

23  [5] The fact that Sutter produced these documents in discovery shows that documents from this time
24  period are relevant to this case.  Indeed, Sutter has included the 1998 Reed memorandum in its
   own exhibit list. Jain Declaration at ¶22.

25  [6] For example, Sarah Krevans, who is currently Sutter's CEO and previously was head of
26  Sutter's Managed Care Department, testified that she left all her files on contracting from the
   1999-2000 timeframe with the Managed Care Department or in storage.  Krevans Dep. at
27  291:20-292:3, Jain Decl. Ex. 19.

28  [7] Specific examples and further details regarding the purported lack of memory of these witnesses
   are provided as exhibits to the Jain Declaration at ¶23.

1  advance theories with virtually no connection to any documentary evidence and free from

2  concerns about cross-examination based on contemporaneous documents.

3  **VI.   CONCLUSION**

4       Sutter's intentional destruction of the entirety of its archived Managed Care Department

5  files from 1995-2005 profoundly hindered the search for truth about Sutter's anticompetitive

6  conduct that has harmed millions of Californians.  Plaintiffs request measured relief designed to

7  attempt (however inadequately) to put Plaintiffs in the position they would be in had Sutter not

8  destroyed important evidence.

9       Plaintiffs request that the Court: (1) find that Sutter intentionally spoliated materials; and

10  (2) enter an Order approving a jury instruction informing the jury of the Court's factual findings

11  and directing the jury to infer that the documents in the destroyed files would have supported

12  Plaintiffs' claims and would have undermined Sutter's defenses.  Such an instruction "is

13  proportional to Defendant's spoliation, because [Sutter] willfully destroyed relevant evidence that

14  has significantly hampered Plaintiff[s'] ability to go to trial."  *Waters*, 2015 WL 1519657, at *2–6.

15  The precise wording of the instruction should be determined after the parties submit their sets of

16  proposed jury instructions. *See Napster*, 462 F. Supp. 2d at 1078; *Blumenthal Distrib*., 2016 WL

17  6609208, at *25; *Ramos v. Swatzell*, No. EDCV121089BROSPX, 2017 WL 2857523, at *5–6

18  (C.D. Cal. June 5, 2017), report and recommendation adopted, No. EDCV121089BROSPX, 2017

19  WL 2841695 (C.D. Cal. June 30, 2017).

20  Dated: March 19, 2021

21
22  Respectfully submitted,

23  /s/ *Jean Kim*
       DAVID C. BROWNSTEIN (141929)

24  MATTHEW L. CANTOR (admitted phv)     WILLIAM S. FARMER (46694)
    JEAN KIM (admitted phv)                DAVID M GOLDSTEIN (142334)

25  J. WYATT FORE (admitted phv)          FARMER BROWNSTEIN JAEGER &
    CONSTANTINE CANNON LLP               GOLDSTEIN LLP

26  335 Madison Avenue                    235 Montgomery Street, Suite 835
    New York, NY 10017                    San Francisco, CA 94104

27  (212) 350-2738                        (415) 795-2050
    (212) 350-2701 (fax)                  (415) 520-5678 (fax)

28  mcantor@constantinecannon.com         dbrownstein@fbj-law.com

jkim@constantinecannon.com
wfore@constantinecannon.com

AZRA Z. MEHDI (220406)
One Market
Spear Tower, Suite 3600
San Francisco, CA 94105
(415) 293-8039
(415) 293-8001 (fax)
azram@themehdifirm.com

wfarmer@fbj-law.com
dgoldstein@fbj-law.com

ALLAN STEYER (100318)
D. SCOTT MACRAE (104663)
JILL M. MANNING (178849)
SUNEEL JAIN (314558)
STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
235 Pine Street, 15th Floor
San Francisco, CA 94104
(415) 421-3400
(415) 421-2234 (fax)
asteyer@steyerlaw.com
smacrae@steyerlaw.com
jmanning@steyerlaw.com
sjain@steyerlaw.com

*Counsel for Plaintiffs and the Class*