CONSTANTINE CANNON LLP
MATTHEW L. CANTOR (*pro hac vice*)
JEAN KIM (*pro hac vice*)
335 Madison Avenue, 9th Floor
New York, NY 10017
Telephone: (212) 350-2700
Facsimile: (212) 350-2701
mcantor@constantinecannon.com
jkim@constantinecannon.com

*Lead Counsel for Plaintiffs and the Class*

JONES DAY
Jeffrey A. LeVee (State Bar No. 125863)
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 489-3939
Facsimile: (213) 243-2539
jlevee@JonesDay.com

*Counsel for Defendant Sutter Health*

THE MEHDI FIRM
AZRA Z. MEHDI (State Bar No. 220406)
One Market Street
Spear Tower, Suite 3600
San Francisco, CA 94105
Telephone: (415) 293-8039
Facsimile: (415) 293-8001
azram@themehdifirm.com

*Co-Lead Counsel for Plaintiffs and the Class*

BARTKO ZANKEL BUNZEL & MILLER
Robert H. Bunzel (State Bar No. 99395)
Patrick M. Ryan (State Bar No. 203215)
Oliver Q. Dunlap (State Bar No. 225566)
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Telephone: (415) 956-1900
Facsimile: (415) 956-1152
rbunzel@bzbm.com
pryan@bzbm.com
odunlap@bzbm.com

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| DJENEBA SIDIBE, et al., | Case No. 3:12-CV-04854-LB |
|---|---|
| Plaintiffs, | **JOINT PROPOSED JURY INSTRUCTIONS (DISPUTED & STIPULATED)** |
| v. | |
| SUTTER HEALTH, | Courtroom:  B, 15th Floor |
| Defendant. | Judge:  The Hon. Laurel Beeler |
| | Date:  August 19, 2021 |
| | Time:  1:00 PM |

Plaintiffs, Djeneba Sidibe et al., and Defendant Sutter Health, submit the following Joint Jury Instructions (Disputed and Stipulated).  As required by the Court's Case Management and Pretrial Order (ECF No. 114), each of the instructions includes citations to authority.  If undisputed, an instruction is labeled "STIPULATED INSTRUCTION NO. __."  If disputed, the parties' versions bear the same instruction number, labeled with the sponsoring party's name. Modifications to non-substantive form instructions are identified in red in the proposed instruction or in brackets following the source of the instruction.  Where modifications to form instructions have been made (other than removing brackets or bracketed material), the form instructions are included in the packet following the parties' proposed instruction.  For the substantive antitrust instructions, modifications to the CACI or other form instructions are explained in the parties' notes with those instructions.

The parties have in general included their arguments supporting or opposing any proposed instruction in the notes following their proposed instruction on that topic.  However, for certain issues (as identified in the notes), the parties are presenting their arguments in separate legal memoranda filed concurrently with this joint submission.

The parties each preserve all of their arguments regarding legal or factual issues in this case, including arguments made in connection with the pleadings, class certification, summary judgment, *Daubert* motions, and motions in limine.  The parties also reserve their right to assert at trial, and to file appropriate motions asserting, that some or all of the proposed instructions should not be given because the evidence at trial does not warrant them or establishes that they should not be given.

The parties also reserve their right to propose additional instructions or modified instructions based on developments at trial, including this Court's rulings on the instructions proposed in this submission.  Should the Court determine, for example, the jury must resolve any relevant disputes in extrinsic evidence pertaining to contract interpretation, Sutter may propose instructions relevant to the jury's consideration of that issue.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

PRELIMINARY INSTRUCTIONS ............................................................... 1

Stipulated Instruction No. P-1 – Duty of the Jury (Before Trial) ............................................. 2

Plaintiffs' Instruction No. P-2 – Overview and Contentions of the Parties ........................... 3

Sutter's Instruction No. P-2 – Claims and Defenses ............................................................. 5

Model Instruction No. P-2 (Ninth Circuit No. 1.5) – Claims and Defenses ........................... 7

Plaintiffs' Instruction No. P-3 – Class Action ....................................................................... 8

Sutter's Instruction No. P-3 – Class Action ......................................................................... 10

Plaintiffs' Instruction No. P-4 – Burden of Proof – Preponderance of the Evidence ........... 11

Sutter's Instruction No. P-4 – Burden of Proof – Preponderance of the Evidence .............. 12

Stipulated Instruction No. P-5 – Opening Instructions ........................................................ 13

Stipulated Instruction No. P-6 – What Is Evidence ............................................................. 14

Stipulated Instruction No. P-7 – What Is Not Evidence ....................................................... 15

Stipulated Instruction No. P-8 – Evidence For Limited Purpose .......................................... 16

Stipulated Instruction No. P-9 – Direct And Circumstantial Evidence ................................. 17

Stipulated Instruction No. P-10 – Ruling On Objections...................................................... 18

Stipulated Instruction No. P-11 – Judges Questions to Witnesses ...................................... 19

Stipulated Instruction No. P-12 – Credibility Of Witnesses................................................. 20

Plaintiffs' Instruction No. P-13 -Willful Suppression of Evidence ...................................... 21

Sutter's Objection to Plaintiffs' Instruction No. P-13 .......................................................... 23

Stipulated Instruction No. P-14 – Conduct Of The Jury...................................................... 24

Stipulated Instruction No. P-15 – Publicity During Trial ..................................................... 26

Stipulated Instruction No. P-16 – No Transcript Available to Jury...................................... 27

Stipulated Instruction No. P-17 – Taking Notes ................................................................. 28

Stipulated Instruction No. P-18 – Questions To Witnesses By Jurors During Trial ............. 29

Stipulated Instruction No. P-19 – Bench Conferences And Recesses ................................... 30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Stipulated Instruction No. P-20 – Outline of Trial ................................................31

INSTRUCTIONS IN THE COURSE OF TRIAL ........................................................ 32

Stipulated Instruction No. M-1 – Cautionary Instructions.....................................33

Stipulated Instruction No. M-2 – Stipulations Of Fact ..........................................34

Stipulated Instruction No. M-3 – Deposition In Lieu Of Live Testimony ............................35

Stipulated Instruction No. M-4 – Use Of Interrogatories .......................................36

Stipulated Instruction No. M-5 – Use Of Requests For Admission.......................................37

Stipulated Instruction No. M-6 – Expert Opinion ..................................................38

Stipulated Instruction No. M-7 – Charts And Summaries Not Received In Evidence..........39

Stipulated Instruction No. M-8 – Charts And Summaries Received In Evidence................40

Stipulated Instruction No. M-9 – Duty of the Jury (End of Case)........................................41

SUBSTANTIVE INSTRUCTIONS ............................................................................ 42

Plaintiffs' Instruction No. S-1 – Cartwright Act – Purposes and Goals ................................43

Sutter's Instruction No. S-1 – Cartwright Act – Overview ....................................45

Plaintiffs' Instruction No. S-2 – Cartwright Act – Tying Explained.....................................47

Sutter's Objection to Plaintiffs' Instruction No. S-2 – Tying Explained..............................50

Plaintiffs' Instruction No. S-3 – Elements – Per Se Unlawful Tying...................................52

Sutter's Instruction No. S-3 – Tying.......................................................................55

Model Instruction No. S-3 – 3420 Tying.................................................................60

Plaintiffs' Instruction No. S-4 – Tying—"Product Market" Explained................................61

Sutter's Instruction No. S-4 – Product Market Explained ......................................62

Model Instruction No. S-4 – Rule of Reason—"Product Market" Explained......................64

Plaintiffs' Instruction No. S-5 – Tying—"Geographic Market" Explained .........................65

Sutter's Instruction No. S-5 – Rule of Reason—"Geographic Market" Explained...............67

Model Instruction No. S-5—3414 Rule of Reason—"Geographic Market"
Explained ........................................................................................................69

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs' Instruction No. S-6 – Tying—"Economic Power" Explained ..............................70

Sutter's Instruction No. S-6 – Tying—"Economic Power" Explained...................................72

Model Instruction No. S-6 – 3423 Tying—"Economic Power" Explained...........................74

Plaintiffs' Instruction No. S-7 – Cartwright Act – Rule of Reason ......................................75

Sutter's Instruction No. S-7 – Unreasonable Restraint of Trade ..........................................79

Model Instruction No. S-7 – 3405 Horizontal and Vertical Restraints (Use for
    Direct Competitors or Supplier/Reseller Relations)—Other Unreasonable
    Restraint of Trade—Rule of Reason—Essential Factual Elements...........................83

Plaintiffs' Instruction No. S-8 – Cartwright Act— Course of Conduct.................................84

Sutter's Objection to Plaintiffs' Instruction No. S-8 ............................................................86

Plaintiffs' Instruction No. S-9 – Rule of Reason – Direct and Circumstantial
    Evidence of Anticompetitive Effects.........................................................................87

Sutter's Objection to Plaintiffs' Instruction No. S-9 ............................................................88

Plaintiffs' Instruction No. S-10 – Rule of Reason – "Market Power" Explained.................89

Sutter's Instruction No. S-10 –Rule of Reason – "Market Power" Explained .....................90

Model Instruction No. S-10 – 3412 Rule of Reason—"Market Power" Explained .............92

Plaintiffs' Instruction No. S-11 – Rule of Reason—Anticompetitive Versus
    Beneficial Effects.......................................................................................................93

Sutter's Instruction No. S-11 – Anticompetitive Versus Beneficial Effects.........................95

Model Instruction No. S-11 – 3411 Rule of Reason—Anticompetitive Versus
    Beneficial Effects.......................................................................................................97

Sutter's Instruction No. S-12 – Harm to Competition ..........................................................98

Plaintiffs' Response to Sutter's Instruction No. S-12 ...........................................................99

Sutter's Instruction No. S-13 – Cartwright Act – Refusal to Deal .....................................100

Plaintiffs' Response to Sutter's Instruction No. S-13 .........................................................101

Sutter's Instruction No. S-14 – Cartwright Act – Right to Set Own Prices........................102

Plaintiffs' Response to Sutter's Instruction No. S-14 .........................................................103

Sutter's Instruction No. S-15 – Cartwright Act – Lawful Discounts..................................104

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs' Response to Sutter's Instruction No. S-15 ........................................................105

Sutter's Instruction No. S-16 – Confidential Information ..................................................106

Plaintiffs' Response to Sutter's Instruction No. S-16 .........................................................107

Plaintiffs' Instruction No. S-17 – Causation – Substantial Factor......................................108

Sutter's Instruction No. S-17 – Causation: Substantial Factor ...........................................109

Model Instruction No. S-17 – 430 Causation: Substantial Factor .......................................110

Plaintiffs' Instruction No. S-18 – Damages .........................................................................111

Sutter's Instruction No. S-18 – Damages .............................................................................114

Model Instruction No. S-18 – 3440 Damages ......................................................................117

Model Instruction No. S-18 – 3924 No Punitive Damages ..................................................117

Model Instruction No. S-18 – 219 Expert Witness Testimony.............................................117

CONCLUDING INSTRUCTIONS ................................................................................................ 119

Stipulated Instruction No. C-1 – Duty To Deliberate ..........................................................120

Stipulated Instruction No. C-2 – Consideration Of Evidence—Conduct Of The Jury ........121

Stipulated Instruction No. C-3 – Communication With Court .............................................123

Stipulated Instruction No. C-4 – Readback Or Playback......................................................124

Stipulated Instruction No. C-5 – Return Of Verdict ............................................................125

Stipulated Instruction No. C-6 – Additional Instructions Of Law.......................................126

Stipulated Instruction No. C-7 – Deadlocked Jury ..............................................................127

Stipulated Instruction No. C-8 – Continuing Deliberations After Juror Is Discharged.......128

Stipulated Instruction No. C-9 – Post-Discharge Instruction ..............................................129

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# PRELIMINARY INSTRUCTIONS

**Stipulated Instruction No. P-1 – Duty of the Jury (Before Trial)**

Members of the jury:  You are now the jury in this case.  It is my duty to instruct you on the law.

It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you whether you agree with it or not.  And you must not be influenced by any personal likes or dislikes, opinions, prejudices or sympathy.  That means that you must decide the case solely on the evidence before you.  You will recall that you took an oath to do so.

At the end of the trial I will give you final instructions.  It is the final instructions that will govern your duties.

Please do not read into these instructions, or anything I may say or do, that I have an opinion regarding the evidence or what your verdict should be.

**Source:**  9th Cir. Model Jury Instructions (2020) No. 1.3 (verbatim)

**Plaintiffs' Instruction No. P-2 – Overview and Contentions of the Parties**

The Plaintiffs are individuals and employers that are located in Northern California who paid premiums, either in whole or in part, for health insurance between January 1, 2011 and the present. The Plaintiffs represent a Class of over three million Class Members who also paid premiums to health insurance companies during this time.  The defendant is Sutter Health, a health care system that owns and operates 24 hospitals, in addition to various medical service providers in Northern California.

This case involves health insurance provided by Anthem Blue Cross, Blue Shield of California, United Healthcare, Aetna and Health Net.  These health insurance companies cover medical expenses incurred for medical services provided to their members, including those provided at Sutter hospitals.  They also contract with Sutter for services that Sutter provides to their members.

Plaintiffs claim that Sutter has engaged in two forms of anticompetitive conduct that violates California's antitrust law known as the Cartwright Act and which enabled Sutter to charge higher prices for Inpatient Hospital Services that these health insurers purchased on behalf of their members.  First, Plaintiffs claim that Sutter used its economic power in Northern California markets where it is dominant to force health plans to purchase or contract for Sutter's Inpatient Hospital Services in other Northern California markets.  Plaintiffs claim that the prices for Inpatient Hospital Services that these health plans were forced to pay were higher than they would have been without this forcing.  Second, Plaintiffs claim that Sutter's contracts with health plans reduced consumer choice and competition by hindering health plans from developing or offering effective lower-cost health insurance network products to Class Members.  According to Plaintiffs, Sutter would have reduced its pricing if the growth of these lower-cost network products was not hindered by Sutter.

Plaintiffs have the burden of proving these claims.

Sutter denies those claims and also contends that…[list affirmative defenses]]. Sutter has the burden of proving these affirmative defenses.  Plaintiffs deny Sutter's affirmative defenses.

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 1.5 (2020).

**Argument:** "[A] litigant is entitled to have the jury charged concerning his theory of the case if there is any direct or circumstantial evidence to support it. *Apple Inc. v. Samsung Elecs. Co*., 2017 WL 4776443, at *18 (N.D. Cal. Oct. 22, 2017) (quoting *Don Burton, Inc. v. Aetna Life & Cas. Co*., 575 F.2d 702, 706 (9th Cir. 1978)). Plaintiffs proposed instruction sets forth a short neutral description of their claims.

Sutter's proposed Claims and Defenses instruction does not accurately describe Plaintiffs' claims. For example, Sutter fails to mention Plaintiffs' tying claim and states that Plaintiffs assert that "Sutter entered into agreements with the five insurance companies that unreasonably restrained trade" without stating that Plaintiffs assert that Sutter forced these anticompetitive agreements on the health plans. Plaintiffs should be allowed to accurately explain their own claims to the jury. Sutter may summarize its defenses to Plaintiffs' claims but has not done so in its proposed instruction.

Sutter's argues that Plaintiffs should not be allowed to describe their tying claim as "Sutter used its economic power in Northern California markets where it is dominant to force health plans to purchase or contract for Sutter's Inpatient Hospital Services in other Northern California markets" because, according to Sutter, being forced to contract for services does not constitute tying. Sutter is wrong. In *Datagate, Inc. v. Hewlett-Packard Co*., 941 F.2d 864 (9th Cir. 1991), the Ninth Circuit found the evidence of a tying violation sufficient to survive summary judgment where the plaintiff theory was that defendant "**threatened to withhold software service if customers did not also contract for hardware service**." *Id*. at 870 (emphasis added).

In *UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357 (2008), the Cartwright Act case that most closely resembles this case, the court found that the evidence supported a *per se* tying violation where insurers were forced to accept contracts with restrictive contractual provisions that required health plans to give defendant preferential network status for outpatient services as a condition for purchasing the defendant's must-have inpatient services. *Id*. at 371. Requiring insurers to contract for both outpatient services and inpatient services in a single contract with restrictive provisions was sufficient to establish a *per se* tie although the contract did not "require the insurers to purchase any services from respondent." *Id*. Similarly, in *Suburban Mobile Homes, Inc. v. Amfac Communities, Inc*., 101 Cal. App. 3d 532, 538 (1980), the court found a *per se* tying arrangement based on a written agreement between a trailer park operator and mobile home dealers with restrictive provisions. *Id*. at 538. The court found that the plaintiff's "business was seriously affected by the aforesaid restrictive agreements and the actual sales practice conducted pursuant thereto." *Id*. *See also In re Visa Check/Mastermoney Antitrust Litig*., 2003 WL 1712568, *4 (E.D.N.Y. Apr. 1, 2003).

Sutter forced the health plans to accept Systemwide Contracting whereby the health plans could not purchase Inpatient Hospital Services from any Sutter hospital unless they contracted with all Sutter hospitals. The health plans were contractually required to include all Sutter's hospitals in network as a default and could only exclude or tier them if Sutter so agreed. And, if Sutter did so agree, the health plans were then required to pay penalty rates for services rendered at those hospitals. This is a *per se* tie.

Accordingly, Plaintiffs' instruction regarding the contentions of the parties should be given.

**Sutter's Instruction No. P-2 – Claims and Defenses**

The Plaintiffs are individuals and employers that are located in Northern California who paid premiums, either in whole or in part, for health insurance between January 1, 2011 and the present.  The Plaintiffs represent a Class of other individual and employers that also paid premiums to health insurance companies during this time.  The defendant is Sutter Health, a health care system that owns and operates 24 hospitals, in addition to various medical service providers in Northern California.

This case involves health insurance provided by Anthem Blue Cross, Blue Shield of California, United Healthcare, Aetna and Health Net.  These health insurance companies cover medical expenses incurred for medical services provided to their members, including those provided at Sutter hospitals.  They also contract with Sutter for services that Sutter provides to their members.

Plaintiffs claim that Sutter engaged in two forms of conduct that they allege violate California's antitrust statute, known as the Cartwright Act.  First, plaintiffs claim that Sutter has engaged in tying of its Inpatient Hospital Services.  Specifically, plaintiffs claim that Sutter has economic power in seven Northern California markets where it operates the following hospitals: Alta Bates Summit Medical Center, Sutter Amador Hospital, Sutter Coast Hospital, Sutter Lakeside Hospital, Sutter Auburn Faith Hospital, Sutter Delta Medical Center, and Sutter Tracy Community Hospital.  Plaintiffs claim that Sutter refused to sell Inpatient Hospital Services at these seven hospitals unless the insurance companies also purchased Inpatient Hospital Services at CPMC, Sutter Modesto, Sutter Sacramento Medical Center, and Sutter Santa Rosa.  Plaintiffs contend that the insurance companies paid higher prices at CPMC, Sutter Modesto, Sutter Sacramento, and Sutter Alta Bates Summit Medical Center as a result of the alleged tying.

Second, plaintiffs claim that Sutter's agreements with the five insurance companies contained certain terms that they allege unreasonably restrained competition and resulted in increased prices for Inpatient Hospital Services at CPMC, Sutter Modesto, Sutter Sacramento, and Alta Bates Summit Medical Center.  Specifically, plaintiffs contend that the following terms violate the Cartwright Act: (i) terms related to the rates charged by Sutter hospitals when they do

not participate in a network or product; (ii) terms related to tiering of Sutter hospitals or how Sutter hospitals are treated in networks or products; and (iii) terms related to confidentiality of prices negotiated between Sutter and the insurance companies.  Plaintiffs contend that prices for Inpatient Hospital Services at CPMC, Sutter Modesto, Sutter Sacramento, and Sutter Alta Bates Summit Medical Center were higher than they otherwise would have been absent the provisions.

Plaintiffs allege that the alleged higher prices were passed on to plaintiffs and class members through higher health insurance premiums they paid to the five insurance companies.  The plaintiff has the burden of proving these claims including damages.

Sutter denies that it tied the sale of its inpatient hospital services or that any of its contract terms unreasonably restrained competition or caused any increase in prices or insurance premiums.  Sutter also claims that it had legitimate business justifications for its conduct and contract terms that benefited competition and consumers, and that these benefits outweigh any impact on competition.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.5 (additions in red)

<u>**Sutter's Objection to Plaintiffs' Instruction No. P-2**</u>

Sutter generally agrees with the first two paragraphs of Plaintiffs' Instruction No. P-2 and has included them (with minor edits) in its proposed instruction.  Sutter also agrees that the jury should be given a brief overview of plaintiffs' two claims and Sutter's defenses.  Plaintiffs' overview, however, is argumentative and risks jury confusion over what portion describes plaintiffs' contentions and theories, and what, if anything, represents the law.  Among other things, the overview conflates "contract[ing]" with Sutter with purchasing hospital services, which is improper for the reasons explained in Sutter's Objection to Plaintiffs' Instruction Nos. S-2 and S-3.  *Apple Inc. v. Samsung Elecs. Co.*, 2017 WL 4776443, at *16, stands only for the proposition that a party is entitled to substantive instructions advising the jury on the law (there, what could constitute an "article of manufacture" in a patent-infringement case); it provides no support for including a prefatory instruction that is argumentative and risks confusion.  Plaintiffs' high-level overview also does not sufficiently describe plaintiffs' theories as alleged in their complaint, pretrial motion practice, and expert disclosures.  Sutter's proposed instruction will better assist the jury in understanding what is at issue in this case and what it must decide.

**Model Instruction No. P-2 (Ninth Circuit No. 1.5) – Claims and Defenses**

To help you follow the evidence, I will give you a brief summary of the positions of the parties:

The plaintiff asserts that [*plaintiff's claims*].  The plaintiff has the burden of proving these claims.

The defendant denies those claims [and also contends that [*defendant's counterclaims and/or affirmative defenses*]].  [The defendant has the burden of proof on these [*counterclaims and/or affirmative defenses.*]]

[The plaintiff denies [*defendant's counterclaims and/or affirmative defenses*].]

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Plaintiffs' Instruction No. P-3 – Class Action**

This case is proceeding as a "class action." A class action is a procedure that allows the filing of one lawsuit by a representative or a small number of representatives on behalf of numerous unnamed plaintiffs who have similar claims. The procedure is intended to avoid having potentially millions of people and companies with similar claims start their own individual lawsuits before different judges and different juries, or to be prevented from doing so because the cost of litigating their claim far outweighs the amount of their individual loss. In short, the class action procedure avoids duplication of effort and expense. Your verdict here will be binding on all class members.

Prior to this trial, I have ruled that this case is a proper class action. The Class in this case is defined as:

> All entities in California Rating areas 1, 2, 3, 4, 5, 6, 8, 9 or 10 (the "Nine RAs"), and all individuals that either live or work in one of the Nine RAs, that paid premiums for a fully-insured health insurance policy from Blue Shield, Anthem Blue Cross, Aetna, Health Net or United Healthcare from January 1, 2011 to the present.

This class definition includes Class Members that paid premiums for individual health insurance policies that they purchased from these health plans and Class Members that paid premiums, in whole or in part, for health insurance policies provided to them as a benefit from an employer or other group purchaser located in one of the Nine Rating Areas. A Rating Area is a geographical area determined by the State for the purpose of setting commercial health insurance premiums. Individuals that are members of the Class may have either purchased individual health insurance policies or shared in the payment of premiums, with their employers or groups, for group health insurance.

You should not construe the physical absence of any Class Member in any way as a lack of concern or interest on his, her or its part as to the outcome of this litigation. It is the very purpose of the Class Action procedure to avoid having to bring each class member here, and, therefore, their absence from this trial should not be construed against the class in any way.

