Pages 1 - 239

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE LAUREL BEELER, MAGISTRATE JUDGE

| | |
|---|---|
| DJENEBA SIDIBE, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| VS. ) | **No. 12-cv-4854-LB** |
| ) | |
| SUTTER HEALTH, ) | |
| ) | |
| Defendant. ) | |
| _____) | San Francisco, California |
| | Thursday, August 12, 2021 |

**TRANSCRIPT OF PROCEEDINGS VIA ZOOM WEBINAR**

**APPEARANCES**:  (via Zoom Webinar)

Lead Counsel for Plaintiffs and the Class:
                        CONSTANTINE CANNON LLP
                        335 Madison Avenue, 9th Floor
                        New York, New York 10017
                BY:  **MATTHEW L. CANTOR, ESQ.**
                     **JEAN KIM, ESQ.**


                        CONSTANTINE CANNON LLP
                        1001 Pennsylvania Avenue,  N.W.
                        Suite 1300N
                        Washington, District of Columbia 20004
                BY:  **HENRY C. SU, ESQ.**
                     **JAMES JOSEPH KOVACS, ESQ.**
                     **PAULETTE MARIE RODRIGUEZ LOPEZ, ESQ.**


                (Appearances continued on next page)


Reported By:  Katherine Powell Sullivan, CSR #5812, CRR, RMR
              Official Reporter - U.S. District Court

1   **APPEARANCES**: (via Zoom Webinar; continued)

2   Co-Lead Counsel for Plaintiffs and the Class:
                        FARMER BROWNSTEIN JAEGER GOLDSTEIN
3                        KLEIN & SIEGEL LLP
                        235 Montgomery Street, Suite 835
4                        San Francisco, California 94104
                   BY:  **DAVID C. BROWNSTEIN, ESQ.**
5                        **DAVID M. GOLDSTEIN, ESQ.**

6                        THE MEHDI FIRM, PC
                        One Market
7                        Spear Tower, Suite 3600
                        San Francisco, California 94105
8                  BY:  **AZRA Z. MEHDI, ESQ.**

9   Additional Co-Lead Counsel for Plaintiffs and the Class:
                        STEYER LOWENTHAL BOODROOKAS
10                       ALVAREZ & SMITH LLP
                        235 Pine Street, Fifteenth Floor
11                       San Francisco, California 94104
                   BY:  **ALLAN STEYER, ESQ.**
12                       **D. SCOTT MACRAE, ESQ.**
                        **JILL MANNING, ESQ.**
13                       **SUNEEL JAIN, ESQ.**

14  For Defendant Sutter Health:
                        JONES DAY
15                       555 South Flower Street, 50th Floor
                        Los Angeles, California 90071
16                 BY:  **JEFFREY A. LEVEE, ESQ.**
                        **ELIZABETH M. BURNSIDE, ESQ.**
17                       **JEREMY R. KAUFFMAN, ESQ.**

18                       JONES DAY
                        555 California Street, 26th Floor
19                       San Francisco, California 94104
                   BY:  **DAVID C. KIERNAN, ESQ.**
20                       **CRAIG E. STEWART, ESQ.**
                        **MATTHEW J. SILVEIRA, ESQ.**
21
                        JONES DAY
22                       4655 Executive Drive
                        San Diego, California 92121
23                 BY:  **CAROLINE OWENS VAN WAGONER, ESQ.**

24

25                  (Appearances continued on next page)

1   **APPEARANCES:** (via Zoom Webinar; continued)

2   For Defendant Sutter Health:

3                            BARTKO, ZANKEL, BUNZEL & MILLER
                            One Embarcadero Center, Suite 800
                            San Francisco, California 94111

4                    BY:  **ROBERT H. BUNZEL, ESQ.**
                         **PATRICK M. RYAN, ESQ.**

5                         **OLIVER Q. DUNLAP, ESQ.**
                         **PATRICK O'SHAUGHNESSY, ESQ.**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1   <u>**Thursday - August 12, 2021**</u>                      <u>**10:06 a.m.**</u>

 2                   **P R O C E E D I N G S**

 3                        ---oOo---

 4        **THE CLERK:**  Calling Civil action 12-4854, Sidibe

 5   versus Sutter Health.

 6        Counsel, if you could please state your appearances for

 7   the record.

 8        **MR. CANTOR:**  For the plaintiffs, this is Matthew

 9   Cantor, Constantine Cannon.  We represent both the plaintiffs

10   and the certified class.

11        Judge Beeler, as we've sent an email, there are a lot of

12   attorneys both on the plaintiff and defense side present today.

13   Would you like us to announce all those attorneys at this --

14        **THE COURT:**  I think -- why don't we do this.  There

15   are two ways we could do it.  You could state your colleagues'

16   names, or when people step up to argue a particular issue, they

17   could just say their name for the record.

18        Unless Kathy prefers something else, then we'll just take

19   up too much time.  She's shaking her head no.  I'm fine with

20   just doing it along the way if you're fine with that.

21        **MR. CANTOR:**  That works for me, Your Honor.  Thank

22   you.

23        **THE COURT:**  Okay.

24        **MR. LEVEE:**  Good morning, Your Honor.  This is Jeff

25   LeVee, from Jones Day, on behalf of Sutter Health.  I, too,
</pre>

1  have a number of individuals, both from Jones Day and from the

2  Bartko firm.  I will not introduce them now, and they will

3  introduce themselves when it's their turn to speak.

4          **THE COURT:**  That's great.  Okay.  Give me a second.

5  I'm going to go slide and put my video up.  I meant to think

6  more about the mechanics of presentation.  I'm not going to

7  burden with you flipping my web cam and showing you all the

8  binders I have decoratively arranged around my office, but I

9  have what I call a "skinny-file" approach to trying to deal

10  with argument.

11          And I will not flip my camera to show you the chaos that

12  is now my desk, but I've got kind of a skinny file system, so

13  I'm going to take myself off video for a second.

14          I would like you, while I'm doing that to just -- if you

15  could put on the record and I -- as you know, I do case

16  management off the record.  I previously told you off the

17  record I'd like you to kind of at least put on the record the

18  volume of the pretrial filings because I think it's an

19  important point of reference.

20          So I will leave my headset on, stop the video, and grab my

21  short file from my left while you do that.

22          **MR. LEVEE:**  I do have that, Your Honor.  We have

23  counted the pages.  And this does not include proposed orders

24  or the separate sealing notices, but I have a combined number

25  of pages for today's hearing, which now includes more than one

1    anticipated pretrial conference of 18,068, of which 10,206

2    pages were filed or lodged by the plaintiffs and 7,862 pages

3    were filed or lodged by Sutter Health.  So, again, the total

4    cumulative amount is just over 18,000.

5              **THE COURT:**  Right.

6              **MR. LEVEE:**  We hope that you enjoyed every page and we

7    thank you for raising the issue.  And I will say, on behalf of

8    Sutter Health, we did find your note to be funny.

9              **THE COURT:**  Okay.  Good.  Yeah, I aim to entertain if

10   not to please; right.

11        All right.  So let's start with -- so my view is we're

12   going to try to get through as much as we can today.  I'm not

13   going to be uncivilized about it.  We can take a lunch break at

14   some point, for example, just because I'm going to run out of

15   steam and need some nutrition.

16        And then I know that makes for a slightly long day on the

17   East Coast.  And I did not get to jury instructions.  I

18   100 percent did not get to jury instructions so that is not on

19   the table for today.

20        I got through a lot.  And I think that even if we took a

21   lunch break, I might get some more of the trial mechanics in a

22   little bit in a way that I think would be useful for advancing

23   our discussion.

24        So -- and, you know, I've gotten through all the *Daubert*

25   and motions *in limine*, which usually I think is the heavy

1    lifting.  It was not as bad as I feared, I will say that.  It
2    was not as bad as I feared.  And it was interesting.
3        And then I would like, if we can, to get through some of
4    the other mechanics issues, too, because I think that would be
5    useful.
6        So let's plow ahead with the *Daubert* motions.  My view, as
7    I think I said to you, is that we start with Chipty and Willig.
8    I'm indifferent about -- you know, we could flip a coin or --
9    oh, and I said I would tell you -- well, so maybe we should
10   start with Chipty and then Willig.  I'm --
11            MR. CANTOR:  That's fine with us, Your Honor.
12            THE COURT:  I just wanted to give you some preliminary
13   thoughts about how I've been thinking about the experts to the
14   extent that it's helpful in, you know, framing our
15   conversation.
16       When I look at -- and, obviously, we've traveled some
17   territory in this case from class certification through the
18   most recent summary judgment motions, and that's the sort of
19   context that's most in my head.
20       And one of the things that I think about Chipty --
21   Dr. Chipty is that, how does a plaintiff in any case like this,
22   that's complex, put on a case without the sorts of summaries of
23   evidence that Dr. Chipty relies on?  The plaintiff just can't.
24   That's the practical reality.
25       You know, an expert's -- one, experts can assume disputed

1  facts and use them for expert analysis.  So that's -- you know,

2  and the sort of common Rule 704 analysis that, you know, it's

3  not even objectionable if it's on the ultimate opinion

4  necessarily.

5      And there seems to be -- I read a lot of cases in this

6  district, and monographs.  And this is my first antitrust

7  trial, and so, you know, I really wanted to sort of bone up on

8  the esthetic of the district.

9      And it seems that, even with the predicates under

10  Rule 702, there seems to be a pretty firm, you know -- you

11  know, I'm mindful of the Court's gatekeeping function, but a

12  lot of it goes to weight, not admissibility.

13      And then back to my preliminary point, how does a

14  plaintiff try a case?  Because Sutter's facts are through

15  friendly witnesses; right?  Sutter's got a way of putting in a

16  narrative that the plaintiffs do not.

17      That is just the -- and Dr. -- I think Dr. Chipty's

18  summaries and discussions may be the only way the plaintiffs

19  can -- the jury can understand the plaintiffs' case.  That's

20  the practical reality.

21      And they will help the trier of fact determine, you know,

22  a fact in issue.  That's a 702(a) analysis.  And so that's my

23  sort of meta-level issue with some of Sutter's arguments to

24  exclude her.

25      Because, in a very real way, the plaintiffs' case stands

1   or falls -- the damages case, anyway, and liability, too, I
2   suppose, in some part -- at least understanding the liability
3   case, right, understanding the liability case stands or falls
4   on Dr. Chipty, because who else do the plaintiffs have,
5   because, necessarily, the fact witnesses are going to be
6   adverse.  Of course, they're going to have to call them.  Of
7   course, they're going to have to put in the predicate facts.
8   Of course.
9        I mean, there may be facts, admissions, and the like.
10  Plaintiffs can sponsor party admissions through any witness.
11  Plaintiffs can just stand up and put them in without a
12  sponsoring witness.  So that is a practical problem, I think,
13  with excluding her summaries.
14       And, here's the other thing, I will just leave my analysis
15  of Dr. Chipty at the class certification stage to the things I
16  said about it in my orders.  In the end, when I certified the
17  (b)(3) class, I -- I spent days that exceeded the -- exceeded
18  the business model of my job.  I put in so many days to
19  understand and summarize and synopsize her reports.  And so I
20  made a call.  I expressed scepticism and, still, I certified
21  the class.
22       And largely -- and I'm happy for -- it's Sutter's motion.
23  I'm happy to be told that I'm wrong, but I think she comes in
24  subject to some caveats; right?
25       I don't know that she -- you know, the point that she

1    didn't analyze profitability or conduct a financial analysis of

2    Sutter's business makes it problematic for her to opine that it

3    operated successfully before systemwide contracting, so I get

4    it.  I get those kind of arguments.  But that -- again, she can

5    assume facts.  She's got her hypotheticals.  There's things

6    that she did that she can talk about.  And I think largely that

7    it comes in.

8        Now, the flip of that is if Chipty comes in and, you know,

9    considering my scepticism -- not scepticism, but, you know,

10   pushing at her analytic models, that kind of means it all comes

11   in, because I don't know that plaintiffs, you know, can rattle

12   too loudly about excluding Sutter's experts given -- given some

13   of the rulings that I contemplate issuing on Chipty; right?

14       So I just -- you know, and then the bottom line becomes --

15   with some exceptions, right, and I'm happy to walk through your

16   motions and to hear how you want to argue them with your slide

17   decks -- that -- that largely drives the expert stuff in your

18   *Daubert* motions.  That's my view.  That's the meta level.

19       So now let's talk to you about how -- I know you guys have

20   coordinated about how you want to make your arguments today.

21   What does that look like and what sort of time should we expect

22   by category?

23       I expect mostly to listen just to advance the argument.  I

24   spent -- I spent days on your motions, days and days and days,

25   just so you know.

 1          **MR. KIERNAN:**  Your Honor, so what I think we'll do is

 2    I will start on Dr. Chipty, and we'll -- we'll use the slides.

 3    I won't go through probably every single one, but just --

 4    because we had a lot of arguments in there, and so I wanted

 5    something to allow us to kind of focus our attention, but I'm

 6    not going to sit here and reread slides to you.  I will address

 7    the points that you raised because that's the bulk, frankly, of

 8    the presentation, and I'll be very mindful of your other

 9    comments.

10        And then I think we'll turn it over to Mr. Cantor for, you

11    know, his opposition.  I'll save a little time to respond to

12    anything, although I'm going to try to respond as I go along

13    because I've seen his slides, of course.

14        And then I think, you're right, it's going to inform --

15    you know, some of it will inform Dr. Willig's *Daubert*, which I

16    think we do next.  I think you're right.

17        Dr. Willig, though, is kind of a separate issue about an

18    argument that doesn't apply in the Chipty motion where they --

19    plaintiffs seek to exclude his opinions related to

20    procompetitive benefits.

21          **THE COURT:**  It was a lot easier.  That motion was a

22    lot easier.  And I literally -- just, again, to give you

23    confidence -- and my approach is to listen -- I have spent days

24    and days and days on *Daubert*, and I have written my tentative

25    views for every witness contextualized to the evidence.  So I

1  really am going to let you do your slides and argument.

2      Do you have a ballpark for Chipty, a ballpark about what

3  you think the time is?

4        **MR. KIERNAN:**  Oh, sure.  I think I should be able to,

5  with my, you know, initial presentation, not responding to

6  Mr. Cantor, I'm thinking 30 minutes.

7        **THE COURT:**  Okay.

8        **MR. KIERNAN:**  If I get interrupted a little bit, maybe

9  it's 45, but somewhere between -- I'm just looking at, you

10  know, 30 slides.

11        **THE COURT:**  That's great.

12      And, Mr. Cantor, what do you think about your time in

13  response?

14        **MR. CANTOR:**  I think that's about the amount of time I

15  would have.  I would hope that I would be done by, like, 35

16  minutes.

17        **THE COURT:**  Okay.

18        **MR. CANTOR:**  But if you have questions, I would be

19  happy to address your questions during my presentation.

20        **THE COURT:**  Okay.  Good.

21        **MR. LEVEE:**  Judge Beeler?

22        **THE COURT:**  Yes.

23        **MR. LEVEE:**  Would it be helpful to ask the lawyers not

24  involved in Chipty and Willig to turn off their cameras so that

25  it's -- for us, it'll be Mr. Kiernan and Mr. Stewart.  You have

```
 1   not met, I don't think, but Craig Stewart, who is next to you
 2   on my screen --
 3          THE COURT:  Right.  I see him.
 4          MR. LEVEE:  -- one of my partners from San Francisco,
 5   will be assisting on Professor Willig.  And I'm going to ask
 6   the rest of the Sutter team to turn off their camera so that it
 7   helps you see everything.
 8          THE COURT:  Right.  That's great.
 9          MR. CANTOR:  And, Your Honor, I'll respond to that.
10   Yes, I think that's very helpful.
11          THE COURT:  You guys know this on Zoom, but you can
12   make it so people who've turned off their cameras, that you
13   can't see them.  And it just makes it less, whatever,
14   disruptive.
15          MR. CANTOR:  And, Your Honor, let me also -- just as
16   Mr. LeVee introduced Mr. Stewart to you, I'm going to introduce
17   to you my partner Henry Su who will be arguing the Willig
18   motion.
19          THE COURT:  Great.  Nice to meet you.
20          MR. SU:  Good afternoon, Your Honor.  Henry Su on
21   behalf of the plaintiffs.  I will be arguing the Willig
22   Daubert.  And I will actually go ahead and turn off my camera
23   for this part of the argument as well.
24          THE COURT:  Perfect.  Thank you.
25       Okay.  Mr. Kiernan, the floor is yours.
```

1          **MR. KIERNAN:**  Your Honor, do you see --

2          **THE COURT:**  I do.

3          **MR. KIERNAN:**  All right.  Good first step, I guess.

4     Well, Your Honor, I'm going to address a number of points

5     that we made in the brief, but the first point will be the one

6     that you summarized and how the plaintiff proved their case.

7          And I think it was at the end you made the point, which is

8     the plaintiffs have to put in the predicate facts.  They've got

9     to call fact witnesses from Sutter.  They've got to call fact

10    witnesses from the carriers.

11         They had something like 50 witnesses on their witness

12    list, many of which are from each of the health plans -- from

13    Blue Shield, from Anthem, Aetna, Health Net, United -- where

14    they're going to tell their story.

15         And they've got the obligation to put in the predicate

16    facts that support their claims both through the testimony and

17    through the documents.

18         Dr. Chipty will then go last, or somewhere around there.

19    They haven't given us their sequence of witnesses, but my hunch

20    is she will be the last witness, or maybe it's the second to

21    last witness, and she will base her opinions on all the

22    evidence that she's heard up to then, and she -- at that point

23    she can summarize what came in the record.

24         What she can't do, Your Honor -- and the cases, I think,

25    are very clear on this -- is she can't summarize and act as a

1    conduit for hearsay and inadmissible evidence that's never been

2    presented to the jury.

3        If that were the case, then plaintiffs could put

4    Dr. Chipty on first.  They could be her first witness and have

5    Dr. Chipty summarize, as she does in her report, all the facts

6    that she finds.

7        It would almost be like, you know, having a constable in

8    Scotland.  That's how they do it over there.  They have the

9    constable who goes out, finds the facts, comes into the court,

10   tells the judge, I went out, I did the fact-finding, here's my

11   report.  I'm under oath, I'll swear this is everything.  Now

12   you determine whether the defendant is guilty or not.

13       That's not the American system.  Dr. Chipty is not a

14   constable.  She's an expert.  And she has to apply her

15   specialized knowledge and scientific, technical, rather

16   specialized knowledge.

17       Her job is not to find facts.  Her job is not to establish

18   facts.  Her job is to apply her opinions to help the trier of

19   facts understand the evidence or otherwise determine whether a

20   fact is in issue, but it's applying that specialized

21   background.

22       The cases are clear.  If it consists nothing more than

23   drawing inferences from documents or reading testimony and

24   restating, you know, testimony from depositions and

25   declarations, and simply repeating it, that's invading the

1  province of the jury.  That's the jury's job.  And it's why a

2  liability expert like Dr. Chipty in an antitrust case or in any

3  case doesn't go first.

4      There is no -- this is responding to one of the arguments

5  I saw in the opposition.  There is no massive case exception or

6  an antitrust exception for experts.  That does not exist.  The

7  plaintiffs still have to put on their case.

8      And, as you said, Your Honor, they've got to lay down the

9  predicate facts.  And there are very good reasons for it.  One

10 is the 702 requirement.  Two is to ensure that the expert is

11 not serving as a conduit to get hearsay and other untested

12 evidence before the jury where we would be deprived of our

13 cross-examination of that evidence.

14     When you go through her report -- and I know you've been

15 through them because we've done this before, Your Honor.

16     **THE COURT:**  I read everything for Chipty and

17 everything for Willig.  Everything.

18     **MR. KIERNAN:**  Everything.

19     **THE COURT:**  Yeah.

20     **MR. KIERNAN:**  I was going back through it, and some of

21 the paragraphs that we cited in our motion -- you know, she

22 gives the opinion that the contracts, quote, forced each of the

23 health plans to carry all Sutter providers.

24     What does she cite for that?  Melody declaration.  Someone

25 the plaintiffs intend to call at trial.  Joyner declaration.

1    Now, those declarations, Your Honor, that the plaintiffs are

2    trying to use Chipty as a conduit to get in front of the jury

3    and adopt statements as her own, I know those declarations very

4    well.

5        Those declarations were submitted in the *UFCW* case by the

6    health plans.  They were written by lawyers in the *UFCW* case.

7    I deposed those individuals.  Many of the statements in those

8    declarations were not based on personal knowledge, did not have

9    foundation.  They were hearsay within hearsay.  And they would

10   not have come in as declarations in the *UFCW* case.

11       What were the plaintiffs required to do?  They had to call

12   Mr. Joyner.  They had to call Ms. Melody.  They had to call the

13   other witnesses that they intend to use at trial.  And when you

14   have a big case, a massive case, you have a longer trial.

15       That case, we had planned three months for that trial.

16   Why?  Because the plaintiffs were seeking liability from 2002

17   to the present, and they had a hundred witnesses that they were

18   going to bring in to lay the predicate facts that then their

19   experts, Dr. Leitzinger and Dr. Vistness, could rely upon.

20       There was no intent to try to use Dr. Vistness or

21   Dr. Leitzinger to summarize; like a constable in Scotland, to

22   go out and be fact-finders.  Why?  Because it's improper.  It's

23   improper in state court; it's improper in federal court.  So

24   that's a second reason.

25       A third reason that it's improper is it's highly

prejudicial.  It puts a gloss on the evidence if it comes out
of the mouth of an expert.  If a jury, that's what they hear,
Dr. Chipty, you know, a healthcare economist out of Boston and
she testifies, after reading a bunch of declarations and
deposition testimony and documents, "My opinion is Sutter
forced X, my opinion is that Sutter recognized X," now she's an
expert on state of mind.  "My opinion is" -- I mean, "they've
refused to participate," that's what she found as a factual
matter after reading all these documents.

Not only is it displacing the jury's role.  That's their
role to figure out in this case.  But, in addition, it puts a
gloss on it that's highly prejudicial.

And, finally, Your Honor, and I think I mentioned this
before, we're deprived of the opportunity to cross-examine.  If
she can just testify as to what is in Mr. Joyner's declaration
or deposition, we're deprived of the opportunity to
cross-examine Mr. Joyner on the stand on that issue.

**THE COURT:**  So may I ask a question?

**MR. KIERNAN:**  Yes.

**THE COURT:**  So you read my pretrial orders, because
you cited them back to me.

**MR. KIERNAN:**  Yes.

**THE COURT:**  And I can't remember if it was *Bowie* or
*May*, but you know that I'm uncomfortable with this idea of
treading too close to the ultimate opinion.  And I've set up

procedures that essentially require assumption of facts, not citing them as true.

Why doesn't that address your concern?  Because that is how I've approached issues for exactly the reasons you identify.  I mean, I know those were police excessive force cases, but having an expert say, "I think that this force was constitutionally unjustified" isn't okay.

**MR. KIERNAN:**  It's not okay.

**THE COURT:**  And so then I allow them to talk about what the rules are; right?  And not to render legal opinions, but what are the rules that govern the conduct.  In police cases that's P.O.S.T.  In your case it's something different. It's more about the contracting practices.

And then I allow them to assume facts before rendering an opinion.  And why doesn't that -- and I do not allow people to just say that facts are true unless they are either percipient witnesses or unless it's something like a party admission, which, as I said, can be sponsored with any witness.

So why doesn't that address your concern?

**MR. KIERNAN:**  Well, Your Honor, if that is a ruling, that Dr. Chipty can assume facts and that -- you know, we agree with that.

**THE COURT:**  Okay.  I mean, that's pretty much what I think; right?  I think that she can't say stuff is true that's disputed.  That's the thrust of your motion.  That's not okay.

1    That's not okay.

2        That said, it comes up in other witnesses that might

3    actually have percipient knowledge.  I don't know whether they

4    do or don't.  But if she doesn't, she doesn't; right?

5        **MR. KIERNAN:**  Exactly right.  And that's our point is,

6    consistent with your prior rulings, frankly, consistent with

7    the rulings in the Northern District and elsewhere, they --

8    Dr. Chipty can rely on assumed predicate facts, meaning --

9        **THE COURT:**  Exactly.  Exactly.

10       **MR. KIERNAN:**  But what she can't do is assert that

11   they're true.  She's not a fact-finder.

12       **THE COURT:**  I agree with that.  I agree with that.

13       **MR. KIERNAN:**  And then she can't just review a bunch

14   of documents and then restate it as her own opinions; reading

15   Mr. Joyner's view on out-of-network rates and the conduct with

16   Sutter and then say, I've read this and my opinion is X.

17       **THE COURT:**  Right.  But she could say, if it is true,

18   that -- I mean, I'm trying to think of an easy example, not a

19   hard one.

20       Sutter's contracting practices are unique.  That's a

21   disputed fact; right?  And so if she said, "Assuming nobody

22   else does this, then my opinion is Y," then -- so that's the

23   difference.  That's the distinction I would draw.

24       **MR. KIERNAN:**  Yes.

25       **THE COURT:**  She's not a percipient witness and she

1   can't conclude that facts are true.  But she can assume

2   predicate facts as true as a foundation for rendering an

3   opinion.

4        **MR. KIERNAN:**  Right.  Yes, Your Honor.  So, you know,

5   we walked through some of the examples.  I don't want to spend

6   a lot of time now because that is precisely what we are seeking

7   to preclude her from doing.

8        It's okay to assume certain facts based upon what's in the

9   record, but beyond that she can't opine or find facts.  And

10  some of the things that she has done in her report in

11  summarizing -- she does more than summarize, she then asserts

12  and establishes facts:  Sutter was able to operate

13  successfully.

14       And when you look at what she cites, it is a number of

15  declarations, deposition testimonies, cherrypicked documents

16  where she is finding facts.  She's displacing the jury.

17       "Sutter understood the strategic benefits."  Now she's

18  giving state-of-mind opinions about what Sutter understood,

19  what they were thinking.

20       "Health plans were unable to defeat."  Again, it's opinion

21  upon what the health plans were able or were not able to do.

22       And the relevance -- this stuff may be relevant to

23  something.  Ultimately, it may be relevant to her opinions on

24  X, Y, and Z, but she needs to, as you said, either assume the

25  facts or base it upon the predicate facts that were admitted in

1   evidence.

2        So I don't want to spend more time on this because I think

3   we are on the same page.

4        **THE COURT:**  It's a lot harder with an economist than

5   it is with a police expert; right?  But I think that the -- but

6   I think that the rule doesn't -- isn't altered, as you said, by

7   the complexity of the case.

8        **MR. KIERNAN:**  It's not.  It's the same rule.

9        I mean, look at the second bullet here where she states,

10  "Sutter refused to participate" -- this is from Mr. Cantor's

11  slide deck -- "in narrow tiered networks."  Sutter demanded

12  this, Sutter interfered with that, and then explains why.

13       **THE COURT:**  Could I ask another opinion, because I

14  just really want to push at it just to make sure we get it

15  right.

16       So, typically, an expert might say -- you know, "Do you

17  have an opinion about X?"  "I do."  "What's your opinion?"

18  "Y."  "What do you base that opinion on?"  And then you go

19  through it; right?

20       But that person does refer to the underlying facts but is

21  not saying that they're true.  They're assuming them to be true

22  for purposes of rendering the opinion because the fact

23  witnesses are needed to put in all the predicate facts.

24       **MR. KIERNAN:**  Well, Your Honor, I was with you the

25  entire way.  I almost wasn't until that last point you made was

 1  critical.

 2          **THE COURT:**  Yes.

 3          **MR. KIERNAN:**  That the fact witnesses come in and lay

 4  down the predicate facts.

 5          **THE COURT:**  They have to put down the predicates.

 6  They really do.  I mean, there's some exceptions to that, but

 7  not -- not relevantly here; right.  The experts can rely on

 8  stuff that, technically, you know, the whole backdoor for

 9  hearsay kind of issue.

10          **MR. KIERNAN:**  Yes.

11          **THE COURT:**  But that's not what we're talking about

12  here.  We're talking about the plaintiffs' burden is to prove

13  the anticompetitive effects of Sutter's contracting practices.

14  And to do that they must put in fact witnesses to establish the

15  predicate facts.

16      And then Dr. Chipty can testify about them, assuming there

17  are -- there is a fact record of predicate facts to support her

18  conclusion.

19          **MR. KIERNAN:**  Correct, Your Honor.

20          **THE COURT:**  So then plaintiffs have just got to

21  sponsor the evidence one way or the other.

22          **MR. KIERNAN:**  Right.

23          **THE COURT:**  Whether that's admissions or fact witness

24  testimony, they've got to sponsor it.  Yes, I agree with that.

25          **MR. KIERNAN:**  On the nonpar, I'm going to spend a

moment on this because plaintiffs had two responses.  So one

part of it, Your Honor -- and just to review the bidding, the

nonparticipation rate -- sometimes you'll see it in the

documents referred to as the nonpar rate -- is the

out-of-network rate that Sutter and other hospitals charge when

their hospitals are not in a provider's -- in a health plan's

network.

And throughout Dr. Chipty's report she states in several

places that Sutter's nonparticipation rates are, quote,

onerous.  They were punitive, quote, excessive, or otherwise

above competitive levels.

And there are two reasons that we are seeking to strike

those opinions.  One is simply parroting and regurgitating what

the health plans have said.  She just goes through documents,

reads them, and then adopts as her own what they said.

And the second reason -- frankly, it should have been the

first -- is she's done no analysis.  She's done no economic

analysis of whether the nonpar rates were, in fact, onerous,

were, in fact, above competitive levels.  Instead, her sole

basis is she reads these documents and then repeats what the

health plans say.

So I asked her at deposition what the basis was for

opining that the nonpar rates are onerous.  Her answer:

"The point of my discussion on the nonpar rates is

that they are so onerous, and I -- I described them as

1        onerous because the health plans described them as

2        onerous."

3            That's her sole basis that the nonparticipation rates are

4    onerous.  That's not expert opinion.  She's applying none of

5    her specialized knowledge, no technical knowledge to determine

6    whether, in fact, the nonparticipation rates were onerous.

7            I asked her about calculations.  Did she do any economic

8    work to determine whether the nonparticipation rates were

9    higher than competitor rates.  She has an opinion in here that

10   they're above competitive levels.

11           So I asked her about the -- did she do any econometric

12   work or any economic work at all with respect to it.

13           "I haven't done the calculation."  She says, "I have not

14   taken a position on and I have not given consideration to what,

15   if you will, competitive out-of-network rates would be."

16           Well, if she hasn't even taken into consideration, too,

17   what a competitive rate would be, stating the obvious, she

18   can't offer an opinion that Sutter's out-of-network rate was

19   higher than whatever that mythical competitive rate would be.

20           I asked her, How would you do it?  She's a healthcare

21   economist.

22                "How would you evaluate what the baseline competitive

23            out-of-network rate would be to which you would compare

24            Sutter's in order to arrive at an opinion of whether it

25            was lower, the same as, or higher than a competitive

1        rate?"

2        Her answer:

3            "Someone would have to do a thoughtful analysis of

4        what's a competitive or appropriate out-of-network rate."

5            So, in other words, what's the benchmark?  You'd have to

6    do a thoughtful analysis.  She didn't do it.

7            **THE COURT:**  I'm with you on onerous, just so you know.

8            **MR. KIERNAN:**  I actually moved from onerous to whether

9    the nonparticipation rate is above competitive rates.

10           **THE COURT:**  Right, right, right.  Okay.  That's fine,

11   of course.

12           **MR. KIERNAN:**  Okay.  And then I asked her if she --

13           **THE COURT:**  But so if she didn't do the analysis, then

14   is she even going to testify to it, as a result, if she hasn't

15   done the analysis?

16           **MR. KIERNAN:**  Well, the plaintiffs in the opposition

17   say they intend to have her do so, that she will testify

18   they're onerous, punitive, and they're above-competitive

19   levels.  And, one, they argue that she can repeat what the

20   carriers say; and then, two, their second argument is she did

21   this Anthem North/South analysis.

22           **THE COURT:**  All right.  So just to go back to the

23   subpar rate thing because, sorry, I did think about this.

24           **MR. KIERNAN:**  Yeah.

25           **THE COURT:**  So onerous, merely repeating a

1    characterization, not helpful, not appropriate.  If she doesn't

2    have an opinion, then she can't give one, if she didn't form an

3    opinion or do the calculation.

4        That said, and when we get now to the -- you know, your

5    argument about -- for the correlation causation, I think you

6    put it in your brief, something along the lines of you

7    challenged whether the analysis, you know, shows that your

8    conduct, as a whole, hindered narrow networks because it's

9    limited to Anthem, doesn't account for Kaiser, why isn't that

10    weight, not admissibility?  Because it is an opinion.

11        You've got some good arguments there, but is that really a

12    basis for precluding her testimony on the point entirely?

13            MR. KIERNAN:  Sure.  And can I put a pin in that?

14            THE COURT:  Okay.

15            MR. KIERNAN:  Because I want to clarify one point.

16            THE COURT:  Okay.

17            MR. KIERNAN:  You mentioned that Dr. Chipty may not be

18    offering an opinion that the nonpar rates are onerous or above

19    competitive levels.

20            THE COURT:  She can't use that word because that's

21    parroting a fact witness.  They've got to call the fact witness

22    to prove the point.  I don't think she can even use the word.

23    I mean, maybe in recounting their testimony she can refer to

24    their testimony before she describes any economic significance

25    that she attributes to the fact testimony.  That's really what

```
 1   I was trying to say --
 2            MR. KIERNAN:  Okay.
 3            THE COURT:  -- not really well.
 4            MR. KIERNAN:  Okay.  Or maybe I didn't understand.
 5            THE COURT:  I don't think I said it very well.  It's
 6   been a long few days, I'll just tell you.
 7            MR. KIERNAN:  I understand.  I'm definitely
 8   sympathetic.
 9            THE COURT:  I'm exhausted, yes.
10            MR. KIERNAN:  And then the second piece, because I
11   don't want it to get lost --
12            THE COURT:  Yes.
13            MR. KIERNAN:  -- she does opine that the
14   nonparticipation rates are above competitive levels.
15       And so the record is clear, when I was walking through,
16   she admitted she did not do that analysis.  And, therefore, her
17   opinion that the nonparticipation rates are above competitive
18   levels must be stricken.  She does not have the basis to
19   provide that opinion.
20            THE COURT:  Okay.  Let's talk about Anthem.
21            MR. KIERNAN:  Okay.  So with respect to the Anthem
22   analysis, we're moving to exclude on that because it is not
23   the -- not based on a generally accepted methodology and it, on
24   its face, is categorically unreliable, because all it shows, at
25   most, is that -- and she confuses correlation with causation.
```

1    The only thing she does is she compares the number of

2  claims at narrow networks and tiered products in Northern

3  California, for Anthem, and compares the number of claims at

4  narrow networks and tiered products for Anthem in Southern

5  California.  That's all she does.  She doesn't control for

6  anything else.

7    And she looks at it and says, okay, well, it looks like

8  there are more claims in Southern California for narrow and

9  tiered products than there are in Northern California.

10    **THE COURT:**  So I understand that point, but -- so your

11  point is really:  So.  You know, what does that show?  So.  It

12  doesn't really show that your conduct hindered narrow networks.

13  All it does is recount statistics.

14    Why isn't that just a good cross-examination point?  Why

15  can't she -- why isn't it sort of helpful and she -- she will

16  admit or describe the limits of her analysis, which she did --

17  on cross-examination in the points that we just discussed?  Why

18  isn't that good enough?

19    **MR. KIERNAN:**  The reason, Your Honor, is because,

20  under 702, *Daubert* and the rest -- and progeny, that the

21  expert, particularly an economist, needs to use generally

22  accepted principles and science to support an opinion.

23    Her opinion is Sutter interfered with narrow networks and

24  but for the conduct there would be more of them, and then

25  points to this analysis which simply counts the number of

1    claims.

2         **THE COURT:**  Well, the opinions really are sort of more

3    focused on the sufficiency of the predicate facts, right, not

4    the sufficiency of the opinion.  When you really look at the

5    cases, it's just like -- you know, once you get to the actual

6    opinion itself, it's -- I'm not going to -- don't hold me to

7    this word, it's descriptive and maybe not sufficient, but it's

8    a lighter analysis of the opinion itself and a tougher analysis

9    under -- not tougher but a different analysis under the 702

10   analysis of the predicates.

