Pages 1 - 201

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE LAUREL BEELER, MAGISTRATE JUDGE


DJENEBA SIDIBE, et al.,            )
                                   )
          Plaintiffs,              )
                                   )
  VS.                              )   **No. 12-cv-4854-LB**
                                   )
SUTTER HEALTH,                     )
                                   )
          Defendant.               )
_____)   San Francisco, California
                                       Thursday, August 19, 2021


**TRANSCRIPT OF PROCEEDINGS VIA ZOOM WEBINAR**

**APPEARANCES**:  (via Zoom Webinar)

Lead Counsel for Plaintiffs and the Class:
                    CONSTANTINE CANNON LLP
                    335 Madison Avenue, 9th Floor
                    New York, New York 10017
          BY:  **MATTHEW L. CANTOR, ESQ.**
               **JEAN KIM, ESQ.**


                    CONSTANTINE CANNON LLP
                    1001 Pennsylvania Avenue,  N.W.
                    Suite 1300N
                    Washington, District of Columbia 20004
          BY:  **HENRY C. SU, ESQ.**
               **JAMES JOSEPH KOVACS, ESQ.**
               **PAULETTE MARIE RODRIGUEZ LOPEZ, ESQ.**


          (Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, CRR, RMR
               Official Reporter - U.S. District Court

1  **APPEARANCES:** (via Zoom Webinar; continued)

2  Co-Lead Counsel for Plaintiffs and the Class:

3                  FARMER BROWNSTEIN JAEGER GOLDSTEIN
                    KLEIN & SIEGEL LLP

4                  235 Montgomery Street, Suite 835
                    San Francisco, California 94104
            BY:  **DAVID C. BROWNSTEIN, ESQ.**

5                  **DAVID M. GOLDSTEIN, ESQ.**

6  Additional Co-Lead Counsel for Plaintiffs and the Class:
                    STEYER LOWENTHAL BOODROOKAS

7                   ALVAREZ & SMITH LLP
                    235 Pine Street, Fifteenth Floor

8                  San Francisco, California 94104
            BY:  **ALLAN STEYER, ESQ.**

9                  **D. SCOTT MACRAE, ESQ.**
                    **JILL MANNING, ESQ.**

10                 **SUNEEL JAIN, ESQ.**

11  For Defendant Sutter Health:
                    JONES DAY

12                 555 South Flower Street, 50th Floor
                    Los Angeles, California 90071

13          BY:  **JEFFREY A. LEVEE, ESQ.**
                    **ELIZABETH M. BURNSIDE, ESQ.**

14                 **JEREMY R. KAUFFMAN, ESQ.**

15                 JONES DAY
                    555 California Street, 26th Floor

16                 San Francisco, California 94104
            BY:  **DAVID C. KIERNAN, ESQ.**

17                 **CRAIG E. STEWART, ESQ.**
                    **MATTHEW J. SILVEIRA, ESQ.**

18
                    JONES DAY

19                 4655 Executive Drive
                    San Diego, California 92121

20          BY:  **CAROLINE OWENS VAN WAGONER, ESQ.**

21                 BARTKO, ZANKEL, BUNZEL & MILLER
                    One Embarcadero Center, Suite 800

22                 San Francisco, California 94111
            BY:  **ROBERT H. BUNZEL, ESQ.**

23                 **PATRICK M. RYAN, ESQ.**
                    **OLIVER Q. DUNLAP, ESQ.**

24                 **PATRICK O'SHAUGHNESSY, ESQ.**

25

1    <u>**Thursday - August 19, 2021**</u>                          <u>**11:39 a.m.**</u>

2                            P R O C E E D I N G S

3                              ---oOo---

4        **THE CLERK:**  Calling Civil action 12-cv-4854, Sidibe

5    versus Sutter Health.

6        **THE COURT:**  So we'll let lead counsel -- not lead

7    counsel but lead counsel for the preliminaries for the parties

8    please state your appearances for the record.

9        Mr. Cantor, you first.

10       **MR. CANTOR:**  Thank you, Your Honor.  Matthew Cantor,

11   Constantine Cannon, counsel for the plaintiff and the certified

12   class.

13       **THE COURT:**  All right.  Mr. Kiernan for Sutter.

14       **MR. KIERNAN:**  Yes, David Kiernan, with Jones Day, on

15   behalf of Sutter Health.

16       **THE COURT:**  All right.  We have agreed that we're

17   going to do two motions first for counsel availability reasons.

18       Mr. Cantor, what's the first motion *in limine* you would

19   like to have addressed?

20       **MR. CANTOR:**  Your Honor, if it's okay with you, there

21   would be three that we would like to be addressed.

22       **THE COURT:**  Three.

23       **MR. CANTOR:**  Mr. -- my colleague, Mr. Su, will argue

24   Plaintiffs' Motion No. 1 and Plaintiffs' Motion No. 2.  And my

25   colleague, Mr. Kovacs, will argue Plaintiffs' Motion No. 6.  We

1    appreciate you accommodating their time constraints.  Thank
2    you.
3            THE COURT:  Perfect.  So we'll start with plaintiffs'
4    motions.  Are the same lawyers for Sutter responding to 1 and
5    2?
6            MR. KIERNAN:  No, Your Honor.  1 will be Craig
7    Stewart, and 2 will be me.
8            THE COURT:  Okay.  Perfect.  So we'll start with
9    Plaintiffs' 1.  And so Mr. Stewart can state his appearance for
10   the record, too, after Mr. Su states his.  I'll let Mr. Su
11   state his appearance for the record.
12           MR. SU:  Yes.  Good morning, Your Honor.  Henry Su,
13   from Constantine Cannon, on behalf of the plaintiffs, arguing
14   Motion No. 1.
15           THE COURT:  Okay.
16           MR. STEWART:  Good morning, Your Honor.  Craig
17   Stewart, of Jones Day, on behalf of defendant Sutter Health.
18           THE COURT:  So this is the plaintiffs' motion to
19   exclude evidence about procompetitive benefits.  We had the
20   conversation about procompetitive benefits in the context of
21   the *Daubert* motions.
22       And I pretty much said in the *Daubert* motions that the
23   evidence is relevant to -- evidence of capital investments, et
24   cetera, and other investments are relevant to procompetitive
25   benefits.

1    I've already said in the context of the -- of the *Daubert*

2   motions that I'm allowing that evidence in, and I think that

3   drives -- that, in turn, drives the analysis of Motion

4   *in Limine* 1.

5    But, Mr. Su, please tell me anything that you want to put

6   on the record to advance a contrary point.

7    **MR. SU:** Yes.  Thank you, Your Honor.

8    So last week I addressed the Court regarding the

9   limitations of Dr. Willig's testimony on the procompetitive

10  benefits; specifically, his inability to say that, you know,

11  the challenged contract provisions actually caused or -- you

12  know, these benefits to happen.

13   This -- on this motion, the issue here is, where are those

14  benefits?  So Sutter, in response, has said, well, Dr. Willig

15  doesn't have to address this because we're going to call some

16  fact witnesses to talk about the spending, the investments that

17  Sutter has been able to engage in with the money that comes

18  from these contracts with the insurers, and specifically we're

19  talking about funding pension plans, doing seismic

20  retrofitting, and investing in things like, you know,

21  electronic health records.

22   And the thrust of our motion, Your Honor, is that none of

23  these spending -- you know, instances of spending or investment

24  are procompetitive benefits because the law requires that

25  procompetitive benefits actually enhance or promote

 1    competition, market-wide competition.

 2         It's got to, you know, result in, for instance, lower

 3    prices, greater output, higher quality of services.  And absent

 4    a showing that any of these things, any of the spending, any of

 5    the investments that Sutter is engaged in relate to any -- you

 6    know, to the enhancement of competition, you know, market-wide

 7    competition, their witnesses shouldn't be allowed to testify.

 8    They simply aren't relevant to the issue at hand.  And that's,

 9    of course, the standard under 402.

10         **THE COURT:**  All right.  So, for Sutter.

11         **MR. STEWART:**  Thank you, Your Honor.  Craig Stewart.

12         I do think Your Honor's comments last week are certainly

13    implicit in allowing Dr. Willig to present his testimony about

14    the procompetitive benefits of Sutter's investments and how

15    those are facilitated by the contracting practices.

16         Implicit in that ruling was that those investments are

17    procompetitive.  And I think Mr. Su put his finger right on it

18    when he said the question is whether they result in greater

19    output, higher quality, and the like.  And each of the items

20    that they're challenging as not being a procompetitive benefit

21    falls squarely within that category he just described.

22         And we're not arguing that we need to restrain

23    competition, you know, prevent Sutter from facing competition.

24    We're not arguing ruinous competition as the ground here.

25         What we're talking about is Sutter's investments, whether

1   it's in hospital viability and seismic safety and electronic

2   health records did increase quality and increase output.  And

3   that's squarely within the realm of what the courts have

4   consistently and repeatedly recognized as procompetitive

5   justifications.

6       So unless Your Honor has any further questions about

7   that --

8       **THE COURT:**  No, I think that's fine.  So we'll take

9   that motion under submission.

10      So we'll go to Motion *in Limine* 2, which is to exclude

11  evidence of Sutter's nonprofit status.  Mr. Su is again arguing

12  this one.  Mr. Kiernan has already stated his appearance for

13  the record and is arguing for Sutter.

14      I will tell you that, obviously, Judge Massullo dealt with

15  the same issue in the state case and denied the motion.  I

16  can't see how -- I mean, again, preliminarily, of course -- and

17  Mr. Su can tell me why he thinks I'm wrong, but I can't see how

18  the evidence -- the evidence, it is relevant to its financial

19  governance, to its pricing, spending, et cetera.  And it would

20  be an artificial construct -- I don't know if that's really the

21  right word -- to eliminate it and to say you couldn't talk

22  about it.

23      But that's what I think.  Mr. Su, you tell me what you

24  think, and then Mr. Kiernan can weigh in.

25      **MR. SU:**  Yes.  Thank you, Your Honor.

1        So with respect to Motion *in Limine* No. 2, the concern

2   that the plaintiffs had here is the risk of confusion, by risk

3   of jury confusion.

4        If Sutter is allowed to trot out witnesses to talk about

5   how being a nonprofit affects the way it spends, affects the

6   way it raises money, affects the way it budgets, et cetera, the

7   concern is that the jurors will think, well, then Sutter must

8   be entitled to a special pass under the antitrust laws because

9   of all these great things that it does because of the

10  challenges that it faces as a nonprofit.

11       That's of concern to us, again, because Sutter's not the

12  only nonprofit health system in California.  There are other

13  nonprofit health systems in California that don't engage in the

14  practices that we've challenged in this litigation.

15       So the risk here is that the jurors will be confused into

16  thinking that Sutter is somehow entitled to some special

17  dispensation under the antitrust laws because of all the good

18  things that their witnesses are going to talk about, right, and

19  all the challenges that their witnesses are going to talk

20  about.

21       So even though Sutter, in its opposition papers, has said

22  we agree, you know, the antitrust laws don't exempt nonprofits,

23  the concern is here that the jurors, nonetheless, will be

24  confused and the plaintiffs will be prejudiced by having all

25  this testimony come out about, you know, what Sutter does as a

1    nonprofit.

2         **THE COURT:**  At least conceptually -- we'll let

3    Mr. Kiernan respond, but at least conceptually, sure.  Like it

4    always -- 403 sideshow.  You know, deviate from, you know, sort

5    of the way evidence ought to be.  And that seems amenable to an

6    objection at trial, but I don't know that it's appropriately

7    reflected in a motion to exclude altogether.

8         But we'll let Mr. Kiernan weigh in at this point.

9         **MR. KIERNAN:**  On that last point, Your Honor, if this

10   were a real risk, there would be volumes of cases prohibiting

11   not-for-profit defendants from describing their business and

12   explaining how they operate, their financial governance, how

13   they raise funds.  There would be reams and reams of cases.

14   There are none.  And the reason is obvious.

15        The not-for-profit status is relevant to the issues in the

16   case.  And the reason why is it's relevant to how Sutter

17   operates and the choices it makes.

18        You mentioned capital investments before and the

19   investments in the communities.  The not-for-profit status and

20   mission is highly relevant to that.  It explains its prices, it

21   explains investments it's making.

22        A not-for-profit hospital system like Sutter, because it

23   doesn't have shareholders, in other words, investor

24   shareholders, it has to reinvest all its money back into its

25   facilities, back into its employees.  That determines and

1  influences the prices it sets.

2       A lot of this case is going to be about where the money

3  goes.  How does Sutter spend the money?  What is the

4  justification for the prices it charges?

5       And we have fancy regressions that are trying to figure

6  that out, but the jury needs to hear from the business folks.

7  And it is impossible for them to describe the choices that

8  they're making without discussing -- they're not for profit.

9  They have some restrictions.  They have some missions that they

10  have to pursue.  And they're going to describe how the

11  challenged terms enabled Sutter to achieve it's not-for-profit

12  mission to provide affordable, high-quality care to Northern

13  California communities.

14       We agree there's not going to be argument that -- in

15  closing -- and this would be in closing -- that being a

16  not-for-profit immunizes Sutter or any other not-for-profit

17  firm that's being accused of violating the antitrust laws.

18  We've never intended to argue that.  We agree with that.

19       But it would be highly prejudicial to Sutter, and I don't

20  know how, frankly, we would do it.  It's coming out of their

21  mouths even if we try to, you know --

22            **THE COURT:**  It's --

23            **MR. KIERNAN:**  -- put a muzzle on their mouth.

24            **THE COURT:**  It seems -- yeah, it seems undoable for a

25  bunch of reasons.

1    Thank you.  I'll take that motion under submission.

2    So the next one is Motion *in Limine* 6 to exclude evidence

3    about payor mix and cost shifting.

4    Who's taking the lead on that?  Mr. Cantor again?

5    Mr. Kovacs, right.

6        **MR. CANTOR:**  Mr. Kovacs, right.  Thank you, Your

7    Honor.

8        **THE COURT:**  All right.  Good.  I'll let you state your

9    appearance, and I'll let the Sutter person state his or her

10    appearance too.

11        **MR. KOVACS:**  Your Honor, this is James Kovacs, from

12    Constantine Cannon, on behalf of plaintiffs.

13        **THE COURT:**  All right.  And for Sutter, who do we have

14    on this motion?

15        **MR. KIERNAN:**  Go ahead, Caroline, please.

16        **MS. VAN WAGONER:**  Good morning, Your Honor.  This is

17    Caroline Van Wagoner, from Jones Day, on behalf of Sutter.

18        **THE COURT:**  Okay.  Great.

19    So, again, this is -- as I said, it's a motion *in limine*

20    to exclude evidence about payor mix and cost shifting.  It does

21    seem relevant to pricing at minimum, and some of the

22    procompetitive benefits, but let's let Mr. Kovacs tell me why

23    he thinks that's wrong.

24        **MR. KOVACS:**  Your Honor, let me just go ahead and jump

25    straight to it, because I think that's what's really a key

issue here; right.  So what payor mix is, is the government's

payment for healthcare services.  And the cost shift, right, is

Sutter's purported offsetting of those noncontracted payments

by raising rates for the commercial payors.

       **THE COURT:**  To compensate for the loss of revenue from

its government revenue stream.

       **MR. KOVACS:**  Right.  Correct, Your Honor.

    And there's a lot of economic evidence that that's a myth,

that the only way you can actually do that is with market

power, but I'll put that to the side for now, because I think

what really matters is, where's the causal link?  Where's the

causal link between government-run healthcare and payments from

that and commercial reimbursement rates, and specifically in

this case, the anticompetitive clauses, right, that Sutter

forces on commercial health plans?

    So this is really getting back to the *Ohio v. AmEx*,

*NCAA v. Alston*.  You have to have this causal link.  There has

to be a procompetitive rationale for their strength.  And what

Sutter wants to say is the payor makes that cost-shifting, and

it amounts to how many Medicare/Medi-Cal patients they have,

how much money they make off those patients.  And that has no

relationship whatsoever.

    And, in fact, in their brief, in their opposition, page

number 3 -- I'll quote what they write.  They write:

       "Plaintiffs argue, first, that Sutter cannot link its

 1          spending on undercompensated care to the challenged

 2          provisions.  They note that the challenged provisions only

 3          apply to Sutter's participation in commercial plans, not

 4          to government-insured or uninsured care.  Motion at 5."

 5          That is true but irrelevant.  They admit it.  It's true.

 6     There is no causal link here.  There's no relationship between

 7     the government payments and to Sutter.

 8          Now, there's an additional caveat, Your Honor, and that's,

 9     I think, very important to note from Dr. deGhetaldi's

10     deposition.  So his deposition occurred after the motions *in

11     limine* were filed.  And he's going to be speaking as the fact

12     witness to cost shifting, and then their experts will use that.

13     He testified over and over again in his deposition that any

14     sort of payor mix and cost-shifting issue, right, is predicated

15     on where you are.

16          So, in Northern California, for example, all providers,

17     Sutter and nonSutter, are facing this.  In fact, if you look at

18     page 198 of his deposition transcript that we sent to you, he

19     uses the word *equally*.  Everybody is affected equally.  This is

20     not anything to do with antitrust case, this is just something

21     that's already baked into the cake.

22          And I think what's important here, Your Honor, is also

23     that Judge Massullo previously ruled on this subject, and there

24     she restricted Patrick Pilch from testifying to these very

25     issues.

1    So, in addition, Your Honor, I'd also point out that

2    Sutter's own experts here have looked at this issue and have

3    actually found that this is -- this is not a procompetitive

4    justification.  It has no relationship to the case.

5    So Dr. Willig referred to, sort of, this as a dead weight

6    loss, right, where you would use profits, monopoly profits, and

7    then spend it on something else for a, quote-unquote, good

8    effect.  That's not a rationale.  That's not a procompetitive

9    justification.

10    And Dr. Gowrisankaran, who my colleague, Matt Cantor,

11    referred to in his *FTC vs. Phoebe Putney* case, in the amicus

12    brief there, right, he talked about the supposed funding of

13    uncompensated care through charging higher commercial rates,

14    and he argued to the Supreme Court that's not a procompetitive

15    justification.  That doesn't get you off the hook.

16    So what Sutter wants to do, Your Honor, and they've

17    already alluded to this, is to say this is all about pricing,

18    this is all about how we look at pricing for the commercial

19    side because we take such a loss.

20    Well, Your Honor, I would go back to, you know,

21    Dr. deGhetaldi, and I would say there are things that are not

22    in dispute.

23    First, Your Honor, there is no dispute that hospitals do

24    not negotiate Medicare or Medi-Cal rates.  That's one.

25    Second, Your Honor, every single hospital in Northern

1    California, within a specific geographic area, is paid the same

2    exact amount by each of the governmental sources for each

3    procedure.  So there's no distinguishing feature.  They all get

4    the same money.  And so it's all baked into the cake, it's all

5    part of this same pot of money.

6         And, finally, Your Honor, I'd like to also reference in

7    their opposition Sutter brings up this concept of free riding.

8    And they cite to *Legion*, which is the Supreme Court case that

9    said rule of reason for resale price maintenance.

10        Now, what's important to distinguish in free riding, Your

11   Honor, is that it's within the same relevant market, a free

12   riding situation.  I'm not disputing that.

13        What we're talking about here is separate markets.  These

14   are separate relevant markets.  Our relevant market is

15   commercial inpatient hospital services that's defined by Your

16   Honor and found by Your Honor.

17        This is talking about Medicare and Medi-Cal.  They are not

18   the same market and they cannot be a free riding situation.  I

19   think that's a very important distinction.

20        And so for those reasons, Your Honor, I'd like to reserve

21   a minute to respond to Sutter's --

22             **THE COURT:**  That's fine.  You can do that.

23             **MR. KOVACS:**  Thank you.

24             **THE COURT:**  All right.  Ms. Van Wagoner.

25             **MS. VAN WAGONER:**  Good morning, Your Honor.

1          We certainly agree with your tentative that this evidence

2      is relevant to pricing and to procompetitive benefits, so I'll

3      just take a few moments to respond to some of Mr. Kovacs'

4      arguments.

5          You know, he said that there's -- there's economic

6      evidence that this is a myth that this happens.  That's false.

7      Plaintiffs' own expert, Dr. Chipty, agrees that cost-shifting

8      occurs and that it affects commercial prices.

9          **THE COURT:**  It seems an unremarkable proposition that,

10     you know, the government revenue stream doesn't affect, you

11     know, overall pricing decisions.  I mean, the tougher -- you

12     know, it's an interesting argument about the free riding issue.

13     So it's, at minimum, relevant to pricing.  That's what I said.

14         And then, of course, the issue is, then, what about the

15     procompetitive benefits and the arguments that Mr. Kovacs

16     raises there; right?

17         **MS. VAN WAGONER:**  Yes, sure.  So agree it's highly

18     relevant to pricing.  As to the arguments -- so, for that

19     reason alone, you can deny their motion.

20         As to Mr. Kovacs' arguments about the procompetitive

21     benefits piece --

22         **THE COURT:**  Well, access to medical care, I think, was

23     one of your procompetitive benefits.  That seems a bit easier.

24         **MS. VAN WAGONER:**  Right.

25         **THE COURT:**  But what about the free riding argument

1    when it's -- you know, the whole issue with free riding in the

2    context of the contract was actually about the benefits of the

3    contracting practices to avoid having the insurance companies,

4    you know, free ride; right?

5         That's a different issue when you're talking about

6    government benefits.  So what about the point?  He says it's a

7    totally separate market and it can't be free riding.

8              **MS. VAN WAGONER:**  Sure.  Well, so Sutter's challenged

9    conduct, the terms eliminate the free riding --

10             **THE COURT:**  By insurance plans.

11             **MS. VAN WAGONER:**  Sure.  By eliminating that, Sutter's

12   able to have predictable and reliable revenue that it can then

13   budget to cover these losses.  By being able to cover the

14   losses from the government and the uninsured payors, it can

15   increase its output, it can widen consumer choice.

16        He makes the point that somehow this same relevant -- they

17   have to be within the same relevant market.  First, that's

18   contrary to law.

19        I'll point out that plaintiffs cite *Sullivan versus NFL*

20   for this proposition.  And in that case the court actually

21   reversed and said it was error for a verdict form to include

22   the language about *same relevant market* in the jury instruction

23   because the jury then wouldn't be able to consider all of the

24   defendant's proper justifications.

25        We cited in our brief several cases where you can, you

1    know, look beyond what plaintiffs are arguing as their relevant

2    market both inside and outside.  And I'll note that Sutter

3    itself, you know, disputes plaintiffs' relevant market.  We are

4    going to argue that it's too narrow.  Evidence is not

5    irrelevant simply because it's inconsistent with plaintiffs'

6    conception of what the market should be.

7         So there is a link between Sutter's subsidy of the

8    noncommercial payors and its challenged terms.  The terms

9    provide the reliability, they provide --

10        **THE COURT:**  So say that again.  There is a link

11   between the government revenue stream and -- just start there.

12        **MS. VAN WAGONER:**  Sure.  There is a link between

13   Sutter's subsidy of the losses from its noncommercial payors,

14   from government insured and uninsured payors, and the

15   challenged contract terms.

16        The challenged contract terms provide volume assurances

17   and revenue assurances.  With those assurances, Sutter is able

18   to budget to cover for the undisputed losses from those

19   noncommercial payors.  With that revenue and that reliability,

20   Sutter can, you know, keep service lines open, provide care to

21   these patients, increase access.

22        I think, you know, it's -- it's not a remarkable

23   proposition that if you can't cover your losses you're going to

24   go out of business.  And you have to charge higher prices to

25   commercial payors to cover those losses to stay in business.

And how much higher your prices are going to be depends on what
your payor mix is.

So this issue is highly relevant for Sutter in how it
conducts its business.  It's been subject to a lot of discovery
in this case.  Evidence will show that Sutter has more of these
patients, a higher burden.

So, you know, it's relevant, one, to pricing and how
Sutter has to set its commercial prices; and it's relevant,
second, because it's procompetitive and allows Sutter to
increase its output, widen consumer choice, and provide care to
people.

**THE COURT:**  Okay.  No, I understand your argument.
That's helpful.

**MS. VAN WAGONER:**  Thank you.

**THE COURT:**  All right.  Mr. Kovacs, you said you
wanted to respond briefly.

**MR. KOVACS:**  I appreciate it, Your Honor.

On the point of outside of the relevant market for
procompetitive benefits, I'd cite -- I think the *Sullivan* case
is on point for its note.  But I also to *Topco*, *In re NCAA
Student Athlete*, and *United States v. Philadelphia National
Bank*.

But I think what's important here is Your Honor hit the
nose on the head.  It's unremarkable, right, you said pricing
is unremarkable that this would be affect.  And I think that's

what Dr. deGhetaldi says.

It's equally true for every single provider in Northern California, meaning that everybody faces this. This is not unique to Sutter. Sutter is saying they're more special, but then they're trying to tie it to anticompetitive practices.

But here's the point, Your Honor. Nobody else is doing this in Northern California. Nobody else has been alleged to violate the antitrust laws the way that Sutter has. So that's my point.

It's all been baked into the cake. Everybody is facing the supposed cost shifting. Everybody's facing Medicare losses, Medi-Cal losses, potentially. I don't necessarily agree with Sutter that everybody is.

But the point is, is that Sutter, while facing these things, has violated the antitrust laws. And that's what we allege.

**THE COURT:** Right. Of course, that kind of gets to your conclusion, right, Sutter's practices are anticompetitive.

That is not a conclusion or a predicate that Sutter accepts. To the contrary, Sutter's point is that its contracting practices enable efficiencies in the form of predictable volume and resulting revenue streams that allow it to have procompetitive benefits.

They're not using it as, really, necessarily even an excuse for anti- -- justification for anticompetitive

1    practices.  They're just saying there is a business

2    justification.  That's what Sutter has always said.  That's why

3    it brought a summary judgment motion.

4        I mean, maybe I'm just misunderstanding it entirely, but

5    there's a business justification, so we've chosen to do it this

6    way, that allows us to negotiate in the context of our plans,

7    you know, our contracts with health plans, you know, this model

8    of doing business.

9        And, also, as I recall from *Daubert* I think Sutter

10   disputes the issue that no one else is doing it.  But -- and --

11   but that's a disputed fact point.  But I understand it.  I

12   understand it.

13       You know, as I think I said before, I think the case

14   stands and falls -- I mean, what do I know; right?  I'm only

15   beginning to hear it better.

16       But I think the case stands or falls on whether a jury

17   goes with you and says this is an anticompetitive practice

18   designed to, you know, increase, you know, Sutter's revenues

19   for -- you know, as a result of anticompetitive practices, or

20   whether Sutter contends these are just -- it's just its

21   business model that allows us to deliver services in this way,

22   and they're just totally different narratives.

23       I don't think -- Sutter's really now -- you know, maybe

24   Sutter's prosecuting its case has to be that it's not an

25   anticompetitive predator and, instead, is a model of doing

 1  business that enures to everybody's benefit.

 2      Okay.  That's super helpful.

 3          **MR. CANTOR:**  Your Honor, this is Mr. Cantor.

 4          **THE COURT:**  Yes.

 5          **MR. CANTOR:**  Can I just raise one issue?  Because I

 6  just think you made a statement now that it just -- it really

 7  is incorrect as a matter of law --

 8          **THE COURT:**  Okay.

 9          **MR. CANTOR:**  -- and I just want to make the point.

10  When it comes down to, quote-unquote, justifications, not any

11  justification will do.  And I'll give you a really good example

12  about that.

13      The NCAA student compensation rules were just struck down.

14  They were struck down notwithstanding that the NCAA had a

15  justification for that, to protect its amateurism.  That may

16  have been a very noble goal, but the reality is there has to be

17  procompetitive impact.

18      So the fact that Sutter had a justification, for example,

19  to get more revenue to offset its Medicare losses does not

20  qualify as a procompetitive justification and does not lead to

21  procompetitive effects for the reasons Mr. Kovacs said.

22      I just want to make that point.  Any justification is not

23  enough.  It has to be one that would impact competition

24  beneficially.  And that is stated -- that's precisely what the

25  holding was in the *Alston* case that was just decided by the

1    United States Supreme Court five weeks ago, six weeks ago.

2         **THE COURT:**  Right.  I didn't mean to suggest that

3    Sutter was -- I was trying to say just the opposite, that

4    Sutter is not offering, you know, a justification for its

5    anticompetitive practices.  Instead, it's advancing an argument

6    that everything it does is procompetitive, whether that's

7    couched in terms of an antitrust violation or otherwise.  But

8    it was just --

9         **MR. CANTOR:**  But what's the relevance of that?

10       Your Honor, if they're not responding to whether or not

11    there was an anticompetitive effect and this is offsetting,

12    then it's not relevant and, it's completely outside this stuff.

13    You can't just say, well, that's the basis for their business

14    model.

15       How does that impact this case?  Again, the NCAA's basis

16    for their models for decades was --

17         **THE COURT:**  Right.  No, I understand that.

18         **MR. CANTOR:**  That's just not enough.  Anyway, that's

19    my point.

20         **THE COURT:**  No, no, I understand.  Okay.  But they are

21    advancing it as a procompetitive benefit in response to your

22    charge of, you know, per se tying and the rule of reason.  So,

23    you know, that's what they're advancing.

24       Okay.  That's helpful.

25         **MR. KIERNAN:**  Your Honor?

 1           THE COURT:  Yes.

 2           MR. KIERNAN:  If I may, just to clarify one point.

 3           THE COURT:  Yeah.

 4           MR. KIERNAN:  Procompetitive benefit and justifying

 5     the challenged contract provisions, because -- and you spelled

 6     it out, you know, precisely right --

 7           THE COURT:  That was the whole point of the summary

 8     judgment.

 9           MR. KIERNAN:  Exactly.

10           THE COURT:  That was the whole point of the summary

11     judgment; right.

12           MR. KIERNAN:  I wanted to --

13           THE COURT:  I hoped you liked that summary judgment

14     order because I wrote it myself.  So I understand --

15           MR. KIERNAN:  Didn't like the result, but --

16           THE COURT:  No, no, exactly.  Yeah.  But what I said

17     is these are issues of fact; right.

18           MR. KIERNAN:  Yes.

19           THE COURT:  I understood the theories.  That's why

20     summary judgment was -- it was a very useful -- and, also -- of

21     course, again, I don't need to go here, but as we sort of saw

22     when you look at the sort of evolution in the case from the

23     Third Amended Complaint to the Fourth Amended Complaint, it was

24     useful to have the summary judgment motion because all that

25     work I had done, you know, slicing through the Third Amended

1   Complaint, you know, I saw it through a different set of

2   binoculars, or whatever, by the time we got to your summary

3   judgment motion.

4       Okay.  That' --

5           MR. KIERNAN:  One last thing, and I'm not going to

6   argue.  Sutter disagrees with Mr. Cantor's reading of *Alston*.

