# EXHIBIT 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN HANSEN, DAVID HERMAN, OPTIMUM GRAPHICS, INC., and JOHNSON POOL & SPA, on Behalf of Themselves and All Others Similarly Situated,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>SUTTER HEALTH,<br><br>　　　　　　Defendant. | Case No. 3:12-cv-4854-LB<br><br>CLASS ACTION |

Expert Report of Dr. Tasneem Chipty

April 22, 2019

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Table of Contents**

I.      Introduction ........................................................................................................... 1

II.     Summary of Opinions ............................................................................................ 7

III.    Background ........................................................................................................... 15

        A.  Consumers of Health Insurance Products ................................................... 15

        B.  The Role of Health Plans ........................................................................... 18

            1.  Assembling Provider Networks .......................................................... 19

            2.  Selling Commercial Health Insurance Products ................................. 20

            3.  Selling Commercial Health Insurance Products in Northern California ...... 25

        C.  The Role of Healthcare Providers ............................................................... 28

            1.  General Acute Care Hospitals ............................................................. 29

            2.  Physician Practices ............................................................................. 30

            3.  Other Types of Medical Facilities ...................................................... 32

        D.  Hospitals and Hospital Systems in Northern California ............................... 33

            1.  Sutter Health ...................................................................................... 33

            2.  Kaiser Permanente .............................................................................. 35

        E.  Two Stage Competition in Healthcare Markets ........................................... 39

IV.     Sutter's Use of Systemwide Contracts and the Challenged Contractual Provisions ....... 42

        A.  Sutter's Systemwide Contracts ................................................................... 43

        B.  The Challenged Contractual Provisions in Sutter's Systemwide Contracts ...... 49

            1.  All-or-Nothing Clause and the Non-Par Rate Provision ..................... 49

            2.  Equal Treatment and Anti-Tiering Restriction .................................... 51

            3.  Restrictions on Providing Price and Quality Information to Consumers ...... 53

            4.  The Complementary Challenged Restrictions Reinforce Each Other ...... 55

        C.  Health Plans Have Tried to Push Back, but Sutter Enforces the Challenged Restrictions ...... 59

        D.  Other Hospitals and Hospital Systems in Northern California Do Not Utilize the Challenged Contractual Provisions in Contracts with Health Plans ...... 69

            1.  Health Plan Testimony ........................................................................ 69

            2.  Non-Sutter Hospital Testimony .......................................................... 73

V.      Market Definition ................................................................................................. 77

        A.  Principles of Antitrust Market Definition ................................................... 78

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA        i

B.  GAC Inpatient Hospital Services Sold to Non-Kaiser, Commercial Health Plans Are a Relevant Product Market ................................................................................. 81

C.  Certain Hospital Service Areas Are Relevant Geographic Markets ...................... 83

    1.  Overview of Prior Results ......................................................................... 83

    2.  Additional Evidence in Support of Prior Work ......................................... 85

VI.  Sutter Has Substantial Pre-Existing Market Power in the Tying Hospital Markets .................. 91

A.  Structural Evidence Shows Sutter's Market Power .............................................. 91

B.  Direct Qualitative Evidence Shows Sutter's Market Power ................................. 92

C.  Sutter Tying Hospital Prices Are Higher than Benchmark Hospitals, Even Before Sutter Began to Force Health Plans into Systemwide Contracts ........................... 93

    1.  Sutter Has Higher Prices at All of its Tying Hospitals, Relative to a More Competitive Benchmark ............................................................................. 94

    2.  Sutter Tying Hospital Prices Have Been Elevated Even Before Sutter's Systemwide Contracting ............................................................................. 99

    3.  Sutter's Higher Prices Are Not Explained by Higher Quality ................... 106

D.  Kaiser Does Not Constrain Sutter's Market Power in the Upstream Market .................... 109

    1.  Qualitative Evidence Showing that Kaiser Does Not Constrain Sutter Hospital Prices ........................................................................................... 110

    2.  The Kaiser Hospital Network Is Not a Good Substitute for Many Class Health Plan Members ................................................................................. 119

    3.  Profitability Analysis Shows that Kaiser Is Unlikely to Discipline Sutter Hospital Prices ........................................................................................... 123

E.  Substantial Barriers to Entry Protect Sutter's Market Power ............................... 128

    1.  Qualitative Evidence of Substantial Barriers to Entry .............................. 128

    2.  There Has Been Virtually No Entry of New Hospitals in Northern California Over the Past 20 Years ............................................................... 131

VII.  Economics of Bilateral Negotiations and Steering Strategies ....................................... 133

A.  Health Plans Usually Threaten to Steer Patient Volume Away from Hospitals to Negotiate Lower Prices .......................................................................................... 133

    1.  Health Plans Can Use Competitive Alternatives Within a Market to Achieve Lower Negotiated Prices .............................................................. 134

    2.  Health Plans Can Use Competitive Alternatives Anywhere in a Hospital System's Network to Achieve Lower Negotiated Prices in Areas with Fewer Competitive Alternatives ............................................................... 135

B.  Prices Usually Provide the Information and Incentives for Competition to Work ........... 136

C.  Health Plans Use Steering Strategies to Reduce Prices ....................................... 137

1. Tiered and Narrow Networks.................................................................................. 138

2. Informative Mechanisms that Steer Patients.......................................................... 143

3. Preferring Physicians Who Are Likely to Send Patients to Lower Cost Hospitals ................................................................................................................ 146

D. Steered Products Are Associated with Savings in Medical Cost and Premiums.............. 147

E. Sutter Recognizes that Steering Strategies Put Downward Pressure on Price................... 149

VIII. The Challenged Restrictions Have Harmed Competition and Resulted in Less Penetration of Innovative Steered Products in Northern California ...................................... 153

A. Class Health Plans Wanted to Use Steering Strategies............................................... 154

B. Many Attempts to Introduce Steered Products in Northern California by Class Health Plans Have Failed............................................................................................. 159

1. Anthem Attempts .............................................................................................. 160

2. Blue Shield Attempts ........................................................................................ 164

3. Health Net Attempts .......................................................................................... 167

4. Aetna Attempts ................................................................................................ 171

5. United Attempts ............................................................................................... 175

C. A Comparison of Northern and Southern California Shows that the Challenged Restrictions Have Interfered with the Success of Steered Products ................................. 176

IX. The Challenged Conduct Has Harmed Competition and Resulted in Higher Prices.............. 181

A. The Challenged Provisions Interfere with Health Plans' Ability to Negotiate................. 181

1. Health Plans Have Competitive Alternatives to Sutter in Each of the Tied Markets ............................................................................................................. 182

2. Illustrative Calculation Showing How Steering in the Tied Markets Can Affect Negotiated Prices: Alta Bates ............................................................................ 183

B. The Challenged Provisions Place Upward Pressure on Sutter Hospital Prices in the Sutter Damage Markets................................................................................................ 185

1. Documents and Testimony on Sutter Prices Being Higher ....................................... 186

2. Damage Hospital Prices Are Elevated as a Result of the Challenged Restrictions ....................................................................................................... 197

3. Claims Data Also Show that the Sutter Damage Hospitals Are More Expensive than Northern California Benchmarks................................................................... 198

4. Overcharge Regression Analysis in the Damage Markets........................................ 201

5. Dr. Willig's Overcharge Regression Analysis Yields Non-Sensical Results that Are Contrary to the Substantial Body of Evidence................................................. 211

C. Increased Hospital Prices Are Passed on to Consumers in Northern California in the Form of Higher Health Insurance Premiums ......................................................... 229

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      iii

X.     Sutter's Challenged Conduct Is Not Justified by Alleged Pro-Competitive Effects ............... 231

       A.  Sutter Does Not Charge "Lower Prices" in Exchange for Volume ................................... 231

       B.  Sutter's Hospital Quality Is Average or No Better than Competitor Hospitals ................. 232

       C.  Sutter Does Not Need the Challenged Restrictions to Make Greater Investments ............ 233

       D.  Sutter Does Not Need the Challenged Conduct to Pay for Care of Government-
           Insured and Uninsured Patients ..................................................................................... 239

XI.    Sutter's Anticompetitive Conduct Has Damaged Class Members ........................................ 241

       A.  Data ................................................................................................................................ 243

       B.  Premium Damage Estimates ........................................................................................... 246

       C.  Conservative Aspects of My Damage Methodology ........................................................ 249

XII.   Need for Injunctive Relief ................................................................................................... 251

XIII.  Conclusions ........................................................................................................................ 253

## I.    Introduction

1.    My name is Tasneem Chipty. I am a managing principal and founder of Matrix Economics, an economic consulting firm in the Boston area. I specialize in industrial organization—the study of how markets function, including the choices consumers make and the competitive interactions among firms. I also specialize in econometrics—the application of statistical methods to empirically study marketplace behaviors. I have served on the faculties of The Ohio State University, Brandeis University, and the Massachusetts Institute of Technology, where I taught courses in industrial organization, regulatory policy, and econometrics. I am the author or coauthor of several academic articles that have been published in peer-reviewed journals including the American Economic Review and the Review of Economics and Statistics. I received my Ph.D. in Economics from the Massachusetts Institute of Technology in 1993 and my B.A. in Economics and Mathematics from Wellesley College in 1989.

2.    I have been a consultant to a variety of businesses and government agencies, including the U.S. Department of Justice ("DOJ") and Australia's Department of Health. As part of this work, I have studied market definition and competitive effects of firm behavior in a wide range of industries, for both plaintiffs and defendants involved in adversarial proceedings. I have also analyzed antitrust damages and am the editor of the current edition of the American Bar Association's book *Proving Antitrust Damages*.[1] A significant portion of my work has focused on the healthcare marketplace, specifically on issues involving hospital competition and hospital contracting practices. For example, I was the antitrust expert for the DOJ in a lawsuit challenging the use of steering restrictions imposed by the Carolinas Healthcare System, in Charlotte, North Carolina.[2] I was a consulting expert for private plaintiff Saint Alphonsus Medical Center to evaluate the competitive effects of St. Luke's Health System's acquisition of Saltzer Medical Group, in Nampa, Idaho. I serve as an antitrust advisor to the Massachusetts Health Policy

---

[1] *Proving Antitrust Damages*, 3rd Edition, American Bar Association, 2017.

[2] The Carolinas Healthcare System submitted to a Final Judgment under which it agreed to stop its practices that precluded competitive steering by health plans. *See* "Competitive Impact Statement," *United States of America and the State of North Carolina v. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System*, Case No. 3:16-cv-00311, filed December 4, 2018, p. 11 (describing the terms of the proposed Final Judgement designed to prevent CHS from "impeding insurers' steered plans and transparency.").

Commission and have studied the competitive effects of hospital acquisitions by Partners HealthCare, in that capacity. For these and other assignments, I have analyzed patients' choice of hospitals using both state inpatient databases and health plan claims data; I have studied issues of product and geographic market definition; I have studied the question of whether hospitals have market power over health plans in various relevant antitrust markets; and I have studied the competitive effects of challenged conduct. A copy of my curriculum vitae is attached as Appendix A. It describes my background, including education, publications, teaching, and testifying experience.

3.      I have been retained as an independent expert in antitrust economics by counsel for the putative Class to evaluate competitive effects and to quantify damages to Class Members resulting from certain contracting practices imposed by Sutter Health ("Sutter") on commercial health plans Anthem Blue Cross of California ("Anthem"), Blue Shield of California ("Blue Shield"), Health Net, Aetna, and UnitedHealthcare ("United") (referred to collectively as the "Class Health Plans").[3,4] According to the Complaint, Sutter imposes "all-or-nothing" terms upon health plans,[5] and it prevents "health plans from steering members to lower-cost, quality hospitals. . . ."[6] I refer to the restrictions that prevent health plans from steering as "steering restrictions." I refer to the combination of the all-or-nothing contracting and steering restrictions collectively as the "challenged conduct" or the "challenged restrictions."

---

[3] "Fourth Amended Complaint," Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health, Case No. 3:12-cv-4854-LB, filed September 29, 2017 (hereafter "Complaint"), ¶ 1.

[4] The Class includes "All entities in California Rating area 1, 2, 3, 4, 5, 6, 8, 9 or 10 (the 'Nine RAs'), and all individuals that either live or work in one of the Nine RAs, that paid premiums for a fully-insured health insurance policy from Anthem, Blue Shield, Health Net, Aetna, or United. This class definition includes Class Members that paid premiums for individual health insurance policies that they purchased from these health plans and Class Members that paid premiums, in whole or in part, for health insurance policies provided to them as a benefit from an employer or other group purchaser located in one of the Nine RAs." "Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification," *Djeneba Sidibe et al. on Behalf of Themselves and All Others Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, filed June 22, 2018, p. 4.

[5] Complaint, ¶¶ 4-6.

[6] Complaint, ¶ 7. Throughout this report, I use the terms: (a) "health plan" to mean commercial health plans or insurers that sell health insurance products; (b) "entities" to mean the purchasers of healthcare insurance products, including both group purchasers, such as employers, and individuals; (c) "plan members" to mean individuals that are covered by the health insurance policy; (d) "subscribers" to mean the primary plan members (*e.g.*, the employees of a large group); and (e) "patients" to mean individuals that use healthcare services.

4.    I have submitted three previous reports in this matter.[7] In my first report, I evaluated issues surrounding market definition for general acute care ("GAC") inpatient hospital services, by applying the framework of the hypothetical monopolist test. In the next two reports, I assessed whether all or nearly all proposed Class Members incurred common antitrust impact as a result of Sutter's conduct, and whether there exists a common methodology that can be used to assess damages to all Class Members. Where appropriate, I refer to evidence described in those reports.

5.    In this report, I provide a more comprehensive assessment of the effects of Sutter's challenged restrictions on competition. I present a more complete assessment of damages, using data for all Class Health Plans. To this end, I evaluate whether and the extent to which Sutter: (a) has market power sufficient to force health plans to accede to contractual terms that would restrict them from steering patient volume away from expensive Sutter hospitals; and (b) has actually forced such contractual terms upon health plans. I also evaluate the extent to which health plans could have used steering strategies to discipline Sutter's prices.[8] Further, I study whether and the extent to which the challenged restrictions imposed by Sutter have resulted in harm to competition, impeded the introduction of innovative, lower-cost health insurance products, elevated the price of GAC inpatient hospital services, and elevated premiums

---

[7] Declaration of Dr. Tasneem Chipty in Opposition to Motion for Summary Judgment, May 26, 2018 (hereafter "Chipty SJ Declaration"); Expert Declaration of Dr. Tasneem Chipty in Support of Plaintiffs' Motion for Class Certification, June 21, 2018 (hereafter "Chipty Class Declaration"); and Reply Declaration of Dr. Tasneem Chipty in Support of Plaintiffs' Motion for Class Certification, November 26, 2018 (hereafter "Chipty Reply Declaration"). I have been deposed three times in this matter: (a) once on August 15, 2018, on the issues of market definition and market power; (b) once on August 16, 2018, on issues of class certification; and (c) once on December 20, 2018, on issues of class certification. The opinions expressed in my previous declarations in this matter are incorporated by reference herein.

[8] Health plans use steering strategies that involve various mechanisms, including the creation of narrow and tiered provider networks, the deployment of price transparency tools, and reference pricing, and the identification of centers of excellence, that encourage members to consider cost as well as quality when choosing healthcare providers. *See* Robinson, James C. and Kimberly MacPherson, "Payers Test Reference Pricing and Centers of Excellence to Steer Patients to Low-Price and High-Quality Providers," *Health Affairs*, Vol. 31(9), 2012, pp. 2028-2036, at p. 2028; National Academy of Social Insurance, "Addressing Pricing Power in Health Care Markets: Principles and Policy Options to Strengthen and Shape Markets," April 2015, available at https://www.urban.org/sites/default/files/publication/50116/2000212-Addressing-Pricing-Power-in-Health-Care-Markets.pdf, *site visited* April 17, 2019, at pp. 20-22; and Kowalczyk, Liz, "Plans Steer Patients to Lower-Cost Hospitals," *The Boston Globe*, February 10, 2011, available at http://archive.boston.com/lifestyle/health/articles/2011/02/10/plans_steer_patients_to_lower_cost_hospitals/, *site visited* April 17, 2019.

for health insurance. In addition, I estimate damages for all Class Members, using the common methodology that I described in my Class reports.

6.      In forming my opinions, I have reviewed a substantial volume of documents prepared in the ordinary-course of business by Sutter, the Class Health Plans, non-Sutter hospitals, and other marketplace participants. I understand that my team and I have had access to all documents, deposition testimony, and discovery responses produced by or to Plaintiffs in this matter. These documents include, but are not limited to, hospital contracts, strategy documents, internal and external email exchanges, letters, and pricing analyses. I have also reviewed health plan declarations filed in the *UFCW & Employers Benefit Trust* (*"UEBT"*) matter or in this case by former and current health plan executives and Sutter,[9] including, but not limited to, those of: (a) David Joyner, Vice President of Blue Shield;[10] (b) Tracy Barnes, Director of Contracting for Northern California at Blue Shield;[11] (c) Steve Melody, who served as Director of Network Development and Management for Northern California at Anthem from 1997 to 2001 and Vice President of Anthem's Health Care Service from 2001 to 2009;[12] (d) Aldo De La Torre, Vice President of Provider Engagement and Contracting at Anthem;[13] (e) Janet Lundbye, who served as Vice President of Network Management in California at United from 2009 to 2015 and is currently the Regional Vice President of Network Strategy for the West Region at United;[14] (f) Chandra Welsh, Vice President for Network Management in Northern California at Aetna;[15] (g)

---

[9] "Class Action Complaint," UFCW & Employers Benefit Trust v. Sutter Health; Sutter East Bay Hospitals; Sutter West Bay Hospitals; Eden Medical Center; Sutter Central Valley Hospitals; Mills-Peninsula Health Services; Sutter Health Sacramento Sierra Region; Sutter Coast Hospital; Palo Alto Medical Foundation for Healthcare, Research and Education; and Sutter Medical Foundation, Case No. CGC-14-538451, filed April 7, 2014 (hereafter "UEBT Complaint").

[10] Declaration of David Joyner in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017 (hereafter "Joyner (Blue Shield) Declaration").

[11] Declaration of Tracy Barnes in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017 (hereafter "Barnes (Blue Shield) Declaration").

[12] Declaration of Steve Melody in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017 (hereafter "Melody (Anthem) Declaration").

[13] Declaration of Aldo De La Torre in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017 (hereafter "De La Torre (Anthem) Declaration").

[14] Declaration of Janet Lundbye in Connection with Plaintiff UEBT's Motion for Class Certification, February 6, 2017 (hereafter "Lundbye (United) Declaration").

[15] Declaration of Chandra Welsh in Connection with Plaintiff UEBT's Motion for Class Certification" February 8, 2017 (hereafter "Welsh (Aetna) Declaration").

Becky LaCroix-Milani, Chief Contracting Officer of Health Net;[16] (h) Michael Ramseier, President and General Manager at Anthem;[17]and (i) Jeff Sprague, Chief Financial Officer at Sutter.[18] I have also reviewed deposition testimony collected in this matter, from numerous Sutter and third party health plans and hospital witnesses. Antitrust economists typically rely on this type of evidence to gain insight into firms' decision-making and competitive dynamics. My analysis synthesizes this body of evidence using an economic framework that sheds light on the competitive effects of the challenged conduct.

7.        In addition to documents, declarations, and deposition testimony, I have also reviewed a substantial body of electronic data produced by the Class Health Plans, from each of their respective data systems used to process claims and record premiums in California. My empirical analysis of antitrust impact, hospital price overcharges, and premium damages relies upon these data systems which comprehensively reflect inpatient claims and member premiums for the Class Health Plans in Northern California. These data include:[19]

- ███████████████████████████████████████████████████████

- Over 20 million claims, $52 billion in paid amounts, and 196 million member-months of premium data from Blue Shield, from 2006 to 2015;

- ███████████████████████████████████████████████████████

- ████████████████████████████████████████████████████ and


---

[16] Declaration of Becky LaCroix-Milani in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017 (hereafter "LaCroix-Milani (Health Net) Declaration").

[17] Declaration of Michael Ramseier in Connection with Plaintiff UEBT's Motion for Class Certification, February 6, 2016 (hereafter "Ramseier (Anthem) Declaration").

[18] Declaration of Jeff Sprague in Connection with Plaintiff UEBT's Motion for Class Certification, April 11, 2017 (hereafter "Sprague (Sutter) Declaration").

[19] I describe here the size of the raw claims data, which were ultimately processed for analysis. Unlike the other health plans, Anthem did not limit their claims production to inpatient hospitals claims.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA        5

- ██████████████████████████████████████████
  ██████████████████████████████████████████

In each instance, I married the information in the claims data and the Sutter contracts to validate the electronic data, by reconciling prices across the two sources. In addition, I relied upon publicly available data from (a) the American Hospital Association; (b) the Office of Statewide Health Planning and Development ("OSHPD"); (c) the Centers for Medicare and Medicaid Services ("CMS"); (d) the California Department of Insurance ("CDI"); and (e) the California Department of Managed Health Care ("DMHC").

8.    Finally, I have reviewed and relied upon the opinions of David Axene, actuary and founder of Axene Health Partners, and Kenneth W. Kizer, M.D., M.P.H., who have also submitted reports in this matter.[21] I have also reviewed the reports of Sutter's experts Dr. Gautam Gowrisankaran, Dr. Robert Willig, and Mr. Patrick Travis, submitted in this matter to date.[22,23] These and other materials are cited throughout my report. An incremental list of materials that I have considered in forming my expert opinions described in this declaration is attached as Appendix B to this report.

9.    The work presented in this report has been conducted by me and staff working under my direction, at both Berkeley Research Group and Matrix Economics. Matrix Economics is compensated at a rate of $850 per hour for my work in this matter. Matrix Economics also receives compensation from Berkeley Research Group based on its collective staff billings in support of this effort. My compensation is not dependent on the outcome of this matter. My work

---

[20] Chipty Workpapers.

[21] Declaration of David V. Axene, FSA, FCA, CERA, MAAA in Support of Plaintiffs' Motion for Class Certification, June 21, 2018 (hereafter "Axene Declaration"); and Expert Report of Kenneth W. Kizer, MD, MPH, April 22, 2019 (hereafter "Kizer Declaration").

[22] Declaration of Gautam Gowrisankaran, Ph.D., in Support of Defendant's Motion for Summary Judgement, October 5, 2017 (hereafter "Gowrisankaran Report"); Deposition of Gautam Gowrisankaran, February 6, 2018 (hereafter "Gowrisankaran Deposition (February 6, 2018)"); Expert Declaration of Dr. Robert D. Willig, in Support of Defendant's Opposition to Class Certification, September 21, 2018 (hereafter "Willig Declaration"); Sur-Reply Declaration of Dr. Robert D. Willig, in Further Support of Defendant's Opposition to Class Certification, January 7, 2019 (hereafter "Willig Sur-Reply Declaration"); and Expert Declaration of Patrick Travis, in Support of Defendant's Opposition to Class Certification, September 21, 2018 (hereafter "Travis Declaration").

[23] I have addressed different aspects of Dr. Gowrisankaran's, Dr. Willig's, and Mr. Travis's opinions in my previous reports. My silence with respect to any of their opinions in this report should not be viewed as agreement.

is ongoing, and I will continue to review the discovery record to understand the evidence in this case. I reserve the right to supplement and to amend my opinions.

## II.    Summary of Opinions

10.    Based on my training and experience in antitrust economics, my review of the record in this case, and the analyses described in this report, it is my opinion that Sutter's use of the challenged restrictions has harmed competition in several relevant markets for GAC inpatient hospital services sold to health plans. By forcing health plans to engage in systemwide contracting and limiting health plans' ability to steer volume away from Sutter—one of the most expensive hospital systems in Northern California—the challenged restrictions have interfered with health plans' ability to discipline Sutter's hospital prices. The challenged restrictions have also limited health plans' ability to offer innovative, lower-cost steered products that likely would have been attractive to some consumers of insurance products, including small and large group health insurance products as well as individual insurance products, sold in Northern California. As a result, consumers—who in this case include employers and employees that purchase small and large group products and individuals that purchase individual products—in at least nine different rating areas of Northern California have less choice and paid higher premiums for health insurance products than they would have but-for Sutter's challenged conduct.[24] Using qualitative evidence, I document the fact that Sutter's prices are higher than those of other similarly situated hospitals in Northern California, none of which impose Sutter's combination of challenged restrictions. Using the economic data described above, I estimate hospital price overcharges at each of four Sutter Damage Hospitals.[25] Finally, I conservatively

---

[24] The nine rating areas (the "Nine RAs") are Rating Areas 1, 2, 3, 4, 5, 6, 8, 9, and 10. Rating area 1 includes the counties of: (a) Del Norte; (b) Siskiyou; (c) Modoc; (d) Lassen; (e) Shasta; (f) Trinity; (g) Humboldt; (h) Tehama; (i) Plumas; (j) Nevada; (k) Sierra; (l) Mendocino; (m) Lake; (n) Butte; (o) Glenn; (p) Sutter; (q) Yuba; (r) Colusa; (s) Amador; (t) Calaveras; (u) Tuolumne; and (v) Alpine. Rating area 2 includes the counties of: (a) Napa; (b) Sonoma; (c) Solano; and (d) Marin. Rating area 3 includes the counties of: (a) Sacramento; (b) Placer; (c) El Dorado; and (d) Yolo. Rating area 4 includes the county of San Francisco. Rating area 5 includes Contra Costa County. Rating area 6 includes Alameda County. Rating area 8 includes San Mateo County. Rating area 9 includes Santa Cruz County. Rating area 10 includes the counties of: (a) Merced; (b) San Joaquin; and (c) Stanislaus. *See* Complaint, ¶¶ 77-85.

[25] The five Sutter Damage Hospitals consist of: (a) Sutter Medical Center, Sacramento ("Sutter Sacramento"); (b) California Pacific Medical Center ("CPMC"); (c) Memorial Medical Center Modesto ("Sutter Modesto"); (d) Sutter Santa Rosa Regional Hospital (previously called "Sutter Medical Center of Santa Rosa") ("Sutter Santa Rosa"); (e)

estimate damages to Class Members, stemming from the impact of Sutter's inflated hospital prices on health insurance premiums, to be between $478.6 million and $503.3 million over the period September 2008 to December 2017.[26] The data necessary to complete my calculation of damages for calendar year 2018 has yet to be produced by Plaintiffs; if possible, I intend to offer damages calculations for 2018 in a supplemental report that would be issued prior to trial. The highlights of my analysis and the specific conclusions are summarized here.

11.     *It is my opinion that GAC inpatient hospital services sold to health plans constitute a relevant product market and there are eleven distinct areas in Northern California that constitute the relevant geographic markets for the purpose of assessing the competitive impact of the challenged conduct.*[27] These eleven relevant markets include four Tied Markets and seven Tying Markets.[28,29] It is also my opinion that Kaiser Permanente ("Kaiser") hospitals do not participate in the relevant product market, as Kaiser does not contract with non-Kaiser health plans for GAC inpatient services; nor does Kaiser significantly constrain Sutter hospital prices charged to non-Kaiser health plans. As I explain in this report, my conclusions with

---

Alta Bates Medical Center ("Alta Bates"). I am not able to reliably estimate overcharges for Sutter Santa Rosa; as such, my assessment of damages excludes Sutter Santa Rosa. *See* Section IX.B.4, below.

[26] *See* Exhibit 35 below.

[27] "Order (1) Granting In Part And Denying In Part Defendant's Motion For Summary Judgment, (2) Denying In Part And Denying As Moot In Part Defendant's Motion To Exclude Plaintiffs' Expert, And (3) Denying As Moot Plaintiffs' Motion To Exclude Defendant's Expert," *Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health*, Case No. 3:12-CV-4854-LB, April 12, 2019.

[28] The Tied Markets include: (a) the Sacramento HSA, where Sutter owns and operates Sutter Sacramento; (b) the San Francisco HSA, where Sutter owns and operates four campuses of CPMC, three of which (the Davies, Pacific, and California campuses) are described as "CPMC-Main" and one of which (the St. Luke's campus) is described as "CPMC-St. Luke's;" (c) the Modesto HSA, where Sutter owns and operates Sutter Modesto; and (d) the Santa Rosa HSA, where Sutter owns and operates Sutter Santa Rosa. *See* Chipty SJ Declaration, Section V.

[29] The seven Tying Markets include: (a) the combination of the Berkeley and Oakland HSAs, where Sutter owns and operates three campuses of Alta Bates, two of which (the main and Herrick campuses) are located in Berkeley and are described together as "Alta Bates-Main" and one of which (the Summit campus) is located in Oakland and is described as "Alta Bates-Summit;" (b) the Crescent City HSA, where Sutter owns and operates Sutter Coast Hospital ("Sutter Coast"); (c) the Lakeport HSA, where Sutter owns and operates Sutter Lakeside Hospital ("Sutter Lakeside"); (d) the Antioch HSA, where Sutter owns and operates Sutter Delta Medical Center ("Sutter Delta"); (e) the Jackson HSA, where Sutter owns and operates Sutter Amador Hospital ("Sutter Amador"); (f) the Tracy HSA, where Sutter owns and operates Sutter Tracy Community Hospital ("Sutter Tracy"); and (g) the Auburn HSA, where Sutter owns and operates Sutter Auburn Faith Hospital ("Sutter Auburn"). *See* Chipty SJ Declaration, Section VI.

respect to market power and the competitive effects associated with the challenged conduct are robust to reasonable alternative geographic areas.[30]

12.    *It is my opinion that Sutter has pre-existing market power in the relevant Tying Markets.* This conclusion stems from a combination of structural evidence based on market share analysis, direct evidence from health plan testimony, as well as a series of pricing analyses that show Sutter's market power in these markets:

- First, Sutter faces virtually no local competition in four of the seven Tying Markets. Consistent with Sutter's own documents, including its Systemwide Agreements, and testimony, Sutter is the only provider of GAC inpatient hospital services in the Lakeport, Crescent City, and Jackson HSAs (Sutter's "Rural Tying Markets"), where Sutter operates Sutter Lakeside, Sutter Amador, and Sutter Coast (the Sutter "Rural Tying Hospitals"). The only local competition for Sutter's Alta Bates hospitals in the Berkeley-Oakland HSAs is Alameda County Medical Center, which has been out-of-network for Anthem and Blue Shield over the relevant period.[31] Consistent with these facts, health plan executives have testified that they cannot market commercially successful health insurance products to consumers in Northern California without including at least certain Sutter hospitals in their provider networks.

- Second, each of the Tying Hospitals accounts for a high share of inpatient discharges associated with area residents. The local Sutter hospital accounts for 43 percent to 72 percent of inpatient discharges for residents in each of the Rural Tying Markets. Alta Bates accounts for 76 percent of inpatient discharges for residents of the Berkeley-Oakland HSAs. The local Sutter hospital accounts for 37 percent to 57 percent of inpatient discharges for residents in each of the remaining Tying Markets of the Tracy, Antioch, and Auburn HSAs.[32] Further, as I explained in my SJ Declaration, it is a mistake to "focus on the patients who leave a proposed market instead of on hospitals'

[30] My conclusions with respect to the competitive effects of the challenged conduct would hold even if not all of the Tying Markets were determined to be relevant geographic markets.
[31] Chipty SJ Declaration, ¶ 91.
[32] *See* Exhibit 7, below.

market power over the patients who remain."[33] To this end, it is notable that the Tying Hospitals account for nearly 100 percent share of inpatient discharges among area residents who chose an area hospital.[34] Moreover, the finding that the Sutter Tying Hospitals account for a high share of inpatient discharges is robust to other geographies, including each hospital's 75 percent primary service area.

- Third, prices at each of the Sutter Tying Hospitals are higher than prices in more competitive areas. There is direct evidence that Sutter was able to raise prices substantially at Alta Bates, in the Berkeley-Oakland area, following its acquisition of Summit Medical Center, demonstrating that Sutter exercised substantial market power over the Class Health Plans there. Furthermore, prices at the other Sutter Tying Hospitals are higher than prices in more competitive urban areas and in other rural areas, where there are fewer hospital choices available to local residents.

- Fourth, Kaiser does not indirectly discipline Sutter in the Tying Markets through health insurance price competition between non-Kaiser and Kaiser health plans. In theory, Sutter could lower its price to non-Kaiser health plans, so that they can compete more effectively with Kaiser health plans, which in turn could give Sutter access to more patients. However, the theory does not fit the facts. Evidence shows that there are *no* Kaiser hospitals in any of the Rural Tying Markets; as such, there can be no competition between Kaiser and non-Kaiser health plans there. Furthermore, evidence suggests that a substantial portion of Northern California residents, including Class Members, live more than 30 minutes from any Kaiser hospital. Evidence also shows that Sutter prices are elevated at the Tying Hospitals even where there are local Kaiser hospitals. For example, Sutter was able to raise prices at Alta Bates Summit by up to 70 percent per procedure, in the early 2000s, after it was acquired by Alta Bates. This price increase was possible, despite the fact that Kaiser owns and operates a large hospital facility in Oakland, California. Moreover, Sutter documents show that it would not and did not lower hospital

---

[33] Chipty SJ Declaration, ¶ 64 (citing the Advocate-NorthShore Opinion, pp. 25-26).
[34] *See* Exhibit 8, below.

prices to non-Kaiser health plans because Sutter could not gain enough volume from Kaiser to make the price decrease profitable.

Collectively, this evidence supports the conclusion that Sutter has substantial market power stemming from its Tying Hospitals. It also supports the conclusion that Sutter has sufficient market power in the Tying Markets to force health plans to accept the challenged restrictions. Moreover, evidence shows that substantial barriers to entry have protected Sutter's market power over many years and that Sutter exercised this market power by forcing Class Health Plans into burdensome systemwide contracts.

13.      *It is my opinion that Sutter's systemwide contracts, with provisions requiring all-or-nothing contracting, onerous non-participating provider rates, and equal treatment and anti-tiering clauses, constitute an anticompetitive tying arrangement whereby Sutter ties the purchase of GAC inpatient services in the Tied Markets to the purchase of GAC inpatient services in the Tying Markets.*

- GAC inpatient services at the Sutter Tying Hospitals and Tied Hospitals constitute distinct products, for which Class Health Plans and their members have differing levels of demand. Likely for this reason, access to these inpatient services at the different Sutter hospitals had been sold separately, before Sutter began its practice of systemwide contracting.

- Beginning in the early 2000s and continuing through today, Sutter forces health plans to purchase inpatient services at all Sutter hospitals—including the Tying and Tied Hospitals—under a single contract. Sutter further ensures that health plans cannot steer their members away from Sutter hospitals through restrictions that prevent Class Health Plans from using tools—such as narrow and tiered provider networks, price transparency tools, reference pricing, and centers of excellence—that Class Health Plans would have liked to use and would likely otherwise have used to encourage members to consider cost as well as quality when choosing healthcare providers within their provider network. The combination of the challenged provisions impedes health plans' ability to drop, steer, or threaten to steer members away from expensive Sutter hospitals in the Tied Markets, for which there are reasonable substitutes. *As a result, the challenged provisions have the effect of elevating Sutter's prices in both the Tied and the Tying Markets.*

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- Sutter has significantly overcharged the Class Health Plans for GAC inpatient services at Sutter Damage Hospitals. Economic principles and qualitative evidence indicate that Sutter's challenged conduct has enabled it to raise hospital prices to health plans to supra-competitive levels. Consistent with this body of evidence, regression analysis of Class Health Plan claims data shows that inpatient prices at four Sutter Damage Hospitals are significantly higher than inpatient prices at benchmark hospitals in Northern California. Because Sutter's conduct also has the effect of elevating prices at benchmark hospitals, these hospital price overcharge estimates understate the true extent of Sutter's overcharge.

- Sutter's challenged conduct harms competition by foreclosing lower-priced hospitals from receiving patient volume that the Class Health Plans would have directed to them. As a result, the challenged conduct destroys competing hospitals' incentives to lower prices to become the preferred provider in a steered insurance product and has the effect of elevating non-Sutter hospital prices.

- Sutter's challenged conduct harms consumers in at least two different ways. First, they diminish consumer choice by reducing the variety and success of steered, lower-cost insurance products that would otherwise have been available to consumers of health insurance policies in Northern California. Second, they raise premiums for health insurance products in several rating areas of Northern California, as a result of elevated hospital prices and excessive volume of GAC inpatient services at the Sutter Damage Hospitals.

- I have not seen any evidence to suggest that the challenged conduct is necessary or justified because it has resulted in pro-competitive benefits that offset the anticompetitive effects it has caused. Sutter cannot justify its conduct by claiming that it gives price discounts in exchange for greater volume delivered by the challenged restrictions, because Sutter's prices are *higher* than those of other hospitals that do not impose the same combination of restrictions. As explained by Dr. Kizer, the challenged restrictions are not necessary to protect the integrated care model or to provide quality health care

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    12

services.[35] Nor are the restrictions necessary for Sutter to serve lower-profit patients with government insurance or no insurance. Finally, Sutter does not need the restrictions to make capital investments. I note that many non-Sutter hospitals in Northern California, with whom the Class Health Plans contract at lower hospital prices, provide comparable quality of care, serve more government insured and uninsured patients than Sutter, undertake equal or greater investments in system assets, and invest substantial sums of money to upgrade facilities. Yet, none of these other hospitals or hospital systems impose the combination of systemwide contracting and anti-steering restrictions as does Sutter.

These facts confirm my opinion that Sutter's challenged conduct is anticompetitive and not necessary or justified by pro-competitive benefits.

14.    *Finally, I compute aggregate premium overcharges paid by Class Members who purchased health insurance policies from Anthem, Blue Shield, Health Net, Aetna, and United in the Nine RAs, using the formulaic methodology described in detail in my Class and Class Reply Declarations.*[36] This methodology uses the econometric estimates of Sutter's in-network hospital price overcharges and my analysis of pass-through to trace the effect of increased medical expenditures on premiums, in a manner consistent with the actuarial principles described by Plaintiffs' actuarial expert, Mr. David Axene. The analysis shows that from September 2008 to December 2017 (the "Class Period"), Class Members:[37]

- Paid between ▮▮▮▮▮▮▮▮▮▮▮ more in health insurance premiums to Anthem than they would have but-for the challenged conduct;

- Paid between $211.9 million and $228.4 million more in health insurance premiums to Blue Shield than they would have but-for the challenged conduct;

- Paid between ▮▮▮▮▮▮▮▮▮▮ more in health insurance premiums to Health Net than they would have but-for the challenged conduct;

---

[35] Kizer Declaration, ¶ 17.

[36] Chipty Class Declaration, Section X; and Chipty Reply Declaration, Sections IV.C and IV.D.

[37] *See* Exhibit 35, below.

- Paid between $███████████████ more in health insurance premiums to Aetna than they would have but-for the challenged conduct; and

- Paid between ███████████████ more in health insurance premiums to United than they would have but-for the challenged conduct. The United estimates exclude 2017 premium damages due to data limitations.

This calculation yields aggregate premium damages, or overcharges paid by all Class Members, that are between $478.6 million and $503.3 million, from September 2008 to December 2017. These calculations are conservative for several reasons, including: (a) they do not account for the onerous non-participating rates the Class Health Plans were required to pay when they attempted to exclude any of the Tied Hospitals; and (b) prices charged by benchmark hospitals would likely have been lower but for Sutter's conduct. Other reasons why these estimates are conservative are explained in Section XI.C.

15.     The remainder of this report explains my opinions in greater depth and provides details of the facts and analyses that led me to reach them. Section III provides relevant background to guide the discussion in the remainder of the report. Section IV describes Sutter's use of systemwide contracts, the challenged contractual provisions, and evidence showing that Sutter enforces these provisions, despite Class Health Plans' attempts to push back. Section V describes my analysis of market definition. Section VI presents evidence of Sutter's market power in the relevant Tying Markets. Section VII discusses the underlying economic principles relevant to my analysis of health plans' steering strategies in healthcare markets. In particular, it explains how all-or-nothing contracting and the anti-steering restrictions in Sutter's contracts with the Class Health Plans interfere with the competitive process in healthcare markets in Northern California. Further, it explains how steered products can result in lower costs for health plans and consumers of health insurance policies, and it presents ordinary-course evidence that Sutter knows that if health plans could steer, Sutter would have to lower its prices. Section VIII presents evidence that the challenged conduct has harmed competition and resulted in less penetration of innovative, lower-cost insurance products in Northern California. Section IX presents evidence that the challenged conduct has also resulted in higher hospital prices. Section X considers and rejects potential justifications Sutter might offer and Dr. Willig previously has offered for the steering restrictions. Section XI presents my damage model, along with an

estimate of premium damages suffered by Class Members who purchased health insurance in Northern California during the Class Period from any of Anthem, Blue Shield, Health Net, Aetna, and/or United. Section XII discusses the need for injunctive relief. Section XIII concludes.

## III.    Background

16.    In this section, I provide relevant background to guide the discussion of market definition, market power, and the competitive effects resulting from the challenged conduct. I begin with a description of: (a) the entities that purchase health insurance products ("consumers"); (b) health plans that sell health insurance coverage; and (c) the healthcare service providers ("providers") that treat health plan members who need healthcare services ("patients").[38] Along the way, I provide an overview of the healthcare landscape in Northern California, including in the relevant Tying and Tied Markets. I conclude the section with a description of the interaction among consumers of healthcare services, health plans, and providers and the unique features of the healthcare industry that are relevant for studying the competitive effects of Sutter's behavior.

### A.    Consumers of Health Insurance Products

17.    At the most basic level, the consumers of health insurance products are the individuals and (small and large) businesses—who purchase health insurance coverage through individuals and group insurance products. Group insurance products are often purchased jointly by employees and their employers, who help their employees defray some or all of the cost of health insurance premiums. Insurance products where the health plan provides administrative services and bears the risk for medical expenditures incurred by its members are "fully-insured" products; by contrast, insurance products where the health plan only provides administrative services and the employer or group bears the risk for medical expenditures incurred by its

---

[38] Medicare.gov, "Glossary," available at https://www.medicare.gov/glossary/h.html, *site visited* April 16, 2019 ("Health care provider: A person or organization that's licensed to give health care. Doctors, nurses, and hospitals are examples of health care providers.").

members are called "self-insured" products.[39] The putative Class in this case includes entities that purchased fully-insured products from one of the Class Health Plans.

18.    Health insurance provides entities access to prices that health plans negotiate with hospitals and other providers. Health insurance helps pay for healthcare services when a plan member in need of medical care becomes a patient. According to statistics from the U.S. Department of Health and Human Services, almost everyone is a patient at some point in their life: only 1.4 percent of adults say they have never had contact with a healthcare professional about their own health.[40] As such, health insurance protects employee productivity, and it protects plan members from the uncertainty of financial loss, particularly in the event of a serious illness or injury that would require very expensive treatment.

19.    Most people in the United States are covered by some form of health insurance, either through a commercial health plan or a government program. Exhibit 1 describes the mix of health insurance coverage, separately for the populations of the United States and the State of California. As seen here, approximately 54 percent of California's population is covered by a commercial health insurance policy; approximately 38 percent of California's population is covered by a government program;[41] and approximately seven percent of California's population

---

[39] Self-insured employers and groups contract with a health plan for administrative services only ("ASO"). *See* Cothran, Josh, "The Private Insurance Market in California, 2015," *California Healthcare Foundation*, available at https://www.chcf.org/publication/the-private-insurance-market-in-california-2015/, *site visited* March 17, 2018.

[40] Centers for Disease Control and Prevention, National Center for Health Statistics, "Age-adjusted percent distribution (with standard errors) of length of time since last contact with doctor or other health care professional among adults aged 18 and over, by selected characteristics: United States, 2016," Table A-18a, available at http://ftp.cdc.gov/pub/Health_Statistics/NCHS/NHIS/SHS/2016_SHS_Table_A-18.pdf, *site visited* April 16, 2019.

[41] Government programs include both state and federal programs such as: (a) Medicare, for those over 65 years old or with certain disabilities or diseases; (b) Medicaid and Children's Health Insurance Program (CHIP), for those whose income falls below certain specified thresholds; (c) the Veterans Health Administration, for retired career military personnel; and (d) Medi-Cal, which is California's Medicaid program. *See* Medicare.gov, "What's Medicare," available at https://www.medicare.gov/sign-up-change-plans/decide-how-to-get-medicare/whats-medicare/what-is-medicare html, *site visited* June 9, 2018; U.S. Department of Health and Human Services, "Who is eligible for Medicare?" available at https://www hhs.gov/answers/medicare-and-medicaid/who-is-elibible-for-medicare/index html, *site visited* June 9, 2018; Kaiser Family Foundation, "Total Number of Medicare Beneficiaries," available at https://www.kff.org/medicare/state-indicator/total-medicare-beneficiaries/, *site visited* August 6, 2018; Medicaid.gov, "Medicaid," available at https://www medicaid.gov/medicaid/index html, *site visited* June 9, 2018; The Center for Medicaid and CHIP Services, "Eligibility," available at https://www.medicaid.gov/medicaid/eligibility/, *site visited* June 9, 2018; U.S. Department of Veterans Affairs, "Veterans Health Administration," available at

is uninsured.[42] By comparison, less than six percent of Northern California's population is uninsured.[43]

**Exhibit 1**
**Health Insurance Coverage in the U.S., 2017**
**Percent of Area Population, by Health Plan Type**

| Type | U.S. | CA |
|------|------|-----|
| Commercial | 56% | 54% |
| Government | 36% | 38% |
| Uninsured | 9% | 7% |

*Notes*:

1. Numbers may not add to 100 percent due to rounding.

2. "Commercial" health insurance includes Employer and Non-Group coverage; "Government" health insurance includes Traditional Medicare, Medicare Advantage, Medicaid, Children's Health Insurance Program, Military Coverage, and Veterans Administration coverage.

*Source*: Kaiser Family Foundation, "Health Insurance Coverage of the Total Population," 2017, available at https://www.kff.org/other/state-indicator/total-population/, *site visited* March 26, 2019.

20.    Exhibit 2 describes the mix of insurance coverage across all discharges at non-Kaiser GAC hospitals in Northern California, at Sutter hospitals, and at non-Sutter, non-Kaiser hospitals in Northern California. The shares are calculated by identifying the type of insurance for each patient discharged from a Northern California hospital in 2011. A comparison across the columns shows that Sutter, including at the Tied and the Tying Hospitals, has a higher share of commercial patients and a lower share of government and uninsured patients, compared to other non-Kaiser hospitals in Northern California.[44]

---

https://www.va.gov/health/, *site visited* June 9, 2018; and Covered California, "Medi-Cal," available at https://www.coveredca.com/medi-cal/, *site visited* April 16, 2019.

[42] Uninsured patients either pay for their own care ("self-pay") or receive charity care. *See* Melnick, Glenn A. and Katya Fonkych, "Hospital Pricing And The Uninsured: Do The Uninsured Pay Higher Prices?" *Health Affairs*, Vol. 27, No. 2, March/April 2008, available at https://www.healthaffairs.org/doi/full/10.1377/hlthaff.27.2.w116, *site visited* April 18, 2019 ("Consequently, not only do uninsured patients pay for all their care out of pocket, but because of continually rising billed charges, they may actually face higher prices for the same health care service than insured patients face. … many hospitals have indigent care programs that provide subsidies or discounts to uninsured low-income patients.").

[43] *See* Chipty Workpapers.

[44] Exhibit 1 reports health plan-mix in the entire population, regardless of whether a covered member seeks care. By contrast, Exhibit 2 reports health plan-mix for actual patients seeking inpatient hospital care. The differences between the two are likely driven by the fact that the older, Medicare population accounts for a greater share of inpatient hospital care, relative to the general commercially insured population. *See* Weiss,

**Exhibit 2**
**Health Insurance Coverage in Northern California, 2011**
**Percent of GAC Inpatient Hospital Discharges, by Health Plan Type**

| | | Sutter Hospitals | | | |
| Type | Northern California Non-Kaiser Hospitals | All | Tied Hospitals | Tying Hospitals | Non-Sutter Non-Kaiser Hospitals |
|---|---|---|---|---|---|
| Commercial | 27% | 32% | 35% | 29% | 25% |
| Government | 65% | 61% | 59% | 65% | 66% |
| Uninsured | 7% | 5% | 5% | 5% | 7% |
| Other | 1% | 1% | 1% | 0% | 1% |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** |

*Notes*:

1. Numbers may not add to 100 percent due to rounding.

2. The column "All Sutter Hospitals" includes the Tied Hospitals, the Tying Hospitals, as well as the other Sutter hospitals.

3. Discharges from a Kaiser hospital and discharges with Kaiser insurance are excluded from this analysis.

4. "Government" discharges include discharges covered by Medicare, Medi-Cal, and "Other Government" programs.

5. "Uninsured" discharges include discharges categorized as "Self Pay," "County Indigent," and "Other Indigent."

6. "Other" discharges include discharges categorized as "Workers' Compensation" and "Other Payer."

*Source*: OSHPD Patient Discharge Data, 2011.

## B.    The Role of Health Plans

21.    Health plans perform a variety of functions in the healthcare system. They assemble "provider networks" through which their members can access healthcare services when needed, at prices negotiated by the health plan. They design and sell healthcare policies to individuals and employers, who often obtain and subsidize health insurance for their employees and employees' families. Health plans also provide certain administrative services, such as the processing and billing of insurance claims for the healthcare services that patients receive; and in some cases, they bear the risk of medical costs for their members. I discuss these functions below, along with a description of the health plans in Northern California.

---

Audrey J., and Anne Elixhauser, "Overview of Hospital Stays in the United States, 2012," *Statistical Brief #180, Healthcare Cost and Utilization Project, Agency for Healthcare Research and Quality*, October 2014, available at https://www.hcup-us.ahrq.gov/reports/statbriefs/sb180-Hospitalizations-United-States-2012.pdf, *site visited* August 3, 2018, Table 1 (showing hospitalization rates per 1,000 population of 108.8 for 45 to 64-year olds, and 260.9 for 65 to 84-year olds.).

### 1.    Assembling Provider Networks

22.    Health plans assemble networks of healthcare providers by entering into contracts with hospitals, primary care and specialty physicians, and other medical facilities that provide diagnostic and other types of health care services. Contracts between health plans and providers specify the terms on which the providers will treat the health plans' members. One of the key terms in those contracts is the negotiated price (sometimes known as "allowed amount"[45]) that the provider will be paid for the service provided. ███████████████████████

███[46] (a) customized prices or "case rates" for specific services that consist of fixed amounts for various medical services and products to treat a particular illness or condition, sometimes specified by a "Diagnostic Related Group" ("DRG");[47] (b) discounts off of the hospital's master price list or "chargemaster;" or (c) a "per-diem" payment that consists of a fixed amount for a patient-day in the hospital, regardless of the hospital's charges or costs associated with the care provided to that particular patient.[48] Hospital contracts with health plans can include a

---

[45] The "allowed amount" or "negotiated rate" or "contracted rate" represents the maximum amount that a provider receives for a service provided to a member, based on the health plan's contract with the provider. A portion of the allowed amount is paid directly by the health plan through the "reimbursement amount," while the remainder is paid by the patient through deductibles, copayments, or coinsurance.

[46] Deposition of Melissa Brendt, Chief Contracting Officer at Sutter, May 15-16, 2018 (hereafter "Brendt Deposition (Sutter, May 15-16, 2018)"), pp. 53-55; Declaration of Melissa Brendt in Support of Defendants' Opposition to UEBT's Motion for Class Certification, April 13, 2017 (hereafter "Brendt (Sutter) Declaration"), ¶¶ 16-22.

[47] DRGs were designed for inpatient hospital services by the Centers for Medicare & Medicaid Services ("CMS"). According to CMS, "DRGs are a patient classification scheme which provides a means of relating the type of patients a hospital treats (*i.e.*, its case mix) to the costs incurred by the hospital." Each DRG describes a type of patient (*e.g.*, by diagnosis and treatment—such as a knee replacement) and has an associated weight ("DRG weight"), which reflects an estimate of the cost to the hospital of treating such a patient. *See* CMS.gov, "Design and Development of the Diagnosis Related Group (DRG)," available at https://www.cms.gov/ICD10Manual/version34-fullcode-cms/fullcode_cms/Design_and_development_of_the_Diagnosis_Related_Group_(DRGs)_PBL-038.pdf, *site visited* March 15, 2019. *See also,* CMS.gov, "Acute Inpatient PPS," available at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/index html?redirect=/AcuteInpatientPPS/, *site visited* April 19, 2017.

[48] There may also be stop-loss provisions that protect the health plan in the event the cost of medical care exceeds a pre-determined threshold. *See* Berenson, Robert A., *et al.*, "Per Diem Payments to Hospitals for Inpatient Stays," *Urban Institute Research Report*, April 2016, available at https://www.urban.org/sites/default/files/03_per_diem_payment_to_hospitals_for_inpatient_stays.pdf, *site visited* April 17, 2019; McPhee & Associates, Inc., "Managed Care Glossary," available at https://mcpheeassociates.com/managed-care-glossary/, *site visited* April 11, 2019; Health Partners, "Provider Reimbursement," available at https://www healthpartners.com/hp/legal-notices/disclosures/reimbursement/index.html, *site visited* April 17, 2019; and Brendt (Sutter) Declaration, ¶¶ 19-20.

combination of any of these price mechanisms,[49] although hospitals and health plans, particularly in the course of negotiations, █████████████████████████████████[50]

23.     The agreements between health plans and providers also include other terms, such as requirements that a healthcare provider cannot refuse to treat a health plan's member who seeks healthcare services; requirements that the healthcare provider and health plan maintain all necessary licenses; and procedures for submitting, processing, and paying claims. In this case, the Plaintiffs challenge restrictions that appear in health plan contracts with Sutter: (a) the all-or-nothing requirement and the related non-participating rate provision, referred to in the documents and by the Class Health Plans as the "non-par rate" provision; (b) the equal treatment and tiering restrictions that limit incentives health plans may use to steer members; and (c) the price information health plans can provide members while they are choosing among different providers.

### 2.     Selling Commercial Health Insurance Products

24.     Health plans sell access to their provider networks through health insurance products that are described by the composition of their provider networks, rules governing how a member can choose a provider within a provider network, and rules governing the extent to which the health plan will pay for the selected care. The combination of these product features affects the product's price—which is commonly referred to as a "premium." As discussed in my Class Declarations, premiums for all or nearly all Class Members were adversely affected by Sutter's conduct, irrespective of any of these insurance product features.[51]

25.     The size of an insurance product's provider network is often described as "broad" or "narrow." Insurance products with broad provider networks typically include substantially all

---

[49] ███████████████████████████████████████████████████████████

[50] ███████████████████████████████████████████████████████████

[51] Chipty Class Declaration, ¶¶ 120-122; Chipty Reply Declaration, ¶ 75.

of the hospitals and many physicians and other providers in a particular area. Insurance products with narrow networks, as the name implies, include fewer providers than broad networks, but still enough providers to offer a full range of services and meet the accessibility requirements imposed by regulation. As described below, because patient out-of-pocket costs are typically greater for out-of-network providers, narrow networks motivate patients to visit the specific providers that participate in the network. Health plans typically seek discounts from participating providers in exchange for including them in a narrow network. All else equal, health plans with broad provider networks are typically more expensive for consumers than health plans with narrower networks.

26.     Fully-insured health plans establish rules under which health plan members can access their provider network; these rules are sometimes referred to as "benefit design." For example, there can be rules that determine whether health plan members can access all in-network providers at the same out-of-pocket cost; a provider network in which higher-cost providers can only be accessed at a higher out-of-pocket cost may be described as a "tiered" network. All else equal, premiums charged for insurance products with tiered networks are typically lower because plan members are steered via the tiering mechanism to choose lower-cost providers. There can be rules that stipulate whether the member needs pre-approval from a primary care physician for such access and whether the health plan will pay for out-of-network coverage. All else equal, insurance products that require pre-approval are typically less expensive for consumers than insurance products that do not require pre-approval, and insurance products with more generous out-of-network coverage are typically more expensive than health plans with less generous (or no) out-of-network coverage.

27.     One type of insurance product is known as a "Preferred Provider Organization" ("PPO").[52] PPOs generally offer broad provider networks, and they generally allow their members to utilize healthcare services without the approval of a primary care physician or pre-approval from the health plan. Such insurance products provide out-of-

---

[52] Medical Mutual, "HMO vs. PPO Insurance Plans," available at https://www.medmutual.com/For-Individuals-and-Families/Health-Insurance-Education/Compare-Health-Insurance-Plans/HMO-vs-PPO-Insurance.aspx, *site visited* June 9, 2018.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

network coverage, but as discussed below, members will typically pay more if they choose an out-of-network provider for non-emergency services.

28.     Other types of health insurance products include "Health Maintenance Organizations" ("HMOs"), "Point-of-Service" ("POS") plans, and "High Deductible Health Plans" ("HDHPs").[53] HMOs typically offer narrower networks than PPOs; some HMOs require members to use primary care physicians as gatekeepers to access specialized medical services;[54] and they do not cover non-emergency, out-of-network services.[55] POS plans are similar to HMOs in that they generally have narrower networks, and often require referrals from a primary care physician before covering specialty care. Unlike most HMOs, however, POS plans allow referrals outside of their network, though such out-of-network referrals are typically costlier to patients than in-network referrals. As the name suggests, HDHPs have a high deductible, in comparison to PPOs, HMOs, and POS products.[56] Because of the high deductible, HDHP members are much more directly affected by provider prices than members of other types of plans, at least up until the point that the deductible is reached. HDHPs have become more popular in recent years.[57]

29.     Each of these types of health insurance products requires patients to bear varying degrees of out-of-pocket costs for the healthcare that they receive. When costs to the patient increase with the total cost of the healthcare service provided, one might expect the patient to seek out and select a lower-priced provider that delivers an acceptable level of service quality. Research shows, however, that incentives alone generally do not lead

---

[53] The Kaiser Family Foundation and Health Research & Educational Trust, "Employer Health Benefits 2017 Annual Survey," available at http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017, *site visited* July 1, 2018 (hereafter "Employer Health Benefits 2017 Annual Survey"), p. 72, Figure 5.1.

[54] Medical Mutual, "What is an HMO? Understanding HMO Health Plans," available at https://www.medmutual.com/For-Individuals-and-Families/Health-Insurance-Education/Health-Insurance-Basics/Types-Health-Insurance/HMO-Health-Insurance-Plans.aspx, *site visited* April 17, 2019 ("HMO networks are usually smaller than PPO networks. … You may need a PCP referral for certain tests or to see a specialist. In some cases, you may also need to be pre-approved before receiving certain services.").

[55] Employer Health Benefits 2017 Annual Survey, p. 69 ("The survey defines an HMO plan as a plan that does not cover non-emergency out-of-network services.").

[56] As explained below, a deductible is a specified amount of money that the patient must pay towards healthcare services consumed before a health plan will pay any portion of the direct cost of care.

[57] Employer Health Benefits 2017 Annual Survey, p. 72, Figure 5.1.

patients to account for both price and quality because patients have difficulty obtaining meaningful price information before choosing a provider.[58] For this reason, health plans are increasingly introducing mechanisms that provide patients with both information and incentives to help them evaluate healthcare providers and manage their out-of-pocket costs.[59]

30.     I refer to health plans that provide patients with both an incentive and a price signal in an attempt to steer patients towards lower-cost providers as "steered products." An example of a steered product is a tiered network plan that groups providers into tiers typically based on cost and quality considerations. A tiered plan provides patients with financial incentives for selecting the highest-value providers, which are in the plan's most-preferred tier. The cost to members of accessing providers in less-preferred tiers is generally higher than the cost of accessing providers in the most-preferred tier, but less costly to members than accessing an out-of-network provider.

### a)  Premiums and Out-of-Pocket Expenses

31.     Some combination of individuals and group purchasers (including both employers and their employees) purchase access to a commercial health plan's provider network and the other services that the health plan provides. Together, they pay premiums to

---

[58] Government Accountability Office, "Health care price transparency: Meaningful Price Information Is Difficult for Consumers to Obtain Prior to Receiving Care," September 2011, available at http://www.gao.gov/assets/590/585400.pdf, *site visited* August 2, 2018, p. 28 ("Transparent health care price information—especially estimates of consumers' complete costs—can be difficult for consumers to obtain prior to receiving care....This lack of health care price transparency presents a serious challenge for consumers who are increasingly being asked to pay a greater share of their health care costs."). *See also*, Gander, Kashmira, "Hospital Prices: Full Cost Lists Must Be Published From January 1, New Federal Rule Says," December 27, 2018, available at https://www.newsweek.com/end-hidden-costs-january-1st-all-us-hospitals-must-publish-price-lists-all-1272328, *site visited* April 10, 2019 ("Hospitals across the country have geared up to publish online price lists for all the medical services they provide, as a federal law takes effect on January 1 [...] Currently, under the Affordable Care Act, hospitals must release public price lists, but from the start of 2019 they will be required to post these prices online in a format that can be downloaded to computers. The prices must be updated every year.").

[59] America's Health Insurance Plans (AHIP), "How Much Does It Cost? Health Plan Tools Empowering Consumers with Provider Price Information," AHIP Issue Brief, August 2015, available at https://www.ahip.org/wp-content/uploads/2015/08/ConsumerTools_IssueBrief.8.24.15-2.pdf, *site visited* August 4, 2018.

health plans in exchange for health plan members having the option to access, at negotiated rates, the network of healthcare providers with which the health plan has contracted.[60]

32.    Typically, individuals and employees pay some portion of premiums for health insurance coverage, and when they become patients, they pay part of the direct costs of their care out-of-pocket (*i.e.*, part of the allowed amounts that providers have agreed to charge for healthcare services rendered to plan members). Patients bear direct costs in one of three ways: (a) deductibles; (b) copayments; and (c) coinsurance.

- A deductible is a specified amount of money that the patient must pay towards healthcare services consumed before a health plan will pay any portion of the direct cost of care.[61] Once a patient meets the deductible amount, the patient's financial responsibility is limited to copayments or coinsurance, and the health plan pays the rest. The deductible may or may not apply to all healthcare services covered under a member's plan. For example, the deductible might apply to services provided by a hospital, but not to physician office visits or to specific services such as immunizations.

- Copayments are fixed payment amounts associated with specific services for which the member is responsible. For example, a member may be required to pay a $30 charge for every physician office visit.[62]

- With coinsurance, the patient is responsible for a fixed percentage of cost; for example, a 20 percent coinsurance contribution for diagnostic imaging services

---

[60] Deposition of Michael Beuoy, Vice President at Blue Shield, May 2, 2018 (hereafter "Beuoy Deposition (Blue Shield, May 2, 2018)"), p. 39 ("In general, the required premium is the sum of…cost of health care, administrative costs, and margin requirements.").

[61] Healthcare.gov, "Deductible," available at https://www.healthcare.gov/glossary/deductible/, *site visited* April 17, 2019.

[62] Healthcare.gov, "Copayment," available at https://www healthcare.gov/glossary/co-payment/, *site visited* June 9, 2018.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    24

would require the patient to pay $40 for an x-ray that had an allowed amount of $200.[63]

33.    The member's financial responsibility is generally lower when seeking care from a healthcare provider within his or her provider network, relative to a healthcare provider that is outside of the provider network (an "out-of-network" provider). In other words, to the extent that out-of-network services are covered at all, the deductibles, copayments, and coinsurance amounts are generally higher.[64] Again, Sutter's conduct has adversely affected premiums paid by all or nearly all Class Members, regardless of the out-of-pocket costs that they incurred or could have incurred as a result of the benefit design of their health insurance product.

### 3.    Selling Commercial Health Insurance Products in Northern California

34.    Health plans compete against each other through the premiums that they charge, the quality of their provider networks, and other aspects of benefit design. As explained in my Reply Declaration and in the Axene Declaration, the major health plans in California apply actuarial principles to set premiums, by business line, within geographic regions called rating areas.[65] While the demarcation of these regions has varied over time, the basic principles have remained the same.[66]

---

[63] Healthcare.gov, "Coinsurance," available at https://www.healthcare.gov/glossary/co-insurance/, *site visited* June 9, 2018.

[64] Healthcare.gov, "Out-of-Network Coinsurance," available at https://www.healthcare.gov/glossary/out-of-network-coinsurance/, *site visited* June 15, 2018; Healthcare.gov, "Out-of-Network Copayment," available at https://www.healthcare.gov/glossary/out-of-network-copayment/, *site visited* June 15, 2018.

[65] Chipty Reply Declaration, ¶ 102; and Axene Declaration, ¶ 50. *See also*, Beuoy Deposition (Blue Shield, May 2, 2018), p. 25 ("A rating region is a geographic region where the rate is the same for all members within that geographic rating region. The pricing manager will calculate or direct a calculation of the premium relationship between the different geographic rating regions. Those are driven in general by the average costs in that geographic rating region.").

[66] As of 2014, there are 19 geographic rating areas in California that have been identified by law under the Affordable Care Act. *See* Chipty Class Declaration, ¶ 26 and Exhibit 7.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

a)  Premium Setting by Business Line

35.    A health plan's expectation of total medical costs for an area are forecasted based on historical costs that reflect the actual claims paid by the plan for plan members living or working in the area.[67] This is referred to as the "base rate" or "index rate."[68] Areas that have higher healthcare expenses because of higher hospital prices would have higher premiums, all else equal.[69]

36.    Furthermore, entities are eligible to purchase certain health plans, priced in certain ways, depending on where they or their employees live or work:

- *Individuals*: Individuals can purchase plans offered in the rating area where they live, and they pay a premium that reflects their age, their family composition, their rating area medical costs, and their chosen benefit level.[70]

- *Small Group*:[71] Small group employers and their employees generally purchase plans offered in the rating area where their employees work, and they pay a premium that reflects their employee age mix, their family composition, the cost factors of the rating areas where their employees live or work, and their chosen benefit levels.

- *Large Group*:[72] Premiums for large groups are based on: (a) "manual ratings," which reflect claims data for all large groups in California with an adjustment for rating area

---

[67] Beuoy Deposition (Blue Shield, May 2, 2018), pp. 39-40. *See also*, Axene Declaration, ¶¶ 29, 50.

[68] Beuoy Deposition (Blue Shield, May 2, 2018), pp. 85-86.

[69] Beuoy Deposition (Blue Shield, May 2, 2018), pp. 86-87.

[70] Beuoy Deposition (Blue Shield, May 2, 2018), p. 33. *See also*, Axene Declaration ¶¶ 48-50.

[71] Until 2016, small group employers were employers with 50 or fewer workers. (*See* American Academy of Actuaries, "Potential Implications of the Small Group Definition Expanding to Employers with 51-100 Employees," March 2015, available at https://www.actuary.org/files/Small_group_def_ib_030215.pdf, *site visited* June 12, 2018.) Today, small group employers are employers with 100 or fewer workers. *See* California Department of Managed Health Care, "Key Terms," available at http://www.dmhc.ca.gov/HealthCareinCalifornia/PremiumRateReview/KeyTerms.aspx, *site visited* March 17, 2018. *See also,* Beuoy Deposition (Blue Shield, May 2, 2018), p. 34 (explaining that "from 2008 to 2016, a small group would have been 1 to 50 employees in California, and after that, it would have been 1 to 100 employees."); and Axene Declaration ¶¶ 48-50.

[72] Large group employers are employers with more than 100 employees. *See* California, the Department of Managed Health Care, "Key Terms," available at http://www.dmhc.ca.gov/HealthCareinCalifornia/PremiumRateReview/KeyTerms.aspx, *site visited* March 17, 2018.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      26

factors, for the areas in which members of the large group reside;[73] (b) actual experience the health plan has with the large group; or (c) a combination of both.[74] If a large group has employees residing in multiple rating areas, the premium would reflect the blended area cost factors.[75] For example, if a large employer had 100 employees residing in Los Angeles and 200 residing in San Francisco, the employer's manual rating would be based on the weighted average (one-thirds, two-thirds) of the Los Angeles and the San Francisco rating factor, respectively.

In the case of group policies, employers and their employees, often jointly purchase the health insurance product, and both consume it, in the sense that both benefit from its purchase. As I explained in my Class Reply Declaration, a proportional split of premium overcharges resulting from Sutter's conduct yields a reasonable allocation of damages.[76]

### b)  Primary Health Plans in Northern California

37.     As explained in my Class Declaration, commercial health plans in California sell fully-insured products to individuals, small group employers, or large group employers.[77] Of these, Blue Shield and Anthem are the largest, collectively serving about 60 percent of statewide, non-Kaiser plan members.[78] Anthem, Blue Shield, Health Net, Aetna, and United collectively account for nearly 90 percent of all non-Kaiser plan members in California.[79]

38.     In California, regulatory oversight of health plans is handled by two separate entities: (a) the Department of Managed Health Care ("DMHC") that oversees health maintenance organizations ("HMOs"); and (b) the California Department of Insurance ("CDI") that oversees traditional health insurance products, including preferred provider organization

---

[73] Beuoy Deposition (Blue Shield, May 2, 2018), pp. 81-83; and Deposition of Chris Mathewson, Actuarial Director at Anthem, May 18, 2018 (hereafter "Mathewson Deposition (Anthem, May 18, 2018)"), pp. 95-96. *See also*, Axene Declaration, ¶¶ 50-51.

[74] Beuoy Deposition (Blue Shield, May 2, 2018), p. 81; and Mathewson Deposition (Anthem, May 18, 2018), pp. 95-96. *See also*, Axene Declaration, ¶ 51.

[75] Beuoy Deposition (Blue Shield, May 2, 2018), p. 183. *See also*, Axene Declaration ¶ 51 and Footnote 43.

[76] Chipty Reply Declaration, ¶¶ 48-51.

[77] Chipty Class Declaration, ¶ 23.

[78] Chipty Class Declaration, ¶ 24 and Exhibit 6.

[79] *Id.*

("PPO") products.[80] Both agencies focus on consumer rights and the stability of the healthcare delivery system in California.[81] As part of this mission, both agencies oversee the financial ability of health plans to pay claims, and both require health plans to adhere to network adequacy standards under which health plans must provide hospital services within 30 minutes or 15 miles of a member's residence or workplace.[82]

## C.    The Role of Healthcare Providers

39.    Depending on their healthcare needs, patients may receive healthcare services from (a) GAC hospitals, (b) physician practices, or (c) other types of medical facilities, including psychiatric, rehabilitation, and long-term care facilities. A health plan's provider network typically includes a selection of each of these types of healthcare providers. I describe each of the categories of providers below.

---

[80] California Health Care Foundation, "Insurance Markets Regulatory Oversight of Health Insurance in California," June 2003, available at https://www.chcf.org/wp-content/uploads/2017/12/PDF-HIMURegulatoryOversight.pdf, *site visited* March 18, 2018 (hereafter "CHCF Insurance Markets"), p. 3.

[81] Hansen, John, "The Department of Managed Health Care Regulates California Health Plans and Protects Consumers," *Health for California Insurance Center*, June 21, 2016, available at https://www.healthforcalifornia.com/the-department-of-managed-health-care-regulates-california-health-plans-protects-consumers, *site visited* April 12, 2018 (hereafter "DMHC Regulates California Health Plans"); and CHCF Insurance Markets, p. 3.

[82] DMHC Regulates California Health Plans, p. 1 ("The department gets its authority from the Knox Keene Health Care Service Plan Act of 1975"); 28 CCR § 1300.51 (H); and California Department of Insurance, "Provider Network Adequacy," available at http://www.insurance.ca.gov/01-consumers/110-health/10-basics/pna.cfm, *site visited* April 12, 2018.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     28

### 1.    *General Acute Care Hospitals*

40.    General acute care hospitals provide a broad range of 24-hour care that includes, but is not limited to, medical, nursing, surgical, and pharmacy services.[83],[84] The median length of stay for commercial patients at Northern California, non-Kaiser hospitals in 2011 was two days.[85] Hospitals provide both inpatient services and outpatient services, and the top-ten most common inpatient hospital services delivered at Northern California, non-Kaiser hospitals in 2011 are shown in Exhibit 3.[86] These services collectively account for about 40 percent of all inpatient discharges in that year.

---

[83] The term "general acute care hospital" excludes specialty facilities such as psychiatric hospitals, rehabilitation facilities, and long-term acute care facilities. *See* "CMS Data Navigator Glossary of Terms" available at https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ResearchGenInfo/Downloads/DataNav_Glossary_Alpha.pdf, *site visited* March 15, 2019 ("Acute Care Hospital: A hospital that provides inpatient medical care and other related services for surgery, acute medical conditions or injuries (usually for a short term illness or condition)."); and SEIU Nurse Alliance of California, "Chapter 1: General Acute Care Hospitals Definitions," available at http://www.nurseallicanceca.org/files/2012/02/CA_Title_22_S_70000.pdf, *site visited* March 15, 2019 ("General acute care hospital means a hospital…with… an organized medical staff which provides 24-hour inpatient care, including the following basic services: medical, nursing, surgical, anesthesia, laboratory, radiology, pharmacy, and dietary services.").

[84] I refer to general acute care hospitals as "hospitals" or "GAC hospitals."

[85] Chipty Workpapers.

[86] These inpatient services are identified using a classification system developed by CMS. This classification system uses a method known as "Diagnosis-Related Groups" ("DRGs") to describe different types of inpatient services. *See* Centers for Medicare & Medicaid Services, "Design and development of the Diagnosis Related Group (DRG)," October 1, 2016, available at https://www.cms.gov/ICD10Manual/version34-fullcode-cms/fullcode_cms/Design_and_development_of_the_Diagnosis_Related_Group_(DRGs)_PBL-038.pdf, *site visited* April 18, 2019 ("DRGs are a patient classification scheme which provides a means of relating the type of patients a hospital treats (i.e., its case mix) to the costs incurred by the hospital… Each DRG should contain patients with a similar pattern of resource intensity [and] should contain patients who are similar from a clinical perspective"). *See also,* Healthcare Cost and Utilization Project, "Most Common Diagnoses for Inpatient Stays," available at https://www.hcup-us.ahrq.gov/faststats/NationalDiagnosesServlet?year1=2014&characteristic1=0&included1=1&year2=&characteristic2=0&included2=1&expansionInfoState=hide&dataTablesState=hide&definitionsState=hide&exportState=hide, *site visited* June 28, 2018 (describing the most common inpatient services include the delivery of a child, treatment for sepsis, treatment for joint disorders, and heart failure.).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    29

**Exhibit 3**
**Most Common Inpatient Hospital Services Provided**
**at Northern California, Non-Kaiser Hospitals, 2011**

| Rank | Inpatient Service | % of Discharges |
|------|-------------------|-----------------|
| 1 | Vaginal delivery without complications | 15.9 |
| 2 | Cesarean section without complications | 6.0 |
| 3 | Major joint replacement or reattachment of lower extremity without complications | 3.5 |
| 4 | Uterine and adnexa procedure for non-malignancy without complications | 3.2 |
| 5 | Cesarean section with complications | 3.0 |
| 6 | Esophagitis, gastroenteritis, and misc. digestive disorders without complications | 2.4 |
| 7 | Vaginal delivery with complications | 2.3 |
| 8 | Appendectomy without complicated principal diagnosis without complications | 1.7 |
| 9 | Cellulitis without complications | 1.1 |
| 10 | O.R. procedure for obesity without complications | 1.0 |

*Note*: Shares are calculated after restricting the data to commercially insured discharges from Non-Kaiser GAC hospitals in Northern California.

*Source*: OSHPD Patient Discharge Data, 2011.

### 2.    Physician Practices

41.    Physicians are trained medical personnel, who (along with nurses, nurse practitioners, and medical assistants) provide patient care in hospital, outpatient, and office settings.[87] Many health plans encourage or require their members to identify a primary care physician.[88] This physician is often the first point of contact for patients for preventive medicine, for the evaluation and treatment of new conditions, and sometimes for the

---

[87] Bureau of Labor Statistics, "Occupational Outlook Handbook," available at www.bls.gov/ooh, *site visited* July 14, 2018. *See also,* Bureau of Labor Statistics, "Physicians and Surgeons," available at https://www.bls.gov/ooh/healthcare/physicians-and-surgeons.htm, *site visited* August 8, 2018; Bureau of Labor Statistics, "Registered Nurses," available at https://www.bls.gov/ooh/healthcare/registered-nurses.htm, *site visited* August 8, 2018; Bureau of Labor Statistics, "Nurse Anesthetists, Nurse Midwives, and Nurse Practitioners," available at https://www.bls.gov/ooh/healthcare/nurse-anesthetists-nurse-midwives-and-nurse-practitioners.htm, *site visited* August 8, 2018; and Bureau of Labor Statistics, "Physician Assistants," available at https://www.bls.gov/ooh/healthcare/physician-assistants.htm, *site visited* August 8, 2018.

[88] For example, most HMO plans require a member to choose a primary care physician. *See* Medicare.gov, "Health Maintenance Organization (HMO)," available at https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans/health-maintenance-organization-hmo, *site visited* April 16, 2019.

management of chronic health conditions.[89] Primary care physicians also play a critical role in influencing patients' choice of GAC hospitals, either by making recommendations about different hospitals or by referring patients to admitting physicians who tend to admit patients to specific hospitals.[90]

42.     Given the central role of physicians in the healthcare system, health plans may choose to create steered products that exclude high-cost physician groups and/or physicians that tend to steer to high-cost hospitals. Sutter has 13 medical groups and 5,000 physicians in 17 Northern California counties.[91] Evidence indicates Sutter's physician

---

[89] American Academy of Family Physicians, "Primary Care," available at https://www.aafp.org/about/policies/all/primary-care.html#3, *site visited* June 15, 2018.

[90] Deloitte Center for Health Solutions, "2011 Survey of Health Care Consumers in the United States: Key Findings, Strategic Implications," available at http://www.statecoverage.org/files/Deloitte_US_CHS_2011ConsumerSurveyinUS_062111.pdf, *site visited* March 23, 2019, p. 15 and Figure 14 (explaining the main reasons for hospital selection in order are: (a) insurance coverage; (b) reputation; and (c) physician recommendation); and Deposition of Don Wreden, President and CEO of Sutter Medical Group at Sutter, June 27, 2018, pp. 26-27 (agreeing that when choosing hospitals, patients "usually follow their physician's recommendations").

[91] De La Torre (Anthem) Declaration, ¶ 8 (citing Exhibit 1, "Sutter Health System Internal Sales & Account Management Talking Points As of September 6, 2013," ABCLH120166-170, at 166). *See also* "Sutter Health/Aetna Overview," April 25, 2012, AET-ESI0021372-375, at 372 (noting that, in 2012, ███████████████).

groups, like its hospitals, are among the most expensive in Northern California,[92] and Sutter physicians tend to steer patients to Sutter hospitals.[93]

### 3. Other Types of Medical Facilities

43.     Other types of medical facilities include stand-alone outpatient facilities and non-GAC inpatient facilities. Outpatient facilities offer outpatient services—such as diagnostic imaging, mammography screening, ambulatory surgeries, and emergency room services (when these services do not lead to an inpatient stay), that can also be performed on an outpatient basis at GAC hospitals that also offer inpatient services.[94] Non-GAC inpatient facilities include psychiatric hospitals, rehabilitation facilities (where patients recover from injuries or surgeries), and long-term care facilities.[95] Both stand-alone outpatient and non-GAC inpatient facilities may be associated with a hospital or hospital system.

---

[92] For example, a 2013 United document notes that, with respect to physician networks, "SUTTER is paid significantly higher than ALL of their competitors," (Lundbye (United) Declaration, ¶ 20 (citing Exhibit 3, Sutter Health, "Sutter – P3: Pre-Negotiation Prep Packet – P3, FFS Contract – PPO & HMO," February 2013, UHC-00303532-563, at 553. *See also* De La Torre (Anthem) Declaration, ¶ 4 (citing Exhibit 4, Letter from Deborah Henning, Regional Vice-President, Network Management, at Anthem, to Melissa Brendt, then Vice-President, Managed Care, at Sutter, October 7, 2013, ABCLH054780-783, at 781 (stating ███████████████████

███████████████████████████████████████████████

█████")); LaCroix-Milani (Health Net) Declaration, ¶ 7 (citing Exhibit 3, Letter from Becky LaCroix-Milani, Regional Vice President, Provider Network Management at Health Net to Jan Voge, Director of Managed Care at Sutter, August 4, 2014, HN-0003274-275, at 274 (████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████ (Aldo De La Torre Deposition Exhibit 1662, Email from Paige Rothermel at Anthem to ELBAC participants, "Subject: Network Update - - Sutter Health System," October 29, 2013, ABCLH161586-589, at 588.)

[93] *See* Section VIII, below.

[94] WebMD, "Ambulatory patient services, also called outpatient care," available at https://www.webmd.com/health-insurance/terms/ambulatory-patient-services, *site visited* June 9, 2018.

[95] LongTermCare.gov, "How Much Care Will You Need," available at https://longtermcare.acl.gov/the-basics/how-much-care-will-you-need.html, *site visited* June 15, 2018; Camicia, Michelle, *et al.*, "Length of Stay at Inpatient Rehabilitation Facility and Stroke Patient Outcomes," *Rehabilitation Nursing*, Vol. 41, No. 2,

### D. Hospitals and Hospital Systems in Northern California

44. As described in my Class Report, there were approximately 118 non-Kaiser GAC hospitals in Northern California, over the period 2008 to 2015.[96] As of 2015, the top-five non-Kaiser hospital systems, in order of number of hospitals in Northern California are: (a) Sutter, with 22 hospitals; (b) Dignity Health, with 14 hospitals; (c) Adventist, with seven hospitals; (d) St. Joseph Health System, with five hospitals; and (e) Tenet Healthcare, with three hospitals. Among the hospital systems with which the Class Health Plans can contract, Sutter is the largest health system in Northern California, in terms of number of hospitals, number of beds, and number of GAC inpatient discharges.[97]

#### 1. Sutter Health

45. Sutter consists of a network of hospitals, physician organizations, surgery centers, home health and hospice programs, medical research facilities, training programs, and specialty services, serving communities in Northern California cities and towns. Sutter currently reports that it owns and operates: (a) 24 hospitals;[98] (b) a network of about 5,500 physicians; (c) about 36 outpatient surgery centers; (d) about five acute rehabilitation centers; (e) seven behavioral health centers; (f) about 33 urgent care centers; and (g) about ten walk-in-clinics.[99]

46. By different measures, the Sutter hospitals draw patients from a substantial portion of Northern California. For example, Exhibit 4 shows Sutter's share of commercial discharges by zip code in Northern California: (a) the darkest color denotes zip codes where Sutter's share is over 80 percent, and the lightest color denotes zip codes where Sutter's share is greater than zero but under 20 percent; (b) the green lines demark the Tying Markets; and (c) the blue lines demark the Tied Markets. As seen in this exhibit, residents in a substantial portion of

---

2016, available at https://onlinelibrary.wiley.com/doi/abs/10.1002/rnj.218, *site visited* June 15, 2018, pp. 78-90.

[96] Chipty Class Declaration, ¶ 19.

[97] Chipty Class Declaration, Exhibit 3A and Exhibit 3B. *See* Chipty Workpapers.

[98] As described in Chipty Class Declaration ¶ 20, OSHPD reports there were 22 Sutter hospitals in 2015. Today, Sutter reports having 24 hospitals on its website. *See* Sutter Health, "What is Sutter Health," available at https://www.sutterhealth.org/about/what-is-sutter-health, *site visited* May 17, 2018.

[99] Sutter Health, "What is Sutter Health," available at https://www.sutterhealth.org/about/what-is-sutter-health, *site visited* May 17, 2018.

Northern California zip codes choose to receive care at Sutter hospitals. Moreover, consistent with Plaintiffs' theory of Sutter's market power in the Tying Markets, Sutter's share is generally higher in the seven Tying Market zip codes, and its share is lower in the four Tied Market zip codes.

**Exhibit 4**
**Sutter's Share of Commercial Inpatient Discharges by Zip Code, 2011**

| | | | | |
|---|---|---|---|---|
| 0% < & < 20% | 20%-40% | 40%-60% | 60%-80% | 80% < |

— Geographic Market with Sutter Tied Hospital  — Geographic Market with Sutter Tying Hospital

O Sutter Tied Hospital  ▲ Sutter Tying Hospital  ■ Sutter Other Hospital

*Sources*:
1. OSHPD Patient Discharge Data, 2011.
2. OSHPD Hospital Annual Financial Disclosure Data Pivot Profile, 2011.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    34

3. U.S. Census Bureau 2016 Shapefiles.

4. Dartmouth Atlas of Healthcare HSA Listings, 2015.

### 2.    Kaiser Permanente

47.    As explained in my Class Declaration, Kaiser Permanente ("Kaiser") is the largest healthcare system in California. Kaiser consists of a network of owned and operated hospitals, outpatient facilities, and physicians.[100] Kaiser is also a health plan covering about 45 percent of commercial plan members in the state of California.[101] The Kaiser health plan is widely described as a "health maintenance organization" (or HMO)[102] which means that for the vast majority of services, other than emergency care, Kaiser plan members must stay within the Kaiser network and their care is closely managed to contain costs. Kaiser is a "closed" healthcare system because the Class Health Plans cannot include Kaiser hospitals in their provider networks.[103] With the exception of emergencies, only Kaiser plan members can access healthcare in the Kaiser system.

48.    Because Kaiser is a closed system, commercial health plans cannot turn to Kaiser hospitals as substitutes for non-Kaiser hospitals, like the Sutter hospitals, when assembling their provider networks. Thus, Kaiser does not compete with Sutter in the first stage of hospital competition, for inclusion in provider networks. Kaiser also does not compete with Sutter in the second stage of hospital competition to attract patients because no patient would have both Kaiser and Sutter hospitals in his or her provider network. Thus, Kaiser hospitals are not in the relevant antitrust markets for the sale of inpatient hospital services to the Class Health Plans.[104]

49.    Sutter's expert Dr. Willig claims that Kaiser hospitals compete with Sutter hospitals in the relevant hospital markets, by pointing to Kaiser's share of discharges in each

---

[100] Chipty Class Declaration, ¶ 16.

[101] California Health Care Foundation, "California Health Insurers, Enrollment," available at https://www.chcf.org/wp-content/uploads/2018/02/QRGHealthInsurersEnrollment2018.pdf, *site visited* April 30, 2018, p. 2.

[102] CalHealth.Net, "Anthem Blue Cross Versus Kaiser – The Heavyweights of California," available at https://www.calhealth.net/Kaiser-versus-Anthem-California.htm, *site visited* April 8, 2018.

[103] Chipty Class Declaration, ¶ 17; and Chipty Reply Declaration, ¶ 159.

[104] The Plaintiffs have alleged the existence of two different types of relevant markets: (a) a set of upstream markets for the sale of inpatient hospital services to commercial health plans; and (b) a set of downstream markets for the sale of commercial insurance to subscribers in different rating areas. (*See* Complaint, ¶ 73.)

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    35

Sutter hospital's 75 percent service area.[105] Yet, a closer look at each of the three rural Sutter hospitals shows: (a) *no overlap* between Sutter Lakeside's 75 percent service area and the 75 percent service area for any Kaiser hospitals; (b) *no overlap* between Sutter Coast's 75 percent service area and the 75 percent service area for any Kaiser hospitals; and (c) *no overlap* between Sutter Amador's 75 percent service area and the 75 percent service area for any Kaiser hospitals.[106] For residents living in these Tying Markets, it would not be possible to replace the local Sutter hospital with a Kaiser hospital in the health plan's provider network, even if—contrary to fact—non-Kaiser health plans could contract with Kaiser hospitals. Thus, the treatment of Kaiser does not affect my conclusion that Sutter has pre-existing market power in the Lakeport (with Sutter Lakeside), Crescent City (with Sutter Coast), and Jackson (with Sutter Amador) HSAs.

50.    By contrast, there is substantial overlap in the 75 percent service areas of Alta Bates, in the Berkeley-Oakland HSAs, and those of all Kaiser hospitals.[107] Based on such an overlap, Dr. Willig concludes that Sutter competes with Kaiser.[108] However, this conclusion ignores the significant fact that Sutter was able to raise hospital prices at Alta Bates Summit, after that hospital was acquired by Sutter in 2001, despite the strong local presence of Kaiser in the Bay Area.[109] At the time, Sutter's expert Dr. Meg Guerrin-Calvert explained that diverting less than eight percent of discharges away from Sutter in the Bay Area could discipline Sutter from imposing a small but significant increase in price at Alta Bates.[110] The fact that Sutter was able to raise prices at Alta Bates Summit by as much as 72 percent per procedure after the acquisition indicates that Kaiser was an insufficient competitive constraint to meaningfully

---

[105] Willig Declaration, Table 5.

[106] Chipty Workpapers.

[107] Chipty Workpapers.

[108] Willig Declaration, Table 5.

[109] Tenn, Steve, "The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction," *International Journal of the Economics of Business*, Vol. 18, No. 1, 2011, (hereafter "Tenn 2011") p. 75 ("The price increase for Alta Bates ranges from 10.2% to 20.7%, depending on the insurer, compared to 29.0% to 72.0% at Summit.").

[110] Sarah Krevans Deposition Exhibit 4287, "Defendants Sutter Health and Alta Bates Medical Center's First Amended Proposed Findings of Fact and Conclusions of Law on Plaintiff's Motion for Preliminary Injunction," November 3, 1999, AGO-Sutter-005171-252 (hereafter "Summit-Alta Bates Proposed Findings of Fact"), at ¶ 30.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

discipline Sutter's pricing at Alta Bates.[111] This contradiction highlights the flaw in Dr. Willig's logic and supports the view that Kaiser does not constrain Sutter's market power in the upstream market in which Sutter negotiates hospital prices with non-Kaiser health plans.[112]

51.     Kaiser competes with the Class Health Plans for plan members in the "downstream" markets for the sale of commercial insurance.[113] When health plans lose plan members to Kaiser, Sutter also loses the ability to attract those plan members to a Sutter hospital when they need inpatient medical care. Thus, there are separate issues of whether and the extent to which Kaiser disciplines health plan premiums. Ordinary-course evidence shows that Kaiser premiums are typically lower cost than non-Kaiser premiums.[114] Ordinary-course evidence also shows that at least some non-Kaiser health plans would like to offer lower-cost, narrow network products to attract subscribers that would otherwise go to Kaiser.[115] However, the challenged conduct restricts non-Kaiser health plans' ability to offer competitive narrow network products and, by so doing, interferes with competition between Kaiser and non-Kaiser health plans in the downstream markets.

52.     For example, United attempted to compete against Kaiser with a Sutter-focused narrow HMO product called Signature Value Alliance, which launched in Northern California in

---

[111] Tenn 2011, p. 79. ("Summit and Alta Bates were located in a large urban area with many other hospitals that offered a similar range of services. Based on patient flow data, one might conclude that consumers (and health insurance providers) could turn to many other hospitals for care. A central issue raised by the Sutter-Summit transaction was whether this patient flow indicated that travel costs were sufficiently low that the presences of other hospitals would prevent an anticompetitive price increase. Our results suggest they were an insufficient constraint.")

[112] *Id.*, p. 69 ("Kaiser hospital in Oakland offered a comparable range of services to Summit and Alta Bates. However, it competed with other hospitals only indirectly, since Kaiser is a vertically integrated healthcare provider that serves patients covered by its health plans. As such, health insurers could not choose Kaiser Oakland as an alternative to Summit and Alta Bates when forming their hospital networks.").

[113] Boston Consulting Group, "Consumer and Employer Research: Key Imperatives and Strategic Implications," December 4, 2014, DEF00877864-907, at 886 ("once consumers chose [Kaiser], they no longer have the option of selecting Sutter. *[Kaiser] is the enemy and that battle must be fought at the insurance level.*" (Emphasis in original)). This Boston Consulting Group presentation was prepared for Sutter, at Sutter's request. *See* Deposition of Jeff Sprague, Chief Financial Officer at Sutter, May 17 & 29, 2018 (hereafter "Sprague Deposition (Sutter, May 17 & 29, 2018)"), pp. 147-151.

[114] Sutter Health, "Strategy Session," January 18, 2011, DEF001993646-928 (hereafter "Sutter Strategy Session"), at 736 ("Kaiser is the 'gold standard' in the commercial business for affordability to consumers and employers.").

[115] Sutter Strategy Session, at 736 ("Non-Kaiser competitors are attempting to mitigate this advantage through alliance with supplementary providers and aligning with health plans in a narrow network product.").

2012.[116] But the product was not successful because of Sutter's pricing. This fact is evident from an internal email exchange where United's Mr. Cain, Vice President, Sales & Account Management, Key Accounts, explains that ███████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████[17]

According to Mr. Cain, ███████████████████████████████████████ ████████████████████████████████████████[18] Mr. Cain testified that ███████████████████████████████████████████████████████████ ██████████████████████████████████████[119] He also testified that ███████████████ ██████████████████████████████████████████,[120] Consistent with this characterization, Sutter's Melissa Brendt testified that ███████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████[121] "████████████████████████████████ ███████████████████████████████████████████████████████████

---

[116] Deposition of Janet Lundbye, Regional VP of Network Strategy for the West Region at United, May 15-16, 2018 (hereafter "Lundbye Deposition (United, May 15-16, 2018)"), pp. 157, 166-168; and Deposition of Steve Cain, Vice President, Sales & Account Management, Key Accounts, at United, June 20, 2018 (hereafter "Cain Deposition (United, June 20, 2018),"), pp. 136-137 (testifying that "████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

[117] Steve Cain Deposition Exhibit 1453, Email from Steve Cain, Vice President, Sales & Account Management, Key Accounts, at United, to United personnel, "Subject: FW: Sutter PEP Questionnaire," March 1, 2016, with attachment "UHC/Sutter Joint Venture Internal Review," UHC-00289049-084, at 052.

[118] Steve Cain Deposition Exhibit 1453, Email from Steve Cain, Vice President, Sales & Account Management, Key Accounts, at United, to United personnel, "Subject: FW: Sutter PEP Questionnaire," March 1, 2016, with attachment "UHC/Sutter Joint Venture Internal Review," UHC-00289049-084, at 052.

[119] Cain Deposition (United, June 20, 2018), p. 152 ("████████████████████████ ███████████████████████████████████████████████████████████

[120] Cain Deposition (United, June 20, 2018), p. 148.

[121] Deposition of Melissa Brendt, Chief Contracting Officer at Sutter, August 28, 2018 (hereafter "Brendt Deposition (Sutter, August 28, 2018)"), p. 169 ("████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    38

Evidence shows that Health Net did not succeed because Sutter's prices did not allow Health Net to be cost competitive against Kaiser, a fact that Sutter's Ms. Brendt herself acknowledged.[122]

### E.    Two Stage Competition in Healthcare Markets

53.    For an assessment of the competitive effects of hospital conduct, like the use of Sutter's restrictions on steering and information transparency, it is helpful to understand the interactions among patients, health plans, and providers, and the incentives to which they each respond. Hospital markets are characterized by two stages of competition.[123] As described above, in the first stage each hospital and health plan negotiate the terms under which the health plan could include the hospital in the health plan's provider networks. As negotiations between hospitals and health plans proceed, questions of price, quality, and relative bargaining position influence the ultimate structure of each health plan's provider network and the terms on which hospitals participate in that network.

54.    From the health plan's perspective, it is important to include enough hospitals in provider networks to attract and retain current and potential health plan

---

[122] Hamilton Deposition (Health Net, September 11, 2018), pp. 56-57, 62-69 (███████████████████████████████████████████████████████████████; Thomas Hamilton Deposition Exhibit 633, Email string among Health Net personnel, "Subject: Sutter update – PremierCare and WholeCare," April 17, 2013, HN0020315-317, at 315-316 ████████████████████████

████"); LaCroix-Milani Deposition Exhibit 266, Email from Becky LaCroix-Milani, Regional Vice President for Provider Network Management at Health Net, to Melissa Brendt and Ann Carder, Contract Manager, Managed Care, at Sutter, "Subject: Fw: Health Net - Sutter Health Proposal 1- 2013 renewal," September 19, 2012, DEF003337410-468, at 411 ("PremierCare runs in excess of 100% MCR and the premiums still average 25% more than WHA and Kaiser for their UC/ Dignity-centric network. If Sutter is interested in the growth and success of a mid-market Sutter-centric network that can compete, the reductions proposed [in Sutter's rates] are necessary."); LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 171-175, 180-181 ████████████████; and LaCroix-Milani Deposition Exhibit 710, Email from Becky LaCroix-Milani, Regional Vice President for Provider Network Management at Health Net, to Sutter personnel, "Subject: Health Net comprehensive proposal #6," December 20, 2012, HN-003199-202, at 200

████████████████████████████████████████

[123] Vistnes, Gregory, "Hospitals, Mergers, and Two-Stage Competition," *Antitrust Law Journal*, Vol. 67, No. 3, 2000, pp. 671-692 (hereafter "Vistnes (2000)"); Farrell, Joseph, *et al.*, "Economics at the FTC: Hospital Mergers, Authorized Generic Drugs, and Consumer Credit Markets," *Review of Industrial Organization*, Vol. 39, No. 4, 2011, pp. 271-296 (hereafter "Farrell *et al.* (2011)").

members (and their employers, who frequently select health plan options for their employees).[124] The more important a given hospital is to area residents, the more a health plan with members in that area needs to include that hospital in its provider network. In other words, if having the option to use a certain hospital is important to sufficient numbers of potential patients—for example if that hospital is in a particularly convenient location or if that hospital is the only hospital capable of performing certain services—health plans will find it more important to reach an agreement with that hospital to include it in its network of providers. This dynamic increases the relative bargaining power of such a hospital.[125] It is a general proposition in economics that consumers prefer more choices to fewer choices,[126] and that concept also applies to a health plan's provider network. All else equal (*e.g.*, for the same price), a network with more hospitals is generally more valuable to a health plan's members, and hence more valuable to a health plan. But because there are costs associated with creating and managing a larger network, there may be limits to the optimal size of a health plan's network.

55.     From the hospital's perspective, inclusion in a health plan's provider network provides access to the health plan members who purchase access to that provider network; these members are prospective patients of the hospital.[127] All else equal, a hospital is more

---

[124] *See, e.g.*, Deposition of Chandra Welsh, Vice President for Network Management in Northern California at Aetna, August 28, 2018 (hereafter "Welsh Deposition (Aetna, August 28, 2018)"), p. 90 ███████████
███████████████████████████████████████████████████████████
███████████████████. *See also*, Melody (Anthem) Declaration, ¶ 7 (██████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████

[125] Town, Robert and Gregory Vistnes, "Hospital Competition in HMO Networks," *Journal of Health Economics*, Vol. 20, 2001, pp. 733-753; Ho, Katherine, "Insurer-Provider Networks in the Medical Care Market," *American Economic Review*, Vol. 99, No. 1, 2009, pp. 393-430.

[126] This preference depends on how much that extra choice costs; some people will trade off choice for price.

[127] McGuire, Thomas G., "Demand for Health Insurance," *Handbook of Health Economics*, Vol. 2. Ed. Mark V. Pauly, Ed. Thomas G. McGuire, Ed. Pedro P. Barros, 2012, pp. 317-396, at p. 366 ("[B]y promising an enhanced patient flow from network inclusion, a health plan is in a position to negotiate discounts or control over treatment decisions through managed care tactics") and p. 367 ("A provider may accede to a plan's terms in exchange for the extra volume of business associated with participating in the plan's network."). *See also*, Capps, Cory, David Dranove, and Mark Satterthwaite, "Competition and Market Power in Option Demand

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

interested in contracting with a health plan that can deliver more members that are likely to be prospective patients, because failing to be part of such a health plan's provider network would reduce the hospital's access to patient volume. This dynamic increases the relative bargaining power of such a health plan.[128]

56. These bargaining dynamics play out in the first stage of competition as hospitals compete against each other to be included in provider networks assembled by health plans. The health plans use benefit design, including the composition and structure of their provider networks and other features of the health plans that they sell to employers and individuals, to place competitive pressure on hospitals. For example, a health plan may suggest a benefit design that excludes certain facilities within a hospital system. Doing so could cause some of that system's facilities to be out-of-network or in a less preferred tier. Alternatively, the suggestion of even partial exclusion might lead the hospital system to lower the price of those facilities in exchange for the health plan keeping those facilities in-network. As explained in the proceedings related to the Summit-Alta Bates merger, "Hospitals will therefore frequently offer health plans better rates for delivering a greater volume of patients."[129] Sutter's steering restrictions prevent health plans from engaging in

---

Markets," *RAND Journal of Economics*, Vol. 34, No. 4, Winter 2003, pp. 737-763, at p. 737 ("We call markets in which intermediaries sell networks of suppliers to consumers who are uncertain about their needs 'option demand markets.' In these markets, suppliers may grant the intermediaries discounts in order to be admitted to their networks.").

[128] *See, e.g.,* Summit-Alta Bates Proposed Findings of Fact, ¶¶ 27-28 ("For these reasons, hospitals are very sensitive to even small declines in volume.[] This is especially true of high-value specialty services such as cardiac care, neurosurgery and oncology due to the large capital commitments required for such programs.[] Directing patients to other providers for tertiary care, for outpatient procedures, for diagnostic and other ancillary services, or for elective surgeries would quickly have a serious impact on revenue and profitability. [] Hospitals will therefore frequently offer health plans better rates for delivering a greater volume of patients."); Dafny, Leemore, Mark Duggan, and Subramaniam Ramanarayanan, "Paying a Premium on Your Premium? Consolidation in the US Health Insurance Industry," *American Economic Review*, Vol. 102, No. 2, 2012, pp. 1161-1185, at p. 1162 ("[I]ncreases in market concentration may strengthen insurers' bargaining positions vis-à-vis health-care providers, leading to reduced negotiated reimbursements and lower premiums."). *See also,* Gaynor, Martin and William B. Vogt, "Antitrust and Competition in Health Care Markets," *Handbook of Health Economics*, Ed. A. J. Culyer, Ed. J. P. Newhouse, 2000, pp. 1405-1487, at p. 1435. ("Each insurer faces a demand for its services as a function of its… provider network." In a managed care environment, "[d]erived demand for each hospital by each insurer [...] is a function of the number and characteristics of the covered lives of the insurer, the probability that the hospital is in the insurer's network, and the probability that various competing hospitals are in the insurer's network.").

[129] Summit-Alta Bates Proposed Findings of Fact, ¶ 28.

some forms of benefit design that they might have otherwise used to discipline Sutter's prices.

57.    In the second stage of competition, patients who need access to a hospital choose one from their health plan's provider network. Patients that have equal access to all hospitals in their provider network,[130] as is often the case for popular PPO plans, will typically choose a hospital based on non-price factors such as convenience and whether the hospital has the expertise to address their medical needs. In these circumstances, patients are effectively insulated from price signals because their out-of-pocket costs are largely unaffected by the prices paid by the health plans to hospitals on their behalf. By contrast, patients that bear a higher out-of-pocket burden for choosing certain hospitals (*e.g.*, an out-of-network hospital or a hospital in a less-preferred tier of a tiered provider network) will choose a hospital on the basis of both price and non-price factors.[131] Increasingly, health plans and employers throughout the country are trying to use a combination of financial incentives and disclosure of meaningful cost and quality information to help members (and employees) make more informed decision, with tools that enable members to compare the cost of care at different providers within a provider network.[132]

## IV.    Sutter's Use of Systemwide Contracts and the Challenged Contractual Provisions

58.    Sutter began to impose systemwide contracting beginning in 1998.[133] In 2000-2001, it drafted and began to use, at different times with each of the large health plans

---

[130] In this example I intend "equal access" to mean both the right to use any provider in the network and that there are no significant differences in out-of-pocket costs associated with the patient's choice.

[131] The structure of benefit design can be especially important for inpatient services which can be costly to consumers and health plans, alike. If a patient has no coinsurance associated with an inpatient stay, he or she is completely insulated from price. Even if a patient has a coinsurance requirement, an out-of-pocket maximum amount, which is common in many health plans, could still render differences in costs between certain providers to be irrelevant, particularly for in-network providers in the same tier. However, the cost of moving to a less-preferred tier or out-of-network provider generally leads to higher costs for the patient. *See* Section VII.A-B for a broader discussion of price signals in healthcare markets.

[132] *See e.g.*, Aldo De La Torre Deposition Exhibit 1662, Email from Paige Rothermel, Vice President of Sales at Anthem to ELBAC participants, "Subject: Network Update - - Sutter Health System," October 29, 2013, ABCLH161586-589, at 588.

[133] Brendt (Sutter) Declaration, ¶ 9. Brendt Deposition (Sutter, May 15-16, 2018), pp. 90-92.

in California, a master systemwide amendment that contained the challenged restrictions.[134] In this section, I describe Sutter's move to systemwide contracting, the terms of the challenged provisions, and Sutter's enforcement of them. I also describe deposition testimony from health plans and non-Sutter hospital system employees about their hospital contracts, which shows that other hospitals and hospital systems in Northern California generally do not utilize the challenged provisions and *none* of these contracts contain the collection of these provisions.

### A.    Sutter's Systemwide Contracts

59.    As explained by Sutter's Melissa Brendt, "[i]n the 1990s, as a general matter each Sutter hospital or provider negotiated its own contract with network vendors."[135] Over this period, Sutter did not require all-or-nothing contracting, nor did it impose onerous non-par rates, or the anti-steering or anti-tiering provisions, and contracted hospitals each had their own contract termination dates with individual health plans.[136] Yet, even at that time, Sutter recognized the value of contracting as a system in lieu of each affiliate contracting independently. In an internal memo to Van Johnson, then CEO of Sutter, Robert Reed, then CFO of Sutter, stated: "The importance of our achieving success cannot be overstated. The very essence of Sutter Health as a system is our ability, through leadership, to get our not-for-profit affiliates to act in a cohesive fashion which will result in a better outcome for the group than each of the not-for-profit affiliates can achieve acting independently."[137]

60.    Sutter contemplated a strategy to move to systemwide contracting and obtain rate increases as early as 1997, and the big health plans resisted. For example, a November 24, 1997 memo from Ed Berger, then Vice President of Managed Care at Sutter, to the Sutter Hospital CEOs states that "[Anthem] was selected as one of the payors to be negotiated on a system-wide basis" and "[a]fter receiving and reviewing the proposal,

---

[134] Chipty Class Declaration, ¶¶ 29-38.
[135] Brendt (Sutter) Declaration, ¶ 8.
[136] Brendt Deposition (Sutter, May 15-16, 2018), pp. 89, 212-213, 224, 226-227, and 239.
[137] Sutter Health Finance Memorandum from Robert Reed, then Senior Vice President & CFO of Sutter, to Van Johnson, then President & CEO of Sutter, 1999, DEF004964650-653, at 650.

[Anthem] indicated that they 'valued their individual relationships with the hospitals,' and did not want to negotiate through Sutter Health. They indicated that they would negotiate with hospitals 'on an individual basis, or not at all'….The 'divide and conquer' strategy has worked well for [Anthem] in the past and they can be expected to resist system-wide negotiations because of *the increased leverage that twenty-one hospitals can achieve by working together.*"[138] In January 1998, Sutter terminated its participation in Anthem's network, because of Anthem's refusal to enter Sutter's systemwide agreement. The Sutter providers were only out-of-network for a few weeks until Anthem conceded and signed a systemwide agreement.[139]

61.     In the early 2000s, Sutter required all Class Health Plans to negotiate on a systemwide-basis with Sutter. There is substantial evidence showing that Sutter terminated the then existing agreements and forced the Class Health Plans, over their objections, to enter into Sutter's systemwide agreement, that included the challenged restrictions:

- *Anthem*: In 1998, Anthem informed Sutter that they "would not deal with Sutter Health as a system."[140] In 2001,  [141]

---

[138] Van Johnson Deposition Exhibit 280, Compilation of Sutter Documents, including a Sutter Health Memorandum from Ed Berger, then Vice President of Managed Care at Sutter, to Sutter personnel (Managed Care Department), "SUBJECT: BLUE CROSS NEGOTIATIONS," March 24, 1997, DEF001924626-678, at 639-640 (emphasis added). *See also,* DEF001924626-678, at 631 (a March 12, 1998 internal Sutter memo from Sutter's Ed Berger explains, "As you may recall, we submitted a system-wide proposal to Blue Cross in late October… Blue Cross initially indicated that they 'would not deal with Sutter Health as a system'. [sic] After receiving a system-wide termination notice (on behalf of twenty -three hospitals and five medical groups) in January, they indicated they would respond to our proposal.").

[139] Deposition of Van Johnson, former CEO of Sutter, May 30-31, 2018 (hereafter, Johnson Deposition (Sutter, May 30-31, 2018)"), pp. 75-77; Melissa Brendt Deposition Exhibit 2365, Sutter Health Memo from Pat Aberle, former Senior Vice President of Managed Care at Sutter, to Sutter Hospital CEOs, "Re: Blue Cross Rates," June 11, 1998, DEF001920189-208, at 189.

[140] Van Johnson Deposition Exhibit 280, Compilation of Sutter Documents, including a Sutter Health Memorandum from Ed Berger, then Vice President of Managed Care at Sutter, to Sutter personnel (Managed Care Department), "Subject: Blue Cross & Blue Shield," March 12, 1998, DEF001924626-678, at 631.

[141] Van Johnson Deposition Exhibit 281, Letter from Van Johnson, then CEO of Sutter, to Ron Williams, then CEO of Anthem, January 19, 2001, ABCLH008431-436, at 431-432.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      44



[142] Consistent with his testimony, Sutter's Melissa Brendt also testified that Anthem did not want to agree to the 2001 Systemwide Amendment.[143] Consistent with Mr. Melody's and Ms. Brendt's testimony,

[144]

[145]

[146]

---

[142] Melody (Anthem) Declaration, ¶¶ 9, 12, 13. *See also,* Melissa Brendt Deposition Exhibit 2368, Blue Cross of California and Sutter Health Systemwide Amendment, February 18, 2001, Section 2.08.4, ABCLH000003-121, at 014-015; and Van Johnson Deposition Exhibit 281, Letter from Van Johnson, then CEO of Sutter, to Ron Williams, then CEO of Anthem, January 19, 2001, ABCLH008431-436, at 431-432 (

[143] Brendt Deposition (Sutter, May 15-16, 2018), pp. 351-352.

[144] Deposition of Curtis Terry, Former Regional President, Aetna West Region, and previously with Anthem, July 11, 2018 (hereafter "Terry Deposition (Aetna, July 11, 2018)"), pp. 45, 187-189.

[145] Terry Deposition (Aetna, July 11, 2018), pp. 202-203.

[146] Terry Deposition (Aetna, July 11, 2018), pp. 203-204 (emphasis added).

- *Blue Shield*: David Joyner, Vice President and then Senior Vice President at Blue Shield from 1998 to 2012, explains that Sutter imposed all-or-nothing requirements on Blue Shield beginning in 2002.[147] Prior to 2002, Mr. Joyner explained that Blue Shield negotiated individually with Sutter's various hospitals, physician groups, and other providers to assemble provider networks.[148]

- *Health Net*:



- *Aetna*: Aetna entered into its first systemwide agreement with Sutter on June 14, 2000.[151] In late 2002, when it had not reached a new agreement with Aetna, Sutter threatened to terminate Aetna.[152] ███████████████ ████████████████[153] and Curtis Terry, who joined Aetna in 2002

---

[147] Joyner (Blue Shield) Declaration, ¶ 15, referencing Joyner Exhibit 1, Blue Shield's systemwide agreement with Sutter from 2002.

[148] Joyner (Blue Shield) Declaration, ¶ 7.

[149] Deposition of Jenni Vargas, Health Care Delivery Officer at Health Net, August 20, 2018 (hereafter "Vargas Deposition (Health Net, August 20, 2018)"), p. 124. *See* Brendt Deposition July 25, 2018 Exhibits 536-539 (showing examples of termination notices Health Net received from Sutter regarding the Health Net-Sutter pre-systemwide contracts).

[150] Vargas Deposition (Health Net, August 20, 2018), p. 124.

[151] Welsh (Aetna) Declaration, ¶ 11; Deposition of Melissa Brendt, Chief Contracting Officer at Sutter, June 12, 2018 (hereafter "Brendt Deposition (Sutter, June 12, 2018)"), pp. 153-168; Melissa Brendt Deposition Exhibit 421, Provider Contract Amendment between Aetna and Sutter, June 14, 2000, DEF000099883-978, at 906-907.

[152] Melissa Brendt Deposition Exhibit 422, Letter from Kris Vine, Vice President & Chief Contracting Officer at Sutter, to Northern California Health Insurance Brokers/Employers, DEF004569802.

[153] *See, e.g.*, Terry Deposition (Aetna, July 11, 2018), pp. 58-60; Welsh (Aetna) Declaration, ¶ 8, Exhibit 1 (Email from Chandra Welsh, then Network Manager, to Aetna personnel, "Subject: RE: Sutter appeal," September 29, 2011 ████████). Parity with Sutter continued to be a critical issue for Aetna. *See, e.g.*, Email from Greg Stevens, Vice President, Network, West Region at Aetna, to Brendhan Green, former Vice President of Network Management at

from Anthem,



Aetna, "Subject: RE: Sutter Feedback," AET-ESI0022695 (████████████████████████████ ████████████████████████████████████████); Email from Mark Reynolds, Chief Operating Officer for Commercial Products at Aetna, to Aetna personnel, "Subject: RE: FY 2011 Hewitt (Followup to Dignity Health Discussion," January 8, 2013, AET-ESI0022915 (██████████████████████████ ████████████████████████████████; Deposition of Greg Stevens, Vice President, Network, West Region at Aetna, August 21, 2018 (hereafter "Stevens Deposition (Aetna, August 21, 2018)"), pp. 157-167; Greg Stevens Deposition Exhibit 3690, Email from Brendhan Green, former Vice President of Network Management at Aetna, to Greg Stevens, Vice President, Network, West Region at Aetna, "Subject: RE: Sutter – Approval Request," November 15, 2011, AET-ES10025034-038, at 034 (█████████████████████████████ ██████████████

[154] Terry Deposition (Aetna, July 11, 2018), pp. 57-59. Curtis Terry Deposition Exhibit 1498, Email from Chandra Welsh, then Network Manager, East Bay/Central Valley, at Aetna, to Greg Stevens, Vice President, Network, West Region at Aetna, "Subject: Sutter final letter," December 20, 2002, with attachment, Letter from Kris Vine, Vice President and Chief Contracting Officer at Sutter, to Greg Stevens, Vice President, Network, West Region at Aetna, "Re: Process Letter," December 20, 2002, AET-ESI0026667-677, at 669 (████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████.

[155] Chandra Welsh Deposition Exhibit 616, Email from Chandra Welsh, then Network Manager, East Bay/Central Valley, at Aetna, "Subject: Sutter," January 7, 2003, AET-ESI0022418-419, at 418 (emphasis added). *See also*, Welsh Deposition (Aetna, August 28, 2018), pp. 378-380; Chandra Welsh Deposition Exhibit 615, Email from Chandra Welsh, then Network Manager, East Bay/Central Valley, at Aetna, to Anne Hansen, Director of Site Operations Management at Aetna, "Subject: Sutter," December 18, 2002, AET-ESI0022515 (███████████████ ██████████████████████████████████████████████; Welsh (Aetna) Declaration, ¶ 8, citing Exhibit 1, Email from Chandra Welsh to Aetna personnel, "Subject: RE: Sutter Appeal," September 20, 2011, AET-ESI0022876 (███ ██████████████████████████████████████████████████

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     47

██████████████████████████████████████████████████████████

█████████████████████████████████████████████[156]

- *United*: In 2000, prior to PacifiCare's merger with United, Sutter issued termination notices to PacifiCare for its contracts with individual Sutter hospitals and required entering into a Systemwide Agreement.[157] Melissa Brendt confirmed that the individual provider contracts were terminated.[158]

62. This evidence from the ordinary-course provides multiple relevant insights for my economic analysis. It demonstrates that Sutter was able to operate successfully before its insisted on systemwide contracting. It shows Sutter understood the strategic benefits of all-or-nothing contracting. It also shows that health plans were unable to defeat Sutter's new contracting strategy.

---

[156] Greg Stevens Deposition Exhibit 3690, Email from Brendhan Green, former Vice President of Network Management at Aetna, to Greg Stevens, Vice President, Network, West Region at Aetna, "Subject: RE: Sutter – Approval Request," November 15, 2011, AET-ES10025034-038, at 034 (emphasis added).

[157] Melissa Brendt Deposition Exhibit 670, "PacifiCare and Sutter Health Systemwide Amendment, December 27, 2000, UHC-00073965-4075, at 3969 ("Company has existing provider contracts with some or all of the Providers listed on Exhibits 1a-1c (these contracts are individually or collectively referred to as "Provider Contract(s)"). Company and Sutter intend for this Amendment to serve as a binding Amendment of each of the Provider Contracts and to the degree there is no existing Provider Contract, this Amendment will serve as a Provider Contract. The Parties also understand and agree that this Amendment memorializes the material financial and business terms pursuant to which Sutter will rescind the termination notices sent on behalf of the Providers listed on Exhibit 9."), 4051-4052 ("Affiliate Termination List" identifying the Sutter provider contracts that Sutter is terminating), 3984 ("Rescind Terminations. Sutter or the individual Providers have sent notices terminating all Company products covered by the Provider Contracts for the Providers listed on Exhibit 9. The Parties agree to rescind these terminations effective upon the signature of this Amendment."). *See also,* Melissa Brendt Deposition Exhibit 675, Letter from John Pickett, Senior Manager, Network Management, at PacifiCare, to Todd Smith, Vice President, Managed Care at Sutter, July 23, 2004, DEF007005516-518, at 517 (a July 13, 2004 letter from PacifiCare (predecessor-in-interest to United) to Sutter, showing that, after Sutter terminated the individual provider contracts, Sutter had previously "obligate[d] Pacificare to include all Sutter affiliates in all products"); and Melissa Brendt Deposition Exhibit 677, Letter from Fred Dodson, Vice President and General Manager at PacifiCare, to Kris Vine, Chief Contracting Officer at Sutter, July 23, 2004, DEF007005522-525, at 525 (a July 23, 2004 follow-up letter from PacifiCare to Sutter showing that "Sutter and each of its Affiliated Sutter Providers shall participate in the following products, and any and all new products which can be administered by the Agreement, without limitation.").

[158] Brendt Deposition (Sutter, August 28, 2018), pp. 112-114.

**B.    The Challenged Contractual Provisions in Sutter's Systemwide Contracts**

63.    As described in my Class Declaration, evidence shows that Sutter imposed the same or nearly the same contractual terms with respect to the all-or-nothing restriction, the excessive non-par rates, and the anti-steering and anti-tiering provisions in their contracts with each of the Class Health Plans. The parity of these restrictions across health plan contracts is evident from the declarations of each of the health plan executives and the underlying contracts themselves.[159] I describe each of these restrictions here.

*1.    All-or-Nothing Clause and the Non-Par Rate Provision*

64.    Sutter's standard all-or-nothing restriction requires that the health plan include all Sutter providers in the health plan's provider network. For example:

- *Anthem*: The Anthem provision reads, "With respect to Existing Plans and New Plans in which Providers participate, Company or Other Payor, whichever is applicable, ***shall include all [Sutter] Providers in the Plan,*** unless the Parties mutually agree otherwise."[160]

- *Blue Shield*: The Blue Shield provision reads, "With respect to Existing Plans and New Plans in which [Sutter] Providers participate, [Blue Shield] or Other Payor, whichever is applicable, ***shall include all [Sutter] Providers in the Plan***, unless the Parties mutually agree otherwise…."[161]

Similar provisions exist for Health Net,[162] Aetna,[163] and United.[164] These provisions forced each of the health plans to carry all Sutter providers as in-network providers in each of their health insurance products. As a result, health plans were unable to use the threat of dropping a Sutter

---

[159] Chipty Class Declaration, ¶¶ 34-53. *See also*, Brendt Deposition (Sutter, May 15-16, 2018), p. 102.

[160] Melody (Anthem) Declaration, ¶ 12 (emphasis in original), referencing Anthem's systemwide agreement with Sutter from 2001.

[161] Joyner (Blue Shield) Declaration, ¶ 15 (emphasis in original), referencing Joyner Exhibit 1, Blue Shield's systemwide agreement with Sutter from 2002.

[162] "Health Net, Inc. and Sutter Health Systemwide Amendment," November 29, 2001, STCA0004697-831, at 707.

[163] Welsh (Aetna) Declaration, ¶ 13.

[164] "PacifiCare and Sutter Health Systemwide Amendment," December 27, 2000, UHC-00073965-4075, at 3976-3977.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    49

hospital in an area with greater competition as a credible negotiation tactic to secure lower prices for Sutter hospitals in areas with less competition.

65.     Sutter eventually replaced its "all-or-nothing" requirement with its "Non-Participating Provider Rates" provision, referred to as the "non-par rate" provision, starting in 2005.[165] According to Sutter's Melissa Brendt, the new non-par rate provision required health plans to pay close to 100 percent of billed charges for all services, including inpatient services, provided to a health plan member on an out-of-network basis.[166] At the time, Sutter's contracted rates were about 50 percent of billed charges;[167] thus, the non-par rate represented a substantial rate increase. For example:

- The non-par rate provision in the Blue Shield agreement is as follows: "Effective January 1, 2005, Hospital Providers *shall be paid ninety-five percent (95%) of Billed Charges*, less a Member's applicable co-payment or cost-share, for services rendered to Members enrolled in any Benefit Program (excluding Medicare + Choice Members) in which a Hospital Provider does not participate."[168]

- The specific language of Anthem's contract is as follows: "2.01.1 Non-participating Provider Rates. Company and Other Payor shall pay for Covered Services and Emergency Services rendered by Providers that do not participate in the Member's Plan in accordance with the Member's Benefit Plan and the Provider shall be entitled to be paid *100% of Billed Charges*, less Member's applicable copayment, coinsurance or cost share (excluding claims for services rendered to Medicare or Medi-Cal Members or for Workers Compensation Services)."[169]

---

[165] Joyner (Blue Shield) Declaration, ¶ 37; and Brendt Deposition (Sutter, May 15-16, 2018), p. 442.

[166] Brendt Deposition (Sutter, May 15-16, 2018), p. 445. *See also*, Melissa Brendt Deposition Exhibit 2377, "Eighth Amendment to the Blue Cross of California and Sutter Health Systemwide Amendment," September 12, 2005, ABCLH000162-249, at 165-166 (Section 2.01.1 Non-participating Provider Rates).

[167] Brendt Deposition (Sutter, May 15-16, 2018), p. 455.

[168] Joyner (Blue Shield) Declaration, ¶ 37 (emphasis added).

[169] Melissa Brendt Deposition Exhibit 2377, "Eighth Amendment to the Blue Cross of California and Sutter Health Systemwide Amendment," September 12, 2005, ABCLH000162-249, at 166 (Section 2.01.1 Non-participating Provider Rates) (emphasis added).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

Similar restrictions exist for Health Net,[170] Aetna,[171] and United.[172] Whereas the all-or-nothing restriction directly forced health plans to include all Sutter providers in health plan provider networks, the non-par provision implicitly forced each of the health plans to do the same. Anthem's Aldo De La Torre—who, from 2002 to 2014, served as Anthem's Director of Provider Engagement and Contracting, Vice President for Northern California, and Vice President, West Region Provider Engagement and Contracting, including California, Nevada, and Colorado— explained that Sutter imposes on Anthem non-par provisions that have the effect of forcing Anthem to include all Sutter hospitals in Anthem's provider network.[173] ██████████████

██████████████████████████████ [174]

### 2. Equal Treatment and Anti-Tiering Restriction

66.     Sutter imposed "Equal Treatment" provisions that prevented plans from steering to lower-cost providers and provisions that prevented plans from placing Sutter in a disfavored tier. I refer to these provisions as "anti-steering" restrictions. In some instances, there are explicit prohibitions on tiering as well. For example:

- *Anthem*: According to Anthem's Mr. De La Torre, Anthem's agreement with Sutter outright prohibits the use of benefit design to steer members away from Sutter hospitals.[175] He explains the specific language in Anthem's contract is as follows: "2.06.3 Equal Treatment. Payers shall treat Providers as an equal member of all of the provider panels for all Plans and Networks in which that Provider participates and shall make the services of each Provider equally available within the Plans and Networks covered by

---

[170] "Second Amendment to the Health Net and Sutter Health 2008 – 2009 Systemwide Amendment," January 15, 2010, STCA0060998-1236, at 0999.

[171] "Seventh Amendment to the Aetna Health of California, Inc.' Aetna Health Management and Aetna Life Insurance Company and Sutter Health Systemwide Amendment," April 26, 2005, DEF000096837-923 (hereafter "Seventh Amendment to the Aetna and Sutter Systemwide Amendment"), at 840.

[172] "Twelfth Amendment to the PacifiCare of California and Sutter Health Systemwide Amendment," January 19, 2007, STCA0006807-7039 (hereafter "Twelfth Amendment to the PacifiCare and Sutter Systemwide Amendment"), at 6813.

[173] De La Torre (Anthem) Declaration, ¶ 14.

[174] Deposition of Aldo De La Torre, Vice President of Provider Engagement and Contracting at Anthem, July 17-18, 2018 (hereafter "De La Torre Deposition (Anthem, July 17-18, 2018)"), pp. 344-345.

[175] De La Torre (Anthem) Declaration, ¶ 19.

this Agreement. In no event shall the Member be financially penalized for accessing any Sutter Provider that participates in the Member's Plan and Network."[176]

- *Blue Shield*: According to Blue Shield's Mr. Joyner, Sutter imposed requirements prohibiting benefit design that would steer volume away from Sutter beginning in 2004.[177] These provisions gave Sutter "veto power over any proposed narrow network (*i.e.* A network including less than all Sutter providers) that would foster price competition in Northern California hospital healthcare markets."[178] As highlighted by Mr. Joyner, Sutter's contract with Blue Shield requires that "[p]ayers shall treat [Sutter] as an equal member of all of the provider panels for all Benefit Programs and Networks in which that [Sutter] participates and shall make the services of each [Sutter provider] equally available within the Benefit Programs and Networks covered by this Agreement. **In no event shall the Member be financially penalized for accessing any [Sutter provider] that participates in the Member's Benefit Program and Network**."[179]

- *United*: According to United's Ms. Lundbye, "[f]rom its earliest agreements, Sutter has included 'Equal Treatment' provisions that required United and PacifiCare to treat Sutter the same as any other provider . . . PacifiCare 2001 Systemwide Amendment § 2.13.4 (Ex. 8 at UHC-00073977) ('Sutter has negotiated this Amendment and the rates Company will pay on behalf of a network of Providers, based on the assumption that Company will treat Providers, individually and collectively, in the same manner that it treats all of its other participating providers. Therefore Company shall treat Providers as

---

[176] "Blue Cross of California and Sutter Health Systemwide Amendment," December 30, 2006, STCA0125576-926, at 598.

[177] Joyner (Blue Shield) Declaration, ¶¶ 18-19, 45 ("For many years Blue Shield has attempted to create tiered networks to foster price and quality competition among the health care providers in its networks. In 2001, for example, Blue Shield created a tiered network called Network Choice that included Sutter hospitals, but Sutter required that all of its facilities be included as 'Tier 1 (Choice) providers.' Sutter threatened that Blue Shield and its self-funded health plan customers would have to pay Non-Par rates equal to 95% of full-billed charges if all its facilities were not placed in the preferred tier. By requiring that all of its facilities be included in the first tier, Sutter prevented Blue Shield from offering customers financial incentives to utilize more cost-effective hospitals. Thus, although Sutter technically was participating in a tiered product, its hospitals were not placed in the lower tier that actually corresponded with its significantly higher prices.").

[178] Joyner (Blue Shield) Declaration, ¶ 19.

[179] Joyner (Blue Shield) Declaration, ¶ 48 (emphasis in original).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    52

an equal member of all of the provider panels in which that Provider participates and make Providers equally available within all networks and products covered by this Amendment.').")[180] Sutter's January 1, 2004 and January 1, 2007 contracts with United also included an explicit anti-tiering provision.[181]

Sutter's contracts with Health Net[182] and Aetna[183] contained similar equal treatment and anti-tiering provisions.

### 3. Restrictions on Providing Price and Quality Information to Consumers

67. In addition, Sutter prohibits health plans from disclosing meaningful cost and quality information that might assist patients in choosing among different providers, including

---

[180] Lundbye (United) Declaration, ¶ 17.

[181] "United Health Group and Sutter Health Systemwide Fee For Service Agreement," December 29, 2003, DEF000102373-463, at 387 ("2.06.5 Tiered Products and Reduced Network Products. This Agreement does not currently apply and Providers do not participate in tiered products, plans, or benefit designs or any Benefit Plan which ranks participating Providers where the rank directly affects the Member's co-pay, co-insurance percentage in the Member's benefit design within their Benefit Plan, or reduces the network of Company participating providers. If Company wants some or all Sutter Providers to participate in an existing Benefit plan in which Sutter Providers do not currently participate or in a new Benefit Plan, it will provider prior written notice to Sutter that explains in detail how the new Benefit Plan or benefit design will work, including specifically the basis for determining the tiers or establishing the Provider's rank or inclusion in the restricted network. The Parties shall then meet and confer to determine which, if any, Sutter Providers will participate in such new Benefit Plan and the additional terms and conditions that will apply to their participation."); and "Twelfth Amendment to the PacifiCare and Sutter Health Systemwide Amendment," January 19, 2007, STCA0006807-7039, at 6818 ("2.08.5 Tiered Products, Restricted or Limited Network Products. Except for Providers' current participation in the PacifiCare Signature Value Select Hospital HMO Product (such participation shall be consistent with Company's obligations as specified in 2.08.4), Providers have not agreed to participate in any tiered products, plans or benefit designs or any Plan or Benefit Program which ranks participating Providers where the rank directly affects the Member's premium (and/or the employer's premium), co-pay, co-insurance percent or cost share, or restricts or limits Member's access to Providers. Further, Providers have not agreed to participate in any restricted or limited network product or products that would require Members (or those who pay for their coverage) to pay more for the same (or substantially similar) product or benefit design to access all Sutter Providers compared to a network that did not include all Sutter Providers. If Company wants some or all Sutter Providers to participate in such new Plans or Benefit Programs, it will provide prior written notice to Sutter that explains in detail how the new benefit design of the new Plan or Benefit Program will work, including specifically the basis for determining the tiers or establishing the Provider's rank or inclusion in the restricted network. The Parties shall then meet and confer to determine which, if any, Sutter Providers will participate in such new Plan or Benefit Program and the additional terms and conditions that will apply to their participation.").

[182] LaCroix-Milani (Health Net) Declaration, ¶ 14; and "Health Net and Sutter Health Second Amendment to the Systemwide Amendment," September 16, 2003, DEF000096188-383, at 199.

[183] Welsh (Aetna) Declaration, ¶ 14; and Seventh Amendment to the Aetna and Sutter Systemwide Amendment, DEF000096837-923, at 846.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    53

Sutter's competitors. For example, the Sutter systemwide agreement with Blue Shield contains two relevant clauses:[184]

- "6.07.1 No Disclosure. Except as provided in Section 6.07.3 below, Sutter and [Blue Shield] shall maintain each other's Confidential Information in strictest confidence and in compliance with all applicable state and federal law, and shall not disclose it unless authorized in writing by the other . . . ." and

- "6.07.2 Confidential Information/Defined. Confidential information means (i) the [Sutter] Provider Contracts, including this Amendment; (ii) any patient information; and (iii) materials, data, records or other information concerning any matter relating to the business of the other which is obtained from the other during the negotiation or performance of this Amendment . . . ."

As explained by Blue Shield's Mr. Joyner, in an ordinary course email sent to his colleagues, "*Sutter was 'restricting our ability to be transparent with our customers regarding their relative costs, quality or clinical data.'*"[185] Similar terms exist in Sutter's contracts with Anthem,[186] Aetna,[187] United,[188] and Health Net.[189]

---

[184] Joyner (Blue Shield) Declaration, ¶ 63 (referring to Blue Shield's 2002 systemwide agreement with Sutter).

[185] Joyner (Blue Shield) Declaration, ¶ 64 (emphasis added). Other health plans also complained about Sutter restricting their ability to be transparent with their customers. (*See* Section IV.C below.)

[186] De La Torre (Anthem) Declaration, ¶¶ 29-41 ("'Unlike all other California hospitals, Sutter's contract prohibits the disclosure of meaningful cost data/information to support Anthem's clients.' Ex. 1 at ABLH120166. 'Sutter is the only contract with a gag clause.' Ex. 11 at ABLH104183.")

[187] Welsh (Aetna) Declaration, ¶ 15 ("The 2003 Systemwide Amendment also prohibited Aetna from disclosing any Sutter prices or information about Sutter's prices to any third party unless authorized by Sutter in writing. See Section 6.07.1 [and] Section 6.07.2 ('Confidential Information/Defined…'").

[188] Lundbye (United) Declaration, ¶¶ 14-16 and Exhibit 8 (PacifiCare 2001 Systemwide Amendment, at § 6.08, UHC- 00073987-988), Exhibit 9 (PacifiCare 2003 Systemwide Amendment, at § 6.08, UHC-00073784-785), Exhibit 10 (Twelfth Amendment to PacifiCare 2003 Systemwide Amendment, at § 6.08, DEF000015558-559), Exhibit 11 (United 2004 Systemwide Fee for Service Agreement, at § 8.04, STCA0006193, Exhibit 12 (United 2009 Systemwide Amendment, at § 6.08, STCA0007116 -18, and Exhibit 13 (United 2015 Systemwide Agreement, at § 6.08, DEF000002628-30).

[189] LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 314-318. *See also,* LaCroix-Milani (Health Net) Declaration, ¶ 6.

### 4. The Complementary Challenged Restrictions Reinforce Each Other

68. The different challenged restrictions reinforce and strengthen each other. To see how, suppose Sutter only imposed its all-or-nothing requirement. In this scenario, health plans that do not want to include all Sutter providers in their provider network could contract with all Sutter providers (as required), but then incent health plan members not to use certain the Sutter providers, by steering members to preferred providers. Sutter's combined use of its all-or-nothing and equal-treatment provisions make it impossible for health plans to engage in this strategy. Now suppose Sutter did not impose its onerous non-par rates. In this scenario, health plans that do not want to include all Sutter provider network may opt to place some providers out-of-network. However, having to pay 95 percent (or more) of billed charges for out-of-network use makes it difficult for health plans to engage in this strategy. Health plans that decide to exclude some Sutter providers, reduce the competitiveness of the narrow networks or tiered products deployed in Northern California because of Sutter's non-par rates. Health plans that include Sutter providers in narrow networks or tiered products are cost-disadvantaged by Sutter's high in-network prices. These economic principles are consistent with health plan ordinary-course documents and testimony. For example:

- *Anthem*: Steve Melody, former Director of Network Development and Management for Northern California and Vice President of Health Care Services at Anthem, explains that Sutter's non-par provision, which "makes narrow networks commercially unviable by eliminating the savings from excluding high-priced Sutter providers,…has had the effect of carrying on Sutter's all-or-nothing contracting practice."[190] █████████████████████████████████████████

  ███████████████████████████████████████████████

---

[190] Melody (Anthem) Declaration, ¶¶ 14, 18.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

█████████[191] As negotiations evolved, Anthem proposed a 70% non-par rate, which Sutter rejected.[192]

- *Blue Shield*: Similarly, Blue Shield executives explain that Sutter's 95 percent non-par rate combined with the other challenged restrictions impaired its ability to launch narrow or tiered networks because of inevitable emergency room leakage at non-par Sutter providers. For instance, Tracy Barnes, Director of Contracting for Northern California at Blue Shield, confirmed that it is Blue Shield's opinion that Sutter applies "the non-participating penalty rates as a way to avoid being tiered and to prevent health plans from offering cost effective tiered networks in markets where Sutter has a presence."[193] The same sentiment is seen in a Blue Shield document prepared by Blue Shield for the California Attorney General regarding Sutter's "Contracting Practices" and the "Problematic Contract Language;" in this document, Blue Shield explains that it has not been able to offer certain products because of Sutter's excessive non-par rate combined with its restrictive contract provisions.[194]

---

[191] Deborah Henning Deposition Exhibit 2862, Email from Deborah Henning, Regional Vice President, Network Management, at Anthem, to Melissa Brendt at Sutter, "Subject: Anthem Second Counter Offer," October 8, 2013, with attached letter from Deborah Henning at Anthem to Melissa Brendt at Sutter, October 7, 2013, ABCLH139438-442, at 441 ████████████████████

████████████████████████████████████████████████████████

[192] Deborah Henning Deposition Exhibit 2863, Email from Deborah Henning, Regional Vice President, Network Management, at Anthem, to Melissa Brendt at Sutter, "Subject: Anthem Counter Proposal," October 24, 2013, with attached letter from Deborah Henning at Anthem to Melissa Brendt at Sutter, October 24, 2013, DEF004055013-018, at 016 ("Anthem views payment of 100% of charges for services rendered when Sutter has opted out of such offerings as unreasonably punitive. Anthem proposes payment of 70% of charges for services provided when Sutter has opted out of such offerings.").

[193] Deposition of Tracy Barnes, Director of Contracting for Northern CA at Blue Shield, January 30 – February 1, 2018 (hereafter "Barnes Deposition (Blue Shield, January 30 - February 1, 2018)"), p. 589.

[194] Tracey Barnes Deposition Exhibit 2002, BSC-UEBT-0037886-899, at 886-887 ("When [Sutter's non-par] provision is combined with the New Affiliate (2.05.2.3), No Change to Provider Status (2.06.1), New Plan (2.0602), Tiered Products (2.06.4) and Centers of Excellence and Payer Designated Network (2.06.5) provisions, it effectively precludes a health plan from developing such new products or networks unless the health plan agrees to include Sutter as a participating provider. This is because the non-par rate constitutes such a significant penalty for all

In a letter to Sutter regarding 2014 contract negotiations, Blue Shield explains that the anti-tiering restriction and the all-or-nothing clause "work in combination with the non-participating provider rates to automatically exclude certain Sutter Health providers from certain plan designs while guarantying those providers a reimbursement rate far in excess of what Blue Shield would otherwise pay a non-participating provider. Thus, Blue Shield must include all Sutter Health providers or pay a significant penalty for not doing so."[195]

- *Health Net*: Thomas Hamilton, Regional Health Plan Officer at Health Net, testified that " ███████████████████████████████ reasonable rate,"[196] ███████████████████████████████

---

emergency services that cannot be re-directed away from the non-participating Sutter affiliates that these products are not financially viable. Even though Sutter has expressly indicated they do not want to participate in any tiered product or network (which is where providers are ranked and depending upon ranking benefit differentials are applied) without their prior approval, and they apply the nonparticipating penalty rates as a way to avoid being tiered and to prevent health plans from offering cost effective tiered networks in markets where Sutter has a presence. Because of Sutter's non-participation, we have not been able to offer some of the following products /networks: Bariatric Network, Savenet /NetValue (selected markets), and tiered networks with the United Food Chain Workers (UFCW)."). A 2009 Blue Shield ordinary-course document notes that Blue Shield wanted to create a "Sutterless network" for individual and small group business. (James Orchison Deposition Exhibit 3246, Email from James Orchison, then Director, Network Design & Programs, Network Management at Blue Shield, to Eileen Duncan, "Subject: Update," October 20, 2009, BSC_SutterSub00038368-374, at 370.) James Orchison, Director, Network Design & Programs, Network Management at Blue Shield, confirmed that, around 2009, Blue Shield was "looking at potentially creating a Sutterless network for the individual small group business unit," but it was "not marketable from a competitive [pricing] standpoint." (Deposition of James Orchison, Director, Network Design & Programs, Network Management at Blue Shield, July 20 & 24, 2018 (hereafter "Orchison Deposition (Blue Shield, July 20 & 24, 2018)"), pp. 267-268.)

[195] Melissa Brendt Deposition Exhibit 524, Letter from Tami Lucas, Senior Network Manager, Provider Contracting, at Blue Shield, to Melissa Brendt, Vice President, Managed Care at Sutter, "RE: Sutter Health's July 1st letter to Blue Shield," July 14, 2014, DEF000049921-924, at 923. *See also,* Deposition of Kristen Miranda, Director of Network Management at Blue Shield, July 18-19, 2018 (hereafter "Miranda Deposition (Blue Shield, July 18-19, 2018)"), pp. 280-281, 312 (testifying that Blue Shield was "[u]nable to tier Sutter facilities or create networks around them" because "the Sutter tiering restrictions" require them "to go and either include their facilities at the highest tier, which often would make a product prohibitively expensive, or…if they agreed to not participate in that tiered product, then…in many markets across Northern California, that 95 percent penalty for emergency services,…our assessment was it just made the product also prohibitively expensive…. [T]he practical implication of that is that it made it extremely difficult to introduce a cost-effective tiered offering to the market.")

[196] Deposition of Thomas Hamilton, Regional Health Plan Officer at Health Net, September 11, 2018 (hereafter "Hamilton Deposition (Health Net, September 11, 2018)"), p.178 (" ████████████████████████████ ████████████████████████████████████████████████

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA



- *Aetna*:

- *United*: Janet Lundbye, Regional VP of Network Strategy for the West Region at United, testified that Sutter's high non-par rate "was a barrier to us implementing new narrow network products."[200] Once United started to offer narrow networks,

---

[197] Hamilton Deposition (Health Net, September 11, 2018), p. 52 (emphasis added).

[198] Deposition of Gregory Kazmirchuk, Actuary and Project Manager at Health Net, October 15, 2018 (hereafter "Kazmirchuk Deposition (Health Net, October 15, 2018)"), pp. 186-187, 202.

[199] Terry Deposition (Aetna, July 11, 2018), pp. 142-145.

[200] Lundbye Deposition (United, May 15-16, 2018), pp. 273-274.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    58

████████████████████████████████████

████████████████████████████ [201]

### C.    Health Plans Have Tried to Push Back, but Sutter Enforces the Challenged Restrictions

69.    Health plans have tried to push back on both Sutter's attempts at systemwide contracting, its non-par rate provisions, its equal treatment and anti-tiering restrictions, and its restrictions on information disclosure. They have been unsuccessful in "breaking" systemwide contracting or removing these provisions from their systemwide contracts with Sutter.

- *Anthem*: As Anthem's Aldo De La Torre explained, Anthem "repeatedly sought to remove the non-par provision or reduce the non-par penalty."[202]



[203]

- *Blue Shield*: Paul Markovich, CEO of Blue Shield, personally asked that Sutter's non-par rate be changed in 2017.[204] Blue Shield repeatedly sought to remove or change the 95 percent non-par rate without success.[205]

---

[201] Lundbye Deposition (United, May 15-16, 2018), p. 297.

[202] De La Torre (Anthem) Declaration, ¶ 17.

[203] Steve Scott Deposition Exhibit 2810, Email from Steven Scott, General Manager and now Chief Operating Officer at Anthem, to himself, "Subject: Sutter," September 25, 2015, ABC108551, with multiple attachments, including an Anthem presentation, "Sutter Health 2016 Contract Renewal," ABC109022-033, at 029.

[204] Deposition of Paul Markovich, Chief Operating Officer at Blue Shield, August 10, 2018 (hereafter "Markovich Deposition (Blue Shield, August 10, 2018)"), pp. 191-193.

[205] *See, e.g.*, Miranda Deposition (Blue Shield, July 18-19, 2018), p. 309 (Blue Shield "always" sought to eliminate the offensive "contract language with Sutter" but was unsuccessful, as it remained in the 2007, 2010, 2012 Systemwide Agreements and renewals); Barnes Deposition (Blue Shield, January 30 – February 1, 2018), pp. 364-

- *Health Net*: Becky LaCroix-Milani, Chief Contracting Officer at Health Net,

  

  [206]

- *Aetna*: Chandra Welsh, Vice President of Network Management in Northern California at Aetna, testified that ███████████████████████████████████ ███████████████████████████████[207] More generally, Ms. Welsh expressed in a December 2015 email to Melissa Brendt, VP and Chief Contracting Officer at Sutter, "[a]s you must recognize, the contracting approach from Sutter has always been heavy handed and not collaborative. You rarely work collaboratively to come up with solutions that work for both, but rather force us to take your proposal and figure a way to manage it. It has been very difficult to manage both internally and externally."[208]

---

367 (Blue Shield sought to eliminate the challenged contract provisions during the 2015 and 2017 renewal negotiations with Sutter); Jon Chason Deposition Exhibit 270, Email from Tami Lucas, former Senior Network Manager, Provider Contracting, at Blue Shield, to Melissa Brendt, Chief Contracting Officer of Sutter, "Subject: Blue Shield Counter proposal to Sutter's Proposal #9," December 31, 2014, with attachment "Blue Shield's Current Position regarding the following Sutter proposed Language Provisions," December 31, 2014, PROD00377517-520, at 518 (2014 correspondence from Blue Shield to Sutter requesting deletion of the 95 percent non-par rate: "*Blue Shield cannot accept the 95% rate Sutter continues to propose… As Blue Shield has explained on several occasions (both in the context of this and prior negotiation(s)), Sutter's insistence on the inclusion of this provision as a condition to contracting effectively creates an all-or-nothing proposition that Blue Shield is no longer willing to accept.*" (emphasis added)).

[206] Deposition of Becky LaCroix-Milani, Chief Contracting Officer at Health Net, August 30-31, 2018 (hereafter "LaCroix-Milani Deposition (Health Net, August 30-31, 2018)"), pp. 161-167.

[207] Welsh Deposition (Aetna, August 28, 2018), pp. 117-138. *See also,* Welsh Deposition (Aetna, April 12, 2017), p. 58 ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████; Welsh Deposition (Aetna, April 12, 2017), pp. 215-216 ██████████████████████████ ██████████████; Deposition of Mark Reynolds, Vice President of Medical Economics at Aetna, August 7, 2018 (hereafter "Reynolds Deposition (Aetna, August 7, 2018)"), p. 140; Mark Reynolds Deposition Exhibit 3417, Email from Mark Reynolds, Chief Operating Officer for Commercial Products at Aetna, to Aetna personnel, "Subject: RE: Hill / Dignity Prep for 9/30 meeting," September 25, 2013, AET-ESI0036572-574, at 573 █████████████████████████████████); Brendt Deposition (Sutter, June 12, 2018), pp. 218-219; Melissa Brendt Deposition Exhibit 430, Email from Chandra Welsh, Director, Northern California, at Aetna, to Jan Voge, Director, Managed Care at Sutter, "Subject: FW Follow up," September 17, 2013, DEF002760511 (explaining that the 95 percent non-par rate is "excessive"); Brendt Deposition (Sutter, June 13, 2018), p. 706 (95% applied to any non-par provider not participating in a narrow network).

[208] Chandra Welsh Deposition Exhibit 618, Email from Chandra Welsh, VP for Network Management in Northern CA at Aetna, to Melissa Brendt, Chief Contracting Officer at Sutter, "Subject: RE: Sutter proposal #6 to Aetna -

- *United*: Janet Lundbye, Regional VP of Network Strategy for the West Region at United, claims that it has been United's goal to eliminate the key anticompetitive provisions of the Sutter contracts, noting that a "key objective[] for 2015" includes "[e]liminate Nonpar rates (95%)" because they affect United's "[a]bility to effective[ly] [create] narrow products (for products they don't participate in, rates are 95% charges, affects narrow networks)."[209] In negotiations with Sutter, United has repeatedly tried to eliminate the non-par rate from the Systemwide Agreement, but Sutter has successfully refused.[210]



[211]

---

follow-up to our telephone call this afternoon leadership change information request," December 11, 2015, DEF000094759-763, at 759.

[209] Lundbye (United) Declaration, Exhibit 22, "Sutter Strategy and Update," January 19, 2014, at UHC-00204851-852, at 851.

[210] Lundbye (United) Declaration, ¶ 12 and Exhibit 22 ("Sutter Strategy and Update," January 19, 2014, at UHC-00204851-852, at 851), Exhibit 24 (Letter from Trina Honea, Director, Network Management, at United, to Susann Bonslett, Director, Managed Care, of Sutter, May 8, 2014, UHC-00011192-193, at 192 ("████████████████████ ████████████████████████████████████ ████████████████████████████████████ )), and Exhibit 26 (Letter from Melissa Brendt, Vice President & Chief Contracting Officer of Sutter, to Janet Lundbye, Vice President, Network Management and Contracting, May 12, 2014, UHC-00035140-143, at 140 (████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ )). *See also,* Lundbye Deposition (United, May 15-16, 2018), pp. 408-410, 414; Melissa Brendt Deposition Exhibit 3936, Email from Trina Honea, Director, Network Management at United, to Sutter personnel, "Subject: United Proposal #7," October 28, 2014, with attachment, "UHC Response to Proposal 6, United Healthcare Insurance Company/ United Healthcare of California and Sutter Health 2015 Systemwide Amendment," DEF003601144-576, at 162 (████████ ████████████████████████████ ); and Deposition of Melissa Brendt, Chief Contracting Officer at Sutter, August 22, 2018 (hereafter "Brendt Deposition (Sutter, August 22, 2018)"), pp. 99-100.

[211] Susann Conley Deposition Exhibit 2685, Email from Della Bresina, Contract Manager for Sutter Health Managed Care, to Racquel Stone at Sutter, "Subject RE: UHC proposal grid," September 5, 2014, with attachment "UHC Proposal 4 /Sutter Proposal 5," September 2, 2014, DEF008175364; Brendt Deposition (Sutter, August 22, 2018), pp. 83-84.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    61

███████████████████████████ [212] ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ [213]

Similarly, there have been many instances over the years in which health plans have approached Sutter to delete the anti-steering provision or make an exception and to lift the restrictions on information transparency, but Sutter has typically denied such requests. [214]

70.    Aware of health plans' desire to drop some Sutter providers and steer patients away from expensive Sutter providers, Sutter has employed a variety of enforcement tactics, including monitoring health plan activities, informing them of contract violations, and even threatening litigation or contract termination. For example, in a March 7, 2003 letter to Anthem, Melissa Brendt, then Vice President, Managed Care at Sutter, notes that Sutter expressed their concerns about tiered networks during the negotiation of the 2001-2002 Systemwide Amendment and included Section 2.08, "which[,] among other things, provides that BCC may not change any Sutter Provider's participating status without Sutter's prior written consent…[and] that all Sutter Providers shall participate in Existing Plans on the same basis as other providers" and states that Sutter would not participate in the Advantage HMO and Compass Tiered products. [215] On numerous other occasions, Sutter notified Anthem of what they perceived to be violations of the anti-tiering and equal treatment

---

[212] Melissa Brendt Deposition Exhibit 3935, Email from Dolores Bonslett, Director, Managed Care at Sutter, to Jan Voge, Director of Managed Care at Sutter, "Subject: FW: United Proposal #5," September 18, 2014, with attachment, "UHC response to Proposal 4 of UnitedHealthcare Insurance Company/UnitedHealthcare of California and Sutter Health 2015 Systemwide Amendment," DEF003599539-978, at 553.

[213] Brendt Deposition (Sutter, August 22, 2018), pp. 87, 101-103 ("Q. So the non-par rate did not go down at all, correct? A. No.")

[214] *See* Sections VIII.A and VIII.B, below.

[215] Melissa Brendt Deposition Exhibit 2369, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Steve Melody, then Vice President, Network Services, Northern Region, at Anthem, March 7, 2003, DEF002020706-707, at 706.

provisions.[216] Similarly, Sutter sent correspondence enforcing its anti-steering provisions to other health plans.[217]

71. Sutter also informed health plans that their exclusion of Sutter facilities from Centers of Excellence networks violated the challenged contractual provisions. For example, in December 2003, upon learning of Anthem's plan to create a Bariatric Surgery Centers of

---

[216] *See, e.g.*, Melissa Brendt Deposition Exhibit 2385, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Aldo De La Torre, then Regional Vice President at Anthem, October 14, 2010, DEF002009745; Melissa Brendt Deposition Exhibit 2386, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Aldo De La Torre, then Vice President Statewide Contracting at Anthem, October 26, 2010, DEF003932277-278, at 277-278 (noting that the exclusion of Sutter providers from the Value Based Purchasing Center ("VBPC") designation "penalizes CalPERS PPO members who choose Sutter facilities over VBPC facilities" and, thus, "violates the 'Equal Treatment' provision…[and the] prohibition on tiered benefit designs that rank providers."); Brendt Deposition (Sutter, May 15-16, 2018), pp. 537-538; Melissa Brendt Deposition Exhibit 2813, Email from Sina Santagata on behalf of Melissa Brendt, then Vice President, Managed Care, at Sutter, to Randy Lukins, then Regional Director at Anthem, "Subject: Sent on behalf of M Brendt - Ltr of 11.4.10 to R Lukins - Re: Tiered Benefit for Hip and Knee Join Replacement for CalPERS PPO," November 4, 2010, with attachment Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Randy Lukins, then Regional Director at Anthem, November 4, 2010, DEF006662714-718, at 716.

[217] *See, e.g.*, Melissa Brendt Deposition Exhibit 3340, Letter from Kris Vine, Vice President of Managed Care & Chief Contracting Officer at Sutter, to Ken Wood, Chief Operating Officer of Blue Shield, December 6, 2001, DEF001929207 (noting that Blue Shield's tiered product proposal violates the Systemwide Agreement and "Sutter Providers are willing to consider participating in new Blue Shield products, the design of which may include tiering, but only if all Sutter Providers are in the 'preferred tier'."); Melissa Brendt Deposition Exhibit 521, Letter from Melissa Brendt, Vice President, Managed Care at Sutter, to Kristen Miranda and Andrea Brown of Blue Shield, "Re: Follow-up to our legal meeting," December 8, 2006, BSC_UFCW-0060134-135 (Sutter's response to Blue Shield's complaint that, "because of its market position, Sutter Health has unfair bargaining power over Blue Shield and is forcing Blue Shield to agree to contract terms that Blue Shield does not understand or agree with"); Melissa Brendt Deposition Exhibit 522, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Tracy Barnes, Director, Provider Contracting at Blue Shield, April 22, 2008, DEF004968296 (informing Blue Shield that it was violating the Equal Treatment provision of the Systemwide Agreement by steering patients to Quest Labs); Melissa Brendt Deposition Exhibit 534, Letter from Armine Papouchian, Vice President, Network Management, at Blue Shield, to Melissa Brendt, Vice President and Chief Contracting Officer at Sutter, January 7, 2014, BSC-UEBT-0005339-40; and Melissa Brendt Deposition Exhibit 3354, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter to David Morris, Assistant General Counsel at Blue Shield, April 10, 2012, DEF004937294 (regarding disclosure of non-par rate to CCSF). In October 2002, Sutter disputed Health Net's characterization of its new Variable HMO Hospital Copy Plan as a traditional HMO, claimed it was a tiered network that violates their Systemwide Agreement, demanded Health Net remove Sutter providers as participating, and informed Health Net that it expects reimbursement of 100 percent of billed charges for members of this plan who present to Sutter providers. (Melissa Brendt Deposition Exhibit 3369, Letter from Kris Vine, then Vice President and Chief Contracting Officer at Sutter, to Jenni Vargas, then Network Management and Development Officer at Health Net, October 22, 2002, DEF001900078-080, at 079-080.) Following a response from Health Net informing Sutter it would remove Sutter providers from its Variable HMO Hospital Copay Plan, Sutter's outside counsel, Stephen Goff, then sent a letter to Jan Wiltgen at Health Net, agreeing to allow Sutter providers to participate if placed in the lowest copay tier. (*See* Melissa Brendt Deposition Exhibit 3370, Letter from Stephen L. Goff, Counsel at McDonough, Holland & Allen, on behalf of Sutter, to Jan Wiltgen at Health Net, October 25, 2002, DEF001900087-088, at 087-088.)

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

Excellence network, Sutter wrote to inform Anthem that excluding any Sutter providers from the Bariatric Surgery Centers of Excellence ("COE") network would violate their systemwide agreement.[218] Nearly a year later, the Bariatric Surgery Centers of Excellence network dispute between the parties was still unresolved, at which time Sutter informed Anthem that it would increase rates "for all affected hospitals to take into account the effect of Blue Cross' decision to exclude them from its Bariatric Services COE."[219] In further correspondence regarding a letter from Anthem to bariatric surgery providers that Sutter obtained, Sutter stated Anthem was violating the systemwide agreement and demanded Anthem add Sutter Hospitals with bariatric surgery services to the Bariatric Surgery COE Hospital Network.[220] In May 2005, with the Bariatric Surgery COE Network issue still unresolved, Sutter informed Anthem that they would proceed with binding arbitration since Anthem was steering Bariatric Surgery patients away from

---

[218] *See* Melissa Brendt Deposition Exhibit 2373, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Steve Melody, then Vice President, Network Services, Northern Region, at Anthem, December 5, 2003, DEF001928208-210, at 209 ("Section 2.08 means that no Sutter providers may be excluded from the Bariatric Surgery COE without Sutter's written consent and BCC's effort to do so could be viewed as an anticipatory breach of the Systemwide Amendment. Therefore, please confirm for Sutter in writing that BCC intends to honor the terms of the Systemwide Amendment and not exclude (or require higher member contribution) for services provided at any Sutter Providers from this new COE for 2004."). See also, Brendt Deposition (Sutter, May 15-16, 2018), pp. 424-425.)

[219] Melissa Brendt Deposition Exhibit 2374, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Mike Ramseier, Director Network Services at Anthem, November 29, 2004, DEF006833295-297, at 296.

[220] Melissa Brendt Deposition Exhibit 2375, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Steve Melody, then Vice President, Network Services, Northern Region, at Anthem, January 24, 2005, DEF006198965-968, at 965-966 ("This letter…included a list of the Blue Cross of California Bariatric Surgery COE Hospital Network. This Blue Cross list does not include any of the Sutter Hospitals. This was disappointing given our conversation on December 14, 2004, in which I informed you that excluding Sutter Hospitals from the Bariatric Surgery COE Hospital Network would violate the contract currently in place between Sutter Health and Blue Cross… [W]e believe that Blue Cross is in violation of [Section 2.08 of] the Sutter Health/Blue Cross of California Systemwide Amendment ('Amendment')… Section 2.08 means that the Sutter Providers covered by the Amendment may not be excluded from the Blue Cross Bariatric Surgery COE Network, unless the parties mutually agree. We recognize that the parties are in renewal discussions and that the network participation may change in the future, but until then we expect Blue Cross to comply with the terms of the Amendment. Therefore, please confirm in writing that Blue Cross intends to honor the terms of the Amendment and not exclude Sutter Providers that provide Bariatric Surgery Services from the COE Network, unless the parties mutually agree otherwise.").

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

Sutter Hospitals.[221] Sutter also had similar communications with other health plans about their COE networks being violations of the anti-steering provisions.[222]

72.    Sutter has also objected to health plan initiatives at price and quality transparency. For example, during negotiations with Sutter in 2013, Anthem requested and Sutter denied the removal of contract provisions that restrict Anthem's ability to publish Sutter's cost data as part of its transparency initiatives. Anthem tried to convince Sutter that, "[a]s employers turn to employees for active and responsible engagement in choosing cost-effective care, their efforts are thwarted if there is no access to the provider community's cost data. Anthem encourages Sutter to join the spirit of cost containment by agreeing to remove the terms of the contract that prohibit publication of that data. Anthem proposes removal of contract provision that restricts

---

[221] Melissa Brendt Deposition Exhibit 2376, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Randy Lukins, then Senior Contract Manager, Healthcare Management, at Anthem, April 19, 2005, DEF004260229-230, at 230. See also, Deposition of Melissa Brendt, Chief Contracting Officer at Sutter, June 18, 2018 (hereafter "Brendt Deposition (Sutter, June 18, 2018)"), pp. 21-22.

[222] *See, e.g.*, Melissa Brendt Deposition Exhibit 517, Letter from Isabelle "Tina" B. Greene, Assistant General Counsel at Sutter, to Lyle Swallow, Associate General Counsel at Blue Shield, May 10, 2005, DEF002655756-757, at 756-757 (informing Blue Shield that their Blue Shield Cardiac COE Network that excluded all Sutter Providers was a violation of their Systemwide Agreement and demanded they include all Sutter Providers in their Cardia COE Network,); LaCroix-Milani Deposition Exhibit 4154, Email from Becky LaCroix-Milani, then Regional Vice President, Provider Network Management at Health Net, to Melissa Brendt, Vice President, Managed Care at Sutter, "Subject: Fw: Health Net - counter offer #2," August 3, 2009, with attachment Letter from Becky LaCroix-Milani to Melissa Brendt, "RE: Health Net 2010 renewal – 2nd proposal," August 3, 2009, STCA0388318-320, at 319 ("Attached is Health Net's counter to Sutter's second proposal received July 17, 2009. ... We also want to reiterate our prior position, reflected in the proposed language concerning Centers of Excellence. Health Net will not be forced to recognize all current and future Sutter affiliates that perform services that may be required to meet certain criteria in order to be recognized in a network (i.e. bariatric, transplant)."); LaCroix-Milani Deposition Exhibit 4154, Email from Becky LaCroix-Milani to Sutter personnel, "Subject: Health Net proposal #10," December 31, 2012, HN-003215 – 218, at 215 ("In order to close on COEs, the attached Proposal #10 provide assurance that Health Net will introduce no new COEs in 2013. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████); LaCroix-Milani Deposition (Health NET, August 30-31, 2018), pp. 296-302, 311-314); Melissa Brendt Deposition Exhibit 682, Letter from Fred Dodson, then Vice President Pacificare of California, to Kris Vine, then Vice President and Chief Contracting Officer of Sutter, September 24, 2004, DEF005123816-818, at 816 (noting that Sutter had "request[ed] to require PacifiCare to offer Sutter Affiliates in our Centers of Excellence Programs (COE) regardless of the cost and quality of the Sutter providers"); Melissa Brendt Deposition Exhibit 683, Letter from Fred Dodson, then Vice President Pacificare of California to Pete McKinley, Senior Vice President, Network Management, at Pacificare, October 5, 2004, DEF007005547-548, at 547.

publication of Cost Transparency data."[223],[224] Not only does Sutter refuse to lift the information restrictions, but they actively police the marketplace to ensure compliance. For example:

- In an April 3, 2007 letter to Blue Shield, Melissa Brendt, then Vice President, Managed Care, at Sutter, expressed concern regarding "the potential release of confidential information in connection with the proposed Pay-For-Performance ('P4P') efficiency study sponsored by Integrated Healthcare Association ('IHA')."[225]

- On June 13, 2007, Kris Vine, then Vice President and Chief Contracting Officer at Sutter, sent a letter to Steve Melody, then Vice President, Health Care Management, at Anthem, "concerning Blue Cross' obligations to obtain Sutter's consent before disclosing Sutter affiliate-specific information to CalPERS" and "insist[ing] that you refrain from disclosing your communications to us and our communications to you

---

[223] Deborah Henning Deposition Exhibit 2863, Email from Deborah Henning, Regional Vice President, Network Management, at Anthem, to Melissa Brendt at Sutter, "Subject: Anthem Counter Proposal," October 24, 2013, with attached letter from Deborah Henning at Anthem to Melissa Brendt at Sutter, October 24, 2013, DEF004055013-018, at 016 (emphasis in original). *See also*, Aldo De La Torre Deposition Exhibit 1662, Email from Paige Rothermel, Vice President of Sales at Anthem, to ELBAC participants, "Subject: Network Update - - Sutter Health System," October 29, 2013, ABCLH161586-589 at 588 (██████████████████████████ ██████████).

[224] Evidence from other health plans also demonstrates a desire for similar transparency initiatives that were refused by Sutter. *See e.g.*, Brendhan Green Deposition Exhibit 3146, Email from Brendhan Green, former Vice President of Network Management at Aetna, to Aetna personnel, "Subject: FW: Sutter/Aetna Overview," April 25, 2012, with attachment "Sutter Health/Aetna Overview," April 25, 2012, AET-ESI0021370-375, at 375 (█ ████████████████████████████████████████ ████████████████████████████████████████).

[225] Melissa Brendt Deposition Exhibit 2713, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to David Joyner, then Senior Vice President, Network Management, at Blue Shield, April 3, 2007, DEF002437706 ("While Sutter Health supports the various transparency initiatives currently underway in our industry, we also believe that any data exchange and reporting must comply with the antitrust laws and the Enforcement Guidelines issued by the Department of Justice /FTC as well as with the applicable provisions of our Systemwide Amendment. (See in particular, Sections 6.07 and 6.09). Accordingly, until we are confident that Blue Shield has adequately addressed the antitrust issues, Sutter Health cannot consent to the release of confidential information, including affiliate- specific claims or encounter data. In addition, we are seeking assurance that Blue Shield will comply with the provisions of the Systemwide Amendment that give Sutter Health the right to consent prior to the release of confidential information, including affiliate- specific claims data, encounter data, or other cost information.").

on the subject of the affiliate-specific information and confidentiality provisions of the Systemwide Amendment."[226]

- Sutter sent additional correspondence to Blue Shield informing Blue Shield that its publication of Sutter Provider information on its Provider Performance Profile website "*is a very serious breach of the Blue Shield and Sutter Health Systemwide Amendment" and claiming it would seek an injunction against Blue Shield*.[227] Sutter made a comparable request regarding Sutter's professional providers and demanded Blue Shield "remove all Sutter providers from the Blue Shield Provider Performance Profile website (including any website link to CalPERS) immediately."[228]

73.     In 2010, it appears that Sutter briefly considered the possibility of participating in transparency initiatives. For example, in a January 2010 email exchange among Sutter executives, including Linda Khachadourian, Chief Enterprise Transformation Officer at Sutter, and Peter Anderson, Chief Strategy Officer at Sutter, described the potential benefits of price

---

[226] Melissa Brendt Deposition Exhibit 2381, Letter from Kris Vine, then Vice President and Chief Contracting Officer at Sutter, to Steve Melody, then Vice President, Health Care Management, at Anthem, June 13, 2007, DEF005230414. *See also,* Email from Steve Melody, then Vice President, Health Care Management at Anthem, to Kris Vine, then Vice President and Chief Contracting Officer at Sutter, "Subject: Request for Release," May 31, 2007, DEF002723603.

[227] Melissa Brendt Deposition Exhibit 2712, Letter from Stephen L. Goff, Attorney at Law at McDonough Holland & Allen PC, counsel for Sutter, to Seth Jacobs, Senior Vice President and General Counsel at Blue Shield, October 31, 2008, BSC-UFCW 00003290-291 (emphasis added). Shortly thereafter, Melissa Brendt, then Vice President, Managed Care, at Sutter, followed up with a letter to Tracy Barnes, then Director, Provider Contracting Sacramento/Central Region, at Blue Shield, demanding Blue Shield remove Sutter Hospitals from the Provider Performance Profile website or replace the restricted information with an indicator that the data are not available. *See* Melissa Brendt Deposition Exhibit 2713, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Tracy Barnes, then Director, Provider Contracting Sacramento/Central Region, at Blue Shield, November 5, 2008, DEF004968290-291, at 290 ("Sutter Health has asked on numerous occasions that Blue Shield not disclose information on its website as to 'efficiency measures' for Sutter Providers, and that Blue Shield only report information on quality and patient satisfaction that is publicly available in a format that is standard for public display. As we discussed on our telephone call yesterday, to remedy this breach of the Systemwide Amendment to Sutter's satisfaction for the Sutter hospitals, Blue Shield must either remove Sutter hospitals from the Provider Performance Profile website that reports any cost indicator/efficiency measure for either inpatient or outpatient cost or place an indicator in the field that holds the dollar signs that reads 'NO DATA AVAILABLE'.").

[228] Melissa Brendt Deposition Exhibit 2713, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Tracy Barnes, then Director, Provider Contracting Sacramento/Central Region, at Blue Shield, November 5, 2008, DEF004968290-291, at 291.

transparency to Sutter.[229] Kris Vine, then Vice President and Chief Contracting Officer at Sutter, and Melissa Brendt, then Vice President of Managed Care at Sutter, disagreed and asked "[m]aybe we should solve world hunger too" and "Peter has got to be kidding--right?"[230] On the heels of this communication, Sutter then sent letters to health plans reminding them of their obligations under the confidentiality provisions of the Systemwide Agreements, thereby thwarting health plans' transparency initiatives.[231]

74. Collectively, this evidence provides insights for my economic analysis. It demonstrates that health plans wanted to compete with steering strategies, but the challenged restrictions blocked their efforts. If in fact health plans did not want to engage in steering strategies, Sutter would not have had to police compliance with their policies.

---

[229] Peter Anderson Deposition Exhibit 3043, Email communications among Sutter personnel, "Subject: 2010 Pricing & Charging PSDP Objective," January 25-26, 2010, DEF000409422-423.

[230] Peter Anderson Deposition Exhibit 3043, Email communications between Kris Vine and Melissa Brendt, "Subject: Re: 2010 Pricing & Charging PSDP Objective," January 26, 2010, DEF000409422-423, at 422.

[231] *See, e.g.*, Melissa Brendt Deposition Exhibit 2710, Email from Sina Santagata, on behalf of Kris Vine, then Vice President and Chief Contracting Officer at Sutter, to Brendhan Green, then Vice President, Network Management Northern CA, at Aetna, October 11, 2010, with attachment Letter from Kris Vine at Sutter to Brendhan Green at Aetna, October 11, 2010, DEF000207165-167, at 166-167 (stating that Aetna's "unauthorized disclosure of confidential rate information is a material breach of [Section 6.08.1 of] the Systemwide Agreement" and requesting that Aetna "[r]emove from the Aetna web site all Confidential Information, including but not limited to rate information, regarding Sutter providers."); Melissa Brendt Deposition Exhibit 2722, Email from Sina Santagata, on behalf of Kris Vine, then Vice President and Chief Contracting Officer at Sutter, to Janet Lundbye, then Vice President, Network Management Northern CA at United, with attachment Letter from Kris Vine at Sutter to Janet Lundbye at United, November 22, 2011, DEF000207186-188, at 187 (stating that "it appears that UHC has violated the confidentiality requirements of the Systemwide Agreement between Sutter Health and UHC. As you know, we were provided an example of the Treatment Cost Estimator for a Sutter Affiliate Provider by your staff. The unauthorized disclosure of confidential rate information is a breach of [Sections 6.08.1 and 6.06 of] the Systemwide Agreement."); Melissa Brendt Deposition Exhibit 2820, Email from Sina Santagata, on behalf of Melissa Brendt, then Vice President Managed Care at Sutter, to Benjamin Katz, Vice President, Provider Network Management, at CIGNA, April 13, 2011, with attachment Letter from Melissa Brendt at Sutter to Benjamin Katz at CIGNA, April 13, 2011, DEF000207542-545, at 543-545 (regarding CIGNA's disclosure of Sutter paid claims data, which Melissa Brendt contends was a violation of Sections 6.06, 6.08, and 2.14.4 of their Systemwide Agreement.); Melissa Brendt Deposition Exhibit 3457, Letter from Melissa Brendt, then Vice President Managed Care at Sutter, to Benjamin Katz, Vice President, Provider Network Management, at CIGNA, June 12, 2012, DEF005361700-701, at 700-701 (informing CIGNA that its plan "to publish its Quality and Cost Efficiency Data for what it refers to as a Centers of Excellence ('COE') Program and Hospital Value Tool for Sutter Hospitals" "is a clear violation…of our [Systemwide Agreement].").

**D.      Other Hospitals and Hospital Systems in Northern California Do Not Utilize the Challenged Contractual Provisions in Contracts with Health Plans**

75.      According to both health plan and non-Sutter hospital deposition testimony, the challenged contractual restrictions are unique to Sutter. I provide an overview of that evidence here.

*1.      Health Plan Testimony*

76.      Executives from each of the Class Health Plans have testified that Sutter is the only hospital system in Northern California that uses its own systemwide contract language with health plans, whereas health plans typically use their own model contracts with hospitals. For example:

- *Anthem*: Steve Melody, Director of Network Development and Management for Northern California at Anthem until 2001 and then VP of Health Care Services at Anthem until 2009, states that "Sutter's 'systemwide' contracts are unique because they are negotiated from a standard form provided by Sutter. Sutter is the only provider I know that insists on using its own 'paper' for the contract. By contrast, non-Sutter providers in Northern California have agreed to negotiate off of Anthem's standard provider contract."[232]

- *Blue Shield*: In a 2014 pre-negotiation document, Blue Shield notes "Sutter is on their own paper and are not using any model language."[233] David Joyner, Senior Vice President, Network Management, at Blue Shield, explains that Sutter's "systemwide agreements" were "significantly different" than Blue Shield's contracts with non-Sutter providers, which did not require their own paper like Sutter did.[234]

---

[232] Melody (Anthem) Declaration, ¶ 10.

[233] Tami Lucas Deposition Exhibit 1547, Email from Anita Lee, Lead Business Analyst, Network Performance, Network Management at Blue Shield, to Tami Lucas, then Senior Network Manager, Provider Contracting, at Blue Shield, "Subject: Sutter Health Hospital Pre-negotiation Checklist," June 25, 2014, with attachment "Sutter Health: contract opportunities checklist," June 2014, BSC-UEBT-0015383-431, at 387.

[234] Joyner (Blue Shield) Declaration, ¶ 14.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- *Aetna*: Similarly, Aetna's Chandra Welsh explains: "Because [Sutter is] spread across the market, they are often the monopoly provider in a given area or one of two options. They are the true 800 pound gorilla in our market. Their leverage over all health plans is enormous. In fact, all health plans contract with Sutter using 'Sutter paper' and not their own boilerplates."[235]

Health Net[236] and United[237] also make comparable claims regarding ███████████

████████████████

77.    Health plans also explain that no other hospital or hospital system imposes the same set of comprehensive restrictions, and no other hospital or hospital system imposes non-par rates as high as high as 95 to 100 percent of billed charges. For example:

- *Anthem*: Anthem's Steve Melody, former Director of Network Development and Management for Northern California and Vice President of Health Care Services, explains that, "because of Sutter's market power, it is able to impose unique terms in its 'systemwide' contracts required by no other California provider with whom

---

[235] Welsh (Aetna) Declaration, ¶ 8 (citing Exhibit 1, an email thread between Chandra Welsh and Aetna personnel, "Subject: RE: Sutter appeal," September 29, 2011, AET-ESI0022876-880, at 876). *See also,* Greg Stevens Deposition Exhibit 3690, Email from Brendhan Green, former Vice President of Network Management at Aetna, to Greg Stevens, Vice President, Network, West Region at Aetna, "Subject: RE: Sutter – Approval Request," November 15, 2011, AET-ES10025034-038, at 034 (███████████████████

███████████████████

[236] *See, e.g.,* LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 187-188 ("Q. ████████

████████████████). *See also, e.g.,* Lundbye Deposition (United, May 15-16, 2018), pp. 381-382 ("Q. ████████

████████████████

[237] *See, e.g.,* Lundbye (United) Declaration, Exhibit 2, "Sutter Health Strategy Meeting," September 29, 2010, UHC00499801-877, at 835 (noting that its contract with Sutter is "[o]n Sutter's contract paper").

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    70

Anthem contracts."[238] He goes on to explain that "Sutter's non-par provision is unique. In my experience, Sutter is the only provider I am aware of that has imposed any non-par rate—let alone a non-par rate of 100% of billed charges."[239] He also states that he is "not aware of any other provider imposing provisions substantially similar to Sutter's 'Equal Treatment' or 'Tiered Products' provisions."[240]

- *Blue Shield*: Tracy Barnes, Director of Contracting for Northern California at Blue Shield, testified that "Sutter is the only provider that has insisted on having in its contracts 95 percent of billed charges for non-participating."[241]

- *Health Net*: Thomas Hamilton, Regional Health Plan Officer at Health Net, testified that ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████[242]

- *United*: Janet Lundbye of United testified that ████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████[243] ███████████████████████ ███████████████████████████████████████ █████████[244]

- *Aetna*: ███████████████████████████████ ███████████████████████████████████████

---

238 Melody (Anthem) Declaration, ¶ 10.

239 Melody (Anthem) Declaration, ¶ 22.

240 Melody (Anthem) Declaration, ¶ 31.

241 Barnes Deposition (Blue Shield, January 30 – February 1, 2018), p. 364.

242 Hamilton Deposition (Health Net, September 11, 2018), p. 206.

243 Lundbye Deposition (United, May 15-16, 2018), pp. 199-202.

244 Lundbye Deposition (United, May 15-16, 2018), pp. 149-150.



[245] Chandra Welsh, VP for Network Management in Northern California at Aetna, testified that ███████████ ████████████████████████████████████ [246] ████████ ███████████████████████████████████████ ████████████████████████████ [247]

78.     Anthem's Mr. De La Torre also explains that Sutter's contract is unique with respect to its confidentiality and non-disclosure provisions. Specifically, he says that "[u]nlike all other California hospitals, Sutter's contract prohibits the disclosure of meaningful cost data/information to support Anthem's clients" and that "Sutter is the only contract with a gag clause." [248] Anthem requested "removal of contract provision that restricts publication of Cost Transparency data."[249]

---

[245] Greg Stevens Deposition Exhibit 3690, Email from Brendhan Green, former Vice President of Network Management at Aetna, to Greg Stevens, Vice President, Network, West Region at Aetna, "Subject: RE: Sutter – Approval Request," November 15, 2011, AET-ES10025034-038, at 034.

[246] Welsh Deposition (Aetna, August 28, 2018), p. 118.

[247] Welsh Deposition (Aetna, August 28, 2018), pp. 273-274.

[248] De La Torre (Anthem) Declaration, ¶ 9. *See also,* Aldo De La Torre Deposition Exhibit 1662, Email from Paige Rothermel, Vice President of Sales at Anthem, to ELBAC participants, "Subject: Network Update - - Sutter Health System," October 29, 2013, ABCLH161586-589, at 588

[249] Deborah Henning Deposition Exhibit 2863, Email from Deborah Henning, Regional Vice President, Network Management, at Anthem, to Melissa Brendt at Sutter, "Subject: Anthem Counter Proposal," October 24, 2013, with attached letter from Deborah Henning at Anthem to Melissa Brendt at Sutter, October 24, 2013, DEF004055013-018, at 016 (emphasis in original).

████████████████████████████████████████████████████
████████████████████████████████████ ,,250

### 2.  *Non-Sutter Hospital Testimony*

79.    Consistent with health plan testimony, deposition testimony of executives of other large hospital systems in Northern California supports the conclusion that Sutter is unique in its use of the challenged restrictions.[251] For example, other systems in Northern California do not implement the same complement of provisions that force health plans to carry all providers as in-network providers:[252]

- Dignity Health ("Dignity"), the second largest hospital system in Northern California (after Sutter), ████████████████████████████[253] but the ████████████████████████████[254] According to Ezequiel Tasabia, former Director of Managed Care at Dignity from 1999 to 2013, █████████████

---

[250] Brendhan Green Deposition Exhibit 3146, Email from Brendhan Green, former Vice President of Network Management at Aetna, to Aetna personnel, "Subject: FW: Sutter/Aetna Overview," April 25, 2012, with attachment "Sutter Health/Aetna Overview," April 25, 2012, AET-ESI0021370-375, at 375.

[251] Executives from each of the following four Northern California hospital systems were deposed: (a) Dignity Health; (b) Adventist Health; (c) Tenet Healthcare; and (d) University of California. These four are the second, third, fifth, and seventh largest hospital systems in Northern California based on number of hospitals, respectively, after Sutter. I understand executives representing St. Joseph's Health System, Daughters of Charity Health System, HCA Healthcare Corporation, and Prime Healthcare Services—the other large hospital systems in Northern California—were not deposed. *See* Chipty SJ Declaration, Exhibits 3A and 3B.

[252] Consistent with this evidence, in 2016 Sutter ███████████████████████████████████████ *See* Deposition of Jon Chason, Vice President of Managed Care Analysis at Sutter, May 23-25, 2018 (hereafter "Chason Deposition (Sutter, May 23-25, 2018)"), pp. 539 (" ████████████████████████████████████████████████████████████████████ A: Yes."). *See also*, Jon Chason Deposition Exhibit 2419, Email from Jon Chason, Vice President of Managed Care Analysis at Sutter, to Sutter colleagues, "Subject: RE: OON and non-par rates -education training session follow-up," July 1, 2016, with attachment " ██████████████████████████ DEF000730479-499, at 499.

[253] Deposition of Tammy Wilcox, Senior Vice President Managed Care at Dignity Health, October 19, 2018 (hereafter "Wilcox Deposition (Dignity, October 19, 2018)"), p. 27 ( ████████████████████████████████████████████████████████████████████████████

[254] Wilcox Deposition (Dignity, October 19, 2018), p. 126 (" ███████████████████████████████████████████████████████████████



[255] and

[256]

- Adventist Health ("Adventist"), the third largest hospital system in Northern California (after Sutter), negotiates contracts for each of its hospitals separately.[257] Jeffery Conklin, Senior Vice President Payer and Network Strategies at Adventist, testified that he is not aware of contractual provisions that would require all Adventist hospitals to be in-network.[258]

- Tenet Healthcare Corporation ("Tenet"), the fifth largest healthcare system in Northern California (after Sutter), uses the health plans' contracting templates.[259] Further, as explained by Dawn Cirri, Assistant Vice President Payer and Network Strategies at Tenet, "it is often … the [health plan that] determines the scope of their

---

[255] Deposition of Ezequiel Tasabia, Director of Managed Care at Dignity Health from 1999 to 2013, May 16, 2018 (hereafter "Tasabia Deposition (Dignity, May 16, 2018)"), p. 33 ("

[256] Tasabia Deposition (Dignity, May 16, 2018), p, 34 (

[257] Deposition of Jeffery Conklin, Senior Vice President Payer and Network Strategies at Adventist Health, October 9, 2018 (hereafter "Conklin Deposition (Adventist, October 9, 2018)"), pp. 21–22 ("Q: So my question is about generally how Adventist goes . . . about contracting with payers, whether there is a systemwide or regional approach or individual hospitals. How -- how does it work? A: Okay. We have a team that's based in markets – generally, our hospitals refer to those as markets -- and then roll up to regions, and then the system. And we have a team that resides in the markets, or in the regions, that handles negotiations locally. They're part of my team. So we guide them from the system, but they negotiate in markets. … Q: Markets -- how would you define 'markets' in that sense? . . . A: It's just our terminology for where hospitals are. Q: How many markets are within the Adventist system? A: The way I would count that is by the number of hospitals. And we currently have, I think -- I should know -- 20 or 21.").

[258] Conklin Deposition (Adventist, October 9, 2018), pp. 150-151, ("MS. REICHER: Q. In your negotiations with health plans, have you ever negotiated a contractual provision that states that all Adventist providers must be included in any product offered by a health plan . . . MR. TATE: And again, we're talking Northern California . . . THE WITNESS: No . . . THE WITNESS: So you're asking me if our contracts have language requiring all of our hospitals to be in? MS. REICHER: That's right. THE WITNESS: No, we don't. I'm not aware that we have those provisions.").

[259] Deposition of Dawn Cirri, Assistant Vice President of Managed Care at Tenet Healthcare since December 2013, October 17, 2018, (hereafter "Cirri Deposition (Tenet, October 17, 2018)"), p. 43 ("A. Tenet does not have a contracting template. We take the payor's template.").

contracting responsibility, which often determines whether or not hospitals are included or are not included in a contract."[260]



[261]

80.    The Dignity, Adventist, and UC hospital systems confirmed that, unlike Sutter, they do not have written policies prohibiting the use of narrow or tiered networks:[262]

- Dignity has participated in tiered products with only some Dignity providers and products where certain Dignity providers were not in the most-preferred tier.[263] Tammy Wilcox, Senior Vice President Managed Care at Dignity, could not recall instances where Dignity did not want to participate in narrow networks because all

---

[260] Cirri Deposition (Tenet, October 17, 2018), pp. 15-16.

[261] Deposition of Reese Fawley, Vice President of Health Plan Strategy and Managed Care at UCSF, October 10, 2018, (hereafter "Fawley Deposition (UCSF, October 10, 2018)"), pp. 39-40. *See also,* Deposition of Annie Wong, Director of U.C. Davis Health Contracts at U.C. Davis, September 27, 2018, (hereafter "Wong Deposition (UC Davis, September 27, 2018)"), p. 172 ("MR. REESE: Q. . . . In your negotiations with health plans, you are negotiating for U.C. Davis only, not for other U.C. campuses, like UCSF or UCLA; is that right? A. That is correct.").

[262] With respect to Tenet, the testimony was ambiguous. *See, e.g.* Cirri Deposition (Tenet, October 17, 2018), p. 108 ("Q. Okay. Are there any other circumstances where a network might include some but not all of Tenet's facilities? . . . A There could be or there could not be. I don't know."); and Cirri Deposition (Tenet, October 17, 2018), p. 110 ("Q. Using that definition [of narrow networks as having less than 100 percent of the contracted providers in a full PPO network], has Tenet participated in narrow networks? A. If a payor invites us to participate in a network that is narrow, we may or may not participate.").

[263] Wilcox Deposition (Dignity, October 19, 2018), p. 70 ■



); and p. 122 (                                                                              ). *See also,* Tasabia Deposition (Dignity, May 16, 2018), p. 37 (

Dignity providers were not included,[264] and Ezequiel Tasabia, Director of Managed Care at Dignity from 1999 to 2013, ███████████████████████ ███████████████████████[265]

- Adventist has not negotiated provisions with health plans that penalize members for accessing and Adventist provider or that require health plans to treat all providers in the provider network equally.[266,267] In addition, health plans are free to tier Adventist providers without the prior agreement of Adventist under its agreement.[268]



- ████████████████████████████████████████ ████████████████████[269] and ██████████████ ███████████████████████████████████████ ███████████████████████████[270]

81.   Furthermore, while certain types of confidentiality clauses are common in health contracts, executives at Adventist Health, University of California, and Tenet were

---

[264] Wilcox Deposition (Dignity, October 19, 2018), p. 70 ("███████████████████████████████████████ ████████████████████████████████████████████████████

[265] Tasabia Deposition (Dignity, May 16, 2018), pp. 42 – 43 ("████████████████████████████ ████████████████████████████████████████████████████

[266] Conklin Deposition (Adventist, October 9, 2018), p. 138 ("MS. REICHER: Q. Has Adventist ever negotiated the inclusion of a provision that prohibits health plans from penalizing members for accessing an Adventist provider? THE WITNESS: Penalizing -- no, no, I can't think of any circumstance for that.").

[267] Conklin Deposition (Adventist, October 9, 2018), p. 139 ("Q: Has Adventist ever negotiated the inclusion of a provision that requires a health plan to treat all providers in the provider network equally? . . . THE WITNESS: . . . No, we have not.").

[268] Conklin Deposition (Adventist, October 9, 2018), p. 133 ("MS REICHER: Q. Under your contracts with the health plans, are the health plans free to tier Adventist providers without your prior agreement? . . . THE WITNESS: Yes. Yes, they are.").

[269] ████████████████████████████████████████████████████████████████████████████

[270] ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

not aware of contractual provisions restricting price transparency to plan members.[271,272] Health plans have created tools, such as United's Treatment Cost Estimator and Blue Shield's Provider Performance Profile, to provide their members with the ability to compare the costs of different providers when specific healthcare needs arise, but ███████████ ███████████████████████████[273] Compliance with the Sutter provisions necessarily reduces the value of price transparency tools to residents of Northern California, including the Class Members.

## V.      Market Definition

82.      I turn now to the issue of market definition. As I explained in my SJ Declaration, market definition entails defining a set of relevant products and relevant geographies where the challenged conduct might harm competition and consumers. With a well-defined relevant market, one can compute market shares that can provide indirect evidence of market power. Without market power, the firm alleged to have engaged in the challenged conduct could not meaningfully harm competition because the firm would be disciplined by competitive forces and any competitive effects associated with the challenged conduct would be undone by market forces. Thus, structural analysis of market definition

---

[271] *See* Conklin Deposition (Adventist, October 9, 2018) pp. 148-149 (MS. REICHER: Q. Has Adventist ever told a health plan that they couldn't provide Adventist rate information on one of these online tools for its members? . . . THE WITNESS: No, I don't -- I don't recall any instances where our contracts have called that out. . . .MS REICHER: Q. Are you aware of Adventist ever refusing to participate in online price transparency tools -- by any party? A: It wouldn't be my area of expertise within the system, but I'm not aware of it."); ████████████████

████████████████████████████████████████████

[272] I note that, according to the deposition testimony of Tammy Wilcox, Senior Vice President Managed Care at Dignity Health, "Dignity Health generally strives to require health plans to only disclose information that is accurate. And ideally, for the health plans to disclose to us what they are going to disclose externally in advance of any external disclosure so that we can review its accuracy." *See* Wilcox Deposition (Dignity, October 19, 2018), p. 115.

[273] Brendt Deposition (Sutter, July 12, 2018), pp. 236-262 ("Sutter has refused to grant its consent to Blue Shield's web-based provider performance profile"); and Brendt Deposition (Sutter, June 13, 2018), pp. 717-722.

(and market power in the relevant antitrust market) provides a diagnostic tool to assess the likelihood of competitive harm. Of course, one can also assess market power and competitive harm through direct evidence of supra-competitive pricing, the ability to force purchasers to buy on unwanted terms, or the ability to exclude competition. Where available (as is the case here), the direct evidence itself can assist with the exercise of market definition.

83.     I begin with a discussion of the principles of market definition and then turn to evidence from applying those principles to arrive at a set of relevant markets, which include both Tying and Tied Markets. Based on this analysis, I conclude that GAC inpatient hospital services sold to health plans in various geographic markets in Northern California are economically coherent and valid antitrust markets for the purpose of assessing the effects of Sutter's challenged conduct.

## A.     Principles of Antitrust Market Definition

84.     There are two dimensions of a relevant market: product market and geographic market. A product market consists of a set of goods and/or services that consumers regard as reasonable substitutes for one another.[274] A geographic market consists of a geographic area over which consumers consider the relevant products to be reasonable substitutes.[275] A relevant antitrust market is the combination of the relevant products and geographies.[276]

---

[274] U.S. Department of Justice and the Federal Trade Commission, Horizontal Merger Guidelines, August 19, 2010, available at https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf, *site visited* June 17, 2018 (hereafter "*Merger Guidelines*"), at p. 8 ("When a product sold by one merging firm (Product A) competes against one or more products sold by the other merging firm, the Agencies define a relevant product market around Product A to evaluate the importance of that competition. Such a relevant product market consists of a group of substitute products including Product A. Multiple relevant product markets may thus be identified.").

[275] *Merger Guidelines*, at p. 13 ("The arena of competition affected by the merger may be geographically bounded if geography limits some customers' willingness or ability to substitute to some products, or some suppliers' willingness or ability to serve some customers.").

[276] *Merger Guidelines*, at p. 8 ("Although discussed separately for simplicity of exposition, the principles described in Sections 4.1 and 4.2 are combined to define a relevant market, which has both a product and a geographic dimension.").

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

85.     In defining relevant markets, economists begin with a hypothesis about the boundaries of a possible relevant market (called a "candidate market"), and then use a well-known framework—called the "hypothetical monopolist test"—to assess whether that candidate market is a relevant antitrust market.[277] The hypothetical monopolist test is a thought experiment that asks whether a profit-maximizing hypothetical monopolist over a candidate market would impose at least a "small but significant and non-transitory increase in price ('SSNIP')," which is typically taken to be five or ten percent.[278] One can begin this thought experiment by positing a candidate market that specifies both product and geographic dimensions. One then imagines that a "hypothetical monopolist" controls all present and future sales of the products in the candidate market and asks whether the hypothetical monopolist would find it profitable to impose at least a SSNIP on at least one product in the candidate market.[279] The price increase would be profitable if it causes little substitution away from the candidate market, either to products outside of the candidate product market or to products outside of the candidate geographic market or both. This substitution outside of the candidate market is sometimes referred to as "outflow." If the price increase is anticipated to cause significant outflow, the attempted price increase will not be profitable for the hypothetical monopolist,[280] and the candidate market is not a relevant antitrust market. In that case, the economist would repeat the exercise with a broader candidate market that includes products or geographies to which consumers turned to defeat the price increase in the initial candidate market. Increasingly broad candidate markets would continue to be tested until one arrives at a market in which a price increase over at least one product would lead to sufficiently little outflow that the hypothetical

---

[277] Merger Guidelines, at pp. 8-10.

[278] *Merger Guidelines*, at p. 10 ("The Agencies most often use a SSNIP of five percent of the price paid by customers.").

[279] *Merger Guidelines*, at p. 9 ("The hypothetical monopolist test requires that a product market contain enough substitute products so that it could be subject to post-merger exercise of market power significantly exceeding that existing absent the merger. Specifically, the test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ('hypothetical monopolist') likely would impose at least a small but significant and non-transitory increase in price ('SSNIP') on at least one product in the market, including at least one product sold by one of the merging firms.").

[280] The price increase would not be profitable if the hypothetical monopolist would lose more profit from patient outflow that it would gain from the higher price on sales remaining within the candidate market.

monopolist would find it profitable to impose a SSNIP. That market is a relevant antitrust market.

86.     There are several noteworthy aspects of market definition that can guide the practitioner:

- First, a well-defined antitrust market does not have to be a closed system but can have *some* inflows and outflows.[281] The hypothetical monopolist test provides a framework to assess whether those flows are sufficient to deter firms from increasing prices, and small outflows would not prevent such firms from raising prices.

- Second, one must be careful not to trigger what has become known as the "Cellophane Fallacy" in applying the framework of the hypothetical monopolist test in a market in which prices are already elevated as a result of a firm's historical exercise of substantial market power.[282] In such cases, naïve application of the hypothetical monopolist test may lead to too broad of a market.

- Third, there can be more than one relevant market that satisfies the hypothetical monopolist test and where the effects of the conduct could be felt.[283] What matters is that there is at least one relevant market in which the firm has market power.

- Fourth, market definition is not a precise exercise, and there may be reasonable variants, all of which may be approximately right.[284] What is important is that one's conclusions about market power, competitive effects, and harm to competition are robust to reasonable alternatives to the precise boundaries of the relevant market.

87.     In any particular case, economists use available evidence to apply the hypothetical monopolist test. Such evidence may come from ordinary-course business

---

[281] *Merger Guidelines*, at p. 9 ("Groups of products may satisfy the hypothetical monopolist test without including the full range of substitutes from which customers choose. The hypothetical monopolist test may identify a group of products as a relevant market even if customers would substitute significantly to products outside that group in response to a price increase.").

[282] Chipty SJ Declaration, ¶ 41.

[283] *Merger Guidelines*, at p. 9 ("The hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market.").

[284] *Merger Guidelines*, at p. 7 ("Relevant markets need not have precise metes and bounds.").

documents, testimony of industry participants, and data that capture consumers' preferences. In cases in which sufficient information is available, one may implement a full numerical calculation to assess the price increase that a hypothetical monopolist over the candidate market would find profitable, but a numerical calculation is not necessary nor is it always the most reliable in comparison to qualitative evidence. In cases where a full numerical calculation is not possible, one still uses the framework of the hypothetical monopolist test to evaluate the available evidence on consumers' ability to defeat an attempted price increase.[285] In this matter, I have presented both qualitative and quantitative evidence within the framework of the hypothetical monopolist test to evaluate whether the candidate markets described in the Complaint constitute economically meaningful relevant antitrust markets for the purposes of assessing the competitive effects of Sutter's conduct.

## B.    GAC Inpatient Hospital Services Sold to Non-Kaiser, Commercial Health Plans Are a Relevant Product Market

88.    As I explained in my SJ Declaration, Dr. Gowrisankaran does not dispute Plaintiffs' candidate product market of GAC inpatient services.[286] GAC hospitals provide a wide variety of acute care inpatient services that are not substitutes for one another. For example, a hip replacement is not a substitute for a normal delivery. However, for practical reasons largely out of convenience, antitrust analysts have aggregated inpatient services together for the purpose of analyzing competitive effects, when the conduct at issue is likely to affect the cluster of inpatient services in the same way.[287] This condition will tend to be satisfied in circumstances where the cluster of services faces similar competitive conditions.

---

[285] *Merger Guidelines*, at p. 12 ("Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition.").

[286] Gowrisankaran Deposition (February 6, 2018), p. 116 ("I have not contested that definition in any way, and so I've accepted the plaintiffs' statement that that is the product market.").

[287] Tenn, Steven, "Key Takeaways from the Advocate-Northshore Merger Litigation," *Competition Policy International*, 2017, available at http://www.crai.com/sites/default/files/publications/Key-Takeaways-from-the-Advocate-Northshore-Merger-Litigation.pdf, *site* visited September 1, 2017, footnote 15 ("Individual inpatient [hospital] services generally are not substitutes for each other. For example, a cardiac procedure is not a substitute for an orthopedic procedure. Because of this lack of interchangeability, in principle one might separately delineate each individual inpatient [hospital] service as a distinct product market. Instead, solely for analytical convenience, a 'cluster market' of inpatient [hospital] services is typically employed in hospital mergers.").

89.    Outpatient services are not a substitute for inpatient services.[288] Some services, like a surgery to deliver a baby (known as a cesarean section), are only performed on an inpatient basis. Other services can be performed either on an inpatient or outpatient basis. But even in these circumstances, there are differences in medical need. Outpatient services tend to be less complicated, or rather performed on patients with fewer medical complications, and, as such, outpatient services tend to be less expensive. Thus, because health insurance coverage is typically purchased before medical needs arise, consumers demand access to inpatient services even though outpatient services might be possible for some conditions, under some circumstances. To my knowledge, antitrust analysts have not aggregated outpatient services with inpatient services into a cluster of all hospital services largely because outpatient services face different competitive conditions. For example, facilities that provide only outpatient services compete with hospitals for outpatient but not inpatient services.

90.    For these reasons, a hypothetical monopolist over all inpatient services in a relevant geographic market would be able to raise prices for those services, despite the fact that some inpatient services could be provided on an outpatient basis. Furthermore, a provider network without inpatient hospital services would not be commercially viable because patients would not be willing to replace all inpatient care with outpatient care due to a small but significant and non-transitory increase in the price of inpatient services. Consistent with this fact, I am not aware of any health insurance products in California—whether commercial or government sponsored, whether fully-insured or self-insured—that do not offer inpatient coverage. Moreover, health plans could not substitute away entirely from inpatient services, even if they wanted to, because they are required by regulation to provide coverage for inpatient services.[289]

---

[288] *See* for example, "Brief and Required Short Appendix of Appellants Federal Trade Commission and State of Illinois (Public Version)," *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, et al.*, Case No. 16-2492, filed July 15, 2016, pp. 38-39; "Opinion," *ProMedica Health System, Inc. v. Federal Trade Commission*, Case No. 12-3583, filed April 22, 2014, § II.A; and "Opinion," *United States v. Rockford Memorial Corp.*, Case No. 89-1900, filed April 3, 1990, ¶ 16.

[289] Department of Managed HealthCare, "California Knox-Keene Health Care Service Plan Act and Regulations," 2018 Edition, §1300.67, at p. 619, *available at* https://www.dmhc.ca.gov/Portals/0/Docs/OLS/2018%20KKA%20and%20Title%2028.pdf, *site visited* April 17, 2019 ("The basic health care services required to be provided by a health care service plan to its enrollees shall

91.     Finally, as noted in Section III.D.2, Kaiser hospitals do not compete with Sutter for inclusion in provider networks. As such, GAC inpatient services provided by Kaiser hospitals are not in the relevant antitrust markets for the sale of inpatient hospital services to the Class Health Plans.

**C.     Certain Hospital Service Areas Are Relevant Geographic Markets**

92.     In my SJ Declaration, I also evaluated whether the candidate Tying and Tied Markets described in the Complaint constituted relevant geographic markets for the purpose of studying Sutter's conduct. The Complaint describes four candidate Tied Markets: (a) the Sacramento HSA, with Sutter Sacramento; (b) the San Francisco HSA, with CPMC-Main and CPMC-St. Luke's; (c) the Modesto HSA, with Sutter Modesto; and (d) the Santa Rosa HSA, with Sutter Santa Rosa. The Complaint also describes eight Tying Markets: (a) the combined areas of the Berkeley-Oakland HSAs; (b) the Crescent City HSA; (c) the Lakeport HSA; (d) the Antioch HSA; (e) the Jackson HSA; (f) the Tracy HSA; (g) the Auburn HSA; and (h) the Davis HSA.

93.     In this section, I provide an overview of my prior results, and I present new analyses that complement my prior work and strengthen my initial conclusions.

*1.     Overview of Prior Results*

94.     In my SJ Declaration, I applied standard methods for evaluating relevant geographic hospital markets to assess whether the Plaintiffs' proposed candidate markets were valid antitrust markets.[290] Using the framework of the hypothetical monopolist test, my analysis evaluated: (a) qualitative information from health plans, including health plan ordinary-course documents and testimony, about the importance of specific hospitals to their members and, as such, to their provider networks; (b) data on how far patients drive and what share of area-patients leave the area for inpatient care; (c) statistical and ordinary-course analysis of diversion and aggregate diversion outside of the candidate market; and

---

include, where medically necessary, subject to any copayment, deductible, or limitation of which the Director may approve: … (b) Inpatient hospital services…").

[290] Chipty SJ Declaration, ¶ 47.

(d) assessment of patient flows.[291] For the Tied Markets, I also performed numerical analyses demonstrating that a hypothetical monopolist in the Tied Markets could profitably impose more than a five percent price increase.

95.  Sutter's expert Dr. Gowrisankaran argues that the Dartmouth Atlas HSAs were "not constructed to be antitrust markets, are not equivalent to antitrust markets, and cannot be used to define antitrust markets," and that the "Dartmouth HSAs in California, including those identified by Plaintiffs as alleged tying and tied markets, exclude competitive alternatives."[292] As I have explained, antitrust economists routinely use off-the-shelf geographies—like zip codes, counties, towns, suburb designations—none of which have been created for antitrust analysis. Yet, the exercise of market definition involves determining whether the off-the-shelf geography satisfies the test for market definition and whether the conclusions drawn from a particular definition are sensitive to reasonable alternatives.[293,294] My SJ Declaration detailed the studies of consumer demand that I performed and those studies supported nearly all of the candidate markets that are defined by single or combined HSAs.

96.  Based on this analysis, I found that all four of the candidate Tied Markets are economically coherent antitrust markets. These Tied Markets are summarized in Exhibit 5A, below. I also found that the Berkeley-Oakland, Crescent City, Antioch, Lakeport, Jackson, Tracy, and Auburn HSAs are economically coherent relevant antitrust markets. These Tying Markets are summarized in Exhibit 5B.

---

[291] *Id.*

[292] Declaration of Gautam Gowrisankaran, PhD, in Support of Defendant Sutter Health's Motion for Summary Judgement Pursuant to Rule 56, October 5, 2017 (hereafter "Gowrisankaran SJ Declaration"), ¶ 11. I note that Dr. Willig reviewed Dr. Gowrisankaran's declaration and joins him in concluding that "HSAs do not constitute relevant geographic markets for inpatient hospital services." *See* Willig Declaration, ¶ 161.

[293] Chipty SJ Declaration, ¶ 21

[294] Dr. Willig also dismisses the geographic markets I have identified on the basis that "Dartmouth Atlas HSAs were not intended to be relevant antitrust markets." (*See* Willig Declaration, ¶ 133.) However, both forget that neither were any other building blocks, like zip codes, cities, and counties, which other experts and courts have relied upon, including in hospital antitrust matters. *See, e.g.,* the appellate decision in *St. Luke's-Saltzer* did not dispute that the relevant geographic market was Nampa, and the appellate decision in *Hershey-Pinnacle* accepted the relevant geographic market to be four Pennsylvania counties ("Opinion," *Saint Alphonsus Medical Center-Nampa Inc.; Saint Alphonsus Health System Inc.; Saint Alphonsus Regional Medical Center, Inc.; Treasure Valley Hospital Limited Partnership; Federal Trade Commission; State of Idaho; v. St. Luke's Health System Ltd.; St. Luke's Regional Medical Center, Ltd.; Saltzer Medical Group,* Case Nos. 1:12-cv-00560-BLW and 1:13-cv-00116-BLW, February 9, 2015, pp. 12-13; and "Opinion," *Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center; Pinnacle Health System,* Case No. 16-2365, filed September 27, 2016, pp. 19-21.).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit 5A**
**Summary of the Valid Antitrust Tied Markets**

| Geographic Market | Tied Hospital(s) |
| --- | --- |
| Sacramento HSA | Sutter Sacramento |
| San Francisco HSA | CPMC-Main and CPMC-St. Luke's |
| Modesto HSA | Sutter Modesto |
| Santa Rosa HSA | Sutter Santa Rosa |

*Source*: Chipty SJ Declaration, Section III.

**Exhibit 5B**
**Summary of the Valid Antitrust Tying Markets**

| Geographic Market | Tying Hospital(s) |
| --- | --- |
| Combined Areas of Berkeley-Oakland HSAs | Alta Bates-Main and Alta Bates-Summit |
| Crescent City HSA | Sutter Coast |
| Lakeport HSA | Sutter Lakeside |
| Antioch HSA | Sutter Delta |
| Jackson HSA | Sutter Amador |
| Tracy HSA | Sutter Tracy |
| Auburn HSA | Sutter Auburn |

*Source*: *See* source for Exhibit 5A.

### 2. *Additional Evidence in Support of Prior Work*

97.     Sutter's experts have been critical about relevant geographic markets that I have identified, substantively on the basis that they are "too small" to capture relevant competitive constraints. Sutter's expert Dr. Willig, for example, argues that there may be additional hospitals within each Sutter hospital's *primary service area* that may be important to consider.[295] A primary service area is a "draw area" from which the hospital draws its patients, and other practitioners have used this geographic construct to understand issues surrounding hospital competition related to mergers and joint ventures.[296] To be responsive to Sutter's criticisms, in

---

[295] *See e.g.*, Willig Declaration, ¶ 9 and Table 5 (describing Kaiser's share).

[296] The concept of a primary service area is used in the ordinary course by hospitals as well as by federal antitrust authorities tasked with oversight of hospital markets. For example, accountable care organizations track their 75

this section, I present additional evidence to assess whether key conclusions that may rely upon well-defined markets are robust to the consideration of broader areas that extend to each Sutter hospital's 75 percent primary service area, which is what Dr. Willig uses when he studies competition from Kaiser.[297] In this regard, the two conclusions that may potentially be dependent on well-defined antitrust markets are:[298] (a) a conclusion about Sutter's market power in the Tying Markets; and (b) a conclusion with respect to whether Sutter could have exercised its market power in the Tying Markets to impose onerous contractual restrictions upon Class Health Plans, which resulted in higher hospital prices and elevated insurance premiums in the Tied and the Tying Markets. As a preview, I find my conclusions with respect to both are robust to the broader areas.

98.    First, I find that the basic drivers of patient (and therefore consumer) preferences are substantively the same, regardless of whether the area in question concerns the defined relevant markets or the 75 percent primary service area ("PSA"):[299] (a) there is no material difference in the percent of patients that stay in these areas for hospital services; (b) there is no material difference in the average drive time for patients that stay in these areas; (c) there is no material difference in the average drive time for patients that leave these areas; and (d) there is no material difference in aggregate diversion inside the Tied Markets, where there are multiple hospitals to choose among. By "no material difference," I mean that these alternative analyses using the 75 percent PSA do not affect my opinions regarding market definition. These results show that a large fraction of area patients prefer to stay in the area, and those that leave drive significantly further for their hospital care, relative to those that stay. As discussed in my SJ

---

percent primary service area, which is defined as "the lowest number of postal zip codes from which [an accountable care organization participant] draws at least 75 percent of its [patients]." (*See* U.S. Department of Justice, "Statement of Antitrust Enforcement Policy Regarding Accountable Care Organizations Participating in the Medicare Shared Savings Program." *Federal Register*, Vol. 76, No. 209, 2011, available at https://www.gpo.gov/fdsys/pkg/FR-2011-10-28/pdf/2011-27944.pdf, *site visited* April 24, 2018, at p. 67028.)

[297] Willig Declaration, Table 5.

[298] I say "may potentially be" instead of "are" because in a conduct case, such as this, where there is direct evidence of Sutter's market power, one need not rely on market shares (the calculation of which requires a well-defined antitrust market) as a proxy for market power. Moreover, where there is direct evidence of Sutter imposing onerous contractual restrictions upon Class Health Plans that have the effect of result in higher prices and higher insurance premiums, the competitive effects conclusions would be robust to many alternative geographies.

[299] *See* Appendix C.

Declaration, these results suggest the preferences of those that stay may well be different from those that leave the area for care. Accordingly, it would be a mistake to "focus on the patients who leave a proposed market instead of on hospitals' market power over the patients who remain, which means that the hospitals have market power over the health plans who need them to offer commercially viable products to customers who are reluctant to travel farther for general acute hospital care."[300]

99.    Second, there are relatively few additional non-Sutter, non-Kaiser hospitals in the 75 percent PSA, as compared to the relevant geographic market, for each of the Sutter Tying Hospitals. In fact, there are *no additional non-Sutter hospitals*—as such no competitors that could have been ignored—in moving from the relevant geographic area to the 75 percent PSA for Sutter Coast, Sutter Lakeside, Sutter Delta, Sutter Tracy, and Sutter Amador. There would be one additional hospital identified for Sutter Auburn, and two additional hospitals identified for Alta Bates. (*See* the "Tying Markets" panel of Exhibit 6, below.) By contrast, there would have been four additional hospitals identified for Sutter Sacramento (on top of three), two additional hospitals (on top of six) for CPMC Main and CPMC St. Luke's, two additional hospitals (on top of one) for Sutter Modesto, and an additional hospital (on top of one) for Sutter Santa Rosa. (*See* the "Tied Markets" panel of Exhibit 6, below.)

---

[300] Chipty SJ Declaration, ¶ 15 (citing Advocate-North Shore Appellate Decision, pp. 25-26.).

**Exhibit 6**
**Number of Additional Non-Sutter, Non-Kaiser Hospitals in the 75 Percent PSA,**
**Relative to the Geographic Market**



■ Additional Non-Sutter, Non-Kaiser Hospitals in 75 Percent PSA
■ Non-Sutter, Non-Kaiser Hospitals in Geographic Market

*Notes*:

1. The 75 percent PSA corresponds to the 75 percent PSA for the Sutter hospital or hospitals located within that market, as of 2011. For the two geographic markets with multiple Sutter hospitals (San Francisco and Berkeley/Oakland), the PSA was constructed by first pooling the discharges from the Sutter hospitals in the market and then identifying the 75 percent PSA.

2. For each area, the hospitals in the geographic market are also included within the local Sutter hospital's 75 percent PSA.

*Sources*:

1. OSHPD Patient Discharge Data, 2011.

2. OSHPD Hospital Annual Financial Disclosure Data Pivot Profile, 2011.

3. Dartmouth Atlas of Healthcare HSA Listings, 2015.


On its surface, this pattern suggests that moving from the relevant geographic market to a broader area that Sutter's experts may endorse will do little to affect the relative market power of Sutter in the Tying and Tied Markets. If anything, these results suggest that Sutter's market

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    88

power in the Tying Markets and its opportunities for steering in the Tied Markets may be more expansive than originally described.

100.    Exhibit 7 describes the local Sutter hospital's share of discharges for *all patients who live* in the identified geography. The darker bar describes the local Sutter hospital's share in the relevant geography and the lighter bar the local Sutter hospital's share in the hospital's 75 percent primary service area. However, as I have explained, it would be a mistake to focus on the patients who leave a proposed market instead of on hospitals' market power over the patients who remain. Exhibit 8 describes the local Sutter hospital's share of discharges for *all patients who live and stay* to receive care in the identified geography. As seen here, Sutter's share is at or near 100 percent in all but one of the Tying Markets, and this fact is invariant to the geographies considered. Further, Sutter's share is substantially lower in the Tied Markets, relative to almost all of the Tying Markets, and this fact too is invariant to the geographies considered.

**Exhibit 7**
**Sutter Hospital Shares of Inpatient Discharges**
**for Patients Who Live in the Area, OSHPD 2011**

Notes:

1. Shares are calculated as the Sutter hospital's share of general acute care, inpatient discharges of patients living in the areas who are treated at non-Kaiser facilities.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    89

2. Shares are calculated only for the Sutter hospital(s) in the geographic area. In the San Francisco and Berkeley-Oakland areas, the share reflects the sum of shares of the Sutter hospitals in the geographic area.

*Sources*:

1. OSHPD Patient Discharge Data, 2011.

2. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

3. Northern CA Zip Code Lookup.

**Exhibit 8**
**Sutter Hospital Shares of Inpatient Discharges**
**for Patients Who Live and Stay in the Area, OSHPD 2011**



*Notes*:

1. Shares are calculated as the Sutter Tied or Tying Hospital's share of general acute care, inpatient discharges of patients living in the areas who are treated at non-Kaiser facilities located within the area.

2. Shares are calculated only for the Sutter hospital(s) in the geographic area. In the San Francisco and Berkeley-Oakland areas, the share reflects the sum of shares of the Sutter hospitals in the geographic area.

*Sources*: *See* sources for Exhibit 7.

101.    Thus, the additional evidence demonstrates that my conclusions with respect to market power and the competitive effects associated with the challenged conduct described in my SJ Declaration are robust to the consideration of each Sutter hospital's primary service area—as Dr. Willig appears to endorse.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

## VI.    Sutter Has Substantial Pre-Existing Market Power in the Tying Hospital Markets

102.    As explained in my SJ Declaration, market power refers to the ability of a firm or group of firms to raise prices above competitive levels or to force consumers to accept onerous terms they cannot avoid.[301] Only firms with sufficient market power can engage in unilateral anticompetitive conduct; absent market power, the conduct would be undone by competitive forces and as such could not have an anticompetitive effect. Thus, market power is a necessary condition to concluding anticompetitive effects. Given the theory of harm in this case, the question is whether Sutter has sufficient market power in one or more of the Tying Markets to force health plans into the onerous contractual restrictions described above. Also, as explained in my SJ Declaration, there can be several ways to assess market power. There can be both structural and direct evidence of market power. In this section, I show with a range of different approaches that Sutter has market power in its Tying Markets. I also present analysis of evidence that shows Kaiser does not constrain Sutter's market power in the upstream market.

### A.    Structural Evidence Shows Sutter's Market Power

103.    There is structural evidence, as developed in the prior section, that Sutter has market power in the Tying Markets. The Sutter Tying Hospitals have high market shares in the Tying Markets, and this impression is not sensitive to the exact geographic boundaries over which the shares are calculated. In particular:

- The local Sutter hospital's share of discharges among all patients who live in the Tying Markets ranges from nearly 40 percent to nearly 80 percent. (*See* Exhibit 7.)

- The local Sutter hospital's share of discharges among all patients who live and stay in the area for their inpatient care is 100 percent for six of the Tying Markets; and it is nearly 100 percent for one of the Tying Markets. (*See* Exhibit 8.)

- The local Sutter hospital's share of discharges remains high even when calculated over the local hospital's 75 percent service area. (*See* Exhibit 7 and Exhibit 8.)

---

[301] Chipty SJ Declaration, ¶ 132.

Such high shares in hospital markets are typically indicative of hospital market power over health plans.[302]

## B.   Direct Qualitative Evidence Shows Sutter's Market Power

104.   There is substantial direct qualitative evidence in this case that Sutter has market power over the Class Health Plans:

- Ordinary-course documents and testimony in this case show that Sutter has forced the Class Health Plans to accept the challenged restrictions and that these restrictions are not typical of the types of terms that other Northern California hospitals, including large health systems, are able to achieve with the health plans. (*See* the discussion in Sections IV.A, C, and D above.)

- Sutter describes itself as being the monopoly provider in the rural communities served by Sutter Coast, Sutter Lakeside, and Sutter Amador (Sutter's Rural Tying Hospitals).[303]

- Blue Shield has determined repeatedly over multiple negotiation cycles that its patients who rely on several of the Sutter hospitals in the Tying Markets are very insistent on the hospital being in their provider network.[304]

I have described more of this evidence in my SJ Declaration.[305]

---

[302] For example, in Advocate-Northshore, the Court found that the merged hospitals would control 60 percent of the relevant hospital market. *See* "Redacted Memorandum Opinion and Order," *Federal Trade Commission and State of Illinois* v. *Advocate Health Care Network, et al.,* Case No. 15 C 11473, filed March 16, 2017 in the United States District Court for the Northern District of Illinois Eastern Division, p. 17.

[303] Brendt Deposition (Sutter, May 15-16, 2018), pp. 200-202.

[304] Barnes Deposition (Blue Shield, January 30 - February 1, 2018), pp. 423-462. *See also,* Blue Shield, "IP Redirection Analysis 2014 data.xlsb," October 12, 2015, BSC_SutterSub00037814, Sheet = "Sutter_Redirection_Assumptions;" Blue Shield, "IP & OP Claims Summary by Major Sutter Hospitals_20150629.xlsb," June 30, 2015, BSC_SutterSub00063625; Blue Shield, "Blue Shield of California Presented to UFCW & Employers Benefit Trust," December 8, 2011, BSC_SutterSub00013018, at pp. 6 and 26; and Blue Shield, "CCSF Sutter Exclusion Scenario Summary," November 4, 2011, BSC_SutterSub00063496. Analyses by United also indicate that its members who rely on several Sutter hospitals in the Tying Markets are insistent on the hospital's inclusion in the provider network. *See* United, "Sutter Hosp Redirection Assumptions.xls," August 20, 2010, UHC-00118324; and United, "Sutter Redirection Assumptions 2 2 2014.xlsx," February 2, 2014, UHC-00203488.

[305] Chipty SJ Declaration, ¶¶ 135-137.

## C.      Sutter Tying Hospital Prices Are Higher than Benchmark Hospitals, Even Before Sutter Began to Force Health Plans into Systemwide Contracts

105.      Another indicator of market power can be the ability to charge higher prices for reasons that cannot be explained by positive factors, such as differences in quality. In this section, I first show that the Sutter Tying Hospitals have higher prices, using a method that directly accounts for Sutter's case mix. I also show that Sutter's ability to charge higher prices at its Tying Hospitals pre-dates the challenged conduct, using a different measure of price—hospital net patient revenues as a multiple of Medicare—which is available before and after Sutter began to engage in the challenged conduct. I then explain that higher prices at the Sutter Tying Hospitals cannot be explained by them offering higher quality services.

106.      As seen through these analyses, prices at the Sutter Tying Hospitals are generally higher than prices at: (a) non-rural, non-Sutter hospitals; and (b) other rural, non-Sutter hospitals that like the Sutter Rural Tying Hospitals inherently face less competition than hospitals in non-rural areas. (*See* Exhibit 9A-C, Exhibit 10, and Exhibit 11.) Consistent with the qualitative evidence, these analyses show that Sutter is able to charge higher prices at its Tying Hospitals, relative to both more competitive benchmarks (non-rural hospitals) and less competitive benchmarks (rural hospitals). Exhibit 11 also shows that Sutter's market power was pre-existing, because prices at the Sutter Tying Hospitals have been elevated above more competitive benchmarks since well before Sutter began to engage in systemwide contracting. Furthermore, a comparison of prices at the Rural Tying Hospitals and the Tied Hospitals shows that Sutter's Tying Hospital prices were higher than prices at Sutter's Tied Hospital prices in the years *before* Sutter began to engage in systemwide contracting. (*See* Exhibit 12.) This analysis suggests that the inpatient services provided at the Sutter Tying and Tied Hospitals are distinct products, with differentiated demand. Finally, in Section IX, I show that Sutter has been able to further elevate its prices in the Tying and the Tied Markets, through the use of its challenged restrictions; moreover, econometric analysis shows that prices at the Tied Hospitals and at Alta Bates are higher that they would have been otherwise in a world absent the anticompetitive conduct.[306]

---

[306] As I explained in my class declaration, one should not conclude that there is no room for competitive harm in the Tying Markets, under the single monopoly profit theory, simply because Sutter has market power there. See Baker, Jonathan, "Note on "Single Monopoly Profit" Theory," September 18, 2014, available at

*1.    Sutter Has Higher Prices at All of its Tying Hospitals, Relative to a More Competitive Benchmark*

107.    First, I study Sutter Tying Hospital prices using a basket approach. In this analysis, I focus on the "basket" of inpatient hospital services provided at each of the Sutter Tying Hospitals. Specifically, I calculate what it would cost in *total medical expenditure* to treat the same basket of services provided at each of the Sutter Tying Hospitals at a set of benchmark hospitals, using claims data from Anthem and Blue Shield.[307,308] By fixing the basket, it cannot be that differences in mix of services provided at the Sutter and benchmark hospitals explains the observed price differences, and there should be no debate about how to adjust for the resource intensity of the care provided; Sutter's expert Dr. Willig has raised both of these issues,[309] which this analysis (and some I present later) demonstrates are simply distractions. I study three groups of Sutter Tying Hospitals: (a) Alta Bates; (b) the Sutter Rural Tying Hospitals; and (c) the non-rural, non-Alta Bates Sutter Tying Hospitals. In each instance, as I explain below, I find the Sutter Tying Hospitals to be more expensive.

---

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2496932, *site visited* June 4, 2018 (Explaining that some antitrust commentators argued that firms that "already have the incentive and ability to charge a monopoly price, and that it cannot profitably expand or extend its monopoly power, as by charging even higher prices, through practices that restrict …competition," and "The single monopoly profit theory is logically valid as a matter of economic theory only in one extreme case: when buyers have literally no alternatives to the monopolist's product and prohibitively high entry barriers prevent any future competition."). Chipty Class Declaration, Footnote 166.

[307] For each DRG performed at the Sutter hospital, I calculate the benchmark price as the simple average price of the average prices associated with the DRG at each benchmark hospital. The results are qualitatively similar when the benchmark price is computed as the weighted average of benchmark hospital prices, where the weights are the number of claims for that DRG observed at each benchmark hospital. *See* Chipty Workpapers.

[308] In this section and in Appendix D, I present 54 total medical expenditure basket calculations for the Sutter Tying Hospitals, separately by plan (Anthem and Blue Shield) and for different time periods (2008-2010, 2011-2013, and 2014-2015). For 48 of these 54 calculations, at least 95 percent of claims performed at the Sutter Tying Hospital were for a DRG that was also performed at one or more benchmark hospital. For the remaining six calculations, at least 89 percent of claims performed at the Sutter Tying Hospital were for a DRG that was also performed at one or more benchmark hospital. To be conservative, in the handful of instances when a DRG performed at a Sutter hospital is never performed at any benchmark hospital, I assign the benchmark price to be the average price observed at the Sutter hospital for that DRG. *See* Chipty Workpapers.

[309] Willig Declaration, ¶¶ 195-197.

108.    The results of this analysis are shown in Exhibit 9A to Exhibit 9C. In each instance, I find that the Sutter Tying Hospitals are higher priced relative to a more competitive set of benchmark hospitals.[310]

- Exhibit 9A presents the analysis for Alta Bates, using both the Anthem and Blue Shield data from 2008 to 2010: the red bars depict total medical expenditures, in millions of dollars, for treating the basket of services at each of the Alta Bates facilities; the blue bars depict total medical expenditures, in millions of dollars, for treating the *same* baskets of services at relatively large, non-rural, non-Sutter Northern California hospitals. I chose relatively large, non-rural, non-Sutter hospitals as a "competitive" benchmark—where a relatively large hospital is defined as a hospital with more than 144 beds, the median of the average number of acute beds at non-rural hospitals in Northern California that were active at some point from 1995 to 2016—because Alta Bates is a large, non-rural, Sutter hospital. Urban areas generally tend to exhibit more hospital competition, because more densely-populated areas can support more healthcare providers.[311] As seen in the exhibit, it is more expensive to treat the same basket of services at the Alta Bates facilities than at the benchmark hospitals (i.e., the red bars are always higher than the blue bars). This comparison shows health plans could save money—on the order of tens of millions of dollars—if Alta Bates were priced more like the set of benchmark hospitals.

---

[310] This analysis starts in 2008 because CMS changed the DRG designations partway through 2007. *See* Appendix D for a tabular summary of results for the additional time periods 2011 to 2013 and 2014 to 2015. It also presents year-by-year graphical comparisons for case-mix adjusted prices, another measure of prices.

[311] *See* North Carolina Rural Health Research Program, "Rural Health Snapshot (2017)," May 2017, available at https://www.shepscenter.unc.edu/product/rural-health-snapshot-2017/, *site visited* April 19, 2019; and National Rural Health Association, "About Rural Health Care," available at https://www.ruralhealthweb.org/about-nrha/about-rural-health-care, *site visited* April 19, 2019. A study on access to obstetric services in rural counties found that from 2004 to 2014, "9 percent of rural counties experienced the loss of all hospital obstetric services" and "another 45 percent of rural US counties had no hospital obstetric services at all during the study period." *See* Hung, Peiyin *et al.*, "Access to Obstetric Services in Rural Counties Still Declining, with 9 Percent Losing Services, 2004-14," *Health Affairs*, September 2017, Vol. 36, No. 9, 1663-671, at 663.



**Exhibit 9A**
**Total Medical Expenditures for the Basket of Inpatient Services**
**Performed at Each Sutter Alta Bates Tying Hospital**
**Anthem and Blue Shield Claims, 2008-2010**

*Notes*:

1. The Sutter bar corresponds to actual total medical expenditures for that hospital and plan. The blue bar is calculated as the total medical expenditures for the same basket of services, using the average in-network prices for each service at the benchmark hospitals.

2. Percent differences are calculated as the difference in total medical expenditures of Sutter and benchmark hospitals, divided by the total medical expenditure at the benchmark hospitals.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2015.

2. Anthem Claims Data.

3. Blue Shield California Claims Data.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- Exhibit 9B presents the analysis for the Sutter Rural Tying Hospitals, using both the Anthem and the Blue Shield data from 2008 to 2010: the red bars describe total medical expenditures, in millions of dollars, for treating the basket of services at each of the Rural Tying Hospitals; the blue bars describe total medical expenditures, in millions of dollars, for treating the *same* basket of services at two different sets of benchmark hospitals. The first benchmark is the set of rural, non-Sutter Northern California hospitals. This benchmark contains other hospitals that like the Sutter Rural Tying Hospital, are likely to face relatively little competition from area hospitals, because rural areas tend to have lower population density and thus fewer hospitals. The second benchmark, which may be a more appropriate "competitive" benchmark, is the set of relatively small, non-rural, non-Sutter Northern California hospitals. I chose relatively small non-Sutter hospitals for comparison—where again I define relatively small hospitals as those with less than 144 beds—because the Sutter Rural Tying Hospitals are small hospitals. Further, because non-rural, small hospitals are likely to face more competition than rural, small hospitals, this comparison sheds light on whether prices at the Sutter Tying Hospitals are supra-competitive. As seen in the exhibit, the red bars are almost always higher than the blue bars, up to ██ percent higher for Anthem and up to 57 percent higher for Blue Shield, demonstrating Sutter Rural Tying Hospitals are more expensive than both sets of benchmark hospitals. Again, this comparison shows health plans could save money if the Sutter Rural Tying Hospitals were priced like the set of benchmark hospitals.

- Exhibit 9C presents the analysis for the non-rural, non-Alta Bates Sutter Tying Hospitals, using both the Anthem and the Blue Shield data from 2008 to 2010: the red bars describe total medical expenditures, in millions of dollars, for treating the basket of services at each of the non-rural, non-Alta Bates Sutter Tying Hospitals; the blue bars describe total medical expenditures, in millions of dollars, for treating the *same* basket of services at a set of benchmark hospitals. The benchmark for this set of Sutter Tying Hospitals is the set of relatively smaller, non-rural, non-Sutter Northern California hospitals, because the non-rural, non-Alta Bates Sutter Tying Hospitals are relatively smaller, non-rural hospitals. As seen in the exhibit, the red

bars are always higher than the blue bars, up to ■ percent higher for Anthem and up to 42 percent higher for Blue Shield, showing the non-rural, non-Alta Bates Sutter Tying Hospitals are more expensive than the benchmark hospitals. Again, this comparison shows health plans could save money if the non-rural, non-Alta Bates Sutter Tying Hospitals were priced like the set of benchmark hospitals.

**Exhibit 9B**
**Total Medical Expenditures for the Basket of Inpatient Services**
**Performed at Each Sutter Rural Tying Hospital**
**Anthem and Blue Shield Claims, 2008-2010**



*Notes*: *See* notes in Exhibit 9A.
*Source*: *See* sources in Exhibit 9A.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    98

**Exhibit 9C**
**Total Medical Expenditures for the Basket of Inpatient Services**
**Performed at Each Sutter Non-Rural, Non-Alta Bates Tying Hospital**
**Anthem and Blue Shield Claims, 2008-2010**



*Notes*: *See* notes in Exhibit 9A.
*Source*: *See* sources in Exhibit 9A.

109.    The patterns presented above are seen not only over the 2008-2010 period, but also over the 2011-2013 and 2014-2015 periods as well. *See* Appendix D.

2.    *Sutter Tying Hospital Prices Have Been Elevated Even Before Sutter's Systemwide Contracting*

110.    I now turn to the question of whether Sutter had pre-existing market power in the Tying Markets, which would have been necessary to force Class Health Plans to accept all-or-nothing contracting terms. For this purpose, I study whether Sutter commanded higher prices at

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

its Tying Hospitals *prior* to the challenged conduct, using information on net patient revenues reported by hospitals in their annual financial disclosures to OSHPD.[312]

111.    As I explained in my Class Declaration, OSHPD reports net patient revenue, which includes all inpatient and outpatient services revenue collected by hospitals from all commercial health plans.[313] A common way to describe a hospital price is as a multiple of Medicare, that is:[314] the ratio of commercial net patient revenue to net patient revenues that would have been earned under Medicare pricing at that hospital.[315,316] The ratio implicitly

---

[312] Net patient revenue is defined as gross patient revenue and capitation premium revenue less deductions from revenue. *See* OSHPD, "Hospital Annual Financial Data," June 30, 2004, available at https://www.oshpd.ca.gov/documents/HID/HospitalFinancial/Pivot/HAFDDoc2013.pdf, *site visited* April 13, 2018.

[313] These revenues include revenues for all patients covered by health plans other than those funded by Medicare, Medi-Cal, or a county, including Managed Care, Short-Doyle, CHAMPUS, IRCA/SLIAG, California Children's Services, Healthy Families, indemnity plans, fee-for-service plans, and Workers' Compensation. *See* OSHPD, "Hospital Annual Financial Data," June 30, 2004, available at https://www.oshpd.ca.gov/documents/HID/HospitalFinancial/Pivot/HAFDDoc2013.pdf, *site visited* April 13, 2018.

[314] Medicare is the single largest payor in the United States healthcare industry. (*See* Centers for Medicare and Medicaid Services, "CMS Roadmaps Overview," available at https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/QualityInitiativesGenInfo/Downloads/RoadmapOverview_OEA_1-16.pdf, *site visited* April 16, 2019.) This fact makes the Medicare allowed amount a commonly used and widely understood baseline for comparing provider reimbursement. The Medicare allowed amount is adjusted by provider, geography, and service type. (*See* LaPointe, Jacqueline, "The Difference Between Medicare and Medicaid Reimbursement," *Revcycle Intelligence*, June 9, 2017, available at https://revcycleintelligence.com/features/the-difference-between-medicare-and-medicaid-reimbursement, *site visited* April 17, 2019.) Therefore, the Medicare allowed amount can normalize prices for relevant differences in provider, geography, and service.

[315] This price measure is calculated as commercial net patient revenues as a percentage of commercial gross patient revenues divided by Medicare net revenues as a percentage of Medicare gross patient revenues.

[316] Researchers and industry participants have calculated multiple of Medicare prices for different purposes, but in each case the principle of using the multiple of Medicare as a method to measure the expensiveness of hospital care provided to commercial payors. In one of its own documents Sutter calculates a measure of the multiple of Medicare in order to compare the prices of hospitals in the San Francisco area (*see* Sutter Health, "06OSHPD_MarkupCompare.xls," February 2, 2009, DEF003100243, Sheet = "Basic_data (2)"). In this document, Sutter compares prices for a single year (2006), and uses a different formula than I have used because for my work I needed to construct a measure of the multiple of Medicare that was consistent across changes in the categories of net patient revenues that OSHPD reports. (*See* OSHPD, "Hospital Annual Financial Data, Selected Data File Documentation, For Report Periods Ended On and After June 30, 2000," available at https://data.chhs.ca.gov/dataset/pre-2012-hospital-annual-financial-data-selected-data-pivot-tables/resource/dce072e9-d624-4d70-b1c0-127e0a7d3b71, *site visited* April 1, 2019, at p. 1.) Industry analysts have studied prices paid by commercial payors relative to Medicare by reporting the multiple of Medicare price measure for a group of DRGs, which is another approach to computing a multiple of Medicare measure of prices. (*See* America's Health Insurance Plans (AHIP), "National Comparisons of Commercial and Medicare Fee-For-Service Payments to Hospitals," February 2016, available at https://www.ahip.org/national-comparisons-of-commercial-and-medicare-fee-for-service-payments-to-hospitals/, *site visited* April 13, 2019.) Also, researchers studying increasing costs of healthcare over time have looked at commercial net patient revenue relative to Medicare net patient revenue. *See* Selden, Thomas, Zeynal Karaca, Patricia Keenan, Chapin White, and Richard Kronick, "The Growing

adjusts for differences in complexity of care provided at the different hospitals and for differences in local cost factors. A hospital with a higher multiple of Medicare is more expensive than a hospital with a lower multiple of Medicare.

112.     As I also explained in my Class Declaration, one of the advantages of using this measure is that it allows for a comparison over a long time period—1995 to 2016—that includes some years before Sutter's systemwide contracting. In Exhibit 10 of my Class Declaration, I showed using this measure that the prices at the Sutter Damage Hospitals increased significantly after Sutter forced health plans to systemwide contracting. I now use the same type of approach to study prices at the Tying Hospitals. Specifically, I focus on: (a) Sutter's Rural Tying Hospitals (Sutter Amador, Sutter Coast, and Sutter Lakeside); and (b) Sutter's non-rural, non-Alta Bates Tying Hospitals (Sutter Auburn, Sutter Delta, and Sutter Tracy). Alta Bates is included in Exhibit 10 of my Class Declaration; I exclude it here because during most of the available pre-systemwide contracting period, Sutter had not yet acquired Summit Hospital—a transaction which in hindsight was found to have enabled Sutter to raise prices significantly in the Berkeley-Oakland area.[317]

113.     Exhibit 10 compares prices at the Sutter Rural Tying Hospitals to two different sets of benchmark hospitals: the red line is the Sutter Rural Tying Hospitals price line, the blue lines are the benchmark price lines, and the red dashed line denotes the approximate period at which Sutter began to move to systemwide contracting. As explained earlier, the first benchmark is the set of rural, non-Sutter, non-Kaiser Northern California hospitals, which risks comparing Sutter Rural Hospital prices to other hospitals that also face limited competition; as such, this comparison will tend to understate Sutter's ability to raise prices. The second benchmark is the set of relatively smaller, non-rural, non-Sutter, non-Kaiser Northern California hospitals. Because there are typically more hospitals in non-rural areas, prices at comparably-sized

---

Difference Between Public and Private Payment Rates for Inpatient Hospital Care," *Health Affairs*, Vol. 34, No. 12, 2015, pp. 2147-2150.

[317] A retrospective analysis of the merger between Sutter's Alta Bates and Summit, which created the current Alta Bates Medical Center, found that post-merger prices "increased at both hospitals for every insurer." The authors found that "The price increase for Alta Bates ranges from 10.2% to 20.7%, depending on the insurer, compared to 29.0% to 72.0% at Summit." *See* Tenn, Steven, "The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction," *International Journal of the Economics of Business*, Vol. 18, No.1, 2011, pp. 65-82, at p.75.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

hospitals in non-rural areas provide a more appropriate "competitive" benchmark for this purpose. Moreover, with the exception of Alta Bates, the Sutter Tying Hospitals tend be relatively small, as measured in beds.[318]

114.    I find that Sutter Rural Tying Hospital prices were higher than the more competitive, non-rural benchmark price, for all years from 1995 to 2016 except one, 2012. (*See* Exhibit 10.) I also find that Sutter Rural Tying Hospital prices were higher than the less competitive, rural benchmark price for all years except one, 2012. Importantly, both methods show that Sutter was able to charge elevated prices at the Sutter Rural Tying Hospital prices *before* it started to engage in systemwide contracting.

---

[318] The median number of acute beds at non-rural hospitals in Northern California that were active at some point from 1995 to 2016 is 144. The average number of acute care beds at Sutter Tying Hospitals, excluding Alta Bates, are below this threshold. For example, the average number of acute beds at Sutter Amador is 45, the average at Sutter Coast is 53, and the average at Sutter Lakeside is 45. *See* Chipty Workpapers.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      102

**Exhibit 10**
**Hospital Net Patient Revenue from Commercial Health Plans as Multiple of Medicare**
**Sutter Rural Tying Hospitals and Benchmark Hospitals,**
**1995-2016**



Source: Hospital Annual Financial Data, California Office of Statewide Health Planning and Development, 1995-2016.

115.    Exhibit 11 compares prices at the non-rural, non-Alta Bates Sutter Tying Hospitals to a benchmark set of relatively smaller, non-rural, non-Sutter, non-Kaiser Northern California hospitals. As before, the red line is the Sutter price line, the blue line is the benchmark price line, and the red dashed line denotes the approximate period at which Sutter began to move to systemwide contracting. I find that prices at the non-rural, non-Alta Bates Sutter Tying Hospital were higher than the more competitive, non-rural benchmark price, for all but two years. This analysis also shows that Sutter Tying Hospital prices were elevated *before* Sutter engaged in systemwide contracting, and for virtually all years.

**Exhibit 11**
**Hospital Net Patient Revenue from Commercial Health Plans as Multiple of Medicare**
**Sutter Non-Rural, Non-Alta Bates Tying Hospitals and Benchmark Hospitals,**
**1995-2016**



Source: See the source for Exhibit 10.

116.    Finally, I compare prices at the Sutter Rural Tying Hospitals to prices at the Sutter Tied Hospitals. As seen in Exhibit 12, prices at the Sutter Rural Tying Hospitals were higher than prices at the Sutter Tied Hospitals, *before* Sutter began to engage in systemwide contracting.[319] These price differences suggest that the inpatient services provided at the two sets

[319] For five of the seven years from 1995 to 2001, prices at the Sutter non-rural, non-Alta Bates Tying Hospitals were higher than the Sutter Tied Hospitals—though the magnitude of the difference in prices is much smaller than the magnitude of the difference in prices between the Sutter Rural Tying Hospitals and Sutter Tied Hospitals (displayed in Exhibit 12). From 2002 onward, prices at the Sutter non-rural, non-Alta Bates Tying Hospitals follow a similar pattern as the Sutter Tied Hospitals, despite the fact that the Sutter non-rural, non-Alta Bates Tying Hospitals are smaller than the Sutter Tied Hospitals. *See* Chipty Workpapers.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    104

of hospitals are distinct products and that Sutter commanded more pricing power over its Rural Tying Hospitals, relative to its Tied Hospitals.

**Exhibit 12**
**Hospital Net Patient Revenue from Commercial Health Plans as Multiple of Medicare**
**Sutter Rural Tying Hospitals and Sutter Tied Hospitals,**
**1995-2016**



*Source*: *See* the source for Exhibit 10.

117.    These finding are consistent with the view that Sutter had pre-existing market power in the Tying Markets, which was necessary to force Class Health Plans to accept all-or-nothing contracting terms.

3.    *Sutter's Higher Prices Are Not Explained by Higher Quality*

118.    As I explained in my Class Reply Declaration, Sutter hospitals are not particularly known as being "higher" quality than many other Northern California hospitals.[320] Moreover, Sutter itself recognizes that its higher prices cannot be justified on the basis of higher quality.[321] In addition to the substantial evidence that I have already presented (which I provided in Appendices C and D to my Class Reply Declaration and, for convenience, I re-attach as Appendices E and F to this report), I describe here a handful of additional assessments of Sutter's quality, from both Sutter and the Class Health Plans:

- *Sutter's Own Assessment*: In April 2006, Peter Anderson, then Sr. Vice President at Sutter, and Jim Harrison, then Vice President at Sutter, prepared a paper for the Sutter Health Support Services Leadership in which they explained: "Today, Sutter Health affiliates provide a wide range of quality, price, service level, and convenience results. Both our scale of variation and our overall percentile performance versus our peers must improve into a consistently attractive, high-value mix in order to meet our markets' expectations and to remain competitive with those who would like to win our customers' loyalty away from us."[322]

- *Blue Shield*: In 2014, Blue Shield's Anita Lee, Lead Business Analyst, Network Performance and Network Management at Blue Shield, sent to Tami Lucas, then Blue Shield's Senior Network Manager, Provider Contracting, a chart summarizing an overall assessment of Sutter quality.[323] This chart, shown in Exhibit 13 below,

---

[320] Chipty Reply Declaration, ¶¶ 35-37 and Appendix C (reattached here as Appendix E).

[321] Chipty Reply Declaration, Appendix D (reattached here as Appendix F) (providing evidence of Sutter's awareness of its higher prices) and Appendix C (reattached here as Appendix E) (noting "We often contend we provide a higher value product that can demand a higher price - - but in truth our value is only average as there is little differentiation among providers on quality or ratings of care.").

[322] James Harrison Deposition Exhibit 3391, Email from Kandace Zuccala, on behalf of Peter Anderson, then SVP, Strategy & Business Development at Sutter, to Sutter personnel, "Subject: ~ Message from Peter Anderson re: 4/26/06 SHSS Leadership Symposium – 'Case for Transformation and Cultural Change' Pre-conference Reading Materials," April 24, 2006, with attachment Sutter Health Memorandum from Peter Anderson, Sr. Vice President, and Jim Harrison, Vice President, to Sutter Health Support Services Leadership, "Subject: The Case for Transformation and Cultural Change," April 24, 2006, STCA0720225-248, at 226.

[323] Email from Anita Lee, Lead Business Analyst at Blue Shield of California, to Tami Lucas, then Senior Network Manager, Provider Contracting, at Blue Shield, "Subject: Sutter Health Hospital Pre-negotiation Checklist," June 25,

describes Sutter as being overall "good," but it also highlights areas in which Sutter is either below average, poor, or worse than a U.S. benchmark. Notably, the analysis describes Sutter as being "below average" in patient experience ratings, the measure Dr. Willig has adopted in his regression model to control for Sutter hospital quality.[324]

- *United*: Consistent with Blue Shield's assessment, Janet Lundbye, Regional VP of Network Strategy for the West Region at United, testified that Sutter is a well-regarded system that scores high on patient satisfaction at *some* of their locations, but that Sutter did not execute well in terms of utilization and performance management before 2013-2014.[325]

---

2014, with attachment Blue Shield, "Sutter Health: contract opportunities checklist," June 2014, BSC-UEBT-0015383-431, at 421.

[324] Willig Declaration, Tables 7-10.

[325] Lundbye Deposition (United, May 15-16, 2018), pp. 107-108.

**Exhibit 13**
**Blue Shield Ordinary-Course Document Describing the Quality of Sutter Hospitals**

draft for internal discussion

## Sutter Health

## Hospital Quality Indicators

- Overall, the results are **good**
- The hospitals scored equal to or above the CA average for 75% or 700 out of 937 CHART metrics, which were driven by the Clinical Process results which were equal to or above the CA average for 91% or 329 out of 363 metrics, and the Patient Experience results which were equal to or above the CA average for 81% or 173 out of 240 metrics. Similar results were also seen with the CMS measures, where the Sutter Health hospitals were equal to or above the CA average for 81% or 77 out of 95 metrics.
- The Sutter Health hospitals also received sixteen (16) "Better than the U.S. National Rate / Benchmark" for seven (7) different CMS outcome measures.
- However, the Sutter Health hospitals also received five (5) "Below Average" ratings for Patient Experience – Hospital Rating, and four (4) "Poor" ratings for four (4) different metrics from CHART. Additionally, Sutter was rated "Worse than the U.S. National Rate / Benchmark" for four (4) separate CMS Outcome measures. These measures, shown in the table represent the areas of improvement for the Sutter Health hospitals:

| Measure Name | Rating | # of Ratings |
|---|---|---|
| CHART: Patient Experience - Hospital Rating | Below Average | 5 |
| CHART: Hip or Knee Surgery Complication Rate, Pneumonia Death Rate, Heart Bypass Surgery: Internal Mammary Artery Usage Rate | Poor | 4 |
| CMS: Serious Complications Composite (PSI 90), Accidental Cuts and Tears from Medical Treatment (PSI 15), Methicillin-resistant Staphylococcus Aureus (or MRSA) blood infections (Antibiotic-resistant blood infections), Surgical site infections from colon surgery (SSI: Colon) | Worse than the U.S. Natl Rate / Benchmark | 4 |

Note: Blue Shield of California uses the inpatient quality, patient experience, and outcome measures from CHART (February 2014 update) and from the CMS Hospital Compare database (December 2013 update). Metrics from both organizations are based on discharge data from July 2009 thru March 2013.

blue 🛡 of california          Confidential & Proprietary – Not To Be Copied Or Distributed          blueshieldca.com

Highly Confidential - Attorneys Eyes Only          BSC-UEBT-0015421

119.    Additionally, in his expert report, Dr. Kenneth Kizer explains that "there is no demonstrably predictable and consistent relationship between the cost or price of hospital care, or health care broadly, and the quality of care" and "[t]here is no demonstrable reason to believe that Sutter hospitals would be different from hospitals broadly with regard to the relationship between hospital costs and quality of care."[326] Moreover, based on his review of the ordinary-course documents in the record, he notes that "it appears that Sutter did not consider quality when establishing rates" and concludes that "Sutter was particularly aware of its uneven quality and that such did not justify its higher prices."[327]

---

[326] Kizer Declaration, ¶¶ 17, 53.
[327] Kizer Declaration, ¶¶ 75, 77.

### D.     Kaiser Does Not Constrain Sutter's Market Power in the Upstream Market

120.     As I explained in my Class Declaration, Kaiser and non-Kaiser hospitals do not compete against each other for inclusion in provider networks for non-Kaiser health plans, because Kaiser is a closed health system.[328] Sutter's expert Dr. Gowrisankaran himself testified in this case that Kaiser does not contract with any of the non-Kaiser health plans for non-emergency services.[329] James Harrison, Sutter's Vice President of Competitive Intelligence during the period 2005-2014, testified that Kaiser does not "contract[] for inclusion in Blue Shield, Anthem, UHC, and Aetna provider networks."[330] Maya Greenfield, Kaiser's Director of Strategy and Business Development, confirmed that Kaiser is a closed system, and Kaiser hospitals are not available for inclusion in the provider networks of non-Kaiser health plans.[331] Health plans know they cannot include Kaiser hospitals in their provider networks, and patients with a non-Kaiser insurance product do not seek non-emergency hospital care at a Kaiser hospital. Consistent with these facts, ██████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████[332] Thus, I concluded that Kaiser is not in the same hospital antitrust market as Sutter and does not directly constrain Sutter's prices.[333]

121.     However, as I also explained in my prior reports, the fact that Kaiser hospitals are not in the relevant hospital product market does not necessarily mean that Kaiser is competitively insignificant. Recall that Kaiser is a closed health system that sells health insurance. As such, it is a competitor to the Class Health Plans and could constrain Sutter's market power indirectly by competing against non-Kaiser *health plans* for members. Health insurance consumers who choose Kaiser would be essentially lost to Sutter. Thus, there is the important question of whether Kaiser successfully disciplines Sutter's prices through this *indirect* mechanism. As

---

[328] Chipty Class Declaration, ¶¶ 16-18.

[329] Gowrisankaran Deposition (February 6, 2018), pp. 118-120.

[330] Deposition of James Harrison, Vice President of Competitive Intelligence at Sutter from 2005 to 2014, August 2-3, 2018 (hereafter, "Harrison Deposition (Sutter, August 2-3, 2018)"), p. 388.

[331] Deposition of Maya Greenfield, Director of Strategy and Business Development at Kaiser, November 5, 2018 (hereafter "Greenfield Deposition (Kaiser, November 5, 2018)"), pp. 165-166.

[332] ████████████████████████████.

[333] Chipty Reply Declaration, ¶ 160.

described in my Class Reply Declaration, evidence in the record indicates that Kaiser does not sufficiently discipline Sutter's prices.[334] I now describe a substantial body of evidence, including ordinary-course documents from health plans, Sutter, and Kaiser, as well as empirical analyses of the Kaiser hospital network and a critical loss analysis, all of which confirm my conclusion that Kaiser does not constrain Sutter's prices either directly or indirectly.

### 1.    *Qualitative Evidence Showing that Kaiser Does Not Constrain Sutter Hospital Prices*

122.    In this section, I provide an overview of additional qualitative evidence that shows (a) Class Health Plans cannot (and do not) contract with Kaiser hospitals for non-emergency care; (b) Class Health Plans compete with Kaiser at the health plan level, not at the hospital level ; and (c) Sutter does not lower its prices because of competition between non-Kaiser Health Plans and Kaiser.

### a)    Class Health Plans Cannot Contract with Kaiser Hospitals

123.    Class Health Plan documents and testimony make clear that Kaiser hospitals do not compete with non-Kaiser hospitals for inclusion in commercial health plan networks, nor do the Class Health Plans include Kaiser hospitals in their networks. For example, Ernest Schwefler, Regional Vice President at Anthem until 2015, testified that ██████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████[335] Chandra Welsh, Vice President of Network Management in Northern California at Aetna, testified that ████████████████████████████████████ ██████████████████████████████████████████████████████████████

---

[334] Chipty Reply Declaration, ¶¶ 163-164.

[335] Deposition of Ernest Schwefler, Regional Vice President at Anthem until 2015, July 23, 2018 (hereafter "Schwefler Deposition (Anthem, July 23, 2018)"), pp. 295-296.

██████████████████████████████[336] There is similar testimony from each of the other Class Health Plans.[337]

        b) Class Health Plans Compete with Kaiser at the Health Plan Level, Not at the Hospital Level

124.    Evidence from each of Class Health Plans, Kaiser, and Sutter shows that competition with Kaiser takes place at the *health plan level*, not at the hospital level.[338]

        (1) Class Health Plans

125.    For example, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████[339] Similarly, in a June 2014 "contract opportunities checklist"

---

[336] Welsh Deposition (Aetna, April 12, 2017), pp. 296-297 (██████████████████████

██████████████████████████████████

[337] *See, e.g.,* LaCroix-Milani Deposition (Health Net, August 30-31, 2018), p. 479 (Q. ...██████████

████████████████████████████████████████

    ██████); Lundbye Deposition (United, May 15-16, 2018), pp. 103-104 (

██████████████████████████████████████████

██); Deposition of David Joyner, Vice President at Blue Shield from 1998 to 2012, March 20, 2017 (hereafter "Joyner Deposition (Blue Shield, March 20, 2017)"), p. 194 ("Q. Mr. Joyner, did Blue Shield ever include Kaiser Hospitals in the networks it offered to its employer customers? A. No. Kaiser doesn't contract with health -- independent health plans like Blue Shield in this market.")

[338] Non-Sutter hospitals in Northern California also recognize they only compete indirectly with Kaiser. (*See, e.g.,* Wong Deposition (UC Davis, September 27, 2018), p. 24 (UC Davis doesn't "compare to Kaiser pricing. We don't know what Kaiser pricing is. The only thing we would look at is employer group offerings and what Kaiser premiums charge compared to other plan products in which we participate."); Deposition of Douglas Sturnick, Vice President of Managed Care and Payer Relations for Cedars-Sinai Medical Center, November 12, 2018 (hereafter "Sturnick Deposition (Cedars-Sinai, November 12, 2018)"), pp. 24-26 ("I would consider Kaiser a competitor for health plans that we participate with that would be alternatives to Kaiser... [F]rom the standpoint of Kaiser competing, it really competes at a plan level to, in fact, redirect patients away from not just Cedars-Sinai but community hospitals in general."). *See also* Deposition of Joan Kezic, Vice President, Payor Relations, for El Camino Hospital, November 1, 2018 (hereafter "Kezic Deposition (El Camino, November 1, 2018)"), p. 29; Deposition of Jannine Segall, Executive Director of Contracting and Network Management for John Muir Hospital, September 28, 2018 (hereafter "Segall Deposition (John Muir, September 28, 2018)"), pp. 25-26; Wilcox Deposition (Dignity, October 19, 2018), pp. 140-141.)

[339] Aldo De La Torre Deposition Exhibit 478, McKinsey & Company, "Exchange network strategy: Preliminary recommendations – San Francisco, CA," WellPoint, March 28, 2012, ABCLH379969-380037, at 79987, 80019-80029, 80032. *See also,* De La Torre Deposition (Anthem, July 17-18, 2018), p. 338.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    111

regarding upcoming negotiations with Sutter, Blue Shield compares its HMO and PPO premiums to competitor health plans, including Kaiser.[340] Consistent with these documents, Darrin Wells, Director of Actuarial and Analytics at Blue Shield, testified that he thinks "in general Kaiser, throughout the state, is a ["formidable"] competitor for all non-Kaiser *health plans*."[341]

### (2) Kaiser

126.    Evidence from Kaiser also indicates that competition between the Class Health Plans and Kaiser occurs at the health plan level. For example, Maya Greenfield, Director of Strategy and Business Development for the Northern California Region at Kaiser, testified that the Kaiser health plan competes with other commercial health plans when consumers are making health plan membership decisions. When asked "[w]ho are Kaiser's main competitors for inpatient care in Northern California," she testified: "It's hard to say who the competitors are for inpatient care because Kaiser mainly competes as a health plan. That's kind of the front door you have to walk into to receive -- to be able to access the – Kaiser's delivery system, both inpatient care and outpatient care."[342] She further notes that it is "not accurate" to use "the word competitor" for CPMC because "to access the Kaiser delivery system…you have…to be a [Kaiser] health plan member" and Kaiser members must choose a different health plan if they want to access other providers, such as CPMC or UCSF.[343] Further, while she notes that "some

---

[340] Darrin Wells Deposition Exhibit 1547, Email from Anita Lee, Network Performance, Network Management, at Blue Shield, to Tami Lucas, former Senior Network Manager, Provider Contracting, at Blue Shield, "Subject: Sutter Health Hospital Pre-negotiation Checklist," June 25, 2014, with attachment Blue Shield, "Sutter Health: contract opportunities checklist," June 2014, BSC-UEBT-0015383-431, at 413.

[341] Deposition of Darrin Wells, Director of Actuarial & Analytics at Blue Shield, August 29-30, 2018 (hereafter "Wells Deposition (Blue Shield, August 29-30, 2018)"), pp. 373-374 (emphasis added). *See also,* LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 443-444 ("Q: ███████████████████████████████████████████████████████████████████████████████████████████████████ ████ "); Lundbye Deposition (United, May 15-16, 2018), pp. 103-104 ("████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████████████████████████

[342] Greenfield Deposition (Kaiser, November 5, 2018), pp. 46-47.

[343] Greenfield Deposition (Kaiser, November 5, 2018), pp. 54-56 (noting "Q. And if a patient wanted to go to Kaiser's hospitals in San Francisco, they would need to choose Kaiser's health plan; correct? A. Correct. Q. And if a patient wanted to have access to CPMC, they would need to choose a health plan other than Kaiser; correct? A. Correct. Q. And the same would be true if a consumer wanted to have access to UCSF; they would need to choose a health plan other than Kaiser; correct? A. Yes.").

people" may consider the health care delivery system during open enrollment or job/life change when they must "choose Kaiser Permanente Health Plan product versus, you know, a Blue Shield or an Anthem product," she thinks "most people, when it comes [to] open enrollment or time to choose a health plan, are deciding mainly on price and the out-of-pocket impact to their, you know, paycheck or their bank account versus the delivery system."[344]

127.    Maya Greenfield also testified that Kaiser considers other health plan premiums in determining its own rates. When asked whether "Kaiser takes into account its understanding of the premiums that are offered by health plans, like Blue Shield and Blue Cross and CIGNA, in determining what Kaiser's rates will be," she answered in the affirmative, explaining that other health plan pricing might affect the prices Kaiser offers to its members.[345]

### (3) Sutter

128.    Sutter itself recognizes they compete only indirectly with Kaiser because Kaiser providers do not compete for inclusion in the provider networks of commercial health plans. For example, as noted above, James Harrison, Sutter's Vice President of Competitive Intelligence during the period 2005-2014, testified that Kaiser providers do not "contract[] for inclusion in Blue Shield, Anthem, UHC, and Aetna provider networks."[346] James Conforti, President, Operating Division at Sutter, testified that Sutter competes with Kaiser in Northern California with its Sutter Health Plus ("SHP") insurance plan: "I don't think we compete on prices with Kaiser to payers. I think we work with our payer partners to have competitive products in the…marketplace for employers to offer alternatives to Kaiser."[347] In internal email communication, Ed Berdick, Senior Vice President at Sutter, notes that his "biggest concern is the continued insistence that Kaiser is our major competitor. Really- I didn't know we offered

---

[344] Greenfield Deposition (Kaiser, November 5, 2018), pp. 54-57.

[345] Greenfield Deposition (Kaiser, November 5, 2018), pp. 168-169.

[346] Harrison Deposition (Sutter, August 2-3, 2018), p. 388.

[347] Deposition of James Conforti, President, Operating Division at Sutter, May 9 & 31, 2018 (hereafter, "Conforti Deposition (Sutter, May 9 & 31, 2018)"), pp. 263-264. *See also* pp. 355-356 ("[F]rom the insurance perspective, we…have Sutter Health Plus that we compete with Kaiser directly on. And we also work with our health plan partners to be able to offer – for them to offer a competitive alternative to Kaiser as well.").

insurance products. I though[t] Kaiser's competitors were HealthNet, Blue Shield, etc..."[348] A Boston Consulting Group presentation for Sutter states that "unlike other provider competitors[,] once consumers chose [Kaiser], they no longer have the option of selecting Sutter. [Kaiser] is the enemy and that battle must be fought at the insurance level."[349] When asked if Sutter's research showed that employers believed Kaiser was a lower-cost provider than Sutter, Patrick Fry, former CEO at Sutter, testified that Kaiser and Sutter are different: "[I]t is almost impossible to compare Kaiser and Sutter at all... Kaiser is, first, a health plan, and Sutter is not a health plan...if you are in a fee-for-service relationship, the health plan is predominantly the determiner of where you can seek services, whether things are authorized or not. We, as a provider, are not. So it's an apple and an orange comparison."[350]

129.    Sutter ordinary-course documents and testimony also compare Kaiser premiums to those of other health plans. For example, a Sutter analysis of the potential creation of a Sutter-focused narrow network for the City and County of San Francisco depicts the gap between the current Blue Shield premium levels to Kaiser premiums, where Kaiser premiums are 19 percent lower.[351] In April 2006, Peter Anderson, then Sr. Vice President at Sutter, and Jim Harrison, Vice President at Sutter, prepared a paper for the Sutter Health Support Services Leadership, regarding "the Case for Transformation and Cultural Change," in which they depict the premium differential between a Kaiser, Blue Shield, and Health Net plans for the small employer product segment in 2004-2005 and conclude "[Kaiser] undercuts [Blue Shield] premium 9% and Health Net 30%."[352] Further, a 2011 Sutter presentation compares premiums for non-Kaiser health plans

[348] Ed Berdick Deposition Exhibit 551, Email from Ed Berdick, Senior Vice President at Sutter, to Peter Anderson, then Sr. Vice President, Strategy & Business Development, at Sutter, "Subject: Branding/Ad spending," January 18, 2010, DEF007119381. *See also*, Tasabia Deposition (Sutter, May 16, 2018), pp. 177-179 (Tasabia testified that Sutter, "in tandem with the health plan, we are competing with Kaiser for – for membership...[Q] But you're not competing with Kaiser in the sense that you're competing for volume after the plan – the member has already chosen a plan? A. Once the member chooses Kaiser, they stay within the Kaiser system.").

[349] Sanjay Saxena Deposition Exhibit 768, The Boston Consulting Group, "Consumer and Employer Research: Key Imperatives and Strategic Implications," December 4, 2014, DEF000877866-907, at 886.

[350] Deposition of Patrick Fry, former CEO at Sutter, June 26-27, 2018 (hereafter, "Fry Deposition (Sutter, June 26-27, 2018)"), pp. 187-188.

[351] Brendt Deposition Exhibit 3945, Sutter Health, "Narrow Network Scenarios & Impact," August 26, 2010, STCA0287521, at p. 2.

[352] James Harrison Deposition Exhibit 3391, Email from Kandace Zuccala, on behalf of Peter Anderson, then SVP, Strategy & Business Development at Sutter, to Sutter personnel, "Subject: ~ Message from Peter Anderson re:

in which Sutter providers participate to Kaiser premiums and concludes: "The differential between Kaiser and Non-Kaiser health plan premiums in which Sutter providers participate is increasing and being passed down to employees."[353] None of these pricing analyses compares the price of Sutter hospitals to those of Kaiser hospitals.

130.    Additionally, when asked if Sutter competes with Kaiser on prices, Sutter's Mr. Conforti recognizes that the extent to which Sutter competes with Kaiser is limited to indirect competition, through health insurance premiums. For example, Mr. Conforti testified that Sutter "compete[s] with Kaiser on premium and work[s] to try to have a competitive premium in the marketplace on the insurance products." [354] Similarly, Sanjay Saxena, a BCG consultant to Sutter, agreed that commercial health plans have to compete with Kaiser "at the point of employer plan selection" and explained that "premium cost is the attribute that's most important. And so the way that Kaiser competes against other commercial health plans is with a premium advantage or a pricing advantage."[355]

---

4/26/06 SHSS Leadership Symposium – 'Case for Transformation and Cultural Change' Pre-conference Reading Materials," April 24, 2006, with attachment Sutter Health Memorandum from Peter Anderson, Sr. Vice President, and Jim Harrison, Vice President, to Sutter Health Support Services Leadership, "Subject: The Case for Transformation and Cultural Change," April 24, 2006, STCA0720225-248, at 237.

[353] James Harrison Deposition Exhibit 294, Sutter Health, "Competitor Response Analysis: Summary Trends Across Regions," SMT Strategy Session, January 18, 2011, STCA0234063, at p. 13. *See also,* Harrison Deposition (Sutter, August 2-3, 2018), pp. 288-290 ("Q. Okay. Why were you looking at this information or presenting this information to your upper management? A. Well, I think as you'll recall when we were talking yesterday, there was an increasing movement towards consumer participation in making decisions about what they purchase for healthcare, and we were talking specifically about co-pays and deductibles. But in this case, this is looking at what an employee will need to pay for the premium on a health plan if they wanted to continue with a specific non-Kaiser plan versus the Kaiser plan. Q. Right. And given that it was so much more expensive for employees, based on these cost share figures, to enroll in products that the commercial health plans that Sutter was contracting with, was it your conclusion that commercial health plans were under some pressure to reduce their premiums to be able to compete with Kaiser? A. That was the point we were trying to make, that because of the increasing sensitivity of the consumer in terms of their exposure to healthcare costs, this is concerning to us, that we needed to do something in this particular area to make our value proposition something that was attractive to the general public."). *See also* James Harrison Deposition Exhibit 3390, Email from Jim Harrison to Sutter personnel, "Subject: 2012 Competitive Position Analysis," February 14, 2012, with attachment Sutter Health, "Competitive Position Analysis: Sutter Health Combined Regions," February 2012, STCA0593936, at slide 62 (showing the premium differential between Kaiser and non-Kaiser HMO plans, stating "The differential between Kaiser and the non-Kaiser health plans Sutter Health participates in is widening."); Todd Smith Deposition Exhibit 20, Sutter Health, "Kaiser Permanente Intelligence Report, Presented to the Sutter WBR Board of Directors," September 2012, DEF000186527-565, at 542.

[354] Conforti Deposition (Sutter, May 9 & 31, 2018), p. 274.

[355] Deposition of Sanjay Saxena, BCG consultant to Sutter, October 15, 2018 (hereafter "Saxena Deposition (BCG, October 15, 2018)"), pp. 129-130.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    115

    c)   Sutter Does Not Lower Its Prices Because of Competition Between Non-Kaiser Health Plans and Kaiser

131.    Class Health Plans recognize the difficulty in competing with Kaiser insurance products at least in part because of high Sutter pricing that gets passed through to consumers in the form of higher premiums.[356] There are numerous examples from ordinary-course documents that show Sutter refuses to lower its price in response to Kaiser. For example:

- *Blue Shield*: Kristen Miranda, Chief Contracting person for Blue Shield during 2011-2014, had discussions with Sutter related to Blue Shield's inability to price compete with Kaiser.[357]

- *Health Net*:



[358]

[359]

- *Aetna*:

---

[356] *See* Chipty Class Declaration, Section VIII, for evidence that increases in medical expenditures are passed through to consumers in the form of higher premiums.

[357] Miranda Deposition (Blue Shield, July 18-19, 2018), pp. 159-160.

[358] Thomas Hamilton Deposition Exhibit 633, Email from Thomas Hamilton of Health Net to Health Net personnel, "Subject: Sutter update—PremierCare and WholeCare," April 17, 2013, HN0020315-317, at 316). *See also*, Hamilton Deposition (Health Net, September 11, 2018), pp. 66-68.

[359] Hamilton Deposition (Health Net, September 11, 2018), pp. 62-63, 69.



███████████████████████████████████
████████████████████████ 360

- *United*: In internal email communication regarding ████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████ 361 Nonetheless, United

notes, █████████████████████████████████████

████████████████████████████████████████
████████████████████ 362

132.    Consistent with these examples, there is evidence that Sutter's hospital prices are elevated irrespective of the presence of a nearby Kaiser hospital. The most prominent example comes from the Berkeley-Oakland area. As previously explained, a retrospective analysis of the merger between Sutter's Alta Bates and Summit, which created the current Alta Bates Medical Center, found that post-merger prices "increased at both hospitals for every insurer." [363] The authors found that "The price increase for Alta Bates ranges from 10.2% to 20.7%, depending on

---

[360] Brendhan Green Deposition Exhibit 3146, Email from Brendhan Green, Vice President of Network Management at Aetna, to Aetna personnel, "Subject: FW: Sutter/Aetna Overview," April 25, 2012, with attachment "Sutter Health/Aetna Overview," April 25, 2012, AET-ESI0021370-375, at 370.

[361] Steve Cain Deposition Exhibit 1456, Email from Steve Cain, Vice President, Sales & Account Management, Key Accounts, at United, to Mary Anna Weklar, Senior Consultant & Wellness Products at Sutter, "Subject: Alliance," March 14, 2013, DEF002131968-969, at 968 (United also notes that "Kaiser is fully aware of the Alliance product and is reacting to our pricing by lowering their renewals and chasing our pricing."). *See also,* Cain Deposition (United, June 20, 2018), pp. 136-138 and 140 ("Q Was that one of the goals of this product, was to compete head to head with Kaiser on HMO? THE WITNESS: That was one of the objectives, yes.")

[362] Steve Cain Deposition Exhibit 1453, Email from Steve Cain, Vice President, Sales & Account Management, Key Accounts, at United, to United personnel, "Subject: FW: Sutter PEP Questionnaire," March 1, 2016, with attachment "UHC/Sutter Joint Venture Internal Review," UHC-00289049-084, at 052 ("Due to the nature of the NCA provider footprint, there are significant network gaps if you narrow any of the major players and to date the price variance from narrow to full hasn't be wide enough to push employers to those products. This was one of the main reasons the Alliance product hasn't sold in the commercial space. It was meant to compete with Kaiser, but our rough estimates have that product priced 10-15% above Kaiser."); Cain Deposition (United, June 20, 2018), pp. 136-138, 142-143 (Alliance is "still a product that we sell, but the current state, as we sit here today, is that it has not been successful,). *See also,* Deposition of Maurice Couser, Underwriting Market Vice President at United, August 15, 2018 (hereafter "Couser Deposition (United, August 15, 2018)"), p. 314.

[363] Tenn (2011), p. 75.

the insurer, compared to 29.0% to 72.0% at Summit."[364,365] Sutter found this price increase to be profitable despite the presence of a large Kaiser hospital in the area. There are also examples from Sutter documents where Sutter executives contemplated, but ultimately rejected the notion of lowering prices to health plans because the lower prices would not result in sufficient benefit to Sutter.[366] Raising prices (as at Alta Bates) or being reticent to lower prices (as in other instances) despite the presence of Kaiser indicates that Kaiser does not constrain Sutter prices.

133.    Consistent with this evidence is the possibility that Kaiser customers are more price sensitive than those of the non-Kaiser health plan. For example, in April 2006, Peter Anderson, then Sr. Vice President at Sutter, and Jim Harrison, Vice President at Sutter, prepared a paper for the Sutter Health Support Services Leadership, explaining that, "over the past 6 years an increasing percent of commercial patients chose [Kaiser]" and that this trend "underscores California consumers' increasing premium price sensitivity."[367] That non-Kaiser health plan customers are less price sensitive can also explain why Sutter chooses not to lower price, even in areas with a strong Kaiser presence.

---

[364] *Id.*

[365] Sutter's price increase following the Summit acquisition was not unique. ████████████ ████████████████████████████████████████████████████████████ *See* Brendhan Green Deposition Exhibit 3146, Email from Brendhan Green, Vice President of Network Management at Aetna, to Aetna personnel, "Subject: FW: Sutter/Aetna Overview," April 25, 2012, with attachment "Sutter Health/Aetna Overview," April 25, 2012, AET-ESI0021370-375.

[366] *See* Chipty SJ Declaration, ¶¶ 141-142 (citing Deposition of Robert Reed, Chief Financial Officer at Sutter, October 17, 2017, pp. 115-116).

[367] James Harrison Deposition Exhibit 3391, Email from Kandace Zuccala, on behalf of Peter Anderson, then SVP, Strategy & Business Development at Sutter, to Sutter personnel, "Subject: ~ Message from Peter Anderson re: 4/26/06 SHSS Leadership Symposium – 'Case for Transformation and Cultural Change' Pre-conference Reading Materials," April 24, 2006, with attachment Sutter Health Memorandum from Peter Anderson, Sr. Vice President, and Jim Harrison, Vice President, to Sutter Health Support Services Leadership, "Subject: The Case for Transformation and Cultural Change," April 24, 2006, STCA0720225-248, at 235.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    118

2.    *The Kaiser Hospital Network Is Not a Good Substitute for Many Class Health Plan Members*

134.    Analysis of the Kaiser hospital network shows that the Kaiser network is not a good substitute for many of the Class Health Plan's Northern California members.[368] With respect to large group products, I evaluate the extent to which Class Health Plans' large group employers have between 10 to 20 percent of their employees more than a 30-minute drive away from a Kaiser hospital. (*See* Exhibit 14.) With respect to small group products, I evaluate the extent to which Class Health Plans' small group employers are located more than a 30-minute drive away from a Kaiser hospital. (*See* Exhibit 15.) Finally, with respect to individual products, I evaluate the extent to which Class Health Plans' individual members live more than a 30-minute drive away from a Kaiser hospital. (*See* Exhibit 16.) In each instance, I use the best available data from either Anthem or Blue Shield (or both).

135.    The results show that a significant number of Northern California employers, their employees, and individual members would not find it possible to switch to a Kaiser insurance product, because of the inability of the Kaiser hospital network to serve their hospital needs. Specifically, I find that a significant portion of Anthem's Northern California large group employers have at least 10 percent or at least 20 percent of their subscribers living far from a Kaiser hospital: roughly ▮ percent to ▮ percent. For example, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮[369]▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮[370] Finally, a

---

[368] This analysis is limited to large group employees, small groups, and individuals that are located within a 30-minute drive of at least one hospital. Further, it describes the distribution of health plan subscribers in Northern California, but it is not restricted to health plan subscribers living in one of the nine RAs.

[369] Chipty Workpapers.

[370] *See* Exhibit 15.

significant number of Anthem's Northern California individual subscribers live far from a Kaiser hospital: roughly ██ percent to ██ percent.[371]

136.    Cumulatively, these patterns suggest that even if some Northern California employers, their employees, and individual members would consider switching to Kaiser, a sufficiently high number of customers could not switch because of the inadequacy of the Kaiser hospital network in certain areas. For this reason also, Sutter would be insulated, at least in part, from the risk of losing patients who would otherwise switch from a Class Health Plan to a Kaiser insurance product. This fact inherently limits the indirect competition Class Health Plans face from Kaiser, and it limits pricing discipline Kaiser may indirectly impose on Sutter.

---

[371] *See* Exhibit 16.

**Exhibit 14**

**Percent of Large Groups for which at Least 10 or 20 Percent of that Group's Northern California Subscribers Live More than a 30-Minute Drive Away from a Kaiser Hospital Anthem, 2006-2015**



■ At Least 10 Percent of Subscribers    ■ At Least 20 Percent of Subscribers

*Notes*:

1. Percent is calculated as the number of large groups with at least 10 or 20 percent of Northern California subscribers living more than a 30-minute drive away from a Kaiser hospital, divided by the total number of large groups with at least one subscriber living in Northern California.

2. Large group subscribers in Northern California who do not live within a 30-minute drive of any hospital (Kaiser or otherwise) are conservatively excluded from the calculation. Such large-group-subscriber-years represent approximately seven percent of Anthem's Northern California large-group-subscriber-years.

*Sources*:

1. Anthem Large Group Premium Data.
2. OSHPD Patient Discharge Data, 2011.
3. Northern California Zip Code Lookup.
4. OSHPD Annual Financial Disclosure Data Pivot Profiles, 2006-2015.
5. Google Maps Distance Matrix API.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    121

**Exhibit 15**
**Percent of Northern California Small Groups Located More than a 30-Minute Drive Away**
**from a Kaiser Hospital**
**Anthem and Blue Shield, 2006-2015**



*Note:*

1. Small group zip codes in Northern California that are not located within a 30-minute drive of any hospital (Kaiser or otherwise) are conservatively excluded from the calculation. These small-group-zip-years represent approximately six percent of the Anthem and about seven percent of the BSC small-group-zip-years.

2. Several Anthem Small Groups have multiple plans, and these plans can have different associated zip codes. Ten percent of Anthem small-group-years are associated with multiple zip codes. The numerator only includes those employers for which observed drive-time zip codes associated with *all* plans are more than a 30-minute drive away from a Kaiser hospital.

3. For the first two bars, the percent is calculated as the number of small groups located more than a 30-minute drive away from a Kaiser hospital, divided by the total number of small groups located in Northern California.

4. For the third bar, the percent is calculated as the number of small group subscribers associated with a small group located more than a 30-minute drive away from a Kaiser hospital, divided by all small group subscribers associated with a Northern California small group.

*Sources:*

1. Anthem Small Group Premium Data.
2. Blue Shield Small Group Premium Data.
3. OSHPD Patient Discharge Data, 2011.
4. Northern California Zip Code Lookup.
5. OSHPD Annual Financial Disclosure Data Pivot Profiles, 2006-2015.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    122

6. Google Maps Distance Matrix API.

**Exhibit 16**
**Percent of Northern California Individual Subscribers that Live More than a 30-Minute Drive Away from a Kaiser Hospital**
**Anthem, 2006-2015**



*Note*: Individual subscribers in Northern California that are not located within a 30-minute drive of any hospital (Kaiser or otherwise) are conservatively excluded from the calculation. These subscriber-years represent approximately nine percent of the individual subscriber-years.

*Sources*:

1. Anthem Individual Premium Data.
2. OSHPD Patient Discharge Data, 2011.
3. Northern California Zip Code Lookup.
4. OSHPD Annual Financial Disclosure Data Pivot Profiles, 2006-2015.
5. Google Maps Distance Matrix API.

       3.     *Profitability Analysis Shows that Kaiser Is Unlikely to Discipline Sutter Hospital Prices*

137.    I now turn to an illustrative profitability analysis to assess how much volume Sutter would have to lose indirectly to Kaiser, through less competitive pricing of the non-Kaiser health plans, in order for Sutter to find it unprofitable to raise its hospital prices by five percent on all its GAC inpatient hospital services sold to health plans in a given geographic market. A

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    123

Sutter hospital price increase would be unprofitable if the non-Kaiser health plan premium increase triggered by the associated increase in medical costs were to cause a sufficiently large number of customers to switch away from non-Kaiser to Kaiser insurance products and subsequently, a sufficiently large decrease in patient volume ("critical volume") at the Sutter hospital.[372] If the actual decrease in patient volume at a Sutter hospital is likely to be greater than the critical volume, then it would be unprofitable for Sutter to raise price and one could say that Sutter was "disciplined" by Kaiser. Conversely, if the actual decrease in patient volume at a Sutter hospital is likely to be less than the critical volume, then it would be profitable for Sutter to raise price and one could say that Sutter was not disciplined by Kaiser

138.    Suppose Sutter considers the possibility of raising hospital prices at one of its hospitals by $\delta$ (*e.g.* five percent). Further, suppose that before the price increase, the volume of patients at the Sutter hospital is $V$, and that after the price increase the volume of patients at the Sutter hospital would be $V - \Delta V$, where $\Delta V$ is the decrease in patient volume resulting from a premium increase resulting from an increase in the Sutter hospital price. Finally, suppose $m$ is the Sutter hospital's contribution margin. To determine the critical volume that would make it unprofitable for Sutter to raise prices, one must balance the gains from the price increase against the loss.

139.    The gain is the additional money ($\delta$) the hospital would earn on patient volume that would remain:

$$Gain = \delta (V - \Delta V)$$

The loss is the contribution margin ($m$) the hospital would lose on lost patient volume ($\Delta V$):

$$Loss = m \, \Delta V$$

One can then solve for the critical volume of lost patients ($\Delta V^*$) by setting the Gain equal to the Loss. This exercise yields the following expression of *critical loss*:

$$\frac{\Delta V^*}{V} = \frac{\delta}{m + \delta}$$

---

[372] The idea of critical loss has been at center of market definition for decades. *See* Harris, Barry C. and Joseph J. Simons, "Focusing Market Definition: How Much Substitution is Necessary," *Research in Law and Economics*, Vol. 12, 1989, pp. 207-226 for an early discussion of the idea.

140.    If the actual loss from a price increase is expected to be greater than the critical loss from a price increase, the price increase would be unprofitable. To provide an illustration, suppose the contribution margin is 50 percent, which is approximately the contribution margin at Alta Bates,[373] and the contemplated price increase is five percent. In this case, the critical volume of lost patients would be about nine percent. If the actual decrease in patient volume (from a five percent increase in the hospital price) is anticipated to be greater than nine percent, then the price increase would be unprofitable. In this case, one would say Kaiser disciplines Sutter, albeit indirectly. Alternatively, if the actual decrease in patient volume (from a five percent increase in the hospital price) is anticipated to be less than nine percent, then the price increase would be profitable, and one would say Kaiser does not discipline Sutter.

141.    Exhibit 17 shows the critical volume of lost patients associated with a range of plausible Sutter contribution margins and a five percent price increase, using the formula derived above. To assess whether Kaiser is able to discipline Sutter pricing, this range of critical volumes can be compared with anticipated actual volumes of lost patients, in response to a five percent hospital price increase.

**Exhibit 17**
**Critical Volumes Associated with a Range of Plausible**
**Sutter Contribution Margins and a 5 Percent Hospital Price Increase**

| Margin [A] | Critical Volume [B] |
|---|---|
| 30% | 14% |
| 40% | 11% |
| 50% | 9% |
| 60% | 8% |

*Notes*:

1. The average margin for each Sutter Tying Hospital during the damages period (2006-2015) was 39 to 54 percent. The average was calculated for each hospital using all of the available margin information for each hospital during those years that I was able to identify in the record.

2. [B] = 5% / ([A] + 5%).

---

[373] Sutter Health, "DEF000756198.xls," 2009, DEF000756198, and Sutter Health, "DEF000761111.xls," 2010, DEF000761111.

*Sources*:

1. Sutter Health, "DEF000756198.xls," 2009, DEF000756198.
2. Sutter Health, "DEF000761111.xls," 2010, DEF000761111.
3. Sutter Health, "DEF000154044.xlsx," 2012, DEF000154044.
4. Sutter Health, "DEF000154045.xlsx," 2013, DEF000154045.
5. Sutter Health, "DEF002345130.xlsm," 2014, DEF002345130.
6. Sutter Health, "DEF000154047.xlsx," 2015, DEF000154047.

142.    Whether Kaiser disciplines Sutter then depends on whether actual loss is anticipated to be greater than or less than critical loss, for the appropriate contribution margin shown above. This is an empirical question. There is substantial evidence in the record that suggests that Sutter would not lose much, *if any*, patient volume to Kaiser if it were to raise prices by five percent or even more. For example:

- Sutter profitably raised prices at Alta Bates-Summit by substantially more than five percent (up to 70 percent) when it acquired Summit hospital, in Berkeley-Oakland—an area with a strong Kaiser presence. The possibility that Sutter might lose patient volume to Kaiser there did not dissuade Sutter from raising its prices there.

- Evidence suggests that patients who prefer Sutter hospitals are less likely to be the ones to switch to Kaiser.[374]

- The structure of premium setting allows Sutter to enjoy the benefits of the price increase without suffering the losses associated with it. This intuition was explained by Sutter's Chief Financial Officer, Robert Reed, in a communication to a colleague in 2009. As Mr. Reed explained, "our current business model is dependent upon commercial insurance, we are more expensive than community average, therefore our current business model is reliant upon pooling our more expensive product offering with lower-cost non-Sutter providers in an insurance wrapper to achieve a

---

[374] James Harrison Deposition Exhibit 3391, Email from Kandace Zuccala, on behalf of Peter Anderson, then SVP, Strategy & Business Development at Sutter, to Sutter personnel, "Subject: ~ Message from Peter Anderson re: 4/26/06 SHSS Leadership Symposium – 'Case for Transformation and Cultural Change' Pre-conference Reading Materials," April 24, 2006, with attachment Sutter Health Memorandum from Peter Anderson, Sr. Vice President, and Jim Harrison, Vice President, to Sutter Health Support Services Leadership, "Subject: The Case for Transformation and Cultural Change," April 24, 2006, STCA0720225-248, at 246.

competitive 'average.'"[375] This means that if Sutter were to raise price by five percent, the effect of Sutter's price increase would be averaged by health plans across total medical costs associated in arriving at premiums. Consistent with these principles, some years later after Mr. Reed's communication, he calculated that "if Sutter reduced its prices by 20 percent, it would only have a 4 or 5 percent impact on total premiums."[376] He also concluded that because Kaiser's premiums are 15 to 20 percent lower than premiums of broad network insurance products that include Sutter and non-Sutter hospitals, lowering Sutter's prices would not be worthwhile.[377] In economics parlance, his comment means that the anticipated loss in profits (from the price decrease) would not be offset by the anticipated gain in profits (from the increased patient volume).

- When the premiums for individual coverage by non-Kaiser health plans offered to Stanford employees experienced a 15 percent increase relative to the premium for coverage by Kaiser, the share of employees electing for non-Kaiser coverage reduced by only about 20 percent.[378] This substitution pattern combined with Mr. Reed's premium impact calculation (4 or 5 percent premium impact from a 20 percent Sutter price change) suggests that a five percent increase in Sutter's hospital prices would lead to less than a two percent reduction in non-Kaiser membership.[379] This reduction is substantially less than the critical volume reported in Exhibit 17 that would be required for Kaiser to discipline Sutter.

---

[375] Reed Deposition Exhibit 2780, Email from Robert Reed, Chief Financial Officer at Sutter, to Bill Gleeson, Vice President of Communications at Sutter, "Subject: RE: Self Funded Product, Holding Statement," August 25, 2009, DEF001454377.

[376] Deposition of Robert Reed, Chief Financial Officer at Sutter, October 17, 2017 (hereafter "Reed Deposition (Sutter, October 17, 2017)"), p. 116.

[377] Reed Deposition Exhibit 95, Sutter, "Strategy Session," January 18, 2011, DEF001993646-928, at 774 ("Sutter's ability to move the premium based on price gap concessions alone is not sufficient to bridge the gap with Kaiser in Health Plans' "Blended Premium" … "Premium gaps with Kaiser are in the range of 15% - 20%.").

[378] Sutter Health, "Strategy Session," January 18, 2011, DEF001993646-928 at 717. *See* Chipty Workpapers.

[379] Using the five-to-one ratio in Mr. Reed's calculation, a five percent Sutter price increase would lead to approximately a one percent increase in non-Kaiser premiums. This increase would in turn lead to a slightly over one percent reduction in non-Kaiser membership based on the substitution pattern observed in the Stanford experience. *See* Chipty Workpapers.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    127

143.    For these reasons, the actual loss of patient volume from a five percent increase in the Sutter hospital prices is likely to be substantially lower than critical volume—meaning that Sutter would find it profitable to raise prices. Or, in other words, Sutter is largely undisciplined by Kaiser.

### E.    Substantial Barriers to Entry Protect Sutter's Market Power

144.    Analysis of publicly available material, Sutter documents, deposition testimony, and data indicate that there are substantial barriers to entry that protect Sutter's pre-existing market power.

### 1.    Qualitative Evidence of Substantial Barriers to Entry

145.    The qualitative evidence shows that there are substantial barriers to entry. These barriers stem, in part, from technological investments hospitals must make in capabilities like electronic health records and from California regulations that require hospitals to invest in facilities to meet seismic codes. To comply with seismic codes, hospitals must invest in structural upgrades or, in many cases, construct new buildings, both of which are costly and take considerable time to achieve.[380] Consistent with these facts, Sutter's ordinary-course documents note the presence of high barriers to entry and that Sutter benefits from barriers to entry to

---

[380] For example, CPMC's plan to build a new 600-bed hospital in San Francisco was projected to cost $1.2 billion, took nine years to secure local regulatory approval, and spanned a period of 15 years from the time the land was purchased (in 2004) until the time the building is projected to be complete. (*See* Colliver, Victoria, "Acute development / California Pacific to build $1 billion hospital on hotel site," SFGATE, August 2, 2005, available at https://www.sfgate.com/business/article/Acute-development-California-Pacific-to-build-2618912.php, *site visited* April 17, 2019; *See also:* San Francisco Examiner, "S.F. approves final terms of California Pacific Medical Center hospital deals" available at https://www.sfexaminer.com/news/s-f-approves-final-terms-of-california-pacific-medical-center-hospital-deals/, *site visited* April 17, 2019; Sutter Health, "CPMC kicks off construction of two new San Francisco hospitals" available at https://www.cpmc2020.org/sites/default/files/DemoEventNewsRelease_0.pdf, *site visited* April 17, 2019. Similarly, it took ten years for Sutter to open a new hospital to replace CPMC – St. Luke's Hospital, which it announced in 2008. *See* CPMC, "2008 Institutional Master Plan?" available at http://www.marcheseco.com/wp-content/uploads/CPMC-Institutional-Master-Plan.pdf, *site visited* April 17, 2019, at pp v and 5; *See also* CPMC, "Construction Schedule" available at http://www.cpmc2020.org/mb/timeline, *site visited* April 17, 2019, *see also* Sutter Health, "Doors Officially Open at Sutter Health's CPMC Mission Bernal Campus" available at https://news.sutterhealth.org/2018/08/25/doors-officially-open-sutter-healths-cpmc-mission-bernal-campus/, *site visited* April 17, 2019. Sutter's new state-of-the-art replacement hospital for Eden Medical Center, with 130 acute care beds cost $230 million (*see* Sutter Health, "Structural Engineer's Active Role in an IPD Project with Lean and BIM Components" available at https://www.structuremag.org/?p=534, *site visited* April 17, 2019).

competition in inpatient hospital services. For example, a 2008 project notes that "Barriers to Entry are High."[381] Another internal document from 2008 explains that "Sutter and its affiliates have benefited from the regulatory and economic complexity which translates to risk and a natural barrier to entry from competition and disruptive innovation" and also claims "the healthcare business has an extraordinarily long lag period to put supply into or out of the market. It takes approximately 10 years from start to finish to put a hospital project into the market and an indeterminate amount of time to take excess capacity out of the market."[382]

146.    In proceedings related to the merger of Summit and Alta Bates Medical Center, Sutter claimed that "[h]ospitals in general and Alta Bates and Summit in particular have extremely high fixed costs, both in terms of the physical plant and equipment as well as the high cost of maintaining a highly skilled staff."[383]

147.    Several Sutter executives have also testified in this case about the existence of high barriers to entry. For example:

- Peter Anderson, Chief Strategy Officer at Sutter, testified that Sutter would need to invest considerable money into meeting these regulations: "[W]e were going to have to pull billions of dollars into new facilities to replace facilities that didn't meet the state seismic code. We would have to put in hundreds of millions, up towards a billion dollars in our electronic health record to meet the federal guidelines that came out later and to provide integrated care to reduce duplication, et cetera."[384]

---

[381] Sutter, "Governance Assessment Project Update," 2008, STCA0509277, at p. 23. *See also,* Robert Reed Deposition Exhibit 85, Robert D. Reed, Chief Financial Officer, "CEO Meeting," Sutter Health, February 26, 2008, DEF002217932-961, at 938 (stating that one of the "Contributors to Sutter's Success" is that "Barriers to Entry are High" and there is "Price inelasticity.").

[382] Jeff Gerard Deposition Exhibit 305, Sutter Health Finance Memorandum from Robert Reed, then Senior Vice President & Chief Financial Officer, to Sutter Health Finance & Planning Committee, January 7, 2008, STCA0704098-201, at 110, 132.

[383] Sarah Krevans Deposition Exhibit 4287, *State of California v. Sutter Health, et al.,* Case No. C-99-3803-MMC (Nov. 3, 1999), "Defendants Sutter Health and Alta Bates Medical Center's First Amended Proposed Findings of Fact and Conclusions of Law on Plaintiff's Motion for Preliminary Injunction," ¶ 26 (citing Guerin-Calvert Report, ¶ 63).

[384] Deposition of Peter Anderson, Chief Strategy Officer at Sutter, June 28-29, 2018 (hereafter "Anderson Deposition (Sutter, June 28-29, 2018)"), pp. 176-177.

- Robert Reed, Chief Financial Officer at Sutter, describes a 2008 Sutter presentation at a meeting of hospital CEOs that states one of the "Contributors to Sutter's Success" is that "Barriers to Entry are High" and there is "Price Inelasticity."[385] He testified that barriers to entry are high because "people are reluctant to start a business in California…a hospital business" because "the State of California provides an enormous challenge for people to operate. Specifically, say, in order to comply with the state regulatory framework, construction tends to be between two and three times more expensive than it would be, say, building in other states, so it drives a significantly higher capital cost…" Further, he notes that what specifically was challenging about the regulatory environment was "[t]he corporate practice of medicine in the State of California. It's illegal to have the corporate practice of medicine," which "creates a significant barrier of trying to organize the delivery of cost effective care."[386]

- Jeff Gerard, President, Sutter Health Bay Area, testified that the time it takes to construct a hospital facility serves as a barrier to entry.[387] Further, he testified that the regulatory requirements in California are significant, and it is expensive to build a hospital in California, which act as barriers to entry.[388]

---

[385] Robert Reed Deposition Exhibit 85, Robert D. Reed, Chief Financial Officer, "CEO Meeting," Sutter Health, February 26, 2008, DEF002217932-961, at 938.

[386] Reed Deposition (Sutter, October 17, 2017), pp. 55-57. *See also,* Deposition of Robert Reed, Chief Financial Officer at Sutter, June 12-13, 2018, pp. 74-76 (noting that, while "there's no certificate of need legislation which prohibits new entrants to the market,….[i]n California,…there's some soft barriers like doing business in the state of California" and "high barriers to entry [are] a contributor to Sutter's success…[b]ecause people don't want to come and open hospitals in California.")

[387] *See* Deposition of Jeff Gerard, President, Sutter Health Bay Area, May 4, 2018 (hereafter "Gerard Deposition (Sutter, May 4, 2018)"), pp. 201-204 (noting the fastest opening of a new general acute care hospital he has seen in Northern California was three years for the Sutter Maternity and Surgery Center and the longest was Mills Peninsula, which was a ten year project, of which it took four years for the actual construction); and Deposition of Jeff Gerard, President, Sutter Health Bay Area, June 1, 2018 (hereafter "Gerard Deposition (Sutter, June 1, 2018)"), p. 445 (noting "it is faster to construct an outpatient facility than it is an inpatient facility").

[388] Gerard Deposition (Sutter, May 4, 2018), pp. 192-197.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    130

2.      *There Has Been Virtually No Entry of New Hospitals in Northern California Over the Past 20 Years*

148.    Finally, I examined OSHPD data to study hospital entry from 1995 to 2016 in Northern California. California hospitals are required to submit a Hospital Disclosure Report to OSHPD each year,[389] and OSHPD assigns new identification numbers ("IDs") when hospitals enter or move their facilities. Accordingly, one can use the OSHPD hospital IDs to identify and study episodes of potential entry. Over this period, there were 184 unique non-Kaiser OSHPD hospital IDs in Northern California that were classified by OSHPD as GAC for at least one year; of these hospitals, 167 were in existence in 1995.[390] Staff working under my direction studied each of the 17 (= 184 – 167) remaining hospital IDs to determine how many belong to new hospitals:

- In 11 of the 17 cases, OSHPD had issued a new identification number for a pre-existing hospital (and discontinued using the old identification number), after the hospital either moved to a new building located nearby or expanded its current facility.[391]

- Of the remaining six cases, research indicated that at least three of the hospitals were in operation prior to 1996.[392,393,394]

---

[389] OSHPD, "Submit Financial Data (SIERA)," available at https://oshpd.ca.gov/data-and-reports/submit-data/financial-reporting/, *site visited* April 1, 2019.

[390] Chipty Workpapers.

[391] Chipty Workpapers.

[392] Laguna Honda Hospital and Rehabilitation Center first appears in the OSHPD data as a GAC hospital in 2001, but this hospital has been in operation since 1963. *See* San Francisco Health Network Laguna Honda Hospital and Rehabilitation Center, "Our History," available at https://lagunahonda.org/OurHistory, *site visited* April 17, 2019 ("Laguna Honda became accredited as a hospital in 1963 as it continued to redefine itself in ways that would allow it to meet the needs of its diverse service population. The 1920s-era buildings underwent a major renovation in the mid-70s.").

[393] ValleyCare Medical Center in Pleasanton first appears in the OSHPD data as a GAC hospital in 2008, but this hospital has been in operation since 1991. *See* Stanford Health Care: ValleyCare, "History," available at https://www.valleycare.com/about-history.aspx, *site visited* April 17, 2019 ("As the Tri-Valley community grew, so did ValleyCare and in 1991 ValleyCare Medical Center in Pleasanton opened.").

[394] Nelson Holderman Memorial Hospital first appears in the OSHPD data as a GAC hospital in 2000, but this state-operated facility for veterans opened in 1929. *See* O'Dea Gaughan, Timothy, "Veterans Home marks 125 years. Yountville: Home to the first California veterans and first veterans home in the U.S.," *Napa Valley Register*, March 22, 2009, available at https://napavalleyregister.com/lifestyles/real-napa/article_22948b48-

Thus, there were at most three instances of *de novo* non-Kaiser GAC hospital entry across all of Northern California from 1996 to 2016: (a) Sutter Maternity and Surgery Center, which opened in 1996 but was not designated by OSHPD as a GAC hospital until 2008;[395] (b) Stanislaus Surgical Hospital, which opened in 1983 as an ambulatory surgery center and became licensed as a hospital in 2000;[396] and (c) Fresno Heart and Surgical Hospital, which opened in 2003.[397] These three occurrences would constitute a two percent increase in the number of hospital facilities over a 20-year period.[398]

149.    Evidence also indicates that constructing a new hospital facility can cost over $100 million and take years to complete. For example, Adventist Medical Center at Hanford was built to replace two existing hospitals in the community and opened in 2010; construction of the new facility took three years and reportedly cost $114 million.[399]

---

8e8b-5373-b590-1479d2f39387 html, *site visited* April 17, 2019 ("The Veterans Home would find its salvation in the person of Col. Nelson H. Holderman, a World War I veteran and recipient of the Congressional Medal of Honor. . . . Significantly, in 1929 he was also able to oversee the construction of a 500-bed hospital that the home had needed for years.").

[395] Sutter Health, "Sutter Maternity and Surgery Center Snapshot," available at https://www.sutterhealth.org/smscsc, *site visited* April 17, 2019 ("The hospital is fully accredited by The Joint Commission and opened in 1996."); and Chipty Workpapers.

[396] Carlson, Ken, "Stanislaus Surgical Hospital always a different patient experience," *Modesto Bee*, July 14, 2014, available at https://www modbee.com/news/local/article3167869 html, *site visited* April 17, 2019 ("In 1984, a dozen physicians broke away from larger hospitals in Modesto and built an ambulatory surgery center with support from two business partners. In 2000, the center was expanded and licensed as a 23-bed specialty hospital. . . .").

[397] Community Medical Centers, "Historical Highlights," May 2013, available at https://www.communitymedical.org/CMC/media/Fact-Sheets/facts-historical-highlights.pdf, *site visited* April 17, 2019.

[398] Two percent = (3 / 173), where 173 (= 184 – 11) is the number of distinct Northern California hospitals observed in the OSHPD data over the 1995 to 2016 period.

[399] Becker's Hospital Review, "New Adventist Hospital to Open in Hanford, California," June 24, 2010, available at https://www.beckershospitalreview.com/hospital-management-administration/new-adventist-hospital-to-open-in-hanford-california html, *site visited* April 17, 2019 ("A 200,000 square-foot, 144-bed replacement facility for Adventist Health's Hanford (Calif.) Community Medical Center is nearing completion, according to a report by *KMPH News*. The $114 million hospital is expected to open in October. . . . Construction on the facility began in 2007 and will partially consolidate Hanford Community with Central Valley General Hospital, another Adventist facility also located in Hanford, according to an Adventist news release.").

*** 

150.    Thus, there is substantial structural and direct evidence that Sutter has substantial pre-existing market power in the Tying Markets, and that this market power is protected by barriers to entry.

## VII.    Economics of Bilateral Negotiations and Steering Strategies

151.    I now turn to an analysis of the economic principles underlying the competitive effects arising from Sutter's all-or-nothing and anti-steering restrictions. I begin with a discussion of negotiation strategy that exposes how the all-or-nothing provision, reinforced by the steering restrictions, interferes with health plans' ability to negotiate lower prices in both the Tied and the Tying Markets, where Sutter faces little to no competition. Next, I explain the central role of prices in driving consumer choices and, as such, competition in many markets. I contrast that structure with the failure of prices to play a similar role in healthcare markets; specifically, I describe the consequences of this failure on the choices made by consumers of healthcare services and the implications for healthcare costs. I then explain how health plans have been developing steering mechanisms to give patients more information and incentives to consider both cost and quality when selecting healthcare providers. Finally, I present evidence that shows Sutter knows steering strategies, such as the use of narrow or tiered networks and excluding Sutter physicians from provider networks, will tend to put downward pressure on hospital prices.

### A.    Health Plans Usually Threaten to Steer Patient Volume Away from Hospitals to Negotiate Lower Prices

152.    In the textbook bargaining model, the arms-length price determined by negotiation between a willing buyer (a health plan in this case) and a willing seller (a hospital system in this case) divides the surplus generated from trade; in equilibrium, neither party is worse off than the surplus from the walk-away scenario in which negotiations break down.[400] In

---

[400] *See, e.g.*, Chipty, Tasneem and Christopher M. Snyder, "The Role of Firm Size in Bilateral Bargaining: A Study of the Cable Television Industry," *Review of Economics and Statistics*, May 1999, Vol. 81, No. 2, pp. 326–340; Raskovich, Alexander, "Pivotal Buyers and Bargaining Position," *Journal of Industrial Economics*, December 2003, Vol. 51, No. 4, pp. 405-426.

this context, there are two different means by which a health plan can achieve a lower negotiated price. First, the health plan could take steps to worsen the hospital system's walk-away options. One can think of the hospital's walk-away option as the patient volume the hospital would likely receive in the event negotiations terminated and the health plan did not include the hospital in its provider network. The worse the hospital system's walk-away scenario, the lower will be the hospital price that emerges from the arms-length negotiation. Second, the health plan could take steps to improve its walk-away options. One can think of the health plan's walk-away option as the subscriber volume and margins that it could achieve in the event the health plan did not include the hospital in its provider network. The better the health plan's walk-away-scenario, the lower will be the arms-length hospital price.

153.    There is ample evidence that health plans desire to achieve more favorable negotiated outcomes, by both worsening Sutter's walk-away options and improving their own walk-away options. These opportunities stem from health plans' ability to threaten to steer patient volume away from Sutter hospitals in the Tied Markets, where health plans and patients have more hospital choices. I describe the mechanisms through which such a threat can discipline prices in both the Tying and Tied Markets. I also describe how Sutter's all-or-nothing arrangements, reinforced by the steering restrictions, eliminate this pricing pressure.

*1.    Health Plans Can Use Competitive Alternatives Within a Market to Achieve Lower Negotiated Prices*

154.    It is well-established in economics and business that in markets where buyers (health plans in this case) have competitive alternatives, they can achieve lower prices in their negotiations with suppliers (hospital systems in this case).[401] Such negotiation success can be achieved in different ways. For example:

- A health plan could single-source to lower prices. In a two-hospital market, single-sourcing may mean that the health plan entirely excludes one of the two hospitals

---

[401] Baumol, William J. and Alan S. Blinder, *Microeconomics Principles and Policy*, Sixth Edition, Orlando, FL: Harcourt Brace & Company, 1994, p. 223.

from its provider network. In this case, the threat of switching to the other hospital (and dropping the first hospital) would force the first hospital to charge lower prices.

- A health plan could multi-source, provide equal access to both hospitals, and achieve lower prices. In such a case, the threat of dropping one of the hospitals may not need to be exercised. What matters is that the threat was credible.

- A health plan could multi-source, provide unequal access to both hospitals, and still achieve lower prices. In such a case, hospitals may compete to be the preferred provider, giving price concessions for greater access to patient volume.

Notably, each of these strategies that take advantage of competitive alternatives to secure lower hospital prices requires that health plans can steer volume away from competing hospitals in part or in full, as part of an effective negotiation strategy. As I explain below, anti-steering restrictions, combined with all-or-nothing contracting, interfere with this competitive process.

    2.  *Health Plans Can Use Competitive Alternatives Anywhere in a Hospital System's Network to Achieve Lower Negotiated Prices in Areas with Fewer Competitive Alternatives*

155. It is well-established in economics and business that under certain conditions, buyers (health plans in this case) that purchase in multiple markets from the same sellers (hospital systems in this case) may be able to use competitive alternatives in one market to achieve lower prices in another market. As noted by Ed Berger, Vice President of Managed Care at Sutter, if allowed, health plans may use their whole purchase portfolio with a "divide and conquer strategy" across the Sutter network.[402] Such a strategy can be achieved in different ways. For example:

- A health plan could choose to drop from its provider network a hospital system's hospital in a hospital market where the hospital system faces more competition.

- A health plan could choose to place in a less desirable tier a hospital system's hospital in a more competitive hospital market.

---

[402] Van Johnson Deposition Exhibit 280, Compilation of Sutter documents, including a Sutter Health Memorandum from Ed Berger, then Vice President of Managed Care at Sutter, to Sutter personnel (Managed Care Department), "Subject: Blue Cross & Blue Shield," March 12, 1998, DEF001924626-678, at 640.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA  

Each of these strategies contemplates using competitive alternatives available in certain parts of a hospital system's network (the Tied Markets in this case) to achieve lower costs in other parts of a hospital system's network (the Tying Markets in this case). The combination of Sutter's all-or-nothing and anti-steering restrictions interfere with this competitive process.

### B.     Prices Usually Provide the Information and Incentives for Competition to Work

156.    Prices play an important role in efficiently allocating resources in the economy.[403] In most markets, consumers' decisions are influenced by the prices they must pay for the goods and/or services available to them. Consider a simple example from the cereal industry involving a consumer who prefers Kellogg's Raisin Bran to Post Raisin Bran. When that consumer is in a supermarket, she would be expected to purchase Kellogg's Raisin Bran instead of Post Raisin Bran if the prices of the two were the same. In fact, given the consumer's preference, she might even be willing to pay a higher price for Kellogg's Raisin Bran. However, if upon arriving at the supermarket, the consumer sees a sale on Post Raisin Bran, lowering the price of Post Raisin Bran to a level that is $1.00 less than the same size package of Kellogg's Raisin Bran, the consumer might choose to purchase Post Raisin Bran instead. In this example, price serves an important dual function in the competition between Kellogg's and Post: price both informs the consumer how much she will have to pay for each brand of cereal and provides an incentive to select Post over Kellogg's as a way to save $1.00. The use of prices to provide both information and incentives is so ubiquitous in our economy that one might overlook how important it is to the competitive process.

157.    There is a growing literature that suggests that "blinding" patients from the prices charged by healthcare providers (as Sutter did) can lead to a variety of what is described in economics as "market failures."[404] This literature suggests that obscuring price signals to patients

---

[403] Mankiw, N. Gregory, *Principles of Microeconomics*, Fifth Edition, South-Western Cengage Learning, 2008, at p. 85 ("In any economic system, scarce resources have to be allocated among competing uses…Supply and demand together determine the prices of the economy's many different goods and services; prices in turn are the signals that guide the allocation of resources.").

[404] A market failure is a situation in which the free market results in an inefficient allocation of resources, and there is a net reduction in social welfare. *See* Pindyck, Robert and Daniel Rubinfeld, *Microeconomics*, Eighth Edition, Upper Saddle River, NJ: Pearson Education, Inc., 2013, at p. 324 ("In some situations, a market

leads to inefficient provision of care, higher costs, and higher prices.[405] Sutter's restrictions on price (and quality) transparency interfere with the usual competitive process and contribute to these market failures.

### C.    Health Plans Use Steering Strategies to Reduce Prices

158.    Health plans and employers are increasingly searching for strategies to reduce or contain rising healthcare costs.[406] As I explained in my Class Declaration, in a traditional broad network insurance product, members can choose any provider in the network without an immediate cost consequence. That is, the out-of-pocket costs to the patient are largely the same, no matter which hospital from the provider network is selected, despite the fact that some hospitals may be significantly more expensive than others for the health plan. Thus, in a broad network insurance product, a higher-priced hospital can attract as much patient volume as a lower-priced hospital. To temper this problem, health plans and employers increasingly are interested in developing health insurance products that restore the price-choice connection for patients.

159.    To this end, health plans are employing various mechanisms to provide patients with both the information and incentives needed to account for price and quality when choosing providers.[407] These "steered products" include tiered networks, narrow networks, and other

---

failure occurs: Because prices fail to provide the proper signals to consumers and producers, the unregulated competitive market is inefficient--*i.e.*, does not maximize aggregate consumer and producer surplus.").

[405] Brown, Zach Y., "Equilibrium Effects of Health Care Price Information," *Review of Economics and Statistics*, forthcoming (explaining that price transparency tools in medical imaging can benefit all insured individuals even if they do not use the price transparency tool). *See also* Reinhardt, Uwe, "The Disruptive Innovation of Price Transparency in Health Care," *American Medical Association*, 2013, Vol. 310, No. 18, 1927-1928, at p. 1927 ("A second factor facilitating high US prices for health care has been the shroud of secrecy draped over the health care prices negotiated in the private sector.").

[406] LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 177-178 ("Q: ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████") *See also*, Lundbye Deposition (United, May 15-16, 2018), p. 165 ("A: [Narrow networks] are gaining in popularity simply because the health care costs are so expensive...[s]o they're literally looking for solutions here to mitigate their cost exposure. Q: Who is 'they'? A: Employers, purchasers.").

[407] Kowalczyk, Liz, "Plans Steer Patients to Lower-Cost Hospitals," *The Boston Globe*, February 10, 2011, available at http://archive.boston.com/lifestyle/health/articles/2011/02/10/plans_steer_patients_to_lower_cost_hospitals/, *site visited* June 16, 2018; Robinson, James C. and Kimberly MacPherson, "Payers Test Reference Pricing and Centers of Excellence to Steer Patients to Low-Price and High-Quality Providers," *Health Affairs*, September 2012, Vol. 31,

benefit designs that provide patients with both: (a) an incentive to consider price as well as quality when selecting providers; and (b) information about the implications of their provider choices for their out-of-pocket costs.[408] I turn next to a more detailed discussion of how steered products can contain healthcare costs.

### 1.    Tiered and Narrow Networks

160.    One way that health plans can steer patients to lower-cost / higher-quality providers is through the use of a "tiered" network that divides the providers in the health plan's provider network into groups of more-preferred and less-preferred providers. In tiered health plans, patients are given financial incentives, in the form of lower out-of-pocket expenses (*i.e.*, through some combination of lower deductibles, lower co-payments, and/or lower coinsurance) to select providers in a preferred tier.[409] Thus, the tiered structure provides patients with a combination of information and financial incentives that steers patients towards a provider in the most-preferred tier. In turn, the tiered structure creates an incentive for providers to compete to be placed in the most-preferred tier by offering lower prices. Examples of such health insurance

---

No. 9, 2028-2036 (hereafter "Robinson and MacPherson (2012)"), at p. 2028; National Academy of Social Insurance, "Addressing Pricing Power in Health Care Markets: Principles and Policy Options to Strengthen and Shape Markets," April 2015, pp. 20-22, available at https://www.urban.org/sites/default/files/publication/50116/2000212-Addressing-Pricing-Power-in-Health-Care-Markets.pdf, *site visited* June 16, 2018; and Delbanco, Suzanne, Robert Berenson, Divvy Upadhyay, and Roslyn Murray, "Understanding How Payment and Benefit Designs Work Together In Health Care," *Health Affairs Blog*, May 25, 2016 (hereafter "Delbanco et al."), available at http://www.healthaffairs.org/do/10.1377/hblog20160525.055020/full/, *site visited* November 13, 2017.

[408] Delbanco, Suzanne F., et al., "Tiered Networks," Urban Institute, April 2016, available at https://www.urban.org/sites/default/files/03_tiered_networks.pdf, *site visited* November 25, 2017, at pp. 1-2.

[409] *Id.*

products include the Sharp Health Plan;[410] Anthem's Advantage HMO and PPO products[411] and PERS Select PPO;[412] Blue Shield's Network Choice[413] and Blue Groove;[414] United's Nexus

---

[410] The Sharp Health Plan, for example, offers a point-of-service plan that provides "a network of care in every neighborhood across San Diego and southern Riverside counties with an in-network Tier 1 that "includes all of the hospitals and providers participating in the Sharp Health Plan Choice network" and Tier 2 where Sharp tells members, "you can get care from the Aetna Open Choice PPO provider network, as well as out-of-network providers – with no referral needed," and that "[i]t's important to remember that when you choose to get care from the Aetna Open Choice PPO provider network or out-of-network providers, your out-of-pocket costs will be higher." (See Sharp Health Plan, "Point-of-Service Plans," available at https://www.sharphealthplan.com/our-plans/group-plans/point-of-service-plan, *site visited* April 12, 2019; and Sharp Health Plan, "Point-of-Service Plan Resources," available at https://www.sharphealthplan.com/members/manage-your-plan/point-of-service-plan-resources, *site visited* April 12, 2019.)

[411] *See,* Aldo De La Torre Deposition Exhibit 1636, "2007-2008 Blue Cross of California and Sutter Health Systemwide Amendment," December 30, 2006, DEF002005445-794, at 768; "Blue Cross of California and Sutter Health Systemwide Third Amendment," December 24, 2008, STCA0013395-583, at 576; Aldo De La Torre Deposition Exhibit 1638, "2012 Anthem Blue Cross of California and Sutter Health Systemwide Amendment," December 29, 2011, DEF002006307-690, at 653; "2014 Anthem Blue Cross of California and Sutter Health Seventh Systemwide Amendment," December 13, 2013, DEF002006936-7254, at 7113; and "2016 Blue Cross of California and Sutter Health Systemwide Amendment," January 6, 2016, DEF000000330-746, at 647.

[412] Aldo De La Torre Deposition Exhibit 1638, "2012 Anthem Blue Cross of California and Sutter Health Systemwide Amendment," December 29, 2011, DEF002006307-690, at 655.

[413] Network Choice was a tiered network launched in 2001 that included all Sutter hospitals in Tier 1 per Sutter's insistence, which ultimately had to be discontinued in 2006 due to Sutter's "significantly higher prices." (Joyner (Blue Shield) Declaration, ¶¶ 45-46.) *See also*, Joyner (Blue Shield) Declaration, ¶ 46 & Exhibit 14 (2010 internal Blue Shield email showing Network Choice failed in North because of Sutter and the 95 percent non-par rate).

[414] *See* James Orchison Deposition Exhibit 1699, "Chart of Blue Shield Fully Insured Products and Associated Information," DEF009259960, at p. 2.

ACO Product and Premium Designation Program;[415] Health Net's Variable HMO Hospital Copay Plan;[416] and Aetna's Aexcel Product[417] and Benefit Engagement Network.[418]

161.    To see how and why tiered-plan incentives might work, consider a simple example with two hospitals (Hospital A and Hospital B) and a world where there are only ten patients and all of them require one type of inpatient hospital service, which both hospitals can provide at the same level of quality. In this example, assume that the service is for major joint replacement without major complications, and that Hospital A charges $60,000 for this service, while Hospital B charges only $30,000.[419]

---

[415] The Nexus ACO Product has a tiered network that tiers by practice group instead of individual physicians. (Lundbye Deposition (United, May 15-16, 2018), pp. 225-227, 385-386; Cain Deposition (United, June 20, 2018), pp. 175-177.) ▮▮▮ Lundbye Deposition (United, May 15-16, 2018), pp. 215-218, 383, 385-386.

[416] In the early 2000s, Health Net proposed the tiered network product called Health Net Variable Hospital Copay Plan, ▮▮▮ n ▮▮▮ (Hamilton Deposition (Health Net, September 11, 2018), pp. 31, 33, 36). The Variable HMO Hospital Copay Plan "is a plan that allows three levels of Copayments for Hospital inpatient services and outpatient surgery benefits." Thomas Hamilton Deposition Exhibit 630, Letter from David Fassil, Vice President, Provider Network Management, North, at Health Net, to Kris Vine, then Vice President & Chief Contracting Officer at Sutter, November 8, 2002, with enclosures, DEF009971571-652, at 577.

[417] ▮▮▮ d (See Robinson Deposition (Aetna, August 28, 2018), p. 95.) ▮▮▮ (See Greg Stevens Deposition Exhibit 3679, Email from Brendhan Green, former Vice President of Network Management at Aetna, to Aetna personnel, "Subject: FW: Aexcel and Concentric w/ Sutter," November 10, 2004, AET-ESI0022886.)

[418] The Benefit Engagement Network is a "three tiered hospital network in conjunction with Aexcel and Aexcel Plus Physician Network." Tier 1 is called Choose & Save, Tier 2 is other in-network hospitals, and Tier 3 is out-of-network hospitals. See Chandra Welsh Deposition Exhibit 609, Fifth Amendment to the Aetna and Sutter Health Systemwide Amendment, December 23, 2010, DEF002946386-387, at 386; Welsh Deposition (Aetna, August 28, 2018), pp. 343-345.

[419] This service is described by DRG code 470. The full description of this service is "major joint replacement or reattachment of lower extremity [without major complications or comorbidities]." (See Centers for Medicare & Medicaid Services, "CMS_1632_FR_And_CN_Table_5.xlsx," available at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/FY2016-IPPS-Final-Rule-Home-Page-Items/FY2016-IPPS-Final-Rule-Tables.html, site visited June 9, 2018.) In 2015, Anthem claims data, the Sutter Tied Hospitals' average price for this service was about $60,000. The average price for this service by all other non-Sutter hospitals in Northern California was about $30,000. See Chipty Workpapers.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

162.    *In scenario one*: Assume that all patients are enrolled in a PPO plan in which Hospital A and Hospital B are both in-network and which requires them to make a $150 copayment to receive the service. Because the patients have neither a financial incentive nor price information to pick one hospital over another, and (by assumption) there are no quality differences, one might expect that half of the patients will seek care at Hospital A, and the other half will seek care at Hospital B. In this scenario, the cost of treating five patients at Hospital A would be $300,000 (= $60,000 x 5), and the cost of treating five patients at Hospital B would be $150,000 (= $30,000 x 5). Total costs would be $450,000, and the average cost would be $45,000 per patient. Each patient's contribution to the cost of the procedure is their $150 copayment, which is independent of which hospital he or she chooses. Thus, the $450,000 cost to treat all ten patients is shared among the patients and the health plan: (a) patients pay total out-of-pocket expenditures of $1,500 (= $150 x 10); and (b) the health plan pays the remainder of $448,500 (= $450,000 - $1,500).

163.    *In scenario two*: Assume the health plan has a tiered network where Hospital B is in the most-preferred tier (with patients making a $100 copayment to receive services there) and Hospital A is in a less-preferred tier (with patients making a $150 copayment to receive services there). These differential co-payments would encourage some patients, say one out of five, who otherwise would have visited Hospital A to switch to Hospital B instead.[420] Under these assumptions, the cost of treating four patients at Hospital A would be $240,000 (= $60,000 x 4), and the cost of treating six patients at Hospital B would be $180,000 (= $30,000 x 6). Total costs would be $420,000, and the average cost would be $42,000.[421] This tiering strategy results in total savings of $30,000 or a per-patient saving of $3,000 (= $45,000 - $42,000) in average costs versus the *scenario one* outcome. Patients' contributions to total cost would decline to $1,200, for an average savings of $30 per patient.[422,423] There may also be an additional effect, whereby Hospital A lowers its price to be more competitive against Hospital B. This combination of

---

[420] Because there are many factors that impact an individual patient's choice of hospital (*e.g.*, distance from their home), it is also not reasonable to assume that all patients would switch to the lower-cost alternative.

[421] ($30,000 x 0.6) + ($60,000 x 0.4) = $42,000.

[422] ($100 x 6) + ($150 x 4) = $1,200.

[423] The reduction in total medical expenditures incurred by the health plan may lead to a reduction in premiums, which would further benefit patients.

effects is the dynamic that health plans wish to encourage through various forms of steering. Such steering strategies are more successful the greater the financial incentives to use the low-cost provider and the more responsive patients are to prices.

164.    As an alternative to a tiered network, a health plan may offer a health insurance product with a "narrow" network that includes only a subset of the providers contained in the health plan's broad network and treats others as out-of-network providers. The in-network providers are typically selected based on some combination of cost and quality factors.[424] As a result, providers may offer discounts to the health plan to be included in the narrow network, which may, in turn, allow the health plan to charge lower premiums to members.[425] For example, in Northern California, in 2007, Anthem launched its Select HMO and PPO narrow network products, in which Sutter only allowed its three rural hospitals and CPMC (plus another hospital for transplants only) to participate initially and, consequently, Anthem could not offer the products in several counties in Northern California because of Sutter's refusal to participate.[426] Similarly, after successfully launching in Southern California, Blue Shield launched the narrow network product SaveNet in certain geographies in Northern California with limited Sutter exposure and in San Francisco and Sacramento where they excluded Sutter.[427]

165.    Consider again the Hospital A and Hospital B example discussed above. In that example, I illustrated how a differentiated copayment based on a tiered network structure could

---

[424] Delbanco, Suzanne F., et al., "Narrow Networks," Urban Institute, April 2016, available at https://www.urban.org/sites/default/files/04_narrow_networks.pdf, *site visited* November 25, 2017.

[425] Giovannelli, Justin, Kevin Lucia, and Sabrina Corlette, "Health Policy Brief: Regulation of Health Plan Provider Networks," *Health Affairs Blog*, July 2016, available at https://www healthaffairs.org/do/10.1377/hpb20160728.898461/full/, *site visited* November 24, 2017.

[426] *See*, Mathewson Deposition (Anthem, May 18, 2018), pp. 121-122; Aldo De La Torre Deposition Exhibit 1636, "2007-2008 Blue Cross of California and Sutter Health Systemwide Amendment," December 30, 2006, DEF002005445-794, at 768, 770; Steve Scott Deposition Exhibit 432, Email from Steven Scott, then General Manager, Large Group Public Entities at Anthem, to Anthem personnel, "Subject: RE: Select," June 15, 2006, ABCLH006605-609, at 606.

[427] *See*, James Orchison Deposition Exhibit 1699, "Chart of Blue Shield Fully Insured Products and Associated Information," DEF009259960, at p. 2; Orchison Deposition (Blue Shield, July 20, 2018), pp. 176, 328; Brendt Deposition (Sutter, July 25, 2018), pp. 186-187; Hermosillo Deposition (Blue Shield, October 11, 2018). p. 260; Brendt Deposition Exhibit 310, "Eighth Amendment to the Blue Shield of California and Sutter Health Systemwide Amendment," January 9, 2012, PROD00287861-8253, at 7966, (noting that Sutter hospitals are non-participating other than the rural hospitals.); Brendt Deposition (Sutter, July 30, 2018), pp. 249-251.

lower the total costs of care across the population of patients. An alternative structure to achieve a similar result could have been for the health plan in this hypothetical example to offer a narrow network that includes only the lower-cost hospital, Hospital B. Suppose that, in this narrow-network plan, the copayment at Hospital B is lowered to $100, while the copayment at Hospital A (which is out-of-network) is raised to $300.[428] Just as in the tiered-network example, these differential copayments would encourage some patients, say three out of five, who otherwise would have visited Hospital A to switch to Hospital B instead. Under these assumptions, the cost of treating the two remaining patients at Hospital A would be $120,000 (= $60,000 x 2), and the cost of treating eight patients at Hospital B would be $240,000 (= $30,000 x 8). Total costs would be $360,000, and the average cost would be $36,000.[429] Relative to the outcome without steering, total savings would be $90,000 (= $450,000 - $360,000), and average per-patient savings would be $9,000 (= $45,000 - $36,000).[430] Patient contribution to total cost would also decline to $1,400, for an average savings of $10 per patient.[431] These savings could be even greater if: (a) Hospital B further discounts its price in exchange for inclusion in the health plan's narrow network; and/or (b) Hospital A lowers its price to stem the loss of patients to Hospital B.

### 2. Informative Mechanisms that Steer Patients

166. Health plans may also rely on mechanisms that convey price and quality information—mechanisms such as "centers of excellence," "reference pricing," or "price transparency tools"—to increase patients' awareness prices and price sensitivity, both of which may ultimately result in patients choosing lower-cost providers.

167. Health plans can use a "center of excellence" designation to steer patients to preferred providers based on quality and price considerations. Often, centers of excellence focus on specific procedures (such as bariatric surgery) or the treatment of certain health conditions

---

[428] While actual narrow-network health plans often provide other financial disincentives to members to avoid out-of-network providers (such as higher deductibles and higher coinsurance rates), I focus only on copayments in this hypothetical example for ease of exposition.

[429] ($30,000 x 0.8) + ($60,000 x 0.2) = $36,000.

[430] Patients may also benefit from lower insurance premiums if health plans share with their members some of the cost savings from the reduction in total medical expenditures from $450,000 to $360,000.

[431] ($100 x 8) + ($300 x 2) = $1,400.

(such as cancer) rather than the entirety of services offered by a particular provider.[432] Health plans can design health insurance products to give patients financial incentives to receive care from a provider that has been designated as a center for excellence for that type of care.[433] Health plans also may simply designate a provider as a center of excellence to signal that the provider is high quality, without providing any financial incentive for patients to obtain care there.

168.    Returning to the example of Hospital A and Hospital B, consider a situation in which a health plan designates Hospital B as a center of excellence for the service in the example and reduces its members' out-of-pocket costs from $150 to $50 when they choose the center of excellence. If that incentive were to cause one patient to switch from Hospital A to Hospital B, the total costs of care would decline by $30,000 (the difference between $60,000 and $30,000) on the one patient that switches or $3,000 per patient, spread across the health plan's ten patients. The one patient would directly share in the savings through the $100 reduction in out-of-pocket costs, and all members may save because of a reduction in premiums due to the reduction in total medical expenditures incurred by the health plan. The savings could be even greater if either Hospital A or Hospital B lowers its price (or both do) to entice the health plan to designate it (rather than, or in addition to, its competitor) as a center of excellence.

169.    "Reference pricing" is another tool that health plans use to steer patients to lower-cost providers. With reference pricing, health plans pay a "defined contribution toward covering the full price charged by the provider, with the patient being required to pay the remainder."[434] Reference pricing allows patients to become aware and take advantage of price variation across providers. Since the patient pays any cost above the reference price, patients with this benefit design are encouraged to make efficient choices.[435] Consider again the example of Hospital A and Hospital B. Recall that Hospital A charged $60,000 for treatment, and Hospital B charged $30,000 for treatment. If the health plan set a reference price of $30,000, patients choosing

---

[432] Robinson and MacPherson (2012), at p. 2029.

[433] Robinson and MacPherson (2012), at p. 2030. In addition, Medicare has employed this approach. In 2006, the CMS ruled that "Medicare would pay only for bariatric surgery that was performed at an ASMBS center of excellence or an ACS level 1 bariatric surgery center." *See* Sugerman, Deborah Tolmach, "Centers of Excellence," *Journal of the American Medical Association*, September 2013, Vol. 310, No. 9, at p. 994, available at https://jamanetwork.com/journals/jama/fullarticle/1734706, *site visited* April 16, 2019.

[434] Robinson and MacPherson (2012), at p. 2029.

[435] Robinson and MacPherson (2012), at pp. 2034-2035.

Hospital A would be required to contribute $30,000 towards the cost of their care, while patients choosing Hospital B would not be required to make any payment. This design creates strong incentives for patients to choose Hospital B (to avoid $30,000 in out-of-pocket expenses); moreover, if patients understand that the $30,000 cost associated with choosing Hospital A is due to Hospital A's higher price, Hospital A may reduce its prices (to mitigate the number of patients who choose the lower-cost provider).

170.    "Price transparency tools" are designed to make members aware of their likely out-of-pocket costs prior to seeking care.[436] These tools can include cost-calculators available on a health plan's website or a mobile app that allow members to estimate how much they will have to pay if they receive a particular service from a particular provider. These tools can be particularly important for members with high deductible plans, members whose plans require coinsurance (*i.e.*, the member is responsible for a fixed percentage of the price of the service), members who are unlikely to meet their out-of-pocket maximum, and members who are subject to reference pricing. Such tools make it easier for members to be aware of how price differences among providers affect their out-of-pocket costs prior to making their decision on where to seek care.[437] In addition, price transparency is needed for other forms of steering (*e.g.*, reference pricing) to be effective because patients cannot respond to the incentives created by benefit plans with steering features if they are completely unaware of providers' relative prices.

171.    Returning again to the Hospital A and Hospital B example, a price transparency tool might influence patient decisions in the presence of coinsurance. Patients responsible for 20

---

[436] Healthcare Financial Management Association, "Price Transparency in Health Care," 2014, available at https://www hfma.org/PriceTransparencyInHealthCare, *site visited* April 19, 2019. p. 3 ("[Price] Transparency tools for insured patients should include some essential elements of price information, including: The total estimated price of the service; A clear indication of whether a particular provider is in the health plan's network and information on where the patient can try to locate a network provider; A clear statement of the patient's estimated out-of-pocket payment responsibility; [and] Other relevant information related to the provider or the specific service sought (e.g., clinical outcomes, patient safety, or patient satisfaction scores.)").

[437] Healthcare Financial Management Association, "Price Transparency in Health Care," 2014, available at https://www hfma.org/PriceTransparencyInHealthCare, *site visited* April 19, 2019. p. 3 ("[Price] Transparency tools for insured patients should include some essential elements of price information, including: The total estimated price of the service; A clear indication of whether a particular provider is in the health plan's network and information on where the patient can try to locate a network provider; A clear statement of the patient's estimated out-of-pocket payment responsibility; [and] Other relevant information related to the provider or the specific service sought (e.g., clinical outcomes, patient safety, or patient satisfaction scores.)").

percent of the direct cost of care may prefer Hospital B if they could discover the price difference between Hospital A and Hospital B in advance of making their hospital choice. Upon learning that their out-of-pocket costs for Hospital A would be $12,000 (= 20 percent $x$ $60,000) and their out-of-pocket costs for Hospital B would be $6,000 (= 20 percent $x$ $30,000), some patients may choose to save $6,000 (= $12,000 - $6,000), by choosing Hospital B over Hospital A. In turn, Hospital A might respond to the threat of losing volume by lowering its prices.

### 3. Preferring Physicians Who Are Likely to Send Patients to Lower Cost Hospitals

172. As explained earlier, physicians play a critical role in influencing patients' choice of GAC hospitals, either by making recommendations about different hospitals or by referring patients to admitting physicians who tend to admit patients to specific hospitals. Sutter itself recognizes this connection. For example, a 2009 Sutter plan observes that "[p]hysician practice is currently the primary entry point into the Sutter Health and West Bay Enterprise system of care. Additionally, physicians continue to drive the majority of resource utilization decision making across the organization."[438] Health plans also recognize this connection. ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮[439] In other words, health plans can steer patients to lower-cost hospitals by preferring physicians who admit to lower-cost hospitals.

---

[438] Sutter Health, "Sutter West Bay Region Strategic Plan 2010 - 2012," December 21, 2009, DEF007028658–763, at 668.

[439] Aldo De La Torre Deposition Exhibit 478, McKinsey & Company, "Exchange Network Strategy: Preliminary Recommendations – San Francisco, CA," WellPoint, March 28, 2012, ABCLH379969-380037, at 79973.

**D.    Steered Products Are Associated with Savings in Medical Cost and Premiums**

173.    Thus, steered products give patients incentives to consider both cost and quality when selecting providers and information about how their choices will affect their out-of-pocket costs. There are several mechanisms through which steering can help contain healthcare costs:[440]

- Holding hospital prices constant, health plans may be able to incent patients to choose lower-priced hospitals, and thereby lower their total medical expenditures.

- By steering (or threatening to steer) patient volume to lower-priced hospitals, health plans may gain bargaining leverage over hospitals and may be able to create competitive rivalry among hospitals to lower price in exchange for volume. Further, the threat of being excluded or placed on a less favorable tier may force hospitals to become more competitive, either on the cost or quality front.

- The ability to offer new and innovative health insurance products, like narrow and tiered network products, can also foster competition among health plans. This competition would, in turn, place downward pressure on premiums, including for broad network products.

174.    These economic principles are supported by empirical evidence. For example, Professors Ho and Lee apply a bargaining framework to simulate optimal network structure and negotiated hospital prices in a counterfactual world where Blue Shield could create narrow network products and threaten to exclude hospitals in order to negotiate lower prices.[441] With respect to Blue Shield's contractual incentives, Professors Ho and Lee simulate that by adopting this strategy, Blue Shield would negotiate hospital prices that are 12 percent lower than they

---

[440] Dafny, Leemore S., Igal Hendel, Victoria Marone, and Christopher Ody, "Narrow Networks on the Health Insurance Marketplaces: Prevalence, Pricing, and the Cost of Network Breadth," *Health Affairs*, Vol. 36, No. 9, September 2017, pp. 1606-1614 (hereafter "Dafny et al. (2017)").

[441] Ho, Kate and Robin Lee, "Equilibrium Provider Networks: Bargaining and Exclusion in Health Care Markets," *American Economic Review*, Vol. 109, No. 2, 2019, pp. 473-522 (hereafter "Ho and Lee (2019)").

would have been otherwise.[442] In this setting, health plans can use simply the threat of creating narrow and tiered network products to place competitive pressure on hospitals.[443]

175.    Empirical studies of U.S. healthcare exchanges in multiple states also support the notion that steered products tend to be less expensive for consumers and are increasing in prevalence. For example:

- The proportion of products offered on healthcare exchanges that are steered (*i.e.*, narrow or tiered) increased from 47 percent in 2014 to 53 percent in 2017. In addition, the median premiums for broad network products were 11 percent to 17 percent higher than for steered network products in 2014 and 18 percent to 35 percent higher than for steered network products in 2017.[444]

- Econometric analysis of data from eight states (California, Colorado, Florida, Michigan, New Jersey, New York, Texas, and Washington) from 2014-2015 shows that network breadth is positively correlated with insurance premiums; increasing the breadth of the network from narrow to broad is associated with an increase in premiums by about 16 percent.[445]

- These findings are also confirmed by an econometric analysis based on data from all fifty states (plus the District of Columbia) from 2014: after controlling for characteristics that may influence premium variations between different products, narrow networks are found to be associated with premiums about seven percent lower than the premiums paid for broad networks.[446]

---

[442] Ho and Lee (2019), p. 477.

[443] Ho and Lee (2019), p. 475-476.

[444] McKinsey & Company, "Hospital Networks: Perspective from Four Years of the Individual Market Exchanges," May 2017, available at https://healthcare.mckinsey.com/sites/default/files/2017%20Hospital%20networks%20-%20Perspectives%20from%20four%20years%20of%20the%20individual_%20exchanges%20vF.pdf, *site visited* March 25, 2019, pp. 2-3 and 5.

[445] Dafny et al. (2017), pp. 1606-1607 and 1611.

[446] Polsky, Daniel, Zuleyha Cidav, and Ashley Swanson, "Marketplace Plans with Narrow Physician Networks Feature Lower Monthly Premiums than Plans with Larger Networks," *Health Affairs*, Vol. 35, No. 10, October 2016, pp. 1842-1848.

176.    Other studies have documented that steered insurance products—with lower costs, including lower premiums—are popular, even off the healthcare exchanges. For instance, a 2018 survey by the Kaiser Family Foundation found that over 25 percent of employers with 1,000 or more employees have a high-performance or tiered provider network  in their health insurance product with the largest enrollment, and across all firms with 50 or more employees that offer health benefits, 14 percent have a high-performance or tiered provider network in their health insurance product with the largest enrollment.[447] Further, across all firms that offered health benefits, seven percent offered a narrow network product.[448] Importantly, the popularity of narrow networks may have important spillover effects since it places pressure on providers within *all* networks, including broad networks, to offer greater value (*e.g.*, lower prices) if they want to stay competitive in the marketplace.[449]

### E.    Sutter Recognizes that Steering Strategies Put Downward Pressure on Price

177.    Consistent with economic principles and the academic literature evidencing the price / cost effects of steering strategies, evidence from this case shows that Sutter recognizes that steering strategies, such as the use of narrow or tiered networks and excluding Sutter physicians, put downward pressure on hospital prices. Additionally, Sutter acknowledges that narrow networks can improve a hospital's competitive position, particularly due to consumers' increasing price sensitivity. For example:

---

[447] The Kaiser Family Foundation completed interviews with 2,160 employers for its 2018 survey. The report defines a high-performance network as a network that "groups providers . . . based on the cost, quality, and/or the efficiency of care they deliver." (Kaiser Family Foundation, "Employer Health Benefits: 2018 Annual Survey," October 2018, available at http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2018, *site visited* March 1, 2019 (hereafter "Kaiser Family Foundation (2018)"), pp. 21 and 216-217.) Empirical research also indicates that subscribers are more likely to select lower-cost providers when enrolled in a tiered network. *See, e.g.*, Frank, Matthew B., John Hsu, Mary Beth Landrum, and Micheal E. Chernew, "The Impact of a Tiered Network on Hospital Choice," *Health Services Research*, Vol. 50, No. 5, October 2015, pp. 1628-1648, at p. 1628 ("The [tiered network insurance plan] was associated with increased use of hospitals on the preferred and middle tiers relative to the nonpreferred tier for planned admissions. The results suggest that if all members were in a [tiered network] plan, relative to all members being in a non-[tiered network] plan, scheduled admissions to hospitals on the nonpreferred tier would drop by 7.6 percentage points, while those to middle and preferred tier hospitals would rise by 0.9 and 6.6 percentage points, respectively.").

[448] Kaiser Family Foundation (2018), p. 218.

[449] Dafny et al. (2017), p. 1612.

- In proceedings related to the merger of Summit and Alta Bates Medical Center, Sutter acknowledged that health plans can use steering strategies to "redirect patients [*i.e.*, volume] away from higher-priced hospitals or other facilities."[450] Sutter explained that "hospitals are very sensitive to even small declines in volume" and "the loss of even a modest number of patients would be sufficient to discipline Alta Bates' and Summit's prices. Defendants' economist estimated that a shift of less than 8% (equal to about an additional 1 patient per day in various competing East Bay hospitals) would be sufficient to prevent a 5% price increase at Summit or Alta Bates."[451] Thus, Sutter concluded that hospitals' "viability depends on volume, and only a modest loss of patients would be sufficient to discipline their pricing activity" and that "[h]ospitals will therefore frequently offer health plans better rates for delivering a greater volume of patients."[452]

- In April 2006, Peter Anderson, then Sr. Vice President at Sutter, and Jim Harrison, Vice President at Sutter, explained that "narrow networks, tiering, [and] high-deductible-high co-pays" are "market forces" that are used to control health care cost inflation. Further, they claim: "High Relative Prices Beget Narrow Networks" and that, for employers that buy fully-insured products, payers can exclude high-priced

---

[450] Sarah Krevans Deposition Exhibit 4287, "Defendants Sutter Health and Alta Bates Medical Center's First Amended Proposed Findings of Fact and Conclusions of Law on Plaintiff's Motion for Preliminary Injunction," *State of California v. Sutter Health, et al.*, Case No. C-99-3803-MMC, November 3, 1999, ¶ 56. Sutter also claimed that "[t]here are numerous mechanisms by which health plans can discipline the hospitals in the event of an attempted price increase… The simplest, but rarely used, is to exclude hospitals from the plans' provider networks. … A much more common and effective strategy used by health plans and physician groups is to leave a hospital in the network while using various techniques to shift volume to lower cost hospitals… Managed care plans and physician groups commonly engage in various strategies to direct patients to cost-effective facilities, including direct financial incentive and penalties as well as more general risk-sharing arrangements that give physicians a direct stake in hospital costs." (¶¶ 58-59, 61-62.)

[451] Sarah Krevans Deposition Exhibit 4287, "Defendants Sutter Health and Alta Bates Medical Center's First Amended Proposed Findings of Fact and Conclusions of Law on Plaintiff's Motion for Preliminary Injunction," *State of California v. Sutter Health, et al.*, Case No. C-99-3803-MMC, November 3, 1999, ¶¶ 27, 30, 79.

[452] Sarah Krevans Deposition Exhibit 4287, "Defendants Sutter Health and Alta Bates Medical Center's First Amended Proposed Findings of Fact and Conclusions of Law on Plaintiff's Motion for Preliminary Injunction," *State of California v. Sutter Health, et al.*, Case No. C-99-3803-MMC, November 3, 1999, ¶¶ 28, 55.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

providers from narrow networks to reduce cost.[453] Peter Anderson testified that these methods were "intended to be" methods "to control health care cost inflation."[454]

- In 2010, Sutter contemplated the creation of a Sutter-focused narrow network with Blue Shield for the City and County of San Francisco in which CPMC would be the sole hospital provider.[455] Sutter recognized that, "[w]ithout narrowing the network, CPMC's efforts to impact premium levels will be diluted."[456] For this purpose, Sutter considered reducing CPMC's price by 25 percent,[457] and it was concerned about the potential financial impact of more comprehensive price reductions.[458]

- Similarly, a 2010 Sutter presentation on its price and cost position states: "To play in Health Net's narrow network[,] [we] need a 32% reduction in our rates" and "[w]ith no change in our price structure[,] we cannot compete with narrow network plan products."[459]

---

[453] James Harrison Deposition Exhibit 3391, Email from Kandace Zuccala, on behalf of Peter Anderson, then SVP, Strategy & Business Development at Sutter, to Sutter personnel, "Subject: ~ Message from Peter Anderson re: 4/26/06 SHSS Leadership Symposium – 'Case for Transformation and Cultural Change' Pre-conference Reading Materials," April 24, 2006, with attachment Sutter Health Memorandum from Peter Anderson, Sr. Vice President, and Jim Harrison, Vice President, to Sutter Health Support Services Leadership, "Subject: The Case for Transformation and Cultural Change," April 24, 2006, STCA0720225-248, at 231, 237 ("Sometimes a payer will single out a provider or provider system as 'high priced' and give the employer the option to buy a narrow network that excludes the "high priced" provider. This is what CalPERS did in 2004 when they excluded 13 Sutter Health facilities. They did not consider quality or utilization advantages, they simply reacted to unit prices. Though this simplistic solution is neither fair nor complete nor rational, it appeals to some employers who are eager to cut costs. Several other payers have told us that employers have asked them for 2006 renewal quotes with options to exclude Sutter Health facilities in order to save money. In addition, several large payers have set up 'centers of excellence' for particular services, and though we meet their quality screens, they have not come to agreement with Sutter Health due to disagreements over price points. Hence, we have been excluded.")

[454] Anderson Deposition (Sutter, June 28-29, 2018), pp. 183-184.

[455] Melissa Brendt Deposition Exhibit 3945, Sutter Health, "Narrow Network Scenarios & Impact," August 26, 2010, STCA0287521, at pp. 2, 4-5. See also, Brendt Deposition (Sutter, August 22, 2018), pp. 231-236.

[456] Melissa Brendt Deposition Exhibit 3945, Sutter Health, "Narrow Network Scenarios & Impact," August 26, 2010, STCA0287521, at p. 3.

[457] Melissa Brendt Deposition Exhibit 3945, Sutter Health, "Narrow Network Scenarios & Impact," August 26, 2010, STCA0287521, at pp. 4-5.

[458] Melissa Brendt Deposition Exhibit 3945, Sutter Health, "Narrow Network Scenarios & Impact," August 26, 2010, STCA0287521, at pp. 8.

[459] James Harrison Deposition Exhibit 293, Email from Jim Harrison, then Vice President, Business Intelligence, Strategy & Business Development, at Sutter, to Kris Vine, former Chief Contract Officer at Sutter, "Subject: FW: ***strategy session slides," August 13, 2010, with attachment Sutter, "Price + Cost: What is driving our Price and Cost Position?" August 17, 2010, STCA0117620, at pp. 11, 13. See also, Harrison Deposition (Sutter, August 2-3,

- A 2011 Sutter Presentation states, "Payers want to launch 3-4 narrow networks and have them compete to drop entire price environment."[460]

- In a 2011 Sutter presentation, Sutter states that they must introduce narrow network products involving hospitals and physician groups in the Sacramento Sierra, West Bay, East Bay, and Central Valley Regions "to improve [its] competitive position."[461]

- In a 2015 Sutter presentation, Sutter notes that "[h]istorically, health care providers were relatively immune to consumer price sensitivity" but that "[s]hifts in the industry environment are redefining the provider pricing landscape," including that "[h]igher deductibles [are] driving increased consumer price sensitivity."[462]

***

178.    Sutter's contractual provisions interfere with the many ways in which health plans could use threats to steer volume away from higher-priced hospitals to achieve lower hospital prices and pass through lower premiums, as health plans have done in other parts of the country. As I have explained, Sutter's conduct stops health plans from leveraging competitive alternatives within and across hospital markets to negotiate lower prices. Specifically, health plans cannot

---

2018), pp. 274-275 ("Q. And the target rate buildup in this model here was the basis for your statement up top that to play in Health Net's narrow network, Sutter needed a 32 percent reduction in its rates. Correct? A. Correct. And that's looking at the reduction in the healthcare, HCC. Q. Okay. So Sutter had to reduce its rates by 32 percent to achieve the target premium that Health Net hoped to provide for this particular product. Right? ... THE WITNESS: Right. I agree."), 276-277 ("Q. ...If you would go to the slide that's titled, 'With no change in our price structure, we cannot compete with narrow network plan products.' Do you see that slide? ... Q. And what was your basis for writing that as the heading to the slide? A. Well, in terms of looking at the slide, itself, the graphic, it's showing a Blue Shield net value, which is a narrow network program, and it's showing the Sutter Only HMO product. And it breaks out the costs here in terms of what's in the premium, the monthly premium. So if we wanted to participate in this product with the Blue Shield net value, we would need to drop our cost structure by 30.1 percent. ... It's just making a comparison between the two products and what it would take to move from one to the other. Q. Okay. And at this point in time, was Sutter considering a Sutter Only HMO product? A. Let's see. I believe so, yes.").

[460] Peter Anderson Deposition Exhibit 50, Sutter Health, "Strategy Session," January 18, 2011, DEF001993646-928, at 804.

[461] James Harrison Deposition Exhibit 294, Sutter Health, "Competitor Response Analysis: Summary Trends Across Regions," SMT Strategy Session, January 18, 2011, STCA0234063, at p. 30.

[462] Jeff Sprague Deposition Exhibit 345, Sutter Health, "Pricing and Charging Initiatives," Revenue Integrity Steering Committee Meeting, May 1, 2015, DEF002065731-823, at 734.

drop or tier a Sutter hospital or physician group, by placing it on a less accessible tier, where possible.[463]

## VIII.  The Challenged Restrictions Have Harmed Competition and Resulted in Less Penetration of Innovative Steered Products in Northern California

179.    I now assess the extent to which Sutter's use of the challenged restrictions have harmed competition and resulted in less penetration of innovative, lower-cost, steered products in Northern California than would have otherwise occurred. As a starting point, I observe that health plans are aware of their contractual obligations to Sutter. For example, in an Aetna ordinary-course document from 2012, Aetna personnel explain: "



"[464]

180.    Evidence in this case is replete with examples of health plans attempting to create steered products in Northern California. In some instances, health plans approach Sutter and have been told that doing so would be in breach of their contract. In other instances, health plans have offered steered products that feature Sutter providers, but given Sutter's high prices, these products have not been commercially successful. In still other instances, health plans launched some products that attempt to steer volume way from expensive Sutter providers, but the burden of Sutter's onerous non-par rate creates financial risk. In this section, I compile this evidence and evaluate both qualitatively and quantitatively the extent to which, absent the challenged

---

[463] A Sutter Health Managed Care Department 2001 Annual Report summarized the "systemwide relationship" renewals with health plans, including Anthem, Blue Shield, and Health Net, and identified annual rate increases through 2003, including double-digit rate increases for Anthem, as well as the inclusion of "Key Language Provisions" including "[e]qual treatment" and "[n]ew affiliates" in the 2001 systemwide contracts with Anthem, Blue Shield, and Health Net. (Van Johnson Deposition Exhibit 277, Sutter Health Interoffice Memorandum from Kris Vine, Vice President of Managed Care & Chief Contracting Officer at Sutter to Van Johnson and Bob Reed, "Subject: Sutter Health Managed Care Department 2001 Annual Report," December 17, 2001, DEF001977924-928, at 924-927. *See also,* Johnson Deposition (Sutter, May 30-31, 2018), pp. 54-57.)

[464] Greg Stevens Deposition Exhibit 3692, Email from Greg Stevens to Aetna personnel, "Subject: Sutter/Aetna Overview," April 25, 2012, AET-ES10025369-373, at 371.

restrictions, there would have been more cost-competitive steered products available to consumers in Northern California and whether there would have been greater penetration of such products. As I explain, the evidence indicates that absent the challenged restrictions, Class Members would have had access to more cost-competitive steered products, and there would have been significantly greater penetration of steered products in Northern California throughout the Class Period.

### A.    Class Health Plans Wanted to Use Steering Strategies

181.    Ordinary-course documents and deposition testimony indicate that the Class Health Plans wanted to use steering strategies, but the challenged restrictions were an obstacle to so doing. Each of the Class Health Plans unsuccessfully attempted to remove Sutter's challenged restrictions from their contracts. For example:

- *Anthem*: Aldo De La Torre, Vice President of Provider Engagement and Contracting at Anthem, testified  [465] Mr. De La Torre also explains that Anthem has

[467] These requests are evident, for example, in a 2005

---

[465] De La Torre Deposition (Anthem, July 17-18, 2018)"), pp. 345-346, 484. In 2004, Anthem objected to and sought removal of the "New Plan" provision, which had all Sutter providers participating in new products. (Van Johnson Deposition Exhibit 283, Letter from Josh Valdez, Senior Vice President of Anthem, and Van Johnson, then President and CEO of Sutter, March 12, 2004, DEF001908712-715, at 713. *See also,* Johnson Deposition (Sutter, May 30-31, 2018), pp. 102-104 (confirming that Anthem sought the removal of the new plan language.); and De La Torre (Anthem) Declaration, ¶ 27, citing Exhibit 4 at ABCLH054783.

[466] De La Torre (Anthem) Declaration, ¶ 17.

[467] De La Torre Deposition (Anthem, July 17-18, 2018), p. 341. *See also,* De La Torre (Anthem) Declaration, ¶ 14

draft proposal of the eighth amendment to the Anthem-Sutter contract, showing that Anthem proposes deleting both: (a) Section 2.01, Sutter's non-par provision requiring non-participating providers at a rate of 100 percent of billed charges;[468] and (b) Section 2.08.6, Sutter's equal treatment provision. About its request to delete the equal treatment provision, Anthem explains to Sutter (in a redlined note) "[Anthem] believes that the inclusion of this language would further limit our ability to develop future network models as requested by our employer groups."[469] Steve Melody, former Director of Network Development and Management for Northern California and Vice President of Health Care Services at Anthem, also explains that "Anthem has sought to remove [Sutter's] non-par provision or reduce the non-par penalty" because it "restricts Anthem's ability to create viable narrow networks," but "Sutter blocked these efforts."[470] Anthem was not successful at removing the restrictions.[471] By contrast, in the 2019 Anthem/Sutter Systemwide Agreement, subsequent to this litigation, Sutter reduced the non-par rate to 82 percent for

---

[468] Melissa Brendt Deposition Exhibit 3950, Email from Melissa Brendt, Chief Contracting Officer at Sutter, to Sutter personnel, "Subject: Blue Cross proposal," October 13, 2004, with attachment Draft Proposal of the Eighth Amendment to the Blue Cross of California and Sutter Health Systemwide Amendment, DEF004644989-5070, at 997. *See also*, Brendt Deposition (Sutter, August 22, 2018), pp. 271-272, 276 (confirming that Anthem was not successful at removing the non-par provider rate provision in the final copy of the Eight Amendment, which contains a non-par rate of 100 percent of billed charges: "Q So Anthem did not succeed in removing that provision, correct? … THE WITNESS: The negotiated rate remained 100 percent of billed charges.").

[469] Melissa Brendt Deposition Exhibit 3950, Email from Melissa Brendt, Chief Contracting Officer at Sutter, to Sutter personnel, "Subject: Blue Cross proposal," October 13, 2004, with attachment Draft Proposal of the Eighth Amendment to the Blue Cross of California and Sutter Health Systemwide Amendment, DEF004644989-5070, at 001. *See also*, Deborah Henning Deposition Exhibit 2862, Email from Deborah Henning, Regional Vice President, Network Management, at Anthem, to Melissa Brendt at Sutter, "Subject: Anthem Second Counter Offer," October 8, 2013, with attached letter from Deborah Henning at Anthem to Melissa Brendt at Sutter, October 7, 2013, ABCLH139438-442, at 442 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ )

[470] Melody (Anthem) Declaration, ¶ 23. *See also*, Mathewson Deposition (Anthem, May 18, 2018), pp. 121-122; and De La Torre Deposition (Anthem, July 17-18, 2018)"), pp. 342-344.

[471] *See, e.g.*, Brendt Deposition (Sutter, August 22, 2018), pp. 274, 277-278 (confirming that Anthem was not successful at removing the Equal Treatment provision: "Q Okay. And the equal treatment provision was not modified, correct? A It was not modified. Q And it was not removed, correct? A It was not removed.").

inpatient services, demonstrating that Sutter's imposition of a 95 percent non-par rate for many years was a penalty.[472]

- *Blue Shield*: Blue Shield also repeatedly sought to remove or change the challenged provisions without success. When asked if Blue Shield sought "changes in the contract language," in the negotiations with Sutter for the 2010 renewal, Kristen Miranda, former Senior Vice President of Strategic Partnerships and Innovation at Blue Shield, testified "I know, going into that negotiation, our intent would have been, as it always was, to address...these concerns," thereby indicating Blue Shield sought to eliminate the offensive "contract language with Sutter."[473] However, she notes that Blue Shield was unsuccessful, as the contract language remained in the 2007, 2010, and 2012 Systemwide Agreements and renewals.[474] Ms. Miranda explains, for example, the "practical implication" of Sutter's 95 percent rate non-par rate for Blue Shield: "there were effectively two choices: You either included Sutter in a product, which typically drove the cost of that product up, or you excluded Sutter from that product, which, because of that 95 percent penalty, also drove the cost of that product up."[475] Tracy Barnes, Director

---

[472] "Sutter Health and Anthem Blue Cross 2019 Systemwide Agreement," April 1, 2019, SIDIBE_ABC_0147312-362, at 322 ("2.01.2 Non-Participating Provider Rates. During the Term of this Agreement, Payer shall pay Hospital Providers that do not participate in the Member's Plan or Network at 82% of Provider's Total Billed Charges for Inpatient Services excluding Trauma Services, less the Member's Liability for all Covered Services and Authorized non-Covered Services.").

[473] Miranda Deposition (Blue Shield, July 18-19, 2018), p. 309.

[474] *See*, Miranda Deposition (Blue Shield, July 18-19, 2018), p. 309; Melissa Brendt Deposition Exhibit 3351, "2007 Blue Shield of California and Sutter Health Systemwide Amendment," February 2, 2007, STCA0000856-1079, at 866 (2.01.2 Non-Participating Provider Rates) and 874-875 (Equal Treatment § 2.06.3 Equal Treatment; 2.06.4 Tiered Products, Restricted or Limited Networks; 2.06.5 Centers of Excellence and Payer Designated Network);

Melissa Brendt Deposition Exhibit 3362, "Fourth Amendment to the Blue Shield of California and Sutter Health Systemwide Amendment," January 8, 2010, STCA0001266-482, at 267 and 274 (showing there are no changes to the challenged provisions); Melissa Brendt Deposition Exhibit 3364, "Eighth Amendment to the Blue Shield of California and Sutter Health Systemwide Amendment," January 10, 2012, SUTCON000442-667, at 444 (showing there are no changes to the Non-Participating Provider Rates) and 447 (showing there are no changes to the Equal Treatment Section and the only changes to the other challenged provisions state that the agreement doesn't limit a BlueCard Plan from being able to develop and/or market Tiered, Restricted or Limited Networks or products, or Centers of Excellence or Payer Designated Network or products within its own home service area, outside of California).

[475] Miranda Deposition (Blue Shield, July 18-19, 2018)"), pp. 279-280 (noting that "at this time, Blue Shield had...a narrow network product in place. I think it was Local Access+ or Local Plus... And...in 2005, I think we were required to have...all Sutter...hospitals in the preferred tier of that product, which I believe made it just much too expensive...to reasonably sell in Northern California. And...I know at some point,...Blue Shield just

of Contracting for Northern California at Blue Shield, explains it was the same for the 2015 and 2017 renewal negotiations with Sutter.[476] In a January 7, 2015 letter to Sutter, Blue Shield writes: "Although some of the existing language we have proposed removing may not be new, they are unfair and unreasonable and that is why Blue Shield is seeking to change them. An example of an unfair and unreasonable existing provision is section 2.01.2, which sets Non-par rates at 95% of Sutter's full rate. We understand why Sutter wants that language but we cannot agree to it as it far exceeds the out-of-network rates Blue Shield and its members pay other providers."[477] Blue Shield's David Joyner explains, "[t]hese provisions gave Sutter veto power over any proposed narrow network (i.e. a network including less than all Sutter providers) that would foster price competition in the Northern California hospital healthcare markets."[478]

-

discontinued...with that product."), and 281 (Blue Shield was "[u]nable to tier Sutter facilities or create networks around them" because the "95 percent penalty...made the product...prohibitively expensive.").

[476] Barnes Deposition (Blue Shield, January 30 – February 1, 2018), pp. 364-367.

[477] Melissa Brendt Deposition Exhibit 534, Letter from Armine Papouchian, Vice President of Network Management at Blue Shield, to Melissa Brendt, Vice President and Chief Contracting Officer at Sutter, January 7, 2015, BSC-UEBT-0005339-340, at 340 (the date of January 7, 2014 in the letter is incorrect, as deduced by the contents of the letter). Jon Chason Deposition Exhibit 270, Email from Tami Lucas, Senior Network Manager, Provider Contracting at Blue Shield, to Melissa Brendt, Vice President and Chief Contracting Officer at Sutter, December 31, 2014, PROD00377517-520, at 518 (a 2014 Blue Shield letter to Sutter requesting deletion of the 95 percent non-par rate, as in "prior negotiations."); Deposition of Jon Chason, Vice President of Managed Care Analysis at Sutter, May 23-25, 2018 (hereafter "Chason Deposition (Sutter, May 23-25, 2018)"), pp. 581-587.

[478] Joyner (Blue Shield) Declaration, ¶ 19. See also, Barnes Deposition (Blue Shield, January 30 – February 1, 2018), p. 588 (explaining that "non-par rates of 95 percent of charges for emergency services sort of takes away any savings you develop from any other network design piece that you just cannot get -- so if you save some money in narrowing a network or tiering a network because you are using more cost effective provider, when you have to pay the non-par rate and penalty for the Sutter providers that aren't in the network... it just eats away the savings and you can't get that cost differential you needed for those product designs.").

[479] LaCroix-Milani (Health Net) Declaration, ¶ 9.

[480]

[481]

[482]

[483]

---

[480] LaCroix-Milani (Health Net) Declaration, ¶ 28.

[481] Vargas Deposition (Health Net, August 20, 2018), pp. 286-287.

[482] Hamilton Deposition (Health Net, September 11, 2018), p. 52.

[483] Kazmirchuk Deposition (Health Net, October 15, 2018), pp. 186-187, 201-202



CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     158

- There is similar evidence for both Aetna[484] and United.[485]

This qualitative evidence, ranging from health plan testimony to ordinary-course communications, make clear that the Class Health Plans wanted to use steering strategies to bring consumers more cost-effective insurance products, but they were impeded by Sutter's challenged restrictions.

### B.    Many Attempts to Introduce Steered Products in Northern California by Class Health Plans Have Failed

182.    Evidence demonstrates that health plans attempted to steer patients to lower-cost providers in Northern California through the creation of tiered and narrow networks and Centers of Excellence, but Sutter's challenged restrictions interfered with their success. Some of these product attempts involved excluding high-cost hospitals or placing them in less favorable tiers within a provider network;[486] ████████████████████████████████████████████████████

---

[484] For example, Chandra Welsh, Vice President for Network Management in Northern CA at Aetna, testified that

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[485] For example, Janet Lundbye, Regional VP of Network Strategy for the West Region at United, testified that United asked for lower rates from participating providers in narrow networks to steer volume and wanted to eliminate the non-par rate. Lundbye Deposition (United, May 15, 2018), p. 163 ("we're asking for lower rates for those providers that are participating in that network separate from the full network in order to steer volume.") and p. 270 ("We would like to eliminate the non-par rate. There should not be a non-par rate in these contracts. It implies that if we terminate the Sutter contract, we're paying 95%. And that doesn't make any sense.").

[486] For example, Blue Shield launched Access + HMO/EPO CalPERS Limited Network that excludes Sutter and other high-cost providers. (Fifth Amendment to Blue Shield and Sutter's 2002 Systemwide Amendment, April 8, 2004, DEF000097933-997, at 996). David Joyner, Vice President of Blue Shield, contends that "CalPERS Sought To Exclude Sutter's Expendable High Priced Hospitals," explaining that "The dramatically higher prices that Sutter charged following the 2002 Systemwide agreement quickly caught the attention of the employers that were forced to absorb the brunt of those price increases. By late 2003, CalPERS, the nation's largest pension fund, and Blue Shield engaged in discussions to assemble a narrow network to be launched in 2005 that would reduce costs for CalPERS. It would only include the Sutter hospitals that CalPERS considered essential to a viable provider network" and citing the agenda for a meeting with Sutter, which states "there are dramatic discrepancies in hospitals costs for hospitals in the same region without any correlation to better quality. As a result, CalPERS is seriously considering establishing a smaller hospital network for 2005 as a means to save money without sacrificing quality. There are several hospitals and hospital systems that stand out in terms of having higher relative costs and Sutter is one of the most prominent. In fact, if we were going strictly by the model, only a few Sutter hospitals and by extension a subset of Sutter physician groups would actually be included in the network." Joyner (Blue Shield) Declaration, ¶¶ 28-29. Further, Mr. Joyner claims that "Sutter also forced CalPERS to accept unique out-of-network pricing terms that reversed much, if not all, of the savings that CalPERS could hope to achieve by *excluding high priced Sutter*

███████████████████████████████████[487] In some instances, Sutter refused to participate in the steered products; in other instances, Sutter demanded favorable treatment even though the Sutter providers were higher cost. As a result, health plans either dropped the products or the products remained available but were never commercially successful. I describe some of these attempted steered products here.

### 1.    Anthem Attempts

183.    As explained above, Anthem maintains that Sutter's challenged restrictions have "either blocked or effectively limited Blue Cross' ability to respond to the demands of our constituents to develop new and innovative benefit designs and/or lower cost networks."[488] Consistent with this view, Anthem had difficulties launching a set of tiered and narrow network products in Northern California. For example:

---

*hospitals from its network* where more moderately priced alternatives were available nearby." (¶¶ 31, 33 (emphasis

████████████████████████████████████████████████████████████

[487] ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

[488] ████████████████████████████████████████████████████████

- Between 2001 and 2003, Anthem attempted to create a set of tiered products called "Advantage HMO," "Advantage PPO," and "Compass." Initially, Sutter refused to participate in them.[489] The Compass product was never launched.[490] The Advantage products launched, but without Sutter's full participation for much of the Class Period.[491] Anthem's Aldo De La Torre testified that ███████████████



█████████████████████████.[492] Mr. De La Torre also testified that ████████ ███████████████████████████████████████ ████████████████████████████[493] With respect to "Advantage HMO," Sutter asserted that its "Systemwide Amendment did not contemplate a tiered product of this sort."[494]

---

[489] Brendt Deposition (Sutter, May 15-16, 2018), pp. 399-401 ("Q. Okay. I'm aware that it never launched, but did Sutter ever agree to participate in it[?] …A. No, I don't believe we.  Q. Was Sutter asked to participate in it? A. It sounds like we were, from this letter.").

[490] Melissa Brendt Deposition Exhibit 2369, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Steve Melody, then Vice President, Network Services, Northern Region, at Anthem, March 7, 2003, DEF002020706-707, at 706.

[491] A review of the Systemwide Agreements indicates Sutter Hospitals were partially participating in Power Advantage HMO/Advantage HMO until 2014. In 2016, all Sutter Hospitals became participating providers in Advantage HMO, but Sutter Hospitals were only partially participating in the Advantage PPO product. (*See* Aldo De La Torre Deposition Exhibit 1636, 2007-2008 Blue Cross of California and Sutter Health Systemwide Amendment, December 30, 2006, DEF002005445-794, at 768; Blue Cross of California and Sutter Health Systemwide Amendment, December 24, 2008, STCA0013395-583, at 576; Aldo De La Torre Deposition Exhibit 1638, 2012 Blue Cross of California and Sutter Health Systemwide Amendment, December 29, 2011, DEF002006307-690, at 653; 2014 Blue Cross of California and Sutter Health Systemwide Amendment, December 13, 2013, DEF002006936-7254, at 7113; and 2016 Blue Cross of California and Sutter Health Systemwide Amendment January 6, 2016, DEF000000330-746, at 647.)

[492]

[493] De La Torre Deposition (Anthem, July 17-18, 2018), pp. 529-530.

[494] Melissa Brendt Deposition Exhibit 2369, Letter from Melissa Brendt, then Vice President, Managed Care at Sutter, to Steve Melody, Vice President, Network Services, Northern Region, at Blue Shield, March 7, 2003, DEF002020706-707, at 706; and Scott Deposition Exhibit 1374, Email from Steve Melody, Vice President of Network Services at Anthem, to Anthem personnel, "Subject: Sutter Talking Points and Rebbutal [sic]," July 25, 2003, with attachment "Talking Points for Use with Van Johnson," ABCLH004743-746, at 744 ████████

- In 2003, in response to Anthem's attempt to promote a "Bariatric Surgery Centers of Excellence ('COE') Network" that excluded Sutter hospitals, Sutter informed Anthem that excluding any Sutter providers from its COE network would violate their systemwide agreement.[495] Nearly a year later, with the Bariatric Surgery Centers of Excellence network dispute between the parties was still unresolved, Sutter told Anthem that it was violating the systemwide agreement and demanded Anthem add Sutter Hospitals with bariatric surgery services to the Bariatric Surgery COE Hospital Network.[496] In May 2005, with the Bariatric Surgery COE Network issue still unresolved, Sutter informed Anthem that they would proceed with binding arbitration since Anthem was steering bariatric surgery patients away from Sutter Hospitals, which Sutter "consider[ed]… a violation of our current Systemwide Amendment."[497]

---

[495] Melissa Brendt Deposition Exhibit 2373, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Steve Melody, then Vice President, Network Services, Northern Region, at Anthem, December 5, 2003, DEF001928208-210, at 209 ("Section 2.08 means that no Sutter providers may be excluded from the Bariatric Surgery COE without Sutter's written consent and BCC's effort to do so could be viewed as an anticipatory breach of the Systemwide Amendment. Therefore, please confirm for Sutter in writing that BCC intends to honor the terms of the Systemwide Amendment and not exclude (or require higher member contribution) for services provided at any Sutter Providers from this new COE for 2004."). *See also,* Brendt Deposition (Sutter, May 15-16, 2018), pp. 405-406.

[496] Melissa Brendt Deposition Exhibit 2375, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Steve Melody, then Vice President, Network Services, Northern Region, at Anthem, January 24, 2005, DEF006198965-968, at 965-966 ("This letter…included a list of the Blue Cross of California Bariatric Surgery COE Hospital Network. This Blue Cross list does not include any of the Sutter Hospitals. This was disappointing given our conversation on December 14, 2004, in which I informed you that excluding Sutter Hospitals from the Bariatric Surgery COE Hospital Network would violate the contract currently in place between Sutter Health and Blue Cross… [W]e believe that Blue Cross is in violation of [Section 2.08 of] the Sutter Health/Blue Cross of California Systemwide Amendment ('Amendment')… Section 2.08 means that the Sutter Providers covered by the Amendment may not be excluded from the Blue Cross Bariatric Surgery COE Network, unless the parties mutually agree. We recognize that the parties are in renewal discussions and that the network participation may change in the future, but until then we expect Blue Cross to comply with the terms of the Amendment. Therefore, please confirm in writing that Blue Cross intends to honor the terms of the Amendment and not exclude Sutter Providers that provide Bariatric Surgery Services from the COE Network, unless the parties mutually agree otherwise.").

[497] Melissa Brendt Deposition Exhibit 2376, Letter from Melissa Brendt, then Vice President, Managed Care, at Sutter, to Randy Lukins, then Senior Contract Manager, Healthcare Management, at Anthem, April 19, 2005,

- In 2006, Anthem also attempted to launch a set of narrow network products that excluded high cost Sutter physicians who were likely to refer patients to high cost Sutter hospitals. For example, Steven Scott, General Manager and now Chief Operating Officer of Anthem, testified that "



[502]

---

DEF004260229-230, at 230. *See also,* Brendt Deposition (Sutter, June 18, 2018), pp. 21-23 (stating that, in fact, Sutter did file the arbitration against Anthem).

[498] Scott Deposition (Anthem, June 13, 2018), p. 94.

[499] Steven Scott Deposition Exhibit 1358, Blue Cross of California, "Blue Cross Select PPO: A Strategic Solution for CalPERS," May 16, 2006, DEF004271115-127, at 118; and Scott Deposition (Anthem, June 13, 2018), pp. 161-162.

[500] Steven Scott Deposition Exhibit 432, Email from Steven Scott, then General Manager, Large Group Public Entities at Anthem, to Anthem personnel, "Subject: RE: Select," June 15, 2006, ABCLH006605-609, at 606; and Chris Mathewson Deposition Exhibit 1284, Email from Aldo De La Torre, then Regional Vice President of Provider Engagement and Contracting, to Anthem personnel, "Subject: RE: Narrow Network & Select PPO," April 6, 2011,

[501] Steven Scott Deposition Exhibit 432, Email from Steven Scott, General Manager and now Chief Operating Officer at Anthem, to Anthem personnel, "Subject: RE: Select," June 15, 2006, ABCLH006605-609, at 606.

[502] Deposition of Edward Davis, Director of Network Compliance at Anthem, July 12, 2018 (hereafter "Davis Deposition (Anthem, July 12, 2018)"), pp. 171-173.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    163