• ███████████████████████████████████████████ [503]

### 2.    *Blue Shield Attempts*

184.    As explained above, Blue Shield also maintains that Sutter's challenged restrictions interfere with Blue Shield's ability to launch narrow and tiered networks and expand its Centers of Excellence in Northern California.[504] Consistent with this view, evidence indicate that Blue Shield had difficulties launching a set of tiered and narrow network products in Northern California. For example:

• In 2001, Blue Shield launched "Network Choice," a tiered network product in which Sutter would not participate as a Tier 2 provider. At Sutter's insistence, all Sutter hospitals were placed at Tier 1, instead of the less desirable tier (Tier 2) that corresponded to their higher prices.[505] According to David Joyner, Vice President of Blue Shield, Sutter's "improper" participation as a Tier 1 provider prevented Blue Shield from financially incentivizing members to choose more cost-effective hospitals, thereby making the product unviable.[506] Mr. Joyner explains that, "although Sutter technically was participating in a tiered product, its hospitals were not placed in the lower tier that actually corresponded with its significantly higher prices."[507] Mr. Orchison, former Director, Network Design & Programs, Network Management at Blue Shield, explained that Sutter hospitals were placed in the

---

[503] Davis Deposition (Anthem, July 12, 2018), pp. 76, 271.

[504] Barnes (Blue Shield) Declaration, ¶¶ 19-20; and Joyner (Blue Shield) Declaration, Exhibit 13 (Blue Shield presentation, "Sutter Health Observations on Relative Cost February 16, 2006," stating, at BSC_UFCW-00045014, "Sutter's contracting stance, in the end, hurts our ability to compete with Kaiser [with their] Restrictions on Centers of Excellence (All Sutter facilities must be in) [and] 'All or nothing' contract[ing].").

[505] Joyner (Blue Shield) Declaration, ¶ 45.

[506] Joyner (Blue Shield) Declaration, ¶¶ 44-46, and Exhibit 14 (2010 internal Blue Shield email showing Network Choice failed in Northern California because of Sutter and its 95 percent non-par rate). *See also,* Orchison Deposition (Blue Shield, July 20 & 24, 2018), pp. 236-245; and James Orchison Deposition Exhibit 3240, Email from Jim Orchison, Director, Network Design & Programs, Network Management at Blue Shield, to Blue Shield personnel, "Subject: FW: Tiered Hospital Network," May 13, 2010, BSC-AG-00112666 ("Sutter's contract was a significant problem in the North with Network Choice," though "they didn't qualify," undermining the "integrity and costs savings" of the network).

[507] Joyner (Blue Shield) Declaration, ¶ 45.

preferred tier because of the Sutter contract, not because they earned that position on the basis of Blue Shield's cost/quality criteria, and that this placement "undermined the integrity and cost savings of the tiering network in the north."[508] In 2006, Network Choice was discontinued due to Sutter's "significantly higher prices."[509]

- In 2005, Blue Shield also struggled to launch successful narrow networks in Northern California because of Sutter's challenged contractual provisions. According to Kristen Miranda, former Senior Vice President of Strategic Partnerships and Innovation at Blue Shield, Blue Shield discontinued a narrow and tiered network product called "Local Access+" because "we were required to have…all…Sutter hospitals in the preferred tier of that product, which I believe made it just much too expensive to -- to reasonably sell in Northern California."[510]

- In 2005, in response to Blue Shield's attempt to create a "Cardiac COE Network" that excluded all Sutter providers, Sutter sent Blue Shield a warning letter informing them that the COE network violated their systemwide agreement and demanded that Blue Shield include all Sutter Providers in their Cardiac COE Network.[511]

- In 2006, Blue Shield was developing a high-performance PPO network, which Blue Shield did not ultimately launch, due to Sutter's contractual restrictions. Given its cost structure, Sutter providers would have been included in the less preferential tier, but given Sutter's contractual restrictions, Blue Shield understood that Sutter would

---

[508] Orchison Deposition (Blue Shield, July 20 & 24, 2018), pp. 239-241.

[509] Joyner (Blue Shield) Declaration, ¶¶ 45-46.

[510] Miranda Deposition (Blue Shield, July 18-19, 2018), pp. 279-280.

[511] Melissa Brendt Deposition Exhibit 517, Letter from Isabelle "Tina" B. Greene, Assistant General Counsel at Sutter, to Lyle Swallow, Associate General Counsel at Blue Shield, May 10, 2005, DEF002655756-757, at 756-757 ("The Systemwide Amendment specifically says that Blue Shield will not change a Sutter Provider's participating status without Sutter's consent. That consent has not been obtained. If Blue Shield or any of Blue Shield's clients ('Other Payers') implements a Cardiac COE network that does not include Sutter Providers, Blue Shield will be in material breach of the Systemwide Amendment and the public announcement of such a network could irreparably harm the reputations of the wrongfully excluded Sutter Providers. … Sutter has no choice, therefore, but to respectfully demand that Blue Shield provide Sutter Health with its written assurance that Blue Shield will comply with its contractual obligations with respect to the Cardiac COE network by including all Sutter Providers in any Cardiac COE network created by Blue Shield or any Other Payer.").

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

not participate and instead trigger Sutter's non-par rate.[512] Blue Shield abandoned the network because a cost analysis suggested the network would not be profitable, in part because of Sutter's non-par rate.[513]

- In 2010, Blue Shield attempted to expand SaveNet, a Blue Shield narrow network product that had initially launched primarily in Southern California, into certain Northern California geographies with limited Sutter exposure in San Francisco and Sacramento, where it excludes Sutter because Sutter did not participate.[514] Blue Shield launched SaveNet in counties with minimal exposure to Sutter, but was forced to pay a 95 percent non-par rate in Sacramento and San Francisco.[515]

- A Blue Shield document, prepared for the California Attorney General, explains that the combination of Sutter's contractual restrictions "effectively precludes a health plan from developing such new products or networks unless the health plan agrees to include Sutter as a participating provider."[516] In this context, Blue Shield explained that they "have not been able to offer some of the following products /networks:

---

[512] Orchison Deposition (Blue Shield, July 20 & 24, 2018), pp. 161-163; James Orchison Deposition Exhibit 3241, Email from Jim Orchison, Director, Network Design & Programs, Network Management, at Blue Shield, to Kristen Miranda, former Senior Vice President of Strategic Partnerships and Innovation at Blue Shield, "Subject: Ancient History - PPO HPN for CalPERS," August 10, 2010, with attachment Blue Shield, "High Performance PPO Network Steering Committee 2nd Meeting," October 2, 2006, BSC_SutterSub00012356-391, at 385.

[513] Orchison Deposition (Blue Shield, July 20 & 24, 2018), pp. 161-163.

[514] Deposition of Juan Davila, Executive Vice President of Health Care Quality and Affordability at Blue Shield, July 11-12, 2018 (hereafter "Davila Deposition (Blue Shield, July 11-12, 2018)"), pp. 187-189; Orchison Deposition (Blue Shield, July 20 & 24, 2018), pp. 323-332; Miranda Deposition (Blue Shield, July 18-19, 2018), p. 282 ("SaveNet was a product that we looked at introducing in Northern California that was a narrow network, not a tiered network, if memory serves."); Brendt Deposition (Sutter, July 25, 2018), pp. 186-187; Deposition of Jeffrey Hermosillo, Senior Vice President, Markets Division, at Blue Shield, October 11, 2018 (hereafter "Hermosillo Deposition (Blue Shield, October 11, 2018)"), p. 260; Melissa Brendt Deposition Exhibit 3364, Eighth Amendment to the Blue Shield of California and Sutter Health Systemwide Amendment, January 1, 2012, SUTCON000442-667, at 636 (noting that SaveNet is offered in a few counties in Northern California and includes only Sutter's three rural hospitals); and Deposition of Melissa Brendt, Chief Contracting Officer at Sutter, July 30, 2018 (hereafter "Brendt Deposition (Sutter, July 30, 2018)"), pp. 249.

[515] Orchison Deposition (Blue Shield, July 20 & 24, 2018), pp. 290, 323-332.

[516] Tracy Barnes Deposition Exhibit 2002, BSC-UFCW-0037886-899, at 886-887. *See also,* Barnes Deposition (Blue Shield, January 30 – February 1, 2018), pp. 584-588.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

Bariatric Network, [narrow networks] Savenet /NetValue (selected markets), and tiered networks with the United Food Chain Workers (UFCW)."[517]

### 3. Health Net Attempts

185. Health Net also was interested in offering products "that would incentivize consumers to avoid high cost hospitals" by steering to "high quality, lower cost alternative[s]."[518] ██████████████████████████████████

██████████████████████████████████████████████████████[519]

For example:

- In 2002, Health Net attempted to launch a tiered product. According to Jenni Vargas, Health Net's Health Care Delivery Officer, Sutter objected, claiming that the product would violate the Systemwide Agreement.[520]

- In the early 2000s, Health Net launched two steered products in Southern California: (a) "Variable Hospital CoPay," a fully-insured tiered product designed so that if a member wanted to go to a higher-cost hospital, they would have a higher cost share;[521] and (b) "PremierPlan," a narrow network product. However, they were unable to expand the products to Northern California. As explained by Health Net's Becky LaCroix-Milani, Chief Contracting Officer at Health Net, ████████████



---

[517] Tracy Barnes Deposition Exhibit 2002, BSC-UFCW-0037886-899, at 887.

[518] LaCroix-Milani (Health Net) Declaration, ¶ 9.

[519] LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 103-104.

[520] Vargas Deposition Exhibit 3649, Email from Kris Vine, then Vice President and Chief Contracting Officer of Sutter, to Jenni Vargas, Network Management and Development Officer of Health Net, "Re: Health Net Variable Hospital Copay Network," October 17, 2002, DEF001900076. *See also,* Vargas Deposition (Health Net, August 20, 2018), pp. 141-145.

[521] Hamilton Deposition (Health Net, September 11, 2018), pp. 30-36. *See also,* Hamilton Deposition Exhibit 630, Letter from David Fassil, Vice President, Provider Network Management, North, at Health Net, to Kris Vine, then Vice President & Chief Contracting Officer of Sutter, "Re: Health Net Variable Hospital co-pay plan," November 8, 2002, DEF009971571-652, at 571-572.



[522] Sutter specifically carved these products out from participation in the 2004 Amendment.[523] According to Thomas Hamilton, Regional

---

[522] LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 73-77 and 79-84 ██████████████████████████████████████████). *See also,* Thomas Hamilton Deposition Exhibit 630, Letter from David Fassil, Vice President, Provider Network Management, North, at Health Net, to Kris Vine, then Vice President & Chief Contracting Officer at Sutter, "Re: Health Net Variable Hospital co-pay plan," November 8, 2002, DEF009971571-652.

[523] LaCroix-Milani Deposition Exhibit 706, "Health Net and Sutter Health Second Amendment to the Systemwide Amendment," January 1, 2004, STCA0004973-5115, at 4986 ("2.08.5 Tiered Products and Reduced Network Products. This Amendment does not currently apply and Providers do not participate in tiered products, plans, or benefit designs (e.g. Variable Hospital Copay Plan and Premier Plan) or any Benefit Program which ranks participating Providers where the rank directly affects the Member's co -pay, coinsurance percentage as reflected in the Member's benefit design within their Benefit Program, or reduces the network of Company Participating Providers.").

[524] Hamilton Deposition (Health Net, September 11, 2018), p. 36.

[525] Hamilton Deposition (Health Net, September 11, 2018), pp. 55-57.

[526] LaCroix-Milani Deposition Exhibit 266, Email from Becky LaCroix-Milani, Regional Vice President, Provider Network Management, to Melissa Brendt and Ann Carder, Contract Manager, Managed Care, at Sutter, "Subject: Fw: Health Net - Sutter Health Proposal 1- 2013 renewal," September 19, 2012, DEF003337410-468, at 411 ("Premiercare runs in excess of 100% MCR and the premiums still average 25 percent more than WHA and Kaiser for their UC/ Dignity-centric network. If Sutter is interested in the growth and success of a mid-market Sutter-centric network that can compete, the reductions proposed [in Sutter's rates] are necessary.").

[527] LaCroix-Milani Deposition (Health Net, August 30-31, 2018), p. 180; LaCroix-Milani Deposition Exhibit 710, Email from Becky LaCroix-Milani, Chief Contracting Officer at Health Net, to Sutter personnel, "Subject: Health Net comprehensive proposal #6," December 20, 2012, HN-003199-201, at 200.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA



- Also in 2011, Health Net created its "Blue & Gold HMO" narrow network product for the University of California ("UC"), the state of California's second largest employer.[530] ██████████████████████ ██████[531] as such, its provider network "was developed to include all HMO contracted provider hospitals but only those physician groups that met certain cost criteria."[532]



---

[528] ████████████████████████████████████████ " *See* LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 171-175, 180; and LaCroix-Milani Deposition Exhibit 710, Email from Becky LaCroix-Milani, Chief Contracting Officer at Health Net, to Sutter personnel, "Subject: Health Net comprehensive proposal #6," December 20, 2012, HN-003199-202, at 200.

[529] Hamilton Deposition (Health Net, September 11, 2018), pp. 62-69; Hamilton Deposition Exhibit 633, Email communications among Health Net personnel, "Subject: Sutter update – PremierCare and WholeCare," April 17, 2013, HN0020315-317, at 315-316 (███████████████████████████████████████████████ ██████████████████████████████████████ ); LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 180-181 (████████████████████████████████ █████████ ).

[530] LaCroix-Milani Deposition Exhibit 713, Sutter Health and Health Net of California, Inc., 2013 Systemwide Agreement, January 3, 2013, DEF004839457-727, at 718.

[531] LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 234-236.

[532] LaCroix-Milani (Health Net) Declaration, ¶ 34. *See also,* LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 219-223, 226; and Hamilton Deposition (Health Net, September 11, 2018), pp. 69-70.

[533] Hamilton Deposition (Health Net, September 11, 2018), pp. 68, 78. *See also,* Hamilton Deposition Exhibit 635, Email from Becky LaCroix-Milani, then Regional Vice President, Provider Network Management at Health Net, to Health Net personnel, "Subject: NEW Sutter Response re: UC Narrow Network," July 16, 2010, HN0019846-849, at 848 ██████████████████████████ ).

[534] Hamilton Deposition (Health Net, September 11, 2018), pp. 81-82.

[535] Hamilton Deposition (Health Net, September 11, 2018), p. 79.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     169



540

536                                          LaCroix-Milani Deposition Exhibit 4153, Email from Becky LaCroix-Milani, then Regional Vice President, Provider Network Management, at Health Net, to Health Net personnel, "Subject: VERY ROUGH DRAFT – Sutter UC NN talking points/ask for Steve/Jay," June 11, 2010, HN0019766-769; LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 284-287.

537 Hamilton Deposition (Health Net, September 11, 2018), p. 82-84. *See also,* Hamilton Deposition Exhibit 635, Email from Thomas Hamilton, then Vice President, Provider Network Management at Health Net, to Health Net personnel, "Subject: Re: Fw: NEW Sutter Response re: UC Narrow Network," July 19, 2010, HN0019846-849, at 846.

538 Hamilton Deposition (Health Net, September 11, 2018), p. 85.

539 Hamilton Deposition (Health Net, September 11, 2018), pp. 85-86; Brendt Deposition (Sutter, August 28, 2018), pp. 39-42.

540 Brendt Deposition (Sutter, August 28, 2018), pp. 39-42.

541 Hamilton Deposition (Health Net, September 11, 2018), pp. 96-103, 111.

542 LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 250-256.

543 LaCroix-Milani Deposition (Health Net, August 30-31, 2018), p. 254. *See also,* Hamilton Deposition (Health Net, September 11, 2018), pp. 98-99 (stating that SmartCare HMO launched only in Santa Clara county in Northern California).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA



545

### 4.   Aetna Attempts

186.   According to Curtis Terry, former Regional President, Aetna West Region,



546

547 For example:

- 

548

549

550

---

[544] LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 250-256. *See also*, Hamilton Deposition (Health Net, September 11, 2018), pp. 97-98 (noting that Health Net could not obtain the requisite discounts to launch more broadly in Northern California).

[545] *See, e.g.*, Hamilton Deposition (Health Net, September 11, 2018), p. 102; LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 251-252.

[546] Terry Deposition (Aetna, July 11, 2018), pp. 153-156. *See also*, Green Deposition Exhibit 3146, AET-ES10021370-375, at 373.

[547] Stevens Deposition Exhibit 3692, AET-ES10023369-375, at 371.

[548] Robinson Deposition Exhibit 4091, Email from Brendhan Green, former Vice President of Network Management at Aetna, to Aetna personnel, "Subject: Concentric w/Sutter," January 6, 2005, AET-ESI0028569-571, at 570.



[549] Melissa Brendt Deposition Exhibit 424, Sutter Health Memorandum from Kris Vine, VP and Chief Contracting Officer, to Sutter Health Affiliate CEOs, "Re: Aetna Aexcel – Follow-Up Action Required," July 11, 2005, DEF000218294; Brendt Deposition (Sutter, June 12, 2018), pp. 175-177.

[550] Stevens Deposition Exhibit 3679, Email from Brendhan Green, former Vice President of Network Management at Aetna, to Aetna personnel, "Subject: Aexcel and Concentric w/ Sutter," November 10, 2004, AET-ES10022886; and Michael Robinson Deposition Exhibit 4097, Email from Elena Carnes, Project Manager at Aetna, to Aetna personnel, "Subject: Aexcel Network ID Update," August 19, 2005, AET-ESI0007134 .

Aetna's Mr. Terry emailed Sutter's Peter Anderson and Robert Reed that Sutter's position frustrated the purpose of Aexcel because "there would be no point in having a performance network if the selection were not based on performance criteria."[551]



---

[551] Curtis Terry Deposition Exhibit 1502, Email from Curtis Terry, Former Regional President, Aetna West Region, to Peter Anderson and Robert Reed at Sutter, "Subject: Aexcel in Sacramento," August 31, 2005, DEF005272962-963, at 963; Terry Deposition (Aetna, July 11, 2018), pp. 173-174 ("

[552] *See, e.g.,* Michael Robinson Deposition Exhibit 4103, Email from Brendhan Green, former Vice President of Network Management at Aetna, to Aetna personnel, "Subject: Aexcel-Please Review and Comment," April 26 2006, AET-ESI0001511-12, at 511; Welsh Deposition (Aetna, April 12, 2017), pp. 83-84 (

[553] Robinson Deposition (Aetna, August 28, 2018), p. 98; Michael Robinson Deposition Exhibit 4097, Email from Elena Carnes, Project Manager at Aetna, to Aetna personnel, "Subject: Aexcel Network ID Update," August 19, 2005, AET-ESI0007134.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA



[554]

[555]

[556] In 2008-2009, Sutter still did not participate in Aexcel in the Sacramento region even though it understood that Aetna would have accepted all Sutter hospitals to participate in the network.[557] Aexcel is an example of a network where Sutter used its contractual provisions to defeat the purpose of—and negate the savings from—tiering.

[558]

[559]

---

[554] Robinson Deposition Exhibit 4103, Email from Brendhan Green, former Vice President of Network Management at Aetna, to Michael Robinson, Vice President of National Accounts Strategy at Aetna, "Subject: Aexcel-Please Review and Comment," April 26, 2006, AET-ESI0001511-512, at 511. Curtis Terry testified that when Sutter joined

July 11, 2018), p. 164.)

[555] Robinson Deposition (Aetna, August 28, 2018),  pp. 107-108.

[556] Welsh Deposition (Aetna, April 12, 2017), pp. 77-82, 209-210.

[557] Brendt Deposition (Sutter, June 12, 2018), pp. 193-195.

[558] *See, e.g.,* Robinson Deposition (Aetna, August 28, 2018), pp. 90-91 ("

[559] *See* Robinson Deposition (Aetna, August 28, 2018), pp. 98-99; Michael Robinson Deposition Exhibit 4097, Email from Elena Carnes, Project Manager at Aetna, to various Aetna personnel, including Michael Robinson, Vice President of National Accounts Strategy at Aetna, "Subject: Aexcel Network ID Update," August 19, 2005, AET-ESI0007134.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA



---

[560] Welsh Deposition (Aetna, August 28, 2018), pp. 323, 336.

[561] Robinson Deposition (Aetna, August 28, 2018), pp. 26-29; Curtis Deposition Exhibit 1501, Seventh Amendment to the Aetna Health of California, Inc., Aetna Health Management, and Aetna Life Insurance Company and Sutter Health Systemwide Agreement, April 26, 2005, DEF000013014-100, at 091.

[562] Green Deposition (Aetna, July 16, 2018), pp. 69-71; Brendhan Green Deposition Exhibit 1631, Email from Brendhan Green, former Vice President of Network Management at Aetna, to Sutter personnel, "Subject: Tiered Networks/Concentric," January 1, 2005, DEF006557775-776 (indicating Aetna and Sutter discussed Sutter's participation in future narrow or tiered networks and specifically mentions the Concentric HMO narrow network).

[563] Welsh Deposition (Aetna, August 28, 2018), pp. 208-211; Chandra Welsh Deposition Exhibit 5370, Letter from Todd Smith, Vice President, Managed Care at Sutter, to Brendhan Green, former Vice President of Network Management at Aetna, "Re: Concentric Network HMO," February 17, 2005, DEF002704586-587, at 568 (offering only a few Sutter providers to potentially participate in Concentric); Terry Deposition (Aetna, July 11, 2018), pp. 154-155; Terry Deposition Exhibit 1501, Seventh Amendment to the Aetna Health of California, Inc., Aetna Health Management and Aetna Life Insurance Company and Sutter Health Systemwide Amendment, March 24, 2005, DEF000013014-100, at 091-092 (showing the small subset of Sutter Hospitals that are participating in Concentric).

[564] Terry Deposition (Aetna, July 11, 2018), p. 128, 130.



### 5.      *United Attempts*

187.      Like the other Class Health Plans, United also was interested in offering steered products in Northern California.  Janet Lundbye, Regional VP of Network Strategy for the West Region at United, testified that Sutter has not always given approval for narrowing or tiering in Northern California, and that is the "main barrier" that impacts United's ability to offer narrow networks.[568]  Andrew Clare, Regional Vice President of Business Development at United, explains that United executives have told their clients over the last ten to fifteen years that terms in their contract with Sutter have prevented them from offering tiered or narrow networks in Northern California.[569]  For example:

- 

---

[565] Terry Deposition (Aetna, July 11, 2018), p. 144.

[566] Terry Deposition (Aetna, July 11, 2018), p. 130.

[567] Mark Reynolds Deposition Exhibit 3416, Email from Mark Reynolds, Vice President of Medical Economics at Aetna, to Aetna personnel, "Subject: RE: Sutter Governance Symposium," April 25, 2012, AET-ESI0023374-378, at 374.

[568] Lundbye Deposition (United, May 15-16, 2018), pp. 230-231.

[569] Deposition of Andrew Clare, Regional Vice President, Business Development, at United, June 6, 2018 (hereafter "Clare Deposition (United, June 6, 2018)"), pp. 32-36

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

███████████████████████[570] Sutter claimed the product "didn't make good sense for our patient and in our model of how we deliver care."[571]



- ███████████████████████████████████████████████████[572]

███████████████████████████████████████████████[573]

## C. A Comparison of Northern and Southern California Shows that the Challenged Restrictions Have Interfered with the Success of Steered Products

188.  A comparison of Northern and Southern California provides insight into whether and the extent to which Sutter's contractual restrictions have affected the launch and success of

---

[570] Lundbye Deposition (United, May 15-16, 2018), pp. 214-218, 383, 385-386 ███████████████████████████████████████████████████████████████████

[571] Brendt Deposition (Sutter, August 22, 2018), p. 61.

[572] Cain Deposition (United, June 20, 2018), pp. 137-138, 143. *See also,* Cain Deposition Exhibit 1453, Email from Steve Cain, Vice President, Sales & Account Management, Key Accounts, at United, to United personnel, "Subject: FW: Sutter PEP Questionnaire," March 1, 2016, with attachment "UHC/Sutter Joint Venture Internal Review," UHC-00289049-084, at 052.

[573] Couser Deposition Exhibit 551, Sixth Amendment to the UnitedHealthcare Insurance Company and Sutter Health 2009 Systemwide Amendment, June 1, 2012, STCA0270810-873, at 869 (███████████████████████████████████████████████████████████████████████████████████); Couser Deposition (United, August 15, 2018), pp. 290-296 (████████████████████████████████████████████████████████████████████

innovative steered products that provide cost-conscious consumers a high quality, lower-cost option for health insurance. The comparison is especially appropriate because Sutter is exclusively a Northern California healthcare system, and the Class Health Plans operate in both Northern and Southern California.

189.    Evidence indicates that each of the Class Health Plans has introduced commercially successful steered products in Southern California, but has struggled to do the same in Northern California. For instance:

- *Anthem*: Ed Davis, Director of Network Compliance at Anthem, testified that



---

[574] Deposition of Ed Davis, Director of Network Compliance at Anthem, July 12, 2018 (hereafter "Davis Deposition (Anthem, July 12, 2018)"), pp. 44-46.

[575] Declaration of Aldo De La Torre in Connection with Plaintiff UEBT's Motion for Class Certification, February 7, 2017 (hereafter "De La Torre (Anthem) Declaration"), ¶ 26.

[576] Steven Scott Deposition Exhibit 1358, Blue Cross of California, "Blue Cross Select PPO: A Strategic Solution for CalPERS," May 16, 2006, DEF004271115-127, at 118. *See also,* Deposition of Steven Scott, General Manager and now Chief Operating Officer at Anthem, June 13, 2018 (hereafter "Scott Deposition (Anthem, June 13, 2018)"), pp. 161-162.

███████████████████████████████████████████
████████████,577

- *Blue Shield*: According to Blue Shield's Kristen Miranda, former Senior Vice President of Strategic Partnerships and Innovation, Blue Shield successfully launched two steered products—Local Access+ and SaveNet—in Southern California.[578] However, Ms. Miranda testified that Blue Shield "struggled a bit" to launch narrow network products in Northern California, in part because of Sutter's high existing rates and 95 percent non-par provision.[579] Similarly, in an internal email from May 13, 2010, James Orchison, then Director, Network Design & Programs, Network Management at Blue Shield, wrote:[580]

  "Sutter's contract was a significant problem in the North with Network Choice and Sutter hospitals were all in the preferred tier even though they didn't qualify undermined the integrity and cost savings of the tiering network in the North (e.g., CPMC was in the preferred tier in SF but St. Mary's SF (which is lower cost) was not).
  . . .
  Sutter will likely continue to be an issue in the North (at least until the contract renews in 2012, at which point we can try to renegotiate to allow this) because they require either being included in the preferred tier (which eliminates potential COHC savings) or charge 95% of billed charges for each admission (ER and non-ER in this case since it's a tiered network) if they are not in the preferred tier (which eliminates potential COHC savings)[.] This implies that the concept will only succeed in the South and maybe select non-Sutter counties in the North unless the Sutter contract changes in 2012."

- 

_____

577 Steven Scott Deposition Exhibit 432, Email from Steven Scott at Anthem to Anthem personnel, "Subject: RE: Select," June 15, 2006, ABCLH006605-609, at 606.

578 Miranda Deposition (Blue Shield, July 18-19, 2018), pp. 126-127, 413-415.

579 Miranda Deposition (Blue Shield, July 18-19, 2018), pp. 126-127.

580 James Orchison Deposition Exhibit 3240, Email from Jim Orchison, then Director, Network Design & Programs, Network Management at Blue Shield, to Blue Shield personnel, "Subject: FW: Tiered Hospital Network," May 13, 2010, BSC-AG-00112666.

581 LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 73-74.



- *Aetna*:

---

[582] LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 72-77, 79-84

[583] Hamilton Deposition (Health Net, September 11, 2018), pp. 96-103.

[584] Hamilton Deposition (Health Net, September 11, 2018), pp. 99-103.

[585] Hamilton Deposition (Health Net, September 11, 2018), p. 102.

[586] Terry Deposition (Aetna, July 11, 2018), pp. 127-128 and 142-145.

[587] Terry Deposition (Aetna, July 11, 2018), pp. 142-145, 237-239.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA



"588

"589

- *United*: Steve Cain, Vice President, Sales & Account Management, Key Accounts, at United, testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 590 Mr. Cain testified that "the Alliance product, in its entirety . . . has not been successful in Northern California" because "ultimately, the price point for selling Alliance did not -- was not -- the variance between full and Alliance was not big enough to make purchasers buy it."591

\*\*\*

190.      Evidence presented in this section shows that the challenged restrictions harmed competition in Northern California. The Class Health Plans wanted to launch and market more steered products than they did, and Sutter interfered by refusing to participate, by charging an onerous non-par rate, and by accusing the health plans of breaching the terms of their systemwide agreements (as with the attempts to establish COEs). But for Sutter's challenged restrictions, there likely would have been significantly more use of innovative, cost-competitive

---

588 Terry Deposition (Aetna, July 11, 2018), pp. 156-157.
589 Terry Deposition (Aetna, July 11, 2018), pp. 130-131 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
590 Cain Deposition (United, June 20, 2018), pp. 148-149.
591 Cain Deposition (United, June 20, 2018), pp. 137-138 and 143.

steered insurance products in Northern California. This evidence also shows injury to Class Members.

## IX.    The Challenged Conduct Has Harmed Competition and Resulted in Higher Prices

191.    I now assess the extent to which Sutter's use of the challenged restrictions has resulted in higher prices for inpatient hospital services. First, I describe the presence of other hospitals in each of the Tied Markets to which Class Health plans could steer or threaten to steer. I also describe an illustrative calculation of how steering or threatening to steer could lower negotiated hospital prices; this exercise shows that, absent the challenged restrictions, a relatively small amount of steering of patient volume away from Sutter Tied Hospitals could have enabled health plans to negotiate lower prices with Sutter at Alta Bates—one of the Damage Hospitals. Second, I review ordinary-course documents and testimony evidence that shows that Sutter hospitals are over-priced for reasons that cannot be explained by positive factors, like higher quality. Third, I show that hospital prices at the Damage Hospitals have risen over time at a faster rate than prices at other Northern California hospitals, after Sutter began to impose systemwide contracting, with its all-or-nothing and steering restrictions. Fourth, I present the results of a hospital-level overcharge regression model, estimated using claims data from each of the Class Health Plans. *Each of these analyses consistently shows that the challenged conduct has harmed competition and has resulted in higher hospital prices.* Because higher hospital prices are passed downstream to employers and individuals that pay premiums, this evidence continues to demonstrate that all or virtually all Class Members were injured as a result of Sutter's conduct.

### A.    The Challenged Provisions Interfere with Health Plans' Ability to Negotiate

192.    In this section, I describe the hospital landscape in each of the Tied Markets, showing that health plans have competitive hospital choices to which, absent the challenged restrictions, they could have plausibly steered some of their members. I also describe an illustrative calculation that shows that a relatively small amount of steering in the Tied Markets would be sufficient to place downward pressure on the negotiated price at Sutter's Alta Bates hospital, which is both a Tying Hospital and Damage Hospital. As I explain, this illustrative calculation and associated results are comparable to those of Sutter's expert Dr.

Guerin-Calvert, who studied Sutter's acquisition of Summit hospital in the Berkeley-Oakland market.

### 1. Health Plans Have Competitive Alternatives to Sutter in Each of the Tied Markets

193.    In each of the Tied Markets, Class Health Plans had competitive hospital options to which they could have steered patients away from Sutter:

- In the Sacramento Tied Market, there are three non-Sutter hospitals: (a) University of California Davis Medical Center; (b) Methodist Hospital of Sacramento; and (c) Mercy General Hospital.[592]

- In the San Francisco Tied Market, there are six non-Sutter hospitals: (a) Chinese Hospital; (b) Laguna Honda Hospital and Rehabilitation Center; (c) San Francisco General Hospital Medical Center; (d) St. Francis Memorial Hospital; (e) St. Mary's Medical Center-San Francisco; and (f) UCSF Medical Center.[593]

- In the Modesto Tied Market, there is one non-Sutter hospital: Doctor's Medical Center.[594]

- In the Santa Rosa Tied Market, there is one non-Sutter hospital: Santa Rosa Memorial Hospital.[595]

194.    Despite Sutter's imposition of the challenged restrictions, Sutter's competitors in the Tied Markets still treat a sizeable proportion of patients that reside in those markets. Exhibit 8 above describes the local Sutter hospital's share of inpatient discharges in 2011, for all patients *who live and stay* in each of the Tied Markets for their care. The local Sutter hospital's share is: (a) 37 percent in the Sacramento market; (b) 64 percent in the San Francisco market; (c) 51 percent in the Modesto market; and (d) 35 percent in the Santa Rosa market. Thus, Sutter's local competitor hospitals had shares of: (a) 63 percent (= 100 percent – 37 percent) in the Sacramento

---

[592] Chipty SJ Declaration, ¶ 66.

[593] Chipty SJ Declaration, ¶ 73.

[594] Chipty SJ Declaration, ¶ 78.

[595] Chipty SJ Declaration, ¶ 83.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

market; (b) 36 percent (= 100 percent – 64 percent) in the San Francisco market; (c) 49 percent (= 100 percent – 51 percent) in the Modesto market; and (d) 65 percent (= 100 percent – 35 percent) in the Santa Rosa market. Thus, for each Tied Market, health plans had other local hospital options to which to steer patient volume from Sutter.

195.    In addition, there are also two Kaiser hospitals in the Sacramento Tied Market: (a) Kaiser Foundation Hospital-Sacramento/Roseville; and (b) Kaiser Foundation Hospital-South Sacramento.[596] There is also one Kaiser hospital in the San Francisco Tied Market: Kaiser Foundation Hospital - Geary (S.F.).[597] If health plans could have created a more cost-competitive steered product that successfully steered volume away from the expensive Sutter hospitals in Sacramento and San Francisco, then health plans might have been able to better compete with Kaiser in these areas. But, consumers did not get the benefit of that competition either.

### 2.    Illustrative Calculation Showing How Steering in the Tied Markets Can Affect Negotiated Prices: Alta Bates

196.    I now present an illustrative calculation that shows how steering in the Tied Markets can result in lower hospital prices at Alta Bates. If health plans could steer, Sutter would have to do a profitability analysis, weighing the cost of losing patient volume in the Tied Markets to the cost of lowering price at Alta Bates. The cost of losing patient volume in the Tied Markets is the profit Sutter would lose on patient volume that would be steered away from the Sutter Tied Hospitals in the Tied Markets, where health plans have more competitive choices. The cost of lowering price at Alta Bates is the profit Sutter would lose from a five percent decrease in the negotiated hospital price at Alta Bates. If the lost profit from the price decrease at Alta Bates is less than the lost profit from the steerage. Sutter would agree to a five percent price decrease at Alta Bates.

197.    For the sake of example, I use Blue Shield claims data from 2009. Using this information, I calculate Sutter lost profits under the two different scenarios:

---

[596] Chipty SJ Declaration, Footnote 128.
[597] Chipty SJ Declaration, Footnote 141.

(1)     Lost Profits 1  = Steerage % *x* Tied Hospital Revenue *x* Tied Hospital Margin

(2)     Lost Profits 2 = 5% *x* Alta Bates Revenue

where *Steerage %* is the percentage of Tied Hospital Revenues a health plan could steer away from Sutter. Within this framework, one can calculate the critical steering percentage at which Sutter would be exactly indifferent between scenarios one and two. But for the challenged conduct, if actual steering were to be greater than the critical steering percentage, then health plans could use steering to lower hospital prices at Alta Bates.

198.     Exhibit 18 shows the critical steering percentage associated with a range of hospital margins. Sutter's actual hospital margins at the Tied Hospitals are close to 50 percent.[598] *As such, if Blue Shield could steer about three percent of patient volume away from the Sutter Tied hospitals, it could achieve a five percent price reduction at Alta Bates.* To the extent there are additional Sutter Tied Hospitals that are not identified by the Complaint, it is possible that the critical steering percentage is even lower. Evidence in the record indicates that actual steering at the Sutter Tied Hospitals could be much greater than the critical steering percentage necessary to discipline prices at Alta Bates.[599] Consistent with this evidence, Sutter's own expert (Dr. Guerin-Calvert) described steering of eight percent of volume away from Alta Bates as "a modest number of patients" and explained that such a volume of steering could discipline prices at Alta Bates.[600] This type of profitability analysis can be done for all of the Tied and Tying Hospitals.

---

[598] *See* sources for Exhibit 18.

[599] Chipty SJ Declaration, Exhibit 20.

[600] Summit-Alta Bates Proposed Findings of Fact, ¶ 30 ("Under these circumstances, the loss of even a modest number of patients would be sufficient to discipline Alta Bates' and Summit's prices.).

**Exhibit 18**
**Illustrative Calculation for Blue Shield, 2009:**
**Small Amounts of Steering in the Tied Markets Could Allow Health Plans**
**to Achieve Price Concessions at Alta Bates**

| Margin on Inpatient Services [A] | Critical Steerage to Achieve a 5% Reduction in the Negotiated Price at Alta Bates [B] |
|---|---|
| 30% | 5.1% |
| 40% | 3.8% |
| 50% | 3.1% |
| 60% | 2.6% |

*Notes:*

1. The average margin for each Sutter Tied Hospital during the damages period (2006-2015) was 38 to 60 percent. The average was calculated for each hospital using all of the available margin information for each hospital during those years that I was able to identify in the record.

2. In 2009, Sutter earned from Blue Shield inpatient revenues close to $▮ million at Alta Bates and inpatient revenues close to $▮ million at the Sutter Tied Hospitals, excluding CPMC-St. Luke's. CPMC-St. Luke's revenues were conservatively excluded from the calculation because its margin was not observed in any year during the Class Period.

3. [B] = (5% $x$ $▮ million) / ([A] $x$ $▮ million).

*Sources:*

1. BSC Claims Data.
2. Sutter Health, "DEF000756198.xls," 2009, DEF000756198.
3. Sutter Health, "DEF000761111.xls," 2010, DEF000761111.
4. Sutter Health, "DEF000154044.xls," 2012, DEF000154044.
5. Sutter Health, "DEF000154045.xls," 2013, DEF000154045.
6. Sutter Health, "DEF002345130.xlsm," 2014, DEF002345130.
7. Sutter Health, "DEF000154047.xls," 2015, DEF000154047.

## B. The Challenged Provisions Place Upward Pressure on Sutter Hospital Prices in the Sutter Damage Markets

199.     In my previous reports, I described health plan testimony, ordinary-course evidence from the health plans and from Sutter, and industry studies that show the Sutter hospitals are priced higher than most other hospitals in Northern California.[601] Additional evidence that I have reviewed confirms my original conclusion. I describe some of this additional evidence here.

---

[601] Chipty Class Declaration, ¶¶ 65-73; Chipty Reply Declaration, ¶¶ 108-113 and Appendix D (reattached to this report as Appendix F).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     185

### 1.    Documents and Testimony on Sutter Prices Being Higher

200.    A memo to the California Health Facilities Financing Authority ("CHFFA")
Board Members from the Service Employees International Union in August 2005 regarding
Sutter's failure to pass on savings from its tax-exempt CHFFA bonds in the form of lower prices
to consumers states that "Sutter's prices have now reached levels that far exceed those of other
hospitals" and provides examples of analyses by Blue Shield, Anthem, and California Health
Care Coalition that demonstrate Sutter has higher prices.[602] Exhibit 19 depicts this document,
which also shows several Sutter hospitals, including three of the Sutter Damage Hospitals (Alta
Bates, CPMC, and Sutter Modesto), are among the most expensive in northern California:[603]

**Exhibit 19**



---

[602] Steve Scott Deposition Exhibit 431, Memorandum from the Service Employees International Union to the
CHFFA Board Members, "Re: Sutter Health's Violation of 'Savings Pass-Through' Requirement of CHFFA Act,"
August 15, 2005, DEF003982122-143, at 123-124.

[603] Steve Scott Deposition Exhibit 431, Memorandum from the Service Employees International Union to the
CHFFA Board Members, "Re: Sutter Health's Violation of 'Savings Pass-Through' Requirement of CHFFA Act,"
August 15, 2005, DEF003982122-143, at 127.

*Note*: Red arrows added to identify Sutter hospitals.

*Source*: Steve Scott Deposition Exhibit 431, Memorandum from the Service Employees International Union to the CHFFA Board Members, "Re: Sutter Health's Violation of 'Savings Pass-Through' Requirement of CHFFA Act," August 15, 2005, DEF003982122-143, at 127.

201. *Anthem describes that Sutter Hospitals were far more expensive than peer hospitals in Northern California.* For example:

- Curtis Terry, previously with Anthem, testified that, 

- In 2004, an analysis from Anthem for California Works Foundation in 2004 calculates hospital DRG case-mix adjusted performance measures, which involves calculating the average cost per DRG for all Anthem-contracted hospitals statewide and comparing the weighted average cost per case for a specific hospital to the statewide average. This analysis demonstrates that most Sutter facilities have higher prices, with only 5 of 24 Sutter hospitals having lower cost than the statewide average.[606]

- A May 27, 2004, letter from Anthem to CalPERS included with this memorandum summarizes an analysis of the costs of hospital care, which demonstrates that "[t]he

---

[604] Terry Deposition (Aetna, July 11, 2018), pp. 187-189.

[605] Terry Deposition (Aetna, July 11, 2018), p. 109. *See also,* Curtis Terry Deposition Exhibit 469, Email from Greg Stevens, Vice President, Network, West Region at Aetna, to Kim Cox, Contract Manager at Aetna, "Subject: FW: managed Care Week 12/22/03," January 5, 2004, AET-ESI0019139-149, at 140.

[606] Steve Scott Deposition Exhibit 431, Memorandum from the Service Employees International Union to the CHFFA Board Members, August 15, 2005, DEF003982122-143, at 131-133. *See also,* Aldo De La Torre Deposition Exhibit 478, McKinsey & Company, "Exchange network strategy: Preliminary recommendations – San Francisco, CA," March 28, 2012, ABCLH379969-380037, at 976 and 987-988 (

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

average cost of claims paid for CalPERS PPO Basic plan participants at Sutter Health hospitals is 73% greater than the average cost of all other hospital claims paid on behalf of CalPERS PPO Basic plan participants in the State of California, excluding Sutter Health hospitals" and "[t]he average cost of claims paid for CalPERS PPOS plan participants at Sutter Health hospitals is 62% greater than the average cost of all other hospital claims paid on behalf of CalPERS PPO Basic plan participants in Northern California, excluding Sutter Health hospitals."[607]



- Similarly, during 2014 contract negotiations with Sutter, Anthem explains that



---

[607] Steve Scott Deposition Exhibit 431, Memorandum from the Service Employees International Union to the CHFFA Board Members, "Re: Sutter Health's Violation of 'Savings Pass-Through' Requirement of CHFFA Act," August 15, 2005, DEF003982122-143, at 129.

[608] Aldo De La Torre Deposition Exhibit 1644, Email from Aldo De La Torre at Anthem to David Goldberg, Product Manager Director at Anthem, and later Product Line Management and Strategy at Blue Shield, "Subject: Narrow Network Scenario #1," January 3, 2010, ABC013672, with attachment "Narrow Network Hospital List -- IP and OP combined Cost Relativity."

[609] Ramseier (Anthem) Declaration, ¶ 6.

[610] Aldo De La Torre Deposition Exhibit 1662, Email from Paige Rothermel, Vice President of Sales, at Anthem to ELBAC participants, "Subject: Network Update - - Sutter Health System," October 29, 2013, ABCLH161586-589 at 588. *See also,* De La Torre (Anthem) Declaration, ¶ 5 Exhibit 1, ABCLH120166; Aldo De La Torre Exhibit 1644, email from Aldo De La Torre, Vice President of Provider Engagement and Contracting at Anthem, to David Goldberg, Product Development Director at Anthem, and later Product Line Management and Strategy at Blue Shield, "Subject: Narrow Network Scenario #1," January 3, 2010, with attachments, ABC013672-673; Deborah Henning Deposition Exhibit 2861, Email from Deborah Henning, Regional Vice President, Network Management, at Anthem, to Marc Caporaso, Provider Network Management Director at Anthem, "Subject: Webinar Slides," April 25, 2014, with attachment "Sutter Health Negotiations Status," September 12, 2013, ABCLH398795-811, at 801

███████████████████████████████████████████████████████ Deborah Henning

202.    *Blue Shield describes that Sutter Hospitals were far more expensive than peer hospitals in Northern California.* Blue Shield has consistently complained about Sutter's "dramatically higher prices compared to other hospitals in the same geographic areas."[611] For example:

- Since at least 2001, Blue Shield collected and analyzed pricing data for network hospitals in preparation for contract negotiations, including for Sutter.[612] In fact, Tracy Barnes, Director of Contracting for Northern California at Blue Shield, testified that Blue Shield "would look at the pricing of different providers in different geographies and markets" and share such information with Sutter to explain to them that Sutter's prices to Blue Shield are higher than those of other providers.[613] Furthermore, Barnes testified that Sutter's prices "were on the higher side of providers in Northern California."[614]

---

Deposition Exhibit 2862, Email from Deborah Henning, Regional Vice President, Network Management, at Anthem, to Melissa Brendt at Sutter, "Subject: Anthem Second Counter Offer," October 8, 2013, with attached letter from Deborah Henning at Anthem to Melissa Brendt at Sutter, October 7, 2013, ABCLH139438-442, at 440; Scott Deposition (Anthem, June 13, 2018), p. 329 ███████████████████████████████████████████

[611] *See, e.g.,* Van Johnson Deposition Exhibit 286, Email from Sina Santagata on behalf of Kris Vine, Vice President & Chief Contracting Officer at Sutter, to Sutter Personnel, "Subject: Re: Letters of 2.17.04 from K. Vine to L. Farnan of Blue Shield CalPERS," February 17, 2004, with attached 2004 Letter from Lisa Farnan, then Vice President of Provider Relations and Network Development at Blue Shield, to Kris Vine regarding CalPERS negotiations and Sutter's high prices, DEF001981816-826, at 819. *See also,* Darrin Wells Deposition Exhibit 569, Email from Kristen Miranda, former Senior Vice President of Strategic Partnerships and Innovation at Blue Shield, to Kris Vine Vice President of Managed Care at Sutter, and other personnel, "Subject: RE: 5pm – City & County of San Francisco Meeting," September 17, 2010, with attachment "Evaluation of CPMC's cost to cohort," BSC_UFCW 00006125-128, at 128 ("Applying the above methodology shows that on a case-mix, cost adjusted basis, CPMC is over 40% more expensive than the market competitors."); and Deposition of Peter Anderson, Chief Strategy Officer at Sutter, August 31, 2017 (hereafter "Anderson Deposition (Sutter, August 31, 2017)"), pp. 57-61.

[612] Joyner (Blue Shield) Declaration, ¶¶ 24-25.

[613] Barnes Deposition (Blue Shield, January 30 – February 1, 2018), pp. 343-358. *See also,* Orchison Deposition (Blue Shield, July 20 & 24, 2018), p. 86 ("Q: Okay. And was it your understanding that Sutter's [contractual rates] were higher than other hospitals in California?… The Witness: Yes.").

[614] Barnes Deposition (Blue Shield, January 30 – February 1, 2018), p. 343. *See also,* Hermosillo Deposition (Blue Shield, October 11, 2018), p. 155 ("[Sutter] was the highest cost provider in the state."); and Juan Davila Deposition Exhibit 3093, "Sutter System Analysis: for Juan and Armine," December 19, 2014, BSC-UEBT-0030512-518.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      189

- Blue Shield observed that, after Sutter imposed systemwide contracting in 2002, Sutter's "pricing for acute care hospital services" increased "dramatically faster" than "all or nearly all of its competitors."[615]

- In 2004, Blue Shield complained that Sutter's "entire system of hospitals is more than 60% above the Northern California average and 80% above the statewide average."[616]

- In a January 2014 exchange between Sutter and Blue Shield, a Blue Shield executive writes, "As it relates to your hospitals, in some counties, Sutter hospital costs are 89% higher compared to their cohort. On an overall basis, Sutter hospital costs are 17% higher relative to the Northern California average and 34% higher than the State average."[617]

- In a June 2014 "contract opportunities checklist" regarding upcoming negotiations with Sutter, Blue Shield states that Sutter's "overall cost [is] above region average (1.17 relative to region)," and a hospital-by-hospital analysis of Sutter costs

---

[615] Joyner (Blue Shield) Declaration, ¶ 25. *See also,* Kristen Miranda Deposition Exhibit 3, "Blue Shield of CA and Sutter Health Strategy Development 2007 Executive Planning Session I," September 23, 2005, BSC_UCFW-00059907-968 at 928 ("Compared to other major CA health systems, Sutter's costs are increasing as fast or faster despite starting at a higher unit cost."); and Miranda Deposition (Blue Shield, July 18-19, 2018), pp. 297-299.

[616] *See* Van Johnson Deposition Exhibit 286, Email from Sina Santagata on behalf of Kris Vine, Vice President & Chief Contracting Officer at Sutter, to Sutter Personnel, "Subject: Re: Letters of 2.17.04 from K. Vine to L. Farnan of Blue Shield CalPERS," February 17, 2004, with attached 2004 Letter from Lisa Farnan, then Vice President of Provider Relations and Network Development at Blue Shield, to Kris Vine regarding CalPERS negotiations and Sutter's high prices, DEF001981816-826, at 819. *See also,* Joyner (Blue Shield) Declaration, Exhibit 16, Email from Eileen Duncan, Network Design at Blue Shield, to Blue Shield personnel, "Subject: RE: Sutter – Internal NM discussion," December 15, 2008, BSC_UFCW 00003249-253 at 249 (stating that, in 2007, Sutter was more than 30% above the Northern California and 48% above the statewide average, excluding Sutter.). This trend continued into 2015, when Sutter's prices were 18% to 30% higher than Northern California hospitals and the State, respectively. (Barnes (Blue Shield) Declaration, ¶ 5 and Exhibit 2 (Blue Cross, "Sutter Health Analysis," January 2015, BSC-UEBT-0005326-336 at 330.) A 2010 CalPERS email regarding a NPR story, "Big Hospital Clout Dictates Premiums," citing Sutter as an example of the "'market power of providers' making control of health care costs difficult," provides a short history of CalPERS excluding Sutter in 2005 and states that, "[b]y early 2004, an analysis by BSC suggested that Sutter's costs were '60 to 80 percent higher than comparable hospitals.'" (Kathy Donneson Deposition Exhibit 5966, Email from Richard Sun, Medical Consultant at CalPERS, to "Health Branch, All" at CalPERS, "Subject: CalPERS's 2004 Removal of 13 Sutter Hospitals from BSC HMO Network: a Brief History Based on Public Documents (FYI)," November 22, 2010, CALPERS 09667-668, at 667.)

[617] Melissa Brendt Deposition Exhibit 534, Letter from Armine Papouchian, Vice President of Network Management at Blue Shield, to Melissa Brendt, Vice President and Chief Contracting Officer at Sutter, January 7, 2014, BSC-UEBT-0005339-340.

compared to county, cohort, Northern California, and statewide hospitals demonstrates Sutter hospitals are typically more expensive, including the Sutter Damage Hospitals.[618] Overall, this analysis shows that average Sutter hospital prices are nearly always higher for both inpatient and outpatient services.[619]

- In a July 2014 letter to Sutter, Blue Shield states "the data shows Sutter Health's health care costs are generally significantly higher when compared to the north and statewide averages for all services. In fact, the average Sutter Health allowed charges per day for hospital services have continuously increased by 166% from 2001 to 2013 and fee for service /professional and ancillary reimbursement over the last 11 years have increased by 110 %… Sutter Health is currently reimbursed significantly higher than its competitors which makes health care unaffordable and must be addressed by Sutter Health in this negotiation."[620]

203.    *Health Net has also determined that Sutter's prices are amongst the highest in California.* For example,

- [621]

---

[618] Deposition of Yun Kim, Senior Director for Network Performance, at Blue Shield, August 31, 2018 (hereafter "Kim Deposition (Blue Shield, August 31, 2018)"), Exhibit 1547, Email from Anita Lee, Network Performance, Network Management, at Blue Shield, to Tami Lucas, former Senior Network Manager, Provider Contracting, at Blue Shield, "Subject: Sutter Health Hospital Pre-negotiation Checklist," June 25, 2014, with attachment Blue Shield, "Sutter Health: contract opportunities checklist," June 2014, BSC-UEBT-0015383-431, at 386, 391; *see also* 394-406.

[619] Yun Kim Deposition Exhibit 1547, Email from Anita Lee, Network Performance, Network Management, at Blue Shield, to Tami Lucas, former Senior Network Manager, Provider Contracting, at Blue Shield, "Subject: Sutter Health Hospital Pre-negotiation Checklist," June 25, 2014, with attachment Blue Shield, "Sutter Health: contract opportunities checklist," June 2014, BSC-UEBT-0015383-431, at 392.

[620] Melissa Brendt Deposition Exhibit 524, Letter from Tami Lucas, Senior Network Manager, Provider Contracting, at Blue Shield, to Melissa Brendt, Vice President, Managed Care at Sutter, "RE: Sutter Health's July 1st letter to Blue Shield," July 14, 2014, DEF000049921-924, at 922-923.

[621] Becky LaCroix-Milani Deposition Exhibit 710, Email from Becky LaCroix-Milani, Regional Vice President, Provider Network Management, at Health Net, to Melissa Brendt, then Vice President, Managed Care at Sutter, and other Sutter personnel, "Subject: Health Net comprehensive proposal #6," December 20, 2012, HN-003199-201, at

- In a December 2013 email to Melissa Brendt, Becky LaCroix-Milani states:



[622]

Affirming that the information in this email is truthful, Becky LaCroix-Milani testified that "Sutter's really just out of line…in terms of where they fall cost wise."[623]

204.    *United documents and testimony highlight similar concerns about Sutter prices.* For example:

- In a 2016 United document



_____

199. *See also,* Becky LaCroix-Milani Deposition Exhibit 266, Email from Becky LaCroix-Milani, Regional Vice President, Provider Network Management, at Health Net, to Melissa Brendt, Vice President and Chief Contracting Officer at Sutter Health, "Subject: Health Net – Sutter Health Proposal 1 – 2013 renewal," September 19, 2012, DEF003337410-468, at 411, 414 ("Sutter Health providers consistently cost Health Net at least 8% more across the Sutter system in nearly all markets when compared to other contracted providers. In many markets and when reviewed at a specific provider level, that cost can be significantly more, ranging upwards of 20% and higher, than the market… Sutter Health is a cost outlier."); and Hamilton Deposition (Health Net, September 11, 2018), pp. 87-89 and 291.

[622] Becky LaCroix-Milani Deposition Exhibit 711, Email from Becky LaCroix-Milani, Regional Vice President, Provider Network Management, at Health Net, to Melissa Brendt, then Vice President, Managed Care at Sutter, and other Sutter personnel, "Subject: Sutter Health proposal #7," December 24, 2013, HN-0003254-256, at 254-255 (emphasis added).

[623] LaCroix-Milani Deposition (Health Net, August 30-31, 2018), pp. 192-193. *See also* Melissa Brendt Deposition Exhibit 668, Letter from Becky LaCroix-Milani Regional Vice President, Provider Network Management, at Health Net to Jan Voge, Managed Care Director at Sutter, August 4, 2014, HN-0003274-275, at 274 ("[i]n reviewing our most costly hospitals in Northern California, Sutter hospitals continue to represent a disproportionate number of our highest cost facilities.")

██████████ ”[624] Sutter's "Price Point/Cost: (Highest Cost/UHC BIC)" was also listed as a concern for United with respect to a potential joint venture.[625] Janet Lundbye, Regional VP of Network Strategy for the West Region at United, agreed that, on aggregate, Sutter's prices are higher than other providers in Northern California. [626]

205.    *Sutter itself recognizes that its prices are higher than other hospitals in Northern California.* For example:

- In a 2007 Sutter Health Finance and Planning Committee document, Patrick Fry, then President and CEO of Sutter Health, recognized that "affiliates believe that they have done a good job of holding price increases over the last two years to single digit, yet payers continue to provide feedback that Sutter Health services are priced higher than its competitors."[627]

---

[624] Steve Cain Deposition Exhibit 1453, Email from Steve Cain, Vice President, Sales & Account Management, Key Accounts, at United, to United personnel, "Subject: FW: Sutter PEP Questionnaire," March 1, 2016, with attachment "UHC/Sutter Joint Venture Internal Review," UHC-00289049-084, at 053.

[625] Steve Cain Deposition Exhibit 1453, Email from Steve Cain, Vice President, Sales & Account Management, Key Accounts, at United, to United personnel, "Subject: FW: Sutter PEP Questionnaire," March 1, 2016, with attachment "UHC/Sutter Joint Venture Internal Review," UHC-00289049-084, at 053.

[626] Lundbye Deposition (United, May 15-16, 2018), p. 377. Ms. Lundbye also notes that now some other hospitals, like Washington Hospital and some Dignity Hospitals, are more expensive than Sutter. (Lundbye Deposition (United, May 15-16, 2018), pp. 377-378, 428).

[627] Robert Reed Deposition Exhibit 92, "Sutter Health Finance and Planning Committee," August 27, 2007, STCA0608569-620, at 573. *See also,* Robert Reed Deposition Exhibit 2777, Email from Sina Santagata, Executive Assistant at Sutter, to Darlyn Jones, Senior Staff to the President & CEO at Sutter, "Subject: Management Committee Presentation – Affordability," April 24, 2007, STCA0116269-270, with attached presentation "Affordability/Pricing/Parameters Management Committee Presentation," pp. 5 ("Health Plan Feedback: Sutter Provider's Prices remain higher than average."), and 11; Anderson Deposition Exhibit 44, "Governance Assessment Process Board Updates As of February 2008," February 2008, STCA0630549-605, at 563 ("We are 15-30% more expensive than other providers."); and Anderson Deposition (Sutter, August 31, 2017), pp. 75-76; Harrison Deposition (Sutter, August 2-3, 2018), p. 176 (testifying that Sutter's "major obstacle, our price, that's because that's what we've been told by the health plans and payers. They would tell us that our prices were high."); Harrison Deposition Exhibit 3399, Email from James Harrison, Vice President of Competitive Intelligence at Sutter from 2005 to 2014, to Suparna Ferreira, Strategy and Business Development Director at Sutter, "Subject: RE: FOR ACTION: RESPOND BY NOON ON 16TH MAY: Pre-work for meeting on the 17th of May," May 16, 2007, DEF006360873-875, with attachment "Our Strategy" at 875 ("Major obstacle: Our price is a major barrier to providing the value sought by our customers."); and Linda Khachadourian Deposition Exhibit 3824, email from Linda Khachadourian, Sutter's Vice President of Strategy from 2001 to 2014 and Chief Enterprise Transformation Officer since 2014, to Sutter personnel, "Subject: Market presentation examples," March 20, 2006 with attachments "The Environmental Landscape Sutter Health Board Retreat," and "Consumer Driven Imperatives Sutter Health Governance Symposium October 2005," DEF003119844-934 at 928 (on a slide entitled "Sutter Health's costs drive

- In internal 2009 email communications, Robert Reed, former Chief Financial Officer at Sutter, recognizes Sutter is higher priced than competitors and claims they can get away with it because health plans pool their higher prices with other hospitals' lower prices: "[O]ur current business model is dependent upon commercial insurance, *we are more expensive than community average, therefore our current business model is reliant upon pooling our more expensive product offering with lower cost non-Sutter providers in an insurance wrapper to achieve a competitive 'average', if we go direct as Sutter only we would have to take a significant price cut* to first overcome the average rate and second to provide an incentive to use a network that is Sutter exclusive."[628] Further, in his deposition, Reed clarified that "a Sutter exclusive product would probably be more expensive" because Sutter's prices were significantly above market average.[629]

- In a 2010 internal Sutter email, Peter Anderson, then Sr. Vice President, Strategy & Business Development at Sutter, states "[t]here is a commercial contracted rate gap vs. our competitors and it's fairly large for hospitals, and very large for foundations."[630] Notably, Sutter has recognized that "[p]rice is the most important factor for healthcare decision making, and Sutter Health is not positioned well."[631]

- A 2010 Sutter presentation on its price and cost position states:

---

up prices," Sutter notes that "[o]ur cost has risen from a modest premium over national and statewide comparisons to a 30% spread vs. the national average and 15% above the state average.").

[628] Robert Reed Deposition Exhibit 2780, Email from Robert Reed, former Chief Financial Officer at Sutter, to Bill Gleeson, Vice President of Communications at Sutter, "Subject: RE: Self Funded Product, Holding Statement, August 25, 2009, DEF001454377-379, at 377 (emphasis added).

[629] Deposition of Robert Reed, Chief Financial Officer at Sutter, June 12-13, 2018 (hereafter "Reed Deposition (Sutter, June 12-13, 2018)"), p. 211.

[630] Jeff Gerard Deposition Exhibit 2532, Email from Peter Anderson, then Sr. Vice President, Strategy & Business Development at Sutter, to Sutter personnel, "Subject: Slides for Tuesday Afternoon – CONFIDENTIAL," August 16, 2010, STCA0604630.

[631] Anderson Deposition Exhibit 44, "Governance Assessment Process Board Updates As of February 2008," February 2008, STCA0630549-605, at 563.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

o "We often hear our prices are too high." A chart depicting average cost per day shows Sutter Hospitals are 128% higher than Catholic Healthcare West Hospitals (now called Dignity Health).[632]

o "Sutter's 'price' is 32% above all other Bay Area providers and 15% above the providers we directly compete with." A chart demonstrates nearly all Sutter Hospitals are higher priced than the average of direct competitors and the average of Bay Area providers without Sutter.[633]

o A comparison of severity and case mix-adjusted relative hospital unit costs depicts Sutter's cost relative to non-Sutter hospitals in Norther California of 1.46 and relative to the Northern California average (including Sutter) of 1.30.[634]

Moreover, this presentation shows that the 2009 rate reductions required by Bay and Valley Area Sutter Hospitals to get back into CalPERS vary between 5.4 percent (except for Sutter Roseville at 0 percent) and 40.9 percent (at Memorial Modesto).[635] Regarding

---

[632] James Harrison Deposition Exhibit 293, Email from Jim Harrison, then Vice President, Business Intelligence, Strategy & Business Development, at Sutter, to Kris Vine, former Chief Contract Officer at Sutter, "Subject: FW: ***strategy session slides," August 13, 2010, with attachment Sutter, "Price + Cost: What is driving our Price and Cost Position?" August 17, 2010, STCA0117620, at p. 4 (The chart also shows physician fees are higher, with obstetric professional fees for Palo Alto Medical Foundation obstetricians 144 percent higher than other obstetricians.). *See also,* Harrison Deposition (Sutter, August 2-3, 2018), pp. 250-256 ("Q. Okay. And what was the basis of your statement there that, 'We often hear our prices are too high'?  A. Well, what I used is an illustration. It was some news clips from Bloomberg. And this is -- we would hear frequently from news sources like this or from the health plans that our prices were too high.").

[633] James Harrison Deposition Exhibit 293, Email from Jim Harrison, then Vice President, Business Intelligence, Strategy & Business Development, at Sutter, to Kris Vine, former Chief Contract Officer at Sutter, "Subject: FW: ***strategy session slides," August 13, 2010, with attachment Sutter, "Price + Cost: What is driving our Price and Cost Position?" August 17, 2010, STCA0117620, at p. 5. *See also,* Harrison Deposition (Sutter, August 2-3, 2018), pp. 256-261 (confirming that the "purpose was to provide a point of comparison for the senior management team with respect to Sutter's pricing versus the pricing of its competitors").

[634] James Harrison Deposition Exhibit 293, Email from Jim Harrison, then Vice President, Business Intelligence, Strategy & Business Development, at Sutter, to Kris Vine, former Chief Contract Officer at Sutter, "Subject: FW: ***strategy session slides," August 13, 2010, with attachment Sutter, "Price + Cost: What is driving our Price and Cost Position?" August 17, 2010, STCA0117620, at p. 7. *See also,* Harrison Deposition (Sutter, August 2-3, 2018), pp. 261-266 (confirming the charts demonstrate Sutter is higher priced than other hospitals in Northern California).

[635] James Harrison Deposition Exhibit 293, Email from Jim Harrison, then Vice President, Business Intelligence, Strategy & Business Development, at Sutter, to Kris Vine, former Chief Contract Officer at Sutter, "Subject: FW: ***strategy session slides," August 13, 2010, with attachment Sutter, "Price + Cost: What is driving our Price and Cost Position?" August 17, 2010, STCA0117620, at pp. 9, 11 ("[t]o play in Health Net's narrow network[,] [they] need a 32% reduction in [their] rates"), 13 ("[w]ith no change in our price structure we cannot compete with narrow network plan products."). *See also,* Harrison Deposition (Sutter, August 2-3, 2018), pp. 267-269 (confirming "[t]hat

the information contained in this presentation, James Harrison testified: *"I'm telling the senior management team that this is an issue we need to deal with. Our costs are perceived as being higher, our rates are perceived as being higher, we need to do something about it. So this is basically building a case. We have a problem here. We need to deal with it. ... And I would point out, too, we've got to remember that this was a document that was put together to let the senior management team be aware of the fact that we had an issue with price and cost and that we needed to deal with that,* and we were using -- this document is directional, and we were using it to try and move the senior management team towards some sort of business action."[636]

- A 2011 Sutter presentation, which depicts results of a Blue Shield assessment of Sutter facility price relative to other Northern California hospitals, states that "[w]e often hear our 'prices' are too high...Blue Shield of Northern California communicated that Sutter Health's facility costs were on average 30% higher than other Northern California hospitals," and shows that all but one Sutter Hospital have higher costs and most are more than 25 percent higher.[637]

- In 2011, Sutter performed a pricing analysis to evaluate the impact of a price war on patient revenue.[638] It demonstrates that Sutter would lose patient revenues in each region (Central Valley, Easy Bay, Peninsula Coast, Sacramento Sierra, and West

---

was a document that...Blue Shield had submitted to us in regards to very specifically how we could get back into the CalPERS plan," noting Blue Shield had "excluded some of our facilities from the CalPERS product," and confirming that the product was a narrow network.), 269-276 (agreeing that "Sutter had to reduce its rates by 32 percent to achieve the target premium that HealthNet hoped to provide for this particular product") and 276-284 (confirming he "endeavored to do an apples-to-apples comparison between the Blue Shield Net Value product and a...hypothetical Sutter Only HMO product" and that "the ultimate conclusion in the slide is that the premium that would need to be charged for the Sutter Only HMO would be 30.1 percent higher than the premium for the Blue Shield narrow network product").

[636] Harrison Deposition (Sutter, August 2-3, 2018), pp. 276, 283 (emphasis added).

[637] James Harrison Deposition Exhibit 294, Sutter Health, "Competitor Response Analysis: Summary Trends Across Regions," SMT Strategy Session, January 18, 2011, STCA0234063, at p. 10. *See also,* STCA0720226-248, at 238 and 241 ("One California health plan perceives Sutter Health as the most expensive inpatient provider in the State.")

[638] James Harrison, former Vice President of Competitive Intelligence at Sutter, testified that "the increasing sensitivity to price on the part of the consumer could instigate a price war" but that he thought it was "unlikely that a price war,...defined as an effort to drop price to increase volume, was going to happen in healthcare" (or "in the Northern California healthcare market."). (Harrison Deposition (Sutter, August 2-3, 2018), pp. 306, 341-343).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

Bay) if they priced at the "floor," which is "set by the provider [in each region] who can reach the lowest net patient revenue per adjust discharge and remain at breakeven."[639] Sutter does not set the floor price in any region and "the impact on loss of patient revenues is substantial in all Regions."[640]

### 2.  Damage Hospital Prices Are Elevated as a Result of the Challenged Restrictions

206.  Analysis of a long time-series of data from OSHPD enables me to evaluate whether the data are consistent with the proposition that prices at the Sutter Damage Hospitals are elevated as a result of the challenged restrictions. For this purpose, I measure hospital price as a multiple of Medicare, that is: the ratio of commercial net patient revenue to net patient revenues that would have been earned under Medicare pricing at that hospital.[641] As I have explained, a hospital with a higher multiple of Medicare is more expensive than a hospital with a lower multiple of Medicare. The analysis, shown in Exhibit 10 of my Class Declaration and reproduced below as Exhibit 20, indicates that, from 1995 to about 2002, prices at the Sutter Damage Hospitals were comparable to those of other Northern California hospitals. Beginning about 2002, at about the time when Sutter implemented all-or-nothing contracting, Sutter's prices have exceeded prices at the benchmark hospitals; and Sutter's prices have risen at a faster rate.

---

[639] James Harrison Deposition Exhibit 296, Email from Jim Harrison, former Vice President of Competitive Intelligence at Sutter, to Sutter personnel, "Subject: Price War Impact on Patient Revenues," December 27, 2011, with attachment Sutter Health, "Race to the Bottom: Impact of a Price War on Patient Revenue," Working Draft, December 2011, DEF005019448-465, at 448, 453, 456, 459, 462, and 465. *See also,* Harrison Deposition (Sutter, August 2-3, 2018), p. 307 ("I wouldn't think a provider would set a floor -- I mean, would set a price that would put him below break-even. So I looked at the 12 most efficient provider in each region in terms of net revenue per -- and looked at how low they could go until they were no longer break-even or got to break-even; and whoever had the lowest point, that would be the floor.").

[640] James Harrison Deposition Exhibit 296, Email from Jim Harrison, former Vice President of Competitive Intelligence at Sutter, to Sutter personnel, "Subject: Price War Impact on Patient Revenues," December 27, 2011, with attachment Sutter Health, "Race to the Bottom: Impact of a Price War on Patient Revenue," Working Draft, December 2011, DEF005019448-465, at 448, 453, 456, 459, 462, and 465. *See also,* Harrison Deposition (Sutter, August 2-3, 2018), pp. 307-308 (confirming that the study shows that Sutter's loss of patient revenues is substantial in all regions).

[641] For a description of how multiple of Medicare and a description of its uses in healthcare analysis, *see* Section VI.C.2.



**Exhibit 20**
**Hospital Net Patient Revenue from Commercial Health Plans as a Multiple of Medicare**
**Reproduction of Chipty Class Declaration, Exhibit 10**



*Source*: OSHPD Annual Financial Disclosures Reports, 1995-2016.

> 3. *Claims Data Also Show that the Sutter Damage Hospitals Are More*
> *Expensive than Northern California Benchmarks*

207.    Next, I study prices at the Sutter Damage Hospitals using the basket
approach I described earlier. In this analysis, I focus on the "basket" of inpatient hospital
services provided at each of the Sutter Damage Hospitals. Specifically, I calculate what it
would cost in *total medical expenditure* to treat the same basket of services provided at each
of the Sutter Damage Hospitals at a set of benchmark hospitals, using claims data from

Anthem and Blue Shield. [642,643] By fixing the basket, it cannot be that differences in mix of services explains the observed price differences, and there should be no debate about how to adjust for the resource intensity of the care provided. Sutter's expert Dr. Willig has raised both of these issues, which this analysis (and some I present later) demonstrates are simply distractions.[644] The results of this analysis are consistent with the proposition that the Sutter Damage Hospitals are more expensive than other hospitals in Northern California.

208.     The results of this analysis are shown in Exhibit 21 and Exhibit 22, using Anthem and Blue Shield data, respectively. Exhibit 21 describes what it would cost in total medical expenditures to treat the same basket of inpatient services performed at each of the Sutter Damage Hospitals at a set of benchmark hospitals, using the Anthem data from 2008 to 2010:[645] the red bars depict total medical expenditures, in millions of dollars, for treating the basket of services at each of the Sutter Damage Hospitals; the darker blue bars depict total medical expenditures, in millions of dollars, for treating the *same* basket of services at non-Sutter Northern California hospitals; and the light blue bars depict total medical expenditures, in millions of dollars, for treating the *same* basket of services at relatively large, non-rural, non-Sutter Northern California hospitals.[646] As seen in the exhibit, the Sutter Damage Hospitals are more expensive than the benchmark hospitals (i.e., the red bars are always higher than the blue bars). This comparison shows health plans could save

---

[642] Prices for services at benchmark hospitals are calculated for each DRG performed at the Sutter hospital by first calculating the average price of that DRG at each benchmark hospital, then calculating the simple average of these prices across benchmark hospitals. The results are qualitatively similar when benchmark prices for each DRG are computed as the average of benchmark hospital prices, weighted by the number of claims for that DRG observed at each benchmark hospital. *See* Chipty Workpapers.

[643] If a DRG performed at a Sutter hospital is never performed at any hospital in the benchmark, the analysis conservatively sets the benchmark price equal to the average price observed at the Sutter hospital for that DRG. At least 99 percent of claims performed at a Sutter Tied Hospital in each time period for both Anthem and Blue Shield claims are also performed at least one benchmark hospital. *See* Chipty Workpapers.

[644] Willig Declaration, ¶¶ 195-197.

[645] This analysis starts in 2008 because CMS changed the DRG designations partway through 2007. *See* Appendix G for additional Anthem results: tabular summary of results for the additional time periods 2011 to 2013 and 2014 to 2015, as well as year-by-year graphical comparisons of case-mix adjusted average prices.

[646] As explained earlier, I define relatively large hospitals to be hospitals with more than 144 beds, the median of the average number of acute beds at non-rural hospitals in Northern California that were active at some point from 1995 to 2016. Each of the Sutter Tied and Alta Bates Hospitals is non-rural and has more than 144 beds except for Sutter Santa Rosa, which is non-rural and has 128 beds.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

money—on the order of tens of millions of dollars—if the Sutter Damage Hospitals were priced more like the set of benchmark hospitals.[647]

**Exhibit 21**
**Total Medical Expenditures for the Basket of Inpatient Services Performed at Each Sutter Damage Hospital**
**Anthem Claims, 2008-2010**



Note: See notes for Exhibit 9A.

Sources:
1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2015.
2. Anthem Claims Data.

209.     Exhibit 22 presents the same comparison using the Blue Shield data.[648] Again, I find that the Sutter Damage Hospitals are more expensive than the benchmark hospitals (*i.e.*, the

---

[647] With the exception of Sutter Santa Rosa, the qualitative pattern that the Sutter Damage Hospitals are more expensive than the benchmark hospitals is generally robust to other time periods and other measures of price. *See* Appendix G.

[648] *See* Appendix G for additional Blue Shield results: a tabular summary of results for the additional time periods 2011 to 2013 and 2014 to 2015, as well as year-by-year graphical comparisons of case-mix adjusted average prices.

red bars are always higher than the blue bars). The two exceptions are CPMC-St. Luke's and
Sutter Santa Rosa, where there is approximately no difference in this price measure between
those two hospitals and the benchmark of relatively large, non-rural, non-Sutter Northern
California hospitals with more than 144 beds. Generally, however, this comparison shows health
plans could save money—on the order of millions of dollars—if the Sutter Damage Hospitals
were priced more like the set of benchmark hospitals.

**Exhibit 22**
**Total Medical Expenditures for the Basket of Inpatient Services Performed at Each
Sutter Damage Hospital
Blue Shield Claims, 2008-2010**



*Note*: See notes for Exhibit 9A.

*Sources*:
1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2015.
2. Blue Shield California Claims Data.

### 4.    Overcharge Regression Analysis in the Damage Markets

210.    I now turn to a regression analysis of hospital price overcharges. I presented this
regression methodology in my Class and Class Reply Declarations, as they set forth a common

method for calculating overcharges that Sutter imposed on each of the Class Health Plans.[649] Here, I apply that methodology to claims data from all five Class Health Plans, to further assess impact and quantify the magnitude of overcharges imposed by Sutter.

211.     Specifically, I study price differences between each of the Sutter Damage Hospitals and a group of benchmark hospitals that in many ways resemble Sutter, except they have not imposed similar restrictions on health plans.[650] For this purpose, my analysis focuses on the Sutter hospitals in three Tied Markets (Sacramento, San Francisco, and Modesto) and the Berkeley-Oakland Tying Market, which is about three times as large, in terms of population, as the next-largest Tying Market.[651,652] I exclude from the overcharge analysis (and also the damage calculation) Sutter Santa Rosa because I am not able to reliably estimate a statistically significant overcharge for this Tied Hospital.[653] To the extent the challenged conduct caused overcharges at Santa Rosa or at any of the other Sutter Hospitals, the damages estimates I present below will be conservative.

212.     Furthermore, the fact that I do not present overcharge estimates for Sutter Santa Rosa (or include it in my damage calculation) does not in any way affect my opinion that Sutter's challenged conduct caused competitive injury to all or virtually all Class Members.[654] First, as I explained in my Class and Class Reply Declarations and elsewhere in this report, my

---

[649] Chipty Class Declaration, Section VII; and Chipty Reply Declaration, Section V.E.

[650] *See* Section IV.D.

[651] Chipty SJ Declaration, Exhibits 11C, 12C, 13C, 14C, 15C, 16C, and 17C (showing a population of 506,138 in the Berkeley-Oakland Tying Market and a population of 171,575 in the Antioch Tying Market, which is the Tying Market with the second-highest population).

[652] Measured as a multiple of Medicare, prices at the Sutter Damage Hospitals, excluding Sutter Santa Rosa, are higher than prices at non-Sutter Northern California hospitals. *See* Chipty Workpapers.

[653] In my Class Declaration, I presented statistically significant overcharge estimates for Sutter Santa Rosa, using Anthem data. However, I am not able to reliably estimate a significant overcharge for Sutter Santa Rosa, for any of the other Class Health Plans, using the same regression model. (*See e.g.*, Chipty Reply Declaration, Exhibit 17.)

[654] Santa Rosa represents a relatively small share (3.9 percent) of Class Health Plan inpatient spend at the Sutter Damage Hospitals: (a) about ▮ percent of Anthem's inpatient spend at the Sutter Damage Hospitals was at Sutter Santa Rosa; (b) about 4.5 percent of Blue Shield's inpatient spend at the Sutter Damage Hospitals was at Sutter Santa Rosa; (c) ▮ percent of Health Net's inpatient spend at the Sutter Damage Hospitals was at Sutter Santa Rosa; (d) ▮ percent of Aetna's inpatient spend at the Sutter Damage Hospitals was at Sutter Santa Rosa; and (e) 3.1 percent of Blue Shield's inpatient spend at the Sutter Damage Hospitals was at Sutter Santa Rosa. *See* Chipty Workpapers.

approaches to estimating overcharges and to calculating damages is conservative.[655] The overcharge estimates ignore the fact that Sutter's conduct has diminished other hospitals' incentives to lower prices and, as such, has placed upward pressure on benchmark prices. The damage analysis studies only in-network claims and, as such, ignores damages flowing from Sutter's use of the onerous non-par rates, which Class Health Plans had to pay from time-to-time. Moreover, Sutter's conduct foreclosed Sutter Santa Rosa's competitors because the challenged conduct precluded those competitors from servicing patient volume that otherwise would have been directed to them and away from Sutter Santa Rosa.

### a) Data

213.　My analysis relies upon claims data from all five Class Health Plans.[656] In each instance, I processed individual line-item level information for each claim associated with an inpatient stay at a California hospital, for a member of each of the Class Health Plans, either from 2006 to 2015 (Anthem, Blue Shield, and United) or from 2008 to 2015 (Health Net and Aetna). Staff working under my direction developed an approach to aggregating the line-items into claim-level information.[657]

214.　Using these data, I identified benchmark hospitals in Northern California that provide a broad range of hospital services on an inpatient basis, like the Sutter Damage Hospitals. To these data, I matched information on: (a) Diagnosis Related Groups ("DRGs") and DRG weights, a widely-used measure of resource intensity for inpatient care that is constructed by CMS;[658] and (b) hospital characteristics from OSHPD. The final analysis dataset consists of

---

[655] See, e.g., Chipty Declaration, ¶¶ 80 and 101; and Chipty Reply Declaration, Footnote 53.

[656] See Appendix H for a discussion of the processing of the Health Net, Aetna, and United claims data.

[657] I typically use the term "claim" to refer to an entire hospital stay. Dr. Willig attempts a similar roll-up, which he describes as an "episode." See Willig Declaration, ¶ 220. See also, Appendix H.

[658] As explained in my Class Declaration, a DRG is a categorization of inpatient medical services based on the nature of the disease or injury beating treated. It was created and is maintained by CMS. Each DRG is associated with a numeric weight that reflects the national "average hospital resource consumption" by patients for that DRG, relative to the national "average hospital resource consumption" of all patients. The most commonly used DRG classification system is provided by CMS. One would expect prices of services that are more resource intensive to be higher than prices of services that are less resource intensive. See Chipty Class Declaration, Footnotes 161 and 172.

the Sutter Damage Hospitals and hundreds of benchmark hospital-year observations, spanning the years 2006 to 2015.

### b) Price Measure

215.     Some of the claims data did not contain information describing the DRG associated with each inpatient stay. Absent information about the DRG—or at least the DRG weight—one cannot account for differences in case mix at the hospitals in each overcharge analysis. Blue Shield and Health Net claims data and a portion of the United claims data (from United's NICE data system[659]) did not contain DRG information.

216.     As I explained in my Class Reply Declaration, I assigned a DRG to each Blue Shield claim using the DRG grouper software from CMS that hospitals use in their ordinary-course for this purpose.[660] For most claims, the software only requires information on the diagnosis and ICD[661] procedure codes in order to assign a DRG, but for some claims, it is also necessary to know patient attributes such as patient age, gender, length of stay, and/or discharge status. The Blue Shield data contained all of the necessary input information, and it was possible to run the grouper to retrieve a DRG (and thus a DRG weight) associated with each Blue Shield claim.

217.     The Health Net claims data and a portion of the United NICE claims data, however, do not contain the necessary ICD procedure codes that the grouper software requires. While it is mechanically possible assign DRGs without procedure codes, this assignment will be inaccurate for many claims, particularly claims involving more resource intensive medical procedures. Examples of DRGs that require procedure codes for accurate assignment include surgical DRGs, such as DRG 001 ("heart transplant with major complication or

---

[659] United organizes their claims data in two different data systems: (a) the UNET data system, which contain information on United's PPO claims; and (b) the NICE data system, which contain information on United's HMO claims. Email from Kaitlyn Murphy, counsel for United, to David Brownstein, counsel for Sidibe Plaintiffs, "Subject: RE: Sidibe v. Sutter: United HealthCare data," October 17, 2018.

[660] Chipty Reply Declaration, ¶ 149.

[661] International Statistical Classification of Diseases and Related Health Problems ("ICD") is a categorization of medical diagnoses and procedures maintained by the World Health Organization. *See* World Health Organization, "International Classification of Diseases (ICD) Information Sheet," available at https://www.who.int/classifications/icd/factsheet/en/, *site visited* April 19, 2019.

comorbidity").[662] If the grouper software is implemented without using procedure codes, then the overall case mix for a given facility will tend to be biased downwards, because the grouper software will tend to incorrectly assign a DRG associated with a smaller DRG weight than it should.[663] To address this data issue, staff working under my direction developed an adjustment procedure to estimate the DRG weight.[664]

218.    The approach to imputing DRG weights was developed and validated using Blue Shield claims data, where it was possible to assign DRGs with the grouper software using: (a) all necessary inputs for the grouper; and (b) all necessary inputs for the grouper except procedure codes. Exhibit 23 shows the distribution of the difference between the estimated and actual DRG weight. This diagnostic highlights how well the imputation method performs: as seen here, the distribution is tightly centered around zero—meaning that the procedure generates a reliable, unbiased estimate of the true DRG weight.

---

[662] Davis, Elizabeth, "How Your DRG Is Determined," Verywell Health, December 4, 2018, available at https://www.verywellhealth.com/how-is-your-drg-determined-1738875, *site visited* April 19, 2019. *See also*, Chipty Workpapers.

[663] Chipty Workpapers.

[664] *See* Appendix I for a description of this estimation procedure.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit 23**
**Distribution of the Difference Between Predicted and Actual DRG Weights**
**Blue Shield Claims Data**



*Notes*:
1. Differences greater than two in magnitude are not displayed.
2. *See* Appendix I for a detailed description of the estimation procedure.
*Sources*:
1. Blue Shield Claims Data, 2008-2015.
2. CMS Grouper Software, Version 36.0.

c) Pooled Regression Model

219.    Using the data, I then estimate a series of separate hospital-level regressions to estimate overcharges at each Sutter Damage Hospital, by Class Health Plan. For convenience, Exhibit 24 shows a side-by-side comparison of the coefficient estimates and their 90 percent confidence intervals for the baseline in-sample regressions using prices from each of Anthem, Blue Shield, Health Net, Aetna and United. As seen here, the coefficients estimated from the separate regression models have the same expected signs in all of the models and most are significant at the same level.

220.    Further, the estimated coefficients across the Health Plans have substantially

overlapping confidence intervals—meaning that the effects of these control factors are statistically similar across the different regression models. Under these circumstances, it is more efficient, in a statistical sense, to jointly estimate the regression models, allowing for separate overcharge estimates but common coefficients on the other coefficient estimates.[665] Indeed, this is the same approach Dr. Willig adopted in his Declaration, where he also jointly estimated an overcharge model by pooling together claims data from Anthem, Aetna, and United.[666] In his model, Dr. Willig estimated a common set of hospital-level and claim-level coefficients for all three plans and included indicator variables separately for each plan.[667] I adopt the same approach here.

---

[665] Supporting documentation from SAS, a statistical software package used by researchers in economics, explains that under certain circumstances, researchers may gain precision by "pooling" or "stacking" datasets into one common data set. (*See* Taylor Lewis, "Estimation Strategies Involving Pooled Survey Data," Paper 767-2017, available at https://support.sas.com/resources/papers/proceedings17/0767-2017.pdf, site visited April 14, 2019 (hereafter "SAS Documentation"), p. 1 (explaining that "By 'pooled,' we mean two or more data sets combined (i.e., stacked) into one.") The documentation from SAS goes on to conclude, "Pooling two or more data sets together can increase the sample size and, thus, precision, but it changes the interpretation to mean the point estimate at or around the midpoint in time of the repeated survey administrations. This may be acceptable, or even preferred, depending on the context of the analysis and how much the underlying target population changes across the two or more time periods." *See* SAS Documentation, p. 14. *See also*, Wooldridge, Jefferey M., *Introductory Econometrics: A Modern Approach*, 4th Edition, Mason, OH: South Western Cengage Learning, 2009, p. 445 (explaining "By pooling random samples drawn from the same population, but at different points in time, we can get more precise estimators and test statistics with more power. Pooling is helpful in this regard only insofar as the relationship between the dependent variable and at least some of the independent variables remains constant over time. . . . Typically, to reflect the fact that the population may have different distributions in different time periods, we allow the intercept to differ across periods, usually years. This is easily accomplished by including dummy variables for all but one year, where the earliest year in the sample is usually chosen as the base year.").

[666] Willig Declaration, ¶ 223 and Tables 9 and 14-16.

[667] Willig Declaration, notes to Tables 9 and 14 ("This regression includes Plan-Type, Insurer, and DRG fixed effects. . . .") and Tables 15-16 ("All regressions include Plan-Type, Insurer, and DRG fixed effects. . . .").

**Exhibit 24**
**Comparison of Covariate Parameter Estimates and 90 Percent Confidence Intervals**
**Based on Models Estimated Separately by Class Health Plan**



Parameter Estimate

• Aetna   • Anthem   • Blue Shield   • HealthNet   • United

*Notes*:

1. Parameter estimates measure each variable's unit association with the log of mix-adjusted hospital price.

2. These estimates are based on in-network, fully-insured, commercial claims for each Class Health Plan occurring at the Sutter Damage Hospitals and benchmark hospitals in Northern California. *See* Appendices H and I for more detail on data processing.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data, 2006-2015.

2. Centers for Medicare & Medicaid Services (CMS) Impact Files and Hospital Compare Data, 2006-2015.

3. Anthem, Blue Shield, and United Claims Data, 2006-2015. Health Net and Aetna Claims Data, 2008-2015.

4. Google Maps Distance Matrix API.

5. National Bureau of Economic Research NPI to Medicare CCN Crosswalk.

d) Overcharge Estimates

221.    Exhibit 25 presents the in-sample overcharge percentages comparable to the estimates presented in my Class Declaration (for Anthem) and my Reply Class Declaration (for Blue Shield).[668] The overcharges are significant at the five percent level for all Sutter Damage Hospitals, for each of the Class Health Plans, with the exception of CPMC St. Luke's (for Anthem, Health Net, and United) and Sutter Modesto (for Health Net). The out-of-sample model also shows that Sutter Damage Hospitals significantly overcharged the Health Plans for the overwhelming majority of years during the damages period.[669]

---

[668] Chipty Class Declaration, ¶ 110; Chipty Reply Declaration, 151. The full set of overcharge estimates for my baseline model are shown in Appendix J.

[669] I probe the robustness of my overcharge estimates using an unpooled model that also includes Sutter Santa Rosa. I also probe the robustness of my Aetna overcharge estimates using a different approach to processing newborn delivery claims, which I describe below and in Appendix H. *See* Chipty Workpapers.

**Exhibit 25**
**Overcharge Estimates by Health Plan**



Notes:

1. Overcharge estimates which are not significant at the 5 percent level are displayed with transparency. This affects Anthem, Health Net, and United estimates at CPMC-St. Luke's, and the HealthNet estimate at Sutter Modesto.

2. *See* notes for Exhibit 24.

3. *See* Appendix J for the full set of in-sample and out-of-sample overcharge estimates from the baseline model.

*Source*: *See* sources for Exhibit 24.

222.    As I have explained before, my estimation of these overcharges—which is based on the difference between actual prices at a Sutter Damage Hospital and at the set of Northern California benchmark hospitals for in-network claims—is conservative for several reasons. First, the benchmark analysis does not account for the fact that benchmark prices would have been lower but-for the challenged conduct. As I have explained, Sutter's conduct has interfered with the competitive process and diminished incentives of other hospitals to lower prices. Hence, one should expect that in the but-for world (*i.e.*, absent the challenged restrictions), prices at the benchmark hospitals would be lower, because plans would likely have introduced more steered

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

products in Northern California, and hospitals would likely have competed more fiercely to participate as preferred providers in those steered products. Second, the benchmark analysis does not account for the effects of "umbrella pricing," a phenomenon that refers to a "copy-cat" scenario where market participants demand the same high prices as the firm engaging in the challenged conduct; there is evidence, described in different portions of this report and in my Class Reply Declaration,[670] that other hospitals are demanding higher prices because Sutter is able to charge higher prices. For both of these reasons, benchmark hospital prices are likely too high and as a result, the estimated overcharges (based on these inflated benchmark prices) are likely too low. Third, because the benchmark analysis focuses only on in-network claims, I do not measure the effect of Sutter's onerous non-par rate structure on health plans. Yet, the qualitative evidence shows that in instances where a health plan has attempted to exclude a Sutter hospital, the health plan has been required to pay close to billed charges for a member's out-of-network use of that Sutter hospital.

223.    Finally, I observe that the estimated overcharges are in line with the substantial qualitative documentary and testimony evidence in this case. The fact that both the quantitative and qualitative evidence align provides additional support for the regression model.

### 5.    Dr. Willig's Overcharge Regression Analysis Yields Non-Sensical Results that Are Contrary to the Substantial Body of Evidence

224.    I now turn to an assessment of Dr. Willig's overcharge regression model. In his Sur-Reply Declaration, Dr. Willig has criticized my overcharge regression model.[671] In an attempt to support his criticisms, he has presented an alternative set of overcharge regression models that modify features of my model, using data from Anthem, Blue Shield, Aetna, and United.[672] Broadly speaking, Dr. Willig's criticisms of my model fall into one of two categories:

- First, Dr. Willig criticizes me for estimating a hospital-level regression model, instead of using more disaggregated data at the claim-level.[673] Dr. Willig bases this

---

[670] Chipty Reply Declaration, ¶¶ 10, 111 and Appendix D (reattached to this report as Appendix F), (at p. F-5).

[671] Willig Sur-Reply Declaration, ¶¶ 24-34.

[672] Willig Sur-Reply Declaration, ¶¶ 29-30 and 34.

[673] *See, e.g.*, Willig Sur-Reply Declaration, ¶ 25.

argument on an assertion that hospital-level case mix adjusted prices are inherently unreliable for analyzing prices across hospitals.[674] Dr. Willig modifies my hospital-year level regression models by estimating his own regression models that rely on claim-level data.[675,676]

- Second, Dr. Willig criticizes the set of hospital-level covariates that I include in my regression model.[677] In his Sur-Reply Declaration, Dr. Willig modifies my set of hospital-level covariates by: (a) replacing the number of competitor indicator variables with a hospital-specific measure of the Hirschman-Herfindahl Index ("HHI") that he constructed; (b) adding the log of hospital system assets; and (c) adding hospital operating expenditures divided by beds.[678]

Using his alternative models, Dr. Willig claims to show my model artificially finds overcharges where there are none, and his results imply that Sutter prices are no higher— and in some instances lower—than prices at other Northern California hospitals.

225.     There are several problems with Dr. Willig's analysis and arguments. First, inspection of Dr. Willig's estimates shows that his conclusions are not supported by the ordinary-course evidence from health plans and Sutter itself identifying Sutter's higher prices. According to Dr. Willig's estimates, Sutter's prices at Anthem, Blue Shield, and United are not statistically significantly different than the benchmark hospitals' prices, and Sutter's prices at Aetna are statistically significantly *lower than* the benchmark hospitals' prices. However, his estimates are inconsistent with substantial evidence that Sutter's prices are higher, despite Sutter having quality that is average or no better than competitors.

---

[674] Willig Declaration, ¶¶ 194-195 and 199-205; and Willig Sur-Reply Declaration, ¶ 25.

[675] Willig Declaration, ¶ 198; and Willig Sur-Reply Declaration, ¶¶ 27-28 and Exhibits 8 and 11.

[676] Dr. Willig incorporates the following encounter-level variables in his regression analyses: (a) fixed effects for the DRG associated with the encounter; (b) log of the patient's age; (c) log of the patient's age, squared; (d) an indicator for the patient having an age of zero; (e) log of the length of stay; (f) log of the length of stay, squared; (g) an indicator for the patient being male; and (h) fixed effects for the plan type of the patient. (Willig Declaration, ¶ 215; and Willig Sur-Reply backup production.)

[677] Willig Declaration, ¶¶ 209-210.

[678] Willig Declaration, ¶ 215; and Willig Sur-Reply Declaration, ¶ 27.

226.     Second, Dr. Willig's decision to drop variables that measure the number of competitors facing each hospital, in favor of his constructed HHI variable, suffers from serious problems.[679] His preferred measure of competition is based on discharge volumes at Sutter and non-Sutter hospitals that are affected by Sutter's challenged conduct. If health plans had been permitted to deploy innovative, lower-cost steered products in Northern California, other hospitals may have been able to attract more volume, by competing on price. Dr. Willig's preferred measure of competition does not account for this fact. Further, his preferred measure does a poor job at capturing the effects of competition: as shown below, Dr. Willig's "Hospital HHI" variable does not have a statistically significant effect on prices in most of his models. By contrast, my number of competitors variables robustly capture the effect of the competitive landscape on hospital price, as I explain in more detail below.

227.     Third, Dr. Willig's regression model generates other non-sensical patterns. For discussion, Exhibit 26 exposes Dr. Willig's estimates from the version of his regression model where he includes both claim- and hospital-level variables in one model—what I refer to as his "one-stage model." Each column of Exhibit 26 reports estimates using data from a different plan. In Exhibits 8 and 11 of his Reply Declaration, Dr. Willig displays the estimates from the "Sutter Overcharge Percent" row in my Exhibit 26, but he does not display the rest of the regression estimates in his report. As seen here, Dr. Willig estimates that the effect of competition on hospital prices (as reflected in the coefficient estimate on his "Hospital HHI" variable) is not statistically significant. In other words, Dr. Willig's model generates the non-sensical implication that competition does not lead to lower hospital prices. Dr. Willig also estimates that prices at teaching hospitals are no higher than, or *even less than*, prices at non-teaching hospitals, despite considerable evidence to the contrary. Further, two of the variables that Dr. Willig insists on including in the regression—a measure of a hospital system's assets and hospital operating

---

[679] In my Class and Reply Declarations, I recognized that there are different ways to control for the characteristics of the competitive landscape, and I myself attempted to test the sensitivity of my baseline model using a measure of HHI. However, I note that my baseline and sensitivity analyses generally showed statistically significant effects of competition; had they not, that would have been symptomatic of a problem with the proposed measure. Dr. Willig ignores this symptom. *See* Chipty Class Declaration, footnote 208; and Chipty Reply Declaration backup production.

expenditures—are associated with estimated effects that are generally not statistically significant. I describe these patterns in more detail below.

228.    In addition to estimating a one-stage model, Dr. Willig also estimates what he describes as a "two-stage regression procedure."[680] Dr. Willig describes the results of his two-stage model as qualitatively similar to his one-stage model.[681]

---

[680] In the first stage of this procedure, Dr. Willig uses claim-level data to estimate hospital-year level fixed effects, after controlling for the claim-level variables that he includes in his analyses. In the second stage, Dr. Willig regresses the hospital-year level fixed effect estimates on his hospital-level variables, including a Sutter Damage Hospital indicator variable. For each health plan, Dr. Willig estimates two versions of his two-stage model: (a) one where he weights the second stage using the number of discharges for that hospital-year; and (b) one where he does not weight the second stage. (*See* Willig Sur-Reply Declaration, ¶¶ 26-28, footnote 29, and Exhibit 8.) For Blue Shield, Dr. Willig also estimates versions of his two-stage model where he limits the data to 2010-2015. *See* Willig Sur-Reply Declaration, ¶ 31 and Exhibit 10.

[681] Willig Sur-Reply Declaration, ¶ 29 and Exhibit 11.

**Exhibit 26**
**Dr. Willig's One-Stage Overcharge Regression Estimates**

| Explanatory Variables | Anthem | Blue Shield | Aetna | United |
|---|---|---|---|---|
| Wage Index | | 0.909*** | | |
| Major Teaching | | -0.083 | | |
| Trauma Level 1 or 2 | | 0.105 | | |
| % Rating Hospital 9 or 10 | | -0.003 | | |
| Log of System Beds | | -1.146*** | | |
| Log of System Beds, Squared | | 0.074*** | | |
| Hospital HHI | | -0.004 | | |
| Log of System Assets | | 0.093 | | |
| Hospital Op Ex / Hospital Beds | | 0.000 | | |
| | | | | |
| Log of Age | | 0.059 | | |
| Log of Age, Squared | | -0.012 | | |
| Age = 0 Indicator | | 0.109* | | |
| Log of Length of Stay | | 0.413*** | | |
| Log of Length of Stay, Squared | | 0.117*** | | |
| Male Indicator | | 0.009 | | |
| | | | | |
| Year 2007 | | 0.128*** | | |
| Year 2008 | | 0.264*** | | |
| Year 2009 | | 0.280*** | | |
| Year 2010 | | 0.513*** | | |
| Year 2011 | | 0.472*** | | |
| Year 2012 | | 0.521*** | | |
| Year 2013 | | 0.548*** | | |
| Year 2014 | | 0.514*** | | |
| Year 2015 | | 0.524*** | | |
| | | | | |
| Sutter Overcharge Percent | | 0.133 | | |
| | | | | |
| DRG Fixed Effects? | | Yes | | |
| Product Type Fixed Effects? | | Yes | | |
| Observations | | 257,959 | | |
| Adjusted R-Squared | | 0.756 | | |

*Note*: Asterisks *, **, *** represent statistical significance at ten percent, five percent, and one percent levels, respectively.

*Source*: Willig Sur-Reply Declaration backup production.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     215

229.    In the remainder of this subsection, I explain how Dr. Willig's criticisms are either exaggerated or unsupported. I expose flaws in his work and show that his own analytical approaches demonstrate impact and generate large, statistically significant overcharge estimates, once an appropriate set of hospital-level control variables are used in the analysis.

a)  Dr. Willig's Estimates Are Contrary to a Substantial Body of Evidence in This Case

230.    It is well-understood by practitioners that once the econometric model is specified and estimated, one must subject the results to a series of sanity checks to assess the reliability and robustness of the estimates.[682] For example, one checks the signs of the estimated coefficients to see if they are consistent with economic principles and industry facts. In each of my reports, I confirmed that my overcharge regressions passed this sanity check.[683] Dr. Willig apparently agrees with me, at least in principle, when he writes that "it is important for an economist to perform sanity checks on econometric findings."[684] However, he has not performed the same sanity checks. Had he done so, he would have found that his model fails to comport with evidence in this case and basic economic theory.

231.    As I explained above in Section IX.B.1, there is substantial ordinary-course evidence and deposition testimony that Sutter's prices were significantly higher than other Northern California hospitals during the Class Period. This evidence is consistent with empirical analyses that I presented showing that Sutter's prices at the Damage Hospitals are substantially higher than other Northern California hospitals.[685]

---

[682] American Bar Association, *Proving Antitrust Damages*, Chapter 6 "Econometrics and Regression Analysis," pp. 190-191 ("Once the econometric model is specified and estimated, one must subject the results to a series of sanity checks and another series of statistical tests to assess the reliability and robustness of the estimates. The starting place is typically examining the sign and statistical significance of the coefficients. If, for example, the coefficient on cost in a price regression is negative and statistically significantly different from zero (or very small and/or not significantly different from zero), this would cast doubt on the reliability of the model, since one would normally expect cost to have a positive effect on price." (footnote omitted.))

[683] *See, e.g.,* Chipty Class Declaration, ¶¶ 108-109 and Exhibit 13 ("Thus, these regression results pass the basic sanity checks one typically performs with regression output."); Chipty Reply Declaration, ¶ 150 and Exhibit 16; and Section IX.B.4, above.

[684] Willig Reply Report, ¶ 185.

[685] *See, e.g.,* Chipty Class Declaration, Exhibit 10.

232.    Evidence also indicates that Sutter's higher prices are not justified by Sutter's quality. For example:

- As I explained in my prior declarations, none of the Sutter Damage Hospitals are teaching hospitals and only one of them is a designated Trauma Level 1 or 2 facility for all years from 2006-2015.[686]

- As described in ordinary-course evidence and testimony, Class Health Plans note that other hospitals have lower prices with equal or higher than Sutter's quality.[687]

- Sutter's own employees recognize that Sutter's quality is not consistently higher than other Northern California hospitals and that its quality could not justify its higher prices.[688]

- I understand that Dr. Kenneth Kizer, an expert in hospital quality retained by Plaintiffs, has concluded that "[i]n comparison to other hospitals in individual geographic service areas, higher quality of care is not a differentiating factor for Sutter Health that would justify higher prices for hospital care."[689]

233.    Contrary to this substantial body of evidence, Dr. Willig estimates that prices at the Sutter Damage Hospitals are no higher than—and in some instances *lower than*—prices at Northern California benchmark hospitals. Dr. Willig offers no explanation to reconcile his

---

[686] In addition, another Sutter Damage Hospital was a designated Trauma Level 1 or 2 facility for only one year between 2006-2015. *See* Chipty Class Declaration, ¶ 101 and Exhibit 12.

[687] *See, e.g.,* Chipty Reply Declaration, ¶ 36.

[688] *See, e.g.,* Chipty Reply Declaration, ¶¶ 35, 113 and Appendix C (reattached to this report as Appendix E).

[689] Kizer Report, ¶ 17 and §V.D. To reach this conclusion, Dr. Kizer compares the results of a number of quality measures for Sutter Tied Hospitals and other hospitals in the same geographic service areas. For example, Dr. Kizer analyzes the CMS Hospital Compare star ratings for Sutter and non-Sutter hospitals in Northern California and finds that the average star ratings for the Sutter Tied Hospitals and non-Sutter hospitals in the same geographic service area "are relatively comparable, with the non-Sutter comparison hospital(s) rating somewhat higher in some instances and somewhat lower in others." (¶ 60) Dr. Kizer also finds that comparisons of other outcome measures demonstrate "Sutter and non-Sutter hospitals, in the aggregate, are not notably different, although non-Sutter hospitals more often had higher scores than Sutter hospitals." (¶ 63) Further, Dr. Kizer notes that "a comparison of average Leapfrog Group Hospital Safety Grade for the Sutter tied hospitals and non-Sutter hospitals in the same geographic service area" shows that "the non-Sutter hospitals rate higher in most cases," and, on still other quality measures, Dr. Kizer finds that "Sutter hospitals do not score consistently higher." (¶¶ 67, 69) Thus, he concludes: "In comparison to non-Sutter hospitals, higher quality of care is not a differentiating factor that would justify higher prices for Sutter hospital care." (¶ 73)

estimates with the vast body of evidence indicating that: (a) Sutter's prices are higher than other Northern California hospitals; and (b) this price premium is not explained by Sutter having higher quality.

234.     Other estimates from Dr. Willig's regression model, displayed above in Exhibit 26, also fail basic sanity checks. As I explained above, *Dr. Willig's measure of hospital competition (his "Hospital HHI") is not statistically significantly related to allowed amount.* His result nonsensically suggests that hospital prices are independent of competition from other hospitals, something that is contradicted by many hospital studies in different parts of the country as well as evidence in this case.[690] By contrast, my overcharge regression model accounts for competition among hospitals using a different set of control variables, as I explain in more detail below, and finds statistically significant negative effects of competition on hospital prices (*i.e.* lower prices for hospitals that face more competition).

235.     Another example is that *Dr. Willig estimates that major teaching hospitals charge the same prices or lower prices, relative to non-teaching hospitals.* For his Aetna regression, Dr. Willig estimates a negative, statistically significant effect such that major teaching hospital prices are 36 percent lower than non-teaching hospital prices.[691] However, academic research and industry studies demonstrate that major teaching hospitals generally charge higher prices relative to non-teaching hospitals.[692] By contrast, my regression model finds that prices at major teaching hospitals are higher than non-teaching hospitals. (*See* Exhibit 24, above.)

---

[690] Dr. Willig himself cites multiple academic articles that find a positive, statistically significant relationship between hospital concentration and prices among California hospitals. (Melnick, Glenn and Emmett Keeler, "The effects of multi-hospital systems on hospital prices," *Journal of Health Economics*, Vol. 26, 2007, pp. 400-413, at pp. 410-411; and Keeler, Emmett, Glenn Melnick, and Jack Zwanziger, "The changing effects of competition on non-profit and for-profit hospital pricing behavior," *Journal of Health Economics*, Vol. 18, 1999, pp. 69-86, at p. 79.) *See also*, Haas-Wilson, Deborah and Christopher Garmon, "Hospital mergers and competitive effects: two retrospective analyses," *International Journal of the Economics of Business*, Vol. 18, No. 1, 2011, pp. 17-32; and Section VI.C, above.

[691] Because the model uses the natural log of allowed amounts, the percent difference for major teaching hospitals is approximated as $100 * (e^{-0.444} - 1) = -36$, where -0.444 is Dr. Willig's coefficient estimate for the major teaching hospital indicator variable in his Aetna one-stage regression.

[692] Keeler, Emmett, Glenn Melnick, and Jack Swanziger, "The changing effects of competition on non-profit and for-profit hospital pricing behavior," *Journal of Health Economics*, Vol. 18, 1999, p. 78; and Frakt, Austin, "Teaching Hospitals Cost More, but Could Save Your Life," *The New York Times*, June 5, 2017, available at https://www.nytimes.com/2017/06/05/upshot/teaching-hospitals-cost-more-but-could-save-your-life.html, *site visited* April 15, 2019.

b) Dr. Willig's Sweeping Criticism of Case-Mix Adjusted Prices Is Still Exaggerated and Untrue

236.     In my Reply Declaration, I explained that there are inherent tradeoffs between estimating a regression model using disaggregated data (*e.g.*, at the encounter-level) and using aggregated data (*e.g.*, at the hospital-year level).[693] I also explained that industry participants and academic economists use case mix adjusted prices in their analyses of hospitals.[694] In fact, Dr. Willig himself cites work by economists who have published academic articles in recent years in leading economics journals that use case-mix adjusted prices.[695]

237.     Despite these facts, in his sur-reply declaration, Dr. Willig continues to argue that the use of case-mix adjusted prices renders my results unreliable.[696] He apparently bases his assertion on a theoretical illustrative example, in which two hospitals perform different mixes of DRGs, and these DRGs have different prices per DRG weight.[697] However, in Exhibit 21 and Exhibit 22 above, I demonstrated that the Sutter Damage Hospitals have substantially higher prices than benchmark hospitals—even when the mix of DRGs is held constant across hospitals.

238.     In my Reply Declaration, I explained that analyzing disaggregated data may increase the risk that a model is mis-specified, meaning that the model is inadequate to explain the variation in the outcome variable of interest (*e.g.*, hospital prices).[698] I also explained that Dr. Willig's claim-level regressions suffer from misspecification error, because his models do not capture the variability of within-hospital and cross-hospital price variation at the claim-level.[699] As Dr. Willig himself recognizes:[700]

"[H]ospital services are sometimes paid on a per diem, percent of charges, or case-rate basis that does not imply a relationship to DRG-weight. Moreover, other contract terms such as stop-loss may bind and render the relationship between an inpatient visit and a

---

[693] Chipty Reply Declaration, ¶¶ 124-128.
[694] Chipty Reply Declaration, ¶ 121.
[695] Chipty Reply Declaration, ¶ 121.
[696] Willig Sur-Reply Declaration, ¶ 25 and Footnote 28.
[697] Willig Sur-Reply Declaration, Exhibit 7.
[698] Chipty Reply Declaration, ¶¶ 124-128.
[699] Chipty Reply Declaration, ¶¶ 125-128.
[700] Willig Declaration, ¶ 200.

case rate irrelevant. Also, the pricing methodology between insurance carriers and providers varied across insurance carriers and over time."

In other words, the formula that determines how much a health plan pays for a given claim will vary across DRGs, across hospitals, and over time. For example, in 2012, Anthem paid Sutter on a per diem basis for DRG 392 (meaning that the payment depended on the patient's length of stay) and on a case rate basis for DRG 775 (meaning that the payment was independent of the patient's length of stay).[701] Further, payment mechanisms can and do vary across hospitals and across time.[702] Rather than accounting for these relationships, Dr. Willig instead bakes into his model an invalid assumption that the effect of length of stay on allowed amount is the same for all DRGs, all hospitals, and over all years that he analyzes.[703]

239.    Despite this misspecification error in Dr. Willig's regression, below I present analyses that demonstrate that—even when estimating Sutter's overcharge using Dr. Willig's approach of analyzing claim-level data—his model (when corrected for other problems) nevertheless generates large, statistically significant overcharges.

c)    Dr. Willig Lacks Support for Adding System Assets as a Control Variable in His Regression

240.    In his Declaration, Dr. Willig added a measure of system assets to my set of hospital-level variables, and he cited a single article to justify his modelling decision.[704] In my

_____

[701] Chipty Reply Declaration, ¶ 127 and Exhibit 11. DRG 392 is associated with esophagitis, gastrointestinal, and miscellaneous digestive disorders without complications. DRG 775 is associated with vaginal delivery without complications.

[702] See, e.g., Brendt (Sutter) Declaration, ¶¶ 22-25 ("Starting with United and Health Net, Sutter agreed in 2005 to pilot the use of case rates for certain inpatient services. Rather than being based on the number of days in the hospital (per diem), the case rate is an all-inclusive rate for a particular procedure, regardless of the length of stay. … The transition to using these case rates proceeded in stages for different vendors. For example, in 2005, Sutter piloted the use of case rates with Health Net at two hospitals and with United Healthcare at four hospitals. The following year, Sutter piloted these case rates with Aetna at three hospitals. … By 2008, most Sutter hospitals had implemented case rates for many inpatient procedures and for most network vendors. But exceptions remained. … With the exception of the Rural Hospitals, during contract amendments and renewals with the major network vendors, Sutter has continued to add more inpatient services to case rates over the years. In addition to differences in timing, the amount of the negotiated case rates also varied across network vendors and across hospitals.").

[703] More formally, Dr. Willig assumes that the relationship between (a) the log of the allowed amount paid for a given encounter and (b) the log of the length of stay and log of the length of stay squared for that same encounter is the same across encounters that he analyses, for a given plan.

[704] Willig Declaration, footnote 279.

Reply Declaration, I pointed out that the authors of that article did not control for system assets, rather they controlled for the hospital's capital ratio (defined as assets divided by operating expenditures).[705] Further, I explained that my regression model already accounted for system beds, which captures the size of a hospital system (including its system assets).[706] Rather than adopting the variable that the authors actually used in the article that he cited (capital ratio), Dr. Willig instead decided to respond to my Reply Declaration by adding yet another variable (operating expenditures per bed) in addition to systems assets, and he provided no justification for this decision.[707]

241.    It is unclear why Dr. Willig insists on including a measure of system assets in his models. *His estimate of the effect of his system assets variable on allowed amount is not statistically significant in all four of his one-stage models, and his estimated effect of the operating expenditures per bed variable is only statistically significant in one of his four one-stage models (see Exhibit 26, above).*[708] Further, the correlation between the system beds and system assets variables that Dr. Willig includes in his analysis is around 0.9,[709] indicating that these two variables are highly correlated; as such, the addition of system assets is not likely to add much explanatory power to the model.

242.    In fact, guidance provided in econometrics textbooks suggests that Dr. Willig *should not* include his measure of system assets in the regression. Variance Inflation Factor ("VIF") is a statistic that econometricians compute to assess whether a given explanatory variable is so correlated with the other explanatory variables in the model that inclusion can lead

---

[705] Chipty Reply Declaration, ¶ 147; and Keeler, Emmett. B., Glen Melnick, and Jack Zwanziger, "The Changing Effects of Competition on Non- Profit and For-Profit Hospital Pricing Behavior," *Journal of Health Economics*, Vol. 18, pp. 69-86, pp. 73-74.

[706] Chipty Reply Declaration, ¶ 147.

[707] Willig Sur-Reply Declaration, ¶ 27.

[708] In addition to the one-stage model estimates that are displayed in Exhibit 26 above, Dr. Willig also estimated analogous two-stage regressions for each of the four plans. For each plan, he estimated two versions of his two-stage procedure: weighted and unweighted. Dr. Willig's estimated effect of log of system assets on log of price was not statistically significant in three of these eight two-stage regressions, and his estimated effect of operating expenditures per bed on log of price was not statistically significant in five of these eight two-stage regressions. *See* Chipty Workpapers.

[709] Because Dr. Willig includes the log of system beds and the log of system assets in his regression models, the correlation was calculated using the logs of system beds and system assets. *See* Chipty Workpapers.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     221

to unstable estimates.[710] Although there is no consensus on how high a VIF must be in order to raise concern, some authors suggest that a VIF in excess of five or 10 is concerning.[711] Across Dr. Willig's one-stage models, the VIF for his system assets variable always exceeds 10 and in some instances exceeds 15.[712] This provides further evidence that Dr. Willig does not have support for including a measure of system assets.

> d) Dr. Willig's Processing of Blue Shield, Aetna, and United Claims Data Is Unreliable

243.    In addition to the modeling flaws that I described above, Dr. Willig also incorrectly processed the claims data produced by Blue Shield, Aetna, and United for his sur-reply declaration analyses. (Dr. Willig does not present any analysis of Health Net claims data and relies on my processing of the Anthem data.) These errors are distinct from the errors that I identified in my Reply Declaration, which concerned Dr. Willig's processing of the Aetna and United claims data that were used in his reply declaration.[713]

- *Blue Shield*: Dr. Willig's Blue Shield data processing relies on a field which, according to correspondence with Blue Shield, ██████████████. Blue Shield confirmed in a November 30, 2018 letter that ██████████████████████

   ███████████████████████████████████████████████████████

   ███████[714] One can derive the correct hospital price, as I have done, by instead summing the claim-level amount paid by Blue Shield with the claim-level amount

---

[710] Kennedy, Peter, *A Guide to Econometrics*, 2nd Edition, Cambridge MA: MIT Press, 1989, p. 153 ("The inverse of the correlation matrix is also used in detecting multicollinearity. The diagonal elements of this matrix are called variance inflation factors, $VIF_i$. They are given by $(1 - R_i^2)^{-1}$ where $R_i^2$ is the $R^2$ from regressing the independent variable on all the other independent variables. A high VIF indicates an $R_i^2$ near unity and hence suggests collinearity. As a rule of thumb, for standardized data a $VIF_i > 10$ indicates harmful collinearity.").

[711] *Id.*; and Studenmund, A. H., *Using Econometrics: A Practical Guide*, 3rd Edition, Reading, MA: Addison-Wesley, 1997, pp. 274-276 ("[A] common rule of thumb is that if [the VIF statistic] > 5, the multicollinearity is severe.").

[712] Chipty Workpapers.

[713] Chipty Reply Declaration, ¶¶ 137-143.

[714] Email from Scott Perlman to Christopher Spiers, "Blue Shield Written Responses to Sutter August 27 Data Questions," November 30, 2018, and Attachment, "Blue Shield Written Responses to Sutter August 27 Data Questions.docx," November 30, 2018.

owed by the patient.[715] For example, according to Sutter Health's contract with Blue Shield, the 2015 ▮▮▮▮▮ price for a drug-eluting stent at an Alta Bates hospital was $▮▮▮▮.[716] Claim number 20151000297300 in the Blue Shield data describes a drug-eluting stent provided at an Alta Bates hospital, but Dr. Willig uses the claim-level allowed amount of $▮▮▮▮ in his data processing.[717] The claim-level paid amount, however, is $▮▮▮▮, with zero patient liability; the calculated price I rely on therefore matches Blue Shield's contract exactly.[718]

- *Aetna*: Dr. Willig's analysis of the Aetna data fails to correctly calculate prices for newborn deliveries. In Aetna's claims data, contracted amounts for newborn deliveries at Sutter hospitals frequently split across two claims: one for the mother and another for the child.[719] Treating these as two separate claims in a price calculation is inaccurate and will not produce prices which match Sutter's Aetna contracts. As detailed in Appendix H, I calculate prices for delivery claims at Sutter hospitals that incorporate contract provisions, including separate instructions for claims involving newborn stays at neo-natal intensive care units.[720] Exhibit 27 below shows examples of the incorrect prices used by Dr. Willig in his Aetna data processing, alongside the corrected price I rely on and the price reported in Sutter's Aetna contracts.

---

[715] Chipty Workpapers.

[716] *See* Blue Shield, "2015 Blue Shield of California and Sutter Health Systemwide Agreement," February 1, 2015, BSC_UFCW0001143-609, at 224.

[717] Chipty Workpapers.

[718] Chipty Workpapers.

[719] Chipty Workpapers.

[720] *See, e.g.*, Second Amendment to Aetna and Sutter Health Systemwide Agreement, STCA0024672-876, at 747.

**Exhibit 27**
**Examples of Maternity Prices in Aetna Claims**
**Based on Dr. Willig's Aetna Data Processing**

| Episode ID | Service Year | Service Date | Facility | Willig Allowed Amount | Corrected Allowed Amount | Contract Allowed Amount | Contract Delivery Type |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

*Sources*:

1. United Claims Data, 2008-2015.

2. Aetna and Sutter Health, "Aetna Current Agreement," February 1, 2008, STCA0199749-984.

3. Aetna and Sutter Health, "Aetna and Sutter Health Systemwide Amendment," January 22, 2010, STCA0024672-876.

- *United*: Dr. Willig assigns DRG weights to claims without necessary information regarding the procedures performed on the patient.[721] As explained above, United's NICE data does not contain complete DRG information, nor does it contain the underlying inputs to accurately estimate DRGs using grouper software. My review of the procedure Dr. Willig uses shows that his estimation procedure systematically underestimates the case mix for services provided at a given hospital, and biases corresponding price calculations. As I explained, staff working under my direction developed an adjustment methodology to adjust the estimated case mix index to remove systematic bias.

---

[721] Dr. Willig's programming attempts to assign DRGs using Current Procedural Terminology (CPT) procedure codes, rather than the International Classification of Disease (ICD) procedure codes required by the software. This yields equivalent results to omitting procedure codes from the programming.





**Exhibit 28**
**Comparative Accuracy of Dr. Willig's Case Mix to Adjusted Case Mix**
**Calculated Using United NICE Claims with Available DRGs**

*Notes*:
1. Differences greater than 2.5 in magnitude are not displayed.
2. *See* notes in Exhibit 23.
*Sources*:
1. United NICE Claims Data, 2008-2015.
2. CMS DRG Grouper Software, Version 36.0.

To illustrate the importance of this point, I present a diagnostic comparing the relative accuracy of Dr. Willig's and my procedure for imputing DRG weights over a set of United claims where DRG information is available. Exhibit 28 above illustrates the comparative accuracy of Dr. Willig's assigned case mixes to the adjusted case mixes upon which I rely: (a) the orange distribution shows the difference between Dr. Willig's estimated DRG weight and the actual DRG weight; (b) the blue distribution shows the difference between my estimated DRG weight and the actual DRG weight; and (c) the green line marks zero error in case mix estimation. As seen here, Dr. Willig's case mix methodology is higher-variance (showing a "fatter" or "wider" distribution), downward-biased (*i.e.* the "center" is to the left of the zero-error line), and skewed left (*i.e.* showing more values to the left of the "peak"), whereas my methodology yields a tighter distribution that is centered around zero and less skewed. This diagnostic shows that Dr. Willig's DRG

assignment is unreliable, which implies that the overcharge estimates which depend
on it are also unreliable.

My analysis corrects for Dr. Willig's various data processing errors.[722] These corrections are
described in greater detail in Appendices H and I.

> e)  Dr. Willig's Claim-Level Regressions Demonstrate Impact and Large,
> Statistically Significant Overcharges Once an Appropriate Set of Hospital-
> Level Variables Are Used

244.    I now assess the robustness of Dr. Willig's finding of lack of impact and damages,
by correcting his data processing errors and addressing the specification problems I described
above. For this purpose, I follow Dr. Willig's approach of estimating a common Sutter
overcharge across all Sutter Damage Hospitals and years. I also adopt Dr. Willig's processed
Anthem data and use my own processed Blue Shield and Aetna data, which avoid the errors in
Dr. Willig's processing that I described above. I estimate the Sutter overcharge using: (a) the
variables in my preferred specification; (b) the variables in my preferred specification and adding
Dr. Willig's Hospital HHI; and (c) the variables in my preferred specification and adding Dr.
Willig's Hospital HHI and his capital ratio variable. I vary the procedure with which I estimate
the Sutter overcharge to be: (a) my hospital-level regression model; (b) Dr. Willig's one-stage
regression model; (c) Dr. Willig's two stage regression model (weighted); and (d) Dr. Willig's two
stage regression model (unweighted).

245.    The results of these analyses are summarized in Exhibit 29, for Anthem, Blue
Shield, and Aetna. It is not possible to estimate Dr. Willig's estimation procedure for Health Net
and United, because claims data from these health plans did not contain information sufficient to
identify DRGs for all claims, which is a required input for Dr. Willig's models. (The imputed
DRG weights, which I describe above and have utilized in my regression analysis, enable
hospital-level estimation, but not claim-level estimation controlling for DRG fixed effects, as Dr.

---

[722] Specifically, to process Aetna claims, I correct the treatment of newborn deliveries performed at Sutter hospitals, based on information in Sutter's contracts. To process United claims, I incorporate information from the separate UNET and NICE claims databases, and I adjust DRG weight information when either DRGs are not reported by United or the claims data do not contain ICD procedure codes. To process Health Net claims, I apply the same DRG weight adjustment, and exclude claims with a non-zero "adjustment amount."

Willig advocates.) Also omitted from the analysis presented in Exhibit 29 is Sutter Santa Rosa from the estimation, as I have done in my affirmative overcharge regression model.

246.    Each cell in Exhibit 29 displays the common Sutter overcharge from a distinct regression model, where each model is estimated with a different combination of variables and a different estimation procedure:

- Panel [A] of Exhibit 29 reports estimated Sutter overcharges when the regression models use my set of hospital-year level variables;

- Panel [B] reports estimated Sutter overcharges when Dr. Willig's HHI variable is added as an explanatory variable to my set; and

- Panel [C] reports estimated Sutter overcharges when Dr. Willig's HHI variable and capital ratio are added as explanatory variables to my set.

Each panel consists of four rows. The first row of each panel displays results when the regression is estimated at the hospital-year level, using the log of case mix adjusted price as the dependent variable. The first row of Panel [A] thus uses my hospital-year level variables and my approach of estimating the regression at the hospital-year level.[723] The second, third, and fourth rows of each panel display results when Dr. Willig's one-stage, two-stage weighted, and two-stage unweighted models are used to estimate the overcharge, respectively; the only difference in regression specification between Dr. Willig's model and the model estimated in these rows is the set of hospital-level variables that are used.

247.    *The results strongly support a conclusion of impact and damages.* The estimated Sutter overcharge is positive and statistically significant for: (a) all 12 of the regressions that use Anthem data; (b) all 12 of the regressions that use Blue Shield data; and (c) six of the 12 regressions that use Aetna data—which is the plan that has by far the fewest encounter-level

---

[723] The first row of Panel [A] differs from the results that I displayed above in Exhibit 25 in that: (a) a single Sutter overcharge indicator variable is estimated, instead of Sutter Damage Hospital-specific overcharge indicator variables; (b) the model is estimated separately by plan—the approach Dr. Willig took in his Sur-Rebuttal Declaration—rather than estimating the model pooling across plans; and (c) the regression dataset drops a small number of claims that Dr. Willig filters from his analysis (where length of stay is zero days or age is negative). *See* Chipty Workpapers.

observations amongst the three plans analyzed here.[724] In addition, if the overcharges in each row are estimated in a single regression after pooling the three plans' datasets together—which as I explained above will increase the efficiency of the estimation—then the estimated Sutter overcharge is positive and statistically significant for: (a) all 12 of the overcharge coefficients at Anthem; (b) all 12 of the overcharge coefficients at Blue Shield; and (c) 11 of the 12 overcharge coefficients at Aetna.[725]

**Exhibit 29**
**Estimates of a Single Sutter Overcharge Indicator, across a Variety of Model Specifications**

| Model and Variable Selection | Anthem | Blue Shield | Aetna |
|---|---|---|---|
| **Panel [A]: Chipty's Hospital-Level Variables** | | | |
| Hospital-Year Model | | 56% *** | |
| Willig's One-Stage Model | | 21% *** | |
| Willig's Two-Stage Model (Weighted) | | 26% *** | |
| Willig's Two-Stage Model (Unweighted) | | 42% *** | |
| **Panel [B]: Chipty's Hospital-Level Variables + Willig's HHI** | | | |
| Hospital-Year Model | | 54% *** | |
| Willig's One-Stage Model | | 21% *** | |
| Willig's Two-Stage Model (Weighted) | | 27% *** | |
| Willig's Two-Stage Model (Unweighted) | | 40% ** | |
| **Panel [C]: Chipty's Hospital-Level Variables + Willig's HHI + Capital Ratio** | | | |
| Hospital-Year Model | | 46% *** | |
| Willig's One-Stage Model | | 18% ** | |
| Willig's Two-Stage Model (Weighted) | | 23% ** | |
| Willig's Two-Stage Model (Unweighted) | | 34% ** | |

*Notes:*

1. Each cell in the table corresponds to the estimate of a single Sutter overcharge percentage from a separate regression. Because the dependent variable of the model is the natural log of price, each overcharge estimate reported in this table is calculated as $(e^{\beta_1}-1)$, where $\beta_1$ is the coefficient for the indicator variable that the hospital is a Sutter Damage Hospital.

2. Estimates reported in the Anthem and Blue Shield columns use data from 2006 to 2015. Estimates reported in the Aetna column use data from 2008 to 2015.

___

[724] The number of observations in the Aetna encounter-level regressions is less than 20 percent of the number of observations in the Anthem encounter-level regressions and less than 10 percent of the number of observations in the Blue Shield regressions. *See* Chipty Workpapers.

[725] *See* Chipty Workpapers. I note that Dr. Willig estimated a regression model where he pooled Anthem, Aetna, and United data. *See* Willig Declaration, ¶ 223 and Table 9.

3. Dr. Willig's claims data processing includes filters that drop claims for which either (a) length of stay is zero days or (b) age is negative. For consistency, I apply these filters when constructing the hospital-year-level dataset that is used in the analysis reported in this exhibit.

4. Asterisks *, **, *** represent statistical significance at ten percent, five percent, and one percent levels, respectively. Green shading identifies those estimates that are positive and statistically significant at the ten percent, five percent, or one percent level.

*Sources*:

1. Willig Sur-Rebuttal Report backup production.

2. Blue Shield Claims Data, 2006-2015.

3. Aetna Claims Data, 2008-2015.

4. Hospital Variable Dataset Sources.

248.     These results demonstrate that Dr. Willig's inability to estimate Sutter overcharges is driven by a combination of data processing errors and inappropriate model specification. The finding of antitrust impact does not depend on the level of aggregation: hospital-level or claim-level. Nor does it depend on the manner in which one controls for case mix: case-mix adjusted allowed amounts or DRG fixed effects. My work here demonstrates that the pages and pages of Dr. Willig's reports on these topics are a distraction without substance.

## C.     Increased Hospital Prices Are Passed on to Consumers in Northern California in the Form of Higher Health Insurance Premiums

249.     As I explained in my Class Declaration, basic economic principles indicate that health plans will pass through at least some portion of medical cost increases to their consumers in the form of higher premiums.[726] Dr. Willig agrees that this principle is not controversial.[727] Institutional features of the health insurance marketplace make it more likely that health plans will pass through a significant portion of hospital price overcharges to entities purchasing healthcare coverage.[728] Health plan actuaries testified that health plans pass through increases in healthcare costs.[729] Sutter's own internal analysis, conducted by Mr. Reed, Sutter's Chief

---

[726] Chipty Class Declaration, ¶ 112.

[727] Willig Declaration, ¶ 65.

[728] Chipty Class Declaration, ¶ 114. In addition, Mr. Travis testified that the premium calculation process includes looking at medical costs experience and then applying a trend factor to them in order to estimate projected medical spend. (Deposition of Patrick Travis, former Actuarial Assistant at Blue Shield, October 23, 2018 (hereafter "Travis Deposition (Blue Shield, October 23, 2018)"), p. 38.)

[729] Chipty Class Declaration, ¶¶ 116-117.

Financial Officer, and jointly presented with Ms. Brendt, Sutter's Chief Contracting Officer, to Sutter's Systemwide Management Team, shows that Sutter expects health plans to fully pass through changes in costs to premiums.[730] This evidence provides strong support for the proposition that increases in healthcare costs will be passed through, at least in part, to all or nearly all Class Members. As I describe in this report, health plan executives explain that Sutter's high prices place upward pressure on health insurance premiums.[731] Further, as I explained in my Reply Declaration, there is also ample empirical support for my conclusion that there is pass through, and it is likely 100 percent for all or nearly all Class Members.[732]

250.    This evidence demonstrates that increased hospital prices have been passed on to all or nearly all Class Members in the form of higher health insurance premiums.

\*\*\*

251.    These results indicate that the challenged restrictions harmed competition in Northern California. Both the qualitative and the quantitative evidence show that Sutter prices are elevated, in comparison to other Northern California hospitals. The quantitative results are robust across many different price measures: (a) multiple of Medicare; (b) case-mix adjusted allowed amounts, at the hospital-level; (c) total medical expenditures for a common basket of services basis; and (d) allowed amounts at the claim-level, within DRGs.  The results also cannot be explained by higher quality at Sutter hospitals; to the contrary, the evidence shows Sutter quality does not and cannot explain higher Sutter prices. The combination of this evidence establishes that Sutter's hospital prices are artificially elevated. This evidence also shows common injury to Class Members.

---

[730] Chipty Class Declaration, ¶¶ 118-122; and Sutter Health, "Strategy Session," January 18, 2011, DEF001993646-928, at 648 and 774.
[731] For example, Aetna's Curtis Terry testified that ███████████████████████████████ ██████████████████████████████████████████" (Terry Deposition (Aetna, July 11, 2018), pp. 236-237.)  Health Net's Becky LaCroix-Milani testified that ████████████████████ ██████████████████████████████████ (LaCroix-Milani Deposition (Health Net, August 30, 2018), p. 151.)
[732] Chipty Reply Declaration, ¶¶ 62-81.

## X.     Sutter's Challenged Conduct Is Not Justified by Alleged Pro-Competitive Effects

252.     In his initial declaration, Dr. Willig claimed that the challenged restrictions enable Sutter to achieve at least four pro-competitive benefits: (a) ensuring patient access to Sutter hospitals that, absent the challenged restrictions, might not be included as in-network providers; (b) giving health plans and their customers the benefit of lower Sutter prices; (c) improving quality of care by improving coordination of care; and (d) enabling greater investments in "safety (e.g., seismic), innovation, and enhanced quality of care."[733] In my Reply Declaration, I explained that there are problems with each of Dr. Willig's claims.[734]

253.     In this section, I expand on some of the evidence that I described in my Reply Declaration. I also address other potential pro-competitive justifications that Sutter and its experts may advance. To the extent that Sutter's experts assert additional claimed pro-competitive justifications in subsequent reports, I reserve the right to amend my assessment after I review their claims.

### A.     Sutter Does Not Charge "Lower Prices" in Exchange for Volume

254.     Sutter and its experts may argue that Sutter and the Class Health Plans entered into a fair negotiation in which health plans bargained for and received price discounts in return for agreeing not to steer patient volume away from Sutter. For this argument to be valid, it would have to be the case that Sutter's prices were lower than those of comparable hospitals. However, as I have just explained in Section IX.B, the body of evidence shows that Sutter's prices have been *higher* than those of comparable hospitals. Merely observing that Sutter offers "discounts" off its chargemaster rates is irrelevant. The relevant question is whether Sutter gave additional discounts in exchange for health plans agreeing to the challenged restrictions. I have seen no evidence to suggest they have.

---

[733] Willig Declaration, ¶ 34.
[734] Chipty Reply Declaration, ¶¶ 165-169.

## B.      Sutter's Hospital Quality Is Average or No Better than Competitor Hospitals

255.      Sutter and its experts might argue that Sutter needs to elevate hospital prices to deliver higher quality inpatient services. In Section VI.C.3, however, I explained that Sutter hospitals are not known as being "higher" quality than many other Northern California hospitals, and that Sutter itself recognizes that its higher prices cannot be justified on the basis of higher quality.[735] In addition, I explained in Section IV.D that other hospitals and hospital systems in Northern California do not utilize the challenged restrictions in their contracts with health plans. This fact pattern indicates that the challenged restrictions are not necessary for hospitals to provide high-quality service, as other Northern California hospitals and hospital systems are able to provide care of similar or greater quality than Sutter without engaging in the challenged conduct.

256.      Evidence also indicates that the *breadth* of services that Sutter provides is similar to Dignity, the second-largest hospital system in Northern California.[736] This pattern is seen through analysis of OSHPD data. Each year, OSHPD produces data that identify the service lines that each California hospital provides.[737] In 2011, OSHPD reported this information for 216 distinct service lines, including a variety of inpatient services (*e.g.*, "Intensive Care Services: Neurosurgical," "Surgery Services: Heart"), long-term care services (*e.g.*, "Long-Term Care: Sub-Acute Care"), and psychiatric services (*e.g.*, "Psychiatric Services: Psychiatric Therapy"). Appendix K lists each of these 216 service lines, along with the percent of Sutter's 23 GAC hospitals in Northern California and the percent of Dignity's 15 Northern California GAC hospitals that offered each service line in 2011.[738] The services are sorted in descending order, based on the Sutter hospital percent. The shading color codes the magnitude of the percent, with greener shades identifying higher percentages and redder shades identifying lower percentages.

---

[735] *See also,* Chipty Reply Declaration, ¶¶ 35-37 and Appendices C and D (reattached to this report as Appendices E and F).

[736] Chipty Class Declaration, Exhibits 3A and 3B.

[737] OSHPD, "Hospital Annual Financial Disclosure Report – Complete Data Set" available at https://data.chhs.ca.gov/dataset/hospital-annual-financial-disclosure-report-complete-data-set, *site visited* April 17, 2019.

[738] Chipty Workpapers.

257.    There are different ways that one could describe the similarities and differences across Sutter's and Dignity's service offerings. I describe the similarities by comparing the percent of the Northern California hospitals within each hospital system that offers each of the services. If the percent of hospitals in each hospital system offering the service is within 15 percentage points of the other, I describe that service as being offered by both hospital systems.[739] By this metric, I find that Sutter and Dignity offer 159 of the 216 service lines in similar proportions.[740] For 45 of the remaining 57 (= 216 – 159) service lines, Dignity offered the service more frequently at its Northern California hospitals than Sutter.[741] For only 12 of the service lines did Sutter offer the service more frequently than Dignity.[742] Thus, the number of service lines offered by Sutter at its hospitals is not systematically bigger than the number of service lines offered by Dignity at its Northern California hospitals. Dignity was able to offer its portfolio of service lines, despite not imposing the confluence of non-par rates, equal treatment provisions, and anti-steering provisions that Sutter imposed on health plans.[743] To the extent Dignity might have had more patient volume, through fair competition unobstructed by the challenged restrictions Sutter imposed on the Class Health Plans, Dignity may have been able to expand its offerings even further.

### C.    Sutter Does Not Need the Challenged Restrictions to Make Greater Investments

258.    Sutter and its experts might argue that Sutter needs to engage in the challenged restrictions to elevate hospital prices for costly infrastructure investments. If this were true, one would expect to see Sutter making greater investments than other comparable hospitals in Northern California. As I explained in my Reply Declaration, the theory does not fit the facts. An analysis based on Dr. Willig's own measure of hospital investment (system assets per system

---

[739] For Dignity, 15 percentage points corresponds to more than two of Dignity's 15 Northern California hospitals (13 percent = 2 / 15). For Sutter, 15 percentage points corresponds to more than three of Sutter's 23 hospitals (13 percent = 3 / 23). If, for example, a service that was offered at all Dignity hospitals and at least 20 of Sutter's hospitals would be described as being offered in similar proportion by both hospital systems.

[740] Chipty Workpapers.

[741] Chipty Workpapers.

[742] Chipty Workpapers.

[743] See Section IV.D.

bed) shows Sutter is not ahead of all of its competitors, despite its conduct and charging higher prices than rival Northern California health systems.[744]

259.    Further, Dr. Willig claims without support that the challenged conduct might have enabled Sutter's investment in "safety (e.g., seismic)."[745] My analysis of OSHPD data shows that many of the non-Sutter hospitals in the Sutter Tied Markets have buildings that meet a high-level of seismic safety. OSHPD compiles data on whether California hospitals are in compliance with the California seismic safety standards that I described above in my discussion of barriers to entry.[746] OSHPD assigns hospital buildings a "Structural Performance Category," which is a scale from one to five where higher categories denote safer buildings: (a) Category 1 identifies "[b]uildings posing significant risk of collapse and danger to the public;" (b) Category 2 identifies "[b]uildings in compliance with the pre-1973 *California Building Standards Code* … [that] do not significantly jeopardize life, but may not be repairable or functional following strong ground motion;" (c) Category 3 identifies "buildings [that] may experience structural damage which does not significantly jeopardize life, but may not be repairable or functional following strong ground motion;" (d) Category 4 identifies buildings that "may experience structural damage which may inhibit ability to provide services to the public following strong ground motion;" and (e) Category 5 identifies buildings that "are reasonably capable of providing services to the public following strong ground motion."[747] Hospitals were initially mandated by law to be brought up to Category 2 by 2008, but subsequent provisions granted Category 1 hospitals (including some of CPMC's buildings) an extension that allowed the hospital to continue in operation until 2020.[748]

---

[744] Chipty Reply Declaration, ¶¶ 167-168 and Exhibits 19-20.

[745] Willig Declaration, ¶ 34.

[746] *See* Section VI.E. *See also*, OSHPD, "Seismic Compliance and Safety," available at https://oshpd.ca.gov/construction-finance/seismic-compliance-and-safety/, *site visited* April 17, 2019; and OSHPD, "Seismic Program Overview," available at https://oshpd.ca.gov/construction-finance/seismic-compliance-and-safety/program-overview/, *site visited* April 17, 2019.

[747] OSHPD, "Structural Performance Category (SPC) Ratings & Definitions," available at https://oshpd.ca.gov/construction-finance/seismic-compliance-and-safety/seismic-performance-ratings/, *site visited* April 17, 2019.

[748] *Id. See also,* OSHPD, "Seismic Program Overview," available at https://oshpd.ca.gov/construction-finance/seismic-compliance-and-safety/program-overview/, *site visited* April 17, 2019; and Chipty Workpapers (showing that some of CPMC's buildings have a Structural Performance Category of 1).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

260.    To assess whether Sutter is somehow "better" than its competitor hospitals in terms of their investments in seismic compliance, I study the Structural Performance Category of non-Sutter hospitals in the Tied Markets. Exhibit 30 lists non-Sutter hospitals in the Tied Markets that have or are constructing at least one building with a Structural Performance Category of 4 or 5, along with examples of their buildings that have received the designation of Structural Performance Category 4 or 5. In the Modesto, Sacramento, and Santa Rosa Tied Markets, all of the non-Sutter hospitals have at least one building with a Structural Performance Category of 4 or 5, and in the San Francisco Tied Market, four of the six non-Sutter hospitals have at least one building that has a Structural Performance Category of 4 or 5.[749] Evidence also indicates that some of the non-Sutter hospitals in the Tied Markets invested substantial sums of money to upgrade their facilities. For example, UC Davis Medical Center is investing $215 million on "[m]ajor seismic safety improvements," in addition to the $424 million that the hospital invested in building a new wing to its hospital that opened in 2010.[750] Chinese Hospital in San Francisco invested $180 million for its new "Patient Tower," which is "a structurally sound building that meets seismic regulations" and opened in 2016.[751] This evidence indicates that non-Sutter hospitals have invested in buildings to improve their seismic safety, all without forcing health plans to accept the challenged restrictions.

---

[749] Saint Francis Memorial Hospital and St. Mary's Medical Center are the two non-Sutter hospitals in the San Francisco market without a building that has a Structural Performance Category of 4 or 5. *See* Chipty Workpapers.

[750] UC Davis Health, "UC Davis Medical Center spending $215 million on seismic safety upgrades," November 16, 2017, available at https://health.ucdavis.edu/publish/news/newsroom/12461, *site visited* April 17, 2019.

[751] Chinese Hospital, "New construction in the heart of Chinatown? How Chinese Hospital accomplished the impossible," June 24, 2016, available at https://www.chinesehospital-sf.org/articles/new-construction-in-the-heart-of-chinatown-how-chinese-hospital-accomplished-the-impossible, *site visited* April 18, 2019.

**Exhibit 30**
**Non-Sutter Hospitals in the Tied Markets with at Least One Building**
**with a Structural Performance Category of 4 or 5, as of March 2019**

| Market | Hospital | Examples of Buildings with a Structural Performance Category of 4 or 5 |
|---|---|---|
| Sacramento | Mercy General Hospital | Northeast Wing (4) <br> Heart Center (5) |
| | Methodist Hospital of Sacramento | North Wing (5) <br> ED Expansion (5) |
| | University of California Davis Medical Center | Davis Tower (5s) <br> Surgery and Emergency Services Pavillion (5s) |
| San Francisco | Laguna Honda Hospital & Rehabilitation Center | North Residence (5) <br> Pavillion Building (5s) |
| | San Francisco General Hospital | Replacement Hospital (5) <br> Service Building (5) |
| | Chinese Hospital | Patient Tower (5s) |
| | UCSF Medical Center | Magnetic Resonance Imaging Building (4) |
| Modesto | Doctors Medical Center - Modesto | West Tower (5) <br> ER/Lab (5) |
| Santa Rosa | Santa Rosa Memorial Hospital | ED Expansion (5) <br> Surgery Building and Cath Lab Infill (5) |

*Notes*:

1. The underlying OSHPD data were downloaded on March 28, 2019.

2. The "Examples of Buildings with Structural Performance Category 4 or 5" displays the OSHPD-reported building name and the Structural Performance Category, in parenthesis. An "s" next to the Structural Performance Category denotes an instance in which OSHPD has not verified the category.

3. Structural Performance Category 4 describes buildings that "may experience structural damage which may inhibit ability to provide services to the public following strong ground motion," and Structural Performance Category 5 describes buildings that "are reasonably capable of providing services to the public following strong ground motion."

*Source*: OSHPD Structural and Nonstructural Performance Categories and Collapse Probability of General Acute Care Hospital Buildings.

261.     Even if I were to assume that the imposition of the challenged restrictions allows Sutter to make more investments, that would not necessarily be a pro-competitive effect. For instance, if Sutter can invest more because the challenged conduct allows it to keep more volume than it otherwise would, then Sutter's competitors are getting less volume than they otherwise would. Thus, even if the challenged conduct allows Sutter to invest more, rival hospitals may invest less. There is no reason to believe that overall market-wide investment would be lower in the absence of the challenged conduct.

262.     Sutter and its experts may also argue that the challenged restrictions are pro-competitive because the conduct increases the stability and predictability of Sutter's patient volume (as opposed to generating higher levels of volume), which in turn improves Sutter's quality of care and investment. However, such a claim would be baseless. For the period from 2006 to 2015, I studied the variability in the number of discharges for each of the eight largest health systems in Northern California.[752] For each hospital system, I calculated the coefficient of variation, a widely-used measure of variability, where smaller values indicate less variability.[753] As shown in Exhibit 31, below, Sutter's system-level discharge volume variability is fourth-largest among the eight systems and of similar magnitude to Dignity's and Tenet's variability. Because hospital systems that do not engage in the challenged restrictions sometimes have more predictable volumes than Sutter, the challenged restrictions appear to be unnecessary to reduce volume variability.

---

[752] *See* Chipty Class Declaration, Exhibits 3A and 3B for a list of the nine largest health systems in Northern California. The variability analysis that I present here excludes the ninth-largest health system (Prime Healthcare) because Prime Healthcare did not operate a Northern California GAC hospital in 2006 and 2007. *See* Chipty Workpapers.

[753] The coefficient of variation is calculated as: the absolute value of the standard deviation of discharge volume over the period 2006 to 2015 divided by average discharge volume over the same time period. *See* DeGroot, Morris H., *Probability and Statistics*, Second Edition, Addison Wesley, 1986, at p. 329.



**Exhibit 31**
**Discharge Volume Volatility, 2006-2015**
**Eight Largest Health Systems in Northern California**

*Notes*:

1. For each system, the coefficient of variation is calculated as the standard deviation in system-level annual inpatient discharges at Northern California hospitals, divided by the mean of annual inpatient discharges.

2. For each system, the set of hospitals was limited to those hospitals that the system owned and operated continuously throughout the 2006 to 2015 period.

*Sources*:

1. Willig Sur-Reply Declaration backup production.

2. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2006-2015.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     238

### D. Sutter Does Not Need the Challenged Conduct to Pay for Care of Government-Insured and Uninsured Patients

263.   Sutter and its experts may argue that Sutter needs to elevate hospital prices to pay for government-insured and uninsured patients. Certainly, it is well-documented that hospital care of uninsured patients and patients insured by government programs is not as profitable for hospitals as is the care of commercially insured patients.[754] Commercial health plans, therefore, pay a disproportionate share of the costs of hospital care.[755] Sutter and its experts may claim that the challenged conduct is justified because it allows Sutter to pay for care of non-commercial patients, but such a claim would be baseless.

264.   If it were true that the challenged restrictions enabled Sutter to better serve government-insured and uninsured patients, then one would expect to see that, compared to Sutter, other hospitals would serve a disproportionally lower share of government-insured and uninsured patients. However, as I showed in Exhibit 2 above, the Sutter Tied and Tying Hospitals had a smaller share of inpatient discharges that were government-insured or uninsured, in 2011, relative to the average across non-Sutter non-Kaiser Northern California hospitals. Exhibit 32 below displays this same data, in disaggregated form. Each bar represents a hospital, and the height of each bar reflects the percent of inpatient discharges in 2011 that were of government-insured and uninsured patients at that hospital. Blue bars represent non-Sutter non-Kaiser Northern California hospitals; dark red bars represent Sutter Tied Hospitals; and light red bars represent Sutter Tying Hospitals. As seen here, the Sutter Tied and Tying Hospitals are distributed throughout the range and if anything are more skewed towards having smaller

---

[754] Goldsmith, Jeff and Richard Bajner, "5 Ways U.S. Hospitals Can Handle Financial Losses from Medicare Patients," *Harvard Business Review*, November 15, 2017, available at https://hbr.org/2017/11/5-ways-u-s-hospitals-can-respond-to-medicares-mounting-costs, *site visited* April 17, 2019 ("[H]ospitals have been losing nearly three times as much caring for Medicare patients as they have caring for their Medicaid patients. . . . While the average hospital profit margin on Medicare patients has been relatively steady at negative 10%, it is closer to negative 18% for the three-quarters of hospitals that lost money on their Medicare business.") (emphasis omitted).

[755] Toussaint, John, "One Proven Way to Improve U.S. Health Care: Expand Medicare Advantage," *Harvard Business Review*, February 14, 2018, available at https://hbr.org/2018/02/one-relatively-easy-way-to-improve-u-s-health-care-expand-medicare-advantage, *site visited* April 16, 2019 ("Because Medicare and Medicaid underpay providers and don't cover the full costs of treating their populations, commercial plans are forced to pay more than their fair share to cover this shortfall.").

percentages: the overall average percentage across all hospitals is 76 percent, whereas the average for the Sutter Tied and Tying Hospitals is 73 percent.[756] The fact that many hospitals provide a higher percentage of their services to government-insured and uninsured patients than Sutter, even without engaging in the challenged conduct, demonstrates that the challenged conduct is not needed to care for those patients.

**Exhibit 32**
**Percent of Inpatient Discharges that Are Government-Insured and Uninsured,**
**Sutter Tied and Tying Hospitals and Benchmark Hospitals, 2011**



*Note*: *See* the notes in Exhibit 2 for a description of how discharges were classified. This calculation excludes the one percent of discharges classified as "Other" in Exhibit 2.

*Source*: OSHPD Patient Discharge Data, 2011.

---

[756] Chipty Workpapers.

*** 

265.     Thus, it remains my opinion that Sutter's conduct is not justified on the basis of efficiencies or pro-competitive benefits that may offset the anticompetitive harm which I have documented.

## XI.     Sutter's Anticompetitive Conduct Has Damaged Class Members

266.     This section turns to the issue of damages to Class Members. In the Chipty Class Declaration, I outlined a formulaic approach to calculating premium damages that is based in part on the opinions rendered by Mr. Axene, the Plaintiffs' actuarial expert.[757] In his declaration, Mr. Axene describes the process by which actuaries in their ordinary-course of business construct "manual-rated" premiums.[758] Building on this process, I developed a four-step methodology to assess premium damages to Class Members.[759]

267.     Dr. Willig and Mr. Travis submitted declarations in which they criticized my class-wide methodology as not amenable to the large group line-of-business because of variations in how large group premiums are constructed across: (a) manually-rated large groups; (b) blended-rated large groups; and (c) experience-rated large group.[760] As I described in my Reply Declaration, I strongly disagree with Dr. Willig and Mr. Travis. My methodology can account for the ways in which manually-rated, blended-rated, and experience-rated large groups are treated, and I introduced methodological refinements to deal with the specific nuances of large group premiums.[761] In addition, Dr. Willig and Mr. Travis claimed my damage methodology could not account for changes in rating area designations pre- and post-ACA.

---

[757] Chipty Declaration, Section X; and Axene Declaration, ¶¶ 63-65.

[758] According to Mr. Axene, the manual rating process is a process that is used to construct healthcare premiums based on statewide average claims experience, including for those groups that are evaluated on the basis of their own group's experience. (Axene Declaration, ¶ 51.) Manual ratings are used to determine premiums for individual, small group, and the majority of large group health plan products. For certain very large group employers, premiums are based on the employer's actual claims experience (called "experience rating"). (Axene Declaration, Footnote 44.) Additionally, I understand that certain mid-tier large group rates were constructed based on a blend of the manual and experience rating. (Axene Declaration, Footnote 44.)

[759] Chipty Class Declaration, ¶¶ 137-148.

[760] Willig Declaration, ¶ 107; and Travis Declaration, Section VII.A.

[761] Chipty Reply Declaration, ¶¶ 87-94.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     241

Again, I strongly disagree, and observe that their criticism ignores the fact that the health plans maintain information regarding the geographic boundaries of their historical rating areas. Using this information, I demonstrated that my proposed damage methodology is sufficiently flexible to incorporate both the pre- and post-ACA rating areas.[762]

268.    I now estimate premium damages to Class Members who purchased health insurance products from Health Net, Aetna, and United, using the methodology presented in the Chipty Reply Declaration. This methodology reflects the refinements to the treatment of large groups, and it relies upon health plan-specific, applicable rating areas, by year.[763] I also update my damage estimates for Anthem and Blue Shield, using the overcharge estimates from the more efficient estimation procedure (involving pooling the health plan data), described above. For ease of reference, Exhibit 33 repeats Exhibit 9 of my Reply Declaration, which describes the four steps of my refined damage methodology.

---

[762] Chipty Reply Declaration, ¶¶ 104-105.
[763] Chipty Reply Declaration, ¶ 93.

**Exhibit 33**
**Chipty Reply Declaration, Exhibit 9: Damage Methodology Refined to Incorporate Experience-Rated and Blended-Large Groups**



Step 1: Calculate the percentage overcharge in hospital prices, at each Sutter Damage Hospital, for each year.

Step 2: Calculate the aggregate and the per-member, per-month amount by which Anthem overpaid Sutter, for members attached to the nine rating areas, by group type, for each year. Large group refinement as follows:
- Manual rating: adjust for employer group's subscriber geographic distribution and apply premium overpayment across entire group.
- Experience rating: adjust for employer group's experience and apply premium overpayment across entire group.
- Blended rating: adjust for blend of experience and manual rating results

Step 3: Calculate the percentage overcharge in premiums, by rating area, by group type, and by year.

Step 4: Calculate the aggregate premium damages and premium damages by Class member.

### A.    Data

269.    The damage calculation relies on three primary inputs including: (a) estimates of Sutter Damage Hospital price overcharges for 2006 to 2015; (b) health plan-specific claims expenditures at each of the Sutter Damage Hospitals for 2006 to 2015; and (c) health plan-specific premium information for 2006 to 2017. The first input was estimated using my hospital-

level regression model described above.[764] The second and third inputs are available from data provided by each of the Class Health Plans.[765] In particular:

- *Anthem*: For Anthem, I received paid claims data from 2006 to 2018 and premium data from 2006 to 2017. Over the Class Period, Anthem's spend for inpatient services at the Sutter Damage Hospitals was approximately $1.1 billion. The Anthem data contain location information, for individuals, small groups, and large groups. In addition, the Anthem premium data contain information on Anthem's pre-ACA rating areas, and I was able to obtain an understanding of Anthem's threshold at which large groups were eligible for experience rating.[766]

- *Blue Shield*: For Blue Shield, I received paid claims and premium data from 2000 to 2018. Over the Class Period, Blue Shield's spend for inpatient services was approximately $1.1 billion at the Sutter Damage Hospitals. The Blue Shield data contain location information for small groups; I was able to identify location information for individuals and large groups by extrapolating the location information contained in Blue Shield claims data. In addition, Blue Shield provided pre-ACA rating area information in conjunction with the production of the premium data, and I was able to obtain an understanding of Blue Shield's threshold at which large groups were eligible for experience rating.[767]

- 

---

[764] *See* Section IX.B.4. *See* Appendices H and I provide a more complete description of the claims data and data processing steps, and Appendix J for a full set of overcharge estimates from my baseline regression model

[765] *See* Chipty Workpapers.

[766] ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

250 subscribers. *See* Mathewson Deposition (Anthem, May 18, 2018), pp. 88-89.

[767] *See* Beuoy Deposition (Blue Shield, May 2, 2018), p. 129.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     244



- *Aetna:* For Aetna, I received paid claims data from 2002 to 2016 and premium data from 2008 to 2018. Over the Class Period, Aetna's spend for inpatient services at the Sutter Damage Hospitals was approximately $110 million. The Aetna data contain location information, for individuals, small groups, and large groups. In addition, Aetna documents contain information on Aetna pre-ACA rating areas,[771] and I was able to obtain an understanding of Aetna's threshold at which large groups were eligible for experience rating.[772]

- *United:* For United, I received paid claims data from two claims processing systems, UNET and NICE. I received the UNET data from 2005 to 2017 and NICE data from 2003 to 2018. I also received premium data from 2007 to 2016. Over the Class Period, United spend on for inpatient services was approximately $148 million at the Sutter Damage Hospitals. The United premium data do not contain location information; however, I was able to identify location information for individuals, small groups, and large groups by extrapolating from location information in the United claims data. In addition, United documents contain information on its pre-

---

[768] Health Net data location information is at the three-digit zip code. The data was assigned to the relevant rating area based on the population distribution of each three-digit zip code obtained from the U.S. Department of Housing and Urban Development's Office of Policy Development and Research.

[769] Health Net, "Individual HMO Plans," January 1, 2013, HN0007886; and Health Net, "Individual HMO Rates," January 1, 2012, HN0006301.

[770] Health Net, "Premium Rate Manual," HN0019446-546.

[771] Aetna, "Summary Description of Plan Organization and Operation Amended 3rd Quarter 2007 HMO Standard Risk Rates," April 3, 2007, AETNA00021039-40.

[772] Wei, Samantha, "Subject: Aetna Life Insurance Company - NAIC No. 00160054 Student Health Blanket Accident and Sickness Policy SERFF Tracking Number: AETN-130853872," *Aetna*, January 9, 2018, available at https://www.insurance.pa.gov/Consumers/ProductNotices/Documents/Student%202018-2019%20Aetna%20Life%20-%20AETN-131331937.pdf, *site visited* April 18, 2019.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

ACA rating areas,[773] and I was able to obtain an understanding of United's threshold at which large groups were eligible for experience rating.

## B.      Premium Damage Estimates

270.    Using the formulaic approach to estimating damages described above, along with the various data and information provided by health plans, I was able to estimate hospital price overcharges, and therefore premium damages, that occurred as a result of Sutter's conduct for: (a) all years of the Class Period for Anthem and Blue Shield; (b) for all years of the Class Period beginning in 2010 for Health Net and Aetna; and (c) for all years of the Class Period except 2008 and 2017 for United.

271.    Exhibit 34 summarizes estimated premium damages, using both the out-of-sample and in-sample overcharge estimates, from my baseline regression model. I only calculate damages for a given health plan at a given hospital (in-sample) or for a health plan at a given hospital, in a given year (out-of-sample) if the regression analysis found a statistically significant overcharge, at least at the ten percent significance level.[774] As seen here, over the health plan-year combinations shown in the exhibit, I estimate total premium damages between $465 and $490 million.

---

[773] "Attachment 'A' PacifiCare of California Small Employer Group Product Risk Category Regarding Geographic Regions," UHC_Sidibe-0000664.

[774] This is the same approach I used in my Class and Class Reply Declarations. The ten percent significance level (or 90 percent confidence) is described in the regression work with "one star." Two stars denote statistical significance at the five percent level (or 95 percent confidence), and three stars denote statistical significance at the one percent level (or 99 percent confidence). The vast majority of estimated overcharges are statistically significant at the 95 percent level or more. See Appendix J for the full set of Sutter overcharges for my baseline model.

**Exhibit 34**
**Aggregate Premium Damages for to Class Members**
**Attached to One of the Nine Rating Areas, September 2008 to December 2017**

| Health Plan | Years | Using Out-of-Sample Overcharge Estimates | Using In-Sample Overcharge Estimates |
|---|---|---|---|
| Anthem | 2008 - 2017 | | |
| Blue Shield | 2008 - 2017 | $211,940,419 | $228,421,553 |
| Health Net | 2010 - 2017 | | |
| Aetna | 2010 - 2017 | | |
| United | 2009 - 2016 | | |
| Total | | $464,896,827 | $490,158,705 |

*Note*: Anthem and Blue Shield damages have been updated to reflect the overcharge estimates from the pooled regression model.

*Sources:*

1. Anthem Claims Data.
2. US Census Bureau Zip Code and County Data.
3. The Center for Consumer Information & Insurance Oversight: California Geographic Rating Areas.
4. Anthem Premium Data.
5. Blue Shield Claims Data.
6. Blue Shield Premium Data.
7. Health Net Claims Data.
8. Health Net Premium Data.
9. Aetna Claims Data.
10. Aetna Premium Data.

272.     Because of data limitations, I am unable to directly estimate damages for Health Net and Aetna in 2008 and 2009. I am also unable to directly estimate damages for United for 2008 and 2017. Given available data, I am able to extrapolate damages for Health Net and Aetna for 2008 and 2009 and for United in 2008. This extrapolation relies upon each health plan's actual member months for each of the missing damage years and the health plan's minimum estimated per-member, per-months ("PMPM") damage amount in the two closest years following the missing year, based on the in-sample overcharge estimates. For example, I estimate Health Net's 2008 premium damages as:

$$Damages_{2008} = Member\ Months_{2008} \ x\ Minimum\{PMPM\ Damage_{2010}, PMPM\ Damage_{2011}\}$$

A nice feature of the extrapolation methodology is that it is a within-health plan extrapolation, meaning that it does not rest on any assumptions about similarities in overcharges or damages

across health plans. Another nice feature of the extrapolation methodology is that it relies upon *actual* health plan-specific data on Class Member months in the year for which damages are being extrapolated. I conservatively did not extrapolate United damages in 2017, because I do not have actual member months for United in 2017. However, I may estimate United damages for 2017 if I receive the necessary information, or I may develop an alternative extrapolation method. Exhibit 35 summarizes total estimated premium damages after extrapolation for missing years. As seen here, I estimate total premium damages between $479 and $503 million. Estimated damages are about eight percent higher if calculated using overcharge estimates from an unpooled set of regression models, including Sutter Santa Rosa.[775]

**Exhibit 35**
**Extrapolated Aggregate Premium Damages to Class Members**
**Attached to One of the Nine Rating Areas, September 2008 to December 2017**

| Health Plan | Years | Using Out-of-Sample Overcharge Estimates | Using In-Sample Overcharge Estimates |
|---|---|---|---|
| Anthem | 2008 - 2017 | | |
| Blue Shield | 2008 - 2017 | $211,940,419 | $228,421,553 |
| Health Net | 2008 - 2017 | | |
| Aetna | 2008 - 2017 | | |
| United | 2008 - 2016 | | |
| **Total** | | $478,589,085 | $503,335,014 |

*Note*: Anthem and Blue Shield damages have been updated to reflect the overcharge estimates from the pooled regression model.

*Sources*:

1. Anthem Claims Data.
2. US Census Bureau Zip Code and County Data.
3. The Center for Consumer Information & Insurance Oversight: California Geographic Rating Areas.
4. Anthem Premium Data.
5. Blue Shield Claims Data.
6. Blue Shield Premium Data.
7. Health Net Claims Data.
8. Health Net Premium Data.
9. Aetna Claims Data.
10. Aetna Premium Data.

---

[775] *See* Chipty Workpapers.

273.    I have not yet been provided with the all of the premium and claims data necessary to complete a 2018 premium damage calculation. If I am provided the relevant data and if Plaintiffs' counsel requests that I do so, I will use that data to update my calculations to include premium damages for 2018.

## C.    Conservative Aspects of My Damage Methodology

274.    Finally, as I have mentioned before, the methodology I use to estimate premium damages is conservative for many reasons. For example:

- *In the But-For World, the Benchmark Prices Would Have Been Lower*: Damages are calculated using overcharge estimates that rely on a comparison of hospital prices at Sutter and non-Sutter hospitals in Northern California. However, as I have explained, the challenged restrictions have interfered with the competitive process and have reduced competitor hospitals' incentives to lower prices to compete for volume. Accordingly, the actual prices at the non-Sutter hospitals themselves are higher than they would have been in the but-for world absent Sutter's conduct. My overcharge estimates do not account for this fact and, thus, are lower than they would have been. Related to this, I do not measure damages to Class Members because of these inflated non-Sutter hospital prices flowing from the Sutter conduct. Estimated premium damages would have been higher had I so done.

- *Inclusion of Dignity Health in Benchmark Data*: Damages are calculated using overcharge estimates that include hospitals from the Dignity Health System in the benchmark set of hospitals. ███████████████████████████ ████████████████████████████████████████████ ███████.[776] As a result, both my hospital price overcharge and premium damage

---

[776] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

estimates are too low. Estimated premium damages would have been higher had I accounted for umbrella effects.

- *Did Not Consider Out-of-Network Overcharges*: The overcharge estimates focus only on in-network claims. However, there are times when Class Members use the Sutter Damage Hospitals on an out-of-network basis, use for which the Class Health Plans paid Sutter's onerous non-par rates.[777] Estimated premium damages would have been higher had I factored in the direct effects of Sutter's "non-par" rates.

- *Did Not Apply a "Trend Factor:"* As I explained in my Class Declaration, healthcare premiums at a given point in time are based on historical medical expenditures. In order to account for medical inflation and changes in utilization, actuaries use "trend factors" to inflate the historical medical expenditure to construct healthcare premiums. My damage methodology sets the trend factor to one, but, in reality, this trend factor is typically well above one. Estimated premium damages would have been higher had I applied trend factors.[778]

[777] Chipty Reply Declaration, ¶ 86.
[778] Chipty Class Declaration, ¶ 144.

- *Did Not Consider Administrative Fees and Profit*: As I explained in my Class Declaration, healthcare premiums are constructed using projected medical expenditures plus administrative fees and profit.[779] To the extent health plans set administrative and profit margins to be in proportion to medical expenditures, premium damages flowing from Sutter conduct should include an assessment of these elevated components of premium construction. Estimated premium damages would likely have been higher had I incorporated administrative fees and health plan profit in my damages model.

- *Did Not Consider Claims for Mental Health, Substance Abuse, and Ungroupable DRGs*: The damage methodology only includes inpatient acute care services and excludes services for mental health, substance abuse, and ungroupable DRGs, even when they are acute services provided on an inpatient basis. While it is likely the prices for services related to mental health, substance abuse, and ungroupable DRGs would be impacted by Sutter's conduct, estimated premium damages would have been higher had I factored in the effect of Sutter's conduct on other types of medical services.

## XII.   Need for Injunctive Relief

275.   Evidence shows that Sutter has market power sufficient to force health plans to accept onerous contractual restrictions and that it has actually imposed these contractual restrictions upon health plans. These contractual restrictions have interfered with competition among hospitals in Northern California. They have stifled health plans' ability to introduce, develop, and expand their use of innovative, lower-cost steered products that create competition among hospitals to lower prices. Evidence shows there would have been more steered products launched and developed in Northern California, but-for Sutter's conduct. Evidence also shows that steered products would have been more commercially successful, but-for Sutter's conduct. Sutter has among the highest hospital prices in Northern California: qualitative and quantitative

---

[779] Chipty Class Declaration, ¶ 27.

evidence shows that Sutter's prices for inpatient hospital services at the Damage Hospitals are often more than 30 percent—and in some instances more than 60 percent—higher than those of other Northern California hospitals, after controlling for differences in hospital attributes.[780] Notably, these substantial price differences cannot be justified on the basis of higher quality. Further, evidence shows that Sutter's higher prices have caused people to pay higher premiums for health insurance products.

276.     There are strong reasons to expect that, unchecked, Sutter will continue to impose onerous contractual restrictions on health plans and an undue burden on consumers. Sutter has a large footprint in Northern California (see Exhibit 4, above), and health plans cannot exclude Sutter hospitals from their provider networks. Given the vital importance of healthcare to consumer welfare, an injunction precluding Sutter from forcing health plans to accept the challenged restrictions would foster vibrant competition among healthcare providers and health plans in Northern California to the benefit of Class Members.

277.     There are generally two approaches to address on-going competitive concerns:[781] (a) a structural remedy which would force Sutter to divest its Tying Hospitals, the source of its market power; or (b) a conduct remedy that would enjoin Sutter from engaging in the conduct that has been destructive to competition. A conduct remedy could enjoin Sutter from:

- Contractually forcing the purchase of hospital services at the Tied Hospitals with the purchase of hospital services at the Tying Hospitals by requiring health plans to engage in all-or-nothing contracting;

- Effectively forcing health plans to include Sutter Tied Hospitals "in-network" by requiring health plans to pay onerous non-par rates for out-of-network usage by their members;

---

[780] *See* Exhibit 25.

[781] As explained by the Department of Justice in the context of merger enforcement, "remedies take two basic forms: one addresses the structure of the market, the other the conduct of the merged firm. Structural remedies generally will involve the sale of physical assets by the merging firms.... A conduct remedy usually entails injunctive provisions that would, in effect, manage or regulate the ... firm's ... business conduct." See Antitrust Division Policy Guide to Merger Remedies, October 2004, available at https://www.justice.gov/atr/antitrust-division-policy-guide-merger-remedies-october-2004#3, *site visited* April 17, 2019.

- Reducing the cost-effectiveness of health plans' narrow networks by requiring them to pay these onerous non-par rates when seeking to exclude Sutter Tied Hospitals from particular products; and

- Forcing health plans to comply with its equal treatment and/or anti-tiering provisions, or otherwise restricting health plans from using incentives to steer patients to lower-cost, higher-quality providers.

278.    These prohibitions are similar in spirit to the relief that the United States has sought and obtained, pending final court approval, in its lawsuit against Carolinas Health Systems for similar anticompetitive conduct. There, for example, the proposed final settlement states, "For Healthcare Services in the Charlotte Area, Defendant will not seek or obtain any contract provision which would prohibit, prevent, or penalize Steered Plans or Transparency."[782]

279.    It is my opinion that Class Members will continue to incur harm by Sutter's anticompetitive conduct, unless an injunction is issued that stops Sutter from: (a) continuing to force health plans to contract for all Tying and Tied Hospitals in a single contract; and (b) enforcing the challenged restrictions.

## XIII.    Conclusions

280.    Based on my economic analyses—which have been informed by academic literature, ordinary-course documents, testimony from employees of Sutter, other hospital systems, and health plans, and a series of data-driven analyses—it is my opinion that Sutter's challenged restrictions have harmed competition and consumers of health insurance products in Northern California. Evidence shows that Sutter forced these restrictions on the Class Health Plans who would have otherwise launched additional innovative, cost-competitive products in Northern California, and the steered products would have been more commercially successful than they were. Evidence also shows that the challenged restrictions enabled Sutter to charge significantly higher hospital prices to the Class Health Plans, which directly translated to higher

---

[782] Proposed Final Judgment, *United States of America and State of North Carolina v. the Charlotte-Mecklenburg Hospital Authority d/b/a Carolinas Healthcare System*, Case No. 3:16-cv-00311-RJC-DCK, November 15, 2018, p. 6.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

premiums for insurance products in Northern California. Further, I have seen no evidence to suggest that the challenged restrictions are necessary or justified. Thus, I conclude that the challenged restrictions are anticompetitive.

281.    In addition, it remains my opinion that: (a) Class Members have suffered common impact due to Sutter's elevated prices at the Sutter Damage Hospitals; and (b) a common method exists to reasonably approximate aggregate and individual Class Member damages. Application of my damage methodology, which is both grounded in actuarial principles and conservative for the reasons I have outlined, shows that Class Members have suffered damages amounting to hundreds of millions of dollars over the Class Period.

Tasneem Chipty, Ph.D.
April 22, 2019



**TASNEEM CHIPTY**
**Managing Principal**

**Appendix A: CV**

Office: (617) 315-0355

Cell: (617) 697-6826

tchipty@matrixeconomics.com

125 High Street
Suite 1632
Boston, MA 02110

Dr. Chipty is an expert in industrial organization, antitrust economics, and econometrics. Her practice spans both the areas of antitrust litigation and mergers and acquisitions, in a broad array of sectors including: agricultural equipment; airlines; broadcast and satellite radio; cable and satellite television; containerized shipping; healthcare; newspapers; pharmaceuticals; pulp and paper; and tobacco. Her work has been influential both internationally and domestically. She has assisted the U.S. Department of Justice on several investigations and merger reviews. She has assisted the Government of Australia at the World Trade Organization in a dispute surrounding Australia's national tobacco control policy. She was Comcast's antitrust damages expert in *Behrend et al. vs. Comcast* – a U.S. Supreme Court case in which the Court dismissed the case against Comcast because of deficiencies in the plaintiffs' damages model. On behalf of the parties, she studied the competitive effects of the CenturyLink-Level 3 merger and the Charter-Time Warner Cable merger, both of which received approvals from the U.S. Department of Justice and the Federal Communications Commission. She serves as an antitrust advisor to the Massachusetts Health Policy Commission, for whom she has evaluated the competitive effects of healthcare transactions in the Commonwealth, including Partners Healthcare's attempted acquisition of South Shore Hospital and Hallmark Health. Dr. Chipty has submitted testimony, been deposed, and testified at trial in several litigation matters. She has appeared before the Federal Trade Commission, the Department of Justice, the World Trade Organization, the Canadian Mergers Bureau, the U.S. Copyright Board, and the Canadian Copyright Board. She is co-editor of the current edition of the American Bar Association's book *Proving Antitrust Damages*. She has published research on the strategic use of vertical integration, the role of firm size and network effects on bilateral business negotiations, and the effects of regulations on firm behavior.

Prior to founding Matrix Economics, Dr. Chipty was a Managing Principal at Analysis Group, and before that a Vice President at Charles River Associates. She has served on the faculties of the Ohio State University, Brandeis University, and MIT, where she taught courses in antitrust and regulation, industrial organization, and econometrics. Dr. Chipty received her Ph.D. in economics from the Massachusetts Institute of Technology and her undergraduate degree in economics and mathematics from Wellesley College.

**EDUCATION**

Ph.D.        Economics, Massachusetts Institute of Technology

B.A.         Mathematics and Economics, with honors, Wellesley College

**PROFESSIONAL EXPERIENCE**

2016 –          Matrix Economics, LLC
               *Founder and Managing Principal*

2010 – 2016    Analysis Group, Inc.
               *Managing Principal* (2010-2016)

1999 – 2010    Charles River Associates, Inc.
               *Vice President* (2005-2010)

2005           Massachusetts Institute of Technology
               *Visiting Associate Professor of Economics*

1997 – 1999    Brandeis University, Graduate School of International Economics and Finance
               *Visiting Assistant Professor of Economics*

1995           Osaka University
               *Visiting Foreign Scholar*

1993 – 1999    Ohio State University
               *Assistant Professor of Economics*

## TESTIMONY EXPERIENCE

- *Federal Trade Commission vs. Qualcomm Incorporated*, Case No. 17-CV-00220-LHK, in United States District Court for the Northern District of California. On behalf of Qualcomm, submitted an expert report on June 28, 2018; testified at deposition on August 10, 2018; and testified at trial on January 22, 2019. Cravath Swaine and Moore (Gary Bornstein and Yonatan Even).

- *In Re: Qualcomm Antitrust Litigation*, Case No. 17-MD-02773-LHK, in United States District Court for the Northern District of California. On behalf of Qualcomm, submitted an expert report on November 16, 2018 and testified at deposition on December 18, 2018. Keker, Van Nest & Peters LLP (Eugene Paige and Justina Sessions).

- *Djeneba Sidebe et al. v. Sutter Health*, Case No. 3: 12-cv-4854-LB, in United States District Court for the Northern District of California. On behalf of the Djeneba Sidebe *et al.*, submitted expert reports on May 26, 2018, June 22, 2018, and November 26, 2018; and testified at depositions on August 15, 2018, August 16, 2018, and December 20, 2018. Constantine Cannon (Matthew Cantor).

- *In Re: Qualcomm Litigation*, Case No. 17-cv-00108-GPC-MDD, in United States District Court for the Southern District of California. On behalf of Qualcomm, submitted expert reports on June 29, 2018 and October 2, 2018; and testified at deposition on October 10, 2018. Cravath Swaine and Moore (Gary Bornstein and Yonatan Even).

- *United States of America and the State of North Carolina vs. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System*, in the Western District of North Carolina, Charlotte Division, Case No. 3:16-cv-00311-RJC-DCK. On behalf of the United

States of America, submitted an expert report on August 10, 2018. U.S. Department of Justice (Andy Ewalt and Beth Armington).

- *United States of America v. Deere & Company, Precision Planting LLC, and Monsanto Company,* Civil Action No. 1:16-cv-08515, in the United States District Court for the Northern District of Illinois Eastern Division. On behalf of the United States, submitted expert reports on December 23, 2016 and January 10, 2017; and testified at deposition on March 2, 2017. U.S. Department of Justice (Norm Familant and Bill Jones).

- *United States of America, et al. v. Hillsdale Community Health Center, et. al.,* Case No. 5:15-cv-12311-JEL-DRG in the United States District Court for the Eastern District of Michigan. On behalf of the United States, submitted expert reports on October 27, 2016 and December 5, 2016; and testified at deposition on December 12, 2016. U.S. Department of Justice (Beth Armington and Katrina Rouse).

- *In the Matter of: Statement of Proposed Royalties to be Collected for the Retransmission of Distant Television Signals, In Canada, for the Years 2014 to 2018*, before the Canadian Copyright Board. On behalf of Bell Canada, Cogeco Cable Inc., Rogers Communications Inc, Shaw Communications Inc., Videotron G.P., and Telus Communications Company, submitted an expert report on October 2, 2015 and testified at trial on January 25-26, 2016. Fasken Martineau DuMoulin, LLP (Jay Kerr-Wilson).

- Challenges to Australia's Tobacco Plain Packaging Act, on behalf of Australia, in the World Trade Organization. Submitted written testimony on March 9, 2015, May 31, 2015, September 14, 2015, October 26, 2015, December 8, 2015, and February 1, 2016. Australian Government Solicitor (Simon Sherwood and Damien O'Donovan).

- *Caroline Behrend et al. v. Comcast Corporation et al.*, Civil Action No. 03-6604 in the United States District Court for the Eastern District of Pennsylvania. On behalf of Comcast Corporation, submitted expert reports on April 10, 2009, May 6, 2009, May 11, 2009, August 21, 2009, September 18, 2009, May 22, 2012, and January 15, 2014; testified at deposition on May 22, 2009; and testified at a class recertification hearing on October 26, 2009. Kasowitz Benson Torres & Freidman (Michael Shuster and Sheron Korpus) and Davis Polk (David Toscano and Arthur Burke).

- *American Broadcasting Company Inc., et. al. v. Aereo*, 12 Civ. 1543, in United States District Court in the Southern District of New York. On behalf of Aereo, submitted an expert report on December 20, 2013. Fish and Richardson (David Hosp).

- *DISH Network LLC. f/k/a Echostar Satellite LLC v. ESPN, Inc., and ESPN Classic, Inc.*, No. 09 CIV 6875 (JGK) (FM), in United States District Court in the Southern District of New York. On behalf of DISH Network, submitted an expert report on July 29, 2011; testified at depositions on November 22, 2011 and January 2013; testified at trial February 2013. Flemming Zulack Williamson Zauderer LLP (Dean Nyciper) and Simpson Thatcher (Barry Ostrager and Mary Kay Vyskocil).

- *Echostar Satellite LLC v. ESPN, Inc., ESPN Classic, Inc., ABC Cable Networks Group, Inc., Soapnet L.L.C., and International Family Entertainment Inc.*, Index 08-600282 in the Supreme Court of the State of New York County of New York. On behalf of Echostar Satellite LLC, testified at deposition on June 23, 2011. Flemming Zulack Williamson Zauderer LLP (Dean Nyciper).

- *Casitas Municipal Water District v. United States*, Case No. 05-168L in the United States Court of Federal Claims. On behalf of the United States, submitted expert reports on February 25, 2010 and February 8, 2007; testified at deposition on March 10, 2010; and testified at trial on October 28, 2010. U.S. Justice Department (James Gette and Barrett Atwood).

- *Royalties To Be Collected By CSI and SOCAN For the Reproduction and the Communication to the Public by Online Music Services, In Canada, of Musical or Dramaticaomusical Works, for the years 2007 to 2010*, before the Canadian Copyright Board. On behalf of Apple Inc., Bell Canada Enterprises Inc., Rogers Communications Inc., Telus Communications Company, and Videotron Ltd., submitted expert reports on April 29, 2010 and June 9, 2010, and testified at trial on June 28-9, 2010. Goodmans LLP for Apple Inc. (Michael Koch); and Fasken Martineau DuMoulin, LLP for the rest (Jay Kerr-Wilson).

- *United States of America v. Daily Gazette Company and MediaNews Group, Inc.*, Civil Action No. 2:07-0329 in the United States District Court Southern District of West Virginia. On behalf of the United States of America, submitted an expert report on September 1, 2009. U.S. Justice Department (John Reed, Mark Merva and Norm Familant).

- *In re. ASARCO LLC, et al.*, Case No. 05-21207 in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division. On behalf of Ready Mix USA, LLC., submitted an expert report on August 1, 2008 and testified at deposition on August 7, 2008. Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. (Gary Shockley).

- *SOCAN Tariff No. 16 – Royalties To Be Collected By SOCAN For the Public Performance or the Communication to the Public by Telecommunication, In Canada, of Musical or Dramaticaomusical Works, for the years 2007 to 2009*, before the Canadian Copyright Board. On behalf of a consortium of Canadian background music users, including Bell ExpressVu, Chum Satellite Services, and DMX Canada, submitted an expert report on November 30, 2007 and testified at trial in January 2008. Fasken Martineau DuMoulin, LLP (Jay Kerr-Wilson and Aidan O'Neill).

- *In the Matter of Digital Performance Right in Sound Recordings and Ephemeral Recordings for a New Subscription Service*, CRB Proceeding 2005-5, before the U.S. Copyright Board. On behalf of Sirius Satellite Radio and XM Satellite Radio, submitted expert reports on October 30, 2006 and July 24, 2007; testified at deposition on May 8, 2007; and testified at trial in June 2007. Wiley Rein, LLP for Sirius (Bruce Joseph) and Weil, Gotshal & Manges for XM (Ralph Miller).

## MERGERS AND ACQUISITIONS AND OTHER GOVERNMENT INVESTIGATIONS

Dr. Chipty has extensive experience evaluating the competitive effects of proposed transactions and has advised clients at various stages of their deals, including strategic advice in identifying targets, assistance with agency review, and analyses for post-merger contestations. She has employed economic and econometric tools to evaluate issues of market definition, critical loss analysis, direct evidence of unilateral effects, and efficiencies. She has studied the likelihood of temporary or permanent foreclosure, as part of a raising rivals cost strategy. In addition, she has assessed regulatory structures and their associated effect on competition. Examples of Dr. Chipty's work in this area include:

- Assisted parties in the formation of a joint venture between Nippon Yusen Kabushiki Kaisha Ltd., Mitsui O.S.K. Lines, Ltd., Kawasaki Kisen Kaisha Ltd, before the Department of Justice, 2017. WilmerHale (Hartmut Schneider).

- Assisted parties in the CenturyLink-Level 3 merger, before the Department of Justice and the Federal Communications Commission, 2017. Wachtell, Lipton, Rosen & Katz and Jones Day (Ilene Gotts and Bruce McDonald) and Covington & Burling (Yaron Dori).

- Assisted parties in the Charter-Time Warner Cable merger, before the Department of Justice and the Federal Communications Commission, 2015-2016. Wachtell, Lipton, Rosen & Katz and Jenner Block (Ilene Gotts and John Flynn).

- Submitted white paper evaluating the impact of tobacco plain packaging on smoking prevalence in Australia, to the Australian Parliament on behalf of the Government of Australia, in Australia's post implementation review of tobacco plain packaging legislation, 2016. Australian Government Solicitor (Simon Sherwood and Simon Daley).

- Expert for the U.S. Department of Justice in its review of the One Main-Spring Leaf merger, 2015. U.S. Department of Justice (Stephanie Fleming and Nicholas Hill).

- Coauthored a white paper, on behalf of Aeromexico, evaluating the competitive effects of airport slot allocation governing air traffic to and from Mexico City Airport, submitted to Mexico's competition authority, 2015, (joint with Professor Robert Pindyck).

- Expert for Olin Corporation in its acquisition of Dow Chemical's cholor-alkali business unit, before the Federal Trade Commission, 2014-2015. Baker Botts (William Henry and Thomas Dillickrath).

- Expert for the Mergers Bureau of Canada in its review of Post Media's acquisition of Sun Media. Canadian Mergers Bureau (Steve Sansom and Nicholas Janota).

- Assisted the U.S. Department of Justice in its challenge of American Express's use of merchant restraints, 2014-2015. U.S. Department of Justice (Craig Conrath and John Read).

- Advised the Massachusetts Health Policy Commission on the likely competitive impact of Partners HealthCare System's proposed acquisition of Hallmark Health System, including submitting a written statement in the HPC's Cost and Market Impact Review of the transaction, 2014. Health Policy Commission (Karen Tseng and Kate Scarborough).

- Advised the Massachusetts Health Policy Commission on the likely competitive impact of Partners HealthCare System's proposed acquisition of South Shore Hospital, including submitting a written statement in the HPC's Cost and Market Impact Review of the transaction, 2013-2014. Health Policy Commission (Karen Tseng and Kate Scarborough).

- Assisted Saint Alphonsus Medical Center to evaluate the competitive effects of St. Luke's Health System's acquisition of Saltzer Medical Group, in Nampa, Idaho, 2012-2013. Honigman, Miller, Schwartz and Cohn (David Ettinger).

- Assisted Arris Group in its acquisition of Motorola Home business unit from Google, before the Department of Justice, 2013. Hogan Lovells (Logan Breed) and Troutman Sanders (Daniel Anziska).

- Coauthored a white paper, on behalf of Televisa, evaluating the competitive impact in the mobile telephone marketplace of Televisa's proposed acquisition of 50% of GSF Telecom

Holdings, S.A.P.I. de C.V., which owns 100% of Grupo Iusacell, S.A. de C.V. (joint with Almudena Arcelus and David Sosa). Submitted to Mexico's competition authority, Federal Commission of Economic Competition, 2012.

- Conducted analyses and presented before staff of the FTC, in an investigation of two joint venture partners involving allegations of potentially anticompetitive conduct, 2011-2012. Baker Botts (Thomas Dillickrath and William Henry).

- Authored a white paper analyzing the likely effects of Steward Healthcare's acquisition of Morton Hospital, in the greater Boston area, submitted to the State Attorney General's office, June 14, 2011. Edwards Angell Palmer & Dodge (Patricia Sullivan).

- Evaluated the likely effects of the Southwest Airlines-Airtran merger, on behalf of the United States, Winter 2011. U.S. Justice Department (Michael Billiel and Oliver Richard).

- Coauthored a white paper, on behalf of Time Warner Cable, analyzing brinkmanship tactics and broadcast retransmission consent rules established by the 1992 Cable Act, submitted to the Federal Communications Commission (joint with Prof. Steven Salop, Dr. Martino DeStefano, Dr. Serge Moresi, and Dr. John Woodbury), June 3, 2010.

- Authored Federal Communication Commission Media Study #5, on behalf of the Commission, as part of it periodic review of the media ownership rules, analyzing the effects of ownership structure in broadcast radio, on program variety and advertiser and listener welfare, released June 2007.

- Coauthored a white paper analyzing bidding behavior and the potential competitive effects of the merger of Alcatel and Lucent, submitted to the Department of Justice (joint with Drs. Andrew Dick and Stanley Besen), April 28, 2006. Skadden, Arps, Slate Meagher & Flom LLP (James Keyte and Neal Stoll).

- Conducted and presented analysis before the Federal Trade Commission on behalf of Barr Pharmaceuticals regarding its acquisition of a hormone contraceptive product (joint with Prof. Steven Salop), Fall 2005. Kirkland & Ellis LLP (Mark Kovner).

- Conducted an analysis of efficiencies on behalf of Time Warner and Comcast, in their joint bid for Adelphia Communications (joint with Dr. Stanley Besen). Paul Weiss Rifkind Wharton & Garrison, LLP (Joseph Simons).

- Assisted NorthShore University HealthSystem (formerly Evanston Northwestern Health Corporation) with the Federal Trade Commission's post-merger investigation of the 2000 merger of Evanston Hospital and Highland Park Hospital. Winston & Strawn LLP (Michael Sibarium).

## OTHER CONSULTING EXPERIENCE, BY TOPICAL AREA

Dr. Chipty has also provided consultation to litigation clients on matters some of which eventually settled, and she has provided business guidance to clients for strategic planning. Examples of Dr. Chipty's work in this area include:

## Tobacco

- Assisted the Department of Justice, in *United States v. Philip Morris et al.*, Civil Action No. 99- 2486, a RICO case against the major tobacco manufacturers and associations involving allegations of conspiracy to suppress information and to suppress innovation. U.S. Department of Justice (Steve Brody, Renee Brooker, and James Gette).

- Assisted Appalachian Oil Company, in *R.J. Reynolds Tobacco Company v. Market Basket Food Stores, Inc., et al.*, Civil Action No. 5:05-CV-253. Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. (Gary Shockley).

- Assisted Star Scientific, in *Star Scientific, Inc. v. R.J. Reynolds Tobacco Company*, Case No. AW 01-CV-1504 and AW 02-CV-2504. Crowell and Moring (Richard MacMillan and Kathryn Kirmayer).

## Pharmaceutical and Health Care

- Advised the working groups of the Advanced Market Commitment ("AMC"), an initiative of the Gates Foundation to pilot the first AMC for the pneumococcus vaccine. The goal of this AMC is to provide appropriate market-based incentives to induce capacity investments by the major pharmaceutical companies for manufacturing sufficient vaccines for low-income countries.

- Assisted a pharmaceutical manufacturer against Medicaid reimbursement, fraud, and unfair trade practices claims brought by numerous State Attorneys General. O'Melveny & Meyers LLP (Steve Brody and Brian Anderson) and Baker Botts LLP (Richard Josephson).

- Advised Regional Urology, in *Willis-Knighton Health System and Health Plus of Louisiana, Inc. v. Regional Urology LLC, et al.*, Civil No. CV02-1094-S. Breazeale Sachse & Wilson, LLP (Claude Reynaud).

## Media and Sports

- Assisted the YES Television Network in evaluating the value to the network of carriage rights for certain New Jersey Nets games, for contract renegotiation and possible arbitration. Boies Schiller & Flexner, LLP (Robert Dwyer).

- Assisted the Monte Carlo Tennis Tournament, in a dispute with the ATP Tour, alleging abuse of market power. Sidley Austin LLP (Alan Unger).

- Assisted a team of the National Football League, in a dispute with a cable operator, alleging vertical foreclosure. Boies Schiller & Flexner, LLP (Robert Dwyer).

- Assisted Major League Baseball in *Major League Baseball Properties, Inc. v. Salvino*, involving a challenge to the league's use of centralized trademark licensing. Foley & Lardner LLP (Jim Mckeown).

- Advised HBO on reasonable fees for music performance rights in their negotiation with BMI. Cravath, Swaine & Moore LLP (Kenneth Lee).

- Advised XM Satellite Radio on reasonable fees for music performance rights for business negotiations. Shaw Pittman LLP (Cynthia Greer).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      A-7

## ECONOMETRICS AND STATISTICS

Dr. Chipty is an expert in the area of statistics and econometrics and has been successful at using econometric arguments both to construct affirmative arguments in litigation as well as to evaluate the use of econometrics by opposing experts. Many of the projects described above used econometric analysis. Other examples of Dr. Chipty's work in this area are described below:

- Submitted a white paper to the European Commission, DG Competition Bureau, on behalf of the European Liner Affairs Association, analyzing the impact of shipping conferences on carriers' ability to collude on prices (joint with Professor Fiona Scott Morton and Mr. Nils Von Hinten-Reed).

- Developed analyses and drafted a report on behalf of defendants in the *In Re: Monosodium Glutamate Litigation* in support of a defendants' motion to dismiss plaintiff's expert testimony based upon improper use of econometrics. Dorsey & Whitney LLP (Michael Lindsay) and Haynes & Boone LLP (Ronald Breaux).

- Used advanced statistical techniques along with a large volume of administrative data, on behalf of United Parcel Service, to evaluate the Postal Service's expert testimony on variable costs. Piper & Marbury LLP (John McKeever).

- Evaluated and criticized the econometric testimony of a defendants' expert, on behalf of a generic pharmaceuticals firm alleging vertical foreclosure and unlawful delay of entry. Solomon Zauderer (Colin Underwood).

## TRISTATE RESEARCH PARTNERSHIP

Dr. Chipty was a member of the research team from 1997-1999 in this Department of Health and Human Resources funded collaboration that included the states of Massachusetts, Alabama, and Florida. Dr. Chipty worked with state governments to design research experiments, develop econometric models, and process large administrative databases, in an effort to understand the structure, administration, and impact of minimum standards regulations.

- "The Black-White Wage Gap in the Deep South: Location, Location, Location?" (with Ann Dryden Witte), Working Paper 98-03, Tri-State Child Care Research Partnership, Miami, FL.

- "Employment Patterns of Workers Receiving Subsidized Child Care: A Study of Eight Counties in Alabama," (with Ann Dryden Witte), Available from Margie Curry, Executive Director, Childcare Resources, 1904 First Ave. North, Birmingham, AL 35203-4006.

- "Parents Receiving Subsidized Child Care: A Study of Alabama's Labor Force," (with Ann Dryden Witte), Working Paper 98-01, Tri-State Child Care Research Partnership, Miami, FL.

- "Employment of Parents Receiving Subsidized Child Care in Dade County, Florida," (with Harriet Griesinger and Ann Dryden Witte), Working Paper 98-03, Department of Economics, Wellesley College, Wellesley MA 02481.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      A-8

## PAPERS AND PRESENTATIONS

### Published Articles

"US: Economics" (with Michael Chapman), *Global Competition Review, The Antitrust Review of the Americas 2016*, available at:
http://globalcompetitionreview.com/reviews/74/sections/275/chapters/2983/us-economics/.

"Economists' Perspective on the Efficiency Defense in Provider Consolidations:  What Works, What Doesn't Work, and What We Still Don't Know" (with Asta Sendonaris), American Health Lawyer's Association *Connections Magazine*, September 2015.

"Competitor Collaborations in Health Care: Understanding the Proposed ACO Antitrust Review Process," *CPI Antitrust Chronicle*, May 2011 (1).

"Vertical Integration, Market Foreclosure, and Consumer Welfare in the Cable Television Industry," *American Economic Review*, Vol. 91, No. 3, June 2001, pp. 428-453.

"The Role of Buyer Size in Bilateral Bargaining: A Study of the Cable Television Industry" (with Christopher Snyder), *Review of Economics and Statistics*, May 1999, 81(2): 326-340.

"Economic Effects of Quality Regulations in the Daycare Industry," *American Economic Review*, Vol. 85, No. 2, May 1995, pp. 419-424.

"Horizontal Integration for Bargaining Power: Evidence from the Cable Television Industry," *Journal of Economics and Management Strategy*, Vol. 4, No. 2, Summer 1995, pp. 375-397.

"A Marginal Cost Transfer Pricing Methodology," *Tax Notes*, Nov. 26, 1990 (with Ann Dryden Witte, Wellesley College and NBER).

### Chapters in Books

"Hospital-Physician Integration: The St. Luke's Case" (with Deborah Haas-Wilson), in *The Antitrust Revolution, 7th Edition* (Oxford University Press), edited by John Kwoka and Lawrence White.

### Books Edited

*Proving Antitrust Damages*, 3rd Edition, (American Bar Association, 2017).

### Book Reviews

*The Antitrust Source*, October 2007, Book Review of Michael D. Whinston, *Lectures on Antitrust Economics* (Cambridge, MIT Press, 2006).

*The Journal of Economic Literature*, June 1992, Vol. XXX, No. 2, Book Review of Frank Cowell, *Cheating the Government* (with Ann Dryden Witte, Wellesley College and NBER) (Cambridge, MIT Press, 1990).

## Working Papers

"In a Race Against the Clock:  Auctioneer Strategies and Selling Mechanisms in Live Outcry Auctions," 2014 (with Lucia Dunn and Stephen Cosslett, the Ohio State University).

"Efficient Estimation Via Moment Restrictions," (with Whitney K. Newey).

"Antidumping and Countervailing Orders: A Study of the Market for Corrosion-Resistant Steel," (with Brian L. Palmer).

"Firms' Responses to Minimum Standards Regulations: An Empirical Investigation" (with Ann Dryden Witte), NBER Working Paper # 6104.

"Effects of Information Provision in a Vertically Differentiated Market" (with Ann Dryden Witte), NBER Working Paper # 6493.

"Unintended Consequences? Welfare Reform and the Working Poor" (with Ann Dryden Witte, Magaly Queralt, and Harriet Griesinger), NBER Working Paper # 6798.

## Select Invited Presentations and Interviews

FTC Hearings #3: Competition and Consumer Protection in the 21st Century, October 2018.

Interview with the Antitrust Practice Group, *AHLA Antitrust Spotlight Series*, March 2018.

ABA Webinar: "Market Definition in section 2 and section 7: The same but not the same? Questions of fact or law?" November 2017.

International Congress of Addictology Albatros, "Economics of Tobacco Plain Packaging: Australian Legislation," May 2017.

Federal Communication Commission's Event on Challenges Facing Independent Programmers, April 2016, available at: https://www.youtube.com/watch?v=8yxC_3M4IWA.

Federal Communication's Panel on Challenges Facing Multichannel Video Programming Distributors, March 2016, available at: https://www.youtube.com/watch?v=03CMDtdpRDQ.

ABA Webinar: "Sports Leagues Claims After 5 Years After American Needle," 2015.

NYSBA Antitrust Class Action Program: "Comcast v. Behrend:  Interpretation and Application of *Comcast* to Damages Issues in Class Certification," 2015.

AHLA Annual Meetings: "Antitrust and Provider Mergers and Affiliations: Competition vs. More Affordable Care?" 2015.

AHLA Webinar: "Antitrust Implications and Lessons Learned from the Ninth Circuit Decision in *St. Luke's*," 2015.

ABA Webinar: "St. Lukes: State and Federal Enforcement in Non-Reportable Program," 2015.

NYC Bar Antitrust and Healthcare Program, 2015.

NYSBA Antitrust Law Section Annual Meetings: "Efficiencies:  The Cheshire Cat of Merger Analysis," 2014.

NYC Bar Antitrust & Trade Regulation Committee: "Approaches to Antitrust Damages," 2014.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    A-10

## PROFESSIONAL SERVICE

Defendant's expert at the ABA Mock Trial involving the issue exclusivity, in the form of theaters' use of clearances, 2017.

Vice Chair of the Antitrust Practice Group of the American Health Lawyers Association, 2014-2016.

Advisory board of the Pricing Conduct Committee, 2011-2012.

Editorial comments on a chapter of the ABA's *Price Discrimination Handbook*, 2011.

Plaintiffs' expert at the ABA Mock Trial involving the issue of resale price maintenance, 2008.

Editorial comments on a chapter of the ABA's book on *Market Definition*, 2008.

Contribution to the ABA's *Econometrics Legal, Practical, and Technical Issues*, 2005.

## MEMBERSHIPS

American Health Lawyers Association

American Bar Association

American Economic Association

## HONORS

National Science Foundation Fellowship, 1989-1992

Phi Beta Kappa, 1988

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA   A-11

## Appendix B: Materials Considered

All materials cited in this report, all materials listed in Appendix B of Chipty SJ Declaration, Chipty Class Declaration, and Chipty Class Reply Declaration, and the following:

## I.   Expert Reports and Declarations

- Declaration of Darrin Wells in Connection with Plaintiff UEBT's Motion for Class Certification, May 24, 2017.
- Expert Declaration of Dr. Robert D. Willig and Backup Production, in Support of Defendant's Opposition to Class Certification, September 21, 2018.
- Expert Report of Kenneth W. Kizer, MD, MPH, April 22, 2018.
- Sur-Reply Declaration of Dr. Robert D. Willig and Backup Production, in Further Support of Defendant's Opposition to Class Certification, January 7, 2019.

## II.   Depositions and Associated Exhibits

- Deposition of Aldo De La Torre, Vice President of Anthem, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, et al., v. Sutter Health,* Case Nos. CGC-14-538451 consolidated with CGC-18-565398, and 3:12-CV-4854-LB, July 17-18, 2018.
- Deposition of Annie Wong, Director of U.C. Davis Health Contracts at U.C. Davis, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health,* Case Nos. CGC-14-538451 and CGC-18-565398, September 27, 2018.
- Deposition of April Martin, Vice President Managed Care, East Bay Region at Sutter until 2008, *Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health, UFCW & Employers Benefit Trust v. Sutter Health, et al., and People of the State of California, ex rel. Xavier Becerra, v. Sutter Health,* Case Nos. 3:12-CV-4854-LB, CGC-14-538451 consolidated with CGC-18-565398, August 10, 2018.

- Deposition of Beau Trojan, Director of Contracting in Managed Care at Cottage Health, *Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health, UFCW & Employers Benefit Trust v. Sutter Health, et al., and People of the State of California, ex rel. Xavier Becerra, v. Sutter Health,* Case Nos. 3:12-CV-4854-LB**,** CGC-14-538451 consolidated with CGC-18-565398, October 30, 2018.

- Deposition of Benjamin W. Katz, Vice President of PPO Segment at Hill Physicians Medical Group, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, et al., vs. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, September 21, 2018.

- Deposition of Carl Sotherland, Executive Director of Analytic Services at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al.,* Case No. CGC-14-538451, May 14-15, 2018.

- Deposition of Colette Boudreau, Vice President Enterprise Finance & Controller at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al. and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451 consolidated with CGC-18-565398, and 3:12-CV-4854-LB, July 13, 2018.

- Deposition of Cynthia Kettmann, Senior Vice President of Public Affairs at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health, et al.,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, June 20, 2018.

- Deposition of Daniel Hodges, Senior Vice President, Benefits at Woodruff-Sawyer, *Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart,*

*Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case No. C 12-CV-4854-LB, November 2, 2018.

- Deposition of Daniel Siler, Contract Manager at Kaiser Permanente, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health, et al.,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, October 2, 2018.

- Deposition of Darrin Wells, Director of Actuarial & Analytics at Blue Shield, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al. and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451 consolidated with CGC-18-565398, and 3:12-CV-4854-LB, August 29-30, 2018.

- Deposition of Dawn Cirri, Assistant Vice President of Managed Care at Tenet Healthcare since December 2013, *UEBT, et al., v. Sutter Health, et al., People of the State of California, v. Sutter Health, et al., and Djeneba Sidibe, et al., v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, October 17, 2018.

- Deposition of Don Wreden, Senior Vice President for Patient Experience at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al. and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451 consolidated with CGC-18-565398, and 3:12-CV-4854-LB, June 27, 2018.

- Deposition of Douglas A. Sturnick, Vice President of Managed Care and Payer Relations for Cedars-Sinai Medical Center, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, et al., v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, November 12, 2018.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- Deposition of Edward Davis, Director of Network Compliance at Anthem, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health, et al.,* Case Nos. CGC-14-538451 consolidated with CGC-18-565398, and 3:12-CV-4854-LB, July 12, 2018.

- Deposition of Edward Lee Berdick, Senior Vice President for Shared Services at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, July 31, 2018.

- Deposition of Elizabeth Gallagher, Director, Provider Network Management at Health Net, *Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case No. C 12-CV-4854-LB, October 15, 2018.

- Deposition of Eric Garthwaite, Director of Data Analysis at Health Net, *Djeneba Sidibe v. Sutter Health,* Case No. 3:12-CV-4854-LB, October 16, 2018.

- Deposition of Gerald Crews, Co-founder at Crews MacQuarrie & Associates, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., Company, Inc., et al.,* Case No. CGC-14-538451, March 15-16, 2018.

- Deposition of Greg Stevens, Vice President, Network, West Region at Aetna, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., Company, Inc., et al., and Djeneba Sidibe, et al., v. Sutter Health,* Case Nos. CGC-14-538451 consolidated with CGC-18-565398, and 3:12-CV-4854-LB, August 21, 2018.

- Deposition of Gregory Kazmirchuk, Actuary and Project Manager at Health Net, *Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case No. C 12-CV-4854-LB, October 15, 2018.

- Deposition of James E. Conforti, President of Operating Division at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al.,* Case No. CGC-14-538451, May 9, 2018.

- Deposition of James E. Conforti, President of Operating Division at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health, et al.,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, May 31, 2018.

- Deposition of James Orchison, Director, Network Design & Programs, Network Management at Blue Shield, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al. and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451 consolidated with CGC-18-565398, and 3:12-CV-4854-LB, July 20 and 24, 2018.

- Deposition of Jannine Segall, Executive Director of Contracting and Network Management for John Muir Hospital, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, et al., v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, September 28, 2018.

- Deposition of Jeff Gerard, President, Sutter Health Bay Area, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al. and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451 and 3:12-CV-4854-LB, May 4, 2018 and June 1, 2018.

- Deposition of Jeffrey Conklin, Payer and Network Strategies Executive at Adventist Health, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, et*

*al., v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, October 9, 2018.

- Deposition of Jeffrey Hermosillo, Senior Vice President of Markets Division at Blue Shield, *Djeneba Sidibe, et al., v. Sutter Health, et al.,* Case No. 3:12-CV-4854-LB, October 11, 2018.

- Deposition of Joan Kezic, Vice President, Payor Relations at El Camino Hospital, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe and Jerry Jankowski, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, November 1, 2018.

- Deposition of John Cascell, Senior Vice President of MemorialCare Health System, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, et al., v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, January 15, 2019.

- Deposition of Jon Chason, Vice President of Managed Care Analysis at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al. and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451 and 3:12-CV-4854-LB, May 23-25, 2018.

- Deposition of Joseph Sweeney, Senior Vice President at The Segal Company, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe and Jerry Jankowski, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, March 22, 2018.

- Deposition of Juan Davila, Executive Vice President of Health Care Quality and Affordability at Blue Shield, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe and Jerry Jankowski, on behalf of themselves and all others similarly*

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

*situated v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, July 11-12, 2018.

- Deposition of Kathleen Donneson, Chief of Health Plan Administration Division at CalPERS, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al. and Djeneba Sidibe, et al., v. Sutter Health, et al.,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, October 31, 2018.

- Deposition of Kristen Miranda, Director of Network Management at Blue Shield, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, et al., v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, July 18-19, 2018.

- Deposition of Lou Bennet, Regional Vice President of Health Corporation of America, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, January 29, 2019.

- Deposition of Maurice Couser, Underwriting Market Vice President at United, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451 consolidated with CGC-18-565398, and 3:12-CV-4854-LB, August 15, 2018.

- Deposition of Melanie Myers, Associate Director of Research and Strategic Initiatives at the America Federation of Teachers, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, and Djeneba Sidibe, et al. v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, August 7, 2018.

- Deposition of Melissa Brendt, Chief Contracting Officer at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al.,* Case No. CGC-14-538451, May 16, 2018.

- Deposition of Melissa Brendt, Chief Contracting Officer at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al. and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451 and 3:12-CV-4854-LB, June 18, 2018.

- Deposition of Michael Ramseier, then Vice President, Provider Engagement and Contracting, West Region at Anthem, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al.,* Case No. CGC-14-538451, March 30, 2017.

- Deposition of Michael Stanish, then Director of Managed Care Analyses at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al. and Djeneba Sidibe, et al. v. Sutter Health, et al.,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, August 22, 2018.

- Deposition of Peter Welch, President of Cigna Healthcare of California, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, and Djeneba Sidibe, et al. v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, October 1, 2018.

- Deposition of Sanjay Saxena, BCG consultant to Sutter, *Djeneba Sidibe, et al. v. Sutter Health,* Case No. 3:12-CV-4854-LB, October 15, 2018.

- Deposition of Saumya Saturia, Senior Partner at McKinsey, *Djeneba Sidibe, et al. v. Sutter Health et al.,* Case No. 3:12-cv-4854-LB, May 10, 2018.

- Deposition of Scott Hamilton, Director of Contracting at Cigna Healthcare of California, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, et al. v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, September 10, 2018.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- Deposition of Sherman Card, Vice President of Claims Operations at HealthNet, *Djeneba Sidibe, et al. v. Sutter Health et al.,* Case No. 3:12-cv-4854-LB, October 19, 2018.

- Deposition of Steve Melody, President, Medicaid Health Plan for California at Anthem until 2018, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al.,* Case No. CGC-14-538451, March 21, 2017.

- Deposition of Steven Cain, Vice President, Sales & Account Management, Key Accounts, at United, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al. and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451 and 3:12-CV-4854-LB, June 20, 2018.

- Deposition of Susann Conley, Former Director of Managed Care at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. Case Nos. CGC-14-538451 consolidated with CGC-18-565398, and 3:12-CV-4854-LB, June 12, 2018.

- Deposition of Tami Lucas, Senior Network Manager of Provider Contracting at Blue Shield, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al. and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. Case Nos. CGC-14-538451 consolidated with CGC-18-565398, and 3:12-CV-4854-LB, August 28-29, 2018.

- Deposition of Tammy Wilcox, Senior Vice President of Managed Care at Dignity Health, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, et al. v. Sutter Health,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, October 19, 2018.

- Deposition of Terri Baker, UEBT Senior Account Representative at Blue Shield, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al. and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. CGC-14-538451 consolidated with CGC-18-565398, and 3:12-CV-4854-LB, May 15, 2018.

- Deposition of Tiffany Christine Figoni, Director of Product Development at Health Net, *Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case No. C 12-CV-4854-LB, September 28, 2018.

- Deposition of Tina Greene, Vice President at Sutter until 2010, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al., and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos. Case Nos. CGC-14-538451 consolidated with 3:12-CV-4854-LB, July 25, 2018.

- Deposition of Todd Smith, Vice President of Product Development and Management, formerly Regional Vice President of Strategy and Business Development and Vice President of Managed Care at Sutter, *Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case No. C 12-CV-4854-LB, August 17, 2017.

- Deposition of Todd Smith, Vice President of Product Development and Management, formerly Regional Vice President of Strategy and Business Development and Vice President of Managed Care at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health, et al.,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, August 21-22, 2018.

- Deposition of Todd Smith, Vice President of Product Development and Management, formerly Regional Vice President of Strategy and Business Development and Vice President of Managed Care at Sutter, *Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case No. C 12-CV-4854-LB, September 13, 2018.

- Deposition of Traci Van Attenhoven, Community Benefit Director at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health, et al.,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, August 28, 2018.

- Deposition of Tracy Murphy, Vice President of Creative Services at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, et al., v. Sutter Health, et al.,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, August 16-17, 2018.

- Deposition of William Gleeson, Vice President of Communications & Marketing at Sutter, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated, v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, et al., and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health, et al.,* Case Nos. CGC-14-538451, CGC-18-565398, and 3:12-CV-4854-LB, July 25, 2018.

- Deposition of Yun J. Kim, Director of Network Performance at Blue Shield, *UFCW & Employers Benefit Trust, et al., v. Sutter Health, et al., People of the State of California, ex rel. Xavier Becerra, v. Sutter Health, and Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case Nos.

CGC-14-538451 consolidated with CGC-18-565398, and 3:12-CV-4854-LB, August 31, 2018.

## III.  Legal Documents

- "Brief and Required Short Appendix of Appellants Federal Trade Commission and State of Illinois (Public Version)," *Federal Trade Commission and State of Illinois v. Advocate Health Care Network, et al.*, Case No. 16-2492, filed July 15, 2016.

- "Class Action Complaint," *UFCW & Employers Benefit Trust v. Sutter Health; Sutter East Bay Hospitals; Sutter West Bay Hospitals; Eden Medical Center; Sutter Central Valley Hospitals; Mills-Peninsula Health Services; Sutter Health Sacramento Sierra Region; Sutter Coast Hospital; Palo Alto Medical Foundation for Healthcare, Research and Education; and Sutter Medical Foundation*, Case No. CGC-14-538451, filed April 7, 2014.

- "Competitive Impact Statement," *United States of America and the State of North Carolina v. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System*, Case No. 3:16-cv-00311, filed December 4, 2018.

- Email from Kaitlyn Murphy, counsel for United, to David Brownstein, counsel for Sidibe Plaintiffs, "Subject: RE: Sidibe v. Sutter: United HealthCare data," October 17, 2018.

- Email from Maxwell Pritt, counsel for United, to David Brownstein, counsel for Sidibe Plaintiffs, "Subject: RE: Urgent UnitedHealthcare question," April 5, 2019.

- Email from Scott Perlman to Christopher Spiers, "Blue Shield Written Responses to Sutter August 27 Data Questions," November 30, 2018, and Attachment, "Blue Shield Written Responses to Sutter August 27 Data Questions.docx," November 30, 2018.

- "Fourth Amended Complaint," *Djeneba Sidibe, Diane Dewey and Jerry Jankowski on Behalf of Themselves and All 15 Other Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, filed September 29, 2017.

- "Opinion," *Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center; Pinnacle Health System*, Case No. 16-2365, filed September 27, 2016.

- "Opinion," *ProMedica Health System, Inc. v. Federal Trade Commission*, Case No. 12-3583, filed April 22, 2014.

- "Opinion," *Saint Alphonsus Medical Center-Nampa Inc.; Saint Alphonsus Health System Inc.; Saint Alphonsus Regional Medical Center, Inc.; Treasure Valley Hospital Limited Partnership; Federal Trade Commission; State of Idaho; v. St. Luke's Health System Ltd.; St. Luke's Regional Medical Center, Ltd.; Saltzer Medical Group*, Case Nos. 1:12-cv-00560-BLW and 1:13-cv-00116-BLW, filed February 9, 2015

- "Opinion," *United States v. Rockford Memorial Corp.*, Case No. 89-1900, filed April 3, 1990.

- "Order (1) Granting In Part And Denying In Part Defendant's Motion For Summary Judgment, (2) Denying In Part And Denying As Moot In Part Defendant's Motion To Exclude Plaintiffs' Expert, And (3) Denying As Moot Plaintiffs' Motion To Exclude Defendant's Expert," *Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Caroline Stewart, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and all others similarly situated v. Sutter Health,* Case No. 3:12-CV-4854-LB, filed April 12, 2019.

- "Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Class Certification," *Djeneba Sidibe et al. on Behalf of Themselves and All Others Similarly Situated, v. Sutter Health*, Case No. 3:12-cv-4854-LB, filed June 22, 2018.

- "Proposed Final Judgment," *United States of America and State of North Carolina v. the Charlotte-Mecklenburg Hospital Authority d/b/a Carolinas Healthcare System*, Case No. 3:16-cv-00311-RJC-DCK, filed November 15, 2018.

- "Redacted Memorandum Opinion and Order," *Federal Trade Commission and State of Illinois* v. *Advocate Health Care Network, et al.,* Case No. 15 C 11473, filed March 16, 2017 in the United States District Court for the Northern District of Illinois Eastern Division.

## IV.  Produced Documents

- ABC000463
- ABCLH007671
- ABCLH008431
- ABCLH008478
- ABCLH053601

- ABCLH108589
- ABCLH135056
- ABCLH143925
- ABCLH158785
- ABCLH158788

- ABCLH158789
- ABCLH166757
- ABCLH209052
- ABCLH214506
- ABCLH241064
- ABCLH371733
- ABCLH410939
- ABCLH423956
- ABCLH453347
- ABCLH465815
- ABCLH467934
- ABLH104183
- ABLH108094
- ABLH120166
- AET-ESI0002403
- AET-ESI0012221
- AET-ESI0021372
- AET-ESI0022515
- AET-ESI0022695
- AET-ESI0022886
- AET-ESI0022915
- AETN-130853872
- AETNA00021039
- Aetna00033475
- BCG000007529
- BCS_UFCW00002953
- BSC_SutterSidibe0005445
- BSC_SutterSidibe0005446
- BSC_SutterSidibe0012773
- BSC_SutterSidibe0038416

- BSC_SutterSidibe0062812
- BSC_SutterSidibe0063440
- BSC_SutterSidibe0079992
- BSC_SutterSidibe0082715
- BSC_SutterSidibe0257619
- BSC_SutterSidibe0257622
- BSC_SutterSub00006983
- BSC_SutterSub00007123
- BSC_SutterSub00008808
- BSC_SutterSub00010777
- BSC_SutterSub00012510
- BSC_SutterSub00013121
- BSC_SutterSub00017071
- BSC_SutterSub00018387
- BSC_SutterSub00018433
- BSC_SutterSub00048729
- BSC_SutterSub00059996
- BSC_SutterSub00060105
- BSC_SutterSub00061437
- BSC_SutterSub00061459
- BSC_SutterSub00061463
- BSC_SutterSub00061477
- BSC_SutterSub00062205
- BSC_SutterSub00062270
- BSC_SutterSub00062376
- BSC_SutterSub00062383
- BSC_SutterSub00062494
- BSC_SutterSub00063491
- BSC_SutterSub00063496
- BSC_SutterSub00063496

- BSC_SutterSub00063499
- BSC_SutterSub00192986
- BSC_SutterSub00272941
- BSC_UCFW-00099460
- BSC_UEBT-0000001
- BSC_UFCW 00005783
- BSC_UFCW 00007728
- BSC_UFCW 00008342
- BSC_UFCW 00010568
- BSC_UFCW00003134
- BSC_UFCW00003249
- BSC_UFCW00003290
- BSC_UFCW00003325
- BSC_UFCW00007608
- BSC_UFCW00010836
- BSC_UFCW0001143
- BSC_UFCW00011799
- BSC_UFCW-00059907
- BSC_UFCW-00060134
- BSC_UFCW-00062854
- BSC_UFCW-00115485
- BSC_UFCW-00116640
- BSC_UFCW-00116778
- BSC_UFCW-00117188
- BSC_UFCW-00121097
- BSC_UFCW-00121169
- BSC_UFCW00121265
- BSC_UFCW-00130137
- BSC_UFCW-00184233
- BSC02689

- BSC-UEBT0005339
- BSC-UEBT-0015383
- BSC-UEBT-0015383-431
- CREWS002939
- DEF000000753
- DEF000002628
- DEF000004082
- DEF000015558
- DEF000018583
- DEF000093590
- DEF000152821
- DEF000154106
- DEF000162456
- DEF000168407
- DEF000207087
- DEF000207137
- DEF000207165
- DEF000207186
- DEF000207542
- DEF000208069
- DEF000227565
- DEF000317070
- DEF000386850
- DEF000390543
- DEF000409422
- DEF000413363
- DEF000413592
- DEF000469382
- DEF000485342
- DEF000609746

- DEF000730479
- DEF000775970
- DEF000877892
- DEF000896411
- DEF000931571
- DEF000937658
- DEF001438456
- DEF001438457
- DEF001449494
- DEF001454377
- DEF001472017
- DEF001497726
- DEF001799622
- DEF001888071
- DEF001898200
- DEF001900078
- DEF001900087
- DEF001904338
- DEF001907874
- DEF001908537
- DEF001908712
- DEF001912944
- DEF001916227
- DEF001920188
- DEF001924593
- DEF001924626
- DEF001927697
- DEF001928208
- DEF001928723
- DEF001928805

- DEF001928831
- DEF001928897
- DEF001929207
- DEF001977345
- DEF001977924
- DEF001978047
- DEF001981799
- DEF001981816
- DEF001993320
- DEF00199364
- DEF001993646
- DEF002009745
- DEF002020706
- DEF002049613
- DEF002052323
- DEF002058337
- DEF002065443
- DEF002086462
- DEF002110534
- DEF002150439
- DEF002195668
- DEF002213757
- DEF002217932
- DEF002376922
- DEF002437706
- DEF002560836
- DEF002575825
- DEF002606875
- DEF002638377
- DEF002647678

- DEF002655756
- DEF002673844
- DEF002682599
- DEF002708342
- DEF002723523
- DEF002723603
- DEF002723965
- DEF002786273
- DEF002822716
- DEF002851848
- DEF002869236
- DEF002894733
- DEF003006903
- DEF003100243
- DEF003119844
- DEF003134809
- DEF003213029
- DEF003218355
- DEF003337410
- DEF003381860
- DEF003418937
- DEF003552139
- DEF003601144
- DEF003923210
- DEF003932277
- DEF004024266
- DEF004027829
- DEF004117114
- DEF004206324
- DEF004254114

- DEF004269829
- DEF004312084
- DEF004436739
- DEF004450349
- DEF004569802
- DEF004644989
- DEF004683617
- DEF004737836
- DEF004854462
- DEF004860874
- DEF004868472
- DEF004873581
- DEF004879178
- DEF004898559_R0001
- DEF004937294
- DEF004950948
- DEF004963321
- DEF004964191
- DEF004964205
- DEF004964650
- DEF004968290
- DEF004968296
- DEF004969488
- DEF005027788
- DEF005123811
- DEF005123819
- DEF005148538
- DEF005148539
- DEF005205132
- DEF005220843

- DEF005230414
- DEF005241466
- DEF005262098
- DEF005265095
- DEF005265990
- DEF005272962
- DEF005312826
- DEF005361700
- DEF005861655
- DEF005955162
- DEF006198965
- DEF006430245
- DEF006649188
- DEF006662714
- DEF006672717
- DEF006787606
- DEF006833295
- DEF006848010
- DEF007028658
- DEF007240936
- DEF007268792
- DEF007276930
- DEF007581573
- DEF008335464
- DEF00877864
- Dignity_0783
- Dignity_08452
- Dignity_08966
- DIGNITY_09040
- Dignity_09131

- DMHC000078876
- DMHC000079052
- DMHC000079467
- ECH0000243
- HN0006301
- HN0007886
- HN0019446
- HN0019766
- PROD002532
- PROD00609670
- PROD00632054
- PROD00727444
- SH000735
- SH-02-011870
- SH-02-011879
- SH-02-103543
- SH-04-000128
- SH-06-001327
- SH-06-005288
- SH-06-009693
- SH-06-009726
- SH-07-000064
- SH-07-000562
- SH-08-000489
- SH-08-000571
- SH-08-000597
- SH-08-000663
- SH-08-000973
- SH-11-000396
- SH-11-000898

- SH-11-000974
- SHC_01518
- SHC_05242
- SIDIBE_ABC_0141070
- SIDIBE_ABC_0141076
- SIDIBE_ABC_0141082
- SIDIBE_ABC_0141561
- SIDIBE_ABC_0141571
- SIDIBE_ABC_0142010
- SIDIBE_ABC_0142072
- SIDIBE_ABC_0142490
- SIDIBE_ABC_0142493
- SIDIBE_ABC_0142494
- SIDIBE_ABC_0142919
- SIDIBE_ABC_0142920
- SIDIBE_ABC_0143350
- SIDIBE_ABC_0143352
- SIDIBE_ABC_0143353
- SIDIBE_ABC_0143354
- SIDIBE_ABC_0143357
- SIDIBE_ABC_0143360
- SIDIBE_ABC_0143781
- SIDIBE_ABC_0143843
- SIDIBE_ABC_0144276
- SIDIBE_ABC_0144277
- SIDIBE_ABC_0144700
- SIDIBE_ABC_0144703
- SIDIBE_ABC_0144704
- SIDIBE_ABC_0144705
- SIDIBE_ABC_0144708

- SIDIBE_ABC_0144711
- SIDIBE_ABC_0145108
- SIDIBE_ABC_0145545
- SIDIBE_ABC_0145547
- SIDIBE_ABC_0145983
- SIDIBE_ABC_0145984
- SIDIBE_ABC_0145985
- SIDIBE_ABC_0145988
- SIDIBE_ABC_0146418
- SIDIBE_ABC_0146419
- SIDIBE_ABC_0146420
- SIDIBE_ABC_0146423
- SIDIBE_ABC_0146864
- SIDIBE_ABC_0146865
- SIDIBE_ABC_0146866
- SIDIBE_ABC_0146874
- SIDIBE_ABC_0147312
- SIDIBEKAISER82440
- STCA0000856
- STCA0006193
- STCA0007116
- STCA0007763
- STCA0007764
- STCA0116269
- STCA0128302
- STCA0146815
- STCA0267709
- STCA0275196
- STCA0287521
- STCA0362005

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    B-19

- STCA0461501
- STCA0472330
- STCA0483764
- STCA0509277
- STCA0528205
- STCA0592945
- STCA0593936
- STCA0649403
- STCA0694067
- STCA0694068
- STCA0696852
- STCA0702628
- STCA0720225
- SUT0101020
- UCD_07053
- UCD_07054
- UCD-10197
- UCSF_03434
- UCSF_06065

- UEBT0273414
- UEBT0273550
- UHC_00210338
- UHC_Sidibe-0000664
- UHC-00009028
- UHC-00073784
- UHC-00073987
- UHC-00118323
- UHC-00118324
- UHC-00149354
- UHC-00203487
- UHC-00203488
- UHC-00204849
- UHC-00303532
- UHC-00470393
- UHC-005084696
- UHC-005091983
- UHC-005092625

## V.   Data Sources and Documentation

- AETNA00021039
- AETNA00085680
- BSC_SutterSub00344685
- BSC_SutterSub00344686
- BSC_SutterSub00344687
- BSC_SutterSub00344688
- HN-0003551
- HN-0003552
- HN0006301

- HN0007886
- HN0018106 - HN0018128
- HN0019446 – HN0019546
- HN0026619 - HN0027518
- HN0027519 - HN0027544
- UHC_Sidibe-0000664
- UHC_Sidibe-0000859
- UHC_Sidibe-0000860
- UHC_Sidibe-0008727 - UHC_Sidibe-0008888
- UHC_Sidibe-0008889
- UHC-00148363
- UHC-005108021
- UHC-005108024
- UHC-005149246 - UHC-005149278
- UHC-005149313 - UHC-005149359
- UHC-005149354
- UHC-005149355
- UHC-481441
- Department of Health and Human Services, Centers for Medicare & Medicaid Services, "CMS Manual System," October 12, 2007.
- Office of Statewide Health Planning and Development, California, "Structural and Nonstructural Performance Categories and Collapse Probability of General Acute Care Hospital Buildings," March 28, 2019, available at https://data.chhs.ca.gov/dataset/seismic-ratings-and-collapse-probabilities-of-california-hospitals.
- Office of Statewide Health Planning and Development, California, 2001 and 2012-2017 "Hospital Annual Utilization Pivot Profiles," available at https://data.chhs.ca.gov/dataset/hospital-annual-utilization-report.

- U.S. Census Bureau, Annual Estimates of the Resident Population, 2017, available at https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=PEP_2017_PEPANNRES&prodType=table.
- U.S. Census Bureau, Small Area Health Insurance Estimates (SAHIE) using the American Community Survey (ACS), 2017, available at https://www2.census.gov/programs-surveys/sahie/datasets/time-series/estimates-acs/sahie-2017-csv.zip.
- U.S. Department of Commerce, United States Census Bureau, "California FIPS Code to County Name," available at https://www2.census.gov/geo/docs/reference/codes/files/st06_ca_cou.txt.
- U.S. Department of Housing and Urban Development, Office of Policy Development and Research, "Zip-CD," available at https://www.huduser.gov/portal/datasets/usps_crosswalk.html, January-March, 2012.
- U.S. Department of Housing and Urban Development, Office of Policy Development and Research, "Zip-County," available at https://www.huduser.gov/portal/datasets/usps_crosswalk.html, January-March, 2011.
- Wei, Samantha, "Subject: Aetna Life Insurance Company – NAIC No. 00160054, Student Health Blanket Accident and Sickness Policy," *Aetna Life Insurance Company*, available at https://www.insurance.pa.gov/Consumers/ProductNotices/Documents/Student%202018-2019%20Aetna%20Life%20-%20AETN-131331937.pdf.

## VI.  Articles and Books

- Atwood, Alicia, Anthony T. Lo Sasso, "The Effect of Narrow Provider Networks on Health Care Use," *Journal of Health Economics*, Vol. 50, December 2016, pp. 86-98.
- Baker, Jonathan, "Note on 'Single Monopoly Profit' Theory," September 18, 2014, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2496932, *site visited June 4, 2018*.
- Baumol, William J. and Alan S. Blinder, *Microeconomics Principles and Policy*, Sixth Edition, Orlando, FL: Harcourt Brace & Company, 1994.

- Berenson, Robert A., Divvy K. Upadhyay, Suzanne F. Delbanco, and Roslyn Murray, "Per Diem Payments to Hospitals for Inpatient Stays," *Urban Institute Research Report*, April 2016, available at https://www.urban.org/sites/default/files/03_per_diem_payment_to_hospitals_for_inpatient_stays.pdf, *site visited* April 17, 2019.
- Brown, Zach Y., "Equilibrium Effects of Health Care Price Information," Working Paper, March 2018, available at http://www-personal.umich.edu/~zachb/zbrown_eqm_effects_price_transparency.pdf, *site visited* July 28, 2018.
- Capps, Cory, David Dranove, and Mark Satterthwaite, "Competition and Market Power in Option Demand Markets," *RAND Journal of Economics*, Vol. 34, No. 4, Winter 2003, pp. 737-763.
- Chipty, Tasneem and Christopher M. Snyder, "The Role of Firm Size in Bilateral Bargaining: A Study of the Cable Television Industry," *Review of Economics and Statistics*, May 1999, Vol. 81, No. 2, pp. 326–340.
- Dafny, Leemore S., Igal Hendel, Victoria Marone, and Christopher Ody, "Narrow Networks on the Health Insurance Marketplaces: Prevalence, Pricing, and the Cost of Network Breadth," *Health Affairs*, Vol. 36, No. 9, September 2017, pp. 1606-1614.
- Dafny, Leemore, Igal Hendel, and Nathan Wilson, "Narrow Networks on the Health Insurance Exchanges: What Do They Look Like and How Do They Affect Pricing? A Case Study of Texas," *American Economic Review*, Vol. 105, No. 5, May 2015, pp. 110-114.
- Dafny, Leemore, Mark Duggan, and Subramaniam Ramanarayanan, "Paying a Premium on Your Premium? Consolidation in the US Health Insurance Industry," *American Economic Review*, Vol. 102, No. 2, 2012, pp. 1161-1185.
- DeGroot, Morris H., *Probability and Statistics*, Second Edition, Addison Wesley, 1986.
- Drake, Coleman, "What Are Consumer Willing to Pay for a Broad Network Health Plan?: Evidence from Covered California," Becker Friedman Institute for Economics at UChicago, Working Paper, No. 2018-23, April 2018.

- Ericson, Keith M. and Amanda Starc, "Measuring Consumer Valuation of Limited Provider Networks," *American Economic Review*, Vol. 105, No. 5, May 2015, pp. 115-119.

- Farrell, Joseph, *et al.*, "Economics at the FTC: Hospital Mergers, Authorized Generic Drugs, and Consumer Credit Markets," *Review of Industrial Organization*, Vol. 39, No. 4, 2011, pp. 271-296.

- Frank, Matthew B., John Hsu, Mary Beth Landrum, and Micheal E. Chernew, "The Impact of a Tiered Network on Hospital Choice," *Health Services Research*, Vol. 50, No. 5, October 2015, pp. 1628-1648.

- Gaynor, Martin and Robert J. Town, "Competition in Health Care Markets," in *Handbook of Health Economics,* Vol. 2, Eds. Mark V. Pauly, Thomas G. McGuire, Pedro P. Barros, Elsevier B.V., 2011, pp. 499-637.

- Gaynor, Martin and William B. Vogt, "Antitrust and Competition in Health Care Markets," *Handbook of Health Economics*, Ed. A. J. Culyer, Ed. J. P. Newhouse, 2000, pp. 1405-1487.

- Glied, Sherry, "Managed Care," *National Bureau of Economic Research Working Paper Series*, July 1999.

- Gruber, Jonathan and Robin McKnight, "Controlling Health Care Costs Through Limited Network Insurance Plans: Evidence From Massachusetts State Employees," *National Bureau of Economic Research Working Paper Series*, September 2014.

- Haas-Wilson, Deborah and Christopher Garmon, "Hospital Mergers and Competitive Effects: Two Retrospective Analyses," *International Journal of the Economics of Business*, Vol. 18, No. 1, 2011, pp. 17-32.

- Haeder, Simon F., David L. Weimer, and Dana B. Mukamel, "California Hospital Networks Are Narrower In Marketplace Than In Commercial Plans, But Access And Quality Are Similar," *Health Affairs*, Vol. 34, No. 5, May 2015, pp. 741-748.

- Harris, Barry C. and Joseph J. Simons, "Focusing Market Definition: How Much Substitution is Necessary," *Research in Law and Economics*, Vol. 12, 1989, pp. 207-226.

- Hastie, Trevor, Robert Tibshirani, and Jerome Friedman, *The Elements of Statistical Learning*, Second Edition, New York, NY, Springer, 2001.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA   B-24

- Higgins, Aparna, Nicole Brainard, and German Veselovskiy, "Characterizing Health Plan Price Estimator Tools: Findings From a National Survey" *The American Journal of Managed Care*, Vol. 22, No. 2, February 2016, pp. 126-131.

- Ho, Kate and Robin Lee, "Equilibrium Provider Networks: Bargaining and Exclusion in Health Care Markets," *American Economic Review*, Vol. 109, No. 2, 2019, pp. 473-522.

- Ho, Katherine, "Insurer-Provider Networks in the Medical Care Market," *American Economic Review*, Vol. 99, No. 1, 2009, pp. 393-430.

- Hung, Peiyin, Carries E. Henning-Smith, Michelle M. Casey, and Katy B. Kozhimannil, "Access to Obstetric Services in Rural Counties Still Declining, with 9 Percent Lising Services, 2004-14," *Health Affairs*, Vol. 36, No. 9, 2017, pp. 1663-1671.

- Keeler, Emmett, Glenn Melnick, and Jack Zwanziger, "The Changing Effects of Competition on Non-Profit and For-Profit Hospital Pricing Behavior," *Journal of Health Economics*, Vol. 18, 1999, pp. 69-86.

- Kennedy, Peter, *A Guide to Econometrics*, 2nd Edition, Cambridge MA: MIT Press, 1989.

- Mankiw, N. Gregory, *Principles of Microeconomics*, Fifth Edition, South-Western Cengage Learning, 2008.

- McGuire, Thomas G., "Demand for Health Insurance," *Handbook of Health Economics*, Vol. 2. Ed. Mark V. Pauly, Ed. Thomas G. McGuire, Ed. Pedro P. Barros, 2012, pp. 317-396.

- Melnick, Glenn A. and Katya Fonkych, "Hospital Pricing And The Uninsured: Do The Uninsured Pay Higher Prices?" *Health Affairs*, Vol. 27, No. 2, March/April 2008, available at https://www.healthaffairs.org/doi/full/10.1377/hlthaff.27.2.w116, *site visited* April 18, 2019.

- Melnick, Glenn A., Jack Zwanziger, Anil Bamezai, and Robert Pattison, "The Effects of Market Structure and Bargaining Position on Hospital Prices," *Journal of Health Economics*, Vol. 11, No. 3, 1992, pp. 217-233.

- Melnick, Glenn and Emmett Keeler, "The Effects of Multi-Hospital Systems on Hospital Prices," *Journal of Health Economics*, Vol. 26, No. 2, 2007, pp. 400-413.

- National Academy of Social Insurance, "Addressing Pricing Power in Health Care Markets: Principles and Policy Options to Strengthen and Shape Markets," April 2015.

- Palabindala, Venkataraman et al., "Adoption of Electronic Health Records and Barriers," *Journal of Community Hospital Internal Medicine Perspectives*, Vol. 6, No. 5, 2016, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5089148/pdf/JCHIMP-6-32643.pdf.

- Pindyck, Robert and Daniel Rubinfeld, *Microeconomics*, Eighth Edition, Upper Saddle River, NJ: Pearson Education, Inc., 2013.

- Polsky, Daniel, Zuleyha Cidav, and Ashley Swanson, "Marketplace Plans with Narrow Physician Networks Feature Lower Monthly Premiums than Plans with Larger Networks," *Health Affairs*, Vol. 35, No. 10, October 2016, pp. 1842-1848.

- Prager, Elena, "Consumer Responsiveness to Simple Health Care Prices: Evidence from Tiered Hospital Networks," Working Paper, March 22, 2018, available at https://faculty.kellogg.northwestern.edu/models/faculty/m_download_document.php?id=419.

- Raskovich, Alexander, "Pivotal Buyers and Bargaining Position," *Journal of Industrial Economics*, December 2003, Vol. 51, No. 4, pp. 405-426.

- Reinhardt, Uwe, "The Disruptive Innovation of Price Transparency in Health Care," *American Medical Association*, 2013, Vol. 310, No. 18, 1927-1928.

- Robinson, James C. and Kimberly MacPherson, "Payers Test Reference Pricing and Centers of Excellence to Steer Patients to Low-Price and High-Quality Providers," *Health Affairs*, September 2012, Vol. 31, No. 9, 2028-2036.

- Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, Chicago, IL: ABA Book Publishing, 2017.

- Selden, Thomas M., Zeynal Karaca, Patricia Keenan, Chapin White, and Richard Kronick, "The Growing Difference Between Public and Private Payment Rates For Inpatient Hospital Care," *Health Affairs*, Vol. 34, No. 12, December 2015, pp. 2147-2150.

- Selden, Thomas M., Zeynal Karaca, Patricia Keenan, Chapin White, and Richard Kronick, Appendices to article, "The Growing Difference Between Public and Private Payment Rates For Inpatient Hospital Care," *Health Affairs*, Vol. 34, No. 12, December 2015.

- Sinaiko, Anna D., Mary Beth Landrum, and Michael E. Chernew, "Enrollment In a Health Plan with a Tiered Provider Network Decreased Medical Spending by 5 Percent," *Health Affairs*, Vol. 36, No. 5, 2017, pp. 870-875.
- Studenmund, A. H., *Using Econometrics: A Practical Guide*, 3rd Edition, Reading, MA: Addison-Wesley, 1997.
- Tenn, Steve, "The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction," *International Journal of the Economics of Business*, Vol. 18, No. 1, 2011.
- Thompson, Aileen, "The Effect of Hospital Mergers on Inpatient Prices: A Case Study of The New Hanover-Cape Fear Transaction," *International Journal of the Economics of Business*, Vol. 18, No. 1, 2011, pp. 91-101.
- Tibshirani, Robert, "Regression Shrinkage and Selection via the Lasso," *Journal of the Royal Statistical Society, Series B (Methodological)*, Vol. 58, No. 1, 1996, 267-288.
- Town, Robert and Gregory Vistnes, "Hospital Competition in HMO Networks," *Journal of Health Economics*, Vol. 20, 2001, pp. 733-753.
- Vistnes, Gregory, "Hospitals, Mergers, and Two-Stage Competition," *Antitrust Law Journal*, Vol. 67, No. 3, 2000, pp. 671-692.
- Wooldridge, Jefferey M., *Introductory Econometrics: A Modern Approach*, 4th Edition, Mason, OH: South Western Cengage Learning, 2009.
- Wu Vivian Y., "Managed Care's Price Bargaining with Hospitals," *Journal of Health Economics*, Vol. 28, No. 2, March 2009, pp. 350-360.
- Zwanziger, Jack, Glenn A. Melnick, and Anil Bamezai, "The Effect of Selective Contracting on Hospital Costs and Revenues," *Health Services Research*, Vol. 35, No. 4, 2000, pp. 849-867.

## VII.  Other Materials Considered

- http://archive.boston.com/business/healthcare/articles/2011/02/10/plans_steer_patients_to_lower_cost_hospitals/
- http://archive.boston.com/lifestyle/health/articles/2011/02/10/plans_steer_patients_to_lower_cost_hospitals/
- http://files.kff.org/attachment/full-report-ehbs-2013-abstract

- http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2017
- http://files.kff.org/attachment/Report-Employer-Health-Benefits-Annual-Survey-2018
- http://ftp.cdc.gov/pub/Health_Statistics/NCHS/NHIS/SHS/2016_SHS_Table_A-18.pdf
- http://healthcare.mckinsey.com/downloads/2015HospitalNetworks_Methodology.pdf
- http://ldi.upenn.edu/sites/default/files/rte/state-narrow-networks.pdf
- http://news.anthem.com/bcp/assets/article/WP-36186-HMO%20Network%20Comparison%20Guide%20%20Small%20Group%20FINAL%209_6_16.pdf
- http://www.cpmc2020.org/mb/timeline
- http://www.crai.com/sites/default/files/publications/Key-Takeaways-from-the-Advocate-Northshore-Merger-Litigation.pdf
- http://www.crai.com/sites/default/files/publications/Key-Takeaways-from-the-Advocate-Northshore-Merger-Litigation.pdf
- http://www.dmhc.ca.gov/HealthCareinCalifornia/PremiumRateReview/KeyTerms.aspx
- http://www.gao.gov/assets/590/585400.pdf
- http://www.healthaffairs.org/do/10.1377/hblog20160525.055020/full/
- http://www.insurance.ca.gov/01-consumers/110-health/10-basics/pna.cfm
- http://www.marcheseco.com/wp-content/uploads/CPMC-Institutional-Master-Plan.pdf
- http://www.ncsl.org/documents/health/CON_State_List.pdf#page=5
- http://www.ncsl.org/research/health/con-certificate-of-need-state-laws.aspx
- http://www.nursealllianceca.org/files/2012/02/CA_Title_22_S_70000.pdf
- http://www.reedley.com/departments/administrative/pdfs/CalPERS%202011%20Health%20Benefit%20Summary.pdf
- http://www.statecoverage.org/files/Deloitte_US_CHS_2011ConsumerSurveyinUS_062111.pdf
- https://bluecrosscamedicarerx.com/wps/portal/ca/agent?content_path=agent/f1/s0/t0/pw_e245943.htm&rootLevel=2&label=Small%20Group%20Health%20Plans
- https://connect.werally.com/medicalProvider/root
- https://data.chhs.ca.gov/dataset/hospital-annual-financial-disclosure-report-complete-data-set

- https://data.chhs.ca.gov/dataset/pre-2012-hospital-annual-financial-data-selected-data-pivot-tables/resource/dce072e9-d624-4d70-b1c0-127e0a7d3b71
- https://data.chhs.ca.gov/dataset/pre-2012-hospital-annual-financial-disclosure-report-complete-data-set/resource/fd2908c1-3d25-4e8c-a514-8a37f37e9734
- https://data.chhs.ca.gov/organization/office-of-statewide-health-planning-development
- https://hbex.coveredca.com/data-research/
- https://hbr.org/2017/11/5-ways-u-s-hospitals-can-respond-to-medicares-mounting-costs
- https://hbr.org/2018/02/one-relatively-easy-way-to-improve-u-s-health-care-expand-medicare-advantage
- https://health.ucdavis.edu/publish/news/newsroom/12461
- https://healthcare.mckinsey.com/sites/default/files/2017%20Hospital%20networks%20-%20Perspectives%20from%20four%20years%20of%20the%20individual_%20exchanges%20vF.pdf
- https://humboldtgov.org/DocumentCenter/View/60889/2018-Health-Benefit-Summary?bidId=
- https://jamanetwork.com/journals/jama/fullarticle/1734706
- https://lagunahonda.org/OurHistory
- https://longtermcare.acl.gov/the-basics/how-much-care-will-you-need.html
- https://mcpheeassociates.com/managed-care-glossary/
- https://napavalleyregister.com/lifestyles/real-napa/article_22948b48-8e8b-5373-b590-1479d2f39387.html
- https://onlinelibrary.wiley.com/doi/abs/10.1002/rnj.218
- https://oshpd.ca.gov/construction-finance/seismic-compliance-and-safety
- https://oshpd.ca.gov/construction-finance/seismic-compliance-and-safety/program-overview/
- https://oshpd.ca.gov/construction-finance/seismic-compliance-and-safety/seismic-performance-ratings/
- https://oshpd.ca.gov/data-and-reports/submit-data/financial-reporting/
- https://oshpd.ca.gov/wp-content/uploads/2018/07/hsptechltr30.pdf

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- https://revcycleintelligence.com/features/the-difference-between-medicare-and-medicaid-reimbursement
- https://support.sas.com/resources/papers/proceedings17/0767-2017.pdf
- https://www.aafp.org/about/policies/all/primary-care.html#3
- https://www.aapc.com/resources/medical-coding/hcpcs.aspx
- https://www.actuary.org/files/Small_group_def_ib_030215.pdf
- https://www.adventisthealth.org/blog/2010/november/hanford-medical-pavilion-open-kings-countys-firs/
- https://www.advisory.com/daily-briefing/2016/11/16/why-a-price-transparency-tool-isnt-just-nice
- https://www.aetna.com/individuals-families/using-your-aetna-benefits/manage-health-care-costs.html
- https://www.ahip.org/national-comparisons-of-commercial-and-medicare-fee-for-service-payments-to-hospitals/
- https://www.ahip.org/wp-content/uploads/2015/08/ConsumerTools_IssueBrief.8.24.15-2.pdf
- https://www.anthem.com/ca/press/california/anthem-blue-cross-partners-with-seven-la-amp-orange-county-health-systems-to-launch-vivity/
- https://www.anthem.com/wps/portal/ca/agent?content_path=agent/f1/s0/t0/pw_e245943.htm&rootLevel=2&label=Small%20Group%20Health%20Plans
- https://www.bcbs.com/news/press-releases/blue-cross-launches-smartshopper-let-customers-shop-online-compare-prices
- https://www.bcbsla.com/SmartShopper
- https://www.bdcadvisors.com/narrow-tailored-tiered-and-high-performance-networks-an-emerging-trend/
- https://www.beckershospitalreview.com/hospital-management-administration/new-adventist-hospital-to-open-in-hanford-california.html
- https://www.bls.gov/ooh
- https://www.bls.gov/ooh/healthcare/nurse-anesthetists-nurse-midwives-and-nurse-practitioners.htm

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     B-30

- https://www.bls.gov/ooh/healthcare/physician-assistants.htm
- https://www.bls.gov/ooh/healthcare/physicians-and-surgeons.htm
- https://www.bls.gov/ooh/healthcare/registered-nurses.htm
- https://www.calhealth.net/Kaiser-versus-Anthem-California.htm
- https://www.calpers.ca.gov/docs/circular-letters/1999/600-051-99.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2000/600-056-00.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2001/600-060-001.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2002/600-027-02.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2003/600-108-03.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2004/600-169-04.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2004/600-173-04.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2005/600-243-05.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2006/600-055-06.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2006/600-056-06.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2007/600-033-07.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2007/600-034-07.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2008/600-040-08.pdf
- https://www.calpers.ca.gov/docs/circular-letters/2008/600-041-08.pdf
- https://www.calpers.ca.gov/docs/forms-publications/2019-health-benefit-summary.pdf
- https://www.census.gov/data/datasets/time-series/demo/sahie/estimates-acs.html
- https://www.chaffey.edu/humres/CalPERS%202017%20Health%20Benefit%20Summary.pdf
- https://www.chcf.org/publication/the-private-insurance-market-in-california-2015/
- https://www.chcf.org/wp-content/uploads/2017/12/PDF-HIMURegulatoryOversight.pdf
- https://www.chcf.org/wp-content/uploads/2017/12/PDF-NarrowNetworksLimitedChoice.pdf
- https://www.chcf.org/wp-content/uploads/2018/02/QRGHealthInsurersEnrollment2018.pdf
- https://www.chinesehospital-sf.org/articles/new-construction-in-the-heart-of-chinatown-how-chinese-hospital-accomplished-the-impossible

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA   B-31

- https://www.cms.gov/icd10manual/fullcode_cms/P0185.html
- https://www.cms.gov/ICD10Manual/version34-fullcode-cms/fullcode_cms/Design_and_development_of_the_Diagnosis_Related_Group_(DRGs)_PBL-038.pdf
- https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/FY2016-IPPS-Final-Rule-Home-Page-Items/FY2016-IPPS-Final-Rule-Tables.html
- https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-Instruments/QualityInitiativesGenInfo/Downloads/RoadmapOverview_OEA_1-16.pdf
- https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/ICD9-10CM-ICD10PCS-CPT-HCPCS-Code-Sets-Educational-Tool-ICN900943.pdf
- https://www.cms.gov/Research-Statistics-Data-and-Systems/Research/ResearchGenInfo/Downloads/DataNav_Glossary_Alpha.pdf
- https://www.communitymedical.org/CMC/media/Fact-Sheets/facts-historical-highlights.pdf
- https://www.coveredca.com/medi-cal/
- https://www.coveredca.com/newsroom/PDFs/CoveredCA_2019_Plans_and_Rates.pdf
- https://www.cpmc2020.org/sites/default/files/DemoEventNewsRelease_0.pdf
- https://www.dmhc.ca.gov/Portals/0/Docs/OLS/2018%20KKA%20and%20Title%2028.pdf
- https://www.fresnostate.edu/adminserv/hr/documents/2012_HealthBenefitSummary.pdf
- https://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf
- https://www.ftc.gov/sites/default/files/documents/reports/effect-state-certificate-need-laws-hospital-costs-economic-policy-analysis/232120.pdf
- https://www.globenewswire.com/news-release/2013/10/31/585476/10055405/en/Alameda-Health-System-Officially-Takes-Ownership-of-San-Leandro-Hospital-From-Sutter-Health.html
- https://www.govinfo.gov/content/pkg/FR-2011-10-28/pdf/2011-27944.pdf
- https://www.hcup-us.ahrq.gov/db/vars/hosp_bedsize/nisnote.jsp

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    B-32

- https://www.hcup-us.ahrq.gov/faststats/NationalDiagnosesServlet?year1=2014&characteristic1=0&included1=1&year2=&characteristic2=0&included2=1&expansionInfoState=hide&dataTablesState=hide&definitionsState=hide&exportState=hide
- https://www.hcup-us.ahrq.gov/reports/statbriefs/sb180-Hospitalizations-United-States-2012.pdf
- https://www.healthaffairs.org/do/10.1377/hpb20100928.658660/full
- https://www.healthaffairs.org/do/10.1377/hpb20160728.898461/full/
- https://www.healthcare.gov/glossary/co-insurance/
- https://www.healthcare.gov/glossary/co-payment/
- https://www.healthcare.gov/glossary/deductible/
- https://www.healthcare.gov/glossary/out-of-network-coinsurance/
- https://www.healthcare.gov/glossary/out-of-network-copayment/
- https://www.healthforcalifornia.com/the-department-of-managed-health-care-regulates-california-health-plans-protects-consumers
- https://www.healthpartners.com/hp/legal-notices/disclosures/reimbursement/index.html
- https://www.hfma.org/PriceTransparencyInHealthCare
- https://www.hhs.gov/answers/medicare-and-medicaid/who-is-elibible-for-medicare/index.html
- https://www.hixcompare.org/
- https://www.irs.gov/pub/irs-utl/zip%20code%20and%20state%20abbreviations.pdf
- https://www.justice.gov/atr/antitrust-division-policy-guide-merger-remedies-october-2004#3
- https://www.kff.org/medicare/state-indicator/total-medicare-beneficiaries/
- https://www.kff.org/other/state-indicator/total-population/
- https://www.laccd.edu/Departments/BusinessServices/Benefits/Documents/2013-Health-Ben-Summary.pdf
- https://www.laccd.edu/Departments/BusinessServices/Benefits/Documents/2016-CalPERS-Documents/2016-health-benefit-summary.pdf

- https://www.lakeconews.com/index.php?option=com_content&view=article&id=33645:nelson-explaining-sutter-lakesides-critical-access-hospital-designation-and-patient-transfers&catid=29:opinion
- https://www.medicaid.gov/medicaid/eligibility/
- https://www.medicaid.gov/medicaid/index.html
- https://www.medicare.gov/glossary/h.html
- https://www.medicare.gov/sign-up-change-plans/decide-how-to-get-medicare/whats-medicare/what-is-medicare.html
- https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans/health-maintenance-organization-hmo
- https://www.medmutual.com/For-Individuals-and-Families/Health-Insurance-Education/Compare-Health-Insurance-Plans/HMO-vs-PPO-Insurance.aspx
- https://www.medmutual.com/For-Individuals-and-Families/Health-Insurance-Education/Health-Insurance-Basics/Types-Health-Insurance/HMO-Health-Insurance-Plans.aspx
- https://www.modbee.com/news/local/article3167869.html
- https://www.modernhealthcare.com/article/20081030/NEWS/310309953/prime-to-take-over-shasta-regional
- https://www.modernhealthcare.com/article/20081030/NEWS/310309953/prime-to-take-over-shasta-regional
- https://www.modernhealthcare.com/article/20181204/NEWS/181209976
- https://www.newsweek.com/end-hidden-costs-january-1st-all-us-hospitals-must-publish-price-lists-all-1272328
- https://www.nytimes.com/2017/06/05/upshot/teaching-hospitals-cost-more-but-could-save-your-life.html
- https://www.oshpd.ca.gov/documents/HID/HospitalFinancial/Pivot/HAFDDoc2013.pdf
- https://www.rand.org/content/dam/rand/www/external/labor/aging/dataprod/randhrs1992_2014v2.pdf
- https://www.ruralhealthweb.org/about-nrha/about-rural-health-care

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- https://www.sfexaminer.com/news/s-f-approves-final-terms-of-california-pacific-medical-center-hospital-deals/
- https://www.sfgate.com/business/article/Acute-development-California-Pacific-to-build-2618912.php
- https://www.sharphealthplan.com/members/manage-your-plan/point-of-service-plan-resources
- https://www.sharphealthplan.com/our-plans/group-plans/point-of-service-plan
- https://www.shepscenter.unc.edu/product/rural-health-snapshot-2017/
- https://www.structuremag.org/?p=534
- https://www.sutterhealth.org/about/what-is-sutter-health
- https://www.sutterhealth.org/newsroom/eden-medical-center-celebrates-5-years-incredible-impact
- https://www.sutterhealth.org/smscsc
- https://www.uhc.com/individual-and-family/member-resources/health-care-tools/cost-estimator
- https://www.urban.org/sites/default/files/03_tiered_networks.pdf
- https://www.urban.org/sites/default/files/04_narrow_networks.pdf
- https://www.urban.org/sites/default/files/publication/50116/2000212-Addressing-Pricing-Power-in-Health-Care-Markets.pdf
- https://www.va.gov/health/
- https://www.valleycare.com/about-history.aspx
- https://www.verywellhealth.com/how-is-your-drg-determined-1738875
- https://www.verywellhealth.com/how-is-your-drg-determined-1738875
- https://www.webmd.com/health-insurance/terms/ambulatory-patient-services
- https://www.who.int/classifications/icd/factsheet/en/
- https://www11.anthem.com/ca/agentsecured/f0/s0/t0/pw_e232896.pdf
- https://www11.anthem.com/ca/shared/f0/s0/t0/pw_e200267.pdf?refer=popcontent

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA   B-35

## Appendix C: Additional Analyses Related to Geographic Areas

### Exhibit C1
### Percent of Individuals that Stay in the Area for Hospital Service, OSHPD 2011



*Notes*:

1. *See* Exhibits 5A-B for a description of the geographic markets.

2. The 75 percent PSA corresponds to the 75 percent PSA for the local Sutter hospital or hospitals, as of 2011. For the two geographic markets with multiple Sutter hospitals (San Francisco and Berkeley/Oakland), the PSA was constructed by first pooling the discharges from the local Sutter hospitals and then identifying the 75 percent PSA.

*Sources*:

1. OSHPD Patient Discharge Data, 2011.

2. OSHPD Pivot Profile Hospital Data, 2011.

3. Dartmouth Atlas of Healthcare HSA Listings, 2015.



**Exhibit C2**
**Average Drive Times for Patients that Stay in the Area in Minutes, OSHPD 2011**

*Note: See* notes for Exhibit C1.

*Sources*:

1. *See* sources for Exhibit C1.

2. Google Maps Distance Matrix API.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    C-2

**Exhibit C3**
**Average Drive Times for Patients that Leave the Area in Minutes, OSHPD 2011**



*Notes*:

1. *See* notes for Exhibit C1.

2. * The average drive time for patients that live in the Crescent City geographic market and leave the market for inpatient care is 275 minutes. The average drive time for patients that live in Sutter Coast's 75 percent PSA and leave the area for inpatient care is 278 minutes.

*Source*: *See* sources for Exhibit C2.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit C4**
**Aggregate Diversion Inside the Tied Markets**



*Notes*:

1. *See* notes for Exhibit C1.

2. The aggregate diversion ratios are calculated using the conditional logit model that was produced with the Chipty Class Declaration.

*Sources*:

1. Chipty Class Declaration backup production.

2. OSHPD Patient Discharge Data, 2011.

3. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

**Appendix D: Additional Analyses of Prices at Sutter Tying Hospitals**

**Exhibit D1**
**Percent by Which Total Medical Expenditures at Each Sutter Tying Hospital**
**Exceeded Non-Sutter Hospitals for the Basket of Inpatient Services**
**Performed at that Sutter Hospital**
**Anthem and Blue Shield Claims, 2008-2015**

| | Anthem Claims Data | | | Blue Shield Claims Data | | |
|---|---|---|---|---|---|---|
| | 2008-2010 | 2011-2013 | 2014-2015 | 2008-2010 | 2011-2013 | 2014-2015 |
| **Benchmark: Non-Rural, >144 Beds** | | | | | | |
| Alta Bates-Main | | | | 33% | 21% | 4% |
| Alta Bates-Summit | | | | 41% | 31% | 3% |
| **Benchmark: Rural** | | | | | | |
| Sutter Coast | | | | 27% | 50% | 18% |
| Sutter Lakeside | | | | 15% | 9% | 12% |
| Sutter Amador | | | | 43% | 30% | 21% |
| **Benchmark: Non-Rural, <144 Beds** | | | | | | |
| Sutter Delta | | | | 42% | 23% | 2% |
| Sutter Tracy | | | | 27% | 32% | 14% |
| Sutter Auburn | | | | 23% | 22% | 21% |

*Notes*:

1. *See* notes from Exhibit 9A.

2. Percent differences are calculated as the difference in total medical expenditures of Sutter and benchmark hospitals, divided by the total medical expenditure at the benchmark hospitals.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2015.

2. Anthem Claims Data.

3. Blue Shield Claims Data.

**Exhibit D2**
**Average Case-Mix Adjusted Prices for**
**Sutter Alta Bates Tying Hospitals and Benchmark Hospitals**
**Anthem Claims, 2006-2015**



*Notes*:

1. The average case-mix adjusted price is calculated as the average across each hospital's summed allowed amount divided by summed DRG weight in a given year.

2. The median number of GAC beds in non-rural Northern California hospitals is 144 beds. This is used as a cutoff when selecting comparable hospitals.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2006-2015.

2. Anthem Claims Data.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     D-2



**Exhibit D3**
**Average Case-Mix Adjusted Prices for**
**Sutter Alta Bates Tying Hospitals and Benchmark Hospitals**
**Blue Shield Claims, 2006-2015**

*Notes*: *See* notes for Exhibit D2.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2006-2015.
2. Blue Shield Claims Data.

**Exhibit D4**
**Average Case-Mix Adjusted Prices for**
**Sutter Rural Tying Hospitals and Benchmark Hospitals**
**Anthem Claims, 2006-2015**



*Notes*:

1. *See* notes for Exhibit D2.

2. The Sutter Rural Tying Hospitals are Sutter Amador, Sutter Coast, and Sutter Lakeside.

*Source*: *See* sources for Exhibit D2.



**Exhibit D5**
**Average Case-Mix Adjusted Prices for**
**Sutter Rural Tying Hospitals and Benchmark Hospitals**
**Blue Shield Claims, 2006-2015**

*Notes*:

1. *See* notes for Exhibit D2.

2. The Sutter Rural Tying Hospitals are Sutter Amador, Sutter Coast, and Sutter Lakeside.

*Source*: *See* sources for Exhibit D3.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     D-5

**Exhibit D6**
**Average Case-Mix Adjusted Prices for**
**Sutter Non-Rural, Non-Alta Bates Tying Hospitals and Benchmark Hospitals**
**Anthem Claims, 2006-2015**



——Non-Rural, Non-Alta Bates Tying Hospitals        ——Benchmark: Non-Rural, <144 Beds

*Notes*:

1. *See* notes for Exhibit D2.

2. The Sutter Non-Rural, Non-Alta Bates Tying Hospitals are Sutter Auburn, Sutter Delta, and Sutter Tracy.

*Source*: *See* sources for Exhibit D2.



**Exhibit D7**
**Average Case-Mix Adjusted Prices for**
**Sutter Non-Rural, Non-Alta Bates Tying Hospitals and Benchmark Hospitals**
**Blue Shield Claims, 2006-2015**

*Notes*:

1. *See* notes for Exhibit D2.

2. The Sutter Non-Rural, Non-Alta Bates Tying Hospitals are Sutter Auburn, Sutter Delta, and Sutter Tracy.

*Source*: *See* sources for Exhibit D3.

**Appendix E: Qualitative Evidence Shows Sutter's Quality is Inconsistent
Reproduction of Chipty Reply Declaration, Appendix C**

1.      As described in Section III.A.2.b of my Class Reply Declaration, qualitative evidence shows Sutter's quality is inconsistent and, at best, equal to or even worse than competitor hospitals. Dr. Willig ignores this qualitative evidence on Sutter's quality. In addition to the evidence presented in Section III.A.2.b of my Class Reply Declaration, there is ample qualitative evidence that, throughout the Class Period and before, Sutter has monitored its own quality, using a variety of quality metrics.[1] Numerous ordinary-course Sutter documents describe Sutter's own assessment of its quality. These documents indicate that Sutter did not view itself as consistently high quality. For example:

- A Sutter internal email from November 30, 2004 notes their quality results are average: "Outcomes based contracting is desired by the plans, may be best for patients, and should be what we want as well - recognize our quality and pay us accordingly - which works well when you can demonstrate high quality. Our dilemma is that our results are pretty average."[2]

- A 2005 Sutter document notes: "Currently, Sutter Health is not positioned positively for this era of transparency. Our quality data is average, our costs are higher than the norm, and the amount of variation across our system is dramatic."[3]

---

[1] *See*, for example, Sutter email and attachment, March 1, 2013, Lockhart Exhibit 2066, DEF002990407–417; Sutter, "5 Sutter Entities Were in Top Half for Their Region, 5 Were in the Bottom Half," August 30, 2013, DEF001238741–754, at 742; Sutter Health, "A Competitive Profile of Our Performance," July 28, 2005, DEF000609747–781.

[2] Email from Kristin Dozier of Sutter to Melissa Brendt of Sutter, Subject: Re: Blue Shield Cardiac RFI, November 30, 2004, DEF009480962–963, at 962.

[3] "Destination 2012 A Perspective on the Environment," DEF003998880–887, at 883 and 885 ("We currently assess Sutter's performance on quality and access as 'average' and we are weak in affordability and product consistency."). *See also*, Sutter Health, "A Competitive Profile of Our Performance," July 28, 2005, DEF000609747–81, at 776 (demonstrating variations in heart attacks outcomes for several Sutter hospitals) and 774-781 (showing some average and below average quality ratings for certain Sutter hospitals).

- A 2005 draft of "An Introduction from Pat Fry" to "A Report from Governance Symposium 2005: Health Care's Gathering Storm – Is Sutter Health Ready?" states: "'In many clinical areas, the quality dashboards show Sutter- affiliated providers at or near the top of the list,' said Dr. Hunt. 'In other areas, the data would suggest our competitors are outperforming us.' … In another revealing presentation at Governance Symposium, Sutter Health Vice President of Strategy Linda Khachadourian took trustees on a tour of actual Internet sites that provide visitors with increasingly detailed quality rankings of physicians and hospitals. Depending on the particular clinical service and the physician group or hospital, Sutter Health -affiliated providers do not necessarily come out on top."[4]

- A 2006 Sutter document states: "We are not prepared for transparency given our current quality and cost positions and the dramatic, largely unexplainable variation across our organizations."[5] In the same year, a Sutter presentation entitled "Quality and Cost" notes that "[h]ow quality is judged is changing" and "[t]ransparency means we must disclose our results and document our quality."[6] Sutter notes its quality is "variable" and recognizes its quality is not differentiated from competitors, particularly given its higher prices: "Our value equation is not compelling today – the quality isn't different enough to make paying more a 'no brainer.'"[7] Sutter concludes, "[w]e're not 'leading'" on quality.[8] A 2006 strategy report commissioned by Sutter, entitled "Interviews Summary Report Sutter Health Strategic Marketing Task Force," notes that the "consensus of the strategic situation is best summarized in the following interviewee comment: 'The lay of the land

---

[4] Fry Deposition (Sutter, June 26, 2018) Exhibit 2953, DEF007471585-591, at 589.

[5] Sutter Health, Best Practices Governance Assessment Project Update, CEO Meeting Update, February 2008, STCA0598682, at slide 11. *See also*, Sutter Health, Pat Fry, President and CEO of Sutter Health, "State of the System," October 2006, DEF003209111–53, at 117 (depicting variation in the quality of Sutter hospitals).

[6] Sutter Health, Ian Leverton, MD, "Quality and Cost," March 24, 2006, DEF005475330–369, at 332.

[7] Sutter defines value as quality over price. Sutter Health, Ian Leverton, MD, "Quality and Cost," March 24, 2006, DEF005475330–369, at 366.

[8] Sutter Health, Ian Leverton, MD, "Quality and Cost," March 24, 2006, DEF005475330–369, at 332.

from my perspective is that the commercial market wants and is demanding cost and high quality. **We offer average quality at high price**.'" [9] Sutter concludes, "we need to be low cost and high quality."[10]

- A Sutter presentation entitled "2010 Competitive Position Update" provides quality measure comparisons of Sutter to competitor hospitals and concludes, "[l]ittle opportunity for quality differentiation exists."[11] An overall comparison of the Sutter Health system to its highest volume competitors demonstrates they "do not hold any significant advantage over each other to establish any discernable differentiation for competitive position based on the current CMS quality process measures."[12] Similarly, a 2010 Sutter memorandum states "a comparison of quality scores for Sutter Health and major health system competitors" indicates that, "as all major competing health systems in Northern California improve their quality process scores[,] it is difficult if not impossible to differentiate a health system based on quality."[13]

- In a 2011 competitor analysis presentation, Sutter states, "it is difficult to justify our position on the basis of value as quality process metric and ratings of care do not provide sufficient differentiation from competing providers."[14] In the notes on that same slide, Sutter writes: "We often contend we provide a higher value product that can demand a higher price - - but in truth our value is only average as there is little differentiation

---

[9] Strategy Advantage, "Interviews Summary Report Sutter Health Strategic Marketing Task Force," March 21, 2006, DEF005800807–838, at 810 (emphasis added).

[10] Strategy Advantage, "Interviews Summary Report Sutter Health Strategic Marketing Task Force," March 21, 2006, DEF005800807–838, at 819.

[11] Sutter Health, "2010 Competitive Position Update," March 2010, STCA0234229, at slide 6.

[12] Sutter Health, "2010 Competitive Position Update," March 2010, STCA0234229, at slide 20. The results are similar when the comparisons are done within regions. (*See* slides 43, 63, 84, 106 and 131.)

[13] Sutter Health Memorandum from Linda Khachadourian to Peter Anderson, "Strategy & Business Development – Summary of 2010 Accomplishments," December 9, 2010, STCA0633362–366, at 364.

[14] Sutter Health, SMT Strategy Session, "Competitor Response Analysis: Summary Trends Across Regions," January 18, 2011, STCA0234063, at slide 12. *See also* Harrison Deposition (Sutter, August 2-3, 2018) Exhibit 3388, DEF003923210–244, at 224.

among providers on quality or ratings of care."[15] Consistent with this view, James Harrison, Sutter's Vice President of Competitive Intelligence for the period 2005-2014, testified that "[t]here is no differentiation" and that the source of the quality metric on that slide is "pretty much a standard throughout the industry of a measure that people look to, to gauge quality."[16] Furthermore, an October 2011 Sutter Health presentation depicts Sutter Health System in the middle of the pack on ICU Mortality among a group of twelve health systems.[17]

- In 2016, Sutter evaluated the CMS Hospital Star Ratings[18] and, in internal email correspondence, noted the quality of their "hospital campuses showed a mixed bag of results" with more than half of Sutter facilities earning 3 or fewer stars (out of 5 stars), 35% earning 4 stars, and only one Sutter facility (Sutter Maternity & Surgery Center) earning 5 out of 5 stars.[19] Consequently, Sutter noted that its Office of Patient Experience "would prefer to promote our scores internally more than externally."[20] Additional documents demonstrate Sutter cherry-picks the quality information to share publicly. For example, an internal email from April 2016 commenting on different hospital quality measures states: "I think we should keep highlighting Truven, but Leapfrog has become

---

[15] Sutter Health, SMT Strategy Session, "Competitor Response Analysis: Summary Trends Across Regions," January 18, 2011, STCA0234063, at slide 12.

[16] Harrison Deposition (Sutter, August 2-3, 2018), p. 73.

[17] Sutter Health, Presentation, October 7, 2011, DEF001791702–713, at 713.

[18] Sutter notes that the CMS Hospital Compare star rating system is a new overall rating system added to the hospital quality information already on the website. A hospital's overall rating "represents a summary of performance of certain measures available on Hospital Compare… The star rating…takes 64 existing quality measures in 7 domains…and summarized them into a single rating of one to five stars. The rating includes quality measures focused on care outcomes and care process [and] CMS heavily weights quality performance in care outcome measures over process measures." (Email from Alexis Rodier, Sutter Health, "Subject: Message from Don Wreden, M.D. re: CMS Hospital Star Ratings," July 27, 2016, Lockhart Exhibit 2069, DEF001253978-980, at 979.)

[19] Email from Kami Lloyd, Communications for Sutter Health to Sutter Health personnel, "Subject: CMS Hospital Star Ratings," July 27, 2016, and Email from Alexis Rodier, Sutter Health, "Subject: Message from Don Wreden, M.D. [Senior Vice President, Patient Experience of Sutter Health] re: CMS Hospital Star Ratings," July 27, 2016, Lockhart Exhibit 2069, DEF001253978-980, at 978, 980.

[20] Email from Kami Lloyd, Communications for Sutter Health to Sutter Health personnel, "Subject: CMS Hospital Star Ratings," July 27, 2016, Lockhart Exhibit 2069, DEF001253978-980, at 978.

problematic. Their data is old and if you look at the entire set of Sutter facilities, we are barely a B– organization. So I am not sure we want to send them to the Leapfrog website to check."[21]

2.      This compelling evidence, which Dr. Willig disregards, demonstrates that Sutter was well aware its quality was inconsistent, average, and equal to or worse than competitors.

---

[21] *See,* for example, Email from Bill Gleeson, Head of Marketing for Sutter Health to Stephanie Breitbart, Communications Specialist for Sutter Health, "Subject: Re: For Review: Four Sutter Health Hospitals Earn 'A' Grade for Patient Safety," April 29, 2016, Lockhart Exhibit 2067, DEF001252470–471.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      E-5

**Appendix F: Qualitative Evidence Shows Sutter's Prices Are Higher than Other Comparison Hospitals**
**Reproduction of Chipty Reply Declaration, Appendix D**

1.      As discussed in Section V.B of my Class Reply Declaration, Dr. Willig's claim that Sutter's prices are not higher than comparison hospitals is at odds with ordinary-course documents and testimony in the record describing Sutter as more expensive than competitor hospitals. I presented substantial ordinary-course evidence describing Sutter as more expensive than other California hospitals in Section VI.A of the Chipty Class Declaration[1] and some additional testimony and ordinary-course evidence that I have reviewed since that time in Section V.B of my Class Reply Declaration. I present below additional qualitative evidence describing Sutter as more expensive than competitor hospitals, including information from health plans, competitor hospitals, and Sutter itself.

2.      Other direct evidence from health plans indicate that Sutter has higher prices, relative to other hospitals in Northern California, including evidence from Blue Shield:

- A December 2014 internal Blue Shield of California email from Yun Kim, Director of Network Performance, Network Management, at Blue Shield of California, to Armine Papouchian, Vice President of Network Management at Blue Shield of California, summarized highlights from a "Sutter System Analysis," which found that average hospital acute cost per day of other Northern California hospitals were "not catching up to Sutter," that "Sutter hospital increases have been slightly higher than Northern and State average," and that "Sutter hospital cost is materially higher than other hospitals in the North and Statewide, 18% - 30% higher."[2]

---

[1] Chipty Class Declaration, Section VI.A.

[2] Email from Yun Kim, Director of Network Performance, Network Management, at Blue Shield of California, to Armine Papouchian, Vice President of Network Management at Blue Shield of California, "Subject: Sutter Analysis Requested," December 19, 2014, with attachment, Blue Shield of California, "Sutter System Analysis: for Juan and Armine, December 19, 2014, BSC -UEBT- 0030511-518, at 511, 513-515.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- An April 2014 Blue Shield of California presentation regarding Sutter states that Sutter reimbursement has cumulatively increased 225% over 13 years from 2002 to 2014, a CAGR of 9.5%,[3] and spend at Sutter is 18% higher relative to the average of hospitals in northern California and 35% higher than the State average.[4] This presentation from Blue Shield also notes they "experienced materially high post-merger price increase (29%-72% increase from various insurers" following the merger of Summit and Alta Bates Medical Centers.[5]

- In January 2015, Armine Papouchian, Vice President of Network Management at Blue Shield of California, sent a letter to Melissa Brendt, Vice President and Chief Contracting Officer at Sutter Health, in which she describes a pricing comparison analysis demonstrating that, "even with an overall 7% reduction in current rates, Sutter will still continue to be materially higher compared to their cohorts in most regions."[6]

- Blue Shield's Armine Papouchian also notes that Sutter's Non-Par rates of 95% of Sutter's full rate "far exceed[] the out-of-network rates Blue Shield and its members pay other providers."[7]

- Blue Shield's former Senior Vice President of Network Management and Senior Vice President of Large Group and Specialty Benefits, David Joyner, notes that "[a]t or around the time that Blue Shield entered into its 'systemwide' agreement with Sutter in 2002, Blue Shield determined that Sutter's pricing for acute care hospital services began

---

[3] Blue Shield of California, "sutter system: negotiation strategy," April 18, 2014, BSC-UEBT-0029568-580, at 572.

[4] Blue Shield of California, "sutter system: negotiation strategy," April 18, 2014, BSC-UEBT-0029568-580, at 576.

[5] Blue Shield of California, "sutter system: negotiation strategy," April 18, 2014, BSC-UEBT-0029568-580, at 573.

[6] Barnes Declaration, ¶ 4 (citing Exhibit 1, Letter from Armine Papouchian, Vice President of Network Management for Blue Shield to Melissa Brendt, Vice President and Chief Contracting Officer at Sutter Health, January 7, 2015, BSC-UEBT-0005339-344, at 339) (Note that the letter is incorrectly dated January 7, 2014.).

[7] Letter from Armine Papouchian, Vice President of Network Management for Blue Shield to Melissa Brendt, Vice President and Chief Contracting Officer at Sutter Health, January 7, 2015, BSC-UEBT-0005339-344, at 340.

increasing at a dramatically faster pace than the prices of all or nearly all of its competitors."[8]

- Additionally, Tracy Barnes also claims that "Sutter's regular pricing analysis for 2015…reported that Sutter's prices continued to exceed those of its rivals."[9]

- A 2015 Blue Shield pricing study reports that "Sutter healthcare prices have risen dramatically" and shows Sutter's average hospital cost per day increasing 166% from 2001 to 2013.[10]

- A Blue Shield of California cohort analysis identifies "Sutter Health is among the most costly of hospitals" as a key takeaway, noting that Sutter's allowed CF is 21 percent higher than the average across hospitals in Northern California and 38 percent higher than the statewide average.[11]

3.  Anthem documents and testimony also contain evidence that Sutter has high prices:



---

[8] Joyner Declaration, ¶ 25.

[9] Barnes Declaration, ¶ 5.

[10] Barnes Declaration, Exhibit 2, "Sutter Health Analysis," January 2015, BSC-UEBT-0005326-336, at 329.

[11] Joyner Declaration, Exhibit 20, Blue Shield of California, "Sutter System Assessment," January 12, 2011, BSC_UFCW-00044706-734, at 716.

[12] De La Torre Declaration, ¶¶ 2, 4-5.



4.      Documents and testimony from Health Net, United, and Aetna also demonstrates that Sutter has higher prices than other hospitals in Northern California:

- 

- United's Regional Vice President of Network Strategy for the West Region, Janet Lundbye testified: "When I came in 2009, yes, it was my sense that [Sutter's] costs were high."[16] A United presentation from 2011 contains information from OSHPD that refers to "Sutter's high costs and revenues."[17]

- Slides from Aetna in 2004 show [18] Mark Reynolds, Aetna's Chief Operating Officer for Commercial Product, confirmed that ███████████████ ████████████████████████████[19] Aetna's Curtis Terry testified that

---

[13] De La Torre Deposition (Anthem, July 17-18, 2018), pp. 466-479.

[14] De La Torre Deposition (Anthem, July 17-18, 2018) Exhibit 1644.

[15] LaCroix-Milani Declaration, ¶ 7 (("████████████████████████████"), citing Exhibit 3, letter from Becky LaCroix-Milani, Regional Vice President, Provider Network Management at Health Net to Jan Voge, Director of Managed Care at Sutter, August 4, 2014, HN-0003274-275, at 274.).

[16] Deposition of Janet Lundbye, Regional Vice President of Network Strategy for the West Region at United, May 15-16, 2018, p. 377.

[17] Lundbye Declaration, ¶ 20 (citing Exhibit 42, a 2011 presentation, UHC-00291232-234, at 232).

[18] Aetna slides, 2004, AET-ESI0019642-645, at 644-645.

[19] Deposition of Mark Reynolds, Chief Operating Officer for Commercial Product at Aetna, August 7, 2018, pp. 97-98.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      F-4

████████████████████████████████████████████████████████
██████████████████████████████[20]

5.     As noted in Section V.B of my Class Reply Declaration, non-Sutter facilities in Northern California have used information on Sutter's higher prices in its attempts to negotiate higher prices from health plans.



[20] Deposition of Curtis Terry, former Regional President, Aetna West Region, July 11, 2018, pp. 236-237.

[21] Email from Steve Melody, Vice President of Health Care Services for Anthem to Anthem personnel, October 16, 2008, "Subject; Re: Marshall Hospital, Placerville," ABCLH172630–634, at 630.

[22] Email from Steve Melody, Vice President of Health Care Services for Anthem to Anthem personnel, October 16, 2008, "Subject; Re: Marshall Hospital, Placerville," ABCLH172630–634, at 632 ███████████████████████
███████████████████████████████████████████████████████



("████████████████████████████"[23]

- ████████████████████████████[24]

  ████████████[25]

- Other health plans faced similar demands from non-Sutter hospitals for rate increases as a result of Sutter's elevated prices. ████████████████████

[23] Email from Steve Melody, Vice President of Health Care Services for Anthem to Anthem personnel, October 16, 2008, "Subject; Re: Marshall Hospital, Placerville," ABCLH172630–634, at 633.

[24] Email from Annette Zahursky, Regional Manager of Provider Contracting at Anthem, to Anthem personnel, "Subject: RE: Fwd: Peninsula Eye Surgery Center – SUTTER," May 6, 2013, ABCLH105097–099, at 097.

[25] De La Torre Deposition (Anthem, July 17-18, 2018), pp. 447-449.

██████████████████████████████████████████████████████████

██████[26]

6.      As noted in Section V.B of my Class Reply Declaration, the presence of such shadow pricing indicates my overcharge estimate is likely conservative since the benchmark prices are higher than they would be in the but-for world absent Sutter's anticompetitive conduct.

7.      Finally, Sutter ordinary-course documents confirm they are the high cost provider in Northern California:

- A 2005 Sutter document states: "When it comes to price, Sutter Health affiliates are not as competitive as they need to be. In a presentation to trustees during Governance Symposium, Sutter Health's Senior Vice President of Strategy Peter Anderson told trustees that Sutter Health needs to focus serious attention on pricing structures, especially in the burgeoning area of outpatient services to ensure that all Sutter affiliates are competitive… The bottom line: Sutter Health affiliates must be more cost-efficient and competitive in order to thrive in a consumer-driven market."[27]

- A January 29, 2007 memorandum from Pat Fry, then President and CEO of Sutter Health, to Sutter Health Leadership Symposium Participants containing a Sutter assessment of their strategic situation states that "Sutter Health has been described by health plans and employers as the high-cost provider in Northern California. This perception was uncovered in our 2006 employer/broker research."[28]

---

[26] Dignity, "CHW Proposal to Aetna," February 10, 2010, DIGNITY_04366-368, at 367. *See also* DIGNITY_06739-740, at 739 (an internal Dignity email from Tammy Wilcox to Bill Hunt ████████████████████

████████████████████████████████████████████████████████████████

[27] Fry Deposition (Sutter, June 26, 2018) Exhibit 2953, DEF007471585-591, at 588.
[28] Memorandum from Pat Fry, President & CEO of Sutter Health to Sutter Health Leadership Participants, "Subject: Delivering Value: The Future for Sutter Health," January 29, 2007, DEF001545014-037, at 021-022.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      F-7

- In a 2008 Sutter presentation, entitled "Best Practices Governance Assessment Project Update," Sutter acknowledges: "We are 15-30% more expensive than other providers."[29]

- A 2011 Sutter Competitor analysis presenting a Blue Shield assessment of Sutter's facility prices shows that most Sutter facilities have costs above the average of other Northern California hospitals, with the majority having facility cost more than 25% above average.[30]

- Sutter recognizes its higher prices are driven by its higher costs, which have "risen from a modest premium over national and statewide comparisons to a 30% spread vs. the national average and 15% above the state average."[31]

8.      Sutter deposition testimony also confirms that Sutter was aware its prices were too high to be competitive. For example, Patrick Fry, then President and CEO of Sutter Health, testified:[32]

> "Q. Okay. And if you look where Mr. Levy, the board member, is responding to Mr. Fisher, and he says, quote, 'There is no question that Sutter is not popular with some of its competitors and some of the insurance companies. This has led to claims of market power enabling high prices. It's all over the local newspapers.' Then he says 'So I'm not surprised you heard the message.' Is that something you were aware of during your tenure at CEO?
> A. I don't understand the question.
> Q. The notion that some of the health plans or insurers were not happy with Sutter?
> A. Yes, I was aware that there were certain health plans that thought our prices were too high.
> …
> Q. Did you, during the time you were CEO, hear claims that Sutter was using its market power to charge higher prices to the health plans?
> A. Yes."

9.      Finally, additional Sutter evidence demonstrates that Sutter's pricing group did not gather information on hospital quality in setting prices. For example, consistent with the view of prior Sutter executives, Sutter's Stephen Lockhart, Chief Administrative Officer at St. Luke's

---

[29] Sutter Health, "Best Practices Governance Assessment Project Update," CEO Meeting Update, February 2008, STCA0598682, at slide 10.

[30] Sutter Health, SMT Strategy Session, "Competitor Response Analysis: Summary Trends Across Regions," January 18, 2011, STCA0234063, at slide 10.

[31] Sutter Health, Ian Leverton, MD, "Quality and Cost," March 24, 2006, DEF005475330–369, at 342.

[32] Fry Deposition (Sutter, June 26, 2018), pp. 335-337.

and Chief Medical Officer at East Bay from 2010 to 2015 and Chief Medical Officer of Sutter Health in 2015, testified that his group at Sutter did not speak about quality to the pricing group at Sutter and vice versa:[33]

> Q. Have you ever been involved in working with the people who sell Sutter's services in developing pricing based on the quality of the services Sutter provides?
> A. That answer would be no, we do not work on pricing.
> Q. Okay. And when you say "we," I assume you mean your entire group; correct?
> A. Correct, yes.
> Q. You're speaking for the entire group. Does the pricing group ever ask you for information that you would just provide to them so they can develop their pricing?
> A. I don't know if necessarily that they are using information for pricing or not or what -- what they would be using it for. But certainly we're happy to provide any information they may want regarding quality if there's something specific that they are interested in.
> Q. Okay. Can you recall any instance in which the pricing group or someone from the pricing group contacted you to say, "We're trying to set prices and would like to base it on the quality of services. Can you provide some information to us?"
> MR. SELDEN: Beyond the scope. And also ask for clarification as to "you" or whether "you" refers to Dr. Lockhart or his group.
> Q. BY MR. GOLDSTEIN: Your organization, to your knowledge.
> A. I am not aware that we have been specifically asked for data stating, "We are about to determine pricing. Can you give us X, Y and Z data, so we can determine the price of X?" We may have requests, because the data – we have data that resides with us for data on maternity care, data on this or that, which we would provide.
> (Interruption in proceedings.)
> Q. BY MR. GOLDSTEIN: Okay. Would it be fair to say in the normal course of business, part of your job is not working with the pricing group to provide quality -- information about quality so they can develop their prices? Is that fair?
> A. That is correct.

---

[33] Lockhart Deposition (Sutter, May 4, 2018), pp. 274-275.

**Appendix G: Additional Analyses of Prices at the Sutter Damage Hospitals**

**Exhibit G1**
**Percent by Which Total Medical Expenditures at Each Sutter Damage Hospital**
**Exceeded Non-Sutter Hospitals for the Basket of Inpatient Services**
**Performed at that Sutter Hospital**
**Anthem Claims, 2008-2015**

| | Benchmark: Northern California Hospitals | | | Benchmark: Non-Rural Hospitals, >144 Beds | | |
|---|---|---|---|---|---|---|
| | 2008-2010 | 2011-2013 | 2014-2015 | 2008-2010 | 2011-2013 | 2014-2015 |
| Alta Bates-Main | | | | | | |
| Alta Bates-Summit | | | | | | |
| Sutter Sacramento | | | | | | |
| CPMC-Main | | | | | | |
| CPMC-St. Luke's | | | | | | |
| Sutter Modesto | | | | | | |
| Sutter Santa Rosa | | | | | | |

*Notes*:
1. *See* notes from Exhibit 9A.
2. Percent differences are calculated as the difference in total medical expenditures of Sutter and benchmark hospitals, divided by the total medical expenditure at the benchmark hospitals.

*Sources*:
1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2015.
2. Anthem Claims Data.

**Exhibit G2**
**Percent by Which Total Medical Expenditures at Each Sutter Damage Hospital**
**Exceeded Non-Sutter Hospitals for the Basket of Inpatient Services**
**Performed at that Sutter Hospital**
**Blue Shield Claims, 2008-2015**

| | Benchmark: Northern California Hospitals | | | Benchmark: Non-Rural Hospitals, >144 Beds | | |
|---|---|---|---|---|---|---|
| | 2008-2010 | 2011-2013 | 2014-2015 | 2008-2010 | 2011-2013 | 2014-2015 |
| Alta Bates-Main | 44% | 31% | 10% | 33% | 21% | 4% |
| Alta Bates-Summit | 49% | 35% | 7% | 41% | 31% | 3% |
| Sutter Sacramento | 34% | 29% | 12% | 26% | 21% | 7% |
| CPMC-Main | 35% | 19% | 10% | 26% | 13% | 6% |
| CPMC-St. Luke's | 9% | 17% | 6% | 1% | 9% | 1% |
| Sutter Modesto | 26% | 10% | 9% | 18% | 4% | 5% |
| Sutter Santa Rosa | 8% | 3% | 0% | 1% | -3% | -5% |

*Notes*:

1. *See* notes from Exhibit 9A.

2. Percent differences are calculated as the difference in total medical expenditures of Sutter and benchmark hospitals, divided by the total medical expenditure at the benchmark hospitals.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2015.

2. Blue Shield Claims Data.

**Exhibit G3**
**Average Case-Mix Adjusted Prices for**
**Sutter Damage Hospitals and Benchmark Hospitals**
**Anthem Claims, 2006-2015**



Sutter Damage Hospitals —Benchmark: N. CA Hospitals —Benchmark: Non-Rural, >144 Beds

*Notes*:

1. The average case-mix adjusted price is calculated as the average across each hospital's summed allowed amount divided by summed DRG weight in a given year.

2. The median number of GAC beds in non-rural Northern California hospitals is 144 beds. This is used as a cutoff when selecting comparable hospitals.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2006-2015.

2. Anthem Claims Data.



**Exhibit G4**
**Average Case-Mix Adjusted Prices for**
**Sutter Damage Hospitals and Benchmark Hospitals**
**Blue Shield Claims, 2006-2015**

*Notes*: *See* notes for Exhibit G3.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2006-2015.

2. Blue Shield Claims Data.

## Appendix H: Description of Overcharge Analysis Data Processing

1.    This Appendix describes the analysis dataset used in the overcharge regressions, including the use of claims data from the Class Health Plans. It discusses the various data sources used to create the overcharge analysis dataset, as well as the key filters and data processing steps applied to each of these data sources.[1] Finally, the appendix includes a summary of the underlying sample sizes associated with the Sutter Damage Hospitals and the Benchmark Hospitals included in the overcharge analysis.

### A.    Hospital Characteristics Dataset

2.    For each year in the period 2006-2015, I obtain hospital-level characteristics for all non-Kaiser, GAC hospitals in Northern California from the OSHPD Hospital Annual Financial Disclosure Data Complete Data Set ("OSHPDFD") and Pivot Profiles Tables ("HAFD"), the Center for Medicare & Medicaid Services ("CMS"), and the Google Maps Distance Matrix API ("Google Maps").[2]

- Hospital-level information on hospital beds, system affiliation,[3] teaching status and trauma level is obtained from HAFD and OSHPDFD;

- Hospital quality information, wage indices, and DRGs are obtained from CMS;[4] and

---

[1] *See* Chipty Workpapers for programming code describing all of the data processing steps.

[2] GAC hospitals are identified using a combination of OSHPD's classification, which must be "General" or "General Acute", and the CMS ID, which must be a short-term acute care ID (i.e. the last 4 digits of the ID fall between 0001 and 0879, inclusive). Kaiser facilities are identified as those with "Kaiser Foundation Hospitals" as the system name; Northern California hospitals are identified as those not in any of the following counties: "Imperial," "Kern," "Los Angeles," "Orange," "Riverside," "Ventura," "San Bernardino," "San Diego," "San Luis Obispo," or "Santa Barbara."

[3] Systems are defined based on each hospital's system name from the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, which is populated for all systems with at least three hospitals. In addition to the system field, I use the owner field to assign hospitals to systems. *See* Chipty Workpapers provided for the Chipty Class Declaration.

[4] DRG codes were obtained for each claim in the Health Net and United NICE database using MS-DRG grouper software published by CMS. *See* Appendix E to the Chipty Reply Declaration for further discussion. I supplemented the DRG codes as returned by the grouper software per the methodology as described in Appendix I.

- The number of competitors within a 30-minute drive from each hospital is determined using the Google Maps.

**B.      Filters and Processing Applied to Claims Data**

3.      The prices used in the overcharge regressions are calculated from the claims datasets produced by each of the five Class Health Plans. Because these claims datasets are unique to each Class Health Plan, the data processing steps applied to each of the datasets are also unique. The subsections below describe the key data processing used to study Health Net, Aetna, and United overcharges.[5]

*1.      Health Net*

4.      The Health Net data were produced at the claim-level with line information contained in multiple columns for each line item (for example, diagnosis codes are found in fields labeled diag_1 through diag_99). The key data processing steps are as follows:

- Non-inpatient claims were removed using the revenue code and bill type methodologies (i.e. the bill type must start with '11' or '12' and at least one revenue code must fall within the range 100-219, inclusive).

- Non-hospital claims were removed based on the provider type. Hospital claims were identified as records where the provider type equaled H.

- Non-final claims were removed using the claim type. Final claims were identified as records where the claim type was not D.

- Claims with a non-zero adjustment amount were removed.

- Claims with $0 allowed amounts were removed. Allowed amounts were calculated in the Health Net data by summing the benefit amount, copay, coinsurance, and deductible.

- Claims with header-level allowed amounts that did not reconcile with the service line allowed amounts were removed.

---

[5] The data processing applied to Anthem and Blue Shield claims datasets is described in appendices contained in my previous reports. *See* Chipty Class Declaration, Appendix C; and Chipty Reply Declaration, Appendix E.

- Duplicate records were identified and removed.

- Claims that are not fully-insured were removed. Fully-insured claims were identified as records with a funding type not equal to S.

- Claims for which Health Net is not the primary payor were removed. Claims where Health Net is the primary payor are identified by a blank COB indicator value and a zero COB amount.

- Claims at non-contracted providers were removed. Claims with contracted providers are those records with a contract flag equal to Y.

- Claims at a provider outside of California or a patient from outside of California were removed. These claims were identified using the provider state and patient zip code.

- Claims with non-commercial insurance were removed.

- Claims with a service start date not in 2008-2015 were removed. Furthermore, claims for 2006-2007 were removed because MS-DRG system was not in use prior to 2008.

- Claims with a non-positive allowed amount were removed.

- CMS' DRG grouper software was used to assign DRGs to each claim based on the diagnosis codes, among other things. Because of the lack of ICD procedure codes in the Health Net data, DRG weights are imputed using the regression adjustment described in Appendix I.

- Claims with an MDC of 00 (missing or invalid), 19 (mental diseases and disorders), or 20 (alcohol/drug use or induced mental disorders) were removed, where the MDC came from a DRG assigned without a procedure code.

5.      After processing the data, the claims data were aggregated to the hospital-year level, using hospital IDs. In calculating prices for Health Net, claims were first aggregated to the episode level, to which I refer in the main report as "claim level." An episode is defined as a unique combination of patient member type, patient gender, patient year of birth, patient zip code, subscriber member type, group ID, group name, group zip code, CMS ID, NPI, provider

name, provider address, service start date, and admit year.[6] When multiple DRGs are found for the same episode, the DRG and weight associated with the first claim to appear for a given encounter was used as the DRG and weight for that encounter. Exhibit H1 below displays the number of claims (or episodes) for each Sutter Damage Hospital in each year in the Health Net overcharge dataset.

**Exhibit H1**
**Sutter Hospital Episode Counts in Health Net**

| Hospital | Beds - 2011 | Sample Size | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| Alta Bates-Main | | | | | | | | | |
| Alta Bates-Summit | | | | | | | | | |
| CPMC-Main | | | | | | | | | |
| CPMC-St Lukes | | | | | | | | | |
| Sutter Modesto | | | | | | | | | |
| Sutter Sacramento | | | | | | | | | |

*Notes:*
1. Beds are defined as acute beds per the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles.
2. Sample size defined as episode counts used in construction of hospital prices from Health Net claims data.
*Sources:*
1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.
2. Health Net Claims Data, 2008-2015.

### 2.    Aetna

6.      I use the Aetna claims data as processed by Dr. Willig in his Sur-Reply Declaration with one exception. I observe that in the Aetna claims data, the allowed amounts for delivery services at Sutter hospitals are split across claims for both the mother and the newborn. For example, claim number EG34PK80X00 occurred at CPMC-Main on November 5, 2010 and is for a woman associated with DRG 766 ("Cesarean Section w/o CC/MCC"), with an allowed amount of $12,327. Dr. Willig labels this claim "episode number 614111" and treats it as a unique observation in his analysis. The allowed amounts that Dr. Willig uses for this "episode"

---

[6] As many patient characteristics as possible were included in this roll-up.

do not match those reflected in Sutter's contracts with Aetna.[7] Based on my review of the Aetna claims data, I find that this claim should be combined with claim number EFYZPLQZX00, which is associated with a diagnosis of DRG 795 ("Normal Newborn"), also occurred at CPMC-Main on November 5, 2010, and has the same subscriber identification number as claim number EG34PK80X00.[8] I note that the allowed dollars on claim number EFYZPLQZX00 are $3,082. By combining the allowed dollars across these two claims, one obtains the amount as specified in 2010 Amendment to the Sutter-Aetna Systemwide Contract for a "C-Section w/o Complication" at CPMC-Main.[9] Dr. Willig erroneously treats these two claims as separate "episodes" when they should be combined pursuant to Sutter's contract with Aetna.

7.      Sutter's contracts with Aetna specify that "[c]laims for newborns that include revenue codes 172-174 at any point in time during the stay are not included in the Mom and Normal Newborn per diem and shall be paid as a claim separate from the Mom's claim from date of birth." [10] As such, prices associated with stays in a neo-natal intensive care unit ("NICU") are paid separately from mothers' delivery claims. Despite this stipulation, Dr. Willig treats newborn claims in the Aetna data separately from those of the mother and removes claims for normal newborns (DRG 795) entirely. This approach is inappropriate. While NICU allowed amounts on newborn claims are distinct from delivery prices, normal newborn allowed amounts (identified by claim lines without NICU revenue codes) comprise part of the contracted delivery price. Thus, these allowed amounts should be combined to reflect the delivery prices listed in Sutter's contracts with Aetna. By removing all normal newborn claims and failing to combine allowed

---

[7] See "Second Amendment to the Aetna and Sutter Health Systemwide Amendment," January 7, 2010, STCA0024672 – 876, at 740.

[8] The subscriber identification number for both of these claims is 174536932. I am unable to assess the accuracy of the age field for the Aetna claims data; see Declaration of Robert C. Krutilla Regarding Aetna Claim Data, October 9, 2018, ¶ 54.

[9] See "Second Amendment to the Aetna and Sutter Health Systemwide Amendment," January 7, 2010, STCA0024672 – 876, at 740. $3,082 + $12,327 = $15,409

[10] See, for example, "Aetna Health of California, Inc., Aetna Health Management, and Aetna Life Insurance Company and Sutter Health Systemwide Amendment," February 1, 2008, STCA0199749 – 984, at 826. Revenue codes 172, 173, and 174 are associated with increasingly acute levels of care in a neo-natal intensive care unit ("NICU").

amounts not associated with the NICU with the mother's claim, Dr. Willig incorrectly calculates delivery prices, and therefore overall prices, at Sutter Damage Hospitals. My methodology corrects this oversight by transferring allowed amounts for non-NICU services from episodes for newborns to their respective delivery episodes (*i.e.* the episodes for the mother who gave birth to the child).

8.      I link newborn and delivery episodes from Sutter hospitals based on subscriber ID and date of service.[11] Newborn episodes are matched to delivery episodes if their subscriber IDs match and if the newborn date of service is on the delivery date of service or one day past the delivery date of service.

9.      After newborn and delivery episodes are matched, I combine the allowed amounts across the matched claims. Allowed dollars for non-NICU services on newborn claims are added to the allowed amounts on their matched delivery claims and subsequently removed. Allowed amounts on newborn claim lines for NICU related revenue codes are kept on the newborn claim.

10.      Exhibit H2 below displays the number of claims (or episodes) for each Sutter Damage Hospital in each year in the Aetna overcharge dataset.

**Exhibit H2**
**Sutter Hospital Episode Counts in Aetna**

| Hospital | Beds - 2011 | Sample Size | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| Alta Bates-Main | 347 | 39 | 67 | 80 | 83 | 81 | 130 | 118 | 110 |
| Alta Bates-Summit | | | | | | | | | |
| CPMC-Main | | | | | | | | | |
| CPMC-St Lukes | | | | | | | | | |
| Sutter Modesto | | | | | | | | | |
| Sutter Sacramento | | | | | | | | | |

*Notes:*

1. Beds are defined as acute beds per the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles.

2. Sample size defined as episode counts used in construction of hospital prices from Aetna claims data.

*Sources:*

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

2. Aetna Claims Data, 2008-2015.

---

[11] Newborn claims are identified through DRGs 789, 790, 791, 792, 793, 794, and 795. Delivery claims are identified through DRGs 765, 766, 767, 768, 774, and 775.

### 3. United

11. The United claims data were produced in two formats, which are respectively called UNET and NICE. The NICE data reportedly contain all of United's fully-insured HMO claims, while the UNET data contain the rest of United's claims.[12] These two datasets were processed separately due to differences between them. UNET contains a usable DRG field, while NICE does not.[13] The key data processing steps are as follows:

- Non-inpatient claims were removed using three flags: one based on the bill type, one based on the revenue codes, and one based on the AMA place of service. A claim must satisfy all three inpatient criteria to be identified as inpatient. For a claim to be considered inpatient by bill type, it must contain at least one line with a bill type that starts with '11' or '12.' For a claim to be considered inpatient by revenue code, it must contain at least one revenue code that falls within the range 100-219, inclusive. For a claim to be considered inpatient by AMA place of service, this field must take the value of 21 or contain INPA.

- Non-hospital claims were removed using the provider classification code and the provider category code. Hospital claims are identified as records with the provider classification code equal to FACILITY and the provider category being one of 0001, 0002, 0003, 0004, 0005, 0006, 0007, 0008, 0009, 0010, 0011, 1032, 1033, 1036, 1037, 1099, 1111, 1225, 1264, 1598, 1599, 1600, 1961, 2888, 3946, 4221, 4234, 5773, or 6780.[14]

- Non-final claims were removed using the charge status code. Final claim are identified as records with charge status code equal to P.

- Duplicate records were identified and removed.

---

[12] Email from Kaitlyn Murphy, counsel for United, to David Brownstein, counsel for Sidibe Plaintiffs, "Subject: RE: Sidibe v. Sutter: United HealthCare data," October 17, 2018.

[13] Even though a DRG field exists in NICE, this field is blank or equal to "00000" for 64% of the claims that survive the other filters described in this Appendix. *See* Chipty Workpapers.

[14] This range of category codes was used by Dr. Willig in processing the UNET data in his Reply Declaration; descriptions for each category can be found in the file "UHC_Sidibe-0008889.xls."

- Prior to aggregation to the claim level, the following fields were checked for consistency across claim lines for the same claim: subscriber number, member ID, patient gender, patient age, patient state, patient zip code, group number, group name, group zip code, product, product description, funding arrangement type, COB indicator, DRG, provider name, provider address (both lines 1 and 2), provider city, provider state, provider zip code, and provider participation status code. Claims with multiple values of any of these fields were removed from the dataset.

- The claims data were then aggregated to the claim or episode level to reflect an episode of care, preserving the minimum first date of service and the maximum last date of service.

- Claims with a provider outside of California or a patient from outside of California were removed. These claims were identified using the provider state and patient state.

- Claims that occurred at non-participating providers were removed. Claims with a participating provider were identified as records with participation status code equal to P or C.

- Claims for which United was not the primary payor were removed. These claims were identified as records where the COB indicator was not missing, N, or U, or where the COB savings amount was non-zero.

- The claims were restricted to fully-insured claims using the funding arrangement type field; this field must equal 1 or F for a claim to be identified as fully-insured.

- Claims with non-positive allowed amounts were removed.

- Claims whose first date of service fell outside of the year range 2006-2015 were removed.

- Finally, claims with a missing DRG weight, a DRG that indicates a normal newborn (391 pre-FY2008, 795 post-FY2008), invalid primary diagnosis (469 pre-FY2008, 998 post-FY2008), or ungroupable diagnoses (470 pre-FY2008, 999 post-FY2008), or an MDC of 00 (missing or invalid), 19 (mental diseases and disorders), or 20 (alcohol/drug use or induced mental disorders) were removed.

12.     The NICE data were filtered in a similar manner that addressed the features unique to it. The key data processing steps are as follows:

- Non-inpatient claims were removed using two flags: one based on the revenue code and one based on the bill type. A claim must satisfy both criteria to be identified as inpatient. For a claim to be considered inpatient by bill type, it must contain at least one line with a bill type that starts with '11' or '12.' For a claim to be considered inpatient by revenue code, it must contain at least one revenue code that falls within the range 100-219, inclusive.

- The claims were checked for duplicative entries; no duplicates were found.

- Claims were checked for consistency across lines for each of the following fields: subscriber ID, subscriber zip code, patient ID, patient gender, patient birth date, patient state, patient zip code, admit and discharge dates, group ID, group name, group zip code, the capitated/administered flag, COB indicator, the diagnosis codes, DRG, facility ID, NPI, tax ID, facility name, provider street address, provider city, provider state, provider zip code, and the provider participation status code. Claims with multiple values across lines on any of these fields were dropped.

- The claims data were then aggregated to the claim level to reflect an episode of care, preserving the minimum first date of service and the maximum last date of service.

- The revenue codes were also included in the claim-level table as a list of 52 revenue code columns. These codes were used in the DRG weight regression adjustment for the claims with missing DRGs.

- Claims for providers outside of California or for patients from outside of California were removed. These claims were identified using the provider state and patient state fields.

- Claims for non-participating providers were removed. Claims with a participating provider were identified as records with the provider participation status code equal to Y.

- Claims for which United was not the primary payor were removed. These claims were identified as records where the COB indicator was not N or where the COB savings amount was non-zero.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      H-9

- Claims with non-positive allowed amounts were removed.

- Claims whose first date of service fell outside of the year range 2006-2015 were removed.

- Capitated claims were removed using the capitated/administered flag; claims were identified as non-capitated if this flag equaled N.

- Missing DRG information was imputed using CMS grouper software. Because of the lack of ICD procedure codes in a subset of the NICE data, DRG weights are imputed using the regression adjustment described in Appendix I.

- Claims with an MDC of 00 (missing or invalid), 19 (mental diseases and disorders), or 20 (alcohol/drug use or induced mental disorders) were removed. The MDC associated with the native DRG was used where available; otherwise, the MDC associated with the DRG assigned without a procedure code was used.

13.     Finally, the processed UNET and NICE datasets were combined into a single dataset and aggregated to the hospital-year level, using hospital IDs. Dr. Willig's address-based crosswalk was used with some adjustment to merge in OSHPD IDs for the UNET data, and his facility ID-based crosswalk was used with some adjustment to merge in the OSHPD IDs for the NICE data. These adjustments to Dr. Willig's crosswalks generally involved OSHPD IDs 106341052 and 106494106, which correspond to Sutter Memorial Hospital, part of Sutter Medical Center Sacramento, and Sutter Santa Rosa Regional Medical Center.[15]

14.     In calculating prices for United, claims were first aggregated to the claim (or episode) level. A claim (or episode) is defined as a unique combination of patient ID, OSHPD ID, provider name, provider address, first service date, admit year, patient zip code, group name, and source database. When multiple DRGs are found for the same episode, the DRG and weight associated with the first claim to appear for a given encounter was used as the DRG and weight for that encounter. Exhibit H3 below displays the number of claims (or episodes) for each Sutter Damage Hospital in each year in the United overcharge dataset.

---

[15] The hospital characteristics dataset does not contain separate information for Sutter Memorial Hospital and Sutter General Hospital, the other entity that makes up Sutter Medical Center Sacramento.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA   H-10

**Exhibit H3**
**Sutter Hospital Episode Counts in United**

| Hospital | Beds - 2011 | Sample Size | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| Alta Bates-Main | 347 | 28 | 55 | 82 | 71 | 70 | 175 | 227 | 195 | 118 | 118 |
| Alta Bates-Summit | 351 | 3 | 12 | 34 | 11 | 20 | 82 | 91 | 70 | 20 | 22 |
| CPMC-Main | 740 | 57 | 95 | 141 | 159 | 125 | 371 | 396 | 231 | 56 | 29 |
| CPMC-St Lukes | 150 | 4 | 4 | 6 | 8 | 6 | 36 | 94 | 163 | 205 | 204 |
| Sutter Modesto | 423 | 1 | 22 | 82 | 52 | 54 | 76 | 47 | 51 | 36 | 71 |
| Sutter Sacramento | 654 | 27 | 60 | 127 | 113 | 105 | 109 | 86 | 89 | 88 | 75 |

*Notes:*

1. Beds are defined as acute beds per the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles.

2. Sample size defined as episode counts used in construction of hospital prices from United claims data.

*Sources:*

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2011.

2. United Claims Data, 2006-2015.

### 4.    Anthem and Blue Shield

15.    The Anthem and Blue Shield overcharge datasets were produced as described in the Chipty Class Declaration and the Chipty Reply Declaration, updated to account for changes to system names over time.

### C.    Regression Sample

16.    Across the Class Health Plans, the overcharge regression analysis dataset contains 3,501 hospital-year observations, 275 of which are associated with the Sutter Damage Hospitals and 3,226 are associated with the Benchmark Hospitals. The 3,501 hospital observations account for 576,121 claims, of which 93,082 (or 16 percent) are associated with the Sutter Damage Hospitals and the other 483,039 (84 percent) are associated with the Benchmark Hospitals. Exhibit H4 describes claim counts by Health Plan and Exhibit H5 describes the Benchmark Hospitals used in the regression sample and identifies the Class Health Plans for which the hospitals have prices.

**Exhibit H4**
**Sample Size by Health Plan in Stacked Overcharge Analysis Dataset**

| Health Plan | Episodes | Hospital-Years |
|---|---|---|
| Aetna | | |
| | | |
| Blue Shield | 295,473 | 792 |
| | | |
| United | | |

*Notes:*

1. Sample Size defined as episode counts used in construction of hospital prices from claims data.

2. Episode counts reported here for Blue Shield and Anthem differ from the Chipty Class Declaration and Chipty Reply Declaration due to the difference between a claim and an episode and the exclusion of Sutter Santa Rosa. Multiple claims can be combined into a single episode.

*Sources:*

1. OSHPD Hospital Financial Disclosure Data Pivot Profiles, 2006-2015.

2. Aetna Claims Data, 2008 - 2015.

3. Health Net Claims Data, 2008 - 2015.

4. United Claims Data, 2006 - 2015.

5. Anthem Claims Data, 2006 - 2015.

6. Blue Shield Claims Data, 2006 - 2015.

**Exhibit H5**
**Benchmark Hospitals in Overcharge Analysis Dataset**

| Benchmark Hospital | HSA | County | Beds | Health Plans with Hospital |
|---|---|---|---|---|
| UCSF Medical Center | San Francisco | San Francisco | 660 | Anthem, BSC, Aetna, Health Net, UHC |
| University Of California Davis Medical Center | Sacramento | Sacramento | 626 | Anthem, BSC, Aetna, Health Net, UHC |
| Community Regional Medical Center - Fresno | Fresno | Fresno | 594 | Anthem, BSC, Aetna, Health Net, UHC |
| Stanford University Hospital | Stanford | Santa Clara | 566 | Anthem, BSC, Aetna, Health Net, UHC |
| John Muir Medical Center - Walnut Creek | Walnut Creek | Contra Costa | 524 | Anthem, BSC, Aetna, Health Net, UHC |
| El Camino Hospital | Mountain View | Santa Clara | 487 | Anthem, BSC, Aetna, Health Net, UHC |
| Santa Clara Valley Medical Center | San Jose | Santa Clara | 464 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Agnes Medical Center | Fresno | Fresno | 436 | Anthem, BSC, Aetna, Health Net, UHC |
| Kaweah Delta Medical Center | Visalia | Tulare | 403 | Anthem, BSC, Aetna, Health Net, UHC |
| San Francisco General Hospital Medical Center | San Francisco | San Francisco | 403 | BSC, Health Net |
| Doctors Medical Center - Modesto | Modesto | Stanislaus | 392 | Anthem, BSC, Aetna, Health Net, UHC |
| Mercy San Juan Hospital | Carmichael | Sacramento | 370 | Anthem, BSC, Aetna, Health Net, UHC |
| Good Samaritan Hospital - San Jose | San Jose | Santa Clara | 366 | Anthem, BSC, Aetna, Health Net, UHC |
| Washington Hospital - Fremont | Fremont | Alameda | 359 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Joseph'S Medical Center Of Stockton | Stockton | San Joaquin | 338 | Anthem, BSC, Aetna, Health Net, UHC |
| O'Connor Hospital | San Jose | Santa Clara | 334 | Anthem, BSC, Aetna, Health Net, UHC |
| John Muir Medical Center - Concord Campus | Concord | Contra Costa | 313 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Mary'S Medical Center - San Francisco | San Francisco | San Francisco | 300 | Anthem, BSC, Aetna, Health Net, UHC |
| Dominican Hospital | Santa Cruz | Santa Cruz | 294 | Anthem, BSC, Aetna, Health Net, UHC |
| Santa Rosa Memorial Hospital | Santa Rosa | Sonoma | 291 | Anthem, BSC, Aetna, Health Net, UHC |
| Rideout Memorial Hospital | Marysville | Yuba | 291 | Anthem, BSC, Aetna, Health Net, UHC |
| Sequoia Hospital | Redwood City | San Mateo | 279 | Anthem, BSC, Aetna, Health Net, UHC |
| Mercy General Hospital | Sacramento | Sacramento | 274 | Anthem, BSC, Aetna, Health Net, UHC |
| Salinas Valley Memorial Hospital | Salinas | Monterey | 269 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Francis Memorial Hospital | San Francisco | San Francisco | 267 | Anthem, BSC, Aetna, Health Net, UHC |
| Mercy Medical Center - Redding | Redding | Shasta | 266 | Anthem, BSC, Aetna, Health Net, UHC |
| Seton Medical Center | Daly City | San Mateo | 255 | Anthem, BSC, Aetna, Health Net, UHC |
| Regional Medical Center Of San Jose | San Jose | Santa Clara | 247 | Anthem, BSC, Aetna, Health Net, UHC |
| Shasta Regional Medical Center | Redding | Shasta | 246 | Anthem, BSC, Aetna, Health Net, UHC |
| Community Hospital Of The Monterey Peninsula | Monterey | Monterey | 242 | Anthem, BSC, Aetna, Health Net, UHC |
| Highland Hospital | Oakland | Alameda | 236 | Health Net, UHC |
| Marin General Hospital | Greenbrae | Marin | 218 | Anthem, BSC, Aetna, Health Net, UHC |
| Emanuel Medical Center | Turlock | Stanislaus | 209 | Anthem, BSC, Aetna, Health Net, UHC |
| Enloe Medical Center - Esplanade Campus | Chico | Butte | 208 | Anthem, BSC, Aetna, Health Net, UHC |

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA   H-13

**Exhibit H5 (continued)**
**Benchmark Hospitals in Overcharge Analysis Dataset**

| Benchmark Hospital | HSA | County | Beds | Health Plans with Hospital |
|---|---|---|---|---|
| Valleycare Medical Center | Pleasanton | Alameda | 202 | Anthem, BSC, Aetna, Health Net, UHC |
| Dameron Hospital Association | Stockton | San Joaquin | 202 | Anthem, BSC, Aetna, Health Net, UHC |
| Adventist Medical Center - Hanford | Hanford | Kings | 199 | Anthem, BSC, Aetna, Health Net, UHC |
| Hanford Community Hospital | Hanford | Kings | 199 | Anthem, BSC, Health Net, UHC |
| San Joaquin General Hospital | Stockton | San Joaquin | 196 | Anthem, BSC, Aetna, Health Net |
| St. Rose Hospital | Hayward | Alameda | 195 | Anthem, BSC, Aetna, Health Net, UHC |
| Lodi Memorial Hospital | Lodi | San Joaquin | 190 | Anthem, BSC, Aetna, Health Net, UHC |
| Doctors Medical Center - San Pablo | San Pablo | Contra Costa | 189 | Anthem, BSC, Aetna, Health Net, UHC |
| Mercy Medical Center - Merced | Merced | Merced | 186 | Anthem, BSC, Aetna, Health Net, UHC |
| Northbay Medical Center | Fairfield | Solano | 180 | Anthem, BSC, Aetna, Health Net, UHC |
| Queen Of The Valley Hospital | Napa | Napa | 177 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Joseph Hospital - Eureka | Eureka | Humboldt | 174 | Anthem, BSC, Aetna, Health Net, UHC |
| Methodist Hospital - Sacramento | Sacramento | Sacramento | 162 | Anthem, BSC, Aetna, Health Net, UHC |
| Oroville Hospital | Oroville | Butte | 133 | Anthem, BSC, Aetna, Health Net, UHC |
| Natividad Medical Center | Salinas | Monterey | 130 | Anthem, BSC, Aetna, Health Net, UHC |
| Sierra View Medical Center | Porterville | Tulare | 128 | Anthem, BSC, Aetna, Health Net, UHC |
| Contra Costa Regional Medical Center | Fairfield | Contra Costa | 123 | Health Net |
| San Ramon Regional Medical Center | San Ramon | Contra Costa | 123 | Anthem, BSC, Aetna, Health Net, UHC |
| Community Hospital Of Los Gatos | San Jose | Santa Clara | 113 | Anthem, BSC, Aetna, Health Net, UHC |
| Clovis Community Medical Center | Fresno | Fresno | 109 | Anthem, BSC, Aetna, Health Net, UHC |
| Tulare Regional Medical Center | Fresno | Tulare | 108 | Anthem, BSC, Aetna, Health Net, UHC |
| Madera Community Hospital | Madera | Madera | 106 | Anthem, BSC, Aetna, Health Net, UHC |
| Watsonville Community Hospital | Watsonville | Santa Cruz | 106 | Anthem, BSC, Aetna, Health Net, UHC |
| Mercy Hospital - Folsom | Folsom | Sacramento | 106 | Anthem, BSC, Aetna, Health Net, UHC |
| Sierra Nevada Memorial Hospital | Grass Valley | Nevada | 104 | Anthem, BSC, Aetna, Health Net, UHC |
| George L. Mee Memorial Hospital | King City | Monterey | 100 | Anthem, BSC, Aetna, Health Net |
| San Mateo Medical Center | San Mateo | San Mateo | 100 | Anthem, BSC, Aetna, Health Net, UHC |
| Alameda Hospital | Alameda | Alameda | 100 | Anthem, BSC, Aetna, Health Net, UHC |
| Feather River Hospital | Paradise | Butte | 100 | Anthem, BSC, Aetna, Health Net, UHC |
| San Leandro Hospital | San Leandro | Alameda | 93 | Anthem, Health Net, UHC |
| St. Helena Hospital | Deer Park | Napa | 91 | Anthem, BSC, Aetna, Health Net, UHC |
| Marshall Medical Center | Placerville | El Dorado | 91 | Anthem, BSC, Aetna, Health Net, UHC |
| Woodland Memorial Hospital | Woodland | Yolo | 88 | Anthem, BSC, Aetna, Health Net, UHC |
| Sonora Regional Medical Center - Greenley | Sonora | Tuolumne | 84 | Anthem, BSC, Aetna, Health Net, UHC |
| Petaluma Valley Hospital | Petaluma | Sonoma | 80 | Anthem, BSC, Aetna, Health Net, UHC |
| Mad River Community Hospital | Arcata | Humboldt | 80 | Anthem, BSC, Aetna, Health Net, UHC |
| Ukiah Valley Medical Center | Ukiah | Mendocino | 78 | Anthem, BSC, Aetna, Health Net, UHC |
| Doctors Hospital Of Manteca | Manteca | San Joaquin | 73 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Louise Regional Hospital | Gilroy | Santa Clara | 72 | Anthem, BSC, Aetna, Health Net, UHC |
| Barton Memorial Hospital | South Lake Tah | El Dorado | 69 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Elizabeth Community Hospital | Red Bluff | Tehama | 66 | Anthem, BSC, Aetna, Health Net, UHC |

**Exhibit H5 (continued)**
**Benchmark Hospitals in Overcharge Analysis Dataset**

| Benchmark Hospital | HSA | County | Beds | Health Plans with Hospital |
|---|---|---|---|---|
| Fresno Heart And Surgical Hospital | Fresno | Fresno | 57 | Anthem, BSC, Aetna, Health Net, UHC |
| Sonoma Valley Hospital | Sonoma | Sonoma | 56 | Anthem, BSC, Aetna, Health Net, UHC |
| Chinese Hospital | San Francisco | San Francisco | 54 | Anthem, BSC, Aetna, Health Net, UHC |
| Vaca Valley Hospital | Vacaville | Solano | 50 | Anthem, BSC, Aetna |
| Hazel Hawkins Memorial Hospital | Hollister | San Benito | 49 | Anthem, BSC, Aetna, Health Net, UHC |
| Adventist Medical Center - Reedley | Fresno | Fresno | 44 | Anthem, BSC, Aetna, Health Net, UHC |
| Colusa Regional Medical Center | Colusa | Colusa | 42 | Anthem, BSC, Aetna, Health Net, UHC |
| Palm Drive Hospital | Sebastopol | Sonoma | 37 | Anthem, BSC, Aetna, UHC |
| Central Valley General Hospital | Hanford | Kings | 36 | Anthem, BSC, Aetna, Health Net, UHC |
| Mark Twain Medical Center | San Andreas | Calaveras | 36 | Anthem, BSC, Aetna, UHC |
| Oak Valley District Hospital | Oakdale | Stanislaus | 35 | Anthem, BSC, Aetna, Health Net, UHC |
| Fresno Surgical Hospital | Fresno | Fresno | 31 | Anthem, BSC, Aetna, Health Net, UHC |
| Northern Inyo Hospital | Bishop | Inyo | 25 | Anthem, BSC |
| Tahoe Forest Hospital | Truckee | Nevada | 25 | Anthem, BSC, Aetna, Health Net, UHC |
| Coalinga Regional Medical Center | Coalinga | Fresno | 24 | Anthem, BSC, Health Net, UHC |
| Corcoran District Hospital | Corcoran | Kings | 24 | Anthem, BSC, Health Net |
| Stanislaus Surgical Hospital | Modesto | Stanislaus | 23 | Anthem, BSC, Aetna, Health Net, UHC |
| Mendocino Coast District Hospital | Fort Bragg | Mendocino | 20 | Anthem, BSC |
| Modoc Medical Center | Alturas | Modoc | 16 | Anthem, BSC |

*Notes:*

1. Beds are defined as acute beds per the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles. If a hospital had a record in 2011, 2011 bed counts are reported, otherwise, next most recent bed counts are reported.

2. Name and County reflect the most recent available from OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles between 2006 and 2015.

3. HSA is pulled from Dartmouth Atlas data using the most recent zip code in the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles between 2006 and 2015.

*Sources:*

1. *See* sources to Exhibit H4.

2. Dartmouth Atlas.

**Appendix I: Description of Case Mix Adjustment Methodology for Health Net and United**

1.      This Appendix addresses the issue of imputing reliable DRG weights for Health Net and United claims data for the purpose of constructing case-mix adjusted prices. An adjustment methodology was used because Health Net data and a portion of the United data do not contain ICD procedure codes that are required by grouper software to properly assign DRGs, and thus DRG weights. This Appendix describes the issues that arise with relying simply on DRGs from the grouper software without the proper procedure codes, as Dr. Willig does. It also describes a regression methodology for adjusting DRG weights from CMS' grouper software when using it without ICD procedure codes. Finally, the Appendix compares the resulting case-mix indices at the hospital-year level from my and Dr. Willig's methodologies, using a benchmark sample of claims from Blue Shield for which actual DRGs (and DRG weights) are available to compare to predicted DRG weights.

**A.      Issues with Use of Grouper Software without Procedure Codes**

2.      In my Class Reply Declaration, I used the DRG assignment software published by CMS (the "grouper") to assign DRGs to claims based on diagnosis and procedure codes on that claim, among other fields.[1] Dr. Willig also relies on this software for assigning DRGs in his Sur-Reply Declaration.[2] Assigning correct DRGs in this manner relies on the availability of the appropriate diagnosis and procedure codes in the data, as there are different coding systems available, particularly for procedure codes. Specifically, reliable use of the grouper software requires codes from the International Classification of Diseases ("ICD").[3] Procedure codes can also appear as Healthcare Common Procedure Coding System ("HCPCS") or Current Procedural

---

[1] Additional fields that are used by the grouper include patient age and gender, length of stay in the hospital, and discharge status.

[2] Willig Sur-Reply Report Backup Production.

[3] *See* Centers for Medicare and Medicaid Services, "Medicare Learning Network Fact Sheet: ICD-10-CM, ICD-10-PCS, CPT, and HCPCS Code Sets," available online at https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/ICD9-10CM-ICD10PCS-CPT-HCPCS-Code-Sets-Educational-Tool-ICN900943.pdf, site visited March 1, 2019.

Terminology ("CPT") codes.[4] However, HCPCS and CPT codes differ in structure and meaning from the ICD procedure codes, and one generally cannot substitute the ICD procedure codes with CPT or HCPCS codes when attempting to assign DRGs with grouper software. While the grouper can be used to mechanically assign DRGs without the correct procedure codes, the assigned DRGs are often inaccurate. DRG 470 ("Major Joint Replacement or Reattachment of Lower Extremity without Major Comorbidity or Complication") is a specific example of a common surgical DRG that is not found in the Blue Shield data when using the grouper without procedure codes (referred to in this Appendix as the "procedure-less grouper").[5] More generally, the assigned DRG is inaccurate for many surgical DRGs when assigned using the procedure-less grouper.[6] Since these surgical DRGs tend to have higher DRG weights,[7] reliance on the grouper when procedure codes are unavailable results in DRG weights and case mix indices that are biased downwards.

      3.      The Health Net and United's NICE claims data do not contain DRGs or the ICD procedure codes necessary to accurately assign DRGs using the grouper alone.[8] Because of the downward bias associated with using the grouper on procedure-less claims, Staff working under my direction developed and used an adjustment methodology for these claims to approximate the

---

[4] The Healthcare Common Procedure Coding System (HCPCS) contains CPT (Current Procedural Terminology) codes as its Level I codes. When discussing HCPCS as separate from CPT codes, the codes referred to are HCPCS Level II codes, which are different from the CPT codes. *See* American Academy of Professional Coders, "What is HCPCS?" available at https://www.aapc.com/resources/medical-coding/hcpcs.aspx, *site visited* April 21, 2019.

[5] Centers for Medicare and Medicaid Services, "Draft ICD-10-CM/PCS MS-DRGv28 Definitions Manual - Major Joint Replacement or Reattachment of Lower Extremity," available at https://www.cms.gov/icd10manual/fullcode_cms/P0185.html, *site visited* April 21, 2019. DRG 470 appears 18,222 times (2.88% of claims) in the claims data when including procedure codes in the grouper run, while it never appears when excluding procedure codes. It is the fourth most common DRG when procedure codes are included. *See* Chipty Work Papers.

[6] *See* Davis, Elizabeth, "How Your DRG Is Determined," available at https://www.verywellhealth.com/how-is-your-drg-determined-1738875, *site visited* April 21, 2019.

[7] The mean surgical DRG weight in 2015 was 3.05, while the mean medical DRG weight in 2015 was 1.23. This trend is also seen in the median (2.24 for surgical DRGs and 1.04 for medical DRGs), as well as the minimum and maximum DRG weights. *See* Chipty Work Papers.

[8] These datasets contain either CPT codes or a mixture of HCPCS and CPT codes.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    

appropriate DRG weights. The rest of this Appendix discusses the adjustment methodology, including comparisons to various other methods of producing DRG weights. All diagnostics are performed on a sample of the Blue Shield claims data for which procedure codes are present and the grouper results are reliable.

## B.   Regression Adjustment Applied to DRG Weights from Procedure-less Grouper

4.    Because some DRGs do not require procedure codes for accurate assignment, the "procedure-less" grouper results provide the starting point for the DRG weight prediction methodology used in this report. The prediction methodology involves a regression adjustment to produce DRG weights based on the procedure-less DRG, the length of stay in the hospital, and the revenue codes for each claim, which describe the set of services a patient received while in the hospital. This regression adjustment is then applied to claims with DRGs which tend to require procedure information for accurate assignment.[9]

5.    To develop the adjustment methodology, I study a 25 percent sample of the Blue Shield claims from 2008-2015 that have both native DRGs and ICD procedure codes (the "diagnostics dataset") that can be used to assign DRGs using grouper software. Using these data, I can learn about the circumstances in which a procedure-less DRG is likely to be inaccurate. Data diagnostics show that only certain revenue codes are likely to have to mismatches between the DRGs assigned by the grouper with and without procedure codes; other revenue codes, like the set of pharmacy codes, are found on most claims. Using the diagnostic dataset, I compare the quality of the match between DRGs generated with procedure codes to procedure-less DRGs. With this analysis, I identify the top 75 revenue codes that have more than 50 claims by percent mismatch when comparing the grouper output with and without procedure codes.

6.    I then use a second dataset from Blue Shield (the "training dataset"), consisting of another 25 percent sample of Blue Shield claims from 2008-2015 that have both native and procedure-less DRGs, with no overlap between this sample and the diagnostics dataset. Using

---

[9] As explained below, the model's predictions are used for claims whose procedure-less DRG does not match the true DRG in more than 10 percent of cases, based on the diagnostics test data sample from Blue Shield.

information on all DRGs present in the training dataset, along with information on length of stay and length of stay squared, I study the relationship between the full set of procedure-less DRGs and select revenue codes, modelled as interactions between revenue codes and DRGs. The DRGs included in the interaction terms (with all 75 revenue codes) are the top 100 procedure-less DRGs by percent mismatch in the diagnostic dataset.[10] The full regression adjustment model, displayed below, was estimated on this set of claims:[11]

$$DRG\ weight = \beta_0 + \beta_1 LOS + \beta_2 LOS^2 + \sum_i \gamma_i DRG_i + \sum_j \delta_j RC_j + \sum_k \alpha_k (DRG * RC)_k + \varepsilon$$

### C.    Use of LASSO Penalized Regression

7.     The full regression model as specified above contains 7,940 explanatory variables (of these there were 4,598 left after removal of variables with zero variance) plus an intercept term. To avoid overfitting due to such a large number of parameters, I use a well-accepted methodology called LASSO ("least absolute shrinkage and selection operator") to select which variables to include in the model.[12] LASSO is a variation on the usual linear regression that works by adding a penalty term associated with each parameter in the model that constrains the magnitude of the parameters. A tuning parameter, $\lambda$, controls the strength of the penalty, and it is chosen through iterating through a number of potential values. The full LASSO regression specification, which includes the penalty term for $\theta$ equal to the set of all parameters, $(\beta_0, \beta_1, \beta_2, \gamma_i, \delta_j, \alpha_k)$, is shown below:

---

[10] *See* Chipty Workpapers for a full list of the revenue codes included in the model and DRGs included as interactions.

[11] Some variables initially considered for inclusion had zero variance after adding indicators to the training dataset due to differences in the set of DRGs between the diagnostics dataset and the training dataset. 3,342 variables were removed in this step; these variables were typically DRG-revenue code interactions. *See* Chipty Workpapers.

[12] *See* Tibshirani, Robert, "Regression Shrinkage and Selection via the Lasso," *Journal of the Royal Statistical Society, Series B (Methodological)*, Vol. 58, No. 1, 1996, pp. 267-288.

$$DRG\ weight = \beta_0 + \beta_1 LOS + \beta_2 LOS^2 + \sum_i \gamma_i DRG_i + \sum_j \delta_j RC_j + \sum_k \alpha_k (DRG * RC)_k$$
$$+ \lambda \sum |\theta| + \varepsilon$$

8.      I use a cross-validation procedure to balance the need to retain parameters for predictive accuracy and the need to remove parameters to avoid overfitting. For this purpose, I use 10-fold cross-validation to calculate an average mean squared error ("MSE") for a range of $\lambda$ values: I then choose the model associated with the lowest average MSE. In general, the higher the value of $\lambda$ the fewer parameters are included in the model.[13] When estimating the DRG weight model using LASSO, I required the DRG fixed effects to remain in the model regardless of the value of $\lambda$, so the LASSO procedure was effectively choosing from among the remaining parameters to minimize the average MSE. Exhibit I1 below shows the average MSE for each value of $\lambda$ tested in the LASSO regression with 10-fold cross validation; the value chosen for $\lambda$ was 0.03905 (-3.24 on the log scale depicted in the exhibit).

9.      The chosen value of $\lambda$ produces a model with 281 non-zero coefficients, including 261 DRG fixed effects, 12 revenue code fixed effects, 6 DRG-revenue code interactions, and length of stay.[14]

---

[13] *See* Hastie, Trevor, Robert Tibshirani and Jerome Friedman, *The Elements of Statistical Learning*, Second Edition, New York, NY, Springer, 2001, pp. 241-244.

[14] Not all DRGs found in the diagnostics data are also found in the training dataset, which is why 102 DRG fixed effects are removed. *See* Chipty Workpapers for the specific set of variables included along with their coefficient estimates.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      I-5

**Exhibit I1**
**Cross-Validation Plot for Penalized LASSO Regression**



*Note*: The vertical lines mark the values of $\lambda$ with the minimum average MSE (-3.24 on the log scale) and with the largest number of parameters while keeping the average MSE within 1 standard error of the minimum (-2.87 on the log scale).

*Source:* LASSO regression with 10-fold cross validation on training dataset.

### D.   Application of Regression-Adjusted DRG Weight Methodology

10.    After developing the approach and estimating the regression adjustment model on the Blue Shield data, I applied it to both the Health Net data and United's NICE data, in a three-step manner as described below:

- Some of the NICE data contain a native DRG with a valid DRG weight for some claims. In these instances, I use the native DRG weight, without adjustment.

- For Health Net and United claims with a procedure-less DRG that have a mismatch rate of 10 percent or lower (that is, the procedure-less DRG matches the actual DRG at least 90 percent of the time) in the Blue Shield diagnostics dataset, I use the unadjusted procedure-less DRG weight.

- I use an adjusted DRG weight for claims with a procedure-less DRG with a mismatch rate greater than 10 percent using the regression adjustment model.

Exhibit I2 below summarizes the number of claims in the Health Net and United NICE claims datasets for which the regression-adjusted procedure-less DRG weight was used.

**Exhibit I2**
**Summary of Adjustments Made to DRG Weights in HealthNet and NICE Claims Data**

| Dataset | Percent Adjusted | |
|---|---|---|
| Health Net | | |
| United NICE | | |
| United | | |

*Notes:*

1. Only certain United NICE data need adjustment. The United UNET data contain a native DRG field that is well-populated. "United" numbers above corresponds to the full dataset; "United NICE" percentages correspond to only data from NICE.

2. Adjustment percentages are calculated over the filtered claims datasets for both Health Net and UHC prior to aggregation to the hospital/year level for price calculations. As a result, some of these claims may fall out of the data due to missing hospital IDs or because they occurred at non-GAC or Southern California hospitals.

*Sources:*

1. United claims data, 2006-2015.
2. Health Net claims data, 2008-2015.

### E.    Comparison of Model to Other Methods

11.    To evaluate the potential magnitude of the error introduced by the estimation procedure, I now turn to a diagnostic to evaluate the accuracy of my estimation procedure, using the remaining 50 percent of Blue Shield claims from 2008-2015 with native and procedure-less DRGs (the "test dataset"). Using the test dataset, I compare the resulting case-mix indices at the hospital-year level from my targeted approach of adjusting procedure-less DRGs with mismatches in the Blue Shield data ("preferred approach") *to* the results from adjusting all DRGs ("less-preferred approach") and *to* the results when using the procedure-less grouper output ("Willig's approach"), as Dr. Willig does. Exhibit I3 below displays the distribution of error in case mix calculated from each method at the hospital-year level. As seen here, my preferred approach (the dark blue distribution) performs the best: it is tightly centered around zero. The less-preferred approach (the orange distribution) is somewhat left-skewed and fatter-tailed. The

Willig approach (the light blue distribution) performs least well: it is the most left-skewed and fattest-tailed.

**Exhibit I3**
**Case Mix Error Distribution for Select CMI Estimation Methods**



*Note*: The "All Adjusted" CMI distribution uses the prediction-adjusted DRG weight for all claims, while the "Adjusted for >10% Mismatch" distribution uses the prediction-adjusted DRG weights where claims have a procedure-less DRG with a greater than 10% mismatch rate in Blue Shield. The latter distribution corresponds to what is used in the overcharge analyses for United and Health Net.

*Sources:*

1. Blue Shield claims data, 2008-2015.
2. CMS DRG grouper software.

These results demonstrate that any additional errors introduced by the estimation procedure are balanced out by the removal of many errors associated with adjusting DRG weights that do not need adjustment.

## Appendix J: Full Set of Overcharge Estimates for Regression Model

### Exhibit J1
### Overcharge Estimates by Health Plan
### Based on Pooled In-Sample Model

| Hospital | Anthem | Blue Shield | Aetna | United | Health Net |
|---|---|---|---|---|---|
| Alta Bates-Main | | 57% *** | | | |
| Alta Bates-Summit | | 81% *** | | | |
| Sutter Sacramento | | 76% *** | | | |
| CPMC-Main | | 36% *** | | | |
| CPMC-St. Luke's | | 21% ** | | | |
| Sutter Modesto | | 28% *** | | | |

*Notes*:

1. These estimates are based on in-network, fully-insured, commercial claims for each Health Plan occurring at general acute care hospitals in Northern California. *See* Appendices H and I for more detail on data processing.

2. Asterisks *, **, *** represent statistical significance at ten percent, five percent, and one percent levels.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data, 2006-2015.

2. Centers for Medicare & Medicaid Services (CMS) Impact Files and Hospital Compare Data, 2006-2015.

3. Anthem, Blue Shield, and United Claims Data, 2006-2015. Aetna and Health Net Claims Data, 2008-2015.

4. Google Maps Distance Matrix API.

5. National Bureau of Economic Research (NBER) NPI to Medicare CCN Crosswalk.

**Exhibit J2**
**Overcharge Estimates for Anthem**
**Pooled Model**

| Hospital | Out of Sample | | | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2006-2015 |
| Alta Bates-Main | | | | | | | | | | | |
| Alta Bates-Summit | | | | | | | | | | | |
| Sutter Sacramento | | | | | | | | | | | |
| CPMC-Main | | | | | | | | | | | |
| CPMC-St. Luke's | | | | | | | | | | | |
| Sutter Modesto | | | | | | | | | | | |

*Note: See* notes for Exhibit J1.

*Source: See* sources for Exhibit J1.

**Exhibit J3**
**Overcharge Estimates for Blue Shield**
**Pooled Model**

| Hospital | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | In-Sample 2006-2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Out of Sample | | | | | | In-Sample |
| Alta Bates-Main | 68% *** | 59% *** | 70% *** | 53% *** | 53% *** | 32% *** | 54% *** | 27% *** | 117% *** | 66% *** | 57% *** |
| Alta Bates-Summit | 116% *** | 109% *** | 133% *** | 140% *** | 147% *** | 120% *** | 117% *** | 103% *** | 19% ** | 1% | 81% *** |
| Sutter Sacramento | 95% *** | 40% *** | 94% *** | 110% *** | 81% *** | 96% *** | 82% *** | 67% *** | 43% *** | 51% *** | 76% *** |
| CPMC-Main | 25% *** | 12% | 56% *** | 39% *** | 50% *** | 50% *** | 43% *** | 32% ** | 29% ** | 18% | 36% *** |
| CPMC-St. Luke's | 14% | 0% | 42% *** | 18% | 22% * | 74% *** | 9% | 8% | 20% | 16% | 21% ** |
| Sutter Modesto | 35% *** | 52% *** | 46% *** | 25% *** | 21% *** | 21% *** | 25% *** | 26% *** | 16% ** | 26% *** | 28% *** |

*Note*: *See* notes for Exhibit J1.

*Source*: *See* sources for Exhibit J1.

**Exhibit J4**
**Overcharge Estimates for Health Net**
**Pooled Model**

| Hospital | Out of Sample | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2008-2015 |
| Alta Bates-Main | | | | | | | | | |
| Alta Bates-Summit | | | | | | | | | |
| Sutter Sacramento | | | | | | | | | |
| CPMC-Main | | | | | | | | | |
| CPMC-St. Luke's | | | | | | | | | |
| Sutter Modesto | | | | | | | | | |

*Note*: *See* notes for Exhibit J1.

*Source*: *See* sources for Exhibit J1.

**Exhibit J5**
**Overcharge Estimates for Aetna**
**Pooled Model**

| Hospital | Out of Sample | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2008-2015 |
| Alta Bates-Main | | | | | | | | | |
| Alta Bates-Summit | | | | | | | | | |
| Sutter Sacramento | | | | | | | | | |
| CPMC-Main | | | | | | | | | |
| CPMC-St. Luke's | | | | | | | | | |
| Sutter Modesto | | | | | | | | | |

*Note*: *See* notes for Exhibit J1.

*Source*: *See* sources for Exhibit J1.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

### Exhibit J6
### Overcharge Estimates for United
### Pooled Model

| Hospital | Out of Sample | | | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2006-2015 |
| Alta Bates-Main | | | | | | | | | | | |
| Alta Bates-Summit | | | | | | | | | | | |
| Sutter Sacramento | | | | | | | | | | | |
| CPMC-Main | | | | | | | | | | | |
| CPMC-St. Luke's | | | | | | | | | | | |
| Sutter Modesto | | | | | | | | | | | |

*Note*: *See* notes for Exhibit J1.

*Source*: *See* sources for Exhibit J1.

## Appendix K: Comparison of Service Lines Offered by Sutter and Dignity in Northern California, 2011

| Medical Category | Service Line | Percent of Hospitals Offering Service Line: | |
|---|---|---|---|
| | | Sutter | Dignity |
| Acute Care Services | Medical | 100.0% | 100.0% |
| Acute Care Services | Surgical | 100.0% | 100.0% |
| Surgery Services | Anesthesia Services | 100.0% | 100.0% |
| Surgery Services | General | 100.0% | 100.0% |
| Acute Care Services | Orthopedic | 95.7% | 100.0% |
| Diagnostic / Therapeutic Services | Endoscopy | 95.7% | 100.0% |
| Surgery Services | Gynecological | 95.7% | 100.0% |
| Diagnostic / Therapeutic Services | Physical Therapy | 91.3% | 100.0% |
| Diagnostic Imaging Services | Computed Tomography | 91.3% | 100.0% |
| Emergency Services | Emergency Room Service | 91.3% | 93.3% |
| Intensive Care Services | Medical | 91.3% | 100.0% |
| Laboratory Services | Chemistry | 91.3% | 100.0% |
| Laboratory Services | Hematology | 91.3% | 100.0% |
| Surgery Services | Otolaryngolic | 91.3% | 100.0% |
| Ambulatory Services | Observation (Short Stay) Care | 87.0% | 93.3% |
| Diagnostic / Therapeutic Services | Electrocardiology | 87.0% | 93.3% |
| Diagnostic / Therapeutic Services | Electroencephalography | 87.0% | 93.3% |
| Diagnostic / Therapeutic Services | Nuclear Medicine | 87.0% | 93.3% |
| Diagnostic / Therapeutic Services | Respiratory Therapy Services | 87.0% | 100.0% |
| Diagnostic Imaging Services | Ultrasonography | 87.0% | 100.0% |
| Diagnostic Imaging Services | X-Ray -Radiology | 87.0% | 100.0% |
| Intensive Care Services | Surgical | 87.0% | 100.0% |
| Laboratory Services | Serology | 87.0% | 86.7% |
| Pharmacy | Pharmacy | 87.0% | 100.0% |
| Surgery Services | Orthopedic | 87.0% | 100.0% |
| Surgery Services | Podiatry | 87.0% | 100.0% |
| Surgery Services | Urologic | 87.0% | 100.0% |
| Acute Care Services | Pediatric | 82.6% | 80.0% |
| Acute Care Services | Post Partum | 82.6% | 86.7% |
| Ambulatory Services | Ambulatory Surgery Services | 82.6% | 93.3% |
| Diagnostic / Therapeutic Services | Echocardiology | 82.6% | 93.3% |
| Diagnostic / Therapeutic Services | Occupational Therapy | 82.6% | 100.0% |
| Diagnostic / Therapeutic Services | Pulmonary Function Services | 82.6% | 100.0% |
| Surgery Services | Dental | 82.6% | 86.7% |
| Surgery Services | Ophthalmologic | 82.6% | 100.0% |
| Surgery Services | Plastic | 82.6% | 93.3% |
| Diagnostic Imaging Services | Cystoscopy | 78.3% | 100.0% |

| Medical Category | Service Line | Percent of Hospitals Offering Service Line: | |
| --- | --- | --- | --- |
| | | Sutter | Dignity |
| Diagnostic Imaging Services | Magnetic Resonance Imaging | 78.3% | 66.7% |
| Emergency Services | Emergency Communications Systems | 78.3% | 86.7% |
| Other Services | Dietetic Counseling | 78.3% | 100.0% |
| Surgery Services | Thoracic | 78.3% | 93.3% |
| Acute Care Services | Geriatric | 73.9% | 80.0% |
| Acute Care Services | Oncology | 73.9% | 86.7% |
| Diagnostic / Therapeutic Services | Stress Testing | 73.9% | 86.7% |
| Intensive Care Services | Pulmonary | 73.9% | 86.7% |
| Laboratory Services | Clinical Pathology | 73.9% | 86.7% |
| Laboratory Services | Microbiology | 73.9% | 100.0% |
| Newborn Care Services | Newborn Nursery Care | 73.9% | 86.7% |
| Diagnostic / Therapeutic Services | Gastro-Intestinal Laboratory | 69.6% | 86.7% |
| Diagnostic / Therapeutic Services | Lithotripsy | 69.6% | 46.7% |
| Emergency Services | Orthopedic Emergency Services | 69.6% | 86.7% |
| Intensive Care Services | Coronary | 69.6% | 86.7% |
| Laboratory Services | Surgical Pathology | 69.6% | 93.3% |
| Obstetric Services | Combined Labor/Delivery Birthing Room | 69.6% | 80.0% |
| Obstetric Services | Labor Room Services | 69.6% | 86.7% |
| Surgery Services | Pediatric | 69.6% | 86.7% |
| Blood Bank | Blood Bank | 65.2% | 66.7% |
| Obstetric Services | Delivery Room Services | 65.2% | 80.0% |
| Other Services | Diabetic Training Class | 65.2% | 73.3% |
| Other Services | Social Work Services | 65.2% | 100.0% |
| Renal Dialysis | Hemodialysis | 65.2% | 66.7% |
| Surgery Services | Kidney | 65.2% | 73.3% |
| Diagnostic / Therapeutic Services | Electromyography | 60.9% | 40.0% |
| Laboratory Services | Anatomical Pathology | 60.9% | 86.7% |
| Laboratory Services | Immunology | 60.9% | 80.0% |
| Acute Care Services | Neonatal | 56.5% | 40.0% |
| Diagnostic / Therapeutic Services | Audiology | 56.5% | 26.7% |
| Diagnostic / Therapeutic Services | Diagnostic Radioisotope | 56.5% | 86.7% |
| Diagnostic / Therapeutic Services | Speech-Language Pathology | 56.5% | 93.3% |
| Intensive Care Services | Definitive Observation Care | 56.5% | 80.0% |
| Laboratory Services | Cytology | 56.5% | 73.3% |
| Obstetric Services | Abortion Services | 56.5% | 0.0% |
| Other Services | Parent Training Class | 56.5% | 60.0% |
| Renal Dialysis | Peritoneal | 56.5% | 60.0% |
| Diagnostic / Therapeutic Services | Cardiac Catheterization | 52.2% | 66.7% |
| Clinic Services | Obstetrics | 47.8% | 60.0% |

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

| Medical Category | Service Line | Percent of Hospitals Offering Service Line: | |
| --- | --- | --- | --- |
| | | Sutter | Dignity |
| Newborn Care Services | Premature Nursery Care | 47.8% | 40.0% |
| Other Services | Drug Reaction Information | 47.8% | 73.3% |
| Surgery Services | Neurosurgical | 47.8% | 73.3% |
| Acute Care Services | Physical Rehabilitation | 43.5% | 46.7% |
| Diagnostic / Therapeutic Services | Peripheral Vascular Laboratory | 43.5% | 80.0% |
| Diagnostic / Therapeutic Services | Therapeutic Radioisotope | 43.5% | 53.3% |
| Emergency Services | Emergency Observation Service | 43.5% | 73.3% |
| Emergency Services | Trauma Treatment E.R. | 43.5% | 46.7% |
| Intensive Care Services | Neonatal | 43.5% | 33.3% |
| Laboratory Services | Necropsy | 43.5% | 86.7% |
| Diagnostic / Therapeutic Services | Biofeedback Therapy | 39.1% | 20.0% |
| Diagnostic / Therapeutic Services | Sportscare Medicine | 39.1% | 46.7% |
| Intensive Care Services | Neurosurgical | 39.1% | 73.3% |
| Clinic Services | Diabetes | 34.8% | 46.7% |
| Diagnostic / Therapeutic Services | Recreational Therapy | 34.8% | 40.0% |
| Emergency Services | Heliport | 34.8% | 40.0% |
| Emergency Services | Medical Transportation | 34.8% | 40.0% |
| Intensive Care Services | Pediatric | 34.8% | 13.3% |
| Laboratory Services | Cytogenetics | 34.8% | 33.3% |
| Laboratory Services | Histocompatibility | 34.8% | 46.7% |
| Other Services | Patient Representative | 34.8% | 53.3% |
| Surgery Services | Heart | 34.8% | 53.3% |
| Surgery Services | Open Heart | 34.8% | 46.7% |
| Diagnostic / Therapeutic Services | Radiation Therapy | 30.4% | 46.7% |
| Diagnostic / Therapeutic Services | Radioactive Implants | 30.4% | 46.7% |
| Diagnostic / Therapeutic Services | X-Ray Radiology Therapy | 30.4% | 46.7% |
| Other Services | Toxicology/Antidote Information | 30.4% | 53.3% |
| Acute Care Services | Alternate Birthing Center (Licensed Beds) | 26.1% | 40.0% |
| Ambulatory Services | Comprehensive Outpatient Rehab Facility | 26.1% | 40.0% |
| Long-Term Care | Skilled Nursing Care | 26.1% | 46.7% |
| Other Services | Medical Research | 26.1% | 40.0% |
| Clinic Services | Obesity | 21.7% | 13.3% |
| Diagnostic / Therapeutic Services | Cobalt Therapy | 21.7% | 6.7% |
| Emergency Services | Radioisotope Decontamination Room | 21.7% | 20.0% |
| Extracorporeal Membrane Oxygenation | Extracorporeal Membrane Oxygenation | 21.7% | 0.0% |
| Home Care Services | Home Nursing Care (Visiting Nurse) | 21.7% | 46.7% |
| Home Care Services | Home Social Service Care | 21.7% | 46.7% |

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     K-3

| Medical Category | Service Line | Percent of Hospitals Offering Service Line: | |
|---|---|---|---|
| | | Sutter | Dignity |
| Medical Education Programs | Approved Residency | 21.7% | 26.7% |
| Medical Education Programs | Diagnostic Radiologic Technologist | 21.7% | 13.3% |
| Medical Education Programs | Pharmacy Intern | 21.7% | 33.3% |
| Medical Education Programs | Registered Nurse | 21.7% | 26.7% |
| Renal Dialysis | Home Dialysis Support Services | 21.7% | 6.7% |
| Renal Dialysis | Self-Dialysis Training | 21.7% | 0.0% |
| Ambulatory Services | Satellite Clinic Services | 17.4% | 40.0% |
| Clinic Services | AIDS | 17.4% | 33.3% |
| Clinic Services | Metabolic | 17.4% | 20.0% |
| Clinic Services | Neonatal | 17.4% | 20.0% |
| Clinic Services | Orthopedic | 17.4% | 40.0% |
| Clinic Services | Pediatric | 17.4% | 26.7% |
| Clinic Services | Renal | 17.4% | 13.3% |
| Clinic Services | Rural Health | 17.4% | 26.7% |
| Diagnostic / Therapeutic Services | Radium Therapy | 17.4% | 33.3% |
| Diagnostic Imaging Services | Positron Emission Tomography | 17.4% | 26.7% |
| Emergency Services | Emergency Helicopter Service | 17.4% | 13.3% |
| Home Care Services | Home Physical Medicine Care | 17.4% | 46.7% |
| Long-Term Care | Sub-Acute Care | 17.4% | 13.3% |
| Long-Term Care | Transitional Inpatient Care (SNF Beds) | 17.4% | 13.3% |
| Medical Education Programs | Approved Fellowship | 17.4% | 13.3% |
| Medical Education Programs | Emergency Medical Technician | 17.4% | 6.7% |
| Medical Education Programs | Hospital Administration Program | 17.4% | 6.7% |
| Medical Education Programs | Nurse Practitioner | 17.4% | 0.0% |
| Medical Education Programs | Occupational Therapist | 17.4% | 6.7% |
| Medical Education Programs | Social Worker Program | 17.4% | 20.0% |
| Organ Acquisition | Organ Acquisition | 17.4% | 20.0% |
| Other Services | Public Health Class | 17.4% | 33.3% |
| Psychiatric Services | Clinic Psychologist Services | 17.4% | 26.7% |
| Psychiatric Services | Psychiatric Acute - Adult | 17.4% | 20.0% |
| Psychiatric Services | Psychiatric Therapy | 17.4% | 26.7% |
| Chemical Dependency - Detox | Alcohol | 13.0% | 13.3% |
| Chemical Dependency - Detox | Drug | 13.0% | 20.0% |
| Clinic Services | Child Diagnosis | 13.0% | 26.7% |
| Clinic Services | Child Treatment | 13.0% | 33.3% |
| Clinic Services | Communicable Disease | 13.0% | 26.7% |
| Clinic Services | Hypertension | 13.0% | 26.7% |
| Clinic Services | Neurology | 13.0% | 20.0% |
| Clinic Services | Ophthalmology | 13.0% | 13.3% |

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

| | | Percent of Hospitals Offering Service Line: | |
|---|---|---|---|
| Medical Category | Service Line | Sutter | Dignity |
| Clinic Services | Otolaryngology | 13.0% | 20.0% |
| Clinic Services | Podiatry | 13.0% | 13.3% |
| Clinic Services | Surgery | 13.0% | 26.7% |
| Diagnostic / Therapeutic Services | Hyperbaric Chamber Services | 13.0% | 40.0% |
| Emergency Services | Psychiatric Emergency Services | 13.0% | 20.0% |
| Home Care Services | Home Dialysis Training | 13.0% | 6.7% |
| Home Care Services | Home Health Aide Services | 13.0% | 46.7% |
| Home Care Services | Home Hospice Care | 13.0% | 13.3% |
| Home Care Services | Home I.V. Therapy Services | 13.0% | 33.3% |
| Hospice Care | Hospice Care | 13.0% | 0.0% |
| Inpatient Care Under Custody (Jail) | Inpatient Care Under Custody (Jail) | 13.0% | 13.3% |
| Medical Education Programs | Dietetic Intern Program | 13.0% | 13.3% |
| Medical Education Programs | Licensed Vocational Nurse | 13.0% | 13.3% |
| Medical Education Programs | Nurse Midwife | 13.0% | 0.0% |
| Medical Education Programs | Physical Therapist | 13.0% | 6.7% |
| Medical Education Programs | Physician's Assistant | 13.0% | 0.0% |
| Medical Education Programs | Respiratory Therapist | 13.0% | 20.0% |
| Newborn Care Services | Developmentally Disabled Nursery Care | 13.0% | 6.7% |
| Obstetric Services | Infertility Services | 13.0% | 0.0% |
| Other Services | Family Planning | 13.0% | 13.3% |
| Psychiatric Services | Electroconvulsive Therapy (Shock) | 13.0% | 13.3% |
| Psychiatric Services | Milieu Therapy | 13.0% | 26.7% |
| Psychiatric Services | Psychopharmacological Therapy | 13.0% | 20.0% |
| Acute Care Services | Transitional Inpatient Care (Acute Beds) | 8.7% | 6.7% |
| Ambulatory Services | Adult Day Health Care Center | 8.7% | 13.3% |
| Clinic Services | Allergy | 8.7% | 13.3% |
| Clinic Services | Cardiology | 8.7% | 20.0% |
| Clinic Services | Chest Medical | 8.7% | 20.0% |
| Clinic Services | Dermatology | 8.7% | 20.0% |
| Clinic Services | Pediatric Surgery | 8.7% | 6.7% |
| Clinic Services | Psychiatric | 8.7% | 13.3% |
| Clinic Services | Rheumatic | 8.7% | 13.3% |
| Medical Education Programs | Associate Records Technician | 8.7% | 6.7% |
| Medical Education Programs | Nurse Anesthetist | 8.7% | 0.0% |
| Other Services | Genetic Counseling | 8.7% | 6.7% |
| Psychiatric Services | Psychiatric - Adolescent and Child | 8.7% | 6.7% |
| Psychiatric Services | Psychiatric Intensive (Isolation) Care | 8.7% | 6.7% |
| Surgery Services | Organ Transplant | 8.7% | 13.3% |

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA   K-5

| | | Percent of Hospitals Offering Service Line: | |
|---|---|---|---|
| Medical Category | Service Line | Sutter | Dignity |
| Ambulatory Services | Satellite Ambulatory Surgery Center | 4.3% | 0.0% |
| Chemical Dependency - Rehab | Alcohol | 4.3% | 0.0% |
| Chemical Dependency - Rehab | Drug | 4.3% | 0.0% |
| Clinic Services | Alcoholism | 4.3% | 6.7% |
| Clinic Services | Drug Abuse | 4.3% | 6.7% |
| Clinic Services | Family Therapy | 4.3% | 13.3% |
| Clinic Services | Group Therapy | 4.3% | 6.7% |
| Emergency Services | Mobile Cardiac Care Services | 4.3% | 6.7% |
| Long-Term Care | Intermediate Care | 4.3% | 0.0% |
| Long-Term Care | Residential/Self Care | 4.3% | 0.0% |
| Long-Term Care | Sub-Acute Care - Pediatric | 4.3% | 0.0% |
| Medical Education Programs | Medical Records Administrator | 4.3% | 0.0% |
| Medical Education Programs | Medical Technologist Program | 4.3% | 13.3% |
| Other Services | Vocational Services | 4.3% | 0.0% |
| Psychiatric Services | Child Care Services | 4.3% | 0.0% |
| Psychiatric Services | Night Care | 4.3% | 0.0% |
| Clinic Services | Dental | 0.0% | 6.7% |
| Home Care Services | Jail Care | 0.0% | 0.0% |
| Home Care Services | Psychiatric Foster Home Care | 0.0% | 0.0% |
| Intensive Care Services | Burn | 0.0% | 13.3% |
| Long-Term Care | Behavioral Disorder Care | 0.0% | 6.7% |
| Long-Term Care | Developmentally Disabled Care | 0.0% | 6.7% |
| Long-Term Care | Self Care | 0.0% | 0.0% |
| Medical Education Programs | Non-Approved Residency | 0.0% | 0.0% |
| Psychiatric Services | Psychiatric Long-Term Care | 0.0% | 0.0% |
| Psychiatric Services | Sheltered Workshop | 0.0% | 0.0% |

*Notes*:

1. The OSHPD data report service availability in four categories: (a) 1 indicates that the service is available at the hospital; (b) 2 indicates that the service is available through an arrangement at another healthcare entity; (c) 3 indicates that the service is not available; and (d) 4 indicates that the service is provided through the hospital's emergency department. For this analysis, category 1 was treated as the hospital providing the service.

2. There were 23 Sutter GAC hospitals and 15 Dignity Northern California GAC hospitals in 2011.

3. The OSHPD data used in this analysis do not report information for Sutter's San Leandro hospital in 2011, so information on San Leandro was extracted from the 2012 version of the OSHPD data.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profile and Complete Data, 2011-2012.

2. Centers for Medicare & Medicaid Services Impact Files, 2011.

3. OSHPD Hospital Annual Financial Data: Complete Data Set, 2011-2012.