# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, JERRY JANKOWSKI,
SUSAN HANSEN, DAVID HERMAN,
OPTIMUM GRAPHICS, INC., and JOHNSON
POOL & SPA, on Behalf of Themselves and All
Others Similarly Situated,

Plaintiffs,

v.

SUTTER HEALTH,

Defendant.

Case No. 3:12-cv-4854-LB

CLASS ACTION

Supplemental Expert Report of Dr. Tasneem Chipty

April 30, 2019

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

1.      My name is Tasneem Chipty. I have been retained as an independent expert by counsel for the putative Class, and in that capacity, I have submitted four previous reports in this matter. On April 22, 2019, the day I submitted my Merits Report in this case, plaintiffs and I received new information from Anthem Blue Cross of California ("Anthem"); plaintiffs and I also received additional clarifying information from Anthem on April 26, 2019.[1] This new information allowed me to use the Anthem claims data to study the penetration of Anthem's steered insurance products (*i.e.*, products with a narrow network and/or tiered products) in Northern and Southern California, separately.

2.      As I have previously explained, qualitative evidence shows that each of the Class Health Plans have been hindered in their ability to introduce commercially-successful steered products in Northern California and that steered products have been more commercially-successful in Southern California, relative to Northern California.[2] As I also explained, this North-South comparison is especially appropriate because Sutter is exclusively a Northern California healthcare system over the period studied, and the Class Health Plans operate in both Northern and Southern California.[3] The new Anthem information has enabled me to develop quantitative analysis to further explore this issue. Consistent with the qualitative evidence, the new analysis shows that Anthem's steered products are more commercially-successful in Southern California, as seen through differential rates of penetration of Anthem steered products.

3.      Specifically, I study the penetration of steered products in Northern and Southern California, as measured by the percentage of Anthem inpatient claims paid on a steered insurance product. Using information recently provided by Anthem, I was able to determine the extent to which ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████[4] ███████████████

---

[1] *See* Chipty Workpapers.
[2] Expert Report of Dr. Tasneem Chipty, April 22, 2019, ¶¶ 188-189.
[3] *Id.*, ¶ 188.
[4] ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████ With this information, I calculated, separately by year for Northern and Southern California, the percent of inpatient hospital claims that were paid under an Anthem steered product.

4.      The results of this analysis are shown in Exhibit 1: (a) the orange line describes *Southern California*; and (b) the blue line describes *Northern California*. As seen here ████████

█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
████████████████████████ *These results suggest that Anthem was about 2.7 (= 24 ÷ 9) times more successful in launching and attracting members to steered products in Southern California. The gap between Northern and Southern California has also widened over the Class Period, since Sutter imposed the challenged restrictions.* [5]

5.      This analysis, along with the qualitative evidence, shows that, but-for the challenged conduct, health plans would have had greater ability to introduce or to threaten to

───────────────────────

█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
[5] █████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

introduce additional lower-priced, steered products in Northern California. As described in my other reports, this greater ability to pursue steering strategies would have likely constrained hospital prices in Northern California, which in turn would have resulted in lower health insurance premiums for Class Members.

**Exhibit 1**
**Percent of In-Network, Inpatient Claims Associated with a Steered Product,**
**for Anthem's Small and Large Group Members**
**Southern California vs. Northern California**



—Patients Living in Northern California  —Patients Living in Southern California

*Note*: Claims are divided between Southern and Northern California based on patient zip code.

*Sources*:

1. Anthem Claims and Premium Data.
2. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2006-2015.
3. Northern California Zip Code Lookup.
4. "Copy of Copy of Anthem Product Classification (DRAFT) 2019.03.31_LG upda....xlsx," received on April 22, 2019.

Tasneem Chipty, Ph.D.
April 30, 2019

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      3

## Appendix A: Materials Considered

All materials cited in this Supplemental Report, all materials listed in Appendix B of Chipty SJ Declaration, Chipty Class Declaration, Chipty Class Reply Declaration, Chipty Merits Report, and the following:

- "Copy of Copy of Anthem Product Classification (DRAFT) 2019.03.31_LG upda....xlsx," received on April 22, 2019.
- Email from Michelle L. Cheng, Partner at Reed Smith, to Matthew L. Cantor, Partner at Constantine Cannon, "Subject: RE: Info on Anthem networks," April 26, 2019.

The following materials were inadvertently omitted from Appendix B of the Chipty Merits Report:

- Expert Report of David Dranove, PhD, *UFCW & Employers Benefit Trust, et al. v. Sutter Health, et al.* and *People of the State of California, ex rel. Xavier Becerra v. Sutter Health*, Case No. CGC-14-538451 consolidated with Case No. CGC-18-565398, August 31, 2018.
- Expert Report of Meredith B. Rosenthal, PhD, *UFCW & Employers Benefit Trust, on behalf of itself and all others similarly situated v. Sutter Health, et al.* and *People of the State of California, ex rel. Xavier Becerra v. Sutter Health*, Case No. CGC-14-538451 consolidated with Case No. CGC-18-565398, August 31, 2018.
- Expert Report of Gregory S. Vistnes, Ph.D., *UFCW & Employers Benefit Trust, on behalf of itself and all other similarly situated v. Sutter Health, et al.* and *People of the State of California, ex rel. Xavier Becerra v. Sutter Health*, Case No. CGC-14-538451 consolidated with Case No. CGC-18-565398, August 31, 2018.

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, JERRY JANKOWSKI,
SUSAN HANSEN, DAVID HERMAN,
OPTIMUM GRAPHICS, INC., and JOHNSON
POOL & SPA, on Behalf of Themselves and All
Others Similarly Situated,

                Plaintiffs,

    v.

SUTTER HEALTH,

                Defendant.

Case No. 3:12-cv-4854-LB

CLASS ACTION

Rebuttal Report of Dr. Tasneem Chipty

August 1, 2019

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

# I.   Introduction

1.      My name is Tasneem Chipty. I declare under penalty of perjury under the laws of the United States of America as follows:

2.      At the request of counsel for the Class Plaintiffs, I previously submitted five reports in *Sidibe et al. vs. Sutter*.[1] Based on this body of work, I concluded that Sutter's systemwide contracts, with provisions requiring all-or-nothing contracting, onerous non-participating provider rates, and equal treatment and anti-tiering clauses, constitute an anticompetitive arrangement whereby Sutter ties the purchase of GAC inpatient services in four Tied Markets to the purchase of GAC inpatient services in seven Tying Markets and prevents health plans from engaging in pro-competitive steering. I concluded that there is common proof demonstrating antitrust impact, and I provided a formulaic method that is consistent with actuarial principles for calculating aggregate premium damages. I also concluded that a growing body of economics literature and case-specific evidence indicate that Sutter's contracting practices have interfered with the competitive process and enabled Sutter to charge health plans higher prices for inpatient hospital services (in addition to outpatient and professional services) than it would have otherwise. Using a damages methodology and claims data from each of the five Class Health Plans (Anthem, Blue Shield, Health Net, Aetna, and United), I estimated aggregate premium damages to Class Members to be between $478.6 million and $503.3 million, from September 2008 to December 2017. I explained these estimates are conservative for several reasons, including the fact that they do not account for: (a) the onerous non-participating rates the Class Health Plans were required to pay when they attempted to exclude any of the Tied Hospitals; and (b) trend factors which actuaries would have applied during premium construction.

---

[1] The opinions expressed in my previous reports in this matter are incorporated by reference herein. My qualifications are set forth in those reports. I adopt in this report the citation shorthand and the use of terms as defined in my previous reports, and my updated CV is included here as Appendix A.

3.      I have been asked to evaluate and respond to additional arguments put forward by Dr. Robert Willig,[2] Dr. Gautam Gowrisankaran,[3] Mr. Patrick Travis,[4] and Ms. Shannon Keller,[5] all of whom have submitted reports on behalf of Sutter. In this report, I assess their key arguments and explain why those arguments are invalid; many of their derivative arguments, which I do not address directly, fail for the same reasons I describe here.[6] My work in this report relies upon much of the same evidence upon which I have previously relied; I also rely upon additional documents produced and deposition testimony obtained in this matter and my review of the electronic productions accompanying the Willig, Gowrisankaran, Travis, and Keller reports. An incremental list of materials that I have considered in forming my opinions described in this rebuttal report is attached as Appendix B.

4.      My work in this matter continues to be supported by staff working under my direction, at both Berkeley Research Group and Matrix Economics. Matrix Economics is compensated for my time in this matter at a rate of $850 per hour. Matrix Economics also receives compensation from Berkeley Research Group based on its collected staff billings in support of this effort. My compensation is not dependent on the outcome of this matter. My work is ongoing, and I will continue to review the discovery record.

## II.      Summary of Opinions

5.      Based on my training and experience as an antitrust economist, my review of the record in this case, and the analyses set forth in this report, it is my opinion that the new arguments made by Dr. Willig, Dr. Gowrisankaran, Mr. Travis, and Ms. Keller in their June

---

[2] Expert Report of Dr. Robert D. Willig, June 21, 2019 (hereafter "Willig Merits Report"); and Deposition of Robert D. Willig, PhD, July 24, 2019 (hereafter "Willig Deposition (July 24, 2019)").

[3] Expert Report of Gautam Gowrisankaran, PhD, June 21, 2019 (hereafter "Gowrisankaran Merits Report"); and Deposition of Gautam Gowrisankaran, PhD, July 17, 2019 (hereafter "Gowrisankaran Deposition (July 17, 2019)").

[4] Expert Declaration of Patrick Travis, June 21, 2019 (hereafter "Travis Merits Declaration").

[5] Expert Declaration of Shannon Keller, June 21, 2019 (hereafter "Keller Merits Declaration").

[6] My silence with respect to any of their arguments should not be construed as agreement.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

2019 reports are flawed, incomplete, irrelevant, and at times, contradictory. The following points summarize my opinions with respect to their specific arguments about market definition, market power, competitive effects, and damages.

6. Dr. Gowrisankaran argues that Kaiser is a participant in the relevant antitrust market, even though he concedes elsewhere that: (a) "[p]rice competition take[s] place during the first stage, when providers compete for inclusion in an insurer's network;"[7] and (b) "Kaiser does not compete with non-Kaiser hospitals for inclusion in non-Kaiser health plans provider network[s]."[8] Dr. Gowrisankaran claims substantial diversion between Sutter and Kaiser hospitals, by studying three natural experiments involving the opening of new Kaiser hospitals and a separate econometric analysis of consumer choice between Kaiser and non-Kaiser hospitals; he also attempts to discredit my profitability analysis showing that Kaiser does not discipline Sutter. A closer look reveals that Dr. Gowrisankaran's market definition analyses are misleading and incapable of supporting his conclusion:

- A proper analysis of the very experiments that Dr. Gowrisankaran attempts to study shows the new Kaiser hospitals attracted patient volume from other Kaiser hospitals, *not* from nearby Sutter hospitals.

- Dr. Gowrisankaran's econometric model is incapable of modeling consumer choice between Kaiser and non-Kaiser hospitals. The flaw in his model becomes apparent upon comparing the diversion between Sutter and Kaiser hospitals that his model predicts and the actual diversion between Sutter and Kaiser hospitals, in Dr. Gowrisankaran's Kaiser event studies.

---

[7] Gowrisankaran Deposition (July 17, 2019), pp. 76-77 and 94 (referencing an *amicus brief* he signed in the *St. Luke's* case "urging affirmance" of the District Court's opinion).
[8] Gowrisankaran Deposition (July 17, 2019), p. 28.

- Dr. Gowrisankaran mischaracterizes my profitability analysis, which shows that Kaiser does not discipline Sutter's prices, and he contradicts himself by rejecting ordinary-course evidence that shows no cross-price effects over a two-year period.

7. Dr. Gowrisankaran argues that Sutter does not have market power in the Tying Markets. There are many problems with his various arguments on this topic. For example, Dr. Gowrisankaran ignores substantial ordinary-course evidence, including from Sutter, describing several of the Tying Markets as areas in which there are no substitute hospitals, even though elsewhere Dr. Gowrisankaran recognizes the role of ordinary-course documents in identifying competitors.[9] Dr. Gowrisankaran also claims to show that the Tying Markets are less concentrated when accounting for patients who leave the market for care. A closer look at his calculation reveals a methodological error. Fixing it shows that concentration in the Tying Markets is substantially higher than the threshold described in the *Horizontal Merger Guidelines* as "highly concentrated" and that the Tying Markets are substantially more concentrated than the Tied Markets. Furthermore, he claims to show that preferences of patients who stay to receive care locally are no different from preferences of those who leave to receive care from a hospital outside of their market. A closer look at his calculation shows there are economically significant differences, by his own metrics, in the preferences of these patient populations.

8. With respect to competitive effects, Sutter's experts make contradictory and incorrect claims:

- Dr. Willig attempts to simultaneously deny and justify adverse effects of Sutter's contractual provisions. He reaches the incorrect conclusion that Sutter's contractual restrictions are not anticompetitive because they were the outcome of a negotiation between willing sophisticated buyers and sellers. He also asserts, without support, that health plans received price discounts in exchange for agreeing to the contractual restrictions: the evidence shows they did not.

---

[9] Gowrisankaran Deposition (July 17, 2019), p. 17.

- Mr. Travis denies "the popularity of steered products in the marketplace,"[10] even though Dr. Willig documents the penetration of steered products (including those of Kaiser health plan) in California to be between 20 and 40 percent,[11] and Dr. Willig described the deployment of these products by health plans during the damages period as "common in many parts of the country."[12] Dr. Willig also presents evidence that indicates non-Kaiser health plans have been disadvantaged against Kaiser health plans in Northern California, relative to Southern California.

- Dr. Gowrisankaran claims that the non-par rates could not have dissuaded health plans from excluding the Tied Hospitals from their provider networks, based on a profitability analysis for Sutter Sacramento that relies on the Blue Shield redirection analysis. His analysis is incomplete and his associated conclusion unreliable. First, Dr. Gowrisankaran bases his opinion on what appears to be a cherry-picked analysis focused on only Sutter Sacramento. Had he studied Sutter Modesto, Sutter Santa Rosa, or CPMC, he would have concluded the opposite. Second, his analysis of Sutter Sacramento fails to evaluate whether a health plan that excludes Sutter Sacramento and pays 95 percent of billed charges for anticipated out-of-network usage could have achieved cost savings sufficient to enable it to achieve commercial success. Ordinary-course evidence in the record suggests that health plans' attempts to exclude Sutter Sacramento were not commercially successful. His analysis is also inconsistent with Dr. Willig's testimony that there would have been more narrow network products in Northern California, had Sutter's non-par rate been lower.[13]

9.      Dr. Willig's and Dr. Gowrisankaran's criticisms of my overcharge regression model are exaggerated and, in some cases, untrue. Both Dr. Willig and Dr. Gowrisankaran criticize my use of competitor indicator variables, based on a 30-minute drive time, to control for

---

[10] Travis Merits Declaration, ¶ 31.

[11] Willig Merits Report, Figure 2.

[12] Willig Deposition (July 24, 2019), Exhibit 896 ("In the United States Court of Appeals for the Third Circuit, *Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center and PinnacleHealth System*, Appendix Volume 5."), p. 849.

[13] Willig Deposition (July 24, 2019), pp. 212-213.

the competitive landscape facing a given hospital. They claim that my results are sensitive to changes in the drive time threshold used to identify the number of competitors and that the variables overstate the degree of competition at Sutter's Alta Bates hospitals. Examination of these criticisms demonstrates that they are of little practical significance. Dr. Willig continues to criticize hospital-level regression models and the use of case mix adjusted prices, even though both can be legitimate modeling choices. I demonstrate below that: (a) differences between the levels of aggregation employed by Dr. Willig's model and my model (*i.e.*, claim-level versus hospital-level) cannot explain his inability to measure a Sutter overcharge; and (b) differences between the mix of cases across Sutter hospitals and the benchmark hospitals are of relatively little practical importance. Further, I demonstrate that Dr. Willig's inability to measure a Sutter overcharge, using the new regression models he presents in his merits report, stems from the same problems with his specification (as in his prior reports) that mask overcharges where they exist.

10.     Mr. Travis's and Ms. Keller's claims that I have overstated damages by $85 million to $90 million are exaggerated. A closer look at their analyses indicates that the majority ($81 million) of their asserted damages overstatement stems from their attempt to pool high-cost claims for individual, small group, and large group lines of business.[14] However, evidence in this case, including Ms. Keller's own supporting evidence and testimony from Mr. Axene, indicates that large health plans (like the Class Health Plans) make minimal adjustments because of high-cost pooling for individual, small group, and manually-rated large group lines of business. Even if one were to reduce damages for blended- and experience-rated large groups in the flawed manner specified by Mr. Travis and Ms. Keller, the effect of the high-cost pooling reduces damages by only $12 million, not $81 million—as Mr. Travis and Ms. Keller claim. Furthermore, their assertions that my damages estimates have been overstated need to be considered within the context of the many ways in which my damages methodology is

---

[14] Mr. Travis and Ms. Keller also claim to identify six other issues with my damages methodology that, even if correct, would reduce my damages estimates by a combined one to two percent. *See* Section VII, below.

conservative. One way in which my methodology is conservative is that it does not account for the trend factors that actuaries would have applied during premium construction.[15] Incorporating a trend factor adjustment alone would increase estimated damages by approximately $75 million, an amount that is substantially greater than the $12 million. Seen in this context, it becomes clear that Mr. Travis and Ms. Keller exaggerate the importance of high-cost pooling and the other issues they raise. For these reasons, it remains my opinion that my damages estimates from my merits report are both reasonable and conservative in that they tend to understate damages.

11.     The remainder of this report provides more detailed explanation of the analyses and evidence that lead me to each of these conclusions.

## III.     Kaiser Hospitals Are Not in the Relevant Product Market and Kaiser Does Not Significantly Discipline Sutter's Pricing

12.     Dr. Gowrisankaran argues that Kaiser hospitals are in the relevant product market,[16] but his arguments are flawed and suffer from fundamental errors in economic reasoning. Dr. Gowrisankaran continues to ignore the fact that *health plans*, not *patients*, are the relevant consumers that negotiate with hospitals.[17] His report obfuscates the distinction between Kaiser-the-hospital-system and Kaiser-the-health-plan, arguing that competition between Kaiser and non-Kaiser health plans implies substitution between Kaiser and Sutter hospitals. To see the flaw of Dr. Gowrisankaran's logic, consider a candidate product market for car tires. Because some end-purchasers of cars may substitute to trucks, Dr. Gowrisankaran would argue that a candidate market for car tires should also include truck tires—even if truck tires cannot be fitted onto cars. But a proper market definition analysis to evaluate the conduct of car tire makers would consider *car makers'* substitution alternatives for car tires, which would exclude truck tires if truck tires cannot be fitted onto cars. In this context, Kaiser hospitals are like truck tires in

---

[15] Chipty Class Declaration, ¶ 148.

[16] Gowrisankaran Merits Report, Section III.

[17] Gowrisankaran Deposition (July 17, 2019), p. 50 ("I looked at the market definition from the point of view of the consumers in this market, not from the point of view of these intermediate negotiators [health plans who negotiate] with hospital systems.").

Gowrisankaran argues that two years is a "relatively short timeframe" to assess substitution between Kaiser and non-Kaiser health insurance products because "consumers' health plan choices display 'inertia.'"[45] I disagree. Two years is not a "relatively short timeframe" when defining antitrust markets; at deposition, Dr. Gowrisankaran acknowledged that the hypothetical monopolist test assesses whether a hypothetical monopolist could "sustain [a] price increase, profitably for a period of *one or two years*."[46] Moreover, consumer "inertia" in health insurance product selection makes it *less likely* that Kaiser hospitals can discipline Sutter hospitals, not *more likely* as Dr. Gowrisankaran appears to suggest.[47]

## IV.   Sutter Has Substantial Pre-Existing Market Power in the Tying Hospital Markets

25.     In my merits report, I presented a rich variety of evidence on which I based my opinions with respect to Sutter's pre-existing market power.[48] Specifically, I relied on a combination of structural evidence, direct evidence, and a series of pricing analyses that compared prices at the Sutter Tying Hospitals to those at benchmark hospitals that resembled the Sutter Tying Hospitals in important dimensions. All of these analyses indicated that Sutter has pre-existing market power in the Tying Markets. Dr. Gowrisankaran criticizes my assessment that Sutter had substantial pre-existing market power in the Tying Markets, suggesting instead

---

[45] Gowrisankaran Merits Report, ¶¶ 56-57.

[46] Gowrisankaran Deposition (July 17, 2019), pp. 62-63 (emphasis added).

[47] Dr. Gowrisankaran also argues that my profitability analysis predicts that Class Health Plans would be unable to discipline Sutter's prices through steering. He considers a scenario where a health plan introduces a narrow network product featuring non-Sutter hospitals that price 20 percent below Sutter for all inpatient, outpatient, and physician services. He makes unsupported assumptions and calculates that Sutter's critical loss (of patient volume) from members switching to the narrow product (28 percent) is greater than the loss he claims Sutter is likely to experience (6.5 percent). (Gowrisankaran Merits Report, ¶¶ 57-59.) Dr. Gowrisankaran understates the likely actual loss by ignoring the possibility that, but for the challenged conduct, non-Kaiser plans could exclude Sutter Tied Hospitals from broad network products. Blue Shield's redirection analysis, for example, suggests that actual loss at Sutter Tied Hospitals from being placed out of network was at least 40 percent (and in some instances much more). *See* Chipty SJ Declaration, Exhibit 20. Thus, the likely actual loss is greater than the critical loss associated with a 20 percent price difference on all services (28 percent).

[48] Chipty Merits Report, Section VI.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

that Sutter faces vibrant competition in those areas.[49] I disagree. For brevity in this section, I focus my response on select arguments and analyses Dr. Gowrisankaran puts forth.

## A.    Dr. Gowrisankaran's Criticism of My Multiple of Medicare Analysis Is Misplaced

26.    My merits report contained a series of analyses comparing Sutter Tying Hospitals' multiple of Medicare to those of benchmark hospitals.[50] A multiple of Medicare is a ratio of a hospitals' commercial prices to Medicare prices. Because Medicare prices reflect adjustors for hospital-specific factors,[51] researchers use the ratio to provide a more controlled comparison of the differences in commercial prices across hospitals.[52] Dr. Gowrisankaran appears to dismiss the observed differences in multiple of Medicare earned by Sutter versus non-Sutter hospitals. He argues that Sutter Tying Hospitals incur higher costs when treating Medicare patients, and therefore Sutter needs to charge higher commercial prices to generate commercial revenues sufficient to cover its Medicare higher costs.[53] By acknowledging that Sutter has a higher cost of treating Medicare patients, Dr. Gowrisankaran is conceding that *Sutter is less efficient* than its rivals, a conclusion that is corroborated by qualitative evidence on Sutter's inefficiency.[54] The fact that Sutter is less efficient is not a pro-competitive justification for its higher prices.

---

[49] Gowrisankaran Merits Report, Section V.

[50] Chipty Merits Report, Exhibits 10-11.

[51] Dr. Gowrisankaran correctly acknowledges that Medicare sets its reimbursement rates by geography to "ensure that hospitals in more expensive regions . . . receive higher compensation." *See* Gowrisankaran Merits Report, ¶ 138.

[52] Chipty Merits Report, ¶ 111 and Footnote 316. This price measure is calculated as commercial net patient revenues as a percentage of commercial gross patient revenues divided by Medicare net revenues as a percentage of Medicare gross patient revenues.

[53] Gowrisankaran Merits Report, ¶¶ 137-140 and Exhibits 14-15.

[54] *See, e.g.*, Chipty Merits Report, ¶ 7 of Appendix F. *See also*, Gowrisankaran Deposition (July 17, 2019), p. 269 (conceding that he "can't rule out" that Sutter has more Medicare losses because it is less efficient).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

the *Horizontal Merger Guidelines* (2,500),[77] and four of the seven Tying Markets have an HHI that is more than 7,000. These calculations provide additional evidence that Sutter has substantial market power in the Tying Markets. In addition, these HHIs show that the Tying Markets are substantially more concentrated than the Tied Markets, which is consistent with Sutter having more market power in the Tying Markets than in the Tied Markets.[78]

**Exhibit 4**
**HHIs Calculated Using Discharges for All Patients Who Live in the Market: 2011**



*Source*: Gowrisankaran Merits Report backup production.

## V.    Sutter's Experts Make Erroneous, Incoherent, and Contradictory Claims About the Adverse Competitive Effects from Sutter's Contractual Provisions

33.    Dr. Willig makes a series of incoherent, theoretical claims that there has been no adverse competitive effect associated with the challenged provisions:

---

[77] Horizontal Merger Guidelines, p. 19.

[78] Concentration in the Tied Markets is likely inflated because Sutter has protected its volume in the Tied Markets, through the use of the challenged contractual restrictions.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- First, Dr. Willig claims that Sutter's contractual provisions cannot be anticompetitive because they were the outcome of "an intense bilateral negotiation."[79] By his logic, it would be impossible for a powerful seller to engage in anticompetitive conduct in situations where the terms of sale are determined in a bilateral negotiation with a powerful buyer.[80] Moreover, evidence in this case reveals Sutter had more power over health plans, particularly in certain geographies, and that Sutter understood that systemwide contracting would enable it to enhance its bargaining position against health plans.[81]

- Second, Dr. Willig claims that health plans received the benefit of a bargain by agreeing to the challenged contractual provisions, and that they obtained "lower prices (or greater discounts) in exchange for greater and more predictable patient volume."[82] Remarkably, Dr. Willig appears to recognize that Sutter does not have lower prices if one compares Sutter prices to those of prices charged by other GAC hospitals in Northern California. To support his claim that Sutter offers "lower prices," he insists on comparing Sutter's in-network prices to its onerous non-par prices. Certainly, Sutter's in-network prices are lower than its non-par prices, but that does not prove that Sutter offers lower prices in exchange for volume. It is the level of the non-par rates coupled with the demand for the Tying Hospitals that allow Sutter to charge elevated in-network prices, relative to in-network prices at non-Sutter hospitals.[83]

---

[79] Willig Merits Report, ¶ 13 (p. 7).

[80] Dr. Willig did not complete an "independent study" of whether Sutter had market power and admitted that evidence of market power can be found when a seller can force buyers to deal with it for inputs necessary to compete. Willig Deposition (July 24, 2019), pp. 55, 144-145.

[81] Van Johnson Deposition Exhibit 280, Compilation of Sutter Documents, including a Sutter Health Memorandum from Ed Berger, then Vice President of Managed Care at Sutter, to Sutter personnel (Managed Care Department), "SUBJECT: BLUE CROSS NEGOTIATIONS," November 24, 1997, DEF001924626-678, at 639-640.

[82] Willig Merits Report, ¶ 13 (p. 9).

[83] Dr. Willig did not do any analysis comparing Sutter in-network and out-of-network prices to non-Sutter in-network and out-of-network prices. Willig Deposition (July 24, 2019), pp. 185-186.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- Elsewhere in his report, Dr. Willig presents a different view still. Using his regression, he argues that Sutter's prices are no higher than those of non-Sutter hospitals.[84] Yet, he suggests that Sutter needs the challenged provisions to cover its higher costs,[85] thus apparently conceding that Sutter's prices are higher.

34.     Dr. Willig describes Kaiser insurance as the "ultimate steered product" and claims that Sutter's conduct has not interfered with the introduction of steered insurance products in Northern California.[86] His Figure 2 shows that between 20 percent and 40 percent of inpatient claims are paid on a steered product (including Kaiser insurance products) in both Northern and Southern California.[87] His evidence shows that overall penetration of steered insurance products is relatively similar across the two regions of California; however, evidence I have previously offered shows that non-Kaiser steered insurance products are significantly more successful in Southern California.[88] The two pieces together indicate that Sutter's conduct has weakened competition among steered insurance products, and it has given Kaiser-the-health-plan an advantage over non-Kaiser health plans, in Northern California. Accordingly, Dr. Willig's Figure 2—understood in the proper context—provides additional insight into the mechanism through which Sutter's conduct has interfered with the competitive process.

35.     By contrast, Mr. Travis argues that I have overstated the popularity of steered products (and therefore the competitive significance of steered products) and that my arguments are "inconsistent with the realities of the healthcare marketplace."[89] Mr. Travis's opinion is not only contradicted by substantial evidence in this case and the literature more broadly, but it is also directly at odds with the opinion of Dr. Willig. For example, in testimony that Dr. Willig

---

[84] Willig Merits Report, ¶ 215.

[85] Willig Merits Report, ¶¶ 76-77 (asserting that Sutter's costly "investments in seismic upgrades were more extensive and occurred earlier than required").

[86] Willig Merits Report, ¶¶ 46-48.

[87] Willig Merits Report, Figure 2.

[88] Supplemental Expert Report of Dr. Tasneem Chipty, April 30, 2019, Exhibit 1.

[89] Travis Merits Declaration, ¶ 31.

provided in *FTC vs. Penn State and Pinnacle Hospitals* in 2016, Dr. Willig acknowledged that the use of tiered networks was common in many parts of the country and that steered products are considered by many "to be the future of health insurance generally."[90] In this case, Dr. Willig describes Kaiser insurance as a narrow network product that has "a lot of popularity" in California,[91] and he calculates that around 35 percent of inpatient claims in California are paid on a steered product (including Kaiser insurance products) as of 2015.[92]

36.　　Dr. Willig also claims that the analysis in Ho and Lee (2019) "does not and cannot establish that the challenged conduct raises prices" because that paper "studied different strategies than the challenged conduct" here.[93] This is untrue. As the authors themselves explain, their paper studies "the consequences of narrow hospital networks in commercial health care markets."[94] The challenged conduct in this case concerns contractual restrictions that interfere with health plans' ability to offer narrow and tiered network products. Dr. Willig obfuscates the results of Ho and Lee (2019) when he writes, "Ho and Lee assume that there is no steering in both the narrow and broad network scenarios they compare, and thus their analysis says nothing about the effects of steering."[95] Yet, elsewhere Dr. Willig describes Kaiser insurance products (which are narrow network products) as the "ultimate steered product."[96]

37.　　Dr. Gowrisankaran challenges the possibility of adverse competitive effects by arguing that Sutter faces "continued and growing competition" in the asserted Tied Markets.[97]

---

[90] Willig Deposition (July 24, 2019), Exhibit 896 ("In the United States Court of Appeals for the Third Circuit, *Federal Trade Commission and Commonwealth of Pennsylvania v. Penn State Hershey Medical Center and PinnacleHealth System*, Appendix Volume 5."), p. 849.

[91] Willig Deposition (July 24, 2019), pp. 151-152.

[92] Willig Merits Report, Figure 2.

[93] Willig Merits Report, ¶¶ 157-160.

[94] Ho, Kate and Robin S. Lee, "Equilibrium Provider Networks: Bargaining and Exclusion in Health Care Markets," *American Economic Review*, Vol. 109, No. 2, 2019, pp. 473-522, p. 473

[95] Willig Merits Report, ¶ 160.

[96] Willig Merits Report, ¶ 46.

[97] Gowrisankaran Merits Report, Section VII.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

Specifically, he explains that "[n]on-Sutter hospitals have been viable competitors to which residents of the asserted Tied Markets could substitute since the beginning of the alleged anticompetitive conduct and some of them have gained share over time."[98] Implicit in Dr. Gowrisankaran's argument is the view that an adverse competitive effect can only exist if a competitor was "driven out" of the market.[99] This is untrue. There can be harm to competition even if competitors were not driven out.[100] Nothing in Dr. Gowrisankaran's analysis examines whether the challenged conduct harmed competition. If anything, the presence of viable competitors in these markets suggests that Sutter would have been forced to lower its hospital prices if these competitors could have competed by offering the Class Health Plans price discounts in exchange for patient volume.

38.     Dr. Gowrisankaran also argues that Sutter's non-par rates are not high enough to "force network inclusion" at the Tied Hospitals.[101] He attempts to support his argument using a profitability analysis using Blue Shield's estimate of patient insistence for Sutter Sacramento (███ percent), from Blue Shield's redirection analysis. According to Dr. Gowrisankaran, a health plan facing more than an ███ percent price difference between Sutter Sacramento and other hospitals would find it profitable to move Sutter Sacramento out-of-network, despite Sutter's 95 percent non-par rate.[102] Given that the price differential I estimate between Sutter Sacramento and benchmark hospitals exceeds ███ percent, Dr. Gowrisankaran argues that Sutter's non-par rate could not have forced health plans to include Sutter Sacramento in their provider networks.[103] Examination of his work, however, suggests that Dr. Gowrisankaran cherry-picked Sutter Sacramento for his analysis; his conclusion does not hold for any of the other Tied Hospitals when the same methodology is applied:

---

[98] Gowrisankaran Merits Report, ¶ 211.

[99] *Id.*

[100] *See, e.g.,* Willig Deposition (July 24, 2019), pp. 194-195.

[101] Gowrisankaran Merits Report, ¶¶ 117-121.

[102] Gowrisankaran Merits Report, ¶ 121.

[103] Gowrisankaran Merits Report, ¶ 121.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- Blue Shield's estimated patient insistence at Sutter Modesto (███ percent) and Sutter Santa Rosa (███ percent) are so high that even if non-Sutter hospitals offered to treat a plan's patients *for free*, the plan would still find it unprofitable to exclude Sutter Modesto and Sutter Santa Rosa from its network because of Sutter's 95 percent non-par rate.[104]

- For CPMC, the critical price difference (37 percent) that Dr. Gowrisankaran could have calculated using the same methodology is greater than my estimated overcharge at CPMC.[105]

Thus, by Dr. Gowrisankaran's logic, Sutter's 95 percent non-par rate would make it unprofitable for a plan to move Sutter Modesto, Sutter Santa Rosa, and CPMC out of network.

39.     Furthermore, despite Dr. Gowrisankaran's calculation for Sutter Sacramento, deposition testimony indicates that Sutter's non-par rate contributed to a lack of success of steered products in Sacramento.



---

[104] Were a plan to exclude Sutter Modesto, it would pay: (a) 100 percent more for the ███ percent of patients that insisted on treatment at Sutter Modesto; and (b) 100 percent less for the ███ percent of patients that were redirected to other hospitals. Under this scenario, the plan's cost would increase by excluding Sutter Modesto (100 percent * ███ percent – 100 percent * ███ percent > 0). Excluding Sutter Santa Rosa would increase cost as well (100 percent * ███ percent – 100 percent * ███ percent > 0). *See* Chipty SJ Declaration, Exhibit 20 for a table summarizing Blue Shield's estimates of insistence.

[105] Chipty Workpapers.

[106] Deposition of Thomas Hamilton, September 11, 2018, p. 52.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

████████████████████████████████████[107] And even if a plan were able to realize some savings by excluding a Sutter hospital from a narrow network, those savings may be too small—because of Sutter's non-par rate—to allow the plan to lower premiums by enough to attract sufficient members to the narrow network product.[108]

## VI.   Dr. Willig's and Dr. Gowrisankaran's Criticisms About My Overcharge Model Are Exaggerated or Untrue

40.     Drs. Willig and Gowrisankaran each levy criticisms about my overcharge model.[109] Dr. Willig continues to criticize my use of hospital-level case mix adjusted prices, and Drs. Willig and Gowrisankaran both criticize my number of competitors variables. For reasons I explain below, their arguments are exaggerated or untrue. Dr. Willig also introduces a new set of overcharge estimates that he claims demonstrate lack of impact and damages, and he introduces an "illustrative damages analysis" that identifies damages as high as $129 million.[110] There are several problems with Dr. Willig's new analyses which have the effect of artificially reducing overcharges and the associated premium damages.

### A.     Despite Unexplained Rejiggering, Dr. Willig's Overcharge Regressions Continue to Yield Non-Sensical Results

41.     Dr. Willig has now presented three different sets of regression models, across his class rebuttal, class sur-rebuttal, and merits rebuttal reports. In his class sur-rebuttal report, Dr. Willig changed his model to address a flaw in his class rebuttal report model, but in his merits report, he abandoned this change in his main specification and also rejiggered other fundamental aspects of his overcharge analysis, without providing explanation.

---

[107] Chipty Merits Report, ¶ 185.
[108] *See, e.g.*, Chipty Merits Report, Section VIII.B.
[109] Willig Merits Report, Section V; and Gowrisankaran Merits Report, Section VI.
[110] Willig Merits Report, ¶¶ 210-215 and Table 9.

- *Method to address masking of overcharges:* In my class rebuttal report, I explained that the claim-level regressions in Dr. Willig's first report were likely to mask overcharges on expensive procedures.[111] In his class sur-rebuttal report, Dr. Willig acknowledged and attempted to address this flaw by: (a) weighting his one-stage claim-level estimation procedure by allowed amount; and (b) introducing a two-stage estimation procedure in which he weighted his first stage claim-level regressions by allowed amount.[112] In his merits rebuttal report, Dr. Willig stopped weighting by allowed amount in his main specification and nearly all of his sensitivities without explaining why.[113] Thus, Dr. Willig's results can yield the false impression of no overcharges, in part, because he has failed to address the problem I previously identified (and he acknowledged).

- *Methodology for constructing HHI:* Dr. Willig uses still a new methodology for constructing his HHI variable. For his first report, he used HHIs from my hospital choice model.[114] For his second report, he developed his own computer code to construct HHIs in a different way than in my choice model.[115] And in his third report, he "updated" the methodology he used in his second report, without explaining why.[116] Through these changes, it appears that Dr. Willig is attempting to resolve the problem that his models generally predicted no effect of competition on hospital prices.

---

[111] Chipty Reply Declaration, ¶¶ 129-132.

[112] Willig Sur-Reply Declaration, ¶ 27 (explaining that Dr. Willig respecified his analysis by "running price-weighted versions of the regression to reflect the possibility (as emphasized by Dr. Chipty) that Sutter price effects are greater for higher-priced DRGs").

[113] He does not weight in any of his primary regressions—including the regressions underpinning his "illustrative damages calculations"—or in all but one set of his sensitivity regressions. Willig Merits Report, ¶ 214, Table 5, and backup production.

[114] Willig Declaration, Appendix C, ¶ 254.

[115] Willig Sur-Reply Declaration, ¶ 27 and backup production.

[116] Willig Merits Report, Footnote 388 ("I have updated my estimates of HHI based on Garmon (2017) and the patient characteristics variables available in the inpatient discharge data. See my backup materials for these calculations.").

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- _Versions of his two-stage model:_ In his sur-rebuttal report, Dr. Willig presented two versions of his two-stage regression procedure: (a) one that weights the second stage by discharges; and (b) one that does not weight the second stage.[117] In my merits report, I demonstrated that both versions estimate large, statistically significant overcharges once an appropriate set of hospital-level controls are used, and the overcharge estimates from the unweighted version were larger in magnitude.[118] In his merits report, Dr. Willig presented only one version of his two-stage procedure—the version that produces lower overcharge estimates—without explaining why.[119]

42.     Despite the model rejiggering, Dr. Willig's overcharge regressions continue to generate non-sensical results. Exhibit 5 reproduces Dr. Willig's new estimates from his primary one-stage regression. Dr. Willig continues to find that Sutter's prices are no different than benchmark hospitals' prices, contradicting overwhelming evidence that Sutter is much more expensive than other area hospitals for reasons unrelated to quality.[120] Dr. Willig estimates that major teaching hospitals are less expensive than other hospitals, contradicting previous studies.[121] Dr. Willig estimates that the effect of HHI on hospital prices is not statistically significant in nearly half his regressions and only weakly statistically significant in other regressions, which is contrary to basic economics.[122]

---

[117] Willig Sur-Reply Declaration, ¶¶ 26 and 28.

[118] Chipty Merits Report, Exhibit 29.

[119] Willig Merits Report backup production.

[120] _See, e.g._, Chipty Merits Report, ¶¶ 231-233.

[121] _See, e.g._, Chipty Merits Report, ¶ 235.

[122] _See, e.g._, Chipty Merits Report, ¶ 234. Dr. Willig's failure to consistently estimate a statistically significant effect of competition on price is a first-order concern. By contrast, my baseline and sensitivity overcharge models show that competition matters and that hospitals facing more competition generally charge lower prices. Dr. Willig distracts from this robust feature of my model by focusing his attention on a lesser concern about whether my estimated coefficients are monotonic (Willig Merits Report, ¶ 199 and Table 3).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit 5**
**Dr. Willig's Primary One-Stage Overcharge Regression Estimates**

| Explanatory Variables | Anthem | Blue Shield | Aetna | United | Health Net |
|---|---|---|---|---|---|
| Wage Index | 0.486*** | 0.646*** | 0.694*** | 1.003*** | 0.292 |
| Major Teaching | -0.174 | -0.216* | -0.316*** | -0.214* | -0.056 |
| Trauma Level 1 or 2 | 0.076 | 0.054 | 0.030 | 0.131** | 0.060 |
| % Rating Hospital 9 or 10 | 0.003 | 0.001 | 0.003 | 0.010** | 0.007*** |
| Log of System Beds | -0.627*** | -1.127*** | -0.945*** | -0.156 | -0.387 |
| Log of System Beds, Squared | 0.052*** | 0.079*** | 0.065*** | 0.012 | 0.029 |
| Hospital HHI | 1.350*** | 0.609* | 0.844** | 0.558 | -0.607 |
| Log of System Assets | 0.018 | 0.116 | 0.133* | 0.052 | 0.063 |
| Hospital Op Ex / Hospital Beds | 0.000*** | 0.000* | 0.000** | 0.000** | 0.000 |
| | | | | | |
| Log of Age | 0.049** | 0.084*** | 0.036 | 0.005 | 0.093** |
| Log of Age, Squared | -0.006** | -0.018*** | 0.002 | -0.010*** | -0.006 |
| Age = 0 Indicator | 0.028 | 0.081*** | 0.070 | -0.258*** | 0.118* |
| Log of Length of Stay | 0.713*** | 0.735*** | 0.698*** | 0.578*** | 0.673*** |
| Log of Length of Stay, Squared | 0.070*** | 0.050*** | 0.057*** | 0.096*** | 0.081*** |
| Male Indicator | 0.017*** | 0.026*** | 0.035*** | 0.041*** | 0.023*** |
| | | | | | |
| Sutter Overcharge Percent | -0.059 | 0.002 | -0.030 | 0.060 | 0.018 |
| | | | | | |
| DRG Fixed Effects? | Yes | Yes | Yes | Yes | Yes |
| Product Type Fixed Effects? | Yes | Yes | Yes | Yes | Yes |
| Year Fixed Effects? | Yes | Yes | Yes | Yes | Yes |
| Observations | 138,887 | 287,213 | 25,948 | 25,952 | 56,506 |
| Adjusted R-Squared | 0.796 | 0.739 | 0.757 | 0.572 | 0.684 |

*Note*: Asterisks *,**,*** represent statistical significance at ten percent, five percent, and one percent levels, respectively.

*Source*: Willig Merits Report backup production.

## B.     Dr. Willig's Sweeping Criticism of Case Mix Adjusted Prices Is Still Exaggerated and Untrue

43.     In prior reports, I explained that industry participants and academics analyze case mix adjusted prices in similar ways, as I do, and that there are advantages of analyzing prices at the hospital-level.[123] For instance, my hospital-level regressions avoid the misspecification error in Dr. Willig's claim-level regressions, where he incorrectly assumes that the "effect of length of stay on allowed amount is the same for all DRGs, all hospitals, and across the years that he

_____

[123] *See, e.g.*, Chipty Merits Report, ¶¶ 236-239

analyzes."[124] Dr. Willig fails to address this fundamental misspecification error in his analyses.[125]

44.    In his merits rebuttal report, Dr. Willig continues to insist that analysis of hospital-level case mix index adjusted prices is inappropriate.[126] Dr. Willig presents a new argument to support his original position.[127] His argument is summarized in Figure 9 of his merits report, which is reproduced as Exhibit 6 below. Here, Dr. Willig presents three theoretical calculations to suggest that my approach could find an overcharge (or undercharge) because of differences in the mix of case across hospitals, not because of actual differences in price. However, he provides no empirical evidence to assess whether any bias actually exists, let alone the magnitude of a bias.

**Exhibit 6**
**Reproduction of Figure 9 from Dr. Willig's Merits Report**

| | DRG Number | DRG Weight | Sutter Price | Number of Sutter Claims | Benchmark Price | Number of Benchmark Claims | Overcharge with Dr. Chipty's Method |
|---|---|---|---|---|---|---|---|
| Ex 1:Ratio of Price to DRG Weight = | A | 1 | $100 | 1 | $100 | 2 | |
| 100 for both DRG A and DRG B | B | 2 | $200 | 2 | $200 | 1 | |
| Hospital-level, DRG-weight Adjusted Price | | | $100.0 | | $100.0 | | |
| | | | | | | | 0.0% |
| Ex 2:Ratio of Price to DRG Weight = | A | 1 | $100 | 1 | $100 | 2 | |
| 100 for DRG A and = 133.3 for DRG B | B | 1.5 | $200 | 2 | $200 | 1 | |
| Hospital-level, DRG-weight Adjusted Price | | | $125.0 | | $114.3 | | |
| | | | | | | | 9.4% |
| Ex 3:Ratio of Price to DRG Weight = | A | 1 | $100 | 1 | $100 | 2 | |
| 100 for DRG A and = 66.7 for DRG B | B | 3 | $200 | 2 | $200 | 1 | |
| Hospital-level, DRG-weight Adjusted Price | | | $71.4 | | $80.0 | | |
| | | | | | | | -10.7% |

---

[124] Chipty Merits Report, ¶ 238.

[125] In his merits report, Dr. Willig claims to have estimated a regression sensitivity that addresses the misspecification error, by "interacting the length of stay variable by the DRG weight variable . . . [to] allow the length of stay effect to vary by case severity." (Willig Merits Report, ¶ 214.) But this sensitivity does not address the misspecification error I raised, because Dr. Willig still assumes that the effect of length of stay on allowed amount is the same for all hospitals and over all years—an assumption Dr. Willig himself acknowledges is incorrect. *See* Chipty Merits Report, ¶¶ 238-239.

[126] Willig Merits Report, ¶¶ 177-192.

[127] Willig Merits Report, ¶¶ 190-192, Table 2, and Figure 10.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

45.     To assess the relevance of his theory, I provide a diagnostic analysis to size the relative importance of the scenarios Dr. Willig posits: (a) no bias; (b) positive bias; and (c) negative bias. The analysis builds upon the basket approach described in my merits report and proceeds in three steps, just as outlined in Dr. Willig's Figure 9.[128] First, I calculate the average price per DRG at the benchmark hospitals. Second, I calculate the average case mix adjusted price for: (a) each Sutter Damage Hospital; and (b) the average benchmark hospital, using the benchmark DRG prices calculated in step one. (Because both the Sutter and the benchmark prices in this analysis are constructed using a common price per DRG, any price differences are necessarily driven by differences in case mix—just as in Dr. Willig's theoretical example above.) Third, I calculate the percent difference between the average case mix adjusted price for the Sutter Damage Hospitals and the benchmark hospitals. For Dr. Willig's concern to be valid, the case mix adjusted price for Sutter would need to be consistently and meaningfully higher than the corresponding benchmark price.

46.     Exhibit 7 summarizes the results of this analysis, using data from the Class Health Plans.[129] Of the 239 Sutter Damage Hospital-health plan-year combinations, the Sutter case mix adjusted price is higher than the benchmark price about half the time and lower than the benchmark price about half the time. This pattern demonstrates that, contrary to Dr. Willig's concern, hospital-level case mix adjusted prices are not systematically biased towards finding a higher Sutter price: the Sutter price is on average about two percent higher than the benchmark price. The magnitude of the difference (two percent, relative to overcharge estimates ranging from roughly 30 to 80 percent) indicates that the concern Dr. Willig raises is a theoretical possibility without any practical relevance. To avoid confusion, I underscore that this analysis does *not* size a bias in a price overcharge: this analysis fixes prices and asks whether the appearance of price differences could be driven by actual differences in the mix of cases across

---

[128] Chipty Merits Report, ¶¶ 107. This illustrative calculation begins in 2008 because CMS changed the DRG designations partway through 2007.

[129] However, as I have explained before, it is not possible to reliably identify DRGs using the Health Net and United claims data. (*See* Chipty Merits Report, ¶ 217.) The results of this diagnostic analysis, which require reliable information on DRGs, are similar when data are limited to Anthem, Blue Shield, and Aetna. (*See* Chipty Workpapers.)

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

Sutter and the benchmark hospitals. The findings show that Dr. Willig's concerns about differences in case mix creating the appearance of overcharges are unfounded.

**Exhibit 7**
**Sizing Importance of Case Mix Differences Between Sutter and Benchmark Hospitals**

|  |  | Percent Difference in Prices | |
| --- | --- | --- | --- |
|  | Count | Simple Average | Weighted Average |
| Sutter Price Is Higher | 115 | 9.6% | 6.7% |
| Sutter Price Is Lower | 124 | -7.7% | -4.3% |
| **Overall** | 239 | 0.6% | 2.3% |

*Notes*:

1. For each Sutter Damage hospital-health plan-year combination, the table describes the difference between the case mix adjusted prices for the Sutter hospital and average benchmark hospital, constructed using a common set of prices.

2. The weights to compute the weighted average are the total allowed amounts at each Sutter hospital-health plan-year.

*Source*: Willig Merits Report backup production.

### C. Dr. Willig's and Dr. Gowrisankaran's Criticisms of My Number of Competitor Control Variables Are Exaggerated

47.      Dr. Willig and Dr. Gowrisankaran introduce misguided critiques about my use of the number of competitors to control for competition.[130] I begin my response by contrasting my number of competitors variables with Dr. Willig's constructed control for competition (HHI), and then I respond to specific critiques raised by Sutter's experts.

48.      I observe at the outset that I agree with Dr. Willig that no measure of competition is perfect.[131] In my assessment, Dr. Willig's HHI measures suffer from serious conceptual and practical problems:

---

[130] Willig Merits Report, ¶¶ 197-202; and Gowrisankaran Merits Report, ¶¶ 201-205.
[131] Willig Merits Report, ¶ 203.

- All three versions of Dr. Willig's HHI variables are tainted by the challenged conduct.[132] In his merits report, Dr. Willig attempts to respond by arguing that his HHI measure is widely used to address the problem I describe.[133] Dr. Willig fails to distinguish between: (a) the classic "endogeneity" problem where hospital competition may affect quality, and thus patient flows; and (b) the effect of the challenged conduct on patient flows. The academic article to which Dr. Willig cites in defending his approach concerns the classic endogeneity problem; it does not address the second one.[134] By contrast, my number of competitor variables do not rely on realized shares and thus are exogenous to the conduct. *Consistent with my approach, Dr. Gowrisankaran himself uses a measure of the number of hospitals within 30, 45, and 60 minutes of a patient's zip code as an exogenous instrument for hospital shares in his nested logit model.*[135]

- Dr. Willig's HHI variables are often insignificant or marginally significant, meaning that he finds competition does not affect hospital prices. For example, in his most recent attempt at redefining his HHI variable, he finds no effect or relatively weak statistical effect of competition in most of the regression results he reports in Table 4 of his merits report.[136] Dr. Willig's findings are in stark contrast to the well-established view that hospital competition is a significant determinant of hospital prices.

---

[132] Chipty Merits Report, ¶ 226.

[133] Willig Merits Report, ¶¶ 203-204.

[134] Willig Merits Report, ¶ 204, citing Kessler, Daniel P. and Mark B. McClellan, "Is Hospital Competition Socially Wasteful?" *The Quarterly Journal of Economics*, Vol. 115, No. 2, May 2000, pp. 577-615. The endogeneity problem the Kessler-McClellan approach is designed to solve is explained by Dranove *et al*: ("[Kessler and McClellan] are studying how relatively exogenous determinants of competition affect quality. Therefore, they do not use variation arising from the fact that high-quality hospitals face less competition ex post because they are better than their would-be competitors."). *See* Dranove, David and Christopher Ody, "Evolving Measures of Provider Market Power," *American Journal of Health Economics*, Vol. 2, No. 2, 2016, pp. 145-160, at p. 153.

[135] Gowrisankaran Merits Report, ¶¶ 5 and 8 of Appendix F, ("I instrument for log [share] using . . . number of hospitals within the nest. . . . I consider alternative specifications, in which the distance threshold for the 'outside option' classification is 30 minutes or 60 minutes. These yield qualitatively similar results as the 45-minute specification.").

[136] Chipty Workpapers.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- A closer look at his HHI variable shows it takes on peculiar values. Consider for example the San Francisco market. Sutter faces a relatively large number of competitor hospitals in San Francisco, and Dr. Gowrisankaran opines that Sutter faces "strong and growing competition in San Francisco."[137] Yet, Dr. Willig's HHI measure shows that CPMC faces little competition relative to other area hospitals, and his measure characterizes the different, relatively nearby hospitals in San Francisco as facing very different competitive conditions. Exhibit 8 displays, for each hospital in the San Francisco market, the percent of hospitals in Northern California that face less competition according to Dr. Willig's HHI measure. According to his measure: (a) CPMC-Main faces more competition than about 20 percent of Northern California hospitals; (b) UCSF Medical Center faces more competition than about 60 percent of Northern California hospitals; and (c) non-Sutter non-UCSF hospitals face more competition than about 90 percent of Northern California hospitals. By contrast, my number of competitors variables more consistently describes the relative competition facing hospitals in the San Francisco market.[138]

**Exhibit 8**
**Competition Faced by Hospitals in the San Francisco Market in 2011,**
**According to Dr. Willig's HHI**



*Note*: The bars display the percentage of Northern California hospitals in my overcharge regression sample that faced strictly less competition in 2011 according to Dr. Willig's HHI.

---

[137] Gowrisankaran Merits Report, ¶ 219.

[138] Chipty Workpapers.

*Sources:*
1. Willig Merits Report backup production.
2. Chipty Merits Report backup production.

49.     Dr. Willig argues that my overcharge estimates are highly sensitive to the drive time used to construct the variables.[139] In an attempt to demonstrate this sensitivity, Dr. Willig re-estimates my overcharge model by recomputing the number of competitors using every drive time threshold from one to 60 minutes.[140] I note at the outset that my drive time threshold (30 minutes) is based on a highly relevant institutional fact: the Knox-Keene network adequacy requirement imposed by the State of California that health plans must offer hospital services within 30 minutes driving time or 15 miles to their members.[141] By contrast, the range over which Dr. Willig computes his sensitivity has no support. For example, Dr. Willig computes overcharges by defining competitors using a *one-minute drive time* threshold. At this threshold, all hospitals in the regression sample are identified as having zero competitors,[142] and the model is incapable of controlling for competition. Similarly, in Dr. Willig's *60-minute drive time* threshold, around 60 percent of hospitals are classified in the bin of having 10 or more competitors, so again Dr. Willig is not effectively controlling for competition in that specification.[143] Limiting to drive time thresholds between 15 and 45 minutes, I find that most of Dr. Willig's estimated overcharges are within the 95 percent confidence interval around the estimated overcharge associated with the 30-minute drive time, as displayed in Exhibit 9 for Anthem.[144] (Appendix D shows similar results for Blue Shield and Aetna.) These results show that my overcharge estimates are generally not statistically different from other estimates obtained by using these alternative drive time thresholds.

---

[139] Willig Merits Report, ¶¶ 199-202.
[140] Willig Merits Report, ¶ 201 and Figure 8.
[141] Chipty SJ Declaration, Footnote 51.
[142] Chipty Workpapers.
[143] Chipty Workpapers.
[144] A set of more formal statistical tests confirms the qualitative pattern reflected in these exhibits. (*See* Chipty Workpapers.)

**Exhibit 9**
**Dr. Willig's Estimated Overcharges Using Different Drive Time Thresholds**
**Anthem**



*Note:* The shaded area identifies the 95 percent confidence interval for the estimated
Sutter overcharge when the number of competitors variables are constructed using a
30-minute drive time.
*Source:* Willig Merits Report backup production.

50.    Dr. Gowrisankaran also criticizes my number of competitors variables by pointing
out that Alta Bates Main and Summit are classified as having six or seven competitors,
respectively, in 2015, which he argues is inconsistent with these hospitals being Tying Hospitals
and with my market definition.[145] To assess the impact of the number of competitors variables at
Alta Bates on total damages, I consider two different sensitivity analyses:

- First, I re-estimated overcharges by using a drive time threshold of 24 minutes for all
  Sutter and benchmark hospitals. With this threshold, Alta Bates Main and Summit are
  classified as facing 1-to-4 competitors for all years from 2006-2015.[146] For this
  sensitivity, damages increase by about 40 percent.[147]

---

[145] Gowrisankaran Merits Report, ¶¶ 205-206.
[146] Chipty Workpapers.
[147] Chipty Workpapers.

- Next, I reclassified the number of competitors facing the Sutter and benchmark hospitals in the Tied and Tying Hospital Markets to reflect the number of competitors as identified in my market definition report; for all other hospitals, I kept those hospitals' number of competitors defined using the 30-minute drive time threshold. I then re-estimated my overcharge and damages models. For this sensitivity, damages decrease by about 10 percent.[148]

While the damages estimates change, depending on how one defines the competition variables, there is no evidence of any systematic bias. Furthermore, there is no evidence that the measurement of competitors facing the Alta Bates hospitals inflates damages by an amount that would offset the conservative nature of my damages estimates, as I describe in Section VII. As such, it continues to be my opinion that the overcharge and damages estimates that I presented in my merits report are reasonable.

### D. Despite Numerous Flaws, Dr. Willig's Claim-Level Regressions Demonstrate Impact and Large, Statistically Significant Overcharges Once an Appropriate Set of Hospital-Level Variables Are Used

51.    Finally, I assess the robustness of Dr. Willig's finding of lack of impact and damages using a similar approach to the one I presented in Exhibit 29 of my merits report. In the results that follow, I update my prior exhibit to incorporate the following changes Dr. Willig has made to his preferred specifications: (a) I estimate claim-level regressions without weighting; (b) I use Dr. Willig's new HHI variable; and (c) I include results for United and Health Net.[149] To be clear, these claim-level regressions I examine for the purpose of illustration all suffer from important flaws, such as: (a) the potential masking of overcharges associated with expensive claims; (b) the inability of Dr. Willig's model to reflect a relationship between length of stay and

---

[148] Chipty Workpapers.

[149] In addition, I also estimate the regressions using my preferred approach of pooling data across plans—an analytical approach that Dr. Willig does not critique—which results in more efficient estimates. Chipty Merits Report, ¶¶ 219-220.

price across DRGs, hospitals, and time; and (c) Dr. Willig's incorrect assignment of DRGs for Health Net and United.[150] In addition, specifications that include Dr. Willig's HHI variable are flawed because that variable is tainted by Sutter's conduct. These and other flaws undermine Dr. Willig's overcharge analyses, including the "illustrative damages calculations" that he presents in Table 9 of his merits report.

52.    Exhibit 10 presents the updated results, following the same structure as Exhibit 29 of my prior report.[151] As before, the results strongly support a conclusion of impact and damages. For Anthem, Blue Shield, and Aetna, there is a positive and statistically significant overcharge in all 12 regressions. For United, there is a positive and statistically significant overcharge in eight of 12 regressions. For Health Net, the hospital-level regressions show positive and statistically significant overcharges.

**Exhibit 10**
**Estimates of a Single Sutter Overcharge Indicator, across a Variety of Model Specifications**

|  | Anthem | Blue Shield | Aetna | United | Health Net |
|---|---|---|---|---|---|
| **Panel [A]: Chipty's Hospital-Level Variables** |  |  |  |  |  |
| Hospital-Year Model | 52% *** | 51% *** | 45% *** | 48% *** | 24% *** |
| Willig's One-Stage Model | 17% *** | 20% *** | 21% *** | 17% ** | 0% |
| Willig's Two-Stage Model (Weighted) | 17% *** | 19% *** | 21% *** | 17% ** | 0% |
| Willig's Two-Stage Model (Unweighted) | 31% *** | 30% *** | 29% *** | 35% *** | 9% |
| **Panel [B]: Chipty's Hospital-Level Variables + Willig's HHI** |  |  |  |  |  |
| Hospital-Year Model | 45% *** | 44% *** | 38% *** | 40% *** | 18% * |
| Willig's One-Stage Model | 13% ** | 16% ** | 17% *** | 13% | -4% |
| Willig's Two-Stage Model (Weighted) | 13% * | 16% ** | 17% ** | 13% | -5% |
| Willig's Two-Stage Model (Unweighted) | 24% ** | 23% ** | 21% ** | 27% ** | 2% |
| **Panel [C]: Chipty's Hospital-Level Variables + Willig's HHI + Capital Ratio** |  |  |  |  |  |
| Hospital-Year Model | 43% *** | 42% *** | 36% *** | 39% *** | 16% * |
| Willig's One-Stage Model | 12% * | 15% * | 16% ** | 12% | -5% |
| Willig's Two-Stage Model (Weighted) | 12% * | 15% * | 16% ** | 12% | -5% |
| Willig's Two-Stage Model (Unweighted) | 25% ** | 24% ** | 22% ** | 28% ** | 3% |

*Notes*:

1. Each row in the table corresponds to estimates of a single Sutter overcharge percentage, across all the Sutter Damage Hospitals, for each plan, from a separate regression constructed using different estimation procedures.

---

[150] Dr. Willig continues to misidentify DRGs for Health Net and certain United claims, despite the fact that the data lack sufficient information to reliably apply DRG grouper software. *See* Chipty Merits Report ¶¶ 217-218; and Willig Merits Report, Footnote 408.

[151] *See* Chipty Merits Report, ¶¶ 244-247 for a description of the structure of the exhibit.

2. The regressions use data from 2006-2015 for Anthem, United, and Blue Shield and from 2008-2015 for Aetna and Health Net.

3. For each health plan and for the purposes of rebuttal, I use Dr. Willig's regression data sets.

4. Asterisks \*, \*\*, \*\*\* represent statistical significance at ten percent, five percent, and one percent levels, respectively. Green shading identifies those estimates that are positive and statistically significant at the ten percent, five percent, or one percent level.

*Source*: Willig Merits Report backup production.

## VII.   Ms. Keller's and Mr. Travis's Critiques Do Not Alter My Conclusion that My Damages Estimates Are Conservative

53.     Ms. Keller and Mr. Travis claim to identify flaws in my damages methodology that cause me to overstate damages by $85 million to $90 million.[152, 153] The majority of their asserted damages overstatement ($81 million) is attributable to their attempt to adjust my methodology by pooling catastrophic (high-cost) claims for individual, small group, and large group lines of business across the state.[154] The remainder of their asserted damages overstatement ($5.5 million) is attributable to six smaller areas of disagreement.[155] In this section, I examine their arguments regarding the pooling of high-cost claims.

54.     As I have explained, health plans set premiums to cover expected medical costs, where these expectations are formed based on actual medical costs from an experience period.[156] Based on testimony from Mr. Axene and other evidence in this case, I understand that in

---

[152] Travis Merits Declaration, ¶ 51; and Keller Merits Declaration, ¶¶ 15-16 and 44.

[153] In addition, Dr. Willig presents two new sets of pass-through analyses that he claims show pass through by Class Health Plans is less than 100 percent. (Willig Merits Report, Section VI.) His first set of analyses, presented in Table 7 of his merits report, slices and dices the data so finely that his regressions each use only three, four, five, or six observations. (*See* Willig Merits Report backup production.) With such small sample sizes, it is unsurprising that Dr. Willig's pass-through estimates vary widely, from -0.95 to 1.49. As I previously demonstrated in my prior reports, there is substantial evidence that pass-through by health plans is at or near 100 percent. (*See, e.g.*, Chipty Reply Declaration, Exhibit 8 and ¶¶ 77-79.)

[154] Travis Merits Declaration, ¶¶ 34 and 49-51; and Keller Merits Declaration, ¶ 44.

[155] These include treatment of: (a) the individual market reinsurance program of the Affordable Care Act ("ACA"); (b) ACA individual and small group risk adjustment transfers; (c) medical loss ratio premium rebates; (d) Blue Shield premium rebates; (e) assignment of Blue Shield experience-rated large group members to the Nine RAs; and (f) an unexplained variance between Mr. Travis's damages calculation and my damages calculation for Blue Shield. *See* Travis Merits Declaration, ¶ 53 and backup production; and Keller Merits Declaration, Footnote 11.

[156] Chipty Class Declaration, ¶¶ 27 and 142.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

instances where there were abnormally high or abnormally low numbers of high-cost claims in the experience period, health plans may adjust their expectation of future medical costs.[157] Thus, health plans may adjust their premiums *up or down* to reflect their expectations of future high-cost claims, although such adjustments tend to be relatively small.[158] I also understand that over a ten-year period, these upward and downward adjustments would likely offset, such that the net effect of high-cost pooling on premiums would be zero.[159]

55.     Further, because of the large numbers of claims associated with the individual, small group, and manually-rated large group lines of business, their realization of high-cost claims is typically aligned with health plans' expectations of high-cost claims, which are formed on the basis of diagnostics performed on larger claims pools.[160] As such, large health plans (like the Class Health Plans) make minimal adjustments because of high-cost pooling, for individual, small group, and manually-rated large group lines.[161] This understanding is consistent with: (a) health plan testimony that high-cost pooling is typically applied to only blended- and experience-rated large groups;[162] and (b) Ms. Keller's own analysis where she identified only *three percent* of (or ten out of the 325) individual and small group rate filings that she reviewed discussed high-cost pooling.[163]

---

[157] Expert Declaration of David Axene, FSA, FCA, CERA, MAAA, August 1, 2019 (hereafter "Axene Merits Rebuttal Declaration"), ¶¶ 7 and 10; and Deposition of Shannon Keller, July 23, 2019 (hereafter "Keller Deposition (July 23, 2019)"), pp. 105-106 ("Q: So what you're trying to do is to assign to each group both the appropriate probability and the expected costs of such a random event occurring, and that's what you want to build into the rate? . . . THE WITNESS: I think that's accurate. I would take exception with the word 'group' because this often isn't done on a group basis; it would be done more by line of business. Or the way I think about it is more on a line-of-business basis.").

[158] Axene Merits Rebuttal Declaration, ¶¶ 12 and 14.

[159] Axene Merits Rebuttal Declaration, ¶¶ 12, 14, and 21.

[160] Axene Merits Rebuttal Declaration, ¶¶ 12-14.

[161] Axene Merits Rebuttal Declaration, ¶¶ 5 and 12-13.

[162] Deposition of Chris Mathewson, May 18, 2018, pp. 104-106.

[163] Keller Merits Declaration, ¶ 44 and Exhibits II-III. Ms. Keller cites the book *Group Insurance* by Daniel D. Skwire to support her opinion that pooling of high cost claims is common across the individual, small group, and large group lines of business. However, this book is related to group plans and the chapter she references is about experience-rated groups. Skwire, Daniel D., *Group Insurance*, New Hartford, Connecticut: ACTEX Publications, 2016, Chapter 27.

56.     Limiting Mr. Travis's and Ms. Keller's adjustment for high-cost pooling to blended- and experience-rated large groups, using their calculations, has the effect of reducing damages by only $12 million, not $81 million.[164] I understand from Mr. Axene that there are several other problems with Mr. Travis's and Ms. Keller's approach to high-cost pooling:

- Adjustments for high-cost claims are based on a comparison of the actual occurrence of high-cost claim dollars in an experience period to the plan's expectations of high-cost claim dollars.[165] Mr. Travis's and Ms. Keller's methodology does not compare actual to expected incidence of high dollar claims, and, as such, does not accurately reflect how health plans construct premiums.

- An adjustment for abnormally high or abnormally low numbers of high-cost claims could result in an upward or downward adjustment to expected medical costs.[166] Mr. Travis and Ms. Keller only make a downward adjustment.

For these reasons, even the portion of Mr. Travis's and Ms. Keller's asserted damages overstatement for experience- and blended-rated large groups ($12 million) is unreliable and likely to be overstated.

57.     Furthermore, to put the asserted $12 million damages overstatement into context, recall that my damages methodology is conservative in numerous ways. For example, I do not apply a "trend factor" that actuaries use in the ordinary course to inflate historical medical expenditure when constructing premiums.[167] To demonstrate the importance of this single conservative feature of my model, I recalculate damages to incorporate a trend factor using the annual inpatient trend factors that Mr. Axene used from 2007 to 2017, in the ordinary-course of his consulting practice.[168] The results of this analysis are shown in Exhibit 11, using my in-

---

[164] Chipty Workpapers.

[165] Axene Merits Rebuttal Declaration, ¶¶ 12 and 19-20.

[166] Axene Merits Rebuttal Declaration, ¶¶ 16 and 20.

[167] Chipty Merits Report, Section XI.C.

[168] Axene Health Partners, LLC, "Trend Summary 2 20 2019.xlsx," February 20, 2019; and Axene Declaration, Footnote 30. Staff working under my direction confirmed that the trend factors reported in Mr. Axene's file are consistent with inpatient trend factors reported in rate filings submitted by Class Health Plans to California's DMHC and DOI for their individual and small group lines of business. *See* Chipty Workpapers.

sample overcharge estimates. (*See* Appendix E for the results using the out-of-sample estimates.) As seen here, incorporating a trend factor increases estimated damages by approximately $75 million, far exceeding any potential $12 million overstatement associated with high-cost pooling. In summary, it continues to be my opinion that my merits report damages estimates are conservative and likely understate damages.

**Exhibit 11**
**Aggregate Premium Damages for Health Plan Class Members**
**Attached to One of the Nine Rating Areas, September 2008 to December 2017,**
**Using In-Sample Estimates**

| Health Plan | Years | Original Estimate | Revised Estimate with Trend Factors | Difference |
|---|---|---|---|---|
| Anthem | 2008 - 2017 | $186,701,223 | $215,710,735 | $29,009,512 |
| Blue Shield | 2008 - 2017 | $228,421,553 | $263,901,546 | $35,479,993 |
| Health Net | 2010 - 2017 | $44,411,222 | $51,235,177 | $6,823,955 |
| Aetna | 2010 - 2017 | $11,555,653 | $13,355,336 | $1,799,683 |
| United | 2009 - 2016 | $19,069,054 | $21,902,826 | $2,833,772 |
| **Total** | | **$490,158,705** | **$566,105,620** | **$75,946,915** |

*Sources*:

1. Anthem, Blue Shield, Health Net, Aetna, and United Claims and Premium Data.

2. U.S. Census Bureau Zip Code and County Data.

3. The Center for Consumer Information & Insurance Oversight: California Geographic Rating Areas.

4. Axene Health Partners, LLC, "Trend Summary 2 20 2019.xlsx," February 20, 2019.

## VIII.   Conclusions

58.     Based on the work I have undertaken, including my review of the reports from Dr. Willig, Dr. Gowrisankaran, Mr. Travis, and Ms. Keller, it remains my opinion that: (a) Sutter's systemwide contracts, with provisions requiring all-or-nothing contracting, onerous non-participating provider rates, and equal treatment and anti-tiering clauses, constitute an anticompetitive arrangement whereby Sutter ties the purchase of GAC inpatient services in four Tied Markets to the purchase of GAC inpatient services in seven Tying Markets and prevents procompetitive steering; (b) Sutter's contracting practices have interfered with the competitive process and enabled Sutter to charge health plans higher prices for inpatient hospital services than it would have otherwise; (c) my damages methodology, including the regression model I used to compute overcharges in Sutter's hospital prices, is reasonable; and (d) Sutter's conduct caused Class Members to be harmed by hundreds of millions of dollars. My analysis shows that this harm is at least $500 million through 2017, and the actual harm is likely higher.

Tasneem Chipty, Ph.D.
August 1, 2019

**Appendix B: Materials Considered**

All materials cited in this report, all materials listed in Appendix B of Chipty SJ Declaration, Chipty Class Declaration, Chipty Reply Declaration, Chipty Merits Report, and Chipty Supplemental Report, and the following:

**I.   Expert Reports and Declarations in This Matter**

- Expert Declaration of David Axene, FSA, FCA, CERA, MAAA, August 1, 2019.

- Expert Report of Gautam Gowrisankaran, PhD, Errata, and Associated Backup, June 21, 2019.

- Expert Declaration of Shannon Keller, Errata, and Associated Backup, June 21, 2019.

- Expert Declaration of Patrick Travis, Errata, and Associated Backup, June 21, 2019.

- Expert Report of Dr. Robert D. Willig, and Associated Backup, June 21, 2019.

**II.   Expert Reports and Declarations in the *UEBT v Sutter Health* Matter**

- Expert Declaration of Gautam Gowrisankaran, PhD, *UEBT v. Sutter Health, et al.*, Case No. CGC-14-538451, October 29, 2018.

- Expert Report of Robert D. Willig, *UEBT v. Sutter Health, and State of California v. Sutter Health*, Case No. CGC-14-538451 Consolidated with Case No. CGC-18-565398, October 29, 2018.

**III.  Depositions and Associated Exhibits**

- Deposition of Gautam Gowrisankaran, PhD, *Djeneba Sidibe, et al., vs. Sutter Health, et al.*, Case No. 3:12-cv-4854-LB, July 17, 2019.

- Deposition of Shannon Keller, *Djeneba Sidibe, et al., vs. Sutter Health, et al.*, Case No. 3:12-cv-4854-LB, July 23, 2019.

- Deposition of Patrick Travis, *Djeneba Sidibe, et al., vs. Sutter Health, et al.*, Case No. 3:12-cv-4854-LB, July 25, 2019.

- Deposition of Robert D. Willig, PhD, *Djeneba Sidibe, et al., vs. Sutter Health, et al.*, Case No. 3:12-cv-4854-LB, July 24, 2019.

## IV. Legal Documents

- "(Redacted) Order (1) Granting in Part and Denying in Part Defendant's Motion for Summary Judgment, (2) Denying in Part and Denying as Moot in Part Defendant's Motion to Exclude Plaintiffs' Expert, and (3) Denying as Moot Plaintiffs' Motion to Exclude Defendant's Expert," *Djeneba Sidibe, et al., vs. Sutter Health, et al.*, Case No. 3:12-cv-4854-LB, May 9, 2019.

- "Motion for Leave to File Brief of Amici Curiae Economics Professors," *St. Alphonsus Medical Center - Nampa, Inc. et al. v. St. Luke's Health System, Ltd. et al.*, the United States Court of Appeals For the Ninth Circuit, Case No. 14-35173 On Appeal From Case No. 1:12-cv-00560-BLW et al., August 20, 2014.

- "Order Re (1) Defendants' Motion to Exclude Testimony of Dr. Gregory Vistnes; (2) Plaintiff's Motion to Exclude Certain Expert Testimony of Dr. Robert Willig; and (3) Plaintiffs' Motion to Exclude Expert Opinion of Dr. Gowrisankaran That Kaiser Competes in the Same Antitrust Market," *UEBT v. Sutter Health, and State of California v. Sutter Health*, Case No. CGC-14-538451 Consolidated with Case No. CGC-18-565398, May 6, 2019.

- "Order Re (1) Defendants' Motion to Exclude the Expert Testimony of Dr. Jeffrey J. Leitzinger; and (2) Defendants' Motion to Exclude Option Testimony of Meredith B. Rosenthal," *UEBT v. Sutter Health, and State of California v. Sutter Health*, Case No. CGC-14-538451 Consolidated with Case No. CGC-18-565398, June 3, 2019.

- "Order Re Sutter's Motion for Summary Judgment or, in the Alternative, Summary Adjudication," *UEBT v. Sutter Health, and State of California v. Sutter Health*, Case No. CGC-14-538451 Consolidated with Case No. CGC-18-565398, June 13, 2019.

## V. Produced Documents

- DEF000154106

- DEF002213757

- STCA0654134

## VI.  Data Sources and Documentation

- Axene Health Partners, LLC, "Trend Summary 2 20 2019.xlsx," February 20, 2019.

## VII. Rate Filings

Rate Filings and New Product Filings filed with the California Department of Managed Health Care, "Search Rate Review Filings," available at http://wpso.dmhc.ca.gov/premiumratereview/FilingList.aspx.

- Aetna Small Group Filings with Proposed Effective Dates: 4/1/2011, 7/1/2011, 10/1/2011, 1/1/2012, 4/1/2012, 7/1/2012, 10/1/2012, 1/1/2013, 7/1/2013, 1/1/2014, 4/1/2014, 7/1/2014, 1/1/2015, 4/1/2015, 7/1/2015, 1/1/2016, 4/1/2016, 7/1/2016, 10/1/2016, 1/1/2017, 4/1/2017, 10/1/2017, 1/1/2018, 4/1/2018, 1/1/2019, 7/1/2019

- Anthem Individual Filings with Proposed Effective Dates: 1/1/2011, 5/1/2011, 5/1/2012, 1/1/2013, 2/1/2013, 1/1/2014, 4/1/2014, 1/1/2015, 4/1/2015, 1/1/2016, 4/1/2016, 1/1/2017, 1/1/2018, 4/1/2018, 1/1/2019, 4/1/2019

- Anthem Small Group Filings with Proposed Effective Dates: 1/1/2011, 4/1/2011, 7/1/2011, 10/1/2011, 1/1/2012, 4/1/2012, 7/1/2012, 10/1/2012, 1/1/2013, 4/1/2013, 7/1/2013, 1/1/2014, 4/1/2014, 10/1/2014, 1/1/2015, 4/1/2015, 7/1/2015, 1/1/2016, 7/1/2016, 10/1/2016, 1/1/2017, 7/1/2017, 10/1/2017, 1/1/2018, 7/1/2018, 10/1/2018, 1/1/2019, 4/1/2019, 7/1/2019

- Blue Shield Individual Filings with Proposed Effective Dates: 1/1/2011, 3/1/2012, 7/1/2012, 3/1/2013, 1/1/2014, 1/1/2015, 1/1/2016, 1/1/2017, 1/1/2018, 1/1/2019

- Blue Shield Small Group Filings with Proposed Effective Dates: 1/1/2011, 7/1/2011, 1/1/2012, 7/1/2012, 1/1/2013, 1/1/2014, 4/1/2014, 7/1/2014, 10/1/2014, 1/1/2015, 7/1/2015, 10/1/2015, 1/1/2016, 10/1/2016, 1/1/2017, 4/1/2017, 10/1/2017, 1/1/2018, 4/1/2018, 10/1/2018, 1/1/2019, 4/1/2019, 7/1/2019

- Health Net Individual Filings with Proposed Effective Dates: 1/1/2012, 7/1/2012, 1/1/2013, 1/1/2014, 1/1/2015, 1/1/2016, 1/1/2017, 1/1/2018, 1/1/2019

- Health Net Small Group Filings with Proposed Effective Dates: 5/1/2011, 7/1/2011, 8/1/2011, 1/1/2012, 3/1/2012, 5/1/2012, 7/1/2012, 8/1/2012, 11/1/2012, 1/1/2013,

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

4/1/2013, 12/1/2013, 1/1/2014, 7/1/2014, 9/1/2014, 10/1/2014, 12/1/2014, 1/1/2015, 2/1/2015, 4/1/2015, 7/1/2015, 10/1/2015, 1/1/2016, 4/1/2016, 7/1/2016, 10/1/2016, 1/1/2017, 4/1/2017, 7/1/2017, 10/1/2017, 1/1/2018, 4/1/2018, 7/1/2018, 10/1/2018, 1/1/2019, 4/1/2019, 7/1/2019

- United Individual Filings with Proposed Effective Dates: 7/1/2013, 1/1/2016

- United Small Group Filings with Proposed Effective Dates: 5/1/2011, 8/1/2011, 11/1/2011, 2/1/2012, 3/1/2012, 4/1/2012, 5/1/2012, 8/1/2012, 1/1/2013, 5/1/2013, 8/1/2013, 1/1/2014, 7/1/2014, 10/1/2014, 1/1/2015, 4/1/2015, 10/1/2015, 1/1/2016, 1/1/2017, 7/1/2017, 10/1/2017, 1/1/2018, 7/1/2018, 10/1/2018, 1/1/2019, 4/1/2019, 7/1/2019

Rate Filings filed with the California Department of Insurance, "Interactive Rate Filings Search", available at https://interactive.web.insurance.ca.gov/apex/f?p=102:InteractiveReport:0::NO:4%2CRIR.

- Aetna Individual Filings with Proposed Effective Dates: 1/1/2011, 4/1/2011, 7/1/2011, 1/1/2012, 3/1/2012, 7/1/2012, 1/1/2013, 4/1/2013, 1/1/2015, 1/1/2016, 1/1/2017

- Aetna Small Group Filings with Proposed Effective Dates: 7/1/2011, 10/1/2011, 1/1/2012, 4/1/2012, 7/1/2012, 1/1/2013, 7/1/2013, 1/1/2014, 4/1/2014, 7/1/2014, 1/1/2015, 4/1/2015, 7/1/2015, 10/1/2015, 1/1/2016, 4/1/2016, 7/1/2016, 10/1/2016, 1/1/2017, 4/1/2017, 7/1/2017, 10/1/2017, 1/1/2018, 1/1/2019, 7/1/2019

- Anthem Individual Filings with Proposed Effective Dates: 1/1/2011, 4/1/2011, 7/1/2011, 4/1/2012, 5/1/2012, 1/1/2013, 2/1/2013, 4/1/2013, 1/1/2014, 4/1/2014, 1/1/2015, 4/1/2015, 4/1/2016, 4/1/2017, 4/1/2018, 4/1/2019

- Anthem Small Group Filings with Proposed Effective Dates: 7/1/2011, 10/1/2011, 1/1/2012, 7/1/2012, 10/1/2012, 1/1/2013, 4/1/2013, 7/1/2013, 10/1/2014

- Blue Shield Individual Filings with Proposed Effective Dates: 1/1/2011, 2/1/2011, 3/1/2011, 3/1/2012, 3/1/2013, 1/1/2014, 1/1/2015, 1/1/2016, 1/1/2019

- Blue Shield Small Group Filings with Proposed Effective Dates: 7/1/2011, 1/1/2012, 7/1/2012, 1/1/2013, 4/1/2013, 7/1/2013, 1/1/2014, 10/1/2014

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- Health Net Individual Filings with Proposed Effective Dates: 10/1/2011, 2/1/2012, 3/1/2012, 7/1/2012, 10/1/2012, 7/1/2013, 1/1/2014, 1/1/2015, 1/1/2016, 1/1/2017, 1/1/2018, 1/1/2019

- Health Net Small Group Filings with Proposed Effective Dates: 5/1/2011, 7/1/2011, 8/1/2011, 9/1/2011, 1/1/2012, 2/1/2012, 3/1/2012, 5/1/2012, 7/1/2012, 8/1/2012, 11/1/2012, 1/1/2013, 2/1/2013, 12/1/2013, 1/1/2014, 7/1/2014, 9/1/2014, 10/1/2014, 12/1/2014, 1/1/2015, 4/1/2015, 7/1/2015, 10/1/2015, 1/1/2016, 4/1/2016, 7/1/2016, 10/1/2016, 1/1/2017, 4/1/2017, 7/1/2017, 10/1/2017, 1/1/2018, 10/1/2018, 1/1/2019, 4/1/2019, 7/1/2019

- United Individual Filings with Proposed Effective Dates: 12/1/2012, 8/1/2013

- United Small Group Filings with Proposed Effective Dates: 8/1/2011, 11/1/2011, 2/1/2012, 5/1/2012, 8/1/2012, 1/1/2013, 5/1/2013, 8/1/2013, 1/1/2014, 4/1/2014, 7/1/2014, 9/1/2014, 10/1/2014, 1/1/2015, 4/1/2015, 1/1/2016, 10/1/2016, 1/1/2017, 7/1/2017, 1/1/2018, 4/1/2018, 1/1/2019, 4/1/2019, 7/1/2019

## VIII.  Articles and Books

- Berenson, Robert A., Jonathan H. Sunshine, David Helms, and Emily Lawton, "Why Medicare Advantage Plans Pay Hospitals Traditional Medicare Prices," *Health Affairs*, Vol. 34, No. 8, August 2015, pp. 1289-1295.

- Berry, Steven T., "Estimating Discrete-Choice Models of Product Differentiation," *The RAND Journal of Economics*, Vol. 25, No. 2, Summer 1994, pp. 242-262.

- Boik, Andre and Kenneth S. Corts, "The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry," *Journal of Law and Economics*, Vol. 59, February 2016, pp. 105-134.

- Cameron, Colin and Pravin Trivedi, *Microeconometrics: Methods and Applications*, Cambridge, United Kingdom: Cambridge University Press, 2005.

- Carlton, Dennis W. and Ralph A. Winter, "Vertical Most-Favored-Nation Restraints and Credit Card No-Surcharge Rules," *Journal of Law and Economics*, Vol. 61, May 2018, pp. 215-251.

- Connaughton, John E., "Local Economic Impact of the Great Recession of 2008/2009," *The Review of Regional Studies*, Vol. 40, No. 1, 2010, pp. 1-4.

- Davidson, Russell and James G. Mackinnon, *Estimation and Inference in Econometrics*, New York, NY: Oxford University Press, 1993.

- Dranove, David and Christopher Ody, "Evolving Measures of Provider Market Power," *American Journal of Health Economics*, Vol. 2, No. 2, 2016, pp. 145-160.

- Gowrisankaran, Gautam, Claudio Lucarelli, Philipp Schmidt-Dengler, and Robert Town, "The Impact of the Medicare Rural Hospital Flexibility Program on Patient Choice," *International Journal of Industrial Organization*, Vol. 29, February 2, 2011, pp. 342-344.

- Gowrisankaran, Gautam, Claudio Lucarelli, Philipp Schmidt-Dengler, and Robert Town, "Can Amputation Save the Hospital? The Impact of the Medicare Rural Flexibility Program on Demand and Welfare," *Journal of Health Economics*, Vol. 58, February 7, 2018, pp. 110-122.

- Greene, William H., *Econometric Analysis*, Third Edition, Upper Saddle River, NJ: Prentice-Hall, Inc, 1997.

- Ho, Katherine, "The Welfare Effects of Restricted Hospital Choice in the US Medical Care Market," *Journal of Applied Econometrics*, Vol. 21, No. 7, November 2006, pp. 1039-1079.

- Kessler, Daniel P. and Mark B. McClellan, "Is Hospital Competition Socially Wasteful?" *The Quarterly Journal of Economics*, Vol. 115, No. 2, May 2000, pp. 577-615.

- Lechner, Michael, "The Estimation of Causal Effects by Difference-in-Difference Methods," *Foundations and Trends in Econometrics*, Vol. 4, No. 3, 2010, pp. 165-224.

- Maeda, Jared L. K. and Lyle Nelson, "How Do the Hospital Prices Paid by Medicare Advantage Plans and Commercial Plans Compare With Medicare Fee-for-Service Prices?" *INQUIRY: The Journal of Health Care*, Vol. 55, 2018, 1-8.

- McGuire, Thomas G., Joseph P. Newhouse, and Anna D. Sinaiko, "An Economic History of Medicare Part C," *The Milbank Quarterly*, Vol. 89, No. 2, 2011, pp. 289-332.

- Raval, Devesh, Ted Rosenbaum, and Steven A. Tenn, "A Semiparametric Discrete Choice Model: An Application To Hospital Mergers," *Economic Inquiry*, Vol. 55, No. 4, October 2017, pp. 1919-1944.

- Skwire, Daniel D., *Group Insurance*, New Hartford, Connecticut: ACTEX Publications, 2016.

- Train, Kenneth E., *Discrete Choice Methods with Simulation*, Second Edition, New York, NY: Cambridge University Press, 2009.

- White, Halbert, "Maximum Likelihood Estimation of Misspecified Models," *Econometrica*, Vol. 50, No. 1, January 1982, pp. 1-25.

## IX. Other Materials Considered

- http://geog.berkeley.edu/PeopleHistory/faculty/R_Walker/Walker_93.pdf

- http://info.kaiserpermanente.org/mssa/applyonline_california/pdfs/ca_kpif_50_agreement_north.pdf

- http://www.insurance.ca.gov/01-consumers/110-health/60-resources/upload/2012KaiserCalPERSHMO.pdf

- https://emma.msrb.org/EP650978-EP508628-EP909589.pdf

- https://oag.ca.gov/sites/all/files/agweb/pdfs/charities/pdf/emc_inpact_rpt.pdf

- https://providers.medicaresolutions.com/pacificare/

- https://sacramento.cbslocal.com/2016/04/29/stocktons-dameron-hospital-loses-beds-as-kaiser-permanente-cuts-ties/

- https://www.brookings.edu/wp-content/uploads/2016/06/0331_recession_garr.pdf

- https://www.brookings.edu/wp-content/uploads/2016/06/0722_recession_report.pdf

- https://www.cbo.gov/publication/53441

- https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf

- https://www.modbee.com/news/local/article3113044.html

- https://www.recordnet.com/article/20070303/A_BIZ/703030317

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     B-7

- https://www.recordnet.com/article/20080928/A_BIZ/809270312

- https://www.sfgate.com/business/article/UnitedHealth-plans-to-acquire-PacifiCare-8-1-2624086.php

- https://www.stata.com/manuals13/rsuest.pdf

## Appendix D: Additional Exhibits Showing Dr. Willig's Estimated Overcharges Using Different Drive Time Thresholds

**Exhibit D1**
### Dr. Willig's Estimated Overcharges Using Different Drive Time Thresholds
**Blue Shield**



*Note*: The shaded area identifies the 95 percent confidence interval for the estimated Sutter overcharge when the number of competitors variables are constructed using a 30-minute drive time.

*Source*: Willig Merits Report backup production.

**Exhibit D2**
**Dr. Willig's Estimated Overcharges Using Different Drive Time Thresholds**



*Note*: *See* Note in Exhibit D1.
*Source*: *See* Source in Exhibit D1.

## Appendix E: Aggregate Premium Damages for Out-of-Sample Estimates

### Exhibit E1
### Aggregate Premium Damages for Health Plan Class Members
### Attached to One of the Nine Rating Areas, September 2008 to December 2017,
### Using Out-of-Sample Estimates

| Health Plan | Years | Original Estimate | Revised Estimate with Trend Factors | Difference |
|---|---|---|---|---|
| Anthem | 2008 - 2017 | $180,241,391 | $208,293,151 | $28,051,760 |
| Blue Shield | 2008 - 2017 | $211,940,419 | $245,756,140 | $33,815,721 |
| Health Net | 2010 - 2017 | $42,933,587 | $49,364,309 | $6,430,722 |
| Aetna | 2010 - 2017 | $10,877,073 | $12,601,829 | $1,724,756 |
| United | 2009 - 2016 | $18,904,358 | $21,705,572 | $2,801,215 |
| **Total** | | **$464,896,827** | **$537,721,001** | **$72,824,173** |

*Sources*:

1. Anthem, Blue Shield, Health Net, Aetna, and United Claims and Premium Data.

2. U.S. Census Bureau Zip Code and County Data.

3. The Center for Consumer Information & Insurance Oversight: California Geographic Rating Areas.

4. Axene Health Partners, LLC, "Trend Summary 2 20 2019.xlsx," February 20, 2019.

# EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, JERRY JANKOWSKI,
SUSAN HANSEN, DAVID HERMAN,
OPTIMUM GRAPHICS, INC., and JOHNSON
POOL & SPA, on Behalf of Themselves and All
Others Similarly Situated,

                Plaintiffs,

    v.

SUTTER HEALTH,

                Defendant.

Case No. 3:12-cv-4854-LB

CLASS ACTION

Supplemental Declaration of Dr. Tasneem Chipty

March 12, 2021

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Table of Contents**

I.     Introduction .............................................................................................................. 1

II.    Summary of Opinions ............................................................................................. 2

III.   Overview of New Data ........................................................................................... 4

IV.    Updated Overcharge Estimates .............................................................................. 5

V.     Updated Pass-Through Estimates ......................................................................... 13

       A.  My Analysis Continues to Show Stability Across Lines of Business ............... 15

       B.  My Analyses Continues to Account for Competition from Kaiser .................. 16

VI.    Updated Damage Estimates .................................................................................. 17

       A.  Calculating Damages for 2011 to 2019, Using Claims Data Through 2017 and
           Premium Data Through 2019 ....................................................................... 18

       B.  Calculating Damages for Q1 2020, Using Actual Premium Data from Q1 2020 .............. 19

       C.  Premium Damage Estimates ......................................................................... 21

VII.   Conclusions .......................................................................................................... 25

## I.   Introduction

1.      My name is Tasneem Chipty. I declare under penalty of perjury as follows:

2.      At the request of counsel for the Class Plaintiffs, I previously submitted eight reports/declarations in *Sidibe et al. vs. Sutter*.[1] Based on this body of work, I concluded that Sutter's systemwide contracts, with provisions requiring all-or-nothing contracting, onerous non-participating provider rates, and equal treatment/no tiering clauses constitute an anticompetitive arrangement whereby Sutter ties the purchase of GAC inpatient services in four Tied Markets to the purchase of GAC inpatient services in seven Tying Markets and prevents health plans from engaging in pro-competitive steering. I concluded that there is common proof demonstrating antitrust impact, and I provided a formulaic method that is consistent with actuarial principles for calculating aggregate premium damages. I also concluded that a growing body of economics literature and case-specific evidence indicate that Sutter's contracting practices have interfered with the competitive process and enabled Sutter to charge health plans higher prices for inpatient hospital services (in addition to outpatient and professional services) than it would have otherwise.

3.      Using a damages methodology and claims data from each of the five Class Health Plans (Anthem, Blue Shield, Health Net, Aetna, and United), I estimated overcharges (and thus overpayments) by Class Health Plans. I previously estimated a pass-through rate of 97.16 percent as the portion of those overpayments that were passed through to Class Members in the form of higher premiums.[2] My baseline calculation yielded aggregate damages of $489 million, from September 2008 to December 2017.[3] The Court certified the Class and concluded that I have "shown the sound methodological steps" for calculating damages.[4] Because of the limited

---

[1] My qualifications are described in my previous reports/declarations in this matter, and my updated CV is included here as Appendix A. I incorporate herein by reference the opinions I have previously expressed, and I adopt in this report the citation shorthand and the use of terms as defined by me previously in this matter.

[2] Chipty Supplemental Declaration, Exhibit 6.

[3] Chipty Supplemental Declaration, Exhibit 16 and Chipty Supplemental Reply Declaration, Exhibit 8.

[4] Order Granting Motion to Certify Class Under Rule 23(B)(3) and Denying Motion for Sanctions, Case 3:12-cv-04854-LB Document 823, July 30, 2020 (hereafter "Class Order"), p. 21.

availability of the MLR Data used to calculate specific pass-through rates for all Class Health Plans, the Court restricted the damage period to 2011 onward.[5] Of the $489 million of damages that I had previously estimated: (a) $120 million are from the 2008 to 2010 period; and (b) $369 million are from the period 2011 to 2017.

4.      I have been asked to update my pass-through and damages analysis to cover the period January 2011 to March 2020.[6] For this purpose, I apply the same methodology described in my prior reports: this methodology includes econometric estimation of overcharges, econometric estimation of pass-through rates, and calculation of damages in a manner that reflects how health plans build premiums. I incorporate additional years of claims and premium data from the each of the Class Health Plans and one additional year of MLR Data. A full list of the incremental materials that I considered is included in Appendix B.

5.      The work presented in this report has been conducted by me and staff working under my direction, at both Berkeley Research Group and AlixPartners (formerly Matrix Economics). AlixPartners receives $850 per hour for my work in this matter. AlixPartners also receives compensation from Berkeley Research Group based on its collected staff billings in support of this effort. My compensation is not dependent on the outcome of this matter. My work is ongoing, and I will continue to review the discovery record to understand the evidence in this case. I reserve the right to supplement and to amend my opinions.

## II.      Summary of Opinions

6.      Based on the evidence described in this report, it remains my opinion that Sutter has charged Class Health Plans supra-competitive prices for general acute care inpatient services, and that Class Health Plans have passed through all or nearly all of these overcharges in the form of higher premiums. My updated analysis shows that, over the period January 2011 to March

---

[5] Class Order, pp. 21, 23.

[6] In addition, I have reviewed the relevant portions of Sutter systemwide contracts from 2016 through the present, including those that I understand were recently produced. Consistent with the older contracts, the more recent ones also contain non-participating penalty rate provisions, anti-steering and anti-tiering clauses, and confidentiality provisions.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

2020, aggregate premium damages to Class Members are approximately $429 million. Specifically:

- It is straightforward to incorporate additional years of claims and premium data from the Class Health Plans and additional MLR Data into my existing damages methodology.

- Econometric analysis of additional years of claims shows that, relative to benchmark hospitals in Northern California, Sutter Damages Hospitals substantially overcharged Class Health Plans.

- Econometric analysis of additional years of MLR data shows that the overall weighted average pass-through across the five Class Health Plans is 96.67 percent.

I have also examined whether to estimate overcharges using claims data from the longer period 2006 to 2017 or the shorter period 2009 to 2017, with and without trend factors.[7] Based on this analysis, it is my opinion that damages range between $428.6 and $429.3 million.

      7.       To demonstrate the robustness of my opinions, I have refreshed many of the diagnostics that I previously performed over the course of my prior reports.[8] The results of this exercise further demonstrate the stability of my models and reinforce my prior opinions. Moreover, for many of the reasons that I have previously explained, it remains my opinion that my methods are conservative: *my updated damage estimates significantly understate the true amount of damages flowing from Sutter's challenged contracting practices.*

      8.       The remainder of this report provides additional details. Section III provides an overview of the new data used to update my analyses. Section IV describes my updated overcharge estimates. Section V describes the updated evidence on the pass-through. Section VI describes how I applied the same methodology from my prior reports to estimating damages for

-------------------------

[7] As I have explained before, health plans construct premiums using their claims experience from a prior experience period, adjusting for inflation between the experience and premium periods. For example, rate filings show that insurers developed their 2015 premiums based on 2013 claims experience; accordingly, to the extent that they were passed through to Class Members in the form of higher premiums, overcharges estimated on 2017 claims data would causally affect 2019 premiums. *See* Chipty Class Declaration, ¶ 142 and Chipty Supplemental Declaration, Exhibit 15 (showing an actual rate filing for 2015, using 2013 as the experience period).

[8] *See* Chipty Workpapers.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

2011 to 2019 and for the first quarter of 2020 ("Q1 2020"); it also presents my updated damage estimates. Section VII concludes.

## III.    Overview of New Data

9.      To update my overcharge, passthrough, and damage estimates through March 2020, I rely upon additional data from both: (a) the Class Health Plans, the majority of which were produced in January and February 2021; and (b) public sources such as CMS and OSHPD. The new data that I received are summarized in Exhibit 1. They are the same types of data that I have previously relied upon for the earlier period.

**Exhibit 1**
**Summary of Additional Data Received and Collected**

| Source | Description | Time Period |
|---|---|---|
| Anthem | Claims and Premiums Data, Large Group Membership Data | 2017 - 2020 |
| Blue Shield | Claims and Premiums Data | 2018 - 2020 |
| Aetna | Claims and Premiums Data | 2016 - 2020 |
| United | Claims Data (UNET Database) and Premiums Data | 2018 - 2020 |
| Health Net | Claims and Premiums Data, Small and Large Group Only | 2018 - 2020 |
| CMS | Hospital Compare Data, and MS-DRG Data and Software | 2017 - 2018 |
| CMS | MLR Data | 2019 |
| California OSHPD | Hospital Annual Financial Disclosure Pivot Profile Data | 2017 - 2018 |

In total, with these additional data, the Production Data include:[9]

- Over 83 million claims and $112 billion in paid amounts from Anthem claims data, from 2006 to 2017; and 275 million member-months of premium data from Anthem, from 2011 to Q1 2020.

_____

[9] As in my Merits Report, I describe here the size of the raw claims data, which were ultimately processed for analysis. Unlike the other health plans, Anthem did not limit their claims production to inpatient hospitals claims. *See* Chipty Merits Report, ¶ 7. *See also*, Chipty Workpapers.

- Over 21 million claims and $61 billion in paid amounts from Blue Shield claims data, from 2006 to 2017; and 196 million member-months of premium data from Blue Shield, from 2011 to Q1 2020.

- Over eight million claims and $17 billion in allowed amounts from Health Net claims data, from 2006 to 2017; and 97 million member-months of premium data from Health Net, from 2011 to 2020.

- Over nine million claims and $26 billion in paid amounts from Aetna claims data, from 2006 to 2017; and three million member-months of premium data from Aetna, from 2011 to Q1 2020.

- Over 19 million claims and $38 billion in allowed amounts from United claims data, from 2006 to 2017; and 63 million member-months of premium data from United, from 2011 to Q1 2020.

10.     For reasons that I explain below, my updated overcharge analysis relies on two additional years of claims data, through 2017, and premium data through Q1 2020. Thus, my analysis of hospital price overcharges and premium damages continues to be based on a substantial body of electronic data produced by the Class Health Plans, from each of their respective data systems used to process claims and record premiums in Northern California.[10]

## IV.     Updated Overcharge Estimates

11.     Using the same common methodology articulated in my previous reports, I estimate the extent to which Sutter inflated its in-network hospital prices as a result of the challenged conduct.[11] This methodology produces separate overcharge estimates for each Sutter Damage Hospital and each Class Health Plan by comparing prices at Sutter Damage Hospitals to a benchmark composed of non-Sutter general acute care hospitals in Northern California. Using a regression-based approach, I control for hospital- and market-specific characteristics, such as

_____

[10] I understand that Class Health Plans may, in particular, produce additional claims-related data. I reserve the right to review such data and update my analysis if they are produced.
[11] Chipty Merits Report, ¶¶ 210-223.

the local hospital wage index, major teaching hospital status, and competitive landscape. As I have explained before, this approach conservatively ignores the possibility of "umbrella pricing," whereby competitors demand "copy-cat" pricing when negotiating with health plans.[12] This approach also conservatively ignores overcharges stemming from inflated out-of-network inpatient prices and inflated outpatient and physician prices caused by Sutter's anticompetitive conduct.

12.      I re-estimated the overcharge model using both a shorter period of claims data from 2009 to 2017 and a longer period of claims data from 2006 to 2017. As a general principle, researchers prefer more data to less, because estimates based on larger samples can have lower estimation variance and hence better precision.[13] More data, however, is not always helpful—for example, some data may not be representative. In this case, as the Class Health Plans have produced substantial claims data going back to 2006, the question is whether to include claims data from 2006 to 2008 in estimating overcharges for the period 2011 to 2019, and the potential issue would be whether there is trending in the overcharge.

13.      Though there is no conclusive statistical test that proves trending systematically across Sutter Damage Hospitals and Class Health Plans, some results suggest that overcharges may be trending down somewhat over time. Consistent with my prior work, I also observe that healthcare inflation is trending upward, which means that Sutter's overcharges should have larger effects over time.[14] The two different trending issues work in opposite directions. Balancing the two effects, my preference is to use data from the shorter period to estimate overcharges and incorporate the health inflation trend factor to calculate damages. As a cross-check of my preferred approach, I also use data from the longer period to estimate overcharges

---

[12] There is evidence, described in my prior reports, that other hospitals in Northern California are demanding higher prices because Sutter charges higher prices. Chipty Reply Declaration, ¶¶ 10, 111 and Appendix D, p. D-5.

[13] See Wooldridge, Jeffery, Introductory Econometrics: A Modern Approach, 6th Ed. Mason, OH: Thomson/South-Western, p. 83. See also Gujarati, Damodar N. and Dawn C. Porter, Basic Econometrics, 5th Ed. Boston, MA: McGraw-Hill, p. 835.

[14] When health plans set premiums, they adjust the claims experience forward using a trend factor to account for general inflation in healthcare costs: see, e.g., Deposition of Patrick Travis, October 23, 2018 (hereafter "Travis Deposition"), 25:3 – 27:19. To the extent that Class Health Plans overpaid for plan members services at Sutter Damage hospitals, when setting premiums, they would adjust those overpayments upward, just as they would their other costs, using industry standard trend factors.

and calculate damages, ignoring the health inflation trend factor. (I return to this choice in Section VI. C below.) Both approaches produce nearly identical results.

14.     I discuss here the overcharge estimation results using first the shorter period and then the longer period. A side-by-side comparison of the coefficient estimates, comparing the coefficients from my original and updated regressions run on each of the samples, shows that the overcharge model is stable and sensible. Directionally, the control variables continue to have their expected effect, as indicated by the signs on the coefficients.[15] Diagnostics and detailed results, including both in-sample and out-of-sample overcharges estimates by Class Health Plan, are presented in Appendix C and Appendix D.

15.     Exhibits 2A and 2B show the implied overcharges based on the in-sample estimates, by Sutter Damage Hospital and Class Health Plan. The results generally show significant overcharges at the Sutter Damage Hospitals, across all Class Health Plans. Specifically, the results show significant overcharges for 25 of the 30 and 26 of the 30 Class Health Plan-Damage Hospital combinations, for the shorter and longer periods, respectively. Most of the insignificant overcharge estimates are at CPMC-St. Luke's. The results also show positive overcharges for all Class Health Plans at all Sutter Damages Hospitals, except Health Net at CPMC-St. Luke's, for which the estimated overcharge is not significant. (I do not calculate damages for the Class Health Plan-Sutter Damage Hospitals for which the overcharges estimates are statistically insignificant, which means that I may have understated damages.) These results are consistent with a substantial body of documentary and testimonial evidence in this case, from both Class Health Plans and Sutter itself.[16]

---

[15] Diagnostic comparing the coefficients are shown in Appendices C and D as Exhibits C1 and D1.

[16] Chipty Merits Report ¶¶ 200-205. The results also track Sutter's own price postings in response to legislation forcing price transparency.



**Exhibit 2A**
**Overcharge Estimates by Health Plan**
**Based on Combined (In-Sample) Model, 2009 to 2017**



*Notes*:

1.The analysis is based on in-network, fully-insured, commercial claims for each Class Health Plan at the Sutter Damages Hospitals and benchmark hospitals in Northern California. Appendix H describes the data processing and estimation samples.

2. Overcharge estimates that are not significant at the ten percent level are displayed with transparency. Estimated overcharges are not statistically significant for Anthem, Health Net, Blue Shield, and United estimates at CPMC-St. Luke's, or for the HealthNet estimate at Sutter Modesto.

*Sources:*

1. OSHPD Hospital Annual Financial Disclosure Data, 2009-2017.

2. CMS Impact Files and Hospital Compare Data, 2009-2017.

3. Class Health Plan Claims Data, 2009-2017.

4. Google Maps Distance Matrix API.

5. National Bureau of Economic Research NPI to Medicare CCN Crosswalk.

6. National Bureau of Economic Research and CMS DRG weights, 2009-2017.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA



**Exhibit 2B**
**Overcharge Estimates by Health Plan**
**Based on Combined (In-Sample) Model, 2006 to 2017**

*Notes:* See Exhibit 2A.

*Sources:* See Exhibit 2A, except the data begin in 2006 instead of 2009.

16.    Exhibit 3 presents a side-by-side comparison of the estimated overcharges from Exhibits 2A and 2B. The heights of the bars (and associated 90 percent confidence intervals) depict the results from the longer sample. The black dots overlaid on each bar depict the point estimates from the shorter sample. As seen here, the point estimate from the shorter period (the dot) generally lies close to the point estimate from the longer period (the height of the bar).

Further, in all but one instance, the dot falls inside the confidence interval around the height of the bar.[17]

**Exhibit 3**
**Comparison of In-Sample Overcharge Estimates Based on the Combined Model:**
**The 2006 to 2017 vs. 2009 to 2017 Sample Periods**



*Note*: The height of the bars and confidence intervals describe the results based on the longer sample period and the black dots describe the results based on the shorter sample period. Transparent bars reflect 2006-2017 estimates that are not significant at the ten percent level. Similarly, faded points reflect 2009-2017 estimates that are not significant at the ten percent level.
*Sources*: *See* Exhibit 2A.

17.     These results are also comparable to those presented in my previous reports. For example, Exhibit 4 shows a side-by-side comparison of estimated overcharges at CPMC-Main for all Class Health Plans using the 2009 to 2017 sample and the 2006 to 2015 sample from Exhibit 25 of my Merits Report. These estimates are displayed along with their associated 90 percent confidence intervals, to illustrate sampling error. Each of the Sutter overcharges are close

---

[17] I conducted a series of statistical tests to study the null hypothesis of zero difference between overcharge estimates across the models, for each Class Health Plan and Sutter Damage Hospital. Of the thirty tests conducted in this way, I find: (a) a statistically significant difference at the five percent significance level in twelve instances; and (b) no statistically significant difference at the five percent level in eighteen instances. This test is conservative (*i.e.*, more likely to find differences) in that it does not correct for false discovery due to multiple comparisons. (For detailed results, *see* Chipty Workpapers.) To be conservative, I present damage estimates using both sample periods.

to each other, irrespective of sample choice, as evidence by the similarities in the heights of the bars and the overlapping confidence intervals.[18]

**Exhibit 4**
**Comparison of In-Sample Overcharge Estimates for CPMC-Main:**
**2006-2015 versus 2009-2017**



*Note*: The results for the 2006 to 2015 sample are taken directly from my Merits Report. As in Exhibits 2A and 2B, transparency indicates results not significant at the ten percent level.
*Sources*: *See* Exhibit 2A.

18.     I have also refreshed many of the diagnostics and workpapers I had previously run on the original 2006 to 2015 sample.[19] For example, among other diagnostics, I refreshed a set of alternative model specifications responding to topics raised by Dr. Robert Willig, which most recently appeared as Exhibit 10 of my Merits Rebuttal report, by limiting the data to the

---

[18] There are 30 different comparisons across the five Class Health Plans and six Sutter Damage Hospitals. The sign and significance only differ for only two comparisons (CPMC-St. Luke's for Anthem and Blue Shield) when comparing the 2006 to 2015 estimates from the Chipty Merits Report to the 2009 to 2017 estimates in Exhibit 2A. The sign and significance only differ for one comparison (CPMC-St. Luke's for Anthem) when comparing the Merits Report to the 2006 to 2017 estimates in Exhibit 2B. *See* Exhibits 4, C8 through C12, and D8 through D13.

[19] *See* Appendices C and D and the Chipty Workpapers.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

more recent 2009-2015 period.[20] This diagnostic relies upon data processed by Dr. Willig, and so it was not possible to update them to include additional years beyond 2015.

19.     Exhibit 5 presents the updated results and follows the same structure as Exhibit 10 of my Merits Rebuttal Report. As before, the results strongly support a conclusion of impact and damages. For Anthem, Blue Shield, and Aetna, there is a positive and statistically-significant overcharge in all twelve regressions. For United, there is a positive and statistically-significant overcharge in eight of twelve regressions. For Health Net, the hospital-level regressions show positive and statistically-significant overcharges when my preferred set of hospital-level control variables is used. These results reinforce my prior opinion that the finding of antitrust impact does not depend on the methodological arguments to which Dr. Willing devotes many pages in his reports. The finding of antitrust impact does not depend on the level of aggregation: hospital-level or claim-level. Nor does it depend on how one controls for case mix: case-mix adjusted allowed amounts or DRG fixed effects. Dr. Willig's discussion of these topics are a distraction without substance.[21]

---

[20] Chipty Merits Rebuttal Report, Exhibit 10. That exhibit was itself an update of a prior exhibit, see Chipty Merits Report, ¶¶ 244-247 for a description of the structure of the exhibit.
[21] Chipty Merits Report, ¶ 248.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit 5**
**Refresh of Merits Rebuttal Exhibit 10**

| | Anthem | Blue Shield | Aetna | United | Health Net |
|---|---|---|---|---|---|
| **Panel [A]: Chipty's Hospital-Level Variables** | | | | | |
| Hospital-Year Model | 47% *** | 46% *** | 41% *** | 44% *** | 22% *** |
| Willig's One-Stage Model | 22% *** | 23% *** | 20% *** | 17% ** | 1% |
| Willig's Two-Stage Model (Weighted) | 22% *** | 23% *** | 21% *** | 17% ** | 1% |
| Willig's Two-Stage Model (Unweighted) | 36% *** | 32% *** | 25% *** | 36% *** | 6% |
| **Panel [B]: Chipty's Hospital-Level Variables + Willig's HHI** | | | | | |
| Hospital-Year Model | 40% *** | 39% *** | 34% *** | 36% *** | 16% |
| Willig's One-Stage Model | 17% ** | 20% ** | 16% ** | 12% | -4% |
| Willig's Two-Stage Model (Weighted) | 17% ** | 20% ** | 16% ** | 12% | -4% |
| Willig's Two-Stage Model (Unweighted) | 28% *** | 24% ** | 18% * | 27% ** | 0% |
| **Panel [C]: Chipty's Hospital-Level Variables + Willig's HHI + Capital Ratio** | | | | | |
| Hospital-Year Model | 38% *** | 37% *** | 33% *** | 35% *** | 15% |
| Willig's One-Stage Model | 17% ** | 19% ** | 15% ** | 12% | -5% |
| Willig's Two-Stage Model (Weighted) | 17% ** | 19% ** | 16% ** | 12% | -5% |
| Willig's Two-Stage Model (Unweighted) | 29% *** | 25% ** | 19% * | 28% ** | 0% |

*Notes*:

1. Each row in the table corresponds to estimates of a single Sutter overcharge percentage, across all the Sutter Damage Hospitals, for each plan, from a separate regression constructed using different estimation procedures.

2. The regressions use data from 2009-2015 for all payors.

3. For each health plan and for the purposes of rebuttal, I use Dr. Willig's regression data sets.

4. Asterisks *, **, *** represent statistical significance at ten percent, five percent, and one percent levels, respectively. Green shading identifies those estimates that are positive and statistically significant at the ten percent, five percent, or one percent level.

*Source*: Willig Merits Report backup production.

## V. Updated Pass-Through Estimates

20. I update my analysis of pass-through to incorporate the 2019 MLR Data, published by CMS in November 2020. As I have explained, the MLR data are of high quality and credible:[22] (a) they reflect actual premium and claims experience for all Class Health Plans and Class Members, across all business lines in California; (b) they are constructed from transaction-level data by the health plans themselves, to comply with federal regulations; (c) they are filed with the federal government as a requirement under the ACA; and (d) they are used in

---

[22] Chipty Supplemental Report, ¶ 13.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA 13

the ordinary-course by CMS, as an input into its assessment of whether health plan premiums meet the MLR requirements.

21.     My previous estimate of weighted-average pass-through across all Class Health Plans using data from 2011 to 2018 was 97.16 percent. My updated estimate using data from 2011 to 2019 is 96.67 percent. Exhibit 6 and Exhibit 7 below describe these results graphically and in a table format, explaining the weighted average calculation. As I have explained before, there are multiple reasons why these estimates are conservatively too low. For example, to calculate the weighted average pass-through rate, I "capped" pass-through at 100 percent; this lowers the empirical pass-through estimate for three out of four health plans. I also chose to weight each health plan's pass-through estimate using premium dollar weights rather than weighting by membership, specifically because the former yields lower estimates.

**Exhibit 6**
**Dollars-Basis Pass-Through Estimates, by Class Health Plan,**
**Using the 2011-2019 MLR Data**



*Note*: The gray line associated with each bar reflects the 95 percent confidence interval.
*Source*: MLR Data, 2011-2019.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     14

**Exhibit 7**
**Weighted Average Dollars-Basis Pass-Through Rate**
**Using the 2011-2019 MLR Data**

| | | Weighted by: | |
| | Pass-Through Rate | MLR Member Months (in 000s) | MLR Premium Dollars ($M) |
| Plan | [A] | [B] | [C] |
|---|---|---|---|
| Anthem | 103.47% | 288,077 | 113,110 |
| Blue Shield | 95.55% | 255,980 | 96,272 |
| Health Net | 84.96% | 98,147 | 39,818 |
| Aetna | 102.97% | 63,825 | 26,562 |
| United | 101.11% | 85,605 | 33,146 |
| **Class Health Plans** | | **96.70%** | **96.67%** |

*Note*: The weighted average pass-through rate caps each plan-specific pass-through rate at 100 percent prior to averaging.
*Source*: MLR Data, 2011-2019.

22.     For completeness, my Appendix E and workpapers show refreshed versions of many of the pass-through diagnostics and results shown in my prior reports. The subsections that follow highlight a handful of those diagnostics.

### A.     My Analysis Continues to Show Stability Across Lines of Business

23.     Exhibit 8 refreshes my prior diagnostic showing the stability of the estimated pass-through estimates on a dollars-basis, by health plan and line of business.[23] The pass-through estimates are all positive and statistically significant, ranging from 138 percent for Anthem's large group business line to about 60 percent for Health Net's individual business line. Nine of the fifteen pass-through estimates are above 100 percent, and twelve of the fifteen estimates have confidence intervals that either include or exceed 100 percent. These figures also show uniformly high and significant pass-through for all Class Members, across all Class Health Plans and lines-of-business.

---

[23] Chipty Supplemental Report, ¶ 68

**Exhibit 8**
**Refresh of Chipty Supplemental Report Exhibit 5**
**Dollars-Basis Pass-Through Estimates, Line of Business, by Class Health Plan**
**Using the 2011-2019 MLR Data**



*Note*: The gray line associated with each bar reflects the 95 percent confidence interval.
*Source*: MLR Data, 2011-2019.

### B.    My Analyses Continues to Account for Competition from Kaiser

24.     Exhibit 9 refreshes my prior diagnostic pressure-testing Dr. Willig's arguments about Kaiser.[24] According to Dr. Willig, the Class Health Plans would be more likely to pass through common cost shocks, and less likely to pass through the Sutter overcharge, because such pass-through would disadvantage non-Kaiser health plans when competing against Kaiser. Dr. Willig describes a way to address the potential bias that concerns him: "include in the regression a separate variable that controls for the level of Kaiser's costs, perhaps also interacted with a measure of the competitive significance of Kaiser."[25] In my supplemental report, I ran two different regression models that implement Dr. Willig's suggestions, using the MLR Data. There, I showed that pass-through rates are uniformly high and significant, even after accounting for competition from Kaiser as Dr. Willig suggests. The same results continue to hold with using the

---

[24] Chipty Supplemental Report, ¶¶ 71-73.
[25] *Id.*

additional year of the MLR Data. As seen here, no matter how one controls for competition from Kaiser, pass-through rates are uniformly high and significant.



**Exhibit 9**
**Refresh of Chipty Supplemental Report Exhibit 7**
**Overall Dollars-Basis Pass-Through Rates by Plan,**
**Accounting for Kaiser's Cost as Advocated by Dr. Willig**

*Note*: The gray line associated with each bar reflects the 95 percent confidence interval.
*Source*: MLR Data, 2011-2019.

## VI.    Updated Damage Estimates

25.    In my Supplemental Reply, I estimated damages from 2008 to 2017. My updated analysis makes two changes: (a) I remove damages for the period 2008 to 2010; and (b) I extend damages to cover the period 2018 to March 2020. The approach I use in updating damages is consistent with the approach used and described in my Class Declaration, my Merits Report, and my Supplemental Reply. I have also computed damages that: (a) incorporate healthcare cost

trend factors, as I did in my Supplemental Declaration;[26] and (b) rely upon Hospital price overcharges estimated over the sample period 2009 to 2017.

### A.   Calculating Damages for 2011 to 2019, Using Claims Data Through 2017 and Premium Data Through 2019

26.   Using additional Production Data and MLR Data, I apply my existing damage methodology to compute premium damages for the period 2011 to 2019. My analysis relies upon four primary inputs: (a) estimates of Sutter Damage Hospital price overcharges, using both estimates from the sample period 2006 to 2017 and the sample period 2009 to 2017; (b) health plan-specific claims expenditures (and thus overpayment by each Class Health Plan) at each of the Sutter Damage Hospitals for 2009 to 2017; (c) pass-through rates for the period 2011-2019; and (d) health plan-specific premium information for 2011 to 2019. An overview of the specific circumstances for each Class Health Plan is as follows:[27]

- *Anthem*:  Anthem previously provided claims data through 2016. They now provide claims data that also covers 2017, as well as additional premium data through 2019. The additional Anthem data are consistent with Anthem's prior production.

- *Blue Shield*:  Blue Shield previously provided claims data through 2017. They now also provide premium data covering the period through 2019. The original Blue Shield premium data did not contain location information for individuals and large groups; I was able to address this limitation by extrapolating the location information contained in Blue Shield claims data.[28] The additional Blue Shield data contains information for individuals, small groups, and large groups. Therefore, location extrapolation for individual and large group members is no longer necessary.

- *Health Net*:  Health Net previously provided claims data through 2017. Now, they provide additional premium data which include the years 2018 and 2019. The

---

[26] Chipty Supplemental Declaration, ¶ 111.

[27] *See* Appendix H for a more complete description of the data and data processing steps. *See also,* Chipty Workpapers.

[28] Chipty Class Rebuttal, Footnote 322.

updated Health Net premium data are consistent with Health Net's previous production.

- *Aetna*:  Aetna previously provided claims data through 2015. They now provide additional claims data which cover 2016 and 2017. They also provide premium data from 2016 to 2019. Aetna's updated premium information was provided in a structure that was consistent with its previous productions.

- *United*:  United originally provided paid claims data through 2017. United now provided additional premium data through 2018 to 2019, but not 2017. Given this limitation, I estimate United's 2017 premiums by line-of-business and rating area by averaging its 2016 and 2018 premiums and member months. Outside of missing premiums and member months for 2017, the additional United data are consistent with United's previous production.

**B.    Calculating Damages for Q1 2020, Using Actual Premium Data from Q1 2020**

27.    I now turn to the issue of calculating premium damages for 2020, particularly in light of the ongoing coronavirus pandemic ("COVID-19"). I consider the impact of COVID-19 on each of the primary inputs:

- *Hospital price overcharges* (based on 2018 claims data): There is a lag between claims experience and premium construction. Thus, the pandemic did not impact claims experience used in construction of 2020 premiums, which were set prior to the COVID-19 pandemic.

- *Pass-through rates*: Because 2020 premiums were set in 2019, prior to the COVID-19 pandemic, there is no reason to expect the pass-through rates that influenced 2020 rate construction to differ from those that influenced 2019 rate construction. In this context, it is noteworthy that pass-through rates using 2019 MLR Data were virtually identical to pass-through rates that did not.

- *Health plan-specific premium information 2020*: Though COVID-19 did not impact 2020 premium construction, it could have affected, among other things, the stability of membership within the health plans due to job loss associated with the pandemic.

Given this last concern, I limit 2020 damages to Q1 2020. Based on my personal knowledge and my review of monthly unemployment statistics by county in California,[29] it appears that the COVID-19 pandemic did not impact employment until April 2020.

28.     With the exceptions of Anthem and Aetna, none of the Class Health Plans produced 2018 claims data (which would be necessary to compute overcharges for 2020) that was directly usable.[30] In addition, CMS has yet to publish the 2020 MLR Data. Given these limitations, I adopt a simple extrapolation methodology grounded in each Class Health Plan's own experience and tied to its actual member months in Q1 2020. Specifically, I assume a Class Health Plan's per member per month ("PMPM") damage amount in Q1 2020 equals the minimum of its PMPM damage amounts in 2018 and 2019, and I apply that amount to the Class Health Plan's actual number of member months in Q1 2020. This methodology is the same as the

---

[29] *See* Chipty Workpapers.

[30] For example, the Blue Shield data covering years beyond 2017 come from multiple overlapping sources, which in some cases do not reconcile. The Health Net data from 2018 forward do not include claims for members covered by Individual market insurance. The United data from 2018 forward were acknowledged by United to be incomplete. Aetna produced new data that appears to correct a problem in their production on March 10, 2021, and as such, my team has not been able to study those data.

one I used previously described in the Chipty Merits Report, for select years for certain health plans.[31]

### C.    Premium Damage Estimates

29.    Exhibit 10 summarizes total estimated damages using the two different overcharge sample periods, with and without the trend factor, and with and without Q1 2020 damages. As seen here, the short sample period with no trend factor yields the lowest damages, and the long sample period with trend factors yields the highest damages.

**Exhibit 10**
**Aggregate Premium Damages for Health Plan Class Members**
**Attached to One of the Nine Rating Areas, Using In-Sample Estimates**

| Overcharge Sample | Include Trend Factor | 2011 - 2019 | Q1 2020 | Total |
|---|---|---|---|---|
| 2009 - 2017 | No | $370,997,642 | $7,544,134 | $378,541,776 |
| 2006 - 2017 | No | $420,680,832 | $8,609,558 | $429,290,390 |
| 2009 - 2017 | Yes | $420,428,516 | $8,325,315 | $428,753,831 |
| 2006 - 2017 | Yes | $476,722,204 | $9,501,060 | $486,223,264 |

*Sources:*

1. Class Health Plan Claims and Premiums Data.

2. US Census Bureau Zip Code and County Data.

3. The Center for Consumer Information & Insurance Oversight: California Geographic Rating Areas.

4. AHP Trend Model Summary: 2003-2021 California Trends.

30.    To select the most reliable damage estimate, I weigh whether to use the shorter or the longer sample period and whether to use an adjustment factor for healthcare cost trends:

- To the extent that overcharges are trending down, using an overcharge estimate based on the longer sample period may overstate damages. Some of the patterns suggest that overcharges may be trending down. However statistical tests comparing overcharges estimated across the longer and shorter samples are not conclusive.[32]

---

[31] Chipty Merits Report, ¶ 272.

[32] *See* Footnote 18, above.

- To the extent healthcare costs are trending up, ignoring the healthcare trend factor will understate damages.[33] The evidence indicates conclusively that healthcare costs are trending up and the healthcare trend factor is greater than one. Consistent with this fact, my premium damages model—initially presented in my Class Report—incorporates a healthcare trend factor (called "Trend Factor").[34] Though my previous baseline damage calculation did not include an adjustment for it,[35] several of my subsequent damage calculations did.[36] These calculations demonstrated the importance of including the adjustment.

- Testimony from Mr. Travis, Mr. Willig, and Ms. Keller—Sutter's economic and premium construction experts—support the application of healthcare cost trend factors. In fact, Mr. Travis's own testimony identifies that "rate development does include a projection of medical trend."[37] Ms. Keller confirms the same when she states "Trend is – typically there's cost trend and utilization trend. When you speak of trend in general, it's usually the combination of those two factors, and that is the way claims costs change year over year."[38] Their testimony is also consistent with

---

[33] Overpayments to Sutter would be inflated when calculating future premiums by the same trend factor used to inflate all other experience period costs; thus, ignoring trend factors necessarily understates damages.

[34] Chipty Class Report ¶ 144: "The percentage overcharge in premiums is then calculated, by cohort as:

$$\frac{\text{Pass-Through} \times \text{Trend Factor} \times PMPM\ Hospital\ Overpayment_{T-2}}{PMPM\ Premium_T}$$

… trend factor is the adjustment applied to grow costs from the historical period to the premium period, to reflect inflation and utilization trends… (f)or the purpose of the illustration, I do not apply any trend factors, which I understand form Mr. Axene are substantially greater than one. The effect this (*sic*) omission is to significantly *understate* the percentage overcharge in premiums and hence, aggregate premium damages."

[35] Chipty Merits Report, ¶ 274 ("As I explained in my Class Declaration, healthcare premiums at a given point in time are based on historical medical expenditures. In order to account for medical inflation and changes in utilization, actuaries use "trend factors" to inflate the historical medical expenditure to construct healthcare premiums. My damage [referring to the baseline calculation] sets the trend factor to one, but, in reality this trend factor is typically well above one. Estimated premium damages would have been higher had I applied trend factors.").

[36] Chipty Merits Rebuttal Report, ¶¶ 10, 57; Chipty Supplemental Declaration, ¶ 111; Chipty Supplemental Reply Declaration, ¶ 77.

[37] Travis Deposition, 25:3 – 27:19.

[38] Deposition of Shannon Keller, July 23, 2019 (hereafter "Keller Deposition"), 63: 20-25.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

testimony from Mr. Axene, documentary evidence from the Actuarial Standards Board,[39] and employees of Class Health Plans regarding premium determination.[40]

- Thus, in my view, it is appropriate to include an adjustment for healthcare cost trends. Given the undisputed evidence that a trend factor adjustment is included in the calculation of premiums by actuaries, the availability of data to apply the adjustment, and the various ways in which my damages model is conservative, I now apply a trend factor adjustment to my baseline damage calculations, as describe in my initial methodology.

31.    In sum, I conclude there is some evidence in favor of using the overcharge estimates from the shorter sample period, and there is clear reason to incorporate the healthcare trend factor.[41] Accordingly, my preferred damage estimate is based on data from the shorter sample period and incorporates a trend factor adjustment.

32.    Notably, the damage estimate built off of the shorter overcharge sample, with trend factor is within *0.02 percent* of the estimate built off of the longer overcharge sample, without a trend factor. Thus, as a practical matter, my analysis shows that both methods yield comparable results, and one can use either approach to arrive at a reliable damages amount. Exhibit 11 shows damages by Class Health Plan for each of these two methods. Appendix F shows additional damage diagnostics.

---

[39] Actuarial Standards Board, "Actuarial Standard of Practice No. 8: Regulatory Filings for Health Benefits, Accident and Health Insurance, and Entities Providing Health Benefits," Doc. No. 176, Adopted March 2014, p. 5: "The actuary should consider historical experience trends when estimating future trends." Designated as a trial exhibit by Sutter, exchange no. 7008.

[40] ████████████████████████████████████████████████████████████████████████████

[41] Chipty Merits Rebuttal, Footnote 168 ("Axene Health Partners, LLC, "Trend Summary 2 20 2019.xlsx," February 20, 2019; and Axene Declaration, Footnote 30. Staff working under my direction confirmed that the trend factors reported in Mr. Axene's file are consistent with inpatient trend factors reported in rate filings submitted by Class Health Plans to California's DMHC and DOI for their individual and small group lines of business. *See* Chipty Workpapers").

**Exhibit 11**
**Aggregate Premium Damages for Health Plan Class Members**
**Attached to One of the Nine Rating Areas, Using In-Sample Estimates**

| Health Plan | Years | Using 2006 to 2017 Overcharge Estimates (Excluding Trend Factor) | Using 2009 to 2017 Overcharge Estimates (Including Trend Factor) |
|---|---|---|---|
| Anthem | 2011 - 2019 | $150,844,299 | $151,517,148 |
| Blue Shield | 2011 - 2019 | $198,415,530 | $194,561,735 |
| Health Net | 2011 - 2019 | $34,656,769 | $36,924,415 |
| Aetna | 2011 - 2019 | $13,325,381 | $14,231,320 |
| United | 2011 - 2019 | $23,438,853 | $23,193,898 |
| Total | 2011 - 2019 | $420,680,832 | $420,428,516 |

*Sources:*
1. Class Health Plan Claims and Premiums Data.
2. US Census Bureau Zip Code and County Data.
3. The Center for Consumer Information & Insurance Oversight: California Geographic Rating Areas.
4. AHP Trend Model Summary: 2003-2021 California Trends.

33.     There are many reasons why my damage methodology is conservative: (a) my damage estimate does not include damages before 2011 even though there is clear evidence, including my own econometric analysis, showing that Sutter overcharged Class Health Plans in the earlier years and that some amount of the overcharge was passed through to Class Members in earlier years;[42] (b) my analysis ignores the "umbrella" effect caused by Sutter pricing (*i.e.*, benchmark hospital prices would have been lower in the but-for world); (c) my analysis does not consider Sutter's conduct on elevated out-of-network inpatient prices or prices for outpatient and physician services; (d) my analysis does not consider claims for mental health and substance abuse; and (e) my calculation of the aggregate pass-through rate caps individual Class Health Plan pass-through rates at 100 percent, even though three of them exceeded 100 percent.

---

[42] While I was not able to quantify the passthrough for 2008 to 2011 using the MLR Data, I was able to demonstrate that substantial pass through did occur. *The fact of pass-through* is confirmed by Sutter's expert Dr. Willig and by Sutter's representative Robert Reed. *See,* e.g., Willig Supplemental Report Tables 1, 2, and 3. Across these three tables Dr. Willig presents 102 new passthrough estimates (not counting five estimates reproduced from my own previous report), only three of which are not positive and statistically significant. Moreover, after correcting these estimates to be expressed on a dollars-basis, they are in many cases indistinguishable from or even higher than my own pass-through estimates: *see* Chipty Passthrough Reply, ¶ 11. *See also* DEF001993774 and Chipty Class Report Exhibits 15 and 16.

34.     As an illustration, I have re-calculated aggregate damages by applying a weighted average pass-through rate, by weighting a pass-through rate by line-of-business, by Class Health Plan, as preferred by Dr. Willig. Exhibit 12 shows these different estimates graphically: the blue bar shows my baseline damage estimate, and the green and orange bars show the alternative damage estimate with and without capping pass-through at 100 percent, respectively. As seen here, my baseline estimate (blue bar) is within 0.1 percent of the green bar, and it is substantially below the orange bar.

**Exhibit 12**
**Refresh of Chipty Supplemental Reply Declaration Exhibit 8**
**Damage Estimates: Based on In-Sample Overcharges Estimates**



*Sources*: Anthem, Blue Shield, Health Net, Aetna, and United Claims and Premium Data; U.S. Census Bureau Zip Code and County Data; The Center for Consumer Information & Insurance Oversight: California Geographic RAs; AHP Trend Model Summary: 2003-2021 California Trends; and MLR Data, 2011-2019.

## VII.   Conclusions

35.     In this report, I present aggregate damages for the period 2011 to 2019 using my baseline methodology, and I extend premium damages to Q1 2020. Consistent with my prior reports, my updated econometric estimates of overcharge, that vary by Class Health Plan and Sutter Damage Hospital, show that Sutter has elevated hospital prices that have resulted in

significant overpayments by the Class Health Plans to Sutter. My updated pass-through analysis shows that Class Health Plans passed through virtually all (96.67 percent) of Sutter's elevated hospital prices to Class Members in the form of higher premiums. In updating my overcharge and passthrough estimates, I also refreshed many of the diagnostics I previously performed over the course of my prior reports.[43]

36.     The results of this exercise demonstrate the stability of my models and reinforce my prior opinions that: (a) Class Members have suffered common impact due to Sutter's elevated prices at the Sutter Damage Hospitals; and (b) a common method exists to reasonably approximate aggregate and individual Class Member damages. My updated calculation yields aggregate damages of $429 million, over the period January 2011 to March 2020. For the reasons I have explained, my updated damage estimates understate the true amount of damages flowing from Sutter's challenged contracting practices.

Tasneem Chipty, Ph.D.
March 12, 2021

---

[43] *See* Chipty Workpapers.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Appendix B: Materials Considered**

All materials cited in this report, all materials listed in Appendix B of Chipty SJ Declaration, Chipty Class Declaration, Chipty Reply Declaration, Chipty Merits Report, Chipty Merits Rebuttal Report, Chipty Supplemental Reply Report, Appendix A of Chipty Supplemental Report, Appendix C of Chipty Supplemental Declaration, and the following:

## I.      Legal Documents

- Order Granting Motion to Certify Class Under Rule 23(B)(3) and Denying Motion for Sanctions, Case 3:12-cv-04854-LB Document 823, July 30, 2020

- Order Granting Sutter's Motion for Summary Judgment For 2008 to 2010 and For the § 2 Claims and Otherwise Denying the Motion, Case 3:12-cv-04854-LB Document 838, March 9, 2021

## II.     Produced Documents

- DEF008230959
- DEF001785018
- DEF000000330
- DEF008231403
- DEF008231447
- DEF008231452
- DEF002435671
- BSC_UFCW00001143
- DEF008231504
- DEF000002121
- DEF000002504
- DEF002059588
- DEF000002593

- DEF000003014

- DEF008233208

**III.    Data Sources and Documentation**

- SIDIBE_ABC_0141067-068

- SIDIBE_ABC_0147746-749

- SUTTER_2018_2nd_qtr.txt

- SUTTER_2018_3rd_qtr.txt

- SUTTER_2018_4th_qtr.txt

- SUTTER_2019

- HN0029924-929

- UHC_Sidibe-0008895

- UHC_Sidibe-0008899-923

- AETNASIDIBE006-015

- AETNASIDIBE-0000001

- HN0029932-939

- HN0030044

- HN0030047-83

- HN0030186-189

- IFP-MBR-DMG-MED-1

- IFP-MBR-DMG-MED-10

- IFP-MBR-DMG-MED-11

- IFP-MBR-DMG-MED-12

- IFP-MBR-DMG-MED-13

- IFP-MBR-DMG-MED-14

- IFP-MBR-DMG-MED-15

- IFP-MBR-DMG-MED-16

- IFP-MBR-DMG-MED-17

- IFP-MBR-DMG-MED-18

- IFP-MBR-DMG-MED-19

- IFP-MBR-DMG-MED-2

- IFP-MBR-DMG-MED-20

- IFP-MBR-DMG-MED-21

- IFP-MBR-DMG-MED-22

- IFP-MBR-DMG-MED-23

- IFP-MBR-DMG-MED-24

- IFP-MBR-DMG-MED-25

- IFP-MBR-DMG-MED-26

- IFP-MBR-DMG-MED-27

- IFP-MBR-DMG-MED-28

- IFP-MBR-DMG-MED-3

- IFP-MBR-DMG-MED-4

- IFP-MBR-DMG-MED-5

- IFP-MBR-DMG-MED-6

- IFP-MBR-DMG-MED-7

- IFP-MBR-DMG-MED-8

- IFP-MBR-DMG-MED-9

- IFP-MBR-DMG-MED-MISC

- IFP-MBR-DMG-MED

- SUTTER_IFP_BillingPrem_Apr_18

- SUTTER_IFP_BillingPrem_Apr_19

- SUTTER_IFP_BillingPrem_Apr_20

- SUTTER_IFP_BillingPrem_Aug_18

- SUTTER_IFP_BillingPrem_Aug_19

- SUTTER_IFP_BillingPrem_Dec_18

- SUTTER_IFP_BillingPrem_Dec_19

- SUTTER_IFP_BillingPrem_Feb_18

- SUTTER_IFP_BillingPrem_Feb_19

- SUTTER_IFP_BillingPrem_Feb_20

- SUTTER_IFP_BillingPrem_Jan_18

- SUTTER_IFP_BillingPrem_Jan_19

- SUTTER_IFP_BillingPrem_Jan_20

- SUTTER_IFP_BillingPrem_Jul_18

- SUTTER_IFP_BillingPrem_Jul_19

- SUTTER_IFP_BillingPrem_Jun_18

- SUTTER_IFP_BillingPrem_Jun_19

- SUTTER_IFP_BillingPrem_Jun_20

- SUTTER_IFP_BillingPrem_Mar_18

- SUTTER_IFP_BillingPrem_Mar_19

- SUTTER_IFP_BillingPrem_Mar_20

- SUTTER_IFP_BillingPrem_May_18

- SUTTER_IFP_BillingPrem_May_19

- SUTTER_IFP_BillingPrem_May_20

- SUTTER_IFP_BillingPrem_Nov_18

- SUTTER_IFP_BillingPrem_Nov_19

- SUTTER_IFP_BillingPrem_Oct_18

- SUTTER_IFP_BillingPrem_Oct_19

- SUTTER_IFP_BillingPrem_Sep_18

- SUTTER_IFP_BillingPrem_Sep_19

- HN0030190-194

- HN0030195-318

- SIDIBE_ABC_0147751

- SIDIBE_ABC_0147752

- HN0030319-322

- FI_Payment-DT_Apr_18

- FI_Payment-DT_Apr_19

- FI_Payment-DT_Apr_20

- FI_Payment-DT_Aug_18

- FI_Payment-DT_Aug_19

- FI_Payment-DT_Dec_18

- FI_Payment-DT_Dec_19

- FI_Payment-DT_Feb_18

- FI_Payment-DT_Feb_19

- FI_Payment-DT_Feb_20

- FI_Payment-DT_Jan_18

- FI_Payment-DT_Jan_19

- FI_Payment-DT_Jan_20

- FI_Payment-DT_Jul_18

- FI_Payment-DT_Jul_19

- FI_Payment-DT_Jun_18

- FI_Payment-DT_Jun_19

- FI_Payment-DT_Jun_20

- FI_Payment-DT_Mar_18

- FI_Payment-DT_Mar_19

- FI_Payment-DT_Mar_20

- FI_Payment-DT_May_18

- FI_Payment-DT_May_19

- FI_Payment-DT_May_20

- FI_Payment-DT_Nov_18

- FI_Payment-DT_Nov_19

- FI_Payment-DT_Oct_18

- FI_Payment-DT_Oct_19

- FI_Payment-DT_Sep_18

- FI_Payment-DT_Sep_19

- Local_Area_Unemployment_Statistics__LAUS_

- CMS-1694-F Table 5

- Hospital_2016.mdb

- Hospital_2017.mdb

- FY 2016 FR and CN Impact PUF

- FY 2017 FR and CN Impact File

- FY 2018 FR and CN Impact File

- Axene Health Partners (AHP) Trend Model Summary: 2003-2021 California Trends

- MLR_DataDictionaryPUF

- MR_Submission_Row_Lookup

- MR_Submission_Sheet_Lookup

- MR_Submission_Template_Header

- Part1_2_Summary_Data_Premium_Claims

- Part3_MLR_Rebate_Calculation

- Part4_Rebate_Disbursement

- Part4_Rebate_Disbursement_Notes

- Part5_Additional_Responses1

- Part5_Additional_Responses2

- Part6_Expense_Allocation

## IV.   Articles and Books

- Mathews, Anna Wilde, Tom McGinty, and Melanie Evans, "How Much Does a C-Section Cost? At One Hospital, Anywhere From $6,241 to $60,584." *The Wall Street Journal*, February 11, 2021. Available online at https://www.wsj.com/articles/how-much-does-a-c-section-cost-at-one-hospital-anywhere-from-6-241-to-60-584-11613051137, site accessed March 11, 2021.

- Gujarati, Damodar and Dawn Porter, *Basic Econometrics* 5th Ed. Boston, MA: McGraw-Hill, p. 835.

## V.    Other Materials Considered

- Actuarial Standards Board, "Actuarial Standard of Practice No. 8: Regulatory Filings for Health Benefits, Accident and Health Insurance, and Entities Providing Health Benefits," Doc. No. 176, Adopted March 2014

- Sutter Health, "Healthcare Cost Transparency," available at https://www.sutterhealth.org/for-patients/healthcare-cost-transparency, site accessed March 9, 2021.

**Appendix C: Analyses Related to 2009 to 2017 Overcharge Estimation**

**Exhibit C1**
**Updated Merits Report Exhibit 24**
**Comparison of Covariate Parameter Estimates and 90 Percent Confidence Intervals**
**Based on Models Estimated Separately by Class Health Plan**
**2009-2017**



*Notes:*

1. Parameter estimates measure each variable's unit association with the log of mix-adjusted hospital price.

2. These estimates are based on in-network, fully-insured, commercial claims for each Class Health Plan occurring at the Sutter Damage Hospitals and benchmark hospitals in Northern California. *See* Appendices H and I for more details on data processing.

*Sources:*

1. OSHPD Hospital Annual Financial Disclosure Data, 2009-2017.

2. Centers for Medicare & Medicaid Services (CMS) Impact Files and Hospital Compare Data, 2009-2017.

3. Anthem, Blue Shield, Aetna, Health Net and United Claims Data, 2009-2017.

4. Google Maps Distance Matrix API.

5. National Bureau of Economic Research NPI to Medicare CCN Crosswalk.

**Exhibit C2**
**Updated Merits Report Exhibit J1**
**Overcharge Estimates by Health Plan**
**Based on Pooled In-Sample Model**
**2009-2017**

| Hospital | Anthem | Blue Shield | Aetna | United | Health Net |
|----------|--------|-------------|-------|--------|------------|
| Alta Bates-Main | 44% *** | 31% *** | 32% *** | 54% *** | 18% ** |
| Alta Bates-Summit | 70% *** | 68% *** | 84% *** | 78% *** | 45% *** |
| Sutter Sacramento | 43% *** | 53% *** | 48% *** | 41% *** | 78% *** |
| CPMC-Main | 30% *** | 25% *** | 34% *** | 27% *** | 21% ** |
| CPMC-St. Luke's | 12% | 11% | 24% ** | 1% | -2% |
| Sutter Modesto | 41% *** | 21% *** | 19% *** | 21% *** | 8% |

*Notes:*

1. These estimates are based on in-network, fully-insured, commercial claims for each Health Plan occurring at general acute care hospitals in Northern California. See Appendices H and I for more detail on data processing.

2. Asterisks *, **, *** represent statistical significance at ten percent, five percent, and one percent levels.

*Sources:*

1. OSHPD Hospital Annual Financial Disclosure Data, 2009-2017.

2. Centers for Medicare & Medicaid Services (CMS) Impact Files and Hospital Compare Data, 2009-2017.

3. Anthem, Blue Shield and United Claims Data, 2009-2017. Aetna and Health Net Claims Data, 2009-2017.

4. Google Maps Distance Matrix API.

5. National Bureau of Economic Research (NBER) NPI to Medicare CCN Crosswalk.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      C-2

**Exhibit C3**
**Updated Merits Report Exhibit J2**
**Overcharge Estimates for Anthem**
**Pooled Model**
**2009-2017**

| Hospital | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | In-Sample 2009-2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Alta Bates-Main | 68% *** | 43% *** | 32% *** | 28% *** | 25% *** | 135% *** | 86% *** | 14% | 16% * | 44% *** |
| Alta Bates-Summit | 117% *** | 119% *** | 93% *** | 111% *** | 111% *** | 8% | 29% *** | 119% *** | 81% *** | 70% *** |
| Sutter Sacramento | 40% *** | 58% *** | 59% *** | 68% *** | 33% *** | 17% ** | 27% *** | 32% *** | 48% *** | 43% *** |
| CPMC-Main | 37% *** | 33% *** | 34% *** | 42% *** | 24% ** | 31% ** | 15% | 32% *** | 17% | 30% *** |
| CPMC-St. Luke's | 16% | 53% *** | -3% | 13% | 16% | 9% | 8% | 14% | -14% | 12% |
| Sutter Modesto | 53% *** | 49% *** | 35% *** | 69% *** | 29% *** | 25% *** | 42% *** | 49% *** | 30% *** | 41% *** |

*Notes: See* notes for Exhibit C2.

*Sources: See* sources for Exhibit C2.

**Exhibit C4**
**Updated Merits Report Exhibit J3**
**Overcharge Estimates for Blue Shield**
**Pooled Model**
**2009-2017**

| Hospital | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | In-Sample 2009-2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Alta Bates-Main | 41% *** | 40% *** | 20% ** | 40% *** | 16% * | 114% *** | 62% *** | -6% | 1% | 31% *** |
| Alta Bates-Summit | 140% *** | 145% *** | 118% *** | 114% *** | 99% *** | 20% *** | 3% | 61% *** | 81% *** | 68% *** |
| Sutter Sacramento | 100% *** | 71% *** | 84% *** | 72% *** | 55% *** | 32% *** | 41% *** | 4% | 30% *** | 53% *** |
| CPMC-Main | 44% *** | 42% *** | 41% *** | 34% *** | 24% ** | 21% * | 11% | 4% | 1% | 25% *** |
| CPMC-St. Luke's | 11% | 14% | 63% *** | 2% | 0% | 12% | 8% | -4% | -4% | 11% |
| Sutter Modesto | 25% *** | 22% *** | 21% *** | 24% *** | 25% *** | 14% ** | 27% *** | 11% | 23% *** | 21% *** |

*Notes: See* notes for Exhibit C2.

*Sources: See* sources for Exhibit C2.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     C-4

**Exhibit C5**
**Updated Merits Report Exhibit J4**
**Overcharge Estimates for Aetna**
**Pooled Model**
**2009-2017**

| | | | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|
| **Hospital** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2009-2017** |
| Alta Bates-Main | 27% ** | 10% | 9% | 48% *** | -13% * | 136% *** | 82% *** | 18% * | 32% *** | 32% *** |
| Alta Bates-Summit | 92% *** | 135% *** | 112% *** | 133% *** | 90% *** | 27% *** | 39% *** | 123% *** | 177% *** | 84% *** |
| Sutter Sacramento | 49% *** | 48% *** | 33% *** | 70% *** | 37% *** | 65% *** | 54% *** | 36% *** | 27% *** | 48% *** |
| CPMC-Main | 14% | 50% *** | 14% | 49% *** | 10% | 32% ** | 34% *** | 30% ** | 82% *** | 34% *** |
| CPMC-St. Luke's | 4% | 10% | 88% *** | 40% *** | 23% * | -3% | 12% | 22% | 35% *** | 24% ** |
| Sutter Modesto | -1% | 0% | 58% *** | 33% *** | 21% *** | 8% | 14% | 30% *** | 29% *** | 19% *** |

*Notes: See* notes for Exhibit C2.

*Sources: See* sources for Exhibit C2.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit C6**
**Updated Merits Report Exhibit J5**
**Overcharge Estimates for United**
**Pooled Model**
**2009-2017**

| Hospital | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | In-Sample 2009-2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Alta Bates-Main | 135% *** | -9% | 54% *** | 19% * | 47% *** | 206% *** | 147% *** | 29% *** | -2% | 54% *** |
| Alta Bates-Summit | 181% *** | 95% *** | 115% *** | 192% *** | 87% *** | 28% *** | 26% *** | 77% *** | 83% *** | 78% *** |
| Sutter Sacramento | 107% *** | 68% *** | 39% *** | 36% *** | 21% ** | 7% | 39% *** | 44% *** | 16% | 41% *** |
| CPMC-Main | 52% *** | 44% *** | 5% | 20% | 6% | 53% *** | 12% | -4% | 63% *** | 27% *** |
| CPMC-St. Luke's | 13% | -7% | -13% | 14% | -9% | 18% | 12% | -5% | -16% | 1% |
| Sutter Modesto | 40% *** | 14% | 25% ** | 68% *** | 25% *** | 11% | 9% | 12% | -1% | 21% *** |

*Notes: See* notes for Exhibit C2.

*Sources: See* sources for Exhibit C2.

**Exhibit C7**
**Updated Merits Report Exhibit J6**
**Overcharge Estimates for Health Net**
**Pooled Model**
**2009-2017**

| Hospital | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | In-Sample 2009-2017 |
|---|---|---|---|---|---|---|---|---|---|---|
| Alta Bates-Main | 11% | 14% | -1% | 18% * | 10% | 90% *** | 54% *** | -7% | 10% | 18% ** |
| Alta Bates-Summit | 59% *** | 77% *** | 85% *** | 99% *** | 45% *** | 18% ** | -1% | 56% *** | 93% *** | 45% *** |
| Sutter Sacramento | 116% *** | 75% *** | 80% *** | 56% *** | 38% *** | 22% ** | 71% *** | 156% *** | 110% *** | 78% *** |
| CPMC-Main | 32% *** | 5% | 11% | 23% * | 21% * | 37% *** | 33% ** | 18% | 5% | 21% ** |
| CPMC-St. Luke's | -15% | 7% | -13% | 10% | -14% | 13% | -2% | -17% | 15% | -2% |
| Sutter Modesto | 44% *** | 11% | 14% | 11% | -9% | 18% ** | -14% ** | 3% | 13% | 8% |

*Notes: See* notes for Exhibit C2.

*Sources: See* sources for Exhibit C2.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA      C-7

**Exhibit C8**
**Comparison of 2006-2015 and 2009-2017 Overcharge Estimates**
**Based on Combined (In Sample) Model for Alta Bates – Main**



*Note:* Model estimates displayed along with their 90 percent confidence intervals. Transparency indicates results not significant at the ten percent level.

*Sources: See* Chipty Merits Report and sources for Exhibit C2.

**Exhibit C9**
**Comparison of 2006-2015 and 2009-2017 Overcharge Estimates**
**Based on Combined (In Sample) Model for Alta Bates – Summit**



*Note:* Model estimates displayed along with their 90 percent confidence intervals. Transparency indicates results not significant at the ten percent level.

*Sources: See* Chipty Merits Report and sources for Exhibit C2.

**Exhibit C10**
**Comparison of 2006-2015 and 2009-2017 Overcharge Estimates**
**Based on Combined (In Sample) Model for CPMC – St. Luke's**



*Note:* Model estimates displayed along with their 90 percent confidence intervals. Transparency indicates results not significant at the ten percent level.

*Sources: See* Chipty Merits Report and sources for Exhibit C2.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit C11**
**Comparison of 2006-2015 and 2009-2017 Overcharge Estimates**
**Based on Combined (In Sample) Model for Sutter Modesto**



*Note:* Model estimates displayed along with their 90 percent confidence intervals. Transparency indicates results not significant at the ten percent level.

*Sources: See* Chipty Merits Report and sources for Exhibit C2.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    C-11

**Exhibit C12**
**Comparison of 2006-2015 and 2009-2017 Overcharge Estimates**
**Based on Combined (In Sample) Model for Sutter Sacramento**



*Note:* Model estimates displayed along with their 90 percent confidence intervals. Transparency indicates results not significant at the ten percent level.

*Sources: See* Chipty Merits Report and sources for Exhibit C2.

**Appendix D: Analyses Related to 2006 to 2017 Overcharge Estimation**

**Exhibit D1**
**Updated Merits Report Exhibit 24**
**Comparison of Covariate Parameter Estimates and 90 Percent Confidence Intervals**
**Based on Models Estimated Separately by Class Health Plan**
**2006-2017**



*Notes:*

1. Parameter estimates measure each variable's unit association with the log of mix-adjusted hospital price.
2. These estimates are based on in-network, fully-insured, commercial claims for each Class Health Plan occurring at the Sutter Damage Hospitals and benchmark hospitals in Northern California. *See* Appendices H and I for more details on data processing.

*Sources:*

1. OSHPD Hospital Annual Financial Disclosure Data, 2006-2017.
2. Centers for Medicare & Medicaid Services (CMS) Impact Files and Hospital Compare Data, 2006-2017.
3. Anthem, Blue Shield, and United Claims Data, 2006-2017. Aetna and Health Net Claims Data 2008-2017.
4. Google Maps Distance Matrix API.
5. National Bureau of Economic Research NPI to Medicare CCN Crosswalk.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    D-1

**Exhibit D2**
**Updated Merits Report Exhibit J1**
**Overcharge Estimates by Health Plan**
**Based on Pooled In-Sample Model**
**2006-2017**

| Hospital | Anthem | Blue Shield | Aetna | United | Health Net |
|---|---|---|---|---|---|
| Alta Bates-Main | 60% *** | 44% *** | 36% *** | 69% *** | 23% *** |
| Alta Bates-Summit | 75% *** | 74% *** | 87% *** | 100% *** | 42% *** |
| Sutter Sacramento | 63% *** | 64% *** | 52% *** | 56% *** | 88% *** |
| CPMC-Main | 33% *** | 30% *** | 37% *** | 30% *** | 22% *** |
| CPMC-St. Luke's | 11% | 14% * | 28% *** | -4% | 1% |
| Sutter Modesto | 48% *** | 25% *** | 23% *** | 16% *** | 9% |

*Notes:*

1. These estimates are based on in-network, fully-insured, commercial claims for each Health Plan occurring at general acute care hospitals in Northern California. See Appendices H and I for more detail on data processing.

2. Asterisks *, **, *** represent statistical significance at ten percent, five percent, and one percent levels.

*Sources:*

1. OSHPD Hospital Annual Financial Disclosure Data, 2006-2017.

2. Centers for Medicare & Medicaid Services (CMS) Impact Files and Hospital Compare Data, 2006-2017.

3. Anthem, Blue Shield and United Claims Data, 2006-2017. Aetna and Health Net Claims Data, 2008-2017.

4. Google Maps Distance Matrix API.

5. National Bureau of Economic Research (NBER) NPI to Medicare CCN Crosswalk.

**Exhibit D3**
**Updated Merits Report Exhibit J2**
**Overcharge Estimates for Anthem**
**Pooled Model**
**2006-2017**

| Hospital | | | | | | Out of Sample | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2006-2017 |
| Alta Bates-Main | 127% *** | 50% *** | 89% *** | 79% *** | 53% *** | 41% *** | 37% *** | 34% *** | 131% *** | 84% *** | 23% ** | 24% ** | 60% *** |
| Alta Bates-Summit | 181% *** | 54% *** | 109% *** | 111% *** | 114% *** | 89% *** | 107% *** | 107% *** | 8% | 29% *** | 113% *** | 76% *** | 75% *** |
| Sutter Sacramento | 167% *** | 66% *** | 96% *** | 47% *** | 66% *** | 67% *** | 76% *** | 41% *** | 24% *** | 34% *** | 39% *** | 56% *** | 63% *** |
| CPMC-Main | 80% *** | 4% | 24% *** | 35% *** | 36% *** | 37% *** | 46% *** | 28% ** | 35% *** | 19% * | 36% *** | 21% * | 33% *** |
| CPMC-St. Luke's | 9% | 12% | -21% ** | 19% * | 58% *** | 0% | 17% | 20% * | 13% | 11% | 18% | -11% | 11% |
| Sutter Modesto | 130% *** | 38% *** | 65% *** | 52% *** | 48% *** | 35% *** | 69% *** | 29% *** | 25% *** | 41% *** | 48% *** | 29% *** | 48% *** |

*Notes: See* notes for Exhibit D2.

*Sources: See* sources for Exhibit D2.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit D4**
**Updated Merits Report Exhibit J3**
**Overcharge Estimates for Blue Shield**
**Pooled Model**
**2006-2017**

| Hospital | Out of Sample | | | | | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2006-2017 |
| Alta Bates-Main | 63% *** | 55% *** | 66% *** | 50% *** | 49% *** | 29% *** | 50% *** | 24% ** | 110% *** | 60% *** | 1% | 9% | 44% *** |
| Alta Bates-Summit | 109% *** | 102% *** | 126% *** | 133% *** | 139% *** | 113% *** | 110% *** | 96% *** | 20% *** | 3% | 56% *** | 76% *** | 74% *** |
| Sutter Sacramento | 93% *** | 35% *** | 92% *** | 109% *** | 80% *** | 94% *** | 81% *** | 64% *** | 40% *** | 49% *** | 10% | 37% *** | 64% *** |
| CPMC-Main | 28% *** | 15% ** | 61% *** | 43% *** | 45% *** | 45% *** | 38% *** | 28% ** | 24% ** | 14% | 7% | 3% | 30% *** |
| CPMC-St. Luke's | 9% | -4% | 37% *** | 14% | 18% * | 68% *** | 6% | 4% | 15% | 12% | 0% | -1% | 14% * |
| Sutter Modesto | 34% *** | 51% *** | 44% *** | 25% *** | 20% *** | 20% *** | 24% *** | 25% *** | 14% ** | 26% *** | 11% | 22% *** | 25% *** |

*Notes: See* notes for Exhibit D2.

*Sources: See* sources for Exhibit D2.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit D5**
**Updated Merits Report Exhibit J4**
**Overcharge Estimates for Aetna**
**Pooled Model**
**2006-2017**

| Hospital | Out of Sample | | | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2008-2017 |
| Alta Bates-Main | 21% * | 35% *** | 17% | 16% * | 58% *** | -7% | 131% *** | 79% *** | 27% ** | 41% *** | 36% *** |
| Alta Bates-Summit | 154% *** | 86% *** | 129% *** | 106% *** | 127% *** | 86% *** | 27% *** | 38% *** | 117% *** | 169% *** | 87% *** |
| Sutter Sacramento | 27% ** | 56% *** | 55% *** | 40% *** | 78% *** | 45% *** | 75% *** | 62% *** | 44% *** | 34% *** | 52% *** |
| CPMC-Main | 36% *** | 12% | 52% *** | 16% | 52% *** | 12% | 35% *** | 38% *** | 34% *** | 86% *** | 37% *** |
| CPMC-St. Luke's | 0% | 6% | 13% | 93% *** | 43% *** | 27% ** | 0% | 15% | 26% ** | 40% *** | 28% *** |
| Sutter Modesto | 78% *** | -2% | -2% | 57% *** | 32% *** | 20% *** | 7% | 12% | 29% *** | 28% *** | 23% *** |

*Notes: See* notes for Exhibit D2.

*Sources: See* sources for Exhibit D2.

**Exhibit D6**
**Updated Merits Report Exhibit J5**
**Overcharge Estimates for United**
**Pooled Model**
**2006-2017**

| Hospital | Out of Sample | | | | | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2006-2017 |
| Alta Bates-Main | 88% *** | 97% *** | 88% *** | 149% *** | -4% | 64% *** | 27% *** | 57% *** | 199% *** | 142% *** | 39% *** | 6% | 69% *** |
| Alta Bates-Summit | 518% *** | 187% *** | 74% *** | 172% *** | 89% *** | 110% *** | 186% *** | 84% *** | 27% *** | 26% *** | 72% *** | 78% *** | 100% *** |
| Sutter Sacramento | 188% *** | 41% *** | 48% *** | 117% *** | 75% *** | 46% *** | 43% *** | 28% *** | 13% | 46% *** | 52% *** | 22% ** | 56% *** |
| CPMC-Main | 24% | 45% *** | 27% ** | 50% *** | 46% *** | 7% | 23% ** | 9% | 57% *** | 15% | -1% | 68% *** | 30% *** |
| CPMC-St. Luke's | -9% | -58% *** | 15% | 15% | -5% | -10% | 17% | -6% | 22% * | 15% | -2% | -13% | -4% |
| Sutter Modesto | -26% ** | 43% *** | 16% | 39% *** | 13% | 24% ** | 67% *** | 25% *** | 11% | 8% | 12% | -2% | 16% *** |

*Notes: See* notes for Exhibit D2.

*Sources: See* sources for Exhibit D2.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     D-6

**Exhibit D7**
**Updated Merits Report Exhibit J6**
**Overcharge Estimates for Health Net**
**Pooled Model**
**2006-2017**

| Hospital | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | In-Sample 2008-2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alta Bates-Main | 18% * | 17% * | 21% ** | 6% | 26% *** | 18% ** | 85% *** | 51% *** | -1% | 18% * | 23% *** |
| Alta Bates-Summit | 35% ** | 54% *** | 72% *** | 80% *** | 94% *** | 42% *** | 18% ** | -2% | 51% *** | 87% *** | 42% *** |
| Sutter Sacramento | 97% *** | 125% *** | 83% *** | 90% *** | 63% *** | 46% *** | 29% *** | 80% *** | 170% *** | 120% *** | 88% *** |
| CPMC-Main | 15% * | 29% *** | 7% | 14% | 25% ** | 24% ** | 40% *** | 36% *** | 21% * | 7% | 22% *** |
| CPMC-St. Luke's | -5% | -13% | 10% | -10% | 13% | -11% | 16% | 1% | -14% | 18% | 1% |
| Sutter Modesto | 16% * | 42% *** | 10% | 13% | 10% | -9% | 17% ** | -15% ** | 2% | 12% | 9% |

*Notes: See* notes for Exhibit D2.

*Sources: See* sources for Exhibit D2.

**Exhibit D8**
**Comparison of 2006-2015 and 2006-2017 Overcharge Estimates**
**Based on Combined (In Sample) Model for Alta Bates – Main**



*Note:* Model estimates displayed along with their 90 percent confidence intervals. Transparency indicates results not significant at the ten percent level.

*Sources: See* Chipty Merits Report and sources for Exhibit D2.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    D-8

**Exhibit D9**
**Comparison of 2006-2015 and 2006-2017 Overcharge Estimates**
**Based on Combined (In Sample) Model for Alta Bates – Summit**



*Note:* Model estimates displayed along with their 90 percent confidence intervals. Transparency indicates results not significant at the ten percent level.

*Sources: See* Chipty Merits Report and sources for Exhibit C2.

**Exhibit D10**
**Comparison of 2006-2015 and 2006-2017 Overcharge Estimates**
**Based on Combined (In Sample) Model for CPMC – Main**



*Note:* Model estimates displayed along with their 90 percent confidence intervals. Transparency indicates results not significant at the ten percent level.

*Sources: See* Chipty Merits Report and sources for Exhibit C2.

**Exhibit D11**
**Comparison of 2006-2015 and 2006-2017 Overcharge Estimates**
**Based on Combined (In Sample) Model for CPMC – St. Luke's**



*Note:* Model estimates displayed along with their 90 percent confidence intervals. Transparency indicates results not significant at the ten percent level.

*Sources: See* Chipty Merits Report and sources for Exhibit C2.

**Exhibit D12**
**Comparison of 2006-2015 and 2006-2017 Overcharge Estimates**
**Based on Combined (In Sample) Model for Sutter Modesto**



*Note:* Model estimates displayed along with their 90 percent confidence intervals. Transparency indicates results not significant at the ten percent level.

*Sources: See* Chipty Merits Report and sources for Exhibit C2.

**Exhibit D13**
**Comparison of 2006-2015 and 2006-2017 Overcharge Estimates**
**Based on Combined (In Sample) Model for Sutter Sacramento**



*Note:* Model estimates displayed along with their 90 percent confidence intervals. Transparency indicates results not significant at the ten percent level.

*Sources: See* Chipty Merits Report and sources for Exhibit C2.

## Appendix E: Updated Passthrough Analyses

### Exhibit E1
### Updated Passthrough Reply Exhibit 3
### Dr. Willig's Pass-Through Estimates
### Calculated on a Dollar Basis
### 2011-2019



*Note*: The gray line associated with each bar reflects the 95 percent confidence interval.
*Source*: MLR Data, 2011-2019.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     E-1

**Exhibit E2**
**Updated Passthrough Report Exhibit D1**
**MLR Regression Results and Sensitivities at Plan-Level**
**2011-2019**

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| | | | Add Kaiser | | Add HHI | | Use Ln Prem | Remove MLR | |
| | | Add Kaiser | Cost with | Add Kaiser | with | Plan - LOB - | Earned as Dep | Rebates from | Drop Linear |
| | Baseline | Cost | Interactions | Share | Interactions | DMHC FEs | Var | Prem | Time Trend |
| **Log PMPM Cost X Plan** | | | | | | | | | |
| Log PMPM Cost X Anthem | 0 830*** | 0 823*** | 0 806*** | 0 821*** | -0 285 | 0 851*** | 0 898*** | 0 827*** | 0 886*** |
| Log PMPM Cost X Blue Shield | 0 780*** | 0 771*** | 0 747*** | 0 765*** | -0 350 | 0 800*** | 0 909*** | 0 787*** | 0 841*** |
| Log PMPM Cost X Health Net | 0 732*** | 0 733*** | 0 733*** | 0 730*** | -0 370 | 0 729*** | 0 859*** | 0 733*** | 0 752*** |
| Log PMPM Cost X Aetna | 0 814*** | 0 817*** | 0 807*** | 0 812*** | -0 296 | 0 809*** | 0 938*** | 0 798*** | 0 881*** |
| Log PMPM Cost X United | 0 822*** | 0 822*** | 0 820*** | 0 845*** | -0 262 | 0 842*** | 0 869*** | 0 826*** | 0 860*** |
| **Line of Business Fixed Effects** | | | | | | | | | |
| Individual | -0 025 | 0 013 | -1 077 | 0 405*** | 0 001 | | 0 003 | -0 028 | -0 029 |
| Small Group | 0 078*** | 0 184*** | -0 231 | 0 335*** | 0 097*** | | 0 086*** | 0 072*** | 0 076*** |
| **DMHC Fixed Effect** | 0 033** | 0 034** | 1 241* | 0 034** | 0 026** | | 0 005 | 0 031** | 0 030** |
| **Kaiser Costs** | | | | | | | | | |
| Ln Kaiser Costs PMPM | | 0 679 | 0 662 | | | | | | |
| Ln Kaiser Costs PMPM X Individual | | | 0 185 | | | | | | |
| Ln Kaiser Costs PMPM X Small Group | | | 0 069 | | | | | | |
| Ln Kaiser Costs PMPM X DMHC | | | -0 206* | | | | | | |
| **Additional Controls** | | | | | | | | | |
| Kaiser Share | | | | 0 019*** | | | | | |
| HHI Incl Kaiser | | | | | -2 327*** | | | | |
| Log PMPM Cost X HHI Incl Kaiser | | | | | 0 405*** | | | | |
| **Plan Fixed Effects?** | Yes | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes |
| **Plan X LOB X Regulator Fixed Effects?** | No | No | No | No | No | Yes | No | No | No |
| **Linear Time Trend?** | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No |
| **Observations** | 240 | 240 | 240 | 240 | 240 | 240 | 240 | 240 | 240 |
| **Adj. R-squared** | 0 866 | 0 868 | 0 868 | 0 871 | 0 883 | 0 903 | 0 943 | 0 865 | 0 858 |
| **Pass-Through on a Dollars-Basis** | | | | | | | | | |
| **Anthem** | 1 035*** | 1 026*** | 1 004*** | 1 023*** | 0 966*** | 1 061*** | 1 135*** | 1 028*** | 1 104*** |
| **Blue Shield** | 0 955*** | 0 944*** | 0 915*** | 0 936*** | 0 873*** | 0 979*** | 1 133*** | 0 959*** | 1 029*** |
| **Health Net** | 0 850*** | 0 849*** | 0 850*** | 0 847*** | 0 795*** | 0 845*** | 1 011*** | 0 850*** | 0 873*** |
| **Aetna** | 1 030*** | 1 034*** | 1 021*** | 1 028*** | 0 959*** | 1 024*** | 1 183*** | 1 006*** | 1 114*** |
| **United** | 1 011*** | 1 011*** | 1 010*** | 1 039*** | 0 989*** | 1 036*** | 1 065*** | 1 015*** | 1 058*** |

*Note*: Asterisks *, **, *** represent statistical significance at ten percent, five percent, and one percent levels.
*Source*: MLR Data, 2011-2019.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

## Exhibit E3
## Updated Passthrough Report Exhibit D2
### MLR Regression Results and Sensitivities at Plan-LOB Level
### 2011-2019

| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|---|
| | | | Add Kaiser | | Add HHI | | Use Ln Prem | Remove MLR | |
| | | Add Kaiser | Cost with | Add Kaiser | with | Plan - LOB - | Earned as Dep | Rebates from | Drop Linear |
| | Baseline | Cost | Interactions | Share | Interactions | DMHC FEs | Var | Prem | Time Trend |
| **Log PMPM Cost $X$ Plan** | | | | | | | | | |
| Log PMPM Cost $X$ Anthem | 1 125*** | 1 108*** | 1 130*** | 1 105*** | -0 269 | 1 113*** | 1 012*** | 1 121*** | 1 172*** |
| Log PMPM Cost $X$ Blue Shield | 1 029*** | 1 013*** | 1 009*** | 1 006*** | -0 375 | 1 004*** | 1 011*** | 1 035*** | 1 080*** |
| Log PMPM Cost $X$ Health Net | 0 893*** | 0 888*** | 0 920*** | 0 886*** | -0 446 | 0 894*** | 0 923*** | 0 894*** | 0 912*** |
| Log PMPM Cost $X$ Aetna | 1 008*** | 1 001*** | 1 020*** | 0 995*** | -0 383 | 1 034*** | 1 001*** | 0 994*** | 1 057*** |
| Log PMPM Cost $X$ United | 0 958*** | 0 954*** | 0 996*** | 0 977*** | -0 339 | 0 925*** | 0 925*** | 0 962*** | 0 990*** |
| **Line of Business Fixed Effects** | | | | | | | | | |
| Individual | 1 939*** | 1 940*** | -2 290 | 2 350*** | 1 724*** | | 0 881*** | 1 923*** | 2 028*** |
| Small Group | 1 042*** | 0 938*** | -0 524 | 1 037*** | -0 513 | | -0 124 | 1 107*** | 0 845*** |
| **Log PMPM Cost $X$ Line of Business Fixed Effects** | | | | | | | | | |
| Log PMPM Cost $X$ Individual | -0 338*** | -0 332*** | -0 393*** | -0 334*** | -0 299*** | -0 314*** | -0 151*** | -0 336*** | -0 354*** |
| Log PMPM Cost $X$ Small Group | -0 167*** | -0 132*** | -0 149*** | -0 121*** | 0 096 | -0 244*** | 0 036 | -0 179*** | -0 133*** |
| **DMHC Fixed Effect** | 0 036*** | 0 038*** | 1 094* | 0 038*** | 0 038*** | | 0 011 | 0 034** | 0 036*** |
| **Kaiser Costs** | | | | | | | | | |
| Ln Kaiser Costs PMPM | | 0 619* | 0 169 | | | | | | |
| Ln Kaiser Costs PMPM $X$ Individual | | | 0 776*** | | | | | | |
| Ln Kaiser Costs PMPM $X$ Small Group | | | 0 256 | | | | | | |
| Ln Kaiser Costs PMPM $X$ DMHC | | | -0 180* | | | | | | |
| **Additional Controls** | | | | | | | | | |
| Kaiser Share | | | | 0 019*** | | | | | |
| HHI Incl Kaiser | | | | | -2 833*** | | | | |
| Log PMPM Cost $X$ HHI Incl Kaiser | | | | | 0 478*** | | | | |
| **Plan Fixed Effects?** | Yes | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes |
| **Plan $X$ LOB $X$ Regulator Fixed Effects?** | No | No | No | No | No | Yes | No | No | No |
| **Linear Time Trend?** | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | No |
| **Observations** | 240 | 240 | 240 | 240 | 240 | 240 | 240 | 240 | 240 |
| Adj. R-squared | 0 893 | 0 895 | 0 901 | 0 898 | 0 910 | 0 922 | 0 950 | 0 892 | 0 889 |
| *Pass-Through on a Dollars-Basis* | | | | | | | | | |
| Anthem - Individual | 1 000*** | 0 987*** | 0 938*** | 0 981*** | 0 898*** | 1 017*** | 1 103*** | 0 999*** | 1 041*** |
| Anthem - Small Group | 1 207*** | 1 230*** | 1 236*** | 1 240*** | 1 132*** | 1 096*** | 1 370*** | 1 179*** | 1 309*** |
| Anthem - Large Group | 1 362*** | 1 342*** | 1 368*** | 1 338*** | 1 348*** | 1 348*** | 1 226*** | 1 358*** | 1 420*** |
| Blue Shield - Individual | 0 823*** | 0 811*** | 0 734*** | 0 801*** | 0 716*** | 0 823*** | 1 066*** | 0 829*** | 0 865*** |
| Blue Shield - Small Group | 1 114*** | 1 139*** | 1 111*** | 1 144*** | 1 026*** | 0 984*** | 1 370*** | 1 098*** | 1 225*** |
| Blue Shield - Large Group | 1 238*** | 1 219*** | 1 214*** | 1 211*** | 1 213*** | 1 209*** | 1 215*** | 1 243*** | 1 300*** |
| Health Net - Individual | 0 596*** | 0 596*** | 0 566*** | 0 592*** | 0 569*** | 0 623*** | 0 858*** | 0 599*** | 0 599*** |
| Health Net - Small Group | 0 906*** | 0 943*** | 0 962*** | 0 954*** | 0 920*** | 0 812*** | 1 207*** | 0 891*** | 0 972*** |
| Health Net - Large Group | 1 036*** | 1 030*** | 1 067*** | 1 027*** | 1 086*** | 1 037*** | 1 070*** | 1 037*** | 1 058*** |
| Aetna - Individual | 0 881*** | 0 879*** | 0 825*** | 0 869*** | 0 849*** | 0 947*** | 1 115*** | 0 865*** | 0 924*** |
| Aetna - Small Group | 1 095*** | 1 130*** | 1 133*** | 1 137*** | 1 041*** | 1 029*** | 1 345*** | 1 053*** | 1 202*** |
| Aetna - Large Group | 1 226*** | 1 217*** | 1 240*** | 1 209*** | 1 215*** | 1 257*** | 1 212*** | 1 208*** | 1 284*** |
| United - Individual | 0 633*** | 0 635*** | 0 616*** | 0 657*** | 0 752*** | 0 624*** | 0 802*** | 0 639*** | 0 649*** |
| United - Small Group | 1 057*** | 1 098*** | 1 132*** | 1 144*** | 1 128*** | 0 910*** | 1 264*** | 1 043*** | 1 145*** |
| United - Large Group | 1 167*** | 1 162*** | 1 213*** | 1 190*** | 1 271*** | 1 126*** | 1 126*** | 1 172*** | 1 205*** |

*Note*: Asterisks *, **, *** represent statistical significance at ten percent, five percent, and one percent levels.
*Source*: MLR Data, 2011-2019.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

# Appendix F: Updated Damages Analyses

## Exhibit F1
## Updated Class Report Exhibit 19
## Anthem Inpatient Incurred Costs for Inpatient Hospital Services Provided by
## Each Sutter Damage Hospital to Anthem Small Group Plan Members
## Attached to One of the Nine Rating Areas, 2012

|  | Alta Bates - Main | Alta Bates - Summit | Sutter Sacramento | CPMC - Main | CPMC - St. Luke's | Sutter Modesto |
|---|---|---|---|---|---|---|
| Rating Area 1 | $0 | $0 | $683,117 | $2,302,513 | $57,153 | $88,973 |
| Rating Area 2 | $247,632 | $31,025 | $296,268 | $5,015,525 | $17,045 | $0 |
| Rating Area 3 | $82,454 | $50,382 | $4,840,770 | $906,264 | $0 | $0 |
| Rating Area 4 | $0 | $26,991 | $177,537 | $7,490,024 | $531,021 | $0 |
| Rating Area 5 | $2,628,345 | $1,146,658 | $13,557 | $947,075 | $66,805 | $0 |
| Rating Area 6 | $4,895,205 | $2,183,512 | $0 | $1,150,338 | $13,545 | $7,416 |
| Rating Area 8 | $68,019 | $23,664 | $0 | $1,594,864 | $40,553 | $14,574 |
| Rating Area 9 | $11,256 | $0 | $3,474 | $1,676,931 | $0 | $0 |
| Rating Area 10 | $0 | $0 | $164,027 | $15,414 | $47,285 | $4,592,638 |
| Total Inpatient Spend | $7,932,912 | $3,462,231 | $6,178,749 | $21,098,946 | $773,407 | $4,703,601 |

*Sources*:
1. Anthem Claims Data.
2. US Census Bureau Zip Code and County Data.
3. The Center for Consumer Information & Insurance Oversight: California Geographic Rating Areas.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit F2**
**Updated Class Report Exhibit 20**
**Aggregate Overpayment by Anthem to Sutter Damage Hospitals,**
**for Small Group Plan Members Attached to One of the Nine Rating Areas, in 2012**
**Using 2006 to 2017 Overcharge Estimates**

|  | Alta Bates-Main | Alta Bates-Summit | Sutter Sacramento | CPMC-Main | CPMC-St. Luke's | Sutter Modesto |
|---|---|---|---|---|---|---|
| Rating Area 1 | $0 | $0 | $263,587 | $576,029 | $0 | $28,816 |
| Rating Area 2 | $92,600 | $13,286 | $114,318 | $1,254,754 | $0 | $0 |
| Rating Area 3 | $30,833 | $21,576 | $1,867,857 | $226,724 | $0 | $0 |
| Rating Area 4 | $0 | $11,558 | $68,504 | $1,873,810 | $0 | $0 |
| Rating Area 5 | $982,851 | $491,044 | $5,231 | $236,934 | $0 | $0 |
| Rating Area 6 | $1,830,528 | $935,065 | $0 | $287,785 | $0 | $2,402 |
| Rating Area 8 | $25,435 | $10,134 | $0 | $398,994 | $0 | $4,720 |
| Rating Area 9 | $4,209 | $0 | $1,340 | $419,525 | $0 | $0 |
| Rating Area 10 | $0 | $0 | $63,291 | $3,856 | $0 | $1,487,423 |
| Aggregate Overpayment | $2,966,457 | $1,482,662 | $2,384,128 | $5,278,410 | $0 | $1,523,361 |

*Sources: See* sources for Exhibit D2 and Exhibit F1.

**Exhibit F3**
**Updated Class Report Exhibit 20**
**Aggregate Overpayment by Anthem to Sutter Damage Hospitals,**
**for Small Group Plan Members Attached to One of the Nine Rating Areas, in 2012**
**Using 2009 to 2017 Overcharge Estimates**

|  | Alta Bates-Main | Alta Bates-Summit | Sutter Sacramento | CPMC-Main | CPMC-St. Luke's | Sutter Modesto |
|---|---|---|---|---|---|---|
| Rating Area 1 | $0 | $0 | $206,196 | $535,062 | $0 | $25,823 |
| Rating Area 2 | $75,927 | $12,818 | $89,427 | $1,165,516 | $0 | $0 |
| Rating Area 3 | $25,281 | $20,815 | $1,461,167 | $210,599 | $0 | $0 |
| Rating Area 4 | $0 | $11,151 | $53,589 | $1,740,544 | $0 | $0 |
| Rating Area 5 | $805,881 | $473,734 | $4,092 | $220,083 | $0 | $0 |
| Rating Area 6 | $1,500,927 | $902,103 | $0 | $267,317 | $0 | $2,152 |
| Rating Area 8 | $20,856 | $9,776 | $0 | $370,617 | $0 | $4,230 |
| Rating Area 9 | $3,451 | $0 | $1,049 | $389,688 | $0 | $0 |
| Rating Area 10 | $0 | $0 | $49,511 | $3,582 | $0 | $1,332,942 |
| Aggregate Overpayment | $2,432,323 | $1,430,398 | $1,865,031 | $4,903,006 | $0 | $1,365,147 |

*Sources: See* sources for Exhibit D2 and Exhibit F1.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit F4**
**Updated Class Report Exhibit 21**
**Aggregate and PMPM Overpayment by Anthem to Sutter Damage Hospitals,**
**for Small Group Plan Members Attached to One of the Nine Rating Areas, in 2012**
**Using 2006 to 2017 Overcharge Estimates**

|  | Aggregate Overpayment | Member Months | PMPM Overpayment |
|---|---|---|---|
| Rating Area 1 | $868,432 | 485,015 | $1.79 |
| Rating Area 2 | $1,474,959 | 369,171 | $4.00 |
| Rating Area 3 | $2,146,989 | 324,639 | $6.61 |
| Rating Area 4 | $1,953,873 | 427,033 | $4.58 |
| Rating Area 5 | $1,716,060 | 266,335 | $6.44 |
| Rating Area 6 | $3,055,779 | 392,508 | $7.79 |
| Rating Area 8 | $439,283 | 282,130 | $1.56 |
| Rating Area 9 | $425,074 | 371,917 | $1.14 |
| Rating Area 10 | $1,554,570 | 357,140 | $4.35 |
| Total | $13,635,019 | 3,275,888 | $4.16 |

*Sources*:
1. Anthem Premium Data.
2. Blue Shield Premium Data.
3. *See* sources for Exhibit F3.

**Exhibit F5**
**Updated Class Report Exhibit 21**
**Aggregate and PMPM Overpayment by Anthem to Sutter Damage Hospitals,**
**for Small Group Plan Members Attached to One of the Nine Rating Areas, in 2012**
**Using 2009 to 2017 Overcharge Estimates**

|  | Aggregate Overpayment | Member Months | PMPM Overpayment |
|---|---|---|---|
| Rating Area 1 | $767,081 | 485,015 | $1.58 |
| Rating Area 2 | $1,343,688 | 369,171 | $3.64 |
| Rating Area 3 | $1,717,862 | 324,639 | $5.29 |
| Rating Area 4 | $1,805,283 | 427,033 | $4.23 |
| Rating Area 5 | $1,503,790 | 266,335 | $5.65 |
| Rating Area 6 | $2,672,500 | 392,508 | $6.81 |
| Rating Area 8 | $405,479 | 282,130 | $1.44 |
| Rating Area 9 | $394,188 | 371,917 | $1.06 |
| Rating Area 10 | $1,386,035 | 357,140 | $3.88 |
| Total | $11,995,905 | 3,275,888 | $3.66 |

*Sources*:
1. Anthem Premium Data.
2. Blue Shield Premium Data.
3. *See* sources for Exhibit F3.

**Exhibit F6**
**Updated Class Report Exhibit 22**
**Aggregate and PMPM Premiums Paid to Anthem by**
**Small Group Plan Members Attached to One of the Nine Rating Areas, in 2014**

|  | Premium | Member Months | PMPM Premium |
|---|---|---|---|
| Rating Area 1 | $230,913,093 | 340,966 | $677.23 |
| Rating Area 2 | $248,467,084 | 289,461 | $858.38 |
| Rating Area 3 | $152,517,022 | 234,996 | $649.02 |
| Rating Area 4 | $389,318,539 | 386,074 | $1,008.40 |
| Rating Area 5 | $158,255,053 | 223,468 | $708.18 |
| Rating Area 6 | $282,263,883 | 320,787 | $879.91 |
| Rating Area 8 | $223,896,443 | 220,411 | $1,015.82 |
| Rating Area 9 | $193,073,214 | 278,131 | $694.18 |
| Rating Area 10 | $181,697,198 | 298,085 | $609.55 |
| Total | $2,060,401,529 | 2,592,378 | $794.79 |

*Sources*:
1. Anthem Premium Data.
2. Blue Shield Premium Data.
3. US Census Bureau Zip Code and County Data.
4. The Center for Consumer Information & Insurance Oversight: California Geographic Rating Areas.

**Exhibit F7**
**Updated Class Report Exhibit 23**
**Premium Percentage Overpayment in 2014, for Anthem Small Group**
**Plan Members Attached to One of the Nine Rating Areas**
**Using 2006 to 2017 Overcharge Estimates**

|  | PMPM Overpayment | PMPM Premium | Premium Percentage Overcharge |
|---|---|---|---|
| Rating Area 1 | $1.79 | $677.23 | 0.264% |
| Rating Area 2 | $4.00 | $858.38 | 0.465% |
| Rating Area 3 | $6.61 | $649.02 | 1.019% |
| Rating Area 4 | $4.58 | $1,008.40 | 0.454% |
| Rating Area 5 | $6.44 | $708.18 | 0.910% |
| Rating Area 6 | $7.79 | $879.91 | 0.885% |
| Rating Area 8 | $1.56 | $1,015.82 | 0.153% |
| Rating Area 9 | $1.14 | $694.18 | 0.165% |
| Rating Area 10 | $4.35 | $609.55 | 0.714% |
| Total | $4.16 | $794.79 | 0.524% |

*Sources*: *See* sources for Exhibits F4-F6.

**Exhibit F8**
**Updated Class Report Exhibit 23**
**Premium Percentage Overpayment in 2014, for Anthem Small Group**
**Plan Members Attached to One of the Nine Rating Areas**
**Using 2009 to 2017 Overcharge Estimates**

|  | PMPM Overpayment | PMPM Premium | Premium Percentage Overcharge |
|---|---|---|---|
| Rating Area 1 | $1.58 | $677.23 | 0.234% |
| Rating Area 2 | $3.64 | $858.38 | 0.424% |
| Rating Area 3 | $5.29 | $649.02 | 0.815% |
| Rating Area 4 | $4.23 | $1,008.40 | 0.419% |
| Rating Area 5 | $5.65 | $708.18 | 0.797% |
| Rating Area 6 | $6.81 | $879.91 | 0.774% |
| Rating Area 8 | $1.44 | $1,015.82 | 0.141% |
| Rating Area 9 | $1.06 | $694.18 | 0.153% |
| Rating Area 10 | $3.88 | $609.55 | 0.637% |
| Total | $3.66 | $794.79 | 0.461% |

*Sources*: *See* sources for Exhibits F4-F6.

**Exhibit F9**
**Updated Class Report Exhibit 24**
**Aggregate Premium Damages**
**for Anthem Plan Class Members Attached to One of the Nine Rating Areas**
**Using 2006 to 2017 Overcharge Estimates – Excluding Trend Factor**

|  | Individual | Small Group | Large Group | All Entities |
|---|---|---|---|---|
| 2011 | $4,120,057 | $7,761,958 | $5,572,663 | $17,454,678 |
| 2012 | $4,671,264 | $7,516,437 | $4,779,249 | $16,966,949 |
| 2013 | $5,350,604 | $10,681,478 | $4,404,074 | $20,436,156 |
| 2014 | $8,544,504 | $10,617,705 | $5,462,496 | $24,624,705 |
| 2015 | $6,730,648 | $7,913,941 | $3,450,628 | $18,095,216 |
| 2016 | $5,916,834 | $6,190,931 | $5,315,745 | $17,423,510 |
| 2017 | $3,040,066 | $5,613,946 | $8,458,432 | $17,112,443 |
| 2018 | $1,610,884 | $4,210,534 | $4,548,191 | $10,369,609 |
| 2019 | $617,949 | $4,110,270 | $3,632,812 | $8,361,031 |
| Q1 2020 | $933,616 | $817,708 | $654,760 | $2,406,084 |
| Total | $41,536,426 | $65,434,908 | $46,279,049 | $153,250,383 |

*Sources*: *See* sources for Exhibits F4-F6.

**Exhibit F10**
**Updated Class Report Exhibit 24**
**Aggregate Premium Damages**
**for Anthem Plan Class Members Attached to One of the Nine Rating Areas**
**Using 2009 to 2017 Overcharge Estimates - Including Trend Factor**

|  | Individual | Small Group | Large Group | All Entities |
|---|---|---|---|---|
| 2011 | $4,419,166 | $8,387,832 | $5,901,133 | $18,708,131 |
| 2012 | $4,912,981 | $7,973,956 | $4,955,807 | $17,842,744 |
| 2013 | $5,455,546 | $10,802,722 | $4,433,208 | $20,691,476 |
| 2014 | $8,499,264 | $10,517,783 | $5,265,105 | $24,282,152 |
| 2015 | $6,698,965 | $7,848,404 | $3,361,133 | $17,908,502 |
| 2016 | $5,849,382 | $6,095,481 | $5,080,833 | $17,025,696 |
| 2017 | $3,020,168 | $5,525,460 | $8,244,984 | $16,790,612 |
| 2018 | $1,595,910 | $4,163,710 | $4,411,791 | $10,171,411 |
| 2019 | $600,317 | $3,992,386 | $3,503,721 | $8,096,424 |
| Q1 2020 | $908,577 | $795,778 | $637,201 | $2,341,555 |
| Total | $41,960,277 | $66,103,510 | $45,794,916 | $153,858,704 |

*Sources*:

1. *See* sources for Exhibits F4-F6.

2. AHP Trend Model Summary: 2003 – 2021 California Trends.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     F-10

**Exhibit F11**
**Aggregate Premium Damages for Health Plan Class Members**
**Attached to One of the Nine Rating Areas, Using In Sample Estimates**

| Health Plan | Years | Using 2006 to 2017 Overcharge Estimates (Excluding Trend Factor) | Using 2009 to 2017 Overcharge Estimates (Including Trend Factor) |
|---|---|---|---|
| Anthem | 2011 - 2019 | $150,844,299 | $151,517,148 |
| Blue Shield | 2011 - 2019 | $198,415,530 | $194,561,735 |
| Health Net | 2011 - 2019 | $34,656,769 | $36,924,415 |
| Aetna | 2011 - 2019 | $13,325,381 | $14,231,320 |
| United | 2011 - 2019 | $23,438,853 | $23,193,898 |
| Total | 2011 - 2019 | $420,680,832 | $420,428,516 |
| All Plans - Extrapolated Q1 2020 | Q1 2020 | $8,609,558 | $8,325,315 |
| Total Including Extrapolated Q1 2020 | 2011 - Q1 2020 | $429,290,390 | $428,753,831 |

| Health Plan | Years | Using 2006 to 2017 Overcharge Estimates (Including Trend Factor) | Using 2009 to 2017 Overcharge Estimates (Excluding Trend Factor) |
|---|---|---|---|
| Anthem | 2011 - 2019 | $171,292,295 | $133,424,702 |
| Blue Shield | 2011 - 2019 | $224,429,986 | $172,029,971 |
| Health Net | 2011 - 2019 | $39,502,503 | $32,392,400 |
| Aetna | 2011 - 2019 | $15,168,370 | $12,502,678 |
| United | 2011 - 2019 | $26,329,049 | $20,647,890 |
| Total | 2011 - 2019 | $476,722,204 | $370,997,642 |
| All Plans - Extrapolated Q1 2020 | Q1 2020 | $9,501,060 | $7,544,134 |
| Total Including Extrapolated Q1 2020 | 2011 - Q1 2020 | $486,223,264 | $378,541,776 |

*Sources:*

1. US Census Bureau Zip Code and County Data.

2. The Center for Consumer Information & Insurance Oversight: California Geographic Rating Areas.

3. Class Health Plan Claims and Premium Data.

4. AHP Trend Model Summary: 2003 – 2021 California Trends.

**Exhibit F12**
**Aggregate Premium Damages for Health Plan Class Members**
**Attached to One of the Nine Rating Areas, Using Out of Sample Estimates**

| Health Plan | Years | Using 2006 to 2017 Overcharge Estimates (Excluding Trend Factor) | Using 2009 to 2017 Overcharge Estimates (Including Trend Factor) |
|---|---|---|---|
| Anthem | 2011 - 2019 | $147,415,121 | $152,463,767 |
| Blue Shield | 2011 - 2019 | $167,923,133 | $181,550,741 |
| Health Net | 2011 - 2019 | $34,679,120 | $34,949,501 |
| Aetna | 2011 - 2019 | $11,314,362 | $13,828,094 |
| United | 2011 - 2019 | $21,620,882 | $21,796,979 |
| Total | 2011 - 2019 | $382,952,618 | $404,589,081 |
| All Plans - Extrapolated Q1 2020 | Q1 2020 | $2,951,085 | $2,272,203 |
| Total Including Extrapolated Q1 2020 | 2011 - Q1 2020 | $385,903,703 | $406,861,284 |

| Health Plan | Years | Using 2006 to 2017 Overcharge Estimates (Including Trend Factor) | Using 2009 to 2017 Overcharge Estimates (Excluding Trend Factor) |
|---|---|---|---|
| Anthem | 2011 - 2019 | $167,777,408 | $133,734,519 |
| Blue Shield | 2011 - 2019 | $192,109,233 | $158,602,219 |
| Health Net | 2011 - 2019 | $39,485,427 | $30,713,962 |
| Aetna | 2011 - 2019 | $12,821,886 | $12,165,632 |
| United | 2011 - 2019 | $24,360,042 | $19,326,063 |
| Total | 2011 - 2019 | $436,553,995 | $354,542,394 |
| All Plans - Extrapolated Q1 2020 | Q1 2020 | $3,256,664 | $2,058,998 |
| Total Including Extrapolated Q1 2020 | 2011 - Q1 2020 | $439,810,659 | $356,601,392 |

*Sources:*
1. *See* sources for Exhibit F11.
2. AHP Trend Model Summary: 2003 – 2021 California Trends.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit F13**
**Updated Passthrough Reply Report Exhibit 8**
**Damage Estimates: Based on 2006 to 2017 In Sample Overcharges Estimates**
**Excluding Trend Factor**



*Notes*: The "Application of Pass-Through" bar reflects the application of the weighted-average pass-through rate of 96.67 percent.

*Sources*:

1. Anthem, Blue Shield, Health Net, Aetna, and United Claims and Premium Data.
2. U.S. Census Bureau Zip Code and County Data.
3. The Center for Consumer Information & Insurance Oversight: California Geographic RAs.
4. MLR Data, 2011–2018.

**Exhibit F14**
**Updated Passthrough Reply Report Exhibit 8**
**Damage Estimates: Based on 2009 to 2017 In Sample Overcharges Estimates**
**Including Trend Factor**



*Notes*: The "Application of Pass-Through" bar reflects the application of the weighted-average pass-through rate of 96.67 percent.

*Sources*:

1. Anthem, Blue Shield, Health Net, Aetna, and United Claims and Premium Data.
2. U.S. Census Bureau Zip Code and County Data.
3. The Center for Consumer Information & Insurance Oversight: California Geographic RAs.
4. MLR Data, 2011-2018.
5. AHP Trend Model Summary: 2003 – 2021 California Trends.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     F-14

**Exhibit F15**
**Example of Premium Damages for One Health Plan Class Member**
**Attached to One of the Nine Rating Areas – Individual Line of Business**
**2006 to 2017 In Sample Overcharges Estimates Excluding Trend Factor**

| Year | Total Individual Premium | Rating Area | Premium Overpayment Percentage | Pass-through Rate | Damage |
|---|---|---|---|---|---|
| 2011 | $0 | N/A | N/A | 96.67% | $0 |
| 2012 | $0 | N/A | N/A | 96.67% | $0 |
| 2013 | $3,390 | 2 | 0.7% | 96.67% | $22 |
| 2014 | $20,684 | 10 | 1.3% | 96.67% | $264 |
| 2015 | $10,778 | 10 | 0.9% | 96.67% | $92 |
| 2016 | $10,646 | 10 | 0.5% | 96.67% | $50 |
| 2017 | $8,950 | 10 | 0.1% | 96.67% | $13 |
| 2018 | $14,996 | 10 | 0.2% | 96.67% | $27 |
| 2019 | $14,931 | 10 | 0.0% | 96.67% | $4 |
| Q1 2020 | $0 | N/A | N/A | 96.67% | $0 |
| | | | | | |
| Total | $84,374 | | | | $473 |

*Sources*: *See* sources for Exhibits F4-F6.

**Exhibit F16**
**Example of Premium Damages for One Health Plan Class Member**
**Attached to One of the Nine Rating Areas – Individual Line of Business**
**2009 to 2017 In Sample Overcharges Estimates Including Trend Factor**

| Year | Total Individual Premium | Rating Area | Premium Overpayment Percentage | Trend Factor (Two Years) | Pass-through Rate | Damage |
|------|------|------|------|------|------|------|
| 2011 | $0 | N/A | N/A | 20.7% | 96.67% | $0 |
| 2012 | $0 | N/A | N/A | 18.6% | 96.67% | $0 |
| 2013 | $3,390 | 2 | 0.60% | 14.6% | 96.67% | $23 |
| 2014 | $20,684 | 10 | 1.18% | 12.4% | 96.67% | $266 |
| 2015 | $10,778 | 10 | 0.80% | 11.4% | 96.67% | $93 |
| 2016 | $10,646 | 10 | 0.44% | 11.1% | 96.67% | $50 |
| 2017 | $8,950 | 10 | 0.13% | 10.7% | 96.67% | $13 |
| 2018 | $14,996 | 10 | 0.17% | 10.0% | 96.67% | $27 |
| 2019 | $14,931 | 10 | 0.03% | 9.8% | 96.67% | $4 |
| Q1 2020 | $0 | N/A | N/A | 10.4% | 96.67% | $0 |
| | | | | | | |
| Total | $84,374 | | | | | $476 |

*Sources*:

1. *See* sources for Exhibits F4-F6.
2, AHP Trend Model Summary: 2003 – 2021 California Trends.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     F-16

**Exhibit F17**
**Example of Premium Damages for One Health Plan Class Member**
**Attached to One of the Nine Rating Areas – Small Group Line of Business**
**2006 to 2017 In-Sample Overcharges Estimates Excluding Trend Factor**

| Year | Total Group Premium | Employer Premium (80%) | Employee Premium (20%) | Rating Area | Premium Overpayment Percentage | Pass-Through Rate | Employer Damage | Employee Damage |
|------|------|------|------|------|------|------|------|------|
| 2011 | $0 | $0 | $0 | N/A | N/A | 96.67% | $0 | $0 |
| 2012 | $0 | $0 | $0 | N/A | N/A | 96.67% | $0 | $0 |
| 2013 | $210,588 | $168,470 | $42,118 | 3 | 0.57% | 96.67% | $926 | $231 |
| 2014 | $886,511 | $709,209 | $177,302 | 4 | 0.45% | 96.67% | $3,111 | $778 |
| 2015 | $927,646 | $742,117 | $185,529 | 4 | 0.49% | 96.67% | $3,494 | $873 |
| 2016 | $1,064,717 | $851,774 | $212,943 | 4 | 0.63% | 96.67% | $5,183 | $1,296 |
| 2017 | $733,382 | $586,706 | $146,676 | 4 | 0.57% | 96.67% | $3,228 | $807 |
| 2018 | $482,840 | $386,272 | $96,568 | 4 | 0.83% | 96.67% | $3,109 | $777 |
| 2019 | $329,083 | $263,267 | $65,817 | 4 | 0.68% | 96.67% | $1,719 | $430 |
| Q1 2020 | $56,935 | $45,548 | $11,387 | 4 | 0.68% | 96.67% | $297 | $74 |
| | | | | | | | | |
| Total | $4,691,703 | $3,753,363 | $938,341 | | | | $21,068 | $5,267 |

*Sources: See* sources for Exhibits F4-F6.

**Exhibit F18**
**Example of Premium Damages for One Health Plan Class Member**
**Attached to One of the Nine Rating Areas − Small Group Line of Business**
**2009 to 2017 In-Sample Overcharges Estimates Including Trend Factor**

| Year | Total Group Premium | Employer Premium (80%) | Employee Premium (20%) | Rating Area | Premium Overpayment Percentage | Trend Factor (Two Years) | Pass-Through Rate | Employer Damage | Employee Damage |
|---|---|---|---|---|---|---|---|---|---|
| 2011 | $0 | $0 | $0 | N/A | N/A | 20.7% | 96.67% | $0 | $0 |
| 2012 | $0 | $0 | $0 | N/A | N/A | 18.6% | 96.67% | $0 | $0 |
| 2013 | $210,588 | $168,470 | $42,118 | 3 | 0.50% | 14.6% | 96.67% | $938 | $234 |
| 2014 | $886,511 | $709,209 | $177,302 | 4 | 0.42% | 12.4% | 96.67% | $3,229 | $807 |
| 2015 | $927,646 | $742,117 | $185,529 | 4 | 0.45% | 11.4% | 96.67% | $3,618 | $904 |
| 2016 | $1,064,717 | $851,774 | $212,943 | 4 | 0.58% | 11.1% | 96.67% | $5,341 | $1,335 |
| 2017 | $733,382 | $586,706 | $146,676 | 4 | 0.53% | 10.7% | 96.67% | $3,315 | $829 |
| 2018 | $482,840 | $386,272 | $96,568 | 4 | 0.77% | 10.0% | 96.67% | $3,172 | $793 |
| 2019 | $329,083 | $263,267 | $65,817 | 4 | 0.63% | 9.8% | 96.67% | $1,749 | $437 |
| Q1 2020 | $56,935 | $45,548 | $11,387 | 4 | 0.63% | 10.4% | 96.67% | $304 | $76 |
| Total | $4,691,703 | $3,753,363 | $938,341 | | | | | $21,668 | $5,417 |

*Sources*:

1. *See* sources for Exhibits F4-F6.
2. AHP Trend Model Summary: 2003 – 2021 California Trends.

**Appendix G: Updated Analyses Related to Sutter Pricing**

**Exhibit G1**
**Updated Merits Report Exhibit 21**
**Total Medical Expenditures for the Basket of Inpatient Services Performed at Each**
**Sutter Damage Hospital**
**Anthem Claims, 2011-2013**



*Notes*:

1. The Sutter bar corresponds to actual total medical expenditures for that hospital and plan. The blue bars are calculated as the total medical expenditures for the same basket of services, using the average in-network prices for each service at the benchmark hospitals.

2. Percent differences are calculated as the difference in total medical expenditures of Sutter and benchmark hospitals, divided by the total medical expenditure at the benchmark hospitals.

3. In my prior report, this analysis defined relatively large hospitals based on the median of the average number of acute beds at non-rural, non-Kaiser, general acute care hospitals in Northern California that were active at some point from 1995-2016. This median was 144.4 and changed to 144.8 when the calculation was updated to the years 1995-2018. Relative to my prior report, there is one hospital from the "Non-Rural Hospitals, <144 Beds" benchmark group that has become a part of the "Non-Rural Hospitals, >144 Beds" benchmark group. This leads to small changes in the percentage differences I calculate between TME at the Sutter and benchmark hospitals during the time period studied in my prior report.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2017.

2. Anthem Claims Data.

**Exhibit G2**
**Updated Merits Report Exhibit 22**
**Total Medical Expenditures for the Basket of Inpatient Services Performed at Each**
**Sutter Damage Hospital**
**Blue Shield Claims, 2011-2013**



*Note*: See notes for Exhibit G1.

*Sources:*

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2017.

2. Blue Shield Claims Data.

**Exhibit G3**
**Updated Merits Exhibit G1**
**Percent by Which Total Medical Expenditures at Each Sutter Damage Hospital**
**Exceeded Non-Sutter Hospitals for the Basket of Inpatient Services**
**Performed at that Sutter Hospital**
**Anthem Claims, 2008-2017**

| | Benchmark: Northern California Hospitals | | | | Benchmark: Non-Rural Hospitals, >144 Beds | | | |
|---|---|---|---|---|---|---|---|---|
| | 2008-2010 | 2011-2013 | 2014-2015 | 2016-2017 | 2008-2010 | 2011-2013 | 2014-2015 | 2016-2017 |
| Alta Bates-Main | 52% | 30% | 28% | 13% | 43% | 23% | 19% | 4% |
| Alta Bates-Summit | 33% | 36% | 24% | 27% | 29% | 29% | 19% | 20% |
| Sutter Sacramento | 28% | 28% | 13% | 22% | 22% | 21% | 7% | 15% |
| CPMC-Main | 26% | 32% | 19% | 23% | 19% | 24% | 12% | 14% |
| CPMC-St. Luke's | 17% | 14% | 17% | 3% | 14% | 6% | 8% | -6% |
| Sutter Modesto | 47% | 38% | 22% | 25% | 42% | 29% | 15% | 17% |
| Sutter Santa Rosa | 37% | 11% | 8% | 0% | 29% | 5% | 0% | -8% |

*Notes*:

1. *See* notes from Exhibit G1.

2. Percent differences are calculated as the difference in total medical expenditures of Sutter and benchmark hospitals, divided by the total medical expenditure at the benchmark hospitals.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2017.

2. Anthem Claims Data.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit G4**
**Updated Merits Exhibit G2**
**Percent by Which Total Medical Expenditures at Each Sutter Damage Hospital**
**Exceeded Non-Sutter Hospitals for the Basket of Inpatient Services**
**Performed at that Sutter Hospital**
**Blue Shield Claims, 2008-2017**

| | Benchmark: Northern California Hospitals | | | | Benchmark: Non-Rural Hospitals, >144 Beds | | | |
|---|---|---|---|---|---|---|---|---|
| | 2008-2010 | 2011-2013 | 2014-2015 | 2016-2017 | 2008-2010 | 2011-2013 | 2014-2015 | 2016-2017 |
| Alta Bates-Main | 44% | 31% | 10% | 2% | 30% | 18% | 1% | -8% |
| Alta Bates-Summit | 49% | 35% | 7% | 3% | 40% | 28% | 0% | -3% |
| Sutter Sacramento | 34% | 29% | 12% | 1% | 25% | 18% | 4% | -5% |
| CPMC-Main | 35% | 19% | 10% | 3% | 24% | 11% | 2% | -5% |
| CPMC-St. Luke's | 9% | 17% | 6% | -5% | -1% | 7% | -2% | -14% |
| Sutter Modesto | 26% | 10% | 9% | -5% | 16% | 2% | 1% | -12% |
| Sutter Santa Rosa | 8% | 3% | 0% | 3% | 0% | -6% | -8% | -6% |

*Notes*:

3. *See* notes from Exhibit G1.

4. Percent differences are calculated as the difference in total medical expenditures of Sutter and benchmark hospitals, divided by the total medical expenditure at the benchmark hospitals.

*Sources*:

1. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2008-2017.

2. Blue Shield Claims Data.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Appendix H: Description of Overcharge Analysis Data Processing**

1.      This Appendix describes the analysis dataset used in the overcharge regressions, including the use of claims data from the Class Health Plans. It discusses the various data sources used to create the overcharge analysis dataset, as well as the key filters and data processing steps applied to each of these data sources.

### A.      Hospital Characteristics Dataset

2.      For each year in the period 2006-2017, I obtain hospital-level characteristics for all non-Kaiser, GAC hospitals in Northern California from the OSHPD Hospital Annual Financial Disclosure Data Complete Data Set ("HAFD CDS") and Pivot Profiles Tables ("HAFD Pivot Profiles"), the Center for Medicare & Medicaid Services ("CMS"), and the Google Maps Distance Matrix API ("Google Maps").[1]

- Hospital-level information on hospital beds, system affiliation,[2] teaching status and trauma level is obtained from HAFD Pivot Profiles and HAFD CDS;

- Hospital quality information, wage indices, and DRGs are obtained from CMS;[3] and

- The number of competitors within a 30-minute drive from each hospital is determined using the Google Maps Distance Matrix API.

---

[1] GAC hospitals are identified using a combination of OSHPD's classification, which must be "General" or "General Acute", and the CMS ID, which must be a short-term acute care ID (i.e. the last 4 digits of the ID fall between 0001 and 0879, inclusive). Kaiser facilities are identified as those with "Kaiser Foundation Hospitals" as the system name; Northern California hospitals are identified as those not in any of the following counties: "Imperial," "Kern," "Los Angeles," "Orange," "Riverside," "Ventura," "San Bernardino," "San Diego," "San Luis Obispo," or "Santa Barbara."

[2] Systems are defined based on each hospital's system name from the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, which is populated for all systems with at least three hospitals. In addition to the system field, I use the owner field to assign hospitals to systems.

[3] DRG codes were obtained for each claim in the Health Net and United NICE database using MS-DRG grouper software published by CMS. *See* Appendix E to the Chipty Reply Declaration for further discussion. When necessary, I supplemented the DRG codes as returned by the grouper software per the methodology as described in Appendix I to the Chipty Mertis Report.

## B.    Filters and Processing Applied to Claims Data

3.      The prices used in the overcharge regressions are calculated from the claims datasets produced by each of the five Class Health Plans. Because these claims datasets are unique to each Class Health Plan, the data processing steps applied to each of the datasets are also unique. The subsections below describe the key data processing steps used to study each of the five Class Health Plans.

### Health Net

4.      The Health Net data were produced in 987 files at the claim-level with line-level information contained in multiple columns (for example, diagnosis codes are found in fields labeled diag_1 through diag_99).[4] The data have service dates in the period 2006 through partial year 2020. Starting in at least service year 2018, produced data appear to omit all or most claims related to the Individual line of business. Files HN0026619 – HN0027518, which contain claims with service dates from 2006 – 2017, were processed using the following key steps:

- Non-inpatient claims were removed using the revenue code and bill type methodologies (i.e. the bill type must start with '11' or '12' and at least one revenue code must fall within the range 100-219, inclusive).

- Non-hospital claims were removed based on the provider type. Hospital claims were identified as records where the provider type equaled H.

- Non-final claims were removed using the claim type. Final claims were identified as records where the claim type was not D.

- Claims with a non-zero adjustment amount were removed.

- Claims with $0 allowed amounts were removed. Allowed amounts were calculated in the Health Net data by summing the benefit amount, copay, coinsurance, and deductible.

- Claims with header-level allowed amounts that did not reconcile with the service line allowed amounts were removed.

―――――――――――――――

[4] All Health Net claims data were produced as Excel files as HN0026619 – HN0027518 and HN0030184 – HN0030270.

- Duplicate records were identified and removed.

- Claims that were not fully-insured were removed. Fully-insured claims were identified as records with a funding type not equal to S.

- Claims for which Health Net is not the primary payor were removed. Claims where Health Net is the primary payor were identified by a blank COB indicator value and a zero COB amount.

- Claims at non-contracted providers were removed. Claims with contracted providers are those records with a contract flag equal to Y.

- Claims at a provider outside of California or a patient from outside of California were removed. These claims were identified using the provider state and patient zip code.

- Claims with non-commercial insurance were removed.

- Claims with a service start date not in 2008-2017 were removed. Furthermore, claims for 2006-2007 were removed because available DRG software cannot assign DRGs prior to 2008.

- Claims with a non-positive allowed amount were removed.

- CMS' DRG grouper software was used to assign DRGs to each claim based on the diagnosis codes, among other things.[5] Because of the lack of ICD procedure codes in the Health Net data, DRG weights are imputed using the regression adjustment described in Appendix I to the Chipty Merits Report.

- Claims with an MDC of 00 (missing or invalid), 19 (mental diseases and disorders), or 20 (alcohol/drug use or induced mental disorders) were removed, where the MDC came from a DRG assigned without a procedure code.

---

[5] Medicare Severity Diagnosis Related Group (MS-DRG) Grouper Software and Medicare Code Editor (MCE) Version 35 R1, ICD-10 Software, *Centers for Medicare & Medicaid Services*, n.d., *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/MS-DRG-Classifications-and-Software.

5.      After processing the data, the claims data were aggregated to the hospital-year level, using hospital IDs. In calculating prices for Health Net, claims were first aggregated to the episode level, to which I refer in the main report as "claim level." An episode is defined as a unique combination of patient member type, patient gender, patient year of birth, patient zip code, subscriber member type, group ID, group name, group zip code, CMS ID, NPI, provider name, provider address, service start date, and admit year.[6] When multiple DRGs are found for the same episode, the DRG and weight associated with the first claim to appear for a given encounter was used as the DRG and weight for that encounter.

### Aetna

6.      The Aetna data were originally produced in 14 files, one for each year from 2003 to 2016.[2] Supplemental Aetna data were produced in 5 files, one for each year from 2016 to 2020. The Aetna data from 2003 to 2015 were processed using Dr. Willig's Sur-Reply data processing. Otherwise, the Aetna data from 2016 to 2020 are processed as below described. There is one exception to Dr. Willig's data processing regarding newborn and delivery claims at Sutter hospitals as described below.

7.      Dr. Willig's provider matching crosswalk was updated to reflect provider names in the new data that did not find matches. A list of providers that did not find matches in Dr. Willig's existing crosswalk were manually reviewed to find matches.

8.      The various filters and data processing steps applied to the Aetna data are described in detail below:

- Non-inpatient claims were identified and removed using two fields, HCFA bill type and HCFA place of service. Claim lines without an inpatient bill type nor an inpatient place of service were removed.

    - For a claim line to be considered inpatient by bill type, it must contain a bill type that starts with '11' or '12.'

_____

[6] As many patient characteristics as possible were included in this roll-up.

- - For a claim line to be considered inpatient by place of service, it must contain a place of service of '21.'
  - Claims with both inpatient and non-inpatient claim lines were removed.
- Claims were removed based on allowed amounts, paid amounts and billed amounts.
  - Claims with negative allowed amounts or paid amounts were removed.
  - Claims with zero billed amounts, allowed amounts and paid amounts were removed.
  - A paid amount field was not produced in the Aetna data from 2016 – 2020. These records had paid amount set to zero.
- Claims with service dates prior to 2008 or after 2017 were removed.
- Claims involving patient hospital transfers were removed.
- Claims for which Aetna was not the primary payor were removed.
- Claims with a missing DRG were removed.
- Military claims were removed.
- Prior to aggregation to the episode level, the following fields are checked for conflicts across claim lines for the same episode: member age, member gender, plan type, funding category code, member zip, member state, network status and DRG. Episodes with multiple values of any of these fields were removed from the dataset.
- The following fields are checked for missing values: member age, member gender, plan type, funding category code, member zip, member state and network status.  Episodes with missing values of any of these fields were removed from the dataset.
- Claims were then aggregated up to the episode level. All payment amount fields (billed amount, allowed amount, paid amount, coinsurance, deductible, copay, and COB savings amount) were summed across claims. The earliest service start date across claims and the latest service end date were set as episode begin and episode end dates, respectively.
- Episodes were removed from the regression dataset if they are considered out of network. Episodes are considered out of network if they do not have a network status of Y or P.

- Episodes were removed from the regression dataset if they do not have a member state of CA.

- Episodes were removed from the regression dataset if they have DRG values of any of the following: UNK, 000, 998, 999, D30, D31, D37, D45 or D54.

- Episodes that were not fully insured are removed from the regression dataset. Episodes are considered fully insured if they have a funding category code of A.

- Episodes with missing MDC values or MDC values of 0 (missing or invalid), 19 (mental diseases and disorders) or 20 (alcohol/drug use or induced mental disorders) were removed.

- Episodes with missing DRG weights were removed.

    o Episodes from 2016 and 2017 were mapped to MS-DRGs, version 36.

- Episodes were removed if the sum of allowed amounts in all of an episode's claim lines is zero or negative.

- Episodes were removed if the type care is not general.

- The regression dataset is limited to episodes from general acute care hospitals. A hospital is considered to be general acute care if its CMS ID is between 50001 and 50879.

- Episodes from hospitals that were in the Sutter system that are not damages hospitals were removed.

- Episodes with for which the percent patient rating 9 or 10 fields are missing were removed.

9.      In addition to the filters outlined above, I also adjusted the prices of newborn and delivery episodes at Sutter damages hospitals in light of a particular clause that is present in Aetna's contracts with Sutter throughout the damages period. These contracts specify that allowed amounts on newborn claims with revenue codes 172-174 are excluded from the Mom and Normal Newborn per diem; as such, prices associated with stays in a neo-natal intensive care unit ("NICU") are paid separately from mothers' delivery claims.  Despite this stipulation, Dr.

Willig treats Aetna normal newborn claims[7] the same as those in the Anthem and Blue Shield data and removes them entirely. This approach is inappropriate because it fails to account for the nuances in newborn and delivery prices set forth by the Aetna-Sutter contracts. While NICU allowed amounts on newborn claims are distinct from mother delivery prices, normal newborn allowed amounts (identified by claim lines with non-NICU revenue codes) often comprise part of the mother delivery price; thus, these allowed amounts must be combined to reflect the newborn delivery prices listed in the contracts. By dropping all normal newborn claims, Dr. Willig deflates newborn delivery prices, and therefore overall prices, at Sutter damage hospitals. My methodology corrects this oversight by transferring non-NICU prices from newborn claims to their respective mother claims. This process is described in detail below.

10. Newborn and delivery episodes from Sutter hospitals are matched based on subscriber ID and date of service.[8] Newborn episodes are matched to delivery episodes if their subscriber IDs match and if the newborn date of service is on the delivery date of service or one day past the delivery date of service.

11. After newborn and delivery episodes are matched, the allowed amounts on the episodes are adjusted. Non-NICU allowed amounts on newborn episodes are added to the allowed amounts on their matched delivery episodes. Allowed amounts on newborn claim lines with NICU related revenue codes are not added to the allowed amounts on their matched delivery episodes and are kept on the newborn episodes. All newborn episodes from Sutter hospitals with only non-NICU related revenue codes were removed from the regression dataset after adjustment of allowed amounts.

12. The prices calculated from this dataset were merged onto the OSHPD hospital characteristics table to create the overcharge dataset for Aetna, which was then stacked with the rest of the overcharge datasets to form the final version.

---

[7] Normal newborn claims are identified
[8] Newborn claims are identified through DRGs 789, 790, 791, 792, 793, 794 and 795 for 2008-2015. Delivery claims are identified through DRGs 765, 766, 767, 768, 774 and 775 for 2008-2015. Newborn claims are identified through DRGs 795, 794, 793, 792, 791, 790 and 789 for 2016-2017. Delivery claims are identified through DRGs 768, 783, 784, 785, 786, 787, 788, 796, 797, 798, 805, 806 and 807 for 2016-2017.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

*United*

13.     The United claims data were produced in two formats, which are respectively called UNET for the period 2005 – 2018 and NICE for the period 2000 – 2019. The NICE data reportedly contain all of United's fully-insured HMO claims, while the UNET data contain the rest of United's claims.[9] These two datasets were processed separately due to differences between them. UNET contains a usable DRG field, while NICE does not.[10] The key data processing steps are as follows:

- Non-inpatient claims were removed using three flags: one based on the bill type, one based on the revenue codes, and one based on the AMA place of service. A claim must satisfy all three inpatient criteria to be identified as inpatient. For a claim to be considered inpatient by bill type, it must contain at least one line with a bill type that starts with '11' or '12.' For a claim to be considered inpatient by revenue code, it must contain at least one revenue code that falls within the range 100-219, inclusive. For a claim to be considered inpatient by AMA place of service, this field must take the value of 21 or contain INPA.

- Non-hospital claims were removed using the provider classification code and the provider category code. Hospital claims are identified as records with the provider classification code equal to FACILITY and the provider category being one of 0001, 0002, 0003, 0004, 0005, 0006, 0007, 0008, 0009, 0010, 0011, 1032, 1033, 1036, 1037, 1099, 1111, 1225, 1264, 1598, 1599, 1600, 1961, 2888, 3946, 4221, 4234, 5773, or 6780.[11]

- Non-final claims were removed using the charge status code. Final claims were identified as records with charge status code equal to P.

- Duplicate records were identified and removed.

---

[9] Email from Kaitlyn Murphy, counsel for United, to David Brownstein, counsel for Sidibe Plaintiffs, "Subject: RE: Sidibe v. Sutter: United HealthCare data," October 17, 2018.

[10] Even though a DRG field exists in NICE, this field is blank or equal to "00000" for 64 percent of the claims that survive the other filters described in this Appendix.

[11] This range of category codes was used by Dr. Willig in processing the UNET data in his Reply Declaration; descriptions for each category can be found in the file "UHC_Sidibe-0008889.xls."

- Prior to aggregation to the claim level, the following fields were checked for consistency across claim lines for the same claim: subscriber number, member ID, patient gender, patient age, patient state, patient zip code, group number, group name, group zip code, product, product description, funding arrangement type, COB indicator, DRG, provider name, provider address (both lines 1 and 2), provider city, provider state, provider zip code, and provider participation status code. Claims with multiple values of any of these fields were removed from the dataset.

- The claims data were then aggregated to the claim or episode level to reflect an episode of care, preserving the minimum first date of service and the maximum last date of service.

- Claims with a provider outside of California or a patient from outside of California were removed. These claims were identified using the provider state and patient state.

- Claims that occurred at non-participating providers were removed. Claims with a participating provider were identified as records with participation status code equal to P or C.

- Claims for which United was not the primary payor were removed. These claims were identified as records where the COB indicator was not missing, N, or U, or where the COB savings amount was non-zero.

- The claims were restricted to fully-insured claims using the funding arrangement type field; this field must equal 1 or F for a claim to be identified as fully-insured.

- Claims with non-positive allowed amounts were removed.

- Claims whose first date of service fell outside of the year range 2006-2017 were removed.

- Finally, claims with a missing DRG weight, a DRG that indicates a normal newborn (391 pre-FY2008, 795 post-FY2008), invalid primary diagnosis (469 pre-FY2008, 998 post-FY2008), or ungroupable diagnoses (470 pre-FY2008, 999 post-FY2008), or an MDC of 00 (missing or invalid), 19 (mental diseases and disorders), or 20 (alcohol/drug use or induced mental disorders) were removed.

14.     The NICE data were filtered in a similar manner that addressed the features unique to it. The key data processing steps are as follows:

- Non-inpatient claims were removed using two flags: one based on the revenue code and one based on the bill type. A claim must satisfy both criteria to be identified as inpatient. For a claim to be considered inpatient by bill type, it must contain at least one line with a bill type that starts with '11' or '12.' For a claim to be considered inpatient by revenue code, it must contain at least one revenue code that falls within the range 100-219, inclusive.

- The claims were checked for duplicative entries; no duplicates were found.

- Claims were checked for consistency across lines for each of the following fields: subscriber ID, subscriber zip code, patient ID, patient gender, patient birth date, patient state, patient zip code, admit and discharge dates, group ID, group name, group zip code, the capitated/administered flag, COB indicator, the diagnosis codes, DRG, facility ID, NPI, tax ID, facility name, provider street address, provider city, provider state, provider zip code, and the provider participation status code. Claims with multiple values across lines on any of these fields were removed.

- The claims data were then aggregated to the claim level to reflect an episode of care, preserving the minimum first date of service and the maximum last date of service.

- The revenue codes were also included in the claim-level table as a list of 52 revenue code columns. These codes were used in the DRG weight regression adjustment for the claims with missing DRGs.

- Claims for providers outside of California or for patients from outside of California were removed. These claims were identified using the provider state and patient state fields.

- Claims for non-participating providers were removed. Claims with a participating provider were identified as records with the provider participation status code equal to Y.

- Claims for which United was not the primary payor were removed. These claims were identified as records where the COB indicator was not N or where the COB savings amount was non-zero.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    H-10

- Claims with non-positive allowed amounts were removed.

- Claims whose first date of service fell outside of the year range 2006-2017 were removed.

- Capitated claims were removed using the capitated/administered flag; claims were identified as non-capitated if this flag equaled N.

- Missing DRG information was imputed using CMS grouper software. Because of the lack of ICD procedure codes in a subset of the NICE data, DRG weights are imputed using the regression adjustment described in Appendix I.

- Claims with an MDC of 00 (missing or invalid), 19 (mental diseases and disorders), or 20 (alcohol/drug use or induced mental disorders) were removed. The MDC associated with the native DRG was used where available; otherwise, the MDC associated with the DRG assigned without a procedure code was used.

15.     Finally, the processed UNET and NICE datasets were combined into a single dataset and aggregated to the hospital-year level, using hospital IDs. Dr. Willig's address-based crosswalk was used with some manual adjustment to merge in OSHPD IDs for the UNET data, and his facility ID-based crosswalk was used with some manual adjustment to merge in the OSHPD IDs for the NICE data. These adjustments to Dr. Willig's crosswalks generally involved OSHPD IDs 106341052 and 106494106, which correspond to Sutter Memorial Hospital, part of Sutter Medical Center Sacramento, and Sutter Santa Rosa Regional Medical Center.[12] These adjustments also account for providers who were not covered by Dr. Willig's crosswalks.

16.     In calculating prices for United, claims were first aggregated to the claim (or episode) level. A claim (or episode) is defined as a unique combination of patient ID, OSHPD ID, provider name, provider address, first service date, admit year, patient zip code, group name, and source database. When multiple DRGs are found for the same episode, the DRG and weight associated with the first claim to appear for a given encounter was used as the DRG and weight for that encounter.

---

[12] The hospital characteristics dataset does not contain separate information for Sutter Memorial Hospital and Sutter General Hospital, the other entity that makes up Sutter Medical Center Sacramento.

*Anthem*

17.     The overcharge regression analysis is based on claim level data from Anthem covering the period between January 2006 and December 2017. These data contain information, at the claim level, on the inpatient hospital services received by each of Anthem's members, including[4] information on the diagnosis associated with care received, the location of the service, and the allowed amount on the claim.

18.     The overcharge regression sample relies on claims related to the Class Members. For that reason, a number of filters are applied to Anthem claims sample. More specifically,

- Complete duplicate records and duplicate records resulting from inconsistent provider name and address or member zip code were removed.[13]

- Limit to inpatient claims only.[14]

- Exclude bill types "0110", "011", "0115", "115", "0118", "0119", "011A", "011C", "011G", "011H", "011I", "011K", "011M", "011N", "011P", "011Q", "011Y", "011Z", "0120", "0129".

- Limit to claims for which Anthem is the primary payer by requiring the PRMRY_CARR_RSPNSBLY_CD in the Anthem claims data to equal "WLP".

- Limit to fully insured claims only by requiring field FUNDING in the Anthem claims data to equal "FI".

- Limit to in-network claims only by requiring the INN_CD in the Anthem claims data to equal "IN".

- Limit to claims associated with members who are residents of California.

---

[13] Duplicate records in the Anthem claims detail resulting from inconsistent provider/patient information were determined based on all data fields excluding fields SERVICE_PROV_NM, PROV_ADRS_LINE_1_TXT, PROV_ADRS_LINE_2_TXT, PROV_CITY_NM, PROV_ST_NM, PROV_ZIP_CD, and MEMBER_ZIP.

[14] Inpatient claims were identified as records where INPAT_CD equals "Y" or TYPE_OF_BILL_CD equals "011" or "012" or the claim detail contained an accommodation revenue code (i.e., a value between 100 and 219).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     H-12

- Exclude DRG codes "UNK", "000", "795", "998", "999", "D30", "D31", "D37", "D45", "D54", "D56", "D62", "D63", "D64", "D75", "D86", "DR>", "DRG", "KEY", "MED", "065", "V10", "V45".

- Exclude missing MDCs and MDCs "0", "19", "20".

- Limit to observations that merge by OSHPD ID and year to the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles Tables.

- Exclude claims with missing allowed amounts or DRG weights and/or non-positive allowed amounts.

- Limit to General Acute Care ("GAC") hospitals only. A GAC hospital is defined as a hospital that: (a) reports itself as "General" or "General Acute" in its annual financial disclosure to OSHPD; and (b) has a CCN whose last four digits fall within the range 0001-0879, the range specified by CMS for "Short-term (General and Specialty) Hospitals."[15]

- Remove duplicate Hospital – Year (Providence St. John's Health Center – 2014, CMS ID 50290).

- Limit to service dates in the period January 2006-December 2017.

- Limit to hospitals in Northern California only, defined as the 48 counties north of San Luis Obispo, Kern, and San Bernardino.[16]

- Limit to claims at the Sutter Damage Hospitals and the Benchmark Hospitals.

- Limit 2006 and 2007 observations to those that merge by CMS ID to the CMI factors from the OSHPD Patient Discharge Data.

- Exclude observations for which *Patient Rating or Wage Index* are missing for all years in the period 2006-2017.

---

[15] The first two digits of the six-digit CCN identify the state in which the hospital is located.

[16] US Census Bureau; and Tenn, Steven, "The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction," *International Journal of the Economics of Business*, Vol. 18, No.1, 2011, pp. 65-82, at p.74.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     H-13

19.     In calculating damages, that data sample is limited to claims at the Sutter Damage Hospitals and the following observations are added back to the data sample:

- Add DRG codes "UNK", "000", "795", "998", "999", "D30", "D31", "D37", "D45", "D54", "D56", "D62", "D63", "D64", "D75", "D86", "DR>", "DRG", "KEY", "MED", "065", "V10", "V45".

- Add MDCs equal to "0".

- Add observations with missing DRG weights.

### Blue Shield

20.     The overcharge regression analysis prices are based on claim level data from Blue Shield covering the period between January 2006 and December 2017. These data contain information, at the claim level, on the inpatient hospital services received by each of Blue Shield's members, including information on the diagnosis associated with care received, the location of the service, and the allowed amount on the claim.[17]

21.     Additionally, the raw Blue Shield claims data do not contain DRG codes for most years. In order to assign a DRG to each claim, publicly available grouper software from CMS[18] was used; this software takes the diagnosis and procedure codes available in the raw data, in addition to patient age, gender, and length of stay, and provides the DRG, DRG weight, and MDC for each claim.[19]

---

[17] Blue Shield produced two types of claims corresponding to two different database systems, TPSU and Facets. Additionally, Blue Shield produced claims data in a third un-named database system in January 2021. These 2021-produced claims primarily cover the post-2017 period.

[18] MS-DRG Grouper Software, available at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/AcuteInpatientPPS/MS-DRG-Classifications-and-Software.html.

[19] The Blue Shield production on July 18, 2018 contained a supplemental file with DRG codes for claim IDs found in the 2016-2018 Facets data, in addition to this set of claims. The grouper's DRG assignments were tested against the DRGs provided by Blue Shield for these claims; mismatching DRGs were found for 2.7% of claims, one fourth of which were missing a discharge date.

22.     The overcharge regression prices rely on claims related to the proposed Class Members. For that reason, a number of filters were applied to the Blue Shield claims data.[20] More specifically,

- Exclude denied claim-lines according to the BE_DT_LINE_PROCESS_STATUS field in the Blue Shield TPSU data and the DENY_IND field in the Blue Shield Facets data.

- Limit to final claim-lines only according to the claim ID suffixes and, in the Blue Shield Facets data, the CLCL_CUR_STS field.

- Limit to claim-lines whose sum of Blue Shield paid amount and patient paid amount is positive.

- Limit to inpatient claims only.[21]

- Limit to claim-lines at hospitals only according to the BE_DT_PROV_TYPE field in the Blue Shield TPSU data and the BILL_PROV_TYPE field in the Blue Shield Facets data.

- Exclude duplicate claim-lines on the basis of claim ID and line number.

- Exclude claims that do not have unique values for key fields across each claim's previously filtered claim-lines.[22]

- Limit to claims that have a valid NPI and/or CMS ID.[23]

- Limit to claims for which Blue Shield is the primary payer only according to the BE_DT_TPSU_LINE_COB_CODE field in the Blue Shield TPSU data and the CDCB_COB_TYPE field in the Blue Shield Facets data.

---

[20] All filters below rely on the data dictionaries for both TPSU and Facets Claims provided by Blue Shield.

[21] In the Blue Shield TPSU data, inpatient claims were identified where BE_HD_BILL_CLASSIFICATION was equal to "1" or "2" or the claim detail contained an accommodation revenue code (i.e., a value between 100 and 219). In the Blue Shield Facets data, inpatient claims were identified where INPATIENT_OUTPATIENT was equal to "inpatient" or the claim detail contained an accommodation revenue code (i.e., a value between 100 and 219).

[22] Key fields are identified as fields that are used for either the overcharge analysis dataset or the damages analysis dataset. These fields are patient ID, patient zip, patient sex, patient date of birth, admit date, discharge date, group zip, funding code, diagnosis code(s), procedure code(s), COB code, admit type, NPI, participation status, group ID, plan type, subscriber zip, subscriber ID, and discharge status.

[23] While NPIs are native to the Blue Shield claims productions, CMS IDs are not. Prior to this filter, claims with missing or invalid NPIs are filled in by mapping IDs found in other claims with the same provider name and address.

- Limit to non-ASO claims only according to the health plan type supplemental datasets provided by Blue Shield in the Blue Shield TPSU data and the LOBD_ID field in the Facets data.

- Limit to in-network claims only according to the BE_DT_PROV_PAR_NONPAR_CD_2 and BE_DT_CAC_CODE fields in the Blue Shield TPSU data and the CLCL_NTWK_IND field in the Facets data.

- Limit to claims associated with members who are residents of California.

- Remove duplicate claims on the basis of patient ID, NPI, minimum service date, maximum service date, admit type, diagnosis, and the sum of Blue Shield total paid and patient paid amounts.

- Exclude claims for which the grouper software could not assign a valid DRG code[24] or for which the grouper assigns a DRG code corresponding to normal newborns, invalid primary diagnosis, or ungroupable diagnosis and procedure codes.[25]

- Exclude claims with a missing minimum service date or maximum service date.[26]

- Exclude claims with MDC 19, 20, or a missing MDC.[27]

- Limit to service dates in the period January 2006-December 2017.

- Limit to non-Kaiser General Acute Care ("GAC") hospitals in the OSHPD Pivot Profiles. A GAC hospital is defined as a hospital that: (a) reports itself as "General" or "General Acute" in its annual financial disclosure to OSHPD; and (b) has a CMS ID whose last four digits fall within the range 0001-0879, the range specified by CMS for "Short-term

---

[24] The DRG grouper software uses a series of return codes to indicate whether or not the DRG it returns is valid. The return code "00" indicates that the DRG is valid, so only claims assigned a DRG with a return code of "00" were used. The return code did not identify all claims with invalid primary diagnosis codes or ungroupable diagnosis and procedure codes as claims to drop, so those filters were applied separately.

[25] These claims have DRG codes 391, 469, and 470 for FY 2006 and FY 2007 and DRG codes 795, 998, and 999 starting in FY 2008.

[26] The minimum and maximum service dates are used to calculate the length of stay for the DRG grouper. Records with a missing minimum or maximum service date would have a missing length of stay, for which there is no return code from the grouper software.

[27] MDCs 19 and 20 correspond to psychiatric and alcohol/drug rehab DRGs.

(General and Specialty) Hospitals."[28]  Kaiser hospitals are identified as all hospitals with "Kaiser Foundation Hospitals" as the system name.

- Limit to hospitals in Northern California only, defined as the 48 counties north of San Luis Obispo, Kern, and San Bernardino.[29]

- Limit to claims at the Sutter Damage Hospitals and the Benchmark Hospitals.

23.    In calculating damages, that data sample is limited to claims at the Sutter Damage Hospitals and the following observations are added back to the data sample:

- Add claims with previously removed DRG codes or with no DRG codes.

- Add claims with missing MDCs.

## C.    Regression Sample

24.    Across the Class Health Plans, the overcharge regression analysis dataset contains 4,250 hospital-year observations for the period 2006-2017, 335 of which are associated with the Sutter Damage Hospitals and 3,915 are associated with the Benchmark Hospitals. The 4,250 hospital observations account for 691,981 claims, of which 108,560 (or 15.7 percent) are associated with the Sutter Damage Hospitals and the other 583,421 (84.3 percent) are associated with the Benchmark Hospitals. Exhibit H1 describes claim counts by Health Plan and Exhibit H2 describes the Benchmark Hospitals used in the regression sample and identifies the Class Health Plans for which the hospitals have prices.

---

[28] The first two digits of the six-digit CMS ID identify the state in which the hospital is located.

[29] US Census Bureau; and Tenn, Steven, "The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction," *International Journal of the Economics of Business*, Vol. 18, No.1, 2011, pp. 65-82, at p.74.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA   H-17

**Exhibit H1**
**Sample Size by Health Plan in Stacked Overcharge Analysis Dataset:**
**The 2006 to 2017 vs. 2009 to 2017 Sample Periods**

|  | 2006-2017 | | 2009-2017 | |
|---|---|---|---|---|
| **Health Plan** | **Episodes** | **Hospital-Years** | **Episodes** | **Hospital-Years** |
| Aetna | 33,313 | 739 | 31,225 | 678 |
| Anthem | 206,841 | 936 | 180,525 | 751 |
| Blue Shield | 346,808 | 943 | 259,368 | 742 |
| Health Net | 66,418 | 776 | 57,214 | 716 |
| UHC | 38,601 | 856 | 35,191 | 685 |

*Notes:*

1. Sample Size defined as episode counts used in construction of hospital prices from claims data.

2. Episode counts reported here for Blue Shield and Anthem differ from the Chipty Class Declaration and Chipty Reply Declaration due to the difference between a claim and an episode and the exclusion of Sutter Santa Rosa. Multiple claims can be combined into a single episode.

*Sources:*

1. OSHPD Hospital Financial Disclosure Data Pivot Profiles, 2006-2017.

2. Aetna Claims Data, 2008 - 2017.

3. Health Net Claims Data, 2008 - 2017.

4. United Claims Data, 2006 - 2017.

5. Anthem Claims Data, 2006 - 2017.

6. Blue Shield Claims Data, 2006 - 2017.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA    H-18

**Exhibit H2**
**Benchmark Hospitals in Overcharge Analysis Dataset**

| Benchmark Hospital | HSA | County | Beds | Health Plans with Hospital |
|---|---|---|---|---|
| UCSF Medical Center | San Francisco | San Francisco | 660 | Anthem, BSC, Aetna, Health Net, UHC |
| University Of California Davis Medical Center | Sacramento | Sacramento | 626 | Anthem, BSC, Aetna, Health Net, UHC |
| Community Regional Medical Center - Fresno | Fresno | Fresno | 594 | Anthem, BSC, Aetna, Health Net, UHC |
| Stanford University Hospital | Stanford | Santa Clara | 566 | Anthem, BSC, Aetna, Health Net, UHC |
| John Muir Medical Center - Walnut Creek | Walnut Creek | Contra Costa | 524 | Anthem, BSC, Aetna, Health Net, UHC |
| El Camino Hospital | Mountain View | Santa Clara | 487 | Anthem, BSC, Aetna, Health Net, UHC |
| Santa Clara Valley Medical Center | San Jose | Santa Clara | 464 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Agnes Medical Center | Fresno | Fresno | 436 | Anthem, BSC, Aetna, Health Net, UHC |
| Kaweah Delta Medical Center | Visalia | Tulare | 403 | Anthem, BSC, Aetna, Health Net, UHC |
| Zuckerberg San Francisco General Hospital & Trauma Center | San Francisco | San Francisco | 403 | BSC, Health Net |
| Doctors Medical Center - Modesto | Modesto | Stanislaus | 392 | Anthem, BSC, Aetna, Health Net, UHC |
| Mercy San Juan Hospital | Carmichael | Sacramento | 370 | Anthem, BSC, Aetna, Health Net, UHC |
| Good Samaritan Hospital - San Jose | San Jose | Santa Clara | 366 | Anthem, BSC, Aetna, Health Net, UHC |
| Washington Hospital - Fremont | Fremont | Alameda | 359 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Joseph'S Medical Center Of Stockton | Stockton | San Joaquin | 338 | Anthem, BSC, Aetna, Health Net, UHC |
| O'Connor Hospital | San Jose | Santa Clara | 334 | Anthem, BSC, Aetna, Health Net, UHC |
| John Muir Medical Center - Concord Campus | Concord | Contra Costa | 313 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Mary'S Medical Center - San Francisco | San Francisco | San Francisco | 300 | Anthem, BSC, Aetna, Health Net, UHC |
| Dominican Hospital | Santa Cruz | Santa Cruz | 294 | Anthem, BSC, Aetna, Health Net, UHC |
| Santa Rosa Memorial Hospital | Santa Rosa | Sonoma | 291 | Anthem, BSC, Aetna, Health Net, UHC |
| Rideout Memorial Hospital | Marysville | Yuba | 291 | Anthem, BSC, Aetna, Health Net, UHC |
| Sequoia Hospital | Redwood City | San Mateo | 279 | Anthem, BSC, Aetna, Health Net, UHC |
| Mercy General Hospital | Sacramento | Sacramento | 274 | Anthem, BSC, Aetna, Health Net, UHC |
| Salinas Valley Memorial Hospital | Salinas | Monterey | 269 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Francis Memorial Hospital | San Francisco | San Francisco | 267 | Anthem, BSC, Aetna, Health Net, UHC |
| Mercy Medical Center - Redding | Redding | Shasta | 266 | Anthem, BSC, Aetna, Health Net, UHC |
| Seton Medical Center | Daly City | San Mateo | 255 | Anthem, BSC, Aetna, Health Net, UHC |
| Regional Medical Center Of San Jose | San Jose | Santa Clara | 247 | Anthem, BSC, Aetna, Health Net, UHC |
| Shasta Regional Medical Center | Redding | Shasta | 246 | Anthem, BSC, Aetna, Health Net, UHC |
| Community Hospital Of The Monterey Peninsula | Monterey | Monterey | 242 | Anthem, BSC, Aetna, Health Net, UHC |
| Highland Hospital | Oakland | Alameda | 236 | Health Net, UHC |
| Marin General Hospital | Greenbrae | Marin | 218 | Anthem, BSC, Aetna, Health Net, UHC |
| Emanuel Medical Center | Turlock | Stanislaus | 209 | Anthem, BSC, Aetna, Health Net, UHC |
| Enloe Medical Center - Esplanade Campus | Chico | Butte | 208 | Anthem, BSC, Aetna, Health Net, UHC |
| Valleycare Medical Center | Pleasanton | Alameda | 202 | Anthem, BSC, Aetna, Health Net, UHC |
| Dameron Hospital Association | Stockton | San Joaquin | 202 | Anthem, BSC, Aetna, Health Net, UHC |
| Adventist Health Hanford | Hanford | Kings | 199 | Anthem, BSC, Aetna, Health Net, UHC |
| Hanford Community Hospital | Hanford | Kings | 199 | Anthem, BSC, Health Net, UHC |
| San Joaquin General Hospital | Stockton | San Joaquin | 196 | Anthem, BSC, Aetna, Health Net |
| St. Rose Hospital | Hayward | Alameda | 195 | Anthem, BSC, Aetna, Health Net, UHC |
| Adventist Health Lodi Memorial | Lodi | San Joaquin | 190 | Anthem, BSC, Aetna, Health Net, UHC |
| Doctors Medical Center - San Pablo | San Pablo | Contra Costa | 189 | Anthem, BSC, Aetna, Health Net, UHC |
| Mercy Medical Center - Merced | Merced | Merced | 186 | Anthem, BSC, Aetna, Health Net, UHC |
| Northbay Medical Center | Fairfield | Solano | 180 | Anthem, BSC, Aetna, Health Net, UHC |
| Queen Of The Valley Medical Center | Napa | Napa | 177 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Joseph Hospital - Eureka | Eureka | Humboldt | 174 | Anthem, BSC, Aetna, Health Net, UHC |
| Methodist Hospital - Sacramento | Sacramento | Sacramento | 162 | Anthem, BSC, Aetna, Health Net, UHC |
| Oroville Hospital | Oroville | Butte | 133 | Anthem, BSC, Aetna, Health Net, UHC |
| Natividad Medical Center | Salinas | Monterey | 130 | Anthem, BSC, Aetna, Health Net, UHC |
| Sierra View Medical Center | Porterville | Tulare | 128 | Anthem, BSC, Aetna, Health Net, UHC |
| Contra Costa Regional Medical Center | Fairfield | Contra Costa | 123 | Health Net |
| San Ramon Regional Medical Center | San Ramon | Contra Costa | 123 | Anthem, BSC, Aetna, Health Net, UHC |

**Exhibit H2 (continued)**
**Benchmark Hospitals in Overcharge Analysis Dataset**

| Benchmark Hospital | HSA | County | Beds | Health Plans with Hospital |
|---|---|---|---|---|
| Community Hospital Of Los Gatos | San Jose | Santa Clara | 113 | Anthem, BSC, Aetna, Health Net, UHC |
| Clovis Community Medical Center | Fresno | Fresno | 109 | Anthem, BSC, Aetna, Health Net, UHC |
| Tulare Regional Medical Center | Fresno | Tulare | 108 | Anthem, BSC, Aetna, Health Net, UHC |
| Madera Community Hospital | Madera | Madera | 106 | Anthem, BSC, Aetna, Health Net, UHC |
| Watsonville Community Hospital | Watsonville | Santa Cruz | 106 | Anthem, BSC, Aetna, Health Net, UHC |
| Mercy Hospital - Folsom | Folsom | Sacramento | 106 | Anthem, BSC, Aetna, Health Net, UHC |
| Sierra Nevada Memorial Hospital | Grass Valley | Nevada | 104 | Anthem, BSC, Aetna, Health Net, UHC |
| George L. Mee Memorial Hospital | King City | Monterey | 100 | Anthem, BSC, Aetna, Health Net, UHC |
| San Mateo Medical Center | San Mateo | San Mateo | 100 | Anthem, BSC, Aetna, Health Net, UHC |
| Alameda Hospital | Alameda | Alameda | 100 | Anthem, BSC, Aetna, Health Net, UHC |
| Adventist Health Feather River | Paradise | Butte | 100 | Anthem, BSC, Aetna, Health Net, UHC |
| San Leandro Hospital | San Leandro | Alameda | 93 | Anthem, BSC, Aetna, Health Net, UHC |
| Adventist Health St. Helena | Deer Park | Napa | 91 | Anthem, BSC, Aetna, Health Net, UHC |
| Marshall Medical Center | Placerville | El Dorado | 91 | Anthem, BSC, Aetna, Health Net, UHC |
| Woodland Memorial Hospital | Woodland | Yolo | 88 | Anthem, BSC, Aetna, Health Net, UHC |
| Adventist Health Sonora - Greenley | Sonora | Tuolumne | 84 | Anthem, BSC, Aetna, Health Net, UHC |
| Petaluma Valley Hospital | Petaluma | Sonoma | 80 | Anthem, BSC, Aetna, Health Net, UHC |
| Mad River Community Hospital | Arcata | Humboldt | 80 | Anthem, BSC, Aetna, Health Net, UHC |
| Adventist Health Ukiah Valley | Ukiah | Mendocino | 78 | Anthem, BSC, Aetna, Health Net, UHC |
| Doctors Hospital Of Manteca | Manteca | San Joaquin | 73 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Louise Regional Hospital | Gilroy | Santa Clara | 72 | Anthem, BSC, Aetna, Health Net, UHC |
| Barton Memorial Hospital | South Lake Tah | El Dorado | 69 | Anthem, BSC, Aetna, Health Net, UHC |
| St. Elizabeth Community Hospital | Red Bluff | Tehama | 66 | Anthem, BSC, Aetna, Health Net, UHC |
| Fresno Heart And Surgical Hospital | Fresno | Fresno | 57 | Anthem, BSC, Aetna, Health Net, UHC |
| Sonoma Valley Hospital | Sonoma | Sonoma | 56 | Anthem, BSC, Aetna, Health Net, UHC |
| Chinese Hospital | San Francisco | San Francisco | 54 | Anthem, BSC, Aetna, Health Net, UHC |
| Vaca Valley Hospital | Vacaville | Solano | 50 | Anthem, BSC, Aetna |
| Hazel Hawkins Memorial Hospital | Hollister | San Benito | 49 | Anthem, BSC, Aetna, Health Net, UHC |
| Adventist Health Reedley | Fresno | Fresno | 44 | Anthem, BSC, Aetna, Health Net, UHC |
| Colusa Medical Center | Colusa | Colusa | 42 | Anthem, BSC, Aetna, Health Net, UHC |
| Sonoma Specialty Hospital | Sebastopol | Sonoma | 37 | Anthem, BSC, Aetna, UHC |
| Central Valley General Hospital | Hanford | Kings | 36 | Anthem, BSC, Aetna, Health Net, UHC |
| Mark Twain Medical Center | San Andreas | Calaveras | 36 | Anthem, BSC, Aetna, UHC |
| Oak Valley District Hospital | Oakdale | Stanislaus | 35 | Anthem, BSC, Aetna, Health Net, UHC |
| Fresno Surgical Hospital | Fresno | Fresno | 31 | Anthem, BSC, Aetna, Health Net, UHC |
| Northern Inyo Hospital | Bishop | Inyo | 25 | Anthem, BSC |
| Tahoe Forest Hospital | Truckee | Nevada | 25 | Anthem, BSC, Aetna, Health Net, UHC |
| Coalinga Regional Medical Center | Coalinga | Fresno | 24 | Anthem, BSC, Health Net, UHC |
| Corcoran District Hospital | Corcoran | Kings | 24 | Anthem, BSC, Health Net |
| Stanislaus Surgical Hospital | Modesto | Stanislaus | 23 | Anthem, BSC, Aetna, Health Net, UHC |
| Mendocino Coast District Hospital | Fort Bragg | Mendocino | 20 | Anthem, BSC |
| Modoc Medical Center | Alturas | Modoc | 16 | Anthem, BSC |

*Notes:*

1. Beds are defined as acute beds per the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles. If a hospital had a record in 2011, 2011 bed counts are reported, otherwise, next most recent bed counts are reported.

2. Name and County reflect the most recent available from OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles between 2006 and 2017.

3. HSA is pulled from Dartmouth Atlas data using the most recent zip code in the OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles between 2006 and 2017.

*Sources:*

1. *See* sources to Exhibit H1.

2. Dartmouth Atlas.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, JERRY JANKOWSKI,
SUSAN HANSEN, DAVID HERMAN,
OPTIMUM GRAPHICS, INC., and JOHNSON
POOL & SPA, on Behalf of Themselves and All
Others Similarly Situated,

                  Plaintiffs,

    v.

SUTTER HEALTH,

                  Defendant.

Case No. 3:12-cv-4854-LB

CLASS ACTION

Rebuttal Report of Dr. Tasneem Chipty

April 16, 2021

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

# Table of Contents

I.    Introduction ........................................................................................................ 1

II.   Summary of Opinions ....................................................................................... 2

III.  Dr. Willig's and Dr. Gowrisankaran's Claims about Sutter's Participation in Narrow and Tiered Network Products Are Exaggerated and Fail to Address Whether these Products Were Commercially Successful ........................................................... 4

IV.  Dr. Willig's Claim that Limited and Tiered Network Products are "Relatively Unpopular" Is at Odds with His Own Statements. ............................................... 9

V.   Dr. Willig Does Not Show that the Challenged Conduct *Caused* the Benefits He Attempts to Describe ...................................................................................... 11

    A.  Dr. Willig's Arguments About "Predictability" Are Not a Justification for Anticompetitive Conduct ......................................................................... 12

    B.  Dr. Willig's Claims that the Challenged Provisions Have Allowed Sutter to Achieve Lower Costs and Charge Lower Prices Are Contradicted by the Evidence .......... 13

    C.  Dr. Willig's Claims that the Challenged Provisions Have Allowed Sutter to Achieve Higher Quality Are Unsupported by the Evidence ................................. 14

    D.  Dr. Willig's Claims Regarding Sutter's Provision of Care to Government-Insured and Uninsured Patients Are Wrong ................................................................. 17

    E.  Dr. Willig's Arguments Ignore the Fact that Other Hospitals in Northern California Are Also Investing and Innovating ..................................................... 19

    F.  Dr. Willig Conflates Sutter "Operating as a System" with Sutter's Practice of Coercive Systemwide Contracting ................................................................ 21

    G.  Dr. Willig Implicitly Admits that Sutter's Conduct Did Not Cause the Alleged Benefits ..................................................................................................... 23

VI.  Even if Dr. Willig's Alleged Benefits Were Supported by Evidence, and Even If They Were Enabled by the Alleged Conduct, They Do Not Justify the Conduct .............. 24

VII.  Conclusions ..................................................................................................... 26

## I.   Introduction

1.      My name is Tasneem Chipty. I declare under penalty of perjury as follows:

2.      At the request of counsel for the Class Plaintiffs, I previously submitted nine reports/declarations in *Sidibe et al. vs. Sutter*.[1] Most recently, I submitted a report that provided updated hospital overcharge, pass-through, and premium damages analyses to cover the period January 2011 to March 2020.[2] I have now been asked to review and respond to the supplemental expert reports of Dr. Robert Willig and Dr. Gautam Gowrisankaran.[3] Dr. Willig devotes half of his new report to the argument that Sutter does not block health plans from creating narrow and tiered network products[4]—products he describes as "unpopular" among the commercially insured.[5] Dismissing the challenged provisions as irrelevant, Dr. Willig then attempts to defend them as *necessary* to ensure volume and revenue predictability, something he claims enabled Sutter to make investments that benefited patients.[6] Ignoring the obvious contradiction in Dr. Willig's two positions, I address both of his views, which I find to be without merit. Dr. Gowrisankaran updates the numbers from his June 2019 report, but otherwise does not alter his methodology or conclusions. Dr. Gowrisankaran's analyses suffer from the same problems that I previously identified.[7]

3.      In forming my opinions, I have reviewed the new reports of Drs. Willig and Gowrisankaran (including their reliance materials), publicly available data and studies, and other materials upon which I have previously relied. I have also had an opportunity to interview Class

---

[1] My qualifications are described in my previous reports/declarations in this matter, and my updated CV is included here as Appendix A. I incorporate herein by reference the opinions I have previously expressed, and I adopt in this report the citation shorthand and the use of terms as defined by me previously in this matter.

[2] Supplemental Declaration of Dr. Tasneem Chipty, March 12, 2021 (hereafter "Chipty March Supplemental Declaration").

[3] Supplemental Expert Report of Dr. Robert D. Willig, March 12, 2021 ("Willig March Supplemental Report"); and Supplement to June 21, 2019 Expert Report of Gautam Gowrisankaran, PhD, March 12, 2021 ("Gowrisankaran Supplement").

[4] Willig March Supplemental Report, ¶¶ 7-19.

[5] Willig March Supplemental Report, ¶¶ 18.

[6] Willig March Supplemental Report, ¶¶ 20-42.

[7] Chipty Merits Rebuttal Report, ¶¶ 5-11.

Plaintiffs' expert Dr. Kenneth Kizer about his opinions regarding Sutter's quality and the work put forth by Mr. Patrick Pilch, that was relied upon by Dr. Willig.[8] A full list of the incremental materials that I considered is included in Appendix B. My understanding is that Dr. Kizer will submit a report in this matter; I reserve the right to review that report and, should I decide to do so, rely upon it.

4.    The work present in this report has been conducted by me and staff working under my direction, at both Berkeley Research Group and AlixPartners (formerly Matrix Economics). AlixPartners receives $850 per hour for my work in this matter. AlixPartners also receives compensation from Berkeley Research Group based on its collected staff billings in support of this effort. My compensation is not dependent on the outcome of this matter. My work is ongoing, and I will continue to review the discovery record to understand the evidence in this case. I reserve the right to supplement and to amend my opinions.

## II.    Summary of Opinions

5.    Based on my training and experience as an antitrust economist, my review of the record in this case, and the analyses set forth in this report, it is my opinion that the largely recycled arguments made by Dr. Willig and Dr. Gowrisankaran in their March 2021 reports are logically flawed and unsupported by the facts. The following points summarize my opinions:

- Drs. Willig and Gowrisankaran attempt to suggest that the challenged provisions were ineffective at deterring Class Health Plans from launching steered products in Northern California. To this end, they provide a list of steered products that did not feature all of the Sutter hospitals.[9] But, the issue is not whether Sutter ever allowed a health plan to launch a narrow or tiered network product; the issue is whether the conditions imposed by Sutter rendered such products financially unviable, in some cases discouraging the Class Health Plans from launching them in the first instance. A closer look at the evidence shows that: (a) many of the products identified by Drs.

---

[8] Interview with Dr. Kenneth Kizer, April 14, 2021 (hereafter "Kizer Interview").
[9] See e.g., Willig March Supplemental Report, Table 1.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

Willig and Gowrisankaran were commercially unsuccessful; and (b) by foreclosing Class Health Plans from offering low-cost, effective, steered products, Sutter's conduct interfered with the overall penetration of steered products in Northern California.

- Dr. Willig attempts to disparage narrow and tiered network products as "relatively unpopular."[10] A combination of the public health literature, evidence from this case, and Dr. Willig's own testimony and written work in this and other matters shows that his characterization is untrue. For example, in a different matter, Dr. Willig testified that tiered products are "common in many parts of the country" and described "by many to be the future of health insurance…."[11] In that same matter, Dr. Willig recognized that even the threat of launching a steered product can be a "powerful negotiating tool" that may limit hospitals' abilities to increase price.[12]

- Dr. Willig also attempts to defend the challenged provisions by saying they were necessary to address "opportunism," suggesting that, absent the challenged provisions, Sutter would have invested less and charged higher prices.[13] A corollary to Dr. Willig's argument is that Sutter invested more and charged lower prices because of the challenged provisions. That is untrue. There is no evidence that Sutter invested more or charged lower prices, relative to comparable hospitals in Northern California, as a result of the challenged conduct.

- Dr. Willig claims that Sutter has done good deeds with the supra-competitive profits that it has earned, suggesting that these deeds—even if they were to exist—make up for Sutter's anticompetitive conduct. As I explain, a monopolist engaging in anticompetitive conduct cannot justify the harm it inflicts on one group of consumers by engaging in charitable acts towards another group of consumers. Furthermore, it

---

[10] Willig March Supplemental Report, ¶ 18.
[11] *See* Paragraph 14 below.
[12] Willig Deposition (July 24, 2019), pp. 155-157.
[13] Willig March Supplemental Report, ¶¶ 20-21.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

is generally not possible for even the most charitable monopolist to make whole the consumers it has harmed through its exercise of market power.

6.      My review of the evidence indicates that the challenged conduct interfered with the commercial success of steered products in Northern California. As a result, Sutter was able to charge significantly higher prices for general acute care inpatient services. Further, there is no evidence that Sutter invested more because of the supra-competitive profits it earned by exercising its market power, let alone that there were no less restrictive alternatives by which Sutter could have achieved the same ends. Instead, Dr. Willig's arguments are at odds with the evidence that other hospitals, without forcing health plans to agree to the challenged provisions, invest in quality and safety, including during the COVID pandemic.

7.      The remainder of this report is organized as follows. Section III explains that Drs. Willig and Gowrisankaran exaggerate the extent of Sutter's participation in narrow and tiered network products, and they fail to address whether these products were commercially successful. Section IV discusses Dr. Willig's claim that limited and tiered network products are "relatively unpopular." Section V discusses the fact that Dr. Willig does not show that the challenged conduct caused the benefits he attempts to ascribe to them. Section VI explains that even if Dr. Willig's alleged benefits were supported by the facts, which they are not, they do not justify Sutter's conduct. Section VII concludes.

## III.   Dr. Willig's and Dr. Gowrisankaran's Claims about Sutter's Participation in Narrow and Tiered Network Products Are Exaggerated and Fail to Address Whether these Products Were Commercially Successful

8.      In a renewed attempt to suggest that Sutter's contractual provisions do not interfere with the Class Health Plan's ability to offer narrow and tiered network products,[14] Dr. Willig claims to provide "examples of many narrow network plans that excluded at least some Sutter hospitals" in Table 1 of his new report,[15] and a handful of examples where Sutter agreed

_____

[14] Dr. Willig does not appear to challenge the fact that the provisions exist, even today. *See* Willig March Supplemental Report, ¶ 10 ("This language is also present in more recent Systemwide Agreements (SWAs), including those with Anthem Blue Cross, United Healthcare, and Health Net."). Dr. Gowrisankaran testified that the provisions exist even today; *see* Gowrisankaran Deposition (March 29, 2021), pp. 26-28.
[15] Willig March Supplemental Report, ¶ 12 and Table 1.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

to participate in a tiered network product,[16] most of which are recycled from his prior report.[17] Dr. Gowrisankaran presents a similar list in his Supplemental Exhibit 11.[18] But Drs. Willig and Gowrisankaran miss the point. The issue is not whether Sutter ever agreed to allow a health plan to launch a narrow or tiered network product that did not feature all of the Sutter hospitals; rather, the issue is whether the conditions imposed by Sutter allowed health plans to offer those products on a competitive, low-cost basis *or* whether Sutter's conduct rendered those products as financially ineffective or unviable.

9.      The testimony from health plan witnesses and my own analyses demonstrate that Sutter's conduct substantially hindered health plans from offering low cost, narrow and tiered network products on a profitable basis.[19] The qualitative evidence shows that the challenged provisions hindered each of the Class Health Plans from offering steered products in Northern California.[20] Much of this evidence describes *the lack of commercial success* the Class Health Plans have had with many of the very products Dr. Willig highlights in his report.[21] Furthermore, using Anthem data, I have demonstrated that Anthem's narrow and tiered network products over the period 2006 to 2015 have achieved greater penetration in Southern California, relative to Northern California.[22] Exhibit 1 below extends my original analysis to cover the period 2006 to 2017.

---

[16] Willig March Supplemental Report, ¶ 15.

[17] Willig Merits Report Appendix Tables 1 to 5.

[18] Gowrisankaran Supplement Exhibit 11.

[19] Chipty Merits Report, ¶¶ 182-187.

[20] Chipty Merits Report, ¶¶ 182-187 and Chipty Supplemental Report, Exhibit 1.

[21] *See e.g.*, Chipty Merits Report, ¶ 184 (discussing two of the products in Dr. Willig's Table 1: (a) the Blue Shield "Local Access+" product was discontinued due to Sutter's contract provisions; and (b) the Blue Shield "SaveNet" product was limited in Northern California due to the 95 percent non-participating rate required by Sutter in San Francisco and Sacramento) ███████████████████████████████████████████████████████████

[22] Chipty Supplemental Report, ¶ 4 (explaining that steered products have been more commercially successful for Anthem in Southern California, where they have achieved greater penetration, about 2.7 times more, than in Northern California. The gap between Northern and Southern California has also widened over the Class Period, since Sutter imposed the challenged restrictions); and Exhibit 1.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

**Exhibit 1**
**Chipty Supplemental Report, Updated Exhibit 1**
**Percent of In-Network, Inpatient Claims Associated with a Steered Product,**
**for Anthem's Small and Large Group Members**
**Southern California vs. Northern California**



*Notes*:

1. Claims are divided between Southern and Northern California based on patient zip code.

2. This analysis relies on the same classification, which was verified by Anthem personnel, of products as either steered or non-steered that was used in my 2006 to 2015 analysis. Using this classification, it was possible to identify all Anthem small and large group claims as being covered by either a steered or a non-steered Anthem insurance product. *See* Chipty Workpapers.

*Sources*:

1. Anthem Claims and Premium Data.

2. OSHPD Hospital Annual Financial Disclosure Data Pivot Profiles, 2006-2017.

3. Northern California Zip Code Lookup.

4. "Copy of Copy of Anthem Product Classification (DRAFT) 2019.03.31_LG upda....xlsx," received on April 22, 2019.

     10.    Despite this evidence, Dr. Willig describes his list of examples as "lots and lots of examples" of narrow and tiered network products in Northern California.[23] Yet, he does not address whether there would have been more of these products or whether they would have been

---

[23] Willig Deposition (July 24, 2019), pp. 171-172.

more successful but-for Sutter's conduct. Dr. Willig appears to suggest that the mere attempts by some of the Class Health Plans is proof that Sutter did not interfere with the ability of Class Health Plans to steer volume to less expensive competitor hospitals. For example, in his deposition, Dr. Willig did not know whether: (a) the identified products were available in most areas of Northern California or whether they were more successful in Southern California, relative to Northern California;[24] (b) these products were profitable for the Health Plans;[25] or (c) Class Health Plans abandoned narrow or tiered network products to avoid paying Sutter's uniquely high non-participating rates.[26] Dr. Gowrisankaran's recent deposition testimony shows a similar lack of knowledge on these subjects.[27] Dr. Willig even goes as far as to say it was not necessary to address these questions to evaluate whether the challenged provisions interfered with competition.[28] His statement is incorrect.

11.     A closer look at Dr. Willig's evidence highlights its shortcomings. Most of the products described by Dr. Willig launched before 2016; my original analysis provided evidence that these products were largely commercially unsuccessful. Dr. Willig describes a handful of new narrow network products and two new tiered network products in which Sutter Health has agreed to participate since 2016. Using publicly available information, I was able to confirm that several of these products are not widely available in Northern California. For example:

---

[24] Willig Deposition (July 24, 2019), pp. 168-169 ("Q: Do you know whether there was testimony that said that Aetna Value Network was more successful in southern California geographies than northern California geographies? A: I don't recall that explicitly, but I wouldn't deny it.").

[25] Willig Deposition (July 24, 2019), p. 168 ("Q: do you know whether there was any testimony in the record that said that Aetna's Concentric and Aexcel products were not viable products in northern California? A: I don't recall specifically, but I wouldn't preclude that."). *See also*, Willig Deposition (July 24, 2019), pp. 173-176.

[26] Willig Deposition (July 24, 2019), p. 175 ("Q: Is the Blue Shield SaveNet HMO product still offered? A: No I don't have the dates in this table on when they were actually offered. Q: Do you know whether they were discontinued due to the lack of Sutter participation? A: Oh, no, I don't know that."). *See also*, Willig Deposition (July 24, 2019), p. 176 ("Q: Are you familiar with the Premier Care HMO product…Do you know whether that product still exists in the market? A: No, I don't know from looking at the table, although that information may well be in the report. Q: Do you know whether the SmartCare HMO product is still on the market? A: I don't know that.").

[27] Gowrisankaran Deposition (March 29. 2021), pp. 43-70; *see e.g.*, Gowrisankaran Deposition (March 26, 2021), p. 68 ("Have you done any analysis of what their membership in these products were in northern California versus southern California? A: So, again, I did not do any analysis to compare enrollment in northern California to southern California….").

[28] Willig Deposition (July 24, 2019), pp. 171-172.

- ███████████████████████████████████████████████████████

  ████████████████████████████████████████████████████ [29]

- Blue Shield's "CalPERS Trio HMO" product is not available in many regions of Northern California, including Alameda, San Francisco, or Stanislaus counties.[30]

- Health Net's "SmartCare HMO" Small Group product does not appear to be available in many regions of Northern California, including Alameda, Sacramento, San Francisco, or Stanislaus counties.[31]

Further, I have provided a systematic description of the commercial success of Anthem's steered products from 2006 to 2017. As shown in Exhibit 1, even accounting for the additional products that Anthem launched in 2016 and 2017, there remains a significant gap between Northern and Southern California in the penetration of Anthem's steered products. Furthermore, most of the new products were introduced *after 2018*, when Sutter faced legal challenges to its contracting practices on multiple fronts.[32] Therefore, it is unclear whether Sutter's willingness to participate in these products, even if they were (or will be) ultimately successful, provides meaningful insight of the effects of the challenged conduct.

12.    Sutter's conduct in 2019 and 2020 may affect the choice of insurance products available to consumers in those years, and, given how premiums are calculated, this conduct may

---

[29] Anthem Blue Cross, "Anthem Blue Cross continues to offer EPO and HMO individual on and off exchange products for 2021," February 1, 2021, available at https://providernews.anthem.com/california/article/anthem-blue-cross-continues-to-offer-epo-and-hmo-individual-on-and-off-exchange-products-for-2021, *site visited* April 7, 2021.

[30] Blue Shield of California, "Trio HMO: The Trio HMO Network," available at https://www.calpers.ca.gov/docs/blue-shield-trio-info.pdf, *site visited* April 6, 2021. Rating Area 3 is composed of Sacramento, Placer, El Dorado, and Yolo counties: *see* CMS, "California Geographic Rating Areas: including State Specific Geographic Divisions," available at https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Market-Reforms/ca-gra, *site visited* April 6, 2021.

[31] Health Net, "Rates Guide: Choice Made Simple," available at https://www.healthnet.com/static/broker/unprotected/pdfs/ca/sbg/ca_sbg_rate_guide_dec.pdf, *site visited* April 7, 2021 (covering Small Groups in December 2017); *see also*, Health Net, "Rates Guide: Choice Made Simple," available at https://www.healthnet.com/content/dam/centene/healthnet/pdfs/broker/ca/sbg/2021-q2-ca-sbg-rate-guide-std.pdf, *site visited* April 14, 2021 (covering Small Groups from April to June 2021).

[32] State of California Department of Justice, "Attorney General Becerra Files Opposition to Sutter Health's Delay of Landmark Settlement of Anticompetitive Practices," June 25, 2020, available at https://oag.ca.gov/news/press-releases/attorney-general-becerra-files-opposition-sutter-health%E2%80%99s-delay-landmark, *site visited* April 8, 2021 (explaining that the California Attorney General brought its lawsuit involving the same set of challenged provisions against Sutter in March 2018).

impact premium overcharges in 2021 and thereafter. In any event, Sutter's conduct in 2019 and 2020 is not relevant to the damages I have calculated. That is because premiums are based on an experience period that reflects historical medical expenditures two years *before* whenever the premiums are set.[33] Though the conduct is on-going, I have only presented a damages analysis through Q1 2020.

## IV.    Dr. Willig's Claim that Limited and Tiered Network Products are "Relatively Unpopular" Is at Odds with His Own Statements.

13.    Dr. Willig claims that limited and tiered networks are "relatively unpopular" with commercially-insured customers and that insurance companies did not "aggressively pursue non-Sutter healthcare providers to participate in narrow networks."[34] Importantly, Dr. Willig ignores the substantial public health literature showing the important role of steered products in containing health care costs.[35] Dr. Willig also ignores the direct testimony from Class Health Plans explaining their desire to offer steered products and their inability to do so in Northern California relating directly to Sutter's contracting provisions.[36]

---

[33] Chipty March Supplemental Declaration, Footnote 7.

[34] Willig March Supplemental Report, ¶ 18.

[35] *See e.g.*, Dafny, Leemore S., Igal Hendel, Victoria Marone, and Christopher Ody, "Narrow Networks On The Health Insurance Marketplaces: Prevalence, Pricing, And The Cost Of Network Breadth," *Health Affairs*, Vol. 36, No. 9, September 2017, available at https://www.healthaffairs.org/doi/10.1377/hlthaff.2016.1669; *site visited* April 14, 2021; Delbanco, Suzanne F., Roslyn Murray, Robert A. Berenson, Divvy K. Upadhyay, "Narrow Networks," *Urban Institute*, April 2016, available at
https://www.urban.org/sites/default/files/2016/05/03/04_narrow_networks.pdf, *site visited* April 14, 2021 (explaining that "While narrow networks impose greater restrictions on a consumer's choice of health care providers, consumers generally enroll in them to take advantage of lower premiums;" and that "Narrow networks are not equally effective in all markets. They may be less able to lower costs in markets lacking provider competition, in which a dominant provider system must be included to ensure adequate access. Furthermore, a dominant provider group that wants to protect its high patient volume will use its leverage either to stop the effort by refusing to participate in the network or to demand an "in-network" designation while maintaining their higher rates. If the dominant provider commands higher-than-competitive prices and is in-network, the potential savings of a narrow network may not be realized."); and Daly, Richard, "Employers again are planning to expand their use of narrow networks, survey finds," *Healthcare Financial Management Association*, October 23, 2020, available at https://www.hfma.org/topics/news/2020/10/employers-again-are-planning-to-expand-their-use-of-narrow-netwo.html, *site visited* April 14, 2021 ("Nearly one-fifth (18%) of large employers offer a high-performance or narrow network in at least one location in their employee health plans, according to the latest Willis Towers Watson 2020 Health Care Delivery Survey. And 40% of employees with access to narrow-network plans were enrolled.").

[36] Chipty Merits Report, ¶¶ 182-187.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA     9

14. More remarkable is the fact that Dr. Willig's claim is at odds with his own prior work in this and other matters. In his Merits Report, Dr. Willig describes Kaiser as "the ultimate steered product," and reports its substantial market share in Northern California.[37] His deposition testimony also acknowledges that Kaiser has "a lot of popularity" in California.[38] Moreover, Dr. Willig recently co-authored a Sixth Circuit *Amici Curiae* Brief that was filed just eleven days prior to his March Supplemental Report. There, Dr. Willig explains that: "Health-plan enrollees ***often are willing to trade*** network breadth for lower premiums, and there is evidence that enrollees in narrow-network plans are particularly price-sensitive" and that "[s]tate and federal policymakers have recognized the potential cost-benefits of narrow networks."[39] In that same Brief, Dr. Willig and his co-authors argue that ProMedica "*must* be able to construct a desirable [narrow] network of providers that it can offer at low premiums" in order for its plans to be successful.[40] Finally, Dr. Willig disregards the testimony that he provided in the *Penn State Hershey/Pinnacle Hospital* merger matter where he described steered products as "innovations in insurance plans that have influenced the marketplace," and said that "[t]his [referring to tiered products] is common in many parts of the country....It's said by many to be the future of health insurance generally."[41]

15. Instead, Dr. Willig points to Health Net and Anthem agreements with Sutter to support his claim that steered products are "unpopular." For example, he describes a 2018 Health Net Systemwide Agreement with Sutter which he claims shows that "Health Net did not offer any tiered network plans" as of 2018.[42] Perhaps because he has not examined the testimony from Class Health Plans or because he does not recall the poor commercial experience of many of the steered products that attempted to exclude Sutter, Dr. Willig misinterprets the absence of steered

---

[37] Willig Merits Report, ¶ 46. Dr. Willig's description of Kaiser as the "ultimate steered product" is also consistent with consistent with evidence from Dr. Gowrisankaran. *See* Gowrisankaran Supplement, Exhibit 2.

[38] Willig Deposition (July 24, 2019), pp. 151-152.

[39] "Brief of Antitrust Economists as Amici Curiae in Support of Defendants-Appellants Urging Reversal," St. Luke's Hospital, D/B/A McLaren St. Luke's; and WellCare Physicians Group, LLC v. ProMedica Health System, Inc. et al, the United States Court of Appeals for the Sixth Circuit, Case No. 21-3007 On Appeal From Case No. 3:20-CV-02533, March 2, 2021 (hereafter "Willig Amici Brief"), p. 9 [Emphasis added].

[40] Willig Amici Brief, pp. 9-10 [Emphasis added].

[41] Willig Deposition (July 24, 2019) Exhibit 896, p. 849.

[42] Willig March Supplemental Report, ¶ 19.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

products in these Sutter contracts as evidence that there is little demand in Northern California for steered products. To the contrary, one might view the absence of steered products in Sutter's contracts with Health Net and Anthem as evidence of the interference arising from Sutter's contract provisions, including its non-participating rates, that hinder health plans' ability to successfully launch steered products in Northern California.[43]

## V.   Dr. Willig Does Not Show that the Challenged Conduct *Caused* the Benefits He Attempts to Describe

16.     Dr. Willig asserts that "by creating more assured volume and preventing ex-post opportunism, the provisions lead to lower prices and more predictable revenue."[44] He, in turn, argues that the challenged provisions thus "foster investments" and allow Sutter to reduce costs.[45] He also states that these "increased investments" by Sutter puts pressure on other systems to invest[46] and that "[c]onsumers … ultimately benefit, not only from the lower prices that accompany assured volume, but also from these investments…."[47] He further argues that the challenged provisions "allow Sutter to offer a broad and integrated health care system that benefits patients."[48]

17.     There are problems with each of Dr. Willig's specific claims as well as conceptual errors with his attempt to justify Sutter's conduct on the basis that they "foster" or "enable" greater investments. I discuss each of these in this section.

---

[43] Chipty Merits Report, ¶¶ 182-187; and Kazmirchuk Deposition (Health Net, October 15, 2018), pp. 185-187.
[44] Willig March Supplemental Report, ¶ 20.
[45] Willig March Supplemental Report, ¶ 27.
[46] Willig March Supplemental Report, ¶ 20.
[47] Willig March Supplemental Report, ¶ 20.
[48] Willig March Supplemental Report, § II.C.

## A.   Dr. Willig's Arguments About "Predictability" Are Not a Justification for Anticompetitive Conduct

18.     Dr. Willig claims the challenged provisions afford Sutter greater "predictability" in volumes and revenues, which, in turn, addresses Sutter's fear of "opportunism."[49] In economics, the term "opportunism" refers to situations in which a trading partner tries to renegotiate terms after investments are made (often referred to as ex post opportunism). The risk of such behavior from one's trading partner can reduce a firm's trade or investment incentives.[50] Thus, Dr. Willig posits that Sutter's challenged provisions minimize the risk of opportunism by ensuring that health plans do not steer volume away from Sutter (*e.g.* by placing Sutter hospitals in a higher cost tier or being placed out-of-network).[51]

19.     There are several problems with Dr. Willig's "predictability" arguments. First, as I have explained before, any hospital or hospital system seeking to ensure large, steady levels of patient volume and revenue can achieve its goal by offering higher quality services at lower prices. Such behavior is the hallmark of competition. Second, Dr. Willig has not provided evidence that the challenged provisions have afforded Sutter greater predictability. In Exhibit 31 from my Merits Report, I showed that Sutter's volume volatility falls in the middle of the benchmark group, so by at least one measure Sutter may not be achieving Dr. Willig's hypothesized "predictability."[52] Third, Dr. Willig has not shown that Sutter's predictability, even if it were higher, is good for consumers. To the contrary, the evidence I describe below shows

---

[49] Willig March Supplemental Report, ¶ 20. *See also*, Willig Merits Report, ¶¶ 70-71 ("Contracts with provisions that attempt to anticipate and prevent opportunistic behavior often do a better job of aligning incentives than contracts that do not include such measures. In the present context, the challenged contract provisions limit insurance carriers' abilities to opportunistically steer patients away from Sutter to other hospitals by raising the premiums or co-pays at Sutter hospitals or removing Sutter hospitals as in-network providers. This increases Sutter's expected returns on investments and its incentives to invest.").

[50] *See e.g.*, Klein, Benjamin, Robert G. Crawford, and Armen A. Alchian, "Vertical Integration, Appropriable Rents, and the Competitive Contracting Process," *Journal of Law and Economics*, Vol. 21, No. 2, October 1978, pp. 297-326, available at https://courseworks2.columbia.edu/files/551319/download?download_frd=1, *site visited* April 14, 2021; and Grossman, Sanford J., and Oliver D. Hart, "The Costs and Benefits of Ownership: A Theory of Vertical and Lateral Integration," *Journal of Political Economy*, Vol. 94, No. 4, 1986, pp. 691-719, available at https://dash.harvard.edu/bitstream/handle/1/3450060/Hart_CostsBenefits.pdf;jsessionid=2365FCB83B93EF7D693E D9892B9A1EA4?sequence=4, *site visited* April 14, 2021.

[51] Willig March Supplemental Report, ¶ 20 *citing to* Willig Merits Report § III.C.3, ¶ 70 (describing a handful of academic papers on moral hazard and contracting).

[52] Chipty Merits Report, Exhibit 31 and ¶ 262.

that Sutter charges higher prices than other hospital systems and that other hospitals are investing and innovating without imposing the challenged provisions on health plans. Moreover, there is no evidence that Sutter invests more because of the challenged provisions. Thus, Dr. Willig's claims are theories at odds with the facts.

### B. Dr. Willig's Claims that the Challenged Provisions Have Allowed Sutter to Achieve Lower Costs and Charge Lower Prices Are Contradicted by the Evidence

20. Dr. Willig claims that Sutter's conduct enabled it to "reduce costs"[53] and charge "lower prices."[54] His claims are not supported by evidence; to the contrary, even a cursory look at the record evidence and econometric analysis, including Dr. Willig's own analysis, shows the opposite. As I have explained before, Sutter hospitals do not outperform comparable hospitals in Northern California in terms of cost control or in terms of prices.[55] For example:

- Sutter's Chief Financial Officer Mr. Robert Reed explains to his team that the challenged conduct makes Sutter's ability to control cost even worse: "Notwithstanding, I am seriously embarrassed by the erosion in our locally controlled cost structure that went from the national average five year [sic] ago to approximately 30% over the national average today. I believe this is a direct result as [sic] our successes in contracting, which has provided the source of cash that has allowed the deterioration in operating discipline."[56]

---

[53] Willig March Supplemental Report, ¶ 34 (explaining that the provisions which allowed Sutter to operate as a system, in turn "allowed Sutter to reduce its costs").

[54] Willig March Supplemental Report, ¶ 20 ("the provisions lead to lower prices") and Willig Merits Report, ¶ 70-71 ("Hence, all else equal, Sutter prefers to have all of its hospitals in an insurance carrier's healthcare network, and it is willing to offer larger discounts to secure in-network positions for all of its hospitals. This recognition that lower prices are linked to predictable and increased patient volume is the core concept underlying provider discounting.").

[55] Chipty Merits Report § IX; Chipty Merits Report ¶ 254; and Chipty Merits Report Appendix F.

[56] Chipty Class Report, Footnote 147 (citing Sutter Health, "Why We Need to Reduce our Cost Structure by More Than 20% And How We Can Do It," DEF002583666-674, at 670.).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- Furthermore, substantial qualitative evidence, spanning ordinary course documents and testimony from Class Health Plans, confirms that Sutter's prices are higher than comparable hospitals in the communities where Sutter operates.[57]

- Moreover, econometric analyses, including Dr. Willig's own regressions, show that Sutter charges higher prices for inpatient hospital services in Northern California.[58]

These findings are consistent with the fact that Sutter interfered with Class Health Plans' ability to steer volume to less expensive providers. As I have explained before, steered products give patients incentives to consider both cost and quality when selecting providers, and steering can help contain healthcare costs.[59] In his testimony in a different matter, Dr. Willig recognized that even the threat of launching a steered product can be a "powerful negotiating tool" that may limit hospitals' abilities to increase price.[60]

### C.     Dr. Willig's Claims that the Challenged Provisions Have Allowed Sutter to Achieve Higher Quality Are Unsupported by the Evidence

21.     Dr. Willig says that the challenged conduct "fostered incentives" to invest in quality, but he admitted that "[e]verybody has got some incentives to invest in quality"[61] because "better facilities will be promoting of more patient flow."[62] Consistent with his theory, the evidence shows that other Northern California hospitals—like UCSF, Stanford, Dignity, and UC Davis—have also made investments in quality and safety, only they have made those

---

[57] *See,* e.g., Email from Yun Kim, Director of Provider Network Performance, Network Management, at Blue Shield of California, to Armine Papouchian, Vice President of Network Management at Blue Shield of California, "Subject: Sutter Analysis Requested," December 19, 2014, with attachment, Blue Shield of California, "Sutter System Analysis: for Juan and Armine, December 19, 2014, BSC -UEBT- 0030511-518, at 515 ("Sutter hospital cost is materially higher than other hospitals in the North and Statewide, 18% - 30% higher"); and De La Torre Deposition (Anthem, July 17-18, 2018) Exhibit 1644 (showing that 17 of 21 Sutter hospitals are in the top 50 most expensive hospitals out of 298 hospitals in an Anthem network); and Sutter Health, "Best Practices Governance Assessment Project Update," CEO Meeting Update, February 2008, STCA0598682, at slide 10 ("We are 15 – 30% more expensive than other providers.").

[58] *See* Chipty March Supplemental Declaration, Exhibit 2 and Exhibit 5 (referencing Dr. Willig's regression model).

[59] Chipty Merits Report, § VII.D and § X.C.

[60] Willig Deposition (July 24, 2019), pp. 155-157.

[61] Willig Deposition Testimony (July 24, 2019), p. 263.

[62] Willig Deposition Testimony (July 24, 2019), pp. 266-267.

investments without relying on high volume levels or supra-competitive profits earned through anticompetitive behavior like Sutter's.[63]

22.     Sutter's own ordinary-course documents repeatedly contradict Willig's claim that "Sutter hospitals remain among the highest quality hospitals" in Northern California:[64]



23.     Dr. Willig references a *U.S. News & World Report* ranking of hospitals. He states, for example, that "In 2020-2021, of the fifty hospitals listed by *U.S. News & World Report*, three Sutter hospitals were ranked among the ten best hospitals in the San Francisco

---

[63] Willig Deposition (July 24, 2019), pp. 256-57 (admitting that Stanford and Dignity made investments in quality during the damages period, and that he could not recall about others); and Chipty Merits Report § IV.D.

[64] Willig March Supplemental Report, ¶ 24.

[65] Strategy Advantage, "Interviews Summary Report Sutter Health Strategic Marketing Task Force," March 21, 2006, DEF005800807–838, at 810.

[66] SMT Strategy Session, "Competitor Response Analysis: Summary Trends Across Regions," Sutter Health, January 18, 2011, STCA0234063, slide notes at slide 13 [Emphasis added].

[67] Email from Kristin Dozier of Sutter to Melissa Brendt of Sutter, "Subject: Re: Blue Shield Cardiac RFI," November 30, 2004, DEF009480962–963, at 962 [Emphasis added].

[68] "Destination 2012 A Perspective on the Environment," DEF003998880–887, at 883 [Emphasis added] and 885 ("We currently assess Sutter's performance on quality and access as 'average' and we are weak in affordability and product consistency."). *See also*, Sutter Health, "A Competitive Profile of Our Performance," July 28, 2005, DEF000609747–81, at 776 (demonstrating variations in heart attacks outcomes for several Sutter hospitals) and 774-781 (showing some average and below average quality ratings for certain Sutter hospitals).

[69] Ian Leverton, MD, "Quality & Cost," Sutter Health, March 24, 2006, DEF005475330–369, at 366 [Emphasis added].

metro area and seven Sutter hospitals were recognized as 'high performers' in at least one area of care."[70] A closer look at his source shows that UCSF, not Sutter, is the top hospital in the San Francisco metro area, and according to testimony in this case, the UC system does not engage in the panoply of anticompetitive conduct that Sutter does.[71] Sequoia Hospital which is number five on the list (immediately after CPMC) is part of Dignity—another system that does not engage in the challenged conduct.[72] There are also other hospitals in this local top ten (*e.g.*, two John Muir campuses are in the top three) that have not engaged in this conduct.[73] Furthermore, **no** Sutter hospitals qualified for the National Rankings from *US News & World Report*, unlike nearby hospitals such as UCSF and Stanford.[74] In the analogous California State Rankings from *US News & World Report*, only one Sutter hospital even ranks in the top 20 (CPMC, at number 20).[75] These examples, based on Dr. Willig's own measure of quality, demonstrate that there are many examples of hospitals achieving high (or even higher) rankings without being in a system that engages in anticompetitive conduct.[76]

24.     Thus, while Dr. Willig attempts to link Sutter's investments in quality to the predictability of volume and revenues enabled by the challenged provisions, there is no evidence that Sutter's patient volume or revenues are actually more predictable or that its quality is any higher, relative to other health systems in Northern California.

---

[70] Willig March Supplemental Report, ¶ 24.

[71] Chipty Merits Report ¶¶ 79-81 (citing testimony of Reese Fawley, Vice President of Health Plan Strategy and Managed Care at UCSF).

[72] Chipty Merits Report ¶¶ 79-81 (citing testimony of Tammy Wilcox, Senior Vice President Managed Care at Dignity).

[73] Chipty Merits Report § IV.D.

[74] Harder, Ben, "2020-21 Best Hospitals Honor Roll and Medical Specialties Rankings," *U.S. News & World Report*, June 28, 2020, available at https://health.usnews.com/health-care/best-hospitals/articles/best-hospitals-honor-roll-and-overview, *site visited* April 7, 2021.

[75] "Best Hospitals in California," *U.S. News & World Report*, available at https://health.usnews.com/best-hospitals/area/ca, *site visited* April 7, 2021.

[76] Kizer Interview.

**D.     Dr. Willig's Claims Regarding Sutter's Provision of Care to
Government-Insured and Uninsured Patients Are Wrong**

25.     Dr. Willig refers back to his Merits report to recite his claim that Sutter provides
more charity care services than other hospitals in Northern California, relying in part on an
earlier analysis by Mr. Pilch that showed that the losses Sutter incurs treating Medicare and
Medi-Cal patients often exceed the losses incurred by non-Sutter hospitals in Northern
California.[77] Dr. Willig now points to an updated analysis by Mr. Pilch that shows the same
result.[78] Assuming for the sake of argument that Dr. Willig is correct about Sutter's losses, the
fact that Sutter loses money on treating Medicare and Medi-Cal patients does not justify its
conduct. The Medicare pricing formula does not vary by provider: only costs vary by provider.
This means that *even if a Sutter hospital provided the same or less Medicare and Medi-Cal care
as a non-Sutter hospital, Sutter's Medicare losses could be higher because Sutter is less
efficient.*[79]

26.     Dr. Willig also points to an analysis by Mr. Pilch claiming to show that "Sutter
reported the most Medicare discharges and the second most Medi-Cal discharges (as measured
by raw discharges) among the systems analyzed."[80] Caution should be exercised in concluding
from Mr. Pilch's work that Sutter provides more Medicare/Medi-Cal care than comparable
hospitals, let alone that it does so because of the challenged conduct. First, as Dr. Kizer explains,
hospital emergency departments have to treat Medicare and Medi-Cal patients until their
emergency condition is stabilized and that hospitals cannot simply transfer and discharge
emergency patients that they do not want to treat.[81] Second, Mr. Pilch's result is at odds with my
own work. As I showed in Exhibit 32 of my Merits Report, using OSHPD data from 2011, there

---

[77] Willig March Supplemental Report, ¶ 25.

[78] Willig March Supplemental Report, ¶¶ 25-26.

[79] *See* Footnote 56.

[80] Willig March Supplemental Report, ¶ 26.

[81] Kizer Interview; CMS, "Emergency Medical Treatment & Labor Act (EMTALA)," available at
https://www.cms.gov/Regulations-and-Guidance/Legislation/EMTALA, *site visited* April 15, 2021 (explaining that
"In 1986, Congress enacted the Emergency Medical Treatment & Labor Act (EMTALA) to ensure public access to
emergency services regardless of ability to pay."); and Consumer Watchdog, "The California Patient's Guide,"
Chapter IV, available at http://calpatientguide.org/iv.html, *site visited* April 15, 2021 ("California law severely
restricts and regulates the ability of all licensed health care facilities with emergency departments to transfer and
discharge emergency patients.").

are many hospitals in Northern California that provide *more* care to government-insured and uninsured patients than Sutter.[82] Mr. Pilch's result is also at odds with Dr. Gowrisankaran's statements in an Amici Brief that he co-authored, "[a] review of the empirical research … lead[s] to the following conclusions: … Nonprofit hospitals with more market power do not provide greater levels of uncompensated care."[83]

27.     In any case, even assuming as Mr. Pilch's suggests that Sutter provides more Medicare/Medi-Cal care, that fact would not justify Sutter's conduct. This case is about Sutter's conduct and its impact on the commercially insured population in Northern California. As I explain below, it is difficult to weigh harm to one consumer group (commercially insured population) against the benefits to another (the Medicare/Medi-Cal population).[84] Consistent with this principle, Dr. Gowrisankaran explains in his Amici Brief that one cannot excuse higher prices from a merger [the challenged conduct in that case] by the fact that the merged system might provide more uncompensated care:

- "Even if it were the case that nonprofit hospitals with more market power both receive higher prices and provide greater levels of uncompensated care, that care would still come at the expense of other consumers who pay the higher prices directly and through reduced pay or benefits, including the possibility of losing insurance coverage entirely."[85]

---

[82] Chipty Merits Report, Exhibit 32 (measuring percent of discharges that are government-insured or uninsured).

[83] "Brief of Amici Curiae Economics Professors in Support of Petitioner," *Federal Trade Commission v. Phoebe Putney Health System, Inc., et al.*, the Supreme Court of the United States, On Writ of Certiorari to the United States Court of Appeals for the Eleventh Circuit, Case No. 11-1160, filed August 20, 2012 (hereafter "Gowrisankaran Amici Brief"), p. 15; and Gowrisankaran Deposition (March 29, 2021), p. 97 ("[T]here is no evidence that, systematic evidence, that these nonprofit hospitals provide more uncompensated care when they have higher prices, all else equal.").

[84] *See* Paragraph 32 below.

[85] Gowrisankaran Amici Brief, p. 14; and Gowrisankaran Deposition (March 29, 2021), pp. 93-94 ("Q: So for example, the brief says, on page 14….Even if it were the case that nonprofit hospitals with more market power both receive higher prices and provide greater levels of uncompensated care, that care would still come at the expense of other consumers who pay the higher prices directly and through reduced pay or benefits, including the possibility of losing insurance coverage entirely." You thought that was a correct statement when you signed on to it, right? A: Yes, absolutely, I thought it was a correct statement then and I continue to think it's a correct statement now.").

- " . . .funding the provision of uncompensated care...is an even less compelling justification for lax antitrust scrutiny of nonprofit hospitals."[86]

### E.    Dr. Willig's Arguments Ignore the Fact that Other Hospitals in Northern California Are Also Investing and Innovating

28.     Dr. Willig points out that Sutter has made investments in safety and in its emergency management system. As Dr. Kizer explains, hospitals are required to make certain investments and to implement an emergency management plan as a condition for licensure or accreditation.[87] It is therefore unsurprising that other hospitals—including both bigger ones that are part of a system of hospitals and smaller ones that are not part of a system—have implemented similar measures, without imposing the challenged provisions or charging higher prices. As I have previously described, other hospitals have capital improvements, including investments in seismic compliance.[88] I have also shown that there is no reason to think Sutter is investing more than other hospital systems. For example, I demonstrated that Sutter's system assets per bed—a measure of investments previously endorsed by Dr. Willig—is similar to that of other systems.[89]

29.     What remains is a collection of anecdotes from Dr. Willig regarding how Sutter has spent its significant earnings, and even these examples can be questioned upon a cursory review of his sources.

- *COVID-19 Response:* Dr. Willig claims that "Sutter's performance in response to the COVID-19 pandemic is one example of how financial integration benefits the Sutter system."[90] Dr. Willig ignores the fact that other hospitals in Northern California also responded to the COVID-19 pandemic.[91] Dr. Willig does not perform any comparative analysis of Sutter's COVID-19 response, or link the results of such comparison he

---

[86] Gowrisankaran Amici Brief, p. 15.

[87] Kizer Interview.

[88] Chipty Merits Report, ¶¶ 258-261 and Exhibit 30.

[89] Chipty Class Reply, Exhibit 19.

[90] Willig March Supplemental Report, ¶ 33.

[91] Kizer Interview.

alleged conduct. Nor does he recognize Sutter's failures during the pandemic. For example, I understand that multiple Sutter hospitals have been fined for violations related to COVID-19 workplace safety.[92] For example at Alta Bates-Summit, "employer did not provide safeguards including personal protective equipment at a reasonable time and place," "COVID-19 Cases were not confined to their rooms," "employer failed to ensure that employees use N95 filtering facepiece respirators," and "employer failed to place cases of COVID-19…in an airborne infection isolation room or area."[93]

- *Seismic Retrofitting:* Dr. Willig describes Sutter's allocation of billions of dollars to facility renovations and relocations designed to improve seismic safety. Again, Dr. Willig conducts none of his own analysis on these topics. Publicly available guidance from OSHPD indicates that "[e]ach general acute care hospital facility must be at certain seismic performance category levels by specified timeframes."[94] Yet, Dr. Willig does not provide a comparative analysis or demonstrate that Sutter needed the challenged provisions to meet seismic safety standards.

- *Electronic ICU ("eICU") Technology:* Dr. Willig indicates that Sutter utilizes a telemedicine-based critical care system called an "eICU," and explains that because reimbursement for eICU services is limited, this technology is unique to large systems

---

[92] State of California Department of Industrial Relations, "Citations for COVID-19 Related Violations," https://www.dir.ca.gov/dosh/COVID19citations.html, *site visited* April 14, 2021 (showing citations to Alta Bates Summit, CPMC, and Sutter East Bay Medical Foundation).

[93] State of California Department of Industrial Relations, "Citation and Notification of Penalty To Sutter Health Alta Bates Summit Medical Center – Summit Campus and Its Successors," pp. 6-11, available at https://www.dir.ca.gov/dosh/Coronavirus/Citations/03.17.2021-Sutter-Health-DBA-Alta-Bates-Summit-Medical-Center-Summit-Campus_1483915.pdf, *site visited* April 14, 2021. *See also*, Hernández, Lauren, "Cal/OSHA Fines Sutter's Alta Bates Hospital in Berkley Over COVID Safety Violations," *San Francisco Chronicle*, March 21, 2021, available at https://www.sfchronicle.com/local/article/Cal-OSHA-fines-Sutter-s-Alta-Bates-hospital-in-16057324.php, *site visited* April 14, 2021.

[94] California's Office of Statewide Health Planning and Development, "Seismic Compliance and Safety: Program Overview," available at https://oshpd.ca.gov/construction-finance/seismic-compliance-and-safety/program-overview/, *site visited* April 7, 2021.

such as Sutter.[95] Dr. Willig ignores other innovations, including in telemedicine, by other hospitals, including ones that are not part of a system.[96]

I understand from Dr. Kizer that all Northern California, not just Sutter, have had to cope with the COVID-19 pandemic.[97] Hospitals other than the Sutter hospitals have engaged in seismic-retrofitting, because like Sutter, they have had to by law. Further, hospitals other than the Sutter hospitals have adopted innovations in healthcare.[98]

### F.   Dr. Willig Conflates Sutter "Operating as a System" with Sutter's Practice of Coercive Systemwide Contracting

30.     Dr. Willig asserts that "operating as a system allows Sutter to support the viability of financially vulnerable hospitals, reduce costs and realize economies of scale, and strengthen its ability to provide high-quality patient care in response to emergencies."[99] Dr. Willig's arguments do not distinguish between *operating as a system*, on the one hand, and *operating under the protection of Sutter's systemwide contracts with the challenged provisions*, on the other hand. The two are very different concepts.

31.     The facts are that:

- Sutter existed as a system prior to its use of systemwide contracting and was able to provide benefits, such as charity care, while operating as a system without systemwide contracting.[100]

- Other California hospital systems are able to operate, invest in high-quality services, and financially support the hospitals within their systems without engaging in the alleged conduct.[101]

---

[95] Willig March Supplemental Report, ¶ 41.
[96] Kizer Interview (describing innovations by UC Davis to provide telehealth consulting services to several rural Northern California hospitals and by UCSF in a sepsis reduction initiative).
[97] Kizer Interview.
[98] Kizer Interview.
[99] Willig March Supplemental Report, ¶ 27.
[100] Sutter Health, "Response to the U.S. Senate Finance Committee's Request for Information: Questions Regarding Charity Care and Community Benefit." DEF006407042-085, at 044.
[101] Kizer Interview.

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- Dr. Willig has not identified any particular Sutter hospital that would be filing for bankruptcy but for the challenged practices.[102]

To the extent "operating as a system" has allowed Sutter "to support the viability of financially vulnerable hospitals,"[103] as Dr. Willig claims, that support has to do with system membership, not systemwide contracting.

32.     Even if Sutter has applied supra-competitive profits it earned as a result of the challenged provisions to support a vulnerable hospital, the ends do not justify the means. A central tenet of economics is that one cannot weigh harm to one consumer group against the benefits accruing to another, at least not without involving some normative value judgement.[104] For example, the antitrust agencies normally assess the potential procompetitive effects of a merger within the *same* relevant market where the merger is likely to substantially lessen competition.[105] Dr. Gowrisankaran endorses this treatment of efficiencies in his Amici Brief, where he rejects the notion that a hospital's exercise of market power can be excused with its providing greater levels of uncompensated care. He explains that such an outcome would "come at the expense of other consumers who pay the higher prices."[106]

---

[102] Willig Deposition (July 24, 2019), pp. 222-223.

[103] Willig March Supplemental Report, ¶ 27.

[104] Robbins, Lionel, *An Essay on the Nature and Significance of Economic Science*, MacMillan & Co., Limited London, 1932, p. 126 ("there is nothing within the body of economic generalisations, even thus enlarged by the inclusion of elements of conventional valuation, which affords any means of deciding this question [how to weigh interpersonal utility].").

[105] Merger Guidelines, p. 30; *see also*, U.S. Department of Justice Archives, "The Merger Guidelines and the Integration of Efficiencies into Antitrust Review of Horizontal Mergers," August 5, 2015, available at https://www.justice.gov/archives/atr/merger-guidelines-and-integration-efficiencies-antitrust-review-horizontal-mergers, *site visited* April 14, 2021 (explaining that "Because accepting a merger [with net anticompetitive effects in one market and more substantial efficiency-enhancing effects in another market or markets] would necessarily mean accepting anticompetitive harm to some consumers, the agencies explain that such mergers 'normally' would be challenged, after a market-by-market analysis. The agencies state, however, that they might accept such a merger if the efficiencies are 'inextricably linked' to the anticompetitive harm -- that is, the harm cannot be avoided in the usual manner by a divestiture or other similar relief -- and if the imbalance is substantial (i.e., the efficiencies are large and the anticompetitive effect small).").

[106] Gowrisankaran Amici Brief, p. 14 ("Even if it were the case that nonprofit hospitals with more market power both receive higher prices and provide greater levels of uncompensated care, that care would still come at the expense of other consumers who pay the higher prices directly and through reduced pay or benefits, including the possibility of losing insurance coverage entirely.").

### G.   Dr. Willig Implicitly Admits that Sutter's Conduct Did Not Cause the Alleged Benefits

33.     Finally, there are serious errors with Dr. Willig's claim that the challenged provisions "foster" or "enable" Sutter's investments. The most serious of these stems from Dr. Willig's failure to demonstrate that the challenged conduct *caused* the increased Sutter investments that he highlights. To be sure, Dr. Willig refused to state that the challenged conduct caused increased investments at Sutter, and he explained that to him the verbs to "foster" or to "enable" are distinct from the verb to "cause."[107] Relatedly, he ignores evidence that suggests that Sutter would have likely made the same investments, as did other hospitals, even without the challenged provisions.

34.     Thus, Dr. Willig has not claimed, let alone presented any evidence, that the claimed benefits are cognizable in the sense that they would not have existed but-for the conduct, they can be verified, and they do not arise from anticompetitive reductions in volume or service.[108] Thus, one should not apply the claimed benefits as an offset against the anticompetitive harm flowing from Sutter's conduct.

35.     Furthermore, Dr. Willig never argues that his claimed benefits (particularly the investments) could not have been attained by practical alternatives that would mitigate the competitive concerns.[109] Thus, even assuming a causal connection (which Dr. Willig does not offer), the fact that other hospital systems invest in quality, infrastructure, and technology—as described by Dr. Kizer—undermines the notion that any claimed efficiencies should be credited to offset harm caused by Sutter's conduct.

---

[107] Willig Deposition (July 24, 2019), p. 258 ("Q: Do you know whether these contract provisions resulted or were the cause of investment in those services? A: 'Cause' is strong. I like the word 'fostering' or 'enabling' instead.").

[108] Merger Guidelines, §10 ("Cognizable efficiencies are merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service.").

[109] Merger Guidelines, Footnote 13 ("The Agencies will not deem efficiencies to be merger-specific if they could be attained by practical alternatives that mitigate competitive concerns, such as divestiture or licensing. If a merger affects not whether but only when an efficiency would be achieved, only the timing advantage is a merger-specific efficiency.").

*** 

36.     The evidence shows that Sutter's conduct was not necessary to control costs, lower prices, offer more government or uncompensated care, or undertake quality-driven or other hospital investments. To the contrary, the evidence suggests that Sutter's conduct contributed to lack of cost control and higher prices and that Sutter does not offer more government or uncompensated care. Moreover, there is no evidence that Sutter's conduct caused it to invest more, nor is there evidence explaining why Sutter would not have invested without the challenged provisions, even though other hospitals did. For all of these reasons, it is my opinion that Dr. Willig's claimed benefits do not offset the demonstrated harm to Class Members.

## VI.     Even if Dr. Willig's Alleged Benefits Were Supported by Evidence, and Even If They Were Enabled by the Alleged Conduct, They Do Not Justify the Conduct

37.     Even if I were to assume that the challenged restrictions have allowed Sutter to make more investments, that would not necessarily be pro-competitive. For instance, if Sutter can invest more because the challenged conduct allows it to keep more volume than it otherwise would, then Sutter's competitors are getting less volume than they otherwise would.[110] Thus, even if the challenged conduct allows Sutter to invest more by virtue of the conduct, rival hospitals may invest less due to their patient volume being foreclosed by Sutter's tactics. There is no reason to believe that *overall market-wide investment would be lower in the absence of the challenged conduct*. Thus, simply showing that the conduct enabled increases in quality-driven investments at some Sutter hospitals (which Dr. Willig has not shown) does not translate to market-wide improvements in quality-driven investments. Revenue earned by Sutter due to its competitive restraints could have been earned by other hospitals and similarly re-invested— without harm to consumers.

38.     As a general principle, benefit to consumers from a firm's expenditure of revenues earned through anticompetitive conduct cannot outweigh the harm to consumers from the same conduct. This fact derives from the principle of "deadweight loss." In economics, "deadweight loss" is the surplus that is never generated because of the exercise of market

---

[110] Chipty Merits Report, ¶ 261.

power.[111] This deadweight loss is shown in Exhibit 2. At the competitive price ($P_c$) and output level ($Qc$), consumer surplus is equal to the area under the demand curve above the competitive price: $CS_c = CS_m + PS_m + DWL$. At a higher price ($P_m$), reflecting the exercise of market power: (a) there is output reduction ($Q_c$ decreases to $Q_m$); (b) a transfer of some consumer surplus to the firm ($PS_m$); and (c) a reduction in consumer surplus ($CS_m < CS_c$). The area labeled "DWL" is the deadweight loss: the surplus that is never generated because of the output reduction. This surplus used to accrue to consumers, at the lower price, but now it is just lost.

39.    Here, Sutter's conduct caused such a deadweight loss by restricting the output of effective, low-cost insurance products in Northern California. By so doing, some consumers, who would otherwise have purchased low-cost health insurance products or, in some cases, any health insurance products, did not.

**Exhibit 2**
**Deadweight Loss**



[111] Mas-Colell, Andreu, Michael Dennis Whinston, and Jerry R. Green, *Microeconomic Theory*, Vol. 1, Oxford Press, 1995, p. 385 ("[T]he monopolist's optimal output…must be below the socially optimal (competitive) output level…The cause of this quantity distortion is the monopolist's recognition that a reduction in the quantity it sells allows it to increase the price charged on its remaining sales…The welfare loss from this quantity distortion [is] known as the deadweight loss of monopoly.").

40. Even if the firm responsible for raising price above the competitive level were to return all of its surplus ($PS_m$) to consumers, the firm would not be able to restore consumer surplus to its competitive level. In this context, it becomes clear that even the most charitable firm is unable to use its monopolistic gains to make whole the consumers it harmed as a result of its exercise of market power. Dr. Willig agreed with this principle in his deposition testimony in this case:[112]

- "**Q**: To the extent … Visa and MasterCard and their bank cartels, reaped or accrued super-competitive profits by their exclusionary conduct, but assume they gave those profits to the American Cancer Society, … would you think that is a pro-competitive impact of the conduct that they engaged in? **A**: No.

- "**Q**: Why Not? **A**:…the generation of profits through monopolization or through abuse of monopoly creates profits, and those profits aren't as a matter of economics, bad in and of themselves, and yes, if they are given to the Red Cross,…can be especially good, but that the harm to consumer or to the dynamics of the marketplace outweighs the good that the profits might bring, that as a matter of economics, there is something we call ***dead weight loss***. A dead weight loss says that when there are profits generated by an anticompetitive monopoly, yeah, those profits could be substantial, but the harm to consumers is bigger than the benefits to the recipients of those profits, whether it is charity or just deserving folks or whatever. So that on net, the practice is rightfully condemned as anticompetitive, then even though the profits might seemingly be used for good effect, the net impact is harmful."

## VII.    Conclusions

41. Based on the work I have undertaken, including my review of the reports from Dr. Willig and Dr. Gowrisankaran, it remains my opinion that: (a) Sutter's systemwide contracts, with provisions requiring all-or-nothing contracting, onerous non-participating provider rates, and equal treatment and anti-tiering clauses, were anticompetitive contracts that prevented

---

[112] Willig Deposition (July 24, 2019), pp.238-239 [Emphasis added].

procompetitive steering; (b) Sutter's contracting practices have interfered with the competitive process and enabled Sutter to charge health plans higher prices for inpatient hospital services than it would have otherwise; and (c) there are no efficiencies that justify this conduct. My analysis shows that the harm to Class Members flowing from Sutter's conduct is at least \$429 million, over the period January 2011 to March 2020, and the actual harm is likely higher.

Tasneem Chipty, Ph.D.
April 16, 2021

**Alix**Partners



Appendix A: CV

**TASNEEM CHIPTY**
Managing Director
tchipty@alixpartners.com

125 High Street Suite 1801
Boston, MA 02110
M: 617-697-6826

Dr. Chipty is an expert in industrial organization, antitrust economics, and econometrics. She works with both private parties and government agencies in antitrust litigation and merger review. Her work spans a broad array of sectors, including: agricultural equipment; airlines; broadcast and satellite radio; cable and satellite television; credit cards; containerized shipping; healthcare; modem chips; newspapers; pharmaceuticals; online platforms; telecommunications; and tobacco. Her work has been influential both internationally and domestically. For example, she was the Department of Justice's antitrust expert in the federal lawsuit challenging Atrium Health's use of anti-steering restrictions in contracts with health plans. She was an expert for the Government of Australia, at the World Trade Organization, in a series of disputes surrounding Australia's national tobacco control policy. She was Comcast's antitrust damages expert in *Behrend et al. vs. Comcast*—a U.S. Supreme Court case in which the Court decertified the class because of deficiencies in the plaintiffs' damages model. She was one of Qualcomm's antitrust experts in a series of lawsuits challenging Qualcomm's licensing practices. Currently, she is an antitrust expert in one of several lawsuits against Sutter Healthcare, challenging Sutter's use of anti-steering provisions in contracts with health plans. Dr. Chipty has submitted testimony, been deposed, and testified at trial in several litigation matters. She has appeared before the Federal Trade Commission, the Department of Justice, the World Trade Organization, the Canadian Mergers Bureau, the Canadian Radio-television and Telecommunications Commission, the U.S. Copyright Board, and the Canadian Copyright Board. She is the co-editor of the current edition of the American Bar Association's book *Proving Antitrust Damages*. She has published research on the strategic use of vertical integration, the role of firm size and network effects on bilateral business negotiations, and the effects of regulations on firm behavior.

Prior to joining AlixPartners, Dr. Chipty was the founder and Managing Principal of Matrix Economics. Before that, she was a Managing Principal at Analysis Group, and before that a Vice President at Charles River Associates. She has served on the faculties of the Ohio State University, Brandeis University, and MIT, where she taught courses in antitrust and regulation, industrial organization, and econometrics. Dr. Chipty received her Ph.D. in economics from the Massachusetts Institute of Technology and her undergraduate degree in economics and mathematics from Wellesley College.

## EDUCATION

Ph.D.   Economics, Massachusetts Institute of Technology

B.A.   Mathematics and Economics, with honors, Wellesley College

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2020 – | AlixPartners<br>*Managing Director, Global Co-Leader of the Economics Practice* |
| 2016 – 2020 | Matrix Economics, LLC<br>*Founder and Managing Principal* |
| 2010 – 2016 | Analysis Group, Inc.<br>*Managing Principal* |

| 1999 – 2010 | Charles River Associates, Inc.<br>*Vice President* (2005-2010) |
| 2005 | Massachusetts Institute of Technology<br>*Visiting Associate Professor of Economics* |
| 1997 – 1999 | Brandeis University, Graduate School of International Economics and Finance<br>*Visiting Assistant Professor of Economics* |
| 1995 | Osaka University<br>*Visiting Foreign Scholar* |
| 1993 – 1999 | Ohio State University<br>*Assistant Professor of Economics* |

## TESTIMONY EXPERIENCE

- *Djeneba Sidibe et al. v. Sutter Health*, Case No. 3: 12-cv-4854-LB, in United States District Court for the Northern District of California. On behalf of the Djeneba Sidibe *et al.*, submitted testimony on May 26, 2018, June 22, 2018, November 26, 2018, April 22, 2019, April 30, 2019, August 1, 2019, November 18, 2019, March 12, 2020; and testified at deposition on August 15, 2018, August 16, 2018, December 20, 2018, June 11, 2019, and January 15, 2020. Constantine Cannon (Matthew Cantor and Jean Kim).

- *Federal Trade Commission vs. Qualcomm Incorporated*, Case No. 17-CV-00220-LHK, in United States District Court for the Northern District of California. On behalf of Qualcomm, submitted testimony on June 28, 2018; testified at deposition on August 10, 2018; and testified at trial on January 22, 2019. Cravath Swaine and Moore (Gary Bornstein and Yonatan Even).

- *In Re: Qualcomm Litigation*, Case No. 17-cv-00108-GPC-MDD, in United States District Court for the Southern District of California. On behalf of Qualcomm, submitted testimony on June 29, 2018 and October 2, 2018; and testified at deposition on October 10, 2018. Cravath Swaine and Moore (Gary Bornstein and Yonatan Even).

- *In Re: Qualcomm Antitrust Litigation*, Case No. 17-MD-02773-LHK, in United States District Court for the Northern District of California. On behalf of Qualcomm, submitted testimony on November 16, 2018; and testified at deposition on December 14, 2018. Keker, Van Nest & Peters LLP (Eugene Paige and Justina Sessions).

- *United States of America and the State of North Carolina vs. The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System*, in the Western District of North Carolina, Charlotte Division, Case No. 3:16-cv-00311-RJC-DCK. On behalf of the United States, submitted testimony on August 10, 2018. U.S. Department of Justice (Andy Ewalt and Beth Armington).

- *United States of America v. Deere & Company, Precision Planting LLC, and Monsanto Company*, Civil Action No. 1:16-cv-08515, in the United States District Court for the Northern District of Illinois Eastern Division. On behalf of the United States, submitted testimony on December 23, 2016 and January 10, 2017; and testified at deposition on March 2, 2017. U.S. Department of Justice (Norm Familant and Bill Jones).

CONTAINS HIGHLY CONFIDENTIAL—AEO—STRATEGIC COMPETITIVE DATA

- *United States of America, et al. v. Hillsdale Community Health Center, et. al.,* Case No. 5:15-cv-12311-JEL-DRG in the United States District Court for the Eastern District of Michigan. On behalf of the United States, submitted testimony on October 27, 2016 and December 5, 2016; and testified at deposition on December 12, 2016. U.S. Department of Justice (Beth Armington and Katrina Rouse).

- *In the Matter of: Statement of Proposed Royalties to be Collected for the Retransmission of Distant Television Signals, In Canada, for the Years 2014 to 2018*, before the Canadian Copyright Board. On behalf of Bell Canada, Cogeco Cable Inc., Rogers Communications Inc, Shaw Communications Inc., Videotron G.P., and Telus Communications Company, submitted testimony on October 2, 2015 and testified at trial on January 25-26, 2016. Fasken Martineau DuMoulin, LLP (Jay Kerr-Wilson).

- Challenges to Australia's Tobacco Plain Packaging Act, on behalf of Australia, in the World Trade Organization. Submitted testimony on March 9, 2015, May 31, 2015, September 14, 2015, October 26, 2015, December 8, 2015, and February 1, 2016. Australian Government Solicitor (Simon Sherwood and Damien O'Donovan).

- *Caroline Behrend et al. v. Comcast Corporation et al.*, Civil Action No. 03-6604 in the United States District Court for the Eastern District of Pennsylvania. On behalf of Comcast Corporation, submitted testimony on April 10, 2009, on May 6, 2009, on May 11, 2009, on August 21, 2009, September 18, 2009, May 22, 2012, and January 15, 2014; testified at deposition on May 22, 2009; and testified at a class recertification hearing on October 26, 2009. Kasowitz Benson Torres & Freidman (Michael Shuster and Sheron Korpus) and Davis Polk (David Toscano and Arthur Burke).

- *American Broadcasting Company Inc., et. al. v. Aereo*, 12 Civ. 1543, in United States District Court in the Southern District of New York. On behalf of Aereo, submitted testimony on December 20, 2013. Fish and Richardson (David Hosp).

- *DISH Network LLC. f/k/a Echostar Satellite LLC v. ESPN, Inc., and ESPN Classic, Inc.*, No. 09 CIV 6875 (JGK) (FM), in United States District Court in the Southern District of New York. On behalf of DISH Network, submitted testimony on July 29, 2011; testified at deposition on November 22, 2011; testified at deposition in January 2013; testified at trial February 2013. Flemming Zulack Williamson Zauderer LLP (Dean Nyciper) and Simpson Thatcher (Barry Ostrager and Mary Kay Vyskocil).

- *Echostar Satellite LLC v. ESPN, Inc., ESPN Classic, Inc., ABC Cable Networks Group, Inc., Soapnet L.L.C., and International Family Entertainment Inc.*, Index 08-600282 in the Supreme Court of the State of New York County of New York. On behalf of Echostar Satellite LLC, testified at deposition on June 23, 2011. Flemming Zulack Williamson Zauderer LLP (Dean Nyciper).

- *Casitas Municipal Water District v. United States*, Case No. 05-168L in the United States Court of Federal Claims. On behalf of the United States, submitted testimony on February 25, 2010 and February 8, 2007, testified at deposition on March 10, 2010, testified at trial on October 28, 2010. U.S. Justice Department (James Gette and Barrett Atwood).

- *Royalties To Be Collected By CSI and SOCAN For the Reproduction and the Communication to the Public by Online Music Services, In Canada, of Musical or Dramaticaomusical Works, for the years 2007 to 2010*, before the Canadian Copyright Board. On behalf of Apple Inc., Bell Canada Enterprises Inc., Rogers Communications Inc., Telus Communications Company, and Videotron Ltd., submitted testimony on April 29, 2010 and on June 9, 2010, and testified at trial on June 28-9, 2010. Goodmans LLP for Apple Inc. (Michael Koch); and Fasken Martineau DuMoulin, LLP for the rest (Jay Kerr-Wilson).

- *United States of America v. Daily Gazette Company and MediaNews Group, Inc.*, Civil Action No. 2:07-0329 in the United States District Court Southern District of West Virginia. On behalf of the United States, submitted testimony on September 1, 2009. U.S. Justice Department (John Reed, Mark

Merva and Norm Familant).

- *In re. ASARCO LLC, et al.*, Case No. 05-21207 in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division. On behalf of Ready Mix USA, LLC., submitted testimony on August 1, 2008 and testified at deposition on August 7, 2008. Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. (Gary Shockley).

- *SOCAN Tariff No. 16 – Royalties To Be Collected By SOCAN For the Public Performance or the Communication to the Public by Telecommunication, In Canada, of Musical or Dramaticaomusical Works, for the years 2007 to 2009*, before the Canadian Copyright Board. On behalf of a consortium of Canadian background music users, including Bell ExpressVu, Chum Satellite Services, and DMX Canada, submitted testimony on November 30, 2007 and testified at trial in January 2008. Fasken Martineau DuMoulin, LLP (Jay Kerr-Wilson and Aidan O'Neill).

- *In the Matter of Digital Performance Right in Sound Recordings and Ephemeral Recordings for a New Subscription Service*, CRB Proceeding 2005-5, before the U.S. Copyright Board. On behalf of Sirius Satellite Radio and XM Satellite Radio, submitted testimony on October 30, 2006 and July 24, 2007; testified at deposition on May 8, 2007; and testified at trial in June 2007. Wiley Rein, LLP for Sirius (Bruce Joseph) and Weil, Gotshal & Manges for XM (Ralph Miller).

## MERGERS AND ACQUISITIONS AND OTHER GOVERNMENT INVESTIGATIONS

Dr. Chipty has extensive experience evaluating the competitive effects of proposed transactions and has advised clients at various stages of their deals, including strategic advice in identifying targets, assistance with agency review, and analyses for post-merger contestations. She has employed economic and econometric tools to evaluate issues of market definition, critical loss analysis, direct evidence of unilateral effects, and efficiencies. She has studied the likelihood of temporary or permanent foreclosure, as part of a raising rivals cost strategy. In addition, she has assessed regulatory structures and their associated effect on competition. Examples of Dr. Chipty's work in this area include:

- Assisted the parties in Liberty Media's acquisition of AT&T's business data service assets in Puerto Rico, before DOJ and FCC, 2019-2020. Dorsey & Whitney (Michael Lindsay) and Arnold & Porter (Debbie Feinstein).

- Submitted Report Studying the State of Competition in the Retail Wireless Marketplace and the Benefits of Additional Competition Among Wireless Service Providers, on behalf of the Competition Bureau of Canada, to the Canadian Radio-Television and Telecommunications Commission, in CRTC 2019-57: Review of Mobile Wireless Services, November 22, 2019 and testified before the CRTC on February 18, 2020 (live testimony at https://www.cpac.ca/en/programs/crtc-hearings/episodes/66152080/?jwsource=cl). Competition Bureau of Canada (Laura Sonley and Matthew Boswell).

- Assisted the Government of Australia, before the World Trade Organization Appellate Body, in "Certain Measures Concerning Trademarks, Geographical Indications and other Plain Packaging Requirements Applicable to Tobacco Products and Packaging," WT/ DS441/ DS435, November 18-22, 2019. Steptoe & Johnson (Matthew Yeo).

- Assisted parties in the formation of a joint venture between Nippon Yusen Kabushiki Kaisha Ltd., Mitsui O.S.K. Lines, Ltd., Kawasaki Kisen Kaisha Ltd, before DOJ, 2017. WilmerHale (Hartmut Schneider).

- Assisted parties in the CenturyLink-Level 3 merger, before DOJ and FCC, 2017. Wachtell, Lipton, Rosen & Katz (Ilene Gotts), Jones Day (Bruce McDonald), and Covington & Burling (Yaron Dori).

- Assisted parties in the Charter-Time Warner Cable merger, before the DOJ and FCC, 2015-2016. Wachtell, Lipton, Rosen & Katz (Ilene Gotts) and Jenner Block (John Flynn).

- Submitted white paper evaluating the impact of tobacco plain packaging on smoking prevalence in Australia, to the Australian Parliament on behalf of the Government of Australia, in Australia's post implementation review of tobacco plain packaging legislation, 2016. Australian Government Solicitor (Simon Sherwood and Simon Daley).

- Expert for the DOJ in its review of the One Main-Spring Leaf merger, 2015. U.S. Department of Justice (Stephanie Fleming and Nicholas Hill).

- Coauthored a white paper, on behalf of Aeromexico, evaluating the competitive effects of airport slot allocation governing air traffic to and from Mexico City Airport, submitted to Mexico's competition authority, 2015, (joint with Professor Robert Pindyck).

- Expert for Olin Corporation in its acquisition of Dow Chemical's chlor-alkali business unit, before the FTC, 2014-2015. Baker Botts (William Henry and Thomas Dillickrath).

- Expert for the Mergers Bureau of Canada in its review of Post Media's acquisition of Sun Media. Canadian Mergers Bureau (Steve Sansom and Nicholas Janota).

- Assisted the DOJ in its challenge of American Express's use of merchant restraints, 2014-2015. U.S. Department of Justice (Craig Conrath and John Read).

- Advised the Massachusetts Health Policy Commission on the likely competitive impact of Partners HealthCare System's proposed acquisition of Hallmark Health System, including submitting a written statement in the HPC's Cost and Market Impact Review of the transaction, 2014. Health Policy Commission (Karen Tseng and Kate Scarborough).

- Advised the Massachusetts Health Policy Commission on the likely competitive impact of Partners HealthCare System's proposed acquisition of South Shore Hospital, including submitting a written statement in the HPC's Cost and Market Impact Review of the transaction, 2013-2014. Health Policy Commission (Karen Tseng and Kate Scarborough).

- Assisted Saint Alphonsus Medical Center to evaluate the competitive effects of St. Luke's Health System's acquisition of Saltzer Medical Group, in Nampa, Idaho, 2012-2013. Honigman, Miller, Schwartz and Cohn (David Ettinger).

- Assisted Arris Group in its acquisition of Motorola Home business unit from Google, before DOJ, 2013. Hogan Lovells (Logan Breed) and Troutman Sanders (Daniel Anziska).

- Coauthored a white paper, on behalf of Televisa, evaluating the competitive impact in the mobile telephone marketplace of Televisa's proposed acquisition of 50% of GSF Telecom Holdings, S.A.P.I. de C.V., which owns 100% of Grupo Iusacell, S.A. de C.V. (joint with Almudena Arcelus and David Sosa). Submitted to Mexico's competition authority, Federal Commission of Economic Competition, 2012.

- Conducted analyses and presented before staff of the FTC, in an investigation of two joint venture partners involving allegations of potentially anticompetitive conduct, 2011-2012. Baker Botts (Thomas Dillickrath and William Henry).

- Authored a white paper analyzing the likely effects of Steward Healthcare's acquisition of Morton Hospital, in the greater Boston area, submitted to the State Attorney General's office, June 14, 2011. Edwards Angell Palmer & Dodge (Patricia Sullivan).

- Evaluated the likely effects of the Southwest Airlines-Airtran merger, for the DOJ, Winter 2011. U.S. Justice Department (Michael Billiel and Oliver Richard).

- Coauthored a white paper, on behalf of Time Warner Cable, analyzing brinkmanship tactics and broadcast retransmission consent rules established by the 1992 Cable Act, submitted to FCC (joint with Prof. Steven Salop, Dr. Martino DeStefano, Dr. Serge Moresi, and Dr. John Woodbury), June 3, 2010.

- Authored Federal Communication Commission Media Study #5, on behalf of the Commission, as part of it periodic review of the media ownership rules, analyzing the effects of ownership structure in broadcast radio, on program variety and advertiser and listener welfare, released June 2007.

- Coauthored a white paper analyzing bidding behavior and the potential competitive effects of the merger of Alcatel and Lucent, submitted to DOJ (joint with Drs. Andrew Dick and Stanley Besen), April 28, 2006. Skadden, Arps, Slate Meagher & Flom LLP (James Keyte and Neal Stoll).

- Conducted and presented analysis before FTC on behalf of Barr Pharmaceuticals regarding its acquisition of a hormone contraceptive product (joint with Prof. Steven Salop), Fall 2005. Kirkland & Ellis LLP (Mark Kovner).

- Conducted an analysis of efficiencies on behalf of Time Warner and Comcast, in their joint bid for Adelphia Communications, before DOJ and FCC. Paul Weiss Rifkind Wharton & Garrison, LLP (Joseph Simons).

- Assisted NorthShore University Health System (formerly Evanston Northwestern Health Corporation) with the Federal Trade Commission's post-merger investigation of the 2000 merger of Evanston Hospital and Highland Park Hospital. Winston & Strawn LLP (Michael Sibarium).

## OTHER CONSULTING EXPERIENCE, BY TOPICAL AREA

Dr. Chipty has provided economics consulting to other clients, including in a business consulting capacity. Here are some examples, organized by topical area:

### Tobacco

- Assisted DOJ, in *United States v. Philip Morris et al.*, Civil Action No. 99- 2486, a RICO case against the major tobacco manufacturers and associations involving allegations of conspiracy to suppress information and to suppress innovation. U.S. Department of Justice (Steve Brody, Renee Brooker, and James Gette).

- Assisted Appalachian Oil Company, in *R.J. Reynolds Tobacco Company v. Market Basket Food Stores, Inc., et al.*, Civil Action No. 5:05-CV-253. Baker, Donelson, Bearman, Caldwell & Berkowitz P.C. (Gary Shockley).

- Assisted Star Scientific, in *Star Scientific, Inc. v. R.J. Reynolds Tobacco Company*, Case No. AW 01-CV-1504 and AW 02-CV-2504. Crowell and Moring (Richard MacMillan and Kathryn Kirmayer).

### Pharmaceutical and Health Care

- Advised the working groups of the Advanced Market Commitment ("AMC"), an initiative of the Gates Foundation to pilot the first AMC for the pneumococcus vaccine. The goal of this AMC is to provide appropriate market-based incentives to induce capacity investments by the major pharmaceutical companies for manufacturing sufficient vaccines for low-income countries.

- Assisted a pharmaceutical manufacturer against Medicaid reimbursement, fraud, and unfair trade practices claims brought by numerous State Attorneys General. O'Melveny & Meyers LLP (Steve Brody and Brian Anderson) and Baker Botts LLP (Richard Josephson).

- Advised Regional Urology, in *Willis-Knighton Health System and Health Plus of Louisiana, Inc. v. Regional Urology LLC, et al.*, Civil No. CV02-1094-S. Breazeale Sachse & Wilson, LLP (Claude Reynaud).

## ECONOMETRICS AND STATISTICS

Dr. Chipty is an expert in the area of statistics and econometrics and has been successful at using econometric arguments both to construct affirmative arguments in litigation as well as to evaluate the use of econometrics by opposing experts. Many of the projects described above used econometric analysis. Other examples of Dr. Chipty's work in this area are described below:

- Submitted a white paper to the European Commission, DG Competition Bureau, on behalf of the European Liner Affairs Association, analyzing the impact of shipping conferences on carriers' ability to collude on prices (joint with Professor Fiona Scott Morton and Mr. Nils Von Hinten-Reed).

- Developed analyses and drafted a report on behalf of defendants in the *In Re: Monosodium Glutamate Litigation* in support of a defendants' motion to dismiss plaintiff's expert testimony based upon improper use of econometrics. Dorsey & Whitney LLP (Michael Lindsay) and Haynes & Boone LLP (Ronald Breaux).

- Used advanced statistical techniques along with a large volume of administrative data, on behalf of United Parcel Service, to evaluate the Postal Service's expert testimony on variable costs. Piper & Marbury LLP (John McKeever).

- Evaluated and criticized the econometric testimony of a defendants' expert, on behalf of a generic pharmaceuticals firm alleging vertical foreclosure and unlawful delay of entry. Solomon Zauderer (Colin Underwood).

## TRISTATE RESEARCH PARTNERSHIP

Dr. Chipty was a member of the research team from 1997-1999 in this Department of Health and Human Resources funded collaboration that included the states of Massachusetts, Alabama, and Florida. Dr. Chipty worked with state governments to design research experiments, develop econometric models, and process large administrative databases, to understand the impact of minimum standards regulations.

- "The Black-White Wage Gap in the Deep South: Location, Location, Location?" (with Ann Dryden Witte), Working Paper 98-03, Tri-State Child Care Research Partnership, Miami, FL.

- "Employment Patterns of Workers Receiving Subsidized Child Care: A Study of Eight Counties in Alabama," (with Ann Dryden Witte), Available from Margie Curry, Executive Director, Childcare Resources, 1904 First Ave. North, Birmingham, AL 35203-4006.

- "Parents Receiving Subsidized Child Care: A Study of Alabama's Labor Force," (with Ann Dryden Witte), Working Paper 98-01, Tri-State Child Care Research Partnership, Miami, FL.

- "Employment of Parents Receiving Subsidized Child Care in Dade County, Florida," (with Harriet Griesinger and Ann Dryden Witte), Working Paper 98-03, Department of Economics, Wellesley College, Wellesley MA 02481.

## PUBLICATIONS

"Market design to accelerate COVID-19 vaccine supply," (with Susan Athey, Arthur Baker, Eric Budish, Juan Camilo Castillo, Rachel Glennerster, Scott Duke Kominers, Michael Kremer, Greg Larson, Jean Lee, Canice Prendergast, Christopher Snyder, Alex Tabarrok, Brandon Joel Tan, Witold Więcek), *Science*, Vol. 371, Issue 6534, March 12, 2021, pp. 1107-1109.

"Hospital-Physician Integration: The St. Luke's Case" (with Deborah Haas-Wilson), in *The Antitrust Revolution, 7th Edition* (Oxford University Press), edited by John Kwoka and Lawrence White.

"US: Economics" (with Michael Chapman), *Global Competition Review, The Antitrust Review of the Americas 2016*, available at:
http://globalcompetitionreview.com/reviews/74/sections/275/chapters/2983/us-economics/.

"Economists' Perspective on the Efficiency Defense in Provider Consolidations:  What Works, What Doesn't Work, and What We Still Don't Know" (with Asta Sendonaris), American Health Lawyer's Association *Connections Magazine*, September 2015.

"Competitor Collaborations in Health Care: Understanding the Proposed ACO Antitrust Review Process," *CPI Antitrust Chronicle*, May 2011 (1).

*The Antitrust Source*, October 2007, Book Review of Michael D. Whinston, *Lectures on Antitrust Economics* (Cambridge, MIT Press, 2006).

"Vertical Integration, Market Foreclosure, and Consumer Welfare in the Cable Television Industry," *American Economic Review*, Vol. 91, No. 3, June 2001, pp. 428-453.

"The Role of Buyer Size in Bilateral Bargaining: A Study of the Cable Television Industry" (with Christopher Snyder), *Review of Economics and Statistics*, May 1999, 81(2): 326-340.

"Economic Effects of Quality Regulations in the Daycare Industry," *American Economic Review*, Vol. 85, No. 2, May 1995, pp. 419-424.

"Horizontal Integration for Bargaining Power: Evidence from the Cable Television Industry," *Journal of Economics and Management Strategy*, Vol. 4, No. 2, Summer 1995, pp. 375-397.

"A Marginal Cost Transfer Pricing Methodology," *Tax Notes*, Nov. 26, 1990 (with Ann Dryden Witte, Wellesley College and NBER).

*The Journal of Economic Literature*, June 1992, Vol. XXX, No. 2, Book Review of Frank Cowell, *Cheating the Government* (with Ann Dryden Witte, Wellesley College and NBER) (Cambridge, MIT Press, 1990).

## WORKING PAPERS

"In a Race Against the Clock:  Auctioneer Strategies and Selling Mechanisms in Live Outcry Auctions," 2014 (with Lucia Dunn and Stephen Cosslett, the Ohio State University).

"Efficient Estimation Via Moment Restrictions," (with Whitney K. Newey).

"Antidumping and Countervailing Orders: A Study of the Market for Corrosion-Resistant Steel," (with Brian L. Palmer).

"Firms' Responses to Minimum Standards Regulations: An Empirical Investigation" (with Ann Dryden Witte), NBER Working Paper # 6104.

"Effects of Information Provision in a Vertically Differentiated Market" (with Ann Dryden Witte), NBER Working Paper # 6493.

"Unintended Consequences? Welfare Reform and the Working Poor" (with Ann Dryden Witte, Magaly Queralt, and Harriet Griesinger), NBER Working Paper # 6798.

## SELECT INVITED PRESENTATIONS AND INTERVIEWS

Georgetown on the Hill, "New Debates and New Tensions in Antitrust: What's Different About Platforms?" March 2, 2020 (video available at https://cbpp.georgetown.edu/events/new-debates-and-tensions-in-antitrust-whats-different-about-platforms/).

ABA Teleseminar: "The Role of Intent in Monopolization, Merger and Other Civil Cases," February 28, 2020.

ABA Teleseminar: "Are You Ready for Some Football (and Antitrust)?! What Does the NFL Sunday Ticket Litigation Bode for Sports Collaborations?" December 9, 2019.

ABA Teleseminar: "Nuts & Bolts Program: Market Definition," June 27, 2019.

FTC Hearings #3: Competition and Consumer Protection in the 21st Century, October 2018.

Interview with the Antitrust Practice Group, *AHLA Antitrust Spotlight Series*, March 2018.

ABA Webinar: "Market Definition in section 2 and section 7: The same but not the same? Questions of fact or law?" November 2017.

International Congress of Addictology Albatros, "Economics of Tobacco Plain Packaging: Australian Legislation," May 2017.

Federal Communication Commission's Event on Challenges Facing Independent Programmers, April 2016, available at: https://www.youtube.com/watch?v=8yxC_3M4IWA.

Federal Communication's Panel on Challenges Facing Multichannel Video Programming Distributors, March 2016, available at: https://www.youtube.com/watch?v=03CMDtdpRDQ.

ABA Webinar: "Sports Leagues Claims After 5 Years After American Needle," 2015.

NYSBA Antitrust Class Action Program: "Comcast v. Behrend:  Interpretation and Application of *Comcast* to Damages Issues in Class Certification," 2015.

AHLA Annual Meetings: "Antitrust and Provider Mergers and Affiliations: Competition vs. More Affordable Care?" 2015.

AHLA Webinar: "Antitrust Implications and Lessons Learned from the Ninth Circuit Decision in *St. Luke's*," 2015.
ABA Webinar: "St. Lukes: State and Federal Enforcement in Non-Reportable Program," 2015.

NYC Bar Antitrust and Healthcare Program, 2015.

NYSBA Antitrust Law Section Annual Meetings: "Efficiencies:  The Cheshire Cat of Merger Analysis," 2014.

NYC Bar Antitrust & Trade Regulation Committee: "Approaches to Antitrust Damages," 2014.

**PROFESSIONAL SERVICE**

Vice Chair of the ABA's Pricing Conduct Committee, 2020-
Editor of *Proving Antitrust Damages*, 3rd Edition, (American Bar Association, 2017).
Defendant's expert at the ABA Mock Trial involving the issue exclusivity, in the form of theaters' use of clearances, 2017.
Vice Chair of the Antitrust Practice Group of the AHLA, 2014-2016.
Advisory board of the Pricing Conduct Committee, 2011-2012.
Editorial comments on a chapter of the ABA's *Price Discrimination Handbook*, 2011.
Plaintiffs' expert at the ABA Mock Trial involving the issue of resale price maintenance, 2008.
Editorial comments on a chapter of the ABA's book on *Market Definition*, 2008.
Contribution to the ABA's *Econometrics Legal, Practical, and Technical Issues*, 2005.

**MEMBERSHIPS**

American Health Lawyers Association
American Bar Association
American Economic Association

**HONORS**

National Science Foundation Fellowship, 1989-1992
Phi Beta Kappa, 1988

**Appendix B: Materials Considered**

All materials cited in this report, all materials listed in Appendix B of Chipty SJ Declaration, Chipty Class Declaration, Chipty Reply Declaration, Chipty Merits Report, Chipty Merits Rebuttal Report, Chipty Supplemental Reply Report, Chipty March Supplemental Declaration, Appendix A of Chipty Supplemental Report, Appendix C of Chipty Supplemental Declaration, and the following:

## I.       Expert Reports and Declarations

- Supplemental Expert Report of Dr. Robert D. Willig, March 12, 2021.

- Supplement to June 21, 2019 Expert Report of Gautam Gowrisankaran, PhD, March 12, 2021.

## II.      Depositions and Associated Exhibits

- Deposition of Gautam Gowrisankaran, March 29, 2021.

## III.     Legal Documents

- "Brief of Antitrust Economists as Amici Curiae in Support of Defendants-Appellants Urging Reversal," *St. Luke's Hospital, D/B/A McLaren St. Luke's; and WellCare Physicians Group, LLC v. ProMedica Health System, Inc. et al*, the United States Court of Appeals for the Sixth Circuit, Case No. 21-3007 On Appeal from Case No. 3:20-CV-02533, March 2, 2021.

- "Brief of Amici Curiae Economics Professors in Support of Petitioner," *Federal Trade Commission v. Phoebe Putney Health System, Inc., et al.,* the Supreme Court of the United States, Case No. 11-1160 On Writ of Certiorari to the United States Court of Appeals for the Eleventh Circuit, filed August 20, 2012.

## IV.      Articles and Books

- Bai, Ge, Hossein Zare, Matthew D. Eisenberg, Daniel Polsky, and Gerard F. Anderson, "Analysis Suggests Government and Nonprofit Hospitals' Charity Care Is Not Aligned With Their Favorable Tax Treatment," *Health Affairs*, Vol. 40, No. 4, pp. 629-636.

- Grossman, Sanford J., and Oliver D. Hart, "The Costs and Benefits of Ownership: A Theory of Vertical and Lateral Integration." *Journal of Political Economy*, Vol. 94, No. 4, 1986, pp. 691-719.

- Klein, Benjamin, Robert G. Crawford, and Armen A. Alchian, "Vertical Integration, Appropriable Rents, and the Competitive Contracting Process," *Journal of Law and Economics*, Vol. 21, No. 2, October 1978, pp. 297-326.

- Mas-Colell, Andreu, Michael Dennis Whinston, and Jerry R. Green. *Microeconomic Theory*. Vol. 1. New York: Oxford University Press, 1995.

- Robbins, Lionel, *An Essay on the Nature and Significance of Economic Science*, MacMillan & Co., Limited London, 1932.

## V.    Produced Documents

- DEF006407042
- PROD01351582

## VI.    Other Materials Considered

- Interview with Kenneth Kizer, April 14th, 2021.

- https://www.cms.gov/Regulations-and-Guidance/Legislation/EMTALA

- https://providernews.anthem.com/california/article/anthem-blue-cross-continues-to-offer-epo-and-hmo-individual-on-and-off-exchange-products-for-2021

- http://calpatientguide.org/iv.html

- https://www.dir.ca.gov/dosh/COVID19citations.html

- https://www.dir.ca.gov/dosh/Coronavirus/Citations/03.17.2021-Sutter-Health-DBA-Alta-Bates-Summit-Medical-Center-Summit-Campus_1483915.pdf

- https://www.sfchronicle.com/local/article/Cal-OSHA-fines-Sutter-s-Alta-Bates-hospital-in-16057324.php

- https://www.calpers.ca.gov/docs/blue-shield-trio-info.pdf

- https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Market-Reforms/ca-gra

- https://www.healthnet.com/static/broker/unprotected/pdfs/ca/sbg/ca_sbg_rate_guide_dec.pdf

- https://www.healthnet.com/content/dam/centene/healthnet/pdfs/broker/ca/sbg/2021-q2-ca-sbg-rate-guide-std.pdf

- https://oag.ca.gov/news/press-releases/attorney-general-becerra-files-opposition-sutter-health%E2%80%99s-delay-landmark

- https://health.usnews.com/health-care/best-hospitals/articles/best-hospitals-honor-roll-and-overview

- https://www.hfma.org/topics/news/2020/10/employers-again-are-planning-to-expand-their-use-of-narrow-netwo.html

- https://health.usnews.com/best-hospitals/area/ca

- https://oshpd.ca.gov/construction-finance/seismic-compliance-and-safety/program-overview/

- https://www.justice.gov/archives/atr/merger-guidelines-and-integration-efficiencies-antitrust-review-horizontal-mergers

- https://www.california-demographics.com/counties_by_population

# EXHIBIT 6

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, JERRY JANKOWSKI,
SUSAN HANSEN, DAVID HERMAN,
CAROLINE STEWART, OPTIMUM
GRAPHICS, INC., and JOHNSON POOL &
SPA, on Behalf of Themselves and All Others
Similarly Situated,

*Plaintiffs*,

v.

SUTTER HEALTH,

*Defendant*.

Case No. 3: 12-cv-4854-LB

CLASS ACTION

Expert Declaration of Dr. Tasneem Chipty
in Support of Plaintiffs' Motion for Class Certification

June 21, 2018

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

## I.    Introduction

1.    My name is Tasneem Chipty. I declare under penalty of perjury under the laws of the United States of America as follows:

2.    I am the managing principal and founder of Matrix Economics, an economic consulting firm in the Boston area. I specialize in industrial organization – the study of how markets function, including the choices consumers make and the competitive interactions among firms. I also specialize in econometrics – the application of statistical methods, including regression models, to empirically study marketplace behaviors. I have served on the faculties of The Ohio State University, Brandeis University, and the Massachusetts Institute of Technology, where I taught courses in industrial organization, regulatory policy, and econometrics. I am the author or coauthor of several academic articles, published in peer-reviewed journals including the *American Economic Review* and the *Review of Economics and Statistics*. I am also a co-editor of the 3rd Edition of the American Bar Association's *Proving Antitrust Damages* book, which describes different empirical approaches to measuring antitrust damages.

3.    I have been a consultant to a variety of businesses and government agencies, including the Department of Justice and the Federal Communications Commission. As part of this work, I have studied market definition and competitive effects of firm behavior in a wide range of industries, for both plaintiffs and defendants involved in adversarial proceedings. A significant portion of my work has focused on the healthcare marketplace, specifically on issues involving hospital competition and hospital contracting practices. For example, I served as a consulting expert for private plaintiff Saint Alphonsus Medical Center to evaluate the competitive effects of St. Luke's Health System's acquisition of Saltzer Medical Group, in Nampa, Idaho. I serve as an antitrust advisor to the Massachusetts Health Policy Commission, and in that capacity have studied the competitive effects of hospital acquisitions by Partners HealthCare. For these and other assignments, I have analyzed patients' choice of hospitals using both state inpatient databases and health plan claims data; I have studied issues of product and geographic market definition; and I have studied the question of whether hospitals have market power over health plans in various relevant antitrust markets. I have also provided economic analyses in matters concerning class certification: in particular, I served as a testifying expert for the defense in *Comcast Corp. v. Behrend,* a case that included United States Supreme Court

95.     There are two reasons why the hypothesis that a parameter is zero is not rejected: (a) it may be the case that the parameter is really zero (*i.e.* the explanatory variable really has no effect on the dependent variable); or (b) it may be the case that the parameter is imprecisely estimated (*i.e.* the confidence interval includes zero, but it also includes a wide range of other non-zero values). Thus, one must be especially cautious in concluding a parameter is zero in circumstances where the parameter estimate is economically significant, but the standard error is large. As a general rule, the smaller the standard error relative to the estimated parameter, the more precise is the estimate of the parameter. Economists typically denote statistical significance using a "star" or "asterisk" convention, where one star denotes statistical significance between five and ten percent, two stars denote statistical significance between one and five percent, and three stars denotes statistical significance at one percent or less. The more stars there are, the more precisely estimated is the effect and the more confidence one has in rejecting the hypothesis that the parameter is zero or, in other words, concluding that the estimated effect is different from zero.

96.     The *adjusted $R^2$* is a measure of goodness-of-fit of the regression model that measures the fraction of the variation in the dependent variable that is explained by the explanatory variables.[192] In the standard model, the values of the adjusted $R^2$ range between zero and one: a value of zero means that the explanatory variables explain none of the variation in the dependent variable (*i.e.*, they are of no predictive value), while a value of one means that they explain all of the variation in the dependent variable (*i.e.*, they exactly predict the dependent variable).

2.     Dependent Variable: Hospital Prices

97.     For each hospital-year, over the years 2006 to 2015, I calculate a case-mix adjusted hospital price as the sum of allowed amounts from the individual claims for each hospital-year combination, divided by the sum of the DRG weights associated with the individual claims.[193] The advantage to this measure of hospital price is that it is based on claim-

---

[192] Reference Guide on Multiple Regression, p. 345. *See also*, Kennedy, pp. 90-92 and 102-103 for a more technical discussion of the adjusted $R^2$.

[193] The analysis includes in-network, fully-insured claims. It excludes claims associated with MDC codes 0 (unknown), 19 (alcohol/drug use), or 20 (psychiatric) or DRG codes "UNK", "000", "795" (normal newborn),

level data and represents the *actual price* received by the hospital for hospital services rendered to Class Members. This includes patient out-of-pocket expenses, not just health plan payments.

### 3.    Explanatory Variables

98.    To be useful for the purpose at hand, the regression model must include the key explanatory variables that are likely to predict hospital prices, especially Sutter hospital prices. For this purpose, I have surveyed the literature to identify control variables that are commonly used by researchers to predict hospital prices, including California hospital prices.[194] While individual researchers make different selections, the common themes are that they control for factors that are likely to affect hospital costs, hospital quality, and the hospital's ability to exercise market power over health plans. As a general matter, hospitals have higher prices when: (a) they have higher costs; (b) they have more desirable characteristics, like being a teaching hospital; (c) they face less competition; and (d) they belong to bigger systems.

99.    Given my review of the available data and my understanding of the drivers of hospital prices, the baseline model I use to predict Sutter prices includes the following explanatory variables:

---

"998" (ungroupable), "999" (unknown), "D30", "D31", "D37", "D45", "D54", "D56", "D62", "D63", "D64", "D75", "D86", "DR>", "DRG", "KEY", "MED", "065", "V10", or "V45". It excludes claims with missing allowed amounts, missing DRG weights, and/or non-positive allowed amounts. It excludes the bill types: "0110," "011," "0115," "115," "0118," "0119," "011A," "011C," "011G," "011H," "011I," "011K," "011M," "011N," "011P," "011Q," "011Y," "011Z," "0120," or "0129." The analysis also excludes claims associated with non-California residents, by retaining claims associated with patient zip code digits between 90000 and 96162. *See* Appendix C.

[194] *See* discussion in Guerin-Calvert, Margaret and Guillermo Israilevich, "Assessment of Cost Trends and Price Differences for U.S. Hospitals," *American Health Association*, March 2011; Capps, Cory and David Dranove, "Hospital Consolidation and Negotiated PPO Prices," *Health Affairs*, Vol. 23, No. 2, 2004, pp. 175–176; Ciliberto, Frederico and David Dranove, "The Effect of Physician-Hospital Affiliation on Hospital Prices in California," *Journal of Health Economics*, Vol. 25, 2006, pp. 29-38; Dranove, David, Richard Lindrooth, William White, and Jack Zwanziger, "Is the Impact of Managed Care on Hospital Prices Decreasing?," *Journal of Health Economics*, Vol. 27, 2008, pp. 362-376; Dranove, David and Richard Ludwick, "Competition and Pricing by Non-Profit Hospitals: A Reassessment of Lynk's Analysis," *Journal of Health Economics*, Vol. 18, 1999, pp. 87-98; Dranove, David, "Pricing by Non-Profit Institutions: the Case of Hospital Cost Shifting," *Journal of Health Economics*, Vol. 7, 1988, pp. 47-57; Keeler, Emmett, Glenn Melnick, and Jack Zwanziger, "The Changing Effect of Competition on Non-Profit and For-Profit Hospital Pricing Behavior," *Journal of Health Economics*, Vol. 18, 1999, pp. 69-86; Melnick, Glenn and Katya Fonkych, "Hospital Price Increases in California, Especially Among Hospitals in the Largest Multi-Hospital Systems," *The Journal of Health Care Organization, Provision, and Financing*, Vol. 53, 2016, pp. 1-7; Dranove, David, Mark Shanley, and William White, "Price and Concentration in Hospital Markets: The Switch from Patient-Driven to Payer-Driven Competition," *Journal of Law and Economics*, Vol. 36, No. 1, 1993, pp. 179-204; Sanchez, Jeffrey and James Welch, "Special Commission on Provider Price Variation Report," March 15, 2017, pp. 1-5.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

- *Wage Index*: This is a variable constructed by CMS to measure differences in hospital wages relative to the national average. Hospitals in areas with higher hospital wages are expected to charge higher prices to cover costs; thus, I expect the estimated coefficient associated with *Wage Index* to be positive.[195]

- *Teaching*: This is an indicator variable equal to one if the hospital is a major teaching hospital and zero otherwise. A hospital is considered a major teaching hospital if its resident-to-bed ratio is greater than or equal to 0.25.[196] Teaching facilities tend to be more expensive on average; thus, I expect the estimated coefficient associated with *Teaching* to be positive.[197]

- *Trauma Level 1 or 2*: This is an indicator variable, obtained from OSHPD, that is equal to one for hospitals with trauma levels one or two, and zero otherwise.[198] Trauma facilities tend to be more expensive on average; thus, I expect the estimated coefficient associated with *Trauma* to be positive.[199]

- *Number of Competitors*: To control for differences in the competitive landscape in which each hospital operates, I control for the number of non-Kaiser hospitals from a different system within a 30-minute drive time from the hospital of interest. Drive times to nearby hospitals are calculated using the Google Distance Matrix API. The maximum number of competitors present using this measure, for any hospital in the sample, is ten. Thus, I

---

[195] Lundbye Declaration, ¶ 20. *See also,* LaCroix-Milani Declaration, ¶¶ 5-6.

[196] Cromwell, Jerry, Walter Adamache and Edward Drozd, "BBA Impacts on Hospital Residents, Finances, and Medicare Subsidies," *Health Care Financing Review.* Vol. 28, No. 1, 2006, p. 121. *See also,* NIS Description of Data Elements, "HOSP_TEACH – Teaching status of hospital," available at https://www.hcup-us.ahrq.gov/db/vars/hosp_teach/nisnote.jsp, *site visited* June 12, 2018.

[197] Frakt, Austin, "Teaching Hospitals Cost More, but Could Save Your Life," *The New York Times,* June 5, 2017, available at https://www.nytimes.com/2017/06/05/upshot/teaching-hospitals-cost-more-but-could-save-your-life.html.

[198] Sutter Health, "What is a Trauma Center?" available at https://www.sutterhealth.org/services/emergency/traumacenters, *site visited* March 17, 2018; and American College of Surgeons, "Searching for Verified Trauma Centers," available at https://www.facs.org/search/trauma-centers, *site visited* March 17, 2018. (Note that the ACS specifically disclaims, "The designation of trauma facilities is a geopolitical process by which empowered entities, government or otherwise, are authorized to designate. The ACS does not designate trauma centers; instead, it verifies the presence of the resources listed in *The Resources for Optimal Care for the Injured Patient.* This is a voluntary process and only those trauma centers that have successfully completed a verification visit are listed.").

[199] Newgard, Craig D. and Robert A. Lowe, "Cost Savings in Trauma Systems: The Devil's in the Details," Annals of Emergency Medicine, Vol. 67, No. 1, 2016, pp. 68-70.

---

create a set of ten indicator variables, one for each configuration.[200] The results of a series of specification tests allow me to collapse the ten indicator variables to seven indicator variables:[201] (a) one is a composite called "One to Four Competitors" which equals one if the hospital has one to four competitors within 30 minutes; (b) the rest are the individual indicator variables for hospitals with five, six, seven, eight, nine, and ten competitors within 30 minutes. Because hospitals that face less competition tend to be more expensive on average, I expect the estimated coefficients associated with the number of competitors in the model to be negative.[202]

- *Patient Rating*: This variable, constructed by CMS, records the percent of patients saying they would rate the hospital nine or ten on a scale from zero to ten, where ten is the most favorable patient rating. Because CMS started reporting this information in 2008, I use the hospital's 2008 value for years 2006 and 2007. This variable is intended to be a proxy for some aspects of hospital quality; as such, I expect the estimated coefficient associated with Patient Rating to be positive. I recognize, however, that there is little agreement among healthcare researchers and practitioners as to the right way to measure hospital

---

[200] These indicator variables are: (a) "One Competitor" equals one if there is one hospital within 30 minutes of the hospital; (b) "Two Competitors" equals one if there are two hospitals within 30 minutes of the hospital; (c) "Three Competitors" equals one if there are three hospitals within 30 minutes of the hospital; (b) "Four Competitors" equals one if there are four hospitals within 30 minutes of the hospital; (c) "Five Competitors" equals one if there are five hospitals within 30 minutes of the hospital; (d) "Six Competitors" equals one if there are six hospitals within 30 minutes of the hospital; (e) "Seven Competitors" equals one if there are seven hospitals within 30 minutes of the hospital; (f) "Eight Competitors" equals one if there are eight hospitals within 30 minutes of the hospital; (g) "Nine Competitors" equals one if there are nine hospitals within 30 minutes of the hospital; (g) "Ten Competitors" equals one if there are ten hospitals within 30 minutes of the hospital.

[201] Specification testing cannot reject the null hypothesis that the marginal effects of "One Competitor," "Two Competitors," "Three Competitors," and "Four Competitors" are equivalent. Accordingly, I group these for convenience into a single category and estimate a common effect across the four variables. The parameter estimates from the regression model with the ungrouped competition variables are similar to the parameter estimates from the regression model with the grouped competition variables. *See* Chipty Workpapers.

[202] The sign of the parameter associated with a set of indicator variables is with reference to the omitted category, which in this case is "No Competitors" which equals one if there are no other hospitals within 30 minutes of the hospital.

quality.[203] Sutter's Chief Medical Officer has also recognized this point, testifying that, "there's not this one universally agreed-upon quality metric."[204,205]

- *System Beds*: This variable measures the total number of inpatient beds in each hospital's system, as reported to OSHPD. It is calculated by summing the total number of acute hospital beds across all hospitals within a hospital system; for other hospitals, system beds are equal to hospital beds. As described in the literature, prices are expected to be higher at hospitals belonging to larger systems, though benefits of belonging to bigger systems may diminish for sufficiently large systems.[206] To account for the potential that the effect of system size tapers off, the model allows for a non-linear effect of *System Beds*.[207]

- *Year:* These are a series of indicator variables that capture changes in average prices over time. In keeping with general inflation of healthcare costs, I expect to find an increase in average hospital prices over time.

---

[203] Bilimoria, Karl Y. and Cynthia Barnard, "The New CMS Hospital Quality Star Ratings. The Stars Are Not Aligned." *JAMA*, Vol. 316, No. 17, 2006, pp. 1761-1762 at 1761: "Many hospital quality rating systems are now available, but there is virtually no agreement among the rating systems in identifying 'better' or 'worse' hospitals".

[204] Deposition of Dr. Stephen Lockhart, Chief Medical Officer for Sutter, *UFCW & Employers Benefit Trust on behalf of itself and all others situated vs. Sutter Health,* November 8, 2016 (hereafter "Lockhart Deposition"), at p. 124. *See also,* Lockhart Deposition, at p. 121 ("Q: Fair to say there's no one metric for quality? A: It is probably… no one universally agreed-upon metric.").

[205] It is notable that Sutter itself does not appear to believe its quality is better than that of other comparator hospitals. For example, a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Consistent with Sutter's view ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[206] Melnick, Glenn A. and Katya Fonkych, "Hospital Price Increase in California, Especially Among Hospitals in the Largest Multi-hospital Systems," INQUIRY: *The Journal of Health Care Organization, Provision, and Financing*, Vol. 53, 2016, pp. 1-7. *See also,* Sanchez, Jeffrey and James Welch, "Special Commission on Provider Price Variation Report," March 15, 2017 (hereafter "Sanchez and Welch"), pp. 19-22.

[207] The model controls for both *System Beds* and *System Beds Squared*. This functional form allows for the possibility that larger hospital systems negotiate higher prices, but the returns to system size (in terms of price effects) may diminish beyond a certain level. Consistent with this effect, one would expect the estimated coefficient associated with *System Beds* to be positive and the estimated coefficient associated with *System Beds Squared* to be negative. *See* Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach*, 5th Edition, Mason, Ohio: Thomson South-Western, 2012, pp. 710-712.

describes the process by which actuaries in their ordinary-course of business construct "manual rated" premiums.[265] Applying the same logic, he then traces the effect of increased medical expenditures on premiums.[266] My analysis of individual damages is consistent with the opinions offered by Mr. David Axene; it is also consistent with my general understanding of how Anthem, Blue Shield, and other health plans set manual rated premiums, as explained in the deposition testimony of (a) Mr. Mike Beuoy, an actuary and Vice President of Blue Shield who oversees all of Blue Shield's lines of business;[267] and (b) Mr. Chris Mathewson, an actuarial director for Anthem.[268] Thus, my approach to damages is based upon my econometric estimates of Sutter's hospital price overcharges, my analysis of pass-through, and my understanding of the actuarial relationship between health care costs and premiums. Using this approach, I am able to compute premium overpayments by (or damages to) Class Members in the nine rating areas who purchased health insurance policies from Anthem. Given comparable claims and premium data, a similar method could be applied to each of the health plans.

137.    This damages methodology can be described in four steps, as shown in Exhibit 18 below. The first step is to calculate the percentage overcharge in hospital prices, at each Sutter Damage Hospital, for each year. The second step is to calculate the aggregate and the PMPM amount by whic█████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████The third step is to calculate the percentage overcharge in premiums, by rating area, by year, and group type. The last step is to calculate aggregate and premium damages for each individual Class Member. I demonstrate the feasibility of implementing this method to estimate individual Class Member damages using Anthem claims and Anthem premium data.

---

[265] According to Mr. Axene, the manual rating process is a process that is used to construct healthcare premiums based on statewide average claims experience, including for those groups that are evaluated on the basis of their own group's experience. (Axene Declaration, ¶ 51.) Manual ratings are used to determine premiums for individual, small group, and the majority of large group health plan products. For certain very large group employers, premiums are based on the employer's actual claims experience (called "experience rating"). (Axene Declaration, Footnote 44.) Additionally, I understand that certain mid-tier large groups rates were constructed based on a blend of the manual and experience rating. (Axene Declaration, Footnote 44.) If the Court determines that large groups whose premiums reflect experience or blended ratings should be treated differently, the approach which I describe in this section could be modified to do so.

[266] Axene Declaration, ¶ 62.

[267] Beuoy Deposition, p. 39.

[268] Mathewson Deposition, pp. 38-40.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**                86

**Exhibit 18**
**Overview of the Individual Damage Methodology**



*A.* *Step One of the Individual Damage Methodology*

138.    In the first step, I estimate the percentage overcharge in hospital prices at each
Sutter Damage Hospital, for each year, using a benchmark analysis that compares prices charged
at Sutter hospitals to prices charged by a set of Northern California hospitals. I implemented this
analysis with a baseline regression model whose parameter estimates enable me to make the out-
of-sample predictions, described in Section VII.[269] For convenience, I repeat Exhibit 14A, which
is also presented above. The panel labeled "Out-of-Sample" shows the estimated percentage
overcharges, by Sutter Damage Hospital, by year.[270]

---

[269] There, to ensure that the results of that model are sufficiently robust, I also estimated alternative regression
models with additional explanatory variables and with alternative groups of benchmark hospitals. The results of
these robustness checks were generally compatible with the results of the baseline model. *See* Chipty Workpapers.

[270] The overcharge percentages are calculated across all product types (*i.e.* HMO, PPO, etc.) because the premium
rate setting process is methodologically the same for HMO and PPO plans. *See* Mathewson Deposition, p. 80; and
Axene Declaration, ¶ 26.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

**Exhibit 14A**
**Hospital Price Overcharge Percentages, Anthem**
**Baseline Regression 2006-2015**

| Hospital | Out-of-Sample | | | | | | | | | | In-Sample |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2006-2015 |
| Alta Bates-Main | 153% *** | 68% *** | 109% *** | 96% *** | 66% *** | 56% *** | 52% *** | 50% *** | 112% *** | 71% ** | 79% *** |
| Alta Bates-Summit | 153% *** | 40% | 87% *** | 87% *** | 92% *** | 71% *** | 89% *** | 92% *** | 3% | 20% ** | 63% *** |
| Sutter Sacramento | 178% *** | 97% *** | 104% *** | 51% *** | 72% *** | 76% *** | 83% *** | 51% *** | 35% *** | 42% *** | 75% *** |
| CPMC-Main | 61% *** | -6% | 10% | 22% ** | 67% *** | 72% *** | 83% *** | 62% *** | 71% *** | 51% *** | 44% *** |
| CPMC-St Luke's | 41% *** | 47% *** | 1% | 49% *** | 102% *** | 28% * | 50% *** | 55% *** | 46% *** | 43% *** | 38% *** |
| Sutter Santa Rosa | 30% *** | 16% * | 85% *** | 21% ** | 18% ** | -2% | 8% | -1% | -4% | 1% | 15% ** |
| Sutter Modesto | 136% *** | 41% *** | 69% *** | 52% *** | 46% *** | 36% *** | 71% *** | 32% *** | 29% *** | 41% *** | 51% *** |

*Notes: See* notes for Exhibit 13.
*Sources: See* sources for Exhibit 12.

### B.    *Step Two of the Individual Damage Methodology*

139.    Second, I calculate the aggregate and the PMPM amount by which ██████████
████████████████████████████████████████████████████████████████████████████████
██████████████████████████████[271]██████████████████████████████ For ease of

notation, I refer to the combination of a rating area, group type, and year as a "cohort." To

implement this calculation, I first determine the total amount paid to each Sutter Damage

Hospital directly by Anthem, exclusive of any patient responsibility in the form of copayments,

deductibles, and coinsurance, as reflected in Anthem's paid claims data ("incurred costs") for

inpatient hospital services[272] provided to Anthem plan members attached to each of the nine

rating areas.[273] These inpatient incurred costs are disaggregated by rating area, group type, and

year ████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████

---

[271] For purposes of the damages model, the rating area for individual and small group subscribers is based on the geographic areas identified by law since 2014 under the Affordable Care Act. The rating area for large group subscribers is based on the first three digits of the five-digit zip code. The use of the rating areas established under the Affordable Care Act is appropriate because "the rating factors used today for particular areas in California are quite similar to those used prior to the implementation of the ACA." *See* Axene Declaration, ¶ 49.

[272] Incurred costs reflect inpatient claims paid by Anthem at the Sutter Damage Hospitals on which Anthem provided primary insurance coverage to the plan member. Claims with substance abuse or behavioral health DRGs where excluded from this calculation. *See* Appendix C.

[273] My analysis identifies: (a) individual plan members attached to a rating area based on where the subscriber resides; (b) small group plan members attached to a rating area based on where the employer is located; and (c) large group plan members attached to a three-digit zip code area based on where the plan member resides (a large group plan member is only included in the calculation if the employer is also located in one of the nine rating areas). This method of attaching plan members to a rating area or three-digit zip code reflects the methodology used by ████
████ pp. 128-129 and 183; Mathewson Deposition, pp. 77-78 and 96-97; and Axene Declaration, ¶ 76.

**Exhibit 19**
**Anthem Inpatient Incurred Costs for Inpatient Hospital Services Provided by**
**Each Sutter Damage Hospital to Anthem Small Group Plan Members**
**Attached to One of the Nine Rating Areas, 2012**



2. US Census Bureau Zip Code and County Data.
3. The Center for Consumer Information & Insurance Oversight: California Geographic Rating Areas.

140.    To estimate the amount by which Anthem overpaid Sutter, I apply the overcharge percentages (shown in Exhibit 14A) to the Anthem incurred costs (shown in Exhibit 19). To understand the calculation, suppose Anthem incurred costs of $550 at Sutter Sacramento in 2012 and the econometric model found that Sutter Sacramento's prices were inflated by 30 percent. In this example, the amount by which Anthem overpaid is $126.50 (= $550 x 23 percent, where 23 percent = 30 percent ÷ (1+ 30 percent)). Here, the 30 percent overcharge is the amount of overcharge as a percentage of the *observed* hospital price, while the 23 percent is the amount of overcharge as a percentage of the *but-for* hospital price. Thus, I calculate Anthem's aggregate overpayment to the Sutter Damage Hospitals using this approach, by cohort. For illustration, Exhibit 20 shows the aggregate hospital overpayment made by Anthem for 2012 to each Sutter Damage Hospital, for small group plan members attached to one of the nine rating areas.

**Exhibit 20**
**Aggregate Overpayment by Anthem to Sutter Damage Hospitals,**
**for Small Group Plan Members Attached to One of the Nine Rating Areas, in 2012**



141.     Finally, I restate Anthem's aggregate overpayment to Sutter as Anthem's PMPM overpayment to Sutter, for each year from 2006 to 2015, by dividing by member months in each year.[274] The PMPM conversion mimics the actuarial process, described by Mr. Axene, by which health plan actuaries study historical health care PMPM healthcare costs to determine projected PMPM healthcare costs for a premium period. As explained by Mr. Axene, given the forward-looking nature of the premium setting process, there is typically a two-year gap between the historic period and the premium period.[275]

[276]

[277,278] For illustration, Exhibit 21 describes the aggregate and

---

[274] This PMPM conversion normalizes changes in volume across time periods.

[275] Axene Declaration, ¶ 27.

[276] Member months are the total months health plan members are enrolled in a fully-insured health insurance product. For example, a health plan member enrolled from January 1 of a year to June 30 of the same year would represent six-member months while a health plan member enrolled from January 1 of a year to December 31 of the same year would represent twelve-member months.

[277] Plan members area attached to a rating area as described in Footnote 274, above.

[278]

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

the PMPM overpayment of incurred costs paid by Anthem to Sutter Damage Hospitals, by rating area, for small group plan members attached to one of the nine rating areas, in 2012.

**Exhibit 21**
**Aggregate and PMPM Overpayment by Anthem to Sutter Damage Hospitals,**
**for Small Group Plan Members Attached to One of the Nine Rating Areas, in 2012**



*Sources:*

2.  Blue Shield Premium Data.
3.  *See* sources for Exhibit 20.

## C.      *Step Three of the Individual Damage Methodology*

142.    In the third step of the damage calculation, I determine how increased medical expenditures in a given year affected healthcare premiums paid two years later and calculate the percentage overcharge in premiums, by cohort. Based on my review of the testimony of Mr. Beuoy and Mr. Mathewson and the Declaration of Mr. Axene, it is my understanding that healthcare premiums at a given point in time are based on historical medical expenditures.[279] Blue Shield's Mr. Beuoy explains that the way premium pricing works is to "start with historical claims experience."[280]

---

84.) Also according to Mr. Axene, the average number of subscribers per small group contract is approximately eight. (*See* Axene Declaration, ¶ 84.)  Mr. Axene's description is consistent with my own analysis of Blue Shield data which provides information on the number of subscribers per small group contract; using those data, I find the average number of subscribers in a year varies between 6.7 and 8.5. (*See* Chipty Workpapers.) Thus, I estimate member months for each group type as follows: (a) individual member months = 2 x the number of individual contract months. (b) small group member months = 2 x the average number of subscribers per small group in the relevant year x the number of contract months. (c) large group member months = 2 x large group subscriber months.

[279] Based on a review of deposition testimony, rate filings, and the Expert Report of David Axene, it appears that healthcare premiums are based on claims experience that is between 15 and 24 months old.  Mathewson Deposition, pp. 41-43; and Axene Declaration, ¶ 28.

[280] Beuoy Deposition, p. 55.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

[black redaction bar]

[black redaction bar] [281] Thus, following this deposition testimony, the opinions of Mr. Axene, and URRT filings actually made by health plans, I determine the effect of overpayments in year $T\text{-}2$ (two years prior to when the premium was paid) on premiums in year $T$ to estimate individual damages, for $T$ spanning the years 2008 to 2017.[282] For example, I determine how Anthem overpayments to Sutter in 2010 affected Anthem premiums paid by Class Members in 2012.

143.    For this purpose, I first calculate the PMPM premium paid to Anthem for each cohort, in each year from 2008 to 2017. This PMPM premium is calculated by dividing the total premiums paid to Anthem by total member months, for each cohort, using information contained in the Anthem premium data.[283],[284] For illustration, Exhibit 22 presents 2014 PMPM premium paid to Anthem by Class Members.

**Exhibit 22**
**Aggregate and PMPM Premiums Paid to Anthem by**
**Small Group Plan Members Attached to One of the Nine Rating Areas, in 2014**



*Sources*:
[black redaction bar]
2. Blue Shield Premium Data.
3. US Census Bureau Zip Code and County Data.
4. The Center for Consumer Information & Insurance Oversight: California Geographic Rating Areas.

---

[281] Mathewson Deposition, p. 39.

[282] Axene Declaration, ¶ 27; and DMHC, "Search Rate Review Filings," available at http://wpso.dmhc.ca.gov/premiumratereview/searchratefilings, *site visited* June 18, 2018.

[283] Plan members area attached to a rating area as described in Footnote 274, above.

[284] For large groups, premiums are only available in aggregate by group. The premiums attached to each three- digit zip code were estimated by allocating the total premium in proportion to the member months attached to each three digit zip code. This is consistent with the methodology of allocating large group premiums identified by Mr. Axene. *See* Axene Declaration, ¶ 88.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

144.    The percentage overcharge in premiums is then calculated, by cohort as:

$$\frac{Pass\text{-}Through \times Trend\ Factor \times PMPM\ Hospital\ Overpayment_{T-2}}{PMPM\ Premium_T}$$

where: (a) pass-through is the pass-through ratio, which I have determined is equal to one; (b) trend factor is the adjustment applied to grow costs from the historical period to the premium period, to reflect inflation and utilization trends; (c) the PMPM hospital overpayment amounts are as illustrated in Exhibit 21; and (d) the PMPM premium amounts are as illustrated in Exhibit 22. For the purpose of the illustration, I do not apply any trend factors, which I understand form Mr. Axene are substantially greater than one.[285] The effect this omission is to significantly *understate* the percentage overcharge in premiums and hence, aggregate premium damages. Exhibit 23 shows the percentage impact of 2012 overpayments on 2014 premiums for small group subscribers attached to one of the nine rating areas by rating area. These premium percentage overpayment values represent the percentage by which Class Member premium payments were inflated due to Sutter's anticompetitive conduct.

**Exhibit 23**
**Premium Percentage Overpayment in 2014, for Anthem Small Group**
**Plan Members Attached to One of the Nine Rating Areas**



---

[285] It is well documented that hospital prices in California generally increased over the years. See Axene Declaration, ¶ 36; Mathewson Deposition, p. 114; and Melnick and Fonkych (2016), at p. 1 (explaining that over the period 2004-2013, hospital prices in California grew by 76 percent.).

## D.    *Step Four of the Individual Damage Methodology*

145.    After calculating the premium percentage overpayment by cohort, the final step of the damage calculation is to determine aggregate premium damages and premium damages by Class Member. To calculate aggregate premium damages between 2008 and 2017, I multiply together: (a) the premium percentage overpayment; and (b) the total premium paid to Anthem, by cohort.[286] The aggregate premium damages for each group type in each year is computed by summing premium damages by group type, across the rating areas. Exhibit 24 presents aggregate premium damages for all years, by group type. The boxed number, in Exhibit 24, completes the exemplar calculation focusing on Anthem small group entities that are located in one of the nine rating areas and that purchased a small group policy from Anthem in 2014. As seen here, the damages due to these Class Members are $13,377,219.

**Exhibit 24**
**Aggregate Premium Damages**
**for Anthem Plan Class Members Attached to One of the Nine Rating Areas**



146.    To calculate premium damages for an individual Class Member, I multiply (a) the premium percentage overpayment, based on the Class Member's cohort, and (b) the Class Member's total premium paid to Anthem. For illustration, Exhibit 25 presents the calculation of premium damage for one small group subscriber.[287]

---

[286] Premiums paid by year, rating area, and group type were previously calculated in determining the PMPM premium paid.

[287] Employers often subsidize only part of the premium paid as an employee benefit. In this instance, the employee pays for the remainder of the premium to obtain health insurance coverage. Accordingly, in instances where the premium is split, both employers and employees have suffered injury. I understand from a conference with the class

**Exhibit 25**
**Class Member Premium Damages**
**for an Entity That Paid Premiums to Anthem Attached to One of the Nine Rating Areas**



\*\*\*

147.    For the purpose of illustration, I can approximate the size of total damages by extrapolating my findings related to Anthem to the other health plans, ███████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████ Thus, I approximate total damages to be $723 million (= $251.0 million / 0.347 = $723 million). Calculating overcharge percentages, in Step One above, as an average across the years for a Sutter Damage Hospital, I approximate total damages to be $749 million (= $259.8 million / 0.347 = $749 million).

148.    Finally, there are several reasons why the four-step methodology for calculating damages I have described is conservative, for at least four reasons. First, the methodology ignores the impact of overcharges on the patient responsibility, in the form of copayments, deductibles, and coinsurance. Second, although there is documentary evidence that the

---

administrator Jennifer Keough, President of JND Legal Administration, that information regarding the employer/employee split of premiums can be elicited as part of a claims administration process, particularly as employers generally keep such information as part of their payroll records. This information can be used to apportion premium overcharge damages to both the employer and the employee.

challenged conduct has likely affected other medical services,[288] the methodology ignores the impact of overcharges on these services (*i.e.* outpatient services, physician services, etc.) provided by Sutter to Anthem plan members.[289] Third, the methodology ignores trend factors, by holding medical expenditures constant in computing the premium overcharge percentage. Fourth, the out-of-sample prediction methodology does not calculate hospital overpayment for Sutter Damage Hospital-years for which the regression model produces statistically insignificant overcharge estimates. This treatment is likely conservative, as shown in the alternative, in-sample prediction model I presented, which shows positive and significant overcharge for all hospitals over the period.

## XI.    Conclusions

149.    For the reasons I have explained in this report, it is my opinion that: (a) the proposed Class includes hundreds of thousands of Class Members; (b) a common method exists to demonstrate that Sutter's contracting practices have resulted in harm to all or nearly all Class Members; (c) evidence that is common to members of the proposed Class shows that all or nearly all proposed Class Members likely incurred at least some overcharge as a result of Sutter's conduct; and (d) the amount of harm to the proposed Class can be estimated on an aggregate level and can be calculated at the individual Class Member level based on a common, formulaic methodology.

*Tasneem Chipty*

Tasneem Chipty, Ph. D.
June 21, 2018

---

[288] "Sutter Health System Internal Sales and Account Management Talking Points," September 6, 2013, ABCLH120166-170; Blue Shield of California, "Sutter Health: Observations on Relative Cost," February 16, 2006, BSC_UFCW-00045000-018, at 002; and De La Torre Declaration, Exhibit 4, ABCLH054780-783, at 781.

[289] The premium rate setting process is based on all medical costs incurred by Anthem plan members. *See* Mathewson Deposition, pp. 83-84; and Axene Declaration, ¶ 29.

# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, JERRY JANKOWSKI,
SUSAN HANSEN, DAVID HERMAN,
OPTIMUM GRAPHICS, INC., and JOHNSON
POOL & SPA, on Behalf of Themselves and All
Others Similarly Situated,

                Plaintiffs,

    v.

SUTTER HEALTH,

              Defendant.

Case No. 3: 12-cv-4854-LB

CLASS ACTION

Reply Declaration of Dr. Tasneem Chipty

in Further Support of Plaintiffs' Motion for Class Certification

November 26, 2018

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

## I.     Introduction

1.     My name is Tasneem Chipty. I declare under penalty of perjury under the laws of the United States of America as follows:

2.     At the request of counsel for the Class Plaintiffs, I previously submitted two declarations in *Sidibe et al. vs. Sutter*.[1] My qualifications are set forth in those declarations, and my updated CV is included here in Appendix A.[2]

3.     In my SJ Declaration, I assessed issues of market definition and market power; in my Class Declaration, I assessed issues of common antitrust impact and I set forth a common model for calculating Class Member damages. Based on the work presented in my Class Declaration, I concluded that a growing body of economics literature and case-specific evidence indicate that Sutter's contracting practices have interfered with the competitive process and enabled Sutter to charge health plans higher prices for inpatient hospital services (in addition to outpatient and professional services) than it would have otherwise.[3] I also concluded that:[4] (a) the proposed Class includes hundreds of thousands of Class Members; (b) a common method exists to demonstrate that Sutter's contracting practices have resulted in harm to all or nearly all Class Members; (c) evidence that is common to members of the proposed Class shows that all or nearly all proposed Class Members paid higher health insurance premiums as a result of Sutter's

---

[1] Declaration of Dr. Tasneem Chipty in Opposition to Motion for Summary Judgment, May 26, 2018 (hereafter "Chipty SJ Declaration"); and Expert Declaration of Dr. Tasneem Chipty in Support of Plaintiffs' Motion for Class Certification, June 21, 2018 (hereafter "Chipty Class Declaration"). I have been deposed twice in this matter: (a) once on August 15, 2018, on the issues of market definition and market power; and (b) once on August 16, 2018, on issues of class certification.

[2] Throughout this declaration, I use the terms: (a) "health plan" to mean commercial health plans or insurers that sell health insurance products; (b) "entities" to mean the purchasers of healthcare insurance products, including both group purchasers, such as employers, and individuals; (c) "plan members" to mean individuals that are covered by the health insurance policy; (d) "subscribers" to mean the primary plan members (*e.g.,* the employees of a large group); and (e) "patients" to mean individuals that use healthcare services.

[3] Chipty Class Declaration, ¶ 10.

[4] *Id.*

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**                    1

125.    Here, there are strong reasons to expect Dr. Willig's claim-level regression is mis-specified because he is unable to model the price variation he introduces. As explained by two prominent econometricians: [287]

> "[E]mpirically estimated micro relations, whether those of individual consumers or of individual producers, should not be assumed to be perfectly specified either in an economics sense or in a statistical sense. Aggregation of economic variables can, and in fact frequently does, reduce these specification errors. Hence, aggregation does not only produce an aggregation error, but may also produce an aggregation gain."

In an attempt to model claim-level price variability, Dr. Willig's claim-level regression attempts to add additional control variables to capture this variability. A closer look at the data and underlying hospital contracts, however, reveals that Dr. Willig's control variables are inadequate to capture both within-hospital and cross-hospital price variation.

126.    The fact is that, even within Sutter, some cases are paid a diagnosis-specific "case rate" that does not vary with length of stay. Many other cases are paid on a general per-diem rate that does not vary by diagnosis.[288] For Dr. Willig's price regression to perform well, he needs to capture both the within-hospital and across-hospital variation in prices that cannot simply be explained in a uniform way by diagnosis (i.e., DRG fixed effects), length of stay, and the other explanatory variables in his model.

127.    To illustrate the problem, Exhibit 11 shows claim-level allowed amounts paid by Anthem to one of the Sutter Damage Hospitals, by length of stay for DRG 392 (esophagitis, gastrointestinal, and miscellaneous digestive disorders without complications) and DRG 775 (vaginal delivery without complications), two high frequency diagnoses treated at the Sutter Damage Hospitals.[289] DRG 392 is paid on a per-diem basis, and its price increases with length of

---

[287] Grunfeld, Yehuda and Zvi Griliches, "Is Aggregation Necessarily Bad?" *The Review of Economics and Statistics,* Vol. 42., No. 1, Feb. 1960, pp. 1-13, p. 1.

[288] Chipty Workpapers. *See also,* Declaration of Melissa Brendt (Sutter) in Support of Defendants' Opposition to UEBT's Motion for Class Certification, June 6, 2017, ¶¶ 19-26; and Brendt Deposition (Sutter, May 5, 2018), pp. 53-55.

[289] DRGs 775 and 392 were two of the most common DRGs by claim count at Sutter Damage Hospitals in the Anthem data in 2012. Under the terms of Anthem's 2012 contract with Sutter, Anthem pays the Sutter Damage

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER                     78

stay; by contrast, DRG 775 is paid on a case-rate, and its price is the same irrespective of the length of stay. Because the exhibit pools the Sutter Damage Hospitals, there is some variation in allowed amounts for the same DRG. Dr. Willig's regression does not account for the differences in the structure of hospital payments across DRGs, because he models length of stay as having the *same* effect on all claims. Yet, Exhibit 11 shows that length of stay does not have the same effect on all claims.

**Exhibit 11**
**Anthem Claim-Level Allowed Amounts by Length of Stay**
**for DRG 392 and 775 at Sutter Damage Hospitals in 2012**



*Sources*:
1. Anthem Claim-Level Data.
2. "Anthem Blue Cross of California and Sutter Health Systemwide Amendment," December 29, 2011, ABCLH055105 - 5488, pp. 5396-5399.

128.    In deciding whether it makes more sense to run a claim-level or hospital-level regression model, one must weigh the advantages and disadvantages. On the one hand, the claim-level regression preserves more information. On the other hand, the claim-level regression

---

Hospitals on a case-basis for DRG 775, and it pays the Sutter Damage Hospitals on a per-diem basis for DRG 392. *See* Chipty Workpapers; Centers for Medicare and Medicaid Services, "Draft ICD-10-CM/PCS MS-DRGv28 Definitions Manual," available at https://www.cms.gov/icd10manual/fullcode_cms/P0165 html, *site visited* November 19, 2018; and "Anthem Blue Cross of California and Sutter Health Systemwide Amendment," December 29, 2011, ABCLH055105-488, pp. 396-399.

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**

6. National Bureau of Economic Research (NBER) NPI to Medicare CCN Crosswalk.

7. Google Maps Distance Matrix API.

152.    Using the overcharge results described above, I estimate premium damages to Class Members who purchased insurance products from Blue Shield using the same general approach[322] outlined in my Class Declaration while incorporating the refinements described in Sections IV.C and IV.D of this Declaration. As seen in Exhibit 18, I estimate that premium damages to Class Members who purchased insurance products from Blue Shield are $235,677,765.

### Exhibit 18
### Aggregate Premium Damages
### for Blue Shield Class Members Attached to One of the Nine Rating Areas
### Based on Refined Large Group Methodology and Using Applicable Rating Areas by Year

| Year | Individual | Small Group | Large Group Rating Methodology | | | All Entities |
| | | | Manual | Blended | Experience | |
|------|-----------|-------------|---------|---------|-----------|--------------|
| 2008 | $858,269 | $1,633,892 | $706,427 | $174,422 | $1,347,235 | $4,720,245 |
| 2009 | $1,246,077 | $2,539,185 | $1,321,317 | $210,502 | $1,339,650 | $6,656,731 |
| 2010 | $7,407,407 | $12,619,569 | $3,292,644 | $678,079 | $9,571,921 | $33,569,620 |
| 2011 | $5,211,247 | $14,191,134 | $2,122,336 | $515,273 | $8,821,884 | $30,861,874 |
| 2012 | $4,595,526 | $13,824,230 | $2,898,188 | $926,293 | $11,851,790 | $34,096,026 |
| 2013 | $4,861,557 | $14,158,633 | $3,632,069 | $964,205 | $1,366,777 | $24,983,241 |
| 2014 | $6,488,124 | $11,825,494 | $4,000,701 | $762,172 | $1,608,886 | $24,685,378 |
| 2015 | $6,872,455 | $9,086,223 | $4,073,151 | $690,891 | $688,701 | $21,411,421 |
| 2016 | $13,482,514 | $8,581,654 | $13,524,580 | $359,694 | $37,437 | $35,985,879 |
| 2017 | $9,942,237 | $5,673,205 | $2,686,289 | $314,617 | $91,003 | $18,707,349 |
| Total | $60,965,413 | $94,133,218 | $38,257,702 | $5,596,148 | $36,725,284 | $235,677,765 |

*Sources:*

1. *See* sources for Exhibit 17.

2. Blue Shield Premium Data, 2006-2017.

3. US Census Bureau Zip Code and County Data.

4. The Center for Consumer Information & Insurance Oversight: California Geographic Rating

---

[322] It is important to note that Blue Shield's premium data do not provide the zip code for Individual subscribers and Large Group employees. However, the paid claims data provide this information for subscribers that utilized healthcare services. Thus, the distribution of where subscribers who utilized healthcare services reside was used to identify where all Individual subscribers and Large Group employees reside. In addition, in certain circumstances information such as group zip code and line-of-business was not available from either the premium data or the claims data, but was available in the other data source. In these circumstances, the relevant information was mapped across the two data sources.

## VII.   Conclusions

170.   Thus, for the reasons set forth in this declaration, it remains my opinion that: (a) Class Members have suffered common impact due to Sutter's elevated prices at the Sutter Damage Hospitals; and (b) a common method exists to reasonably approximate aggregate and individual Class Member damages. Dr. Willig and Mr. Travis speculate that "many" Class Members were not harmed by the challenged conduct and that Class Members suffered such disparate impact that a common methodology cannot be used to assess damages for all Class Members. Both have attempted to identify a laundry-list of theoretical reasons why there may not be common impact, but neither has presented evidence or data analysis to substantiate or quantify the economic significance of their criticisms. Their insistence that individual inquiry is necessary to assess damages is at odds with the data and the evidence in this case.

Tasneem Chipty, Ph. D.
November 26, 2018

**FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**     103