# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN HANSEN, DAVID HERMAN, CAROLINE STEWART, OPTIMUM GRAPHICS, INC., and JOHNSON POOL & SPA, on Behalf of Themselves and All Others Similarly Situated,

                Plaintiffs,

     v.

SUTTER HEALTH,

                Defendant.

Case No. 3: 12-cv-4854-LB

CLASS ACTION

<br>

## CORRECTED EXPERT DECLARATION OF DR. ROBERT D. WILLIG IN SUPPORT OF DEFENDANTS' OPPOSITION TO CLASS CERTIFICATION
### NOVEMBER 8, 2018

### FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

### <u>UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</u>



PLAINTIFF'S EXHIBIT 801
11/8/18
PENGAD 800-631-6989

## I.      INTRODUCTION

### A.      QUALIFICATIONS

1.      My name is Robert D. Willig.  I am Professor of Economics and Public Affairs Emeritus
at Princeton University, where I have held a joint appointment in the Economics Department and
at the Woodrow Wilson School of Public and International Affairs since 1978, and continue to
teach the graduate course, "Legal and Regulatory Policy Toward Markets."  Previously, I was a
Supervisor in the Economics Research Department of Bell Laboratories.  My teaching and
research have specialized in the fields of industrial organization, government-business relations,
and social welfare theory.  I served as Deputy Assistant Attorney General for Economics in the
Antitrust Division of the U.S. Department of Justice from 1989 to 1991, and in that capacity
served as the Division's Chief Economist.  Among my responsibilities were participating in
decisions on merger enforcement and drafting new Merger Guidelines.

2.      I have authored some 80 articles in the economics literature and am the author of *Welfare
Analysis of Policies Affecting Prices and Products* and *Contestable Markets and the Theory of
Industry Structure* (with W. Baumol and J. Panzar).  I am also a co-editor of *The Handbook of
Industrial Organization*, which summarizes the state of economic thinking on the structure of
industries and the nature of competition among firms, and have served on the editorial boards of
the American Economic Review, the Journal of Industrial Economics, and the MIT Press Series
on Regulation.  I am an elected Fellow of the Econometric Society and was an associate of The
Center for International Studies.

3.      I have appeared as an expert witness before Congress, federal and state courts, federal
administrative agencies, and state public utility commissions on subjects involving competition,
regulation, intellectual property rights, and antitrust.  I have also served as a consultant to the
Federal Trade Commission, the U.S. Department of Justice, the OECD, the World Bank, the
Inter-American Development Bank and many leading corporations on antitrust, regulation, and
economic policy issues arising in a wide variety of industries in the U.S. and around the world.

4.      I have substantial experience studying, consulting and testifying as an expert on many
different aspects of the economics of healthcare.  I testified in the spring of 2016 before the
United States District Court for the Middle District of Pennsylvania on my analyses that lent

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

common, more complex inpatient hospital procedure involving neonatal care or cardiac surgery. Inpatient procedures are collected into DRGs for purposes of pricing. DRGs often are used to describe an inpatient hospital stay.

190.    Dr. Chipty has access to detailed claims data from commercial payers, which show the amounts paid for individual hospital stays for particular services—e.g., the amount paid for an OB visit at CPMC. However, Dr. Chipty does not compare the prices of inpatient visits. Instead, for both her comparison of case-mixed adjusted prices reflected in her Exhibit 11 and her overcharge regression, Dr. Chipty aggregates prices up to the hospital-year level of aggregation. Hence, Dr. Chipty's analysis throws away much of the information in these data by collapsing hundreds of thousands of commercial claims down to fewer than one thousand hospital-year average prices. That is, the data Dr. Chipty uses to estimate her regression equations include *only one* price per hospital per year even though prices vary widely across DRGs and inpatient discharges.[254]

191.    When detailed claims data are available from insurance carriers, as they are in this case, researchers typically analyze prices at a much lower level of aggregation—e.g., DRG or inpatient discharge.[255] The reason for this is that detailed claims data allow the researcher to account for as many factors as possible that may cause differences in hospital prices other than the event or conduct being studied. In the case of hospital prices for inpatient stays, there are many

---

Chipty's analysis of OSHPD data is unreliable for a number of reasons, including: (i) OSHPD data do not include a measure of the relevant price, (ii) OSHPD data does not separate inpatient and outpatient revenues, and (iii) OSHPD data is highly aggregated and thus does not allow for the type of detailed analysis of price that is required to perform a reliable comparison of prices across hospitals. In addition to these issues, Dr. Chipty's analysis of OSHPD data is subject to many of the criticisms that I make in this section of Dr. Chipty's analysis of claims data.

[254]    Chipty Decl., Ex. 13.

[255]    *See, e.g.,* Thompson, A., "The Effect of Hospital Mergers on Inpatient Prices: A Case Study of the New Hanover-Cape Fear Transaction," *International Journal of the Economics of Business*, 18(1), 2011; Haas-Wilson, D. and C. Garmon, "Hospital Mergers and Competitive Effects: Two Retrospective Analyses," *International Journal of the Economics of Business*, 18(1), 2011, 17-32; Krishnan, R., "Market Restructuring and Pricing in the Hospital Industry," *Journal of Health Economics*, 20, 2001, 212-237; and Melnick, G., and E. Keeler, "The Effects of Multi-Hospital Systems on Hospital Prices," *Journal of Health Economics*, 26, 2007, 400-413.

differences across DRGs and discharges, both across hospitals and within a given hospital, that affect prices. It is possible to control for these differences in inpatient discharge-level data; it is not possible to control for all of these differences using Dr. Chipty's approach of aggregating claims data to the hospital-year level.

192.    Dr. Chipty's justification for aggregating the available claims data to the hospital-year level of aggregation was that prices at lower levels of aggregation are noisy.[256] Ironically, as discussed above, Dr. Chipty's overcharge estimates using her aggregated approach are extremely noisy. Moreover, avoiding noise is one justification given in the literature for *not* aggregating data to the hospital level, and instead studying pricing at a lower level of aggregation as I do in Section VII.B.[257]

193.    Aggregation of the data to the hospital-year level causes at least two problems with Dr. Chipty's estimates.

194.    First, aggregation to the hospital-year level combines a wide range of services with tremendous variation that is observed at a lower level of aggregation—*e.g.* by type of inpatient stay or procedure—and risks concluding that a hospital is higher-priced simply because that hospital provides *more* higher-priced services than benchmark hospitals. For example, Dr. Chipty's 2010 average price for Stanford University Hospital includes more than 800 claims for more than 275 DRGs. Examples of these DRGs include DRG 343, "An appendectomy without complicated principal diagnosis or major complications," which has an average price of approximately $6,000; and DRG 470, "Major hip and knee joint replacement or reattachment of lower extremity without major complications," which has an average price of approximately $35,000. The hospital's average price is dependent on both the price of these procedures and number of procedures performed. Two hospitals with identical prices for each procedure can

---

[256]    Chipty Dep. at 563. ("Q. Did you conduct any analyses of trying to estimate price at the DRG level, at the admissions level? A. I did not. Q. Okay. And why not? A. Because I think it's a very noisy thing to do.").

[257]    *See, e.g.*, Krishnan, R., "Market Restructuring and Pricing in the Hospital Industry," *Journal of Health Economics*, 20, 2001, 212-237 at 216 ("This approach has been used by Lynk (1995) who argues that DRG-level prices should have much less noise than aggregate hospital-level prices[.]").

have different case-mix adjusted average prices due to differences in patient volumes for procedures. By evaluating prices at the hospital-year level of aggregation, Dr. Chipty is masking observed price differences across DRGs both within and across hospitals. Dr. Chipty makes a crude attempt to account for these differences by deflating hospital prices by DRG weights, but as I show in the next section, this method assumes a particular relationship between price and DRG weight that is rejected by data on hospital prices.

195.    Consider the following example that explains why aggregation can cause bias due to differences in product mix across hospitals. Hospital 1 and hospital 2 each charge a case-mix-adjusted price of $100 for procedure 1 and $200 for procedure 2. Hospital 1 performs procedure 1 100 times and procedure 2 200 times, while hospital 2 performs procedure 1 200 times and procedure 2 100 times. Dr. Chipty's analysis would compute hospital 1's case-mix adjusted average price to be $166.67 and hospital 2's case-mix-adjusted average price to be $133.33. Hence, even though hospitals 1 and 2 have identical prices for procedures 1 and 2, Dr. Chipty's analysis would assume hospital 1's case-mix-adjusted average price is 25 percent higher than hospital 2's case-mix adjusted average price.[258]

196.    Second, there are differences across hospitals in costs, quality, and market conditions that affect prices—aggregating prices to a hospital-year level will place more weight on hospitals that are dissimilar from Sutter (small hospitals) than a regression conducted at the discharge level would. Dr. Chipty includes some observed hospital and market characteristics in her regression equations in an attempt to account for differences across hospitals. However, as I discuss further below, because Dr. Chipty includes hospitals that significantly differ from Sutter hospitals in her control group, it is more likely that the included control variables will be inadequate to account for the differences. For example, in her comparison of hospital-year prices, Dr. Chipty assigns equal weight to the average price at a 16-bed critical access hospital as she does to the average price at the 660-bed UCSF Medical Center. Because a small 16-bed hospital is unlikely to offer

---

[258]    The claim could be made that hospital 1 is higher priced because it has a greater volume of procedures that are high priced relative to their case mix, but this claim rests on the ability of case weighting to capture the proportionate relationship in resource use between more and less intensive procedures. I show below that CMS case weights do not accurately capture this relationship. Furthermore, from the point of view of any patient or class member seeking care the two hospitals have the same price.

the range of services of larger hospitals, it is not appropriate to weight such hospitals equally in an analysis that purports to explain prices for comparison with relevant Sutter hospitals.

197.    Comparisons across hospitals that vary significantly in size and sophistication likely reveal price differences that have nothing to do with the challenged conduct.  Offering a broad array of services, particularly high-end services, requires the maintenance of the equipment and personnel necessary to perform those services.  This tends to increase costs and quality at larger, more sophisticated hospitals, both of which tend to increase prices at such facilities, even for primary and secondary care that could be performed at any hospital.  Dr. Chipty's aggregation choice exacerbates the impact of such price differences by weighting hospitals that are smaller and less sophisticated than Sutter hospitals equally to large hospitals that are closer matches for Sutter hospitals.  Although a discharge-level analysis also may not fully account for differences in prices caused by the relatively high cost and high quality of care at large, sophisticated hospitals, the problem is mitigated relative to a hospital-level analysis because larger, more sophisticated hospitals have many more discharges than smaller, less sophisticated hospitals, and thus larger, more sophisticated hospitals will receive greater weight in a discharge-level regression analysis than they would in Dr. Chipty's hospital-level regression analysis.

198.    One way to investigate whether Dr. Chipty's aggregation decision and choice of control variables are valid is to estimate overcharges using less aggregated prices—*e.g.,* prices for an inpatient discharge such as a vaginal delivery without complicating diagnoses.  If Dr. Chipty's control variables are sufficient to control for differences across hospitals at her chosen level of aggregation, overcharge estimates should be similar when using the same data at an inpatient, discharge-level of aggregation.  Significantly different estimates, on the other hand, indicate flaws in Dr. Chipty's approach.  The regression results presented in Section VII.B below are based on discharge-level data and include the additional discharge-level control variables that I describe below.  The changes I implement lead to significantly different overcharge estimates than Dr. Chipty's estimates, which indicates that Dr. Chipty's regression estimates are unreliable.

### 2.    Dr. Chipty's incorrect accounting for price differences across inpatient procedures biases overcharge estimates

199.    Dr. Chipty makes a crude attempt to control for price differences across DRGs.  Dr. Chipty explains that "[b]ecause the complexity of hospital services varies both across hospitals

"overcharge" estimates are significantly reduced, but she buries this result in her back-up materials.

### 4. Dr. Chipty ignores important control variables in her price comparisons

212.   When estimating the effect of the challenged conduct on hospital prices, it is appropriate to include control variables that might affect hospital prices independently of that conduct.  In fact, Dr. Chipty notes that "[t]o be useful for the purpose at hand, the regression model *must* include the key explanatory variables that are likely to predict hospital prices, especially Sutter hospital prices."[275]  Failure to include appropriate control variables causes estimates to be biased because the econometric model is unable to isolate the effect of the challenged conduct from other cost and demand factors.[276]

213.   As noted above, Dr. Chipty analyzes highly aggregated hospital prices.  One significant side-effect of Dr. Chipty's decision to estimate price effects at the hospital-year level of aggregation is that she cannot control for factors that affect hospital pricing at lower levels of aggregation.  It is well-understood by economists that have studied hospital pricing that there are many reasons that hospital prices may vary at lower levels of aggregation—*e.g.*, by DRG or inpatient discharge.[277]  For example, the severity and price of a procedure may differ greatly

---

[275]   Chipty Decl., ¶ 98. (Emphasis added.)

[276]   *See, e.g.*, American Bar Association, *Proving Antitrust Damages Legal and Economic Issues* 148 (3d ed. 2017) ("Mistakenly excluding important explanatory variables in an attempt at simplicity, on the other hand, can result in an omitted variable bias and misinterpretation of estimated results."); *id.* at 149 ("In general, one should be more concerned with avoiding bias than with improving precision. That is, it is better to be on average right though imprecise, than to be precisely wrong. For these reasons, it is in general better to include more variables than fewer.").

[277]   *See, e.g.,* Thompson, A., "The Effect of Hospital Mergers on Inpatient Prices: A Case Study of the New Hanover-Cape Fear Transaction," *International Journal of the Economics of Business*, 18(1), 2011, 91-101; Haas-Wilson, D. and C. Garmon, "Hospital Mergers and Competitive Effects: Two Retrospective Analyses," *International Journal of the Economics of Business*, 18(1), 2011, 17-32; Krishnan, R., "Market Restructuring and Pricing in the Hospital Industry," *Journal of Health Economics*, 20, 2001, 212-237; Tenn, Steven. "The price effects of hospital mergers: a case study of the Sutter–Summit transaction." *International Journal of the Economics of Business* 18(1), 2011, 65-82; and Melnick, G., and E. Keeler, "The Effects of Multi-Hospital Systems on Hospital Prices," *Journal of Health Economics*, 26, 2007, 400-413.

when performed on a 20-year-old patient versus a 50-year-old patient. These differences are not adequately accounted for when prices are evaluated at the hospital-year level of aggregation.

214.   The economic literature suggests using several variables that Dr. Chipty omits from her regressions to control for differences in costs and demand across inpatient discharges and hospitals.[278]   In this section, I describe these additional control variables and explain why they are appropriate to include in an analysis of hospital prices. Dr. Chipty's failure to include these additional control variables likely biased her overcharge estimates.

215.   In the next section, I present revised regressions that include additional control variables that are used in the economic literature to account for various factors that influence hospital inpatient prices. For the reasons given in the previous section, I included the hospital-specific HHI instead of hospital count indicator variables. I also include a variable that measures the total fixed assets in a hospital's system.[279]  In addition to hospital-level control variables, I include the following patient-level controls that vary at the discharge level of aggregation used in academic studies of hospital pricing.[280]

---

[278]   *See, e.g.,* Thompson, A., "The Effect of Hospital Mergers on Inpatient Prices:  A Case Study of the New Hanover-Cape Fear Transaction," *International Journal of the Economics of Business*, 18(1), 2011, 91-101; Haas-Wilson, D. and C. Garmon, "Hospital Mergers and Competitive Effects: Two Retrospective Analyses," *International Journal of the Economics of Business*, 18(1), 2011, 17-32; Krishnan, R., "Market Restructuring and Pricing in the Hospital Industry," *Journal of Health Economics*, 20, 2001, 212-237; Tenn, Steven. "The price effects of hospital mergers: a case study of the Sutter–Summit transaction." International Journal of the Economics of Business 18(1), 2011, 65-82; and Melnick, G., and E. Keeler, "The Effects of Multi-Hospital Systems on Hospital Prices," *Journal of Health Economics*, 26, 2007, 400-413.

[279]   I use fixed assets as a proxy for the significant investments hospital systems make in improved quality of care. Similar measures have been used in academic studies of hospital pricing. *See, e.g.*, Keeler, E.B., G. Melnick, and J. Zwanziger, "The Changing Effects of Competition on Non-Profit and For-Profit Hospital Pricing Behavior," Journal of Health Economics, 18, 69-86.

[280]   *See, e.g.,* Thompson, A., "The Effect of Hospital Mergers on Inpatient Prices:  A Case Study of the New Hanover-Cape Fear Transaction," *International Journal of the Economics of Business*, 18(1), 2011, 91-101; Haas-Wilson, D. and C. Garmon, "Hospital Mergers and Competitive Effects: Two Retrospective Analyses," *International Journal of the Economics of Business*, 18(1), 2011, 17-32; Krishnan, R., "Market Restructuring and Pricing in the Hospital Industry," *Journal of Health Economics*, 20, 2001, 212-237; Tenn, Steven. "The price effects of hospital mergers: a case study of the Sutter–Summit transaction." International Journal of the Economics of Business

## VIII.   CONCLUSION

226.   Based on empirical and documentary evidence of (i) large benefits from the challenged conduct to many members of the purported class that obtain hospital care from Sutter, (ii) small or non-existent overcharges, and (iii) disparate rates at which hospital prices are passed on to purported class members, I conclude as follows:

- The net impact of the challenged conduct on many members of purported class is positive, *i.e.*, they are better off due to the challenged conduct.

- Dr. Chipty does not present a valid common method to show impact or determine its sizes for all nor nearly all members of the purported class.

- Determining the impact of the challenged conduct would require individual inquiries to determine numerous facts that are specific to each member of the purported class.

227.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 8, 2018.

*Robert Willig*

_____          _____
Robert D. Willig, Ph.D.                                                November 8, 2018

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 11

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, et al.,

                  Plaintiff,

    v.

SUTTER HEALTH,

                  Defendant.

Case No. 3: 12-cv-4854-LB

CLASS ACTION

## RESPONSE OF DR. ROBERT D. WILLIG
## TO REBUTTAL REPORT OF DR. TASNEEM CHIPTY
### May 7, 2021

**Exhibit
934**
5/7/2021
Willig

CONTAINS HIGHLY CONFIDENTIAL – AEO – STRATEGIC COMPETITIVE DATA

1.      My name is Robert D. Willig. I have previously provided six reports in this matter: (1) my initial merits report, dated June 21, 2019;[1] (2) an expert declaration in support of Defendants' opposition to class certification, dated September 21, 2018;[2] (3) a sur-reply declaration in further support of Defendants' opposition to class certification, dated January 7, 2019;[3] (4) a supplemental declaration, originally filed on January 31, 2020 and corrected February 25, 2020, that responded to Dr. Chipty's Supplemental Expert Declaration on pass-through issues in the class certification phase of this case;[4] (5) a supplemental expert report, dated March 12, 2021;[5] and (6) a rebuttal report, dated April 16, 2021.[6] The analyses I presented in these reports and the conclusions I reached based on those analyses have not changed and I incorporate them by reference here and will be prepared to testify about the opinions and bases for such opinions at trial.

2.      I have been asked by counsel to respond to Exhibit 1 in the Rebuttal Report of Dr. Tasneem Chipty dated April 16, 2021.[7]

3.      In Exhibit 1 of her Rebuttal Report, Dr. Chipty updates her analysis that purports to compare the prevalence of narrow networks in Northern to Southern California using Anthem data from 2006 to 2017.[8] She had previously presented this analysis for the period 2006 to 2015

---

[1]     Expert Report of Dr. Robert D. Willig, June 21, 2019 (hereinafter "Willig Merits Report").

[2]     Expert Declaration of Dr. Robert D. Willig in Support of Defendants' Opposition to Class Certification, September 21, 2018 (hereinafter "Willig Class Decl.").

[3]     Sur-Reply Declaration of Dr. Robert D. Willig in Support of Defendant's Opposition to Class Certification, January 7, 2019 (hereinafter "Willig Sur-Reply Decl.").

[4]     Corrected Supplemental Declaration of Dr. Robert D. Willig, February 25, 2020 (hereinafter "Willig Pass-Through Decl.").

[5]     Supplemental Expert Report of Dr. Robert D. Willig, March 12, 2021 (hereinafter "Willig Supp'l Report").

[6]     Rebuttal Expert Report of Dr. Robert D. Willig, April 16, 2021 (hereinafter "Willig Rebuttal Report").

[7]     My failure to respond to any particular claim or opinion by Dr. Chipty does not indicate agreement. I will be prepared to testify about my opinions and bases for such opinions at trial. I reserve the right to update my analysis as new information becomes available.

[8]     Rebuttal Report of Dr. Tasneem Chipty, April 26, 2021, ¶ 9.

CONTAINS HIGHLY CONFIDENTIAL – AEO – STRATEGIC COMPETITIVE DATA

in her April 30, 2019 Supplemental Report, and I responded to it in my June 21, 2019 Merits Report.

4.       Exhibit 1 of her Rebuttal Report presents the results of her updated analysis and claims that it demonstrates that Anthem's narrow and tiered network products over the period 2006 to 2017 have achieved greater penetration in Southern California, relative to Northern California.[9] Dr. Chipty's Exhibit 1 relies on newly processed Anthem data that she had not previously provided. Since she first presented this update on April 16th, I was unable to respond to it in my April 16th Rebuttal Report. I have now updated the analysis in my Merits Report to account for the new data underlying Dr. Chipty's Exhibit 1 and discuss the results below.

5.       The fundamental mistake in Dr. Chipty's analysis in her Exhibit 1 is that she continues to incorrectly exclude Kaiser. As I explained in my Merits Report, Kaiser is the ultimate steered product in California healthcare markets—Kaiser plan enrollees must go to Kaiser hospitals or Kaiser subcontracted hospitals for care—and Kaiser is more popular in Northern California than it is in Southern California.[10] I update below Figure 1 of my Merits Report to include data until 2017. Figure 1 shows that Kaiser accounts for a substantially higher share of discharges in Northern California (blue line) than in Southern California (orange), approximately 31 percent to 25 percent in 2017.

---

[9]      *Id.*

[10]     Willig Merits Report, June 21, 2019, ¶¶46-47.

CONTAINS HIGHLY CONFIDENTIAL – AEO – STRATEGIC COMPETITIVE DATA

**Figure 1: Kaiser Share in Northern and Southern California, 2002-2017**



Sources: OSHPD Discharge Data; Backup to Dr. Chipty's Reports.

Notes: Kaiser's share is defined as the number of discharges for which Kaiser was listed as the payor in the OSHPD data, or discharges at Kaiser facilities with a missing payor, divided by total commercial discharges.

— Share of Commercial Discharges for Northern California Patients
— Share of Commercial Discharges for Southern California Patients
— Share of Commercial Discharges for California Patients

6.    I also update below Figure 2 from my Merits Report to extend analysis through 2017. Figure 2 demonstrates that when Kaiser is appropriately considered, narrow networks were somewhat more prevalent in Northern California (where Sutter competes) than in Southern California (where it does not) from at least 2006 until 2012 and somewhat less prevalent in Northern California since 2013. Thus, there is no evidence that narrow networks have systematically lower penetration in Northern California.

CONTAINS HIGHLY CONFIDENTIAL – AEO – STRATEGIC COMPETITIVE DATA

**Figure 2: Dr. Chipty's Rebuttal Report of April 16, 2021, Exhibit 1 – Percent of In-Network, Inpatient Claims Associated with a Steered Product, Assuming Dr. Chipty's Proportions for non-Kaiser Commercial Discharges and Including Kaiser**



Robert D. Willig, Ph.D.

May 7, 2021

CONTAINS HIGHLY CONFIDENTIAL – AEO – STRATEGIC COMPETITIVE DATA

4

# EXHIBIT 12

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4    DJENEBA SIDIBE, JERRY
     JANKOWSKI, SUSAN HANSEN, DAVID
5    HERMAN, CAROLINE STEWART,
     OPTIMUM GRAPHICS, INC., and
6    JOHNSON POOL & SPA, on Behalf
     of Themselves and All Others
7    Similarly Situated,

8          Plaintiffs,

9      vs.                      Case No. 3:12-CV-4854-LB

10   SUTTER HEALTH,

11         Defendant.
     _____

12

13

14     **HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**

15    VIDEOTAPED DEPOSITION OF TASNEEM CHIPTY, Ph.D.

16            San Francisco, California

17              August 16, 2018

18                 Volume II

19

20

21

22   REPORTED BY:

23   REBECCA L. ROMANO, RPR, CSR No. 12546

24   JOB NO. 10046382

25

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4  DJENEBA SIDIBE, JERRY
    JANKOWSKI, SUSAN HANSEN, DAVID
 5  HERMAN, CAROLINE STEWART,
    OPTIMUM GRAPHICS, INC., and
 6  JOHNSON POOL & SPA, on Behalf
    of Themselves and All Others
 7  Similarly Situated,

 8          Plaintiffs,

 9      vs.                    Case No. 3:12-CV-4854-LB

10  SUTTER HEALTH,

11          Defendant.
    _____

12

13

14

15      VIDEO DEPOSITION OF TASNEEM CHIPTY, Ph.D.,

16  taken on behalf of the Defendant, at

17  Constantine Cannon, 150 California Street,

18  Suite 1600, San Francisco, California, commencing

19  at 9:06 a.m., Thursday, August 16, 2018, before

20  Rebecca L. Romano, Certified Shorthand

21  Reporter No. 12546

22

23

24

25
```

```
 1                    APPEARANCES OF COUNSEL

 2

 3   For the Sidibe Plaintiffs:

 4        CONSTANTINE CANNON

 5        BY:  MATTHEW L. CANTOR

 6        Attorney at Law

 7        450 Lexington Avenue

 8        Floor 17

 9        New York, New York 10017

10        (212) 350-2700

11        mcantor@constantinecannon.com

12

13   For the Sidibe Plaintiffs:

14        STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH

15        BY:  ALLAN STEYER

16        Attorney at Law

17        One California Street

18        Suite 300

19        San Francisco, California 94111

20        (415) 421-3400

21        asteyer@steyerlaw.com

22

23

24

25   /////
```

```
 1              APPEARANCES OF COUNSEL (cont'd)

 2

 3   For the Defendant:

 4        JONES DAY

 5        BY:  DAVID C. KIERNAN

 6        Attorney at Law

 7        555 California Street

 8        26th Floor

 9        San Francisco, California 94104

10        (415) 626-3939

11        dkiernan@jonesday.com

12   and

13        BY:  AIMEE E. DeFILIPPO

14        Attorney at Law

15        51 Louisiana Avenue, N.W.

