# EXHIBIT 22

CONFIDENTIAL ATTORNEYS EYES ONLY

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2         FOR THE CITY AND COUNTY OF SAN FRANCISCO

3

4             DOCKET NUMBER:  CGC 14-538451

5           CONSOLIDATED WITH CGC 18-565398

   ---------------------------)

6   UFCW & EMPLOYERS BENEFIT    )

7   TRUST                       )

8             Plaintiff(s),     )

9   VS                          )

10  SUTTER HEALTH, ET AL.       )

11                              )

12            Defendant(s).     )

   ---------------------------)

13          CONFIDENTIAL ATTORNEYS EYES ONLY

14      VIDEOTAPED DEPOSITION OF PAUL PANDOLFO

15  DATE:      September 11, 2019

16  TIME:      9:00 a.m.

17  HELD AT:  Shipman & Goodwin

18              One Constitution Plaza

19              Hartford, Connecticut

20

21  Reporter:

22  JENNY C. EBNER, RPR/CLR/LSR 00030

23  JOB No. 3512155

24

25  PAGES 1 - 287

                                        Page 1

```
 1   APPEARANCES:
 2
 3   REPRESENTING THE PLAINTIFF:
     FARELLA BRAUN & MARTEL, LLP
 4   Russ Building
     235 Montgomery Street
 5   San Francisco, CA 94104
     415.954.4400
 6   jreicher@fbm.com
 7   By:  JANICE W. REICHER, ESQ.
 8
     REPRESENTING THE DEFENDANT SUTTER HEALTH:
 9   JONES DAY
     717 Texas
10   Suite 3300
     Houston, TX 77002
11   832.239.3827
12   chdomingo@jonesday.com
     By:  CHRISTOPHER H. DOMINGO, ESQ.
13
     REPRESENTING UNITED HEALTHCARE SERVICES, INC.:
14   BOIES SCHILLER FLEXNER, LLP
     44 Montgomery Street
15   41st Floor
     San Francisco, CA 94104
16   415.293.6800
     mpritt@bsflp.com
17   By:  MAXWELL V. PRITT, ESQ.
18
     IN ATTENDANCE:
19   SUSAN MURPHY, ESQ.
     & KENNETH FETTERMAN, ESQ.
20   * LESLIE SCHAFER
     * RYAN WONG, ESQ.
21   * JEAN KIM
22   NIKHIL GUPTA
23   SARAH ABRAHAM
24   ED GIOVANNI, Videographer
25   * Appearing by telephone
```

Page 2

CONFIDENTIAL ATTORNEYS EYES ONLY

```
1                              PAUL PANDOLFO,
2                     called as a witness, being duly
3                     sworn or affirmed by Jenny C. Ebner,
4                     RPR, CSR, CLR, a Notary Public in and
5                     for the State of Connecticut,
6                     testified as follows:
7
8                       DIRECT EXAMINATION
9
10   BY MR. DOMINGO:
11        Q    Good morning, Mr. Pandolfo.  How are you?
12        A    Good morning.
13        Q    Will you please state your full name for
14   the record?
15        A    Paul David Pandolfo.
16        Q    Can you spell your last name, please?
17        A    P-a-n-d-o-l-f-o.
18        Q    We met a few minutes ago, but for the
19   record I represent Sutter Health in the lawsuit
20   that we are about, that we are here about today,
21   and I will be taking your deposition.  Okay?
22             Where are you employed?
23        A    At United Healthcare.
24        Q    And what is your title?
25        A    My title is Senior Manager of Data
```

Page 9

CONFIDENTIAL ATTORNEYS EYES ONLY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 20

CONFIDENTIAL ATTORNEYS EYES ONLY



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 21

CONFIDENTIAL ATTORNEYS EYES ONLY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page  77

CONFIDENTIAL ATTORNEYS EYES ONLY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 78

CONFIDENTIAL ATTORNEYS EYES ONLY



Page 79



Page 80

CONFIDENTIAL ATTORNEYS EYES ONLY

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19          COURT REPORTER:  Wait a minute.  Hold
20     it.  You can't talk on top of each other.
21          MS. REICHER:  -- calls for
22     privileged --
23          COURT REPORTER:  I'm sorry, ma'am,
24     you're going to have to say it again.
25          MS. REICHER:  Objection; may call for
```

Page 81

**PAUL PANDOLFO-CONFIDENTIAL**

ERRATA SHEET

Attach to deposition of:     Paul Pandolfo

Taken on:                    September 11, 2019

In the matter of:            *UEBT v. Sutter Health, CGC 14-538451 & 18-565398*

Reasons: TE = Transcription Error, C = Correction, MW = Misspelled word, CE = Capitalization error, M = Missing Words, D = Deletion of extra word(s), RW = Repeated word

| PAGE | LINE NO. | CHANGE | REASON |
|------|----------|--------|--------|
| 21 | 8 | There is self-funded business that is | TE |
| 23 | 16 | refers to the broad universe of processing | M |
| 35 | 6 | days is tape cartridge | TE |
| 44 | 12 | processing system | TE |
| 75 | 24 | In the extract logic in this code, I am not. | M |
| 119 | 8 | Data production.  Let alone what it might be today. | M |
| 156 | 13 | It appears, I think, plausible | TE |
| 162 | 21 | definitionally,  specification-wise. | MW |
| 169 | 25 | be one reason, that there was an adjustment | C |
| 172 | 7 | The claim paid date would commonly indicate | TE |
| 174 | 16 | They were broader in the 2018 production | TE |
| 194 | 7 | business operation | D |
| 208 | 7 | extraction as a kind of supplement of  more recently | TE |
| 258 | 9 | is a reflection of benefit determination | MW |

I, **Paul Pandolfo,** having duly sworn, do hereby certify that I have read the transcript of my **September 11, 2019** deposition in the above-captioned matter, and that the same is a true and correct transcript of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance set forth above.

**Paul Pandolfo**

2/19/2020

**Date**

CONFIDENTIAL ATTORNEYS EYES ONLY

```
 1                  STATE OF CONNECTICUT
 2           I, JENNY C. EBNER, a Registered
    Professional Reporter/Commissioner within and for
 3  the State of Connecticut, do hereby certify that
    pursuant to Notice I took the deposition of PAUL
 4  PANDOLFO, on September 11, 2019, at the offices of
    Shipman Goodwin, One Constitution Plaza, Hartford,
 5  Connecticut.
 6           I further certify that the above named
    deponent was by me first duly sworn to testify to
 7  the truth and nothing but the truth concerning his
    knowledge in the matter of the case of UFCW &
 8  EMPLOYERS BENEFIT TRUST VS SUTTER HEALTH, ET AL.,
    now pending in the Superior Court of the State of
 9  California for the City and County of San
    Francisco.
10
             I further certify that the within
11  testimony was taken by me stenographically and
    reduced to typewritten form under my direction by
12  means of COMPUTER ASSISTED TRANSCRIPTION; and I
    further certify that said deposition is a true
13  record of the testimony given by said witness.
14           I further certify that I am neither
    counsel for, related to, nor employed by any of the
15  parties to the action in which this deposition was
    taken; and further, that I am not a relative or
16  employee of any attorney or counsel employed by the
    parties hereto, nor financially or otherwise
17  interested in the outcome of the action.
18       WITNESS my hand and seal this 16th day of
19  September, 2019.
20
21
22
23       Jenny C. Ebner, RPR, CSR, CLR,
24
25  Certified Connecticut Reporter Number:  00030


                                        Page 287
```

**EXHIBIT 23**

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO DIVISION

 4

 5   DJENEBA SIDIBE, JERRY JANKOWSKI,

 6   SUSAN HANSEN, DAVID HERMAN,

 7   CAROLINE STEWART, OPTIMUM GRAPHICS,

 8   INC., AND JOHNSON POOL & SPA, ON

 9   BEHALF OF THEMSELVES AND ALL OTHERS

10   SIMILARLY SITUATED,

11          PLAINTIFFS,

12      vs.                        NO. 3:12-CV-04854-LB

13   SUTTER HEALTH,

14          DEFENDANT.

     _____/

15        **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

16             **PURSUANT TO PROTECTIVE ORDER**

17

18          VIDEOTAPED DEPOSITION OF CLYDE MARTIN

19           *VIA REMOTE COUNSEL VIDEOCONFERENCE*

20                 MONDAY, APRIL 5, 2021

21                      VOLUME I

22

     STENOGRAPHICALLY REPORTED BY:

23   MEGAN F. ALVAREZ, RPR, CSR No. 12470

24   JOB NO. 4528433

25   PAGES 1 - 145
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4

5    DJENEBA SIDIBE, JERRY JANKOWSKI,

6    SUSAN HANSEN, DAVID HERMAN,

7    CAROLINE STEWART, OPTIMUM GRAPHICS,

8    INC., AND JOHNSON POOL & SPA, ON

9    BEHALF OF THEMSELVES AND ALL OTHERS

10   SIMILARLY SITUATED,

11          PLAINTIFFS,

12      vs.                        NO. 3:12-CV-04854-LB

13   SUTTER HEALTH,

14          DEFENDANT.

15   _____/

16

17

18          Videotaped Videoconference Deposition of CLYDE

19   MARTIN, Volume I, taken on behalf of Defendant, VIA

20   REMOTE COUNSEL.  Deponent testifying from Lancaster,

21   Pennsylvania, beginning at 11:00 a.m. and ending at

22   3:01 p.m. on Monday, April 5, 2021, before

23   Megan F. Alvarez, RPR, Certified Shorthand Reporter

24   No. 12470.

25

                                              Page 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    APPEARANCES: (ALL PARTIES APPEARING VIA VIDEOCONFERENCE)

2

3    FOR THE SIDIBE PLAINTIFFS:

4              BY:  DAVID BROWNSTEIN, ESQ.

5              FARMER BROWNSTEIN JAEGER GOLDSTEIN & KLEIN

6              235 MONTGOMERY STREET, SUITE 835

7              SAN FRANCISCO, CALIFORNIA 94111

8              415.962.2873

9              DBROWNSTEIN@FBJGK.COM

10

11   FOR DEFENDANTS:

12             BY:  CAROLINE O. VAN WAGONER, ESQ.

13             JONES DAY

14             555 CALIFORNIA STREET, 26TH FLOOR

15             SAN FRANCISCO, CALIFORNIA 94104

16             858.314.1200

17             CVANWAGONER@JONESDAY.COM

18

19

20

21

22

23

24

25
```

Page 3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    APPEARANCES (CONTINUED):

 2

 3    FOR THE DEPONENT:

 4              BY:  KATHERINE TREFZ, ESQ.

 5                   KATIE O'BRIEN, ESQ.

 6              WILLIAMS & CONNOLLY LLP

 7              725 12TH STREET NW

 8              WASHINGTON DC 20005

 9              202.434.5000

10              KTREFZ@WC.COM

11              KOBRIEN@WC.COM

12

13    THE VIDEO OPERATOR:

14              JOANN YAGER, VERITEXT

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | MS. VAN WAGONER:  My name is Caroline | 11:01:37 |
| 2 | Van Wagoner from the Jones Day law firm, and I | 11:01:39 |
| 3 | represent Sutter Health. | 11:01:42 |
| 4 | MR. BROWNSTEIN:  I'm David Brownstein from | 11:01:44 |
| 5 | the Farmer Brownstein law firm on behalf of the | 11:01:46 |
| 6 | plaintiffs and the certified class. | 11:01:49 |
| 7 | MS. O'BRIEN:  Katlin O'Brien, on behalf of | 11:01:52 |
| 8 | the witness, from Williams & Connolly.  I'm also | 11:01:55 |
| 9 | here with my colleague Katie Trefz, also from | 11:01:57 |
| 10 | Williams & Connolly. | 11:01:58 |
| 11 | THE VIDEO OPERATOR:  The witness may be | 11:02:00 |
| 12 | sworn in. | 11:02:00 |
| 13 | CLYDE MARTIN, | 11:02:00 |
| 14 | called as a witness by the Defendant, having | 11:02:00 |
| 15 | been first duly sworn, was examined and | 11:02:00 |
| 16 | testified as follows: | 11:02:00 |
| 17 | --o0o-- | 11:02:00 |
| 18 | EXAMINATION | 11:02:22 |
| 19 | BY MS. VAN WAGONER: | 11:02:23 |
| 20 | Q.   Hi, Mr. Martin.  Good morning.  My name is | 11:02:25 |
| 21 | Caroline Van Wagoner.  I represent Sutter Health in | 11:02:30 |
| 22 | this litigation that was filed by the plaintiffs, as | 11:02:32 |
| 23 | represented by Mr. Brownstein here.  And I'll be the | 11:02:35 |
| 24 | one taking your deposition today. | 11:02:39 |
| 25 | A.   Okay. | 11:02:40 |

Page 10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | the data production not including the COB code? | 13:03:04 |
| 2 | MR. BROWNSTEIN:  Object to the form. | 13:03:11 |
| 3 | THE WITNESS:  Do you mean the -- the fact | 13:03:14 |
| 4 | that it was not in the previous one, in the one | 13:03:17 |
| 5 | pulled in November, or... | 13:03:20 |
| 6 | BY MS. VAN WAGONER: | 13:03:21 |
| 7 | | 13:03:24 |
| 8 | | 13:03:26 |
| 9 | | 13:03:30 |
| 10 | | 13:03:33 |
| 11 | | 13:03:36 |
| 12 | | 13:03:46 |
| 13 | | 13:03:49 |
| 14 | | 13:03:56 |
| 15 | | 13:03:59 |
| 16 | | 13:04:02 |
| 17 | | 13:04:05 |
| 18 | | 13:04:12 |
| 19 | | 13:04:16 |
| 20 | | 13:04:20 |
| 21 | | 13:04:23 |
| 22 | | 13:04:31 |
| 23 | | 13:04:37 |
| 24 | | 13:04:38 |
| 25 | | 13:04:39 |

Page 80

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | ████████████████████████████ | 13:04:42 |
| 2 | ████████████████████████████ | 13:04:45 |
| 3 | ████████████████████████████ | 13:04:48 |
| 4 | Q.    Are you aware that Aetna provided a | 13:04:52 |
| 5 | crosswalk to try to figure out the issue with the | 13:04:56 |
| 6 | missing COB code? | 13:05:00 |
| 7 | MR. BROWNSTEIN:  Object to the form. | 13:05:03 |
| 8 | THE WITNESS:  Correct.  Correct. | 13:05:03 |
| 9 | MS. VAN WAGONER:  I'm going to introduce | 13:05:09 |
| 10 | now an exhibit marked Exhibit 6317, which is the | 13:05:12 |
| 11 | March 5th, 2021, production letter from Williams & | 13:05:19 |
| 12 | Connolly, Aetna's counsel, to plaintiff's and | 13:05:28 |
| 13 | Sutter. | 13:05:31 |
| 14 | Let me know when you have the document. | 13:05:46 |
| 15 | A.    Which was the name, again?  Or the number? | 13:05:47 |
| 16 | Q.    Exhibit 6317. | 13:05:49 |
| 17 | A.    Okay. | 13:05:52 |
| 18 | Q.    It should have a yellow stamp in the | 13:05:53 |
| 19 | bottom right-hand corner. | 13:05:55 |
| 20 | A.    Okay. | 13:05:56 |
| 21 | (Whereupon Exhibit 6317 was marked for | 13:05:57 |
| 22 | identification.) | 13:05:57 |
| 23 | BY MS. VAN WAGONER: | 13:05:58 |
| 24 | Q.    And this letter says, in the first | 13:05:58 |
| 25 | paragraph, the third sentence:  "This data is | 13:06:02 |

Page 81

## ERRATA FORM FOR CLYDE MARTIN (AETNA)

*Djeneba Sidibe v. Sutter Health*, No. 3:12-cv-4854-LB (N.D. Cal.)

Deposition Date: April 5, 2021

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 11 | 10 | Add "Project" between "Business" and "Program" | Clarification |
| 38 | 23 | Add "?" after claims | Clarification |
| 58 | 16 | Change "plain" to "claim" | Clarification |
| 76 | 2 | add "do" after "to" | Clarification |

Under penalty of perjury, I have read my deposition in this matter and entered any changes in form or substance as reflected above.

_04-26-2021_____
DATE

_____
CLYDE MARTIN

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1              CERTIFICATE OF REPORTER

2              I, the undersigned, a Certified Shorthand

3    Reporter of the State of California, do hereby

4    certify:

5              That the foregoing proceedings were taken

6    before me at the time and place herein set forth;

7    that any witnesses in the foregoing proceedings,

8    prior to testifying, were administered an oath; that

9    a verbatim record of the proceedings was made by me

10   using machine shorthand, which was thereafter

11   transcribed under my direction; and that the

12   foregoing is an accurate transcription thereof.

13             Further, that if the foregoing pertains to

14   the original transcript of a deposition in a federal

15   case, before completion of the proceedings, review

16   of the transcript [X] was [ ] was not requested.

17             I further certify that I am neither

18   financially interested in the action, nor a relative

19   or employee of any attorney of any party to this

20   action.

21             IN WITNESS WHEREOF, I have this date

22   subscribed my name this 8th day of April, 2021.

