February 27, 2022

**BY ELECTRONIC CASE FILING**

The Honorable Laurel Beeler
United States Magistrate Judge
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

      Re:    <u>Djeneba Sidibe et al. v. Sutter Health, Case No. 3:12-cv-04854-LB</u>

Dear Judge Beeler:

    Plaintiffs, on behalf of the certified Class, and Defendant Sutter Health (together, the "Parties") submit this joint letter regarding TX 7544, TX 8764, TX 8765, and TX 8927, which are attached hereto as Exhibits 1 through 4.

PLAINTIFFS' STATEMENT

    Plaintiffs object to four exhibits that Sutter seeks to admit into evidence during Ms. Brendt's testimony totaling 445 pages of a "provider bill of rights" regulation, regulatory rule making proceedings concerning patient network access, and a US Senate committee report. Statutes, regulations and legislative history should not be admitted into evidence because it is the province of the Court to instruct the jury on the applicable law. These documents should be precluded from evidence under FRE 402 and 403, and the Court should not take judicial notice of them, should Sutter still seek for the Court to do so.

    Admission of these voluminous legal documents would substantially confuse the jury over the law governing this antitrust case, which Your Honor will instruct them on. None of the jury instructions proposed by Sutter, or proposed by the Court in response to the parties' earlier jury instruction submissions, concern the regulations to which Sutter points. Admission of these documents will thus put the jury in a position where it will have to decide whether other state regulations relevant to health plans somehow trump the need for Sutter to follow antitrust law.

    These documents are also irrelevant. Tx 8927, the referenced Senate report, for example, concerns a company known as Ingenix that calculated "reasonable and customary" out-of-network rates for insurers (prior to Dr. Chipty's overcharge period) that were allegedly too low: it primarily concerns proceedings that occurred in 2009 in New York over Ingenix's actions. There has been no evidence elicited by Sutter to date, notwithstanding the numerous health plan witnesses that have testified, that any of the reasonable and customary rates that they calculated during the time period relevant to this case for the Northern California markets at issue were calculated by Ingenix or were artificially low and no Sutter expert has ever made such a claim in a report.

February 27, 2022
Page 2

### TX 7544 – California Health Care Providers' Bill of Rights, §1375.7

This exhibit includes the complete text of Cal. Health & Safety Code § 1375.7, which was one of the statutes that was previously included in Sutter's Request for Judicial Notice. Sutter there asserted that this statute "precludes contract provisions that grant authority to health plans to change material terms in contracts without providing notice and negotiating with the provider about the changes, unless a provider has specifically contracted otherwise."

Sutter apparently seeks to suggest that this statute makes Sutter's anticompetitive contract practices that restrict the deployment of effective, quality, narrow and tiered networks *per se* lawful. That is patently disingenuous, particularly given that Sutter's conduct is subject to antitrust scrutiny irrespective of the existence of this statute, demonstrated most prominently by the fact that the California enforcer responsible for antitrust enforcement, sued Sutter for the very contractual practices at issue here. This statute cannot and does not pre-empt the Cartwright Act and Sutter's obligations thereunder. Indeed, if this statute did immunize Sutter's conduct, one wonders why it settled the virtually identical *UEBT/California* litigation (premised on the same contract provisions and antitrust theories).

Admitting this statute into evidence would also be confusing to the jury, particularly as nothing in the statute explicitly or implicitly blesses Sutter's non-par penalty rate, anti-steering and anti-tiering contract provisions that were forced upon health plans and prohibited them from launching effective, quality narrow and tiered networks. The statute, for example, does not evidence that a health plan's launching of a tiered network during the pendency of a provider contract, which placed that provider in a non-preferred tier would constitute a "material" change under the statute. The jury would be left to guess whether that was so, as the Court will not instruct the jury on this issue (something Sutter has never sought). Cal. Health & Safety Code § 1375.7 is also irrelevant and admitting it into evidence and publishing it to the jury would lead to substantial jury confusion. *See Baines v. Maddock*, 2007 WL 2994802, at *1 (S.D. Cal. Oct. 11, 2007) (granting motion to exclude a statute and two regulations "on the grounds that they are irrelevant and would confuse the jury.").

