Jeffrey A. LeVee (State Bar No. 125863)
jlevee@jonesday.com
Elizabeth M. Burnside (State Bar No. 258184)
eburnside@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA  90071
Telephone:     213.489.3939
Facsimile:     213.243.2539

David C. Kiernan (State Bar No. 215335)
dkiernan@jonesday.com
Caroline N. Mitchell (State Bar No. 143124)
cnmitchell@jonesday.com
Brian G. Selden (State Bar No. 261828)
bgselden@jonesday.com
Catherine Zeng (State Bar No. 251231)
czeng@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     415.626.3939
Facsimile:     415.875.5700

Attorneys for Defendant
SUTTER HEALTH

Robert H. Bunzel (State Bar No. 99395)
rbunzel@bzbm.com
Patrick M. Ryan (State Bar No. 203215)
pryan@bzbm.com
Oliver Q. Dunlap (State Bar No. 225566)
odunlap@bzbm.com
BARTKO, ZANKEL, BUNZEL & MILLER
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Telephone:     415.956.1900
Facsimile:     415.956.1152

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DJENEBA SIDIBE, et al., | Case No. 3:12-CV-04854-LB |
| Plaintiff, | **SUTTER HEALTH'S BRIEF RE JURY INSTRUCTIONS** |
| v. | |
| SUTTER HEALTH, | |
| Defendant. | |

1    Sutter addresses in this brief the topics identified in ECF 1449 and its email to the Court

2    of February 27, 2022.  As stated in ECF 1449, Sutter may separately propose additional

3    instructions based on the trial evidence.  Page citations are to the ECF header page number.  The

4    revisions Sutter proposes to the instructions are shown in Exhibit A, and the proposed revisions to

5    the verdict form are shown in Exhibit B.

6    **1.**    **Market Power – CACI 3412, 3423 & 3405; Verdict Form**

7    Sutter requests that the Court revise its Proposed Final Jury Instructions and Verdict Form

8    to align them with the Court's legal ruling regarding market power.

9    On the parties' separate memoranda regarding jury instructions (ECF 1134, 1135), the

10   Court ruled that market power is a threshold element that applies to both of plaintiffs' claims.  *See*

11   ECF 1193, p. 7 (ruling that "market power is an element of both claims").  The Court also

12   recognized as much elsewhere in its Proposed Final Jury Instructions.  *See* ECF 1276, p. 8,

13   Cartwright Act Claim – Introduction Instruction ("[F]irst, I will explain the concepts of 'markets'

14   and 'market power,' which apply to both claims.").  The Proposed Final Jury Instructions and

15   Verdict Form, however, do not currently require the jury to make this legally necessary finding as

16   to both of plaintiffs' claims.  ECF 1275, 1276.

17   Plaintiffs have previously argued that the Court's proposed final instructions "include the

18   standard CACI instruction on market power (CACI 3412), *which applies to both Plaintiffs'*

19   *claims*."  ECF 1403, p. 3 (emphasis added).  But nothing in the current instruction indicates that

20   market power is a necessary element for both claims.  *See* ECF 1276, CACI 3412.  Contrary to

21   plaintiffs' assertion, Sutter's requested change does not "elevate" the market-power element over

22   the other elements.  Rather, it merely tells the jury that market power must be found for both

23   claims, as the Court ruled.  Without these changes, the jury could come back with a verdict for the

24   plaintiffs despite not having made the market power finding necessary as a matter of law.

25   **2.**    **CACI 3405**

26   As proposed by the Court, this instruction describes the first element of plaintiffs' Rule-

27   of-Reason claim as being established if plaintiffs prove "Sutter and insurance companies agreed

28   to contracts with terms that unreasonably restrained trade because they prevented the insurance

companies from steering patients to lower-cost non-Sutter hospitals within the health-plan network." This instruction should be revised because it implies that plaintiffs will have proved that Sutter has "unreasonably restrained trade" if the jury concludes that Sutter "prevented" insurers from steering patients to other hospitals. That implication is legally erroneous because merely stopping an insurer from steering patients to other hospitals does not necessarily unreasonably restrain trade. Plaintiffs have asserted that a provision requiring that an insurer give a provider notice and an opportunity to negotiate an appropriate rate before changing the participation status of the provider's hospital "prevents" the insurer from steering to other hospitals. But Sutter denies that "preventing" steering in this manner (or in the other ways plaintiffs allege) is a restraint of trade at all, let alone an unreasonable one. Plaintiffs' own witnesses have agreed that such a provision is both reasonable and common, and is consistent with the statutory Health Care Provider Bill of Rights. In these circumstances, it would be error to instruct the jury that proof that Sutter has "prevented" steering means that Sutter has unreasonably restrained trade.

