Jeffrey A. LeVee (State Bar No. 125863)
jlevee@jonesday.com
Elizabeth M. Burnside (State Bar No. 258184)
eburnside@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA  90071
Telephone:     213.489.3939
Facsimile:     213.243.2539

David C. Kiernan (State Bar No. 215335)
dkiernan@jonesday.com
Caroline N. Mitchell (State Bar No. 143124)
cnmitchell@jonesday.com
Brian G. Selden (State Bar No. 261828)
bgselden@jonesday.com
Catherine Zeng (State Bar No. 251231)
czeng@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA  94104
Telephone:     415.626.3939
Facsimile:     415.875.5700

Robert H. Bunzel (State Bar No. 99395)
rbunzel@bzbm.com
Patrick M. Ryan (State Bar No. 203215)
pryan@bzbm.com
Oliver Q. Dunlap (State Bar No. 225566)
odunlap@bzbm.com
BARTKO, ZANKEL, BUNZEL &
MILLER
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Telephone:     415.956.1900
Facsimile:     415.956.1152

Attorneys for Defendants
SUTTER HEALTH

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DJENEBA SIDIBE, et al.,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>SUTTER HEALTH,<br><br>　　　　　　Defendant. | Case No. 3:12-CV-04854-LB<br><br>**SUTTER HEALTH'S MOTION FOR JUDGMENT AS A MATTER LAW**<br><br>Courtroom:　　9, 19th Floor<br>Judge:　　　The Hon. Laurel Beeler |

1

**MOTION**

Defendant Sutter Health ("Sutter") has already moved orally at trial for judgment as a matter of law under Federal Rule of Civil Procedure 50 on all of plaintiffs' claims.  Sutter's motion is now based on the following memorandum of points and authorities, the trial transcript and other files of this action, oral argument of counsel and such other matters as the Court may consider.

**RELIEF SOUGHT**

Sutter requests judgment as a matter of law in its favor on all of plaintiffs' causes of action or, alternatively, on such claims and issues as the Court determines that judgment is proper.

# TABLE OF CONTENTS

Page

MOTION..............................................................................................................................i

RELIEF SOUGHT................................................................................................................i

INTRODUCTION ...............................................................................................................1

ARGUMENT .......................................................................................................................2

I.      LEGAL STANDARD...............................................................................................2

II.     THE EVIDENCE IS INSUFFICIENT TO PROVE TYING....................................3

        A.      There is No Evidence of Any Tie of Network Participation. ........................4

                1.      Plaintiffs Have Not Proved that Sutter Tied Its Hospitals Together in
                        Contract Negotiations. .......................................................................4

                2.      Provisions prohibiting unilateral changes do not create a tie. ............8

                3.      The non-par rate provision does not create a tie....................................9

                4.      Systemwide contracting does not create a tie....................................10

        B.      There is No Evidence that Sutter Conditioned the Sale of Any Service on the
                Purchase of Any Other Service.......................................................................14

III.    PLAINTIFFS HAVE NOT PROVEN A RULE-OF-REASON CLAIM. ..........................15

        A.      Preventing Unilateral Changes to a Valid Contract is Not a Restraint of Trade. .........15

        B.      The Non-Par Rate is Not an Antitrust Violation............................................19

        C.      Sutter's Price Confidentiality Provisions Do Not Support a Claim............................21

IV.     Plaintiffs' Failure to Separately Analyze Impact or Damages Defeats Their Claim if
        Any Part of the Challenged Conduct is Found to Be Lawful. ...............................22

        CONCLUSION....................................................................................................24

# TABLE OF AUTHORITIES

Page

**Cases**

*32nd St. Surgery Ctr., LLC v. Right Choice Managed Care*,
820 F.3d 950 (8th Cir. 2016)..................................................................................................... 15

*Ace v. Aetna Life Ins. Co.*,
39 F.3d 1241 (9th Cir. 1998)....................................................................................................... 2

*Advo, Inc. v. Philadelphia Newspapers, Inc.*,
51 F.3d 1191 (3d Cir. 1995)....................................................................................................... 16

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
948 F.2d 536 (9th Cir. 1991)..................................................................................................... 19

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010)..................................................................................................... 15

*Archibald v. Cty. of San Bernardino*,
No. EDCV1601128ABSPX, 2018 WL 6017032 (C.D. Cal. Oct. 2, 2018) ................................ 3

*Bangert Bros. Cons. Co., Inc. v. Kiewit Western Co.*,
310 F.3d 1278 (10th Cir. 2002)................................................................................................... 2

*Bell v. Blue Cross of California*,
131 Cal. App. 4th 211 (2005) .................................................................................................... 21

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)...................................................................................................... 19

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995)...................................................................................................... 19

*Chicago Prof'l Sports, Ltd. v. Nat'l Basketball Ass'n*,
95 F.3d 593 (7th Cir. 1996)....................................................................................................... 21

*Children's Hosp. Cent. California v. Blue Cross of California*,
226 Cal. App. 4th 1260 (2014) ................................................................................................. 21

*City of Vernon v. S. California Edison Co.*,
955 F.2d 1361 (9th Cir. 1992).................................................................................................... 22

*Classen v. Weller*,
145 Cal. App. 3d 27 (1983) ................................................................................................... 3, 10

*Elliott v. Versa CIC, L.P.*,
No. 16-CV-0288-BAS-AGS, 2019 WL 414499 (S.D. Cal. Feb. 1, 2019)................................... 3

*First State Orthopaedics v. Concentra, Inc.*,

534 F. Supp. 2d 500 (E.D. Pa. 2007) ....................................................................... 15

*Freeman v. San Diego Ass'n of Realtors,*
   77 Cal. App. 4th 171 (1999) ......................................................................... 3, 19

*Gray v. Perry,*
   No. 215CV05642CASJCX, 2020 WL 1275221 (C.D. Cal. Mar. 16, 2020)............................. 3

*ILC Peripherals Leasing Corp. v. IBM Corp.,*
   458 F. Supp. 423 (N.D. Cal. 1978),
   *aff'd sub nom. Memorex Corp. v. IBM Corp.,*
   636 F.2d 1188 (9th Cir. 1980).......................................................................... 22

*In re Indep. Serv. Orgs. Antitrust Litig.,*
   85 F. Supp. 2d 1130 (D. Kan. 2000) ...................................................................... 23

*In re REMEC Inc. Sec. Litig.,*
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) ................................................................... 22

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde,*
   466 U.S. 2 (1984)........................................................................................ 14

*Jocks v. Tavernier,*
   316 F.3d 128 (2d Cir. 2003).............................................................................. 2

*Kentucky Ass'n of Health Plans, Inc. v. Miller,*
   538 U.S. 329 (2003) ..................................................................................... 15

*Lillie v. ManTech Int'l. Corp.,*
   No. 217CV02538CASSSX, 2019 WL 3387732 (C.D. Cal. July 26, 2019),
   *aff'd.,* 837 F. App'x 455 (9th Cir. 2020) ................................................................ 3

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.,*
   817 F.3d 934 (6th Cir. 2016)............................................................................. 15

*People's Choice Wireless, Inc. v. Verizon Wireless,*
   131 Cal. App. 4th 656 (2005) ............................................................................ 18

*Rebel Oil Co., Inc. v. ARCO,*
   51 F.3d 1421 (9th Cir. 1995)............................................................................. 22

*United States v. Colgate & Co.,*
   250 U.S. 300 (1919) ..................................................................................... 18

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004) .................................................................................. 18, 21

*W. Parcel Exp. v. United Parcel Serv. of Am., Inc.,*
   190 F.3d 974 (9th Cir. 1999)............................................................................. 16

*Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*,
  810 F.2d 243 (D.C. Cir. 1987) .................................................................................. 19

**Statutes**

Cal. Health & Safety Code 1375.7(b) ........................................................................... 17

Health & Safety Code § 1395.6 .................................................................................... 20

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1807b2 (May 2020) ........................... 16

**Rules**

Fed. R. Civ. P., Rule 50(a)(1) ........................................................................................ 2

Fed. R. Civ. P., Rule 50, 1993 Advisory Committee Note ............................................ 2

1

**INTRODUCTION**

2       Plaintiffs have not met their burden of proof on either of their claims.

3       On tying, their theory—as alleged in their complaint, argued in their opening, and

4   contained in the jury instructions—is that Sutter tied the sale of inpatient hospital services in

5   seven tying markets to the purchase of services from four tied markets.  That theory required

6   plaintiffs to prove that Sutter engaged in *conditioned* sales—*i.e.*, that insurers wanted to buy

7   hospital services in the tying markets without buying hospital services in the tied markets but

8   Sutter refused.  Plaintiffs presented literally no evidence of that.  Not a single witness testified

9   that any insurer said to Sutter that it wanted to buy services from Sutter Lakeside, Amador, Coast

10  or any other tying hospital (either individually or in combination) but Sutter refused unless the

11  insurer bought unwanted services from CPMC, Modesto, Sacramento, or Santa Rosa.  To the

12  contrary, the record is replete with evidence of Sutter repeatedly agreeing that insurers could

13  include tying hospitals in their networks without any of the tied hospitals.  Plaintiffs thus

14  defaulted on the core allegation of their case.

