February 8, 2022

<u>VIA ELECTRIC CASE FILING</u>

The Honorable Laurel Beeler
United States Magistrate Judge
Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

      Re:     ***Djeneba Sidibe et al. v. Sutter Health*, Case No. 3:12-cv-04854-LB**

Dear Judge Beeler:

The parties respectfully submit this joint letter regarding the scope of testimony to be provided by David Axene and Jenni Vargas, two witnesses to be called in plaintiffs' case-in-chief on February 10 and 11, 2022, respectively.

    **<u>Sutter's Position:</u>**

**Testimony of David Axene[1]**

Plaintiffs' actuarial expert, David Axene, will testify to an opinion for which he relies entirely on proprietary, never-disclosed "facts and data." *See* Fed. R. Civ. P. 26(a)(2)(B)(ii). Because plaintiffs' failure to disclose such materials is not substantially justified or harmless, plaintiffs should not be allowed to use that opinion at trial. Fed. R. Civ. P. 37(c)(1); *see also Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011) ("Rule 37 gives teeth to Rule 26's disclosure requirements by forbidding the use at trial of any information that is

---

[1] Sutter previously filed a *Daubert* motion explaining why some of Mr. Axene's opinions were unreliable. ECF 996-1, 1092-1. Although the Court did not grant the motion in full, Sutter believes that Mr. Axene's in-court testimony will highlight the flaws Sutter raised in its motion such that broader exclusion is warranted. In particular, Mr. Axene is expected to make repeated assertions of fact based on no methodology or analysis at all, but rather Mr. Axene's purported experience. As Sutter explained in its *Daubert* motion, any such testimony is inadmissible because an expert must articulate what exactly his experience is and how it helped him reach his conclusion. ECF 996-1, pp. 6–8, 11–13; 1092-1, pp. 6–9. Accordingly, Sutter reserves the right to raise and renew *Daubert* challenges to Mr. Axene's opinions based on the testimony that he provides at trial. *Cf. United States v. J-M Mfg. Co., Inc.*, No. EDCV 06-55-GW-PJWX, 2020 WL 4196880, at *3 (C.D. Cal. June 5, 2020) (explaining it is "permissible" for a party to renew its pre-trial Daubert challenges based on the "context" of the expert's "actual testimony of trial").

The Honorable Laurel Beeler
February 8, 2022
Page 2

not properly disclosed." (cleaned up)).

Mr. Axene in his report, claimed to have relied on undisclosed proprietary information to prepare a chart of "trend factors" from 2008 to 2018.  Ex. A (Axene Report, Attachment E.) (Trend factors reflect the projected increase in overall healthcare costs over a period of time.) The facts and data used to prepare this chart remain a mystery:  neither Mr. Axene nor plaintiffs have produced the underlying information to Sutter.  Based on that representation, Plaintiffs had an obligation under Rule 26 to disclose all of this data—not just the ultimate trend factors Mr. Axene (or others at his firm) calculated.  *See Lundquist v. First Nat'l Ins. Co. of Am.*, No. 18-5301 RJB, 2020 WL 2041748, at *3 (W.D. Wash. Apr. 28, 2020) (holding that "intermediate data files" relied on by an expert fall within Rule 26(a)(2)(B)(ii)'s requirement that an expert disclose "facts or data considered . . . in forming" his opinions); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 3155574 at *4–6 (N.D. Cal. Aug. 2, 2012) (upholding magistrate judge's exclusion of expert opinions based on undisclosed evidence).

Worse still, in or around March 2021, Mr. Axene prepared a brand new chart with additional years of trend factors, without supplementing his report or disclosing the new chart (let alone the underlying facts and data) to Sutter.  Instead, he simply provided the new chart to Dr. Chipty, who relied on Mr. Axene's trend factor calculations in calculating her damages figures.  (Chipty 3/12/2021 Report, ¶ 29 source 4.)  While this second chart was produced to Sutter as part of Dr. Chipty's backup, plaintiffs have produced no information about the underlying data or methodology used to calculate these figures and failed to supplement Mr. Axene's report to reflect this updated work.  *Cf.* Fed. R. Civ. P. 26, Advisory Committee Note ("[T]he intention is that 'facts or data' be interpreted broadly to require disclosure of any material considered by the expert, from whatever source, that contains factual ingredients."); *see also* Fed. R. Civ. P. 26(e) (expert's duty to supplement extends to information included in the report).

Now, Plaintiffs disclose that the representation that a proprietary database supported Mr. Axene's Attachment F was untrue and represent for the first time that there "is no backup file" for Attachment E of Mr. Axene's report.  Instead, they now state that the figures in the Attachment are a "mixture of actuarial judgment and what they're seeing in the course of their work."  Not only does this response do nothing to address Sutter's concerns, it creates a new and more serious issue of its own.  First, the figures have to be based on *something*; they were not just plucked out of thin air.  Sutter was entitled to the "facts and data" that these figures were derived from.  Even plaintiffs' description of these figures being based on "what they're seeing in the course of their work," confirms that the figures are based on *something*—and plaintiffs are still not fully disclosing it.  Second, plaintiffs' description illuminates that Attachment E is itself the product of purported expert judgment.  To the extent the figures from Attachment E were derived using "actuarial judgment" of unknown employees at Axene Health Partners, that was not a basis disclosed in Mr. Axene's report.  Rather, Mr. Axene stated in his report that these figures were based on the "historical trends" seen in the "Axene Health Partners Proprietary

The Honorable Laurel Beeler
February 8, 2022
Page 3

Database." (Axene Report n.30).  If plaintiffs are correct, and these figures are not based on any underlying material, but are instead just the product of Mr. Axene's "judgment," such "judgment" needed to have been articulated in an expert report disclosed in accordance with Rule 26(a).  *Cf. Duncan v. Woodford*, No. CV 92-1403 AHS, 2003 WL 27388811, at *4 (C.D. Cal. Dec. 24, 2003) (an expert needs to "explain his methodology with sufficient specificity for the Court to determine its reliability"); *Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*, No. 14-CV-00876-RS(JSC), 2018 WL 1569762, at *2 (N.D. Cal. Mar. 30, 2018) (an expert must include "reasoning and analysis in an expert report" because "the purpose of the expert disclosure rule is to provide opposing parties reasonable opportunity to prepare for effective cross examination" (cleaned up)).  Plaintiffs cannot fail to disclose the basis of an opinion and then, when confronted with that failure, claim that Sutter should have divined the basis and asserted a *Daubert* challenge earlier.  Sutter is not seeking reconsideration of the Court's *Daubert* order here.  Rather, Plaintiffs' belated disclosure has identified a new basis for exclusion.

Plaintiffs cannot show that their failure to disclose this information was substantially justified or harmless.  Sutter is entirely deprived of the ability to cross-examine Mr. Axene about the accuracy or propriety of the figures he relied on to calculate the trend factors he will opine about.  Plaintiffs argue that Sutter's motion is "untimely" because Sutter didn't ask for this information at an earlier date.  But Sutter was under no obligation to identify and then raise every flaw in plaintiffs' expert reports before trial.  In fact, Sutter had no reason to focus on plaintiffs' failure to produce the material underlying Mr. Axene's trend factor opinion until after Dr. Chipty added trend factor to her damages calculations—which she did not do until March 2021—long after Mr. Axene had already been deposed.  *See* Chipty 3/12/2020 Report ¶ 77 (explaining damages methodology does not account for trend factors); Chipty 3/12/2021 Report ¶ 31 (including trend factor for the first time).

At bottom, it was incumbent on plaintiffs to comply forthrightly with Rule 26, "without the need for a request from opposing counsel or an order from the Court."  *Apple*, 2012 WL 3155574 at *4–6; *see also White v. Deere & Co.*, 2016 WL 525911, *1 (D. Colo. 2016) (rejecting argument that a party's failure to [seek a witness-exclusion order under Rule 37(c)(1)] until shortly before trial somehow waives that party's right to object.").  Indeed, a contrary rule would turn the mandatory disclosure requirements of Rule 26 and the automatic, self-executing sanctions of Rule 37, on their head.  *Silvia v. EA Techinical Servs., Inc*., No. 15-CV-04677-JSC, 2018 WL 306690, at *5 (N.D. Cal. Jan. 5, 2018) (explaining that Rule 37 is "self-executing" and "automatic": "Once non-compliance is shown, the burden is on the party who failed to comply to demonstrate that it meets one of the two exceptions to mandatory sanctions").

