1   CONSTANTINE CANNON LLP
    JEAN KIM (*pro hac vice*)
2   6 East 43rd Street, 26th Floor
    New York, NY 10017
3   (212) 350-2700
    (212) 350-2701 (fax)
4   jkim@constantinecannon.com

5   *Lead Counsel for Plaintiffs and the Class*

6
    THE MEHDI FIRM
7   Azra Z. Mehdi (State Bar No. 220406)
    95 Third Street
8   2nd Floor, No. 9122
    San Francisco, CA 94103
9   Ph/Fax: (415) 294-0070
    azram@themehdifirm.com

10
    *Co-Lead Counsel for Plaintiffs and the Class*
11  ,

SHINDER CANTOR LERNER LLP
MATTHEW L. CANTOR (*pro hac vice*)
14 Penn Plaza, Suite 1900
New York, NY 10122
Telephone: 646-960-8601
matthew@scl-llp.com

STEYER LOWENTHAL BOODROOKAS
ALVAREZ & SMITH LLP
ALLAN STEYER (100318)
D. SCOTT MACRAE (104663)
235 Pine Street, Fifteenth Floor
San Francisco, CA 94104
(415) 421-3400
(415) 421-2234 (fax)
asteyer@steyerlaw.com
smacrae@steyerlaw.com

FARMER BROWNSTEIN JAEGER
GOLDSTEIN KLEIN & SIEGEL LLP
DAVID C. BROWNSTEIN (141929)
DAVID M. GOLDSTEIN (142334)
155 Montgomery Street, Suite 301
San Francisco, CA 94104
(415) 795-2050
(415) 520-5678 (fax)
dbrownstein@fbj-law.com
dgoldstein@fbj-law.com

*Counsel for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN
HANSEN, DAVID HERMAN, OPTIMUM
GRAPHICS, INC., and JOHNSON POOL & SPA, on
Behalf of Themselves and All Others Similarly
Situated,

                    Plaintiffs,

        vs.

SUTTER HEALTH,

                    Defendant.

Case No. 3:12-cv-4854-LB

**DECLARATION OF JEAN KIM IN
SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
APPROVAL**

I, Jean Kim, hereby declare as follows:

1.      I am a partner at Constantine Cannon LLP, Lead Counsel for Plaintiffs and the Class in the above-captioned matter.

2.      I am a member in good standing of the Bar of the State of New York and admitted to practice *pro hac vice* before this Court.

3.      I have personal knowledge of the facts set forth in this Declaration and am fully familiar with the proceedings in this case.

4.      I submit this Declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Settlement, Notice Plan, and Plan of Distribution, the supporting papers for which are submitted herewith.

## THE PLEADING STAGE

5.      Plaintiffs filed their first complaint in this action on September 17, 2012.  They alleged that Defendant Sutter Health ("Sutter"), a Northern California hospital system, had engaged in anticompetitive conduct in violation of state and federal antitrust laws and California's Unfair Competition Law.  At that time, there was only one law firm representing Plaintiffs, the Mehdi Firm, PC.  Plaintiffs amended their complaint as of right on December 10, 2012.

6.      Sutter moved to dismiss the First Amended Complaint and the parties litigated that motion from January to June of 2013.  On June 3, 2013, the Court ruled that Plaintiffs had standing but dismissed the complaint for failure to allege relevant product and geographic markets, allowing leave to replead (ECF No. 34).

7.      Plaintiffs filed their Second Amended Complaint on July 1, 2013.

8.      In August 2013, Constantine Cannon LLP ("CC") joined the action as counsel for Plaintiffs.  I and my-then partners, Matthew L. Cantor and Axel Bernabe, entered appearances.  In September 2013, the law firms of Steyer Lowenthal Boodrookas Alvarez & Smith LLP ("Steyer Lowenthal") and Farmer Brownstein Jaeger LLP ("Farmer Brownstein") joined the action as counsel for Plaintiffs.  Allan Steyer and D. Scott Macrae, of Steyer Lowenthal, and David Brownstein of Farmer Brownstein entered appearances.  Other counsel from all these firms later entered appearances on behalf of Plaintiffs.

9.     On August 2, 2013, Sutter filed a Motion to Dismiss the Second Amended Complaint.  The parties litigated that motion from August through November 2013.  On November 7, 2013, the Court granted Sutter's Motion to Dismiss the Second Amended Complaint for failure to allege harm in the tied market as it related to Plaintiffs' tying claim and failure to allege market power and in the relevant geographic market for Plaintiffs' monopolization and attempted monopolization claims (ECF No. 64).

10.     On December 9, 2013, Plaintiffs filed the Third Amended Complaint – the first filed by Constantine Cannon LLP – alleging that Sutter had engaged in *per se* illegal tying arrangements and an anticompetitive course of conduct that violated federal and state antitrust laws.  Plaintiffs alleged tying and tied markets for Sutter's sale of inpatient hospital services to commercial insurers in several hospital services areas ("HSAs"), based on the Dartmouth Atlas of Health Care, an industry authority.  Plaintiffs brought the action on behalf of a putative class of indirect purchasers who had enrolled in fully-insured commercial health plans and alleged that they had been overcharged for their health insurance premiums as a result of Sutter's alleged anticompetitive conduct.  The Third Amended Complaint sought treble damages, restitution, and injunctive relief.

11.     On January 8, 2014, Sutter moved to dismiss the Third Amended Complaint.  After briefing and oral argument, on June 20, 2014, the Court dismissed the Third Amended Complaint with prejudice, holding that Plaintiffs had failed to allege relevant geographic markets (ECF No. 83).  The Court then entered a Final Judgment on behalf of Sutter (ECF No. 84).

12.     On June 27, 2014, Plaintiffs filed a Notice of Appeal to the Ninth Circuit Court of Appeals.  The parties then litigated Plaintiffs' appeal from December 2014 through July 2016.

13.     On July 15, 2016, after the panel heard oral argument on the appeal, the Ninth Circuit reversed the Court's dismissal, finding that Plaintiffs' market definition allegations were sufficient, and remanded for further proceedings (ECF No. 57-1).

**FACT & EXPERT DISCOVERY AND FOURTH AMENDED COMPLAINT**

14.     Upon remand, the parties commenced discovery.  While the parties had been litigating Plaintiffs' appeal from the Court's dismissal of the Third Amended Complaint, on April

2

7, 2014, a different group of plaintiffs filed a complaint on behalf of a putative class of direct purchasers of self-insured health insurance policies in California Superior Court. *UFCW & Emps. Benefit Tr. v. Sutter Health*, CGC-14-538451 (Cal. Super. Ct. S.F. *filed* Apr. 7, 2014) ("*UEBT*"). That case challenged alleged conduct similar to that at issue in this case and alleged Cartwright Act antitrust and UCL claims against Sutter. *Sidibe v. Sutter Health*, 2021 WL 879875, at *6 (N.D. Cal. Mar. 9, 2021) (denying summary judgement "on similar facts" as in *UEBT*).

15.    While Plaintiffs' appeal was pending, discovery commenced in *UEBT*. Given the similarity of the claims and underlying facts between the two cases, discovery was consolidated and coordinated between them.

16.    On March 29, 2018, the California Attorney General sued Sutter in California Superior Court, also based upon alleged conduct similar to that at issue here, alleging violations of the Cartwright Act and the UCL. *California ex rel. Xavier Becerra v. Sutter Health*, CGC-18-565398 (Cal. Super. Ct. S.F. *filed* Mar. 29, 2018) (the "AG" action, and together with *UEBT*, the "State Actions"). The AG action alleged that Sutter's conduct impacted purchasers of both self-insured and fully-insured health insurance policies. Thereafter, discovery was coordinated across all three actions.

17.    Plaintiffs propounded extensive discovery requests during the discovery period, which occurred between 2016 and 2021. More than 2.5 million documents (*i.e.,* over 17 million pages) were produced by the parties and non-parties, including, but not limited to, health plans and hospital systems. Much of the discovery sought, including massive amounts of paid claims and premium data required to analyze liability and damages, was from non-party health plans that purchased inpatient hospital services from Sutter and to whom class members paid insurance premiums. Negotiating and obtaining discovery – documents and deposition -- from Sutter and the health plans-- Anthem Blue Cross, Blue Shield, United Healthcare, Health Net and Aetna -- was difficult, time-consuming work.

18.    To review the substantial discovery produced by Sutter and non-party health plans, Plaintiffs retained the help of additional law firms, including Keller Grover, Schneider Wallace, and Scott & Scott. Constantine Cannon, Steyer Lowenthal, and Farmer Brownstein led discovery

1    efforts and oversaw the review of millions of documents.

2        19.    Plaintiffs prepared for and attended the depositions of one hundred and fifty-five

3    (155) fact witness, many of which were multi-day depositions, amounting to two hundred and

4    twenty-three (223) days of deposition.

5        20.    Sutter propounded substantial discovery – document requests, interrogatories, and

6    requests for admissions on plaintiffs, responding to which was overseen by Steyer Lowenthal, Jill

7    Manning and The Mehdi Firm, PC. All Plaintiffs produced documents, responded to several sets

8    of interrogatories and requests or admissions and appeared for depositions at different times

9    between 2017 and 2018.

10        21.    The parties also engaged in a large amount of expert discovery.  Plaintiffs retained

11    three experts: 1) Dr. Tasneem Chipty, an esteemed Ph.D economist who provided testimony on

12    behalf of the United States in health care antitrust matters and who, in this case, opined on the

13    issues of class certification, relevant markets, liability, antitrust impact, and damages; 2) Dr.

14    Kenneth Kizer, a former Undersecretary of the U.S. Department of Health and Human Services,

15    who served as Plaintiffs' health care industry expert, opining on hospital quality and competition,

16    integration of care and industry background; and 3) Mr. David Axene, a health care actuarial

17    expert with over 50 years of experience in California, who opined on premium construction, an

18    actuarial approach to tracing the impact of alleged overcharges through to health insurance

19    premiums, and other issues relevant to class certification and impact.  Sutter retained seven

20    experts: 1) Dr. Robert Willig, an economist expert on the Princeton University faculty who once

21    served as the head of the economics bureau of the Antitrust Division of the U.S. Department of

22    Justice; 2) Dr. Gautam Gowrisankaran, an economist expert now on the Columbia University

23    faculty; 3) Jonathan Orszag, an economist expert who founded Compass Lexecon; 4) Dr. Jonathan

24    Skinner, a health care economist; 5) Patrick Pilch, a health care industry expert; 6) Shannon

25    Keller, a health care actuarial expert; and 7) Patrick Travis, a health care industry executive with

26    expertise in purchasing and pricing of health insurance.

27        22.    Plaintiffs' experts produced fourteen (14) expert reports and Sutter's produced

28    twenty-three (23).  Each expert sat for deposition, in many instances for multiple days or times,

for a collective twenty-eight (28) days of expert deposition testimony.  Dr. Chipty, in determining

her overcharge estimates, and liability and class opinions, analyzed a massive amount of

transaction data, including:

- Over 83 million claims and $112 billion in paid amounts from Anthem claims
  data, from 2006 to 2017; and 275 million member-months of premium data
  from Anthem, from 2011 to Q1 2020.

- Over 21 million claims and $61 billion in paid amounts from Blue Shield
  claims data, from 2006 to 2017; and 196 million member-months of premium
  data from Blue Shield, from 2011 to Q1 2020.

- Over 8 million claims and $17 billion in allowed amounts from Health Net
  claims data, from 2006 to 2017; and 97 million member-months of premium
  data from Health Net, from 2011 to 2020.

- Over 19 million claims and $38 billion in allowed amounts from United
  claims data, from 2006 to 2017; and 63 million member-months of premium
  data from United, from 2011 to Q1 2020.

- Over 9 million claims and $26 billion in paid amounts from Aetna claims
  data, from 2006 to 2017; and 3 million member-months of premium data from
  Aetna, from 2011 to Q1 2020.

Dr. Chipty was supported by a team of economists, healthcare specialists and data analysts from

Berkeley Research Group (BRG), Matrix Economics, and AlixPartners.  She and her team

collectively spent thousands of hours reviewing document and deposition testimony, and cleaning

(making the data suitable for economic analysis) and analyzing the claims and premium data

produced by non-party health plans.

23.    On July 26, 2017, Plaintiffs moved to amend the complaint to conform their

pleading to the discovery that had been taken up until that time.  The Court granted that motion on

September 28, 2017 (ECF No. 202), and the Plaintiffs amended the complaint for the final time on

September 29, 2017.

24.    Fact discovery was concluded on August 31, 2018, except for some supplemental

discovery and depositions in 2021 and 2025 that were taken of previously undisclosed and

undeposed witnesses.  Expert discovery closed on December 8, 2021 (after Mr. Orszag substituted

for Dr. Willig).

## CLASS CERTIFICATION

25.    The Parties conducted two rounds of briefing on class certification between 2018 and 2020.  On June 22, 2018, Plaintiffs moved to certify an indirect purchaser class of premium payers under Fed. R. Civ. P. 23(b)(2) & (3).  On August 30, 2019, the Court issued its opinion certifying a Federal Rule of Civil Procedure 23(b)(2) injunctive class, but it denied the motion with respect to a Rule 23(b)(3) damages class.  *Sidibe v. Sutter Health*, 333 F.R.D. 463 (N.D. Cal. 2019) (ECF No. 698).  The Court concluded that Dr. Chipty's analysis submitted in support of the class certification motion was insufficient to show that health plans passed Sutter's alleged overcharges to premium payers and, thus, did not offer a mechanism for proving class-wide antitrust injury and damages.  *Id.*

26.    Thereafter, Dr. Chipty expanded her pass-through analysis to include data that all five health plans had filed with the Center for Medicare and Medicaid Services (CMS).  Regression analysis utilizing this data further supported her opinion that antitrust injury and damages could be established on a class-wide basis.  On November 18, 2019, Plaintiffs moved again to certify a Rule 23(b)(3) damages class.  Sutter opposed and moved for sanctions to preclude Dr. Chipty's reliance on CMS data to conduct her pass-through analysis.  On July 30, 2020, the Court granted Plaintiffs' motion, denied Sutter's sanctions motion, and certified a Rule 23(b)(3) class of premium payers.  2020 WL 4368221 (N.D. Cal. July 30, 2020) (ECF No. 823).  The Court, however, only allowed the Class to seek damages incurred after January 1, 2011 (reducing the claimed Class damages by about two years and three months).  The Court appointed Constantine Cannon Lead as Class Counsel and The Mehdi Firm, PC as Co-Lead Class Counsel.

27.    On August 13, 2020, Sutter filed a Petition for Interlocutory Appeal of the Court's two class Orders.  Plaintiff Answered that Petition and Sutter filed a Reply.  On October 16, 2020, the Ninth Circuit denied Sutter's Petition for Interlocutory Appeal (ECF No. 5).

28.    Plaintiffs considered several notice and claims administrators and received proposals from JND Legal Administration ("JND") and Epiq.  Based on a comparison of the proposals, Plaintiffs retained JND based on its track record, reputation and the relative strength of its

proposal.

29.    On September 17, 2020, Plaintiffs submitted a proposed plan to provide Notice of Pendency of this action.  The Court approved the Notice of Pendency, and authorized sending it, on November 5, 2020 (ECF No. 901).  JND performed significant work to clean up contact data from the health plans.  JND effectuated notice between November 2020 and March 2021.  Notice was disseminated via direct mail and email to millions of class members.  Publication notice was disseminated through fifteen print newspapers and digital notice through LinkedIn.  JND developed and maintained a class website, which went live on December 14, 2020; it published the Notice of Pendency and provided important information regarding the case.  See https://www.sutterhealthpremiumlawsuit.com/.  The deadline to opt out of the class action was March 8, 2021.  Two hundred and sixty-one class members, almost all of them individuals, opted out by the deadline.

## SUMMARY JUDGMENT

30.    The Court oversaw two rounds of summary judgment motion practice.

31.    On October 5, 2017, Sutter moved for early summary judgment, asserting that Plaintiffs could not offer material factual support for its alleged relevant geographic markets for inpatient hospital services.  The parties submitted substantial expert reports in support of and in opposition to this motion.  The parties then took depositions on the geographic market opinions of Dr. Chipty and Dr. Gowrisankaran.  Market definition often is a costly and expert-heavy analysis in antitrust litigation, as it was in this case for both sides.

32.    On April 12, 2019, the Court, in a seventy-page opinion, denied Sutter's motion for summary judgment with respect to 11 out of Plaintiffs' 12 alleged geographic markets and granted Sutter's motion with respect to the Davis market.  *Sidibe v. Sutter Health*, 2019 WL 2078788 (N.D. Cal. May 9, 2019) (ECF No. 673).

33.    After the end of fact discovery, on June 22, 2020, Plaintiffs moved for partial summary judgment on the distinct products element of their tying claim.  On October 23, 2020, the Court granted that motion (ECF No. 886).

34.    On August 22, 2020, Sutter moved for summary judgment on several

potentially dispositive issues, including whether Sutter's contracting practices constituted tying arrangements.  The Court, on March 9, 2021 (after the opt-out period for Class Members expired), denied that motion with regard to Plaintiffs' tying claim and course of conduct claim, finding numerous disputed issues of fact.  *Sidibe v. Sutter Health*, 2021 WL 879875 (N.D. Cal. Mar. 9, 2021) (ECF No.962).  The Court granted Sutter's motion with regards to Plaintiffs' Sherman Act Section 2 claims and damages claims from 2008 to 2010.

## SETTLEMENT OF THE STATE ACTIONS

35.     In late 2021, Sutter settled with the AG and *UEBT* plaintiffs in the State Actions for monetary relief and significant injunctive relief relating to Sutter's contracting practices with health plans that were also challenged in this case.  *UFCW & Emps. Benefit Tr. v. Sutter Health*, CGC-14-538451, at *1 (Cal. Super. Ct. S.F. Aug. 27, 2021).  The injunctive relief obtained there included, among other things, terms that prohibit and permit certain conduct related to Sutter's contracting practices with insurance companies concerning network participation, steering, tiering, out-of-network pricing, and availability of pricing information.  The injunction also appointed a monitor to ensure Sutter's compliance with the injunction.[1] The release in the settlement agreement in the State Actions resolved all claims relating to the challenged conduct except it explicitly carved out the damages claims in this matter.