In addition, the fact that there are numerous Class Members, and that this lawsuit is being brought on behalf of a Class, should in no way factor into your deliberations or decisions as to what the outcome of this case should be. You are to look to the conduct of Sutter, not to the size

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1    of the Class, to decide whether Sutter violated the law.

2

3    **Source**: Adapted from Federal Rule of Civil Procedure 23; *In re Vitamins Antitrust Litig*.,
     MDL Docket No. 1285, Misc. No. 99-197 (D.D.C.) (TFH), Jury Instruction No. 2; *see also*
4    *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

5    **Argument**: The parties agree that an instruction should be given that 1) informs the jury that
     this case is proceeding as a class action; 2) explains what a class action is; and 3) defines the
6    Class in this action.  Plaintiffs' proposed instruction includes a paragraph explaining the Class
     definition, which is necessary for the jury to understand who is in the Class, and the nature of
7    the Rating Areas which are referenced in the Class definition.  Plaintiffs' instruction also
8    informs the jury 1) that the Class has been certified by this Court; and 2) that that the jury's
     decisions should not be influenced by the fact that this case is a class action and not all Class
9    Members will be present at the trial.  Many jurors may have a limited understanding of class
     actions and this instruction will help them better understand class action procedure and fairly
10   decide this case.

11       Sutter's instruction does not include this important information explaining the Class
12   definition and that the fact this is a class action should not affect the jury's decisions.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Sutter's Instruction No. P-3 – Class Action**

2

This case is proceeding as a "class action."  A class action is a procedure that allows

3

the filing of one lawsuit by a representative or a small number of representatives on behalf of

4

numerous unnamed plaintiffs who have similar claims.  The Class in this case is defined as:

5

6

7

8

9

10

> All entities in California Rating areas 1, 2, 3, 4, 5, 6, 8, 9 or 10 (the "Nine RAs"),
> and all individuals that either live or work in one of the Nine RAs, that paid
> premiums for a fully-insured health insurance policy from Blue Shield, Anthem
> Blue Cross, Aetna, Health Net or United Healthcare from January 1, 2011 to the
> present.  This class definition includes Class Members that paid premiums for
> individual health insurance policies that they purchased from these health plans
> and Class Members that paid premiums, in whole or in part, for health insurance
> policies provided to them as a benefit from an employer or other group purchaser
> located in one of the Nine RAs."

11

12

13

**Sutter's Objection to Plaintiffs' Instruction No. P-3**

14

15

16

17

Plaintiffs' lengthy discussion of the purposes of class action is unnecessary and complicates an already-complex set of instructions.  Plus, it makes qualitative statements about the class-action procedure that are subject to debate. *See, e.g.*, Martin H. Redish, Rethinking the Theory of the Class Action: The Risks and Rewards of Capitalistic Socialism in the Litigation Process, 64 Emory L. J. 451 (2014) ("[A]ll too often, modern class action procedure is plagued by externalities and perverse economic incentives, allowing class attorneys to profit even when class members will benefit virtually not at all.").  If the Court were to give this instruction (including stating that the Court has ruled that this is a "proper" class action), there is a risk that the jury would interpret it as not merely describing the procedure but as the Court endorsing the merits of the claims of this particular class action.  Plaintiffs offer no reason to think that the jury's decision would be influenced by "the fact that this case is a class action or that not all Class Members will be present at the trial."

18

19

20

21

22

As set out in Sutter's Instruction No. P-3, a simple statement that the action is brought on behalf of a class of plaintiffs, along with a recitation of the class definition, is sufficient for the jury to understand the scope of the damages claim.

23

24

25

26

27

28

**Plaintiffs' Instruction No. P-4 – Burden of Proof – Preponderance of the Evidence**

When a party has the burden of proof on any claim or affirmative defense in this case, they must prove it by a preponderance of the evidence. That means that the party with the burden of proof must persuade, by the evidence, that the claim or affirmative defense is more probably true than not true.

This standard of proof is different from the standard of proof used in criminal proceedings. In a criminal proceeding, the government must prove "beyond a reasonable doubt," that the events in the case happened. The "preponderance of the evidence" standard at issue here does not require that the party with the burden "prove beyond a reasonable doubt" that their claims or defenses are correct: again, they must merely prove that the claim or evidence is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

**Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 1.6 (2020) (additions shown in red) [brackets removed in first paragraph]; Kevin O'Malley, Jay E. Grenig & William C. Lee, Federal Jury Practice and Instructions § 104.01 (5th ed. 2000); Pattern Crim. Jury Instructions for the 7th Cir. 2.03 (1998); 8th Cir. Civil Jury Instructions 3.04 (2008).

**Argument:** Plaintiffs' proposal includes all the language in Model Civil Jury Instructions § 1.6 (2017) and adds three sentences explaining the difference between the civil, preponderance of the evidence, burden of proof and the criminal, beyond a reasonable doubt, burden of proof. Jury members may be more familiar with the latter from movies, television shows and other media and the added language would assist them in understanding the difference. Such language is included in model instructions regarding burden of proof. *See e.g.*, Kevin O'Malley, Jay E. Grenig & William C. Lee, Federal Jury Practice and Instructions § 104.01 (5th ed. 2000); 8th Cir. Civil Jury Instructions 3.04 (2008).

1

**Sutter's Instruction No. P-4 – Burden of Proof – Preponderance of the Evidence**

2
       When a party has the burden of proving any claim or affirmative defense by a

3
preponderance of the evidence, it means you must be persuaded by the evidence that the claim

4
or affirmative defense is more probably true than not true.

5
       You should base your decision on all of the evidence, regardless of which party

6
presented it.

7

8
**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.6 [brackets removed]

9

10
<u>**Sutter's Objection to Plaintiffs' Instruction No. P-4**</u>

11
In contrast to Sutter's proposed instruction (which adheres to the model instruction), plaintiffs

12
propose to add a second paragraph addressing the burden of proof in criminal cases.  There is no
reason to depart from the model instruction on this point.  By emphasizing that the standard is

13
"different" in civil cases and by stating that it "merely" requires that the claim is more probably
true than not, plaintiffs are seeking to unduly minimize the preponderance standard.  This is

14
precisely why the Ninth Circuit Model Jury Instruction does not draw the distinction.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   **Stipulated Instruction No. P-5 – Opening Instructions**

2       During the trial, you will hear me use a few terms that you may not have heard before.

3   Let me briefly explain some of the most common to you.

4       You will sometimes hear me refer to "counsel." "Counsel" is another way of saying

5   "lawyer" or "attorney." I will sometimes refer to myself as the "Court."

6       By your verdict, you will decide disputed issues of fact in this case. I will decide all

7   questions of law that arise during the trial. Before you begin your deliberation at the close of the

8   case, I will instruct you in more detail on the law that you must follow and apply.

9       Because you will be asked to decide the facts of this case, you should give careful

10  attention to the testimony and evidence presented. Keep in mind that I will instruct you at the end

11  of the trial about determining the credibility or "believability" of the witnesses. During the trial,

12  you should keep an open mind and should not form or express any opinion about the case until

13  you have heard all of the testimony and evidence, the lawyers' closing arguments, and my

14  instructions to you on the law.

15      The lawyers are not allowed to speak with you during this case. When you see the

16  lawyers at a recess or pass them in the halls or on the sidewalk near the courthouse and they do

17  not speak to you, they are not being rude or unfriendly; they are simply following the law.

18      During the trial, it may be necessary for me to talk with the lawyers out of your hearing

19  about questions of law or procedure. Sometimes, you may be excused from the courtroom during

20  these discussions. I will try to limit these interruptions as much as possible, but you should

21  remember the importance of the matter you are here to determine and should be patient even

22  though the case may seem to go slowly.

23  **Source**: 3 Fed. Jury Prac. & Instr. § 101:01 (6th ed.).

24

25

26

27

28

**Stipulated Instruction No. P-6 – What Is Evidence**

The evidence you are to consider in deciding what the facts are consists of:

1. the sworn testimony of any witness;

2. the exhibits that are admitted into evidence;

3. any facts to which the lawyers have agreed; and

4. any facts that I may instruct you to accept as proved.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.9 [brackets removed and verb tense selected]

**Stipulated Instruction No. P-7 – What Is Not Evidence**

In reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence, and you may not consider them in deciding what the facts are.  I will list them for you:

1. Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses. What they may say in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence.  If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

2. Questions and objections by lawyers are not evidence.  Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence.  You should not be influenced by the objection or by the court's ruling on it.

3. Testimony that is excluded or stricken, or that you are instructed to disregard, is not evidence and must not be considered.  In addition some evidence may be received only for a limited purpose; when I instruct you to consider certain evidence only for a limited purpose, you must do so and you may not consider that evidence for any other purpose.

4. Anything you may see or hear when the court was not in session is not evidence.  You are to decide the case solely on the evidence received at the trial.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.10 [brackets removed and verb tense selected]

1

**Stipulated Instruction No. P-8 – Evidence For Limited Purpose**

2          Some evidence may be admitted only for a limited purpose.

3          When I instruct you that an item of evidence has been admitted only for a limited purpose,

4   you must consider it only for that limited purpose and not for any other purpose.

5

6   **Source:** 9th Cir. Model Jury Instructions (2020) No. 1.11 [deleted third paragraph, which is

7   written to be given in connection with a specific item of evidence and which calls for the
    purposes to be identified]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Stipulated Instruction No. P-9 – Direct And Circumstantial Evidence**

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.12 (verbatim)

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Stipulated Instruction No. P-10 – Ruling On Objections**

There are rules of evidence that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.  If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered, and the exhibit cannot be received.  Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore that evidence.  That means when you are deciding the case, you must not consider the stricken evidence for any purpose.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.13 (verbatim)

1  **Stipulated Instruction No. P-11 – Judges Questions to Witnesses**

2      During the trial, I may sometimes ask a witness questions.  Please do not think I have any

3  opinion about the subject matter of my questions.  I may ask a question simply to clarify a matter,

4  not to help one side of the case or harm another side.  Remember, at all times, that you, as jurors,

5  are the sole judges of the facts of this case.

6

7  **Source**: Federal Jury Practice & Instructions 102.72 (6th ed. 2011).

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Stipulated Instruction No. P-12 – Credibility Of Witnesses**

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1)     the opportunity and ability of the witness to see or hear or know the things testified to;

(2)     the witness's memory;

(3)     the witness's manner while testifying;

(4)     the witness's interest in the outcome of the case, if any;

(5)     the witness's bias or prejudice, if any;

(6)     whether other evidence contradicted the witness's testimony;

(7)     the reasonableness of the witness's testimony in light of all the evidence; and

(8)     any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.14 (verbatim).

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Plaintiffs' Instruction No. P-13 - Willful Suppression of Evidence**

The Court has found that Sutter willfully destroyed evidence relevant to this case. Sutter destroyed 192 boxes of documents from Sutter's Managed Care Department dating from 1995-2005 -- the period when Sutter adopted the allegedly anticompetitive restraints which are the basis for Plaintiffs' claims. As a result, Plaintiffs have been unable to use evidence relevant to the issues in this case. You must infer that this evidence would have been unfavorable to Sutter and favorable to Plaintiffs.

Whether Sutter's willful destruction of evidence is important to you in reaching a verdict in this case is for you to decide. You may choose to find it determinative, somewhat determinative or not at all determinative in reaching your verdict.

**Source**: *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1150 (N.D. Cal. 2012); *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 2251005, at *10 (N.D. Cal. May 13, 2015); *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 2016 WL 6609208, at *25 (C.D. Cal. July 12, 2016), report and recommendation adopted, 2016 WL 6901696 (C.D. Cal. Sept. 2, 2016); *Ramos v. Swatzell*, 2017 WL 2857523, at *14 (C.D. Cal. June 5, 2017), report and recommendation adopted, 2017 WL 2841695 (C.D. Cal. June 30, 2017); *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1053, 1060 (S.D. Cal. 2015); *Zest IP Holdings, LLC v. Implant Direct Mfg. LLC*, 2014 WL 6851607, at *15 (S.D. Cal. June 16, 2014).

**Argument:**  Because the evidence shows that Sutter acted willfully in destroying 192 boxes of documents from its Managed Care Department, a strong remedial jury instruction is necessary, appropriate, and justified.  "[A]n adverse inference instruction can take many forms, again ranging in degrees of harshness. The level of harshness should be commensurate with the egregiousness of the conduct."  *Blumenthal Distrib.*, 2016 WL 6609208, at *10 (citation and internal quotations omitted).

> There are three levels of instructions generally considered: (1) "when a spoliating party has acted willfully or in bad faith, the jury can be instructed that certain facts are deemed admitted and must be accepted as true"; (2) "when a spoliating party has acted willfully or recklessly, a court may impose a mandatory presumption"; and (3) the least harsh instruction "permits (but does not require) a jury to presume that the lost evidence is both relevant and favorable to the innocent party."  Id. (citation omitted).

*Id*. (quoting *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1150 (N.D. Cal. 2012)).

Plaintiffs' instruction reflects the mid-level sanction of a mandatory presumption instruction, even though the harshest level of instruction would also be appropriate and commensurate with the egregiousness of Sutter's bad faith and willful spoliation of 192 boxes of important evidence.  Sutter's conscious destruction of these critical documents – after extensive

internal deliberation and specifically authorized by Sutter's key witness (Ms. Brendt) – conclusively demonstrates that Sutter's conduct far exceeds the "willfully or recklessly" threshold for a mandatory presumption instruction. *See Blumenthal Distrib.*, 2016 WL 6609208, at *25 (ordering mandatory presumption instruction although evidence did not show deliberate intent).

The second paragraph of the instruction comes from the spoliation jury instruction given by Judge Labson Freeman in *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 2251005, at *8 (N.D. Cal. May 13, 2015).

Sutter cites *Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971 (9th Cir. 2009) to argue that only permissive adverse inference spoliation instructions may be given.  But in *Millenkamp* no adverse inference instruction was given because the destroying party had no reason to know of any impending litigation. *Id*. at 981.  *Millenkamp* does not preclude mandatory inference instructions in cases like this one where the spoliation was willful. *See e.g.*, *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1053, 1060 (S.D. Cal. 2015) (citing *Millenkamp* and ruling that "the more appropriate sanction is an adverse inference that cannot be rebutted"); *Clear-View Techs.,* 2015 WL 2251005, at *8 ("'when a spoliating party has acted willfully or recklessly, a court may impose a mandatory presumption.'") (quoting *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities*, 685 F. Supp.2d 456, 470 (S.D.N.Y 2010)); *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1150 (N.D. Cal. 2012) (same); *Ramos v. Swatzell*, 2017 WL 2857523, at *14 (C.D. Cal. June 5, 2017), report and recommendation adopted, 2017 WL 2841695 (C.D. Cal. June 30, 2017) (same); *Zest IP Holdings, LLC v. Implant Direct Mfg. LLC*, 2014 WL 6851607, at *15 (S.D. Cal. June 16, 2014) (same).

1

**Sutter's Objection to Plaintiffs' Instruction No. P-13**

2

3

Sutter objects to this instruction because plaintiffs are not entitled to an adverse inference instruction for the reasons explained in Sutter's Opposition to Plaintiffs' Motion for Sanctions (ECF 975-1) and Sutter's Motion in Limine No. 5 Regarding Alleged Spoliation (ECF 1049-1). Even if an adverse inference instruction were warranted, plaintiffs' proposal is improper because it instructs the jury that the evidence *was* relevant and *requires* the jury to infer that the evidence was unfavorable, rather than merely allowing such an inference. *See Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 981 (9th Cir. 2009) ("*[a]llowing* the trier of fact to draw an adverse inference presumably deters parties from destroying relevant evidence before it can be introduced at trial.") (emphasis added; citation omitted).  As explained in Sutter's briefing on this issue, it is also not correct that all of the 192 boxes contained potentially relevant information and it would therefore be misleading to refer to that number of boxes.  Nor is it accurate to characterize the 1995-2005 period as the period in which the alleged anticompetitive restraints at issue were adopted, as explained in Sutter's briefing.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Stipulated Instruction No. P-14 – Conduct Of The Jury**

I will now say a few words about your conduct as jurors.

First, keep an open mind throughout the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.  Thus, until the end of the case or unless I tell you otherwise:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it.  This includes discussing the case in person, in writing, by phone, tablet, or computer, or any other electronic means, via email, text messaging, or any internet chat room, blog, website or application, including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, Tiktok, or any other forms of social media.  This applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else including your family members, your employer, the media or press, and the people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in the case, and how long you expect the trial to last.  But, if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and report the contact to the court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict: do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it; do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials; and do not make any investigation or in any other way try to learn about the case on your own.  Do not visit or view any place discussed

1   in this case, and do not use the Internet or any other resource to search for or view

2   any place discussed during the trial.  Also, do not do any research about this case,

3   the law, or the people involved—including the parties, the witnesses or the

4   lawyers—until you have been excused as jurors.  If you happen to read or hear

5   anything touching on this case in the media, turn away and report it to me as soon

6   as possible.

7        These rules protect each party's right to have this case decided only on evidence

8   that has been presented here in court.  Witnesses here in court take an oath to tell the truth, and

9   the accuracy of their testimony is tested through the trial process.  If you do any research or

10  investigation outside the courtroom, or gain any information through improper communications,

11  then your verdict may be influenced by inaccurate, incomplete or misleading information that has

12  not been tested by the trial process.  Each of the parties is entitled to a fair trial by an impartial

13  jury, and if you decide the case based on information not presented in court, you will have denied

14  the parties a fair trial.  Remember, you have taken an oath to follow the rules, and it is very

15  important that you follow these rules.

16       A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a

17  mistrial could result that would require the entire trial process to start over.  If any juror is

18  exposed to any outside information, please notify the court immediately.

19

20  **Source:** 9th Cir. Model Jury Instructions (2020) No. 1.15 [deletes statement that court has no
    information that there will be news reports; deletes brackets in last paragraph]

21

22

23

24

25

26

27

28

**Stipulated Instruction No. P-15 – Publicity During Trial**

  If there is any news media account or commentary about the case or anything to do with it, you must ignore it.  You must not read, watch or listen to any news media account or commentary about the case or anything to do with it.  The case must be decided by you solely and exclusively on the evidence that will be received in the case and on my instructions as to the law that applies.  If any juror is exposed to any outside information, please notify me immediately.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.16 (verbatim)

**Stipulated Instruction No. P-16 – No Transcript Available to Jury**

I urge you to pay close attention to the trial testimony as it is given.  During deliberations you will not have a transcript of the trial testimony.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.17 (verbatim)

**Stipulated Instruction No. P-17 – Taking Notes**

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you go to the jury room to decide the case. Do not let notetaking distract you. When you leave, your notes should be left in the jury room. No one will read your notes.

Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of other jurors.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.18 [deletes references to leaving notes in courtroom or in an envelope in jury room]

1

**Stipulated Instruction No. P-18 – Questions To Witnesses By Jurors During Trial**

2

*Option 2*

3

      When attorneys have finished their examination of a witness, you may ask questions of

4

the witness.  <span style="color:red">To do so, you should write your questions on a piece of paper and provide them to</span>

5

<span style="color:red">the courtroom deputy.  The deputy will hand the questions to me and I will pose them to the</span>

6

<span style="color:red">witness.</span>  If the rules of evidence do not permit a particular question, I will advise you.  After

7

your questions, if any, the attorneys may ask additional questions.

8

9

**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.19 [selects Option 2; adds language in

10

red].

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Stipulated Instruction No. P-19 – Bench Conferences And Recesses**

From time to time during the trial, it may become necessary for me to talk with the attorneys out of the hearing of the jury, either by having a conference at the bench when the jury is present in the courtroom, or by calling a recess.  Please understand that while you are waiting, we are working.  The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error.

Of course, we will do what we can to keep the number and length of these conferences to a minimum.  I may not always grant an attorney's request for a conference.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.20 [brackets removed and verb tense selected]

**Stipulated Instruction No. P-20 – Outline of Trial**

Trials proceed in the following way:  First, each side may make an opening statement. An opening statement is not evidence.  It is simply an outline to help you understand what that party expects the evidence will show.  A party is not required to make an opening statement.

The plaintiffs will then present evidence, and counsel for the defendant may cross-examine.  Then the defendant may present evidence, and counsel for the plaintiffs may cross-examine.

After the evidence has been presented, I will instruct you on the law that applies to the case and the attorneys will make closing arguments.

After that, you will go to the jury room to deliberate on your verdict.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 1.21 [pluralized plaintiff]

1

**INSTRUCTIONS IN THE COURSE OF TRIAL**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Stipulated Instruction No. M-1 – Cautionary Instructions**

**At the End of Each Week:**

As I indicated before this trial started, you as jurors will decide this case based solely on the evidence presented in this courtroom.  This means that, after you leave here for the night, you must not conduct any independent research about this case, the matters in the case, the legal issues in the case, or the individuals or other entities involved in the case.  This is important for the same reasons that jurors have long been instructed to limit their exposure to traditional forms of media information such as television and newspapers.  You also must not communicate with anyone, in any way, about this case.  And you must ignore any information about the case that you might see while browsing the internet or your social media feeds.

**At the Beginning of Each Week:**

As I reminded you yesterday and continue to emphasize to you today, it is important that you decide this case based solely on the evidence and the law presented here.  So you must not learn any additional information about the case from sources outside the courtroom.  To ensure fairness to all parties in this trial, I will now ask each of you whether you have learned about or shared any information about this case outside of this courtroom, even if it was accidental.

If you think that you might have done so, please let me know now by raising your hand.  [Wait for a show of hands].  I see no raised hands; however, if you would prefer to talk to the court privately in response to this question, please notify a member of the court's staff at the next break.  Thank you for your careful adherence to my instructions.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 2.0 [selected alternative 1 and deleted alternative 2; modified frequency of giving instructions]

1

**Stipulated Instruction No. M-2 – Stipulations Of Fact**[1]

2

    The parties have agreed to certain facts [to be placed in evidence as Exhibit ___] [that will

3

be read to you]. You must therefore treat these facts as having been proved.

4

5

**Source:** 9th Cir. Model Jury Instructions (2020) No. 2.2

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[1] Read if necessary.

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Stipulated Instruction No. M-3 – Deposition In Lieu Of Live Testimony**[2]

A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth and lawyers for each party may ask questions.  The questions and answers are recorded.  When a person is unavailable to testify at trial, the deposition of that person may be used at the trial.

Insofar as possible, you should consider deposition testimony, presented to you in court in lieu of live testimony, in the same way as if the witness had been present to testify.

Deposition testimony may be presented by showing a videotape of the relevant portion of the deposition or it may be presented by having another person read the testimony from the deposition transcript.  When the testimony is read from the transcript, do not place any significance on the behavior or tone of voice of any person reading the questions or answers.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 2.4 [brackets and reference to witness's name and deposition date deleted]

---

[2] Read if necessary.

**Stipulated Instruction No. M-4 – Use Of Interrogatories**[3]

  Evidence will now be presented to you in the form of answers of one of the parties to written interrogatories submitted by the other side.  These answers were given in writing and under oath before the trial in response to questions that were submitted under established court procedures.  You should consider the answers, insofar as possible, in the same way as if they were made from the witness stand.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 2.11 [brackets removed and verb tense selected]

---

[3] Read if necessary.

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1    **Stipulated Instruction No. M-5 – Use Of Requests For Admission**[4]

2         Evidence will now be presented to you in the form of admissions to the truth of certain

3    facts.  These admissions were given in writing before the trial, in response to requests that were

4    submitted under established court procedures.  You must treat these facts as having been proved.