11        **MR. KIERNAN:**  But this is -- I mean, this is her

12   model.  This is her economic model to show that there would be

13   more narrow networks and tiered products in Northern California

14   for Anthem but for Sutter's conduct.

15        And so it's no different than looking at regression models

16   that get thrown out all the time when the economist does not

17   take into account the explanatory reasons of why --

18        **THE COURT:**  Well, a regression model is different.  A

19   regression model is different because, as I remember from my

20   econometrics class in college, you can choose the outcome by

21   the predicates that you put into the formula.  And so, you

22   know, I just think a regression analysis is different.

23        I think your point's a good one on correlation is not

24   causation -- get it -- but I don't know that a regression model

25   is the right analogy.

1          **MR. KIERNAN:**  Well, the reason I think it is, is

2    you're using a regression in an antitrust case when you're

3    using it for prices to show that if you control for all these

4    factors, then the price is higher as a result of the conduct.

5          Here she's using this correlation analysis to opine that

6    as a result of Sutter's conduct there were fewer narrow

7    networks and tiered products --

8          **THE COURT:**  This is a liability opinion, not a damages

9    opinion.

10          **MR. KIERNAN:**  It is, but it's an economic model

11    regardless.

12          **THE COURT:**  Okay.

13          **MR. KIERNAN:**  It's just being used for a different

14    purpose.

15          **THE COURT:**  I understand the argument.  Okay.

16          **MR. KIERNAN:**  So she hasn't accounted for the

17    differences.  She's completely ignored it.  All she does is

18    bean counting and assumed that because Sutter is in Northern

19    California that must be the cause.

20          Doesn't account for Kaiser.  Doesn't evaluate the presence

21    of UCSF.  Doesn't account for the number of products launched

22    in each region, consumer preference in each region.  I quoted

23    this in our briefs.

24          I asked her, What are some of the reasons why there may be

25    a difference in Northern and Southern California?  She

1  mentioned consumer preference, there's differences in

2  marketing, network and product design.

3       There are all these different reasons that she ignored.

4  She just didn't account for them.  That makes this model -- her

5  economic model fundamentally flawed and unreliable.

6       And the problem is she presents this to a jury, and the

7  jury hears a healthcare economist, with her resume, setting

8  forth this, I mean, frankly, junk model that all it does is

9  compare claims in one region to the next.

10      And a jury may think, well, if a healthcare economist

11  relies upon this, it must be good enough; otherwise, the Court

12  wouldn't let me hear it.

13      And that's why we have the gatekeeping function is to

14  ensure that the models that get presented to the jury are

15  reliable; they're based on science, they have the *imprimatur* of

16  being based on the scientific method and being reliable for the

17  jury to rely on.

18      And, you know, we -- the last point on this, Your Honor,

19  and I'll move on, is we had Dr. Willig just to control for one

20  of the factors between Northern California and Southern

21  California.  That was the presence of Kaiser.

22      And when you compare those two charts, you see

23  immediately.  You just control for one factor and it nearly

24  eliminates the differences.

25      I do want to say -- you just reminded me -- since we both

enjoy regressions --

      **THE COURT:**  I don't know, "enjoy" may be too strong a word.

      **MR. KIERNAN:**  That may be too strong a word.

      **THE COURT:**  I thought to myself, well, gee, I'm sorry that I'm an economics major.  I was economics and philosophy.  My econometrics class convinced me that I made the wrong choice of majors, but that's a different -- I kept it because I had the credits.  Anyway.

      **MR. KIERNAN:**  So I should have thought of this before, and shame on me for not, but a regression does evaluate correlation.  And you've got -- you know, they examine the correlation between the dependent variable and the explanatory variables.

    And what the economist tries to do is control for all these to determine, what actually is that causal nexus?  What's the cause?  You want to get rid of the things that are correlated.  You want to make sure you don't have multicollinearity problems, et cetera, et cetera.

    Here, her model that she's presenting is basically premised on the same thing.  Her benchmark is Southern California.  She's comparing to it to Northern California.  But she hasn't controlled for all the variables, all the reasons that would explain the difference.  Instead, she attributes the cause solely to the presence of Sutter in Northern California.

1    That's just not a valid method to do it.

2        Your Honor, you touched upon -- I want to switch to her

3    opinions on the ultimate conclusions.  And I think you and I

4    are of the same mind on this because you mentioned it at the

5    top, is that the economist is not permitted to give an opinion

6    on the ultimate issue.

7            **THE COURT:**  Well, certainly not the ultimate legal

8    issue.  Certainly not the ultimate legal issue.  But the issue

9    here is -- okay, go on.

10           **MR. KIERNAN:**  We have two opinions that Dr. Chipty

11   intends to provide to the jury that would -- that would replace

12   the jury, invading their province.  One is tying.

13       And the courts are very clear -- plaintiffs have not cited

14   to one case that's to the contrary -- that experts are not

15   permitted to opine on whether a tie, in fact, exists.

16       And the courts strike those opinions to ensure that it's

17   the jury -- because it's a jury's responsibility.  They get a

18   jury instruction that asks them, was there a conditional sale?

19   Did the defendant condition the sale on bread on the purchase

20   of milk?  And that's a factual issue and a legal question that

21   the jury decides.

22       It's not for an expert to decide.  And if the expert does

23   opine on it, it's too prejudicial for the defendant because now

24   it has the gloss of having the *imprimatur* of an expert opinion

25   about what the jury is supposed to find.

1          **THE COURT:**  Let me ask you -- let's talk about this.

2     You're right; right.  You can't say this is an illegal tying

3     arrangement.

4          And the plaintiffs say something -- leaving aside your

5     challenges to the sort of predicates for Dr. Chipty's opinions,

6     and the reliability of them, plaintiffs make an argument that,

7     you know, the word "tying" has independent significance.

8     Dr. Willig is going to use the term, we should be able to use

9     it too.

10         So leaving aside the challenges to the sufficiency of

11    her -- you know, the quality of her opinions, you know, words

12    have economic significance.

13         Look, I'm just going to preview the monopoly argument.

14    "Monopoly" is a bad word, and just to preview how that's going

15    to come out -- or my opinion on that is I -- I think you're

16    right on your motion *in limine*; right.  "Monopoly" is a bad

17    word.

18         Illegal tying -- you know, "anticompetitive" is a

19    perfectly good word.  "Illegal tying" is no good, but tying --

20    how else do you describe the conduct when you've got a case

21    that's predicated on tying?  And why shouldn't everybody just

22    be able to use the word "tying"?

23              **MR. KIERNAN:**  Your Honor --

24         **THE COURT:**  And I wish I'd gotten to jury instructions

25    because a lot of this would be helpful.  By next week I'll have

```
 1   gotten through the jury instructions.

 2        But some of this analysis, I might have it, because I can

 3   imagine even potentially a fix depending on what the jury

 4   instructions say.

 5        MR. KIERNAN:  And, Your Honor, to be clear, we're not

 6   seeking -- and we didn't file a motion in limine -- to preclude

 7   Dr. Chipty from discussing the economic significance of tying.

 8        THE COURT:  Okay.  Perfect.  That's fine.

 9        MR. KIERNAN:  She did testify, because I asked her at

10   deposition, about tying.  And she did say, "I can't give you a

11   legal definition; I'm not a lawyer."

12        But she can discuss --

13        THE COURT:  Perfect.  That's fine.  That's good enough

14   for government work.  Okay.

15        MR. KIERNAN:  But what she said in her report was

16   "Sutter" -- I'm quoting here -- "engaged in anticompetitive

17   tying arrangements."  She cannot say that.

18        THE COURT:  So --

19        MR. KIERNAN:  That's for the jury.

20        THE COURT:  Well, so competition is --

21        MR. KIERNAN:  If the -- if the plaintiffs have laid

22   the predicate that Sutter engaged in tying, they conditioned

23   the sale of inpatient services at CPMC on the purchase of

24   inpatient services at Alta Bates, and that's in the record, and

25   Dr. Chipty, like we were discussing before --
```

1              **THE COURT:**  And she can then render an economic

2    opinion on the anticompetitive effects.

3              **MR. KIERNAN:**  Correct.

4              **THE COURT:**  Yes.  That's fine.  I think that's

5    correct.  I think that's correct.  It all goes back to, are

6    predicate facts sufficient.  And experts, all the time in their

7    reports, have to take the facts that they're given to render

8    their opinions.  But by the time you get to trial, the

9    predicate facts have to be introduced to support the opinion.

10   That's just the way it works.

11             **MR. KIERNAN:**  Right.

12             **THE COURT:**  Okay.  Okay.

13             **MR. KIERNAN:**  And it's the same issue with respect to

14   balancing the pro-competitive benefits versus the

15   anticompetitive harm.

16             **THE COURT:**  I haven't gotten to the per se tying issue

17   yet, that you flagged, because I've got to think about it in

18   jury instructions.  But I -- the rule of reason analysis, I

19   agree with you, just so you know.

20             **MR. KIERNAN:**  Okay.  We're going to make this

21   efficient then.

22        Finally, I don't think there's much dispute between the

23   parties on this, but just to make sure I'm making the record

24   and ensure that this is addressed in whatever order, is in her

25   report Dr. Chipty interprets the systemwide agreements between

1    Sutter and various health plans and gives opinions upon what

2    they require or what they force, what they prevent, the meaning

3    of those contracts.  She's not a lawyer; she admitted to that.

4    And the plaintiffs conceded she can't interpret contracts.

5         And there's a similar -- they filed a similar *Daubert*

6    against Dr. Willig.

7              **THE COURT:**  Right.  And you conceded the point too.

8         I mean, the way I looked at it as the way it all shook

9    out -- and, again, I'm reporting from memory, which isn't a

10   great way to proceed, but she can't testify about the quality.

11   She doesn't say she's going to talk about the quality.

12        But, like Dr. Willig, she can talk about how quality can

13   affect pricing and she can talk about, because I think she said

14   this, how she controlled for relative medical quality in her

15   regression analysis.  So that sort of seems to dispose of that

16   issue.

17             **MR. KIERNAN:**  Right.  And then she could assume -- you

18   know, like we discussed before -- and it's the same with

19   Dr. Willig -- if the predicate facts are set forth before the

20   jury during the trial, then either one of them can offer

21   economic opinions that respond to or are based upon those

22   predicate facts.

23             **THE COURT:**  So let's talk about that just a little

24   bit, because the one -- you know, going to your -- and maybe

25   I'm jumping the gun here, but, you know, as far as -- you know,

1    talking about the pro-competitive benefits, the anticompetitive

2    effects, they all have to be predicated on facts.  But there's

3    the issue that's brought up about the weighing of the benefits

4    and the harms.  What's your view on that?

5                **MR. KIERNAN:**  The weighing is done by the jury.

6                **THE COURT:**  Yeah, I mean, that's my inclination.  I

7    think that just because -- and this is more for Mr. Cantor to

8    put a pin in so he can talk about it if he wants to.

9          But my view there is that it just became -- you know, they

10   can talk about the logical connection between practices and

11   benefits.  I think you said this for Willig.  They can talk

12   about examples that show a link between, you know, a practice

13   and a benefit or a practice and a harm.

14         But the weighing itself gets a little too close to the

15   jury's decision, for my comfort level anyway, and it's argument

16   that the lawyers will make and a conclusion that the juries

17   will draw.

18               **MR. KIERNAN:**  Right.

19               **THE COURT:**  So that's my inclination.  Okay.

20               **MR. KIERNAN:**  Let me switch then.  And mindful of your

21   earlier comments on the damages model, one thing I want to note

22   at the start is I do know, because I was at the hearing and we

23   spent a lot of time on Dr. Chipty's --

24               **THE COURT:**  I know.  You were very unhappy with the

25   indirect purchaser conclusions that I drew.  I remember --

1          **MR. KIERNAN:**  Not the first time.  The first time I

2    was very happy.

3          **THE COURT:**  I know.  I remember your face at the

4    hearing that followed the class cert motion.  And I thought,

5    oh, no, I've lost them forever.  But that's okay.  All right.

6          **MR. KIERNAN:**  I'm an Irish guy.  I wear it on my

7    lapel.  Don't play poker -- or, actually, play poker against

8    me.

9          **THE COURT:**  Okay.

10         **MR. KIERNAN:**  So we were very -- I say I was very

11   careful in terms of what I was going to focus on.

12         **THE COURT:**  No, you were.  You did a good job.  You

13   did a good job.

14         **MR. KIERNAN:**  And I limited it to just a few things

15   that we did not cover during class.  And your order was very

16   careful, and we quoted it in the reply brief, that you were not

17   opining on the overcharge regression.

18         **THE COURT:**  It wasn't an issue there.  You assumed it

19   and then just went straight to the sort of indirect purchaser

20   kind of issue.  Yeah.

21         **MR. KIERNAN:**  Right.

22      So let me quickly go through several points here.  One is,

23   the overall overcharge regression, that's separate from the

24   passthrough.  I'm not talking about passthrough.  I'm only

25   focusing on the overcharge regression.

1    It omits a significant variable, and that's patient

2    characteristics, despite the fact Dr. Chipty had the data.

3    Second, it uses a flawed novel competition variable.

4    And then the other thing I just want to touch on is her

5    opinions on United in 2017, where she has not done a damages

6    analysis and, therefore, for 2017, any claim for United damages

7    should be excluded.

8    And then, finally, she offers an opinion on the first

9    quarter of 2020, where she has not done a damages analysis but,

10    nevertheless, puts forward --

11    **THE COURT:**  So let me push on this a little bit

12    because, obviously, the analysis and the class cert order

13    was -- you know, and tossing the 2008, you know, 2010 time

14    period generally on the theory that the intervening ACA made a

15    difference and the dataset couldn't be reliably put to the

16    earlier time period.

17    This is different.  There's no data available for Q1 2020,

18    and there was no data for the 2017 United damages.  And it

19    seems a more routine statistical -- what's the word? --

20    inference, extrapolation, in a way that it wasn't at class

21    cert.  So why is that wrong?

22    **MR. KIERNAN:**  The reason, Your Honor, is, going back

23    to class cert, the plaintiffs and Dr. Chipty did not have MLR

24    data, medical loss ratio data --

25    **THE COURT:**  Right.  I remember.

1          **MR. KIERNAN:**  -- 2008, right, to 2010.

2          **THE COURT:**  Because it didn't exist.

3          **MR. KIERNAN:**  Didn't exist.  And then she tried to --

4    I'll call it back-casting.  She tried to extrapolate backwards,

5    and you rejected that.  She looked at, you know, what had

6    happened, and then she just back-casted backwards.

7          And you are right, one of the grounds -- and we pointed

8    this out -- is that there were changes like the ACA.  And so

9    back-casting had no basis.

10         Here, what's similar, she does not have the data for

11   United for 2017.  Zero.  They could have gone back and asked

12   for it.  They didn't.  That was plaintiffs' choice.  For

13   whatever reason, they decided --

14         **THE COURT:**  Okay.  Okay.

15         **MR. KIERNAN:**  -- last year not to get that data.

16         Instead, they took a shortcut.  And they make an

17   assumption that the year in 2017 is not going to be any

18   different, and so they make some averages and then apply it to

19   that year.  That's unsupported.

20         To me, that's no different from what they did in --

21         **THE COURT:**  Is it an easier analysis for the

22   plaintiffs if you're only talking about Q1 in 2020?

23         **MR. LEVEE:**  Well, for 2020, so that's Q1 2020, where

24   she has not done the analysis and --

25         **THE COURT:**  Because she can't.

1          **MR. KIERNAN:**  Well, some time has passed.  They

2     haven't attempted to.

3          **THE COURT:**  Yeah.

4          **MR. KIERNAN:**  But the other thing is things have

5     changed.  Her own analysis shows -- when you track her

6     regression results in her report, it shows each year the

7     alleged Sutter overcharge, that we highly dispute, which is

8     take her own report -- goes down each year.  From 2016, goes

9     down; 2017, continues to go down.  Yet she takes the average of

10    2018.

11         So we know things are changing.  The market is changing.

12    The number of narrow networks and tiered products, what's

13    happened at Sutter is changing.  All these things are changing

14    in the marketplace during this time period.

15         Yet, she assumes that nothing has changed, and she takes

16    the average of 2018 and '19 and simply applies it to the first

17    quarter of 2020.  Things have changed.  She does nothing to

18    address it.  She assumes that it hasn't, in fact, changed and

19    applies two previous years, takes the average and applies it

20    forward.

21         With respect to the patient characteristics, to review the

22    bidding, Dr. Chipty uses a regression to compare Sutter's

23    prices at what it calls the damages hospitals and compares it

24    to a set of benchmark hospitals after controlling for various

25    factors that would explain prices.

1    There's no dispute among the parties that Dr. Chipty's

2    regression has to control for the factors that would drive

3    prices.

4        One of those factors -- and there is consensus among

5    healthcare economists -- is patient characteristics drive

6    prices for the -- you know, differences in -- for prices of the

7    same procedure.  This is common sense.

8        The price for surgery, for example, can vary greatly based

9    on patient's age.  Younger people tend to heal faster.  They

10   spend less time in the hospital when they have major surgery

11   for the same procedure than someone in their 60s and 70s.  It's

12   just a fact, and that's why healthcare economists control for

13   that.

14       Length of stay can have a great impact on prices.  As

15   Chipty admitted -- I quoted this in the papers.  She admitted,

16   quote, price increases with length of stay for the same

17   procedure.

18       This is all common sense, which is why healthcare

19   economists, when they have the data available -- when they have

20   the data, they control for things such as age, gender, length

21   of stay, patient's case severity.

22       And Dr. Tenn, someone cited by the plaintiffs, and

23   Dr. Chipty explains controls for gender, age, length of case,

24   and diagnosis.  They control for those differences in hospital

25   payments.

Garmon, Melnick, there are a whole number of economists, Keeler, Krishnan, Cooper, Garmon, Thompson, Tenn, they all -- when they have the data, they control for the patient characteristics.

Now, there are economists in peer-reviewed articles where that's not controlled for.  When you review those articles, the reason why they're not controlling for it is the data was either not available, so they just couldn't do it -- that's what -- some of these analyses.  And then the second reason, the analysis is for a different purpose.  The purpose is not to compare hospital prices and to figure out whether one is higher than the other.  It may be in the merger analysis, may be in some other context where the exact difference between prices doesn't matter.

Here, that's the whole ballgame.  The whole ballgame of this case:  Are Sutter's prices at the damages hospital higher than the benchmark set?

Dr. Chipty knows it has a significant impact.  This is from her report, Exhibit 5.  And let me just -- one minute on this.  I'll just use the top panel, panel A here.

What she's done is -- these are her numbers from her regression, this top line.  I'm not a very good drawer.  Top line is her regression results.

In the Willig's one-stage model, that's the model that has the patient characteristics where it's controlling for the

1    patient characteristics.

2         What you see, Your Honor, is just adding those

3    characteristics causes the overcharges to drop in half,

4    sometimes more than half across the board, across the board,

5    just controlling for that.

6         I'm not that surprised that she doesn't control for it,

7    because it eliminates half the damages in the case despite the

8    fact that the common methodology in -- in determining and

9    explaining differences in pricing across hospitals is

10   controlled for patient characteristics, age, length of stay.

11        The things that, just common sense, you know impact

12   differences in prices for the same procedure, she ignores.  She

13   does not control for it.  Why?  This chart tells you why.

14        The competition law variable, she made it up for this

15   lawsuit.  It's never been used.  She doesn't cite any economist

16   who's ever used this competition law variable.

17        Despite being an industrial economist, who also does work

18   in the antitrust arena, she does not use HHI, which all of us

19   are very familiar with in seeing regressions all the time.

20        She comes up with this new, novel variable.  It's premised

21   on a false assumption.  I'm going to get to that in a minute.

22   Assumes that all hospitals within the 30-minute drive time that

23   she uses are equal competitors.  Extremely sensitive to

24   changes.  And, ultimately, results in just complete nonsensical

25   results.

1    So I want to get to her assumption and what she is

2    controlling for.  She has a variable that measures how many

3    competitor -- how many competing hospitals are within 30-minute

4    drive time of each other.

5    So how far -- if you take CPMC, one of the damages

6    hospitals, she identifies all the other hospitals that are

7    within 30-minute drive time and assumes that that's a good

8    competition variable, that will control for competition.

9    And we looked at what was the basis for that?  We've never

10    seen this before.  What was the basis for picking up this

11    30-minute drive time between hospitals?

12    She says in her report -- this is in Exhibit 1 to the

13    motion for *Daubert* -- she says she bases it on the Knox-Keene

14    network adequacy requirement that she reads, as imposing by the

15    State of California, that hospital services must be within

16    30-minute drive time or 15 miles to their members.  That's the

17    measurement of the Knox-Keene Act.  It's the distance between

18    CPMC and its members, not CPMC and another hospital.

19    So the entire premise upon which she designed this

20    competition variable is false, and that alone is the reason why

21    it should be excluded.

22    The variable -- and this is just one example of this --

23    leads to these nonsensical results.  It assumes, because it's

24    just based on drive time and nothing else, that hospitals, so

25    long as they're within that radius, they all have the same

1    competitive pressure.

2        And that's what she's trying to measure here.  She's

3    trying to measure, all right, with all the different

4    competitors, what impact is that going to have on prices?

5        But unlike other generally accepted variables that account

6    for differences in the size of the competitor and the scope of

7    services, Dr. Chipty's variable treats all the other providers

8    the same.

9        So CPMC, which has 740 beds, is a trauma center, has a

10    NICU.  She assumes that UCSF, which also has a NICU, is a

11    teaching hospital, Chinese Hospital, which is much smaller, has

12    no NICU, is not trauma, is not teaching, Chinese Hospital has

13    the same competitive impact on CPMC's prices as UCSF.  That's

14    nuts.  That just defies common sense that that would be true.

15        And, finally, Your Honor, her variable leads to

16    nonsensical results.  What Dr. Willig did is showed the impact

17    of Dr. Chipty's model examining this competition variable.

18        What's the impact that she finds in her own regression on

19    prices?  She finds that there are one to four competitors, that

20    there is -- Sutter's price is .389.  Okay.  Let's look at ten

21    competitors.

22        Just thinking of it economically, if there are more

23    competitors, what should happen to prices?  And this is over

24    two times as many.  If there are more competitors, prices

25    should be lower, not higher; right?  That's just econ 101.

1          She finds ten competitors, negative .62.  What that

2     means -- and Dr. Willig explains this in his report.  What that

3     means is if there are ten competitors, her regression using

4     that variable now finds that Sutter's prices are almost twice

5     higher.  That is complete nonsense and defies econ 101, what we

6     all know to be true, which is, if you have more competitors in

7     a market, prices in general, all else equal, should go down.

8          So for those two reasons, excluding the significant

9     explanatory variable that other economists -- healthcare

10    economists use to measure price, that is, the patient

11    characteristics, and then using this novel competition

12    variable, for those two reasons, the overcharge model should be

13    excluded.

14         I've already talked about extrapolations, so I'm not going

15    to do it again, but that's a reason to exclude just those

16    years, United 2017 and then the first quarter of 2020.

17         All right.  So I've got two more parts of the argument.  I

18    know I've been going longer.

19         **THE COURT:**  And I was asking questions.

20         **MR. KIERNAN:**  That's okay.  I want to be mindful of

21    time because we have a lot to do today.

22         **THE COURT:**  I know.  We'll get through it.  And if we

23    don't, we'll get through it next time.  We'll go till 5:00

24    today, but not longer than 5:00.  Just for planning purposes,

25    we won't go longer than 5:00.

1        **MR. KIERNAN:**  Well, I'm going to be mindful.

2    Dr. Chipty has a number of unsupported opinions that her

3    damages are conservative.

4        The first bullet is very significant.  So with Sutter

5    Santa Rosa, which the plaintiffs claim is a tied hospital and a

6    damages hospital, Dr. Chipty -- and we went through this with

7    class -- attempted to determine damages at Sutter Santa Rosa.

8        At her deposition, quote, she testified, "I'm not able to

9    reliably estimate overcharges." So she dropped it.  We don't

10   have any numbers right now in the record about damages or

11   overcharges at Sutter Santa Rosa.  So we included in our

12   *Daubert* a statement that she's not permitted to say that "My

13   damages are conservative because it doesn't include Sutter

14   Santa Rosa."

15       And, by my surprise, the plaintiffs have resisted that.

16   Despite her admission that she cannot reliably estimate

17   overcharges, they still intend to ask her, "Why are your

18   damages conservative?" and have her say, "Well, I think there

19   are damages over there at Sutter Santa Rosa even though I

20   couldn't estimate."

21       That's highly prejudicial.  It's not founded or supported

22   by any econometric work and, therefore, should be excluded.

23       The same reasoning applies to CPMC St. Luke's.  There are

24   five health plans at issue in the case where she, Dr. Chipty,

25   estimates damages at several hospitals, and CPMC St. Luke's is

one of them.

When she updated her analysis with additional data, her
regressions show that there were no overcharges at any of the
other -- at any health plan other than Aetna.  Aetna is the
only one.  The other ones, no overcharges and, therefore, there
will be no damages with respect to those health plans.

So we've asked, just like with Santa Rosa, since she
doesn't have a reliable estimate for overcharges at St. Luke's
for Blue Shield, Anthem, United, and Health Net, that she's not
permitted to give an opinion to the jury, "My overall damages
are conservative because I think there are damages at
St. Luke's, but I couldn't do it."

**THE COURT:**  Okay.  Just as a pin for Mr. Cantor, I do
agree on that point.  So just -- that doesn't mean you can't
tell me something to the contrary.  I'm just letting you know
that.

**MR. KIERNAN:**  And then on other hospitals and other
services, it's the same analysis.  Dr. Chipty did not analyze
outpatient prices.  She did not analyze the prices of services
at ambulatory surgery centers for positions, at psych centers,
et cetera.  She did no analysis whatsoever.  She could have,
you know, like what happened in the *UFCW*.

But the plaintiffs in this case decided to limit their
analysis to inpatient services.  So there's absolutely zero
econometric or economic analysis of prices of any other

1    services, and she should not be permitted to opine to the jury,

2    "Well, my damage is conservative because I didn't examine the

3    outpatient services."

4        The last two, pre-2011 damages, you know, this was another

5    surprise.  We thought this was an easy give.  The Court has

6    excluded 2008 to 2010 because, quote, Dr. Chipty had failed to

7    prove damages for those years.

8        So we included it just to make sure we don't have any

9    confusion at trial, that Dr. Chipty is not going to opine,

10    "Although, you know, I'm not including a number in my overall

11    damages calculation, I did calculate damages for those years."

12        **THE COURT:**  Yeah, I agree.  I mean, I agree.  The

13    way -- it's a good lesson about how to be careful in writing an

14    opinion.

15        I think the way I would say it is that her inability or

16    failure to calculate damages, for example, for St. Luke's,

17    Sutter Santa Rosa, et cetera, is not a basis for an opinion

18    that her overall damages are conservative.

19        She, instead, has to talk about what she considered and

20    excluded in forming her opinions in the conventional sense, but

21    not -- her inability to calculate damages does not seem to me,

22    or failure to, it shouldn't be -- you know, subject to

23    Mr. Cantor's telling me I'm wrong -- shouldn't be a ground for

24    her opining that her damages calculations were conservative.

25        **MR. KIERNAN:**  Finally, Your Honor, on the umbrella

1    effect -- and we cite this in the briefs -- it's sheer

2    speculation.  She has not done any analysis -- she could have;

3    she's an economist, but she did not analyze whether there was,

4    in fact, an umbrella effect in Northern California as a result

5    of any of the conduct.

6        So last point --

7            THE COURT:  Can you hang on for one sec?

8            MR. KIERNAN:  Yes.

9            THE COURT:  Sorry.

10    (Pause)

11            THE COURT:  Someone's calling back.  It was

12    distracting.  Sorry about that.  Somebody obviously wants to

13    get ahold of us.

14        Sorry.  Go on.

15            MR. KIERNAN:  The last part of the argument, Your

16    Honor, is the overall damages calculated by Dr. Chipty --

17            THE COURT:  Yes.

18            MR. KIERNAN:  -- is inflated by unknown millions.

19        And I want to spend a little -- a moment on that last part

20    because I'm sure that's unsatisfactory to you, as it was for

21    me, but I'm going to do something at the end that helps us out

22    a little bit.

23            THE COURT:  Okay.

24            MR. KIERNAN:  So the main problems are that the

25    damages model includes nonclass members, members that we all

1    know don't meet the class definition.

2        **THE COURT:**  Right.  And that Dr. Willig accounted for

3    in his opinion by rerunning her regression analysis to exclude

4    them, right, thereby dumping damages down.

5        **MR. KIERNAN:**  Right.  And one of the issues we have

6    and why it's unknown, Dr. Willig has pointed out -- I'll get to

7    the numbers in a minute, but even with all the corrections by

8    the plaintiffs -- and there are a couple of areas where I'm

9    going to show you there's a dispute -- you know, we're looking

10   at what we've been able to identify is about a 3.2 percent of

11   the damages are attributed to nonclass members.  That's only

12   what we know.

13       And the challenge here is there's insufficient data that

14   the health plans have provided to identify who the class

15   members are in order to calculate the overcharges.

16       And that -- it's not because data doesn't exist.  I mean,

17   the health plans have the data.  The issue is the plaintiffs

18   and Dr. Chipty never went back to get the missing data.  They

19   just, you know, good enough for government work, and moved on.

20   That's not good enough in an antitrust case.

21       It's not good enough when they are seeking $429 million

22   from a healthcare provider in Northern California that so many

23   people rely upon.  Even the recalculation, $13 million from

24   what we've been able to identify, that's a lot of money.

25   $13 million is a lot of money.

1        And I understand it can -- sometimes we can lose sight of

2    how significant that is when you have numbers like 429 million,

3    but that's 3.2 percent of it, and that $13 million would be

4    otherwise used to help patients in Northern California.

5        So let me just -- I'm not going to -- because I think the

6    briefs --

7            THE COURT:  You're saying that she literally can't

8    rerun her analyses because she doesn't have the data.

9            MR. KIERNAN:  That's the issue.

10           THE COURT:  So I suppose she could concede

11   Dr. Willig's point, but she can't rerun it.

12           MR. KIERNAN:  That's the problem.

13           THE COURT:  Okay.

14           MR. KIERNAN:  That's her main problem, that

15   Dr. Willig -- but, also, that we've discussed in our motion and

16   in the declaration, that we've got all these people

17   self-funded, flex-funded, Medicare, dental, but she doesn't

18   have a way to identify them all.

19        And I do want to just comment on two pieces about nonclass

20   members, and that's the flex-funded and the CalPERS.

21           THE COURT:  They conceded CalPERS; right?  So.

22           MR. KIERNAN:  So on flex-funded, which the plaintiffs

23   have described as -- and I agree with this -- there is a

24   self-funded component to it and there's a -- called a

25   fully-funded component to it.  But there are two pieces.

1        And for CalPERS, as an example, the majority is

2    self-funded, and it kind of works like a stop loss.  The

3    self-funded funds the program, then when it reaches a certain

4    level then the insurance carrier kicks in.  That's how --

5    that's how a flex-funded works.

6        Their class, the plaintiffs' class in this case that Your

7    Honor certified, is all entities in California, located in

8    various rating areas, that paid premiums for a fully insured

9    health insurance policy.  It's got to be fully insured.

10        Dr. Chipty, in her report, defined -- and this is relevant

11    to how she should be analyzing damages -- a fully insured

12    product is one in which the underwriter -- that is, the health

13    plan, the underwriter -- underwrites the risk and assumes full

14    financial responsibility.  Full financial responsibility.

15        That's not the case with a flex-funded plan.  The

16    flex-funded plan is self-insured, which means the employer or

17    the trust, they bear financial responsibility, and then the

18    health plan bears some other.  It's a split between the

19    financial responsibility.  It's not a fully insured plan that

20    Your Honor certified in this action.

21        With respect to CalPERS, it has both a self-funded plan --

22        **THE COURT:**  I hope I was quoting somebody in my class

23    definition as opposed to writing it myself, because --

24        **MR. KIERNAN:**  That came right out of the complaint,

25    Your Honor.

1          **THE COURT:**  Exactly.  Yeah, I used a hyphen there to

2     create a phrasal adjective, which is improper because you can't

3     make a phrasal adjective with an adverb.  But that's okay.

4          **MR. KIERNAN:**  Your Honor, you did not draft it.

5          **THE COURT:**  Good.  All right.

6          **MR. KIERNAN:**  So with respect to CalPERS, which the

7     plaintiffs have resisted in their opposition, these are quotes

8     from the plaintiff that we received while we've been

9     negotiating the objections to the evidence in the case.

10         And there are a number of CalPERS documents that we had

11    put in, and the plaintiffs responded that the document is

12    irrelevant, CalPERS is not part of the certified class.  Well,

13    we agree with that.  They're not part of the certified class

14    because they don't have a fully insured product.

15         They also write "This document is inadmissible because

16    it's not a fully insured health plan."  Well, we agree with

17    that.  CalPERS is not part of the certified class.

18         So plaintiffs have told us, while we're preparing for

19    trial, that the CalPERS documents are not relevant because

20    they're not part of the class; in one place it's not a fully

21    insured plan.

22         What they've come back with in their opposition to try to

23    reconcile this is, well, no, what we meant is CalPERS may be

24    part of the class for one product called flex funded.  That's

25    not how they're dealing with this now with trial exhibits.

1      But then we run right back to the class definition:

2  Flex-funded where the financial responsibility is split between

3  a self-funded payor and the fully insured -- or in the health

4  plan, that is not a fully insured product.  Plaintiffs' own

5  expert agrees with us on that.

6      Finally, what I've done, Your Honor, is I took

7  Mr. Cantor's chart that he included in his slide deck, and he

8  had set forth the -- you know, what plaintiffs have

9  recalculated what Dr. Willig's numbers were.

10      So the 33 million was what was in Ms. Shapiro's

11  declaration.  They subtracted out 18 million because of

12  something called Pathways PPO, then they subtracted out CalPERS

13  and Blue Card plans and flex-funded plans.

14      We disagree with plaintiffs' characterization of Pathways

15  PPO.  Put that aside, just give them the 18 million.  Put that

16  aside for the moment.  And we do dispute it, but I think

17  there'll be a factual dispute with respect to the Pathways PPO.

18      On the other matters, CalPERS is not in the class because

19  they do not have a fully insured plan.  So adding back in the

20  5,882,688, so it should be zero.  So we're basically adding

21  back in the 5,882,688.

22      With respect to the Blue Card plans, the plaintiffs did

23  identify an error in how we identified the Blue Card plans.  So

24  we redid it, and that's the corrected amount.

25      With flex-funded, they're wrong, but they also pointed out

a data issue, which we corrected.  And that's what this represents.

When you add this all back up, just for the ones that we've been able to identify, there's $13.5 million in damages that are attributed to either nonclass -- or nonclass members or nonclass products, that combination, which is 3.2 percent of 429 million.

The last piece of this -- and you touched on it, so I think you understand -- is we don't know the ultimate amount because we don't have sufficient data to do it, but it's also not sufficient just to subtract that number.

So plaintiffs say, well, we can fix this, we just subtract $13.5 million from 429 million and it's okay.  But the way that Dr. Chipty's damages analysis works, we don't know what the ultimate overcharge is.

And the reason why is she has this four-part -- or four-step analysis to estimate damages in the case.  This is from her report, Exhibit 33.

In steps 2 and then 3 and 4, she needs the actual class members.  In step 2, she's calculating what the overcharge is; that is, what's the overall damages that I am determining?  And then my next step is to figure out what is passed through.

So we spent all that time on passthrough at class and everything.  The question is, what's the number?  Is it 429? Is it 350?  What is that overall number?

1      In order to calculate that number, Dr. Chipty needs to

2   know who's in the class because that's how she's calculating

3   the number.

4      So in order to fix this, you can't just subtract out

5   13 million.  You've got to rerun the model.  You've got to

6   rerun the regression, and then rerun -- it's actually not the

7   regression.  You've got to rerun her steps here to figure out

8   what the ultimate big pie is.  And that pie may be much lower

9   than what it is now.  Well, we know it is, because we already

10  counted the 13 million.

11     With that, Your Honor, unless you have any questions --

12         **THE COURT:**  I think that's very helpful.

13         **MR. KIERNAN:**  -- I concede the floor.

14         **THE COURT:**  Okay.  So probably should take a break.

15  So, Kathy, can you tell us how long we've been going?

16             (Brief discussion off record.)

17              (Recess taken at 11:30 a.m.)