7   I don't think that impacts, at all, your ruling here, but our

8   view is he overstates the holding in that case.

9           THE COURT:  This is the *NCAA* case.

10          MR. KIERNAN:  Yeah.

11          THE COURT:  Yeah, yeah, yeah.  Well, that was a very

12  fact-specific --

13          MR. KIERNAN:  Indeed.

14          THE COURT:  -- holding.  And so, I mean, it's an

15  interesting one, and it seems a correct one.  It's not up to me

16  to opine whether opinions are correct, but it's certainly an

17  understandable one, and it's a fact-specific result.

18          MR. KIERNAN:  Yeah.

19          THE COURT:  Okay.  So let's go to Motion *in Limine* 3.

20  Who's going to be arguing that on behalf of Sutter?

21          MR. SU:  Your Honor, this is Henry Su.  If I may

22  interrupt, thank you again for taking my motions first.  And on

23  this point --

24          THE COURT:  Oh, we already did 3.  Sorry.  We did 3.

25  Sorry.  No, no, we did 1 and 2.

1          **MR. SU:**  I'm just saying, Your Honor, may I be

2  excused?

3          **THE COURT:**  Oh, yes, of course, Mr. Su.  Thanks for

4  sticking it out with us up until now.

5          **MR. SU:**  Thank you.

6          **THE COURT:**  All right.  Okay.

7          **MR. CANTOR:**  Your Honor, plaintiffs' Motion *in*

8  *Limine* 3 will be argued by Ms. Kim.

9          **THE COURT:**  Excellent.

10          **MR. BUNZEL:**  And Rob Bunzel will respond for Sutter.

11          **THE COURT:**  Okay.  So, hi, Ms. Kim.

12          **MS. KIM:**  Hi, Judge Beeler.  How are you?

13          **THE COURT:**  I'm fine.  How are you doing?

14          **MS. KIM:**  Good, good.

15      So this is plaintiffs' *in limine* motion to exclude

16  references to COVID and wildfires.  And you and I have been

17  down this road before.

18          **THE COURT:**  Exactly.  Exactly.

19          **MS. KIM:**  Yes.  So when we were last before Your Honor

20  regarding discovery related to Sutter's COVID and wildfire

21  efforts, Your Honor expressed her scepticism as to how any of

22  this is relevant to the contracting practices that are at issue

23  in this case and any issue that is to be tried in the case.

24          Since that time we've received some very limited -- some

25  very limited and largely one-sided document discovery from

```
 1   Sutter.  We've deposed various clinician witnesses and,
 2   obviously, Sutter's experts, all of whom Sutter seeks to have
 3   testify to Sutter's efforts regarding -- during the pandemic
 4   and during wildfires.  And this discovery reinforces that this
 5   is a complete distraction from the core issues of whether
 6   Sutter is liable for its antitrust violations and any defenses
 7   that may apply in this case.
 8        These are events that took place long after Sutter first
 9   imposed its restraints and have absolutely nothing to do with
10   Sutter's contracting practices.
11        Sutter's clinician witnesses had no idea what Sutter's
12   contracting practices had to do with their various efforts
13   during COVID or wildfires.
14        And its experts didn't do any comparative analysis to
15   assess whether Sutter's efforts during pandemic or wildfires,
16   how they compared with their competitors and, instead, just
17   seek to narrate what Sutter did during the pandemic.
18        I mean --
19        THE COURT:  The one thing -- let me make an
20   observation just so you can have an opportunity to kind of
21   respond to it in the context of your argument.
22        Obviously, we had a conversation about this last week,
23   too, in the context of the Daubert motions.  My instinctive
24   reaction when we were dealing with the discovery disputes --
25   you know, I'm sceptical by nature.  And so I try to always
```

1    think, you know, why?  Why?  You know, so I always want to be

2    sceptical on both sides.

3        But then -- and the reason I was sceptical was kind of

4    sideshow 403, you know, can't let this, you know, rattle on to

5    some distraction, you know, wrapping ourselves in we're the --

6    you know, we're the good guys kind of flag.

7        But then I -- sort of in the context of *Daubert*, I took a

8    slightly deeper breath and thought, well, you know, at least

9    conceptually that this falls into -- you know, these are the

10   benefits of the practices.  You know, we talked about the

11   remote ICU or things like that.

12       And so, you know, I still think that in the context of --

13   you know, if Sutter were to wax too poetic about how awesome

14   it, that does seem to kind of travel into Rule 403 territory

15   that would catch an appropriate objection at trial.  But as a

16   categorical basis to exclude it, I sort of rolled back my

17   initial, oh, come on, we're not going to have a lot of

18   sideshows here.

19       So the same is true when we get to the -- you know,

20   Sutter's pre2006, you know, kind of categorical ask to, you

21   know, eliminate all evidence from that time period.  It just --

22   you know, these things don't seem susceptible to a categorical

23   exclusion.

24       So that kind of explains, you know, discovery/motion *in*

25   *limine*, but I just wanted to put that out there so you can

```
 1    have -- you know, to the extent you think it's worth responding
 2    to, you could.
 3              MS. KIM:  I don't want to reargue procompetitive
 4    effects.
 5              THE COURT:  Yeah.
 6              MS. KIM:  I understand Your Honor's approach to how
 7    you're going to let the evidence come in with respect to
 8    procompetitive effects.
 9          Respectfully, I think there is some serious conflation
10    going on in terms of the arguments that Sutter is mounting with
11    respect to procompetitive effects.
12          Plaintiffs are not challenging Sutter's ability to enter
13    into commercial contracts with health plans.  We are not
14    challenging their ability to get commercial revenues, not at
15    all.
16          And that is all that their clinician witnesses and these
17    folks -- finance folks, who are going to talk about the money
18    and how it's spent, that's all they're going to say.  They're
19    going to say, well, we need to make the money, we need to have
20    the revenue streams to pay for these things.
21          We're not challenging their ability to have commercial
22    revenues.  We are challenging very specific conduct, specific
23    contractual provisions, the way that systemwide contracting was
24    forced upon the health plans.
25          So there is this conflation going on and, you know, I see
```

1    the confusion and I -- plaintiffs are very concerned that the

2    jury is going to, you know, go down the road of this

3    conflation.  Because these are not procompetitive benefits.

4    Every hospital in Northern California faced COVID and COVID

5    surges.  Every hospital in Northern California, to be licensed

6    as an acute care hospital, has to have an emergency response

7    plan.

8         So all this testimony about Sutter's SHEMS and eICU and

9    telemedicine and all of that during COVID, it's not related to

10   the contracting practices.  This is mandated by state licensure

11   rules with respect to if you want to be a hospital, you have to

12   do these things.

13        So this is what other hospitals did as well.  They took

14   care of COVID patients.  They had telemedicine.  They had

15   eICUs.  And letting Sutter -- Sutter's witnesses and the

16   experts just narrate that to the jury, it presents huge 403

17   issues.  Huge.

18        It's the fault and the conflation of the procompetitive

19   effects in terms of commercial revenue versus, you know, the

20   specific conduct that we're being challenged -- that's being

21   challenged in this case, and the lack of the link.  And it's

22   also the narration of everything that Sutter does as a

23   hospital.

24        *Alston* makes very clear that there is no special

25   dispensation for nonprofits like the NCAA or nonprofits like

Sutter.  There is no hospital exemption to the antitrust laws.
There is none.  And this testimony is telling the jury that
there is special dispensation, there should be because we're a
nonprofit, we do all these good things.  We help -- you know,
so --

THE COURT:  But let me just ask you this.  So on the
one hand, by saying 403, it kind of concedes relevance.
Although -- I know you're not conceding relevance, so I want to
come back to that point.

MS. KIM:  Not conceding relevance.

THE COURT:  But the problem when you're asserting
anticompetitive conduct, a violation of the antitrust laws, and
then there's a legal landscape that allows Sutter to advance
procompetitive reasons by eliminating -- so this is on the
relevance as opposed to the 403 grounds.

So by eliminating categorically, you then deny Sutter the
ability to be -- basically, it's almost like a directed verdict
on anticompetitive practices because Sutter has no ability
to -- you know, to resist that characterization of its conduct
by saying, look, by having predictable revenue streams, it
allows us to invest in capital investments that ensure --
again, assuming the evidence comes in to show causation or
whatever, that allows us to provide this kind of care or
improve access or whatever its procompetitive justifications
are.

1    And then to eliminate that categorically under a sort of a

2  relevance thing, well, that seems like making your case almost

3  in a summary judgment sort of way because it cuts off the

4  ability to make any kind of defense at all.

5    Then when you go into the 403 analysis, I think it's --

6  it's important; right?  And then -- and, certainly, the issues,

7  the pandemic and wildfires, I mean, you know, it's so

8  depressing; right.  Here we are in year two of the pandemic.

9    It feels like a full second year, right, even though it's

10  not.  Ten months or nine months.  But, again, I'm just looking

11  out the window because I can't see the sun, and we've all seen

12  that we're back in wildfire seasons.

13    And it feels like it's got the potential to, I think you

14  said, pull at the heart strings in a way that seems

15  inappropriate.  But then from Sutter's point, it's just another

16  example as opposed to they've got to prove up at trial with the

17  appropriate causal link.

18    And, again, so I don't know what your reaction is to that

19  interplay with the kind of 402 argument that you're making in

20  cutting off Sutter's ability to mount any defense at all versus

21  the 403 argument, which is your -- it's like this, at least,

22  category of response is a little too close to the pandemic and

23  the wildfire season for it to feel fair.

24      **MS. KIM:**  Right.  Right.

25    The 402 argument is still there.  We think, you know, the

 1   evidence is coming in too broad.  Things that are not real

 2   procompetitive benefits -- remember, it has to be linked to the

 3   actual restraint.

 4        The restraint here isn't just, you know, Sutter's ability

 5   to get commercial revenue.  It's -- it's the specific

 6   provisions, it's systemwide contracting, it's the forcing

 7   that's gone on, and the anti-steering provisions.  There's

 8   specific portions of the contract that we're targeting, and

 9   specific conduct.

10        We're not in any way opposing Sutter's ability to get

11   commercial revenues.  Of course not.  It's a hospital, it needs

12   the commercial revenues.  We understand that.

13        THE COURT:  And I hear your argument is they're

14   forcing people to accept its terms because the plans have no

15   choice.

16        MS. KIM:  Right.

17        THE COURT:  Because they can't have the -- you know,

18   the hospitals they need unless they accede to the systemwide

19   contracts.

20        MS. KIM:  Exactly.  And their defense is going to be

21   no, there's no forcing going on here and this is why.  And they

22   have full rein to present all the evidence of, you know, lack

23   of forcing; right.

24        THE COURT:  Well, you know, at the end of the day it

25   does seem to me that -- I mean, evidence needs to be relevant.

1   It can't be blown out of proportion by, you know, inflammatory

2   sideshow kinds of things.

3           **MS. KIM:**  Exactly.

4       **THE COURT:**  In the end the jury is going to have to be

5   presumed to follow the instructions they're given to decide

6   whether, in fact, there's a tying case here or whether there

7   isn't one at all.

8           **MS. KIM:**  Right.

9       **THE COURT:**  So -- but, okay.  I understand.  You do a

10  great job, as always.

11      Okay.  So, Mr. Bunzel.

12      **MR. BUNZEL:**  Yes.  I think the 402 issue is pretty

13  much resolved by the Court's tentatives on Motion *in Limine*

14  No. 1 from the plaintiffs and the *Daubert*.

15      It's clearly relevant.  And these are poignant, timely

16  examples in wildfires and COVID as to how Sutter's contracting

17  practices have allowed the predictable revenue stream to enable

18  Sutter to perform in these difficult times and to improve its

19  competitive place in the marketplace vis-a-vis other hospitals.

20      The evidence will be that investments were made in SHEMS,

21  in eICU, and that people other than the clinicians -- Ms. Kim

22  mentioned that the clinicians weren't involved in the

23  contracting practices.  No, they were involved in evaluating

24  what kind of investments and innovations would benefit Sutter,

25  and then it's up to others in the link of the evidence here to

1    tie that to the contracting practices, the pricing, and the

2    like.

3         So the clinicians and the COVID or wildfire examples of

4    Sutter's performance and beneficial effects are linked in the

5    chain.  And, as we observed last week, the law is that, you

6    know, no witness has to have every link in the causation chain

7    come together.

8         I do think that -- the attack here on Sutter, it's both

9    contracting practices and it's an attack on the system,

10   systemwide agreements.

11        And what you see in the examples from what Sutter can do

12   as a system, having negotiated rates as a system, which the

13   plaintiffs object to, is to have this steady amount of revenue

14   to build capabilities which allow Sutter, at one place,

15   where -- where it can put maximum effective technology and

16   innovation, such as in San Francisco, and then be able to

17   transport that electronically for the benefit of fire victims,

18   benefit of COVID patients and the like to another place.  It's

19   a direct result of the practices which are at issue in this

20   case, negotiating as a system and seeking what we believe are

21   discounted prices for volume which allow all of these benefits

22   to occur.

23        I also want to point out, Your Honor, that to the extent

24   this is 403 material, we're not going to gild the lily at

25   trial.  You're not going to let us.

```
 1              THE COURT:  Well, also, the jury wouldn't like it if
 2   you did --
 3              MR. BUNZEL:  Exactly.
 4              THE COURT:  -- because it's pandering.
 5              MR. BUNZEL:  It is.  And we weren't going to do it.
 6              THE COURT:  You guys are too -- well, I hope that
 7   you're too understated to overreach the appropriate bounds of
 8   evidence.  And so I'm trusting in that.  So that's why my
 9   inclination was 403 can be dealt with in trial.
10       But it would be such a mistake -- we all know that jurors
11   smell a rat, and if you're exaggerating for poetic effect, it
12   doesn't --
13              MR. BUNZEL:  Exactly.
14              THE COURT:  -- you know, it doesn't work.
15              MR. BUNZEL:  I think the defense side and the
16   plaintiffs' side, we've all tried too many cases --
17              THE COURT:  Exactly.
18              MR. BUNZEL:  -- to think we're going to dodge the
19   major issues.
20              THE COURT:  You're all very normal.  You're all very
21   normal, yes.
22              MR. BUNZEL:  I also want to point out that this is not
23   new.  You know, we're not trying to galvanize current events.
24       This goes back to the 2019 report from Mr. Pilch, and
25   that's at paragraphs 141 and 142.  He talks about how Sutter's
```

1    forward-looking investments allowed it to cope with the Zika

2    situation, with wildfires, and the like.  This is just another

3    more current example that's expanded in a supplemental report

4    because events have changed.

5         We're now in 2021 and, obviously, this issue of what's

6    happening with hospitals and the like during this period is

7    going to be on the jurors' minds.  It's only going to be put

8    into this case if it's relevant.

9         I do, Your Honor, have a few clips that we've provided to

10   the plaintiffs of some of the clinician witnesses, about five

11   or six minutes of testimony which -- in which two clinicians

12   are asked -- this is Dr. Eisenberg and Dr. Shaughnessy -- you

13   know, what's the relationship between these benefits and the

14   contracting practices.  And they attempt to answer those

15   questions.

16        If that would be helpful to see, I could play those clips.

17        **THE COURT:**  I'm happy for you to play them if you want

18   to.  It's up to you.  It can be useful to preview things.  I

19   mean, my inclination was not to grant -- you know, you heard

20   what I said.

21        **MR. BUNZEL:**  Right.

22        **THE COURT:**  I think it's difficult from a Rule 402

23   perspective, and that 403 is best addressed at trial.  But I do

24   expect that you won't, as you said, gild the lily because it

25   would be such a tactical or strategic mistake to do so.

 1          But if you think there's a utility to showing it, to be

 2     absolutely clear from a record perspective so I have that

 3     context to support my inclination, I'm happy to defer to your

 4     view of what you want to do.  So I'm not telling you not to do

 5     it.  You can if you think it would be helpful.

 6          **MR. BUNZEL:**  Why don't we play one of the -- one of

 7     the clips then, not both of them --

 8          **THE COURT:**  Okay.

 9          **MR. BUNZEL:**  -- just in the interest of time.

10          **THE COURT:**  You can share screen, and you should be

11     able to do it.  And, obviously, Kathy doesn't have to report a

12     clip.

13          **MR. BUNZEL:**  Yes.  Mr. O'Shaughnessy, could you play

14     Dr. Eisenberg's clip?

15          And this is William Eisenberg.  He's in Sutter leadership

16     with respect to the medical side.  He's also, obviously, a

17     longtime OB/GYN and important member of the San Francisco

18     legal -- medical community.

19          **THE COURT:**  Right.  And also the subject of

20     plaintiffs' Motion *in Limine* 9.

21          **MR. BUNZEL:**  Yes.  I think I have the honor of dealing

22     with that as well, Your Honor.

23          **THE COURT:**  Okay.  Good.  So let's play the clip.

24          **MR. BUNZEL:**  Okay.

25          (Video played.)

1          **MR. BUNZEL:**  Not getting any audio.

2          **THE COURT:**  He's not speaking.

3          **MR. BUNZEL:**  He was responding to a question.

4      (Video played.)

5          **MR. BUNZEL:**  You can take that down,

6  Mr. O'Shaughnessy.

7      And I want to be clear, Your Honor, that that's not a clip

8  we would play to the jury.

9          **THE COURT:**  It's just meant to illustrate.

10         **MR. BUNZEL:**  Exactly.  It's different parts of the

11  examination.

12         **THE COURT:**  Exactly.

13         **MR. BUNZEL:**  The point is, I think, well made by

14  Dr. Eisenberg.  And it will be Sutter's job to link these

15  innovations, as he put them, that are conceived, and the like,

16  largely from the clinicians' side, to link that to the

17  contracting practices to be attacked here on systemwide

18  contracting and to the issues in the case.

19      And we will do that, and I don't have anything further to

20  say.

21         **THE COURT:**  All right.  Okay.  The motion is under

22  submission.

23      I think that moves us to motion *in limine* --

24         **MS. KIM:**  Your Honor, I'm so sorry, I was on mute --

25         **THE COURT:**  Okay.  Sorry.

1          **MS. KIM:**  -- yelling at my screen by myself.  Sorry

2    about that.

3          **THE COURT:**  Yes.

4          **MS. KIM:**  If I may.  But Sutter went there, so we too

5    have clips of Eisenberg, and I want to play a little bit for

6    you just so --

7          **THE COURT:**  Okay.

8          **MS. KIM:**  -- you understand, you know.

9        I understand that witnesses are -- one witness is not

10   supposed to provide all the testimony.  You know, we understand

11   that.  That's a pretty generic principle.  But if you listen

12   carefully to the clip that they just played, all Dr. Eisenberg

13   said was that the money comes from the contracts.  You know,

14   the money to invest.

15       And I told you last week, when we were talking about

16   Mr. Pilch's testimony, profitability cannot be, you know, a

17   procompetitive benefit.

18       It would flip antitrust law on its head if a monopolist

19   was able to argue, hey, I get more money by doing this, and I

20   can go pay for really good things that I do, and that's a

21   procompetitive benefit.  You can't do that.  It's contrary to

22   law.

23         **THE COURT:**  Isn't Sutter's -- again, isn't Sutter's

24   argument something more like you get what you pay for and we

25   deliver a product that people pay for?

1        **MS. KIM:**  You know --

2        **THE COURT:**  Procompetitive benefits.

3        **MS. KIM:**  -- I deposed Dr. Eisenberg.  He seems like a

4   fine doctor and has had an illustrious career doing many good

5   things, I am sure.  And his only concern was he wanted -- he

6   wanted to make these investments, and all he knew was that he

7   made the requests and the money came from the commercial

8   contracts.

9        **THE COURT:**  Yes.

10       **MS. KIM:**  That's not enough of a link.  You know, the

11  only link that that provides is that, you know, commercial

12  revenues fund Sutter's investments.

13       **THE COURT:**  But Mr. Bunzel's point would be something

14  like not all links are established through one witness.

15       **MS. KIM:**  Right.

16       **THE COURT:**  So Dr. Eisenberg can testify about the

17  benefit itself, but obviously he's not the business guy.  The

18  business people might be providing testimony.

19     I mean, I'm making this up, but I think Sutter is not

20  going to be able to offer an integrated witness speaking on all

21  of these points.

22       **MS. KIM:**  I understand, but I'm saying if Sutter's

23  financial witnesses, all they say is it gives us revenue to pay

24  for these things, that's not a procompetitive justification

25  or --

1          THE COURT:  Not until it's a benefit; right?  Not

2      until it's a benefit.

3          MS. KIM:  Unless it benefits competition --

4          THE COURT:  Correct.

5          MS. KIM:  -- all the things that they seek to narrate

6      as procompetitive effects, they don't benefit competition, they

7      allow Sutter to make these investments.

8          But it doesn't -- even the cost shift argument, there is

9      no evidence in the record that Sutter's contracting practices

10     that are at issue in this case somehow allow Sutter to serve

11     more Medicare patients, allow Sutter to be more efficient in

12     its service of Medicare patients or Medi-Cal patients.  And

13     that is what they would have to show as a procompetitive

14     effect, that they somehow increased --

15         THE COURT:  Yeah, improving access.  Well, I suppose

16     their access to care is not just about access to care for

17     people who might not otherwise get it for financial reasons;

18     the pandemic wildfire example or otherwise.

19         MS. KIM:  Right.

20         THE COURT:  So it is about that, I guess.

21     Interesting.  Interesting.

22         MS. KIM:  I'd like to show this clip to you just

23     because --

24         THE COURT:  That's fine.  Fair is fair.

25         MS. KIM:  Okay.  Right.  I'm a Luddite, so this is

1  very funny I'm doing this IT.

2          **THE COURT:**  You should be able to screen share.

3          **MR. CANTOR:**  Your Honor, she's better than I am.

4  Please.

5          **MS. KIM:**  Oh, God.

6          **THE COURT:**  Ms. Kim is too polite to say that might

7  not be saying much.  I'm just teasing.

8          **MS. KIM:**  Do you see Dr. Eisenberg?

9          **THE COURT:**  I do.  Same day, same bow tie.

10     (Video played.)

11         **THE COURT:**  I think that makes the point pretty well,

12  Ms. Kim.

13         **MS. KIM:**  And he goes on.

14         **THE COURT:**  I understand the point perfectly.  It

15  illustrates --

16         **MS. KIM:**  The ultimate conclusion being that all he

17  can testify to is that, you know, commercial revenues pay for

18  all these good investments.

19     And if that's all that Sutter's finance witnesses are

20  going to testify to, which I suspect is the case, because years

21  into this case there's no evidence in the record as to what

22  this link is, and the link has to be direct, as the Supreme

23  Court provided in *Alston*, it cannot be, you know, somehow the

24  revenues from the contracts pay for these things.  That cannot

25  be a procompetitive defense.  That would not be recognized,

1    under the rule of reason, as a procompetitive defense.

2         Anyway, we got a little off track.  So, anyway, the 403

3    arguments are there for COVID.  As you remarked, Your Honor, we

4    are all very much still living the pandemic, unfortunately.

5    And, you know, the wildfires and COVID will have touched the

6    lives of each and every juror who sits for this trial.

7         And we would submit that under Rule 403 this is classic,

8    classic categorical evidence that should be excluded because

9    the prejudicial effect of this evidence getting into trial far

10   outweighs any, any probative value.  We submit there is no

11   probative value for the reasons that I stated.

12        **THE COURT:**  All right.

13        **MS. KIM:**  Okay.

14        **THE COURT:**  I'll take the matter under submission.

15   We'll move to Motion *in Limine* 5 to exclude evidence of

16   the patients' personal experiences.

17        Who is going to be arguing this?

18        **MR. CANTOR:**  So, Your Honor, for the plaintiffs, last

19   week you said you wanted Mr. Jain to argue a motion --

20        **THE COURT:**  Okay.

21        **MR. CANTOR:**  -- so we're serving him up to you.

22        But I do want to say one other thing really quickly before

23   you move on.  I just want you to consider one thing.  We're the

24   plaintiffs.  We have to be lean and mean at trial, there's no

25   question about it, and we will be.

1      But by not precluding certain evidence like COVID-19, you

2  know, we're going to have to respond.  And we have -- Sutter

3  did produce, although most of it was one-sided, documents that

4  demonstrate that their COVID-19 services were sub par.  Now we

5  have to go into that in the cross-examination of their

6  witnesses and maybe even playing some video.

7      So I just wanted to identify that --

8           **THE COURT:**  I caught that from --

9           **MR. CANTOR:**  -- this is a two-way street.

10          **THE COURT:**  I caught that from your papers.

11      I guess my reaction to the motion *in limine* was that, you

12  know, to reach back to the discovery reaction I had, is that it

13  has to be a small point, not a big one, else it's too

14  side-showy.

15      And the reality is the adequacy of Sutter's response

16  during the pandemic and wildfires, potentially, is implicated

17  by the kinds of evidence it puts on.  But I hope not, right,

18  because it is too side-showy.

19      So that's why I take Mr. Bunzel at his word when he said

20  he doesn't plan to gild the lily.  It's just an example, you

21  know, illustration of the procompetitive benefits.

22      But thank you for that point.

23      All right.  So Motion *in Limine* 5.  And who's arguing for

24  Sutter?

25          **MR. BUNZEL:**  I am again, Your Honor.

1          **THE COURT:**  You know, one thing I thought is that --

2     you know, I resist categorical exclusions because you never

3     know.

4          Obviously, for some of the same 402 -- 402/403 reasons

5     that Ms. Kim advanced in the earlier argument, you could stray

6     pretty far from the issues at play in the litigation if you

7     went too side-showy on things like patient care.

8          That said -- I think this was the point that Sutter made

9     in its papers -- sometimes examples can illustrate complex

10    issues.  And it seemed that, you know, again taking Mr. Bunzel

11    at his word, here again, that he's not going to gild the lily

12    or stray too far from the issues in the litigation, I did not

13    think -- my reaction was this was not amenable to a categorical

14    exclusion.  But I am looking forward to hearing why that might

15    be wrong.

16         So, Mr. Jain.

17         **MR. JAIN:**  Good afternoon, Your Honor.

18         **THE COURT:**  You just accidentally took yourself off

19    video.  There you go.

20         **MR. JAIN:**  Thanks.  Suneel Jain, from Steyer

21    Lowenthal, for the plaintiffs.

22         So I can address those points first --

23         **THE COURT:**  Okay.

24         **MR. JAIN:**  -- regarding the categorical with the

25    specificity issue.  And Sutter did raise that, you know,

plaintiffs' motion is speculative.  I guess our response would
be that if Sutter doesn't, in fact, attempt to bring up
anecdotal evidence, we're happy to withdraw our motion without
prejudice with that understanding.

Sutter's own witness list includes three doctors and one
nurse testifying on very broad categories that appear tailored
to anecdotal experience.

So, for example, Sutter has Jonathan Judy-Del Rosario, a
nurse, described as testifying to Sutter's emergency and
earthquake preparedness.  And their using a nurse to opine on
these preparedness systems seems like they're more likely
focused on trying to sway a jury through anecdotal evidence
rather than to explain a health system, or else we might expect
a more relevant or expert witness to be brought in.

Part of the issue with the specificity is that Sutter has
listed 72 witnesses; 38 who are will call, 34 who are may call.
And we believe that Sutter intends to use these four witnesses
in particular, and possibly others, to present anecdotal
patient experiences given the broad topics for which they've
been designated.

Given the broad topics and the, you know, over 600
exhibits, 1400-plus exhibits on the FRA 1006 list, given all of
that and that any exhibit discussing quality can then be a
gateway or segue into discussing, well, for example, this one
patient, you know, it's difficult to say these specific

1   documents, which is why we're seeking this motion *in limine*.

2        The best way to get through this motion, though, you know,

3   might be just to have an offer of proof from Sutter right now

4   and find out whether they actually intend to offer anecdotes

5   about patient experiences, particularly with their, you know,

6   four witnesses, doctors and nurse.  And if they do, then that

7   resolves concerns about specificity, and we can narrow the

8   dispute.  And if they don't, then, you know, we can move on

9   very easily.

10       And then the other example, other point that you raised,

11  that Sutter wants to, you know, use these as illustrative

12  examples, I don't know that these require specific patient

13  experiences.

14       A helpful illustration, you know, is more along the lines

15  of saying something like how a patient can use various Sutter

16  technology.  That, you know, they might have their shim system.

17  And it was described, you know, in previous argument, I think,

18  sufficiently.

19       But describing specific patient experiences seems like

20  it's a step above, and that's where you risk that, you know,

21  prejudicial outweighing the probative value.

22       So we just think that there's no need for Sutter to use

23  highly emotional personal stories that are also irrelevant and

24  unreliable indicators for what they're trying to prove.

25       I do want to add that a lot of this goes back to the

1  quality issue that Sutter's trying to show, you know, through

2  specific anecdotes, Sutter's quality, and yet this anecdotal

3  evidence is -- you know, has been shown irrelevant in expert

4  reports and in medical settings like FDA investigations.

5      And in both plaintiffs' and Sutter's expert reports,

6  instead, used quality from sources such as the Center for

7  Medicare and Medicaid Services, Leapfrog, and Cal Hospital

8  Compare.

9      So both parties rely on those and have used those, but

10  Sutter's use of anecdotal testimony, which Judge Massullo has

11  described as misleading and of marginal relevance, it's just

12  not relevant in the first place.

13      And then once we get to 403, it's prejudicial in that it

14  just seems to, as you mentioned before, be pulling at the

15  heartstrings rather than trying to actually show, you know,

16  something like quality.

17          **THE COURT:**  Okay.  Good.  Thank you.

18      And part of that point, too, Mr. Bunzel, is you can -- to

19  the extent you need to illustrate, hypotheticals work pretty

20  well too; right.  But, also, there's the suggestion that if you

21  stray too far into the personal, it just isn't relevant.  But

22  if you're really not trying to do that, then maybe there's less

23  cause for concern.

24      So what's your view?

25          **MR. BUNZEL:**  There should not be cause for concern

1    here, Your Honor.  There are no -- there are no patients on our

2    list.  There's no medical histories, you know, individual

3    patient histories in the exhibit list.  We're not going there.

4        The plaintiffs -- I believe they asked the questions

5    during all the discovery of the clinician witnesses about

6    examples and the like, but if they didn't, then that's -- they

7    didn't ask the questions.

8        This is a case about the hospital industry and how it's

9    supported by the insurance industry.  The plaintiffs didn't sue

10   a slaughterhouse or a steel company.  They sued a hospital

11   system.

12       The business that my clients are in are helping people,

13   helping patients.  From time to time, there will be examples of

14   that, not with names or dates or tiers, but with, for instance,

15   how is it that, you know, an ICU patient in a rural hospital is

16   benefited?