16        Washington, D.C. 20001-2113

17        (202) 879-3939

18        adefilippo@jonesday.com

19

20

21   ALSO PRESENT:

22        Nathan Basseen, Berkeley Research Group

23        Dan O'Brien, Ph.D., Compass Lexecon

24        David Manzo, Videographer

25   /////
```

| | | |
|---|---|---|
| 1 | Will counsel please identify yourselves | 09:07:56 |
| 2 | and state whom you represent. | 09:07:57 |
| 3 | MR. KIERNAN:  David Kiernan with | 09:07:59 |
| 4 | Jones Day on behalf of the Sutter defendants. | 09:07:59 |
| 5 | MS. DeFILIPPO:  Aimee DeFilippo, Jones | 09:08:05 |
| 6 | Day, for the Sutter defendants. | 09:08:05 |
| 7 | MR. STEYER:  Allan Steyer, Steyer | 09:08:10 |
| 8 | Lowenthal, for the Sidibe plaintiffs. | 09:08:10 |
| 9 | MR. CANTOR:  Matt Cantor, Constantine | 09:08:13 |
| 10 | Cannon, for the Sidibe plaintiffs and for the | 09:08:14 |
| 11 | witness. | 09:08:20 |
| 12 | THE VIDEOGRAPHER:  Will the | 09:08:21 |
| 13 | court reporter please swear in the witness. | 09:08:22 |
| 14 | THE REPORTER:  If you could raise your | 09:08:23 |
| 15 | right hand for me, please. | 09:08:23 |
| 16 | THE DEPONENT:  (Complies.) | 09:08:23 |
| 17 | THE REPORTER:  You do solemnly state, | 09:08:23 |
| 18 | under penalty of perjury, that the testimony you | 09:08:23 |
| 19 | are about to give in this deposition, shall be the | 09:08:23 |
| 20 | truth, the whole truth and nothing but the truth? | 09:08:23 |
| 21 | THE DEPONENT:  I do. | 09:08:23 |
| 22 | | 09:08:23 |
| 23 | | 09:08:23 |
| 24 | | 09:08:23 |
| 25 | ///// | 09:08:34 |

| | | |
|---|---|---|
| 1 | A.   Yes, several economists, and some of the | 05:06:36 |
| 2 | papers that I've already cited do that. | 05:06:39 |
| 3 | Q.   Do you cite any papers that contradict | 05:06:42 |
| 4 | your view of using aggregate-level data rather than | 05:06:47 |
| 5 | DRG-transaction level? | 05:06:53 |
| 6 | MR. CANTOR:   Objection. | 05:06:56 |
| 7 | THE DEPONENT:   I don't know that it | 05:06:57 |
| 8 | contradicts my view even if they do it a different | 05:06:58 |
| 9 | way.   There can be other ways to deal with the | 05:07:01 |
| 10 | design issues, but I -- sitting here, I don't know | 05:07:03 |
| 11 | if any of the papers I've cited rely on a DRG-level | 05:07:07 |
| 12 | estimation. | 05:07:13 |
| 13 | Q.   (By Mr. Kiernan)   Does your regression | 05:07:21 |
| 14 | include any patient-level controls? | 05:07:23 |
| 15 | A.   No, it does not. | 05:07:28 |
| 16 | Q.   Why not? | 05:07:29 |
| 17 | A.   Because, as I've described to you, it's a | 05:07:31 |
| 18 | hospital-level price measure. | 05:07:33 |
| 19 | So what the regression does control for | 05:07:35 |
| 20 | are aspects in -- the backup specifications explore | 05:07:38 |
| 21 | more of it, but aspects of the local demographic | 05:07:42 |
| 22 | conditions. | 05:07:47 |
| 23 | Q.   Do patient demographics influence price? | 05:07:48 |
| 24 | A.   In principle, they might, but, in fact, I | 05:07:54 |
| 25 | have found that they tend not to in the areas of | 05:07:57 |

```
 1   Northern California that I've studied.                    05:08:01

 2        Q.   Does length of stay influence price?           05:08:06

 3        A.   I would -- I don't know if -- it would         05:08:12

 4   affect total price.  I don't know it affects unit        05:08:14

 5   price.  And in the end, to the -- to the extent          05:08:18

 6   that a particular stay was particularly expensive,       05:08:21

 7   the -- the -- the DRG weight associated with that        05:08:26

 8   stay would go a long way towards addressing the          05:08:33

 9   resource issue.                                           05:08:35

10        Q.   Does length of stay influence the allowed      05:08:37

11   amount?                                                   05:08:40

12        A.   No, I don't think the length of stay           05:08:42

13   influences the allowed amount.  But, again, I            05:08:44

14   don't -- actually, I should not generalize.              05:08:47

15           It would depend on the nature of the --          05:08:48

16   the compensation with the contract -- under the          05:08:51

17   contract.  And so I -- I can't say uniformly that        05:08:54

18   it wouldn't.  I'd have to -- I'd have to look.           05:08:58

19        Q.   For example, if a contract had a case          05:09:00

20   rate with a stop-loss provision and the patient was      05:09:03

21   there long enough to trigger the stop loss, under        05:09:08

22   that circumstance, then, the length of stay could        05:09:12

23   impact the allowed amount, correct?                      05:09:17

24        A.   Possibly it could.                             05:09:20

25        Q.   Is that something you studied in this          05:09:21
```

| | | |
|---|---|---|
| 1 | case, whether length of stay influenced the allowed | 05:09:22 |
| 2 | amounts that you used in your regression? | 05:09:27 |
| 3 | A.    So I did not control for length of stay | 05:09:33 |
| 4 | in my regression, but I will observe that the | 05:09:36 |
| 5 | sample consists of other general acute care | 05:09:38 |
| 6 | hospitals in Northern California, and it also | 05:09:42 |
| 7 | controls for certain attributes of those hospitals. | 05:09:45 |
| 8 | And to the extent that length of stay | 05:09:47 |
| 9 | is -- is common across -- or the distribution of | 05:09:51 |
| 10 | lengths of stay is common across the hospitals, | 05:09:56 |
| 11 | that would not be a factor in the specification. | 05:09:59 |
| 12 | Further, to the extent that length of | 05:10:01 |
| 13 | stay is correlated with certain attributes of the | 05:10:03 |
| 14 | hospital, I believe the regression would account | 05:10:06 |
| 15 | for those types of differences across the | 05:10:09 |
| 16 | hospitals. | 05:10:12 |
| 17 | Q.    And your testimony, if I understand it | 05:10:12 |
| 18 | today, is you studied whether patient | 05:10:15 |
| 19 | demographics -- sex, age, and race -- would | 05:10:18 |
| 20 | influence prices. | 05:10:21 |
| 21 | Your opinion is that it has no influence | 05:10:22 |
| 22 | on price in Northern California; is that correct? | 05:10:26 |
| 23 | A.    My finding is that, statistically, at | 05:10:28 |
| 24 | least sitting here remembering the -- some of the | 05:10:31 |
| 25 | specifications in my backup -- in fact, one of the | 05:10:34 |

```
 1   needs to do that because he's introducing a lot          05:13:06
 2   more heterogeneity that -- that he needs to try to       05:13:09
 3   explain.                                                 05:13:13
 4          And so -- so one of the benefits of               05:13:13
 5   studying at the hospital level is you don't need to      05:13:18
 6   study the individual circumstances of the -- of the     05:13:21
 7   specific cases.                                          05:13:25
 8          But that's not to say that you're losing          05:13:26
 9   any information.  You're actually -- if you think        05:13:29
10   about controlling for sex or -- or -- or age within     05:13:32
11   large populations, you're going to arrive at local      05:13:39
12   communities that have approximately the same split      05:13:43
13   of gender or same -- approximately -- not the same      05:13:46
14   but approximately the same distribution of age.         05:13:50
15      Q.   So your opinion is, by conducting this          05:13:53
16   study at the aggregate level, you're not losing any     05:13:57
17   information with respect to comparing prices of         05:14:01
18   Sutter to non-Sutter facilities?                        05:14:05
19      A.   That's correct.  For this purpose, I            05:14:07
20   think that's correct.                                   05:14:08
21      Q.   Can you cite for me any healthcare              05:14:16
22   economist that supports your opinion that using         05:14:19
23   aggregate-level hospital data does not lose any         05:14:26
24   information compared to conducting the analysis at      05:14:34
25   the DRG-transaction level?                              05:14:44
```

```
 1  STATE OF CALIFORNIA        )  ss:
                               )
 2  COUNTY OF CONTRA COSTA     )

 3       I, Rebecca L. Romano, CSR. 12546, do hereby
    certify:
 4       That the foregoing deposition testimony was
    taken before me at the time and place therein set
 5  forth and at which time the witness was
    administered the oath;
 6
         That the testimony of the witness and all
 7  objections made by counsel at the time of the
    examination were recorded stenographically by me,
 8  and were thereafter transcribed under my direction
    and supervision, and that the foregoing pages
 9  contain a full, true and accurate record of all
    proceedings and testimony to the best of my skill
10  and ability.

11       I further certify that I am neither counsel
    for any party to said action, nor am I related to
12  any party to said action, nor am I in any way
    interested in the outcome thereof.
13
         Further, that if the foregoing pertains to
14  the original transcript of a deposition in a federal
    case, before completion of the proceedings, review of
15  the transcript [X] was [ ] was not requested.

16       IN WITNESS WHEREOF, I have subscribed my name
    this 21st day of August, 2018.
17

18

19  _____
    Rebecca L. Romano, RPR,
20  CSR. No 12546

21

22

23

24

25
```

1

## DEPOSITION ERRATA SHEET

**Case:** *Sidibe v. Sutter Health*, Case No. 3:12-CV-4854-LB (N.D. Cal.)
**Date(s) of Deposition:** August 16, 2018
**Name of Deponent:** Dr. Tasneem Chipty

Dr. Tasneem Chipty:

I have read the transcript of my deposition taken on August 16, 2018. The contents thereof are an accurate transcription of the deposition, subject to the following corrections or changes:

| Page:Line | Original | Correction | Reason |
|---|---|---|---|
| 288:04 | Newberg | Neupert | Misspelling |
| 288:04 | Stolyan | Stoyan | Misspelling |
| 288:05 | Stolyanovich | Stoyanov | Misspelling |
| 288:06 | Mansy | Mansie | Misspelling |
| 305:14-15 | the class health plans, which is Anthem Blue Cross, United Aetna, or Health Net | the class health plans, which are Blue Shield, Anthem Blue Cross, United, Aetna, or Health Net | Misspoke |
| 324:11 | 20/40 | 60/40 | Misspoke/Mistranscription |
| 326:15 | It's all-in bill | It's an all-in bill | Mistranscription |
| 328:06 | element | elements | Mistranscription |
| 322:02 | Okay | No | Misspoke |
| 352:13 | the amount of damage | that amount of damage | Misspoke/Mistranscription |
| 352:20 | paying same | paying the same | Mistranscription |
| 358:03 | shield | Shield | Mistranscription |
| 358:9-10 | It's further bolstered my opinion, pass-through. | It's further bolstered my opinion on pass-through. | Mistranscription |
| 368:13-14 | More granular. | More granularity. | Misspoke |
| 377:02 | other context | another context | Mistranscription |
| 378:25 | is most | is the most | Misspoke |
| 382:07-08 | Premium Care. | PremierCare. | Misspelled |
| 388:08 | the usable | a usable | Misspoke |
| 389:20 | would I | did I | Misspoke/Mistranscription |
| 411:25 | actually's | actually | Mistranscription |
| 412:06-07 | Sutter versus other Sutter hospitals | Sutter versus other non-Sutter hospitals | Misspoke/Mistranscription |
| 413:08 | administrators | administrator | Misspoke/Mistranscription |
| 415:15 | Anthem | Aetna | Misspoke |

## DEPOSITION ERRATA SHEET

**Case:** *Sidibe v. Sutter Health*, Case No. 3:12-CV-4854-LB (N.D. Cal.)
**Date(s) of Deposition:** August 16, 2018
**Name of Deponent:** Dr. Tasneem Chipty

| Page:Line | Original | Correction | Reason |
|---|---|---|---|
| 419:16 | on | of | Mistranscription |
| 426:02-03 | in the sense of the two stages are the two stages if | in the sense that the two stage are the two stages, if | Misspoke/mistranscription |
| 427:20 | by their | of their | Mistranscription |
| 429:02 | attractiveness enables | attractiveness that enables | Mistranscription |
| 433:01 | separate apart | separate and apart | Mistranscription |
| 434:19 | you said about | you set about | Mistranscription |
| 439:14-15 | decide to manage to drop | decide to and manage to drop | Misspoke |
| 444:01-02 | but make it explicit | but I'll make it explicit | Mistranscription |
| 446:14 | they're | there is | Mistranscription |
| 448:12 | I think them of | I think of them as | Mistranscription |
| 450:14 | Anthems | Anthem's | Mistranscription |
| 455:13 | PremiereCare | PremierCare | Misspelled |
| 456:14 | PremiereCare | PremierCare | Misspelled |
| 458:09 | expectation | expectations | Mistranscription |
| 461:04 | seams | seems | Misspelled |
| 461:05 | PremiereCare | PremierCare | Misspelled |
| 462:14 | PremiereCare | PremierCare | Misspelled |
| 471:06-07 | the effect of Sutter's contractual restrictions | Sutter's contractual restrictions | Misspoke |
| 472:01 | health plans. Because | health plans, because | Mistranscription |
| 472:14 | go us | go up | Mistranscription |
| 476:05 | but if | because if | Misspoke |
| 479:19 | done not | not done | Mistranscription |
| 503:02 | there a | there are a | Misspoke/mistranscription |
| 503:03 | that do cite | that I do cite | Mistranscription |
| 506:22-23 | market definition. There | market definition -- there | Mistranscription |
| 509:12 | they have research arm | they have a research arm | Mistranscription |
| 509:17 | is | has | Mistranscription |
| 511:19 | authorized | authored | Misspoke/mistranscription |
| 512:18 | but | what | Mistranscription |
| 513:13 | Dranoff | Dranove | Misspelling |
| 515:09 | which why | which is why | Mistranscription |
| 518:07 | tended | tend | Misspoke |
| 518:08 | here when | here is when | Misspoke/mistranscription |

**DEPOSITION ERRATA SHEET**

**Case:** *Sidibe v. Sutter Health*, Case No. 3:12-CV-4854-LB (N.D. Cal.)
**Date(s) of Deposition:** August 16, 2018
**Name of Deponent:** Dr. Tasneem Chipty

| Page:Line | Original | Correction | Reason |
|-----------|----------|------------|--------|
| 529:19 | materialize | materialized | Mistranscription |
| 533:14 | think cleaner sample | think a cleaner sample | Mistranscription |
| 550:03 | I was | I wasn't | Misspoke/mistranscription |
| 561:17 | employees | employers | Misspoke/mistranscription |
| 578:18 | and how to | on how to | Mistranscription |
| 578:19 | describe the, quote, quality of a hospital. | describe the "quality" of a hospital. | Mistranscription |
| 582:18 | considered | consider | Mistranscription |
| 592:16 | rely | reply | Mistranscription |

I declare under penalty of perjury that the forgoing is true and correct.
Executed on: September 24, 2018.


_____
Dr. Tasneem Chipty

# EXHIBIT 14

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5   DJENEBA SIDIBE, JERRY JANKOWSKI,          CERTIFIED

 6   SUSAN HANSEN, DAVID HERMAN, CAROLINE      TRANSCRIPT

 7   STEWART, OPTIMUM GRAPHICS, INC., AND

 8   JOHNSON POOL & SPA, ON BEHALF OF

 9   THEMSELVES AND ALL OTHERS SIMILARLY

10   SITUATED,

11        PLAINTIFFS,

12      vs.                         NO. 3:12-CV-04854-LB

13   SUTTER HEALTH,

14        DEFENDANT.

15   _____/

16       **HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**

17           **PURSUANT TO PROTECTIVE ORDER**

18     VIDEOTAPED DEPOSITION OF TASNEEM CHIPTY, PH.D.

19        *VIA REMOTE COUNSEL VIDEOCONFERENCE*

20             FRIDAY, MAY 14, 2021

21

22   STENOGRAPHICALLY REPORTED BY:

23   MEGAN F. ALVAREZ, RPR, CSR No. 12470

24   JOB NO. 4560902

25   PAGES 1 - 295
```

Page 1

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

```
 1                  UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO DIVISION

 4

 5   DJENEBA SIDIBE, JERRY JANKOWSKI,

 6   SUSAN HANSEN, DAVID HERMAN, CAROLINE

 7   STEWART, OPTIMUM GRAPHICS, INC., AND

 8   JOHNSON POOL & SPA, ON BEHALF OF

 9   THEMSELVES AND ALL OTHERS SIMILARLY

10   SITUATED,

11          PLAINTIFFS,

12     vs.                          NO. 3:12-CV-04854-LB

13   SUTTER HEALTH,

14          DEFENDANT.

15   _____/

16

17          Videotaped Videoconference Deposition of

18   TASNEEM CHIPTY, PH.D., Volume I, taken on behalf of

19   Defendants, VIA REMOTE COUNSEL.  Deponent testifying

20   from Boston, Massachusetts, beginning at 9:35 a.m. and

21   ending at 6:15 p.m. on Friday, May 14, 2021, before

22   Megan F. Alvarez, RPR, Certified Shorthand Reporter

23   No. 12470.

24

25
```

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

```
 1    APPEARANCES: (ALL PARTIES APPEARING VIA VIDEOCONFERENCE)

 2

 3    FOR THE SIDIBE PLAINTIFFS:

 4             BY:  ALLAN STEYER, ESQ.

 5             STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH

 6             ONE CALIFORNIA STREET, STE. 300

 7             SAN FRANCISCO, CALIFORNIA 94111

 8             415.421.3400

 9             ASTEYER@STEYERLAW.COM

10    AND

11             BY:  MATTHEW CANTOR, ESQ.

12             CONSTANTINE CANNON LLP

13             335 MADISON AVENUE

14             NEW YORK, NEW YORK 10017

15             212.350.2734

16             MCANTOR@CONSTANTINECANNON.COM

17

18

19

20

21

22

23

24

25
```

Page 3

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

```
 1   APPEARANCES (CONTINUED):

 2

 3   FOR DEFENDANTS:

 4           BY:  DAVID KIERNAN, ESQ.

 5               CAROLINE O. VAN WAGONER, ESQ.

 6           JONES DAY

 7           555 CALIFORNIA STREET, 26TH FLOOR

 8           SAN FRANCISCO, CALIFORNIA 94104

 9           415.875.5745

10           CVANWAGONER@JONESDAY.COM

11           DKIERNAN@JONESDAY.COM

12

13   ALSO PRESENT:

14           DANIEL BOADA, BERKELEY RESEARCH GROUP

15           JEFFREY RAILEANU, COMPASS LEXECON

16

17   THE VIDEO OPERATOR:

18           JOANN YAGER, VERITEXT

19

20

21

22

23

24

25
```

                                              Page 4

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | beginning with the noticing attorney. | 09:36:34 |
| 2 | MR. KIERNAN:  David Kiernan with Jones Day | 09:36:36 |
| 3 | on behalf of Sutter. | 09:36:39 |
| 4 | MS. VAN WAGONER:  Caroline Van Wagoner | 09:36:42 |
| 5 | with Jones Day on behalf of Sutter Health. | 09:36:45 |
| 6 | MR. CANTOR:  Matthew Cantor, Constantine | 09:36:48 |
| 7 | Cannon, lead counsel for the plaintiffs and the | 09:36:50 |
| 8 | class. | 09:36:53 |
| 9 | MR. STEYER:  Allan Steyer, | 09:36:57 |
| 10 | Steyer Lowenthal, et al., for the plaintiffs and | 09:36:58 |
| 11 | class. | 09:37:03 |
| 12 | MR. CANTOR:  We're also joined by Daniel | 09:37:05 |
| 13 | Boada on the plaintiff side, who is with Berkeley | 09:37:07 |
| 14 | Research Group supporting Dr. Chipty. | 09:37:10 |
| 15 | MR. RAILEANU:  And Jeff Raileanu from | 09:37:17 |
| 16 | Compass Lexecon supporting Dr. Willig. | 09:37:22 |
| 17 | THE VIDEO OPERATOR:  The witness may be | 09:37:24 |
| 18 | sworn in. | 09:37:24 |
| 19 | TASNEEM CHIPTY, PH.D., | 09:37:24 |
| 20 | called as a witness by the Defendants, having | 09:37:24 |
| 21 | been first duly sworn, was examined and | 09:37:24 |
| 22 | testified as follows: | 09:37:24 |
| 23 | --o0o-- | 09:37:24 |
| 24 | | |
| 25 | | |

Page 11

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.   And since reviewing his April 16th report | 10:19:42 |
| 2 | and his portions of his deposition transcript with | 10:19:45 |
| 3 | respect to Table 15, have you done any additional | 10:19:48 |
| 4 | work in this matter with respect to the subject | 10:19:52 |
| 5 | matter of his opinions? | 10:19:57 |
| 6 | A.   Yes, I did.  I did.  For example, I looked | 10:20:01 |
| 7 | at his description of what he calls an -- a coding | 10:20:05 |
| 8 | error or an error -- I forget his exact language, | 10:20:12 |
| 9 | but that's the gist of it -- with respect to the | 10:20:16 |
| 10 | United 2017 estimation I do for the -- for the | 10:20:19 |
| 11 | damage calculation for United because they -- United | 10:20:27 |
| 12 | did not produce premium data for 2017, at least | 10:20:29 |
| 13 | cert- -- the full type of information that I would | 10:20:33 |
| 14 | need to calculate damages using the baseline method. | 10:20:36 |
| 15 | And so I looked at that and I considered | 10:20:43 |
| 16 | it, and I -- and I did come to an opinion that I | 10:20:46 |
| 17 | disagree with his characterization of that issue | 10:20:52 |
| 18 | that he describes as an error. | 10:20:55 |
| 19 | I also looked at his Table 15, like I | 10:20:58 |
| 20 | said, to try to get a handle on, you know, even I -- | 10:21:00 |
| 21 | if you take his numbers at face, is he raising a | 10:21:05 |
| 22 | material issue.  And in my view, after having | 10:21:11 |
| 23 | considered his -- his opinion in the data that he | 10:21:14 |
| 24 | provides, I came to the view that he's raised an | 10:21:19 |
| 25 | issue that's just not material. | 10:21:22 |

Page 39

| | | |
|---|---|---|
| 1 | It's been previously marked as 932.  If you could | 10:24:19 |
| 2 | open that, please. | 10:24:21 |
| 3 | A.   Yes, I did, and I see it. | 10:24:21 |
| 4 | Q.   Okay.  And you could also use Tab 6 of the | 10:24:23 |
| 5 | binder if it's more convenient for you. | 10:24:29 |
| 6 | A.   Yes, I'm there. | 10:24:40 |
| 7 | Q.   Okay.  All right.  If -- could you | 10:24:41 |
| 8 | identify what Exhibit 932 is? | 10:24:44 |
| 9 | A.   Yeah.  It looks to be Dr. Willig's report | 10:24:48 |
| 10 | that he filed on April 16 of this year. | 10:24:51 |
| 11 | Q.   If you could turn to page 46, go to | 10:24:55 |
| 12 | paragraph 84. | 10:24:58 |
| 13 | A.   I'm there. | 10:25:21 |
| 14 | Q.   Thank you. | 10:25:22 |
| 15 | Does paragraph 84, does that describe -- | 10:25:22 |
| 16 | strike that. | 10:25:24 |
| 17 | Is paragraph 84 the paragraph that you | 10:25:24 |
| 18 | were just describing with respect to the United data | 10:25:26 |
| 19 | error that Dr. Willig was opining about? | 10:25:29 |
| 20 | A.   That's correct. | 10:25:34 |
| 21 | Q.   And you stated before that your opinion is | 10:25:39 |
| 22 | that Dr. Willig is wrong? | 10:25:42 |
| 23 | A.   Yeah, I -- I -- let me say it like this: | 10:25:59 |
| 24 | For example, Dr. Willig says that I take the average | 10:26:01 |
| 25 | of zero and 30.  And the way the SQL code works is | 10:26:05 |

Page 42

| | | |
|---|---|---|
| 1 | that it takes the average of 30 in that instance. | 10:26:09 |
| 2 | There was no zero.  It was -- it was really an | 10:26:12 |
| 3 | instance where you had a plan that -- so this is a | 10:26:15 |
| 4 | 2017 issue, Mr. Kiernan. | 10:26:20 |
| 5 | And so the question is:  Can you use the | 10:26:23 |
| 6 | information in '16 and '18 to estimate what '17 | 10:26:25 |
| 7 | would likely be?  And in the vast majority of the | 10:26:32 |
| 8 | cases, to do this calculation, there is a number | 10:26:36 |
| 9 | in -- at '16 and there's number in '18, and the code | 10:26:39 |
| 10 | averages it. | 10:26:42 |
| 11 | And in a handful of instances, or | 10:26:43 |
| 12 | certainly in the types of cases that Mr. -- that | 10:26:45 |
| 13 | Dr. Willig is talking about here, what happens is | 10:26:48 |
| 14 | that there is -- this is specific to large group. | 10:26:52 |
| 15 | There could be a large group that either came on or | 10:26:55 |
| 16 | left United, in which case there would be not two | 10:26:59 |
| 17 | numbers to average.  There would be the one number. | 10:27:03 |
| 18 | And the average of the one number is the one number. | 10:27:06 |
| 19 | Q.   And you mentioned there's a handful of | 10:27:10 |
| 20 | instances.  Approximately how many? | 10:27:12 |
| 21 | A.   So I -- sitting here, I don't know how | 10:27:16 |
| 22 | many, but I do know that it's a large group issue, | 10:27:18 |
| 23 | so it doesn't affect individuals or small groups. | 10:27:21 |
| 24 | And it -- it does happen with large groups.  But, | 10:27:24 |
| 25 | again, for those large groups, you have to go | 10:27:27 |

Page 43

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | in your damages calculation could impact your | 10:46:58 |
| 2 | damages calculation? | 10:47:02 |
| 3 | A.   In principal, yes; but as I've said, I | 10:47:10 |
| 4 | don't think that this is a material issue, and | 10:47:13 |
| 5 | certainly Dr. Willig's quantification of this | 10:47:16 |
| 6 | affirms that. | 10:47:19 |
| 7 | Q.   And what would you need to do to determine | 10:47:20 |
| 8 | whether including the plans with no damages | 10:47:23 |
| 9 | hospitals impacts your final damages calculation? | 10:47:26 |
| 10 | A.   I'm sorry.  I don't understand your | 10:47:36 |
| 11 | question.  Could you ask it again or perhaps | 10:47:38 |
| 12 | rephrase it? | 10:47:40 |
| 13 | Q.   Yeah. | 10:47:41 |
| 14 | Well, what would you need to do to | 10:47:42 |
| 15 | determine the amount by which including the plans | 10:47:45 |
| 16 | with no damages hospitals impacted your final | 10:47:50 |
| 17 | damages calculation? | 10:47:55 |
| 18 | MR. CANTOR:  Objection. | 10:47:58 |
| 19 | BY MR. KIERNAN: | 10:47:58 |
| 20 | Q.   Assume you'd have to rerun your -- your | 10:48:09 |
| 21 | damages calculation excluding those plans, correct? | 10:48:14 |
| 22 | A.   No, I'm not sure that's correct.  No, I | 10:48:18 |
| 23 | don't -- I'm not -- I would disagree with that. | 10:48:20 |
| 24 | Actually, Dr. Willig has done a lot of | 10:48:24 |
| 25 | that work for us.  You could do -- you could perhaps | 10:48:27 |

Page 57

| | | |
|---|---|---|
| 1 | pull out a calculator, and look at the plans that | 10:48:31 |
| 2 | he's attributed damages to. | 10:48:35 |
| 3 | So he has, for each of the plans, as I | 10:48:36 |
| 4 | understand -- and I have to look again because I -- | 10:48:40 |
| 5 | I have looked at his backup.  I just, sitting here, | 10:48:42 |
| 6 | I can't -- I can't tell you strictly that I'm | 10:48:45 |
| 7 | describing it correctly.  But, qualitatively, | 10:48:49 |
| 8 | Dr. Willig has given us information on the damages | 10:48:53 |
| 9 | associated with each of these plans, or flowing from | 10:48:57 |
| 10 | the inclusion of each of those plans, in the damage | 10:49:00 |
| 11 | calculation. | 10:49:03 |
| 12 | And so what I'm telling you is, at the | 10:49:05 |
| 13 | outside, it could be no more than his number, | 10:49:08 |
| 14 | according to him.  And then I would say that's an | 10:49:11 |
| 15 | upper bound because, like I said, I'd have to verify | 10:49:14 |
| 16 | having seen the characterization of the no damages | 10:49:18 |
| 17 | hospitals by Mr. Travis, I'm -- I'm mindful of | 10:49:22 |
| 18 | taking that description at face value. | 10:49:27 |
| 19 | And so I would have to go through each of | 10:49:31 |
| 20 | these line items to determine -- make my own | 10:49:36 |
| 21 | determination of whether or not I would agree with | 10:49:39 |
| 22 | that.  And if I agreed with that, then, okay, | 10:49:43 |
| 23 | then -- like I said, in principal, you would take | 10:49:46 |
| 24 | that out. | 10:49:51 |
| 25 | But, like I said, I don't think this is a | 10:49:51 |

Page 58

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | And so in order for me to ultimately -- | 10:54:51 |
| 2 | you know, if I were to take Dr. Willig's calculation | 10:54:54 |
| 3 | on its face, the last thing one would have to do is | 10:54:59 |
| 4 | verify whether or not I -- one agrees with his | 10:55:02 |
| 5 | characterization of the no damage hospitals. | 10:55:08 |
| 6 | I think the work is done to a first | 10:55:10 |
| 7 | approximation.  I don't think that it's that | 10:55:13 |
| 8 | complicated to do.  In fact, he's done it using the | 10:55:16 |
| 9 | code that I provided. | 10:55:19 |
| 10 | So it's -- this isn't -- this is more an | 10:55:21 |
| 11 | intellectual question of what's the right decision | 10:55:26 |
| 12 | to make and whether it's -- it's necessary to make | 10:55:30 |
| 13 | in the larger context, not so much heavy lift at | 10:55:33 |
| 14 | all, quite frankly, to actually do the calculation. | 10:55:38 |
| 15 | Like I told you, he's provided the numbers.  If one | 10:55:42 |
| 16 | were to, say, drop a particular plan -- a product -- | 10:55:45 |
| 17 | sorry -- from the calculation, he's given a road map | 10:55:48 |
| 18 | on what should be deducted, if you will, from the | 10:55:53 |
| 19 | aggregate damage amount. | 10:55:58 |
| 20 | And so I -- I don't know if that answers | 10:55:59 |
| 21 | your question, but that's how I see the answer to | 10:56:02 |
| 22 | your question. | 10:56:04 |
| 23 | Q.   So if you assume -- assume for purposes of | 10:56:10 |
| 24 | this question that the plans set forth -- the | 10:56:12 |
| 25 | products set forth in Table 15A are ones with no | 10:56:16 |