23

24        MEGAN F. ALVAREZ

25        CSR No. 12470, RPR
```

Page 145

# EXHIBIT 24

Page 1

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4    DJENEBA SIDIBE, JERRY              )

5    JANKOWSKI, SUSAN HANSEN,           )   Case No.

6    DAVID HERMAN, CAROLINE             )   C 12-04854 LNB

7    STEWART, OPTIMUM GRAPHICS,         )

8    INC., and JOHNSON POOL, &          )

9    SPA, on Behalf of                  )   Pages 1-202

10   Themselves and All Others         )

11   Similarly Situated,               )

12          Plaintiffs,                )

13             vs.                     )

14   Sutter Health,                    )

15          Defendant.                 )

16          PORTIONS OF THIS TRANSCRIPT CONTAIN

17          STRATEGIC COMPETITIVE DATA TO BE

18          DESIGNATED BY HEALTH NET'S COUNSEL

19

20     VIDEOTAPED DEPOSITION OF HEALTH NET, INC.'S

21        RULE 30(b)6 DESIGNEE ROBERT KUEKS

22            TUESDAY, JULY 31, 2018

23   Reported by:  BRENDA R. COUNTZ, RPR-CRR

24   CSR NO. 12563

25   JOB NO. 144920

1

2

3

4

5

6

7

8

9

10          Videotaped deposition of HEALTH NET,

11    INC.'S RULE 30(b)6 DESIGNEE ROBERT KUEKS taken at

12    the law firm of Jones Day, 555 South Flower

13    Street, Fiftieth Floor, Los Angeles, California,

14    on Tuesday, July 31, 2018, before Brenda R.

15    Countz, CSR No. 12563.

16

17

18

19

20

21

22

23

24

25

1    Farmer Brownstein Jaeger & Goldstein, on behalf

2    of the Sidibe plaintiffs and the proposed class.

3              MR. HOLMER:  Andrew Holmer of Crowell &

4    Moring on behalf of Health Net and the witness.

5              THE VIDEOGRAPHER:  Will the court

6    reporter please swear in the witness.

7

8                        ROBERT KUEKS,

9          having been first duly sworn, was

10         examined and testified as follows:

11

12                     EXAMINATION

13   BY MR. ABRAHAM:

14        Q.   Please state your full name for the

15   record.

16        A.   Robert Kueks.

17        Q.   Have you ever had your deposition taken

18   before?

19        A.   I have.

20        Q.   On how many occasions?

21        A.   One.

22        Q.   What was the circumstance that caused

23   your deposition to be taken?

24        A.   It was a long time ago so I cannot be

25   sure but I think it was a class action suit

Page 27

1       Q.    And when you say a standard medical

2   benefit, what do you mean by that?

3       A.    Meaning it does not include

4   chiropractic, acupuncture, dental, pharmacy.

5   Those are the costs that go into it.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20       Q.    Would the model that we are currently

21   discussing include HMOs, elect open access manual

22   written formula?  Does this formula apply to all

23   of the HMO products offered by Health Net in

24   California for large groups?

25       A.    I'm sorry, can you restate the

1    have -- do not have excessive amounts of margin

2    are adequate and reasonable.

3

4

5

6

7

8

9

10

11

12

13

14

15

16        Q.    And this requirement that rates be

17   actuarially sound in the aggregate, as far as you

18   understand did that apply to Health Net's small

19   group book of business?

20        MR. HOLMER:  Objection to the extent it

21   calls for a legal conclusion.

22        THE WITNESS:  We needed an actuarial

23   opinion for a small group and individual filings.

24   BY MR. BROWNSTEIN:

25        Q.    And I take it when you worked on small

Page 200

DECLARATION

1

2

3      I hereby declare I am the deponent in

4  the within matter; that I have read the foregoing

5  deposition and know the contents thereof, and I

6  declare that the same is true of my knowledge,

7  except as to the matters which are therein stated

8  upon my information or belief, and as to those

9  matters, I believe it to be true.

10      I declare under the penalties of perjury

11  of the State of California that the foregoing is

12  true and correct.

13      Executed on the_____day of_____,

14  2018, at_____, California.

15

16

17

18      _____

19      W I T N E S S

20

21

22

23

24

25

Page 201

1    STATE OF CALIFORNIA      )   SS

2    COUNTY OF LOS ANGELES    )

3            I, BRENDA R. COUNTZ, Certified Shorthand

4    Reporter No. 12563 for the State of California,

5    do hereby certify:

6            That prior to being examined, the

7    witness named in the foregoing deposition was

8    duly sworn to testify the truth, the whole truth,

9    and nothing but the truth;

10           That said deposition was taken down by

11   me in shorthand at the time and place therein

12   named and thereafter transcribed and that the

13   same is a true, correct, and complete transcript

14   of said proceedings.

15           Before completion of the deposition,

16   review of the transcript [X] was [  ] was not

17   requested.  If requested, any changes made by the

18   deponent during the period allowed are appended

19   hereto.

20           I further certify that I am not

21   interested in the outcome of the action.

22   Witness my hand this 3rd day of August, 2018.

23           *Brenda R. Countz*

24   _____

25           Brenda R. Countz, CSR No. 12563

# EXHIBIT 25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO DIVISION

 4

 5   DJENEBA SIDIBE, JERRY      )
     JANKOWSKI, SUSAN HANSEN,   ) Case No. 3:12-CV-4854-LB
 6   DAVID HERMAN, CAROLINE     )
     STEWART, OPTIMUM GRAPHICS,)
 7   INC., and JOHNSON POOL &   )
     SPA, on Behalf of          )
 8   Themselves and All Others  )
     Similarly Situated,        )
 9                              )
                 Plaintiffs,    )
10                              )
         vs.                    )
11                              )
     SUTTER HEALTH,             )
12                              )
                 Defendants.    )
13   _____)

14

              HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
15
                 STRATEGIC, COMPETITIVE DATA - UW
16

17                 DEPOSITION OF MAURICE COUSER

18                     Irvine, California

19                 Wednesday, August 15, 2018

20

21              REPORTED BY:  Michelle Milan Fulmer
                   CSR No. 6942, RPR, CRR, CRC
22

23

24

25   PAGES 1 - 335


                                            Page 1
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN FRANCISCO DIVISION

 4

 5    DJENEBA SIDIBE, JERRY      )
      JANKOWSKI, SUSAN HANSEN,   ) Case No. 3:12-CV-4854-LB
 6    DAVID HERMAN, CAROLINE     )
      STEWART, OPTIMUM GRAPHICS, )
 7    INC., and JOHNSON POOL &   )
      SPA, on Behalf of          )
 8    Themselves and All Others  )
      Similarly Situated,        )
 9                               )
                  Plaintiffs,    )
10                               )
         vs.                     )
11                               )
      SUTTER HEALTH,             )
12                               )
                  Defendants.    )
13    _____)

14

15

16        Deposition of MAURICE COUSER, taken before

17    Michelle Milan Fulmer, a Certified Shorthand Reporter for

18    the State of California, with principal office in the

19    County of Orange, commencing at 9:01 a.m., Wednesday,

20    August 15, 2018, in the law offices of Jones Day,

21    3161 Michelson Drive, Suite 800, Irvine, California.

22

23

24

25

                                                   Page 2
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                    MAURICE COUSER,

 2    called as a witness by and on behalf of the

 3    Defendant, having been first duly sworn by the

 4    Certified Shorthand Reporter, was examined and

 5    testified as follows:

 6

 7                    EXAMINATION

 8    BY MR. WRIGHT:

 9       Q    Mr. Couser, can you state and spell your

10    name for the record?                          09:04:16

11       A    Maurice Couser.  M-a-u-r-i-c-e, last name

12    C-o-u-s-e-r.

13       Q    Have you ever been deposed before,

14    Mr. Couser?

15       A    No, I have not.                        09:04:27

16       Q    Just to go over some ground rules.

17            I'll be asking you questions, of course.

18    Your attorney may object to questions.  You can

19    still answer the questions, even when they object.

20            Do you understand?                     09:04:39

21       A    Yes.

22       Q    If you don't understand a question, please

23    let me know and I'll try to clarify.

24            If you answer, I'll assume that you

25    understood the question.                       09:04:47
```

Page 12

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page  72

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page  73

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    network?
 2         A    That could be one of the scenarios, yes.
 3         Q    And what would be the other scenarios?
 4         A    We have other network products that we
 5    offer besides Full network and Focus.  We have some    10:38:50
 6    other network products as well.
 7         Q    What are the other network products that
 8    you're referring to?
 9         A    So, on HMO, I would be referring to our
10    Full network.  We have a network called               10:39:06
11    Significant Value Advantage, we have another network
12    called Signature Alliance, and we have a network
13    which would be Signature Focus.
14         Q    Is Signature Focus the Focus network --
15         A    Yes.                                         10:39:28
16         Q    -- we've been discussing?
17              And what are the differences between the
18    Full network, Signature Value Advantage, and
19    Signature Value -- I'm sorry.  I got lost in the
20    different Signatures there.                            10:39:51
21              It's Signature Value Advantage,
22    Signature Value Alliance --
23         A    Yes.
24         Q    -- and then Signature Value Focus?
25         A    Yes.                                         10:40:02
```

Page 78

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          CERTIFICATION OF COURT REPORTER

2                    FEDERAL JURAT

3

4          I, the undersigned, a Certified Shorthand

5    Reporter of the State of California do hereby certify:

6              That the foregoing proceedings were taken

7    before me at the time and place herein set forth; that

8    any witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is an accurate

13   transcription thereof.

14              That before completion of the deposition, a

15   review of the transcript was not requested.

16          I further certify that I am neither

17   financially interested in the action nor a relative or

18   employee of any attorney of any of the parties.

19          IN WITNESS WHEREOF, I have this date

20   subscribed my name:  Date:  August 17, 2018.

21

22

23

24              Michelle Milan Fulmer

25              CSR 6942, RPR, CRR, CRC

                                      Page 335

# EXHIBIT 26

CONFIDENTIAL – ATTORNEYS'S EYES ONLY

Page 1

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA
                    COUNTY OF SAN FRANCISCO
2                        ---oOo---

3    UFCW & EMPLOYERS BENEFIT
     TRUST, et al.,
4                   Plaintiffs,

5     vs.                          No.  CGC-14-538451

6    SUTTER HEALTH, et al.,
                    Defendants.
7    _____/
     PEOPLE OF THE STATE OF
8    CALIFORNIA, ex rel., XAVIER
     BECERRA,
9                   Plaintiffs,

10   vs.                           No.  CGC-18-565398

11   SUTTER HEALTH, et al.,
                    Defendants.
12   _____/

13
                  UNITED STATES DISTRICT COURT
14              NORTHERN DISTRICT OF CALIFORNIA
                        ---oOo---
15
     DJENEBA SIDIBE, et al.,
16                  Plaintiffs,

17   vs.                           3:12-cv-4854-LB

18   SUTTER HEALTH,
                    Defendants.
19   _____/

20
               CONFIDENTIAL ATTORNEYS'S EYES ONLY
21          VIDEOTAPED DEPOSITION OF STEVEN SCHNEIDER
                  SAN FRANCISCO, CALIFORNIA
22                 THURSDAY, JULY 25, 2018

23

24   BY:  ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~

25        CSR LICENSE NO. 9830      JOB NO. 144203

CONFIDENTIAL – ATTORNEYS'S EYES ONLY

Page 2

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA
                        COUNTY OF SAN FRANCISCO
 2                           ---oOo---

 3    UFCW & EMPLOYERS BENEFIT
      TRUST, et al.,
 4              Plaintiffs,

 5     vs.                              No.  CGC-14-538451

 6    SUTTER HEALTH, et al.,
                Defendants.
 7    _____/
      PEOPLE OF THE STATE OF
 8    CALIFORNIA, ex rel., XAVIER
      BECERRA,
 9              Plaintiffs,

10    vs.                              No.  CGC-18-565398

11    SUTTER HEALTH, et al.,
                Defendants.
12    _____/

13              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
14                           ---oOo---

15    DJENEBA SIDIBE, et al.,
                Plaintiffs,
16
      vs.                              3:12-cv-4854-LB
17
      SUTTER HEALTH,
18              Defendants.
      _____/
19
              Videotaped Deposition of Steven Scheinder,
20
        taken on behalf of the Defendants, on Tuesday,
21
        July 25, 2018, at Bartko Zankel Bunzel Miller,
22
        One Embarcadero Center San Francisco, California,
23
        beginning at 9:33 a.m., and ending at 6:03 p.m.
24

25
```

CONFIDENTIAL – ATTORNEYS'S EYES ONLY

Page 6

1          MR. ABRAHAM:  Michael Abraham with Bartko,

2    Zankel, Bunzel & Miller.  I'm representing defendant

3    Sutter Health.

4          MR. BROWNSTEIN:  David Brownstein, Farmer

5    Brownstein Jaeger & Goldstein, for the plaintiffs in

6    the Sidibe federal matter.

7          And I just want to make sure the record is

8    clear, that this deposition is being taken in the

9    federal matter, as well as the two state cases.

10          MR. RUAN:  Matthew Ruan, Cohen Milstein

11    Sellers & Toll, on behalf of the UFCW & Employers

12    Benefit Trust and the class.

13          MS. RICHARDSON:  Heather Richardson from

14    Gibson Dunn & Crutcher, on behalf of Aetna and the

15    witness.

16          THE VIDEOGRAPHER:  Can the court reporter

17    please swear in the witness.

18

19                    STEVEN SCHNEIDER,

20               having been sworn as a witness

21             by the Certified Shorthand Reporter,

22                  testified as follows:

23

24          THE VIDEOGRAPHER:  You may proceed.

25    ///

CONFIDENTIAL – ATTORNEYS'S EYES ONLY

Page 54

1    on credibility.

19          MR. ABRAHAM:   Okay.   We can go ahead and take

20    the break.

21          MS. RICHARDSON:   Okay.   Thank you.

22          THE VIDEOGRAPHER:   We're off the record at

23    10:49 a.m.

24          (Recess taken.)

25          THE VIDEOGRAPHER:   This is the beginning of

CONFIDENTIAL – ATTORNEYS'S EYES ONLY

Page 282

1                    CERTIFICATE OF REPORTER

2

3         I, ANDREA M. IGNACIO, hereby certify that the

4    witness in the foregoing deposition was by me duly

5    sworn to tell the truth, the whole truth, and nothing

6    but the truth in the within-entitled cause;

7         That said deposition was taken in shorthand

8    by me, a disinterested person, at the time and place

9    therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12         That before completion of the deposition,

13   review of the transcript [X] was [ ] was not

14   requested.  If requested, any changes made by the

15   deponent (and provided to the reporter) during the

16   period allowed are appended hereto.

17         I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22   Dated: August 3, 2018

23   _____

24    ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830

25

# EXHIBIT 38

# RIDER TO GROUP AGREEMENT

## BETWEEN CALIFORNIA PHYSICIANS' SERVICE, dba BLUE SHIELD OF CALIFORNIA

## AND

## SAN FRANCISCO HEALTH SERVICE SYSTEM FUND

## JANUARY 1, 2013

9/4/13

c:\users\jquinn01\appdata\local\microsoft\windows\temporary
internet files\content.outlook\01xmhf0z\00868188 ccsf.docx

**CCSF 0008057**

Sidibe_CCSF 0008057

# RIDER TO GROUP AGREEMENT

THIS RIDER TO GROUP HEALTH SERVICE CONTRACT ("Rider") dated as of January 1, 2013, is attached to and a part of the Group Health Service Contract, including the Evidence of Coverage and Medicare Coordination of Benefits Addendum documents, incorporated by reference herein (the "Group Agreement"), whose effective date is January 1, 2013 (the "Effective Date"), between CALIFORNIA PHYSICIANS' SERVICE, dba BLUE SHIELD OF CALIFORNIA ("Health Plan") and the SAN FRANCISCO HEALTH SERVICE SYSTEM FUND ("Group"). Capitalized terms contained in this Rider and not defined herein shall have the meanings assigned to such terms in the Group Agreement. The term "Group Agreement" shall refer to the entire Group Agreement, including this Rider. The term "City" shall refer to the City and County of San Francisco. In the event of any inconsistency between any terms of this Rider and any other terms of the Group Agreement, the terms of this Rider shall govern to the extent consistent with the applicable requirements of the Knox-Keene Act and its related applicable regulations.

Now, THEREFORE, the parties agree as follows:

## 1.   Certification of Funds; Budget and Fiscal Provisions; Termination in the Event of Non-Appropriation

This Agreement is subject to the budget and fiscal provisions of the City's Charter. Charges will accrue only after prior written authorization certified by the Controller, and the amount of City's obligation hereunder shall not at any time exceed the amount certified for the purpose and period stated in such advance authorization. This Agreement will terminate without penalty, liability or expense of any kind to City at the end of any fiscal year if funds are not appropriated for the next succeeding fiscal year. If funds are appropriated for a portion of the fiscal year, this Agreement will terminate, without penalty, liability or expense of any kind at the end of the term for which funds are appropriated. Group shall remain liable, however, for all costs, expenses and obligations incurred by Group prior to the end of such term. City has no obligation to make appropriations for this Agreement in lieu of appropriations for new or other agreements. City budget decisions are subject to the discretion of the Mayor and the Board of Supervisors. Health Plan's assumption of risk of possible non-appropriation is part of the consideration for this Agreement. In the event that Group fails to pay Health Plan in accordance with the Group Agreement, Health Plan may terminate or cancel the Group Agreement in accordance with the provisions of the Group Agreement.

THIS SECTION CONTROLS AGAINST ANY AND ALL OTHER PROVISIONS OF THIS AGREEMENT.

## 2.   Term of the Group Agreement

Subject to Section 1, the term of this Group Agreement shall be from January 1, 2013 through December 31, 2013.

## 3.   Left Blank by Agreement of the Parties

## 4.   Left Blank by Agreement of the Parties

## 5.   Left Blank by Agreement of the Parties

## 6.   Left Blank by Agreement of the Parties

## 7.   Left Blank by Agreement of the Parties

1

IN WITNESS WHEREOF, the parties hereto have executed this Group Agreement effective January 1, 2013.

**HEALTH SERVICE SYSTEM**

CATHERINE DODD  Lisa Ghotbi
Director, Health Service System

**BLUE SHIELD OF CALIFORNIA**

By signing this Agreement, I certify that I comply with the requirements of the Minimum Compensation Ordinance, which entitle Covered Employees to certain minimum hourly wages and compensated and uncompensated time off.

I have read and understood paragraph 35, the City's statement urging companies doing business in Northern Ireland to move towards resolving employment inequities, encouraging compliance with the MacBride Principles, and urging San Francisco companies to do business with corporations that abide by the MacBride Principles.

**APPROVED AS TO FORM:**

Dennis J. Herrera
City Attorney

ERIK A. RAPOPORT
Deputy City Attorney

PAUL MARKOVICH
President and CEO
Blue Shield

Federal Tax ID Number: 96-0360524

17

CCSF 0008077

Sidibe_CCSF 0008077

**FLEXIBLE FUNDING ADDENDUM**
**BETWEEN**
**BLUE SHIELD OF CALIFORNIA**
**AND**
**San Francisco Health Service System Fund (CCSF)**

This agreement ("Addendum") is made between California Physicians' Service, d.b.a. Blue Shield of California ("Blue Shield" or "Health Plan"), a California corporation, and San Francisco Health Service System Fund ("Contractholder" or "Group"), as an addendum to the Contractholder's Blue Shield Group Health Service Contracts ("Group Contracts") for group numbers H12187 (except Cal-Cobra enrollees), H12189, and H12195.  See appendix F for group structure.