Contrary to Sutter's submission, this statute nowhere addresses tiering or any of Sutter's anticompetitive contract provisions or practices. Sutter falsely states that the anti-tiering provision it forced upon each Health Plan requires nothing more than notice and the chance to negotiate, when the truth is that it gives Sutter veto power over any tiered network that does not put Sutter in the top tier.

If this regulation is admitted, Plaintiffs should be able to put on evidence that the California agency responsible for enforcing antitrust law, the Office of the Attorney General, sued Sutter for its practices hindering the deployment by health plans of effective low-cost narrow and tiered network products.

### TX 8764 & TX 8765 – California Department of Insurance Network Adequacy Regulations & Comments

These two exhibits contain proposed changes to California network adequacy regulations, along with comments from the public and responses from the California Department of Insurance. TX

February 27, 2022
Page 3

8764 includes 76 pages; TX 8765 includes 340 pages. These are not evidence; they are entirely irrelevant, and risk confusing the jury as to the legal standards of the case.

Sutter apparently seeks to suggest that compliance (or not) with network adequacy regulations makes Sutter's anticompetitive contract provisions that restrict the deployment of effective, quality, narrow and tiered networks *per se* lawful. Sutter apparently also intends to suggest that the official California policy somehow disfavors narrow or tiered networks. Given the California AG's suit against Sutter over the actions at issue in this case, such a suggestion to the jury would be wholly inappropriate.

These regulations and legislative history would also be confusing to the jury, particularly as nothing in the regulations or commentary explicitly or implicitly blesses Sutter's non-par penalty rate, anti-steering and anti-tiering contract provisions that were forced upon health plans and prohibited them from launching effective, quality narrow and tiered networks. For example, the description of the proposed regulatory change to add a "requirement that an insurer that uses a tiered network must demonstrate compliance with standards based on providers available at the lowest cost-sharing tier," at TX 8765.004 (section 2240.15), does not articulate what those standards are, or the justifications for those standards. Again, the jury would be left to guess what they are. Admission of these exhibits should be denied because it would be prejudicial and "of little relevance to [plaintiff's] claims." *Lan v. Allstate Ins. Co.*, 127 F. App'x 932, 933 (9th Cir. 2005). Moreover, these exhibits should not be admitted into evidence because "[t]he Court will instruct the jury on the relevant law." *Almendarez v. BNSF Ry. Co.*, 2014 WL 1338090, at *2 (W.D. Wash. Apr. 2, 2014) (excluding evidence or argument of statutory legislative history); *Broadus v. CSX Transp., Inc.*, 2009 WL 1402025, at *6 (E.D. La. May 14, 2009) ("The Court will not allow (i), the FRA Regulations, to be introduced into evidence. The Court will instruct the jury on the applicable law.")

If these documents are admitted, Plaintiffs should be able to put on evidence that the California agency responsible for enforcing antitrust law, the Office of the Attorney General, sued Sutter for its practices hindering the deployment by health plans of effective low-cost narrow and tiered network products.

**TX 8927 – The U.S. Senate Committee on Commerce, Science, and Transportation (Office of Oversight and Investigation) Report titled, "Underpayments to Consumers by the Health Insurance Industry"**

This 25-page report ("Report"), published in June 2009, is a prejudicial, irrelevant sideshow. As aforesaid, it concerns the activities of a company known as Ingenix, which had been calculated out-of-network payments that were alleged to be artificially low. Notably, the name "Ingenix" has not been uttered during the first two-and-a-half weeks of trial or in any of Sutter's expert reports filed in this case. The Report should thus be excluded because:

1. Sutter fails to specify which facts, if any, in this report it will ask Ms. Brendt about. Indeed, Sutter does not even identify which pages it intends to use;

2. It is entirely irrelevant to the damages period (or the 2009-2017 overcharge period that preceded it) in this litigation. Indeed, by January 2009**,** UnitedHealthcare and "several other

February 27, 2022
Page 4

> large insurance companies" agreed to stop working with Ingenix, which was the source of the alleged under-calculated reimbursement amounts;

3. There is no specific information in the Report regarding any payment by any Class Health Plan to a provider, let alone Sutter, or any person located in any of the relevant California ratings areas.