To avoid that error, the first element of this instruction should (as the CACI form instruction contemplates) merely state in neutral terms the agreement plaintiffs challenge as unlawful, without any reference to whether the agreement is a restraint of trade. The subsequent elements then require the jury to determine whether the agreement (if proved) restrained trade, whether it had an anticompetitive effect, and whether the anticompetitive effect outweighed any beneficial effects on competition. The jury's findings on these elements, taken together, determine whether an unreasonable restraint of trade exists (subject to this Court's review of whether such a provision can, as a legal matter, be found to be a restraint of trade at all). The Court's proposed instruction is erroneous because, by referring to "unreasonably restrained trade," it includes in the first element language that goes to the ultimate conclusion that can be drawn only if the jury properly finds for plaintiffs on *all* of the elements. Sutter's proposed instruction avoids this error, is consistent with the CACI form instruction, and should be given.

### 3.   <u>CACI 3414</u>

The Court included the following language from the CACI form instruction: "You may

consider whether purchasing patterns are so different in the two areas that services sold in one area tend not to be sold in another.  For example, this might occur if the cost of transporting a service into or out of the claimed geographic market is large compared to the value of the service."  *See* ECF 1276, p. 9.  This phrasing does not make sense in a case involving inpatient hospital services.  For inpatient hospital services, it is the *patient* who would travel, not the service.  The instruction as phrased (*e.g.*, in discussing "transporting a service") is likely to cause confusion.  Presumably this is the reason neither party included this CACI language in its proposed instructions.  *See* ECF 1133, pp. 71 & 73.  Sutter's proposed change is consistent with how the parties and their experts have presented the issue.  *See, e.g.,* Trial Tr. Vol. 10 2292:12–15 (Dr. Chipty testifying "patients' willingness to travel gives us some insight into whether health plans are going to be able to substitute from area hospitals to out-of-area hospitals").

### 4. <u>CACI 3420</u>

Although the language in the second clause of the second element appears in CACI, neither party requested that it be included and, at least in the circumstances of this case, it is not an accurate statement of tying law.  The first clause of the second element accurately captures the requirement of a tying claim—*i.e.*, that the defendant "agrees to sell one product (the tying product) on the condition that the buyer also purchases a different product (the tied product)."  *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 183 (1999); *Corwin v. Los Angeles Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842, 856 (1971) (tying is an "agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product").  The second clause, however, suggests that a tie could alternatively be found even in the absence of a sale conditioned on the purchase of the tied product—*i.e.*, it suggests that a tie could exist so long as the seller is selling two separate products and coerces the purchase of one of them, even if the method of coercion is something other than refusing to sell them except as a package.  That is not an accurate statement of tying law.  The tie must be an actual tying of two products together.  See *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he *essential characteristic* of an invalid tying arrangement lies *in the seller's exploitation of its control over the tying product* to force the buyer into the purchase of a tied product that the buyer

1   either did not want at all, or might have preferred to purchase elsewhere on different terms.")

2   (emphasis added).  Sutter may not be held liable for tying simply because an insurer may have

3   felt coerced by something other than an actual tie into accepting a hospital in its network.  It is not

4   enough, for example, that an insurer included a given Sutter hospital in its network because Sutter

5   offered lower rates for that hospital in exchange for being in-network.  To avoid the jury

6   erroneously finding a tie in that circumstance—or otherwise finding a tie based on something

7   other than an actual conditioned sale—the Court should delete the second clause of the second

8   element.

9        Finally, the instruction should ask about the *tying arrangement*.  Asking about Sutter's

10  "conduct" generally risks the jury penalizing Sutter for conduct not at issue.  This is particularly

11  prejudicial given the testimony on extraneous issues that the jury might view as part of Sutter's

12  "conduct."  *E.g.*, Trial Tr. 596:21–597:10 (testimony about "new affiliates" and "acute enrollee"

13  contract terms); *id.* 487:2–5, 564:13–24 (testimony about Sutter's acquisitions of ambulatory

14  surgery centers, which do not even provide inpatient hospital services); 504:5–10 (testimony on

15  "Sutter's medical group costs").