15      The contract provisions on which plaintiffs rely do not cure that default.  The so-called

16  "anti-tiering clauses" simply prevent insurers from unilaterally changing agreed-upon network

17  participation status during the term of the contract (excluding an individual hospital after agreeing

18  to include it or tiering an individual hospital after agreeing not to).  Nothing about those clauses

19  ties hospitals together because they do not condition the sale of one on the purchase of another.

20  They simply preserve whatever deal the parties struck.  The non-par rate also does not tie

21  hospitals together because it does not condition the availability or price of one hospital on the

22  insurer's purchasing another.  Whether the rate applies to an individual hospital depends solely on

23  whether the insurer includes ***that*** hospital in the network, not whether the insurer includes some

24  ***other*** hospital.  And the fact that these provisions are contained in a single systemwide contract is

25  irrelevant, because the evidence confirmed that systemwide contracting does not determine

26  network participation—and network participation is what plaintiffs allege was tied.  Network

27  participation is determined by the parties' negotiations and the agreed-upon contract terms, not

28  whether there is one contract covering 24 hospitals or 24 separate contracts with the same terms.

Sutter's Motion for JMOL
3:12-CV-04854-LB

Plaintiffs' "course of conduct," or Rule-of-Reason claim, fails because (1) antitrust law does not give one party to a contract the right to change the contract without the other party's consent, and (2) antitrust law is not a price-control statute that regulates the price a seller sets for its own services.  The former is all that the so-called "anti-tiering" clauses prevent.  And the latter price regulation is precisely what plaintiffs are seeking here with their challenge to the non-par rate, as evidenced by their constant refrain at trial that the non-par rate is "excessive" and by Dr. Chipty's admission that her opinion is not that negotiating a higher price for out-of-network services is improper but rather that the "level" of Sutter's rate was too high.  Plaintiffs want the jury and the Court to regulate what a hospital can charge for its services.

The foregoing requires that judgment be entered for Sutter, even if plaintiffs had presented a valid damages model.  But plaintiffs did not do that either.  Dr. Chipty admitted that her model cannot segregate the effect on prices of the various categories of conduct plaintiffs are challenging.  But the law requires that the impact of lawful acts be separated from that of any unlawful acts.  Thus, if the jury or this Court concludes that any of the challenged acts are lawful (*e.g.*, the "anti-tiering" clauses or the non-par rate), judgment is required on the entire claim.

## ARGUMENT

### I.   LEGAL STANDARD

Judgment as a matter of law is proper when the evidence is insufficient for a reasonable juror to find in plaintiffs' favor.  Fed. R. Civ. P., Rule 50(a)(1).

Even if the Court does not grant judgment on the entire case, it may resolve particular claims or issues within a claim and remove them from the jury's consideration.  Fed. R. Civ. P., Rule 50, 1993 Advisory Committee Note ("judgments as a matter of law in jury trials may be entered . . . with respect to issues or defenses that may not be wholly dispositive of a claim or defense"); *Ace v. Aetna Life Ins. Co.*, 139 F.3d 1241, 1247 (9th Cir. 1998) (granting JMOL on punitive damages only); *Jocks v. Tavernier*, 316 F.3d 128, 136-37 (2d Cir. 2003) (partial JMOL for defendant on emergency measure justification but not on self-defense claim); *Bangert Bros. Cons. Co., Inc. v. Kiewit Western Co.*, 310 F.3d 1278, 1286-87 (10th Cir. 2002) (partial JMOL for plaintiff on fraudulent misrepresentation claim but not on damages).

"The prior denial of summary judgment does not preclude a district court from later granting judgment as a matter of law pursuant to Rule 50 because the latter tests the sufficiency of the evidence actually presented at trial." *Gray v. Perry*, No. 215CV05642CASJCX, 2020 WL 1275221, at *2 (C.D. Cal. Mar. 16, 2020); *Elliott v. Versa CIC, L.P.*, No. 16-CV-0288-BAS-AGS, 2019 WL 414499, at *6 (S.D. Cal. Feb. 1, 2019) (same); *Archibald v. Cty. of San Bernardino*, No. EDCV1601128ABSPX, 2018 WL 6017032, at *4 n.3 (C.D. Cal. Oct. 2, 2018) (same); *Lillie v. ManTech Int'l. Corp.*, No. 217CV02538CASSSX, 2019 WL 3387732, at *22 (C.D. Cal. July 26, 2019) (granting JMOL after denying summary judgment on the same claims, noting that "[n]ow, viewing all the evidence in the light most favorable to plaintiff, the Court finds that the evidentiary record does not permit a reasonable jury to" find in favor of the plaintiff), *aff'd.*, 837 F. App'x 455 (9th Cir. 2020).

## II.     THE EVIDENCE IS INSUFFICIENT TO PROVE TYING.

To establish a tying claim, a plaintiff must meet specific proof requirements unique to tying law.  Chief among these is that the defendant engaged in *conditioned* sales—*i.e.*, that a seller with market power would "sell one product (the tying product) on the condition that the buyer also purchases a different product (the tied product)." *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 183 (1999).  Absent such conditioned sales, there is no tie.  It is not enough that a defendant declined to contract to sell certain products at a given price or at all.  Nor is it enough that it sold two products together.  Instead, a "tie-in (or tying arrangement) is a *requirement* that a buyer purchase one product or service as a *condition* of the purchase of another." *Classen v. Weller*, 145 Cal. App. 3d 27, 36 (1983) (emphasis added).  Satisfying this particularized proof requirement is the prerequisite for obtaining the more strict treatment that has historically applied to tying arrangements.[1]  Plaintiffs have not met their burden to go to the jury on this critical element.

---

[1]     As Sutter has previously explained, courts have recognized for several decades that tying arrangements are not inherently pernicious and have accordingly permitted defendants to present procompetitive justifications for a tie.  ECF 1134, § II.  Sutter preserves its position on that point and its objection to the Court's proposed instructions that preclude Sutter from offering justifications for a tie.

A.      **There is No Evidence of Any Tie of Network Participation.**

Plaintiffs' tying theory is that Sutter refused to allow insurers to include Sutter's seven alleged tying hospitals (Coast, Lakeside, Auburn Faith, Delta, Amador, Tracy, Alta Bates) "in their health plan provider networks" unless the insurer included Sutter's four alleged tied hospitals (CPMC, Sacramento, Santa Rosa, Modesto) "in their provider networks."  ECF 204, ¶ 6.[2]  Plaintiffs have asserted various mechanisms by which this alleged forced network inclusion occurred, including Sutter's contract negotiations, the so-called "anti-tiering" provisions, the non-par rate, and systemwide contracting.  Even if Sutter is deemed to be selling network participation rather than the hospital services it actually sells (*see infra*, p. 14), each of these theories fails because plaintiffs have not shown that the challenged conduct conditioned participation of some hospitals on the participation of other hospitals.