**Testimony of Jenni Vargas**

Jenni Vargas negotiated Health Net's contracts with Sutter from 1999 to 2004/2005 only, and left Health Net in March 2007, before it began negotiating any of the Sutter SWAs at issue in this case.  Any testimony she may offer about Sutter's contracts and contracting practices

The Honorable Laurel Beeler
February 8, 2022
Page 4

therefore is tied to pre-2006 conduct.  To avoid confusion of the issues and a waste of the jurors'
and Ms. Vargas's time, the Court should preclude Ms. Vargas from testifying about her
experience with Sutter's contracts and contracting practices during her time with Health Net.

Plaintiffs' operative witness list identifies Ms. Vargas as a former Health Net contract
negotiator who "will testify" about Health Net's "systemwide contracts and contract negotiations
with Sutter," Sutter's contracting practices related to contract provisions at issue in this case, and
various other Sutter-related topics.  Plaintiffs' witness list goes on to state that Ms. Vargas "may
testify" concerning her subsequent work at Stanford.  With respect to her time at Health Net,
Ms. Vargas testified at deposition that, from 1999 to 2004, she served as General Manager of
Northern California and then Network Management and Development Officer (Ex. B [Vargas
Dep.] at 114:4-21, 142:9-143:11), and that she participated in negotiations with Sutter during this
time (*id.* at 118:19-23).  However, Ms. Vargas confirmed that in 2004/2005, she became Health
Net's Health Care Delivery Officer.  (*Id.* at 114:22-115:3.)  While Ms. Vargas testified that her
responsibilities in that role included "contracting with providers on behalf of Health Net" and
"network management" (*id.*), she explained that she no longer participated in contract
negotiations with Sutter (*id.* at 119:11-24).  She held the Health Care Delivery Officer role until
she left Health Net in 2007.  *Id.* at 115:20-116:5.  Accordingly, Ms. Vargas's testimony confirms
that her interactions with Sutter, including as to any contract negotiations and operative
contracts, concerned only a pre-2006 time period.  In fact, negotiations for the first Health Net
SWA relevant to the damages period in this case did not even <u>begin</u> until May 31, 2007—two
months <u>after</u> Ms. Vargas departed Health Net for Stanford.  *See* DEF003518267;
https://www.linkedin.com/in/jenni-vargas-13ab09117/details/experience/.

Ms. Vargas's testimony regarding her experience with Sutter contracts and contracting
practices while at Health Net is excluded by two express rulings from the Court.  The Court's
Final Pretrial Order (ECF 1167) granted Sutter's Motion in Limine No. 3 and laid out in no
uncertain terms that pre-2006 evidence is excluded:

> Pre-2006 evidence has minimal relevance, and in any event results in confusing,
> cumulative presentations that substantially outweigh any relevance.  Also, pre-
> 2006 evidence generally is cumulative of similar evidence within the post-2006
> time period…. Even if evidence is not cumulative, evidence from the earlier years
> (stretching back to the early 2000s) is too attenuated from the relevant period,
> confuses the issues, wastes time, and adds delay in the form of the parties'
> litigating collateral issues.

*Id.* at 8:1-3.  And when plaintiffs raised the issue a second time as part of their offer of proof, the
Court again found that pre-2006 evidence was "old," "confusing," and only marginally relevant,
and confirmed its prior ruling (ECF 1282).

The Honorable Laurel Beeler
February 8, 2022
Page 5

All of these concerns are equally present even as to Ms. Vargas's short tenure with
Health Net after 2006. Any knowledge Ms. Vargas has of Sutter's contracts and contracting
practices concerns pre-2006 contracts. As plaintiffs emphasized when meeting and conferring
about the scope of Ms. Vargas's testimony, Ms. Vargas cannot be "lobotomized" of her years of
history dealing with Sutter while at Health Net. But that is precisely why she should be
precluded from testifying on that subject. Ms. Vargas's knowledge comes almost entirely from
the pre-2006 period and does not extend to the Sutter contracts relevant to the damages period.
Her testimony "is too attenuated from the relevant period, confuses the issues, wastes time, and
adds delay in the form of litigating collateral issues." ECF 1167 at 8:1-3. Moreover, Ms. Vargas
is scheduled to testify immediately after another Health Net witness, Becky Lacroix-Milani,
whose experience negotiating contracts with Sutter also dates back to the early 2000s, while
extending to the present. Lacroix-Milani Dep., at 28:6-32:2 (noting that she had not worked with
Ms. Vargas since "way back in the day"). Ms. Vargas's Health Net testimony would therefore
be "cumulative of similar evidence within the post-2006 time period." ECF 1167 at 8:1-3.

Far from a "last-minute request," Sutter raised with Plaintiffs its concerns over the scope
of Ms. Vargas's testimony on December 9, 2021. At a February 3 meet and confer, plaintiffs
insisted that they only intend to ask a "couple of questions" about Ms. Vargas's time at Health
Net and that they would not mark any documents in connection with her Health Net testimony.
But that merely reinforces that Ms. Vargas does not have unique testimony with respect to
Health Net and that plaintiffs' decision to call her immediately after Ms. Lacroix-Milani is an
end run on the orders precluding pre-2006 evidence. To avoid confusion and delay, the Court
should preclude Ms. Vargas from testifying about her Health Net experience with Sutter.

### **Plaintiffs' Position:**

**Testimony of David Axene**

Sutter's attempt to exclude testimony of David Axene, Plaintiffs' insurance
industry/actuary expert, on the eve of trial for allegedly failing to comply with Rule 26 disclosure
obligations is not only exceedingly untimely, but also meritless. It foreshadows an
obstructionist, wasteful campaign to litigate arguments that should have been raised many years
ago or in the context of the *Daubert* motions filed last Spring and argued last Summer. Sutter's
claim that Mr. Axene did not provide backup relevant to his opinions concerning health care
inflation trend factors is not true. Had Sutter made such a claim earlier, or otherwise asked
Plaintiffs whether there was further backup to Mr. Axene's report, Plaintiffs would then have
demonstrated then that **no further backup materials to Mr. Axene's reports exist, including
to Mr. Axene's opinions concerning health care inflation factors.** As Mr. Axene produced all
materials that backed up the opinions in his reports, Sutter's motion should be summarily
rejected.

Sutter also argues for the first time that Mr. Axene's 2018 Report fails to adequately
explain his methodology for determining trend factors used in premium construction. Sutter has

The Honorable Laurel Beeler
February 8, 2022
Page 6

waived this frivolous challenge to Mr. Axene's testimony because it was not raised in Sutter's *Daubert* motion. *Finjan, Inc. v. Sophos, Inc*., No. 14-CV-01197-WHO, 2016 WL 4702651, at *2 (N.D. Cal. Sept. 8, 2016)2016 WL 4702651, at *3 (N.D. Cal. Sept. 8, 2016) (objection to expert opinion "should have been raised in its prior *Daubert* motion and has now been waived for purposes of the *Daubert* challenge"); *GPNE Corp. v. Apple, Inc*., No. 12-CV-02885-LHK, 2014 WL 3870256, at *5 (N.D. Cal. Aug. 6, 2014) (denying renewed *Daubert* motion where "Apple has had ample prior opportunity to object to [a previously uncontested] aspect of Mr. Dansky's testimony.")