## PRETRIAL

36.     Due to delays caused by the COVID-19 pandemic and witness availability, the parties prepared for the first trial three separate times.

37.     Trial was first scheduled to commence on October 4, 2021.  Starting in November/December 2020, the parties began working diligently for months during pretrial to prepare exhibit lists, trial witness lists, and designations of deposition testimony.  The parties exchanged those materials and held extensive meet and confers for months regarding exhibits and deposition designations.  Collectively, there were thousands of exhibits on the parties' exhibit lists and many hours of deposition designations.

---

[1]  The Final Judgment in the State Proceedings can be found at: chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://oag.ca.gov/system/files/attachments/press-docs/Final%20Judgment%20Redacted%20Sutter.pdf

38.     The parties also filed thirteen (13) *in limine* motions and motions to exclude expert evidence under Fed. R. Evid. 702.  On August 30, 2021, the Court issued a pretrial order denying all seven (7) of Plaintiffs' *in limine* motions and granting all six (6) of Sutter's *in limine* motions. One Order precluded Plaintiffs from offering any evidence from the period before January 1, 2006, unless the Court ordered otherwise.  In response, Plaintiffs made an offer of proof relating to twenty-three (23) pieces of evidence otherwise precluded by the Court's pre-2006 *in limine* ruling: that Offer of Proof was denied as to all twenty-three (23) pieces of evidence.  The Court also largely denied the parties' Rule 702 motions.

39.     On September 23, 2021, the Court adjourned the October 4, 2021 date for the commencement of trial to January 6, 2022.  On December 16, 2021, the parties conducted *voir dire* and selected a jury.  But on January 5, 2022, the day before trial was scheduled to commence, the Northern District suspended all jury trials due to the outbreak of another strain of COVID.

40.     Trial was rescheduled for the third time -- to commence on February 9, 2022.  The parties conducted *voir dire* and selected a jury on February 9, 2022.

## JURY TRIAL

41.     The case was tried from February 9, 2022 to March 11, 2022. During nineteen (19) full trial days, over four (4) weeks, the jury heard testimony from fifty (50) witnesses, including six (6) expert witnesses. Three hundred and fifty-one (351) exhibits were entered into evidence. The jury heard testimony from non-party health plan witnesses regarding Sutter's contracting practices and the impact of Sutter's conduct on premiums.  Plaintiffs testified on behalf of the Class regarding their premium payments and the relief they hoped to achieve from the lawsuit. Over ten (10) Sutter witnesses also testified in defense.  Non-Sutter hospital and other witnesses testified to hospital contracting practices, charity care, and clinical integration.  Dr. Chipty testified to her liability and damages opinions (asserting that the Class had incurred damages of approximately $411 million) and explained her opinion of how the overcharges resulting from Sutter's conduct were passed on through higher premiums to class members. Sutter's experts testified as to their opinions on liability and damages, claiming that the Class was not injured by Sutter's conduct and did not incur damages.

42.     Trial was conducted under COVID protocols, with participants wearing masks and social distancing to the extent possible.  Several witnesses were permitted to testify remotely due to illness or difficulty of travel during the pandemic.

43.     On March 11, 2022, the jury rendered a verdict in Sutter's favor.

44.     Final judgment was entered on March 29, 2022.

## APPEAL OF PRE-2006 EXCLUSION AND JURY INSTRUCTIONS

45.     Plaintiffs promptly appealed this second Final Judgment to the Ninth Circuit, asking that the Final Judgment be reversed and remanded for a new trial.  Plaintiffs appealed the Court's *in limine* and other rulings that precluded Plaintiffs from presenting any pre-2006 evidence at trial. The pre-2006 ruling precluded Plaintiffs from introducing evidence from the late 1990s/early 2000s – which Plaintiffs alleged was when Sutter conceived of and began implementing the alleged restraints.  Plaintiffs argued that this evidence of health plan negotiations before and after Sutter's systemwide contracting and anticompetitive contract terms had been forced on health plans supported their tying claims.  The precluded evidence included alleged admissions from Sutter executives who conceived of and were charged with carrying out Sutter's alleged systemwide restraints.  Plaintiffs argued that, as a result, they were prejudiced at trial.

46.     Plaintiffs also appealed the Court's elimination of the consideration of the history and purpose of Sutter's restraints, which was a revision of CACI jury instructions for a course of conduct claim.  Plaintiffs argued that this had the effect of the jury assessing Sutter's alleged restraints without understanding the purpose for which Sutter had imposed them--to raise prices. Plaintiffs argued that if the jury had been instructed to consider such purpose, the jury would have understood the likely anticompetitive effects that resulted from Sutter's conduct.

47.     Plaintiffs also appealed the Court's Orders denying their request to define the "relevant purchaser" as the health plans and their motion for sanctions.

48.     Sutter argued that the jury instructions that the Court adopted for plaintiffs' course of conduct claim were correct or, alternatively, that any error was harmless because the jury had concluded that Sutter did not engage in tying and therefore not reached the verdict-form question

1    that related to consideration of the purpose and history of Sutter's alleged restraints.  Sutter argued

2    with regard to the excluded pre-2006 evidence that the trial court had acted well within its

3    discretion to streamline trial and the excluded materials were cumulative of other evidence that

4    had already been admitted and confusing for the jury.

5        49.    The record on appeal was substantial and included many volumes of trial transcripts

6    and evidence.

7        50.    On June 4, 2024, the Ninth Circuit, in a 2-1 decision, reversed the jury verdict based

8    on the Court's revisions to the CACI jury instructions and preclusion of pre-2006 evidence.

9    *Sidibe v. Sutter Health*, 103 F.4th 675 (9th Cir. 2024) (ECF No. 147-1).

10       51.    The Ninth Circuit found that evidence from before 2006 was relevant and probative

11   of Sutter's intent, the likely effect of Sutter's conduct and whether Sutter forced health plans into

12   systemwide contracting and other contract terms.  It found that the exclusion was not harmless and

13   had prejudiced Plaintiffs in the first trial.  It also found that the failure to instruct the jury to

14   consider the history and purpose of Sutter's restraints was legal error.  Finding that these errors,

15   individually and cumulatively, prejudiced the Plaintiffs, the Ninth Circuit reversed and remanded

16   for further proceedings in this Court.

17       52.    Judge Bumatay filed a dissent wherein he cautioned against disturbing the trial

18   court's evidentiary rulings over which it has wide discretion.  He also argued that the majority

19   opinion broke new ground in antitrust rule of reason analysis, making mandatory the consideration

20   of the "purpose" of a restraint's imposition for all antitrust claims.  He agreed with Sutter's

21   argument that the revisions to the jury instruction was harmless error.

22       53.    The Ninth Circuit, in an unpublished memorandum, also affirmed the Court's

23   "relevant purchaser" instruction and its denial of Plaintiffs' motion for sanctions (ECF No. 148-1).

24       54.    On July 18, 2024, Sutter then, filed a Petition for Rehearing and Rehearing *En Banc*

25   (ECF No. 152).  That Petition was denied on August 12, 2024 (ECF No. 153), and the Ninth

26   Circuit issued its mandate reversing and remanding on August 19, 2024 (ECF No. 154).

27                                **RE-TRIAL AND SETTLEMENT**

28       55.    On remand, Plaintiffs immediately sought to schedule a re-trial and began preparing

                                                11

for it.  On November 6, 2024, the Court ordered the re-trial to commence on March 3, 2025. Following that Order, the parties began preparations.  The parties made supplemental pretrial exchanges and met and conferred regarding the witnesses, exhibits, and testimony designations. They also worked diligently to subpoena and prepare witnesses for trial testimony.  The parties appeared at several pre-trial hearings to argue new *in limine* motions and agree on trial logistics.

56.     On February 27, 2025, the parties conducted *voir dire* and selected a jury for the re-trial.  They finalized trial logistics and prepared to give opening statements a few days later, on March 3, 2025.

57.     While the parties had settlement discussions throughout this litigation, including a formal mediation session and follow-up conversations from 2019 through 2021, those discussions ultimately were unsuccessful.

58.     However, in the leadup to the re-trial, the parties retained Gregory P. Lindstrom of Phillips ADR to mediate their dispute.  They had numerous communications with Mr. Lindstrom and participated in an in-person mediation with him in the months leading to the re-trial.  The parties also engaged in direct settlement communications with each other.  After the jury was selected, but before opening statements, they reached an agreement in principle to settle the matter for $228.5 million.  The parties informed the Court of their agreement and filed a notice of settlement on March 2, 2025.

59.     The parties thereafter negotiated a settlement agreement over six weeks.  These negotiations included Mr. Lindstrom, were arm's-length negotiations, and involved multiple rounds of comments and back and forth regarding the terms of settlement.

60.     I, Matthew Cantor, and Lloyd Constantine of CC, in consultation with Azra Mehdi, Farmer Brownstein, and Steyer Lowenthal, negotiated the settlement on behalf of Plaintiffs and the Class.  We have over 100 years of experience litigating complex antitrust matters between the three of us, advocating on behalf of both plaintiffs and defendants and taking a number of cases to trial.  Mr. Cantor and I had prosecuted the case since the very early days through to the first trial and appeal, and we were most familiar with its strengths and weaknesses.  We were aware of the risks of another jury trial, having tried the case once already and understanding the difficulties of

Declaration in Support of Plaintiffs' Motion for Preliminary Approval, Case No. 3:12-CV-04854-LB

deciding an antitrust case of this magnitude and complexity for a jury of laypersons. Jeffrey A. LeVee and David C. Kiernan, both of Jones Day, negotiated the settlement agreement on behalf of Sutter.  They too had litigated the case for these many years.

61.    On April 24, 2025, the parties executed the settlement agreement (the "Settlement Agreement").  Attached as Exhibit A is a true and accurate copy of the executed Settlement Agreement.

## THE SETTLEMENT PROVIDES REAL AND TIMELY RELIEF TO THE CLASS

62.    In the collective judgment of all Class Counsel, the Class Settlement is fair, reasonable, and adequate.  Continuing to litigate this matter carries substantial risk and even more delay for recovery by Class Members.

63.    The risk is demonstrated by the jury verdict in Sutter's favor in the first trial.  There, the jury held that Sutter did not tie its inpatient hospital services together and that Sutter did not force health plans into contracts that prevented steering.  Despite the formerly excluded pre-2006 evidence that Plaintiffs could use in the second trial and the corrected jury instructions, there was a significant risk that a second jury could similarly find against Plaintiffs.

64.    Fact discovery closed in 2018, and given the passage of time, Plaintiffs have to contend with an old evidentiary record and fading memories of events, some of which took place in the late 1990s.  Several key witnesses for Plaintiffs were non-party health plan executives. These were additional risks to Plaintiffs in any re-trial.

65.    It is expected that in the second trial, Sutter would continue to make the following arguments, which, if credited by the jury, could result in a second verdict for Sutter:

a.    Plaintiffs' product market for inpatient hospital services is faulty because it does not include Kaiser Permanente hospitals;

b.    Plaintiffs' geographic markets for inpatient hospital services are drawn too narrowly;

c.    Sutter did not tie its inpatient hospital services at different hospitals;

d.    Sutter did not force health plans into anticompetitive contracts;

e.    Sutter's conduct did not have anticompetitive effects;

Declaration in Support of Plaintiffs' Motion for Preliminary Approval, Case No. 3:12-CV-04854-LB

f.      Any anticompetitive effects from Sutter's conduct were outweighed by procompetitive effects of Sutter's conduct;

g.      Class Members did not suffer antitrust impact; and

h.      Dr. Chipty's damages calculations are deficient.

66.    Moreover, even if Plaintiffs prevailed at trial, it is likely that Sutter would have appealed such a verdict and the parties would have engaged in another round of appellate proceedings, which, like the first two appeals, could have taken more than two years to litigate.  If the Plaintiffs prevailed on appeal, Sutter could have sought further review by the United States Supreme Court.  All in all, if Plaintiffs had retried the case and prevailed, it would take many more years for them to collect any damages.

67.    The Settlement was reached before the Court resolved several important contentious issues regarding jury instructions, the resolution of which could have created substantial issues on appeal regardless of whether Sutter or Plaintiffs prevailed.

68.    The award provides real relief to the Class.  The Class award amounts to approximately 55% of single damages, a percentage of damages that is in line with the percentage of damages provided in settlements of other antitrust cases that have been approved in the Northern District of California.

## SETTLEMENT NOTICE AND PLAN OF DISTRIBUTION

69.    Plaintiffs have retained JND once again to administer settlement notice and the Plan of Distribution ("POD").  JND is a nationally recognized notice and claims administrator and successfully effectuated the Notice of Pendency to more than three million class members.  JND has designed a Settlement Notice Plan that is similar to the Notice of Pendency plan that the Court approved in December 2020.  *See* Declaration of Jennifer M. Keough, dated April 24, 2025 ("Keogh Decl."), and Proposed Settlement Notice Plan, incorporated therein.  As detailed in Ms. Keogh's Declaration:

a.      To account for the passage of time, JND will update the previously used contact information obtained from the Health Plans relevant to the Class and will disseminate direct notice via U.S. mail and email.

14

b.  JND will also disseminate digital notice to business entities via LinkedIn and other online platforms.  It will serve digital notice to consumers via Facebook/Instagram and other online platforms and targeted advertising.  JND will also conduct an internet search campaign and distribute a press release to media outlets in English and Spanish.  While JND did publish notice of pendency in newspapers, JND has determined that the readership of print newspapers has declined significantly in the past several years.  JND therefore will expand its digital publication of notice as described above.

70.    Plaintiffs prepared the distribution in consultation with JND.  Plaintiffs also looked to precedent from another recent class settlement that involved a similar (but nationwide) class of premium payers.  *See In Re: Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, MDL 2406, 2022 WL 4587618 (N.D. Ala. Aug. 9, 2022), *aff'd ,* 85 F.4th 1070 (11th Cir. 2023) ("*BCBS*").  JND also served as the claims administrator for *BCBS*.  Attached as Exhibit B is a true and accurate copy of Plaintiffs' Proposed Plan of Distribution ("POD").

71.    Portions of the $228.5 million Settlement Fund shall be used to pay certain costs and fees prior to determining a net amount that is available for distribution to class members (the "Net Settlement Fund"). The fees and other costs to be deducted from the Settlement Fund include approximately:  $10 million of costs to cover notice and administration of the settlement; expenses incurred by Class Counsel of approximately $28 million in prosecuting the case; escrow account fees and costs (including taxes incurred by the Class and tax expenses), reimbursement of which shall be subject to a petition to and approval by the Court; attorneys' fees, not to exceed 33.33% of the Settlement Fund, to the counsel representing the Class, also subject to a petition to and approval by the Court; service awards to class representatives, approved by the Court; and escrow account costs.  At this time, we estimate that Class Counsel total lodestar for the matter will exceed $75 million.

72.    The Class Representatives, Djeneba Sidibe, David Herman, Susan Hansen, Susan MacAusland (Optimum Graphics Inc.), Tina Feeney (Johnson Pool & Spa), and Jerry Jankowski, acted to protect the interests of the class over the many years of this litigation, and expended

significant time and effort on the case. Each class representative reviewed and approved each of the complaints, searched their personal and business files for copies of their health insurance plans and payments, produced responsive documents, answered interrogatories, prepared for and sat for deposition, prepared to testify at trial and, some of them, testified at trial. Each class representative was in regular communication throughout the litigation spanning over a decade, including one trial and three trips to the Ninth Circuit. Because of their efforts, the Class Representatives are eligible for Court-approved Service Awards, which does not constitute preferential treatment.

73.    Assuming an attorney's fee award of one-third of the Settlement Fund, reasonable Service Awards, minimal Escrow Account costs, notice and claims administration costs of $10 million, and an expense reimbursement award of $28 million, the Net Settlement Fund proceeds available for distribution to class members would be approximately $115 million (equal to $228.5 million, less costs, expenses, awards above).

74.    The default payment for each class member who submits an eligible claim will be calculated according to the following equation:

The payment for a claim submitted by an Authorized Claimant (e.g., "Claimant A")

shall be determined by the following equation:

"Total Premiums Paid" (as defined below by this Plan)

during Class Period by Claimant A


**Divided by**

Total Premiums Paid during Class Period by

all Authorized Claimants who submit claims


**Multiplied by**

Total dollars in Net Settlement Fund


**= Claimant A's claim payment**

16

1

2    75.    The inputs and assumptions that are provided in this equation are explained in

3    greater detail in the POD.  Ex. B.  ¶¶ 10–14.  The POD also provides a Group/Employee

4    distribution process for premium contributions paid jointly by a group/employer and employee.

5    *See id.* at ¶¶ 15–17.  Plaintiffs relied on data published by the Kaiser Family Foundation to derive

6    a default option for Group/Employee split of premiums during the Class Period (2011–21): 18%

7    Employee Claimant/82% Group Claimant for individual plans and 30% Employee Claimant/70%

8    Group Claimant for family plans.  *Id.* at ¶¶ 16(f)–(g).

9    76.    For claimants who forego the default option and elect to submit documentation of

10   premium payments to calculate their payment rather than the default method with the

11   assumptions described above, the POD provides an alternative option on their claim form.  Any

12   claimant whose counterpart (for a claiming Group Claimant, the Employee; and for a claiming

13   Employee Claimant, its Group Claimant) elects the alternative option will be contacted by the

14   Claims Administrator and provided with the opportunity to submit additional evidence to assist in

15   the ultimate determination of how to allocate their unallocated employee premiums.  *Id at* ¶¶

16   16(h)-(l).