5

6    **Source:** 9th Cir. Model Jury Instructions (2020) No. 2.12 [brackets removed and verb tense

7    selected]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    _____

[4] Read if necessary.

**Stipulated Instruction No. M-6 – Expert Opinion**

You will hear testimony from some witnesses who will testify to opinions and the reasons for those opinions. This opinion testimony is allowed, because of the education or experience of the witness.

Such opinion testimony should be judged like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 2.13 [verb tense and pronouns selected]

**Usage note:** To be given once before Plaintiffs' first expert and once again before Sutter's first expert.

1

**Stipulated Instruction No. M-7 – Charts And Summaries Not Received In Evidence**

2      Certain charts and summaries not admitted into evidence may be shown to you in order to

3   help explain the contents of books, records, documents, or other evidence in the case.  Charts and

4   summaries are only as good as the underlying evidence that supports them.  You should,

5   therefore, give them only such weight as you think the underlying evidence deserves.

6   **Source**: Ninth Circuit Manual of Model Civil Jury Instructions § 2.14 (2017) [brackets removed

7   and verb tense selected]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **Stipulated Instruction No. M-8 – Charts And Summaries Received In Evidence**

2      Certain charts and summaries may be admitted into evidence to illustrate information

3  brought out in the trial.  Charts and summaries are only as good as the testimony or other

4  admitted evidence that supports them.  You should, therefore, give them only such weight as you

5  think the underlying evidence deserves.

6

7  **Source:** 9th Cir. Model Jury Instructions (2020) No. 2.15 [brackets removed and verb tense
   selected]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1    **Stipulated Instruction No. M-9 – Duty of the Jury (End of Case)**

2        Members of the Jury: Now that you have heard all of the evidence , it is my duty to

3    instruct you on the law that applies to this case.

4        Each of you has received a copy of these instructions and the verdict form that you may

5    take with you to the jury room to consult during your deliberations.

6        It is your duty to find the facts from all the evidence in the case. To those facts you will

7    apply the law as I give it to you. You must follow the law as I give it to you whether you agree

8    with it or not. And you must not be influenced by any personal likes or dislikes, opinions,

9    prejudices, or sympathy. That means that you must decide the case solely on the evidence before

10   you. You will recall that you took an oath to do so.

11       Please do not read into these instructions or anything that I may say or do or have said or

12   done that I have an opinion regarding the evidence or what your verdict should be.

13

14   **Source:** 9th Cir. Model Jury Instructions (2020) No. 1.4 [inserted "and the verdict form" in
     second paragraph; deleted alternative of instructions being left in the jury room rather than

15   handed out to jurors]

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**SUBSTANTIVE INSTRUCTIONS**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Plaintiffs' Instruction No. S-1 – Cartwright Act – Purposes and Goals**

I will now instruct you on the law under which the Plaintiffs have brought their claims: the California Cartwright Act.

The purpose of the Cartwright Act, California's antitrust law, is to promote competition, increase consumer welfare and to prevent any action which has as its purpose or effect an unreasonable restraint of trade.

The goals of the Cartwright Act are maximizing effective deterrence of antitrust violations, enforcing the state's antitrust laws against those violations that do occur, and ensuring disgorgement of any ill-gotten proceeds.

The Cartwright Act applies to tax-exempt entities such as Sutter.

**Source:** *AT & T Mobility LLC v. AU Optronics Corp*., 707 F.3d 1106, 1112–13 (9th Cir. 2013); *Knevelbaard Dairies v. Kraft Foods, Inc*., 232 F.3d 979, 999 (9th Cir. 2000); *GreenCycle Paint, Inc. v. PaintCare, Inc*., 250 F. Supp. 3d 438, 446 (N.D. Cal. 2017); *Corwin v. L.A. Newspaper Serv. Bureau, Inc*., 22 Cal.3d 302, 314 (1978); *UFCW & Employers Ben. Trust v. Sutter Health*, CGC-14-538451, Order re Antitrust Standards at 2-3 (Aug. 12, 2019); *Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp*., 456 U.S. 556, 580 (1982).

**Argument:** The jury would benefit from hearing a statement about the purpose and goals of the Cartwright Act as articulated by the California Supreme Court, the Ninth Circuit, and courts in this District.  This is particularly true, as many, if not all, of the jurors will likely be unfamiliar with the Cartwright Act.  *See Torres v. Parkhouse Tire Serv., Inc*., 26 Cal. 4th 995, 1003–04 (2001) (jury instruction regarding purpose of statute is helpful where jury might have difficulty understanding language of the statute).

As the Ninth Circuit recognized, "the purpose of [the Cartwright Act is] promoting competition and increasing consumer welfare." *Knevelbaard Dairies v. Kraft Foods, Inc*., 232 F.3d 979, 999 (9th Cir. 2000).  In *Corwin v. L.A. Newspaper Serv. Bureau, Inc*., 22 Cal.3d 302, 314 (1978), the California Supreme Court explained that the purpose of the Cartwright Act is to prevent any conduct which "has as its purpose or effect an unreasonable restraint of trade."  *See also GreenCycle Paint, Inc. v. PaintCare, Inc*., 250 F. Supp. 3d 438, 446 (N.D. Cal. 2017) (quoting *Corwin*).  In *AT & T Mobility LLC v. AU Optronics Corp*., 707 F.3d 1106 (9th Cir. 2013), the Ninth Circuit recognized the "Cartwright Act's 'overarching goals of maximizing effective deterrence of antitrust violations, enforcing the state's antitrust laws against those violations that do occur, and ensuring disgorgement of any ill-gotten proceeds.'"  *Id*. at 112-13 (quoting *Clayworth v. Pfizer, Inc*., 49 Cal.4th 758, 763 (2010)).

Sutter has made clear that it wishes to tell the jury about its not-for-profit status, so it is important for the jury to be instructed that such status does not immunize not-for-profit entities from antitrust liability.  *See Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp*., 456 U.S. 556, 580 (1982).

Sutter objects to the statement in this instruction that one purpose of the Cartwright Act is to prevent any action which has as its purpose or effect an unreasonable restraint of trade, arguing

1
2
3
4
5

that a defendant's purpose is irrelevant and only the effect of the restraint should be mentioned. Sutter's argument has no merit.  CACI No. 3405 (Model Jury Instruction S-7) provides that a Rule of Reason claim under the Cartwright Act requires "[t]hat the purpose or effect of [name of defendant]'s conduct was to restrain competition." *See also Corwin v. Los Angeles Newspaper Service Bur.*, 22 Cal. 3d 302, 314–15 (1978) ("A contract, combination, or conspiracy is an illegal restraint of trade if it constitutes a *per se* violation of the statute or has as its purpose or effect an unreasonable restraint of trade."); *GreenCycle Paint, Inc. v. PaintCare, Inc.*, 250 F. Supp. 3d 438, 446 (N.D. Cal. 2017) (quoting *Corwin*).

6
7
8
9
10

The Ninth Circuit agrees that under the Cartwright Act a violation can be shown by either a purpose or effect that restrains trade. *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1483 (9th Cir. 1986) ("In order to show a violation of the Cartwright Act in a rule of reason case, a plaintiff must show that **either** the purpose of the effect of the conspiracy is an illegal restraint of trade) (emphasis added); *See also, Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1202 (9th Cir. 1975) (approving jury instruction based on "agreement the purpose or effect of which is to unreasonably restrain trade" because it "fairly embodied the law of this circuit.").

11
12
13
14
15
16

Sutter's instruction provides an incomplete and one-sided characterization of the Cartwright Act, which would confuse and mislead the jury.  For example, the statement in Sutter's proposal that "[t]he Cartwright Act does not regulate a company's unilateral conduct, including a company's decisions about how much to charge for its own products" is misleading. It could confuse the jury into believing that Plaintiffs merely claim that Sutter unilaterally charged higher prices without engaging in associated anticompetitive conduct that served to shield those prices from competitive constraints.  The final sentence of Sutter's proposal incorrectly implies that "market power" is required for all of Plaintiffs' Cartwright Act claims. Proof of market power is not required for Plaintiffs' Rule of Reason claims.  *See* Plaintiffs' Brief Regarding Certain Disputed Jury Instruction Section IV.

17
18
19

Plaintiffs' proposed instruction, which is derived directly from the language of California Supreme Court and Ninth Circuit decisions, should be given rather than Sutter's proposed "Cartwright Act Instructions – Overview."

20
21
22
23
24
25
26
27
28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Sutter's Instruction No. S-1 – Cartwright Act – Overview**

Plaintiffs claim that Sutter engaged in conduct that is prohibited by California's antitrust statute, known as the Cartwright Act.  In general, the Cartwright Act prohibits agreements that unreasonably restrain trade.

Each of plaintiffs' Cartwright Act claims has its own set of elements that plaintiffs must prove.  In a moment, I will instruct you on the elements of each Cartwright Act claim.  Before I do so, however, I will explain the concepts of "markets" and "market power," which apply to all of plaintiffs' Cartwright Act claims.

**Source**:  Bus & Prof. Code § 16720 (Cartwright Act applies to "a combination of capital, skill or acts by two or more persons"); *Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.,* 198 Cal. App. 4th 1366, 1386 (2011) ("[T]he Cartwright Act contains no provision parallel to the Sherman Act's prohibition against monopolization (15 U.S.C. § 2), and the Cartwright Act applies only to a 'combination' involving 'two or more persons' (§ 16720), not to *unilateral* conduct.") (emphasis in original); *see also Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1478 (9th Cir. 1986) (Cartwright Act "does not address unilateral conduct").

**Sutter's Objection to Plaintiffs' Instruction No. S-1**

As indicated by Sutter's Instruction No. S-1, Sutter believes that a brief introduction to the Cartwright Act would be useful.  But Plaintiffs' Instruction No. S-1 is misleading and inaccurate.  By stating that the Cartwright Act's purpose is "to prevent any action which has as its purpose or effect an unreasonable restraint of trade," the second paragraph of the instruction encourages the jury to focus only on that single question, rather than applying the more detailed and demanding standards of the instructions that follow.  And the third paragraph's statement about "maximizing effective deterrence" risks encouraging the jury to set aside plaintiffs' burden of proving their claims.  Moreover, the "purpose" and "goals" of the Cartwright Act are not appropriate matters for the jury's consideration, as the jury's role is limited to resolving disputes of fact and following the Court's instructions on what the law requires.

Plaintiffs argue that courts should instruct the jury on a statute's purposes when the jury may be unfamiliar with the statute or might have difficulty understanding the statute's language.  The case they cite, however, does not support that position.  The court there merely instructed the jury that one of the required elements of the plaintiffs' claim was that the defendant had an "intent to injure."  *Torres v. Parkhouse Tire Serv., Inc*., 26 Cal. 4th 995, 1005 (2001).  It did not hold—or even suggest—that a court should describe for the jury the purported overall purposes of the statute.

In addition to those broad concerns, plaintiffs' instruction is also inaccurate in stating that the Cartwright Act seeks "to prevent any action that has as its *purpose or* effect an unreasonable

Joint Proposed Jury Instructions
3:12-CV-04854-LB

restraint of trade."  While that phrase appears in the CACI instruction, it is inaccurate.  Purpose by itself, without actual anticompetitive effect, is not an antitrust violation.  See "Explanation" to Sutter's Instruction No. S-7; *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 495 (2011) ("it is plaintiff's burden to make the required showing of a substantially adverse effect on competition in the relevant market") (internal quotation marks and citation omitted); *Exxon Corp. v. Superior Court*, 51 Cal. App. 4th 1672, 1680–81 (1997) ("plaintiff must prove that the restraint had an anticompetitive effect in the relevant market in order to prevail") (citation omitted); *Schachar v. Am. Acad. of Ophthalmology Inc.*, 870 F.2d 397, 400 (7th Cir. 1989) ("Animosity, even if rephrased as 'anticompetitive intent,' is not illegal without anticompetitive effects."); *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988) ("Since the effect on competition is the touchstone of rule of reason analysis, the intent of the defendants is relevant but not dispositive."); *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1552 (11th Cir. 1996) ("The rule of reason analysis is concerned with the actual or likely effects of defendants' behavior, not with the intent behind that behavior."); *SCFC ILC, Inc. v. Visa U.S.A., Inc.*, 36 F.3d 958, 969 (10th Cir. 1994) ("[I]ntent to harm a rival, protect and maximize profits, or 'do all the business if they can' . . . is neither actionable nor sanctioned by the antitrust laws." (citations omitted)).

Nor is an instruction regarding the applicability of the Cartwright Act to nonprofits necessary. The jury will understand that the law applies to Sutter by virtue of Sutter being a defendant in this trial.

To avoid these issues, the Court should give Sutter's Instruction No. S-1, which gives a general statement about the Cartwright Act and then properly directs the jury to the specific elements of the claims as described in the ensuing instructions.

1   **Plaintiffs' Instruction No. S-2 – Cartwright Act – Tying Explained**

2       The Cartwright Act prohibits unlawful "tying" arrangements.

3       A "tying arrangement" is the sale of one product, called the "tying product," in which the

4   buyer is required or forced to also purchase a different, separate product, called the "tied

5   product." For example, if a supermarket sells flour only if its customers also buy sugar at higher

6   prices than would have otherwise prevailed, that supermarket would be engaged in tying. Flour

7   would be the tying product and sugar the tied product.

8       Plaintiffs claim that there is an unlawful tying arrangement in which Inpatient Hospital

9   Services provided by Sutter in the Antioch, Auburn, Crescent City, Jackson, Lakeport, Tracy and

10   Berkeley-Oakland markets are the tying products and Inpatient Hospital Services provided by

11   Sutter in the Modesto, Sacramento, San Francisco, and Santa Rosa markets are the tied products.

12   Plaintiffs refer to the markets in which Sutter's tying hospitals are located as the "tying markets"

13   and the markets in which Sutter's tied hospitals are located as the "tied markets."

14       Plaintiffs claim that, in order to operate successful networks in the tying markets, the

15   health plans had to include the Sutter hospitals in their networks in those markets. Plaintiffs

16   further claim that Sutter refused to allow Plaintiffs to include Sutter Hospitals in the tying markets

17   unless the health plans also contracted for Sutter hospitals in the tied markets.

18       Plaintiffs claim that Sutter accomplished this by requiring health plans to enter into

19   systemwide contracts that included all Sutter hospitals and which applied various anticompetitive

20   contractual terms to all Sutter tying and tied hospitals. Plaintiffs further claim that Sutter, through

21   these systemwide contracts, forced health plans to accept contract provisions that hindered health

22   plans from excluding Sutter hospitals from their networks in the tied markets or from providing

23   their members incentives to use hospitals other than Sutter hospitals.

24

25   **Source**: Judicial Council of California, Civil Jury Instructions No. 3420 (2020); *Sidibe v. Sutter
    Health*, 2021 WL 879875, at *5-6 (N.D. Cal. Mar. 9, 2021); *Datagate, Inc. v. Hewlett-Packard

26   Co.*, 941 F.2d 864, 870 (9th Cir. 1991); *UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal.
    App. 4th 357, 368-69 (2008); *Suburban Mobile Homes, Inc. v. Amfac Communities, Inc.*, 101 Cal.

27   App. 3d 532, 538 (1980).

28

1
2
3
4
5
6

**Argument**: This instruction uses language from CACI Civil Jury Instructions § 3420 and then explains how Plaintiffs' tying claims fit into the framework of Cartwright Act tying law.  "A party is entitled to have the jury instructed on his theory of the case, if it is reasonable and finds support in the pleadings and evidence or any inference which may be properly drawn from the evidence." *Apple Inc. v. Samsung Elecs. Co*., 2017 WL 4776443, at *18 (N.D. Cal. Oct. 22, 2017) (quoting *Don Burton, Inc. v. Aetna Life & Cas. Co*., 575 F.2d 702, 706 (9th Cir. 1978)).  This explanation of Plaintiffs' tying claims is consistent with this Court's analysis of Plaintiffs' tying claims in its order denying Sutter's motion for summary judgment on Plaintiffs' tying claims. *See Sidibe v. Sutter Health*, 2021 WL 879875, at *6 (N.D. Cal. Mar. 9, 2021).

7
8
9
10
11
12
13
14

This instruction substitutes the word "forced" for the word "coerced" in the first sentence to make it more easily understandable by the jury without changing its meaning.  The word "coerce" often implies threats of violence, which do not need to be proven under Cartwright Act precedent to show an illegal tie.  See https://www.findlaw.com/criminal/criminal-charges/what-is-coercion-law.html ("The broad definition of coercion is 'the use of express or implied threats of violence or reprisal (as discharge from employment) or other intimidating behavior that puts a person in immediate fear of the consequences in order to compel that person to act against his or her will.'")  "Force" is a term frequently used in Cartwright Act cases.  *See e.g., Sidibe v. Sutter Health*, 2021 WL 879875, at *5 (N.D. Cal. Mar. 9, 2021) (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912-13 (9th Cir. 2008) ("The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.").

15
16
17

Alternatively, both terms could be used in this instruction.  *See UAS Mgmt., Inc. v. Mater Misericordiae Hosp*., 169 Cal. App. 4th 357, 368-69 (2008) ("it is unlawful under California's Cartwright Act, as relevant here, for a seller to use its market power in one market to force or coerce a buyer to purchase its product or service in a distinct market in which the seller does not have such market power or to refrain from buying from the seller's competitor.").

18
19
20
21
22

Sutter argues that the jury should not be told that "Plaintiffs claim that Sutter refused to allow Plaintiffs to include Sutter Hospitals in the tying markets unless the health plans also contracted for Sutter hospitals in the tied markets" because, according to Sutter, being forced to contract for services cannot be a tie. Sutter is wrong. In *Datagate, Inc. v. Hewlett-Packard Co*., 941 F.2d 864 (9th Cir. 1991), the Ninth Circuit found the evidence of a tying violation sufficient to survive summary judgment where the plaintiff theory was that defendant "**threatened to withhold software service if customers did not also contract for hardware service**." *Id*. at 870 (emphasis added).

23
24
25
26
27
28

In *UAS Mgmt.*, the Cartwright Act case that most closely resembles this case, the court found that the evidence supported a *per se* tying violation where insurers were not required to purchase the tied service from defendant but were instead forced to accept contracts with restrictive contractual provisions that required health plans to give defendant preferential network status for outpatient services as a condition for purchasing the defendant's must-have inpatient services.  169 Cal. App. 4th at 371.  Requiring insurers to contract for both outpatient services and inpatient services in a single contract with restrictive provisions was sufficient to establish a *per se* tie although the contract did not "require the insurers to purchase any services from respondent."  *Id*.  Similarly in *Suburban Mobile Homes, Inc. v. Amfac Communities, Inc*., 101

1

2

3

4

Cal. App. 3d 532, 538 (1980), the court found a *per se* tying arrangement based on a written agreement between a trailer park operator and mobile home dealers that included restrictive provisions. *Id*. at 538.  The court found that the plaintiff's "business was seriously affected by the aforesaid restrictive agreements and the actual sales practice conducted pursuant thereto." *Id. See also In re Visa Check/Mastermoney Antitrust Litig*., 2003 WL 1712568, *4 (E.D.N.Y. Apr. 1, 2003).

5

6

7

8

     Sutter forced the health plans to accept Systemwide Contracting whereby the health plans could not purchase Inpatient Hospital Services from any Sutter hospital unless they contracted with all Sutter hospitals.  The health plans were contractually required to include all Sutter's hospitals in network as a default and could only exclude or tier them if Sutter so agreed.  And, if Sutter did so agree, the health plans were then required to pay penalty rates for services rendered at those hospitals.  This is a *per se* tie.

9

10

     Plaintiffs' instruction, which is based on CACI No. 3420 and accurately states the Cartwright Act tying law as applied to Plaintiffs' tying claim, should be given.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Sutter's Objection to Plaintiffs' Instruction No. S-2 – Tying Explained**

Plaintiffs' Instruction No. S-2 should not be given for the reasons stated in the following paragraphs. Sutter's Instruction No. S-3 should be given instead.

Only the second and third paragraphs of Plaintiffs' Instruction No. S-2 come from CACI No. 3420. Those paragraphs are included in Sutter's Instruction No. S-3, except that Sutter's instruction identifies the hospitals at issue by name, given that the testimony at trial will likely primarily do so.

Sutter objects to the first paragraph of Plaintiffs' Instruction No. S-2 on the ground that it is not helpful to the jury, and potentially misleading, to state that the Cartwright Act prohibits unlawful tying arrangements without describing at the same time what constitutes an "unlawful" arrangement—and the first paragraph is not the place to describe what is lawful or unlawful. The enumeration of the required elements later in the instruction is proper place to do that.

The last two paragraphs are not in the CACI instruction, and they should not be given because they simply ask the Court to re-state the basis for plaintiffs' contentions, which is not proper in the jury instructions. Courts rightly reject proposed jury instructions that, in the guise of "setting forth the theories of" a party, really "argue[] the facts." *S.A. Healy Co. v. Milwaukee Metropolitan Sewage Dist.*, 50 F.3d 476, 480 (7th Cir. 1995); *see also Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1294 (4th Cir. 1995) (no error where instructions did not "go into great detail about defendant's evidence or contentions, just as it did not discuss plaintiff's evidence or contentions in great depth"). Plaintiffs' reliance on *Apple*, 2017 WL 4776443, at *16, is misplaced because that case stands only for the proposition that that a party is entitled to substantive instructions advising the jury on the law (there, what could constitute an "article of manufacture" in a patent-infringement case) when the evidence supports giving such an instruction. It does not hold that the court should rehearse the bases for the plaintiffs' contentions. *See also Don Burton, Inc. v. Aetna Life & Cas. Co.*, 575 F.2d 702, 706 (9th Cir. 1978) (explaining that a failure to charge the jury with a substantive instruction supported by the evidence "is, in effect, tantamount to directing a verdict for the opposing party on the disputed issue").

In addition, even if it were otherwise proper to re-state the parties' contentions, the last two paragraphs are likely to confuse the jury as to what plaintiffs must prove to prevail on their tying claim. To prove a tying claim, Plaintiffs must prove a forced *purchase*—that Sutter forced buyers to purchase inpatient hospital services from tied hospitals that the buyer did not want as a condition of purchasing inpatient hospital services from tying hospitals. *See, e.g., UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 368–69 (2008) (it is a tying arrangement "for a seller to use its market power in one market *to force or coerce a buyer to purchase its product or service in a distinct market* in which the seller does not have such market power or to refrain from buying from the seller's competitor" (emphasis added)); *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 183 (1999) ("A tying arrangement under antitrust laws exists when a party agrees to sell one product (the tying product) on the condition that the buyer *also purchases a different product* (the tied product), thereby curbing competition in the sale of the tied product." (emphasis added)); *Suburban Mobile Homes, Inc. v. Amfac Communities, Inc.*, 101 Cal. App. 3d 532, 542 (1980) (same).

The last two paragraphs of plaintiffs' proposed instruction, however, confuse that fact by conflating their claims—tying claim and claim challenging certain contract terms. As reflected in

Plaintiffs' Instruction No. S-3, plaintiffs' tying claim is that Sutter refused to sell inpatient services at seven tying hospitals *unless* the buyer also purchased services at four tied hospitals. By contrast, their contract claim is that Sutter insisted on systemwide contracting that allegedly included anticompetitive terms.  By describing plaintiffs as alleging that Sutter insisted on systemwide contracting and that Sutter made it harder for health plans to exclude hospitals from their networks, these paragraphs suggest to the jury that proof of those allegations would suffice to prove a tying claim, when they do not do so; indeed, plaintiffs' specific tying instruction provides that plaintiffs must prove that Sutter forced a purchase of services from a tied hospital as a condition for purchasing services from a tying hospital.  And by ambiguously stating that systemwide contracting "included all Sutter hospitals," the instruction also suggests that the fact of systemwide contracting meant that all Sutter hospitals were "included" in network, which is not true.  Systemwide contracting meant that an insurer engaged in contract negotiations with all Sutter hospitals, and the systemwide contract that resulted from that process may or may not have provided for a given hospital to be in network, depending on the parties' negotiations.

*Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864 (9th Cir. 1991), does not support plaintiffs' "contracting" argument.  The contract at issue there required the purchase of hardware service. *Id.* at 870.  Sutter's systemwide contracts did not require the purchase of any service.

Similarly, it is not enough that Sutter "hindered" health plans from excluding Sutter hospitals or from providing incentives for patients to use other hospitals (*i.e.*, placing them in disfavored tiers).  That is the basis of plaintiffs' claim challenging the contract terms, but by seeking to have the Court describe their contentions in this fashion, plaintiffs are seeking to improperly suggest to the jury that such "hindering" would be enough for a tying claim if the jury finds that it occurred.

Sutter also objects to instructing the jury on plaintiffs' specific claims before instructing them on market power.  As set out in Sutter's Separate Memorandum in Support of its Proposed Jury Instructions, § I, a showing of market power is a threshold requirement of all of plaintiffs' claims. The jury should accordingly be first instructed on the meaning of market power and on product markets and geographic markets before being instructed on the tying or the course-of-conduct claim.  Specifically, Sutter's Instruction No. S-10 should immediately follow Sutter's Instruction No. S-1, and then Sutter's Instruction Nos. S-4 and S-5 should immediately follow No. S-10.

**Plaintiffs' Instruction No. S-3 – Elements – Per Se Unlawful Tying**

To establish a *per se* tying claim against Sutter, Plaintiffs must prove all of the following:

1.    That the "tying" products for Inpatient Hospital Services sold by Sutter in Antioch, Auburn, Crescent City, Jackson, Lakeport, Berkeley-Oakland, and/or Tracy are separate and distinct from the "tied" products for Inpatient Hospital Services sold by Sutter in Modesto, Sacramento, San Francisco, and/or Santa Rosa. The Court has determined this element in favor of Plaintiffs as a matter of law;

2.    That Sutter linked the sale of Inpatient Hospital Services in the alleged "tying" markets (Antioch, Auburn, Crescent City, Jackson, Lakeport, Berkeley-Oakland, and Tracy) to the sale of Inpatient Hospital Services in the "tied" markets (Modesto, Sacramento, San Francisco, and Santa Rosa) through contracts with health plans;

3.    That Sutter had sufficient economic power in the market for Inpatient Hospital Services in the "tying" markets to force, at least, some of the health plans to purchase or contract for Inpatient Hospital Services from Sutter in, at least, some of the "tied" markets (Modesto, Sacramento, San Francisco, and Santa Rosa) that, at least, some of the health plans either did not want at all, or might have preferred to purchase or contract for on different terms;

4.    That Sutter's conduct involved a substantial amount of sales, in terms of the total dollar value of Inpatient Hospital Services in the "tied" markets;

5.    That the Class Members were harmed; and

6.    That Sutter's conduct was a substantial factor in causing the Class Members' harm.

For this *per se* tying claim, you shall not consider any justifications offered by Sutter for its conduct or any beneficial effects on competition asserted by Sutter.

**Source:** Judicial Council of California, Civil Jury Instructions No. 3420 (2020); *Sidibe v. Sutter Health*, 333 F.R.D. 463, 471 (N.D. Cal. 2019) ("hospitals [such as Sutter] sell hospital services to health-insurance plans [such as Blue Shield, Anthem, Aetna, Health Net, or UnitedHealthcare]." *Sidibe v. Sutter Health*, No. 12-CV-04854-LB, 2021 WL 879875, at *4, *6 (N.D. Cal. Mar. 9,

2021) ("inpatient hospital services at Sutter's tying hospitals, on the one hand, and inpatient hospital services offered at Sutter's tied hospitals, on the other, are distinct or separate products under the Cartwright and Sherman Acts."); *UFCW & Employers Ben. Trust v. Sutter Health*, CGC-14-538451, Order re Antitrust Standards at 6 (Aug. 12, 2019) *UFCW & Employers Ben. Trust v. Sutter Health*, CGC-14-538451, Order re Motion for Summary Judgment at 5 (Aug. 12, 2019); *Classen v. Weller*,145 Cal.App.3d 27, 37–38 (1983); *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 462, 479 (1992) (in assessing whether Kodak's tying arrangement violated Section 1 of the Sherman Act, "[w]e need not decide whether Kodak's behavior has any procompetitive effects . . . .") (citation omitted); *Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 4 Cal.3d 842, 853 (holding that tying arrangements under the Cartwright Act "are agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use."); *MacManus v. A. E. Realty Partners*, 146 Cal. App. 3d 275, 285–86 (1983) (same) *UFCW & Empl'rs Benefit Trust et al. v. Sutter Health*, No. CGC-14-53845, Order re Antitrust Jury Instructions at 8-10 (Cal. Sup. Ct. Sept. 16, 2019).

**Argument:** This proposed jury instructions adapts the elements of a tying claim set forth in CACI No. 3420 to the facts of this case.  This instruction refers to a "*per se*" tying claim because the California cases applying the Cartwright Act hold that when the enumerated elements are satisfied, they create an irrebuttable presumption of harm to competition and any purported justification for the tying should not be considered.  *See In re Cipro Cases I & II*, 61 Cal.4th 116, 146 (2015); *Corwin v. L.A. Newspaper Serv. Bureau, Inc.*, 4 Cal.3d 842, 856-57 (1971); *UAS Mgmt, Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 369 (2008) ("Where such a [tying] arrangement is found, it is illegal *per se*; that is, the seller's justifications for the arrangement are not measured by a rule of reasonableness.").  This issue is discussed in Section II of Plaintiffs' Jury Instruction Brief.

The first numbered paragraph tells the jury that this Court has already ruled that the distinct product requirement has been satisfied.  The second numbered paragraph uses the word "linked" because that is the verb used for this tying element in *UAS Mgmt, Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 369 (2008), a tying case involving hospital services that closely resembles this case. *See also Classen v. Weller*,145 Cal.App.3d 27, 37–38 (1983).  This is also the same language used in *Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.*, 101 Cal. App. 3d 532, 542 (1980), the case cited by the Court for Cartwright Act tying elements in denying Sutter's motion for summary judgment on Plaintiffs' *per se* tying claim. *Sidibe v. Sutter Health*, 2021 WL 879875, at *6 (N.D. Cal. Mar. 9, 2021).  The third numbered paragraph adopts the language used by this Court in that same decision. *Id*. at *5 (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912-13 (9th Cir. 2008)); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984); *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 841 (N.D. Cal. 2020) (As explained in *Jefferson Parish*, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to **force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms**.") (emphasis added).

Plaintiffs' instruction directs the jury not to consider Sutter's justifications for the ties in deciding the *per se* tying claim.  That sentence is needed to avoid jury confusion about the difference between Plaintiffs' *per se* claim and the Rule of Reason claim.

Sutter's proposed instruction should be rejected because it would erroneously instruct the jury to consider Sutter's business justifications on the *per se* tying claim and find for Sutter if it presents evidence of business justifications that cannot be achieved by less restrictive means.

1

2

3

This issue is further discussed in Plaintiffs' Jury Instruction Brief Section II.  Sutter's proposed instruction also fails to identify the health plans as the relevant buyers in this action, fails to mention the first element of the CACI instruction, which the Court has adjudicated in Plaintiffs' favor and adds unnecessary language to the second element of the CACI instruction that could confuse the jury.

4

5

6

7

8

9

10

11

12

Sutter's argument that a tie exists only when the defendant imposes an express requirement that the plaintiff purchase the tied product misstates the law. "Tying liability, however, has not been limited to situations in which sellers engaged in express conditioning with respect to the sale of the tying product. For example, 'separate availability will not preclude antitrust liability where a defendant has established its pricing policy in such a way that the only viable economic option is to purchase the tying and tied products in a single package." *Apple iPod iTunes Antitrust Litig.*, 2009 WL 10678931, at *3 (N.D. Cal. May 15, 2009) (citation omitted); *see also Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 450 (3d Cir. 1977) ("an illegal tie-in may exist even when the seller has not expressly conditioned the sale of one product upon purchase of another, if the existence of a tie-in can otherwise be established from business conduct").  The contract in *UAS Mgmt* was subject to *per se* tying analysis even though it **did not "require the insurers to purchase any services from respondent**". 169 Cal. App. 4th at 371. (emphasis added).  The contractual tying arrangement in *UAS Mgmt* required health plans to give defendant preferential network status for outpatient services not because its product was lower-priced or higher-quality, but as a condition for purchasing the defendant's must-have inpatient services.  *Id.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sutter's Instruction No. S-3 – Tying**

Plaintiffs claim that Sutter has engaged in an unlawful tying arrangement. Plaintiffs claim that Sutter has economic power in the following areas where it operates hospitals: Antioch, Auburn, Crescent City, Jackson, Lakeport, Tracy and the combined area of Berkeley and Oakland. Plaintiffs claim that Sutter refuses to sell inpatient hospital services at the hospitals in these markets (which plaintiffs call the "Tying Hospitals") unless the buyer also purchases inpatient services at hospitals in San Francisco, Modesto, Sacramento, and Santa Rosa, which plaintiffs call the "Tied Hospitals." The Tying Hospitals are Alta Bates Summit Medical Center, Sutter Delta Medical Center, Sutter Auburn Faith Hospital, Sutter Coast Hospital, Sutter Amador Hospital, Sutter Lakeside Hospital, Sutter Tracy Community Hospital. The Tied Hospitals are CPMC, Memorial Medical Center, Sutter Medical Center Sacramento, and Sutter Santa Rosa Regional Hospital.

A "tying arrangement" is the sale of one service, called the "tying service," in which the buyer is required or coerced to also purchase a different, separate service, called the "tied service." For example, if a supermarket sells flour only if its customers also buy sugar, that supermarket would be engaged in tying. Flour would be the tying product and sugar the tied product. Simply offering discounts when services are purchased together is not a tying arrangement.

To establish their tying claim against Sutter, plaintiffs must prove all of the following:

1.    That Sutter will sell inpatient hospital services from the Tying Hospitals only if the buyer also purchases inpatient hospital services from the Tied Hospitals—e.g., Sutter will sell inpatient hospital services at Alta Bates Summit Medical Center only if the buyer also purchases inpatient hospital services from CPMC or one or more of the other Tied Hospitals;

2.    That Sutter has sufficient economic power in the markets for inpatient hospital services from the Tying Hospitals to coerce at least some buyers of inpatient hospital services from the Tying Hospitals into purchasing inpatient hospital services from the Tied Hospitals;

3.      That the tying arrangement involves a substantial amount of sales, in terms of the

total dollar value of inpatient hospital services from the Tied Hospitals;

4.      That plaintiffs were harmed; and

5.      That the tying arrangement was a substantial factor in causing plaintiffs' harm.

If you find that the plaintiffs have proved each of these elements, you must consider

whether Sutter has proven, by a preponderance of the evidence, a business justification for the

tying arrangement.  If you find that the tying arrangement serves a legitimate business purpose of

Sutter, and that there are no substantially less restrictive means reasonably available to achieve

that purpose, then you must find for Sutter and against plaintiffs on the tying claim.

**Source**:  CACI 3420

**Explanation**:  This instruction is based on CACI 3420 but is modified to delete the first element ("separate and distinct" products) to reflect that there is no dispute, as reflected in the Court's summary judgment ruling, that Sutter's inpatient hospital services are separate and distinct from each other for tying purposes.

The instruction also modifies CACI 3420 to add the final paragraph.  This paragraph is proper for reasons explained in Sutter's Separate Memorandum in Support of its Proposed Jury Instructions, § II.

**Sutter's Objection to Plaintiffs' Instruction No. S-3**

Plaintiffs' Instruction No. S-3 should not be given for the reasons stated in the following paragraphs.  Sutter requests that Sutter's Instruction No. S-3 be given instead.

Plaintiffs' first paragraph improperly refers to plaintiffs' tying claim as a "per se" claim.  That reference is unnecessary and prejudicial as it suggests to the jury that tying conduct is especially nefarious, without providing any context or explanation.  The jury should be instructed as to the elements of the tying claim, without any characterization whether it is per se or otherwise, as that characterization is irrelevant to the jury's consideration of the claim.

The first element of Plaintiffs' Instruction No. S-3 is not necessary, as it is not at issue given the Court's summary judgment ruling on this issue.  ECF 886.  Instructing the jury on it will unnecessarily complicate an already complicated set of instructions.

Plaintiffs misstate the law in their second element by stating that only a "link" must exist between the tying and the tied services.  The law is clear that a tie exists only "when a party agrees to sell one product (the tying product) on the condition that the buyer also purchases a different product (the tied product)." *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 183 (1999); *Suburban Mobile Homes, Inc. v. Amfac Communities, Inc.*, 101 Cal. App. 3d 532, 542 (1980)

(same); *UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 368–69 (2008) (it is a tying arrangement "for a seller to use its market power in one market *to force or coerce a buyer to purchase its product or service in a distinct market* in which the seller does not have such market power or to refrain from buying from the seller's competitor") (emphasis added). "[W]here the buyer is free to take either product by itself there is no tying problem." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 n.4 (1958).   "Essential to the second element of a tying claim is proof that the seller *coerced* a buyer to purchase the tied product."  *Paladin Assocs. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.").

Cases referring generally to a "link" between tying and tied products do not hold that the required "link" may be found absent the seller requiring the purchase of one service to obtain another. Those cases use the term "link" simply as shorthand for the required conditioned sale, and they make clear (as numerous cases have held) that "where the buyer is free to take either product by itself there is no tying problem."  *RLH Indus., Inc. v. SBC Commc'ns, Inc.*, 133 Cal. App. 4th 1277, 1284 (2005) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 n.4 (1958)); *Classen v. Weller*, 145 Cal. App. 3d 27, 36 (1983) ("A tie-in (or tying arrangement) is a requirement that a buyer purchase one product or service as a condition of the purchase of another."); *UAS Mgmt.*, 169 Cal. App. 4th at 369 (2008) (stating that it is a tying arrangement "for a seller to use its market power in one market *to force or coerce a buyer to purchase its product or service in a distinct market* in which the seller does not have such market power or to refrain from buying from the seller's competitor" and finding summary judgment for respondent improper because "respondent refused to sell inpatient services to patients' health insurance companies unless the companies established respondent as the exclusive preferred, or "in-network," provider of outpatient surgery services").  Plaintiffs cite no case finding a tie where a "link" existed but without proof of actual conditioning.  For that reason, the CACI model instruction does not use the term "link" but rather, consistent with all of the governing cases, requires that the jury find that the seller "will sell [tying item] only if the buyer also purchases [tied item]."

Nor does a tie exist merely because the buyer decides to purchase services together or the seller offers the services together as package.  *See RLH Indus.*, 133 Cal. App. 4th at 1284; *Jefferson Par.*, 466 U.S. at 11–12; *Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984) (finding no evidence of coercion when a rental car company offered customers discounted airfare if they agreed also to rent a car).  Instead, "[a]ctual coercion by the seller that in fact forces the buyer to purchase the tied product is an indispensable element of a tying violation."  *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 685 (2nd Cir. 1982).  By erroneously stating that only an undefined "link" is required, plaintiffs' proposed instruction would misleadingly suggest to the jury that it could find a tie based simply on Sutter offering better rates for in-network hospitals or seeking in negotiations to have insurers include all Sutter hospitals in network.  That would be reversible error.

Plaintiffs cite *Apple iPod iTunes Antitrust Litig.*, 2009 WL 10678931, at *3 (N.D. Cal. May 15, 2009), and *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 450 (3d Cir. 1977), for the proposition that a tie can exist even absent "express conditioning."  That principle, however, does not support instructing the jury that only a "link" is necessary.  Whether the tie results from an express

condition or from another form of coercion, there must ultimately be a forced purchase of the tied product, not merely an undefined link between the tying and tied products. That is why the CACI instruction requires a forced sale. Further, when a plaintiff tries to prove a tie based on other forms of coercion, additional requirements must be met. For example, to prove an "economic tie" of the kind described in *Apple iPod,* the plaintiff must prove that the discounted price on the tying service is available only if the buyer also purchases the tied service, that the discount makes it so that the "only viable economic option is to purchase the tying and tied products in a single package" (*Ways & Means, Inc. v. IVAC Corp.*, 506 F. Supp. 697, 701 (N.D. Cal. 1979)), and that the discount is so large that, when its amount is attributed to the price of the tied services, the price for the tied services is less than the seller's costs to produce them. *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 271 (6th Cir. 2015) ("[D]ifferential pricing becomes equivalent to an unlawful tying arrangement when the price discount, as applied to the original price of the tied product, in effect lowers the price of the tied product below the seller's cost."). Plaintiffs have not proposed that the jury be instructed on an economic tying theory—and Sutter objects to giving an instruction on this unasserted theory. But if such an instruction were proper, it would require each of the elements described above.

The third element of plaintiffs' proposed instruction is also erroneous. First, it conflates the difference between "purchas[ing]" and "contract[ing] for" services. The evidence will show that Sutter's contracts with health plans did not require the purchase of any hospital services from any hospital, so that "contract[ing] for" services is distinct from purchasing them. To prove a tie, plaintiffs must prove that Sutter required a purchase of the tied market services, as discussed above and as the CACI instruction reflects. Thus, it is not enough for plaintiffs to prove that Sutter required health plans to "contract[] for" tied market services—they must prove that Sutter required the *purchase* of such services. "Contacted for" should accordingly be omitted. Nor can plaintiffs justify their instruction by arguing that, as a factual matter, contracting with Sutter for services in fact required the purchase of such services. That argument concedes that the legal standard is a required purchase, not merely a contract with Sutter. The jury should be instructed on that proper legal standard, so that it can properly evaluate whatever factual argument plaintiffs may make as to whether it was satisfied.

Second, plaintiffs improperly add "might have preferred to purchase or contract for on different terms" to the requirement that plaintiffs prove a forced purchase of tied market services. This addition improperly weakens the fundamental requirement that Sutter forced the purchase of tied market services as a condition for selling tying market services, suggesting that it is enough if plaintiffs were unhappy with the terms of sale for the tied services, even if the purchase itself was not forced. There is no legal support for that weakening, which does not appear in CACI. The cases using this language refer to a buyer who "might have preferred to purchase *elsewhere* on different terms." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913–14 (9th Cir. 2008) (emphasis added) (quoting *Jefferson Parish*, 466 U.S. at 12). They do not refer buyers who purchased from the defendant but simply would have preferred better terms.

Third, plaintiffs' proposed instruction describes the buyer or purchaser as the health plans. That description is erroneous for the reasons addressed in Sutter's Separate Memorandum in Support of its Proposed Jury Instructions, § III.

The final sentence of plaintiffs' proposed instruction telling the jury that it may not consider procompetitive justifications for the tying arrangement is not correct for the reasons addressed in

Sutter's Separate Memorandum in Support of its Proposed Jury Instructions, § II.

**Model Instruction No. S-3 – 3420 Tying**

[Name of plaintiff] claims that there is an unlawful tying arrangement in which [specify the particular real estate, product, or services] is the tying product and [specify the particular real estate, product, or services] is the tied product. A "tying arrangement" is the sale of one product, called the "tying product," in which the buyer is required or coerced to also purchase a different, separate product, called the "tied product." For example, if a supermarket sells flour only if its customers also buy sugar, that supermarket would be engaged in tying. Flour would be the tying product and sugar the tied product.

To establish this claim against [name of defendant], [name of plaintiff] must prove all of the following:

1. That [tying item] and [tied item] are separate and distinct;

2. That [name of defendant] will sell [tying item] only if the buyer also purchases [tied item], or that [name of defendant] sold [tying item] and required or otherwise coerced buyers to [also purchase [tied item]] [agree not to purchase [tied item] from any other supplier];

3. That [name of defendant] has sufficient economic power in the market for [tying item] to coerce at least some buyers of [tying item] into [purchasing [tied item]] [agreeing not to purchase [tied item] from a competitor of [name of defendant]];

4. That the conduct involves a substantial amount of sales, in terms of the total dollar value of [tied item];

5. That [name of plaintiff] was harmed; and

6. That [name of defendant]'s conduct was a substantial factor in causing [name of plaintiff]'s harm.

**Source**: CACI 3420.

1    **Plaintiffs' Instruction No. S-4 – Tying—"Product Market" Explained**

2            A product market consists of all services that can reasonably be used for the same

3    purpose.  Services are not in the same product market if users are not likely to substitute one for

4    the other.

5            In deciding whether products are reasonable substitutes, you may consider whether a

6    small increase in the price of one product would cause a considerable number of health plans who

7    purchased that product to switch to a second product within the candidate market.  If so, these two

8    products are likely to be in the same market.  If a significant increase in the price of one product –

9    here, prices for Inpatient Hospital Services — does not cause a significant number of health plans

10   to switch to a different product, the two products are not likely to be in the same market.

11           Plaintiffs and Sutter agree that the relevant product market is for the sale of Inpatient

12   Hospital Services.  The parties do not agree whether Kaiser Permanente hospitals are part of the

13   relevant product market.

14

15
     **Source**: Judicial Council of California, Civil Jury Instructions No. 3413 (2020); *Sidibe v. Sutter*
16   *Health*, 2019 WL 2078788, at *3 (N.D. Cal. May 9, 2019); *Newcal Indus., Inc. v. Ikon Office Sol.*,
     513 F.3d 1038, 1045 (9th Cir. 2008); *Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health*
17   *Sys. Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015).

18

19   **Argument:** Plaintiffs' instruction is closely based on CACI No. 3413 including the "SSNIP test"
     language from the model instruction and identifies the health plans as the buyers.  As this Court
20   and the Ninth Circuit have both ruled, the relevant markets in this case must be viewed from the
     perspective of the health plans. *See* Section I of Plaintiffs' Jury Instruction Brief; *Sidibe v. Sutter*
21   *Health*, No. 12-CV-04854-LB, 2019 WL 2078788, at *3 (N.D. Cal. May 9, 2019); *Saint*
     *Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys. Ltd.*, 778 F.3d 775, 784 (9th Cir.
22   2015).
             Sutter's proposal improperly omits the final two paragraphs of the CACI instruction
23   which explain how a product market must be determined.  Sutter's proposal omits the CACI
     "SSNIP test" language – although Sutter concedes the relevance of SSNIP analysis by including
24   such language in its Geographic Market instruction.  The final paragraph in Sutter's instruction,
     which is not in the CACI instruction, is not necessary and would confuse the jury.  Since the
25   health plans are the relevant direct purchasers, upon whom the tying arrangement was imposed,
     and Kaiser Permanente was not an alternative available to health plans, the fact that hospitals may
26   have viewed Kaiser as a competitor for patients is not relevant to the issue of whether Kaiser is a
     participant in the relevant product market in this case.
27

28

**Sutter's Instruction No. S-4 – Product Market Explained**

The parties agree that the product market is general acute care inpatient hospital services. But they disagree about whether Kaiser is a participant in that product market.

A product market consists of all services that can reasonably be used for the same purpose. Services are not in the same product market if users are not likely to substitute one for the other.

In deciding whether services are reasonable substitutes, you may consider whether a small increase in the price of one service would cause a considerable number of customers of that service to switch to a second service. If so, these two services are likely to be in the same market. If a significant increase in the price of one service does not cause a significant number of consumers to switch to a second service, these services are not likely to be in the same market.