18            (Proceedings resumed at 11:31 a.m.)

19         **THE COURT:**  Okay.  Mr. Cantor.

20         **MR. CANTOR:**  Hi.  How are you, Your Honor?

21         **THE COURT:**  I'm fine.  How are you?

22         **MR. CANTOR:**  Fine.  I'm going to go a little bit

23  longer than I thought given the length of Mr. Kiernan's

24  presentation.

25         **THE COURT:**  Yes.  Tell me how long you think you'll

```
 1    go.
 2         MR. CANTOR:  I think that I'll be going at least 45
 3    minutes.
 4         THE COURT:  That's fine.  That's totally fine.
 5         Just give me one second.  I'm just going to coordinate one
 6    small thing.  I think we maybe take 30 minutes for lunch.  What
 7    do folks think?  I know those of you who aren't arguing can eat
 8    and no one will be the wiser.
 9         How long would you like, Kathy and Elaine, 30 minutes?
10         (Responses off record.)
11         THE COURT:  Okay.  Just give me one second.
12         (Pause)
13         THE COURT:  Go ahead.  Thanks for that little break.
14         MR. CANTOR:  I'm going to have to share my screen, so
15    I'm going to do that and ask you if you see what I see.
16         THE COURT:  Well, I do.  I see you in the process of
17    sharing.  There it is.  Perfect.  Okay.
18         MR. CANTOR:  Okay.  Give me one second, Your Honor.
19    Just want to move the little box of people around so I can see
20    the words.  Here we go.
21         Okay.  So, Your Honor, I want to start with some responses
22    to Mr. Kiernan's argument, but then what I think I'm going to
23    do is I'm just going to go through my presentation because I
24    think it hits a lot of the themes that you were discussing.
25    And I'm going to try to interweave some of my rebuttal reports
```

1    that way.

2         **THE COURT:**  Okay.

3         **MR. CANTOR:**  The thing that's most important, that I

4    want to start off with, with respect to Mr. Kiernan's

5    presentation, is threefold.

6         First of all, Mr. Kiernan often says that the

7    well-established case law or the consensus says this, but he

8    doesn't give you a citation.  And there's a reason: because

9    he's wrong.

10        In fact, if you look at their reply brief and you look at

11   Mr. Kiernan's presentation, they do not take issue with almost

12   all of the cases that we cite in opposition.

13        I ask you to look at the cases that we cite in opposition

14   very, very closely because it identifies what the correct legal

15   standard is on an admissibility at motion.  This is not a

16   motion that goes to the weight of the evidence.  That's the

17   first thing.

18        The second thing is that Mr. Kiernan makes some statements

19   about economic principles that he says are well established or

20   consensus.  That, too, is not true.  And I'm going to give you

21   citations again that demonstrate where he erred.

22        And, thirdly -- and this was somewhat surprising to me,

23   Your Honor -- he made some statements that were absolutely

24   factually incorrect.  And let me just state the one that was

25   most -- most poignant to me.

1          You and he, at the end, talk about the analysis that was

2    done by Sutter concerning groups that they say or products

3    that --

4          **THE COURT:**  Yeah, Dr. Willig's rewriting the data to

5    take out the wrongly included class members; right.

6          **MR. CANTOR:**  You mentioned that that was Dr. Willig's

7    analysis, and he said yes.  That is not Dr. Willig's analysis.

8    That is a lawyer's analysis.  It was done by Jones Day.

9          **THE COURT:**  I thought -- did they say it was

10    Dr. Willig's analysis in their motion, too, because I believe

11    they did?

12          **MR. CANTOR:**  What Dr. Willig did is he took

13    Dr. Chipty's code and he created some databases that

14    apportioned damages by groups or by plan --

15          **THE COURT:**  Right.  Exactly.  Exactly.

16       Hang on one sec.  Sorry.  This is one of the perils of

17    actually being a judge is sometimes the phone rings and there's

18    an emergency.  So let me just see what's going on.

19          **MR. CANTOR:**  That's fine, Your Honor.

20          **THE COURT:**  Sorry, guys.  I'll be back in a minute.

21    Someone is calling, and it's urgent.  It's an unrelated issue.

22    So I'll be back.

23          **MR. CANTOR:**  No worries.  Thanks, Your Honor.

24                    (Recess taken at 11:47 a.m.)

25                  (Proceedings resumed at 11:57 a.m.)

```
 1            THE COURT:  I'm back.  There was an emergency in a

 2   criminal matter, and I had to deal with it.

 3            MR. CANTOR:  I'm sure it was.  No worries.  I feel

 4   like a sprinter who went up to the starting line and then false

 5   starts.

 6            THE COURT:  Exactly.  And another thing -- okay.  No.

 7   All right.

 8            MR. CANTOR:  Okay.  Your Honor, I'm just going to

 9   restart.  I hope you'll give me some patience here.

10      There are three things I said I wanted to state at the

11   beginning of the argument.

12            THE COURT:  Right.  Though I do have them in mind,

13   right.  So I'm looking forward to your fact citations and your

14   case citations, but I do remember what you told me.  You don't

15   have to repeat it, yeah.

16            MR. CANTOR:  The thing that I was in the midst of

17   saying --

18            THE COURT:  Yeah, you can start at the beginning of

19   that part of it, if you want, when you were talking about the

20   lawyer's involvement and what Dr. Willig actually did.  If you

21   want to start at the beginning of that piece, that's fine.

22            MR. CANTOR:  I do.  So what Dr. Willig did was he

23   utilized Dr. Chipty's code, and by doing that he was able to

24   apportion damages and identify class members by group, by plan,

25   by product.  He broke it down that way.  So he has this
```

1    database apportioning damages.  But that's as far as he went.

2        At the end of his report -- it's Exhibit 15 to his report

3    from April of this year -- he has these charts that say:

4    Products that do not include Sutter damages hospitals;

5    self-funded plans, out-of-state plans.

6        I took him through every one of those charts in his May

7    deposition, and I said, "Did you prepare this?"

8        He said, "Nope."

9        "Did someone on your team prepare this?"

10        "Nope."

11        I said, "Who prepared it?"

12        He said, "Jones Day."

13        I said, "What criteria did they use to prepare this?"

14        He said, "I have no idea."

15        And all these cites concerning the fact that this is not

16    his analysis but it's Jones Day analysis is -- they're cited on

17    page 20 of our opposition brief.

18        We have a whole paragraph describing how this analysis

19    where they're saying there's inflated damages or there was a

20    certain amount of unharmed class members, all these

21    calculations are done by Jones Day.  They're the ones who are

22    identifying plans as not having damages hospitals.

23            THE COURT:  So but could I just ask a question,

24    though, on this point?

25            MR. CANTOR:  Sure.

1        **THE COURT:**  Because -- okay.  So isn't it just like

2   Dr. Chipty, though, that, you know, he assumes -- he takes the

3   data and he does the analysis of rerunning -- taking her

4   formula and rerunning the regression analysis to take out --

5   you know, to identify, you know, proportion among issues.  He

6   don't know if it's fact or not.  He just pushes the button.

7        Sutter, of course, would have to put in the predicate

8   facts to establish the foundation for what he did.  He doesn't

9   know what they are.  All he can do is, I did this because I was

10  given -- I did X because I was given Y.

11       So that seems totally okay to me as long as Sutter

12  establishes the fact predicates for what Dr. Willig did.  He's

13  doing nothing more than doing what experts do.  Jones Day is

14  the intermediary for wherever the claims data came from.

15       Why is that wrong?

16       **MR. CANTOR:**  The reason why it's wrong is he didn't do

17  the calculations.  He just put these charts in his report,

18  saying, "Jones Day told me that these are plans that don't

19  include damages hospitals."  That's it.

20       He then didn't do what you're saying, which is -- and, by

21  the way, if you assume that, there are so many thousands of

22  people who are unharmed class members, and damages were

23  inflated by X, all the calculations have been done by Jones Day

24  in their lawyer's declaration.  That's a very different

25  analysis.

1          **THE COURT:**  Okay.  That's fine.  Okay.

2          **MR. CANTOR:**  So all the citations for that are on

3    page 20 of our opposition brief.

4          Let me start with another thing that Mr. Kiernan stated

5    that I just want to disagree with viscerally.

6          Mr. Kiernan stated that an expert who takes the stand can

7    only attest to admissible evidence.  That's wrong.  Rule 703 --

8          **THE COURT:**  No, I know.  I mean, I brought that up

9    too; right?  I said that.  I said that.  Agreed.

10         But, generally, when you're actually trying to establish

11   that challenged contracting practices constitute an

12   impermissible tying arrangement, you've got to back it up with

13   facts; right.  It's not really a hypothetical.

14         I was just saying that it is true that experts can

15   consider all sorts of things, including otherwise inadmissible

16   evidence, in forming their conclusions in appropriate

17   circumstances.

18         And I think the argument is here that when you're

19   rendering an economic opinion, you're rendering an opinion

20   based on fact, not on hearsay.  And I think that's an

21   unremarkable thing to say.

22         I don't think experts can render a conclusion based on a

23   hearsay declaration, for example.  But then at the trial the

24   predicate facts have to come in or the opinion doesn't come in.

25   You can't backdoor the facts in through an expert.  You've got

1  to put in the predicates.

2          **MR. CANTOR:**  I agreed with you to an extent.

3          **THE COURT:**  Okay.

4          **MR. CANTOR:**  The way it's happened in the cases that

5  I've tried -- and I've tried a number of cases, Your Honor, is

6  that --

7          **THE COURT:**  Me too.  Me too.

8          **MR. CANTOR:**  You're right.  You're right.  Maybe

9  you've tried antitrust --

10          **THE COURT:**  I have not tried an antitrust case.  I've

11  prosecuted antitrust cases, but I didn't try them.  Yeah.

12  Never tried one.  Yeah, I tried securities fraud though.  I

13  tried security fraud cases, and those are big cases.

14          **MR. CANTOR:**  Oh, I don't know anything about

15  securities.

16          **THE COURT:**  I'm just saying it's the same sort of

17  thing, just a very -- they're very fact-intensive,

18  document-intensive, complex cases.  So I have tried those.

19  Yeah.

20          **MR. CANTOR:**  I understand.  I understand.

21      But what I was going to say is, generally, what happens is

22  that the expert cannot publish anything to the jury that has

23  not come into evidence.

24          **THE COURT:**  Correct.

25          **MR. CANTOR:**  They can't say, you know, "I'm giving

1    you" -- I think Mr. Kiernan mentioned the Joyner declaration.

2    I think that was one of the declarations he mentioned.  "I'm

3    going to show you the Joyner declaration."  That can't happen.

4    And I would agree with that.

5        They can refer in their testimony and republish to the

6    jury evidence that's already been admitted.  That I would agree

7    with.

8        Well, it's me, so I'm agreeing with myself.

9            **THE COURT:**  Yes.

10           **MR. CANTOR:**  The other thing they can do, though, is

11   they can rely on inadmissible hearsay.  I'll give you an

12   example.

13       You talk about Steve Tenn's article that showed that, post

14   merger, Sutter's prices went up in the East Bay by up to

15   72 percent per procedure.  An expert can rely upon that.

16   That's hearsay.  That's not evidence.  It's not going to get

17   into evidence.

18       Dr. Chipty can talk about it.  She can't show anything to

19   the jury with that.  And that, frankly, is a problem for the

20   proponent of the expert, because the jury may not believe the

21   expert as much because there's nothing put in front of them

22   that demonstrates that.

23       So all I wanted to say is it's wrong to say that in an

24   antitrust case an expert can only rely on admissible evidence.

25   No, that's not true.  They can rely on inadmissible evidence,

too, so long as it's the type of evidence that an expert would
rely upon.

     **THE COURT:**  Okay.  That's fair enough.  I still have
trouble reaching an economic conclusion about the effects of
anticompetitive practices -- alleged anticompetitive practices
without the appropriate fact predicates to reach that expert
conclusion.

   So that's -- yeah, that's what I'm really -- and that's
what most of the arguments are about here; right?  So --

     **MR. CANTOR:**  That's where we're copesetic.  I agree.

     **THE COURT:**  Okay.

     **MR. CANTOR:**  Mr. Kiernan said we're going to have to
put facts into the record.  We're calling health plan
witnesses, we're calling Sutter witnesses adversely.  We're
calling nonparty witnesses.  If you look at our trial witness
list, that's what we're going to do.

     **THE COURT:**  I know.  Of course.  That's what you have
to do.  So, right.

     **MR. CANTOR:**  Exactly.  So it's not like we intend just
to put on a witness who's not going to have that factual
predicate.  She will.  But we don't want to limit her testimony
to only admissible evidence because she has the right -- not
she has the right -- we have the right, through her, to put on
evidence that is inadmissible so long as an expert would rely
upon it.

1          **THE COURT:**  Yeah, I understand that.

2          **MR. CANTOR:**  Okay.

3     So let me talk about my motion now.  Let me just talk

4     about the argument in response to their motion.  Those were the

5     two things I wanted to discuss at the beginning.

6          So, Your Honor, as you know, only expert evidence that

7     amounts to junk science can be excluded.  Sutter has not made

8     any showing that comes close to demonstrating that Dr. Chipty's

9     substantial opinions were junk science.

10         This motion, which is a kitchen sink motion, should be

11    denied for three reasons.

12         First of all, Your Honor, as I said, this is not an

13    exclusion motion.  This is not concerning admissibility.  And

14    you mentioned this a couple of times.  This goes to the weight

15    of the evidence to be afforded.  And the weight of the

16    evidence, that determination, is within the province of the

17    jury.

18         Secondly, Dr. Chipty's liability opinions, they're

19    relevant, reliable, and supported by exhaustive analysis.  And

20    we're going to talk about the case law that identifies that

21    it's, indeed, necessary in an antitrust case for an expert to

22    review the qualitative record in addition to supporting their

23    opinions with quantitative analyses, which she does.

24         Mr. Kiernan said that she doesn't offer scientific

25    expertise with respect to the interpretation of documents or

1    testimony.  That's not what Sutter is saying with respect to

2    their other experts, and we're going to talk about that.

3         Dr. Chipty has a specific technical expertise in antitrust

4    economics.  She can review certain documentation and relay to

5    the jury how that fits into the puzzle.

6         I'll give you one example that Mr. Kiernan raised:

7    Forcing.  The issue of whether the health plans were forced or

8    not, even if she says, "I've reviewed these documents and I'm

9    assuming the forcing took place," it's relevant to market

10   power.

11        Whether or not Sutter had economic power to make forcing

12   probable is an issue that goes to whether or not a tying

13   arrangement is anticompetitive.

14        She can explain what market power is and how the forcing

15   that she has observed or she has assumed, based on her review

16   of the documents, fits into that piece of the puzzle and her

17   ultimate opinion that there are anticompetitive effects from

18   Sutter's conduct.

19        Thirdly, Dr. Chipty's damages opinions, which have been

20   scrutinized twice now by the Court -- and Mr. Kiernan said

21   something like, well, you'd said in one of your orders that

22   you're not reviewing her overcharge regression.

23        Your Honor, your first order in 2019 goes into great

24   detail about her overcharge regression.  And what you said

25   there was there's an overcharge regression, it's been applied

1    to Blue Shield and Anthem; she didn't apply it to the other

2    three plans.  That's where you stopped.  She has to do that.

3    And then she did it, of course, in her merits analysis.

4        So this has been scrutinized on two occasions.  They asked

5    for interlocutory review of those class orders at the Ninth

6    Circuit, and the Ninth Circuit denied that application.

7        Those damages opinions are based on academic literature,

8    which we cite in our brief and in our papers, and massive

9    amounts of data produced by the health plans from the regular

10   course of business.

11       Now, one of the cases that you cited in your prior *Daubert*

12   order, denying the *Daubert* against Dr. Chipty with respect to

13   the market definition motion that Sutter brought -- they

14   brought a summary judgment motion, I'm sure you'll recall, on

15   market definition grounds -- was *Wendell*, which is a Ninth

16   Circuit opinion.

17       In *Wendell*, the Court says you can't focus on nitpicky

18   little things with respect to an expert opinion.  You have to,

19   as you quoted, look to the broader overall methodology of the

20   expert.  That's something I want you to keep in mind as we go

21   through the argument today.

22       Now -- there we go.  Sorry.

23       Just to set the record -- and this is in the papers --

24   Dr. Chipty served and filed ten different expert reports

25   amounting to almost 800 pages of economic analysis.  In those

1    reports, she identifies the output of over 150 quantitative

2    exercises.  Her opinions are also found in six days of

3    deposition transcript.

4        Mr. Kiernan said that there's certain analyses, like with

5    the nonpar rate, that are not economic.  That's not true.  And

6    we're going to talk about why that's not true.

7        She didn't do a statistical or econometric analysis of the

8    nonpar rate, but she certainly looked at the nonpar rate,

9    considered the economic consequences of it, and can render an

10   opinion on it.

11       Dr. Chipty employed a three-pronged analysis that is

12   scientifically valid in approaching her assignment.

13       First, she evaluated the economic theory on tying, on

14   network exclusion of providers, and steering.  She reviewed the

15   academic literature of this.  It's cited throughout her

16   reports.  Mr. Kiernan really did not take issue with this.  And

17   she confirmed that Sutter's experts agreed with her much if not

18   most of the time on the theory.

19       Secondly, she completed an exhaustive review of the

20   record.  Mr. Kiernan suggested pejoratively that she

21   cherrypicked documents.  She had the whole record open to her.

22   We didn't limit her from reviewing any portion of the record,

23   and she states that again and again in her reports.

24       She reviewed hundreds, her and her staff, hundreds upon

25   hundreds upon hundreds of documents.  She reviewed scores of

1    deposition transcripts.  And she didn't only look at the health

2    plan documents and deposition transcripts, she looked at the

3    Sutter information and nonparty hospital information as well.

4        Lastly, she completed substantial econometric and

5    statistical analysis.  She analyzed for her regression

6    analysis, her overcharge regression, over 140 million health

7    plan hospital transactions.

8        Sutter nitpicks at the data here.  I want you to consider

9    the massive nature of the set that she used here.  She

10    considered over 600 million member months of premium data.  She

11    considered data filed with the federal government by the class

12    health plans.  She considered data filed by the class health

13    plans, by Sutter, and by hospitals with the state.

14        And based on her comprehensive analysis, based on this

15    tripartite analysis, she determined that Sutter had engaged in

16    anticompetitive conduct that led to anticompetitive effects and

17    foreclosure, and harmed the class members in the form of higher

18    premium payments.

19        Now, Dr. Chipty, notably, did an analysis that was far

20    more comprehensive than the plaintiffs' experts in *UEBT*.  In

21    *UEBT*, Dr. Leitzinger, who was their impact and damages expert,

22    didn't even look at pricing data.

23        Sutter objected to that, as we would have expected they

24    would have.  His overcharge was based on something called a

25    reimbursement rate analysis, which was novel.

1        Dr. Chipty not only considered prices, she considered all

2   the pricing data.  Dr. Vistness, who Mr. Kiernan mentioned, the

3   liability expert for the plaintiffs, who was the liability

4   expert on a tying claim, did not even define tied markets.

5        Dr. Chipty not only defined the tied markets, her analysis

6   has already survived *Daubert* attack.

7        Now, Dr. Chipty appropriately considered record evidence.

8   I want to read from one of the cases that we cite that Sutter

9   is silent about.  This is the *In re Eggs Processing Antitrust*

10  *Litigation* from 2015.  And let me tell you what the court says

11  there.

12       "It is consistent with sound economic practice to

13       review the factual record.  The examination of the record

14       is necessary to determine which tests to run and confirm

15       the stories drawn from the data and the factual record are

16       consistent."

17  That is exactly what Dr. Chipty did.

18       Now, Dr. Chipty reviewed the evidence in the record, of

19  course, under Federal Rule of Evidence 703, "An expert may base

20  an opinion on facts or data in the case that the expert has

21  been made aware of."  The deposition transcripts that she

22  looked at, the documents that she looked at are all evidence in

23  the case.

24       And just to show the 180 that Sutter is doing, in the

25  other case, in the state litigation, there is a motion to

1    exclude Dr. Gowrisankaran.  We made a motion too.  Our motion

2    is based on very different grounds.

3        The motion there was based on the fact that he did not

4    complete an econometric SSNIP test in order to define the

5    product market and say that Kaiser was a participant in the

6    market.  That's what the plaintiffs did.

7        Sutter came back and said no, no, no, he doesn't have to

8    do an econometric test.  He can rely on documents.  He can rely

9    on testimony.  He can consider the views of the business

10   entities in deciding whether or not Kaiser's in the relevant

11   market.  Indeed, they make the same argument here, to some

12   extent, in response to the Gowrisankaran --

13       **THE COURT:**  Just one observation.  Of course, an

14   expert can consider that stuff; right.  But they can't -- he

15   can't -- the expert -- the business entities say X.  If that's

16   true, then Y.  He can't say it's true or not.

17       So it's sort of an unremarkable thing.  So I think we're

18   good on that.  I think we're good.

19       **MR. CANTOR:**  Okay.  Your Honor.

20       **THE COURT:**  And I'm not proposing to kick out your

21   summaries.  And you've seen my approach in my other expert

22   stuff.  You can't just say it's true, you know, that -- you

23   know, if the industry folks view conduct as predatory, for

24   example, they'll say that at trial.  And if -- and an expert

25   can rely on the characterization of their views, accepting them

as true for purposes of rendering an opinion.  But the jury

decides whether it's true or not; right.

So I think we're good on this stuff.  I don't think we

need to beat what Dr. Chipty can talk about.  I think the more

important stuff to talk about is really -- you know, you

characterized it as nitpicking, but just the substantive

challenges to the things that she actually can't testify about

because her predicates are insufficient to allow her to draw

the conclusions.  I think that would be the most helpful way.

**MR. CANTOR:**  I don't really know what that is because

I don't think there are any predicates that she's going to

testify about that are insufficient.

**THE COURT:**  No, I just mean that Sutter's

challenges -- you know, like, for example, you've already

talked about one of them, which is Dr. Willig and not including

the -- you know, not excluding the -- including wrongly

excluded class members.

They just basically -- that's setting aside the damages,

but they make very specific challenges.  Once you get through,

you know, the summaries -- and I've already said that I'm not

prepared to exclude -- then I think you move on to Sutter's

arguments about which opinions are unreliable.  They made

specific arguments about the unreliability of opinions.

I'm with you.  I'm not -- I'm not kicking out all the

stuff that she might say or her ability to lend coherence to

1    the narrative that you're going to have to elicit primarily

2    from hostile witnesses -- hostile or not, but I assume a bunch

3    of them will be -- not hostile, I'm sure they'll be pleasant,

4    but you know what I mean.

5            MR. CANTOR:  I do.

6            THE COURT:  They're not your witnesses.  You're going

7    to be cross-examining them as a part of your direct examination

8    most likely.

9            MR. CANTOR:  Your Honor, I just want to point out in

10   this here, because I think we should stay in liability for a

11   little bit more --

12           THE COURT:  No, no, we should stay in liability.  But

13   they have specific arguments that there are reliability

14   opinions that are unreliable.

15       In addition to their, you know, parroting, they then

16   say -- they do all of it and they say all of this is parroting.

17   Okay, no, I'm not going to go there.  But then they say, okay,

18   let's walk through them and -- and that they shouldn't come in,

19   and that's when they start getting into subpar --

20           MR. CANTOR:  We're almost there, Your Honor.

21           THE COURT:  Okay.

22           MR. CANTOR:  One more thing I want to say before we

23   get to that point is the "ultimate issue" issue.

24       So you'll remember that Mr. Kiernan stated that Dr. Chipty

25   cannot say that something is tying.  That --

1          **THE COURT:**  Well, they said that she could say

2     "tying."  They said that they shouldn't be able to say "illegal

3     tying."  And then they threw in the anticompetitive tying.

4          I pushed back on that and said, well, I think that the

5     experts can render an economic opinion about the procompetitive

6     and anticompetitive effects of the contracting practices, but I

7     was just uncomfortable with them opining on the ultimate

8     balancing inquiry.  That's how I came out on that one.

9          **MR. CANTOR:**  Okay.  So I agree with everything that

10    you said.  On the balancing inquiry, I will tell you that it's

11    Dr. Chipty's opinions that the conduct resulted in

12    anticompetitive effects and that there are no procompetitive

13    benefits --

14          **THE COURT:**  If she doesn't think there are

15    procompetitive opinions, then she can get that opinion.  But

16    she'll have to base that on the predicate facts.  That's fine.

17         All I was tossing out, you know, as I said during

18    Mr. Kiernan's presentation, I'm comfortable with her testimony

19    about, you know, tying acts to benefits or harms, and I just

20    didn't want anyone to testify that the -- you know, to do the

21    balancing inquiry.

22         If she has an economic opinion that there's nothing that

23    Sutter did that's okay, I suppose she can render that opinion.

24          **MR. CANTOR:**  Your Honor, it's not that there's nothing

25    that they did was okay.  Sutter is a hospital.  Sutter does

good things.  We're not saying that it doesn't.  That would be
silly.

     **THE COURT:**  No, I understand.  I understand.

     **MR. CANTOR:**  What we are saying is that there is no
evidence that any of the things that they say are good, like
their COVID services or their clinical integration or an
investment made in their pensions or an investment made in
charity care, there is no evidence that any --

     **THE COURT:**  So that's fine.  That's what the trial
will test.  That's what the trial will test.

     **MR. CANTOR:**  But Dr. Chipty has an opinion and can
state to the jury in order to qualify as a pro-competitive
benefit there are two things that need to happen.  One, Sutter
needs to show or the evidence needs to show that there was a
direct cause --

     **THE COURT:**  No, I understand that.  There was a
challenged contracting practice; right.  There's got to be a
nexus between the practice and the procompetitive benefit.  I
understand that perfectly.

     **MR. CANTOR:**  Right.

     **THE COURT:**  I mean, literally, if you knew how many
days I've spent working on your motions, you would understand
that I know -- well, I didn't understand -- will be interesting
what Mr. Kiernan says about the Willig point.  I didn't really
catch that quite so well in the opposition.  But your

1  arguments -- I'm pretty confident about the arguments that

2  you've made.

3          **MR. CANTOR:**  Okay.

4          **THE COURT:**  What's helpful for me is for you to really

5  show me as a matter of fact, and then if you think that there

6  are legal citations that support a view that's different than

7  ones announced -- I'm not opposed to the law.  But I know

8  generally the law on the admissibility of experts.  Of course,

9  I do.  I want to talk about why the opinions are reliable so

10 that they come in.

11         **MR. CANTOR:**  Okay.

12         **THE COURT:**  That's most helpful when you're dealing

13 with *Daubert*.

14         **MR. CANTOR:**  I agree with you on the way -- she can --

15 not argue, she can opine to the jury --

16         **THE COURT:**  -- about the economic significance of the

17 contracting --

18         **MR. CANTOR:**  -- the economic analysis for, you know,

19 benefits and how they have to be directly caused and how those

20 benefits have to either meet the lower prices or expanded

21 output or some type of innovation creation.  You know, welfare

22 benefits are not something considered in an antitrust analysis.

23     I just wanted to point that out and show --

24         **THE COURT:**  No, I know that.  I definitely recognize

25 your arguments about that.  And now we're kind of, you know,

1    skipping into Willig and other witnesses.

2        But the evidence of the connections is a fact issue that

3    Sutter is putting in through its fact witnesses, and the expert

4    testimony that Sutter is offering is only testimony about

5    logical connections between what companies do and how those can

6    have procompetitive benefits.

7        So that's -- but Sutter has acknowledged your point, so

8    that's fine.  That's Willig.

9        **MR. CANTOR:**  I'll leave that to Mr. Su to argue that

10    point.

11        **THE COURT:**  Okay.  That's fine.  That's totally fine.

12        **MR. CANTOR:**  So let's talk about specific issues now,

13    so the nonpar rate.

14        **THE COURT:**  Yes.

15        **MR. CANTOR:**  Mr. Kiernan said she didn't do any

16    economic analysis.  She didn't do a statistical analysis.  She

17    didn't do econometric analysis.  She didn't need to.

18        The evidence in the record identifies that all of the

19    health plans stated that the nonpar rates were much more than

20    the ordinary and customary rates that they pay.  She doesn't

21    know the specific competitive rate.

22        But I want to read to you portions of her depositions --

23    this is at P16 of our papers, Exhibit P16, because these quotes

24    follow right after what Mr. Kiernan cited.

25        She states, for example, that "I haven't done the

1    calculation with respect to the nonpar rate" but the testimony

2    of market participants is extremely meaningful and informative

3    here on whether they think there's a high price and it's

4    justified.

5        She says on page 124 -- that was on page, by the way, 99

6    of her deposition.

7        On page 124 of her deposition, they cite page 123:

8            "I do know directionally that the nonpar rate would be

9            lower, considerably lower, given the testimony that I've

10           read from the class health plans."

11       And this wasn't just -- if you look at her report, you can

12   look at pages 50 through 51 of her merits report, 59 through --

13       THE COURT:  But I'm with you on that point.  So just

14   to kind of get to the -- cut to the chase, you know, you're

15   going to have to call the health plans or whoever, the

16   predicates for the testimony; right?

17       I mean --

18       MR. CANTOR:  Right.

19       THE COURT:  -- you're just going to have to because

20   you can't leave -- even assuming you could backdoor it all,

21   obviously for her reports she had nothing to rely on but

22   declarations or but prior testimony.

23       And I assume she'll be sitting there through the trial,

24   the whole time, listening to what people talk, and she'll have

25   the predicate testimony for what the health plans say, and

you'll put it in.  And then she'll draw conclusions from those

facts, and that's all fine.  That's all fine.  That's all fine.

          **MR. CANTOR:**  That's what's going to happen.  And just

one last thing on that tiny point --

          **THE COURT:**  Yes.

          **MR. CANTOR:**  It's not just the declaration --

          **THE COURT:**  She just shouldn't use the word "onerous"

as her opinion; right?  I mean, that's really all I was saying

there.  I mean, that's somebody else's words; that's not her

word.

     If she assumes facts -- if she takes the facts that you

put in, and based on those facts has a conclusion to draw from

them, a hundred percent she could do it and that's fine.

          **MR. CANTOR:**  So I want to now talk --

          **THE COURT:**  Talk about Anthem and Kaiser, so that was

the next stuff.

          **MR. CANTOR:**  So the North/South analysis, this is a

quantity analysis.  It's not a regression, but Mr. Kiernan

said, well, the law concerning regression really should apply

to this because this is an economic analysis.

     First of all, look at page 16 of our brief.  We cite there

*Capacitors*, which cites to *Obrey*, a Ninth Circuit case, *Korean*

*Ramen Noodle*, *Giuliano*, *LCD*, these are all Northern District of

California cases that I denied exclusion motions where

defendants, like what Sutter is saying here, said, well,

1    there's this economic analysis like a regression, and it didn't

2    include various different inputs that it should have included.

3    We think it should have included X.  We think it should have

4    included Y.

5        And the courts uniformly held no, no, no no, no.  A

6    regression analysis or an economic analysis does not become

7    inadmissible because it does not include every variable that is

8    quantifiable and may be relevant.

9        **THE COURT:**  They're basically -- just to push back a

10    little here, though, I didn't like the regression analogy so

11    much either.  You heard me say that.  But really what Sutter is

12    saying here is they're not challenging the comparison that she

13    did as not being sort of -- let's -- I mean, they can push back

14    or not.

15        They're saying it shows correlation, not causation; and,

16    therefore, it's not reliable.  I mean, the fact she did it,

17    that -- she is showing facts by that thing.  That's a fact, and

18    those facts are fine.  The question is whether those facts

19    are -- the facts are reliable insofar as no one is challenging

20    the predicates for the data.

21        What Sutter is saying is, hey, it shouldn't come in

22    because it's -- it just shouldn't come in because it doesn't

23    show anything, and the jury is going to be swayed by it because

24    she's going to say it's a basis.  Yeah.

25        **MR. CANTOR:**  That's an issue of fact.  That's a he

 1  said/she said.  You asked him --

 2       **THE COURT:**  Well, I think they're not disputing the

 3  fact.  They're challenging whether it's sufficient under

 4  Rule 702 to form the predicate for an opinion about causation,

 5  liability.

 6       **MR. CANTOR:**  Right.  And they haven't cited anything

 7  that says it's not.  This was all Mr. Kiernan saying it didn't

 8  include this, it didn't include that.  The reality is --

 9       **THE COURT:**  No one say -- that's why I made --

10       (Unreportable simultaneous colloquy.)

11       **MR. CANTOR:**  -- cross-examination.  That's what it is.

12       **THE COURT:**  That's what I said, too.  So.

13       **MR. CANTOR:**  The reality is -- and the courts are

14  very, very clear.  And you can look at all the opinions on

15  page 16 -- that these types of things where a defendant --

16  because it happens in every antitrust case; right?

17       I'm not criticizing Mr. Kiernan.  That's what defendants

18  do.  They're going to say this regression analysis that was

19  done doesn't include X, Y, Z.  A, B, and C should have been

20  reformatted, didn't do this.  They can make that point at the

21  jury stage.

22       And the fact that they're saying they're prejudiced, I

23  don't know why there's prejudice.  He can cross-examine

24  Dr. Chipty, who, by the way, is an MIT Ph.D. in economics.

25       **THE COURT:**  No, no, she's highly qualified.  She's

1    highly qualified.

2         **MR. CANTOR:**  Highly qualified.

3         And Dr. Willig can say she's wrong.  So there's no

4    prejudice.  They'll have their ability to defend themselves.

5         This goes to the weight that should be afforded this

6    substantial analysis which identifies that, you know, in

7    Southern California this plan was able to proliferate these

8    narrow and tiered network products, but it couldn't do it in

9    Northern California.

10        And where Mr. Kiernan says well, you know, there's no --

11   she hasn't studied any of this stuff.  Look at her report again

12   on North/South.  She has a whole section on how Anthem and

13   other plans attempted to deploy and wanted to utilize the same

14   strategies in California, the same regulatory environment

15   between South and North for narrow and tiered networks, but

16   they couldn't do it because of Sutter.

17        So this goes to causation.  If they want to challenge that

18   opinion at trial, they're welcome to it.  It should not be

19   excluded.

20        The other thing I'll just say on this, is he says, well,

21   you should include Kaiser.  I don't know why you would include

22   Kaiser in an analysis that's trying to show foreclosure for a

23   particular plan, but if you do, I ask you to go back to that

24   slide again, Your Honor.

25        That slide that he showed you is damning.  What it shows

1    you is that in Southern California, okay, at the beginning of

2    the period 2006, you're looking at 18 percent of the claims

3    paid for these plans, including Kaiser, okay, were for narrow

4    and tiered networks.  By 2017, it's 43 percent.  It went from

5    18 to 43 percent.  In Northern California even under this

6    analysis, it only goes from 26 percent to 36 percent.  The

7    growth rate is substantial in Southern California.  It's much

8    lower in Northern California.

9        And, again, we would argue -- and we will when we

10   cross-examine Dr. Willig on this -- that this is a causation

11   analysis, demonstrates causation.

12       **THE COURT:**  So just for -- you know, two points.

13       One, by the time this order comes out -- and I'm still

14   slogging my way through it -- I will have read every fact point

15   that you guys assert in your motions, every single fact point

16   in the expert reports.

17       And so just to make the record clear, whether my order --

18   my orders tend to be to the point because who has -- because

19   that's the model.  But what I've said to you already is, I do

20   think that this is for -- these are issues that generally go to

21   weight, not admissibility.

22       Still, I think it's important for you to respond to

23   Mr. Kiernan's points because it is helpful as a question of

24   fact for me to consider this.

25       I will tell you -- and this is along the lines of case

1    management -- they teach in the manual of complex litigation

2    that case management sometimes is talking to people along the

3    way, you know, your sort of reactions.

4        You know, I said in one of my trials -- once again, I'm

5    going to say it's a civil rights excessive force case.  I did

6    say to the defendants, I said, you know, one of -- there are

7    rules that apply to cases; right?  There are rules.  And every

8    case is about whether or not you did your job.  That's going to

9    be -- you know, and that's as true for defendants as it is for

10   plaintiffs.

11       A little different here.  Your whole case is predicated on

12   Sutter's not doing its job.  But there are certain rules that

13   apply to cases.  In the civil rights context, I always say one

14   rule is that if you call 911 and the police show up to your

15   house and kill you, jurors don't like that.