17       And when the clinicians say, well, let me give you an

18   example, a patient presents with this and the people up in

19   Del Norte aren't able to diagnose an incipient stroke

20   situation, but we have, this Telestroke, you know, capability

21   and we get -- we get experts in San Francisco, to examine the

22   scans from the rural county in real time, talk to the patient

23   in real time, and produce a -- a benefit for our system and for

24   the business that we're in and for that patient.

25       And I think that our witnesses should be allowed to do

1   that.  They don't have to say, oh, and the patient was a mother

2   of three and saved, you know, lives and specific people.  We

3   won't do that.

4        But it's inappropriate to hamstring -- in a case about the

5   benefits of improved competitive care, it's just inappropriate

6   to try to hamstring us.  And they have no examples that they're

7   seeking to exclude.

8        **THE COURT:**  I think we're fine.  I think it's probably

9   less of a concern based on your representation about how Sutter

10  tends to approach, perhaps sometimes providing an illustration.

11       I don't think the plaintiffs need to withdraw the motion

12  *in limine*.  I think it can be just be -- if there is a

13  particular issue, I think it's better addressed in the context

14  of an objection at trial.

15       You know, Sutter is essentially saying we're low-keying

16  it, and its potential examination.  We're not planning to go

17  sideways into long explanations about patient care and patient

18  experiences.  And you shouldn't, and you said you're not going

19  to.

20       Okay.  So that's helpful.  Thank you very much.

21       Let's move on to Motion *in Limine* 7 to exclude the health

22  plans' financial information.  Who's arguing that motion?

23       It looks like --

24       **MR. BROWNSTEIN:**  Good afternoon, Your Honor.  David

25  Brownstein for plaintiffs and the class.

1          **THE COURT:**  And who's arguing for Sutter?

2          **MS. BURNSIDE:**  Good afternoon, Your Honor.  Elizabeth

3    Burnside, from Jones Day, for Sutter.

4          **THE COURT:**  Great.  So this is the motion to exclude

5    the health plans' financial information.  Okay.

6          So I feel like, because some of the motions are on both

7    sides of the V, we have a different one that's Sutter's motion

8    *in limine*, but why don't you tell me, Mr. Brownstein, what you

9    want to tell me on this point.

10         I think Sutter largely says that the financial evidence,

11   including executive compensation, as a component of overall

12   costs is relevant, and you argue to the contrary.

13         So tell me what you want me to know.

14         **MR. BROWNSTEIN:**  Yes.  Not exactly to the contrary.

15         **THE COURT:**  Yep.

16         **MR. BROWNSTEIN:**  Let's start with perhaps the more

17   prejudicial or inflammatory type of information, which would be

18   executive salaries.  And there we have a relevance point, which

19   is, to be really simple, in talking about sideshows, you know,

20   this case is about --

21         **THE COURT:**  Are you guys both arguing Motion *in*

22   *Limine* 6 on the -- on the Sutter side too?

23         **MR. BROWNSTEIN:**  I am, Your Honor.

24         **MS. BURNSIDE:**  I am.

25         **MR. BROWNSTEIN:**  Yes.

1          THE COURT:  And you are too, Ms. Burnside?

2          MS. BURNSIDE:  Yes, I am.

3          THE COURT:  So let's just talk about them together,

4     because they have overlapping issues.

5          MR. BROWNSTEIN:  Happy to take them together, Your

6     Honor.

7          THE COURT:  Or somewhat overlapping issues; right.

8          MR. BROWNSTEIN:  Right.  I'm going to argue that they

9     don't overlap so much.

10          THE COURT:  Okay.

11          MR. BROWNSTEIN:  But the starting point here, Your

12     Honor, is we have some basic issues in the case.  Does Sutter

13     have market power, and did it abuse that market power to

14     foreclose competition in the relevant markets?  That is, put

15     another way, is their business model anticompetitive?

16          Now, what an executive at a health plan makes has zero

17     bearing on that.  The health plans operate in different

18     markets.  It's, frankly, a different industry.  You know,

19     Sutter has its own insurance company, which is a different

20     industry.

21          So talking about executive salaries, I really think those

22     are out of bounds.  Now, as you pointed out --

23          (Interruption.)

24          MR. BROWNSTEIN:  Of course, the phone rings the moment

25     I start.

1          **THE COURT:**  You have the old-school landline; right.

2          **MR. BROWNSTEIN:**  Let me just turn this off, Your

3  Honor.

4          Okay.  As Your Honor pointed out, you know, Sutter's point

5  is, look, there is -- there's some relevance here to these

6  costs because it affects passthrough; right?  And, of course,

7  health plan costs do affect passthrough.

8          Now, passthrough, of course, is something that has been

9  the subject of a great deal of briefing before Your Honor and

10  is not something, frankly, that lay witnesses are going to

11  testify about.  That is the subject of expert testimony.

12          And in getting ready for today's hearing, I went back and

13  I opened up Dr. Willig's reports.  And he's filed a number of

14  reports.  I counted up about 75 pages of discussion about

15  passthrough, and that's not including all the charts and all

16  the backup materials, which probably accounts for several

17  hundred more pages.

18          Our motion does not attack whatever Mr. Willig -- sorry --

19  Dr. Willig looked at.  Frankly, his opinions and the basis for

20  his opinions are in the can, and that's it.  But there are no

21  individual materials in his reports about health plan executive

22  salaries or about this, that, or the other.  I've read through

23  it.  To the extent there's anything in there, he can testify

24  about it.

25          But this motion is directed at the evidence.  And the idea

1   that Sutter is now going to put in fresh evidence about health

2   plan spending, to what end, when, frankly, you know, Dr. Willig

3   is not going to be able to rely on anything new for his

4   opinions, is sort of beyond me.

5       In fact, if you look at Sutter's papers here, they cite

6   only to Patrick Pilch with respect to this evidence.  And

7   Mr. Pilch does not address passthrough.

8       So even though Sutter argues that there's some relevance

9   to health plan costs or spending or financials to passthrough,

10  there's nothing in their expert presentations about that.

11      So, to us, this appears to be more like an opening,

12  perhaps an open field, to get into some sideshows and to

13  illustrate in completely unrelevant ways that the health plans

14  are large or powerful or their executives make a lot of money.

15  And that really has nothing to do with this case.

16      So that's our Motion *in Limine* 7.

17          **THE COURT:**  Okay.  So let's hear from Ms. Burnside.

18          **MS. BURNSIDE:**  Thank you, Your Honor.

19      So I think what's important to note about Motion *in Limine*

20  No. 7 is that there's several categories of documents that are

21  kind of lumped together in this motion.

22      We've been speaking specifically about executive salaries.

23  And Mr. Brownstein made a comment that they think talking about

24  executive salaries is out of bounds.  And as we set forth in

25  our Motion *in Limine* No. 6, we agree.  We don't think that

 1    talking about specific executive salaries is necessary in this

 2    case.

 3         However, to the extent that plaintiffs are going to offer

 4    evidence of specific salaries of Sutter executives, then Sutter

 5    must be able to respond to explain how those salaries are

 6    appropriate and normative.  And that does include evidence of

 7    executive compensation at other nonprofit participants in the

 8    healthcare industry.

 9         **THE COURT:**  So, just to Mr. Brownstein's point,

10    though, so do you agree that, generally, the financial

11    predicates that are relevant at trial are the financial

12    predicates relevant to both experts' assessment, you know, of

13    the opinions or calculations of the passthrough rates?

14         And then your point then is, you know, to the extent this

15    comes up as part of the plaintiffs' case, we need to be able to

16    at least respond to it, you know, as -- at least categorically,

17    if it is at issue in the litigation in the plaintiffs' case.

18         Is that what you just said?

19         **MS. BURNSIDE:**  Specifically as to executive

20    compensation and specific amounts of executive compensation,

21    that's correct.

22         **THE COURT:**  Okay.  So I'm having a hard time

23    understanding what you're disagreeing about here.

24         Because in Sutter's motion later, which maybe we deal with

25    later, that's more about inquiring to -- you know, impeaching

somebody based on personal, you know, bias.  So that's maybe

different.  We'll just deal with that later.

     But, so here in the context of this motion it's -- what

are you disagreeing about?

          **MS. BURNSIDE:**  Sure.

          **THE COURT:**  Because the only thing you guys are

talking about right now are executive -- is executive

compensation.  You said, well, if it's an issue in the

plaintiffs' case.  And my question was, do you mean financial

information relevant to the -- the calculations of damages, you

want the ability to be able to respond to it, but it then

becomes what's at issue.

     You know, Dr. Willig isn't going to testify about more

than the financial predicates he testified about.  Your

challenges to the liability or the damages cases are going to

be limited to what the experts say about it.

     And so what are you disagreeing about here?  I don't

understand necessarily.

          **MS. BURNSIDE:**  So I think with respect to executive --

specific amounts of executive compensation, we would agree that

if -- that we don't need to go into those specific amounts if

plaintiffs aren't going to be bringing up specific amounts of

compensation regarding Sutter witnesses.

     With respect to the rest of the Motion *in Limine* No. 7 --

          **THE COURT:**  For purposes of calculating damages as

1  opposed to addressing bias.  I mean, bias we'll get to when we

2  get to your motion.  But your motion is about bias, and this

3  motion is about damages.

4        **MS. BURNSIDE:**  Right.  So I do think that for the same

5  reason that information in insurer financial statements beyond

6  executive compensation are relevant to undermining Dr. Chipty's

7  passthrough analysis.  And that could be information that is

8  addressed directly with Dr. Chipty.  And that --

9        **THE COURT:**  So that would go to her financial

10  predicates that she assumed; right?

11        **MR. BROWNSTEIN:**  Correct.

12        **THE COURT:**  So, again, to Mr. Brownstein's point,

13  everything -- to the extent -- this motion *in limine* is about

14  damages.  And the motion is aimed at limiting damages

15  essentially to what the experts considered and that that's --

16  that's the relevant landscape.

17     And it sounds like you guys basically agree on that point.

18  Am I wrong?

19        **MR. BROWNSTEIN:**  Well, I think, Your Honor, the way

20  you put it, you know, we do agree.  This motion is aimed

21  towards putting in, you know, new evidence.

22     Of course, experts can rely on materials that aren't in

23  evidence as part of their calculation, and Dr. --

24        **THE COURT:**  But they're still in their reports because

25  the bases for their opinions are in the reports, and the

1   testimony is confined to what's in the reports.

2         **MR. BROWNSTEIN:**  Exactly, Your Honor.

3         **THE COURT:**  And so this is just a damages motion,

4   making sure that the universe is nailed to, you know, the

5   damages platforms.  And, therefore, you basically agree.

6         Because if you were quarreling about predicates that the

7   experts included, that's fair cross-examination.  Or didn't

8   include.  But you're just saying, no, you can't come in and

9   sort of redo the whole shebang, the experts guy, the damages

10  analysis.

11        I mean, you have no choice, right, but to do that?

12        **MR. KIERNAN:**  Your Honor, if I could add one gloss.

13        **THE COURT:**  Yes.

14        **MR. KIERNAN:**  Yeah, so you've got the damages piece

15  and passthrough.  And, clearly, whatever profits and financial

16  performance at an individual health plan is highly relevant to

17  passthrough.

18        The other piece, putting damages aside, is it's relevant

19  to why certain of the narrow networks failed.  It is relevant

20  to why some --

21        **THE COURT:**  So you're saying there's some business

22  justifications for how you construct the networks that might be

23  implicated --

24        **MR. KIERNAN:**  Correct.

25        **THE COURT:**  -- and that if you categorically exclude

 1   this information --

 2           **MR. KIERNAN:**  Exactly.

 3           **THE COURT:**  -- that you might preclude your ability to

 4   describe why --

 5           **MR. KIERNAN:**  Something failed.

 6           **THE COURT:**  -- contracting practices -- yeah, okay.  I

 7   understand.  And so --

 8           **MR. KIERNAN:**  Yeah, so the Health Net -- oh, sorry,

 9   sorry.

10           **THE COURT:**  No, no, it's more important for you.

11           **MR. KIERNAN:**  Real quickly.

12       For example, the plaintiffs claim that one of the

13   Health Net products failed because of Sutter's pricing.  And,

14   you know, the counter to that is Sutter dropped its pricing to

15   create a product that competes with Kaiser, one of its number

16   one competitors.

17       And the evidence will show that what was happening is

18   Health Net was holding on to profits rather than dropping the

19   premium to compete with Kaiser.

20       That would be -- and plaintiffs, I'm sure, dispute that,

21   but we're going to have that argument that takes on plaintiffs'

22   argument.  Some of the experts may touch upon it, but we don't

23   need experts to make that argument to the jury.

24           **THE COURT:**  Okay.  Well, I guess, again, in context,

25   if there's specific challenges to evidence that someone's

 1    relying on, you know, in the expert context, which is not going

 2    to happen, it sounds like, by agreement, because your damages

 3    analysis is driven by what your experts have to say, and so too

 4    is your cross-examination.

 5         And then as to the second point, that there might be --

 6    this issue that could potentially come up in the context of a

 7    business justification -- not justification -- a business

 8    explanation for something --

 9              **MR. KIERNAN:**  Yes.

10              **THE COURT:**  -- that happened, we shouldn't

11    categorically preclude it.

12         But that, of course, would not prevent the plaintiffs from

13    objecting to evidence on some grounds that have to do with

14    relevance or prejudice or something like that.

15         Okay.  That sounds -- I don't know how the heck I'm

16    supposed to write that.  But at least there's a transcript.  At

17    least there's a transcript that says it.

18         Okay.  I think that's fine.  Okay.

19              **MR. KIERNAN:**  Okay.

20              **THE COURT:**  All right.  Thank you.

21         So that's -- so that moves us to the final plaintiffs' --

22    well, I think we'll table the motion *in limine*.  And we don't

23    have to do it in this order.

24         We might as well move to the last plaintiffs' motion *in*

25    *limine* and then we'll take a break after that.  I think that

 1  will put us about at the hour and a half slot, unless Kathy

 2  disagrees.

 3     I think we started at about quarter to 11:00, Kathy, and

 4  so I'm hopeful ten minutes.  And that would be a nice time for

 5  a break, but you tell me if you'd like one sooner.

 6     All right.  Plaintiffs' Motion *in Limine* No. 9.

 7        **MR. CANTOR:**  Your Honor, that's going to be argued by

 8  our colleague Paulette Rodriguez Lopez.

 9        **THE COURT:**  Excellent.

10     And for Sutter?

11        **MR. BUNZEL:**  I drew that straw again, Your Honor.

12        **THE COURT:**  Okay.  Mr. Bunzel.  Okay.  So let me just

13  tell you -- thank you all, or both.

14     Let me just tell you what I -- you know, some of my

15  preliminaries.  For what it's worth, this is the one I wrote

16  the most on, just to try to unpack it from a fact perspective,

17  to sort of work through what the issues were in the context of

18  the specific witnesses.  So I'll just summarize, you know, a

19  little bit, my little outline here.

20     So, one -- so the four witnesses in 2014, and the holds

21  were delayed.  Eight witnesses between 2016 and 2018.  So those

22  are the witnesses.

23     You know, Sutter makes the point that you're supposed to

24  challenge spoliation through a spoliation motion.  That's fine.

25  I just went ahead and assumed we can address the issue here so

1    we just get to the meat of the issue, you know.

2        And here's my reaction.  So I think that, you know, there

3    are arguments that we can -- we can talk through it in more

4    detail, but it's -- assuming it was procedurally correct,

5    again, it just boils down to what we talked about last week

6    with Mr. LeVee and the sanctions motion, the issue about what's

7    the evidence, what's the -- what does the record suggest about

8    spoliated evidence being lost?  And I -- it seemed pretty

9    speculative.

10       And then Sutter actually put in its record about how it

11    evaluated the scope of its litigation holds periodically.  And

12    that, too, was discussed, you know, last week with Mr. LeVee in

13    the context of the spoliation issue.

14       So I sort of just cut to the chase about what's going on

15    with these witnesses.  So, you know, the -- Ms. Brosnahan and

16    Ms. Carriere, that sort of stands and falls on the kind of

17    analysis we talked about last week with the sanctions motion.

18       As I said last week, I have a really hard time, for

19    multiple reasons, in the sanctions motion context, finding

20    relevance for a period that predated the class period by years

21    and no record of actual spoliated evidence.  And we kind of

22    went over that territory.

23       And my -- you know the issues that surround adverse

24    inference instruction, those witnesses are document retention

25    witnesses, as Sutter says, and so it seems -- you know, again,

1   that same analysis about the time period seems relevant here.

2       The next two witnesses are more engaged, and they weren't

3   involved in the contracting practices.  So they talk about

4   budgeting and operations, and that does seem sort of

5   unremarkable as far as the scope of evidence that somehow is

6   lost by virtue of allowing these witnesses to testify.

7       Taylor is -- you know, no one asked any questions at the

8   PMK.  Again, the next witnesses, the clinical care witnesses,

9   weren't involved in the contracting practices.

10      And then the new witnesses, the three witnesses, the

11  doctor witnesses -- well, there's the two; Dr. Eisenberg and

12  Dr. Vial -- you know, Sutter characterizes them as not being

13  involved in the contracting practices.

14      We just got into that in the earlier motion *in limine* now

15  and basically stepped up and took new roles.  And the

16  plaintiffs' doc requests for those witnesses were 2017 on.

17      And then Mr. Dean was added to the witness list when he

18  was a successor CFO.  So, you know, sort of boiled down, no

19  evidence of destruction, speculation that there could be,

20  nothing about spoliation of evidence.

21      The nature of the testimony doesn't seem relevant to what

22  the core -- the core issue in the case, which is the

23  contracting practices.  And these witnesses don't have anything

24  to do with these contracting practices.

25      So that was what I thought by working my way through all

 1   of the challenges to the witnesses.

 2        So why don't you tell me, Ms. Rodriguez Lopez, what you

 3   want to tell me about the motion given that -- sort of how I

 4   define the prism of how I'm looking at your motion to

 5   exclude -- the motion to exclude pre-litigation hold evidence

 6   and those -- you know, which -- in the context of those 12

 7   witnesses.

 8        **MS. RODRIGUEZ LOPEZ:**  Your Honor, Sutter would like

 9   you to believe that the issue before this Court is whether it

10   failed to send litigation holds to 50,000 of its employees.

11        But, really, the issue here is that Sutter failed to send

12   litigation holds to key executives that it knew would be

13   essential to this case.  These aren't just any employees.

14   These are trial witnesses that Sutter is calling to defend

15   itself --

16        **THE COURT:**  So let's focus on them.  So Brosnahan and

17   Carriere, those are the documents retention witnesses.  And

18   that's a different issue.  We dealt with that in the sanctions

19   motion.  I think that that sort of stands or falls on the

20   sanction motion.  So I think we can sort of table those two.

21        And let's focus on the executives.  So that would be

22   starting with, you know, Moore and Gates.  I don't know if you

23   want to go through them by category or by witness.  I don't

24   know how you want to frame it.

25        **MS. RODRIGUEZ LOPEZ:**  I'll start with the clinicians

1    who are off the witness list.

2         **THE COURT:**  Okay.  That's fine.

3         **MS. RODRIGUEZ LOPEZ:**  So, for example, Dr. Eisenberg

4    is Sutter's chief safety and quality officer and part-time

5    chief medical officer.

6         He worked -- has worked for Sutter for about two decades,

7    including as Enterprise EHR Physician Adoption Executive

8    beginning in 2009, and SHEMS lead.  He was also Vice President

9    of Patient Safety starting in 2015.  And he was former chair of

10   obstetrics at Alta Bates and Summit.

11        The hold for Dr. Eisenberg was not issued until 2016.

12   That's six years after this lawsuit was filed.

13        **THE COURT:**  Can I ask a question?  But he's not a

14   contracting practices guy; right?  I mean, like we sort of

15   talked about in the last motion *in limine*, Ms. Kim argued --

16   and she's right; right?  You know, he can't talk about -- he

17   literally said in the -- for some reason, *literally* is a word

18   I'm overusing recently.  I have to scrub it from my vocabulary.

19   Well, so I'm overusing it.

20        But he's basically said, I can't tell you about that; I

21   don't have anything to do with that.  If he were a contracting

22   practices witness, you might really be right.  But since he's

23   not, you know, where's the foul?  I mean, it's -- yeah, so

24   where's the foul?

25        **MS. RODRIGUEZ LOPEZ:**  Your Honor, I think it's

important for us to think about why it was included in your
initial order that we issue a litigation hold and why
litigation holds are a practice in the first place.

    I want to ensure that both parties have the opportunity to
meaningfully test evidence.  And in order to meaningfully test
evidence, most of the time we need documents.  We need the
ability to cross-examine and point at things that people have
said in the past; impeach them, for example.

    Whether -- I agree with you that Dr. Eisenberg and the
other clinicians don't have much to offer in this case.
Certainly, I don't believe that their evidence is relevant,
because it is not a procompetitive justification.

    But to the extent that they are going to appear and
plaintiffs are going to need to cross-examine them, the fact
that we have no clear understanding whether they kept documents
that might be relevant or not in this case is -- is of great
prejudice to the plaintiffs.

    And to be specific with another examples,
Mr. Judy-Del Rosario, who's a senior nursing executive at CPMC
and we've discussed before, he, when asked during deposition
whether he remembered being issued a litigation hold,
categorically said no, he didn't remember at all.

    And so there's a big question as to how witnesses are
supposed to comply with their duty to preserve evidence if they
don't even remember that they have a duty.  They have no idea.

He seemed -- he had no answer to that.

THE COURT:  So let me just push back a little, though, just to kind of frame the issue.

So, sure, if someone's integral to contracting practices and a litigation hold -- a litigation hold isn't issued.  But these are witnesses who are being put forward as having evidence relevant to the procompetitive benefits of the challenged contracting practices, not the -- you know, as I said, Dr. Eisenberg said, "I can't talk about that."

And they're identified when their role becomes apparent as witnesses.  So, I mean, this case is about contracting practices.  And that's really what the litigation hold is in play for.  Witnesses who are identified as witnesses when they become apparent as having relevant information, that's something different.

You know, if it were about contracting practices, I think it would be a great point.  But I'm not sure it is because Sutter does not have any -- I understand why you bring the motion, right, because you want to make sure that they got nothing.

But Sutter, in response, says, well, they're not going to talk about contracting practices, they can't, because they have no knowledge about it.

MS. RODRIGUEZ LOPEZ:  Well, Your Honor, if I may, just to clarify, the litigation hold is not about a specific

1    defense.  And Sutter has more than one, right.

2        So they're saying more than one as far -- if you think

3    about the links in the chain that they need to prove, they need

4    to prove that they had these contracting practices and that

5    they create -- they create -- procompetitive effects flow

6    directly from them.

7        And part of the piece of the puzzle that they're trying to

8    put before the jury here is that the high quality of Sutter's

9    services is a procompetitive justification.  This is something

10   they've said from the beginning in this case.  This is not a

11   new defense.

12       Quality as a procompetitive justification has been

13   something they've been putting forward before the Court from

14   the beginning.  It's what they -- why they say people choose

15   Sutter and pay Sutter higher prices.  They say, Our prices are

16   higher, and they're willing to pay it because our quality is so

17   great.

18       So how are plaintiffs supposed to respond to this and --

19   without assurances that they have the documents that are

20   relevant to this argument, that they haven't been destroyed?

21       And I think part of what you mentioned is this prejudice,

22   how do we prove prejudice.  This is -- the balancing test, this

23   is really about equities.

24       When you think about litigation holds, it's not about

25   proving exactly what has been lost.  The burden for plaintiffs

1    to do that would be very high, or for opposing parties to do

2    that would be very high, because, as a matter of fact, they're

3    the ones with the information as to what has been kept or lost.

4        And it's unlikely people are going to be very honest about

5    that.  It's not usual for people to write emails saying, I

6    deleted things.  You might get a joke like the one

7    Ms. Santagata made that suggests that, but it's unusual for

8    people to admit it.

9        So it's very hard for us to prove exactly what has been

10   lost, but that is why the duty falls to issue the holds.

11   That's why the duty falls to ensure that you don't only issue

12   it but you ensure that your witnesses are aware of it and are

13   following that duty to preserve.

14       And there are cases that we cited in our brief that show

15   that courts, when they look at the equities and they see that a

16   party is going to have to question a witness and risk that they

17   don't have the documents to properly do so, to properly

18   impeach, that the equities lie such that the Court should not

19   allow that -- that evidence to come in, because it'll mislead

20   the jury.  It might mislead the jury.

21       And that's ultimately what courts are concerned about,

22   making sure that we are making decisions on the facts and the

23   evidence rather than games and systemic failures to preserve

24   documents, which is our duty.

25           **THE COURT:**  Okay.

1          **MS. RODRIGUEZ LOPEZ:**  This is not one failure, this is

2     repeated failures over a series of seven years.

3          **THE COURT:**  Good.  Thank you.  I understand the

4     argument.

5          So was it you, Mr. Bunzel?  Is that what you said?

6          **MR. BUNZEL:**  Very briefly, Your Honor.

7          You're correct that the plaintiffs' case evolved, and as

8     defenses became more necessary and apparent, especially the

9     procompetitive issue, additional witnesses, you know, were

10    added.

11         There's just no evidence here of any -- counsel,

12    Ms. Rodriguez Lopez, used the word *systemic failure*.  It's

13    really just the opposite.

14         Unlike *Montoya* and *Napster* and those cases where there

15    really was either a policy to destroy documents or actual

16    destruction, here -- and it's in the record, the Gasper

17    declaration, at Exhibit D50 -- Sutter's had a policy since 2005

18    not to destroy any emails.

19         So it's the antithesis of a case where there's a systemic

20    failure, and it was simply dealing with litigation holds being

21    issued at varying times based on when a responsible defendant

22    thinks it needs to broaden the net of potentially responsive

23    custodians.

24         With respect to the clinician witnesses in particular,

25    they were deposed, and there's no evidence that there was

 1   anything relevant that was -- was destroyed.

 2       So there are no lost documents.  There's no discovery

 3   obligation failure here.  And it's all speculative.  And so I

 4   believe your read through this -- and I commend you for looking

 5   at each one of the --

 6           **THE COURT:**  I looked at each one of them individually,

 7   yeah, that's what I did.

 8           **MR. BUNZEL:**  Yeah, looked at them all individually, as

 9   did we.  And the motion just -- you know, it doesn't rise to

10   the level of substantial, you know, prejudice, you know,

11   against relevant evidence.

12           **THE COURT:**  Okay.

13           **MR. BUNZEL:**  So I don't have anything further to add.

14           **THE COURT:**  All right.  So I'll take the motion under

15   submission.  We're going to take --

16           **MR. BUNZEL:**  Oh, I do, your Honor.  I had one further

17   thing to add, because you mentioned in your discussion that the

18   spoliation, you know, motion touches on at least two of these

19   witnesses.

20       This afternoon Mr. Kiernan will be revisiting and arguing

21   the Motion *in Limine* No. 5 by Sutter that's linked to the

22   spoliation instruction motion of the plaintiffs.  I just wanted

23   to preview that for you.

24           **THE COURT:**  Okay.  That's fine.  Thank you.

25       We'll take a little break but with a short introduction to

 1    our break.

 2         So last week we did discuss Motion *in Limine* 4.  You know,

 3    Motion in Limine 5, to exclude evidence of spoliation, which

 4    you just referred to, sort of stands and falls, on some level,

 5    on the spoliation motion that we argued last week.  I feel like

 6    we argued it exhaustively.

 7         You guys, of course, can tell me what else you want to

 8    hear, but I thought Mr. Steyer and Mr. LeVee did a good job

 9    last week fully illuminating the landscape, you know, from the

10    plaintiffs' perspective what should happen, wait; and Sutter's

11    view about what should not happen, don't wait, it defines the

12    landscape at trial.  And we think that this case -- and it's

13    probably a danger to report from memory -- we think this case

14    is so different, not the least because the class period in the

15    *UEBT* case went back to 2002 and was also predicated on fraud,

16    in part.  You know, the claims in that case were on fraud, and

17    this case is about contracting practices that, at most, went

18    back to 2008, as framed in the original complaint, until the

19    Court limited the class period to 2011.

20         So I think we did a really good job banging on that issue.

21    But I'm just telling you that because, you know, I feel like we

22    really talked about it a lot last week.  So I'm just letting

23    you know.

24         And we're going to take a 15-minute break now, and I will

25    see you in 15 minutes.

1          **MR. BUNZEL:**  Thank you, Your Honor.

2          **MR. KIERNAN:**  Thank you, Your Honor.

3                    (Recess taken at 1:24 p.m.)

4                (Proceedings resumed at 1:42 p.m.)

5          **THE COURT:**  So we're back on the record.

6      Our next motion is --

7          **MR. CANTOR:**  Your Honor, can I just make -- I just

8      want to make one 2-second statement --

9          **THE COURT:**  Okay.

10         **MR. CANTOR:**  -- because I think it's critical.  And,

11     obviously, this is going to be discussed in the motions *in*

12     *limine* now that were brought by the defendants, but I think

13     it's critical.

14         You made a statement, and maybe I misinterpreted it, but

15     to state for the record that the evidence of why Sutter engaged

16     in systemwide contracting came out between 1997 and about 2002.

17         It's that mechanism through which it forced not only the

18     inclusion of Sutter network hospitals in these health plan

19     networks but also the nonpar penalty rate, the anti-tiering,

20     the anti-steering clauses, and the price secrecy clauses.  That

21     evidence is not only relevant, it is critical.

22         So I just wanted to make --

23         **THE COURT:**  No, I appreciate that.  But just so --

24     I'll just sort of make my fact point, which will be made more

25     explicitly in the order about the sanctions motion.

1          Fair enough.  Irrelevance stretches back to a period of

2     time when Sutter began its contracting practices.  I completely

3     understand that.  And, still, if we were doing -- and, by the

4     way, the sanctions motion is about litigation holds that were

5     in a case that involved a different time period than this one,

6     and so, you know, what is its obligation?  And, of course, the

7     resulting prejudice in this case, because the litigation is

8     known and all of that, so it's different.

9          The reality of the discovery landscape in this case is

10    that -- you know, and we'll get to it in the context of some of

11    these motions *in limine* -- is that you reserved your right to

12    be back to 2002, for example, in that CMC statement.  We never

13    actually went back before 2006.

14         In the -- had UEBT not existed at all, you know, there

15    would be no, you know, foul attached to a time period, I think,

16    for this litigation given the difference in the conduct there.

17         But, no, I get it.  I get that you have a relevance

18    argument for 1997.  But, you know, if you had asked me for

19    discovery back to 1997 in this case, I probably never would

20    have authorized it.  I would have gone back, you know, five

21    years or something, which is what we essentially did, because

22    that seems to be the default.

23         **MR. CANTOR:**  Yeah, I'm not making the sanctions point.