Page 63

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | BY MR. KIERNAN: | 11:10:23 |
| 2 | Q. Okay. Dr. Chipty, we're going to stick | 11:10:25 |
| 3 | with that Table 15. And if you turn the page -- | 11:10:27 |
| 4 | A. Okay. | 11:10:37 |
| 5 | Q. -- to 15B titled "Self-Funded Plans." | 11:10:38 |
| 6 | Do you see that? | 11:10:47 |
| 7 | A. Yes, I see that. | 11:10:50 |
| 8 | Q. And do you have an understanding of | 11:10:52 |
| 9 | whether self-funded plans are in the class for this | 11:10:53 |
| 10 | case? | 11:10:57 |
| 11 | MR. CANTOR: Objection. | 11:11:00 |
| 12 | THE WITNESS: My understanding is that | 11:11:02 |
| 13 | they are not in the class. This is a class of fully | 11:11:03 |
| 14 | insured, yes. | 11:11:07 |
| 15 | BY MR. KIERNAN: | 11:11:11 |
| 16 | Q. Was it your -- in calculating total | 11:11:11 |
| 17 | overpayments, calculate -- strike that. | 11:11:16 |
| 18 | In calculating damages, was your intent to | 11:11:19 |
| 19 | include only class members? | 11:11:25 |
| 20 | A. Yes, that was my intent. And the -- the | 11:11:34 |
| 21 | way I practice that was to exclude self-funded plans | 11:11:38 |
| 22 | from the -- from the set of plans that -- or | 11:11:45 |
| 23 | products that I looked at. | 11:11:49 |
| 24 | Q. Okay. And how did you identify which | 11:11:51 |
| 25 | entities and individuals were class members in the | 11:11:54 |

Page 66

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | case? | 11:11:58 |
| 2 | A.   Well, certainly the original information | 11:11:58 |
| 3 | request to the class health plans was a request to | 11:12:07 |
| 4 | produce data on the non-self-funded products and | 11:12:11 |
| 5 | members of non-self-funded products.  So certainly | 11:12:16 |
| 6 | that was the -- that was the ask. | 11:12:20 |
| 7 | And then if you actually look at the data | 11:12:23 |
| 8 | that was produced, you know, when you actually -- | 11:12:25 |
| 9 | so -- so let me start with that was my understanding | 11:12:28 |
| 10 | of what was requested.  That was -- that is also my | 11:12:32 |
| 11 | understanding of what was produced.  But if you look | 11:12:35 |
| 12 | at the actual data that was provided by the class | 11:12:40 |
| 13 | health plans, at least several of the class health | 11:12:44 |
| 14 | plans explicitly have a -- some information -- for | 11:12:51 |
| 15 | example, Blue Shield, which is the -- the -- all of | 11:12:54 |
| 16 | the products, I think, in Dr. Willig's Table 15B are | 11:12:58 |
| 17 | Blue Shield-labeled products. | 11:13:10 |
| 18 | Blue Shield, for example, has an indicated | 11:13:15 |
| 19 | variable in the structure data that they provided | 11:13:19 |
| 20 | that the name of the field is ASO.  And I understand | 11:13:22 |
| 21 | ASO -- an ASO product to be a self-funded product. | 11:13:25 |
| 22 | And that field in the Blue Shield data that was | 11:13:31 |
| 23 | produced in response to a request for | 11:13:38 |
| 24 | non-self-funded plans takes the value N, as in "no." | 11:13:41 |
| 25 | And so I take the structure data to be affirming of | 11:13:46 |

Page 67

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | both the requested data as well as the | 11:13:51 |
| 2 | representation from Blue Shield that that's what | 11:13:55 |
| 3 | they provided. | 11:13:58 |
| 4 | And so -- so really, as I understand it, | 11:13:59 |
| 5 | the products that are contained in, say, the | 11:14:02 |
| 6 | Blue Shield structure data govern non-self-funded | 11:14:06 |
| 7 | products. | 11:14:11 |
| 8 | Q.   Okay.  And if you had included self-funded | 11:14:13 |
| 9 | plans in your damages calculation, would that impact | 11:14:21 |
| 10 | the ultimate aggregate premium damages that you | 11:14:27 |
| 11 | calculated? | 11:14:29 |
| 12 | A.   In -- in principle, they could.  If there | 11:14:30 |
| 13 | were payments made by the class health plans to a | 11:14:38 |
| 14 | Sutter damage hospital on behalf of members of those | 11:14:42 |
| 15 | self-funded products, in principle, it could. | 11:14:48 |
| 16 | But, again, as I explained with respect to | 11:14:51 |
| 17 | Table 15A, I also looked at that issue in terms of | 11:14:54 |
| 18 | materiality with respect to Table 15B and -- so, | 11:14:58 |
| 19 | first of all, it's not clear to me that Dr. Willig | 11:15:02 |
| 20 | correctly identified self-funded products.  I | 11:15:07 |
| 21 | don't -- at least looking at the structure data, I | 11:15:11 |
| 22 | would suggest that he -- it would suggest he didn't. | 11:15:15 |
| 23 | But, in any case, I haven't myself gone | 11:15:19 |
| 24 | through this line by line in his Table 15B, but I | 11:15:21 |
| 25 | did look at his backup.  And I looked at the | 11:15:24 |

Page 68

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | you would, if you have it available for me to look | 11:16:46 |
| 2 | at where I describe it in -- in several of my prior | 11:16:49 |
| 3 | reports.  Maybe my merits report if it's -- if you | 11:16:53 |
| 4 | have that available. | 11:16:56 |
| 5 | MR. KIERNAN:  Caroline, do you have that | 11:16:58 |
| 6 | available? | 11:16:59 |
| 7 | MS. VAN WAGONER:  Yeah, I can pull that | 11:17:03 |
| 8 | up. | 11:17:04 |
| 9 | THE WITNESS:  I believe it's there. | 11:17:08 |
| 10 | MR. KIERNAN:  Yeah.  She'll be able to get | 11:17:11 |
| 11 | it.  She knows where it is. | 11:17:12 |
| 12 | BY MR. KIERNAN: | 11:17:14 |
| 13 | Q.   In connection with calculating the total | 11:17:21 |
| 14 | amount of overpayments by a health plan to Sutter | 11:17:23 |
| 15 | for the services provided to class members at | 11:17:25 |
| 16 | damages hospitals, your intent was to include only | 11:17:28 |
| 17 | claims by class members, correct? | 11:17:32 |
| 18 | A.   That's correct. | 11:17:37 |
| 19 | Q.   And if you had included claims by entities | 11:17:38 |
| 20 | or individuals who were not class members, that | 11:17:43 |
| 21 | would increase the amount of overpayments, correct? | 11:17:47 |
| 22 | A.   It -- in principle, yes, it would increase | 11:17:57 |
| 23 | the -- the dollars of overpayment calculated in that | 11:18:00 |
| 24 | second step.  But you have to be a little careful | 11:18:05 |
| 25 | because those overpayments are then transcribed to a | 11:18:09 |

Page 70

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | definitional.  To the extent they are not class | 11:46:51 |
| 2 | members, they would not be.  But I don't have an | 11:46:54 |
| 3 | opinion as to whether they are or they are not under | 11:46:57 |
| 4 | the class definition. | 11:47:00 |
| 5 | BY MR. KIERNAN: | 11:47:01 |
| 6 |     Q.   Yes, and I'm not asking you that. | 11:47:02 |
| 7 |         I'm just asking, to the extent that | 11:47:03 |
| 8 | entities listed in 15H are not class members, they | 11:47:06 |
| 9 | should have been excluded from your damages | 11:47:11 |
| 10 | calculations; is that correct? | 11:47:14 |
| 11 |        MR. CANTOR:  Objection.  Asked and | 11:47:18 |
| 12 | answered. | 11:47:18 |
| 13 |        THE WITNESS:  Same answer that I just | 11:47:22 |
| 14 | gave. | 11:47:23 |
| 15 | BY MR. KIERNAN: | 11:47:24 |
| 16 |     Q.   Please give me your answer. | 11:47:24 |
| 17 |     A.   So -- | 11:47:27 |
| 18 |        MR. CANTOR:  Objection. | 11:47:28 |
| 19 |        THE WITNESS:  Again, my damage calculation | 11:47:30 |
| 20 | was designed and intended to -- to calculate damages | 11:47:31 |
| 21 | associated with class members.  So to the extent | 11:47:37 |
| 22 | it's -- it's determined that these are not class | 11:47:40 |
| 23 | members, then I would agree that they should not be | 11:47:43 |
| 24 | in the damage calculation.  But, as I said, I don't | 11:47:47 |
| 25 | have an opinion as to whether they are or they are | 11:47:51 |

Page 89

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | from the damage calculation that I've made.  And I | 11:49:57 |
| 2 | tried to give you an answer that I think accurately | 11:50:00 |
| 3 | reflects my opinion on that. | 11:50:05 |
| 4 | BY MR. KIERNAN: | 11:50:07 |
| 5 | Q.   Please turn back Tab 2, Exhibit 6362, your | 11:50:08 |
| 6 | supplemental report. | 11:50:15 |
| 7 | MR. CANTOR:  Should we put Dr. Willig's | 11:50:24 |
| 8 | report aside for now? | 11:50:26 |
| 9 | MR. KIERNAN:  Oh, yes.  Thank you, Matt. | 11:50:28 |
| 10 | BY MR. KIERNAN: | 11:50:44 |
| 11 | Q.   Let me know when you're there, Dr. Chipty. | 11:50:45 |
| 12 | A.   I'm there.  Thank you. | 11:50:46 |
| 13 | Q.   Okay.  Good. | 11:50:47 |
| 14 | And you noted before that you had | 11:50:48 |
| 15 | estimated overcharges or damages solely for | 11:50:49 |
| 16 | in-network, inpatient hospital services, correct? | 11:50:54 |
| 17 | A.   That's correct. | 11:51:01 |
| 18 | Q.   And you did not estimate overcharges or | 11:51:03 |
| 19 | damages for outpatient services, correct? | 11:51:06 |
| 20 | A.   That's correct. | 11:51:10 |
| 21 | Q.   And you did not estimate damages or | 11:51:11 |
| 22 | overcharges for professional services, correct? | 11:51:14 |
| 23 | A.   That's correct. | 11:51:18 |
| 24 | Q.   And you did not estimate damages or | 11:51:20 |
| 25 | overcharges for out-of-network services, correct? | 11:51:23 |

Page 92

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A.   That's correct. | 11:51:30 |
| 2 | Q.   And you've not estimated damages or | 11:51:34 |
| 3 | overcharges for services provided by ambulatory | 11:51:36 |
| 4 | surgery centers, correct? | 11:51:42 |
| 5 | A.   That's correct.  I'm hesitating because -- | 11:51:50 |
| 6 | you know, I would say that's correct.  To be -- I | 11:51:53 |
| 7 | just don't know whether there are certain types of | 11:51:59 |
| 8 | facilities where an inpatient patient could receive | 11:52:04 |
| 9 | care if it was a adjacent to an inpatient building | 11:52:08 |
| 10 | or facility.  I just don't -- I just don't know | 11:52:12 |
| 11 | enough about coding.  But just in principle, yes, | 11:52:15 |
| 12 | I'm -- I -- the calculation should not have included | 11:52:19 |
| 13 | outpatient services, including those performed at an | 11:52:24 |
| 14 | ambulatory surgery center. | 11:52:29 |
| 15 | Q.   In connection with your work in this | 11:52:42 |
| 16 | matter, have you evaluated the prices for outpatient | 11:52:44 |
| 17 | services? | 11:52:47 |
| 18 | A.   So I have not looked at it from the lens | 11:52:58 |
| 19 | of the claims data.  But I have looked at a variety | 11:53:01 |
| 20 | of the testimony, documents from Sutter and some not | 11:53:07 |
| 21 | from Sutter, all of the -- the qualitative evidence | 11:53:10 |
| 22 | in this case with respect to the effect of the | 11:53:14 |
| 23 | challenged provisions on outpatient prices as well | 11:53:19 |
| 24 | as professional services. | 11:53:25 |
| 25 | Q.   Can this be -- | 11:53:27 |

Page 93

| | | |
|---|---|---|
| 1 | Q. Did you compare Sutter's out-of-network | 11:58:07 |
| 2 | prices of damages hospitals to the out-of-network | 11:58:08 |
| 3 | prices charged by the benchmark hospitals after | 11:58:14 |
| 4 | controlling for hospital and market characteristics? | 11:58:18 |
| 5 | MR. CANTOR:  Objection. | 11:58:24 |
| 6 | THE WITNESS:  No, I did not.  But I did | 11:58:27 |
| 7 | consider testimony and evidence that gives some | 11:58:30 |
| 8 | window into what the -- what is a more typical out | 11:58:34 |
| 9 | of network to rate, if you will, a percentage off of | 11:58:43 |
| 10 | list prices in some of the qualitative evidence that | 11:58:49 |
| 11 | I presented. | 11:58:51 |
| 12 | BY MR. KIERNAN: | 11:58:52 |
| 13 | Q.  With respect to any of the testimony or | 11:58:54 |
| 14 | other evidence that you refer to as "qualitative," | 11:58:57 |
| 15 | did -- with respect to any of that testimony or | 11:59:02 |
| 16 | other evidence, did that involve a comparison of | 11:59:05 |
| 17 | Sutter's out-of-network prices at the -- at the | 11:59:11 |
| 18 | damages hospitals compared to the benchmark | 11:59:15 |
| 19 | hospitals after controlling for hospital and market | 11:59:20 |
| 20 | characteristics? | 11:59:24 |
| 21 | MR. CANTOR:  Objection. | 11:59:26 |
| 22 | THE WITNESS:  No, I did not do that type | 11:59:27 |
| 23 | of regression analysis on the out-of-network prices. | 11:59:31 |
| 24 | BY MR. KIERNAN: | 11:59:35 |
| 25 | Q.  Are any of the documents or evidence that | 11:59:36 |

Page 97

| | | |
|---|---|---|
| 1 | I've described in my report.  So don't -- I don't | 12:01:11 |
| 2 | think they come from a regression analysis, but they | 12:01:14 |
| 3 | come from market participants who -- typically to | 12:01:17 |
| 4 | make judgments and decisions that are not done in | 12:01:21 |
| 5 | the same way as economists do in the research arena. | 12:01:26 |
| 6 | Q.    Having not conducted regression analysis, | 12:01:31 |
| 7 | I take it that you do not have an opinion of whether | 12:01:35 |
| 8 | Sutter's out-of-network prices at the damages | 12:01:39 |
| 9 | hospitals are higher than the out-of-network prices | 12:01:43 |
| 10 | charged by the benchmark hospitals after adjusting | 12:01:48 |
| 11 | for hospital and market characteristics; is that | 12:01:51 |
| 12 | right? | 12:01:55 |
| 13 | MR. CANTOR:  Objection. | 12:01:57 |
| 14 | THE WITNESS:  So I haven't done that | 12:02:03 |
| 15 | calculation, but I would not -- I -- I would say | 12:02:04 |
| 16 | that the -- the testimony of market participants is | 12:02:10 |
| 17 | extremely meaningful and informative on what -- | 12:02:14 |
| 18 | whether they think a price -- a high price is | 12:02:20 |
| 19 | justified.  Because if you read the testimony, | 12:02:23 |
| 20 | there's no -- there's no suggestion that, oh, Sutter | 12:02:24 |
| 21 | charges, you know, twice what anyone else does, but | 12:02:29 |
| 22 | it -- but there's a reason for it. | 12:02:33 |
| 23 | So I have not seen anything -- I have seen | 12:02:35 |
| 24 | testimony characterizing Sutter's out-of-network | 12:02:38 |
| 25 | prices as high.  I have not seen any market | 12:02:40 |

Page 99

| | | |
|---|---|---|
| 1 | participants explain or justify why they're high, | 12:02:45 |
| 2 | which I think is consistent with a view that -- that | 12:02:48 |
| 3 | there is no adjustment, in their mind, that would | 12:02:54 |
| 4 | make it acceptable or, quote, market. | 12:02:57 |
| 5 | So that's my -- that's how I understand | 12:03:01 |
| 6 | the testimony that was given to be.  But, no, I have | 12:03:04 |
| 7 | not conducted my own regression analysis controlling | 12:03:08 |
| 8 | for other factors. | 12:03:13 |
| 9 | BY MR. KIERNAN: | 12:03:14 |
| 10 | Q.   Other than reviewing the testimony with | 12:03:15 |
| 11 | respect to Sutter's out-of-network prices, have you | 12:03:17 |
| 12 | conducted any other economic analysis of -- to | 12:03:21 |
| 13 | determine whether Sutter's out-of-network prices are | 12:03:25 |
| 14 | higher than other hospitals in Northern California? | 12:03:29 |
| 15 | A.   No, beyond what I've just described, I've | 12:03:40 |
| 16 | not -- there's -- I don't think I've conducted any | 12:03:43 |
| 17 | additional analysis beyond what we've just | 12:03:46 |
| 18 | discussed. | 12:03:48 |
| 19 | Just -- and there may be -- I'm sorry, | 12:03:50 |
| 20 | Mr. Kiernan.  Just because there's been a lot of | 12:03:53 |
| 21 | paper exchanged, there may be other testimony or | 12:03:55 |
| 22 | document evidence that I'm just not remembering. | 12:03:58 |
| 23 | But certainly I've not done a regression analysis of | 12:04:01 |
| 24 | it.  And that much I can tell you for certain. | 12:04:04 |
| 25 | Q.   Paragraph 2, you state that you've | 12:04:10 |

Page 100

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | what the market would bear.  But beyond that, I -- I | 12:07:05 |
| 2 | don't know why -- | 12:07:09 |
| 3 |      Q.   Are you aware of any -- | 12:07:12 |
| 4 |      A.   -- they would -- | 12:07:13 |
| 5 |      Q.   Are you aware of any testimony from Sutter | 12:07:17 |
| 6 | that explains why 60 percent was used? | 12:07:18 |
| 7 |      A.   No, not -- I'm not aware of testimony.  I | 12:07:26 |
| 8 | don't even recall the exact individuals who would | 12:07:28 |
| 9 | have been.  But I do recall there was a calculation | 12:07:31 |
| 10 | that I've looked at at some point. | 12:07:34 |
| 11 |      Q.   I asked you what you meant by the term | 12:07:37 |
| 12 | "onerous nonparticipating provider rate," and you | 12:07:39 |
| 13 | defined it as excessively high. | 12:07:43 |
| 14 |           What does "excessively high" mean? | 12:07:46 |
| 15 |      A.   You know, it means that it -- it is -- it | 12:07:49 |
| 16 | is at a rate -- and there's a lot of testimony on | 12:07:57 |
| 17 | this.  It's at a rate that destroys the incentives | 12:08:00 |
| 18 | to create a narrow network product that excludes the | 12:08:02 |
| 19 | Sutter damage hospitals. | 12:08:05 |
| 20 |           So, for example, what -- the way that the | 12:08:06 |
| 21 | out-of-network rate would factor into that type of | 12:08:09 |
| 22 | consideration is, you know, of -- a class health | 12:08:12 |
| 23 | plan in trying to design a product would have to | 12:08:16 |
| 24 | think through, "Okay.  If I remove this hospital | 12:08:19 |
| 25 | from my in-network provider -- from my provider | 12:08:21 |

Page 103

| 1  | network and if patients continue to use that        | 12:08:26 |
|----|-----------------------------------------------------|----------|
| 2  | hospital because they -- they want to go there" --   | 12:08:29 |
| 3  | at least some patients will want to go there --      | 12:08:31 |
| 4  | the -- the class health plan has to factor in the    | 12:08:35 |
| 5  | cost consequence of moving that hospital out of      | 12:08:38 |
| 6  | network and if that rate structure is such that it   | 12:08:41 |
| 7  | destroys the incentives for creating the narrow      | 12:08:46 |
| 8  | network product in the first instance or perhaps     | 12:08:51 |
| 9  | make it commercially unviable.                       | 12:08:54 |
| 10 | So suppose I take out -- or suppose, for             | 12:08:56 |
| 11 | example, Anthem tries to take out CPMC from a        | 12:08:58 |
| 12 | product but factors in that some people will be      | 12:09:04 |
| 13 | insistent on using CPMC, well, by charging a         | 12:09:08 |
| 14 | nonparticipating rate that's essentially list price, | 12:09:14 |
| 15 | the effect of that is to increase the price --       | 12:09:19 |
| 16 | because the health plan has to factor in the cost    | 12:09:23 |
| 17 | associated with providing coverage under that        | 12:09:27 |
| 18 | network, it's going to destroy the ability of Anthem | 12:09:29 |
| 19 | to offer a cost-competitive narrow network product.  | 12:09:34 |
| 20 | And in that sense -- and I've given you a            | 12:09:40 |
| 21 | lot of discussion at various points, especially      | 12:09:43 |
| 22 | during my -- in my merits report, about how          | 12:09:45 |
| 23 | steering -- about how high nonparticipating rates    | 12:09:49 |
| 24 | can, in fact, destroy the ability to compete on a    | 12:09:55 |
| 25 | narrow or tiered network product.  So, in that       | 12:10:00 |

Page 104

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | I've also given you a lot of evidence from the | 12:11:29 |
| 2 | record and from the experience of the class health | 12:11:32 |
| 3 | plans of products that were either abandoned or | 12:11:35 |
| 4 | ultimately not commercially successful because of | 12:11:39 |
| 5 | the out-of-network rate structure, at least in part | 12:11:42 |
| 6 | the out-of-network rate structure. | 12:11:46 |
| 7 | BY MR. KIERNAN: | 12:11:48 |
| 8 | Q.    What method did you apply to determine | 12:11:48 |
| 9 | that Sutter's out-of-network rates were the cause of | 12:11:51 |
| 10 | a network or product to be financially nonviable? | 12:11:56 |
| 11 | A.    So I begin with examples from -- from the | 12:12:12 |
| 12 | class health plans in Northern California where they | 12:12:17 |
| 13 | point to specific attempts to design and launch and | 12:12:20 |
| 14 | compete, in some cases, against Kaiser with | 12:12:25 |
| 15 | cost-competitive narrow network products. | 12:12:28 |
| 16 | And, in fact -- so there are specific | 12:12:32 |
| 17 | examples, several of which I described before.  And | 12:12:35 |
| 18 | I -- sitting here, I can't recite them off the top | 12:12:39 |
| 19 | of my head.  But I know there are examples. | 12:12:41 |
| 20 | And then you couple that with the evidence | 12:12:44 |
| 21 | of just overall ability to penetrate.  I think -- | 12:12:50 |
| 22 | even I link it all between theory, the practical | 12:12:53 |
| 23 | testimony, and experience coupled with the | 12:12:58 |
| 24 | quantification.  I would say that I presented a | 12:13:01 |
| 25 | connection between the conduct and the effect. | 12:13:06 |

Page 106

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | MR. CANTOR:  Could I ask for a one-minute | 12:13:10 |
| 2 | break?  There's a cup of coffee calling my name | 12:13:13 |
| 3 | right there.  I just want to go grab it. | 12:13:16 |
| 4 | Doctor, do you want any? | 12:13:23 |
| 5 | THE WITNESS:  No, thank you. | 12:13:25 |
| 6 | MR. CANTOR:  Okay.  My apologies.  I'm | 12:13:46 |
| 7 | back.  Thank you, David. | 12:13:47 |
| 8 | MR. KIERNAN:  That's just fine.  That's | 12:13:49 |
| 9 | just fine. | 12:13:51 |
| 10 | BY MR. KIERNAN: | 12:13:52 |
| 11 | Q.   When you said "quantification," | 12:13:52 |
| 12 | Dr. Chipty, you're referring to the analysis you did | 12:13:54 |
| 13 | of -- for Anthem of penetration of narrow tiered | 12:13:56 |
| 14 | networks in Southern California compared to | 12:14:00 |
| 15 | Northern California? | 12:14:02 |
| 16 | A.   Yes, that's right. | 12:14:04 |
| 17 | Q.   Is there any other quantification you did | 12:14:05 |
| 18 | to evaluate whether any products or networks either | 12:14:08 |
| 19 | failed or were not commercially viable as a result | 12:14:18 |
| 20 | of Sutter's out-of-network rates? | 12:14:21 |
| 21 | A.   I'm sorry, Mr. Kiernan.  Are you asking | 12:14:33 |
| 22 | about quantification or evidence?  Those are not | 12:14:35 |
| 23 | necessarily -- | 12:14:39 |
| 24 | Q.   I asked you for quantification. | 12:14:39 |
| 25 | A.   No, I've not done any other quantification | 12:14:41 |

Page 107

| 1  | of that.                                              | 12:14:44 |
| 2  | Q.   So you understand that Sutter, for               | 12:14:58 |
| 3  | out-of-network services -- strike that.               | 12:14:59 |
| 4  | You understand that Northern California,               | 12:15:00 |
| 5  | as a general matter, hospitals charge higher prices   | 12:15:01 |
| 6  | for out-of-network services than they do for          | 12:15:05 |
| 7  | in-network services?  You understand that?            | 12:15:08 |
| 8  | A.   I would expect that to be the case.              | 12:15:16 |
| 9  | Q.   Why?                                             | 12:15:24 |
| 10 | A.   Well, because the -- there's no benefit of       | 12:15:25 |
| 11 | the contract negotiation.  So I would expect that to  | 12:15:29 |
| 12 | be the case.  I don't know that to be the case in     | 12:15:31 |
| 13 | Northern California, but I would expect               | 12:15:34 |
| 14 | contractually negotiated rates to be more favorable.  | 12:15:36 |
| 15 | Q.   Do you know -- let's take UCSF as an             | 12:15:44 |
| 16 | example.  Does UCSF charge higher prices for          | 12:15:48 |
| 17 | out-of-network services, out-of-network inpatient     | 12:15:52 |
| 18 | services, compared to what it offers for in-network   | 12:15:56 |
| 19 | inpatient services?                                   | 12:15:59 |
| 20 | A.   I haven't looked specifically at what UCSF       | 12:16:03 |
| 21 | charges in that -- in that specific way.  But, like   | 12:16:06 |
| 22 | I said, I would expect that its out-of-network        | 12:16:08 |
| 23 | prices were higher.  I could be wrong, but I would    | 12:16:11 |
| 24 | expect that. Otherwise, everyone would want to go     | 12:16:19 |
| 25 | out of network to get the benefit of the lower        | 12:16:22 |

Page 108

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | BY MR. KIERNAN: | 12:25:53 |
| 2 | Q.   And you're referring to the analysis that | 12:25:55 |
| 3 | you did for Anthem comparing its penetration in | 12:25:58 |
| 4 | Northern California to Southern California; is that | 12:26:02 |
| 5 | right? | 12:26:05 |
| 6 | A.   That's correct. | 12:26:06 |
| 7 | Q.   Did you do that same analysis for any | 12:26:07 |
| 8 | other health plan? | 12:26:09 |
| 9 | A.   No, I didn't. | 12:26:11 |
| 10 | Q.   Did you consider -- for any of the | 12:26:14 |
| 11 | products or networks that you identified as not | 12:26:18 |
| 12 | commercially successful, did you consider any other | 12:26:21 |
| 13 | factors that may have led to them not being | 12:26:24 |
| 14 | commercially successful? | 12:26:28 |
| 15 | A.   Did I consider any other factors that | 12:26:41 |
| 16 | would have led them to not be commercially | 12:26:45 |
| 17 | successful?  Is that your question? | 12:26:47 |
| 18 | Q.   That is my question. | 12:26:49 |
| 19 | A.   Well, the analysis itself captures a lot | 12:26:54 |
| 20 | of factors, right?  It's got the same -- same health | 12:26:58 |
| 21 | plans operating in North and South.  We've got -- | 12:27:04 |
| 22 | so -- so, I mean, I just want to make it clear the | 12:27:09 |
| 23 | analysis, that's just one dimension.  But the | 12:27:13 |
| 24 | analysis already accounts for a variety of factors | 12:27:16 |
| 25 | implicitly in the comparison.  And -- and so beyond | 12:27:20 |