The purpose of this Addendum is to provide for an alternative dues payment arrangement to the Group Contracts for Subscribers assigned to group numbers H12187 (except Cal-Cobra enrollees), H12189 and H12195.  For so long as this Addendum remains in effect, it shall replace and supersede any inconsistent terms of Part A., Section IV. ["Dues"], of the Group Contracts.  This is an alternative dues payment arrangement only.  All terms and conditions of the Group Contracts shall otherwise remain in full force and effect.

1.    TERM

      This agreement is effective for the period January 1, 2013 – December 31, 2013, unless sooner terminated pursuant to the "Termination" provisions of this Addendum.  This Addendum may be renewed for additional periods by mutual written agreement of Contractholder and Blue Shield.

2.    DEFINITIONS

      The following definitions shall apply to this Addendum.  Unless otherwise defined in this Addendum, the Group Contracts' definitions shall also apply to this Addendum.

- 1 -

CCSF 0008129
Sidibe_CCSF 0008129

a.  Administrative Fee - The amount charged by Blue Shield to administer the Flexible Funded Agreement billed on a Per Employee Per Month (PEPM) basis. Any changes in legislation as a result of federal or state mandates are not included in the administrative fee.

b.  Benefits - Covered Services under the Group Contracts.

c.  Capitation - A Per Member Per Month (PMPM) fee paid by Contractholder to Health Plan for capitated providers' provision of agreed upon services. Capitated providers include: IPAs and Medical groups, chiropractic, acupuncture, and mental health and substance abuse providers.

d.  Contract Year - Each one-year term of the Group Contracts.

e.  Dues – Payments from the Contractholder to the Health Plan, which are comprised of Fixed Dues Charges and Variable Dues Charges.

f.  Group Contracts – the Group health service contracts entered into between Blue Shield and Group.

g.  Fixed Dues Charges - The fixed component(s) of Dues such as Administrative Fees, Pooling Charges and Capitation fees that are a pre-set amount to be paid on a pre-defined payment schedule.

h.  Maximum Annual Financial Liability- The total paid Dues for the Contract Year, i.e., Variable Dues Charges (Fee-for-Service Claims) plus Fixed Dues Charges (Administration Fees plus Pooling Charges plus Capitation) normalized for membership as a PEPM value. The Maximum Annual Financial Liability shall be calculated within 150 days following the Contract Year as all Fixed and Variable Dues paid during the Contract Year divided by the number of Subscriber months in the same Contract Year.

- 2 -

CCSF 0008130
Sidibe_CCSF 0008130

i.    <u>Maximum Annual Financial Liability Target</u>- This dollar amount is the highest financial liability the Contractholder is responsible for funding normalized for membership as a PEPM target. Any amount above this target is funded by the Health Plan. This target is preset annually at ███% of expected Dues liability.

j.    <u>Member</u> - The primary contract holder and all enrolled dependents assigned to group numbers H12187 (except Cal-Cobra enrollees), H12189 and H12195.

k.    <u>Paid Claims</u> – Variable Dues Charges or fee-for-service claims that have been reported and paid by the Health Plan.

l.    <u>Primary Enrollee</u> - The primary dependent (i.e., a spouse or the oldest dependent) in a split contract assigned to group numbers H12195 or H12189.

m.    <u>Pooling Charge</u> – The amount charged by Health Plan for assuming the liability for Benefits in excess of the Pooling Point normalized for membership as a PEPM value. Pooling is not applicable to run out claims during the termination period.

n.    <u>Pooling Point</u> – This dollar amount is the highest financial liability the Group is responsible to fund for Variable Dues Charges (fee-for-service claims) for Covered Services to any one Member in a Contract Year. Calculated within 45 days following the Contract Year as all Variable Dues Charges paid during the Contract Year for each member.

o.    <u>Terminal IBNR Benefit Liability</u> – In addition to the Fixed Dues Charges and Variable Dues Charges paid by Contractholder during the term of this Addendum, the Contractholder is also liable for a Terminal

- 3 -

CCSF 0008131

Sidibe_CCSF 0008131

Incurred-But-Not-Reported (IBNR) Benefit Liability, which are the Variable Dues Charges for the fee-for-service claims for Covered Services incurred during the plan year, which were uncompleted, unreported, or reported but not paid by the Contractholder as of the date of termination of the plan year. A renewal for an additional plan year between Group and Health Plan will result in no Terminal IBNR Benefit Liability for the contract year and Variable Dues Charges will continue to be paid as the incurred claims are reported and paid.

p.   Variable Dues Charges - The variable component(s) of Dues are fee-for-service claims that are charged to the Contractholder on a regular basis they are paid by the Health Plan.

q.   Subscriber – Refers to the primary contract holder (active employees, early retirees and Primary Enrollees) assigned to group numbers H12187 (except Cal-Cobra enrollees), H12189 and H12195. [BSC– "Subscriber" includes Primary Enrollees, which by definition could include dependents.]

r.   PEPM (Per Employee Per Month)– A normalization of dollars, claim counts or other value by the average number of Subscribers in the Group each month.  For example, Administration Fee PEPM means a set administrative fee will be charged for every Subscriber enrolled in the group in a given month.

s.   PMPM (Per Member Per Month) - A normalization of dollars, claim counts or other value by the average number of members in the Group each month.  For example, Capitation Fee PMPM means a set capitation fee will be charged for every Member enrolled in the group in a given month.

t.   Wash Rule – Dues that are subject to this rule, such as Administration Fees and Pooling Charges, will be paid as follows with respect to new Members and terminated Members beginning or terminating coverage in the middle of a coverage month:

- 4 -

     i. Dues are payable for the entire month for new Members whose coverage effective date falls between the 1st and the 15th day of the month. No dues are payable for the month for Members whose effective dates are after the 15th day of the month.

     ii. Dues are payable for the entire month for Members whose coverage is terminated on or after the 16th day of that month. No dues are payable for the month for Members whose coverage terminates before the 16th day of the month.

u.   Average Contract Size- The total number of enrolled employees plus dependents divided by the total number of enrolled employees.

v.   Automated Clearing House (ACH) – payment method similar to a bank wire payment whereby payment from one entity to another is made electronically and settled via the Automated Clearing House (ACH) bank transfer process.  This payment method effectively transfers funds directly from the Group's bank account to the Health Plan's bank account upon authorization of the payment by the Group.

w.   Accountable Care Organizations (ACO) program –a pilot collaboration project amongst Blue Shield Health Plan, the City as payer, and the relevant network of hospital and physician provider partners to solve the healthcare affordability crisis. The goal of the ACOs is to improve the quality and lower the cost of health care through mechanisms such as improved care coordination and the alignment of financial incentives for physicians and hospitals via shared savings, otherwise known as ACO Incentive Payments.  In 2011, Blue Shield piloted two ACOs in the San Francisco market for the City and County of San Francisco (CCSF).

x.   ACO Provider Partners: To date, Blue Shield has established three ACOs for the City, two of which are CCSF-specific and one is non-CCSF

- 5 -

CCSF 0008133

Sidibe_CCSF 0008133

specific.   The Provider Partners in the three medical-group led ACOs are as follows:

1.) **Brown and Toland ACO:**  Brown and Toland; California Pacific Medical Center (CPMC)
2.) **Hills Physicians Medical Group ACO:**  Hills Physician Medical Group, University of California in San Francisco,  Dignity Health.
3.) **John Muir Medical Group:** John Muir Medical Group and John Muir Medical Center.

y.   ACO Incentive Payments:  the ACO programs create a global per member per month target amount for the cost of health care, without changing the underlying payment mechanism for physicians and hospitals. If savings targets are exceeded, the partners share in the savings.  If actual experience exceeds the cost targets, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Total incentive payments shall not exceed the maximum incentive payout limit for each ACO.

3.   ALTERNATIVE DUES PAYMENT ARRANGEMENT

When referring to the "Dues" owed under this Addendum's alternative dues payment arrangement, Dues means Fixed Dues Charges and Variable Dues Charges.

a.   Fixed Dues Charges are calculated based on the number of Subscribers enrolled under the Group Contracts and are adjusted monthly based on actual enrollment and include:

1)   Administrative Fees;

2)   Capitation ; and

- 6 -

3)   Pooling Charge (if applicable).

b.   Variable Dues Charges include:

1)   Fee-for-service claims for Covered Services paid by Blue
     Shield, including, but not limited to, institutional and
     prescription drug Covered Services (if applicable), out-of-
     area and other paid claims (up to the Pooling Point, if
     applicable).

Nothing in this Addendum shall limit Blue Shield's ability to modify its
contracts with its participating providers.  Dues rates may be changed in
accordance with the terms of the Group Contracts.

No taxes, fees, or other charges or offsets by any state or federal
government which may, in the future, be assessed against Blue Shield on
the basis of Benefit payments made under this alternative dues payment
arrangement are contemplated in setting the Dues rates.  In the event
Blue Shield becomes liable for any such taxes, fees, other charges or
offsets, whether by reason of a tax ruling or any other determination by
any governmental authority, including amounts assessed under Medicare
Secondary Payer regulations, Contractholder agrees to reimburse Blue
Shield for such amounts, including any retroactive assessments,
attributable to Benefit payments made under the Group Contracts.

If Contractholder proposes a change in the Group Contracts, or
Contractholder changes the Benefits, eligibility criteria, employee
contribution, or a there is a change in the Group Contracts enrollment of
±■% from the enrollment on the effective date of this Addendum; Blue
Shield may make an equitable adjustment to the Dues to reflect such
change.

4.    CONTRACTHOLDER'S FINANCIAL RESPONSIBILITY

- 7 -

CCSF 0008135
Sidibe_CCSF 0008135

a.    Funding Payment of Dues: Contractholder agrees to pay Blue Shield Fixed Dues Charges and Variable Dues Charges up to the Maximum Annual Financial Liability Target in accordance with the "Payment Schedule" provisions of this Addendum. With regards to the retroactive deletions to enrollment requested by the Contractholder, Blue Shield will credit only those Fixed Dues Charges that are recoverable pursuant to the terms of Blue Shield's contracts with its participating providers and only those Variable Dues Charges that Blue Shield actually recovers.

b.    Maximum Annual Financial Liability: The Contractholder's Maximum Annual Financial Liability for each Contract Year during the term of this Addendum is the actual paid Dues for the Contract Year, measured annually in total, and not based on any given individual month during the contract period, or by individual groups or by components of the Maximum Annual Financial Liability costs.

For each Contract Year during the term of this Addendum, Blue Shield will, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ days after the close of the Contract Year, reconcile the Contractholder's total paid Fixed Dues Charges and Variable Dues Charges for the Contract Year (including any Variable Dues Charges carried over from the prior Contract Year, not applicable for the First Year Contract) against the Maximum Annual Financial Liability Target, as set forth in Appendix B. Any Variable Dues Charges for the Contract Year, which have not been invoiced by Blue Shield when the reconciliation is performed, will be carried forward and reconciled the following Contract Year.

If this Addendum is terminated, Blue Shield will, ▓▓▓▓▓▓▓▓▓▓▓ days after the termination of the Addendum, reconcile the Contractholder's total Dues payments ( Fixed Dues Charges and Variable Dues Charges paid during the policy year) against the Contractholder's Maximum Annual Financial Liability Target for the final Contract Year of the Addendum. Variable Dues Charges

- 8 -

incurred during the final policy year but paid after the termination date (run out claims) will be reconciled against the Terminal IBNR Benefit Liability for a period of ▇▇▇▇▇▇. Pooling will not be applied to the run out claims.

The Maximum Annual Financial Liability Target does not include any amounts for extra contractual benefits which have been authorized by the Contractholder (including, but not limited to, services which Blue Shield has determined not to be Medically Necessary under its standard Medical Policy).

In the event any annual reconciliation demonstrates that the Contractholder has paid in excess of the Maximum Annual Financial Responsibility, Blue Shield will repay the Contractholder the amount of the overpayment, which repayment will accompany the reconciliation sent to Contractholder.

c.    Terminal IBNR Benefit Liability:  If this Addendum or the Group Contracts are terminated or canceled, the Contractholder continues to be liable up to the Terminal IBNR Benefit Liability provided for the contract period for ▇▇▇▇▇▇▇▇▇▇ for the final Contract Year of the Addendum.  Calculation for The Terminal IBNR Benefit Liability will be calculated by the Terminal Liability Per Contract listed in appendix A, multiply by the average enrollment of the last ▇▇▇▇ of this Addendum and/or the Group Contracts. The Contractholder's obligation to pay this Terminal IBNR Benefit Liability shall survive termination or cancellation of this Addendum and/or the Group Contracts.  Pooling does not apply during the termination period.

d.    ACO Financial Collaboration:  Group has agreed to pay provider incentives for each ACO collaboration as outlined in appendix E.

Provider incentives will be based on a 2 tier structure:
•If actual experience exceeds Tier 1 target PMPM individually for each ACO, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

- 9 -

CCSF 0008137
Sidibe_CCSF 0008137

• If actual experience falls below the Tier 1 targets, but is greater than or equal to Tier 2 targets, savings will be split per the Tier 1 incentive structure.

• If actual experience falls below the Tier2 stretch targets, savings between the Tier1 targets and the Tier 2 stretch target will be split per the Tier 1 incentive structure. Savings beyond the Tier 2 stretch targets will be split per the Tier 2 incentive structure.

• Total incentives shall not exceed the maximum incentive payout limit for each provider.

Blue Shield shall provide a final accounting of the collaboration to the ACOs and Group no later than ███████████████ days following the end of the collaboration to determine if any amounts are owed to the Medical Group or Hospital.   Any amounts owed to the Medical Group or Hospital would be paid by Blue Shield no later than ██████ following the distribution of the final accounting.  Blue Shield will provide a final accounting invoice to Group upon payment to the ACOs.  Group to reimburse Blue Shield within █████████████ of receipt of the invoice.

5.    PAYMENT SCHEDULE

a. Payment of Capitation: Health Plan will invoice Contractholder on approximately the twentieth (20th) of each month for Capitation as of the first of that month for that same month. Capitation will be charged for each Member  assigned to the  Flex-Funded Arrangements. (Appendix F outlines the members covered by the Flex Funding arrangement.)  The invoice will be based on Health Plan's count of Members with personal physicians, and will be supported by detail that Health Plan will provide with the monthly invoice.  Contractholder agrees to pay this invoice no later than █████ business days after Contractholder's receipt of the invoice and supporting detail. Contractholder agrees to pay the invoiced amount subject to eligibility reconciliation in the subsequent month(s).

- 10 -

b. <u>Payment of Variable Dues Charges (fee-for-service claims):</u> Health Plan will invoice Contractholder ▇▇▇▇▇▇▇ for Variable Dues Charges paid by Health Plan in the prior ▇▇▇. Variable Dues Charges are all non-capitated claims as follows: (a) medical claims; (b) pharmacy claims; and (c) group performance payments. This invoice will be supported by claim detail including group ID, member ID, date of service, paid date, provider ID, paid amounts, etc. Contractholder agrees to pay each invoice by depositing the invoiced amount into Health Plan's account with Bank of America (#1499-9-05524) within ▇▇ business days by the ACH bank transfer process. Contractholder agrees to pay the invoiced amount subject to reconciliation on all adjusted claims in subsequent month(s).

c. <u>Payment of Administrative Fees and Pooling Charges:</u> Health Plan will invoice the Contractholder for Administration Fees and Pooling Charges on approximately the first (1st) of each month for that same month. The invoice will based on Health Plan's count of Subscribers eligible for these charges, and shall include only one charge per contract or family unit (e.g. E, E+1 or E+2) assigned to the Flex Funded Arrangements. (Appendix F outlines the members covered by the Flex Funding arrangement.) Contractholder agrees to pay that invoice no later than ▇▇▇ business days after Contractholder's receipt of the invoice and supporting detail. Contractholder agrees to pay the invoiced amount subject to eligibility reconciliation during the subsequent month(s) in accordance with the Wash Rule. The amount of monthly Administrative Fees and Pooling Charges, Terminal Liability and Maximum Annual Financial Liability Target are set forth in Appendix A.

d. <u>Grace Period:</u> A grace period of ▇▇▇ days will be allowed for payment of the Fixed Dues and a grace period of ▇▇▇ days will be allowed for payment of the Variable Dues Charges invoices under this Addendum. During this grace period, this Addendum will remain in effect.

- 11 -

CCSF 0008139

Sidibe_CCSF 0008139

Members will be eligible for Covered Services under the Group Contracts only for the period for which Dues have been fully paid.

e. Blue Shield may, at its sole discretion, provide the Contractholder with notice of termination of this Addendum, pursuant to the "Termination" provisions of this Addendum.

Following any termination of this Addendum, dues are payable according to Part A., Section IV. ["Dues"] and the other terms and conditions of the Group Contracts.

6.      REPORTS

a.      Subject to the requirements of state and federal law regarding the confidentiality of medical and personal information, Blue Shield will prepare in its standard format summaries of checks (including the amounts thereof) issued, paid, voided, canceled and not presented for payment, including any special reports of uncashed checks required to comply with applicable forfeiture provisions of the Plan or abandoned property laws. Such summaries and reports will not include Member-identifiable medical or personal information.

b.      Blue Shield shall also provide Contractholder with those periodic reports specified in Appendix C.

c.      In accordance with the Knox-Keene Act, the Confidentiality of Medical Information Act, the U.S. Public Health Service Act and other applicable privacy laws, Blue Shield will not release individually identifiable medical information regarding Members to the Contractholder. Contractholder specifically acknowledges that Blue Shield is subject to Health & Safety Code Section 1374.8, which prohibits the release of any information to an employer that

- 12 -

CCSF 0008140
Sidibe_CCSF 0008140

would indicate that an employee is even receiving health care services.