4. The Report describes several large pieces of private litigation and investigations in New York and by the Senate Commerce Committee, virtually all of which were concluded by 2009. Report at pp. 10-13 and n. 19. Not only is citation to this litigation highly prejudicial, it is contrary to the Court's order granting Sutter's MIL 2 (ECF 1167 at 7:8-18). Should the Court decide to permit the introduction of this material, it should likewise permit introduction of the far more relevant *UEBT/California* litigation.

Sutter has not elicited any information demonstrating that any of the Class Health Plans underpaid Sutter or customers in Northern California during the relevant time period. Accordingly, this Report should be excluded. The admission of this document would result in prejudice and a waste of time that substantially outweighs any probative value that it could possibly have. *See Berndt v. California Dep't of Corr.*, 2016 WL 2909392, at *6 (N.D. Cal. May 19, 2016), *aff'd sub nom. Berndt v. California Dep't of Corr. & Rehab.*, 715 F. App'x 593 (9th Cir. 2017) (probative value of legislative materials is far outweighed by the "a high risk of confusing the issues and misleading the jury.")

Accordingly, these four exhibits should not be admitted or published to the jury. Nor should the Court take judicial notice of them because they are "legislative fact[s]" not "adjudicative fact[s]." *Antman v. Uber Techs., Inc.*, No. 3:15-CV-01175-LB, 2015 WL 6123054, at *7 (N.D. Cal. Oct. 19, 2015) and for the other reasons set forth in Plaintiffs Opposition to Sutter Health's Request for Judicial Notice. ECF 1300.

## DEFENDANT'S STATEMENT

Plaintiffs' assertion that exhibits 7544, 8764, 8765, and 8927 are irrelevant or unduly prejudicial is belied by the facts. The exhibits go to the core of what the jury must decide regarding the effect and reasonableness of the challenged provisions. *See* ECF 1276, CACI 3411 (listing elements to consider when analyzing effect on competition). They are properly the subject of judicial notice and admissible. The Court should overrule plaintiffs' objections.

### I. Exhibits 7544, 8764, 8765, and 8927 Are Relevant and not Confusing or Unduly Prejudical[1]

---

[1] The cases plaintiffs cite are neither helpful nor dispositive. The cases all arise in distinct factual scenarios or are irrelevant. For example, plaintiffs cite *Baines v. Maddock* to show that this Court should exclude the Health Care Provider's Bill of Rights. But in that case, while the court granted the motion to exclude, the court required the defendants to provide a witness who could testify to the relevant issues or for the parties to agree on a relevant stipulation. 2007 WL 2994802, at *1 (S.D. Cal. Oct. 11, 2007). Plaintiffs also cite *Berndt v. California Department of Corrections* to support their

### a. Cal. Health & Safety Code § 1375.7 (TX 7544)

One of the challenged contract terms is Sutter's tiering language, which provides that, if insurers want to change a Sutter hospital's participation status during the term of the contract, they must provide Sutter notice and the opportunity to negotiate. California Health & Safety Code § 1375.7 similarly provides that no contract between an insurer and a healthcare provider can include a term that lets an insurer "change a material term of the contract, unless the change has first been negotiated and agreed to by the provider and the plan."  The fact that the purported anti-tiering provision is consistent with this "Health Care Providers' Bill of Rights" is relevant to the jury's evaluation of the effect of Sutter's tiering provision.  The jury is entitled to know that the California legislature thought that material terms in an insurer-provider contract should be subject to notice and an opportunity to negotiate.  And that is particularly true given that some insurer witnesses testified that Sutter's tiering provision, and its effect of requiring insurers give Sutter notice and an opportunity to negotiate, was unreasonable or aberrational.  Trial Tr. 2161:10–13 ("Q Okay.  And you thought it was unreasonable for Sutter to ask, via the contract, to require United to even ask for permission, much less have to negotiate. A Correct."); *id.* at 2160:21–2161:2 ("Q Right.  And what you didn't like is that you didn't like that United could not, on its own, simply change the network status of certain Sutter hospitals during the term of the agreement.  Right? A Yes.  Because we don't have those limitations in our other contracts.  We have the freedom and flexibility to build networks without providers' permissions.").