16      **5.   CACI 3411**

17       As the Court recognized by omitting "purpose" from its CACI 3405 instruction, the law

18  requires plaintiffs to prove anticompetitive effect, not just purpose.  *See* ECF 1133, pp. 51–52,

19  85–86 (citing, among other cases, *Marsh v. Anesthesia Servs. Med. Grp., Inc.*, 200 Cal. App. 4th

20  480, 495 (2011) ("it is plaintiff's burden to make the required showing of a substantially adverse

21  effect on competition in the relevant market") (internal quotation marks and citation omitted);

22  *Exxon Corp. v. Superior Court*, 51 Cal. App. 4th 1672, 1680–81 (1997) ("plaintiff must prove

23  that the restraint had an anticompetitive effect in the relevant market in order to prevail") (citation

24  omitted); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1395

25  (9th Cir. 1984) ("[A]nticompetitive purpose alone is not enough to condemn [a restraint].  The

26  rule must actually harm competition, and that harm must be evaluated in light of the

27  procompetitive benefits the rule might foster." (citations omitted)); *Bd. of Trade of City of*

28  *Chicago v. United States*, 246 U.S. 231, 238 (1918) (explaining that the history or purpose of a

restraint might be relevant "not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences." (emphasis added)).  To avoid confusion and to correctly state the law, the first paragraph's references to "purpose" should likewise be omitted.

### 6.    CACI 3440

The instruction implies that the jury must award damages for all harm caused by Sutter, without specifying that it is only such harm incurred by *plaintiffs* that is compensable.  The jury will be misled into thinking that they are supposed to award damages based on "all harm" caused by Sutter, even if not harm incurred to these plaintiffs.

### 7.    Verdict Form Question 5–7

Questions 5 and 6 should be combined, and that combined question as well as Question 7 should identify each of the challenged provisions and ask the jury whether the effect of that provision was to restrain trade (either alone or together with the other provisions).  Sutter maintains that each of the challenged provisions is valid and cannot serve as the basis of liability. Requiring the jury to identify which of the challenged provisions it finds to be unlawful will facilitate review by this Court (and, if necessary by the Ninth Circuit) of whether the jury has rested its verdict on a basis that is insufficient as a matter of law to support liability.

By not requiring the jurors to make a separate finding as to each challenged provision, the Court's proposed form deprives the verdict form of one of its principal benefits.  As the Federal Judicial Center explains in the *Manual for Complex Litigation*: "Special verdicts and interrogatories are common in complex trials. . . . they simplify instructions, help jurors organize their deliberations, facilitate partial verdicts, isolate issues for possible appellate review, and reduce the costs and burdens of a retrial." *Manual for Complex Litigation, Fourth, §* 12.451, pp. 160-161.  Similarly, the Supreme Court has recognized that special verdicts can "be very useful in facilitating review, uniformity, and possibly postverdict judgments as a matter of law." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 39 n.8 (1997); *accord Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 279 (2d Cir. 1979) ("[T]he better practice "in large and complex cases ..., involving many novel legal issues, [is] to require special verdicts or

1   the submission of interrogatories to the jury pursuant to Fed.R.Civ.P. 49.  In that way the right to

2   a jury trial of all factual issues is preserved while the probability of a laborious and expensive

3   retrial is reduced."); *Pacific West Cable Co. v. City of Sacramento,* 672 F. Supp. 1322 (E.D. Cal.

4   1987) ("Special verdicts . . . isolate fact findings in such a way as to allow reviewing courts to

5   make determinations as a matter of law while preserving the jury's role as a fact finder.  For this

6   reason, special verdicts are a valuable tool when the law is uncertain or in a state of development;

7   special verdicts minimize the need for, and scope of, a new trial in the event of an error of law or

8   a misapplication of law to the facts.").

9          Separate questions for each provision are also necessary in light of how plaintiffs

10   calculated their damages.  Dr. Chipty admitted at trial that she is measuring the purported effects

11   of all of the challenged provisions together and has not isolated the damages attributable to each

12   provision.  *See* Trial Tr. 2454:24–2455:1, 2458:1–7.  Thus, the jury must be asked about each

13   provision separately because otherwise the jury could (a) believe that some of the challenged

14   provisions are lawful; (b) believe that the other provisions restrain trade; and (c) award damages

15   based on Dr. Chipty's calculations.  Such a scenario would be reversible error because the jury

16   would be awarding damages based on lawful conduct.  *See Comcast Corp. v. Behrend*, 569 U.S.