1.      **Plaintiffs Have Not Proved that Sutter Tied Its Hospitals Together in Contract Negotiations.**

Plaintiffs have not offered any evidence that Sutter ever conditioned network participation of any hospital on the participation of another—*i.e.*, that it required an insurer to include one or more of the tied hospitals in a network as a condition for including one of the tying hospitals (*e.g.*, that Sutter required CPMC to be included in a network if the insurer wanted to include Alta Bates).  Some insurer witnesses testified generally that "Sutter" (without naming hospitals) would not agree to participate in narrow or tiered networks.  (No witness claimed that Sutter refused to allow a tied hospital to be excluded.)  That testimony does not establish a tie because the witness did not claim that Sutter refused to include a tying hospital unless the insurer included a tied hospital—*i.e.*, the alleged refusal was not *conditional*.  As discussed above, a seller is not

---

[2]      *See also id*. ¶¶ 5 (alleged tying arrangement forced insurers to include hospitals services "in their networks"), 9 ("Sutter's conduct has forced commercial health plans to include higher-priced Sutter hospital facilities in their networks"), 125 (Sutter forced insurers "to include all or no Sutter hospitals in their networks"), 126 (Sutter allegedly "condition[ed] the inclusion of any inpatient hospital services that Sutter has supplied in the tying markets, on the inclusion of the separate, distinct and higher-priced inpatient hospital services that Sutter has supplied in the tied markets"), 127, 142–43.

engaged in a tie any time it declines to sell one or more of its products.  Plaintiffs' own witness

acknowledged that a provider may choose to decline to participate in a narrow or tiered product

for any number of reasons entirely apart from any effort to tie hospitals together, including that it

does not make business sense to agree to discounted rates for a hospital that will get less volume

because it has been excluded or tiered.[3]  Such decisions are not a tie.  A tie exists only if the seller

refused to sell one product unless the buyer bought another.  Plaintiffs' witnesses' testimony does

not show that.

The very few specific products to which plaintiffs pointed at trial confirm the point.

Ms. Lacroix-Milani testified that Sutter declined to participate in Health Net's "Variable HMO

Hospital Co-Pay Plan" because Health Net proposed to place the Sutter hospitals in tier 2.

RT 506:8–507:8.  But she did not assert that this involved any tying of Sutter hospitals together—

*i.e.*, that Health Net asked to include some hospitals and Sutter refused unless other hospitals

were included.  She testified only that Sutter did not want to participate at all if its hospitals were

in tier 2.  *Id.*  That is not a tying arrangement.[4]

Similarly, Ms. Lacroix-Milani testified that Sutter declined its request to have all of

Sutter's hospitals participate in the Blue & Gold HMO product.  RT 530:2–534:6.  But this

assertion that Sutter declined to have all its hospitals *included* is the opposite of plaintiffs' tying

theory that insurers wanted to *exclude* certain Sutter hospitals but Sutter refused.  And the Blue &

Gold product refutes plaintiffs' theory because Sutter agreed to the participation of six of the

---

[3]     RT 2074:22–2076:3 (Fawley) ("Q. All right.  And you've declined to participate in tiered
networks over both issues of the discounts that are required or the placement in lower tiers; right?
A. Absolutely.  Generally it's a business calculation; and if there's -- if it's not clear that there's
going to be significant volume, it really doesn't make sense. . . . I mean, we passed on a number
of them. They generally don't make sense. There have been a few that do , and those we have
done, and they've been based on business expectations.  Q. And you evaluate them?  A. Yes.  Q.
All right. And that's when you decide whether they make business sense or not?  A. Correct. And
-- and I would say it's also fair to say that more often than not what's being asked is a very
significant discount, and given the likelihood and being as full as we are, that there would be
significant additional volume.  The general rule is, no, they don't go forward, yes.").

[4]     The same is true of the Tenet PPO discussed in Ms. Brendt's deposition designations.
Sutter elected not to participate at tier 2 in that product for the reasons Ms. Brendt explained, but
plaintiffs offered no evidence that Sutter's position was conditional.

tying hospitals (Amador, Lakeside, Coast, Alta-Bates, Delta, and Tracy), even though three of the tied hospitals—the hospitals Sutter supposedly required be included if any tying hospitals were

| | | | | | |
|---|---|---|---|---|---|
| A8 | Health Net Blue & Gold HMO | This product functions the same as a standard HMO Product but with a narrow network offering and is available only to the UC Members. Member selects a Primary Care Physician from a participating Blue & Gold Network provider group. Services not available within a provider group must be authorized and/or referred by a PCP or provider group to a participating Blue & Gold HMO provider. | Non-Participating, except SPMF/ SMGR (includes MHMG) PAMF/MPD (Note 5) | Non-Participating, except SAH, SMCSR, SLH, SCH, NCH, EMC, ESLH, ABSMC, MPHS, SDMC, STCH and TRAC | Non-Participating, except ACT, CPAI, PSC, SFEC, SVNAH, SIPS, NBRSC, SRSC, GGEC, MCMI, MIA, SSEC, SCABSMC and THME |

included—were not included:

*See* TX 661.262; TX 661.056-59; RT 553:12–557:19.

The Anthem Select PPO and ACO Flex products about which Mr. De La Torre testified likewise show the opposite of plaintiffs' tying theory.  Rather than tying its hospitals together, Sutter agreed to including in that product three of its alleged tying hospitals (Lakeside, Coast, and Amador), even though three of the alleged tied hospitals were excluded from the Anthem Select PPO product and all of the tied hospitals were excluded from ACO Flex.  TX 2387.349.  Mr. De La Torre's complaint was not that Sutter was refusing to allow Anthem to *exclude* selected Sutter Hospitals (*i.e.*, purchase them separately), but rather that Anthem wanted to *include* more Sutter hospitals.  RT 1998:22–1999:15, 2007:20–2008:7.  A complaint about "limited participation" is the opposite of a claim that a seller would agree only to a packaged sale.

The only other product that any witness identified as purportedly evidencing that Sutter blocked a narrow or tiered network was the United Premium Designation product.  But that product is irrelevant because it involved tiering of *physicians*, not hospitals, and certainly not the alleged seven tying hospitals and four tied hospitals.  *See* RT 2137:10–2138:6.

In contrast to the complete dearth of evidence of Sutter tying hospitals together, the record is filled with evidence of instances in which Sutter agreed to participate in narrow or tiered networks, including networks that included one or more typing hospitals ***but excluded one or more tied hospitals***:

Sutter's Motion for JMOL
3:12-CV-04854-LB

| aetna | Anthem BlueCross | | | | | | BlueShield | | Health Net | UnitedHealthcare |
|---|---|---|---|---|---|---|---|---|---|---|
| Aetna Premier Care/Plus | ACO Flex | Community Med Centers | Healthy Check Program | USC | Prime Healthcare | USC Verdugo Hills Hospital | SA PPO ASO – Adventist | Tandem PPO | Blue & Gold HMO | CORE |
| Aetna Value Network | Advantage PPO | Community Memorial Health | Henry Mayo Newhall | Pathway HMO Plans | Salinas Valley Memorial Hospital | UC Care | SA PPO – Alameda Hosp | Trio ACO HMO Covered CA – Small Business | ExcelCare ELECT Open Access | Nexus ACO |
| Aexcel/Aexcel PLUS | Alameda Health System | Cottage Health System | HMO Saver Small Group Plan | Pathway(s) Narrow PPO Network | Salinas Valley Memorial Hosp Union | Access+ HMO/EPO CalPERS | SA PPO – Bakersfield Heart Hosp | Trio ACO HMO – SF Health Svc System | ExcelCare HMO | |
| BEN/Choose and Save | American Hospital/ Mad River | County of San Joaquin | Huntington Memorial Hospital | Pathway(s) EPO (Tiered Hospital) | Scripps Health | ASO – Washington Hospital | SA PPO – Casa Colina Hosp | Trio ACO HMO (sold outside CHBE) | PremierCare HMO | |
| Concentric | Barton Health Systems | Dameron Hospital Association | KPC Healthcare EPO | Pathway(s) PPO (Tiered Hospital) | Select HMO | Blue Groove | SA PPO – Enloe Med Ctr (Classic / Value) | Trio ACO HMO (sold through CHBE) | PureCare Health Care Service Plan | |
| Jackson Labs | California Pathway EPO | Dignity Health Plans | KPC Healthcare PPO | Pebble Beach Company | Select HMO (CalPERS Only) | CalPERS Trio HMO | SA PPO – Marin General Hosp | | PureCare One EPO | |
| Savings Plus | Cedars Sinai Health Systems | Eisenhower Med Center | Madera Community Hospital | PERS Select PPO | Select PPO | Daughters of Charity Health System | SA PPO – Marshall Med Ctr | | SmartCare HMO | |
| SHCA Cisco Life-Connections | Central Coast Health Program | EPO Tiered Hospital Program | Memorial Care Health System | Power Advantage HMO | Torrance Health Association | Local Access+ | SA PPO – Plumas District Hosp | | | |
| Stanford HealthCare | CHA Hollywood Presbyterian PPO | Fairfield Medical Center | Oak Valley Hospital District | Power Select HMO | UC Faculty Health Insurance Plan | Net Value HMO CalPERS | SA PPO – UC Berkeley Student Plan | | | |
| Stanford Healthcare Alliance | Community Hospital – Monterey Peninsula | Fremont Rideout Health Group | Orchard Hospital | Presbyterian Intercommunity Hosp | UC Student Health Insurance Plan | SA ASO – John Muir | Save Net HMO | | | |