Mr. Axene submitted a Report on June 21, 2018, in support of Plaintiffs' first  class certification motion.  In that declaration, Mr. Axene discussed, among other things, how health care inflation trends are factored into the Health Plans premiums.  As he explained: "In my experience, trend factors are invariably greater than 1.0, meaning that health care inflation is factored into all premiums and rates generally increase year over year." Ex. A at p. 20, n. 30. Mr. Axene gave the following example at page 20 of that Report:

> [I]f costs are assumed to increase 10% per year and the projection period is two years, the trend factor would be 1.21 (i.e., 1.10 x 1.10 = 1.21) If historical IHS costs were inflated as a result of Sutter's conduct, future IHS costs projected by health plans (which use the trend factor calculations discussed above) will as a consequence be higher than they would have been absent Sutter's conduct.

Mr. Axene's Report included his Attachment E, which is a printout of inflation trend estimates that Axene Health Partners creates annually for use in its business and for which no backup file exists.

When Plaintiffs served their expert reports, including Mr. Axene's June 2018 declaration and his August 2019 expert report, they fully complied with Federal Rules of Civil Procedure 26(a)(2)(B) by producing **all** material that was considered by their experts, including Mr. Axene, in formulating their opinions. That production included Attachment E to Mr. Axene's report. No other material or data underlying Attachment E was produced because there is none.

Sutter deposed Mr. Axene in September 2018 and again in June 2019, but did not ask Mr. Axene about Attachment E, or whether there was any backup file.  In March 2021, Plaintiffs produced to Sutter an update of Attachment E to the September 2018 declaration.  That updated inflation trend factor document was produced as part of the materials that Dr. Chipty considered in preparing her March 12, 2021 Report.  At that time, Sutter again did not ask any questions about whether any further backup existed to Mr. Axene's historical trend factor document

The inflation trend factor document is predicated on the industry experience and observations of actuaries who work for Mr. Axene's firm.  As it is compiled based on that experience and those observations, no further backup to it exists.  Notably, this document was not prepared for litigation, but rather has been prepared in the regular course of business and is used when consulting for Axene Health Partners' health plan clients.

The Honorable Laurel Beeler
February 8, 2022
Page 7

On February 2, 2022, four months after the original October 4, 2021 trial date, Sutter informed Plaintiffs that it would seek to exclude Mr. Axene's testimony about Attachment E as a discovery sanction under Rule 37(c) based on Mr. Axene's purported failure to produce material underlying Attachment E.  But as Plaintiffs informed Sutter last week, no backup file for Attachment E or its March 2021 supplement has ever existed.  But, even if it had, Sutter's Rule 37(c) attack would be untimely.  *See Jarrell v. Wal-Mart Stores, Inc.*, No., 2021 WL 1169889, at *2 (D. Nev. Mar. 26, 2021) (two-year delay in seeking exclusion of expert damages opinions under Rule 37(c) for Rule 26(b) expert disclosure violations was unreasonable and denied the motion for sanctions for alleged discovery violations was untimely). *Id.* "It is generally agreed that a motion for sanctions, regardless of the source of authority for the imposition of sanctions, must be timely filed." *Id.* at *2 (quoting *MGA Ent., Inc. v. Nat'l Prod. Ltd*., 2012 WL 4052023, at 4 (C.D. Cal. Sept. 14, 2012)).  "Although Rule 37 does not contain an express time limit for filing a motion for sanctions, '[u]nreasonable delay may render a motion for sanctions untimely.'" *Id.* (quoting *Tourgeman v. Collins Fin. Servs., Inc.*, 2012 WL 28289, at * 3 (S.D. Cal. Jan. 5, 2012)).

Mr. Axene considered his own industry experience and Attachment E, which he regularly relies upon in his work, in formulating his trend opinion.  He fully complied with Rule 26(a)(2)(B)(ii) by producing Attachment E.  *See In re Google Adwords Litig*., No. C08–03369 JW (HRL), 2010 WL 5185738, at *4–5 (N.D. Cal. Dec. 8, 2010) (where expert relied on "his basic experience in the field", Rule 26(a)(2)(B)(ii) does not require expert to disclose data he "did not specifically review, generate, or rely upon.").  Accordingly, Sutter's 37(c) challenge is frivolous because Plaintiffs fully complied with Rule 26(a)(2)(B)(ii).  *See SiteLock LLC v. GoDaddy.com LLC*, 2021 WL 2895503, at *6 (D. Ariz. July 9, 2021) ("The party requesting sanctions [under Rule 37(c)(1)] bears the initial burden of establishing that the opposing party failed to comply with the [applicable] disclosure requirements.").

Sutter now argues that Plaintiffs made a "belated disclosure" by informing Sutter that no backup material for Attachment E has ever existed.  That argument is disingenuous because Sutter was effectively apprised that there was no backup file for Attachment E in 2018 when Plaintiffs produced their expert reports supporting class certification and all material considered by their experts, including Mr. Axene, pursuant to Rule 26(a)(2)(B).[2]  Of course, Sutter could have confirmed this fact had it asked in 2018 when it received Mr. Axene's report and when Sutter deposed Mr. Axene.

Sutter's accusation that Plaintiffs failed to disclose expert material under Rule 26(a)(2)(B), when there never was anything to disclose, is a sham.

---

[2] Sutter's argument that Mr. Axene was obligated to prepare a supplemental report when he updated Attachment E has no merit.  Nothing else in the report needed updating and Plaintiffs' production of the updated Attachment E was all the supplemental disclosure that was required.

The Honorable Laurel Beeler
February 8, 2022
Page 8

Sutter pivots from its false accusation that Plaintiffs failed to fulfill their expert disclosure obligations to argue that Mr. Axene's report is insufficient because it does not adequately explain how Attachment E was created. Any challenge to the adequacy of the foundation for Mr. Axene's opinions should have been made when Sutter filed its *Daubert* motion in May of 2021. At that time Sutter had received both the updated Attachment E trend factor document and Dr. Chipty's March 12, 2021 Report that relied on these inflation trend factors in calculating damages. But Sutter failed to challenge the foundation for Mr. Axene's trend factor analysis in its *Daubert* motion, and that challenge too is waived. *Finjan, Inc.*, 2016 WL 4702651, at *3; *GPNE Corp.*, 2014 WL 3870256, at *5. Moreover, Sutter's challenge to the trend analysis would have had no merit even if Sutter had avoided waiver by timely raising it in its *Daubert* motion, because Mr. Axene had no obligation to generate or further explain any non-existent data that he "did not specifically review, generate, or rely upon." *In re Google Adwords Litig.*, 2010 WL 5185738, at *4–5.[3] Moreover, Sutter's current argument that Mr. Axene cannot rely on his own extensive experience in premium construction fails for the same reasons this Court rejected Sutter's *Daubert* arguments that Mr. Axene cannot base his pass-through opinions on his own experience. Axene Health Partners' business involves, among other things, advising health plans on premium construction including the inflation trend factors health plans use to do so. What Mr. Axene and his assistants have observed in interacting with health plans and observing inflation trends is the sort of information reasonable relied upon by experts and sufficient support for his inflation trend factoes opinion. *See Google Adwords*, 2010 WL 5185738, at *4-5.

As the Health Plan actuary witnesses have confirmed in their testimony, trend factors are one of the components the Health Plans consider when calculating premiums. *See e.g.*, Ex. C (Deposition of Gerard Laland) at 20:18 – 21:17; Ex. D (Deposition of Michael Beuoy) at 39:8-23. This Court has already ruled that that Mr. Axene may testify about how premiums are calculated. ECF1166 at 17. Sutter may cross-examine Mr. Axene about premium construction, but it cannot prevent him from testifying about one premium construction component.

Finally, Sutter purports to "reserve the right" to renew the *Daubert* challenges to Mr. Axene's other testimony that this Court has already rejected. Such a renewed motion to exclude Mr. Axene's opinions would be a procedurally improper motion for reconsideration because it could not comply with Civil Local Rule 7-9(b). *See Krommenhock v. Post Foods, LLC*, No. 16-cv-04958-WHO, 2020 WL 2322993, at *1–2 (N.D. Cal. May 11, 2020) (motion for reconsideration of *Daubert* order denied because it did not meet the requirements of Rule 7-

---

[3] *Lundquist v. First Nat'l Ins. Co. of Am.*, 2020 WL 2041748 (W.D. Wash. Apr. 28, 2020), the only case Sutter cites addressing "intermediate data files", is inapposite. In that case, "underlying programs, computer spreadsheets, calculations, intermediate data files, computer output files, printouts, and execution logs [] were used to create the Database." *Id.* at *3. Moreover, *Lundquist* involved a motion to compel production not a motion to exclude expert testimony. If Sutter had ever asked Dr. Axene or Plaintiffs, Sutter would have learned that no such material exists in this case.