17   77.    In preparing the POD, Plaintiffs pursued a fair and efficient plan to allocate the Net

18   Settlement Fund in a manner that would preserve class resources and inure to the benefit of the

19   Class.

20

21                              Respectfully submitted,

22

23                              CONSTANTINE CANNON LLP

24   Dated: April 25, 2025        */s/ Jean Kim*
                                  Jean Kim

25                                *Lead Class Counsel*

26

27

28

# EXHIBIT A

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (the "Settlement Agreement," "Settlement," or "Agreement") is made and entered into on April 24, 2025, by and between: (a) Plaintiffs Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Optimum Graphics, Inc., and Johnson Pool & Spa (together "Plaintiffs"), on behalf of themselves and the Class: and (b) Defendant Sutter Health, including all of its predecessors, successors, affiliates and subsidiaries ("Defendant" or "Sutter").

WHEREAS, Defendant is a not-for-profit healthcare system that provides healthcare services to communities throughout Northern California;

WHEREAS, Plaintiffs Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Optimum Graphics, Inc., and Johnson Pool & Spa filed an action on behalf of themselves and all others similarly situated against Defendant captioned *Sidibe, et al. v. Sutter Health,* 3:12-cv-04854, pending in the United States District Court, Northern District of California, San Francisco Division (the "Action"). The Action was originally filed on September 17, 2012;

WHEREAS, the Fourth Amended Complaint, filed September 29, 2017, is the operative complaint in the Action;

WHEREAS, on August 31, 2019, the Court certified a class to pursue injunctive relief under Federal Rule of Civil Procedure 23(b)(2) and, on July 30, 2020, the Court certified the class to pursue damages claims under Federal Rule of Civil Procedure 23(b)(3);

WHEREAS, the Court defined the Class to include "All entities in California Rating area 1, 2, 3, 4, 5, 6, 8, 9 or 10 (the "Nine Rating Areas" or "Nine RAs"), and all individuals that either live or work in one of the Nine RAs, that paid premiums for a fully-insured health insurance policy from Blue Shield, Anthem Blue Cross, Aetna, Health Net or UnitedHealthcare from January 1, 2011 to the present. This class definition includes class members that paid premiums

1

for individual health insurance policies that they purchased from these health plans and class

members that paid premiums, in whole or in part, for health insurance policies provided to them as

a benefit from an employer or other group purchaser located in one of the Nine RAs";

WHEREAS, on March 9, 2021, the Court clarified that the Class includes any person that

paid any portion of a premium for a fully-insured health insurance policy from any of the five

class health plans at any time from January 1, 2011 to the present if, during the period the person

paid those premiums, the person lived or worked (or, if an employer, had an office located) in one

of the following California counties: Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra

Costa, Del Norte, El Dorado, Glenn, Humboldt, Lake, Lassen, Marin, Mendocino, Merced,

Modoc, Napa, Nevada, Placer, Plumas, Sacramento, San Francisco, San Joaquin, San Mateo,

Santa Cruz, Shasta, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Sutter, Tehama, Trinity,

Tuolumne, Yolo or Yuba;

WHEREAS, on November 5, 2020, the Court approved an opt-out notice that informed

Class Members that if they did not opt out, "they will be bound by the outcome of the lawsuit"

and "will not be able to file a lawsuit asserting claims against Sutter related to the allegations or

claims in this case" and "will not be able to remove yourself from [the Action]";

WHEREAS, the opt-out notice was sent to Class Members with an opt-out deadline of

March 8, 2021;

WHEREAS, on March 11, 2022, a jury returned a verdict in favor of Defendant following

a trial on Plaintiffs' claims under California's Cartwright Act for alleged tying and unreasonable

course of conduct, and the Court thereafter entered a Final Judgment in favor of Sutter on all of

Plaintiffs' claims;

WHEREAS, on June 4, 2024, the United States Court of Appeals for the Ninth Circuit

reversed the judgment and certain trial court orders regarding evidentiary exclusion and jury

2

instructions, and remanded for a new trial; the Ninth Circuit also affirmed certain trial court orders;

WHEREAS, Plaintiffs have asserted and continue to assert that they have meritorious claims against Defendant;

WHEREAS, Defendant has denied and continues to deny that it engaged in any wrongdoing of any kind, or violated or breached any law, regulation or duty owed to Plaintiffs (and to each of them), and further denies that it has any liability as a result of any and all allegations in the Action;

WHEREAS, Plaintiffs have vigorously prosecuted the Action and Defendant has vigorously defended against the Action;

WHEREAS, a jury trial was scheduled to commence on March 3, 2025;

WHEREAS, Sutter previously settled litigation brought by the California Attorney General and a separate class action filed on behalf of purchasers of "self-funded" health insurance in *California ex rel. Xavier Becerra v. Sutter Health*, CGC-18-565398 (Cal. Super. Ct. S.F. *filed* March 29, 2018), and *UFCW & Employers Benefit Trust v. Sutter Health*, CGC-14-538451 (Cal. Super. Ct. S.F. *filed* April 7, 2014), and as part of that settlement Sutter agreed to injunctive relief similar to the relief Plaintiffs sought in this Action;

WHEREAS, Plaintiffs and Defendant have been engaged in extensive arm's-length negotiations in an effort to resolve all claims that have been or could have been asserted in the Action, including through mediation with Gregory P. Lindstrom of Phillips ADR, as well as through numerous in-person, telephone, and email conferences and communications where the terms of this Settlement were extensively debated and negotiated;

WHEREAS, the Settling Parties have reached an agreement providing for the settlement and dismissal with prejudice of the claims asserted in the Action on the terms and subject to the

conditions set forth below, and are entering into the Settlement to eliminate the burden, distraction, expense, and uncertainty of further litigation; and

WHEREAS, based on their analysis of the merits of the claims and the benefits provided to the Class by the Settlement Agreement, including an evaluation of a number of factors including the substantial risks of continued litigation and the possibility that the litigation, if not settled now, might result in no recovery whatsoever for the Class or in a recovery that is less favorable to the Class, Class Counsel believe that it is in the best interests of the Class to resolve finally and completely their claims against the Defendant and that the terms of the Settlement Agreement are in the best interests of the Class and are fair, reasonable, and adequate;

NOW, THEREFORE, in consideration of the promises, agreements, covenants, representations, and warranties set forth herein, and other good and valuable consideration provided for herein, Plaintiffs and Defendant agree to a full, final, and complete settlement of the Action on the following terms and conditions:

## I.     GENERAL TERMS OF THE SETTLEMENT AGREEMENT

### A.     Definitions

In addition to terms identified and defined elsewhere in this Settlement Agreement, and as used herein, the terms below shall have the following meanings:

1.     "Action" means the lawsuit captioned *Sidibe, et al. v. Sutter Health,* pending in the United States District Court, Northern District of California, San Francisco Division, case number 3:12-cv-04854-LB.

2.     "Attorneys' Fees and Expenses" means the amounts approved by the Court for payment to Class Counsel and Additional Counsel, including attorneys' fees, costs, expert and consultant fees and expenses, and litigation expenses, as described in Section VII herein.

4

3.     "Class" or "Class Member(s)" means "All entities in California Rating area 1, 2, 3, 4, 5, 6, 8, 9 or 10 (the "Nine Rating Areas" or "Nine RAs"), and all individuals that either live or work in one of the Nine RAs, that paid premiums for a fully-insured health insurance policy from Blue Shield, Anthem Blue Cross, Aetna, Health Net or UnitedHealthcare from January 1, 2011 to March 8, 2021. This class definition includes Class Members that paid premiums for individual health insurance policies that they purchased from these health plans and Class Members that paid premiums, in whole or in part, for health insurance policies provided to them as a benefit from an employer or other group purchaser located in one of the Nine RAs." The "Class" includes any person that paid any portion of a premium for a fully-insured health insurance policy from any of the five class health plans at any time from January 1, 2011 to March 8, 2021 if, during the period the person paid those premiums, the person lived or worked (or, if an employer, had an office located) in one of the following California counties: Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Glenn, Humboldt, Lake, Lassen, Marin, Mendocino, Merced, Modoc, Napa, Nevada, Placer, Plumas, Sacramento, San Francisco, San Joaquin, San Mateo, Santa Cruz, Shasta, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Sutter, Tehama, Trinity, Tuolumne, Yolo or Yuba. Members of the Federal Rule of Civil Procedure 23(b)(3) Class are all such persons who did not opt-out of the Class on or before the Court-ordered opt-out deadline of March 8, 2021. Excluded from the terms "Class" or "Class Members" are all entities or individuals that opted out of the Class on or before the Court-ordered opt-out deadline of March 8, 2021. Those that opted out are no longer Class Members and they are not entitled to any relief under this Settlement, including any monetary relief, or to object to this Settlement. A list of those who opted out is attached hereto as **Exhibit A**.

4.      "Claims Administrator" means the entity which has been designated to provide Notice to the Class and to administer the Settlement Fund pursuant to Section II.A. below and by order of the Court.

5.      "Class Counsel" means the law firms of Constantine Cannon LLP; The Mehdi Firm, PC; Shinder Cantor Lerner LLP; Farmer Brownstein Jaeger Goldstein Klein & Siegel LLP; and Steyer Lowenthal Boodrookas Alvarez & Smith LLP. Additional counsel also assisted in the efforts of Class Counsel. "Additional Counsel" means Scott & Scott; Schneider Wallace Cottrell Konecky LLP; Pearson Warshaw LLP, The Manning Law Firm, and Keller Grover.

6.      "Court" means the United States District Court for the Northern District of California.

7.      "Defendant" means Sutter Health including all of its predecessors, successors, affiliates, and subsidiaries.

8.      "Defendant's Counsel" means the law firms of Jones Day and Bartko Pavia LLP.

9.      "Effective Date" is the effective date of the Settlement Agreement, as defined in Section II.F herein.

10.     "Escrow Agent" means The Huntington National Bank, which, assuming it agrees to do so, shall enter into an Escrow Agreement agreed to by the Settling Parties to carry out the tasks more fully detailed in that Escrow Agreement, including to receive, hold, and disburse the Settlement Fund, subject to the direction of Class Counsel as authorized and approved by the Court. The Settling Parties may replace The Huntington National Bank with another mutually-agreeable financial institution.

11.     "Final Approval" means the order of the Court granting final approval of the Settlement Agreement pursuant to Federal Rule of Civil Procedure 23(e).

6

12.     "Final Approval Hearing" or "Fairness Hearing" means the hearing at which the Court will consider Plaintiffs' motion for judgment and final approval of the Settlement.

13.     "Final Judgment and Order" means the Proposed Final Judgment and Order attached as **Exhibit B**, which shall be submitted to and entered by the Court as described herein.

14.     "Health Plans" or "class health plans" means Aetna, Anthem Blue Cross, Blue Shield, Health Net, and United Healthcare.

15.     "Notice" means the Notice of Proposed Settlement, which is to be disseminated pursuant to the Court-approved Plan of Notice;

16.     "Notice Completion Date" is the date that notice is completed by JND.

17.     "Plaintiffs" means the Court-approved class representatives: Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Optimum Graphics, Inc., and Johnson Pool & Spa.

18.     "Plan of Distribution" means the formula and process by which the Settlement Fund will be allocated and distributed to Class Members.

19.     "Plan of Notice" means the plan for disseminating the Notice to Class Members.

20.     "Preliminary Approval" means the Court's Order preliminarily approving the Settlement, the Plan of Notice, the form of the Notice, the Plan of Distribution, and other related matters.

21.     "Released Claims" means those claims specified in Section VI *infra*.

22.     "Released Parties" means Defendant Sutter Health, including all of its predecessors, successors, affiliates, and subsidiaries, and those entities specified in Section VI *infra.*

23.     "Settlement," "Agreement," and "Settlement Agreement" each mean the settlement terms agreed to by the Plaintiffs and Defendant as reflected in this Settlement Agreement and attachments hereto, including the Proposed Final Judgment and Order attached as **Exhibit B**.

24.    "Settlement Fund" means the $228,500,000 that the Defendant shall pay as described in Section III.A, to be held, administered, and disbursed pursuant to this Settlement Agreement and applicable orders of the Court.

25.    "Settling Parties" means Plaintiffs, on behalf of themselves and the Class, and Defendant.

## II.    COURT APPROVAL OF SETTLEMENT AND CLASS NOTICE

### A.    Retention of Claims Administrator

1.    Class Counsel shall retain a Claims Administrator which shall be responsible, under the supervision of Class Counsel, for the Notice administration process, administering the Settlement Fund, allocation and distribution of payments to Class Members as approved by the Court, withholding and paying applicable taxes, and performing other duties as provided herein. Class Counsel shall obtain approval by the Court of the choice of the Claims Administrator. Class Counsel shall be responsible for determining payments to Class Members from the Settlement Fund based on the Plan of Distribution approved by the Court. The Claims Administrator shall sign and be bound by the Protective Order governing the Action and be required to agree in writing in a form approved by Plaintiffs and Defendant, such approval not to be unreasonably withheld, to treat information it receives or generates as part of the Notice administration process as confidential. The Claims Administrator shall agree to use confidential information solely for the purposes of Notice administration, administering the Settlement Fund, and completing the functions associated therewith or required by this Agreement and applicable Court orders, and shall keep the information confidential. The fees and expenses of the Claims Administrator shall be paid exclusively out of the Settlement Fund. In no event shall the Defendant be separately responsible for fees or expenses of the Claims Administrator.

**B.    Preliminary Approval and Notice of Settlement**

1.    Class Counsel shall file with the Court a motion for Preliminary Approval of the Settlement and Exhibits to the Settlement Agreement, which will include a Proposed Preliminary Approval Order, a Proposed Notice of Settlement, and a Plan of Distribution.

2.    Class Counsel shall provide Notice to Class Members of the Settlement Agreement pursuant to the Court-approved Plan of Notice. Recognizing that the Court may make changes to the Parties' agreed-upon Notice, Defendant shall be provided with the form of Notice approved by the Court no later than five (5) court days before the Notice is first mailed to Class Members. Any costs for such Notice shall be borne by Class Counsel, not Defendant. Class Counsel shall be entitled to reimbursement from the Settlement Fund for the costs of such Notice.

3.    Class Counsel shall provide the Defendant with the draft motion for Preliminary Approval and supporting documents at least ten (10) calendar days before it is due to be filed. Defendant shall have the right to propose changes, and Class Counsel shall consider such changes, in good faith, and not unreasonably reject such changes. Defendant will then provide timely notice of such submission pursuant to the Class Action Fairness Act, 28 U.S.C.§ 1715(b).

4.    In the event that the Court grants Preliminary Approval of the Settlement, Class Counsel shall direct the Claims Administrator to provide the Class with Notice as ordered by the Court.

5.    If the Court denies the motion for Preliminary Approval without leave to re-file, and either no appeal is taken or an appeal is taken and the denial is affirmed, the Action will proceed as if no settlement had been attempted, and the Settling Parties shall be returned to their respective procedural postures, *i.e.*, the *status quo* as of March 2, 2025, so that the Settling Parties may take such litigation steps that the Settling Parties otherwise would have been able to take absent the pendency of this Settlement Agreement.  In such event, the Settling Parties will negotiate and

9

submit for Court approval a revised case schedule for any trial-related events previously scheduled for dates following March 2, 2025.

      **C.**      <u>**Objections**</u>

      1.      Unless the Court provides otherwise, objections to the Settlement, if any, must be submitted in writing, and must include a detailed description of the basis of the objection. Objections must be filed with the Court, with copies served on Class Counsel and Defendant's Counsel, postmarked on or before a date certain to be specified in the Notice, which will be forty-five (45) days after the Notice Completion Date. No one may appear at the Final Approval Hearing for the purpose of objecting to the Settlement without first having filed and served objection(s) in writing postmarked on or before forty-five (45) days after the Notice Completion Date. Only Class Members who did not opt out of the Settlement may object to the terms of the Settlement.

      **D.**      <u>**Class Member Opt-Out**</u>

      1.      The Court certified the Class and provided Class Members with an opportunity to opt out of the Action before deciding summary judgment to avoid one-way intervention. In addition, the Court-approved opt-out notice stated that any Class Members who did not opt out of the Class would be bound by the outcome of the lawsuit, would receive the benefits of any settlement, and would not be able to remove themselves from the Class in the future. The opt out deadline was March 8, 2021. The Settling Parties agree that Class Members will not be provided with an opportunity to opt out of the Settlement. The Settling Parties shall oppose any efforts by a Class Member to opt out or any effort by an objector or other person/entity to challenge the Settlement on the grounds that it does not provide an opportunity to opt out of the Settlement. Each party reserves the right to terminate the Settlement should the Court not follow its prior Orders and instead provide for an additional opportunity to opt out of the Class or the Settlement.

2.      On or before March 8, 2021, certain individuals and entities opted out of the Class; a list of those opt outs is attached as **Exhibit A** hereto.

        **E.      Final Approval**

1.      The Final Approval Hearing shall be scheduled for no earlier than ninety-five (95) days from the hearing date for the motion for Preliminary Approval to allow the Court time to review and adjudicate the motion for Preliminary Approval, to allow Defendant sufficient time to complete its obligations under the Class Action Fairness Act, and to allow for Notice to be issued and for the deadline for filing objections to expire. Plaintiffs shall submit a motion to the Court for Final Approval of the Settlement and the entry of an order granting Final Approval of the Settlement and request that the Court, after inquiry:

        a.      finds the Settlement and its terms to be fair, adequate, and reasonable within the meaning of Federal Rule of Civil Procedure 23, and directs its consummation pursuant to its terms;

        b.      finds that the Notice given constitutes due, adequate, and sufficient notice, and meets the requirements of due process and any applicable laws;

        c.      provides for payment of any Attorneys' Fees and Expenses solely from the Settlement Fund (as provided in Section VII herein);

        d.      approves payment of service awards for Plaintiffs from the Settlement Fund (as provided in Section VII herein);

        e.      sets forth the method for allocating the Settlement Fund (set forth in the Plan of Distribution as provided in Section V herein);

        f.      directs the Action to be dismissed with prejudice as to Defendant, without costs to the Settling Parties (except as provided in Section VII herein) and provides that all costs including those provided in Section VII are payable from the Settlement Fund only;

11

       g.     approves the release of claims specified herein as binding and effective as to all Class Members, permanently barring and enjoining Plaintiffs and Class Members from asserting any Released Claims (as defined in Section VI herein);

       h.     reserves to this Court exclusive and continuing jurisdiction over the Settlement, including the Settlement Fund (as defined in Section III herein) and the administration, consummation and interpretation of this Settlement Agreement; and

       i.     directs an Order and Final Judgment of Dismissal be entered.