In deciding whether Kaiser and Sutter compete in the general acute care inpatient hospital services market, you may also consider evidence of whether Sutter and other industry participants viewed or treated Kaiser hospitals as competitors in the general acute care inpatient hospital services market.

**Source**: CACI 3413; *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 41 (D.D.C. 2015) (relying on "[d]efendants' ordinary course documents" describing their competitors in defining the relevant market); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 21 (D.D.C. 2017) ("Ordinary course of business documents reveal the contours of competition from the perspective of the parties, who have been quite successful in the [market] and may be presumed to 'have accurate perceptions of economic realities.'") (citations omitted); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 52 (D.D.C. 2011) ("When determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents."); United Stated Dep't of Justice and Fed. Trade Comm'n, *Commentary on the Horizontal Merger Guidelines* at 11 (Mar. 2006) ("References to a 'market' in business documents may provide important insights into the identity of firms, products, or regions that key industry participants consider to be sources of rivalry, which in turn may be highly probative evidence upon which to define the 'relevant market' for antitrust purposes.").

**Explanation**: CACI 3413, as written, assumes a dispute between parties on the general scope of the product market. There is no such dispute in this case, where the parties agree that general acute care inpatient hospital services are the relevant product market, but disagree on whether the services of a single company, Kaiser, are in that product market. The resolution of that issue is a significant issue in this case given Kaiser's enormous market share in the fully insured commercial market and the competitive pressure it puts on other providers including Sutter in Northern California, which is why plaintiffs offer expert testimony on the issue. The first paragraph of this proposed instruction therefore replaces the first two paragraphs of CACI 3413

1

with an explanation of the parties' dispute in this case.

2

3

Contrary to plaintiffs' suggestion otherwise, Sutter's instruction includes the CACI language regarding the SSNIP test verbatim in paragraph three.

4

5

6

7

8

9

10

The fourth paragraph instructs that the jury may also consider business documents and other evidence in assessing the inclusion of Kaiser in the market, an issue that is not addressed by CACI 3413 but that is well established in antitrust precedent. *See, e.g.*, *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 41 (D.D.C. 2015) (relying on "[d]efendants' ordinary course documents" describing their competitors in defining the relevant market); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 21 (D.D.C. 2017) ("Ordinary course of business documents reveal the contours of competition from the perspective of the parties, who have been quite successful in the [market] and may be presumed to 'have accurate perceptions of economic realities.'") (citations omitted); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 52 (D.D.C. 2011) ("When determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents.").

11

**Sutter's Objection to Plaintiffs' Instruction No. S-4**

12

13

Plaintiffs' proposed instruction incorrectly asserts in the second paragraph that health plans purchase Sutter services. That issue is addressed in Sutter's Separate Memorandum in Support of its Proposed Jury Instructions, § III.

14

15

16

Plaintiffs' proposal also fails to instruct the jurors that, in evaluating the product market, they can take into account ordinary-course business documents, which is a well-established method of identifying the scope of a product market.

17

18

As discussed above (at Sutter's Objection to Plaintiffs' Instruction No. S-2), the jury should be instructed on market power and defining relevant markets (No. S-10, followed by Nos. S-4 and S-5) before the instructions on plaintiffs' claims.

19

20

21

22

23

24

25

26

27

28

1    **Model Instruction No. S-4 – Rule of Reason—"Product Market" Explained**

2         [Name of plaintiff] claims that the product market is [insert claimed product market, e.g.,

3    "paper clips"]. [Name of defendant] claims that the product market is [insert claimed product

4    market, e.g., "all paper fasteners"].

5         To define the product market, you must determine which [products/services] are in the

6    market in which [name of defendant] is claimed to have carried out its restraint of trade.

7         A product market consists of all [products/services] that can reasonably be used for the

8    same purpose. [Products/services] are not in the same product market if users are not likely to

9    substitute one for the other.

10        In deciding whether products are reasonable substitutes, you may consider whether a

11   small increase in the price of one product would cause a considerable number of customers of that

12   product to switch to a second product. If so, these two products are likely to be in the same

13   market. If a significant increase in the price of one product does not cause a significant number of

14   consumers to switch to a second product, these products are not likely to be in the same market.

15

16   **Source:** CACI 3413

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
                                                        3:12-CV-04854-LB

**Plaintiffs' Instruction No. S-5 – Tying—"Geographic Market" Explained**

Plaintiffs claim that there are multiple geographic markets for Inpatient Hospital Services relevant to this case: The "tying" geographic markets, which include areas that are roughly equivalent to the Antioch, Auburn, Crescent City, Jackson, Lakeport, Tracy and Berkeley-Oakland Hospital Services Areas.  And the "tied" markets, which include areas that are roughly equivalent to the Modesto, Sacramento, San Francisco, and Santa Rosa Hospital Service Areas as defined by *The Dartmouth Atlas of Healthcare*.

A geographic market is the area where buyers turn for alternate sources of supply or where sellers normally sell. The geographic market may or may not be the same as the area where the parties in this case currently compete or do business. It may be smaller or larger than that area.  The boundaries of a relevant geographic market need not be defined with scientific precision.

Plaintiffs claim that the buyers or direct purchasers here are commercial health plans who contracted with Sutter for Inpatient Hospital Services.  The relevant geographic markets depend on whether these health plans could reasonably purchase Inpatient Hospital Services from another hospital in the same geographic area.  For example, if they could not substitute hospitals outside the alleged geographic markets for hospitals inside the alleged geographic markets, the relevant geographic markets are properly defined.

In deciding whether products are in the same geographic market, you may consider whether a small increase in the price of the product would cause a considerable number of health plans in that area to buy the product in another area.  If so, these two areas are likely to be in the same geographic market.  If a significant increase in the price in one area does not cause a significant number of health plans to buy the product in another area, these areas are not likely to be in the same geographic market.

**Source:** Judicial Council of California, Civil Jury Instructions No. 3414 (2019); *Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys. Ltd*., 778 F.3d 775, 784 (9th Cir. 2015); *Sidibe v. Sutter Health*, 667 F. App'x 641, 642 (9th Cir. 2016); *Sidibe v. Sutter Health*, 2019 WL 2078788, at *4 (N.D. Cal. May 9, 2019); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966).

**Argument:** Plaintiffs' instruction is closely based on CACI No. 3414, which has been adapted to

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1    Plaintiffs' claims in this case.  This Court and the Ninth Circuit have both ruled that the relevant

2    geographic markets in this case must be viewed from the perspective of the health plans, which
     should be included in this instruction. *See* Section I of Plaintiffs' Jury Instruction Brief.  The third

3    paragraph in Plaintiffs' instruction properly frames that question as whether the health plans
     could reasonably "substitute hospitals outside the alleged geographic markets for hospitals inside

4    the alleged geographic markets."

5    The last sentence of the second paragraph is taken *verbatim* from this Court's decision
     denying Sutter's motion for summary judgment on geographic markets. *Sidibe v. Sutter Health*,

6    2019 WL 2078788, at *3 (N.D. Cal. May 9, 2019) (quoting *United States v. Pabst Brewing Co.*,
     384 U.S. 546, 549 (1966)).

7    Sutter's proposal fails to identify the health plans as the relevant buyers and erroneously

8    states that the geographic markets should be determined by whether a significant increase in price
     in one area would cause **patients** to visit a hospital in another area.  That statement is contrary to

9    settled Ninth Circuit law that geographic markets must be determined from the viewpoint of the
     health plans not patients, who are insensitive to hospital price increases.  *Saint Alphonsus Med.*

10   *Ctr.-Nampa, Inc. v. St. Luke's Health Sys. Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015); see also *Sidibe*
     *et al. v. Sutter Health*, 2019 WL 2078788, *24 (N.D. Cal. May 9, 2019) ("Here, the consumers

11   responding to a hypothetical-monopolist hospital's SSNIP are health plans, not the health-plan
     enrollees (*i.e.*, patients) because health plans (not enrollees) directly pay the hospital's price

12   increases.").

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Sutter's Instruction No. S-5 – Rule of Reason—"Geographic Market" Explained**

A geographic market is the area where buyers turn for alternate sources of supply or where sellers normally sell.  The geographic market may or may not be the same as the area where Sutter currently competes or does business.  It may be smaller or larger than that area.

A geographic market may be limited to the area where general acute care inpatient hospital services can be offered profitably.  You may consider whether patients in one area tend not to travel to another area to receive general acute care inpatient hospital services.  For example, this might occur if the cost or time required to travel into or out of the claimed geographic market is large compared to the value of the general acute care inpatient hospital services sought.

In deciding whether general acute care inpatient hospital services are in the same geographic market, you may consider whether a small increase in the price of the services in one area would cause a considerable number of patients in that area to visit hospitals in another area.  If so, these two areas are likely to be in the same geographic market.  If a significant increase in the price in one area does not cause a significant number of patients to visit hospitals in another area, these areas are not likely to be in the same geographic market.

This case involves multiple geographic markets.  Sutter has hospitals in many markets throughout Northern California.  The parties dispute how the geographic markets should be defined.  Plaintiffs claim that the geographic markets are roughly equivalent with what plaintiffs contend are the Dartmouth Atlas hospital service areas ("HSAs") for Antioch, Auburn, Crescent City, Jackson, Lakeport, Tracy and the combined Berkeley and Oakland HSAs.  Sutter denies that these HSAs constitute valid geographic markets.

**Source**: CACI 3414.

**Explanation**:  CACI 3414 is framed in terms of a product, rather than a service.  For example, it refers to shipping and sale of products.  This contains the same operative language of CACI 3414 but is rephrased to address the relevant consideration for hospital services—patient travel rather than product shipping.  Because of the large number of markets at issue, it also describes the significance of geographic markets before explaining what the alleged markets are, reversing the order of CACI 3414.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Sutter's Objection to Plaintiffs' Instruction No. S-5

Plaintiffs' Instruction No. S-5 unnecessarily and without justification deviates from the CACI model instruction. In place of the third paragraph from the CACI instruction, plaintiffs include a paragraph stating that the geographic market depends on whether health plans "could reasonably purchase Inpatient Hospital services from another hospital in the same geographic area." The statement is confusing and circular, as the issue the jury must decide is which hospitals should be considered to be in the "same" area. As the CACI instruction sets out, to determine that question, the jury should consider among other things which hospitals a significant number of consumers would turn to in event of a price increase. *See also Sidibe v. Sutter Health*, 667 F. App'x 641, 642 (9th Cir. 2016) ("geographic market is the area 'where buyers can turn for alternative sources of supply'") (citation omitted). Telling jurors to consider whether consumers would turn to other hospitals in the "same geographic area" does not tell them how to define what that area is.

Plaintiffs' instruction also improperly describes the buyer or purchaser as the health plans. That description is erroneous for the reasons addressed in Sutter's Separate Memorandum in Support of its Proposed Jury Instructions, § III.

As discussed above (at Sutter's Objection to Plaintiffs' Instruction No. S-2), the jury should be instructed on market power and defining relevant markets (No. S-10, followed by Nos. S-4 and S-5) before the instructions on plaintiffs' claims.

**Model Instruction No. S-5—3414 Rule of Reason—"Geographic Market" Explained**

[Name of plaintiff] claims that the relevant geographic market is [identify area, e.g., "the city of Los Angeles"]. [Name of defendant] claims that the relevant geographic market is [identify area, e.g., "the state of California"].

A geographic market is the area where buyers turn for alternate sources of supply or where sellers normally sell. The geographic market may or may not be the same as the area where the parties in this case currently compete or do business. It may be smaller or larger than that area.

A geographic market may be limited to the area where a product can be shipped and sold profitably. You may consider whether purchasing patterns are so different in the two areas that products sold in one area tend not to be sold in another. For example, this might occur if the cost of transporting a product into or out of the claimed geographic market is large compared to the value of the product.

In deciding whether products are in the same geographic market, you may consider whether a small increase in the price of the product in one area would cause a considerable number of customers in that area to buy the product in another area. If so, these two areas are likely to be in the same geographic market. If a significant increase in the price in one area does not cause a significant number of consumers to buy the product in another area, these areas are not likely to be in the same geographic market.

**Source:** CACI 3414

**Plaintiffs' Instruction No. S-6 – Tying—"Economic Power" Explained**

In determining whether Sutter has sufficient economic power in the tying markets for Inpatient Hospital Services (i.e., Antioch, Auburn, Crescent City, Jackson, Lakeport, Tracy and Berkeley-Oakland), you may consider whether Sutter has such a large share of the market for Inpatient Hospital Services in the tying markets that some or all of the health plans do not have alternate sources of Inpatient Hospital Services or a reasonably available substitute for them.

You may also consider whether any health plan would be unable to easily locate a similar or equally desirable product in the marketplace. If health plans do not generally consider other Inpatient Hospital Service providers to be substitutes for those in the claimed relevant markets, this fact may demonstrate that Sutter has economic power over Inpatient Hospital Services in the tying markets.  If Sutter has economic power, it may be established even though it exists with respect to some, but not all, of the health plans.

You may also consider whether Sutter has been able to force any health plan to contract with Sutter on a systemwide basis and force health plans to accept contractual provisions that they did not want.  If Sutter has been able to force health plans to contract with Sutter on a systemwide basis and/or force health plans to accept contractual provisions that they did not want, these facts may also demonstrate that Sutter has economic power in the market for Inpatient Hospital Services.

**Source:** Judicial Council of California, Civil Jury Instructions No. 3423 (2020); *Sidibe v. Sutter Health*, No. 12-CV-04854-LB, 2021 WL 879875, at *5 (N.D. Cal. Mar. 9, 2021) *Sidibe v. Sutter Health*, No. 12-CV-04854-LB, 2019 WL 2078788, at *2 (N.D. Cal. May 9, 2019); *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 841 (N.D. Cal. 2020); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984); *U. S. Steel Corp. v. Fortner Enterprises, Inc*., 429 U.S. 610, 620 (1977); *Digidyne Corp. v. Data Gen. Corp*., 734 F.2d 1336, 1340 (9th Cir. 1984).

**Argument:** The first two paragraphs of this instruction are from CACI No. 3423 and identify the health plans as the buyers because it is Sutter's economic power over the health plans that is at issue in this case.  The last sentence of CACI No. 3423 has been omitted because it is not applicable to the facts of this case.

The final paragraph of Plaintiffs' instruction reflects the well-settled law that economic power may also be established by a defendant's ability to force a party to accept contact terms that the party did not want.  *See U. S. Steel Corp. v. Fortner Enterprises, Inc*., 429 U.S. 610, 620 (1977) (economic power in tying case may be established by "the power, within the market for the tying product, to raise prices or to **require purchasers to accept burdensome terms that**

1

**could not be exacted in a completely competitive market.**") (emphasis added); *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1340 (9th Cir. 1984) (same); *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 841 (N.D. Cal. 2020) (As explained in *Jefferson Parish*, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.") (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)); *Sidibe v. Sutter Health*, 2021 WL 879875, at *5 (N.D. Cal. Mar. 9, 2021) (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912-13 (9th Cir. 2008)).

2

3

4

5

6        Sutter's proposed instruction includes the final sentence of CACI No. 3423 which should not be included because there is no dispute in this case that Sutter's competitors also offer Inpatient Hospital Services.  The issue here is the health plans' inability to substitute Inpatient Hospital Services from Sutter's competitors for Inpatient Hospital Services from Sutter in the tying markets.  Accordingly, that sentence should not be included in the instruction because it is inapplicable to this case and would confuse the jury.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Sutter's Instruction No. S-6 – Tying—"Economic Power" Explained**

In determining whether Sutter has sufficient economic power in the markets in which the alleged Tying Hospitals operate, you may consider whether Sutter has such a large share of those markets that buyers do not have alternate sources for services in those markets or a reasonably available substitute.  If Sutter has economic power, it may be established even though it exists with respect to some, but not all, buyers.

You may also consider whether a buyer would be unable to easily locate a similar or equally desirable service in the marketplace.  If buyers do not generally consider other services to be substitutes, this fact may give Sutter economic power over its services.  The fact that Sutter can provide services from the alleged Tying Hospitals in an efficient manner or at a high level of quality does not, by itself, mean that competitors do not offer a similar product.

**Source**:  CACI 3423 (brackets filled in)

<u>**Sutter's Objection to Plaintiffs' Instruction S-6**</u>

Plaintiffs' Instruction S-6 again assumes that Sutter sells health services to health plans rather than to patients.  That is incorrect for the reasons stated in Sutter's Separate Memorandum in Support of its Proposed Jury Instructions, § III.

The first paragraph improperly departs from CACI by adding the phrase "some or all" and by moving the last sentence of the first paragraph in CACI to the end of the second paragraph.  As Sutter proposes, the first paragraph should follow CACI.

The second paragraph improperly omits the following sentence from CACI:  "The fact that [name of defendant] can produce [tying item] in an efficient manner or at a high level of quality does not, by itself, mean that competitors do not offer a similar product."  This sentence is amply supported by the case law and should be given.  *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) ("Courts have repeatedly rejected efforts to define markets by price variances or product quality variances."), *aff'd sub nom. Haagen–Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990); *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) ("The argument which the Discounters attempt—that quality, price, and reputation determine the relevant product market—is difficult to maintain.").  Sutter's evidence at trial will show that Sutter's services are in high demand both because they are efficiently offered and are of high quality.  Sutter is entitled to have the jury instructed that this does not mean that Sutter faces no competition.  Plaintiffs argue that this sentence should be omitted because health plans are supposedly unable to substitute hospital services from other providers for Sutter's services.  But that is the very factual issue that the jury must decide—and this sentence is important to the jury's ability to make that decision.  And plaintiffs' contention also rests on their erroneous position that

1

2

the health plan is the relevant buyer and that the only relevant substitutes are suppliers with which the health plan can contract. That contention is incorrect for the reasons explained in Sutter's Separate Memorandum in Support of its Proposed Jury Instructions, § III.

3

4

5

6

7

8

9

10

11

Plaintiffs' third paragraph is not contained in CACI and is not supported by any authority. This paragraph wrongly suggests that plaintiffs need not prove market power if they show that Sutter imposed a tying arrangement. If that were correct, a tying plaintiff would never need to prove market power. In fact, however, a separate showing of market power is a threshold requirement for a tying claim. *See Exxon Corp. v. Superior Court*, 51 Cal. App. 4th 1672, 1686 (1997) ("Exxon's lack of market power eliminates a prerequisite to plaintiffs' success on" a Cartwright Act tying claim); *SC Manufactured Homes, Inc. v. Liebert*, 162 Cal. App. 4th 68, 91 (2008) ("[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." (quoting *Ill. Tool Works Inc. v. Indep. Ink., Inc.*, 547 U.S. 28, 46 (2006))). Nor is it correct that economic power exists if the health plans accepted contractual provisions "that they did not want." Parties frequently agree to contracts that contain provisions that one side or the other would have preferred be different but that the party accepted as part of the negotiated bargain. The existence of such provisions does not establish that either side has "economic power" for antitrust purposes.

12

13

14

15

16

17

18

19

Plaintiffs cite this Court's earlier rulings in this case but neither supports their instruction. The Court recognized a tying claim requires a showing of market power, not simply that a party entered a contract with terms that it "did not want." *Sidibe v. Sutter Health*, No. 12-CV-04854-LB, 2021 WL 879875, at *5 (N.D. Cal. Mar. 9, 2021) ("A tying arrangement occurs where 'a seller with market power in one product market [ ] extend[s] its market power to a distinct product market.'" (quoting *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008))); *Sidibe v. Sutter Health*, No. 12-CV-04854-LB, 2019 WL 2078788, at *2 (N.D. Cal. May 9, 2019) ("Market power is the ability to raise price profitably by restricting output." (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018))). The other cases plaintiffs cite for this point likewise do not suggest that it is enough that buyers accepted contractual provisions they did not want. To the contrary, they specifically recognized that tying requires a forced purchase—*i.e.*, that the seller forced "some buyers to purchase a tied product they do not want or would have preferred to purchase elsewhere." *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1340–41 (9th Cir. 1984).

20

21

22

23

24

25

26

27

28

**Model Instruction No. S-6 – 3423 Tying—"Economic Power" Explained**

In determining whether [name of defendant] has sufficient economic power in the market for [tying item], you may consider whether [name of defendant] has such a large share of the market for [tying item] that buyers do not have alternate sources of [tying item] or a reasonably available substitute. If [name of defendant] has economic power, it may be established even though it exists with respect to some, but not all, buyers.

You may also consider whether a buyer would be unable to easily locate a similar or equally desirable product in the marketplace. If buyers do not generally consider other products to be substitutes, this fact may give [name of defendant] economic power over its [tied item]. The fact that [name of defendant] can produce [tying item] in an efficient manner or at a high level of quality does not, by itself, mean that competitors do not offer a similar product.

**Source:** CACI 3423

**Plaintiffs' Instruction No. S-7 – Cartwright Act – Rule of Reason**

In addition to claiming that Sutter committed a *per se* tying violation of the Cartwright Act, Plaintiffs also claim that Sutter has engaged in a course of anticompetitive conduct that unreasonably restrains trade in the Modesto, Berkley/Oakland, Sacramento, San Francisco, and Santa Rosa markets.  Plaintiffs claim that Sutter's contracts contained anti-steering, ant-tiering and non-par penalty rate provisions that limited the ability of plans to steer patients to less expensive, non-Sutter hospitals within the health plan's network.

To establish their anticompetitive conduct claim, Plaintiffs must prove all of the following:

1. That Sutter forced health plans to agree to contracts that unreasonably restrained trade;

2. That the purpose or effect of Sutter's conduct was to restrain competition, particularly in, at least some of, the Modesto, Berkeley/Oakland, Sacramento, San Francisco, and Santa Rosa markets;

3.  That the anticompetitive effect of the restraints outweighed any beneficial effect on competition;

4.  That the Class Members were harmed; and

5.  That Sutter's conduct was a substantial factor in causing the Class Members' harm.

Under this claim, the Plaintiffs must first prove that the challenged conduct resulted in an anticompetitive effect.  If they do so, the burden then shifts to Sutter to provide evidence that Sutter's conduct that restrained competition also had a beneficial effect on competition in the same markets,  and that any such beneficial effect on competition could not have been achieved by any less restrictive alternative.

Beneficial effects on competition are effects that promote, enhance, or benefit competition and consumers that were directly caused by the challenged conduct. Beneficial effects on competition must benefit the entire market, not only benefit services offered by Sutter.

While there may be other goals that were achieved by Sutter's conduct, only those that are relevant to consumer welfare are deemed "procompetitive" benefits.  For example, increasing profitability is not a procompetitive effect.  Public policy and social welfare goals, such as

1    offsetting losses sustained on providing care to Medicare or Medi-Cal patients, also do not qualify

2    as legitimate procompetitive objectives unless they serve to benefit competition and consumers.

3    Helping hospitals that are struggling financially also is not a legitimate procompetitive

4    justification.

5          If Sutter is unable to provide evidence that its conduct that restrained competition also has

6    procompetitive effects in the same market, that its conduct led to the procompetitive effects that it

7    claims, and that there are no less restrictive alternatives to its conduct, then you must find for

8    Plaintiffs. If Sutter provides such evidence, then the burden shifts back to Plaintiffs to prove that

9    the anticompetitive effects of Sutter's conduct that restrained competition outweighed any

10   beneficial effects on competition caused by the conduct.