16       It's also true the one antitrust trial I sat through --

17   and I did sit through one, not all of it, but I listened to the

18   experts -- I personally -- and, of course, I was hopping in and

19   out, I wasn't giving it enormous scrutiny.  The experts were

20   identical.

21       I might have told you this.  They even looked identical.

22   Similar pedigrees.  And I couldn't tell them apart.  I mean, I

23   could; one had blond hair and the other had dark hair.  But the

24   jury couldn't understand them either.

25       So I think -- but, that said, when I read the expert

reports -- and this is not a ground for exclusion; it's weight, not admissibility -- I do find Mr. Kiernan's arguments as a matter of, you know, whatever, to be persuasive.

I'm not prepared -- I told you this already. Listening to your fact points, I'm not prepared to exclude Dr. Chipty. It would, you know, eviscerate your case, for one. That's not a *Daubert* ruling. It's not a reason for you to criticize me later. I'm just saying it is part of the analysis that one considers, and it's part of the analysis about why I'm letting her talk about the evidence in a way that you want her to talk about the evidence. It's assuming you prove it up.

But, you know, I do find this issue -- I'm just going to tell you -- this issue of what she did or didn't include in her analysis, I do -- I have concerns.

I hear what you're telling me about the Anthem, but it's -- I think Mr. Kiernan's actually correct. I'm not going to exclude it on that grounds because I think that you're right, you know, she's going to testify something different, that you're asserting to me that the predicate facts are sufficient for her to draw the conclusions that she draws from them.

I am verifying that by literally looking at all the predicate facts that you guys have identified in the record. I've already read the sort of main reports, the Chipty, Gowrisankaran, and Willig reports because they're so important.

 1   So I started reading them early and doing little outlines to

 2   keep track of them.

 3        But I'm rereading every seminal fact point that you guys

 4   make in your orders.  And I'm going your way, but I still think

 5   you should talk about it.  But I have my concern because I find

 6   Dr. Willig's discussion of it -- I actually find the Kaiser

 7   argument to be -- again, it's not my job to decide any of these

 8   things.  My job is just to listen to it and decide whether it

 9   comes in.

10        But I find the Kaiser argument to be persuasive; right.

11   And we'll talk about that in the context of some of your other

12   motions.  I'm just telling you that.  That doesn't mean I'm

13   keeping Chipty out, but I find, you know, the exclusion of -- I

14   find the inclusion of Kaiser as just as possibly a -- you know,

15   the sort of right analysis.  But, you know, I'm not your

16   fact-finder, so I don't --

17        **MR. CANTOR:**  Exactly.  Your Honor, honestly, I

18   appreciate those comments.

19        **THE COURT:**  But I just thought I would tell you

20   because I feel like I'm not doing my job sometimes if I don't

21   tell you my reaction to the experts.

22        **MR. CANTOR:**  I understand.

23        **THE COURT:**  And not to say she's not super qualified,

24   but a lot of Sutter's arguments, I think, are good ones.  I

25   don't think they're enough.  I go with you on weight versus --

as opposed to admissibility.

I hear what Sutter is telling me, though.  They're saying it's almost impossible.  And here's the practical reality, too: You can't put on your case very well if you didn't have Dr. Chipty to lend it some coherence; right?

It would really cripple you if she couldn't talk about some of the evidence in a way to lend coherence to your narrative.  And I think it's absolutely permissible for her to do it.  And it is also true from Sutter's perspective and what they've characterized as a threat to their very existence as a business entity, given the damages at stake.  They did that previously.

It is also extremely hard to cross-examine on these points, too, because the practical reality is the jurors often can't tell and the experts are really a way of wrapping a verdict around the outcome, you know, if they determine that there's liability.

So that's it on my opining on the experts, but feel -- I want you to tell me anything on the fact points because I think it is useful.  It's useful for me to hear what you say because I do want to test my own assumptions about the evidence that's coming in.

        **MR. CANTOR:**  Your Honor, on this point I can continue to go on.  The reality is that including Kaiser in the analysis is a waste of time, and Dr. Chipty would tell you that.

1          Again, Dr. Chipty is not some janitor.  Okay?

2          **THE COURT:**  No, I know she's not.  I know she's not.

3          **MR. CANTOR:**  Dr. Chipty has -- what she did here was a

4     massive amount of work.  In fact, they didn't even do anything

5     like this in the *UEBT* case.

6          **THE COURT:**  I saw that argument, too.  And I saw the

7     *UEBT* experts.  You know I read all the *UEBT* orders too, every

8     one of them.

9          **MR. CANTOR:**  No.  So the reality is that she's showing

10    here -- and you have to look at this -- I was just going to

11    laugh because I was going to use the word "holistically" and

12    you made --

13         **THE COURT:**  I know.  It's a little joke, yeah.

14         **MR. CANTOR:**  You have to look at this holistically,

15    Your Honor.  Again, Dr. Chipty looked at the testimony from the

16    health plan, some of which you identified in your motion for

17    summary judgment in March of this year.

18         The health plans say the following.  Because of the nonpar

19    rates and the associated anticompetitive conduct, when they

20    wanted to exclude Sutter from a network, where they wanted to

21    tier Sutter, they had to pay higher prices for the

22    out-of-network services than they would have paid for other

23    hospitals that charged out-of-network prices.

24         Okay.  The nonpar rates were higher.  And what that

25    does -- I just want to state this.  What that does is it raises

the premiums of these narrow and tiered network products so

high that they're no longer a discounted product.

     **THE COURT:**  I a hundred percent understand --yeah,

yeah.

     **MR. CANTOR:**  What she's testing here, she's saying,

okay, this is what the health plans say, let me see if it's

quantitatively backed up.  And it is.

    She's showing here that, for this health plan, this

substantial health plan, they had much more success in Southern

California than in Northern California.  Same health plan.

There's no comparison between the two.  You don't need to.

It's the same health plan.  Same regulatory environment.  Same

strategy.

     **THE COURT:**  Yeah, I'm not excluding her opinion

either.

     **MR. CANTOR:**  I know --

     **THE COURT:**  So I get it.  I totally get it.  I

understand.

     **MR. CANTOR:**  I will keep moving, but I will just say

on this, the last thing about Kaiser:  The only relevance

Kaiser has is Mr. Kiernan said we don't even know if people in

Northern California like these products better than in Southern

California, whether they even like the products.

    He asked Dr. Chipty that very question, and he said:

     "Well, you said that Kaiser is a narrow network.

1          Kaiser does even better in Northern California than it

2          does in Southern California, so people must like narrow

3          network products up there."

4     So, in any event, all I'm saying is that this analysis

5     they have -- they can cross-examine, Dr. Willig can say

6     whatever he wants about it, he can put in his analysis, and we

7     will characterize this as causation.

8     One last thing I just want to make sure you understand.

9     This is critical.  I think Mr. Kiernan will absolutely

10    stipulate to this.  No one is going to confuse Dr. Chipty with

11    Dr. Willig.  They look very different.

12         **THE COURT:**  No, no.  I know that.  But part of it

13    is -- I understand that.

14    The one antitrust trial I saw was complicated by how

15    similar the witnesses looked.  But the larger point is -- you

16    know, and I thought a lot about this in the context of -- you

17    know, I did some market cases, not in -- I worked on the Enron

18    litigation.  Let's just say that.

19    And econometrics evidence and sort of actuarial stuff

20    figured into those cases at least -- particularly on the civil

21    side of the cases.  And my jaundiced view is that jurors have a

22    very hard time distinguishing between experts, rely on proxies

23    for understanding them, like boots-on-the-ground experience.

24    And, you know, I have a whole bunch of other theories, but

25    it's complicated evidence.  It is complicated evidence.  And

1    the short version of it is often I think jurors can't tell.

2         And my experience is informed by the sort of entire

3    litigation context that attached Enron, which was a lot of --

4    and sort of the estimation of damages that people were doing in

5    that case.

6         So, anyway, let's get through Chipty.  Let's get through

7    Chipty.  So that's --

8              **MR. CANTOR:**  Let me keep going.

9              **THE COURT:**  They may not look alike, but it's going to

10   be hard for the jury to understand.

11             **MR. CANTOR:**  Look, it's a challenge for all the

12   lawyers to make their economists understandable.  There's no

13   question about it.

14             **THE COURT:**  Yep.  Yes.

15             **MR. CANTOR:**  One -- let's talk about this really

16   quickly.  We've already talked about the fact that Dr. Chipty

17   will -- you know, has opined and will opine that there were not

18   procompetitive benefits from this conduct.

19        Two things I wanted to point out on that.  One is, again,

20   the causation point, which I've met -- made.  And you should

21   know that recently, in the *Alston* case -- I think this was

22   decided after our paper.

23        So this was the big *NCAA* case that was at the Supreme

24   Court.  I think that you should read that case.  There, Justice

25   Gorsuch held that rules on NCAA student compensation were

struck down because they failed to establish that the

challenged compensation rules have any direct connection to

consumer demand.  That's something that just came out of the

Supreme Court.

**THE COURT:**  I know.  And I'm obviously aware of the

opinion.  And that result makes sense there in the fact context

of the case.  I completely agree.

So what's the relevance here, though?  What analogy do you

draw from that --

**MR. CANTOR:**  As I said, they don't have anyone who can

testify -- anyone who can say Sutter engaged in these tying

arrangements, or Sutter put up the nonpar rate, or Sutter

included anti-steering clauses in their contracts, you know.

And that's what happened.

**THE COURT:**  Right.  But isn't that because they just

dispute as a matter of fact that there's any tying arrangement

at all?

I mean, I let it go through summary judgment, right, but I

tossed on the monopolization.  Their procompetitive effects are

a defense, but their main prosecution of their case is this

wasn't anticompetitive conduct at all.

**MR. CANTOR:**  I understand.  I understand that, Your

Honor, but when they make a procompetitive defense, okay, a

procompetitive benefits defense, they have to say -- they say,

for example, "There are all these investments that we paid

1    for."

2          THE COURT:  That's assuming you get the tying case,

3    though; right?  I mean, you've got to prove your tying case.

4    And I think their point is you don't have a tying case.

5    There's no "there" there.  I mean, that's their main thrust at

6    trial.

7          MR. CANTOR:  It is, but, Your Honor, Dr. Chipty can

8    also -- we have a rule of reason case too.

9          THE COURT:  I know.

10         MR. CANTOR:  There's a tying case and a rule of reason

11   case.  Two claims.

12       So on a rule of reason claim, we have to prove a *prima*

13   *facie* case of anticompetitive effects.  The burden then shifts

14   to the defendant, who has to show that there were legitimate

15   justifications for the policy, and that that resulted in

16   procompetitive benefits that could not be achieved by less

17   restrictive means.

18       That's what they have to do.  If they show that, then it

19   comes back on us to prove the weighing, that the

20   anticompetitive effects outweigh the procompetitive benefits.

21       I'm saying here is that Dr. Chipty has an opinion -- they

22   moved to strike it, so I have to defend it --

23         THE COURT:  Yep.

24         MR. CANTOR:  -- okay, that on causation grounds

25   there's no evidence that EICU investment or electronic health

 1   record investment or investment in seismic retrofitting or

 2   investments in charity care, that any of that resulted from

 3   systemwide contracting.  That's a fact, systemwide contracting.

 4        The nonpar rate, tiering, the anti-tiering clause, the

 5   tiering provision, anti-steering clause; they don't have

 6   evidence to state that any of these specific investments

 7   resulted from those acts.  That's what they have to show.

 8        Also, as I said before, really quickly, social -- you said

 9   what does Sutter do?  Sutter does good things.  That's not the

10   query.  The query is whether or not there was a beneficial

11   impact on competition.

12        This is a brief from Dr. Gowrisankaran, that he filed with

13   the Supreme Court of the United States in the *FTC versus Phoebe

14   Putney*.  This is a hospital case.  In this hospital case, he

15   stated that even if it were the case that nonprofit hospitals

16   with more market power both receive higher prices and provide

17   greater levels of uncompensated care -- that's charity care to

18   the indigent -- that care will still come at the expense of

19   other consumers who paid the higher prices directly.  This is

20   not a procompetitive benefit.

21        Now, Sutter states, well, wait a minute, you can offset

22   the harms to one consumer group with the benefits that are

23   enured by another consumer group by the practice.

24        They point to the Supreme Court's opinion in *Ohio versus

25   American Express*.  There, there was a two-sided market, a

1    two-sided transaction market at issue.  American Express's

2    policies caused the merchant prices to go up, which resulted in

3    more cardholder rewards.

4        So Justice Thomas said, in that very specific case, in

5    that case where both the cardholders and the merchants are in

6    the relevant market, you have to make this showing.  That's

7    very different than this, where people who are indigent aren't

8    paying the commercial rates at all.  That is not a

9    procompetitive benefit.  And we'll talk more about that today.

10        Let's talk about damages.  I know we're spending a long

11    time --

12        **THE COURT:**  And then Chipty is the hardest, and we're

13    going to have to figure out a way to get through this faster.

14    This is -- today's *Daubert*, and we're not doing *Daubert* next

15    week.  And I don't have the same amount of time to give you

16    next week.  So that's something to be very mindful of.

17        I really -- I thought it was going to go faster.  So,

18    anyway.  It's not a criticism.  It's just a feature of today's

19    hearing.

20        **MR. CANTOR:**  I'm trying, Your Honor --

21        **THE COURT:**  No, no, no.  It's not a criticism.  It

22    really is not a criticism.

23        **MR. CANTOR:**  Okay.  Dr. Chipty's damages opinions.

24    First of all, the Court, again, twice scrutinized them, has

25    held that she's shown sound the methodological steps for which

1    she calculated damages.  That's what was held.

2         We're talking about antitrust damages now.  We talked

3    about this at the class cert stage.  Sutter does not reject

4    this proposition, because they can't.  Well-established case

5    law for a hundred years, at the United States Supreme Court and

6    in the California courts, states that a plaintiff does not need

7    to prove damages in an antitrust case --

8         **THE COURT:**  I totally get the case law.  I read all

9    the cases.  There was good cases that you cited.  That's all

10   good.  I read them.  I understand.

11        **MR. CANTOR:**  -- mathematical precision.

12        **THE COURT:**  That's totally fine.  What would be

13   helpful is to talk specifically.  So Sutter says you didn't --

14   talk a little bit -- let's talk about the inputs of the

15   regression model as a matter of fact.

16        So it would be helpful to me for you to go through that,

17   not because I'm inclined to rule against you -- I just want to

18   emphasize that -- but because by your putting them on the

19   record and walking me through it makes me write a better order.

20        **MR. CANTOR:**  Right.

21        **THE COURT:**  I agree with you based on the opinions,

22   but I think Sutter raises some fair points, and it's worth

23   discussing them point by point so I can fully understand your

24   reactions to Mr. Kiernan's arguments.

25        **MR. CANTOR:**  Okay.  So here it is, this is the slide

1    you want to talk about.

2         **THE COURT:**  Yes.

3         **MR. CANTOR:**  Their overcharge model is reliable. We've

4    already talked about the case law that says that, you know, a

5    quibble over inputs is not something that makes it invisible.

6         Mr. Kiernan raised three primary points with respect to

7    Dr. Chipty's overcharge analysis.  The first, he says she

8    wrongly used aggregated pricing as the input for the model.

9    She should have used procedure-by-procedure pricing because

10   that takes into account variables that she should have included

11   like length of stay and the severity of the illness and the

12   complexity of the treatment, for example.

13        Your Honor, first of all, Dr. Chipty didn't just use

14   aggregate pricing; she used aggregated case mix adjusted

15   pricing.  That's critical to understand.  And she did this for

16   a couple of reasons.

17        First of all, if you look at Exhibits P62 through P66 of

18   my declaration, you will see that health plans don't look at

19   hospital pricing on a procedure-by-procedure basis.  When they

20   compare hospitals, they do it on an aggregated

21   case-mix-adjusted basis.

22        And the reason is because, as Dr. Chipty mentions in her

23   report, and we cite in our brief, health plans don't buy a

24   particular procedure or a particular procedure here and there.

25   They buy the basket, the panoply of inpatient services for the

benefit of their membership in a given year.  So they look at
everything on an aggregated basis.

     We also identify how Sutter itself, when it negotiates
prices, will look at aggregated prices and say, okay, for
inpatient prices this year for commercial rates we're going to
seek a 5 percent increase or a 6 percent increase.  That's what
they do.  This demonstrates that what Dr. Chipty is doing is
okay.

     Moreover, she relies on academic literature.  We cited
different articles, all found at P61 of my declaration, that
shows that healthcare economists have used aggregated
case-mix-adjusted pricing.

     And Mr. Kiernan says, well, they won't use it when there's
other information.  That's not what the articles say.  You can
read the articles.  She has academic literature that supports
her.

     Secondly, Mr. Kiernan says the number of competitors
variable that Dr. Chipty utilized was faulty.  This is
critical.

     If I knew I was going to have this much time, I would have
had more slides, which I'm sure you don't want to hear.

          **THE COURT:**  We're going to have a different model for
the rest of them, but this one's important because it's the
crux of your case, and it's helpful for me to understand it, so
I think it's time well spent.

 1          **MR. CANTOR:**  The reality is Mr. Kiernan said the

 2    generally accepted way of looking at --

 3          **THE COURT:**  Competition.

 4          **MR. CANTOR:**  -- competition is HHI, the

 5    Herfindahl-Hirschman Index.

 6          Now, Your Honor, HII is generally used in merger

 7    proceedings; right.  And what you look at is you look at the

 8    market shares in a given region that all the players -- let's

 9    say it's a hospital market -- all the hospitals have there.

10          You square the shares.  So if it's 20 percent, the square

11    is 400.  You square the shares, you come up with a total number

12    both pre and post merger.  And then you find, if the

13    post-merger numbers have reached a certain level, that there's

14    a presumption of anticompetitive effect, that the prices will

15    likely go up.  That's what merger analysis does.

16          The reason why Dr. Chipty, who is, remember, the editor of

17    proving antitrust damages for the ABA, the reason why she did

18    not use that is because when you're looking at HHI historically

19    you're basing it on historic market share.

20          Market shares in this case, over the last 20 years, are

21    related to the conduct in question.  Sutter's shares are

22    higher, so say our allegations.  The nonSutter shares are

23    lower.  That means that it's not exogenous from the conduct.

24          If you look at Footnote 16 of our brief, we cite economic

25    literature that says the inputs have to be exogenous from the

conduct.  That's why she didn't want to use HHI.

So what she did was she used this number-of-competitors variable, which, by the way, is supported by academic literature, particularly when there's an endogeneity problem like you have here.  And the number-of-procompetitors variable demonstrates that you're not affected by the conduct at all because it's not based on share.

Now, what Mr. Kiernan showed you -- I hope I have the right slide because I don't have his slide deck in front of me. I do have it over there, but I'm trying to go fast, Your Honor.

He showed you a slide -- one sec.  Ah.  Thank you.

His slide 22, if you look at it again, he showed you that slide with the pictures of three hospitals, CPMC.

**THE COURT:**  Yes, exactly.  I remember it.

**MR. CANTOR:**  Okay.  So what he said there is two things.  He said, well, look at this.  You've got three different hospitals here with very different amounts of beds. Chinese Hospital is small compared to these guys.  How could they be weighted equally in a competitive way?

Dr. Chipty -- remember what I said about the *Wendell* case? You have to look at her regression in the aggregate.  You have to look at it holistically.  She has a number of beds explanatory variable.  She has an explanatory variable for academic medical centers which identifies that UCSF would be weighted more heavily than the other two hospitals.

1      So she took this into account with respect to all of her

2  various explanatory variables.  And you can look at Exhibit --

3  I'm sorry, you could look at Exhibit P9, which is her

4  supplemental report, Exhibit C-1 of that.  Okay.  That

5  identifies the various explanatory variables that she utilized.

6  So that's taken into account for with other variables.

7      The other thing that's really critical here is he

8  criticizes Dr. Chipty in Slide 23.  He says that her analysis

9  doesn't show that there's a lesser or a greater price effect

10  when there's more competition.  He just interprets it wrong.

11  That is not true.  He's wrong.

12      It does show the numbers go up and it shows that there's a

13  greater effect on prices when there's more competitors in the

14  market.  That's what it says.  It says negative 3.4.  Number 10

15  says negative .66.  So that's just a wrong interpretation.

16      But what's critical here is what happens to Dr. Willig's

17  regression with respect to HHI, and we mentioned this in the

18  brief.  So Dr. Willig -- if you look at Exhibit 23 -- sorry,

19  Exhibit 19 -- say that again -- it's Exhibit 19 to the Cantor

20  declaration.  Tables 9 and 10, this is Dr. Willig's report from

21  this year on damages, okay?  You'll see there he lists his

22  explanatory variables.  And then he identifies whether they're

23  statistically significant for each of the health plans.

24      And what you'll see -- and you know if it's statistically

25  significant or not if there's a star or two stars or three

1    stars next to the number.  For United Healthcare and for

2    Health Net, no stars.

3        His HHI variable cannot estimate any impact on price for

4    two of the health plans.  That is nonsensical.  That's

5    impossible.  But that's where he lands.  HHI, for these

6    purposes where you're measuring historic price, is not a good

7    variable because it's not exogenous to the --

8        **THE COURT:**  All right.  It's all very helpful.  That's

9    all very helpful.

10       Okay.  So let's talk about the exclusion -- inclusion of

11   nonclass members.  You know, I understand weight not

12   admissibility.  Let's just assume for argument's sake that I'm

13   with you and we'll go that way.

14       But you had specific facts -- specific arguments about why

15   Mr. Kiernan was wrong.  Let's have you tell me that.

16       **MR. CANTOR:**  Okay.  So --

17       **THE COURT:**  So one is that -- one is -- he had two

18   points.  One is, you can't fix it; and, two, we talked a little

19   bit about what Dr. Willig did or didn't do.  And so those are,

20   I think, the two points that are worth discussing.

21       **MR. CANTOR:**  And there's one more point about how

22   they're wrong with respect to flex-funded and Blue Card plans.

23       **THE COURT:**  Okay.  That's fine.  That's good.  All

24   right.

25       **MR. CANTOR:**  So the first thing is you don't have to

1  fix it because this is an estimate.

2      **THE COURT:**  Okay.  That goes back to your point about

3  method.  Okay.  That's fine.

4      **MR. CANTOR:**  Again, what happened here, this was not

5  Dr. Willig.  Dr. Willig did not identify whether any plans or

6  products were not fully insured, were out of state, or were

7  dental plans.  Sutter did that.  Sutter made that

8  determination -- I'm sorry, not Sutter.  Jones Day did that.

9  That's not even admissible stuff.

10     **THE COURT:**  Okay.  Well, we'll get to that, because I

11 think that's the only point that I think I want Mr. Kiernan to

12 comment on after this.

13     **MR. CANTOR:**  If you look at this chart -- so it's in

14 the Shapiro declaration, Sutter says it's about $33 million

15 worth of damages out of the $428 million estimate that are

16 inflated.

17     First, if you go to Exhibit 61 of the Shapiro declaration,

18 you'll see that they say these products are not -- have no

19 damages hospitals in them and, therefore, should not have been

20 included here.  Okay.

21     Anthem Pathway PPO is one of those products.  At Exhibits

22 P74 and P75 of my declaration, we gave you the Anthem contracts

23 with Sutter that identify that, indeed, Sutter damages

24 hospitals -- and it's not one, it's a few -- are part of those

25 PPO networks.  That was an $18.5 million error by Jones Day.

1          The CalPERS issue, okay, what we said in our objections --

2     and maybe they could have been framed a little bit more

3     succinctly, but we didn't say CalPERS doesn't have a fully

4     insured product.  Of course, it does.  The facts are the facts.

5     It has a self-insured product, and we objected to documents

6     concerning that.

7          But the fully insured products, Your Honor -- I wish that

8     the typing here was greater.  I just pulled this out of the

9     Shapiro declaration.  I don't know if you can see it.  It's

10    Exhibit 46, so you can go, you know, to look at it when you

11    have an opportunity.  You'll see these are the CalPERS

12    products.  It's impossible to see it clearly.

13          **THE COURT:**  It is impossible to see it.  Your screen

14    is not an ELMO.  Your screen is not an ELMO.

15          **MR. CANTOR:**  What you see here -- what you're going to

16    see here in this first row is CalPERS.  This is Exhibit 46 of

17    the Shapiro declaration.  What you're going to see in the next

18    row, it says "Commercial HMO, Commercial PPO."  These are

19    commercial fully insured products.

20          It then says "Regulator."  And it says "DMHC," Department

21    of Managed Health Care.  The Department of Managed Health Care

22    only regulates fully insured products.  They're fully insured

23    products, they should be included in the damages.  There's no

24    basis to exclude them from damages.  That's a $6 million error.

25          "Flex-funded and Blue Cards."  Sutter says Blue Card

1    products, they shouldn't be included at all because they're not

2    really fully insureds products.

3        Your Honor, look at Exhibit 74 -- is it 74?  Hold on, let

4    me make sure I give you the right exhibit.  Yes.

5        Look at Exhibit 74 of my declaration.  There's Anthem data

6    there that identifies Blue Card.  And it says for each and

7    every one of those fully insured, fully insured, fully insured,

8    fully insured.  The Blue Card products are fully insured, they

9    should be in the class.

10       Even if you bought Sutter's argument, what they did in

11   their lawyer's declaration -- and, by the way, this is

12   something that might be helpful.  All this is laid out at

13   paragraphs 96 through 118 of the Cantor declaration.  Okay?

14       Here, Ms. Shapiro, what she did, she took Dr. Willig's

15   database -- remember I told you he did prepare a database that

16   apportioned damages based on Dr. Chipty's code to these

17   products and plans.

18       She searched it, and she put in the letters "BC" for Blue

19   Card.  But what she came out with for some of those products

20   were Blue Cross of California.  BC is within Blue Cross of

21   California product.  That's Anthem.  They were fully insured

22   products.  That was a million-dollar error by them.

23       So all these products should be included in the --

24            **THE COURT:**  Okay.

25            **MR. CANTOR:**  -- damages estimate.  But if you bought

their argument, their search errors show that they had a

million-dollar error there.

Lastly, flex funded.  So they say flex-funded products

clearly are not fully insured.

Go to Exhibit P77 of my declaration.  You'll see a

declaration there from a Blue Shield witness and audit

consultant named Megan Murphy.  Ms. Murphy, in paragraph 23,

says that flex-funded products are fully insured.  That's

factual.  That's what she says.

**THE COURT:**  Okay.  So you quarrel -- that's fine.  You

quarrel with the contention that Dr. Chipty wrongly included

class members.  Well, that's fine.

**MR. CANTOR:**  So there were certain -- you know, there

are certain -- I will just say this.  There are certain things

that Mr. Kiernan mentioned, okay, that they're just taking

issue with the data.

Like, there were certain plans that were listed as dental

plans.  The data, you know, in an anomaly, may have listed it

as fully insured.  For that, I just want to give you the

numbers we're talking about because it's so ridiculously minor.

Out-of-state plans that they say exist that were in the

data, $3,878.  Medicare plans, 136,000.  It's not 428 million.

Dental plans, 104,000.  These are *de minimus* issues.  They do

not undermine the reasonableness of her opinion.

And, lastly, I will say Dr. Willig, again, did not total

the alleged overinflated damages or the number of alleged
unharmed class members.  He didn't provide any total,
whatsoever, of that.  That is not part of his opinion.  And, in
fact, in the motion to exclude Dr. Willig, they concede that he
will not provide those opinions.

     **THE COURT:**  Okay.  So let's try to wrap it up in five
minutes.  We've got to do something better with our day.  It's
literally 1:00 o'clock, and you have four more hours left in
*Daubert*.

     **MR. CANTOR:**  I'm going to wrap it up in three, Your
Honor.

     **THE COURT:**  Okay.  Good.

     **MR. CANTOR:**  The conservative nature of the estimate.
One thing -- they said she should not be able to say her
estimate is conservative.

    Dr. Chipty, in her supplemental report, identifies -- you
may remember with the passthrough rate calculation, that she
capped her individual passthrough rates at a hundred percent
even though some of them showed passthrough like 110 or
120 percent.

    Dr. Flamm didn't do that in *Qualcomm*.  Other experts
haven't done that.  But she did it to be conservative.  This
identifies that if she didn't cap her passthrough rates at a
hundred percent, there would have been an additional
$60 million worth of damages.  She should be able to testify to

```
 1    this.  Okay?

 2         THE COURT:  I've already said that she could testify

 3    about what she considered in forming her opinions; right.  So

 4    that's --

 5         MR. CANTOR:  Then the other things that they point

 6    to -- they point to a couple of other things.

 7         First, they say, well, she shouldn't be able to say that

 8    there were Santa Rosa damages.  But she quantified for Anthem

 9    Santa Rosa damages.  She didn't quantify it for the other

10    plans.  But if she would have included that in the Anthem

11    portion of the damages estimate --

12         THE COURT:  Well, that's different.  My ruling was

13    much simpler.  If she was unable or failed to calculate

14    damages -- and those were two examples but there are others --

15    then she can't testify that that's a basis for her damages

16    calculations being conservative.  She just can't do that.

17         MR. CANTOR:  I agree.  Where she did, like for

18    Anthem --

19         THE COURT:  If she calculated, that's different.

20    That's different.  If she reached certain conclusions and then

21    narrowed it to be conservative, she can talk about that, too.

22         All right.  So just anything in, like, two minutes,

23    Mr. Kiernan, you want to say --

24         MR. KIERNAN:  Yeah.

25         THE COURT:  -- then I'm going to have you tell us what
```

1  the plan is going to be for the rest of the afternoon.

2          **MR. CANTOR:**  Your Honor, thank you for listening.

3          **THE COURT:**  This is an important witness.  And, also,

4  it is good for me to know what the expert case is going to

5  sound like.  And it's much faster to talk it through than it is

6  to sit there laboring in solitary splendor at my conference

7  table.  So it was useful.

8      All right.  Mr. Kiernan.

9          **MR. KIERNAN:**  Okay.  Your Honor, I'm not going to

10  address the liability arguments made by Mr. Cantor --

11          **THE COURT:**  You don't need to.  And I've got a whole

12  approach to how I can deal with the issues, because I have a

13  plan.  So, yes.  Okay.

14          **MR. KIERNAN:**  Okay.  With respect to your question

15  about Dr. Willig and --

16          **THE COURT:**  What he did.

17          **MR. KIERNAN:**  -- what he did, which is spelled out in

18  our papers, spelled out in the declaration, I mentioned during

19  my argument, I referred to Dr. Willig and the Shapiro

20  declaration because they go together.  Dr. Willig did the

21  calculation of damages for the class members.  He's the only

22  one who can do it.  He's an economist.  He ran a regression

23  model.  I couldn't do it.  Shaina Shapiro couldn't do.  No one

24  at Jones Day --

25          **THE COURT:**  No, I understand that he actually took her

1  formula and ran it and then apportioned damages to the

2  entities.

3  　　　　　MR. KIERNAN:  To each of the entities; right.

4  　　　　　THE COURT:  Yes.  And which, presumably, can be done

5  because it's all part of Dr. Chipty's damages model.

6  　　　　　MR. KIERNAN:  Right.  Although Dr. Chipty didn't do

7  it, so we had to have --

8  　　　　　THE COURT:  No, I know.  That's fine.

9  　　　　　MR. KIERNAN:  Dr. Willig did.

10  　　　What we did, Your Honor, is we took those damages tables

11  that included everybody, and then -- and this is explained in

12  the declaration -- and then we filtered it so that it

13  included -- I'll just make it up -- the flex-funded plans or

14  CalPERS.  And that's what Mr. Cantor was showing you.

15  　　　So we took it, we found all the CalPERS from the data and

16  the calculations that Dr. Willig had calculated, put it in the

17  table and then added it up.

18  　　　So, in any event, that's all explained in the documents.

19  I hope that's clear the way I just described it.

20  　　　　　THE COURT:  Yeah, I do understand.  That's fine.  All

21  right.

22  　　　　　MR. KIERNAN:  If I can just real quick -- and I'm

23  going to rattle through these.  One is, our reply brief does

24  address the cases cited by Mr. Cantor.  You will see that

25  throughout --

1    When you look at the cases, the *Eggs* case, all that stood

2    for was that an expert can use and look at evidence that's in

3    the record.  That's very different from what we were talking

4    about here, which is an expert cannot find facts.  They can

5    rely on and assume predicate facts brought into trial.  That's

6    okay as a basis for an opinion, but it cannot opine on the

7    ultimate fact or make factual findings --

8         **THE COURT:**  No, I understand that.

9         **MR. KIERNAN:**  -- to the jury.

10        **THE COURT:**  I understand that.

11        **MR. KIERNAN:**  The last two points, Your Honor, was on

12   the nonpar rate.

13        When you go back and you look at the reports and look at

14   the briefs and the argument today with respect to the nonpar

15   rate -- and Mr. Cantor confirmed what I said -- when she opines

16   that the rate is higher than competitive rates, she's relying

17   solely upon testimony from the health plans.

18        So she basically reads documents and then adopts as her

19   own the opinion and statements of health plan.  That's improper

20   expert opinion.  We've cited to the cases that support that.

21   She has no basis for that opinion; therefore, it should be

22   stricken.

23        With respect to North/South and the cases, Mr. Cantor was

24   incorrect that we did not cite cases.  I direct you to page 11

25   of our brief and page 16, footnote 6.  Both those cases that we

cite exclude expert analysis, regressions and the like, in models that don't control for the variables that an economist should use when they're trying to explain --

THE COURT:  I shouldn't really say anything at all for the rest of the hearing just so we can survive the day, but I just don't find the regression cases to be, you know, sufficient or as persuasive as you do, because I think it's an unremarkable conclusion that if you don't control for things in a regression model that you shouldn't be able to rely -- things that really, really matter in a regression model -- we're talking about the Anthem North/South data; right?  So, of course, that makes sense in a regression model, but when -- this data exists, so it's not a question of -- and the conclusion isn't a regression conclusion.  It's a straight-up comparison.  It's no analysis at all.

And you're saying that the opinion -- and it's being used to support an overall opinion.  And so I don't think -- you know, it seems to me that it's very different from the kinds of cases where you exclude a regression analysis because of the predicates.

It's just a different kind of conclusion.  A regression analysis is one kind of a conclusion.  And this is a different one that is a liability conclusion that's more qualitative, I guess, is what I would say.  But I don't know.  You tell me why that's wrong in, like, 30 seconds.

 1          **MR. KIERNAN:**  Well, I think I want to spend another

 2   moment on different --

 3          **THE COURT:**  Okay.

 4          **MR. KIERNAN:**  It's for the reasons I've stated before,

 5   which is, I don't think there are different rules for

 6   regression.

 7          **THE COURT:**  That's okay.  We don't have to -- I'm

 8   mindful of your argument.  That's fine.  Okay.

 9          **MR. KIERNAN:**  Yeah.  The one thing I did want to

10   clarify and I realize -- probably because it was late in the

11   argument -- the slide 25 where I showed the nonsensical

12   results --

13          **THE COURT:**  Yes.

14          **MR. KIERNAN:**  -- I compared the wrong two numbers.

15   And what I should have compared was looking at one to four

16   competitors as negative .389 to nine competitors.  Therefore,

17   showing that having nine competitors results in -- pardon me --

18   having one to four competitors associated with lower prices

19   than having nine.  And if you look at having six competitors

20   you associate with lower prices than any other number of

21   competitive hospitals nearby.  This is explained in

22   Dr. Willig's rebuttal report at Table 4, and I just wanted to

23   clarify that for the record because I compared the wrong two

24   numbers.

25          Your Honor, with respect to the competition law -- or the

1    competition variable, Mr. Cantor and the plaintiffs focus on

2    Dr. Willig and HHI.  That's not the issue.  And just -- and

3    this is in our papers, but Dr. Willig used an HHI variable that

4    Dr. Chipty had used at class and then she dropped presumably

5    because she saw the impact when Dr. Willig used it.

6        What we're focusing on is Dr. Chipty's use of a variable

7    that's never been used.

8        **THE COURT:**  No, I understood that.  I thought what

9    Mr. Cantor said was referred me to the footnote and suggested

10   it had been used.  That's -- I'm not sure.

11       **MR. CANTOR:**  That is what I did, Your Honor --

12       **THE COURT:**  Okay.  We're finished with Dr. Chipty.

13       **MR. CANTOR:**  Your Honor, can I say one thing?  I

14   miscited -- I want to make sure -- for the Anthem PPO point,

15   the contracts, I gave you the wrong cite.  Those are -- those

16   contracts are at Exhibit P75 and P76 of my declaration.  I

17   think I gave you the wrong numbers.  That's it.