24    I'm not the sanctions arguer.  I'm making a relevance point for

25    admitting evidence that we have into the record at trial.  And

 1   I just wanted to --

 2           **THE COURT:**  Yeah, yeah, yeah.  So I'm not putting

 3   any -- well, just so you know, we'll get to that when we get to

 4   the motion, but I'm not inclined to issue any categorical

 5   exclusion of evidence proceeding from before 2006.  My point

 6   was a very modest one that had only to do with the sanctions

 7   motion.

 8           **MR. CANTOR:**  Exactly.

 9           **THE COURT:**  And insofar as it related to the

10   litigation hold for the witnesses here, who had nothing to do

11   with contracting practices, I was using it as an example.

12       But -- we'll get to it, but I don't see how, just for the

13   same reason as I didn't categorically -- you know, I was not

14   inclined to categorically exclude categories of evidence of

15   procompetitive effect, the same analysis would apply to you.

16   I'm not going to leave you -- you know, say that you can't use

17   evidence from an earlier time period.

18           **MR. CANTOR:**  Thank you.

19           **THE COURT:**  And to your point that 1997, of course,

20   there may be some relevance that attaches to an earlier time

21   period to give context to how contracting practices evolved.

22       Okay.  Let me just find my pen.  All right.

23       So we are now on to Motion *in Limine* 1 to exclude

24   references to the term *monopoly*.  Who is going to be arguing

25   that for the plaintiffs?

 1        Is that going to be you, Ms. Rodriguez Lopez, again?

 2            **MS. RODRIGUEZ LOPEZ:**  (Nods head.)

 3            **THE COURT:**  Great.

 4        **MR. KAUFFMAN:**  Good morning, Your Honor.  Jeremy

 5    Kauffman, from Jones Day, on behalf of Sutter Health.

 6            **THE COURT:**  Okay.  Great.  Good.  So, yes, I'm happy

 7    to hear your argument.  You know that I previewed it last week.

 8    I think I already said, as to that motion, you know, no, you

 9    can't use the term *monopoly*.

10        You know, it's such a -- it's a word that's so fraught,

11    unlike the use of the word *tying*, which even if Sutter hadn't

12    basically not mounted and Mr. LeVee did not mount any serious

13    objection to the word -- didn't mount any objection to the word

14    *tying*, which had sort of economic significance, not just legal

15    significance, but it does seem to me that *monopoly* is a big

16    word.

17        And the word *anticompetitive* serves pretty well, but I

18    will let you tell me why you think that's wrong,

19    Ms. Rodriguez Lopez.

20        Oh, actually, it's Sutter's motion, but I think we'll

21    start with you because you want to use the word.  So we'll go

22    to you, and then we'll ask Sutter to respond.

23            **MS. RODRIGUEZ LOPEZ:**  Thank you, Your Honor.

24        Sutter's insistence here that the issue is an improper

25    opinion is unintelligible given the relief sought.  Let's be

1   clear that the relief Sutter seeks is to bar access to the most

2   basic word the witnesses have used to describe Sutter's

3   contracting behavior at issue in this trial.

4        This is the very testimony this Court repeatedly cited in

5   its order on summary judgment on geographic markets.  That's

6   ECF 673.  This Court not only cited but also quoted several

7   documents where United Healthcare and Aetna witnesses explain

8   the limited contracting choices they had due to Sutter's market

9   power.

10       These percipient witnesses are using the word *monopoly*

11  when describing Sutter's forcing as they shop for hospital

12  services.  Just like this evidence was key for the Court, it

13  will be key for the jury, a jury that, notably, needs to

14  determine whether it's impossible, as Sutter claims, for a

15  health plan to be coerced.

16       Your Honor, these witnesses use this word for a reason,

17  because it gave full effect to the nature of that coercive

18  force.  And the use of this word is not surprising.  It's the

19  name of a popular board game.  It's a very common word

20  Americans use in everyday conversation, as demonstrated by the

21  Merriam-Webster definitions we included in our briefs.

22       That is the evidence that Sutter seeks to erase.  Indeed,

23  Your Honor, Sutter's requested gag order broadly seeks to

24  prohibit the use of the word *monopoly* and its derivatives by

25  attorneys, experts, lay witnesses, and in documents, yet

1    nothing in the case law Sutter cites supports the relief

2    sought.

3        This is not shopping.  Use of the word *monopoly* is not

4    remotely analogous to a 1500-page frame-by-frame analysis of a

5    video.  And it's not a patent case where the issue of

6    patentees' straight granted monopoly is truly irrelevant.

7    Thus, there the use of the word is a true tangent.  The word

8    *monopoly* here is useful for plaintiffs' case on market power

9    and relevant market definition.

10       And when it comes to the issue of prejudice, this case is

11   on all fours with *Johnson* where the defendants sought to

12   exclude the word *kickback* in a trial about kickbacks.  Just

13   like the word *kickback* in *Johnson*, the word *monopoly* here is a

14   word of general understanding that will be placed in context.

15   It's simply unlikely to lead to an emotional response.

16       And, as in *Johnson*, it would be a waste of time for the

17   Court to go through the trouble of working around the word

18   *kickback*.

19       And it makes sense if you think about -- to yourself, Your

20   Honor, what would this look like?  You can just imagine a

21   witness wanting to say, And then I asked him if he was going to

22   offer me a kickback, and, instead, being forced to say

23   something like, And then I asked him if he was offering me

24   something that I'm not allowed to say, but it's when --

25           **THE COURT:**  But I would say -- let me offer this

1    though.  I would totally let you use the word *kickback*.  I

2    think it's a great word, and it means something, and it's

3    illustrative, and you have a visceral understanding of it.  And

4    although it may have legal significance, it has sort of

5    ordinary significance.

6         But I think the word *monopoly* is different.  And I think

7    you can use words like coercion, unfair, predatory.  I don't

8    know -- you know, I'm making those words up.  And, please, no

9    one in Sutter object to them; I'm not saying they're okay to

10   use.

11        But there are lots of words to describe anticompetitive

12   behavior.  And I query whether -- and there was a *monopoly*

13   claim in here before and there isn't now.  And the issue with

14   that was, you know, the analysis as described in my order.

15   Those claims are gone; right?

16        So now what we have is we have a claim of anticompetitive

17   conduct by coercive systemwide contracting practices that the

18   health plans may view -- those are your percipient witnesses, I

19   presume -- as monopolistic, but those claims don't exist

20   anymore because I tossed them for legal reasons, and an

21   anticompetitive tying arrangement.

22        They can talk about -- whatever claims are left, they can

23   talk about them in the ordinary way they talk about them.  But

24   you do prep witnesses before you -- before you bring them in as

25   witnesses.  You can tell them they can't use the word *monopoly*.

1   They can use anything else they want.

2       And I don't see the burdens of, you know, redacting the

3   occasional word given that redactions are so -- you know, I've

4   always said this to you guys.  I can't see -- you can't have

5   that many documents at trial.  The key documents, the ones you

6   show, are probably not that many.  And I don't see the burdens

7   attached to redaction that preclude my, you know, prohibiting

8   the term.

9       So I hear you on *kickback*.  That's a great word.  And you

10  should be able to use the word *kickback* and should be able to

11  use the word *tying* because what else are you supposed to do?

12  *Monopoly*, that seems a little harsher.

13          **MS. RODRIGUEZ LOPEZ:**  Your Honor, I have a few points.

14          **THE COURT:**  Okay.

15          **MS. RODRIGUEZ LOPEZ:**  I'll start with the fact that

16  monopolization is no longer one of our claims.  I think that's

17  right.  And our interest is to present a clear and concise case

18  to the jury.

19       Just like you are not categorically excluding other

20  evidence in this case because you understand that we have

21  certain interests as parties to present a clear case, I don't

22  think you should categorically exclude the word *monopoly* here

23  under the assumption that we're somehow going to belabor the

24  point.

25       We don't want to take upon ourselves the burden of showing

1    monopolization if it's not a triable claim.  And there's no

2    risk we're going to abuse this term.  However, as to your other

3    point, the word *monopolization* here, or *monopoly*, or

4    *monopolistic*, is not irrelevant just because that claim is no

5    longer part of what we're presenting the jury.  It's still

6    really relevant to the issues of relevant market and market

7    power.  It's still a word that these witnesses used at the time

8    to explain it.  It's not a complicated word.

9        But -- you know, there might be other words, Your Honor,

10   but to put it more precisely, I think motions *in limine* are

11   there to foster efficiency in the presentation of evidence to a

12   jury.  And this motion, if it's granted, will have the opposite

13   effect.  It's not going to promote understanding or economy.

14   It's going to result in stilted, unnatural testimony, documents

15   with blanks that are going to be hard for the jury to

16   understand.  It's going to raise eyebrows, and it's going to

17   prejudice plaintiffs.

18       And we're going to waste a lot of time arguing about

19   semantics.  And it's hard to justify all of that when, really,

20   the burden is on defendants to show why this would prejudice

21   them.

22       And I understand that, Your Honor, you mentioned that you

23   think *monopoly* is a bad word --

24           **THE COURT:**  You could totally use it if they had a

25   charge of monopoly against them.  You wouldn't be precluded

about using the word *monopoly*.  Just the fact that a word has

legal significance doesn't preclude your using it.

The issue here is narrower.  It's that the word doesn't

apply to the tying claims at issue in the litigation.  That's

the issue.  It's such a word that it means something, that it

seems to me that the 403 prejudice for using it outweighs any

tangential relevance.  But I don't even see the relevance.

**MS. RODRIGUEZ LOPEZ:**  Your Honor, just one quick

point.  There's a reason that I started by pointing out that

this Court has cited some of these documents with the word

*monopoly*.  And it's because this Court specifically found that

these documents were probative to the issue of relevant markets

as to the tying claim.

And so this word, Your Honor --

**THE COURT:**  Well, I was looking at my summary judgment

order, so -- to see where I said that in the context of a

tying -- the tying claim.

**MS. RODRIGUEZ LOPEZ:**  So, Your Honor, you quote

ECF 311-5 and ECF 311-20.  There are two documents.  There's a

United Healthcare and there's an Aetna document.  I can pull up

the order.

**THE COURT:**  I have all my orders in my case file.  I

have them always at hand.

**MS. RODRIGUEZ LOPEZ:**  So I can tell you the page

numbers.  But it's actually -- both of those documents with the

1    word *monopoly* in it were cited around seven times in --

2         **THE COURT:**  What page number?

3         **MS. RODRIGUEZ LOPEZ:**  -- the geographic markets order.

4    So the first time I see it cited is on page 22, footnote

5    72.  And there's a quote there that I won't read because I know

6    these documents are OCU and we're in open court, but you see

7    you cite a United Healthcare email.

8         **THE COURT:**  Well, so let's just look at that email.

9    So here's, you know, one issue just to sort of flip a

10   little bit.  I mean, one of the issues, you know, was -- I

11   can't remember, was this the Fourth Amended Complaint at this

12   point, or are we still at the Third Amended Complaint?

13        **MR. CANTOR:**  It was the Fourth Amended Complaint.  It

14   was the motion for summary judgment --

15        **THE COURT:**  No, no, no, I remember the summary

16   judgment part of it.

17   So, I mean, I don't have a great sense yet, because we

18   haven't looked at the witness lists, about how the witnesses

19   actually are going to talk about what happened.

20   But let's talk about this issue, the -- you know, what was

21   at issue in what you call the geographic markets order was

22   that, you know, Sutter must have hospitals, you know, because

23   it's the only game in town in certain areas.  And so it was

24   able to use that market power because it has a monopoly, you

25   know.  That's not -- that's not a bad word in -- because, you

1    know, there's nothing wrong with a monopoly.  There are natural

2    monopolies; right.  The issue is anticompetitive behavior.

3         And so, you know -- so there's a point; right?  So I don't

4    want the tying -- you know, if there are health plans that

5    complain about Sutter's behavior being monopolistic, insofar as

6    the challenged tying practices are concerned, that seems

7    problematic.  Describing Sutter's being the only game in town,

8    having a monopoly in the tying markets might be a more ordinary

9    and not inflammatory way of using the word *monopoly*.

10        And I wonder what Sutter's reaction to that point is,

11   because that is the, sort of, one issue that you don't want to

12   have people testify awkwardly about what is an understandable

13   way of describing.

14        And that's also something that could be illuminated on

15   cross-examination to the extent it's an issue.  But --

16        So, Mr. Kauffman, what's your reaction to that point?

17        **MR. KAUFFMAN:**  Yeah.  So I would just say I think the

18   Court can look at the documents that were submitted on this

19   motion, including the ones that were submitted by plaintiffs,

20   and you'll see that the term is just not being used in that way

21   at all.

22        **THE COURT:**  So you don't have an objection to it being

23   used in that way, the way I used it in my order, which is just

24   sort of a necessary descriptor of what, you know, Sutter's

25   market power is in the tying markets.  But you do have an

1   objection to its being used to sort of dirty Sutter up in the

2   context of the tying claims.

3        **MR. KAUFFMAN:**  I would state no just because I think

4   there is still prejudice to Sutter from use of the term just to

5   describe its geographic market power, and that's for two

6   reasons.

7        One is, I think the term is inherently prejudicial.  I

8   think the Court has sort of recognized that in its earlier

9   conversations.  I think the cases that we cite in our motion

10  recognize that the term sort of inherently conjures the sense

11  of, like, bad guy, bad company.

12       And so I think, even if used in, like, a highly economic

13  sense to describe that it is a technical monopoly to the extent

14  that, you know, it's the only hospital in a given area, I think

15  that that's further than we --

16       **THE COURT:**  Well, let me ask a question though.  Is

17  there -- so, obviously, a tying claim depends on having market

18  power in the -- in the tying market.

19       Are there cases that address in the use at trial of the

20  word *monopoly* in a tying case to describe market power in the

21  tying market?

22       And, of course, I don't have the jury instruction in front

23  of me, but -- and, you know, obviously, the language of the

24  jury instruction -- so just to go all practical on you, the

25  reality is, if you don't speak in the language of the jury

1  instruction the whole time, you lose your audience, because you

2  have to always set up -- I mean, especially in instances like

3  this where, of course, they're going to talk about tying, of

4  course, they're going to talk about market power, of course, of

5  course, of course.

6      And it just seems, practically, the plaintiffs have to

7  talk in the language of the jury instruction or it doesn't make

8  any sense because, you know, certainly, by the time of closing

9  you are arguing to the jury instructions in your closing

10  argument and you're excerpting testimony about, you know,

11  market power or whatever it is in the language of the

12  instruction.

13      So your point, Mr. Kauffman, is it's just prejudicial, and

14  then my point is it's not even the language of the jury

15  instruction.  So --

16          **MR. KAUFFMAN:**  And, Your Honor --

17          **THE COURT:**  But has any court addressed the issue?

18  That's a Judge Alsup kind of question.

19          **MR. KAUFFMAN:**  Yeah.  So as far as I'm aware, no court

20  has upheld the use of the term *monopoly*.

21          **THE COURT:**  Has any court addressed the issue?

22          **MR. KAUFFMAN:**  Not that I'm aware of.

23          **THE COURT:**  Exactly.  And so, to Mr. Kiernan's point,

24  if no court has addressed the issue, maybe it wasn't

25  consequential enough to either be raised or so trivial that no

 1    one disputed it.

 2            **MR. KAUFFMAN:**  Which I think --

 3            **THE COURT:**  I don't know.  I went and looked at -- I

 4    researched cases.  You know, I looked at other cases to try to

 5    find go-bys beyond those that you cited to me, and I did not

 6    see the issue in any of the cases I looked at.

 7            **MR. KAUFFMAN:**  Yeah.  And if I may, Your Honor, I

 8    would just say that this is probably that latter scenario where

 9    it is just so simple that in an antitrust case, where

10    monopolization claims have been dismissed, continued use of the

11    term *monopoly* is going to be prejudicial to the defendant.

12            **THE COURT:**  Okay.

13            **MR. KAUFFMAN:**  It is going to confuse the issues.

14            **THE COURT:**  Well, let's go back to Ms. Rodriguez Lopez

15    and let her finish her argument, because I just wanted to have

16    you respond to that specific one, that the use of the term is

17    so ordinary in at least the context of describing market power

18    in the tying market that the Court should preclude it.

19        The second issue was -- that Mr. Kauffman raised that you

20    might speak to, too, is the examples of documents that we've

21    attached to our motion *in limine* do not confine the use of the

22    term to that description of market power in the tying market

23    and, instead, is a much more pejorative use of the term in a

24    way that's prejudicial and inflammatory.

25            **MS. RODRIGUEZ LOPEZ:**  Yes, Your Honor.  I'll start

1    with the last one about -- to me, my gloss on that is we need

2    to focus on practicalities.  And I think a wholesale exclusion

3    here of -- through an order that says you can't -- the word

4    *monopoly* cannot be used in any way, it might be true that some

5    of the documents that are part of this motion don't fit exactly

6    into the mold of the two documents we were talking about, but

7    then that brings into question why the relief sought in this

8    motion is so broad.

9        Is this, again, the case of a motion that -- where we're

10   asking for wholesale exclusion, where the Court should really

11   be listening carefully during trial and addressing objections

12   as they're raised rather than categorically excluding all

13   evidence that falls under this bucket, not knowing whether it

14   falls into the first kind, which you seem to be amenable to

15   admitting, or the second.

16       **THE COURT:**  Less concerned with.  Maybe not amenable.

17   Less concerned with.

18       **MS. RODRIGUEZ LOPEZ:**  Less concerned with, right.

19       **THE COURT:**  Good argument.  Good argument.  It was a

20   nice nuance.

21       **MS. RODRIGUEZ LOPEZ:**  And another two points, Your

22   Honor.  Again, I don't want to belabor it, but this word is not

23   just tangential or incidental.  It's highly probative and

24   central to the issue of market power.

25       And we do face a difficult burden here of proving that

1    these big health plans that make so much money would capitulate

2    to a regional hospital, to a hospital in California, and

3    specifically in Northern California.  And it's -- it's hard to

4    imagine how the jury's going to appreciate that if we don't use

5    the words that express the gravity of what they thought they

6    were experiencing.

7        And they didn't pick the word *monopoly* without reason.

8    They picked it because it's the word that communicated the

9    impact of the market power that Sutter had and the control and

10   all the trappings that come with it.

11       And whether you call it foreseeing or control or power or

12   coercion, right, those are all tactical decisions we're going

13   to have to make as a team.  But it's still the same concept

14   that they need to grasp.  And if we delete that word that was

15   used that really expresses the gravity of a situation it will

16   be hard for the jury to really judge correctly.

17       And my last point on the inherently prejudicial, I think,

18   Your Honor, you've made this point already.  It's axiomatic

19   that having a *monopoly* in and of itself is not illegal.

20       We see that, you know, only one company can put a curved

21   checkmark on athletic apparel; that's Nike.  And that monopoly

22   over athletic apparel with curved checkmarks is perfectly

23   legal.  We see that in all the cases that Sutter cites on

24   patent law.

25       We see that in *U.S. Aluminum Corporation of America* where

1    Learned Hand teaches a monopolization is only actionable if it

2    comes with intent and power.  We see that in the recent *NCAA*

3    decision that my colleague cited where the court says really

4    clearly that a monopsony power in and of itself is not illegal.

5        So I think that the jury will understand that this

6    evidence, if anything, goes to the health plans' state of mind

7    rather than a baseless attack on Sutter's character, impugning

8    Sutter's character, or a legal opinion.

9        And I think this understanding in the law is reflective of

10    a *zeitgeist*, right, a public culture where we, as Americans,

11    generally root for the monopolists unless they are cheating;

12    right?  And that is pretty much a standard you see in court.

13        We're okay with monopolists unless they're using that

14    power incorrectly.  And I think the jury -- even laypeople -- I

15    used to be a public school teacher.  I think my students would

16    understand this -- the distinction.

17        **THE COURT:**  Good.  Thank you for that argument.

18        Mr. Kauffman, anything else you want to add to your

19    argument?

20        **MR. KAUFFMAN:**  Yes, thanks, Your Honor.  If I could

21    just briefly add three more points.

22        The first issue is your point about whether or not we

23    should allow the use of the term in its geographic sense,

24    right, so when it's being used to say that Sutter has a

25    geographic monopoly.

1          **THE COURT:**  Or essentially a proxy for a market power.

2    Something that would have to be described or it would make no

3    sense.

4          **MR. KAUFFMAN:**  Right.  And so there's two explanations

5    there.  The first is, market power in antitrust law has a very

6    technical economic definition.  It doesn't just mean that it's

7    a big bad company on the other side of the negotiation table.

8          And that's particularly true here in a case where

9    plaintiffs' entire theory of the case is about specific

10   geographies having market power that can then be leveraged over

11   a completely different set of geographies and hospitals; right.

12         So the inquiry here is not, is Sutter bigger and more

13   powerful financially than the insurers?  The inquiry is much

14   more hospital by hospital, geographic by geography.

15         Related, I would say that *Johnson* and your sort of

16   discussion of kickback also confirms why the word shouldn't be

17   used here even as an expression of market power.  Namely,

18   *Johnson* relied on the fact there was, quote, no other apt way

19   of describing the conduct at issue short of kickback.

20         The opposite is true here.  Your Honor has used terms like

21   *market power, market dominance, market share*.  Plaintiffs'

22   counsel has used similar terms in describing it.  In fact,

23   there's really no shortage of ways to describe the specific

24   facts that plaintiffs are trying to get at here without using a

25   heavily-laden term, one that's inherently prejudicial and one

1    that's often found in documents that are specifically created

2    to paint Sutter in a negative light.

3        THE COURT:  And so another way of saying that is

4    probably to, you know, look, the words are equivalent.  Even

5    though *tying* is an economic term with economic significance, it

6    really is the same word as the legal term which embodies the

7    economic significance.  So, too, with kickback, right.  It's

8    literally describing factually the same conduct.

9        And, whereas, *monopoly* is not the functional equivalent of

10    market power, it's something that has a different meaning and

11    that it's a term that's assessed differently than just having

12    market power, for example, in a tying market.

13        Okay.  Good.  You guys did a great job.  Thank you.  I'll

14    take the motion under submission.

15        MR. KAUFFMAN:  Thank you.

16        THE COURT:  All right.  So Motion *in Limine* 2 to

17    exclude other litigation and investigations, who's going to be

18    arguing that?

19        MR. SILVEIRA:  Good afternoon, Your Honor.  This is

20    Matt Silveira from Jones Day.  We'll be arguing for Sutter

21    Health.

22        THE COURT:  Okay.

23        And who's going to argue for the plaintiffs?

24        MS. KIM:  It'll be me, Your Honor.

25        THE COURT:  Okay.  Great.

 1      All right.  So I will tell you my views generally on other

 2  litigation investigations.  I think that you get to use the

 3  evidence.  I should pull out the motion too.  It's here.  I've

 4  officially gotten tired at this point.

 5      You obviously get to use evidence.  I don't tend to like

 6  the words, you know, "In a civil investigation by the SEC

 7  involving substantially similar conduct, you said X," you know.

 8  It's more like "In another proceeding you admitted X or

 9  whatever."

10      And so I -- so that's my -- that's my reaction to -- and

11  then when you stray into "You got an OSHA citation didn't you?"

12  that just sort of seems like it gets too close to liability.

13      So my tentatives in these things tend to be -- my approach

14  in this sort of situation tends to be -- I mean, stretching

15  back to my years as a lawyer -- use the evidence if

16  contextually it could be, you know, "In your criminal trial for

17  an SEC proceeding," you say "In a prior proceeding you said."

18      And then things like OSHA citations seem to be excludable

19  under 404(b) but not evidence.  Okay.  And not context.

20      So why don't we start -- Mr. Silveira, since it's your

21  motion, why don't we start with what you want to tell me about

22  your motion, and then we'll let Ms. Kim respond.

23          MR. SILVEIRA:  Yeah.  I appreciate it, Your Honor.

24      So there were actually four categories that we set out in

25  our motion.  One is the UEBT AG investigation on the state

 1   cases.

 2           THE COURT:  Yes.

 3           MR. SILVEIRA:  Two is the Sutter-Summit merger

 4   litigation from 1999.  Three are OSHA citations just mentioned.

 5   And then four were references to other DOJ and FTC

 6   investigations of Sutter.

 7           THE COURT:  So UEBT and Sutter, you know, the first

 8   two, puts under the other -- you know, as kind of grouping

 9   under the other -- other proceedings kind of issue.

10       And OSHA citations I grouped, you know, in its own

11   category.  But I kind of threw in DOJ-type, you know,

12   investigations into that because that's pretty prejudicial.  So

13   that's -- so I kind of grouped OSHA and DOJ into that one

14   category.

15       So I had the sort of other proceedings category and then

16   the other investigations category.  But, of course, evidence --

17   you know, admissions, for example, evidence comes in if it's

18   otherwise admissible, you know, when you can lay the foundation

19   for it.  So -- okay.

20           MR. SILVEIRA:  Understood, Your Honor.  I was just

21   setting up that framing because I think it will kind of inform

22   the argument here while I walk through it.

23           THE COURT:  Okay.

24           MR. SILVEIRA:  So I was just saying on the DOJ and FTC

25   investigations, where you've lumped into other type of

1    investigations, plaintiffs actually didn't respond to that

2    point, so I think there's no question --

3         **THE COURT:**  So I've left it out of my order for that

4    reason.  I said other proceedings and OSHA citations.  And then

5    my little draft order, those are the things I stuck to because

6    those were the things at play, still, by your respective

7    motions.

8         **MR. SILVEIRA:**  And we identified specific exhibits in

9    connection with DOJ and FTC investigations, references to

10   those.  So I think the order should make clear that those are

11   not coming in, you know, references like that, because I think

12   that's consistent with what Your Honor is saying at this point.

13        So I'm going to focus more on --

14        **THE COURT:**  I'm going to go grab -- give me a second.

15   I'm going to go grab the other -- I've got two sets of binders,

16   and I'm going to go grab this other binder.  I'll be right

17   back.  Give me one sec.

18        (Pause)

19        **THE COURT:**  Okay.  Sorry about that.  I'm back.

20        I also wanted to say again, Mr. LeVee pointed this out

21   last week.  And I, you know, compliment all of you on doing

22   such a good job on your very extensive pretrial submissions,

23   but one of the things -- one of the small moments of happiness

24   I had -- and this is kind of a joke -- was this one binder that

25   you gave me in support of your motions *in limine*.  That was a

1    rare moment of joy, in marked contrast to the 8,000 binders

2    that you submitted in support of your *Daubert* motions.  Just

3    kidding.  But thank you for doing that.  It was super

4    organized.

5        Okay.  So I interrupted your argument.  Please go back to

6    it.

7        **MR. SILVEIRA:**  Sure.  And I'm glad that was helpful.

8    It was intentional.

9        **THE COURT:**  Yeah.  That was good.

10       **MR. SILVEIRA:**  So Exhibits D12 and D13 are instances

11   where you have documents that are referring to DOJ or FTC

12   investigations of Sutter.  And, you know, argument would be

13   that those types of references should not be coming in.

14       You shouldn't be talking about whether an insurer is

15   speaking to the California Attorney General regarding antitrust

16   concerns or an FTC investigation in the past.

17       Those types of things, we think, you know, should not be

18   coming in.  So I just wanted to stop on that because that is a

19   point that plaintiffs did not actually respond to in our

20   motion.

21       But given that Your Honor was thinking that might not make

22   it into the order, I want to be clear that that should go into

23   the order, that those types of references are coming out.

24       **THE COURT:**  Okay.

25       **MS. KIM:**  Your Honor --

1          **MR. SILVEIRA:**  Now I'm going to --

2          **THE COURT:**  Just for efficiency, why don't we have

3    Ms. Kim respond to that point, and then we can kind of move on.

4          **MS. KIM:**  I just wanted to clarify that this portion

5    we didn't respond to because we had no intention of referring

6    specifically to any particular investigations, et cetera.

7          But per Your Honor's comments that any admissions that

8    were given in those investigations -- for instance, there is a

9    witness, Kris Vine, who used to head up the managed care

10    division at Sutter; she was a lead negotiator.  She gave

11    deposition testimony in connection with an investigation

12    conducted by the DOJ.

13          And we're assuming that we can still use any admissions

14    from such testimony so long as we don't identify the testimony

15    as having been given pursuant to a DOJ investigation.  But with

16    that clarification --

17          **THE COURT:**  That was my intent.  I mean, I literally

18    wrote you can -- the evidence from other proceedings comes in,

19    but *evidence* is a word that has legal significance, right, if

20    it's otherwise admissible.  And so generally that would be an

21    admission.

22          Or maybe it would be a business record that you've got and

23    you're not challenging.  It was probably independently produced

24    in this case and you're not challenging foundation, so it's

25    admissible.  So the evidence comes in but, generally, not the

1  fact of the investigation.  Or a person, for instance, in the

2  OSHA context, the OSHA citation.

3      And the way I kind of wrote my -- and then it did seem --

4  you know, as Ms. Kim just said -- and there's only so much one

5  can write in these orders, guys.  That's why you see most of

6  the courts don't write a lot in motions *in limine*, because you

7  just can't keep writing all the time on stuff that's

8  procedural.

9      It is problematic and excludable and doesn't come in, but

10 evidence comes in, and then the plaintiffs know the rules and

11 they're never going to break the rules to try to -- you know,

12 that would be pretty bad error, you know, that leads to appeals

13 issues if they were going to try to dirty Sutter up by using

14 otherwise inadmissible evidence sort of as -- you know, that

15 would be not permitted under Rule 404(b).

16      **MS. KIM:**  Your Honor, we are fine with that with

17 respect to the DOJ antitrust --

18      **THE COURT:**  Yep.

19      **MS. KIM:**  -- investigations into Sutter's contracting

20 practices.  We view the OSHA fines and violations and citations

21 as fitting into another category altogether.

22      **THE COURT:**  Well, that might be rebuttal evidence for

23 the COVID-19 issue --

24      **MS. KIM:**  Exactly.

25      **THE COURT:**  -- so I'm not categorically excluding it.

1    I'm marking it as potentially problematic and better to be

2    ruled on in the issues in context at trial.

3         **MS. KIM:**  Correct.

4         **THE COURT:**  And so then Sutter's got to just -- this

5    came up in the earlier motion with Mr. Bunzel where he said

6    "We're not going to gild the lily."  And if they go too far,

7    then they open the door, and all this stuff comes in and says,

8    "Well, you didn't do such a good job after all."

9         And we're going to have to have some kind of offer of

10   proof or something like that, I don't know.  But to the point

11   in the last *in limine*, as well, it's better to address the word

12   *monopoly* in context.

13        Well, if you use the word *monopoly*, the cat's out of the

14   bag, and so you've got to have an offer of proof before you use

15   some of these things.  And so I think the idea is that you've

16   got to have some kind of an offer of proof before you use that

17   stuff.