Page 115

| | | |
|---|---|---|
| 1 | those factors that are implicitly controlled for in | 12:27:25 |
| 2 | that comparison, I didn't do anything beyond that. | 12:27:29 |
| 3 | But that's already, I think, a fair bit of all else | 12:27:32 |
| 4 | equal. | 12:27:37 |
| 5 | Q.   Well, in Northern California, let's take | 12:27:38 |
| 6 | Blue Shield. | 12:27:40 |
| 7 | For Blue Shield, for any commercial | 12:27:42 |
| 8 | products that you believe were unsuccessful as a | 12:27:46 |
| 9 | result of out-of-network charges by Sutter, what are | 12:27:52 |
| 10 | other factors that could have contributed to the | 12:27:57 |
| 11 | product being unsuccessful?  Strike that. | 12:28:03 |
| 12 | Let's just take, Dr. Chipty, for a narrow | 12:28:14 |
| 13 | network or tiered product, what factors could | 12:28:19 |
| 14 | contribute to whether the product or network is | 12:28:22 |
| 15 | successful or not in Northern California? | 12:28:25 |
| 16 | A.   Well, one of the factors would certainly | 12:28:40 |
| 17 | be the cost of health care and health insurance | 12:28:43 |
| 18 | generally.  I would expect that the -- that a narrow | 12:28:47 |
| 19 | or tiered network product which is, in principle, | 12:28:52 |
| 20 | supposed to be more cost-effective for -- for | 12:28:55 |
| 21 | individuals and members, people looking for health | 12:28:59 |
| 22 | and, you know, employers looking for health | 12:29:02 |
| 23 | insurance coverage, that the more expensive are the | 12:29:04 |
| 24 | other alternatives, the more likely you would -- I | 12:29:07 |
| 25 | would expect price-sensitive customers to be more | 12:29:13 |

Page 116

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| 1 | interested in narrow and tiered network products. | 12:29:16 |
| 2 | And in this respect, certainly we know | 12:29:19 |
| 3 | that there is taste for narrow and tiered network | 12:29:23 |
| 4 | products in Northern California, perhaps even | 12:29:27 |
| 5 | relative to Southern California if you look at the | 12:29:30 |
| 6 | Kaiser experience. | 12:29:33 |
| 7 | Q.   And with the cost of health care being a | 12:29:38 |
| 8 | factor that could influence whether a product or | 12:29:46 |
| 9 | network is successful, would the health plan's | 12:29:47 |
| 10 | marketing efforts impact the commercial success? | 12:29:50 |
| 11 | (Reporter request for clarification.) | 12:30:01 |
| 12 | MR. KIERNAN:   Sure. | 12:30:01 |
| 13 | BY MR. KIERNAN: | 12:30:02 |
| 14 | Q.   Would the marketing efforts of a health | 12:30:02 |
| 15 | plan impact the commercial success of a narrow or | 12:30:04 |
| 16 | tiered network that's introduced in | 12:30:08 |
| 17 | Northern California? | 12:30:11 |
| 18 | MR. CANTOR:   Objection. | 12:30:12 |
| 19 | THE WITNESS:   It could.   In principle, it | 12:30:16 |
| 20 | could. | 12:30:17 |
| 21 | BY MR. KIERNAN: | 12:30:18 |
| 22 | Q.   Did you consider the marketing efforts for | 12:30:19 |
| 23 | any of the products or networks that the health | 12:30:21 |
| 24 | plans have identified as being unsuccessful in | 12:30:26 |
| 25 | Northern California? | 12:30:29 |

Page 117

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A.   I'd have to refresh my memory on some of | 12:30:37 |
| 2 | the qualita- -- the testimony and the qualitative | 12:30:39 |
| 3 | evidence, but I don't specifically recall any right | 12:30:42 |
| 4 | now. | 12:30:47 |
| 5 | But I -- what I do recall is that the | 12:30:48 |
| 6 | health plans really try to negotiate terms that | 12:30:53 |
| 7 | could work for them and -- in Northern California | 12:30:56 |
| 8 | with Sutter.  And they wouldn't -- it doesn't -- I | 12:30:59 |
| 9 | wouldn't expect them to have made that effort time | 12:31:03 |
| 10 | and time again without a serious desire and | 12:31:07 |
| 11 | commitment to try to sell that product if they could | 12:31:11 |
| 12 | have attained terms that would have made those | 12:31:14 |
| 13 | products commercially attractive for them.  And it | 12:31:20 |
| 14 | related to commercially attractive for -- for the | 12:31:26 |
| 15 | buyers of those products as well. | 12:31:29 |
| 16 | So I -- I didn't -- I don't think I -- I | 12:31:31 |
| 17 | don't think I have looked at information on | 12:31:34 |
| 18 | marketing, though I can't definitively say that.  It | 12:31:37 |
| 19 | would have been in the qualitative evidence which | 12:31:40 |
| 20 | I -- which I -- sitting here, I don't have a good | 12:31:43 |
| 21 | enough memory to remember. | 12:31:46 |
| 22 | But -- but I would expect that the actions | 12:31:48 |
| 23 | of the class health plans demonstrate a desire to | 12:31:54 |
| 24 | sell those products.  Otherwise, why go through the | 12:31:58 |
| 25 | effort. | 12:32:02 |

Page 118

| | | |
|---|---|---|
| 1 | Q. Is it your opinion that but for Sutter's | 12:32:04 |
| 2 | out-of-network rates, all narrow and tiered networks | 12:32:07 |
| 3 | that are launched by a health plan would be | 12:32:13 |
| 4 | successful? | 12:32:16 |
| 5 | A. No, it's certainly not my opinion that all | 12:32:17 |
| 6 | of anything could ever be definitively successful. | 12:32:20 |
| 7 | You know, some products succeed, some products fail. | 12:32:25 |
| 8 | But where there's a systematic wedge, it tells us | 12:32:28 |
| 9 | something, like in the case of the ability of | 12:32:33 |
| 10 | steered products to succeed in Northern California | 12:32:36 |
| 11 | versus Southern California. | 12:32:37 |
| 12 | Q. What are some of the reasons why a narrow | 12:32:40 |
| 13 | or tiered network would fail in Northern California | 12:32:41 |
| 14 | aside from your opinion that Sutter's out-of-network | 12:32:46 |
| 15 | rates caused that? | 12:32:49 |
| 16 | MR. CANTOR: Objection. | 12:33:01 |
| 17 | THE WITNESS: Well, an important reason | 12:33:08 |
| 18 | would be that there was a pocket of insistent | 12:33:09 |
| 19 | customers who show up at an out-of-network hospital | 12:33:12 |
| 20 | whose cost just below the ability of pricing in a -- | 12:33:19 |
| 21 | in a competitive way possible. So I think that that | 12:33:24 |
| 22 | would be a situation where a product, a steered | 12:33:29 |
| 23 | product, may not be able to succeed. I think that | 12:33:36 |
| 24 | if a health plan were forced in a steered product to | 12:33:44 |
| 25 | include physicians that were likely to send patients | 12:33:48 |

Page 119

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | 28 minutes.  So if you could finish up with this | 12:38:03 |
| 2 | line, I think we should take a break after that. | 12:38:06 |
| 3 | Thank you. | 12:38:08 |
| 4 | BY MR. KIERNAN: | 12:38:09 |
| 5 | Q.   And with respect to CPMC, it's your | 12:38:10 |
| 6 | opinion in this matter that Blue Shield could offer | 12:38:13 |
| 7 | a commercially viable network or product that | 12:38:17 |
| 8 | excludes CPMC if the out-of-network rates were not | 12:38:22 |
| 9 | extremely high?  Is that your opinion? | 12:38:27 |
| 10 | A.   No, I -- I can't say definitively that | 12:38:36 |
| 11 | that's my opinion.  I'm just saying that I think | 12:38:42 |
| 12 | it's possible.  And there may be more evidence than | 12:38:44 |
| 13 | this that would help refresh my memory on -- on the | 12:38:47 |
| 14 | facts that could strengthen that statement, but I | 12:38:50 |
| 15 | can't sit here recalling that.  So that's the extent | 12:38:52 |
| 16 | of which -- what I can say sitting here right now. | 12:38:56 |
| 17 | Q.   If a health plan wished to exclude CPMC, | 12:38:59 |
| 18 | what you characterize as a tied hospital, from a | 12:39:02 |
| 19 | network, what price should C- -- should Sutter have | 12:39:07 |
| 20 | charged for out-of-network services at CPMC? | 12:39:13 |
| 21 | A.   I have not taken a position on and I have | 12:39:19 |
| 22 | not given consideration to what a, if you will, | 12:39:22 |
| 23 | competitive out-of-network rate would be.  It's not | 12:39:26 |
| 24 | something I've been asked to design or think about, | 12:39:31 |
| 25 | and I have not.  So I don't have an opinion on that. | 12:39:33 |

Page 123

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.    How -- | 12:39:37 |
| 2 | A.    I do know -- I'm sorry, Mr. Kiernan.  I | 12:39:37 |
| 3 | know.  I stopped and then I started again. | 12:39:39 |
| 4 | I do know directionally it would be lower, | 12:39:42 |
| 5 | considerably lower, given the testimony that I've | 12:39:44 |
| 6 | read from the class health plans. | 12:39:49 |
| 7 | Q.    With respect to CPMC, other than the | 12:39:53 |
| 8 | testimony, is there any other evidence you're aware | 12:39:56 |
| 9 | of that would support your opinion today that CPMC's | 12:40:00 |
| 10 | out-of-network rates would be lower? | 12:40:04 |
| 11 | MR. CANTOR:  Objection. | 12:40:12 |
| 12 | THE WITNESS:  Well, it's not just the | 12:40:24 |
| 13 | testimony; it's also the -- the surrounding evidence | 12:40:26 |
| 14 | on the inability to sell commercially successful | 12:40:30 |
| 15 | steered products on a sustained basis in | 12:40:35 |
| 16 | Northern California relative to Southern California. | 12:40:37 |
| 17 | I think that the -- the out-of-network rates play an | 12:40:40 |
| 18 | important role in that wedge between the North and | 12:40:45 |
| 19 | the South. | 12:40:48 |
| 20 | And so it's not specifically about CPMC; | 12:40:49 |
| 21 | but, generally, I think there is evidence that the | 12:40:51 |
| 22 | rates should be lower.  But I have not done any | 12:40:54 |
| 23 | further analysis or calculation of what that rate | 12:40:58 |
| 24 | should be. | 12:41:02 |
| 25 | | |

Page 124

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| 1 | BY MR. KIERNAN: | 12:41:02 |
| 2 | Q.   How would an economist such as yourself | 12:41:06 |
| 3 | determine what the competitive out-of-network rate | 12:41:09 |
| 4 | for CPMC should be? | 12:41:11 |
| 5 | A.   So I have not been asked to do that.  And | 12:41:15 |
| 6 | if -- if the class -- if class counsel were to ask | 12:41:17 |
| 7 | me to do that, I'd have to think about it.  These | 12:41:24 |
| 8 | questions are -- are hard to answer, and I'd have to | 12:41:27 |
| 9 | think about it.  And I'm certain we'd find a path | 12:41:30 |
| 10 | forward assuming we -- well, not certain.  I would | 12:41:33 |
| 11 | hope we'd find a path forward.  But I -- I can't | 12:41:35 |
| 12 | speculate on something that I haven't put a lot of | 12:41:39 |
| 13 | thought into. | 12:41:44 |
| 14 | MR. KIERNAN:  Why don't we go off the | 12:41:45 |
| 15 | record, please. | 12:41:47 |
| 16 | THE VIDEO OPERATOR:  Going off the record. | 12:41:48 |
| 17 | The time is 12:41 p.m. | 12:41:49 |
| 18 | (Whereupon the luncheon recess was taken | 12:41:51 |
| 19 | at 12:41 p.m.) | 12:41:51 |
| 20 | --o0o-- | 12:41:51 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 125

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | the work that I had done -- I have done with respect | 13:25:42 |
| 2 | to -- using the OSHPD data to look at Sutter's | 13:25:46 |
| 3 | prices as a multiple of Medicare, I'm -- I can't -- | 13:25:51 |
| 4 | I think those were the negotiated prices.  But I | 13:25:54 |
| 5 | feel like I've seen an analysis maybe.  And I've | 13:26:06 |
| 6 | cited in my reliance material before Dr. Leitzinger. | 13:26:09 |
| 7 | I believe I have seen some work that I've disclosed | 13:26:14 |
| 8 | that I've looked at because I looked at it -- his | 13:26:17 |
| 9 | work looking at some prices -- some measures of | 13:26:22 |
| 10 | prices out of the OSHPD data that are closer to list | 13:26:26 |
| 11 | price or may actually have been list price. | 13:26:30 |
| 12 | So I do think I've seen some evidence to | 13:26:32 |
| 13 | suggest that Sutter's at least list prices were | 13:26:36 |
| 14 | higher than other hospital list prices.  But that's | 13:26:39 |
| 15 | the extent to which I can recall right now. | 13:26:43 |
| 16 | Q.   Have you done any empirical analysis to | 13:26:45 |
| 17 | determine whether CPMC's list prices are higher than | 13:26:48 |
| 18 | the list prices for -- for hospitals that operate in | 13:26:54 |
| 19 | San Francisco? | 13:26:58 |
| 20 | A.   I have not specifically looked at that, at | 13:27:03 |
| 21 | least to -- to my recollection.  So -- so no. | 13:27:05 |
| 22 | Q.   And with respect to Sutter Sacramento, | 13:27:15 |
| 23 | have you done any empirical analysis to determine | 13:27:16 |
| 24 | whether Sutter Sacramento's chargemaster prices are | 13:27:22 |
| 25 | higher or lower than the list prices of hospitals | 13:27:26 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | that operate in the same market as you defined it | 13:27:32 |
| 2 | for purposes of your report? | 13:27:37 |
| 3 | A.    No, specifically I have not looked at the | 13:27:41 |
| 4 | list prices of either of those two hospitals. | 13:27:44 |
| 5 | Although I -- you know, I have -- when we | 13:27:48 |
| 6 | were talking about the nonparticipating rates and | 13:27:51 |
| 7 | the extent to which they were -- whether they | 13:27:54 |
| 8 | defeated attempts to create narrow or tiered network | 13:27:59 |
| 9 | products, the fact that a hospital -- excuse me -- a | 13:28:03 |
| 10 | health plan -- the fact that a health plan had to | 13:28:08 |
| 11 | make a trade-off of include Sutter on their | 13:28:11 |
| 12 | preferred terms in the most widely penetrated tier, | 13:28:14 |
| 13 | put the hospital in a less preferred tier, or put | 13:28:18 |
| 14 | the hospital out of network, in making that | 13:28:21 |
| 15 | trade-off if, in fact, Sutter's list prices were | 13:28:25 |
| 16 | low, and their out-of-net- -- and their | 13:28:29 |
| 17 | nonparticipating percentage was high, to the extent | 13:28:31 |
| 18 | there was an offsetting list price effect, putting | 13:28:36 |
| 19 | Sutter out of network wouldn't have been as | 13:28:41 |
| 20 | defeating of a steered network product. | 13:28:44 |
| 21 | So -- so I haven't done a precise | 13:28:47 |
| 22 | quantification in that -- the type of comparison | 13:28:50 |
| 23 | you're asking.  But there is certainly evidence to | 13:28:54 |
| 24 | suggest that Sutter's high out-of-network rate is | 13:28:57 |
| 25 | not offset somehow by its lower list prices because, | 13:29:00 |

Page 129

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | them.  But I understand that the tying hospitals are | 13:50:50 |
| 2 | hospitals where health plans don't feel like they | 13:50:54 |
| 3 | have any other choice but to include them in order | 13:50:58 |
| 4 | to sell the products to certain people in | 13:51:02 |
| 5 | Northern California. | 13:51:05 |
| 6 |     Q.   I see. | 13:51:06 |
| 7 |          And what about the tied hospitals? | 13:51:07 |
| 8 |     A.   The tied hospitals.  Well, for -- there | 13:51:10 |
| 9 | are more choices available in the tied hospital | 13:51:16 |
| 10 | areas, but I don't know if the health plans use that | 13:51:20 |
| 11 | term.  I just don't recall since I can't recall the | 13:51:24 |
| 12 | specific way in which they use that term.  But | 13:51:28 |
| 13 | certainly several of the hospitals, including some | 13:51:31 |
| 14 | of the tied hospitals, are hospitals that at least | 13:51:36 |
| 15 | some patients would continue to prefer to use, which | 13:51:40 |
| 16 | is why the class health plans worry about | 13:51:45 |
| 17 | out-of-network prices. | 13:51:50 |
| 18 |     Q.   Because there's some consumers who | 13:51:57 |
| 19 | continue to demand a -- certain Sutter hospitals and | 13:52:01 |
| 20 | don't want them excluded? | 13:52:05 |
| 21 |          MR. CANTOR:  Objection. | 13:52:10 |
| 22 |          THE WITNESS:  That's right.  There are | 13:52:11 |
| 23 | some consumers who would prefer to use Sutter. | 13:52:12 |
| 24 | That's certainly true.  And there are some consumers | 13:52:16 |
| 25 | who would be willing to trade lower prices for | 13:52:19 |

Page 145

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| 1 | A.   That's correct. | 14:23:32 |
| 2 | Q.   You've not attempted to estimate any | 14:23:33 |
| 3 | overcharges for 2019 or 2020, correct? | 14:23:35 |
| 4 | A.   That is correct.  Those overcharges would | 14:23:44 |
| 5 | not be necessary for a damage period ending in Q1 | 14:23:46 |
| 6 | 2020. | 14:23:50 |
| 7 | Q.   And then you calculate pass-through rates | 14:23:51 |
| 8 | through the end of 2019; is that correct? | 14:23:53 |
| 9 | A.   That's correct. | 14:23:57 |
| 10 | Q.   And you've not calculated pass-through | 14:23:59 |
| 11 | rates for year 2020? | 14:24:01 |
| 12 | A.   That's correct. | 14:24:07 |
| 13 | Q.   The first quarter of 2020, you extrapolate | 14:24:08 |
| 14 | the premium overcharges using year 2019 data, | 14:24:10 |
| 15 | meaning -- strike that. | 14:24:20 |
| 16 | For the first quarter of 2020, you | 14:24:27 |
| 17 | estimate premium overcharges, right? | 14:24:33 |
| 18 | A.   That's correct. | 14:24:38 |
| 19 | I'm sorry.  No, that's correct.  Could you | 14:24:39 |
| 20 | restate that?  I -- I should not have said "yes." | 14:24:42 |
| 21 | Q.   My understanding is that you estimate | 14:24:47 |
| 22 | premium overcharges or overpayments, whatever you | 14:24:51 |
| 23 | call them -- let me strike that. | 14:24:54 |
| 24 | My understanding is that you estimate | 14:24:56 |
| 25 | premium overpayments from January 2011 through | 14:24:59 |

Page 168

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Do you see that? | 15:27:28 |
| 2 | A.   Yes, I do. | 15:27:29 |
| 3 | Q.   With respect to the premiums -- the | 15:27:34 |
| 4 | premium data for that first quarter, what do you use | 15:27:36 |
| 5 | for that, for your calculations? | 15:27:41 |
| 6 | A.   So what I use from Q1 2020, so my -- my | 15:27:49 |
| 7 | extrapolation is grounded in reality of the | 15:27:54 |
| 8 | beginning of 2020, which is member months.  And what | 15:28:00 |
| 9 | I multiplied to member months -- you can see it in | 15:28:04 |
| 10 | the sentence -- is the minimum of the PMPM damage | 15:28:07 |
| 11 | amounts from 2018 and 2019.  So I didn't want to | 15:28:12 |
| 12 | just take the previous year.  I wanted to take the | 15:28:16 |
| 13 | smaller of the two numbers and multiply it by the | 15:28:19 |
| 14 | number of member months actually in Q1 2020. | 15:28:22 |
| 15 | Q.   And did you perform any analysis to | 15:28:30 |
| 16 | determine that the minimum PMPM damage amount of | 15:28:33 |
| 17 | either 2018 or '19 is a good proxy for what the PMPM | 15:28:39 |
| 18 | would be in Q1 2020? | 15:28:45 |
| 19 | A.   You know, I didn't do anything elaborate | 15:28:59 |
| 20 | in the sense that I'm using -- but I'm using | 15:29:03 |
| 21 | something that's incredibly adjacent to the period | 15:29:07 |
| 22 | in which I'm extrapolating.  So I'm using the health | 15:29:11 |
| 23 | plan's own information, so it's a health plan | 15:29:15 |
| 24 | specific adjustment, in an adjacent year.  And I'm | 15:29:18 |
| 25 | not even stopping at the adjacent year.  I'm going | 15:29:22 |

Page 198

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| 1 | to use the minimum of the prior year or the adjacent | 15:29:25 |
| 2 | year.  So I think this is a reasonable method for an | 15:29:28 |
| 3 | adjacent quarter. | 15:29:30 |
| 4 | And beyond that, no, I haven't done any | 15:29:32 |
| 5 | further analytics to -- to support this.  I think | 15:29:35 |
| 6 | it's a reasonable approach to a -- a relatively | 15:29:39 |
| 7 | minor out-of-sample extrapolation. | 15:29:45 |
| 8 | Q.   If the overcharges at Sutter damages | 15:29:49 |
| 9 | hospitals were trending downward from 2018 through | 15:29:54 |
| 10 | 2020, wouldn't it be the case that if you use the | 15:30:00 |
| 11 | earlier adjacent years, the PMPMs end up with higher | 15:30:07 |
| 12 | damages than if you use the actual data from 2020? | 15:30:11 |
| 13 | A.   In principle, you're right.  Except that, | 15:30:20 |
| 14 | in practice, I think I -- this is what I tried to | 15:30:23 |
| 15 | explain to you.  The trending is subtle.  I was -- I | 15:30:28 |
| 16 | was working to provide a conservative reasonable | 15:30:33 |
| 17 | estimate on the trending.  And here, really, the | 15:30:36 |
| 18 | issue on trending was going all the way back to | 15:30:39 |
| 19 | 2008.  It wasn't about trending between, say, 2019 | 15:30:43 |
| 20 | and 2020 or 2018 -- '17 to '18 or anything like | 15:30:48 |
| 21 | that. | 15:30:51 |
| 22 | So I think the whole -- the trending | 15:30:51 |
| 23 | discussion that we spent some time talking about is | 15:30:54 |
| 24 | actually different from the relevant issue about | 15:30:58 |
| 25 | trending here.  And this is exactly also why I | 15:31:02 |

Page 199

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | average.  Not capped.  So it's a combination of | 15:43:57 |
| 2 | factors. | 15:44:00 |
| 3 | And that last thing, the line of business | 15:44:01 |
| 4 | point that I just mentioned, is not listed in the | 15:44:03 |
| 5 | paragraph 33.  So thank you for pointing that out. | 15:44:06 |
| 6 | Q.   But, for example, paragraph 34 is not an | 15:44:14 |
| 7 | illustration of 33, Sub B, where you describe an | 15:44:17 |
| 8 | umbrella effect? | 15:44:23 |
| 9 | A.   That's correct.  If I -- if I had an | 15:44:27 |
| 10 | approach to quantify that, I would have demonstrated | 15:44:30 |
| 11 | it and it would have shown -- it directionally has | 15:44:34 |
| 12 | to show, given the evidence available on this point, | 15:44:37 |
| 13 | that, in fact, the benchmark prices are likely | 15:44:40 |
| 14 | overstated.  But I have not given you a | 15:44:44 |
| 15 | quantification of that. | 15:44:46 |
| 16 | Q.   Okay.  So with respect to umbrella | 15:44:48 |
| 17 | pricing, have you done any quantification to | 15:44:53 |
| 18 | evaluate whether umbrella pricing, in fact, existed? | 15:44:57 |
| 19 | A.   So I've looked at evidence, if that | 15:45:09 |
| 20 | qualifies as quantification.  I've looked at | 15:45:13 |
| 21 | evidence that demonstrates that -- that supports and | 15:45:16 |
| 22 | suggests that other hospital systems are going in | 15:45:21 |
| 23 | and negotiating with the class health plans by | 15:45:25 |
| 24 | reference to Sutter.  And that, in fact, the class | 15:45:27 |
| 25 | health plan deponents have indicated that they have, | 15:45:34 |

Page 208

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | prepared to describe things that I haven't done. | 15:48:25 |
| 2 | Q.   As an expert, have you -- or an economist, | 15:48:29 |
| 3 | have you ever determined whether a umbrella price | 15:48:33 |
| 4 | effect exists in any particular market? | 15:48:38 |
| 5 | A.   I guess I'm not sure what you're asking | 15:48:51 |
| 6 | me. | 15:48:52 |
| 7 | Q.   I'm asking, are you -- | 15:48:53 |
| 8 | A.   Whether I've -- I'm sorry.  Go ahead, | 15:48:55 |
| 9 | please. | 15:48:57 |
| 10 | Q.   Yeah.  I'm asking, as an economist, have | 15:48:58 |
| 11 | you ever determined whether an umbrella effect | 15:49:01 |
| 12 | exists in any particular market? | 15:49:04 |
| 13 | A.   Yeah.  I -- I reached a conclusion that | 15:49:10 |
| 14 | there is -- there likely is an umbrella effect in | 15:49:12 |
| 15 | this market based on the qualitative evidence I've | 15:49:18 |
| 16 | seen as well as some of the quantitative patterns | 15:49:23 |
| 17 | that I've just described. | 15:49:26 |
| 18 | Q.   Let me do this first.  Page 6, please. | 15:49:28 |
| 19 | MR. CANTOR:  Her report, right? | 15:49:39 |
| 20 | BY MR. KIERNAN: | 15:49:46 |
| 21 | Q.   Top of the page, you write:  "As I've | 15:49:47 |
| 22 | explained before, this approach conservatively | 15:49:48 |
| 23 | ignores the possibility of umbrella pricing." | 15:49:49 |
| 24 | Have you determined whether there has, in | 15:49:53 |
| 25 | fact, been umbrella pricing in Northern California | 15:49:55 |

Page 211

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | during the class period? | 15:49:58 |
| 2 | A.   All I have determined is that it is likely | 15:50:00 |
| 3 | given the evidence that I've just described.   Have I | 15:50:07 |
| 4 | conclusively proven it?   I don't think so.   Which is | 15:50:11 |
| 5 | why I say this as the possibility of.   Because the | 15:50:15 |
| 6 | evidence suggests that this is going on. | 15:50:18 |
| 7 | Q.   Outside of this case, have you offered the | 15:50:22 |
| 8 | opinion in any other matter for your work in the | 15:50:28 |
| 9 | government that umbrella pricing existed in a | 15:50:32 |
| 10 | particular market? | 15:50:36 |
| 11 | A.   Not that I can think of sitting here right | 15:50:49 |
| 12 | now. | 15:50:52 |
| 13 | Q.   This is the first time? | 15:50:53 |
| 14 | A.   But I've worked on an awful lot of cases, | 15:50:53 |
| 15 | and I'd have to think hard about that.   But -- but | 15:50:56 |
| 16 | nothing comes to mind right now. | 15:50:59 |
| 17 | Q.   It's possible this is the first time? | 15:51:01 |
| 18 | A.   It's possible, but I can't say for | 15:51:04 |
| 19 | certain. | 15:51:05 |
| 20 | Q.   Are you aware -- | 15:51:07 |
| 21 | A.   It's certainly -- I'm sorry. | 15:51:08 |
| 22 | Q.   Are you aware of any -- | 15:51:09 |
| 23 | A.   May I finish?   It's certainly something -- | 15:51:10 |
| 24 | Q.   You were finished and you cut me off, to | 15:51:13 |
| 25 | be frank. | 15:51:16 |

Page 212

| | | |
|---|---|---|
| 1 | looked at his backup which provides a road map | 16:21:25 |
| 2 | because he has -- at least he claims to show the | 16:21:29 |
| 3 | members attached to these products in Table 15B and | 16:21:33 |
| 4 | the damages that flow from those members and their | 16:21:38 |
| 5 | inclusion in the -- in my damage calculation. | 16:21:43 |
| 6 | So one can -- so the work that one would | 16:21:48 |
| 7 | have to do is go look at Dr. Willig's backup, which | 16:21:51 |
| 8 | is something I have done.  And, you know, sitting | 16:21:55 |
| 9 | here, I can't recall the number as precisely, but | 16:21:57 |
| 10 | suffice it to say if one were to throw out the | 16:22:00 |
| 11 | products in -- and the associated members in | 16:22:04 |
| 12 | Table 15B, the -- the effect is really de minimis, | 16:22:07 |
| 13 | on the order of -- I don't even -- I can't even | 16:22:12 |
| 14 | recall how small.  Certainly less than 0.5 percent | 16:22:17 |
| 15 | in terms of impact. | 16:22:23 |
| 16 | And so -- so in terms of what would I have | 16:22:26 |
| 17 | to do?  I'd have to continue to finish my vetting of | 16:22:27 |
| 18 | Dr. Willig's work.  But if I take him on face that | 16:22:34 |
| 19 | he's done his calculations correctly, he's | 16:22:36 |
| 20 | essentially done the calculation for you. | 16:22:39 |
| 21 | BY MR. KIERNAN: | 16:22:42 |
| 22 | Q.   And then those amounts would be subtracted | 16:22:42 |
| 23 | from the estimated premium overpayment damages? | 16:22:44 |
| 24 | A.   That's right.  Subject to, again, my | 16:22:51 |
| 25 | verification of these products and my ability to | 16:22:54 |