7.   TERMINATION

    a.    Blue Shield may, in its sole discretion, terminate this Addendum for Contractholder's failure to pay any component of the Dues in accordance with the "Payment Schedule" provisions of this Addendum.

    b.    Blue Shield may, in its sole discretion, terminate this Addendum if there is a change in the Group Contracts enrollment of ± ■ % from the enrollment on the effective date of this Addendum.

    c.    Either party may terminate this Addendum without cause by giving the other party at least ■ days written notice prior to the date of such termination. Contractholder remains responsible for the Terminal IBNR Benefit Liability.

    d.    This Addendum will terminate automatically on the effective date of enactment or interpretation on any law, ruling or other determination by any governmental authority, which prohibits the continuance of this alternative dues payment arrangement.

    e.    If this Addendum is terminated, Part A.; Section IV. ["Dues"], of the Group Contracts shall be revived as of the same date. Notwithstanding the preceding, Contractholder remains responsible for the Terminal IBNR Benefit Liability.

8.   GENERAL TERMS

    a.    Audit: During the term of this Addendum, Contractholder may inspect and audit Benefit payment records relevant to Blue Shield's invoices under this Addendum with ■ days prior written notice and request for such records. Any examination of individual

- 13 -

CCSF 0008141

Sidibe_CCSF 0008141

Benefit payment records will be carried out in a manner agreed to in advance by the parties and designed to protect the confidentiality of individually identifiable medical information regarding of the Members.

Audits may be conducted by Contractholder's audit staff or by an independent contractor employed at Contractholder's expense, who must be either a Certified Public Accountant or otherwise professionally qualified to perform such auditing services. Blue Shield is not required to allow access for the purpose of an audit to any individual Blue Shield reasonably believes is likely to misuse or misappropriate information which may be available in the course of an audit as a result of a conflict of interest, or to any independent contractor whose compensation for performing such an audit is contingent on or otherwise wholly or partially based on the audit findings.

All audit protocols must be based on generally accepted audit standards selected to achieve verifiable, statistically valid results.

b.  

- 14 -

CCSF 0008142
Sidibe_CCSF 0008142

9.    INFORMATION REQUIRED

The Contractholder agrees to furnish Blue Shield all information which Blue Shield may from time to time reasonably require to perform under the Addendum.  Blue Shield shall not be responsible for any delay or non-performance of its performance under this Addendum, which is caused or contributed to in whole or in part by the failure of the Contractholder to timely furnish any required information.

IN WITNESS WHEREOF, the parties have executed this Addendum by their respective authorized officers duly authorized to act on their behalf.

CALIFORNIA PHYSICIANS' SERVICE,
d.b.a. BLUE SHIELD OF CALIFORNIA

By: _William McQuven_

Title: _VP & GM_

Date: _9-23-13_

San Francisco Health Service System
Fund (CCSF)

By: _____

Title: _Acting Director_
_Health Service System_

Date: _9/6/13_

- 15 -

CCSF 0008143

Sidibe_CCSF 0008143

CCSF 0008144
Sidibe_CCSF 0008144

# EXHIBIT 39

# RIDER TO GROUP AGREEMENT

## BETWEEN CALIFORNIA PHYSICIANS' SERVICE, dba BLUE SHIELD OF CALIFORNIA

## AND

## SAN FRANCISCO HEALTH SERVICE SYSTEM FUND

## JANUARY 1, 2014

I:\vendor management\blue shield of california\2014
rider\00883321-2014 ccsf-bsc rider execution copy.doc

CCSF 0008385

Sidibe_CCSF 0008385

# RIDER TO GROUP AGREEMENT

THIS RIDER TO GROUP HEALTH SERVICE CONTRACT ("Rider") dated as of January 1, 2014, is attached to and a part of the Group Health Service Contract, including the Evidence of Coverage and Medicare Coordination of Benefits Addendum documents, incorporated by reference herein (the "Group Agreement"), whose effective date is January 1, 2014 (the "Effective Date"), between CALIFORNIA PHYSICIANS' SERVICE, dba BLUE SHIELD OF CALIFORNIA ("Health Plan") and the SAN FRANCISCO HEALTH SERVICE SYSTEM FUND ("Group"). Capitalized terms contained in this Rider and not defined herein shall have the meanings assigned to such terms in the Group Agreement. The term "Group Agreement" shall refer to the entire Group Agreement, including this Rider. The term "City" shall refer to the City and County of San Francisco. In the event of any inconsistency between any terms of this Rider and any other terms of the Group Agreement, the terms of this Rider shall govern to the extent consistent with the applicable requirements of the Knox-Keene Act and its related applicable regulations.

Now, THEREFORE, the parties agree as follows:

## 1. Certification of Funds; Budget and Fiscal Provisions; Termination in the Event of Non-Appropriation

This Agreement is subject to the budget and fiscal provisions of the City's Charter. Charges will accrue only after prior written authorization certified by the Controller, and the amount of City's obligation hereunder shall not at any time exceed the amount certified for the purpose and period stated in such advance authorization. This Agreement will terminate without penalty, liability or expense of any kind to City at the end of any fiscal year if funds are not appropriated for the next succeeding fiscal year. If funds are appropriated for a portion of the fiscal year, this Agreement will terminate, without penalty, liability or expense of any kind at the end of the term for which funds are appropriated. Group shall remain liable, however, for all costs, expenses and obligations incurred by Group prior to the end of such term. City has no obligation to make appropriations for this Agreement in lieu of appropriations for new or other agreements. City budget decisions are subject to the discretion of the Mayor and the Board of Supervisors. Health Plan's assumption of risk of possible non-appropriation is part of the consideration for this Agreement. In the event that Group fails to pay Health Plan in accordance with the Group Agreement, Health Plan may terminate or cancel the Group Agreement in accordance with the provisions of the Group Agreement.

THIS SECTION CONTROLS AGAINST ANY AND ALL OTHER PROVISIONS OF THIS AGREEMENT.

## 2. Term of the Group Agreement

Subject to Section 1, the term of this Group Agreement shall be from January 1, 2014 through December 31, 2014.

## 3. Left Blank by Agreement of the Parties

## 4. Left Blank by Agreement of the Parties

## 5. Left Blank by Agreement of the Parties

## 6. Left Blank by Agreement of the Parties

## 7. Left Blank by Agreement of the Parties

1

I:\vendor management\blue shield of california\2014
rider\00883321-2014 ccsf-bsc rider execution copy.doc

CCSF 0008389

Sidibe_CCSF 0008389

IN WITNESS WHEREOF, the parties hereto have executed this Group Agreement effective January 1, 2014.

HEALTH SERVICE SYSTEM

_Catherine Dodd_
CATHERINE DODD
Director, Health Service System

**APPROVED AS TO FORM:**

Dennis J. Herrera
City Attorney

_Erik A. Rapoport_
ERIK A. RAPOPORT
Deputy City Attorney

BLUE SHIELD OF CALIFORNIA

By signing this Agreement, I certify that I comply with the requirements of the Minimum Compensation Ordinance, which entitle Covered Employees to certain minimum hourly wages and compensated and uncompensated time off.

I have read and understood paragraph 35, the City's statement urging companies doing business in Northern Ireland to move towards resolving employment inequities, encouraging compliance with the MacBride Principles, and urging San Francisco companies to do business with corporations that abide by the MacBride Principles.

_Paul Markovich_
PAUL MARKOVICH
President and CEO
Blue Shield

Federal Tax ID Number: 96-0360524

17

l:\vendor management\blue shield of california\2014
rider\00883321-2014 ccsf-bsc rider execution copy.doc

**CCSF 0008405**

Sidibe_CCSF 0008405

**APPENDIX C -**
**ALTERNATIVE FUNDING ADDENDUM**
**for group contracts H12187, H12189, H12195**

THIS APPENDIX C ("Addendum") to the Rider to the Group Health Service
Contracts dated as of January 1, 2014 ("Group Contracts") between
CALIFORNIA PHYSICIANS' SERVICE, d.b.a. BLUE SHIELD OF CALIFORNIA ("Health
Plan"), and the SAN FRANCISCO HEALTH SERVICE SYSTEM FUND ("Group") is part
of the Group Contracts for group numbers H12187 (except Cal-COBRA
enrollees), H12189, and H12195 whose effective date is January 1, 2014 (the
"Effective Date").  This Addendum is referred to as a "Flexible Funding
Addendum" in the Group Contracts.

The purpose of this Addendum is to provide for an alternative dues payment
arrangement to the Group Contracts for Enrollees assigned to group numbers
H12187 (except Cal-Cobra enrollees), H12189 and H12195 (see Appendix C-6 for
group structure). For so long as this Addendum remains in effect, it shall replace
and supersede any inconsistent terms of Part V. ["Dues"], of the Group
Contracts.  This is an alternative dues payment arrangement only.  All other
terms and conditions of the Group Contracts shall otherwise remain in full force
and effect.


1.    TERM

This Addendum is effective for the period January 1, 2014 through December 31,
2014, unless terminated at an earlier date under the "Termination" provision of
this Addendum, or the "Cancellation/Reinstatement/Grace Period" provisions of
the Group Contracts.

2.    DEFINITIONS

The following definitions shall apply to this Addendum.  Unless otherwise defined
in this Addendum, the definitions in the Group Contracts shall also apply to this
Addendum.

Appendix C:  Page - 1 -

CCSF 0008587
Sidibe_CCSF 0008587

a. Administrative Fee – The amount charged by Health Plan to administer the Group Contracts for each Enrollee covered under this Addendum. Any changes in legislation as a result of federal or state mandates are not included in the administrative fee.

b. Benefits – The covered services which a Member is entitled to receive under the Group Contracts.

c. Capitation – A prepaid periodic PMPM payment paid by Health Plan to participating providers for their provision of agreed upon services. Capitated providers include: Independent Practice Associations (IPAs) and medical groups, chiropractic, acupuncture, and mental health and substance abuse providers.

d. Contract Year – The one-year term set forth in the Group Contracts.

e. Dues – Payments to Health Plan from Group comprised of Fixed Dues Charges and Variable Dues Charges. See Group Contracts Part V. "Dues" for additional requirements.

f. Enrollee – refers to the active employee or early retiree assigned to groups H12187 (except Cal-COBRA enrollees), H12195, and the primary dependent in a split contract assigned to groups H12195 and H12189 as set forth in Appendix C-7. For this Addendum, Enrollee has the same meaning as subscriber, primary contract holder, or Employee.

g. Fixed Dues Charges – The fixed components of Dues comprised of Administrative Fee, Medical Pooling Charge, and legislative fees which are pre-set amounts to be paid on a pre-defined payment schedule as set forth in Appendix C-1 in addition to the actual Capitation payments.

Appendix C: Page - 2 -

CCSF 0008588
Sidibe_CCSF 0008588

h.    Group Contracts – The group health service contracts entered into between the Health Plan and Group.

i.    Maximum Group Financial Liability - The Dues amount paid in the Contract Year not to exceed the Maximum Group Financial Liability Target.

j.    Maximum Group Financial Liability Target – Under this Alternative Funding Addendum, Group is financially responsible up to ███% of the expected annual Dues liability. This target is set by Health Plan prior to the beginning of the contract year at ███% of the expected monthly Dues per Enrollee as a PEPM target. At the end of the contract year, the PEPM target is multiplied by the actual Enrollee months in the contract year to determine the annual target as described in Section 4b and set forth in Appendix C-2. The Maximum Group Financial Liability Target (PEPM) for the 2014 contract year is $█████.

k.    Member – The Enrollee and all enrolled dependents assigned to group numbers H12187 (except Cal-Cobra enrollees), H12189 and H12195 as set forth in Appendix C-7.

l.    PEPM – Per Enrollee Per Month. For example, a PEPM cost means a set cost charged for every Enrollee in the group in a given month.

m.    PMPM – Per Member Per Month. A PMPM cost means a set cost charged for every Member enrolled in the group in a given month.

n.    Medical Pooling Charge (excludes pharmacy claims) – The Health Plan charge to assume the liability for Benefits in excess of the Medical Pooling Point. Medical Pooling Charge is a Fixed Dues Charge as set forth in Appendix C-1. This charge is set by Health Plan prior to the beginning of the Contract Year as a PEPM charge.

o.    Medical Pooling Point (excludes pharmacy claims) – The highest financial liability Group is responsible to fund for Variable Dues Charges (exclusive of outpatient prescription charges) for any one Member in a contract year. Any charge amount over the Medical Pooling Point for an individual member in a contract year will be reimbursed to Group.   Medical Pooling Point reconciliation is described in Section 4c and Appendix C-2.

Appendix C:  Page - 3 -

p.   <u>Terminal Incurred-But-Not-Reported (IBNR) Benefit Liability</u> – The Variable Dues Charges incurred during the Contract Year but paid after the termination date for a period of ▮▮▮▮ following the Contract Year not to exceed the Terminal Incurred-But-Not-Reported (IBNR) Benefit Liability Target.  This liability amount is only applied in the event that this Addendum and/or the Group Contracts are/is terminated or cancelled.

q.   <u>Terminal Incurred-But-Not-Reported (IBNR) Benefit Liability Target</u> – This target is set by the Health Plan prior to the beginning of the Contract Year as a PEPM target. In the event this Addendum and/or the Group Contracts are/is terminated or cancelled, the PEPM target will be multiplied by the average monthly Enrollees in the last ▮▮▮▮ of the final Contract Year to determine the annual target as described in Section 4d and set forth in Appendix C-3.

r.   <u>Variable Dues Charges</u> – The variable component(s) of Dues comprised of fee-for-service medical and outpatient prescription claims charged to Group on a regular basis and paid on a pre-defined payment schedule.

s.   <u>Wash Rule</u> – Administrative Fees and Medical Pooling Charges will be paid as follows with respect to new Members (and terminated Members) beginning (or terminating) coverage in the middle of a coverage month:

  i.  Dues are payable for the entire month for new Members whose coverage effective date falls between the 1st and the 15th day of the month. No dues are payable for the month for Members whose effective dates are after the 15th day of the month.
  ii. Dues are payable for the entire month for Members whose coverage is terminated on or after the 16th day of that month. No dues are payable for the month for Members whose coverage terminates before the 16th day of the month.

3.   <u>ALTERNATIVE DUES PAYMENT ARRANGEMENT</u>

All Group Contracts covered by this Alternative Funding Addendum are subject to the Fixed Dues Charges and Variable Dues Charges.  To the extent that a Group Contract is fully-insured, Enrollees in that Group Contract are not subject

Appendix C:  Page - 4 -

**CCSF 0008590**

Sidibe_CCSF 0008590

to this Addendum.  See Appendix C-7 for a description of the Group Contract structure.

    a.    <u>Fixed Dues Charges</u> are calculated based on the number of Enrollees enrolled under the Group Contracts, and are adjusted monthly based on actual enrollment.  Fixed Dues Charges include: (1) Administrative Fees; (2) Capitation; (3) Medical Pooling Charges; and (4) other legislative fees/taxes (if applicable) as set forth in Appendix C-1.

    b.    <u>Variable Dues Charges</u> are fee-for-service claims for Benefits including, but not limited to, institutional and outpatient prescription claims, out-of-area and other paid claims (up to the Medical Pooling Point, if applicable).

Nothing in this Addendum shall limit Health Plan's ability to modify its contracts with its participating providers.

In the event Health Plan becomes liable for any state or federal taxes, fees, other charges or offsets, whether by reason of a tax ruling, or any other determination by any governmental authority including amounts assessed under Medicare Secondary Payer regulations, Group agrees to reimburse Health Plan for such amounts, including any retroactive assessments attributable to Benefit payments made under the Group Contracts, but only at the next renewal and only during the following plan year as part of Fixed Dues Charges unless the Group Contracts are terminated or cancelled.

If Group proposes a change in the Group Contracts, or Group changes Benefits, eligibility criteria, employee contributions, or if there is a change in the Group Contracts enrollment of ±■% from the enrollment on the effective date of this Addendum, Health Plan may make an equitable adjustment to the Dues to reflect such change, but only at the next renewal for the following plan year.

4.    <u>GROUP'S FINANCIAL RESPONSIBILITY</u>

    a.    <u>Funding Payment of Dues</u>:  Group agrees to pay Health Plan the Fixed Dues Charges and Variable Dues Charges up to the Maximum Annual Financial Liability Target in accordance with the "Payment Schedule" provisions set forth in Section 5 of this Addendum.  With respect to retroactive enrollment deletions requested by Group, Health Plan will credit only those Fixed Dues

Appendix C:  Page - 5 -

CCSF 0008591
Sidibe_CCSF 0008591

Charges recoverable under Health Plan's contracts with its participating providers, and only those Variable Dues Charges that Health Plan actually recovers.

b.   Maximum Annual Financial Liability Reconciliation: ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ days after the close of the contract year, Health Plan will reconcile the Group's total paid Fixed Dues Charges and Variable Dues Charges for the Contract Year, including any Variable Dues Charges carried over from the prior Contract Year against the Maximum Group Financial Liability Target set forth in Appendix C-2.  Any Variable Dues Charges for the Contract Year, which have not been invoiced by Health Plan when the reconciliation is performed, will be carried forward and reconciled during the following Contract Year.

The Maximum Annual Financial Liability Target does not include any amounts for extra contractual benefits authorized by Group including, but not limited to, services which Health Plan has determined not to be medically necessary as defined under its standard medical policy.

In the event an annual reconciliation demonstrates that Group has made payments in excess of the Maximum Annual Financial Liability Target, Health Plan will repay Group the overpayment amount.  The repayment shall accompany the annual reconciliation sent to Group.

If this Addendum is terminated, Health Plan will, ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ days after the termination date, reconcile Group's total Dues payments (Fixed Dues Charges and Variable Dues Charges paid during the Contract Year) against the Group's Maximum Group Financial Liability Target for the final Contract Year of the Addendum.  Variable Dues Charges incurred during the final Contract Year, but paid after the termination date (run out claims), will be reconciled against the Terminal IBNR Benefit Liability for a period of ▮▮▮▮▮.  Medical pooling will not be applied to run out claims.

c.   Medical Pooling Point Reconciliation:  As part of the Maximum Annual Financial Liability reconciliation, Health Plan will also reimburse Group for any paid Variable Dues Charges subject to the Medical Pooling Point in excess of the Medical Pooling Point that have not already been reimbursed via invoice credit.