Plaintiffs' misconstrue Sutter's argument about the relevance of this statute.  Sutter does not contend that it preempts the Cartwright Act or Sherman Act or grants immunity.  Rather, the statute is relevant regulatory context for evaluating the effect and reasonableness of one of the challenged provisions at issue in this case.  Indeed, Mr. Barnes testified about this document already, stating that the statute is "consistent with my understanding that we have processes to follow to amend or change a contract."  Trial Tr. 1855:14–1859:17.  In overruling plaintiffs' objection to this testimony, the Court explained that Mr. Barnes "is allowed to testify what the point of the contract provisions are from a negotiator's standpoint and from an institutional standpoint, not as a matter of law."  *Id.* at 1859:14–17.  This ruling is consistent with the Court's recognition that the healthcare and insurance fields are highly regulated, and that regulatory context is relevant to the jury's understanding of the issues in this case and Sutter's negotiations with insurers.  *See, e.g.*, *Id.* 890:15-17 ("[The Court:] I mean, you know, it's the regulatory context and it's going to come in in this case.").  Ms. Brendt will likewise testify about her understanding about the regulatory context and how it influenced Sutter's view of the tiering provision.  All of this evidence is important for the jury to evaluate plaintiffs' claim that the tiering provision is unreasonable or that prevented insurers from unilaterally excluding or tiering Sutter, which they might not have been able to do regardless of this provision.

Plaintiffs' suggestion that this four-page statute would confuse the jury is baseless.  If the jury deems the statute to be relevant regulatory context for evaluating the anticompetitive effect of Sutter's tiering provision, it is perfectly capable of evaluating the text of the statute and whether a hospital's participation status constitutes a "material" change to the negotiated contract.  Plaintiffs offer no

---

contention that legislative history is inadmissible.  But legislative history was not at issue in that case.  Instead, there, the court considered the admissibility of prior judicial rulings.  2016 WL 2909392, at *6 (N.D. Cal. May 19, 2016).  Sutter does not seek admission of prior judicial rulings.

February 27, 2022
Page 6

reason to think that the jury will be left wondering whether the Court will issue an instruction on this point.  But to the extent the Court thinks an instruction regarding the statute is important or necessary, that can be addressed at the charging conference.

### b. Network Adequacy Regulation (Permanent) Initial and Final Statement of Reasons (TX 8764, 8765)

The Initial and Final Statements of Reasons regarding Government Code § 11346.2(b) articulate the DOI's reasons for adopting new network adequacy regulations.  The document shows that the DOI thought that narrow and tiered networks presented such pervasive and serious problems that it needed to take regulatory action.  For example, the DOI found that when insurers began creating narrow and tiered networks, consumers were "more frequently exposed to out-of-network bills."  TX 8764.0006.  These surprise bills arose because a patient could be "admitted to a network facility by a network provider (such as a surgeon)" without realizing that other medical staff at the hospital (such as radiologists, anesthesiologists, etc.) had been narrowed or tiered out of the patient's insurance network.  *Id.*  Additionally, patients sometimes went to out-of-network providers because the insurers' provider directories were inaccurate.  TX 8764.0007–08.  This government report documenting the nature and extent of issues with narrow networks goes to the core question for the jury to decide regarding the reasonableness and effect of the challenged provisions.