17   27, 36, 38 (2013) (rejecting damages model that did not "measure damages resulting from the

18   particular antitrust injury on which petitioners' liability in this action is premised"; "'The first

19   step in a damages study is the translation of the *legal theory of the harmful event* into an analysis

20   of the economic impact *of that event*.'") (quoting Federal Judicial Center, Reference Manual on

21   Scientific Evidence 432 (3d ed. 2011) (emphasis added by Court)).[1]

22

23

---

24   [1]        Plaintiffs have argued that, even if some provisions would be lawful on their own, they are
25   illegal in combination with other provisions.  But the jury and the Court are entitled to reject that
     assertion.  Sutter contends, for example, that it is reasonable to have provisions that prohibit
26   unilateral changes to the contract during its term, as plaintiffs' own witnesses testified.  The fact
     that the contract may also have a non-par rate does not change that conclusion.  At best for
27   plaintiffs, the non-par rate means that excluding a Sutter hospital will result in a higher rate for
     that hospital.  But that higher rate would pose the same alleged barrier to excluding Sutter
28   hospitals whether or not there is also a provision that prohibits unilateral changes.

1

     **8.**    **Verdict Form Questions 1–8:**

2

     The verdict form asks questions of the jury outright rather than framing the questions in

3

terms of the plaintiffs' burden of proof.  To clearly indicate that the plaintiffs bear the burden of

4

proof on each of these questions, the proposed verdict form should ask questions in a way that

5

reflects the plaintiffs' burden—*i.e.*, "Did plaintiffs prove that [the tying arrangement was a

6

substantial factor in causing plaintiffs' harm?]" rather than "Was [e.g., the tying arrangement a

7

substantial factor in causing plaintiffs' harm?]."  *See* ECF 1130-1, Attach. F, pp. 176–83.  This

8

change is particularly important given how some of the evidence has come in.  *E.g.*, Trial Tr.

9

2578:20–22 (Dr. Chipty: "So I did not look at this example [of an improperly included class

10

member]. I looked at the one that you pointed out. And I will notice that none of the Sutter

11

experts have pointed these out.").

12

          **9.**    **Verdict Form Questions 1 & 2:**

13

     The second clause of Question 1 should be deleted.  Question 2 should not first ask the

14

"economic power" question generally before asking specifically as to each market.  The questions

15

should ask specifically if Sutter tied the sale of services in the markets for which the jury finds

16

Sutter had economic power.

17

     **10.**    **Verdict Form Question 3 & 4:**

18

     The question should refer to the "tying arrangement" not "conduct" generically.  *See*

19

*supra* ¶ 3, CACI 3420.

20

     **11.**    **Restatement of Previously Raised Objections**

21

     Sutter continues to object to the Court's ruling on the following jury instruction issues

22

based on the reasons previously stated (as may be supplemented at the instructions conference in

23

light of the trial evidence):

24

     **CACI 3411:**  The instruction omits the word "substantially" before the phrase "less

25

restrictive means."  *See* ECF 1133, pp. 86–88, Sutter's Objection to Plaintiffs' Instruction No. S-7

26

(collecting cases).

27

     **CACI 3412:**  The instruction fails to instruct the jury that it should consider other

28

evidence in addition to barriers to market entry.  ECF 1133, p. 96.

1      **CACI 3413:**  The jury should be instructed that it may consider market participants'

2  views in evaluating the relevant product market.  *See* ECF 1133, p. 68 (explaining other evidence

3  the jury should consider in assessing the relevant market).

4      **CACI 3420 & Verdict Form:**  The jury should be instructed regarding Sutter's business

5  justification defense, which is a defense even in "per se" tying claims.  *See* ECF 1134 § II, pp.

6  10–16.  The Verdict Form should likewise include a question asking whether Sutter has proven a

7  business justifications defense.

8      **CACI 3440:** The instruction should include the paragraph Sutter proposed regarding

9  expert testimony.  ECF 1133, pp. 120–121.

10      **Omitted Instructions:** The Court should give Sutter's Proposed Instructions Nos. S-12,

11  S-13, S-14, S-15, and S-16 for the reasons previously explained and in light of testimony given at

12  trial.  *See* ECF 1133, pp. 104, 106, 108, 110, 112.

13

14  Dated: February 28, 2022                         Respectfully submitted,

15                                                   JONES DAY

16

17                                                   By:   /s/ Jeffrey A. LeVee
                                                        Jeffrey A. LeVee

18                                                   Counsel for Defendant
19                                                   SUTTER HEALTH

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1

2 **CACI 3412: "MARKET POWER" EXPLAINED**

3
        Market power is the ability to increase prices or reduce output without losing market
4 share. The higher a seller's market share, the more likely is has market power. If you conclude
that Sutter does not have market power in the relevant markets that I will describe, then you must
5 find for Sutter on all counts in this case.