TX 9142.[5]  In addition to these products, Sutter also repeatedly agreed to participate in certain of an insurer's products, even though the insurer excluded Sutter hospitals from other products. *E.g.,* 3226:21–3228:4 (Blue Shield alone has roughly 50 ACO narrow network products that exclude Sutter entirely).  The existence of so many separate sales is flatly inconsistent with plaintiffs' theory.  And it bolsters the conclusion, which the evidence otherwise establishes, that

[5]    *See* RT 930:2–13 (Sutter has participated in 51 narrow or tiered networks with Anthem and 7 with HealthNet); RT 932:9–15 (Anthem CalPERS); RT 932:18–933:22 (SmartCare); RT 791:22-792:25 (Blue Shield Access Plus HMO EPO, CalPERS Limited Network); TX 4840 at .058 & RT 797:18–798:6 ("Shared Advantage PPO, ASO, tiered network plan for Alameda Hospital"); RT 1853:12–19 (Q. And you agree, Mr. Barnes, that overall with respect to tiered products, that Sutter agreed to participate more often than not? . . . [A]: With tiered networks around other providers or providers as payers, that's correct."); RT 1847:7–16 (Blue Shield Access Plus, HMO/EPO, CalPERS Limited Network); RT 1847:17–25 (Blue Shield NetValue HMO); RT 1848:1–20 (Blue Shield SaveNet HMO); RT 1882:14–1883:7 (Tandem); RT 1883:8–1885:5 (Trio); RT 2035:11–14 ("Q. There were many networks that Anthem had that Sutter agreed to participate where some of the hospitals were in network and some of the hospitals were not in the network?  A.  Yes."); RT 1999:5–12, 2030:22–2032:11 (Select PPO); RT 2008:2–7 (ACO Flex); RT 2032:12–2033:6 (discussing TX 4839.129, PERS Select PPO); RT 2033:9–2034:20 (PERS Select); RT 2034:3–2035:7 (CCSF plan); RT 2036:5–2037:2 (Power Advantage HMO); RT 2037:3–21 (Power Select HMO); RT 2163:22–2165:12 (CORE).

     As Ms. Brendt explained, even if self-funded plans and Southern California plans are removed from this list, the list includes about 50 plans.  RT 3230:20–3232:5.  And she explained why the self-funded and Southern California plans should not be removed.  RT 3232:14–3241:18.

Sutter did not tie its hospitals together.

### 2. Provisions prohibiting unilateral changes do not create a tie.

The so-called "anti-tiering" provisions on which plaintiffs rely also do not establish a tie. They do not create any prohibited conditioning because they do not link hospitals together—*i.e.*, they do not condition the participation of one hospital on any other hospital's participation. Instead, the provisions simply prevent insurers from unilaterally changing the network participation status of a hospital during the term of the contract or from unilaterally imposing a network participation status that the parties never agreed upon. That is true of each of the challenged provisions, as shown by the language of those provisions on their face and the testimony at trial:

- The "no change in provider status" provision requires Sutter's consent to any changes in the agreed-upon participation status. *See* RT 2973:5–24 (Brendt) (this provision specifies that "the payer can't make changes to the product grid, the Exhibit 23, without Sutter's permission"); RT 1850:2–9 (Barnes) ("So what that means, Mr. Barnes, is Blue Shield or self-funded payer, whoever is defined as a payer, can't change that product grid, Exhibit 23, without Sutter's consent? A. During the term of the agreement.").

- The "new plan" provision requires that the parties negotiate over Sutter's participation in any new plan. *See* RT 2973:25–2974:24 (Brendt) (this provision is "to make sure that if there is something new that you are selling, you will at least let us know if you are interested including us, that we'll negotiate those terms of our participation").

- The "equal treatment" provision requires that, once the parties have agreed that a Sutter hospital will participate in a network at discounted rates, the insurer will not deviate from that agreement by treating the hospital less favorably than other participating hospitals. *See* RT 2974:25–2975:17 (Brendt) (explaining that "Equal Treatment" provision protected the parties' agreement—"[i]f we're in the network, we want to be treated equally, unless we've pre-agreed to be in a Tier 2").

- The "tiered products, restricted or limited networks" provision states that the agreed-upon network participation status is specified in the contract and any changes require Sutter's consent. RT 2976:5–2978:1 (Brendt) (explaining that this provision makes clear that Sutter's network participation is specified in the contract and, before changes may be made "we have to talk about it and make sure we agree").

Plaintiffs presented no evidence that these clauses create a tying arrangement. Their witnesses complained that the clauses make it difficult for insurers to steer patients away from certain hospitals during the term of the contract by unilaterally excluding or tiering those

1    hospitals.  But that assertion (even if it were factually supported) does not mean that the

2    availability of one hospital for network participation was conditioned on the insurer including a

3    different hospital—*e.g.*, that to have Sutter Lakeside or Sutter Coast in-network, the insurer also

4    had to include CPMC or Sutter Sacramento in-network.  Plaintiffs are simply asserting that, as to

5    *individual* hospitals, the insurers were prevented from unilaterally using a narrow network or

6    tiering to induce their members to obtain less services from *that* hospital.  Even accepting that

7    assertion as true, the alleged impediment operated on a hospital-by-hospital basis.  The contracts

8    did condition network participation of one hospital on how a separate hospital was treated.

9                    **3.      The non-par rate provision does not create a tie.**

10          The non-par rate provision does not create a tie for the same reason:  it does not require

11   the purchase of two services (or hospitals) *together*.  It simply sets the price for an excluded

12   hospital.  *See, e.g.,* TX 426.015 (§ 2.01.2 – non-par rate applies to the hospitals "that do not

13   participate").  As Mr. De La Torre put it, "[i]f it was deemed in the contract that Sutter, a Sutter

14   facility or group or provider was not in the network, our network, we were required to reimburse

15   *that particular entity.*"  RT 1993:17–21 (emphasis added); *see also* RT 902:14–15 (Tasabia)

16   (non-par rate applies if "if one of the Sutter hospitals is out of network, and an insurance

17   company's customer ends up in that hospital"); RT 1579:23–1580:1 (Welsh) (non-par rate

18   provision "required that Aetna pay 95 percent of charges for any providers that were not in their

19   network").

20          Because the non-par rate affects only the price of the excluded hospital, the rate induces

21   insurers to include in their networks the hospital to which it applies, not any other hospital.  In

22   other words, it does not link hospitals together by conditioning the availability or price of one on

23   the insurer's purchasing the other.  Like the so-called "anti-steering clauses," it operates on a

24   hospital-by-hospital basis.  *See* RT 2933:19–2934:9 (Brendt) ("Q. So as part of CPMC negotiated

25   in-network rate, Sutter negotiated an out-of-network rate for CPMC?  A. Yes.  Q. And that out-

26   of-network rate for CPMC didn't depend upon rates of any other hospitals?  A. No.  Q. It was

27   with respect to CPMC?  A. That's correct.  Q. And then the same would be true for Alta Bates?

28   A. Correct.  Q. Or Memorial Modesto?  A. Correct.  Q. Or Sutter Medical Center of Sacramento?

1    A. Right.  Q. Correct?  A. Yes.").

2         In these circumstances, plaintiffs' argument reduces to the assertion that the non-par rate

3    creates a tie because an insurer would pay less for a given hospital by including it in network and

4    earning a volume discount.  That is not the law, which imposes tying lability only there "is a

5    *requirement* that a buyer purchase one product or service as a *condition* of the purchase of

6    another." *Classen,* 145 Cal. App. 3d at 36 (emphasis added).  Tying law is addressed to tying

7    separate products together, not to pricing that induces a buyer to purchase a greater volume of a

8    single product.  No tie exists if a seller says it will sell apples at $2 per pound and oranges at $3

9    per pound, but will lower the price for the oranges to $2 per pound if the buyer purchases at least

10   three pounds of oranges.  The price differential on oranges might induce the buyer to purchase

11   more oranges to get the lower price.  But the differential has nothing to do with the apple price or

12   whether the buyer purchases any apples.  There is accordingly not even an arguable sale of one

13   product conditioned on the other, and thus no tie, even if the buyer elects to buy the apples and

14   three pounds of oranges together.