The Honorable Laurel Beeler
February 8, 2022
Page 9

9(b).).  Civ. L.R. 7-9(b) provides that a party must seek leave to file a motion for reconsideration and "must specifically show reasonable diligence in bringing the motion" and either 1) "a material difference in fact or law"; "new material facts or a change of law occurring after the time of such order"; or (3) "A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order." Having waited over five months after this Court's *Daubert* order to seek reconsideration, Sutter cannot show reasonable diligence.  Nor are there any new or different law or facts or "failure to consider material facts or dispositive legal arguments" that could warrant reconsideration.

**Testimony of Jenni Vargas**

Sutter's attempt to exclude testimony by Jenni Vargas about her time at Health Net should be rejected.  Ms. Vargas worked at Health Net through the spring of 2007 and under this Court's pre-2006 *in limine* order, Ms. Vargas is allowed to testify about her experience at Health Net during 2006 and 2007.  Sutter overreaches by now claiming that since the Sutter contract in effect when Ms. Vargas left Health Net in 2007 was negotiated prior to 2006, she should not be allowed to testify at all.  Such a prohibition would far exceed what Sutter sought—and what this Court ordered—in granting Sutter's pre-2006 motion *in limine*.  In that motion, Sutter asserted that "the Court should exclude all evidence of events before 2006." ECF 1045 at 1:18-19.  In granting that motion the court ruled

> The history of Sutter's practices is relevant within some reasonable time period that predates the class period: the plaintiffs are entitled to provide context in the form of pre-limitations and pre damages period evidence. Allowing evidence from the five-year period that proceeds the class period achieves this objective. (ECF 1167 at 8:20-23).

Ms. Vargas's testimony about her experiences at Health Net in 2006 and 2007 is not precluded by this Court's *in limine* order.  While Plaintiffs continue to disagree with that order, they are complying with it.  Plaintiffs have removed all documentary exhibits predating 2006 from their trial exhibit list and will not ask Ms. Vargas about any events before 2006.[4]

Sutter argues that Ms. Vargas testified at deposition that in 2004-2005 she became Health Net's Health Care Delivery Officer and that she did not recall directly participating in contract negotiations with Sutter thereafter.  But, while Ms. Vargas served in her Health Care Delivery Officer position, her responsibilities included "contracting with providers on behalf of Health Net" and "network management." Ex. B (Vargas Dep) at 114:22 -115:7.)  This case has never been limited to contract negotiations.  A central issue is the effects of the anti-competitive contract provisions that Sutter forced on the Health Plans, particularly in hobbling the Health Plans efforts to create commercially-viable narrow and tiered network products.  In her role as

---

[4] As with other witnesses, Plaintiffs will ask Ms. Vargas about her job titles and responsibilities prior to 2006 to lay a foundation for her post 2006 testimony.

The Honorable Laurel Beeler
February 8, 2022
Page 10


Health Care Delivery Officer, Ms. Vargas gained important first-hand knowledge of the anti-competitive effects of Sutter's contracting practices and provisions and other important issues in this case.

Sutter's also argues that Ms. Vargas's testimony is cumulative because Becky Lacroix-Milani also worked at Health Net during 2006 and 2007. But Ms. Vargas was senior to Ms. Lacroix-Milani and had a broader view of Health Net's product strategy. Moreover, any objection that their testimony could be cumulative is premature. *Apple iPod iTunes Antitrust Litig.*, No. 05-CV-0037, YGR2014 WL 12719192, at *1 (N.D. Cal. Nov. 18, 2014) (the possibility of cumulative testimony "does not necessitate the Court excluding the presentation of such evidence in advance.")

Sutter's last-minute request for a new *in limine* order preventing Ms. Vargas from testifying about her experiences at Health Net in 2006 and 2007, effectively seeks to extend this Court's order excluding evidence of events prior to 2006 to an order excluding evidence of events prior to 2008. The Court has ruled that Plaintiffs may use evidence from the period beginning in 2006. Ms. Vargas' Health Net testimony is allowed by, and will comply with, that ruling.

Respectfully submitted,


  */s/ David Brownstein*
David Brownstein
Farmer Brownstein Jaeger Goldstein Klein &
Siegel LLP
*Counsel for Plaintiffs and the Certified Class*


  */s/ Jeffrey A. LeVee*
Jeffrey A. LeVee
Jones Day
*Counsel for Sutter Health*

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

DJENEBA SIDIBE, JERRY JANKOWSKI,
SUSAN HANSEN, DAVID HERMAN,
CAROLINE STEWART, OPTIMUM
GRAPHICS, INC., AND JOHNSON POOL &
SPA, on Behalf of Themselves and All Others
Similarly Situated,

Case No. 3:12-cv-4854-LB

                              *Plaintiffs,*

CLASS ACTION

              v.

SUTTER HEALTH,

                              *Defendant.*


DECLARATION OF DAVID V. AXENE, FSA, FCA, CERA, MAAA
IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

June 21, 2018


**Filed Under Seal Pursuant to Protective Order**

## V.    Summary of Opinions

98.     Based on my training, education, experience in the field, and work on this matter, I have developed the following opinions for this case:

- **Health Cost Pass Through:**  Overall health care costs, and, in particular for this case, inpatient hospital costs, are directly incorporated into the premium development process used by each health plan.  If health care costs are higher than normal or are subject to higher than normal rates of increase, these increases are passed directly through to subscribers through higher premium rates.  Health care cost increases result in premium rate increases.  Health plans build premium rates that recover all health care costs, pay for administrative expenses and produce a margin (i.e., profit margin or contribution to surplus), and health plans certify that they in fact have done so.

- **Inpatient Hospital Costs Impact on Premium Rates:**  The impact of a specific increase to inpatient hospital costs alone results in an increase in overall health care costs.  For example, assuming a 30% ratio of inpatient hospital costs to total healthcare costs, a 10% increase in inpatient hospital costs would result in a 3% increase in overall health care costs.  Since health care costs are included in all premium rates, this would lead to an increase in premium rates.  This is true regardless of the type of product at issue (i.e., HMO, PPO), the line of business relevant to the product, where the product is offered, or the benefit design relevant to the product.

- **Class Member Premium Overcharge Model.**  A common methodology that relies on sound actuarial factors exists to estimate premium overcharges that Class Members incurred for premiums they paid as a result of increases in IHS prices that Sutter imposed on health plans.  This common methodology applies across all lines of businesses, products, benefit coverage levels, health plans and rating areas.

I declare under penalty of perjury that the foregoing is true and correct, and that I have signed this declaration on June 21, 2018, in Temecula, California.