2.     Class Counsel shall provide the Defendant with the draft motion for Final Approval and supporting documents at least ten (10) calendar days prior to the date such motion is filed. Sutter shall have the right to propose reasonable changes, and the Plaintiffs shall consider such changes, in good faith, and not unreasonably reject such changes.

3.     If required by the Court in connection with approval of the Settlement, the Settling Parties agree to accept non-material changes to this Settlement Agreement. However, the Settling Parties are not obligated to accept any changes to the Settlement Fund amount, any material changes to the Final Judgment and Order, or any other substantive changes to the material terms of this Settlement Agreement.

4.     The Claims Administrator's affidavit of compliance with Notice shall be filed with the motion for Final Approval.

      **F.**    **Effective Date of the Settlement**

1.     The Settlement shall become final and effective upon the occurrence of all of the following ("Effective Date"):

       a.     The Court enters an order granting Final Approval of the Settlement Agreement;

       b.     The Court enters the Final Judgment and Order of dismissal of the Action, with prejudice, substantially in the form attached as **Exhibit B** hereto, without costs to the Settling

Parties (except as provided in Section VII herein) and provided that all costs including those provided in Section VII are payable from the Settlement Fund only; and

        c.      Completion of any appeal(s) from the Court's Final Judgment and Order of dismissal with prejudice and/or Order granting Final Approval of the Settlement Agreement (including any such order on remand from a decision of an appeals court), provided, however, that a modification or reversal on appeal of any amount of the Attorneys' Fees and Expenses awarded by the Court from the Settlement Fund or the amount of any service awards to the Plaintiffs shall not by itself prevent this Settlement from becoming final and effective if all other aspects of the Final Judgment and Order and the Final Approval order have been affirmed or not appealed. If no appeal is filed from the Court's Final Judgment and Order and/or Final Approval of the Settlement, the Effective Date shall be the date on which the time for any such appeal has expired.

## III.    CONSIDERATION FOR SETTLEMENT

### A.    Settlement Fund

1.      Within twenty (20) calendar days from the date of the Court's order granting Final Approval, whether or not Final Approval is appealed, Sutter shall deposit or cause to be deposited by wire transfer to an Escrow Agent approved by the Court a total of two hundred twenty-eight million, five hundred thousand dollars ($228,500,000) ("Settlement Fund") in exchange for the promises, covenants, and provisions set forth herein, including without limitation dismissal of the entire Action with prejudice, complete release of all Released Claims against Defendant and the Released Parties, release of any claim for Attorneys' Fees and Expenses, costs, interest (pre- and post-judgment interest), administrative costs, and any and all amounts to be paid to Class Members other than from the Settlement Fund. Under no circumstance shall Sutter be required to pay more than this amount, *i.e.*, the Settlement Fund is the maximum amount that Sutter shall be required to pay that is in any way associated with the Settlement of the Action. Sutter's transfer of the

Settlement Fund to the Escrow Agent shall constitute full and complete satisfaction of its monetary

obligations under this Settlement and to settle the Action. Sutter shall not be required to provide

any other relief, including without limitation injunctive relief. Sutter shall have no obligation to pay

any amounts in addition to the amount of the Settlement Fund, which will cover any and all forms

of monetary relief to settle the Action, including without limitation any and all compensation to the

Class, any service awards, fees and costs of the Class Administrator, Attorneys' Fees and Expenses,

litigation and court costs (including expert, consultant, or witness fees), and all other fees and

expenses arising out of or related to the Action, including without limitation any costs incurred

relating to objections filed to the Settlement. Sutter shall have no obligation to compensate

Plaintiffs or others who might assert rights under this Settlement Agreement for Attorneys' Fees or

Expenses or costs, including for the fees and costs to enforce the terms of this Settlement including

the Final Judgment and Order. No portion of the Settlement Fund will revert to Defendant unless

the Settlement is terminated, as described in Section VIII.C, or is not finally approved or does not

become effective for any reason. Except as provided in this Agreement or by Order of the Court, no

Defendant, Plaintiff or Class Member shall have any interest in the Settlement Fund or any portion

thereof.

     2.       The Escrow Agent will deposit the Settlement Fund in an interest-bearing account

created pursuant to an Order of the Court (the "Account"). The Settlement Fund shall be deemed

and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of

the Court until it has been fully disbursed pursuant to orders of the Court. The Settling Parties agree

to treat the Settlement Fund as being, at all times, a "qualified settlement fund" within the meaning

of Treas. Reg. § 1.468B-1 and to refrain from taking any action inconsistent with such treatment.

For the purpose of § 468B of the Internal Revenue Code of 1986, as amended, and the regulations

promulgated thereunder, the "administrator" shall be the Escrow Agent and shall promptly take all

steps necessary so that the Settlement Fund qualifies as a "qualified settlement fund" within the meaning of Treas. Reg. § 1.468B-1.

3.      Following Sutter's transfer of the Settlement Fund to the Escrow Agent, Sutter, its counsel, and the Released Parties shall have no liability, obligation, or responsibility with respect to the payment, determination of payments, disbursement, disposition, distribution, or other administration or oversight of the Settlement Fund or Account, and shall have no liability, obligation, or responsibility with respect to any liability, obligation, or responsibility of the Escrow Agent, Claims Administrator, or Class Counsel, including without limitation to liabilities, obligations, or responsibilities arising in connection with the payment, determination of payments, disbursement, disposition, distribution, or other administration or oversight of the Settlement Fund or Account.

4.      The Escrow Agent shall invest the Settlement Fund in interest-bearing instruments backed by the full faith and credit of the United States Government or fully insured by the United States Government or agency thereof, or in money market funds invested in such instruments.

5.      All interest earned by the Settlement Fund in the Escrow Account during the period between the deposit of the Settlement Fund and the Effective Date of the Settlement defined in Section II.F shall be split fifty percent (50%) for the benefit of the Class and fifty percent (50%) for the benefit of Sutter. Sutter shall be paid its fifty percent (50%) share of interest from the Escrow Account within thirty (30) days of the Effective Date. Sutter shall have no liability, obligation, or responsibility for any taxes on interest that is for the benefit of the Class or any reporting requirements relating to such interest. Neither the Class nor Class Counsel shall have any liability, obligation, or responsibility for any taxes on interest that is paid for the benefit of Sutter or any reporting requirements relating to such interest. To the extent interest is awarded on the Court's award of Attorneys' Fees and Expenses, such interest on the award shall accrue for the benefit of

15

Class Counsel from the date of the Court order awarding such Attorneys' Fees and Expenses and interest; for avoidance of doubt, the interest on the award of Attorneys' Fees and Expenses shall not reduce the amount of interest on the Settlement Fund owed to Sutter.

6.      If Defendant or any Released Party asserts it has incurred any tax liability, or any interest or penalties imposed on such tax liability, resulting from income earned on the Settlement Fund or the Account for the benefit of the Class or payments made from the Account for the benefit of the Class (or any Class Member's receipt of any payment under this Section III.A), the Defendant or the Released Party shall promptly notify Class Counsel in writing to afford Class Counsel a reasonable opportunity to investigate, dispute and/or pay such asserted tax liability, interest, or penalties. No payment shall be made to Defendant or the Released Party until resolution of Class Counsel's investigation or dispute of any asserted tax liability, interest, or penalties. Upon resolution of any such investigation or dispute, if funds are owed to Defendant or the Released Party the funds shall be reimbursed from the Account in the amount of such tax liability, interest, or penalties promptly and in no event later than ten (10) calendar days after Defendant's or any Released Party's written request to the Claims Administrator and Class Counsel.

7.      Unless the Parties otherwise agree, in the event that the Court issues an order giving Final Approval of this Settlement, but an appellate court later reverses such order, the Settlement Fund, and all interest earned thereon, shall be paid to Sutter within ten (10) calendar days of such order.

## IV.    INJUNCTIVE RELIEF

Given the injunctive relief provided for in *California ex rel. Xavier Becerra v. Sutter Health*, CGC-18-565398 (Cal. Super. Ct. S.F. *filed* March 29, 2018) no injunctive relief is included in this Settlement.

V.    **ADMINISTRATION AND DISTRIBUTION OF SETTLEMENT FUND**

A.    **Administration, Allocation, and Distribution**

1.    Class Counsel shall be solely responsible for the administration of claims, and all costs of administration shall be paid for by the Settlement Fund. Sutter shall have no liabilities, obligations, or responsibilities with respect to the administration, oversight, disbursement, disposition, or distribution of the Settlement Fund. To avoid doubt, all expenses and costs of administration shall be payable solely out of the Settlement Fund in such amounts as the Court orders. Sutter shall have no liability or responsibility for fees, costs, expenses, or interest, including without limitation Attorneys' Fees and Expenses, costs, expert or witness fees, consultant fees or costs, or administrative fees or costs.

2.    The claims administration process shall be determined by Class Counsel in consultation with the Claims Administrator and shall be approved by the Court. Class Counsel shall propose an allocation formula that will provide for allocation of the net Settlement Fund, after Attorneys' Fees and Expenses and other costs are deducted, to the Class Members, which shall be approved by the Court ("Plan of Distribution").

3.    Any unredeemed distributions to Class Members shall be redistributed to the other Class Members in a second distribution according to the Plan of Distribution.

4.    Class Counsel shall be responsible for determining the monetary award that shall be paid to each eligible Class Member, which shall be approved by the Court. Under the supervision of Class Counsel, the Claims Administrator shall, among other things, confirm the identity of each eligible Class Member based on the methodology set forth in the Plan of Distribution as approved by the Court. As will be reflected in the Final Approval order, Defendant and the Released Parties shall have no responsibility, and may not be held liable, for any determination reached by Class Counsel or the Claims Administrator.

17

5.      The total amount of all monetary awards paid to Class Members, as determined by the Claims Administrator, shall not exceed the net amount of the Settlement Fund (including accrued interest) after all costs, expenses, service awards, Attorneys' Fees and Expenses, and taxes have been paid by the Claims Administrator.

6.      If, after the second distribution to Class Members and after all costs (including notice costs and Attorneys' Fees and Expenses) have been paid from the Settlement Fund, there are any remaining funds, they shall be distributed to the Class, or, if in Class Counsel's reasonable judgment it is uneconomical to distribute the remaining funds to Class Members, Class Counsel will make an application to the Court for *cy pres* distribution in accordance with governing standards in the Ninth Circuit, provided that the funds are not used for advocacy or litigation against Defendant. None of the Settlement Fund shall revert to Defendant.

**B.      Payment of Federal, State and Local Taxes**

1.      Payments to Plaintiffs and other Class Members (or their counsel or others) from the Settlement Fund may be subject to applicable tax withholding and reporting requirements. For avoidance of doubt, neither Sutter, its counsel, nor any Released Party shall have any liability, obligation or responsibility whatsoever for tax obligations arising from payments from the Settlement Fund to Plaintiffs, any Class Member, or any other person or entity based on the activities and income of the Account. In addition, neither Sutter nor any Released Party shall have any liability, obligation or responsibility whatsoever for tax obligations arising from payments to Class Counsel. Each recipient of payments from the Settlement Fund will be solely responsible for its/his/her tax obligations.

2.      The Claims Administrator shall be responsible for satisfying from the Settlement Fund any and all federal, state, and local taxes incurred on interest that accrues in the Account for the benefit of Plaintiffs, any Class Member, or Class Counsel. The Claims Administrator, as

administrator of the Account, and on behalf of the Account, is responsible for withholding any applicable taxes and completing all reporting requirements for payments made to Plaintiffs, any Class Member, or Class Counsel. Sutter shall be responsible for determining and paying from its own funds all federal, state, and local taxes due on interest that accrues in the Account for the benefit of Sutter.

## VI.    RELEASE

### A.    Release And Covenant Not To Sue

1.      Upon the Effective Date, Plaintiffs and all Class Members (collectively, the "Releasors"), shall release, forever discharge and covenant not to sue Sutter, its past or present parents, subsidiaries, divisions, affiliates, providers (including, but not limited to, hospitals, foundations, doctors, ambulatory surgery centers and any other providers), officers, directors, employees, agents, attorneys, and any of their legal representatives (and the predecessors, heirs, executors, administrators, successors, purchasers, and assigns of each of the foregoing) (the "Released Parties") from any and all claims, whether federal or state, known or unknown, asserted or unasserted, regardless of legal theory, arising from or related to the facts, activities, or circumstances that were or could have been alleged in the complaints filed by Plaintiffs, including in the Fourth Amended Complaint, or arising from or related to any purported anticompetitive effect resulting from the conduct alleged by Plaintiffs in this Action, including conduct alleged during the first trial of this matter in 2022 ("Release"). Claims within the scope of this Release shall be released up to the Effective Date of this Settlement.  Claims released pursuant to this paragraph are the "Released Claims."

2.      Each Releasor expressly agrees that, upon the Effective Date, he, she, or it waives and forever releases with respect to the Released Claims any and all provisions, rights, and benefits conferred by either (a) § 1542 of the California Civil Code, which reads:

**SECTION 1542. GENERAL RELEASE; EXTENT. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

or (b) any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code.

3.    Upon the Effective Date, Releasors shall be bound by the dismissal with prejudice and the release of the Released Claims set forth in this Section VI.

## VII.    ATTORNEYS' FEES AND EXPENSES AND ADMINISTRATIVE EXPENSES

1.    Class Counsel will apply to the Court for an award of Attorneys' Fees and Expenses incurred in this Action. Class Counsel also will apply to the Court for service awards to acknowledge Plaintiffs' service to the Class in participating in the litigation as representatives. All Attorneys' Fees and Expenses and any interest due to counsel (to the extent any interest is awarded) shall be payable solely out of the Settlement Fund in such amounts as the Court orders and may be deducted from the Settlement Fund prior to the distribution to Class Members, but only on or after entry of an Order by the Court approving Attorneys' Fees and Expenses. Neither Sutter nor any Released Party shall have any liability or responsibility for fees, costs, expenses, or interest, including without limitation to attorneys' fees, costs, expenses, expert fees, consultant fees or costs, or administrative fees or costs, which will be paid solely out of the Settlement Fund.

2.    The Settling Parties agree that Lead Class Counsel, Constantine Cannon LLP, no fewer than five (5) days following the Court's award of Attorneys' Fees and Expenses, may request permission from the Court to withdraw the amount awarded by the Court for Attorneys' Fees and Expenses for any Class Counsel or Additional Counsel, or any portion thereof, from the Settlement Fund before the Effective Date. The Settling Parties agree that the Court may not permit any such

20

pre-Effective Date withdrawal until after (a) Final Approval has been granted, and (b) the time for all appeals – with the sole exception of any appeals that solely challenge the amount of Attorneys' Fees and Expenses awarded by the Court – has expired. To be clear, the Court may permit Lead Class Counsel to withdraw awarded Attorneys' Fees and Expenses before the Effective Date where Final Approval has been granted and despite any pending appeals, where such appeals exclusively challenge the amount of Attorneys' Fees and Expenses awarded by the Court. But if Final Approval has not yet been granted, or if there are any pending appeals or collateral attacks that challenge any aspect of the Settlement other than the amount of Attorneys' Fees and Expenses awarded by the Court, then no such withdrawal may occur or be ordered by the Court. Any order permitting Lead Class Counsel to withdraw Attorneys' Fees and Expenses from the Settlement Fund before the Effective Date shall require Class Counsel or Additional Counsel to make appropriate refunds or repayments of amounts paid to that Class Counsel or Additional Counsel to the Settlement Fund if the Attorneys' Fees and Expenses are reduced or reversed on appeal. Class Counsel and Additional Counsel to whom Attorney's Fees or Expenses have been paid shall defend, indemnify, and hold harmless Sutter and the Released Parties from and against any rights, demands, claims, or causes of action asserted by any person or entity arising out of or related to such refunds or repayments to the Settlement Fund.

## VIII.  <u>OTHER CONDITIONS</u>

### A.    <u>Confidentiality</u>

The terms of this Settlement Agreement shall remain confidential until Plaintiffs file their motion for Preliminary Approval. The Settling Parties may, however, confidentially disclose the terms of the Settlement before Plaintiffs file their motion for Preliminary Approval to their auditors, legal and financial advisers, and, as to Sutter, as otherwise required by law or contract so long as parties receiving the terms agree in writing not to disclose terms to third parties.

Notwithstanding, Sutter may disclose the amount of the Settlement in its financial statements.

**B.    <u>Press Release</u>**

Upon submission of this Settlement Agreement for Preliminary Approval by the Court, Plaintiffs and Sutter will issue the following joint press release regarding the Settlement: "Sutter Health and Plaintiffs Djeneba Sidibe, Jerry Jankowski, Susan Hansen, David Herman, Optimum Graphics, Inc., and Johnson Pool & Spa, on behalf of themselves and a certified class of similarly situated persons, have reached a settlement of *Sidibe, et al. v. Sutter Health*, a class action antitrust lawsuit. The settlement resolves strongly disputed claims involving alleged conduct spanning from the late 1990s to 2020. The parties agree this settlement is what's best for the parties, for patients and for the class, and that the prospect of additional litigation is not in anyone's interest. There is no admission of liability, and the settlement is subject to court approval."