11   **Source**: Judicial Council of California Civil Jury Instruction (2020), CACI No. 3405; 2
12   California Antitrust and Unfair Competition Law § 2.04 Rule of Reason Analysis, 2014 WL
     9967408 (2016); *UFCW & Employers Ben. Trust v. Sutter Health*, CGC-14-538451, Order re
13   Motion for Summary Judgment at 11 (Aug. 12, 2019) (procompetitive effect must be connected
     to challenged contractual provisions and challenged contractual provisions must be necessary to
14   achieve procompetitive effect); *In re Cipro Cases I & II*, 61 Cal.4th 116, 146 (2015) ("Under the
     traditional rule of reason, 'inquiry is limited to whether the challenged conduct promotes or
15   suppresses competition.' [Citations.] To determine whether an agreement harms competition
16   more than it helps, a court may consider 'the facts peculiar to the business in which the restraint is
     applied, the nature of the restraint and its effects, and the history of the restraint and the reasons
17   for its adoption.'"); *Marin County Bd. of Realtors, Inc. v. Palsson*,16 Cal.3d 920, 934-35 (1976);
     *Corwin v. Los Angeles Newspaper Service Bureau, Inc.*, 4 Cal. 3d 842, 855 (1971) ("If a less
18   restrictive means can be used to recompense the Bureau for services such as lobbying, clearly the
     provision of those services cannot justify the restraints imposed by the present agreements.");
19   *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424 (1990) (rejecting argument by trial
20   lawyers that boycott of court-appointed work was justified to promote the social value of
     increasing the quality of representation); *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 462–64
21   (1986) (refusing to consider ethical policy of ensuring proper dental care as a valid
     procompetitive end); *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 695 (1978)
22   (holding that policy goals such as protecting public safety and promoting ethical behavior do not
     qualify as legitimate procompetitive objectives unless they serve to "regulate and promote"
23   competition); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1154 (9th Cir. 2003)
24   ("Stripped to its essentials, defendants' argument is that some of the firms they wanted to include
     in the joint venture were so inefficient that they could survive only under cartel pricing.
25   Defendants' concern for the weakest among them has a quaint Rawlsian charm to it, but we find it
     hard to square with the competitive philosophy of our antitrust laws. Inefficiency is precisely
26   what the market aims to weed out."); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football
27   League*, 468 F. Supp. 154, 167 (C.D. Cal. 1979) ("Though profit maximization is certainly in the
     best interests of the football industry, it is not, by itself, a procompetitive justification, and, under
28   *Professional Engineers*, may not be factored into the reasonableness determination."); *Polygram*

*Holding, Inc. v. FTC*, 416 F.3d 29, 38 (D.C.Cir. 2005) ("A restraint cannot be justified solely on the ground that it increases the profitability of the enterprise...."); *Law v. NCAA*, 134 F.3d 1010, 1023 (10th Cir.1998) ("[M]ere profitability or cost savings have not qualified as a defense under the antitrust laws.").

**Argument:** Plaintiffs' instruction follows and supplements CACI No. 3405. The first sentence has been added to alert the jury that Plaintiffs' Course of Conduct Rule of Reason claim is different from the *per se* tying claim that was the subject of the previous substantive instructions. The CACI "Directions for Use" for this instruction suggest that "connecting language between the pertinent instructions should be provided", if the complaint "include[s] both *per se* and rule of reason claims."

Plaintiffs have modified the first numbered paragraph of the CACI instruction to reflect that Plaintiffs' tying claim is not based on anticompetitive contracts that the health plans voluntarily agreed to, but rather on contracts Sutter forced on the health plans. Plaintiffs have added language explaining the shifting Rule of Reason burdens that the jury should apply in deciding the Rule of Reason claim. Determination of whether the parties have satisfied their respective evidentiary burdens must be decided by the jury and not the Court, contrary to Sutter's position. *See* Section III of Plaintiffs' Jury Instruction Brief.

Under the Cartwright Act, Sutter has the burden of showing that the challenged conduct caused procompetitive effects that could not be achieved by less restrictive means. *Marin County Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 939 (1976) ("the rule of reason requires not only a demonstration that the anticompetitive practice relates to a legitimate purpose, but also that it is reasonably necessary to accomplish that purpose and narrowly tailored to do so."); *Corwin v. Los Angeles Newspaper Service Bureau, Inc.*, 4 Cal. 3d 842, 855 (1971) ("If a less restrictive means can be used to recompense the [defendant] for services such as lobbying, clearly the provision of those services cannot justify the restraints imposed by the present agreements."); Cal. Anti. & Unfair Comp. L. §2.04 Rule of Reason Analysis (In a Cartwright Act Rule of Reason claim, "a defendant must show that the challenged restraint . . . is sufficiently narrowly tailored to accomplish the procompetitive goal and that there is not a less-restrictive alternative available that can accomplish the same goal.").

Plaintiffs have also added language explaining what is and is not a beneficial effect on competition. That language is also necessary and appropriate because Sutter is attempting to justify its anticompetitive restraints with purported justifications that do not qualify as beneficial effects on competition under the controlling case law and which do not directly result from the challenged conduct.

Sutter's proposal inaccurately characterizes Plaintiffs' Course of Conduct claim. Sutter's proposal incorrectly states that Plaintiffs can prevail only if provisions in the agreements Sutter and the insurance companies entered into had the effect of restraining trade. That ignores the claim that Sutter's forcing of systemwide contracting on the health plans itself caused anticompetitive effects. Moreover, the challenged conduct should be described as Sutter's forcing health plans to agree to contracts that unreasonably restrained trade, not the health plans entering into such agreements with Sutter, which incorrectly suggests voluntary agreement. Contrary to Sutter's argument, such coerced anticompetitive agreements do not constitute "unilateral conduct" outside the purview of the Cartwright Act.

Sutter's proposal also erroneously deletes the word "purpose" from the second numbered paragraph of the CACI instruction contrary to the controlling Cartwright Act case law. *Corwin v. Los Angeles Newspaper Service Bur.*, 22 Cal. 3d 302, 314–15 (1978) ("A contract, combination,

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1
2

or conspiracy is an illegal restraint of trade if it constitutes a *per se* violation of the statute or has as its purpose or effect an unreasonable restraint of trade."); *GreenCycle Paint, Inc. v. PaintCare, Inc.*, 250 F. Supp. 3d 438, 446 (N.D. Cal. 2017) (quoting *Corwin*).

3
4
5
6
7

The Ninth Circuit agrees that under the Cartwright Act a violation can be shown by either an anticompetitive purpose or effect. *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1483 (9th Cir. 1986) ("In order to show a violation of the Cartwright Act in a rule of reason case, a plaintiff must show that **either the purpose of the effect** of the conspiracy is an illegal restraint of trade) (emphasis added); *See also., Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc*., 526 F.2d 1196, 1202 (9th Cir. 1975) (approving jury instruction based on "agreement the **purpose or effect** of which is to unreasonably restrain trade" because it "fairly embodied the law of this circuit.") (emphasis added).

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Sutter's Instruction No. S-7 – Unreasonable Restraint of Trade**

Plaintiffs claim that Sutter entered agreements with insurance companies that unreasonably restrain competition for general acute care inpatient hospital services.  The contractual provisions plaintiffs challenge are (1) provisions that prevent an insurance company from changing, without Sutter's consent, the network-participation status of a Sutter hospital after the contract has been entered (for example, whether the hospital is in or out of network or whether the hospital is "tiered" in a network or product), (2) provisions that require that Sutter hospitals be treated equally within a network with all other providers that participate at the same level in that network, (3) provisions that set a higher rate for services at a non-participating Sutter hospital (*i.e.*, a hospital that does not participate in the network or product), and (4) provisions that place limitations on the insurance companies' disclosing Sutter's negotiated prices for its general acute care inpatient hospital services.  To establish this claim, plaintiffs must prove all of the following:

1. That Sutter and insurance companies entered agreements that contained one or more of the challenged contractual provisions listed above;

2. That the effect of the contractual provision or provisions was to restrain competition in the market for general acute care inpatient services;

3. That the anticompetitive effect of the restraint outweighed any beneficial effect on competition;

4. That plaintiffs were harmed; and

5. That Sutter's conduct was a substantial factor in causing plaintiffs' harm.

**Source**:  CACI 3405; *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988) ("Since the effect on competition is the touchstone of rule of reason analysis, the intent of the defendants is relevant but not dispositive."); *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1552 (11th Cir. 1996) ("The rule of reason analysis is concerned with the actual or likely effects of defendants' behavior, not with the intent behind that behavior."); *Schachar v. Am. Acad. of Ophthalmology*, 870 F.2d 397, 400 (7th Cir. 1989) ("Animosity, even if rephrased as 'anticompetitive intent,' is not illegal without anticompetitive effects."); *Wilk v. Am. Med. Ass'n*, 719 F.2d 207, 225 (7th Cir. 1983) ("it is effect or consequence which controls, not intent or motive"); *H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978) ("Absent anticompetitive effect, an unlawful intent will not establish a rule of reason violation . . . .").

1

2   **Explanation**:  This is based on CACI 3405, with the deletion of "purpose or" from "purpose or
3   effect" in the second element to conform the instruction with precedent.  *See, e.g., Los Angeles
    Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395 (9th Cir. 1984)
4   ("[A]nticompetitive purpose alone is not enough to condemn [a restraint].  The rule must actually
    harm competition, and that harm must be evaluated in light of the procompetitive benefits the rule
5   might foster."  (citations omitted)); *Bd. of Trade of City of Chicago v. United States*, 246 U.S.
6   231, 238 (1918) (explaining that the history or purpose of a restraint might be relevant "not
    because a good intention will save an otherwise objectionable regulation *or the reverse*; but
7   because knowledge of intent may help the court to interpret facts and to predict consequences."
    (emphasis added)); *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 130 (2d
8   Cir. 1995) ("[A]nticompetitive intent is not by itself sufficient to meet the adverse-effect
9   requirement. . . . Without some evidence of an adverse impact on competition in either the
    interbrand or intrabrand market, the fact that customers induce a seller to refrain from dealing
10  with another potential customer in order to limit competition does not satisfy a plaintiff's initial
    burden under § 1." (citations omitted)); *Levine v. Cent. Fla. Med. Affiliates*, 72 F.3d 1538, 1552
11  (11th Cir. 1996) ("The rule of reason analysis is concerned with the actual or likely effects of
12  defendants' behavior, not with the intent behind that behavior."); *Hahn v. Or. Physicians' Serv.*,
    868 F.2d 1022, 1026 (9th Cir. 1988) ("Since the effect on competition is the touchstone of rule of
13  reason analysis, the intent of the defendants is relevant but not dispositive."); *SCFC ILC, Inc. v.
    Visa U.S.A., Inc.*, 36 F.3d 958, 969 (10th Cir. 1994) ("[I]ntent to harm a rival, protect and
14  maximize profits, or 'do all the business if they can' . . . is neither actionable nor sanctioned by
    the antitrust laws." (citation omitted)); *Schachar v. Am. Acad. of Ophthalmology*, 870 F.2d 397,
15  400 (7th Cir. 1989) ("Animosity, even if rephrased as 'anticompetitive intent,' is not illegal
    without anticompetitive effects."); *Wilk v. Am. Med. Ass'n*, 719 F.2d 207, 225 (7th Cir. 1983) ("it
16  is effect or consequence which controls, not intent or motive"); *H & B Equip. Co. v. Int'l
17  Harvester Co.,* 577 F.2d 239, 246 (5th Cir. 1978) ("Absent anticompetitive effect, an unlawful
    intent will not establish a rule of reason violation . . . .").

18  **Sutter's Objection to Plaintiffs' Instruction No. S-7**

19  Plaintiffs' Instruction No. S-7 departs from CACI in unjustified and improper ways as described
20  in the following paragraphs.  The Court should use Sutter's Instruction No. S-7 instead.

21  Plaintiffs' first paragraph improperly refers to plaintiffs' tying claim as a "per se" claim.  That
    reference is unnecessary and prejudicial as it suggests to the jury that tying conduct is especially
22  nefarious, without providing any context or explanation.  The jury should be instructed as to the
    elements of the tying claim, without any characterization whether it is per se or otherwise, as that
23  characterization is irrelevant to the jury's consideration of the claim.

24  The reference in the first paragraph to "course of anticompetitive conduct" is argumentative and
25  incorrectly omits, as CACI and supporting case law make clear, that the Cartwright Act is
    addressed only to anticompetitive agreements, not to unilateral conduct.  *Flagship Theatres of
26  Palm Desert, LLC v. Century Theatres, Inc.,* 198 Cal. App. 4th 1366, 1386 (2011) ("[T]he
    Cartwright Act contains no provision parallel to the Sherman Act's prohibition against
27  monopolization (15 U.S.C. § 2), and the Cartwright Act applies only to a 'combination' involving
    'two or more persons' (§ 16720), not to *unilateral* conduct.") (emphasis in original); *see
28  also Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1478 (9th Cir. 1986) (Cartwright Act "does

not address *unilateral* conduct").

The second sentence of first paragraph is likewise argumentative and impermissibly vague as to what provisions in the contract plaintiffs claim constitute the unlawful restraint.  As set out in Sutter's proposed instruction, the jury should be told specifically which contractual agreements plaintiffs challenge as unlawful, so that jury can make findings as to those provisions.

As discussed above (at Sutter's Explanation in Support of its Instruction No. S-7 & Sutter's Objection to Plaintiffs' Instruction No. S-1), the words "purpose or" in the second element are improper because the Cartwright Act requires anticompetitive effect.

By including the phrase "particularly in, at least some of," the second element improperly suggests that the jury could find competitive harm in markets other than the four markets in which Dr. Chipty has found damages—*i.e.*, Modesto, Berkeley/Oakland, Sacramento, and San Francisco.  ECF 1017-5, Ex. 1, ¶ 211–223 & Exhibits J1–J6.  That phrase should not be included. And Santa Rosa should not be included because Dr. Chipty found no damages there.  *Id.* ¶ 211.

For the reasons discussed in Sutter's Separate Memorandum in Support of its Proposed Jury Instructions, § IV, Plaintiffs' discussion of burden shifting and procompetitive effects (all of the paragraphs under the numbered elements) should be omitted.  Moreover, plaintiffs' instruction on what constitutes a procompetitive effect is inaccurate and unduly narrow for the reasons Sutter explained in its Oppositions to Plaintiffs' Motion in Limine Nos. 1–3 & 6.

The first paragraph under the numbered paragraphs also erroneously suggests that Sutter must produce evidence that no less-restrictive means exist.  That misstates the law.  As CACI 3411 reflects, whether a less restrictive alternative exists is one of several factors the jury may consider, and it is a factor on which plaintiffs bear the burden.  *See also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) ("If the defendant makes this showing [that a procompetitive rationale exists for the restraint], then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) (plaintiff must prove "that the challenged restraint is not reasonably necessary to achieve the defendants' procompetitive justifications, or that those objectives may be achieved in a manner less restrictive of free competition"); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991) (same); *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001) ("plaintiffs must also show that "an alternative is substantially less restrictive *and* is virtually as effective in serving the legitimate objective *without significantly increased cost*" (emphasis in original; internal quotation marks and citation omitted).

Plaintiffs' cases do not hold otherwise.  *Marin Cty. Bd.*, 16 Cal. 3d at 939 (stating only that the rule of reason requires that the practice be "reasonably necessary" and "narrowly tailored," without addressing which party has the burden); *Corwin v. Los Angeles Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842, 855–86 & n.11 (1971) (stating that whether less-restrictive means are available is a factual issue for the jury, but not addressing which party has the burden); *In re Cipro Cases I & II*, 61 Cal. 4th 116, 157–58 (2015) (stating that defendant has the burden of *production* regarding procompetitive justification but not addressing less-restrictive alternatives).

In addition, plaintiffs' burden is not merely to show that a less-restrictive means exists.  As the Supreme Court recently recognized, "antitrust law does not require businesses to use anything

like the least restrictive means of achieving legitimate business purposes.  To the contrary, courts should not second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'"  *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2161 (2021) (citation omitted).  As the Court stated, "[t]hat would be a recipe for disaster, for a 'skilled lawyer' will 'have little difficulty imagining possible less restrictive alternatives to most joint arrangements.'"  *Id.* (quoting 11 P. Areeda & H. Hovenkamp, Antitrust Law ¶1913b, p. 398 (2018).  Accordingly, plaintiffs must "prove that 'substantially less restrictive alternative [means]' existed to achieve the same procompetitive benefits."  *Id.* at 2162.

**Model Instruction No. S-7 – 3405 Horizontal and Vertical Restraints (Use for Direct Competitors or Supplier/Reseller Relations)—Other Unreasonable Restraint of Trade—Rule of Reason—Essential Factual Elements**

[Name of plaintiff] claims that [name of defendant] agreed to [insert unreasonable restraint of trade]. To establish this claim, [name of plaintiff] must prove all of the following:

1. That [name of defendant] [and [name of alleged coparticipant[s]]] agreed to [describe conduct constituting an unreasonable restraint of trade];

2. That the purpose or effect of [name of defendant]'s conduct was to restrain competition;

3. That the anticompetitive effect of the restraint[s] outweighed any beneficial effect on competition;

4. That [name of plaintiff] was harmed; and

5. That [name of defendant]'s conduct was a substantial factor in causing [name of plaintiff]'s harm.

**Source:** CACI 3405

**Plaintiffs' Instruction No. S-8 – Cartwright Act— Course of Conduct**

In deciding whether the effect of Sutter's conduct was to restrain competition, you must view Plaintiff's evidence as a whole, rather than separately considering each component of Sutter's allegedly anticompetitive conduct in isolation.

You should give Plaintiffs and the Class the full benefit of their proof without tightly compartmentalizing the various factual components of their Cartwright Act claim and wiping the slate clean after scrutiny of each.  Plaintiffs and the Class are not required to prove every one of their allegations about anti-competitive conduct.  The question you must answer is whether the totality of Sutter's alleged conduct, including System-wide contracting, and requiring all-or-nothing, non-par rate, anti-tiering and anti-steering restraints, and/or price-secrecy restraints contractual provisions, considered as a whole, restrained competition.

**Source**: *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962); *In re Auto. Antitrust Cases I & II*, 1 Cal. App. 5th 127, 152 (2016); *UFCW & Employers Ben. Trust v. Sutter Health*, CGC-14-538451, Order re Motion for Summary Judgment at 5 (Aug. 12, 2019) (course of conduct theory of liability "is based on the combined effects of multiple contractual provisions."); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152–53 (9th Cir. 2019) ("Contrary to the defendants' argument, we are required to take a holistic look at how the interlocking agreements actually impact competition. Indeed, 'the essential inquiry' is 'whether or not the challenged restraint enhances competition,' which is assessed by considering the totality of 'the nature or character of the contracts.'") (citations omitted); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1522 (10th Cir. 1984), aff'd, 472 U.S. 585 (1985).

**Argument:** An antitrust plaintiff "'should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.' Thus, '[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" *In re Auto. Antitrust Cases I & II*, 1 Cal. App. 5th 127, 152 (2016) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962)).  As the Ninth Circuit explained in *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152–53 (9th Cir. 2019): "Contrary to the defendants' argument, we are required to take a holistic look at how the interlocking agreements actually impact competition.  Indeed, 'the essential inquiry' is 'whether or not the challenged restraint enhances competition,' which is assessed by considering the totality of 'the nature or character of the contracts.'" *Id.* at 1152–53 (citations omitted).  Judge Massullo ruled, in denying Sutter's motion for summary judgment, that under the Cartwright Act plaintiffs' Course of Conduct theory of liability "is based on the combined effects of multiple contractual provisions." *UFCW & Employers Ben. Trust v. Sutter Health*, No. CGC-14-538451, 2019 WL 3856011, at *9 (Cal. Super. June 13, 2019).

In *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509 (10th Cir. 1984), aff'd, 472 U.S. 585 (1985), the trial court in an antitrust case correctly gave "instructions that required the jury to consider the evidence as a whole." *Id.* at 1522, n. 18.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Contrary to Sutter's objection, the existing CACI Rule of Reason instructions do not adequately instruct the jury to assess the effects of Sutter's conduct as a whole.  Accordingly, the jury should be instructed to view Sutter's contractual restraints collectively and holistically in determining their anticompetitive effect.

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1

**Sutter's Objection to Plaintiffs' Instruction No. S-8**

2

3

Plaintiffs' proposed instruction is misleading, because it collapses the detailed, prior, multi-element instructions and seems to wrongly suggest that the only question is whether Sutter restrained competition.  Moreover, there is no need or basis for this instruction.  The CACI-based instructions on the rule of reason are already consistent with *Continental Ore* because they call for the jury to assess the "effect of Sutter's conduct" as a whole.  None of the cases plaintiffs cite approve of instructing the jury in this manner; each instead concerns the method by which a court should consider antitrust allegations in deciding whether to enter judgment as a matter of law.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Plaintiffs' Instruction No. S-9 – Rule of Reason – Direct and Circumstantial Evidence of Anticompetitive Effects**

Plaintiffs may prove anticompetitive effect through direct or circumstantial evidence.

Direct evidence of anticompetitive effect is evidence that Sutter's conduct caused inflated prices, reduced output, or reduced consumer choice in Northern California.

Circumstantial evidence of anticompetitive effect is evidence that Sutter had market power in one or more relevant markets plus some additional evidence that Sutter's conduct had a tendency to harm competition.

**Source:** *Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (quoting 7 P. Areeda, Antitrust Law ¶ 1511, p. 429 (1986)) (Market power is a "surrogate for direct evidence."); *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 336 (3d Cir. 2018); *Marin Cty. Bd. of Realtors, Inc. v. Palsson*, 16 Cal. 3d 920, 935 (1976) (relying on direct evidence to determine whether the challenged horizontal constraint had anticompetitive effects such that consideration of the cross-defendant's "possible justifications" was appropriate); *In re Cipro Cases I & II*, 61 Cal. 4th 116, 157 (2015) (quoting *Roth v. Rhodes*, 25 Cal. App. 4th 530, 542 (1994)) ("'Proving that a restraint has anticompetitive effects often requires the plaintiff to 'delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly,' *i.e.* has market power.").

**Argument:**  This instruction is necessary for the jury to understand that in a Cartwright Act Rule of Reason claim, anticompetitive effects can be shown either through direct evidence or, alternatively, through evidence of market power.  *See* Plaintiffs' Jury Instruction Brief Section IV.

1

**Sutter's Objection to Plaintiffs' Instruction No. S-9**

2

3

     This instruction is erroneous for the reason set out in Sutter's Separate Memorandum in Support of its Proposed Jury Instructions, § I.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Plaintiffs' Instruction No. S-10 – Rule of Reason – "Market Power" Explained**

Market power is well understood to be the ability of a provider in a relevant market to charge a price higher than the one that would prevail in competitive markets. The higher a seller's market share, the more likely it has market power.

In deciding whether Sutter has market power, you should consider how difficult it is for a potential competitor to successfully enter the market. The more difficult it is to successfully enter a market, the more likely Sutter has market power within that market. Market power is less likely to exist if it is not difficult for potential competitors to enter a market successfully.

As I have already instructed you, each market has two components: a product market and a geographic market.  Please consider my earlier instructions on product market and geographic market definition in considering the issue of whether Sutter wields market power over commercial health plans.

**Source***:* Judicial Council of California Civil Jury Instruction (2020 edition), CACI No. 3412; *In re Cipro Cases I & II*, 61 Cal.4th 116, 157 (2015) ("Proving that a restraint has anticompetitive effects often requires the plaintiff to 'delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly,' *i.e.*, has market power.").

**Argument:** Plaintiffs' instruction closely mirrors CACI No. 3412.  The final sentence has been added to remind the jurors that they have already been instructed regarding product markets and geographic markets as part of the *per se* tying instructions and correctly refers to the commercial health plans as the entities over whom Sutter's market power must be determined.