18       **THE COURT:**  Okay.  That's fine.

19       So, listen.  Okay.  So, one, my approach going forward --

20   just, again, to reiterate what I said at the beginning of the

21   hearing -- we're going to take a break now -- is my approach is

22   I've gone through your arguments, I've gone through the briefs,

23   I've organized my thoughts, and I'm slogging my way through

24   every single pincite that you give me in your briefs for

25   today -- on the record, I wrote down a couple of things -- to

1 verify the assertions made by the experts; right?

2     So that's what I'm doing.  You know, for example, what I

3 have not done -- although I read Chipty previously, I had

4 written down that one of my fact points that I need to do is I

5 need to look at paragraphs 98 and 99 of Exhibit 6 to the

6 Shapiro declaration.  So that's one of my to-dos.  So I'm doing

7 that for each of your -- each -- for each of you.

8     And so you can have that level of confidence in my total

9 review.  And if I could have gotten through it before the

10 hearing today, this would have been -- because, initially, I

11 thought to myself, ah, I will let you talk me through the fact

12 points because who has the time to read through 17,000 pages of

13 *Daubert* issues.

14     I changed my mind.  And I almost said -- I thought of it

15 earlier -- one of my favorite things to do is make the lawyer

16 my paralegals.  I might have had you give me, you know, a

17 shorter version of your exhibits, but it was too late by that

18 point.  So I can do it. I can flip through the binders.  That's

19 what I'm doing.

20     So now what are we doing the rest of the afternoon?

21 Today's *Daubert*.  We're taking a half-hour break.  I've got a

22 timer.  This is to remind me to get up from my sit/stand desk.

23 I'm putting it on 30 minutes.  We'll be back in 30 minutes.

24     We started with -- we started with Chipty because I viewed

25 that as Sutter's most important motion.

1        So Mr. Cantor gets to go next.  Whatever you want -- you

2   guys needs to prioritize what you want to talk about.  Take off

3   the table what I care about.  I understand Willig.  If it's

4   important to you, we can talk about it.

5        But, for example, Sutter's next thing on their list was

6   Kaiser, so I assume Kaiser probably is the thing that -- when

7   we come back to Sutter, that Chipty is going to want to talk

8   about -- or Sutter is going to want to talk about Kaiser.

9        But your turn next, Mr. Cantor, so you pick whatever you

10  want to talk about, then it'll flip back to Sutter, and

11  we'll -- and then you need to allocate your time accordingly.

12  I have a ton of questions, but it's taking too long, so we just

13  got to get through what you want to tell me.

14       And it's most helpful for me to deal with the challenges

15  that you make to the reliability of the expert opinions as

16  grounded in the facts that the experts assert as predicates for

17  their opinion.  That's what I was trying to push here today.

18       You know, I do -- as Judge Lynch once said, when I was a

19  baby lawyer appearing before him, and the lawyers postponed a

20  hearing at the last minute, he said, "I do wish you would tell

21  me."  I told him in court. "I do wish you would tell me. I

22  prepare."

23       So I just want you guys to know I've read everything,

24  right, and I'm working my way through the opinions.  That's

25  what we've got to do.

```
 1        Okay.  So --
 2             MR. LEVEE:  Your Honor --
 3             THE COURT:  -- who are you going to go with?
 4        Yes, Mr. LeVee.
 5             MR. LEVEE:  I just wanted to say, if there is an
 6   opportunity to also hit the spoliation motion --
 7             THE COURT:  Yeah, I'm happy -- I would like to get
 8   through -- look, on my agenda today was Daubert, spoliation,
 9   motions in limine.  And I was hoping that we could talk about
10   trial mechanics.
11        And then I thought we would talk about jury instructions
12   next week.  Normally do an instructions conference, but
13   because this is a complicated case I wanted to do an
14   instructions conference now, you know, next week or whatever,
15   and then do another one at trial.
16        But I thought it would get everybody -- helpful to, you
17   know, kind of get a sense of what the landscape looks like,
18   including for me, especially with some of the arguments about
19   the per se, tying stuff.  And I am interested in reading the
20   cases, and I didn't have to for the Daubert motions.  That's
21   what I thought.
22        But, yes, I'm happy to do spoliation.  And I'm good to go.
23   I mean, I'm through motions in limine, you know.  So I'm going
24   to take the break.  But we'll take the --
25        So allocate your time accordingly.  If you guys want to
```

```
 1    have a brief -- Elaine will stop recording.  If you guys want

 2    to chat with each other for a minute about how you want to

 3    allocate the rest of the afternoon.

 4         As I said, you enjoy the advantage that we do not, which

 5    is I'm not starting the 30 minutes until you -- Kathy can stop

 6    reporting.  Elaine can stop recording.

 7         Kathy, you can stop reporting.

 8                    (Recess taken at 1:16 p.m.m.)

 9                    (Proceedings resumed at 1:53 p.m.)

10         MR. SU:  Good afternoon, Your Honor.  Henry Su from

11    Constantine Cannon.  I'll be arguing the Willig motion.

12         THE COURT:  Okay.

13         MR. SU:  And I will keep it to ten minutes or less.

14         So I'd like to start, Your Honor, with our proposed order

15    and the five elements of relief that are in the order, and to

16    basically tick off the ones that I think, based on the parties'

17    papers as well as the exchange that's occurred this morning

18    with respect to Dr. Chipty, are nondisputes.

19         THE COURT:  I should give you tentatives on this.  I

20    think it's all fine what you want to do with Dr. Willig, you

21    know, so I just will tell you that.  Okay?

22         MR. SU:  Okay.  Fine.

23         THE COURT:  So maybe -- you may want to emphasize

24    things, you know, you acknowledge that -- so, wait.  So --

25    sorry.  I'm sorry.
```

1    I think what Dr. Willig wants to testify -- sorry -- is

2    fine.  Not what you want is fine.  What Dr. Willig wants to

3    testify about.  So just stick to the facts and not the law, and

4    I think we'll be fine.

5        **MR. SU:**  Okay.

6        **THE COURT:**  I don't see why there's a problem with any

7    of that subject to the kind of Chipty analysis that I put about

8    the fair scope of expert testimony.

9        Okay.  Go.

10       **MR. SU:**  All right.  So really quickly going through

11   our proposed order, I believe the parties are in agreement

12   about what Dr. Willig can or cannot testify about quality.

13       In Sutter's opposition papers they admit that he doesn't

14   offer independent judgment of Sutter's quality and he doesn't

15   offer an opinion on Sutter's relative quality.  So I think

16   that -- that request for relief should be granted.  I don't

17   think there's any issue about that.

18       I think both Dr. Chipty and Dr. --

19       **THE COURT:**  All the stuff you've agreed on, I've

20   already written an order that, you know, sticks to what the

21   parties agreed to; right?  Sutter agrees, but Sutter says

22   there's stuff he can testify about, and that seems okay to me.

23   Okay.

24       **MR. SU:**  All right.  Just, again, really quickly, the

25   third request for relief from a legal meaning of contract, both

1    sides agree that economists can't talk about a legal meaning of

2    contract.  They can talk about economic significance of certain

3    terms, but they can't talk about legal meaning.  So that's

4    done.

5                **THE COURT:**  Yep.

6           **MR. SU:**  Number 4 in our proposed order, this relates

7    to whether Dr. Willig has an opinion on whether certain

8    entities or group are in the class.  And I know that there was

9    a lot of exchange between Mr. Kiernan and Mr. Cantor about that

10   already.

11        Our position is that Dr. Willig has said, I don't offer an

12   opinion on that.

13               **THE COURT:**  Exactly.  He's not going to testify about

14   what entities are in the class.  He can talk about his

15   apportionment of damages.

16           **MR. SU:**  Right.  So that then leaves us with Number 1

17   and Number 5 in our proposed order.

18        Number 1 relates to these procompetitive benefits and what

19   Dr. Willig can or cannot say about them.

20        Number 5 relates to his point about free-riding.

21        On Number 1, I want to put a pin on it.  I know that we'll

22   have a charging conference with Your Honor about the

23   instructions --

24               **THE COURT:**  Yeah, I just went right to the rule of

25   reason argument.  So I skipped it.  And I didn't look at the

cases because I was told I didn't need to, and who had the

time.  But I will look at it in context of jury instructions,

so that's fine.  So kick it down the road.

**MR. SU:**  Our position is Dr. Willig --

**THE COURT:**  I understand your position.  You say he

only gets there for rule of reason.  Sutter says there's a ton

of cases for per se tying.  We'll deal with it at jury

instructions.  That obviously -- sorry, Kathy -- that applies.

Okay.  Next point.

**MR. SU:**  So then where Dr. Willig comes in is at step

two of the rule of reason.  I know I heard Your Honor say this

morning that, you know, obviously it seems like Sutter's saying

that the contracts aren't even anticompetitive in the first

place.  But assuming -- and we will prove that there -- there

are anticompetitive effects, then under the rule of reason we

go to step two.

And that's where we are with this motion is what

Dr. Willig can or cannot say about step two, which is that the

defendant has the burden of persuading the trier of fact that

there are procompetitive benefits.

And the law has been very clear on this, but obviously the

most recent statement on this comes from the *Alston* case;

right.  And the *Alston* case, as Mr. Cantor mentioned, Justice

Gorsuch had an opinion and talked about, you know, this

requirement of a direct connection between the challenged

provisions and the procompetitive benefits.  That would be a
direct connection.

     And that wasn't -- Justice Gorsuch didn't just come up
with that language himself.  It actually came from
Judge Wilken.  It was in Judge Wilken's opinion where she
actually struck Dr. Elzinga from testifying about consumer
demand because he could not demonstrate this direct connection
between these, you know, rules and compensation that the NCAA
was enforcing and this argument about consumer demand.

     So our point, Your Honor, is that the *Alston* case, you
know, from Judge Wilken to the Ninth Circuit, all the way to
the Supreme Court, it's very consistent.  You have to show --
if something like consumer demand is your procompetitive
justification, you've got to show that the challenge
provisions, you know, enable, they directly cause and are
necessary to those benefits.  There's got to be that direct
connection.

     **THE COURT:**  But Sutter acknowledged that the testimony
of connection comes from its fact witnesses.  So, again, I
don't think we need to worry about this point.

     **MR. SU:**  Well, so that's where I think -- you know,
the point here is Dr. Willig really doesn't go far enough;
right.  In both his expert report and in his depositions, he
says, I can't tell you.  I can't tell you that these caused
Sutter --

1    **THE COURT:**  Right.  And he cannot testify about the

2   terms causing procompetitive effects.  But his expert testimony

3   is helpful to the jury to understand the concepts so -- because

4   Sutter's fact witness will talk about it.  So everybody agrees.

5    I wouldn't waste -- I don't mean -- I'm delighted that you

6   have an opportunity to argue a motion, but it would be good to

7   get through more stuff today, if we could.  So I think

8   everybody is right here.

9    **MR. SU:**  So, Your Honor, if I may, then, let me get to

10  that point about Sutter's other witnesses.  Here's the problem.

11  Dr. Willig can't say in court at trial -- he can't tell the

12  jury, see, Sutter's witnesses A, B, C, and D said this, this is

13  why there's a procompetitive justification.  He doesn't do that

14  because it's not in his report.

15    **THE COURT:**  Well, of course, as with any expert, what

16  he can testify is confined by what he says in his report.

17    **MR. SU:**  Right.  But he never talked to any of these

18  witnesses in advance.

19    **THE COURT:**  I understand.  It's not in his report.

20  And my read of what you all told me, subject again to my going

21  through and reading the individual paragraphs, is that he's

22  going to -- he's going to testify that there can be logical

23  connections.  He can talk about what procompetitive benefits

24  might be.

25    And my understanding is he's generally talking about the

concepts, whereas, the proof of the link of the challenged

contracting practices to the allegedly procompetitive benefits

is through evidence of fact witnesses.

**MR. SU:** And, Your Honor, the point here, though, is,

again, the *Alston* case is instructive on this because

Judge Wilken precluded Dr. Elzinga from talking about this

stuff because she held he did not analyze, for instance,

whether changes to the compensation rules affected consumer

demand.

**THE COURT:** Right. That was your concern in your -- I

will say that he cannot testify about the terms. I mean, my

order says that.

**MR. SU:** Okay.

**THE COURT:** Yeah. It says what he can't testify to

and what he can. So I think you're fine. You're covered.

I recognize that you said in your reply that you were

concerned that Sutter's concession meant that you should still

get an order. Fine. It's in the order.

**MR. SU:** It's just that our main point, Your Honor, is

that then Sutter has no one to tie this all together.

**THE COURT:** Well, that's Sutter's problem, not yours.

**MR. SU:** Right. And our concern is then the jury --

what Dr. Willig said is not helpful to the jury as the trier of

fact.

**THE COURT:** Well, I think somebody needs --

 1          **MR. SU:**  He's going to say, okay, Sutter's witnesses,

 2    you'll hear from them, you make your own decision, I can't help

 3    you, I can't talk about what they're going to say.

 4          **THE COURT:**  I think what -- he would talk about how

 5    contracting practices provide efficiencies and can be

 6    procompetitive events.

 7          Let's hear from Mr. Kiernan what he -- I mean -- okay.  So

 8    I understand --

 9          **MR. SU:**  Okay.

10          **THE COURT:**  -- that point.

11          **MR. SU:**  I will stop here.

12          **THE COURT:**  Okay.

13          **MR. SU:**  That's --

14          **THE COURT:**  Mr. Kiernan, the only thing I care about

15    is this point that we've been talking about.  Everything else

16    is easy.

17          **MR. KIERNAN:**  Yeah.  So because it's related to this

18    particular point -- I, of course, know Dr. Willig very well,

19    but since this particular point is related also to an MIL and a

20    jury instruction Mr. Stewart is handling, I'm going to ask

21    Mr. Stewart to address this question and issue.

22          **THE COURT:**  Okay.

23          **MR. STEWART:**  Thank you, Your Honor.  Craig Stewart.

24          A couple of points I wanted to make specifically on what

25    we were just talking about.  I think Your Honor has it exactly

1    correct in describing what Willig will do and what parts of it

2    will be supplied by other witnesses.

3        The point I want to emphasize, however, is this debate

4    about the type of connection that must be shown.  Counsel was

5    arguing about the *Alston* case and the Supreme Court's reference

6    to showing a direct connection, and there's been discussion

7    about who has the burden with respect to, you know, whether

8    it's narrowly tailored and what the level of causation must be

9    shown is.

10       And I think all of that is going to be addressed in the

11   jury instructions, and we'd just urge the Court to -- the only

12   issue on this motion is who must supply -- whatever the causal

13   connection is that must be shown, the question -- the only

14   question on this motion is does -- does Willig himself have to

15   show that?

16       **THE COURT:**  The answer -- and your answer is no;

17   right?

18       **MR. STEWART:**  No, he doesn't.

19       **THE COURT:**  Right.

20       **MR. STEWART:**  And we've cited cases in our brief.  The

21   expert doesn't have to opine on every issue; right.

22       So they cite --

23       **THE COURT:**  It's fine.  It's fine.  I think putting it

24   in through fact witnesses is fine.

25       **MR. STEWART:**  Yeah.

1       **THE COURT:**  They're the -- it's the business

2 justification for the practice.  It seems that it's very well

3 suited for fact witness testimony.

4       **MR. STEWART:**  Exactly.

5       **THE COURT:**  I mean, it's the business model.  It's

6 Sutter's business model.  That's why you say, this isn't tying;

7 this is why we do it; we're the business guys; we do stuff for

8 these reasons, to get revenue, presumably; and then we spend

9 our revenue for investments and quality of care and all the

10 other stuff we do.  And so it's the business model.  Got it.

11     Motion denied.  How about that?  We can move on to the

12 next one.

13       **MR. KIERNAN:**  Thank you, Your Honor.

14       **MR. STEWART:**  Thank you, Your Honor.

15       **THE COURT:**  All right.  So that's easy; right?  It's

16 easy for me.

17     Mr. Su is right about the overall -- like, how useful is

18 the expert on this point.  I think there's some utility to

19 explain kind of generally, but other than that, no.

20     So, anyway, next motion.  We're going to talk

21 Gowrisankaran.  Fifteen minutes on.

22       **MR. LEVEE:**  You can rejoin us, Matt.  Otherwise, I'm

23 going to argue the motion for him.

24       **MR. CANTOR:**  You're going to argue the motion for me?

25       **MR. LEVEE:**  Yes.

1          **MR. CANTOR:**  All right.  You're pretty good at that.

2          **MR. LEVEE:**  I offered to stipulate on the papers.  I

3    think maybe the Judge was going to give us a tentative.  Oh,

4    no, no, that was spoliation.  Never mind.

5          **THE COURT:**  That was spoliation.  So sorry.

6      My timer just literally ran out of batteries.  Just shows

7    you how much -- I've been timing myself with work.

8          **MR. LEVEE:**  I could time Mr. Cantor.

9          **THE COURT:**  So we're doing Gowrisankaran.

10          **MR. LEVEE:**  I'm sorry.

11          **THE COURT:**  Yeah, so this is the plaintiffs' motion to

12    exclude and, you know, the erring by excluding Kaiser.  I'll

13    just tell you what I think, and then you guys can tailor your

14    arguments accordingly.

15      I don't think that -- you know, Sutter doesn't accept your

16    two-stage model.  It doesn't accept your theory of the case;

17    right?  And so he accounted for the model.  He did his analyses

18    and says you should have included Kaiser.

19      And Judge Massulo went against you in state court, and I

20    think it's fair -- just like with Chipty, stuff ends up

21    going -- you can argue.  I think it's helpful and relevant to

22    whether evidence is relevant to whether the plaintiffs' market

23    definition is too narrow, and I think it comes in.

24      So that's what I think, but tell me in 15 minutes why

25    that's wrong.

1    **MR. LEVEE:**  Just to be clear, Sutter would stipulate

2  to that --

3          **THE COURT:**  Yeah.

4          **MR. LEVEE:**  -- and submit on the tentative.

5          **THE COURT:**  Yeah, because you won; right?

6          **MR. LEVEE:**  Yes.  But I'll also --

7          **THE COURT:**  Mr. Cantor might want to say something.

8          **MR. LEVEE:**  No, no.  Of course, Mr. Cantor should

9  argue.  But at the end of his argument, if you would like for

10  me not to argue on --

11          **THE COURT:**  If you win, you may not need to unless you

12  think there's something you need to respond to.

13          **MR. LEVEE:**  If we do, we'll let you know.

14          **THE COURT:**  Yep.

15      **MR. CANTOR:**  So, Your Honor, this is different than

16  the Chipty motion, and there's a couple of reasons why this is

17  different.

18      First of all, there's law.  And the law states -- hold on

19  one second.  The law states -- and this comes from the motion

20  for summary judgment, that order -- are you there, Your Honor?

21          **THE COURT:**  I'm here.  Sorry.  I'm just grabbing

22  something to try to fix my timer.  I'm listening raptly.  Okay.

23      **MR. CANTOR:**  Okay.  The law from your motion for

24  summary judgment order, which follows the Ninth Circuit in this

25  case, which follows the Ninth Circuit in *St. Adolphus versus*

*St. Luke's* -- and you cited that *St. Luke's* case over 20 times in your summary judgment order -- that states that as a matter of law in a healthcare provider case concerning the creation enhancement or exercise of market power over health plans, you have to define the market from the perspective of health plans.

It says the vast majority of healthcare consumers are not direct purchasers of healthcare.  The correct focus is on the likely response of insurers to a hypothetical demand by all the hospitals in a particular market for a SSNIP.

You then say, here, the consumers, responding to a hypothetical-monopolist's SSNIP are health plans, not the health plan enrollees, because health plans directly pay the hospital's price increases.

This is a matter of law.  Who the relevant consumer is, Your Honor, is something that you have to -- have to instruct the jury on.  And in this case it's health plans.

Sutter says, but this is an issue of fact, market definition is an issue of fact.  That's generally true when you're looking at a particular set of consumers and you're saying is the market narrow or are there alternative products that make the market broad?

Are you still there, Your Honor?

**THE COURT:**  Yeah, I'm here.  I'm sorry.  I'm just dropping something, and I went off screen for a second.

**MR. CANTOR:**  The question there is, is the market

1    narrow or is the market broad from the perspective of one

2    consumer?  It's not an issue of fact as to who the relevant

3    consumer is for market definition purposes.

4        In fact, one of the cases that they cite is the *Thurman*

5    *Industries* case from the Ninth Circuit.  There it was

6    stipulated that the consumers who were relevant were the

7    purchasers of home goods.

8        So this issue is a matter of law.  I'll tell you another

9    case which is cited in our jury instruction brief, probably

10    should have cited it here as well, is the *Telecor*

11    *Communications* case.  That case is a Tenth Circuit case.

12        There the lower court -- it concerned pay phone services.

13    The lower court said pay phones, that can't be a relevant

14    market because, for consumers like Matt Cantor, natural person

15    consumers, they can substitute pay phone services with wireless

16    services.  So, clearly, that's too narrow a market.

17        However, the allegations in that case were that the

18    location owners, the entities that installed the phones were

19    the ones who were subject to the anticompetitive conduct.

20        The Court at the Tenth Circuit level said that dismissal

21    below was wrong because, as a matter of law, you have to define

22    the market from the perspective of the location owners, not

23    from the Matt Cantors of the world, not from the natural person

24    consumers of the world.

25        So this is a legal issue.  It's not a fact issue as to who

1    the relevant consumer is.  And the Ninth Circuit, like the

2    Third Circuit, like the Seventh Circuit, has held that the

3    relevant consumer in market definition is the health plan.

4        Also, Dr. Gowrisankaran -- this is critical that you

5    appreciate this.  The economic underpinnings of this is not in

6    dispute.  Dr. Gowrisankaran filed an amicus brief with other

7    economists in the Ninth Circuit in the *St. Luke's* case.  You

8    didn't have this, we didn't have this for summary judgment.

9        **THE COURT:**  I read it here.  I mean, you submitted it,

10   so I read it.

11       **MR. CANTOR:**  Good.  So the reality is here -- he's

12   never produced it to us, by the way.  I found it on the

13   Internet.  I just put his name.

14       When I asked him about it in 2019, he said --

15       **THE COURT:**  I read the depo too.  I read the depo too.

16       **MR. CANTOR:**  So what he says in the brief is the

17   following -- he says that -- I'll just read the third extract

18   here:  Courts -- not the *St. Luke's* court, not only this court,

19   courts should focus -- multiple -- on the likely responses of

20   insurers, not patients to post merger price increases when

21   defining geographic markets.

22       He also submitted a declaration in this case in support of

23   the motion for summary judgment.  And there he wrote, "It is

24   critical in this case."  So when you say they didn't accept the

25   two-stage view, they did.

1    It is critical --

2        **THE COURT:** Well, they have to, right, because the

3    whole idea is this is an indirect purchaser case, and the

4    health plans are the ones who negotiate with insurers in the

5    first place.

6        Of course, they have to account for the model, and he did

7    account for the model.  The issue -- well, you say he didn't

8    accept it.  He necessarily accepts it because this is an

9    indirect purchaser case and it's a passthrough that becomes

10   ultimately important in the case.

11       But the issue that he says is the product market is too

12   narrow, right.  The product market is too narrow.  And that

13   seems an -- that seems an unremarkable --

14       **MR. CANTOR:** No, he says the product market is too

15   narrow from the patients' perspective.

16       **THE COURT:** Right, exactly, because it excluded

17   Kaiser.  Exactly.

18       **MR. CANTOR:** That's not the relevant market.  Again,

19   the issue of the relevant market and how you define the market,

20   the perspective is a matter of law.  And it's been defined in

21   this case already in the motion for summary judgment and in the

22   Ninth Circuit that it is -- it's the health plan.

23       It would be error to allow to go to the jury, let them

24   make the factual determination -- it's not a factual

25   determination -- to let them make the determination at all as

1    to who the relevant consumer is.

2       In fact, he stated, again, in his original summary

3    judgment declaration, it's critical in this case to understand

4    whether HSA's geographic markets include a hospital's

5    competitors at the first stage of competition.

6         **THE COURT:**  Right, but here's the thing.  The health

7    plans obviously are the ones that negotiate with the -- with

8    Sutter; right?  So that's -- and the hospitals and the insurers

9    negotiate with each other.

10       And it has to be -- and I still have to do my due

11    diligence by checking all of your pincites for all the expert

12    evidence, but it has to be that Kaiser factors into how they

13    negotiate their rate with each other in the two-stage model.

14    That seems to me to be an unremarkable business reality.

15       So that's my reaction to it.  And Mr. LeVee will do a

16    better job than I am of understanding --

17         **MR. CANTOR:**  Your Honor, I understand that's your

18    gut --

19         **THE COURT:**  It's not my gut.  It's not my gut.  The

20    whole point about cases is they're about business models, and

21    this is a business model.

22         **MR. CANTOR:**  The evidence here does not show at all

23    that they take into account Kaiser when they're negotiating

24    rates.

25         **THE COURT:**  Well -- okay.

1          **MR. CANTOR:**  What it comes down to is that they

2     negotiate rates -- when Sutter raises rates, the key issue on

3     the market definition analysis is, if Sutter raises rates by a

4     certain percentage, could the health plan substitute for

5     Kaiser?  The answer is no, they cannot.  Absolutely not.

6          Kaiser is not an alternative --

7          **THE COURT:**  No, no, no, I see the point.

8          Okay.  Let's let Mr. LeVee just respond.

9          **MR. CANTOR:**  Can I just make one other point?

10          **THE COURT:**  Okay.  I don't think you need to talk

11     about the supplemental report.  I think that's --

12          **MR. CANTOR:**  Okay.

13          **THE COURT:**  I don't care.  I don't care.

14          **MR. CANTOR:**  The last thing I just want to say about

15     this is you mentioned they have to account for Kaiser.  That's

16     what you said.

17          **THE COURT:**  Well, I said that's what my reaction was.

18     You told me it was wrong.

19          **MR. CANTOR:**  Correct.

20          **THE COURT:**  We'll let Mr. LeVee tell me what I should

21     really be thinking.

22          **MR. CANTOR:**  Well, okay, because I want you to know

23     what you should really be thinking is that's not the issue.

24     Even if that -- and they don't account for Kaiser.

25          But even if that was the issue, that they had to account

1    for Kaiser, okay, the issue is whether the accounting for

2    Kaiser was so great that a hypothetical monopolist could not

3    raise rates to health plans.  That's the issue.  Does it

4    constrain pricing enough to stop a hypothetical monopolist of

5    hospital services from raising prices to health plans?

6          **THE COURT:**  Exactly.

7          **MR. CANTOR:**  And he doesn't answer that question.  He

8    doesn't say that anywhere in his reports.  He never says that.

9    He says, well, there may have been a price constraint, but he

10   does not -- I'm not saying he had to do an econometric

11   analysis.  He doesn't even conclude as a thought experiment

12   that that, in fact, is his conclusion.  That means his report

13   is of no moment.  And he's not answering the question which is

14   at the center of the market definition debate.

15       Okay.  I'll stop on that.

16          **THE COURT:**  All right.  Great.  Thanks.

17          **MR. LEVEE:**  Matt, can you take your slide deck down?

18          **MR. CANTOR:**  Yeah.  Hold on one second.

19       Is it down now?

20          **THE COURT:**  It is.

21          **MR. LEVEE:**  Yes.  Thank you.

22       Your Honor, you've already anticipated what I'm going to

23   say, so I'll be brief.

24       Plaintiffs' complaint defines the relevant product market

25   in a way as to exclude Kaiser.  And plaintiffs are entitled to

propose that definition, but that does not mean that Sutter has
to agree with that definition or that the jury is obligated to
accept it.

Dr. Gowrisankaran addresses the relevant product
definition and explains why it should include Kaiser.  And he
does so via analyses that are based on well-accepted economic
principles.

THE COURT:  Okay.  We're just going to say it's
weight, not admissibility.

You know, I told you guys before, once you buy Chipty,
what I do with Chipty, I don't think you've got a lot of
grounds to stand on kicking out Gowrisankaran's opinion,
Mr. Cantor.  It's a pretty big win, so --

(Unreportable simultaneous colloquy.)

THE COURT:  I know they're different.

MR. CANTOR:  If you give me a choice on keeping Chipty
and excluding Gowrisankaran, I'm obviously --

THE COURT:  Yeah. Yeah. Yeah.

So Mr. LeVee want to offer one more thing.  I'm sorry.

MR. LEVEE:  Well, maybe I don't.

Really, the entire argument that Mr. Cantor just gave is
an argument that he can give to the jury for cross-examination
of Dr. Gowrisankaran as to the two-stage method.

Dr. Gowrisankaran has answered those questions in
deposition.  He will answer them at trial.  And he will explain

the reason that Kaiser -- which, by the way, every year has

increasing commercial market share in hospital discharges.

They have more hospital discharges than most other hospital

systems combined in Northern California.  They are the

800-pound gorilla.

     And he will explain how that makes them relevant to the

product market definition and how the *amicus* brief that he

signed and the other briefs that Mr. Cantor has referenced are

all distinguishable, because none of those situations involved

Kaiser.  There is no Kaiser in Nampa, Idaho.

     And so, unless you have questions, I'm going to stop.

          **THE COURT:**  No, that's fine.  Let's go to Pilch.

          **MR. LEVEE:**  Okay.  Pilch it is.

          **THE COURT:**  Timer on for 30 minutes.

          **MR. LEVEE:**  So arguing the Pilch argument for our side

will be Mr. Bunzel.  And there he is, he's just joined.

          **MR. BUNZEL:**  Good afternoon.

          **THE COURT:**  Hi.

          **MR. CANTOR:**  And I will concede to Ms. Kim.  Ms. Kim

will argue for us.

          **MS. KIM:**  Can you hear me okay?

          **THE COURT:**  Yes.

          **MS. KIM:**  Not mic'd up because I don't want to be

tethered.

     Your Honor, you've probably heard this before on a *Daubert*

motion, but Sutter's proffered industry expert, Pilch,

Mr. Patrick Pilch, offers precisely the kinds of opinions that

*Daubert* was designed to exclude and over which this Court is

tasked with exercising its gatekeeping role to keep the jury

from confusion and preventing wasting of time at trial.

**THE COURT:** So let me just do a couple of

preliminaries. He will not offer economic opinions, period;

right? You asked about that.

And so that's -- you know, we don't have to regurgitate

those kinds of arguments. I know you're not making them, but

he -- you know, again, I look at this as -- it strays away from

the fact witnesses and into expert testimony about what the

fact witnesses will say about Sutter's business practices. And

that's ultimately what you object to; right?

**MS. KIM:** Absolutely. He's a mouthpiece for

percipient witnesses that Sutter has put on its will call --

**THE COURT:** Isn't Dr. Chipty the same?

**MS. KIM:** No, no, absolutely not. Absolutely not. I

mean, absolutely not, Your Honor.

**THE COURT:** On the liability case, not the damages

case, the liability case; right?

**MS. KIM:** She has conducted overcharge analyses and

regressions to support her opinions on -- on a liability case.

Her citations to the record and her review of the evidentiary

record was to corroborate her quantitative analysis. That's

1    not what is happening with Mr. Pilch.

2        I'd like to start by just by going over his lack of

3    credentials.  He's not qualified to offer his wide-ranging

4    opinions regarding the claimed procompetitive benefits of

5    Sutter's contracting practices.

6        And if I understood you correctly, are you excluding him

7    from testifying to the procompetitive benefits of Sutter's

8    contracting practices?

9        **THE COURT:**  I think -- he's not going to offer

10    economic opinions.  That's what I said.  I did not say that he

11    couldn't talk about -- I'm letting Dr. Willig testify about

12    procompetitive benefits.  And then my view is the expert

13    testimony here is also relevant to that analysis, right.  But

14    he -- you know, it's more or less following what Judge Massulo

15    did in the *UEBT* case.

16        **MS. KIM:**  Okay.  But just to put a finer point on

17    this, because economic opinions, in my mind, would encompass an

18    opinion that a certain set of supposed benefits are

19    procompetitive benefits because you're characterizing them as

20    benefiting competition, and Mr. Pilch is not an economist.  He

21    has no training in assessing healthcare economics.

22        **THE COURT:**  I agree that he shouldn't be -- my

23    understanding of what he'll testify to -- and please correct me

24    if I'm wrong -- and he talks about, you know, how it works --

25    you know, he's an operations guy -- and why people -- you know,

1    how -- Sutter's business is obviously coming in through

2    Sutter's fact witnesses, but he's going to talk about the

3    healthcare industry generally and Sutter specifically and

4    explain the practices that are at issue in this case.

5        He can't testify, I suppose, that there's -- I don't

6    suppose he would use the word "procompetitive benefit," but he

7    can talk about why people do stuff.  You know, why they engage

8    in contracts to -- you know, for revenue streams.

9        So, you know, I think he provides context for the fact

10   witnesses that Sutter is going to put on; right?  He's a

11   business guy.  He's an executive type.

12       **MS. KIM:**  He is an executive.  He is a business type.

13   His only experience with hospital contracting was when he

14   worked with the hospital system in New York state for 1.5 years

15   almost 15 years ago.

16       **THE COURT:**  Is that weight, not admissibility?  I

17   mean, you know.

18       **MS. KIM:**  Your Honor, this isn't weight just because

19   it goes to the reliability of his opinions.  He doesn't meet

20   the low threshold of Rule 702.

21       And not only is he not qualified --

22       **THE COURT:**  Well, you don't think he has a sufficient

23   understanding of the industry to testify about the predicate

24   facts that attach to industry practices.

25       **MS. KIM:**  Correct.

1      **THE COURT:**  Okay.  So that's your big point.  Okay.

2  That's something that Sutter can address.

3      **MS. KIM:**  His training is in investment banking and

4  accounting.  This is a guy who's done black box analyses for

5  mergers and acquisition in healthcare.  He has no expertise in

6  clinical integration.  He's not a medical doctor.

7      He has one and a half years of experience in hospital

8  contracting in a supporting role in a hospital system in

9  New York almost 15 years ago.

10      He's never been published in a peer-reviewed or

11  nonpeer-reviewed publication on matters of healthcare

12  antitrust, healthcare provider contracting, hospital quality,

13  clinical --

14      **THE COURT:**  But he's not going to talk about any of

15  those things, because he can't; right.

16      He can talk about how quality maybe affects pricing, but

17  he can't talk about quality care, he can't opine about medical

18  care.  And he's basically talking about the benefits -- the

19  business benefits of the integrated model, which sounds to me

20  like someone in M&A work and is charged with valuing this stuff

21  can offer an opinion about why it matters.

22      Because what are you looking there?  You're doing an

23  analysis of, you know, is Sutter making money; right?  And it

24  seems to me that those are the sorts of things that people

25  analyze in looking on -- you know, looking at the supports of

the business model.

**MS. KIM:** Yes, Your Honor.  I mean, that is true.  I just want to -- I just want to read to you a couple of the statements that he makes in his expert disclosures.

He submitted 200 pages, without counting the appendices, of supposed expert opinions in this case.  And in his own summary of opinions he writes as follows, quote, In my view and experience, Sutter's contracting practices are necessary and relevant to maintaining its integrated delivery system and offering integrated patient care.

He says they're necessary.  However, when I asked him in deposition whether they were actually necessary and had he done the analysis to ascertain whether or not Sutter could offer integrated patient care without its contracting practices, he said he hadn't done that analysis.  He wasn't asked to do that analysis and he hadn't done that analysis.

I asked him would Sutter have to forego any of its investments if it had to forego its contracting practices at issue in this case?  And he responded that he had not done that analysis.  He could not identify a single investment.

So without providing the link -- and Sutter admits that he doesn't provide a link -- between the contracting practices and all the ways in which Sutter spends its money, that Sutter seeks to have Mr. Pilch narrate to the jury, which is just kind of bolstering of its percipient witness testimony anyway, but

his testimony without that link will read to the jury like
Sutter should not be held liable for its antitrust violations
because it spends its money on all these good things.   And
that's just really contrary to law.

So not only is he not qualified, he didn't do the work
that would be required.  He didn't conduct the analyses to see
to what extent contracting practices were necessary for any
specific investment, for clinical integration, for quality, for
meeting the shortfall in Medicare and Medi-Cal patients, which
he wants to testify about.  He didn't do any of that analysis.