18        Not offer of proof, but just a heads-up, right.  So the

19   day before, when you do your order of proof, you generally --

20   if there are exhibits that fall in the potential bad zone, as

21   described by the motions *in limine*, you've got to give a

22   heads-up about your desire to use them so we can take it up

23   outside of the jury's present.

24        **MS. KIM:**  Right.  Your Honor, our position would be

25   Sutter has already put at issue its supposedly superior quality

and safety and superiority as a system, the quality of its
system.

Worker safety, the safety of their workers and patients,
falls squarely within those --

**THE COURT:**  You may be right.  I mean, you may well be
right.  And I think it's hard to tell until we're in context.
But I can sure see it, right.  You open the door and it all
comes in.

And Mr. Cantor said, well, you know, "I'm concerned about
time constraints," you've got some -- you know, there's some
utility to excluding it because it saves us all some time.  And
then to Sutter you say, careful what you ask for, because is
putting it in really worth it.

So I hear you.  You're all right on this point.

**MR. SILVEIRA:**  Your Honor, I haven't spoken to that
yet at all, actually, the OSHA point in the --

**THE COURT:**  Yeah, I'm not saying it's okay to use it.
I'm just saying I'm not going to categorically exclude it
because I can see that there could be relevant bias or
impeachment or evidence that counters Sutter's evidence of
procompetitive benefits of the challenged contracting
practices.

**MR. SILVEIRA:**  Right.  It all depends on what the
evidence is, obviously.

**THE COURT:**  Correct.

1          **MR. SILVEIRA:**  And so comparing the benefits of, you

2   know, Sutter's long-term investments in eICU, for instance, on

3   its COVID response, I don't see how that would have opened the

4   door to and, oh, by the way, there was an OSHA citation in an

5   individual facility.  Right?  So, again, this is very much to

6   be contextual --

7          **THE COURT:**  Well, you do just have to be careful,

8   though, because you stretch too far, you know, then -- then

9   it's fair criticism.  I don't know.  But, anyway, it's

10  contextual.  So I think we all agree on that point.

11         **MR. SILVEIRA:**  I can move on with --

12         **MS. KIM:**  If Sutter makes the case that it has

13  superior quality in one part of its system, I think we're well

14  within our rights to point out other areas where they may not

15  have -- or they may have sub par quality and safety issues.

16         **THE COURT:**  Well, and is it relevant?  Probably.  Is

17  it attenuated?  Who knows?  Is it prejudicial to the point

18  where, you know, the probative value is substantially

19  outweighed by the danger of undue prejudice?

20       Well, those magic words, *substantially outweighed*, that's

21  a pretty big standard.  We've got to see when we get there.

22         **MR. SILVEIRA:**  Understood, Your Honor.  It sounds like

23  Ms. Kim is talking about actually COVID -- OSHA citations in

24  the context of --

25         **THE COURT:**  That's what I think that the --

1          (Unreportable simultaneous colloquy.)

2          **THE COURT:**  That's what the OSHA citations are

3     relevant to, is the COVID-19 response, from what I can tell

4     from the record.

5          **MR. SILVEIRA:**  Right.  Not just Sutter's quality

6     at-large generally; because, otherwise, it sounds like Ms. Kim

7     is saying that OSHA citations are just kind of part of this

8     case as rebuttal, not related to COVID particularly.

9          **THE COURT:**  Well, we're just going to have to --

10         **MS. KIM:**  To quality generally.  We're still within

11    the damages period.

12         **THE COURT:**  Yeah.  So this is why we have trial

13    limits.

14         **MR. SILVEIRA:**  Understood, Your Honor.

15         **THE COURT:**  Hour limits to hear testimony going in a

16    trial.

17       So, all right.

18         **MR. SILVEIRA:**  So I'd like to focus on what I think

19    are the two bigger issues on this particular motion, which is,

20    one, the state cases; and then, two, the Sutter-Summit

21    litigation.  So I'll start with the state cases.

22       And I think plaintiffs acknowledge that there's no place

23    for direct references to the state cases.

24         **THE COURT:**  Correct.

25         **MR. SILVEIRA:**  So then they focus on the use of

documents and depositions from those cases in light of the

coordinated discovery with this case.  And they note that the

parties did discuss a stipulation to handle this issue, but I

think they leave out some details that matter here.

We agreed -- Sutter agreed that evidence from the state

cases could come in so long as that evidence is not otherwise

inadmissible.

Our motion is not directed to the use of otherwise

admissible evidence.  Rather, we're seeking to exclude any

reference to the fact or nature of the state cases to avoid

unfair prejudice.

THE COURT:  Right.  But you heard that I already went

with you on that point; right?

MR. SILVEIRA:  Right.

THE COURT:  So I said you could say words like *other*

*proceedings*, you can use evidence from the other proceedings,

but you can't -- they can't dirty you up by saying you had the

same lawsuit in the *UEBT* case in state court or you had this

other lawsuit.

They just have to say, You gave testimony under oath,

didn't you?  And -- or -- or whatever it is.  Or the evidence

is admissible if it's otherwise admissible.

MR. SILVEIRA:  Thank you for that clarity, Your Honor,

because I was responding to their opposition where they --

THE COURT:  Well, if Ms. Kim might want to say

1    something else, then you might respond to what she says here

2    today, but that's what I thought by reading the papers.

3          **MR. SILVEIRA:**  Okay.  Great.  So that would mean that,

4    you know, they wouldn't be able to talk about a settlement of

5    this other litigation or appropriate context and explanation

6    for testimony and evidence that reflects information from the

7    state cases, because all of that sounds to me a lot like they

8    want to talk about this other litigation that was settled.

9    They just --

10         **THE COURT:**  My view is they can't.  Ms. Kim can tell

11   me if they want to.  I can't imagine that they would.

12         The *UEBT* case is easy because there's so much in common

13   that there's not going to be any -- there's not going to be any

14   jarring effect of using evidence and testimony from that case

15   just saying, "You previously gave testimony under oath."

16         No one will be able to tell.  It won't matter.  To the

17   extent evidence supports the plaintiffs' case, the plaintiffs

18   will be able to use it.  It's pretty easy.

19         In the other litigation, I assume that whatever value it

20   has, has to do with either Sutter's admissions or whatever it

21   shows about Sutter's challenged contracting practices.  And

22   it's the same thing.

23         And the plaintiffs have to make it fit in this litigation

24   and what their theory of prosecution is in this case.  So I

25   just don't see there's even really -- as long as they play by

1  those rules, which I imagine they would because anything else

2  would be 403 at worst; right?  And there might be other

3  arguments, too, but they just can't do it.

4      So that's what my view is.  But, of course, use the

5  evidence.

6          MR. SILVEIRA:  Okay.  Thank you, Your Honor.  I

7  appreciate that --

8          THE COURT:  So, Ms. Kim, did you want to offer

9  anything else on that point?

10         MS. KIM:  You're correct, Your Honor, we don't seek to

11 publish the fact of settlement, the nature of settlement, any

12 terms of settlement to the jury.  We just want enough

13 flexibility so that -- you know, Mr. Silveira mentioned

14 context.

15     So, for instance, Sutter had the same four experts testify

16 in the state cases -- they sat for separate depositions -- as

17 well as in our case.  So Dr. Willig, Dr. Gowrisankaran,

18 Mr. Pilch, Mr. Travis, they all testified both in the state

19 case and in our case.

20     We want to be able to use any prior inconsistent testimony

21 they may have given in the state case.  We have to give some

22 context.  For instance, Dr. Willig, in other proceedings, when

23 you were looking at these same markets you testified thus.

24         THE COURT:  I don't -- well, sort of depends.  The

25 amicus brief is an easier example; right.  You previously had

1  said this, and that's not what you're saying here; right?  And

2  so that's not another proceeding that involves Sutter.  That's

3  different, easier.

4      In this case, though, I do think you have to say "In a

5  previous proceeding you testified X."  You know, just your

6  classic impeachment.  It is the same case.  I mean, it's

7  slightly different, but -- I mean, it's more than slightly

8  different because the plaintiff is different, but the issues

9  really are the same.

10     And I don't see that -- I think you just have to say, "In

11  an earlier proceeding you previously gave testimony, didn't

12  you?" and then use it for -- involving these exact issues, you

13  know, on these points.

14     So I think that you can give enough context without

15  suggesting that there was an earlier lawsuit, which I think is

16  problematic.

17          MS. KIM:  We're fine with those parameters, Your

18  Honor.

19          THE COURT:  Yeah, yeah.  Perfect.

20          MR. SILVEIRA:  I guess I'd push back a little bit on

21  *the exact same issues*, because, you know, our position would be

22  they're not the exact same issues.

23          THE COURT:  Well, you ought to be -- I don't know what

24  the --

25          (Unreportable simultaneous colloquy.)

1      **THE COURT:**  Those were my words.  But you say

2   "Previously you gave" -- I mean, you know how you set up

3   impeachment.  You commit, confirm -- I can't remember the three

4   Cs anymore; right?

5      You basically say what it is, you get them to commit to it

6   was a position, and then you contrast it to the current

7   position that they're taking as a way of impeaching their

8   current statement.

9      And so that's -- you know, and often your pushback might

10   go to weight.  You could rehab; well, that was a slightly

11   different issue, wasn't it, blah, blah, blah.  I think you guys

12   know the appropriate playing field for dealing with prior

13   testimony and evidence.

14      Okay.  All right.  That's --

15      **MR. SILVEIRA:**  Thank you, Your Honor.

16      So let me move on to the Sutter-Summit litigation.  This

17   is the 1999 Sutter-Summit merger litigation.  I jut don't see

18   any way that doesn't lead to a mini trial.

19      You know, if you look at the --

20      **THE COURT:**  But what's going to come in from that

21   litigation?  I mean, what's going to come in?

22      **MR. SILVEIRA:**  We focused on two things in the brief,

23   and those are the only two that they respond to in their

24   opposition motion *in limine*.

25      One is the proposed findings of fact and conclusions of

1  law, which is, you know, an argumentative document; an 81-page,

2  192-paragraph, proposed findings of fact.  And plaintiffs want

3  to pull out certain sentences from that 192-paragraph proposed

4  findings of fact and offer those to the jury as admissions.

5       But, you know, if you just look at it -- and this is --

6  you know, it's Exhibit, I think, P12 -- or not P12.  It must be

7  P11 then.

8       Yeah, Exhibit P11.  If you look through it, you'll see

9  that's the document that would be at issue, but then they want

10 to take certain statements, you know, we would view out of

11 context and we think, ultimately, in a way that ends up being

12 very cumulative of testimony that is being given.

13      If you look at these statements, you'll see that

14 oftentimes they're supported by a whole ream of other

15 citations, whether they be trial transcript citations, other

16 sources, reports, things of that nature.

17      And I don't know how we essentially publish that sort of

18 material to the jury without then getting into all the

19 underpinnings of it; what it meant, what the context of the

20 actual statement was, what the nature of the litigation from

21 which it comes is, and all the underlying evidence.

22      So --

23          **THE COURT:**  But one of the issues here is you're

24 making a motion *in limine* that's categorical to exclude

25 something.  And how am I supposed to tell, in the context of an

1    exhibit that I don't even know that the plaintiffs are going to

2    sponsor, whether it should or shouldn't come in, in whatever

3    redacted form or partial form the plaintiffs are planning to

4    argue to admit it as a party admission?  It's just really hard

5    to tell; right?

6        So that's the problem with -- that's the problem with --

7    Judge Spero said he just does not deal with challenges to

8    exhibits.  Trial limits tend to whittle down your exhibit list,

9    and by the time you get to trial you're pruning, pruning,

10   pruning, pruning, pruning.

11       By the time you get to your first day of trial or second

12   day of trial or second week of trial your exhibit list is much

13   smaller, and then you can decide in the context of a particular

14   exhibit whether the -- whether it comes in as an admission;

15   right.

16       So I don't feel like I want to offer a hypothetical

17   opinion on some kind of an 88-page document that has some

18   things in it that the plaintiffs might or might not offer into

19   evidence.  If I did that, I'd be bogged into a spiral of

20   pre-reviewing your evidence that's going to be whittled down

21   for trial.

22            **MR. SILVEIRA:**  Yeah, I guess I would push back a

23   little bit on that in the sense that plaintiffs have said this

24   is critical; this is, you know, critical admissions; this sets

25   everything up; this shows Sutter's duplicity.

1    So the notion that they're not going to try to admit this

2    into evidence, I think, seems a little far-fetched --

3        **THE COURT:** So let's look at your motion.  Evidence

4    should be articles -- two articles, an FTC assessment.

5        **MR. SILVEIRA:** And I'll come to that next.  This would

6    be on page 5 and 6 of our motion, findings of fact and

7    conclusions of law.

8        **THE COURT:** I will just say that it seems tough to

9    exclude party admissions as cumulative and unnecessary.  It

10   doesn't seem like the best argument in the world.

11       **MR. SILVEIRA:** Well, it's not the only argument we

12   make, as you can tell from the rest of this.  The other point

13   is you're essentially -- you know, in large part, you're

14   relitigating merger litigation.  You're getting into why

15   something was said.

16       **THE COURT:** If the plaintiffs want to spend part of

17   their time on -- I mean, again, I'm just being practical here.

18   You guys are going to get time limits set by me.  We're going

19   to talk about it.

20       If they, you know, prove logistically overly narrow on my

21   part, I may adjust along the way.  But you're going to need to

22   plan in advance to put in a clean case.  And I think that that

23   approach tends to eliminate the sorts of sideshows that you're

24   concerned about.

25       I'm not giving you unlimited time to try your case.

1      **MR. SILVEIRA:**  Yeah.  And I wasn't sure if that was

2  directed at plaintiff.

3      **THE COURT:**  It's directed at everybody.

4      **MR. SILVEIRA:**  Understood.  Yeah.  And, again --

5      **THE COURT:**  So for now I think I'm sticking to, you

6  know, you can use it if it's admissible evidence, if it's

7  otherwise admissible under the rules of evidence.  You know,

8  the kind of sideshow 403 types of arguments get evaluated in

9  context.

10      **MR. SILVEIRA:**  Okay.  And I guess I would say maybe

11  put a pin on that, because I do not see how this could not be

12  turned into a sideshow.

13      **THE COURT:**  And I agree with you.  It seems pretty

14  attenuated.  And I'm going to look back on some of my pretrial

15  procedures and see what we might do to build in something

16  about, you know, as part of the offer -- you know, your order

17  of proof if there are these documents that have been flagged as

18  part of the motion *in limine* process as problematic, those have

19  got to be flagged as part of your order of proof that you give

20  up, and then we can address it outside the presence of the

21  jury.

22      **MR. SILVEIRA:**  Yeah.  So maybe we'll come back to this

23  one, Your Honor, because I think when you look at the whole

24  document -- again, it's Exhibit P11 --

25      **THE COURT:**  I'm looking at your discussion of it.  I

1    mean, one of the problems is -- you know, that's fine, I'll

2    look at Exhibit P11, but, you know, it's -- I kind of think

3    anytime you refer to an exhibit in a motion *in limine* you

4    probably ought to attach a copy of it so I don't have to go

5    spelunking through the record to try to find -- I mean, that

6    has been the single hardest part of this pretrial work was

7    literally finding the exhibits.

8        I mean, have to go to the docket sheet, you know, to see

9    what motion it's attached to.  And I know you gave me exhibits

10   and all that kind of stuff, but it's very hard to find them

11   because -- because it just is.

12       I'm managing.  I've got it all nailed down on the expert

13   part of it, but there is just a limit to my ability to try to

14   find where things are in the record.

15       **MR. KIERNAN:**  Your Honor, if that comes up again --

16   and we apologize --

17       **THE COURT:**  No, no, you don't have to apologize.

18   That's a big word.  I think in the future I'm going to make you

19   hyperlink your evidence in your briefs.  That's what you should

20   do, and then you should give it all on a hard drive.  I don't

21   know what case management --

22       **MR. KIERNAN:**  It works.

23       **THE COURT:**  Because I -- that's how I put my cases

24   together; right.  I don't know what litigation software you

25   use, but I tagged my evidence to issues, and everything was --

1  you could just click right through the document.

2      And if you just hyperlink your briefs to the evidence, I

3  mean, my job would have been reduced by -- literally to the

4  pincite, I mean, what took me six full days, and I'm still

5  working on it, would have taken me two days; right.

6      So it's not a criticism, but, I mean, one of the things I

7  don't think you really appreciate at the courts is -- I mean, I

8  have wonderful support, wonderful, really great, hardworking

9  people who do a fantastic job, but there are only so many hours

10  of the day; right.

11      I don't have a paralegal.  I don't have somebody to do

12  that work for me.  And, you know, everybody else has

13  full-time -- more than full-time jobs.  The courtroom deputy's

14  job is a crazy job.  It's like two jobs.  The clerk's job is

15  like two jobs, too, if you remember, if you clerked yourself.

16      **MR. KIERNAN:**  Yes, I do.  I remember.

17      **THE COURT:**  Yeah.  So, anyway, it's not a criticism.

18  All in all, I'm very pleased with the work you guys did putting

19  this together.  But, anyway, next time I'm going to try to

20  hyperlinking and a hard drive.  That's the way to go because

21  ECF is painfully slow.

22      **MR. SILVEIRA:**  Let me then just transition to the one

23  other document that --

24      **THE COURT:**  Okay.  Perfect.

25      **MR. SILVEIRA:**  -- that relates to the Sutter-Summit

1   litigation, and that's the FTC working paper.  So that was on

2   the page before that you were looking at first in our motion.

3   And that was attached as --

4          **THE COURT:**  D11.  I'll look at that right now.

5          **MR. SILVEIRA:**  And, you know, that document should be

6   excluded, both because it's hearsay -- and Judge Massullo

7   recognized this in the UEBT litigation.  It was going to

8   require a foundation to be laid before that could come in.  And

9   because it will lead to the same type of mini trial as the rest

10  of this evidence related to the Sutter-Summit litigation.

11         Now, last week I think Mr. Cantor effectively conceded

12  that Dr. Tenn's analysis is not independently admissible.

13  Instead, plaintiffs contend that it's a proper Rule 703 basis

14  for Dr. Chipty's witness.  And it's not.

15         Dr. Chipty is not entitled to simply parrot another

16  economist's opinions and then refer to them as facts, as she

17  does in the Exhibit P12.  This was in their response to our

18  motion, but they provided some excerpts from Dr. Chipty's

19  report where she relies on this Exhibit D11, that FTC working

20  paper.

21         And it's her sole support for these propositions about

22  Sutter raising prices after the merger.  So, I mean, that's

23  just parroting.  That's not something that you're entitled to

24  get in through the expert.

25         So, essentially, you know, if we have an agreement that

1   this isn't coming in by itself, it's not independently

2   admissible, I think the point here would be, just in response

3   to their opposition to the motion *in limine*, that they

4   shouldn't be permitted to rely on Rule 703 as a back door to

5   admit what is clearly otherwise inadmissible evidence for the

6   truth of the underlying matter, because that's what you're

7   doing if you look at Exhibit P12 and the excerpts from the

8   Chipty --

9        **THE COURT:**  You certainly can't use expert testimony

10   as a way of back-dooring in hearsay evidence for the truth.

11   You clearly can't do that.

12       All right.  So, Ms. Kim, what's your view on this?

13       **MS. KIM:**  Okay.  I have a response just because we

14   left the --

15       **THE COURT:**  The P11 issues.

16       **MS. KIM:**  -- documents as potentially problematic --

17       **THE COURT:**  Yes.

18       **MS. KIM:**  -- and I don't want that to be the last word

19   on those.

20       Your Honor, the admissions that you've been referring to,

21   that were made during the California versus Sutter merger

22   proceedings, these admissions show that the restraints, the

23   very restraints that are being challenged in this case, have

24   allowed Sutter to abuse its market power for many, many years.

25       Remember, Sutter started forcing systemwide contracting

1   and the contractural provisions that are at issue here in the

2   late '90s and the early 2000s, and the merger proceedings were

3   smack in the middle of the start of all the conduct that's at

4   issue in this case.

5        And, you know, those provisions have been in the contracts

6   with the health plans since that time until now.  So Sutter

7   can't dismiss or try to hide their admissions because they were

8   made many years ago or because it was during merger

9   proceedings.  There's no relitigating the merger proceedings

10  there.

11       Full disclosure, I was a clerk for the Department of

12  Justice at the time, so I -- I was kind of the go-fer for the

13  attorneys working on that merger challenge brought by the

14  attorney general at the time, Bill Lockyer.

15       And, you know, it's -- we're not litigating those same

16  cases.  What we are saying is probative of those admissions go

17  to the likely effect on competition of Sutter's restraints and

18  the intent behind Sutter's restraints.

19       Antitrust law provides that to properly evaluate a

20  restraint of trade and its likely anticompetitive effects you

21  have to go back and you have to look at the history and intent

22  of the restraint.  And that's from the *Cipro* cases.  That's

23  61 Cal.4th 116, a seminal case analyzing Cartright Act claims.

24  So that's the law.  You go back to the history, you go back to

25  the purpose of the restraints, and you look what all happened

there.

    The proposed findings of fact and conclusions of law that
Sutter submitted in *California versus Sutter* -- and it was to
this Court; Judge Chesney was presiding over those
proceedings -- reflect the history and purpose of Sutter's
restraints.  So it's squarely probative.  It's very probative.

        **THE COURT:**  Right.  But let's say -- let's say you
have got an admission, right, that you want to use.  Why isn't
it appropriate to say, "In a prior proceeding you said this
about your contract"?  "In a prior proceeding you said this
about your contracting practices"?

        **MR. SILVEIRA:**  Is that a question to me, Your Honor?

        **THE COURT:**  No, no.  I'm asking Ms. Kim, and then you
can respond.

    **MS. KIM:**  Okay.  I mean, we would like to publish that
it was to the same court.  I mean, it was.

        **THE COURT:**  Well, so, I mean, why can't you say --
again, I'm not saying this is what the answer should be, but
why can't you say, "In prior representations," you know, "to
this Court" --

    **MS. KIM:**  Your Honor, the import of the statements
that were made, the admissions that were made in those
proceedings requires some context.

        **THE COURT:**  Give me an example.  Tell me the story.
How would you do it?

1      **MS. KIM:**  So just for the context, the California AG

2  filed to challenge this merger -- proposed merger whereby

3  Sutter was proposing to acquire Summit Medical Center in the

4  East Bay.  The antitrust --

5      **THE COURT:**  I'm familiar with the case, because I read

6  about it.  I read it and I've read all the Judge Chesney stuff,

7  so I'm familiar with the case.  I mean, how do you tell the

8  story in this case?

9      **MS. KIM:**  Right.  So in response to the attorney

10  general's argument that the merger was anticompetitive, that

11  prices would go up post merger because it would create this

12  dominant hospital, you know, pairing of hospitals in the merged

13  entity in the East Bay, Sutter argued that, no, post merger

14  hospital prices aren't going to go up because the health plans

15  have all these mechanisms available.  They could exclude Sutter

16  from their networks.  They could steer away from Sutter to

17  lower-priced providers.  And that would defeat any price

18  increase because even a small loss of volume, you know, we

19  really feel it, so we wouldn't be able to raise prices in the

20  face of these types of steering mechanisms and network

21  exclusion mechanisms that the health plans had available to

22  them.

23      But now we know after, you know, years of discovery on

24  this case, that at the same time, or shortly thereafter, Sutter

25  was putting in contract provisions -- forcing contract

provisions into its systemwide health plans to prevent the very

mechanisms that it was arguing to this Court were

procompetitive and would defeat price increases.

And Your Honor cited heavily to the proposed findings of

fact and conclusions of law in your order certifying the (b)(2)

class in this case.  You cited that evidence to say that

plaintiffs and Dr. Chipty had presented sufficient evidence

regarding what would happen in the but-for world.  You know,

what would happen, that prices would come down.

**THE COURT:**  So the evidence is certainly relevant.

That's not my concern.  So I'm not pushing back on you -- I

mean, maybe there's a temporal issue that Sutter wants to

advance, but I'm not questioning the relevance and taking a

position and then taking a different position.  And -- or

taking a position and then engaging in the anticompetitive

context challenged in this case that is directly the opposite

of what -- of what Sutter said in the earlier proceeding.

What I am concerned about is, how do you refer to the

earlier proceeding?  So if you say:  "In an earlier proceeding

called X, you said this," and if you're talking about -- you

know, in the Alta Bates Summit merger proceeding and arguing to

Judge Chesney that there would be no, you know, blah blah blah

effect, "No, you, in fact, said this," that doesn't seem okay

because you're basically dirtying Sutter up with, you know,

prior specific litigation.  That part of it doesn't seem

1    relevant.

2        What's relevant is, in a prior proceeding Sutter made

3    representations about its business model and then turned around

4    and did something, in your theory of the case, that was

5    directly opposite to what it said in the earlier litigation.

6        So, you know, I -- that's why I suggested words like *prior*

7    *proceeding* or the equivalent for you to -- and this, of

8    course -- again, to Sutter, this, of course, would be without

9    prejudice to mounting any Rule 403 objections at trial.

10       It would just be a means of not categorically excluding

11   the evidence.  Instead, saying if something's otherwise

12   admissible, an admission, that that would be admitted subject

13   to any 403 argument and limited to some more innocuous

14   description of the prior proceeding than the Alta Bates Summit

15   merger proceeding, which is the subject of a federal court

16   lawsuit.  So that was my point here.

17       **MR. CANTOR:**  Your Honor, this is Mr. Cantor.  We

18   really don't care about referencing the merger proceeding.  By

19   the way, Sutter won that proceeding, so I don't --

20       **THE COURT:**  I know they did.  But that's why Ms. Kim

21   thinks it's so important; right?  Because she's going to say,

22   You did it to win and then you liar, liar, pants on fire, you

23   just went around and did something totally different, and so

24   that's not okay; right?  That's why you care about the

25   evidence.

1      **MR. CANTOR:**  What we care about, with respect, is

2  there are these admissions about how Sutter's prices would have

3  been constrained by steering, by health plan exclusion, by --

4      **THE COURT:**  Right.

5      **MR. CANTOR:**  -- tiering.  The expert from that

6  proceeding is not their expert in this proceeding.  So we

7  can't -- we don't have Meg Guerin-Calvert, their expert in this

8  proceeding, to cross-examine.  We're going to get these

9  positions in through --

10      **THE COURT:**  Through Sutter.

11      **MR. CANTOR:**  -- proposed findings of fact.  And the

12  proposed findings of fact we can then relate to, and we can say

13  this was submitted in 1999, and this is what you said.  And

14  then we can say, and in 2021, your Anthem contract had an equal

15  treatment provision that said you can't steer this way.  That's

16  how we're going to do it.

17      It's not so much the proceeding itself, it's the admission

18  in court.

19      **THE COURT:**  Yeah, that's why I was just trying to say

20  the admissions come in; right.  If the evidence is otherwise

21  admissible and subject to any 403 objections it comes in.  It's

22  hard to say it's not relevant; right.  It's not a Rule 402

23  boot.  The argument is it's a Rule 403 issue and, you know,

24  that issue seems to be addressed by being more innocuous.

25      Okay.  All right.  Anything else?

1          **MS. KIM:**  On the Tenn study, I would like to address

2    that, and it's related to the merger proceedings in that Steve

3    Tenn, Dr. Steve Tenn, who's a very well-respected healthcare

4    economist, conducted a post-merger study of pricing at

5    Alta Bates Summit in 2008.

6          And Dr. Tenn's study found that post-merger pricing at

7    Summit Hospital -- which was the targeted hospital in Sutter's

8    proposed acquisition -- post-merger pricing at Summit increased

9    by upwards of 70 percent.  The study is probative of several

10   issues that are live in this case.

11         One, why Kaiser, who -- you know, you all who live in the

12   Bay Area, you know Kaiser's -- you know, there's a presence.

13   They have a significant presence in the East Bay.  Why did

14   Kaiser not constrain pricing in the East Bay post merger?  Why

15   was Sutter able to raise prices by 70 percent?

16         So it's probative of that issue.  It shows the

17   anticompetitive effect of Sutter's restraints.  It shows

18   Sutter's market power.  It's probative of key issues in the

19   case.

20         Dr. Chipty should be allowed to rely on the hospital

21   pricing study conducted by Steve Tenn, who, by the way, was the

22   FTC's expert in *Advocate Health*, a Seventh Circuit merger case

23   in 2016.

24         These are the types of things that economists like

25   Dr. Chipty rely upon in support of her opinions.  It's not the

sole support of her opinions on anticompetitive effects or
market power, not by a long shot, but it's admissible under
Federal Rule 703 as one of the bases for her opinions.

And she could explain to the jury, okay, well, I relied on
this study, as well, and that, too, corroborates my
quantitative --

THE COURT:  Well, but the point that Mr. Silveira
makes is she can't say it's true.  She can say she relied on
it.

MS. KIM:  Yes.  Exactly.

THE COURT:  And she can't use -- you know, you just
can't use -- of course, she can consider it.  That's the whole
point of expert testimony.  You can consider things that are
not otherwise admissible.  But you can't rely on that, you
know, ability to predicate your opinion on those sorts of
things on a way of back-dooring it as true; right.  She's just
assuming it to be true, or relying on it.

MS. KIM:  That's correct.  No, she's going to opine
that it was reliable and she relied on it.  And these are the
types of things that economists, you know, look to in support
of their opinions.  That's it.

MR. SILVEIRA:  Yeah.  Your Honor, I would just like
you to look at Exhibit P12, which is the excerpts from the
Chipty report that plaintiffs put in front of you to make this
very point.

1       And, you know, the statements are, you know, this

2  conclusion ignores the significant fact that Sutter was able to

3  raise hospital prices, the fact that Sutter was able to raise

4  prices at Alta Bates Summit.  So they were relying on this as

5  facts.  You'll also see this is the only citation in these

6  paragraphs in their own excerpts from Dr. Chipty's report.

7       So this isn't a situation where she's done the independent

8  analysis and she's bolstering it with someone else's opinion.

9  She is taking another expert's opinion -- and Ms. Kim

10  acknowledged Mr. Tenn was another expert, who was an expert in

11  the *Advocate* litigation -- and she is just adopting that as her

12  own and then using that to justify another opinion and the sole

13  support for that opinion.

14       I'd just ask you to look at --

15       **THE COURT:**  So we talked about this in the *Daubert*

16  context too.  So here's my reaction to it, because I want to

17  hear what Ms. Kim has to say.  You know, well, and I'll look --

18  I'll go back and look at it.

19       Of course, she can rely on it.  And, of course, she can

20  rely on the predicates that he relied on, the analysis he did,

21  to form her own conclusions, assuming that she relied on those

22  predicates.

23       But she can't say those things are true; right.  She can't

24  say those things are true.  She can only say, you know, if they

25  were true, then this would be the result.  I don't know.  I'll

1    look at it and think about it.