Page 226

```
 1    sort of sanity check his code.  But, yes, that's          16:22:57

 2    right.  Assuming all of that holds, like you've           16:23:00

 3    asked me to assume, then they would be subtracted,        16:23:04

 4    in principle, from damages if, in fact, these were        16:23:07

 5    not class members.                                        16:23:10

 6         Q.   Okay.  And if Dr. Willig ran the -- your        16:23:12

 7    code or your scripts incorrectly, in order for you        16:23:17

 8    to recalculate -- to recalculate premium overpayment      16:23:22

 9    damages, am I correct that you'd have to do your          16:23:32

10    Steps 2, 3, and 4 again with excluding the                16:23:37

11    self-funded plans that are not class members?             16:23:43

12         A.   Not necessarily.  It would depend on the        16:23:48

13    nature of his error.  It's quite possible that I          16:23:50

14    could fix it in his code.  It would just depend on        16:23:54

15    the nature of his error.                                  16:23:58

16         Q.   Understood.                                     16:23:59

17              Okay.  You understand that Dr. Willig           16:24:01

18    performed your Steps 2, 3, and 4 excluding the            16:24:05

19    self-funded plans that are not class members.  And        16:24:08

20    if he made an error in there, perhaps you could fix       16:24:12

21    whatever that error was in his recalculation?             16:24:17

22              MR. CANTOR:  Objection.                         16:24:23

23              THE WITNESS:  So, to a first                    16:24:23

24    approximation, yes, that's my understanding of what       16:24:26

25    he attempted to do.  And if my, you know, vetting of      16:24:28
```

Page 227

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | theory to justify the behavior here does not fit the | 16:48:55 |
| 2 | facts. | 16:48:58 |
| 3 | Q.   Are you familiar with modification clauses | 16:48:59 |
| 4 | in commercial contracts under which the parties | 16:49:02 |
| 5 | agree that no modification to the terms of the | 16:49:06 |
| 6 | contract can be made without the express written | 16:49:08 |
| 7 | modification of both parties? | 16:49:13 |
| 8 | MR. CANTOR:  Objection.  Objection to the | 16:49:16 |
| 9 | extent you're asking for legal opinion. | 16:49:17 |
| 10 | THE WITNESS:  I am not -- I'm not a | 16:49:26 |
| 11 | lawyer.  I'm not a contract expert.  Am I familiar | 16:49:27 |
| 12 | with this specific clause?  No, I'm not. | 16:49:30 |
| 13 | But the general idea, I could understand, | 16:49:34 |
| 14 | is that oftentimes when two parties agree to terms, | 16:49:37 |
| 15 | both parties have to agree to a modification of | 16:49:43 |
| 16 | those terms. | 16:49:46 |
| 17 | BY MR. KIERNAN: | 16:49:47 |
| 18 | Q.   Do you have a -- | 16:49:47 |
| 19 | A.   And that -- to me as a layperson. | 16:49:47 |
| 20 | Q.   Do you have a -- either an employment | 16:49:51 |
| 21 | agreement or some agreement that sets forth the | 16:49:57 |
| 22 | terms of your employment with AlixPartners? | 16:49:59 |
| 23 | A.   I sure do. | 16:50:04 |
| 24 | Q.   Does it have a modification clause? | 16:50:06 |
| 25 | MR. CANTOR:  Objection.  I don't think | 16:50:10 |

Page 243

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | with other hospitals.  But with Sutter, they start | 16:52:59 |
| 2 | with Sutter's template contract. | 16:53:02 |
| 3 | So that's what I remember.  I don't | 16:53:05 |
| 4 | remember much else about specific clauses in the -- | 16:53:08 |
| 5 | in -- to be honest, either the Sutter or the | 16:53:12 |
| 6 | non-Sutter contracts.  I -- I understood that, in | 16:53:15 |
| 7 | fact -- and the focus on the challenge provisions is | 16:53:20 |
| 8 | that I understood that the other contracts don't | 16:53:24 |
| 9 | have those same provisions and that nothing about | 16:53:26 |
| 10 | the incentive structures in those other contracts | 16:53:32 |
| 11 | preserve or protect volume in the same way that the | 16:53:39 |
| 12 | Sutter contracts do. | 16:53:44 |
| 13 | BY MR. KIERNAN: | 16:53:45 |
| 14 | Q.   And since you're not a lawyer, as you | 16:53:45 |
| 15 | mentioned before, you're unable to interpret those | 16:53:47 |
| 16 | contracts to conclude whether they do prevent the | 16:53:51 |
| 17 | health plans from doing certain things; is that | 16:53:57 |
| 18 | correct? | 16:54:00 |
| 19 | A.   That's correct.  I'm not a lawyer.  But | 16:54:08 |
| 20 | the -- but the testimony and the -- and the | 16:54:10 |
| 21 | juxtaposition of the discussions of even Sutter's | 16:54:12 |
| 22 | own contracts before and after their move to | 16:54:16 |
| 23 | systemwide agreements with the challenge provisions | 16:54:19 |
| 24 | appears to suggest that, before, their contracts, at | 16:54:23 |
| 25 | least in broad strokes, were more similar to those | 16:54:28 |

Page 246

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | groups that are listed in Anthem, they all just | 17:56:29 |
| 2 | happen to have the same address? | 17:56:34 |
| 3 | A.   You're asking if the ZIP codes -- if the | 17:56:44 |
| 4 | small groups in Anthem happen to all have the same | 17:56:47 |
| 5 | ZIP code?  Is that what you're asking me? | 17:56:51 |
| 6 | Q.   I'm looking here, and all of these small | 17:56:53 |
| 7 | groups appear to have the same address in the same | 17:56:56 |
| 8 | ZIP code. | 17:56:59 |
| 9 | Does that make any sense to you? | 17:57:00 |
| 10 | MR. CANTOR:  Are you saying this is a | 17:57:02 |
| 11 | complete version of the data? | 17:57:04 |
| 12 | MR. KIERNAN:  This is an extract from her | 17:57:08 |
| 13 | work papers of these small groups that she used to | 17:57:10 |
| 14 | estimate damages.  And she assigned them to Rating | 17:57:13 |
| 15 | Area 3. | 17:57:20 |
| 16 | THE WITNESS:  I'd just like to -- | 17:57:26 |
| 17 | BY MR. KIERNAN: | 17:57:27 |
| 18 | Q.   Here's my question, Dr. Chipty:  Do you | 17:57:28 |
| 19 | know if the address here and the ZIP code, is that | 17:57:29 |
| 20 | their billing address?  Do you know? | 17:57:32 |
| 21 | A.   I -- I don't know, sitting here, what that | 17:57:50 |
| 22 | address is.  I'd have to take a closer look to see | 17:57:52 |
| 23 | what it is, sir.  I don't -- I can't answer this | 17:57:55 |
| 24 | question with this information right now. | 17:57:58 |
| 25 | Q.   Do you know if the ZIP code in Rating 3, | 17:58:00 |

Page 280

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | the rating area, do you know if that's based upon | 17:58:02 |
| 2 | the work address of the small group entities? | 17:58:04 |
| 3 | A.   So I understand that -- and I don't | 17:58:24 |
| 4 | know -- I don't know what these fields are.  These | 17:58:26 |
| 5 | line 1 address text, I don't know whether there are | 17:58:30 |
| 6 | other address fields, for example.  I can't, sitting | 17:58:34 |
| 7 | here, verify that this is intending to be the | 17:58:36 |
| 8 | address of the purchaser organization.  It's very | 17:58:39 |
| 9 | hard for me to tell, sitting here looking at this | 17:58:42 |
| 10 | extract, what this address field is and whether | 17:58:45 |
| 11 | there are other address fields.  I -- I cannot | 17:58:50 |
| 12 | answer that question right now about what this -- | 17:58:53 |
| 13 | what this specific address field is. | 17:58:56 |
| 14 | Q.   Okay.  If you go down to Row 98 and 99 -- | 17:58:59 |
| 15 | they're numbered.  If you go to Rows 98 and 99.  Let | 17:59:03 |
| 16 | me know when you get there. | 17:59:07 |
| 17 | A.   Yeah, I'm there. | 17:59:09 |
| 18 | Q.   And the purchaser org name, the small | 17:59:10 |
| 19 | group, is Los Angeles City Employee. | 17:59:14 |
| 20 | Do you see that see? | 17:59:21 |
| 21 | A.   Yes, I do. | 17:59:22 |
| 22 | Q.   Is it your understanding that Los Angeles | 17:59:24 |
| 23 | City Employee operates in Rating Area 3, which is in | 17:59:25 |
| 24 | Sonoma County? | 17:59:29 |
| 25 | A.   Again, the same answer I gave you.  I | 17:59:39 |

Page 281

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | the first piece of it, the Number 108. | 18:01:10 |
| 2 | Q.   Do you know, Dr. Chipty, or did you do | 18:01:16 |
| 3 | anything to analyze in connection with the health | 18:01:18 |
| 4 | plan data when they provided the ZIP codes for small | 18:01:24 |
| 5 | group where a TPA was involved, whether they used | 18:01:27 |
| 6 | the address and ZIP code for the TPA rather than the | 18:01:31 |
| 7 | small group employer? | 18:01:35 |
| 8 | A.   I don't specifically recall looking at | 18:01:44 |
| 9 | that.  It's been couple years since we initially did | 18:01:46 |
| 10 | our vetting of this data.  So I'd have to take a | 18:01:49 |
| 11 | look and refresh my memory. | 18:01:53 |
| 12 | Q.   And with respect to the rating areas that | 18:01:54 |
| 13 | you used, did you use -- define the rating areas by | 18:01:59 |
| 14 | county or by ZIP code? | 18:02:04 |
| 15 | A.   I believe it would have been ZIP code is | 18:02:13 |
| 16 | my recollection.  But, ultimately, I'd have to look | 18:02:16 |
| 17 | at the code and talk to my team to -- to answer that | 18:02:18 |
| 18 | definitively.  But I believe it would have been the | 18:02:23 |
| 19 | ZIP code. | 18:02:25 |
| 20 | Q.   Do you know how California defines rating | 18:02:26 |
| 21 | areas? | 18:02:29 |
| 22 | A.   So at one point, I knew this fairly well. | 18:02:30 |
| 23 | There is a map of the California post-ACA rating | 18:02:40 |
| 24 | areas in one of my original reports.  But, sitting | 18:02:44 |
| 25 | here, I don't have a memory of how the boundaries | 18:02:46 |

Page 283

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q. Okay. And scroll back down to Fresno, | 18:10:07 |
| 2 | which starts on page 4 of the document. | 18:10:09 |
| 3 | A. Yes, I see that. | 18:10:18 |
| 4 | Q. And you'll notice that this crosswalk that | 18:10:19 |
| 5 | we extracted from your work papers assigns Fresno | 18:10:22 |
| 6 | the rating area of 9 in Row 177, and then 11 for a | 18:10:25 |
| 7 | series of ZIP codes. In Row 188, it assigns it to | 18:10:34 |
| 8 | Rating Area 10. And 190, Rating Area 10. And | 18:10:40 |
| 9 | there's several other examples of that. | 18:10:45 |
| 10 | Why does your work papers that were used | 18:10:48 |
| 11 | in connection with the damages calculation assign | 18:10:52 |
| 12 | parts of Fresno to Rating Areas 9 and 10 rather than | 18:10:56 |
| 13 | Rating Area 11? | 18:11:01 |
| 14 | MR. CANTOR: I just have a question. | 18:11:03 |
| 15 | Sorry. Is this her backup? Or is this something | 18:11:04 |
| 16 | that you created? | 18:11:07 |
| 17 | MR. KIERNAN: We got this out of | 18:11:10 |
| 18 | Dr. Chipty's files. | 18:11:12 |
| 19 | MR. CANTOR: Okay. It doesn't answer my | 18:11:14 |
| 20 | question. | 18:11:17 |
| 21 | I'm objecting to the question because I | 18:11:17 |
| 22 | can't tell if this is something she produced or | 18:11:19 |
| 23 | something that you prepared. So, anyway... | 18:11:22 |
| 24 | THE WITNESS: So it's -- it's hard for me | 18:11:28 |
| 25 | to say who prepared this. It's certainly not | 18:11:30 |

Page 289

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | obvious from anything here.  And I'd have to take a | 18:11:35 |
| 2 | closer look. | 18:11:37 |
| 3 | But as a general principle, I tell you, | 18:11:38 |
| 4 | looking at Fresno, it's largely assigned to 11.  And | 18:11:40 |
| 5 | there are some exceptions, you're right, where it's | 18:11:45 |
| 6 | assigned to 9 in one instance and 10 in a handful of | 18:11:47 |
| 7 | other instances.  And I expect if, in fact, this is | 18:11:53 |
| 8 | because of a border ZIP code issue between the | 18:11:54 |
| 9 | boundaries of what would otherwise be in 11. | 18:11:58 |
| 10 | So I see that.  I'd have to take a closer | 18:12:01 |
| 11 | look, and I'd have to determine if, in fact, this is | 18:12:05 |
| 12 | something that has -- that should have been 11 but | 18:12:08 |
| 13 | for the ZIP code map.  I'd have to determine the | 18:12:13 |
| 14 | materiality of it. | 18:12:18 |
| 15 | You know, you've pointed to a handful of | 18:12:18 |
| 16 | ZIP codes, not even the entire county.  So I have no | 18:12:21 |
| 17 | idea whether this is of any substance or not. | 18:12:25 |
| 18 | Certainly I've not -- I've not encountered | 18:12:27 |
| 19 | Dr. Willig or anyone, Dr. Gowrisankaran, who -- who | 18:12:32 |
| 20 | in many instances rely on the same processing of the | 18:12:36 |
| 21 | data to say anything differently. | 18:12:40 |
| 22 | BY MR. KIERNAN: | 18:12:42 |
| 23 | Q.    But you're attempting to estimate | 18:12:43 |
| 24 | accurately pass-through overpayments for class | 18:12:46 |
| 25 | members per the class definition, correct? | 18:12:52 |
| | | Page 290 |

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

```
 1                     CERTIFICATE OF REPORTER

 2             I, the undersigned, a Certified Shorthand

 3     Reporter of the State of California, do hereby

 4     certify:

 5             That the foregoing proceedings were taken

 6     before me at the time and place herein set forth;

 7     that any witnesses in the foregoing proceedings,

 8     prior to testifying, were administered an oath; that

 9     a verbatim record of the proceedings was made by me

10     using machine shorthand, which was thereafter

11     transcribed under my direction; and that the

12     foregoing is an accurate transcription thereof.

13             Further, that if the foregoing pertains to

14     the original transcript of a deposition in a federal

15     case, before completion of the proceedings, review

16     of the transcript [X] was [ ] was not requested.

17             I further certify that I am neither

18     financially interested in the action, nor a relative

19     or employee of any attorney of any party to this

20     action.

21             IN WITNESS WHEREOF, I have this date

22     subscribed my name.

23     DATED: May 18, 2021

24                     _____

                       MEGAN F. ALVAREZ

25                     CSR No. 12470, RPR


                                             Page 295
```

**Deposition Errata Sheet**

**Case**: *Sidibe et al. v. Sutter Health*, Case No. 3:12-CV-4854-LB (N.D. Cal.)
**Date of Deposition:** May 14, 2021
**Name of Deponent:** Dr. Tasneem Chipty

Dr. Tasneem Chipty:

I have read the transcript of my deposition taken on May 14, 2021. The contents thereof are an accurate transcription of the deposition, subject to the following corrections or changes:

| Page:Line | Original | Correction | Reason |
|---|---|---|---|
| 27:25 | Baseen | Basseen | Misspelling |
| 28:2-3 | B-A-S-E-E-N | B-A-S-S-E-E-N | Misspelling |
| 50:15 | this is a | this is not a | Misspoke/Mistranscription |
| 53:19 | outer bound | upper bound | Clarification |
| 97:8-9 | out of network to rate | out-of-network rate | Mistranscription |
| 98:21 | out of network | out-of-network | Mistranscription |
| 98:22-23 | from in network to out of network | from in-network to out-of-network | Mistranscription |
| 100:6 | given to be | given | Clarification |
| 118:14-15 | it related to | it is related to | Mistranscription |
| 127:3 | all most | most | Misspoke/Mistranscription |
| 129:11 | trade-off of | trade-off to | Misspoke/Mistranscription |
| 137:11 | higher tier | less penetrated tier | Clarification |
| 137:15 | deferential | differential | Mistranscription |
| 150:12 | favorable relatively even for | favorable price, relative even to | Misspoke |
| 158:14 | URT | URRT | Mistranscription |
| 158:23 | URT | URRT | Mistranscription |
| 158:25 | URT | URRT | Mistranscription |
| 159:3 | URT | URRT | Mistranscription |
| 159:14 | URT | URRT | Mistranscription |
| 165:17 | formulation | formula | Misspoke/Mistranscription |
| 185:12 | affects | effects | Mistranscription |
| 193:18 | conduction | construction | Misspoke/Mistranscription |
| 209:16 | affects | effects | Mistranscription |
| 216:24-25 | of the extent to which ignoring this piece | of this piece | Misspoke/Clarification |
| 260:21 | and in sort of competition | and in competition | Misspoke |
| 266:12 | memorialized | memorializes | Misspoke |
| 278:17 | "Purchaser Org_NM" | "PRCHSR_ORG_NM" | Mistranscription |
| 292:1 | genesis of providence | genesis or provenance | Misspoke/Mistranscription |

I declare under penalty of perjury that the forgoing is true and correct.
Executed on: May 26, 2021

_Tasneem Chipty_
Dr. Tasneem Chipty

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY - PURSUANT TO PROTECTIVE ORDER

# EXHIBIT 15

Page 1

1

2    UNITED STATES DISTRICT COURT

3    NORTHERN DISTRICT OF CALIFORNIA

4    SAN FRANCISCO DIVISION

5    Case No. 3:12-cv-4854-LB

6    ----------------------------------x

     DJENEBA SIDIBE, et al.,

7

                  Plaintiffs,

8

9

         - against -

10

11

     SUTTER HEALTH,

12

                  Defendant.

13   ----------------------------------x

                  November 8, 2018

14                9:31 a.m.

15

16        Videotaped Deposition of ROBERT D.

17   WILLIG, Ph.D., taken by Plaintiffs,

18   pursuant to Notice, held at the offices of

19   Jones Day, 250 Vesey Street, New York, New

20   York, before Todd DeSimone, a Registered

21   Professional Reporter and Notary Public of

22   the State of New York.

23

24

25

Page 2

```
 1
 2    A P P E A R A N C E S :
 3    CONSTANTINE CANNON LLP
      335 Madison Avenue
 4    New York, New York 10017
               Attorneys for Plaintiffs
 5    BY:     MATTHEW L. CANTOR, ESQ.
                mcantor@constantinecannon.com
 6              JEAN KIM, ESQ.
                jkim@constantinecannon.com
 7              TIMOTHY DYER, ESQ.
                tdyer@constantinecannon.com
 8
 9
10
      JONES DAY
11    555 South Flower Street
      Fiftieth Floor
12    Los Angeles, California 90071
               Attorneys for Defendant
13    BY:     JEFFREY A. LEVEE, ESQ.
                jlevee@jonesday.com
14
15
16
17
18    ALSO PRESENT:
        LAURA PHILLIPS PERKINS, Matrix Economics
19
        ROCCO MERCURIO, Videographer
20
21
22
23
24
25
```

Page 3

1          WILLIG, Ph.D.

2              THE VIDEOGRAPHER:  We are now

3     going on the record.  Today is November

4     8th, 2018 and the time is approximately

5     9:31.

6              This is media one, video one,

7     of the deposition of Dr. Robert Willig,

8     case entitled Sidibe versus Sutter Health,

9     filed in the U.S. Northern District of San

10    Francisco, California, Case No.

11    3:12-CV-4854-LB.  The deposition is being

12    held at Jones Day, 250 Vesey Street, New

13    York, New York.

14              My name is Rocco Mercurio, the

15    videographer.  The court reporter is Todd

16    DeSimone.

17              Will counsel please introduce

18    yourselves and who you represent for the

19    record.

20              MR. CANTOR:  Matthew Cantor,

21    Constantine Cannon, for the Sidibe

22    plaintiffs.

23              MS. KIM:  Jean Kim of

24    Constantine Cannon, also for the Sidibe

25    plaintiffs.

Page 4

1          WILLIG, Ph.D.

2          MR. DYER:  Timothy Dyer of

3     Constantine Cannon for the Sidibe

4     plaintiffs.

5          MR. LEVEE:  You should also

6     introduce yourself.

7          MS. PERKINS:  Laura Phillips

8     Perkins, Matrix Economics.

9          MR. LEVEE:  Jeff LeVee, Jones

10    Day, on behalf of Sutter Health and the

11    witness.

12          THE VIDEOGRAPHER:  The court

13    reporter will now swear in the witness and

14    we can proceed.

15     *     *     *

16    R O B E R T   D.   W I L L I G, Ph.D.,

17    called as a witness, having been first duly

18    sworn, was examined and testified

19    as follows:

20          (Plaintiffs' Exhibit 800 marked

21    for identification.)

22          (Plaintiffs' Exhibit 801 marked

23    for identification.)

24          (Plaintiffs' Exhibit 802 marked

25    for identification.)

```
                                        Page 5
 1                    WILLIG, Ph.D.
 2   EXAMINATION BY MR. CANTOR:
 3        Q.      Good morning, Dr. Willig.
 4        A.      Good morning, Mr. Cantor.
 5        Q.      Dr. Willig, if you need a break
 6   at any time today, please let me know.
 7        A.      Thank you very much.
 8        Q.      Also, are you taking any
 9   medication today that would impair your
10   ability to give accurate and truthful
11   testimony?
12        A.      No.
13        Q.      Dr. Willig, I have marked a
14   document as Exhibit 800.
15               Could you please take a look at
16   it and let me know if you recognize it.
17        A.      It looks very familiar.  At a
18   quick look, I would say it is my
19   declaration in this case.
20        Q.      Dr. Willig, please turn to page
21   124 and let me know when you're there.
22        A.      Yes.
23        Q.      Do you see your signature
24   there?
25        A.      I do.
```

```
                                        Page 6
 1               WILLIG, Ph.D.
 2      Q.      Is it yours?
 3      A.      Yes.
 4      Q.      Do you believe that this is
 5   your report dated September 21st, 2018 that
 6   was submitted in this matter?
 7      A.      I do.
 8      Q.      Now, Dr. Willig, Mr. LeVee
 9   handed me a couple of documents today that
10   I would also like to mark.
11               This is marked as Exhibit 801.
12   That is Exhibit 801, sir.  And this is
13   Exhibit 802.
14               MR. CANTOR:  Jeff, do you need
15   a copy of the errata?
16               MR. LEVEE:  I do not.
17      Q.      Sir, do you recognize what
18   Exhibit 801 is?
19      A.      I think so.
20      Q.      What do you think it is?
21      A.      I think it is a version, an
22   updated version, of Exhibit 800, which I
23   hope incorporates some of the typological
24   corrections that are also I think
25   memorialized on an errata sheet, which may
```

Page 7

```
 1                  WILLIG, Ph.D.
 2   be this other document that you handed to
 3   me.
 4              But I hope that has been
 5   incorporated into the report.
 6        Q.    I understand, sir.
 7              The other document that I
 8   handed to you that you were referencing is
 9   Exhibit 802, correct?
10        A.    Yes.
11        Q.    Could you turn to page 124 of
12   Exhibit 801.
13        A.    Yes.
14        Q.    Do you see a signature there?
15        A.    I do.
16        Q.    Is it yours?
17        A.    It is.
18        Q.    Do you believe that Exhibit 801
19   is the corrected version of your report
20   dated November 8th, 2018?
21        A.    I believe it is, tentatively.
22   I haven't actually checked to see if it
23   incorporates the fixes of the errata.
24        Q.    Okay, fair enough, sir.
25              Do you know if there are any
```

Page 342

1

2          CERTIFICATION

3

4     I,   TODD DeSIMONE, a Notary Public for

5   and within the State of New York, do hereby

6   certify:

7     That the witness whose testimony as

8   herein set forth, was duly sworn by me; and

9   that the within transcript is a true record

10  of the testimony given by said witness.

11    I further certify that I am not related

12  to any of the parties to this action by

13  blood or marriage, and that I am in no way

14  interested in the outcome of this matter.

15    IN WITNESS WHEREOF, I have hereunto set

16  my hand this 9th day of November, 2018.

17

18

19

20  _____

            TODD DESIMONE

21          *       *       *

22

23

24

25

## DEPOSITION ERRATA SHEET

Job No.:                          3032701
Case Caption:                DJENEBA SIDIBE, et al. v. SUTTER HEALTH, 12-cv-04854 (N.D. Cal.)


## DECLARATION UNDER PENALTY OF PERJURY


I, Robert Willig, do hereby declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the above captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.


Signed on this _21_ day of _November_, 2018, at _Princeton_, _NJ_.
                                                                                        (City)                    (State)


_Robert Willig_
Robert Willig

# EXHIBIT 16

Page 1

```
 1
 2   ** C O N F I D E N T I A L **
 3   ** ATTORNEYS' EYES ONLY **
 4   UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF CALIFORNIA
 5   SAN FRANCISCO DIVISION
     Case No. 3:12-cv-4854-LB
 6   ---------------------------------x
     DJENEBA SIDIBE, et al.,
 7
            Plaintiffs,
 8
 9
        - against -
10
11
     SUTTER HEALTH,
12
            Defendant.
13   ---------------------------------x
                July 24, 2019
14              9:41 a.m.
15
16       Videotaped Deposition of ROBERT D.
17   WILLIG, Ph.D., taken by Plaintiffs,
18   pursuant to Notice, held at the offices of
19   Jones Day, 250 Vesey Street, New York, New
20   York, before Todd DeSimone, a Registered
21   Professional Reporter and Notary Public of
22   the State of New York.
23
24
25
```

```
 1
 2   A P P E A R A N C E S :
 3   CONSTANTINE CANNON LLP
     335 Madison Avenue
 4   New York, New York 10017
             Attorneys for Plaintiffs
 5   BY:     MATTHEW L. CANTOR, ESQ.
              mcantor@constantinecannon.com
 6            ROSA M. MORALES, ESQ.
              rmorales@constantinecannon.com
 7
 8
 9   JONES DAY
     555 California Street
10   26th Floor
     San Francisco, California 94104
11           Attorneys for Defendant
     BY:     DAVID C. KIERNAN, ESQ.
12            dkiernan@jonesday.com
13              - and -
14   JONES DAY
     51 Louisiana Avenue, N.W.
15   Washington, D.C. 20001-2113
     BY:     NATHANIEL J. HARRIS, ESQ.
16            nharris@jonesday.com
17              - and -
18   JONES DAY
     555 South Flower Street
19   Fiftieth Floor
     Los Angeles, California 90071
20   BY:   ERIN L. BURKE, ESQ.
            eburke@jonesday.com
21
22   ALSO PRESENT:
23     CHRIS RYBAK, Compass Lexecon (Via Phone)
24     KEVIN GALLAGHER, Videographer
25
```

Page 3

1          WILLIG - CONFIDENTIAL

2                  THE VIDEOGRAPHER:  We are now

3      going on the record at approximately 9:41

4      a.m.  I would like to remind everybody at

5      this time to silence their phones if they

6      haven't already done so.

7                  This is media unit number one

8      of the video-recorded deposition of Robert

9      Willig taken by the plaintiff in the matter

10     of Djeneba Sidibe versus Sutter Health

11     filed in the U.S. District Court, Northern

12     District of California, San Francisco

13     Division, case number is 3:12-cv-4854-LB.

14     The deposition is being held today at Jones

15     Day located at 250 Vesey Street in New

16     York, New York.

17                  I'm the videographer, my name

18     is Kevin Gallagher, from Veritext, as is

19     our court reporter, Todd DeSimone.

20                  At this time the attorneys

21     present in the room will identify

22     themselves and their affiliations for the

23     record as well as those on the phone.