Appendix C:  Page - 6 -

During the year-end reconciliation, and ███████████ days after the contract period ends, the Variable Dues Charges that exceed the Medical Pooling Point per member charged to the Member account (excluding the outpatient prescription claim charges) will be reconciled. Medical Pooling is based on a paid basis (incurred in the last ████████ and paid in the last ████████ for the policy period. In other words, medical claims that are subject to medical pooling in 2014 will include medical claims incurred from ███████████ (covering the ████████ period before the Contract Year and the ███████████████ but paid from ███████████████████████).

d.   Terminal IBNR Benefit Liability:  If this Addendum, or the Group Contracts, are terminated or canceled, Group shall continue to be liable up to the Terminal IBNR Benefit Liability for ███████████ ████ after the final Contract Year.  Calculation for the Terminal IBNR Benefit Liability will be calculated by multiplying the Terminal IBNR Benefit Liability Target per Enrollee, listed in Appendix C-3, by the average Enrollee enrollment of the last ███████████ of the final Contract Year. Group's obligation to pay the Terminal IBNR Benefit Liability shall survive termination or cancellation of this Addendum and/or the Group Contracts.  Medical Pooling is not applicable during this termination period.

A renewal for an additional subsequent plan year will result in no Terminal IBNR Benefit Liability for the Contract Year, and Variable Dues Charges will continue to be paid by Group as the incurred claims are reported and paid by Health Plan.

e.   Accountable Care Organization (ACO) Financial Collaboration: Accountable Care Organizations (ACO) partnership(s) are collaboration projects involving Health Plan, Group, and the relevant network of hospital and physician provider partners aimed at improving quality and lowering the cost of health care.

Under each ACO partnership(s), global PMPM health care cost targets and quality goals are set for the Contract Year. If PMPM targets are met or exceeded, Group agrees to fund an incentive payment up to the Maximum Incentive Payment Limit shared by the ACO participant partners as described below. If actual experience exceeds the cost targets, ███████████████████████ ███████████.

Appendix C: Page - 7 -

CCSF 0008593
Sidibe_CCSF 0008593

Group has agreed to pay provider incentives for ACO collaboration(s) for the Contract Year as outlined in Appendix C-6.

Health Plan shall provide an annual reconciliation of the collaboration to Group █████████████████████████ ▐█████████████████████ to determine if any amounts are owed to the medical group or hospital.  Any amounts owed to the medical group or hospital would be paid by Health Plan no later than █████████████ following the distribution of the annual reconciliation.  Health Plan will provide an invoice to Group upon payment to the ACOs.  Group shall reimburse Health Plan within ████████ business days of receipt of the invoice.

5.   PAYMENT SCHEDULE

   a.   Payment of Capitation:  Health Plan will invoice Group on approximately the twentieth (20th) of each month for Capitation as of the first of that month for that same month for each Member assigned to this Alternative Funding Addendum.  The Capitation invoice will be based on Health Plan's count of Members with personal physicians, and will be supported by detail that Health Plan will provide shortly after the monthly invoice.  Group agrees to pay this invoice by depositing the invoiced amount into Health Plan's account with Bank of America (#1499-9-05524) by the ACH (Automated Clearing House) bank transfer process no later than ████████ business days after Group's receipt of the invoice and supporting detail.  Group agrees to pay the invoiced amount subject to eligibility reconciliation in the subsequent month(s).

   b.   Payment of Variable Dues Charges:  Health Plan will invoice Group ██████████████ for Variable Dues Charges paid by Health Plan in the prior █████  Variable Dues Charges are all Benefit claims not covered by Capitation as follows:  (a) medical claims; (b) pharmacy claims; and (c) group performance payments.  Health Plan's invoices will be supported by claims detail including group ID, , date of service, paid date, provider ID, paid amounts, etc.  Group agrees to pay each invoice by depositing the invoiced amount into Health Plan's account with Bank of America (#1499-9-05524) within ████████ business days by the ACH (Automated Clearing House)

Appendix C:  Page - 8 -

bank transfer process.  Group agrees to pay the invoiced amount subject to reconciliation on all adjusted claims in subsequent month(s).

c.  <u>Payment of Administrative Fees, Medical Pooling Charges and other Fixed Dues Charges</u>:  Health Plan will invoice Group for Administrative Fees, Medical Pooling Charges and other Fixed Dues Charges on approximately the first (1st) of each month for that same month.  The invoice will be based on Health Plan's count of eligible Enrollees, and shall include only one charge per contract or family unit (e.g., E, E+1 or E+2) assigned to this Alternative Funding Addendum. Group agrees to pay by depositing the invoiced amount into Health Plan's account with Bank of America (#1499-9-05524) by the ACH (Automated Clearing House) bank transfer process no later than ▮▮▮ business days after receipt of the invoice with supporting detail. Group agrees to pay the invoiced amount subject to eligibility reconciliation during the subsequent month(s) in accordance with the Wash Rule.  The monthly Fixed Dues Charges are set forth in Appendix C-1.

d.  <u>Grace Period</u>:  A grace period of ▮▮▮ days will be allowed for payment of Fixed Dues Charges, including Capitation and Medical Pooling Charges, and a grace period of ▮▮▮ days will be allowed for payment of Variable Dues Charges.

Members will be eligible for Benefits under the Group Contracts only for the period for which Dues have been fully paid.

6.  <u>REPORTS</u>

a.  Subject to state and federal law requirements regarding confidentiality of medical and personal information, Health Plan will prepare in its standard format summaries of checks  issued, paid, voided, canceled and not presented for payment, including the amounts thereof and any special reports of uncashed checks required to comply with applicable forfeiture provisions of the Plan or abandoned property laws.  Such summaries and reports will not include Member-identifiable medical or personal information.

b.  Health Plan shall also provide Group with the periodic reports specified in Appendix C-4.

Appendix C:  Page - 9 -

c.    In accordance with the Knox-Keene Act, the Confidentiality of Medical Information Act, the U.S. Public Health Service Act and other applicable privacy laws, Health Plan will not release individually identifiable medical information regarding Members to the Group.  Group specifically acknowledges that Health Plan is subject to Health & Safety Code Section 1374.8.

7.    <u>TERMINATION</u>

a.    With ▮▮▮▮ notice, Health Plan may, in its sole discretion, terminate this Addendum for Group's failure to pay Dues in accordance with the Addendum's "Payment Schedule" provisions.

b.    With ▮▮▮▮ notice, Health Plan may, in its sole discretion, terminate this Addendum if there is a change in the Group Contracts enrollment of ±▮% from the enrollment on the effective date of this Addendum.

c.    This Addendum will terminate automatically on the effective date of the enactment or interpretation of any law, ruling or other determination by any governmental authority prohibiting the continuance of this alternative dues payment arrangement.

d.    If this Addendum is terminated, then Part V. ["Dues"] of the Group Contracts shall be revived as of the termination date.

e.    Notwithstanding the preceding, Group remains responsible for the Terminal IBNR Benefit Liability.

8.    <u>GENERAL TERMS</u>

a.    <u>Audit</u>: During the term of this Addendum, Group may inspect and audit Benefits payment records relevant to Health Plan's invoices under this Addendum with ▮▮▮▮ days prior written notice and request for such records.  Any examination of individual Benefit payment records will be carried out in a manner agreed to in

Appendix C: Page - 10 -

CCSF 0008596

Sidibe_CCSF 0008596

advance by the parties, and designed to protect the confidentiality of individually identifiable medical information regarding of the Members.

Audits may be conducted by Group's audit staff, or by an independent contractor employed at Group's expense, which must be either a Certified Public Accountant or otherwise professionally qualified to perform such auditing services. Health Plan is not required to allow access for the purpose of an audit to any individual Health Plan reasonably believes is likely to misuse, or misappropriate, information which may be made available during the course of an audit as a result of a conflict of interest. Nor is Health Plan required to allow access to any independent contractor whose compensation for performing such an audit is contingent on, or otherwise wholly or partially based on, the audit findings.

All audit protocols shall be based on generally accepted audit standards selected to achieve verifiable, statistically valid results.

b.



Appendix C: Page - 11 -

**CCSF 0008597**

Sidibe_CCSF 0008597

9.   INFORMATION REQUIRED

Group agrees to furnish Health Plan information which Health Plan may from time to time reasonably require to meet its obligations under this Addendum. Health Plan shall not be responsible for any delay, or non-performance, caused by the failure of the Group to timely furnish required information.

IN WITNESS WHEREOF, the parties have executed this Addendum by their respective authorized officers duly authorized to act on their behalf.

CALIFORNIA PHYSICIANS' SERVICE,
d.b.a. BLUE SHIELD OF CALIFORNIA

San Francisco Health Service System Fund

By: _William McQueen_

By: _Catherine J. Dodd_

Title: _VP & Gm_

Title: _Director, HSS_

Date: _10/03/2014_

Date: _10/14/2014_

Appendix C:  Page - 12 -

**CCSF 0008599**

Sidibe_CCSF 0008599

# EXHIBIT 41

# RIDER TO GROUP AGREEMENT

## BETWEEN CALIFORNIA PHYSICIANS' SERVICE, dba BLUE SHIELD OF CALIFORNIA

## AND

## CITY AND COUNTY OF SAN FRANCISCO

## JANUARY 1, 2016

CCSF 0055216

Sidibe_CCSF 0055239

## RIDER TO GROUP AGREEMENT

THIS RIDER TO GROUP HEALTH SERVICE CONTRACT ("Rider" or "Agreement") dated as of January 1, 2016, is attached to and a part of the Group Health Service Contract, including the Evidence of Coverage , incorporated by reference herein (the "Group Agreement"), whose effective date is January 1, 2016 (the "Effective Date"), between CALIFORNIA PHYSICIANS' SERVICE, dba BLUE SHIELD OF CALIFORNIA ("Contractor" or "Health Plan") and the CITY AND COUNTY OF SAN FRANCISCO ("Group" or "City").

Capitalized terms contained in this Agreement and not defined herein shall have the meanings assigned to such terms in the Group Agreement.  The term "Group Agreement" shall refer to the entire Group Agreement, including this Agreement.

### Recitals

WHEREAS, the City and County of San Francisco, , acting by and through its Director of its Health Service System or the Director's designated agent  ("City") wishes to receive Health Plan services, including but not limited to; Health Plan administration, Health Plan claims payment, Health Plan provider network administration, and pharmacy benefit management services; and,

WHEREAS, Contractor represents and warrants that it is qualified to perform the Services required by City as set forth under this Agreement;

WHEREAS, approval for this Amendment was obtained when the Civil Service Commission approved file No. 0135-16-8 on April 4, 2016, which granted the Health Service System continuing approval for benefit related contracts;

Now, THEREFORE, the parties agree as follows:

### Article 1    Definitions

The following definitions apply to this Agreement:

1.1    "Agreement" means this contract document, including all attached appendices, and all applicable City Ordinances and Mandatory City Requirements which are specifically incorporated into this Group Agreement by reference as provided herein.

1.2    "City", "the City", or "Group" means the City and County of San Francisco, a municipal corporation, acting by and through both its Director of the Health Service System or the Director's designated agent.

1.3    "CMD" means the Contract Monitoring Division of the City.

1

IN WITNESS WHEREOF, the parties hereto have executed this Group Agreement effective January 1, 2016.

HEALTH SERVICE SYSTEM

CATHERINE J. DODD PhD, RN.

Director, Health Service System

BLUE SHIELD OF CALIFORNIA

PAUL MARKOVICH
President and CEO Blue Shield

Federal Tax ID Number: 96-0360524

**APPROVED AS TO FORM**:
Dennis J. Herrera

City Attorney

ERIK A. RAPOPORT/
GUSTIN R. GUIBERT
Deputy City Attorney

26

## APPENDIX B - ALTERNATIVE
## FUNDING ADDENDUM
### for group contract W0051448

THIS APPENDIX B ("Addendum") to the Rider to the Group Health Service Contracts dated as of January 1, 2016 ("Group Contracts") between CALIFORNIA PHYSICIANS' SERVICE, d.b.a. BLUE SHIELD OF CALIFORNIA ("Health Plan"), and the SAN FRANCISCO HEALTH SERVICE SYSTEM FUND ("Group") is part of the Group Contracts for group number W0051448 whose effective date is January 1, 2016 (the "Effective Date"). This Addendum is referred to as a "Flexible Funding Addendum" in the Group Contracts.

The purpose of this Addendum is to provide for an alternative dues payment arrangement to the Group Contracts for Enrollees assigned to group number W0051448 (see Appendix B-6 for group structure). For so long as this Addendum remains in effect, it shall replace and supersede any inconsistent terms of Part V. ["Dues"], of the Group Contracts. This is an alternative dues payment arrangement only. All other terms and conditions of the Group Contracts shall otherwise remain in full force and effect.

### 1.   TERM

This Addendum is effective for the period January 1, 2016 through December 31, 2016, unless terminated at an earlier date under the "Termination" provision of this Addendum, or the "Cancellation/Reinstatement/Grace Period" provisions of the Group Contracts.

### 2.   DEFINITIONS

The following definitions shall apply to this Addendum. Unless otherwise defined in this Addendum, the definitions in the Group Contracts shall also apply to this Addendum.

CCSF 0055272
Sidibe_CCSF 0055295

a.   <u>Administrative Fee</u> – The amount charged by Health Plan to administer the Group Contracts for each Enrollee covered under this Addendum. Any changes in legislation as a result of federal or state mandates are not included in the administrative fee.

b.   <u>Benefits</u> – The covered services which a Member is entitled to receive under the Group Contracts.

c.   <u>Capitation</u> – A prepaid periodic PMPM payment paid by Health Plan to participating providers for their provision of agreed upon services. Capitated providers include: Independent Practice Associations (IPAs) and medical groups, chiropractic, acupuncture, and mental health and substance abuse providers.

d.   <u>Contract Year</u> – The one-year term set forth in the Group Contracts.

e.   <u>Dues</u> – Payments to Health Plan from Group comprised of Fixed Dues Charges and Variable Dues Charges. See Group Contracts Part V. "Dues" for additional requirements.

f.   <u>Enrollee</u> – refers to the active employee or early retiree assigned to group W0051448 as set forth in Appendix B-7. For this Addendum, Enrollee has the same meaning as subscriber, primary contract holder, or Employee.

g.   <u>Fixed Dues Charges</u> – The fixed components of Dues comprised of Administrative Fee, Medical Pooling Charge, and legislative fees which are pre-set amounts to be paid on a pre-defined payment schedule as set forth in Appendix B-1 in addition to the actual Capitation payments.

Appendix B: Page - 2 -

CCSF 0055273
Sidibe_CCSF 0055296

h.    Group Contracts – The group health service contracts entered into between the Health Plan and Group.

i.    Maximum Group Financial Liability - The Dues amount paid in the Contract Year not to exceed the Maximum Group Financial Liability Target.

j.    Maximum Group Financial Liability Target – Under this Alternative Funding Addendum, Group is financially responsible up to ▇▇% of the expected annual Dues liability.  This target is set by Health Plan prior to the beginning of the contract year at ▇▇% of the expected monthly Dues per Enrollee as a PEPM target. At the end of the contract year, the PEPM target is multiplied by the actual Enrollee months in the contract year to determine the annual target as described in Section 4b and set forth in Appendix B-2. The Maximum Group Financial Liability Target (PEPM) for the 2016 contract year is $▇▇▇▇.

k.    Member – The Enrollee and all enrolled dependents assigned to group number W0051448 as set forth in Appendix B-7.

l.    PEPM – Per Enrollee Per Month. For example, a PEPM cost means a set cost charged for every Enrollee in the group in a given month.

m.    PMPM – Per Member Per Month.  A PMPM cost means a set cost charged for every Member enrolled in the group in a given month.

n.    Medical Pooling Charge (excludes pharmacy claims) – The Health Plan charge to assume the liability for Benefits in excess of the Medical Pooling Point. Medical Pooling Charge is a Fixed Dues Charge as set forth in Appendix B-1.  This charge is set by Health Plan prior to the beginning of the Contract Year as a PEPM charge.

o.    Medical Pooling Point (excludes pharmacy claims) – The highest financial liability Group is responsible to fund for Variable Dues Charges (exclusive of outpatient prescription charges) for any one Member in a contract year.  Any charge amount over the Medical Pooling Point for an individual member in a contract year will be reimbursed to Group.   Medical Pooling Point reconciliation is described in Section 4c and Appendix B-2.

Appendix B: Page - 3 -

p.  Terminal Incurred-But-Not-Reported (IBNR) Benefit Liability – The Variable Dues Charges incurred during the Contract Year but paid after the termination date for a period of ▮▮▮▮▮ following the Contract Year not to exceed the Terminal Incurred-But-Not-Reported (IBNR) Benefit Liability Target.  This liability amount is only applied in the event that this Addendum and/or the Group Contracts are/is terminated or cancelled.

q.  Terminal Incurred-But-Not-Reported (IBNR) Benefit Liability Target – This target is set by the Health Plan prior to the beginning of the Contract Year as a PEPM target. In the event this Addendum and/or the Group Contracts are/is terminated or cancelled, the PEPM target will be multiplied by the average monthly Enrollees in the last ▮▮▮▮▮▮▮ of the final Contract Year to determine the annual target as described in Section 4d and set forth in Appendix B-3.

r.  Variable Dues Charges – The variable component(s) of Dues comprised of fee-for-service medical and outpatient prescription claims charged to Group on a regular basis and paid on a pre-defined payment schedule.

s.  Wash Rule – Administrative Fees and Medical Pooling Charges will be paid as follows with respect to new Members (and terminated Members) beginning (or terminating) coverage in the middle of a coverage month:

> i. Dues are payable for the entire month for new Members whose coverage effective date falls between the 1st and the 15th day of the month. No dues are payable for the month for Members whose effective dates are after the 15th day of the month.
> ii. Dues are payable for the entire month for Members whose coverage is terminated on or after the 16th day of that month. No dues are payable for the month for Members whose coverage terminates before the 16th day of the month.