Starting with their opening, plaintiffs have argued to the jury that narrow and tiered products were good for consumers and that health plans should have the "freedom" to create narrow products that exclude Sutter hospitals or tiered products that tier Sutter hospitals without seeking Sutter's consent.  Health Plan witnesses, including Janet Lundbye, testified that they wanted the unilateral right to exclude or tier Sutter hospitals.  Trial Tr. 2168:16–2169:11.  And Dr. Chipty opined at length about the benefits of "narrow and tiered network products" that "many consumers want."  *Id.* at 2366:16–18.  She also opined that the challenged terms prevented the launch of these products.  *Id.* at 2368:14–2369:6.  Sutter is entitled to rebut this evidence by showing that consumers did not want narrow and tiered networks and that they were not commercially successful because of the issues detailed in the DOI report—not because of Sutter's contract provisions.  Sutter has explained that the challenged terms are necessary, among other things, to allow Sutter to evaluate narrow and tiered products to ensure that they do not interfere with the ability to provide patient care and do not present other problems like surprise bills.  Indeed, Sutter declined participating in various products for the reasons identified by the government.  In addition, Sutter witnesses will testify about Sutter's response to the report and regulatory changes, which they followed closely.

The DOI report is also independently relevant to refuting plaintiffs' claim that the non-participating provider rate is a penalty compared to what insurers paid other out-of-network providers.  Plaintiffs' insurer witnesses testified about what they purportedly paid other providers out of network and Dr. Chipty relied on that testimony (along with a presentation prepared by Jon Chason assuming a 60% usual and customary rate) to support her opinion about the effect of Sutter's contract terms.  *E.g.* Trial Tr. 727:6-15 (testifying that Blue Shield usually paid 60-75% of an out-of-network provider's charges).  The DOI report directly contradicts plaintiffs' evidence and supports Sutter's arguments that the non-participating provider rate represents the reasonable value of its out-of-network services that it would have been entitled to even without the non-par provision.  For example, the report explains that "[b]illed charges are what providers ask for their services if there is no contract with insurers."

February 27, 2022
Page 7

TX 8764.0055. It also explains that the average *in-network* rates are 65% of billed charges, which casts doubt on the insurer witness testimony that this is what they paid to providers when out-of-network. TX 8764.0056. Similarly, when analyzing the effects of the new regulations it was promulgating, the DOI assumed an out-of-network payment of 90% of billed charges. *Id.* Plaintiffs cannot rely on evidence like Mr. Chason's presentation assuming a usual and customary rate of 60% of charges, while simultaneously preventing Sutter from introducing evidence showing that the usual out-of-network payment rates were in fact much higher.

Plaintiffs' own actions at trial belie their contention that this evidence is irrelevant. For example, on redirect, plaintiffs asked Ms. Vargas about network adequacy. Trial Tr. 608:21-609:2. What's more, Ms. Lacroix-Milani testified about the findings of the report without objection. *Id.* at 543:21-544:5. And Dr. Chipty was questioned about it. *Id.* at 2537:1-20. Sutter does not intend to wade into the specifics of the regulations. Rather, it simply intends to offer the DOI's statement of reasons for taking regulatory action—because those reasons bear directly on plaintiffs' central claims in this case.

### c. Senate Report titled, "Underpayments to Consumers by the Health Insurance Industry" (TX 8927)

This June 2009 Report from the U.S. Senate Committee on Commerce, Science, and Transportation demonstrates that insurers were routinely underpaying out-of-network providers with black-box "usual and customary" methodologies. One of those methodologies (Ingenix) was systematically designed to "skew[] reimbursement rates downward—in a direction that allowed insurers to reduce their claims payments." TX 8927.0004. This evidence provides important context for the jury to evaluate the insurer witness testimony that their usual and customary payments were much lower than Sutter's non-participating provider rate. Further, it provides necessary context for explaining why the non-participating rate was important to Sutter—*i.e.*, it protects Sutter from unilaterally calculated insurer payments that are below what Sutter is entitled to receive as an out-of-network provider.