6
        In deciding whether a seller has market power, you should consider, in addition to other
evidence, how difficult it is for a potential competitor to successfully enter the market. The more
7 difficult it is to successfully enter a market, the more likely a seller has market power within that
market. Market power is less likely to exist if it is not difficult for potential competitors to enter a
8 market successfully.

9
        Each market has two components: a product market and a geographic market.

10

11 **CACI 3413: "PRODUCT MARKET" EXPLAINED**

12
        To define the product market, you must determine which services are in the market in
which Sutter is claimed to have carried out its restraint of trade.

13
        A product market consists of all services that can reasonably be used for the same
14 purpose. Services are not in the same product market if users are not likely to substitute one for
the other.

15
        In deciding whether services are reasonable substitutes, you may consider whether a small
16 increase in the price of one service would cause a considerable number of customers of that
service to switch to a second service. If so, these two services are likely to be in the same market.
17 If a significant increase in the price of one service does not cause a significant number of
consumers to switch to a second service, these services are not likely to be in the same market.

18
        The parties agree that the product market is general acute care inpatient hospital services.
19 But they disagree about whether Kaiser is a participant in that product market. In deciding what
constitutes the relevant product market, you may also consider evidence of whether Sutter and
20 other industry participants viewed or treated Kaiser hospitals as competitors in the general acute
care inpatient hospital services market.

21

22 **CACI 3414: "GEOGRAPHIC MARKET" EXPLAINED**

23
        This case involves multiple geographic markets. The plaintiffs claim that the geographic
24 markets are roughly equivalent with hospital service areas (HSAs) as defined by *The Dartmouth
Atlas of Healthcare*. The plaintiffs claim that the "tying" geographic markets are roughly
25 equivalent to the HSAs for Antioch, Auburn, Crescent City, Jackson, Lakeport, Tracy, and the
combined Berkeley-Oakland HSAs. They claim that the "tied" geographic markets are roughly
26 equivalent to the Modesto, Sacramento, San Francisco, and Santa Rosa HSAs. Sutter denies that
these HSAs constitute valid geographic markets.

27
        A geographic market is the area where buyers turn for alternate sources of supply or
28 where sellers normally sell. The geographic market may or may not be the same as the area where
the parties in this case currently compete or do business. It may be smaller or larger than that

PROPOSED FINAL JURY INSTRUCTIONS
– No. 12-cv-04854-LB

1   area.

2        A geographic market may be limited to the area where a service can be sold profitably. You may consider whether ~~patients in one area tend not to travel to another area to receive general acute care inpatient hospital services~~purchasing patterns are so different in the two areas that services sold in one area tend not to be sold in another. For example, this might occur if the cost or time required to travel ~~of transporting a service~~ into or out of the claimed geographic market is large compared to the value of the service.

5

6        In deciding whether services are in the same geographic market, you may consider whether a small increase in the price of the service in one area would cause a considerable number of customers in that area to buy the service in another area. If so, these two areas are likely to be in the same geographic market. If a significant increase in the price in one area does not cause a significant number of consumers to buy the service in another area, these areas are not likely to be in the same geographic market.

9

10                          **CACI 3420: TYING CLAIM**

11        The plaintiffs claim that there is an unlawful tying arrangement in which inpatient services at Sutter hospitals in the tying markets (Antioch, Auburn, Crescent City, Jackson, Lakeport, Tracy, and Berkeley-Oakland) are the tying products, and inpatient services at Sutter hospitals in the tied markets (Modesto, Sacramento, San Francisco, and Santa Rosa) are the tied products. The hospitals in the tying markets are Alta Bates Summit Medical Center, Sutter Delta Medical Center, Sutter Auburn Faith Hospital, Sutter Coast Hospital, Sutter Amador Hospital, Sutter Lakeside Hospital, and Sutter Tracy Community Hospital (collectively, the tying hospitals). The hospitals in tied markets are California Pacific Medical Center (CMPC), Memorial Medical Center, Sutter Medical Center Sacramento, and Sutter Santa Rosa Regional Medical Center (collectively, the tied hospitals).