15        This case is no different.  Sutter's contracts specify an out-of-network rate for CPMC and

16   a lower in-network rate.  Sutter does not condition the lower in-network for CPMC on the price or

17   participation of any other hospital.  If an insurer wants to avoid paying the out-of-network rate for

18   CPMC, it merely has to put CPMC in the network, and that is true without regard to whether the

19   insurer includes any or all of Sutter's 23 other hospitals.  In other words, if an insurer includes

20   CPMC but excludes the other Sutter 23 hospitals, the insurer still pays the in-network rate for

21   CPMC rather than the non-par rate.  The participation of those other hospitals has *no* impact on

22   which rate applies to CPMC.

23              **4.     Systemwide contracting does not create a tie.**

24        The entry of systemwide contracts also was not a conditioned sale of network

25   participation.  As Mr. Barnes acknowledged, merely entering a systemwide contract does not

26   determine which hospitals will be in-network.  RT 1845:10–15 (Barnes) ("Q. Now, the fact that

27   Sutter -- that Sutter and Blue Shield have a systemwide agreement that covers all the providers --

28   the hospitals, medical foundation, the ambulatory surgery centers -- that does not mean that each

1   hospital participates in every network or product that Blue Shield offers; right?  A. Correct.").

2   Whether contracting is systemwide or hospital-by-hospital, the network participation status of

3   hospitals must be negotiated and determined as to each hospital—and, as discussed, the evidence

4   is uncontradicted that such negotiations occurred and resulted in hospitals participating in some

5   products and not participating in other products.  *See supra*, pp. 4–7.  This defeats plaintiffs'

6   claim that Sutter refused to allow insurers to include "in their health plan provider networks"

7   certain hospitals unless the insurer included other hospitals "in their provider networks."  ECF

8   204, ¶ 6.

9        Plaintiffs argue that systemwide contracting was a tie because, to contract with any Sutter

10   hospital, insurers had to contract with all hospitals, and that contract had a non-par rate (and other

11   terms) that applied to all hospitals.  But that argument fails for the same reasons.  Setting a non-

12   par rate is not a sale of anything, so agreeing to it is not a *conditioned* sale of anything.  And, as

13   discussed, the non-par rate does not in any event tie hospitals together because it operates on a

14   hospital-by-hospital basis.  Likewise, entering a contract with Sutter that includes a non-par rate

15   is not a sale of anything, whether of services or network participation.  Services are sold when

16   patients come to Sutter for care, and network participation is agreed upon when the parties

17   negotiate over network participation.

18        Plaintiffs' argument also fails because it rests on the false premise that, absent a

19   systemwide contract, the insurers would have had no contract at all with certain hospitals and thus

20   no non-par rate would apply to those hospitals.  No witness testified that any insurer would have

21   opted to not contract at all with certain Sutter hospitals.  To the contrary, each of the witnesses

22   who addressed this question—including witnesses from each insurer as well as Dr. Chipty—

23   testified unequivocally that each insurer would have had a contract with each Sutter hospital even

24   absent systemwide contracting because each insurer offered at least one broad network for which

25   it wanted all Sutter hospitals.  And this was true specifically as to each of the alleged tied

26   hospitals, which are the hospitals plaintiffs argue the non-par rate prevented insurers from

27   excluding.

28        Mr. De La Torre's testimony is illustrative.  He said Anthem wanted to exclude some

Sutter hospitals from "*some* of its more affordable networks."  RT 1970:19–20 (emphasis added).

But he did not say Anthem wanted to exclude any Sutter hospital from *all* of its networks and

have no contract at all with that hospital.  He testified to just the opposite:

> Q.  Okay. And, in fact, Anthem offered its members in California a broad
> PPO network that included all Sutter hospitals?
> A.  Yes.
> Q.  And a broad HMO network that included all Sutter hospitals?
> A.  Yes.
> Q.  And Anthem wanted to do that; that wasn't at Sutter's insistence?
> A.  Yes.
> Q.  Anthem wanted these broad networks; right?
> A.  When those networks were formed, I wasn't with Anthem, but I'm
> assuming, yes, that's the case.
> Q.  Okay. And so Anthem actually had to contract with every Sutter
> hospital so that it could have every Sutter hospital in its broadest networks; right?
> A.  Yes.

RT 2027:11-2028:2.[6]

Each of the other insurers give similar testimony, with no insurer testifying that it would

have gone uncontracted with particular Sutter hospitals:

- **Blue Shield:**  RT 791:9–19 (Miranda) ("Q. If we look at A1, "Blue Shield Access Plus HMO (Plan)," this is Blue Shield's broad HMO product?  A. Yes.  Q. And if you look under "Hospital" it says "P." That means that all Sutter hospitals are participating; right?  A. That's right.  Q. And for that product, Blue Shield would want all the Sutter hospitals in order to compete with Anthem and United, the other insurance companies that have broad HMO products; right? A. Yes, I would say that's true.").

- **United:**  RT 2159:2–16 (Lundbye) ("Q Okay. I'm here to ask you a few questions. Now, you -- United was interested in narrow and tiered products , but it was also important for United to have a broad network available to its customers who wanted a broad network. Correct?  A Yes.  Q.  Okay.  And so for that broad network, United was interested in having the participation of all Sutter hospitals, right?  A Yeah. Certainly, those geographies that we served.  There were some geographies where we didn't have service area and really didn't need the hospital, but yes.  Q Okay.  So

---

[6]    *See also* RT 2028:14–16; 2028:23-2029:8 (De La Torre) ("Q. Anthem wanted CPMC in many of its networks.  Maybe not all, but many?  A. Yes." . . . Q. . . . . Anthem wanted the Memorial Medical Center of Modesto to be in many of its networks during the time period 2006 to '14; correct? A. Yes.  Q. So you would have needed to have a contract that included Sutter Memorial Medical Center in Modesto?  A. Yes.  Q. And, likewise, with Sutter Medical Center in Sacramento?  A. Yes.  Q. And, likewise, with Sutter Santa Rosa?  A. Yes."); RT 2047:13–15 (De La Torre) ("Q. But you would always contemplate offering a broad network product along with a narrow or tiered network product?  A. Yes.  They didn't -- one did not replace the other.").

United wasn't looking to exclude any of the Sutter hospitals from the broad network that it had established.  A.  The full network is inclusive of all the hospitals, yes."); RT 1496:13–19 (Harvey) ("Q. So these large national companies wanted to make sure that United had products that included Sutter because their employees in California wanted to go to Sutter doctors and Sutter hospitals; correct? A. The Northern California employees? Q. Yes. And so the answer is yes? A. Yes.").

- *Aetna*:  RT 1560:1–7 (Welsh) ("Q. Okay. Was Sutter an important provider of hospital services in Northern California? A. Why.  Q. And why is that?  A. In order to offer a competitive network to employer groups to sell, they were important to have in the network to offer that robust network.").

- *Health Net:*  RT 549:12-22 (LaCroix-Milani) ("Q And it was important for Health Net to have a broad network available to customers who wanted a broad network. Correct?  A Yes. For choice.  Q And for those broad networks, Health Net was interested in having the participation of most, if not all, of the Sutter hospitals. Correct?  A Um, yes.  Q So Health Net wasn't looking to exclude Sutter hospitals from its broadest networks, was it?  A That's generally correct, yes."); RT 547:14-548:1 ("Q And you're familiar with the Sutter hospitals in the San Francisco County region, California Pacific Medical Center, and formerly the St. Luke's campus, those two facilities? You are familiar with them?  A Yes.  Q Okay.  And in general, in order to sell health networks to employers, Health Net wanted those Sutter facilities to be in network in most of its offerings.  Correct?  A Right.  We had proposed Sutter hospitals in our networks at their existing rates.  Q. So Sutter wasn't forcing CPMC on Health Net.  Health Net generally wanted CPMC in network, right?  A Yes, Health Net wanted CPMC in our network.").[7]

Consistent with this uniform testimony, Ms. Brendt confirmed that each of the five insurers asked that "all the Sutter hospitals participate in" the insurer's broad network products and that Sutter would therefore have had a contract with each insurer for "each of the 24 hospitals," regardless of whether contracting were systemwide or hospital-by-hospital. RT 2930:21–2933:13, 2960:22–2962:11.