DAVID V. AXENE

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# Attachment E AHP Trend Factors

| 2008 | Category of Service | Weight | Utilization | Community Charges | Community Trends | Negotiated Charges | Negotiated Trend |
|---|---|---|---|---|---|---|---|
| | Inpatient Hospital | 30% | 1.2% | 10.3% | 11.6% | 9.7% | 11.0% |
| | Outpatient Hospital | 20% | 3.8% | 12.7% | 17.0% | 10.4% | 14.6% |
| | Subtotal | 50% | 2.2% | 11.3% | 13.8% | 10.0% | 12.4% |
| | Physician | 40% | 2.4% | 6.2% | 8.7% | 5.7% | 8.2% |
| | Subtotal (non Rx) | 90% | 2.3% | 9.0% | 11.5% | 8.1% | 10.6% |
| | Pharmacy | 10% | 4.1% | 9.9% | 14.4% | 7.9% | 12.3% |
| | Total | 100% | 2.5% | 9.1% | 11.8% | 8.1% | 10.8% |

| 2009 | Category of Service | Weight | Utilization | Community Charges | Community Trends | Negotiated Charges | Negotiated Trend |
|---|---|---|---|---|---|---|---|
| | Inpatient Hospital | 30% | 1.1% | 9.8% | 11.0% | 9.2% | 10.5% |
| | Outpatient Hospital | 20% | 3.6% | 12.1% | 16.1% | 9.9% | 13.8% |
| | Subtotal | 50% | 2.1% | 10.7% | 13.1% | 9.5% | 11.8% |
| | Physician | 40% | 2.3% | 5.9% | 8.3% | 5.4% | 7.8% |
| | Subtotal (non Rx) | 90% | 2.2% | 8.6% | 10.9% | 7.7% | 10.0% |
| | Pharmacy | 10% | 3.9% | 9.4% | 13.7% | 7.5% | 11.7% |
| | Total | 100% | 2.4% | 8.6% | 11.2% | 7.7% | 10.2% |

| 2010 | Category of Service | Weight | Utilization | Community Charges | Community Trends | Negotiated Charges | Negotiated Trend |
|---|---|---|---|---|---|---|---|
| | Inpatient Hospital | 30% | 1.0% | 10.4% | 11.5% | 9.6% | 10.7% |
| | Outpatient Hospital | 20% | 3.0% | 12.7% | 16.1% | 11.4% | 14.7% |
| | Subtotal | 50% | 1.8% | 11.3% | 13.3% | 10.3% | 12.3% |
| | Physician | 40% | 1.4% | 5.7% | 7.2% | 5.2% | 6.7% |
| | Subtotal (non Rx) | 90% | 1.6% | 8.8% | 10.6% | 8.0% | 9.8% |
| | Pharmacy | 10% | 3.0% | 10.2% | 13.5% | 8.8% | 12.1% |
| | Total | 100% | 1.8% | 9.0% | 10.9% | 8.1% | 10.0% |

| 2011 | Category of Service | Weight | Utilization | Community Charges | Community Trends | Negotiated Charges | Negotiated Trend |
|---|---|---|---|---|---|---|---|
| | Inpatient Hospital | 30% | 1.0% | 10.7% | 11.8% | 10.1% | 11.2% |
| | Outpatient Hospital | 20% | 3.0% | 12.7% | 16.1% | 12.0% | 15.4% |
| | Subtotal | 50% | 1.8% | 11.5% | 13.5% | 10.9% | 12.9% |
| | Physician | 40% | 1.4% | 5.7% | 7.2% | 5.4% | 6.9% |
| | Subtotal (non Rx) | 90% | 1.6% | 8.9% | 10.7% | 8.4% | 10.2% |
| | Pharmacy | 10% | 3.0% | 9.5% | 12.8% | 8.8% | 12.1% |
| | Total | 100% | 1.8% | 9.0% | 10.9% | 8.5% | 10.4% |

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

| 2012 Category of Service | Weight | Utilization | Community Charges | Community Trends | Negotiated Charges | Negotiated Trend |
|---|---|---|---|---|---|---|
| Inpatient Hospital | 30% | 1.0% | 7.9% | 9.0% | 7.7% | 8.8% |
| Outpatient Hospital | 20% | 2.0% | 8.9% | 11.1% | 8.5% | 10.7% |
| **Subtotal** | **50%** | **1.4%** | **8.3%** | **9.8%** | **8.0%** | **9.5%** |
| Physician | 40% | 1.5% | 5.9% | 7.5% | 5.7% | 7.3% |
| **Subtotal (non Rx)** | **90%** | **1.4%** | **7.2%** | **8.8%** | **7.0%** | **8.5%** |
| Pharmacy | 10% | 2.0% | 5.4% | 7.5% | 5.0% | 7.1% |
| **Total** | **100%** | **1.5%** | **7.1%** | **8.7%** | **6.8%** | **8.4%** |

| 2013 Category of Service | Weight | Utilization | Community Charges | Community Trends | Negotiated Charges | Negotiated Trend |
|---|---|---|---|---|---|---|
| Inpatient Hospital | 30% | 1.2% | 6.5% | 7.8% | 6.4% | 7.7% |
| Outpatient Hospital | 20% | 2.1% | 8.6% | 10.9% | 8.4% | 10.7% |
| **Subtotal** | **50%** | **1.6%** | **7.3%** | **9.0%** | **7.2%** | **8.9%** |
| Physician | 40% | 1.6% | 5.5% | 7.2% | 4.9% | 6.6% |
| **Subtotal (non Rx)** | **90%** | **1.6%** | **6.5%** | **8.2%** | **6.2%** | **7.9%** |
| Pharmacy | 10% | 1.8% | 5.5% | 7.4% | 5.2% | 7.1% |
| **Total** | **100%** | **1.6%** | **6.4%** | **8.1%** | **6.1%** | **7.8%** |

| 2014 Category of Service | Weight | Utilization | Community Charges | Community Trends | Negotiated Charges | Negotiated Trend |
|---|---|---|---|---|---|---|
| Inpatient Hospital | 30% | 1.3% | 5.8% | 7.2% | 5.6% | 7.0% |
| Outpatient Hospital | 20% | 2.1% | 6.3% | 8.5% | 6.1% | 8.3% |
| **Subtotal** | **50%** | **1.6%** | **6.0%** | **7.7%** | **5.8%** | **7.5%** |
| Physician | 40% | 1.6% | 4.5% | 6.2% | 4.4% | 6.1% |
| **Subtotal (non Rx)** | **90%** | **1.6%** | **5.3%** | **7.0%** | **5.2%** | **6.9%** |
| Pharmacy | 10% | 2.5% | 15.5% | 18.4% | 14.4% | 17.3% |
| **Total** | **100%** | **1.7%** | **6.4%** | **8.2%** | **6.1%** | **7.9%** |

| 2015 Category of Service | Weight | Utilization | Community Charges | Community Trends | Negotiated Charges | Negotiated Trend |
|---|---|---|---|---|---|---|
| Inpatient Hospital | 30% | 1.3% | 5.7% | 7.0% | 5.5% | 6.8% |
| Outpatient Hospital | 20% | 2.0% | 6.1% | 8.3% | 5.9% | 8.1% |
| **Subtotal** | **50%** | **1.6%** | **5.9%** | **7.5%** | **5.7%** | **7.3%** |
| Physician | 35% | 1.6% | 4.4% | 6.0% | 4.3% | 5.9% |
| **Subtotal (non Rx)** | **85%** | **1.6%** | **5.2%** | **6.9%** | **5.1%** | **6.7%** |
| Pharmacy | 15% | 2.4% | 15.1% | 17.9% | 14.0% | 16.8% |
| **Total** | **100%** | **1.7%** | **6.7%** | **8.5%** | **6.4%** | **8.2%** |