**C.    <u>Settlement Does Not Become Effective</u>**

In the event that the Settlement Agreement is terminated, is not finally approved or does not become effective for any reason, judgment is not entered in accordance with this Agreement, or such judgment does not become final, then (a) this Settlement Agreement shall be null and void and of no force and effect, (b) the entire amount of the Settlement Fund and any and all interest earned thereon shall be returned to the Defendant within ten (10) calendar days from the date the Settlement Agreement becomes null and void, and (c) any and all releases pursuant to Section VI herein shall be of no force or effect.  In such event, the case will proceed as if no settlement has been attempted, and the Settling Parties shall be returned to their respective procedural postures, *i.e.*, *status quo* as of March 2, 2025, so that the Settling Parties may take such litigation steps that they otherwise would have been able to take absent the pendency of this Settlement.  In such event, the Settling Parties will negotiate and submit for Court approval a revised case schedule for any trial-related events previously scheduled for dates following March 2, 2025.  However, any

reversal, vacating, or modification on appeal of (a) any amount of Attorneys' Fees and Expenses awarded by the Court to Class Counsel and Additional Counsel, or (b) any determination by the Court to award less than the amount requested in Attorneys' Fees and Expenses, shall not give rise to any right of termination or otherwise serve as a basis for termination of this Settlement Agreement.

D.    **Preservation of Rights**

The Settling Parties expressly reserve all of their rights, claims, and defenses if this Settlement does not become final and effective in accordance with the terms of this Settlement Agreement. The Settling Parties further agree that this Settlement Agreement, whether or not it shall become effective pursuant to Section II.F herein, and any and all negotiations, documents, and discussions associated with it, shall be without prejudice to the rights of any party; shall not be deemed or construed to be an admission or evidence of any violation or lack of violation of any statute or law; shall not be deemed to be an admission of any liability or wrongdoing by Defendant or any Released Party; and shall not be deemed or construed to be an admission or evidence of the truth of any of the claims or allegations or denials or defenses made in the Action, whether in this case or any other action or proceeding. The Settling Parties further acknowledge and agree that the substance of the negotiations and discussions that led to this Settlement are fully protected from disclosure by Federal Rule of Evidence 408 and California Evidence Code §§ 1119 and 1152.

E.    **Authority to Settle**

The undersigned represent and warrant each has authority to enter into this Settlement Agreement on behalf of the party indicated below his or her name.

F.    **No Assignment**

Plaintiffs and Class Counsel represent and warrant that they have not assigned or

transferred, or purported to assign or transfer, to any person or entity, any claim or any portion thereof or interest therein, including, but not limited to, any interest in the Action or any related action, and they further represent and warrant that they know of no such assignments or transfers on the part of any Class Member.

### G.    Binding Effect

This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Settling Parties and the Released Parties.

### H.    Mistake

In entering and making this Settlement Agreement, the Settling Parties assume the risk of any mistake of fact or law.  If the Settling Parties, or any of them, should later discover that any fact they relied upon in entering into this Settlement Agreement is not true, or that their understanding of the facts or law was incorrect, the Settling Parties shall not be entitled to seek rescission of this Settlement Agreement, or otherwise attack the validity of the Settlement Agreement, based on any such mistake.  This Settlement Agreement is intended to be final and binding upon the Settling Parties regardless of any mistake of fact or law.

### I.    Advice of Counsel

Except as set forth in this Settlement Agreement, the Settling Parties represent and warrant that they have not relied upon or been induced by any representation, statement, or disclosure of the other Settling Parties or their attorneys or agents, but have relied upon their own knowledge and judgment and upon the advice and representation of their own counsel in entering into this Settlement Agreement.  Each Settling Party warrants to the other Settling Parties that it has carefully read this Settlement Agreement, knows its contents, and has freely executed it.  Each Settling Party, by execution of this Settlement Agreement, represents that it has been represented by independent counsel of its choice throughout all negotiations preceding

the execution of this Settlement Agreement.

**J.     Integrated Agreement**

This Settlement Agreement, including exhibits, contains the entire, complete, and integrated statement of each and every term and provision of this Settlement Agreement agreed to by and among the Settling Parties. This Settlement Agreement shall not be modified in any respect except by a writing executed by the undersigned in the representative capacities specified, or others who are authorized to act in such representative capacities.

**K.     Headings**

The headings used in this Settlement Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Settlement Agreement.

**L.     No Drafting Presumption**

Class Counsel and Defendant's Counsel have materially participated in the drafting of this Settlement Agreement. No party hereto shall be considered to be the drafter of this Settlement Agreement or any provision hereof for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

**M.     Choice of Law**

All terms of this Settlement Agreement shall be governed by and interpreted according to the substantive laws of the State of California without regard to its choice of law or conflict of laws principles.

**N.     Enforcement of Settlement; Consent to Jurisdiction and Choice of Exclusive Forum**

Any and all disputes arising from or related to this Settlement, the Settlement Agreement, the Final Judgment and Order or distribution of the Settlement Fund, including Attorneys' Fees and Expenses, must be brought by Plaintiffs, Class Members, Sutter, or a Released Party, exclusively in the Court presiding over the Action. Plaintiffs, each Class Member, and Sutter hereby irrevocably

submit to the exclusive and continuing jurisdiction of the Court for any suit, action, proceeding, or dispute arising out of or relating to this Settlement Agreement or the applicability or interpretation of this Settlement Agreement, including without limitation any suit, action, proceeding or dispute relating to the release provisions herein or relating to the Final Judgment and Order, except that this paragraph shall not prohibit any Released Party from asserting in the forum in which a claim is brought that the Release herein is a defense, in whole or in part, to such claim.

### O.    Enforcement of Release

Nothing in this Settlement Agreement prevents Defendant or any Released Party from enforcing or asserting any Release herein.  Notwithstanding any other provision of this Settlement Agreement, this Settlement Agreement and the Releases contained herein may be pleaded as a full and complete defense to any action, suit, or other proceeding that has been or may be instituted, prosecuted or attempted by any Plaintiff or Class Member (who is not otherwise properly excluded as provided herein) with respect to any of the Released Claims and may be filed, offered, and received into evidence and otherwise used for such defense.

### P.    Severability

In the event any one or more of the provisions of this Settlement Agreement shall for any reason be held, after any proceedings in appellate courts, to be illegal, invalid, or unenforceable in any respect, such illegality, invalidity, or unenforceability shall not affect any other provision if Defendant's Counsel and Class Counsel mutually agree in writing to proceed as if such illegal, invalid, or unenforceable provision had never been included in the Settlement Agreement.

### Q.    Denial of Liability and No Admission

The Settlement is not an admission of any of the allegations, and Sutter has denied, and continues to deny, that it has engaged in any wrongdoing of any kind, or violated any law or regulation, or breached any duty to Plaintiffs or Class Members. Sutter further denies that it has

liability as a result of any and all allegations that were or could have been asserted arising out of or relating to the allegations in the complaints filed in the Action, and is entering the Settlement to eliminate the burden, distraction, expense, and uncertainty of further litigation.

**R.    Execution in Counterparts**

This Settlement Agreement may be executed in counterparts.  Facsimile or PDF signatures shall be considered as valid signatures as of the date they bear.

**S.    Appeals**

The Final Approval order shall provide that any Class Member that wishes to appeal the Court's Final Approval order or Final Judgment and Order, which appeal will delay the distribution of the Settlement Fund to the Class and/or the effective date of the Final Judgment and Order, shall post a bond with this Court in an amount to be determined by the Court as a condition of prosecuting such appeal.

**T.    Representations to the Court About Settlement Negotiations**

The Settling Parties confirm, and will so represent to the Court, that these settlement negotiations were arm's-length and facilitated through the aid of the mediator described above, and that there was no discussion of attorneys' fees or expenses prior to or in the course of negotiating the Settlement.  Class Counsel and Defendant's Counsel agree this Settlement is beneficial to the Class and Sutter and will not represent otherwise to the Court.

IN WITNESS WHEREOF, the Settling Parties hereto through their fully authorized representatives have agreed to this Settlement Agreement on the date first herein above written.

**ACCEPTED AND AGREED**:

Dated:  April  24, 2025

**JONES DAY**

By: _____
David C. Kiernan
Counsel for Defendant Sutter Health


**SUTTER HEALTH**


By: _____
Jonathan Ma
Interim Chief Financial Officer
Sutter Health


**CONSTANTINE CANNON LLP**


By: _____
Jean Kim
Lead Counsel for Plaintiffs and the Class


**THE MEHDI FIRM, PC**


By: _____
Azra Mehdi
Co-Lead Counsel for Plaintiffs and the Class

**ACCEPTED AND AGREED:**

Dated:  April 14, 2025

                                                      **JONES DAY**

By: _____
                David C. Kiernan
                Counsel for Defendant Sutter Health

                **SUTTER HEALTH**

By: _____
                Jonathan Ma
                Interim Chief Financial Officer
                Sutter Health

                **CONSTANTINE CANNON LLP**

By: _____
                Jean Kim
                Lead Counsel for Plaintiffs and the Class

                **THE MEHDI FIRM, PC**

By: _____
                Azra Mehdi
                Co-Lead Counsel for Plaintiffs and the Class

**ACCEPTED AND AGREED:**

Dated:  April __, 2025

**JONES DAY**

By: _____
     David C. Kiernan
     Counsel for Defendant Sutter Health

**SUTTER HEALTH**

By: _____
     Jonathan Ma
     Interim Chief Financial Officer
     Sutter Health

**CONSTANTINE CANNON LLP**

By: _____
     Jean Kim
     Lead Counsel for Plaintiffs and the Class

**THE MEHDI FIRM, PC**

By: _____
     Azra Mehdi
     Co-Lead Counsel for Plaintiffs and the Class

28

**ACCEPTED AND AGREED:**

Dated:  April__, 2025

**JONES DAY**

By: _____
David C. Kiernan
Counsel for Defendant Sutter Health

**SUTTER HEALTH**

By: _____
Jonathan Ma
Interim Chief Financial Officer
Sutter Health

**CONSTANTINE CANNON LLP**

By: _____
Jean Kim
Lead Counsel for Plaintiffs and the Class

**THE MEHDI FIRM, PC**

By: _____
Azra Mehdi
Co-Lead Counsel for Plaintiffs and the Class

28

# EXHIBIT A



***Sutter Health Litigation***

USDC Northern District of California, Case No. 3:12-cv-4854-LB

**Report of Opt-Outs (as of March 8, 2021)**

| ID | FIRST NAME | LAST NAME |
|----|------------|-----------|
| 1 | JULIE | AARON |
| 2 | DEBORAH D | ABBADIE |
| 3 | KIM R | ALEMAN |
| 4 | EDGAR | ANDERSON |
| 5 | DALE | ANDERSON |
| 6 | JAY T | ARNETT |
| 7 | FANY | ASHER |
| 8 | JANET | AUSTIN |
| 9 | KELSEY VOELZ | BAKER |
| 10 | JOSE L | BALTA SILVA |
| 11 | RICHARD L | BARNES |
| 12 | GLORIA | BEASLEY |
| 13 | ELIZABETH | BEASLEY |
| 14 | LINDA A | BEATTY |
| 15 | SANDA | BENLIEN |
| 16 | JOANNE | BENNETT |
| 17 | AGATHE | BERANGER |
| 18 | MANUEL C | BERGADO |
| 19 | MICHAEL H. | BIEN |
| 20 | JULIAN A | BIGGS |
| 21 | CYNTHIA | BINYON |
| 22 | PATRICIA L | BOETSCH |
| 23 | TERRI L | BOTHELIO |
| 24 | NANCY | BOYD |
| 25 | DOUGLAS | BRENN |
| 26 | DAVID | BRINTON |
| 27 | WILLIAM H | BROWN |
| 28 | GREGORY J | BURI |
| 29 | VELEDA | BURTON |
| 30 | KRISTINA | BUUCK |
| 31 | ESTHER | CALABRESE |
| 32 | EMILY M | CANAFAX |
| 33 | KAREN | CARLL |
| 34 | ERIC | CARLSON |
| 35 | PAUL G | CARRANCO |
| 36 | LYMAN H | CASEY |
| 37 | JOYCE | CASTLES |

1

| ID | FIRST NAME | LAST NAME |
|----|-----------|-----------|
| 38 | PHYLLIS J | CETNAR |
| 39 | CHI | CHANG |
| 40 | SOTHEA | CHENG |
| 41 | MINH N | CHIEM |
| 42 | STEPHANIE A | CHOURY |
| 43 | JAMES | CINQUEMANI |
| 44 | THOMAS D | COLE |
| 45 | MICHAEL D | COLLINS |
| 46 | MICHAEL E | CONKLIN |
| 47 | TERI | COOK |
| 48 | AVRIL M. | COPE |
| 49 | ELISE | COPELAND |
| 50 | JOHN | COSTA |
| 51 | PAMELA M | COUTO |
| 52 | CLAIRE E | CRABTREE |
| 53 | RICHARD | DALE |
| 54 | LINDA | DAVOOD |
| 55 | APOLINARIA MOLANO | DE BLAS |
| 56 | KATHLEEN G | DETORE |
| 57 | MELANDRO | DIZON |
| 58 | JENNIFER M | DOJKA |
| 59 | MARK | DREIER |
| 60 | ERNEST C | DUHAIME |
| 61 | PATRICIA | DWYER |
| 62 | SYLVIA | EDNEY |
| 63 | MARY E | EDWARDS |
| 64 | DEBORAH | ERIKSSON |
| 65 | MARY | FONG |
| 66 | DONNA | FRY |
| 67 | RANDY | GAPASIN |
| 68 | KATIE F | GARGANO |
| 69 | SABA | GERAMI |
| 70 | DONALD B | GIBSON |
| 71 | SUE | GLOVER |
| 72 | ROBERT S | GLOVER |
| 73 | SUE | GLOVER |
| 74 | SANTIAGO FERNANDEZ | GOMEZ |
| 75 | MARIA | GOMEZ |
| 76 | DAVID | GONZALEZ |
| 77 | PAMELA D | GUTIERREZ |
| 78 | JAMES | HAACK |
| 79 | LYNN K | HAMBLIN |
| 80 | LOUIE M | HANCE |
| 81 | SHIRLEY A | HANCE |
| 82 | ABIGAIL | HASSEL |
| 83 | RORY M | HENDERSON |

| ID | FIRST NAME | LAST NAME |
|---|---|---|
| 84 | EMBERT J | HENDRICKSON |
| 85 | LUISA F | HERNANDEZ |
| 86 | DIEGO | HERNANDEZ |
| 87 | DAVID | HITCHCOCK |
| 88 | JASON | HITCHCOCK |
| 89 | TAN TAI | HUYNH |
| 90 | PASTOR BLAS | ISARIO |
| 91 | SAIF | ISSAC |
| 92 | SONIA | ITURRALDE |
| 93 | GREGORY | JACKSON |
| 94 | MAMOON | JAMILY |
| 95 | EDELMIRO | JIMENEZ |
| 96 | STUART S | JIVAPONGSE |
| 97 | VERONICA | JOHNSON |
| 98 | CAROL D | JORDAN |
| 99 | GIOVANNI MORELLI | JR |
| 100 | MADONNA | KAMPFER |
| 101 | KEITH | KANEDA |
| 102 | JAMES MICHAEL | KECKLER (ON BEHALF OF J M KECKLER MEDICAL CO., INC.) |
| 103 | MARY | KEELIN |
| 104 | ABDALHAMID | KHALLOUF |
| 105 | SHIN YUIN | KHU |
| 106 | PHYLLIS J | KILGORE |
| 107 | IVY | KIM |
| 108 | ROBERT | KIMBALL |
| 109 | RICHARD | KITT |
| 110 | BRUCE | KLAMAN |
| 111 | SUSANNE | KO |
| 112 | MARION E | KODANI |
| 113 | MISAO | KODANI |
| 114 | WILLIAM D | KODANI |
| 115 | PIOTR | KOLESINSKI |
| 116 | MARCIA | KRAM |
| 117 | JULIE | KROPA |
| 118 | SALLY V | KRUEGER |
| 119 | HENRY | LAM |
| 120 | CONG | LAM |
| 121 | MARC | LANUZA |
| 122 | KIMBERLY | LARSON |
| 123 | ZACHARY K | LATTIN |
| 124 | KENNETH | LAU |
| 125 | KATHY J | LEE |
| 126 | CHING | LEE |
| 127 | YOUNGHUN | LEE |

| ID | FIRST NAME | LAST NAME |
|---|---|---|
| 128 | FERRIS Q | LEWALD |
| 129 | ZHEN | LI |
| 130 | XIAO | LIANG |
| 131 | PETER | LIU |
| 132 | QIU | LIU |
| 133 | JEFFREY C | LOCKHART |
| 134 | ADELIA A | LOPES |
| 135 | ADOLPH | LOPEZ |
| 136 | MENDY | LOWE |
| 137 | MENDY J | LOWE |
| 138 | DENISE | LUKO |
| 139 | CRISTINA | LUNA |
| 140 | MARLENE | LYNN |
| 141 | EUDORO AYALA | MACIAS |
| 142 | RODERICK K | MACLEAN |
| 143 | PEARL O | MAR |
| 144 | GERALDINE | MARTINEZ |
| 145 | FLORENCIA CARREROU | MAUROJO |
| 146 | ALAN | MAYER |
| 147 | STEPHEN J | MAZAIKA |
| 148 | ELLEN | MCDONALD |
| 149 | PHILIP | MCLENNAN |
| 150 | CYNTHIA M | MESSER |
| 151 | JUDITH ANN | METTLER |
| 152 | STEVE F | MILLAN |
| 153 | JUDITH I | MILLAN |
| 154 | KATHRYN | MILLER |
| 155 | GEORGINA | MILLER |
| 156 | DARRELL T | MORLEY |
| 157 | STEFANIE | NAIFEH |
| 158 | LENA | NAM |
| 159 | JAYA | NATESH |
| 160 | RAJ | NATESH |
| 161 | CATHERINE | NELSON |
| 162 | CYNTHIA | NEUMANN |
| 163 | TAM | NGUYEN |
| 164 | CHARLES | NGUYEN |
| 165 | TERUKO | NISHIKAWA |
| 166 | DAVID | NISHIKAWA |
| 167 | PETER | NIXON |
| 168 | NONA | NOROYAN |
| 169 | JAMES C | OCONNOR |
| 170 | DAVID | OEUR |
| 171 | JULIO | OJEDA |
| 172 | ELIZABETH C | OLGUIN |
| 173 | RAQUEL CUMERAS | OLMEDA |