Sutter's instruction adds language to the CACI instruction incorrectly informing the jury that if they find that Sutter does not have market power in the relevant markets they must find for Sutter on all counts in this case.  That is a misstatement of the law with respect to Plaintiffs' Rule of Reason Claim because "proof of actual detrimental effects . . . can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" *Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) (quoting P. Areeda, *Antitrust Law* ¶ 1511, p. 429 (1986)). Se*e* Plaintiffs' Jury Instruction Brief Section IV and Plaintiffs' Instruction No. S-9, *supra*.

*Exxon Corp. v. Superior Ct.*, 51 Cal. App. 4th 1672 (1997) does not support Sutter's argument because, in that case, the court found that the plaintiff produced neither direct evidence of anticompetitive effects nor evidence of market power.  *Id*. at 1685-86

**Sutter's Instruction No. S-10 –Rule of Reason – "Market Power" Explained**

Market power is the ability to increase prices or reduce output without losing market share.  The higher a seller's market share, the more likely it has market power.  If you conclude that Sutter does not have market power in the relevant markets that I will describe, then you must find for Sutter on all counts in this case.

In deciding whether a seller has market power, you should consider in addition to the other evidence how difficult it is for a potential competitor to successfully enter the market.  The more difficult it is to successfully enter a market, the more likely a seller has market power within that market.  Market power is less likely to exist if it is not difficult for potential competitors to enter a market successfully.

Each market has two components: a product market and a geographic market.

**Source**: CACI 3412; *Exxon Corp. v. Superior Court*, 51 Cal. App. 4th 1672, 1681–82, 1686 (1997) ("[T]he need to prove market power is a threshold consideration in an antitrust case and is the sine qua non of recovery."; "Exxon's lack of market power eliminates a prerequisite to plaintiffs' success on" a Cartwright Act tying claim); *SC Manuf. Homes, Inc. v. Liebert*, 162 Cal. App. 4th 68, 91 (2008) ("[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." (quoting *Ill. Tool Works Inc. v. Ind. Ink., Inc.*, 547 U.S. 28, 46 (2006)); *Dang. S.F. Forty Niners*, 964 F. Supp. 2d 1097, 1104 (N.D. Cal. 2013) ("In order to state a valid antitrust claim [under the Cartwright Act], a plaintiff must allege that the defendant has market power within a legally cognizable relevant market."); *Theme Promotions, Inc. v. New Am. Mktg.* FSI, 546 F.3d 991, 1001 (9th Cir. 2008) (under the Cartwright Act, a "rule of reason analysis requires a threshold inquiry into the defendant's market power"); *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 n.7 (2018) ("Vertical restraints often pose no risk to competition unless the entity imposing them has market power . . . ."); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 898 (2007) ("[T]hat a dominant manufacturer or retailer can abuse resale price maintenance for anticompetitive purposes may not be a serious concern unless the relevant entity has market power.").

**Explanation**:  The third sentence of the first paragraph is not in CACI 3412.  The CACI instructions provide an explanation of market power and market definition, but they do not explain why market power and market definition matter.  This sentence, which is supported by the cases cited in the source paragraph above, explains that market power is a "prerequisite to plaintiffs' success on" their Cartwright Act claims.  *Exxon Corp. v. Superior Court*, 51 Cal. App. 4th 1672, 1686 (1997).  The words "in addition to the other evidence" in the first sentence of the second paragraph are not in CACI 3412.  They are necessary to clarify that barriers to entry are not the only consideration in assessing market power, as the first paragraph's definition of market power and discussion of market share show.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Sutter's Objection to Plaintiffs' Instruction No. S-10</u>**

As discussed above (at Sutter's Objection to Plaintiffs' Instruction No. S-2) the jury should be instructed on market power and defining relevant markets (No. S-10, followed by Nos. S-4 and S-5) before the instructions on plaintiffs' claims.

The first sentence of plaintiffs' first paragraph is changed substantially from the CACI instruction, which correctly focuses on "the ability to increase prices or reduce output without losing market share," rather than on price levels generally.  There is no basis for this change.

Plaintiffs' third paragraph again assumes, by adding "over commercial health plans," that Sutter sells inpatient hospital services to commercial health plans rather than to patients, a disputed fact. Those words should be omitted for the reasons stated in Sutter's Separate Memorandum in Support of its Proposed Jury Instructions, § III.

1  **Model Instruction No. S-10 – 3412 Rule of Reason—"Market Power" Explained**

2         Market power is the ability to increase prices or reduce output without losing market

3  share. The higher a seller's market share, the more likely it has market power.

4         In deciding whether a seller has market power, you should consider how difficult it is for a

5  potential competitor to successfully enter the market. The more difficult it is to successfully enter

6  a market, the more likely a seller has market power within that market. Market power is less

7  likely to exist if it is not difficult for potential competitors to enter a market successfully.

8

9  **Source:** CACI 3412

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Plaintiffs' Instruction No. S-11 – Rule of Reason—Anticompetitive Versus Beneficial Effects**

In deciding whether Sutter's challenged restraint had an anticompetitive or beneficial purpose or effect on competition in the relevant markets, you should consider the results the restraint was intended to achieve or actually did achieve. In balancing these purposes or effects, you may also consider, among other factors, the following:

(a) Harm to consumers in the form of higher prices or a reduction in choice or output;

(b) Harm to Sutter's competitor hospitals' ability to compete in the market;

(c) The nature of Sutter's conduct;

(d) The probable effect of Sutter's conduct on the business involved;

(e) The history of Sutter's conduct;

(f) The reasonableness of the stated purpose for the Sutter's conduct;

(g) The availability of less restrictive means to accomplish the stated purpose for Sutter's conduct;

(h) The portion of the market affected by Sutter's conduct; and

(i) The extent of Sutter's market power.

**Source:** Judicial Council of California Civil Jury Instruction (2020 edition), CACI No. 3411; *Corwin v. Los Angeles Newspaper Service Bur.*, 22 Cal. 3d 302, 314–15 (1978) ("A contract, combination, or conspiracy is an illegal restraint of trade if it constitutes a *per se* violation of the statute or has as its purpose or effect an unreasonable restraint of trade. [] The determination of the existence of such an illegal restraint of trade turns upon findings of fact and involves 'weigh[ing] all of the circumstances of a case.' [] Moreover, in reaching this determination, '[r]ealities must dominate the judgment' []'It is not the form of the combination or the particular means used but the result to be achieved 'that the antitrust law condemns.") (citations omitted); *Ben-E-Lect v. Anthem Blue Cross Life & Health Ins. Co*., 51 Cal. App. 5th 867, 878 (2020); *Reynolds v. California Dental Service*, 200 Cal. App. 3d 590, 596–97 (1988) ("Under the rule of reason, the court inquires into the nature and history of the restraint, as well as other relevant considerations."); *Kolling v. Dow Jones & Co.*,137 Cal. App. 3d 709, 727 (1982); *Marin County Bd. of Realtors, Inc. v. Palsson*,16 Cal. 3d 920, 935 (1976).

**Argument:** Plaintiffs' instruction adopts the first paragraph and all seven relevant considerations specified by CACI No. 3411 which also says to "[i]nsert other relevant consideration."  Plaintiffs have done so by stating that the jury may also consider: "(a) Harm to consumers in the form of higher prices or a reduction in choice or output;" and "(b) Harm to Sutter's competitor hospitals' ability to compete in the market."  Both of these are well-recognized evidence of anticompetitive effect which the jury should also consider.  *See Ben-E-Lect v. Anthem Blue Cross Life & Health Ins. Co*., 51 Cal. App. 5th 867, 878 (2020) (identifying both harm to consumers who paid higher health insurance premiums and harm to competitor denied a fair opportunity to compete as anticompetitive effects under Cartwright Act).

1

2

3   Paragraph (e) of Sutter's proposed instruction improperly seeks to alter the language of CACI No.
3411 to instruct the jury that they may consider less restrictive means to accomplish the stated
purpose only if such means are "substantially" less restrictive.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sutter's Instruction No. S-11 – Anticompetitive Versus Beneficial Effects**

In deciding whether Sutter's challenged conduct had an anticompetitive or beneficial effect on competition, you should consider the results the restraint was intended to achieve or actually did achieve.  In balancing these effects, you also may consider, among other factors, the following:

    (a)    The nature of the restraint;

    (b)    The probable effect of the restraint on the business involved;

    (c)    The history of the restraint;

    (d)    The reasonableness of the stated purpose for the restraint;

    (e)    The availability of substantially less restrictive means to accomplish the stated purpose;

    (f)    The portion of the market affected by the restraint; and

    (g)    The extent of Sutter's market power.

**Source**:  CACI 3411 (modified); *In re Cipro Cases I & II*, 61 Cal. 4th 116, 145–46 (2015) ("[A]lthough the prohibitions of the Cartwright Act are framed in superficially absolute language, deciding antitrust illegality is not as simple as identifying whether a challenged agreement involves a restraint of trade. . . .  Instead, the Cartwright Act and Sherman Act carry forward the common law understanding that "only unreasonable restraints of trade are prohibited." (citation and internal quotation marks omitted)).

**Explanation**:  The first paragraph modifies CACI 3411 to delete references to "purpose."  As discussed above, antitrust liability turns on the effect of the challenged conduct, not the defendant's purposes.  *See supra*, Sutter's Objection to Plaintiffs' Instruction No. S-1 & Sutter's Explanation in Support of its Instruction No. 7.

Element (e) modifies CACI to clarify that the alternative means must be "substantially" less restrictive, consistent with the law in this area.  *See supra*, Sutter's Objection to Plaintiffs' Instruction No. S-7 (citing cases).

**<u>Sutter's Objection to Plaintiffs' Instruction S-11</u>**

Plaintiffs add additional factors (a) and (b) to the CACI instruction, but do not cite any support for doing so other than CACI's option to "Insert other relevant consideration."  Plaintiffs offer no antitrust case in which the court deemed these factors necessary or appropriate to add to CACI (despite the fact that they would be potentially applicable in any case alleging antitrust violations).  The Court should simply use the CACI instruction.  Factor (f), which is in the CACI instruction, already covers plaintiffs' proposed factors (a) and (b).  And plaintiffs' proposed factor

(b) improperly invites the jury to find liability and award damages based on purported harm to other hospital providers, rather than to plaintiffs and the class.

Plaintiffs also improperly change "restraint" to "Sutter's conduct."  By using "restraint," CACI properly focuses the jury on the alleged anticompetitive agreement—here, the challenged provisions in the contracts between Sutter and the health plans.  The Court should adhere to the CACI formulation to prevent the jury from resting its verdict on an assessment of Sutter's generalized "conduct" apart from the challenged restraints.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Model Instruction No. S-11 – 3411 Rule of Reason—Anticompetitive Versus Beneficial Effects**

In deciding whether [name of defendant]'s challenged restraint had an anticompetitive or beneficial purpose or effect on competition, you should consider the results the restraint was intended to achieve or actually did achieve. In balancing these purposes or effects, you also may consider, among other factors, the following:

(a) The nature of the restraint;

(b) The probable effect of the restraint on the business involved;

(c) The history of the restraint;

(d) The reasonableness of the stated purpose for the restraint;

(e) The availability of less restrictive means to accomplish the stated purpose;

(f) The portion of the market affected by the restraint; [and]

(g) The extent of [name of defendant]'s market power; [and]

(h) [Insert other relevant consideration].

**Source:** CACI 3411

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sutter's Instruction No. S-12 – Harm to Competition**

To show an unreasonable restraint or effect on competition, plaintiffs must show more than an injury to a competitor.  The restraint or effect must be on market-wide competition.  This means that the defendant's conduct must have had an adverse impact on the competitive conditions in general as they exist in the relevant market.

**Source**:  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186 (1999) ("Injury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws."); *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 495 (2011) ("antitrust laws . . . were enacted for the protection of competition, not competitors"; "A complaint must allege facts from which injury to market-wide competition can be inferred." (internal citation and quotation marks omitted)); *Gough v. Rossmoor Corp.,* 585 F.2d 381, 386 (9th Cir. 1978) ("[T]he anticompetitive conduct must have an effect greater than its effect upon the plaintiff's business. . . .  The conduct must have an adverse impact on the competitive conditions in general as they exist within the field of commerce in which the plaintiff is engaged.").

**Explanation**:  This instruction follows settled antitrust law and is necessary to ensure that the jury understands that it must find harm to competition between Sutter and other providers, not just to plaintiffs or to individual competitors.  Neither of plaintiffs' cases require a contrary result, as both merely identify possible ways of proving market-wide harm to competition, which is what Sutter's proposed instruction calls for.  *See Ben-E-Lect v. Anthem Blue Cross Life & Health Ins. Co.*, 51 Cal. App. 5th 867, 878 (2020) (focusing on the "interaction of competitive forces" and the competitive "environment"); *Trendsettah USA, Inc. v. Swisher Int'l Inc*., No. SACV14-01664, 2016 WL 6822191, at *8 (C.D. Cal. Jan. 21, 2016) (finding genuine dispute of fact regarding whether plaintiff suffered causal antitrust injury because "*harm to competition* resulting from restricted output constitutes a viable antitrust injury"); *see also id.* at *9 (relying on a dispute of fact regarding whether "*the overall market* output was unaffected" as a result of defendant's conduct) (emphases added).

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1

**Plaintiffs' Response to Sutter's Instruction No. S-12**

2

3       This instruction should not be given because it is unnecessary and confusing since harm to competition can come in the form of higher prices to Class Members or reduced output of low-cost insurance products, not just harm to Sutter's competitors. See *Ben-E-Lect v. Anthem Blue Cross Life & Health Ins. Co.*, 51 Cal. App. 5th 867, 878 (2020) (harm to competition included higher health insurance premiums paid by consumers as well as harm to competitors); *Trendsettah USA, Inc. v. Swisher Int'l Inc.*, 2016 WL 6822191, at *8 (C.D. Cal. Jan. 21, 2016) ("'harm to competition manifested as higher prices, lower output, or decreased quality in the products within a defined market.'").

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
                                                                       3:12-CV-04854-LB

1

**Sutter's Instruction No. S-13 – Cartwright Act – Refusal to Deal**

2

A seller, acting independently, may choose with whom and on what terms it will agree to

3

enter contracts.  A seller does not violate the Cartwright Act by deciding on its own not to enter a

4

contract with a third party on the terms that the third party would prefer.

5

6

**Source**: *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 663–67
(2005) ("[T]he right to refuse to deal remains sacrosanct.  Because that is true, the mere refusal to
deal does not violate the spirit or policy of antitrust law.").

7

8

**Explanation**:  There is no CACI instruction addressing refusal to deal in this context, but
precedent establishes that the Cartwright Act does not make it unlawful for a company to refuse
to enter a contractual relationship or to reject the terms of a proposed relationship.  This
instruction should be given to prevent juror confusion on this point, given the nature of plaintiffs'
allegations.

9

10

11

Plaintiffs do not challenge the accuracy of this proposed instruction, except to assert that *People's
Choice* was not an antitrust case.  That assertion is meritless, because the Unfair Competition Law
claim the court was considering was predicated on alleged violation of the "policy or spirit" of the
antitrust laws, and the court ruled that no such violation existed because the antitrust laws were
not violated at all.  131 Cal. App. 4th at 668 ("The allegations here are simply too far removed
from cognizable antitrust evils to warrant intervention by a California court.").

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Plaintiffs' Response to Sutter's Instruction No. S-13**

2

3          This instruction should not be given because it is unnecessary, irrelevant and confusing
since Plaintiffs do not assert a refusal to deal claim. *People's Choice Wireless, Inc. v. Verizon*
*Wireless*, 131 Cal. App. 4th 656, 663–667 (2005), which Sutter cites, was not an antitrust case
4     and did not address jury instructions.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1

**Sutter's Instruction No. S-14 – Cartwright Act – Right to Set Own Prices**

2

The Cartwright Act does not regulate whether the prices a seller charges for its own

3

products or services are reasonable or unreasonable.  In other words, charging higher prices alone

4

is not a violation of the Cartwright Act.  For that reason, you may not decide that Sutter violated

5

the Cartwright Act simply because you think that Sutter's prices for its services were

6

unreasonable.  Rather, if you conclude that Sutter's challenged conduct was nothing more than

7

Sutter setting prices for its own services, standing alone, then you must conclude that Sutter did

8

not violate the Cartwright Act, even if you think that the prices Sutter set were unreasonable.

9

10

**Source**:  *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 201 (1999) ("We do not interpret *Palsson* and its progeny as construing the Cartwright Act to permit judicial oversight of unilateral price decisions.").

11

12

**Explanation**:  There is no CACI instruction addressing a seller's right to set its own prices, but precedent makes clear that, aside from a predatory-price allegation not alleged in this case, the Cartwright Act does not regulate whether prices are reasonable.  Plaintiffs' response to this instruction only confirms its necessity. It is precisely because plaintiffs "do not merely claim that Sutter unilaterally charged higher prices" but instead claim that "Sutter was able to charge higher prices *as a result of associated anticompetitive conduct*," that this instruction is warranted to ensure that the jury does not hold Sutter liable merely because of its prices.  Judge Massullo's order provides no support for not giving this instruction.  The quoted language is from Judge Massullo's order denying Sutter's motion for summary judgment on the grounds that the non-par rate was per se lawful.  *UFCW & Emps. Benefit Trust v. Sutter Health*, No. CGC-14-538451, 2019 WL 3856011, at *7 (Cal. Super. June 13, 2019).  But whether the non-par rate is per se lawful is not relevant to determining whether this instruction should be provided as a prophylactic against jury confusion.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Plaintiffs' Response to Sutter's Instruction No. S-14**

2

3        This instruction should not be given because it is unnecessary, irrelevant and confusing,
which is why there is no CACI instruction for this.  Moreover, it misstates the challenged

4    conduct.  Plaintiffs do not merely claim that Sutter unilaterally charged higher prices: Plaintiffs
claim that Sutter was able to charge higher prices as a result of associated anticompetitive

5    conduct.

6        As Judge Massullo ruled:

7        This case is not a challenge to Sutter's prices "standing alone." To the extent the amount

8        of Sutter's non-par rate is implicated, it is challenged as part of a broader scheme through
which Sutter used the threat of supracompetitive prices in some markets to extract

9        concessions in other markets….Nor does Sutter cite authority holding that challenged
conduct is immune from an antitrust challenge on the basis that one element of the

10       conduct touches on pricing. The facts that Sutter's non-par rate can be described as a
pricing decision and that Sutter's non-par rate is one element of the alleged restraint do not

11       foreclose the application of a rule of reason analysis.

12   *UFCW & Employers Ben. Trust v. Sutter Health*, No. CGC-14-538451, 2019 WL 3856011, at *7
(Cal. Super. June 13, 2019).

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Sutter's Instruction No. S-15 – Cartwright Act – Lawful Discounts**

2        The Cartwright Act does not prohibit sellers from offering discounts or lower prices,

3   including volume or bundled discounts, and requiring that buyers who wish to receive such

4   discounts or lower prices agree to purchase the specified volume or bundle of services.  If you

5   conclude that Sutter's challenged agreements consisted of offering discounts (including volume

6   or bundled discounts) for Sutter services, you may not decide that Sutter violated the Cartwright

7   Act simply because Sutter offered such discounts.

8

9   **Source**: *W. Parcel Express v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 976 (9th Cir. 1999)
    ("The district court properly concluded that UPS' contracts are volume discount contracts, not

10  exclusive dealings contracts. Such volume discount contracts are legal under antitrust law.");
    *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1062 (8th Cir. 2000) (rejecting a tying

11  claim based on allegations of discounts involving "only one product," rather than a linkage
    between two products).

12

13  **Explanation**:  There is no CACI instruction addressing volume discounts, but precedent clearly
    establishes that they are lawful.  This instruction should be given to ensure that the jury does not

14  find in plaintiffs' favor based on contractual terms that provide discounted rates in exchange for
    the patient volume that results from in-network status.

15

16  Contrary to plaintiffs' suggestion, the instruction is accurate and necessary in light of plaintiffs'
    argument that Sutter should be held liable for contract provisions that seek to prevent insurers

17  from unilaterally altering Sutter's agreed-upon participation status after Sutter has agreed to rates
    based on expected volume from that agreed-upon participation status.  To the extent plaintiffs

18  have a viable argument that Sutter engaged in something beyond offering volume discounts that
    is actionable under the antitrust laws (or an argument that Sutter's contract rates were not in fact

19  discounted), this instruction does not preclude them from making that argument.

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
                                                                              3:12-CV-04854-LB

1

**Plaintiffs' Response to Sutter's Instruction No. S-15**

2

3          This instruction is unnecessary, irrelevant and confusing, which is why there is no CACI

instruction for this.  The instruction misstates the law: the issue is whether Sutter charged higher

4     prices as the result of anticompetitive conduct, not whether Sutter offered a discount off its higher

prices.  Notably, Sutter argued extensively that its challenged conduct was nothing more than

5     offering lawful discounts in its recent motion for summary judgment. *See* ECF 831-1 and 904-1.

The Court disregarded those lawful discount arguments in denying Sutter's motion, finding them

6     not sufficiently relevant to the claims in this case to merit mentioning in the decision.  Nothing

immunizes Sutter for offering "discounts," particularly when it is undefined from which prices

7     Sutter is offering discounts.  Finally, the instruction is wholly irrelevant to the challenged conduct

which concerns Sutter's requirement that health plans forego procompetitive, individual hospital

8     contracting, and submit to anticompetitive provisions for all of Sutter's hospitals.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Sutter's Instruction No. S-16 – Confidential Information**

Unless required by a statute, regulation or other authority, a health care provider is not required to disclose its trade secret, confidential or proprietary information, including information related to pricing.

**Source**:  Cal. Civ. Code §§ 3426.1 - 3426.3 (defining a "trade secret" subject to legal protection as something that "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy" and protecting trade secrets from misappropriation); *Whyte v. Schlage Lock Co.,* 101 Cal. App. 4th 1443, 1455 (2002) ("Cases have recognized that information related to cost and pricing can be trade secret."); *Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117, 1128 (2010) (holding insurer had no duty to disclose basis for pricing calculations in insurance contract negotiations, and stating "[t]here is no duty of ordinary care to disclose pricing information during arm's-length contract negotiations") (quotation marks and citation omitted).

**Explanation**:  This instruction should be given to ensure that the jury is informed that a company generally has the right to keep private its trade secret, confidential, or proprietary information and that the jury does not find in plaintiffs' favor based on an incorrect view that Sutter breached some general duty to disclose.

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1    **Plaintiffs' Response to Sutter's Instruction No. S-16**

2         This instruction, which is not based on any CACI jury instruction, is unnecessary,

3    irrelevant and confusing because Plaintiffs do not assert trade secret claims or allege that Sutter
     had a duty to disclose trade secrets.  This is not a jury instruction, as the jury is not required to

4    decide anything under the instruction, but to take directive.  It should not be given.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
                                        3:12-CV-04854-LB

1

**Plaintiffs' Instruction No. S-17 – Causation – Substantial Factor**

2

If you find that Sutter violated the Cartwright Act, you must determine whether Sutter's

3

antitrust violations were the proximate cause of injuries to Plaintiffs and the Class Members.  The

4

antitrust violations need not be the sole or controlling cause of the injury in order to establish

5

proximate cause, but only need be a substantial factor in bringing about the injury.  A substantial

6

factor in causing harm is a factor that a reasonable person would consider to have contributed to

7

the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of

8

the harm.

9

10

**Source:** Judicial Council of California, Civil Jury Instruction No. 430 (2020); *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 723 (1982); *Saxer v. Philip Morris, Inc.*, 54 Cal. App. 3d 7, 23 (1975).