So he is really just acting as a mouthpiece.  He's not
qualified.  He didn't do the work.  And without this link that,
you know, we've been talking about today, without this link
and -- and we haven't seen this link yet.

Discovery -- you'll recall that we had several
late-disclosed Sutter witnesses that we had to depose.  And we
had to depose them in the last couple of weeks.  It was pretty
hectic getting ready for pretrial and also deposing these
late-disclosed clinical witnesses.

I deposed one of them, Sutter's chief medical officer and
chief safety and Quality officer, Dr. William Isenberg.  And he
testified that he didn't know of a link between any of Sutter's
clinical integration efforts and its contracting practices
challenged in this case.

He never requested any of the provisions that were at

issue in this case.  He had no idea even what they were.  It
was awkward.  It was actually awkward.

     So there is no link.  We're waiting for a link.  Sutter
keeps obfuscating and deferring and promising at trial we'll
get the link.

          THE COURT:  That's an issue of fact that -- you know,
you've done the depositions, so I accept your representations
about what they do and don't show.  Sutter is not going to
depose its witnesses on all of its trial theories, right, so I
don't know what they will or will not testify to.

     You get to test what they're going to talk about through
your depositions, but Sutter has said, at least in its pretrial
papers, that the fact witnesses will provide the predicates
linking the challenged contracting benefits to the alleged,
but, you know, benefits.  And we'll see; right?  We'll see.

     And we'll see what the -- you know, what the -- we'll see
what it looks like in the end.  You know, maybe the best claim
is your rule of reason claim.  And in the end maybe there are
no true procompetitive benefits and there will be no evidence
about them.  But that's sort of peering into the mist of trial.

     You know, there's no way I'm going to read all your
exhibits before the trial.  It just doesn't work that way.  So
we'll just have to see what the testimony -- how it goes in and
deal with the exhibits and stuff along the way.

          MS. KIM:  Your Honor, I submitted a packet of short

 1    excerpts of testimony of the clinician witnesses that have been

 2    deposed so far.  These are the witnesses Sutter is supposedly

 3    going to provide this link with at trial.

 4            **THE COURT:**  Right.

 5            **MS. KIM:**  And they all basically testified that Sutter

 6    uses its revenue from its commercial contracts to pay for all

 7    the good things that it does at the hospital system.  But, to

 8    state the obvious, profitability alone cannot be a defense to

 9    the antitrust law.  That would flip antitrust law on its head.

10        So as you're making these determinations about whether to

11    let in, you know, this testimony if at trial --

12            **THE COURT:**  But not letting it in means Sutter has no

13    opportunity to explain how its business model, for example,

14    creates revenue that allows it to invest in infrastructure and

15    provide quality of care.

16        Now, whether their evidence is correct, whether the

17    witness testimony is true -- but how can you have -- just

18    looking at the rule of reason claim, how can it be that you get

19    to put in a case without any opportunity to mount a defense to

20    why the contracting practices are not anticompetitive and, in

21    fact, are procompetitive; right?  That's what we're talking

22    about.

23        And it just -- what Mr. LeVee said in the last hearing

24    about, you know, the plaintiffs have every -- you know, they're

25    allowed to define their product market as they choose, and

1  we're allowed to challenge it, well, you can say -- and

2  Dr. Chipty will say it -- that there are no procompetitive

3  benefits of this business model.  But that's a very different

4  issue about whether Sutter is able to put in evidence that it

5  says, you know, are.  And then the jury ultimately decides if

6  they are, you know, procompetitive benefits.

7      There are procompetitive benefits, conceptually at least.

8  And the experts can -- Dr. Willig will talk about that.  And

9  then the question is as a question of fact whether what Sutter

10 does actually qualifies as a procompetitive benefit that -- you

11 know, and maybe even more fundamentally, that it's actually

12 linked to a challenged contract term.  I don't know.  Right?  I

13 don't know.  You may be right; right?  But --

14     **MS. KIM:**  Your Honor, I appreciate all that.  And I

15 understand the quandary that you find yourself in.

16     **THE COURT:**  I'm not in a quandary, because that's

17 what -- you just look to see whether the predicate facts are

18 enough so the expert gets to testify.  It's hard for me to say

19 that they're not.

20     You're talking about the truth.  And the truth is very

21 different than the *Daubert* inquiry.  The *Daubert* inquiry is

22 maybe about reliability of the opinion, based on sufficient

23 predicate facts under Rule 702, but it's really not about the

24 truth.  That was kind of my point with the Chipty versus Willig

25 analysis, too, you know; who in the end is telling the truth.

1      Your account is persuasive; right?  But that's for the

2  jury, not for me.

3          **MS. KIM:**  Right.  I do believe, however, given that,

4  you know, Mr. Pilch's opinions are very wide-ranging -- I don't

5  know if you've seen his reports, but they --

6          **THE COURT:**  Yeah, I told you I'm working my way

7  through all the facts and submissions, yeah.

8          **MS. KIM:**  They're very kitchen sinky.  I mean, they go

9  through the history of California healthcare.  And he's someone

10  who has never worked with a California hospital or health plan

11  in California.

12      I would ask you to look at our proposed order.  It looks

13  like you've cribbed out a tentative ruling already.

14          **THE COURT:**  Well, the way -- I gave your proposed

15  order to see what -- because you have so many concessions back

16  and forth that I wanted to see what your final proposed orders

17  looked like as a way of navigating your motions *in limine*.

18  There was no magic to my ask.  That's why I asked.

19      And I have told you I cannot read 17,000 pages.  But I

20  will read every record cite that you've given me.  So

21  everything that you have attacked in your motion *in limine*, I

22  will read.  And I will skim read -- you know, especially for

23  the shorter expert reports, I'll obviously skim read the

24  opinions themselves.  But I'll slow read the pincites of what

25  you give to me.  And that's sort of the best I can do.

 1          **MS. KIM:**  Okay.  Well, I would just say that our

 2    proposed order is fairly narrowly tailored, so that it would

 3    preclude Mr. Pilch from testifying specifically that Sutter's

 4    investments and costs are the, quote, procompetitive effects or

 5    justifications for Sutter's contracting practices.

 6          That is, I think, within the bounds of what you

 7    characterize as an economic opinion.  And he certainly didn't

 8    do any of the work and lacks any of the expertise to opine on

 9    any supposed procompetitive effects.

10          And the rest of the proposed order asks for very specific

11    things in that -- in that line.  So we would recommend it to

12    you and ask you to take a look at it.

13          One last comment about Sutter's proposed order.  It

14    completely distorts what we were seeking to do with the motion.

15    So we weren't seeking this kind of really broad exclusion on

16    areas that -- that our motion doesn't seek preclusion on.

17          So I would -- I would note for the record that the

18    proposed order that Sutter has submitted is completely vague

19    and mischaracterizes our motion to exclude Mr. Pilch's

20    opinions.

21          **THE COURT:**  Okay.

22          All right.  Mr. Bunzel.

23          **MR. BUNZEL:**  Briefly, Your Honor.  I certainly heard

24    the Court this morning that the experts should not be engaging

25    in the weighing of the procompetitive and the anticompetitive.

1          **THE COURT:**  And I'll just offer this additional sort

2    of, maybe, solace to Ms. Kim.  I haven't gone through the

3    witness list yet either because I ran out of time.  I was

4    hoping to as part of my thought as to how the overall structure

5    of the trial is going to be.

6          But there are going to be limits, especially with the

7    experts; right?  I have to think about how this plays.  I'm

8    less persnickety about time limits with fact witnesses.  And it

9    sort of depends, but there may be some witnesses that I'll want

10   to say -- well, you've got to be careful; right?

11         You really have to be careful with your expert opinions.

12   And your expert opinions have to be predicated on facts and

13   based on the expert's expertise.  You know, so that's one of

14   the things.

15         I will -- of course, I read the proposed order.  I read

16   the motions and I read the proposed orders, and I started going

17   through the exhibits.  And so that's what I did.  And that's

18   how I -- I used that as a framework for looking about who

19   the -- mostly who the party who's asking for the relief is

20   asking for.

21         The reason I wanted proposed orders from Sutter is because

22   they made so many concessions to some of your orders that I

23   thought it would be an easier framework to use as an outline

24   for our 25-page motion *in limine*.

25         That hope was not borne out by the actual proposed order.

1    So it's fine.  It's not a criticism.  But that was my concept.

2        Okay.  So, Mr. Bunzel.

3        **MR. BUNZEL:**  Yeah, I was just saying, Your Honor, that

4    we understand and agree with the Court that experts should not

5    be doing the weighing of what's procompetitive versus

6    anticompetitive in coming out with an opinion one way or

7    another.  That's for the jury to do.

8        But Mr. Pilch is an industry expert, and he is very

9    capable of identifying what the beneficial effects are that, as

10   a business person for a hospital, that the negotiators would

11   seek and try to accommodate in their revenue streams.  And much

12   of his opinion is from the industry focus.

13       You are correct, he will not offer an economic opinion.

14   That is for Mr. Willig to do.  But he can offer industry

15   opinions.

16       And healthcare is, as we all know in this case, very

17   complex.  This is an area where having an industry expert who

18   can explain, to bring some of this together that, based on what

19   he's heard from the fact witnesses, will be beneficial to the

20   jury.

21       This -- and I don't think I need to repeat much in the way

22   of the predicate facts coming in through the fact witnesses

23   because we've gone over that today, but that was repeated in

24   Ms. Kim's argument that somehow Mr. Pilch's opinions are

25   vulnerable because he will not opine with respect to causation.

He shouldn't opine with respect to causation.  Other fact
witnesses will.

I think where she misses some of the boat is who at Sutter
will be providing this linkage?  She mentioned Dr. Isenberg,
for instance.  Dr. Isenberg is a doctor.  He's also a senior
person in the Sutter hierarchy --

THE COURT:  I remember from your motions *in limine*;
right.

MR. BUNZEL:  Yeah.  And, you know, he testified in his
deposition -- and we have a clip of that to play when we get to
the motions *in limine* -- that his job and that of the other
people in the medical profession is to evaluate what would be
the best innovations to advance the interests of patients.  And
then those ideas get percolated to others within the company to
achieve the revenue in order to bring those innovative ideas
and improvements to fruition.

And he testified as to the other clinicians that they
understand that the only place for that to come from is from
commercial health plans.  And he expects Sutter to do that
assuming that Sutter, as a system, validates the need for these
innovations and puts it into their capital budgets.

That process will include testimony from managed care
people.  It will include testimony from the finance director,
the CFO, from strategic planners of financial planning and also
from the chief executive officer of the company.

1        So we understand our burden to provide the linkage, and it

2    will be done.  But it is -- it's not a reason to negate the

3    opinions of a witness like Mr. Pilch.

4        Ms. Kim criticized his capabilities or his expertise.

5    Yeah, he's -- he is not an academic.  He doesn't write a lot of

6    peer-reviewed papers, perhaps any peer-reviewed papers.  He

7    published some material in journals from the business side.

8    Frankly, I found that refreshing in putting witnesses in front

9    of the jury who actually know the industry and aren't just

10    academics and write papers all day long.  He's that kind of a

11    person.

12        He has 25 years of healthcare experience.  His operational

13    experience was not limited to the hospital in Long Island.  He

14    also came in with respect to a hospital in Atlanta and dealt

15    with that coming out of bankruptcy.

16        And he dealt -- as he testified in his depositions and the

17    like, it's in the record, that he's just got a plethora of

18    experience, hands-on experience in dealing with health plan

19    negotiations and -- from the provider perspective.

20        So he's very well suited to provide the opinions that are

21    in his report.  And I think if the Court issued an order

22    similar to what Judge Massullo did, we would obviously abide by

23    it, and I think it would be fair and reasonable here.

24        Let me see if there's anything else I need to do.

25        Ms. Kim had indicated that he isn't a doctor.  Well, there

1  will be plenty of doctors testifying about their needs for

2  these innovations.  And he's going to base his opinions based

3  on the fact testimony, not independent medical opinion.

4      He has done analysis -- comparative analysis with respect

5  to quality, comparing Sutter's quality to that of others from a

6  business perspective.  Quality is evaluated very much so at,

7  you know, the C suite.  Are we, for our dollars that we're

8  expending, achieving something that's competitive and benefits

9  the consumers and puts the company in a position to excel so

10  that we can, you know, market our products and services.  So

11  his perspective is from that level, and he's done that work.

12      **THE COURT:**  Just one -- this is -- this is kind of a

13  little bit of an aside, but the fact witnesses are the

14  causation witnesses.  And Dr. Willig is more like a connection

15  witness.  And then the argument is, of course, this provides

16  context to the fact witnesses.  And, also, the industry expert

17  and Dr. Willig's opinions kind of support each other.

18      **MR. BUNZEL:**  Yes.

19      **THE COURT:**  Okay.  So, okay.  All right.

20      **MR. BUNZEL:**  I think the rest of the arguments

21  involving Mr. Pilch are set forth very well in our papers, and

22  I don't think we need to belabor them.

23      **THE COURT:**  Okay.  All right.  Thanks.

24      **MS. KIM:**  Your Honor, I would just say once again that

25  in your general perception that he should be precluded from

speaking to economic issues, he should specifically be

precluded from characterizing Sutter's costs and investments as

procompetitive effects or speaking to any kind of price

differential.  Just wanted to explain that away with quality

and investments just because he --

**THE COURT:**  What's your view on that?  I assume that

there's not anything -- is that in his report?  The problem

with the report -- sorry -- the problem with the reports is the

reports have so many more opinions than people are advancing --

**MS. KIM:**  Right.

**THE COURT:**  -- for what they're putting it in for

trial.  So, as I read Sutter's papers here, they're not

offering that opinion.  That's my understanding of them.

So I'm confining in many ways my analysis to what you guys

are saying in your papers.  You say, well, he says all these

things which are clearly impermissible.  And then Sutter is

like, okay, we'll sort of hew to what Judge Massullo did, and

we're not going to do that, but we do think that he provides

relevant context so the jury can understand the concepts from

the business perspective.

**MS. KIM:**  You'll see from our order, Your Honor, that

it's narrowly tailored.  And it's targeted to those statements

in his own report where he veers outside of, you know, his

analysis and his areas of expertise.

He shouldn't be speaking to price.  He shouldn't be

 1  speaking to economic concepts like procompetitive effects.   And

 2  if you look at our order, it will provide some basic

 3  guideposts.

 4      And, you know, I understand what Sutter's arguing in their

 5  papers now, but these statements are contained in his own many

 6  pages of expert disclosures.  So we have to protect ourselves,

 7  and so we would request an order limiting --

 8          **THE COURT:**  So let's just go through them.

 9          **MS. KIM:**  Sure.

10          **THE COURT:**  So, A -- and Mr. Bunzel can respond.

11      Sutter's investments and costs are the procompetitive

12  effects or justifications for Sutter's contracting practices.

13      What -- so, you know, my view when I read it and I think

14  about what's appropriate for his testimony is he can talk about

15  business and finances of the healthcare industry generally.

16      He can't offer those kinds of economic opinions, but he

17  can talk meaningfully about the context of hospital operations,

18  you know, how Sutter -- he can talk about Sutter's spending in

19  investments compared to other providers.  And he can explain

20  how some of these things affect hospital operations; right?  He

21  can't opine on quality of care because he's not a medical

22  doctor.

23      So when I sort of tick through, I can think there are a

24  lot of things that you say in your opposition that are fair,

25  and I agree.  But there's -- you know, Ms. Kim is right too.

1   And so looking at this -- and I can't -- well, anyway.  That's

2   my view.

3       I don't want to feel like anybody is being sandbagged at

4   trial when people are straying into impermissible economic

5   opinion that, really, I'm very -- he's an industry expert that

6   talks about business realities.

7           MR. BUNZEL:  Sure.

8           THE COURT:  He can't give the kinds of opinions here.

9   He just is providing context for industry practices and

10  commenting on Sutter's in particular with reference to that

11  standard.

12          MR. BUNZEL:  Your Honor, let me respond.  And price is

13  a good example, and it's a good example as to why the

14  plaintiffs' proposed order is not the right outline for the

15  review of these issues.

16      They moved to exclude Mr. Pilch from offering opinions

17  that Sutter's investment cost influenced its price, affected

18  price, price differentials.

19          THE COURT:  Well, the opinion is quality is one factor

20  among others in the pricing that Sutter is able to negotiate

21  with the commercial players.

22          MR. BUNZEL:  That's another opinion with respect to

23  quality.

24          THE COURT:  Yeah.  Well, it's interplay of quality and

25  pricing; right?

1          **MR. BUNZEL:**  With respect --

2          **MS. KIM:**  Your Honor --

3          **MR. BUNZEL:**  Let me just finish.

4      With respect to price, what Mr. Pilch testified to, and

5  what Judge Massullo said was perfectly permissible, and it's

6  really the only thing he puts in his report about price on this

7  issue, is that he looks at the various inputs that the provider

8  systems, hospital systems, look to, to cover in terms of

9  building price.  How's the money going to be spent from a

10  business perspective.  We need money for capital improvement,

11  for seismic.  All of those are inputs to price.

12          **THE COURT:**  That's fine.  So what he would testify

13  about is he will testify about the factors that industry

14  participants consider when they're setting prices.

15          **MR. BUNZEL:**  Exactly.

16          **THE COURT:**  And that's fine.  That's fine.  That's not

17  an economic opinion.  That's fine.

18          **MR. BUNZEL:**  Correct.  And with respect to quality, he

19  doesn't opine as a medical doctor.  He uses some analyses,

20  which I don't even believe are being challenged on this motion,

21  other than the fact that -- the question about whether there's

22  causation links to the contracting practices to quality.

23      But Pilch is our quality expert in opposition to Dr. Kizer

24  with respect to Sutter's relative quality among its peers in

25  Northern California.  That's not even being challenged here.

1    You know, he is going to testify about that from a -- an expert

2    perspective having evaluated, you know, appropriate sources of

3    data.

4        With respect to this term "procompetitive," I heard your

5    comment this morning that, you know, "illegal" is not a very

6    good word.  But you said, well, "anticompetitive" --

7            THE COURT:  Well, is "procompetitive" a word that

8    Mr. Pilch would use ordinarily?  Because if it's not, he

9    shouldn't use it; right?  So "tying" is a word that Dr. Chipty

10    uses all the time, as does Dr. Willig; and, of course, they

11    should be able to use it, and it's a term with economic

12    significance.

13        But I think absent -- if you're not an antitrust person,

14    you don't go around saying stuff that's -- you might say some

15    stuff is anticompetitive, but I don't even think you'd say

16    that.  So I don't like the word "procompetitive."

17            MR. BUNZEL:  I think the term that's used --

18            THE COURT:  "Business justification" might be a good

19    word, but not --

20            MR. BUNZEL:  -- "beneficial effects," I think the

21    terms are used somewhat interchangeably.

22        But just to be clear, what Mr. Pilch is not doing, and

23    will not do anywhere in his report, is to say, I have evaluated

24    the anticompetitive effect or I've looked at it, seen the

25    expert reports from others, and I'm going to testify that the

1    procompetitive benefits outweigh the --

2            THE COURT:  No one's going to testify to that point.

3            MR. BUNZEL:  Correct.

4            THE COURT:  But lots of people are going to be able to

5    say, well -- not lots of people, but Dr. Willig, for example,

6    for your witness, and Dr. Chipty in a very different way, will

7    be able to talk about, you know, the procompetitive versus the

8    anticompetitive benefits and will be able to testify about

9    that.

10       But if -- Mr. Pilch is a business guy, and he's got to

11   speak in the language of his, you know, ordinary business

12   context.  He can't adopt terms to basically stray over into

13   either the economic opinion or the -- what the jury ultimately

14   has to do in doing the weighing itself.

15           MS. KIM:  Exactly.

16           MR. BUNZEL:  Yes.  And, like I said, he's not going to

17   do the qualitative balancing of --

18           THE COURT:  Well, let's just be specific.

19   Procompetitive, that doesn't sound like a word he should use.

20           MR. BUNZEL:  Well, I think, to him --

21           THE COURT:  Is it a word that he would use ordinarily?

22   Right?

23           MS. KIM:  It is a word that he uses in his report.

24           THE COURT:  No, I appreciate, that's why I'm pushing

25   back on that point.

1          **MS. KIM:**  And that's the danger here, that you're

2     having someone --

3          **THE COURT:**  Well, the jury's not going to see the

4     report.  So that's okay.

5          **MS. KIM:**  But whatever is in his report --

6          **THE COURT:**  Well, Sutter will have to prep him

7     accordingly; right?  It's like the word "monopoly," which we'll

8     get to later.  So words have -- you know, frankly, I mean, I

9     think, just to preview that, N-O on the word "monopoly."  I

10    tossed those claims.  But we'll talk about it.

11         But to say if it's true -- what's good for the goose is

12    good for the gander; right?  Nobody should be able to --

13    economists can talk about words that they use, but no one

14    should be trying to gin up their case in front of the jury by

15    tossing around words that have economic or legal -- unless they

16    had the requisite expertise.

17         So the lawyers are the ones who can talk about legal

18    concepts.  Economists are the ones who can talk about economic

19    concepts.  People can talk in the language of their expertise,

20    and they shouldn't adopt the words that they don't have

21    expertise in to cloak their opinions in something that, you

22    know, is designed to get the jury to vote their way.

23         So pushback, Mr. Bunzel, but I think I'm right.

24         **MR. BUNZEL:**  Understood.  And, you know, in his report

25    he uses "procompetitive" and "beneficial effects" pretty much

1    interchangeably.  And we don't need to use the word

2    "procompetitive" to describe those.  These are beneficial

3    investments that healthcare systems --

4         **THE COURT:**  He should be talking about investments.

5    He should be talking the language of business.

6      Okay.  All right.  I'm just going to think if there was

7    anything else I wanted to ask.  I don't think so.

8         **MS. KIM:**  I sound like a broken record, Your Honor,

9    but I did pour through his reports and kind of pick up on the

10   procompetitive language and everything else that we would find

11   problematic where he's really veering out of his area of

12   business expertise.  And they're all outlined in our proposed

13   order, so we would recommend that to you.

14        **THE COURT:**  Yes.  All right.

15     So I think we're on to spoliation.  I'm going to have to

16   go get my spoliation folder from the other room, so give me a

17   second.

18        **MS. KIM:**  Thank you, Your Honor.

19        **MR. BUNZEL:**  Thank you, Your Honor.

20     (Pause)

21        **THE COURT:**  Not doing anybody any favors by telling

22   you what I think.  So, you know, I was ready to -- I can't

23   remember when we were last together.  In a motions context, we

24   decided to kick the spoliation can down the road.

25     I will say I just don't see it.  I don't see it.  You

know, of course, the boxes got destroyed.  There was a litigation hold.  Just looking at it very pragmatically, nothing to me suggested a culpable state of mind.

You know, the supervisor didn't realize that part of it was subject to the hold.  I don't see Sutter acted with bad intent here.  You know, negligence maybe.  Maybe.  But not tantamount to bad faith.

And, you know, the relevance issue, I mean, the class period begins in 2011 now.  I'm not saying I'm precluding evidence from earlier.  You know, we talked about that this is an issue that comes up in the motions *in limine*.

But this is not a case that's suffered from a lack of discovery.  And I can't see any prejudice that happens from this.  And so, you know, the answer -- you know, my tentative, but we can hear, obviously, from whoever is going to argue it for the plaintiffs' side -- is no.

As I said, there's been so much evidence, and none of this is going to matter to the -- this sort of stuff isn't going to be, you know, relevant to anybody's case.  And there's so much duplicate discovery that's been produced anyway.

For that reason, too, I would say no on the motion *in limine*; right?  I mean granted the motion *in limine*, because you don't get to cut a backdoor culpability when you don't get an adverse inference instruction.  So that's my tentative.

So, obviously, you can -- plaintiffs can tell me why I'm

1    wrong.  And I'll put the timer on now.

2         **MR. STEYER:**  Good afternoon, Your Honor.  Can you hear

3    me?  Allan Steyer for the plaintiff.

4         **THE COURT:**  Sure can.

5         **MR. STEYER:**  Thank you.  Mr. Jain, from my office,

6    might put up some slides.

7         **THE COURT:**  I thought we were going to get a chance to

8    hear Mr. Jain argue.

9         **MR. STEYER:**  He has a motion *in limine*.

10        **THE COURT:**  Okay.  Good.

11        **MR. STEYER:**  Have to put up with the old people.

12    So in the interests, it's undisputed, Your Honor, in this

13    case that while this case was pending and *UEBT* was pending,

14    Ms. Brendt, the head of Sutter's managed care department,

15    intentionally authorized the destruction of 192 boxes of

16    evidence that contained evidence that was relevant or

17    reasonably calculated to lead to the discovery of admissible

18    evidence.

19    It's undisputed that Ms. Brendt ordered the destruction of

20    this massive amount of evidence despite knowing that a

21    litigation hold had been issued by Sutter's legal department.

22    This act, it's beyond argument, violated Sutter's internal

23    rules.

24        **THE COURT:**  I get it.  I get it.  There was a

25    litigation hold in place and it shouldn't have happened; right.

1    That's undisputed.

2         MR. STEYER:  Okay.  So the point, Your Honor, is under

3    the circumstances of the case law, which we'll get to in a

4    couple of minutes, it seems to me that the violation of

5    Sutter's internal rule reflects a *prima facie* evidence of

6    intentional conduct as Judge Karnow found and Judge Massullo

7    did not disturb.

8         So, in essence, Sutter is here taking a third bite at the

9    apple.  The problem for Sutter, however, is the facts have not

10   changed at all.  At all.

11        And so I'd like to start with slide 6 just to set the

12   factual predicate.  This is from Ms. Santagata, Ms. Brendt's

13   assistant, after she authorized, at Ms. Brendt's direction, the

14   destruction.  And if you look down, she says, quote, Fingers

15   crossed that I haven't authorized something the FTC will hunt

16   me down for.

17        FTC being Federal --

18        THE COURT:  I know who the FTC is.

19        MR. STEYER:  Clearly, consciousness of guilt, Your

20   Honor.

21        There's also, if you look at slide 2, no dispute that

22   there was a litigation hold in place.  This is Ms. Brosnahan,

23   who's a civil litigation lawyer by training.  She was the head

24   of E-discovery at Sutter from February of '14 until she left in

25   2019.  She says, "Yes, litigation hold in place in Sidibe.  I

1  reviewed it myself."  Undisputed.

2      And I might add, Your Honor, despite pounds of paper being

3  submitted by Sutter, they never addressed the existence of the

4  litigation hold.  They have nothing to come back with.  And

5  it's prima facie evidence of intentional misconduct.

6      I'd like you to look, please, at slide 3.  This is from

7  the deposition of Ms. Carriere, a 30-year employee of Sutter

8  and a supervisor in the warehouse.  Paragraph 7 of her

9  declaration, quote, Before records management can dispose of

10 any box, it requires a certification that the documents within

11 the box are not subject to any current legal hold.

12     That certification, Ms. Brendt directed her long-time

13 assistant to give on July 28th, 2015.  I'll show that to you

14 momentarily.

15     Your Honor, the certification is false.  The managed care

16 department that Brendt headed at the time lied to the warehouse

17 people, plain and simple.  There's no other inference to draw.

18     But it goes on:  "Policy requires the person making the

19 certification has conducted a formal inquiry into whether a

20 document hold exists."

21     There was no formal inquiry.  I would represent to you,

22 Your Honor, based on the testimony in the declarations, there

23 was no inquiry whatsoever.

24     Ms. Brendt, as the executive who, in her declaration in

25 the *UEBT* case, laid out the history of systemwide agreements in

1    the relevant time period of 1998 to 2004, when Sutter

2    conceived, implemented, and effectuated the issues that bring

3    us here today, no inquiry whatsoever.  And then it says the

4    certification is customarily executed by someone in the legal

5    department.  Instead, Ms. Brendt had her assistant do that.

6         And, in fact, we've put before you the declaration of the

7    in-house lawyer, Ms. Almeida, who at the time, in 2015, was 16

8    years out of law school.  And if you'll take a look at

9    slide 15, please, this was filed October 10th, 2017.

10        And I would like to add, Your Honor, despite putting in

11   pounds of paper to Your Honor, Sutter did not deem it

12   appropriate to disclose that declaration to you.  I'd like the

13   Court to ponder about that because this is an extraordinary

14   declaration.

15        And take a look if you would, please, paragraph 3, Almeida

16   says, "Upon the filing of the case, I put a legal hold in place

17   and that hold has been in place continuously since 2014."

18        Next paragraph.  Almeida, Your Honor, the lawyer managing

19   this litigating, didn't learn about the massive destruction

20   until a year later.  Think about that.  She's supposed to sign

21   off on it.  She doesn't sign off on it.  And she finds out a

22   year later.

23        **THE COURT:**  Remind me what Ms. Brendt's job was.  I

24   know she was the supervisor --

25        **MR. STEYER:**  No, no, no.

1          **THE COURT:**  I know you're talking about Almeida, but

2   this is a question for me, not a question about your argument.

3   I just want to get everyone's job title straight.

4          **MR. STEYER:**  Melissa Brendt was the executive in

5   charge of the Managed Care department.

6          **THE COURT:**  What was her official title?

7          **MR. CANTOR:**  She's the chief contracting officer for

8   Sutter, Your Honor.

9          **THE COURT:**  Chief contracting officer, okay.

10         **MR. STEYER:**  Thank you.

11     She worked in that department since 1997.  The former

12  head, Ms. Vine --

13         **THE COURT:**  That's all fine.  She's the one who

14  authorized the destruction of the 192 boxes.

15         **MR. STEYER:**  Correct.  And not only did she authorize

16  the destruction, she submitted false testimony in the form of a

17  declaration, Exhibit 24 to the state court, which we'll get to.

18     Sutter is attempting to perpetrate a fraud on this Court

19  just like they attempted to perpetrate a fraud in the state

20  court.  And we'll get to that in a moment.

21     If you look at paragraph 5, Your Honor, of Almeida's

22  declaration, she says, "I was at the depo of Santagata.

23  Apparently, she thinks I authorized her and Brendt to dispose

24  of the record.  I don't recall the conversation."

25     "I don't recall the conversation."  Then she goes on to

1  say in paragraph 6, "I have reviewed the list of boxes that

2  were discarded and do not recall seeing any such list during

3  any conversation with Sina in 2015."

4      It gets worse, Your Honor.

5          THE COURT:  Well, so she doesn't remember, which is

6  not surprising.

7          MR. STEYER:  No.

8          THE COURT:  She wasn't told.  And let's say she wasn't

9  told, there was a mistake, and she was not part of this

10  process, okay.  So let's just take that as a predicate for --

11  you know, for what --

12          MR. STEYER:  Your Honor, it's worse than that.  If you

13  look at paragraph 7, quote, I never would knowingly authorize

14  the destruction of any document or potential evidence that

15  would be relevant to ongoing litigating.

16          THE COURT:  Right.  So she's saying she didn't

17  authorize this.  I totally get it.  I totally get it.

18          MR. STEYER:  Right.  Wait.  It's worse.  "And would

19  recall any conversation in which I did."

20      Your Honor, Almeida is saying --

21          THE COURT:  She didn't approve it.  I'm giving you

22  that.  I think it's a very important fact, so I get it.

23      So, obviously, Ms. Santagata is not running around

24  destroying documents by herself as an executive assistant.

25  Ms. Brendt is the one that authorizes.

1    Let's talk about Ms. Brendt and assume that Ms. Almeida

2    did not authorize it per her declaration; right?

3    **MR. STEYER:** Correct, Your Honor. So Ms. -- so

4    Ms. Brendt has lied to the Court. There's no other way to

5    characterize it. None. Perpetrated a lie. And if you look,

6    Your Honor --

7    **THE COURT:** Let's look at that exhibit.

8    **MR. STEYER:** Look at slide 8. Just so the record's

9    clear, this is where Santagata, in her April 2017 deposition --

10   **THE COURT:** Right. She said -- she a hundred percent

11   says Ms. Brendt told her it was okay.

12   **MR. STEYER:** Correct.

13   **THE COURT:** It does not say Ms. Santagata -- and

14   there's an email that confirms that link, supervisor-executive

15   assistant; right?

16   **MR. STEYER:** Precisely.

17   **THE COURT:** So that's fine. So Ms. Brendt, I think,

18   one could say undisputedly, authorized the destruction.

19   **MR. STEYER:** Correct. And, Your Honor, it's

20   undisputed that at the time she authorized the destruction --

21   and just so we're clear here, we are not talking about a box.

22   We're not talking about someone's file. We're not talking

23   about deleting some emails. We are talking about destroying

24   ten years of the Managed Care department's records.

25   **THE COURT:** Paper records. Paper records.

 1         **MR. STEYER:**  At a time -- at a time when this case was

 2    pending and when the *UEBT* case was pending.

 3         **THE COURT:**  Right.

 4         **MR. STEYER:**  And, frankly, Your Honor, in getting

 5    ready for the argument, Mr. Macrae, the legal eagle, reminded

 6    me -- and I looked at your 2014 decision, which we cited, in

 7    the *Black & Decker* case, and in that case you granted

 8    terminating sanctions.

 9         **THE COURT:**  I know the case.  I know the order because

10    that guy took -- that was a totally different -- you know what

11    the guy did, so.

12         **MR. STEYER:**  Yes.  But here, Your Honor, respectfully,

13    the conduct is worse, worse because they have lied to the state

14    court --

15         **THE COURT:**  So let's look at what Ms. Brendt has to

16    say.

17         **MR. STEYER:**  Okay.  Let's do that.  I'd like you to

18    look -- this is Exhibit 8 to Mr. Jain's declaration.  This

19    is -- well, it's also Exhibit 24 to my declaration.  It is a

20    declaration that she put in, in the state court.

21         She says under oath, quote, During a meeting I was having

22    with Daniela Almeida in Room 211 of our River Plaza Office Sina

23    Santagata came into the room to ask whether she could tell

24    records management to proceed with the destruction.  We -- "we"

25    implying her and Almeida -- told Sina that she could have

1    records management proceed to the next step.

2         It's a lie.  It's that simple.

3         **THE COURT:**  Well, she -- yeah, the lie is that she

4    said "we."

5         **MR. STEYER:**  Correct, Your Honor.

6         **THE COURT:**  Alleged lie, right?  The alleged lie.

7         **MR. STEYER:**  Falsely indicating under oath to the

8    Court that the legal department was in the loop.

9         They are completely silent, both her and Santagata, in

10   this alleged casual meeting.  Did they discuss the list of

11   documents?  Did they discuss how much time they spent?

12        And there is absolutely nothing -- absolutely nothing in

13   the record from Almeida confirming it's good to go.

14        And you compare that, Your Honor, with the emails between

15   Santagata --

16        **THE COURT:**  Well, she clearly got permission from

17   Brendt; right?

18        **MR. STEYER:**  Precisely.

19        **THE COURT:**  So let's just talk about the legal

20   standard again, because I'll tell you why I'm having trouble;

21   right.  Obviously, it's bad that documents get destroyed.  It

22   is also true that at the end there were 41 boxes that might

23   have had responsive documents.

24        And there was essentially -- the *UEBT* court addressed --

25   the *UEBT* court addressed the issue by the restoration of the

backup tapes and never found that Sutter acted with bad intent.

I know it looks bad.  But so what you come down to for your smoking gun evidence, or the smell test, that makes you say under the relevant legal standard this was bad faith or conduct tantamount to bad faith such as recklessness combined with an additional factor such as harassment or an improper purpose, there's no discovery order so we've got to go under the court's inherent authority.  So that's the standard.

So what you have there is you have a lawyer who says, hey, I -- you know, here's my declaration.  No.

I have the Brendt -- really, I've got another file in the other room, so I really should go pull out those things so I can look at them directly.

You've got Brendt saying "we," but all we really have is the email authorizing destruction; right?  So what I would say is the bad evidence in the case -- because the last thing we'll talk about is the Santagata email.

The bad evidence is this sort of conflict between Brendt and Almeida, and your conclusion is that one of them is lying.  Now, you were suggesting that it's not Almeida that's lying, I think, because --

          **MR. STEYER:**  Yes, Your Honor.

          **THE COURT:**  -- because litigation holds are precisely the sort of thing a lawyer would never, unless the lawyer deserves to be disbarred, but the lawyer is going to remember

1    that sort of thing because they -- they would remember that

2    sort of thing.  So, therefore, your liar becomes Ms. Brendt.

3         And, again, I hate to be -- and then the thing that you --

4    and I guess I should go back and look at her declaration again

5    because her declaration is in the other room.  I think I've got

6    it.  But you don't have her declaration in your slide deck.