2        I have no problem having Dr. Chipty rely on assumed facts

3    from fact witnesses that are going to come in to trial because

4    there's no way she could form an opinion otherwise.

5        It gets -- I start to get a little bit nervous if she's

6    reaching an opinion based on another expert's opinion without

7    any independent -- any independent evidence of the truth of the

8    facts in the other expert's opinion; right.

9        So that's the issue.

10        **MR. CANTOR:**  Your Honor, I'll just say that

11    Dr. Gowrisankaran does the same thing.  He relies, for the

12    Kaiser issue, on a study from economists Ho and Lee.  This is

13    what economists do.  They rely upon academic studies.

14        **THE COURT:**  But a treatise is different than expert

15    testimony in another case; right.  So that's --

16        **MR. CANTOR:**  This wasn't expert testimony.  This was a

17    retrospective done by the Federal Trade Commission by Steve

18    Tenn.  This wasn't testimony.

19        **THE COURT:**  So you're saying it's the equivalent?

20    It's the equivalent.  Okay.

21        **MS. KIM:**  It's a study.

22        **MR. CANTOR:**  Right.

23        **MR. SILVEIRA:**  This is a retrospective of the merger

24    litigation, essentially.  So, I mean, I think this is a little

25    bit different.  This is, essentially, the FTC, after the fact,

1    coming back and saying, oh, that merger litigation, maybe they

2    got it wrong, because prices were raised.  And then Dr. Chipty

3    is accepting that as truth, and we don't have the underlying

4    data that was used to reach those conclusions.

5        It was a different analysis and then just accepting that

6    as true and saying to the jury, According to the expert report,

7    prices were raised by X amount, that's a fact, and that's

8    justifies my opinion that Kaiser could not have been

9    restrained.

10       So, again, I --

11       **THE COURT:**  So the findings of fact -- the proposed

12    findings of fact by Sutter, you know, it's easier, I mean,

13    because of Sutter's admissions.

14       And then when you say that their contracting practices

15    resulted in -- you know, flew in the face of those earlier

16    admissions and -- but I'll look at the pin -- I'll look at the

17    Tenn report.

18       What page does Dr. Chipty rely on it in her report?

19       **MR. SILVEIRA:**  Paragraph 50 and paragraph 112.  These

20    are in Exhibit P12.

21       **MR. CANTOR:**  Your Honor, just remember, what's good

22    for the goose is good for the gander.

23       **THE COURT:**  No, I hundred-percent agree with that.

24    The problem is this is not -- well, it's fine.  It's fine.

25       You just have to tell -- and maybe you did this.  Just let

1  me look at this again.

2  **MS. KIM:**  Your Honor, we don't intend to have her

3  testify that it's true.  It's just one of the bases for opinion

4  under 703.  Falls squarely within the evidentiary rules.

5  **THE COURT:**  Okay.  Just out of curiosity, have you

6  thought -- I have not looked.  I did look, at sort of a meta

7  level, you know, how many hours you guys are estimating for

8  your cases.  How many hours were you allotting to Dr. Chipty,

9  just out of curiosity?

10  **MR. CANTOR:**  That's a good point, Your Honor, because

11  I've been meeting with Dr. Chipty, and I wanted to say, you

12  know, we put down three hours in our trial witness list.  I

13  think it's going to be more like four.

14  **THE COURT:**  Okay.  I will just tell you, you know, I

15  always think -- that's why I raised the question at the

16  beginning of the hearing.  Two is idea, three is okay.  You

17  start to get into four and it becomes a snoozefest.

18  **MR. CANTOR:**  I subscribe to that, believe me,

19  particularly when you're in front of a jury.  It's just that

20  Dr. Chipty, as you know, rendered opinions on market

21  definition, damages.  She has sort of a wide array of opinions.

22  There's a bunch of markets here.  So I think four is just

23  safer.  I don't want to mislead the Court.

24  **THE COURT:**  Oh, no, I wouldn't worry about misleading

25  me so much.  You'll come up with your trial estimates.  But I'd

just say what you really should strive for is something more like three because it's just you really do risk losing your audience.

**MR. CANTOR:**  I hear you.

**THE COURT:**  And I understand we all do this.  We want to over -- we want to over deliver; right?  So you give the jury a trial estimate of, you know, X number of weeks, and you bring it in at, you know, .6 of that, the jury is overjoyed.  But you keep the jury longer than you promised them and they're not so happy.

Okay.  All right.  Thank you.  I do understand.  So let's take that motion under submission.

Kathy, are we at the one and a half hour point for you?

(Response off the record.)

**THE COURT:**  Let's take a 15-minute break.

(Recess taken at 2:58 p.m.)

(Proceedings resumed at 3:14 p.m.)

**THE COURT:**  So we're back on the record.  I think we're on to Motion *in Limine* 3, to exclude pre2006 evidence.

**MR. KIERNAN:**  Yes, Your Honor.  And David Kiernan will be handling that one.

**THE COURT:**  And who for Sutter?

**MR. MACRAE:**  Good afternoon, Your Honor.  Scott Macrae, from Steyer Lowenthal.  I'm going to argue in opposition to Motion *in Limine* No. 3.

1          **THE COURT:**  Okay.  Let me get my pens because I am

2     taking notes in a certain way.

3          Okay.  So what I'm thinking here, which I've previewed

4     this for you already, is that, you know, again, to echo what I

5     said before, at some point everybody's got to try their case to

6     the challenged contracting period or it's not going to fly.

7     That's what the case is about.  It's in the class period for

8     the challenged contracting practices, you know, and the terms

9     in the contracts; anticompetitive, anticompetitive tying

10    arrangement.

11         And, certainly, Sutter's knowledge some years before,

12    certainly, the genesis of some of these practices, as Ms. Kim

13    alluded to, are going to be relevant.  But you're going to have

14    time limits in trial.  It's not realistic to think you get to

15    prosecute Sutter, you know, starting at -- starting however

16    many years ago, you know, 25 years ago or whatever, or more

17    than 25 years ago.  It's not a realistic way for your case to

18    go in.

19         So I do tend to think that those trials limits are going

20    to define what the plaintiffs are going to be able to do.  I do

21    have that aversion to a categorical bar of evidence.  I

22    recognize that you have specific examples that you talk about

23    in your motion *in limine*.

24         As I mentioned, citing Judge Spero, this idea of -- it's

25    so much less work to look at what the plaintiffs actually are

going to put in and argue about it then.  And so while I do

think that it may be cumulative, irrelevant, prejudicial, some

of those issues are better addressed in the context of trial or

an identified exhibit that the plaintiffs actually plan to put

in.  So -- and I worry that we're too far away from that query

now.

But it's Sutter's motion, so I'll let Mr. Kiernan take it

away.

**MR. KIERNAN:**  Thank you, Your Honor.

And I have been listening very closely and understand your

view and some of the challenges.  And I do think that we will

be reraising some of these and deciding some of them on the

exhibit list.  And as Judge Spero and as you just noted, that

would allow us to focus a bit more exhibit by exhibit and

address some of these prejudice issues, the confusion issues.

I think -- I'm not going to spend much time because I

think Your Honor understands our point.  Our point is not as

the plaintiffs contend in their opposition.  We're not saying

that in a rule of reason case or even a tying case that some

history of background is not relevant.

In our brief we cite to cases that reflect that, and the

plaintiffs cite them back in their opposition.  So we

understand that.  Our point is that any minimal relevance that

has background or some history is substantially outweighed by

the risk of unfair prejudice.  The prejudice is obvious.

1          If the jury is -- and I heard some of this today.  If the

2     jury is focused on whether Sutter was engaged in tying in

3     2002 -- which didn't happen, but they're focused on that --

4     then in their mind they think to themselves:  Well, am I

5     supposed to hold Sutter liable for the conduct in 2002?  Ms.

6     Kim and Mr. Cantor spent some time about the late 1990s and

7     2000, about systemwide contracting, and then they started

8     talking about the Sutter merger.  So when I'm sitting there am

9     I supposed to hold Sutter liable for what they did 20 years ago

10    if I accept the arguments as true?

11         That is confusing, and particularly in an antitrust case

12    that's focused on -- and I'll quote from their complaint --

13    this is the Fourth Amended Complaint, paragraph 1:  "This case

14    concerns anticompetitive tying arrangements Sutter has forced

15    upon the health plans."

16         And the complaint focuses on the contracts.  The statute

17    of limitations goes back to 2008.  The class period is 2011 to

18    the present.  That means that what's at issue are the operative

19    contracts, the conduct in that period, not what Sutter was

20    doing in 2000.

21         The other issue with it, the other prejudicial point is

22    tying.  Your Honor has said that we're going to get

23    somewhere -- and we're going to talk about this later --

24    between four and six weeks of trial.

25         What plaintiffs are proceeding with is they want to try

the *UFCW* case.  That's what I've heard today.  The *UFCW* case

class period was 2003 to present.  The focus was on the

contracting practices that were implemented in 2001, that they

allege caused damages in 2003.

     And we had witnesses, documents from the late '90s, early

2000s, witnesses and documents that should not be on the

parties' list here.  Why?  One, it's not relevant.  Two -- and

it's not relevant for the jury to find liability over the

contracting practices during the class period.  But the other

reason is we don't have the time.  *UFCW* was a three-month

trial.  That's what was scheduled.  And the reason it was three

months was because we were going to cover 20 years' worth of

conduct.

     As just one example, in *UFCW* they challenged Sutter not

participating in a tiered program for Blue Shield in 2001.  We

were going to have witnesses from Blue Shield -- not "we"; the

plaintiffs.  We were going to have witnesses from Blue Shield

describing that contract negotiation, testifying about what

exactly happened, the back and forth.  The documents over that

negotiation were going to come in.  We were going to

cross-examine those witnesses about that specific event.

     Then we were going to have Sutter witnesses come in, and

they were going to talk about that specific event.

Fast-forward, we were going to do the same thing in 2003, when

they challenged a different product that they claimed Sutter

1    did not participate in.  That was going to take a lot of time.

2        If plaintiffs are permitted to bring in evidence and tell

3    this story, and what they want to do is very quick -- I mean,

4    I've been down this road before.  I know exactly what they want

5    to do.

6        They're going to go in, tell this very quick story in the

7    '90s, and then go through the 2000s and create this atmosphere

8    for the jury that Sutter's been doing this all along and

9    they've been tying all along.

10       But they're going to deprive us -- or they're asking Your

11   Honor to deprive us the opportunity to respond to that, because

12   we're going to be on the clock.  You're going to say,

13   Mr. Kiernan, you're on the clock.  You can't be going into this

14   allegation that in 1998, you know, Sutter terminated some

15   agreement with Anthem over one of their products.  You don't

16   have time for that.  You need to focus on the late 2000s, over

17   which this case is about.

18       So the prejudice here is great not only because a jury can

19   get confused -- Am I supposed to hold them liable for tying in

20   2003 or tying in 2009 or '10? -- there's also prejudice to

21   Sutter in a due process issue that we're not going to have

22   sufficient time to respond.

23       The Sidibe plaintiffs could have filed the *UFCW* case.

24   They decided not to.  They decided to have a very -- I

25   shouldn't say very limited because it was much broader in their

first complaint, and then Your Honor dismissed it three times,
and it became narrower and narrower with each complaint, where
the Fourth Amended Complaint, as I just state, it's a very
narrow complaint that now they're trying to expand and go back
in time to replicate what was in *UFCW*.

Your Honor, two more points, and I want to go through some
of the specifics that we have just so you --

**THE COURT:** Your point here, too, is it's easier for
plaintiffs to prosecute a case and it's harder for a defendant
to respond to it --

**MR. KIERNAN:** Exactly.

**THE COURT:** -- because that's the nature of -- you
know, the plaintiffs want a net, and it doesn't have to have
all the little holes sewn in. But to respond to the sweep is a
different -- is a different game. Okay.

**MR. KIERNAN:** It is.

**THE COURT:** That's a very good point. That's a very
good point.

**MR. KIERNAN:** Relatedly, the market has changed
significantly during this time period that we would have to
deal with.

The ACA did not exist in 2005. The ACA did not exist in
2002. There were other new entrants in the market. Sutter,
the size and scope, that has changed. The finances has
changed. We don't have sufficient time to try the *UFCW* case.

1          With respect to the contract terms, those have changed.

2     So the -- when you read the complaint and you look at

3     Dr. Chipty's expert report, the plaintiffs focus on what they

4     call all-or-nothing provision, nonpar rate, anti-tiering,

5     anti-steering.  In anti-steering they put what they call the

6     equal treatment clause.

7          Well, I looked back, as I was preparing, at the

8     all-or-nothing provision.  And I went to Chipty -- and this is

9     Exhibit 1 to the *Daubert* motion, but Dr. Chipty's report, at

10    paragraphs 64 and 65, she describes the all-or-nothing

11    provision.  And she says the all-or-nothing provision was

12    replaced by the nonpar rate starting in 2005.  It was no longer

13    in existence.

14         Now, in *UFCW* they made the same argument and they sought

15    liability for that contract provision that they claimed was in

16    existence between 2000 and 2005.  So it made a lot of sense

17    that it was in their expert reports.

18         We had witnesses and documents on our list that we were

19    prepared to present to the jury to focus on what they call the

20    all-or-nothing provision.  It was gone by 2005, Your Honor.  It

21    has no relevance to the issues in the case, has no relevance to

22    whether or not Sutter was tying the sales at Alta Bates or the

23    other tying hospitals with the purchase of services at the tied

24    hospitals; CPMC, Modesto, and the other two.  Has no relevance.

25    It didn't exist anymore.  Moreover, it was all barred by the

 1    statute of limitations.  They did not bring that case.

 2        Two other points.  One, I heard a lot today about the

 3    origin of systemwide agreements in the late 1990s.  Both

 4    plaintiffs' lawyers made the argument that they've got to tell

 5    the story about systemwide contracting, the fact of systemwide

 6    contracting.  And that's what -- one of the challenges in the

 7    case.

 8        I understand that plaintiffs are masters of their

 9    complaint, but the complaint does not challenge the fact of

10    systemwide contracting.  It has never been part of this case.

11        Go back and look at the Fourth Amended Complaint, the

12    challenges on specific provisions.  In fact, you cannot find

13    anywhere in the Fourth Amended Complaint where they even

14    describe -- they challenge systemwide contracting.  They don't

15    talk anything about it.

16        Today they claim, well, we need to bring in that evidence

17    from the '90s to show the fact of systemwide contracting; that

18    is, one contract with each insurer rather than having 24

19    separate contracts.  We're challenging that.

20        If you go back to Dr. Chipty's report, which I know you're

21    reading in connection with the *Daubert*, you'll see where she

22    describes what the challenged content check provisions are.

23    There's a whole section that's titled, page 49, *The Challenged*

24    *Contractual Provisions*.  And she identifies them.  She never

25    attacks systemwide contracting.

1    We cited for Your Honor in Footnote 9 of our MIL -- let me

2  just make sure it's 9 and not 8.  Pardon me, Your Honor.  It's

3  Footnote 8 of the MIL, quotes from Dr. Chipty's deposition,

4  where I -- I took her deposition several times and asked her

5  about systemwide contracting and whether they were challenging

6  that.

7    Dr. Chipty testified that they were not challenging

8  systemwide contracting.  She said sitting -- quote, Sitting

9  down and negotiating jointly is not, in and of itself, what I'm

10 measuring.  That is, whether she's measuring the

11 anticompetitive effects.

12   And that is a *sine qua non* of an antitrust claim, is the

13 effects on competition.  She's not measuring it.  She went on:

14      "I don't think I said that negotiating comprehensively

15      necessarily is bad.  That, to me, is not the relevant

16      question in the case."

17   It's not a relevant question in the case, Your Honor, if

18 Sutter contracts as a system.  That's by Dr. Chipty,

19 plaintiffs' expert.  She went on:

20      "Health plans don't talk about the upward pressure on

21      pricing because of systemwide contracting.  They talk

22      about the upward pressure on pricing because of the

23      challenged restrictions."

24      All or nothing, which we just established no longer

25      exists, the nonpar rate, the anti-tiering, and

1      anti-steering provisions during the relevant period.

2      So the fact of systemwide contracting or operating as a

3  system, that is not the challenge.  Dr. Chipty's regression

4  estimates impact or effects of competition of the challenged

5  provisions that she outlines in her report.

6      **THE COURT:**  So to your point then, the contracts that

7  are relevant are the ones in the class period.  Period, end of

8  story.  Maybe there's a little context.  You know, I'm not

9  saying --

10     **MR. KIERNAN:**  A little context.

11     **THE COURT:**  -- there's not a reach-back, but just --

12  it's just not relevant --

13     **MR. KIERNAN:**  Correct.

14     **THE COURT:**  -- because the issue has to be what -- is

15  what Sutter -- if Sutter did something bad in 1996, that's

16  totally different or not from this.  What's really relevant is

17  are they doing anything bad now.

18      I know there could be some, you know, knowledge, intent,

19  kind of knowledge or admissions or similar sorts of things.

20  You've got to try it to the challenge period.

21     **MR. KIERNAN:**  You have to do it to the challenge

22  period.

23     **THE COURT:**  Otherwise, you can't defend it; right?

24  Okay.

25     **MR. KIERNAN:**  Well, you can't defend it.  You've got

1  statute of limitations issues.  We have a statute of

2  limitations for a reason.

3          **THE COURT:**  Yeah.

4          **MR. KIERNAN:**  And *UFCW* plaintiffs, they tried to get

5  around the statute of limitations.  The Sidibe plaintiffs

6  decided not to.

7          Final two points.  There's a category of documents and

8  testimony that they expect to bring in related to pricing,

9  Sutter's pricing in the pre2006 period.  It has nothing to do

10  with the price of bread in this case.

11         They include an article from Glen Melnick, on our exhibit

12  list from 1999, regarding prices in the '80s and '90s.  That

13  has absolutely nothing to do with Sutter's prices, which is the

14  issue, in 2009, from which she measures her overcharges.

15         And then, finally, Your Honor, they have documents for --

16  actually, we put on documents on the exhibit list from CalPERS

17  from -- only in the event we lose this.  And the plaintiffs --

18  and we talked about this last week -- objected to all of them

19  on the grounds that CalPERS is not a class member.  Those

20  should be -- you know, that whole period, that testimony around

21  CalPERS in 2004, what happened, that should be excluded.

22         So, Your Honor, I understand your overall point.  I've

23  been listening, and it makes sense with other motions that

24  having a blanket may not be appropriate.  But when you

25  review -- you're considering this motion again, and considering

 1   the trial architecture as referred to it, the time that we

 2   have, four to six weeks, not three months, what the jury is

 3   going to be specifically asked to decide in that jury room with

 4   the jury instructions, and then the ability of Sutter to

 5   respond, you know, I ask that you review all that in deciding

 6   this MIL so that we have some strong guardrails to protect and

 7   ensure a fair trial for Sutter, as well as for the plaintiffs,

 8   but ensure that the jury is focused on the right issues.

 9           **THE COURT:**  Okay.

10        **MR. CANTOR:**  Your Honor, this is Mr. Cantor.  I have

11   to respond before Mr. Macrae does because what Mr. Kiernan said

12   was just wrong.  And the law is clear.

13        Yes, I'm not saying that we're going to spend all of our

14   time on the pre2006 period.  Of course, not.  We have to prove

15   damages.

16        You're going to -- you're going to identify in the jury

17   instructions that damages are only recoverable from 2011 to the

18   present, or first quarter of 2020, which is what Dr. Chipty

19   did.  But in antitrust cases you're allowed to go back to

20   discuss the history of the restraints.

21        What Mr. Kiernan said about systemwide contracting and

22   what Dr. Chipty said just ain't true.  I don't even have a

23   report in front of me, and I can tell you the following cites.

24        Look at paragraph 13 of the merits report.  She talks

25   about how systemwide contracting, including all of these

1  clauses, is what's the problem.

2      This argument that Mr. Kiernan just made up, that just

3  stated, where he said, well, you know, she said that systemwide

4  contracting was procompetitive, Mr. LeVee made the same

5  argument at the summary judgment hearing, and then I pulled out

6  for you her testimony from that deposition where she said

7  systemwide contracting can be procompetitive, but in this

8  instance it's not.

9      She has an exhibit in her merits report, Exhibit 20, which

10  is a before-and-after analysis with systemwide contracting,

11  which identifies how systemwide contracting not only forced

12  plaintiffs -- forced health plans like Anthem, in 1998, to

13  succumb to the market power of Sutter but caused prices to go

14  up, that it was anticompetitive.

15      Your Honor, with all due respect to Mr. Kiernan, he just

16  said we can't defend against this because we're going to have

17  limited time.  You, just today, let them put in everything

18  under the sun that they characterize as a procompetitive

19  benefit.  Pension funding, you know.  The reality is, seismic

20  retrofitting, that has nothing to do with medical quality.

21      This is critical to the plaintiffs' case.  We have to be

22  able to talk about the history of the restraint, the mechanism

23  that they used to force the nonpar rate on health plans, to

24  force the anti-steering clauses on health plans, to force the

25  anti-tiering clauses on health plans, and to force the price

1    secrecy clauses on health plans.

2        If we can't go back and tell that history, okay, you're

3    going to be pulling the rug out from under us.  And, frankly,

4    it would be judicial error.

5        Case after case after case allows for plaintiffs in an

6    antitrust case to go beyond the limitation period to discuss

7    the history of the restraint and what its anticompetitive

8    purposes are.

9        They don't want us to tell that story because the evidence

10   is bad for them.  That's not prejudice.

11           MR. KIERNAN:  Your Honor, if I may --

12           THE COURT:  Let me just ask --

13           MR. KIERNAN:  Please.

14           THE COURT:  -- the history of the restraint, the

15   restraint here is the contracting practices.

16           MR. CANTOR:  That's right.

17           THE COURT:  And either those contracting practices

18   have an anticompetitive effect or they don't.

19           MR. CANTOR:  And they began -- they began -- they

20   began in 2000.  They began --

21           THE COURT:  No, no, I appreciate -- let me just, like,

22   sort of unpack what I'm thinking.

23       So if somebody engages in some -- this is a tying case;

24   right?  It's about somebody who has market power in one -- in

25   the tying market saying:  I'm using that market power to force

1    you into these contracts.  You've got no choice.  You can

2    either be with me or you can be without me, but those are your

3    two choices.  It's a zero-one game.

4         And then the contract provisions that you challenge are

5    the ones that have anticompetitive effect, right, and those are

6    the ones we've identified.  So that's all very well and fine.

7         And either economically -- and it's a pretty simple story.

8    And so it's a little different than a case where you might have

9    a history of gaining the market power, you know, where you

10   really do need to show the history of the restraint as it

11   developed.

12        But this is a restraint in the form of a contract that

13   either does or doesn't have anticompetitive practices.  And I

14   don't know how going back to sort of say *and it's existed for a*

15   *long time* is anything more than sort of, you know, stretching

16   back the statute of limitations; right?

17        Of course, a little context matters.  Of course, you know,

18   how it evolved matters.  But either the contract -- the history

19   of it has nothing to do with whether it is, in fact,

20   anticompetitive.  Either it is or it isn't.

21             **MR. CANTOR:**  Your Honor --

22             **THE COURT:**  And the reason it is, according to you, is

23   because the health plans literally have no choice.

24             **MR. CANTOR:**  That's right.  And the best evidence of

25   that having -- that they had no choice is that before there

 1   were individual contracts they had a choice.

 2        When they went to systemwide contracts, Anthem, for

 3   example -- Mr. Kiernan mentioned it -- Anthem said, We don't

 4   want to do this.  They tried to kick Sutter out -- or Sutter

 5   kicked them out -- excuse me -- for 35 or 40 days.  Then they

 6   had to succumb.  They had to come crawling back to Sutter

 7   because they had to have the Sutter system in their network.

 8   That's exactly what happened.

 9        The stories that Mr. Kiernan talked about --

10        **THE COURT:**  So that might be relevant; right?

11        **MR. CANTOR:**  Exactly.

12        **THE COURT:**  So -- so, you know, it's a pretty obvious

13   point that if you've got to have Sutter in your system, you

14   know, period, end of story, you've got no choice.  And you have

15   no choice in the tying markets.  You have no choice.

16        Then if you push back and Sutter kicks you out and you

17   have no choice, Well, I've got to come crawling back, so I have

18   to acquiesce to your systemwide contract, that's a great

19   example of how if you don't say yes, you're out.

20        But that's a different example than sort of going back

21   years, at least conceptually, and putting in evidence that's

22   not about the contracting practices.

23        **MR. CANTOR:**  No, but it is about the -- I don't

24   understand, Your Honor.  The contracting practices are

25   systemwide.  The systemwide contract originated in the 2000s.

1    And what happened at that time, what Sutter thought, what their

2    purposes were, the rule of reason states you can consider the

3    anticompetitive purposes of the restraints.

4        We have documents from '97 where they say we know -- we

5    know that Anthem's going to want to resist this because we're

6    going to bring the leveraging of 21 hospitals against that, and

7    they're not going to be able to resist.  That's completely

8    relevant to the issue of market power and to what their

9    anticompetitive purposes were.

10        Then, Your Honor, the fact of the matter is, what we're

11   going to show is that -- again, we talked about the Anthem

12   negotiations in '98 and 2001 and some of the early

13   negotiations.  It was through that mechanism.

14        They now have a systemwide contract.  They put in a nonpar

15   rate.  The health plans can't get out of that because they need

16   the entire system, because Sutter is saying it's all or

17   nothing; either you take all of our hospitals or you get none

18   of them.

19        So now you have to include the nonpar rate in there.  We

20   have to still tell the story about how the systemwide contracts

21   caused them to succumb to the nonpar rate.  The same thing with

22   the anti-tiering clause, the same thing with the anti-steering

23   clause.  So, absolutely.

24        And the law is black letter here.  The law says under the

25   rule of reason the purpose of the restraint, the history of the

1    restraint is relevant.

2         I'm not going to spend -- like you said, we're going to

3    have a clock.  We're not going to spend all of our time on the

4    early years because we have to prove damages during the damage

5    period, of course, and we're going to talk a lot about that.

6         But, Your Honor, it would be error for you to say we can't

7    talk about genesis of systemwide contracts that show causation,

8    as Dr. Chipty does in the analysis, that shows what prices were

9    before systemwide contracting and after.

10        And it's particularly -- it would particularly be wrong

11   because we've been discussing this for years.  We discussed it

12   in the terms of the class order.  Pages 7 through 12 of your

13   original class order talk about the genesis of systemwide

14   contracting.  In summary judgment, we talked about this.  And

15   you also mentioned facts there that talk about the genesis of

16   systemwide contracting and how that could have led to forcing.

17        And what Mr. Kiernan just stated about Dr. Chipty's

18   testimony is absolutely wrong.  And, again, I played this

19   testimony for you at the summary judgment argument.

20        **THE COURT:**  The reason I quoted it in the class cert

21   order is because the complaint -- it's your theory of the case,

22   and that's what you have to do to recount, like, what the

23   theory of the case is.  It's just a different analysis that's

24   done at the class cert --

25        **MR. KIERNAN:**  Your Honor, may I respond since

1    Mr. Cantor is --

2              **THE COURT:**  Yes.

3              **MR. KIERNAN:**  -- said I've misrepresented the facts at

4    least three times?

5         So, Your Honor, when you go back to the -- Dr. Chipty's

6    report, again, if you focus on what the challenged provisions

7    are, she does provide background, but she provides background

8    and says that the challenged provisions are inside systemwide

9    contracts.

10        The reason I asked her the questions at deposition that

11   are quoted in Footnote 8 -- or the citations are in Footnote 8

12   of the MIL -- was I wanted to pin her down and ensure she was

13   not contending that the fact of contracting as a system was

14   anticompetitive.  And I wanted to ensure at the deposition that

15   she was not contending that damages were caused by a fact of

16   contracting as a system.

17        When you read that deposition testimony, you will find,

18   contrary to what you were just told, that I was not

19   misrepresenting her deposition testimony or her views.  There's

20   a reason why.  She has a very specific portion of a report

21   focusing on the challenged terms.

22        And what I just heard is why it highlights and underscores

23   the prejudice to Sutter.  What Mr. Cantor said is he wants to

24   focus on 1998 and negotiations with Anthem and how that came

25   about.  It's going to go in really quick.  And then, as he

1    said, we're all going to be on a clock, so depriving Sutter the

2    ability to focus on that area.

3         THE COURT:  And so what would that focus look like?  I

4    mean, if you were going to counter it, what does it look like?

5         MR. KIERNAN:  It's going to have our witnesses

6    spending time explaining -- one, cross-examining the Anthem

7    witnesses; two, having our witnesses explain what happened.

8         And it's not just that one event.  They have things on

9    there about both pricing -- we just heard Mr. Cantor wants to

10   have -- although it can't be Dr. Chipty, because she didn't do

11   any regressions of before-and-after pricing in systemwide

12   contracting, but he wants to focus on pricing in the 1990s,

13   before and after the systemwide contracts.

14        The systemwide contracts are not the challenged

15   provisions.  She did not estimate damages based upon that.  She

16   admitted to that.  So whatever the prices are before and after

17   systemwide contracting is completely and utterly irrelevant.

18        THE COURT:  To Dr. Chipty's damages analysis.

19        MR. CANTOR:  Right, but not causation --

20        (Unreportable simultaneous colloquy.)

21        MR. KIERNAN:  They can't bring in lay opinion

22   testimony --

23        THE COURT:  So how does Mr. Cantor respond to that

24   point?  Because the point is a pretty simple one.  It's just

25   like, well, Dr. Chipty's damages analysis is what it is.  She

1  analyzes it based on certain factors.  She says she does a

2  damages analysis based on the challenged contract terms.  And

3  she does that.

4     And so why -- so how is any of this relevant to the

5  damages analysis for the class period, because her analysis is

6  just dependent on this is the result of these contract

7  provisions?

8         **MR. CANTOR:**  It's not --

9         **MR. KIERNAN:**  In 2009.

10        **MR. CANTOR:**  It's not going in for the purposes of the

11 damages analysis.  It's going in for the purposes of showing

12 causation.

13    Again, Mr. Kiernan keeps saying she didn't -- just look at

14 her report, paragraph 13.

15        **THE COURT:**  I've got paragraph 13 written down.

16        **MR. CANTOR:**  Systemwide contracting is at the

17 epicenter of what Sutter was able to do.  Sutter was able to

18 force all these provisions on the health plan because they

19 started with systemwide contracting.

20    Systemwide contracting, as she testified in this instance,

21 was anticompetitive.  One of the --

22        **THE COURT:**  So let me ask --

23        **MR. CANTOR:**  Let me finish.  I've got to get to the

24 end here.