24                  MR. CANTOR:  Matthew Cantor

25     from Constantine Cannon in New York.  We

```
                                      Page 4
 1            WILLIG - CONFIDENTIAL

 2   represent the plaintiffs in this matter.

 3              MS. MORALES:  Rosa Morales from

 4   Constantine Cannon representing plaintiffs.

 5              MR. KIERNAN:  David Kiernan

 6   with Jones Day on behalf of Sutter.

 7              MR. HARRIS:  Nate Harris from

 8   Jones Day on behalf of Sutter.

 9              MS. BURKE:  Erin Burke on

10   behalf of Jones Day and on behalf of

11   Sutter, from Jones Day.

12              MR. CANTOR:  There is also

13   someone on the line as well, on the

14   telephone line.  Can you please introduce

15   yourself for the record as well.

16              MR. RYBAK:  This is Chris Rybak

17   from Compass Lexecon on behalf of Sutter.

18              THE VIDEOGRAPHER:  And now our

19   court reporter will swear the witness and

20   we can proceed.

21       *    *    *

22   R O B E R T   D.   W I L L I G, Ph.D.,

23   called as a witness, having been first duly

24   sworn, was examined and testified

25   as follows:
```

```
                                          Page 5
 1            WILLIG - CONFIDENTIAL
 2               (Plaintiffs' Exhibit 890
 3    premarked for identification.)
 4               (Plaintiffs' Exhibit 891
 5    premarked for identification.)
 6               (Plaintiffs' Exhibit 892
 7    premarked for identification.)
 8               (Plaintiffs' Exhibit 893
 9    premarked for identification.)
10   EXAMINATION BY MR. CANTOR:
11        Q.        Professor Willig, you have been
12   deposed a few times before.  You know the
13   rules of engagement here.  But if you need
14   a break at any point throughout the day, so
15   long as there is not a question pending, I
16   will attempt to accommodate you, okay?
17        A.        Thank you, yes.
18        Q.        I'm going to start with some
19   preliminaries here.  I have put before you
20   what has been premarked as Exhibit 890.
21                  Do you recognize that document?
22        A.        I do.
23        Q.        What is that document, sir?
24        A.        It is my expert report in this
25   phase of this case.
```

```
                                                    Page 6
 1              WILLIG - CONFIDENTIAL
 2         Q.        And could you turn to page 162,
 3    sir.
 4         A.        Yes.
 5         Q.        And is that your signature on
 6    that page?
 7         A.        Yes, it is.
 8         Q.        You signed this on or about
 9    June 21st, 2019?
10         A.        Yes, sir.
11         Q.        I'm now going to give you
12    another document for identification.  I
13    premarked this as Exhibit 891.  I have
14    handed copies to counsel.
15                   Can you please review that
16    document and let me know if you can
17    identify it.
18         A.        This would be a report of mine
19    in another matter involving Sutter which I
20    call UEBT.  I'm not sure that's the right
21    formal name, but Employers Benefit Trust.
22         Q.        Is this the antitrust case
23    pending against Sutter in California state
24    court?
25         A.        That is my understanding, yes.
```

Page 336

1

2            CERTIFICATION

3

4      I,   TODD DeSIMONE, a Notary Public for

5    and within the State of New York, do hereby

6    certify:

7      That the witness whose testimony as

8    herein set forth, was duly sworn by me; and

9    that the within transcript is a true record

10   of the testimony given by said witness.

11     I further certify that I am not related

12   to any of the parties to this action by

13   blood or marriage, and that I am in no way

14   interested in the outcome of this matter.

15     IN WITNESS WHEREOF, I have hereunto set

16   my hand this 25th day of July, 2019.

17

18

19

20   _____

          TODD DESIMONE

21          *       *       *

22

23

24

25

## DEPOSITION ERRATA SHEET

Job No.:                      3447457
Case Caption:                 DJENEBA SIDIBE, et al. v. SUTTER HEALTH, 12-cv-04854 (N.D. Cal.)

## DECLARATION UNDER PENALTY OF PERJURY

I, Robert Willig, do hereby declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the above captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on this 22 day of August, 2019, at *Lake Luzerne  NY* .
                                              (City)              (State)

*Robert Willig*
Robert Willig

1

# EXHIBIT 17

Page 1

```
 1
 2    ** C O N F I D E N T I A L **
 3    ** ATTORNEYS' EYES ONLY **
 4    UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF CALIFORNIA
 5    SAN FRANCISCO DIVISION
      Case No. 3:12-cv-4854-LB
 6    ----------------------------------x
      DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN
 7    HANSEN, DAVID HERMAN, CAROLINE STEWART,
      OPTIMIUM GRAPHICS, INC., and JOHNSON POOL
 8    & SPA, on Behalf of Themselves and All
      Others Similarly Situated
 9
              Plaintiffs,
10
11
          - against -
12
13
      SUTTER HEALTH,
14
              Defendant.
15    ----------------------------------x
                   May 7, 2021
16                 10:21 a.m.
17
18        Videotaped Deposition of ROBERT D.
19    WILLIG, Ph.D., taken by Plaintiffs,
20    pursuant to Notice, held via Zoom
21    videoconference, before Todd DeSimone, a
22    Registered Professional Reporter and Notary
23    Public of the States of New York and New
24    Jersey.
25
```

```
                                           Page 2
 1
 2    A P P E A R A N C E S :
 3    CONSTANTINE CANNON LLP
      335 Madison Avenue
 4    New York, New York 10017
              Attorneys for Plaintiffs
 5    BY:     MATTHEW L. CANTOR, ESQ.
                mcantor@constantinecannon.com
 6              MATTHEW KOENIG, ESQ.
                mkoenig@constantinecannon.com
 7
 8
 9
      JONES DAY
10    555 California Street
      26th Floor
11    San Francisco, California 94104
              Attorneys for Defendant
12    BY:     DAVID C. KIERNAN, ESQ.
                dkiernan@jonesday.com
13
          - and -
14
      JONES DAY
15    4655 Executive Drive
      Suite 1500
16    San Diego, California 92121
              CAROLINE VAN WAGONER, ESQ.
17              cvanwagoner@jonesday.com
18
19
20
      ALSO PRESENT:
21      NAUMAN ILIAS, Compass Lexecon
22      MARCELO RIVERA, Videographer
23      CHRIS FAULK, Concierge Tech
24
25
```

Page 3

1          WILLIG - CONFIDENTIAL

2               THE VIDEOGRAPHER: Good morning.

3     We are going on the record at 10:21 a.m. on

4     May 7th, 2021.

5               This deposition is being taken

6     remotely of Dr. Robert Willig in the matter

7     Djeneba, et al., versus Sutter Health.  My

8     name is Marcelo Rivera from Veritext Legal

9     Solutions and I am the videographer.  The

10    court reporter is Todd DeSimone in

11    association with Veritext Legal Solutions.

12    I am not related to any party in this

13    action nor am I financially interested in

14    the outcome.

15               Counsel and all present

16    remotely will now state their appearances

17    and affiliations for the record.  If there

18    are any objections to proceeding, please

19    state them at the time of your appearance,

20    beginning with noticing attorney.

21               MR. CANTOR:  My name is Matthew

22    Cantor.  I'm with the firm Constantine

23    Cannon.  I'm with my colleague today,

24    Matthew Koenig, who will be assisting me.

25    We are counsel for the plaintiffs and the

```
                                        Page 4
 1           WILLIG - CONFIDENTIAL
 2   certified class.
 3               MR. KIERNAN:  David Kiernan
 4   with Jones Day on behalf of Sutter.
 5               MS. VAN WAGONER:  Caroline
 6   Van Wagoner with Jones Day on behalf of
 7   Sutter.
 8               MR. ILIAS:  Nauman Ilias with
 9   Compass Lexecon on behalf of Sutter.
10       *    *    *
11   R O B E R T   D.   W I L L I G,  Ph.D.,
12   called as a witness, having been first duly
13   sworn, was examined and testified
14   as follows:
15   EXAMINATION BY MR. CANTOR:
16       Q.     Good morning, Dr. Willig.  How
17   are you?
18       A.     Good morning, Mr. Cantor.  I am
19   fine.  Sorry to hold up the start here with
20   my gyrations on the screen.
21       Q.     I would beseech you not to
22   apologize.  It is all fine.
23               Dr. Willig, I'm going to start
24   by introducing a report that you recently
25   authored.
```

```
 1            WILLIG - CONFIDENTIAL
 2                MR. CANTOR:  I will hear it
 3    then when you ask him questions and then if
 4    I have more questions, I will.
 5                MR. KIERNAN:  All right.
 6                MR. CANTOR:  Okay, let's go to,
 7    Matt, let's put the Exhibit 932 in front of
 8    Dr. Willig.
 9                (Exhibit 932 marked for
10    identification.)
11        Q.     Now, Dr. Willig, do you still
12    have Exhibit Share up?
13        A.     I just clicked on the arrow and
14    it seems to be -- yes, I do.  Here it is.
15        Q.     Okay.  So can you click,
16    Dr. Willig, please, on Exhibit 932.
17        A.     Yes, sir.
18        Q.     Do you recognize Exhibit 932,
19    sir?
20        A.     Yes, I do.
21        Q.     And could you explain what
22    Exhibit 932 is?
23        A.     It appears to be the rebuttal
24    expert report of one Dr. Robert D. Willig,
25    which is me.
```

Page 136

1             WILLIG - CONFIDENTIAL

2        Q.     Okay.  And can you please

3    turn -- and I understand you have a paper

4    copy of that that you would rather use for

5    the purpose of the deposition?

6        A.     Yes, thank you.

7        Q.     Can you please turn to page 49.

8        A.     Yes.

9        Q.     Page 49, there is a signature.

10   Is that your signature, sir?

11       A.     It is.

12       Q.     And you served this report on

13   or about April 16th of this year, correct?

14       A.     Yes.

15       Q.     Okay.

16             MR. CANTOR:  Now, Mr. Koenig,

17   can you please put up Exhibit 933.

18             (Exhibit 933 marked for

19   identification.)

20       Q.     Do you see 933, sir?

21       A.     Not yet.  Maybe I have to go in

22   and out again, will that help?  Oh, I see

23   it now.

24       Q.     Now I have to wait.  One

25   second, sir.  Thank you.  Okay, Exhibit

```
 1              WILLIG - CONFIDENTIAL
 2     933, can you identify this for the record,
 3     sir?
 4          A.     Yes.  This is a Notice of
 5     Errata Re the Rebuttal Expert Report of
 6     Dr. Robert D. Willig and Backup Materials
 7     Thereto.
 8          Q.     Okay.  And did you see this
 9     before?
10          A.     Yes.
11          Q.     And did you authorize counsel
12     to serve this for you on April 27th?
13          A.     Yes.  27th?  Is that the right
14     date?
15          Q.     It says dated April 27th.
16          A.     Okay, I guess that's right.
17          Q.     Okay.  And could we go back
18     to -- so this is an errata, this April 27th
19     errata, it is a correction to your April
20     16th report, Exhibit 932, correct?
21          A.     Yes.  So I'm not sure about the
22     communication.  It says dated April 27th.
23          Q.     Yes.
24          A.     Okay, sorry.
25          Q.     I'm asking whether this errata,
```

```
 1              WILLIG - CONFIDENTIAL
 2    this April 27th notice of errata, is a
 3    correction or notifies us of corrections to
 4    your April 16th report which is Exhibit
 5    932.
 6         A.     Yes.
 7         Q.     Not the March report, this is
 8    the April report that this is a correction
 9    to?
10         A.     That's right.
11         Q.     Right, okay.
12         A.     I think before you were saying
13    17th, but anyway, it doesn't matter.
14         Q.     You know what, I may have, I
15    apologize if I did.
16         A.     It will come up in redirect,
17    Matt, don't worry about it.
18         Q.     I understand.  I understand,
19    Professor Willig.
20              Can you, Dr. Willig, can you
21    please look back in your Exhibit Share now
22    to Exhibit 929.
23         A.     Okay.
24         Q.     Exhibit 929 is another notice
25    of errata, you identified that for me
```

```
                                        Page 139
 1             WILLIG - CONFIDENTIAL
 2   before.  This appears to have edits not
 3   only to your March report, which you did
 4   say before in the first table, but edits to
 5   your April 16th report which are in the
 6   second table; is that right?
 7        A.     Yes, that's right.
 8        Q.     Okay.  So this also offers
 9   edits to Exhibit 932, and this was served
10   upon us yesterday at 2 in the morning.
11             MR. CANTOR:  Let's take a break
12   for one second.  Could we go off the record
13   for one second, please.
14             (Discussion off the record.)
15   BY MR. CANTOR:
16        Q.     Professor Willig, I have asked
17   Mr. Koenig to upload another exhibit as
18   Exhibit 934.
19             (Exhibit 934 marked for
20   identification.)
21        Q.     And I haven't received it yet.
22        A.     Nor I.
23             MR. KIERNAN:  It will get
24   there.
25        Q.     Professor Willig, do you see
```

```
                                              Page 140

 1           WILLIG - CONFIDENTIAL
 2    Exhibit 934 yet?
 3         A.     Yes, it just arrived and I'm
 4    opening it now.
 5         Q.     Thank you.  Can you identify
 6    this for the record, sir?
 7         A.     Sure.  It is called Response of
 8    Dr. Robert D. Willig to Rebuttal Report of
 9    Dr. Tasneem Chipty of May 7, 2021.
10         Q.     Okay.  And is this your
11    signature, sir, on the last line here?
12         A.     Yes.
13         Q.     And is this a report that you
14    served upon me as counsel for the
15    plaintiffs just a few moments ago?
16         A.     Yes.
17         Q.     I will just make a statement
18    for the record.  I will look at this on a
19    break.  I may ask you questions about this
20    today, but I am reserving all of
21    plaintiffs' rights to examine this with due
22    notice or to strike this report altogether.
23    We may or may not do that, but I'm
24    reserving all rights appropriately for the
25    case.
```

Page 147

1              WILLIG - CONFIDENTIAL

2                   MR. CANTOR:  So, Mr. Koenig,

3      can you please put on Exhibit Share

4      document number 9.

5                   (Exhibit 935 marked for

6      identification.)

7          Q.      Dr. Willig, you are going to

8      have to look at Exhibit Share again, and

9      this will be identified as Exhibit 935 for

10     the record.

11         A.      My screen says "File is too

12     large to be previewed."  Oh, "download."  I

13     will download.

14         Q.      Tell me whether you were able

15     to open the file, sir.

16         A.      Yes.

17         Q.      Okay.  Can you tell me what

18     this is?

19         A.      Let's see.  I have to move

20     around in it.

21         Q.      That's okay.  I want to make

22     sure you're able to identify it.

23         A.      Yeah, so this is a spreadsheet

24     and the first column is Plan Name and the

25     second column is Plan ID, in other words,

1              WILLIG - CONFIDENTIAL

2    it speaks to the type of plan that it is,

3    and we're on the tab, at least I am, you

4    may not be there, that says Individual Plan

5    Summary.  Is that the same tab that you're

6    on?

7         Q.    It is, but I guess my question

8    is a bit broader.  Do you recognize this

9    document?

10        A.    Yeah, I do.

11        Q.    Okay.  Is this a document that

12   you prepared?

13        A.    The actual footwork was done by

14   my team but with my understanding and

15   cognizance of what they were doing and we

16   discussed methodology and so forth.

17        Q.    Okay.  And is this one of the,

18   I'm looking at paragraph 87 again, one of

19   the damages tables that you referenced in

20   paragraph 87?

21        A.    Yes.

22        Q.    Okay.  That's what I wanted to

23   know.  And is this -- you served this as

24   part of the backup for Exhibit 932, your

25   April 2021 report, correct?

Page 149

1              WILLIG - CONFIDENTIAL

2         A.      I'm sorry, the backup for my

3    April report, yes.

4         Q.      And in your April report, at

5    the back, or towards the end I should say,

6    beginning on page 55 and going through page

7    61, you have Table 15a through 15h, as in

8    Henry.   Do you see that?   Again, that is

9    pages 55 to 61.

10        A.      Yes, up to 15h.

11        Q.      Yes.   My question is, is

12   Exhibit 935, the spreadsheet that's before

13   you, is this part of the backup for

14   Exhibits 15a through 15h?

15        A.      In the sense that the names of

16   the plans in these Tables 15 were drawn

17   either from the spreadsheet or from a long

18   list of plans' names without the rest of

19   the stuff in the sheet, and they were

20   selected by counsel, as I think I made

21   clear in my text, to meet certain criteria

22   in which counsel was interested.

23        Q.      So these -- this table before

24   you, Exhibit 935, was part of the

25   information that counsel used to make the

Page 301

1

2                    CERTIFICATION

3

4      I,   TODD DeSIMONE, a Notary Public for

5    and within the State of New York, do hereby

6    certify:

7      That the witness whose testimony as

8    herein set forth, was duly sworn by me; and

9    that the within transcript is a true record

10   of the testimony given by said witness.

11     I further certify that I am not related

12   to any of the parties to this action by

13   blood or marriage, and that I am in no way

14   interested in the outcome of this matter.

15     IN WITNESS WHEREOF, I have hereunto set

16   my hand this 10th day of May, 2021.

17

18                *Todd DeSimone*

        _____

19          TODD DESIMONE

20

21           *       *       *

22

23

24

25

# EXHIBIT 18

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1            SUPERIOR COURT OF THE STATE OF CALIFORNIA

2                    COUNTY OF SAN FRANCISCO

3

4   UFCW & Employers Benefit

5   Trust, on behalf of itself

6   and all others similarly

7   situated,                      CASE NO. CGC 14-538451

8             Plaintiff(s),       Consolidated with

9         vs.                     Case No. CGC 18-565398

10  Sutter Health, et al.,

11            Defendant(s).

12  _____

13  (CAPTION CONTINUED ON PAGE 2)

14

15       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16

17       VIDEOTAPED DEPOSITION OF PAUL MARKOVICH

18              San Francisco, California

19               Friday, August 10, 2018

20

21  Reported by:

22  ASHALA TYLOR, CSR #2436, CLR, CRR, RPR

23  JOB NO. 2982979

24

25  PAGES 1 - 326

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4    DJENEBA SIDIBE, JERRY JANKOWISKI,

5    SUSAN HANSEN, DAVID HERMAN,

6    CAROLINE STEWART, OPTIMUM

7    GRAPHICS, INC., and JOHNSON

8    POOL & SPA, on Behalf of Themselves

9    and All Others Similarly Situated,      Case No.

10              Plaintiffs,          3:12-cv-4854-LB

11       vs.

12   SUTTER HEALTH,

13              Defendant.

14   _____

15

16

17

18      Videotaped Deposition of PAUL MARKOVICH, taken at

19   Jones Day, 555 California Street, 26th Floor,

20   San Francisco, California, commencing at 9:10 a.m. and

21   ending at 6:13 p.m., on Friday, August 10, 2018, before

22   Ashala Tylor, CSR No 2436, RPR, CRR, CLR.

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

1    APPEARANCES OF COUNSEL:

2

3    FOR THE CERTIFIED CLASS AND ITS CLASS REPRESENTATIVE:

4         PILLSBURY & COLEMAN, LLP

5         BY:  RICHARD L. GROSSMAN, ESQ.

6         The Transamerica Pyramid

7         600 Montgomery Street, 31st Floor

8         San Francisco, California  94111

9         415.433.8000

10        rgrossman@pillsburycoleman.com

11

12   FOR THE UFCW PLAINTIFFS CLASS:

13        FARELLA BRAUN + MARTEL LLP

14        BY:  RYAN H. WESSELS, ESQ.

15        Russ Building

16        235 Montgomery Street

17        San Francisco, California  94104

18        415.954.4400

19        rwessels@fbm.com

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 4

```
 1   A P P E A R A N C E S  (continued)

 2

 3   FOR PLAINTIFFS SIDIBE IN THE FEDERAL ACTION:

 4        STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH LLP

 5        BY:  ALLAN STEYER, ESQ.

 6             SUNEEL JAIN, ESQ.

 7        One California Street, Third Floor

 8        San Francisco, California  94111

 9        415.421.3400

10        asteyer@steyerlaw.com

11        sjain@steyerlaw.com

12

13   FOR DEFENDANTS SUTTER HEALTH, ET AL:

14        JONES DAY

15        BY:  DAVID C. KIERNAN, ESQ.

16             CAROLINE N. MITCHELL, ESQ.

17        555 California Street, 26th Floor

18        San Francisco, California  94104

19        415.626.3939

20        dkiernan@jonesday.com

21        cnmitchell@jonesday.com

22

23

24

25
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 5

1   A P P E A R A N C E S (continued)

2

3   FOR BLUE SHIELD OF CALIFORNIA AND THE WITNESS PAUL

4   MARKOVICH:

5         MAYER BROWN LLP

6         BY:  ROBERT E. BLOCH, ESQ.

7              SCOTT P. PERLMAN, ESQ.

8         1999 K Street, N.W.

9         Washington, D.C.  20006-1101

10        202.263.3201

11        rbloch@mayerbrown.com

12        sperlman@mayerbrown.com

13

14  Also Present:

15        Ramon Peraza, Videographer

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

1    behalf of the witness and Blue Shield of California.    09:11

2          MR. PERLMAN:  Scott Perlman from Mayer

3    Brown, on behalf of non-party Blue Shield and the

4    witness.

5          MR. GROSSMAN:  Richard Grossman, Pillsbury    09:11

6    Coleman, on behalf of the certified class and its

7    class representative.

8          MR. WESSELS:  Ryan Wessels, Farella Braun

9    & Martel, representing the UFCW plaintiffs class.

10          MR. STEYER:  Allan Steyer, Steyer    09:11

11    Lowenthal et al., for the Sidibe plaintiffs.

12                PAUL MARKOVICH,

13      being first duly sworn or affirmed to testify

14      to the truth, the whole truth, and nothing but

15      the truth, was examined and testified as follows:    09:11

16                EXAMINATION

17    BY MR. KIERNAN:

18      Q.   Good morning, Mr. Markovich.

19      A.   Good morning.

20      Q.   Do you want to state your full name for    09:11

21    the record?

22      A.   Paul Steven Markovich.

23      Q.   Okay.  I represent Sutter Health and the

24    three lawsuits that were just identified:  The UEBT,

25    the Sidibe lawsuit, and then there's a third lawsuit    09:12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 272

1   networks themselves, you can get a much more          04:48

2   affordable product, help address the affordability

3   issues that we talked about before.

4   BY MR. GROSSMAN:

5       Q.   I want to ask you about your -- if you      04:49

6   recall, the product that was -- that Blue Shield

7   provided to the City and County of San Francisco.

8       A.   Okay.

9       Q.   Do you recall whether or not that was a

10  product that was referred to as flex funded?          04:50

11      A.   I don't remember.  I believe it was, but I

12  just can't be sure.

13      Q.   What about the product that was provided

14  to CalPERS, was that your flex-funded product?

15      A.   Yes, that was a flex-funded product when     04:50

16  we brought it to CalPERS.

17      Q.   And how do flex-funded products differ, if

18  you know the details, from Blue Shield's other

19  products?

20      A.   Well, yes, this was -- the regulators        04:50

21  introduced this notion of flex funded and HMO

22  because HMOs --

23           (Reporter clarification.)

24      A.   The flex funded, the ability to flex fund

25  an HMO product, because they were trying to increase  04:50

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 273

1    the flexibility in terms of what health plans could        04:50

2    offer customers that preferred a self-funded

3    scenario.  And so what -- what it effectively said

4    is that in a fully-insured product, a health plan

5    simply says, "I'm offering you this price.  It costs       04:51

6    you $100.  We're charging you $100.  We're

7    collecting $100 from you.  And then wherever the

8    costs come in, that's our problem, not your

9    problem."

10           In a flex-funded arrangement, generally            04:51

11   the health plan and the employer are negotiating

12   some level -- some amount of money at which the

13   health plan takes on all the financial risks.  So if

14   the costs exceed a certain level or amount, then the

15   health plan's taking that financial risk on, the          04:51

16   same way they are in the insured, except that the

17   premium that gets charged and the costs and the risk

18   below that ceiling can be shared between the

19   employer and the health plan.  It allows the

20   employer to potentially take on a lot more of the         04:51

21   financial risk in a manner that's similar to the way

22   they take on that function risk in a self-funded

23   scenario.

24       Q.   And -- that's all the questions I have

25   about that.                                                04:52

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 325

1                    DECLARATION

2

3        I hereby declare I am the deponent in the within

4   matter; that I have read the foregoing transcript and

5   know the contents thereof; and I declare that the same

6   is true of my knowledge except as to the matters which

7   are therein stated upon my information or belief, and as

8   to those matters, I believe them to be true.

9        I declare under the penalties of perjury

10  under the laws of the United States that the

11  foregoing is true and correct.

12

13       This declaration is executed this _____ day

14  of _____, 20___, at

15  _____, California.

16

17

18

19

20       _____

21            PAUL MARKOVICH

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1            CERTIFICATE OF REPORTER

2       I, ASHALA TYLOR, CSR No. 2436, in and for the State

3   of California, do hereby certify:

4       That the foregoing proceedings were taken before me

5   at the time and place herein set forth; that any

6   witnesses in the foregoing proceedings, prior to

7   testifying, were placed under oath; that a verbatim

8   record of the proceedings were made by me using machine

9   shorthand which was thereafter transcribed under my

10  direction; further that the foregoing is an accurate

11  transcription thereof.

12      That before the completion of the deposition, review

13  of the transcript [ ]was [X] was not requested.

14      I further certify that I am neither financially

15  interested in this action nor a relative or employee of

16  any attorney or any of the parties hereto.

17      In compliance with Section 8016 of the Business and

18  Professions Code, I certify under penalty of perjury

19  that I am a Certified Shorthand Reporter with California

20  License No. 2436 in full force and effect.

21  WITNESS my hand this 14th day of August, 2018.

22

23

24

25      Ashala Tylor, CSR #2436, RPR, CRR, CLR

Page 326

# EXHIBIT 19

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4

 5   DJENEBA SIDIBE, JERRY JANKOWSKI,

 6   SUSAN HANSEN, DAVID HERMAN,

 7   CAROLINE STEWART, OPTIMUM GRAPHICS,

 8   INC., AND JOHNSON POOL & SPA, ON

 9   BEHALF OF THEMSELVES AND ALL OTHERS

10   SIMILARLY SITUATED,

11          PLAINTIFFS,

12      vs.                         Case No.

13   SUTTER HEALTH,                 3:12-CV-04854-LB

14          DEFENDANT.
     _____/

15      **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

16            **STRATEGIC COMPETITIVE DATA**

17

18      VIDEOTAPED DEPOSITION OF CHRISTY GREGG

19         *VIA REMOTE COUNSEL VIDEOCONFERENCE*

20              FRIDAY, APRIL 9, 2021

21                   VOLUME I

22

23   STENOGRAPHICALLY REPORTED BY:

24   MEGAN F. ALVAREZ, RPR, CSR No. 12470

25   JOB NO. 4517687; PAGES 1 - 260
```

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4

 5   DJENEBA SIDIBE, JERRY JANKOWSKI,

 6   SUSAN HANSEN, DAVID HERMAN,

 7   CAROLINE STEWART, OPTIMUM GRAPHICS,

 8   INC., AND JOHNSON POOL & SPA, ON

 9   BEHALF OF THEMSELVES AND ALL OTHERS

10   SIMILARLY SITUATED,

11          PLAINTIFFS,

12      vs.                          Case No.