3.  ALTERNATIVE DUES PAYMENT ARRANGEMENT

All Group Contracts covered by this Alternative Funding Addendum are subject to the Fixed Dues Charges and Variable Dues Charges.  To the extent that a Group Contract is fully-insured, Enrollees in that Group Contract are not subject

Appendix B: Page - 4 -

CCSF 0055275
Sidibe_CCSF 0055298

to this Addendum.  See Appendix B-7 for a description of the Group Contract structure.

      a.    Fixed Dues Charges are calculated based on the number of Enrollees enrolled under the Group Contracts, and are adjusted monthly based on actual enrollment.  Fixed Dues Charges include: (1) Administrative Fees; (2) Capitation; (3) Medical Pooling Charges; and (4) other legislative fees/taxes (if applicable) as set forth in Appendix B-1.

      b.    Variable Dues Charges are fee-for-service claims for Benefits including, but not limited to, institutional and outpatient prescription claims, out-of-area and other paid claims (up to the Medical Pooling Point, if applicable).

Nothing in this Addendum shall limit Health Plan's ability to modify its contracts with its participating providers.

In the event Health Plan becomes liable for any state or federal taxes, fees, other charges or offsets, whether by reason of a tax ruling, or any other determination by any governmental authority including amounts assessed under Medicare Secondary Payer regulations, Group agrees to reimburse Health Plan for such amounts, including any retroactive assessments attributable to Benefit payments made under the Group Contracts, but only at the next renewal and only during the following plan year as part of Fixed Dues Charges unless the Group Contracts are terminated or cancelled.

If Group proposes a change in the Group Contracts, or Group changes Benefits, eligibility criteria, employee contributions, or if there is a change in the Group Contracts enrollment of ±■■% from the enrollment on the effective date of this Addendum, Health Plan may make an equitable adjustment to the Dues to reflect such change, but only at the next renewal for the following plan year.

4.    GROUP'S FINANCIAL RESPONSIBILITY

      a.    Funding Payment of Dues:  Group agrees to pay Health Plan the Fixed Dues Charges and Variable Dues Charges up to the Maximum Annual Financial Liability Target in accordance with the "Payment Schedule" provisions set forth in Section 5 of this Addendum.  With respect to retroactive enrollment deletions requested by Group, Health Plan will credit only those Fixed Dues

Appendix B: Page - 5 -

CCSF 0055276
Sidibe_CCSF 0055299

Charges recoverable under Health Plan's contracts with its participating providers, and only those Variable Dues Charges that Health Plan actually recovers.

b.     Maximum Annual Financial Liability Reconciliation: ▮▮▮▮▮▮▮ ▮▮▮▮ days after the close of the contract year, Health Plan will reconcile the Group's total paid Fixed Dues Charges and Variable Dues Charges for the Contract Year, including any Variable Dues Charges carried over from the prior Contract Year against the Maximum Group Financial Liability Target set forth in Appendix B-2.  Any Variable Dues Charges for the Contract Year, which have not been invoiced by Health Plan when the reconciliation is performed, will be carried forward and reconciled during the following Contract Year.

The Maximum Annual Financial Liability Target does not include any amounts for extra contractual benefits authorized by Group including, but not limited to, services which Health Plan has determined not to be medically necessary as defined under its standard medical policy.

In the event an annual reconciliation demonstrates that Group has made payments in excess of the Maximum Annual Financial Liability Target, Health Plan will repay Group the overpayment amount.  The repayment shall accompany the annual reconciliation sent to Group.

If this Addendum is terminated, Health Plan will, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ days after the termination date, reconcile Group's total Dues payments (Fixed Dues Charges and Variable Dues Charges paid during the Contract Year) against the Group's Maximum Group Financial Liability Target for the final Contract Year of the Addendum.  Variable Dues Charges incurred during the final Contract Year, but paid after the termination date (run out claims), will be reconciled against the Terminal IBNR Benefit Liability for a period of ▮▮▮▮▮.  Medical pooling will not be applied to run out claims.

c.     Medical Pooling Point Reconciliation:  As part of the Maximum Annual Financial Liability reconciliation, Health Plan will also reimburse Group for any paid Variable Dues Charges subject to the Medical Pooling Point in excess of the Medical Pooling Point that have not already been reimbursed via invoice credit.

Appendix B: Page - 6 -

CCSF 0055277
Sidibe_CCSF 0055300

During the year-end reconciliation, and ▉▉▉▉▉▉▉ days after the contract period ends, the Variable Dues Charges that exceed the Medical Pooling Point per member charged to the Member account (excluding the outpatient prescription claim charges) will be reconciled. Medical Pooling is based on a paid basis (incurred in the last ▉▉▉ and paid in the last ▉▉▉ for the policy period. In other words, medical claims that are subject to medical pooling in 2016 will include medical claims incurred from ▉▉▉▉▉▉▉▉ (covering the ▉▉▉▉▉ period before the Contract Year and the ▉▉▉▉▉▉▉▉▉▉▉ but paid from ▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

d.  Terminal IBNR Benefit Liability: If this Addendum, or the Group Contracts, are terminated or canceled, Group shall continue to be liable up to the Terminal IBNR Benefit Liability for ▉▉▉▉▉▉ ▉▉▉▉ after the final Contract Year. Calculation for the Terminal IBNR Benefit Liability will be calculated by multiplying the Terminal IBNR Benefit Liability Target per Enrollee, listed in Appendix B-3, by the average Enrollee enrollment of the last ▉▉▉▉▉▉▉ of the final Contract Year. Group's obligation to pay the Terminal IBNR Benefit Liability shall survive termination or cancellation of this Addendum and/or the Group Contracts. Medical Pooling is not applicable during this termination period.

    A renewal for an additional subsequent plan year will result in no Terminal IBNR Benefit Liability for the Contract Year, and Variable Dues Charges will continue to be paid by Group as the incurred claims are reported and paid by Health Plan.

e.  Accountable Care Organization (ACO) Financial Collaboration: Accountable Care Organizations (ACO) partnership(s) are collaboration projects involving Health Plan, Group, and the relevant network of hospital and physician provider partners aimed at improving quality and lowering the cost of health care.

    Under each ACO partnership(s), global PMPM health care cost targets and quality goals are set for the Contract Year. If PMPM targets are met or exceeded, Group agrees to fund an incentive payment up to the Maximum Incentive Payment Limit shared by the ACO participant partners as described below. If actual experience exceeds the cost targets, ▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉

Appendix B: Page - 7 -

Group has agreed to pay provider incentives for ACO collaboration(s) for the Contract Year as outlined in Appendix B-6.

Health Plan shall provide an annual reconciliation of the collaboration to Group ███████████████████████████

███████████████████████ to determine if any amounts are owed to the medical group or hospital.  Any amounts owed to the medical group or hospital would be paid by Health Plan no later than ██████████ following the distribution of the annual reconciliation.  Health Plan will provide an invoice to Group upon payment to the ACOs.  Group shall reimburse Health Plan within ████████████████████ of receipt of the invoice.

5.     <u>PAYMENT SCHEDULE</u>

    a.     <u>Payment of Capitation</u>: Health Plan will invoice Group on approximately the twentieth (20th) of each month for Capitation as of the first of that month for that same month for each Member assigned to this Alternative Funding Addendum. The Capitation invoice will be based on Health Plan's count of Members with personal physicians, and will be supported by detail that Health Plan will provide shortly after the monthly invoice. Group agrees to pay this invoice by depositing the invoiced amount into Health Plan's account with Bank of America (#1499-9-05524) by the ACH (Automated Clearing House) bank transfer process no later than ██████ business days after Group's receipt of the invoice and supporting detail. Group agrees to pay the invoiced amount subject to eligibility reconciliation in the subsequent month(s).

    b.     <u>Payment of Variable Dues Charges</u>: Health Plan will invoice Group ███████████ for Variable Dues Charges paid by Health Plan in the prior ██████. Variable Dues Charges are all Benefit claims not covered by Capitation as follows:  (a) medical claims; (b) pharmacy claims; and (c) group performance payments. Health Plan's invoices will be supported by claims detail including group ID, , date of service, paid date, provider ID, paid amounts, etc. Group agrees to pay each invoice by depositing the invoiced amount into Health Plan's account with Bank of America (#1499-9-05524) within ███████ business days by the ACH (Automated Clearing House)

Appendix B:  Page - 8 -

CCSF 0055279

Sidibe_CCSF 0055302

bank transfer process.  Group agrees to pay the invoiced amount subject to reconciliation on all adjusted claims in subsequent month(s).

c.   Payment of Administrative Fees, Medical Pooling Charges and other Fixed Dues Charges:  Health Plan will invoice Group for Administrative Fees, Medical Pooling Charges and other Fixed Dues Charges on approximately the first (1st) of each month for that same month.  The invoice will be based on Health Plan's count of eligible Enrollees, and shall include only one charge per contract or family unit (e.g., E, E+1 or E+2) assigned to this Alternative Funding Addendum. Group agrees to pay by depositing the invoiced amount into Health Plan's account with Bank of America (#1499-9-05524) by the ACH (Automated Clearing House) bank transfer process no later than ▉▉▉▉ business days after receipt of the invoice with supporting detail. Group agrees to pay the invoiced amount subject to eligibility reconciliation during the subsequent month(s) in accordance with the Wash Rule. The monthly Fixed Dues Charges are set forth in Appendix B-1.

d.   Grace Period:  A grace period of ▉▉▉▉ days will be allowed for payment of Fixed Dues Charges, including Capitation and Medical Pooling Charges, and a grace period of ▉▉▉▉ days will be allowed for payment of Variable Dues Charges.

Members will be eligible for Benefits under the Group Contracts only for the period for which Dues have been fully paid.

6.   REPORTS

a.   Subject to state and federal law requirements regarding confidentiality of medical and personal information, Health Plan will prepare in its standard format summaries of checks  issued, paid, voided, canceled and not presented for payment, including the amounts thereof and any special reports of uncashed checks required to comply with applicable forfeiture provisions of the Plan or abandoned property laws.  Such summaries and reports will not include Member-identifiable medical or personal information.

b.   Health Plan shall also provide Group with the periodic reports specified in Appendix B-4.

CCSF 0055280
Sidibe_CCSF 0055303

c.    In accordance with the Knox-Keene Act, the Confidentiality of Medical Information Act, the U.S. Public Health Service Act and other applicable privacy laws, Health Plan will not release individually identifiable medical information regarding Members to the Group.  Group specifically acknowledges that Health Plan is subject to Health & Safety Code Section 1374.8.

7.    <u>TERMINATION</u>

a.    With &#9608;&#9608; notice, Health Plan may, in its sole discretion, terminate this Addendum for Group's failure to pay Dues in accordance with the Addendum's "Payment Schedule" provisions.

b.    With &#9608;&#9608; notice, Health Plan may, in its sole discretion, terminate this Addendum if there is a change in the Group Contracts enrollment of ±&#9608;% from the enrollment on the effective date of this Addendum.

c.    This Addendum will terminate automatically on the effective date of the enactment or interpretation of any law, ruling or other determination by any governmental authority prohibiting the continuance of this alternative dues payment arrangement.

d.    If this Addendum is terminated, then Part V. ["Dues"] of the Group Contracts shall be revived as of the termination date.

e.    Notwithstanding the preceding, Group remains responsible for the Terminal IBNR Benefit Liability.

8.    <u>GENERAL TERMS</u>

a.    <u>Audit:</u>  During the term of this Addendum, Group may inspect and audit Benefits payment records relevant to Health Plan's invoices under this Addendum with &#9608;&#9608; days prior written notice and request for such records.  Any examination of individual Benefit payment records will be carried out in a manner agreed to in

Appendix B: Page - 10 -

CCSF 0055281

Sidibe_CCSF 0055304

advance by the parties, and designed to protect the confidentiality of individually identifiable medical information regarding of the Members.

Audits may be conducted by Group's audit staff, or by an independent contractor employed at Group's expense, which must be either a Certified Public Accountant or otherwise professionally qualified to perform such auditing services. Health Plan is not required to allow access for the purpose of an audit to any individual Health Plan reasonably believes is likely to misuse, or misappropriate, information which may be made available during the course of an audit as a result of a conflict of interest. Nor is Health Plan required to allow access to any independent contractor whose compensation for performing such an audit is contingent on, or otherwise wholly or partially based on, the audit findings.

All audit protocols shall be based on generally accepted audit standards selected to achieve verifiable, statistically valid results.

b.



Appendix B: Page - 11 -

CCSF 0055282
Sidibe_CCSF 0055305

9.    INFORMATION REQUIRED

Group agrees to furnish Health Plan information which Health Plan may from time to time reasonably require to meet its obligations under this Addendum.  Health Plan shall not be responsible for any delay, or non-performance, caused by the failure of the Group to timely furnish required information.

IN WITNESS WHEREOF, the parties have executed this Addendum by their respective authorized officers duly authorized to act on their behalf.

CALIFORNIA PHYSICIANS' SERVICE,        San Francisco Health Service System
d.b.a. BLUE SHIELD OF CALIFORNIA        Fund


By: _____        By: _____
                                          CATHERINE J. DODD, PHD RN

Title: _____        Title: Director

Date: _____        Date: _____


Appendix B:  Page - 12 -

## APPENDIX B-1
## ALTERNATIVE FUNDING ADDENDUM

### Fixed Dues Charges

This Appendix B-1 is applicable for <u>January 1, 2016 -December 31, 2016.</u>

Administrative Fee PEPM:                                $▮

Projected Capitation PEPM:                            $▮

Legislative Fee PEPM:                                  $▮

The Group has elected Medical Pooling Point coverage with the Medical Pooling Point and Medical Pooling Charge set forth below.

Medical Pooling Point:                                 $▮

Medical Pooling Charge PEPM:                           $▮

Assumed average contract size:                         ▮

The Administration Fee assumes that there are no commissions payable. The above fees and targets are subject to renewal assumptions set forth in Appendix B-5, and may be adjusted at the next renewal for the following Contract Year should any of the assumptions not hold true.

Capitation it paid by Health Plan to participating providers on a PMPM basis and converted to a PEPM charge for this Addendum. Projected Capitation PEPM is provided in this exhibit on an illustrative basis. Group will be charged actual paid provider capitation amounts.

Legislative fee is a new fee for the 2016 Contract Year and includes Federal PPACA (Patient Protection and Affordable Care Act) taxes and fees.

Appendix B-1 Page -1-

CCSF 0055284
Sidibe_CCSF 0055307

## APPENDIX B-2
## Alternative Funding Addendum

### Maximum Group Financial Liability Target

The Maximum Group Financial Liability PEPM target for the 2016 Contract Year is
$      .  The Maximum Group Financial Liability Target is the PEPM target of
$     multiplied by the number of Enrollee months in the Contract Year.

Reconciliation will be performed within ▮▮▮ days following the Contract Year
based on actual Dues payments multiplied by the number of Enrollee months in
the Contract year not to exceed the Maximum Group Financial Liability.

Group will be liable up to the Maximum Group Financial Liability.

The Maximum Group Financial Liability PEPM target of $▮▮▮▮ for the 2016
Contract Year is comprised as follows:

|  | PEPM |
| --- | --- |
| Projected Incurred Medical Claims: | $▮ |
| Projected Rx claims: | $▮ |
| Projected Capitation Cost: | $▮ |
| Administrative Fee PEPM: | $▮ |
| Medical Pooling Charge PEPM: | $▮ |
| Legislative Fees PEPM: | $▮ |
| Maximum Group Financial Liability PEPM target: | $▮ |

Medical Pooling Point reconciliation will also be performed within ▮▮▮ days
following the Contract Year per Section 4c of this Addendum.

Appendix B-2 Page -1-

**APPENDIX B-3**
**Alternative Funding Addendum**

**Terminal IBNR Benefit Liability Target**

The Terminal Incurred-But-Not-Reported (IBNR) Benefit Liability Target per Enrollee for the 2016 Contract Year is $███████  The Terminal IBNR Benefit Liability is the average monthly Enrollees in the last ████████████ of the final Contract Year multiplied by the Terminal IBNR Benefit Liability Target per Enrollee.

In the event this Addendum or the Group Contracts are terminated or cancelled, Terminal IBNR Benefit Liability will be calculated as set forth in Section 4d.

Group will be liable up to the Terminal IBNR Benefit Liability.

2016 Terminal IBNR Benefit Liability Target per Enrollee:   $███████

Appendix B-3 Page -1-

CCSF 0055286

Sidibe_CCSF 0055309

**APPENDIX B-4**
**Alternative Funding Addendum**

**PLAN REPORTS**

Plan Reports:

a.    Health Plan will make the necessary reports to the United States
      Internal Revenue Service and State Franchise Tax Board regarding
      benefit payments to providers of service as required by law.

b.    Health Plan will make the following monthly invoices available to
      Group (subject to the requirements of state and federal law regarding
      the confidentiality of medical and personal information):

             (1)    Capitation;
             (2)    Administrative Fees; and
             (3)    Payment Registers

CCSF 0055287
Sidibe_CCSF 0055310

## APPENDIX B-5
## Alternative Funding Addendum

### 1/1/2016-12/31/2016 Renewal Assumptions

Health Plan's renewal for this Alternative Funding Addendum is based on the following assumptions set forth below. Reference to "flex-funded" or "flex-funding plans" has the same meaning as the financial arrangement outlined in this Alternative Funding Addendum. Should any of the assumptions vary, Health Plan reserves the right to adjust rates in the following Contract Year.

1. **PPACA**: Health Plan has undertaken its best efforts to analyze and implement the requirements of the federal Patient Protection and Affordable Care Act ("PPACA"). The information included in this quote includes benefit changes required by the Act. However, a number of questions remain, and federal regulators continue to issue new regulations and regulatory guidance. Therefore, the final plan and rates issued by Health Plan may be different than those stated herein to accommodate additional changes required by the PPACA. All rate changes shall be negotiated for the following plan year.

    **Insurer Fee and Reinsurance & PCORTF Fee**: Applicable Federal, State, and ACA taxes/fees are included in the legislative fees. These include a ▉% of premium ACA insurer fee; a $▉ PMPM ACA reinsurance fee; and a $▉ PMPM Patient Center Outcomes Research Trust Fund (PCORTF) fee.