Plaintiffs argue that the report is irrelevant because insurers agreed to stop using Ingenix in 2009, but the document is still relevant to showing the context in which Sutter and insurers were operating when the challenged provisions at issue were being negotiated. Moreover, the fact that United orchestrated this methodology for underpaying providers is relevant to the jury's evaluation of United witnesses' testimony about usual and customary payments. Plaintiffs argue that there is nothing in the report indicating that the class insurers used Ingenix or otherwise underpaid providers. But that is simply not true. The report makes clear that United (which owned Ingenix) and Blue Cross Blue Shield of California and Health Net were all using Ingenix. *See* TX 8927.0005 & 0018 n.53. (Plaintiffs argue that Sutter has not elicited any evidence that insurers underpaid Sutter specifically, but that is because the non-participating rate protected Sutter from insurer attempts to unilaterally calculate payments for out-of-network care that Sutter provided—which is precisely why this document is relevant.)

Finally, passing references to litigation and the New York Attorney General's investigation into insurer underpayments do not render the document inadmissible. The report merely references the litigation and investigation in the context of explaining the source of the *evidence* that the report was relying on. The Court recognized this very distinction in ruling on Sutter's motion in limine. ECF

1167 at p. 8 ("This [ruling] does not preclude the plaintiffs from using admissible evidence from the other proceedings."). And regardless, the litigation and investigation regarding underpayments is directly relevant to plaintiffs' claim that insurers would have paid less to Sutter if it did not have a non-par rate because it shows that such payments might have been below what Sutter was entitled and could have resulted in costly litigation between Sutter and the insurers over out-of-network payment amounts—something that the non-par rate beneficially avoids. The *UEBT* litigation and AG investigation of Sutter are distinguishable from the litigation referenced in the Senate report because the *UEBT*/AG matters involved the same issues as plaintiffs' case and the same issues for the jury to decide based on the evidence at trial—*i.e.*, whether Sutter's contracting terms violate the antitrust laws. (If the Court disagrees, references to the litigation and investigation can easily be redacted.)

## II. These Exhibits Are Judicially Noticeable and Admissible as Substantive Evidence

"[C]ourts may take judicial notice of state statutes and their legislative history." *Buffin v. City & Cty. of San Francisco*, 2019 WL 1017537, at *8 n.28 (N.D. Cal. Mar. 4, 2019); *Oceanic Cal., Inc. v. City of San Jose*, 497 F. Supp. 962, 967 n.8 (N.D. Cal. 1980) (explaining that courts may take judicial notice of state statutes). As such, courts in this Circuit routinely take judicial notice of documents similar to those challenged here. *See, e.g.*, *L.H. v. Schwarzenegger*, 519 F. Supp. 2d 1072, 1079 (E.D. Cal. 2007) (taking judicial notice of a Senate Report because "the contents of the Report derive from a source whose accuracy cannot reasonably be questioned"); *United States v. Kiewit Pac. Co.*, 2013 WL 5770514, at *5 (N.D. Cal. Oct. 24, 2013) ("Government investigation reports . . . are . . . judicially noticeable, as the authenticity of such public documents is beyond dispute."); *See Cortez v. Evans*, 2009 WL 10700753, at *3 (N.D. Cal. Mar. 13, 2009) (taking judicial notice of the Initial Statement of Reasons for the adoption of a California regulation); *Faragi v. Provident Life & Acc. Ins. Co.*, 161 F. App'x 649, 650 (9th Cir. 2005) (taking judicial notice of CDI records).[2]

These exhibits are likewise properly admitted as substantive evidence. *See, e.g.*, *Westpac Audiotext, Inc. v. Wilks*, 756 F. Supp. 1267, 1268 (N.D. Cal. 1991) ("The bulk of the Court's findings are based on legislative history and other public documents, evidence that would be admissible at trial."), *vacated by stipulation*, 804 F. Supp. 1225 (N.D. Cal. 1992); *Whitford v. Gill*, 218 F. Supp. 3d 837, 894 n.224 (W.D. Wis. 2016) (finding legislative history admissible for a nonhearsay purpose because it "provides useful background information on [the law's] path to enactment and on the types of concerns voiced by legislators"), *vacated on other grounds by* 138 S. Ct. 1916 (2018); *Chapman v. S.F. Newspaper Agency*, 2002 WL 31119944, at *2 (N.D. Cal. Sept. 20, 2002) (printout of delivery confirmation from United States Postal Service "Track & Confirm" webpage "is an admissible public record"). This Court has recognized as much. *See, e.g.*, Trial Tr. 890:14-17 (noting that the "regulatory context . . . [is] going to come in in this case"); Hr'g Tr. 15:23-16:6 (Dec. 9, 2021) ("[I]t's the fact of this is the regulatory landscape or . . . the regulatory scheme. And if that's relevant and