16        A "tying arrangement" is the sale of one product, called the "tying product," in which the buyer is required or coerced to also purchase a different, separate product, call the "tied product." For example, if a supermarket sells flour only if its customers also buy sugar, that supermarket would be engaged in tying. Flour would be the tying product and sugar the tied product.

19        To establish this claim against Sutter, the plaintiffs must prove all of the following:

20        1.   That inpatient hospital services at the tying hospitals and inpatient hospital services at the tied hospitals are separate and distinct. The parties agree that services in tying and tied markets are distinct. Therefore, you must treat this fact as having been proved.

22        2.   That Sutter will sell inpatient hospital services at the tying hospitals only if the buyer also purchases inpatient hospital services at the tied hospitals~~, or that Sutter sold inpatient hospital services at the tying hospitals and required or otherwise coerced buyers to also purchase inpatient hospital services at the tied hospitals~~;

25        3.   That Sutter has sufficient economic power in the market for inpatient hospital services at the tying hospitals to coerce at least some buyers of inpatient hospital services at the tying hospitals into purchasing inpatient hospital services at the tied hospitals;

4.     That the ~~conduct~~ tying arrangement involves a substantial amount of sales, in terms of the total dollar of inpatient hospital services at the tied hospitals;

5.     That the plaintiffs were harmed; and

6.     That ~~Sutter's conduct~~ the tying arrangement was a substantial factor in causing the plaintiffs' harm.

If you find that the plaintiffs have proved each of these elements, you must consider whether Sutter has proven, by a preponderance of the evidence, a business justification for the tying arrangement.  If you find that the tying arrangement serves a legitimate business purpose of Sutter, and that there are no substantially less restrictive means reasonably available to achieve that purpose, then you must find for Sutter and against plaintiffs on the tying claim.

## CACI 3405: UNREASONABLE COURSE-OF-CONDUCT CLAIM — RULE OF REASON — ESSENTIAL FACTUAL ELEMENTS

In addition to their tying claim, the plaintiffs claim that Sutter entered contracts with insurance companies that unreasonably restrain competition for inpatient hospital services in the tied markets. The plaintiffs claim that the contracts contained terms that prevented the insurance companies from creating effective narrow network products or tiered products that would have allowed the insurance companies to steer patients to lower-cost non-Sutter hospitals within the health-plan network.

To establish this claim, the plaintiffs must prove all of the following:

1.     That Sutter and insurance companies entered agreements that contain ~~agreed to contracts with~~ terms that ~~unreasonably restrained trade because they~~ prevented the insurance companies from steering patients to lower-cost non-Sutter hospitals within the health-plan network;

2.     That the effect of Sutter's conduct was to restrain competition;

3.     That the anticompetitive effect of the restraint outweighed any beneficial effect on competition;

4.     That the plaintiffs were harmed; and

5.     That Sutter's conduct was a substantial factor in causing the plaintiffs' harm.

## CACI 3411: RULE OF REASON — ANTICOMPETITIVE VERSUS BENEFICIAL EFFECTS

In deciding whether Sutter's challenged restraint has an anticompetitive or beneficial ~~purpose or~~ effect on competition, you should consider the results the restraint ~~was intended to achieve or~~ actually did achieve. In balancing these ~~purposes or~~ effects, you also may consider, among other factors, the following:

PROPOSED FINAL JURY INSTRUCTIONS
– No. 12-cv-04854-LB

(a)   The nature of the restraint;

(b)   The probable effect of the restraint on the business involved;

(c)   The history of the restraint;

(d)   The reasonableness of ~~the stated purpose for~~ the restraint;

(e)   The availability of <u>substantially</u> less restrictive means to accomplish the <u>beneficial effect on competition</u>~~stated purpose~~;

(f)   The portion of the market affected by the restraint; and

(g)   The extent of Sutter's market power.

## CACI 3440: DAMAGES

If you decide that the plaintiffs have proved their claims against Sutter, you must also decide how much money will reasonably compensate the plaintiffs and the class for the harm. This compensation is called "damages."

The amount of damages must include an award for all <u>of plaintiffs'</u> harm that was caused by Sutter, even if the particular harm could not have been anticipated.

The plaintiffs must prove the amount of their damages. However, the plaintiffs do not have to prove the exact amount of damages that will provide reasonable compensation for the harm. You must not speculate or guess in awarding damages.

You must not include in your award any damages to punish or make an example of Sutter. Such damages would be punitive damages, and they cannot be a part of your verdict. You must award only the damages that fairly compensate the plaintiffs for their loss.