Dr. Chipty likewise agreed that each of the insurers would have had a contract with each of the four tied hospitals even without systemwide contracting.  RT 2545:25–2546:10 ("Q. And we've heard testimony in this case from each of the insurance companies that they wanted the four tied hospitals in at least one of their broad PPO and broad HMO networks.  Is that consistent

---

[7]     Ms. Dodd also testified from the perspective of an employer that it was important for the insurer to have a broad network with Sutter hospitals in it along with other providers. RT 1713:21–1714:11 ("Q Now, you mention that the City and County had members who went to Sutter providers. Right?   A Yes.  Q CPMC?  A Yes. CPMC, St. Luke's, Alta Bates, Children's. Yes. . . .  Q.  And it was important to you to have offerings where CPMC and St. Luke's, Children's and Alta Bates was available.  A Yes.").

1   with your understanding of the facts?  A. Yes. Roughly, yes.  Q. So those four tied hospitals --

2   CPMC, Memorial Modesto, Sutter Medical Center of Sacramento, and Santa Rosa – they would

3   all have a contract with an insurance carrier to be in network; right? To be in network you've got

4   to have a contract with the health plan? A. That's right.").

5        In short, plaintiffs' theory that systemwide contracting was a tying arrangement is directly

6   contrary to the uncontradicted trial record.  Systemwide contracting is not a sale of anything, and

7   it did not in any event result in the existence of a contract or contracted rates where none would

8   otherwise existed.

9        **B.     There is No Evidence that Sutter Conditioned the Sale of Any Service**

10           **on the Purchase of Any Other Service.**

11       The foregoing shows that plaintiffs' tying claims fails even if Sutter is deemed to be

12   selling network participation.  In fact, however, Sutter does not sell network participation.  Sutter

13   sells hospital and other healthcare services.  RT 3243:10–13 (Brendt).  Insurance networks are

14   created and sold to patients by insurance companies, not by Sutter.[8]  Insurers may offer to include

15   a hospital in their networks if the provider will agree to lower rates for that hospital, and the

16   provider may or not agree to accept that offer.  RT 959:3–13 (Tasabia); RT 3246:9–11 (Brendt).

17   But such negotiations over the rates that will apply if services are purchased are not themselves a

18   sale.  The sale occurs only when Sutter provides the service, which is the only thing Sutter sells.

19       Plaintiffs have presented no evidence that Sutter ever refused to provide a hospital service

20   unless the purchaser of that service also purchased a separate service from Sutter.  To the

21   contrary, the only evidence on this point is that Sutter did not require patients to purchase services

22   from one hospital as a precondition to purchasing services from another hospital.  RT 1895:7–17

23   (Barnes).  Judgment as a matter of law for Sutter is required on this ground as well.  Sutter cannot

24   tie the sale of something that Sutter does not sell, and it did not tie the sale of the only thing it

25   does sell.  *See Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("essential

26   _____

27   [8]    RT 824:2–4 (Miranda) ("Q. Blue Shield is in the business of creating provider networks to
     offer to its members– A. Yes."); RT 477:23–24 (LaCroix-Milani) ("Our network is our
28   product."); RT 2648:16–21 (Brendt) (insurers create and sell networks); RT 3246:3–8 (Brendt)
     (Sutter does not sell insurance networks).

1    characteristic" of a tying claim is that a "seller" has refused to separately sell its products).

2    **III.    PLAINTIFFS HAVE NOT PROVEN A RULE-OF-REASON CLAIM.**

3          Plaintiffs also failed to prove their Rule-of-Reason claim.  That claim rests on the

4    propositions (1) that a company that has entered a valid volume-discount contract may not

5    negotiate for contract provisions that prevent the other side from unilaterally changing the terms

6    of the deal, and (2) that antitrust law regulates a company's setting of its own prices by

7    precluding a company from setting a price that is allegedly "too high."  Both propositions are

8    groundless.

9          **A.    Preventing Unilateral Changes to a Valid Contract is Not a Restraint**

10              **of Trade.**

11         Plaintiffs offered no evidence—and do not appear to contend—that it is unreasonable or

12   unlawful for a provider to agree to discounted rates in exchange for network participation.  No

13   such contention would be tenable, as providing lower rates for network participation is a

14   longstanding and accepted cornerstone of insurer-provider contracting, as numerous cases have

15   recognized[9] and the trial testimony establishes.  RT 2073:13–15 (Fawley) ("the expectation of

16   volume . . . drives the discounted rates"); RT 2547:15–18 (Chipty) (hospitals are "willing to offer

17   discounts to get into the network").  Even outside of insurer-provider contracting, antitrust law

18   recognizes the general lawfulness of volume discounting.  *See, e.g.*, *Allied Orthopedic*

19   *Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 997 (9th Cir. 2010) (loyalty

20   _____

21   [9]    *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 332 (2003) ("Providers in
     such networks agree to render health-care services to the HMOs' subscribers at discounted rates

22   and to comply with other contractual requirements.  In return, they receive the benefit of patient
     volume higher than that achieved by nonnetwork providers who lack access to petitioners'

23   subscribers."); *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934, 941 (6th
     Cir. 2016) ("Hospitals generally seek to become 'in-network' or 'preferred' providers for a

24   number of insurers, often accepting lower rates from the insurance companies in exchange for a
     higher volume of patients."); *32nd St. Surgery Ctr., LLC v. Right Choice Managed Care*, 820

25   F.3d 950, 952 (8th Cir. 2016) ("The benefits of participating in an insurer's networks include
     increased patient volume and marketing and promotion by the insurer.  In exchange for these

26   benefits, a network provider generally agrees to receive discounted reimbursement rates."); *First*

27   *State Orthopaedics v. Concentra, Inc.*, 534 F. Supp. 2d 500, 505 (E.D. Pa. 2007) ("A provider
     who contracts with a PPO agrees to become a 'preferred provider' in the PPO network and accept

28   discounted rates in exchange for anticipated increased patient volume.").

discount not anticompetitive because a more efficient competitor could still compete by offering lower prices); *W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 976 (9th Cir. 1999) ("volume discount contracts" that "do not preclude consumers from using" competitors' services "are legal under antitrust law"); *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1203 (3d Cir. 1995) ("PNI's discounts, based on the total amount of dollars spent by a customer, offend no antitrust principles."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1807b2 (May 2020) (loyalty and volume discounts are generally "beneficial, bringing higher output and lower prices," especially "in markets with high fixed costs").

Because volume-discount contracting is reasonable and lawful, the challenged contract provisions here are also lawful.  Plaintiffs presented no evidence that the provisions do anything more than validly preserve the parties' lawful contractual bargain by preventing the insurers from unilaterally changing the participation status of a Sutter hospital during the term of the contract. Indeed, far from plaintiffs' proving that the provisions unlawfully restrain trade, plaintiffs' own witnesses confirmed that the provisions are reasonable and legitimate.  With one exception discussed below that only proves the rule, plaintiffs' insurer witnesses, provider witness, and expert all admitted that it is reasonable (and, indeed, common) for a contract to provide that changes to the agreed-upon participation status or other material changes require notice to the provider and an opportunity to negotiate:

- *Aetna*: RT 1670:5–10 (Stevens) ("In your view, it's unreasonable for the provider to be requesting notice and an opportunity to discuss terms with the insurance company during the term of the contract for a new product? You think it's unreasonable? A. For a big health system, I don't think it's unreasonable.  It's fairly common.");

- *Anthem:* RT 2038:23–2039:5 (De La Torre) ("Q. . . . You don't think it's unreasonable for a hospital provider to ask Anthem for notice and an opportunity to negotiate before Anthem, the insurance company, decides to offer a new product that changes the network status of hospitals during the term of the agreement? It's not unreasonable to ask for that, is it? A. No.");

- *UCSF*: RT 2074:3–8 (Fawley) ("Q. And so in your experience during the term of a contract, if there's going to be a material change to the obligations and expectations of the insurance company or U.C.S.F., it's customary to have a clause allowing the parties to get notice and an opportunity to negotiate; correct?  A. Correct.");

- **_Dr. Chipty:_**  RT 2543:22–2545:14 (putting aside Sutter's non-par rate, she does not "have a problem" with a provision that gives the right to notice and an opportunity to decline to agree to change in network participation; "I think they should have a right to say no.").[10]

Indeed, the provisions are consistent with the California statutory Health Care Provider's Bill of Rights, which precludes changes to a material term of a contract unless the provider agrees.  *See* RT 1855:14–1858:11 (Barnes) (testifying that clause prohibiting amendments unless in writing and signed by the parties ensured consistency with the Provider's Bill of Rights); Cal. Health & Safety Code 1375.7(b).  And they are consistent with provisions in the contracts (which plaintiffs' witnesses all endorsed as reasonable) that prohibit amendments to the contract unless both sides agree in writing.  TX 426.023–024 (Aetna 2008 SWA); TX 661.022–25 (Health Net 2013 SWA); TX 2387.023–24 (Anthem 2012 SWA);TX 3351.018–19 (Blue Shield 2007 SWA); TX 4842.005-008.