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

| 2016 | Category of Service | Weight | Utilization | Community Charges | Community Trends | Negotiated Charges | Negotiated Trend |
|---|---|---|---|---|---|---|---|
| | Inpatient Hospital | 30% | 1.2% | 5.5% | 6.8% | 5.3% | 6.6% |
| | Outpatient Hospital | 20% | 2.0% | 6.0% | 8.1% | 5.8% | 7.9% |
| | **Subtotal** | **50%** | **1.5%** | **5.7%** | **7.3%** | **5.5%** | **7.1%** |
| | Physician | 35% | 1.5% | 4.3% | 5.9% | 4.2% | 5.8% |
| | **Subtotal (non Rx)** | **85%** | **1.5%** | **5.1%** | **6.7%** | **5.0%** | **6.6%** |
| | Pharmacy | 15% | 2.4% | 14.7% | 17.5% | 13.7% | 16.4% |
| | **Total** | **100%** | **1.7%** | **6.6%** | **8.3%** | **6.3%** | **8.0%** |

| 2017 | Category of Service | Weight | Utilization | Community Charges | Community Trends | Negotiated Charges | Negotiated Trend |
|---|---|---|---|---|---|---|---|
| | Inpatient Hospital | 30% | 1.2% | 5.2% | 6.5% | 5.1% | 6.3% |
| | Outpatient Hospital | 20% | 1.9% | 5.7% | 7.7% | 5.5% | 7.5% |
| | **Subtotal** | **50%** | **1.5%** | **5.4%** | **7.0%** | **5.2%** | **6.8%** |
| | Physician | 35% | 1.4% | 4.1% | 5.6% | 4.0% | 5.5% |
| | **Subtotal (non Rx)** | **85%** | **1.5%** | **4.9%** | **6.4%** | **4.7%** | **6.2%** |
| | Pharmacy | 15% | 2.3% | 14.0% | 16.6% | 13.0% | 15.6% |
| | **Total** | **100%** | **1.6%** | **6.2%** | **7.9%** | **6.0%** | **7.6%** |

| 2018 | Category of Service | Weight | Utilization | Community Charges | Community Trends | Negotiated Charges | Negotiated Trend |
|---|---|---|---|---|---|---|---|
| | Inpatient Hospital | 30% | 1.1% | 4.8% | 6.0% | 4.7% | 5.8% |
| | Outpatient Hospital | 20% | 1.8% | 5.3% | 7.1% | 5.1% | 6.9% |
| | **Subtotal** | **50%** | **1.4%** | **5.0%** | **6.4%** | **4.8%** | **6.3%** |
| | Physician | 35% | 1.3% | 3.8% | 5.1% | 3.7% | 5.1% |
| | **Subtotal (non Rx)** | **85%** | **1.3%** | **4.5%** | **5.9%** | **4.4%** | **5.8%** |
| | Pharmacy | 15% | 2.1% | 12.9% | 15.3% | 12.0% | 14.4% |
| | **Total** | **100%** | **1.5%** | **5.8%** | **7.3%** | **5.5%** | **7.1%** |

FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER

# EXHIBIT B

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                    COUNTY OF SAN FRANCISCO

 3

 4    UFCW & EMPLOYERS BENEFIT TRUST,

 5    ON BEHALF OF ITSELF AND ALL

 6    OTHERS SIMILARLY SITUATED,

 7         PLAINTIFFS,

                                      NO. CGC-14-538451

 8       vs.                          CONSOLIDATED WITH

                                      CGC-18-565398

 9    SUTTER HEALTH, ET AL.,

10         DEFENDANTS.

11    _____

12

13         **HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**

14              **PURSUANT TO PROTECTIVE ORDER**

15          VIDEOTAPED DEPOSITION OF JENNI VARGAS

16                 SAN FRANCISCO, CALIFORNIA

17                 MONDAY, AUGUST 20, 2018

18                      VOLUME II

19

20

21

22    REPORTED BY:

23    MEGAN F. ALVAREZ,

      RPR, CSR No. 12470

24    JOB NO. 2983908B

25    PAGES 79 - 330
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE ORDER

1  Q.  What happened to MedPartners, to the     11:30:13
2 extent you know?                              11:30:14
3     A.  Well, fairly shortly after I got there, it    11:30:15
4 attempted to merge with a company called FICOR.  And    11:30:19
5 the merger did not happen, and MedPartners      11:30:23
6 essentially -- well, I don't know exactly what the    11:30:26
7 term would be, but reconstituted as a pharmacy    11:30:30
8 company.                                        11:30:33
9        So its original -- what I was hired to do    11:30:37
10 no longer existed.  So they sold off their assets,    11:30:40
11 closed many of their operations within nine months    11:30:43
12 after I got there.                             11:30:47
13    Q.  So still in 1997 --                    11:30:48
14    A.  Yes.                                   11:30:49
15    Q.  -- 1998 maybe?                         11:30:49
16    A.  Correct.                               11:30:51
17    Q.  Okay.  And did at some point then you    11:30:52
18 cease to work for MedPartners?                 11:30:54
19    A.  Correct.                               11:30:56
20    Q.  And was that in that 1997-1998 time frame?    11:30:57
21    A.  Exactly.                               11:31:00
22    Q.  All right.  So were you just there just    11:31:01
23 less than a year?                             11:31:02
24    A.  Very brief.                            11:31:02
25    Q.  And where did you go when you left      11:31:03

Page 112

1 MedPartners?                                    11:31:05
2     A.  I went to Health Net.                   11:31:06
3     Q.  What was your title when you began at    11:31:17
4 Health Net?                                     11:31:19
5     A.  I think it was vice president of provider    11:31:20
6 contracting.                                    11:31:23
7     Q.  What were your responsibilities as vice    11:31:24
8 president of provider contracting?              11:31:28
9     A.  I was responsible for the statewide     11:31:29
10 contracting with -- California state contracting    11:31:31
11 with providers for Health Net's insurance products.    11:31:34
12    Q.  Were you -- so you were -- you weren't    11:31:42
13 contracting with employers to buy Health Net's    11:31:50
14 insurance products, correct?                   11:31:54
15    A.  Correct.                               11:31:55
16    Q.  Instead, you were contracting with      11:31:56
17 providers who participated in Health Net's insurance    11:31:57
18 products, correct?                            11:32:02
19    A.  Correct.                               11:32:03
20    Q.  And your responsibility spanned the entire    11:32:03
21 state of California?                          11:32:05
22    A.  Correct.                               11:32:06
23    Q.  Did your role or title at Health Net    11:32:19
24 subsequently change?                          11:32:23
25    A.  Many times.                            11:32:24

Page 113

1     Q.  All right.  To the best of your ability,    11:32:26
2 could you walk me through the progression of your    11:32:28
3 roles at Health Net?                          11:32:32
4     A.  Fairly quickly after I got there,        11:32:33
5 Health Net was reorganized into a general manager    11:32:35
6 structure.  So I became the general manager of    11:32:38
7 Northern California, which meant that I was only    11:32:41
8 focused on the provider contracting, medical    11:32:44
9 management, sales, underwriting, product offering --    11:32:48
10 in Northern California.  And that existed for quite    11:32:54
11 a while.                                       11:33:01
12    Q.  Do you have -- just to pause you there.    11:33:03
13 Do you have an estimate of when that reorganization    11:33:06
14 happened and you became the general manager of    11:33:11
15 Northern California for Health Net?            11:33:14
16    A.  I think it might have been in 1999, but I    11:33:16
17 don't remember exactly.                        11:33:18
18    Q.  All right.  Please continue.           11:33:20
19    A.  So probably, I'm thinking for at least    11:33:25
20 five years, we were organized in that way.  So that    11:33:34
21 would take it through 2004.                    11:33:37
22        Then somewhere in the 2004-2005 -- excuse    11:33:42
23 me -- time period, my role changed back to something    11:33:45
24 called health care delivery officer.  And that was,    11:33:51
25 again, a statewide role where I had network -- what    11:33:55

Page 114

1 we called then network management, so that would be    11:34:00
2 the contracting, and then medical management for the    11:34:03
3 state of California.                          11:34:06
4     Q.  So in that role as the health care       11:34:13
5 delivery officer, did you have responsibilities for    11:34:15
6 contracting with providers on behalf of Health Net?    11:34:20
7     A.  Yes.                                   11:34:23
8     Q.  Did you also have responsibility for    11:34:24
9 contracting with employers on behalf of Health Net?    11:34:26
10    A.  No.                                    11:34:31
11    Q.  How did that role as health care delivery    11:34:33
12 officer differ from your initial role as the VP of    11:34:35
13 provider contracting?                         11:34:38
14    A.  Primarily it was different in that it also    11:34:40
15 included medical management.  So the people, the    11:34:43
16 doctors, and nurses that authorized care and did    11:34:45
17 disease management and that kind of thing in    11:34:49
18 California reported to me as well as the people who    11:34:51
19 did the contracting.                          11:34:53
20    Q.  And did your role subsequently change from    11:35:04
21 being health care delivery officer?           11:35:07
22    A.  I think that was my last title.        11:35:10
23    Q.  All right.  And at some point you left    11:35:12
24 Health Net, correct?                          11:35:14
25    A.  Correct.                               11:35:16