| ID | FIRST NAME | LAST NAME |
|----|------------|-----------|
| 174 | ERIN L | OSBORNE |
| 175 | LAWRENCE | OSIRIS |
| 176 | SHOKO | OTSUBO |
| 177 | CHRISTINE E | PARAS |
| 178 | ARETHA | PAULEY |
| 179 | JOSH | PERKINS |
| 180 | TANYA L | PETERS |
| 181 | RANDOLPH E | PETERSEN |
| 182 | SHARON A | PETERSEN |
| 183 | JOHN T | PIETILA |
| 184 | LESLEY | PILLSBURY |
| 185 | TINA | PINTO |
| 186 | JIMMY | PINTO |
| 187 | LEO G. | POLVOROSA |
| 188 | CATHERINE | POON |
| 189 | RAQUEL | RADEN |
| 190 | NITYA | RAJESHUNI |
| 191 | LUCINDA F | RAMOS |
| 192 | WALTER J | RANGEL |
| 193 | ALFRED G | RAVA |
| 194 | LAURA J | RAWSON |
| 195 | CAREN A | RAY |
| 196 | DONALD J | REGO |
| 197 | LYNN D | RICE |
| 198 | KERRY E | ROBERSON |
| 199 | ISABEL | RODRIGUEZ |
| 200 | DAVID | ROGERS |
| 201 | JOAQUIN PENUNURI | ROMERO |
| 202 | JOSE | ROMERO |
| 203 | TOM | ROSS |
| 204 | IGNAZIO J | RUVOLO |
| 205 | DAVID | SALOMON |
| 206 | ROSEMARY | SAMANIEGO |
| 207 | CHRIS | SANCHEZ |
| 208 | LINDA | SAVIN |
| 209 | DESIREE N | SAYLES |
| 210 | GEOFFREY | SCAMMELL |
| 211 | CYNTHIA | SCHAIRER |
| 212 | STEVEN | SCHOCH |
| 213 | JULIA M | SCHUMACHER |
| 214 | JASON | SEWARD |
| 215 | CLAUDIA | SHORTZ |
| 216 | ROBERT A | SINCLAIR |
| 217 | DARSHAN | SINGH |
| 218 | BRIAN | SINGH |
| 219 | BOBBY | SIRON |

| ID | FIRST NAME | LAST NAME |
|----|------------|-----------|
| 220 | CARL B | SPECKMAN |
| 221 | ANANYA | SREEKANTH |
| 222 | SHELBY J | STENTZEL |
| 223 | SASHA | STRAM |
| 224 | TAMEKA R | STRONG |
| 225 | TADASHI | SUZUKI |
| 226 | MARK | SZUREK |
| 227 | AKSHAYA | TANKASALA |
| 228 | DIANE L | TAYLOR |
| 229 | BENJAMIN J | TEICHMAN |
| 230 | JANET S | TERRY |
| 231 | WAYNE | TESTORI |
| 232 | JOHN | TEVENAN |
| 233 | PAUL C | THOMPSON |
| 234 | MARK P | TILLOTSON |
| 235 | DAVID | TOLBERT |
| 236 | JUDY L | TOMSIC |
| 237 | VERONICA RUIZ | TORRES |
| 238 | LYNN L | TOVEG |
| 239 | KOJI | TSUNODA |
| 240 | NAIL | UMIAROV |
| 241 | SAYRA | VALDERRAMA |
| 242 | DELIA | VALENZUELA |
| 243 | BONNIE L | VANDER PLATE |
| 244 | GLENN H | VANDER PLATE |
| 245 | JUAN F | VELASCO |
| 246 | GILBERTO | VELAZCO |
| 247 | ROBERT F | VENTEICHER |
| 248 | CHONG S | VENTEICHER |
| 249 | CAROLINA L | VISCOGLIOSI |
| 250 | TAMARA | WALKER |
| 251 | DAVID A | WALLANDER |
| 252 | BARBARA L | WAMPNER |
| 253 | CAROL L | WEINFELD |
| 254 | REBECCA J | WESTERFIELD |
| 255 | AMELIA | WHITE |
| 256 | EUGENIA | WHITLOCK |
| 257 | LU | WISNIEWSKI |
| 258 | GARRETT R | WYNNE |
| 259 | JING-WEN | YANG |
| 260 | ASENA CANSU | YILDIZ |
| 261 | RACHEL | ZACK |

# EXHIBIT B

1   Jeffrey A. LeVee (State Bar No. 125863)          Oliver Q. Dunlap (State Bar No. 225566)
    jlevee@jonesday.com                              odunlap@bartkolaw.com
2   JONES DAY                                        BARTKO LLP
    555 South Flower Street, Fiftieth Floor          1100 Sansome Street
3   Los Angeles, CA  90071                           San Francisco, CA  94111
    Telephone:   213.489.3939                        Telephone:  415.956.1900
4   Facsimile:   213.243.2539                        Facsimile:    415.956.1152

5   David C. Kiernan (State Bar No. 215335)
    dkiernan@jonesday.com
6   Caroline N. Mitchell (State Bar No. 143124)
    cnmitchell@jonesday.com
7   Brian G. Selden (State Bar No. 261828)
    bgselden@jonesday.com
8   Catherine Zeng (State Bar No. 251231)
    czeng@jonesday.com
9   JONES DAY
    555 California Street, 26th Floor
10  San Francisco, CA  94104
    Telephone:   415.626.3939
11  Facsimile:   415.875.5700

12  Attorneys for Defendant
    SUTTER HEALTH

13

14                          UNITED STATES DISTRICT COURT

15                         NORTHERN DISTRICT OF CALIFORNIA

16                              SAN FRANCISCO DIVISION

17

18  DJENEBA SIDIBE, et al.,              Case No. 3:12-CV-04854-LB

19                 Plaintiffs,           **[PROPOSED] FINAL JUDGMENT AND
                                         DISMISSAL**
20         v.

21  SUTTER HEALTH,

22                 Defendant.

23

24

25

26

27

28

1      The Court hereby enters final judgment in this action as between Plaintiffs and Defendant

2  Sutter Health, as defined in Federal Rule of Civil Procedure 58(a). Pursuant to this Final

3  Judgment:

4      1.  All Released Claims of Plaintiffs and the Class are hereby released as against

5  Defendant and all other Released Parties as defined in the Settlement.

6      2.  Without effecting the finality of the Court's judgment in any way, the Court

7  retains jurisdiction over this matter for the purposes of resolving issues related to the

8  interpretation, administration, implementation, effectuation and enforcement of the Settlement.

9      3.  The parties and the Class Administrator are hereby ordered to comply with the

10  terms of the Settlement.

11      4.  This action is dismissed with prejudice as against the Defendant, each side to bear

12  its own costs, expenses and attorneys' fees except as provided by the Settlement and the Court's

13  orders.

14      5.  This document constitutes a final judgment and separate document for purposes of

15  Federal Rule of Civil Procedure 58(a).

16      6.  The Court finds, pursuant to Rules 54(a) and (b) of the Federal Rules of Civil

17  Procedure, that this Final Judgment should be entered and that there is no just reason for delay in

18  the entry of this Final Judgment as to Plaintiffs and the Class and Defendants.

19      7.  Accordingly, the Clerk is hereby directed to enter Judgment forthwith.

20      8.  The Clerk shall close the case file.

21

22

23  Dated:

24  _____

      Hon. Laurel Beeler
      UNITED STATES DISTRICT COURT

25

26

27

28

NAI-1543472493v1

# EXHIBIT B

CONSTANTINE CANNON LLP
JEAN KIM (*pro hac vice*)
6 East 43rd Street, 26th Floor
New York, NY 10017
(212) 350-2700
(212) 350-2701 (fax)
jkim@constantinecannon.com

*Lead Counsel for Plaintiffs and the Class*

THE MEHDI FIRM, PC
AZRA Z. MEHDI (220406)
95 Third Street
2nd Floor #9122
San Francisco, CA 94103
(415) 293-0070
(415) 293-0070 (fax)
azram@themehdifirm.com

*Co-Lead Counsel for Plaintiffs and the Class*

SHINDER CANTOR LERNER LLP
MATTHEW L. CANTOR (*pro hac vice*)
ELLISON A. SNIDER (*pro hac vice*)
14 Penn Plaza, Ste. 1900
New York, NY 10122
(646) 960-8601
matthew@scl-llp.com
esnider@scl-llp.com

JAMES J. KOVACS (*pro hac vice*)
J. WYATT FORE (*pro hac vice*)
600 14th St NW, 5th Floor
Washington DC 20005
(646) 960-8601
james@scl-llp.com
wyatt@scl-llp.com

(*Additional counsel listed on signature page*)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DJENEBA SIDIBE, JERRY JANKOWSKI, SUSAN HANSEN, DAVID HERMAN, OPTIMUM GRAPHICS, INC., and JOHNSON POOL & SPA, on Behalf of Themselves and All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>    vs.<br><br>SUTTER HEALTH,<br><br>                Defendant. | Case No. 3:12-cv-4854-LB<br><br>**[PROPOSED] PLAN OF DISTRIBUTION**<br><br>Date:  May 22, 2025<br>Time: 9:30 AM<br>Judge: The Honorable Laurel Beeler |

# Table Of Contents

I.    INTRODUCTION ........................................................................................1

II.   DISTRIBUTION OF THE NET SETTLEMENT FUND .......................................2

III.  DISTRIBUTION OF THE NET SETTLEMENT FUND.......................................5
      A.    Group/Employee Allocation Process ...........................................6
            = Unallocated Employee Premium for employee X during year Y ...........................7
      B.    Allocations Where a Group Purchases Health Plans on Behalf of Employer
            Groups...............................................................................11

IV.   MINIMUM VALUE OF DISTRIBUTIONS FROM NET SETTLEMENT FUND ..............12

V.    AUTHORIZED CLAIMANT REVIEW OF TOTAL PREMIUMS PAID ..........................13

VI.   RESIDUAL FUNDS...................................................................13

I.    **INTRODUCTION**

1.    This [Proposed] Plan of Distribution ("Plan of Distribution" or "Plan") shall govern the distribution of the Settlement Fund provided for by the settlement reached between the Plaintiffs, on behalf of the certified Class, and Defendant Sutter Health ("Sutter") in the above-captioned case ("Settlement Agreement" or "Settlement", attached as Exhibit A to Plaintiffs' Motion for Preliminary Approval of Class Settlement).[1] This Plan is referenced at pages 7-8, 11, and 17 of the Settlement Agreement, and is subject to Court approval.

2.    All capitalized terms used in this Plan of Distribution shall have the same meaning as provided for in the Settlement Agreement, unless expressly stated otherwise.

3.    As set forth in section III.A.1. of the Settlement Agreement, Sutter shall pay an amount of $228.5 million into the Settlement Fund, which shall be held in the Escrow Account.

4.    As set forth in section III.A.2. of the Settlement Agreement, portions of the Settlement Fund shall be used to pay certain costs and fees prior to determining a net amount that is available for distribution to Class Members (the "Net Settlement Fund"). The fees and other costs to be deducted from the Settlement Fund include:

    a.    $10 million of costs to cover Notice and Administration of the Settlement (with any excess costs above that amount subject to replenishment upon a showing of necessity if approved by the Court, and with any residual amount from the $10 million that is not needed for Notice and Administration to be returned to the Settlement Fund for distribution to Class Members).

    b.    Expenses incurred by Class Counsel of approximately $28 million in prosecuting the case, reimbursement of which shall be subject to a petition to and approval by the Court.

---

[1] All descriptions of the Settlement Agreement's terms are summary and are not intended to, and shall not be deemed to, modify the Settlement Agreement in any way, or have any bearing on the meaning or interpretation of the Settlement Agreement. The Settlement Agreement should be consulted for its actual terms and conditions.

c.  Attorney's Fees, not to exceed one-third of the Gross Settlement Fund, to the counsel representing the Class, also subject to a petition to and approval by the Court. Kim Decl. ¶ 71.

d.  Service Awards to the Class Representatives (as permitted by 9th Circuit precedent and awarded by the Court). Kim Decl. ¶ 71

e.  Escrow Account fees and costs (including taxes incurred by the Class and tax expenses). Kim Decl. ¶ 71.

5.  Assuming an Attorney's Fee Award of one-third of the Gross Settlement Fund, reasonable Service Awards, reasonable Escrow Account fees and costs, and an expense reimbursement award of $28 million, the Net Settlement Fund proceeds available for distribution to Class Members would be approximately $115 million (equal to $228.5 million, less aforementioned fees and expenses).

6.  The mechanics of this Plan shall operate in the same manner regardless of whether the Net Settlement Fund available for distribution to Class Members is precisely $115 million or some different amount.

## II.    DISTRIBUTION OF THE NET SETTLEMENT FUND

7.  As reflected in the Settlement Agreement and pursuant to various Orders of the Court, including its Order certifying a Rule 23(b)(3) Class dated July 30, 2020, the Class Members potentially eligible to receive a payment are those members of the certified Class who were previously given an opportunity to opt-out of the Class and did not opt out of the Class by the Court-ordered deadline of March 8, 2021; they are referred to in this Plan as "the Class" or "Class Members."  The "Class Period" is January 1, 2011 to March 8, 2021.  Class Members are:

All entities in California Rating area 1, 2, 3, 4, 5, 6, 8, 9 or 10 (the "Nine Rating Areas" or "Nine RAs"), and all individuals that either live or work in one of the Nine RAs, that paid premiums for a fully-insured health insurance policy from Blue Shield, Anthem Blue Cross, Aetna, Health Net or UnitedHealthcare from January 1, 2011 to [March 8, 2021]. This class definition includes Class Members that paid premiums

2

for individual health insurance policies that they purchased from these health plans and Class Members that paid premiums, in whole or in part, for health insurance policies provided to them as a benefit from an employer or other group purchaser located in one of the Nine RAs. The "Class" includes any person that paid any portion of a premium for a fully-insured health insurance policy from any of the five class health plans at any time from January 1, 2011 to [March 8, 2021] if, during the period the person paid those premiums, the person lived or worked (or, if an employer, had an office located) in one of the following California counties: Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Glenn, Humboldt, Lake, Lassen, Marin, Mendocino, Merced, Modoc, Napa, Nevada, Placer, Plumas, Sacramento, San Francisco, San Joaquin, San Mateo, Santa Cruz, Shasta, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Sutter, Tehama, Trinity, Tuolumne, Yolo or Yuba. Members of the Federal Rule of Civil Procedure 23(b)(3) Class are all such persons who had an opportunity to opt-out of the Class on or before the Court-ordered opt-out deadline of March 8, 2021. Excluded from the terms "Class" or "Class Members" are all entities or individuals that opted out of the Class on or before the Court-ordered opt-out deadline of March 8, 2021. Those that opted out are no longer Class Members and they are not entitled to any relief under this Settlement, including any monetary relief, or to object to this Settlement.

Ex. A at section I.A.3.

    8.    This Plan of Distribution shall provide for a recovery to each Class Member that makes a timely claim for payment from the Net Settlement Fund. This includes:

        a.   Individuals who paid premiums for fully-insured policies directly and not through any employer or group coverage, including policies that provided health care coverage for that individual and, if applicable, that individual's dependents during the Class Period ("Individual Claimants").

      b.  Employers or Groups (including Taft-Hartley plans, multi-employer welfare arrangements, association health plans, retiree groups, and other non-employer groups) that paid premiums, or a portion thereof, for fully-insured policies that provided health care coverage for their employees/group members and, if applicable, their employees'/group members' dependents, during the Class Period ("Group Claimants").

      c.  Natural persons, including employees, that shared in the payment of premiums with their employers or groups for fully-insured policies that provided health care coverage for themselves and, if applicable, their dependents, during the Class Period ("Employee Claimants").

      d.  Individual Claimants, Group Claimants, and Employee Claimants with a valid claim are together referred to as "Authorized Claimants" for the purposes of this Plan. Dependents and beneficiaries, whether of Individual Claimants, Group Claimants, or Employee Claimants, are not Authorized Claimants.

9.    To the extent that Authorized Claimants to the Net Settlement Fund do not submit claims, that will result in increased compensation to Authorized Claimants who submit claims, and not to all Authorized Claimants overall.

## III.    DISTRIBUTION OF THE NET SETTLEMENT FUND[2]

10.    The payment for a claim submitted by an Authorized Claimant (e.g., "Claimant A") shall be determined by the following equation:

"Total Premiums Paid" (as defined below by this Plan)

during Class Period by Claimant A

### Divided by

Total Premiums Paid during Class Period by

all Authorized Claimants who submit claims

### Multiplied by

Total dollars in Net Settlement Fund

### = Claimant A's claim payment

11.    The foregoing calculation shall be called the "Claim Payment Calculation" and the result of this calculation shall be the "Claim Payment" for each Authorized Claimant who submits a claim.

12.    The Total Premiums Paid for each Authorized Claimant who submits a claim will be the sum of premiums paid for fully-insured policies for that Authorized Claimant's coverage during the Class Period.  For Authorized Claimants who are natural persons, the Total Premiums Paid will include any premiums paid as an Individual Claimant and/or an Employee Claimant. Class Counsel have obtained Health Plan data that will be used to identify Authorized Claimants and estimate their Total Premiums Paid without requiring the Authorized Claimant to submit any

---

[2]    *See* Declaration of Daniel J. Boada dated April 25, 2025 for further discussion concerning the operation and reasonableness of this Distribution Plan.

premium data. To the extent no data is available, the Claims Administrator will seek additional information from the Authorized Claimant as necessary.