11

12

**Argument:** The last two sentences of Plaintiffs' proposal are taken *verbatim* from CACI No. 430. The first two sentences have been added to place the CACI instruction in context based on language from Cartwright Act cases. *See Saxer v. Philip Morris, Inc.*, 54 Cal. App. 3d 7, 23 (1975) ("The alleged antitrust violation need not be the sole or controlling cause of the injury in order to establish proximate cause, but only need be a substantial factor in bringing about the injury."); *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 723 (1982) ("The plaintiff in a Cartwright Act proceeding must show that an antitrust violation was the proximate cause of his injuries.").  These cases comport with Ninth Circuit law; *see Mulvey v. Samuel Goldwyn Productions*, 433 F.2d 1073, 1075 n. 3 (9th Cir. 1970) *cert. denied*, 402 U.S. 923 (1971) ("Legal cause exists between the antitrust wrong and the injury if that wrong is a substantial factor in bringing about the injury.  It need not be the sole or the 'controlling' cause of the injury.")

13

14

15

16

17

18

Plaintiffs object to the last sentence in Sutter's proposed instruction, which is optional under the CACI instruction, and should not be given this case because there was no concurrent cause of the Class Members' harm.  The "market demand and consumer/health plan preferences" identified by Sutter in its objection to Plaintiffs' instruction were not concurrent causes of the higher prices resulting from Sutter's anticompetitive conduct that harmed Plaintiffs.

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1

**Sutter's Instruction No. S-17 – Causation: Substantial Factor**

2          A substantial factor in causing harm is a factor that a reasonable person would consider to

3   have contributed to the harm.  It must be more than a remote or trivial factor.  It does not have to

4   be the only cause of the harm.  Conduct is not a substantial factor in causing harm if the same

5   harm would have occurred without that conduct.

6

7   **Source:**  CACI 430

8   **Sutter's Objection to Plaintiffs' Instruction No. S-17**

9
    The first two sentences of plaintiffs' proposed instruction are not found in CACI No. 430 and
10  should not be given.

11  Plaintiffs also improperly omit the last sentence of CACI No. 430, which is needed because the
    evidence will show that, because of market demand and consumer/health plan preferences, the
12  number of narrow or tiered networks would not have been materially different even absent the
    challenged contractual provisions and contracting practices.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Model Instruction No. S-17 – 430 Causation: Substantial Factor**

A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm.

[Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.]

**Source:** CACI 430

1    **Plaintiffs' Instruction No. S-18 – Damages**

2         If you decide that Plaintiffs have proved any of their claim(s) against Sutter, you also must

3    decide how much money will reasonably compensate Plaintiffs and the Class Members for the

4    harm. This compensation is called "damages." The amount of damages must include an award for

5    all harm that was caused by Sutter, even if the particular harm could not have been anticipated.

6    Plaintiffs must prove the amount of the Class Members total damages. However, they do not have

7    to prove the exact amount of damages that will provide reasonable compensation for the harm.

8    You must not speculate or guess in awarding damages. The following are the specific items of

9    damages claimed:

10        Plaintiffs seek damages in an amount equal to the increased health insurance premiums

11   that they and the Class Members paid to health plans during the Class Period as a result of

12   Sutter's conduct. Plaintiffs are seeking to recover damages on behalf of themselves and a class of

13   individuals and businesses that paid health insurance premiums.

14        In antitrust class actions such as this one, Plaintiffs often attempt to prove damages

15   suffered by the Class in the aggregate.  To award damages to the Class, you do not need to

16   determine the amount of the increase in health insurance premiums that each Class Member paid

17   during the Class period.  You also do not need to determine the amount of damages that the Class

18   suffered in the aggregate with mathematical certainty or precision.

19        It is sufficient for you to reasonably estimate the total amount of the increase in insurance

20   premiums that the Class Members paid, as long as the estimate is based on evidence and

21   reasonable inference.  You may award damages even if they cannot be calculated with absolute

22   exactness.

23

24   **Source:** CACI No. 3440; *In re Cipro Cases I & II*, 121 Cal. App. 4th 402, 411 (2004); Conte &
     Newberg, Newberg on Class Actions (4th ed.2002) § 10:3, pp. 479–480);  *Eastman Kodak Co. v.*
25   *Southern Photo Materials Co*., 273 U.S. 359, 379 (1927); *Bigelow v. RKO Radio Pictures*, 327
     U.S. 251, 264–65 (1946); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555,
26   563 (1931)); *Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.*, 101 Cal.App.3d 532,
     545-46 (1980); *Diesel Elec. Sales and Serv., Inc. v. Marco Marine San Diego, Inc*., 16
27   Cal.App.4th 202, 219–220 (1993); *Moldanado v. Apple, Inc*., 2021 WL 1947512, at *22 (N.D.
     Cal. May 14, 2021); *In re Glumetza Antitrust Litig*., 336 F.R.D. 468, 480 (N.D. Cal. 2020); *U.S.*
28   *Football League v. Nat'l Football League*, 842 F.2d 1335, 1378, n. 27 (2d Cir. 1988).

**Argument:** The first four sentences of Plaintiffs' instruction are from CACI No. 3440.  The instruction then explains the damages Plaintiffs seek in accordance with the CACI instruction.  Since this is a class action, which is not addressed in CACI No. 3440, Plaintiffs' instruction also explains that Plaintiffs are not required to prove individual damages for each Class Member but need only establish aggregate damages for the Class.  "The total amount of overcharges to the class as a whole…based on a standard economic formula…is an accepted method of proving aggregate damages to the class."  *In re Cipro Cases I & II*, 121 Cal. App. 4th 402, 411 (2004) (citing 3 Conte & Newberg, *Newberg on Class Actions* § 10:3, pp. 479–480(4th ed. 2002)).

The final paragraph reflects well-settled case law that reasonable damage estimates based on reasonable inferences are sufficient in Cartwright Act cases. As held in *Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc*., 101 Cal.App.3d 532, 545-46 (1980):

> [T]he jury will be permitted to act upon probable and inferential proof and to 'make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.'  This is in line with the California authorities which emphasize that while the plaintiff must show with reasonable certainty that he has suffered damages by reason of the wrongful act of the defendant, once the cause and existence of damages have been so established, recovery will not be denied because the damages are difficult to ascertain with precision. On the contrary, the law only requires that some reasonable basis of computation be used and will allow damages so computed even if the result has been reached by way of approximation.  (citations and internal quotes omitted)

*Diesel Elec. Sales and Serv., Inc. v. Marco Marine San Diego, Inc*., 16 Cal.App.4th 202, 219–220 (1993) which is cited as an authority in CACI No. 3440 similarly explains: "[D]amage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts" and that the factfinder may determine the amount of damages "as a matter of just and reasonable inference….".  *See also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–65 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."); *Story Parchment Co. v. Paterson Parchment Paper Co*., 282 U.S. 555, 563 (1931); *Moldanado v. Apple, Inc*., 2021 WL 1947512, at *22 (N.D. Cal. May 14, 2021) ( "Damages calculations have long been understood to involve a degree of approximation; because of the economic complexities of the real world, it could not be otherwise . . ."); *In re Glumetza Antitrust Litig*., 336 F.R.D. 468, 480 (N.D. Cal. 2020) (Alsup, J.) ("It remains . . . impossible to know what would have happened absent defendants' unlawful conduct because . . . the [] scheme itself deprived us of that information.  Estimates are [] the only way to replay the film without the violation"). The jury should be so informed.

In *U.S. Football League v. Nat'l Football League*, the judge instructed the jury "It might be difficult for you to measure the plaintiff[s'] damages in this case. However, the fact that it might be difficult to determine the amount of the plaintiffs' damages should not prevent you from awarding damages to plaintiffs. The law allows a party injured by conduct which violates the Sherman Act to collect damages even if the evidence does not reflect how those damages are to be calculated with mathematical precision." 842 F.2d 1335, 1378, n. 27 (2d Cir. 1988).

Sutter's instruction, which would require the jury to first find the amount Sutter overcharged the health plans at each of the damages hospitals and then determine the amount of that overcharge that was passed on to the Class Members, finds no support in CACI No. 3440 or any other authority and is apparently designed to make the jury's damage calculation complicated and confusing.  Sutter's final paragraph is unnecessary and inappropriate because the jury will have already been instructed about expert opinion. *See* Stipulated Instruction No. M-6 – Expert Opinion, *supra*.  Sutter offers no authority for including statements about expert testimony in a

damages jury instruction and cites only *People v. Sanchez*, 63 Cal. 4th 665, 675 (2016), an inapposite criminal law case that had nothing to do with damages.

**Sutter's Instruction No. S-18 – Damages**

If you find that plaintiffs suffered harm, and that Sutter's conduct was a substantial factor in causing that harm, you must decide how much money will reasonably compensate plaintiffs for the harm that Sutter caused them.  This compensation is called "damages."

The amount of damages must include an award for all harm that plaintiffs show Sutter's conduct has caused plaintiffs, even if the particular harm could not have been anticipated.

Plaintiffs must prove the amount of their damages.  Plaintiffs do not have to prove the exact amount of damages that will provide reasonable compensation for the harm, but you must not speculate or guess in awarding damages.

You must not include in your award any damages to punish or make an example of Sutter. Such damages would be punitive damages, and they cannot be a part of your verdict.  You must award only the damages that fairly compensate plaintiffs for their loss.

The specific item of damages plaintiffs claim here is the amount that plaintiffs allegedly overpaid in premiums for fully insured health insurance policies as a result of Sutter's challenged conduct, above what plaintiffs would have spent on those premiums without the challenged conduct.  First, plaintiffs claim that Sutter overcharged for inpatient services at four hospitals: Memorial Medical Center, Sutter Medical Center Sacramento, Alta Bates Summit Medical Center and CPMC (but at CMPC-St. Luke's, only for services provided to patients covered by Aetna insurance).  Plaintiffs further claim that the insurance companies passed through the overcharge on inpatient services to class members by increasing their premiums.  This means that the Plaintiffs must show that there was an initial overcharge at these hospitals and that the insurance companies passed on some or all of the overcharge in the form of premiums paid by plaintiffs.  If you find that plaintiffs suffered harm, and that Sutter's conduct was a substantial factor in causing that harm, you will need to determine the amount that Sutter overcharged the carriers and how much of the overcharge was passed through to class members in the form of higher premiums

During the trial you heard testimony from expert witnesses about damages.  You do not have to accept an expert's opinion on damages, just as you do not have to accept an expert's opinion on other topics.  As with any other witness, it is up to you to decide whether you believe

the expert's testimony and choose to use it as a basis for your decision.  You may believe all, part, or none of an expert's testimony.  In deciding whether to believe an expert's testimony, you should consider:

     a.      The expert's training and experience;

     b.      The facts the expert relied on;

     c.      Whether those facts have been adequately proven;

     d.      The reasons for the expert's opinion; and

     e.      Whether the expert's opinion is based upon principles that are well-established in the expert's field.

**Source**: CACI 3440; CACI 3924; CACI 219; *People v. Sanchez*, 63 Cal. 4th 665, 675 (2016) ("The jury may conclude a fact necessary to support the opinion has not been adequately proven, even though there may be some evidence in the record tending to establish it.  If an essential fact is not found proven, the jury may reject the opinion as lacking foundation."); *id.* at 686 ("A jury may repose greater confidence in an expert who relies upon well-established scientific principles.  It may accord less weight to the views of an expert who relies on a single article from an obscure journal or on a lone experiment whose results cannot be replicated.").

**Explanation**:  The first two paragraphs, and the first sentence of the third paragraph, come directly from CACI 3440, except that the first sentence adds a reference to the "substantial factor" standard for clarity.  The second sentence of the third paragraph is a rephrased version of the second and third sentences of the third paragraph of CACI 3440, which as written in CACI fail to explain how to reconcile the competing concepts they describe.

The fourth paragraph comes directly from CACI 3924.

The fifth paragraph describes plaintiffs' claimed damages, in accordance with CACI 3440.

The final paragraph comes from CACI 219.  It is necessary here because plaintiffs' damages evidence will depend heavily on expert testimony.  Subparagraph c. is added to clarify that the jury must assess whether the facts the expert relies on have been proven and may not simply take the expert's factual assumptions as true.  Subparagraph e. is added to make clear, as the California Supreme Court held in *People v. Sanchez*, that the jury may properly consider the level of scientific support for the principles on which the expert's opinion relies in deciding how much weight to give that opinion.  *Sanchez*, 63 Cal. 4th at 675.

### Sutter's Objection to Plaintiffs' Instruction No. S-18

The second paragraph of plaintiffs' proposed instruction is insufficient because it does not tell the jury the determinations it must make to support a damages award—*i.e.*, that it must first find the amount of the overcharge in hospital services at the alleged damages hospitals, and then determine the amount of that overcharge that was passed through to plaintiffs.

The third and fourth paragraphs are not anywhere in CACI and are not justified.  There is no need to instruct on the propriety of an aggregate award because Sutter will not argue to the jury that an aggregate award is impermissible.  The last sentence of the third paragraph and the entire fourth paragraph are addressed to whether damages must be proved exactly.  But that topic is already covered by the language in the CACI instruction that plaintiffs need not prove the exact amount of damages, with the qualification that the jury may not speculate or guess.  By unnecessarily repeating the lack of need for exactness (but not repeating that the jury must not speculate or guess), plaintiffs' instruction improperly dilutes the standard the jury must follow.

**Model Instruction No. S-18 – 3440 Damages**

If you decide that [name of plaintiff] has proved [his/her/nonbinary pronoun/its] claim against [name of defendant], you also must decide how much money will reasonably compensate [name of plaintiff] for the harm. This compensation is called "damages."

The amount of damages must include an award for all harm that was caused by [name of defendant], even if the particular harm could not have been anticipated.

[Name of plaintiff] must prove the amount of [his/her/nonbinary pronoun/its] damages. However, [name of plaintiff] does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

The following are the specific items of damages claimed by [name of plaintiff]:

1. [Loss of reasonably anticipated sales and profits];

2. [An increase in [name of plaintiff]'s expenses];

3. [Insert other applicable item of damage].

**Source:** CACI 3440

**Model Instruction No. S-18 – 3924 No Punitive Damages**

You must not include in your award any damages to punish or make an example of [name of defendant]. Such damages would be punitive damages, and they cannot be a part of your verdict. You must award only the damages that fairly compensate [name of plaintiff] for [his/her/nonbinary pronoun/its] loss.

**Source:** CACI 3924

**Model Instruction No. S-18 – 219 Expert Witness Testimony**

During the trial you heard testimony from expert witnesses. The law allows an expert to state opinions about matters in the expert's field of expertise even if the expert has not witnessed any of the events involved in the trial.

1     You do not have to accept an expert's opinion. As with any other witness, it is up to you to

2  decide whether you believe the expert's testimony and choose to use it as a basis for your

3  decision. You may believe all, part, or none of an expert's testimony. In deciding whether to

4  believe an expert's testimony, you should consider:

5          a. The expert's training and experience;

6          b. The facts the expert relied on; and

7          c. The reasons for the expert's opinion.

8  **Source**: CACI 219

1

**CONCLUDING INSTRUCTIONS**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Stipulated Instruction No. C-1 – Duty To Deliberate**

Before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right, or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 3.1 [verbatim]

**Stipulated Instruction No. C-2 – Consideration Of Evidence—Conduct Of The Jury**

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or to the issues it involves.  Except for discussing the case with your fellow jurors during your deliberations:

> Do not communicate with anyone in any way and do not let anyone else
> communicate with you in any way about the merits of the case or anything to do
> with it.   This includes discussing the case in person, in writing, by phone, tablet,
> computer, or any other means, via email, via text messaging, or any internet
> chat room, blog, website or application, including but not limited to Facebook,
> YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other forms
> of social media.  This applies to communicating with your family members,
> your employer, the media or press, and the people involved in the trial.   If you are
> asked or approached in any way about your jury service or anything about this
> case, you must respond that you have been ordered not to discuss the matter and
> to report the contact to the court.
> Do not read, watch, or listen to any news or media accounts or commentary about
> the case or anything to do with it; do not do any research, such as consulting
> dictionaries, searching the Internet, or using other reference materials; and do
> not make any  investigation or in any other way try to learn about the case on
> your own.  Do not visit or view any place discussed in this case, and do not use
> Internet programs or other devices to search for or view any place discussed
> during the trial.   Also, do not do any research about this case, the law, or the
> people involved—including the parties, the witnesses or the lawyers—until you
> have been excused as jurors.  If you happen to read or hear anything touching on
> this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on evidence that has been presented here in court.  Witnesses here in court take an oath to tell the truth, and

1   the accuracy of their testimony is tested through the trial process.  If you do any research or

2   investigation outside the courtroom, or gain any information through improper

3   communications, then your verdict may be influenced by inaccurate, incomplete or misleading

4   information that has not been tested by the trial process.  Each of the parties is entitled to a fair

5   trial by an impartial jury, and if you decide the case based on information not presented in court,

6   you will have denied the parties a fair trial.  Remember, you have taken an oath to follow the

7   rules, and it is very important that you follow these rules.

8        A juror who violates these restrictions jeopardizes the fairness of these proceedings, and

9   a mistrial could result that would require the entire trial process to start over.  If any juror is

10  exposed to any outside information, please notify the court immediately.

11

12  **Source:** 9th Cir. Model Jury Instructions (2020) No. 3.2 [deletes statement that court has no
    information that there will be news reports; deletes brackets in last paragraph]

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Stipulated Instruction No. C-3 – Communication With Court**

2   If it becomes necessary during your deliberations to communicate with me, you may

3 send a note through the courtroom deputy, signed by your presiding juror or by one or more

4 members of the jury.  No member of the jury should ever attempt to communicate with me

5 except by a signed writing; I will communicate with any member of the jury on anything

6 concerning the case only in writing, or here in open court.  If you send out a question, I will

7 consult with the parties before answering it, which may take some time.  You may continue your

8 deliberations while waiting for the answer to any question.  Remember that you are not to tell

9 anyone—including me—how the jury stands, numerically or otherwise, until after you have

10 reached a unanimous verdict or have been discharged.  Do not disclose any vote count in any

11 note to the court.

12

13 **Source:** 9th Cir. Model Jury Instructions (2020) No. 3.3 [changed "marshal" to "courtroom
deputy"]

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Stipulated Instruction No. C-4 – Readback Or Playback**[5]

2

Because a request has been made for a [readback] [playback] of the testimony of

3

[*witness's name*] it is being provided to you, but you are cautioned that all [readbacks]

4

[playbacks] run the risk of distorting the trial because of overemphasis of one portion of the

5

testimony.  Because of the length of the testimony of this witness, excerpts will be [read]

6

[played].  The [readback] [playback] could contain errors. The [readback] [playback] cannot

7

reflect matters of demeanor [, tone of voice,] and other aspects of the live testimony. Your

8

recollection and understanding of the testimony controls. Finally, in your exercise of judgment,

9

the testimony [read] [played] cannot be considered in isolation, but must be considered in the

10

context of all the evidence presented.

11

12

**Source:** 9th Cir. Model Jury Instructions (2020) No. 3.4 [bracketed sentence regarding hearing all of the witness's testimony deleted]

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[5] Read if necessary.

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Stipulated Instruction No. C-5 – Return Of Verdict**

A verdict form has been prepared for you.  [Explain verdict form as needed.]  After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the courtroom deputy that you are ready to return to the courtroom.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 3.5 [used "foreperson" and "courtroom deputy"]

Joint Proposed Jury Instructions
3:12-CV-04854-LB

1    **Stipulated Instruction No. C-6 – Additional Instructions Of Law**[6]

2            At this point I will give you an additional instruction.  By giving an additional

3    instruction at this time, I do not mean to emphasize this instruction over any other instruction.

4            You are not to attach undue importance to the fact that this instruction was read

5    separately to you.  You must consider this instruction together with all of the other

6    instructions that were given to you.

7            [Insert text of new instruction.]

8            You will now retire to the jury room and continue your deliberations.

9

10   **Source:** 9th Cir. Model Jury Instructions (2020) No. 3.6 [verbatim]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[6] Read if necessary.

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Stipulated Instruction No. C-7 – Deadlocked Jury[7]**

Members of the jury, you have advised that you have been unable to agree upon a verdict in this case.  I have decided to suggest a few thoughts to you.

As jurors, you have a duty to discuss the case with one another and to deliberate in an effort to reach a unanimous verdict if each of you can do so without violating your individual judgment and conscience.  Each of you must decide the case for yourself, but only after you consider the evidence impartially with the other jurors.  During your deliberations, you should not be unwilling to reexamine your own views and change your opinion if you become persuaded that it is wrong.  However, you should not change an honest belief as to the weight or effect of the evidence solely because of the opinions of the other jurors or for the mere purpose of returning a verdict.

All of you are equally honest and conscientious jurors who have heard the same evidence.  All of you share an equal desire to arrive at a verdict.  Each of you should ask yourself whether you should question the correctness of your present position.

I remind you that in your deliberations you are to consider the instructions I have given you as a whole.  You should not single out any part of any instruction, including this one, and ignore others.  They are all equally important.

You may now return to the jury room and continue your deliberations.

**Source:**  9th Cir. Model Jury Instructions (2020) No. 3.7 [verbatim]

---

[7] Read if necessary.

**Stipulated Instruction No. C-8 – Continuing Deliberations After Juror Is Discharged[8]**

[One] [Some] of your fellow jurors [has] [have] been excused from service and will not participate further in your deliberations. You should not speculate about the reason the [juror is] [jurors are] no longer present.

You should continue your deliberations with the remaining jurors. Do not consider the opinions of the excused [juror] [jurors] as you continue deliberating. All the previous instructions given to you still apply, including the requirement that all the remaining jurors unanimously agree on a verdict.

**Source:**  9th Cir. Model Jury Instructions (2020) No. 3.8 [verbatim]

---

[8] Read if necessary.

Joint Proposed Jury Instructions
3:12-CV-04854-LB

**Stipulated Instruction No. C-9 – Post-Discharge Instruction**

Now that the case has been concluded, some of you may have questions about the confidentiality of the proceedings.  Now that the case is over, you are free to discuss it with any person you choose.  By the same token, however, I would advise you that you are under no obligation whatsoever to discuss this case with any person.

If you do decide to discuss the case with anyone, I would suggest you treat it with a degree of solemnity in that whatever you do decide to say, you would be willing to say in the presence of the other jurors or under oath here in open court in the presence of all the parties.

Finally, always bear in mind that if you do decide to discuss this case, the other jurors fully and freely stated their opinions with the understanding they were being expressed in confidence.  Please respect the privacy of the views of the other jurors.

Finally, if you would prefer not to discuss the case with anyone, but are feeling undue pressure to do so, please feel free to contact the courtroom deputy, who will notify me and I will assist.

**Source:** 9th Cir. Model Jury Instructions (2020) No. 3.9 [brackets removed]

Dated:  July 22, 2021                                JONES DAY

                                                                    By  /s/ *Jeffrey A. LeVee*
                                                                    ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                                                    Jeffrey A. LeVee
                                                                    Attorneys for Defendant Sutter Health

Dated:  July 22, 2021                                STEYER LOWENTHAL BOODROOKAS
                                                                    ALVAREZ & SMITH LLP

                                                                    By  /s/ *Allan Steyer*
                                                                    ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                                                    Allan Steyer
                                                                    Attorneys for Plaintiffs

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FILER'S ATTESTATION**

Pursuant to Civil L.R. 5-1(i)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the above signatories.


Dated:  July 22, 2021                    By:  */s/ Jeffrey A. LeVee*

                                                    Jeffrey A. LeVee