7              **MR. STEYER:**  I don't believe so, Your Honor.

8              **THE COURT:**  I have it.

9              **MR. STEYER:**  I was trying not to burden you.

10             **THE COURT:**  It's all fine.  I read it.  You know, I

11   read it because I wrote -- the way I learn stuff is I write the

12   facts.

13        I know she talks about the declaration and the

14   destruction.  And then so she's either lying or mistaken when

15   she says "we"; right?

16             **MR. STEYER:**  Your Honor --

17             **THE COURT:**  You're saying it's a lie.  You're saying

18   it's a lie.

19             **MR. STEYER:**  Correct.

20             **THE COURT:**  And why -- it's certainly inaccurate,

21   okay.  But why is it bad faith?

22             **MR. STEYER:**  Well, first off --

23             **THE COURT:**  What shows you the bad faith; right?

24             **MR. STEYER:**  Bad faith, Your Honor, is not the legal

25   standard and is not required, as Judge Koh articulated in the

 1   *Apple v. Samsung* case.

 2        But let me take a minute and go through very briefly Judge

 3   Karnow's comments --

 4        **THE COURT:**  I did read them all.  I'm going to go get

 5   my exhibits from the other room -- sorry -- because I'm going

 6   to read faster.

 7        The problem is, what makes this look really bad and what

 8   makes you take the big, deep inhaled breath when you read it,

 9   is that terrible email from Ms. Santagata, that I'm sure must

10   have given everybody an enormous lurch when reading it.

11        And I know that I -- I often say that one is not required

12   to divorce reason and common sense when you enter the

13   courtroom, even if this is a virtual courtroom.  And it's a

14   terrible email, but I don't think it -- and so I don't think it

15   means anything.  It's just stupid.

16        **MR. STEYER:**  Your Honor, respectfully, with all due

17   respect --

18        **THE COURT:**  Please don't say that.

19        **MR. STEYER:**  -- that decision should be made by the

20   jury because the --

21        **THE COURT:**  An adverse inference is basically -- you

22   know, you know all the things that people said in the state

23   court; right?  And I do have the inherent authority.

24        So you have to tell me why I can't do this, because, you

25   know, at some point -- one, I don't buy it.  I don't buy it.  I

 1  retain my practical understanding of human nature when I think

 2  that most people don't necessarily do a good job, but they

 3  often try to do a good job.  This is a terrible email.  It's a

 4  terrible joke.  And I'm sure what the truth probably was is

 5  something more innocuous.

 6      But, in any event, I think that the evidence of the

 7  scienter required for an adverse inference instruction would be

 8  a killer.  It would be a killer.  I have it -- it was my

 9  inherent authority to say no, and I don't see it as that kind

10  of content.  I just don't.

11      I'm happy to walk through it, but I'm going to get my

12  exhibits because they're right on the other shelf in the other

13  room.  I do want to read -- while we're having the

14  conversation, I want to reread the Brendt declaration.

15          **MR. STEYER:**  Yeah, if I could just make a comment?

16          **THE COURT:**  Yes.

17          **MR. STEYER:**  You don't have to decide today whether or

18  not you're going to give the adverse inference.

19          **THE COURT:**  Yes, I do.  I mean, we've got to decide

20  these things.  We're not going to wait.

21          **MR. STEYER:**  Your Honor, respectfully, Judge Massullo,

22  in the state court case, said, "I'll let the evidence come in

23  and will make that decision at the end of trial."

24          **THE COURT:**  The evidence in about the destruction of

25  the evidence.

1          **MR. STEYER:**  Yes.  Exactly.  Exactly.

2      And let me explain why it's inherently unfair that

3  Ms. Brendt not be subject to cross-examination.  She is, if not

4  the key witness, one of the key witnesses for Sutter.

5          **THE COURT:**  Okay.

6          **MR. STEYER:**  We both know she's going to get up and

7  wax eloquent about the alleged procompetitive benefits of

8  Sutter's systemwide agreements.  And it's inherently unfair and

9  prejudicial to the class plaintiffs to not allow us to

10  cross-examine her about her role in destroying 192 boxes of

11  evidence in the summer of --

12          **THE COURT:**  Okay.  Okay.  I understand.  So you're

13  saying the motion *in limine* argument is a bit closer.

14          **MR. STEYER:**  It's not closer.  Respectfully, it would

15  be a grave miscarriage of justice.

16          **THE COURT:**  I understand what you're saying.  I

17  understand.

18          **MR. STEYER:**  A grave miscarriage and, arguably, a

19  reversible error under the abuse of discretion standard.  Your

20  Honor cannot let Ms. Brendt get away with what happened here.

21  It's that simple.

22      And I might point out that after Judge Karnow issued his

23  ruling in November 13, 2017, and he closed by saying, "At best

24  for Sutter, it was grossly reckless."  He said the destruction

25  was intentional in the sense that Sutter positively ordered the

1    destruction.

2         THE COURT:  Well, it's definitely intentional.  They

3    pushed the button and authorized the destruction.  So there's

4    no dispute that it's intentional.

5         The question is whether it rises to the standard of, you

6    know, where an adverse -- under the Court's authority, inherent

7    authority, that it goes to the level of an adverse inference

8    instruction.

9         MR. STEYER:  Correct.  And in the point, Your Honor, I

10   want to reiterate it again, you don't have to make that ruling

11   today.  But the trier of fact should be able to hear the

12   evidence.

13        I would also respectfully point out that Judge Massullo,

14   almost two years later, when it was before her, basically said,

15   I'm not going to issue a sanctions order now, we will hear the

16   evidence at trial and then we'll make a decision.  And you

17   should do the same.

18        Your Honor, under the case law, which is abundantly clear,

19   negligence is sufficient -- and this is well --

20        THE COURT:  Negligence is sufficient for what?

21        MR. STEYER:  Would be sufficient to have an adverse

22   ruling.

23        THE COURT:  What's your authority for that?

24        MR. STEYER:  Well, if you look at Judge Koh's decision

25   in *Apple*, 2012, *Apple versus Samsung*.  I would also point you

1    to the *Leon* case, the Ninth Circuit case from 2006.  And they

2    said, quote:

3            A parties' destruction of evidence qualifies as

4        willful spoliation if the party has some notice that the

5        documents were potentially relevant to the litigation

6        before they were destroyed.

7        That's at 959.

8        And in the *Napster* copyright case, 2006, Judge Patel said:

9            "Plummer's conduct amounts to gross negligence, if not

10        willfulness, and that's sufficient culpability to justify

11        an adverse inference."

12        And then Judge Koh, six years later, in the

13    *Apple v. Samsung* --

14            **THE COURT:**  Let me look at my folder here.  I've got

15    the cases in the other room.

16            **MR. STEYER:**  Okay.

17            **THE COURT:**  I might have the cases right here.  Never

18    mind.  Let me just see if I have the cases here.

19            **MR. STEYER:**  Should I wait?

20            **THE COURT:**  Well, just give me a second.

21        (Pause)

22            **THE COURT:**  All right.  I'm back.

23            **MR. STEYER:**  Okay.  I think you were asking -- I was

24    giving you some legal authority.

25            **THE COURT:**  Yeah.  You said the Patel case.  What's

1    the name of the Patel case again?    *Napster*.

2            **MR. STEYER:**    2006, Judge Marilyn Patel.

3            **THE COURT:**    Of course.    I tried my last case in front

4    of her.

5            **MR. STEYER:**    And I'd also, Your Honor, point out the

6    *Leon* case, the Ninth Circuit case in 2006.    And in that case

7    the Ninth Circuit affirmed the District Court's terminating

8    sanction against the plaintiff for deleting many emails from a

9    laptop computer.

10        But the point is, the standard is, "A parties' destruction

11   of evidence qualifies as willful spoliation if the party has

12   some notice that documents were potentially relevant to

13   litigation before they were destroyed."    That's *id* at 959.

14        And then in the *Apple v. Samsung* decision, there were two

15   cases.    That was patent infringement litigation in front of

16   Judge Koh in 2012 --

17           **THE COURT:**    I'm much more interested in the context of

18   it.    Was there a discovery order in place?    Was it in the

19   context of the court's authority?    I can't put my hands on my

20   key authorities section.    It somehow went missing from my

21   folder.

22           **MR. STEYER:**    Here's the point I'd like to make, Your

23   Honor, about the standard.    The factor is satisfied by showing

24   evidence was destroyed, quote, knowingly even if without intent

25   to breach a duty to preserve it, or negligently.

1        We are well beyond negligence in this case, Your Honor.

2   We are dealing with a senior executive who has made

3   misrepresentations under oath to the state court.

4        **THE COURT:**  She certainly made statements that are

5   incorrect.  The issue is what's the evidence that it was a

6   misrepresentation?

7        **MR. STEYER:**  Your Honor, the misrepresentation is the

8   only way they could destroy the documents.

9        And if you take a look at --

10       **THE COURT:**  I think you've got a pretty good point

11  about it's fair cross-examination of the witness; right?

12       **MR. STEYER:**  Your Honor --

13       **THE COURT:**  No, no, I'm not finished.  And I'm not

14  even necessarily quarreling with your suggestion that we wait

15  and see how the evidence actually comes in; right.

16       **MR. STEYER:**  Precisely.

17       **THE COURT:**  I'm asking -- and -- I'm just saying, you

18  know, you just want to press her on the point, even though you

19  pressed her on the point in deposition, to see how it goes, and

20  then make -- the problem, too, is I think it's -- well, I've

21  got to think about what I want to say on that point.

22       I am a bit more persuaded on the motions *in limine* that

23  it's completely fair, and I'm not necessarily opposed to

24  kicking the adverse inference instruction down the road.

25       But I'm telling you, if I were to rule on it today, it

1   would be a no.  And, you know, obviously, if things go -- and

2   I'm not saying I won't rule on it today.  I think you make some

3   good arguments.

4       But my sceptical nature is such that I don't see this as

5   the kind of situation, on this record, that allows me to issue

6   an adverse inference instruction.  So I think that is probably

7   fair, but that doesn't mean that it couldn't be renewed after

8   the evidence goes in.

9       **MR. STEYER:**  Precisely, Your Honor, because -- let me

10  be very blunt -- to make us try this case and not be able to

11  cross-examine Ms. Brendt would be like asking for me to --

12      **THE COURT:**  No, no, I hear you on that point.  We'll

13  see what Sutter has to say.  But, I mean -- yeah, and I'll

14  reread Judge Massullo's order.

15      All right.  Let's go to Sutter and hear what Sutter has to

16  say.

17      **MR. LEVEE:**  Your Honor, thanks.

18      **MR. STEYER:**  Okay.  Fine.  Thank you.

19      **MR. LEVEE:**  So, Your Honor, I'm -- I also have a

20  presentation.  Can you see that?

21      **THE COURT:**  I can.  Thank you.

22      **MR. LEVEE:**  I'm going to get through this fairly

23  quickly given your tentative and questions to counsel.

24      **THE COURT:**  Well, just remember, though, maybe we

25  should talk about the motion *in limine* at the same time, too;

1  right?

2      **MR. LEVEE:**  I'm very happy to do.

3      **THE COURT:**  Yeah.  But I -- and you know my level of

4  discomfort with issuing the kind of adverse inference

5  instruction.  I still think it's worth talking about because

6  we've had the argument.

7      The answer is almost certainly no today.  That doesn't

8  necessarily mean that it's no forever.  That's maybe something

9  we can talk about.  Again, I agree that probably -- I am

10  somewhat concerned about keeping it away from the jury entirely

11  because I think that it is probably fair cross-examination even

12  if it's not the truth that it was done on purpose.  And there

13  are discrepancies in the record, and maybe the plaintiffs are

14  entitled to explore them through cross-examination.

15      Okay.  Over to you.

16      **MR. LEVEE:**  Yeah, so there's two issues.  One is the

17  instruction.  And we'd very much like for you to issue the

18  order on that today, or soon, because there are several

19  witnesses who are teed up to testify at trial solely on

20  spoliation.  And if you do not issue an adverse instruction, we

21  may be able to alleviate a lot of that testimony.

22      This is the outline --

23      **THE COURT:**  What about the point that maybe on this

24  record that I don't have enough but that record might change at

25  trial?

1      **MR. LEVEE:**  I don't see how the record changes at

2  trial, Your Honor.

3      **THE COURT:**  Okay.

4      **MR. LEVEE:**  The discovery into the spoliation has been

5  exhaustive, both by UEBT and by these plaintiffs.  One of the

6  reasons that I think you can issue a ruling today is this is a

7  very different situation than the case presented before

8  Judge Karnow, and that's what I want to emphasize.

9      **THE COURT:**  Okay.

10      **MR. LEVEE:**  Here's my outline.  Relevance.  Not

11  willful.  We've produced almost everything that matters, and

12  there's no presumption of prejudice.  But here's the key, and

13  the reason why this case is so different than what was before

14  Judge Karnow.

15      This case was filed in 2012.  Your Honor may remember,

16  very different First Amended Complaint, Second Amended

17  Complaint, Third Amended Complaint.  Huge differences in the

18  legal theories, the facts.  But none of them implicated

19  pre-2006 documents.

20      The Third Amended Complaint certainly did not.  There was

21  a single reference to systemwide contracting but no hint that

22  systemwide contracting and its origins were the key to the

23  case.  So the class period's always been 2008 forward.  And, as

24  you noted, the damages period now is 2011 forward.

25      Here's the key:  The plaintiffs did not serve a demand for

1  production of documents until November of 2016, so their

2  request for production --

3          **THE COURT:**  They never asked for anything before 2006.

4  I'm mindful of your motions *in limine* arguments; right.

5          **MR. LEVEE:**  We agreed to produce documents from 2006

6  forward.  That's all we agreed to do.  And the plaintiffs never

7  challenged that decision in this court.  So, yes, the Court has

8  issued all sorts of orders in the case, but none of them

9  predate the spoliation.

10     Plaintiffs then reference our answer in their reply brief

11  on the motion.  They reference our expert reports in their

12  reply brief.  Those documents were served in 2018 and 2019,

13  again, years after spoliation.

14     What we did agree to do was to give the plaintiffs the

15  entirety of the production from the state court case because it

16  did reduce our burden.  But we never had an agreement regarding

17  pre-2006 documents, and here's why that matters.

18     The issue before Judge Karnow was that the complaint in

19  *UEBT* specifically sought damages back to 2002 and '3 on a

20  fraudulent concealment claim.  That theory of fraudulent

21  concealment has never been in this case.

22     So UEBT argued to Judge Karnow, hey, we sought documents

23  in our complaint that go back to 2002 or potentially even

24  before.  This case, never happened.  Sutter never agreed to

25  produce it and certainly was not ordered to.

1          Now, there's no doubt Sutter approved the destruction.  We

2     know that.  But there is no evidence -- and this is the key --

3     under the case law, including the *Leon* case, the *Apple* case,

4     there's no evidence that Sutter was attempting to destroy

5     documents knowing that those documents were relevant to this

6     case.

7               THE COURT:  Because this case is fundamentally

8     different than the *UEBT* case.

9               MR. LEVEE:  Exactly.

10              THE COURT:  In that regard; right?

11              MR. LEVEE:  Correct.

12              THE COURT:  Yeah.

13              MR. LEVEE:  Now, Sutter explains that the destruction

14    was not initiated by the managed care department.  We have a

15    off-site facility that's looking for -- to clear up space for a

16    hospital that's about to close.  So it's the off-site facility

17    that initiates the request.

18         This is not a one-off.  The slides that you are about to

19    see, that the plaintiffs had, suggested that this is a one-off

20    situation.  It's not.

21         Ms. Santagata did not know that there had been other

22    situations where Managed Care had approved the destruction

23    earlier, before the litigation.

24         And what the cases require -- I'm going to show you some

25    quotes -- conscious disregard of an obligation to preserve

evidence.  Here, there's no indication of a conscious disregard

because in this case those documents were never relevant prior

to the destruction.

Here's a quote from *Hamilton versus Signature Flight*:

"A party seeking an adverse inference instruction

based on the destruction must establish that the party

having control had an obligation to preserve it at the

time it was destroyed."

Here, there was no obligation to preserve for this case.

And this is the only case that matters.

The records have to be destroyed with a culpable state of

mind.  Not true that they were destroyed with a capable state

of mind.  And the destroyed evidence has to be relevant.

Here's what another district judge said.  I apologize I

forget who wrote this.  In this case before -- the *Steshenko*

case, the record shows careless and inadequate diligence --

we've got that here, inadequate diligence -- not the targeted

destruction of evidence.

So under all the circumstances it's not reasonable to

presume that the documents that were lost were significant.

And that's very important because there's no presumption here

of prejudice because Sutter did not destroy documents in

response to the litigation and did not do so in bad faith, and

the plaintiffs don't argue that there's bad faith.

What Judge Karnow found, as I've already said -- I'm

1  sorry -- he did not find an intention to destroy evidence.  He

2  found that the destruction was intentional, not accidental.

3  But that's all that he found.

4      The absence of prejudice is demonstrated by -- I'm

5  going --

6          THE COURT:  That's fine.  That's the Judge Massullo

7  fix in state court.  It was Judge Massullo who ordered the kind

8  of restoration of the backup.

9          MR. LEVEE:  Well, actually, Judge Karnow ordered the

10 restoration.  And Judge Massullo was addressing --

11         THE COURT:  She declined to do more -- she didn't do

12 any more discovery sanctions --

13         MR. LEVEE:  And she made no ruling at the time about a

14 jury instruction.

15         THE COURT:  Right.  Exactly.

16         MR. LEVEE:  The point I want to emphasize, in a case

17 where pre-2006 was never at issue until after the spoliation,

18 nevertheless, the plaintiffs have all sorts of documents that

19 predate 2006.  They have 133,000 documents.  They have --

20         THE COURT:  Because of the production in the *UEBT*

21 case; right.

22         MR. LEVEE:  Correct.

23         THE COURT:  This is helpful.

24         MR. LEVEE:  We also produced the production that we

25 gave to the Department of Justice, which had issued a subpoena

1    to us at the end of 2011.

2           **THE COURT:**  I remember very well.

3           **MR. LEVEE:**  Importantly, and I want to reference here

4    that some of the slides that counsel for plaintiffs did not get

5    to, but slide 12, slide 19, slide 20, they refer to specific

6    incidences of prejudice or alleged prejudice.

7         One of them is the 2001 managed care contracting packets.

8    We produced it all; all of the contracts from 2001, the

9    amendments, the policies, the meeting agendas, the packets.  Is

10   it possible that some note was destroyed?  Yes, we've

11   acknowledged that.  But to the extent 2001 matters in this

12   case, the plaintiffs have what matters.

13        And I should note that 2001 is before the production that

14   we had agreed to even in *UEBT*.  So some of the examples that

15   the plaintiffs give in their brief -- this is the last point on

16   this slide -- documents that predate 2000, we were never going

17   to save those anyway.

18          **THE COURT:**  Yeah.  Yeah.

19          **MR. LEVEE:**  Nobody asked for them.  We weren't going

20   to save them for --

21          **THE COURT:**  And that's because of the 2002 damages

22   period?

23          **MR. LEVEE:**  Correct.

24          **THE COURT:**  Yeah.

25          **MR. LEVEE:**  Actually, the damages period starts in

1   2003 and then traces back to 2002.

2           **THE COURT:**  Okay.  So you were never going to --

3           **MR. LEVEE:**  I want to mention something, also, in

4   terms of the equities.

5       Sutter's counsel identified the fact that the spoliation

6   occurred, and the very first thing that counsel did was notify

7   the plaintiffs' counsel.

8       And so this is not a situation where we tried to hide

9   spoliation and had some, you know, intent knowing that we had

10  done a terrible thing and now we're going to compound the error

11  by trying to do a coverup.

12          **THE COURT:**  And I would never -- I know that you --

13  that you wouldn't.  And your in-house contact identified the

14  error to you and then you told plaintiffs' counsel immediately.

15          **MR. LEVEE:**  Yes.  And so this is my last slide.

16          **THE COURT:**  Yep.

17          **MR. LEVEE:**  There's a reference to unclean hands, but

18  it's really -- in our motion, our opposition, but it's really

19  an issue under 403 and the motion *in limine* that we filed.

20      We do have a situation where every single one of the

21  plaintiffs threw away documents.  They did so in conscious

22  disregard of Your Honor's orders.

23      We'd rather not bring this up at all.  It's going to take

24  a lot of trial time.  But if we're accused of throwing away

25  relevant documents as a tactical matter, of course, we're going

1  to have to respond in kind.

2          **THE COURT:**  Okay.

3          **MR. LEVEE:**  We think that the right approach is to

4  grant the motion *in limine*, save the jury all of the time that

5  would be needed -- I know the plaintiffs want to embarrass

6  Ms. Brendt, but if she did not intentionally spoliate documents

7  for this case, the fact that she did it for some -- the fact

8  that she threw away documents that were relevant to a different

9  case, I get that.  But it shouldn't be cross-examination fodder

10  in this trial, which is going to be limited to four, five, six

11  weeks, whatever Your Honor winds up giving us.

12          **THE COURT:**  All right.  That's very helpful.

13      I'll let Mr. Steyer respond, because I know he wants to.

14          **MR. LEVEE:**  Can I add one thing?

15          **THE COURT:**  Yes.  Please.

16          **MR. LEVEE:**  Steyer started quoting from Judge Koh's

17  decision in *Apple*.

18          **THE COURT:**  I've got it now.

19          **MR. LEVEE:**  I'm not going to read it, but I would very

20  much invite the Court to read from her opinion --

21          **THE COURT:**  What's the pincite for it?

22          **MR. LEVEE:**  It's --

23          **THE COURT:**  I've got the case itself, but do you know

24  what page it's on?

25          **MR. LEVEE:**  I'm staring at it.

1          **THE COURT:**  Oh, it's Judge Grewal, yea.

2          **MR. LEVEE:**  992 and 993.  And she concludes by saying

3    that even if the elements were found in that case -- which, by

4    the way, she overruled the magistrate judge.

5          **THE COURT:**  Exactly.

6          **MR. LEVEE:**  She wanted to issue a spoliation

7    instruction.  She overruled the magistrate judge.

8          **THE COURT:**  Yeah.

9          **MR. LEVEE:**  She said, Even if I had found that the

10   elements for a jury instruction were present, I still have the

11   inherent authority not to give the instruction.

12         **THE COURT:**  Well, that's what I was aiming at.

13         **MR. LEVEE:**  And that's a very important element of the

14   decision that I would suggest, Your Honor.

15      I'll turn it back to Mr. Steyer.

16         **MR. STEYER:**  Thank you.

17         **THE COURT:**  Okay.

18         **MR. STEYER:**  Your Honor, so let me go through --

19         **THE COURT:**  I'm sorry -- Mr. LeVee, could you give me

20   the -- I've got the underlying Grewal opinion that I managed to

21   pull out.  What was the cite, since you have it in front of

22   you?

23         **MR. LEVEE:**  888 F.Supp.2d.

24         **THE COURT:**  Okay.

25         **MR. LEVEE:**  976.  And, as I said, this is Judge Koh's

1  decision reversing the magistrate judge --

2       **THE COURT:**  I actually remember the case very well,

3  now that I'm contextualizing it, because, obviously, it was

4  a -- yeah, it was interesting.

5       **MR. LEVEE:**  It was a very big deal at that time.

6       **THE COURT:**  Well, I remember.  Oh, my goodness.  Talk

7  about bringing back memories.  You know, the whole case just

8  infiltrated the entire Northern District of California.

9  Another time, to Mr. Cantor's point, well, he's got a story to

10  share.  Sometime in another time, when we're long through this,

11  I'll give you my impression of the client, Samsung clients, and

12  the conversations they were having with Quinn Emanuel along the

13  way.  I have, like, a whole running thing I do on it, but I'll

14  spare you.

15      Okay.  So let's go back to Mr. Steyer.

16      **MR. STEYER:**  I'm going to try to respond in a sort of

17  staccato way to Mr. LeVee's points to dispel some of the

18  misconceptions he's articulated to the Court.  I say that

19  respectfully.

20      The *Hamilton* case.  What he doesn't tell you is that the

21  *Hamilton* case, 2005, held, quote:

22          Where the party destroying evidence acted, at a

23          minimum, in a negligent manner, that party acted with a

24          culpable state of mind.

25      **THE COURT:**  But to destroy evidence; right?

1          **MR. STEYER:**  Correct.  Exactly what happened here.

2          **THE COURT:**  And so Mr. LeVee's point is, well, this

3    isn't evidence.  Certainly, no one can quarrel with the

4    proposition that they intentionally destroyed documents.  The

5    issue is whether they destroyed evidence.  And so that standard

6    would be appropriate for evidence.

7        But what about the point that this isn't evidence?

8          **MR. STEYER:**  It is evidence, Your Honor.  And I'm

9    going to point to that in one second.  If you look at our

10   Exhibits 30, 32, 34, 37, and 40, you will see that there are a

11   number of boxes of documents that were unable to be put back

12   together because the remediation effort, as the person in

13   charge of it -- if we look at slide 18, this is Ms. Brosnahan,

14   a lawyer who is in charge of this -- she admitted at her

15   deposition, that I took in March of this year, that it was

16   guesswork because all 192 boxes had been destroyed.  So they

17   were guessing about how to put it back together.

18          **THE COURT:**  Right.  But they were able to identify

19   that 41 boxes had potentially responsive documents; right?  The

20   others were --

21          **MR. STEYER:**  Wait a second.

22          **THE COURT:**  The others were too old or not relevant;

23   right?

24          **MR. STEYER:**  No.  Wrong.  They arbitrarily decided

25   that they wouldn't look at things before 2002.

1          **THE COURT:**  Well, that's because that was the -- was

2    that the agreement in state court for production of documents?

3    Because the damages period began in 2003, so they went back a

4    year before that.

5        Just like here you never made any document requests that

6    predated 2006.  You did, of course, get documents from the *UEBT*

7    for sort of efficiency reasons, but you never requested any.

8          **MR. STEYER:**  Your Honor, that's not correct.  That's

9    inaccurate.

10        What you must remember, you dismissed the case in June of

11   2014.

12         **THE COURT:**  Yes, I do remember.  I do remember.

13         **MR. STEYER:**  We spent two years in the Ninth Circuit.

14         **THE COURT:**  I know that.  So then you came back and

15   started discovery in November 2016.  Right.  That's from your

16   motion *in limine*; right.

17         **MR. STEYER:**  Precisely.  But it even goes beyond that

18   for the moment.  If you look at the slide that Sutter has put

19   together, if you look at their second slide, they call it

20   relevance.

21        What they fail to point out is that the Third Amended

22   Complaint was filed on December 9th, 2013.  That is the

23   complaint that you dismissed.

24        And I will give you the paragraph numbers because they've

25   misrepresented what's in it.  You could look at paragraphs 5,

6, 12, 29, 33 to 38, 85, 88, 91, 94, 126, 128, 136, 137, 146,
and 153, which implicated the systemwide agreements which were
put into place in the 1998 time frame.

And I would respectfully ask you to take a look, not
necessarily this moment, at Mr. Jain's declaration, Exhibit 5.
That's the Brendt declaration April 13, 2017, Sutter's
opposition to class cert in *UEBT*.  She lays out the history of
systemwide agreements starting in 1998 and going up to 2004.

The time period when Sutter conceived, adopted, and
implemented and imposed systemwide agreements on the health
plans predated 2002.  So the fact when they went to remediate,
they said, oh, we're not going to look at anything before 2002,
that's like teaching U.S. history --

**THE COURT:**  That's because that's all that Judge
Karnow ordered them to do.

**MR. STEYER:**  Your Honor, the law says -- and I have
cited it -- is that you have an obligation, as a party, to
preserve evidence that you know or reasonably should know could
lead to relevant information in a case, regardless of what --

**THE COURT:**  Well, that's different than your
litigation hold argument.

**MR. STEYER:**  Regardless of what Judge Karnow said
or -- in the *UEBT* case, Sutter knew that the key time period
was '98 to '04.  That's when they implemented the policies that
are in dispute here.  They can't put their head in the sand.

1      And the other point --

2          THE COURT:  But your class period -- this case here,

3  just to be specific -- is about a damages period that begins in

4  2011.  It is about whether Sutter's contracting practices

5  during the time frame relevant to this litigation is

6  anticompetitive, resulting in damages to the case.

7      There's no way I would ever authorize -- and Judge Karnow

8  in the Sutter -- as I recall, because I was ready to talk about

9  this at our last motions hearing that we decided to put it off

10 until August, but Judge Karnow, as I recall, ordered production

11 back to 2002 and then Sutter agreed, for certain specific

12 requests, to go back to 1998.

13     And while I'm not inclined to preclude -- there's a motion

14 *in limine* about evidence coming in before 2006 -- I think that

15 it seems wrong to make categorical determinations of what does

16 or doesn't come in.  It's very hard for me to evaluate it

17 divorced from the context of a trial.

18     But, you know, I cannot imagine -- I don't think you would

19 have asked for discovery back to -- back to before 2002 in this

20 case.  Maybe you did, I don't remember.

21         MR. STEYER:  We did.

22         THE COURT:  You did, and then we --

23         MR. STEYER:  Let me give you the cite, Your Honor.

24         THE COURT:  Well, no, it's okay.  You don't have to.

25 You tell me you did, that's fine.

1          **MR. STEYER:**  If I may, I have it right here.

2      The second CMC we had after we came back from the Ninth

3  Circuit was, I believe, in January of 2017.  On January 12th,

4  we filed a joint CMC statement with Mr. LeVee's firm.  Page 2,

5  line 27 to page 3, quote:

6          Plaintiffs reserve their right to seek documents

7      dating back to January 1st, 2002, to the extent requests

8      in this action do not completely overlap with UEBT's party

9      requests and unique issues present in this case warrant

10     the production of documents dating back to January 2002 or

11     earlier.

12     We expressly preserved it.

13         **THE COURT:**  Right.  I understand.  That's fine.  I

14  understand.  Okay.

15         **MR. STEYER:**  Okay?  Now --

16         **THE COURT:**  So we've got six minutes left.  I'm giving

17  you the rest of Mr. LeVee's argument time to keep us within the

18  time frame.

19         **MR. STEYER:**  What I want to point out --

20         **THE COURT:**  You can still have five minutes, if you

21  want, Mr. LeVee.

22         **MR. LEVEE:**  Could I have 30 seconds when he's done?

23         **THE COURT:**  Yes.

24         **MR. LEVEE:**  Thank you.

25         **THE COURT:**  Let me ask Kathy.  Kathy, how much time

1  have you been typing?

2      (Response off record.)

3          **THE COURT:**  We have to wrap up.  Two minutes to

4  Mr. Steyer, 30 seconds to Mr. LeVee.

5      Sorry, Kathy.

6          **MR. STEYER:**  Number one, the law is very settled that

7  the temporal scope of discovery is not confined to the

8  limitations period of antitrust law or the damage period.

9  Broad discovery may be needed to uncover evidence of insidious

10 design, pattern, or intent.

11     There's a Ninth Circuit case two months ago, *Sandler*

12 *Partners versus* --

13         **THE COURT:**  I understand.

14         **MR. STEYER:**  That's number one.

15         **THE COURT:**  Yep.

16         **MR. STEYER:**  Let me talk about prejudice for a moment,

17 Your Honor.

18     Okay.  Number one --

19         **THE COURT:**  Honestly, 52 seconds.

20         **MR. STEYER:**  -- Brosnahan admitted it was guesswork.

21     Number two, they only looked at 29 percent of the 192

22 boxes.  If you look at the Grimes declaration from May 17,

23 2019, paragraph 9, they were only able to reconstruct 38 of the

24 55 boxes they even deemed relevant, which means less than

25 20 percent of the destroyed documents did they try to do

1  anything.

2         THE COURT:  So I definitely understand this fact

3  context.  That's super helpful.  Thank you.

4         MR. STEYER:  And just one other key point, Your Honor,

5  in closing.  I could go on, but that's this --

6         THE COURT:  You can't, we've got to stop.

7         MR. STEYER:  Chris Vine, the head of the department,

8  her notes are lost forever, forever.  And she was the head of

9  the department when they formulated this policy.

10     If that isn't prejudice, I don't know what is, Your Honor.

11         THE COURT:  All right.  I know you want the

12  opportunity to test prejudice in talking to witnesses about

13  what they might have and what they might produce.

14     But, Mr. LeVee, 30 seconds.

15         MR. LEVEE:  Your Honor, filing a CMC statement after

16  the spoliation occurs, that says that the plaintiffs reserve

17  their right --

18         THE COURT:  That's all right.  That's okay.  Yeah.

19         MR. LEVEE:  -- where they don't ever move this Court

20  for an order and where Sutter says we will only give you

21  documents back to 2006, that literally answers the question.

22         THE COURT:  Okay.  Thank you.  All right.

23     Fifteen minutes, folks.

24         MR. LEVEE:  Thank you, Your Honor.

25                 (Recess taken at 3:54.m.)

1          (Proceedings resumed at 4:13.m.)

2          **THE COURT:**  So we are back.  Elaine, you can press

3   record.

4      So we're going to go to Skinner.  And I'm putting Skinner

5   on now.

6          **MR. KOVACS:**  Your Honor, this is James Kovacs with the

7   plaintiffs.

8          **THE COURT:**  Okay.

9          **MR. LEVEE:**  Your Honor, I wanted to introduce you to

10  Patrick Ryan, who is Mr. Bunzel's law partner.

11         **THE COURT:**  Excellent.

12         **MR. LEVEE:**  He will be arguing with respect to

13  Dr. Skinner.

14         **MR. KOVACS:**  Your Honor, I'll keep this brief.  The

15  plaintiffs are narrowly moving to exclude Dr. Skinner's expert

16  testimony on the subjects of COVID-19 and the California

17  wildfires for three separate reasons.

18      First, Your Honor, Dr. Skinner has no basis to opine on

19  either subject as he has no experience concerning COVID-19 nor

20  the California wildfires.  His analysis is solely predicated on

21  some interviews with Sutter physicians, a short analysis of

22  patient transfers only to Sutter hospitals, and reliance on

23  Sutter's Patrick Pilch's own findings.

24      Second, Your Honor, as we've discussed frequently today in

25  other motions, both COVID-19 and the California wildfires are

1    another example of wholly unrelated and disconnected

2    information that's not related to Sutter's anticompetitive

3    contracting practices with the commercial health plans in this

4    case.

5         And, finally, Your Honor, at best, Sutter's efforts to

6    provide the COVID-19 and wildfire relief are mere social

7    benefits that the Supreme Court recently, in the *NCAA* and the

8    *Alston* decision, articulated it should be ignored by courts for

9    the purposes of antitrust analysis.

10        **THE COURT:**  Let me just ask you, just because I'd like

11   to cut to what I think is the most -- okay.  So just, like,

12   from a fact perspective, remote -- you know, he gives examples

13   of the investments and then their advantages; right?  Not

14   necessary.  I don't think anyone -- he obviously can't opine on

15   the quality of medical care, that's for sure.

16        But why -- and I get the kind of -- sort of argument that,

17   oh, come on, the pandemic is just a -- it's too much.  But

18   another way to look at it is that it's just another example of

19   the advantages of a remote ICU or remote -- better emergency

20   management practices.

21        So why -- you know, so leaving -- again, because we've

22   already talked about the -- you know, the procompetitive

23   benefits that have to be tied to the challenged contracting

24   practices as a way of limiting what any testimony is about.

25        There are clearly things within his expertise; quality of

medical care is not.  Not whether there was quality of medical

care, but he might be able to say, you know, business

advantages to certain investments.

And so I just wanted to at least touch on -- given what

I've said already about what I think is appropriate for

testimony, that I am going to allow Sutter to have testimony

about those procompetitive advantages, obviously, they have to

establish the causation.  And Ms. Kim is sceptical that they

can and thinks that they won't.

But just maybe speak to just that one point.  You know,

focus on why it seems so prejudicial.  Because I do think that

there's an argument that Sutter makes that it's not about

public -- social welfare benefits don't excuse antitrust

conduct.  They're, instead, benefits.

So just limit it to COVID-19 and the wildfires, I think,

is the best -- maybe just focus on the prejudice first, because

I'm with you on the -- I'm with you on the quality of medical

services.

MR. KOVACS:  So, Your Honor, to be clear --

THE COURT:  And other witnesses need to talk about the

causation issue.  He can't talk about causation; right, so.