25    One of the ways she shows this is the before-and-after

1    analysis.  In the 1990s, the prices are like this.  In the

2    2000s, they shoot up.  And that's shown in Exhibit 20 of

3    Dr. Chipty's merits report.

4        It goes to causation.  It's not going to damages, it goes

5    to causation and liability.

6            **THE COURT:**  But your liability analysis is also

7    predicated on the challenged terms; right?

8            **MR. CANTOR:**  I agree.

9            **THE COURT:**  Because there's no -- I mean, liability is

10   by having these terms, you caused damage; right.  That's

11   liability.  It caused an injury.  And the injury is calculated.

12   And the injury is calculated -- she calculates the injury, the

13   damages.

14       And, certainly, it's an unremarkable fact -- a new phrase

15   that I've developed in this litigation -- that if you have a

16   systemwide contract, it is that mechanism that allows you to

17   force these terms on the plans.

18       But it's the terms that are the rub in your litigation.  I

19   mean, the systemwide contract is merely the mechanism for

20   delivery of the anticompetitive terms that result in the

21   damages that are limited to the class period.

22           **MR. CANTOR:**  Your Honor --

23           **THE COURT:**  Why is that wrong?

24           **MR. CANTOR:**  No, no.  I don't think that's wrong.  You

25   said *merely the mechanism*.  We have to show the mechanism of

market power in forcing laws.

This is -- remember -- and you stated this in your motion for summary judgment.  You -- in your order -- excuse me -- your motion for summary judgment.  You quoted to *Jefferson Parish*, okay.

The essential characteristic of a tying arrangement, *Jefferson Parish* said, is forcing, is the ability to force terms that the purchaser did not want.  That's what -- that's what it says.

**THE COURT:**  So your case sort of has to be tried this way though:  Here are the terms that are anticompetitive. You're able to have the terms that are anticompetitive because of systemwide contracting practices.  Sutter -- you know, the challenged terms are for the class period that starts in 2011. Systemwide contracting allowed these practices.  This was forced on the plans, you know.

But it still -- I mean, that's the point, but that's sort of it.  You know, that's sort of it.  It can't be more than that.

**MR. CANTOR:**  No, no, no.  It's also, and we're going to show you how systemwide contracting did this.  We're going to show you what Sutter's purposes were in adopting systemwide contracting originally so that it could get terms, as Bob Reed said, better for the group than they could get individually. Okay.

1          We're going to show that this constituted an exercise of

2     market power, and this is the quintessential, the *sine qua non*

3     of market power of economic forcing is through the deployment

4     of systemwide contracting.

5          And then we're going to show you how, through the

6     systemwide contracting beginning in 2005 -- Mr. Kiernan's

7     correct on that -- beginning in 2005, they started with the

8     nonpar rates, they started with the anti-steering clause, they

9     started with the anti-tiering clause.

10         And you're going to instruct them damages can be recovered

11    from 2011 to 2020.  By the way, the overcharge period begins in

12    2009 because there's a two-year lag.

13         **THE COURT:**  Well, so a 2005 time period for putting in

14    the nonpar rates and some of the challenged provisions is a far

15    different issue than stretching back to, you know, the 1990s.

16         The genesis of the terms themselves seems of closer

17    temporal relevance and more easily part of the narrative, and

18    it still gives you context.  And so I just --

19         **MR. CANTOR:**  Yeah, but you need to tell the jury, and

20    we're going to tell the jury, if you permit us -- and, Your

21    Honor, it's admissible evidence.  It's not prejudicial.  David

22    and his colleagues can -- I mean, Mr. Kiernan, I'm using the

23    familiar.  I don't mean to --

24         **MR. KIERNAN:**  That's okay, I don't take offense.

25         **MR. CANTOR:**  But Mr. Kiernan and his colleagues can

1    cross-examine the Anthem witnesses or cross-examine the other

2    witnesses.  They can put on evidence from the early years.

3         Ms. Brendt, their central witness, has been in the managed

4    care department since 2000, since any of these provisions

5    began.  She's going to be able to testify to all this stuff.

6         And like I said, to me -- I keep using this term what's

7    good for the goose is good for the gander -- they're going to

8    be putting on a lot of evidence of procompetitive effects that

9    we need to now --

10         **THE COURT:**  But it's much more pragmatically that -- I

11    mean, again, it's not going to be heaps and heaps and heaps of

12    testimony.  It's just not, because it's not as big a point;

13    right?

14         I mean, going back years of contracting practices is very

15    different than saying, you know, this is what our contracting

16    practices allows us to do.  It's not a lot of testimony.  In

17    its reach it's not as grand.

18         **MR. CANTOR:**  We're not trying -- Your Honor, like I

19    said, we're not trying to say, you know, let's spend, you know,

20    half our time on the pre2011 period.  That would be ridiculous.

21    The jury wouldn't go with us.

22         We have to demonstrate during the relevant time period,

23    2009, I'd say, because that's when the overcharge period

24    begins, through the March 2020, which is the damages period,

25    that, indeed, there was anticompetitive effect.  We have to

1    show that.

2        But we are charged in a tying case, under the rule of

3    reason, with demonstrating what the mechanism was for the

4    forcing.  How Sutter had market power, how it couldn't be

5    resisted, and how Sutter knew from the outset, which is the

6    '90s evidence, that it could force these terms, it could force

7    the health plans into --

8            THE COURT:  I don't know how Sutter -- I think it's

9    fine to have testimony about how Sutter developed market power

10   and that if Sutter has market power in the tying markets then

11   it's historic.  I don't have any idea what the evidence

12   actually looks like at that point.  But that's fine.  Fine,

13   fine.  It's true.  And so it's not that big a deal.

14       The issue then is how Sutter used that power to force

15   systemwide contracting with the challenged terms on -- that it

16   caused anticompetitive effect on the health plans that could

17   not resist it because they had no choice.

18           MR. CANTOR:  Right.

19           THE COURT:  And so that's the case.  That's the case.

20   And it just --

21           MR. KIERNAN:  Your Honor, if I may?

22           THE COURT:  Yes.

23           MR. KIERNAN:  Just while there's a short break in

24   this?

25           THE COURT:  Poor Mr. Macrae.

1          **MR. CANTOR:**  I feel terrible.

2          **THE COURT:**  And we don't have all day and all night on

3     all of this stuff.

4          **MR. KIERNAN:**  We don't.  I'm going to keep this short.

5          **THE COURT:**  And I think maybe you talk about specific

6     documents if you want to.

7          **MR. KIERNAN:**  Well, I think -- like I said, I think

8     during the exhibit list it's going to help Your Honor a great

9     deal.  But I do want to cover two things.  One is the mechanism

10    that the plaintiffs' challenge is market power.  It's not

11    systemwide agreements.  The fact of systemwide agreements,

12    we'll stipulate.  We have systemwide agreements.  That's not a

13    dispute in the case.

14         **THE COURT:**  It's market power allows them to have

15    systemwide contracts with anticompetitive terms.

16         **MR. CANTOR:**  Right.

17         **MR. KIERNAN:**  But the key, Your Honor, because it's a

18    tying case, right, is --

19         **THE COURT:**  Right, that allowed them to have an

20    all-or-nothing system --

21         **MR. KIERNAN:**  It's not even all or nothing for them

22    because they -- this is not *UFCW*.

23         **THE COURT:**  Right.  It's inpatient -- allows them to

24    tie inpatient hospital services in the tied markets; right.

25         **MR. KIERNAN:**  Exactly.  Which is only four hospitals.

1          **THE COURT:**  I know.  Exactly.

2          **MR. KIERNAN:**  It's very different.  *UFCW* was all 24.

3      The Sidibe plaintiffs argue that Sutter used its market

4  power in seven tying markets to require them to get four.  And

5  then they claim that we -- that Sutter used its market power in

6  seven to prevent tiering that caused prices only to increase at

7  those tied hospitals.

8      It's a very specific allegation and claim that is not

9  challenging just the fact of systemwide contracting.  No one

10  has challenged that, just having a systemwide contract where

11  you contract on behalf of all the hospitals in one contract.

12          **THE COURT:**  I understand.

13          **MR. KIERNAN:**  It's illegal.

14          **THE COURT:**  I understand.  Okay.

15          **MR. MACRAE:**  May I make a few points, Your Honor?

16          **THE COURT:**  No.

17          **MR. MACRAE:**  No?

18      (Laughter)

19          **MR. KIERNAN:**  I think we should move on.

20          **THE COURT:**  Mr. Macrae, I'm totally kidding.

21          **MR. CANTOR:**  I'm sorry about this.  Sorry.  Go ahead.

22          **MR. MACRAE:**  -- characterizing this pre2006 evidence

23  as having minimal relevance and being background, and it's

24  neither.  I think when he focuses just on the systemwide

25  contracting, he forgets that before 2006 each and every one of

these contractual restraints was already in place.  So it's not just systemwide contracting.  It's all of it.  And once it was in place, they could never, ever get out under from under it.

      **THE COURT:**  But was that as of 2005?

      **MR. MACRAE:**  Or 2006.  Very similar to what's in effect now.  And they didn't have to force it on it during the damage period because once the lock was in, they could never get out.

    Now, I think the great importance of this pre2006 evidence is demonstrated by your summary judgment order in March of this year where you said that before 2006 insurers negotiated in Sutter hospitals individually when they assembled their provider networks.

    Then Sutter moved to systemwide contracting, forcing insurers to participate.  The systemwide contracts have allegedly anticompetitive provisions, penalty nonpar rates, and anti-steering and tiering provisions, secrecy provisions about price and quality.

    So I think an important point is that, on a summary judgment decision, the Court can only consider admissible evidence.  So, in effect, it's already found that this is admissible.  And it's important and the jury should be allowed to consider it.

      **THE COURT:**  But that's all in the 2005-2006 type of time frame, which I don't know Mr. Kiernan has any great

1    quarrel with.  Maybe he does, maybe he doesn't.  But that's all

2    okay.  I think that's a hundred percent okay, that kind of

3    evidence that talks about the time period when the terms went

4    into effect.  That's all fair.  That's all fair.

5         **MR. CANTOR:**  The equal treatment provisions, the

6    anti-steering provisions went into effect in 2001.

7         And I believe Mr. Macrae misread your order.  It was

8    before 2000 that you said, you know, where contracts were

9    negotiated individually, not before 2006.

10        **THE COURT:**  Okay.

11        **MR. MACRAE:**  So under the law, Cartwright Act, rule of

12   reason claim requires consideration of the history of restraint

13   and the reasons for its adoption.

14        **THE COURT:**  But the restraint is going to be the terms

15   in the contracts that are challenged in this lawsuit.  And so

16   the history of those terms may well be relevant, but it's --

17   those are the anticompetitive terms that are challenged.  And

18   then the history of those restraints is going to be relevant,

19   but it's going to be relatively narrow in terms of time

20   periods, and it's not going to extend back to some time period

21   that addresses systemwide contracts, qua systemwide contracts.

22        Instead, it has to be pretty much nailed to these

23   contracts and these terms that you're challenging in this

24   litigation.  And so -- and I can see that it might get

25   side-showy, but --

1          **MR. MACRAE:**  The terms have not changed materially

2    since they were put into effect before 2002.  And the Ninth

3    Circuit held that, you know, the history and the purpose, just

4    three months ago in the *Sandler Partners* case.

5          And in May, Judge Alsup, in *Glumetza*, also said that a

6    rule of reason claim must be determined, quote, in light of

7    peculiarities of the business and the nature and history of

8    restraint and its reason for being.

9          So if you want to look at the purpose and the history of

10   these restraints, the damage period is not when you look.  You

11   look --

12         **THE COURT:**  No, I understand.  It's the challenged

13   terms.  It's the challenged terms.

14         **MR. KIERNAN:**  But, Your Honor, I will say, just

15   because the Judge Alsup decision, he wasn't deciding an MIL,

16   and the plaintiffs are making the argument that 403 basically

17   has no application in a rule of reason case, and you can go

18   back to the beginning of time to tell a history story.

19         It's not the case.  We cited *Aetna versus Blue Cross Blue*

20   *Shield of Michigan*, where they limit the time period by which

21   they could bring in the history of the restraints.

22         Your Honor still has the discretion to ensure that there

23   is a fair and just trial.  And, you know, at issue in the case

24   is whether Sutter was tying during the period.

25         **THE COURT:**  Well, this is very helpful.  I have some

1  ideas.  I'm going to take a crack at it and write something.

2  This is not the last time that we're going to be talking about

3  this --

4          **MR. KIERNAN:**  I understand.

5          **THE COURT:**  -- just so you know.  And just so you

6  know, I'm not cutting anybody -- well, so we will have -- you

7  know, as the case settles into an exhibit list that's a bit

8  more meaningful, in that it becomes less speculative and more

9  real, I think we can consider, you know, how we shape the trial

10 in a way that makes sense.

11         **MR. KIERNAN:**  Yeah.

12         **THE COURT:**  And we're going to be looking at things

13 along the way.  So that's -- this was actually very, very

14 helpful.

15         **MR. KIERNAN:**  Thank you, Your Honor.

16         **MR. MACRAE:**  Can I say one more point?

17         **THE COURT:**  Yes.

18         **MR. MACRAE:**  That has to do with there's been talk

19 about the *UEBT* case being different because it has a different

20 damages period, because there they alleged fraudulent

21 concealment that tolled the statute of limitations.

22     But both of the cases address the same restraints.  And

23 the history and purpose of those restraints occurred exactly at

24 the same time, in the late '90s and the early aughts, when

25 those restraints were planned and first imposed.

1      So the idea that this doesn't go to damages, it goes to

2      the --

3      **THE COURT:** I'll have to go back to look at *UEBT*

4      again, but the whole idea of the sort of fraudulent concealment

5      aspect of it being part of extending the time period back, and

6      I just remember thinking at the time when I was reading Judge

7      Massullo's orders just how different in scope her need for a

8      three-month trial versus our need for something more like a

9      month trial seemed just very different.

10     But I'll go back. I took some notes back then when I was

11     thinking about the -- I just wonder where I put those notes. I

12     have a very organized system, but I have two big binders of

13     Sutter case management, and then I have one which is a state

14     case. Thank you for keeping me in the loop with the papers

15     along the way.

16     Okay. So I think that's as much as we can do.

17     **MR. KIERNAN:** Thank you, Your Honor.

18     **THE COURT:** Of course. We already did Motion *in*

19     *Limine* 4, which raises somewhat similar issues.

20     We dealt with the Motion *in Limine* 5 about the evidence of

21     the alleged spoliation. You know, look. We did talk about

22     those arguments last time in the context of the spoliation

23     motion.

24     I wonder what else, Mr. Kiernan, you want to offer on that

25     motion?

1          **MR. KIERNAN:**  Yeah.  And I was there and I was

2   listening, Your Honor.  And the thing that -- I'm just going to

3   hit just a couple points.  And the reason is that with Mr. --

4   and Mr. LeVee and I talked about this after the argument.  He

5   was focusing on the spoliation, not so much on the motion *in*

6   *limine*.  And let me just make a couple points.

7          So we agreed with Your Honor that -- with the Court's

8   tentative to grant Sutter's motion *in limine* for the very

9   reason you gave, that plaintiffs should not get to cut a back

10  door on culpability.

11         One doesn't get an adverse inference instruction.  And the

12  reason is pretty obvious.  Once a jury is informed that

13  evidence has been destroyed, the jury's perception of the

14  so-called spoliator is going to be unalterably changed.  Once

15  that's out, they're just going to have a view of that

16  individual or the company and hold it against them.

17         And that's contrary to having cases decided on the merits

18  rather than on an improper basis, like prejudice, that can be

19  injected into the trial.

20         That's what allowing evidence of the destruction in front

21  of the jury, punting, going against, you know, the tentative

22  and giving plaintiffs another bite out of the apple with the

23  jury, that is the great risk.

24         Now, plaintiffs criticized Sutter in its opposition to the

25  MIL for not citing more cases in addition to the *Henning* case.

 1    The Court has the discretion not to send this to the jury,

 2    particularly when there's been no finding of deliberate intent

 3    to deprive the other side of evidence.

 4         I remember this *Steshenko-McKay* case.  You and I, Your

 5    Honor, were involved in that case.  Judge Seeborg was the

 6    District Court judge.  And in that case the plaintiff,

 7    Mr. Steshenko, brought a motion for sanctions for -- because

 8    the plaintiff had destroyed emails, one of the principal

 9    witnesses in the case.

10         Judge Seeborg found that the record showed carelessness

11    and inadequate diligence, not targeted destruction of evidence.

12    And Judge Seeborg went on:

13              "In this instance, however, while the failures on

14         defendant's part are not excusable, there's no reason to

15         infer that plaintiff has thereby been deprived of his

16         right to a fair trial in a decision on the merits.  As

17         reflected by the authorities cited above" -- and I'll give

18         you the cite -- "spoliation is an issue to be determined

19         by the Court.  In light of this order, defendant's motion

20         to exclude evidence and argument at trial regarding the

21         alleged spoliation is granted."

22         And that's at 214 WL 12787653.  And that's what should

23    happen here.

24         They also focus on - or this was an argument in connection

25    with the MIL, that Judge Massullo was going to allow this to go

1   to the jury.  There, Your Honor, she decide -- the judge

2   decided the spoliation motion.  There was not an MIL on the

3   issue.  We did not file one.

4       These things were pretty close together to trial.  But

5   closer to trial, the plaintiffs in that case put Ms. Sina

6   Santagata's email on their exhibit list.  We objected on 352

7   grounds, which is 403 under the Federal Evidence Code, and

8   Judge Massullo sustained our objection on 403 grounds, 352 for

9   state court.

10       And that's in the transcript dated 10/10/2019, at page 20.

11   And then she confirmed it the next day, on October 11th, in

12   that transcript.  Because we settled the case, we didn't get to

13   a point where the oral order was put in, in writing.  So, you

14   know, as we were getting to trial and about to try the case,

15   that evidence was going to get excluded because of its

16   prejudice.

17       The last point I want to make, that we didn't touch upon,

18   is we heard that they want to argue -- go after Ms. Brendt for

19   credibility.  And there was a big focus on I versus we, because

20   she used the pronoun *we* with respect to who approved the

21   destruction of documents.

22       And what Mr. Steyer said was Sutter committed a fraud on

23   the Court.  Sutter committed that fraud by submitting that

24   declaration.  Your Honor, that declaration was on our paper.

25   That declaration was on our caption.  We signed that paper --

we signed the filing that went in.

I can tell you, Jones Day and the lawyers involved were not suborning perjury. We did not commit a fraud on the Court as Mr. Steyer accused us of.

When you read those declarations -- Ms. Brendt's declaration and Ms. Almeida's declaration -- they are consistent. The idea that they're inconsistent is wrong.

Ms. Brendt testified in the declaration that we filed that she was in the room -- this is at paragraph 4 -- with Sina Santagata and with Ms. Almeida, "and we told Sina that she could have records management proceed to the next step." That was the *we*. So she's saying that Ms. Brendt and Ms. Almeida approved it with Ms. Santagata.

What did Ms. Santagata say under oath at deposition? She said the same thing. She said the same exact thing. Ms. Brendt and Ms. Almeida approved it. They're completely consistent.

What Ms. Almeida said was -- in her declaration is she could not remember. And, as everyone recognized, even Mr. Steyer last week, that's not a surprise. You've got fading memories.

And what he focused on, where he said it's worse than that, it's worse than that, Your Honor, is where she writes:

"I never would knowingly" -- and that's the key word.

"I never would knowingly authorize the destruction of any

1          document or potential evidence that would be relevant on

2          ongoing litigating, and I would recall it."

3          What she was saying, Your Honor -- and Jones Day filed

4     this declaration, too, in the same package, same package, along

5     with the deposition testimony.  What she was saying is she

6     would not have knowingly done it.  She would not knowingly

7     destroy evidence.  And had she knowingly done it, you know,

8     destroyed evidence in a litigation, she would remember that.

9     But she doesn't remember this because she wasn't knowingly

10    destroying anything.

11         So the declarations are completely consistent.  There is

12    not a credibility issue.

13         And I think this is very telling.  We're all litigators

14    here.  The Sidibe plaintiffs had these declarations in 2017.

15    They had Judge Karnow's order in 2017.  In 2018, Ms. Brendt was

16    deposed for 12 days.  I defended Ms. Brendt for 11 of those 12

17    days.

18         The Sidibe plaintiffs were at all of those deposition

19    days.  Mr. Cantor asked Ms. Brendt questions for five days,

20    Your Honor.  He asked her questions for five days.  Not one

21    time did he cross-examine her on this declaration.

22         Not one time did he ask her about inconsistencies; why was

23    it *we* versus *I*.  Although, it's obvious because it's consistent

24    with Ms. Almeida's declaration about what Ms. Santagata said.

25    And I should have mentioned that.  Ms. Almeida's declaration

says that -- this is at paragraph 5:

>"I was present for the deposition testimony of Sina Santagata and understand that Sina believes that she was authorized by me and Ms. Brendt."

So everything is out in the open.  There are no credibility issues.  The Sidibe plaintiffs never asked her -- that is Ms. Brendt; they never deposed Ms. Almeida -- why?  Because the declarations that we submitted in opposition to spoliation are consistent.

This was made up, basically, in a character assassination of Ms. Brendt.  And that's what they want to do at trial.  They don't want to try to argue to the jury that there is, you know, some smoking gun in there, because they can't.  Different time period.

They have -- I don't even know how many pages it is.  It's in the millions.  I haven't counted it up.  But the volume -- you think the *Daubert* binders were big, you should see the volume.

**THE COURT:**  Twelve days of deposition, whatever you said, 11 days, I should stop feeling sorry -- I don't feel sorry for myself, it's just a joke.  But that's something to feel sorry for yourself about, 11 or 12 days of depos.

**MR. KIERNAN:**  You know, I heard earlier today that the plaintiffs don't want sideshows, they don't want inflammatory language being brought in.  One plaintiffs' attorney argued

1    that we should try this case on the merits.

2        The jury should decide, Did Sutter engage in tying

3    arrangements?  They should not be deciding between Ms. Brendt's

4    declaration paragraph 4 and Ms. Almeida's declaration 7.  This

5    should not be a character assassination on Ms. Brendt or any of

6    the other witnesses about the destruction of any of these

7    documents, particularly when there's not a finding of

8    spoliation.

9        Finally, and I think Mr. LeVee did mention this, that in

10   connection with it being a sideshow it will take trial time

11   to -- you know, we're going to have two additional witnesses

12   that would have to come in.  We'll be spending time explaining

13   this.  We've got to justify and support and explain what

14   happened.

15       And that's not what this case is about.  This is the

16   antitrust case.  We should be trying it on the merits, not

17   trying it on, you know, some late idea that Sutter, through

18   its -- I guess its outside counsel and its own witnesses

19   committed a fraud on the court.  That did not happen.

20           **THE COURT:**  No, I know that Sutter did not commit a

21   fraud on the Court.  I'll just go on the record and say that.

22       So, Mr. Steyer, what else would you like to offer?

23           **MR. STEYER:**  Thank you, Your Honor.

24       Sutter's Motion *in Limine* No. 5 is unsupported by law or

25   the facts.

1      There is ample precedent in the Ninth Circuit, the *Miranda*

2  *v. Wyatt* case, *Oppenheimer versus the City of La Habra*, and

3  also the case of *Johnson vs. Wells Fargo Home Mortgage*, where

4  the Ninth Circuit basically affirmed allowing evidence of

5  spoliation to be heard by the jury even when the Court

6  ultimately denied the adverse jury instruction or, like Judge

7  Massullo, reserved decision.

8      So in the *Oppenheimer* case, 2017 case, the Court said, I

9  may not give the adverse instruction, but I will allow the

10  plaintiff to argue that the destroyed system -- what the system

11  evidence might have shown.

12      And there's -- in the *Wells Fargo* case, the District Court

13  instructed the jury they should decide whether documents were

14  destroyed, and if the jury so found, the instruction would

15  create a presumption in favor of Wells Fargo that the spoliated

16  evidence was unfavorable to Johnson.

17      In a 2018 case, *RePET, Inc. v Zhao,* the Court denied the

18  defendant's motion *in limine* to exclude evidence of the

19  spoliation and said that issue was a disputed issue for the

20  jury to decide.

21      I would also refer the Court to the 2015 decision by Judge

22  Freeman of the Northern District, *Clear-View Technologies*

23  *versus Rasnick*.  And in that case Judge Freeman denied the

24  motion of defendants to preclude introducing evidence of a

25  nonparty alleged co-conspirator about evidence that he

destroyed.

And the Court agreed with the plaintiff and said the evidence of purported spoliation is admissible because it's relevant to the dispute and that the jury should hear it.  And the case law goes on in that way, and that should be what the Court should do here is let the jury hear that.

I would also cite to Your Honor there's a case by Judge Cousins from this district.  It's *Tyko*, T-y-k-o, *Thermal*, T-h-e-r-m-a-l, Controls.  Not a spoliation case, but Judge Cousins agreed it is inappropriate for the Court to make factual determinations as to disputed questions of fact through an *in limine* order.

Two other cases, Your Honor, out of the Ninth Circuit, the *Vasquez versus City of Idaho Falls*.  This is a 2020 case.  And there the Court said, in response to the motion *in limine*, the courts must be careful not to resolve factual disputes or weigh evidence when ruling on a motion *in limine*.

Vasquez sought sanctions for destruction, apparently, of notebooks and calendars, and the Court said at the close of evidence at trial Vasquez could ask the Court for a spoliation instruction and the Court will decide if it's warranted based on the evidence at trial.

And in the *Zhao* case that I mentioned, a 2019 case which we cited to you, the motion *in limine* was denied to exclude spoliation.  And the same should occur here.

1        I would also cite Your Honor to Judge Orrick's decision in

2   2017, in the case of *Doe versus County of San Mateo*.  And so I

3   think that that's clear.

4        Now, let me just respond to something that Mr. Kiernan

5   said because it's very important to distinguish.  In no way was

6   I suggesting that Mr. Kiernan or his colleagues have done

7   something inappropriate.  I'm distinguishing between counsel

8   and Sutter.

9        And I would point out, though, that the Almeida

10  declaration of October 10th, 2017, in this case before Your

11  Honor, was put in the record by us, not by Sutter.  It was

12  never disclosed to this Court until we brought it up.

13       And the point is, Your Honor, Mr. Kiernan, who's a very

14  fine lawyer, and very smooth, is trying to spin it and say

15  everyone's consistent.  My position is it's completely

16  inconsistent.

17            **THE COURT:**  Well, the lead argument before -- and

18  let's just talk about it -- is that it doesn't even matter

19  because --

20            **MR. KIERNAN:**  Right.

21            **THE COURT:**  -- because the hold was -- you know, there

22  was a different -- the *UEBT* case is a different case.  The

23  litigation hold went in there at a different time, quite

24  obviously, because it was a case in play as opposed to the fact

25  our case wasn't in play.

 1      The issue then is whatever obligations do attend there,

 2  you know, see Judge Karnow, on what he said, that it involves a

 3  different case involving a different time period.

 4      And here -- so that was -- you know, and here there is

 5  no -- the record does not have anything that suggests

 6  spoliation of evidence.  And then only then did he get to the

 7  argument made today.  And another thing, they're actually not

 8  inconsistent.  And so, fair enough.

 9          **MR. KIERNAN:**  I did --

10          **MR. STEYER:**  Your Honor --

11      (Unreportable simultaneous colloquy.)

12          **MR. STEYER:**  Excuse me, Mr. Kiernan.  I'm speaking.

13  Don't interrupt me, please.

14          **THE COURT:**  Okay.

15          **MR. STEYER:**  Your Honor -- Suneel, can you put up

16  slide 2.

17      I want you to see the testimony of Ms. Brosnahan so the

18  record is clear.

19          "It is correct that the litigation hold for the

20          Sidibe case was in place when you joined Sutter in

21          approximately February 2014?

22      **"A.**  That's correct.

23      **"Q.**  And you reviewed the litigation hold yourself?

24          "Yes."

25      So the litigation hold in this case was in place at the

time of the spoliation.  Brendt admitted knowing about the --
about the hold and --

THE COURT:  I don't have the spoliation motion in
front of me, but my recollection was -- let me see if I can
pull it up.  I thought the litigation hold went into place in
this case in 2015.

MR. STEYER:  No, Your Honor.  This is the testimony
from --

THE COURT:  Not the testimony, but the proof is in the
actual hold; right.  Witness memories aren't necessarily
accurate.

MR. STEYER:  No, Your Honor, respectfully, this is a
lawyer.

THE COURT:  Okay.  Got it.

MR. STEYER:  Okay.  This is a Cornell-educated lawyer,
who was the head of E-discovery.

THE COURT:  Thank goodness she didn't go somewhere
else.

MR. STEYER:  She didn't join Sutter until February of
'14.  The *UEBT* case was not filed until April.  So this was the
only hold that was in place.  Subsequently, they put a hold in
place in *UEBT*.

But the other point is, Your Honor, is you, yourself,
acknowledged last July, July 2nd, at the hearing on the renewed
class cert motion, you said the *UEBT* case and Sidibe are the

1    same case except for the passthrough issue.

2        That's ECF 811, page --

3        **THE COURT:**  Well, just because I say it doesn't make

4    it true.  But what I -- because, you know, I -- when you

5    actually parse out the cases and when you look at the theories

6    of liability that the plaintiffs assert against Sutter, the

7    cases are very much the same.

8        And so that's -- that makes, of course, you know, a lot of

9    the territory that you followed in state court helpful.  And so

10   they're not exactly the same, but they're a lot the same;

11   right.  They're a lot the same.  I diagrammed both cases.

12       **MR. STEYER:**  Precisely.  The liability issues are the

13   same.

14       **THE COURT:**  Yes.

15       **MR. STEYER:**  The history of Sutter implementing

16   systemwide contracting wasn't different for UEBT and Sidibe.

17   They did that across the board.  And the best evidence of it,

18   Your Honor, is Ms. Brendt's declaration, which is Exhibit 5 to

19   Mr. Jain's declaration on April 13th, 2017.

20       In Sutter's opposition to class cert in *UEBT*, she filed a

21   declaration laying out the history of the systemwide

22   agreements.  And, basically, in 1998, they had the first

23   systemwide amendment with Anthem and then in 1999 with Blue

24   Shield.  Then in 2001, they drafted the master systemwide

25   agreement for Anthem and for PacifiCare, which later merged

1   with United Healthcare.

2       January 1st, '02, Blue Shield; January 1st, '02,

3   Health Net; July 1st, 2002, Signa; and then January 1st, '03,

4   Aetna.  So that's the same.  And it's the same evidence for

5   both cases.

6       I would also add, as you observed with your vast

7   experience as a federal prosecutor, the Court has an obligation

8   to conduct a fair and balanced trial.