13   SUTTER HEALTH,                  3:12-CV-04854-LB

14          DEFENDANT.

15   _____/

16

17

18          Videotaped Videoconference Deposition of

19   CHRISTY GREGG, Volume I, taken on behalf of Defendant,

20   VIA REMOTE COUNSEL.  Deponent testifying from Diamond

21   Springs, California, beginning at 9:14 a.m. and ending

22   at 5:16 p.m. on Friday, April 9, 2021, before

23   Megan F. Alvarez, RPR, Certified Shorthand Reporter

24   No. 12470.

25
```

Page 2

```
 1   APPEARANCES: (ALL PARTIES APPEARING VIA VIDEOCONFERENCE)

 2

 3   FOR THE SIDIBE PLAINTIFFS:

 4           BY:  DAVID BROWNSTEIN, ESQ.

 5           FARMER BROWNSTEIN JAEGER GOLDSTEIN & KLEIN

 6           235 MONTGOMERY STREET, SUITE 835

 7           SAN FRANCISCO, CALIFORNIA 94104

 8           415.962.2873

 9           DBROWNSTEIN@FBJGK.COM

10

11   FOR DEFENDANTS:

12           BY:  DANIEL CORBETT, ESQ.

13           JONES DAY

14           555 CALIFORNIA STREET, 26TH FLOOR

15           SAN FRANCISCO, CALIFORNIA 94104

16           858.314.1200

17           DCORBETT@JONESDAY.COM

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES (CONTINUED):

 2

 3    FOR THE DEPONENT AND BLUE SHIELD:

 4              BY:  SCOTT PERLMAN, ESQ.

 5              MAYER BROWN LLP

 6              3000 EL CAMINO REAL SUITE 300

 7              PALO ALTO CALIFORNIA 94306

 8              650.331.2000

 9              SPERLMAN@MAYERBROWN.COM

10

11    THE VIDEO OPERATOR:

12              JOANN YAGER, VERITEXT

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| 1 | MR. CORBETT:  I'm Dan Corbett, counsel for | 09:15:00 |
| 2 | Sutter Health, defendant. | 09:15:04 |
| 3 | MR. BROWNSTEIN:  David Brownstein from the | 09:15:08 |
| 4 | Farmer Brownstein law firm on behalf of the | 09:15:09 |
| 5 | plaintiffs and the certified class. | 09:15:12 |
| 6 | MR. PERLMAN:  Scott Perlman on behalf of | 09:15:14 |
| 7 | Blue Shield of California and the witness. | 09:15:16 |
| 8 | THE VIDEO OPERATOR:  The witness may be | 09:15:19 |
| 9 | sworn in. | 09:15:21 |
| 10 | | 09:15:21 |
| 11 | CHRISTY GREGG, | 09:15:21 |
| 12 | called as a witness by the Defendant, having | 09:15:21 |
| 13 | been first duly sworn, was examined and | 09:15:21 |
| 14 | testified as follows: | 09:15:42 |
| 15 | --o0o-- | 09:15:42 |
| 16 | EXAMINATION | 09:15:44 |
| 17 | BY MR. CORBETT: | 09:15:45 |
| 18 | Q.   Good morning, Ms. Gregg.  My name is | 09:15:46 |
| 19 | Dan Corbett, as I just mentioned, and I'm counsel | 09:15:49 |
| 20 | for Sutter Health with the law firm Jones Day in the | 09:15:52 |
| 21 | class action lawsuit filed by the Sidibe plaintiffs. | 09:15:56 |
| 22 | I will be taking this deposition today. | 09:16:00 |
| 23 | To get started, will you please state and | 09:16:03 |
| 24 | spell your full name for the record. | 09:16:04 |
| 25 | A.   Christy Gregg.  C-H-R-I-S-T-Y, G-R-E-G-G. | 09:16:06 |

Page 10

| 1 | than the ones that are listed here? | 14:25:19 |
| 2 | A.    Yes, there are. | 14:25:21 |
| 3 | Q.    Approximately how many are there?  Do you | 14:25:24 |
| 4 | know? | 14:25:26 |
| 5 | A.    I'd give an estimate of 20. | 14:25:32 |
| 6 | Q.    Is there a code for an AOC funding type? | 14:25:35 |
| 7 | A.    Did you say "AFC"? | 14:25:41 |
| 8 | Q.    AOC.  Excuse me.  ASO, I meant to say.  I | 14:25:42 |
| 9 | misspoke. | 14:25:46 |
| 10 | A.    Oh, okay.  Yes, there is. | 14:25:47 |
| 11 | Q.    Would that be one code for ASO or several? | 14:25:50 |
| 12 | A.    There's two.  And I'm trying in my mind -- | 14:26:01 |
| 13 | I know one off the top of my head. | 14:26:02 |
| 14 | So Blue Shield of California is general | 14:26:04 |
| 15 | ASO, a business what we think of as strictly ASO. | 14:26:09 |
| 16 | The line of business ID is 6. | 14:26:12 |
| 17 | Shared Advantage is another sort of hybrid | 14:26:15 |
| 18 | of ASO, and it has its own line of business ID.  And | 14:26:19 |
| 19 | I don't recall what that is off the top of my head. | 14:26:26 |
| 20 | And -- and the between the two, 6 and | 14:26:29 |
| 21 | whatever the Shared Advantage was, that would be | 14:26:34 |
| 22 | inclusive of ASO and Shared Advantage. | 14:26:37 |
| 23 | Q.    Thank you. | 14:26:41 |
| 24 | And would you turn to Row 49, please? | 14:26:48 |
| 25 | MR. BROWNSTEIN:  Sorry.  Was that 49? | 14:27:00 |

Page 170

| | | |
|---|---|---|
| 1 | moment. | 16:34:23 |
| 2 | It's just additional data element that | 16:35:07 |
| 3 | Blue Shield uses in our product configuration to | 16:35:09 |
| 4 | help subcategorize products beyond just that initial | 16:35:12 |
| 5 | grouping of is it an HMO or PPO plan?  Is it a | 16:35:17 |
| 6 | medical plan or is it an under those lines of | 16:35:22 |
| 7 | business categories? | 16:35:26 |
| 8 | This, from a reporting perspective, | 16:35:32 |
| 9 | provide -- may provide some additional designation | 16:35:34 |
| 10 | or categorization of the product. | 16:35:36 |
| 11 | Q.   Would you please turn to the IFP layout | 16:35:40 |
| 12 | file, Exhibit 6349, and the "Business Category" tab? | 16:35:44 |
| 13 | A.   I'm on that tab. | 16:36:01 |
| 14 | Q.   If you look at Row 16, you'll see the code | 16:36:02 |
| 15 | SARB in Column B. | 16:36:02 |
| 16 | Do you see that? | 16:36:04 |
| 17 | A.   Yes, I do. | 16:36:05 |
| 18 | Q.   What does SARB mean? | 16:36:06 |
| 19 | A.   SARB is a way for us to designate our | 16:36:09 |
| 20 | Shared Advantage plans.  It's really to categorize | 16:36:13 |
| 21 | them into certain administrative functions.  And if | 16:36:17 |
| 22 | it's okay, I'll explain using 26, 27, and 28 -- Rows | 16:36:20 |
| 23 | 26, 27, and 28. | 16:36:24 |
| 24 | They're all interrelated.  SA stands for | 16:36:26 |
| 25 | Shared Advantage.  The third character is an | 16:36:29 |

Page 234

| | | |
|---|---|---|
| 1 | indicator of whether or not we -- the -- that our | 16:36:32 |
| 2 | relationship with the TPA includes them sending | 16:36:36 |
| 3 | their adjudication data back to us, which | 16:36:41 |
| 4 | Blue Shield would refer to as a return file. And | 16:36:44 |
| 5 | the last character in that acronym is a designation | 16:36:47 |
| 6 | as to whether or not that particular | 16:36:55 |
| 7 | Shared Advantage client has purchased or is | 16:36:56 |
| 8 | participating in the Blue Card program. | 16:36:59 |
| 9 | So if I was to decipher Row 26, SARB would | 16:37:02 |
| 10 | mean that it's a Shared Advantage plan that sends us | 16:37:07 |
| 11 | their adjudication back as a return file, and their | 16:37:10 |
| 12 | members are eligibility to participate in the Blue | 16:37:14 |
| 13 | Card program where the one -- Row 20- -- pardon -- | 16:37:17 |
| 14 | Item Number 27 that's a Shared Advantage plan where | 16:37:20 |
| 15 | they send us a file back with their adjudication, a | 16:37:25 |
| 16 | return file, but they do not participate in Blue | 16:37:28 |
| 17 | Card processing. | 16:37:34 |
| 18 | Q. And did I hear you say 28? | 16:37:44 |
| 19 | A. Sure. I'll say 28. It's a | 16:37:45 |
| 20 | Shared Advantage plan. The N signifies that they do | 16:37:46 |
| 21 | not share their adjudication with us, there is not a | 16:37:50 |
| 22 | return file expected. And the last N is an | 16:37:54 |
| 23 | indication that they do not participate in the Blue | 16:37:58 |
| 24 | Card program. | 16:38:03 |
| 25 | Q. Thank you. | 16:38:04 |

Page 235

```
1              I, CHRISTY GREGG, do hereby declare

2     under penalty of perjury that I have read the

3     foregoing transcript; that I have made any

4     corrections as appear noted, in ink, initialed by

5     me, or attached hereto; that my testimony as

6     contained herein, as corrected, is true and correct.

7              EXECUTED this _____ day of _____,

8     2021, at _____, _____.

9                        (City)                    (State)

10

11

12

13

14         _____

15                     CHRISTY GREGG

16                     VOLUME I

17

18

19

20

21

22

23

24

25

                                              Page 259
```

```
 1              CERTIFICATE OF REPORTER

 2              I, the undersigned, a Certified Shorthand

 3     Reporter of the State of California, do hereby

 4     certify:

 5              That the foregoing proceedings were taken

 6     before me at the time and place herein set forth;

 7     that any witnesses in the foregoing proceedings,

 8     prior to testifying, were administered an oath; that

 9     a verbatim record of the proceedings was made by me

10     using machine shorthand, which was thereafter

11     transcribed under my direction; and that the

12     foregoing is an accurate transcription thereof.

13              Further, that if the foregoing pertains to

14     the original transcript of a deposition in a federal

15     case, before completion of the proceedings, review

16     of the transcript [X] was [ ] was not requested.

17              I further certify that I am neither

18     financially interested in the action, nor a relative

19     or employee of any attorney of any party to this

20     action.

21              IN WITNESS WHEREOF, I have this date

22     subscribed my name this 14th day of April, 2021.

23

24              MEGAN F. ALVAREZ

25              CSR No. 12470, RPR
```

Page 260

# EXHIBIT 27

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                 SAN FRANCISCO DIVISION

 4                      --oOo--

 5   DJENEBA SIDIBE, et al.,

 6                  Plaintiffs,

 7   vs.                        Case No. 3:12-cv-4854-LB

 8   SUTTER HEALTH, et al.,

 9                  Defendants.

     _____/

10

11       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

12               COMPETITIVELY SENSITIVE

13

14       VIDEOTAPED DEPOSITION OF EDWARD LUI

15            THURSDAY, OCTOBER 4, 2018

16

17

18

19

20   Reported by:

21   Anrae Wimberley,

22   CSR No. 7778

23   Job No.  3024335

24

25   Pages 1 - 267
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4                       --oOo--

 5   DJENEBA SIDIBE, et al.,

 6                  Plaintiffs,

 7   vs.                      Case No. 3:12-cv-4854-LB

 8   SUTTER HEALTH, et al.,

 9                  Defendants.

     _____/

10

11      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

12                COMPETITIVELY SENSITIVE

13

14           Transcript of videotaped deposition of

15   EDWARD LUI, taken at Jones Day, LLP,

16   555 California Street, 26th Floor, San Francisco,

17   California 94104, beginning at 9:09 a.m. and ending

18   at 5:35 p.m. on Thursday, October 4, 2018, before

19   Anrae Wimberley, Certified Shorthand Reporter No.

20   7778.

21

22

23

24

25

                                            Page 2
```

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | My name is Brandon Miller from the firm | 09:10:04 |
| 2 | Veritext Legal Solutions and I'm the videographer. | |
| 3 | The court reporter is Anrae Wimberley from the firm | |
| 4 | Veritext Legal Solutions. | |
| 5 | I'm not related to any party in this | 09:10:14 |
| 6 | action, nor am I financially interested in the | |
| 7 | outcome. | |
| 8 | Counsel and all present in the room will | |
| 9 | now state their appearances and affiliations for the | |
| 10 | record. | 09:10:23 |
| 11 | MR. WRIGHT:  Jason Wright of Jones Day for | |
| 12 | defendant Sutter Health. | |
| 13 | MR. BROWNSTEIN:  David Brownstein, Farmer, | |
| 14 | Brownstein, Jaeger & Goldstein, for the Sidibe | |
| 15 | plaintiffs. | 09:10:33 |
| 16 | MR. PERLMAN:  Scott Perlman for nonparty Blue | |
| 17 | Shield of California and the witness. | |
| 18 | MS. MURPHY:  Victoria Murphy for nonparty Blue | |
| 19 | Shield of California and the witness. | |
| 20 | THE VIDEOGRAPHER:  Thank you. | 09:10:43 |
| 21 | You may now swear in the witness. | |
| 22 | EDWARD LUI, | |
| 23 | sworn as a witness by the Certified | |
| 24 | Shorthand Reporter, testified as follows: | |
| 25 | // | 09:10:44 |

Page 11

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1        A.   A few years.                              09:36:19

 2        Q.   And what was your next position?

 3        A.   Director.

 4        Q.   And your responsibility -- what were your

 5   responsibilities as senior manager?                09:36:27

 6        A.   When I first started, I was the entire

 7   underwriting department for the sector.  Literally I

 8   was Employee 1 or 2, so buck stops here.

 9        Q.   So responsible then for creating all of

10   the premiums for clients in that group?            09:36:46

11        A.   The ratings for the beginnings of what was

12   known as public sector.  It went through different

13   names.  Labor, public sector, public business unit,

14   on and on, but we can refer all that.  But it's the

15   same set of groups.  It's Premier.                 09:37:05

16        Q.   And how did your responsibilities change

17   when you became a director?

18        A.   I hired staff as we grew the sector.

19   Later on I was given charge of Core accounts as well

20   and National accounts and later the stop-loss team  09:37:28

21   as well.

22        Q.   And Core accounts you've already defined.

23             How are National accounts defined?

24        A.   So as defined by the Blue Cross Blue

25   Shield Association, so long as the group is of       09:37:49
```

Page 31

| | | |
|---|---|---|
| 1 | large-group size and there is 100 employees-plus | 09:37:53 |
| 2 | across multiple states outside of the home state, so | |
| 3 | outside of California for Blue Shield. | |
| 4 | Q. To clarify, more than 100 employees | |
| 5 | outside of California? | 09:38:10 |
| 6 | A. A large group within the home state plus | |
| 7 | 100 lives over multiple states outside the home | |
| 8 | state. | |
| 9 | Q. And you also referred to the Federal | |
| 10 | Employees Health Benefits Program? | 09:38:23 |
| 11 | A. That's right. | |
| 12 | Q. What was your responsibility with respect | |
| 13 | to that program? | |
| 14 | A. The underwriting and pricing. | |
| 15 | Q. Is that a National plan? | 09:38:32 |
| 16 | A. This is in respect to the HMO California | |
| 17 | plan. | |
| 18 | Q. So -- | |
| 19 | A. The fed's program refers to the national | |
| 20 | PPO plan that I believe you're referring to. This | 09:38:43 |
| 21 | is for the specific California HMO population. | |
| 22 | Q. So only offered to residents of California | |
| 23 | for that particular HMO? | |
| 24 | A. Right. This is what the federal program | |
| 25 | offers to the California employees for HMO. PPO | 09:38:57 |

Page 32

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | through Blue Cross Blue Shield Association, through | 09:39:01 |
| 2 | the BlueCard plan, is the national offering in the | |
| 3 | Blues. | |
| 4 | Q.   Did you have any responsibility for the | |
| 5 | national offering? | 09:39:12 |
| 6 | A.   No, that's handled from the Indiana -- the | |
| 7 | association plan. | |
| 8 | Q.   You're referring to the Blue Cross Blue | |
| 9 | Shield Association? | |
| 10 | A.   Yes.  Yes. | 09:39:22 |
| 11 | Q.   And how long were you a director? | |
| 12 | A.   Let's see.  I got the promotion -- let's | |
| 13 | see.  Go with my memory.  I believe that was March | |
| 14 | of '13, from director to vice president. | |
| 15 | Q.   And when did you become a director? | 09:39:43 |
| 16 | A.   I believe in and around three years after | |
| 17 | my hire. | |
| 18 | Q.   So around 2008? | |
| 19 | A.   Give or take. | |
| 20 | Q.   And when you became a vice president of | 09:39:53 |
| 21 | underwriting in 2013, how did your responsibilities | |
| 22 | change? | |
| 23 | A.   The scope -- or the scope of business is | |
| 24 | all large group.  I already had all the teams, so | |
| 25 | the scope in terms of lines of business and segments | 09:40:08 |

Page 33

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       FEDERAL CERTIFICATE OF DEPOSITION OFFICER
2       I, ANRAE WIMBERLEY, CSR NO. 7778, do hereby
    declare:
3       That, prior to being examined, the witness
    named in the foregoing deposition was by me duly
4   sworn pursuant to Section 30(f)(1) of the Federal
    Rules of Civil Procedure and the deposition is a
5   true record of the testimony given by the witness;
6       That said deposition was taken down by me in
    shorthand at the time and place therein named and
7   thereafter reduced to text under my direction;
8       -----   That the witness was requested to
    review the transcript and make any changes to the
9   transcript as a result of that review pursuant to
    Section 30(e) of the Federal Rules of Civil
10  Procedure;
11      -----   No changes have been provided by the
    witness during the period allowed;
12      -----   The changes made by the witness are
13  appended to the transcript;
14      --X---   No request was made that the
    transcript be reviewed pursuant to Section 30(e) of
15  the Federal Rules of Civil Procedure.
16      I further declare that I have no interest in
    the event of the action.
17      I declare under penalty of perjury under the
18  laws of the United States of America that the
    foregoing is true and correct.
19      WITNESS my hand this 8th day of October, 2018.
20
21
22
23
24
25      ANRAE WIMBERLEY, CSR NO. 7778

                                        Page 267

# EXHIBIT 28

# Reference Manual on Scientific Evidence

*Third Edition*

Committee on the Development of the Third Edition of the
Reference Manual on Scientific Evidence

Committee on Science, Technology, and Law
Policy and Global Affairs

FEDERAL JUDICIAL CENTER

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

# Reference Guide on Multiple Regression

DANIEL L. RUBINFELD

*Daniel L. Rubinfeld, Ph.D., is Robert L. Bridges Professor of Law and Professor of Economics Emeritus, University of California, Berkeley, and Visiting Professor of Law at New York University Law School.*

CONTENTS

I. Introduction and Overview, 305

II. Research Design: Model Specification, 311
   A. What Is the Specific Question That Is Under Investigation by the Expert? 311
   B. What Model Should Be Used to Evaluate the Question at Issue? 311
      1. Choosing the dependent variable, 312
      2. Choosing the explanatory variable that is relevant to the question at issue, 313
      3. Choosing the additional explanatory variables, 313
      4. Choosing the functional form of the multiple regression model, 316
      5. Choosing multiple regression as a method of analysis, 317

III. Interpreting Multiple Regression Results, 318
   A. What Is the Practical, as Opposed to the Statistical, Significance of Regression Results? 318
      1. When should statistical tests be used? 319
      2. What is the appropriate level of statistical significance? 320
      3. Should statistical tests be one-tailed or two-tailed? 321
   B. Are the Regression Results Robust? 322
      1. What evidence exists that the explanatory variable causes changes in the dependent variable? 322
      2. To what extent are the explanatory variables correlated with each other? 324
      3. To what extent are individual errors in the regression model independent? 325
      4. To what extent are the regression results sensitive to individual data points? 326
      5. To what extent are the data subject to measurement error? 327

*Reference Manual on Scientific Evidence*

IV.  The Expert, 328
    A.  Who Should Be Qualified as an Expert? 328
    B.  Should the Court Appoint a Neutral Expert? 329
 V.  Presentation of Statistical Evidence, 330
    A.  What Disagreements Exist Regarding Data on Which the Analysis Is Based? 330
    B.  Which Database Information and Analytical Procedures Will Aid in Resolving Disputes over Statistical Studies? 331
Appendix: The Basics of Multiple Regression, 333
    A.  Introduction, 333
    B.  Linear Regression Model, 336
        1.  Specifying the regression model, 337
        2.  Regression line, 337
    C.  Interpreting Regression Results, 339
    D .Determining the Precision of the Regression Results, 340
        1.  Standard errors of the coefficients and *t*-statistics, 340
        2.  Goodness-of-fit, 344
        3.  Sensitivity of least squares regression results, 345
    E.  Reading Multiple Regression Computer Output, 346
    F . Forecasting, 348
    G.  A Hypothetical Example, 350
Glossary of Terms, 352
References on Multiple Regression, 357

*Reference Guide on Multiple Regression*

# I. Introduction and Overview

Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables.[1] Multiple regression involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable.[2] For example, a multiple regression analysis might estimate the effect of the number of years of work on salary. Salary would be the dependent variable to be explained; the years of experience would be the explanatory variable.

Multiple regression analysis is sometimes well suited to the analysis of data about competing theories for which there are several possible explanations for the relationships among a number of explanatory variables.[3] Multiple regression typically uses a single dependent variable and several explanatory variables to assess the statistical data pertinent to these theories. In a case alleging sex discrimination in salaries, for example, a multiple regression analysis would examine not only sex, but also other explanatory variables of interest, such as education and experience.[4] The employer-defendant might use multiple regression to argue that salary is a function of the employee's education and experience, and the employee–plaintiff might argue that salary is also a function of the individual's sex. Alternatively, in an antitrust cartel damages case, the plaintiff's expert might utilize multiple regression to evaluate the extent to which the price of a product increased during the period in which the cartel was effective, after accounting for costs and other variables unrelated to the cartel. The defendant's expert might use multiple

1. A variable is anything that can take on two or more values (e.g., the daily temperature in Chicago or the salaries of workers at a factory).

2. Explanatory variables in the context of a statistical study are sometimes called independent variables. *See* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section II.A.1, in this manual. The guide also offers a brief discussion of multiple regression analysis. *Id.*, Section V.

3. Multiple regression is one type of statistical analysis involving several variables. Other types include matching analysis, stratification, analysis of variance, probit analysis, logit analysis, discriminant analysis, and factor analysis.

4. Thus, in *Ottaviani v. State University of New York,* 875 F.2d 365, 367 (2d Cir. 1989) (citations omitted), *cert. denied,* 493 U.S. 1021 (1990), the court stated:

In disparate treatment cases involving claims of gender discrimination, plaintiffs typically use multiple regression analysis to isolate the influence of gender on employment decisions relating to a particular job or job benefit, such as salary.

The first step in such a regression analysis is to specify all of the possible "legitimate" (i.e., non-discriminatory) factors that are likely to significantly affect the dependent variable and which could account for disparities in the treatment of male and female employees. By identifying those legitimate criteria that affect the decisionmaking process, individual plaintiffs can make predictions about what job or job benefits similarly situated employees should ideally receive, and then can measure the difference between the predicted treatment and the actual treatment of those employees. If there is a disparity between the predicted and actual outcomes for female employees, plaintiffs in a disparate treatment case can argue that the net "residual" difference represents the unlawful effect of discriminatory animus on the allocation of jobs or job benefits.

*Reference Manual on Scientific Evidence*

regression to suggest that the plaintiff's expert had omitted a number of price-determining variables.

More generally, multiple regression may be useful (1) in determining whether a particular effect is present; (2) in measuring the magnitude of a particular effect; and (3) in forecasting what a particular effect would be, but for an intervening event. In a patent infringement case, for example, a multiple regression analysis could be used to determine (1) whether the behavior of the alleged infringer affected the price of the patented product, (2) the size of the effect, and (3) what the price of the product would have been had the alleged infringement not occurred.

Over the past several decades, the use of multiple regression analysis in court has grown widely. Regression analysis has been used most frequently in cases of sex and race discrimination[5] antitrust violations,[6] and cases involving class cer-

5. Discrimination cases using multiple regression analysis are legion. *See, e.g.,* Bazemore v. Friday, 478 U.S. 385 (1986), *on remand,* 848 F.2d 476 (4th Cir. 1988); Csicseri v. Bowsher, 862 F. Supp. 547 (D.D.C. 1994) (age discrimination), *aff'd,* 67 F.3d 972 (D.C. Cir. 1995); EEOC v. General Tel. Co., 885 F.2d 575 (9th Cir. 1989), *cert. denied,* 498 U.S. 950 (1990); Bridgeport Guardians, Inc. v. City of Bridgeport, 735 F. Supp. 1126 (D. Conn. 1990), *aff'd,* 933 F.2d 1140 (2d Cir.), *cert. denied,* 502 U.S. 924 (1991); Bickerstaff v. Vassar College, 196 F.3d 435, 448–49 (2d Cir. 1999) (sex discrimination); McReynolds v. Sodexho Marriott, 349 F. Supp. 2d 1 (D.D.C. 2004) (race discrimination); Hnot v. Willis Group Holdings Ltd., 228 F.R.D. 476 (S.D.N.Y. 2005) (gender discrimination); Carpenter v. Boeing Co., 456 F.3d 1183 (10th Cir. 2006) (sex discrimination); Coward v. ADT Security Systems, Inc., 140 F.3d 271, 274–75 (D.C. Cir. 1998); Smith v. Virginia Commonwealth Univ., 84 F.3d 672 (4th Cir. 1996) (en banc); Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1184–86 (9th Cir. 2000); Mehus v. Emporia State University, 222 F.R.D. 455 (D. Kan. 2004) (sex discrimination); Guiterrez v. Johnson & Johnson, 2006 WL 3246605 (D.N.J. Nov. 6, 2006) (race discrimination); Morgan v. United Parcel Service, 380 F.3d 459 (8th Cir. 2004) (racial discrimination). *See also* Keith N. Hylton & Vincent D. Rougeau, *Lending Discrimination: Economic Theory, Econometric Evidence, and the Community Reinvestment Act,* 85 Geo. L.J. 237, 238 (1996) ("regression analysis is probably the best empirical tool for uncovering discrimination").

6. *E.g.,* United States v. Brown Univ., 805 F. Supp. 288 (E.D. Pa. 1992) (price fixing of college scholarships), *rev'd,* 5 F.3d 658 (3d Cir. 1993); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224 (3d Cir.), *cert. denied,* 510 U.S. 994 (1993); Ohio v. Louis Trauth Dairy, Inc., 925 F. Supp. 1247 (S.D. Ohio 1996); *In re* Chicken Antitrust Litig., 560 F. Supp. 963, 993 (N.D. Ga. 1980); New York v. Kraft Gen. Foods, Inc., 926 F. Supp. 321 (S.D.N.Y. 1995); Freeland v. AT&T, 238 F.R.D. 130 (S.D.N.Y. 2006); *In re* Pressure Sensitive Labelstock Antitrust Litig., 2007 U.S. Dist. LEXIS 85466 (M.D. Pa. Nov. 19, 2007); *In re* Linerboard Antitrust Litig., 497 F. Supp. 2d 666 (E.D. Pa. 2007) (price fixing by manufacturers of corrugated boards and boxes); *In re* Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348 (N.D. Ga. 2000); *In re* OSB Antitrust Litig., 2007 WL 2253418 (E.D. Pa. Aug. 3, 2007) (price fixing of Oriented Strand Board, also known as "waferboard"); *In re* TFT-LCD (Flat Panel) Antitrust Litig., 267 F.R.D. 583 (N.D. Cal. 2010).

For a broad overview of the use of regression methods in antitrust, see ABA Antitrust Section, Econometrics: Legal, Practical and Technical Issues (John Harkrider & Daniel Rubinfeld, eds. 2005). *See also* Jerry Hausman et al., *Competitive Analysis with Differenciated Products,* 34 Annales D'Économie et de Statistique 159 (1994); Gregory J. Werden, *Simulating the Effects of Differentiated Products Mergers: A Practical Alternative to Structural Merger Policy,* 5 Geo. Mason L. Rev. 363 (1997).

*Reference Guide on Multiple Regression*

tification (under Rule 23).[7] However, there are a range of other applications, including census undercounts,[8] voting rights,[9] the study of the deterrent effect of the death penalty,[10] rate regulation,[11] and intellectual property.[12]

7. In antitrust, the circuits are currently split as to the extent to which plaintiffs must prove that common elements predominate over individual elements. *E.g., compare In Re* Hydrogen Peroxide Litig., 522 F.2d 305 (3d Cir. 2008) *with In Re* Cardizem CD Antitrust Litig., 391 F.3d 812 (6th Cir. 2004). For a discussion of use of multiple regression in evaluating class certification, see Bret M. Dickey & Daniel L. Rubinfeld, *Antitrust Class Certification: Towards an Economic Framework*, 66 N.Y.U. Ann. Surv. Am. L. 459 (2010) and John H. Johnson & Gregory K. Leonard, *Economics and the Rigorous Analysis of Class Certification in Antitrust Cases*, 3 J. Competition L. & Econ. 341 (2007).

8. *See, e.g.,* City of New York v. U.S. Dep't of Commerce, 822 F. Supp. 906 (E.D.N.Y. 1993) (decision of Secretary of Commerce not to adjust the 1990 census was not arbitrary and capricious), *vacated,* 34 F.3d 1114 (2d Cir. 1994) (applying heightened scrutiny), *rev'd sub nom.* Wisconsin v. City of New York, 517 U.S. 565 (1996); Carey v. Klutznick, 508 F. Supp. 420, 432–33 (S.D.N.Y. 1980) (use of reasonable and scientifically valid statistical survey or sampling procedures to adjust census figures for the differential undercount is constitutionally permissible), *stay granted,* 449 U.S. 1068 (1980), *rev'd on other grounds,* 653 F.2d 732 (2d Cir. 1981), *cert. denied,* 455 U.S. 999 (1982); Young v. Klutznick, 497 F. Supp. 1318, 1331 (E.D. Mich. 1980), *rev'd on other grounds,* 652 F.2d 617 (6th Cir. 1981), *cert. denied,* 455 U.S. 939 (1982).

9. Multiple regression analysis was used in suits charging that at-large areawide voting was instituted to neutralize black voting strength, in violation of section 2 of the Voting Rights Act, 42 U.S.C. § 1973 (1988). Multiple regression demonstrated that the race of the candidates and that of the electorate were determinants of voting. *See* Williams v. Brown, 446 U.S. 236 (1980); Rodriguez v. Pataki, 308 F. Supp. 2d 346, 414 (S.D.N.Y. 2004); United States v. Vill. of Port Chester, 2008 U.S. Dist. LEXIS 4914 (S.D.N.Y. Jan. 17, 2008); Meza v. Galvin, 322 F. Supp. 2d 52 (D. Mass. 2004) (violation of VRA with regard to Hispanic voters in Boston); Bone Shirt v. Hazeltine, 336 F. Supp. 2d 976 (D.S.D. 2004) (violations of VRA with regard to Native American voters in South Dakota); Georgia v. Ashcroft, 195 F. Supp. 2d 25 (D.D.C. 2002) (redistricting of Georgia's state and federal legislative districts); Benavidez v. City of Irving, 638 F. Supp. 2d 709 (N.D. Tex. 2009) (challenge of city's at-large voting scheme). For commentary on statistical issues in voting rights cases, see, e.g., *Statistical and Demographic Issues Underlying Voting Rights Cases,* 15 Evaluation Rev. 659 (1991); Stephen P. Klein et al., *Ecological Regression Versus the Secret Ballot,* 31 Jurimetrics J. 393 (1991); James W. Loewen & Bernard Grofman, *Recent Developments in Methods Used in Vote Dilution Litigation,* 21 Urb. Law. 589 (1989); Arthur Lupia & Kenneth McCue, *Why the 1980s Measures of Racially Polarized Voting Are Inadequate for the 1990s,* 12 Law & Pol'y 353 (1990).