2. **Enrollment (Census)**: The following is a summary of the January 2015 census used for fee/rate development:

|  | Active/COBRA | Early Retiree | Splits | Total Expected Flex Enrollment |
|---|---|---|---|---|
| Single | 7,174 | 1,673 | 55 | 8,902 |
| 2 Party | 4,473 | 637 | 0 | 5,110 |
| Family | 4,318 | 273 | 0 | 4,591 |
| Spouse Only | 0 | 0 | 444 | 444 |
| Child Only | 3 | 0 | 93 | 96 |
| Spouse & Child Only | 0 | 0 | 60 | 60 |
| Total Contracts/Subscribers* | 15,968 | 2,583 | 652 | 19,203 |
| Total Members | 33,830 | 3,285 | 608 | 37,723 |

Appendix B-5 Page -1-

CCSF 0055288

Sidibe_CCSF 0055311

*Total Contracts/Subscribers is equivalent to Total Enrollees
Should actual enrollment vary by more than ▇% (in total, by product, or by tier) from the above table, Health Plan reserves the right to review and modify rates but only at the next contract renewal.

3. **Effective Date:** Renewal rates are valid for the effective date shown. The Contract Year is 12 months – January 1, 2016 through December 31, 2016.

4. **Participation**: 75% of eligible employees must enroll in employer-sponsored medical coverage. When offering Health Plan coverage with another carrier, 75% of eligible employees must enroll in employer-sponsored medical coverage.

5. **Eligible Employees:** Eligible employees are defined as active, permanent and working a minimum of 20 hours per week. Eligibility is determined by the HSS.

6. **Eligible Dependents:** Eligible dependents include a legally married spouse, domestic partner, or a child up to age 26. Eligibility is determined by the HSS.

7. **Retirees:** Renewal rates/fees assume that there are retirees (under 65 and over 65), and that all medical carriers cover retirees (under 65 and over 65).

8. **Workers' Compensation:** All eligible employees must have Workers' Compensation coverage where required by law.

9. **Broker Commission:** Renewal rates/fees assume no broker commissions/fees.

10. **Consolidated Omnibus Budget Reconciliation Act (COBRA) Participation:** Renewal rates assume a current COBRA participation of <1% of total enrollment. Should current COBRA percentage increase or decrease by (+/- 2%), Health Plan reserves the right to adjust the final rates for the following Contract Year.

11. **General Provisions:** Renewal rates are for flex-funding plans, with standard Health Plan provisions as outlined in the Health Plan Guide, unless otherwise stated.

12. **Current Carrier Offerings/Exclusivity:** Renewal rates assume that Health Plan's $25 Office Visit Health Maintenance Organization (HMO) is offered

CCSF 0055289
Sidibe_CCSF 0055312

alongside Kaiser's Health Maintenance Organization(HMO) and the City Plan Preferred Provider Option (PPO) only.

13. **Additional Carrier and/or Plan Offerings:** Health Plan's renewal rates assume no changes in Group product or carrier offerings including, but not limited to, the following:
    a. New plan option (Low cost Health Maintenance Organization (HMO), narrow network, or High Deductible Health Plan);
    b. New carrier offering;
    c. Elimination of plan option (eliminate self-funded plan or a Preferred Provider Option (PPO));
    d. Changes in current benefit plan by a competitor; or
    e. New offering to a subset employee population

14. **Benefit Design:** Renewal rates are based upon the provided benefit plan grids for flex-funded Health Maintenance Organization (HMO) and prescription drug plan.  Any deviations will require underwriting approval.

15. **State Mandates/Legislative Changes:** Health Plan reserves the right to modify benefits, or premiums, in connection with changes in federal or state premium taxes, assessments, or benefit mandates enacted during the course of the policy year, but only at the next contract renewal and during the following Contract Year as part of Fixed Dues Charges.

16. **Consistent Tier Ratios:** Renewal rates assume rate ratios by rate tier must be the same for all health plan offerings.  For example, if the two-party rate is set at 2.0 (employee rate x 2.0), the two-party rate for all health plan offerings must be set at a 2.0 rate ratio.

17. **Regional vs. Statewide Rates:** If rates are offered on a regional basis (such as North and South rates), each health plan offered must have their respective rates offered on the same regional rate basis.  For example, if Group decided to offer different employee rates for the Peninsula vs. the East Bay, Health Plan would require all plans that Group offers including Kaiser and United Healthcare to be offered on the same basis.

18. **Active/Early Retiree Pricing:** Renewal rates for each and every health benefit plan must be offered on the same basis, with respect to blended rates covering actives and early retirees as a single group, or separate rates covering actives only and early retirees only.

19. **Medical Pooling Level:** The flex-funded rating assumes a ▮▮▮▮▮▮▮ medical pooling level.  Medical pooling is based on a paid basis (incurred ▮▮▮▮▮▮/ paid ▮▮▮▮▮▮) for the policy period. This means that medical

Appendix B-5: Page -3

CCSF 0055290

Sidibe_CCSF 0055313

claims subject to medical pooling in 2016 would include claims incurred
from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ but paid from
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As medical pooling is
based on a paid basis, any claims (such as IBNR claims) ▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ would be recognized under the 2016 Contract Year.

20. **Package Basis:** The flex-funded quote assumes the active/early retiree
split population will be included under the flex-funded quote while the
Group Medicare Advantage Prescription Drug Plan ("GMAPD") and
Coordination Of Benefits members will be fully insured, i.e., non flex
funded. As a result, the flex-funded quote assumes that Group will make
appropriate changes in group structure to track membership under these
two funding arrangements – flex-funded and fully insured.

21. **Standard Policy:** The fully insured plans assume standard policies,
practices, and contracts.

22. **Flex-Funded Maximum Group Financial Liability:** The Maximum Group
Financial Liability is based on the assumptions above and the current
enrollment distribution. Should there be any variance, such as employee
contributions or enrollment that alters the assumptions, Health Plan
reserves the right to adjust the Maximum group Financial Liability Target in
the following Contract Year. The Maximum Group Financial Liability is
measured on a paid basis for the policy period from 1/1/16 thru 12/31/16.
Claims incurred during this period, but paid after this period are not
included in the Maximum Group Financial Liability reconciliation.

23. 

Appendix B-5: Page -4

CCSF 0055291

Sidibe_CCSF 0055314

**APPENDIX B-6**
**Alternative Funding Addendum**

**Accountable Care Organization (ACO) Partnerships**
**CY2016 ACO Incentive Targets**

Three ACO collaborations are set for the 2016 Contract year:

1.) **Brown and Toland ACO:** Brown and Toland (B&T); California Pacific Medical Center (CPMC), Group (HSS)

2.) **Hills Physicians ACO:** Hills Physician Medical Group(Hill), University of California in San Francisco (UCSF), Dignity Health (Dignity), Group (HSS)

3.) **John Muir ACO:** John Muir Medical Group and John Muir Medical Center, Group (HSS)

ACO PRINCIPLES AND REQUIREMENTS
Blue Shield shall collaborate with the Group and ensure that ACO's uphold and meet the following principles and requirements:

1.) ACO's have a defined network of high-performance primary care and specialty providers, inpatient and outpatient facilities and ancillary providers;

2.) ACO's intent is to provide high quality, cost-effective healthcare services to Members;

3.) ACO's provide patient-centered care for Participants across the continuum of care they need;

4.) ACO's agree that the goal of the collaboration is to operate within budget targets, and to earn shared savings as a part of a value-oriented payment structure as noted in Appendix B-6;

CARE COORDINATION.
ACO's shall coordinate care for its patient population. Blue Shield will collaborate with the ACO's to establish a systematic process for identifying and engaging patients who may benefit from care management.

1.) The ACO's shall consider the risk factors including, but not limited to the following:

a. Behavioral health condition;

b. High cost/high utilization;

c. Poorly controlled or complex conditions; and,

2.) The ACO's shall engage at-risk Participants identified through its process and criteria, including but not limited to the following:

a. Referrals by outside organizations (e.g., insurers, health system, ACO), practice staff or

CCSF 0055292
Sidibe_CCSF 0055315

    patient/family/caregiver; and,

    b. Prospective identification of Participants and proactive outreach based on claims history and referral patterns, as available.

3.) The ACO's provides additional patient and caregiver support, including but not limited to the following:

    a. Educational materials and resources to patients;

    b. Self-management and self-monitoring tools; and,

    c. Structured health education programs.

4.) The ACO's reports at least quarterly on the following:

    a. Total membership engaged in care management programs;

    b. Total membership by type of intervention; and,

    c. Total membership graduated and/or disenrolled from care management programs.

## ACO FINANCIAL & UTILIZATION DASHBOARD:

In order to monitor the performance of the ACO collaborations, Blue Shield shall provide to Group a monthly ACO Dashboard.   The monthly ACO Dashboard will include a Cost of Healthcare Report.  The Cost of Healthcare Report shall provide year-to-date results and shall include ▬▬▬▬▬ of run out claims.  In addition, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Blue Shield shall provide to Group the ACO Dashboard and the Cost of Healthcare Reports monthly until the Health Plan completes the annual reconciliation for all three of the ACO collaborations.

Appendix B-6: Page -1-

Sidibe_CCSF 0055316

CCSF 0055293

ANNUAL RECONCILIATION:

Health Plan shall provide Group an annual reconciliation of each ACO collaboration no later than ███████

determine if any amounts are owed to ACO parties.  Reports provided to the Group shall include:
  1. ████████████████████████████████████████████████████
  2. ████████████████████████████████████████████████████

If an incentive payment is due, then within ██ days from the submission of the annual reconciliation documents

Annual reconciliation dates for the ACO collaborations in 2016 are:
  1. Hill Physician: July 7, 2017
  2. Brown & Toland: October 9, 2017

Within ████████ days of distributing the annual reconciliation, Health Plan will make payment to the ACO parties, if applicable, and will provide an invoice to Group.

Group shall reimburse Health Plan within ████████ business days from date of receipt of the invoice.

Sidibe_CCSF 0055317

CCSF 0055294

## Note: these ACO incentive targets are finalized for CY 2016

### 1. HSS-Specific ACO: Brown &Toland ACO Renewal Cost Targets for 1/1/2016 – 12/31/2016

#### B&T/CPMC Collaboration

| | Cost Target (PMPM) | | Risk Share Allocation % | | | | Maximum Incentive Payouts | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | CPMC | B&T | HSS | Total | CPMC | B&T | Total |
| Tier 1 Target | $ ▮ | (1), (3) | ▮% | ▮% | ▮% | 100% | $ ▮ | $ ▮ | $ ▮ |
| Tier 2 Stretch Target | $▮▮▮.▮▮ | (2) | ▮▮▮% | ▮% | ▮% | 100% | | | |

(1) If Actual PMPM in CY 2016 is less than $▮ PMPM but greater than or equal to $▮ PMPM, the savings are split ▮% CPMC/▮% B&T, ▮% HSS per the Tier 1 incentives

(2) If the actual PMPM in CY2016 is less than $▮ PMPM, the savings between $▮ and $▮ will be split ▮% CPMC/▮% B&T/▮% HSS per the Tier 1 incentives. Additional savings between $▮ PMPM and the actual PMPM, will be split ▮% CPMC/30% B&T/▮% HSS per the Tier 2 incentives. Total incentives shall not exceed $▮ for CPMC and $▮ M for B&T.

(3) If Actual PMPM exceeds $▮ PMPM then ▮▮▮▮▮▮▮▮▮▮▮

Sidibe_CCSF 0055318
CCSF 0055295

## 2. HSS-Specific ACO: Hill Physicians ACO Renewal Cost Targets for 1/1/2016 – 12/31/2016

Targets will be split into 2 tiers:
- Tier 1 Target PMPM excluding large claims excess over $███K **per member per year**
- Tier 2 Target PMPM for large claims excess over $███K **per member per year**



| Cost Targets | PMPM |
|---|---|
| 1.) Target excluding high cost claims excess | $████ |
| 2.) Target for high cost claims excess | $████ |

High cost claims defined as large claims in excess of $████ per member per year. Large claimant costs include ████████████

Provider incentives will be based on the 2 target tiers:
- If actual experience exceeds tier 1 targets, ████████████████████
- Each tier is subject to a maximum incentive payout ceiling
- Providers need to meet targets for both tiers to achieve the total maximum incentive payout of $█████ as set forth in Appendix B-6 on page 5.

### Tier1 – All services excluding facility claims excess
- If actual experience excluding high cost claims excess falls below the Tier 1 targets, savings will be split per the Tier 1 incentive structure
- Tier 1 incentive ceiling is $████████, equivalent to ██% of total incentive ceiling.

Sidibe_CCSF 0055319

CCSF 0055296

## Tier2 – Facility Claims excess

- Tier 2 incentives will only apply if Tier 1 targets are met
- If actual experience of high cost claims excess falls below the Tier 2 high cost claims target, savings will be split per the Tier 2 incentive structure.
- Tier 2 high cost claims incentives ceiling is $█████ equivalent to █% of total incentive ceiling.

| Cost Targets | PMPM | Risk Share Allocation % | | | | | Maximum Incentive Payouts | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | UCSF | Dignity | Hill | HSS | Total | UCSF | Dignity | Hill | Total |
| 1) Target excluding high cost claims excess | $ ████ | █% | █% | █% | █% | 100% | $ | $ ████ | $ ████ | $ ████ |
| 2) Target for high cost claims excess | $ ████ | █% | █% | █% | █% | 100% | $ | $ ████ | $ █ | $ ████ |
| Total Maximum | | | | | | | $ | $ ████ | $ ████ | $ ████ |

High cost claims defined large claims in excess of $190K per member per year. Large claimant costs include ████████████████

Sidibe_CCSF 0055320

CCSF 005297

## 3. Non-HSS Specific ACO: John Muir ACO Collaboration Discounts 1/1/2016 – 12/31/2016

HSS shall receive █████████████████████████████████████████████ HSS
████████████████████████████████████████

## APPENDIX B-7
## Alternative Funding Addendum

## Group Contract Structure

San Francisco Health Service System Fund
January 2016 Group Structure
Group #: W0041558

**Urgent Access to Care e-mails** = send all urgent access to care e-mails to LargeGroup.AccesstoCare@blueshieldca.com with a cc to Summer Morris and include the following:
  Member Name, Member SSN, Group #, Class#, Product and Subgroup.

**Non urgent processing e-mails** = send all non urgent processing to LargeGroup.Dedicated@blueshieldca.com with a cc to Summer Morris and include the following:
  Member Name, Member SSN, Group #, Class#, Product and Subgroup.

**Member eligibility e-mails** = send all member eligibility e-mails to Premier_Priority@blueshieldca.com with a cc to Summer Morris and include the following:
  Member Name, Member SSN, Group #, Class#, Product and Subgroup.

| | |
|---|---|
| H2187 - Active employees, their dependants, their non-Medicare Domestic Partners and COBRA enrollees (Flexi Funded) | HMOX0001 |
| H2187 - Cal-Cobra enrollees | HMOX0004 |
| H2188 - Medicare A&B retirees and Medicare A&B dependants not in MAPD service area | HMOX0003 |
| H2189 - Early Retirees, their non-Medicare-eligible dependants and their Medicare A or B dependants, and non-Medicare-eligible dependants of Medicare A&B | HMOX0001 |
| H2195 - Retirees with Medicare A or B, and dependants with Medicare A or B not assigned to H2189 (Flexi Funded) | HMOX0002 |
| MA0002 - Medicare A&B retirees and Medicare A&B dependants in MAPD service area (Fully Insured) | MAPDSB01 |

### Active / Cobra & Cal-Cobra

| Relation | Status | | | | |
|---|---|---|---|---|---|
| Employee | Active | | | | |
| Spouse/Domestic Partner | Active | | | | |
| Additional Dependants | Active | | | | |
| Relation | Enrolled in: | Class | Product | Funding | Subgroup |
| Employee | H2187-0000 | 1000 | HMOX0001 | Flex | 1001 |
| Spouse/Domestic Partner | H2187-0000 | 1000 | HMOX0001 | Flex | 1001 |
| Additional Dependants | H2187-0000 | 1000 | HMOX0001 | Flex | 1001 |

| Relation | Status | | | | |
|---|---|---|---|---|---|
| Employee | Cobra | | | | |
| Spouse/Domestic Partner | Cobra | | | | |
| Additional Dependants | Cobra | | | | |
| Relation | Enrolled in: | Class | Product | Funding | Subgroup |
| Employee | H2187-0CBA | C100 | HMOX0001 | Flex | 1001 |
| Spouse/Domestic Partner | H2187-0CBA | C100 | HMOX0001 | Flex | 1001 |
| Additional Dependants | H2187-0CBA | C100 | HMOX0001 | Flex | 1001 |

| Relation | Status | | | | |
|---|---|---|---|---|---|
| Employee | Cal-Cobra | | | | |
| Spouse/Domestic Partner | Cal-Cobra | | | | |
| Additional Dependants | Cal-Cobra | | | | |
| Relation | Enrolled in: | Class | Product | Funding | Subgroup |
| Employee | H2187-0CC0 | C500 | HMOX0004 | N/A | 1000 |
| Spouse/Domestic Partner | H2187-0CC0 | C500 | HMOX0004 | N/A | 1000 |
| Additional Dependants | H2187-0CC0 | C500 | HMOX0004 | N/A | 1000 |

### Active Employee with Domestic Partner Medicare entitled due to age

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Non Medicare | | | | |
| Domestic Partner | Medicare A AND B | | | | |
| Additional Dependants | Non Medicare or Medicare A AND B | | | | |
| Relation | Enrolled in: | Class | Product | Funding | Subgroup |
| Employee Enrollment | H2187-0000 | 1001 | HMOX0001 | Flex | 1001 |
| Domestic Partner | H2188-0010 | 1001 | HMOX0003 | Insured | 1000 |
| Additional Dependants | H2187-0000 | 1001 | HMOX0001 | Flex | 1001 |

Appendix B-7: Page -1

CCSF 0055299

Sidibe_CCSF 0055322

Retirees
Member home zip code is _802?_  in the 65 Plus GMAPD Service Area

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Medicare | | | | |
| Spouse/Domestic Partner | Medicare | | | | |
| Additional Dependants | Medicare | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| **Employee Enrollment** | H12188-0MPD | 1002 | HMOX0003 | Insured | 1000 |
| Spouse/Domestic Partner | H12188-0MPD | 1002 | HMOX0003 | Insured | 1000 |
| Additional Dependants | H12188-0MPD | 1002 | HMOX0003 | Insured | 1000 |