---

[2] Plaintiffs cite this Court's decision in *Antman v. Uber Technologies* in support of their argument that these documents are not properly the subject of judicial notice. But there, this Court found only that judicial notice of the legislative history was *unnecessary* because it could "consider them without taking judicial notice of them" in ruling on a motion to dismiss. 2015 WL 6123054, at *7 (N.D. Cal. Oct. 19, 2015). This Court simultaneously acknowledged that "courts take judicial notice of policy documents available on a government website." *Id.*

February 27, 2022
Page 9

frames testimony, then, of course, the issue becomes the witness's understanding of that regulatory landscape which either - - is a fair subject of direct and cross-examination.").

Finally, as public records, these exhibits are self-authenticating. Fed. R. Evid. 902(5)); *Paralyzed Veterans of Am. v. McPherson*, 2008 WL 4183981, at *7 (N.D. Cal. Sept. 9, 2008) ("Federal courts consider records from government websites to be self-authenticating under Rule 902(5)."); *Hispanic Broadcasting Corp. v. Educational Media Found.*, 2003 WL 22867633, at *5 n.5 (C.D. Cal. Oct. 30, 2003) ("[E]xhibits which consist of records from government websites, such as the FCC website, are self-authenticating."). And plaintiffs have come forward with no "negative factors" to demonstrate that the records should not be admitted. *Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999) ("A trial court may presume that public records are authentic and trustworthy. The burden of establishing otherwise falls on the opponent of the evidence, who must come 'forward with enough negative factors to persuade a court that a report should not be admitted.'" (quoting *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992))).

### III. Admission of These Exhibits Does Not Warrant Admission of Evidence Regarding the *UEBT* Litigation

Plaintiffs argue that if this evidence is admitted then they should be able to put in evidence regarding the California Attorney General's lawsuit against Sutter. But plaintiffs offer no explanation for how admission of any of these three documents justifies the Court revisiting its *in limine* ruling. *See* ECF 1167, at p. 8 (granting in part Sutter's motion in limine to exclude other litigation evidence, and finding "[t]he UEBT and California AG cases . . . are collateral actions that raise Rule 403 concerns, not just of unfair prejudice but also of confusion of the issues and wasting time). Sutter is not arguing that the statute (or any of the other documents) immunize it from antitrust scrutiny. So even if plaintiffs are right that the AG's suit is indicative of its view on the "material term" provisions of the statute (which was not raised in *UEBT*), and even if the AG's view of a statute is relevant for the jury in a different case, it would not matter here. Sutter is merely arguing that the documents inform the relevant context in which Sutter and the insurers were negotiating the challenged terms.

Worse still, plaintiffs' argument highlights the prejudicial way in which they intend to use the evidence of the *UEBT* litigation—*i.e.*, to imply that Sutter would not have "settled the virtually identical *UEBT/California* litigation" unless it thought that it had violated the antitrust law or that the California AG would not have brought the suit unless Sutter had violated the law. This is precisely the type of undue prejudice that the Court recognized in granting Sutter's motion in limine. It is for the jury to decide whether Sutter's tiering provision is anticompetitive based on the evidence presented at *this* trial. Sutter's business decision to settle the parallel lawsuit or the AG's decision to bring it does nothing to helping the jury evaluate whether the evidence in this case supports a finding of liability.

\*   \*   \*

For these reasons, the Court should overrule plaintiffs' objections and allow these exhibits to be admitted into evidence.

Respectfully submitted

February 27, 2022
Page 10

                        Matthew L. Cantor
                        *Counsel for Plaintiffs*

                        David C. Kiernan
                        *Counsel for Sutter Health*