The plaintiffs seek damages in an amount equal to the increased health-insurance premiums that they and the class members paid to the health-insurance companies during the class period as a result of Sutter's conduct.

<u>The specific item of damages plaintiffs claim here is the amount that plaintiffs allegedly overpaid in premiums for fully insured health insurance policies as a result of Sutter's challenged conduct, above what plaintiffs would have spent on those premiums without the challenged conduct.  First, plaintiffs claim that Sutter overcharged for inpatient services at four hospitals: Memorial Medical Center, Sutter Medical Center Sacramento, Alta Bates Summit Medical Center and CPMC (but at CMPC-St. Luke's, only for services provided to patients covered by Aetna insurance).  Plaintiffs further claim that the insurance companies passed through the overcharge on inpatient services to class members by increasing their premiums.  This means that the Plaintiffs must show that there was an initial overcharge at these hospitals and that the insurance companies passed on some or all of the overcharge in the form of premiums paid by plaintiffs.  If you find that plaintiffs suffered harm, and that Sutter's conduct was a substantial factor in causing that harm, you will need to determine the amount that Sutter overcharged the carriers and how much of the overcharge was passed through to class members in the form of higher premiums.</u>

PROPOSED FINAL JURY INSTRUCTIONS
– No. 12-cv-04854-LB

During the trial you heard testimony from expert witnesses about damages.  You do not have to accept an expert's opinion on damages, just as you do not have to accept an expert's opinion on other topics.  As with any other witness, it is up to you to decide whether you believe the expert's testimony and choose to use it as a basis for your decision.  You may believe all, part, or none of an expert's testimony.  In deciding whether to believe an expert's testimony, you should consider:

    a.   The expert's training and experience;

    b.   The facts the expert relied on;

    c.   Whether those facts have been adequately proven;

    d.   The reasons for the expert's opinion; and

Whether the expert's opinion is based upon principles that are well-established in the expert's field.

# EXHIBIT B

**Part I – Market Power**

For each of the following geographic areas, did plaintiffs prove *both* (a) that the area is a properly defined geographic market for general acute care inpatient hospital services *and* (b) that the geographic area is a market in which Sutter had market power in the market for general acute care inpatient hospital services?  (For each area, circle "Yes" only if plaintiffs proved *both* (a) *and* (b).)

| | | |
|---|---|---|
| Antioch | Yes | No |
| Auburn | Yes | No |
| Crescent City | Yes | No |
| Jackson | Yes | No |
| Lakeport | Yes | No |
| Tracy | Yes | No |
| Berkeley/Oakland | Yes | No |

If your answer to all parts of this question is no, stop here, answer no further questions, and have the presiding juror sign and date this form.  If your answer to any part of this question is yes, proceed to Part II.

**Part II – Tying Claim**

~~1.     Did Sutter sell inpatient hospital services in one or more of the tying hospitals only if the buyer also purchased inpatient hospital services at the tied hospitals, or did Sutter sell inpatient hospital services at one or more of the tying hospitals and require or otherwise coerce buyers to also purchase inpatient hospital services at the tied hospitals?~~

~~Yes: _____     No: _____~~

~~If you answered yes to question 1, then answer question 2. If you answered no, stop here, answer no further questions in this section, and proceed to the "Unreasonable Course of Conduct Claim" section.~~

~~2.~~1.    Did ~~plaintiffs prove that~~ Sutter ~~have~~ has sufficient economic power for inpatient hospital services in ~~one or more of the~~the following tying markets considered individually (Antioch, Auburn, Crescent City, Jackson, Lakeport, Tracy, and Berkeley-Oakland) to

coerce at least some buyers of the services to purchase inpatient hospital services from Sutter in the tied markets (Modesto, Sacramento, San Francisco, and Santa Rosa):~~?~~

Yes: _____          No: _____

~~If you answered no to question 2, stop here, answer no further questions in this section, and proceed to the "Unreasonable Course of Conduct Claim" section. If you answered yes, then answer yes or no for each tying market and then proceed to question 3.~~

| | | |
|---|---|---|
| Antioch | Yes: _____ | No: _____ |
| Auburn | Yes: _____ | No: _____ |
| Crescent City | Yes: _____ | No: _____ |
| Jackson | Yes: _____ | No: _____ |
| Lakeport | Yes: _____ | No: _____ |
| Tracy | Yes: _____ | No: _____ |
| Berkeley-Oakland | Yes: _____ | No: _____ |

If your answer to all parts of question 1 is no, proceed to Part III.  If your answer to any part of question 1 is yes, proceed to question 2.