The one exception was Ms. Lundbye, who testified that United wanted the ability to, "on its own, simply change the network status of certain Sutter hospitals during the term of the agreement" and to "have the freedom and flexibility to build networks without providers' permissions."  RT 2160:21–2161:2.  In her view, it was "unreasonable for Sutter to ask, via the contract, to require United to even ask for permission, much less have to negotiate." RT 2161:10–13; *see also* RT 2169:15–16 ("We wanted the ability to be able to launch our products without having to go to Sutter for permission.  Correct.").  No other witness endorsed this unsupportable view.  And accepting it would revolutionize antitrust law—and with it much of contract law and property rights in this country.  Insurers are of course free to launch their products without Sutter's or any other provider's permission.  But that is not what plaintiffs here are seeking.  Rather, they are seeking to force Sutter to accept discounted rates for hospitals that the insurer has unilaterally excluded or tiered after promising in exchange for those discounted rates that hospital would be fully in network.  That would be forcing Sutter to deal with insurers

---

[10]     *See also* RT 1260:21-1261:8 (Kizer) ("if an insurance company in the middle of a contract essentially changes the deal and steers, let's say, half the volume away from that hospital system, . . . that could impact that hospital system's budgeting for capital improvements").

1    on terms to which Sutter has never agreed.  The Supreme Court has emphatically rejected such

2    "enforced sharing," recognizing that, "as a general matter, the Sherman Act 'does not restrict the

3    long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely

4    to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon*

5    *Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,* 540 U.S. 398, 408 (2004) (quoting *United*

6    *States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *People's Choice Wireless, Inc. v. Verizon*

7    *Wireless*, 131 Cal. App. 4th 656, 663–67 (2005) ("[T]he right to refuse to deal remains

8    sacrosanct.  Because that is true, the mere refusal to deal does not violate the spirit or policy of

9    antitrust law.").

10   Plaintiffs presumably will try to distance themselves from Ms. Lundbye's view.  But she

11   was merely saying the quiet part out loud, giving voice to the necessary consequence of plaintiffs'

12   challenge to Sutter's contract provisions.  If it is an unreasonable restraint of trade for a provider

13   like Sutter to negotiate for provisions that prohibit the insurer from unilaterally changing a

14   hospital's participation status during the contract term, the result is exactly what Ms. Lundbye

15   identified—insurers will have the freedom to contract for discounted rates based on network

16   inclusion and then to unilaterally change that participation status without any notice to the

17   provider and no opportunity to negotiate the terms of the reduced participation.

18   Dr. Chipty tried to thread the needle by opining that the contract provisions—while

19   reasonable on their own—become unreasonable when contained in the same contract with a non-

20   par rate.  But she offered no coherent basis for that opinion.  According to plaintiffs, the non-par

21   rate makes it less expensive to include a hospital than exclude it.  But that purported effect is the

22   result of the non-par rate alone, not of the provision that prevents unilateral changes to agreed-

23   upon participation status.  The alleged effect would exist whether or not insurers are precluded

24   from unilaterally changing the contract (*i.e.*, the non-par rate would impede such networks at the

25   negotiation stage and during the term of contract when the provisions are in force, without regard

26   to the other provisions).  If Dr. Chipty were correct that the non-par rate makes these other

27   provisions unlawful, then the contractual provision prohibiting amendments to the contract absent

28   the written consent of both parties would also be an unlawful restraint of trade.  Plaintiffs

1  understandably do not make that argument.  Their argument that the purported "anti-tiering"

2  provisions are unlawful fails for the same reason.

3          **B.**        **The Non-Par Rate is Not an Antitrust Violation.**

4         The non-par rate does not violate the Rule of Reason because, except in certain limited

5  circumstances not alleged to be present here, antitrust law does not regulate the prices at which

6  companies sell their own products or services.  The courts have uniformly recognized that "the

7  antitrust laws are not a price-control statute." *Blue Cross & Blue Shield United of Wisconsin v.*

8  *Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995).  "[A]n excessive price alone does not

9  establish a violation of the antitrust laws, because imposition of a high price is not, in and of

10  itself, an anticompetitive act." *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810

11  F.2d 243, 252 (D.C. Cir. 1987); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 549

12  (9th Cir. 1991) (while "setting a high price may be a use of monopoly power, . . . it is not in itself

13  anti-competitive") (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir.

14  1979)); *Freeman,* 77 Cal. App. 4th at 200, 201 ("charging allegedly excessive prices, standing

15  alone, does not ordinarily violate the antitrust laws"; "We do not interpret *Palsson* and its

16  progeny as construing the Cartwright Act to permit judicial oversight of unilateral price

17  decisions.").

18         That plaintiffs are impermissibly seeking to use the antitrust laws to regulate Sutter's

19  price-setting—*i.e.*, that they are challenging the level of Sutter's prices as too high—was

20  confirmed by the trial testimony.  Plaintiffs offered no evidence that it is unlawful as a general

21  matter for a provider to have a non-participation rate.  To the contrary, Dr. Chipty agreed that it is

22  appropriate for a provider to set a different, higher rate for hospitals that will get less volume

23  because they are excluded or disfavored in an insurer's network.[11]  California law likewise

24  expressly recognizes that providers may set higher prices for out-of-network care.  Health &

25

26  [11]    RT 2547:7–18 ("Q. But as you noted yesterday, in this industry the out-of-network rate is
generally higher than in-network rates; right?  A. That's right.  Q. And that's because, you know,

27  hospitals, they want to – a hospital wants to get in network to get access to the membership;
right? A. That's right.  Q. Right. And so -- and I think you wrote this in your report -- because of

28  that, they're willing to offer discounts to get into the network, lower prices? A. That's right.").

Safety Code § 1395.6.  And the trial evidence was uncontradicted that a provider like Sutter has a strong, legitimate, and procompetitive interest in having an agreed-upon out-of-network rate so that it is not exposed to the risk of having to either accept an insurer's unilaterally determined "reasonable and customary" rate determinations or engage in burdensome and expensive litigation to obtain reasonable payment.[12]

Rather than challenging Sutter's right to have a non-par rate in general (or even to have one that is higher than the in-network rate), plaintiffs claim Sutter violated antitrust law by setting the price too high for out-of-network services.  According to Dr. Chipty, the issue is not the mere fact of having a non-par rate, but the *level* at which Sutter sets its price.  RT 2546:20–25 ("Q. Yeah.  You're focusing on the amount.  I want to focus on just the fact of having a negotiated rate in a contract for when you're in network and when you're out-of-network.  There's nothing anti-competitive about that?  I mean, it makes sense.  A. Well, it's -- it's -- it's more about the level of the price.").  Her testimony on this point mirrored plaintiffs' opening statement, which likewise asserted that Sutter's non-par rate is unlawful because it is "excessive" and purportedly "much higher" than what other hospitals seek.  RT 292:11, 293:23; *see also* RT 2549:14-17 (Chipty) (asserting that Sutter's non-par rate is "significantly higher" than competitor's rates); RT 2245:24–2246:3 (Chipty) (asserting that Sutter's "high" non-par rate hampered narrow and tiered networks).

Plaintiffs are thus inviting the Court and the jury to engage in precisely the kind of price regulation that the antitrust laws do not permit.  The antitrust laws "do not deputize district judges as one-man regulatory agencies" with power to set a defendant's prices.  *Chicago Prof'l Sports,*

---

[12]     RT 1867:5–17 (Barnes) ("Q:  And then the provider, of course, can ask for more and then litigate over the reasonable value of those services; right?  A. Yeah. . . . Q. Yeah. And I think during -- when we met before, we discussed that Blue Shield has had litigation over its R&C? A. Correct.  Q. How much it paid providers? A. Correct."); RT 1868:9–12 (Barnes) ("Q. . . . So having an agreement with Sutter would avoid legal challenges over the R&C, how much Blue Shield would pay for out-of-network services?  A. Correct."); RT 2017:22–25 (De La Torre) ("Q. But if the hospital doesn't agree to what Anthem said was the usual and customary rate, you would have litigation or arbitration? A. Yeah. Both parties would present their sides, yes."); RT 3266:25–3267:5 (Brendt) ("Q. . . . one of the reasons for having an out-of-network rate that's negotiated in these contracts is to avoid litigation?  A. That is one of the reasons, yes.  Q. And why do you want to avoid litigation?  A. Because it's expensive.").