Page 115

10 (Pages 112 - 115)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE ORDER

1  Q. And when was that?                    11:35:16
2  A. 2007.                                 11:35:18
3  Q. And did you leave Health Net to go to  11:35:25
4  Stanford?                                 11:35:27
5  A. Yes.                                   11:35:28
6  Q. Who did you report to when you were the VP  11:35:50
7  of provider contracting?                  11:35:52
8  A. Jeff Bairstow.                         11:35:56
9     The -- my initial job?                 11:35:59
10 Q. Right.                                 11:36:01
11 A. Jeff Bairstow.                         11:36:02
12 Q. And what was his role?                 11:36:03
13 A. I think it was the CFO. But he had other  11:36:06
14 responsibilities including that.           11:36:11
15 Q. How about as the GM for                11:36:14
16 Northern California? Who did you report to?  11:36:15
17 A. To Cora Tellez.                        11:36:17
18 Q. Could you spell that first name?       11:36:20
19 A. C-O-R-A, T-E-L-L-E-Z.                  11:36:22
20 Q. And what was Ms. Tellez's title?       11:36:28
21 A. President of California.               11:36:35
22 Q. And how about as health delivery officer?  11:36:40
23 To whom did you report?                   11:36:42
24 A. Basically, Steve Lynch.                11:36:49
25 Q. Who is Steve Lynch?                    11:36:51
                                            Page 116

1  A. His title would have been something like  11:36:55
2  western region president or something. I don't  11:36:58
3  remember his exact title.                 11:36:59
4  Q. In your role as -- or actually, in all  11:37:08
5  your roles at Health Net, you had some     11:37:10
6  responsibility for provider contracting, correct?  11:37:12
7  A. Correct.                               11:37:14
8  Q. Were you personally involved in the    11:37:16
9  negotiations with providers in your various roles at  11:37:18
10 Health Net?                               11:37:22
11 A. It depended. Sometimes, yes.           11:37:23
12 Q. In what circumstances would you have been  11:37:26
13 personally involved?                      11:37:28
14 A. When it was requested or -- primarily if  11:37:31
15 it was a very large contract. Or -- or     11:37:35
16 organizationally, I was requested to participate.  11:37:42
17 Q. And who would -- who at Health Net would  11:37:48
18 request your involvement in a contracting  11:37:51
19 negotiation?                              11:37:53
20 A. Well, it wouldn't necessarily be       11:37:54
21 internally. It could be externally, too, where the  11:37:56
22 other party requested it, that they wanted that  11:38:00
23 level of involvement.                     11:38:03
24 Q. For the contracts where you were not    11:38:10
25 personally involved, who would have been in charge  11:38:11
                                            Page 117

1  of negotiating those provider contracts? And if it  11:38:14
2  changed over time, please tell me.        11:38:19
3  A. Okay. Well, even if I was personally   11:38:21
4  involved, I was not doing the detail. I would be  11:38:23
5  involved at an executive sponsor sort of level, but  11:38:25
6  I was not the detail person.              11:38:30
7     So there's always a team of people. And  11:38:31
8  there would be a VP of contracting in      11:38:34
9  Northern California or similar title. So the state  11:38:36
10 was divided up, and we tended to do things  11:38:41
11 regionally. And then their team. It depends on,  11:38:44
12 again, how big it was and how many people it needed.  11:38:47
13 Q. In your role as the VP of provider      11:39:05
14 contracting, that first role that you had at  11:39:08
15 Health Net, did you negotiate with -- did you  11:39:10
16 negotiate contracts with Sutter Health or  11:39:14
17 Sutter Health affiliates?                 11:39:16
18 A. Not in that first role.                11:39:17
19 Q. How about as the GM for                11:39:20
20 Northern California? Did you negotiate contracts  11:39:22
21 with Sutter Health or Sutter Health affiliates?  11:39:24
22 A. I participated in negotiations, yes, with  11:39:26
23 Sutter Health and Sutter Health affiliates.  11:39:30
24 Q. And what was your role in those        11:39:38
25 negotiations?                            11:39:41
                                            Page 118

1  A. You know, as what, you know, I would sort  11:39:46
2  of characterize as the executive sponsor as the  11:39:49
3  highest ranking person typically involved in any  11:39:52
4  way.                                      11:39:55
5  Q. Would you meet with representatives from  11:39:58
6  Sutter Health?                            11:40:00
7  A. Yes.                                   11:40:01
8  Q. Would you correspond with representatives  11:40:03
9  from Sutter Health?                       11:40:05
10 A. Yes.                                   11:40:07
11 Q. And how about as health care delivery   11:40:26
12 officer? Did you participate in negotiations of  11:40:30
13 contracts with Sutter Health or Sutter Health  11:40:33
14 affiliates?                               11:40:36
15 A. I don't recall at that point in time   11:40:37
16 participating.                            11:40:42
17 Q. Do you have any understanding about why  11:40:45
18 you did not participate in negotiations with  11:40:47
19 Sutter Health in your role as health care delivery  11:40:49
20 officer?                                  11:40:56
21 A. I don't really remember, but I believe we  11:41:03
22 had done at least three systemwide negotiations and  11:41:06
23 sort of understood what was required. And it was  11:41:11
24 just no longer required.                  11:41:13
25 Q. So your understanding is that by the time  11:41:19
                                            Page 119

11 (Pages 116 - 119)

1 from Ms. Vine on October 17th, 2002, or thereabouts?    13:00:26
2    A. I believe so since it looks like I    13:00:32
3 received it.    13:00:35
4    Q. Do you have any reason to think you didn't    13:00:35
5 receive it?    13:00:37
6    A. No.    13:00:37
7    Q. Okay. And would letters such as this be    13:00:37
8 the means by which you would have typically    13:00:45
9 corresponded with Sutter Health about contracting    13:00:48
10 issues when you were at Health Net?    13:00:50
11       MR. HEAPS: Objection. Vague and    13:00:53
12 ambiguous.    13:00:53
13 BY MS. ALEXANDER:    13:00:57
14    Q. You can answer if you understand the    13:00:57
15 question.    13:00:58
16    A. Well, I would not have corresponded with    13:00:59
17 Sutter in this way, but this was typical of how    13:01:00
18 Sutter communicated their displeasure to us of    13:01:04
19 things that we did.    13:01:07
20    Q. And I should -- I should clarify. I'm not    13:01:09
21 so much referring to the tone of letter but as to,    13:01:11
22 you know, by sending letters back and forth, is this    13:01:14
23 one of the means in which you communicated with    13:01:18
24 Sutter in the normal course of your duties at    13:01:20
25 Health Net?    13:01:23

Page 140

1    A. Yes.    13:01:23
2    Q. Okay. And this letter to you from    13:01:24
3 Kris Vine begins: "We were dismayed to learn on    13:01:31
4 October 15th, 2002, that Health Net has launched a    13:01:32
5 new product called variable hospital co-payment plan    13:01:36
6 without notifying Sutter Health or asking whether    13:01:41
7 Sutter providers wished to exercise their option to    13:01:44
8 be included as participating providers in this new    13:01:46
9 product."    13:01:50
10    Do you see that?    13:01:51
11    A. Yes.    13:01:52
12    Q. Do you recall that in the fall of 2002,    13:01:53
13 Health Net launched a variable hospital co-payment    13:01:55
14 plan product?    13:01:58
15    A. I didn't remember that until I saw this    13:02:02
16 letter.    13:02:03
17    Q. But now seeing this letter, do you recall    13:02:04
18 that?    13:02:06
19    A. Vaguely.    13:02:07
20    Q. Okay. Do you recall Sutter objecting to    13:02:07
21 the launch of that plan -- of that product by    13:02:13
22 Health Net?    13:02:18
23    A. By reading the letter, yes.    13:02:19
24    Q. Okay.    13:02:21
25    A. And -- and remembering their point of view    13:02:21