13.     For Authorized Claimants who are Individual Claimants and who submit claims, premiums during the Class Period shall be estimated from the data provided by the Health Plans, along with any data the Class Administrator obtains.

14.     For the Group Claimants and Employee Claimants who submit claims, the determination of the premiums to be included in an Authorized Claimant's Total Premiums Paid to any and all of the Health Plans during the Class Period shall be estimated from (a) the data produced by the Health Plans, which generally provides for the total amount of premiums paid by any Group, and (b) an allocation of the Total Premiums Paid between each specific Group that paid premiums ("Group") and any employees of that Group who submits claims ("Group/Employee Allocation Process").

**A.     Group/Employee Allocation Process**

15.     If a Group Claimant submits a claim, but none of the employees for that Group Claimant submits any claims, then the full premium paid by that Group Claimant shall be allocated entirely to that Group Claimant and shall constitute the "Total Premiums Paid" for that Group Claimant for purposes of the Claim Payment Calculation set forth above.

16.     If a Group Claimant submits a claim and one or more of its employees also submits a claim, then there shall be an allocation of the Group premium between the Group Claimant and each Employee Claimant who submits a claim.

a.     To perform that allocation, the first step will be to determine how much of the total premiums paid by a particular Group during the Class Period were paid to provide coverage for each specific Employee Claimant who submits a claim. This will require using the data produced by the Health Plans, or, where relevant, provided by the Employer Claimant or Employee Claimant, to estimate the dates when each Employee Claimant received coverage by any Group, and the number of covered

6

lives under that Employee Claimant's policy (the employee plus any covered dependents) during each year of those coverage dates. Using data from the Health Plans, the Claims Administrator shall then estimate the total premiums paid by a Group during the Class Period to provide coverage for that claiming Employee Claimant ("Unallocated Employee Premium").

b.  The Unallocated Employee Premium will be calculated on an annual basis for each employee X in year Y to be allocated between the Group Claimant and Employee Claimant, and will be estimated as follows:

Total Group Premium for year Y (from Health Plan data, or calculated as described below)

**Divided by**

Annual average number of members[3] (employees and covered dependents) under the Group Plan during year Y

**Multiplied by**

Number of members on employee X's policy during year Y

**= Unallocated Employee Premium for employee X during year Y**

c.  If an employee Class Member does not submit a claim, the entire Unallocated Employee Premium for that non-claiming employee shall be allocated to the Group Claimant that was the employer of that non-claiming employee.

---

[3] Where the health plan data does not specifically identify the number of members associated with a group, those members will be estimated based upon the health plan data and public information.

d.  For each Group, where an Employee Claimant submits a claim, the Claims Administrator shall allocate this Unallocated Employee Premium between (1) the Group from which the specific claiming Employee Claimant obtained coverage, and (2) the specific claiming Employee Claimant.

e.  The Claims Administrator's allocation of the Unallocated Employee Premium may be done pursuant to either a "Default" option or an "Alternative" option, depending upon the elections made by the relevant Employee Claimant and/or the Group Claimant from which that employee obtained coverage..

**<u>Default option</u>:**

f.  The Default option shall allocate the Unallocated Employee Premium according to one of two fixed percentages: (1) 18% to the Employee Claimant during periods in which the employee had only individual coverage, and (2) 30% to the Employee Claimant during periods in which there is evidence that the person had family coverage (i.e., where coverage that covered dependents). The residual amounts in both cases (82% and 70%, respectively) shall be allocated to the Group. Those Default fixed percentages were determined by Class Counsel based on consideration of numerous factors, including the fact that:

  i.   Most Health Plans do not have data showing how much, if anything, each employee contributed, directly or indirectly, through payroll deductions or otherwise, toward the premiums paid by the relevant Group.

  ii.  There is publicly available data regarding employee health care contribution percentages from an annual report published by The Kaiser Family Foundation ("Kaiser Report") based on its annual survey of employer health benefits.[4] The Kaiser Report is available annually throughout the Class

---

[4] 2019 Employer Health Benefits Survey, September 25, 2019, https://www.kff.org/health-costs/report/2019- employer-health-benefits-survey/.

Period. The Kaiser Reports show that the average employee contribution percentage for Groups is consistently higher for those with family coverage over the Classs Period.

iii.    Some employees do not contribute any out-of-pocket amount for their health insurance premiums.

iv.    Economic literature supports the fact that employees may bear part of the cost of employer-sponsored health insurance through a reduction in their total compensation, rather than only in the form of their out-of-pocket contribution toward premiums.

v.    The Group retains 100% of the value of any unclaimed Employee premiums along with the value of any Employee Claimant claims for that Group falling below the $5 minimum payment threshold (discussed in ¶ 19 below).

g.  If both the Group Claimant and all the Employee Claimants of that Group Claimant who submit claims accept the Default option, then the Default option shall be applied to determine the allocation of the premiums paid for Group coverage between the Group Claimants and the Employee Claimants who submit claims.

**Alternative option**:

h.  If either the Group Claimant or an Employee Claimant of that Group Claimant believes that their contribution percentage was greater than the Default option, then they may (but do not have to) elect the Alternative option on their claim form. Any Claimant whose counterpart (for a claiming Employer Claimant, the employee; and for a claiming Employee Claimant, its Group Claimant) elects the Alternative option will be contacted by the Claims Administrator and provided with the opportunity to submit additional evidence to assist in the ultimate determination of how to allocate their Unallocated Employee Premiums.

i.  If a Group Claimant or an Employee Claimant elects the Alternative option, the Claimant making the election must submit sufficient data, records, or other materials supporting a greater contribution percentage together with the claim form that is sent to the Claims Administrator.

        i.  If the Claims Administrator determines there is sufficient data to establish an Alternative allocation based upon sufficient data, records, or other materials provided by the Claimant, then the Alternative option shall be used to allocate the Unallocated Employee Premium.

        ii.  If the Claims Administrator determines that a Claimant seeking to elect the Alternative option has provided insufficient data, records, or other materials to establish a specific Alternative allocation, the Default option shall apply.

        iii.  If the Claims Administrator determines that a Claimant has provided sufficient data, records, or other materials to support a higher contribution percentage for time periods within the relevant coverage period(s), then the Alternative option shall be used to allocate the Unallocated Employee Premium for those time periods, but the Default option shall apply to time periods for which there is insufficient data to apply the Alternative options.

j.  If an Employee Claimant elects the Alternative option and the Group Claimant does not contest the Alternative option, and if the Claims Administrator determines the Alternative option applies, it shall apply only to the Employee Claimants who elected the Alternative option.  If the Group Claimant contests the Alternative option, and the Claims Administrator determines the Alternative option applies, it shall apply to all Employee Claimants within that Group.

k.   In determining whether the Default or the Alternative option shall apply, the Claims Administrator shall consider the following:

i.   Any supporting data, records or other materials presented by Claimants in support of their election of the Alternative Option, considering both the reliability and the comprehensiveness of the materials;

ii.  any additional data, records, or other materials that the Claims Administrator may receive from parties impacted by the election of the Alternative option; and

iii. The same factors listed above that were taken into account by Class Counsel in determining the Default percentages, and any associated data, records, or other materials submitted by the parties regarding those factors.

l.  The Claims Administrator will notify all Claimants within the Group whose Claim Payments may be impacted by the Claim Administrator's determination. The Claims Administrator's determination shall be final.

17.   If an Employee Claimant submits a claim as a member of a Group that does not submit a claim, then the amounts that would have been allocated to that Group shall remain in the balance of the Net Settlement Fund for distribution to all other Authorized Claimants in accordance with this Plan.

**B.    Allocations Where a Group Purchases Health Plans on Behalf of Employer Groups**

18.   If a Group has purchased one or more health plans from a Health Plan during the Class Period on behalf of one or more other employer or member groups, as is the case, for example, with Professional Employer Organizations ("PEOs"), unions, certain benefit plans (such as CalPERS) and similar member associations, then both that purchasing entity and the corresponding employer and member groups (on behalf of whom that purchasing entity acquired health insurance) shall be eligible to file a claim. The claim form shall provide an opportunity to indicate whether the claiming Group is either (a) an employer or member group who acquired its

11

insurance through another purchasing entity (a "Covered Entity"), or (b) a purchasing entity (such as a PEO) that purchased insurance on behalf of the employer and/or member groups (a "Purchasing Entity"). The Claims Administrator shall review the claim form submissions along with the data made available by the Health Plans to determine whether any Group falls into either of these two categories. If the Claims Administrator determines that both a Purchasing Entity and one or more Covered Entities for a single Group have submitted claims, the Claims Administrator will first contact those claiming parties to see if an allocation can be agreed upon in the first instance. If no such allocation agreement can be reached, the Claims Administrator shall make an allocation determination in light of all the facts and circumstances and available data it can collect with respect to each such purchasing association and the respective employers on behalf of whom it made purchases. The Claims Administrator's determination is final. Once that allocation determination is made, either through agreement or by the Claims Administrator, the allocation between any specific Group subject to this paragraph and any Employee Claimant of that Group shall be determined in the same way as it is for all other Groups (i.e., in accordance with the Default and Alternative options and procedures set forth above).

**IV.    MINIMUM VALUE OF DISTRIBUTIONS FROM NET SETTLEMENT FUND**

19.    If the total Claim Payment for any Authorized Claimant who submits a claim is equal to or less than **$5.00** for the entire Class Period, then no distribution shall be made to that Claimant and the Claimant will be notified that there will be no distribution given the *de minimis* value. If the Authorized Claimant is an Individual Claimant or a Group Claimant, the amount of the Claim Payment for that Authorized Claimant shall remain in the Net Settlement Fund for distribution to Authorized Claimants who have Claim Payments in excess of $5.00.[5] If the Authorized Claimant is an Employee Claimant, the  Claim Payment will revert to the respective Group for distribution to the Group and other Employee Claimants.[6]

---

[5] To implement this calculation, the Settlement Administrator will perform the calculation in ¶ 10 excluding from "Total Premiums Paid" any Authorized Claimant with a combined Claim Payment less than the minimum threshold.

[6] To implement this calculation, the Settlement Administrator will perform the Group/Employee Allocation Process treating any Authorized Claimant with a combined Claim Payment less than the minimum threshold as not having submitted a claim. However, if the Group does not submit a claim, that Group's allocation of premiums paid will be

12

## V.    AUTHORIZED CLAIMANT REVIEW OF TOTAL PREMIUMS PAID

20.    Authorized Claimants will be provided the opportunity to review the Total Premiums Paid upon which their Claim Payment is based prior to distribution of the Net Settlement Fund. To the extent an Authorized Claimant seeks to adjust their Total Premiums Paid and the necessary materials to support that adjustment, the Claims Administrator will review any data in support of that proposed adjustment and determine whether to alter the Total Premiums Paid for that Authorized Claimant.  The Claims Administrator's determination is final.

## VI.    RESIDUAL FUNDS

22.    Upon the completion of the initial distribution to Authorized Claimants that filed a claim, a second distribution of any unredeemed payments will be made *pro rata* to those Authorized Claimants who redeemed their initial payment, subject to Paragraph 20 above.

21.    Pursuant to section V.A.3. of the Settlement Agreement, if any part of the Settlement Fund remains in the Escrow Account after the Claims Administrator has made the second distribution Class Counsel and Sutter's counsel will jointly seek Court approval to disburse the remainder of the Settlement Fund pursuant to section V.A.6 of the Settlement Agreement. The Claims Administrator will follow the directions approved by the Court.

Dated:    _____

Hon. Laurel Beeler
UNITED STATES DISTRICT COURT

---

excluded from the Total Premiums Paid in the formula in ¶ 16 and therefore returned to the Net Settlement Fund.

13

# EXHIBIT C

## CUSTODIAN/ESCROW AGREEMENT

This Custodian/Escrow Agreement dated April 24, 2025, is made among Constantine Cannon LLP ("Class Counsel"), Sutter Health ("Defendant") and **THE HUNTINGTON NATIONAL BANK**, as Custodian/Escrow agent ("Custodian/Escrow Agent").

Recitals

A.      This Custodian/Escrow Agreement governs the deposit, investment and disbursement of the settlement funds that, pursuant to the Stipulation of Settlement (the "Settlement Agreement") dated April 24, 2025 attached hereto as Exhibit A, entered into by, among others, Class Counsel on behalf of the Lead Plaintiffs, will be paid to settle the class action captioned *Sidibe et al. v. Sutter Health, 3:12-cv-04854*, pending in the United States District Court, Northern District of California (the "Court").

B.      Pursuant to the terms of the Settlement Agreement, the Defendant has agreed to pay or cause to be paid the total amount of two hundred twenty-eight million five hundred thousand dollars ($228,500,000.00) in cash (the "Settlement Amount") in settlement of the claims brought against the Defendant in the Class Action.

C.      The Settlement Amount, together with any interest accrued thereon, is to be deposited into Custodian/Escrow and used to satisfy payments required of Defendants, including payments to Authorized Claimants, payments for attorneys' fees and expenses, payments for tax liabilities, and other costs pursuant to the terms of the Settlement Agreement.

D.      As provided in paragraph III.A.5 of the Settlement Agreement, half of the interest earned by the Settlement Fund in the Account during the period between the deposit of the Settlement Fund into the Account and the Effective Date shall be for the benefit of Defendants, and shall be paid to Sutter Health within five (5) days of the Effective Date (as defined in the Settlement Agreement) and pursuant to disbursement instructions to be provided by Class Counsel under Section 7 below, and half of such interest shall be for the benefit of the Class and shall become part of the Settlement Fund. Interest earned by the Settlement Fund in the Account after the Effective Date shall be for the benefit of the Class and shall become part of the Settlement Fund.

E. Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Settlement Agreement.

### Agreement

1.      Appointment of Custodian/Escrow Agent.  The Custodian/Escrow Agent is hereby appointed to receive, deposit and disburse the Settlement Amount upon the terms and conditions provided in this Custodian/Escrow Agreement, the Settlement Agreement and any other exhibits or schedules later annexed hereto and made a part hereof.

2.    <u>The Custodian/Escrow Account</u>.  The Custodian/Escrow Agent shall establish and maintain one or more Custodian/Escrow accounts titled as "Sutter Health Premium Overpayment Settlement Fund" (the "Custodian/Escrow Account").  Pursuant to the Settlement Agreement, the Defendant shall cause the Settlement Amount to be deposited into the Custodian/Escrow Account within twenty (20) days following entry of the Court's order of Final Approval of the settlement. Custodian/Escrow Agent shall receive the Settlement Amount into the Custodian/Escrow Account. The Settlement Fund shall be held and invested on the terms and subject to the limitations set forth herein, and shall be released by Custodian/Escrow Agent in accordance with the terms and conditions hereinafter set forth and set forth in the Settlement Agreement and in orders of the Court approving the disbursement of the Settlement Fund.

3.    <u>Investment of Settlement Fund</u>.  At the written direction of Class Counsel, Custodian/Escrow Agent shall invest the Settlement Fund exclusively in instruments or accounts backed by the full faith and credit of the United States Government or fully insured by the United States Government or an agency thereof, including a U.S. Treasury Fund or a bank account that is either (a) fully insured by the Federal Deposit Insurance Corporation ("FDIC") or (b) secured by instruments backed by the full faith and credit of the United States Government. Defendants shall not bear any responsibility for or liability related to the investment of the Settlement Fund by the Custodian/Escrow Agent. Moreover, Defendants', Defendants' Counsels' and Released Parties' liability, obligation or responsibility is limited consistent with Paragraph III.A.3 of the Settlement Agreement.

4.    <u>Custodian/Escrow Funds Subject to Jurisdiction of the Court</u>.  The Settlement Fund shall remain subject to the jurisdiction of the Court until such time as the Fund shall be fully distributed, pursuant to the Settlement Agreement and on further order(s) of the Court.

5.    <u>Tax Treatment & Report</u>.  The Settlement Fund shall be treated at all times as a "Qualified Settlement Fund" within the meaning of Treasury Regulation §1.468B-1 (26 C.F.R. § 1.468B-1).  Class Counsel shall timely make such elections as necessary or advisable to fulfill the requirements of such Treasury Regulation, including the "relation-back election" under Treas. Reg. § 1.468B-1(j)(2) if necessary to the earliest permitted date.  For purposes of §468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" of the Settlement Fund shall be Class Counsel.  Class Counsel shall timely and properly prepare, deliver to all necessary parties for signature, and file all necessary documentation for any elections required under Treas. Reg. §1.468B-1.  Class Counsel shall timely and properly prepare and file any informational and other tax returns necessary or advisable with respect to the Settlement Funds and the distributions and payments therefrom including without limitation the returns described in Treas. Reg. §1.468B-2(k), and to the extent applicable Treas. Reg. §1.468B-2(1).

6.    <u>Tax Payments of Settlement Fund</u>.  Taxes with respect to the Settlement Fund earned by the Class, as more fully described in the Settlement Agreement, shall be treated as and considered to be a cost of administration of the Settlement Fund and the Custodian/Escrow Agent shall timely pay such Taxes out of the Settlement Fund without prior order of the Court, as directed by Class Counsel.  Class Counsel shall be responsible for the timely and proper preparation and delivery of necessary documentation for signature by all necessary parties, and the timely filing of

2

all tax returns and other tax reports required by law, except those tax returns that Defendant is required to file and are relevant to the interest that it will earn on the Settlement Fund. The Class Counsel may engage an accounting firm or tax preparer to assist in the preparation of any tax reports or the calculation of any tax payments due as set forth in Sections 5 and 6, and the expense of such assistance shall be paid from the Settlement Fund by the Custodian/Escrow Agent at Class Counsel's direction. Defendant shall bear its own costs with respect to the preparation of any tax returns relevant to the interest that it earns on the Settlement Fund. The Settlement Fund shall indemnify and hold the Defendant harmless for any taxes that may be deemed to be payable by the Defendant by reason of the income earned on the Settlement Fund or for any reporting requirements, except for interest that Defendant will earn from the Settlement Fund pursuant to Section III.A.5 of the Settlement Agreement, and Custodian/Escrow Agent, as directed by Class Counsel, shall establish such reserves as are necessary to cover the tax liabilities of the Settlement Fund and the indemnification obligations imposed by this paragraph. If the Settlement Fund is returned to the Defendant pursuant to the terms of the Settlement Agreement, or to fulfill the interest payment that will be earned by the Defendant from the Settlement Fund pursuant to Section III.A.5 of the Settlement Agreement, the Defendant shall provide Custodian/Escrow Agent with a properly completed Form W-9.