MR. KOVACS:  I agree with you on that, Your Honor.

And I do think there is no connection here whatsoever.

And I will also note, Your Honor, that in the Pilch

*Daubert* and also in the Motion *in Limine* No. 3, they both

1    concern COVID and wildfires as well --

2            **THE COURT:**  Right.

3            **MR. KOVACS:**  -- previously for Patrick Pilch.

4        I think what matters here is that Dr. Skinner is a

5    healthcare economist.  And what matters when we're talking

6    about prejudice is he's an unreliable -- he can't really

7    discuss these facts.  He has no reliability.

8        He has no knowledge under FRE 702 to be able to speak to

9    these issues because he talks about, in his previous report,

10   the total cost of care.  He talks about quality.  These are

11   things that --

12           **THE COURT:**  He can't talk about quality.  I think

13   that's undisputed, and that's part of the order.  He can't talk

14   about quality.  He can talk about how quality -- he can talk, I

15   think, about the efficiency of medical care, right, but not the

16   quality of it.

17           **MR. KOVACS:**  Right.  And so my point, Your Honor, is

18   that Dr. Skinner, again, is a healthcare economist.  He is not

19   a clinician.  He has no knowledge whatsoever -- and he's never

20   really dealt with COVID or California wildfires.

21       What work he has done -- what limited work he has done,

22   outside of talking to the Sutter physicians -- and I think this

23   is an important prejudicial point, Your Honor, because you

24   talked about the prejudice of all this.

25       What Sutter did is they set up some interviews for their

experts to talk to various Sutter physicians and clinicians,
some of who will be called as witnesses at trial by Sutter.
And a lot of them are going to be focusing on COVID-19.

In his deposition, when Dr. Skinner was asked, Did you
take any notes of these so, you know, we can examine what you
talked about?  Nope, didn't take any notes.

Well, did you think this was important?  Was this
necessary to form the opinions in your report?  Nope.  It was
not necessary.

And, in fact, Your Honor, this -- this is a key -- this is
a key point.  In his deposition Dr. Skinner admitted that he
has no idea how COVID-19 relates to the issues in this case.

And then the other prejudicial point which I think is
equally important and sort of dovetails into other arguments
that we made and will be previewed in the MILs, this issue, the
pandemic, impacts all hospitals in Northern California.  Sutter
is not unique --

**THE COURT:**  Let's leave the pandemic aside for a
second, right, because, you know, the -- although it's an
example of how a remote ICU can be helpful in situations where
you shouldn't be in the same room with somebody, so, you know,
and -- and I -- I don't think it should be a big point, but I
wonder for Sutter whether -- why he needs to talk about it.

But the wildfires, you know, with examples about how
emergency management investments can help you provide better

1  services, why isn't that -- since he's an expert about

2  components of the healthcare industry, why isn't that something

3  he can talk about?

4       Same true, actually, with the remote ICU issue, too.  He

5  can't talk about quality.  He can talk about ability.  And it

6  seems like sort of an unremarkable point that if you've got --

7  if you invest in emergency management practices then that helps

8  you do better in a time of an emergency.  Well, what's an

9  example of an emergency?  Well, consider the wildfires.  These

10  sorts of things are possible.

11       And why isn't it the -- just like Dr. Chipty, why isn't

12  that the kind of context to the fact witnesses that it's

13  helpful to the trier of fact to understand an issue, a fact in

14  issue?

15       **MR. KOVACS:**  I understand, Your Honor.  And I think

16  what's key here is Dr. Skinner is a healthcare economist.

17       What he is offering opinions upon is -- again, his primary

18  point is cost of care, where he uses Medicare, doesn't want to

19  rely on commercial because it shows Sutter does poorly, so they

20  rely on Medicare data to skew the data.

21       And now, in his supplemental report, he's going into new

22  areas and talking become shams and he's talking about COVID and

23  fire relief.  That's not his expertise.  He is a healthcare

24  economist.  He specializes in analyzing and understanding the

25  inputs of costs.

1       And that's what he'll testify to, and we will

2  cross-examine him on those issues.  That's why we're

3  restricting him, because he had no authority to speak to these

4  subjects.  He has no expertise.  That's why it's our primary

5  point of our motion.

6              **THE COURT:**  Okay.  Let's hear from Sutter.

7              **MR. RYAN:**  Good afternoon, Your Honor.  Nice to see

8  you.

9              **THE COURT:**  Nice to see you too.

10             **MR. RYAN:**  Okay.  So directing at those comments,

11  Dr. Skinner is an efficiency expert in healthcare.  And what he

12  talks about is the fact that you have to look holistically at

13  the total cost of care, not at a specific instance of a price

14  or a procedure.

15      And when you're talking about efficiency, some of the most

16  important things you look at are:  Was the patient required to

17  be admitted to the hospital?  And once they got there, how long

18  did they have to stay?  And did they have to get readmitted?

19  And things that relate to that are what happens while they're

20  in the hospital; were there complications.

21      And the investments that go into reducing hospital

22  admissions, reducing the length of stay, reducing readmissions,

23  all relate to his opinions from an economic point of view.

24      And as we said in footnote 2 in our opposition, the law is

25  clear in federal court.  Efficiencies are a critical part of

1    the analysis when you're talking about a procompetitive

2    justification defense.  They're core admissible.

3        Okay.  Now, the --

4        **THE COURT:**  Well, what about the argument -- you heard

5    me use the word "efficiency."  I got it from you; right.  So

6    what about the argument that it's just a little too much to

7    have him talk about the pandemic and the wildfires?  It sort of

8    fans the flames beyond what he really should do.  And maybe you

9    can have fact witnesses talk about that.

10       I know there's a motion *in limine*, and we'll deal with it

11   when we get there.  But my view on the motion *in limine* parts

12   are those are examples of efficiencies, not the only examples

13   but the examples, and it seems odd to divorce examples

14   because -- and I'm not prepared to do it, although we'll hear

15   argument when we get to the motion *in limine*.

16       But what about the argument that this isn't the witness;

17   that's a fact issue?

18       **MR. RYAN:**  So there are examples from the pandemic

19   that are core on efficiency.  And I'll just give you a couple

20   for example.

21       **THE COURT:**  Okay.

22       **MR. RYAN:**  And he cites to the Pilch report, which

23   outlines all of these; right.

24       **THE COURT:**  Yep.

25       **MR. RYAN:**  The remote ICU.  Specifically, in April

1    Sutter had 600 ICU beds during the pandemic.  That is

2    converting hospital rooms that normally wouldn't be able to be

3    an ICU because of their extensive investment in the EICU, EHR,

4    and other things.  They are very expensive.

5            **THE COURT:**  Okay.

6            **MR. RYAN:**  There's nothing more efficient than being

7    able to overnight --

8            **THE COURT:**  Okay.  That's a good example.  Okay.

9    That's helpful.  Thanks.  Okay.  I think I'm fine on a proffer

10   for Skinner.

11       Why don't we go to Axene.  Who's doing Axene?

12           **MR. BROWNSTEIN:**  Your Honor, David Brownstein for the

13   plaintiffs.

14           **MR. LEVEE:**  Jeff LeVee for Sutter.

15           **THE COURT:**  Okay.

16           **MR. LEVEE:**  I'll try to be very brief.

17       Sutter's motion seeks to preclude Mr. Axene from offering

18   just two opinions.  I'm going to be brief as to those.

19       One is the passthrough opinion.  At deposition, Mr. Axene

20   testified that his opinion that he would give to the jury at

21   trial is that there is a 100 percent passthrough.

22       The plaintiffs' opposition to this motion starts out

23   denying that that's his opinion, but on page 10 of the brief we

24   find plaintiffs actually defending, quote, Mr. Axene's opinion

25   of 100 percent passthrough.

1        The problem is that Mr. Axene did no analysis of

2   passthrough in this case.

3            **THE COURT:**  So can't he --

4            **MR. LEVEE:**  No.

5            **THE COURT:**  -- talk -- I appreciate -- so I don't

6   think he should be able to testify about Sutter's rates because

7   he didn't analyze the data; right.

8            **MR. LEVEE:**  Correct.

9            **THE COURT:**  But he does seem to have good actuarial

10  expertise on premium construction and seems to opine that, in

11  the aggregate, premiums are calculated to pass through

12  100 percent of medical cost.  In the aggregate; right?

13           **MR. LEVEE:**  Yes.

14           **THE COURT:**  And so it seems to me he should be able to

15  testify about how premiums are constructed generally, but not

16  about Sutter's rates because he didn't analyze the data.

17       And so you have a counter to that.  You challenged him;

18  right?

19           **MR. LEVEE:**  Yes.

20           **THE COURT:**  You say, oh, costs aren't necessarily

21  passed through and profit margins might be decreased and all

22  that.  But that, to me, again feels like fair cross-examination

23  but does not preclude testimony about how premiums are

24  designed.

25       And it seems to me that, you know, he's got expertise in

the industry and seems pretty qualified to talk about what in
the aggregate is done.  If it isn't done here, well, that's
your cross-examination.

    And the other part of it is you do have that 2011
PowerPoint slide which assumed a hundred percent passthrough
rate.  Okay.  Fine.  It's an assumption.  Weight, not
admissibility.  But I think it's pretty helpful testimony.
That's what I thought.

    And then I also thought his catastrophic claim pooling, I
thought it was -- you know, was fine.  He's the rebuttal
witness to Travis; right?

        **MR. LEVEE:**  He is on that point, yes.

        **THE COURT:**  On that point.  And then you can test any
foundation for his opinion through cross.  So I thought he
seemed like a good witness to me.

        **MR. LEVEE:**  So if the Court is allowing him to testify
generally --

        **THE COURT:**  Yes.

        **MR. LEVEE:**  -- as to how premiums are calculated --

        **THE COURT:**  Yep.

        **MR. LEVEE:**  -- how medical costs are part of that
premium, I have no --

        **THE COURT:**  And then in the aggregate premiums are
calculated to pass on a hundred percent of medical costs.

        **MR. LEVEE:**  Yes, but not -- what I think I hear you

 1    saying --

 2            **THE COURT:**  But he cannot -- he supports the opinion

 3    in part 2 with the kind of actuarial certification he talks

 4    about; right?  But he cannot testify about Sutter's rates

 5    because he didn't analyze them.  Period.  End of story.

 6            **MR. LEVEE:**  And he can't testify, therefore, as to

 7    whether --

 8            **THE COURT:**  There's a hundred-percent passthrough.

 9            **MR. LEVEE:**  -- the higher prices in this case will

10    pass through.

11            **THE COURT:**  Correct.  I think that's correct.

12            **MR. LEVEE:**  Let me go to the second opinion.

13        Let me talk about catastrophic claim pooling --

14            **THE COURT:**  Okay.

15            **MR. LEVEE:**  -- because I do think there's a

16    difference.

17            **THE COURT:**  Okay.

18            **MR. LEVEE:**  Catastrophic claim pooling in this

19    instance has two components; small groups in individual plans,

20    large groups.

21            **THE COURT:**  Okay.

22            **MR. LEVEE:**  With respect to small groups, he's got one

23    opinion:  Catastrophic claim doesn't exist, doesn't occur, and

24    he doesn't see it.

25        The problem is he's done no analysis.  And Mr. Travis

 1   has -- presents evidence of 20 different examples, all filed

 2   with the California regulator, that showed catastrophic claim

 3   pooling for small group insurance plans.

 4       So Mr. Travis is going to walk through, "Here are my 20

 5   examples," and Mr. Axene is going to stand up and say, "Well,

 6   no, it doesn't occur."

 7       I suppose I could cross-examine and ask, "Did you do any

 8   work in the case?" and the answer will be "No."  But I don't

 9   understand how he could even give the opinion in the first

10   instance --

11            THE COURT:  Well, I think he can talk about what it is

12   and how it works, but he's not able to say anything about what

13   happened here.  And you've got 20 examples of where -- that he

14   could be confronted with.

15       I assume he probably will listen to Travis's testimony

16   because he's a rebuttal expert.  I mean, how does this go?

17   Will he go in, in a rebuttal case or are you going to put him

18   on in a case-in-chief?

19            MR. BROWNSTEIN:  Your Honor, we're going to put him in

20   on the case-in-chief and --

21            THE COURT:  Because he has other stuff to talk about.

22            MR. BROWNSTEIN:  You know, the funny part about it

23   will be that, to the extent he's rebutting Mr. Travis'

24   opinions, that's going to go in before Travis talks, unless we

25   save him for a rebuttal case, which I'm sure Your Honor would

1    like to avoid having.

2           THE COURT:  Yeah, one of the issues is if you have --

3    if you have the same witnesses, you've got to do them all at

4    once.  We're not going to call people back.  We'll tell the

5    jury that.  It'll be fine.

6        So, yeah.  All right.

7           MR. LEVEE:  So --

8           THE COURT:  He's got expertise.  He's an actuary.  And

9    it's going to be helpful to the jury.  But you're saying it's

10   contradicted by the actual facts.

11          MR. LEVEE:  If he says that he understands what

12   catastrophic claim pooling is, I've got no qualms with that.

13          THE COURT:  And explains what it is and how it works.

14          MR. LEVEE:  Right.  But if he then says --

15          THE COURT:  He says that high-value claims don't

16   affect premiums.  And you're saying that's contradicted by the

17   actual evidence that your expert's going to put in.

18          MR. LEVEE:  So, actually, that's as to large groups.

19          THE COURT:  To large groups, okay.

20          MR. LEVEE:  Let me address large group.

21          THE COURT:  Okay.

22          MR. LEVEE:  Let me give you his opinion.  I'm going to

23   quote it.

24          THE COURT:  Okay.

25          MR. LEVEE:  I would not expect the aggregate net

1    impact of premium pooling adjustments to be statistically

2    different than zero over a 10-year period across an entire

3    geographic region.  Close quote.

4        The problem is that the reason he says, "I would not

5    expect," is he hasn't done a lick of work in this case or, as

6    far as I know, in any case as to whether catastrophic claim

7    pooling with respect to large claim does, in fact, have an

8    impact.

9        And so since he didn't discuss this issue with the

10   witnesses in this case, he didn't analyze any claims data,

11   didn't analyze any part of the record in this case, he should

12   not be permitted to testify that he would expect the effect of

13   the pooling to be zero, where we have an expert who has done a

14   lot of work.

15       **THE COURT:**  It seems like it would be a -- I mean, it

16   seems like it might be helpful in the plaintiffs' case-in-chief

17   to have him talk about catastrophic claims pooling but just

18   generally.

19       But if it's at issue, it seems like the real value of his

20   opinion is the hundred-percent passthrough rate.  That's how it

21   works.  And if he's testifying about he wouldn't expect -- and

22   he makes that observation in the context of actual evidence

23   that refutes that observation, that doesn't seem like a very

24   good choice for the plaintiff.

25       What do you think about of that?

1          **MR. LEVEE:**  I understand.

2          **THE COURT:**  Let's see what Mr. Brownstein thinks of

3    that.  What is he going to testify on that point?  What are you

4    going to have him testify about?

5          **MR. BROWNSTEIN:**  What he's going to testify about is

6    that, based on 40 years as an actuary and knowing the types of

7    adjustments that are made in large group and, frankly,

8    occasionally in small individual group, and knowing that

9    catastrophic claims pooling deals with randomly occurring large

10   claims, that other over time he expects they will even out.

11   And that's based on his observation and his experience in the

12   industry.  So, Your Honor, that's actually in the heartland of

13   his experience.

14         **THE COURT:**  All right.  Well, I mean, I'll look at the

15   report on that section.

16         **MR. BROWNSTEIN:**  I think it would be very helpful to

17   the jury.

18         **THE COURT:**  Okay.  I'll look at the report on the

19   points.

20       So I think that gets us through the *Daubert*.  I've now --

21         **MR. BROWNSTEIN:**  Your Honor, can I actually cover a

22   couple of these points with Mr. LeVee?

23         **THE COURT:**  I know, but I think you won on the other

24   point.

25         **MR. BROWNSTEIN:**  If I won on the first point, I will

rest on that.

**THE COURT:**  Because you can't talk about Sutter.  You don't really dispute that.  But he's got great testimony that explains how it works and the aggregate and the actuarial certifications, and it all seems really helpful.  It helped me. So if it helps me, it's got to help the jury.

**MR. BROWNSTEIN:**  Correct, Your Honor.

**THE COURT:**  It was interesting to read about it.

**MR. BROWNSTEIN:**  Right.  The testimony that Sutter moved on there was, frankly, not in his report.  He testified about how premiums --

**THE COURT:**  Well, you know -- yeah.

**MR. BROWNSTEIN:**  Sutter asked the question.  Honestly, if they ask him that at trial --

**THE COURT:**  He'll say he didn't do it, yeah.

**MR. BROWNSTEIN:**  -- that there will be passthrough based on his experience.  I'm assuming Sutter is not going to ask that question, and we won't elicit that.

**MR. LEVEE:**  We'll stipulate to that.

**MR. BROWNSTEIN:**  Let me talk to you about pooling for a moment because Mr. LeVee misstated Mr. Axene's actual opinion about the small group and individual group pooling.

What he -- what his report says and what he will testify to is that, because the populations in California of these insurers are so large, that there are rarely pooling

1  adjustments made to small group or individual group premiums

2  based on pooling.  He did not say nor will he testify that

3  pooling, as an exercise, is never done by actuaries.

4      As you probably know from other cases, Your Honor,

5  actuaries look at everything from every angle and run every

6  possible permutation to try to get premiums right.  That's

7  their whole job.

8          THE COURT:  I did ERISA work.  So, unfortunately, I

9  know more about it than you would think.  Or fortunately.  I

10 actually really liked ERISA work, to be honest with you.

11         MR. BROWNSTEIN:  And he's in California, and he can

12 say, based literally on his years of experience in watching

13 this, that over time you're going to expect pooling charges to

14 even out.

15     He is not going to testify that he did it mathematically

16 or that there is absolutely no difference.  His opinion is

17 exactly as stated in the report, that it would be zero or close

18 to it over time.

19         THE COURT:  That's helpful.  All right.  That's good.

20 Thank you for making that fact clarification.

21     Okay.  So now I think that, with the rest of our time, I

22 sort of rethought what we could do.

23     I thought someone could send me Sutter's motion on Motion

24 *in Limine* 4.  It's the Kauffman declaration was just a big ole

25 binder.

 1          You know, I know Exhibit 30 was the --

 2          **MR. LEVEE:**  Yeah, so --

 3          **THE COURT:**  -- was the deposition.  I just need

 4     someone to give me the numbers for all the exhibits.

 5          **MR. LEVEE:**  I got it, Your Honor.  I want to

 6     apologize.  The motion refers in the first paragraph --

 7          **THE COURT:**  Exactly.

 8          **MR. LEVEE:**  -- to plaintiffs' exhibit list.

 9          **THE COURT:**  Okay.

10          **MR. LEVEE:**  Not to exhibits.  Ready?

11          **THE COURT:**  Oh, yeah.

12          **MR. LEVEE:**  P31 --

13          **THE COURT:**  P31.

14          **MR. LEVEE:**  -- through 35.

15          **THE COURT:**  Okay.  Perfect.  Okay.  Good.  Thank you.

16     It just defeated me.

17          **MR. LEVEE:**  They're in a footnote, but, of course, the

18     Court wouldn't find it.

19          **THE COURT:**  Well, I did see the footnote.  So I got

20     from the footnote to the declaration, and I got from there from

21     later in the text when we're talking about the metadata to the

22     overall report.  But then I just started flailing around in the

23     record and realized it's too many exhibits.  And I didn't

24     really find the underlying witness summaries.

25          So let's table that one.  That was the one that I spent

1  the least amount of time on because I just thought I'll let

2  them walk me through it.

3      We can talk about your motions *in limine*, I thought,

4  Mr. LeVee, if you wanted to.

5          **MR. LEVEE:**  Actually, that's one of them.

6          **THE COURT:**  Okay.

7          **MR. LEVEE:**  And my argument --

8      **MR. KOVACS:**  One thing to note is that Sutter included

9  some exhibits.  They missed one.  And that's in our motion, P2.

10 So in our opposition we included Sarah Krevans' interview

11 notes.

12         **THE COURT:**  Exhibit P2 to which declaration?

13         **MR. KOVACS:**  Opposition to Motion *in Limine* No. 4.

14         **THE COURT:**  Okay.

15         **MR. KOVACS:**  I apologize for interrupting.

16         **THE COURT:**  Oh, no, you're not interrupting.  You're

17 helping.  You're helping.

18     Okay.  The problem is that I have -- that's fine.  I'll

19 find it.  Things like P2 -- I mean, now that I'm in a binder,

20 so I'm looking at -- and the docket sheet is actually pretty

21 helpful because you can see the number of exhibits.  But it can

22 be very complicated just finding the darn exhibits.

23         **MR. LEVEE:**  We did an omnibus declaration for all the

24 motions.

25         **THE COURT:**  Yours was actually very easy because it

1    was an omnibus declaration.  That was great.  And so -- yeah,

2    and I --

3          **MR. LEVEE:**  If Your Honor wants, in two to three

4    minutes --

5          **THE COURT:**  Yes.

6          **MR. LEVEE:**  -- I can quickly explain our position on

7    Motion *in Limine* 4, and then --

8          **THE COURT:**  Sure.  That's fine.  That's fine.

9       So let's talk about it.  Yes, that's fine.  We can talk

10   about Motion *in Limine* 4.

11         **MR. LEVEE:**  Okay.  I'll be fast.  I'm losing my voice.

12   I don't understand how you guys aren't.

13      Motion *in Limine* 4 refers to some materials prepared by a

14   little company known as Strategy Advantage.  Sutter retained

15   Strategy Advantage in 2006 to interview a bunch of Sutter

16   employees and prepare a report.

17      The purpose of the work, as quoted in the deposition, was

18   to focus on Sutter's marketing strategy, not managed care

19   contracting.

20      Strategy Advantage had one employee, Kim King.  Ms. King

21   testified that she may or may not -- she's not sure -- have

22   used an intern to take notes of the interviews, and she then

23   used those notes, or the intern used those notes -- she's not

24   sure -- to create memos of the interviews.

25      She doesn't recall anything about the interviews.  She

1   doesn't recall who did the interviews.  She doesn't recall who

2   she interviewed.  She knows she was involved, but she doesn't

3   know if there was an intern.  She thinks they were by phone,

4   and she knows that they were not recorded.

5       The one thing she is certain of, the interview notes are

6   gone, so they were not produced.  So the memos --

7           **THE COURT:**  And she also said in her deposition she

8   wasn't exactly sure what her practices would have been in the

9   time period.

10          **MR. LEVEE:**  Correct.

11          **THE COURT:**  Here's the issue I have with it, and let's

12  talk through it.

13          **MR. LEVEE:**  Yeah.

14          **THE COURT:**  And I don't have the memo in front of me.

15  It's over there on my desk.  The binder is open to it.

16      You know, that's the whole reason we have the business

17  records rule --

18          **MR. LEVEE:**  Yes.

19          **THE COURT:**  -- because no one ever is going to

20  remember stuff, or past recollection recorded for that matter.

21      And so if someone is able to testify -- and I have not

22  gone into the last part of your motion.  I mean -- because I

23  didn't look at what the individual statement said yet.  I just

24  read her summary of them.  I read it quickly.  I need to read

25  it slower.

1    But it is -- it is the unremarkable feature of human

2    memory that we don't remember things many years after we do it.

3    We generally remember our practices.  It doesn't defeat a memo

4    that somebody else took notes and even typed them up, because

5    if you were there, we do it all the time; right?  Depo

6    summaries.

7    If your recollection -- I'm just using that as an example

8    because for some reason -- I had some of my clerks help me, you

9    know, get excerpts, some of the expert stuff to make it quicker

10    for me to get at the record.  All of a sudden, I had a

11    flashback to writing depo summaries in my practice as a lawyer.

12    So I was using that as an example.

13    But, you know, you look at it, you were there.  You

14    remember.  You use notes or you don't use notes.  It's

15    relatively contemporaneous.  It doesn't have to be the same

16    day.  It's always better if it's right away, but if it's some

17    period later and you have a good memory of it, there's nothing

18    wrong with it.

19    And so that's the problem.  Even though she can't -- and,

20    again, what I thought was -- reading it -- and you tell me why

21    I'm wrong -- I thought, well, gee, I read the deposition

22    testimony.  She, of course, has to satisfy the foundational

23    predicates for coming in, but isn't that something better

24    evaluated in context, because she would be able to do it?  But

25    that's one thing.

1      Then, of course, the second part of your motion is also

2  some of it shouldn't come in; right?  Well, and she's allowed

3  to rely on hearsay for a business record.

4      It does seem to me that Sutter contracted with her for

5  internal -- for its marketing team to be able to consider.  Why

6  isn't she the equivalent of a custodian who can testify?  You

7  know, do you disagree with that?  I can't remember if that was

8  in your motion.

9      You don't say that because she's a contractor -- we have

10  contractors all the time who serve custodial roles in

11  companies; right.  That's the whole point, is you hire contract

12  employees.

13      **MR. LEVEE:**  I wasn't challenging that, but in this

14  context the outside vendor who has the intern participate in

15  interviews, take notes --

16      **THE COURT:**  But she was in all the interviews herself

17  too; right?

18      **MR. LEVEE:**  Yes.  But we don't know who prepared the

19  memos because she's not sure.

20      **THE COURT:**  And is she able to say that her memos,

21  whoever prepared them, that she would read them and be able to

22  say, because of her actual participation in the interviews,

23  that they would be an accurate reflection of what was said

24  during the conversation?  That seems to be enough to

25  authenticate.

1          **MR. LEVEE:**  Well, she said that she tried.  But here's

2    the problem.  There are fundamental errors.  She literally --

3    let me give you the two examples that are the most important

4    ones.  One person, the name is wrong.  Just completely.

5    Another person is given a job title that that person never had.

6          And we then fast-forward 15 years later and the person who

7    she says she interviewed, who had a job title as a CEO of a

8    hospital, who was never a CEO of a hospital, winds up being the

9    CEO of Sutter Health 15 years later.  And there's something in

10   that memo that's very prejudicial, that Ms. Krevans, the CEO,

11   swears that she never would have said.

12         And we have no basis, really, to cross-examine Ms. King on

13   this document, because she says, yeah, I think -- I know I got

14   the name wrong and I know I got the job title wrong, but we put

15   the memo together and it's the best that we could do.  And,

16   yes, we didn't do the memo contemporaneously as in that day,

17   but we did it within --

18         **THE COURT:**  Is that a Rule 403 analysis as opposed to

19   a foundation --

20         **MR. LEVEE:**  Well, the plaintiffs say that the cases

21   allow you to do it days later.  There's certainly cases that

22   say that it needs to be done -- that contemporaneous means,

23   like, within a day or two or three.

24         **THE COURT:**  Well, if you did it that way, it doesn't

25   really qualify as a business record.

1      But having worked with the FBI and always having a -- it

2  would stick in my craw if a 302 got written up ten days later

3  as opposed to the next day.  Hated it.  Hated it.

4          **MR. LEVEE:**  She didn't remember when they were done.

5          **THE COURT:**  Well, you've got the metadata of the

6  final --

7          **MR. LEVEE:**  Exactly.  There's metadata.  And

8  there's -- there's some confusion on the metadata because looks

9  like some of the metadata was altered later.  I don't know why

10  or by whom.

11      But the point is that a business record should have

12  some -- really, it should have an aura of reliability.  Here we

13  have a 15-year-old business record prepared by a one-time

14  vendor.  Not clear if she's the one who actually wrote the

15  memos.  The memos have mistakes.  That's really, really

16  doubtful that it's actually a business record.

17      And so the plaintiffs also argue that they're party

18  admissions.  If you want me to address that --

19          **THE COURT:**  Yeah, you should address the party

20  admission argument too.  And you also made an argument, which I

21  didn't really focus on either because I couldn't find the

22  actual statement, about stuff that should come out in any

23  event.

24          **MR. LEVEE:**  Yeah.  So the argument I made at the end

25  was simply a 402, 403 argument --

1          **THE COURT:**  Okay.

2          **MR. LEVEE:**  -- because we're dealing with documents

3    that were prepared for a different purpose 15 years earlier, by

4    a nonSutter employee, that are now going to be used against

5    Sutter for statements that are made where, honestly, we're not

6    sure if the statements were even made by the persons to whom

7    they were attributed.  We just can't tell.

8          **THE COURT:**  Those generally -- I hear what you're

9    saying about business records.

10         **MR. LEVEE:**  Yes.

11         **THE COURT:**  The fact of it being a record is the sort

12   of thing that gives one confidence that it's done by somebody

13   who's charged with reporting the information on it at or near

14   the time of the actual occurrence of the information.

15         **MR. LEVEE:**  Right.

16         **THE COURT:**  And you don't have that confidence here.

17         **MR. LEVEE:**  And that's the reason they're not party

18   admissions.

19         **THE COURT:**  Right.

20         **MR. LEVEE:**  Because you don't have confidence as to

21   who made -- said what about a topic that was basically off

22   topic.

23         The statements the plaintiffs want to use relate to

24   Sutter's relationship with health plans, and the work that was

25   being done was for Sutter's marketing department.  So these are

offhand statements made by people whose identification is
unclear.

      THE COURT:  And done for a purpose unrelated to
contracting practices.

      MR. LEVEE:  Yes.  So, thank you.

      THE COURT:  Remind me, again, the date of the thing?
2006?  Is that what you told me?

      MR. LEVEE:  The interviews and the memos were all done
in 2006, yes.

      THE COURT:  Okay.  So a long, long time ago.

   Okay.  All right.  So, Mr. Cantor, you're leaning forward.
Are you the one who's going to talk about it?

      MR. CANTOR:  No, no, Mr. Kovacs will.  But I certainly
wanted to have an opportunity to respond.  So, thank you.

      MR. KOVACS:  Your Honor, I'm going to clear up a few
misrepresentations that Mr. LeVee made.  He attended the
deposition, actually met with the witness beforehand.

   So, first of all, this is a Sutter-hired consultant.  And
everything that was produced in terms of the final report was
actually produced to Tracy Barnes at Sutter.  Sutter hired her,
Ms. King, who's the only Strategy Advantage employee to do this
work.

   What's important is the files from the metadata, they come
from Ms. King's files.  These are her notes that she wrote.
Now, she may not remember; that's why it's a business record.

1        And I'd like to talk about a few other things --

2        **THE COURT:**  You're saying all the metadata from the

3   produced documents all goes right back to her computer,

4   essentially, not just to an extern typing it up?

5        **MR. KOVACS:**  I apologize for interrupting.  It goes to

6   Strategy Advantage, which she said was her files.

7        **THE COURT:**  And she's the only person there.  But what

8   about the fact that she sometimes uses clerks, or whatever, to

9   take notes?

10       **MR. KOVACS:**  She said she wasn't clear if she used an

11  intern; she was unaware.  But what matters, as you were asking

12  earlier, she said over and over again that she was sure that it

13  was honest and truthful and accurate, everything she wrote up

14  or anybody wrote up, because her point is, is that these notes

15  were made.

16       And these notes contain -- let's be very clear.  They

17  contain the date and time the interview occurred, the name of

18  the interviewee, and then the candid quotes.

19       Now, Mr. LeVee makes the point we don't know who said

20  what.  That's the point of the exercise, Your Honor.  The point

21  of the exercise is you have interview notes where you interview

22  somebody individually so you can get their candid statements.

23       You then combine them into the interview summary report,

24  which is sent to Sutter, and then Sutter can review them with

25  the names attached, which is what we put in our charts.  And

1    you can see individual quotes and then the summary document.

2    So that Sutter could see it and examine themselves without

3    saying, oh, such and such person made that statement.

4         Now, Your Honor, as it relates to why this was done, I

5    think Mr. LeVee again misstates the record.  And I will quote

6    from page 2 of our brief.  This was done -- this is saying --

7    at the top of page 2:

8              "All I can say is that this project was about Sutter

9         Health wanting to take time out of their kind of normal

10         activities to conduct a planning process that allowed

11         folks to think about what was going on in the marketplace

12         and then the decisions they made as they were making

13         choices via their health plans, via their employers, via

14         their relationship with doctors."

15         This is obviously probative and relevant.  And I'd like to

16    read Ms. Krevans' quote.  She's now the CEO and president of

17    Sutter.  She said, and I quote:

18              Related to the health plans, we force them to pay us

19         more.  They do pay us more, and they don't like us.  In

20         some cases they have paid us more than market.

21         **THE COURT:**  Okay.  All right.  She says, Mr. LeVee,

22    she never said that; right?

23         **MR. LEVEE:**  And the memo says that she's the CEO of a

24    hospital, which she's not.

25         **MR. KOVACS:**  Let me continue.  What's really --

1        **THE COURT:**  Well, I did ask that question, so that's

2    only fair.  It's my fault, not Mr. LeVee's fault.

3        **MR. KOVACS:**  I will retract my objection.

4        **THE COURT:**  He said his point already.  So why don't

5    you continue.

6        **MR. KOVACS:**  The other thing that's very important

7    here is we keep talking about contemporaneous as the standard.

8    Sutter misstates, again, the law.  The Ninth Circuit does not

9    apply a contemporaneous standard, and Mr. LeVee is citing cases

10   outside of the Ninth Circuit.

11       The Ninth Circuit applies a standard that is at or near

12   the time.  And I would point the Court to *the Sana v. Hawaiian*

13   *Cruises* case.

14       **THE COURT:**  Yeah, at or near the time.  I know it,

15   yeah.

16       **MR. KOVACS:**  And then looking at the metadata, Your

17   Honor, which is what you were referring to, the date that

18   matters is the date created.  Each of these notes, the

19   interview notes, were created near dates after the interviews

20   occurred, which meets the standard.

21       Now, the next question that you have to ask yourself, when

22   it comes to a regularly conducted business activity is, is the

23   author trustworthy?

24       So Ms. King's first full job is to take accurate, candid

25   notes of Sutter executives so that she can produce that to

1    Sutter in summary form.  There's nothing more trustworthy than

2    that.  She has no reason to lie.

3         And I would point the court to the *R.C. Fischer* case for

4    the point that Mr. LeVee made about the two mistakes.  Minor

5    mistakes are not a reason to find something untrustworthy.

6    That's just not the standard.

7         Now, alternatively, Your Honor, this is also party

8    admission.  The reason why it's a party admission is that

9    Sutter executives making --

10        **THE COURT:**  Yeah, I'm very familiar with party

11   admissions.  So, yeah.

12        **MR. KOVACS:**  If I could, I would point you to the

13   *Rearden* case and the *Holzhauer* case.  Those both involved

14   interviews and interview summaries where the totality of those

15   came in as party admissions.

16        Now, Sutter cites to other cases to say, oh, well, this is

17   the problem because, you know, these are representations; it's

18   not fair.

19        Well, their cases actually -- the *Larez* case is a perfect

20   example.  That involved a newspaper article, and the author of

21   the article was not available for cross-examination.

22        Ms. King is available for cross-examination.  Sutter can

23   ask her these questions.  They can challenge the record.  This

24   goes to the weight.  This is all about weight.  This is not

25   about inadmissibility.

1          **THE COURT:**  Okay.

2          **MR. KOVACS:**  If I could, Your Honor, on the prejudice

3    point, I think it's important.  We cite to a great case on this

4    point, and this is found on page 7 of our brief.  There's no

5    prejudice when a party makes admissions.

6          The *FCC v. Qualcomm* case, right, says evidence is not

7    unfairly prejudicial merely because it tends to prove a

8    defendant's guilt.

9          And this is exactly what's happening here.  Sutter's

10   now-CEO and president is saying that they knew back in 2006

11   that they were forcing the health plans to charge -- you know,

12   to take the contract terms, they were getting higher prices.

13   She admits that.  She, of course, should be asked those

14   questions at trial.

15         So for those reasons, Motion *in Limine* No. 4 should be

16   denied in its entirety.

17         **THE COURT:**  Okay.  Great.  Thank you.  It was very

18   helpful argument on both points.

19         I think that probably brings us to the end of our

20   transcribed day.  Do we agree?

21         **MR. LEVEE:**  Yes.

22         **MR. CANTOR:**  That's fine, Your Honor.

23         **THE COURT:**  Thank you, Kathy.

24         We'll go off the record now.

25         (At 4:52 p.m. the proceedings were adjourned.)

1

2

3                    __CERTIFICATE OF REPORTER__

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6   DATE: Monday, August 16, 2021

7

8

9
                              _Katherine Sullivan_
10  _____

11       Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25