9       It would be inherently unfair and prejudicial to allow

10   Ms. Brendt, who was the chief contracting officer and been a

11   vice president for years -- she's been the head of the managed

12   care department for eight years, she's a senior executive.  She

13   ordered the destruction of the ten years of evidence.  And it

14   would be absolutely unfair and prejudicial to the plaintiffs

15   not to have the opportunity to cross-examine on this issue of

16   spoliation.

17       As you well know, it's a stipulated jury instruction, P12,

18   Credibility of Witnesses.  And, as you know, that allows the

19   trier of fact, if they think somebody lied about one topic,

20   it's within their purview to think they're lying about other

21   topics, or it's within their purview to say this witness wasn't

22   honest about X but was honest about ABC, and then, subsequent,

23   she lied about what happened.

24       What's astonishing, Your Honor, if you look at the record,

25   Santagata testified, I spoke to Almeida.  I don't remember

1    when, where, what the context was.  What they don't say is,

2    they never say, We gave Almeida the list of documents to be

3    destroyed.

4         In fact, if you look at Almeida's declaration, which

5    Mr. Kiernan referred you to, she says, "In June of 2016, I

6    learned about the destruction of the 192 boxes of records." She

7    didn't know about it until 11 months later.

8         And in sharp contrast to all the emails we put before you,

9    between Santagata getting approval from her boss, Ms. Brendt,

10   there's no emails between Santagata and Almeida confirming it's

11   okay, and there's no emails between Almeida and Brendt saying

12   it's okay.

13        It's very clear, Your Honor, or certainly arguable, that

14   Ms. Brendt, the senior executive in charge of this key

15   department, ordered the destruction.  It's beyond dispute that

16   the jury should be entitled to hear that.

17        The other comment I would make is that, to me, it's like

18   the pot calling the kettle black.  Sutter had 2,700 or more

19   trial exhibits.  They now have 72 trial witnesses when, in

20   their Rule 26 disclosure, they had six, but now there's this

21   grave concern about time.  It's sort of ironic.

22        But here's the point:  We will not need a lot of time at

23   trial to cross-examine Ms. Santagata or Ms. Brendt on these

24   points.  Clearly, less than an hour.

25        I highly doubt that Sutter will -- that the Jones Day

1    lawyers, who are very fine lawyers, will bring in Ms. Carriere,

2    the warehouse supervisor, because nothing she has said helps

3    them.  And I highly doubt that they'll bring in Ms. Brosnahan,

4    who testified that the remediation was guesswork.

5        So my point is, with this concern about trial time, I'll

6    represent to you it'll be very limited.

7            THE COURT:  I'm not concerned about trial time.  I'm

8    concerned -- I mean, Sutter made those points about those two

9    witnesses and all that, but that's a small point, not a big

10   one.

11       The issue is whether there's anything in the record that

12   shows spoliation, that there is -- you know, that there was

13   evidence that was destroyed.  And that was Mr. LeVee's sort of

14   lead argument.  Well, no duty to preserve was --

15           MR. KIERNAN:  Yes, Your Honor.

16           THE COURT:  No duty to preserve was the lead, but also

17   nothing suggests anything was destroyed.  And, you know-- but I

18   understand.  I understand the arguments.  But, you know, if --

19   I understand.  I understand.

20           MR. STEYER:  Your Honor, I'm prepared to respond.  I

21   took a long time to prepare.

22           THE COURT:  Okay.  Well, just so you know, we've got

23   one more *in limine* motion, and there will be no more arguments

24   on *in limine* motions after today.

25           MR. STEYER:  There is evidence of prejudice.  I will

refer the Court -- and you may want to make a note -- Exhibit
30, 32, 34, 37, and 40 to my declaration shows you boxes and
boxes of documents that were -- that were destroyed, that had
key evidence.

And, for example, one of the key things is there are boxes
with Kris Vine's notes.  They are gone forever.  None of us
will ever know what was said.  That's what Judge Karnow noted,
and I think the same thing applies here.

And let's not forget, Ms. Vine was the head of the managed
care department from the '90s into her unfortunate passing in
2013.  Key witness in the case.  I think Mr. Jain put it up.

So look at this, Your Honor.  Aetna files 1986-2003, Vine.
Aetna meetings year 2000.  It goes on and on and on.  There's
no doubt that we were prejudiced by this massive, unprecedented
destruction of evidence by the head of the department.  No
doubt.

And as Judge Karnow noted, the fact that they were able to
produce some documents doesn't make up for the stuff that was
destroyed and that you're not going to know what was there.

And, you know, Your Honor, this isn't a situation where
we're coming before you going, you know, Ms. Brendt or someone
in the department left one box at home and the dog ate the box.
We're talking ten years of documents.  And even under the
remediation, Your Honor, they chose to look at 55 boxes out of
192.  But if you look at the Grimes declaration, they were only

1    able to remediate 38 of those, which is less than 20 percent of

2    the 192 boxes.

3         As Judge Karnow said, Sutter with a straight face can't

4    tell us to rely on them that there was nothing important in

5    them, because, remember, the boxes just had, like, what's

6    called a record of deposit.  There was no protocol what you had

7    to put down.  Some people may have been very precise, others

8    weren't.

9         It's very clear --

10        **THE COURT:**  But I think it's a little bit more

11   specific than that.  Reporting from memory from last week,

12   there were the 41 boxes that had potentially responsive

13   information based on time frame and custodian and the like.

14        So, of course, you can't tell one way or the other whether

15   there was anything responsive; right?  But at least by category

16   and by time period, you should be able to say who might have

17   good information, Chris Pine, for example --

18        **MR. STEYER:**  Kris Vine.

19        **THE COURT:**  It's not Chris Pine.  Chris Pine is the

20   actor.  But, yeah, okay.

21        **MR. STEYER:**  Sutter chose -- it's in the record.  They

22   cut off going back before 2002.  Now, think about that.  They

23   cut off going back to look before 2002, but it's beyond dispute

24   that the policies in play here were formulated and implemented

25   in the late 1990s.

1        **THE COURT:**  But Judge Karnow ordered no more; right?

2    He ordered restoration of some of the -- I mean, again, I'm

3    reporting from memory, always a problem, but he ordered email

4    restoration but declined as overbroad, essentially, any

5    bigger -- you can't criticize Sutter for not going back further

6    when Judge Karnow didn't require it.  And Sutter complied with

7    what Judge Karnow required them to do.

8        **MR. KIERNAN:**  We did.

9        **MR. STEYER:**  Let me respond to that, Your Honor.  The

10   duty to preserve is very broad.  And the case law says -- and

11   we cited it to you before, so I won't repeat it.  It's in the

12   brief.

13       The duty is -- a party has a duty that they know or should

14   have known that evidence could become relevant in a case.  It's

15   a broad duty.  Otherwise, people -- you would be encouraging

16   parties or potential parties to destroy evidence.

17       **THE COURT:**  Let me -- again, not having -- we argued

18   this last week.  But the idea is that spoliation isn't supposed

19   to be speculative.  You're supposed to show an obligation to

20   preserve -- having control over the evidence and an obligation

21   to preserve it, the records were destroyed with a culpable

22   state of mind and that destroyed evidence was relevant.

23       And, yet, you chose to ask no questions on these topics

24   over the 11 days or 12 days, or whatever it was, that you had

25   to depose.  You could have made a better record; you didn't.

1          **MR. STEYER:**  Let me respond to that.  I wasn't at all

2     of those depositions, so I don't want to make up what happened,

3     okay?

4          But you will recall that after we came back from the Ninth

5     Circuit, at our first CMC with you, that was raised.  And you

6     told us, I don't want to deal with spoliation now, we'll deal

7     with it, quote, closer to trial.

8          **THE COURT:**  Well, I just meant so a record could be

9     developed --

10          **MR. KIERNAN:**  Yes.

11          **THE COURT:**  -- so I could address the issue.  I can't

12     address the spoliation argument in a vacuum --

13          **MR. STEYER:**  Let me --

14          **THE COURT:**  -- and that was why.

15          **MR. KIERNAN:**  And you said after discovery.

16          **THE COURT:**  After discovery.  After discovery.

17          **MR. KIERNAN:**  That's what you said.

18          **MR. STEYER:**  Let me talk, and then you can go.

19          Your Honor, the record was already fairly established in

20     the *UEBT* case.  Bear in mind, in this case we've now taken over

21     106 depositions.  It's been a sprawling, time-consuming case.

22     The lawyers on the other side have kept us on our toes.

23          But I would also point out, Your Honor, in the Third

24     Amended Complaint, which I mentioned last time, but I want to

25     specifically -- I won't read it to you in the interests of

1    time -- paragraph 28, paragraph 35, and paragraph 94, the Third

2    Amended Complaint was filed December 9th, 2013, a year and a

3    half before the spoliation occurred.

4        We all know what happens when large companies are

5    represented by large national law firms.  They speak to

6    in-house or outside counsel saying, okay, what do we have to

7    preserve?

8        It wasn't a secret to them that the genesis of these

9    systemwide agreements went back to the late 1990s.  And the

10   case law is very clear that the Court should consider the

11   nature of a restraint, the history and the reasons for its

12   adoption.

13       The California Supreme Court in the *Cipro* case, in 2015,

14   said that.  And as Mr. Macrae pointed out, it was just cited

15   several months ago by the Ninth Circuit in the *Sandler* case.

16   So they knew what was relevant.  Plain and simple, Your Honor,

17   there's no other way to say it.

18       And I would also point out -- bear with me one second.

19   When you look -- you know, you mentioned the Karnow order.  The

20   thing that's really important, Your Honor, is when you cut to

21   the chase, Judge Karnow, who I might add is a very

22   even-tempered --

23           **THE COURT:**  I know Judge Karnow.  I know all the

24   complex lit judges.  I may not have practiced in state court,

25   but, you know, we talked back and forth.

1      I still mourn Steve Brick, you know, who was a

2  thoroughly --

3           **MR. STEYER:**  Yes.

4        **THE COURT:**  -- wonderful judge, too.  Yeah, I talk

5  with a lot of the complex lit judges, yeah, so I know them

6  well.

7           **MR. STEYER:**  I don't want to take up your time, but

8  Judge Brick was a fine fellow.

9           **THE COURT:**  He was an amazing human being.

10          **MR. STEYER:**  Sometime, with Kiernan present, I'll tell

11 you a few stories about a case that Mr. Lowenthal and I had, in

12 our youth, representing an allegedly locked-up person over a

13 big construction project in San Francisco.

14      And Brick looked at us and said, Nice guys like you

15 hanging out with a guy like that?  He goes, I don't get that.

16 You guys are in the wrong neighborhood.

17      Anyway, Judge Karnow, in his order -- it's really

18 important.  And to put it in context, in simple English, Judge

19 Karnow wasn't buying what Sutter was selling.  He said the

20 document destruction, quote, was decidedly odd.  Quote, this

21 was not a routine destruction authorization.

22      Santagata testified in 17 years she was unaware of any

23 other time managed care department authorized destruction of

24 records.

25      Quote, in footnote 4, I reject Sutter's attempts to argue

 1   that this was, indeed, routine.  And he then goes on to say

 2   that, at best, for Sutter -- at best, quote, it was grossly

 3   reckless, unquote.

 4       And the standard, Your Honor, because I noticed, in

 5   looking at the transcript, you had mentioned bad faith, and I

 6   just wanted to make sure that we were all clear that in the --

 7       **THE COURT:**  Well, a culpable state of mind is the

 8   correct use of the word.

 9       **MR. STEYER:**  Correct.

10       **THE COURT:**  And sanctions are available generally

11   under the -- this is divorced from the sanctions inquiry of

12   preceded by a finding of bad faith or conduct tantamount to bad

13   faith, such as recklessness combined with an additional factor

14   such as frivolousness, harassment, or an improper purpose.

15       But then you stray into the -- really, the standard is the

16   spoliation standard.  So I was just parroting the sort of

17   general standards that apply to the Court's inherent authority

18   when there's no relevant discovery order to order sanctions.

19       **MR. STEYER:**  But what I want the record to be clear

20   about, bad faith is not required.

21       **THE COURT:**  No, I understand.  I understand that.  I

22   understand that.

23       **MR. STEYER:**  Okay.  That's the point.

24       And, ironically, the *Hamilton* case, which Mr. LeVee cited

25   last week, said this factor is satisfied by showing the

1   evidence was destroyed knowingly, without intent to breach duty

2   to preserve it, or negligently.

3       And I would respectfully submit we are well beyond

4   negligent conduct in this case.  This is as egregious as it

5   gets.

6       The jury is entitled to hear the cross-examination of

7   Ms. Brendt about what she did, and then it's up to the jury --

8   it's up to you to decide whether we get the adverse jury

9   instruction, which, under the facts here, is a very modest

10  remedy.

11      But it's for the jury to decide her credibility and any

12  other witness in the case.  They can think it's nothing, pay no

13  attention, or they might think it's something.  I can't predict

14  that.  And it will not take a lot of time.

15      Thank you.

16          **THE COURT:**  All right.  Thanks.

17      **MR. KIERNAN:**  Your Honor, may I have 60 seconds?

18          **THE COURT:**  Sure.  You guys are just running out of

19  time because --

20      **MR. KIERNAN:**  That's why I said 60 seconds.

21          **THE COURT:**  -- at five minutes Kathy is at her

22  hour-and-a-half mark.

23      **MR. KIERNAN:**  Thank you, Your Honor.

24      Mr. Steyer went through a number of cases that were cited

25  in the brief.  None of them require it to go to the jury.  The

discretion is Your Honor's.

Just like Judge Seeborg, you can exercise your discretion and decide that the substantial prejudice to Sutter outweighs any relevance of the document destruction.

The second point is -- and we walked through this last week. I'm not going to repeat it. We heard a reargument of the spoliation motion. I'm not going to do that. It's in the transcript and in our briefs. But you asked a question that I just want to clarify about the facts.

The plaintiffs in the case served their RFPs, their request for production --

**THE COURT:** In 2016.

**MR. KIERNAN:** -- in 2016.

**THE COURT:** I went back and looked at all the declarations --

**MR. KIERNAN:** Okay.

**THE COURT:** -- and the timeline again.

**MR. KIERNAN:** Yeah.

**THE COURT:** I just had looked at it in June, and then I hadn't really relooked at it. Then I looked at it again on Friday.

**MR. KIERNAN:** We objected to producing anything before 2006. The plaintiffs said, well, we're going to reserve the right -- Mr. Steyer explained that last week -- we'll reserve the right to go back to 2002. Not the '90s, 2002. They never

1    did it.  They never moved to compel.  They never sought

2    documents from Sutter before that time period.

3        And that's highly relevant to the example that Mr. Steyer

4    showed you today of Aetna documents from 1986 to 2003.  He said

5    that they had handwritten notes.  There was no indication that

6    they had handwritten notes.  The description was negotiations

7    over Aetna 2000 contracts, the contracts in 2000.

8        2000 is before, of course, 2006, where we objected to

9    producing documents before then.  It's also before 2002, when

10   they reserved the right to seek more documents.  So they never

11   sought Aetna contracting negotiations from 2000.

12       Finally, he made several references to emails.  The

13   evidence is clear.  Emails were not destroyed.  The

14   declaration -- Sutter's emails -- they save every email.  And

15   we produced the emails that were responsive based -- you know,

16   using technology-assisted review.  So the comment that there

17   are emails that were destroyed is not supported by the record.

18       So with that, Your Honor, we agree with your tentative

19   that, given the substantial prejudice and no finding of

20   spoliation, that the evidence of destruction should not go to

21   the jury.

22           **THE COURT:**  Okay.  So let's just -- you know, the last

23   motion *in limine* was a little bit -- we previewed it with the

24   plaintiffs' motion about -- that we ended up sort of brokering

25   an agreement.

1       But this is Motion *in Limine* 6 about the specific amount

2   of compensation earned by executives.  The issue is -- you

3   know, I don't think anyone -- so the issue is that -- there

4   were some cases that you cited.  I read them.

5       The WHO case -- sorry, that's what we call the judge.  We

6   call them WHO and WHA, Judge Orrick and Judge Alsup.  But the

7   W-H-O, the Orrick case, WHO excluded it.  And then the Judge

8   Freeman case, he did something similar.

9       Plaintiffs disagree.  They say it's got -- but Sutter's

10  view is it's got really nothing to do with the challenged

11  contracting practices, and you could explore bias adequately.

12      So that's the brief.  It seems to me there's plenty of

13  fodder for cross-examination in this case.

14      It looks like, Mr. Brownstein, you're arguing this motion,

15  because you told me you were before, and Ms. Burnside is

16  responding.

17      Why don't we just lead with Mr. -- Sutter's made the

18  motion.  I've made Sutter's argument.  Why don't we hear from

19  Mr. Brownstein, just very briefly, about why you really want to

20  cross-examine on bias, and tell me why that's appropriate and

21  why Judges Orrick and Freeman were wrong in situations similar

22  to this.

23      In the Judge Freeman case in particular, when she excluded

24  it based on -- for consultants, she basically was like -- you

25  know, consultants were more -- she didn't say it this way

1    exactly, but the consultants' relationship was more like an

2    employment relationship, a continuous relationship.  There

3    wasn't as much fodder for cross-examination as it is with

4    experts.

5         So, quickly, just so we get through this, because Kathy is

6    at the end of her day, you guys, you've got a minute.

7              **MR. BROWNSTEIN:**  Well, I may need just a little more.

8                   (Discussion held off the record.)

9                   (Recess taken at 4:44 p.m.)

10                  (Proceedings resumed at 4:54 p.m.)

11             **THE COURT:**  Okay.  Mr. Brownstein, the floor is yours.

12             **MR. BROWNSTEIN:**  Okay.  Thank you, Your Honor.  It's

13   been a long day, and I will try to be brief, and I will try to

14   convince you, or at least make our record, and I will try to do

15   it efficiently.

16        So let me start by stealing a page from Mr. Bunzel's

17   playbook and tell you that plaintiffs have no intention here of

18   overkilling on executive salaries.  I think that would backfire

19   on us.  We don't intend to spend a lot of time on it.  But the

20   starting point of any discussion about what goes in about

21   executive salaries is they're relevant.

22        As I read Sutter's motion and, frankly, as I read the

23   cases --

24             **THE COURT:**  Can I just ask you a question before we

25   get to that?

1    **MR. BROWNSTEIN:**  Sure.

2         **THE COURT:**  What are you putting in?  What's your

3    evidence look like that you're putting in?

4         So let's just see how much we really disagree; right?

5    What does it look like?  What is -- hey, Mr. CFO, you make

6    $4 million a year.  Maybe I'm grossly underestimating what

7    people actually make for executive compensation.

8         **MR. BROWNSTEIN:**  Right.

9         **THE COURT:**  I know truly business sector executive

10   compensation, but not necessarily nonprofit.

11        You've got a bias to do whatever, you know, Sutter wants

12   you to do.  That's one thing.  But then there's also the kind

13   of categorical approach, which is Sutter pays executives lots

14   of money.

15        **MR. BROWNSTEIN:**  Right.

16        **THE COURT:**  So what does it look like?  What are you

17   putting in?

18        **MR. BROWNSTEIN:**  Okay.  So a couple or three different

19   ways it can come in.  One, as you point out, it can come in on

20   cross.  And I can describe a little bit of that.

21        **THE COURT:**  Just give me one person and one example of

22   a person that might be cross-examined.  And you can make up the

23   numbers, you can even make up the name.

24        **MR. BROWNSTEIN:**  I don't need to make up the numbers.

25   But I was looking, as we were talking today, and Sutter was

1    telling you that nothing before 2006 ought to be in the case.

2        I went back and looked at their -- their trial witness

3    disclosures, and I was looking at Pat Fry.  He's the former CEO

4    of Sutter.  Among other things, he's going to testify about

5    Sutter's acquisition strategy from the 1990s.  He's going to be

6    talking about their system strategy, again from the 1990s and

7    the early 2000s.  He's going to be talking about all their

8    capital spending and all the wonderful things they've done and

9    wax eloquent about all the great ways they spend their money.

10        And if Sutter gets its way on this motion, the jury will

11   never know that he walked out of the door at Sutter one day

12   with an eight-figure check.  And we think that does go to bias.

13   It frankly does.  And it's one of the things the jury can weigh

14   as to credibility.

15           **THE COURT:**  Okay.  That's one example.  Good.

16           **MR. BROWNSTEIN:**  There's a category --

17           **THE COURT:**  I'm clearly in the wrong line of work.  I

18   just want to put that on the record.

19           **MR. BROWNSTEIN:**  Aren't we all, Your Honor.

20        You know, there are other witnesses, of course.  There are

21   witnesses -- senior executives, like Ms. Brendt, who also is

22   going to testify about the reasons for and the benefits of the

23   conduct in going way back.  Her bonus every year is tied

24   directly to how much EBITDA, roughly, cash flow, Sutter earns

25   every year.

1    Now, that's exactly like the *American Tobacco* case.

2    There's a direct line between continuing this scheme and

3    keeping the pre cash flow high and her bonus.  And we think

4    that, frankly, is fair game.  Although, again, if we overkill

5    on that point, it will be to our detriment.

6         **THE COURT:**  So the overkill would be asking too many

7    questions?  Or -- what was her bonus?  I mean, let's just --

8         **MR. BROWNSTEIN:**  I don't have those numbers in front

9    of me, Your Honor, but it is a substantial part of the bonus

10   program.

11        **THE COURT:**  Okay.  You want to say, You got a

12   million-dollar bonus, didn't you?  You don't want to say, Your

13   salary and your bonus and all that reflects the work you put in

14   on behalf of Sutter.  You want to hit her with the exact

15   amount; is that right?

16        **MR. BROWNSTEIN:**  Well, of course, we'd hit her with

17   the exact amount.

18        **THE COURT:**  Okay.

19        **MR. BROWNSTEIN:**  And when I say overkill, if we spend

20   too much time arguing it, if we play it too hard to the jury,

21   you know, it'll take away from the real thrust of our case.

22   But we do think it goes to witness credibility.

23        There's another category of evidence, which are Sutter's

24   Form 990s.  And they have a witness, the head of their HR.  You

25   know, as a not-for-profit that doesn't pay taxes, they have to

file forms every year publicly showing what their executives

make.  And so that's easy to come in.

    And I won't -- I will note that this motion -- Sutter's

motion does not seek to preclude us from putting in or arguing

generally about levels of executive comp.

        **THE COURT:**  Right.

        **MR. BROWNSTEIN:**  I would think, you know, we'd only

have a couple or three individuals where we think it might

actually make a difference in examining them in terms of

individual salaries.

    But I think there is a broader point here, Your Honor,

which is, you know, if I have heard the discussion correctly

today, Sutter is going to put in all sorts of evidence about

what it spends money on, on a promise as yet unfulfilled, and

as yet we haven't seen any evidence of it, that there is a

direct link between Sutter's contracting practices, Sutter's

spending, and improved competition in these markets.

    That is not improved condition of Sutter.  They have to

demonstrate that there's improved competition in the market,

not that Sutter is a stronger competitor.

    Frankly, Your Honor, if -- if it were the case that a

company accused of an antitrust violation could come forward

and say, yes, but we made more money on -- because of this

business practice or scheme, so we could make better products,

I think we'd be hard-pressed to find an antitrust violation

1    anywhere.

2        As an aside, Mr. LeVee and I had separate defendants in a

3    case in the Central District of California a few years ago, and

4    if it was a fair defense to an antitrust violation that a

5    company made more money so it could make better products, none

6    of the executives at either of our clients would have gone to

7    prison.  But, in fact, they did.

8        So, you know, Sutter's got a lot of -- a lot of --

9            **THE COURT:**  Although, so you know --

10           **MR. BROWNSTEIN:**  In terms of putting in we've got all

11   this great spending, right.  And there's no linkup now.  And

12   what they want to do is say, on the other side, you also can't

13   tell the jury where else they spend their money on, you know,

14   what we consider to be -- like we could all say, or at least

15   compared to lawyers -- are pretty substantial salaries.

16       And if you're thinking about it in terms of 403, that's

17   not a particularly fair trial, you know, giving Sutter as much

18   free rein as it wants to talk about all of its spending and

19   can't even throw a dart or two at other aspects of its

20   spending.

21           **THE COURT:**  But can I just push back a little bit to

22   ask you about this?

23       One, let me ask Ms. Burnside, what does your evidence look

24   like at trial about executive compensation?  Just very shortly.

25   Don't talk about what you want here, just what evidence -- how

1  does your evidence about executive compensation come in?  Who

2  sponsors it and what is it?

3      MS. BURNSIDE:  Sure.  I mean, I think that there is

4  evidence that relates to Sutter's compensation of executives as

5  part of the reinvestment back into the system --

6      THE COURT:  Literally, how does it look?  Give me,

7  like, a snip of testimony.  Like, what does -- what does it

8  sound like when you put it in?

9      MS. BURNSIDE:  I think it --

10     THE COURT:  Or what does it look like, I guess, is

11 better.

12     MS. BURNSIDE:  Sure.  I think there are reports that

13 Sutter has that reflects its spending on the executive

14 compensation generally and employee compensation as part of

15 where the -- where Sutter reinvests its money back into the

16 system.

17     THE COURT:  Is it in the aggregate or is it broken

18 down by category?

19     MS. BURNSIDE:  Yes.

20     THE COURT:  But is it entirely in the aggregate, or is

21 it executive compensation is X, or CFO compensation is Y, or to

22 have a CFO, to attract a CEO, we need to pay in this salary

23 range, and we pay in the salary range, and we're competitive

24 because we pay this versus that?  I mean, is it specific in

25 that way?

1          **MS. BURNSIDE:**  It's an aggregate basis, Your Honor.

2    And that's what we object to.  And specifically what this

3    motion is focused on very narrowly is specific amounts of

4    compensation --

5          **THE COURT:**  No, no, I understand.  Tethered to

6    individuals as opposed to by category.

7          **MS. BURNSIDE:**  Correct.

8          **THE COURT:**  Okay.  So, Mr. Brownstein, back to you.

9          **MR. BROWNSTEIN:**  Okay.  Your Honor, really, I think I

10   made all the points I need to make here.

11         **THE COURT:**  Okay.

12         **MR. BROWNSTEIN:**  We believe, particularly if we're

13   going to be loosey goosey about Sutter being able to, on a

14   promise of tying it up someday, talk about all its wonderful

15   spending and then tie our hands on just a couple of darts on

16   the other side does not look to us like an appropriate way to

17   use Rule 403.

18         **THE COURT:**  Okay.  So, Ms. Burnside, what's your

19   response?

20         **MS. BURNSIDE:**  Yes, Your Honor.

21      I think, as I mentioned, the fact that we are narrowly

22   moving in this motion to specific amounts of compensation does

23   not restrict plaintiffs from talking about where the money goes

24   at an executive compensation level.

25      What this motion is targeted towards is the prejudice that

would result in appealing to jurors' economic prejudices and
sympathies by rolling out specific figures relating to specific
testifying witnesses.

I think that's -- that's why the Court in *Finjin* created
a -- recognized the bias that was attendant in introducing
compensation errors.  And that's the Judge Orrick case that you
mentioned.

THE COURT:  Right.

MS. BURNSIDE:  I think that that bias is what we're
concerned about.

And, actually, in a case that plaintiffs cited, the
*United States v. PG&E* case, also a Northern District case, that
actually didn't -- the Court didn't conduct a Rule 403
balancing there.  It was in connection with a motion to quash a
subpoena, but one of the elements of the subpoena was
compensation data.

And in footnote 6 the Court noted -- it actually struck
the compensation data aspect of the subpoena and noted that
revealing a witness's salary seems an unnecessarily intrusive
way --

THE COURT:  Was that the case that was Judge
Henderson's case?

MS. BURNSIDE:  Correct, Judge Henderson.

THE COURT:  That's a criminal case.  I mean, my
goodness, you can't dirty up a corporation in a criminal

1    prosecution by throwing out its executive compensation as a way

2    to fan -- poor choice of words in the wildfire context these

3    days, but that's an easier outcome.  Yeah.

4         Yeah, so that's a decision -- I know the case.  Of course,

5    we all know the case.

6         **MS. BURNSIDE:**  Understood.  And I think, just to make

7    one more point, I know that Mr. Brownstein has said that

8    plaintiffs don't intend to spend a lot of time on this, but the

9    issue for Sutter is that once those specific compensation

10   amounts are revealed, that's when Sutter will have to prepare

11   its defense to explain why those compensation amounts were

12   appropriate.

13        **THE COURT:**  But you're going to be doing that.  The

14   reality is -- I'm just saying, you're doing that anyway because

15   you're using it as part of your overall inputs into price and

16   using that as part of your -- you know, to explain your

17   business model.

18        **MS. BURNSIDE:**  I do think it would require going into

19   some more detail there, Your Honor, although I understand your

20   point.  You know, but I think it would require going into

21   comparing specific salaries of Sutter executives to other

22   salaries for nonprofit healthcare executives.

23        How Sutter pays out its compensation, as Mr. Brownstein

24   alluded to, you know, the payment that Mr. Fry left Sutter with

25   in terms of, you know, long-term incentives, supplemental

1  retirement benefits, all of this is details that would not be

2  necessary to go into but for bringing up specific compensation

3  amounts that need responding to.

4        THE COURT:  Okay.  All right.  So I will make this

5  observation about all the motions *in limine* and the case.  At

6  the end of the day, this case is about a period of time,

7  whatever that period of time is, when Sutter began contracting

8  practices that the plaintiffs challenge as anticompetitive in

9  the form of terms being forced on plans that, you know, forced

10  them into essentially accepting supercompetitive prices.

11       And so that -- that movie version of whatever that time

12  period is, wherein before 2006 seems -- you know, is -- you

13  know, I'm going to try to think about tethering it to the

14  conduct.

15       So you're really reaching back to some of the challenge

16  provisions and looking at where it begins, where it evolves

17  into a sideshow to just, you know, inflame or confuse or

18  whatever, but on some level -- who kept on saying -- was it

19  Mr. Steyer? -- what's good for the goose is good for the

20  gander?  Or was that Mr. Cantor?

21       At some point, whatever the movie version is of Sutter's

22  business model during the relevant time period, the trial, it's

23  kind of coming in; right.  And so the issue is what parameters

24  we put on all of it.

25       So I'm going to do my best with the motions *in limine*.

1    They're all taken under submission.

2         I think at this point we go off the record.  We excuse

3    Kathy.  We excuse Stephen.  He can press end recording.

4         Stephen, if you can make me co-host, I can keep doing a

5    CMC with these guys.  I do CMCs off the record.

6         (At 5:08 p.m. the proceedings were continued off the

7    record.)

8                                - - - - -

9

10

11

12                       **<u>CERTIFICATE OF REPORTER</u>**

13         I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15    DATE: Monday, August 23, 2021

16

17

18

19    _____

20         Katherine Powell Sullivan, CSR #5812, RMR, CRR
                       U.S. Court Reporter

21

22

23

24

25