10. *See, e.g.,* Gregg v. Georgia, 428 U.S. 153, 184–86 (1976). For critiques of the validity of the deterrence analysis, see National Research Council, Deterrence and Incapacitation: Estimating the Effects of Criminal Sanctions on Crime Rates (Alfred Blumstein et al. eds., 1978); Richard O. Lempert, *Desert and Deterrence: An Assessment of the Moral Bases of the Case for Capital Punishment,* 79 Mich. L. Rev. 1177 (1981); Hans Zeisel, *The Deterrent Effect of the Death Penalty: Facts v. Faith,* 1976 Sup. Ct. Rev. 317; and John Donohue & Justin Wolfers, *Uses and Abuses of Statistical Evidence in the Death Penalty Debate,* 58 Stan. L. Rev. 787 (2005).

11. *See, e.g.,* Time Warner Entertainment Co. v. FCC, 56 F.3d 151 (D.C. Cir. 1995) (challenge to FCC's application of multiple regression analysis to set cable rates), *cert. denied,* 516 U.S. 1112 (1996); Appalachian Power Co. v. EPA, 135 F.3d 791 (D.C. Cir. 1998) (challenging the EPA's application of regression analysis to set nitrous oxide emission limits); Consumers Util. Rate Advocacy Div. v. Ark. PSC, 99 Ark. App. 228 (Ark. Ct. App. 2007) (challenging an increase in nongas rates).

12. *See* Polaroid Corp. v. Eastman Kodak Co., No. 76-1634-MA, 1990 WL 324105, at *29, *62–63 (D. Mass. Oct. 12, 1990) (damages awarded because of patent infringement), *amended by* No.

Multiple regression analysis can be a source of valuable scientific testimony in litigation. However, when inappropriately used, regression analysis can confuse important issues while having little, if any, probative value. In *EEOC v. Sears, Roebuck & Co.*,[13] in which Sears was charged with discrimination against women in hiring practices, the Seventh Circuit acknowledged that "[m]ultiple regression analyses, designed to determine the effect of several independent variables on a dependent variable, which in this case is hiring, are an accepted and common method of proving disparate treatment claims."[14] However, the court affirmed the district court's findings that the "E.E.O.C.'s regression analyses did not 'accurately reflect Sears' complex, nondiscriminatory decision–making processes'" and that the "'E.E.O.C.'s statistical analyses [were] so flawed that they lack[ed] any persuasive value.'"[15] Serious questions also have been raised about the use of multiple regression analysis in census undercount cases and in death penalty cases.[16]

The Supreme Court's rulings in *Daubert* and *Kumho Tire* have encouraged parties to raise questions about the admissibility of multiple regression analyses.[17] Because multiple regression is a well–accepted scientific methodology, courts have frequently admitted testimony based on multiple regression studies, in some cases over the strong objection of one of the parties.[18] However, on some occasions courts have excluded expert testimony because of a failure to utilize a multiple regression methodology.[19] On other occasions, courts have rejected regression

76-1634-MA, 1991 WL 4087 (D. Mass. Jan. 11, 1991); Estate of Vane v. The Fair, Inc., 849 F.2d 186, 188 (5th Cir. 1988) (lost profits were the result of copyright infringement), *cert. denied*, 488 U.S. 1008 (1989); Louis Vuitton Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 576, 664 (S.D.N.Y. 2007) (trademark infringement and unfair competition suit). The use of multiple regression analysis to estimate damages has been contemplated in a wide variety of contexts. *See, e.g.,* David Baldus et al., *Improving Judicial Oversight of Jury Damages Assessments: A Proposal for the Comparative Additur/Remittitur Review of Awards for Nonpecuniary Harms and Punitive Damages,* 80 Iowa L. Rev. 1109 (1995); Talcott J. Franklin, *Calculating Damages for Loss of Parental Nurture Through Multiple Regression Analysis,* 52 Wash. & Lee L. Rev. 271 (1997); Roger D. Blair & Amanda Kay Esquibel, *Yardstick Damages in Lost Profit Cases: An Econometric Approach,* 72 Denv. U. L. Rev. 113 (1994). Daniel Rubinfeld, *Quantitative Methods in Antitrust, in* 1 Issues in Competition Law and Policy 723 (2008).

13. 839 F.2d 302 (7th Cir. 1988).

14. *Id.* at 324 n.22.

15. *Id.* at 348, 351 (quoting EEOC v. Sears, Roebuck & Co., 628 F. Supp. 1264, 1342, 1352 (N.D. Ill. 1986)). The district court commented specifically on the "severe limits of regression analysis in evaluating complex decision-making processes." 628 F. Supp. at 1350.

16. *See* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Sections II.A.3, B.1, in this manual.

17. Daubert v. Merrill Dow Pharms., Inc. 509 U.S. 579 (1993); Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999) (expanding the *Daubert's* application to nonscientific expert testimony).

18. *See* Newport Ltd. v. Sears, Roebuck & Co., 1995 U.S. Dist. LEXIS 7652 (E.D. La. May 26, 1995). *See also* Petruzzi's IGA Supermarkets, *supra* note 6, 998 F.2d at 1240, 1247 (finding that the district court abused its discretion in excluding multiple regression-based testimony and reversing the grant of summary judgment to two defendants).

19. *See, e.g., In re* Executive Telecard Ltd. Sec. Litig., 979 F. Supp. 1021 (S.D.N.Y. 1997).

*Reference Guide on Multiple Regression*

studies that did not have an adequate foundation or research design with respect to the issues at hand.[20]

In interpreting the results of a multiple regression analysis, it is important to distinguish between correlation and causality. Two variables are correlated—that is, associated with each other—when the events associated with the variables occur more frequently together than one would expect by chance. For example, if higher salaries are associated with a greater number of years of work experience, and lower salaries are associated with fewer years of experience, there is a positive correlation between salary and number of years of work experience. However, if higher salaries are associated with less experience, and lower salaries are associated with more experience, there is a negative correlation between the two variables.

A correlation between two variables does not imply that one event causes the second. Therefore, in making causal inferences, it is important to avoid *spurious correlation*.[21] Spurious correlation arises when two variables are closely related but bear no causal relationship because they are both caused by a third, unexamined variable. For example, there might be a negative correlation between the age of certain skilled employees of a computer company and their salaries. One should not conclude from this correlation that the employer has necessarily discriminated against the employees on the basis of their age. A third, unexamined variable, such as the level of the employees' technological skills, could explain differences in productivity and, consequently, differences in salary.[22] Or, consider a patent infringement case in which increased sales of an allegedly infringing product are associated with a lower price of the patented product.[23] This correlation would be spurious if the two products have their own noncompetitive market niches and the lower price is the result of a decline in the production costs of the patented product.

Pointing to the possibility of a spurious correlation will typically not be enough to dispose of a statistical argument. It may be appropriate to give little weight to such an argument absent a showing that the correlation is relevant. For example, a statistical showing of a relationship between technological skills

---

20. *See* City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.2d 548 (11th Cir. 1998), in which the court ruled plaintiffs' regression-based expert testimony inadmissible and granted summary judgment to the defendants. *See also* American Booksellers Ass'n v. Barnes & Noble, Inc., 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001), in which a model was said to contain "too many assumptions and simplifications that are not supported by real-world evidence," *and* Obrey v. Johnson, 400 F.3d 691 (9th Cir. 2005).

21. *See* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section V.B.3, in this manual.

22. *See, e.g.,* Sheehan v. Daily Racing Form Inc., 104 F.3d 940, 942 (7th Cir.) (rejecting plaintiff's age discrimination claim because statistical study showing correlation between age and retention ignored the "more than remote possibility that age was correlated with a legitimate job-related qualification"), *cert. denied,* 521 U.S. 1104 (1997).

23. In some particular cases, there are statistical tests that allow one to reject claims of causality. For a brief description of these tests, which were developed by Jerry Hausman, see Robert S. Pindyck & Daniel L. Rubinfeld, Econometric Models and Economic Forecasts § 7.5 (4th ed. 1997).

and worker productivity might be required in the age discrimination example, above.[24]

Causality cannot be inferred by data analysis alone; rather, one must infer that a causal relationship exists on the basis of an underlying causal theory that explains the relationship between the two variables. Even when an appropriate theory has been identified, causality can never be inferred directly. One must also look for empirical evidence that there is a causal relationship. Conversely, the fact that two variables are correlated does not guarantee the existence of a relationship; it could be that the model—a characterization of the underlying causal theory—does not reflect the correct interplay among the explanatory variables. In fact, the absence of correlation does not guarantee that a causal relationship does not exist. Lack of correlation could occur if (1) there are insufficient data, (2) the data are measured inaccurately, (3) the data do not allow multiple causal relationships to be sorted out, or (4) the model is specified wrongly because of the omission of a variable or variables that are related to the variable of interest.

There is a tension between any attempt to reach conclusions with near certainty and the inherently uncertain nature of multiple regression analysis. In general, the statistical analysis associated with multiple regression allows for the expression of uncertainty in terms of probabilities. The reality that statistical analysis generates probabilities concerning relationships rather than certainty should not be seen in itself as an argument against the use of statistical evidence, or worse, as a reason to not admit that there is uncertainty at all. The only alternative might be to use less reliable anecdotal evidence.

This reference guide addresses a number of procedural and methodological issues that are relevant in considering the admissibility of, and weight to be accorded to, the findings of multiple regression analyses. It also suggests some standards of reporting and analysis that an expert presenting multiple regression analyses might be expected to meet. Section II discusses research design—how the multiple regression framework can be used to sort out alternative theories about a case. The guide discusses the importance of choosing the appropriate specification of the multiple regression model and raises the issue of whether multiple regression is appropriate for the case at issue. Section III accepts the regression framework and concentrates on the interpretation of the multiple regression results from both a statistical and a practical point of view. It emphasizes the distinction between regression results that are statistically significant and results that are meaningful to the trier of fact. It also points to the importance of evaluating the robustness

---

24. *See, e.g.,* Allen v. Seidman, 881 F.2d 375 (7th Cir. 1989) (judicial skepticism was raised when the defendant did not submit a logistic regression incorporating an omitted variable—the possession of a higher degree or special education; defendant's attack on statistical comparisons must also include an analysis that demonstrates that comparisons are flawed). The appropriate requirements for the defendant's showing of spurious correlation could, in general, depend on the discovery process. *See, e.g.,* Boykin v. Georgia Pac. Co., 706 F.2d 1384 (1983) (criticism of a plaintiff's analysis for not including omitted factors, when plaintiff considered all information on an application form, was inadequate).

*Reference Guide on Multiple Regression*

of regression analyses, i.e., seeing the extent to which the results are sensitive to changes in the underlying assumptions of the regression model. Section IV briefly discusses the qualifications of experts and suggests a potentially useful role for court-appointed neutral experts. Section V emphasizes procedural aspects associated with use of the data underlying regression analyses. It encourages greater pretrial efforts by the parties to attempt to resolve disputes over statistical studies.

Throughout the main body of this guide, hypothetical examples are used as illustrations. Moreover, the basic "mathematics" of multiple regression has been kept to a bare minimum. To achieve that goal, the more formal description of the multiple regression framework has been placed in the Appendix. The Appendix is self-contained and can be read before or after the text. The Appendix also includes further details with respect to the examples used in the body of this guide.

# II. Research Design: Model Specification

Multiple regression allows the testifying economist or other expert to choose among alternative theories or hypotheses and assists the expert in distinguishing correlations between variables that are plainly spurious from those that may reflect valid relationships.

## A. What Is the Specific Question That Is Under Investigation by the Expert?

Research begins with a clear formulation of a research question. The data to be collected and analyzed must relate directly to this question; otherwise, appropriate inferences cannot be drawn from the statistical analysis. For example, if the question at issue in a patent infringement case is what price the plaintiff's product would have been but for the sale of the defendant's infringing product, sufficient data must be available to allow the expert to account statistically for the important factors that determine the price of the product.

## B. What Model Should Be Used to Evaluate the Question at Issue?

Model specification involves several steps, each of which is fundamental to the success of the research effort. Ideally, a multiple regression analysis builds on a theory that describes the variables to be included in the study. A typical regression model will include one or more dependent variables, each of which is believed to be causally related to a series of explanatory variables. Because we cannot be certain that the explanatory variables are themselves unaffected or independent of the influence of the dependent variable (at least at the point of initial study), the explanatory

311

variables are often termed *covariates*. Covariates are known to have an association with the dependent or outcome variable, but causality remains an open question.

For example, the theory of labor markets might lead one to expect salaries in an industry to be related to workers' experience and the productivity of workers' jobs. A belief that there is job discrimination would lead one to create a model in which the dependent variable was a measure of workers' salaries and the list of covariates included a variable reflecting discrimination in addition to measures of job training and experience.

In a perfect world, the analysis of the job discrimination (or any other) issue might be accomplished through a controlled "natural experiment," in which employees would be randomly assigned to a variety of employers in an industry under study and asked to fill positions requiring identical experience and skills. In this observational study, where the only difference in salaries could be a result of discrimination, it would be possible to draw clear and direct inferences from an analysis of salary data. Unfortunately, the opportunity to conduct observational studies of this kind is rarely available to experts in the context of legal proceedings. In the real world, experts must do their best to interpret the results of real-world *"quasi-experiments,"* in which it is impossible to control all factors that might affect worker salaries or other variables of interest.[25]

Models are often characterized in terms of parameters—numerical characteristics of the model. In the labor market discrimination example, one parameter might reflect the increase in salary associated with each additional year of prior job experience. Another parameter might reflect the reduction in salary associated with a lack of current on-the-job experience. Multiple regression uses a sample, or a selection of data, from the population (all the units of interest) to obtain estimates of the values of the parameters of the model. An estimate associated with a particular explanatory variable is an estimated regression coefficient.

Failure to develop the proper theory, failure to choose the appropriate variables, or failure to choose the correct form of the model can substantially bias the statistical results—that is, create a systematic tendency for an estimate of a model parameter to be too high or too low.

## 1. Choosing the dependent variable

The variable to be explained, the dependent variable, should be the appropriate variable for analyzing the question at issue.[26] Suppose, for example, that pay dis-

25. In the literature on natural and quasi-experiments, the explanatory variables are characterized as "treatments" and the dependent variable as the "outcome." For a review of natural experiments in the criminal justice arena, see David P. Farrington, *A Short History of Randomized Experiments in Criminology*, 27 Evaluation Rev. 218–27 (2003).

26. In multiple regression analysis, the dependent variable is usually a continuous variable that takes on a range of numerical values. When the dependent variable is categorical, taking on only two or three values, modified forms of multiple regression, such as probit analysis or logit analysis, are

*Reference Guide on Multiple Regression*

crimination among hourly workers is a concern. One choice for the dependent variable is the hourly wage rate of the employees; another choice is the annual salary. The distinction is important, because annual salary differences may in part result from differences in hours worked. If the number of hours worked is the product of worker preferences and not discrimination, the hourly wage is a good choice. If the number of hours worked is related to the alleged discrimination, annual salary is the more appropriate dependent variable to choose.[27]

## 2. *Choosing the explanatory variable that is relevant to the question at issue*

The explanatory variable that allows the evaluation of alternative hypotheses must be chosen appropriately. Thus, in a discrimination case, the variable of interest may be the race or sex of the individual. In an antitrust case, it may be a variable that takes on the value 1 to reflect the presence of the alleged anticompetitive behavior and the value 0 otherwise.[28]

## 3. *Choosing the additional explanatory variables*

An attempt should be made to identify additional known or hypothesized explanatory variables, some of which are measurable and may support alternative substantive hypotheses that can be accounted for by the regression analysis. Thus, in a discrimination case, a measure of the skills of the workers may provide an alternative explanation—lower salaries may have been the result of inadequate skills.[29]

---

appropriate. For an example of the use of the latter, see *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 325 (7th Cir. 1988) (EEOC used logit analysis to measure the impact of variables, such as age, education, job-type experience, and product-line experience, on the female percentage of commission hires).

27. In job systems in which annual salaries are tied to grade or step levels, the annual salary corresponding to the job position could be more appropriate.

28. Explanatory variables may vary by type, which will affect the interpretation of the regression results. Thus, some variables may be continuous and others may be categorical.

29. In *James v. Stockham Valves*, 559 F. 2d 310 (5th Cir. 1977), the Court of Appeals rejected the employer's claim that skill level rather than race determined assignment and wage levels, noting the circularity of defendant's argument. In *Ottaviani v. State University of New York*, 679 F. Supp. 288, 306–08 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 365 (2d Cir. 1989), *cert. denied*, 493 U.S. 1021 (1990), the court ruled (in the liability phase of the trial) that the university showed that there was no discrimination in either placement into initial rank or promotions between ranks, and so rank was a proper variable in multiple regression analysis to determine whether women faculty members were treated differently than men.

However, in *Trout v. Garrett*, 780 F. Supp. 1396, 1414 (D.D.C. 1991), the court ruled (in the damage phase of the trial) that the extent of civilian employees' prehire work experience was not an appropriate variable in a regression analysis to compute back pay in employment discrimination. According to the court, including the prehire level would have resulted in a finding of no sex discrimination, despite a contrary conclusion in the liability phase of the action. *Id. See also* Stuart v. Roache, 951 F.2d 446 (1st Cir. 1991) (allowing only 3 years of seniority to be considered as the result of prior

*Reference Manual on Scientific Evidence*

Not all possible variables that might influence the dependent variable can be included if the analysis is to be successful; some cannot be measured, and others may make little difference.[30] If a preliminary analysis shows the unexplained portion of the multiple regression to be unacceptably high, the expert may seek to discover whether some previously undetected variable is missing from the analysis.[31]

Failure to include a major explanatory variable that is correlated with the variable of interest in a regression model may cause an included variable to be credited with an effect that actually is caused by the excluded variable.[32] In general, omitted variables that are correlated with the dependent variable reduce the probative value of the regression analysis. The importance of omitting a relevant variable depends on the strength of the relationship between the omitted variable and the dependent variable and the strength of the correlation between the omitted variable and the explanatory variables of interest. Other things being equal, the greater the correlation between the omitted variable and the variable of interest, the greater the bias caused by the omission. As a result, the omission of an important variable may lead to inferences made from regression analyses that do not assist the trier of fact.[33]

---

discrimination), *cert. denied*, 504 U.S. 913 (1992). Whether a particular variable reflects "legitimate" considerations or itself reflects or incorporates illegitimate biases is a recurring theme in discrimination cases. *See, e.g.*, Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 677 (4th Cir. 1996) (en banc) (suggesting that whether "performance factors" should have been included in a regression analysis was a question of material fact); *id.* at 681–82 (Luttig, J., concurring in part) (suggesting that the failure of the regression analysis to include "performance factors" rendered it so incomplete as to be inadmissible); *id.* at 690–91 (Michael, J., dissenting) (suggesting that the regression analysis properly excluded "performance factors"); *see also* Diehl v. Xerox Corp., 933 F. Supp. 1157, 1168 (W.D.N.Y. 1996).

30. The summary effect of the excluded variables shows up as a random error term in the regression model, as does any modeling error. *See* Appendix, *infra*, for details. *But see* David W. Peterson, *Reference Guide on Multiple Regression*, 36 Jurimetrics J. 213, 214 n.2 (1996) (review essay) (asserting that "the presumption that the combined effect of the explanatory variables omitted from the model are uncorrelated with the included explanatory variables" is "a knife-edge condition . . . not likely to occur").

31. A very low $R$-squared ($R^2$) is one indication of an unexplained portion of the multiple regression model that is unacceptably high. However, the inference that one makes from a particular value of $R^2$ will depend, of necessity, on the context of the particular issues under study and the particular dataset that is being analyzed. For reasons discussed in the Appendix, a low $R^2$ does not necessarily imply a poor model (and vice versa).

32. Technically, the omission of explanatory variables that are correlated with the variable of interest can cause biased estimates of regression parameters.

33. *See* Bazemore v. Friday, 751 F.2d 662, 671–72 (4th Cir. 1984) (upholding the district court's refusal to accept a multiple regression analysis as proof of discrimination by a preponderance of the evidence, the court of appeals stated that, although the regression used four variable factors (race, education, tenure, and job title), the failure to use other factors, including pay increases that varied by county, precluded their introduction into evidence), *aff'd in part, vacated in part*, 478 U.S. 385 (1986).

Note, however, that in *Sobel v. Yeshiva University*, 839 F.2d 18, 33, 34 (2d Cir. 1988), *cert. denied*, 490 U.S. 1105 (1989), the court made clear that "a [Title VII] defendant challenging the validity of

*Reference Guide on Multiple Regression*

Omitting variables that are not correlated with the variable of interest is, in general, less of a concern, because the parameter that measures the effect of the variable of interest on the dependent variable is estimated without bias. Suppose, for example, that the effect of a policy introduced by the courts to encourage husbands to pay child support has been tested by randomly choosing some cases to be handled according to current court policies and other cases to be handled according to a new, more stringent policy. The effect of the new policy might be measured by a multiple regression using payment success as the dependent variable and a 0 or 1 explanatory variable (1 if the new program was applied; 0 if it was not). Failure to include an explanatory variable that reflected the age of the husbands involved in the program would not affect the court's evaluation of the new policy, because men of any given age are as likely to be affected by the old policy as they are the new policy. Randomly choosing the court's policy to be applied to each case has ensured that the omitted age variable is not correlated with the policy variable.

Bias caused by the omission of an important variable that is related to the included variables of interest can be a serious problem.[34] Nonetheless, it is possible for the expert to account for bias qualitatively if the expert has knowledge (even if not quantifiable) about the relationship between the omitted variable and the explanatory variable. Suppose, for example, that the plaintiff's expert in a sex discrimination pay case is unable to obtain quantifiable data that reflect the skills necessary for a job, and that, on average, women are more skillful than men. Suppose also that a regression analysis of the wage rate of employees (the dependent variable) on years of experience and a variable reflecting the sex of each employee (the explanatory variable) suggests that men are paid substantially more than women with the same experience. Because differences in skill levels have not been taken into account, the expert may conclude reasonably that the

a multiple regression analysis [has] to make a showing that the factors it contends ought to have been included would weaken the showing of salary disparity made by the analysis," by making a specific attack and "a showing of relevance for each particular variable it contends . . . ought to [be] includ[ed]" in the analysis, rather than by simply attacking the results of the plaintiffs' proof as inadequate for lack of a given variable. *See also* Smith v. Virginia Commonwealth Univ., 84 F.3d 672 (4th Cir. 1996) (en banc) (finding that whether certain variables should have been included in a regression analysis is a question of fact that precludes summary judgment); Freeland v. AT&T, 238 F.R.D. 130, 145 (S.D.N.Y. 2006) ("Ordinarily, the failure to include a variable in a regression analysis will affect the probative value of the analysis and not its admissibility").

Also, in *Bazemore v. Friday,* the Court, declaring that the Fourth Circuit's view of the evidentiary value of the regression analyses was plainly incorrect, stated that "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility. Importantly, it is clear that a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiff's case." 478 U.S. 385, 400 (1986) (footnote omitted).

34. *See also* David H. Kaye & David A. Freedman, Reference Guide on Statistics, Section V.B.3, in this manual.

*Reference Manual on Scientific Evidence*

wage difference measured by the regression is a conservative estimate of the true discriminatory wage difference.

The precision of the measure of the effect of a variable of interest on the dependent variable is also important.[35] In general, the more complete the explained relationship between the included explanatory variables and the dependent variable, the more precise the results. Note, however, that the inclusion of explanatory variables that are irrelevant (i.e., not correlated with the dependent variable) reduces the precision of the regression results. This can be a source of concern when the sample size is small, but it is not likely to be of great consequence when the sample size is large.

## 4. Choosing the functional form of the multiple regression model

Choosing the proper set of variables to be included in the multiple regression model does not complete the modeling exercise. The expert must also choose the proper form of the regression model. The most frequently selected form is the linear regression model (described in the Appendix). In this model, the magnitude of the change in the dependent variable associated with the change in any of the explanatory variables is the same no matter what the level of the explanatory variables. For example, one additional year of experience might add $5000 to salary, regardless of the previous experience of the employee.

In some instances, however, there may be reason to believe that changes in explanatory variables will have differential effects on the dependent variable as the values of the explanatory variables change. In these instances, the expert should consider the use of a nonlinear model. Failure to account for nonlinearities can lead to either overstatement or understatement of the effect of a change in the value of an explanatory variable on the dependent variable.

One particular type of nonlinearity involves the interaction among several variables. An interaction variable is the product of two other variables that are included in the multiple regression model. The interaction variable allows the expert to take into account the possibility that the effect of a change in one variable on the dependent variable may change as the level of another explanatory variable changes. For example, in a salary discrimination case, the inclusion of a term that interacts a variable measuring experience with a variable representing the sex of the employee (1 if a female employee; 0 if a male employee) allows the expert to test whether the sex differential varies with the level of experience. A significant negative estimate of the parameter associated with the sex variable suggests that inexperienced women are discriminated against, whereas a significant

---

35. A more precise estimate of a parameter is an estimate with a smaller standard error. *See* Appendix, *infra,* for details.

*Reference Guide on Multiple Regression*

negative estimate of the interaction parameter suggests that the extent of discrimination increases with experience.[36]

Note that insignificant coefficients in a model with interactions may suggest a lack of discrimination, whereas a model without interactions may suggest the contrary. It is especially important to account for interaction terms that could affect the determination of discrimination; failure to do so may lead to false conclusions concerning discrimination.

## 5. Choosing multiple regression as a method of analysis

There are many multivariate statistical techniques other than multiple regression that are useful in legal proceedings. Some statistical methods are appropriate when nonlinearities are important;[37] others apply to models in which the dependent variable is discrete, rather than continuous.[38] Still others have been applied predominantly to respond to methodological concerns arising in the context of discrimination litigation.[39]

It is essential that a valid statistical method be applied to assist with the analysis in each legal proceeding. Therefore, the expert should be prepared to explain why any chosen method, including multiple regression, was more suitable than the alternatives.

---

36. For further details concerning interactions, see the Appendix, *infra*. Note that in *Ottaviani v. State University of New York*, 875 F.2d 365, 367 (2d Cir. 1989), *cert. denied*, 493 U.S. 1021 (1990), the defendant relied on a regression model in which a dummy variable reflecting gender appeared as an explanatory variable. The female plaintiff, however, used an alternative approach in which a regression model was developed for men only (the alleged protected group). The salaries of women predicted by this equation were then compared with the actual salaries; a positive difference would, according to the plaintiff, provide evidence of discrimination. For an evaluation of the methodological advantages and disadvantages of this approach, see Joseph L. Gastwirth, *A Clarification of Some Statistical Issues in* Watson v. Fort Worth Bank and Trust, 29 Jurimetrics J. 267 (1989).

37. These techniques include, but are not limited to, piecewise linear regression, polynomial regression, maximum likelihood estimation of models with nonlinear functional relationships, and autoregressive and moving-average time-series models. *See, e.g.*, Pindyck & Rubinfeld, *supra* note 23, at 117–21, 136–37, 273–84, 463–601.

38. For a discussion of probit analysis and logit analysis, techniques that are useful in the analysis of qualitative choice, see *id.* at 248–81.

39. The correct model for use in salary discrimination suits is a subject of debate among labor economists. As a result, some have begun to evaluate alternative approaches, including urn models (Bruce Levin & Herbert Robbins, *Urn Models for Regression Analysis, with Applications to Employment Discrimination Studies*, Law & Contemp. Probs., Autumn 1983, at 247) and, as a means of correcting for measurement errors, reverse regression (Delores A. Conway & Harry V. Roberts, *Reverse Regression, Fairness, and Employment Discrimination*, 1 J. Bus. & Econ. Stat. 75 (1983)). *But see* Arthur S. Goldberger, *Redirecting Reverse Regressions*, 2 J. Bus. & Econ. Stat. 114 (1984); Arlene S. Ash, *The Perverse Logic of Reverse Regression, in* Statistical Methods in Discrimination Litigation 85 (D.H. Kaye & Mikel Aickin eds., 1986).