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Non Medicare | | | | |
| Spouse/Domestic Partner | Medicare A and B | | | | |
| Additional Dependants | Non Medicare | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| **Employee Enrollment** | H12189-0002 | 1003 | HMOX0001 | Flex | 1001 |
| Spouse/Domestic Partner | H12188-0MP2 | 1003 | HMOX0003 | Insured | 1000 |
| Additional Dependants | H12189-0002 | 1003 | HMOX0001 | Flex | 1001 |

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Non Medicare | | | | |
| Spouse/Domestic Partner | Non Medicare | | | | |
| Additional Dependants | Non Medicare | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| **Employee Enrollment** | H12189-0001 | 1004 | HMOX0001 | Flex | 1001 |
| Spouse/Domestic Partner | H12189-0001 | 1004 | HMOX0001 | Flex | 1001 |
| Additional Dependants | H12189-0001 | 1004 | HMOX0001 | Flex | 1001 |

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Medicare A OR B, not both | | | | |
| Spouse/Domestic Partner | Non Medicare, Medicare A OR B or Medicare A AND B | | | | |
| Additional Dependants | Non Medicare, Medicare A OR B or Medicare A AND B | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| **Employee Enrollment** | H12195-0MP3 | 1005 | HMOX0002 | Flex | 1001 |
| Spouse/Domestic Partner | H12189-0003 – Non Medicare | 1005 | HMOX0001 | Flex | 1001 |
|  | H12195-0MP3 – Medicare A OR B | 1005 | HMOX0002 | Flex | 1001 |
|  | H12188-0MP3 – Medicare A AND B | 1005 | HMOX0003 | insured | 1000 |
| Additional Dependants | H12189-0003 – Non Medicare | 1005 | HMOX0001 | Flex | 1001 |
|  | H12195-0MP3 – Medicare A OR B | 1005 | HMOX0002 | Flex | 1001 |
|  | H12188-0MP3 – Medicare A AND B | 1005 | HMOX0003 | insured | 1000 |

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Medicare A OR B | | | | |
| Spouse/Domestic Partner | Medicare A AND B | | | | |
| Additional Dependants | Non Medicare, Medicare A OR B, or Medicare A AND B | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| **Employee Enrollment** | H12195-0MP4 | 1008 | HMOX0002 | Flex | 1001 |
| Spouse/Domestic Partner | H12188-0MP4 | 1008 | HMOX0003 | Insured | 1000 |
| Additional Dependants | H12188-0004 – Non Medicare | 1006 | HMOX0001 | Flex | 1001 |
|  | H12195-0MP4 – Medicare A OR B | 1008 | HMOX0002 | Flex | 1001 |
|  | H12188-0MP4 – Medicare A AND B | 1008 | HMOX0003 | Insured | 1000 |

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Medicare A AND B | | | | |
| Spouse/Domestic Partner | Non Medicare, Medicare A AND B, or Medicare A OR B | | | | |
| Additional Dependants | Non Medicare, Medicare A AND B, or Medicare A OR B | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| Employee Enrollment | H12188-0MP5 | 1006 | HMOX0003 | Insured | 1000 |
| Spouse/Domestic Partner | H12189-0005 – Non Medicare | 1006 | HMOX0001 | Flex | 1001 |
|  | H12188-0MP5 – Medicare A AND B | 1006 | HMOX0003 | Insured | 1000 |
|  | H12195-0MP5 – Medicare A OR B | 1006 | HMOX0002 | Flex | 1001 |
| Additional Dependants | H12189-0005 – Non Medicare | 1006 | HMOX0001 | Flex | 1001 |
|  | H12188-0MP5 – Medicare A AND B | 1006 | HMOX0003 | Insured | 1000 |
|  | H12195-0MP5 – Medicare A OR B | 1006 | HMOX0002 | Flex | 1001 |

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Medicare A AND B | | | | |
| Spouse/Domestic Partner | Medicare A AND B | | | | |
| Additional Dependants | Non Medicare, Medicare A AND B, or Medicare A OR B | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| Employee Enrollment | H12188-0MP6 | 1007 | HMOX0003 | Insured | 1000 |
| Spouse/Domestic Partner | H12188-0MP6 | 1007 | HMOX0003 | Insured | 1000 |
| Additional Dependants | H12189-0006 – Non Medicare | 1007 | HMOX0001 | Flex | 1001 |
|  | H12188-0MP6 – Medicare A AND B | 1007 | HMOX0003 | Insured | 1000 |
|  | H12195-0MP6 – Medicare A OR B | 1007 | HMOX0002 | Flex | 1001 |

Appendix B-7: Page -2

CCSF 0055300

Sidibe_CCSF 0055323

Retirees
Member home zip code _// in the 65 Plus GMAPD Service Area

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Medicare | | | | |
| Spouse/Domestic Partner | Medicare | | | | |
| Additional Dependants | Medicare | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| **Employee Enrollment** | MA0002-0MDD | 1002 | MAPDSB01 | Insured | 1000 |
| Spouse/Domestic Partner | MA0002-0MDD | 1002 | MAPDSP01 | Insured | 1000 |
| Additional Dependants | MA0002-0MDD | 1002 | MAPDDP01 | Insured | 1000 |

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Non Medicare | | | | |
| Spouse/Domestic Partner | Medicare A AND B | | | | |
| Additional Dependants | Non Medicare | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| **Employee Enrollment** | H12189-0002 | 1003 | HMOX0001 | Flex | 1001 |
| Spouse/Domestic Partner | MA0002-0MD2 | 1003 | MAPDSP01 | Insured | 1000 |
| Additional Dependants | H12189-0002 | 1003 | HMOX0001 | Flex | 1001 |

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Non Medicare | | | | |
| Spouse/Domestic Partner | Non Medicare | | | | |
| Additional Dependants | Non Medicare | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| **Employee Enrollment** | H12189-0001 | 1004 | HMOX0001 | Flex | 1001 |
| Spouse/Domestic Partner | H12189-0001 | 1004 | HMOX0001 | Flex | 1001 |
| Additional Dependants | H12189-0001 | 1004 | HMOX0001 | Flex | 1001 |

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Medicare A OR B | | | | |
| Spouse/Domestic Partner | Non Medicare, Medicare A OR B, or Medicare A AND B | | | | |
| Additional Dependants | Non Medicare, Medicare A OR B, or Medicare A AND B | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| **Employee Enrollment** | H12195-0MP3 | 1005 | HMOX0002 | Flex | 1001 |
| Spouse/Domestic Partner | H12189-0003 - Non Medicare | 1005 | HMOX0001 | Flex | 1001 |
| | H12195-0MP3 - Medicare A OR B | 1005 | HMOX0002 | Flex | 1001 |
| | MA0002-0MD4 - Medicare A AND B | 1005 | MAPDSP01 | Insured | 1000 |
| Additional Dependants | H12189-0003 - Non Medicare | 1005 | HMOX0001 | Flex | 1001 |
| | H12195-0MP3 - Medicare A OR B | 1005 | HMOX0002 | Flex | 1001 |
| | MA0002-0MD4 - Medicare A AND B | 1005 | MAPDDP01 | Insured | 1000 |

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Medicare A OR B | | | | |
| Spouse/Domestic Partner | Medicare A AND B | | | | |
| Additional Dependants | Non Medicare, Medicare A OR B, or Medicare A AND B | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| Employee Enrollment | H12195-0MP4 | 1008 | HMOX0002 | Flex | 1001 |
| Spouse/Domestic Partner | MA0002-0MD4 | 1008 | MAPDSP01 | Insured | 1000 |
| Additional Dependants | H12189-0004 - Non Medicare | 1008 | HMOX0001 | Flex | 1001 |
| | H12195-0MP4 - Medicare A OR B | 1008 | HMOX0002 | Flex | 1001 |
| | MA0002-0MD4 - Medicare A AND B | 1008 | MAPDDP01 | Insured | 1000 |

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Medicare A AND B | | | | |
| Spouse/Domestic Partner | Non Medicare, Medicare A AND B, or Medicare A OR B | | | | |
| Additional Dependants | Non Medicare, Medicare A AND B, or Medicare A OR B | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| **Employee Enrollment** | MA0002-0MD5 | 1002 | MAPDSB01 | Insured | 1000 |
| Spouse/Domestic Partner | H12189-0005 - Non Medicare | 1006 | HMOX0001 | Flex | 1001 |
| | MA0002-0MD5 - Medicare A AND B | 1006 | MAPDSP01 | Insured | 1000 |
| | H12195-0MP5 - Medicare A OR B | 1006 | HMOX0002 | Flex | 1001 |
| Additional Dependants | H12189-0005 - Non Medicare | 1006 | HMOX0001 | Flex | 1001 |
| | MA0002-0MD5 - Medicare A AND B | 1006 | MAPDDP01 | Insured | 1000 |
| | H12195-0MP5 - Medicare A OR B | 1006 | HMOX0002 | Flex | 1001 |

| Relation | Medicare Status | | | | |
|---|---|---|---|---|---|
| Employee | Medicare A AND B | | | | |
| Spouse/Domestic Partner | Medicare A AND B | | | | |
| Additional Dependants | Non Medicare, Medicare A AND B, or Medicare A OR B | | | | |
| Relation | Enrolled in: | Clas | Product | Fundin | Subgroup |
| **Employee Enrollment** | MA0002-0MD6 | 1007 | MAPDSB01 | Insured | 1000 |
| Spouse/Domestic Partner | MA0002-0MD6 | 1007 | MAPDSP01 | Insured | 1000 |
| Additional Dependants | H12189-0006 - Non Medicare | 1007 | HMOX0001 | Flex | 1001 |
| | MA0002-0MD6 - Medicare A and B | 1007 | MAPDDP01 | Insured | 1000 |
| | H12195-0MP6 - Medicare A OR B | 1007 | HMOX0002 | Flex | 1001 |

Appendix B-7: Page -3

CCSF 0055301

Sidibe_CCSF 0055324

# EXHIBIT 42



July 20, 2016

*Sent via email: paul.brown@blueshieldca.com*

Mr. Paul Brown
Area Vice President—Premier Accounts
Blue Shield of California
2175 N. California Boulevard, Suite 250
Walnut Creek, California 94596

RE:   City and County of San Francisco Renewal Confirmation
      Coverage Period—January 1, 2017 to December 31, 2017
      Medical and Pharmacy Coverage—Flex Funded Arrangement
      Contract # W0051448—Actives / Non-Medicare Dependents / Non-Medicare Retirees
      Medical and Pharmacy Coverage—Fully Insured
      Policy # W0051448—Medicare Retirees

Dear Paul:

Please accept this letter as confirmation that the City and County of San Francisco (CCSF) will be continuing their medical and pharmacy coverage with Blue Shield of California (BSC) effective January 1, 2017 based on the current plans with the exception of the BSC 65 Plus (MAPD) / BSC Access + (COB) program. BSC's Medicare Retiree plan will be terminated effective January 1, 2017. The Actives, Split Contracts (Non-Medicare dependents), and Non-Medicare Retirees will continue under a flex funded arrangement.

The confirmed fees / premiums detailed below are net of commissions and are shown on a per month basis for the plan year January 1, 2017 to December 31, 2017.

| Blue Shield of California—Monthly Flex Funding Fees | | |
|---|---|---|
| **Monthly Fees** | **1/1/2016–12/31/2016** | **1/1/2017–12/31/2017** |
| Medical and Rx ASO Fee (PEPM) | | |
| Legislative Fees | | |
| Pooling Point—$1,000,000 (PEPM) | | |
| Attachment Point (of projected claims) | | |
| **Maximum Liability** | **1/1/2016–12/31/2016** | **1/1/2017–12/31/2017** |
| Projected Incurred Medical Claims (PEPM) | | |
| Projected Rx Claims (PEPM) | | |
| Projected Medical Capitation Cost (PEPM) | | |
| Terminal Liability Factor (per subscriber) | | |

Aon | Aon Hewitt | Health & Benefits
199 Fremont Street | Suite 1500 | San Francisco, California 94105
t: 415.486.7500 | f: 415.486.7026 | aon.com

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                     AON0000102



July 20, 2016
Mr. Paul Brown
Page 2

| 2017 Federal, State and PPACA Taxes and Fees4 | |
|---|---|
| ACA Insurer Fee | |
| Patient-Centered Outcomes Research Trust Fund Fee | |

| 2017 Plan Design Changes Requested by CCSF |
|---|
| There were no client requested plan changes. |

| 2017 Mandated Plan Design Changes |
|---|
| **Federal Mandates** |
| None |
| **State-Based Mandates** |
| None |

BSC fees and rates are based on the renewal assumptions which may be found in the renewal package.

We look forward to working with you on this mutual client. In the meantime, should you have any questions, please feel free to call me at (503) 306-2838.

Sincerely,

Anne E. Thompson
Vice President, Aon
California License #0K11129

cc:   Catherine Dodd, San Francisco Health Service System          Won Andersen, Aon
      Mitchell Griggs, San Francisco Health Service System         Anil Kochhar, Aon
      Pamela Levin, San Francisco Health Service System
      Marina Coleridge, San Francisco Health Service System

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



July 20, 2016
Mr. Paul Brown
Page 3

................................................................................................................................................

*Acknowledgement & Signature*

................................................................................................................................................

To ensure consistency between our records, please review the plan design changes and rates listed above and email a signed copy of this letter to my attention at anne.thompson2@aonhewitt.com no later than July 27, 2016.

Your signature to the right indicates that you have reviewed the plan design changes and rates presented in this letter and agree to their accuracy.

Acknowledged & Approved By:

_____
**Signature—Blue Shield of California**

_____
**Date**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 43



July 7, 2017                                          *Sent via email: jeanette.mone@blueshieldca.com*

Ms. Jeanette Mone
Major Account Manager—Premier Accounts
Blue Shield of California
2175 N. California Boulevard, Suite 250
Walnut Creek, California 94596

RE:   City and County of San Francisco Renewal Confirmation
      Coverage Period—January 1, 2018 to December 31, 2018
      Medical and Pharmacy Coverage—Flex Funded Arrangement / Trio HMO Flex Funded
      Arrangement
      Contract # W0051448—Actives / Non-Medicare Dependents / Non-Medicare Retirees
      Medical and Pharmacy Coverage—Fully Insured
      Policy # W0051448—Medicare Retirees

Dear Jeanette:

Please accept this letter as confirmation that the City and County of San Francisco (CCSF) will be
continuing their medical and pharmacy coverage with Blue Shield of California (BSC) effective
January 1, 2018 based on the current plans. CCSF has elected a status quo renewal for the flex
funded HMO Access Plus Program.  CCSF will add a Trio HMO Flex Funded Arrangement option for
their active employees and early retirees effective January 1, 2018.

The confirmed fees detailed below are net of commissions and are shown on a per month basis for
the plan year January 1, 2018 to December 31, 2018.

| Blue Shield of California—Monthly Access Plus Flex Funded Fees | | |
|---|---|---|
| **Monthly Fees** | 1/1/2017–12/31/2017 | 1/1/2018–12/31/2018 |
| Medical and Rx ASO Fee (PEPM) | | |
| Legislative Fees (PEPM) | | |
| Pooling Point—$1,000,000 (PEPM) | | |
| Attachment Point (of projected claims) | | |
| **Maximum Liability** | 1/1/2017–12/31/2017 | 1/1/2018–12/31/2018 |
| Maximum Liability including Legislative Fees | | |
| Terminal Liability Factor (per subscriber) | | |

Aon  |  Health & Benefits Consulting
425 Market Street  |  Suite 2800  |  San Francisco, California  94105
t: 415.486.7500  |  f: 415.486.7025  |  aon.com

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                    AON0000105



July 7, 2017
Ms. Jeanette Mone
Page 2

| Blue Shield of California— Monthly Trio HMO Flex Funded Fees | | |
|---|---|---|
| **Monthly Fees** | 1/1/2017–12/31/2017 | 1/1/2018–12/31/2018 |
| Medical and Rx ASO Fee (PEPM) | | |
| Legislative Fees | | |
| Pooling Point—$1,000,000 (PEPM) | | |
| Attachment Point (of projected claims) | | |
| **Maximum Liability** | 1/1/2017–12/31/2017 | 1/1/2018–12/31/2018 |
| Maximum Liability including Legislative Fees | | |
| Terminal Liability Factor (per subscriber) | | |

| 2018 Federal, State and PPACA Taxes and Fees | |
|---|---|
| ACA Insurer Fee | |
| Patient-Centered Outcomes Research Trust Fund Fee | |
| Pooling Charge | |
| Managed Care Organization Tax | |

2018 Plan Design Changes Requested by CCSF – Accepted

2018 Plan Design Changes Requested by CCSF – Declined

2018 Plan Design Changes Implemented by Blue Shield

AON0000106



July 7, 2017
Ms. Jeanette Mone
Page 3

| 2018 Mandated Plan Design Changes |
|---|
| **Federal Mandates** |
| None |
| **State-Based Mandates** |
| None |

BSC fees and rates are based on the renewal assumptions which may be found in the renewal package.

We look forward to working with you on this mutual client. In the meantime, should you have any questions, please feel free to call me at (503) 306-2838.

Sincerely,

Anne E. Thompson

Anne E. Thompson
Vice President, Aon
California License #0K11129

cc:   Mitchell Griggs, San Francisco Health Service System          Won Andersen, Aon
      Pamela Levin, San Francisco Health Service System            Anil Kochhar, Aon
      Marina Coleridge, San Francisco Health Service System        Suzanne Kohlmann, Aon

---

*Acknowledgement & Signature*

---

To ensure consistency between our records, please review the plan design changes and rates listed above and email a signed copy of this letter to my attention at anne.thompson2@aonhewitt.com no later than July 10, 2017.

Your signature to the right indicates that you have reviewed the plan design changes and rates presented in this letter and agree to their accuracy.

Acknowledged & Approved By:

Signature—Blue Shield of California
Paul J. Seaun
7/7/2017
Date

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                                        AON0000107