2.    Did plaintiffs prove that Sutter sells inpatient hospital services from the hospital or hospitals for which you answered "Yes" in question 1 only if the buyer also purchased inpatient hospital services at the tied hospitals (i.e., Memorial Medical Center, Sutter Medical Center Sacramento, CPMC, and Sutter Santa Regional Hospital)?

Yes: _____          No: _____

If your answer to question 2 is no, stop here and proceed to Part III.  If your answer to question 3 is yes, proceed to question 3.

3.    Did ~~the conduct~~plaintiffs prove that the tying arrangement involved a substantial amount of sales, in terms of the total dollar value of inpatient hospital services at the tied hospitals?

Yes: _____          No: _____

If you answered yes to question 3, then answer question 4. If you answered no, stop here, answer no further questions in this section, and proceed to the "Unreasonable-Course-of-Conduct Claim" section.

4.    ~~Was~~ Did plaintiffs' prove that ~~Sutter's conduct~~the tying arrangement was a substantial factor in causing harm to the plaintiffs?

Yes: _____          No: _____

5.      Did Sutter prove that the tying arrangement serves a legitimate business purpose of Sutter, and that there are no substantially less restrictive means reasonably available to achieve that purpose?

Yes: _____     No: _____

Proceed to the next section.

**Part III –** **Unreasonable-Course-of-Conduct Claim**

5.      ~~Did Sutter force the class health plans to agree to contracts that unreasonably restrained trade because they had terms that prevented the plans from steering patients to lower-cost non-Sutter hospitals within the plan network?~~

~~Yes: _____     No: _____~~

~~If you answered yes to question 5, then answer question 6. If you answered no, stop here, answer no further questions in this section, and proceed to the "Damages" section.~~

6.      ~~Was the effect of Sutter's conduct to restrain competition?~~

~~Yes: _____     No: _____~~

~~If you answered yes to question 6, then answer question 7. If you answered no, stop here, answer no further questions in this section, and proceed to the "Damages" section.~~

7.      ~~Did the anticompetitive effect of Sutter's restraint outweigh any beneficial effect on competition?~~

~~Yes: _____     No: _____~~

6.      For each of the following provisions that you find were contained in Sutter's agreements with insurance companies, did plaintiffs prove that the effect of the provision was to restrain competition?  (Circle "Yes" or "No" for each provision you find to have been present.  If the provision was not present, answer "Not Present")

a.  Prevented the insurance company       Yes       No       Not present
from changing, without Sutter's consent,
the network-participation status of a
Sutter hospital after the contract has been
entered.

b.  Required that Sutter hospitals be       Yes       No       Not present
treated equally within a network with all
other providers that participate at the
same level in that network.

c.  Set a higher rate for services at a non-       Yes       No       Not present
participating Sutter hospital.

d.  Placed limitations on the insurance companies' disclosing Sutter's negotiated prices for its general acute care inpatient hospital services.     Yes     No     Not present

If your answer to all parts of question 6 is no or not present, stop here and proceed to Part IV.  If your answer to any part of question 6 is yes, proceed to question 7.

7.     Did plaintiffs prove that the anticompetitive effect of the provisions for which you answered "yes" in question 6 outweighed any beneficial effect on competition?  (Circle "Yes" or "No" for each provision for which you answered "yes" in question 6.)

a.  Prevented the insurance company from changing, without Sutter's consent, the network-participation status of a Sutter hospital after the contract has been entered.     Yes     No

b.  Required that Sutter hospitals be treated equally within a network with all other providers that participate at the same level in that network.     Yes     No

c.  Set a higher rate for services at a non-participating Sutter hospital.     Yes     No

d.  Placed limitations on the insurance companies' disclosing Sutter's negotiated prices for its general acute care inpatient hospital services.     Yes     No

If you answered yes to question 7, then answer question 8. If you answered no, stop here, answer no further questions in this section, and proceed to the "Damages" section (Part IV).

8.     ~~Was~~ Did plaintiffs prove that Sutter's conduct a substantial factor in causing harm to the plaintiffs?

Yes: _____     No: _____

Proceed to question 9.

## Part IV – Damages

9.     Did you answer yes to question 4 or yes to question 8?

Yes: _____     No: _____

If you answered yes to question 9, proceed to question 10. If you answered no, stop here, answer no further questions, and have the presiding juror sign and date this form.

10.    What are the damages to the class?

$ _____

Signed: _____(Presiding Juror)

Dated:_____