*Ltd. v. Nat'l Basketball Ass'n*, 95 F.3d 593, 597 (7th Cir. 1996).  As the Supreme Court observed in *Verizon*, courts are "ill suited" to "act as central planners, identifying the proper price, quantity, and other terms of dealing." 540 U.S. at 408.  Yet that is exactly what plaintiffs are seeking. Because the law does not permit such claims, judgment as a matter of law is proper.

Even if a claim of "excessive" pricing were a valid antitrust claim, plaintiffs have failed prove that Sutter's price is excessive.  Their theory is that Sutter's contractual non-par rate is higher than what insurers would have to pay in the absence of any agreed-upon non-par rate.  For that contention, plaintiffs presented insurer witnesses who asserted that they would offer only their "usual and customary" rates for any out-of-network care Sutter provided, which rates the witnesses said were lower than Sutter's non-par rates.  But the evidence was uncontradicted that the insurer's unilaterally set "usual and customary" rate is not determinative, because Sutter (like any other provider) is not obligated to accept that rate but is entitled to take the issue to litigation or arbitration.  *See supra*, p. 20, n. 12; *see also Bell v. Blue Cross of California*, 131 Cal. App. 4th 211, 218 (2005) (explaining that a provider can dispute and recover more than an insurer's reasonable and customary payments); *Children's Hosp. Cent. California v. Blue Cross of California*, 226 Cal. App. 4th 1260, 1271-76 (2014) (same).  Plaintiffs offered no evidence that the amounts awarded in such proceedings were materially less than Sutter's non-par rate.  To the contrary, the only evidence on that issue was that Sutter was awarded 90–95% of billed charges in two arbitrations against Kaiser (RT 2998:21–3000:6, 3285:2-6 (Brendt)) and that North Bay Medical Center was awarded an amount that is much greater than Sutter's 95% rate (RT 1937:5–1942:22 (Barnes), 3598:7–3600:10 (Chason)).

**C.**    **Sutter's Price Confidentiality Provisions Do Not Support a Claim.**

Plaintiffs do not contend that their challenge to Sutter's confidentiality provisions can sustain a Rule-of-Reason claim on its own.  Nor have they presented any evidence that could support any such contention.  To the contrary, each insurance company testified that they want to keep their rates confidential.[13]  And, as discussed below, plaintiffs' expert has not attempted to

---

[13]    RT 2038:5-8, 2038:19-22 (Q:  . . . "All of Anthem's contracts with every single hospital in

1  determine what damages, if any, flowed from the confidentiality provisions even if they had been

2  shown to be anticompetitive.  Accordingly, because judgment is proper for Sutter as to the other

3  provisions and practices plaintiffs challenge, it should be entered as to the challenge to the

4  confidentiality provisions as well.

5  **IV.   PLAINTIFFS' FAILURE TO SEPARATELY ANALYZE IMPACT OR DAMAGES**

6  **DEFEATS THEIR CLAIM IF ANY PART OF THE CHALLENGED CONDUCT IS**

7  **FOUND TO BE LAWFUL.**

8  An antitrust plaintiff may not recover for injuries that are due to conduct that does not

9  violate the antitrust law, "since it is inimical to the antitrust laws to award damages for losses

10  stemming from acts that do not hurt competition."  *Rebel Oil Co., Inc. v. ARCO*, 51 F.3d 1421,

11  1433 (9th Cir. 1995).  Thus, an expert's impact and damages model must "segregate the losses, if

12  any, caused by acts which were not antitrust violations from those that were."  *City of Vernon v.*

13  *S. California Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992).  Where a plaintiff fails to do so,

14  judgment for the defendant is required.  *Id.* at 1373 (affirming grant of summary judgment for

15  failure to segregate the alleged losses where the plaintiff asserted that "all of Edison's acts

16  contributed to the damage figure, but the district court and we have already found that many of

17  those acts were proper"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273–74 (S.D. Cal.

18  2010) (excluding damages study and granting summary where study failed to "separate the loss

19  caused by" accused conduct from loss caused by legitimate conduct); *ILC Peripherals Leasing*

20  *Corp. v. IBM Corp.*, 458 F. Supp. 423, 435 (N.D. Cal. 1978) (granting directed verdict where

21  ───────────

22  California contains a confidentiality clause during your term while you were there; correct?  A:
   Yes. . . . Q:  Okay.  And Anthem wanted to keep its rates confidential because Anthem wouldn't
   want other hospitals or even Anthem's competitors to see those rates; right?  A:  Correct."); RT

23  2189:12-19 ("Q: . . . United's template contains confidentiality language?  A:  It contains, yes,
   industry standard confidentiality language saying that you cannot share the contract or the

24  contracted rate.  Q:  Okay.  And you're not aware of a single contract that United has with a

25  hospital that does not have a confidentiality clause?  A:  Correct."); RT 1676:22-1677:4 ("Q:
   Now, Aetna, in terms of the confidentiality of its pricing during the time you were at Aetna, it's

26  true, isn't it, that Aetna didn't want other insurance companies – United, Blue Shield, Anthem –
   to know the contracted rates between Sutter and Aetna?  A:  No, we didn't.  Q:  You wanted that

27  to remain confidential; correct?  A:  Correct."); RT 546:13-16 ("Q: . . . And from the insurance
   companies' perspective, you don't want Aetna and United and the others to know what your

28  contracted rates are with Sutter.  Right?  A:  We would not, correct.").

damage study did not separate effects of particular acts so that "there was no basis in the record for the jury to determine what the effect on damages would be if it found one or more of the challenged acts lawful"), *aff'd sub nom. Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir. 1980); *In re Indep. Serv. Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130, 1157 (D. Kan. 2000) (granting summary judgment where plaintiffs had "been on notice that the case involved a critical distinction between damages attributable to the refusal to sell patented, as opposed to unpatented parts," and therefore "should have requested leave to amend its expert reports to disaggregate damages long before . . . when it opposed the [] motion for summary judgment").

Plaintiffs have failed to satisfy this requirement. Dr. Chipty has not separately estimated the impact of the various contract provisions and contracting practices plaintiffs challenge. Instead, she lumped everything together and calculated only a single purported impact. RT 2454: 21–23 (Chipty) ("But as far as damages go or my overcharge analysis goes, I have not separately estimated overcharges or damages for the individual aspects of Sutter's contracts."). Thus, if the Court rules, for example, that the equal treatment or "no change" provisions are valid, plaintiffs have no competent proof separating out the effect of those provisions and isolating only the injury or damages attributable to the other challenged provisions or conduct. As Dr. Chipty admitted:

> Q . . . If the jury were to find that having a clause in a contract like the ones in Sutter's contract, the tiering provision, was lawful, found that that was reasonable, it should be in the -- the hospital should have that right, your regression has no way to isolate the effects of that clause from the other ones. You don't have a variable for it, there's no way to isolate the impact of just the tiering clause. Right?
>
> A. That's right. I think you need the two together to really measure the impact. The anti-tiering and steering, and the non-par."

RT 2456:23–2457:8 (Chipty). Dr. Chipty similarly has no means of determining the impact of the other contract provisions if the non-par rate is found to be valid.

> Q And with respect to the non-participation clause, the out-of-network, that set the out-of-network prices, if the jury were to find that having a clause that sets out-of-network prices is lawful, you have no way to isolate the impact of just that clause from the other clauses on this page (Indicating). Right?
>
> A That's correct.

1   RT 2458:1–7.

2         Accordingly, if the Court grants judgment as matter of law for Sutter on either the so-

3   called "anti-tiering provisions" or on the non-par rate, the Court must grant judgment for Sutter

4   on plaintiffs' other claims as well for lack of competent proof of injury or damages.

5                                    **CONCLUSION**

6         Judgment as a matter of law should be entered in Sutter's favor on all of plaintiffs' causes

7   of action.

8    Dated: March 7, 2022                          JONES DAY

9
                                          By:    */s/ David C. Kiernan*
10                                               David C. Kiernan

11                                               Attorneys for Defendant Sutter Health

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28