Page 141

1 on this kind of thing.    13:02:23
2    Q. What do you remember of Sutter's point of    13:02:27
3 view on this type of thing?    13:02:29
4    A. That Health Net -- I think they believe    13:02:33
5 that Health Net was contractually prohibited from    13:02:35
6 offering products like this where there was some    13:02:39
7 change in the way Sutter was offered.    13:02:43
8    Q. Uh-huh.    13:02:48
9    A. Can I also add something? When you were    13:02:51
10 asking me about my resume --    13:02:53
11    Q. Uh-huh.    13:02:54
12    A. Because you could tell by this letter my    13:02:54
13 title is different. So by 2002 -- and I had    13:02:57
14 forgotten this part -- Cora Tellez left the    13:03:03
15 organization and Chris Wing, who's copied here. And    13:03:06
16 then I went back. So, you know, as I mentioned, we    13:03:10
17 had multiple shifts here.    13:03:11
18       So just to be clear, here my title is    13:03:12
19 network management and development officer, which is    13:03:15
20 different than the GM role. So I forgot the timing    13:03:18
21 of that. But that's why you don't see Cora. Chris    13:03:23
22 was my boss. He was the president of California at    13:03:27
23 that point, and my role was slightly different.    13:03:31
24    Q. Okay. In what way was your role as    13:03:33
25 network management and development officer different    13:03:35

Page 142

1 from your role as general manager of    13:03:39
2 Northern California?    13:03:40
3    A. So it was -- as network management and    13:03:40
4 development officer, I was focused functionally on    13:03:44
5 the network and its performance. And I believe in    13:03:46
6 this incarnation, it was statewide. As when I was a    13:03:49
7 general manager, I was focused on the overall    13:03:54
8 business for Northern California.    13:03:56
9       So in both cases I had contracting, but it    13:03:58
10 was just a different focus. But I just noticed that    13:04:01
11 and just to clarify because I'd forgotten.    13:04:05
12    Q. The letter from Sutter goes on to say:    13:04:11
13 "No attempt was made to obtain Sutter providers'    13:04:14
14 permission to include them as participating    13:04:17
15 providers, and no attempt was made to negotiate    13:04:19
16 rates or terms governing participation."    13:04:21
17    Do you see that?    13:04:23
18    A. Yes. In the first paragraph?    13:04:25
19    Q. Yes.    13:04:27
20    A. Yes.    13:04:27
21    Q. And do you recall Sutter having complained    13:04:28
22 that it wasn't consulted about the development of    13:04:30
23 this variable hospital co-payment plan?    13:04:32
24    A. I don't recall it; but seeing it, it seems    13:04:36
25 familiar.    13:04:39

Page 143

17 (Pages 140 - 143)

```
1              I, JENNI VARGAS, do hereby declare

2    under penalty of perjury that I have read the

3    foregoing transcript; that I have made any

4    corrections as appear noted, in ink, initialed by

5    me, or attached hereto; that my testimony as

6    contained herein, as corrected, is true and correct.

7              EXECUTED this _____ day of _____,

8    2018, at _____, _____.

9                      (City)                (State)

10

11

12

13         _____

14              JENNI VARGAS

15              VOLUME II

16

17

18

19

20

21

22

23

24

25

                                              Page  329
```

# EXHIBIT C

HIGHLY CONFIDENTIAL

Page 1

1

2                 UNITED STATES DISTRICT COURT

3            FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5

6    DJENEBA SIDIBE, ET AL.,          )
                                      )
7                    Plaintiff,       )
                                      ) Case No.
8           vs.                       ) 3:12-CV-4854-LB
                                      )
9    SUTTER HEALTH,                   )
                                      )
10                   Defendants.      )
     _____)

11

12

13                 HIGHLY CONFIDENTIAL

14       VIDEO RECORDED DEPOSITION OF GERALD LALANDE

15                 Irvine, California

16            Friday, September 29, 2017

17

18

19

20   Reported by:
     Shari Stellhorn
21   CSR No. 2807

22

     Job No. 2667819

23

24

     PAGES 1 - 223

25

Page 20

1    That's testing the adequacy of our current products.

2             On an ongoing basis if there are new

3    product initiatives or new plan designs that want to

4    be introduced either on our small group offering or

5    even on large group, which is more case by case, we

6    may assist the underwriters in evaluating benefit

7    changes, so any new product introduction or an

8    assessment of price for new networks that we have to

9    establish a premium rate for, my team would be

10   responsible for coming up with the premium for those

11   new benefit offers.

12       Q    And what is a premium rate?

13       A    Premium rate would be the dollar value that

14   given insured customer, either for a small employer

15   or the large employer, is having to pay on a monthly

16   basis for their -- for the benefit coverage that

17   they've selected.

18       Q    Can you describe for me in general terms

19   how your group tests the adequacy of the premium

20   rates of health plans?

21           MR. PRITT:  Object to form.

22   BY MR. BROWNSTEIN:

23       Q    Go ahead.  If you can take a stab at it I'd

24   appreciate it.

25       A    Yeah.  The methodology is really centered

1     around an evaluation of claims experience for the

2     most recent 12-month period.  We are generally

3     taking those claims, making some adjustments that we

4     apply factors to project to the policy period that

5     we are evaluating.

6              We are then in our -- then comparing it to

7     our current -- like on small group current file

8     small group manual rates.  Clarify.  We project our

9     claims, we then also adjust those claims, projected

10    claims, for expenses, margin, to gross it up to a

11    premium, then compare to our current manual rates.

12             To the extent that it's either -- the

13    latest view of our projection would suggest we

14    either need an increase or decrease in rates, then

15    that's what we would be going through the process of

16    preparing the filing on our small group side.  Large

17    group a filing is not required by State law.

18    Q     But you'd go through the same process with

19    large groups whether or not --

20    A     We do.

21    Q     -- you made the filing; is that right?

22    A     Correct, correct.

23    Q     So when you take the claims experience for

24    the last 12 months as you've described, does that

25    include inpatient hospital services?

# EXHIBIT D

HIGHLY CONFIDENTIAL

Page 1

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4    _____

                                    )

5    DJENEBA SIDIBE and JERRY       )

     JANKOWSKI, SUSAN HANSEN,       )

6    DAVID HERMAN, CAROLINE         )

     STEWART, OPTIMUM GRAPHICS,     )

7    INC., and JOHNSON POOL & SPA,)

     on Behalf of Themselves and   )

8    All Others Similarly          )

     Situated,                      )

9                                   )

            Plaintiffs,             )

10                                  )

        vs.                         )No. 3:12-cv-04854-LB

11                                  )

     SUTTER HEALTH,                 )

12                                  )

            Defendants.             )

13   _____)

     _____

14

15        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16       VIDEO-RECORDED DEPOSITION OF MICHAEL BEUOY

17               Los Angeles, California

18               Wednesday, May 2, 2018

19                    Volume I

20

21   Reported by:

     LORI SCINTA, RPR

22   CSR No. 4811

23   Job No. 2905952

24

25   PAGES 1 - 294

HIGHLY CONFIDENTIAL

Page 39

1      A    Not that I'm aware of, no.

2      Q    Okay.  So you've touched on, already, the

3  fact that you, in your various jobs at Blue Shield

4  and before, have -- have worked on the pricing or

5  calculation of premiums for health plans.

6           Correct?

7      A    Correct.

8      Q    Can you describe in general terms what it

9  means to calculate a premium for a health plan.

10     A    The details vary significantly by line of

11 business but, in general, it involves forecasting

12 costs of healthcare for the -- the -- the time

13 period for which the rates are being set, in

14 addition to forecasting for -- including projections

15 related to administrative costs as well as margin

16 requirements.

17     Q    And once one has, in general, forecasted

18 the cost of healthcare, administrative costs and

19 margin requirements, how -- how does that translate

20 into premiums?

21     A    In general, the required premium is the sum

22 of those three components, cost of healthcare,

23 administrative costs and margin requirements.

24     Q    So I take it that those forecast costs,

25 then, are calculated not only on an aggregate basis