7.     Disbursement Instructions

(a)     Prior to the Effective Date, Class Counsel may, within the stipulations of the Settlement Agreement, instruct Custodian/Escrow Agent to disburse funds as necessary to fulfill the obligations of the Settlement Agreement. After the Effective Date, Class Counsel may, without further order of the Court or authorization by the Defendant's Counsel, instruct Custodian/Escrow Agent to disburse the funds necessary to pay Notice and Administration Expenses.

(b)     Disbursements other than those described in paragraph 7(a), including disbursements for distribution of Class Settlement Funds, must be authorized by either (i) an order of the Court, or (ii) the written direction of Jean Kim or Lloyd Constantine of Class Counsel.

(c)     In the event funds transfer instructions are given (other than in writing at the time of execution of this Agreement), whether in writing, by facsimile, e-mail, telecopier or otherwise, Custodian/Escrow Agent will seek confirmation of such instructions by telephone call back when new wire instructions are established to the person or persons designated in subparagraphs (a) and (b) above and Custodian/Escrow Agent may rely upon the confirmations of anyone purporting to be the person or persons so designated. To assure accuracy of the instructions it receives, Custodian/Escrow Agent may record such call backs. If Custodian/Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it shall not execute the instruction until all issues have been resolved. The persons and telephone numbers for call backs may be validly changed only in a writing that (i) is signed by the party changing its notice designations, and (ii) is received and acknowledged by Custodian/Escrow Agent. Class Counsel will notify Custodian/Escrow Agent of any errors, delays or other problems within 30 days after receiving notification that a transaction has been executed. If it is determined that the transaction was delayed or erroneously executed as a result

3

of Custodian/Escrow Agent's error, Custodian/Escrow Agent's sole obligation is to pay or refund the amount of such error and any amounts as may be required by applicable law. Any claim for interest payable will be at the then-published rate for United States Treasury Bills having a maturity of 91 days.

(d)     The Custodian/Escrow Agent shall not be liable for any losses, costs or expenses arising directly or indirectly from the Custodian/Escrow Agent's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The party providing electronic instructions agrees; (i) to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Custodian/Escrow Agent, including, without limitation, the risk of the Custodian/Escrow Agent acting on unauthorized instructions, and the risk or interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting instructions to the Custodian/Escrow Agent and that there may be more secure methods of transmitting instructions than the method(s) selected by the Custodian/Escrow Agent; and (iii) that the security procedures (if any) to be followed in connection with its transmission of instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances.

(e)     The Escrow Agent will use its best efforts to comply promptly with valid written instructions to disburse funds from the Account, including in particular, valid written instructions to comply with the ten (10) day deadline for reimbursing Defendant pursuant to paragraph III.A.7. of the Settlement Agreement and with the ten (10) calendar day deadline for returning the Settlement Fund to the Defendants pursuant to paragraph VIII.C. of the Settlement Agreement.

8.     <u>Fees</u>. The Custodian/Escrow Agent waives all fees and expenses for its services.

9.     <u>Duties, Liabilities and Rights of Custodian/Escrow Agent</u>. This Custodian/Escrow Agreement sets forth all of the obligations of Custodian/Escrow Agent, and no additional obligations shall be implied from the terms of this Custodian/Escrow Agreement or any other agreement, instrument or document.

(a)     Custodian/Escrow Agent may act in reliance upon any instructions, notice, certification, demand, consent, authorization, receipt, power of attorney or other writing delivered to it by Class Counsel, subject to oral confirmation by Class Counsel as provided herein, without being required to determine the authenticity or validity thereof or the correctness of any fact stated therein, the propriety or validity of the service thereof, or the jurisdiction of the court issuing any judgment or order. Custodian/Escrow Agent may act in reliance upon any signature which is reasonably believed by it to be genuine, and may assume that such person has been properly authorized to do so, subject to oral confirmation by Class Counsel.

(b)     Custodian/Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder, and it shall incur no liability and shall be fully protected to the extent Custodian/Escrow Agent acts in accordance with the reasonable opinion and instructions of

4

counsel. Custodian/Escrow Agent shall have the right to reimburse itself for reasonable legal fees and reasonable and necessary disbursements and expenses actually incurred from the Custodian/Escrow Account only (i) upon approval by Class Counsel or (ii) pursuant to an order of the Court.

(c)    The Custodian/Escrow Agent, or any of its affiliates, is authorized to manage, advise, or service any money market mutual funds in which any portion of the Settlement Fund may be invested.

(d)    Custodian/Escrow Agent is authorized to hold any treasuries held hereunder in its federal reserve account.

(e)    Except as specifically set forth in this agreement, Custodian/Escrow Agent shall not bear any risks related to the investment of the Settlement Fund in accordance with the provisions of paragraph 3 of this Custodian/Escrow Agreement. The Custodian/Escrow Agent will be indemnified by the Settlement Fund, and held harmless against, any and all claims, suits, actions, proceedings, investigations, judgments, deficiencies, damages, settlements, liabilities and expenses (including reasonable legal fees and expenses of attorneys chosen by the Custodian/Escrow Agent) as and when incurred, arising out of or based upon any act, omission, alleged act or alleged omission by the Custodian/Escrow Agent or any other cause, in any case in connection with the acceptance of, or performance or non-performance by the Custodian/Escrow Agent of, any of the Custodian/Escrow Agent's duties under this Agreement, except as a result of the Custodian/Escrow Agent's bad faith, willful misconduct or gross negligence.

(f)    Upon distribution of all of the funds in the Custodian/Escrow Account pursuant to the terms of this Custodian/Escrow Agreement and any orders of the Court, Custodian/Escrow Agent shall be relieved of any and all further obligations and released from any and all liability under this Custodian/Escrow Agreement, except as otherwise specifically set forth herein.

(g)    In the event any dispute shall arise between the parties with respect to the disposition or disbursement of any of the assets held hereunder, the Custodian/Escrow Agent shall be permitted to interplead all of the assets held hereunder into a court of competent jurisdiction, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets. The parties further agree to pursue any redress or recourse in connection with such a dispute, without making the Custodian/Escrow Agent a party to same, unless the actions of the Escrow Agent are the subject of dispute.

11.    <u>Non-Assignability by Custodian/Escrow Agent</u>. Custodian/Escrow Agent's rights, duties and obligations hereunder may not be assigned or assumed without the written consent of Class Counsel and the Defendant.

12.    <u>Resignation of Custodian/Escrow Agent</u>. Custodian/Escrow Agent may, in its sole discretion, resign and terminate its position hereunder at any time following 120 days prior written notice to the parties to the Custodian/Escrow Agreement herein. Prior to the Effective Date (as defined in the Settlement Agreement), Class Counsel and Defendant may terminate

Custodian/Escrow Agent at any time upon written notice. On the effective date of such resignation, Custodian/Escrow Agent shall deliver this Custodian/Escrow Agreement together with any and all related instruments or documents and all funds in the Custodian/Escrow Account to the successor Custodian/Escrow Agent, subject to this Custodian/Escrow Agreement.  If a successor Custodian/Escrow Agent has not been appointed prior to the expiration of 120 days following the date of the notice of such resignation, then Custodian/Escrow Agent may petition the Court for the appointment of a successor Custodian/Escrow Agent, or other appropriate relief.  Any such resulting appointment shall be binding upon all of the parties to this Custodian/Escrow Agreement.

13.    <u>Notices</u>.  Notice to the parties hereto shall be in writing and delivered by hand-delivery, facsimile, electronic mail or overnight courier service, addressed as follows:

| | |
|---|---|
| If to Class Counsel: | CONSTANTINE CANNON LLP<br>Jean Kim, Partner<br>335 Madison Avenue, 9th Floor<br>New York, NY 10017<br>Telephone: (212) 350-2734<br>E-mail: jkim@constantinecannon.com |
| If to Defendants: | Jonathan Ma<br>Interim CFO<br>Sutter Health<br>2200 River Plaza Drive<br>Sacramento, CA 95833<br>jonathan.ma2@sutterhealth.org |
| If to Custodian/Escrow Agent: | THE HUNTINGTON NATIONAL BANK<br>Rose K. Clark, Vice President<br>650 E. Swedesford Road, Suite 310<br>Wayne, PA 19087-1610<br>Telephone: (215) 430-5289<br>E-mail:  rose.kohles@huntington.com<br><br>Susan Brizendine, Trust Officer<br>Huntington National Bank<br>7 Easton Oval – EA5W63<br>Columbus, Ohio 43219<br>Telephone: (614) 331-9804<br>E-mail:  susan.brizendine@huntington.com |

14.    <u>Patriot Act Warranties</u>.  Section 326 of the USA Patriot Act (Title III of Pub. L. 107-56), as amended, modified or supplemented from time to time (the "Patriot Act"), requires financial institutions to obtain, verify and record information that identifies each person or legal entity that opens an account (the "Identification Information").  The parties to this Custodian/Escrow Agreement agree that they will provide the Custodian/Escrow Agent with such

Identification Information as the Custodian/Escrow Agent may request in order for the Custodian/Escrow Agent to satisfy the requirements of the Patriot Act.

15.   <u>Entire Agreement</u>.  This Custodian/Escrow Agreement, including all Schedules and Exhibits hereto, constitutes the entire agreement and understanding of the parties hereto.  Any modification of this Custodian/Escrow Agreement or any additional obligations assumed by any party hereto shall be binding only if evidenced by a writing signed by each of the parties hereto.  To the extent this Custodian/Escrow Agreement conflicts in any way with the Settlement Agreement, the provisions of the Settlement Agreement shall govern.

16.   <u>Governing Law</u>.  This Custodian/Escrow Agreement shall be governed by the law of the State of California in all respects.  The parties hereto submit to the jurisdiction of the Court, in connection with any proceedings commenced regarding this Custodian/Escrow Agreement, including, but not limited to, any interpleader proceeding or proceeding Custodian/Escrow Agent may commence pursuant to this Custodian/Escrow Agreement for the appointment of a successor Custodian/Escrow agent, and all parties hereto submit to the jurisdiction of such Court for the determination of all issues in such proceedings, without regard to any principles of conflicts of laws, and irrevocably waive any objection to venue or inconvenient forum.

17.   <u>Termination of Custodian/Escrow Account</u>.  The Custodian/Escrow Account will terminate after all funds deposited in it, together with all interest earned thereon, are disbursed in accordance with the provisions of the Settlement Agreement and this Custodian/Escrow Agreement.

18.   <u>Miscellaneous Provisions</u>.

(a)   <u>Counterparts</u>.  This Custodian/Escrow Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Custodian/Escrow Agreement.

(b)   <u>Further Cooperation</u>.  The parties hereto agree to do such further acts and things and to execute and deliver such other documents as Custodian/Escrow Agent may request from time to time in connection with the administration, maintenance, enforcement or adjudication of this Custodian/Escrow Agreement in order (a) to give Custodian/Escrow Agent confirmation and assurance of Custodian/Escrow Agent's rights, powers, privileges, remedies and interests under this Agreement and applicable law, (b) to better enable Custodian/Escrow Agent to exercise any such right, power, privilege or remedy, or (c) to otherwise effectuate the purpose and the terms and provisions of this Custodian/Escrow Agreement, each in such form and substance as may be acceptable to Custodian/Escrow Agent.

(c)   <u>Electronic Signatures</u>. The parties agree that the electronic signature (provided by the electronic signing service DocuSign initiated by the Custodian/Escrow Agent) of a party to this Escrow Agreement shall be as valid as an original signature of such party and shall be effective to bind such party to this Escrow Agreement. The parties agree that any electronically signed document shall be deemed (i) to be "written" or "in writing," (ii) to have been signed, and

7

(iii) to constitute a record established and maintained in the ordinary course of business and an original written record when printed from electronic files.

(d)    <u>Non-Waiver</u>.    The failure of any of the parties hereto to enforce any provision hereof on any occasion shall not be deemed to be a waiver of any preceding or succeeding breach of such provision or any other provision.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

THE HUNTINGTON NATIONAL BANK, as Custodian/Escrow Agent

By: _____
     Rose K. Clark, Vice President

CONSTANTINE CANNON LLP, Class Counsel

By: _____
     Jean Kim, Partner

Defendant

By: _____
     Jonathan Ma, Interim CFO
     Sutter Health

8

**Exhibit A**

**Settlement Agreement**

**DocuSign.**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: C5FE7A79-2F9D-4DD3-B74C-C3E27D14A69E | | Status: Completed |
| Subject: Complete with Docusign: Revised Draft Escrow Agreement 04-24-25_Updated Clean.pdf | | |
| Source Envelope: | | |
| Document Pages: 9 | Signatures: 3 | Envelope Originator: |
| Certificate Pages: 6 | Initials: 0 | Ashley Snyder |
| AutoNav: Enabled | | 41 S High St |
| EnvelopeId Stamping: Enabled | | Columbus, OH  43215-6170 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | Ashley.Snyder@huntington.com |
| | | IP Address: 10.103.81.137 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Ashley Snyder | Location: DocuSign |
|     4/24/2025 4:25:00 PM |     Ashley.Snyder@huntington.com | |

## Signer Events — Signature — Timestamp

| Signer Events | Signature | Timestamp |
|---|---|---|
| Jean Kim<br>JKim@constantinecannon.com<br>Security Level: Email, Account Authentication<br>(None) | *Signed by:* Jean Kim<br>7A6831E1C589450... | Sent: 4/24/2025 5:03:00 PM<br>Resent: 4/24/2025 5:36:55 PM<br>Resent: 4/24/2025 5:40:11 PM<br>Viewed: 4/24/2025 5:43:51 PM<br>Signed: 4/24/2025 5:45:32 PM |
| | Signature Adoption: Pre-selected Style<br>Using IP Address: 67.245.235.183 | |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 4/24/2025 5:03:31 PM<br>  ID: 4cb569da-9d27-49e3-9df9-b9dd9ad5b792<br>  Company Name: The Huntington National Bank | | |
| Jonathan Ma<br>jonathan.ma2@sutterhealth.org<br>Interim CFO<br>Security Level: Email, Account Authentication<br>(None) | *Signed by:* Jonathan Ma<br>97DB5D3F28B6454... | Sent: 4/24/2025 5:03:00 PM<br>Viewed: 4/24/2025 5:20:21 PM<br>Signed: 4/24/2025 5:20:31 PM |
| | Signature Adoption: Pre-selected Style<br>Using IP Address: 198.217.64.104 | |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 4/24/2025 5:20:21 PM<br>  ID: 1d619225-812b-4963-a284-c394ebcf83c1<br>  Company Name: The Huntington National Bank | | |
| Rose K Clark<br>Rose.Clark@huntington.com<br>VP<br>Security Level: Email, Account Authentication<br>(None) | *Signed by:*<br>46C3FA123B33499... | Sent: 4/24/2025 5:03:01 PM<br>Viewed: 4/24/2025 5:05:05 PM<br>Signed: 4/24/2025 5:05:19 PM |
| | Signature Adoption: Drawn on Device<br>Using IP Address: 174.198.10.202<br>Signed using mobile | |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 4/24/2025 5:05:05 PM<br>  ID: a8502068-508b-4d90-aebd-8d8cd3a235d4<br>  Company Name: The Huntington National Bank | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 4/24/2025 5:03:01 PM |
| Certified Delivered | Security Checked | 4/24/2025 5:05:05 PM |
| Signing Complete | Security Checked | 4/24/2025 5:05:19 PM |
| Completed | Security Checked | 4/24/2025 5:45:32 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure | | |
|---|---|---|

Electronic Record and Signature Disclosure created on 4/13/2020 3:21:39 PM
Parties agreed to: Jean Kim, Jonathan Ma, Rose K Clark

Case 3:12-cv-04854-LB    Document 1745-2    Filed 04/25/25    Page 89 of 92

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE AGREEMENT

From time to time, The Huntington National Bank (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure Agreement (Agreement), please confirm your agreement by selecting the checkbox next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents,  you may request them from your Relationship Manager. You will not be charged a fee for paper copies.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that you want to receive required notices and disclosures only in paper format. To receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically please follow the instructions  described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you regarding this transaction. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically via Docusign or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know by one of the methods described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact The Huntington National Bank:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

**To advise The Huntington National Bank of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must contact your Relationship Manager for further instructions on changing your email.

**To request paper copies from The Huntington National Bank**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must contact your Relationship Manager and provide  your email address, full name, mailing address, and telephone number. You will not be charged a fee for paper copies.

**To withdraw your consent with The Huntington National Bank**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent; or

ii. contact your Relationship Manager and inform them you would like to change your delivery preference to U.S. mail. You will not be charged a fee for U.S. mail delivery if you withdraw your consent.

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this Agreement, and: (i) that you are able to print on paper or electronically save this Agreement for your future reference and access; or (ii) that you are able to email this Agreement to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures,' you confirm that:

•       You can access and read this Electronic Record and Signature Disclosure Agreement; and

•       You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and

•       Until or unless you notify The Huntington National Bank as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations,

acknowledgements, and other documents that are required to be provided or made available to you by The Huntington National Bank regarding this transaction.